## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**                                                    **No. 2:15-CR-04268-JB**

**ANGEL DELEON, et. al.,**

     **Defendant.**

### NOTICE OF JOINDER TO DEFENDANTS' JOINT MOTION TO CONTINUE THE OCTOBER 4, 2016, TRIAL SETTING, AND RELATED SCHEDULING ORDER

COMES NOW, the Accused, Allen Patterson, and files this Notice of Joinder to join Defendants' Unopposed Joint Motion to Continue October 4, 2016, Trial Setting, filed on September 13, 2016.

Respectfully submitted,

*/s/Jeff Lahann*
Jeff Lahann
665 E. University Ave.
Las Cruces, NM 88005
575-523-4394

*Electronically filed SEPTEMBER 15, 2016*

### CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2016 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to counsel of record.

*/s/Jeff Lahann*
Jeff Lahann

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                       No. 2:15-CR-4268-26-JB

RUDY PEREZ,

        Defendant.

### JOINT MOTION FOR DISCLOSURE
### AND PRODUCTION OF CONFIDENTIAL INFORMANT

Defendant, Rudy Perez, by counsel, The Law Office of Ryan J. Villa, by Ryan J. Villa, pursuant to Fed R. Crim. 12(b)(1), *Giglio v. United States*, 405 U.S. 150 (1972); and *Roviaro v. United States*, 353 U.S. 53 (1957) moves the Court for an order requiring the United States to disclose the identity of a confidential informant and all information concerning the use of this informant during the investigation and prosecution of Mr. Perez's case, including but not limited to, the informant's name, addresses, statements given in this proceeding and others, criminal history, past cooperation as an informant, and any consideration, such as promises, inducements, or payments, extended to and/or received by this informant.  Mr. Perez is joined in this motion by Defendants Edward Troup, Daniel Sanchez, Jerry Montoya, Anthony Ray Baca, Andrew Gallegos and Carlos Herrera.

### BACKGROUND

Mr. Perez is a co-defendant in perhaps the single largest and most complicated criminal prosecution in this district's history.  He is charged in Counts 6 and 7, along with co-defendants Jerry Armenta, Jerry Montoya, Mario Rodriguez, Timothy Martinez, Anthony Ray Baca, Mauricio Varela, Daniel Sanchez, and Carlos Herrera. *See* Superseding Indictment [Doc. 368].  The counts

allege these defendants conspired to and did murder Javier Molina on March 7, 2014.  At the time, all defendants were inmates in the custody of the New Mexico Department of Corrections (DOC). Defendants and Javier Molina are alleged to be members of the Syndicato Nuevo Mexico (SNM). At the time of Mr. Molina's death, he and many of the defendants were inmates at DOC's Southern New Mexico Correctional Facility (SNMCF).  Mr. Molina was killed in pod 1A-B, a pod where many of the defendants, including Mr. Perez, were housed at the time. On this date, Mr. Perez, was still recovering from a bowel obstruction that led to multiple surgeries and an extended hospitalization.  Due to this and pre-existing leg injuries, he required the assistance of a wheeled walker to ambulate. While Mr. Perez was inside his locked cell in the downstairs portion of 1A-B pod, Mr. Molina was allegedly killed in his cell, which was in the upstairs portion of the pod.

Shortly after Mr. Molina's death, law enforcement recovered several shanks, from trash cans and shower drains, which the Government alleges were used in the killing.  In reviewing the massive discovery in this case,[1] the defense has found only one document that contains information suggesting Mr. Perez assisted in killing Mr. Molina. *See* FBI Confidential Human Source Reporting, dated 2/11/16, *attached as* **Exhibit 1.**  Specifically, this document details an informant's allegations that Mr. Perez "provided his walker to make shanks that were used in the murder." *Id*.  A number of other informants have provided information on Molina's killing; however, this informant is the only one to accuse Mr. Perez of being involved.  There is no other evidence tying Mr. Perez to this alleged crime.  Indeed, upon review of the government's massive discovery, it appears that the United States is relying on a single unnamed confidential informant in the prosecution of Mr. Perez. *See* **Exhibit 1.**

---

[1] *See* Joint Motion to Vacate March 2017 Trial [Doc. 676] at 3-4 (discussing the quantity of discovery produced to date, including approximately 40,784 pages and 412 hours of audio and video recordings).

Along with implicating Mr. Perez, this report describes the informant's efforts to purchase heroin from another alleged SNM member's mother. In a separate piece of discovery, an FBI search warrant affidavit describes an informant's similar attempt to buy heroin, also notably, from an alleged SNM member's mother. Because of this similarity, it is believed that the same informant implicating Mr. Perez was utilized by the FBI during the investigation that led to SNM December indictments.  *See* Excerpt- FBI Affidavit in Support of Search Warrants, dated 4/25/16, *attached as* **Exhibit 2.**

On September 17, 2015, Jerry Armenta, a co-defendant and cooperating witness, was interviewed by FBI agents regarding his involvement in SNM and Mr. Molina's murder. *See* FBI Report on Jerry Armenta Interview, dated 9/18/15, *attached as* **Exhibit 3.**  During this interview, Mr. Armenta names at least a dozen individuals involved in SNM-related crimes including the Javier Molina killing. Among those named by Mr. Armenta are: Benjamin Clark, Edward Troup, Daniel Sanchez, Jesse Sosa, Anthony Ray Baca, Lupe Urquizo, Mauricio "Archie" Varela, Timothy Martinez, Mario Rodriguez, Jerry Montoya, Robert Martinez and Roy Martinez. *See* **Ex. 3**.  Mr. Perez, however, is noticeably absent from Mr. Armenta's "tell-all" list.[2]

Critically, there can be no dispute that Mr. Perez was not a "hands on" participant in the killing of Mr. Molina.  Video evidence makes clear that there were four individuals who could have physically assaulted Mr. Molina.  Two are seen going into his cell and leaving shortly thereafter and then another two different individuals go in and purportedly stab him.  Mr. Armenta, identifies himself as one of these individuals.  Mr. Molina is then seen running out of the cell and is pursued by Mr. Armenta and anther individual who appear to continue to attack Mr. Molina as

---

[2] In referring to the law enforcement interview with Mr. Armenta, counsel is in no way conceding the credibility of his statements.  Indeed, there exists many grounds on which to impeach Mr. Armenta's credibility.

DNM 428

he flees.  Of the three that are not Mr. Armenta, none match Mr. Perez's description and Mr.

Armenta identifies these three as other than Mr. Perez.  Thus, Mr. Perez's only involvement, if

any, is allegedly providing his walker to make shanks.  The only source for this is the unidentified

informant identified in **Exhibit 1**.  The vague statement made by the informant regarding Mr.

Perez's role offers little insight into the basis of the informant's knowledge, making his identity

critical.

It is unknown if the informant will claim he obtained this knowledge directly from Mr.

Perez or other individuals.  Mr. Perez and his co-defendants charged in Mr. Molina's killing are

also charged with conspiracy to kill Mr. Molina.  It is quite possible the informant may have

participated in any alleged planning or conspiracy to kill Mr. Molina or was an eyewitness to Mr.

Molina's killing.  Like the United States' other informant, co-defendant Armenta, it is also possible

this informant was one of the hands on killers of Mr. Molina.  Therefore, this informant will

provide key testimony for the prosecution, and he possesses information that would benefit Mr.

Perez's defense.  Specifically, the informant's claims regarding how other defendants or uncharged

co-conspirators came to possess parts of Mr. Perez's walker and whether Mr. Perez voluntarily

agreed to provide his walker for parts, rendering him unable to ambulate, are highly relevant to

Mr. Perez's defense.  If the informant claims Mr. Perez knowingly agreed to do this for the purpose

of killing Mr. Molina, it is critical to know how he obtained this knowledge, in order to properly

challenge these allegations.  This cannot be accomplished without knowing the informant's

identity and other information that would reveal any motives he might have to lie.  Mr. Perez, by

counsel, requested the United States reveal the identity of this informant.  The United States, by

counsel, stated it would not.  *See* Email thread between Villa and Armijo, *attached as* **Exhibit 4**.

In this case, the Court should require the United States to disclose the informant's identity because

DNM 429

Mr. Perez's right to prepare for his defense outweighs the government's interest in keeping the informant's identity confidential.

## INFORMATION SOUGHT

Mr. Perez requests the disclosure of the following information pertaining to this informant:

1. Full name and occupation;

2. Whether the informer was a citizen or police informer;

3. What consideration, if any, he received or will receive for cooperation and/or testimony. *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Mayer*, 556 F.2d 245 (5th Cir. 1977);

4. Training and experience with drug trafficking and gang activity both in and outside the prison system;

5. Narcotic or controlled substance history and habit. *United States v. Fowler*, 465 F.2d 4664 (D.C. Cir 1976); *United States v. Smith*, 692 F.2d 658, 661 (10th Cir. 1983) (normally the trial court runs a substantial risk of causing prejudice to a fair trial when it fails to instruct the jury concerning the inherent unreliability of an addict's testimony);

6. Psychiatric history. *United States v. Lindstrom*, 698 F.2d 1154 (11th Cir. 1983); *United States v. Partin*, 493 F.2d 750, 762-764 (5th Cir. 1074);

7. Criminal history, including probation and parole status. *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980);

8. Any and all statements, in addition to the agent reports, that are material to this case and which should be disclosed to the defense; and

9. Identification of any prior testimony; and all details or disclosure or reports regarding any prior investigations. *United States v. Cutler*, 806 F.2d 933 (9th Cir. 1986).

DNM 430

## ARGUMENT

This Court has authority to order the United States to identify the informant implicating Mr. Perez. *See United States v. Garrison,* 147 F. Supp. 3d 1173, 1179 (D. Colo. 2015) (discussing the inherent authority of the federal judiciary in criminal prosecutions to compel discovery); *United States v. Nobles*, 422 U.S. 225, 231, 95 S.Ct.2160 (1975) ("Decisions of the Court… have recognized the federal judiciary's inherent power to require the prosecution to produce the previously recorded statements of its witnesses so that the defense may get the full benefit of cross-examination, and the truth-finding process may be enhanced").  While the government has the privilege "to withhold from disclosure the identity of persons who furnish information of violations of law to officers…" the privilege is not absolute, and must give way when "the disclosure of an informer's identity… is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro v. United States*, 353 U.S. 53 at 59-61 (1957). Accordingly, disclosure may be required when the confidential source is a "participant in and a material witness to" the alleged crime. *Id*. at 65. Three broad categories of cases involving CIs exist:

> At one extreme are the cases where the informant is a mere tipster, and disclosure is not required. At the other extreme are cases such as *Roviaro* itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial. In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant.

*United States v. Rivas*, 26 F. Supp. 3d 1082, 1120 (D.N.M. 2014) (quoting *United States v. Moralez,* 908 F.2d at 568 (citations omitted).  Mr. Perez submits the informant in this case may have played a crucial role in the alleged criminal transaction based on the allegations he is making, requiring disclosure of his identity.

"As a general rule…the government must identify an informant who" assists the government in "obtaining evidence of crimes and whose testimony might be relevant to the defense." *United States v. Williams*, 488 F.2d 788, 790 (10th Cir. 1973); *Roviaro v. United States*, 353 U.S. 53 (1957); *United States v. Martinez*, 487 F.2d 973 (10th Cir. 1973); *Garcia v. United States,* 373 F.2d 806 (10th Cir. 1967). "The Tenth Circuit's take on this analysis is well-known." *United States v. Padilla*, No CR 09-3598 JB, 2010 WL 4337819, at * 7 (D.N.M. Sept. 3, 2010) (Browning, J.). When a confidential source plays an active role in the government's investigation, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors." *Id*. at 62. In short, this analysis requires this Court to balance "the public's interest in protecting the flow of information against the individual's right to prepare his defense." *United States v. Mendoza-Salgado*, 964 F.2d 993, 1000 (10th Cir. 1992) (quoting *Roviaro* at 62 internal quotations omitted).

## MR. PEREZ'S RIGHT TO PREPARE HIS DEFENSE OUTWEIGHS THE UNITED STATES' INTEREST IN KEEPING THE INFORMANT'S IDENTITY CONFIDENTIAL

Because the government has not disclosed the identity of the informant used in its investigation, Mr. Perez is being deprived of his right to adequately prepare his defense. To date, Mr. Perez is only named in 18 of the tens of thousands of discovery documents. Out of these 18, his name most commonly appears on a list of inmates who were housed in the same pod as Mr. Molina and who law enforcement attempted to interview after his killing. The informant's statement in the CHS Report is the *only* evidence within the discovery that purports to tie Mr. Perez to Mr. Molina's murder. *See* **Ex. 1**, CHS Rpt. at 2. In this report, the informant alleges that Mr. Perez assisted in the crime by "provid[ing] his walker to make shanks that were used in the murder." *Id*.

7

Outside of this limited information, the United States has failed to provide any other statements or evidence linking Mr. Perez to Mr. Molina's killing or demonstrating Mr. Perez's involvement in a conspiracy. The defense, therefore, reasonably believes that this informant will be a key witness for the government's case against Mr. Perez. As this informant's allegation appears to be the sole evidence against Mr. Perez in this case, his interest in preparing his defense outweighs the government's interests in keeping the informant's identity confidential. *See United States v. Rivas*, 26 F. Supp. 3d 1082, 1114 (D.N.M. 2014) ("The Court has required the United States to disclose a CI's identity where the CI 'was integrally involved in the criminal transaction[,] ... observed the criminal transaction[,] and was not a mere bystander.'") (quoting *United States v. Aguilar*, 2010 WL 2977708, at *5 (D.N.M. June 28, 2010)).

The Tenth Circuit requires disclosure when the information sought by the defendant may be relevant to his defense and justice would be best served. *United States v. Holmes*, 487 F. Supp. 2d 1206, 1211 (D. Kan. 2007), *aff'd, United States v. Holmes*, 311 Fed. Appx. 156 (10th Cir. 2009). Alternatively, when the informant's testimony would be cumulative or where the informant did not participate in the alleged crime, disclosure is not required. *Id.* Instructive to Mr. Perez's request is *United States v. Martinez,* where the Tenth Circuit held that the district court erred in refusing the defendant's motions to disclose an informant's identity. 87 F.2d 973, 977 (10th Cir. 1973). In *Martinez*, the defendant was charged with multiple counts of unlawful possession and intent to distribute controlled substances. *Id.* 974. The informant accompanied an undercover law enforcement officer to the home of Mr. Martinez's co-defendant where the undercover agent purchased heroin from the co-defendant. *Id.* At trial, the undercover officer testified that Mr. Martinez was present and implicated Mr. Martinez in the transaction. *Id.* The officer's testimony formed the basis of the government's prosecution against Mr. Martinez. *Id.* Mr. Martinez's and his

DNM 433

co-defendant's testimony directly contradicted the officer's statements in that, although Mr. Martinez agreed he was at the co-defendant's home on the day of the transaction, he was not present or even aware of the heroin sale. *Id.*

The court held the informant's identity should have been disclosed because the informant was a participant, as well as an eyewitness who was "present at the very time and place where the crime… occurred." *Id*. at 975. The court noted that the informant's testimony took on "additional importance in view of the fact that" the testimony from law enforcement was in direct conflict with the defendant's testimony. *Id.*

Likewise, in *United States v. Moralez*, the Tenth Circuit held that the district court abused its discretion in denying the defendant's motion to disclose the identity of the informant. 908 F.2d 565, 569 (10th Cir. 1990).  There, the court determined the district court based the denial on an insufficient record and remanded the case for an *in camera* hearing to determine the informant's level of involvement. *Id*. In *Moralez*, the defendant and two co-defendants were charged and convicted of marijuana possession and multiple related counts. *Id*. at 567.  After law enforcement received information from a confidential informant that one of the co-defendants was dealing marijuana, officers began watching the co-defendant's service station and caught him distributing marijuana to a car parked nearby. *Id*.   Upon entering the station, law enforcement found nearly two hundred pounds of marijuana scattered throughout the building and arrested Mr. Moralez and his other co-defendant. *Id*.

While the Tenth Circuit was not satisfied with the record before it, it nevertheless emphasized that Mr. Moralez "clearly stated how the informant's testimony was essential to [his] defense" and necessary to address critical issues like who owned the marijuana and whether Mr. Moralez was involved in the illegal marijuana operation. *Id.* 568. The informant's testimony would

9

support Mr. Moralez's argument that he was "in the wrong place at the wrong time." *Id*.  The Court

also noted that the confidential informant's testimony would not be cumulative because it would

"provide a different perspective" than the testimony of Moralez's co-defendants who had "motives

for implicating Moralez." *Id.*

In Mr. Perez's case, the defense has the burden to "explain to the court as precisely as

possible what testimony he thinks the informer could give and how this testimony would be

relevant to a material issue of guilt or innocence." *United States v. D'Armond*, 65 F. Supp. 2d 1189,

1198–99 (D. Kan. 1999) (quoting 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's

Evidence ¶ 510[06] (1991)).  Here, the testimony the informant would provide that is critical to

guilt or innocence is how he obtained information that Mr. Perez allegedly provided his walker to

make shanks.  Does he allege he witnessed Mr. Perez provide his walker?  Where was he?  Who

else was present?  How does he know the walker pieces were to be used as shanks?  How did he

know the shanks were used to kill Mr. Molina? How did he know Mr. Perez knew that?  Was he

told anything by Mr. Perez?  How was he told?  Was he told by another?  If so, who?  Was the

informant a member of SNM?  Did he participate in or was he an eyewitness to the conspiracy to

kill, and the killing of, Mr. Molina?  The identity of the confidential informant would likely answer

many of these questions or would reveal his possible bases of knowledge, which would then allow

Mr. Perez to investigate the informant's veracity and ability to perceive.

Knowing his identity and basis of knowledge, like in *Moralez*, will permit Mr. Perez to

prepare for and defend against the informant's inevitable testimony to critical issues such as:

whether Mr. Perez was involved in the plot to murder Mr. Molina; if Mr. Perez willingly provided

his walker with the intended purpose of assisting in the crime; who took possession of the walker;

and who made the shanks.

Because the confidential informant is the only source implicating Mr. Perez, his testimony is significant and would not be cumulative. Also like *Moralez*, Mr. Perez has many co-defendants who may think that they will benefit from falsely implicating him in the crime. The importance of identifying the confidential informant in this case, therefore, is doubly important. First, because it will reveal whether the confidential informant is one of Mr. Perez's co-defendants who has a motive to assist the United States in getting as many SNM convictions as possible. And second, because, if the confidential informant is not a co-defendant, his testimony may provide information to contradict the testimony of any co-defendants who may choose to testify against Mr. Perez in hopes of obtaining a deal for cooperating. "[T]he CI may be in a unique position to amplify or contradict the testimony of [other] witnesses" who may testify that it was Mr. Perez instead of others who provided materials to be used to kill Mr. Molina. *United States v. Aranda-Diaz*, 2013 WL 4446793 at 12 (Browning, J.) (quoting *Roviaro*, 353 U.S. at 64) (internal quotation omitted). The confidential informant's testimony may resolve a direct conflict with the United States' theory and the testimony of Mr. Perez should he choose to testify that he was not involved in the conspiracy to murder Mr. Molina. Given these circumstances, "it is not at all clear that the informant cannot aid [Mr. Perez's] defense," and the Government should therefore be required to disclose the informant's identity to Mr. Perez and his counsel. *Id.* at 13.

If Mr. Perez is found guilty of the murder charge, he faces a mandatory life sentence. See 18 U.S.C. § 1959(a)(1). As this Court has properly recognized, "steep [sentences] … weigh in favor of requiring the United States to disclose the CI's identity." *United States v. Rivas*, 26 F. Supp. 3d 1082, 1117 (D.N.M. 2014). Short of the death penalty, Mr. Perez faces the steepest criminal sentence available in the American justice system. The risk of such a highly punitive sentence taken along with the relevant testimony that the defense anticipates the informant will

DNM 436

provide, weigh in favor of requiring the United States to disclose the identity of the confidential informant.

In *Rivas*, this Court refused to order the United States to disclose the identity of a confidential informant after the defendant pleaded guilty to distributing narcotics. *Id.* at 1116. The defense sought disclosure of the informant's identity because the defendant already believed he knew who the informant was and that once named the informant could support the defendant's claim of imperfect entrapment and request for a variance in the defendant's sentence. *Id*. at 1089, 1103. The defense argued that revealing the confidential informant's identity was necessary to "properly represent the defendant at sentencing, jeopardizing [the defendant's] right to due process and effective assistance of counsel" during the sentencing phase. *Id.* at 1094.  This Court considered the following *Roviaro* factors to determine whether Rivas could show that disclosing the informant's identity outweighed the public's interest in keeping it confidential: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors." *Id*. at 1113. The Court found that the first two factors favored disclosure, but the last two favored keeping the informant's identity confidential.

On the first factor, the Court found that upper limits of the sentence weighed in favor of disclosing the informant's identity. *Id.* at 1117. The Court also found that "the need for Rivas to make his defense, including his argument for a variance, weighs in favor of requiring the United States to disclose the CI's identity." *Id* at 1120-21. However, with regard to the third factor, the Court concluded that because the informant could not testify regarding drug transactions he was not present for, his testimony would not be useful or significant regarding those transactions. *Id* at 1120-1121. With regard to other relevant factors, the Court determined that disclosure was not

warranted because Rivas believed he knew who the informant was and because the informant had received threats.

Unlike *Rivas,* Mr. Perez does not know who the informant may be. The government charged 30 individuals in the superseding indictment and has relied heavily on insider informants, many looking to "make a deal" during its sprawling investigation.  If the defense is correct that the CHS Reporting Document and the FBI search warrant affidavit reference the same confidential informant, then the informant was shot several times in February 2016. *See* **Ex. 1**, CHS Rpt. at 2; *see* **Exhibit 3.** If this is the case, the defense request that the Court conduct an in camera hearing to determine whether this shooting was related to the current SNM investigation and whether the confidential informant is presently in danger because of his status as a confidential informant. Both the CHS Reporting Document and the affidavit state that informant is a gang member, and it is possible that the February 2016 shooting was not related to his involvement in the present investigation but rather his involvement in gang activity. *Id.*

In addition to the informant's gang affiliation, his on-going involvement in criminal behavior makes his credibility highly questionable.   The CHS Reporting Document and the affidavit both state the informant sought out the mother of another SNM member to buy heroin. *Id*. The CHS Reporting document also states that the informant conspired with the SNM member's mother to smuggle Suboxone strips into prisons using mail. *See* **Ex. 1**, CHS Rpt. at 2. Further, whether this informant is a co-defendant who is being rewarded for cooperating with the government goes directly to his motivation for providing this statement and his credibility as a witness. *See e.g. U.S. v. Moralez*, 908 F.2d at 568.

Disclosing the informant's identity is essential to the fair adjudication of Mr. Perez's case and outweighs the government's interests in keeping it confidential. Learning the identity of the

DNM 438

informant at the earlier stage of discovery will be critical given this is the only witness who links

Mr. Perez to the crime charged.  Mr. Perez will need sufficient time to weed through the massive

amounts of discovery in this case to determine the informant's role and to conduct an investigation

into the background of this informant to prepare for cross-examination and impeachment. *United*

*States v. Ruiz*, 536 U.S. at 632, 122 S.Ct. 2450 (explaining that "impeachment information is

special in relation to the *fairness of a trial*" not in determining voluntariness) (emphasis in

original); *see United States v. Nobles*, 422 U.S. 225, 231, 95 S.Ct.2160 (1975).

## CONCLUSION

Mr. Perez respectfully requests that this Court order the United States to disclose the

identity of the confidential informant implicating Mr. Perez and other information requested herein

as it is essential to the fair adjudication and to a fair trial for Mr. Perez.

## CONSULTATION WITH OPPOSING COUNSEL

Counsel for Rudy Perez, Ryan J. Villa, sought the position of all counsel for all parties on

this Motion.  Counsel for the United States, AUSA Maria Armijo, opposes this motion.  *See* **Ex.**

**4**.  Counsel for Defendants Anthony Ray Baca, Edward Troup, Daniel Sanchez, Jerry Montoya,

Andrew Gallegos and Carlos Herrera have informed that their clients join in this Motion.  Counsel

for all other Defendants, except where noted below, have indicated they do not oppose this motion.

Counsel for Defendant Robert Martinez, C.J. McElhinney, indicates Mr. Martinez takes no

position.  Counsel for Defendants Leonard Lujan, Eugene Martinez, Benjamin Clark, Ruben

Hernandez, Jerry Armenta, Gerald Archuleta, Conrad Villegas, Roy Martinez, Paul Rivera, and

Shauna Gutierrez did not respond.

DNM 439

Respectfully submitted,

*/s/ Ryan J. Villa*_____
Ryan J. Villa
Counsel for Rudy Perez
2501 Rio Grande Blvd. NW Ste. A
Albuquerque, NM 87104
(505) 639-5709
(505) 433-5812 (facsimile)
ryan@rjvlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 22, 2016, a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/Ryan J. Villa*
RYAN J. VILLA

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION<br>CHS REPORTING DOCUMENT |  |

## HEADER

**Source ID:** ███████
**Date:** 02/11/2016
**Case Agent Name:** NEALE, THOMAS
**Field Office/Division:** Albuquerque
**Squad:** CRIM

## SOURCE REPORTING

**Date of Contact:**  02/09/2016

**List all present including yourself (do not include the CHS):**
SA T. Neale, SA B. Acee, SA J. Sainato, TFO Mark Myers, Laura Dailey, Matthew Chance, Sergio Sapien, Ronald Martin

**Type of Contact:**   In Person

    **Country:**  UNITED STATES
    **City:**  Albuquerque
    **State:**  New Mexico

**Date of Report:**  02/11/2016

| Substantive Case File Number |
|---|
| 281D-AQ-6239655 |

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION |  |
| --- | --- | --- |
| | CHS REPORTING DOCUMENT | |

**Check here if additional reporting is in Echo**
No

**Source Reporting:**
On 2/9/2016, Confidential Human Source (CHS) ███████ met with Federal Bureau of Investigation (FBI) Special Agents (SA) T. Neale, B. Acee, J. Sainato, Task Force Officers (TFO) Mark Myers, Laura Dailey, Matthew Chance, S. Sapien, and R. Martin at the Albuquerque Division of the FBI. The CHS provided the following information:

The CHS was brought into the Sindicato de Nuevo Mexico (SNM) Gang by Billy BACA, AKA "DUKE," Gerald ARCHULETA, AKA "STYX," Joe GORDON, and Netavio GARCIA, AKA "DAFFY."

Rudy PEREZ, AKA "Ru-Dog" assisted in the killing of Javier MOLINA; PEREZ provided his walker to make shanks that were used in the murder.

Jesse SOSA has an aunt that lives or works in Las Cruces and has been providing information about the whereabouts of SNM members.

The CHS knows Geraldine HERRERA, the mother of Carlos HERRERA, AKA "LAZY." Geraldine is a well-known narcotics trafficker with ties to the Juarez Cartel; the CHS went to her to establish a source of supply but she directed him to her son, "SHORTY." The CHS taught Geraldine how to conceal Suboxone strips in mail and send them into prison facilities. The wives of Carlos and Anthony Ray BACA, AKA "PUP," regularly met to coordinate smuggling narcotics into prison and passing messages amongst SNM members.

The RASCON brothers were in bad standing with the SNM and were ordered to kill Freddie SANCHEZ; the "paperwork" on SANCHEZ was delivered by "CHEECH." "WENO" and "HUERO TROUP" saw that the RASCON brothers were taking too long and killed SANCHEZ.

The CHS believes that had the FBI case not transpired when it did, BACA would have reorganized the SNM and return it to its' former glory. BACA'S plan was to create a hierarchy within SNM that consisted of the "19%" (true, seasoned SNM members), or "Zia Mono," Carnales, and "Zia Keeskee" (phonetic), or prospects. BACA wanted to divide New Mexico into four "rayos" - each consisting of four counties - that would be managed by "Captains." Greg CHACON was supposed to take a "Captain" spot over Albuquerque, but CHACON decided he wanted to commit robberies and pay "homage" to SNM leadership. Instead, Chris GARCIA assumed the "Captain" position, which caused turmoil between GARCIA and Freddie QUINTANA.

Willie ROMERO, AKA "DEMON," lives in Belen, New Mexico and smuggles narcotics into federal penitentiaries for the SNM.

Shawn URAL, ALA "SHAWN SHAWN" lives near the ██████████████████ in Albuquerque.

In July or August of 2005, Chris GARCIA called the CHS and told him to look in the newspaper for a report that ANTHONY APODECA, AKA "Popeye" had been killed. The CHS and other SNM members began to plan for retaliation and met at a funeral home. GARCIA subsequently informed the CHS and others not to seek retaliation, on orders from Gerald ARCHULETA, because APODECA "needed to go." Netavio GARCIA later told the CHS that he gave APODECA a "hotshot" of heroin provided by Chris GARCIA.

In 2005 Cipriano GARCIA and the Los Carnales gang tried to kill SNM member Robert SHANKS AKA "SHANKY." In retaliation, SHANKS gave GARCIA a fatal "hotshot."

| **SIGNATURE** | | |
| --- | --- | --- |
| Submitted By | **TNEALE (THOMAS NEALE)** | **Tue, 16 Feb 2016 16:38:05 -0700** |
| First Level Approved By | **skchavez (Sonya Chavez)** | **Wed, 17 Feb 2016 09:13:05 -0700** |

| FD-1023 | Page 2 of 2 | FEDERAL BUREAU OF INVESTIGATION |
| --- | --- | --- |

U.S. v.  DELEON, ET AL.   3309 DNM 442

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

APR 25 2016

MATTHEW J. DYKMAN
CLERK

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| | ) | Case No. |
| SEE ATTACHMENT "A" | ) | 16 m r 323 |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT "A"

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT "B"

CERTIFIED a True Copy of the
original filed in the office
of the Clerk
by _____ Deputy

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1962(d) | Racketeer Influenced and Corrupt Organizations (R.I.C.O.) Conspiracy; |
| 18 U.S.C. Section 1959 (a) | Violent Crime in Aid in Aid in Racketeering (V.I.C.A.R.); |
| 18 U.S.C. Section 2 | Aiding and Abetting. |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan Acee, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **April 25, 2016**
_____
*Judge's signature*

City and state: Albuquerque, New Mexico

Karen B. Molzen, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Bryan Acee, Special Agent of the Federal Bureau of Investigation, being duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search seven (7) residences (hereinafter referred to as the "Subject Premises"), which are listed below and further described in Attachment A.  This affidavit seeks search warrants to obtain evidence of violations of: 18 U.S.C. § 1962(d) Racketeer Influenced and Corrupt Organizations ("R.I.C.O.") Conspiracy, 18 U.S.C. § 1959(a) Violent Crime in Aid of Racketeering ("V.I.C.A.R."), and 18 U.S.C. § 2 Aiding and Abetting (hereinafter referred to as the "Target Offenses"), and are more specifically described in Attachment B.

| Subject Premises | Target Subject | Location |
|---|---|---|
| A-1 | MANUEL JACOB ARMIJO | |
| A-2 | SERGIO LOYA RODRIGUEZ | |
| A-3 | MANUEL BENITO | |
| A-4 | VINCENT GARDUNO | |
| A-5 | ANTHONY CORDOVA | |
| A-6 | RICHARD GALLEGOS | |
| A-7 | SHAUNA GUTIERREZ | |

### Background of the Investigation

2.     The Federal Bureau of Investigation ("FBI"), New Mexico Corrections Department ("NMCD"), and Bernalillo County Sheriff's Office ("BCSO") are investigating the criminal activities of the Syndicato de Nuevo Mexico ("SNM") gang/criminal enterprise that operates within the District of New Mexico and elsewhere.  I am the lead case agent in the investigation.  The investigation into the SNM began in March

Search Warrant Affidavit Page | 1

DNM 444

21.     SNM members frequently commit "branded" criminal acts, in other words, they commit crimes in the name of the gang. Examples of branded criminal acts include: gang members shouting references to SNM before or during a crime; gang members demanding property or services because of their membership; gang members killing or attempting to kill members of rival gangs. SNM members have been known to kill or attempt to kill law enforcement officers, as well.

22.     Weapons, to include blunt force and edged weapons, and firearms, to include handguns, rifles, and shotguns, are important tools of the trade and instrumentalities of the SNM.

23.     SNM members operate under a "blood in, blood out" rule that prohibits them from leaving the gang unless they are assaulted (i.e. "jumped out") or killed.

24.     SNM members are forbidden to speak with law enforcement officials and to do so may result in the SNM member's violent death at the hands of his fellow gang members; as was the case on multiple occasions in this investigation.

**Violence Targeting Witnesses and Cooperating Defendants in the Instant Investigation:**

25.     Over the course of this investigation, I have become aware of several instances in which SNM members or associates have threatened or conducted violent acts aimed at witnesses, victims, or cooperating defendants.  Some of the most recent examples follow.

26.     _Example 1_:  In February, 2016, during a recorded telephone call, a CHS, who is a member of the SNM, spoke with a fellow SNM member and the member's mother, who is a long-time heroin dealer. The CHS attempted to order heroin from the mother.  The SNM member and his mother became suspicious of the CHS and subsequently declined to sell heroin to the CHS.  A few days later, the CHS was shot several times by a street gang member with family ties to the SNM.  I should note that the CHS was utilized in the FBI's investigation of the SNM that led to the December 1, 2015, federal indictments and Phase I takedown operation.

27.     _Example 2_:  In February, 2016, three subjects entered a residence in Los Lunas, NM, and assaulted a victim, who was cooperating with Valencia County officials in an aggravated battery against

Search Warrant Affidavit Page | 8

FD-302 (Rev. 5-8-10)

**OFFICIAL RECORD**

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     09/18/2015

On September 17, 2015, Jerry ARMENTA, date of birth ▮▮▮▮▮▮▮ was interviewed at the United States Attorney's Office in Las Cruces, New Mexico. Individuals present at the interview were Special Agent (SA) Bryan Acee and SA Joseph Sainato of the Federal Bureau of Investigation (FBI), District of New Mexico Assistant United States Attorney Maria Amrijo, Dona Ana County Deputy District Attorneys Daniel Dougherty and Davis Ruark, and Ruben Archuleta, Daniel Blanco, Chris Cupid, Ron Martin and Sergio Sapien of the New Mexico Department of Corrections. After being advised of the identity of the interviewing Agents and the nature of the interview, ARMENTA provided the following information:

ARMENTA was brought into the Syndicato Nuevo Mexico (SNM) gang in 2005 by Michael ARMANDARES, when ARMENTA intervened in an altercation in which ARMANDARES was being attacked by 8 members of the Surenos gang. Validated SNM members who voted for ARMENTA's membership were James JOKUM (sp), Sam SILVA, Gerald ARCHULETA, Michael ARMANDARES and Frank GONZALES.

Gerald "Styx" ARCHULETA told Michael ASTORGA the only way for him to get back in good standing with the SNM again was to kill a police officer. ASTORGA later murdered Deputy James McGrane of Bernalillo County Sheriff's Office. This act made ASTORGA "good" again in many SNM members' eyes, to include ARMENTA. At the time of this interview, ARCHULETA was in Tennessee but was still in good standing within the SNM and maintained a leadership position.

Benjamin CLARK confessed to ARMENTA that he was present when Edward "Huero" TROUP strangled "Fred-Dog."

With regard to the murder of Javier MOLINA, ARMENTA provided the following information:

---

| | | |
|---|---|---|
| Investigation on   09/17/2015   at | Las Cruces, New Mexico, United States (In Person) | |
| File #   281D-AQ-6239655 | | Date drafted   09/17/2015 |
| by   Joseph Sainato | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

281D-AQ-6239655

Continuation of FD-302 of  9/17/15 Interview of Jerry ARMENTA  , On  09/17/2015 , Page  2 of 2

    Daniel "Dan-Dan" SANCHEZ "called for" the murder after seeing "paperwork" provided by Jesse SOSA, which implicated MOLINA as an informant in a case in which SOSA was a co-defendant with MOLINA. The "paperwork" was a police report which contained statements made by MOLINA. The report was obtained by Anthony Ray "Pup" BACA in the Northern New Mexico Correctional Facility and was passed to the Southern New Mexico Correctional Facility by Lupe URQUIZO and Archie VARELA, who in turn passed the report to Daniel SANCHEZ, Timothy "Red" MARTINEZ and Mario "Blue" RODRIGUEZ.

    SANCHEZ gave ARMENTA the order to carry out the murder because he needed to "put in work" for the SNM, and threatened to have ARMENTA killed if he refused. On March 7, 2015, SANCHEZ instructed ARMENTA to go to Mario RODRIGUEZ's cell, where RODRIGUEZ provided ARMENTA with a shank he had made and showed ARMENTA how to use it. RODRIGUEZ and Timothy MARTINEZ entered MOLINA's cell under the guise of using heroin together. Once inside, MARTINEZ choked MOLINA to the point of unconsciousness. MARTINEZ and RODRIGUEZ then left the cell and Jerry "Plazz" MONTOYA and ARMENTA entered the room and began stabbing MOLINA. MOLINA regained consciousness while being stabbed, got up and ran from his cell down to the lower level. MONTOYA and ARMENTA gave chase and stabbed him several more times. Throughout the attack, Daniel SANCHEZ sat at table he knew to be within view of a camera, so as to avoid implication, however he yelled something to the effect of "Get him! Get him!" during the chase.

    After the attack, Jerry MONTOYA threw the shank he had used in the stabbing up onto the upper level, where it was recovered by Mario RODRIGUEZ. RODRIGUEZ then hid the shank in the showers.

    With regard to the SNM call for murder of Greg Marcantel and Dwayne Santistevan, ARMENTA provided the following information:

    While ARMENTA was in "X pod" with Robert MARTINEZ, Robert MARTINEZ told ARMENTA that he put out the "hit order" under the orders of Roy MARTINEZ. ARMENTA believes the reasoning behind the hit order was due to the fact that SNM members have been "locked down" for too long.

Index:

Filing and Security

**UNCLASSIFIED**

**Primary Case:** 281D-AQ-6239655          **Case Title:** (U) Operation Atonement;
                                                           Syndicato de Nuevo Mexico;
                                                           Violent Prison Gang

**Serial Number:** 142

**Serialized:** 09/18/2015

**Category:** Full Investigation
**Initiated:** 04/02/2015

**Restrict to FBI Only:** Yes
**Justification:** ███████████████

Details

**Document Title:** (U) 9/17/15 Interview of Jerry ARMENTA
**Drafted Date:** 09/17/2015
**Type of Activity:** Interview
**Methods:** In Person
**Investigation On:** 09/17/2015
**At:** Las Cruces, New Mexico, United States
**Details:** (U)

On September 17, 2015, Jerry ARMENTA, date of birth
████████████ was interviewed at the United States Attorney's
Office in Las Cruces, New Mexico. Individuals present at the
interview were Special Agent (SA) Bryan Acee and SA Joseph
Sainato of the Federal Bureau of Investigation (FBI),
District of New Mexico Assistant United States Attorney
Maria Amrijo, Dona Ana County Deputy District Attorneys
Daniel Dougherty and Davis Ruark, and Ruben Archuleta,
Daniel Blanco, Chris Cupid, Ron Martin and Sergio Sapien of
the New Mexico Department of Corrections. After being
advised of the identity of the interviewing Agents and the
nature of the interview, ARMENTA provided the following
information:

ARMENTA was brought into the Syndicato Nuevo Mexico (SNM)
gang in 2005 by Michael ARMANDARES, when ARMENTA intervened
in an altercation in which ARMANDARES was being attacked by
8 members of the Surenos gang. Validated SNM members who
voted for ARMENTA's membership were James JOKUM (sp), Sam
SILVA, Gerald ARCHULETA, Michael ARMANDARES and Frank
GONZALES.

Gerald "Styx" ARCHULETA told Michael ASTORGA the only way
for him to get back in good standing with the SNM again was
to kill a police officer. ASTORGA later murdered Deputy
James McGrane of Bernalillo County Sheriff's Office. This
act made ASTORGA "good" again in many SNM members' eyes, to
include ARMENTA. At the time of this interview, ARCHULETA
was in Tennessee but was still in good standing within the
SNM and maintained a leadership position.

Benjamin CLARK confessed to ARMENTA that he was present
when Edward "Huero" TROUP strangled "Fred-Dog."

With regard to the murder of Javier MOLINA, ARMENTA
provided the following information:

Daniel "Dan-Dan" SANCHEZ "called for" the murder after
seeing "paperwork" provided by Jesse SOSA, which implicated
MOLINA as an informant in a case in which SOSA was a
co-defendant with MOLINA. The "paperwork" was a police
report which contained statements made by MOLINA. The report

**U.S. v. DELEON, ET AL.   2251** DNM 448

was obtained by Anthony Ray "Pup" BACA in the Northern New
Mexico Correctional Facility and was passed to the Southern
New Mexico Correctional Facility by Lupe URQUIZO and Archie
VARELA, who in turn passed the report to Daniel SANCHEZ,
Timothy "Red" MARTINEZ and Mario "Blue" RODRIGUEZ.

   SANCHEZ gave ARMENTA the order to carry out the murder
because he needed to "put in work" for the SNM, and
threatened to have ARMENTA killed if he refused. On March 7,
2015, SANCHEZ instructed ARMENTA to go to Mario RODRIGUEZ's
cell, where RODRIGUEZ provided ARMENTA with a shank he had
made and showed ARMENTA how to use it. RODRIGUEZ and Timothy
MARTINEZ entered MOLINA's cell under the guise of using
heroin together. Once inside, MARTINEZ choked MOLINA to the
point of unconsciousness. MARTINEZ and RODRIGUEZ then left
the cell and Jerry "Plazz" MONTOYA and ARMENTA entered the
room and began stabbing MOLINA. MOLINA regained
consciousness while being stabbed, got up and ran from his
cell down to the lower level. MONTOYA and ARMENTA gave chase
and stabbed him several more times. Throughout the attack,
Daniel SANCHEZ sat at table he knew to be within view of a
camera, so as to avoid implication, however he yelled
something to the effect of "Get him! Get him!" during the
chase.

   After the attack, Jerry MONTOYA threw the shank he had
used in the stabbing up onto the upper level, where it was
recovered by Mario RODRIGUEZ. RODRIGUEZ then hid the shank
in the showers.

   With regard to the SNM call for murder of Greg Marcantel
and Dwayne Santistevan, ARMENTA provided the following
information:

   While ARMENTA was in "X pod" with Robert MARTINEZ, Robert
MARTINEZ told ARMENTA that he put out the "hit order" under
the orders of Roy MARTINEZ. ARMENTA believes the reasoning
behind the hit order was due to the fact that SNM members
have been "locked down" for too long.

Index:

1A/1C Packages

   Package 1A60

      Summary: (U) Interview notes.
      Acquired By: Joseph Sainato

      Acquired On: 09/17/2015
      Receipt Given: No

      Attachments: UNCLASSIFIED
                   (U) Interview notes.
                   Physical Record

Indexing

| Display Name | Enterprise Role | Entity Role | Entity Type | US Person |
|---|---|---|---|---|
| Jerry ARMENTA | CASE INDEX | Reference | PERSON | Unknown |

U.S. v. DELEON, ET AL.   2252





**Routing**

**Drafted by:**    Joseph Sainato

**Approved by:**    SSA SONYA K. CHAVEZ

**Distribution:**    AQ-CRIM (OST)

| | |
|---|---|
| **From:** | Armijo, Maria (USANM) |
| **Received:** | Wed 9/14/2016 2:40 PM |
| **To:** | Ryan Villa |
| **Cc:** | Castellano, Randy (USANM) |
| **Subject:** | Re: USA v. DeLeon- request to disclose CI |
| **File:** | Perez, Rudy (2:15-cr-04268-JB) |

We will not reveal it at this time.

Sent from my iPhone

On Sep 14, 2016, at 2:37 PM, Ryan Villa <ryan@rjvlawfirm.com<mailto:ryan@rjvlawfirm.com>> wrote:


Maria,

I'm requesting you disclose the CHS identified in this document to me pursuant to the Court's protective order or any other additional protective order you deem necessary.  Please let me know if you will disclose the CHS or not, so I can file a motion with the Court.

Thank you.


Ryan J. Villa

The Law Office of Ryan J. Villa
2501 Rio Grande Blvd NW Suite A
Albuquerque, NM 87104
Office: 505-639-5709
Fax:   505-433-5812
Email: ryan@rjvlawfirm.com<mailto:ryan@rjvlawfirm.com>
<DISC 3308-3309.Redacted.FBI FD 1023 re interview of CHS on 2-9-16.pdf>

Ryan Villa                                                                        Printed: Mon 9/19/2016 12:13 PM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CRIMINAL NO.  15-CR-04268-JB** |
| | § | |
| **JOE LAWRENCE GALLEGOS** | § | |
| | § | |
| **Defendant.** | § | |

### DEFENDANT'S MOTION TO SHOW CAUSE FOR VIOLATION OF ORDER, DOCUMENT 299 AND REQUEST FOR EVIDENTIARY HEARING ON VIOLATIONS OF 4TH AMENDMENT AND 6TH AMENDMENTS TO THE UNITED STATES CONSITUTION

ON SEPTEMBER 2ND, 2016 the United States and the State of New Mexico acted in concert to violate Joe Lawrence Gallegos' constitutional rights. This was done through the premise of an attempted investigation that mirrors the facts of the indicted conduct. To date, the confidential and constitutionally protected materials that were seized have not been returned and are believed upon information and belief to be being read, copied or disseminated. The Defendant would show the following in support of this extremely strong allegation:

**A. Raid-**

The defendants in this matter have continuously been concerned with the United States' actions in this matter. This stemmed from initial actions that occurred at Otero County Detention Center. *See Doc 277.* Subsequently the Court entered Document 299, which denied the Defendants' requested relief, but contained specific language requiring as a condition precedent to inspecting attorney client materials that the Government seek prior permission from **the Court**. [emphasis added] The Government on or about September 2, 2016 filed, in a separate cause a request for a search warrant. This search warrant in cause 16-mr-00628-KBM

conspicuously omits any mention of this order by Judge Gonzales in the request for the raid on

Joe Gallegos' cell. Additionally, the items that are listed in the "Items/ Person seized" column of

the return that was filed in Document 9 in the search warrant cause list four items. One of these

items is a notepad. This notepad is believed to be a notepad that Is labeled as "Attorney-client".

| Otero County Prison Facility, 10 McGregor Range Rd, Chaparral, New Mexico | JOE LAWRENCE GALLEGOS | 2:00pm | 3 envelopes containing miscellaneous documents and 1 notepad were seized by Filter Agent TFO C. Yarnell. SA Acee, the co-case agents, and the AUSA in the SNM investigation did not review the evidence. |
|---|---|---|---|

The insert above is a screen shot from page two of document 9 in the search warrant cause.

Further, it should be noted that this lists the involved case agent, SA Acee as being involved in

the raid on Joe Gallegos' cells. It fails to mention that the raid was also conducted by the gang

intel officers at Otero as well.

**B. Warrant-**

The search warrant in this matter is best described as being void for vagueness. The

warrant fails to provide any specifics in regards to dates, times, or actions that would justify the

knowing invasion of a constitutionally protected materials such as attorney client materials, or

show that the Court was informed as it ordered the government to do in its Order in Document

299.

1. The search warrant describes in paragraph 42 conduct that is alleges in the instant

indictment in this case. It failed to identify that information as simply allegations, rather alluding

that it is new and independent information. This conduct appears directed to mislead the United

States Magistrate into believing that the conduct that is described is somehow different than

conduct that is alleged in the indictment that was a) never indicted in 2001 (Counts 1 & 2) or b)

subject to a no probable cause finding in 2012 (Counts 4 and 5).

DNM 453

2. Paragraph 52 contains a blatant speculation that the tablets are being "secretly" shared to identify who informants and cooperators are. This speculation is ridiculous as all of the tablets were procured from the same source and loaded with the same materials. Therefore, even if tablets were being shared, it belies the obvious that the defendants were not "sharing" unique information. The information is labeled with Bate Stamps and is on every tablet. Joe Gallegos was specifically sanctioned by Otero County Prison Facility for sharing his tablet with Carlos Herrera, who used that tablet to discuss matters in preparation of his defense with his attorney. There was no "secret" sharing. It was wrong, but out in the open. Paragraph 52 is simply a blatant attempt to recklessly mislead the issuing court with biased speculation. Further, Doc. 589 specified a procedure under the protective order that would take place if there was a belief that the discovery materials or tablets that contained them were being used improperly. This procedure was not followed, but disregarded knowingly by the Government.

3. Paragraphs 116 through 126 relate to Joe Gallegos. They are allegations that track the allegations against Joe Gallegos by a Jose Gomez, a registered sex offender who is pending federal charges and believed to be "working them off" as they have not moved since the VICAR case has been filed. Further these allegations are stale in that SA Acee drafted this document "a few weeks" after he arrested Shauna Gutierrez. He does not tell the Court that Shauna Gutierrez was arrested before August 4, 2016.

DNM 454

**C. Constitutional Violations-**

The government in this matter is believe to be in possession of materials that are attorney client privilege materials that do not contain any evidence that would vitiate that privilege. A demand was made for return of those materials and the Government stated in an email that it would produce the search warrant and materials in discovery. This is unacceptable. This search warrant was disclosed to the Press before it was even accessible on **pacer.gov**. This raid has no clear legitimate objective other than to invade attorney client privilege, curry favor with the press and withhold property that the government is not entitled to possess. Courts that have reviewed government intrusions into the affairs of defendants have found that prejudice does not need to be shown in order for a 6th Amendment violation to be established. *See Caldwell v. United States,* 205 F.2d 879 (D.C. Cir. 1953).

**D. Conclusion-**

Defendant Joe Gallegos hereby requests that the Court order that the Government return all material that is not facially contraband. Further, Mr. Gallegos hereby requests that the Court order that the Government stop its attempts to conduct an end run around this Court's order in documents 299, 589 and that prior to taking any action in the future that will invade the attorney client privilege in the manner that this raid did, that it approach this Court, an Article III Judge who is firmly aware of the concerns of the defendants and the course of proceedings. Lastly, if

there is a concern regarding the materials, someone other than a party to the case should review

the materials, not an alleged taint team led by the case agent as reflected in the warrant return.

Respectfully submitted,

/s/_____
BROCK BENJAMIN
Attorney for Defendant
New Mexico State Bar No. 141535
747 E. San Antonio, Suite 203
El Paso, Texas 79901
Tel. (915) 412-5858
Fax (915) 503-2224

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this the 26th day of September, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants

/s/_____
BROCK BENJAMIN

**NOTICE TO COURT OF PARTIES POSITION**

On September 25th this motion was emailed to the defendants and the government in this matter.   No defendants are opposed.  The Government opposes this motion.

/s/_____
BROCK BENJAMIN

5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Action No. No. 15-CR-4268-JB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ANGEL DELEON,
**JOE GALLEGOS**,
**EDWARD TROUP**,
LEONARD LUJAN,
**BILLY GARCIA**,
EUGENE MARTINEZ,
ALLEN PATTERSON,
CHRISTOPHER CHAVEZ,
JAVIER ALONSO,
ARTURO ARNULFO GARCIA,
BENJAMIN CLARK,
RUBEN HERNANDEZ,
JERRY ARMENTA,
**JERRY MONTOYA**,
MARIO RODRIGUEZ,
TIMOTHY MARTINEZ,
MAURICIO VARELA,
DANIEL SANCHEZ,
GERALD ARCHULETA,
CONRAD VILLEGAS,
ANTHONY RAY BACA,
ROBERT MARTINEZ,
ROY MARTINEZ,
CHRISTOPHER GARCIA,
CARLOS HERRERA,
RUDY PEREZ,
ANDREW GALLEGOS,
SANTOS GONZALEZ,
PAUL RIVERA, AND
SHAUNA GUTIERREZ,
           Defendants.

DNM 457

**STATUS REPORT REGARDING MOTION FOR SPECIFIC DISCOVERY (DOC. NO. 539)**

Defendants Joe Gallegos, Edward Troup, Billy Garcia, Jerry Montoya provide a status report in advance of the October 4, 2016 motions hearing as outlined below:

**<u>INTRODUCTION</u>**

It is not defense counsel's intent nor their role to assess or affirm to this Court whether the government's production of materials has been wholly responsive or complete in respect to the Court's disclosure orders or it's obligations under Crim. P. 16, *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and *Giglio v. United States*, 405 U.S. 150, 153 (1972). Only the government can know that. However, what defense counsel can do is to point out certain instances where it is evident to the defense that the government has not complied with its obligations or agreements to date and to outline those areas still in dispute and those which are not in dispute.   To that end this status report is offered.

**<u>REPORT TO THE COURT</u>**

1.      On May 23, 2016 the above named defendants filed their Motion for Discovery (Doc. No. 539).   On July 5, 2016 the government filed its Response to the Motion for Specific Discovery (Doc. No. 613). On July 25, 2016 the defendants filed a Reply (Doc. No. 632).

2.      The discovery motion was filed on counts one and two only as those counts relate to two homicides occurring on the same day in 2001 and are separated in

DNM 458

time from all the other counts which relate to one count with an offense date in 2007 and the remaining counts with offense dates in the time period from 2012-2016.

3.   Efforts have been made to resolve one or more of the discovery requests. Efforts prior to the filing of the Reply were outlined in that reply. Since the filing of the reply, Mr. Bob Cooper has made a further effort to resolve some of the discovery matters, but the government has not responded.

4.   To date the government has produced 18,090 pages of discovery.   This total is for all indicted cases. 8,433 of those pages have been marked as discovery for case 15-cr-4268.  Of those pages, 1,286 pages have been marked by the government as relating to counts one and two of the superseding indictment.  Additional pages relating to 15-cr-4268 and counts one and two have been found in discovery folders marked for other indicted cases so an accurate assessment of the number of pages actually related to 15-cr-4268 or counts one and two cannot be offered.

5.   The government has provided statements or summaries of statements from 330 informants, of which 29 have been identified by name and 301 are yet to be identified.[1]

6.   To date the government has provided no impeachment information concerning any of the named or unnamed informants pursuant to *Giglio v. United States*, 405 U.S. 150 (1972).

---

[1] Some of the unidentified informants may have made more than one statement.  The government has not chosen to provide an alphanumeric identifier for the various unidentified informants.  As such, the actual total number of unidentified informants may be less than that set forth above.

DNM 459

7.      In regard to mandated disclosures pursuant Crim. P. 16 (a) (1) (B), (D) and (E), as outlined in a letter from the defense to the government dated June 23, 2016, the government has not responded.   See Appendix D to Doc. No. 632.   It is unknown whether all statements of the defendants have been produced but it is known that the prior records of the defendants, and the vast majority of warrants and returns on warrants have not been produced.

8.      In its Response to the Motion for Discovery, the government conceded it would provide separatee listings for inmates F.C. and R.G.. Response, Doc. 632, p. 13. In the nearly 3 month time period since the government agreed to produce these materials, the defense has not received any of these materials.

9.      In its Response, the government conceded it would provide administrative segregation waivers signed by F.C. or R.G. and associated documentation "to the extent that they exist, and to the extent that NMCD agrees to allow the United States to obtain these listings."   Response, Doc. 632, p. 14. To date, these materials have not been produced.

10.      In its Response, the government conceded it would provide DNA analysis notes, electropherograms and graphs "to the extent that it exists and is in the United States' possession, custody or control." Response, Doc. 632, p. 16. To date, these materials have not been produced to the defense.

11.      In its Response, the government conceded it would provide copies of inmates' "Wanted for Escape/Master Record Entry" for inmates R.G. and F.C..   The government has produced two pages in compliance with this request.

4

12.     In its Response, the government conceded, "copies of the log books from the day of the murders, however, have been preserved as part of the investigation and, if not yet disclosed, are in the process of being disclosed."  Response, Doc. 632, p. 16. To the knowledge of counsel, these log books have not been disclosed, although it is possible they may have been disclosed but have not been identified as such in the discovery.

13.     In the Motion for Discovery the defense asserted, "According to the discovery, codefendant Leonard Lujan, on August 8, 2007 made a statement to the District Attorney and their investigators. During this interview, which has been provided in discovery, the district attorney indicated there had been a prior interview of Lujan. This prior interview has not been provided in discovery."  Motion for Discovery, Doc. No. 539, para. 1.  To date, the government has not provided this interview to the defense nor have they responded to this request in their response or in any written communications with the defense.

14.     On June 30, 2016, the government offered to provide to the defense certain materials that they later did not concede should be produced in the response to the Court.  See Appendix A To Doc. No. 632.  In that letter the government indicated they would provide materials relating to the "Pen Pack" for witness Frederico Munoz (Mr. Munoz is a disclosed informant).  To date, these materials have not been produced to the defense.

5

15.     In the June 30, 2016 letter, the government indicated "to the extent that they exist, we'll agree to disclose to you the STIU files for R.G. and F.C.." To date, these materials have not been produced to the defense.

16.     In the June 30, 2016 letter, the government indicated "with regard to Request No. 4, we'll agree to provide to you the "pen packs" for R.G. and F.C. to the extent that they exist, as well as the pen packs for Leonard Lujan." To date, these materials have not been produced to the defense.

17.     In the June 30, 2016 letter, the government indicated, "We also will agree to disclose the relevant portions of the STIU files and complete "pen packs" for all charged defendants." To date, these materials have not been produced to the defense.

18.     In the June 30, 2016 letter, the government indicated that with respect to Case Nos. 281D-AQ-62017,281D-AQ-59388, and 2450-AQ-63435 they would "agree to ask the proper agency to look through that file and, if documents within that file 'relate to the allegations contained within the indictment,' and if the agency does not have any specific safety or confidentiality concerns in the document(s), we'll disclose those to you as well."  From a review of disclosures, it appears that agents did conduct searches in files 281D-AQ-62017 and 281D-AQ-59388 for documents, which contained the defendant's names.  Some materials from those searches were provided in discovery since the filing of the original motion for discovery.  It does not appear that counsel for the government has conducted a search through these files for all documents, whether or not they contain a defendant's name, that relate to the allegations contained within the indictment.  From these new disclosures, additional federal government files have now

6

been identified of related investigations of suspected SNM members who are alleged to be part of the criminal enterprise charged in this case.  These new files are 270M-AQ-61844 and 92D-AQ-57713 (see Appendix A and B respectively).

19.     In the June 30, 2016 letter, the government indicated that it would produce the list of inmates who were housed at the Penitentiary of New Mexico (PNM) on March 26, 2001. To date, these materials have not been produced to the defense.

20.     With respect to the specific request regarding file 2450-AQ-63435, the defense has not received any documents.

21.     With respect to the specific request regarding file 281D-AQ-59388, the defense has received 5 pages (pages 2625, 2627, 3029, 3104 and 3109).

22.     With respect to file 281D-AQ-54711 has received 9 pages (pages 3015-3018, 3032, 3059-60, 3034-35).

23.     With respect to file 281D-AQ-62017 it appears that the government has now produced hundreds of pages of material relevant to the indictment but it is unknown whether the entire file has been reviewed.


Submitted this 30th day of September, 2016.

s/ Brock Benjamin

Brock Benjamin

Richard Sindell

Attorneys for Joe Gallegos (2)

DNM 463

s/ Cori Harbour-Valdez

Patrick Burke

Cori Harbour-Valdez

Attorneys for Edward Troup (3)


/s/ Jim Castle

Robert Cooper

Jim Castle

Attorneys for Billy Garcia (5)


/s/ Margaret Strickland

Margaret Strickland

Larry Hammond

Attorneys for Jerry Montoya (14)


CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2016, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


/s/ James A. Castle

**Filing and Security**
**Primary Case:** 92D-AQ-57713-SNM          **Case Title:** (U) SNM

**Serial Number:** 42

**Serialized:** 07/02/2008

**Category:** Full Investigation
**Initiated:** 12/02/2003


**Details**
**Serial #:** 42                                    **Type:** FD1023

**Document Title:** 7/2/08-CHS MADE CONTACT WITH LIONEL CASTILLO WHO ADVISED RAY

**Approval Date:** 07/03/2008
**Classification:** U

**Contents:**

Confidential Human Source (CHS) Reporting Document


Reporting Date: 07/03/2008

Case ID: 92D-AQ-57713-Sub-SNM (Pending)
270M-AQ-61844-A (Pending)

Contact Date: 07/02/2008

Type of Contact: In person

Location: Albuquerque, New Mexico

Written by: TFO Nathan J. Lerner
Other(s) Present:


Source Reporting:

Source who is in a position to testify, provided the
following information.

On 7/02/08 Source made contact with Task Force Officer
Nathan J. Lerner and advised it made contact with LIONEL
CASTILLO. LIONEL advised RAY BACA a.k.a. "PUP" was transferred
back from the Nevada Prison system to the New Mexico prison
system. Source also advised RAY BACA used to call the shots or
was in charge of the SYNDICATO NUEVO MEXICO or SNM, a gang based
out of the State of New Mexico Prison system. This was prior to
getting shipped to Nevada due to interstate compacts.

Source was told by LIONEL that RAY BACA told everyone
that GERALD ARCHULETA a.k.a. "STYX" was out, meaning that he was
done or had a green light put on him. Source was also advised
that RAY BACA is trying to take back control of the SNM.

Source was also told RAY BACA will try to organize the
SNM. This is because RAY BACA has gotten several members of the
SNM mesa or table which consists of high ranking members that
make decisions. These members cast a vote on decisions that
involve the gang and its priorities. RAY BACA has been able to
convince two members of the mesa to take his side. Source
advised these two members are ROBERT MARTINEZ a.k.a. "BABY ROB"
and JUAN MENDEZ. Source does believe with these two individuals,
RAY BACA will be able to generate a lot of alliances.

Source was also told they want to take out or try to

U.S. v. DELEON, ET AL.    2654                   DNM 465

kill FREDRICO MUNOZ a.k.a. "PLAYBOY". This is because FREDRICO
is on the same side or supports STYX.

Source does not know when or how the SNM members
siding with RAY BACA will try to kill STYX or FREDERICO, but is
insistent that they will attempt to carry this threat out.

LIONEL also told source that BILLY GARCIA a.k.a "WILD
BILL" was advised by RAY BACA that if he is not with him he is
against him. LIONEL went on to say he was not talking to "STYX",
and he wants to distance himself from him. This is due to the
fact that mostly everybody in SNM is afraid of RAY BACA. Source
also advised that LIONEL goes where it benefits him.

LIONEL also asked source to send word up to Sante Fe,
meaning to send a message to members of SNM who are incarcerated
in the state run facility in Sante Fe. The message LIONEL wanted
sent was "to quit trying to kill each other."

Source also stated that LOUIE MONTOYA a.k.a "SQUIRREL"
transports two loads of marijuana a week from El Paso to
Albuquerque, and then on to Oklahoma. Source remains insistent
that "SQUIRREL" does have a person that works for the UNITED
STATES MARSHALL SERVICE working for him.

Source also reiterated that "SQUIRREL" has either a
member of UNITED STATES BORDER PROTECTION SERVICE or UNITED
STATES CUSTOMS SERVICE on his payroll or working for him.

Source provided information on RANDY FRANK ARMIJO a.k.a
"FRANK FROST". Armijo used to be an inmate at the penitentry of
New Mexico. This inmate did kill someone at the penitentiary of
New Mexico for changing the channels on the television. SOURCE
stated that this individual was living in Long Beach, California.

**U.S. v.  DELEON, ET AL.   2655** DNM14666

Sentinel Working Copy Case 2:15-cr-04268-JB Document 766-2 Filed 09/30/16 "overage, Sarah & billy garcia"/primarycase...

Appellate Case: 20-2058 Document: APPENDIX B3 Date Filed: 09/29/2020 Page: 43

**Filing and Security**

Primary Case: 92D-AQ-57713-SNM    Case Title: (U) SNM

Serial Number: 37

Serialized: 04/08/2008

Category: Full Investigation
Initiated: 12/02/2003

**Details**

Serial #: 37    Type: FD302

Document Title: INTERVIEW WITH ████████████ (PROTECT IDENTITY)

Approval Date: 04/09/2008
Classification: SN

Contents:

04/09/2008

On 04/09/08 ████████ (PROTECT IDENTITY), date of birth
(dob), ████████ social security number (ssn) ████████,
provided
the following information. The interview was continued on 04/11/08.

████████ was an active member of the SINDICATO NUEVO MEXICO,
an active prison gang in the New Mexico Department of Corrections
(NMDOC). SNM was founded in the early 1980's after the Sante Fe
Prison
riots.

When ████████ was approximately 22 years of age (yoa), he
began serving a lengthy prison sentence for an armed robbery
conviction. He began serving this sentence at the main NMDOC
facility
in Santa Fe.

Prior to joining the SNM, ████████ was a known enforcer on the
street for various drug dealers in the city of Albuquerque. ████████
explained this to mean that he would provide these drug dealers with
security while they conducted their drug transactions. Specifically,
he recalled siting on the couch with a sawed off shotgun at various
drug dealers' houses to protect them from being robbed while they
conducted drug deals.

████████ was compensated for this with either narcotics or
money from those he protected. Because he provided security for
noted
drug dealers, ████████ reputation proceeded him when he arrived at
NMDOC. Although he was not in a street gang, inmates were afraid of
him.

During his time as the leader of the SNM, ████████ was on
"lock down" on a regular basis. He explained this to mean that the
prison administration would put him into the super max unit, with
very
little contact with other inmates. Eventually, and with good
behavior,
████████ was able to get himself back into the general population.
During this time, if ████████ had to discipline a member for stealing
and disrespecting people, commonly referred to as a "violation,"
████████ would do it himself. He would normally have them come to his
cell and beat them down.

In 1992, ████████ was transferred to a prison facility in
Eloy, Nevada and it was at this time, that BARROS took control of
the

U.S. v. DELEON, ET AL. 2646 DNM 467

SNM. BARROS was apparently using and selling narcotics during this
period. BARROS was known to have connections within the prison
administration and had the ability to get SNM members moved to
different facilities to benefit the SNM.

In 1996, ███████ was transferred back to New Mexico and
housed in Estancia, a correctional facility located in Torrance
County.
While he was there, ███████ learned of a plot by BILLY GARCIA, also
known as (aka), "WILD BILL," and JUANIO Last Name Unknown (LNU) to
kill
BOBBY ORTEGA, aka, "BOBBY O." ███████ called ORTEGA'S mother to warn
her and hoped that she would tell her son.

███████ was then transferred to the north facility in Santa
Fe, and ORTEGA, BILLY GARCIA, and JUANIO were all sent to a
privately-
run correctional facility in Hobbs, New Mexico. This is where they
eventually killed ORTEGA. All the individuals involved were
subsequently sent to the maximum security facility Sante Fe.

In the early nineties, BILLY GARCIA challenged BARROS. This
was attempt to prove that BARROS was helping the prison
administration.
BARROS ended up being placed into protective custody, and BILLY
GARCIA
gained power within the SNM. In 1997, the power of the SNM was
placed
under the control of BILLY GARCIA, RAY BACA, GERALD ARCHULETA.

After this power shift occurred, another member of the SNM
splintered off and formed another faction of this gang called the
ALL-
STARS. This group was lead by LEROY TORREZ, JR., aka, "JR." This
group was started because ORTEGA was killed, and SNM got tired of
BARROS and BILLY GARCIA lying to them. ORTEGA is related to TORREZ.
This group's motto was, "In with new, out with the old," meaning
they
were going to try to take out all of the old school members and
replace
them with new SNM members.

Within the last two years, ███████ was told by BILLY GARCIA
that ARCHULETA wants to kill him because he was old and that
ARCHULETA
started the ALL-STARS. In fact, it was BILLY GARCIA trying to cause
turmoil by starting rumors. ███████ confronted ARCHULETA out on the
streets. ARCHULETA advised ███████ he was good which ███████
explained
to mean he (ARCHULETA) did not have an active hit on his life.
ARCHULETA and BILLY GARCIA have been fighting for power from 1997 to
2008.

In the middle nineties, MUNOZ came back into the New Mexico
prison system and started ordering multiple hits or contracts on
peoples lives. One of these incidents occurred at a methadone clinic
on San Mateo northeast in Albuquerque. BILLY GARCIA had sent his
nephew, "RAY RAY" GARCIA to kill ARCHULETA. "RAY RAY" GARCIA went by
the methadone clinic four days in a row and pointed a gun three
times
at ARCHULETA. On the fourth day, however, ARCHULETA shot "RAY RAY"
GARCIA.

In 2008, BILLY GARCIA requested protective custody within the
prison because while he and ARCHULETA were inmates at the
Metropolitan
Detention Center (MDC) in Albuquerque, ARCHULETA confronted BILLY
GARCIA and told him he knew he (BILLY GARCIA) ordered his nephew,
"RAY
RAY" GARCIA to kill him. ARCHULETA also threatened BILLY GARCIA,

**U.S. v. DELEON, ET AL.   2647** DNM04468

7

.telling him he is next to be killed.

ARCHULETA was going to have a corrections officer "pop his
door" and BILLY GARCIA'S door at the same time. Popping a door is a
slang term for opening a door in the jail. This is done by an inmate
in an attempt to enable ARCHULETA to have direct access to BILLY
GARCIA, making it easier for ARCHULETA to kill him. BILLY GARCIA
requested to be placed in protective custody after this.

▆▆▆▆ identified the NUESTRA FAMILIA (NF) as the gang in
control of the main prison facility at Sante Fe, prior to the riots
in
1980. The gang is based within the State of California Department of
Corrections. GILBERT GALLEGOS was running the NF at the time and was
considered "the general," which is a position of leadership.

In the late seventies or early eighties, while they were both
in state custody, ▆▆▆▆ was approached by GALLEGOS who knew
▆▆▆▆
from their time on the streets in Albuquerque. GALLEGOS asked
▆▆▆▆
to join him as a member of the NF. ▆▆▆▆ knew the NF was at war,
which he explained to mean fighting with, the MEXICAN MAFIA, a
prison
gang based out of the California Department of Corrections, commonly
referred to as "LA EME."

In approximately August 1982, ▆▆▆▆ was approached in the
mess hall at the main prison in Sante Fe New Mexico by JUAN BACA,
who
was considered to be the "jefe" of SNM, meaning BACA was in charge
of
the gang and its activities. At the time, BACA told ▆▆▆▆ to stay
away from the SNM.

At this time, the SNM had only six known members. JACOB
ARMIJO was considered the "general" or second-in-command. ANGEL
MUNOZ
was considered another "general" or third-in-command. HENRY CLARK
was
a "lieutenant," which is fourth-in-command. RUDY ALDAZ, TOMAS CLARK,
RAMON CLARK and FERNANDO OLGA were all considered soldiers or
members
who took orders from their superiors during this time.

During his years of incarceration, ▆▆▆▆ was disciplined
numerous times and sent to cell block three, which is where inmates
went when they were disruptive. While in cell block three, ▆▆▆▆
was asked by BACA to join the SNM.

BACA told ▆▆▆▆ that RICKY GARCIA, an inmate from LOS
CARNALES LOCOS (LC), another prison gang, was stabbing other inmates
while they were in handcuffs. (The interviewing officers knows that
GARCIA is currently incarcerated in the California Department of
Corrections at Pelican Bay).

While in prison together, ▆▆▆▆ was asked to kill an inmate
named GILBERT GALLEGOS, a member of NF. Because GALLEGOS was scared
of
▆▆▆▆, GALLEGOS would not go to the yard or go anywhere near where
he
believed ▆▆▆▆ would be. This was one of the reasons ▆▆▆▆ was
allowed into SNM. He was able to prove himself as an individual who
would conduct violent acts on behalf of the gang.

SNM was originally formed for protection against other prison
gangs, including NF and LC. SNM wanted eventual control of the drugs
and the prison, but was most concerned with earning respect as a
group.

In 1982, RICHARD VALDEZ, an inmate from California with no
known gang affiliation, along with BLACKIE MOYA, and TONY O'CONNELL,
wiped out the NF in the New Mexico prison system. He explained this
to
mean they eliminated the group completely by physically beating
them.
As a result, GALLEGOS became paralyzed from the neck down. GALLEGOS
was
eventually released from prison. After GALLEGOS' release, CIPRIANO
FELIX went to the trailer where GALLEGOS was living and set it on
fire.
GALLEGOS died as a result of the fire.

In 1983, BILLY GARCIA intentionally got a disciplinary report
while in prison. Inmates could dispute this with the help of another
inmate of their choice at a judiciary hearing. BILLY GARCIA
requested
that JUAN BACA represent him at his hearing, so BILLY GARCIA could
get
close to BACA and kill him. ▆▆▆ was asked by BACA to go in his
place because he (BACA) was scared of BILLY GARCIA. ▆▆▆ called
BACA a coward in front of the entire cell block, which was a risky
thing to do, since BACA was essentially in charge of SNM at that
time.

It was because of this that all three leaders of the SNM;
JUAN BACA, JACOBO ARMIJO, and ANGEL MUNOZ were shipped to Marion,
Illinois. The leadership was left in the hands of TOMAS CLARK, which
was not good because he was starting trouble with everybody and also
disrespecting both SNM members and other prison inmates. There were
about twenty active SNM members at that time. Because of this, an
inmate known only to ▆▆▆ as "RV," stabbed TOMAS CLARK'S brother,
HENRY CLARK in the head in the mess hall. HENRY CLARK did not die as
a
result of this stabbing. Three days later, all of the members of the
SNM were told to bring their weapons to the yard.

Although there were believed to only be approximately 20
official SNM members during this period, there were associates of
SNM
that, together with the membership, totaled approximately 50. They
were going to fight with approximately 50 non-SNM inmates because of
the stabbing of HENRY CLARK in the mess hall. ▆▆▆ told HENRY
CLARK
at the time that the dispute should be just between CLARK and "RV"
and
should not involve the entire SNM membership. ▆▆▆ further
advised
HENRY CLARK that some of the opponents in the dispute were his
▆▆▆ friends and he did not want to be involved in the
dispute.
▆▆▆ walked away and was followed by two other respected SNM
members; SAM GUEVERA and "KILLER." It was after this incident, that
▆▆▆ became the shotcaller for the SNM.

During this time, to become a member of the SNM an individual
needed to be sponsored by another member. The sponsor would then be
responsible for the new member during his probation or after he has
entered the gang. If the person violates any of the gang's rules,
the
sponsor is responsible for killing the new member. The prospect (new
member) must complete missions to prove their worth. An example of a
mission is to fight someone or stab someone on behalf of the gang.
The
active membership must vote to allow the prospect into the gang
following the six-month probationary period. The vote must be
unanimous. If there is a person who disputes the membership, he must
prove his case or be killed himself.

During this time, ▆▆▆ received a letter from BACA telling

*him that BACA wanted out (of the SNM) because he had found 'God."
▮▮▮▮ told BACA that the only way out of SNM is by death. ▮▮▮▮
was in charge of the SNM, along with two other people, MARTY BARROS
and
FERNANDO OLGAS during this period, so he had the authority to put a
"hit" (an order to be killed) out on BACA, but did not.

BARROS eventually returned to the Main Penitentiary in Santa
Fe. It was at this time that GUSTAVO GRENADOS, a member of the TEXAS
SYNDICATE, a prison gang based out of the Texas Department of
Corrections, accused an SNM inmate, Name Unknown, of being a "rat,
(someone who helps the police).

Over the next several days, several members of SNM planned
GRENADOS' execution. While in the yard in the prison, several
members
of SNM, including BARROS, OLGAS, FRED SANCHEZ, also known as (aka),
"FRED DOG," killed GRENADOS in the yard.

Shortly thereafter, ▮▮▮▮ received a letter from PEDRO
MARTINEZ, a fellow SNM member. MARTINEZ wrote that the GRENADOS was
telling the truth about the SNM member. Following the murder,
▮▮▮▮
admonished the SNM members who killed GRENADOS, telling them that
they
had just supported the efforts of a "rat."

▮▮▮▮ is also aware of inmates moving heroin into the
prison system in New Mexico during this period. He estimated that he
personally observed approximately one ounce each week. Inmates used
the heroin to satisfy their own heroin addictions and to sell to
other
inmates in an effort to make money.

Currently, the leadership for SNM is as follows: ARCHULETA
is the general. ARTURO GARCIA is second-in-command, and third-in-
command is FREDERICO MUNOZ.

SNM is currently in a state of disarray where everyone is
fighting for power. There is no way that SNM would be able to try to
take the lives of various public officials. The organization would
not
want pressure from law enforcement agencies.

MICHAEL PAUL ASTORGA, who is currently charged for killing a
Bernalillo County Sheriff's Office (BCSO) deputy, does not have the
power to order hits on public officials and he is not in good
standing
with the SNM.

When ▮▮▮▮ was last released from prison, he was receiving
telephone calls from JOHNNY PADILLA, a noted member of the LOS
PADILLAS
street gang in Albuquerque. The calls were originating from a
cellular telephone that originated in Mexico. This number is
▮▮▮▮. The last text message ▮▮▮▮ received from this
number
was on 10/29/2007. The interviewer verified this by looking at the
text message itself with the permission of ▮▮▮▮. One of the
reasons ▮▮▮▮ turned off his phone is because PADILLA kept calling
him and pressuring him to sell narcotics for him.

▮▮▮▮ received a telephone call from PADILLA, who told
▮▮▮▮ to meet with PADILLA'S father, JERRY PADILLA. ▮▮▮▮
subsequently met with JERRY PADILLA, who told him that the SNM is
threatening his son JEFFERY PADILLA, who is currently housed at the
north facility in the New Mexico Department of Corrections.

▮▮▮▮ told JERRY PADILLA that MICHAEL PADILLA, who is
believed to be incarcerated, was trying to stab all the SNM members.

JERRY PADILLA said that MICHAEL would be taken care of. ████
understood this to mean that JERRY PADILLA would make sure MICHAEL
PADILLA would stop this behavior.

Following this conversation with JERRY PADILLA, ████
placed a telephone call to LIONEL CASTILLO, who then talked to
ARCHULETA about this issue.

████ also talked to ISAAC SAAVEDRA, also a member of SNM.
SAAVEDRA told ████ that FRANK HOFFMAN was the one who shot at
SAAVEDRA. SAAVEDRA also said that HOFFMAN recently was arrested and
is
incarcerated at the MDC. There is an active $50,000 contract out on
HOFFMAN'S life.

U.S. v.  DELEON, ET AL.  2651

**Filing and Security**

**Primary Case:** 92D-AQ-57713-SNM      **Case Title:** (U) SNM

**Serial Number:** 13

**Serialized:** 06/07/2005

**Category:** Full Investigation
**Initiated:** 12/02/2003

**Details**

**Serial #:** 13      **Type:** FD320

**Document Title:** FBI CASE STATUS FORM

**Approval Date:** 06/08/2005
**Classification:** SN

**Contents:**

```
92D-AQ-57713
06/08/2005
David C. Iglesias, 201 3rd Street NW, Alb. NM
SAC Andreas Stephens
Syndicato Nuevo Mexico
Jim Tierney
Todd M. Kalish 6/7/2005
x
```

21 841 a1

The Syndicato Nuevo Mexico (SNM) has been the strongest
prison gang in the New Mexico prison system since the 1980s. SNM
criminal activities include murder, assaults, intimidation,
weapons violations and trafficking illegal drugs among many other
violations. The membership of the SNM is several hundred strong
with several factions within the group.

Source information has determined the hierarchy of the SNM
to be structured with a leader, Gerald "Sticks" Archuleta, with a
board of six members who make decisions for the organization with
Archuleta's final approval. The board consists of Arturo Garcia,
Juan Mendez, Michael Zamora, Ferny Hernandez, Rudy Munoz and
Robert "Baby" Martinez.

Gerald Archuleta was paroled from the New Mexico Department
of Corrections (NMDOC) in early May, 2005. Archuleta's prior
criminal convictions include murder and conspiracy for murder.
Source information indicates Archuleta has ordered the murder of
several more people, but has not been prosecuted for those
murders. NMDOC Security Threat Intelligence Unit (STIU) officers
report Archuleta and SNM are responsible for smuggling illegal
drugs into the New Mexico prison system.

Ben King, a self admitted member of the SNM currently on
parole, was recently approached by Bernalillo County Sheriffs
Office gang detective Nate Learner to determine if he would be
willing to assist law enforcement and work against the SNM. King
declined to assist law enforcement and bragged that he had
already "put in work" for the SNM and he had as much authority
within the organization as Archuleta. As a result, King stated
he did not have to answer to Archuleta or do any more work for at
his direction. Learner inquired as to who Archuleta might be

planning to kill in the near future, and King stated he would not
answer that question.

Both King and Archuleta have both placed multiple security
cameras around the perimeter of their homes. It is believed the
two have been in contact since Archuleta was paroled, though King
denies having contacted Archuleta.

Archuleta's former girlfriend, known only as "Peg Leg", used
to smuggle heroin into prison for Archuleta. Peg Leg left
Archuleta for another man during his most recent incarceration.
Information from the STIU indicates Archuleta may be planning to
kill Peg Leg.

It is believed that King and Archuleta may be conspiring to
traffic heroin and money to members of the SNM still
incarcerated.

**Routing**

**Drafted by:** KALISH TODD M

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) CRIMINAL NO. 15-4268 JB |
| | ) |
| vs. | ) |
| | ) |
| **JERRY MONTOYA,** | ) |
| **MARIO RODRIGUEZ,** | ) |
| **TIMOTHY MARTINEZ,** | ) |
| **DANIEL SANCHEZ,** | ) |
| **ANTHONY RAY BACA,** | ) |
| **CARLOS HERRERA, and** | ) |
| **RUDY PEREZ,** | ) |
| | ) |
| Defendants. | ) |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY [DOC. 668]

The Defendants' Motion to Compel Discovery [Doc. 668] ("Discovery Motion") requests discovery to which neither the Federal Rules of Criminal Procedure nor the United States Constitution entitles them. At least not at this stage in the litigation. The Discovery Motion advocates for a broad scope of discovery that the Court already concluded the United States Court of Appeals for the Tenth Circuit rejected as inconsistent with Brady v. Maryland, 373 U.S. 83, 87 (1963). The United States of America opposes many of these requests because they are nothing more than unsupported fishing expeditions. Accordingly, the United States asks this Court to deny the requests for the materials that the United States has not agreed to disclose.

## BACKGROUND

This criminal matter involves approximately 30 Defendants who have been indicted on charges of, among others, violent crimes in aid of racketeering, including charges that they

conspired to murder and assault certain individuals. In pursuit of these illegal purposes and

activities, SNM, and its leaders and members, including Defendants Jerry Montoya, Mario

Rodriguez, Timothy Martinez, Daniel Sanchez, Anthony Ray Baca, Carlos Herrera and Rudy

Perez (the "Defendants"), in March 2014 and on March 7, 2014, conspired to murder and

murdered J.M. at the Southern New Mexico Correctional Facility ("SNMCF"). They murdered

J.M. to further SNM's purposes and reputation in the New Mexico prison system, and to further

their own standing within SNM.

## PROCEDURAL HISTORY

On December 1, 2015, the United States filed the Redacted Indictment [Doc. 2] in this

matter, charging approximately 24 defendants with violations of, among others, 18 U.S.C. §

1959(b)(2). See id. ¶ 2. On April 21, 2016, the United States filed the Redacted Superseding

Indictment [Doc. 368] ("Indictment"), which alleged the same charges against the same

Defendants, but adds additional Defendants and additional counts to bring the case to 30

Defendants. The Indictment charges that each of the Defendants "were members/prospects/

associates of the Syndicato de Nuevo Mexico Gang (SNM), a criminal organization whose

members/prospects/associates engaged in acts of violence and other criminal activities,

including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute

narcotics, and firearms trafficking." Indictment ¶ 1.

Count 6 of the Indictment charges the Defendants with conspiracy to murder J.M. See id.

at 20-21. Count 7 of the Indictment charges the Defendants with the knowing and intentional

murder of J.M. See id. at 21-26.

This is the third discovery motion in this criminal matter to which the United States responds. See Doc. Nos. 539 & 678 (Defendants' Specific Discovery Motions); see also Doc. Nos. 613 & 694 (Governments' Responses to the Discovery Motions).[1]  The United States opposes many of the requests for the reasons discussed below.

## LEGAL AUTHORITIES

A.    Rule 16 of the Federal Rules of Criminal Procedure.

Rule 16 of the Federal Rules of Criminal Procedure guides the discovery process in criminal proceedings. Rule 16(a)(1)(E) provides the Government's obligation to disclose documents and objects:

> **(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> **(i)** the item is material to preparing the defense;
>
> **(ii)** the government intends to use the item it its case-in-chief at trial; or
>
> **(iii)** the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).

Rule 16 does not authorize a defendant to engage in a fishing expedition, nor does it grant defendants access to the prosecution's file: "Although rule 16's language is permissive, it does

---

[1] The defendants' two Motions for Specific Discovery, Documents Number 539 & 678, request many of the same types of materials as this Discovery Motion and rely on much of the same reasoning and precedent. The United States therefore directs the Court to its previous responses in opposition to those motions, Documents Number 613 & 694, and recommends that the Court read those two responses before this third response. While this Discovery Motion was filed before the second Motion for Specific Discovery [Doc. No. 678], the United States responded to that motion before filing this response. Cf. United States' Motion for Extension of Time to Respond to Defendants' Motion to Compel Discovery [Doc.668] [Doc. No. _____] (Filed Sept. 30, 2016).

not authorize 'a blanket request to see the prosecution's file,' and a defendant may not use the rule to engage in a 'fishing expedition.'" United States v. Hykes, No. CR 15-4299 JB, 2016 WL 1730125, at *5 (D.N.M. Apr. 11, 2016) (Browning, J.) (quoting United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)). Rule 16 does not require the Government to discover information that it does not have. And Rule 16 does not require the Government to secure information from third parties. See id. (citing United States v. Badonie, No. CR 03-2062 JB, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005) (Browning, J.)).

With regard to Rule 16(a)(1)(E)(i), an item is material to the defense's preparation "if 'there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, or assisting impeachment or rebuttal.'" Id. (quoting United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)). "'[T]he Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor.'" Id. (quoting United States v. Graham, 83 F.3d at 1474).

B.    The United States Constitution's Criminal Disclosure Obligations.

Aside from the criminal procedural rules, the United States Constitution's Due Process clause also imposes disclosure obligations on the Government. It requires the Government to disclose "any evidence that 'is material either to guilt or to punishment,'" including "evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory." Hykes, 2016 WL 1730125, at *6 (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963); citing Giglio v. United States, 405 U.S. 150, 153 (1972)).

"'[T]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard.'" United States v. Rivas, 26 F. Supp. 3d 1082, 1110 (D.N.M. 2014)

4

(Browning, J.) (quoting United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994)).

Duplicative impeachment evidence isn't material; nor is inadmissible information. See id.

"Favorable evidence is only material and thus subject to mandated disclosure when it 'could

reasonably be taken to put the whole case in such a different light as to undermine confidence in

the verdict.'" Id. at 1111 (quoting Cone v. Bell, 556 U.S. 449, 470 (2009)).

Defendants cite to United States v. Sudikoff, 36 F. Supp. 2d 1196 (C.D. Cal. 1999), for

the proposition that, "[i]n analyzing these requests, the standard of the trial court should simply

be whether the evidence is favorable to the accused." Discovery Motion at 4.

But this Court already considered -- and rejected -- the broader pretrial discovery

standard in Sudikoff. See United States v. Padilla, No. CR 09-3598 JB, 2010 WL 4337819, at *5

(D.N.M. Sept. 3, 2010) (Browning, J.) ("[T]he Court is not inclined to adopt Judge Pregerson's

broad pretrial disclosure standard." (citing United States v. Comosona, 848 F.2d 1110 (10th Cir.

1988))). The Court recognized that "[t]he Tenth Circuit has not adopted such a broad standard of

disclosing all evidence which might reasonably be favorable to a defendant. To the contrary, the

Tenth Circuit has found that requiring the United States to produce evidence which might be

favorable creates an 'insuperable burden' . . . ." Id. (quoting Comosona, 848 F.2d at 1115). As

the Court noted, Judge Pregerson's approach in Sudikoff is in direct "tension" with "the Supreme

Court's unambiguous holding that no constitutional violation occurs unless the United States

withholds evidence material to guilt or punishment." Id. The Court pointed that, "[t]o adopt

Judge Pregerson's standard would effectively require the government to produce all information

rather than conduct a materiality review; the Court believes that such an approach gets close to

civil discovery rather than the standard the American courts have employed since <u>Brady v. Maryland</u>." <u>Id.</u>

Thus, the Court has concluded that, to show that certain materials should be disclosed, a defendant must demonstrate specific facts that support that the requested discovery may contain material information. For example, in <u>Hykes</u>, the Court required the United States to search its files once the defendant came forth with facts which demonstrated that the requested material information may exist:

> Hykes is not sending the United States on a fishing expedition. Hykes demonstrates that the officers' personnel files may contain impeachment evidence. As support, Hykes points to the officers' involvement in several excessive-force lawsuits, discrepancies between the officers' story and eyewitnesses' stories, and evidence that the officers had a personal feud with Hykes.

<u>Hykes</u>, <u>2016 WL 1730125</u>, at *20 (citation omitted).

The timing when the Government must disclose materials under <u>Brady</u> and <u>Giglio</u> varies. But "[a]s a general matter, 'some limitation on disclosure delay is necessary to protect the principles articulated in <u>Brady v. Maryland</u>.'" <u>Rivas</u>, <u>26 F. Supp. 3d at 1106-07</u> (quoting <u>United States v. Burke</u>, <u>571 F.3d 1048, 1054</u> (10th Cir. 2009)). The Supreme Court articulated a bright-line rule that <u>Brady</u> does not require "preguilty plea disclosure of impeachment information." <u>United States v. Ruiz</u>, <u>536 U.S. 622, 629</u> (2002). The United States Court of Appeals for the Tenth Circuit recently affirmed this Court's conclusion in <u>United States v. Harmon</u>, <u>871 F. Supp. 2d 1125, 1151</u> (D.N.M. 2012) (Browning, J.), that the Government is not required to disclose impeachment information before a suppression hearing. <u>See United States v. Harmon</u>, <u>742 F.3d 451</u> (10th Cir. 2014).

C.     The Jencks Act.

In response to the Supreme Court of the United States' decision in <u>Jencks v. United States</u>, <u>353 U.S. 657</u> (1957), Congress enacted the Jencks Act, <u>18 U.S.C. § 3500</u>, which requires the Government to disclose a government witness's statements after that witness's trial testimony. <u>See</u> <u>United States v. Lujan</u>, <u>530 F. Supp. 2d 1224, 1232-33</u> (2008) (Brack, J.) (quoting <u>18 U.S.C. §§ 3500(a)</u> & <u>(b))</u> (cited in <u>Hykes</u>, <u>2016 WL 1730125</u>, at *11). While the Tenth Circuit held that "[i]nterview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim," <u>United States v. Smith</u>, <u>984 F.2d 1084, 1086</u> (10th Cir. 1993), this Court has required the Government to turn over law enforcement agents' reports and even investigative and interview notes that contain statements from a testifying Government witness. <u>See</u> <u>United States v. Tarango</u>, <u>760 F. Supp. 2d 1163, 1164</u>, <u>1167</u> (D.N.M. 2009) (Browning, J.); <u>United States v. Harry</u>, No. CR 10-1915 JB, <u>2013 WL 684671</u>, at *11-12 (D.N.M. Feb. 6, 2013) (Browning, J.).

## **ARGUMENT**

The Defendants request materials and information to which neither the Federal Rules of Criminal Procedure nor the United States Constitution entitle them, and other materials and information which simply aren't material to guilt or punishment. The United States opposes those requests. On the other hand, the Defendants request some impeachment materials to which they may be entitled -- <u>at some future point</u>. But not yet. <u>See, e.g.</u>, <u>Rivas</u>, <u>26 F. Supp. 3d at 1106-07</u>. The United States therefore opposes those requests at present as well.

1.   <u>Defendants' Statements</u>.

Defendants first request their statements provided to New Mexico State Police after J.M.'s murder. <u>See</u> Discovery Motion at 2. The United States disclosed all of the requested

7

statements to the Discovery Coordinator on March 25, 2016. The requested recorded statements do not exist for Defendants Herrera or Perez.

2.  Video

Defendants request video of the pod in which J.M. was housed on March 7, 2014 and the "neighboring pod." Discovery Motion at 2. They assert that "[e]ach prison pod has several cameras filming from different angles that continually record." Id. They contend that, because the United States alleges that J.M. was murdered after paperwork was passed between neighboring prison pods, these videos are discoverable in this criminal matter.

Because the State of New Mexico, and not the United States, runs SNMCF, the United States asked the New Mexico Corrections Department ("NMCD") whether these videos exist. The United States disclosed the video from J.M.'s housing pod to the Discovery Coordinator on March 14, 2016. NMCD informed us that the videos from the neighboring pod do not exist.

3.  Procedures, Log Books, and Master Roster from SNMCF and STIU.

A.  Procedures.

The Defendants in this section first request "SNMCF's procedures for monitoring inmates in housing until [sic] 1A." Discovery Motion at 3. The United States understands this to be a request for SNMCF's procedures for monitoring inmates in housing unit 1A. Assuming that's the case, the United States opposes this request for two reasons.

First, the United States opposes this request, because the Defendants have not provided any facts that demonstrate why they may be entitled to this information. Without any factual basis for the request, this is nothing more than an impermissible fishing expedition. See Hykes, 2016 WL 1730125, at *5 ("Although rule 16's language is permissive, it does not authorize 'a

8

blanket request to see the prosecution's file,' and a defendant may not use the rule to engage in a 'fishing expedition.'" (quoting Maranzino, 860 F.2d at 985-86)). Second, somewhat related to the first, Defendants do not explain how these requested documents relating to assessing or classifying individuals may be "both favorable to the accused, and 'material either to guilt or to punishment.'" Hykes, 2016 WL 1730125, at *6 (quoting Brady, 373 U.S. at 87). And they cannot, because SNMCF's procedures simply cannot be "'material either to guilt or to punishment'" of any defendant. Id. (citation omitted).

The United States articulates more fully in paragraphs 16 and 17 of the United States' Response in Opposition to Defendants' Motion For Specific Discovery [Doc. 678] [Doc. No. 694] ("Second Discovery Motion Response"), why these requested procedures are not properly discoverable in criminal proceedings. See Second Discovery Motion Response ¶¶ 16-17, at 15-17. Suffice it to say that, as the Court notes in Padilla, while such procedures may be properly discovery in a civil matter -- against NMCD, and not the United States – they are not discoverable in criminal matters. See 2010 WL 4337819, at *5. For these reasons, and the reasons in the United States Second Discovery Motion Response, the Court should deny the Defendants' request for the SNMCF's procedures.[2]

B.   Log books.

_____

[2] Moreover, any procedures related to SNMCF are not in the United States' possession or control. SNMCF is a facility that the State of New Mexico runs, and not the United States Government. While the United States concedes that the Tenth Circuit imputes knowledge of certain facts of investigation to the United States when the State is intimately involved in the prosecution, see Smith v. Secretary of N.M. Dep't of Corr., 50 F.3d 801, 825 n.36 (10th Cir. 1995) (cited in Discovery Motion at 4), this imputed knowledge doesn't extend to impute custody, control or possession of unrelated, proprietary procedures or policies of the State. See id. ("Clearly, if the prosecution had actual knowledge that several arms of the State were involved in the investigation of a particular case, then the knowledge of those arms is imputed to the prosecution.").

The United States opposes the Defendants' request for the log books at SNMCF housing unit 1A, because the Defendants have not met the threshold requirement that they come forth with facts that "demonstrate" that the log books may contain information to which they are entitled in criminal discovery. Hykes, 2016 WL 1730125, at *20. Indeed, they ask for seven months' total of daily log books from a housing pod without alleging even one fact how these log books may contain information that may be helpful to their defense and material to their guilt or punishment. Compare id. (Court required United States to look through state's personnel file for officers when Defendant "demonstrate[d] that the officers' personnel files may contain impeachment evidence," by pointing to specific facts, including "the officers' involvement in several excessive-force lawsuits, discrepancies between the officers' story and eyewitnesses' stories, and evidence that the officers had a personal feud with Hykes"). The United States therefore opposes their request.

C. Master Roster.

The United States pointed out in its First Discovery Motion Response and in its Second Discovery Response that NMCD doesn't have what the Defendants refer to as the Master Roster. Cf. United States' Response to Defendants' Motion for Specific Discovery [Doc. 539] [Doc. No. 613] ¶ 16, at 17 ("First Discovery Motion Response"); Second Discovery Motion Response ¶ 15, at 15. On September 30, 2016 (the same day the United States filed this response), the Defendants' counsel e-mailed the United States that they read that portion of the response briefs, and, given that, they want "whatever documentations NMDC has on inmate information about threats to other inmates in that pod for the relevant time." The Defendants have not, however, "domonstrat[ed]" with sufficient facts that these requested documents about other inmates in

10

J.M.'s housing unit may contain information to which they are entitled. <u>Hykes</u>, <u>2016 WL</u>

<u>1730125</u>, at *20. To the extent that these documents may be identifiable by the NMCD, and to

the extent that they exist, the United States therefore opposes this discovery request.

4. <u>Impeachment materials and STIU file for Jerry Armenta and any other cooperating</u>
   <u>witness</u>.

For the same reasons that the United States opposed this request in the Defendants' First

Discovery Motion, <u>see</u> First Discovery Motion Response ¶ 3, at 10-11; Second Discovery

Motion Response ¶ 4, at 11, the United States opposes this same request here. The United States

incorporates here its reasons for opposing this overbroad request in its previous responses.

## <u>CONCLUSION</u>

For the reasons above, the United States of America asks that the Court deny the requests

that the United States opposes, because the Defendants fail to demonstrate that the requested

materials may contain information to which they are entitled.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

*<u>Electronically filed on 9/30/16</u>*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM   88011
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/_____
MATTHEW M. BECK
Assistant United States Attorney

11

DNM 485

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
CASE NO.: 15-cr-4268-JB

UNITED STATES OF AMERICA,

        Plaintiff,

   vs.

MARIO RODRIGUEZ,

        Defendant.

_____/

## DEFENDANT MARIO RODRIGUEZ' FILING OF SUPPLEMENTAL AUTHORITY RE DISCOVERY MOTIONS

The Defendant, Mario Rodriguez, hereby files the following supplemental authority regarding the present discovery pleadings pending before the Court, in advance of the scheduled October 4th hearing.

**Rule 16**

The Government's assertion in its *Response* (dkt.710), p. 3, that "Rule 16 of the Federal Rules of Criminal Procedure guides the discovery process in criminal proceedings" is only partially correct. It is unquestionably the truth, but not the whole truth. Rather, the present discovery litigation must begin with the recognition that Rule 16 is "intended to prescribe the **minimum** amount of discovery to which

the parties are entitled. It is not intended to limit the judge's discretion to order

broader discovery in appropriate cases". Fed.R.Crim.P. 16, Adv. Comm. Note

(emphasis added).

This is so because, as the Advisory Committee Notes recognize, "[b]road

discovery contributes to the fair and efficient administration of criminal justice by

providing the defendant with enough information to make an informed decision as

to plea; by minimizing the undesirable effect of surprise at trial; and by otherwise

contributing to an accurate determination of the issue of guilt or innocence"

(emphasis added). This basic tenet of Federal discovery practice is applicable in any

criminal prosecution, and especially so in a complex, multi-defendant RICO case

such as this.

Indeed, this Court has recently noted that:

In refusing to disclose evidence, documents, and materials unless the
law requires it to produce the items, the United States may be
undermining the appearance of justice. Defendants are often left in the
dark, not knowing what information the United States has in its
possession. While Courts and Congress have placed requirements on
what information the United States must disclose, **these requirements
are a bare minimum and not a recommendation**. Criminal
defendants are already at a disadvantage, because of the United States'
resources and because the United States gets a head start in every case
by being able to investigate before bringing an indictment. The United
States need not compound this disadvantage by refusing to give over
any evidence unless it is absolutely required.

*United States v. Deleon, et. al.*
*Defendant Mario Rodriguez' Filing of Supplemental Authority re Discovery Motions*
Page **2** of **9**

*United States v. Hykes*, No. CR 15-4299 JB, 2016 U.S. Dist. LEXIS 49049, at *46-49 n.8 (D.N.M. Apr. 11, 2016)(emphasis added)

Here, it cannot be disputed that the nature of the Government's evidence **demands** heightened scrutiny. When the prosecution relies upon the testimony of cooperating witnesses and convicted criminals, due process requires that a more careful examination of the witnesses be conducted. Even the jury is ultimately instructed in such a case that:

> You are to keep in mind, however, that **accomplice testimony should be received with caution and considered with great care**.
>
> …
>
> You must examine and weigh an **informant's testimony** with **greater care than the testimony of an ordinary witness**. You must determine whether the informant's testimony has been affected by self-interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against the defendant.
>
> …
>
> You should consider **testimony given under a grant of immunity** with **greater care and caution than the testimony of an ordinary witness**. You should consider whether testimony under a grant of immunity has been affected by the witness's own interest, the government's agreement, the witness's interest in the outcome of the case, or by prejudice against the defendant.

10th Circuit Criminal Pattern Jury Instructions (updated September 2015)

*United States v. Deleon, et. al.*
*Defendant Mario Rodriguez' Filing of Supplemental Authority re Discovery Motions*
Page **3** of **9**

DNM 488

The Center for Wrongful Convictions at Northwestern University School of Law has concluded that "snitch testimony is the leading cause of wrongful convictions in capital cases", See, *How Snitch Testimony Sent Randy Steidl and other Innocent Americans to Death Row, a Center on Wrongful Convictions Survey, Winter, 2004-2005,* www.law.northwestern.edu/wrongfulconvictions. There is no reason to believe that such concerns suddenly cease to exist when  - as here - the death penalty is taken off the table.

**"Tip of the iceberg"**

The Government's opposition cites a prior opinion of this court (*United States v. Rivas*) for the proposition that "Duplicative impeachment evidence isn't material; nor is inadmissible information". See *Response* (dkt 694), p. 4. To whatever extent the Government is suggesting that only **admissible** evidence need be disclosed, its position is inconsistent with recognized authority[1].

It has been stated that "the duty of disclosure under *Brady* extend[s] not only to the government's knowledge of concrete exculpatory information, but also to facts from which other exculpatory information could be inferred, *i.e.*, facts which could

---

[1]      Indeed, the very case cited by this Court in *Rivas* actually held that "to be material under Brady, undisclosed information **or evidence acquired through that information** must be admissible". *United States v. Rivas*, 26 F. Supp. 3d 1082, 1110 (D.N.M. 2014).

*United States v. Deleon, et. al.*
*Defendant Mario Rodriguez' Filing of Supplemental Authority re Discovery Motions*
Page **4** of **9**

DNM 489

constitute the 'tip of the iceberg' of other *Brady* evidence". *United States v. Burnside*, 824 F,Supp. 1215 (N.D.Ill. 1993), citing *United States v. Shaffer*, 789 F.2d 682 (9th Cir.1986). Indeed, "evidence in the hands of a competent defense attorney may be used to uncover other leads and defense theories", *Banks v. Reynolds*, 54 F.3d 1508 (10th Cir. 1995), citing *Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986), and for this reason, Courts "may draw reasonable inferences as to what those other lines of defense may [be]." *Id*, at 1519.

Finally, the United States Attorneys' Manual expressly recognizes the desirability of such disclosure, cautioning prosecutors that "Unlike the requirements of *Brady* and its progeny, which focus on evidence, the disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence". *United States Attorneys' Manual, § 9-5.001*.

**Duty of prosecution to investigate**

To whatever extent the Government contends that it has no obligation to seek exculpatory or impeachment information from State authorities or other agencies, it is not entirely correct. Section 9-5.001 of the *United States Attorneys' Manual* is entitled "Policy Regarding Disclosure of Exculpatory and Impeachment Information, and expressly recognizes that:

*United States v. Deleon, et. al.*
*Defendant Mario Rodriguez' Filing of Supplemental Authority re Discovery Motions*
Page **5** of **9**

DNM 490

> … It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all the members of the prosecution team. **Members of the prosecution team include federal, state, and local law enforcement officers** and other government officials participating in the investigation and prosecution of the criminal case against the defendant. *Kyles*, 514 U.S. at 437 (emphasis added).

See also, Memorandum for Department Prosecutors, January 4, 2010, from Deputy Attorney General David W. Ogden, *Guidance for Prosecutors Regarding Criminal Discovery* ("prosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes"). This Court has recognized that "Although these memoranda are 'not intended to have the force of law or to create or confer any rights, privileges or benefits,' DOJ attorneys will likely have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations. *United States v. Hykes*, *supra*, at 44 (D.N.M. Apr. 11, 2016).

A prosecutor whose case relies upon unsavory witnesses assumes a heightened duty – it has been held that "[a]n Assistant United States Attorney using a witness with an impeachable past has a constitutionally derived duty to search for and produce impeachment information requested regarding the witness" and **this duty is not discharged until "all those in the government in a position to know**

*United States v. Deleon, et. al.*
*Defendant Mario Rodriguez' Filing of Supplemental Authority re Discovery Motions*
Page **6** of **9**

DNM 491

of such information have been canvassed". (emphasis added). *United States v. Osorio*, 929 F.2d 753, 761-62 (1st Cir. 1991).

In dealing with the prosecution's duty to search for and disclose such items, if they exist, the Government has an affirmative duty "… **to turn over an easily turned rock**". *United States v. Brooks*, 966 F.2d 1500 (D.C. Cir. 1992)(emphasis added).  See also, *Vaughn v. United States*, 93 A.3d 1237, 1258 (D.C. 2014)("*Brady* does not tolerate the government['s] failure to turn over an easily turned rock"), *United States v. Hankins*, 872 F. Supp. 170, 173 (D.N.J. 1995)("courts nationwide have recognized that 'an inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure'"), *Carey v. Duckworth*, 738 F.2d 875 (7th Cir. 1984)("a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case"), *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution had not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government").

Finally, the explicit language of *Federal Rules of Criminal Procedure* 16(C) requires the Government to provide documents and tangible objects that are …

*United States v. Deleon, et. al.*
*Defendant Mario Rodriguez' Filing of Supplemental Authority re Discovery Motions*
Page **7** of **9**

"material to the preparation of the defendant's defense", and **"aside from outright exculpatory items, it is difficult to imagine information more material to the preparation of the defense than credibility items for critical or major government witnesses"**. *United States v. Five Persons,* 472 F.Supp. 64, 67 (D. N.J. 1979).

### Resolving doubts about disclosure

The United States Attorneys' Manual, § 9-5.001, cautions that "prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence". In a case of this magnitude and complexity, all doubts should be resolved in favor of disclosure. See, *e.g.*, *United States v. Ramirez*, 608 F.2d 1261 (9th Cir. 1979)("reasonable doubts should be resolved in favor of disclosure"), *United States v. Johnson*, 840 F.Supp. 634 (E.D.Wis. 1993)("All doubts should be resolved in favor of disclosure. A prosecutor will never get in dutch for disclosing too much. When everything is not disclosed, a prosecutor is asking for trouble"), *United States v. McVeigh*, 954 F.Supp. 1454 (D.Colo. 1997)("Doubts must be resolved in favor of disclosure"), *United States v. Karake*, 281 F. Supp. 2d 302, 306 (D.D.C. 2003)("the government should err on the side of disclosure when interpreting its *Brady/Giglio* obligations given the need for the

*United States v. Deleon, et. al.*
*Defendant Mario Rodriguez' Filing of Supplemental Authority re Discovery Motions*
Page **8** of 9

DNM 493

utmost reliability in capital proceedings")[2].

See also, *Ogden v. United States*, 303 F.2d 724 (9th Cir. 1962)("doubts [about Rule 16 material] are to be resolved in favor of disclosure, for the Court necessarily proceeds without the benefit of counsel's more intimate knowledge of the possible significance of particular information for purposes of impeachment").

**WHEREFORE,** the Defendant respectfully submits this supplemental authority.

Respectfully submitted, via ECF, this 3rd day of October, 2016

*s/Steve Potolsky*
STEVEN M. POTOLSKY, ESQ.
Florida Bar No. 380601
Attorney for Defendant Mario Rodriguez

Steven M. Potolsky, P.A.
PO Box 50973
Jacksonville Beach, Florida 32250

100 SE 2nd Street
Suite 3550
Miami, Florida 33131

Telephone: (305) 335-5539
Fax: (305)358-5917
E-mail: stevepo@bellsouth.net

---

[2]     Although this case in no longer a "capital proceeding", we contend that given the nature of the charges and the nature of the Government's witnesses, "utmost reliability" should still be the overriding goal of the discovery process.

*United States v. Deleon, et. al.*
*Defendant Mario Rodriguez' Filing of Supplemental Authority re Discovery Motions*
Page **9** of 9

DNM 494

**FILED**

UNITED STATES DISTRICT COURT

ALBUQUERQUE, NEW MEXICO

OCT 04 2016

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

MATTHEW J. DYKMAN

CLERK

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                                           No. CR 15-4268 JB

ANGEL DELEON, et al.,

          Defendants.

## ORDER GRANTING MOTION TO CONTINUE THE OCTOBER 4, 2016, TRIAL SETTING, AND RELATED SCHEDULING ORDER

THIS MATTER having come before the Court on joint defendants Unopposed Motion to Continue the October 4, 2016, Trial Setting and Related Scheduling Order (Doc. 683), and the Court being fully advised of the circumstances finds that pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii), the defense requires the time from October 4, 2015 to March 6, 2017, to continue to review thousands of pages of discovery with their respective clients, compensate for the time when the defendants' have not had access to their tablets and the discovery, and to continue the defense investigation.  Counsel must also summarize and transcribe thousands of audio recordings, locate witnesses, hire expert witnesses, file pretrial motions, including, but not limited to multiple discovery motions, motions to suppress (impacting all three cases), *Brady* motions, a motion to identify the multiple CHS/informants early, Motion to Produce unredacted discovery, a Motion to Dismiss based on Multiplicity/Duplicity, among others.  Counsel Many CJA

counsel are also in the process of compiling discovery demands and motions to compel

discovery to the government while reviewing the discovery.

IT IS THEREFORE ORDERED THAT:

1.      The Unopposed Motion to Continue the October 4, 2016, Trial Setting and

Related Scheduling Order (Doc. 683) is granted.

2.      The trial setting is rescheduled for _____March 6_____, 2017

at 9:00 am on a trailing docket.

3.      After weighing the best interests of the public and the Defendants with

the ends of justice, the Court finds that granting a continuance will strike a proper

balance between the ends of justice and the best interests of the public and of the

Defendants for the reasons stated in the motion requesting continuance filed September

13, 2016 (Doc. 683).  Specifically, the joint defendants need additional time to continue

to review thousands of pages of discovery with their respective clients, compensate for

the time when the defendants' have not had access to their tablets and the discovery,

and to continue their respective defense investigations.  Counsel must summarize and

transcribe thousands of audio recordings, locate witnesses, hire expert witnesses, file

pretrial motions, including, but not limited to multiple discovery motions, motions to

suppress (impacting all three cases), *Brady* motions, a motion to identify the multiple

CHS/informants early, Motion to Produce unredacted discovery, a Motion to Dismiss

based on Multiplicity/Duplicity, among others.  Counsel must also ascertain if any

competency or mental health issues exist for their respective clients, conduct plea

DNM 496

negotiations, and obtain records necessary for each client's defense. Many counsel are

also in the process of compiling discovery demands and motions to compel discovery to

the government while reviewing the discovery, which outweighs the Defendants and

the public's interest in a speedy trial. See 18 U.S.C. § 3161(h)(7)(B).

The Court will set the trial for March 6, 2017, as ordered during the June 2, 2016

hearing (Doc. 624). This 153 day continuance is sufficient, without being greater than

necessary, for the Defendants to complete the tasks set forth in the motion to continue.

6.      The time between the October 4, 2016 trial setting and March 6, 2017, is

excluded for purposes of the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(B).

_____
UNITED STATES DISTRICT JUDGE

Submitted by:
/s_____
Cori A. Harbour-Valdez
*Counsel for Edward Troup*

After weighing the best interests of the public and of the Defendant with the ends of justice, the Court finds that granting a continuance will strike a proper balance between the ends of justice and the best interests of the public and of the Defendants for the reasons stated at the hearing held June 2, 2016 and the written motion justifying the request for a continuance, filed September 13, 2016 (Doc. 683). Specifically, the Defendants' need to obtain and review discovery, summarize and transcribe audio recordings, locate witnesses, hire expert witnesses, file pretrial motions, determine if any competency or mental health issues exists, conduct plea negotiations and obtain records necessary for their defense, outweighs the Defendants' and the public's interest in a speedy trial. See 18 U.S.C. Section 3161(h)(7). The Court will set the trial for _March 6, 2017_____. This 153 day continuance is sufficient, without being greater than necessary, for the Defendant to complete the tasks set forth in the motion to continue.

10|4|16

DNM 497

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )    CRIMINAL NO.      15-4268 JB
                                 )
RUDY PEREZ,                      )
                                 )
                Defendant.       )
                                 )

**UNITED STATES' RESPONSE IN OPPOSITION TO THE JOINT MOTION FOR
DISCLOSURE AND PRODUCTION OF CONFIDENTIAL INFORMANT [698]**

The United States of America opposes the Joint Motion for Disclosure and Production of

Confidential Informant [698] ("Disclosure Motion"), because, other than in relation to Defendant

Rudy Perez, the confidential informant's identity is not required, and the government's privilege

thus prevails. Accordingly, the Court properly should deny the Disclosure Motion.

**PROCEDURAL BACKGROUND**

1.      On December 1, 2015, the United States filed the Redacted Indictment [Doc. 2] in

this matter, charging approximately 24 defendants with violations of, among others, 18 U.S.C. §

1959(b)(2). See id. ¶ 2. On April 21, 2016, the United States filed the Redacted Superseding

Indictment [Doc. 368] ("Indictment"), which alleged the same charges against the same

Defendants, but adds additional Defendants and additional counts to bring the case to 30

Defendants.

2.      Perez is charged in Counts 6 and 7, which relate to the murder and conspiracy to

murder J.M. on May 7, 2014 at the Southern New Mexico Correctional Facility.

3.      On September 14, 2016, Perez's counsel asked the United States whether it

agreed to disclose the Confidential Human Source identified in the FBI Confidential Human
Source Reporting (Feb. 11, 2016), Bates No. U.S. v. DeLeon, et. al. 3308-3309 (the "CI"). See
Disclosure Motion Exhibits 4 & 1. The United States did not agree to the disclosure, and Perez's
counsel filed the Disclosure Motion on September 22, 2016. See Disclosure Motion.

4.      The factual basis and discussion of the Disclosure Motion focus solely on Rudy
Perez. See id. at 1-14. At page 14 of the Disclosure Motion, however, it states that "Counsel for
Defendants Anthony Ray Baca, Edward Troup, Daniel Sanchez, Jerry Montoya, Andrew
Gallegos and Carolos Herrera have informed that their clients join" in the motion, while all
others took no position or didn't respond with their position. Id. at 14.

5.      On October 6, 2016, the United States requested a 10-day extension to respond to
the Disclosure Motion, so that the United States could take a "hard look" at the motion; Perez's
counsel informed the United States that there was no objection to the extension.

## RELEVANT LAW

The United States "has a privilege 'to withhold from disclosure the identity of persons
who furnish information of violations of law to officers charged with enforcement of that law.'"
United States v. Rivas, 26 F. Supp. 3d 1082, 1113 (D.N.M. 2014) (Browning, J.) (quoting
Roviaro v. United States, 353 U.S. 53, 59 (1957)). But the privilege is not absolute. Where "the
disclosure of an informer's identity is relevant and helpful to the defense or an accused, or is
essential to a fair determination of a cause, the privilege must give way.'" Id. (quoting Roviaro,
353 U.S. at 60-61).

The United States Court of Appeals for the Tenth Circuit articulated a balancing test that
the district court should use when exercising its discretion to order the United States to disclose a
confidential informant's identity:

2

The disclosure of a confidential informant's identity involves balancing the public
interest in protecting the flow of information in a manner necessary for effective
law enforcement against an individual's right to prepare his defense. In making
the determination as to whether disclosure is necessary, the court must consider
the particular circumstances of the case, including the crime charged, the possible
defenses, and the significance of the informer's testimony. Where it is clear that
the informant cannot aid the defense, the government's interest in keeping secret
his identity must prevail over the defendant's asserted right of disclosure. A
defendant seeking disclosure has the burden of proof, and we review the district
court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d 1527, 1538 (10th Cir. 1997) (internal citations and quotation

marks omitted) (quoted in Rivas, 26 F. Supp. 3d at 1114).

        This Court "has required the United States to disclose a CI's identity where the CI 'was

integrally involved in the criminal transaction, observed the criminal transaction, and was not a

mere bystander.'" Rivas, 26 F. Supp. 3d at 1114 (original alterations omitted) (quoting United

States v. Aguilar, Memorandum Opinion and Order, No. CR 09-3207 JB, 2010 WL 2977708, at

*5 (D.N.M. June 28, 2010) (Browning, J.)).

## **DISCUSSION**

        The Disclosure Motion states that it was brought by Perez and his counsel. See

Disclosure Motion at 1. The Disclosure Motion's factual background lays out a factual basis

regarding only Perez's circumstances in this matter, which he asserts requires disclosure of the

CI's identity and certain information about the CI. See id. at 1-4. Although other Defendants

"joined in this motion," id. at 1, aside from pointing out that a co-Defendant implicated co-

Defendants other than Perez in September 2015 and describing a video of the murder, see id. at

3, the Disclosure Motion does not mention anyone other than Perez, see id. at 1-14.

3

The United States and Perez's counsel agreed to disclosure of the CI's identity under a protective order. Perez's counsel agrees that the United States' agreement to disclosure under the protective order satisfies Perez's requests under the Disclosure Motion.

With regard to Defendants Troup, Sanchez, Montoya, Baca, Andrew Gallegos and Herrera, the assertions in and exhibits to the Disclosure Motion do not provide any sound basis on which they are entitled to disclosure of the CI's identity. So there is no basis on which the Court may properly conclude that "[t]he particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony" may be helpful to those remaining Defendants. Rivas, 26 F. Supp. 3d at 1114 (internal quotation marks & citations omitted). Compare United States v. Aguilar, Memorandum Opinion and Order, No. CR 09-3207 JB, 2010 WL 2977708, at *5-8 (Browning, J.) (requiring disclosure of the confidential informant's identity under an attorneys-eyes-only protective order where the government conceded that informant was "integrally involved in the criminal transaction," and the Court found that he was "present in the car with" the alleged co-conspirators and "would be in a unique position to testify to what conversations, if any, occurred in the car and whether Aguilar took part in them," and that "his potential testimony [wa]s not available from any other witness"). Rather, in relation to the Defendants other than Perez, "the informant cannot aid the defense," and, thus, "the government's interest in keeping secret his identity must prevail over the defendant[s'] asserted right of disclosure." Id. (internal quotation marks & citation omitted). The United States therefore opposes the Disclosure Motion to the extent that it requests, without support, any relief in relation to the remaining Defendants, and submits that the Court properly should deny those overbroad and unsupported requests.

4

## **CONCLUSION**

For the reasons above, the United States asks that the Court deny the Disclosure Motion.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

***Electronically filed on 10/17/16***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM   88011
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/_____
MATTHEW M. BECK
Assistant United States Attorney

5

DNM 502

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' NOTICE OF PROPOSED SCHEDULING ORDER**

The United States hereby submits for this Court's consideration the attached Proposed

Scheduling Order as ordered on October 4, 2016.

**PROPOSED SCHEDULING ORDER**

The Court, having granted the motion by the United States and the defendants to declare

this case complex, and considering the parties' proposed scheduling order, hereby imposes the

following deadlines in this case:

1.  November 18, 2016:     Reciprocal discovery by the defendants (except for the

    defendants' continuing duty to disclose);

2.  December 5, 2016:      Scientific expert witness notices and reports; Fed. R. Crim.

    P. 16 discovery motions; Fed. R. Crim. P. 7(f) motions;

3.  December 19, 2016:     Responses to Fed. R. Crim. P. 16 discovery motions and

    Rule 7(f) motions; Objections to scientific expert witness

    notices.

4.  January 3, 2017:       Responses to scientific expert witness notices.

5.  January 9, 2017:       Fed. R. Crim. P. 12 pretrial motions; *Daubert* motions;

Government's notice of gang experts.

6.   January 23, 2016:      Responses to pretrial and *Daubert* motions; Defendants'

notice gang experts; Notices of defenses pursuant to Fed.

R. Crim. P. 12.1 and 12.3.

7.   February 6, 2017:      Responses to notices of defenses; motions *in limine*; Fed.

R. Evid. 404(b) notices; jury instructions; proposed *voir*

*dire*.

8.   February 21, 2017:    Responses to motions *in limine*; objections to jury

instructions and proposed *voir dire*.

9.   March 6, 2017:        Jury Selection/Trial at 9:00 a.m., Federal Courthouse, Las

Cruces, New Mexico.

The Court further orders that the United States shall continually make available discovery

on an ongoing basis, and make available to the defendants by the time required by the applicable

law all material for which disclosure is mandated by *Giglio v. United States*, 405 U.S. 150 (1972)

and the Jencks Act, 18 U.S.C. § 3500.

The Court further orders, pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii), that the time between

the entry of this Order and the trial date is excluded for the purposes of the Speedy Trial Act

computation.

                                          Respectfully submitted,
                                          DAMON P. MARTINEZ
                                          United States Attorney

                                          ***Electronically filed on 10/18/16***
                                          MARIA Y. ARMIJO
                                          RANDY M. CASTELLANO
                                          MATTHEW M. BECK
                                          Assistant United States Attorneys
                                          555 S. Telshor Blvd., Suite 300
                                          Las Cruces, NM   88011
                                          (575) 522-2304

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA and SHAUNA
GUTIERREZ,

      Defendants.

## **MEMORANDUM OPINION AND ORDER**[1]

---

[1]In its Sealed Memorandum Opinion and Order, filed October 11, 2016 (Doc. 728)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to

**THIS MATTER** comes before the Court on: (i) the Defendants' Brief Regarding "Protective Orders" for Materials Obtained from Sources Other Than the Government, filed March 8, 2016 (Doc. 302)("Protective Order Brief"); (ii) Defendant Daniel Sanchez's Reply Regarding Court's Ability to Subject Materials Obtained Independently of This Court's Process to Court's Protective Order (Doc. 313), filed March 15, 2016 (Doc. 315)("Sanchez' Protective Order Reply"); (iii) the United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in This Case or Any Other Case, filed April 1, 2016 (Doc. 358)("United States' Notice"); (iv) Motion for Order Directing the United States to Comply with Fundamental Due Process, filed March 28, 2016 (Doc. 342)("Due Process Motion"); (v) Motion to Suspend Scheduling Order (Doc. 250), Request for Status Conference and Ex Parte CJA Conference with the District Court, filed May 18, 2016 (Doc. 535)(Motion to Suspend"); and (vi) the Defendants' Opposed Joint Motion for Reconsideration of the Protective Order, filed May 23, 2016 (Doc. 541)("Motion for Reconsideration"). The Court held a hearing on June 2, 2016. As became evident at the hearing, many of the issues raised by the motions and briefing had significant overlap. At their core, the issues are: (i) whether the Court should amend the Protective Order, filed March 14, 2016 (Doc. 313)("Protective Order"), that the Honorable Kenneth Gonzales, United States District Judge for the District of New Mexico, issued before his recusal; (ii) how the Court is going to treat any other motions to reconsider -- based on Judge Gonzales' conflict of interest -- the orders that Judge Gonzales issued before his recusal; (iii) how the Court is going to manage the parties'

---

protect confidential information within the Sealed MOO before the Court publishes a public version. See Sealed MOO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

public, ex parte, and sealed filings; and (iv) what amendments might need to be made to the scheduling order following the case's transition to the Court.

The primary issue is whether the Court should amend the Protective Order that Judge Gonzales issued when he presided over this case.  The Court will reconsider and modify the Protective Order, because it too broadly limits the Defendants' access to discovery materials, and because it places too heavy a burden on the Defendants and their counsel.  The Court will order most discovery materials to be uploaded onto the Defendants' tablets.  The Court will, however, still restrict the Defendants' access to ex parte and sealed pleadings.  The Court will thus grant in part and deny in part the Motion for Reconsideration, which disposes of the Motion for Reconsideration, and the requests in the Protective Order Brief and in Sanchez' Protective Order Reply.

The next issue -- how the Court will treat motions to reconsider orders that Judge Gonzalez issued before his recusal -- was resolved at the hearing by a compromise between the Court and the parties.  This issue, raised primarily by the United States' Notice and the Defendant's Response to Doc. No. 358 -- the United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in This Case or any Other Case, filed April 4, 2016 (Doc. 360)("Response to United States' Notice") -- relates to orders that Judge Gonzalez issued when he potentially had a conflict.  To avoid relitigating the substantive rulings that Judge Gonzalez issued in the case's early stages, and to take reconsideration of the conflict-related matters instead as they might individually arise, the Court proposed that the Defendants' lawyers -- should they raise a Motion for Reconsideration of Judge Gonzales' rulings -- would not need to satisfy the high standards that are generally incumbent on filing a motion to reconsider if the Court would need to decide if

Judge Gonzales had a conflict when he entered the order.  The parties agreed, and that compromise -- to the extent that there is a motion in the United States' Notice or the Response to United States' Notice -- disposes of the United States' Notice.

A compromise at the hearing resolved the third issue, related to the public, ex parte, and sealed nature of the various documents filed thus far in this case.  Different case management practices in Las Cruces, New Mexico -- where the case originated -- can generally explain the issue that Defendants' Due Process Motion primarily raises.  The Court explained the nature of the document filings that the Court uses in Albuquerque, New Mexico, fall into three categories -- public, ex parte, and sealed -- and the Court would thus order strict compliance with those filing categories.  Adherence with the filing categories is of further importance given the requirements of the Court's amendments to the Protective Order.  This compromise and directive disposes of the Defendants' Due Process Motion.

The last issue, raised primarily by the Defendants' Motion to Suspend, was generally moot by the time of the hearing, because some of the requests made by the Motion to Suspend, regarding a status conference and ex parte CJA[2] conference with the Court, were addressed by the Court setting them, and the only item on the scheduling order that the Court foresaw issues surrounding was the trial date.  Because the Court recognized that the trial could be continued as was necessary in the future, it chose not to grant the Motion to Suspend.  The Court thus denies the Motion to Suspend.

## **FACTUAL BACKGROUND**

The Court takes its facts from the United States' Redacted Superseding Indictment, filed April 21, 2016 (Doc. 368)("Superseding Indictment"), and from DA Drops Charges Against

---

[2]Referring to the Criminal Justice Act, 18 U.S.C. §§ 3006 to 3006A.

Inmates Accused Of Murder, Released November 25, 2015, Sun-News Report, filed March 15, 2016 (Doc. 315-1)("Exhibit 1").[3]  This case deals with crimes that the Syndicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM") allegedly committed through its members.  See Superseding Indictment at 2.  SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Superseding Indictment at 2.  SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taken them hostage.  See Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over two hundred were injured.  See Superseding Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as five hundred members.  See Superseding Indictment at 3.  SNM has approximately 250 members, comprised of "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members."  See Superseding Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Superseding Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Superseding

_____

[3]Defendant Sanchez attached the article as Exhibit 1 to Sanchez' Protective Order Reply.

Indictment at 4.  Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] include[ing] murder and assaults."  Superseding Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Superseding Indictment at 4.  If another gang does not abide by SNM's demands, SNM manages to assault or kill one of the other gang's members to show its power.  See Superseding Indictment at 4.  SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Superseding Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show it superiority over others."  Superseding Indictment at 4-5.  In order to show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Superseding Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.  See Superseding Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Superseding Indictment at 7.  The relevant facts giving rise to the instant case are as follows.

In March of 2014, a Doña Ana County grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, a fellow inmate of Montoya and Armenta during their incarceration at the Southern New Mexico Correctional Facility state prison.  See Exhibit 1 at 1.  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  See Exhibit 1 at 1.  That grand jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii)

tampering with evidence; and (iv) two counts of conspiracy.  See Exhibit 1 at 1.  The Doña Ana County District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015.  See Exhibit 1 at 1.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level."  Exhibit 1 at 1.

The United States of America now brings this case against thirty Defendants, charging them with a total of fifteen counts.  See Superseding Indictment at 1.  All Defendants are accused of participating in the operation and management of the enterprise and committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."  Superseding Indictment at 6-31.  Defendants A.A. Garcia, G. Archuleta, B. Clark, M. Rodriguez, A.R. Baca, R. Martinez, R.P. Martinez, and D. Sanchez are the alleged leaders of the enterprise.  See Superseding Indictment at 6.  The other twenty Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Superseding Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1); (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512 and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant;" and (iv) offenses involving trafficking in narcotics in violation

- 7 -

of 21 U.S.C. §§ 841 and 846.  Superseding Indictment at 9.  In all, the indictment alleges fifteen different counts against the various Defendants.

Specifically, the indictment provides that on March 26, 2001, DeLeon, J. Gallegos, Troup, Lujan, and B. Garcia allegedly murdered "F.C."  Superseding Indictment at 9.  On the same day, Lujan, B. Garcia, E. Martinez, Patterson, and Chavez allegedly murdered "R.G."  Superseding Indictment at 12.  On June 17, 2007, Alonso, Troup, A.A. Garcia, Clark, and Hernandez allegedly murdered "F.S."  Superseding Indictment at 15.  On November 12, 2012, J. Gallegos and A. Gallegos allegedly conspired to murder "A.B."  Superseding Indictment at 18.  On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B.  See Superseding Indictment at 19.  In March 2014, Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly conspired to murder "J.M."  Superseding Indictment at 20-21.  On March 7, 2014, Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M.  See Superseding Indictment at 21.

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R."  Superseding Indictment at 27.  And, starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Baca, R.P. Martinez and R. Martinez allegedly conspired to murder "D.S."  Superseding Indictment at 28.  During the same period of time, Baca, R.P. Martinez, R. Martinez and C. Garcia allegedly conspired to murder "G.M."  Superseding indictment at 28.  On November 29, 2015, C. Garcia, a convicted felon, is alleged to have unlawfully possessed a firearm.  See Superseding Indictment at 29.  On the same day, C. Garcia, a convicted felon, is alleged to have knowingly used and carried a firearm in relation to a charge of conspiracy to murder.  See Superseding Indictment at 29.

As well, on March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G."  Superseding Indictment at 30.  Then, between February 1, 2016, until February 27, 2016, J. Gallegos, Gonzalez, Rivera, Gutierrez "and others known and unknown to the grand jury," allegedly conspired to murder "J.G."  Superseding Indictment at 30.  The final count alleges that on February 27, 2016, J. Gallegos, Gonzalez, Rivera and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G.  See Superseding Indictment at 31.

## **PROCEDURAL BACKGROUND**

On December 1, 2015, a federal grand jury indicted twenty-four Defendants for the crimes of Murder (under 18 U.S.C. § 1959(a)(1); Violent Crimes in Aid of Racketeering and U.S.C. § 2: Principals), Conspiracy to Murder (under 18 U.S.C. § 1959(a)(5); and Conspiracy to Commit Assault Resulting in Serious Bodily Injury (under 18 U.S.C. § 1959(a)(6)).  See Indictment at 1.  The Defendants are all allegedly members, prospects, or otherwise associated with SNM, which constituted an enterprise as defined in Title 18, United States Code, § 1959(b)(2).  See Indictment at 2.

On April 21, 2016, the United States sealed a Superseding Indictment[4] after another grand jury instead indicted thirty Defendants -- twenty-four of whom were Defendants in the original Indictment.  See United States' Redacted Superseding Indictment at 1, filed April 21, 2016 (Doc. 368)("Superseding Indictment").  In addition to the new Defendants, the Superseding Indictment also contains new charges under modified count numbers.  See Superseding Indictment at 9-31.  The Superseding Indictment contains fifteen counts for: (i) the Murder of

---

[4]The Court describes in detail the counts set forth by the Superseding Indictment, rather than the Indictment.  The United States Attorney's Office filed the Superseding Indictment after Judge Gonzales issued the Protective Order, but before the Defendants filed the Motion for Reconsideration.

F.C. ("Count 1"); (ii) the Murder of R.G. ("Count 2"); (iii) the Murder of F.S. ("Count 3"); (iv) Conspiracy to Murder A.B. ("Count 4"); (v) the Murder of A.B. ("Count 5"); (vi) Conspiracy to Murder J.M. ("Count 6"); (vii) the Murder of J.M. ("Count 7"); (viii) Conspiracy to Commit Assault Resulting in Serious Bodily Injury to J.R. ("Count 8"); (ix) Conspiracy to Murder D.S. ("Count 9"); (x) Conspiracy to Murder G.M. ("Count 10"); (xi) Felon in Possession of a Firearm ("Count 11"); (xii) Using and Carrying a Firearm During and in Relation to a Crime of Violence ("Count 12"); (xiii) Assault with Dangerous Weapon of J.G. ("Count 13"); (xiv) Conspiracy to Murder J.G. ("Count 14"); and (xv) Attempted Murder of J.G., Assault with a Dangerous Weapon Upon J.G., Resulting in Serious Bodily Injury to J.G. ("Count 15").  See Superseding Indictment at 9-31.  At the time the Defendants filed the Motion for Reconsideration, and at the time the Court held its June 2, 2016, hearing, some of the Defendants were death penalty eligible.  See The United States' Notice of Intent Not To Seek a Sentence of Death, filed June 6, 2016 (Doc. 567)(stating that it would not seek a death sentence against twenty-one Defendants).

Judge Gonzales initially presided over the case until it was reassigned to the Court on March 30, 2016.  See Judge Update, filed December 1, 2015, and Notice of Case Reassignment, filed March 30, 2016 (Doc. 351).  The Court will first address the procedural background under Judge Gonzales' presiding role, before turning to the procedure once Judge Browning became the presiding Judge.

**1.**      **The Proceedings Before Judge Gonzales.**

On February 5, 2016, the United States filed a motion requesting a protective order.  See United States' Sealed Motion for Protective Order at 1, filed February 5, 2016 (Doc. 260)("Motion for Protective Order").  In its Motion for Protective Order, the United States cited to rule 16(d) of the Federal Rules of Criminal Procedure to request that the Court restrict "the

defendants' handling and use of the discovery in this case."  Motion for Protective Order at 2. The United States requested: (i) that Judge Gonzales bar the Defendants and their counsel from using discovery materials except to prepare for this case, impeach witnesses, refresh a witness' recollection or test a witness' credibility; (ii) that only the Defendants' counsel, personnel that the Defendants' counsel or the United States regularly employ, or Court staff involved in the proceedings may have access to discovery materials; (iii) that the Defendants' counsel not disclose to any third-party, unrelated to the case, the content of any nonpublic-record materials that they receive from the United States; (iv) that the Court bar the Defendants' counsel from copying any discovery materials and disseminating it to the Defendants; (v) that any of Defendants' counsel, who might later withdraw, will provide discovery materials to new counsel; and (vi) that the protective order's provisions must remain in effect until further order of the Court, and that the parties should have an opportunity to be heard if a modification is necessary. See Motion for Protective Order at 2-3.

On February 8, 2016, Judge Gonzales issued an order providing the Defendants with an opportunity to respond to the United States' request for a protective order and requesting that the United States supplement its Motion for Protective Order.  See Court's Order on the United States' Sealed Motion for Protective Order, filed February 8, 2016 (Doc. 279)("Court's Order on Motion for Protective Order").  Judge Gonzales, concerned about the United States' broad request, asked that the United States supplement its motion "by specifying the kinds of information or categories of information it seeks to protect by order of the Court."  Court's Order on Motion for Protective Order at 1.  The United States filed a Sealed Supplement to the Sealed Motion for Protective Order, filed February 12, 2016 (Doc. 280)("Supplement to Motion for Protective Order").  In its Supplement to Motion for Protective Order, the United States specified

- 11 -

the nature of the discovery materials it anticipates to produce and explained the need for the Court to issue a protective order.  See Supplement to Motion for Protective Order at 2-3.  The United States reiterated its concern that, historically, SNM members have threatened to kill, or have indeed killed, cooperating witnesses.  See Supplement to Motion for Protective Order at 3.  Additionally, the United States stated that Defendant Anthony Ray Baca was recorded having a conversation during which "he put out hits on people who were not following orders and who were not in good standing with SNM," and specifically "green-lit" a co-defendant whom he suspected was cooperating with the authorities.  Supplement to Motion for Protective Order at 3.

On February 17, 2016, the Defendants filed a memorandum in opposition to the Motion for Protective Order.  See Defendants' Joint Opposition To Government's Sealed Motion For Proposed Protective Order, filed February 17, 2016 (Doc. 281)("Defendants' Memo").  In the Defendants' Memo, the Defendants argued that the United States did not demonstrate good cause to support its Motion for Protective Order.  See Defendants' Memo at 5.  They also contended that such an order would place too heavy a burden on the Defendants' counsel.  See Defendants' Memo at 7.

On March 3, 2016, Judge Gonzales held a hearing to address four motions, one of which was the Motion for Protective Order.  See Clerk's Minutes before the Honorable Kenneth J. Gonzales, filed March 3, 2014 (Doc. 297)("Clerk's Minutes 1").  At the hearing, Defendants' counsel first objected to their clients being improperly excluded from the hearing, citing issues of due process and the notion that the Defendants' presence would help the attorney-client relationship.  See Clerk's Minutes 1 at 2-3.  And, because some Defendants had waived their appearance, while others had not, Troup's counsel argued that the Court should unseal the hearing.  See Clerk's Minutes 1 at 3.  Judge Gonzales then took up the United States' Motion for

- 12 -

Protective Order and the Defendants' arguments.  See Clerk's Minutes 1 at 4.  The United States

argued that it had good cause to request a protective order based on the arguments it submitted in

its request for a protective order.  See Clerk's Minutes 1 at 4.  E. Martinez' counsel objected to

the Defendants not being present at a hearing regarding a fact-based protective order.  See

Clerk's Minutes 1 at 4.  The United States Attorney then updated the parties on the status of

discovery disclosure, stating that it had received some discovery from the FBI, but that it had not

yet been sent.  See Clerk's Minutes 1 at 5.  Judge Gonzales asked the United States about the

amount of discovery, and the United States answered that it anticipated producing a minimum of

10,000 pages.  See Clerk's Minutes 1 at 5.  Judge Gonzales expressed his concern that the

Defendants' counsel would have to take thousands of items back if everything fell under the

protective order's scope.  See Clerk's Minutes 1 at 5.  The United States then, for the first time,

proposed to have the Department of Corrections provide the Defendants with tablets so they

could review discovery materials on their own, thus avoiding "creat[ing] a paper trail."  Clerk's

Minutes 1 at 5.  The United States stated that there had been two attempted murders of a witness

just that week, tied to a Defendant in the case, emphasizing the need for Judge Gonzales to

regulate the Defendants' access to discovery.  See Clerk's Minutes 1 at 5.  The Defendants'

counsel agreed with the United States' tablet proposal -- provided that the Defendants could

protect their tablets with passwords.  See Clerk's Minutes 1 at 6.

Judge Gonzales held that the United States had shown good cause to support its request

for a protective order.  See Clerk's Minutes 1 at 6.  The United States argued that cooperator

statements should not go on the tablets.  See Clerk's Minutes 1 at 6.  Judge Gonzales noted that,

if the United States' main concern was the Defendants having paper copies of discovery

materials, the tablets would put that fear at rest.  See Clerk's Minutes 1 at 6.  The United States

argued that sentiment was not fully accurate.  See Clerk's Minutes 1 at 6.  Judge Gonzales then proposed to keep "confidential materials" -- the Defendants' post-arrest statements, eyewitness statements, cooperating Defendants, confidential government sources regarding the Defendants, photographs, audio/video recordings identifying witnesses -- undisclosed, while everything would be turned over in tablets.  See Clerk's Minutes 1 at 7.  Judge Gonzales then granted the United States' Motion for Protective Order on the terms he had just described and he specified that the United States should disclose all of its discovery, whether it can go onto the tablets or not.  See Clerk's Minutes 1 at 7.  Judge Gonzales explained that, going forward, if the parties thought that an item should not be uploaded onto the tablets, and if they could not agree, they could file an ex-parte motion for in camera review.  See Clerk's Minutes 1 at 8.  Judge Gonzales further held that any information that had been disclosed in the state case would be subject to the protective order.  See Clerk's Minutes 1 at 8.  Judge Gonzales stated that the documents in the federal case and in the state case are identical.  See Clerk's Minutes 1 at 9.  Ultimately, Judge Gonzales concluded that he would set aside the issue of the state documents, and he requested that the parties submit briefs on the state disclosures.  See Clerk's Minutes 1 at 9-10.

### a.    **Defendants' Protective Order Brief**.

On March 8, 2016, the Defendants filed the Protective Order Brief, to further educate the Court on the legality of the United States' requested protective order.  See Protective Order Brief at 1.  In their Protective Order Brief, the Defendants stated that they did not find any case law supporting the United States' request for a protective order.  See Brief at 2.  The Defendants asserted that the only support that they had found regarding the legality of the Motion for Protective Order was Rule 16, which, they contended, states that a party can move for a protective order if it believes discovery should be protected.  See Protective Order Brief at 2.

- 14 -

The Defendants advanced that, although courts can issue protective orders when the moving party shows good cause, protective orders "do not cover information obtained outside the discovery process." Protective Order Brief at 2. The Defendants referred the Court to "a recent District of Colorado case," where the court held that "[a] protective order, of course, prevents only the disclosure of information obtained solely as the result of court sanctioned discovery." Protective Order Brief at 2 (quoting Landco Equity Partners, LLC v. City of Colo. Springs, 259 F.R.D. 510, 512-13 (D. Colo. 2009)(Hegarty, M.J.). The Defendants further cited to Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984), where the Supreme Court of the United States of America held that a "protective order prevents a party from disseminating only that information obtained through use of the discovery process." Protective Order Brief at 3 (quoting Seattle Times Co. v. Rhinehart, 467 U.S. at 34). The Defendants also stated that there were "no legal grounds on which defense counsel can be barred from using that information," and that some of the confidential material that the United States seeks to include in its protective order is already in some of the Defendants' hands. Protective Order Brief at 3. The Defendants concluded that including this material in the protective order would be unfair to the Defendants who had not yet had a chance to review the material and that it would limit the ability of the Defendants' counsel to represent effectively their clients under the Sixth Amendment to the Constitution of the United States of America. See Protective Order Brief at 3.

### b.     Judge Gonzales' Protective Order.

On March 14, 2016, without a further hearing, Judge Gonzales granted the United States' request for a protective order. See Protective Order at 1. The Protective Order states, in full:

> The Court having been advised that all counsel agree to the provision set forth herein, and the Court having considered the pleadings and oral arguments of the parties, hereby grants the United States' Sealed Motion for Protective Order

- 15 -

(Doc. 260) and enters the following protective order pursuant to Rule 16(d) of the Federal Rules of Criminal Procedure.

For purposes of this protective order, the term "Confidential Material" is defined as follows: (1) any defendant's post-arrest statement; (2) statements by eyewitnesses, cooperating witnesses, and confidential government sources regarding the crimes charged in these cases; and (3) photographs and/or audio/video recordings that would identify such persons or the content of the statements in (1) or (2), above.

**Discovery materials shall be disclosed to defense counsel immediately and no later than the previously set deadline of March 25, 2016.** The government shall have a continuing duty to disclose following that date. Any disclosure of discovery material in the above-referenced cases shall be subject to the following restrictions:

1. All discovery material may be reproduced and provided to the following persons: defense counsel, attorneys for the United States of America, any paralegal, secretarial, or clerical personnel regularly employed by counsel for the United States or defendants in preparation of these proceedings, including, but not limited to, associate attorneys, law enforcement and defense investigators, expert witnesses, mitigation specialists, and Court personnel and stenographic reporters necessarily involved in these proceedings.

2. All discovery material may be disclosed to and viewed by a defendant in the presence of and under the direct supervision of his counsel of record or staff, or another individual described in paragraph 1 of this Order. Absent further order of the Court, the defendants are not to be provided paper copies of any discovery materials.

3. As soon as practicable, but in no event later than April 4, 2016, the government is to provide each defendant with a password protected tablet or laptop computer, or its substantial equivalent ("Computer") suitable for the purposes described herein. The government discovery materials not designated as Confidential Material shall be loaded onto the Computers by the designated Discovery Coordinator,[5] who shall also update these Computers at regular intervals to include all government discovery materials not designated as

---

[5]On January 2, 2016, Judge Gonzales granted the Defendants' Joint Ex Parte Motion for Order Appointing Coordinating Discovery Attorney, Russell M. Aoki, for the Benefit of All Court-Appointed Counsel. See Order Appointing Coordinating Discovery Attorney, filed January 22, 2016 (Doc. 231)("Discovery Coordinator Appointment Order"). Judge Gonzales held a hearing on January 20, 2016, with all parties present. See Discovery Coordinator Appointment Order at 1. The Court found that appointing Mr. Aoki is justified given the complexity of this case and the thousands of pages of discovery documents. See Discovery Coordinator Appointment Order at 2.

- 16 -

Confidential Material.  These Computers shall be accessible to the defendants in their cells and during legal visits.  The defendants may display the contents of their Computers only to those individuals described in paragraph 1 of this order. The password for each Computer shall be set by the defendant and his counsel and shall not be disclosed to counsel for the government, United States Marshals, or corrections officers.  Once provided to a defendant, the Computer and the materials and any markings thereon will be protected by the attorney/client privilege.  Corrections officials may periodically ask the defendants to unlock the Computers and scan the devices for contraband and damage.  Corrections officials shall not read or otherwise examine the content of the Computers.  At the conclusion of the case, the Discovery Coordinator shall provide defense counsel with an electronic copy of the entire contents of their client's Computer. Thereafter, all materials on the Computer shall be deleted by the Discovery Coordinator, who shall then return the Computers to the New Mexico Department of Corrections.

4.   Nothing contained herein shall preclude the government, defendants or their counsel, or their respective assistants from conducting an investigation of the facts of this case on behalf of the government or defendants, including interviewing witnesses, showing witness statements contained in the Confidential Material to witnesses and asking witnesses about the content of such statements.

5.   Should either party seek to add or subtract discovery material from the category of Confidential Material, as defined herein, the party seeking the addition or subtraction shall notify and confer with all other parties of the exact discovery materials it seeks to add or subtract from the category of Confidential Material and the reason(s) it believes such materials should be added or subtracted. The parties shall make all reasonable efforts to limit the volume of discovery materials designated as Confidential Material.   In the event the government and defense counsel arrive at an impasse as to the designation of particular discovery materials, the party seeking to add to or subtract from the category of Confidential Material may file an application with the Court seeking its proposed modification.   Any such application shall set forth the party's showing of good cause for the requested modification and be served on the Court and all parties.   The opposing party will be given 14 days to respond to the application, unless there is an emergency or exigent situation, which shall be stated in the application.   If necessary, the Court will request additional briefing and/or schedule a hearing regarding any modification to the Confidential Material category prior to issuing a ruling.

6.   A copy of this order must be provided to any individual working for or with the defense before providing that individual with access to any discovery material.   Counsel for the defendants shall maintain a record of all persons to whom access to the discovery material has been provided.

7.   Should counsel withdraw or cease to participate in these cases, any discovery material and any copies derived therefrom shall be provided to new counsel once the substitution is ordered by the Court.

8.   All discovery material disclosed by the government in this matter shall be used solely in connection with these proceedings, or any related appellate proceedings and collateral review, and not for any other purpose, including any other litigation or proceeding.

9.   The provisions of this order shall remain in effect until further order of this Court.

Protective Order at 1-4.

### c.      Daniel Sanchez' Protective Order Reply.

On March 15, 2016, Defendant Daniel Sanchez filed Sanchez' Protective Order Reply, further objecting to the United States' Motion for Protective Order.  See Sanchez' Protective Order Reply at 1.  Sanchez first explained that at least three co-Defendants were prosecuted in State court in Doña Ana County.  See Sanchez' Protective Order Reply at 2.  He also stated that counsel for Armenta told the Court that he and other counsel had received discovery materials from the Doña Ana County's District Attorney's Office, in connection with the prior state prosecution.  See Sanchez' Protective Order Reply at 2.  According to Sanchez, these discovery materials were not subject to a protective order, and were disseminated to other individuals, but no one knows exactly how many Defendants received the materials.  See Sanchez' Protective Order Reply at 2.  Sanchez advanced that rule 16 "does not empower the Court to protect materials obtained outside of the Court's discovery process."  Sanchez' Protective Order Reply at 3.  Sanchez states that rule 16 regulates "Discovery and Inspection."  Sanchez' Protective Order Reply at 3.  He advances, however, that rule 16(d) grants courts the discretion to issue protective orders, but courts "do not have the general authority to order the non-dissemination of documents obtained outside its judicial process."  Sanchez' Protective Order Reply at 3 (quoting

Seattle Times Co. v. Rhinehart, 467 U.S. at 37).  Sanchez then cited to several civil cases in

which courts have excluded materials that had been gathered independently of the judicial

process from some protective orders' portions.  See Sanchez' Protective Order Reply at 4 (citing

Bridge C.A.T. Scan Assoc. v. Technicare Corp., 710 F.2d 940, 944-46 (2d Cir. 1983); Int'l

Prods. Corp. v. Koons, 325 F.2d 403, 407-408 (2d Cir. 1963)).  Sanchez concluded that the co-

Defendants who received the state materials received them "outside of this court's discovery

process" and that the Court therefore lacks the authority to "regulate the dissemination of

materials obtained outside of the discovery process."  Sanchez' Protective Order Reply at 4.

Sanchez requested that the Court not include the State materials in its protective order.  See

Sanchez' Protective Order Reply at 5.

   **d.    Judge Gonzales' Potential Conflict and Reassignment of the Case to the Court.**

On March 23, 2016, the Defendants filed a Motion For Briefing Schedule on Issue of

Recusal, filed March 23, 2016 (Doc. 326)("Motion On Recusal Briefing Schedule").  See Motion

On Recusal Briefing Schedule at 1.  On March 25, 2016, Judge Gonzales filed a letter addressed

to the parties discussing his potential conflict in this case.  See Letter from Judge Gonzales to

Counsel of Record, filed March 25, 2016 (Doc. 338)("Gonzales' Letter").  In his letter, Judge

Gonzales wrote, in relevant part:

> It was reported to me and defense counsel at the March 22, 2016, hearing
> that the investigation that resulted in the instant three indictments began in spring
> 2015, approximately 2.5 years after I was sworn in as district judge.  It also was
> suggested at the hearing that the investigation may have extended back to 2014,
> and that the FBI may have made inquiries into SNM in 2005 or 2006.  Moreover,
> Mr. Castle mentioned a United States Attorney press release from
> October/November 2010 that references SNM.
>
> Based on all that was discussed on March 22, I recall participating in a
> meeting with the FBI and USAO leadership while an Assistant United States
> Attorney (approximately 2009/2010), and before I became the United States

- 19 -

Attorney.  Meetings such as this are common between prosecutors and law
enforcement agencies to determine whether any investigative steps are warranted.
The topic of this meeting was prison gangs in New Mexico, including SNM.  I do
not recall any names of targeted gang members that were mentioned, however.
Nor do I recall whether the result of the meeting was to open an active
investigation either before or after I became the United States Attorney.

Gonzales' Letter at 1.

2.      **The Proceedings Before the Court.**

On March 28, 2016, Judge Gonzales granted the Defendants' Motion on Recusal Briefing

Schedule in his Order Granting Briefing Schedule on Issue of Recusal, filed March 28, 2016

(Doc. 346).  Judge Gonzales, in effect, recused himself, because two days after granting the

Motion on Recusal Briefing Schedule, the case was assigned to the Court on March 30, 2016.

See Notice, filed March 30, 2016 (Doc. 351).  The Court now describes the proceedings before

the Court since reassignment.

a.      **The United States' Protective Order Response.**

On the same day that the Court began to preside over this case, the United States

responded to the Defendants' Protective Order Brief and Sanchez' Protective Order Reply.  See

The United States' Response to Defendants' Brief Regarding "Protective Orders" for Materials

Obtained From Sources Other Than the Government and Defendant Daniel Sanchez's Reply

Regarding Court's Ability to Subject Materials Obtained Independently of the Court's Process to

Court's Protective Order, filed March 15, 2016 (Docs. 354, 355)("Response 1").[6]  In Response 1,

_____

[6]The Court filed the United States' Response under two separate documents.  The first
document was filed as the United States' Response to the Defendants' Brief (Doc. 354), and the
second was filed as the United States' Reply to Sanchez's Supplemental Brief (Doc. 355).  Both
documents are one and the same, entitled United States' Response To Defendants' Brief
Regarding "Protective Orders" For Materials Obtained From Sources Other Than The
Government And Defendant Daniel Sanchez's Reply Regarding Court's Ability To Subject
Materials Obtained Independently Of The Court's Process To Court's Protective Order, and this
Memorandum Opinion and Order will refer to it as Response 1.

the United States first gave the Court some background on the Defendants and the counts with which each one has been charged.  See Response 1 at 1-2.  The United States explains that two counts refer to state murder charges that the Third Judicial District Attorney's Office of New Mexico brought against three of the Defendants.  See Response 1 at 3-4.  According to the United States, although the Third Judicial District Attorney's Office later dismissed the charges, the state sent discovery relating to the state case.  See Response 1 at 4.  The United States rejected the Defendants' position that "items they received from sources other than the United States not be part of the protective order this Court entered."  Response 1 at 4.  The United States explained that it based its request for a protective order on rule 16 which gives courts the discretion to deny, restrict, or defer discovery if good cause exists.  See Response 1 at 4.  The United States quoted United States of America v. Smith, 985 F. Supp. 2d 506 (S.D.N.Y. 2013)(Karas, J.), advancing that good cause exists "when a party shows that disclosure will result in a clearly defined, specific and serious injury."  Response 1 at 5 (quoting United States v. Smith, 985 F. Supp. 2d at 523).  The United States further cites to United States v. Smith for the proposition that protective orders do not eliminate the First Amendment to the Constitution of the United States of America, but rather, confine its scrutiny, "including defendants' right to disseminate the discovery material, to the framework of rule 16(d)'s good cause requirement."  Response 1 at 5 (quoting United States v. Smith, 985 F. Supp. 2d at 523).  The United States asserted that the Court should then apply a balancing test, weighing the hazard to others against the prejudice to the Defendants.  See Response 1 at 5.  The United States contended that the Defendants relied on civil cases that discuss rule 26 of the Federal Rules of Civil Procedure, which does not apply in the criminal context.  See Response 1 at 6.  The United States advanced that it had already established good cause in its Supplement to Motion for Protective Order,

- 21 -

where it explained SNM's pattern of retaliation after the gang receives information on cooperating witnesses.  See Response 1 at 6.  The United States therefore asks that the Court issue a protective order covering the "materials currently in the possession of both defense counsel and their clients, [or a]t a minimum . . . that the defendants who currently possess these materials be prohibited from further disseminating them."  Response 1 at 6.

### b.    Due Process Motion.

On that same day -- March 28, 2016 -- Defendants filed their Due Process Motion.  See Due Process Motion at 1.  The Due Process Motion essentially alleges that "[t]he United States has violated this Court's rules and in so doing deprived the Defendants of fundamental due process.  Due Process Motion at 1.  The United States has filed pleadings in this case 'under seal' without providing notice to all parties and without obtaining the approval of the Court."  Due Process Motion at 2.  And, on a related note, the Due Process Motion alleges that the United States has not appropriately made various ex parte documents available to all of the Defendants. See Due Process Motion at 4.  In sum, "[w]ithout compliance with the applicable rules, and without compliance with established precedent, the defendants' Sixth Amendment right to the assistance of effective counsel and their Fifth Amendment right to due process are thwarted." Due Process Motion at 6-7.  The United States did not respond.

### c.    United States' Notice.

On April 1, 2016, the United States filed its United States' Notice to address the issue of when the New Mexico United States' Attorney's office had become involved in the prosecution of the instant SNM Defendants.  See United States' Notice at 1.  The purpose of the United States' Notice was to ascertain whether Judge Gonzales might face a conflict when trying the case.  See United States' Notice at 1.  Ultimately, "[t]he USAO determined that then AUSA

Kenneth Gonzales was assigned as co-counsel from June 19, 2009[,] to February 23, 2010, to an investigation opened by the USAO in 2008 under the name of Gerald Archuleta.  The USAO declined prosecution in 2015, prior to when the investigation was opened by the FBI and USAO that led to the instant cases."  United States' Notice at 2.  There was one letter addressed to Judge Gonzales in that investigation, but the United States provided that the issue of his involvement "was largely moot" given the case's reassignment.  United States Notice at 2.

<p style="text-align:center"><b>1.        <u>Defendants' Response to the United States' Notice</u>.</b></p>

In response, some Defendants filed a Response to Doc. No 358-United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in this Case or any Other Case, filed April 14, 2016 (Doc. 360)("Response to the United States' Notice").  In the Response to the United States' Notice the Defendants largely rehashed their arguments made in the Motion on Recusal Briefing Schedule – those arguments being, essentially, that "the conduct that's alleged in these cases extends into the Court's time at the U.S. Attorney's Office."  Response to the United States' Notice at 2.  Although Judge Gonzales had already recused himself by the time the Response to the United States' Notice was filed, Defendants disagree that the issue is "moot."  Response to the United States' Notice at 5.  Such is so, the Defendants argue, because Judge Gonzales had made various substantive rulings that could still implicate a conflict given his involvement in the 2009 investigation.  See Response to the United States' Notice at 5.  And, despite the disclosures made in the United States' Notice, the Defendants argue that a more extensive inquiry ought to be undergone.  See Response to the United States' Notice at 13.

d.     **Motion to Suspend Scheduling Order**.

According to the Motion to Suspend Scheduling Order, filed on May 18, 2016, "[d]ue to

the superseding indictment, new defendants and counsel, and the new related racketeering case,

the current deadlines in the Scheduling Order (Doc. 250) are unworkable."  Motion to Suspend

Scheduling Order at 5.  As such, "Defense counsel respectfully request a Status Conference to

discuss matters involving discovery, the Scheduling Order, the Protective Order, and other case

related matters.  In addition, joint defense counsel also request[s] an Ex Parte CJA Conference to

discuss outstanding CJA matters."  Motion to Suspend Scheduling Order at 5.  The United States

did not respond.

e.     **The Defendants' Motion for Reconsideration**.

On May 23, 2016, sixteen of the Defendants[7] filed a motion asking the Court to

reconsider the Protective Order that Judge Gonzales issued in this case.  See Motion for

Reconsideration at 1.    Defendant Leonard Lujan opposes the relief the Motion for

Reconsideration requests.  See Motion for Reconsideration at 3.  Defendant Ruben Hernandez

does not join the Motion for Reconsideration.  See Motion for Reconsideration at 3.  Defendants

Eugene Martinez, Roy Paul Martinez, Benjamin Clark, and Paul Rivera take no position.  See

Motion for Reconsideration at 3.  Defendants Allen Patterson, Mauricio Varela, Robert Martinez,

and Andrew Gallegos have not responded to approve or disapprove of the filing of the Motion

for Reconsideration.  See Motion for Reconsideration at 3.

The sixteen Defendants that filed the Motion for Reconsideration ask the Court to

"reconsider the protective order and modify [it] to permit the defendants to possess all discovery

_____

[7]Defendants J. Gallegos, Troup, B. Garcia, Chavez, Alonso, A.A. Garcia, Montoya, T. Martinez, Sanchez, Archuleta, Villegas, Baca, C. Garcia, Perez, Herrera, and Gonzales filed the Motion for Reconsideration jointly.

on their tablet computers." Motion for Reconsideration at 3. The Defendants contend that Judge Gonzales issued the Protective Order after he held a hearing during which some Defendants were absent. See Motion for Reconsideration at 2. At the time, the Defendants advance, Judge Gonzales had a "potential conflict of interest," because he worked at the United States Attorney's Office "during the time that crimes charged in this indictment were investigated by federal law enforcement authorities." Motion for Reconsideration at 2. The Defendants then mention the April 21, 2016, grand jury's Superseding Indictment adding more Defendants, many of whom were death eligible. See Motion for Reconsideration at 4. In sum, the Defendants initially contend that the Protective Order affects the newly added Defendants, yet they did not have an opportunity to be heard at the March 3, 2016, hearing. See Motion for Reconsideration at 4.

The Defendants further argue that the Protective Order is too broad. See Motion for Reconsideration at 4. According to the Defendants, the United States supported its request for an all-encompassing protective order by, among other things, the fact that, "in the past, members of the Syndicato de Nuevo Mexico ("SNM") have threatened gang members who have cooperated with law enforcement based on discovery paperwork [and] that the motive for some of the murders alleged in the Indictment [involve a] decedent's cooperation with law enforcement." Motion for Reconsideration at 5. To explain, the Defendants next provide a detailed timeline of the events and argue that the United States changed its strategy regarding the Protective Order after seeing that the Court was not inclined to prohibit the Defendants from possessing any discovery. See Motion for Reconsideration at 7. The Defendants contend that the United States then, "for the first time, raised the possibility of providing discovery to the defendants in electronic form on tablet computers each defendant could individually access in their respective

- 25 -

DNM 530

custodial settings."   Motion for Reconsideration at 7.  According to the Defendants, the United

States' main concern, then, seems to be creating a paper trail.  See Motion for Reconsideration at

7.  The Defendants contend, however, that the Protective Order is too broad, because "the final

Protective Order maintained the omission of certain 'Confidential Materials' from the tablet

computers provided to the defendants."  Motion for Reconsideration at 7-8.

The Defendants further assert that the Court should issue a new protective order, because

Judge Gonzales -- who issued the Protective Order -- had a potential conflict of interest in

working on this case, and that conflict was likely why the recent case was reassigned to Judge

Browning.   See Motion for Reconsideration at 8.   As such, the Defendants reiterate their

concerns that Judge Gonzales in effect recused himself because of his potential conflict of

interest and that the Court should therefore consider amending the Protective Order.  See Motion

for Reconsideration at 9.

The Defendants next raise a number of practical difficulties under the Protective Order

that they ask the Court to take into consideration in deciding whether to amend it.  See Motion

for Reconsideration at 9.  The Defendants assert that the first difficulty is that the United States is

"over-using" the "Confidential Material" designation.   Motion for Reconsideration at 9.

According to the Defendants, in the Protective Order, discovery materials are divided into two

categories: general discovery and confidential material.  See Motion for Reconsideration at 9.

Regarding that categorization, Defendants now assert that the United States has included many

more items under the "Confidential Material" designation than comports with the definition of

confidential material in the Protective Order.   See Motion for Reconsideration at 10.   The

Defendants further contend that the United States did not comply with the protocol described in

the Protective Order, which requires all parties to confer if the United States wishes to exclude

- 26 -

more material from the tablets.  See Motion for Reconsideration at 10.  See also Amy E. Jacks'

affidavit, Cori A. Harbour-Valdez' affidavit, and James Castle's affidavit, filed May 23, 2016

(Doc. 541-2,[8] Doc. 541-3,[9] and Doc. 541-4).[10]  Counsel for the Defendants have asked for these

materials to be reclassified as general discovery, because if this material remains classified as

confidential, then litigation will be burdensome, because the Defendants will have access only to

that information in the presence of their counsel in custody.  See Motion for Reconsideration at

10-11.

     The second difficulty that the Defendants identify is the delay in the production of the

tablets.  See Motion for Reconsideration at 11.  The Defendants argue that they have not yet

received the tablets, and that the additional Defendants who were later added under the

Superseding Indictment may have to wait even longer.  See Motion for Reconsideration at 11.

---

[8]Jacks stated in her affidavit that she had received discovery from the United States regarding her client, Sanchez.  See Amy E. Jacks' affidavit at 1.  Some of it related to the state charge of "Murder of J.M."  See Amy E. Jacks' affidavit at 1.  She contended that, out of hundreds of pages, only four pages documenting a cooperating inmate's interview and the recordings of interviews with two inmates complied with the Protective Order's definition of confidential.  See Amy E. Jacks' affidavit at 2-3.  She asserted that the United States had not discussed with her the need to designate additional materials as confidential, like the Protective Order required.  See Amy E. Jacks' affidavit at 3.

[9]Harbour-Valdez submitted an affidavit stating that discovery relating to F.S.' alleged homicide contained 171 pages of non-confidential materials and 127 pages of confidential materials.  See Cori A. Harbour-Valdez' affidavit at 1.  She gave a detailed list of dozens of pages of materials that, she argued, was improperly classified as confidential.  See Cori A. Harbour-Valdez' affidavit at 1-3.  The only materials complying with the Protective Order's definition of confidential materials, she contended, amounted to fewer than 50 pages.  See Cori A. Harbour-Valdez' affidavit at 3-4.

[10]Jim Castle submitted an affidavit stating that he had received materials regarding F.C.'s and R.G.'s homicides.  See Jim Castle's affidavit at 1.  Castle contended that 238 pages regarding J.M.'s homicide were not confidential, whereas 489 pages were designated as confidential.  See Jim Castle's affidavit at 1.  Of that confidential material, he further contended, dozens of pages did not comport with the Protective Order's definition of confidential material. See Jim Castle's affidavit at 1-2.  He argued that the United States had also improperly classified dozens of pages relating to R.G.'s murder as confidential.  See Jim Castle's affidavit at 2-3.

This, the Defendants insist, means that they are not therefore all equal in terms of access to discovery.  <u>See</u> Motion for Reconsideration at 11.

A third difficulty that the Defendants identify is an increased demand on funding under the CJA.  <u>See</u> Motion for Reconsideration at 11.  According to the Defendants, until the tablets are available, defense attorneys are having to "utilize valuable attorney-client time, and with it extensive CJA resources, simply being present while defendants review all discovery."  Motion for Reconsideration at 11.  The Defendants argue that they will need to use double the amount of CJA funds -- for counsel's time to review the materials and for their time to review them with the Defendants, because counsel must meet with their clients to review discovery items.  <u>See</u> Motion for Reconsideration at 12.

The Defendants therefore assert that good cause exists at law to reconsider the Protective Order's terms.  <u>See</u> Motion for Reconsideration at 12.  The Defendants first maintain that parties in criminal cases can seek reconsideration of orders.  <u>See</u> Motion for Reconsideration at 13 (citing <u>United States v. Randall</u>, 666 F.3d 1238 (10th Cir. 2011)(Baldock, J.)).  They then refer the Court to rule 59(e) of the Federal Rules of Civil Procedure, which establishes the conditions under which a motion to reconsider are warranted.  <u>See</u> Motion for Reconsideration at 13.  The Defendants cite five factors that, they argue, support reconsideration in this case: (i) the Defendants did not attend the proceedings where Judge Gonzales established the Protective Order's terms; (ii) Judge Gonzales had a potential conflict of interest when he issued the Protective Order; (iii) Judge Gonzales clearly erred by ordering that confidential materials be omitted from the tablets, when the United States' arguments related to paper discovery; (iv) the United States' categorization of confidential materials being overly broad and against protocol;

and (v) the newly added Defendants did not have an opportunity to be heard before the Court issued the Protective Order.  See Motion for Reconsideration at 13-14.

With respect to their absence from the proceedings where Judge Gonzales heard the parties' arguments on the Protective Order's terms, the Defendants essentially argue that their exclusion from the hearing constitutes a violation of their rights under the Fifth Amendment to the Constitution of the United States.  See Motion for Reconsideration at 14.  They contend that the "Defendants are guaranteed the right to be present at any proceeding critical to the outcome of the prosecution if [their] presence would contribute to the overall fairness of the process." Motion for Reconsideration at 14 (citing Kentucky v. Stincer, 482 U.S. 730, 745 (1987), and Faretta v. California, 422 U.S. 806, 819 n.15 (1975)).  The Defendants then cite to rule 43 of the Federal Rules of Criminal Procedure, which addresses when a defendant's presence may not be required.  See Motion for Reconsideration at 14-15.

The Defendants also argue that their absence from the hearing is a violation of their rights under the Sixth Amendment to the Constitution of the United States, because the Protective Order burdens counsel in a way that prevents them from providing constitutionally appropriate assistance to the Defendants.  See Motion for Reconsideration at 15.  They argue that the Court should be particularly sensitive to this issue, because this case involves death penalty eligible Defendants.  See Motion for Reconsideration at 16.

The Defendants then reiterate their concern about Judge Gonzales' potential conflict of interest when he presided over this case and issued the Protective Order.  See Motion for Reconsideration at 16.  They note that, after the parties inquired about Judge Gonzales' potential conflict of interest, the case was reassigned to the Court.  See Motion for Reconsideration at 16. The Defendants advance that "the subsequent removal of the case from Judge Gonzales provides

an adequate basis for this Court to reexamine and reconsider the protective order." Motion for

Reconsideration at 17. The Defendants contend that Judge Gonzales' potential conflict of

interest is problematic because the Protective Order potentially includes biased terms that affect

death-eligible Defendants. See Motion for Reconsideration at 17.

The Defendants next address the alleged existence of clear error in ordering materials to

be omitted from the tablets based on the United States' arguments relating to paper discovery.

See Motion for Reconsideration at 17. The United States' main showing of good cause was

leaving paper behind,[11] but now because they have tablets, the Defendants argue that the United

States' good cause no longer applies to electronic discovery materials. See Motion for

Reconsideration at 17. The Defendants thus remind the Court that rule 16(d)(1) gives the Court

discretion to issue a protective order upon a showing of good cause. See Motion for

Reconsideration at 17. They contend that the United States, however, still asks, without good

cause, that the Protective Order requires the presence of the Defendants' counsel to access the

electronic version of some documents. See Motion for Reconsideration at 18-19.

The Defendants next address their fourth concern: that the United States' categorization

of confidential materials is overly broad and does not follow protocol. See Motion for

Reconsideration at 19. The argument is that "the government has improperly expanded the

materials designated as confidential material without conferring with defense counsel or seeking

a modification of the Protective Order as required by the Order itself." Motion for

Reconsideration at 19. The Defendants thus contend that no confidential material will be placed

---

[11]The Defendants contend that the United States argued that "possession of paper copies
of materials such as cooperator statements by defendants could potentially be used to 'prove' that
an individual violated a code of ethics within the penal system, and that could then provide a
basis for violence to be inflicted upon that individual." Motion for Reconsideration at 18.

on the tablets, and that defense counsel will spend time during client visits to "review and re-review each page of Confidential Material with the defendants." Motion for Reconsideration at 19. As such, the Defendants maintain that the United States' overly broad categorization of materials as confidential material impedes defense counsel's ability to efficiently review such material, thus limiting the Defendants' access to discovery. See Motion for Reconsideration at 19. The current Protective Order is thereby unworkable, because the United States is "[s]ubstantially ignoring the definition of Confidential Material and the procedural guidelines governing the designation of additional Confidential Material." Motion for Reconsideration at 20.

Lastly, the Defendants address their concern that the six newly added Defendants -- Herrera, Perez, A. Gallegos, Gonzalez, Rivera, and Gutierrez -- did not have an opportunity to be heard before Judge Gonzales issued the Protective Order. See Motion for Reconsideration at 21. They advance that, because six Defendants were not parties to this case before Judge Gonzales entered the Protective Order, "[h]olding [them] to the requirements of the Order, without affording each a right to be heard, does not comport with due process." Motion for Reconsideration at 21. The Defendants thus contend that the Court should reconsider the Protective Order and give the newly added Defendants the opportunity to be heard. See Motion for Reconsideration at 21.

### 1.      United States' Response to the Motion for Reconsideration.

On June 1, 2016, the United States responded to the Defendants' Motion for Reconsideration. See The United States' Sealed Response to Defendants' Opposed Joint Motion for Reconsideration of Protective Order (Doc. 541), filed June 1, 2016 (Doc. 566)("Response 2"). After giving the Court the same background information that it gave in Response 1, the

- 31 -

United States reminds the Court of the timeline under which the Court issued its Protective

Order.  See Response 2 at 4.  It then provides a chart summarizing the names of all of the

Defendants and the counts charged, including the six Defendants added in the April 21, 2016,

Superseding Indictment.  See Response 2 at 5-8.

The United States argues that "the original issues and reasoning for the Confidential

Materials still exist, and the reasons are now more important than ever."  Response 2 at 9.  The

United States first contends that Judge Gonzales' potential conflict of interest did not impact the

Protective Order and that the United States established good cause for the Protective Order.  See

Response 2 at 10.  The United States maintains that a "majority of the defendants" agreed to the

Protective Order's provisions during the March 3, 2016, hearing.  Response 2 at 10.  Further, the

United States contends that it had established good cause, which is why Judge Gonzales issued

the Protective Order.  See Response 2 at 10.  And, the United States maintains that, given the

recent developments, "more information has come to light which further establishes good cause."

Response 2 at 10.  The United States adds that the new counts added by the Superseding

Indictment establish good cause for a protective order, because they are particularly violent

crimes and the incident involves alleged retaliation for cooperating with the authorities.[12]  See

Response 2 at 11.  It also provides that in April, 2016 law enforcement learned of a "hit"

allegedly placed on a Defendant after Anthony Baca's attorney showed him discovery

paperwork.  Response 2 at 11.

Next, the United States argues that it has not expanded the definition of confidential

materials, because "the majority of the documents that the defense objects to as outside the

---

[12]J.G. was attacked and left for dead, allegedly because he was cooperating with the
authorities.  See Sealed Response at 11.  According to the United States, J.G. testified that,
before losing consciousness, he heard his attackers tell him that they "were there on behalf of Joe
Gallegos."  Sealed Response at 11.

DNM 537

protective order are statements and interviews of inmates and correctional officers.  The United

States asserts these statements, and summaries of these statements, fall into the category of 'eye-

witness statements.'"  Response 2 at 12.  The United States insists that the Defendants' argument

regarding the need for a new protective order because of the added Defendants is not valid,

because these new Defendants "have not presented any additional issues that have not already

been considered and litigated."  Response 2 at 12.

       Finally, the United States advances that "courts ordinarily apply the same standards as

those used in civil cases when addressing motions to reconsider."  Response 2 at 13 (quoting

United States v. Harmon, 871 F. Supp. 2d 1125, 1143 (D.N.M. 2012)(Browning, J.), aff'd by

United States v. Harmon, 742 F.3d 451 (10th Cir. 2014)).  The United States advances that rule

59(e) of the Federal Rules of Civil Procedure, therefore, applies.   See Response 2 at 13.

According to the United States, rule 59(e) allows motions to reconsider when: (i) there has been

an intervening change in the controlling law; (ii) there is newly discovered evidence which was

previously unavailable; or (iii) it is necessary to correct clear error or prevent manifest injustice.

See Sealed Response at 13 (quoting Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th

Cir. 2000)).   The United States advances that, because "a motion to reconsider 'is not an

opportunity to rehash arguments previously addressed or to advance new arguments that could

have been raised in prior briefing,'" the Court should deny the Motion for Reconsideration.

Response 2 at 13 (quoting Servants of Paraclete v. Does, 204 F.3d at 1012).

DNM 538

f.     **The June 2, 2016, Hearing**.

The Court held a hearing on the Motion for Reconsideration on June 2, 2016.  See Transcript of Hearing (taken June 3, 2016)("Tr.").[13]  The Court also addressed and resolved the issues raised by Defendants' Protection Order Brief; Sanchez' Protective Order Reply; the United States' Notice; the Due Process Motion; and the Motion to Suspend the Scheduling Order.  The Court first expressed its thoughts on the Motion for Reconsideration.  See Tr. at 12:1-5 (Court).  The Court stated that it seemed that the United States' main reason for requesting a Protective Order was its concern about the Defendants leaving a paper trail in the prisons.  See Tr. at 12:9-11 (Court).  Yet, that fear would no longer be an issue with non-confidential discovery, because the parties agreed that the Defendants could use tablets to review discovery materials.  See Tr. at 12:11-13 (Court).  The Court advanced that the main dispute before it "seemed to be the designation of confidential information, and whether A) there should be designation, and B) if there are designations of confidential information, . . . that the Government is construing that too broadly."  Tr. at 12:13-19 (Court).  Accordingly, the Court stated that it seemed that the Defendants' counsel should be free to show everything to their clients.  See Tr. at 12:19-22 (Court).  It then expressed its concern that the confidential designation of some discovery materials constitutes a substantial inconvenience to the Defendants.  See Tr. at 13:6-7 (Court).

The Court likewise expressed concern about the Defendants not being able to access confidential materials on their tablets, because the Defendants' counsel had to "take large amounts of documents" to custodial facilities to show their clients confidential material that was

---

[13]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

not uploaded onto the tablets.  Tr. at 13:7-11 (Court).  This precaution, the Court noted, was observed to preserve "safety to people that may be mentioned in the documents," and once the Defendants saw these documents, the Court deemed the safety benefit "fairly marginal and minimal" in comparison to the inconvenience to defense counsel.  Tr. at 13:1-6 (Court).  The Court further noted that, out of a total of about 5,000 documents already produced, only 600 were on the tablets.  See Tr. at 13:8-11 (Court).  In total, the United States anticipated getting a total of 10,000 documents.  See Tr. at 13:9-11 (Court).  The Court stated that, because most documents were confidential, "the tablets are not serving as the host for the great bulk of the materials," and the Defendants' counsel should be able to adequately review all documents with their client.  Tr. at 13:13-19 (Court).  Still, the Court was concerned about the Defendants' counsel needing time to review thousands of documents, one at a time, with their clients.  See Tr. at 13:23-25 (Court).  The Court therefore proposed that all documents, including confidential documents, be put onto the tablets, so the Defendants' counsel would not be forced "to bring large stacks of documents and go through them one at a [time]."  Tr. at 13:20-25 (Court).  The Court explained that, after balancing witnesses' safety and inconvenience to the Defendants' counsel, it concluded that the "safety is outweighed considerably by the inconvenience to defense counsel."  Tr. at 14:6-9 (Court).

The Court then addressed the issue of the discovery materials that the Las Cruces District Attorney's Office disseminated to some Defendants, regarding the state case.  See Tr. at 14:9-13 (Court).  The Court stated that, if technologically possible and in coordination with the discovery coordinator, it would support the Defendants' counsel leaving the relevant documents with their clients by uploading them onto the tablets.  See Tr. at 14: 13-25 (Court).  The Court explained that, this way, nobody would leave paper in the prisons.  See Tr. at 15:3-4 (Court).

- 35 -

The Defendants then responded that they agreed with the Court's proposal, but they were concerned that uploading information onto the tablets would be a logistically difficult task, given that the discovery coordinator is in Seattle, Washington, and they would have to send the tablets there every time they receive discovery materials from their investigators or other parties.  See Tr. at 15:18-16:4 (Benjamin).[14]   The Court proposed that, because most of the discovery was likely going to come from the United States, the Defendants' counsel could bring the remaining, non-government discovery in paper form to custodial facilities and then take it with them when they leave so they would not leave a paper trail.  See Tr. at 16:5-17 (Court).  The Defendants agreed with the Court's proposal and explained that Russ Aoki -- the Discovery Coordinator -- had already received tablets for the Defendants under the original Indictment, and that he had uploaded documents onto them.  See Tr. at 16:19-18:7 (Benjamin, Blackburn).  The Defendants added that they instructed Aoki to keep the tablets, awaiting the Court's decision regarding which documents could be uploaded, before shipping them to New Mexico, because of cost concerns.  See Tr. at 18:7-15 (Blackburn).  The Defendants then stated that the Defendants added under the Superseding Indictment had not yet received the tablets, which puts these Defendants in an unfair position in comparison to the other Defendants.  See Tr. at 18:17-19:6 (Blackburn).  They added that, because the Defendants would not have Internet access, they would be able to only read information already uploaded onto the tablets.  See Tr. at 19:7-13 (Blackburn).

Montoya stated that he and several other Defendants had received and read "discovery materials and information obtained by defense counsel from other sources" relating to the State

---

[14]The process to upload discovery materials onto the tablets is logistically complex: the party having the new discovery sends the new information to Mr. Aoki.  The Defendants' counsel gets their clients' tablets from the prisons, then sends the tablet to Mr. Aoki so he can upload the new material onto the tablet.  Mr. Aoki then sends the newly updated tablet back to the Defendants' counsel.

prosecution, before that case was dismissed.   Tr. at 20:4-12 (Hammond).   Montoya thus explained that his counsel and others had received "a great deal of information" relating to the state case -- "both information obtained in the course of discovery in that case and information obtained by defense counsel from other sources for the state trial which was about to commence in Las Cruces at the time that it was dismissed." Tr. at 20:4-12 (Hammond).   The Defendants advanced that they were "prepared to have that information put on tablets" to avoid leaving paper in the prisons.   Tr. at 20:15-22 (Hammond).   The Defendants contended that they were in agreement with the tablet as an accommodation, but that "the Protective Order itself issued under Rule 16 [was] not a basis for doing that." Tr. at 20:20-24 (Hammond).   The Defendants argued that the government did not have the power, under the protective order, to prevent them from having access to information obtained from other sources.   See Tr. at 21: 1-5 (Hammond).

T. Martinez expressed his concern regarding the papers already disseminated, and asked the Court to request the parties "to retrieve those papers as they have been in the correctional facilities." Tr. at 21:24-22:6 (Almanza).   The Court stated that it was not inclined to instruct people to retrieve papers already disseminated, but that, going forward, the Defendants' counsel could bring paper materials into the correctional facilities, but they would have to take them with them.   See Tr. at 22:7-17 (Court).   Lujan did not agree that the "statements made by a defendant should be put on the tablets." Tr. at 23:1-5 (Clark).   Lujan argued that "Rule 16 provides that a defendant can have access to his own statement, but not necessarily a co-defendant's statement." Tr. at 23:6-8 (Clark).   He further asserted that any statement that he made should not be used against any other Defendant, unless he was to testify in their prosecution, which he refused to do. See Tr. at 23:8-18 (Clark).   Making such statements available to all Defendants on their tablets, he argued, would pose a safety concern.   See Tr. at 23:18-25 (Clark).   For these reasons, Lujan

asked the Court to refashion the protective order to exclude co-Defendants' statements from the tablets, unless these statements become relevant evidence to the charges against each individual Defendant.  See Tr. at 24:10-23 (Clark).  The Court asked how many Defendants agreed with this proposed provision and noted that only four agreed.  See Tr. at 25:2-7 (Court).  The Court observed that all other Defendants wanted all statements to be available on the tablets.  See Tr. at 25:7-10 (Court).  Garcia raised the issue of the United States disclosing some documents containing older statements that have not been redacted and might contain the identities of cooperating co-Defendants, thereby putting them in danger.  See Tr. at 26:13-23 (Sirignano).  He argued that, while all recent statements should be made available to all Defendants on the tablets, older statements should be redacted to protect witnesses' identity.  See Tr. at 26:19-27:3 (Sirignano).

The Court explained that it would rewrite the protective order using a bright-line rule, allowing the Defendants to load information, including medical records, onto the tablets if they wished to do so.  See Tr. at 27:19-25 (Court).  The Court reiterated that, any time counsel walks into a correctional facility with papers from any source -- including information related to the state case -- counsel should walk out with those papers, and they could then decide to have the information contained in the papers uploaded to the tablet.  See Tr. at 28:12-24 (Court).  The Court stated that the Defendants could segregate their information on the tablet so that the United States would not have access to it.  See Tr. at 29:7-10 (Court).  The Court warned the Defendants, however, to be judicious about asking for exceptions to this agreement, because this case involves thirty Defendants and any order will be unworkable if parties start asking for "individual deals."  Tr. at 29:22-30:7 (Court).  As such, the Court emphasized that all thirty Defendants would need to compromise to make the Protective Order workable, and thereby

- 38 -

abide by its terms without asking for "individual deals" unless they absolutely had to have them. Tr. at 29:22-30:7 (Court).

Gonzales then raised the issue of the motions filed in this case not being made available to the Defendants. See Tr. at 32:17-20 (Johnson). He asserted that these pleadings, such as the Motion for Reconsideration, were made available to the public, and for purposes of due process, they should be made available to the Defendants. See Tr. at 32:20-33:3 (Johnson).

The United States opposed the Defendants' access to the pleadings, because these relate to "sensitive issues," and because the parties have attached some confidential reports to their pleadings, and the Defendants having access to these attached materials would defeat the tablets' purpose. Tr. at 34:9-24 (Armijo). The United States contended that making some other motions available to the Defendants would not be an issue -- as long as these do not have sensitive materials attached -- but in the spirit of creating a bright-line rule, asserted that the Defendants should not have access to any of the motions. See Tr. at 34:24-35:4 (Armijo). The United States further asserted that the protective order should not be reconsidered, opposing the Motion for Reconsideration in whole. See Tr. at 35:5-7 (Armijo). It argued that the Defendants should not be "having a second bite at the apple" and that the latest developments in the case require confidentiality, now more than ever. Tr. at 35:7-10 (Armijo). The United States further asserted that giving the Defendants tablets still posed a threat to cooperators' safety, because the Defendants will have a lot of time to stare at the tablets, read the documents and remember the number of an exhibit containing cooperating witness information and tell each other to read that exhibit on the tablet, and send out a hit on cooperators. See Tr. at 35:15-21 (Armijo). Still, the United States conceded that although the Defendants could do the same while reviewing documents with counsel, it would be harder for them to do so if they did not have the documents.

- 39 -

See Tr. at 35:24-36:3 (Armijo).  The United States argued that the Defendants would have hours to review the information on the tablets, and because they could still communicate, this scenario would constitute a safety concern.  See Tr. at 36:4-11 (Armijo).

Next, blaming its broad classification of confidential materials on the way Judge Gonzales wrote the Protective Order, the United States addressed the issue of its understanding of confidential materials and eyewitness statements.  See Tr. at 36:11-13 (Armijo).  The United States explained that it construed "eyewitness statement one way," and the Defendants understood that to mean cooperator statements only.  See Tr. at 36:13-19 (Armijo).  The United States further stated that it would "work on fine tuning what goes on and what stays off the tablet," so that it can more capably comply with the categorizations of discovery provided by the Protective Order.  Tr. at 36:19-21 (Armijo).

The Court explained that, although it understood the risks and dangers, its main concern was to determine "whether the marginal increase in safety offsets that tremendous inconvenience and inefficiency, which [the Court] think[s] goes to effective representation."  Tr. at 37:2-12 (Court).  The United States reiterated its position that the tablets did not offset the safety risk, and then addressed the state prosecution documents.  See Tr. at 37:13-15 (Armijo).  The United States agreed with the Court that the protective order should set a bright-line rule regarding the documents and that it should prohibit Defendants' counsel from leaving any paper copies at the detention facilities.  See Tr. at 39:4-9 (Beck).  It disagreed with the Defendants, however, "that rule 16 would not cover these [state case] documents."  Tr. at 38:10-13 (Beck).  The United States stated that it thought the argument was "aside for now" and argued that, if the Court were to draw a bright-line rule, it should not "allow some documents to get into the Defendants' possession and some documents not," calling such a scenario a "slippery slope."  Tr. at 38:15-18

(Beck). The United States reiterated its concerns regarding the Defendants having access to any paper documents, including pleadings. See Tr. at 39:4-9 (Beck). The Court suggested allowing non-sealed pleadings to be made available to the Defendants on their tablets and requiring the Defendants' counsel to take copies of the sealed pleadings to the correctional facilities to review these with them under supervision. See Tr. at 39:22-40:9 (Court). The parties agreed to the Court's proposal. See Tr. at 40:12-41:17 (Cooper)(Johnson)(Beck). The Court explained that, unless the parties raised new issues, it intended to make publicly filed motions available to the Defendants on their tablets, and it would ask the Defendants to draft a new protective order, send it to the United States, and then send it to the Court for approval. See Tr. at 42:17-43:7 (Court). The United States and the Court then briefly discussed the logistics of the tablets and the Discovery Coordinator's involvement in the process of uploading documents onto the tablets. See Tr. at 43:8-44:7 (Armijo, Court). The Court concluded that the United States could do some "selective disclosures" of cooperator statements if it desired and send individual cooperator statements directly to the Defendants' counsel, who would then have to take these to prison to review them with their clients and then take these back with them. Tr. at 44:8-21 (Court).

In conclusion, the Court adopted the aforementioned discussion and compromise to modify the Protective Order, and then ordered the Defendants to draft a new Protective Order which incorporated the agreed upon modifications. See Tr. 46:1-7 (Court).

The Court then addressed the Defendants' Protective Order Brief. See Tr. at 49:10-12 (Court). The Court explained that the parties had already addressed most of the issues related to the Protective Order Brief, in its consideration of the Motion for Reconsideration, and that those issues would be resolved by the forthcoming amended Protective Order. See Tr. at 49:12-15 (Court). Accordingly, the Court explained that the Defendants did not have to share with the

United States materials from sources other than the United States, unless pursuant to an order.

See Tr. at 49:17-20 (Court).   The Court reiterated that defense counsel could show these

documents to their clients in prison, either by uploading them onto the tablets, or by taking paper

copies of these documents to the prison, then taking these papers back with them so that no

papers would be left in the prison.   See Tr. at 49:17-23 (Court).   In tandem, the Court then

addressed Sanchez' Protective Order Reply.   See Tr. at 49:23-50:2 (Court).   In that regard, the

Court concluded that all of the parties had similarly come to an agreement resolving all of the

issues that deserved review in Sanchez' Protective Order Reply.   See Tr. at 50:3-7 (Court).

Next, the Court addressed the United States' Notice, and suggested that, if all the parties

agreed, the Court would "reconsider any rulings [entered earlier] in the case," and that it would

not "put the defense lawyers in the position of having to satisfy the high standards for motions to

reconsider."   Tr. at 53:25-54:5 (Court).   The Court explained that the United States Court of

Appeals for the Tenth Circuit set forth factors in Servants of Paraclete v. Does, 204 F.3d 1005

(10th Cir. 2000),[15] and that courts will often consider those factors when analyzing whether to

reconsider a motion -- imposing a heavy burden for the moving party to overcome.   The Court

explained that it was not excited or inclined to consider whether Judge Gonzales had a conflict of

interest in this case, and, with the parties' agreement not to "reconsider everything just for the

sake of reconsidering it," the Court would, in exchange for not addressing Judge Gonzales'

conflict situation, not apply the usual stringent factors needed to reconsider earlier rulings when

it was asked to reconsider a specific order that Judge Gonzales had entered -- much the same

way it had treated the Motion for Reconsideration of the Protective Order.   Tr. at 54:2-21

---

[15]In that case, the Tenth Circuit set forth factors that courts should analyze when determining whether to grant a motion to reconsider judgments.   See Servants of the Paraclete v. Does, 204 F.3d at 1012.

(Court).  The Defendants and the United States agreed to the Court's proposal, resolving the

United States' Notice, and the Court chose to dismiss the motion without prejudice.  See Tr. at

54:22-56:10 (Castle, Armijo).

The Court also addressed the Defendants' Due Process Motion, which related to the

nature of the filings before the Court.  See Tr. at 57:1-59:14 (Court).  The Court explained that

the filings were to be done in accordance with three -- and only three -- categories, and ex parte

filings were to be kept to a minimum.  See Tr. at 57:2-18 (Court).  The parties agreed that this

compromise, and adherence to the rules moving forward, would resolve the issues raised by the

Due Process Motion.  See Tr. at 64:2-6 (Court).

Lastly, in relevant part, the Court addressed the Motion to Suspend the Scheduling Order.

See Tr. at 64:7-65:22 (Court).  Essentially, because the Court had already set a status conference

and an ex parte CJA conference with the District Court, it concluded that the Motion to Suspend

the Scheduling Order only raised one salient issue -- that being the trial date.  See Tr. at 64:7-

65:22 (Court).  Because the trial could be continued as is necessary, the Court concluded that the

Motion to Suspend the Scheduling Order was effectively moot, and thereby denied it.  See Tr. at

64:7-65:22 (Court).

### g.      **The Proposed Protective Order.**

On June 16, 2016, the parties jointly sent the Court a Proposed Protective Order in

accordance with the discussions at the hearing.  See Proposed Protective Order, filed June 16,

2016 (Doc. 589)("Modified Protective Order").   In the Modified Protective Order, unlike in

Judge Gonzales's Protective Order, there is no reference to confidential materials.   See

Protective Order at 1-5.  Some provisions remained unchanged, but the parties agreed to several

significant changes.  See Modified Protective Order at 1-5.  First, the Modified Protective Order

- 43 -

provided for the United States to make all of its discovery materials available for upload onto the Defendants' tablets: "All government discovery materials will be uploaded onto the Computers by the designated Discovery Coordinator, who will update these Computers at regular intervals as additional government discovery materials are disclosed."  Modified Protective Order at 2.  If the Defendants' counsel wishes to provide "Defense Materials" to their clients, the Modified Protective Order requires the Defendants' counsel to upload the "Defense Materials" onto their clients' tablets, and that the attorney-client privilege and the work product doctrine will protect the content of the documents.  Modified Protective order at 4.  The Defendants may review and possess paper copies of publicly filed pleadings, but they may not possess paper copies of documents filed ex parte or sealed.  See Modified Protective Order at 4.  The Defendants may review copies of such restricted pleadings under the supervision of counsel, as long as counsel takes the papers out of the prison with them.  See Modified Protective Order at 4.  Finally, the parties agreed that the Defendants' counsel "shall make all reasonable efforts to recover all paper copies of discovery from this case or prior State prosecutions, all paper copies of Defense Materials, and all paper copies of ex parte or sealed pleadings currently in the possession of any Defendant."  Modified Protective Order at 4.  The Modified Protective Order also contained some provisions regarding the protocol the parties should follow if they wish to provide a Defendant with paper copies or to seek modification of the Modified Protective Order.  See Modified Protective Order at 4-5.  The last four provisions of the Modified Protective Order are the same as the last four in Judge Gonzales's Protective Order.  See Protective Order at 3-4; Proposed Protective Order at 5.

It is worth noting that, initially, the sixteen Defendants who jointly filed the Motion for Reconsideration wanted the Court "to permit the defendants to possess all discovery on their

- 44 -

tablet computers."   Motion for Reconsideration at 3.   Lujan opposed that relief, while E.

Martinez, R.P. Martinez, Clark, and Rivera took no position on the matter, and Patterson, Varela,

R. Martinez and A. Gallegos had not indicated whether they agreed or disagreed with the relief

that the sixteen filing Defendants sought.   See Motion for Reconsideration at 3.   Only one

Defendant -- Lujan -- explicitly opposed the Motion for Reconsideration's relief.   See Motion for

Reconsideration at 3.   The United States, at all times, remained opposed to the reconsideration

altogether, because "the original issues and reasoning for the 'Confidential Materials' still exist."

Response 2 at 9.   The United States still complied with the Courts' order by ensuring that the

Modified Protective Order, as it was drafted by Defendants, accurately reflected what the Court

stated at the hearing.

The Court adopted the parties' proposed protective order on June 16, 2016.   See Modified

Protective Order at 1.   The Court crossed out the word "Proposed" in the title of the document

and signed off on the Order.   Modified Protective Order at 1, 5.   The Court chose to use the

Modified Protective Order's proposed language as a basis for the section regarding the correction

officers' role in inspecting the Defendants' tablets.   See Modified Protective Order at 3.   The

Court rewrote the Modified Protective Order's section to allow the officers to periodically ask

the Defendants to unlock their tablets so that they can scan them for contraband.   See Modified

Protective Order at 3.   The Court specified that correction officers "shall not read or otherwise

examine the content of the Computers."   Modified Protective Order at 3.

## LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E) Documents and Objects.**  Upon a defendant's request, the government must
permit the defendant to inspect and to copy or photograph books, papers,
documents, data, photographs, tangible objects, buildings or places, or copies or

portions of any of these items, if the item is within the government's possession, custody, or control and:

    **(i)**    the item is material to preparing the defense;

    **(ii)**    the government intends to use the item it its case-in-chief at trial; or

    **(iii)**    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition." United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)). Rule 16 also does not obligate the United States to "take action to discover information which it does not possess." United States v. Badonie, No. CR 03-2062 JB, 2005 WL 2312480, at *2 (D.N.M., Aug. 29, 2005)(Browning, J.)(quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted). Nor is the United States required to secure information from third parties. See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993)) (internal quotation marks omitted). "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant

significantly to alter the quantum of proof in his favor." United States v. Graham, 83 F.3d at

1474 (alterations omitted)(citations omitted)(internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or

modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or
> inspection, or grant other appropriate relief. The court may permit a party to
> show good cause by a written statement that the court will inspect ex parte. If
> relief is granted, the court must preserve the entire text of the party's statement
> under seal.

Fed. R. Crim. P. 16(d)(1). In In re Terrorist Bombings of United States Embassies in East

Africa, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit

held that rule 16(d) gives district courts the discretion to determine the circumstances "under

which the defense may obtain access to discoverable information." In re Terrorist Bombings of

United States Embassies in East Africa, 552 F.3d at 122. In United States v. Delia, 944 F.2d

1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives

district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]."

United States v. Delia, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party

who fails to comply with" rule 16. United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir.

1988).

> **(2) Failure to Comply.** If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its
> time, place, and manner; and prescribe other just terms and
> conditions;
>
> **(B)** grant a continuance;
>
> **(C)** prohibit that party from introducing the undisclosed evidence; or

**(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks

omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)).  In United

States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the Tenth Circuit held that "a court should

impose the least severe sanction."  455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d

1059, 1061(10th Cir. 1988)).  The Tenth Circuit noted: "Rule 16 and our cases specifically

mention continuance or exclusion of the evidence as preferred remedies."  455 F.3d at 1131.

## LAW REGARDING MOTIONS TO RECONSIDER

Motions to reconsider in civil cases fall into three categories:

> (i) a motion to reconsider filed within [twenty-eight][16] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion

---

[16]Former rule 59 used to provide for a ten-day period after entry of judgment to file motions to reconsider.  In 2009, the rule was amended, extending the filing period to twenty-eight days:

> Experience has proved that in many cases it is not possible to prepare a satisfactory post-judgment motion in 10 days, even under the former rule that excluded intermediate Saturdays, Sundays, and legal holidays. These time periods are particularly sensitive because Appellate Rule 4 integrates the time to appeal with a timely motion under these rules. Rather than introduce the prospect of uncertainty in appeal time by amending Rule 6(b) to permit additional time, the former 10-day periods are expanded to 28 days.

Federal Rules of Civil Procedure, Rule 59, Legal Information Institute, https://www.law.cornell.edu/rules/frcp/rule_59.

- 48 -

to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion.  See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).   See

Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).

While the civil rules are not expressly applicable to criminal cases, the courts have used the

principles somewhat interchangeably.  See United States v. Christy, 739 F.3d at 539-40; United

States v. Huff, 782 F.3d 1221, 1223-24 (10th Cir. 2015).  The case law for the civil side can

inform when a motion to consider is appropriate in a criminal case.  See United States v. Christy,

739 F.3d at 534, 539-40 (10th Cir. 2014); United States v. Huff, 782 F.3d at 1223-24.

1.      **Motions for Reconsideration Under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.**

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant

files within twenty-eight days of a court's entry of judgment.  See Price v. Philpot, 420 F.3d at

1167 n.9.  If the movant files outside that time period, courts should treat the motion as seeking

relief from judgment under rule 60(b).  See Price v. Philpot, 420 F.3d at 1167 n.9.  "[A] motion

for reconsideration of the district court's judgment, filed within [rule 59's filing deadline],

postpones the notice of appeal's effect until the motion is resolved."  Jones v. United States, 355

F. App'x 117, 121 (10th Cir. 2009)(unpublished).  The time limit in rule 59(e) is now twenty-

eight days from the entry of a judgment.  See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule

60 is not only a question of timing, but also "depends on the reasons expressed by the movant."

Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194,

1200 (10th Cir. 2011).   Where the motion "involves 'reconsideration of matters properly

encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps

- 49 -

v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d

751, 753 (10th Cir. 1989)).   In other words, if the reconsideration motion seeks to alter the

district court's substantive ruling, then it should be considered a rule 59 motion and be subject to

rule 59's constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal
> representatives from a final judgment, order, or proceeding for the following
> reasons:
>
> > (1)   mistake, inadvertence, surprise, or excusable neglect;
> >
> > (2)   newly discovered evidence that, with reasonable diligence,
> >         could not have been discovered in time to move for a new
> >         trial under Rule 59(b);
> >
> > (3)   fraud (whether previously called intrinsic or extrinsic),
> >         misrepresentation, or misconduct by an opposing party;
> >
> > (4)   the judgment is void;
> >
> > (5)   the judgment has been satisfied, released or discharged; it is
> >         based on an earlier judgment that has been reversed or
> >         vacated; or applying it prospectively is no longer equitable;
> >         or
> >
> > (6)   any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Neither a rule 59 nor a rule 60 motion for reconsideration

> are appropriate vehicles to reargue an issue previously addressed by the court
> when the motion merely advances new arguments, or supporting facts which were
> available at the time of the original motion. . . .   Grounds warranting a motion to
> reconsider include (1) an intervening change in the controlling law, (2) new
> evidence previously unavailable, and (3) the need to correct clear error or prevent
> manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012.   "[A] motion for reconsideration is

appropriate where the court has misapprehended the facts, a party's position, or the controlling

law."  Servants of the Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable

discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

- 50 -

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge the time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . .").  "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."  12 James Wm. Moore, Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations omitted).  Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)."  Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.  See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . .").  Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.  See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572,

DNM 556

577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to

grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled

decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir.

1990)(holding that attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result

of an attorney's deliberate litigation tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577.

This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot
> now avoid the consequences of the acts or omissions of this freely selected agent.
> Any other notion would be wholly inconsistent with our system of representative
> litigation, in which each party is deemed bound by the acts of his lawyer agent
> and is considered to have notice of all facts, notice of which can be charged upon
> the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co.,

370 U.S. 626, 633-34 (1962))(internal quotation marks omitted). The Tenth Circuit has held that

there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct"

and has noted that those "who act through agents are customarily bound," even though, when "an

attorney is poorly prepared to cross-examine an expert witness, the client suffers the

consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case."

Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks

omitted). "If the reasons offered for relief from judgment could be considered under one of the

more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule

60(b)(6)." Moore, supra, § 60.48[2], at 60-182. Accord Liljeberg v. Health Servs. Acquisition

Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and

suggests that clause (6) and clauses (1) through (5) are mutually exclusive."). "The Rule does

not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'" Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863 (quoting Ackermann v. United States, 340 U.S. 193 (1950)).

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief. See Ackermann v. United States, 340 U.S. at 202 ("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." Pierce v. Cook & Co., 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45.

## 2.    Motions to Reconsider Interlocutory Orders.

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment. This confusion originates from the fact that neither the Federal Rules of Civil

Procedure nor the Federal Rules of Criminal Procedure mention motions to reconsider, let alone

set forth a specific procedure for filing them or a standard for analyzing them.   A loose

conflation in terminology in <u>Servants of the Paraclete v. Does</u>, which refers to rule 59(e) motions

in civil cases -- "motion[s] to alter or amend a <u>judgment</u>" -- as "motions to reconsider,"[17]

compounded that baseline confusion.   Fed. R. Civ. P. 59(e) (emphasis added); <u>Servants of the

Paraclete v. Does</u>, 204 F.3d at 1005.

Final judgments are different from interlocutory orders.   <u>See</u> Fed. R. Civ. P. 54(a)

("'Judgment' as used in these rules includes a decree and any order <u>from which an appeal

lies</u>.")(emphasis added).   In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The

courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district

courts . . . ."), the entry of final judgment narrows the district court's formerly plenary

jurisdiction over the case in three ways.   First, for the first twenty-eight days after the entry of a

---

[17]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored <u>Servants of the Paraclete v. Does</u>, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion.   204 F.3d at 1005.   He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within 28 days of the entry of judgment, which the <u>Servants of the Paraclete v. Does</u> standard governs; and (iii) motions to reconsider a judgment made more than 28 days after the entry of judgment, which rule 60(b) governs.   There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).   These are the terms that the Federal Rules of Civil Procedure -- and other Courts of Appeals -- use to describe (ii) and (iii).   The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

civil judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B). Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  See Fed. R. App. P. 4(a)(4)(B). Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality.  The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision-making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case.

The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals. The district court is thus divested of jurisdiction. Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules of Civil Procedure and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules of Civil Procedure set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days. In defining the "limited review" that

rule 59(e) allows a district court to conduct in the twenty-eight-day flux period, the Tenth

Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds --

the same grounds that inform whether a court should depart from an appellate court's prior

decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142 F.3d 1243, 1247

(10th Cir. 1998)(departing from the law-of-the-case doctrine in three exceptionally narrow

circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when

controlling authority has subsequently made a contrary decision of the law applicable to such

issues; or (3) when the decision was clearly erroneous and would work a manifest

injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating

those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a

district court reconsiders one of its own interlocutory orders.   The Federal Rules do not

specifically mention motions to reconsider interlocutory orders, but rule 54(b) of the Federal

Rules of Civil Procedure makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim,
> counterclaim, crossclaim, or third-party claim -- or when multiple parties are
> involved, the court may direct entry of a final judgment as to one or more, but
> fewer than all, claims or parties only if the court expressly determines that there is
> no just reason for delay.   Otherwise, any order or other decision, however
> designated, that adjudicates fewer than all the claims or the rights and liabilities of
> fewer than all the parties does not end the action as to any of the claims or parties
> and may be revised at any time before the entry of a judgment adjudicating all the
> claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b)(emphases added).  Rule 54(b) thus (i) provides that a district court can

freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district

court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ.

P. 54(b).

- 57 -

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)).  In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges.  How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling

was on a criminal suppression motion, class certification motion, or preliminary injunction,[18]

than when the prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to

the overall thoroughness of the prior ruling, but to the thoroughness with which the Court

addressed the exact point or points that the motion to reconsider challenges.  A movant for

reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion

asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she

files a broad motion to reconsider that rehashes the same arguments from the first motion, and

essentially asks the Court to grant the movant a mulligan on its earlier failure to present

persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for

reconsideration's timeliness relative to the ruling it challenges, and any direct evidence that the

parties may produce, and use those factors to assess the degree of reasonable reliance the

opposing party has placed in the Court's prior ruling.  See 18B Charles Alan Wright, Arthur R.

Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E.

Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability

---

[18]The Court typically makes findings of fact and conclusions of law in ruling on these motions.  At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: "**Amended or Additional Findings.**  On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59."  Fed. R. Civ. P. 52(b).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to 28 days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

- 59 -

becomes increasingly important as the proceeding nears final disposition . . . .  Reopening should

be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For

example, if a defendant (i) spends tens of thousands of dollars removing legacy computer

hardware from long-term storage; then (ii) obtains a protective order in which the Court decides

that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to

long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the

plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they

faced in fighting the Motion for Protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds.  The

Court should be more inclined to grant motions for reconsideration if the movant presents

(i) new controlling authority -- especially if the new authority overrules prior law or sets forth an

entirely new analytical framework; (ii) new evidence -- especially if the movant has a good

reason why the evidence was not presented the first time around; or (iii) a clear indication -- one

that manifests itself without the need for in-depth analysis or review of the facts -- that the Court

erred.

These three factors should influence the degree to which the Court restricts its review of a

prior ruling, but they do not necessarily mean that the Court should always apply a deferential

standard of review.  The Court should pause before applying a standard of review to its own

interlocutory orders that is more deferential than the standard that the Court of Appeals will

apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or

the party moving for reconsideration waived its right to appeal the alleged error by not raising

the appropriate argument.  Even in circumstances where the Court concludes that it is insulated

from reversal on appeal, there are principled reasons for applying a de novo standard.  After all,

if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain

that result -- although the Court should weigh this injustice against any injustice that would result

from upending the parties' reliance on the earlier ruling, which is the balancing test that the three

factors above represent.

What the Court means by "restricting its review" is less about applying a deferential

standard of review -- although that may be appropriate in some circumstances -- and more about

reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial

resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party

opposing the motion for reconsideration.  The Court should consider the time and expense that

the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent

that party from having to bear the same impositions again.  Even if the Court ultimately analyzes

a motion to reconsider under the same standard that it analyzed the motion that produces the

earlier ruling, it should analyze the motion in a different way -- one focused on reducing the

litigation burdens of the party opposing reconsideration.  For example, when a party moves the

Court for a preliminary injunction, standard practice is that the Court holds an evidentiary

hearing as a matter of course, regardless whether it looks as if the party has a good chance of

prevailing.  If the party loses and the Court denies the injunction, however, and the party moves

for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing

merely because he or she received that presumption the first time the Court considered the

motion.

In light of these statements, it is perhaps better to characterize the increased burden that a

movant for reconsideration faces as one of production and not of persuasion.  The Court analyzes

motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew.

Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

Finally, the Tenth Circuit has applied the law regarding motions to reconsider in civil cases to the criminal context.  See United States v. Christy, 739 F.3d at 539-40; United States v. Huff, 782 F.3d at 1223-24.  The Tenth Circuit relies on civil cases for the principles that govern motions to reconsider in the criminal context.  See United States v. Christy, 739 F.3d at 539 (applying the standard set forth in Servants of the Paraclete v. Does in the criminal context); United States v. Huff, 782 F.3d at 1224 (same).  In United States v. Christy, the Tenth Circuit explained:

> Motions to reconsider are proper in criminal cases even though the Federal Rules of Criminal Procedure do not specifically provide for them.  A district court should have the opportunity to correct alleged errors in its dispositions.
>
> A motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law.  Specific grounds include: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest

injustice."  A motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier.

739 F.3d at 539 (internal citations omitted).  The Tenth Circuit similarly applied the Servants of the Paraclete v. Does standard in determining whether the district court had properly granted a motion to reconsider its decision to suppress in the criminal context in United States v. Huff, explaining:

> We have held that a motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law.  *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  Specific situations where circumstances may warrant reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."  *Id.*  "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed."  *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan. 1994).  We have specifically held that "[a] motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier."  *United States v. Christy*, 739 F.3d at 539 (10th Cir. 2014).

782 F.3d at 1224.  The Court will thus use the same test that it has developed for motions to reconsider in the civil context for motions to reconsider in criminal cases.  See Anderson Living Trust v. WPX Energy Prod., LLC, 312 F.R.D. 620, 642-49 (D.N.M. 2015)(Browning, J.).

## ANALYSIS

The Court will grant in part and deny in part the Motion for Reconsideration.  Pursuant to its agreement with the parties at the June 2, 2016, hearing on the Motion for Reconsideration, the Court will not strictly apply the usual three-factor test that guides motions to reconsider.  The usual test that the Court applies for motions to reconsider interlocutory orders is the one which the Court elaborated in United States v. Loera, 2016 WL 1730357.[19]  The Court will instead

---

[19]In United States v. Loera, the Court explained that the factors courts should consider when determining whether to reconsider an interlocutory order, are: (i) "how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider

- 63 -

analyze the Protective Order's terms to determine if, on the merits, it is an appropriate, fair, and workable order for the parties pursuant to the agreement at the hearing.  Because the Court concludes that it should modify the Protective Order in the manner discussed at the hearing, it thus grants in part and denies in part the Motion for Reconsideration, and accordingly grants in part and denies in part the requests in the Defendants' Protective Order Brief and in Sanchez' Protective Order Reply.

Second, the Court denies without prejudice the requests in the United States' Notice, and the requests in the Defendants' Response to the United States' Notice, by having struck a compromise with all of the parties that the high standard for bringing a motion for reconsideration will be relaxed where the issue underlying such a motion involves Judge Gonzales potentially having a conflict when he entered orders.  Instead of relitigating all of the issues on which Judge Gonzales ruled because he potentially had a conflict, the Court instead will take those issues as they may arise in accordance with its ruling at the June 2, 2016, hearing.

The Court also brokered a compromise at the hearing regarding the nature of the filings in this case going forward, thereby denying the Defendants' Due Process Motion.  By denying the Defendants' Due Process Motion, the Court brokered a deal with the parties that all filings will be done in accordance with a public, sealed, and ex parte categorization for the rest of the litigation.

---

challenges," 2016 WL 1730357, at *23; (ii) "the case's overall progress and posture, the Motion for Reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling," 2016 WL 1730357, at *24; and (iii) "the Servants of the Paraclete v. Does grounds," 2016 WL 1730357, at *33.

Last, because the issues were generally moot, the Court denied the Defendants' Motion to

Suspend the Scheduling Order.  The only item left to be considered on the Scheduling Order was

the trial date, which the Court concludes can be continued as might become necessary.

I.     **THE COURT WILL EXERCISE ITS DISCRETION IN DETERMINING WHETHER TO RECONSIDER THE PROTECTIVE ORDER.**

The Federal Rules of Criminal Procedure "do not expressly recognize a motion to

reconsider."  United States v. Christy, 810 F. Supp. 2d at 1249.[20]  Rule 16(d)(1) addresses,

however, the circumstances under which courts may modify an order related to regulating

discovery: "At any time the court may, for good cause, deny, restrict, or defer discovery or

inspection, or grant other appropriate relief."  Fed. R. Crim. P. 16(d)(1).  Courts thus have

discretion to regulate discovery.  In United States v. Harmon, the Court held that "[a] district

court has considerable discretion in ruling on a motion to reconsider."  United States v. Harmon,

871 F. Supp. 2d at 1144.  "In the criminal context, however, courts ordinarily apply the same

standards as those used in civil cases when addressing motions to reconsider."  United States v.

Harmon, 871 F. Supp. 2d at 1143.  In United States v. Loera, No. CR 13-1876, 2016 WL

1730357, at *18 (D.N.M. 2016)(Browning, J.), the Court noted: "Courts may treat motions for

reconsideration as a [Federal Rules of Civil Procedure] rule 59(e) motion when the movant files

within twenty-eight days of a court's entry of judgment."  The Court distinguished, however,

---

[20]In United States v. Christy, the defendant moved to suppress evidence and statements, which the Court granted.  See 810 F. Supp. 2d at 1282.  Later, the United States filed a motion to reconsider the suppression order and to reopen a suppression hearing.  See United States v. Christy 810 F. Supp. 2d at 1222.  The Court granted in part the motion to reconsider, holding that it would reopen the suppression hearing and that it would reconsider its memorandum opinion and order, because it had not ruled on the inevitable discovery issue.  See United States v. Christy, 810 F. Supp. 2d at 1282.  The defendant appealed, and the Tenth Circuit affirmed the Court's ruling, holding: "[T]he district court acted well within its discretion in granting the motion to reconsider . . . in order to rule on an issue it mistakenly overlooked.  The district court was plainly aware of the appropriate grounds for a motion to reconsider."  United States v. Christy, 739 F.3d at 539.

- 65 -

motions to reconsider under rule 59(e) and rule 60(b) of the Federal Rules of Civil Procedure, from motions to reconsider interlocutory orders.  See United States v. Loera, 2016 WL 1730357, at *18-21.  The Court stated: "[F]inal judgments are different from interlocutory orders."  United States v. Loera, 2016 WL 1730357, at *21.

In the context of an interlocutory order, the Court analyzes motions to reconsider differently from motions to reconsider final judgments, depending on three factors that the Court listed in United States v. Loera: (i) "how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges,"  2016 WL 1730357, at *23; (ii) "the case's overall progress and posture, the Motion for Reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling,"  2016 WL 1730357, at *24; and (iii) "the Servants of the Paraclete v. Does grounds,"[21] 2016 WL 1730357, at *24.  Here, the Court must determine whether to reconsider the Protective Order that Judge Gonzales issued in this case.  See Motion for Reconsideration at 1; Protective Order at 1.  An interlocutory order is "[a]n order that relates to some intermediate matter in the case; any order other than a final order."  Interlocutory Order, Black's Law Dictionary, at 1207 (9th ed. 2008).  The Protective Order at issue, therefore, is an interlocutory order and not an entry of judgment.

---

[21]As the Court explained in this Memorandum Opinion and Order's Law Regarding Motions to Reconsider Section, the Servants of the Paraclete v. Does grounds include: (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the court erred.  See United States v. Loera, 2016 WL 1730357, at *33.

DNM 571

Accordingly, the Court would normally, routinely apply the three factors that it set forth in United States v. Loera.  See 2016 WL 1730357, at *23-24.  At the hearing on the Motion for Reconsideration, however, the Court ruled, in part, that, if the parties would not insist that the Court decide whether Judge Gonzales had a conflict when he entered the Protective Order, it would not use the requirements in United States v. Loera to decide whether the Protective Order, or any other order that Judge Gonzales entered, should be set aside because he may have had a conflict.  The parties agreed that the Court did not have to decide whether Judge Gonzales had a conflict and that in its discretion it would decide such motions to reconsider on the merits without applying the strict requirements of United States v. Loera.  Consistent with this oral ruling, the Court will decide on the merits whether the Protective Order is working for the parties and whether it is achieving what it sought to accomplish, without consideration of the factors the Court described in United States v. Loera.  In this case, the Protective Order warrants modification given its unworkable nature -- for all of the parties -- and its insurance of only a minimal benefit regarding the Defendants' safety, as balanced against the great expense of Defendants' counsel, as well as the case's reassignment and inherent complexity.  See United States v. Harmon, 871 F. Supp. 2d at 1144 ("A district court has considerable discretion in ruling on a motion to reconsider.").

## II.   __THE COURT WILL MODIFY THE PROTECTIVE ORDER__.

The Court agrees with the Defendants that the Discovery Coordinator should upload what Judge Gonzales' Protective Order calls "Confidential Material" onto the tablets to allow the Defendants to prepare adequately for trial.  Protective Order at 1.  See Motion for Reconsideration at 12.  The Court will limit, however, the Defendants' access to some documents.  In most cases, protective orders concern whether an informant's identity should be

disclosed to the defendants, for fear of retaliation.  See, e.g., United States v. Aranda-Daiz, No. CR 12-2686 JB, 2014 WL 59868 (D.N.M. 2014)(Browning, J.); United States v. Barbeito, No. CR 09-0222, 2009 WL 3645063 (S.D.W. Va. 2009)(Johnston, J.).  Here, under the current Protective Order, the Defendants already have access to alleged cooperators' identities, because they can review "Confidential Materials" with their counsel in prison.  Protective Order at 2. The Court must determine whether it should continue to allow the Defendants to review such "Confidential Material" only in person and with counsel present, or whether it should allow the Discovery Coordinator to upload such "Confidential Material" onto the tablets that the Defendants already use to review non-confidential information.

In United States v. Barbeito, the Honorable Thomas E. Johnston, United States District Judge for the Southern District of West Virginia, granted a motion requesting a protective order, because he concluded that the confidential informant's identity should be kept secret, given the concrete risks of retaliation.  See 2009 WL 3645063, at *1.  In that case, however, the focus of the court's analysis was on the court's and counsel's "real practical control over [the documents'] dissemination."  2009 WL 3645063, at *1.  The district court thus noted: "[T]he danger is certainly compounded when written discovery materials identifying informants are floating about in the community, and perhaps worse yet, on the internet."  2009 WL 3645063, at *1.  Based on his concern about the defendants having access to paper materials, Judge Johnston granted the protective order and held that sensitive materials should not be left in paper form in the hands of defendants who might disseminate them.  See 2009 WL 3645063, at *1.

In United States v. Garcia, 406 F. Supp. 2d 304 (S.D.N.Y. 2005)(Lynch, J.), the Honorable Gerard E. Lynch, United States District Judge for the Southern District of New York,

discussed the need for a case-by-case analysis of protective orders regarding discovery when

retaliation is a valid concern.  See 406 F. Supp. 2d at 306.  Judge Lynch stated:

> [T]he wide dissemination of statements by cooperating witnesses who are regarded as "snitches" or "rats" by their criminal associates, and who often must serve their own sentences in close proximity to other prisoners, poses obvious dangers.  It is not enough to say, as the defendants argue in this case, that the damage is done by the mere disclosure that a witness has cooperated with the authorities.  Hard evidence of the witness's betrayal can facilitate retaliation or intimidation of the witness.  It is therefore appropriate, in a case where such retaliation may be feared, to restrict the circulation of such material.

United States v. Garcia, 406 F. Supp. 2d at 306.  Judge Lynch further stated: "Defendants have a

right to participate in their defense.  Moreover, defense counsel need to be able to consult with

their clients about the nature of the prosecution's expected proof."  406 F. Supp. 2d at 304.

Judge Lynch stated: "Often, the defendants alone possess information that may be critical in

refuting the Government's evidence, or in discrediting expected prosecution witnesses.  Defense

counsel must thus be free to communicate freely with their clients, and to discuss with them the

anticipated testimony against them."  406 F. Supp. 2d at 305.

In United States v. Aranda-Daiz, defendant Aranda-Daiz filed a motion for the court to

modify a protective order.  See 2014 WL 59868, at *1.  The Court had issued a protective order

requiring disclosure of a confidential informant's identity to Aranda-Daiz' counsel, but not to

Aranda-Daiz.  See 2014 WL 59868, at *1.  The Court granted the motion to modify the

protective order, holding that Aranda-Daiz should be able to learn the confidential informant's

identity, because "[t]he Court should not . . . construct a firewall between Aranda-Daiz and his

counsel that would separate Aranda-Daiz from information that is important to his constitutional

right of a 'meaningful opportunity to present a complete defense.'"  United States v. Aranda-

Daiz, 2014 WL 59868, at *13 (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

DNM 574

Here, under the current Protective Order, the Court is faced with a unique situation: the Defendants have very limited access to confidential materials that the United States will use against them, and the Defendants' counsel are significantly burdened by having to meet with their clients at custodial facilities to review confidential materials with them in person. Given the United States' liberal designation of documents as confidential, it appears that most of the documents will be confidential. The prospect of having a lawyer go page by page of nearly 10,000 documents supports that it will require counsel to be at the prison many, many hours. If counsel can go through 20-25 pages an hour, which may be optimistic, it will take 400-500 hours them each to review all of the documents with their clients. The Protective Order provides for tablets for the Defendants to review non-confidential discovery materials. See Protective Order at 2. The Defendants are able to use the tablets "in their cells and during legal visits." Protective Order at 2. The Protective Order also provides, however, for a designation of specific documents as "Confidential Material" -- "(1) any defendant's post-arrest statement; (2) statements by eyewitnesses, cooperating witnesses, and confidential government sources regarding the crimes charged in these cases; and (3) photograph and/or audio/video recordings that would identify such persons or the content of the statements in (1) or (2), above." Protective Order at 1. While the Discovery Coordinator can upload non-confidential material onto the tablets, confidential material "may be disclosed to and viewed by a defendant in the presence of and under the direct supervision of his counsel. . . . Absent further order of the Court, the defendants are not to be provided paper copies of any discovery materials." Protective Order at 2.

The use of tablets mitigates the Court's concerns about the Defendants disseminating paper documents and subsequently engaging in retaliation. Here, unlike in United States v. Barbeito, the Defendants have tablets -- lacking Internet access -- onto which discovery materials

can be uploaded, thus removing the danger of papers circulating in the prison.  See Protective

Order at 2.  If the United States uploads all of its discovery materials onto the Defendants' tablets

-- both non-confidential and confidential materials -- the Defendants will be able to review that

information without leaving behind a paper trail.  This scenario will decrease the risk -- not

eliminate the risk -- that the Defendants will disseminate sensitive information.

    As in United States v. Aranda-Daiz, the Court is concerned about the Defendants' ability

to adequately prepare for trial.  The Court is concerned about the Protective Order constructing a

"firewall" between the Defendants and their counsel that would effectively "separate them from

information that is important to their constitutional right of a 'meaningful opportunity to present

a defense.'"  2014 WL 59868, at *14 (quoting Crane v. Kentucky, 476 U.S. at 690).  The current

document review will take a long time, if it can be done at all.  The death-penalty eligible

Defendants have two counsel, many from out of state.  It is unrealistic to require learned counsel,

many with national practices, and local counsel, with many other clients, to camp out at the

detention center for days at a time, reviewing a page at a time.  Under the current Protective

Order, defense counsel are having to visit custodial facilities in person to review confidential

papers with their clients.  Moreover, the current Protective Order is overly burdensome for

defense counsel and for the Defendants, who are allowed to review the materials that will be

used against them only while they are under counsel's supervision.  Because the Court must

avoid constructing a firewall between the Defendants and their counsel, and because the risk of

leaving a paper trail does not exist with tablets, the Court orders the United States to have the

Discovery Coordinator upload all of its discovery onto the tablets.  This process will allow the

Defendants to adequately review the documents on their own time and then discuss them with

DNM 576

the Defendants' counsel, who will then be better able to use the time they spend with their clients.

The United States conceded at the hearing that its biggest concern is that the Defendants have a lot of time on their hands and that they will study these documents, memorize them, and tell other SNM gang members what they have learned, thus putting at risk cooperators and informants.  See Tr. at 39:4-9 (Beck).  The Court shares this concern.  The problem is that the risk substantially exists under the current order.  The Defendants are smart and can probably remember the names when they read them with their counsel.  The marginal increase in safety -- by intentionally making it more difficult for the Defendants to read the documents -- does not justify the extreme burden the current order is imposing on the Defendants and their counsel.

In its modified protective order, the Court will dispose of the Confidential Material designation altogether.  If, for any reason, materials are only available in paper form -- such as some defense discovery -- the Court will order defense counsel to take these papers with them to custodial facilities, and they will ensure that no paper discovery is left with the Defendants.  Out of concern for witnesses' safety, the Court must ensure that no one leaves a paper trail, to prevent dissemination of sensitive documents.  The Court will allow the Defendants to review and retain the publicly-filed pleadings in paper form, because everyone may have access to these. The Court concludes, however, that the Defendants' access to sealed pleadings should be limited. Such pleadings will therefore not be available on the Defendants' tablets.  Instead, the Defendants' counsel may review sealed pleadings with their clients only in paper form.  The Defendants' counsel will not give any paper copies to the Defendants, and they will ensure they take the papers with them when they leave the prison.  Finally, the Court orders that corrections

officer should inspect the tablets -- without reading their content -- to make sure they are used

solely for the purpose of reading information.

### III.   THE COURT WILL RELAX THE BURDEN OF PROOF NEEDED TO BRING A MOTION FOR RECONSIDERATION IN THIS CASE AS IT RELATES TO JUDGE GONZALES' POTENTIAL CONFLICT.

With respect to the United States' Notice, the Court concludes that it will not run the

parties through the usual ringer of satisfying the three factors that the Court normally considers

in ruling on a motion to reconsider an interlocutory order.  See Tr. at 53:25-54:5 (Court).  The

parties agreed to the Court not deciding whether Judge Gonzales had a potential conflict and to

the Court treating the orders that Judge Gonzales entered as its own.  See Tr. at 54:22-56:10

(Castle, Armijo).  In exchange, should a situation arise where Defendants move to reconsider

another of Judge Gonzales' previous substantive orders because of a potential conflict, the Court

will treat the motion on the merits -- was it a good order or not -- without strictly applying the

movant's high burden of proof for motions to reconsider.  See Tr. at 54:22-56:10 (Castle,

Armijo).  Accordingly, the Court denies without prejudice the United States' Notice and the

requests in the Response to the United States' Notice, with other Judge Gonzales orders to be

considered on an individual basis as might be necessary later in the case.  See Tr. at 55:7-15

(Court).

### IV.   THE COURT'S RULINGS AT THE HEARING MOOT DEFENDANTS' DUE PROCESS MOTION AND THE DEFENDANTS' MOTION TO SUSPEND THE SCHEDULING ORDER.

A court has broad discretion in managing its docket.  See Clinton v. Jones, 520 U.S. 681,

706 (1997)(citing Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)).  At the hearing, the Court

made a bright-line rule for the nature of the filings in this case moving forward.  All filings will

be public, ex parte, or sealed -- there will be no other category, and ex parte filings will need to

be kept to an absolute minimum.  See Tr. at 60: 22-25 (Court).  The Court's ruling resolves the Defendants' Due Process Motion, which merely sought to make sure the filings comported with the rules.  See Tr. at 63:12-17 (Chambers).

In a related sense, the Court concludes that the only potential issue that the Motion to Suspend the Scheduling Order raises is the trial date.  The other requests in the Motion to Suspend the Scheduling Order -- an ex parte CJA conference and a status conference -- were set when the Court held the hearing.  See Tr. at 68:2-18 (Court).  Because the trial can be continued as necessary, the Court denies the Motion to Suspend the Scheduling Order.  See Tr. at 68:19-69:12 (Court).

**IT IS ORDERED** that: (i) the Defendants' Opposed Joint Motion for Reconsideration of the Protective Order, filed May 23, 2016 (Doc. 541), is granted in part and denied in part -- the Court will issue a new Protective Order containing the terms upon which the parties agreed during the June 2, 2016, hearing and in the Proposed Protective Order they filed on June 16, 2016; (ii) Defendants' Brief Regarding "Protective Orders" for Materials Obtained from Sources Other Than the Government, filed March 8, 2016 (Doc. 302), is granted in part and denied in part; (iii) Defendant Daniel Sanchez's Reply Regarding Court's Ability to Subject Materials Obtained Independently of This Court's Process to Court's Protective Order (Doc. 313), filed March 15, 2016 (Doc. 315), is granted in part and denied in part; (iv) the United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in This Case or any Other Case, filed April 1, 2016 (Doc. 358), and the requests in the Response to Doc. No. 358 -- the United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in This Case or any Other Case, filed April 4, 2016 (Doc. 360), are denied without

prejudice; (v) the Motion for Order Directing the United States to Comply with Fundamental Due Process, filed March 28, 2016 (Doc. 342), is denied in part; and (vi) the Motion to Suspend Scheduling Order (Doc. 250), Request for Status Conference and Ex Parte CJA Conference with the District Court, filed May 18, 2016 (Doc. 535), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

     *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, PC
Denver, Colorado

--and--

- 75 -

Cori Ann Harbour-Valdez
The Harbour Law Firm, PC
El Paso, Texas

*Attorneys for Defendant Edward Troup*

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

*Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Robert R. Cooper Law Firm, PC
Albuquerque, New Mexico

*Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

*Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

*Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

  *Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

--and--

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

  *Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

  *Attorney for Defendant Arturo Arnulfo Garcia*

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

--and--

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

  *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

  *Attorney for Defendant Ruben Hernandez*

DNM 582

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, PA
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

--and--

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

--and--

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for Defendant Conrad Villegas*

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

--and--

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Amy Sirignano
Law Office of Amy Sirignano, PC
Albuquerque, New Mexico

--and--

Christopher W. Adams
Charleston, South Carolina

    *Attorney for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Carlos Herrera*

Donald R. West
Don West Law
Orlando, Florida

--and--

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

    *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

    *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*

DNM 586

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

  vs.                               No. CR 15-4268 JB

ANGEL DELEON, et al.,

       Defendants.

## **SCHEDULING ORDER**

     The Court, having granted the motion by the United States and the defendants to declare this case complex, and considering the parties' proposed scheduling order, hereby imposes the following deadlines, without objection from the parties, in this case:

1.  November 18, 2016:    Reciprocal discovery by the defendants (except for the defendants' continuing duty to disclose);

2.  December 5, 2016:    Scientific expert witness notices and reports; Fed. R. Crim. P. 16 discovery motions; Fed. R. Crim. P. 7(f) motions;

3.  December 19, 2016:    Responses to Fed. R. Crim. P. 16 discovery motions and Rule 7(f) motions; Objections to scientific expert witness notices.

4.  January 3, 2017:    Responses to scientific expert witness notices.

5.  January 9, 2017:    Fed. R. Crim. P. 12 pretrial motions; *Daubert* motions; Government's notice of gang experts.

6.  January 23, 2016:    Responses to pretrial and *Daubert* motions; Defendants' notice gang experts; Notices of defenses pursuant to Fed. R. Crim. P. 12.1 and 12.3.

7. February 6, 2017:     Responses to notices of defenses; motions *in limine*; Fed.

R. Evid. 404(b) notices; jury instructions; proposed *voir*

*dire*.

8. February 21, 2017:    Responses to motions *in limine*; objections to jury

instructions and proposed *voir dire*.

9. March 6, 2017:        Jury Selection/Trial at 9:00 a.m., Federal Courthouse, Las

Cruces, New Mexico.

The Court further orders that the United States shall continually make available discovery

on an ongoing basis, and make available to the defendants by the time required by the applicable

law all material for which disclosure is mandated by *Giglio v. United States*, 405 U.S. 150 (1972)

and the Jencks Act, 18 U.S.C. § 3500.

The Court further orders, pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii), that the time between

the entry of this Order and the trial date is excluded for the purposes of the Speedy Trial Act

computation.

UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CLERK'S MINUTES

*BEFORE DISTRICT JUDGE JAMES O. BROWNING*

| | | | |
|---|---|---|---|
| **CR CASE NO.:** | 15-4268 JB &<br>15-4269 JB | **DATE:** | November 29, 2016 |
| **CASE CAPTION:** | *USA v. DeLeon, et al.* | | |
| **CRD:** | K. Wild | **COURT REPORTER:** | J. Bean |
| **COURT IN SESSION:** | 9:19 a.m.<br>11:26 a.m.<br>2:22 p.m. | **COURT IN RECESS:** | 11:00 a.m. = 1:39<br>1:01 p.m. = 1:35<br>3:29 p.m. =  1:07<br>**TOTAL = 4:21** |

**TYPE OF PROCEEDING:**    Motion Hearing (see below)

**COURT'S RULING/DISPOSITION:**

1.  Defendant Anthony Ray Baca's Opposition to Proposed Restrictions on His Participation and Inclusion in Court Proceedings [777] – **TAKEN UNDER ADVISEMENT**
2.  Defendant Anthony Ray Baca's Joint, Unopposed Motion for Disclosure of Grand Jury and Petit Jury Data [773] – **GRANTED**
3.  Defendants' Joint Motion to Vacate March 2017 Trial Setting, Impose a Discovery Scheduling Order and Request for a Hearing [676] – **GRANTED IN PART AND DENEID IN PART**
4.  Joint Motion for Disclosure and Production of Confidential Informant  [698] – **GRANTED**
5.  Joint Motion to Exclude the Prosecution Team From December 2, 2016 Evidence Viewing [763] **- TAKEN UNDER ADVISMENT – INCLINED TO GRANT IN PART AND DENY IN PART**

**ORDER CONSISTENT WITH COURT'S RULING TO BE PREPARED BY:**    Forms of order to be submitted by counsel/opinions to be entered by Court as noted below

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**

Maria Armijo/Randy Castellano/
Matthew Beck, AUSA's

**ATTORNEYS PRESENT FOR DEFENDANT(S):**

Brock Benjamin (for Deft. Joe Lawrence Gallegos)

Cori Harbour-Valdez/Pat Burke (for Deft. Edward Troup)

Dean Clark (for Deft. Leonard Lujan)

Robert Cooper/James Castle (for Deft. Billy Garcia)

Doug Couleur (for Deft**.** Eugene Martinez)

Jeff Lahan (for Deft. Allen Patterson)

Orlando Mondragon (for Deft. Christopher Chavez)

Noel Orquiz/Nathan Chambers *(appearing telephonically beginning at 12:03 p.m.)* (for Deft. Javier Alonso)

Scott Davidson for Billy Blackburn (for Deft. Arturo Arnulfo Garcia)

Pedro Pineda (for Deft. Ruben Hernandez)

Gary Mitchell (for Deft. Jerry Armenta)

Margaret Strickland *(appearing telephonically)*/Larry Hammond (for Deft. Jerry Montoya)

Santiago Hernandez (for Deft. Mario Rodriguez)

Steve Almanza (for Deft. Timothy Martinez)

Mary Stillinger (for Deft. Mauricio Varela)

Richard Jewkes (for Deft. Daniel Sanchez)

B.J. Crow (for Deft. Conrad Villegas)

Marc Lowry/Theresa Duncan (for Deft. Anthony Ray Baca)

Amy Sirignano/Christopher Adams (for Deft. Christopher Garcia)

Michael Davis (for Deft. Carlos Herrera)

Ryan Villa/Justine Fox-Young (for Deft. Rudy Perez)

Donovan Roberts (for Deft. Andrew Gallegos)

Erlinda Johnson (for Deft. Santos Gonzalez)

Keith Romero (for Deft. Paul Rivera) (appearing telephonically)

Angela Arellanes (for Deft. Shauna Gutierrez)

Wayne Baker (for Deft. David Calbert) (*in 15-4269 only*)

## **P**ROCEEDINGS

**C**OURT IN SESSION:      **9:19 a.m.**

- 2 -

**COURT:**     Calls case. Counsel enter appearances. Defendants present in custody. Case agents Bryan Acee, Thomas Neale, Joe Sainato and Nancy Stemo present. Defendant Angel DeLeon remains at large. Court confirms with Defendant Garcia that he consents to Mr. Davidson standing in for Mr. Blackburn today.  Keith Romero not present in person.

## DEFENDANT ANTHONY RAY BACA'S OPPOSITION TO PROPOSED RESTRICTIONS ON HIS PARTICIPATION AND INCLUSION IN COURT PROCEEDINGS [777]

**Court:**  Will first take up the opposition filed by Mr. Baca as to the courtroom restrictions requested by USM.  Understand Mr. Lowry has informed counsel of what occurred during yesterday's hearing in CR 16-1613 – if there is anything further that other counsel want to say will not shut down.  Will work to get opinion out on issue before next time are convened. In the meantime, believe Mr. Baca has given the Court his *assurance* that he will not try to communicate with any of the co-Defendants in this case – the Court has not put any sort of partition up, so Mr. Baca can see everything and the agreement was that there would not be any communication with co-Defendants in the courtroom. So this being a judicial proceeding everybody would agree to that.  Counsel are not restricted from talking to other counsel.  Ask that the Defendants communicate through counsel at least in the courtroom.  Those are the agreements worked out until the Court could review the submissions that were made – some were coming in in this case last night and this morning, so will try to put an opinion together. Had a fairly full and robust argument in the hearing on CR 16-1613 - took some evidence which will consider and probably making some findings of fact. Asks if anyone wants to say anything further?

**9:29 a.m.  Mr. Hammond:**   Addresses Court re: same – requests Court reconsider order as to Defendants communicating in the courtroom at least at the times when court is not in session..

**Court:**  Same rules are going to apply across the board in this and the 16-1613 case.  Will take comments into account when putting opinion together – may be different at next hearing but at least for today will operate under ground rules the Court has laid out. USM is concerned Defendants are communicating about things besides just greetings, so will have to give some thought.  Notes overflow courtroom today is the Bonito.

**9:33 a.m.  Mr. Castle:**  Addresses Court – to extent Court is relying on testimony in other case requests transcript from yesterday's hearing be made part of the record in this case.

**Court:  Fine -** not sure what is meant by being part of record – Mr. Baca filed his opposition in all 3 cases he is in and will be citing to that. Can get transcript from other case if want it.

DNM 591

**ANTHONY RAY BACA'S JOINT, UNOPPOSED MOTION FOR DISCLOSURE OF GRAND JURY AND PETIT JURY DATA [773]**

**Court:**  Asks if there is any objection to Mr. Baca's motion for grand/petit jury data?

No opposition.

**Court:**  Confirms Mr. Lowry and Govt. will submit form of order.

Counsel confirm.

**DEFENDANTS' JOINT MOTION TO VACATE MARCH 2017 TRIAL SETTING, IMPOSE A DISCOVERY SCHEDULING ORDER AND REQUEST FOR A HEARING [676]**

**9:35 a.m.  Court:**  Yesterday all parties in CR 16-1613 agreed to move the trial in that matter to 11/6/17.   Given this, any remaining issues with this motion?  Want to set trial in this matter before November 2017.

**9:37 a.m.  Mr. Villa:**  Argues in support of motion.  Asserts still issue with tablets – his client has still not received his and was told he would be on Wednesday (11/23) of last week.  Has not been in touch with Aoki to determine what the problem is. Suggests should not set trial until understand status of receiving discovery. Asserts no Defendant at TCDC has received a tablet. Understand part of delay is that there is discovery still being provided for uploading – cannot speak to what discovery or when it was provided to Aoki.  There is no issue with counsel receiving the discovery – issue is with Defendants not having it/the tablets. Requests Court reconsider entered Scheduling Order provided by the Defendants. Know some Defendants want trial after November 2017.

**9:45 a.m.  Mr. Hammond:**  Argues motion.  As to tablets, talked with Aoki's office yesterday and was advised that a large number of the tablets – including his client - has not come back from DOC. Suggests not set a trial date/start scheduling order deadlines until tablets are received.  Scheduling order Defendants proposed contemplated an 8 month schedule from the date the Govt.'s discovery disclosure was completed.

**9:48 a.m.  Mr. Davis:**  Argues motion - due to where client is housed is taking more time to go through discovery with him – since Defendant received his tablet have not had opportunity to meet with him.

**9:52 a.m.  Mr. Castle:**  Argues motion – Court has contemplated trial in this matter proceeding before that in CR 16-1613.

**Court:**  Yes – thinks all have been working under that assumption.

**Mr. Castle:**  Given volume of discovery and complexities of case, do not think case can be tried in 2017.  Agrees should wait set a trial date/start scheduling order deadlines until tablets are received.

**9:56 a.m.  Ms. Harbour-Valdez:**  Argues motion – just received e-mail from Aoki as to status of

DNM 592

tablets – 14 Defendants have at facility now – he received 6 reconfigured tablets from DOC yesterday – 5 of those have been uploaded with the discovery and are being sent back today – one of them had an error message pop up when tried to copy discovery on to it, so it was shipped back to DOC.  DOC still has 17 tablets they are reconfiguring – they continue to send to Aoki on a rolling basis, six at a time.  Do not know why the rolling basis.

**9:58 a.m.  Mr. Lowry:**  Argues motion – agree w/Mr. Hammond and Mr. Castle's arguments.  Estimates longest period of time client has had tablet in the past was for 30 days.

**10:00 a.m.  Ms. Armijo:**  Argues in response to motion – agreed to continuance based on the parties in Baca agreeing to continuance in that case, as well.  Want this case tried before *Baca*.  Want to know position of parties in 15-4269 as to continuance – want a trial date set in that case, as well. Vast majority of discovery is out, but it is still ongoing as a result of Defendants' requests. Continue to serve search warrants and investigate. Discovery will be ongoing on a rolling basis. Asserts defense never conferred w/Govt. as to a scheduling order, so the Govt. submitted its own proposal. Want trial date set in this matter next summer. Today is first time hearing issues with tablets, but not involved w/Aoki and how discovery has gone out – only involved a bit with regard to Mr. Gallegos given the quick trial setting for him.

**Court:**  Keep hearing 40,000 documents have been produced - asks if there will be more than 1,000 additional pages produced by Govt.?  Large document production?

**Ms. Armijo:**  Does not anticipate any other large document drops. Just because one matter involves more Defendants than another does not necessarily mean that the ones with fewer Defendants are less complex. Anticipates will take 2 months to try case.

**10:10 a.m.  No other counsel have argument.**

**Mr. Villa:**  Argues motion further.  Concerned because discovery has just been produced as to his client that the Govt. must have had before indictment – what else is out there?

**10:12 a.m.  Ms. Sirignano:**  Argues motion.  Tablet situation is not working – problem is not with Aoki or DOC, but with how the Govt. is putting productions together – defense must go through – not evidence which documents go with which counts. Now in November having to make hard copy of production to take into jail to review with clients.  Would like Govt. to come up with solution as to problem with tablets.

**10:15 a.m.  Mr. Davis:**  Argues motion further – protective order prevents counsel from being able to leave documents with client for review between visits with counsel. Will be asking for 17(c) subpoenas to obtain discovery independently, as well.

**10:17 a.m.  Court:**  Grants motion in part and denies in part – sets JS/JT for 7/10/17.  Asks if there

DNM 593

are other deadlines that need to be modified?

**Ms. Armijo:**  Requests Court modify current scheduling order deadlines to comport with trial date of 7/10 – will provide a proposed order re: same.  Asks if 15-4269 will be set at same time?

**Court:**  How long needed for trial in that matter?

**Ms. Armijo:**  2 weeks – suggests early October.

**Mr. Calbert:**  Fine.

**Ms. Stillinger:**  Addresses Court re: same – want to know order trials will go in so know how to proceed.

**Court:**  Sets JS/JT on 10/2/17 for 15-4269. Anything further needed on status conference portion of hearing as to 15-4269?

**Ms. Armijo:**  No.

**Court:**  Do not think realistic to not set a trial until discovery is done.

**10:25 a.m.  Mr. Villa:**  Addresses Court further.  Understand Court wants to stick with Scheduling Order at Doc. 759.  Would like those dates moved to comport with July setting.

**Court:**   Understand Govt. is going to be submitting form of order.

**Mr. Villa:**  So relieved of current deadlines, now?

**Court:**  No – if reciprocal deadlines in place now need to comply.  Parties should work together to get new dates to the Court.

**Mr. Villa:**  Suggests move all deadlines by 4 months.

**Ms. Armijo:**  Fine.

**Court:**  Will move all out by 4 months – to be outlined in new scheduling order to be entered by Court. Anything further?

Counsel inform there is not.

**Court:**  CRD will prepare order.

### JOINT MOTION TO EXCLUDE THE PROSECUTION TEAM FROM DECEMBER 2, 2016 EVIDENCE VIEWING [763]

**10:32 a.m.  Court:**  If the visit were being done in an office or the like – if party was a private corporation – might be a need for counsel to be present.  Inclined to grant motion.

**10:36 a.m.  Ms. Fox-Young:**  Argues in support of motion.  Will also be inspecting physical evidence – want to see all evidence as to all counts – only set up now as to Counts 6 & 7.  Also want to visit A-pod and B-pod (upstairs and downstairs), the control room, the wheelchair program and also pods where the Defendants were housed after the murder.  Would like any evidence obtained by agents or C.O.'s during inspection not be shared w/Govt.

DNM 594

**10:39 a.m.  Mr. Davis:**  Anticipate videotaping certain areas of the facility for use a trial – request Court provide permission for same.

**10:40 a.m.  Mr. Castellano:**  Argues in response in opposition to motion.  Never seen a request like this before – asks if Court has seen before?

**Court:**  Perhaps in civil context, probably not criminal.

**Mr. Castellano:**  Asserts reason is because has never before been requested - continues arguing motion.  Makes sense as practical matter because all evidence will be in one place at one time.  No on point cases because this is typically not an issue.  Physical evidence will likely be available at state police office.

**10:48 a.m.  Ms. Fox-Young:**  Argues in reply in further support of motion.

**10:53 a.m.  Mr. Castle:**  Argues motion.

**10:56 a.m.  Mr. Lowry:**  Argues motion.

**10:57 a.m.  Court:**  Grants motion.  Prosecution team should not after the visit try to elicit information about what the defense counsel did when there – if approached by anyone with the corrections department or the state police with information should not take that information without consulting with coordinating counsel to see if can be worked out – if cannot be worked out do not take without approaching Court.  If Govt. wishes to challenge down the road the fact that there is no work product here can raise in specific context of the information trying to obtain or saying has been waived. Trying to preserve the Defendants ability to talk while they are there and do what need and can do during visit. As far as other requests being made, not going to start ordering folks – especially not here - corrections – to do things – if there are problems can reapproach.

**Court in recess:  11:00 a.m.**

**Court in session:  11:26 a.m.**

**Ms. Fox-Young:**  No further argument on motion.

**Ms. Armijo:**  Two sets of viewings set-up – Counts 1 & 2 and then the ones for the Molina murder.  There will be one defense counsel who will be point person as to each murder.

**Mr. Cooper:**  Point person for 12/15 SNM site inspection.

### JOINT MOTION FOR DISCLOSURE AND PRODUCTION OF CONFIDENTIAL INFORMANT  [698]

**Court:**  Seems like Mr. Villa has had his issues resolved.

**11:29 a.m.  Mr. Villa:**  Today no remaining issues to request from Court.  Should Court grant any other requests today, may come back and seek other things.

**Court:**  Seems are now moving into a different phase in case – parties know much more than Court does – parties should not presume Court knows all facts – parties should not hesitate to provide more

DNM 595

detail rather than less.  Asks if should first take up motion as to request by Mr. Troup?

**11:32 a.m. Ms. Harbour-Valdez:**  Argues in support of motion re: same/as to F.S.

**11:43 a.m.  Mr. Beck:**  Argues in response in opposition to motion re: same. Intend to call C.I. at trial.
Do not know who Cheech is – have not asked CHS who that is.  References legal section in Doc.
255- in CR 16-1613.

**11:49 a.m. Ms. Harbour-Valdez:**  Argues further.

**11:51 a.m.  Mr. Beck:**  Argues further in opposition.  Will provide the identity of Cheech.

**12:03 p.m.  Mr. Chambers:**  Joins hearing telephonically.

No other defense counsel have argument as request as to F.S.

**12:04 p.m. Ms. Harbour-Valdez:**  Argues in reply in further support of motion as to F.S.

**Court:**  Not going to order production of CHS as to F.S. incident at this time – going to first determine
whether the C.I. analysis is obviated, if, in fact, the person is going to be testifying.  Will take up the
Govt.'s suggestion and will determine the C.I. issue.  At the moment, will require the Govt. to provide
identity of Cheech – defense may be able to talk to him to figure out who he is and then may be able
to bulk up their request – can send Court letter or something if figure out more information. At
moment seems the CHS as far as Mr. Troup may be a  little bit on the periphery of just somebody that
– you know – obviously all would like to know who is there.  But, if start staying going to disclose
every CI to see if they were there, think have just pretty much required every CI to be disclosed – so
think has to be higher standard than that.  So, inclined to leave on the *Jencks* disclosure list, but
maybe defense can bulk up with what learn from Cheech – will think about – not making a final ruling
because do not have to because of *Jencks* issue.

**Ms. Harbour-Valdez:**  Okay to submit supplement briefing on C.I. issue?

**Court:**  Yes.  Will next take up request by Daniel Sanchez.

**12:09 p.m.  Mr. Jewkes:**  Informs request pertains to J.M. murder.

**Court:**  Will come back to Mr. Molina, then.

**12:11 p.m.  Mr. Lowry:**  Argues in support of motion as to Mr. Baca's request as to J.M. murder.

**12:19 p.m.  Mr. Hammond:**  Argues in support of motion re: same.

**12:27 p.m.  Mr. Castle:**  Argues motion re: same.

**12:29 p.m.  Mr. Lowry:**  Argues in reply in support of motion as to J.M. murder.

**12:30 p.m.  Mr. Beck:**  Argues in opposition to same.

**12:37 p.m. No other counsel have argument.**

**Mr. Lowry:**  No further argument.

**Court:**  Because Court is going to have to review this in connection with *Jencks*, not going to order

the production to Mr. Baca at this time.  Will study the legal issue and see if this requires any CI analysis – but if it does require CI analysis, going to think about it a little further, but inclined to order the production here because of the timing issue.  Realize that there may be strong evidence against Mr. Baca from recordings that links him to this murder, but need to figure out whether that still undercuts this theory of --- just because Govt. has strong evidence linking him to the murder - if that is his defense that it could not have happened that this information got to him and then Mr. Perez made shanks out of his walker all within 24 hours - seems that since this is the only source of this information to either Mr. Perez or Mr. Baca, Court may need to require its production if do the CI analysis.

**12:38 p.m.  Mr. Lowry:**  There are plenty of recordings involving Mr. Baca, but there are no direct recordings of him involved in J.M. murder.

**Mr. Beck:**  Not correct. Tapes have been provided where he admits involvement in J.M. murder. Counsel argue further.

**Court:**  Know what thinking and critical point, so if some discovery want Court to review before making final decision should get to Court.

**12:44 p.m.  Mr. Davis:**  Argues motion in support of Carlos Herrera's request as to J.M. murder.

**Ms. Armijo:**  Provides theory as to Herrera's involvement – sanctioned hit – have recordings of him evidencing his involvement.

**12:47 p.m.  Mr. Davis:**  Have not heard recording that substantiates.  Continues arguing.

**12:52 p.m.  Mr. Beck:**  Argues in response in opposition to request.  Do not want to produce due to safety concerns for C.I.

**12:54 p.m.  Mr. Davis:**  Argues in reply in further support of request.

**Mr. Beck:**  Cannot provide defense with direction to the evidence.

**12:59 p.m.  Court:**  Recalls the days when USAO would hand a Defendant a book and say 'here is the evidence against you', but probably not going to solve that today.

**Mr. Davis:**  Argues in reply in further support of request.

**1:00 p.m.  Court:**  Absent a stronger showing, probably not going to require disclosure of C.I.'s because of what is not in the CHS reporting documents.  Bit of a proponent of 'the dog doesn't bark theory' from time to time, but it has probably got to the be stronger than that, so probably not going to make the Govt. disclose CHS's on what is not in the reports without a stronger showing. Will break for lunch until 2:00 p.m.

**Court in recess:  1:01 p.m.**

**Court in session:  2:22 p.m.**

**Court:**  Queries Mr. Romero as to why he is not present at the courthouse?

Mr. Romero informs he is having car issues and is stranded in Moriarty.

**Mr. Hammond:**  Argues in support of motion as to Daniel Sanchez re: J.M. murder.

**2:37 p.m.  No other defense counsel have argument re: same.**

**Mr. Beck:**  Argues in response in opposition to same.

**2:41 p.m.  Ms. Armijo:**  Argues in response in opposition to same.

**2:47 p.m.  Mr. Beck:**  Continues arguing in response in opposition to same.

**2:55 p.m.  Mr. Villa:**  Argues regarding same.

**2:57 p.m.  Mr. Lowry:**  Argues regarding same.

Counsel argue further.

**Court:**  Inclined to find C.I. should be disclosed – probably will allow as to Baca, but not as to Montoya.  Confirms there are no other C.I.'s teed up today.

**3:06 p.m.  Mr. Beck:**  If Court is inclined to grant disclosure of C.I. to Mr. Baca, request Court impose the entry of a protective order that limits disclosure to Mr. Baca and his counsel.

**Court:**  Amenable to same.

**Mr. Lowry:**  No opposition – have seen that in Mr. Perez's case and not opposed.

**3:08 p.m.  Mr. Villa:**  Okay to confer with Mr. Baca's counsel re: same?

**Mr. Beck:**  Fine.

**Mr. Adams:**  This is the one that will be supplemented.

**Court:**  In all 3 cases?

**Mr. Adams:**  Yes.  Will try to make a more particularized request.

**Court:**  As to redactions to be discussed tomorrow during Mr. Gallegos' hearing, suggests parties work together to see if can agree – is it worth fighting over?  Will probably go through one at a time – probably will not make blanket rulings - are personal identifiers really needed?  Anything further today?

**Ms. Armijo:**  There is an outstanding motion regarding appeal of detention as to Shauna Gutierrez.

**Court:**  Want to do today?

**Ms. Arellanes:**  Prefer to address another day.

**Mr. Lowry:**  Asks if can set routine status conferences so there are dates on the books?

Court confers off record with CRD.

**Court:**  Sets hearing on 2/7/17 at 8:30 a.m.

**Ms. Stillinger:**  Client has asked her to ask Court if he can be excused from all hearings other than those evidentiary in nature?

**Court:**  Declines to honor request.

**Mr. Benjamin:**  Suggests Court could find a way to reduce the 18 hour time period in shackles.

**Court:**  Cannot think of anything at this time.

**Mr. Jewkes:**  Requests Court and USM reconsider the use of bellychains.

**Court:**  Anything further?

**Court in recess:  3:29 p.m.**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

  vs.                                    No. CR 15-4268 JB

ANGEL DELEON, et al.,

      Defendants.

## THIRD SCHEDULING ORDER

**THIS MATTER** comes before the Court on the parties' joint request to extend all case deadlines by four months. The Court held a hearing on November 29, 2016.   The parties request that the Court extend the case deadlines by four months.   The Court grants the parties' request and hereby imposes the following deadlines:

1.  March 20, 2017:       Reciprocal discovery by the defendants (except for the defendants' continuing duty to disclose);

2.  April 5, 2017:        Scientific expert witness notices and reports; Fed. R. Crim. P. 16 discovery motions; Fed. R. Crim. P. 7(f) motions;

3.  April 19, 2017:      Responses to Fed. R. Crim. P. 16 discovery motions and Rule 7(f) motions; Objections to scientific expert witness notices.

4.  May 3, 2017:         Responses to scientific expert witness notices.

5.  May 9, 2017:         Fed. R. Crim. P. 12 pretrial motions; *Daubert* motions; Government's notice of gang experts.

6.  May 23, 2017:       Responses to pretrial and *Daubert* motions; Defendants'

notice gang experts; Notices of defenses pursuant to Fed.

R. Crim. P. 12.1 and 12.3.

7. June 6, 2017:        Responses to notices of defenses; motions *in limine*; Fed.

R. Evid. 404(b) notices; jury instructions; proposed *voir*

*dire*.

8. June 21, 2017:       Responses to motions *in limine*; objections to jury

instructions and proposed *voir dire*.

9. July 10, 2017:       Jury Selection/Trial at 9:00 a.m., Federal Courthouse, Las

Cruces, New Mexico.

The Court further orders that the United States shall continually make available discovery

on an ongoing basis, and make available to the defendants by the time required by the applicable

law all material for which disclosure is mandated by *Giglio v. United States*, 405 U.S. 150 (1972)

and the Jencks Act, 18 U.S.C. § 3500.

The Court further orders, pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii), that the time between

the entry of this Order and the trial date is excluded for the purposes of the Speedy Trial Act

computation.

_____

UNITED STATES DISTRICT JUDGE

- 2 -

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) CRIMINAL NO. 15-CR-4268 JB |
| | ) |
| vs. | ) |
| | ) |
| **ANGEL DeLEON, et al,** | ) |
| | ) |
| Defendants, | ) |

**UNITED STATES' NOTICE OF RELATED CASES**

The United States of America hereby submits this notice to inform the Court that this case

is related to the following cases:

*United States v. Warwick,* Case No. 16-CR-4572 MCA;

The charges alleged against the defendants are based on the overlapping investigations

and/or events.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

*/s/ Electronically filed 12/22/16*

RANDY M. CASTELLANO
Assistant United States Attorney
555 S. Telshor, Ste. 300
Las Cruces, New Mexico  88011
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the court
using the CM/ECF system which will send
notification to opposing counsel of record,
on this 22nd day of December, 2016.
/s/
RANDY M. CASTELLANO
Assistant United States Attorney

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        Plaintiff,

**vs.**                      No. 2:15-cr-04268-JB

**ANGEL DELEON, et al.,**

        Defendants.

## JOINT MOTION TO SEVER DEFENDANTS CHARGED WITH OFFENSES IN COUNTS 6 AND 7

Defendants Jerry Montoya, Timothy Martinez, Anthony Ray Baca, Mauricio Varela, Daniel Sanchez, Carlos Herrera and Rudy Perez (referred to herein as the "2014 Defendants") by their respective counsel, move this Court to sever their trial of counts 6 and 7, which are clearly separable and independent, from trial on the remaining counts of the superseding indictment pursuant to Federal Rules of Criminal Procedure 8(a) and (b), and Rule 14, the Fifth Amendment to the United States Constitution and the authorities cited herein.

## INTRODUCTION

Defendants Jerry Armenta, Jerry Montoya, Mario Rodriguez, Timothy Martinez, Anthony Ray Baca, Mauricio Varela, Daniel Sanchez, Carlos Herrera and Rudy Perez (2014 Defendants) are charged in the 15-count superseding indictment in Counts 6 and 7 with conspiracy to commit murder and murder of Javier Molina. *See* Superseding Indictment at 20-26. [Doc. 368]. Counts 6 and 7 accuse these nine Defendants of conspiring to and murdering Javier Molina on March 7, 2014, respectively, in the Southern New Mexico Correctional Facility (SNMCF). Defendants request that this Court sever the trial of Counts 6 and 7 from the other counts in the superseding indictment. With the exception of Defendant Baca, none of the defendants charged in Counts 6

and 7 are charged in any other count of the superseding indictment.  *See* **Exhibit 1** (Chart of charges in the superseding indictment) and **Exhibit 2**, Counts grouping.  Defendant Baca is also charged in counts 8, 9 and 10. *See id.*  The offenses alleged in the other counts of the indictment were not only committed by different defendants, but many occurred in different locations, some as many as 13 years prior to the alleged Molina murder.  *See id.*

In support of this Motion, Defendants advance three main arguments: (1) Counts 6 and 7 were improperly joined under Rule 8(a), as they do not share a sufficient nexus with the other charges to permit joinder; (2) the 2014 Defendants were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 21 other defendants; and (3) should the Court find joinder proper under Rule 8(a) and Rule 8(b), severance is still required under Rule 14 and the Fifth Amendment because a joint trial of the 2014 Defendants for Counts 6 and 7 alongside the 21 other defendants and the 13 other counts in the superseding indictment will deprive the 2014 Defendants of their right to a fair trial.

The Court need not perform the normal balancing analysis under Rule 14, which requires the Court to weigh the concerns of prejudice against judicial economy, as both interests strongly favor severance. This is because, in this case, a joint trial on all counts would be substantially longer and logistically impractical given the number of defendants charged and given that the allegations and evidence thereof spans decades.

## BACKGROUND

The 24 original defendants in this case were charged by indictment with violations of 18 U.S.C. §1959(a)(1)(5)(6) and 18 U.S.C. §2 (Violent Crimes in Aid of Racketeering or VICAR). *See* Indictment [Doc. 2].  At least 19 of the original defendants were charged with capital eligible

2

offenses and faced the possibility of the death penalty under 18 U.S.C. § 3591 et. seq. The original

indictment contains special findings required for the imposition of the death penalty.  The Court

declared the case complex on January 7, 2016.  *See* Order [Doc. 211]. On April 21, 2016, the

government unsealed a superseding indictment in this case which alleges additional crimes and

adds additional defendants. *See* Superseding Indictment [Doc. 368].  The government also revealed

a new indictment in related case no. 16-cr-1613 JB in which some, but not all, of the defendants

in the above-captioned matter, are charged with additional criminal acts.  Both indictments allege

defendants are members of the Syndicato Nuevo Mexico (SNM), a prison gang, and further allege

that defendants engaged in racketeering and committed violent crimes in aid thereof.

As the Court is aware, there are 30 defendants charged in the superseding indictment in

this matter, under a total of 15 counts.  All but one count alleges violent crimes in aid of

racketeering pursuant to 18 U.S.C. § 1959.  These VICAR allegations date back to the early 1980s.

Not including Counts 6 and 7, the indictment alleges the murder of four different victims and

conspiracy to murder four different victims, three of whom are different from the four alleged

murder victims.  This includes the very high profile alleged conspiracies to murder the Secretary

of Corrections, Greg Mercantel, and the head of the New Mexico Department of Corrections

(DOC) Security Threat Intelligence Unit (STIU), Dwayne Santiestevan.  *See* Counts 9 and 10. The

indictment also alleges assaults and/or attempt to commit murder of two victims along with two

gun charges against Defendant Garcia.

Of the nine 2014 Defendants charged in Counts 6 and 7, only one – Defendant Baca, is

charged in any other counts. Due to the distinct nature of the other charges not included in Counts

6 and 7, including their location and dates of incident; the quantity of evidence as to each of these;

the different defendants charged; and other factors discussed herein, the 2014 Defendants move

this Court to sever the trial of Counts 6 and 7 from the remainder of the counts in the superseding indictment.

**Count 1: Murder of F.C.**

This count is alleged against Defendants Angel Deleon, Joe Lawrence Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia. None of these Defendants are accused in Counts 6 and 7. Count 1 alleges these Defendants murdered F.C. on March 26, 2001, in Dona Ana County.  This occurred 13 years before the alleged murder to which the 2014 Defendants stand accused.

**Count 2: Murder of R.G.**

This count is alleged against Defendants Leonard Lujan, Billy Garcia, Eugene Martinez and Christopher Chavez. None of these Defendants are accused in Counts 6 and 7.  Count 2 alleges these Defendants murdered R.G. in Dona Ana County on March 26, 2001, the same date as the alleged murder in Count 1, also 13 years prior to the 2014 Defendants' charges.

**Count 3: Murder of F.S.**

This count is alleged against Defendants Javier Alonso, Edward Troup, Arturo Garcia, Benjamin Clark and Ruben Hernandez.  None of these Defendants are accused in Counts 6 and 7. Count 3 alleges these Defendants murdered F.S. on June 17, 2007, in Dona Ana County.  This alleged murder occurred seven years prior to the crimes alleged in Counts 6 and 7.

**Counts 4 and 5: Conspiracy to Murder A.B. and Murder of A.B.**

These counts are alleged against Defendant Joe Lawrence Gallegos and Andrew Gallegos, neither of whom is charged in Counts 6 and 7.  These counts allege the Gallegos's conspired to and did murder A.B. on November 12, 2012, in Socorro and Valencia counties.  These alleged crimes occurred two years prior to the crimes alleged in Counts 6 and 7, over 100 miles away, and by different individuals.

DNM 606

**Counts 6 and 7: Conspiracy to Murder J.M. and Murder of J.M.**

These are the counts the 2014 Defendants now seek to sever.  Defendants are accused of conspiring to and murdering Javier Molina at the SNMCF on March 7, 2014.  Although the basis for the charges against all the 2014 Defendants is not precisely clear, it is believed the government's theory of the case is, in part, that Defendant Baca ordered Mr. Molina to be killed because he was alleged to have cooperated with law enforcement.  Defendants Sanchez and Varela, as alleged intermediate leaders of the SNM, are alleged to have given the go-ahead for the killing and given orders to help execute it.  Defendant Herrera also allegedly sanctioned the killing.  Defendant Perez is accused of providing his walker to make a shank or shanks for the killing.  Defendants Rodriguez and Martinez are accused of going into Molina's cell and choking him until he was unconscious and Defendant Armenta and Defendant Montoya are alleged to have then gone into the cell and stabbed Molina multiple times, which ultimately led to his death.  All the 2014 Defendants are alleged to be members of the SNM.

On March 28, 2014, the State of New Mexico, by the Third Judicial District Attorney's Office in Las Cruces, obtained indictments against Defendants Jerry Armenta, Jerry Montoya and Mario Rodriguez, for the murder of Molina, along with several other related charges.  The case was to proceed to trial on November 16, 2015, however, the trial was vacated on November 2, 2015, and on November 23, 2015, the State filed a Nolle Prosequi for all three defendants indicating the dismissal was at the "behest of the United States Attorney's Office…which will be pursuing federal charges."  Just eight days later the first indictment in this cause was filed against these three defendants as well as Defendants Martinez, Baca, Varela and Sanchez.  *See* Indictment [Doc. 2].  Mr. Perez and Mr. Herrera were not included in these counts until the superseding indictment was obtained.  *See* Superseding Indictment [Doc. 368].  The other counts in the

5

superseding indictment, unlike Counts 6 and 7, did not have a parallel state prosecution.  Defendant

Jerry Armenta has entered a plea of guilty to both counts.  *See* Plea Agreement [Doc. 802].  All

other Defendants are pending trial.

**Count 8: Conspiracy to Assault J.R.**

This count is alleged against Defendants Anthony Ray Baca, Gerald Archuleta, and Conrad

Villegas.  Defendant Baca is the only defendant who is also charged in Counts 6 and 7.  Defendant

Archuleta has entered a plea agreement to this charge.  *See* Plea Agreement [Doc. 586].  Defendant

Villegas is not charged in any other counts in this case.  In his Plea Agreement, Defendant

Archuleta states that in 2003 he had a falling out with J.R., who is also alleged to be an SNM

member.  *Id.* at 4.  As a result, Defendant Archuleta states he put a "green light" on J.R., which is

common slang for ordering the murder of a person.  *Id.*  Because of Archuleta's green light, J.R.

was shot in 2003, but survived, and then was assaulted in 2015 in SNMCF for the same reason.

*Id.* at 4-5.  Defendant Archuleta implicates Defendant Baca as sanctioning the green light, but does

not implicate any of the other 2014 Defendants, and there is no information in the discovery to

indicate any others were involved.

**Counts 9 and 10: Conspiracy to Murder D.S. and Conspiracy to Murder G.M.**

Counts 9 and 10 are both alleged conspiracies to murder Dwayne Santistevan, the head of

DOC's STIU and former Secretary of Corrections Greg Marcantel.  Defendants Anthony Baca,

Roy Martinez and Robert Martinez, are charged in both counts.  Defendant Roy Martinez has

entered a plea to both counts.  *See* Plea Agreement [Doc. 686]. In his plea, Mr. Martinez claims he

conspired with Defendants Baca, Robert Martinez, and others, to kill Marcantel and Santistevan.

Other than Defendant Baca, Martinez does not identify any of the other defendants in Counts 6

and 7 as being involved.   Defendant Chris Garcia is charged in Count 10.  As with Count 8,

Defendant Baca is the only defendant from the 2014 Defendants charged in these counts.  There is no evidence the other defendants in these charges were involved in Counts 6 and 7.  There is also no evidence any of the 2014 Defendants, save Defendant Baca, were involved in either of these two counts.

**Counts 11 and 12: Felon in Possession of a Firearm and 924(c) against Defendant Garcia**

Both of these counts are against only Defendant Garcia, who is alleged to have committed them on November 29, 2015, in Bernalillo County.  These crimes allegedly occurred outside of prison, and there is no information to believe any of the 2014 Defendants were involved in these crimes.  Defendant Garcia is not one of the 2014 Defendants.

**Counts 13, 14 and 15: Assault against J.G., Conspiracy to Murder J.G., Attempted Murder of J.G.**

Count 13 is charged against only Defendant Joe Lawrence Gallegos and is alleged to have occurred on March 17, 2015, in Valencia County.  Defendant Joe Gallegos is not a 2014 Defendant.  Counts 14 and 15 are alleged against Joe Gallegos, Santos Gonzales, Paul Rivera, Shauna Gutierrez.  These crimes are alleged to have occurred in Otero and Valencia County in February 2016.  None of these defendants are 2014 Defendants, and there is no connection to these crimes by any of the 2014 Defendants, except for the alleged SNM membership of all.

## ARGUMENT

Joinder in criminal cases is governed by Rule 8, and severance, Rule 14 of the Federal Rules of Criminal Procedure as well as the Fifth Amendment.  Under Rule 8(a) the joinder of offenses is appropriate only when the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed.R.Crim.P. 8(a).  While Rule 8(a) "is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system," *United States v. Janus Indus.*, 48 F.3d 1548, 1557

7

(10th Cir. 1995), joinder is only proper where at least one of the Rule 8(a) conditions are met, and "those conditions, although phrased in general terms, are not infinitely elastic." *United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir. 1996).  Rule 8(b) applies to the joinder of defendants in a criminal trial. *Zafiro v. United States*, 506 U.S. 534, 535 (1993).  Under Rule 8(b), joinder of defendants is proper only where the defendants "are alleged to have participated in the same act or transactions, or in the same series of acts or transactions constituting a crime." Fed.R.Crim.P. 8(b).

Even if two or more offenses or defendants are properly joined under Rule 8(a) or (b), joinder is also subject to scrutiny under Rule 14. While the purpose of joinder is to "promote economy and efficiency and to avoid a multiplicity of trials," these objectives must be achieved "without substantial prejudice to the right of the defendants to a fair trial." *Bruton v. United States*, 391 U.S. 123, 131 n. 6 (1968); *Zafiro*, 506 U.S. at 540. Accordingly, Rule 14(a) provides for relief from prejudicial joinder, allowing that "[i]f the joinder of offenses or defendants in an indictment…or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed.R.Crim.P. 14(a); *Zafiro*, 506 U.S. at 537. Under Rule 14, the determination of the risk of prejudice and the decision whether to grant a motion to sever is soundly within the discretion of the trial court.  *Zafiro*, 506 U.S. at 541; *United States v. Haworth*, 168 F.R.D. 658 (D.N.M. 1996)

In determining whether to grant a motion to sever under Rule 14, the Court must weigh the potential prejudice to the defendant against the considerations of judicial economy and efficiency. *Zafiro*, 506 U.S. at 537; *United States v. Dirden*, 38 F.3d 1131, 1140 (10th Cir. 1994). "Even where the requirements of Rule 8(a) are met, however, Federal Rule of Criminal Procedure 14(a) permits the trial court to conduct separate trials if the joinder of separate offense appears to prejudice the

defendant or the government." *United States v. Olsen*, 519 F.3d 1096, 1102 (10th Cir. 2008) (*internal quotation omitted*). The Tenth Circuit has held that "[p]rejudicial joinder occurs under Rule 14 when an individual's right to a fair trial is threatened or actually deprived." *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997). Because "[t]he risk of prejudice will vary with the facts of each case," determining whether severance is required is up to the discretion of the district court. *Zafiro*, 506 U.S. at 539. *See also Haworth*, 168 F.R.D. at 659 (granting motion to sever in light of likely prejudice to the moving defendants given the risk of juror confusion and "the circus like atmosphere inherent in a joint trial of this nature" and finding that severance would also facilitate judicial economy).

In this case, severance of the trial on counts 6 and 7 is required because: (1) the counts were improperly joined, as they do not have a sufficient nexus with the other 13 offenses to permit joinder under Rule 8(a); (2) the 2014 Defendants were improperly joined with the other defendants under Rule 8(b) because they were not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the other 21 defendants; and (3) finally, even if this Court finds joinder of the defendants or offenses proper under Rule 8, the introduction of evidence of the other 13 unrelated crimes purportedly committed by other SNM members and co-defendants will deprive the 2014 Defendants of their rights to a fair trial such that severance must be granted under Rule 14. In addition to protecting the Defendants' right to a fair trial, judicial efficiency and economy further support severance, as a trial of all 24 Defendants on all 15 counts would last considerably longer and would be logistically impractical because all defendants and their counsel may not even fit in the courtroom during the trial. These logistical limitations alone implicate the Defendants' right to confront witnesses, be present at all critical stages of the trial and to have a public trial under the Sixth Amendment.

I.      **Counts 6 and 7 Were Improperly Joined Under Rule 8(a) and Must be Severed From the Remaining Counts.**

Under Rule 8(a), offenses may be joined only when the offenses are (1) of the same or similar character, (2) based on the same act or transaction, or (3) constitute parts of a common scheme or plan.  Fed.R.Crim.P. 8(a).  The "language in Rule 8(a) is a rather clear directive to compare the offenses charged for categorical, not evidentiary, similarities. […] Simply put, if offenses are of like class, […] the requisites of proper joinder should be satisfied so far as Rule 8(a) is concerned."  *United States v. Coleman*, 22 F.3d 126, 133 (7th Cir. 1994).

Crimes are of similar character when they are "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness."  *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) (quoting Webster's New International Dictionary (2d ed.)).  In essence, charges may be joined under this provision of Rule 8(a) only when they are of the same type.  *See United States v. Rodgers*, 732 F.2d 625, 629 (8th Cir. 1984).

As a matter of law, the firearms charges, Counts 11 and 12, against Defendant Garcia, are not "of the same or similar character" as murder and conspiracy to commit murder for purposes of Rule 8(a).  The firearms charges in Counts 11 and 12 are in an entirely different category and class than Counts 6 and 7 and must be severed for this reason alone.  *Compare* 18 U.S.C. § 1959(a) (conspiracy and murder in furtherance of racketeering) *with*, 18 U.S.C. § 924(c) (use of a firearm in furtherance of a violent crime) *and* 18 U.S.C. § 922(g) (felon-in-possession of a firearm).  Further, no evidence suggests that these firearms charges are part of the same act or transaction as Counts 6 and 7.  In fact, the events resulting in Counts 11 and 12 occurred over 18 months *after* the alleged murder of Mr. Molina.  *See Johnson v. United States*, 356 F.2d 680, 682 (8th Cir. 1966) (explaining the joinder of offenses is appropriate when the counts refer to the same type of offenses and occur "over a relatively short period of time").

Since the firearms charges contained in Counts 11 and 12 are not of the same or similar character as the conspiracy to commit murder and murder charges in Counts 6 and 7, and because there is no evidence that Counts 11 and 12 are based on the same act or transaction as Counts 6 and 7, the government can only attempt to argue that the charges reflect a common scheme or plan under the third prong of Rule 8(a). There are limits, however, to how broadly a Court can construe a common scheme or plan.  Under Rule 8(a), offenses are part of a common scheme or plan when the alleged offenses are similar, carried out in the same manner, and are alleged to have occurred over a relatively short period of time.  *United States v. Jordan*, 602 F.2d 171, 172 (8th Cir. 1979). Here, all the government can claim is that the defendants are alleged members of the SNM and have been indicted with VICAR offenses.  While the government can claim that the purpose of the offenses as well as the means and methods of the SNM constitute racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), there is no RICO exception to Rule 8 and the government should not be allowed to rely on allegations of RICO conspiracy to draw every alleged crime of every alleged SNM member under the mantel of a common scheme or plan for purposes of Rule 8(a).  *See Randazzo*, 80 F.3d at 627 (reiterating that although generally phrased, Rule 8(a) "conditions … are not infinitely elastic.") *See also United States v. Guiliano,* 644 F.2d 85, 89 (2d Cir. 1981) ("One of the hazards of a RICO count is that when the Government is unable to sustain a conviction under this statute, it will have to face the claim that the prejudicial effect of tarring a defendant with the label of 'racketeer' tainted the conviction on an otherwise valid count.").

To be sure, the remaining 11 counts are either the same type of offense—murder or conspiracy to commit murder—or are similar in character—assault or attempted murder.  With regard to these charges, perhaps the government could satisfy the first prong of Rule 8(a).  There is no evidence, however, that Counts 6 and 7 are based on the same acts or transactions as these

other charges.  In fact, the crimes alleged in Counts 1 and 2 occurred over a decade before the allegations resulting in Counts 6 and 7. Thus, while many of these other offenses are the same character of offense as Counts 6 and 7, because of the differences in time, location and offenders the "same act or transaction" provision of Rule 8(a) cannot be met here. *Cf. United States v. Riebold*, 557 F.2d 697, 707 (10th Cir. 1977) (holding that joinder is proper "[w]here the evidence overlaps and the offenses are similar… and the operable events occurred within a relatively short span of time").

Turning to the last provision of Rule 8(a), the 11 other murder, conspiracy and assault charges do not constitute parts of a common scheme or plan.  In the Tenth Circuit, the test for joinder is whether there is a common thread. *United States v. Caldwell*, 560 F.3d 1202, 1212 (10th Cir. 2009); *quoting United States v. Rogers*, 921 F.2d 975, 984 (10th Cir.1990) (*internal quotations omitted*). In this case, there are simply no common threads between Counts 6 and 7 and the other counts, and the only commonality shared by all defendants is their alleged involvement with the SNM.

Under the RICO statute it is a crime for individuals to participate in a pattern of racketeering as part of an enterprise that includes any "group of persons associated together for a common purpose in engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). While proof a "common purpose" is sufficient to bring a group of people under RICO, Rule 8(a) and the Tenth Circuit require that the offenses share a commonality that goes beyond merely the goals or purpose of the group. Here, the government will likely argue that these crimes were all committed by SNM members to further SNM goals and thus demonstrate a common scheme or plan. This argument fails, however, because the government cannot simply use the

umbrella of RICO to join every alleged SNM crime by simply stating that the offense shared a common purpose. The plain language of Rule 8(a) and the Tenth Circuit's test requires more.

Therefore, because Counts 6 and 7 are improperly joined under Rule 8(a), these counts must be severed and tried separately.

## II.    The 2014 Defendants Were Improperly Joined Under Rule 8(b) With the Other 21 Defendants and Their Trial On Counts 6 and 7 Should Therefore Be Severed.

Rule 8(b) governs the joinder of defendants and provides in part that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed.R.Crim.P. 8(b). The test for determining whether joinder is proper is whether the defendants are alleged to have participated in the same crime or series of crimes. *See United States v. Santoni*, 585 F.2d 667, 673 (4th Cir. 1978).

Joinder under Rule 8(b) is improper unless the 2014 Defendants are alleged to have "participated in the same acts or transactions constituting an offense or offenses or in the same series of acts or transactions" that constitute crimes as the other defendants. Fed.R.Crim.P. 8(b). "It is not enough," however, "that the defendants are involved in an offense of the same or similar character; there must exist a transactional nexus . . . . before joinder of defendants in a multiple-defendant trial is proper." *United States v. Jimenez*, 513 F.3d 62, 82–83 (3d Cir.2008).

In *Zafiro*, the Supreme Court stated that joinder under Rule 8(b) "serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." 506 U.S. at 537. This possibility of scandal and inequity, however, is not a risk in this case.  In cases where other defendants' charges are based on the same alleged crime and similar evidence or stem from the same conduct, as was the case in *Zafiro*, the court's concern with inequality and inconsistency is understandable.  In *Zafiro*, four defendants were arrested together in an apartment with more than

13

70 pounds of cocaine and other drugs. *Id.* at 535-36. All four defendants were charged and convicted of conspiring to possess illegal drugs, and the Court affirmed the denial of defendants' motions to sever.  *Id.* at 541.

In *United States v. Hill*, the Tenth Circuit affirmed the district court's denial of a motion to sever where multiple co-defendants and members of the Tulsa, Oklahoma Hoover Crips were tried and convicted of conspiracy to commit bank robbery. 786 F.3d 1254, 1258 (10th Cir. 2015), *cert. denied, Hill v. United States,* 136 S. Ct. 377 (2015). Co-defendant Dejuan Hill's motion to sever was denied because the court reasoned that "[a]lthough the Indictment… charged six different robberies alleged to have been committed by different defendants over a more than two-year period, it also alleged that the defendants had conspired and agreed with each other to commit all six of the robberies. *Id.* at 1272.

Unlike the defendants in *Zafiro* and *Hill*, here, there is no allegation that the 2014 Defendants, and the other defendants, with the exception of Defendant Baca where noted, "conspired and agreed with each other to commit" the other crimes alleged in the indictment.  In short, there is no evidence that the crimes alleged in Counts 6 and 7 were part of a series of acts or transactions.  Even in the most favorable light, the indictment alleges that, out of the nine 2014 Defendants, only Defendant Baca participated in any of the other counts. Further, there is no evidence of a transactional nexus between the 2014 Defendants and any of the other defendants or other counts. There is no evidence that the any of the other 2014 Defendants and other defendants participated in a series of acts or transactions despite the fact that the government has actively investigated these defendants for more than two and half years with the help of cooperating witnesses, confidential informants, and call and mail monitoring.

DNM 616

Further, since the crimes alleged in Counts 6 and 7 only involve the 2014 Defendants, the *Zafiro* court's concerns for equality and consistence do not exist. Because the charges against the 2014 Defendants are discrete and not connected to any of the other defendants, a separate trial would not lead to potential inconsistent verdicts with regard to the 2014 Defendants and the other 20 defendants. Since the crimes alleged in Counts 6 and 7 are not connected to the other defendants and because 2014 Defendants are not alleged to have participated in the same act or transaction or in the same series of acts or transactions with the other defendants, joinder of the 2014 Defendants is improper under Rule 8(b). Accordingly, these Defendants trial should be severed.

**III.   Alternatively, Counts 6 and 7 should be severed under Rule 14, as the evidence of other murders, assaults, and conspiracy by SNM members will severely prejudice the 2014 Defendants, and a joint trial of all defendants on all counts is impractical.**

While the federal system favors a single trial for defendants who are indicted together, *see Zafiro*, 506 U.S. 537, "[t]he Federal Rules envision, however, that circumstances may arise where joint trials would be inappropriate and, indeed, harmful to the accused's constitutional rights." *United States v. Neha*, 2005 WL 3663695, at *2 (Browning, J.) (D.N.M. Sept. 13, 2005), *aff'd, United States v. Neha*, 301 Fed. Appx. 811 (10th Cir. 2008). Therefore, a three-step inquiry is necessary to determine whether the Court should grant a motion to sever. *United States v. Gould*, 2007 WL 1302587, at *2 (Browning, J.) (D.N.M. Apr. 6, 2007). First, the Court "must determine whether the defenses presented are so antagonistic that they are mutually exclusive." *United States v. Pursley*, 474 F.3d 757, 765 (10th Cir.2007) (*internal quotations and citations omitted*). Second, "a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. Finally, "the trial court exercises its discretion and weighs the prejudice to a particular defendant caused

15

by joinder against the obviously important considerations of economy and expedition in judicial administration." *Id.*

In *United States v. Hardwell,* the Tenth Circuit held that joinder under Rule 8(b) was proper when six co-defendants were all charged with conspiracy, money laundering, and possession of cocaine with intent to distribute. 80 F.3d 1471 (10th Cir. 1996), *on reh'g in part, United States v. Hardwell,* 88 F.3d 897 (10th Cir. 1996). The Tenth Circuit explained that severance was not necessary, in part, because the "conspiracy was to commit a single offense; there were only six defendants, all charged with the [one] conspiracy" and there was not a great disparity in culpability among the defendants. *Id.* at 1487. Relying on *Zafiro,* the Tenth Circuit also concluded that the limiting instruction given by the trial court was sufficient to cure any potential prejudice under Rule 14. *Hardwell,* 80 F.3d at 1487. In reaching this decision, the court directly contrasted *Hardwell,* in which the trial court found that a severance was not warranted, with *United States v. Gallo,* 668 F. Supp. 736 (E.D.N.Y. 1987), a RICO case where a severance was granted, that is substantially more complex than *Hardwell,* and remarkably similar to the case at hand.

In *Gallo,* the District Court granted the defendants' motion for severance under Rule 14 and separated a 22-count RICO indictment charging 16 defendants into 7 separate trials. *Id.* at 748-61. The 22 count indictment charged the defendants, alleged members and associates of the Gambino Crime Family, with RICO and a multitude of "substantive" offenses that took place over the course of two decades and were related to an alleged criminal enterprise. *Id.* at 738. Although the court determined that the defendants were properly joined under Rule 8(b), it held that severance was required under Rule 14 after considering the prejudice resulting from: (1) the complexity of the indictment; (2) the disproportionality of evidence; (3) whether there is an antagonism of defense strategies and theories; (4) whether there is evidence only admissible as to

16

some defendants; (5) the potential inadequacy of limiting instructions; and (6) the balancing requirements of Rule 14 including the deleterious effect of prolonged complex cases, and whether granting a severance saves time. *Id*. at 749-58.

The *Gallo* court determined that indictment was sufficiently complex given that the case was a RICO conspiracy and that jury would have to "apply the highly technical and counter-intuitive RICO conspiracy elements to a great range of disparate and predicate conspiracies and events . . ." some occurring nearly 20 years apart. *Id*. at 749-750.  The court noted that "[m]uch of the relevant evidence would have to be stored in the jury's collective mind for many months – and a good deal of it introduced only as to certain defendants or certain charges." *Id.* at 750. The court went on to note the risk of prejudice caused by disproportionality of the evidence, stating that "[t]he difficulties of complex, multifarious cases, as this are compounded for those defendants whom only a small portion of the evidence is relevant." *Id*. "The prejudice concomitant with the case's complexity" the court noted "is 'particularly injurious' to defendants charged in a small portion of the counts and who are implicated by only bits and pieces of evidence" because the jury is subjected to months and months of trial "dealing with dozens of incidents of criminal misconduct that does not involve those minor defendants in anyway. *Id.* (citing *United State v. Branker*, 395 F.2d 881, 882, (2d. Cir. 1968) (*internal quotations omitted*)).  With regard to the prejudice caused by an antagonism of defense strategies and theories, the court noted that while a simple showing of some antagonism was insufficient, prejudice rising to the level requiring severance occurs when the "jury must *necessarily* disbelieve the testimony offered on behalf of one defendant in order to believe the core testimony offered on behalf of another." *Id.* at 751 (*quoting United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir.1981)) (*internal quotations omitted*)).

With regard to the prejudice created in joint trials when evidence is admissible only as to some defendants but not others, the *Gallo* court explained the likelihood of frequent instances in which "evidence admitted against one defendant would also be relevant as to another under Rule 401, but would be excluded as to the latter under Rule 403 in a separate trial of that defendant alone because its probative value would be outweighed by the danger of unfair prejudice." *Id.* at 752. On this front, the court concluded that it would be "wholly unreasonable for a jury to perform the intellectual feat in a joint trial of using such proof against some defendants and ignoring it as to others." *Id.* (internal quotation omitted). The court explained that, because the indictment charged a central RICO conspiracy, numerous other conspiracies in the substantive counts and the predicates acts and potential uncharged conspiracies, the result would be "conspiracies within conspiracies, and conspiracies to conceal other conspiracies, conspiracies which are discrete and finite, and those which are amorphous and indefinite, involving conspirators joining and leaving the conspiracy at various times." *Id.* at 751. Meaning that in such a complex trial, "[a]dmissibility decisions will often depend on having faith in the jury's ability to heed extraordinarily intricate limiting instructions" which "[o]ver the course of several months … would virtually be impossible without the aid of a computer" given the number of the co-defendants and counts. *Id*. at 752.

The use of such limiting instructions, the court noted, is "cited as a pivotal reason for denying severance in many cases." *Id*. The court, however, concluded that "the trial judge must be convinced that the jury . . . has a reasonable chance of understanding and acting upon instructions from the court," and that while the use of a limiting instructions cannot be "invariably rejected, neither should it be invariably accepted." *Id.* at 752 (*quoting United States v. Figueroa*, <u>618 F.2d 934, 943</u> (2d.Cir.1980) (*internal quotations omitted*)). Accordingly, the court reasoned, there will be "some contexts in which the risk that the jury will not, or cannot, follow instructions is so great,

and the consequences of failure so vital to the defendant, that the practical and human limitations

of the jury system cannot be ignored." *Bruton,* <u>391 U.S. at 135</u>. The court found this issue

extremely salient, concluding that the *Gallo* case was "far too extensive and intricate" to expect

that a jury could "be expected to retain such precise discriminations weeks and months down the

line, when they retire to deliberate on the basis of a warehouse of diverse evidence." *Gallo* at 753.

Surely, although the accumulation may be slow and at times subtle, severe prejudice is stacked

against the defendants over the course of such a trial.

 Considering the balancing requirement of Rule 14, the court noted that "[t]rials in these

'monster' cases "create "an enormous burden on the courts, as well as on the defendants, the

defense bar, juror, and even prosecutors." *Id.* at 754. *See generally* Paul Marcus, *Re-Evaluating*

*Large Multiple-Defendant Criminal Prosecutions*, 11 Wm. & Mary Bill Rts. J. 67 (2002); Note,

*No Easy Solutions to the Problem of Criminal Megatrials*, 66 Notre Dame L.Rev. 211 (1990)

(highlighting the many complications created when trying 'megatrials'). The burden on the court

itself includes the purely logistical nightmare of coordinating the "schedules of scores of persons

for months on end." *Id*. at 754. For individual jury members, they are removed from the routine

and comfort of their daily lives "for inordinate stretches of time" in which they "must sit stoically

and silently for hours every day, day after day" adsorbing "vast quantities of information" and

"perform the mental gymnastics" required by the court's limiting instructions resulting in a

"process as whole" that is "undoubtedly draining, disorienting, exhausting and often

demoralizing." *Id*. The court also noted the "severe disadvantages to the defendants as well,"

including the potential of being denied their choice of counsel and the prolonged periods of pretrial

incarceration defendants face while they are supposedly presumed innocent. *Id.*

Lastly, the *Gallo* court doubted whether conducting a joint trial on all 16 counts charging 22 defendants would, in fact, save time. *Id*. at 756.  The court concluded that "the 'overall' trial time" was probably "diminished in [the *Gallo*] case by splitting up the trials" … because the trial would be "smoother and more concise . . . evidence in each case does not scatter about the various contours of the conspiracy . . . there are two or three defense counsel cross-examining and raising objections rather than one or two dozen . . . sidebars are much more infrequent . . . [and] continuances and adjournments are less common." *Id*. at 757. "More significantly" the court noted that "the later trials are certain to be shortened or even precluded by the earlier trials" because the prosecution will better understand the strengths and weaknesses of its case, and defendants will may be encouraged to accept plea offers. *Id*.

Like *Gallo*, this case deals with a complex RICO indictment spanning decades' worth of criminal allegations. This case involves separate, distinct alleged murder conspiracies that took place at different points in time, involved completely different alleged conspirators, and different alleged victims.  Exhibit 2, attached, groups the counts in this indictment that bear a relationship to each other and suggest a way this indictment could be severed into seven separate trials that would potentially avoid the problems identified in *Gallo*. Whether the Court severed in this manner, there is no doubt given the discrete nature of the alleged conspiracy and murder in Counts 6 and 7, compared with the other counts in the indictment, Counts 6 and 7 should be tried separately.  The 2014 Defendants who have joined this Motion have agreed to have the trial on this count proceed first in the upcoming July trial slot.

Also similar to *Gallo* is the disproportionality of the evidence in relation to the 30 defendants charged. A review of the discovery to date demonstrates that the government has revealed far more and far stronger evidence against some co-defendants, including audio-recorded

conversations and self-incriminating statements, than against others. Accordingly, "[i]nevitable prejudice to the peripheral defendants is caused by the slow but inexorable accumulation of evidence against the major players." *Gallo*, at 750 (*quoting United States v. Kelly*, 349 F.2d 720, 759 (2d Cir.1965) (reversing conviction because the trial court should have granted severance, where "some [of the evidence regarding the co-defendant's actions] rubbed off on [defendant] we cannot doubt.") (*internal quotations omitted*)).

Given the number of defendants and the fact that discovery is still being provided, it is unclear at this point whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive. However, there can be no doubt there will be antagonistic defenses. For instance, many defendants may argue they were not or are not SNM members. Other defendants will likely argue the alleged crimes were not done in furtherance of the SNM. Defenses may be further developed as discovery and other litigation progress, but given the variation in time, location and defendants involved in the other alleged crimes not part of the 2014 Defendants, it is much more likely than not that mutually exclusive antagonistic defenses will risk causing prejudice to all defendants on trial. Guilt by association is at an extreme risk in this case. If the government can establish in some or all of the other counts that members of SNM carried out or attempted to carry out murders in furtherance of the SNM, and prove that some or all of the 2014 Defendants are members of the SNM, the mere fact that the instant defendants are members could unfairly prejudice the jury into believing they are guilty of the Molina murder.

What is undoubtedly clear is that much of the evidence related to the counts in which the 2014 Defendants are not charged is likely inadmissible in a case on Counts 6 and 7, and presenting it to the jury poses a serious risk that the 2014 Defendants' right to a fair trial will be compromised as the jury will be virtually incapable of reaching a reliable conclusion about each defendant's

guilt or innocence. Presentation of evidence on the multiple other alleged murders, conspiracy to commit murder, assaults and the firearms charges not contained in Counts 6 and 7 will subject the 2014 Defendants to undue prejudice by creating an atmosphere of criminal propensity.  In Counts 6 and 7, the 2014 Defendants are charged with conspiring to and murdering Javier Molina in furtherance of the racketeering activities of the SNM.  If the jury is permitted, however, to hear evidence of the other four alleged murders, four other conspiracies to commit murder, and other violent acts, this will essentially allow the government to introduce propensity evidence.  In other words, in hearing of the other offenses which the government will allege are similar to the Molina murder—that is, some of the victims were allegedly murdered for cooperating with law enforcement—there is a substantial risk that jurors will credit these other offenses improperly in determining each 2014 Defendant's guilt or innocence in regard to the Molina murder. As the Tenth Circuit has noted, "prejudice is more likely to occur when the offenses are of the exact same character."  *United States v. Price*, 265 F.3d 1097, 1105 (10th Cir. 2001).  This prejudicial effect threatens the 2014 Defendants right to a fair trial and weighs strongly in favor of severance.

While the government is likely to suggest that limiting instructions would cure any potential prejudice, the near certainty that such instructions would not so cure the prejudice makes them unworkable in a trial of this complexity and magnitude. In a case this complex, a limiting instruction is more aspirational than a reality, and in a "judicial system, dedicated to truth and justice, such a lack of connection with reality is unacceptable." *Gallo*, 668 F. Supp. at 752.  Asking a jury to make hyper-specific determinations after a month's long trial about how and for what they may consider a piece of evidence is impractical and unnecessary given this request for severance. If the indictment dealt with fewer counts or fewer defendants, perhaps a limiting instruction might be appropriate.

In this case, however, if no severance is granted, the jury will hear about the other murders, conspiracies to commit murder (not of the same victims save one), a conspiracy to commit assault, assault, and an attempted murder plus the firearms charges, all allegedly in furtherance of the SNM. Simply hearing about this activity by alleged fellow gang members makes it unlikely the 2014 Defendants can get a fair shake with the jury, even if a limiting instruction is given and even if the defendants present viable defenses.

For some of the reasons delineated above, this Court recently granted a severance in a related indictment. *See United States v. Baca*, 2016 WL 6404772 (Oct. 20, 2016) (Browning, J.) (granting severance in part because a joint trial would prevent the jury from making a reliable judgment in a case where many defendants with varying degrees of culpability would be tried together) (citing *Zafiro v. United States*, 506 U.S. at 539). In *Baca*, with respect to Defendant Gallegos, the Court noted that the risk of prejudice was heightened given the co-Defendants' "markedly different degrees of culpability," *id.*, and noted that the Defendant Gallegos had a "markedly different degree of culpability" in part because "he was allegedly involved in a single incident." *Baca*, 2016 WL 6404772 at *31. Although the Court based its decision to sever that case on several other factors as well, there are clear parallels with this case, where the defendants in question (with the exception of Defendant Baca) are only alleged to have been involved with one incident and the related conspiracy.

In addition, as was the case in *Gallo*, severing the group of 2014 Defendants from the other co-defendants would best serve the interest of the Court and the jury.[1] First, this Court will benefit

---

[1] The undersigned counsel are aware of the Court's finding in *Baca*, that a joint trial in that case would "certainly be more convenient for the Court," *Baca*, 2016 WL 6404772 at *32, but argue that finding does not hold true in this case, given the sheer number of defendants in this indictment and the complexity of the allegations involving disparate and distinct conspiracies over a period of decades.

DNM 625

from having fewer schedules to attempt to accommodate and therefore greater flexibility in scheduling matters. Also, conducting separate trials may result in defendants named in the subsequent trial accepting plea offers, thus precluding the need for a trial altogether and increasing judicial efficiency.  Second, selecting a jury will be less difficult because it will be easier to find jury members who are available for the several weeks necessary to sit for the 2014 Defendants' trial rather than the several months required to try all remaining defendants for all 15 Counts. Additionally, the longer that the jury has to sit, the greater the risk that Defendants will be found guilty for convenience sake and the greater risk that jurors' decisions will be influenced by the national media attention that has followed this investigation and will likely continue into the trial.

Severance is also required under Rule 14 to avoid violating the 6th Amendment rights of the 2014 Defendants to be present at all critical stages of the trial, confront the witnesses against them and have a public trial. In *United States v. Ellender*, the Fifth Circuit concluded that "[t]he government's aspirations of conducting a megatrial were limited only by the physical bounds of courtroom walls" in upholding the district court's refusal to sever the trial of 23 co-defendants charged with conspiracy to import more than one million pounds of marijuana. 947 F.2d 748, 754 (5th Cir. 1991). In *Ellender*, a specially-modified courtroom in which bleachers and a "special intercom system of dubious efficacy" were installed to attempt to facilitate the three-month long trial. *Id.*

Even the largest of the federal courtrooms in the District of New Mexico, however, cannot adequately accommodate the trial, much less *voir dire*, if a severance is not granted. *See Gomez v. United States*, 490 U.S. 858, 873 (affirming that *voir dire* is a "critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present").  Unless the Court foresees a similar modification to the courtroom as that in *Ellender*, then in the likely event that

24

the courtroom is overfilled with defendants, counsel, and co-counsel, these defendants risk losing

their constitutional right to confront witnesses against them.   *See* U.S. Const. Amend. VI ("[T]he

accused shall enjoy the right ... to be confronted with the witnesses against him .... ");   *cf. Bruton*

*v. United States*, 391 U.S. 123, 136–37 (1968) (holding that threats to a defendant's right to

confront witnesses against him poses a "hazard [the Supreme Court] cannot ignore").   Depending

on where they are seated, a particular defendant may not be able to see the jury or the witness, may

be left out of important bench conferences (by counsel)[2] or other important stages of the trial.

Additionally, these defendants risk losing their right to a public trial if they cannot be seated in the

courtroom or if the courtroom is simply too full, as it has been in the past, to allow access to the

public and the press.   *See Presley v. Georgia*, 558 U.S. 209, 215 (2010) (explaining that "[t]rial

courts are obligated to take every reasonable measure to accommodate public attendance at

criminal trials").

## IV.   Severance of Counts 6 and 7 is necessary to protect the 2014 Defendants' respective rights to a fair trial under the Fifth Amendment

Severance is discretionary up until the point that joinder of either defendants or offenses

cause actual or threatened deprivation of a fair trial. *United States v. Butler*, 494 F.2d 1246, 1256

(10th Cir. 1974)). Misjoinder rises to the level of a constitutional violation when it results in

prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial. *United States v.*

*Lane,* 474 U.S. 438, 446 (1986).  Under such conditions, "[t]he dangers for transference of guilt

from one to another across the line separating conspiracies, subconsciously or otherwise, are so

great that no one really can say prejudice to substantial right has not taken place." *Kotteakos v.*

*United States*, 328 U.S. 750, 774 (1946).  "[A] criminal defendant has no constitutional right to

---

[2] As it stands now, with the remaining defendants, bench conferences would be impossible with the number of attorneys.  The jury would have to be excused just so all counsel could hear the arguments.

severance unless there is a strong showing of prejudice caused by the joint trial." *Cummings v. Evans*, 161 F.3d 610, 619 (10th Cir. 1998).   When improper joinder allows the government to introduce prejudicial evidence that would have been inadmissible had the charges been tried separately and/or when the prosecution joins defendants with grossly disparate charges, courts have recognized the high risk of prejudice that likely requires reversal. *See, e.g., Kotteakos*, 328 U.S. at 773-774 (reversing and holding that, the government was not authorized "to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all"); *United States v. Mardian*, 546 F.2d 973 (D.C.Cir.1976) (reversing defendant's conviction, who was indicted on only one of several counts and alleged to have been involved in only 5 or 45 overt acts, based upon showing of likely prejudice from a joint trial wherein he had been tried with three of the principal members of the Watergate conspiracy); *United States v. Dockery,* 955 F.2d 50, 53 (D.C.Cir.1992); *United States v. Sampol,* 636 F.2d 621, 645–48 (D.C.Cir.1980) (vacating certain defendant's convictions where the district court failed to grant severance and noting the quantity and type of evidence against co-defendants is a vital consideration in evaluating severance).

In *Butler*, which was not a RICO case but did contain a count naming all 23 defendants and charging conspiracy to convert government property, the Tenth Circuit addressed the improper joinder of multiple distinct conspiracies and the impossibility of a fair trial for some defendants under those conditions. Although the government alleged one general conspiracy, the Tenth Circuit found that the evidence supported the existence of no fewer than three.  *Butler*, 494 F.2d at 1255.  In its explanation of the resulting prejudice, the Tenth Circuit could just as easily have been detailing the nature of the indictment in this case, where different combinations of the 30

26

charged defendants are alleged to have been involved in a series of separate acts, some of them

separated by decades. The *Butler* court explained:

> The conspiracy count, which named all twenty-three defendants, alleged as dual
> purposes of the conspiracy the violations of both 18 U.S.C. §§ 641 and 1361 . . . .
> It is always difficult to evaluate evidence in a conspiracy case, and because of the
> secretive nature of the crime, the evidence is almost invariably circumstantial. As
> the Supreme Court has warned, however, caution must be taken that the conviction
> not be obtained by piling inference upon inference. . . . That admonition, we think,
> has special relevance in cases such as this, where many defendants, some of whom
> were not even acquainted, are charged on the basis of varying degrees of
> participation at various times. Guilt must be determined individually and not merely
> by association. Our review of the evidence must therefore be especially meticulous.

*Butler*, 494 F.2d at 1251-1252 (Internal quotation and citation omitted). The Tenth Circuit went

on to say:

> Twenty-three defendants were named in the indictment. Different combinations of
> these defendants were involved in nearly every transaction which figured in the
> trial. Many of the defendants did not know one another prior to trial. Some of the
> members of the 3d Mobile may have assisted Sergeant Greene in obtaining and
> converting Government property from R & M. It is impossible, however, upon the
> evidence presented at trial, to link any of them with the destruction of an electronic
> test unit by members of another organization located elsewhere on the base . . . .
> because Mr. Reinke may have shared mutual acquaintances with those who
> collaborated in the destruction of the unit, he was forced to acquit himself of their
> actions. One can only guess whether he was also forced to share their guilt. We can
> envision circumstances where what has been alleged as one conspiracy is disclosed
> at trial to be several repetitive conspiracies in which there is substantial identity of
> parties and method . . . . In such circumstances a curative instruction may well
> bridge the gap between pleading and proof. Such is not the case here. Mr. Reinke,
> whose participation was limited to his association with Sergeant Greene and the
> other members of the 3d Mobile, should have been tried only on the charges arising
> from that association. The possibility that the issue of his guilt was confused with
> the guilt of other defendants involved in unrelated transactions at different times
> and in different places is too great. His convictions must therefore be reversed, and
> the case is remanded for a new trial.

*Id.* at 1256-1257.

The *Butler* analysis applies here as well, the only further wrinkle being that the crimes

charged in counts 6 and 7 are alleged to have been committed in aid of racketeering activity.  Here,

the fact that the defendants have been charged with VICAR offenses cannot overcome the 2014

Defendants' right to a fair trial on the charges alleged against them. As the *Gallo* court determined,

the complexity of a large multi co-defendant racketeering case almost demands severance at least

"where the severed trials concern aspects of the enterprise which are clearly separable and

independent," as is the case here. *Gallo*, 668 F.Supp. at 758.  A joint trial involving evidence on a

litany of other murders, charged in factually unrelated counts, would be so prejudicial to the 2014

Defendants as to severely impair their respective rights to a fair trial under the Fifth Amendment.

## CONSULTATION WITH COUNSEL

Undersigned counsel attempted to contact counsel for all parties in this matter.  Counsel

for the 2014 Defendants Jerry Montoya (by Larry Hammond), Daniel Sanchez (by Amy Jacks),

Anthony Ray Baca (by Theresa Duncan), Mauricio Varela (by Mary Stillinger) and Timothy

Martinez (by Steven Almanza) join in the Motion.  Counsel for Defendants Joe Gallegos (by Brock

Benjamin), Christopher Chavez (by Orlando Mondragon), Santos Gonzales (by Erlinda Johnson),

Conrad Villegas (by B.J. Crowe) and Paul Rivera (by Keith Romero) do not oppose this Motion.

Counsel for Defendants Eugene Martinez (by Douglas Couleur) and Leonard Lujan (by Dean

Clark) take no position on this Motion.  Counsel for the remaining Defendants did not respond

regarding their position. Counsel for the United States, AUSA Maria Armijo, indicates the United

States opposes this motion.

## CONCLUSION

A joint trial of Counts 6 and 7 alongside the other 13 charges is not permitted under Rule

8(a), or Rule 8(b) and if it were, it is not permitted under Rule 14 or under the Fifth Amendment,

as the 2014 Defendants would be prejudiced by the presentation to the jury of similar offenses by

other purported members of the SNM.  As such, this Court should grant this motion to sever.

Respectfully submitted,
THE LAW OFFICE OF RYAN J. VILLA

*/s/ Ryan J. Villa*
Ryan J. Villa
2501 Rio Grande Blvd. NW Ste. A
Albuquerque, NM 87104
(505) 639-5709
(505) 433-5812 facsimile
ryan@rjvlawfirm.com

AND

*/s/ Justine Fox-Young*
Justine Fox-Young, P.C.
1903 Wyoming Blvd. NE, Suite B
Albuquerque, NM 87112
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Rudy Perez*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system on, this 23rd day of December, 2016, which caused counsel of record for all parties to receive a copy of this Motion electronically.

*/s/ Ryan J. Villa*
Ryan J. Villa

29

Deleon et al. Superseding Indictment Defendant Chart

| | Count 1 | Count 2 | Count 3 | Count 4 | Count 5 | Count 6 | Count 7 | Count 8 | Count 9 | Count 10 | Count 11 | Count 12 | Count 13 | Count 14 | Count 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2001 | 2007 | 2012 | 2012 | 2014 | 2014 | 2003-2015 | 2013 | 2013 | 2015 | 2015 | 2015 | 2016 | 2016 |
| Angel Deleon | X | | | | | | | | | | | | | | |
| Joe Lawrence Gallegos | X | | | X | X | | | | | | | | X | X | X |
| Edward Troup | X | | X | | | | | | | | | | | | |
| Leonard Lujan | X | X | | | | | | | | | | | | | |
| Billy Garcia | X | X | | | | | | | | | | | | | |
| Eugene Martinez | | X | | | | | | | | | | | | | |
| Allen Patterson | | X | | | | | | | | | | | | | |
| Christopher Chavez | | X | | | | | | | | | | | | | |
| Javier Alonso | | | X | | | | | | | | | | | | |
| Arturo Arnulfo Garcia | | | X | | | | | | | | | | | | |
| Benjamin Clark | | | X | | | | | | | | | | | | |
| Ruben Hernandez | | | X | | | | | | | | | | | | |
| Jerry Armenta | | | | | | X | X | | | | | | | | |
| Jerry Montoya | | | | | | X | X | | | | | | | | |

1

Deleon et al. Superseding Indictment Defendant Chart

| | Count 1 | Count 2 | Count 3 | Count 4 | Count 5 | Count 6 | Count 7 | Count 8 | Count 9 | Count 10 | Count 11 | Count 12 | Count 13 | Count 14 | Count 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2001 | 2007 | 2012 | 2012 | 2014 | 2014 | 2003-2015 | 2013 | 2013 | 2015 | 2015 | 2015 | 2016 | 2016 |
| Mario Rodriguez | | | | | | X | X | | | | | | | | |
| Timothy Martinez | | | | | | X | X | | | | | | | | |
| Mauricio Varela | | | | | | X | X | | | | | | | | |
| Daniel Sanchez | | | | | | X | X | | | | | | | | |
| Gerald Archuleta | | | | | | | | X | | | | | | | |
| Conrad Villegas | | | | | | | | X | | | | | | | |
| Anthony Ray Baca | | | | | | X | X | X | X | X | | | | | |
| Robert Martinez | | | | | | | | | X | X | | | | | |
| Roy Paul Martinez | | | | | | | | | X | X | | | | | |
| Christopher Garcia | | | | | | | | | | X | X | X | | | |
| Carlos Herrera | | | | | | X | X | | | | | | | | |
| Rudy Perez | | | | | | X | X | | | | | | | | |
| Andrew Gallegos | | | | X | X | | | | | | | | | | |
| Santos Gonzalez | | | | | | | | | | | | | | X | X |
| Paul Rivera | | | | | | | | | | | | | | X | X |

2

Deleon et al. Superseding Indictment Defendant Chart

| | Count 1 | Count 2 | Count 3 | Count 4 | Count 5 | Count 6 | Count 7 | Count 8 | Count 9 | Count 10 | Count 11 | Count 12 | Count 13 | Count 14 | Count 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2001 | 2007 | 2012 | 2012 | 2014 | 2014 | 2003-2015 | 2013 | 2013 | 2015 | 2015 | 2015 | 2016 | 2016 |
| Shauna Gutierrez | | | | | | | | | | | | | | X | X |

3

**Count 1:**        **Murder of Frank Castillo- 3/26/2001** *[SNMCF]*

| Angel DeLeon |
|---|
| Joe Gallegos |
| Edward Troup |
| Leonard Lujan |
| Billy Garcia |

**Count 2:**        **Murder of Rolando Garza- 3/26/2001** *[SNMCF]*

| Leonard Lujan |
|---|
| Billy Garcia |
| Eugene Martinez |
| Allen Patterson |
| Chris Chavez |

**Count 3:**        **Murder of Freddie Sanchez- 2007** *[SNMCF]*

| Javier Alonso |
|---|
| Edward Troup |
| Arturo Arnulfo Garcia |
| Ben Clark |
| Ruben Hernandez |

**Counts 4 & 5:**        **Murder of Adrian Burns – 2012** *[Socorro & Valencia Counties]*

| Joe Gallegos |
|---|
| Andrew Gallegos |

**Counts 6 & 7:**      **Murder of Javier Molina- 2014** *[SNMCF]*

| |
|---|
| Jerry Armenta |
| Jerry Montoya |
| Mario Rodriguez |
| Timothy Martinez |
| Anthony Ray Baca aka "Pup" |
| Mauricio Varela |
| Daniel Sanchez |
| Carlos Herrera |
| Rudy Perez |

**Count 8:**      **Conspiracy to Assault Julian Romero- 2003 to 2015** *[SNMCF& Dona Ana County]*

| |
|---|
| Anthony Ray Baca |
| Gerald Archuleta aka "Styx" |
| Conrad Villegas |

**Count 9:**      **Conspiracy to Murder D. Santistevan- 2013 to 2015**

| |
|---|
| Anthony Ray Baca |
| Roy Martinez |
| Robert Martinez |

**Count 10:**      **Conspiracy to Murder Marcantel- 2013 to 2015**

| |
|---|
| Anthony Ray Baca |
| Roy Martinez |
| Robert Martinez |
| Christopher Garcia |

**Count 11:**      **Felon in Possession of Firearm**

| |
|---|
| Christopher Garcia |

**Count 12:**      **Using a Firearm during a Crime of Violence [924(c)]**

| |
|---|
| Christopher Garcia |

**Count 13:**   **Assault with Dangerous Weapon on Jose Gomez**
*[Valencia County(not in prison)]*

| Joe Gallegos |
| --- |

**Count 14:**   **Conspiracy to Murder Jose Gomez – Feb. 2016**
**[*Otero & Valencia Counties*]**

| Joe Gallegos |
| --- |
| Santos Gonzales |
| Paul Rivera |
| Shauna Gutierrez |

**Count 15:**   **Attempted Murder of Jose Gomez -** [*Valencia County (not in prison)*]

| Joe Gallegos |
| --- |
| Santos Gonzales |
| Paul Rivera |
| Shauna Gutierrez |

DNM 637

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,      )
       )
Plaintiff,       )
       )
v.       )      No. 15-CR-4268-JB
       )
1.    ANGEL DE LEON,      )
2.    JOE GALLEGOS,      )
3.    **EDWARD TROUP**,      )
4.    LEONARD LUJAN,      )
5.    BILLY GARCIA,      )
6.    EUGENE MARTINEZ,      )
7.    ALLEN PATTERSON,      )
8.    CHRISTOPHER CHAVEZ,      )
9.    **JAVIER ALONSO**,      )
10.    **ARTURO ARNULFO GARCIA**,      )
11.    BENJAMIN CLARK,      )
12.    RUBEN HERNANDEZ,      )
13.    JERRY ARMENTA,      )
14.    JERRY MONTOYA,      )
15.    MARIO RODRIGUEZ,      )
16.    TIMOTHY MARTINEZ,      )
17.    MAURICIO VARELA,      )
18.    DANIEL SANCHEZ,      )
19.    GERALD ARCHULETA,      )
20.    CONRAD VILLEGAS,      )
21.    ANTHONY BACA,      )
22.    ROBERT MARTINEZ,      )
23.    ROY MARTINEZ,      )
24.    CHRISTOPHER GARCIA,      )
25.    CARLOS HERRERA,      )
26.    RUDY PEREZ,      )
27.    ANDREW GALLEGOS,      )
28.    SANTOS GONZALEZ,      )
29.    PAUL RIVERA, and      )
30.    SHAUNA GUTIERREZ      )

Defendants.

1

**RESPONSE OF CERTAIN COUNT 3 DEFENDANTS TO JOINT MOTION TO SEVER
DEFENDANTS CHARGED WITH OFFENSES IN COUNTS 6 AND 7 [Doc. 807]**

Defendants, Edward Troup, Javier Alonso and Arturo Arnulfo Garcia (the Count 3 defendants), through counsel, submit this Response to the Joint Motion to Sever Defendants Charged with Offenses in Counts 6 and 7 [Doc. 807] filed by defendants Jerry Montoya, Timothy Martinez, Anthony Ray Baca, Mauricio Varela, Daniel Sanchez, Carlos Herrera and Rudy Perez.

In this case thirty defendants are charged by Superseding Indictment with violations of 18 U.S.C. 1959(a) and 18 U.S.C. 2 – Violent Crimes in Aid of Racketeering. [Doc.368].  Defendants Edward Troup, Javier Alonso, Arturo Arnulfo Garcia, Benjamin Clark, and Ruben Hernandez are charged in Count 3 with the murder of Freddie Sanchez, alleged to have occurred on June 17, 2007. [Doc. 368, pp.15-18]. In Counts 6 and 7, defendants Jerry Montoya, Timothy Martinez, Anthony Ray Baca, Mauricio Varela, Daniel Sanchez, Carlos Herrera and Rudy Perez are charged with conspiracy to commit murder and murder of Javier Molina alleged to have occurred on March 7, 2014. [Doc. 368, pp.20-26].

The defendants charged in Counts 6 and 7 have moved to have those counts severed from the remaining counts alleged in the Superseding Indictment. [Doc. 807]. The defendants charged in Count 3 file this response to the Joint Motion to Sever Counts 6 and 7.

DNM 639

Although the government's theory is not entirely clear, it appears, based on the discovery produced to date, that the government's theory regarding Count 3 is that co-defendants Arturo Garcia and Benjamin Clark ordered that Freddie Sanchez be killed, that co-defendant Ruben Hernandez assisted in the homicide by covering security cameras, and that co-defendants Edward Troup and Javier Alonso killed Freddie Sanchez.  It must be reiterated that this seems to be the government's theory; however, discovery has been produced which directly contradicts the government's presumed theory.

For the reasons and authorities articulated in the Joint Motion to Sever Counts 6 and 7, the Count 3 defendants join in that motion.  Importantly, and as accurately argued in the Joint Motion to Sever Counts 6 and 7, although Counts 3, 6 and 7 are all alleged to have occurred within the New Mexico Department of Corrections, Count 3 is alleged to have occurred almost seven years before the events charged in Counts 6 and 7 and none of the defendants charged in Count 3 are charged in Counts 6 and 7. Furthermore, the government will perhaps argue that Count 3 should be joined with Counts 6 and 7 because all of the defendants charged in Counts 3, 6 and 7 are alleged members of the SNM.  However, discovery reveals that prior to March 7, 2014 at least one of the Count 3 defendants (Javier Alonso) had renounced any association with the SNM and the other active Count 3 defendants (Edward Troup and Arturo Garcia) were not even in the custody of the New Mexico Department of Corrections on March 7,

2014.[1]  Accordingly, the factor that allegedly unites the Count 3, 6 and 7 defendants, *i.e.* SNM membership and participation in alleged gang activity, was not present in March of 2014.

The Count 3 defendants agree that joinder of Counts 3, 6 and 7 will significantly complicate and lengthen any trial and that consideration of <u>Federal Rules of Criminal Procedure 8</u> and 14 counsels in favor of severance.  The Count 3 defendants adopt the arguments in the Joint Motion to Sever Counts 6 and 7 and accordingly join in the request to sever Counts 3, 6, and 7.  The Count 3 defendants reserve the right to request further severance of the remaining counts and/or defendants and by this pleading merely assert that they specifically join in the Joint Motion to Sever Defendants Charged with Offenses in Counts 6 and 7 [Doc. 807]

Inasmuch as the government opposed the Joint Motion to Sever Counts 6 and 7 [Doc. 807, p.28], the Count 3 defendants assume that the government will persist in that opposition.  Undersigned counsel attempted to confer with co-defendants Clark and Hernandez to determine their position regarding this motion.  Counsel for co-defendant Clark indicated that they take no position.  Counsel for co-defendant Hernandez did not respond.

---

[1] "Active Count 3 defendants" refers to those defendants charged in Count 3 who are actively defending against the charges alleged in the Superseding Indictment, *i.e.* Edward Troup, Javier Alonso, and Arturo Garcia.  The other two defendants charged in Count 3, Ben Clark and Ruben Hernandez, are confirmed cooperators with the prosecution.

DNM 641

WHEREFORE, based on the foregoing it is respectfully requested that Counts 6 and 7 be severed from the remaining counts in the Superseding Indictment and in particular be severed from Count 3 of the Superseding Indictment.

DATED:   January 6, 2017.

Respectfully submitted,


_/s/ Cori Harbour-Valdez_____
Patrick Burke
Cori Harbour-Valdez
Attorneys for Edward Troup (3)

_/s/ Nathan Chambers_____
Nathan Chambers
Noel Orquiz
Attorneys for Javier Alonso (9)

_/s/ Billy Blackburn_____
Billy Blackburn
Attorney for Arturo Garcia (10)


## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


_/s/ Nathan Chambers_____
Nathan Chambers

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **NO.  15-CR-4268-JB** |
| | § | |
| **JOE GALLEGOS (2),** | § | |
| **EDWARD TROUP (3),** | § | |
| **LEONARD LUJAN (4),** | § | |
| **BILLY GARCIA (5),** | § | |
| **ALLEN PATTERSON (7),** | § | |
| **CHRISTOPHER CHAVEZ (8),** | § | |
| | § | |
| **Defendants.** | § | |

## RESPONSE OF CERTAIN COUNT 1 AND 2 DEFENDANTS TO
## JOINT MOTION TO SEVER DEFENDANTS CHARGED WITH OFFENSES
## IN COUNTS 6 AND 7 [Doc. 807]

COME NOW, Defendants Joe Gallegos, Edward Troup, Leonard Lujan, Billy Garcia, Allen

Patterson, and Christopher Chavez, by and through their attorneys, and submit this Response to the

Joint Motion to Sever Defendants Charged with Offenses in Counts 6 and 7 [Doc. 807] filed by

defendants Jerry Montoya, Timothy Martinez, Anthony Ray Baca, Mauricio Varela, Daniel Sanchez,

Carlos Herrera and Rudy Perez.  The Defendants respectfully submit the following:

In this case thirty (30) Defendants are charged by Superseding Indictment with violations of

18 U.S.C. 1959(a) and 18 U.S.C. 2 – Violent Crimes in Aid of Racketeering. [Doc.368].  Defendants

Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, Billy Garcia, Eugene Martinez, Allen

Patterson, and Christopher Chavez are charged in Counts 1 and 2 with the murders of Frank

Castillo and Rolando Garza, alleged to have occurred on March 26, 2001. [Doc. 368, pp. 9-14].  In

Counts 6 and 7, defendants Jerry Montoya, Timothy Martinez, Anthony Ray Baca, Mauricio Varela,

DNM 643

Daniel Sanchez, Carlos Herrera and Rudy Perez are charged with conspiracy to commit murder and murder of Javier Molina alleged to have occurred on March 7, 2014. [Doc. 368, pp.20-26].

The Defendants charged in Counts 6 and 7 have moved to have those counts severed from the remaining counts alleged in the Superseding Indictment. [Doc. 807]. The Defendants charged in Counts 1 and 2 file this response to the Joint Motion to Sever Counts 6 and 7.

It appears based on the discovery produced to date, that the government's theory is that the two murders, which occurred on the same day in 2001, were orchestrated by Defendant Billy Garcia. The government's theory is that Mr. Garcia was the "shot caller" for the SNM gang for the period of time encompassing Counts 1 and 2 of the Superseding Indictment. The government asserts that Mr. Garcia, acting on orders of those higher up in the SNM, orchestrated the murder of both victims by ordering co-defendant Leonard Lujan to arrange for the murders. The government's theory is that Mr. Lujan then arranged for two teams to carry out the murders of Frank Castillo and Rolando Garza on March 26, 2001. The government alleges that the first team was comprised of Defendants Angel DeLeon, Joe Lawrence Gallegos, and Edward Troup and that the second team was comprised of Defendants Eugene Martinez, Allen Patterson, and Christopher Chavez.

It must be reiterated that this seems to be the government's theory; however, discovery has been produced which directly contradicts this theory.

For the reasons and authorities articulated in the Joint Motion to Sever Counts 6 and 7, the Counts 1 and 2 Defendants join in that motion. Importantly, and as accurately argued in the Joint Motion to Sever Counts 6 and 7, although Counts 1, 2, 6 and 7 are all alleged to have occurred within the New Mexico Department of Corrections, Counts 1 and 2 are alleged to have occurred thirteen (13) years before the events charged in Counts 6 and 7 and none of the defendants charged

DNM 644

in Counts 1 and 2 are charged in Counts 6 and 7.  The government will perhaps argue that Counts 1 and 2 should be joined with Counts 6 and 7 because all of the Defendants charged in Counts 1, 2, 6 and 7 are alleged members of the SNM.  However, discovery reveals that Counts 1 and 2 Defendants Angel DeLeon, Edward Troup, Billy Garcia, Eugene Martinez, Christopher Chavez, Allen Patterson were not even in the custody of the New Mexico Department of Corrections on March 7, 2014.  Accordingly, the factor that allegedly unites the Count 1, 2, 6 and 7 defendants, *i.e.* SNM membership and participation in alleged gang activity, was not present in March of 2014.

The Counts 1 and 2 Defendants agree that joinder of Counts 1, 2, 6 and 7 will significantly complicate and lengthen any trial and that consideration of <u>Federal Rules of Criminal Procedure 8</u> and 14 counsels in favor of severance.  The Counts 1 and 2 Defendants adopt the arguments in the Joint Motion to Sever Counts 6 and 7 and accordingly join in the request to sever Counts 1, 2, 6, and 7.  The Counts 1 and 2 Defendants reserve the right to request further severance of the remaining counts and/or Defendants and by this pleading merely assert that they specifically join in the Joint Motion to Sever Defendants Charged with Offenses in Counts 6 and 7 [Doc. 807]

Inasmuch as the government opposed the Joint Motion to Sever Counts 6 and 7 [Doc. 807, p.28], the Counts 1 and 2 Defendants assume that the government will persist in that opposition. Counsel for Eugene Martinez takes no position.

WHEREFORE, PREMISES CONSIDERED, it is respectfully requested that Counts 6 and 7 be severed from the remaining counts in the Superseding Indictment and in particular be severed from Counts 1 and 2 of the Superseding Indictment.

DNM 645

DATED:  January 6, 2017.                              Respectfully submitted,

*/s/ Cori A. Harbour-Valdez*
Cori Ann Harbour-Valdez
The Harbour Law Firm, PC
P.O. Box 13268
El Paso, TX 79913
Phone: 915-544-7600
Fax: 915-975-8036
cori@harbourlaw.net
&
*/s/ Patrick J. Burke*
Patrick J. Burke
Patrick J. Burke, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Phone: (303) 825-3050
Fax: (303) 825-2992
Patrick-j-burke@msn.com
*Attorneys for Edward Troup*


*/s/ Brock Benjamin*
Brock Benjamin
Richard Sindel
*Attorneys for Joe Gallegos*


*/s/ Russell Dean Clark*
Russell Dean Clark
*Attorney for Leonard Lujan*


*/s/ James Castle*
James Castle
Robert Cooper
*Attorneys for Billy Garcia*


*/s/ Orlando Mondragon*
Orlando Mondragon
John Granberg
*Attorneys for Christopher Chavez*


*/s/ Jeff Lahann*
Jeff Lahann
*Attorney for Allen Patterson*


4

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 6, 2016, I caused the instant motion to be filed with the Clerk of the Court using the CM/ECF system that will serve all other parties entitled to service and notice.

<u>s/*Cori A. Harbour-Valdez*</u>
Cori A. Harbour-Valdez

DNM 647

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        Plaintiff,

**vs.**                                No. 2:15-cr-04268-21-JB

**ANTHONY RAY BACA,**

        Defendants.

### DEFENDANT ANTHONY RAY BACA'S SUPPLEMENTAL BRIEF REGARDING TIMING OF DISCLOSURE OF THE IDENTITY OF CONFIDENTIAL INFORMANT

Defendant Anthony Ray Baca respectfully submits this supplemental brief on the issue of when the Court should compel the government to disclose to him and his counsel the identity of the confidential informant whose statements are summarized in FBI Confidential Human Source Reporting (February 11, 2016), Bates No. *U.S. v. DeLeon, et. al.* 3308-3309, and who is the subject of the Joint Motion for Disclosure and Production of Confidential Informant (Dkt. No. 698). As discussed in more detail below, because this informant very likely has information that exculpates Mr. Baca and Mr. Baca may seek to call him as a witness, Mr. Baca is entitled to immediate disclosure of the informant's identity.

### FACTUAL AND PROCEDURAL BACKGROUND

Along with co-defendants Jerry Armenta, Jerry Montoya, Mario Rodriguez, Timothy Martinez, Mauricio Varela, Daniel Sanchez, Carlos Herrera, and Rudy Perez, Defendant Anthony Ray Baca is charged with conspiring to murder and murdering Javier Molina in March 2014. [Dkt. 368 at 20-26.] Mr. Baca and his co-defendants are alleged to have committed these crimes "as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the

purpose of gaining entrance to and maintaining and increasing position in the Syndicato de

Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity," contrary to 18

U.S.C. § 1959(a).  [*Id.*]

The essential allegations underlying these charges are as follows.  On March 7, 2014, Mr.

Molina was stabbed to death while an inmate at the Southern New Mexico Correctional Facility

(SNMCF) in Las Cruces, New Mexico.  It is undisputed that Defendant Jerry Armenta stabbed

Mr. Molina with a shank, and Mr. Armenta recently pleaded guilty to conspiracy and murder in

aid of racketeering in relation to the killing.  [Dkt. 802.]  The government alleges that Mr.

Molina was killed in retaliation for his cooperation with law enforcement, and that Mr. Baca

authorized or "green-lighted" the killing.  More specifically, the government alleges that, while

incarcerated at the Penitentiary of New Mexico in Santa Fe, Mr. Baca gave paperwork

confirming Mr. Molina's cooperation with law enforcement to Mauricio Varela.  Mr. Varela

allegedly brought the paperwork to Las Cruces when he was transferred to SNMCF.  The

government alleges that Mr. Varela showed this paperwork to SNM members at SNMCF and

Mr. Molina was killed as a result.  The government also alleges that the shank (or shanks) used

in the killing came from a walker used by Defendant Rudy Perez.  Less than 24 hours elapsed

between the time Mr. Varela arrived at SNMCF and the killing of Mr. Molina.

On September 22, 2016, Mr. Baca and several of his co-defendants filed a Joint Motion

for Disclosure and Production of Confidential Informant, in which they sought disclosure of the

identity of a confidential informant who allegedly told authorities that Mr. Perez "assisted in the

killing of Javier MOLINA; PEREZ provided his walker to make shanks that were used in the

murder."  [Dkt. 698-1 at 2.]  On October 17, 2016, the government filed its response to the

motion, noting that it had agreed to disclose the identity of the informant to Mr. Perez and his

counsel pursuant to a protective order, but objecting to disclosure to the remaining defendants on the grounds they had failed to provide a factual basis sufficient to justify disclosure.  [Dkt. 741.] On November 7, 2016, four of the remaining defendants, including Mr. Baca, filed a joint reply, in which they provided additional facts in support of their requests for disclosure.  [Dkt. 762.]

This Court held a hearing on the motion on November 29, 2016.  During the hearing, each of the defendants seeking disclosure made supplemental arguments in support of their requests.  After hearing Mr. Baca's arguments and those of the government, the Court stated that it was inclined to order the government to disclose the identity of the confidential informant to Mr. Baca and his counsel.  [Trans. 11/29/16 Hrg. at 178.]  The Court did not make a final ruling, however, because it wanted to address an issue the government raised regarding the timing of the disclosure in light of the government's representation that it intends to call the confidential informant as a witness at trial.  [*Id*. at 92.]

The government argued at the hearing that the *Roviaro*[1] analysis applies only to non-testifying informants and disclosure of testifying informants is controlled solely by the rules governing disclosure of witnesses generally; thus, it was not required to disclose the informant's identity until the deadline for disclosing *Jencks* material pursuant to 18 U.S.C. § 3500.[2]  Mr. Baca respectfully submits this supplemental brief in response to this argument.

---

[1] *Roviaro v. United States*, 353 U.S. 53 (1957).

[2] In making this argument, the government incorporated by reference a pleading it filed in *United States v. Baca*, 16cr1613.   [*United States v. Baca*, 15-cr-1613 JB, Dkt. 255.]

Although the government referred to the Jencks Act in arguing *Roviaro* is not applicable to testifying informants, Jencks is inapplicable because, at least at this point, Mr. Baca is not seeking disclosure of additional statements the confidential informant may have made.  He is only seeking disclosure of the informant's identity, information that the government previously shared with co-defendant Rudy Perez.

3

## DISCUSSION

The defendants' joint motion for disclosure of the confidential informant's identity sets

forth the standard this Court must apply in deciding whether to order disclosure of an

informant's identity prior to trial.  [Dkt. 698 at 6-7.]  Mr. Baca respectfully incorporates that

discussion here.  As the Court previously indicated it was inclined to order disclosure of the

informant's identity to Mr. Baca and his counsel, Mr. Baca does not argue that point in this

pleading.[3]  Rather, this supplemental brief focuses on the timing of that disclosure.

The disclosure of a confidential informant's identity involves "balancing the public

interest in protecting the flow of information [to law enforcement] against the individual's right

to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend

on the particular circumstances of each case, taking into consideration the crime charged, the

possible defenses, the possible significance of the informer's testimony, and other relevant

factors." *Roviaro v. United States*, 353 U.S. 53, 62 (1957).  Once the Court determines that

disclosure of the identity of a confidential informant is appropriate, the defense must have the

opportunity to interview the witness in order to determine whether to call him at trial,

irrespective of whether the United States plans to do so.  *Roviaro* provides that the "desirability

of calling [the informant] as a witness, *or at least interviewing the informant in advance of trial*,

is a matter for the accused, rather than the government, to decide." *Id.* at 64 (emphasis added).

In deciding whether and when to compel disclosure of a confidential informant's identity,

the Court must balance the interests and rights of both the defense and the United States and

---

[3] At the hearing, the Court invited the government to submit a supplemental brief identifying evidence that undermined Mr. Baca's showing that he is entitled to disclosure of the confidential informant's identity.  [Trans. 11/29/16 Hrg. at 133.]  The government has not submitted additional evidence to date, and Mr. Baca reserves his right to respond should it do so in the future.

make timing decisions accordingly. *United States v. Phillips*, 854 F.2d 273, 277 (7th Cir. 1988) ("When a criminal defendant seeks access to confidential informant files, we rely particularly heavily on the sound discretion of the trial judge to protect the rights of the accused as well as the government."). The government argues, however, that the *Roviaro* balancing test applies only when the government does not call the informant as a witness at trial. [Trans. 11/29/16 Hrg. at 93-94.] *See also United States v. Baca*, 16cr1613, Dkt. 255 at 5-6. The government asserts that when it states an intent to call the informant as a witness, the rules governing the disclosure of witnesses generally, rather than *Roviaro*, govern disclosure of the informant's identity. [*Id.*] Thus, even if this Court determines that Mr. Baca is entitled to disclosure of the informant's identity under the *Roviaro* analysis, the government's position is that the Court cannot order disclosure of his identity prior to trial so long as the government states an intention to call the informant as a witness. The government is wrong.

Neither the Supreme Court nor the Tenth Circuit has ever held that the *Roviaro* analysis applies only to non-testifying informants. Indeed, the better reasoned decisions from other circuits have held that *Roviaro* trumps the witness disclosure rules. Mr. Baca is not asking the Court to order the government to disclose the witnesses it intends to call at trial, but rather to identify a particular person with knowledge that may assist in his defense. As this Court has tentatively found, he is entitled to that information because it is relevant and helpful to his defense. *See also Roviaro*, 353 U.S. at 60-61 ("Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.").

The general rule that a criminal defendant has no constitutional right to the production of the names of potential government witnesses "is clearly not applicable to informants." *United*

5

*States v. Norton*, 504 F.2d 342, 343 n. 1 (8th Cir. 1974) (citing *Roviaro*); *see also United States v.*

*Barnes*, 486 F.2d 776, 778 (8th Cir. 1973).  "The exception posited by the government has no

basis in *Roviaro*, which drew no distinction between testifying and non-testifying informants."

*Norton*, 504 F.2d at 343 n. 1; *but see United States v. Glover*, 583 F.Supp.2d 5, 12 (D. D.C.

2008) (court inclined to agree with government that *Roviaro* applies only to non-testifying

experts), citing *United States v. Casseus*, 282 F.3d 253, 257 (3d Cir. 2002).  In the present case,

because the confidential informant appears to have information that is exculpatory as to Mr.

Baca, it is critical that his counsel have an opportunity to interview the informant in advance of

trial to determine whether to call him as a witness—regardless of whether the government

intends to call him as well.  *See generally United States v. Saa*, 859 F.2d 1067, 1074 (2d Cir.

1988) ("From this language [in *Roviaro*], as well as from the practical reality that a witness with

a special relationship with the Government is not truly 'available' to the defense merely because

he is physically available to be called, stems the right under *Roviaro* to information about an

informant not merely so that the defense can call the informant to testify, but so that it can seek

to interview him first.") (internal citation omitted); *see also United States v. Ferguson*, 498 F.2d

1001, 1011-12 (D.C. Cir. 1974) (Bazelon, C.J. dissenting) ("*Roviaro*, itself, however,

specifically identifies still a third reason for pretrial disclosure that the majority ignores:  The

desirability of calling (the informant) as a witness, or at least interviewing him in preparation for

trial, was a matter for the accused rather than the Government to decide.  The Supreme Court's

use of the disjunctive 'or' indicates that the defendant has the right to interview an informant

irrespective of whether he intends to call him as a witness.  Indeed, as this court recognized in

*United States v. DeCoster*, 487 F.2d 1197 (C.A.D.C. 1973), unless counsel interviews a witness

he obviously is unable to make an informed decision as to whether to call him to testify.")

(internal citation omitted).  Under the *Roviaro* balancing test, Mr. Baca is entitled to disclosure of the confidential informant's identity now so that he may locate and attempt to interview the informant.  Delaying disclosure of the informant's identity until trial would deny Mr. Baca his right to prepare a defense.

Many of the cases the prosecution cites in support of its argument that *Roviaro* does not apply to an informant the government may call as a witness found only that the lack of timely disclosure of the informant's identity was not error under the particular circumstances of those cases, including the fact the informant was called to testify at trial.  [*United States v. Baca*, 16cr1613, Dkt. 255 at 5-6.]  *See, e.g., United States v. Tejeda*, 974 F.2d 210, 217 (1st Cir. 1992) (no error where defense failed to show that his need for identity of informant overcame the public interest in encouraging the flow of information to law enforcement and the informant's private interest in his own safety; ultimately witness's identity was disclosed prior to trial, the government called him as a witness, and the defense failed to ask for further relief following disclosure); *Casseus*, 282 F.3d at 257 (defendants allowed to interview eyewitnesses before trial and eyewitnesses testified).  Cases holding after the fact that the informant's production and availability for cross-examination at trial cured any prejudice from the failure to disclose the informant's identity before trial "do not stand for the proposition that the government may withhold names of participating informants so long as it intends to call them at trial."  *Norton*, 504 F.2d at 343 n. 1.

> Nor do they stand as an invitation to trial courts to routinely deny defendants access to the names and addresses of informants prior to trial on the theory that the error may be cured by making the informant available at trial. A finding of no prejudice in a particular case ought never be construed as an invitation to deliberate error in the future.

*Id.*

DNM 654

As noted above, neither the Supreme Court nor the Tenth Circuit has decided the issues

before this Court.[4]  At the November 29, 2016, hearing and in its briefing in Case No. 16cr1613,

however, the government asserted that, in *United States v. Lujan*, 530 F. Supp. 2d 1224 (D. N.M.

2008), Judge Brack "agreed that there is differentiation between testifying witnesses and

confidential informants who will not testify. And that *Roviaro* and that calculus applies only

when it's a CHS that will not testify at trial."  [Trans. 11/29/16 Hrg. at 94; *see also United States

v. Baca*, 16cr1613, Dkt. 255 at 5.]  This is not a fair characterization of Judge Brack's ruling.  In

that case, the defense filed a motion for disclosure of information "concerning the Government's

witnesses, informants, confidential sources, etc."  *Lujan*, 530 F. Supp. 2d at 1260.  The request

included both testifying and non-testifying informants.  *Id*.  In response to the motion, the

government asserted that there was "no one involved in [the] case who provided information on

a confidential basis who would be considered an informant or source."  *Id*.  The government

further asserted that it had previously disclosed the identity of two informants who it intended to

call as witnesses at trial.  *Id*.  It then claimed privilege as to any non-testifying confidential

informants.  *Id*.  Thus, the only issues before Judge Brack were (1) whether the defense was

entitled to disclosure of the government's witness list prior to trial, and (2) whether the

---

[4] In *United States v. Pennick*, 500 F.2d 184 (1974), the Tenth Circuit held that a trial court did not err in denying a defendant's motion for early disclosure of the government's witnesses, including its informant witness.  In reaching this holding, the court first found that the defendant had no statutory right to a list of the government's witnesses generally, or informants specifically.  *Id*. at 186.  Secondly, the court found that the trial court had correctly applied the *Roviaro* analysis in deciding not to order disclosure of the informant's identity before trial.  *Id*. at 187 ("In the instant case the trial court applied the 'balancing test' referred to in *Roviaro* and took into consideration the various factors mentioned in that case, and then in the exercise of its discretion refused to require the Government to reveal the identity of its informer who all knew was to testify upon trial.").  In contrast to Mr. Baca's case, the trial court and the Tenth Circuit in *Pennick* found that the informant's testimony was not helpful to the defendant.  *Id*.  Thus, the court did not decide the timing issue before this Court.

government was required to disclose to the defense any non-testifying confidential informants. *Id*. at 1261-62.

With respect to the first issue, the prosecution did not raise, and Judge Brack did not consider, the issue before this Court: whether a defendant who has met his burden under *Roviaro* is entitled to the pretrial disclosure of the identity of a confidential informant who the government may call as a witness at trial.  Rather, the issue was simply whether the defendants were entitled to disclosure of a list of the government's trial witnesses and, if so, when must the government disclose that list.  *Id*. at 1261. With respect to the issue of non-testifying informants, Judge Brack found the defendants' request moot based on the government's representation that it had previously disclosed the only two people it would consider to be cooperating individuals.  *Id*. at 1263.  Judge Brack also found that the defendants had not "demonstrated the need for any informant's testimony with any particularity."  *Id*.  In this case, by contrast, the Court has preliminarily found that Mr. Baca has demonstrated his need for the identity of the confidential informant who gave the statements summarized in Dkt. 698-1.

Mr. Baca seeks to discover the name of a confidential informant who potentially has information that may exculpate him.  He seeks to discover this information regardless of whether the government may call the informant as a witness.  In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Id*. at 87.  In addition to its duty to disclose favorable evidence that could be used at trial, the prosecution also has a duty to disclose any favorable evidence that could be used "in obtaining further evidence." *Giles v. Maryland*, 386 U.S. 66, 74 (1967).  The Tenth Circuit "strongly disapprove[s] of delayed disclosure of *Brady* materials."

*United States v. Warhrop*, 732 F.2d 775, 777 (10th Cir. 1984).  Due process requires that disclosure of potentially exculpatory information be made in time for a defendant to make use of any benefits of the evidence.  *Id*.  The same should be required for disclosure of a confidential informant's identity where, as here, a court has found such disclosure necessary for a defendant to adequately prepare his defense.

In deciding when to order the government to disclose the identity of the informant to Mr. Baca and his counsel, this Court should consider the same *Roviaro* factors that led it to preliminarily conclude Mr. Baca is entitled to the disclosure.  This informant has potentially exculpatory information as to Mr. Baca and he and his counsel need time to locate the informant, attempt to interview him and conduct related investigation.  As this Court is aware, when the defense puts on exculpatory evidence the jury does not automatically accept it as truth. The defense needs to investigate and corroborate the evidence so the jury can determine whether it is reliable. That investigation is often time consuming and, at this point, trial is only six months away.

Any concerns the government or the informant may have regarding the informant's safety would be answered by ordering disclosure pursuant to a protective order similar to the one entered with respect to Rudy Perez.  [Dkt. 748.]  As discussed at the November 29, 2016, hearing, Mr. Baca has no objection to the entry of a similar protective order, although he requests that it be modified to allow his counsel to communicate with counsel for Rudy Perez regarding the informant.  [Trans. 11/291/6 Hrg. at 180-181.]  The government indicated at the hearing that it does not oppose this request.

**CONCLUSION**

For the foregoing reasons and those stated in the Joint Motion for Disclosure and

Production of Confidential Informant (Dkt. No. 698), Joint Reply to Government's Response to

Joint Motion for Disclosure and Production of Confidential Informant (Doc. 762), and at the

November 29, 2016, hearing, Defendant Anthony Ray Baca respectfully asks the Court to order

the government to immediately disclose to him the identity of the informant whose statements

are memorialized in the FBI Confidential Human Source Reporting (February 11, 2016), Bates

No. *U.S. v. DeLeon, et. al.* 3308-3309.

Respectfully submitted,

/s/ Theresa M. Duncan
Theresa M. Duncan
Theresa M. Duncan, Esq.
515 Granite NW
Albuquerque, NM 87102
505-842-5196
teri@duncanearnest.com

ROTHSTEIN, DONATELLI, HUGHES,
  DAHLSTROM, SCHOENBURG & BIENVENU, LLP

/s/ Marc M. Lowry
MARC M. LOWRY
500 Fourth Street NW, Suite 400
Albuquerque, NM  87102
(505) 243-1443
mlowry@rothsteinlaw.com

*Attorneys for Anthony Ray Baca*

11

### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 8th day of January 2017, I filed the foregoing pleading

electronically through the CM/ECF system, which caused counsel for Plaintiff and Defendants to

be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


<u>/s/ Theresa M. Duncan</u>
Theresa M. Duncan

12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **RUDY PEREZ**, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' SUPPLEMENT IN RESPONSE TO OPPOSITION TO THE JOINT MOTION FOR DISCLOSURE AND PRODUCTION OF CONFIDENTIAL INFORMANT [698]

The United States of America files this Supplemental Memorandum in response to the Court's request for (1) additional evidence linking defendant Anthony Ray Baca to the murder of J.M., (2) additional evidence corroborating the timeframe in which the "green light" on J.M. had been in place, and (3) additional briefing on disclosure of confidential Government informers. Regarding the requests for additional evidence, the United States will provide partial summaries of recorded conversations of Anthony Ray Baca and Rudy Perez with confidential informers. These recordings link Baca to the murder of J.M., and reveal that the "green light" on J.M. had been in place for at least one year. Regarding the request for additional briefing on disclosure of testifying confidential informers, numerous United States Circuit Courts of Appeals, including the Tenth Circuit, have found that pretrial disclosure of a Government informer is not required when the informer testifies at trial. Accordingly, the Court should deny motions for disclosure and production of a confidential informer who the Government intends to call as a witness at trial.

## PROCEDURAL BACKGROUND

On November 29, 2016, the Court conducted a hearing on the Joint Motion for Disclosure

and Production of Confidential Informant [698]. The Court requested additional evidence linking Anthony Ray Baca to the murder of J.M., and corroborating that the "green light" on J.M. had been outstanding longer than 24-48 hours, because the Court concluded that additional corroborating evidence negates that the confidential informant (CI) at issues has information that is helpful and "significan[t]" to Baca's defense. *Roviaro v. United States*, 353 U.S. 53, 62 (1957). *See* Transcript of Motion Proceedings at 134, *United States v. Angel DeLeon, et al.*, No. CR-15-4268-JB (D.N.M. Nov. 29, 2016) (Browning, J.) ("If you've got something specific, as far as recordings or something that link Mr. Baca up to the Molina hit orders, then I guess I'd like to see that."). The United States therefore files this Supplemental Memorandum.

## FACTUAL SUPPLEMENT

The United States offers several sources of evidence that corroborate Baca's involvement in the murder, and reveal that the "green light" on J.M. had been in place for at least one year.[1]

**(1) Corroborating Evidence Linking Baca to the Murder of J.M.**

On December 13, 2016, Jerry Armenta, a.k.a. "Creeper," pled guilty in this case. Armenta admitted to the following:

    i.    On March 6, 2014, Armenta and another member of the SNM gang stabbed and killed J.M. while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County.

    ii.    Prior to the murder of J.M., Armenta and other members of the SNM gang, namely *Anthony Ray Baca, a.k.a. "Pup,"* Daniel Sanchez, a.k.a. "Dan Dan," Carlos Herrera, Rudy Perez, a.k.a. "Ru Dog," Mario Rodriguez, a.k.a. "Blue,"

---

[1] This is not an exhaustive list of evidence possessed by the United States that links Baca and Perez to J.M.'s murder. These are examples among many that support the proposition that the hit on J.M. had been outstanding long before Baca sent the paperwork with Mauricio Varela to SNMCF.

and Timothy Martinez, a.k.a. "Red," conspired to kill J.M. *pursuant to an*

*outstanding "green light" that had been placed on J.M. no later than a year*

*prior to the murder.*

    iii.    Armenta was ordered to kill J.M. by virtue of his membership in the SNM.

Plea Agreement at 4-5, *United States of America v. Jerry Armenta*, No.15-CR-4268 JB (D.N.M.

Dec. 13, 2016) (emphasis added) [Doc. No. 802]. Federal agents obtained additional evidence

linking Baca and Perez to the murder of J.M., and demonstrating the "green light" on J.M. had

been in place for at least one year.

**(2)  Recorded Statements of Anthony Ray Baca**

    Through the use of a confidential informer, whom the United States intends to offer as a

witness, the United States obtained recorded statements of Anthony Ray Baca affirming that the

"paperwork" on J.M. had previously been issued, but the murder was not carried out. The

conversation also reveals Baca's leadership role among the co-Defendants. The recording took

place in October 2015 at the Penitentiary of New Mexico.

| | |
|---|---|
| CHS: | Straight up ay, it's I mean, that's what *BB and all them vatos, the ones that had all the paperwork on [J.M.] before you left, this last time when you came back over here when we came over there they all had the paperwork, nothing happened.* When they got the paperwork over there they fuckin' took care of business and those *vatos* were trying to stop it. |
| Baca: | Oh they were trying to stop it? |
| CHS: | Fuck yea! BB and Cyclone and all them, they didn't want-chh. That's why they kept it quiet when-when the paperwork got there, they fuckin' handled business, but they didn't even tell green pod. But, Lazy, Lazy's been fucking up a lot carnal. They put paperwork (stutters) Blue took paperwork down there gave it to Lazy, Lazy get it to, to Juanito on-on uh, on Con-Conrad or somebody no? For cause they had UI fuckin' rapists or something. Um, anyways they put the paperwork like that, um, Juanito flushed it, right? He flushed it, they didn't do nothing, they didn't want no one else to see it so he flushes the paperwork, and he tells em [phonetic], "Well Lazy told me to fuckin' flush the paperwork." Um, Blue hit up Lazy, and he goes "Eee carnal, I know I fucked up. I shouldn't of told him to flush |

<div align="center">3</div>

| | |
|---|---|
| | it," and, and all this and that dog. But yea he's been fucking up ay. They wanna get him, they wanna get Alex, and they wanna get BB too no? But BB's down there acting like a fucking *jefe* dog. You already know how he is. |
| Baca: | Oh BB's already, that's gonna be taken care of. |
| CHS: | Yea BB's *chafa* dog. He… |
| Baca: | UI taken care of ay. They already, they already shot word to me to say they were gonna go ahead and do it. |
| CHS: | Yea that's what I'm saying but uh, and Blue was like, Blue's us, he said, "I'm behind Baby G." And I said, "You know what *carnal*? I'm behind Pup dog. *Oh Pup's our state, that's my big homie, I ain't listenin' to these motherfuckers dog,* cause these motherfuckers dog, cause these motherfuckers ain't done shit" And I said, *"And matter of fact, I know for a fact that fucking Pup, told fucking Baby G to handle business before, and he didn't fucking do it so that should tell you where he's at, know what I mean?* |
| Baca: | Yea. |

FBI recording 0730.004.wav: CHS and Anthony Ray Baca (Oct. 2015) (on file with author); Transcript of FBI Recording 0730.004.wav: CHS and Anthony Ray Baca (Oct. 2015) at 3-4.

These recorded statements confirm that the "green light" had been outstanding for over one year. The Government intends to offer as a witness the confidential informer who assisted in producing evidence against Baca. Accordingly, the Government will provide the informer's identity with its list of testifying witnesses.

(3) **Recorded Statements of Rudy Perez**

Through the use of a confidential informer, whom the United States intends to offer as a witness, the United States obtained recorded statements of defendant Perez admitting to his involvement in the murder. In February of 2016, at the Southern New Mexico Correction Facility, Rudy Perez disclosed to a confidential informer (CHS) that the "green light" on J.M. had been outstanding for longer than one year.

| | |
|---|---|
| Perez: | I – I tell you, all that came out afterwards because like I say at first, I thought oh they're just homies, you know what I mean? You just showed some homies up, cool.   Because other vatos (UI) them |

4

|        | fuckers is true eh. That's why. Well find out then that the – the truth came out. (UI) *He's got the paperwork a year before.*   That's when he told me hey we got it yes but we're not gonna show it so you just make sure you show some love, no? |
| CHS: | Orale. So, eh, that's…so that's why, so that's why that fool [J.M.] – [J.M.] was fuckin' always sending coffee to him because he knew he was a *chaffa* fucker. |
| PEREZ: | He was, he was covering his ass, dog. |
| CHS: | Orale alright. |

FBI recording 1168.004.wav: CHS and Rudy Perez (Feb. 2016) (on file with author); Transcript of FBI Recording 1168.004.wav: CHS and Rudy Perez (Feb. 2016) at 2.

Perez later repeated to the informer that the "green light" on J.M. should have been carried out more than a year before the murder took place. His statements suggest it was well known that the "green light" had been out.

| CHS: | Hey-hey, carnal, that vato [J.M.] |
| Perez: | Yea |
| CHS: | That vato Jessy, that was just here, that fool Jessy Sosa |
| Perez: | Yeah |
| CHS: | That's the paperwork they had, they-they used to hit that fool, huh? |
| Rudy: | I don't know |
| CHS: | Oh |
| Perez: | I don't know. I've never seen it. I hear about it. |
| CHS: | You only hear about it? |
| Perez: | Yeah. Yeah because when I got over here, they were like na, fuck them. *The other vatos should of already taken care of them the year before.* And I was like, oh well |
| CHS: | You should of taken…that's what I don't understand, esse. *Them vatos already knew about, why didn't they take care of it?* |
| Perez: | *Well that's what everyone wants to know.* |

FBI recording 1168.006.wav: CHS and Rudy Perez (Feb. 2016) (on file with author); Transcript of FBI Recording 1168.006.wav: CHS and Rudy Perez (Feb. 2016) at 2.

During his conversations with the confidential informer, Perez admitted that Baca lamented the fact that the murder had not been carried out sooner.

5

Perez:          *The old man* [Baca] *was pissed* bro, he was like, he-he-he was upset with them. The other fools over there, they, *why didn't they handle it a year sooner when the (UI) took the paperwork over there.*

FBI recording 1168.006.wav: CHS and Rudy Perez (Feb. 2016) (on file with author); Transcript of FBI Recording 1168.006.wav: CHS and Rudy Perez (Feb. 2016) at 6.[2]

The Government intends to offer as a witness the confidential informer who assisted in producing evidence against Perez. Accordingly, the Government will provide the informer's identity with its list of testifying witnesses.

### SUPPLEMENT FOR NONDISCLOSURE OF TESTIFYING INFORMERS

Based on the Court's request, the United States offers this supplemental briefing in support of the proposition that confidential informers who will be called to testify at trial are not subject to pretrial disclosure under *Roviaro*.

## I.   *ROVIARO*: DUTY TO DISCLOSE NON-TESTIFYING CONFIDENTIAL INFORMERS

As a general rule, the Government enjoys a qualified privilege to withhold the identity of an informer who aids or assists law enforcement in the prosecution of a criminal defendant. *Roviaro v. United States*, 353 U.S. 53, 59 (1957). Also known as the "informer's privilege," the privilege is designed to encourage citizens to communicate their knowledge of the commission of crimes by preserving their anonymity. *Id.* at 59. While the privilege offers a necessary safeguard to protect the public interest in effective law enforcement, the propriety of nondisclosure oftentimes comes into conflict with the accused's right to prepare an adequate defense. *Id.* at 61 (noting conflict among several courts as to when disclosure was warranted). In *Roviaro v. United States*, 353 U.S. 53 (1957), the Supreme Court defined the standard by which a court may require pretrial disclosure of a confidential government informer.

---

[2]  Perez refers to Baca as "the old man" several times during the recorded conversation.

In *Roviaro*, the defendant, Roviaro, was charged with transporting and selling heroin in violation of 26 U.S.C. § 2554(a) and 21 U.S.C. § 174. *Id.* During the investigation, Roviaro delivered drugs to an individual operating as a government informer. *Id.* at 52-53. The informer was the only witness to obtain first-hand knowledge of Roviaro's conduct during the transaction. *Id.* at 64. Before and during Roviaro's trial, the trial court denied his requests for production of the informant's name, address, and occupation. *Id.* at 55. The informer was not called to testify as a witness, and Roviaro was found guilty of the charged offenses. *Id.* at 56.

Roviaro appealed his conviction claiming the trial court erred in upholding the right of the Government to withhold the identity of the informer. *Id.* at 58. The Supreme Court recognized that, while certain protections must be afforded to encourage common citizens to "communicate their knowledge of the commission of crimes to law-enforcement officials," the privilege must give way when "the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of the accused[.]" *Id.* at 60-61. Critically, the court reasoned that the determination as to when disclosure of an informer's identity or communication is "helpful to the defense of the accused" may vary. *Id.* Thus, the court pronounced "no fixed rule[.]" *Id.* at 62. Instead, the court supplied a balancing test which tasked lower courts with weighing "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. Specifically, the test requires an evaluation of the "particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62. Because the Government informer in *Roviaro* did not testify and "was the sole participant, other than the accused, in the transaction charged," the court found "the informer was the only witness in a position to amplify or contradict the testimony of government witnesses [involved in the investigation]," thus

7

warranting disclosure. *Id.* at 63-64 (noting the "circumstances of this case demonstrate that [the informer's] possible testimony was highly relevant and might have been helpful to the defense.").

### A. Other Supreme Court Decisions

Whereas the Supreme Court provided guidance as to when the Government must disclose the identity of *non-testifying* confidential informers, it left open the question whether pretrial disclosure was also required of *testifying* confidential Government informers. Subsequent Supreme Court decisions endorse the view that *Roviaro* does not apply to testifying Government informers.

In *Smith v. Illinois*, 390 U.S. 129, 133 n.8 (1968), the Supreme Court noted that the *Roviaro* confidential informer privilege analysis was not relevant to the subject matter of a testifying witness. Critically, in support of the proposition that *Roviaro* wasn't relevant, the Supreme Court cited and quoted the Illinois Court of Appeals' conclusion that the state analogue of the *Roviaro* informer analysis doesn't apply to testifying Government informers. *See id.* ("[T]he state evidentiary informer privilege is not involved when the informer is himself a witness at the trial." (citing *People v. Smith*, 69 Ill. App. 2d 83, 216 N.E.2d 520 (Ill. App. Ct. 1966))). Similarly, in *Banks v. Dretke*, 540 U.S. 668, 697 (2004), the Supreme Court pointed out that its decision in *Roviaro* was limited to non-testifying confidential informers *only*: "The issue of evidentiary law in *Roviaro* was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does *not* call as a trial witness." (Emphasis in original). Although *Banks* and *Smith* addressed different evidentiary issues,[3] the Supreme Court, in both

---

[3]  The issue before the Supreme Court in *Banks* was whether evidence that a key witness for the prosecution was a paid informant is material under *Brady v. Maryland*, 373 U.S. 83 (1963). 540 U.S. at 668. The Court held that under *Brady* the prosecution cannot withhold evidence that a witness is a paid informant so that the defense will not seek disclosure. *Id.* at 697. In *Smith*, the Supreme Court confronted the issue of whether a defendant in a state criminal trial may constitutionally be denied the

cases, took the time to point out the distinguishing feature of *Roviaro*: The informer's privilege

may give way only when the informer is *not available as a witness*. Other United States Circuit

Courts of Appeal, including the United States Court of Appeals for the Tenth Circuit, agree.

## II.    TENTH CIRCUIT: NO DUTY TO DISCLOSE TESTIFYING CONFIDENTIAL INFORMANTS

In *United States v. Pennick,* 500 F.2d 184 (10th Cir. 1974), the Tenth Circuit concluded

that *Roviaro* does not apply to testifying informants, and that the trial court properly denied the

defendant's written motion to disclose the confidential informer, because the fact that the informer

testifies at trial satisfies the concern in *Roviaro* that the informer's identity may be helpful to the

defendant.[4]   The defendant, Pennick, was charged with distributing heroin in violation of 21 U.S.C.

§ 841(a)(1). *Id.* Before and during trial, Pennick sought to compel production of the identity of a

Government informer who tipped investigators off to Pennick's illegal enterprise and who

participated in at least one transaction in which Pennick sold narcotics to an undercover

government agent.   *Id.* at 185. The requests were denied, but the informer testified at trial. *Id.* at

186–87. On appeal, Pennick claimed, among other grounds, that refusal of the trial court to compel

the Government to disclose the informant's identity before trial was reversible error under *Roviaro*.

---

right to question a witness as to his actual name and address on cross-examination. 390 U.S. at 129. The Court held
the defendant's Sixth Amendment right to confront a witness on cross-examination permits inquiry into the informer's
actual name and address for purposes of determining witness credibility. *Id.*

[4] In Defendant Anthony Ray Baca's Supplemental Brief Regarding Timing of Disclosure of the Identity of
Confidential Informant [Doc. 816], filed Jan. 8, 2017, Baca relegates this controlling and dispositive Tenth Circuit
precedent to a footnote, contending that it is distinguished because "the Tenth Circuit . . . found that the informant's
testimony was not helpful to the defendant." *Id.* at 8 n.4. That's inaccurate. The Tenth Circuit found that, *when and
because* the confidential informant testified at trial and was subject to cross-examination, his testimony showed that
"the informant's testimony was not helpful to the defendant." *Id.* The Tenth Circuit held: "The significant difference
between *Roviaro* and the instant case is that in the former the informer did not testify at trial, and in our case he did.
Such ruled out the possibility that the informer's testimony could somehow be helpful to Pennick." *Pennick*, 500 F.2d
at 187.

        Thus, *Pennick* controls this Court's decision, because, as in *Pennick*, when a CI testifies at trial, it satisfies
the unfair possibility that *Roviaro* addressed that helpful, significant information that a CI possesses will go
undiscovered if the CI is not identified *and* does not testify.

DNM 668

*Id*. The Tenth Circuit held that, because *Roviaro* was distinguished by the confidential informant's testimony at trial, the trial court properly denied the motions to compel the informant's identity. *Id.*

The Tenth Circuit held that "[t]he significant difference between *Roviaro* and the instant case is that in the former the informer did not testify at trial, and in our case he did. Such ruled out the possibility that the informer's testimony could somehow be helpful to Pennick." *Id.* at 187.

Indeed, the Tenth Circuit in *Pennick* held that even the very late identification of the confidential informant who was called as the first witness -- after the beginning of the trial during the Government's opening statement -- was sufficient: "Government counsel in his opening statement identified by name his witnesses, revealing at that time the name of the informant." *Id.* And whereas the confidential informer was then subject to cross examination "in great detail," the Tenth Circuit found "nothing in the record to indicate that counsel was in anywise taken by surprise." *Id.*

Accordingly, because the informer's availability as a witness "[r]uled out the possibility that the informer's identity could somehow be helpful to Pennick," *id.*, the Tenth Circuit held that there was "no persuasive reason to depart from the . . . general rule that in a case of this type the Government need not disclose prior to trial the identity of any of its witnesses." *Id.*

The Tenth Circuit's *Pennick* decision stands on the principle that *Roviaro* analysis does not apply to a testifying confidential informer, because production of a confidential informer as a witness at trial forecloses any concern for the effect of non-disclosure on the defendant's right to a fair trial. *See id.* (finding "there is nothing in the record to indicate prejudice resulting from the failure of defense counsel to be earlier apprised of the informer's identity."). This view is consonant with the Supreme Court's endorsement of the proposition that *Roviaro* does not apply

10

to testifying confidential informants in *Smith* and *Banks*. *See Smith*, 390 U.S. at 133 n.8; *Banks*, 540 U.S. at 697. In other words, disclosure analysis begins when the Government attempts to conceal the identity of a confidential informer at trial and terminates when the informer's identity is produced.

Critically, the Tenth Circuit has consistently applied this principle. *See e.g.*, *United States v. Smith*, 273 F.2d 462 (10th Cir. 1959) (finding no error in denying pretrial disclosure of a government informer who "was a witness at trial and subject to extensive cross-examination"); *United States v. Baca,* 494 F.2d 424, 427 (10th Cir. 1974) (permitting government to conceal the name of an informant until trial); *United States v. Nevels*, 490 F.3d 800, 803 (10th Cir. 2007) ("in the absence of a statutory or constitutional requirement . . . there [is no] requirement that the government disclose its witnesses in any manner, except in a case where trial is for treason or other capital offense." (quoting *Baca,* 494 F.2d at 427)). The United States District Court for the District of New Mexico properly has followed the Tenth Circuit's guidance in this area. *United States v. Lujan*, 530 F. Supp. 2d 1224, 1261 (D.N.M. 2008) (Brack, J.) ("There is no constitutional right to pretrial identification of witnesses that the government intends to call at trial." (citing *Weatherford v. Bursey*, 429 U.S. 545, 559–60 (1977)).

Other United States Circuit Courts of Appeals are virtually unanimous in agreement. *See e.g.*, *United States v. Foster*, 815 F.2d 1200, 1202-03 (8th Cir. 1987) (finding no error in denying pretrial disclosure of a testifying confidential informer's identity); *United States v. Perkins*, 994 F.2d 1184 (6th Cir. 1993) (same) (citing *Foster* and *Pennick*); *United States v. Casseus*, 282 F.3d 253, 257 (3d Cir. 2002) (finding *Roviaro* addresses the "duty of the prosecution to disclose the identity of confidential informants who will not testify."); *United States v. Glover,* 583 F.Supp.2d 5, 12 (D.D.C. 2008) (finding "*Roviaro* and its progeny apply only when the informant does *not*

11

testify at trial") (emphasis in original) (citing *United States v. Casseus*, <u>282 F.3d 253, 257</u> (3d Cir.

2002)). Granted, the United States Court of Appeals for the Eighth Circuit, in a footnote in *United*

*States v. Norton*, <u>504 F.2d 342, 343</u> n.1 (8th Cir. 1974), noted that, in its opinion, *Roviaro* "drew

no distinction between testifying and non-testifying informants." *Id.* But this conclusion is directly

contrary to the controlling Tenth Circuit decision in *Pennick*. *See* <u>500 F.2d at 187</u> ("The significant

difference between *Roviaro* and the instant case is that in the former the informer did not testify at

trial, and in our case he did. Such ruled out the possibility that the informer's testimony could

somehow be helpful to Pennick."). Moreover, a separate panel of the Eighth Circuit, in the body

of a decision 20 years after *Norton*, departed from the reasoning in *Norton*'s footnote, and

supported that application of the *Roviaro* analysis for disclosure of confidential informants "hinges

on" whether the informant will testify at trial. *United States v. Gullickson*, <u>982 F.2d 1231, 1234</u>

(8th Cir. 1993).[5]

## **CONCLUSION**

Based on available case law pertaining directly to this issue, testifying confidential

Government informers fall beyond the purview of *Roviaro* pretrial disclosure requirements, and

are treated under the same constitutional principles that apply to testifying witnesses.

Notwithstanding the Government's disclosure obligations under *Brady*, *Giglio*, the Jencks Act,

---

[5]  The issue in *Gullickson* was whether the trial court should have dismissed the case when the Government agreed to produce a witness that the government intended to call as a witness at trial, and then failed to produce that witness, who then was unavailable for trial. *See* <u>982 F.2d at 1233-34</u>. But the Eighth Circuit discussed its precedential decisions applying *Roviaro*, including *United States v. Barnes*, <u>486 F.2d 776</u> (8th Cir.1973), which the Eighth Circuit relied on in the footnote in *Norton*, and pointed out that *Barnes*, like *Roviaro* and its progeny, turn on whether "[t]he informant testifies at trial." *Id.* at 1234. *See id.* ("These cases deal with the government's obligation to disclose an informant's identity or produce the informant as a witness. The reasoning in each of these cases hinges on the fact that the informant was not produced before trial and did not appear at trial. *Barnes* expressly distinguished its holding from a case in which the government produces the informant at trial. According to *Barnes*, when the informant testifies at trial the defendant has the opportunity to cross-examine the informant and no prejudice results. <u>486 F.2d at 779</u>. Therefore, neither *Roviaro* nor our cases interpreting it support the defendants' arguments.").

DNM 671

and Federal Rule of Criminal Procedure Rule 16, the Government is not required to disclose the

identity of a confidential informer under *Roviaro* if the informer testifies at trial.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

***Electronically filed on 1/13/17***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM 88011
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney

13

DNM 672

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CRIMINAL NO.   15-4268 JB |
| vs. | ) |
| | ) |
| **JERRY MONTOYA, a.k.a. "Boxer,"** | ) |
| **TIMOTHY MARTINEZ, a.k.a. "Red,"** | ) |
| **ANTHONY RAY BACA, a.k.a. "Pup,"** | ) |
| **MAURICIO VARELA, a.k.a. "Archie,"** | ) |
| **a.k.a. "Hog Nuts," DANIEL SANCHEZ,** | ) |
| **a.k.a. "Dan Dan," CARLOS HERRERA,** | ) |
| **a.k.a. "Lazy," and RUDY PEREZ, a.k.a.** | ) |
| **"Ru Dog,"** | ) |
| | ) |
| Defendants. | ) |

<u>**UNITED STATES' RESPONSE IN OPPOSITION TO THE JOINT MOTION TO SEVER DEFENDANTS CHARGED WITH OFFENSES IN COUNTS 6 AND 7 [807]**</u>

Defendants' contention in the Joint Motion to Sever Defendants Charged in Counts 6 and 7 of the Superseding Indictment [807] ("Motion to Sever") that Counts 6 and 7 are improperly joined under Rule 8(a) is mistaken, because "Rule 8(a) . . . does not apply in cases where more than one defendant is joined in the same indictment." *United States v. Eagleton*, <u>417 F.2d 11, 14</u> (10th Cir. 1969). Defendants' second contention that they are improperly joined under Rule 8(b) also fails to find support in the law or the facts, because courts construe Rule 8(b) generally to allow for joint trials where the charges overlap factually, and because the different defendants in the different counts are all based on SNM's criminal activities is particularly logical here, given that the SNM operates as a gang within the New Mexico prison system where the incarcerated leaders cannot move freely and thus use separate SNM members or associates to carry on the SNM enterprise's business -- murders, assaults and assaults with deadly weapons. Finally, given the

reality that SNM's operations necessarily require that different leaders and members located within and without the different prisons still carry on the SNM's criminal enterprise, and because the nature of the charges require that the United States prove as an element that the SNM is a racketeering enterprise, neither Rule 14 nor the United States Constitution require or support severance of Counts 6 and 7.

Counts 6 and 7 relate to an SNM-sanctioned murder and conspiracy to murder a purported cooperator at the SNMCF. The SNM's criminal operations as a prison gang operating throughout New Mexico require that the SNM necessarily have different leaders at the different prisons who sanction hits on certain individuals to be taken out by members and associates in the same location as the victim and the leader(s) who ordered the hits. Thus, Counts 6 and 7, and the Defendants (other than Baca), as SNM members who carried out the SNM enterprise's criminal activities by murdering J.M., properly are joined in the Superseding Indictment [368] and properly should be tried alongside the other SNM leaders and members charged with similar violent crimes in aid of racketeering. The Court should therefore deny the Defendants' Motion to Sever.

## **BACKGROUND**

Defendants, Jerry Montoya, a.k.a. "Boxer," Timothy Martinez, a.k.a. "Red," Anthony Ray Baca, a.k.a. "Pup," Mauricio Varela, a.k.a. "Archie," a.k.a. "Hog Nuts," Daniel Sanchez, a.k.a. "Dan Dan," Carlos Herrera, a.k.a. "Lazy," and Rudy Perez, a.k.a. "Ru Dog" ("Defendants"), are charged by Superseding Indictment with Violent Crimes in Aid of Racketeering ("VICAR"), namely conspiracy to commit murder, and murder of J.M. in violation of 18 U.S.C. Sections 1959(a)(1) and (a)(5). Superseding Indictment at 20-21. The grand jury charged:

1. Defendants were members/prospects/associates of the Syndicato de Nuevo Mexico (SNM) gang, a criminal organization whose members/prospects/associates engaged in

acts of violence and other criminal activities, including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking. *Id.* at 2-3.

2. SNM was formed after the February 1980 prison riots at the Penitentiary of New Mexico, and has continued as a criminal enterprise within the New Mexico penal system, and outside of that system, for almost 40 years, bolstering as many as 500 members, and currently consisting of approximately 250. *Id.* at 3.

3. The gang, including its leadership, membership, prospects, and associates, constitutes an "enterprise" as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. *Id.*

4. The enterprise constitutes an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. *Id.*

5. In addition to fighting for control over numerous illegal activities and using violence and terror for the purpose of enriching themselves, the SNM gang also engages in violence simply to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, to gain notoriety and show its superiority over others, and to send messages to others that it was strong, powerful and not to be provoked. *Id.* at 4.

6. Members of the SNM gang are expected to seek out and beat, stab, or shoot rival gang members. Similarly, members of the SNM gang are expected to confront and attack

3

any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex

offenders. *Id.* at 5.

7.   Members who fail to show continued loyalty to the gang are disciplined in various

ways, to include murder and assaults. *Id.*

The Defendants are among 30 members of the SNM charged with 15 Counts in this matter.

## **RELEVANT LAW**

Federal Rule of Criminal Procedure 8 is the procedural vehicle for joinder of offenses and

defendants in a criminal proceeding. Rule 8 provides:

> **(a)  Joinder of Offenses.** The indictment or information may charge *a defendant* in
> separate counts with 2 or more offenses if the offenses charged--whether
> felonies or misdemeanors or both--are of the same or similar character, or are
> based on the same act or transaction, or are connected with or constitute parts
> of a common scheme or plan.
>
> **(b)  Joinder of Defendants.** The indictment or information *may charge 2 or more
> defendants* if they are alleged to have participated in the same act or transaction,
> or in the same series of acts or transactions, constituting an offense or offenses.
> The defendants may be charged in one or more counts together or separately.
> All defendants need not be charged in each count.

Fed. R. Crim. P. 8 (emphasis added). Most United States Circuit Courts of Appeals, including the

Tenth Circuit, held that in cases involving multiple defendants, the propriety of joinder of offenses

is tested by Rule 8(b). *See United States v. Eagleton*, 417 F.2d 11, 14 (10th Cir. 1969) ("Rule 8(a)

. . . does not apply in cases where more than one defendant is joined in the same indictment. Such

joinder [of offenses] is governed by Rule 8(b)."). *See also* 1A Wright et al., *Fed. Practice &*

*Procedure: Criminal* § 143 (4th ed.) ('The conventional wisdom is that [Rule 8(a)] applies only to

the prosecution of a single defendant; if more than one defendant is involved, Rule 8(b) states the

test for joinder."); *United States v. Mann*, 701 F.3d 274, 289 (8th Cir. 2012) ("Where an indictment

joins defendants as well as offenses, the propriety of the joinder of offenses is governed by Rule

4

8(b), rather than Rule 8(a)."); *United States v. Walker*, 657 F.3d 160, 169 (3d Cir. 2011) ("Rule 8(a) applies only to prosecutions involving a single defendant, and [,] in a multi-defendant case such as this, the tests for joinder of counts and defendants is merged in Rule 8(b).").

Parties may seek relief from joinder, even when proper, if joinder results in prejudice to a defendant or the Government. Federal Rule of Criminal Procedure 14(a) provides, in relevant part:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). Critically, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *United States v. Zafiro*, 506 U.S. 534, 538–39 (1993). Because severance is a matter of judicial discretion and not a matter of right, a defendant bears a "heavy burden of showing real prejudice to his case." *United States v. Gould*, No. CR 03-2274 JB, 2007 WL 1302587, at *1 (D.N.M. Apr. 6, 2007) (Browning, J.) (citing *United States v. Hall* 473 F.3d 1301, 1302 (10th Cir. 2007)).

## ARGUMENTS AND AUTHORITIES

### I.  CHALLENGE TO JOINDER OF OFFENSES UNDER RULE 8(A) IS IMPROPER

Defendants claim Counts 6 and 7 were improperly joined under Federal Rule of Criminal Procedure 8(a). *See* Motion to Sever at 10. Defendants' motion under Rule 8(a) is improper; accordingly, Defendants are not entitled to relief.

Federal Rule of Criminal Procedure 8 describes two tests for joinder. *See United States v. Papadakis*, 510 F.2d 287, 299–300 (2d Cir. 1975); *Cupo v. United States*, 359 F.2d 990, 922 (D.D.C. 1996); *King v. United States*, 355 F.2d 700, 703-04 (1st Cir. 1966). Rule 8(a) specifically provides that "a single defendant" may be charged with two or more offenses "if the offenses

DNM 677

charged are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Rule 8(b) provides that "two or more defendants" may be charged "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).

In *United States v. Riebold*, the Tenth Circuit held that "Rule 8(a) . . . does not apply in cases where more than one defendant is joined in the same indictment. Such joinder [of offenses] is government by Rule 8(b)." 557 F.2d at 707 (quoting *Eagleston*, 417 F.2d at 14). The same distinction was made in *United States v. Caldwell*, where the Tenth Circuit held that joinder of offenses among multiple defendants was appropriate under Rule 8(b) where a "number of common threads and much common evidence connecting offenses charged in the indictment" existed. 560 F.3d at 1212. As the Court has pointed out in the past, "as a district court, the Court must faithfully apply controlling Supreme Court and Tenth Circuit precedent." *United States v. Courtney*, 960 F. Supp. 2d 1152, 1179 (D.N.M. 2013) (Browning, J.). Clearly, Rule 8(a) does not apply to joinder of offenses involving multiple defendants.

Because Defendants' entire joinder-of-offenses challenge relies on a rule not applicable here, Defendants are not entitled to relief. The Court should therefore dismiss Defendants' Motion to Sever on these grounds.

## II.   CHALLENGE TO JOINDER OF DEFENDANTS UNDER RULE 8(B) FAILS

Defendants offer two arguments in support of their claim of improper joinder of defendants in the Superseding Indictment: (1) the United States has not alleged that Defendants participated in the same series of acts or transactions with the other defendants charged, and (2) the crimes

DNM 678

alleged in Counts 6 and 7 are not connected to the other defendants. *See* Motion to Sever at 13-15.

Both of these claims lack a sound basis in the law and in the facts.

## A.  The United States explicitly alleges Defendants participated in the same predicate acts as the other Defendants

The United States charges Defendants with being known participants in activities unlawful under the RICO Act. As the Superseding Indictment alleges, Defendants are members of the SNM, a criminal enterprise, and, at the behest of the gang, have participated in predicate racketeering acts, namely, conspiracy to murder and murder. *See* Superseding Indictment at 6-9. The Superseding Indictment characterizes the Defendants' collective conduct as "Violent Crimes in Aid of Racketeering" pursuant to 18 U.S.C. §§ 1959(a)(1) and (a)(5). *See id.* Furthermore, Defendants charged in Counts 6 and 7 are among 29 named Defendants charged with violations of VICAR as a result of acts committed on behalf of the SNM gang. *See id.* Accordingly, the United States explicitly alleges that Defendants participated in the same series of predicate offenses as the other Defendants, all in violation of § 1959.

Defendants' Motion to Sever also suggests that joinder was improper because "there is no allegation that the 2014 Defendants . . . 'conspired and agreed with each other to commit' the other crimes alleged in the indictment." *See* Motion to Sever at 14.  Defendants claim that joinder of defendants is proper only where defendants conspire and agree with each other to commit other charged offenses. *See id*. This claim lacks a sound basis in the law and in fact for two reasons.

First, the Supreme Court unanimously held that, to be found guilty of a conspiracy to commit a RICO violation, a defendant need not personally commit or agree to commit two predicate acts of racketeering. *See United States v. Salinas*, 522 U.S. 52, 64 (1997) ("The RICO conspiracy statute, §1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to

prove each conspirator agreed that he would be the one to commit two predicate acts."). Second, Federal Rule of Criminal Procedure 8(b) permits joinder of defendants in a single indictment where the defendants *participated* in the same series of acts or transactions constituting an offense. The rule does not condition joinder upon whether the defendants *conspired* with each defendant to commit the offenses. Fed. R. Crim. Pro. 8(b). Accordingly, these claims should be dismissed.

## B.  The United States provided evidence demonstrating that the crimes alleged are connected to the other defendants

Defendants' contention that joinder is not proper because none of the Defendants, except Defendant Baca, charged in Counts 6 and 7 are charged in any other offenses, *see* Motion to Sever at 14, cannot logically be correct because it circumvents the essential framework of the RICO Act and VICAR statute. If it were true that such defendants cannot be charged together, this would preclude multi-defendant RICO trials. That simply cannot be true.

The phrase "same series of acts or transactions" in rule 8(b) "is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system." *United States v. Hopkinson*, 631 F.2d 665, 668 (10th Cir. 1980). As this Court recognized, "'[j]oint trials of defendants who are indicted together are preferred because they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Gould*, No. CR 03-2274 JB, Mem'm Opinion & Order, 2007 WL 1302587, at *1 (D.N.M. Apr. 6, 2007) (Browning, J.) (quoting *United States v. Hall*, 473 F.3d 1295, 1301-02 (10th Cir. 2007)). Courts "'apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (quoting *United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007)).

Given this broad construction of rule 8(b), courts conclude that a conspiracy count, while not necessary, is certainly sufficient to make proper joinder of all defendants charged in that conspiracy, regardless whether each defendant is charged in each count or with each substantive act. *See, e.g.*, *United States v. Hill*, 786 F.3d 1254, 1272 (10th Cir. 2015) ("Although the Indictment in this case charged six different robberies alleged to have been committed by different defendants over a more than two-year period, it also alleged that the defendants conspired and agreed with each other to commit all six of the robberies. Given the broad construction we afford Rule 8 and our preference for liberal joinder, this was sufficient to permit joinder."), *cert. denied*, 136 S. Ct. 377 (2015). *See also* 1A Wright et al., *supra*, § 144 ("All courts agree that a conspiracy count normally provides a sufficient allegation that the defendants engaged in the same series of acts or transactions, making joinder permissible . . . . Not all of the defendants charged as conspirators need be charged on all substantive counts . . . .").

The logic behind joinder as proper in conspiracy cases applies equally "where there is a charge of an ongoing racketeering or other criminal enterprise," such as in a RICO case. *Id. See, e.g.*, *United States v. Carson*, 455 F.3d 366, 373 (D.C. Cir. 2006) ("The indictment alleged that all of the[] counts were overt acts in furtherance of the narcotics conspiracy and predicate acts in furtherance of the RICO conspiracy. This provided the necessary link to satisfy Rule 8(b).").

Under RICO, the requirements of Rule 8(b) are satisfied when each defendant *participated in the affairs of the same enterprise* through the commission of the alleged predicate racketeering acts. *See, e.g.*, *United States v. Irizarry*, 341 F.3d 273, 287-90 (3d Cir. 2003) (finding joinder of offenses for multiple defendants merges under Fed. R. Crim. P. 8(b), and, for purposes of joinder under the rule, a RICO conspiracy charge provides the required link); *United States v. Friedman*, 854 F.2d 535 (2nd Cir. 1988) (the presence of a substantive RICO count and of a RICO conspiracy

further broadens the government's power to charge multiple defendants together); *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999) ("In this case, the RICO and RICO conspiracy counts functioned as the 'connective tissue' . . . that allowed joinder of all fifteen incidents and all three defendants in a single trial."); *United States v. Boylan*, 898 F.2d 230, 245 (1st Cir. 1990) (so long as there is reasonable basis for the allegations, charging a RICO conspiracy normally supplies the basis for joinder of multiple defendants at a single proceeding where all are accused of participating in the conspiracy); *United States v. Caporale*, 806 F.2d 1487, 1510 (11th Cir. 1986) (Joinder of co-defendants in a count charging a single RICO conspiracy violation is permissible, even if different defendants are charged with different acts of racketeering, if the racketeering acts are in furtherance of the overarching RICO conspiracy charge).

As is the case under RICO, the requirements for joinder of defendants under VICAR may be satisfied by establishing the existence of an enterprise, and that the defendants' charged crimes related to the affairs of the same enterprise. *See, e.g.*, *Matta-Ballesteros*, 71 F.3d at 770-71 (finding joinder proper where co-defendants' charges related to one another); *United States v. Darden*, 70 F.3d 1507, 1526-27 (8th Cir. 1995) (finding joinder proper where the indictment sufficiently alleged that the joined defendants and counts were factually interrelated). Rule 8(b) also permits joinder even when a defendant is not charged with the same offense. *See United States v. Vasquez-Velasco*, 15 F.3d 833, 844 (9th Cir. 1994) (joinder of offenses is proper where there is a logical relationship between the acts or transactions giving rise to the offense).

The United States alleges that the SNM gang is a criminal enterprise within the meaning of RICO and VICAR, that Defendants are members of the gang. The grand jury found probable cause supports those allegations. The Defendants are charged in Counts 6 and 7 with predicate racketeering offenses—conspiracy to murder, and murder—relating to the affairs of the SNM

enterprise. Given the abundance of case law pertaining to joinder of defendants in RICO and

VICAR cases, joinder of Defendants in Counts 6 and 7 is clearly proper under Rule 8(b), and

Defendants' Motion to Sever should be dismissed.

### III.   RULE 14 DOES NOT SUPPORT SEVERANCE OF DEFENDANTS

Defendants contend that Counts 6 and 7 should be severed under Federal Rule of Criminal

Procedure 14 because a joint trial of all defendants is impractical, and evidence against other

defendants charged in the Superseding Indictment will prejudice the Defendants charged in these

counts. Defendants' contentions are speculative at best. But, even if taken as true, the nature of the

VICAR charges in Counts 6 and 7 means that severance would do little if anything to satisfy

Defendants' complaint.

The Defendants' assert that the Tenth Circuit adopted a three-step inquiry to determine

whether a motion to sever based on a claim of prejudice to the defendant may be granted under

Rule 14:

> First, [the court] must determine whether the defenses presented are so antagonistic
> that they are mutually exclusive. Second, because mutually antagonistic defenses
> are not prejudicial per se, a defendant must further show a serious risk that a joint
> trial would compromise a specific trial right or prevent the jury from making a
> reliable judgment about guilt or innocence. Third, if the first two factors are met,
> the trial court exercises its discretion and weighs the prejudice to a particular
> defendant caused by joinder against the obviously important considerations of
> economy and expedition in judicial administration.

*See* Motion to Sever at 15-16 (citing *United States v. Pursley*, 474 F.3d 757, 765 (10th Cir.
2007)).

### A.  Defendants fail to satisfy the first prong of severance inquiry

Defendants assert that before the Court may grant a motion to sever based on prejudice,

the Court must determine whether the defenses presented are so antagonistic that they are mutually

exclusive. *See id.*

11

Defenses are mutually antagonistic if "the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994) (citing *United States v. Swingler*, 758 F.2d 477, 495 (10th Cir. 1985)). "To sustain a claim of error under this theory, a defendant must make a factual demonstration, not an abstract allegation[.]" *United States v. Smith*, 788 F.2d 663, 668 (10th Cir. 1986).

Defendants claim that "there can be no doubt there will be antagonistic defenses." Motion to Sever at 21. In support of this claim, Defendants anticipate other Defendants will likely deny their association with the SNM, or deny involvement in the alleged crimes. *See id.* This fails to explain how these denials are antagonistic thus, Defendants' characterization of these antagonistic defenses falls short of the type of prejudice Rule 14 inquiry requires to support severance.

Here, Defendants do not state the nature of their defenses or in what respect their defenses are irreconcilable to the other defendants. Defendants merely contend that denial of the crimes is antagonistic. *See Smith*, 788 F.2d at 668 (mere claims of conflicting defense theories are inadequate for showing actual prejudice which requires a granting of separate trials); *United States v. Oakie*, 12 F.3d 1436, 1441 (8th Cir. 1993) (defendants are "required to show that the conflict between the defense is so prejudicial that the differences are "actually irreconcilable").

In reality, as Defendants admit, "it is unclear at this point whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive." Motion to Sever at 21. The Rule 14 inquiry requires the Court to find not only that the defenses are antagonistic, but that they are "mutually exclusive." *United States v. Peveto*, 881 F.2d 844, 857 (10th Cir. 1989) (antagonistic defenses are mutually exclusive when the defendant demonstrates that the acceptance of one party's defense would tend to preclude the acquittal of the other, or that the guilt of one defendant tends to establish the innocence of the other (citing *Smith*, 788 F.2d at 668)). Defendants fail to

12

provide any basis at this point on which the Court may determine that joinder of defendants or offenses would result in the type of prejudice that Rule 14 requires to warrant severance. Accordingly, the Court should deny Defendants' Motion to Sever.

**B.  Defendants fail to satisfy the second prong of severance inquiry**

Defendants contend that, in a motion to sever inquiry, the Court must next determine whether relief is available based on a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence. *See* Motion to Sever at 15 (citing *Pursley,* 474 F.3d at 765). The United States responds to Defendants' arguments under this prong in the order in which they appear in Defendants' Motion to Sever.

*i.   No serious risk that a joint trial will prevent the jury from making a reliable judgment about guilt or innocence*

Defendants contend that joinder of Counts 6 and 7 with the "other alleged murders, conspiracy to commit murder, assaults and firearms charges," would result in the "prejudicial effect" of allowing the jury to infer guilt by creating an atmosphere of criminal propensity. Motion to Sever at 22. This argument amounts to nothing more than a "garden variety" claim of prejudice. *United States v. Candelario-Santa,* 834 F.3d 8, 23 (1st Cir. 2016). "Defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Gould,* 2007 WL 1302587, at *2 (internal quotation marks and citations omitted) (quoting *Zafiro,* 506 U.S. at 540; *United States v. Pursley,* 474 F.3d 757, 766 (10th Cir. 2007)).

Prejudice "always exists when more than one defendant or offense are tried together." *Id.* Standing alone, prejudice "does not warrant a new trial." *Candelario-Santa,* 834 F.3d at 23.  To justify severance of co-defendants, the movant must at least show that he will suffer "specific and compelling prejudice against which the court is unable to afford protection, and that this prejudice would result in an unfair trial." *United States v. Kaufman,* 858 F.2d 994, 1003 (5th Cir. 1988)

13

(quoting *United States v. Toro*, 840 F.2d 1221, 1238 (5th Cir. 1985)); *United States v. Nersesian,* 824 F.2d 1294, 1303 (2d Cir. 1987) (prejudice must be so substantial as to amount to a "miscarriage of justice" (quoting *United States v. Bari,* 750 F.2d 1169, 1177 (2d Cir.1984)). But even where a defendant may show such specific and compelling prejudice, both the Supreme Court and the Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover effect where limiting instructions may minimize the risk of undue prejudice. *See Zafiro*, 506 U.S. at 539 (limiting instructions often will suffice to cure any risk of prejudice); *United States v. Lane*, 883 F.2d 1484 (10th Cir. 1989) ("As a general rule, we presume that juries follow [limiting] instructions."); *United States v. Jones*, 530 F.3d 1292 (10th Cir. 2008) (mere allegations that evidence against one defendant would have a "spillover effect" against another defendant does not demonstrate prejudice (internal quotations omitted)). Because Defendants rely on assertions of prejudice generally, and do not point out specific and compelling prejudice, Defendants fail to uphold their burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence. *See Smith*, 788 F.2d at 668.

Defendants add that, because of the "complexity and magnitude" of this case, limiting instructions would be unworkable at trial. *See* Motion to Sever at 22. But, this argument is contrary to the Supreme Court's and Tenth Circuit's direction regarding use of limiting instructions.

In support of their claim that a jury would not be able distinguish the evidence in a case of this size, Defendants go to great lengths to attempt to analogize the present case to *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987). The comparison, however, is inapposite.

In *Gallo*, the court found severance was proper where the indictment dealt with a RICO conspiracy against the Gambino family organized crime syndicate. The indictment alleged nine areas of illegal activity, including murder, extortion, robbery, labor racketeering, loansharking,

gambling, obstruction of justice, bribery, and interstate travel in aid of racketeering; seventy-two

predicate acts and of forty-six separate specified alleged offenses, representing the violation of

eleven different sections of the state and federal criminal codes; nine separate allegations of illegal

collections; and consisted of at least 25 separable "schemes," "operations," or courses of conduct.

668 F. Supp. at 738–39. In its decision to grant relief under Rule 14, the *Gallo* court found the

complexity of this case was "particularly injurious to defendants charged in a small portion of the

counts and who are implicated by only bits and pieces of evidence." *Id.* at 749-50 (citing *United

States v. Branker*, 395 F.2d 881, 882 (2d. Cir. 1968)).

Defendants argue that "[t]his case involves separate, distinct alleged murder conspiracies

that took place at different points in time involved completely different alleged conspirators and

different alleged victims." Motion to Sever at 20. They also argue that, "[w]hat is undoubtedly

clear is that much of the evidence related to the counts in which the 2014 Defendants are not

charged is likely inadmissible in a case on Counts 6 and 7, and presenting it to the jury poses a

serious risk . . . . [of] creating an atmosphere of criminal propensity." *Id.* at 21-22. These arguments

may find some support if this were a generic (but large) drug-trafficking conspiracy to import more

than one million pounds of marijuana. *See id.* at 24 (citing *United States v. Ellender*, 947 F.2d 748,

754 (5th Cir. 1991)). They may also find some support if this were a RICO conspiracy centered

on a traditional organized crime family, in which there's one godfather with a select couple of

enforcers who carry out the lion's share of the family's criminal activities. *See id.* at 16-23

(discussing *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987)).

Certainly in cases of that nature, an individual or certain individuals who allegedly engaged

in one crime only may have "a markedly different degree of capability," *Baca*, 2016 WL 6404772,

at *33, or may be "'conspirators joining and leaving the conspiracy at various times,'" Motion to Sever at 18 (quoting *Gallo*, 668 F. Supp. at 751).

But in the unique circumstances that the Superseding Indictment alleges, these murders, conspiracies to murder and other violent crimes that involve the various SNM member Defendants are *res gestae* of the SNM's racketeering "enterprise." Superseding Indictment at 3 (quoting 18 U.S.C. § 1959(b)(2)). Unlike a generic drug-trafficking conspiracy (even a large one), and unlike an organized crime family, the SNM's criminal enterprise operates within the confines of the New Mexico prison system, in which the leaders and the members are not at liberty to travel freely to perpetrate their crimes. *See* Superseding Indictment at 3-5. Also locked up in different prison facilities at different locations throughout New Mexico are the victims and targets of the SNM enterprise, including J.M. Thus, unlike the unconstrained criminals in a drug-trafficking conspiracy or an organized crime family, in this case, only SNM members within the particular prison at which the targeted victim resides may carry out the "hit." It is therefore logical, and unsurprising, that different SNM members are alleged to have carried out the SNM's crimes that took place at different locations where the different victims were housed.

Thus, it is part and parcel to all of the VICAR charges in this case that they "involved completely different alleged conspirators and different alleged victims." Motion to Sever at 20. And because these are VICAR charges, the Court should not take for granted that, to prove that each of these Defendant coconspirators is guilty of the VICAR crimes with which they're charged in Counts 6 and 7, the United States must prove that these crimes were committed for gaining value from the SNM "enterprise" or gaining entrance to, maintaining position in, or increasing position in the SNM "enterprise," which engaged in racketeering activity. *See* 18 U.S.C. § 1959; *Smith*, 413 F.3d at 1277 (10th Cir. 2005).

<div align="center">16</div>

Despite Defendants' suggestion that juries are incapable of making "hyper-sensitive determinations after a month's long trial," Motion to Sever at 22, courts routinely have found that juries can *and do* follow jury instructions in complex RICO and VICAR cases, and that jury instructions are an effective mechanism for granting relief where prejudice may arise. *See*, *e.g.*, *United States v. Giampa*, 904 F. Supp. 235 (D.N.J. 1995) (finding no "spillover effect" where jury followed jury instructions to consider evidence against each defendant in a multi-defendant indictment alleging 51 counts of various RICO violations); *United States v. Cervone*, 907 F.2d 332 (2d Cir. 1990) (finding jury instructions were sufficient to avoid prejudice in a RICO case charging 18 defendants with numerous racketeering offenses); *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992) (finding careful instructions by the trial judge, an outline of the elements of the offenses charged, numerous requests for feedback, and the length of deliberations reinforced the court's conclusion that the jury comprehended a RICO case involving nine defendants charged with numerous racketeering offenses).

Moreover, this Court specifically has recognized that it is the "gatekeeper under the Rules of Evidence," and frequently uses limiting instructions to prevent the jury from using evidence for an improper purpose. *United States v. Ballou*, 59 F. Supp. 3d 1038, 1049 (D.N.M. 2014) (Browning, J.) (quoting *United States v. Jordan,* 485 F.3d 1214, 1218 (10th Cir. 2007)). *See, e.g.*, *United States v. Sandoval*, 410 F. Supp. 2d 1071 (D.N.M. 2005) (Browning, J.) ("the Court will give a limiting jury instruction concerning the evidence, minimizing the risk that the evidence will contribute to an improperly-based jury verdict."); *Bhandari v. VHA Sw. Cmty. Health Corp.*, 778 F. Supp. 2d 1155, 1172 (D.N.M. 2011) (Browning, J.) ("the Court does not believe that, with the proper limiting instructions, the jury will attribute evidence that Abalos challenged another physician to a fight to the Defendants' decision to terminate R. Bhandari."); *United States v.*

17

*Rodella*, No. CR 14-2783 JB, 2014 WL 6911573, at *18 (D.N.M. Sept. 21, 2014) (Browning, J.)

("Additionally, providing a limiting instruction, pursuant to rule 105, if requested by Rodella, will

further rein in the jury and prevent it from using the evidence for an improper purpose.").

Defendants have not provided any explanation as to how the jury in this case might be

confused or misled by Defendants' anticipated defenses; the Court, therefore, should not resort to

the "drastic" measure of severing Defendants' trial. *United States v. Ledbetter*, 137 F. Supp. 3d

1042, 1058 (S.D. Ohio 2015). Because Defendants offer an insufficient basis for the Court to

determine whether a joint trial would compromise a specific trial right or prevent the jury from

making a reliable judgment about guilt or innocence, the Court should dismiss Defendants' Motion

to Sever.

*ii.   No serious risk that joinder will compromise Sixth Amendment trial right*

Defendants contend that joinder of Counts 6 and 7 places Defendants' Sixth Amendment

right at risk by prohibiting Defendants from being present at all critical stages of the trial,

confronting the witnesses against them, and having a public trial. Motion to Sever at 24-25. In

support of these claims, Defendants assert: (1) voir dire would be impossible without making

physical modifications to the courtroom; (2) depending on where Defendants are seated,

Defendants will be excluded from important bench conferences with counsel; and (3) if the

courtroom is too full, people will not be seated and the Defendants will risk losing their right to a

public trial. These arguments are speculative and unpersuasive.

In *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1987), the Ninth Circuit held

that, to show that prejudice is "of such a magnitude that the defendant was denied a fair trial," a

party "must show [a] violation of one of his substantive rights by reason of the joint trial:

unavailability of full cross-examination, lack of opportunity to present an individual defense,

18

denial of Sixth Amendment confrontation rights, lack of separate counsel among defendants with conflicting interests, or failure properly to instruct the jury on the admissibility of evidence as to each defendant." The Ninth Circuit added: "Clearly, this is not an easy burden to meet." *Id.*

Although Defendants envision a courtroom "overfilled with defendants, counsel, and co-counsel," Motion to Sever at 25, Defendants fail to establish that joinder would deny Defendants the rights that the Sixth Amendment hold crucial such as, the Constitutional right to cross-examination, opportunity to present an individual defense, right to confront witnesses against them, right to counsel, or right to properly instruct the jury on the admissibility of evidence as to each defendant. The hearings have worked fine thus far, and there is no reason to believe that will change. The rights that Defendants assert may be infringed are not of the same magnitude. Because Defendants offer no sound basis for the Court to determine that a joint trial would compromise Defendants' specific trial rights, the Court should dismiss Defendants Motion to Sever.

*iii.   No serious risk that joinder will compromise Fifth Amendment trial right*

 Defendants also argue that severance is necessary to protect the Defendants' respective rights to a fair trial under the Fifth Amendment. Motion to Sever at 25. Defendants claim that joinder will prejudice their right to a fair trial because they have been charged with VICAR offenses alongside other Defendants charged with other crimes. *Id.* at 27-28. Defendants fail to specify how joinder would compromise their right to a fair trial. But, more than that, they fail to acknowledge that, given the nature of the VICAR charges in Counts 6 and 7, severance would not even cure the prejudice theory they contend may exist.

The essence of Defendants' claim is that Defendants' right to a fair trial will be prejudiced *by the possibility* that the issue of guilt of as to other defendants will be confused with the guilt of

the Defendants. Motion to Sever at 25-27.  Defendants' argument does not find support in Tenth Circuit precedent or otherwise.

Indeed, the Tenth Circuit has repeatedly held that complaints of the "spillover effect" from overwhelming or more damaging evidence against a co-defendant is insufficient to warrant severance. *See, e.g.*, *United States v. Pack*, 733 F.2d 261 (10th Cir. 1985); *United States v. Cardall*, 855 F.2d 656 (10th Cir. 1989); *United States v. Morales*, 108 F.3d 1213, 1219 (10th Cir. 1997). Accordingly, Defendants' contention that their Fifth Amendment trial right comes into play for severance lacks support in the facts and in the law.

Defendants also contend that "the complexity of a large multi co-defendant racketeering case almost demands severance" where the trial involves evidence of other charges. Motion to Sever at 28. Defendants rely heavily on *Butler* to argue that a fair trial would be impossible here if they are tried alongside their fellow SNM Defendants. But their entire argument for severance based on this purported prejudice is belied by what they admit -- but classify as a "wrinkle" with *Butler*'s application to this VICAR case -- that "the crimes charged in counts 6 and 7 are alleged to have been committed in aid of racketeering activity." Motion to Sever at 27. That the crimes charged in Counts 6 and 7 are VICAR crimes, as opposed to simple conspiracies to embezzle or convert government property, *see* Motion to Sever at 26 (citing *Butler*), is not a wrinkle; it is the reason that the charges in the Superseding Indictment are properly joined. And it is the reason that severance will not alleviate the purported prejudice on which Defendants rely for severance.

Unlike in *Butler* and the other cases on which Defendants rely in their prejudice argument, the United States here must prove not only that Defendants conspired to murder J.M. and murdered J.M., the United States must additionally prove that SNM is a criminal enterprise that engaged in racketeering activity, and that the Defendants conspired to and murdered J.M. to receive pecuniary

20

value from SNM or to gain entry to, or to maintain or increase position in, SNM. *See* 18 U.S.C. § 1959; *Smith*, 413 F.3d at 1277.

Now, Defendants complain throughout their Motion to Sever that the United States is somehow improperly using the VICAR statute to back-door evidence that is otherwise inadmissible, or to join Defendants or crimes that shouldn't really be joined together. Motion to Sever at 11. These complaints lack a sounds basis in the law and facts here for two paramount reasons. First, VICAR is a properly enacted statute that Congress saw fit to enact to prevent the exact activity alleged in the Superseding Indictment: violent crimes such as murders perpetrated by individuals who join in a racketeering enterprise such as SNM. Second, by charging this murder and conspiracy to murder as VICAR violations, the United States placed additional burdens on itself: to prove that the SNM is an enterprise, engages in racketeering activities, and that this murder and conspiracy to murder were committed by the Defendants to receive pecuniary value from SNM or to gain entry to, or to maintain or increase position in, SNM. To the extent that Defendants complain about the additional evidence that's admissible in a VICAR case such as this, they conveniently omit from their Motion to Sever that they receive a huge benefit: if the United States fails to prove any one of these additional elements beyond a reasonable doubt, they will be found not guilty of the VICAR crimes with which they're charged.

Because *Butler* does not support Defendants' contention that their Fifth Amendment trial right is prejudiced by joinder, Defendants are left with one final contention: Large multi-defendant racketeering cases virtually always impairs a defendant's right to a fair trial under the Fifth Amendment. *See* Motion to Sever at 28. This claim is particularly alarming, because it invites the Court to accept as a general proposition that joinder of offenses in RICO and VICAR cases necessarily imports unconstitutional prejudice. Accepting this premise entials that joinder in these

cases is almost never proper. That cannot be right. For this reason as well, Defendants fail to demonstrate that their specific Fifth Amendment trial right would be prejudiced by joinder in this case. Accordingly, the Court should deny Defendants' Motion to Sever.

## C.  Defendants fail to satisfy the third prong of joinder inquiry.

Finally, as Defendants assert, only if the Court finds Defendants have satisfied the first two prongs of the severance analysis, then may the trial court exercise its discretion and weigh the prejudice to a particular defendant caused by joinder against the important considerations of economy and expedition in judicial administration. *See* Motion to Sever at 15-16.

Defendants claim that severance of Counts 6 and 7 "would best serve the interest of the Court and the jury" by (1) permitting the Court greater flexibility in scheduling matters; (2) facilitating jury selection for fewer defendants; and (3) relieving jury members of jury service for "inordinate stretches of time." Motion to Sever at 19. The benefits proposed by Defendants overlook the additional expense of time and judicial resources incurred by severance.

First, severance is not in the best interests of the Court, because it will require the court to undergo the same trial process at least twice. Defendants treat Counts 6 and 7 as unrelated to the charges brought against the other Defendants, ignoring the fact that these charges are part and parcel to the SNM's larger racketeering activities and enterprise. The United States is required to produce evidence to prove that Counts 6 and 7 were committed by Defendants who were members of the SNM, and that the alleged racketeering offenses were carried out by Defendants on behalf of the gang. The United States is allowed to prove all of these essential elements effectively. *See Old Chief v. United States*, 519 U.S. 172, 189 (1997) ("the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away . . . .").

Severance duplicates the Court's administration of trial matters such as scheduling, jury selection, and other evidentiary issues that the United States relies upon to prove the necessary

elements of the VICAR conspiracy. Judicial resources are instead better served by requiring one trial by one jury reviewing one body of evidence. *See Gould*, 2007 WL 1302587, at *1 ("Joint trials of defendants who are indicted together are preferred because they promote efficiency and serve the interests of justice . . . .").

Next, joinder of Defendants does not impose an unbearable weight on individual jury members. Defendants fashion a description of a hypothetical trial involving "30 defendants" lasting "months on end" and resulting "in a 'process as a whole' that is 'undoubtedly draining, disorienting, exhausting and often demoralizing'" to jurors. Motion to Sever at 19-21.  This is clearly not the case. Of the Defendants charged in the Superseding Indictment, as in most criminal cases, only a fraction will proceed to trial. Currently, five Defendants have pled guilty in this case. And, others will likely follow suit. However improbable it may be that all remaining Defendants proceed to trial, as pointed out earlier, juries are capable of handling complex litigation. *See Baker*, 10 F.3d at 1374; *Ostrer*, 460 F. Supp. at 1388. Accordingly, the length of this trial will not be so long as to countervail the "'preference in the federal system for joint trials of defendants who are indicted together.'" *United States v. Baca*, No. CR 16-1613 JB, Mem'm Opinion & Order, at 43 (D.N.M. Oct. 20, 2016) (Browning, J.) (quoting *Zafiro*, 506 U.S. at 537).

## CONCLUSION

Based on the foregoing analysis, Defendants' Motion to Sever fails to satisfy the critical elements required for severance. Counts 6 and 7, and all Defendants, properly are joined under Rule 8. Given the VICAR violations alleged in Counts 6 and 7, Defendants do not establish that joinder of those counts or Defendants requires severance under Rule 14. The United States of America therefore respectfully requests that the Court deny in full Defendants' Motion to Sever Counts 6 and 7.

23

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

***Electronically filed on 1/20/17***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM  88011
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 15-CR-4268-JB |
| Plaintiff, | |
| vs. | |
| ANGEL DE LEON, *et. al*., | |
| Defendants. | |

**DEFENDANT MARIO RODRIGUEZ' SUPPLEMENTAL FILING IN SUPPORT OF
MOTION FOR SEVERANCE OF COUNTS 6 AND 7; AND MOTION TO JOIN**

The Defendant, Mario Rodriguez, by and through undersigned counsel, hereby files this

supplemental pleading, and Motion to join, as follows:

## I.     INTRODUCTION

**The charges**

The fifteen count Superseding Indictment charges thirty (30) defendants with various

offenses, including the March 26, 2001 murder of F.C. (Count 1), the March 26, 2001 murder of

R.G. (Count 2), the June 17, 2007 murder of F.S. (Count 3), the November 12, 2012 conspiracy to

murder A.B. (Count 4), the November 12, 2012 murder of A.B. (Count 5), the March, 2014

conspiracy to murder J.M. (Count 6), the March 7, 2014 murder of J.M. (Count 7), the 2003 to July

13, 2015 conspiracy to commit assault of J.R. (Count 8), the 2013 to present conspiracy to murder

D.S. (Count 9), the 2013 to present conspiracy to murder G.M. (Count 10), the November 29, 2015

possession of a firearm by a felon (Count 11), the November 29, 2015 use of a firearm (Count 12),

the March 17, 2015 Assault with a dangerous weapon upon J.G (Count 13), the February 1, 2016 to

1

February 27, 2016 conspiracy to murder J.G. (Count 14), and the February 27, 2016 attempted murder of J.G. (Count 15).

The Court has entered an *Order Declaring Case Complex* (dkt. 211), "due to the number of defendants and nature of the prosecution" (dkt. 211). This Order was upon the Government's request (dkt. 210), which Defendants joined.

**Defendants' Severance Motion**

Counsel for defendant Rudy Perez filed a *Joint Motion to Sever Defendants Charged with Offenses in Counts 6 and 7* (dkt. 807). With the lone exception of Mr. Baca, the moving defendants are charged **only** in Counts 6 and 7, *i.e.*, **only** in connection with the March 7, 2014 murder of J.M., and they seek severance of those Counts from the remainder of the charges and defendants.

**Government's Response**

The Government filed its *Response* (dkt. 836). The Government's suggestion that "the Court … should not resort to the 'drastic' measure of severing Defendants' trial" is highly misguided and ill-advised in the context of a **complex, multi-defendant case such as this**. More accurately, severance in such cases is far from "drastic". Quite to the contrary, "[i]t is not uncommon for large criminal cases to be severed into smaller, more manageable groups". *United States v. Mancuso*, <u>130 F.R.D. 128</u>, <u>1990 U.S. Dist. LEXIS 2916</u> (D. Nev. 1990). In fact, "[t]his practice … is becoming even more widespread with the increase in number and size of drug-related and RICO indictments …"). *Id*, at 130.

**This Pleading**

Mr. Rodriguez is charged in Counts 6 and 7, and no other Counts. By this pleading, he moves to join the severance request of all other Count 6 and 7 defendants (dkt. 807). We also set forth the following supplemental points and authorities, to more fully advance the concept of the Court's

2

inherent authority on this issue (even **absent** a showing of prejudice), and to briefly respond to several matters contained in the Government's *Response*.

## II.    RELEVANT SUPPLEMENTAL POINTS AND AUTHORITIES

### The traditional factors which establish a judicial "preference" for joint trials are inapplicable here

At page 8 of its *Response*, the Government asserts:

As this Court recognized, "'[j]oint trials of defendants who are indicted together are preferred because they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"

The Government is correct that, **in the abstract**, these two considerations - "judicial efficiency" and "avoiding the scandal and inequity of inconsistent verdicts" - account for the judicial preference of joint trials. **However**, due to the unique facts and circumstances of **this** case, and the nature of the requested severance, neither of these traditional justifications weigh in the Government's favor, **regardless of whether or not prejudice otherwise exists**. We address each:

### Scandal and inequity of inconsistent verdicts

The Government ignores the significance of the fact that the instant severance only involves those Defendants charged in Counts 6 and 7, *to wit*: the 2014 J.M. murder. Accordingly, there can be no "scandal and inequity of inconsistent verdicts" as a result of the requested severance, **since all those so charged will be tried together**. The verdicts on Counts 6 and 7 as to any or all of the severed Defendants would not amount to "scandal and inequity", or "inconsistent verdicts" as to any defendant who **was not tried** in the severed group (because they are not charged with those offenses), and likewise, the ultimate verdicts as to any or all unsevered defendants would not comprise "scandal and inequity", or "inconsistent verdicts" as to any defendant who **was tried** in the severed group (because, likewise, **they** are not charged with **those** offenses).  See also, *United States v. Baker*, 10 F.3d 1374, 1390 (9th Cir. Nev. 1993)("avoiding inconsistent verdicts is not a significant concern in a trial such as this. When several defendants are charged with jointly committing a single criminal

3

act and tried on evidence that implicates them all equally, inconsistent verdicts may appear unfair and undermine public confidence in the judicial system. In a trial involving multiple defendants charged with separate substantive offenses, however, the acquittal of some defendants in separate trials is no more problematic than their acquittal in a joint trial").

Further discussion of this prong seems unnecessary.

### Judicial efficiency/docket management

Although traditional Rule 8 and Rule 14 considerations are certainly **always** applicable, "[c]ases have been severed in which there is no mention of prejudice to the prosecution or to the defendants". *United States v. Mancuso*, *supra*, at 130. In such cases, the dispositive considerations have often included case management and related factors. See, *e.g.*, *Id.* ("Many courts have, either explicitly or implicitly, relied on th[e] inherent power to manage its case load, and have severed out of a concern for the efficient administration of justice and judicial economy"), *United States v. Bundy*, 2016 U.S. Dist. LEXIS 172868 (D. Nev. Dec. 12, 2016)("courts have the inherent authority to manage their docket by severing large groups of defendants into more manageable groups").

As the *Bundy* Court observed just last month, "[m]any district courts have recognized the court's inherent authority to manage its case load and to sever in the interest of efficient administration of justice and judicial economy". In addition to District Courts, "a number of circuit courts of appeal … have recognized that the district court has broad discretion to organize the size of its cases in the interest of judicial economy and case management". *Id.*

The United States itself has certainly advocated the very factors which the moving defendants advance herein. See, *e.g.*, *Bundy* ("The government now argues the court should exercise its inherent authority to manage its docket and order severance because a joint trial of all 17 remaining defendants would unreasonably increase the amount of time it takes to try all defendants, result in greater delay, confusion and difficulty in maintaining an orderly and efficient proceeding").

The suggestion in Defendants' Motion that the Count 6 and 7 defendants be tried separately is logical and makes sense. See, *e.g.*, *Bundy*, *supra*, at 52 ("the court agrees that the most logical, efficient, and manageable way to try this case is to separate the defendants into three groups corresponding to their alleged roles in the offenses …").

**Examples of other relevant District Court cases**

In one of the seminal cases on this point, cited in Defendants' initial Motion, the District Court expressly "question[ed] the traditional assumption that denial of severance in cases such as this promotes efficiency", and severed the fourteen RICO defendants into more manageable trial groups. *United States v. Gallo*, 668 F. Supp. 736, 753 (E.D.N.Y. 1987).

In the well-reasoned analysis of another District Court, "a careful review of [the] difficulties [associated with a large, multi-defendant trial] reveals a point of diminishing returns with respect to the net benefits of a joint trial as the number of defendants and complexity of the indictment increases. Accordingly, at some point, the oft-cited advantages of a joint trial are outweighed by the manifest disadvantages of a large and protracted trial". *United States v. Andrews*, 754 F. Supp. 1161, 1990 U.S. Dist. LEXIS 18096 (N.D. Ill. 1990).

Another District Court opined that "[n]ot only would severance into some smaller units relieve the burdens [associated with large, multi-defendant trials] mentioned above, but overall trial time probably would be decreased". *United States v. Mancuso*, *supra*, at 8.

Yet another District Court opined that in considering severance "one may add considerations of case management deriving from the Court's inherent authority to manage its docket. These considerations include, first, the great difficulties in coordinating the schedules of numerous defense attorneys, prosecutors, witnesses, and even jurors, the absence of any one of which can throw a clog into the trial that brings it to a halt. The Court is sensitive, moreover, to the personal burdens that a lengthy megatrial would place on jurors, defendants, and defense attorneys. The Court is of the view

5

that even a severance into two trials, as originally proposed by the government, will not avoid these problems. Breaking the case down into smaller trial units will better alleviate potential difficulties in this area". *United States v. Williams-Davis*, 1991 U.S. Dist. LEXIS 19465, 10-11, 1991 WL 319692 (D.D.C. Dec. 16, 1991)(citations and internal quotes omitted). The *Williams-Davis* Court expressly "look[ed] to the other courts that have considered the distinctive problems to which the RICO megatrial gives rise, and joins those that have questioned the consistency of such trials with the goals of efficiency and fairness". *United States v. Williams-Davis*, *supra*, at 8-9.

Still another District Court noted that "contrary to the view that joint trials serve the goals of judicial efficiency and economy, the Ninth Circuit has aptly noted that in such large trials, judicial economy will often be better served by severance …"[1]. *United States v. Delatorre*, 522 F. Supp. 2d 1034, 1053 (N.D. Ill. 2007).

Similar considerations, including the "indisputably staggering hardships" associated with large, complex, multi-defendant trials, led the Ninth Circuit - in the case referenced just above in *Delatorre* - to observe that "the claim that joint trials save time and serve judicial economy is ludicrous under the present facts. Where trials of this magnitude are involved, judicial economy will often be better served by severance. *United States v. Baker*, *supra*, at 1389.

**United States v. Ledbetter, 137 F. Supp. 3d 1042 (S.D. Ohio 2015)**

Curiously, the Government cites *Ledbetter* for the proposition that "the Court, therefore, should not resort to the 'drastic' measure of severing Defendants' trial". *Response*, page 18. This is

---

[1]     The Ninth Circuit's reasons included "(1) as the government proceeds through separate trials, its presentation becomes sharper and more streamlined so that later trials move more quickly; (2) with fewer defendants and defense counsel, there will be fewer sidebars and continuances; and (3) the court becomes more familiar with the case and the evidence, allowing more expeditious and efficient rulings". Furthermore, the Ninth Circuit opined that "[d]isclosure of the government's method and quality of proof may even benefit the prosecution by inducing additional guilty pleas from severed defendants." *Baker, supra*, at 1390.

difficult to understand, since *Ledbetter* provides strong support for Defendants' argument(s).   In *Ledbetter*, "[d]ue to the complexity of th[e] case, society's need for speedy and efficient trials, and the defendants' interest in fair and accurate results, [the District Court] requested that the Government propose a multi-trial plan". The Court severed the fourteen defendant trial into three smaller trial groups, "based primarily on commonality of evidence and by grouping the defendants with all of their co-defendants in each of the charged murders". *United States v. Ledbetter*, 137 F. Supp. 3d 1042, at 1047. The *Ledbetter* appeal involved **only** the trial court's  refusal to further sever from the three smaller trial groups.

### The Government's *Response* fails to address this important point

The *Response* certainly recognizes that the Defendants have raised the docket control/judicial efficiency issue: *See*, Page 11 ("Defendants contend that Counts 6 and 7 should be severed under Federal Rule of Criminal Procedure 14 because a joint trial of all defendants is impractical"), Page 22 ("Defendants claim that severance of Counts 6 and 7 'would best serve the interest of the Court and the jury" by (1) permitting the Court greater flexibility in scheduling matters; (2) facilitating jury selection for fewer defendants; and (3) relieving jury members of jury service for "inordinate stretches of time.' Motion to Sever at 19", Page 23 ("Defendants fashion a description of a hypothetical trial involving '30 defendants' lasting 'months on end' and resulting 'in a 'process as a whole' that is 'undoubtedly draining, disorienting, exhausting and often demoralizing' to jurors. Motion to Sever at 19-21").

However, the Government has failed to offer a convincing argument distinguishing the instant case from the ones discussed above.

**Public trial considerations**

Although it is of course unclear at this time how many of the defendants will actually proceed to trial, we must consider the possibility that most will. The physical limitations of the situs of trial is an important factor to be considered, since there is a realistic danger that Defendants' Sixth Amendment right to a public trial (among other rights) may be violated.

The Government's *Response* very erroneously suggests that the Sixth Amendment does not "hold crucial" the right to a public trial **to the same extent as other rights**:

> Although Defendants envision a courtroom "overfilled with defendants, counsel, and co-counsel," Motion to Sever at 25, Defendants fail to establish that joinder would deny Defendants **the rights that the Sixth Amendment <u>hold crucial</u>** such as, the Constitutional right to cross-examination, opportunity to present an individual defense, right to confront witnesses against them, right to counsel, or right to properly instruct the jury on the admissibility of evidence as to each defendant. The hearings have worked fine thus far, and there is no reason to believe that will change. <u>**The rights that Defendants assert may be infringed are not of the same magnitude**</u>.

*Response*, page 18 (emphasis added)

Ironically, one of the cases cited by the Government (at page 13), *United States v. Candelario-Santana*[2], <u>834 F.3d 8</u> (1st Cir. 2016), involved reversal of the defendant's murder convictions precisely because the defendant's right to a public trial had been violated. The First Circuit made clear that - contrary to the Government's suggestion herein – the right to a public trial is indeed of the **utmost** "magnitude":

> Denial of a public trial constitutes structural error, rendering the entire trial process "fundamentally unfair". **Given the magnitude of this error**, a defendant need not demonstrate prejudice.

*United States v. Candelario-Santana*, <u>834 F.3d 8</u>, at 19 (emphasis added)

---

[2]     The Government incorrectly spells the case *Candelario-Santa*. It must also be noted that the Government's reliance upon *Candelario-Santana* is questionable: the severance discussion concerned the co-defendant, who failed to "articulate the severance issue below", and therefore, the First Circuit "review[ed] his claims [only] for plain error". *United States v. Candelario-Santana*, *supra*, at 24.

See also, *Arizona v. Fulminante*, <u>499 U.S. 279, 310</u> (U.S. 1991)(denial of the right to a public trial is a structural defect, not subject to harmless error analysis).

To whatever extent the Las Cruces Federal Courthouse has difficulty physically accommodating a complex, multi-defendant trial with this many participants and required spectators, the Defendants' public trial rights are implicated.

The Sixth Amendment guarantees that "the accused shall enjoy the right to a . . . public trial". Of particular significance herein, the Supreme Court has recognized that "[t]he requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, **and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions**". Waller v. Georgia, <u>467 U.S. 39, 46</u>, <u>104 S. Ct. 2210</u>, <u>81 L. Ed. 2d 31</u> (1984)(emphasis added). See also, *In re Oliver*, <u>333 U.S. 257, 271-272</u> (U.S. 1948)("In giving content to the constitutional and statutory commands that an accused be given a public trial, the state and federal courts have differed over what groups of spectators, if any, could properly be excluded from a criminal trial. … **without exception all courts have held that an accused is at the very least entitled to have his <u>friends</u>, <u>relatives</u> and counsel present, no matter with what offense he may be charged)**(emphasis added).

The right to a public trial extends to "voir dire of prospective jurors", *Presley v. Georgia*, <u>558 U.S. 209, 213</u> (U.S. 2010). See also, *Campbell-Eley v. State*, <u>756 So. 2d 1043, 1044</u> (Fla. Dist. Ct. App. 4th Dist. 2000)(murder conviction reversed because "[t]he failure to allow any members of the public, including family members, into the courtroom during jury selection[3] deprived Campbell-Eley

---

[3]       Per the Court's opinion, "Immediately prior to jury selection, the trial court required that all persons seated in the last row of the courtroom vacate the courtroom, as all of the rows of seating would be needed for potential jurors. Defense counsel requested that family members, if present, be

of her right to a public trial"). As a result, "[t]he exclusion of [a defendant's] relatives thus implicates Sixth Amendment values more directly than the exclusion of the general public". *Id*. See also, *Watters v. State*, 328 Md. 38, 48 (Md. 1992)(noting "the inability of the defendant's family to contribute their knowledge or insight to the jury selection and the inability of the venirepersons to see the interested individuals" as "other kinds of harms" when family members are excluded from jury selection).

District Courts have recognized courthouse limitations as an important factor in the severance decision. See, *e.g.*, *United States v. Gray*, 173 F. Supp. 2d 1, 10 (D.D.C. 2001)(In trial involving 17 defendants, "despite the general presumption favoring joinder, some form of severance is necessary because of the physical limitations of the courtroom and hardship on the jurors, the defendants, and the Court"), *United States v. Shea*, 750 F. Supp. 46, 50 (D. Mass. 1990)("An added problem of concern regarding trials in this district is that courthouse facilities for accommodating multi-defendant criminal trials are extremely limited"). *United States v. Delatorre*, *supra*, at 1054 ("As stated above, a joint trial of fourteen defendants could not even physically be tried in one courtroom, much less fairly, in this case. A joint trial in this case has the potential to last longer than five-months, and all of the risks of prejudice from such long trials apply here").

### III.   CONCLUSION

As the Government readily concedes, "[p]rejudice **always** exists when more than one defendant or offense are tried together" [4]. *Response*, Page 13. "It has been long recognized that the risk of prejudice to the entire criminal justice system increases incrementally with the number of defendants and the length of the trial". *United States v. Delatorre*, *supra*, at 1050. See also, *United States v.*

---

allowed to at least sit in the unused jury box seats during jury selection. The court declined to do so and refused to accommodate even Campbell-Eley's father".

[4]      Citing *United States v. Pursley*, 474 F.3d 757, 766 (10th Cir. 2007)(emphasis added).

10

*Baker*, *supra*, at 1390 ("The risk of prejudice to the defendants increases sharply with the number of defendants and the length of the trial")[5].

In *United States v. Mancuso*, then-Chief Judge Reed of the District Court of Nevada issued a comprehensive and well-reasoned opinion concerning "the difficulties of a joint trial in a complex multi-defendant case". *Bundy, supra*. Chief Judge Reed's opinion remains valuable authority today. Just last month, the *Bundy* Court well-summarized the pertinent considerations set forth in *Mancuso*:

> [Chief Judge Reed's]... decision thoughtfully reviewed and considered the difficulties of a joint trial in a complex multi-defendant case. The decision pointed out that a complex multi-defendant case is "fraught with problems". He recognized that a single trial of a complex multi-defendant case imposes enormous burdens on the defendants, defense counsel, prosecutors, jurors, the court, and the judge. Dozens of people are required to be in court every day. Therefore, the absence of any one person may bring the entire trial to a screeching halt. Complex multi-defendant cases involve reconciling the individual calendars of the prosecutors and each defense attorney with the court's docket. Attorneys carrying a full case load have conflicts with other trials, and the longer the case lingers, the more pronounced these conflicts become. Judge Reed noted that a lengthy trial of multiple defendants creates a unique hardship on each party involved. Jurors spend months away from their daily lives, defendants are required to endure months of pretrial incarceration before their case is finally adjudicated, and often significant amounts of time-consuming evidence are presented which are unrelated to a particular defendant. Attorneys are unable to spend significant time on their remaining cases. The court is forced to expend an exorbitant amount of time on a single case, and other litigants must "queue up for the remaining courtrooms". The result is a strain on the court's docket and unconscionable delays of all other cases. Mancuso also recognized the personal strain on the trial judge in a long complex case. The trial court is required to make rulings as issues come up which often require frequent adjournments necessitated by unavoidable problems associated with multiple jurors, multiple defendants, and their counsel as well as the witnesses and courtroom personnel who are required to be present at all times.
>
> *United States v. Bundy*, 2016 U.S. Dist. LEXIS 172868 (D. Nev. Dec. 12, 2016)(citations omitted)

---

[5]     *Baker* was overruled on other grounds by *United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000), which was, in turn, overruled on other grounds in *United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002). However, the Ninth Circuit has recognized that *Baker*'s discussion of the legal principles governing severance of joint trials remains good law. *United States v. Fernandez*, 388 F.3d 1199, 1241 n.27 (9th Cir. 2004).

DNM 707

In reliance upon the points and authorities set forth *supra*, we ask the Court, like the *Bundy* Court, to "exercise its inherent powers to fashion efficient, smaller trials from an otherwise unwieldly, mass, joint trial". *Id*.

Respectfully Submitted, this 24th day of January, 2017.


s/Santiago D. Hernandez                              s/Steve Potolsky

SANTIAGO D. HERNANDEZ, ESQ.          STEVEN M. POTOLSKY, ESQ.
Hernandez Law Firm                               Steven M. Potolsky, P.A.
1219 E. Missouri Avenue                          1348 Beach Blvd.
El Paso, Texas 79902                             #50973
(915) 351-4300 Phone                             Jacksonville Beach, FL 32250
(915) 351-4372 Fax                               E-mail: stevepo@bellsouth.net
Attorney for Mario Rodriguez
                                                 and

                                                 100 SE 2nd St Ste 3550
                                                 Miami, FL 33131
                                                 Office: (305) 530-8090
                                                 Fax:    (305) 358-5917
                                                 Attorney for Mario Rodriguez


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of January, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Assistant United States Attorney.


s/ Steve Potolsky
STEVEN M. POTOLSKY, ESQ.

DNM 708

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                               **15-CR-4268 JB**

**ANDREW GALLEGOS and**
**JOE GALLEGOS,**

        **Defendants.**

## OPPOSED MOTION TO SEVER COUNTS FOUR AND FIVE

COMES NOW, Defendants Andrew Gallegos, by and through his attorney of record, Donavon A. Roberts, Esq., and joined by Brock Benjamin, Esq., attorney for Joe Gallegos, and hereby moves the Court, pursuant to Rule 14 of the Federal Rules of Criminal Procedure, and the Fifth Amendment to the United States Constitution to sever Andrew Gallegos and/or Counts four and five from the trial of the other co-Defendants, and in support states:

### INTRODUCTION

Defendants Joe and Andrew Gallegos (Gallegos Defendants) are charged in the 15-count superseding indictment in Counts 4 and 5 with murder and conspiracy to commit murder of Adrian Burns (AB). *See* Superseding Indictment at 18-19. [Doc. 368]. Andrew Gallegos, who is not charged elsewhere in the superseding indictment, respectfully request that this Court sever Counts 4 and 5 from trial of the other counts in the superseding indictment. Although, Defendant Joe Gallegos is also charged in counts 1, 13, 14 and 15. *See id.,* he joints in this Motion because the offenses alleged in these other counts involve other different defendants, and occurred in different locations, three to four years after the alleged AB murder, and with respect

to count 1, twelve years before the alleged AB murder. *See id.* Furthermore, none of these additional counts have any relationship to counts 4 and 5.

In support of this Motion, Defendants Joe and Andrew Gallegos advance two main arguments: (1) Counts 4 and 5 were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 28 other defendants; and (2) should the Court find joinder proper under Rule 8, severance is still required under Rule 14 and the Fifth Amendment because a joint trial of the two Defendants for Counts 4 and 5 alongside the 28 other defendants and the 13 other counts in the superseding indictment will deprive the Gallegos Defendants of their right to a fair trial, especially given that only a small portion of the evidence in the trial of all the defendants would be relevant to Counts 4 and 5.

In addition to protecting the Gallegos Defendants' right to a fair trial, judicial efficiency and economy supports severance, as a trial of all 24 Defendants on all 15 counts would last considerably longer given the number of defendants and the span of decades between many of the allegations. Further, a joint trial would be logistically impractical because all defendants and their counsel may not even fit in the courtroom during the trial. These logistical limitations alone implicate the Defendants' right to confront witnesses, be present at all critical stages of the trial and to have a public trial under the Sixth Amendment.

## BACKGROUND

The 24 original defendants in this case were charged by Indictment with violations of 18 U.S.C. §1959(a)(1)(5)(6) and 18 U.S.C. §2 (Violent Crimes in Aid of Racketeering or VICAR). *See* Indictment [Doc. 2]. At least 19 of the original defendants were charged with capital eligible offenses and faced the possibility of the death penalty under 18 U.S.C. § 3591 et. seq. The

2

original Indictment contains special findings required for the imposition of the death penalty. The Court declared the case complex on January 7, 2016. *See* Order [Doc. 211]. On April 21, 2016, the government unsealed a superseding indictment in this case that alleges additional crimes and adds additional defendants. *See* Superseding Indictment [Doc. 368]. The government also revealed a new indictment in related case no. 16-cr-1613 JB in which some, but not all, of the defendants in the above-captioned matter, are charged with additional criminal acts. Both indictments allege defendants are members of the *Syndicato Nuevo Mexico* (SNM), and further allege that defendants engaged in racketeering and committed violent crimes in aid thereof.

The distinct charges and separate events in the Superseding Indictment are as follows:

**Count 1: Murder of FC**

Count 1 alleges several Defendants, other than Andrew Gallegos, murdered FC on March 26, 2001, in Dona Ana County. This alleged murder occurred almost 12 years before the alleged murder in counts 4 and 5.

**Count 2: Murder of RG**

This count is alleged against Defendants Leonard Lujan, Billy Garcia, Eugene Martinez and Christopher Chavez. None of these Defendants are accused in Counts 4 and 5. Count 2 alleges these Defendants murdered RG in Dona Ana County on March 26, 2001, also almost 12 years prior to counts 4 and 5.

**Count 3: Murder of FS**

This count is alleged against Defendants Javier Alonso, Edward Troup, Arturo Garcia, Benjamin Clark and Ruben Hernandez. None of these Defendants are accused in Counts 4 and 5. Count 3 alleges these Defendants murdered FS on June 17, 2007, in Dona Ana County. This alleged murder occurred five years prior to the crimes alleged in Counts 4 and 5.

**Counts 4 and 5: Conspiracy to Murder and Murder of Adrian Burns (AB)**

According to the indictment, Joe and his younger brother, Andrew Gallegos, conspired to and did murder AB on or about November 12, 2012, in Socorro and Valencia counties. These alleged crimes occurred at distinctly different times and locations from the crimes alleged in any other counts in the Superseding Indictment and should be sever. Although the basis for Counts 4 and 5 are not precisely clear, it is believed the government's theory of the case is, in part, that Defendants Joe and Andrew Gallegos were allegedly low level members of the SNM who received orders from higher-up to kill AB. It is unspecified as to who specifically gave the kill-order or as to when, where, or how exactly the order came down. At the time of the murder, AB is alleged to have been the Gallegos Defendants' drug supplier and possible rival of the SNM. The Gallegos Defendants, who deny membership with the SNM, are alleged to have tortured and killed AB to gain membership or status with the SNM. AB's body (shot, gasoline doused and burnt) was found in the Bosque with his vehicle, just outside of Socorro County.

The Gallegos Defendants are alleged to have been the last people to see AB alive at his home in Los Lunas, N.M., where he was first shot and killed. Some hours after his death, the Gallegos Defendants were said to have been seen in public with blood and pin-hole burnt marks on their clothes.

On or about November 12, 2012, the State of New Mexico, by the Third Judicial District Attorney's Office in Socorro County, charged Defendants Joe and Andrew Gallegos in County Magistrate Court (Docket No: M-52-FR-2012-00230) with the murder of AB, along with several other related charges. The case was investigated by the New Mexico State Police (NMSP), who later arrested the Gallegos Defendants for the murder of AB on November 20, 2012 in Albuquerque, New Mexico. Upon information and belief, two subsequent DNA tests of the

blood found on their clothing was determined to be non-human.  The burnt marks on their clothes were also tested and determined to be non-gasoline related.  The Gallegos Defendants have asserted all along that the blood came from the roasting of a pig during a birthday celebration the night that they were seen in public, and that the burnt marks were likely from the party or from welding jobs that the brothers often did for spare cash.

On December 14, 2012, the State (after DNA testing) filed a *Nolle Prosequi* for both defendants indicating insufficient evidence to proceed.  Three years later, the first indictment in this federal cause was filed.  *See* Indictment [Doc. 2].  Andrew Gallegos and the AB murder were not included in these counts until the superseding indictment was filed on April 21, 2016.  *See* Superseding Indictment [Doc. 368].  The other counts in the superseding indictment, except Counts 6 and 7 did not have a parallel state prosecution.  Furthermore, the AB murder, unlike most of the alleged murders in the Superseding Indictment, occurred outside of prison and was allegedly committed for profit and not retaliatory reasons.  Upon information and belief, there were no witnesses to the murder or specific, concrete evidence, including DNA, that directly links the Gallegos Defendants to this murder, the murder scene, or to the location where AB's body was found.

**Counts 6 and 7: Conspiracy to Murder JM and Murder of JM**

These counts involve Defendants Armenta, Montoya, Sanchez, Varela, Herrera, Perez, Rodriguez and Martinez; collectively, the 2014 Defendants.   They are alleged to have conspired to murder and to murder JM.  Defendants Sanchez and Varela, as alleged intermediate leaders of the SNM, are alleged to have given the go-ahead for the killing.  Defendant Herrera also allegedly sanctioned the killing.  Defendant Perez is accused of providing his walker to make a shank(s) for the killing.  Defendants Rodriguez and Martinez are accused of choking JM in his

5

prison cell until he was unconscious and Defendants Armenta and Montoya are alleged to have then stabbed Molina multiple times.  All the 2014 Defendants are alleged to be members of the SNM.

**Count 8: Conspiracy to Assault JR**

This count is alleged against Defendants Anthony Ray Baca, Gerald Archuleta, and Conrad Villegas.  Defendant Archuleta has entered a plea agreement.  *See* Plea Agreement [Doc. 586].  Defendant Villegas is not charged in any other counts in this case.  In his Plea Agreement, Defendant Archuleta states that in 2003 he had a falling out with JR, who is also alleged to be an SNM member.  *Id.* at 4.  As a result, Defendant Archuleta states he put a "green light" on JR, which is common slang for ordering the murder of a person.  *Id.*  Because of Archuleta's green light, JR was shot in 2003, but survived, and then was assaulted in 2015 in SNMCF for the same reason.  *Id.* at 4-5.  Defendant Archuleta implicates Defendant Baca as sanctioning the green light, but does not implicate either of the Gallegos Defendants, and there is no information in the discovery to indicate any others were involved.

**Counts 9 and 10: Conspiracy to Murder DS and Conspiracy to Murder GM**

Counts 9 and 10 are both alleged conspiracies to murder Dwayne Santistevan, the head of DOC's STIU and former Secretary of Corrections Greg Marcantel.  Defendants Anthony Baca, Roy Martinez and Robert Martinez, are charged in both counts.  Defendant Roy Martinez has entered a plea to both counts. [Doc. 686]. In his plea, Mr. Martinez claims he conspired with Defendants Baca, Robert Martinez, and others, to kill Marcantel and Santistevan.  There is no evidence the other defendants in these charges were involved in Counts 4 and 5.  There is also no evidence any of the Gallegos Defendants, were involved in either of these two counts.

**Counts 11 and 12: Felon in Possession of a Firearm and 924(c) against Defendant Garcia**

Both of these counts are against only Defendant Garcia, who is alleged to have committed them on November 29, 2015, in Bernalillo County, and there is no information to believe any of the Gallegos Defendants were involved in these crimes.  In fact, the events resulting in Counts 11 and 12 occurred three years *after* the alleged murder of A.B and over one hundred and fifty miles away from each other.

**Counts 13, 14 and 15: Assault, Conspiracy to Murder, and Attempted Murder of JG**

Count 13 is charged against only Defendant Joe Lawrence Gallegos and is alleged to have occurred on March 17, 2015, in Valencia County.  Counts 14 and 15 are alleged against Joe Gallegos, Santos Gonzales, Paul Rivera, Shauna Gutierrez.  These crimes are alleged to have occurred in Otero and Valencia County in February 2016.  Only Joe Gallegos is alleged to be involved in counts 4 and 5, and there is no connection to these crimes and counts 4 and 5, except for the alleged SNM membership of all the defendants.

## ARGUMENT

Joinder in criminal cases is governed by Rule 8, and severance by Rule 14 of the Federal Rules of Criminal Procedure as well as the Fifth Amendment.  Under Rule 8(a) the joinder of offenses is appropriate when the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed.R.Crim.P. 8(a).  While Rule 8(a) "is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system," *United States v. Janus Indus.*, 48 F.3d 1548, 1557 (10th Cir. 1995), joinder is only proper where at least one of the Rule 8(a) conditions are met, and "those conditions, although phrased in general terms, are not infinitely elastic." *United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir. 1996).  Rule 8(b) applies to the joinder of defendants in a criminal trial. *Zafiro v. United States*, 506 U.S. 534, 535 (1993).  Under Rule 8(b), joinder of

7

defendants is proper only where the defendants "are alleged to have participated in the same act or transactions, or in the same series of acts or transactions…." Fed.R.Crim.P. 8(b).

Even if two or more offenses or defendants are properly joined under Rule 8(a) or (b), the joinder is subject to scrutiny under Rule 14. *See also United States v. Olsen*, 519 F.3d 1096, 1102 (10th Cir. 2008). While the purpose of joinder is to "promote economy and efficiency and to avoid a multiplicity of trials," these objectives must be achieved "without substantial prejudice to the right of the defendants to a fair trial." *Bruton v. United States*, 391 U.S. 123, 131 n. 6 (1968); *Zafiro*, 506 U.S. at 540. Accordingly, Rule 14(a) provides for relief from prejudicial joinder, allowing that "[i]f the joinder of offenses or defendants in an indictment…or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed.R.Crim.P. 14(a); *Zafiro*, 506 U.S. at 537. Under Rule 14, the determination of the risk of prejudice and the decision whether to grant a motion to sever is soundly within the discretion of the trial court. *Zafiro*, 506 U.S. at 541; *United States v. Haworth*, 168 F.R.D. 658 (D.N.M. 1996)

In determining whether to grant a motion to sever under Rule 14, the Court must weigh the potential prejudice to the defendant against the considerations of judicial economy and efficiency. *Zafiro*, 506 U.S. at 537; *United States v. Dirden*, 38 F.3d 1131, 1140 (10th Cir. 1994). (*internal quotation omitted*). The Tenth Circuit has held that "[p]rejudicial joinder occurs under Rule 14 when an individual's right to a fair trial is threatened or actually deprived." Because "[t]he risk of prejudice will vary with the facts of each case," determining whether severance is required is up to the discretion of the district court. *Zafiro*, 506 U.S. at 539. *See also, Haworth*, 168 F.R.D. at 659 (granting motion to sever in light of likely prejudice to the

moving defendants given the risk of juror confusion and "the circus like atmosphere inherent in a joint trial of this nature" and finding that severance would also facilitate judicial economy).

**I.      The Gallegos Defendants must be severed, as their joinder with other 21 defendants under Rule 8(b) is improper and sets a dangerous precedent for infinite joinders.**

Rule 8(b) governs the joinder of defendants and provides in part that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed.R.Crim.P. 8(b). *See also, United States v. Santoni*, 585 F.2d 667, 673 (4th Cir. 1978).

In *Zafiro*, the Supreme Court stated that joinder under Rule 8(b) "serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." 506 U.S. at 537. This possibility of scandal and inequity, however, is not a risk in this case. In cases where other defendants' charges are based on the same alleged crime and similar evidence or stem from the same conduct, as was the case in *Zafiro*, the court's concern with inequality and inconsistency is understandable. In *Zafiro*, four defendants were arrested together in an apartment with more than 70 pounds of cocaine and other drugs. *Id.* at 535-36. All four defendants were charged and convicted of conspiring to possess illegal drugs, and the Court affirmed the denial of defendants' motions to sever. *Id.* at 541.

In *United States v. Hill*, the Tenth Circuit affirmed the district court's denial of a motion to sever where multiple co-defendants and members of the Tulsa, Oklahoma Hoover Crips were tried and convicted of conspiracy to commit bank robbery. 786 F.3d 1254, 1258 (10th Cir. 2015), *cert. denied, Hill v. United States,* 136 S. Ct. 377 (2015). Co-defendant Dejuan Hill's motion to sever was denied because the court reasoned that "[a]lthough the Indictment… charged six different robberies alleged to have been committed by different defendants over a more than two-

year period, it also alleged that the defendants had conspired and agreed with each other to commit all six of the robberies. *Id.* at 1272.

Unlike the defendants in *Zafiro* and *Hill*, here, there is no allegation that the Gallegos Defendants, and the other defendants, with the exception of Defendant Joe Gallegos where noted to have, "conspired and agreed with each other to commit" the other crimes alleged in the indictment. In short, there is no evidence that the crimes alleged in Counts 4 and 5 were part of a series of acts or transactions. Even in the most favorable light, the indictment alleges that, out of the two Defendants in Counts 4 and 5, only Joe Gallegos is alleged to have participated in any of the other counts. Also, there is no evidence of a transactional nexus between the Gallegos Defendants named in Counts 4 and 5 and any of the other defendants or other counts. There is no evidence that the Gallegos Defendants and other defendants participated in a series of acts or transactions despite the fact that the government has actively investigated these defendants for more than four years with the help of cooperating witnesses, confidential informants, and call and mail monitoring.

Further, since the crimes alleged in Counts 4 and 5 only involve the Gallegos Defendants, and are discrete and not connected to any of the other defendants, joinder of the Gallegos Defendants is improper under Rule 8(b), and a separate trial would not lead to potential inconsistent verdicts with regard to the Gallegos Defendants and the other 20 defendants, thus alleviating the *Zafiro* court's concerns for equality and consistency.

The government claims that the purpose of the offenses as well as the means and methods of the SNM constitute racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1). The government further claim that proof of a "common purpose" is sufficient to bring a group of people under RICO. But, the government should not be allowed to simply use the umbrella of

RICO to join every alleged SNM crime by simply alleging that the offense shared a common purpose. This would create a slippery slope that this Court, as a public policy matter, should view with great caution.  This is because given the broad parameters set by the Government in this case, almost anyone can be prosecuted under the current indictment because every crime is committed with the intent to be beneficial, and under the government's theory, almost anyone that has been incarcerated is either a member or wannabe member of the SNM. Therefore, allowing this joinder would ultimately give the government free range to join almost any gang-related crime into a single indictment and trial.

II. **Alternatively, counts 4 and 5 should be severed under Rule 14, as the evidence of other murders, assaults, and conspiracy by SNM members will prejudice the Gallegos Defendants, and a joint trial of all defendants on all counts is impractical.**

While the federal system favors a single trial for defendants who are indicted together, *see Zafiro*, 506 U.S. 537, "[t]he Federal Rules envision, however, that circumstances may arise where joint trials would be inappropriate and, indeed, harmful to the accused's constitutional rights." *United States v. Neha*, 2005 WL 3663695, at *2 (Browning, J.) (D.N.M. Sept. 13, 2005), *aff'd, United States v. Neha*, 301 Fed. Appx. 811 (10th Cir. 2008).  Therefore, a three-step inquiry is necessary to determine whether the Court should grant a motion to sever. *United States v. Gould*, 2007 WL 1302587, at *2 (Browning, J.) (D.N.M. Apr. 6, 2007). First, the Court "must determine whether the defenses presented are so antagonistic that they are mutually exclusive." *United States v. Pursley,* 474 F.3d 757, 765 (10th Cir.2007) (*internal quotations and citations omitted*).  Second, "a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* Finally, "the trial court exercises its discretion and weighs the prejudice to a

11

particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." *Id.*

In *United States v. Hardwell,* the Tenth Circuit held that joinder under Rule 8(b) was not proper when six co-defendants were all charged with conspiracy, money laundering, and possession of cocaine with intent to distribute. 80 F.3d 1471 (10th Cir. 1996), *on reh'g in part, United States v. Hardwell,* 88 F.3d 897 (10th Cir. 1996). The Tenth Circuit explained that severance was not necessary, in part, because the "conspiracy was to commit a single offense; there were only six defendants, all charged with the [one] conspiracy" and there was not a great disparity in culpability among the defendants. *Id.* at 1487.  In reaching this decision, the court directly contrasted *Hardwell,* with *United States v. Gallo,* 668 F. Supp. 736 (E.D.N.Y. 1987), a RICO case where severance was granted because it is substantially more complex than *Hardwell,* and remarkably similar to the case at hand.

In *Gallo*, the District Court granted the defendants' motion for severance under Rule 14 and separated a 22-count RICO indictment charging 16 defendants into 7 separate trials.  *Id.* at 748-61. The 22 count indictment charged the defendants, alleged members and associates of the Gambino Crime Family, with RICO and a multitude of "substantive" offenses that took place over the course of two decades and were related to an alleged criminal enterprise. *Id.* at 738. Although the court determined that the defendants were properly joined under Rule 8(b), it held that severance was required under Rule 14 after considering the prejudice resulting from : (1) the complexity of the indictment; (2) the disproportionality of evidence; (3) whether there is an antagonism of defense strategies and theories; (4) whether there is evidence only admissible as to some defendants; (5) the potential inadequacy of limiting instructions; and (6) the balancing

requirements of Rule 14 including the deleterious effect of prolonged complex cases, and whether granting a severance saves time. *Id*. at 749-58.

The *Gallo* court determined that indictment was sufficiently complex given that the case was a RICO conspiracy and that jury would have to "apply the highly technical and counter-intuitive RICO conspiracy elements to a great range of disparate and predicate conspiracies and events . . ." some occurring nearly 20 years apart. *Id*. at 749-750.  The court noted that "[m]uch of the relevant evidence would have to be stored in the jury's collective mind for many months – and a good deal of it introduced only as to certain defendants or certain charges." *Id.* at 750. The court went on to note the risk of prejudice caused by disproportionality of the evidence, stating that "[t]he difficulties of complex, multifarious cases, as this are compounded for those defendants whom only a small portion of the evidence is relevant." *Id*. "The prejudice concomitant with the case's complexity" the court noted "is 'particularly injurious' to defendants charged in a small portion of the counts and who are implicated by only bits and pieces of evidence" because the jury is subjected to months and months of trial "dealing with dozens of incidents of criminal misconduct that does not involve those minor defendants in anyway. *Id.* (citing *United State v. Branker*, 395 F.2d 881, 882, (2d. Cir. 1968) (*internal quotations omitted*). With regard to the prejudice caused by an antagonism of defense strategies and theories, the court noted that while a simple showing of some antagonism was insufficient, prejudice rising to the level for severance occurs when the "jury must *necessarily* disbelieve the testimony offered on behalf of one defendant in order to believe the core testimony offered on behalf of another." *Id.* at 751 (*quoting United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir.1981)) (*internal quotations omitted*).

With regard to the prejudice created in joint trials when evidence is admissible only as to some defendants but not others, the *Gallo* court explained the likelihood of frequent instances in which "evidence admitted against one defendant would also be relevant as to another under Rule 401, but would be excluded as to the latter under Rule 403 in a separate trial of that defendant alone because its probative value would be outweighed by the danger of unfair prejudice." *Id.* at 752. On this front, the court concluded that it would be "wholly unreasonable for a jury to perform the intellectual feat in a joint trial of using such proof against some defendants and ignoring it as to others." *Id.* (internal quotation omitted). The court explained that, because the indictment charged a central RICO conspiracy, numerous other conspiracies in the substantive counts and the predicates acts and potential uncharged conspiracies, the result would be "conspiracies within conspiracies, and conspiracies to conceal other conspiracies, conspiracies which are discrete and finite, and those which are amorphous and indefinite, involving conspirators joining and leaving the conspiracy at various times." *Id.* at 751. Meaning that in such a complex trial, "[a]dmissibility decisions will often depend on having faith in the jury's ability to heed extraordinarily intricate limiting instructions" which "[o]ver the course of several months … would virtually be impossible without the aid of a computer" given the number of the co-defendants and counts. *Id.* at 752.

The use of such limiting instructions, the court noted, is "cited as a pivotal reason for denying severance in many cases." *Id.* The court, however, concluded that "the trial judge must be convinced that the jury . . . has a reasonable chance of understanding and acting upon instructions from the court," and that while the use of a limiting instructions cannot be "invariably rejected, neither should it be invariably accepted." *Id.* at 752 (*quoting United States v. Figueroa*, 618 F.2d 934, 943 (2d.Cir.1980) (*internal quotations omitted*). Accordingly, the

court reasoned, there will be "some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton,* 391 U.S. at 135. The court found this issue extremely salient, concluding that the *Gallo* case was "far too extensive and intricate" to expect that a jury could "retain such precise discriminations weeks and months down the line, when they retire to deliberate on the basis of a warehouse of diverse evidence." *Gallo* at 753.   Although the accumulation of evidence may be slow and at times subtle, severe prejudice is stacked against the defendants over the course of time

Considering the balancing requirement of Rule 14, the court noted that "[t]rials in these 'monster' cases "create "an enormous burden on the courts, as well as on the defendants, the defense bar, juror, and even prosecutors." *Id.* at 754.  *See generally* Paul Marcus, *Re-Evaluating Large Multiple-Defendant Criminal Prosecutions*, 11 Wm. & Mary Bill Rts. J. 67 (2002); Note, *No Easy Solutions to the Problem of Criminal Megatrials*, 66 Notre Dame L.Rev. 211 (1990) (highlighting the many complications created when trying 'megatrials'). The burden on the court itself includes the purely logistical nightmare of coordinating the "schedules of scores of persons for months on end." *Id*. at 754.  For individual jury members, they are removed from the routine and comfort of their daily lives "for inordinate stretches of time" in which they "must sit stoically and silently for hours every day, day after day" adsorbing "vast quantities of information" and "perform the mental gymnastics" required by the court's limiting instructions resulting in a "process as whole" that is "undoubtedly draining, disorienting, exhausting and often demoralizing." *Id*. The court also noted the "severe disadvantages to the defendants as well," including the potential of being denied their choice of counsel and the prolonged periods of pretrial incarceration defendants face while they are supposedly presumed innocent. *Id.*

Lastly, the *Gallo* court doubted whether conducting a joint trial on all 16 counts charging 22 defendants would, in fact, save time. *Id*. at 756. The court concluded that "the 'overall' trial time" was probably "diminished in [the *Gallo*] case by splitting up the trials" … because the trial would be "smoother and more concise . . . evidence in each case does not scatter about the various contours of the conspiracy . . . there are two or three defense counsel cross-examining and raising objections rather than one or two dozen . . . sidebars are much more infrequent . . . [and] continuances and adjournments are less common." *Id*. at 757. "More significantly" the court noted that "the later trials are certain to be shortened or even precluded by the earlier trials" because the prosecution will better understand the strengths and weaknesses of its case, and defendants will may be encouraged to accept plea offers. *Id*.

Like *Gallo*, this case deals with a complex RICO indictment spanning decades' worth of criminal allegations. In fact, this Court declared it complex on January 7, 2016, even before the government unsealed the April 21, 2016, superseding indictment. *See* Order [Doc. 211]. Also similar to *Gallo* is the disproportionality of the evidence in relation to the 30 defendants charged. A review of the discovery to date demonstrates that the government has revealed far more and far stronger evidence against some co-defendants, including audio-recorded conversations and self-incriminating statements, than against others. Accordingly, "[i]nevitable prejudice to the peripheral defendants is caused by the slow but inexorable accumulation of evidence against the major players." *Gallo*, at 750 (*quoting United States v. Kelly*, 349 F.2d 720, 759 (2d Cir.1965) (reversing conviction because the trial court should have granted severance, where "some [of the evidence regarding the co-defendant's actions] rubbed off on [defendant] we cannot doubt.")). (*internal quotations omitted*). To date, the government has only presented rumor, conjectures and circumstantial evidence as to the guilt of the Gallegos Defendants, which is not only

16

substantially weaker evidence when compared to the evidence against most of the other defendants, but is clearly indicative of the government relying on the principle of "guilt by association" to prove their case in counts 4 and 5.

Given the number of defendants and the fact that discovery is still being provided, it is unclear at this point whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive. However, there can be no doubt that there will be antagonistic defenses. For instance, many defendants may argue they were not or are not SNM members. Other defendants will likely argue the alleged crimes were not done in furtherance of the SNM. Defenses may be further developed as discovery and other litigation progresses, but given the variation in time, location and defendants involved in the other alleged crimes not part of the Gallegos Defendants, it is much more likely than not those mutually exclusive antagonistic defenses will risk causing prejudice to all defendants on trial. Guilt by association is at an extreme risk in this case. For instance, if the government can establish in some or all of the other counts that members of SNM carried out or attempted to carry out murders in furtherance of the SNM, and prove that one or both of the Gallegos Defendants are members of the SNM, that mere fact of gang membership could unfairly prejudice the jury into believing they are guilty of the AB murder. In fact, for those defendants, like the Gallegos Defendants, who contend to have no adult gang affiliation, the mere sight of 30-60 defendants and their lawyers sitting in a courtroom presents a stunning display to the jury of an "established gang", before even a word of evidence has been spoken. This visual imagery is extremely prejudicial to non-gang members sitting in the same courtroom. Furthermore, the gruesome images and description of multiple murders that is expected to be presented to the jury will draw a raw emotional response that is overwhelming and overly

prejudicial by their nature. The Court must guard against the prejudicial duplicity of such evidence.

What is undoubtedly clear is that much, if not all, of the evidence related to the counts in which the Gallegos Defendants are not charged is likely inadmissible in a trial on only Counts 4 and 5, and presenting it to the jury poses a serious risk that the Gallegos Defendants' right to a fair trial will be compromised as the jury will be virtually incapable of reaching a reliable conclusion about each defendant's guilt or innocence. Presentation of evidence on the multiple other alleged murders, conspiracy to commit murder, assaults and the firearms charges not contained in Counts 4 and 5 will subject the Gallegos Defendants to undue prejudice by creating an atmosphere of criminal propensity.  In Counts 4 and 5, the Gallegos Defendants are charged with conspiring to and murdering AB in furtherance of the racketeering activities of the SNM.  If the jury is permitted, however, to hear evidence of the other four alleged murders, four other conspiracies to commit murder, and other violent acts, this will essentially allow the government to introduce propensity evidence.  In other words, in hearing of the other offenses that the government will allege are similar to the AB murder—that is, some of the victims were allegedly murdered for cooperating with law enforcement—there is a substantial risk that jurors will credit these other offenses improperly in determining each Gallegos Defendant's guilt or innocence in regard to the AB murder. As the Tenth Circuit has noted, "prejudice is more likely to occur when the offenses are of the exact same character." *United States v. Price*, 265 F.3d 1097, 1105 (10th Cir. 2001).  This prejudicial effect threatens the Gallegos Defendants right to a fair trial and weighs strongly in favor of severance.

While the government will suggest that limiting instructions would cure any potential prejudice, such instructions are unworkable in a trial of this complexity and is more aspirational

than a reality.  In a "judicial system, dedicated to truth and justice, such a lack of connection with reality is unacceptable." *Gallo*, 668 F. Supp. at 752. Asking a jury to make hyper-specific determinations after a month's long trial about how and for what they may consider a piece of evidence is impractical and unnecessary given this request for severance. If the indictment dealt with fewer counts or fewer defendants, perhaps a limiting instruction might be appropriate.

In this case, however, if no severance is granted, the jury will hear about the other murders, conspiracies to commit murder (not of the same victims), a conspiracy to commit assault, assault, and an attempted murder plus the firearms charges, all allegedly in furtherance of the SNM.  Simply hearing about this activity by alleged fellow gang members makes it unlikely the Gallegos Defendants can get a fair shake with the jury, even if a limiting instruction is given and even if the defendants present viable defenses.

For some of the reasons delineated above, this Court recently granted a severance in a related indictment. *See United States v. Baca*, 2016 WL 6404772, (Oct. 20, 2016) (Browning, J.) (granting severance in part because a joint trial would prevent the jury from making a reliable judgment in a case where many defendants with varying degrees of culpability would be tried together) (citing *Zafiro v. United States*, 506 U.S. at 539). In *Baca*, with respect to Defendant Gallegos, the Court noted that the risk of prejudice was heightened given the co-Defendants' "markedly different degrees of culpability," *id.*, and noted that the Defendant Gallegos had a "markedly different degree of culpability" in part because "he was allegedly involved in a single incident." *Baca*, 2016 WL 6404772 at *31. Although the Court based its decision to sever that case on several other factors as well, there are clear parallels with this case, where the defendants in question (except Joe Gallegos) are only charged with one incident and the related conspiracy.

19

In addition, as was the case in *Gallo*, severing the Gallegos Defendants from the other co-defendants would best serve the interest of the Court and the jury.[1] First, this Court will benefit from having fewer schedules to attempt to accommodate and therefore greater flexibility in scheduling matters. Also, conducting separate trials may result in defendants named in the subsequent trial accepting plea offers, thus precluding the need for a trial altogether and increasing judicial efficiency.  Second, selecting a jury will be less difficult because it will be easier to find jury members who are available for the several weeks necessary to sit for the Gallegos Defendants' trial rather than the several months required to try all 29 Defendants for all 15 Counts. Additionally, the longer that the jury has to sit, the greater the risk that Defendants will be found guilty for convenience sake and the risk that jurors' decisions will be influenced by the national media attention that has followed this case.

Severance is also required under Rule 14 to avoid violating the 6th Amendment Rights of the Gallegos Defendants to be present at all critical stages of the trial, confront the witnesses against them and have a public trial. In *United States v. Ellender*, 947 F.2d 748, 754 (5th Cir. 1991), a courtroom specially-modified with bleachers and a "special intercom system of dubious efficacy" were installed to attempt to facilitate the three-month long trial of 23 co-defendants. *Id.*

Even the largest of the federal courtrooms in the District of New Mexico cannot adequately accommodate the trial, much less *voir dire*, if a severance is not granted. *See Gomez v. United States*, 490 U.S. 858, 873 (affirming that *voir dire* is a "critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present").  Unless the

---

[1] The undersigned counsel are aware of the Court's finding in *Baca*, that a joint trial in that case would "certainly be more convenient for the Court," *Baca*, 2016 WL 6404772 at \*32, but argue that finding doesn't hold true in this case, given the sheer number of defendants in this indictment and the complexity of the allegations involving disparate and distinct conspiracies over a period of decades.

Court foresees a similar modification to the courtroom as that in *Ellender*, these defendants risk losing their constitutional right to confront witnesses against them. *See* U.S. Const. Amend. VI ("[T]he accused shall enjoy the right ... to be confronted with the witnesses against him .... "); *cf. Bruton v. United States*, 391 U.S. 123, 136–37 (1968) (holding that threats to a defendant's right to confront witnesses against him poses a "hazard [the Supreme Court] cannot ignore"). Depending on where they are seated, a particular defendant may not be able to see the jury or the witness, may be left out of important bench conferences (by counsel) or other important stages of the trial. Additionally, these defendants risk losing their right to the public trial if they cannot be seated in the courtroom or if the courtroom is simply too full as it has been in the past to allow access to the public and the press. *See Presley v. Georgia*, 558 U.S. 209, 215 (2010) (explaining that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials").

### III.   Severance of counts 4 and 5 is necessary to protect the Gallegos Defendants' respective rights to a fair trial under the Fifth Amendment

Severance is discretionary up until the point that joinder of either defendants or offenses cause actual or threatened deprivation of a fair trial. *United States v. Butler*, 494 F.2d 1246, 1256 (10th Cir. 1974)). Misjoinder rises to the level of a constitutional violation when it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial. *United States v. Lane*, 474 U.S. 438, 446 (1986). Under such conditions, "[t]he dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." *Kotteakos v. United States*, 328 U.S. 750, 774 (1946). "[A] criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial." *Cummings v. Evans*, 161 F.3d 610, 619 (10th Cir. 1998). When improper joinder allows

21

the government to introduce prejudicial evidence that would have been inadmissible had the charges been tried separately and/or when the prosecution joins defendants with grossly disparate charges, courts have recognized the high risk of prejudice that likely requires reversal. *See, e.g.*, *Kotteakos*, 328 U.S. at 773-774 (reversing and holding that, the government was not authorized "to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all"); *United States v. Mardian*, 546 F.2d 973 (D.C.Cir.1976) (reversing defendant's conviction, who was indicted on only one of several counts and alleged to have been involved in only 5 or 45 overt acts, based upon showing of likely prejudice from a joint trial wherein he had been tried with three of the principal members of the Watergate conspiracy); *United States v. Dockery,* 955 F.2d 50, 53 (D.C.Cir.1992); *United States v. Sampol,* 636 F.2d 621, 645–48 (D.C.Cir.1980) (vacating certain defendant's convictions where the district court failed to grant severance and noting the quantity and type of evidence against co-defendants is a vital consideration in evaluating severance).

In *Butler*, which was not a RICO case but did contain a count naming all 23 defendants and charging conspiracy to convert government property, the Tenth Circuit addressed the improper joinder of multiple distinct conspiracies and the impossibility of a fair trial for some defendants under those conditions. Although the government alleged one general conspiracy, the Tenth Circuit found that the evidence supported the existence of no fewer than three. *Butler*, 494 F.2d at 1255. In its explanation of the resulting prejudice, the Tenth Circuit could just as easily have been detailing the nature of the indictment in this case, where different combinations of the 30 charged defendants are alleged to have been involved in a series of separate acts, some of them separated by decades. The *Butler* court explained:

The conspiracy count, which named all twenty-three defendants, alleged as dual purposes of the conspiracy the violations of both 18 U.S.C. §§ 641 and 1361 . . . . It is always difficult to evaluate evidence in a conspiracy case, and because of the secretive nature of the crime, the evidence is almost invariably circumstantial. As the Supreme Court has warned, however, caution must be taken that the conviction not be obtained by piling inference upon inference. . . . That admonition, we think, has special relevance in cases such as this, where many defendants, some of whom were not even acquainted, are charged on the basis of varying degrees of participation at various times. Guilt must be determined individually and not merely by association. Our review of the evidence must therefore be especially meticulous.

*Butler*, 494 F.2d at 1251-1252 (Internal quotation and citation omitted). The Tenth Circuit went

on to say:

Twenty-three defendants were named in the indictment. Different combinations of these defendants were involved in nearly every transaction which figured in the trial. Many of the defendants did not know one another prior to trial. Some of the members of the 3d Mobile may have assisted Sergeant Greene in obtaining and converting Government property from R & M. It is impossible, however, upon the evidence presented at trial, to link any of them with the destruction of an electronic test unit by members of another organization located elsewhere on the base . . . . because Mr. Reinke may have shared mutual acquaintances with those who collaborated in the destruction of the unit, he was forced to acquit himself of their actions. One can only guess whether he was also forced to share their guilt. We can envision circumstances where what has been alleged as one conspiracy is disclosed at trial to be several repetitive conspiracies in which there is substantial identity of parties and method . . . . In such circumstances a curative instruction may well bridge the gap between pleading and proof. Such is not the case here. Mr. Reinke, whose participation was limited to his association with Sergeant Greene and the other members of the 3d Mobile, should have been tried only on the charges arising from that association. The possibility that the issue of his guilt was confused with the guilt of other defendants involved in unrelated transactions at different times and in different places is too great. His convictions must therefore be reversed, and the case is remanded for a new trial.

*Id.* at 1256-1257.

The *Butler* analysis applies here as well, the only further wrinkle being that the crimes

charged in counts 4 and 5 are alleged to have been committed in aid of racketeering activity.

Here, the fact that the defendants have been charged with VICAR offenses cannot overcome the

Gallegos Defendants' right to a fair trial. As the *Gallo* court determined, the complexity of a

23

large multi co-defendant racketeering case almost demands severance at least "where the severed

trials concern aspects of the enterprise which are clearly separable and independent," as is the

case here. *Gallo*, <u>668 F.Supp. at 758</u>.

The Government opposes this Motion.

**CONCLUSION**

WHEREFORE, for the foregoing reasons trial on Counts 4 and 5 should be severed from

the other Counts to avoid prejudice to the Gallegos Defendants, and to permit a fair trial.

Respectfully submitted,
THE LAW OFFICE OF DONAVON A. ROBERTS

*/s/ Donavon A. Roberts*
Donavon A. Roberts
P.O. Box 36344
Albuquerque, NM 87176
(505) 506-3749
(505) 503-8405 facsimile
ladar170@aim.com

*/s/ Brock Benjamin*
Brock Benjamin
Richard Sindel
Attorneys for Joe Gallegos (2)
brock.benjamin@gmail.com
*Attorneys for Joe Gallegos*

**Joined by:**

*/s/ Russell Dean Clark*
Russell Dean Clark
Donald R. Knight
Attorney for Leonard Lujan (4)

*/s/ Amy E. Jacks*
Amy E. Jacks
Richard Jewkes
Attorneys for Daniel Sanchez (18)

*/s/ Erlinda O. Johnson*
Erlinda O. Johnson

Attorney for Santos Gonzalez (28)

**Unopposed by**:

*/s/ Justine Fox-Young*
Justine Fox-Young, P.C.
Attorney for Rudy Perez

*/s/ Cori Harbour-Valdez*
Cori Harbour-Valdez
Patrick Burke
Attorneys for Edward Troup (3)

*/s/ Robert R. Cooper*
Robert Cooper
James Castle
Attorneys for Billy Garcia (5)

*/s/ Jeffrey Lahann*
Jeffrey Lahann
Phillip Linder
Attorneys for Allen Patterson (7)

*/s/ Orlando Mondragon*
Orlando Mondragon
Attorney for Christopher Chavez (8)

*/s/ Nathan Chambers*
Nathan Chambers
Noel Orquiz
Attorneys for Javier Alonso (9)

*/s/ Billy Blackburn*
Billy Blackburn
Attorney for Arturo Garcia (10)

*/s/ Benjamin Clark*
Jerry Herrera
Stephen Hosford
Attorneys for Arturo Garcia (11)

*/s/ Pedro Pineda*
Pedro Pineda
Attorney for Ruben Hernandez (12)

*/s/ Gary Mitchell*

DNM 733

Gary Mitchell
Attorney for Javier Armenta (13)


*/s/ Larry Hammond*
Larry Hammond
Margaret Strickland
Attorneys for Jerry Montoya (14)


*/s/ Mario Rodriguez*
Santiago Hernandez
Steven M. Plotsky
Attorneys for Mario Rodriguez (15)


*/s/ Steven Almanza*
Steven Almanza
Rey Velarde
Attorneys for Timothy Martinez (16)
*/s/ Mary Stillinger*
Mary Stillinger
Joe Spencer
Attorneys for Mauricio Varela (17)


*/s/ George A. Harrison*
George A. Harrison
Attorney for Gerald Archuleta (19)


*/s/ B.J. Crow*
B.J. Crow
Attorney for Conrad Villegas (20)


*/s/ Theresa Duncan*
Theresa Duncan
Marc M. Lowry
Attorneys for Anthony Ray Baca (21)


*/s/ Charles J. McElhinney*
Charles J. McElhinney
Attorney for Robert Martinez (22)


*/s/ Marcia J. Milner*
Marcia J. Milner
Attorney for Roy Paul Martinez (23)


*/s/ Amy Sirignano*
Amy Sirignano
Christopher W. Adamas

Attorneys for Christopher Garcia (24)

*/s/ Michael V. Davis*
Michael V. Davis
Attorney for Carlos Herrera (25)

*/s/ Ryan J. Villa*
Ryan J. Villa
Attorney for Rudy Perez (26)

*/s/ Keith R. Romero*
Keith R. Romero
Attorney for Paul Rivera (29)

*/s/ Angela Arellanes*
Angela Arellanes
Attorney for Shauna Gutirrez (30)

**Takes No Position:**

*/s/ Douglas Couleur*
Douglas Couleur
Carlos Ibarra
Attorneys for Eugene Martinez (6)


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system on, this 31st day of January, 2017, which caused counsel of record for all parties to receive a copy of this Motion electronically.

*/s/ Donavon A. Roberts*
Donavon A. Roberts

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                                         **No. 2:15-cr-04268-JB**

**ANGEL DELEON, et al.,**

        **Defendants.**

### DEFENDANT PEREZ'S REPLY TO THE GOVERNMENT'S RESPONSE TO MOTION TO SEVER DEFENDANTS CHARGED WITH OFFENSES IN COUNTS 6 AND 7

        Defendant Rudy Perez, by counsel, Ryan J. Villa and Justine Fox-Young, submits this Reply in support of his Motion to Sever [Doc. 807]. Defendant Perez is joined by Defendants Mario Rodriguez,[1] Mauricio Varela, Daniel Sanchez, Anthony Baca and Carlos Herrera (2014 Defendants),[2] in his request to sever the trial of Counts 6 and 7 from the trial or trials of the remaining counts in the Superseding Indictment. The United States filed its Response [Doc. 836] opposing the Motion, arguing all counts and all Defendants should be tried jointly. Defendants Joe Gallegos, Christopher Chavez, Santos Gonzales, Conrad Villegas, and Paul Rivera did not oppose the Motion. No other defendant, in response to counsel's inquiry, indicated opposition to the Motion. Since the filing of the Motion, no defendant has filed any response or other pleading indicating opposition to this Motion. To the contrary, Defendants Edward Troup, Javier Alonso and Arturo Garcia (the Count 3 Defendants) filed a Response in Support of the Motion [Doc. 812];

---

[1] Defendant Rodriguez, who did not originally join the Motion to Sever, subsequently filed a brief indicating his joinder in the Motion. *See* Doc. 845. This brief also replied to the government's Response to the Motion. Mr. Perez incorporates the arguments set forth by Mr. Rodriguez as though stated fully herein.

[2] Defendants Timothy Martinez and Jerry Montoya joined in the original Motion. However, they subsequently entered plea agreements. *See* docs. 852 and 855.

1

Defendants Joe Gallegos, Edward Troup, Leonard Lujan, Billy Garcia, Allen Patterson and Christopher Chavez (the Count 1 and 2 Defendants) filed a Response in Support of the Motion [Doc. 807]; Defendant Gonzales filed his Motion to Sever Defendant [Doc. 858]; Defendants Andrew and Joe Gallegos filed their Motion to Sever Counts 4 and 5 [Doc. 868]; and Defendants Troup and Billy Garcia's Motion to Sever Counts 1 and 2 (hereinafter "Garcia Motion to Sever") [Doc. 882].

Mr. Perez will not restate the sound arguments made by his co-defendants in those motions, but incorporates each as though stated fully herein. Based on all of these pleadings before the Court, there is little doubt that severance is required under Rule 8 and Rule 14. The only question is how the Court should sever the entirety of the Superseding Indictment. When examining the facts of each count, the grouping of counts as set forth in Exhibit 2 [Doc. 807-2] to Defendant Perez's Motion appears to be the most logical. *But see* Garcia's Motion to Sever [Doc. 882], at 15 (discussing severance of counts into four trials), *id.* at 18 (discussing severance of counts into five trials). Regardless of how the other counts and defendants should ultimately be tried, what remains clear is that the six remaining Defendants charged in Counts 6 and 7 should be tried separately from the remaining defendants and the remaining counts. This outcome is dictated both by Rule 8 and Rule 14.

It is also dictated by judicial economy, both now and during trial. *See* Garcia's Motion [Doc. 882] at 15-20 (comparing the cost of a joint trial with the cost of severed trials). Importantly, not only would severed trials save millions of dollars in defense costs as demonstrated by Defendant Garcia, but would also save costs and time during pretrial litigation, as many of the motions and pretrial hearings would be count or defendant specific, allowing for hearings that do not require all Defendants to be present. Severing Counts 6 and 7 at this juncture, will streamline

2

the pretrial litigation that will be required and minimize expense and court time.  Undoubtedly, if the Court severs the other counts in the indictment in a similar fashion, the same judicial economy will be obtained for the Court and the parties in those counts.  The government's suggestion this Court should not sever because only a few defendants are likely to proceed to trial is misguided. This approach runs contrary to the interests of judicial economy and is also entirely contrary to the positions of the remaining Defendants.  All six of the 2014 Defendants submit they will proceed to trial.  The remaining Defendants in the remaining counts have indicated the same.  While it is certainly possible some may plea, Defendants do not wish to rely on the government's clairvoyance.

I.   **The 2014 Defendants charged in Counts 6 and 7 were improperly joined with the remaining Defendants charged in the remaining counts.**

Whether analyzed under Rule 8(a) or 8(b), the Court should reach the same conclusion that the 2014 Defendants should not have been joined in the same indictment with the remaining defendants on the remaining counts.  The United States is correct that in multi-defendant cases, the Tenth Circuit has held, albeit without much analysis, that Rule 8(b) is the proper vehicle to analyze a claim of misjoinder.  *See United States v. Eagleston*, 417 F.2d 11, 14 (10th Cir. 1969). In *Eagleston*, the Court held "[u]nder Fed.R.Crim.P. 8(b) when there is a joinder of defendants and offenses totally unconnected, there is no room for judicial discretion and the court must grant severance." *Id.* (citing *Ingram v. United States*, 272 F.2d 567 (4th Cir. 1959)).  In *Eagleston*, the court reversed the conviction of a co-defendant, Faubian, based on improper joinder of defendants, because while Eagleston participated in the offenses charged in all three counts of the indictment alleging interstate transportation of stolen vehicles, Faubian participated only in counts two and three.  *Id.*  While lacking in-depth Rule 8 analysis, *Eagleston* supports the 2014 Defendants claims that they have been improperly joined not in just one count, like Faubian, but in 13 other counts

3

for which none of them, save Defendant Baca, allegedly participated.   Even Mr. Baca only allegedly participated in three other counts, Counts 8, 9, and 10, in which none of the other 2014 Defendants are alleged to have participated.   Faithful application of *Eagleston* dictates that these other 2014 Defendants could not be tried alongside Defendant Baca in Counts 8, 9 and 10.   Thus, severance is required to remedy misjoinder.

To be properly joined under Rule 8(b), defendants must have been alleged to have "participated in the same act of transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).   The test for joinder is a "commonsense" one. *United States v. Shellef*, 507 F.3d 82, 98 (2d. Cir. 2007). The test asks "whether, in the light of the factual overlap among charges, joint proceedings" create "sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to" the defendants. *Id*.   To justify joinder, the government claims the SNM enterprise ties the Defendants together because all the 2014 Defendants participated in the same predicate acts of the other Defendants.   *See* Response at 7. This claim is laughable.

First, and most notably, many of the 2014 Defendants, including Mr. Perez, had not even been incarcerated or allegedly become members or affiliates of SNM at the time the other Defendants were allegedly committing many of the predicate acts.   For Mr. Perez, discovery reveals that the government claims he became a member of SNM in 2009.   This is over two decades after the SNM's formation and a full 8 years after the murders alleged in Counts 1 and 2.   The converse is also true.   For instance, Defendant Billy Garcia, charged in Counts 1 and 2, was apparently no longer participating in SNM activity after 2008 and was released from prison in 2013, a year before the Molina murder.   *See* Garcia Motion to Sever [Doc. 882] at 12.   How could Mr. Perez and Mr. Garcia participate in the same predicate acts as each other when Mr. Garcia was

4

no longer involved in the SNM as of 2008 and Mr. Perez did not allegedly become a member in 2009?  Indeed, most of the Counts 1 and 2 Defendants, including Garcia, J. Gallegos, E. Martinez, Patterson and Deleon were not even in the Department of Corrections when the alleged acts underlying Counts 6 and 7 occurred.  *Id.* at 4-5; *see also id.*at 5-7 (explaining that the Counts 1 and 2 Defendants were not in prison during the time of the alleged acts charged in Counts 8 through 15).

Courts have found that even when racketeering or multiple conspiracies are alleged in one indictment, there must be some relationship between the facts underlying each offense such that proof of those facts is necessary to establish each offense.  *United States v. Flowers*, 304 F.R.D. 501, 504 (E.D. La. 2015) (citing *United States v. Harrelson*, 754 F.2d 1153, 1176 (5th Cir.1985)); *United States v. Hill*, 786 F.3d. 1254, 1272 (10th Cir.2015) (holding joinder of defendants was proper where defendants shared in an agreement to commit six different robberies and therefore participated in a common plan or scheme). "On the other hand, '[w]hen there is no 'substantial identity of facts or participants between the two offenses, there is no 'series' of facts under Rule 8(b).'" *Id.* (quoting *Harrelson*, 754 F.2d at 1176).  That is the case here.  As explained above, in the other briefing done by co-Defendants, and *infra* pp. 10-14, as well as can be demonstrated at the upcoming hearing on this matter,[3] there is not a substantial identity of participants or facts in Count 6 and 7, and the remaining counts.  Other than the allegation that SNM is an enterprise engaged in racketeering activity, there is no substantial identity of facts between Counts 6 and 7, and the remaining counts.  *Compare United States v. Hill*, 643 F.3d 807, 829 (11th Cir. 2011) (holding three distinct conspiracies were properly joined because each of the charges arose out of Hill's master scheme to defraud lenders through a common plan and design).

---

[3] *See* Minute Order [Doc. 874] (setting hearing on motion to sever Count 6 and 7 for February 7, 2017).

In fact, the allegation that SNM is a single, criminal enterprise, and this same enterprise is responsible for all 15 counts, is suspect. *See* Garcia's Motion to Sever [Doc. 882], at 9-15 (arguing the allegations in the indictment are not related to a single enterprise, but rather several distinct and different enterprises); *See also* Ninth Circuit Pattern Jury Instruction, VICAR, § 8.151 (requiring government prove enterprise was in existence at relevant time period of violent crime).[4] In such instances, there is no litmus test and courts have looked to a number of factors to determine whether one conspiracy is part of a larger conspiracy for Rule 8 purposes. *See id.* at 10 (citing *United States v. Abbamonte*, 759 F.2d 1065, 1069; *United States v. Woods*, 1985 U.S. Dist Lexis 16113, at 22-23 (D. Conn. 1985)); Deft. Santos Gonzales's Motion to Sever [Doc. 858] at 5 (citing *United States v. Dowtin*, 2012 WL 7679552, at 2 (E.D.N.Y. 2012); *United States v. Upton*, 856 F.Supp. 727, 736 (E.D.N.Y. 1994). In sum, these factors include 1.) the number and type of offenses and number of defendants, 2.) the complexity of the indictment, 3.) the time between the occurrences of each conspiracy, 4.) the methods in which the conspiracies took place and other overt acts, 5.) the geographic scope and locations of the conspiracies, 6.) the extent to which the conspiracies share a common objective and interdependence upon one another. *Id.* Whether these factors are applied to Counts 6 and 7, or the other Counts, the outcome is the same. *See* Garcia Motion to Sever [Doc. 882] at 13 (applying *Woods* factors).

Importantly, the government did not allege a single, overarching racketeering conspiracy count against all Defendants. *See* Superseding Indictment [Doc. 368]. This is likely because as explained, many of the defendants were no longer in prison or involved with the SNM, there was fracturing within the SNM, and the conspiracies alleged did not have joint participants, overlapping facts and were not interdependent. Generally, such an overarching racketeering

---

[4] The Tenth Circuit does not have a pattern jury instruction for VICAR.

conspiracy count would suffice to overcome Rule 8 misjoinder. *See United States v. Welch*, 656 F.2d 1039, 1049–50 (5th Cir.1981). The court in Welch held that "the joinder of otherwise separate acts may be allowed when the acts are properly linked by means of a conspiracy charge." *Id.   See U.S. v. Jones*, 303 F.R.D. 279, 283-85 (E.D. La. 2014) (finding no misjoinder in 12-defendant indictment charging drug and firearm conspiracies along with RICO conspiracy, where non-RICO defendants were each referenced by name in overt acts section of RICO count and RICO defendants were charged in drug and firearm conspiracy counts and all counts involved same scheme to distribute drugs). The government certainly knows how to plead an overarching RICO conspiracy.   *See United States v. Baca*, No. 2:16-cr-1613-JB, Indictment [Doc. 2], Count 1 (alleging conspiracy to violate 18 U.S.C. § 1962 (RICO)).  Instead, the government alleged discrete acts of violent crimes in aid of racketeering (VICAR) contrary to 18 U.S.C. § 1959.  The elements of a VICAR offense are: 1.) during a specified time period, an enterprise within the meaning of RICO existed; 2.) the enterprise engaged in racketeering activity; 3.) the defendants were members/affiliates of the enterprise; 4.) the defendants committed or conspired to commit a predicate crime of violence; and 5.) the purpose of doing so was for receipt of or consideration for anything of pecuniary value, or to gain entrance to, or to maintain, or to increase the defendants' position in the enterprise. *See* 18 U.S.C. § 1959; *United States v. Kamahele*, 748 F.3d 984, 1007 (10th Cir. 2014); Ninth Circuit Pattern Jury Instruction, § 8.151.  VICAR counts are decidedly different than a RICO conspiracy, and the mere claim that the government must present evidence that a racketeering enterprise existed for each count, is not sufficient to tie all the counts together under Rule 8.  This is especially true given the extreme differences in time frames for each conspiracy.  The government must prove the enterprise existed and engaged in racketeering for each relevant time period.  The remaining elements for each conspiracy and violent crime are

completely different among the different groups of counts.  Accordingly, the government's reliance on cases in which a RICO conspiracy is alleged, which ties all of the participants together, is erroneous.

Simply alleging that the Defendants are members of the SNM does not demonstrate that the Defendants are connected and is insufficient to permit joinder. Absent a showing of interrelated facts or a logical relationship between the other crimes, Counts 6 and 7 must be severed. To be sure, an "indictment need not charge a single overarching conspiracy, provided the separate conspiracies it charges arise from a common plan or scheme and so could alternatively have been charged as a single conspiracy." *United States v. Velasquez*, 772 F. 2d 1348, 1353 (7th Cir. 1985). However, "the mere fact that two conspiracies have overlapping memberships will not authorize a single indictment if the conspiracies cannot be tied together into one conspiracy, one common plan or scheme." *Id*.  Here, the United States did not charge a single overarching conspiracy because they could not.  The facts simply do not provide sufficient overlapping to warrant it.

In *United States v. Darden*, relied on by the government, the Eighth Circuit affirmed the district court's denial of defendants' motion to sever. 70 F.3d 1507, 1526-27 (8th Cir. 1995). After a nine-month jury trial, the defendants in *Darden* were convicted of various RICO *and* VICAR violations in connection with a cocaine and heroin trafficking enterprise. *Id*. at 1517-18.  There, the indictment alleged that twenty-four defendants associated for the purpose of "(1) obtaining an income from the distribution of cocaine, heroin, and marijuana; (2) protecting and preserving the distribution enterprise from competition and interference from law enforcement; and (3) promoting the enterprise and its activities." *Id*. at 1518. The alleged RICO acts included "(i) murder and acts and threats involving murder; (ii) [felony] act(s) involving dealing in narcotic and other dangerous

8

drugs chargeable under state law ... and (iii) felonious ... dealing in narcotic and other dangerous drugs, punishable under any law of the United States." *Id*. at 1518-19.

Unlike the indictment in *Darden*, the United States' Superseding Indictment against the SNM Defendants does not factually deliver. For example, although the Superseding Indictment describes the SNM as a "powerful and violent prison gang, which controlled drug distribution and other illegal actives in the New Mexico penal system" the indictment does not contain a single drug charge. Instead, the Superseding Indictment strings together various murders, assaults, and alleged conspiracies dating back to 2001. Even the United States admits that the SNM is not like an ***organized*** crime family, *see* Response in Opposition at 14-15. Unlike the traditional organized crime model, SNM's activities are largely unregulated. Instead of operating on a traditional organized crime model, the SNM has worked more like an independent franchise. Therefore, at any time, various members and associates may be active or inactive within the SNM. They may be scattered throughout different cliques in either a local jail, or the state or the federal prison systems, or on the streets where their allegiance may be first to a street gang and not the SNM. Within the SNM, status is rivalrous and chaotic, making the loose grouping of individuals prone to intra-group conflict. Additionally, given the SNM's extended confinement in segregation, members and associates have been known to opt out of the SNM and complete gang rehabilitation programs to get less restrictive housing assignments. Under these circumstances, the Count 6 and 7 Defendants cannot be connected to the other defendants merely through their membership or association with the SNM.

This case is unique for many reasons, at least two of which are highly relevant here. First, the government's over-reliance on confidential informants ("CI") in the investigation of the SNM has not resulted in showing that Counts 6 and 7 are factually interrelated to the other courts. To

9

the contrary, the use of CI's has shown only to produce individually self-serving and contradictory information regarding the killing of Molina and the roles of the Count 6 and 7 Defendants.

Second, only three of the Count 6 and 7 Defendants, Jerry Montoya, Jerry Armenta, and Mario Rodriguez, were charged by the State of New Mexico in the months following the killing. Before the United States became involved, the state's investigation had concluded, and the parties in that case were only weeks away from trial.  Although Jerry Montoya and Jerry Armenta provided statements to the New Mexico State Police, they did not implicate the majority of the other Count 6 and 7 Defendants. Jerry Armenta and Timothy Martinez also provided handwritten statements indicating that the killing of Molina was the result of a personal dispute over drugs and not an SNM sanctioned hit. Therefore, aside from the stories provided by CIs after the United States became involved, there are no factual links between the Count 6 and 7 Defendants to a larger SNM conspiracy.  Further, there is no logical relationship between the murder alleged in Counts 6 and 7 and the other crimes included in the United States' indictment. *See Vasquez-Velaso*, 15 F. 3d 833, 843 (9th Cir. 1994) ("a mere factual similarity between the events is not a sufficient basis for joinder."). Accordingly, joinder under Rule 8(b) is improper, and the Defendants' Motion to Sever should be granted.

**II. Severance under Rule 14 is proper to avoid prejudice and promote judicial economy.**

"Even when cautioned, juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one." *United States v. Smith*, 12 F.2d 83, 85(2d Cir. 1940).  This rational observation of human behavior is even more true with regard to this case where multiple defendants have been charged with multiple crimes and implicated in a large-scale prison gang conspiracy.  In fact, the whiff of prejudice is already in the air because Defendants have been named as members of a prison gang. If counts 6 and 7 are not severed, at trial, this

10

evidence will be on display and evidence of the gang's alleged character for criminality and propensity for violence will be underscored in such a way that the Rules of Evidence generally prevent. It is highly unlikely that any jury instruction will provide an adequate remedy.

Further, the SNM is not just any gang or even prison gang. The SNM is a prison gang that has been continually associated with the 1980 Santa Fe Prison Right, the most violent and notorious prison riot in American history. As demonstrated by the less than subtle presence of multiple law enforcement agencies and their treatment of the Defendants at hearings in this Court, the Defendants have already been pre-judged as violent and dangerous individuals, not as people entitled to the presumption of innocence.  At trial, the jury is likely to sense this as well, and the effect of having a multi-count and multi-defendant trial will only emphasize it.  The trials of the other counts involving violent crimes outside of prison and plots to kill cabinet members and high-ranking corrections officials will only amplify the prejudice the 2014 Defendants will experience.

While the government's burden of having to prove SNM is a racketeering enterprise only once weighs in favor of a joint trial, severance is warranted given the relative ease of carrying this burden as compared with the substantial and certain prejudice of a joint trial to Defendants. The prejudice stemming from having to try Counts 6 and 7 alongside three other violent murders of allegedly similar character cannot be overlooked.  Counts 1 through 3 involve the murders in prison of three other individuals alleged to be SNM members who cooperated with authorities.  These three murders occurred many years before the Molina murder and also before Mr. Perez allegedly became a member of SNM. Given the extreme temporal differences in these murders—Counts 1 and 2 in 2001, Count 3 in 2007, and Counts 6 and 7 in 2014—the only true connection is the membership in SNM, and the alleged motives for the murders.

If the evidence is strong in a couple of the counts that the murder was in fact an SNM ordered hit on a former SNM member turned cooperator, the risk is extremely high that the jury may convict a defendant in the counts with weaker evidence merely based upon his association with the SNM.  Further, the defenses will be antagonistic.  There is evidence in Counts 6 and 7 that the murder of Molina was the result of a personal dispute between Javier Armenta, one of the hands-on killers now turned cooperators, and was not an SNM ordered hit.  The same cannot necessarily be said for Counts 1 through 3.  A trial on Counts 6 and 7, separate from Counts 1 through 3, prevents the jury from convicting the 2014 Molina Defendants merely on propensity grounds.  To be sure, if the same Defendants conspired to and murdered the victims in all 5 of these counts, they could not be heard to complain about the risk of prejudice that arises from what amounts to propensity evidence, but all of the Count 6 and 7 Defendants, including Defendant Baca, played no role in Counts 1 through 3.

A joint trial with the remaining counts in the indictment presents an entirely different, and perhaps more serious risk of prejudice.  Counts 4 and 5 involve an even more brutal murder than Counts 1-3, and involve motives much different than Counts 1-3, and 6 and 7.  According to Defendant Gallegos's Motion to Sever, the victim in Counts 4 and 5 was murdered not because he was an SNM member who violated the code of cooperating with authorities, but for retaliation and profit.  *See* Doc. 868, at 5.  Moreover, this murder occurred outside of prison and may have been aimed at taking out an SNM rival.  *Id.* at 4. It is also alleged the victim was tortured, shot, doused with gasoline and burned.  *Id.*  This extremely brutal conduct, if presented in a joint trial, would work a whole separate layer of prejudice on the 2014 Defendants.  Aside from the brutality of the murder, the fact that the murder allegedly occurred on the streets brings a whole new aspect to the case.  Jurors hearing of murder inside prison walls may not be fearful as they perhaps expect such

12

things to happen in prison and do not see themselves or their loved ones ever being in prison. However, outside of prison, everyone is potentially exposed.  It is simply unreasonable to expect jurors to put the facts of Counts 4 and 5 aside when deliberating on the guilt of the 2014 Molina Defendants.

Similarly, counts 13 through 15 are different in that the allegation is that some SNM members believed the alleged victim, who was not in prison, was going to testify, so they ordered him killed.  *See* Gonzales Motion for Severance [Doc. 858] at 1-2, ¶ 3.  The motive to kill the victim in these counts may also have been the victim's failure to supply Defendant Joe Gallegos's girlfriend with heroin while Defendant Gallegos was in prison.  *Id.* at 2, ¶ 5.  This type of (attempted) murder has a decidedly different flavor than those in Counts 1-3, and 6 and 7.  In the latter, the SNM is allegedly killing one of its own members for past cooperation, which is a violation of SNM's code.  The former, involves the more classic (attempted) killing of a witness who is going to testify, or killing for failure to supply drugs as agreed.  It also occurred outside of prison.  The jury hearing this evidence in a joint trial with the 2014 Molina Defendants could easily be prejudiced against them and find guilt for all the wrong reasons, overlooking reasonable doubt as to whether they actually conspired to murder Mr. Molina.

If this were not enough, yet another, different type of prejudice will occur if Counts 6 and 7 are tried alongside Counts 9 through 12.  Counts 9 and 10 involve the alleged conspiracy to murder Greg Marcantel and Dwayne Santistevan, the Secretary of Corrections and the head of STIU.  Counts 11 and 12 relate to Defendant Garcia's possession of a firearm, purportedly to be supplied to the individual who would carry out the murders of Marcantel and Santistevan   With the exception of Defendant Baca, none of the remaining 2014 Defendants had any alleged involvement in this plot.  It is one thing for the jury to hear about prison gang members killing

13

their own, in prison, for violating gang code.  It is another to hear about prison gang members

killing rival gang members on the street.  However, none of this compares to jurors hearing of a

plot to kill a state cabinet member and one of his chief deputies.  The government alleges that

Defendant Baca conspired to and ordered these two individuals killed.  It also alleges Defendant

Baca ordered the murder of Mr. Molina.  While the evidence of this order in Counts 9 and 10 is

strong, in the form of recorded phone calls, the evidence in Count 6 and 7 is all but non-existent,

coming only from those with the least credibility—the individuals who actually killed Mr. Molina

on video and who are looking for a way out.  However, the jury hearing the evidence in Counts 9

and 10, may just assume the same is true in Counts 6 and 7. *See United States v. Villanueva Madrid*,

302 F. Supp. 2d 187, 191 (S.D.N.Y. 2003) (severing trial on laundering counts because it will

involve evidence connecting defendant to a corrupt politician and a powerful, violent narcotics

cartel, which "may well arouse jury animus that could, in a joint trial, spill over into the jury's

consideration of the fraud charges, which involve an alleged scheme which, fortunately, turned

out not to have injured anyone.").

    As Defendant Garcia aptly argues in his Motion to Sever, a joint trial will involve the

introduction of dozens if not hundreds of statements and other items of evidence that are not

admissible as to most of the other Defendants.  *See* Garcia Motion at 20.  The Government would

have the Court believe that all of this evidence is *res gestae* of the criminal enterprise. *Id.*  Even

assuming this were true, there will still be confrontation clause and hearsay problems that will lead

to dozens, if not hundreds of limiting instructions.  *Id.* at 21-23 (discussing the problems with

limiting instructions in a joint trial of this case).  Defendant Garcia also aptly demonstrates why

the cases relied upon by the government do not support severance here. *Id.* at 23-25.

Finally, analyzing the cost-benefit of having separate trials in favor of one joint trial weighs heavily in favor of severance.  In his motion, Defendant Garcia compares the cost of the defense of a joint trial with that of five severed trials.  *See* Garcia Motion to Sever at 16-20.  The savings is over two million dollars.  *See* Garcia Motion to Sever, Chart, at 19-20.  Counsel for the 2014 Molina Defendants concur with the calculations made in Garcia's Motion.  The defense costs of a trial on Counts 6 and 7 is estimated to be $252,040.96 based on the estimated trial length of two weeks.  These costs would sky rocket if the 12 attorneys for the six 2014 Defendants had to sit through weeks of trial on the facts of the other 13 counts with little to do except ask the Court to read limiting instructions at each and every turn.  As noted by Garcia, this does not include costs for investigators, experts and paralegals, which should not be overlooked.  It would be much easier to estimate when an expert needs to be available either to observe certain portions of the trial or testify if the trial were just on Counts 6 and 7.  If all of the Counts were joined, experts, investigators and support staff would likely have to stay in Las Cruces longer, given the difficulty that comes with predicting when they will be needed, thereby exponentially increasing their costs.

Respectfully submitted,
THE LAW OFFICE OF RYAN J. VILLA

*/s/ Ryan J. Villa*
Ryan J. Villa
2501 Rio Grande Blvd. NW Ste. A
Albuquerque, NM 87104
(505) 639-5709
(505) 433-5812 facsimile
ryan@rjvlawfirm.com

AND

*/s/ Justine Fox-Young*
Justine Fox-Young, P.C.
1903 Wyoming Blvd. NE, Suite B

Albuquerque, NM 87112
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Rudy Perez*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system on, this 3rd day of February, 2017, which caused counsel of record for all parties to receive a copy of this Motion electronically.

*/s/ Ryan J. Villa*
Ryan J. Villa

16

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **JOE LAWARENCE GALLEGOS,** | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT JOE LAWRENCE GALLEGOS' MOTION TO SHOW CAUSE FOR VIOLATION OF ORDER, DOCUMENT 299 AND REQUEST FOR EVIDENTIARY HEARING ON VIOLATIONS OF 4TH AMENDMENT AND 6TH AMENDMENTS TO THE UNITED STATES CONSTITUTION (DOC. 700)**

The United States of America opposes Defendant Joe Lawrence Gallegos' Motion to Show Cause for Violation of Order, Document 299 and Request for Evidentiary Hearing on Violations of 4th Amendment and 6th Amendments to the United States Constitution (Doc. 700).

**I.      PROCEDURAL HISTORY AND BACKGROUND**

On December 1, 2015, the United States filed the Redacted Indictment [Doc. 2] in this matter, charging Defendant with two counts of Violent Crimes in Aid of Racketeering in violation of 18 U.S.C. § 1959(a)(1) ("VICAR" offenses). Doc. 2.

The Indictment charges that the Defendant was a member/prospect/associate of the Syndicato de Nuevo Mexico Gang (SNM), a criminal organization whose members/prospects/associates engaged in acts of violence and other criminal activities, including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." *Id*. The Indictment additionally charges that SNM, a prison gang consisting of over 250 members who reside both inside and outside of prisons across New

Mexico and elsewhere, is led by a table of leaders who orchestrate murders and assaults of members who fail to follow SNM orders and their families. *See* Id. ¶¶ 3-5, 8, 13(c).

On February 8, 2016, Defendant was part of a filing for a Joint Motion for Protective Order Concerning All Defendants' Professional Visits and Correspondence.   Doc. 277.   On February 22, 2016, the United States responded to that motion, and argument on the motion was hearing on March 3, 2016.   Doc. 284.

On March 7, 2016, the Honorable Kenneth Gonzales denied Defendant's Joint Motion for Protective Order, and signed a Protective Order.   Doc. 299.   Specifically, the Order stated that "before the Government inspects any privileged attorney-client communications between Defendants and defense counsel, the Government must first inform the Court of its need to inspect those communications and obtain the Court's permission to conduct the inspection."   *Id.* at 1.

On March 30, 2016, this case was reassigned to the Honorable James Browning.

On April 21, 2016, the United States filed the Redacted Superseding Indictment [Doc. 368] ("Indictment"), which alleged the same charges against the Defendant, but added additional VICAR charges against Defendant.   Doc. 368.

On June 2, 2016, this Court indicated that it wanted to keep *ex parte* submissions to a minimum.   *See* Exhibit 1.

On June 16, 2016, this Court entered a Protective Order.   Doc. 589.   Specifically, the order indicated that "any other protective order presently in place in any of the above referenced cases is vacated and superseded by this Order." *Id*. at 1.

On September 2, 2016, the Honorable Karen B. Molzen signed a search warrant in this investigation.  *See* Exhibit 2.   The search warrant allowed for the search of various locations for evidence related to the following crimes:   Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy pursuant to 18 U.S.C. § 1962(d), Intimidating and Retaliating Against a Victim, Witness or Informant pursuant to 18 U.S.C. § 1512 and 1513, and Conspiracy to Distribute a Controlled Substance pursuant to 21 U.S.C. § 846.  *Id*. at 1.   Information specific to Defendant in the affidavit included threats to a victim and a witness in furtherance of the gang's objectives.   Additionally, the information in the Affidavit clearly post-dates the superseding indictment in this case, given that the reference to their actions refers to the "multiple VICAR offenses that the Gallegos brothers have been charged with."   (Affidavit ¶ 117).

The search warrant affidavit details how law enforcement officers learned that Joe Gallegos and his brother, Andrew Gallegos, wanted to find and kill Victim 1 and Witness 1. Both of Gallegos' targets had information that the Gallegos brothers knew to be critical to their cases. (Affidavit ¶ 117). Through monitored phone conversations and coded letters, along with information received from confidential sources, agents learned that Joe and Andrew Gallegos solicited other gang members, friends, and family members to help them locate and "hit" Victim 1 and Witness 1. (Affidavit ¶ 119).

According to a confidential source (CHS-6), Joe Gallegos, with the help of his relatives in the Belen area, had been trying to find Witness 1 and Victim 1. CHS-6 informed law enforcement officers that Joe Gallegos was counting on the SNM to hit Witness 1 and wanted

3

Victim 1 found "so that SNM/ESL could finish (him) [sic]" since Joe Gallegos had previously stabbed Victim 1.   (Affidavit ¶ 121).

During their pursuit to find Victim 1 and Witness 1, Joe and Andrew Gallegos asked two confidential sources (CHS-2 and CHS-6), at separate times, to provide assistance to them. Both of the confidential sources described the request as "locating witnesses or informants, convincing them not to testify, and 'taking them out if necessary.'"   (Affidavit ¶ 119).

A third confidential source, CHS-8, independently corroborated Gallegos' plan to find Victim 1 and Witness 1. CHS-8, a close associate of Joe Gallegos who was housed near Gallegos in jail, informed law enforcement officers that Joe Gallegos was in contact with a woman who was pulling police reports and trying to locate Victim 1 and Witness 1 for the defendant. (Affidavit ¶ 125).

Joe Gallegos even instructed CHS-6 to have Willie Romero (a fellow ESL member) help find Victim 1 and Witness 1. When CHS-6 contacted Willie Romero, Romero informed him that he had already received word from Frankie Gallegos (the defendant's brother) to "smash" Victim 1, and that his "boys" had already "beat down" Witness 1. (Affidavit ¶ 122).   In fact, law enforcement officers learned that Witness 1 had recently been "jumped" at a social gathering. Witness 1 was punched in the back and called "snitch" during the altercation.   (Affidavit ¶ 123).

Related to the execution of the search warrant, a "taint team" was established to make certain any privileged documents would not be seen by the prosecution team.   Specifically, a taint agent was assigned to search Defendant's cell, and a taint AUSA was assigned to review the materials that were seized.   Although Special Agent Bryan Acee's signature is on the search warrant return, he did not review any of the seized items from Defendant's cell until it was

4

provided to him by members of the taint team. Special Agent Acee was provided only those materials that were deemed to be non-privileged.

Items that were deemed confidential or privileged are being returned to defense counsel without the prosecution team or prosecution agents ever seeing these documents.   Items that are in dispute as to their classification are currently being litigated by the taint attorney and defense counsel.

## II.   ARGUMENT

Defendant argues that the United States violated Defendant's rights by violating the Protective Order (Doc. 299) that Judge Gonzales signed on March 7, 2016.   Defendant is mistaken.

To begin with, that Protective Order was modified by this Court and vacated and superseded by the Protective Order entered into on June 16, 2016.   Doc. 589.   That Order does not address the issue of any privileged attorney-client communications.   Additionally, the United States did in fact have Court permission to view any type of documents, given the fact that the Honorable Karen B. Molzen reviewed the search warrant and affidavit, and found there was probable cause to search the Defendant's cell.

Furthermore, the attorney-client relationship excludes representation on crimes committed during the representation.   *See* NM Rules of Professional Conduct, NMRA 16-100 et seq.   *See also Noland v. United States*, 380 F.2d 1016 (10th Cir. 1967) [there is no right to have an attorney during the commission of a crime.]   Thus, given that Defendant was committing additional crimes from the crimes in which he was represented, the United States did not violate his rights in any manner.

5

III.    **CONCLUSION**

For the reasons above, the United States of America asks that the Court deny Defendant's

motion in its entirety.

Respectfully Submitted,

DAMON P. MARTINEZ
United States Attorney

*__Electronically filed on 2/3/2017__*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM   88011
(575) 522-2304 – Tel.
(575) 522-2391 – Fax

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        Plaintiff,

**vs.**                                      No. 2:15-cr-04268-JB

**ANGEL DELEON, et al.,**

        Defendants.

## SUPPLEMENT TO DEFENDANT PEREZ'S MOTION TO SEVER COUNTS 6 AND 7 [DOC. 807]

Defendant, Rudy Perez, by counsel, Ryan J. Villa and Justine Fox-Young, hereby submits this Supplement to provide the Court and counsel for all parties a copy of the PowerPoint presentation counsel utilized during the February 7, 2017, hearing on the Motion.  The presentation is attached hereto as **Exhibit 1**.

        Respectfully submitted,
        THE LAW OFFICE OF RYAN J. VILLA

        */s/ Ryan J. Villa*
        Ryan J. Villa
        2501 Rio Grande Blvd. NW Ste. A
        Albuquerque, NM 87104
        (505) 639-5709
        (505) 433-5812 facsimile
        ryan@rjvlawfirm.com

        AND

        */s/ Justine Fox-Young*
        Justine Fox-Young, P.C.
        1903 Wyoming Blvd. NE, Suite B
        Albuquerque, NM 87112
        (505) 796-8268
        justine@foxyounglaw.com

        *Attorneys for Rudy Perez*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 7, 2017, a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

<u>/s/*Ryan J. Villa*</u>
RYAN J. VILLA

# USA V. DELEON– 2:16–CR–4268

DEFENDANT PEREZ'S MOTION TO SEVER DEFENDANTS ON COUNTS 6 AND 7 [DOC. 807]– DEFT'S BACA, VARELA, SANCHEZ, HERRERA, RODRIGUEZ AND PEREZ

Appellate Case: 20-2058   Document: 010110416863   Date Filed: 08/24/2020   Page: 337

# PLEADINGS DIRECTLY PERTAINING TO MOTION TO SEVER

- JOINT MOTION TO SEVER COUNTS 6 AND 7 [Doc. 807]– JOINED BY ALL REMAINING COUNT 6 AND 7 DEFENDANTS

- RESP. IN SUPP. BY CT 3 DEFTS TROUP, ALONSO AND GARCIA [DOC. 812]

- RESP. IN SUPP. BY CT 1&2 DEFTS GALLEGOS, TROUP, GARCIA, PATTERSON AND CHAVEZ [DOC. 813]

- U.S. RESPONSE [DOC. 836]

- DEFT RODRIGUEZ SUPP. BRIEF IN SUPPORT OF MOTION [DOC. 845]

- DEFT PEREZ REPLY TO U.S. RESPONSE [DOC. 887]

DNM 761

# OTHER MOTIONS TO SEVER

- SANTOS GONZALES MOTION TO SEVER DEFENDANT– DOC. 858
- DEFTS TROUP AND GARCIA'S MOTION TO SEVER COUNTS 1 AND 2
- DEFTS ANDREW AND JOE GALLEGOS'S MOTION TO SEVER COUNTS 4 AND 5 [DOC. 868]
- DEFT ALONSO'S MOTION TO SEVER DEFENDANT (COUNT 3) [DOC. 893]

DMV 762

Appellate Case: 20-2058     Document: 010110416861     Date Filed: 08/24/2020     Page: 339

# RULE 8– JOINDER

- TO JOIN DEFENDANTS– MUST ALLEGE THEY PARTICIPATED IN SAME ACT/TRANSACTION; SERIES OF ACTS OR TRANSACTIONS, CONSITUTING AN OFFENSE OR OFFENSES

- ASK "WHETHER, IN LIGHT OF THE FACTUAL OVERLAP AMONG CHARGES, JOINT PROCEEDINGS CREATE SUFFICIENT EFFICIENCIES SUCH THAT JOINDER IS PROPER"

- MULTI–CONSPIRACY/RACKETEERING– <u>THERE MUST BE SOME RELATIONSHIP BETWEEN THE FACTS UNDERLYING EACH OFFENSE SUCH THAT PROOF OF THOSE FACTS IS NECESSARY TO ESTABLISH EACH OFFENSE</u>

# COUNTS 1 AND 2– 3/26/01– SNMCF

- COUNT 1– MURDER OF F.C.– strangulation

- DEFTS– DELEON, JOE GALLEGOS, EDWARD TROUP, LEONARD LUJAN AND BILLY GARCIA (5 DEFENDANTS TO TRIAL)

- COUNT 2– MURDER OF R.G.– strangulation

- DEFTS– LEONARD LUJAN, BILLY GARCIA, EUGENE MARTINEZ, ALLEN PATTERSON AND CHRISTOPHER CHAVEZ (5 DEFENDANTS TO TRIAL)

- TROUP AND GARCIA MOTION TO SEVER [DOC. 882]
  - JOINED OR NOT OPPOSED BY ALL DEFENDANTS

# COUNTS 1 AND 2– CONT'D

- Count 1– Murder of F.C; Count 2– Murder of R.G.
- GOVT THEORY–Deft. Garcia ordered Deft. Lujan to arrange both murders.
- Murders occurred on same day as each other in SNMCF
- Both alleged SNM hits for cooperation with law enforcement
- <mark>Different faction of SNM than Counts 6 and 7</mark>
- No overlapping defendants
- No overlapping facts except SNM enterprise–separated by 13 years

DNM 765

# COUNT 3– MURDER OF F.S.– SNMCF– 6/17/2007

- DEFTS JAVIER ALONSO, EDWARD TROUP, ARTURO ARNULFO GARCIA, BENJAMIN CLARK, RUBEN HERNANDEZ
  - CLARK AND HERNANDEZ HAVE PLEADED GUILTY
  - <u>THREE DEFENDANTS TO TRIAL</u>
- GOVT THEORY– Garcia and Clark ordered hit. Hernandez covered cameras. Troup and Alonso killed F.S. in his cell.
  - F.S. SNM member who may have cooperated– paperwork sent to SNMCF proving he cooperated.
- <u>No overlapping defendants with Counts 6 and 7, no overlapping facts.</u>

DNM 766

# COUNTS 4 & 5– MURDER OF A.B.– 11/12/12

- Count 4– Conspiracy to Murder A.B. and Count 5– Murder
- Defts. Joe and Andrew Gallegos (both proceeding to trial)
- Socorro and Valencia Counties (Not in prison).
- Motion to Sever Counts 4 & 5 [Doc. 868]
- GOVT THEORY– A.B. was drug supplier to Gallegos's and rival of SNM
- Gallegos's deny membership in SNM
- Alleged to have tortured, shot, and burnt body– found in Bosque

DNM 767

Appellate Case: 20-2058   Document: 010110416883   Date Filed: 08/24/2020   Page: 344

# COUNTS 4 AND 5– CONT'D

- No overlapping Defendants.

- <mark>No overlapping facts– SNM connection is unclear</mark>.

- Different alleged motive. Not law enforcement cooperator.

- Different geographical location from SNMCF or prison generally.

- Gallegos's defenses are strong– Deny SNM membership; No witnesses; No forensic evidence, including DNA, linking them to crime scenes.

# COUNTS 6 AND 7– CONSPIRACY AND MURDER OF J.M.– 3/7/14–SNMCF

- <u>SIX DEFENDANTS PROCEEDING TO TRIAL</u> (BACA, SANCHEZ, VARELA, HERRERA, RODRIGUEZ, PEREZ)

- VIDEO FROM SNMCF–ARMENTA AND MONTOYA PURSUING HIM OUT OF HIS ROOM, DOWN STAIRS, STABBING HIM

- STATE TRIAL– ARMENTA, RODRIGUEZ AND MARTINEZ ONLY
  - DISMISSED WEEKS BEFORE TRIAL IN FAVOR OF FEDERAL INDICTMENT
  - CASE READY TO PROCEED TO TRIAL

- DEFENSE THEORY– MURDER OF MOLINA WAS PRIVATE BEEF

- GOVT THEORY– OUTSTANDING HIT ON J.M., SNM MEMBER WHO COOPERATED WITH L.E., BACA SENT PAPERWORK WIH VARELA; HERRERA AUTHORIZED AND PASSES PAPERWORK TO BLUE POD; ARMENTA, MONTOYA, MARTINEZ AND RODRIGUEZ EXECUTE IT

# COUNT 6 AND 7– NO FACTUAL OVERLAP

- NO DEFENDANTS OVERLAP EXCEPT ANTHONY BACA (COUNTS 8, 9 AND 10)

- WEAK CASE AGAINST BACA COMPARED TO CTS 8–10

- NO FACTS OVERLAP EXCEPT SNM ENTRPRISE–RACKETEERING

- MUST PROVE ENTERPRISE EXISTED <u>**AT TIME**</u> OF MURDER

- COUNT 1 AND 2 DEFENDANTS NOT EVEN IN PRISON

Appellate Case: 20-2058   Document: 010110416663   Date Filed: 09/29/2020   Page: 347

# COUNT 8–ASSAULT ON J.R.–DONA ANA COUNTY

- DEFENDANTS– ANTHONY BACA, GERALD ARCHULETA, CONRAD VILLEGAS

- PLEA AGREEMENT [DOC. 586]–GERALD ARCHULETA

- STATED HE GREEN LIGHTED J.R. IN 2003 DUE TO FALLING OUT

- JR SNM MEMBER

- JR SHOT IN 2003; GREEN LIGHT STAYED IN EFFECT UNTIL 2015, JR ASSAULTED AT SNMCF

- NO OVERLAP OF DEFENDANTS EXCEPT BACA, NO OVERLAP OF FACTS

# COUNTS 9 THROUGH 12–HITS ON MARCANTEL AND SANTISTEVAN

- CT 9– CONSPIRACY TO MURDER D.S.– ANTHONY BACA, ROY MARTINEZ, ROBERT MARTINEZ– MARTINEZS' PLED

- CT 10– CONSPIRACY TO MURDER G.M.– SAME Defts. plus CHRIS GARCIA

- COUNTS 11 AND 12–FELON IN POSSESSION and 924(c)– Garcia's Poss. of gun to provide to Mario Montoya to execute hits

- No overlapping Defendants (except Baca), no overlapping facts

Appellate Case: 20-2058   Document: 010110416661   Date Filed: 09/29/2020   Page: 349

# COUNTS 13 TO 15– MAR. 17, FEB. 1, FEB. 27– VALENCIA COUNTY PRIMARILY

- Count 13– Assault on J.G. w/ Deadly Weapon–Deft. Joe Gallegos– 3/17/15–Valencia County

- Count 14– Conspiracy to Murder of J.G.

- Count 15– Attempted to Murder of J.G.

- Cts. 14–15– Defts. Joe Gallegos, Santos Gonzales, Paul Rivera, Shauna Gutierrez (3 Defendants to trial)

- J.G. was a witness against Joe Gallegos

- PERSONAL BEEF WITH GALLEGOS NOT SNM RELATED?

# RULE 14– SEVERANCE– 3 STEPS–

- 1. Are defenses so antagonistic as to be mutually exclusive?
- 2. Serious risk that joint trial would compromise specific trial right?
- 3. Court's discretion– weighing prejudice with judicial economy

DN 774

# ANTAGONISTIC DEFENSES

- Different factions of SNM– Billy Garcia Motion to Sever [Doc. 882] at 9–14: Three different factions– run by different individuals, different goals, hits on each other

- 1.) Allstars, 2.) Old–timers, and 3.) Rejects

- Deft. Anthony Baca returns to NM prisons and two sets– one by Baca and one by Deft. Gerald Archuleta

- Counts 1 and 2 Defts. not in either set.

- Disparity of evidence– lacking in Counts 1 and 2; Deft. Baca evidence in Cts. 6 and 7 versus evidence in Cts. 6 and 7

Appellate Case: 20-2058   Document: 010110416661   Date Filed: 09/24/2020   Page: 352

# RISK OF COMPROMISING TRIAL RIGHTS

- Confrontation– *Bruton* and Presence (can Ds see witnesses?)

- Right to Public Trial

- Right to be present– Voir Dire, Bench Conferences

- Due process– security presence, shackling, atmosphere

DNM 776

# PREJUDICE V. JUDICIAL ECONOMY

- Atmosphere of propensity– Spillover effect
- Limiting Instructions will be rendered ineffective
- Jury unable to compartmentalize evidence
- No risk of inconsistent verdicts– Cases are too unconnected
- Cost– Defense– $2 million dollar savings from 5 severed trials v. one joint
- Govt. has to present enterprise/racketeering more than once
  - Still must prove time frame
  - Chosen to do that by filing more than one SNM indictment– 4269 (vicar only); 1613 (RICO Conspiracy)

DNM 777

Appellate Case: 20-2058   Document: 010110416661   Date Filed: 09/29/2020   Page: 354

# PREJUDICE TO COUNTS 6 AND 7 DEFTS

- Counts 1–3 are alleged SNM ordered hits on SNM members believed to be cooperating with police– propensity

- Counts 4–5, 8, 13–15 occur outside prison– changes dynamic for jury

- Count 4 and 5 involve brutal murder– torture, burning body with gasoline

- Count 8 has alleged 12 year green light (2003 to 2015), Govt. claims outstanding green light on Molina– propensity

- Counts 9–12 are high profile alleged conspiracies to murder Marcantel and Santistevan– prejudicial to all other counts

- Strong evidence against Baca prejudices remaining Counts 6 and 7 Defts and Baca

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CLERK'S MINUTES

*BEFORE DISTRICT JUDGE JAMES O. BROWNING*

| | | | |
|---|---|---|---|
| **CR CASE NO.:** | 15-4268 JB | **DATE:** | February 7, 2017 |
| **CASE CAPTION:** | *USA v. C. Chavez* | | |
| **CRD:** | K. Wild | **COURT REPORTER:** | J. Bean |
| **COURT IN SESSION:** | 4:48 p.m. | **COURT IN RECESS:** | 5:20 p.m. = :32 |

**TYPE OF PROCEEDING:**  Motion Hearing

**COURT'S RULING/DISPOSITION:**  Opposed Motion for Release of Detention Pending Trial [794] - DENIED

**ORDER CONSISTENT WITH COURT'S RULING TO BE PREPARED BY:**    Court

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**          **ATTORNEYS PRESENT FOR DEFENDANT(S):**

Maria Armijo/Randy Castellano/Matt Beck,       Orlando Mondragon/John Granberg (Appointed)
AUSAs

## PROCEEDINGS

**COURT IN SESSION:**    **4:48 p.m.**

**COURT:**          Calls case. Counsel enter appearances. Defendant present in custody.

**Mr. Mondragon:**   Argues in support of motion.

**Ms. Armijo:**   Argues in opposition to motion – tenders photographs of Defendant right after and a more recent photograph.

**Court:**   Instructs attach hereto as Govt.'s Ex. 1 and Govt.'s Ex. 2.

**4:53 p.m.   Mr. Mondragon:**   Argues further in support of motion.

**5:04 p.m.   Ms. Armijo:**   Argues further in opposition to motion.

**5:09 p.m.   Mr. Mondragon:**   Argues in reply in further support of motion.

**5:16 p.m.   Court:**   Start with presumption Defendant should be detained and a flight risk and danger to community. Finds a flight risk and danger to community. Denies motion. Anything further? Counsel inform there is not.

**COURT IN RECESS:  5:20 p.m.**



Gov't Ex
DNM 780



## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                  Nos. CR 15-4268-JB
                                        CR 16-1613-JB

ANGEL DELEON, et. al.,
ANTHONY RAY BACA, et. al.,

       Defendants.

### ORDER

THIS MATTER comes before the Court on Defendants' Motion to Allow Counsel to Access Sealed Pleadings in Related Cases. The Court, being advised that the United States does not oppose the motion, and being otherwise fully advised in the premises, finds that the motion is well taken and should be granted.

IT IS THEREFORE ORDERED that the Motion is GRANTED and counsel for Defendant Anthony Ray Baca may provide counsel for Defendants Joe Lawrence Gallegos, Edward Troup, Leonard Lujan, Billy Garcia, Allen Patterson, Javier Alonso, Auturo Arnulfo Garcia, Jerry Montoya, Daniel Sanchez, Conrad Villegas, Christopher Garcia, Carlos Herrera, Rudy Perez, Santos Gonzalez, and Shauna Gutierrez with copies of Documents 239, 287, 290, 295, and 296 filed in Case No. 16-cr-1613, as well as any responses and replies to those pleadings that may be sealed.  Counsel for Defendant Baca may also provide counsel for Christopher Garcia, Manuel Benito, Vincent Garduno, Mandel Lon Parker, Daniel Sanchez, and Anthony Cordova copies of Document 762 filed in Case No. 15-cr-4268.

IT IS SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                     No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA and SHAUNA
GUTIERREZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER[1]

---

[1] In its Sealed Memorandum Opinion and Order, filed January 3, 2017 (Doc. 809)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion for Specific Discovery, filed May 23, 2016 (Doc. 539)("First Motion for Specific Discovery"); (ii) the Defendants' Motion to Compel Discovery, filed September 1, 2016 (Doc. 668)("Motion to Compel"); and (iii) the Defendants' Motion for Specific Discovery, filed September 8, 2016 (Doc. 678)("Second Motion for Specific Discovery"). The Court held a hearing on October 4, 2016. The primary issues are: (i) whether the United States must produce specific items of discovery related to Counts 1 and 2 of the United States' Redacted Superseding Indictment, filed April 21, 2016 (Doc. 368)("Superseding Indictment"); (ii) whether the Plaintiff United States of America must produce specific items of discovery related to Counts 6 and 7 of the Superseding Indictment; and (iii) whether the Plaintiff United States of America must produce specific items of discovery related to Count 3 of the Superseding Indictment. At the hearing, the Court addressed each specific discovery request and made specific rulings with respect to the requested discovery. Accordingly, the Court will: (i) grant in part and deny in part the First Motion for Specific Discovery; (ii) grant in part and deny in part the Motion to Compel; and (iii) grant in part and deny in part the Second Motion for Specific Discovery.

## <u>FACTUAL BACKGROUND</u>

The Court takes its facts from the Superseding Indictment. The facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, filed October 28, 2016 (Doc. 753)("MOO"). <u>See</u> <u>United States of America v. Angel DeLeon</u>, No. CR.

---

confidential information within the Sealed MOO before the Court files a public version. <u>See</u> Sealed MOO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions. <u>See</u> Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

15-4268 JB, 2016 WL 7242579 (D.N.M. 2016)(Browning, J.).  The Court does not set forth these facts as findings or the truth.  The Court recognizes that the factual background is largely the United States' version of events and also recognizes that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM") allegedly committed through its members.  <u>See</u> Superseding Indictment at 2.  SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Superseding Indictment at 2.  SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  <u>See</u> Superseding Indictment at 3.  During the riot, thirty-three inmates were killed, and over 200 were injured.  <u>See</u> Superseding Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members.  <u>See</u> Superseding Indictment at 3.  SNM has approximately 250 members, comprised of "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members."  Superseding Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  <u>See</u> Superseding Indictment at 3.  Members who rejoin their

communities after completing their sentences are expected to further the gang's goals, the main

one being the control of and profit from narcotics trafficking.  See Superseding Indictment at 4.

Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, []

includ[ing] murder and assaults."  Superseding Indictment at 4.  SNM also intimidates and

influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Superseding

Indictment at 4.  If another gang does not abide by SNM's demands, SNM manages to assault or

kill one of the other gang's members to show its power.  See Superseding Indictment at 4.

SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison

system.  See Superseding Indictment at 4.  SNM further engages in violence "to assert its gang

identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against

a rival gang or member, [and] to gain notoriety and show it superiority over others."

Superseding Indictment at 4-5.  To show its strength and influence, SNM expects its members to

confront and attack any suspected law enforcement informants, cooperating witnesses,

homosexuals, or sex offenders.  See Superseding Indictment at 5.  To achieve its purpose of

preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.

See Superseding Indictment at 7.  SNM as an enterprise generates income by having its members

and associates traffic controlled substances and extort narcotic traffickers.  See Superseding

Indictment at 7.  SNM's recent activities in a conspiracy to murder high-ranking New Mexico

Corrections Department Officials inspired the present investigation.  See United States v. Garcia,

No. 15-4275 JB, Memorandum Opinion and Order at 2, filed November 16, 2016 (Doc.

133)(citing United States' Response to Defendant's Motion to Designate Complex (Doc. 56) at

1, filed May 3, 2016 (Doc. 70)("United States' Garcia Response")).  The relevant facts giving

rise to this case are as follows.

In March of 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("SNMCF") state prison.  See MOO at 6.  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  See MOO at 6.  That grand-jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  See MOO at 6-7.  The Doña Ana County District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015.  See MOO at 7.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level."  MOO at 7.

The United States now brings this case against thirty Defendants, charging them with a total of fifteen counts.  See Superseding Indictment at 1.  All Defendants are accused of participating in the operation and management of the enterprise and committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."  Superseding Indictment at 6-31.  Defendants Arturo Arnulfo Garcia, Gerald Archuleta, Benjamin Clark, Mario Rodriguez, Anthony Ray Baca, Robert Martinez, Roy Paul Martinez, and Daniel Sanchez are the alleged leaders of the enterprise.  See Superseding

Indictment at 6.  The other twenty Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Superseding Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512 and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant;" and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846. Superseding Indictment at 9.  In all, the indictment alleges fifteen different counts against the various Defendants.

Specifically, the Superseding Indictment provides that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia allegedly murdered "F.C."  Superseding Indictment at 9.  On the same day, Defendants Lujan, B. Garcia, Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G." Superseding Indictment at 12.  On June 17, 2007, Defendants Javier Alonso, Troup, A.A. Garcia, Clark, and Ruben Hernandez allegedly murdered "F.S."  Superseding Indictment at 15.  On November 12, 2012, Defendants J. Gallegos and Andrew Gallegos allegedly conspired to murder "A.B."  Superseding Indictment at 18.  On the same day, Defendants J. Gallegos and A. Gallegos allegedly murdered A.B.  See Superseding Indictment at 19.  In March 2014, Defendants Jerry Armenta, Montoya, Rodriguez, Timothy Martinez, Baca, Mauricio Varela, Sanchez, Carlos Herrera and Rudy Perez allegedly conspired to murder "J.M."  Superseding Indictment at 20-21. On March 7, 2014, Defendants Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M.  See Superseding Indictment at 21.

Further, starting in or around 2003 -- and until about July 13, 2015 -- Defendants Baca, Archuleta, and Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Superseding Indictment at 27. Starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Defendants Baca, R.P. Martinez and Robert Martinez allegedly conspired to murder "D.S." Superseding Indictment at 28. During the same period of time, Defendants Baca, R.P. Martinez, R. Martinez and Christopher Garcia allegedly conspired to murder "G.M." Superseding indictment at 28. On November 29, 2015, Defendant C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Superseding Indictment at 29. On the same day, Defendant C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder. See Superseding Indictment at 29.

On March 17, 2015, Defendant J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Superseding Indictment at 30. From February 1, 2016, until February 27, 2016, Defendants J. Gallegos, Santos Gonzalez, Paul Rivera, Shauna Gutierrez "and others known and unknown to the grand jury," allegedly conspired to murder "J.G." Superseding Indictment at 30. The final count alleges that, on February 27, 2016, Defendants J. Gallegos, Gonzalez, Rivera and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Superseding Indictment at 31.

For fuller context, there are four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States of America v. Anthony Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.), the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. §

- 7 -

1962(d).  See United States v. Baca, No. CR 16-1613, Sealed Indictment, filed April 21, 2016

(Doc. 1).  There is also a prosecution of one Defendant for drug crimes, see United States v.

Garcia, No. 15-4275 JB (D.N.M.)(Browning, J.), and of four defendants for further alleged

conduct constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, see

United States v. Varela, No. 15-4269 JB (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

On December 1, 2015, a federal grand jury indicted twenty-four Defendants for the

crimes of Murder (under 18 U.S.C. § 1959(a)(1)); Violent Crimes in Aid of Racketeering and

U.S.C. § 2: Principals), Conspiracy to Murder (under 18 U.S.C. § 1959(a)(5); and Conspiracy to

Commit Assault Resulting in Serious Bodily Injury (under 18 U.S.C. § 1959(a)(6)).  See

Indictment at 1.  The Defendants are all allegedly members, prospects, or otherwise associated

with SNM, which constitutes an enterprise as 18 U.S.C § 1959(b)(2) defines that term.  See

Indictment at 2.

On April 21, 2016, a grand jury in a Superseding Indictment indicted thirty Defendants --

twenty-four of whom were Defendants in the original Indictment.  See Superseding Indictment at

1.  In addition to the new Defendants, the Superseding Indictment also contains new charges

under modified count numbers.  See Superseding Indictment at 9-31.  The Superseding

Indictment contains fifteen counts for: (i) the Murder of F.C. ("Count 1"); (ii) the Murder of R.G.

("Count 2"); (iii) the Murder of F.S. ("Count 3"); (iv) Conspiracy to Murder A.B. ("Count 4");

(v) the Murder of A.B. ("Count 5"); (vi) Conspiracy to Murder J.M. ("Count 6"); (vii) the

Murder of J.M. ("Count 7"); (viii) Conspiracy to Commit Assault Resulting in Serious Bodily

Injury to J.R. ("Count 8"); (ix) Conspiracy to Murder D.S. ("Count 9"); (x) Conspiracy to

Murder G.M. ("Count 10"); (xi) Felon in Possession of a Firearm ("Count 11"); (xii) Using and

Carrying a Firearm During and in Relation to a Crime of Violence ("Count 12"); (xiii) Assault

with Dangerous Weapon of J.G. ("Count 13"); (xiv) Conspiracy to Murder J.G. ("Count 14");

and (xv) Attempted Murder of J.G., Assault with a Dangerous Weapon Upon J.G., Resulting in

Serious Bodily Injury to J.G. ("Count 15").  See Superseding Indictment at 9-31.  At the time of

the Superseding Indictment, some of the Defendants were death-penalty eligible.  See The

United States' Notice of Intent Not To Seek a Sentence of Death, filed June 6, 2016 (Doc.

567)(stating that it would not seek a death sentence against twenty-one Defendants).

The Defendants have filed the First Motion for Specific Discovery, the Second Motion

for Specific Discovery, and the Motion to Compel.  The motions, in turn, relate to items of

discovery relating to: (i) Counts 1 and 2 of the Superseding Indictment -- regarding the murders

of F.C. and R.G.; (ii) Count 3 of the Superseding Indictment -- regarding the murder of F.S.; and

(iii) Counts 6 and 7 of the Superseding Indictment -- regarding the conspiracy to murder, and

murder, of J.M.

## 1.    First Motion for Specific Discovery.

The First Motion for Specific Discovery "addresses specific discovery requests as they

relate to the defense of Counts 1 and 2."  First Motion for Specific Discovery at 1.  J. Gallegos,

Troup, B. Garcia, Chavez, and Montoya filed the First Motion for Specific Discovery, see First

Motion for Specific Discovery at 1, and Lujan objects to the First Motion for Specific Discovery,

see Addendum to Motion for Specific Discovery at 1, filed May 27, 2016 (Doc. 560).  With

respect to those Counts, the First Motion for Specific Discovery provides that:

> The government's theory is that the two murders, which occurred on the same day
> in 2001, were orchestrated by defendant Billy Garcia.  The government's theory is
> that Garcia was the "shot caller" for the SNM gang for the period of time
> encompassing Counts 1 and 2 of the indictment. . . .  The discovery in this case
> casts Mr. Garcia as the leader of SNM in 2001 and the government asserts that
> Mr. Garcia ordered and orchestrated the murder of both victims by ordering

- 9 -

Leonard Lujan to arrange for the murders.  The government's theory is that Luan then arranged for two teams to carry out the murders of F.C. on March 26, 2001 with one set of complicitors and the murder of R.G. on the same day with a second set of complicitors.

First Motion for Specific Discovery at 3.

The First Motion for Specific Discovery then recounts the "known details concerning the two homicides."  First Motion for Specific Discovery at 4.  Regarding R.G., the First Motion for Specific Discovery provides that the murder occurred at Southern New Mexico Correctional Facility in the Ocean-One-Yellow housing unit, within which there were thirteen inmates; the Superseding Indictment charges three of these inmates.  See First Motion for Specific Discovery at 4.  Further, according to the First Motion for Specific Discovery, there was DNA found on the shoelace used to strangle R.G. that was "consistent with the DNA profile of inmate Martin Chacon who is not indicted in this case."  First Motion for Specific Discovery at 4.  Informants have both inculpated the indicted Defendants, and also exculpated them by identifying other potential participants in the killing.  See First Motion for Specific Discovery at 4.  The First Motion for Specific Discovery then contends that "no physical evidence links the indicted defendants to the murder of R.G. . . .  [T]he government bases its theory that the defendants are guilty on the potential testimony of inmate Leonard Lujan (who is currently charged as a co-defendant)."  First Motion for Specific Discovery at 5.  As to why R.G. was murdered, the First Motion for Specific Discovery explains that the United States' theory is that he had formerly been a "member of the Los Carnales prison gang."  First Motion for Specific Discovery at 5.

Regarding F.C.'s murder, the First Motion for Specific Discovery provides that the murder occurred at the Southern New Mexico Correctional Facility in the Paul-One-Green housing unit, within which there were at least thirteen inmates; the Superseding Indictment charges three of these inmates.  See First Motion for Specific Discovery at 5.  The First Motion

- 10 -

for Specific Discovery explains that there is DNA evidence and informant witnesses that have both inculpated the indicted Defendants, and also exculpated them by identifying other potential participants in the killing.  See First Motion for Specific Discovery at 5.  According to the First Motion for Specific Discovery, "the government bases its theory that the indicted defendants are guilty of this murder on the potential testimony of two inmates, co-defendant Leonard Lujan . . . and Lawrence Torres."  First Motion for Specific Discovery at 5-6.

With respect to Counts 1 and 2, F.C. and R.G.'s murders, the First Motion for Specific Discovery provides that the "discovery . . . to date . . . comprises 1284 pages and a single audio file. . . .  [T]he two homicides were being investigated by the New Mexico State Police.  On November 2, 2001, the District Attorney for the Third Judicial District formally declined to prosecute anyone for the two murders."  First Motion for Specific Discovery at 6.  The First Motion for Specific Discovery then recounts that there have been multiple federal investigations of SNM: (i) case number 281D-AQ-62017 (Sindicato Nuevo Mexico New Mexico-Based Prison Gang Criminal Enterprise); (ii) case number 2450-AQ-63435 (Operation Tar Pit); and (iii) the present investigation, case number 281D-AQ-6239655 (Operation Atonement; Syndicato de Nuevo Mexico; Violent Prison Gang).  See First Motion for Specific Discovery at 6-7.  The First Motion for Specific Discovery then turns to its specific discovery requests.

The specific discovery requests in the First Motion for Specific Discovery are: (i) the Federal Bureau of Investigation's ("FBI") investigations under case numbers 281D-AQ-62017, 281D-AQ-59388, 2540-AQ-63435 and any other related investigations relating to Counts 1 and 2; (ii) New Mexico Corrections Department Security Threat Intelligence Unit ("STIU") files on all inmates at Southern New Mexico on March 26, 2001, and all incidents from the earliest date that either R.G. or F.C. arrived at the facility; (iii) criminal history, impeachment materials, and

STIU files for Lujan and any other cooperating informant witness; (iv) penitentiary packs[2] for R.G. and F.C., and all inmates housed in the Ocean-One-Yellow pod and the Paul-One-Green pod on March 26, 2001, including the pen packs for Lujan and Lawrence Torres; (v) all files, including intelligence materials, concerning SNM, and listing suspected and confirmed members and their activities from the time period that SNM was formed up to the last date that the Superseding Indictment alleges, February 27, 2016; (vi) all files on the Los Carnales prison gang listing suspected and confirmed members, and their activities, specifically including such files on R.G.; (vii) Security Threat Group investigation files for SNM from 1985 to 2016; (viii) threat-separation listings for F.C. and R.G.'s housing in the penitentiary system; (ix) administrative segregation waivers that F.C. or R.G. signed authorizing their housing in general population; (x) the list of inmates in the facility who may have been free to move amongst pods; (xi) the list of inmates residing in the Department of Corrections, Penitentiary of New Mexico-North Facility between January 1, 2001, and March 26, 2001; (xii) the penitentiary pack for Frederico Munoz; (xiii) log books for the three months before and after March 25, 2001; (xiv) the United States' DNA analyst's notes, electropherograms,[3] and graphs; (xv) copies of the inmate's flyer, otherwise known as their Wanted for Escape/Master Record Entry; and (xvi) the Security Threat Group "Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates.  See First Motion for Specific Discovery at 7-11.

---

[2]These "pen packs" apparently contain information concerning particular inmates which the prison system uses so that inmates are not housed with persons to whom they may pose a danger.

[3]"An electropherogram is a plot of results from an analysis done by electrophoresis automatic sequencing.  An electropherogram shows a sequence of data that is produced by an automated DNA sequencing machine.  Electropherograms may be used for deriving results from . . . DNA sequencing . . . ."  Electropherogram, International Society of Genetic Genealogy Wiki, https://isogg.org/wiki/Electropherogram/en. (last accessed Dec. 17, 2016).

In support of its discovery requests, the First Motion for Specific Discovery argues that rule 16 of the Federal Rules of Criminal Procedure, Kyles v. Whitley, 514 U.S. 419, 437 (1995), Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), "and other authorities cited herein," counsel the Court to rule in favor of the motion.  First Motion for Specific Discovery at 11-12.  The First Motion for Specific Discovery requests an order directing the "government to make inquiry as required by *Kyles* and to disclose all of the information described . . . .  This motion seeks discovery of specific information set forth above, all of which is necessary for effective preparation of pretrial motions as well as trial."  First Motion for Specific Discovery at 12.

The First Motion for Specific Discovery then outlines what, in its view, is the United States' disclosure obligation for this case.  See First Motion for Specific Discovery at 12.  First, the First Motion for Specific Discovery argues, is the requirement under the Due Process Clause of the United States Constitution that "the government . . . disclose information favorable to the accused that is material to either guilt or punishment."  First Motion for Specific Discovery at 12 (citing Brady v. Maryland, 373 U.S. at 87).  According to the First Motion for Specific Discovery, that obligation has been extended to "evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory."  First Motion for Specific Discovery at 12 (citing United States v. Rivas, 26 F. Supp. 3d 1082, 1105 (D.N.M. 2014)(Browning, J.)).

The First Motion for Specific Discovery then provides that "the government's discovery obligations do not require the accused to request disclosure of favorable evidence, although such disclosure is specifically requested here."  First Motion for Specific Discovery at 13.  Relying on Kyles v. Whitley, the First Motion for Specific Discovery explains that "regardless of request,

favorable evidence is material, and constitutional error results from its suppression by the government if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." First Motion for Specific Discovery at 13 (internal quotation marks omitted). Accordingly, under Brady v. Maryland, the First Motion for Specific Discovery explains that "due process is violated whenever the government suppresses evidence favorable to the defendant, irrespective of the good faith or bad faith of the prosecution." First Motion for Specific Discovery at 14 (internal quotation marks omitted).

Additionally, the First Motion for Specific Discovery contends that the "prosecution has a duty to search files maintained by other government agencies," meaning that "a prosecutor may have a duty to search files maintained by other governmental agencies closely aligned with the prosecution where there is some reasonable prospect or notice of finding exculpatory evidence." First Motion for Specific Discovery at 15 (citing United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992))(internal quotation marks omitted). Thus, the United States, the First Motion for Specific Discovery argues, has the obligation to investigate the files of any and all governmental agencies and entities connected to this case for exculpatory evidence favorable to the Defendants. See First Motion for Specific Discovery at 16. The First Motion for Specific Discovery next tackles the potential "material to guilt or to punishment" limitation for disclosure under Brady v. Maryland and argues that the "materiality prong is only functional in an appellate context, and it should not be applied in a pretrial application . . . ." First Motion for Specific Discovery at 17 (citing United States v. Carter, 313 F. Supp. 2d 921, 924 (E.D. Wis. 2004)(Adelman, J.)("This standard was developed in the context of appellate consideration of the effect of non-disclosure")). Thus, the First Motion for Specific Discovery points to United States

- 14 -

v. Sudikoff, 36 F. Supp. 2d 1196 (C.D. Cal. 1999)(Pregerson, J.), for the proposition that "the standard should simply be whether the evidence is favorable to the accused, i.e., whether it relates to guilt or punishment and tends to bolster the defendant's case or impeach prosecution witnesses."  First Motion for Specific Discovery (citing United States v. Sudikoff, 36 F. Supp. 2d at 1199).  The First Motion for Specific Discovery concludes by imploring the Court to "use its inherent power to order the requested discovery," and to "control its docket to ensure that cases before the court are handled efficiently and fairly, as well as" in accordance with "Rule 16 of the Federal Rules of Civil Procedure and" Brady v. Maryland.  First Motion for Specific Discovery at 24.

**2.     First Motion for Specific Discovery Response.**

The United States responded to the First Motion for Specific Discovery with the United States' Response in Opposition to Defendants' Motion for Specific Discovery [Doc. 539], filed July 5, 2016 (Doc. 613)("First Motion for Specific Discovery Response").  See First Motion for Specific Discovery Response at 1.  In the First Motion for Specific Discovery Response, the United States argues that the request is for "a broad range of discovery to which neither the Federal Rules of Criminal Procedure nor the United States Constitution entitles them.  Importantly, the Discovery Motion requests materials unrelated to the criminal case against them and intelligence materials that would harm the United States' and others' interests and safety if disclosed."  First Motion for Specific Discovery Response at 1.  According to the First Motion for Specific Discovery Response, "these requests . . . are nothing more than fishing expeditions."  First Motion for Specific Discovery Response at 1.  The First Motion for Specific Discovery Response then recaps the case's factual and procedural background, before addressing its

- 15 -

arguments against disclosure of some of the sixteen items of discovery that the First Motion for Specific Discovery seeks.  See First Motion for Specific Discovery Response at 1-4.

The First Motion for Specific Discovery Response first cites United States v. Hykes, No. CR 15-4299 JB, 2016 WL 1730125, at *5 (D.N.M. 2016)(Browning, J.), for the proposition that "[a]lthough rule 16's language is permissive, it does not authorize a blanket request to see the prosecution's file, and a defendant may not use the rule to engage in a fishing expedition."  First Motion for Specific Discovery Response at 4 (internal quotation marks omitted).  Thus, the First Motion for Specific Discovery Response argues that rule 16 does not "require the Government to discover information that it does not have," including that "information from third parties."  First Motion for Specific Discovery Response at 4-5.  The First Motion for Specific Discovery Response then emphasizes that only material information must be disclosed under rule 16, and that materiality is a prerequisite under both rule 16 and the Due Process Clause.  See First Motion for Specific Discovery Response at 5 (citing United States v. Hykes, 2016 WL 1730125, at *6).  Regarding the timing of their obligatory disclosures, the First Motion for Specific Discovery Response then explains how obligations vary, and that, nevertheless, it is still too early in this case to disclose much of what the First Motion for Specific Discovery seeks.  See First Motion for Specific Discovery Response at 6.

Accordingly, the First Motion for Specific Discovery Response then turns to each of the specific discovery requests to which it objects, applying the standard from United States v. Hykes: "[t]he United States therefore opposes Defendants' Discovery Motion to the extent that most of their requests are sending the United States on a fishing expedition without any demonstration that the requested files contain information in any way relevant to their defense."  First Motion for Specific Discovery Response at 7.  The United States maintains that, after

United States v. Hykes, the Defendants must provide a "good faith basis for the requested discovery," and that here the requests are overbroad and have not made the specific request needed to authorize discovery under that case.  First Motion for Specific Discovery Response at 7-8.

Regarding the Defendants' request for the federal investigations under case numbers 281D-AQ-62017, 281D-AQ-59388, 2540-AQ-63435 and any other related investigations relating to Counts 1 and 2 -- F.C. and R.G.'s murders -- the First Motion for Specific Discovery Response explains that disclosure of the investigation relating to the present prosecution is not yet obligatory, because "we're in the preguilty plea phase in which the obligations to disclose Brady, Giglio, and Jencks material hasn't yet arisen."  First Motion for Specific Discovery Response at 8.  The United States

> concedes, however, that the Defendants in this request demonstrate that the first two investigation files may contain information that may be material to preparing their defense. . . .  If Defendants identify which of the two federal investigations they contend specifically involve the investigation of the murders alleged in Counts 1 and 2, then the Government agrees to request these files from the proper agency.

First Motion for Specific Discovery Response at 8-9.

Turning to the First Motion for Specific Discovery's request for the New Mexico Corrections Department's STIU files on all inmates at Southern New Mexico on March 26, 2001, and all incidents from the earliest date that either R.G. or F.C. arrived at the facility, the First Motion for Specific Discovery Response objects pursuant to United States v. Hykes.  See First Motion for Specific Discovery Response at 9-10.  The First Motion for Specific Discovery Response argues that this request for "all" inmates and incidents is a "quintessential fishing expedition" lacking any specific foundation for their individual materiality.  First Motion for Specific Discovery Response at 9-10.

With respect to the First Motion for Specific Discovery's request for criminal history, impeachment materials, and STIU files for Lujan and any other cooperating informant witness, the United States objects primarily because of a blanket concern for the safety of confidential informants, whom SNM has a history of targeting.  See First Motion for Specific Discovery Response at 10-11.  The First Motion for Specific Discovery Response further concedes that, at some point, the identities of the confidential informants and of all cooperating witnesses will need to be disclosed, but "that obligation hasn't arisen yet."  First Motion for Specific Discovery Response at 11.

Next, addressing the Defendants' request for R.G. and F.C.'s pen packs, and for all pen packs for inmates housed in the Ocean-One-Yellow pod and the Paul-One-Green pod on March 26, 2001, including the pen packs for Lujan and Torres, the First Motion for Specific Discovery Response explains that the New Mexico Corrections Department does not maintain or store pen packs.  See First Motion for Specific Discovery Response at 11.  Instead, the pen packs are created by reference to public record, and, accordingly, the First Motion for Specific Discovery Response objects to this discovery request.  See First Motion for Specific Discovery Response at 11.

The First Motion for Specific Discovery also request any and all files, including intelligence materials, concerning SNM, and listing suspected and confirmed members, and their activities, from the time period that SNM was formed, up to the last date alleged in the Superseding Indictment, February 27, 2016, to which the First Motion for Specific Discovery Response objects pursuant to United States v. Hykes.  See First Motion for Specific Discovery Response at 12.  The First Motion for Specific Discovery Response maintains that this request for "any and all" lacks specificity and foundation, and is thus a fishing expedition.  First Motion

for Specific Discovery Response at 12.  The United States further provides that the New Mexico

Corrections Department has indicated that most of these records have been destroyed.  See First

Motion for Specific Discovery Response at 12 n.1.

Regarding both the First Motion for Specific Discovery's request for all files on the Los

Carnales prison gang listing suspected and confirmed members and their activities, specifically

including such files on R.G., and the First Motion for Specific Discovery's request for Security

Threat Group investigation files for SNM from 1985 to 2016, the First Motion for Specific

Discovery Response objects pursuant to United States v. Hykes.  See First Motion for Specific

Discovery Response at 12-13.  The First Motion for Specific Discovery Response maintains that

the requests are overly broad and lack a foundation for materiality.  See First Motion for Specific

Discovery Response at 12-13.  Additionally, the United States argues that -- to the extent any of

these files still exist -- they may contain sensitive material that ought be shielded from disclosure

in the interest of safety.  See First Motion for Specific Discovery Response at 12-13.

The First Motion for Specific Discovery Response then addresses the request for the

threat-separation listings for F.C. and R.G.'s housing in the penitentiary system, and admits that

the First Motion for Specific Discovery has made the case that "these separate listings may be

relevant to the Defendants' defense, as they contend that the prisons maintain a list that identifies

other inmates who pose a risk of harm to F.C. and R.G., the victims in this case."  First Motion

for Specific Discovery Response at 13 (internal quotation marks omitted).  The First Motion for

Specific Discovery Response does not thereby object to the request and indicates that the United

States will request the listings from the New Mexico Corrections Department.  See First Motion

for Specific Discovery Response at 13.  Accordingly, the First Motion for Specific Discovery

Response likewise does not object to the First Motion for Specific Discovery's request for the

administrative segregation waivers that F.C. or R.G. signed authorizing their housing in general population, and indicates that the United States will also request those waivers.  See First Motion for Specific Discovery Response at 13-14.

With respect to the First Motion for Specific Discovery's request for the list of inmates in the facility that may have been free to move amongst pods, the First Motion for Specific Discovery Response objects pursuant to United States v. Hykes.  See First Motion for Specific Discovery Response at 14.  The First Motion for Specific Discovery Response maintains that the request is overbroad, and lacks specificity as to facility and time period, making it a fishing expedition.  See First Motion for Specific Discovery Response at 14.

Regarding the First Motion for Specific Discovery's request for the list of inmates residing in the Department of Corrections, Penitentiary of New Mexico-North Facility between January 1, 2001, and March 26, 2001, the First Motion for Specific Discovery Response objects pursuant to United States v. Hykes.  See First Motion for Specific Discovery Response at 15.  Essentially, the First Motion for Specific Discovery Response argues that the request lacks foundation as to materiality, and is merely a fishing expedition into a large pool of "possible witnesses or alternate suspects," with the requested list likely having already been destroyed.  First Motion for Specific Discovery Response at 15.  The United States counsels the Defendants, however, that it would comply with a specific request for a specific suspect's files.  See First Motion for Specific Discovery Response at 15.

Then addressing the First Motion for Specific Discovery's request for the pen pack for Munoz, the First Motion for Specific Discovery Response objects, because the "United States' obligation to disclose impeachment materials has not yet arisen."  First Motion for Specific Discovery Response at 16.  The First Motion for Specific Discovery Response thereafter

- 20 -

provides that, regarding the request for the log books for the three months before and after March 25, 2001, the New Mexico Corrections Department has destroyed the requested material. See First Motion for Specific Discovery Response at 16.

Turning to the First Motion for Specific Discovery's request for the United States' DNA analyst's notes, electropherograms, and graphs, the First Motion for Specific Discovery Response objects that rule 16 does not render such raw data discoverable. See First Motion for Specific Discovery Response at 16. The First Motion for Specific Discovery Response nonetheless indicates that the United States will comply with the request to the extent the information is in the United States' "possession, custody, or control." First Motion for Specific Discovery Response at 16.

With respect to the First Motion for Specific Discovery's request for copies of the inmate's flyer, otherwise known as their Wanted for Escape/Master Record Entry, the First Motion for Specific Discovery Response objects pursuant to United States v. Hykes, to the extent that the request relates to any other inmates beside F.C. or R.G. See First Motion for Specific Discovery Response at 16-17. The First Motion for Specific Discovery Response then indicates that it does not object to the disclosure of the flyers for F.C. and R.G., and will disclose as much should the New Mexico Corrections Department comply. See First Motion for Specific Discovery Response at 17.

Last, in response to the First Motion for Specific Discovery's request for the Security Threat Group "Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates, the First Motion for Specific Discovery Response indicates that the United States has requested such a "Master Roster," but

that the New Mexico Corrections Department does not know to what the First Motion for
Specific Discovery refers.  See First Motion for Specific Discovery Response at 17.

>       3.       **First Motion for Specific Discovery Reply.**

The Defendants who filed the First Motion for Specific Discovery supported their motion
with the Reply to United States' Response in Opposition to Defendants' Motion for Specific
Discovery, filed July 25, 2016 (Doc. 632)("First Motion for Specific Discovery Reply").  The
First Motion for Specific Discovery Reply first explains:

> On June 30, 2016, the government sent a letter to the defense proposing an
> agreement for the resolution of the discovery motion.  In the letter the government
> proposed to provide some, but not all, of the discovery requested in return for
> withdrawal        of        the        motion        for        specific        discovery
> . . . .   The government did not commit to a date by which the agreed upon
> materials would be provided.  The government requested a further extension to
> July 12, 2016 for the defense to consider matters but also requested a response
> within 24 hours.

First Motion for Specific Discovery Reply at 2.  Then, according to the First Motion for Specific
Discovery Reply, defense counsel requested to see the documents before agreeing to withdraw
their motion, but the United States did not agree and instead filed their First Motion for Specific
Discovery Response.  See First Motion for Specific Discovery Reply at 2-3.  The First Motion
for Specific Discovery Reply then argues that,

> as a general matter, the government appears to be mistaken in its analysis of its
> constitutional obligations.   The duty to review files or material in the
> government's possession does not turn on the specificity of a defense request. . . .
> [I]t has been the government's obligations since . . . the indictments . . . to learn of
> the existence of all related files in the possession of the government, review such
> files, and disclose exculpatory material.

First Motion for Specific Discovery Reply at 3.

Accordingly, the First Motion for Specific Discovery Reply replies to some of the United
States' responses to the Defendants' discovery requests.  Looking first at the request for the

federal investigations under case numbers 281D-AQ-62017, 281D-AQ-59388, 2540-AQ-63435, and any other related investigations relating to Counts 1 and 2 -- F.C. and R.G.'s murders -- to which the United States responded it would disclose the earlier investigations to the extent that the Defendants named in Counts 1 and 2 indicate which entailed investigation of Counts 1 and 2; the First Motion for Specific Discovery Reply argues that both investigations fall under the United States' concession.  See First Motion for Specific Discovery Reply at 3-4.  The First Motion for Specific Discovery Reply also maintains that the obligation to disclose the material under this request has existed since the time of the indictment.  See First Motion for Specific Discovery Reply at 3-4.

Turning to the request for criminal history, impeachment materials, and STIU files for Lujan and any other cooperating informant witness, the First Motion for Specific Discovery Reply takes issue with the United States' objection "that the defense has failed to demonstrate any facts, which would indicate they are potential alternate suspects."  First Motion for Specific Discovery Reply at 4.  The First Motion for Specific Discovery Reply thus argues that "Lujan admitted to orchestrating the murders alleged in Counts One and Two," and, "[a]s far as the remaining informants they have all admitted to being SNM members during the times alleged in the indictment."  First Motion for Specific Discovery Reply at 4.  Accordingly, the First Motion for Specific Discovery Reply argues that given the "government's theory of prosecution [that] all such SNM members were part of an . . . enterprise responsible for the murders . . . [,] under the government's theory each of the informants are part of the organized criminal activity."  First Motion for Specific Discovery Reply at 4-5.

Regarding the request for threat-separation listings for F.C. and R.G.'s housing in the penitentiary system, and the request for administrative segregation waivers that F.C. or R.G.

- 23 -

signed authorizing their housing in general population, the First Motion for Specific Discovery Reply acknowledges that the United States has agreed to their disclosure, but has not as of yet made the disclosure.  See First Motion for Specific Discovery Reply at 5.  Thus, the First Motion for Specific Discovery Reply requests that the Court order their disclosure.  See First Motion for Specific Discovery Reply at 5.

With respect to the request for the list of inmates in the facility who may have been free to move amongst pods, and the request for the list of inmates residing in the Corrections Department, Penitentiary of New Mexico-North Facility between January 1, 2001, and March 26, 2001, the First Motion for Specific Discovery Reply replies to the United States' objection that the requests "do not specify a facility or even a time period."  First Motion for Specific Discovery Reply at 5.  The First Motion for Specific Discovery Reply thus provides that it is "requesting a list for the dates of March 25 and 26, 2001 for the Southern New Mexico Correctional Facility.  This is not a fishing expedition . . . ."  First Motion for Specific Discovery Reply at 5.

Addressing the request for the United States' DNA analyst's notes, electropherograms, and graphs, the First Motion for Specific Discovery Reply acknowledges that the United States has agreed to their disclosure, but has not as of yet disclosed them.  See First Motion for Specific Discovery Reply at 5.  Thus, the First Motion for Specific Discovery Reply requests the Court order their disclosure.  See First Motion for Specific Discovery Reply at 5.

The First Motion for Specific Discovery Reply then makes the global request that, in the instances where the United States has agreed to disclosure, the Court order such disclosure within a ten-day timeframe.  See First Motion for Specific Discovery Reply at 6.  The First Motion for Specific Discovery Reply specifically argues that, while much of the requested

- 24 -

material is indeed "impeachment material, which they need not disclose at this time," because of the case's complex nature, it will be impractical to wait until "some short period of time before trial" for the eventual disclosure. First Motion for Specific Discovery Reply at 6. The First Motion for Specific Discovery Reply then concludes with a request for a discovery conference. See First Motion for Specific Discovery Reply at 7.

4.      **Motion to Compel.**

On September 1, 2016, Montoya filed the Motion to Compel, making specific discovery requests related to the Superseding Indictment's Counts 6 and 7, pertaining to J.M.'s murder. See Motion to Compel at 1. Rodriguez, T. Martinez, Sanchez, Baca, Herrera, and Perez join the Motion to Compel. See Motion to Compel at 1. The Motion to Compel argues that the United States' "case is based almost entirely on the statements of co-defendant Jerry Armenta. Jerry Armenta was an inmate at SNMCF who has admitted, and can be seen on camera, repeatedly stabbing [J.M.]. Mr. Armenta has admitted that his implication of others was done in hopes of improving his own dire legal situation." Motion to Compel at 1-2.

The Motion to Compel thus requests that the United States provide discovery in the form of: (i) the statements of all of the Defendants whom the New Mexico State Police and the prison's STIU interviewed following the murder of J.M.; (ii) video footage from two neighboring pods; (iii) Southern New Mexico and STIU's procedures, log books, and master roster for inmates housed in unit 1A, for the six months before and one month after March 7, 2014; and (iv) impeachment materials and STIU file for Armenta and any other cooperating witness. See Motion to Compel at 2-3. According to the Motion to Compel, the "Prosecution has these materials and due process requires that they be given to the Accused so that they can fairly investigate and defend cases where each is facing life in prison." Motion to Compel at 4.

In support of their discovery requests, the Motion to Compel relies on the United States' duty to review files of the agencies involved in the investigation of this case, and disclose information favorable to all Defendants, pursuant to Kyles v. Whitley, 514 U.S. at 437. The Motion to Compel also references rule 16 and the United States' obligations under the Due Process Clause, and argues that "the standard of the trial court should simply be whether the evidence is favorable to the accused." Motion to Compel at 4 (citing United States v. Sudikoff, 36 F. Supp. 2d at 1196). In conclusion, the Motion to Compel reiterates the case's complexity and again requests this discovery.

     **5.**     **Motion to Compel Response.**

The United States responded to the Motion to Compel with the United States' Response in Opposition to Defendants' Motion to Compel Discovery [Doc. 668], filed September 30, 2016 (Doc. 710)("Motion to Compel Response"). The Motion to Compel Response begins by arguing that "the Discovery Motion advocates for a broad scope of discovery that the Court already concluded . . . [i]s inconsistent with" Brady v. Maryland, 373 U.S. at 87. Motion to Compel Response at 1. Accordingly, the Motion to Compel Response argues, some of the requests are nothing more than fishing expeditions. See Motion to Compel Response at 1. After recapping the case's factual and procedural history, and remaking the arguments that the United States made in its First Motion for Specific Discovery Response regarding the appropriate disclosure standards, the Motion to Compel Response then turns to the specific requests for discovery in the Motion to Compel. See Motion to Compel Response at 3-7 (arguing, generally, that the Court, in United States v. Hykes, 2016 WL 1730125, at *6, rejected the broader pretrial discovery standard announced in United States v. Sudikoff, 36 F. Supp. 2d at 1196).

Regarding the Motion to Compel's request for the statements of all of the Defendants that New Mexico State Police and the prison's STIU interviewed following J.M.'s murder, the Motion to Compel Response explains that the United States has, on March 25, 2016, already disclosed the requested information.  See Motion to Compel Response at 8.  Similarly, with respect to the request for the video footage from two neighboring pods, the Motion to Compel Response explains that the United States disclosed the video from J.M.'s pod on March 14, 2016, and that, after asking the New Mexico Corrections Department about the video for the neighboring pod, that video does not exist.  See Motion to Compel Response at 8.

Then turning to the Motion to Compel's request for Southern New Mexico and STIU's procedures, log books, and master roster for inmates housed in unit 1A, for the six months before and one month after March 7, 2014, the Motion to Compel Response objects, pursuant to United States v. Hykes, to discovery of "SNMCF's procedures for monitoring inmates in housing unit 1A."  Motion to Compel Response at 8.  The Motion to Compel Response argues that the Defendants have not provided a factual basis for the request, or identified how it is favorable and material to their defense, and that the request is thus a fishing expedition.  See Motion to Compel Response at 8-9.  The Motion to Compel Response also opposes discovery of the log books that the Motion to Compel seeks because, the United States argues, the Motion to Compel has not alleged how "seven months[] total" of log books may contain information helpful to their defense or otherwise "material to their guilt or punishment."  Motion to Compel Response at 10.  Last, concerning this request, the Motion to Compel Response argues that a "master roster" does not exist.  Motion to Compel Response at 10.

Regarding the Motion to Compel's request for the impeachment materials and the STIU file for Armenta and for any other cooperating witness, the Motion to Compel Response provides

- 27 -

that such discovery is not appropriate at this time.  <u>See</u> Motion to Compel Response at 11.  The Motion to Compel Response thus objects to this discovery request.  <u>See</u> Motion to Compel Response at 11.

      **6.**      <u>**Second Motion for Specific Discovery.**</u>

      Troup, B. Garcia, Alonso, A.A. Garcia, and Perez filed the Second Motion for Specific Discovery, which relates to Count 3 of the Superseding Indictment.  <u>See</u> Second Motion for Specific Discovery at 1-2.  Count 3 regards the murder of inmate F.S., a known informant, who was housed at Southern New Mexico in the "1-A/Blue unit, cell 113."  Second Motion for Specific Discovery at 2.  Administrative proceedings, following the murder, were brought against Troup, Alonso, Clark, A.A. Garcia, R. Hernandez, and four other inmates who are not Defendants in this case.  <u>See</u> Second Motion for Specific Discovery at 2-3.  The Second Motion for Specific Discovery then makes specific discovery requests of the United States.  <u>See</u> Second Motion for Specific Discovery at 3.  These requests are for: (i) unredacted copies of all documents provided in discovery; (ii) all documents in the files bearing case number 281-AQ-62017, as well as all documents in related federal investigations of SNM; (iii) STIU files on all inmates who were at Southern New Mexico on June 16, 2007; (iv) criminal history, impeachment materials, and STIU files for any cooperating informant witness; (v) penitentiary packs for F.S., and all inmates housed in Blue Pod on June 17, 2007; (vi) any and all files, including intelligence materials, concerning SNM and listing suspected and confirmed SNM members and their activities from the time period that SNM was formed to the last date alleged in the Superseding Indictment, February 27, 2016; (vii) any and all files on Los Carnales listing suspected and confirmed members and their activities, specifically including such files for F.S.; (viii) Security Threat Group investigation files for the entire SNM from 1985 until 2016; (ix)

separation listings by the prison system for F.S.; (x) Administrative Segregation waivers that F.S. signed; (xi) the listing of inmates at Southern New Mexico that may have been free to move amongst pods; (xii) log books for the three months before and after June 17, 2007; (xiii) the United States' DNA analyst's notes, electropherograms and graphs; (xiv) copies of the inmate F.S.'s flyer, otherwise known as their Wanted for Escape/Master Record Entry; (xv) the Security Threat Group "Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates; (xvi) any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate or affiliate of SNM; and (xvii) any and all documents in the United States' possession relating to SNM's philosophy, practices, and activities in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations. See Second Motion for Specific Discovery at 3-7.

In support of the discovery requests, the Second Motion for Specific Discovery argues that rule 16 of the Federal Rules of Criminal Procedure, Kyles v. Whitley, 514 U.S. at 437, Brady v. Maryland, Giglio v. United States, "and other authorities cited herein," counsel the Court to rule in favor of the motion. Second Motion for Specific Discovery at 7-8. The Second Motion for Specific Discovery, then, provides the exact same legal arguments that were made in support of the discovery requests in the First Motion for Specific Discovery. See Second Motion for Specific Discovery at 8-17. See also First Motion for Specific Discovery at 11-27. Because the Court has already detailed those arguments regarding the disclosure standard that the Second Motion for Specific Discovery Defendants propose, supra in the procedural background section for the First Motion for Specific Discovery, the Court will not again describe the arguments, as

they use the exact same wording.  <u>See</u> Second Motion for Specific Discovery at 8-17.  The

Second Motion for Specific Discovery concludes, with the exact same wording from the First

Motion for Specific Discovery's conclusion, by imploring the Court to "use its inherent power to

order the requested discovery," and to "control its docket to ensure that cases before the court are

handled efficiently and fairly, as well as" in accordance with "Rule 16 of the Federal Rules of

Civil Procedure and" <u>Brady v. Maryland</u>.  Second Motion for Specific Discovery at 16.

   **7.**  <u>**Second Motion for Specific Discovery Response**</u>**.**

   The United States responded to the Second Motion for Specific Discovery with the

United States' Response in Opposition to Defendants' Motion for Specific Discovery [Doc. 678],

filed September 22, 2016 (Doc. 694)("Second Motion for Specific Discovery Response").  As it

did in the First Motion for Specific Discovery Response, the United States, in the Second Motion

for Specific Discovery Response, argues that the requests are for a broad range of discovery to

which neither the Federal Rules of Criminal Procedure nor the United States Constitution entitles

them.  <u>See</u> Second Motion for Specific Discovery Response at 1.  Accordingly, the Second

Motion for Specific Discovery Response characterizes most of the Second Motion for Specific

Discovery's requests as being part of a fishing expedition that the law does not authorize.  <u>See</u>

Second Motion for Specific Discovery Response at 1.

   After a brief recap of the factual allegations underlying Count 3, the Second Motion for

Specific Discovery Response then reiterates its arguments relating to the standard for discovery.

<u>See</u> Second Motion for Specific Discovery Response at 2-5. As the Second Motion for Specific

Discovery did, the United States makes much of the same legal argument that it makes in its

briefing for the First Motion for Specific Discovery.  <u>See</u> Second Motion for Specific Discovery

Response at 3-8.  In essence, the United States relies on <u>United States v. Hykes</u>, whereas the

Second Motion for Specific Discovery relies on United States v. Sudikoff, and the Second

Motion for Specific Discovery Response thus argues that "to show that certain materials should

be disclosed, the Defendants must demonstrate specific facts that support that the requested

discovery may contain material information."  Second Motion for Specific Discovery Response

at 7.  The Second Motion for Specific Discovery Response then takes the Defendants' requests in

turn.  See Second Motion for Specific Discovery Response at 8-16.

    Regarding the Second Motion for Specific Discovery's first request for unredacted

copies of all documents provided in discovery, the Second Motion for Specific Discovery

Response opposes that request out of concern for the safety of "alleged co-conspirators, who are

frequently ear-witnesses and/or eye-witnesses," particularly where SNM is concerned.  See

Second Motion for Specific Discovery Response at 8-9.  Further, the Second Motion for Specific

Discovery Response contends that "Defendants here have not come forth with any clear

explanation or specific information they seek that may show that the testimony of the CI could

be highly significant to the United States' charges and their defenses."  Second Motion for

Specific Discovery Response at 8-9 (internal quotation marks and alterations omitted).  The

United States, accordingly, objects to the Second Motion for Specific Discovery's "generic"

request.  Second Motion for Specific Discovery Response at 9.

    With respect to the Second Motion for Specific Discovery's request for all documents in

the files bearing the case number 281-AQ-62017, as well as all documents in related federal

investigations of SNM, the Second Motion for Specific Discovery Response incorporates its

response to the similar discovery request that the First Motion for Specific Discovery makes --

that being that, to the extent that any Defendant makes a specific showing that Count 3 is

addressed in related federal investigations, they may have that discovery; but, as it pertains to

- 31 -

case number 281-AQ-62017, it is still too early in the prosecution for disclosure.  See Second

Motion for Specific Discovery Response at 9.   The Second Motion for Specific Discovery

Response then makes a blanket argument that this request, as well of many of those that follow,

are overly broad and require specific facts supporting the requests for documents in these broader

files contain information to which the Second Motion for Specific Discovery Defendants are

entitled.  See Second Motion for Specific Discovery Response at 10.

Then turning to the Second Motion for Specific Discovery's request for STIU files on all

inmates who were at Southern New Mexico on June 16, 2007, the Second Motion for Specific

Discovery Response reiterates its opposition to such a request in the First Motion for Specific

Discovery Response, characterizing the requests as overly broad and as a fishing expedition.  See

Second Motion for Specific Discovery Response at 10.   The United States thus opposes this

request.  See Second Motion for Specific Discovery Response at 10.

The United States then incorporates its responses from the First Motion for Specific

Discovery Response, and addresses the Second Motion for Specific Discovery's requests for

criminal history, impeachment materials, and STIU files for any cooperating informant witness,

and for pen packs for F.S. and for all inmates housed in Blue Pod on June 17, 2007.  See Second

Motion for Specific Discovery Response at 11.   Accordingly, the United States opposes the

request for criminal history, impeachment materials, and STIU files for any cooperating

informant witness, because of a blanket concern for the safety of confidential informants, whom

SNM has a history of targeting; and opposes disclosing pen packs for F.S. and for all inmates

housed in Blue Pod on June 17, 2007, because, these packs are created by information on the

public record.  See Second Motion for Specific Discovery Response at 11.

- 32 -

Regarding the Second Motion for Specific Discovery's requests for any and all files, including intelligence materials, concerning SNM listing suspected and confirmed members, and their activities, from the time period that SNM was formed to the last date the Superseding Indictment alleges, February 27, 2016, and for any and all files on Los Carnales listing suspected and confirmed members and their activities, specifically including such files for F.S., the Second Motion for Specific Discovery Response argues that the United States has already responded to the same requests in the First Motion for Specific Discovery Response and, accordingly, continues to oppose the requests. See Second Motion for Specific Discovery Response at 11-12. The United States explains that the requests are nothing more than an overly broad fishing expedition and that the Second Motion for Specific Discovery has not demonstrated that there is anything specific amongst those files which may be material to the defense. See Second Motion for Specific Discovery Response at 11-12.

Turning to the Second Motion for Specific Discovery's request for Security Threat Group investigation files for the entire SNM from 1985 to 2016, the Second Motion for Specific Discovery Response argues that the request -- like the majority of the Second Motion for Specific Discovery's requests -- is overly broad, and fails to explain how the broad swath of files contains information that is material and favorable to them. See Second Motion for Specific Discovery Response at 12. The United States also argues that the information contained in these files may be sensitive and, in the interest of safety, further opposes the request. See Second Motion for Specific Discovery Response at 12.

With respect to the Second Motion for Specific Discovery's requests for separation listings by the prison system for F.S. and for Administrative Segregation waivers that F.S. signed, the Second Motion for Specific Discovery Response indicates that the United States will

comply with the requests.  See Second Motion for Specific Discovery Response at 12-13.

Accordingly, to the extent the items of discovery exist, the United States agrees, if possible, to

obtain them and disclose them.  See Second Motion for Specific Discovery Response at 13.

Regarding the Second Motion for Specific Discovery's request for the listing of inmates

at Southern New Mexico that may have been free to move amongst pods, the Second Motion for

Specific Discovery Response maintains that such a request is overly broad in light of United

States v. Hykes.  See Second Motion for Specific Discovery Response at 13-14.  Accordingly,

the United States opposes the request.  See Second Motion for Specific Discovery Response at

13-14.

Next, addressing the Second Motion for Specific Discovery's request for log books for

the three months before and after June 17, 2007, the Second Motion for Specific Discovery

Response maintains that the log books from this time period have been destroyed.  See Second

Motion for Specific Discovery Response at 14.  The Second Motion for Specific Discovery

Response goes on to provide, however, that the log books from the day of the murder are being,

or have been, disclosed.  See Second Motion for Specific Discovery Response at 14.

The Second Motion for Specific Discovery Response then indicates that, with respect to

the request for the United States' DNA analyst's notes, electropherograms and graphs, the

United States will comply and produce the information.  See Second Motion for Specific

Discovery Response at 14.  Regarding the Defendants' request for copies of the inmate F.S.'s

flyer, otherwise known as their Wanted for Escape/Master Record Entry, the Second Motion for

Specific Discovery Response similarly indicates that it will comply with the request as it

specifically pertains to F.S.  See Second Motion for Specific Discovery Response at 14-15.  With

respect to the Second Motion for Specific Discovery's request for the Security Threat Group

"Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates, the United States, as it did in the First Motion for Specific Discovery Response, maintains that such an item does not exist.  See Second Motion for Specific Discovery Response at 15.

Last, turning to the Second Motion for Specific Discovery's requests for any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM, and for any and all documents in the United States' possession relating to the philosophy, practices, and activities of SNM in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations -- the Second Motion for Specific Discovery Response once more argues that such requests are overbroad fishing expeditions which have not specifically shown how any information contained within might be favorable or material to their defense.  See Second Motion for Specific Discovery Response at 15-16.  Accordingly, the Second Motion for Specific Discovery Response opposes the requests in light of United States v. Hykes, and then concludes.

8.    **Second Motion for Specific Discovery Reply**.

Troup replied to the Second Motion for Specific Discovery Response with Edward Troup's Reply to United States' Response in Opposition to Defendants' Motion for Specific Discovery (Doc. 694), filed September 30, 2016 (Doc. 712)("Second Motion for Specific Discovery Reply").  With respect to the legal argument, the Second Motion for Specific Discovery Reply seeks to explain that

> [t]he burden of materiality under Rule 16 is not high.  The materiality standard under Rule 16 normally is not a heavy burden; rather, evidence is material as long

- 35 -

as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.

Second Motion for Specific Discovery Reply at 4.  Additionally, with respect to United States v. Hykes, in particular, the Second Motion for Specific Discovery Reply asks that, "for the purpose of this complex case, the Court should revisit its prior rulings declining to apply a prospective materiality analysis for *Brady* information."  Second Motion for Specific Discovery Reply at 5.

The Second Motion for Specific Discovery Reply then turns to each of the specific requests for discovery.  For the request for unredacted copies of all documents provided in discovery, the Second Motion for Specific Discovery Reply argues that Troup has not been demonstrated as a danger and that thus the "government's vague assertions about witness safety should fall on deaf ears."  Second Motion for Specific Discovery Reply at 11.  The Second Motion for Specific Discovery Reply thus stands by this request.  See Second Motion for Specific Discovery Reply at 11.  Regarding the request for all documents in the files bearing case number 281-AQ-62017, as well as all documents in related federal investigations of SNM, the Second Motion for Specific Discovery Reply argues that "[t]here were many years of investigation prior to the opening" of the prosecution leading to the charges in this case, and that, "[s]urely, there is information in the previous investigations that is material to the preparation of Mr. Troup's defense, especially where the indictment is so broad and far-ranging."  Second Motion for Specific Discovery Reply at 11-13.  Accordingly, the Second Motion for Specific Discovery Reply maintains that "[r]ight now there are certain things that Mr. Troup knows the government possesses even if he does not know the exact contents."  Second Motion for Specific Discovery Reply at 13.

With respect to the request for STIU files on all inmates who were at Southern New Mexico on June 16, 2007, the Second Motion for Specific Discovery Reply argues that this is not a fishing expedition, as the United States characterizes it, because, it relates to a single day -- that being the day of the murder.  See Second Motion for Specific Discovery Reply at 11-13.  With respect to the request for criminal history, impeachment materials, and STIU files for any cooperating informant witness, the Second Motion for Specific Discovery Reply argues that these requests are not a fishing expedition, because the information sought is "the government's case. . . .  [T]he only evidence against Mr. Troup appears to be the statements of cooperating government informants."  Second Motion for Specific Discovery Reply at 14.  Accordingly, the Second Motion for Specific Discovery Reply argues: "Where the government's case rests on the credibility of informants, it is essential that the government disclose information about those informants in a timely manner . . . ."  Second Motion for Specific Discovery Reply at 14-15.

Turning to the request for pen packs for F.S., and for all inmates housed in Blue Pod on June 17, 2007, the Second Motion for Specific Discovery Reply argues that the United States has the information, it is material to the defense's preparation, and that, thus, it must be disclosed.  See Second Motion for Specific Discovery Reply at 16.  Thus, according to the Second Motion for Specific Discovery Defendants, the United States' objection to this request, that being that it is public record, amounts to gamesmanship.  See Second Motion for Specific Discovery Reply at 16.  Regarding the request for any and all files, including intelligence materials, concerning SNM listing suspected and confirmed members, and their activities, from the time period that SNM was formed to the last date the Superseding Indictment alleges, February 27, 2016, to which the United States objects on overbreadth grounds, the Second Motion for Specific Discovery Reply argues that the breadth of the request simply matches the Superseding

- 37 -

Indictment's breadth.  See Second Motion for Specific Discovery Reply at 16-18 ("Mr. Troup does not seek to send the government fishing for anything.  He wants it to produce what he knows it has.").  For the request for any and all files on Los Carnales listing suspected and confirmed members, and their activities, specifically including such files for F.S., the Second Motion for Specific Discovery Reply argues that the Superseding Indictment specifically references gang wars, making this information likely to aid Troup in identifying alternate specifics.  See Second Motion for Specific Discovery Reply at 18.

Regarding the request for Security Threat Group investigation files for the entire SNM from 1985 until 2016, the Second Motion for Specific Discovery Reply takes issue with the United States' objection for overbreadth and also for sensitivity, providing that, "[t]o the extent that specific [safety] concerns do exist[], the government can certainly explain that information and seek another more specific protective order."  Second Motion for Specific Discovery Reply at 19.  Next, even though the United States agreed to comply with the requests for separation listings by the prison system for F.S., and for Administrative Segregation waivers that F.S. signed, the Second Motion for Specific Discovery Reply details its displeasure with the United States' choice to hedge its agreement by saying "only if NMCD agrees to allow the United States to obtain the listing."  Second Motion for Specific Discovery Reply at 19-21.  In support, the Second Motion for Specific Discovery Reply argues that "[t]here can be no doubt that this was and is a joint investigation between state and federal authorities.  There can also be no question that the government has access to all documents in NMCD possession, custody, or control."  Second Motion for Specific Discovery Reply at 19-21.

With respect to the request for the listing of inmates at Southern New Mexico who may have been free to move amongst pods, the Second Motion for Specific Discovery Reply

recognizes its overbreadth and instead now specifically requests this information only for Southern New Mexico on July 16 and 17, 2007.  See Second Motion for Specific Discovery Reply at 21.  Regarding the request for copies of the inmate F.S.'s flyer, otherwise known as their Wanted for Escape/Master Record Entry, which the Second Motion for Specific Discovery Reply acknowledges the United States will disclose as to F.S., the Second Motion for Specific Discovery Reply further indicates that the Defendants seek these flyers for all inmates at SNMCF on July 16 and 17, 2007.  See Second Motion for Specific Discovery Reply at 21-23. The Defendants also argue that the Security Threat Group "Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates -- which the United States alleges does not exist -- exists.  See Second Motion for Specific Discovery Reply at 23-24.  It exists, Troup argues, because "an NMCD employee provided the SNM organization with . . . 2) Master roster . . . ."  Second Motion for Specific Discovery Reply at 24 (citing Full Investigation entry for Case 281D-AQ-54711-302 (dated September 25, 2001), filed September 20, 2016 (Doc. 712-4)).  Last, regarding the requests for any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM, and any and all documents in the United States' possession relating to the philosophy, practices, and activities of SNM in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations -- the Second Motion for Specific Discovery Reply maintains that the information is material, and in the United States' possession, custody, and control -- i.e., it must be disclosed.  See Second Motion for Specific Discovery Reply at 24-25.

- 39 -

9.      **The October 4, 2016, Hearing**.

The Court held a hearing on October 4, 2016.  See Transcript of Hearing, taken October

4, 2016 (Doc. 743)("Tr.").   The Court began with argument on the Motion to Compel,

specifically the Motion to Compel's request for the statements of all the Defendants whom the

New Mexico State Police and the prison's STIU interviewed following J.M.'s murder.  See Tr. at

13:6-11 (Strickland).   Despite acknowledging that the United States has indicated that it has

disclosed that information, the Motion to Compel Defendants argued that neither Mr. Aoki -- the

discovery coordinator who receives discovery and distributes it to Defendants on tablets -- nor

they, had received all of the requested interviews.  See Tr. at 1:1-15:09 (Strickland).  The United

States then indicated that it would try to send them again, and the Court ordered it be done within

fourteen days.   See Tr. at 15:10-16:3 (Beck, Court).   Argument then turned to the request for

video footage from two neighboring pods; the Motion to Compel Defendants indicated that they

had received video footage for the pod where the murder occurred, but then requested once more

that the United States check with the STIU and with the state police to ensure that the video from

the neighboring pod does not exist.  See Tr. at 16:18-23 (Strickland).  The United States agreed,

and the Court ordered that it check with the FBI, the STIU, and the state police.  See Tr. at 17:1-

8 (Beck, Court).

The Motion to Compel Defendants then explained the background giving rise to their

request for the impeachment materials and STIU file for Armenta, and any other cooperating

witness, which is that, essentially, Armenta -- a witness linking the Motion to Compel

Defendants to this jail-homicide -- had given a number of inconsistent stories surrounding the

homicide of J.M. underlying Counts 6 and 7.  See Tr. at 17:9-18:16 (Strickland).  In response,

the United States argued that the United States is "aware of its obligations . . . with regard to . . .

- 40 -

impeachment material," and that it is "open and agreeable to producing the Jencks and impeachment material two weeks before trial, even though our obligation is not to do so until trial."  See Tr. at 18:21-19:18 (Beck).  The United States then explained that its ability to uncover STIU's files is less so than the Defendants would have the Court believe, because, while they have a close relationship with the New Mexico Corrections Department, the STIU is a distinct entity within the Department.  See Tr. at 19:25-21:24 (Beck).  The United States also indicated that "NMCD has been very good about getting the requested information.  So I think with regard to files, like STIU files, that may contain some information about the defendants or other inmates, I think if we called on the phone they would work with us to get their hands on it." Tr. at 21:25-22:6 (Beck).  Accordingly, the Court ruled that STIU's files were in the possession, custody, and control of the United States, and that the Court was not "going to require any Jencks material to be produced before the 14 days," but that "I am going to require early Brady review of these materials by the Government. . . .  You've got to produce the Brady material promptly, immediately."  Tr. at 23:2-19 (Court).  The Motion to Compel Defendants responded to the Court's ruling by indicating that "I'm only moving under Rule 16 at this point. . . .  Brady and Jencks aren't the only ways to get impeachment materials. . . .  [A]nd 14 days before trial is totally insufficient."  Tr. at 24:2-8 (Strickland).  The Court commiserated, and encouraged the United States to disclose "as soon as it can," "[b]ut I'm not going to order them to do it more than they have on Jencks material."  Tr. at 25:24-26:2 (Court).  Further, the Court provided, "if it's Brady material, if it's DNA and those sort of things, and they fall into the Brady category -- I'm talking about just Jencks material you can wait on."  Tr. at 26:3-26:12 (Court).  The Motion to Compel Defendants last addressed a discovery request for the DNA analysis, notes, electropherograms, and notes -- which they argued includes the hard data -- to which the United

States responded that they had produced everything but also indicated that they would "go back and see if the DNA was in there.  And if it wasn't we will go back to the State and ask for that." Tr. at 29:3-13 (Beck).

The parties then argued about the extent to which the United States Attorney's Office had possession, custody, and control of the information that the various state agencies investigating this case have.  See Tr. at 25:24-26:2 (Beck, Strickland, Court).  The Court addressed the Motion to Compel Defendants and stated that it was not inclined to "think that the State Police's files are in the United States' possession, custody, or control.  So I think they made a representation they've turned over everything that they have.  But if you don't think that they've gotten everything, you're going to have to go to the State Police."  Tr. at 32:25-33:8 (Court).  The Motion to Compel Defendants then turned the argument to the request for the procedures, log books, and master roster from Southern New Mexico and STIU for inmates housed in unit 1A for the six months before and one month after March 7, 2014.  See Tr. at 33:9-16 (Strickland, Court).  The Court inquired why the Motion to Compel Defendants needed seven months, and the Motion to Compel Defendants replied that the homicide victim had "ongoing disputes," and that they thus wanted to review the log books to "potentially develop other motives . . . and potentially other suspects."  Tr. at 33:17-35:3 (Strickland).  The Court compromised and ordered that the United States produce the log books for three weeks before and three days after the incident, denying the request "without prejudice" in case those produced log books show something that might require further production.  Tr. at 36:12-25 (Court).  The Court similarly ordered production of the New Mexico Corrections Department procedures, i.e., the procedures regarding how the log books are put together, for that same time period, assuming that the New Mexico Corrections Department complies with the United States' rule 17 subpoena.  See Tr. at

- 42 -

37:21-40:6 (Court).  Regarding the "master roster" the Court requested that the parties "look and

see if there is anything that gives any sort of indication that they were having an ongoing dispute,

and I think that should be produced. . . .  If it doesn't exist, tell Ms. Strickland that you did the

review and could not find any support in whatever this master roster is, and indicate that it didn't

produce any information that is relevant."  Tr. at 39:21-41:6 (Court).

Turning next to the First Motion for Specific Discovery, the First Motion for Specific

Discovery Defendants first indicated that they were all adopting the others' arguments unless

they specifically objected.  See Tr. at 44:23-45:5 (Castle).  The First Motion for Specific

Discovery Defendants then argued:

> The way I look at it is really three layers of disclosure.  At its base we have what
> the due process clause requires, either in the Brady, Giglio, Kyles progeny.  The
> next layer, which is broader, which is Rule 16.  And then, finally, there is a third
> layer, which we haven't talked about today, which is -- but I think the Court has
> exercised -- which is disclosure to the Court in its supervisory power can order,
> because it's appropriate for the particular case. . . .  [I]f the Court in its discretion
> orders disclosure in a particular area today, then we don't even need to address
> the Rule 16 and Brady issues, because it's a broader concept.  And this is not --
> the Court doesn't need to exercise its discretion in an ordinary criminal case,
> because Rule 16, Brady pretty much protect everybody in your ordinary criminal
> case.  But this is not the ordinary criminal case.  This is a case that -- it probably
> is the largest criminal prosecution in the history of this district, and probably one
> of the largest criminal prosecutions in this country at this time.  And the reason
> that's important is because, when we look at a prosecutor in a normal criminal
> case, it's fairly easy for them to identify what is Brady material, what is Giglio
> material, what is Rule 16 material.

Tr. at 46:11-47:17 (Castle).  Here, however, the First Motion for Specific Discovery Defendants

argued, the United States has thus far "not been that good at analyzing" the potential defenses,

and thus "think that the Court should, in this extraordinary situation, order more discovery than it

would otherwise."  Tr. at 47:18-48:23 (Castle).  Further, the First Motion for Specific Discovery

Defendants also indicated that the two-weeks-before trial date, when the United States intends to

disclose impeachment materials and the like, is not going to be sufficient.  See Tr. at 50:10-19

(Castle).  Speaking generally, the First Motion for Specific Discovery Defendants reiterated their contention that "the investigating agencies are . . . under the umbrella of the prosecution," because the relevant "governmental agenc[ies are] closely aligned with the prosecution."  Tr. at 52:10-25 (Castle).  In support, the Defendants discussed how the "New Mexico Department of Corrections investigated, and so did the State. . . .  So I would suggest that if there is a case where we look to see whether the New Mexico Corrections Department or these local law enforcement agencies are closely aligned with the prosecution, this is the case."  Tr. at 55:3-56:1 (Castle).

At this point, the First Motion for Specific Discovery Defendants began argument that "urg[ed] the Court to consider using a different standard" with respect to the application of "Sudikoff" instead of the Court's allegedly sea-changing decision in United States v. Hykes for criminal discovery matters.  Tr. at 59:11-19 (Castle).  Essentially, the Defendants argue that

> the Brady materiality standard is not useful in this context. . . .  And so we're encouraging the Court to use a different standard.  And I believe the possible exculpatory standard taken by . . . the Sudikoff case, works so that a prosecutor doesn't have to guess what the effect of that piece of evidence is going to be at trial that hasn't occurred in the context of a defense that they haven't seen.  It allows a prosecutor a much cleaner line, which is to look at particular evidence and say, is it possibly exculpatory?  Is there a chance that this is going to be something that would be of value to the defense?  Then you provide it.

Tr. at 59:23-61:17 (Castle).  Accordingly, with respect to the "last prong of Brady," materiality, the First Motion for Specific Discovery Defendants argued that "there is a difference between what needs to be disclosed under the Due Process Clause, and what will result in a reversal under the Due Process Clause."  Tr. at 62:1-13 (Castle).

The Court then addressed this discussion of its decision in United States v. Hykes, providing:

- 44 -

DNM 826

I'm not sure that Hykes . . . [i]s really a sea change in the way I've done things. I think Hykes is a little bit of a reaction to Kozinski's opinion, or article. It's a reaction to what Pregerson has done in the [c]entral [d]istrict. I think it was probably good that it was done in another case without all the pressure of this. I guess, probably, I'm not inclined to reconsider it. It seems to me those guys have a particular view of Brady violations that I don't quite share. And they're throwing out a lot of law to get there, is sort of my thoughts on that. And so I'm going to take a fresh look at it. You have my word on that. But that was some work I did over the summer, so it's fairly fresh on my mind. So I'm not likely to reconsider it. But, at the same time, I think what you see is, in the other opinions, you know, I take a fairly liberal view of rule 16, take a fairly liberal view of Brady, fairly liberal view of Jencks material, both in my in camera reviews and working with the U.S. Attorney's Office here. So if that's of guidance to anybody, that's the way I see myself.

Tr. at 65:17-66:19 (Court).

The United States then argued, and conceded that "this is a joint investigation" with either of the "STIU, NMCD, or the FBI." Tr. at 67:1-14 (Beck). The United States then "pointed the Court to its decision in Hykes," in particular "Footnote 12 at page 19 to 20," which, in the United States' words, reads: "The Court consistently stated that it cannot require the United States to get documents from third parties or to seek documents that refuse access to the United States." Tr. at 67:15-23 (Beck). The United States also argued that "[i]n Hykes I think the Court takes a little bit more nuanced of a position . . . in requiring some sort of factual demonstration that requested materials contain information that is properly discoverable under rule 16, or properly disclosed under Brady." Tr. at 69:18-23 (Beck). Regarding United States v. Hykes, the United States intimated that,

in that case, it was -- I understand it was a motion to disclose Giglio material. . . . the defendant came forth with known excessive force cases that three BCSO officers, who were involved in arrest of that defendant, had been in. So I submit to the Court that . . . it's vastly different to come and ask for 600 STIU files and everything in there, versus asking for three personnel files and pointing to specific facts.

Tr. at 70:1-11 (Beck).

- 45 -

The First Motion for Specific Discovery Defendants then took up argument once more, and, after pressing that this prosecution's size is primarily a consequence of the span of years the Superseding Indictment charges, addressed their specific discovery requests.  See Tr. at 71:22-72:1 (Castle).  With respect to the First Motion for Specific Discovery's first request, for a prior interview of Lujan, coming before August 8, 2007, the United States agreed to produce the statements from that prior interview if they were able to find it.  See Tr. at 73:2-75:11 (Castle, Beck).  The United States also reiterated that it would produce everything that the Court orders at the hearing within fourteen days, whenever possible.  See Tr. at 75:17-24 (Beck).  For anything related to production of DNA, however, the United States indicated that -- because that request entails production of DNA results and hard data underlying those results, it may take longer, if it is even feasible.  See Tr. at 76:21-77:6 (Beck).  The United States also indicated that, again, it is going to be at the State of New Mexico's whims for these DNA reports and that it may not get the hard data.  See Tr. at 76:21-77:6 (Beck).  The Court ruled that the United States would need to try what it could, and if it could not get everything related to the DNA, get what it could and alert Mr. Castle.  See Tr. at 77:10-16 (Court).

The parties next turned to the First Motion for Specific Discovery's request regarding discovery from the previous FBI investigation files related to SNM.  See Tr. at 78:2-22 (Castle). The United States indicated that it had, for the more recent investigations, complied and produced the materials; yet, for the "significantly older" files, the United States indicated that it would go back and review them for Rule 16 and Brady obligations, using the Court's "liberal Rule 16 and Brady eyes."  Tr. at 78:25-79:11 (Beck, Court).  The First Motion for Specific Discovery Defendants then limited their admittedly broad request for all STIU files for inmates at Southern New Mexico, instead requesting just those for those inmates in the relevant cell

- 46 -

blocks whom the United States had indicated were suspects in the alleged murders. <u>See</u> Tr. at 79:14-24 (Castle). The United States agreed and indicated, to the extent STIU would produce the materials, it would "review these with your Honor's liberal standard in mind and produce Rule 16 materials." Tr. at 81:25-82:11 (Beck). Still at issue was the request for Lujan's STIU file, which the United States intended to treat like the rest of the STIU files, because, unlike what the First Motion for Specific Discovery Defendants are asserting, Lujan is not a cooperating government witness. <u>See</u> Tr. at 82:23-83:9 (Beck). The Court then reiterated the order to additionally look at Lujan's STIU file for <u>Brady</u> and rule 16 information. <u>See</u> Tr. at 85:3-4 (Court).

The parties then noted that the United States had complied with the First Motion for Specific Discovery's requests for the seperatee listing for the murder victims, the victim's segregation waivers, and a wanted-for-escape master record entry, or soon would be complying. <u>See</u> Tr. at 85:20-87:3 (Castle). The discussion then turned to the request for the log books, which the United States argued had been destroyed pursuant to administrative protocol, and the First Motion for Specific Discovery Defendants changed their request to being when precisely those log books were destroyed given the fact that SNM has been under investigation, as of at least 2007, making it odd that the relevant log books had not been preserved. <u>See</u> Tr. at 89:9-16 (Castle). The United States agreed to inquire as to the destruction's date. <u>See</u> Tr. at 89:19-22 (Beck).

The First Motion for Specific Discovery Defendants then pressed the issue of pen packs, at which point the United States indicated that "we've conceded that we will provide the victims' pen packs. We'll also provide all of the defendants' pen packs," thereby addressing this discovery request. Tr. at 91:11-13 (Beck). The United States further took the opportunity to

- 47 -

remind the Court that its contention was that "there is a difference, from our standpoint . . .
between documents involved in this investigation and STIU files outside of this investigation."
Tr. at 93:12-22 (Beck).  The First Motion for Specific Discovery Defendants next addressed their
request in the First Motion for Specific Discovery relating to any and all files, including
intelligence materials, for SNM.  <u>See</u> Tr. at 94:2-19 (Castle). The Court, upon hearing the
parties' arguments relating to the numerous federal and state investigation files covering SNM,
ruled that for the state investigation files, with there potentially being up to "600," the United
States will take those "one at a time."  Tr. at 107:18-108:4 (Court).  That ruling means, the Court
indicated, that where it is brought to the United States' attention that one of those files is of
importance to the defense, it would investigate and produce the files to the First Motion for
Specific Discovery Defendants.  <u>See</u> Tr. at 107:18-108:4 (Court).  For the federal investigations,
however, the United States stated: "[T]hey're saying they know of five.  They're going to do the
Brady and Rule 16 review of those files. . . .  And then we have a little bit of dynamic process to
go with the state files."  Tr. at 108:13-17 (Court).  Further, with respect to how closely the
United States needs to look at these files, the Court reminded the United States that it "takes a
human being sitting there putting their feet in the defense lawyers' shoes and saying, 'Could I
use this?'"  Tr. at 111:2-18 (Court).

The First Motion for Specific Discovery Defendants then turned to their last request of
the First Request for Specific Discovery, which is for the list of inmates at the PNM North
facility between January 1, 2001, and March 26, 2001.  <u>See</u> Tr. at 111:21-25 (Castle).  The
United States contested this request, however, and indicated that it was only willing to produce
names for the day of the murder, March 26, 2001, so the First Motion for Specific Discovery
Defendants may have a list of alternate suspects.  <u>See</u> Tr. at 112:1-12 (Beck).  The First Motion

- 48 -

for Specific Discovery Defendants indicated that part of the reason for their response's breadth was because there had been a meeting "in 2001[;] while in the custody of New Mexico Corrections Department, Frederico Munoz attended a meeting with SNM gang leaders, in which hits were placed on the two victims in this case."  Tr. at 113:8-19 (Castle).  The Court, accordingly, ordered that "we find out the date of the meeting, and back it up two weeks.  And then it will be the list of the inmates two weeks before that meeting, up to March 26."  Tr. at 116:1-5 (Court).  After some further discussion, the Court pushed the discovery to three days after the March 26 murder, and ordered that the United States would have "30 days" on this production. Tr. at 118:2-7 (Court).

The Court then took argument from the other First Motion for Specific Discovery Defendants that had joined the First Motion for Specific Discovery.  See Tr. at 120:13-15 (Court).  Troup requested that the United States produce a pen pack for an alternate suspect in one of the murders named "Lawrence Torrez."  Tr. at 121:21-25 (Harbour-Valdez).  The Court ordered the United States to include that pen pack in its disclosures.  See Tr. at 122:6-7 (Court). Baca then explained to the Court that it would be prudent for the United States, when it is doing its discovery review, to consider that one of the theories for the Defendants "banding together" might be that they needed protection from the deplorable conditions in the New Mexico prison system which had led to an outburst of "intergang warfare."  Tr. at 122:1-124:13 (Lowry).  Perez then requested that the Court adjust some of its discovery rulings for the First Motion for Specific Discovery -- which relates to Counts 1 and 2 of the Superseding Indictment, the murder of F.C. and R.G -- and apply them to its rulings on the Motion to Compel -- which relates to Counts 6 and 7 of the Superseding Indictment, the conspiracy to murder and murder of J.M.  See Tr. at 125:6-11 (Villa).  The Court agreed to order the United States to review STIU files in the

same manner as it had already ruled, order the United States to produce the pen packs for the victim in Counts 6 and 7, and order the United States to produce the list of inmates' names in Southern New Mexico's pods 1A and 1B two weeks before, and three days after, the murder of J.M. underlying Counts 6 and 7.  See Tr. at 125:25-130:16 (Court, Villa).  Baca then requested, and the Court ordered, that the United States produce the list of inmates housed at PNM North on the date of the murder underlying Counts 6 and 7.  See Tr. at 132:24-133:7 (Court, Lowry).  The Court then concluded the argument on the First Motion for Specific Discovery and turned to the Second Motion for Specific Discovery.  See Tr. at 133:22-25 (Court).

The first request that the Second Motion for Specific Discovery Defendants addressed during argument on the Second Motion for Specific Discovery was unredacted copies of all documents produced to date.  See Tr. at 141:6-14 (Burke).  After the United States indicated that any redaction related to the identity of a confidential informant or cooperator, and that the Court would need to "take these one at a time and make the showing . . . that's necessary for the Court to order disclosure," Tr. at 142:21-24 (Court), the Second Motion for Specific Discovery Defendants dropped the request, leaving it for another day, see Tr. at 143:2-4 (Burke).  The parties next addressed the Second Motion for Specific Discovery's request for STIU files for all inmates at Southern New Mexico on June 16, 2007.  See Tr. at 145:1-5 (Burke).  The United States clarified what the Court had ordered, and what the United States was going to do, with the STIU file requests:

> [W]e've agreed to review the STIU files for the defendants.  And we've agreed to review the STIU files for the list of suspects that were identified by Mr. Castle in the first specific discovery motion.  We've agreed to review the STIU files for the suspects I believe Mr. Villa will point out to us from the second discovery motion [sic]. . . .  So that same thing would go here.  We will still review the defendants' STIU files . . . but we have not been provided any information on other suspects, and we have not agreed to review the STIU files on all inmates who are on SNM CF on June 16, 2007."

- 50 -

Tr. at 145:6-21 (Beck).  The Court decided not the change its rulings and denied the Second

Motion for Specific Discovery Defendants' requests.  See Tr. at 146:3-4 (Court).

The United States then addressed the Second Motion for Specific Discovery's request for

pen packs for all inmates "housed in the blue pod on June 17," see Tr. at 141:14-19 (Burke),

arguing that "the way that we've been viewing it is that, like the STIU files, if the defendant or

the defendants have specific suspects they believe, we would request of New Mexico Corrections

Department, if those exist, that they turn them over," Tr. at 147:1-11 (Beck).  The Court agreed.

See Tr. at 147:16-19 (Court).  The Second Motion for Specific Discovery Defendants next

argued in favor of their request in the Second Motion for Specific Discovery for the New Mexico

Corrections' Department's "guidelines for assessing, classifying, and validating an inmate,"

which would help the Second Motion for Specific Discovery Defendants understand how

inmates were classified as SNM.  Tr. at 148:7-15 (Burke).  The United States objected to this

request, because, first, "I don't think we have custody or control over those specific regulations

and guidelines, as opposed to actual files," and second, the request "does not fall under Rule 16."

Tr. at 149:1-13 (Beck).  According to the Second Motion for Specific Discovery Defendants,

"they shouldn't be permitted to testify that so and so is a member of a gang if they're not willing

to tell us what the criteria is for membership."  Tr. at 149:13-17 (Burke).  The Court concluded

that, "if you're going to have corrections people come in and say Mr. Baca is a member of the

SNM gang, then I guess I do think you should produce something that indicates how they make

that determination."  Tr. at 150:6-10 (Court).  The Court also concluded that "if . . . you're going

to have an expert do it . . . then I would be inclined to deny the request.  So at the present time

I'll deny the request."  Tr. at 150:11-19 (Court).

- 51 -

The next Second Motion for Specific Discovery request is the master roster, which a confidential source stated exists and is in the possession of one "Geraldine Martinez," and which the United States maintained they had requested from the New Mexico Department of Corrections, but to no avail.  Tr. at 152:8-155:2 (Beck, Burke).  The Court ruled that "if the representation at the present time is the Government cannot locate this document, then I have to deny the request.  I would like the Government to poke around a little bit more."  Tr. at 155:3-6 (Court).  The Court also stated "why don't we also try to have the FBI locate Geraldine Martinez, and put that document in front of her . . . ."  Tr. at 155:16-21 (Court).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE
## IN CRIMINAL CASES

In Brady v. Maryland, the Supreme Court of the United States explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87 ("Brady").  In Giglio v. United States, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405 U.S. at 153 ("Giglio"); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

- 52 -

different.'"  Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at

682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose

exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414

F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose

exculpatory evidence clearly supporting a claim of innocence even without request.").  On the

other hand, "[i]t is well settled that there is no affirmative duty upon the government to take

action to discover information which it does not possess."  United States v. Badonie, 2005 WL

2312480, at *2 (D.N.M. 2005)(Browning, J.)(internal quotation marks omitted).  "A prosecutor

does not have a duty . . . to obtain evidence from third parties."  United States v. Badonie, 2005

WL 2312480, at *2.

    During a criminal prosecution, the Federal Rules of Criminal Procedure and the

Constitution of the United States of America require the United States to disclose certain

evidence to a criminal defendant.  Rule 16 of the Federal Rules of Criminal Procedure is one

source that imposes such a duty on the United States.  The Due Process Clause of the United

States Constitution is another source imposing a duty to disclose on the United States.

### LAW REGARDING RULE 16

    Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E) Documents and Objects.**  Upon a defendant's request, the government must
permit the defendant to inspect and to copy or photograph books, papers,
documents, data, photographs, tangible objects, buildings or places, or copies or
portions of any of these items, if the item is within the government's possession,
custody, or control and:

   **(i)**     the item is material to preparing the defense;

   **(ii)**    the government intends to use the item it its case-in-chief at
            trial; or

   **(iii)**   the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition."  United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)).  Rule 16 also does not obligate the United States to "take action to discover information which it does not possess."  United States v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted).  Nor is the United States required to secure information from third parties.  See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.  The court may permit a party to show good cause by a written statement that the court will inspect ex parte.  If relief is granted, the court must preserve the entire text of the party's statement under seal.

- 54 -

Fed. R. Crim. P. 16(d)(1).   In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information."   In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d at 122.   In United States v. Delia, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." United States v. Delia, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16.   United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.**  If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> **(B)** grant a continuance;
>
> **(C)** prohibit that party from introducing the undisclosed evidence; or
>
> **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)).  In United

States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the United States Court of Appeals for the

Tenth Circuit held that "a court should impose the least severe sanction."  455 F.3d at 1131

(quoting United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988)).  The Tenth Circuit

noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as

preferred remedies."  455 F.3d at 1131.

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA

The Due Process Clause of the Constitution requires that the United States disclose to the

defendant any evidence that "is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  The Supreme Court of the United

States has extended the prosecution's disclosure obligation to include evidence that is useful to

the defense in impeaching government witnesses, even if the evidence is not inherently

exculpatory.  See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir.

2009)("[N]o distinction is recognized between evidence that exculpates a defendant and

'evidence that the defense might have used to impeach the [United States'] witnesses by showing

bias and interest.'"  (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States

v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same

constitutional treatment as exculpatory evidence.").  Finally, the Supreme Court has refined

Brady and clarified that it is not necessary that a defendant request exculpatory evidence:

"Regardless of request, favorable evidence is material, and constitutional error results from its

suppression by the government."  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United

States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The

government's obligation to disclose exculpatory evidence does not turn on an accused's

request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution

has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence

even without request.").

### 1.    Material Exculpatory Evidence Under Brady.

"The Constitution, as interpreted in Brady, does not require the prosecution to divulge

every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y

of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Brady requires disclosure only of

evidence that is both favorable to the accused, and "material either to guilt or to punishment."

Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been

different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202,

1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to

undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal

quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence

is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming,

19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also stated that evidence is material

if it "might meaningfully alter a defendant's choices before and during trial . . . including

whether the defendant should testify." Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting

United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotation marks omitted).

"To be material under Brady, undisclosed information or evidence acquired through that

information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir.

1995)(quoting United States v. Kennedy, 890 F.2d at 1059). The Supreme Court in Cone v. Bell,

556 U.S. 449 (2009), noted:

Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations.  See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)").  See also ABA Model Rules of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; the defendants have no obligation to first note that such materials exist.  See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6 (D.N.M. 2011)(Browning, J.).  This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way."  Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted).  Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant."  United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.

2.   **Timing of the Disclosure Under** Brady.

"The obligation of the prosecution to disclose evidence under <u>Brady</u> can vary depending on the phase of the criminal proceedings and the evidence at issue."  United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), <u>aff'd by</u> 742 F.3d 451 (10th Cir. 2014).  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in <u>Brady v. Maryland</u>."  United States v. Burke, 571 F.3d at 1054.  The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the <u>Brady</u> rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  United States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  United States v. Burke, 571 F.3d at 1054.  The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with <u>Brady</u>, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054.  Notably, "not every delay in disclosure of <u>Brady</u> material is necessarily prejudicial to the defense."  United States v. Burke, 571 F.3d at 1056.  "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."  United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under <u>Brady</u> have been triggered, however, they "continue[] throughout the judicial process."  Douglas v. Workman, 560 F.3d at 1173.  For instance, the prosecutor's obligation to disclose <u>Brady</u> material can arise during trial.  See <u>United</u>

States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise

from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of

favorable evidence (such as impeachment evidence) that is unavailable to the government until

trial is underway."). The disclosure obligation continues even while a case is on direct appeal.

See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th

Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received

after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of

impeachment information." United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide

whether the Constitution requires that preguilty plea disclosure of impeachment information.

We conclude that it does not."). The Supreme Court recognized that "impeachment information

is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."

United States v. Ruiz, 536 U.S. at 632 (emphasis in original). The Supreme Court acknowledged

that, "[o]f course, the more information the defendant has, the more aware he is of the likely

consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but

concluded that "the Constitution does not require the prosecutor to share all useful information

with the defendant." United States v. Ruiz, 536 U.S. at 632. The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness
> of relevant circumstances, does not require complete knowledge of the relevant
> circumstances, but permits a court to accept a guilty plea, with its accompanying
> waiver of various constitutional rights, despite various forms of misapprehension
> under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630. The Supreme Court explained that "a constitutional

obligation to provide impeachment information during plea bargaining, prior to entry of a guilty

plea, could seriously interfere with the Government's interest in securing those guilty pleas that

- 60 -

are factually justified, desired by defendants, and help to secure the efficient administration of

justice." United States v. Ruiz, 536 U.S. at 630.   The Tenth Circuit has reiterated these

principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not
> know that he was giving up a claim that the government failed to disclose
> impeachment evidence.   The Supreme Court, however, foreclosed this exact
> argument in United States v. Ruiz, by holding that the government has no
> constitutional obligation to disclose impeachment information before a defendant
> enters into a plea agreement.   Ruiz emphasized that "impeachment information is
> special in relation to the fairness of a trial, not in respect to whether a plea is
> voluntary."   Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if
> the defendant fully understands the nature of the right and how it would likely
> apply in general in the circumstances -- even though the defendant may not know
> the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United

States v. Ruiz, 546 U.S. at 630).[4]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to

exculpatory evidence, but rather applies only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects.   First, the evidence
> withheld by the prosecution in this case is alleged to be exculpatory, and not just
> impeachment, evidence.   Second, Ohiri's plea agreement was executed the day

---

[4]United States v. Johnson is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See
10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their
persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order has persuasive value with respect to
> a material issue in a case and would assist the court in its disposition, we allow a
> citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).   The Court
concludes that United States v. Johnson and United States v. Ohiri, 133 F. App'x 555 (10th Cir.
2005)(unpublished), have persuasive value with respect to a material issue, and will assist the
court in its disposition of this Memorandum Opinion and Order.

- 61 -

jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in <u>Ruiz</u> that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a <u>Brady</u> violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

<u>United States v. Ohiri</u>, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished). The Tenth Circuit qualified its holding in <u>United States v. Ohiri</u>, however, stating that the case presented "unusual circumstances." 133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether <u>Brady v. Maryland</u>'s restrictions apply to suppression hearings." <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1151. In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u> applies to a suppression hearing, rejected a defendant's argument that the prosecution violated <u>Brady</u> by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material. <u>See</u> <u>United States v. Johnson</u>, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision). Specifically, the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different. First, we question whether the evidence in question would have been admitted at the suppression hearing. Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined. Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the <u>Brady</u> line of Supreme Court cases applies to suppression

- 62 -

hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet Brady rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'"    United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir. 1999)(citation omitted).  Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie.    See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the Brady issues at stake here.").  The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."    United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).  The Second Circuit also noted that Brady's applicability to suppression hearings was not "obvious" for plain error purposes.  United States v. Nelson, 193 F. App'x 47, 50 (2d Cir. 2006).

Before the Supreme Court issued its United States v. Ruiz decision, the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that Brady applies to suppression hearings.  See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "Brady rests on the idea that due process is violated when the withheld

- 63 -

evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine

a defendant's guilt or punishment." United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir.

2015)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir.

2013)(acknowledging that "[w]hether *Brady's* disclosure requirements even apply at the motion

to suppress stage is an open question")).  Although the United States Courts of Appeals have

split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must

disclose impeachment evidence before a suppression hearing in light of the Supreme Court's

conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment

evidence before the entry of a guilty plea." United States v. Harmon, 871 F. Supp. 2d at 1151.

The Tenth Circuit affirmed United States v. Harmon, in which the Court concluded that the

United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of United States v. Ruiz to suppression hearings.  The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial.  The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing.  In United States v. Ruiz, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 . . . (emphasis in original).  It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632 . . . .  Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632 . . . .

United States v. Harmon, 871 F. Supp. 2d at 1169 (emphasis in original).  Accordingly, Brady

does not require the United States to disclose impeachment evidence before suppression

hearings.  See United States v. Harmon, 871 F. Supp. 2d at 1165-67.

3.      **Evidence Must Be in the United States' Possession.**

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).  Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *2.  On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).  Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)).  "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).  A prosecutor does not have a duty, however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties).

**LAW REGARDING THE JENCKS ACT**

In Jencks v. United States, 353 U.S. at 667, the Supreme Court held that a "criminal action must be dismissed when the government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant

- 65 -

statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." 353 U.S. at 672. In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671. Congress later codified the Jencks v. United States in 18 U.S.C. § 3500. See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

**(a)**      In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)**      After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b). "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified." United States v. Lujan, 530 F. Supp. 2d 1224, 1232 (D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a) & (b)). The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment." Palermo v. United States, 360 U.S. 343, 349 (1959). The Jencks Act's purpose is "not only to protect Government

- 66 -

files from unwarranted disclosure but also to allow defendants materials usable for the purposes

of impeachment." United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo

v. United States, 360 U.S. at 352).

The Jencks Act defines statements as:

**(1)**    a written statement made by said witness and signed or otherwise adopted
or approved by him;

**(2)**    a stenographic, mechanical, electrical, or other recording, or a
transcription thereof, which is a substantially verbatim recital of an oral
statement made by said witness and recorded contemporaneously with the
making of such oral statement; or

**(3)**    a statement, however taken or recorded, or a transcription thereof, if any,
made by said witness to a grand jury.

18 U.S.C. § 3500(e).

The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act

if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir.

1993). At least one district court within the Tenth circuit has distinguished interview notes from

reports that "embody only the agent's epitomization, interpretation, or impression of an

interview," finding that the latter are not producible under the Jencks Act. United States v.

Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.). In United States v. Lujan, the

Honorable Robert C. Brack, United States District Judge for the District of New Mexico,

explained that rough interview notes may be discoverable under the Jencks Act, when a

defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes

contained exculpatory evidence not included in any formal interview report provided to the

defense." 530 F. Supp. 2d at 1266. Judge Brack held that, "[b]ecause the contents of rough

interview notes may in some cases be subject to disclosure and because the potential

impeachment value of the notes may not become evident until trial," the United States must,

under 18 U.S.C. § 3500, preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses." 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy.  See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."); United States v. Harry, 2013 WL 684671, at *10 (D.N.M. 2013)(Browning, J.).  To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)).  See United States v. Burton, 81 F. Supp. 3d 1229, 1250-51 (D.N.M. 2015)(Browning, J.).  The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements.  See United States v. Smith, 984 F.2d at 1086.  For example, in United States v. Smith, the Tenth Circuit concluded that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had interviewed her before she testified, and the defense counsel moved for production of the notes.  See 984 F.2d at 1085-86.  Once the defendant makes a prima facie

- 68 -

showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement.  See 984 F.2d at 1086.

In United States v. Fred, No. CR 05-801 JB, the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant.  No. CR 05-801 JB, Order at 1, filed November 8, 2006 (Doc. 86).  The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly prepare for cross-examination at trial of the FBI agent who conducted the interview.  See No. CR 05-801 JB, Order at 1-2.  The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be given to the defendants after the agents testify at trial.  See United States v. Goxcon-Chagal, 2012 WL 3249473, at *2, *6 (D.N.M. 2012)(Browning, J.).  In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce FBI agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial.  See 760 F. Supp. 2d at 1164, 1167.

## THE NEED FOR PRACTICAL AND EFFECTIVE CRIMINAL DISCOVERY

In 1990, a state jury convicted Debra Milke of murdering her four-year-old son, Christopher.  See Milke v. Ryan, 711 F.3d 998, 1000 (9th Cir. 2013).  The state judge sentenced her to death.  See Milke v. Ryan, 711 F.3d at 998.  The Honorable Alex Kozinski, Chief Judge for the Ninth Circuit, described the trial as "a swearing contest between Milke and Phoenix Police Detective Armando Saldate, Jr."  711 F.3d at 1000.  At the trial, Saldate testified that Milke confessed to the murder; Milke vehemently protested her innocence and denied

- 69 -

confessing.  See 711 F.3d at 1000.  With no other witnesses, the state judge and jury believed

Saldate.  See Milke v. Ryan, 711 F.3d 998.  They were unaware, however, of one fact that might

have changed their minds: Saldate had a "long history of lying under oath and other

misconduct."  711 F.3d at 1000-01.  Specifically, Saldate had lied to a grand jury or a judge in

four cases, requiring state judges to throw out indictments or confessions.  See 711 F.3d at 1004.

In another four cases, "judges threw out confessions or vacated convictions because Saldate had

violated suspects' Miranda and other constitutional rights during interrogations, often

egregiously."  Milke v. Ryan, 711 F.3d at 1004.  Finally, Saldate's personnel file documented a

five-day suspension "for taking sexual liberties with a motorist he stopped and then lying to his

supervisors about it."  711 F.3d at 1011.  The file revealed that his "supervisors had caught him

in a lie and concluded that his credibility was compromised."  711 F.3d at 1006, 1012

(describing the report as showing that "Saldate has no compunction about lying during the course

of his official duties" and that he has "a willingness to abuse his authority to get what he wants").

The information about Saldate's misconduct was in the hands of the party responsible for

ensuring that justice is achieved -- the state.  Unfortunately, however, the state did not disclose

this information, despite its requirements under Brady and Giglio.  See Milke v. Ryan, 711 F.3d

at 1005 (describing how the state did not mention the evidence, even though an important

question in Milke's case was whether Saldate ignored Milke's request for an attorney).  "This

error resulted in a 'one-sided presentation of evidence' and 'impeded [the jury's] ability to fully

and fairly assess the credibility of both [Milke] and Saldate."  Milke v. Ryan, 711 F.3d at 1005

(alterations in the original).  More than that problem, however, the error resulted in Milke's death

sentence and imprisonment on death row for twenty-two years.  See Milke v. Ryan, 711 F.3d at 1001.[5]

The disclosure problem is not confined to the context of overzealous police officers closing murder cases.  It reaches to all corners of the criminal justice system.  Judges and scholars are increasingly recognizing the problem with blatant Brady violations.  See Daniel S. Medwed, Brady's Bunch of Flaws, 67 Wash. & Lee L. Rev. 1533 (2010); David Keenan et al., The Myth of Prosecutorial Accountability After Connick v. Thompson: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct, 121 Yale L.J. Online 203 (2011).  For example, in 2012, an investigation revealed that two Department of Justice prosecutors intentionally hid evidence in the 2008 political corruption case against Senator Ted Stevens, the longest serving Republican Senator in history.  See United States v. Stevens, 2009 WL 6525926 (D.D.C. 2009)(Sullivan, J.).  See Henry F. Schuelke III, Special Counsel, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order (dated April 7, 2009), filed March 15, 2012 in In re Special Proceedings, No. 1:09-mc-00198-EGS (D.D.C. March 15, 2012)("Stevens Report").  Special prosecutor Henry F. Schuelke III's blistering report found that the United States team concealed documents that would have damaged the credibility of key United States witnesses and helped the late Stevens to defend himself against false-statements charges.  See Stevens Report at 12.  Stevens lost his Senate seat as the scandal unfolded, dying at age eighty-six in a plane crash two years later.  See

_____

[5]After the Ninth Circuit vacated Milke's conviction and gave Arizona the chance to re-try Milke, the Arizona Court of Appeals barred any re-trial in a scathing opinion that garnered the New York Times' attention.  See Arizona: No Retrial for Woman Freed from Death Row, N.Y. Times (Dec. 11, 2014), http://www.nytimes.com/2014/12/12/us/arizona-no-retrial-for-woman-freed-from-death-row.html?_r_1.  The Arizona Court of Appeals described the "long course of Brady/Giglio violations" as a "flagrant denial of due process" and a "severe stain on the Arizona justice system."  Milke v. Mroz, 339 P.3d 659, 665-66, 668 (Ariz. Ct. App. 2014).

- 71 -

Carrie Johnson, Report: Prosecutors Hid Evidence in Ted Stevens Case, NPR News (May 15, 2012), http://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case. Schuelke based his 500-page report on a review of 128,000 documents and interviews with prosecutors and FBI agents. See Stevens Report at 12. United States Attorney General Eric Holder moved to vacate Stevens' conviction. See Jerry Seper, Inquiry Slams Prosecution of Stevens Corruption Case By Justice Department, The Washington Times (March 15, 2012). The Department of Justice ("DOJ") subsequently "instituted a sweeping training curriculum for all federal prosecutors, and made annual discovery training mandatory." Mark Memmott, Report Slams Sen. Stevens' Prosecutors, NPR News (March 15, 2012), http://www.npr.org/sections/thetwo-way/2012/03/15/148668283/report-slams-sen-stevens-prosecutors.

As Milke v. Ryan and the Stevens Report reveal, prosecutors hold a tremendous amount of power in criminal prosecutions, often more than the jury. See Alex Kozinski, Criminal Law 2.0, 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, xxii (2015)(explaining that prosecutors often hold more power "than jurors because most cases don't go to trial"). They are the ones with access to the evidence, both inculpatory and exculpatory. They can disclose it easier than anyone else can. See Scott H. Greenfield, The Flood Gates Myth, Simple Justice (Feb. 16, 2015), http://blog.simplejustice.us/2015/02/16/the-flood-gates-myth/. As one illustration, in Milke v. Ryan, Milke discovered the impeachment evidence detailing Saldate's misconduct "only after a team of approximately ten researchers in post-convictions proceedings spent nearly 7000 hours sifting through court records." 711 F.3d at 1018. The team worked eight hours a day for three and a half months searching through the clerk of court's officers for Saldate's name in every criminal case file from 1982 to 1990. See 711 F.3d at 1018. It took another researcher another

- 72 -

month to review motions and transcripts from each of those cases to find examples of Saldate's

misconduct.  See 711 F.3d at 1018.  The Ninth Circuit concluded: "A reasonably diligent lawyer

couldn't possibly have found these records in time to use them at Milke's trial."  711 F.3d at

1018.  The prosecutor was in the best position to give Milke the opportunity to effectively cross-

examine Saldate and ensure that she had a fair trial.   Although Brady and Giglio require

prosecutors to disclose exculpatory evidence to the defense, it is often extremely difficult for

criminal defendants to know whether the prosecution is complying with this obligation.

Furthermore, prosecutors exert tremendous control over witnesses.

> They can offer incentives -- often highly compelling incentives -- for suspects to
> testify.  This includes providing sweetheart plea deals to alleged co-conspirators
> and engineering jail-house encounters between the defendant and known
> informants.  Sometimes they feed snitches non-public information about the crime
> so that the statements they attribute to the defendant will sound authentic.   And,
> of course, prosecutors can pile on charges so as to make it exceedingly risky for a
> defendant to go to trial.   There are countless ways in which prosecutors can
> prejudice the fact-finding process and undermine a defendant's right to a fair trial.

Kozinski, supra, at xxii (internal footnotes omitted).

To address this problem, Holder put together a working group of senior prosecutors, law

enforcement representatives, and information technology professionals to improve the DOJ's

discovery practices.  See Hearing on the Special Counsel's Report on the Prosecution of Senator

Ted Stevens at 3-4, Committee on the Judiciary United States Senate (March 28,

2012)("Hearing").   The DOJ then issued guidelines that federal prosecutors must follow in

complying with their discovery obligations in criminal cases.  See Memorandum for Department

Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Issuance of Guidance

and Summary of Actions Taken in Response to the Report of the Department of Justice Criminal

Discovery and Case Management Working Group (Jan. 4, 2010); Memorandum for Department

Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Requirement for Office

- 73 -

Discovery Policies in Criminal Matters (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), https://www.justice.gov/dag/memorandum-department-prosecutors.  These memoranda are intended to establish a methodical approach to discovery obligations and to address inconsistent discovery practices among prosecutors within the same office.  See Hearing at 4-5.  Although these memoranda are "not intended to have the force of law or to create or confer any rights, privileges or benefits," DOJ attorneys will likely have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations.  Later in January, 2010, Deputy Attorney General David W. Ogden appointed a long-serving career prosecutor as the DOJ's first full-time National Criminal Discovery Coordinator to lead and oversee all DOJ efforts to impose disclosure practices.  See Hearing at 4.

Many courts and scholars, however, have argued that training prosecutors is insufficient to fully combat discovery abuse.  Instead of relying on prosecutors alone to disclose all potentially exculpatory evidence, they have suggested that judges take a more active role in preventing Brady and Giglio violations.  See United States v. Jones, 686 F. Supp. 2d 147, 149 (D. Mass. 2010)(Wolf, J.)(expressing the district court's skepticism that prosecution-initiated training sessions, in the absence of strong judicial action, would effectively curb Brady violations).  Chief Judge Kozinski has asserted that "[t]here is an epidemic of *Brady* violations abroad in the land.  Only judges can put a stop to it."[6]  United States v. Olsen, 737 F.3d 625, 626 (9th Cir. 2013)(Kozinski, C.J., dissenting).  Two years after Chief Judge Kozinski described the

---

[6]Neither Chief Judge Kozinski nor anyone else has empirically shown that an epidemic of Brady violations is occurring.  The Court does not see an epidemic of Brady violations.  The Assistant United States Attorneys appear to take their duties very seriously.

"epidemic of *Brady* violations," he observed that his use of the phrase "caused much controversy but brought about little change in the way prosecutors operate."  Kozinski, <u>supra</u>, at viii (citing Center for Prosecutor Integrity, An Epidemic of Prosecutor Misconduct, White Paper (Dec. 2013), <u>available          at          </u>http://www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutor-Misconduct.pdf.   The reason that there was little action on his charge may have been that neither he nor anyone else has done what needs to be done to substantiate his claim with empirical data.   Nonetheless, he proposed some additional reforms, such as requiring open-file discovery.   <u>See</u> Kozinski, <u>supra</u>, at xxvi-vii.   North Carolina has adopted such a rule by statute that requires courts to order the "State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant."   N.C. Gen. Stat. § 15A-903(a)(1) (2011).   The DOJ, however, has opposed such a law, instead advocating that prosecutors should remain in charge of deciding what evidence will be material to the defense.   <u>See</u> Video Recording: Ensuring that Federal Prosecutors Meet Discovery Obligations: Hearing on S. 2197 Before the S. Judiciary Comm., 112th Cong. (2012)(on file with S. Judiciary Comm.)(statement of James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice opposing the bill: "[I]n reacting to the *Stevens* case, we must not let ourselves forget . . . true improvements to discovery practices will come from prosecutors and agents . . . . In other words, new rules are unnecessary."); Eric Holder Jr., Preface, <u>In the Digital Age,</u> <u>Ensuring that the Department Does Justice</u> iii, 41 Geo. L.J. Ann. Rev. Crim. Proc. (2012).  Chief Judge Kozinski contends that effectively deterring <u>Brady</u> and <u>Giglio</u> violations means that

prosecutorial offices across the country must establish firm open-file policies to ensure

compliance.[7]  See Kozinski, supra, at xxviii.

_____

[7]In New Mexico, the New Mexico Legislature has not enacted an open-file policy for its state prosecutors, nor does the United States Attorney's Office -- according to the Assistant United States Attorney in this case -- operate under an open-file policy.  See United States v. Hykes, Tr. at 12:7-15 (Hurtado)("I want to affirm clearly in open Court and on the record that there is no open file policy that the U.S. Department of Justice or the United States Attorney's office follows either in this district or across the entire United States.").  Despite the Assistant United States Attorney's contention in that case, however, the United States Attorney's Office has previously represented to the Court that the Albuquerque office operates under such a policy.  See United States v. Rodella, 2015 WL 711931, at *39 n.12 (D.N.M. Feb. 2, 2015)(Browning, J.)(stating that the United States Attorney's Office for the District of New Mexico has "consistently represented that they maintain an 'open file policy'").  The Court recognized that, despite the United States' representations that it maintains an open-file policy, its "conduct before the Court suggests otherwise."  United States v. Rodella, 2015 WL 711931, at *39 n.12.

These attorneys have at times shown that they are willing to disclose to criminal defendants only the bare minimum that the law requires and nothing more.  In United States v. Roybal, No. CR 12-3182 JB, 2014 WL 4748136 (D.N.M. Sept. 4, 2014)(Browning, J.), the United States refused to produce certain raw wiretap data and progress reports they made concerning wiretaps.  See 2014 WL 4748136, at *1.  The United States did not give a reason for denying the defendants' request for the information, other than the law did not require it to produce the documents.  See 2014 WL 4748136, at *4.  Again in United States v. Folse, the United States refused to disclose reports related to a shooting between a co-defendant and a Federal Bureau of Investigation agent for a similar reason: the law did not require it to disclose the information.  See United States v. Folse, No. CR 14-2354, Unsealed Memorandum Opinion and Order, filed January 26, 2015 (Doc. 75). . . .  By its very name -- the Department of Justice -- the United States is also interested in the pursuit of justice.  In refusing to disclose evidence, documents, and materials unless the law requires it to produce the items, the United States may be undermining the appearance of justice.  Defendants are often left in the dark, not knowing what information the United States has in its possession.  While Courts and Congress have placed requirements on what information the United States must disclose, these requirements are a bare minimum and not a recommendation.  Criminal defendants are already at a disadvantage, because of the United States' resources and because the United States gets a head start in every case by being able to investigate before bringing an indictment.  The United States need not compound this disadvantage by refusing to give over any evidence unless it is absolutely required.  After the United States secures a conviction, the criminal defendant, and the public at large, should feel that the conviction was based on a fair trial in which there was nothing else the defendant could have done to obtain a different result -- i.e. the appearance of justice.  The nation may not be well served when a defendant is left

- 76 -

While these reforms may indeed decrease the number of Brady and Giglio violations that

occur, the Court cannot unilaterally impose those requirements upon attorneys.  Judges have

several other tools at their disposal, however, and the Court uses several of these tools to ensure

compliance with Brady and Giglio in the District of New Mexico.  First, while the Court must

rely heavily on the prosecutors to do their job under Brady and Giglio, the Court does more than

rely solely on the prosecutors to comply with their obligations.  See Kozinski, supra, at xxxiii

("*Brady* is not self-enforcing; failure to comply with *Brady* does not expose the prosecutor to any

personal risk."); Imbler v. Pachtman, 424 U.S. 409, 430, 431 n.34 (1976)(noting that prosecutors

are absolutely immune for "activities [that are] intimately associated with the judicial phase of

the criminal process," including the willful suppression of exculpatory evidence).  The District of

New Mexico Magistrate Judges enter orders at the beginning of cases directing prosecutors to

comply with those obligations by disclosing documents and objects, reports and tests, expert

---

wondering whether things would have been different if the United States had
disclosed all of the information that it possessed.  By refusing to disclose all
available information, the United States may create the perception that it obtained
a conviction through gamesmanship and concealment, i.e., through sharp
practices, and not through the pursuit of truth and justice.  This perception
undermines the pillars of our criminal justice system.  The Court will continue to
faithfully follow the law and will not require the United States to disclose any
information which the law does not require it to disclose.  The Court,
however, cautions the United States that, if it continues its pattern of refusing to disclose
available information to criminal defendants, it is undermining the representation
that it routinely makes that it has an open file policy and that the Court will take
that purported policy with a grain of salt.  That representation, which is not
completely accurate, and the unclear practices of the Assistant United States
Attorneys undermine the administration of justice and the public's perception of
the justice system. It also puts its convictions unnecessarily at risk, if the Court is
wrong that the United States did not have to produce the documents. The United
States is a key player in the adversary system; as the people's representative, it
too plays a fundamental role in ensuring the appearance of justice.

United States v. Rodella, 2015 WL 711931, at *39.  It appears that the United States has finally
abandoned its representations that it has an open-file policy.

- 77 -

witness opinions, and all relevant material that <u>Brady</u> and <u>Giglio</u> require.  If courts do not enter an order requiring prosecutors to comply with <u>Brady</u> and <u>Giglio</u>, the court lacks the power to sanction attorneys, because those attorneys will not have violated any court-imposed obligations. <u>See</u> Henry F. Schuelke III, <u>supra</u>, at 507-510.  By entering such orders, the Court can hold prosecutors personally responsible for failures to disclose information.

Second, when prosecutors hide <u>Brady</u> and <u>Giglio</u> material, courts can name the offending prosecutors in their judicial opinions.  One author terms this technique "public shaming."  Adam M. Gershowitz, <u>Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct</u>, 42 U.C. Davis L. Rev. 1059 (2009).  Naming prosecutors' names can serve as a unique tool to encourage compliance with a prosecutor's disclosure obligations.  Prosecutors will know that non-compliance can expose them to embarrassment in front of their friends and colleagues.  <u>See</u> Jenia Iontcheva Turner, <u>Policing International Prosecutors</u>, 45 N.Y.U. J. Int'l L. & Pol. 175, 229 (2012)("The court's judgment condemning particular actions of prosecutors as unlawful can serve as a potent deterrent for most prosecutors, who would not like to be called out publicly by a court for failing in their obligation.").  While the Court is usually reluctant, in both civil and criminal cases, to name the attorneys it sanctions, prosecutors run the risk that the Court may, depending on the egregiousness of a violation, believe that more than a sanction is necessary.

Finally, several scholars have endorsed Professor Jason Kreag's proposal that judges engage in a formal colloquy with the prosecutor on the record during pretrial hearings.  <u>See</u> Jason Kreag, <u>The Brady Colloquy</u>, 67 Stan. L. Rev. Online 47 (2014); Kozinski, <u>supra</u>, at xxxiv (endorsing Kreag's colloquy); Adam M. Samaha & Lior Jacob Strahilevitz, <u>Don't Ask, Must Tell -- And Other Combinations</u>, 103 Cal. L. Rev. 919, 984 n.296 (2015).  Kreag suggests that trial judges routinely ask a series of questions such as:

1. Have you reviewed your file, and the notes and file of any prosecutors who handled this case before you, to determine if these materials include information that is favorable to the defense?

2. Have you requested and reviewed the information law enforcement possesses, including information that may not have been reduced to a formal written report, to determine if it contains information that is favorable to the defense?

3. Have you identified information that is favorable to the defense, but nonetheless elected not to disclose this information because you believe that the defense is already aware of the information or the information is not material?

4. Are you aware that this state's rules of professional conduct require you to disclose all information known to the prosecutor that tends to be favorable to the defense regardless of whether the material meets the *Brady* materiality standard?

5. Now that you have heard the lines of cross-examination used by the defense and have a more complete understanding of the theory of defense, have you reviewed your file to determine if any additional information must be disclosed?

Kreag, supra, at 50-51 (internal footnotes omitted).  Kreag contends that the formality of facing a judge on the record impresses upon prosecutors the need to scrupulously comply with their disclosure obligations.  See Kreag, supra, at 49.  He further argues that the colloquy will require prosecutors to explain why they are not disclosing certain information at the time they decide not to disclose that information, instead of asking for an explanation years later when the non-disclosure comes to light.  See Kreag, supra, at 53-54.

The Court agrees that some form of pretrial questioning will increase compliance with Brady and Giglio.  Despite this agreement, the Court believes that the formal colloquy that Kreag proposes is not only unnecessary, but also somewhat impractical for district judges that see hundreds of criminal cases a year.  Because the District of New Mexico sees more felony cases

than any other federal district in the country,[8] and more criminal cases than most courts in the country, the Court has developed professional relationships with the Assistant United States Attorneys who appear before it on a regular basis.  See Criminal Cases Commenced, by Number of Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables (listing New Mexico as having the highest number of criminal cases involving felony defendants in the nation).   Asking Assistant United States Attorneys whether they intentionally refused to disclose exculpatory information can appear derogatory and insulting to attorneys who frequently appear before the Court.  See Radley Balko, Judge Says Prosecutors Should Follow Law.   Prosecutors Revolt., Wash. Post. (March 7, 2014), http://www.washingtonpost.com/news/the-watch/wp/2014/03/07/judge-says-prosecutors-should-follow-the-law-prosecutors-revolt (describing how a prosecutor opposed the Arizona Supreme Court's recommendation that Arizona adopt an ethical rule to ensure that prosecutors disclose new evidence of a potential wrongful conviction, in part because he was insulted by the suggestion that an ethical guideline was needed to encourage him to do what he said he would do as a matter of course).  Kreag concedes that "some prosecutors might be insulted by having to answer these or similar questions from the court, believing that the questions themselves amount

---

[8]In addition to seeing more felony cases than other courts, the District of New Mexico consistently sees more criminal cases than most other courts in the country.  See Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending March 31, 2015 and 2016, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables ("Criminal Filings").  In the 12-Month Period ending March 21, 2016, alone, 4,641 criminal cases were filed in the District of New Mexico.  See Criminal Filings at 1.  Only Arizona, with 5,349, and Texas' Southern and Western Districts, with 6,128 and 5,899, respectively, saw more criminal filings. See Criminal Filings at 1.  In comparison, 115 criminal cases were filed in the District of Rhode Island, 170 were filed in Vermont, 135 were filed in the Northern District of Mississippi, 141 were filed in the Western District of Wisconsin, and 89 were filed in the Eastern District of Oklahoma.  See Criminal Filings at 1.

DNM 862

to an accusation." Kreag, supra, at 56. The Court agrees with this assessment. The Court has known many of these lawyers for years; there is no need to insult them with questions about whether they have complied with their ethical duties that it does not ask of defense lawyers or civil lawyers.

Moreover, the Court can accomplish the same goals that the colloquy seeks to accomplish by getting assurances at a pretrial hearing that the United States has complied with its duty. Merely holding a hearing or a pretrial conference where the United States Attorney knows that he or she must answer to the Court about discovery issues, and what has been produced, heightens the importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the seriousness of their representations to the Court.[9] The Court can therefore "signal to young prosecutors [] the importance the judge places on enforcing a prosecutor's ethical and *Brady* obligations" by holding a hearing or pretrial conference, and asking about discovery issues, without running through a standardized and potentially insulting checklist. Kreag, supra, at 54. Second, a hearing or pretrial conference does more than demonstrate the seriousness of the situation. Like the colloquy, it also personalizes the prosecutor's decision not to disclose. A hearing or pretrial conference requires prosecutors to acknowledge that they made the non-disclosure decision, and that they are responsible for providing an explanation for that non-disclosure. Furthermore, the hearing emphasizes -- without having to say it -- that they may be sanctioned for any misrepresentations they make about Brady and Giglio material. This

_____

[9]Those professors and judges who have endorsed the formal colloquy do not hear criminal cases at the district court level, especially with the frequency that the Court does. See Kozinski, supra; Kreag, supra. The District of New Mexico sentences hundreds more criminal defendants than judges in most other districts. A formal colloquy is not always practical in this context.

accountability -- and threat of sanctions for making misrepresentations to the Court -- increases disclosure on the front-end without the need for "public shaming" on the back end if the Court later discovers a Brady or Giglio violation.  The Court agrees that some of Kreag's suggested questions may be useful in some hearings or pretrial conferences.  Other situations, however, call for more pointed and probing questions.  Moving away from a checklist of questions gives judges the flexibility to get to the point more quickly and easily, to ask specific questions rather than general ones, and to avoid impairing its working relationship with United States Attorneys and the assistants in the meantime.  Finally, holding a hearing or pretrial conference encourages prosecutors to review their notes and to effectively prepare a reason for non-disclosure early in the proceedings.  Accordingly, while asking some of Kreag's questions may be helpful, the Court can more practically curb Brady and Giglio violations by asking questions tailored to the circumstance rather than going through a standardized formal checklist.

In sum, the Court is not comfortable with engaging in a colloquy with an Assistant United States Attorney like he or she is a defendant.  While no one wants to admit this fact, the truth is that, if the DOJ prosecutors do not do their duties under Brady and Giglio, the system is in trouble.  The Court, the defense bar, and the nation, to a great extent, trust them.  They are, therefore, entitled to respect, not suspicion, mistrust, or hostility, until they conduct themselves in a manner that is unprofessional.  Sometimes more vigilance is achieved in a respectful environment than one where the Court asks the lawyer: "Have you been ethical today?"

One additional check that the Court requires of prosecutors is to disclose officers' and investigators' notes as "statement[s]" within the meaning of the Jencks Act.  United States v. Harry, 2013 WL 684671, at *1 (D.N.M. 2013)(Browning, J.).  As explained above, some courts -- including the Court -- have concluded that an officer's interview notes are "statement[s]" that

- 82 -

the Jencks Act requires the United States to disclose.  18 U.S.C. § 3500.  See United States v. Harry, 2013 WL 684671, at *11-12 ("The United States must turn over to Harry, after the witness testifies at trial, any investigative notes containing statement from those witnesses . . . ."); United States v. Tarango, 760 F. Supp. 2d at 1164, 1167 (requiring the United States to produce FBI reports, which contain statements from prosecution witnesses after those witnesses testify at trial); United States v. Cooper, 283 F. Supp. 2d at 1238 (noting that rough interview notes may be discoverable under the Jencks Act); United States v. Smith, 984 F.2d at 1086 ("Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).  Officers then maintain these notes pursuant to various standards and protocols.  See United States v. Harrison, 524 F.2d 421, 424 n.2 (D.C. Cir. 1975); United States v. Lujan, 530 F. Supp. 2d at 1267 (stating that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500).  Officers then use their notes as the basis for their reports.  When officers write their reports, however, they may exclude certain information that does not help the prosecution.  These reports are then placed in a prosecutor's file, but the notes are not.  To ensure that any impeachment information is disclosed, the Court requires prosecutors to disclose the investigating officer's notes as Jencks material after the United States' witness testifies at trial.  This disclosure could reveal information that conflicts with the officer's report, serving as valuable impeachment evidence.  The more often that district judges require prosecutors to disclose a testifying officer's notes, the more care officers will take to ensure that

their reports reflect their notes and accurately summarize the events leading to an arrest.  Even if

some courts resist requiring such disclosure, see United States v. Lujan, 530 F. Supp. 2d at 1266,

cases are randomly assigned to different judges.  The threat of being assigned to a judge who

requires disclosure may incentivize officers to include all exculpatory and impeachment

evidence in their formal report.  Additionally, even if a prosecutor's file omits the officer's notes,

courts must require prosecutors to disclose exculpatory information in officers' notes under

Brady.  See Kyles v. Whitley, 514 U.S. at 437 (placing an affirmative obligation on prosecutors

to learn of exculpatory evidence in others' possession); United States v. Padilla, 2011 WL

1103876, at *5 (D.N.M. 2011)(Browning, J.)("The Due Process Clause of the Constitution

requires the United States to disclose information favorable to the accused that is material to

either guilt or to punishment."); United States v. Burke, 571 F.3d at 1054 (holding that the

"belated disclosure of impeachment or exculpatory information favorable to the accused violates

due process when an earlier disclosure would have created a reasonable doubt of guilt").

### LAW REGARDING THE DISCLOSURE OF AN INFORMANT'S IDENTITY

The government has a privilege "to withhold from disclosure the identity of persons who

furnish information of violations of law to officers charged with enforcement of that law."

Roviaro v. United States, 353 U.S. 53, 59 (1957).  "The purpose of the privilege is the

furtherance and protection of the public interest in effective law enforcement.  The privilege

recognizes the obligation of citizens to communicate their knowledge of the commission of

crimes to law-enforcement officials and, by preserving their anonymity, encourages them to

perform that obligation."  Roviaro v. United States, 353 U.S. at 59.  "Anonymity of informants

encourages communications to law enforcement officers."  Usery v. Local Union 720, Laborers'

Int'l Union of N. Am., AFL-CIO, 547 F.2d 525, 527 (10th Cir. 1977).  Cf. United States v.

- 84 -

Brantley, 986 F.2d 379, 383 (10th Cir. 1993)("Nor must the government supply the defendant with information about an informer when the individual introduces suspected traffickers to narcotics agents."); United States v. Ortiz, 804 F.2d 1161, 1166 (10th Cir. 1986)("We have ruled previously that the government is not required to supply information about an informer to a defendant when the informer merely provides the initial introduction.").

The privilege is not absolute, however, and where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Roviaro v. United States, 353 U.S. at 60-61. The Supreme Court in Roviaro v. United States stated that the desirability of calling the informant as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide. See 353 U.S. at 64. When an informant is a "participant in and a material witness to" the alleged criminal transaction, the disclosure of his or her identity is sometimes required. Roviaro v. United States, 353 U.S. at 65. The standard for disclosure of CIs who play an active, as opposed to a passive, role in the investigation is not fixed; rather, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors." Roviaro v. United States, 353 U.S. at 62. In Roviaro v. United States, for example, the informant "helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment." 353 U.S. at 64. The Supreme Court found that the district court's failure to order disclosure of the informant's identity "in the face of repeated demands by the accused for his disclosure" was prejudicial error. 353 U.S. at 64-65.

"The Tenth Circuit's take on this analysis is well-known." United States v. Padilla, 2010 WL 4337819, at *7 (D.N.M. 2010)(Browning, J.). The Tenth Circuit's take on the analysis

places the burden on the defendant to show that the informant's possible aid to the defendant

outweighs the public's interest in protecting the flow of information, which the confidentiality of

the informant's identity facilitates:

> The disclosure of a confidential informant's identity involves balancing the public
> interest in protecting the flow of information in a manner necessary for effective
> law enforcement against an individual's right to prepare his defense.  In making
> the determination as to whether disclosure is necessary, the court must consider
> the particular circumstances of the case, including the crime charged, the possible
> defenses, and the significance of the informer's testimony.  Where it is clear that
> the informant cannot aid the defense, the government's interest in keeping secret
> his identity must prevail over the defendant's asserted right of disclosure.  A
> defendant seeking disclosure has the burden of proof, and we review the district
> court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted).  See

United States v. McKenzie, 2010 WL 597971, at **3-4 (D.N.M. 2010)(Browning, J.)(quoting

United States v. Sinclair, 109 F.3d at 1538).  "[T]he defendant must present more than mere

speculation about the possible usefulness of an informant's testimony."   United States v.

Moralez, 908 F.2d at 567.  In sum,

> [a] defendant may obtain the identity and whereabouts of an informer if his
> testimony might be relevant to the defendant's case and justice would be best
> served by disclosure[, but d]isclosure of an informant is not required . . . where
> the information sought from the informer would be merely cumulative, or where
> the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d 512, 517 (10th Cir. 1986)(internal citations omitted).  See

United States v. Moralez, 908 F.2d at 567.

The Court has required the United States to disclose a CI's identity where the CI "was

integrally involved in the criminal transaction[,] . . . observed the criminal transaction[,] and was

not a mere bystander."   United States v. Aguilar, 2010 WL 2977708, at *5 (D.N.M.

2010)(Browning, J.).  In United States v. Aguilar, the defendant, Aguilar, was one of three

defendants charged with a conspiracy to traffic in cocaine, stemming from a transaction between

his two co-defendants and a government CI.  See 2010 WL 2977708, at *1.  In relation to the

first factor that the Supreme Court identified in Roviaro v. United States -- the crime charged --

the Court noted that "the crimes charged in this case are relatively egregious -- conspiracy,

possession with intent to distribute cocaine, and possessing a gun while committing the other

crimes." 2010 WL 2977708, at *6.  As to the second and third Roviaro v. United States factors -

- the possible defenses and the possible significance of the informer's testimony -- it appeared

that the defendant intended to argue that he did not know his alleged co-conspirator possessed

cocaine or that the drug transaction was going to occur, and the Court found that, given the CI

was present during the crime, the CI's testimony "could be highly significant" to the defenses:

> The [CI] was present in the car with Mirabal, Aguilar, and Garner, and would be
> in a unique position to testify to what conversations, if any, occurred in the car
> and whether Aguilar took part in them.  After the four individuals arrived at the
> [CI]'s residence, again, the [CI] would be in a unique position to testify whether it
> appeared that Aguilar had any idea that the bag Mirabal retrieved from the car
> contained cocaine.  Once the three Defendants and the [CI] were inside the [CI]'s
> residence, the [CI] was able to observe Aguilar's demeanor and whether he
> actively participated in the drug transaction.  The [CI] could testify as to where
> Aguilar was and what he did while the [CI] made the alleged drug transaction
> with Mirabal.

2010 WL 2977708, at *6.  Additionally, the Court noted that the CI might provide relevant

information which no other witness could, because Aguilar's "alleged co-conspirators might try

to push blame away from themselves and on to Aguilar, and Villegas, a law-enforcement officer,

might tend to be biased toward the United States." 2010 WL 2977708, at *6.  The Court thus

granted Aguilar's motion and ordered the United States to disclose the CI's identity.  See 2010

WL 2977708, at *6.  The Court also incorporated the following protective order in its decision:

> Ms. Johnson[, Aguilar's attorney,] is ordered that she will not disclose the identity
> of the CI to anyone -- except the defense investigator she retains in this case --
> unless and until she seeks further leave of the Court.  Any information that the
> United States provides to Ms. Johnson regarding the CI may be discussed only
> with the investigator and the Assistant United States Attorneys who disclosed it.

- 87 -

Finally, any information the United States provides must be returned once this case is closed.  These requirements should minimize the danger, if any, to the CI and perhaps permit law-enforcement to use him in a covert capacity again in the future, if they so desire.

2010 WL 2977708, at *6.  See also United States v. Rivas, 26 F. Supp. 3d 1082 (D.N.M. 2014)(Browning, J.).

## RELEVANT LAW REGARDING CIVIL DISCOVERY

Rule 34 of the Federal Rules of Civil Procedure governs discovery requests for documents.  See Fed. R. Civ. P. 34.  Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

**(1)** to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:

**(A)** any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

**(B)** any designated tangible things; or

**(2)** to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a).  Rule 26(b)(1) explains that the proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  Information sought is relevant "if the discovery appears reasonably calculated to lead to discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  Federal courts have held that the scope of discovery under rule 26 is broad.  See Gomez v. Martin Marrietta Corp., 50 F.3d 1511,

1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning,

J.)("The federal courts have held that the scope of discovery should be broadly and liberally

construed to achieve the full disclosure of all potentially relevant information."). The federal

discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the

relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329

U.S. 495, 507 (1947). As a result of this policy, rule 26 "contemplates discovery into any matter

that bears on or that reasonably could lead to other matter that could bear on any issue that is or

may be raised in a case." Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 649-50 (D.N.M.

2007)(Browning, J.)(internal quotations marks omitted).

A district court is not, however, "required to permit plaintiff to engage in a 'fishing

expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x 214, 217 (10th

Cir. 2002)(unpublished).[10] "'Discovery . . . is not intended to be a fishing expedition, but rather

is meant to allow the parties to flesh out allegations for which they initially have at least a

modicum of objective support.'" Rivera v. DJO, LLC, 2012 WL 3860744, at *1 (D.N.M.

2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., 2002 WL 1967023, at *2

(S.D.N.Y. 2002)(Knapp, J.)). See Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C.

1983)(noting that courts do, and should, remain concerned about "fishing expeditions, discovery

---

[10]McGee v. Hayes is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R.
32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their
persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not
binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if
an unpublished opinion . . . has persuasive value with respect to a material issue in a case and
would assist the court in its disposition, we allow a citation to that decision." United States v.
Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that McGee v. Hayes has
persuasive value with respect to a material issue, and will assist the Court in its disposition of
this Memorandum Opinion and Order.

abuse and inordinate expense involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted).  "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant."  Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than that required for admissibility at trial, "the object of inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue."  Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (N.D. Ill. 1998).  Courts have also recognized that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery."  Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

Rule 26(b)(1) was amended in 2000.  Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).  The 2000 amendments made the following changes, shown here in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is relevant to ~~the subject matter involved in the pending actions, whether it relates to~~ the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity

and location of persons having knowledge of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant ~~The~~ information ~~sought~~ need not be admissible at the trial if discovery the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the changes to the last sentence -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions.  Discovery and Disclosure Practice, supra, at 44-45 (1997).  The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways.  The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party.  The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause.  The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery.  The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery.  Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center.  See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes

- 91 -

beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action.  The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action.  The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision.  A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.  For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard.  Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information.  Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable.  In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.  In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention.  When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence.  As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible.  The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery.  Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence.  As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii).  These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1).  The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated.  See 8 Federal Practice & Procedure § 2008.1 at 121.  This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery.  Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone.  The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance.  The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to exist more to "add teeth" to the relevance standard than to effectuate a substantive narrowing.  It is not surprising that Congress would want to increase judicial presence: "relevance" is a wide-open concept even in the context of trial, see Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."), and it is often said that relevance for discovery is an even broader concept.  One might then say that old rule 26(b)(1)'s relevant discovery provision was toothless.  It is likewise unsurprising that the rulemakers are unable to articulate precise language narrowing the substantive scope of discovery: no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys,

resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, etc.  The determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers wanted when they: (i) encouraged district judges to take a firmer grasp on the scope of discovery; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Of course, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action."  568 F.3d at 1188.  The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action."  This good-cause standard is intended to be flexible.  When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be.  "[T]he actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit

broader discovery in a particular case depending on the circumstances of the case,
the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R.

Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

## ANALYSIS

The Court will grant in part and deny in part (i) the Motion to Compel; (ii) the First

Motion for Specific Discovery; and (iii) the Second Motion for Specific Discovery.  To recap,

the Motion to Compel -- pertaining to Counts 6 and 7, J.M.'s murder -- requests that the United

States provide discovery in the form of: (i) the statements of all of the Defendants whom the

New Mexico State Police and the prison's STIU interviewed following J.M.'s murder; (ii) video

footage from two neighboring pods; (iii) Southern New Mexico and STIU's procedures, log

books, and master roster for inmates housed in unit 1A, for the six months before and one month

after March 7, 2014; and (iv) impeachment materials and STIU file for Armenta and any other

cooperating witness.  See Motion to Compel at 2-3.  The First Motion for Specific Discovery --

pertaining to Counts 1 and 2, F.C. and R.G.'s murders -- requests: (i) the FBI's investigations

under case numbers 281D-AQ-62017, 281D-AQ-59388, 2540-AQ-63435 and any other related

investigations relating to Counts 1 and 2; (ii) New Mexico Corrections Department Security

Threat Intelligence Unit ("STIU") files on all inmates at Southern New Mexico on March 26,

2001, and all incidents from the earliest date that either R.G. or F.C. arrived at the facility; (iii)

criminal history, impeachment materials, and STIU files for Lujan and any other cooperating

informant witness; (iv) pen packs for R.G. and F.C., and all inmates housed in the Ocean-One-

Yellow pod and the Paul-One-Green pod on March 26, 2001, including the pen packs for Lujan

and Torres; (v) all files, including intelligence materials, concerning SNM, and listing suspected

and confirmed members and their activities from the time period that SNM was formed up to the

last date that the Superseding Indictment alleges, February 27, 2016; (vi) all files on the Los

Carnales prison gang listing suspected and confirmed members, and their activities, specifically

including such files on R.G.; (vii) Security Threat Group investigation files for SNM from 1985

to 2016; (viii) threat-separation listings for F.C. and R.G.'s housing in the penitentiary system;

(ix) administrative segregation waivers that F.C. or R.G. signed authorizing their housing in

general population; (x) the list of inmates in the facility who may have been free to move

amongst pods; (xi) the list of inmates residing in the Department of Corrections, Penitentiary of

New Mexico-North Facility between January 1, 2001, and March 26, 2001; (xii) the pen pack for

Munoz; (xiii) log books for the three months before and after March 25, 2001; (xiv) the United

States' DNA analyst's notes, electropherograms, and graphs; (xv) copies of the inmate's flyer,

otherwise known as their Wanted for Escape/Master Record Entry; and (xvi) the Security Threat

Group "Master Roster," containing confidential lists related to Security Threat Groups

concerning which inmates have information about other inmates.  See First Motion for Specific

Discovery at 7-11.  The Second Motion for Specific Discovery -- pertaining to Count 3, the

murder of F.S. -- requests: (i) unredacted copies of all documents provided in discovery; (ii) all

documents in the files bearing case number 281-AQ-62017, as well as all documents in related

federal investigations of SNM; (iii) STIU files on all inmates who were at Southern New Mexico

on June 16, 2007; (iv) criminal history, impeachment materials, and STIU files for any

cooperating informant witness; (v) penitentiary packs for F.S., and all inmates housed in Blue

Pod on June 17, 2007; (vi) any and all files, including intelligence materials, concerning SNM

and listing suspected and confirmed SNM members and their activities from the time period that

SNM was formed to the last date alleged in the Superseding Indictment, February 27, 2016; (vii)

any and all files on Los Carnales listing suspected and confirmed members and their activities,

specifically including such files for F.S.; (viii) Security Threat Group investigation files for the

entire SNM from 1985 until 2016; (ix) separation listings by the prison system for F.S.; (x)

Administrative Segregation waivers that F.S. signed; (xi) the listing of inmates at Southern New

Mexico that may have been free to move amongst pods; (xii) log books for the three months

before and after June 17, 2007; (xiii) the United States' DNA analyst's notes, electropherograms

and graphs; (xiv) copies of the inmate F.S.'s flyer, otherwise known as their Wanted for

Escape/Master Record Entry; (xv) the Security Threat Group "Master Roster," containing

confidential lists related to Security Threat Groups concerning which inmates have information

about other inmates; (xvi) any and all documents relating to the New Mexico Corrections

Department's guidelines for assessing, classifying, and validating an inmate as a gang member,

associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM; and (xvii)

any and all documents in the United States' possession relating to SNM's philosophy, practices,

and activities in the New Mexico Corrections Department -- such as constitutions or bylaws,

membership protocol, and alleged gang-related disciplinary violations.  See Second Motion for

Specific Discovery at 3-7.

At the hearing, where the United States had not otherwise already complied or

compromised with the moving Defendants' requests, the Court either gave a general, categorical

ruling which addressed broad categories of the Defendants' various requests or else ruled on

each of the motions' specific discovery requests.  The United States was then given fourteen

days to comply with the Court's individual orders, unless it otherwise noted.  The Court made its

rulings on these discovery requests for the reasons that follow.

I.    **THE COURT WILL ADHERE TO ITS HOLDING IN <u>UNITED STATES V. HYKES</u>.**

The Court first comments on its holding in <u>United States v. Hykes</u>, 2016 WL 1630125, which appears to be the source of some of the contention amongst the parties, particularly with respect to its treatment of <u>United States v. Sudikoff</u>.   <u>United States v. Hykes</u> concerned a defendant's motion filed pursuant to <u>Giglio</u>, requesting that the United States "disclose certain pertinent information pertaining to [police officers testifying at his suppression hearing] as the information is relevant to impeachment."   <u>United States v. Hykes</u>, 2016 WL 1730125, at *2 (internal quotation marks and citations omitted).   The Defendant in <u>United States v. Hykes</u> argued that

> the Supreme Court's <u>Giglio</u> decision requires the government to disclose evidence affecting a government witness' credibility.  [Hykes] states that he "has a good faith basis to believe that the internal personnel files of some o[r] all of these officers contain information that may potentially be properly used for impeachment."  Hykes asserts that "witnesses have revealed that the information relied upon by officers to arrest Mr. Hykes was false.  [Hykes] contends that this false information led the arresting officers to arrest him, beat him, and search him without warrants.  [Hykes] states that, because the Court will determine whether Hykes' Motion to Suppress is well-founded, the officers' credibility is "of critical import for this Court's ultimate decision Hykes reasons that the officers' personnel files will reveal whether the officers are trustworthy.  Hykes argues that credibility information is especially relevant in this case, where the only witnesses against him are police officers, so "anything that goes to their credibility is exculpatory and admissible."

2016 WL 1730125, at **2-3 (citations omitted).   The United States contested the discovery request for the officers' personnel files in <u>United States v. Hykes</u>, because

> the government's review and determination is controlling unless the defense provides grounds to believe there is impeachment information in the items to which the defense seeks access. . . .  Hykes must "make a particularized showing of what information he was seeking or how it would be material" rather than making broad discovery demands.

2016 WL 1730125, at *4 (citations omitted).

Accordingly, the Court held in <u>United States v. Hykes</u> that

> Hykes is not sending the United States on a fishing expedition. Hykes
> demonstrates that the officers' personnel files may contain impeachment
> evidence. As support, Hykes points to the officers' involvement in several
> excessive-force lawsuits, discrepancies between the officers' story and
> eyewitnesses' stories, and evidence that the officers had a personal feud with
> Hykes.

2016 WL 1730125, at *20.   Cf. United States v. Lafayette, 983 F.2d 1102 (D.C. Cir. 1993)(affirming the denial of the appellants' request for an officer's personnel file, because "nothing in appellants' brief informs us why they have any reason to believe that the personnel files would provide any useful evidence whatsoever"); United States v. Andrus, 775 F.2d 825, 843 (7th Cir. 1985)(noting that the defendant was "not entitled to the personnel files of the law enforcement witnesses without even a hint that impeaching material was contained therein"). The Court then reiterated that Hykes had requested specific information contained within the personnel files and that thus "the United States must search the personnel files of the testifying officers pursuant to the Court's order at the hearing, examining the list of documents that Hykes specifically requests in his Giglio Motion." 2016 WL 1730125, at *20.

As the Court stated at the hearing, see Tr. at 65:17-66:19 (Court), in its analysis of this discovery request in United States v. Hykes, the Court did not deviate from its general philosophy regarding the administration of discovery under Giglio, Brady, the Jencks Act, and rule 16. Instead, the Court in United States v. Hykes merely maintained that

> if the United States uncovers any such exculpatory material, it must produce any
> material evidence in time for its effective use at trial. See United States v. Coppa,
> 267 F.3d 132, 144 (2d Cir. 2001)("[W]e reiterate the longstanding constitutional
> principle that as long as a defendant possesses *Brady* evidence in time for its
> effective use, the government has not deprived the defendant of due process of
> law.").

United States v. Hykes, 2016 WL 1730125, at **19-20. Where the Defendant demonstrated that there was particular impeachment material in the officers' personnel files, the Court ordered the

United States to review the files for the requested information in accordance with its continuing discovery and disclosure obligations. United States v. Hykes, 2016 WL 1730125, at **20-21.

The Defendants, in the Motion to Compel, First Motion for Specific Discovery, and Second Motion Discovery, have "urg[ed] the Court to consider using a different standard" with respect to the application of "Sudikoff," instead of the Court's allegedly sea-changing[11] decision in United States v. Hykes, for criminal discovery matters. Tr. at 59:11-19 (Castle). Essentially, as the Defendants First Motion for Specific Discovery argue,

> the Brady materiality standard is not useful in this context. . . . And so we're encouraging the Court to use a different standard. And I believe the possible exculpatory standard taken by . . . the Sudikoff case, works so that a prosecutor doesn't have to guess what the effect of that piece of evidence is going to be at trial that hasn't occurred in the context of a defense that they haven't seen. It allows a prosecutor a much cleaner line, which is to look at particular evidence and say, is it possibly exculpatory? Is there a chance that this is going to be something that would be of value to the defense? Then you provide it.

Tr. at 59:23-61:17 (Castle). Accordingly, with respect to the "last prong of Brady," materiality, the Defendants argue that "there is a difference between what needs to be disclosed under the Due Process Clause, and what will result in a reversal under the Due Process Clause." Tr. at 62:1-13 (Castle). The First Motion for Specific Discovery Defendants assert that this standard, that Judge Pregerson announced in 1999 in United States v. Sudikoff, 36 F. Supp. 2d at 1196, stands for the proposition that "the standard should simply be whether the evidence is favorable to the accused, i.e., whether it relates to guilt or punishment and tends to bolster the defendant's case or impeach prosecution witnesses." First Motion for Specific Discovery (citing United States v. Sudikoff, 36 F. Supp. 2d at 1199). The Court disagrees. Judge Pregerson, it appears,

---

[11]Indeed, by United States v. Hykes, the Court decided not to make "sea-changes" to the longstanding laws of criminal discovery announced by Brady, Giglio, and the Jencks Act. See United States v. Hykes, 2016 WL 1730125, at **19-20.

was a civil lawyer in private practice in the years before he took the bench.[12]  There is no doubt that using a standard that derives from the Federal Rules of Civil Procedure would be easier to administer.  But, criminal discovery is not civil discovery.  The Supreme Court and the Tenth Circuit repeatedly make this point.  District Courts are not free to make up new standards that they think are better or easier to apply.  See, e.g., United States v. Hopkins, 427 U.S. 123, 125 (1976)("[C]ourts should refrain from  legislating by judicial fiat.")(citation omitted).  District judges cannot be lazy and make their tasks easier than the Supreme Court and the Tenth Circuit require.

Ultimately, the Defendants invite the Court to endorse Judge Pregerson's opinion in United States v. Sudikoff, and abandon its own 2016 opinion in United States v. Hykes for a number of reasons.  First, the Defendants suggest that this case is one of the most complex in which they have ever been involved.  See, e.g., Second Motion for Specific Discovery Reply at 5.  The suggestion is that, because the case is so large and so complex, spanning many years and many violent crimes, the Court should adopt different rules for it.  The Court disagrees.  Getting a handle on a case this large is like eating an elephant; one has to do it one bite at a time.  The Court will need to do one confidential informant at a time; one redaction at a time; and one document at a time.  The Defendants will need to make the showing under rule 16, Brady, and Giglio one informant, one redaction, and one document at a time.  There are no shortcuts.  The Defendants are trying to hit a homerun by getting the Court to lower the standard.  The Defendants cannot do that.  Criminal discovery is hard work.  The Defendants will have to make the necessary showing.  The Court will have to take the time to allow the Defendants to make the showing.  And the United States will have to defend its nonproduction in detail.  There is no

_____

[12]See Dean D. Pregerson, Biographical Directory of Federal Judges, available at http://www.fjc.gov/public/home.nsf/hisj (last accessed Dec. 28, 2016).

DNM 883

other choice.  But the prospect of hard work does not counsel that the Court should change the standard or standards.

In United States v. Hykes the Court explained that "Judges have several . . . tools at their disposal . . . and the Court uses several of these tools to ensure compliance with Brady and Giglio in the District of New Mexico."  United States v. Hykes, 2016 WL 1730125, at **19-20. Those tools range from relying "heavily on the prosecutors to do their job under Brady and Giglio," having the Magistrate Judges enter "orders at the beginning of [a] case directing prosecutors to comply with those obligations by disclosing documents and objects, reports and tests, expert witness opinions, and all relevant material that Brady and Giglio require," and "when prosecutors hide Brady and Giglio material, [naming] the offending prosecutors in their judicial opinions."  United States v. Hykes, 2016 WL 1730125, at **19-20.  The Court, to accomplish the goals that a formal colloquy with the parties might accomplish, will extract "assurances at a pretrial hearing that the United States has complied with its duty.  Merely holding a hearing or a pretrial conference where the [assistant] United States Attorney knows that he or she must answer to the Court about discovery issues and what has been produced heightens the importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the seriousness of their representations to the Court."  United States v. Hykes, 2016 WL 1730125, at **19-20.  Accordingly, the Court will not stray from the principles it has used to manage criminal discovery in the past, and recently memorialized in United States v. Hykes. Under rule 16, at

> a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item it its

case-in-chief at trial; or (iii)   the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).   The United States must also disclose to the Defendants any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," Brady, 373 U.S. at 87, and that disclosure obligation includes evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory, see Giglio, 405 U.S. at 153.   See also United States v. Roybal, 46 F. Supp. 3d 1127, 1166 (D.N.M. 2014)(Browning, J.)(stating that the United States must put itself in the shoes of Defendant's counsel, and be certain that items they do not wish to disclose "do not contain exculpatory or impeachment material," because "[i]n the end, the burden remains on the United States to know its case and comply scrupulously with Brady").   The Jencks Act requires the United States to disclose to criminal defendants any statement that a United States witness made and which is "in the possession of the United States" once that witness has testified.   See 18 U.S.C. § 3500.   The Court can be compliant, as it has been, in applying these standards, and still achieve the goals of Congress and Due Process, without inventing new standards.

The Court, in United States v. Hykes, also addressed the salient issue of what materials are within the United States' possession, custody, and control.   In relevant part, the Court stated

> The Court has consistently stated that it cannot require the United States to go get documents from third parties or to seek documents [from entities] that refuse access to the United States.   See . . . ("And like I said and I've said this in the past, I don't want to require the Government to do any more than the law requires. So I'm trying to toe that line"); United States v. Rivas, 26 F. Supp. 3d 1082, 1105 (D.N.M. 2014)(Browning, J.)("A prosecutor does not have a duty . . . to obtain evidence from third parties."); United States v. Badonie, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.)("It is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess.").   Here, however, the United States has such access to [Bernalillo County Sheriff Office]'s personnel files, even if the BCSO still has

- 103 -

custody or possession of them. _See_ United States v. Padilla, 2011 WL 1103876, at *7 (D.N.M. March 14, 2011)(Browning, J.)("[A] prosecutor's office cannot get around _Brady_ by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case."); id. ("A prosecutor must disclose information of which it has knowledge and access."); United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)(stating that a prosecutor may have a duty to search files maintained by other "governmental agencies closely aligned with the prosecution" when there is "some reasonable prospect or notice of finding exculpatory evidence"). The Court wants to ensure that the United States is the one determining that no _Brady_ or _Giglio_ material exists rather than the BCSO. . . .

United States v. Hykes, 2016 WL 1730125, at **19-20 n.12. In this case, the United States concedes that "this is a joint investigation" of SNM with either of the "STIU, NMCD, or the FBI." Tr. at 67:1-14 (Beck). Accordingly, while the United States does not have an affirmative duty to seek out and produce information that it does not possess, the situation at hand is markedly different. "[A] prosecutor's office cannot get around _Brady_ by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984). Under _Brady_, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d at 1037). "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d at 1503). Given the United States' concession, the United States thus has a duty to search the files that the governmental agencies closely aligned with this prosecution maintain, where there is a reasonable prospect of finding exculpatory evidence -- those agencies being, at the least, New Mexico Corrections Department, including STIU, and of course, the FBI. Other governmental agencies, however, the Court concludes are not involved in the United States' joint investigation of SNM -- in particular, the New Mexico State Police. _See_ Tr. at 32:25-33:8 (Court)(giving the

inclination that the Court did not "think that the State Police's files are in the United States' possession, custody, or control.  So I think they made a representation they've turned over everything that they have.  But if you don't think that they've gotten everything, you're going to have to go to the State Police").  Accordingly, unless and until the Defendants demonstrate that the New Mexico State Police are closely involved in a particular aspect of this prosecution, the Court will not require the United States' wholesale review of that third-party's files.  See United States v. Hykes, 2016 WL 1730125, at **19-20 n.12.

The concept of "possession, custody, or control" is not unique to criminal discovery; civil discovery has the same concept.  See, e.g., Fed. R. Civ. Pro. 34(A).  The Court has always used a pragmatic, functional test of that phrase.  See United States v. 2121 Celeste Road SW, Albuquerque, N.M., 307 F.R.D. 572, 587-92 (D.N.M. 2015)(Browning, J.).  If the attorney responding to the requests for production can pick up the telephone and get the information from a third-party, the documents are effectively in the responding party's "control."  United States v. 2121 Celeste Road SW, Albuquerque, N.M., 307 F.R.D. at 590.  Here, the Court asked the AUSA if he had that level of access to New Mexico Corrections Department and STIU files, to which he responded: "NMCD has been very good about getting the requested information.  So I think with regard to files, like STIU files, that may contain some information about the defendants or other inmates, I think if we called on the phone they would work with us to get their hands on it."  Tr. at 21:25-22:6 (Beck).  This response is not surgery and, indeed, any other response would be surgery.  This entire federal investigation appears to have begun when SNM allegedly threatened to kill the New Mexico Secretary of Corrections.  See United States' Garcia Response at 1.  Here, it is not surgery and it is natural that the AUSAs on this case can call the New Mexico Corrections Department and get what they want.  The New Mexico Corrections

- 105 -

Department is jumping at the chance to help the prosecution.  Under these circumstances, the Court can confidently say that the New Mexico Corrections Department's records, under the unique facts of this case, are under the AUSA's control.

In so holding, the Court addresses a variety of the discovery requests in the Motion to Compel, the First Motion for Specific Discovery, and the Second Motion for Specific Discovery, by simply maintaining the standards -- regarding scope of disclosure and review of third-party files -- that it reaffirmed in United States v. Hykes.  Taking one-by-one the requests that are thus resolved after this clarification, the Court thereby concludes that, regarding the Motion to Compel's request for impeachment materials and STIU file for Armenta, a witness in the murder of J.M. which underlies Counts 6 and 7, these STIU files are in the United States' possession, custody, and control, and orders that, while the Court is not "going to require any Jencks material to be produced before the 14 days," it is going to "require early Brady review of these materials by the Government. . . .  You've got to produce the Brady material promptly, immediately."  Tr. at 23:2-19 (Court).  Similarly, where the Motion to Compel is requesting the procedures, log books, and master roster from Southern New Mexico and STIU for inmates housed in unit 1A for the six months before and one month after March 7, 2014, the Court, upon learning that the homicide victim in Counts 6 and 7 may have had "ongoing disputes," and that thus the log books could help to "potentially develop other motives . . . and potentially other suspects,"  Tr. at 33:17-35:3 (Strickland), will order that the United States produce the log books for three weeks before and three days after the incident, thus denying the request "without prejudice" in case the produced log books consequently necessitate further production, Tr. at 36:12-25 (Court).  The Court will also order production of the New Mexico Corrections Department procedures, i.e., the procedures regarding how the log books are put together, for that same time period.  See Tr. at

- 106 -

37:21-40:6 (Court).  Regarding the Motion to Compel's request for video footage from the pod

neighboring the pod where J.M. was murdered, the United States agreed to make a second check

with the FBI, STIU, and even the New Mexico State Police -- in case they might somehow have

it -- because, while the United States had recovered the footage from the pod where the murder

occurred, it had not yet been able to locate footage from the neighboring pod.  See Tr. at 17:1-8

(Beck, Court).  The Court thus orders the United States to make that second look, because the

footage from the neighboring pod could be exculpatory.  See Tr. at 17:1-8 (Beck, Court).  If the

film shows someone else did it, that evidence could be some of the most exculpatory.

Turning next to the First Motion for Specific Discovery's request regarding discovery

from previous FBI investigation files related to SNM, which the United States indicated that it

had, for the more recent investigations, produced materials, but still had not produced the

materials from the "significantly older" files, the United States must now go back and review

those files for Rule 16 and Brady obligations, using the Court's "liberal Rule 16 and Brady

eyes."  Tr. at 78:25-79:11 (Beck, Court).  Regarding the First Motion for Specific Discovery

Defendants' limited request in the First Motion for Specific Discovery for all STIU files for

inmates at Southern New Mexico in the relevant cell blocks that the United States considers

suspects in the alleged murders, the Court similarly orders that the United States "review these

with [the Court's] liberal standard in mind and produce Rule 16 materials."  Tr. at 81:25-82:11

(Beck).  Still at issue is the specific request for Lujan's STIU file, which the United States

explained it intended to treat like the rest of the STIU files, because, unlike what the First Motion

for Specific Discovery Defendants were asserting, Lujan is not a cooperating government

witness.  See Tr. at 82:23-83:9 (Beck).  The Court thus also orders that the United States look at

Lujan's STIU file for Brady and rule 16 information, because it is under its possession and

control.  See Tr. at 85:3-4 (Court).  That order applies to all Defendants in the case, regarding

their STIU files and related information, as well as for the victims and alternative suspects.

Similarly, the Court's decision not to reconsider United States v. Hykes results in an

order that, for the First Motion for Specific Discovery's request for any and all files, including

intelligence materials, for SNM, of which there were potentially "600," the United States needs

to take those "one at a time," meaning that, where it is brought to the United States' attention by

a Defendant that a particular file is of importance to the defense, they must investigate and

produce that file.[13]   See Tr. at 107:18-108:4 (Court).   For the files related to the FBI

investigations, however, the Court reiterates its order: "[T]hey're saying they know of five.

They're going to do the Brady and Rule 16 review of those files. . . .  And then we have a little

bit of dynamic process to go with the state files."  Tr. at 108:13-17 (Court).  With respect to how

closely the United States needs to look at these files, the Court reminds the United States that it

"takes a human being sitting there putting their feet in the defense lawyers' shoes and saying,

'Could I use this?,'" in order to comply with the Court's explicit discovery standards that the

Court reaffirmed in United States v. Hykes.  See Tr. at 111:2-18 (Court).  The Court also orders

the United States to review STIU files for the victim in Counts 3, 6 and 7, in just the same

---

[13]At the hearing, the United States indicated that it was searching for requested
documents with word and name searches.  See Tr. at 109:15-24 (Beck).  The Court expressed
concern about that approach and suggested that it thought the United States might need to be
looking closely at each document with its rule 16, Brady, and Giglio glasses on.  See Tr. at
111:2-18 (Court).  It was concerned that a word search might not be able to do that review
without somehow looking at the documents.  See Tr. at 111:2-18 (Court).  The Court is aware
that there are modern search engines that use algorithms and that these search engines and
software can be more accurate than human review.  The Court does not wish to preclude the use
of modern search technology.  If the United States can be open with the Defendants about how it
is doing the search, and the parties can agree on the search protocol, the Court will be alright
with the approach.  And if the parties cannot agree on a search protocol making use of modern
search software, the United States may re-approach the Court, and the Court will take a look at
the subject and consider it in a fully informed context.

manner as it has ordered the United States to review the files relating to Counts 1 and 2 underlying the First Motion for Specific Discovery.  See Tr. at 125:25-130:16 (Court, Villa); Tr. at 146:3-4 (Court).

The Court's conclusion to maintain its reliance on the logic of United States v. Hykes also dictates its order regarding the First Motion for Specific Discovery's request for the list of inmates at the PNM North facility between January 1, 2001, and March 26, 2001.  The First Motion for Specific Discovery Defendants made that request because there had been a meeting "in 2001[;] while in the custody of New Mexico Corrections Department, Frederico Munoz attended a meeting with SNM gang leaders, in which hits were placed on the two victims in this case."  Tr. at 113:8-19 (Castle).  The Court orders that "we find out the date of the meeting, and back it up two weeks.  And then it will be the list of the inmates two weeks before that meeting," until three days after the March 26, 2001, murder.  Tr. at 116:1-118:7 (Court)(giving the United States thirty days to make this investigation and production).  The Court also orders the United States to produce the list of inmate's names in Southern New Mexico's pods 1A and 1B two weeks before and three days after J.M.'s murder (the murder underlying Counts 6 and 7), and, similarly, at Baca's request, orders the United States to produce the list of inmates housed at PNM North on the date of the murder underlying Counts 6 and 7.  See Tr. at 132:24-133:7 (Court, Lowry).  The Court is of the opinion that the aforementioned discovery orders require the United States to ensure it has made Brady and Giglio disclosures of all potentially exculpatory information under its custody and control.

United States v. Hykes further guides the Court's rulings regarding the Second Motion for Specific Discovery's requests, particularly concerning the requests that regard STIU files.  As

the United States provided at the hearing, the United States has agreed to adhere to the Court's

orders:

> [W]e've agreed to review the STIU files for the defendants.  And we've agreed to
> review the STIU files for the list of suspects that were identified by Mr. Castle in
> the first specific discovery motion.  We've agreed to review the STIU files for the
> suspects I believe Mr. Villa will point out to us from the second discovery motion
> [sic]. . . .  So that same thing would go here.  We will still review the defendants'
> STIU files. . . .

Tr. at 145:6-21 (Beck).  The Court similarly, now, orders that the pen packs each of the motions

requests should be treated in the same manner as the STIU files -- thus, the United States, having

indicated that "the way that we've been viewing [pen packs] is that, like the STIU files, if the

defendant or the defendants have specific suspects they believe, we would request of New

Mexico Corrections Department, if those exist, that they turn them over."  Tr. at 147:1-11

(Beck).  The Court thus orders that the United States must undergo such work for all pen packs

that the three motions requests.  See Tr. at 147:16-19 (Court).

The Court also notes, at this time, that DNA information can be exculpatory material

under Brady, and, thus, in tandem with the United States' agreement to disclose any relevant

DNA materials from the related state investigations of SNM, the Court will order that the DNA

information requested by each of the three motions be disclosed.  See Tr. at 29:3-13 (Beck).

Because the Court understands that the United States is at the State of New Mexico's whims with

respect to recovery of DNA hard data in state investigations, the Court orders, more generally,

that the United States do whatever it can to obtain those requested materials and keep the

Defendants in the loop with what they are finding.  See Tr. at 77:10-16 (Court).

Regarding the production of a "Master Roster" -- as each of the Motion to Compel, First

Motion for Specific Discovery, and Second Motion for Specific Discovery request -- the Court,

pursuant to United States v. Hykes, orders that, "if the representation at the present time is the

Government cannot locate this document, then I have to deny the request.  I would like the Government to poke around a little bit more," Tr. at 155:3-6 (Court), because, such a document's contents might implicate <u>Brady</u> obligations.  The Court will now turn to the more specific, nuanced requests each of the motions makes which the Court's general conclusions do not adequately resolve -- and also the requests that the United States has decided not to contest.

## II. THE COURT GRANTS IN PART AND DENIES IN PART THE REQUESTS IN THE MOTION TO COMPEL.

The Motion to Compel, in addition to those requests already resolved, requests that the United States provide discovery of the statements of all of the Defendants whom the New Mexico State Police and the prison's STIU interviewed following the murder of J.M.  <u>See</u> Motion to Compel at 2-3.  The United States indicated at the hearing that it had already complied with this request, and thus no dispute exists.  Accordingly, to the extent that the requested information is still not in the Motion to Compel Defendants' possession, the Court now orders that the United States follow through with the production.  <u>See</u> Tr. at 15:10-16:3 (Beck, Court).

## III. THE COURT GRANTS IN PART AND DENIES IN PART THE REQUESTS IN THE FIRST MOTION FOR SPECIFIC DISCOVERY.

The remaining specific discovery requests in the First Motion for Specific Discovery are: (i) all files on the Los Carnales prison gang listing suspected and confirmed members, and their activities, specifically including such files on R.G.; (ii) threat-separation listings for F.C. and R.G.'s housing in the penitentiary system; (iii) administrative segregation waivers that F.C. or R.G. signed authorizing their housing in general population; and (x) the list of inmates in the facility who may have been free to move amongst pods.  <u>See</u> First Motion for Specific Discovery at 7-11.  As the Court ruled with respect to the STIU files for all the Defendants in this case, it will similarly rule for the request for files on the Los Carnales prison gang.  Where the

Defendants alert the United States to a particular suspect or victim involved in the SNM prosecution that is connected to the Los Carnales gang, then the United States will need to make an investigation into that suspect or victim's file, and disclose the relevant <u>Brady</u> materials.  <u>See</u> Tr. at 102:18-23 (Court).  The Court, similarly, will not order wholesale disclosure of a list of inmates who are free to move amongst pods -- there being too many, and the First Motion for Specific Discovery Defendants, as of yet, not having indicated any alternative suspects with such a status who might have committed the alleged murders.  <u>See</u> Tr. at 102:18-23 (Court).  Last, regarding threat-separation listings for F.C. and R.G.'s housing in the penitentiary system and administrative segregation waivers that F.C. or R.G. signed authorizing their housing in general population, the Court will order the United States to disclose those materials in accordance with their agreement in the First Motion for Specific Discovery Response.  <u>See</u> First Motion for Specific Discovery Response at 13-14.  To the extent that the United States has not yet complied, the Court orders the production within fourteen days.

## IV.   **THE COURT GRANTS IN PART AND DENIES IN PART THE REQUESTS IN <u>THE SECOND MOTION FOR SPECIFIC DISCOVERY</u>**.

The remaining requests that the Second Motion for Specific Discovery makes are: (i) unredacted copies of all documents provided in discovery; (iii) separation listings by the prison system for F.S.; (iv) Administrative Segregation waivers that F.S. signed; (v) any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM; and (vi) any and all documents in the United States' possession relating to SNM's philosophy, practices, and activities in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations.  <u>See</u> Second Motion for Specific Discovery at 3-7.

Regarding the request for unredacted discovery, the Second Motion for Specific Discovery chose to rescind the request because, as the Court was indicating, the redacted information was related to the identities of confidential informants and was better left for a different motion on a different day.   See Tr. at 143:2-4 (Burke).   The Defendants realized that they had not come close to making the showing that would be needed to secure the identity of a confidential informant. Regarding the request for separation listings by the prison system for F.S. and Administrative Segregation waivers that F.S. signed, the Court will order the United States to disclose those materials in accordance with their agreement in the Second Motion for Specific Discovery Response.   See Second Motion for Specific Discovery Response at 12-13.   To the extent that the United States has not yet complied, the Court orders the production within fourteen days.

Regarding the requests for any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM; and for any and all documents in the United States' possession relating to SNM's philosophy, practices, and activities in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations, the Court will deny those requests at the present time.   At the hearing, the United States objected to the requests because, in part, it did not have custody or control "over those specific regulations and guidelines, as opposed to actual files."   Tr. at 149:1-13 (Beck).   The Court, however, considered the most salient factor pertaining to this request to be whether an expert would be testifying as to these aspects of gang membership -- and which the requested material appeared to be aimed -- and "if you're going to have corrections people come in and say Mr. Baca is a member of the SNM gang, then I guess I do think you should produce something that indicates how they make that

determination," Tr. at 150:6-10 (Court), and "if . . . you're going to have an expert do it . . . then I would be inclined to deny the request.  So at the present time I'll deny the request," Tr. at 150:11-19 (Court).  The United States stated it would <u>not</u> be Corrections people identifying SNM members, but instead a "gang expert."  Tr. at 149:21-150:5 (Beck).  On that response, the Court has a hard time saying that this request should be granted.  The Court thus denies these requests without prejudice to the Defendants raising their requests if they can show that the materials will be relevant should the United States decide to rely on Corrections people to identify SNM members.

**IT IS ORDERED** that: (i) the discovery requests in the Defendants' Motion for Specific Discovery, filed May 23, 2016 (Doc. 539), are granted in part and denied in part; (ii) the discovery requests in the Defendants' Motion to Compel Discovery, filed September 1, 2016 (Doc. 668), are granted in part and denied in part; and (iii) the discovery requests in the Defendants' Motion for Specific Discovery, filed September 8, 2016 (Doc. 678), are granted in part and denied in part.  In sum, under these circumstances, the Court concludes that the New Mexico Corrections Department's records, under the unique facts of this case, are under the AUSA's control.  Further, by concluding not to stray from the discovery standards it applied in its 2016 opinion <u>United States v. Hykes</u>, the Court resolves a variety of the discovery requests in the Motion to Compel, the First Motion for Specific Discovery, and the Second Motion for Specific Discovery, by simply maintaining the aforementioned standards -- regarding scope of disclosure and review of third-party files -- which were reaffirmed in <u>United States v. Hykes</u>. The Court, accordingly, orders the United States' production of the specific items outlined above in fourteen days, absent a ruling otherwise allowing the United States more time to comply.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
    United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
    Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

        *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

        *Attorneys for Defendant Edward Troup*

- 115 -

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

> *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

> *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

-- and --

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

> *Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

> *Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

-- and --

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

     *Attorney for Defendant Arturo Arnulfo Garcia*

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

-- and --

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

-- and --

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

-- and --

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

-- and --

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

-- and --

Christopher W. Adams
Charleston, South Carolina

    *Attorney for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

-- and --

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Carlos Herrera*

Donald R. West
Don West Law
Orlando, Florida

-- and --

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

    *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Santos Gonzalez*

Appellate Case: 20-2058   Document: 010110415663   Date Filed: 09/29/2020   Page: 479

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

    *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*

DNM 903

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                  Criminal No.  15CR4268 JB

ANGEL DeLEON, et. al.,

 30. SHAUNA GUTIERREZ,

     Defendants.

### DEFENDANT SHAUNA GUTERREZ' OPPOSED SUPPLEMENT IN SUPPORT OF MOTIONS FOR SEVERANCE

**COMES NOW** Defendant Shauna Gutierrez and pursuant to Rules 8(a), 8(b) and 14 of Fed. Rules of Crim. Proc. and files her supplement to the Motions to Sever filed in Docs. 807, 845, 868, 882, 893 and 901 as it relates specifically to her, and moves to sever counts 14 and 15 from the Superseding Indictment.

### BACKGROUND.

A superseding indictment was filed on April 21, 2016, charging thirty (30) Defendants with Violent Crimes in Aid of Racketeering and related charges.  Counts 14 and 15 allege that Shauna Gutierrez conspired with Joe Lawrence Gallegos, Santos Gonzales and Paul Rivera to murder J.G. (Jose Gomez) in violation of 18 U.S.C. §1959, attempted murder of J.G. and Assault with a Dangerous Weapon resulting in Serious Bodily injury to J.G., as consideration of receipt of anything of pecuniary value of the Syndicato de Nuevo Mexico Gang, an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in the SNM

1

gang.

The discovery, in summary, states that on February 27, 2016, Jose Gomez was battered by Santos Gonzales, Brandy Dominguez, Oso (Paul Rivera) and an unknown female (not Shauna). Brandy Dominguez and Paul Rivera are now cooperating witnesses. On March 28, 2016, Brandy Rodriguez was arrested and provided a statement in which she claims that Shauna told Brandy that "Tiny" (J.G.) was at Charlene's residence and they needed to go get him. Rodriguez, Santos Gonzales and Paul Rivera drove Shauna's truck to Charlene's house where they beat and assaulted J.G. The discovery is replete with conflicting information concerning Shauna Gutierrez.

The law on the subject of severance has been briefed and repeated in Documents number 807, 845, 868, 882, 893 and 901, and will be cited to the extent that a particular point is supported. Defendant Gutierrez joins, adopts and incorporates all arguments made heretofore, and further states as follows:

## I. SHAUNA GUTIERREZ IS NOT A MEMBER OF SNM.

Shauna Gutierrez is in a unique position in this case because she is the only female. Based on information and belief, females are not members of SNM. In fact, the government concedes that Ms. Gutierrez is not a member of SNM, but is an associate. Ms. Gutierrez is neither a prospect nor an associate of SNM. She has never been in prison, a prerequisite to membership in SNM. Ms. Gutierrez has not sought consideration of anything of value from SNM, nor has attempted to gain entrance into SNM, but is an associate. She has never participated in the activities of the "enterprise" including this case. The reason Ms. Gutierrez is indicted is because of her former relationship, formed two (2) months before the first indictment filed December 2015,

with Joe Lawrence Gallegos.  Ms. Gutierrez is not the wife of Joe Lawrence Gallegos nor

a family member.  Many Defendants in this large scale indictment have wives, girlfriends

or family members who may have facilitated the activities of SNM who are not indicted.

Ms. Gutierrez should not be in this case.

  II.  THE GOVERNMENT'S PROPOSAL TO SEVER THE INDICTMENT SO THAT
       COUNTS 1 THROUGH 5 AND COUNTS 13, 14, AND 15 BE TRIED JOINTLY DOES
       NOT COMPORT WITH RULES 8(a), 8(b) AND 14 OF FED. R. OF CRIM. PROC.

        The charges do not overlap factually.  The murders of F.C. charged in Count 1,

which occurred in 2001, and R.G., charged in Count 2, which also occurred in 2001, at

Southern New Mexico Correctional Facility, are factually distinct from the allegations in

Counts 14 and 15 which allegedly occurred on February 27, 2016.  The charges are

separated by 15 years, Counts 14 and 15 and the charges bear absolutely no relation to

each other.  The same argument applies to Count 3, the murder of F.S., which occurred at

Southern New Mexico Correctional Facility prison in 2007.

        The indictment is a collection of distinct and discreet charges cut and pasted

together allegedly committed at the behest of the all encompassing SNM enterprise.  In

fact, Counts 14 and 15 relate to a personal conflict between Joe Lawrence Gallegos and

J.G. Counts 14 and 15 are not of the same or similar character, or based on the same

transaction, or parts of a common scheme or plan as counts 1,2, and 3.  Fed. Rule of

Crim. Proc. 8(a).

        The joinder of Counts 14 and 15 with Counts 4 and 5 will result in real prejudice

to Defendants named in counts 14 and 15.  Fed. Rule of Crim. Proc. 14(a). Counts 4 and

5 relate to the gruesome murder of A.B. on November 12, 2012 in Socorro and Valencia

counties allegedly by Joe Lawrence Gallegos and Andrew Gallegos.  It was not a prison

murder.  The method in which A.B. was killed, four years before the assault on J.G., is

markedly different from the assault on J.G.  The evidence in Counts 4 and 5 many spill

over to Counts 14 and 15 for the reason that Joe Lawrence is named in the four counts.

The prejudice is so compelling that the Court would be unable to afford protection, and

thus prejudice would result in an unfair trial.  U.S. v. Kaufman, 858 F. 2d 994.  A

limiting instruction will not cure the prejudice that would result in joining the counts for

trial.  Joinder of Counts 1 through 5 with Counts 13, 14 and 15 does not comport with

reality.

### III.  JOINDER OF COUNTS 14 AND 15 WITH COUNTS 6, 7, 8, 9, 10, 11, AND 12 IS ILLOGICAL.

Counts 6 and 7 relate to the prison murder of Javier Molina in Southern New

Mexico Correctional Facility in March 2014.  Defendants named in the indictment are

Jerry Armenta, Jerry Montoya, Mario Rodriguez, Timothy Martinez, Anthony Ray Baca,

Mauricio Varela, Daniel Sanchez, Carlos Herrera and Rudy Perez.  Counts 6 and 7

involved different Defendants with entirely different evidence at a different location and

time than Counts 14 and 15.  The evidence among the counts are so wildly dissimilar that

a trial jointly may confuse or mislead the jury into concluding that the Defendants in

counts 14 and 15 are some how connected with the murder of Javier Molina which could

not be further from the truth.

The evidence is not of the same or similar character, nor based on the same act or

transaction nor part of a Common scheme or plan.  Rule 8(a) Fed. Rules of Crim. Proc.

The Defendants in Counts 14 and 15 did not participate in the same act or transaction, or

in the same series of acts or transactions as the Defendants in Counts 6 and 7.

Counts 8 is an assault against J.R. in 2015 which occurred at the prison in

4

Southern New Mexico Correctional Facility allegedly by Anthony Ray Baca, Gerald Archuleta and Conrad Villegas. The Defendants are different, at a different location and are factually unrelated to Counts 14 and 15. The same argument holds true for Counts 9, 10, 11--different defendants, different facts, different locations.

The Defendants in Counts 1 thorough 12 have markedly higher levels of culpability than the Defendants in Counts 14 and 15. Initially, many of the Defendants in Counts 1 through 10 were looking at the death penalty. Ms. Gutierrez does not have the same level of culpability. The disproportionality of the evidence in counts 1 through 13 compared to Counts 14 and 15 will confuse and mislead the jury, and will prevent the jury from making a reliable judgment about guilt of innocence. U.S. v. Pursely, 474 F. 3d 757. (10th Cir. 2007).

## CONCLUSION.

The allegations claimed by the Government against Ms. Gutierrez is a small fraction compared to the overall scope of this indictment against the twenty nine (29) other Defendants in this case. The prejudice suffered by Defendants charged in a small portion of the counts is compounded because the jury is subject to months and months of trial "dealing with dozens of incidents of criminal misconduct that does not involve" a minor defendant in any way. U.S. v. Gallo, 668 F. Supp. 736 (E.D.N.Y. 1987). For all the foregoing reasons, Defendant Gutierrez moves the Court to sever Counts 14 and 15 from the Superseding Indictment.

DNM 908

Respectfully submitted,

Electronically filed February 28, 2017
ANGELA ARELLANES
Attorney at Law
P.O. Box 1784
Albuquerque, New Mexico 87103
(505) 247-2417

**Certificate of Service**

**I HEREBY CERTIFY** that on the 28th day of February, 2017, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means (by email), as more reflected on the Notice of Electronic Filing:

AUSA, Maria Ysabel Armijo
maria.armijo@usdoj.gov

AUSA, Randy M Castellano
randy.castellano@usdoj.gov

AUSA, Matthew Beck
matthew.beck2@usdoj.gov

Brock Benjamin
brock@brockmorganbenjamin.com

Richard Sindel
rsindel@sindellaw.com

Cori Ann Harbour-Valdez
cori@harbourlaw.net

Robert R. Cooper
bob@rrcooper.com

James A. Castle
JCastlelaw@gmail.com

Douglas E Couleur
doug@couleurlaw.com

Orlando Mondragon
mondragonom@att.net

6

John L. Granberg
granberglawoffice@yahoo.com

Noel Orquiz
norq@zianet.com

Nathan D. Chambers
nchambers@nathanchamberslaw.com

Billy R. Blackburn
Billy@BBlackburnlaw.com

Santiago David Hernandez
santilawyer@gmail.com


Steven M Potolsky
stevepo@bellsouth.net

Mary Stillinger
stillingerlaw@sbcglobal.net

Joe Spencer
joe@joespencerlaw.com

Richard Jewkes
richardjewkes@sbcglobal.net

Amy E. Jacks
amyejacks@sbcglobal.net

Marc M Lowry
mlowry@rothsteinlaw.com

Theresa M Duncan
teri@duncanearnest.com

Amy Sirignano
amy@abqnmlaw.com

Christopher W Adams
adams.c@me.com

Michael V Davis
mdavis@swcp.com

Carey Corlew Bhalla
carey@bhallalaw.com

Ryan J Villa
ryan@rjvlawfirm.com

Justine Fox-Young
justine@foxyounglaw.com

Donavon A. Roberts
ladar170@aim.com

Erlinda O Johnson
erlindajohnsonlaw@comcast.net


Angela Arellanes
arellanesattorney@yahoo.com


**/S/Angela Arellanes**
Angela Arellanes

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.   15-4268 JB |
| | ) | |
| **ANDREW GALLEGOS, a/k/a "Smiley,"** | ) | |
| **JOE LAWRENCE GALLEGOS,** | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO THE OPPOSED MOTION TO SEVER COUNTS 4 AND 5 [868]

Defendants' contention that Counts 4 and 5 of the Superseding Indictment [868] ("Motion to Sever") are improperly joined under Rule 8(b) fails, because (1) conspiracy to commit other offenses charged in the Superseding Indictment is not a requirement for joinder; (2) the United States offers a sufficient legal and factual basis for the Court to determine that Defendants participated in the affairs of the Syndicato de Nuevo Mexico Gang ("SNM") through the commission of the alleged racketeering offenses; and (3) the United States establishes Defendants were members of the SNM functioning to achieve a "common purpose." Defendants' second contention that severance of Counts 4 and 5 should be severed under Rule 14 fails, because (1) Defendants fail to show any prejudice arising from antagonistic defenses; (2) Defendants fail to show joinder will prejudice Defendants' Fifth and Sixth Amendment rights, or prevent the jury from making a reliable judgment about Defendants' guilt or innocence; and (3) severance does not serve the best interests of the Court or jury. The Court should therefore deny Defendants' Motion to Sever.

1

## BACKGROUND

On November 12, 2012, the Veguita Fire Department responded to a vehicle fire in Socorro County, New Mexico. Upon arrival, fire department personnel discovered the burned corpse of A.B. lying in a fetal position with both hands bound in handcuffs behind the back and a gunshot wound to the head. A.B. was a known drug dealer and drug supplier to Syndicato de Nuevo Mexico Gang ("SNM") members Joe Lawrence and Andrew Gallegos ("Defendants"). During the course of the investigation, various witnesses placed A.B.'s last known whereabouts at the Defendants' home where witnesses say Defendants shot A.B. in the head, and disposed of his body at the site where he was located. Prior to the murder, Joe Lawrence Gallegos became aware that A.B. had disrespected him and was talking negatively about him in the community. As members of the SNM, Defendants were expected to preserve and protect the reputation of the SNM through any means necessary, including murder.

Defendants are charged by Superseding Indictment [Doc. 368] in Count 4—conspiracy to murder, in violation of 18 U.S.C. Sections 1959(a)(5), and Count 5—murder, in violation of 18 U.S.C. Section 1959(a)(1). The grand jury charged:

1. Defendants are members/prospects/associates of the SNM, a criminal organization whose members/prospects/associates engage in acts of violence and other criminal activities including murder, kidnapping, conspiracy to manufacture/distribute narcotics, and firearms trafficking. Superseding Indictment at 2.

2. SNM, including its leadership, membership, prospects, and associates, constitutes an enterprise as defined in Title 18, U.S.C. Section 1959(b)(2). *Id.* at 3.

3. SNM members are expected to remain loyal to the SNM and work to further the goals of the SNM inside and outside the prison environment. *Id.* at 4.

2

4. The purposes of the SNM include: preserving, protecting, promoting, and enhancing the reputation of its members and associates through criminal acts such as intimidation, violence, threats of violence, assaults, and murder. *Id.* at 7.

5. Members who fail to show loyalty to the gang are disciplined in various ways, including murder and assault. *Id.* at 4.

Defendants are among 20 co-Defendants[1] presently pending trial for Violent Crimes in Aid of Racketeering ("VICAR"). They seek severance under Federal Rule of Criminal Procedure 14(a).

## RELEVANT LAW

Federal Rule of Criminal Procedure 8(b) is the primary procedural vehicle for joinder of defendants in an indictment. Rule 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b). "[T]he test for proper joinder is a common thread to each of the defendants which may be established by common evidence as to various counts." *United States v. Caldwell*, 560 F.3d, 1202, 1212 (10th Cir. 2009) (citing *United States v. Rogers*, 921 F.2d 975, 984 (10th Cir. 1990)). Rule 8 is construed broadly "to allow liberal joinder to enhance the efficiency of the judicial system." *Id.* (citing *United States v. Morales*, 108 F.3d 1213, 1219 (10th Cir. 1997)).

A defendant may seek relief from proper joinder if joinder results in prejudice to the defendant. *Zafiro v. United States*, 506 U.S. 534, 538 (1993). Federal Rule of Criminal Procedure 14(a) provides:

---

[1] Of the 29 Defendants charged by Superseding Indictment with VICAR offenses, nine (9) Defendants have pled guilty.

3

> If the joinder of offenses or defendants in an indictment, an information, or a
> consolidation for trial appears to prejudice a defendant or the government, the court
> may order separate trials of counts, sever the defendants' trials, or provide any other
> relief that justice requires.

Fed. R. Crim. P. 14(a). To justify relief under Rule 14, a defendant bears a "heavy burden of showing real prejudice to his case." *United States v. Gould*, No. CR 03-2274 JB, 2007 WL 1302587, at *1 (D.N.M. Apr. 6, 2007) (Browning, J.) (citing *United States v. Hall*, 473 F.3d 1301, 1302 (10th Cir. 2007)). A defendant must show that the prejudice is "of a type against which the court is unable to afford protection." *United States v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007) (Brack, J.) (citing *United States v. Cardall*, 885 F.2d 656, 668 (10th Cir. 1989)). Critically, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538–39. Because the risk of prejudice varies with the facts in each case, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

## **ANALYSIS**

## I.  **Joinder of Defendants is proper under Rule 8(b)**

Defendants offer three contentions in support of their claim that joinder is improper: (1) there is no allegation that Defendants "conspired and agreed with each other to commit" other crimes alleged in the indictment, Motion to Sever at 10; (2) the crimes alleged in Counts 4 and 5 "are discrete and not connected to any of the other defendants," *Id.*; and (3) joinder of Defendants under a "common purpose" standard will "create a slippery slope that would permit the Government to join 'almost anyone' under the current indictment." *Id.* Defendants' claims fail to find support in law or the facts.

4

**A. Conspiracy to commit other offenses charged in the Superseding Indictment is not a requirement for joinder under Rule 8(b)**

Defendants contends that joinder is improper because there is no allegation that Defendants "'conspired and agreed with each other to commit' the *other* alleged crimes in the indictment." Motion to Sever at 10 (emphasis added). Defendants rely on the assumption that a "transactional nexus" between Defendants exists only when Defendants are "alleged to have participated in any of the other counts." Motion to Sever at 10. This view of joinder is negated by a plain reading of Federal Rule of Criminal Procedure 8(b).

Rule 8(b) permits joinder of two or more Defendants "if [defendants] are alleged to have *participated* in the same act or transaction, or same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b) (emphasis added). Despite Defendants' contentions, the Rule does not condition joinder upon whether a defendant *conspired* with other defendants to commit other offenses charged in the indictment, *United States v. Grey Bear*, 863 F.2d 572, 585 (8th Cir. 1988), nor does the Rule require that a defendant be charged with *other* offenses in the indictment. *Caldwell*, 560 F.3d at 1212. Critically, Defendants' legal citations offer no support for their contentions. *See* Motion to Sever at 9-10.

Defendants' claims are further diminished by the Rule 8(b) provision stating that, "[a]ll defendants need not be charged in each count." Fed. R. Crim. P. 8(b). Numerous United States Courts of Appeals have found joinder proper even where defendants are *not* alleged to have participated in every act charged in the indictment. *See United States v. Kelley*, 461 F.3d 817, 830 (6th Cir. 2006) (holding joinder proper where both defendants "participated in at least one act in the series of acts that constituted the offenses"); *United States v. Weisman*, 624 F.2d 1118, 1129 (2nd Cir. 1980) (permitting joinder where Defendants participated in "some but not all counts of the indictment"); *United States v. Jones*, 880 F.2d 55, 62 (8th Cir. 1989) ("it is not necessary that

5

every defendant have participated in or be charged with each offense."). *See also* 1A Charles Alan Wright et al., *Federal Practice and Procedure*, § 144 n.37 (4th ed. 2015) ("Not all of the defendants charged as conspirators need to be charged on all of the substantive counts . . . ."). To the extent Defendants complain that there is "no evidence that the [Defendants] and other defendants participated in a series of acts or transactions" related the SNM VICAR conspiracy, Defendants' own argument is negated by additional charges brought against Defendants in Counts 4 and 5, and additional charges against defendant Joe Gallegos in Counts 1, 13, 14 and 15. *See* Superseding Indictment at 9-31.

Indeed, "the test for a proper joinder is a common thread to each of the defendants which may be established by common evidence as to various counts." *Caldwell*, 560 F.3d at 1212. Here, Defendants' offenses clearly share a "common thread" with each of the co-Defendants' alleged offenses.

First, Defendants are among 20 Defendants[2] charged with VICAR offenses committed on behalf of the SNM. Section 1959 makes it a crime to commit any of a list of violent crimes, including murder and conspiracy to murder, in return for anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of joining, remaining with, or increasing a position in such an enterprise. *See* 18 U.S.C. Section 1959(a). Second, the United States alleges that the SNM gang is a criminal enterprise within the meaning of RICO and VICAR, and that Defendants are members of the gang. Superseding Indictment 18-19. The grand jury found probable cause supports those allegations. Defendants' alleged conduct is therefore part and parcel of the SNM's reputation for violence, comprising exactly the type of conduct that has enabled the

---

[2] Of the 29 Defendants charged by Superseding Indictment with VICAR offenses, nine (9) Defendants have pled guilty.

SNM to continue its racketeering enterprise for over 36 years. Based on these criminal allegations

and the body of "common evidence as to various counts" charged in the Superseding indictment,

*Caldwell*, 560 F.3d at 1212, a sufficient basis exists for the Court to determine proper joinder of

Defendants under Rule 8(b). Accordingly, Defendants' Motion to Sever should be denied on these

grounds.

## B. Joinder of Defendants in a RICO conspiracy is proper where Defendants' conduct constitutes predicate racketeering acts

Based on the forgoing analysis, Defendants' second contention that joinder is improper

because "the crimes alleged in Counts 4 and 5 . . . are discrete and not connected to any of the

other Defendants" also fails.  Under RICO, the requirements of Rule 8(b) are satisfied when each

defendant *participated in the affairs of the same enterprise* through the commission of the alleged

predicate racketeering acts. *See*, *e.g.*, *United States v. Irizarry*, 341 F.3d 273, 287-90 (3d Cir. 2003)

(finding joinder of offenses for multiple defendants merges under Fed. R. Crim. P. 8(b), and, for

purposes of joinder under the rule, a RICO conspiracy charge provides the required link); *United*

*States v. Friedman*, 854 F.2d 535 (2nd Cir. 1988) (the presence of a substantive RICO count and

of a RICO conspiracy further broadens the government's power to charge multiple defendants

together); *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999) ("In this case, the RICO

and RICO conspiracy counts functioned as the 'connective tissue' . . .  that allowed joinder of all

fifteen incidents and all three defendants in a single trial."); *United States v. Boylan*, 898 F.2d 230,

245 (1st Cir. 1990) (so long as there is reasonable basis for the allegations, charging a RICO

conspiracy normally supplies the basis for joinder of multiple defendants at a single proceeding

where all are accused of participating in the conspiracy); *United States v. Caporale*, 806 F.2d 1487,

1510 (11th Cir. 1986) (Joinder of co-defendants in a count charging a single RICO conspiracy

violation is permissible, even if different defendants are charged with different acts of racketeering,

if the racketeering acts are in furtherance of the overarching RICO conspiracy charge).

As is the case under RICO, the requirements for joinder of defendants under VICAR may

be satisfied by establishing the existence of an enterprise, and that the defendants' charged crimes

related to the affairs of the same enterprise. *See, e.g.*, *Matta-Ballesteros*, 71 F.3d at 770-71 (finding

joinder proper where co-defendants' charges related to one another); *United States v. Darden*, 70

F.3d 1507, 1526-27 (8th Cir. 1995) (finding joinder proper where the indictment sufficiently

alleged that the joined defendants and counts were factually interrelated). Rule 8(b) also permits

joinder even when a defendant is not charged with the same offense. *See United States v. Vasquez-*

*Velasco*, 15 F.3d 833, 844 (9th Cir. 1994) (joinder of offenses is proper where there is a logical

relationship between the acts or transactions giving rise to the offense).

The United States charged Defendants with participating in the affairs of the SNM

enterprise through the commission of the alleged predicate racketeering acts. As the Superseding

Indictment alleges, Defendants are members of the SNM, a criminal enterprise, and, at the behest

of the gang, have participated in predicate racketeering acts, namely, conspiracy to murder and

murder, to assert and preserve the reputation of the SNM. *See* Superseding Indictment at 18-19.

The Superseding Indictment characterizes the Defendants' collective conduct as "Violent Crimes

in Aid of Racketeering" pursuant to 18 U.S.C. §§ 1959(a)(1) and (a)(5). *See id.* Accordingly,

Defendants cannot escape joinder by claiming that their offenses are "not connected to any of the

other defendants," when the co-Defendants' alleged acts fulfill the essential expectations of the

SNM VICAR conspiracy. Defendants' Motion to Sever should therefore be denied on these

grounds.

**C.  Defendants' assertions against the VICAR statute itself are unfounded**

In a final effort to challenge joinder under Rule 8(b), Defendants turn their assertions against the VICAR statute itself. Defendants contend that the United States *should not* be allowed to join Defendants under a "common purpose" standard. Motion to Sever at 10-11. Defendants claim that doing so will "create a slippery slope that would permit the Government to join 'almost anyone' under the current indictment. *Id.* This view is without merit and unsupported by the law or facts.

In *Boyle v. United States*, the Supreme Court held: the United States is *required* to establish a RICO association-in-fact "enterprise" by proving "(1) an ongoing organization with a framework, formal or informal, for carrying out its objectives, and (2) that association members functioned as a continuing unit to achieve a *common purpose*." 556 U.S. 938 (2009) (emphasis added). Applying the principles announced in *Boyle*, the Tenth Circuit held, "not only must members of the group only (sic.) share a common purpose, there also must be evidence of "interpersonal relationship" aimed at effecting that purpose . . . ." *United States v. Hutchinson*, 573 F.3d 1011, 1021–22 (10th Cir. 2009) (Gorsuch, J.). The United States is allowed to prove all of these essential elements effectively, *Old Chief v. United States*, 519 U.S. 172, 189 (1997), and does so by producing direct and circumstantial evidence of Defendants' alleged conduct. *United States v. Kamahele*, 748 F.3d 984, 1003 (10th Cir. 2014). Clearly, the United States *should* be allowed to join Defendants under the "common purpose" standard, because it has been required to do so by the Supreme Court.

Moreover, Defendants offer no legal or factual basis to support their claim that joinder under the "common purpose" standard will give the United States "free range to join almost any gang-related crime into a single indictment and trial," or that the United States has joined any

9

"member or wannabe member of the SNM." Motion to Sever at 11. *See United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir. 1985) ("So viewed, Rule 8(b) codifies the long-standing practice of trying conspirators together but does not open the door to mass trials—does not, for example, allow all tax evaders whose last names begin with 'V' to be tried together, or all tax evaders who have the same zip code, or use the same accountant."); *United States v. Riebold*, 557 F.2d 697 (10th Cir. 1977) (joinder of offenses is proper if they are of the same character, but the court must grant severance where defendants and offenses are totally unconnected). Although Defendants warn of potential abuses of Rule 8(b), Defendants do not contend that any have occurred here. Accordingly, Defendants' offer no basis for the Court to determine that joinder is improper on these grounds. Defendants Motion to Sever should therefore be denied.

## II.  Defendants fail to show any legal or factual basis for severance under Rule 14

Defendants contend that even if the Court finds that joinder is proper, severance is still required under Rule 14, "because a joint trial of two Defendants for Counts 4 and 5 alongside 28 [now 18] other defendants and the 13 other counts in the superseding indictment will deprive [Defendants] of their right to a fair trial . . . ." Motion to Sever at 2. Defendants offer three arguments in support of their claim: (1) joinder of Defendants will result in defenses "so antagonistic as to be mutually exclusive," Motion to Sever at 17; (2) joinder of Defendants will prejudice Defendants' constitutional rights, Motion to Sever at 20, 21; and (3) joinder of Defendants is outweighed by considerations for judicial economy. Motion to Sever at 16, 20-21. Defendants' fail to show any legal or factual basis for severance under Rule 14.

## A.  Defendants fail to show prejudice arising from antagonistic defenses

A defendant may seek relief from joinder if joinder results in prejudice to the defendant. Fed. R. Crim. P. 14(a). Because "prejudice always exists when more than one defendant or offense

are tried together," *United States v. Candelario-Santa*, 834 F.3d 8, 23 (1st Cir. 2016), a defendant

must show that the prejudice is "of a type against which the court is unable to afford protection."

*United States v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007) (Brack, J.) (citing *United States*

*v. Cardall*, 885 F.2d 656, 668 (10th Cir. 1989)). To determine whether a motion to sever based on

prejudice should be granted, Defendants contend that the Court must conduct a three-step inquiry:

> First, the Court must determine whether the defenses presented are so antagonistic
> that they are mutually exclusive. Second, a defendant must further show a serious
> risk that a joint trial would compromise a specific trial right or prevent the jury from
> making a reliable judgment about guilt or innocence. Finally, a trial court exercises
> its discretion and weighs prejudice to a particular defendant caused by joinder
> against the obviously important considerations of economy and expedition in
> judicial administration.

Motion to Sever at 11-12 (citing *United States v. Pursley*, 474 F.3d 757, 765 (10th Cir. 2007)

(internal quotations omitted)).

In support of the first prong, Defendants cite the number of individuals charged in the

Superseding Indictment as evidence that joinder will result in prejudice arising from antagonistic

defenses. This claim is unsupported by both the law and the facts.

Defendants claim in no uncertain terms by stating that, "it is unclear at this point whether

the 30 defendants' defenses are so antagonistic as to be mutually exclusive." Motion to Sever at

17. Although Defendants admit that they presently suffer no prejudice from antagonistic defenses,

Defendants contend, "[g]iven the number of defendants" "there can be no doubt that there will be

antagonistic defenses." *Id.* Defendants' broad claims of prejudice fail for several reasons.

First, Defendants frequently conflate the number of *actual* Defendants proceeding with

trial in this case. For example, Defendants offer a variety of estimates ranging from 24 Defendants,

Motion to Sever at 2; 21 Defendants, Motion to Sever at 9; 22 Defendants, Motion to Sever at 16;

30 Defendants, Motion to Sever at 16, 17; and 30-60 Defendants, Motion to Sever at 17. The reality of joinder in this case is much smaller than Defendants would like the Court to believe.

Presently, nine Defendants have pled guilty to various VICAR charges in the Superseding Indictment.[3] Other Defendants will likely follow suit. With only 20 Defendants proceeding to trial on three separate statutes, eleven will be tried for violations of 18 U.S.C. Section 1959(a)(5)— conspiracy to murder, and seventeen will be tried for violations under 18 U.S.C. Section 1959(a)(1)—murder. By virtue of the number of Defendants who have already pled in this case, and those who will likely plead in the coming months, the risk of prejudice arising from antagonistic defenses is diminished. But even if these co-Defendants raise antagonistic defenses at trial, Defendants fail to assert any legal or factual basis for severance on this ground.

In *United States v. Linn*, the Tenth Circuit observed that, "[m]utually antagonistic defenses are not prejudicial *per se*." 31 F.3d 987, 992 (10th Cir. 1994) (quoting *Zafiro*, 506 U.S. at 539). In order for the Court to grant a motion to sever based on prejudice arising from antagonistic defenses, "the conflict between codefendants' defenses must be such that 'the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'" *Id.* (quoting *United States v. Swingler*, 758 F.2d 477, 495 (10th Cir. 1985)).

---

[3] Benjamin Clark pled guilty to Count 3 (Murder) on November 15, 2016; Ruben Hernandez pled guilty to Count 3 (Murder) on February 1, 2017; Jerry Armenta pled guilty to Count 6 (Conspiracy to Murder) and Count 7 (Murder) on December 13, 2016; Jerry Montoya pled guilty to Count 6 (conspiracy to murder) and Count 7 (murder) on January 26, 2017; Timothy Martinez pled guilty to Count 6 (conspiracy to murder) and Count 7 (murder) on January 26, 2017; Gerald Archuleta pled guilty to Count 8 (conspiracy to commit assault resulting in serious bodily injury) on June 16, 2016; Robert Martinez pled guilty to Count 9 (conspiracy to murder) and Count 10 (murder) on September 22, 2016; Roy Paul Martinez pled guilty to Count 9 (conspiracy to murder) and Count 10 (conspiracy to murder) on September 15, 2016; and Paul Rivera pled guilty to Count 14 (conspiracy to murder) and Count 15 (attempted murder, assault with a dangerous weapon resulting in serious bodily injury) on February 1, 2017.

Here, Defendants fail to establish any prejudice whatsoever resulting from antagonistic defenses. Because Defendants offer no theory of defense of their own, Defendants point to two antagonistic theories that *might* arise in the course of trial: (1) "many defendants may argue they were not or are not SNM members," and (2) "[o]ther defendants will likely argue the alleged crimes were not done in furtherance of the SNM." Motion to Sever at 17. These arguments are analogous to the defendants' claim of antagonistic defenses in *Linn*. The Tenth Circuit held: denial of guilt by one party while accusing another is "not so contradictory that the jury must have necessarily disbelieved one to believe another." *Linn*, 31 F.3d at 992. This type of claim "amounts to no more than finger pointing," and affords no basis for severance on these grounds. *Id.*

Significantly, *Linn* affirmed the Supreme Court's instruction on antagonistic defenses, and held: even where prejudice is shown, Rule 14 does not require severance where limiting instructions will suffice to cure any risk of prejudice. *Id.* Defendants do not contend that limiting instructions offer an insufficient safeguard against prejudice arising from antagonistic defenses. Moreover, Defendants do not provide any explanation as to how the jury in this case might be confused or misled by Defendants' anticipated defenses—that is, Defendants have not asserted any theory of defense at all. The Court, therefore, should not resort to the "drastic" measure of severing Defendants' trial. *Zafiro*, 506 U.S. at 539.

Because Defendants offer no basis for the Court to determine that severance should be granted due to prejudice from antagonistic defenses, the Court should deny Defendants' Motion to Sever on these grounds.

**B. Defendants fail to show joinder will prejudice specific trial rights or prevent the jury from making a reliable judgement about guilt or innocence**

Defendants contend that, in a motion to sever inquiry, the Court must next determine whether relief is available based on a serious risk that a joint trial would compromise a specific

trial right or prevent the jury from making a reliable judgment about guilt or innocence. *See* Motion to Sever at 11 (citing *Pursley,* 474 F.3d at 765). The United States responds to Defendants' arguments under this prong in the order in which they appear in Defendants' Motion to Sever.

i.   *No serious risk that a joint trial will prevent the jury from making a reliable judgment about guilt or innocence*

Defendants contend that joinder of Counts 4 and 5 will result in: (1) a disproportionate body of evidence "in relation to the 30 [now 20] defendants charged" and "inevitable prejudice to peripheral defendants," Motion to Sever at 16; (2) an "extreme risk" of guilt by association based upon "the mere sight of 30-60 defendants and their lawyers sitting in a courtroom," Motion to Sever at 17; and (3) "prejudicial effect" from evidence admitted against co-Defendants rendering the jury "virtually incapable of reaching a reliable conclusion about each defendant's guilt or innocence." Motion to Sever at 18. Defendants claims are unsupported by the law or facts.

As the United States has already established, Defendants seek to enlarge the scope of trial by repeating inaccurate estimates of the number of actual Defendants in this case. Not only are these claims—and their subsequent basis for prejudice—without merit, the Court already noted at the hearing on February 7, 2017 that it is inclined to sever this case into groups of 10 or less Defendants. So, Defendants have already effectively been provided the relief they seek.

To the extent that a jury will be incapable of reaching a reliable conclusion about each defendants' guilt or innocence, Defendants rely heavily on *United States v. Gallo,* 668 F. Supp. 736 (E.D.N.Y. 1987). The comparison, however, is inapt.

*Gallo* dealt with a RICO conspiracy centered on a traditional organized crime family, in which one godfather directed a select couple of enforcers to carry out the lion's share of the family's criminal activities. *Id.* The court contributed "the complexity and labrynthian nature of the charged conspiracy and of this case" to the distribution of defendants across the indictment:

14

thirteen defendants, and a "host of unindicted cohorts," were charged with racketeering conspiracy in Count One *alone*. *Id.* at 738-39. The remaining twenty-one counts charged fourteen of the defendants with various "substantive" offenses, all relating to the affairs of the alleged enterprise. *Id.* All in all, the offenses charged in *Gallo* spanned at least nine areas of illegal activity, seventy-two predicate racketeering acts consist[ing] of forty-six separate specified alleged offenses, the violation of eleven different sections of the state and federal criminal codes, and at least 25 separable "schemes," "operations," or courses of conduct. *Id.* In its decision to grant relief under Rule 14, *Gallo* found the complexity of this case was "particularly injurious to defendants charged in a small portion of the counts and who are implicated by only bits and pieces of evidence." *Id.* at 749-50 (citing *United States v. Branker*, 395 F.2d 881, 882 (2d. Cir. 1968)).

Unlike the RICO conspiracy in *Gallo*, the scope of SNM VICAR offenses and the distribution of defendants across the Superseding Indictment is narrow. Here, the majority of charges stem from violations of Section 1959. Moreover, no more than six Defendants will proceed on any one count in the indictment, with the largest number of Defendants charged in Counts 6 and 7, of which Defendants are not charged. Unlike the defendants in *Gallo*, Defendants are not charged in a small portion of the counts nor are they implicated by bits and pieces of evidence. In the unique circumstances that the Superseding Indictment alleges, Defendants' alleged offenses are *res gestae* of the SNM's racketeering "enterprise." As the Grand Jury charged, members of the SNM are expected to preserve, protect, and promote the reputation of the SNM through any means necessary, including murder. Superseding Indictment at 7. Sufficient evidence exists to prove Defendants murdered A.B. at the behest of the SNM.

Based on the actual scope of trial, Defendants offer no factual basis for the Court to determine that the jury will not have "a reasonable chance of understanding and acting upon

15

instructions from the court" in this case. Motion to Sever at 14 (quoting *Gallo*, 668 F. Supp. at 752). Indeed, courts routinely have found that juries can *and do* follow jury instructions in complex RICO and VICAR cases, and that jury instructions are an effective mechanism for granting relief where prejudice may arise. *See*, *e.g.*, *United States v. Giampa*, 904 F. Supp. 235 (D.N.J. 1995) (finding no "spillover effect" where jury followed jury instructions to consider evidence against each defendant in a multi-defendant indictment alleging 51 counts of various RICO violations); *United States v. Cervone*, 907 F.2d 332 (2d Cir. 1990) (finding jury instructions were sufficient to avoid prejudice in a RICO case charging 18 defendants with numerous racketeering offenses); *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992) (finding careful instructions by the trial judge, an outline of the elements of the offenses charged, numerous requests for feedback, and the length of deliberations reinforced the court's conclusion that the jury comprehended a RICO case involving nine defendants charged with numerous racketeering offenses).

Additionally, this Court specifically has recognized that it is the "gatekeeper under the Rules of Evidence," and frequently uses limiting instructions to prevent the jury from using evidence for an improper purpose. *United States v. Ballou*, 59 F. Supp. 3d 1038, 1049 (D.N.M. 2014) (Browning, J.) (quoting *United States v. Jordan,* 485 F.3d 1214, 1218 (10th Cir. 2007)). *See, e.g.*, *United States v. Sandoval*, 410 F. Supp. 2d 1071 (D.N.M. 2005) (Browning, J.) ("the Court will give a limiting jury instruction concerning the evidence, minimizing the risk that the evidence will contribute to an improperly-based jury verdict."); *Bhandari v. VHA Sw. Cmty. Health Corp.*, 778 F. Supp. 2d 1155, 1172 (D.N.M. 2011) (Browning, J.) ("the Court does not believe that, with the proper limiting instructions, the jury will attribute evidence that Abalos challenged another physician to a fight to the Defendants' decision to terminate R. Bhandari."); *United States v. Rodella*, No. CR 14-2783 JB, 2014 WL 6911573, at *18 (D.N.M. Sept. 21, 2014) (Browning,

J.) ("Additionally, providing a limiting instruction, pursuant to rule 105, if requested by Rodella, will further rein in the jury and prevent it from using the evidence for an improper purpose.").

Finally, to the extent that Defendants will suffer prejudice from evidence admitted against co-Defendants, both the Supreme Court and the Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover effect where limiting instructions may minimize the risk of undue prejudice. *See Zafiro*, 506 U.S. at 539 (limiting instructions often will suffice to cure any risk of prejudice); *United States v. Lane*, 883 F.2d 1484 (10th Cir. 1989) ("As a general rule, we presume that juries follow [limiting] instructions."); *United States v. Jones*, 530 F.3d 1292 (10th Cir. 2008) (mere allegations that evidence against one defendant would have a "spillover effect" against another defendant does not demonstrate prejudice (internal quotations omitted)).

Because Defendants rely on assertions of prejudice generally, and do not point out specific and compelling prejudice, Defendants fail to uphold their burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence. *See United States v. Smith*, 788 F.2d 663, 668 (10th Cir. 1986). Accordingly, the Court should deny Defendants' Motion to Sever on these grounds.

  ii. *No serious risk that joinder will compromise Sixth Amendment trial rights*

Defendants contend that joinder of Counts 4 and 5 places Defendants' Sixth Amendment trial rights at risk. In support of this claim, Defendants assert: (1) voir dire and cross-examination would be impossible without making physical modifications to the courtroom; (2) depending on where Defendants are seated, Defendants will be excluded from important bench conferences with counsel; and (3) if the courtroom is too full, people will not be seated and the Defendants will risk losing their right to a public trial. These arguments are speculative and unpersuasive.

17

As previously established, Defendants' contention is based upon an inflated estimate of Defendants actually proceeding to trial. Given the number of Defendants who have pled, and those likely to plead, the number of actual Defendants at trial will not result in the type of environment Defendants predict. Accordingly, Defendants assertions are without merit.

Moreover,  in *United States v. Escalante*, <u>637 F.2d 1197, 1201</u> (9th Cir. 1987), the Ninth Circuit held that, to show that prejudice is "of such a magnitude that the defendant was denied a fair trial," a party "must show [a] violation of one of his substantive rights by reason of the joint trial: unavailability of full cross-examination, lack of opportunity to present an individual defense, denial of Sixth Amendment confrontation rights, lack of separate counsel among defendants with conflicting interests, or failure properly to instruct the jury on the admissibility of evidence as to each defendant." The Ninth Circuit added: "Clearly, this is not an easy burden to meet." *Id.*

Although Defendants envision a courtroom overfilled with "30-60 defendants and their lawyers sitting in a courtroom," Motion to Sever at 17, Defendants fail to establish that joinder would *deny* Defendants the rights that the Sixth Amendment hold crucial such as, the Constitutional right to cross-examination, opportunity to present an individual defense, right to confront witnesses against them, right to counsel, or right to properly instruct the jury on the admissibility of evidence as to each defendant. The hearings have worked fine thus far, and there is no reason to believe that will change. The rights that Defendants assert may be infringed are not of the same magnitude. Because Defendants offer no sound basis for the Court to determine that a joint trial would compromise Defendants' specific trial rights, the Court should dismiss Defendants Motion to Sever on these grounds.

iii.    *No serious risk joinder will compromise Defendants' Fifth Amendment rights*

Defendants also contend that severance is necessary to protect the Defendants' respective

rights to a fair trial under the Fifth Amendment. Motion to Sever at 23. Defendants assert that "the

fact that the defendants have been charged with VICAR offenses cannot overcome [Defendants']

right to a fair trial." *Id.* at 27-28. Not only do Defendants fail to specify how joinder would

compromise their right to a fair trial, they fail to acknowledge that, given the nature of the VICAR

charges in Counts 4 and 5, severance would not cure the prejudice they contend may exist.

The essence of Defendants' claim is that "the complexity of a large multi co-defendant

racketeering case almost demands severance . . . ." Motion to Sever at 23-24. Defendants rely

heavily on *United States v. Butler*, 494 F.2d 1246 (10th Cir. 1974) to argue that a fair trial would

be impossible here if they are tried alongside their fellow SNM Defendants. But their entire

argument for severance based on this purported prejudice is belied by what they admit -- but

classify as a "wrinkle" with *Butler*'s application to this VICAR case -- that "the crimes charged in

counts 4 and 5 are alleged to have been committed in aid of racketeering activity." Motion to Sever

at 23. That the crimes charged in Counts 4 and 5 are VICAR crimes, as opposed to simple

conspiracies to embezzle or convert government property, *see* Motion to Sever at 26 (citing

*Butler*), is not a wrinkle; it is the reason that the charges in the Superseding Indictment are properly

joined. And it is the reason that severance will not alleviate the purported prejudice on which

Defendants rely for severance.

Unlike in *Butler* and the other cases on which Defendants rely, the United States here must

prove not only that Defendants conspired to murder A.B. and murdered A.B., the United States

must additionally prove that SNM is a criminal enterprise that engaged in racketeering activity,

and that the Defendants conspired to and murdered A.B. to receive pecuniary value from SNM or

19

to gain entry to, or to maintain or increase position in, SNM. *See* 18 U.S.C. § 1959; *United States v. Smith*, 413 F.3d 1253, 1277 (10th Cir. 2005).

Now, Defendants complain throughout their Motion to Sever that the United States is somehow improperly using the VICAR statute to back-door evidence that is "likely inadmissible," Motion to Sever at 18, or to join Defendants or crimes that shouldn't really be joined together. Motion to Sever at 10-11. These complaints lack a sounds basis in law and fact here for two paramount reasons. First, VICAR is a properly enacted statute that Congress saw fit to enact to prevent the exact activity alleged in the Superseding Indictment: violent crimes such as murders perpetrated by individuals who join in a racketeering enterprise such as SNM. Second, by charging this murder and conspiracy to murder as VICAR violations, the United States placed additional burdens on itself: to prove that the SNM is an enterprise, engages in racketeering activities, and that this murder and conspiracy to murder were committed by the Defendants to receive pecuniary value from SNM or to gain entry to, or to maintain or increase position in, SNM. To the extent that Defendants complain about the additional evidence that's admissible in a VICAR case such as this, they conveniently omit from their Motion to Sever that they receive a huge benefit: if the United States fails to prove any one of these additional elements beyond a reasonable doubt, they will be found not guilty of the VICAR crimes with which they're charged.

Because *Butler* does not support Defendants' contention that their Fifth Amendment trial right is prejudiced by joinder, Defendants are left with one final contention: Large multi-defendant racketeering cases virtually always impair a defendant's right to a fair trial under the Fifth Amendment. *See* Motion to Sever at 24. This claim is particularly alarming, because it invites the Court to accept as a general proposition that joinder of offenses in RICO and VICAR cases necessarily imports unconstitutional prejudice. Accepting this premise entails that joinder in these

20

cases is almost never proper. That cannot be right. For this reason as well, Defendants fail to

demonstrate that their specific Fifth Amendment trial right would be prejudiced by joinder in this

case. Accordingly, the Court should deny Defendants' Motion to Sever.

**C.  Severance does not best serve the interests of the Court or jury**

Finally, as Defendants assert, only if the Court finds Defendants have satisfied the first two

prongs of the severance analysis, then may the trial court exercise its discretion and weigh the

prejudice to a particular defendant caused by joinder against the important considerations of

economy and expedition in judicial administration. *See* Motion to Sever at 11-12.

Defendants claim that severance of Counts 4 and 5 "would best serve the interest of the

Court and the jury" by (1) permitting the Court greater flexibility in scheduling matters; (2)

facilitating jury selection for fewer defendants; and (3) relieving jury members of jury service for

"inordinate stretches of time." Motion to Sever at 15. The benefits proposed by Defendants

overlook the additional expense of time and judicial resources incurred by severance.

First, severance is not in the best interests of the Court, because it will require the court to

undergo the same trial process on multiple occasions. Defendants treat Counts 4 and 5 as unrelated

to the charges brought against the other Defendants, ignoring the fact that these charges are part

and parcel of the SNM's larger racketeering activities and enterprise. The United States is required

to produce evidence to prove that Counts 4 and 5 were committed by Defendants who were

members or associates of the SNM, and that the alleged racketeering offenses were carried out by

Defendants on behalf of the gang. *Boyle*, 556 U.S. at 938; *Old Chief*, 519 U.S. at 189.

Severance duplicates the Court's administration of trial matters such as scheduling, jury

selection, and other evidentiary issues that the United States relies upon to prove the necessary

elements of the VICAR conspiracy. Judicial resources are instead better served by requiring one

trial by one jury reviewing one body of evidence. *See United States v. Gould*, No. CR 03-2274 JB, 2007 WL 1302587, at *1 (D.N.M. Apr. 6, 2007) (Browning, J.) ("Joint trials of defendants who are indicted together are preferred because they promote efficiency and serve the interests of justice . . . .").

Next, joinder of Defendants does not impose an unbearable weight on individual jury members. Again, of the Defendants charged in the Superseding Indictment, as in most criminal cases, only a fraction will proceed to trial. However improbable it may be that all remaining Defendants proceed to trial, as pointed out earlier, juries are capable of handling complex litigation.  Accordingly, the length of this trial will not be so long as to countervail the "'preference in the federal system for joint trials of defendants who are indicted together.'" *United States v. Baca*, No. CR 16-1613 JB, Mem'm Opinion & Order, at 43 (D.N.M. Oct. 20, 2016) (Browning, J.) (quoting *Zafiro*, 506 U.S. at 537).

## CONCLUSION

Defendants' Motion to Sever fails to offer a sufficient legal or factual basis to support their claim for severance of Counts 4 and 5 in this case. Regarding Defendants' claim that joinder is improper under Rule 8(b), Defendants provide no basis for the Court to determine that Defendants do not share a common thread with each of the co-Defendants charged in this case.  Regarding Defendants' claim that severance should be granted, Defendants fail to uphold their burden of showing real prejudice on which the Court can afford relief. Accordingly, Defendants fail to satisfy their own severance inquiry. The United States respectfully requests the Court deny Defendants' Motion to Sever.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

***Electronically filed on 2/28/2017***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM  88011
(575) 522-2304

I HEREBY CERTIFY that the foregoing
Response was served this 28th day of
February, 2017, by email to all counsel of
record in this matter.

/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

DNM 934

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO.   15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **BILLY GARCIA, a/k/a "Wild Bill," and** | ) | |
| **EDWARD TROUP, a/k/a "Huero Troup,"** | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS MOTION TO SEVER COUNTS 1 AND 2 [882]

Defendants offer three contentions in support of their Motion to Sever Counts 1 and 2 of the Superseding Indictment [882] ("Motion to Sever"). Defendants' first contention that joinder of Counts 1 and 2 will result in undue prejudice fails, because (1) Defendants do not show real prejudice resulting from joinder; (2) disparity of quality and quantity of evidence does not constitute an antagonistic defense; and (3) Defendants' claims of prejudice are negated by their own admissions. Defendants' second contention that severance should be granted based on considerations for judicial economy fails, because *prejudice*, not *judicial economy*, is the proper basis for severance in the Tenth Circuit.  Defendants' third contention that Counts 1 and 2 should be severed because joinder will result in the introduction of inadmissible evidence and a tangled web of jury instructions fails, because Defendants offer an insufficient legal and factual basis for severance on this ground. The United States respectfully requests the Court deny Defendants' Motion to Sever.

## BACKGROUND

March 26, 2001 was a day of reckoning for the Syndicato de Nuevo Mexico Gang ("SNM"). That morning, two SNM members were brutally murdered by their own in the Southern New Mexico Correctional Facility ("SNMCF").

At approximately 8:35 a.m., R.G., an inmate and associate of the SNM, was found dead in his cell in the Ocean-One-Yellow housing unit at the SNMCF. R.G.'s body was discovered lying down on his stomach in his bed. It appeared that he had been strangled. Nearly 30-minutes later, F.C., an inmate and active member of the SNM, was found dead in his cell in the Paul-One-Green housing unit at the SNMCF. F.C.'s body was discovered lying face down in his bed with a laundry bag tied around his neck. The autopsy revealed that the cause of death as to both victims was ligature strangulation, and the manner of death was homicide.

After an extensive investigation, federal investigators discovered that a "green light" was issued for R.G. and F.C. by the SNM. It was believed that R.G. was cooperating with federal investigators and F.C. "ratted" on another inmate while in prison in Santa Fe. Witnesses and confidential human informants confirmed that the "green light" was issued by Billy Garcia, a high ranking member of the SNM, and that Edward Troup was involved in the murder of F.C.

Defendants are charged by Superseding Indictment [Doc. 368] in Counts 1 and 2—murder, in violation of 18 U.S.C. Sections 1959(a)(1). The grand jury charged:

1. Defendants are members/prospects/associates of the SNM, a criminal organization whose members/prospects/associates engage in acts of violence and other criminal activities including murder, kidnapping, conspiracy to manufacture/distribute narcotics, and firearms trafficking. Superseding Indictment at 2.

2

2.  SNM, including its leadership, membership, prospects, and associates, constitutes an enterprise as defined in Title 18, U.S.C. Section 1959(b)(2). *Id.* at 3.

3.  The purpose of the SNM includes: preserving, protecting, promoting, and enhancing the reputation of its members and associates through criminal acts such as intimidation, violence, threats of violence, assaults, and murder. *Id.* at 7.

4.  SNM members are expected to remain loyal to the SNM and work to further the goals of the SNM inside and outside the prison environment. *Id.* at 4.

5.  Members are expected to confront and attack any suspected law enforcement informants or cooperating witnesses. *Id.* at 5.

6.  Members who fail to show loyalty to the gang are disciplined in various ways, including murder and assault. *Id.* at 4.

Defendants are among 20 co-Defendants[1] presently pending trial for Violent Crimes in Aid of Racketeering ("VICAR"). They seek severance under Federal Rule of Criminal Procedure 14(a).

## RELEVANT LAW

Despite Defendants' assertions, Federal Rule of Criminal Procedure 14 is *not* "the law on severance." Motion to Sever at 7-8. Instead, Rule 14 provides relief from prejudicial joinder from which severance *may* be granted.

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court *may* order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14 (emphasis added).

---

[1] Of the 29 Defendants charged by Superseding Indictment with VICAR offenses, nine (9) Defendants have pled guilty.

3

To justify relief under the Rule, a defendant bears a "heavy burden of showing real prejudice to his case." *United States v. Gould*, No. CR 03-2274 JB, 2007 WL 1302587, at *1 (D.N.M. Apr. 6, 2007) (Browning, J.) (citing *United States v. Hall*, 473 F.3d 1301, 1302 (10th Cir. 2007)). The Defendant must show that the prejudice is "of a type against which the court is unable to afford protection." *United States v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007) (Brack, J.) (citing *United States v. Cardall*, 885 F.2d 656, 668 (10th Cir. 1989)). Even if prejudice is shown, "Rule 14 does not require severance," rather "it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *United States v. Zafiro*, 506 U.S. 534, 538–39 (1993).

Defendants assert that, "[i]n order to resolve claims of prejudice in joint trials, 'the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.'" Motion to Sever at 14 (citing *Gould* in part). This is not an accurate description of the law on severance.  When considering a motion for severance, the trial court engages in a three-step inquiry:

> First, [the Court] must determine whether the defenses presented are so antagonistic that they are mutually exclusive. Second, because mutually antagonistic defenses are not prejudicial per se, a defendant must further show a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence. Third, *if the first two factors are met*, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.

*Gould*, 2007 WL 1302587, at *2 (quoting *United States v. Pursley*, 474 F.3d 757, 765 (10th Cir. 2007) (emphasis added). Critically, the Tenth Circuit's three-step inquiry does not afford discretionary consideration for "economy and expedition of judicial administration" until *after* the initial threshold determinations have been made. *See Pursley*, 474 F.3d at 765 (the Court "must" determine prejudice resulting from antagonistic defenses, and the Defendants "must" show risk to

4

a specific trial right, or that the jury will be prevented from making a reliable judgment about

Defendant's guilt or innocence)*.*  A trial court's decision to deny severance will be reversed only

where the defendant has demonstrated an abuse of discretion. *Pursley*, 474 F.3d at 765 (citing

*United States v. Hayes*, 861 F.2d 1225, 1231 (10th Cir. 1988)).

### A.  Defendants' fail to show real prejudice resulting from joinder of Counts 1 and 2

Defendants' contend that severance of Counts 1 and 2 should be granted, because (1)

"evidence concerning Counts 9 and 10 will unfairly prejudice all other defendants," Motion to

Sever at 8; (2) "there exists a disparity in the quality and quantity of evidence, which creates

antagonistic defenses," Motion to Sever at 9; and (3) "the allegations in the superseding indictment

are not related to a single criminal enterprise, but rather describe several distinct and different

criminal enterprises." *Id.*  Defendants offer an insufficient legal and factual basis for severance of

Counts 1 and 2 on these grounds.

*i.    Offenses charged in Counts 9 and 10 are properly joined and adequately addressed in
      the Superseding Indictment*

Defendants' contend that severance should be granted because Defendants are in "no way,

shape or form responsible" for Counts 9 and 10 charging "conspiracy to murder two corrections

officials in the community." Motion to Sever at 8. Defendants contend that, attacking corrections

officers was never stated in the Superseding Indictment as a goal or purpose in the formation or

operations of the SNM, and therefore Counts 9 and 10 "are different in nature and character." *Id.*

Defendant's claims are implausible and without merit.

First, the Superseding Indictment clearly states that the purpose of the SNM is to

"promot[e] and enhance[e] the enterprise and the activities of its members and associates through

criminal acts," and to "keep victims, potential victims, witnesses, and community members in fear

of the enterprise and its members and associates through violence and threats of violence."

Superseding Indictment at 7. This would include conspiracy to murder community members who serve in the capacity as public officials, especially if those officials are deemed by the SNM to be a threat to the enterprise's existence or are believed to be disrespecting the enterprise.

Second, even if Defendants are not charged with Counts 9 and 10, joinder of Defendants under Federal Rule of Criminal Procedure 8(b) is still proper. Under RICO, Rule 8(b) joinder requirements are satisfied when each defendant *participated in the affairs of the same enterprise* through the commission of the alleged predicate racketeering acts. *See*, *e.g.*, *United States v. Irizarry*, 341 F.3d 273, 287-90 (3d Cir. 2003) (finding joinder of offenses for multiple defendants merges under Fed. R. Crim. P. 8(b), and, for purposes of joinder under the rule, a RICO conspiracy charge provides the required link); *United States v. Friedman*, 854 F.2d 535 (2nd Cir. 1988) (the presence of a substantive RICO count and of a RICO conspiracy further broadens the government's power to charge multiple defendants together); *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999) ("In this case, the RICO and RICO conspiracy counts functioned as the 'connective tissue' . . . that allowed joinder of all fifteen incidents and all three defendants in a single trial."); *United States v. Boylan*, 898 F.2d 230, 245 (1st Cir. 1990) (so long as there is reasonable basis for the allegations, charging a RICO conspiracy normally supplies the basis for joinder of multiple defendants at a single proceeding where all are accused of participating in the conspiracy); *United States v. Caporale*, 806 F.2d 1487, 1510 (11th Cir. 1986) (Joinder of co-defendants in a count charging a single RICO conspiracy violation is permissible, even if different defendants are charged with different acts of racketeering, if the racketeering acts are in furtherance of the overarching RICO conspiracy charge).

As is the case under RICO, the requirements for joinder of defendants under VICAR may be satisfied by establishing the existence of an enterprise, and that the defendants' charged crimes

related to the affairs of the same enterprise. *See, e.g.*, *Matta-Ballesteros*, 71 F.3d at 770-71 (finding

joinder proper where co-defendants' charges related to one another); *United States v. Darden*, 70

F.3d 1507, 1526-27 (8th Cir. 1995) (finding joinder proper where the indictment sufficiently

alleged that the joined defendants and counts were factually interrelated). Rule 8(b) also permits

joinder even when a defendant is not charged with the same offense. *See United States v. Vasquez-*

*Velasco*, 15 F.3d 833, 844 (9th Cir. 1994) (joinder of offenses is proper where there is a logical

relationship between the acts or transactions giving rise to the offense).

 The United States charged Defendants with participating in the affairs of the SNM

enterprise through the commission of the alleged racketeering acts. As the Superseding Indictment

alleges, Defendants are members of the SNM, a criminal enterprise, and, at the behest of the gang,

participated in racketeering acts, namely the murders of F.C. and R.G. *See* Superseding Indictment

at 9-14. The Superseding Indictment characterizes the Defendants' collective conduct as "Violent

Crimes in Aid of Racketeering" pursuant to 18 U.S.C. § 1959(a)(1). *See id.* Accordingly,

Defendants cannot escape joinder by claiming that they are in "no way shape or form" responsible

for Counts 9 and 10 when the co-Defendants' alleged acts fulfill the essential elements of the SNM

VICAR conspiracy. Defendants' Motion to Sever should be denied on these grounds.

 Third, in order for the Court to grant severance, Defendants must show (1) "real prejudice"

resulting from antagonistic defenses, and (2) that joinder creates a risk to a specific trial right, or

will prevent the jury from making a reliable judgment about guilt or innocence. *Pursley*, 474 F.3d

at 765. Here, Defendants altogether fail to trigger severance analysis by offering no legal or factual

basis for either requirement. Because Defendants have yet to make a showing of these factors,

Defendants fail to satisfy their "heavy burden" of showing real prejudice resulting from joinder in

this case. Accordingly, Defendant's Motion to Sever should be dismissed.

ii.  *Disparity of quality and quantity of evidence does not constitute an antagonistic defense for purposes of severance under Rule 14*

Defendants contend that severance should be granted because the "stark differences in the quantity and quality of evidence against other defendants" "would place [Defendants] in an antagonistic position with respect to the defenses of all remaining defendants." Motion to Sever at 9. Defendants' claim fails to find support in the law or the facts.

To establish prejudice resulting from antagonistic defenses, "the defendant must show real prejudice, rather than merely note that each defendant is trying to exculpate himself while inculpating the other." *Fox v. Ward*, 200 F.3d 1286, 1293 (10th Cir. 2000). Because "[m]utually antagonistic defenses are not prejudicial per se," *Zafiro*, 506 U.S. at 538, "the conflict between codefendants' defenses must be such that 'the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'" *United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994) (citing *United States v. Swingler*, 758 F.2d 477, 495 (10th Cir. 1985)).

Here, Defendants offer no theory or theories of defense that would serve as a basis for prejudice under this standard. *See* Motion to Sever at 9. Moreover, differences in quality and quantity of evidence do not constitute antagonistic defenses, because they do not require the jury to necessarily disbelieve the core of one defense theory over the other. *See United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996) (district court did not abuse its discretion in denying motion to sever based on theory of insufficiency of the evidence). Finally, being in an "antagonistic position with respect to the defenses of all remaining defendants" affords no legal basis for severance. "Prejudice always exists when more than one defendant or offense are tried together," *United States v. Candelario-Santa*, 834 F.3d 8, 23 (1st Cir. 2016), thus a defendant must show that the prejudice is "of a type against which the court is unable to afford protection." *Lujan*, 529 F. Supp. 2d at 1326. Because Defendants fail to establish real prejudice resulting from joinder

8

of Counts 1 and 2, the Court need not give further consideration into the matter. *Id.* Accordingly,

the Court should deny Defendants' Motion to Sever on these grounds.

      iii.      *Defendants' claims of prejudice are negated by their own admissions*

      Defendants contend that Counts 1 and 2 should be severed because the offenses alleged in

Counts 3-15 were committed by members of a distinct faction of the SNM known as "The All

Stars." Motion to Sever at 10-13. Not only are Defendants' claims implausible, Defendants fail to

establish a sufficient legal or factual basis for severance under Rule 14.

      In an attempt to distinguish their involvement in Counts 3-15, Defendants admit that they

were "old school" members of the SNM, Motion to Sever at 10; that "sometime between 2002 and

2004 the SNM broke into two factions – each with separate leadership," *Id.*; and that one of the

primary objectives of "The All Stars" was "to try and take out all of the old school members," such

as Billy Garcia. Motion to Sever at 10-11. Defendants' also admit that "a review of discovery"

reveals that defendant Edward Troup belonged to this early set of SNM members. *Id.*

      To the extent that Defendants' complain of prejudice resulting from joinder, Defendants'

own admissions provide a sufficient factual basis for the Court to determine that Defendants were

members of the SNM during the commission of offenses charged in Counts 1 and 2. Defendants'

claims are further negated by joinder of defendant Troup who establishes the ongoing nature of

the enterprise. Troup is charged with murdering F.C. in 2001 and F.S. in 2007—nearly five years

after the Defendants claim "The All Stars" assumed control of the gang. Motion to Sever at 4, 11.

Defendants' Motion to Sever should be denied on these grounds.

      Defendants also contend that severance should be granted, because the offenses charged in

Counts 3-15 were committed by a fundamentally different enterprise within the meaning of RICO.

In support of this contention, Defendants claim that "The All Stars" were former members of the

SNM who attempted to *restructure* the gang into a more powerful criminal entity. Motion to Sever at 11. Defendants assert that in addition to operating under a new name, "The All Stars" operated under new leadership with "differing structures and goals" from those of the original SNM. Motion to Sever at 11. Defendants' contentions fail to find support in the law or facts.

In *United States v. Boyle*, 452 U.S. 938, 946 (2009), the Supreme Court held that that under RICO, the Government is required to prove three structural features to establish the existence of an association-in-fact enterprise: "a purpose, relationships among those associated with the racketeering enterprise, and longevity sufficient to permit these associates to pursue the racketeering enterprise's purpose." A reasonable jury could find that despite variations of membership, the criminal purpose of the SNM has remained the same: to preserve and protect the power, territory, reputation, and profits of the enterprise throughout the New Mexico penal system and the streets of New Mexico through the use of intimidation, violence, threats of violence, assaults, and murder. Superseding Indictment at 6-7.  A reasonable jury could also find that the change of name or factions within a group does not establish the existence of separate and distinct groups. Indeed, the Supreme Court recognized that an enterprise need not even have a name, let alone one that remains constant over the course of the enterprise's existence. *Boyle*, 556 U.S. at 948. Finally, a reasonable jury could find that despite infighting among the original members of the SNM, the enterprise remained the same. *See United States v. Fernandez,* 388 F.3d 1199, 1222–23 (9th Cir. 2004) (despite a dispute between two factions within the organization, the evidence established the existence of a single enterprise and showed that all members of the group still identified themselves as members or associates of the group); *United States v. Orena,* 32 F.3d 704, 710–11 (2d Cir. 1994) ("the eruption of [internal] conflict is not dispositive of the issue whether a

10

single enterprise existed"); *United States v. Batts,* 171 F. App'x 977, 981 (4th Cir. 2006) (internal competition does not prevent the gang from being an enterprise)).

Based on Defendants' own admissions, Defendants fail to show any prejudice resulting from joinder to merit severance in this case. Accordingly, the Court should deny Defendants' Motion to Sever on these grounds.

**B. The Court may not grant severance based on considerations for judicial economy alone**

Defendants contend that severance of Counts 1 and 2 should be granted, because "efficiency in this case favors separate trials." Motion to Sever at 14. Defendants' claim fails to find support in law or facts.

In support of their contention, Defendants offer an extensive estimate of the cost and time associated with joinder of defendants into a single trial. Motion to Sever at 14-20. Despite Defendants' efforts to color the standard for severance, *prejudice*, not *judicial economy*, is the legal basis for severance in the Tenth Circuit. *Pursley*, 474 F.3d 757.

Defendants assert that the trial Court may, in the exercise of its discretion, weigh the "prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." *See* Motion to Sever at 14 (citing *Gould*, 2007 WL 1302587, at *2). Defendants conveniently deconstruct the Tenth Circuit's holding in *Pursley* to expand the scope of judicial discretion over motions for severance under Rule 14. Indeed, the Tenth Circuit has held: the Court may weigh "considerations of economy . . . and expedition of judicial administration," *if* the Court finds (1) "defenses presented are so antagonistic that they are mutually exclusive," and (2) "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* (emphasis added). Without a requisite finding of prejudice under the first

two prongs, the Court has no discretion to weigh considerations for judicial economy in a motion

for severance. *See Gould*, 2007 WL 1302587, at *2 ("A court should undertake a three-step inquiry

in determining whether to grant a motion to sever.") (quoting *Pursley*, 474 F.3d at 765); *United*

*States v. Robbins*, 220 Fed. App'x 859, 862 (10th Cir. 2007) ("Because [defendant] did not

demonstrate the requisite prejudice, there is no need "to explicitly engage in the third step of our

inquiry—weighing prejudice to the defendant against considerations of judicial economy.");

*United States v. Jones*, 530 F.3d 1292, 1304 (10th Cir. 2008) (refusing to grant severance where

defendants failed to show mutually exclusive antagonistic defenses); *United States v. Smalls*, No.

CR 06-2403 RB, 2008 WL 9409329, at *10 (D.N.M. May 7, 2008) (Brack, J.) ("[Defendant] has

stated that his defense has not yet been determined. Moreover, I have not been advised of the

defense arguments of [co-defendant]. Accordingly, I am unable to order severance based on this

claim . . . or assess the possibility of any resulting prejudice to the Defendants from their planned

defenses.")). Critically, Defendants offer no example of any court granting severance based on

judicial economy alone.

       Because Defendants fail to satisfy the preliminary requirements of severance analysis,

Defendants' efforts to quantify the benefits of severance are without merit. Accordingly,

Defendants' Motion to Sever should be denied. But even assuming *arguendo* that Defendants have

established the requisite foundation for severance, Defendants still fail to show that severance is

more convenient and cost effective than joinder in this case. The benefits proposed by Defendants

overlook the additional expense of time and judicial resources incurred by severance.

       First, severance is not in the best interests of the Court or the prosecution, because it will

require the court to undergo the same trial process multiple times. For example, instead of choosing

one jury for one trial, the Court will be required to administer *voir dire* at least four times, based

on Defendants' estimates, thus requiring additional time and resources from the Court, Defendants, defense counsel, and the United States.

Defendants contend that "a joint trial may save time in eliminating . . . the government's desire to establish the racketeering organization." Motion to Sever at 15. Defendants ignore the reality that the United States is *required* to prove that all counts were committed by Defendants who were members of the SNM, and that the alleged racketeering offenses were carried out by Defendants on behalf of the gang. *Boyle*, 556 U.S. at 938 (2009). The United States is allowed to prove all of these essential elements effectively. *See Old Chief v. United States*, 519 U.S. 172, 189 (1997) ("the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away . . . ."). Severance will duplicate the Court's duties by requiring it to endure similar facts, similar witnesses, and similar defendants, including those who are charged in several counts across the Superseding Indictment, multiple times. To the extent that Defendants complain about the burden of proof, they conveniently omit from their Motion to Sever that they receive a huge benefit: if the United States fails to prove any one of these additional elements beyond a reasonable doubt, they will be found not guilty of the VICAR crimes with which they're charged.

Severance also does not necessarily save time and money. Motion to Sever 18-19. Unless additional Defendants plead, trial time estimates and the costs associated with prosecuting and defending each individual Defendant will not change. In effect, the cost to the United States to prosecute each Defendant individually will be *the same*; the cost to defend each Defendant individually, including attorneys' fees, travel expenses, travel time, and lodging will be *the same*; and the time and expense allocated to administer a trial for each individual defendant, including court staff, security, and other judicial resources, will be *the same*. In fact, the best solution to the

cost of trying a joint case is to reduce the number of attorneys by dismissing additional counsel for defendants who have more than one. Accordingly, Defendants' contentions are without merit.

Finally, to the extent that Defendants may enjoy relief under Rule 14, the Court already noted at the February 7, 2017 hearing, that that it is inclined to sever this case into groups of 10 or less Defendants. So, Defendants have already effectively been provided the relief they seek. The Court should therefore deny this motion to sever.

## C.  Defendants overstate the effect of inadmissible evidence and excessive jury instructions

Defendants' contend severance of Counts 1 and 2 is warranted, because "[a] joint trial would involve the introduction of innumerable statements and items of evidence inadmissible against [Defendants], and limiting instructions will not suffice to cure the resulting prejudice." Motion to Sever at 20. Defendants' claims are unpersuasive, and fail to find support in the law or the facts.

Defendants rely on a major assumption that *all* the evidence in Counts 3-15 is "either irrelevant, inadmissible hearsay, or inadmissible testimonial statements, as to Counts 1 and 2." Motion to Sever at 20. The effect of Defendants' contention would preclude the United States from producing evidence that Defendants were members of the SNM, and that the SNM was a criminal enterprise when the alleged VICAR offenses were committed. This cannot be true.

Under Section 1959, the United States is required to prove five elements beyond a reasonable doubt as to each Defendant charged: (1) the organization was an enterprise, (2) the enterprise was engaged in racketeering activity, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) such underlying crime of violence was committed either as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from the charged enterprise, or for the purpose of gaining entrance to or maintaining or increasing position in the

14

charged enterprise. 18 U.S.C. § 1959. Clearly, evidence tending to show Defendants' membership in the SNM, and that the SNM was an association-in-fact enterprise is highly relevant and admissible, as it is required proof under the statute.

Moreover, Defendants need not worry about a "tangled web of limiting instructions being read dozens of times per day over the course of a two to three-month trial." Motion to Sever at 21. As the Superseding Indictment alleges, defendant Billy Garcia is joined with only four other co-Defendants charged in Counts 1 and 2; and defendant Edward Troup is joined with only three other co-Defendants charged in Count 3.[2] This is not, as Defendants suggest, a context "in which the risk that the jury will not, or cannot, follow instructions is so great . . . that the practical and human limitations of the jury system cannot be ignored." Motion to Sever at 23 (citing *Bruton v. United States*, 391 U.S. 123, 135 (1968). Accordingly, jury instructions limiting inadmissible evidence will be sufficient to cure any risk of prejudice.

The United States has provided the Court with numerous authorities demonstrating that juries *can and* do follow jury instructions in complex racketeering cases. *United States v. Giampa*, 904 F. Supp. 235 (D.N.J. 1995) (finding no "spillover effect" where jury followed instructions to consider evidence against each defendant in a multi-defendant indictment alleging 51 counts of various RICO violations); *United States v. Cervone*, 907 F.2d 332 (2d Cir. 1990) (finding jury instructions were sufficient to avoid prejudice in a RICO case charging 18 defendants with numerous racketeering offenses); *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992) (finding careful instructions by the trial judge, an outline of the elements of the offenses charged, numerous requests for feedback, and the length of deliberations reinforced the court's conclusion that the jury comprehended a RICO case involving nine defendants charged with numerous racketeering

---

[2] Benjamin Clark pled guilty to Count 3 on November 15, 2016; Ruben Hernandez pled guilty to Count 3 on February 2, 2017.

DNM 949

offenses). Defendants contend that these citations are insufficient because they are either outdated

or deal with criminal enterprises unrelated to the type of enterprise alleged here, but Defendants'

claims are without merit. *See United States v. Diaz*, 52 F.3d 52, 104-05 (2d Cir. 1999); *United

States v. Fernandez*, 388 F.3d 1199, 1244 (9th Cir. 2004), *modified,* 425 F.3d 1248 (9th Cir. 2005);

*United States v. Stinson*, 647 F.3d 1196, 1205 (9th Cir. 2011); *United States v. Knight*, 659 F.3d

1285 (10th Cir. 2011); *United States v. Bellomo*, 954 F. Supp. 630 (S.D.N.Y. 1997); *United States

v. Jones*, 303 F.R.D. 279, 287 (E.D. La. 2014).

Defendants also contend that the legal citations provided by the United States favoring jury

instructions to severance in complex racketeering cases are inapt, because the posture of these

citations involved "post-hoc review of a discretionary decision already made by the trial judge."

Motion to Sever at 25. Indeed, the numerous citations provided by the United States indicate the

likelihood of success of jury instructions on appeal.

Because Defendants fail to establish a sufficient legal and factual basis for severance under

Rule 14, the Court should deny Defendants' Motion to Sever.

## **CONCLUSION**

Defendants' entire Motion to Sever is based upon a faulty application of severance

analysis. Critically, Defendants fail to show that joinder results in real prejudice of which the Court

cannot afford protection. Moreover, the time and cost saving measures proposed by Defendants

afford no legal basis for severance whatsoever. To the extent that the Court has already determined

to sever this case into trials of 10 or fewer Defendants, Defendants have received the relief they

are seeking. The United States respectfully requests the Court deny Defendants' Motion to Sever.

DNM 950

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

*__Electronically filed on 3/2/2017__*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM  88011
(575) 522-2304

I HEREBY CERTIFY that the Clerk of the
Court electronically filed the foregoing response
on the government's behalf. I will serve notice,
to defense counsel of record, this 2nd day of
March, 2017, via email.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

17

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )   CRIMINAL NO.    15-4268 JB
                                     )
      vs.                            )
                                     )
**JAVIER ALONSO, a.k.a. "Wineo,"**   )
                                     )
            Defendant.               )

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SEVER [893]

Defendant offers three contentions in support of his Motion to Sever Count 3 of the Superseding Indictment [893] ("Motion to Sever"). Defendant's first contention that joinder of Count 3 is improper under Rule 8 fails, because (1) Defendant's Motion to Sever under Rule 8(a) is improper, and (2) Defendant fails to provide a legal or factual basis to support a claim of improper joinder under Rule 8(b). Defendant's second contention that severance should be granted under Rule 14 fails, because (1) Defendant fails to show real prejudice resulting from joinder in this case, and (2) *prejudice*, not *judicial economy*, is the proper basis for severance in the Tenth Circuit. Defendant's third contention that severance should be granted because joinder will result in a *Bruton* violation fails, because co-Defendant statements implicating Defendant are not testimonial. The Court should deny Defendant's Motion to Sever.

## BACKGROUND

On June 14, 2007, F.S., a member of the Syndicato de Nuevo Mexico Gang ("SNM"), was transferred from the Penitentiary of New Mexico to the Southern New Mexico Correctional Facility ("SNMCF"). Upon his arrival, F.S. informed SNMCF officials that the SNM had placed

a hit on him. Three days later, F.S.'s body was discovered lying face down on his bed. It appeared that he had been strangled.

After an investigation, federal investigators discovered that members of the SNM arranged to hand deliver court documentation to gang leaders at the SNMCF showing that F.S. was a "rata." The investigation revealed that Javier Alonso ("Defendant") was among those involved in executing the hit on F.S., and that Defendant strangled the victim with a laundry bag.

Defendant is charged by Superseding Indictment [Doc. 368] in Count 3—murder, in violation of 18 U.S.C. Sections 1959(a)(1). The grand jury charged:

1. Defendant is a member/prospect/associate of the SNM, a criminal organization whose members/prospects/associates engage in acts of violence and other criminal activities including murder, kidnapping, conspiracy to manufacture/distribute narcotics, and firearms trafficking. Superseding Indictment at 2.

2. SNM, including its leadership, membership, prospects, and associates, constitutes an enterprise as defined in Title 18, U.S.C. Section 1959(b)(2). *Id.* at 3.

3. The purpose of the SNM includes: preserving, protecting, promoting, and enhancing the reputation of its members and associates through criminal acts such as intimidation, violence, threats of violence, assaults, and murder. *Id.* at 7.

4. SNM members are expected to remain loyal to the SNM and work to further the goals of the SNM inside and outside the prison environment *Id.* at 4.

5. Members are expected to confront and attack any suspected law enforcement informants or cooperating witnesses. *Id.* at 5.

6. Members who fail to show loyalty to the gang are disciplined in various ways, including murder and assault. *Id.* at 4.

Defendant is among 20 co-Defendants[1] presently pending trial for Violent Crimes in Aid of Racketeering ("VICAR"). He seeks severance under Federal Rule of Criminal Procedure 14.

## RELEVANT LAW

Federal Rule of Criminal Procedure 8(b) is the primary procedural vehicle for joinder of multiple defendants in an indictment. *United States v. Riebold*, 557 F.2d 697, 707 (10th Cir. 1977). Rule 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b). "[T]he test for proper joinder is a common thread to each of the defendants which may be established by common evidence as to various counts." *United States v. Caldwell*, 560 F.3d, 1202, 1212 (10th Cir. 2009) (citing *United States v. Rogers*, 921 F.2d 975, 984 (10th Cir. 1990)). The Rule is construed broadly "to allow liberal joinder to enhance the efficiency of the judicial system." *Id.* (citing *United States v. Morales*, 108 F.3d 1213, 1219 (10th Cir. 1997)).

A defendant may seek relief from joinder if joinder results in prejudice to the defendant. *Zafiro v. United States*, 506 U.S. 534, 538 (1993). Federal Rule of Criminal Procedure 14(a) provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). To justify relief under the Rule, a defendant bears a "heavy burden of showing real prejudice to his case." *United States v. Gould*, No. CR 03-2274 JB, 2007 WL

---

[1] Of the 29 Defendants charged by Superseding Indictment with VICAR offenses, nine (9) Defendants have pled guilty.

DNM 954

1302587, at *1 (D.N.M. Apr. 6, 2007) (Browning, J.) (citing *United States v. Hall*, 473 F.3d 1301,

1302 (10th Cir. 2007)). Even if prejudice is shown, "Rule 14 does not require severance," rather

"it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."

*United States v. Zafiro*, 506 U.S. 534, 538–39 (1993). When considering a motion for severance,

a trial court engages in a three-step inquiry:

> First, [the Court] must determine whether the defenses presented are so antagonistic
> that they are mutually exclusive. Second, because mutually antagonistic defenses
> are not prejudicial per se, a defendant must further show a serious risk that a joint
> trial would compromise a specific trial right . . . or prevent the jury from making a
> reliable judgment about guilt or innocence. Third, *if the first two factors are met*,
> the trial court exercises its discretion and weighs the prejudice to a particular
> defendant caused by joinder against the obviously important considerations of
> economy and expedition in judicial administration.

*See Gould*, 2007 WL 1302587, at *2 (quoting *United States v. Pursley*, 474 F.3d 757, 765 (10th

Cir. 2007) (emphasis added). Critically, the Tenth Circuit's three-step inquiry does not afford

discretionary consideration for "economy and expedition of judicial administration" until *after* the

initial threshold determinations have been made. *See Pursley*, 474 F.3d at 765 (the Court "must"

determine prejudice resulting from antagonistic defenses, and the Defendants "must" show risk to

a specific trial right, or that the jury will be prevented from making a reliable judgment about

Defendant's guilt or innocence)*. A trial court's decision to deny severance will be reversed only

where the defendant has demonstrated an abuse of discretion. *Pursley*, 474 F.3d at 765 (citing

*United States v. Hayes*, 861 F.2d 1225, 1231 (10th Cir. 1988)).

## ANALYSIS

### A. Joinder of Defendant in Count 3 is proper under Rule 8

Defendant offers two contentions in support of his claim that joinder is improper under

Federal Rule of Criminal Procedure 8: (1) "Count 3 was improperly joined under Rule 8(a), and

(2) "[Defendant] was improperly joined under Rule 8(b)." Motion to Sever at 2, 10. Defendants contentions fail to find support in law or fact.

     i.     *Challenge to joinder of offenses under Rule 8(a) is improper*

Defendant claims Counts 3 is improperly joined under Rule 8(a), because "Count 3 does not share a sufficient nexus with the other charges to permit joinder." *See* Motion to Sever at 2. Defendants' Motion to Sever under Rule 8(a), however, is improper.

Federal Rule of Criminal Procedure 8 describes two tests for joinder. *See United States v. Papadakis*, 510 F.2d 287, 299–300 (2d Cir. 1975); *Cupo v. United States*, 359 F.2d 990, 922 (D.D.C. 1996); *King v. United States*, 355 F.2d 700, 703-04 (1st Cir. 1966). Rule 8(a) specifically provides that "a single defendant" may be charged with two or more offenses "if the offenses charged are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Rule 8(b) provides that "two or more defendants" may be charged "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).

In *Riebold*, the Tenth Circuit held: "Rule 8(a) . . . does not apply in cases where more than one defendant is joined in the same indictment. Such joinder [of offenses] is governed by Rule 8(b)." 557 F.2d at 707 (quoting *United States v. Eagleston*, 417 F.2d 11, 14 (10th Cir. 1969)). The same distinction was made in *Caldwell*, where the Tenth Circuit held that joinder of offenses among multiple defendants was appropriate under Rule 8(b) where a "number of common threads and much common evidence connecting offenses charged in the indictment" existed. 560 F.3d at 1212. As the Court has pointed out in the past, "as a district court, the Court must faithfully apply

controlling Supreme Court and Tenth Circuit precedent." *United States v. Courtney*, 960 F. Supp.

2d 1152, 1179 (D.N.M. 2013) (Browning, J.).

Clearly, Rule 8(a) does not apply to joinder of offenses involving multiple defendants.

Because Defendant's preliminary joinder-of-offenses challenge relies on a rule not applicable here,

Defendant is not entitled to relief. The Court should therefore dismiss Defendant's Motion to Sever

on these grounds.

ii.     *Challenge to joinder of Defendants under Rule 8(b) fails*

Defendant contends joinder is improper under Rule 8(b), because "[Defendant] is not

alleged to have participated in the same act or transaction or in the same series of acts or

transactions that constitute crimes as the other defendants." Motion to Sever at 2.  In support of

this contention, Defendant claims: "Count 3 is a discrete event, unconnected to any other count,

unconnected to the other defendants, separated by many years from every other allegation in this

case, and as a result not part of a common scheme or plan." Motion to Sever at 10. These arguments

fail to find support in the law or the facts.

First, Defendant offers no factual basis whatsoever to support his contention that joinder

of Count 3 is improper. For example, Defendant makes no effort to explain *how* Count 3 is

"unconnected to any other count," or *why* Count 3 cannot be "part of a common scheme or plan"

charged in the Superseding Indictment. *See* Motion to Sever at 7-8. Indeed, Defendant *merely*

contends that joinder will result in prejudice.

To the extent that Defendant offers any analysis at all, he appears to suggest that joinder is

improper because "none of the defendants charged in Count 3 are charged in any other count in

the Superseding Indictment." Motion to Sever at 8. This is not a sufficient legal basis for improper

joinder.

6

Defendant's claim is negated by the Rule 8(b) provision stating that, "[a]ll defendants need not be charged in each count." Fed. R. Crim. P. 8(b). Numerous United States Courts of Appeals have found joinder proper even where defendants are *not* alleged to have participated in every act charged in the indictment. *See United States v. Kelley*, 461 F.3d 817, 830 (6th Cir. 2006) (holding joinder proper where both defendants "participated in at least one act in the series of acts that constituted the offenses"); *United States v. Weisman*, 624 F.2d 1118, 1129 (2nd Cir. 1980) (permitting joinder where Defendants participated in "some but not all counts of the indictment"); *United States v. Jones*, 880 F.2d 55, 62 (8th Cir. 1989) ("it is not necessary that every defendant have participated in or be charged with each offense."). *See also* 1A Charles Alan Wright et al., *Federal Practice and Procedure*, § 144 n.37 (4th ed. 2015) ("Not all of the defendants charged as conspirators need to be charged on all of the substantive counts . . . .").

Moreover, "the test for proper joinder is a common thread to each of the defendants which may be established by common evidence as to various counts." *Caldwell*, 560 F.3d at 1212. Defendant's involvement in Count 3 clearly shares a "common thread" with each of the co-Defendants charged in the Superseding Indictment.

Under RICO, Rule 8(b) joinder requirements are satisfied when each defendant *participated in the affairs of the same enterprise* through the commission of the alleged predicate racketeering acts. *See, e.g., United States v. Irizarry*, 341 F.3d 273, 287-90 (3d Cir. 2003) (finding joinder of offenses for multiple defendants merges under Fed. R. Crim. P. 8(b), and, for purposes of joinder under the rule, a RICO conspiracy charge provides the required link); *United States v. Friedman*, 854 F.2d 535 (2nd Cir. 1988) (the presence of a substantive RICO count and of a RICO conspiracy further broadens the government's power to charge multiple defendants together); *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999) ("In this case, the RICO and

RICO conspiracy counts functioned as the 'connective tissue' . . .  that allowed joinder of all fifteen incidents and all three defendants in a single trial."); *United States v. Boylan*, <u>898 F.2d 230, 245</u> (1st Cir. 1990) (so long as there is reasonable basis for the allegations, charging a RICO conspiracy normally supplies the basis for joinder of multiple defendants at a single proceeding where all are accused of participating in the conspiracy); *United States v. Caporale*, <u>806 F.2d 1487, 1510</u> (11th Cir. 1986) (Joinder of co-defendants in a count charging a single RICO conspiracy violation is permissible, even if different defendants are charged with different acts of racketeering, if the racketeering acts are in furtherance of the overarching RICO conspiracy charge).

As is the case under RICO, the requirements for joinder of defendants under VICAR may be satisfied by establishing the existence of an enterprise, and that the defendants' charged crimes related to the affairs of the same enterprise. *See, e.g.*, *Matta-Ballesteros*, <u>71 F.3d at 770-71</u> (finding joinder proper where co-defendants' charges related to one another); *United States v. Darden*, <u>70 F.3d 1507, 1526-27</u> (8th Cir. 1995) (finding joinder proper where the indictment sufficiently alleged that the joined defendants and counts were factually interrelated). Rule 8(b) also permits joinder even when a defendant is not charged with the same offense. *See United States v. Vasquez-Velasco*, <u>15 F.3d 833, 844</u> (9th Cir. 1994) (joinder of offenses is proper where there is a logical relationship between the acts or transactions giving rise to the offense).

Here, Defendant is among 20 Defendants charged with VICAR offenses committed on behalf of the SNM. Section 1959 makes it a crime to commit any of a list of violent crimes, including murder, in return for anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of joining, remaining with, or increasing a position in such an enterprise. *See* <u>18 U.S.C. Section 1959(a)</u>. The United States alleges that the SNM gang is a criminal enterprise within the meaning of RICO and VICAR, and that Defendants are members of

8

the gang. Superseding Indictment 18-19. The grand jury finding of probable cause supports those allegations. Defendant's alleged conduct is therefore part and parcel of the SNM's reputation for violence, comprising exactly the type of conduct that has enabled the SNM to continue its racketeering enterprise for over 36 years. Based on these criminal allegations and the body of "common evidence as to various counts" charged in the Superseding indictment, *Caldwell*, <u>560 F.3d at 1212</u>, a sufficient basis exists for the Court to determine joinder proper under Rule 8(b). Accordingly, Defendant's Motion to Sever should be denied on these grounds.

**B. Defendant is not entitled to severance where Defendant fails to show real prejudice resulting from joinder**

Defendant offers three contentions in support of his claim that Count 3 should be severed from the Superseding Indictment: (1) "[t]he introduction of evidence of the other 14 unrelated crimes purportedly committed by and (sic.) co-defendants who are not charged in Count 3 will deprive [Defendant] of his rights to (sic.) fair trail such that severance should be granted," Motion to Sever at 9; (2) [t]he complexity of the indictment, the disproportionality of evidence, and the presence of evidence that would only be admissible as to some defendants make severance a prudent exercise of discretion," *Id.*; and (3) "judicial efficiency and economy should inform this Court's exercise of discretion and counsel in favor of severance." Motion to Sever at 10. These claims fail to find support in law or fact.

First, Defendant offers no factual basis to support his contention that joinder of Count 3 will result in prejudice. For example, Defendant makes no effort whatsoever to explain *how* joinder will deprive Defendant of a fair trial, or which trial rights will be compromised by joinder, or whether joinder will prevent the jury from making a determination of guilt or innocence. *See* Motion to Sever at 9-11. *See also Pursley*, <u>474 F.3d at 765</u>. Defendant's failure to offer any analysis showing prejudice underscores his "heavy burden of showing real prejudice in his case."

9

*Gould*, 2007 WL 1302587, at *1. Moreover, Defendant fails to offer any legal basis to support his claim that severance should be granted based on "judicial efficiency and economy." *See* Motion to Sever at 10-11.

The Tenth Circuit has held: the Court may weigh "considerations of economy . . . and expedition of judicial administration," *if* the Court finds (1) "defenses presented are so antagonistic that they are mutually exclusive," and (2) "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." *Pursley*, 474 F.3d at 765 (emphasis added). Without a requisite finding of prejudice under the first two prongs, the Court has no discretion to weigh considerations for judicial economy in a motion for severance. *See Gould*, 2007 WL 1302587, at *2 (Browning, J.) ("A court should undertake a three-step inquiry in determining whether to grant a motion to sever."); *United States v. Robbins*, 220 Fed. App'x 859, 862 (10th Cir. 2007) ("Because [defendant] did not demonstrate the requisite prejudice, there is no need "to explicitly engage in the third step of our inquiry—weighing prejudice to the defendant against considerations of judicial economy."); *United States v. Jones*, 530 F.3d 1292, 1304 (10th Cir. 2008) (refusing to grant severance where defendants failed to show mutually exclusive antagonistic defenses); *United States v. Smalls*, No. CR 06-2403 RB, 2008 WL 9409329, at *10 (D.N.M. May 7, 2008) (refusing to grant severance where defendant failed to satisfy the preliminary requirements). Critically, Defendant offers no example of any court granting severance based on judicial economy alone.

Because Defendant fails to make any showing of prejudice, Defendant is not entitled to relief under Rule 14. Accordingly, Defendants' Motion to Sever should be denied.

DNM 961

**C.  Admission of Edward Troup's statements will not violate *Bruton***

Defendant contends that "incriminating statements" provided to federal investigators by defendant Edward Troup, also charged in Count 3, raises a *Bruton* violation requiring severance on Sixth Amendment grounds. Motion to Sever at 12-13. Defendant asserts that, "[i]f [Defendant] is forced to go to trial with Edward Troup, where some or all of [Troup's] statements are admitted, [Defendant's] constitutional right to confrontation will be denied." Motion to Sever at 13. Defendant's claim fails, because Troup's statements are not testimonial.

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held: a defendant is deprived of his Sixth Amendment right to confrontation where his accomplice's confession, made to a government agent, is introduced at their joint trial. The *Bruton* Rule protects a defendant's right to confrontation by barring the admission of testimonial statements made by a non-testifying co-defendant. *Id.* However, if a co-defendant's statements are "made unwittingly to a Government informant," those statements are considered "nontestimonial," and are accordingly beyond the scope of *Bruton*. *United States v. Smalls*, 605 F3d 756, 777 (10th Cir. 2010) (quoting *Davis v. Washington*, 547 U.S. 813, 825 (2006)). The following statements are at issue:

> Defendant's Exhibit 1: Troup confessed to being a part of two murders in which two people were strangled to death at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico. Troup stated that during one of the murders, he held [F.S's] legs while [Defendant] strangled him to death with a drawstring from a laundry bag.

> Defendant's Exhibit 2: Troup bragged about being a part of the murder of [F.S] as well, and told [confidential informer] that [Defendant], also from Roswell, was ordered to kill [F.S].

> Defendant's Exhibit 3: In 2007, Edward Troup admitted to CHS that he and [Defendant] killed [F.S.].

Motion to Sever at 13. As Defendant's exhibits reveal, Troup's statements were made to a confidential informer whose status was unknown to him at the time. *See Smalls*, 605 F3d at 777

<center>11</center>

("A declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony . . . .") (quoting *United States v. Saget*, 377 F.3d 223 (2d Cir. 2004) (Sotomayor, J.)). Because "the Confrontation Clause simply does not apply to nontestimonial statements," Defendant's Sixth Amendment right to confrontation will not be violated by admission of Troup's statements. *Id.* at 780.

But even assuming *arguendo* that Troup's statements are testimonial, these statements will still be admissible if properly redacted. Both the Supreme Court and the Tenth Circuit have held: "where a defendant's name is replaced with a neutral pronoun or phrase there is no *Bruton* violation, provid[ed] that the incrimination of the defendant is only by reference to evidence other than the redacted statement and a limiting instruction is given to the jury." *See United States v. Verduzco-Martinez*, 186 F.3d 1208, 1214 (10th Cir. 1999) (citing *Bruton*, 391 U.S. at 123; *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Gray v. Maryland*, 523 U.S. 185 (1998)).

If Troup proceeds to trial, his statements to federal investigators may be admissible against Defendant if properly redacted. References to Defendant are extremely limited, and can be easily redacted with a neutral pronoun or phrase without raising a *Bruton* violation. *See Richardson*, 481 U.S. at 211 (the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."). Critically, neither of Defendant's citations addresses a situation where a proper redaction of the defendant's name accompanied by a limiting instruction was deemed insufficient. *See* Motion to Sever at 12. Accordingly, Defendant's Motion to Sever should be denied on these grounds.

12

## CONCLUSION

Defendant relies on broad assertions of prejudice to support his Motion to Sever. Without more, Defendant fails to offer a sufficient legal or factual basis for the Court to determine that Defendant is entitled to relief under Rule 14. The United States respectfully requests the Court deny Defendant's Motion to Sever.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

***Electronically filed on 3/6/2017***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM  88011
(575) 522-2304

I HEREBY CERTIFY that the Clerk of the Court electronically filed the foregoing response on the government's behalf. I will serve notice to defense counsel of record, via email, this 6th day of March, 2017.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

DNM 964

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                            No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA and SHAUNA
GUTIERREZ,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendants' Joint Motion to Vacate March 2017 Trial Setting, Impose a Discovery Scheduling Order and Request for a Hearing, filed September 7, 2016 (Doc. 676)("Motion to Vacate"); (ii) the Joint Motion for Disclosure and Production of Confidential Informant, filed September 22, 2016 (Doc. 698)("Motion to Disclose"); and (iii) the Joint Motion to Exclude the Prosecution Team from December 2, 2016 Evidence Viewing, filed November 8, 2016 (Doc. 763)("Motion to Exclude").  The Court held a hearing on November 29, 2016.  The primary issues are: (i) whether good cause exists to continue the March, 2017, trial date because of the amount of discovery and requisite pretrial preparations; (ii) whether the Defendants' counsel may view certain physical evidence -- at Southern New Mexico Correctional Facility ("Southern New Mexico") and the police station in Las Cruces, New Mexico -- without Plaintiff United States of America's presence; and (iii) whether the United States must disclose a confidential informant ("CI") whose report has implicated various Defendants, but whom the United States intends to call to testify at trial. Because the Court concludes that good cause exists to continue the trial, in light of the lengthy preparations and discovery needed to adequately facilitate this case, the Court will allow a continuance of the trial date.  Further, because the Court concludes that it is appropriate under the law for the Defendants to view the evidence at the upcoming evidence viewing without the United States' presence, it will allow the sequestered viewing, and will further require that the United States not attempt to determine what occurred while the defense teams attended the viewing.  Last, because the Court is not wholly convinced that all of the Defendants joining the Motion to Disclose have made the proper showing to disclose the CI's identity, the Court will at this time require the United States to disclose the CI's identity only to Baca, but not to others,

under a protective order limiting disclosure to attorneys and investigator's eyes only, and will require the other Defendants joining that Motion to Disclose to make a more substantial showing at a future date should they still seek disclosure of the CI.  Accordingly, the Court will grant the Motion to Vacate, grant the Motion to Exclude, and grant in part and deny in part the Motion to Disclose.

## **FACTUAL BACKGROUND**

The Court takes its facts from the Superseding Indictment.  The facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, filed October 28, 2016 (Doc. 753).  See United States v. DeLeon, 2016 WL 7242579 (D.N.M. 2016)(Browning, J.).  See also United States of America v. Angel DeLeon, 2016 WL 3124632 (D.N.M. 2016)(Browning, J.).  The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background is largely the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM") allegedly committed through its members.  See Superseding Indictment at 2.  SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Superseding Indictment at 2.  SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  See Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured.  See Superseding Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members.  See Superseding Indictment at 3.  SNM has approximately 250 members, comprised of "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members."  Superseding Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Superseding Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Superseding Indictment at 4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Superseding Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Superseding Indictment at 4.  If another gang does not abide by SNM's demands, SNM manages to assault or kill one of the other gang's members to show its power.  See Superseding Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Superseding Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show it superiority over others."  Superseding Indictment at 4-5.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses,

- 4 -

homosexuals, or sex offenders.  <u>See</u> Superseding Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.  <u>See</u> Superseding Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  <u>See</u> Superseding Indictment at 7.  SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the present investigation.  <u>See</u> <u>United States v. Garcia</u>, No. 15-4275 JB, Memorandum Opinion and Order at 2, filed November 16, 2016 (Doc. 133)(citing United States' Response to Defendant's Motion to Designate Complex (Doc. 56) at 1, filed May 3, 2016 (Doc. 70)("United States' <u>Garcia</u> Response")).  The other relevant facts giving rise to this case are as follows.

In March of 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico state prison.  <u>See</u> <u>United States v. DeLeon</u>, 2016 WL 7242579, at *3.  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  <u>See</u> <u>United States v. DeLeon</u>, 2016 WL 7242579, at *3.  That grand-jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  <u>See</u> <u>United States v. DeLeon</u>, 2016 WL 7242579, at *3.  The Doña Ana County District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015.  <u>See</u> <u>United States v. DeLeon</u>, 2016 WL 7242579, at *3.

- 5 -

"A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." See United States v. DeLeon, 2016 WL 7242579, at *3.

The United States now brings this case against thirty Defendants, charging them with a total of fifteen counts. See Superseding Indictment at 1. All Defendants are accused of participating in the operation and management of the enterprise and committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Superseding Indictment at 6-31. Defendants Arturo Arnulfo Garcia, Gerald Archuleta, Benjamin Clark, Mario Rodriguez, Anthony Ray Baca, Robert Martinez, Roy Paul Martinez, and Daniel Sanchez are the alleged leaders of the enterprise. See Superseding Indictment at 6. The other twenty Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders. See Superseding Indictment at 6. The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512 and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant;" and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846. Superseding Indictment at 9. In all, the indictment alleges fifteen different counts against the various Defendants.

Specifically, the Superseding Indictment provides that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia allegedly

murdered "F.C."  Superseding Indictment at 9.  On the same day, Defendants Lujan, B. Garcia, Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G."  Superseding Indictment at 12.  On June 17, 2007, Defendants Javier Alonso, Troup, A.A. Garcia, Clark, and Ruben Hernandez allegedly murdered "F.S."  Superseding Indictment at 15.  On November 12, 2012, Defendants J. Gallegos and Andrew Gallegos allegedly conspired to murder "A.B."  Superseding Indictment at 18.  On the same day, Defendants J. Gallegos and A. Gallegos allegedly murdered A.B.  See Superseding Indictment at 19.  In March 2014, Defendants Jerry Armenta, Montoya, Rodriguez, Timothy Martinez, Baca, Mauricio Varela, Sanchez, Carlos Herrera and Rudy Perez allegedly conspired to murder "J.M."  Superseding Indictment at 20-21.  On March 7, 2014, Defendants Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M.  See Superseding Indictment at 21.

Further, starting in or around 2003 -- and until about July 13, 2015 -- Defendants Baca, Archuleta, and Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R."  Superseding Indictment at 27.  Starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Defendants Baca, R.P. Martinez and Robert Martinez allegedly conspired to murder "D.S."  Superseding Indictment at 28.  During the same period of time, Defendants Baca, R.P. Martinez, R. Martinez and Christopher Garcia allegedly conspired to murder "G.M."  Superseding indictment at 28.  On November 29, 2015, Defendant C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm.  See Superseding Indictment at 29.  On the same day, Defendant C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder.  See Superseding Indictment at 29.

On March 17, 2015, Defendant J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Superseding Indictment at 30. From February 1, 2016, until February 27, 2016, Defendants J. Gallegos, Santos Gonzalez, Paul Rivera, Shauna Gutierrez "and others known and unknown to the grand jury," allegedly conspired to murder "J.G." Superseding Indictment at 30. The final count alleges that, on February 27, 2016, Defendants J. Gallegos, Gonzalez, Rivera and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Superseding Indictment at 31.

For fuller context, there are four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States of America v. Anthony Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.), the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d). See United States v. Baca, No. CR 16-1613, Sealed Indictment, filed April 21, 2016 (Doc. 1).[1] There is also a prosecution of one Defendant for drug crimes, see United States v. Garcia, No. 15-4275 JB (D.N.M.)(Browning, J.), and of four defendants for further alleged conduct, as is alleged in the present case, constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, see United States v. Varela, No. 15-4269 JB (D.N.M.)(Browning, J.).

**PROCEDURAL BACKGROUND**

On December 1, 2015, a federal grand jury indicted twenty-four Defendants for the crimes of Murder (under 18 U.S.C. § 1959(a)(1)); Violent Crimes in Aid of Racketeering and U.S.C. § 2: Principals), Conspiracy to Murder (under 18 U.S.C. § 1959(a)(5); and Conspiracy to

---

[1]The Court declared that case complex. See United States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016 (Doc. 238).

DNM 972

Commit Assault Resulting in Serious Bodily Injury (under 18 U.S.C. § 1959(a)(6)).  See

Indictment at 1.  The Defendants are all allegedly members, prospects, or otherwise associated

with SNM, which constitutes an enterprise as 18 U.S.C § 1959(b)(2) defines that term.  See

Indictment at 2.

On April 21, 2016, a grand jury, in a Superseding Indictment, indicted thirty Defendants

-- twenty-four of whom were Defendants in the original Indictment.  See Superseding Indictment

at 1.  In addition to the new Defendants, the Superseding Indictment also contains new charges

under modified count numbers.  See Superseding Indictment at 9-31.  The Superseding

Indictment contains fifteen counts for: (i) the Murder of F.C. ("Count 1"); (ii) the Murder of R.G.

("Count 2"); (iii) the Murder of F.S. ("Count 3"); (iv) Conspiracy to Murder A.B. ("Count 4");

(v) the Murder of A.B. ("Count 5"); (vi) Conspiracy to Murder J.M. ("Count 6"); (vii) the

Murder of J.M. ("Count 7"); (viii) Conspiracy to Commit Assault Resulting in Serious Bodily

Injury to J.R. ("Count 8"); (ix) Conspiracy to Murder D.S. ("Count 9"); (x) Conspiracy to

Murder G.M. ("Count 10"); (xi) Felon in Possession of a Firearm ("Count 11"); (xii) Using and

Carrying a Firearm During and in Relation to a Crime of Violence ("Count 12"); (xiii) Assault

with Dangerous Weapon of J.G. ("Count 13"); (xiv) Conspiracy to Murder J.G. ("Count 14");

and (xv) Attempted Murder of J.G., Assault with a Dangerous Weapon Upon J.G., Resulting in

Serious Bodily Injury to J.G. ("Count 15").  See Superseding Indictment at 9-31.  At the time of

the Superseding Indictment's filing, some of the Defendants were death-penalty eligible.  See

The United States' Notice of Intent Not To Seek a Sentence of Death, filed June 6, 2016 (Doc.

567)(stating that it would not seek a death sentence against twenty-one Defendants).  The

Honorable Ken Gonzales, District Judge for the United States District of New Mexico, initially

presided over the case until it was reassigned to the Court on March 30, 2016.[2]   See Judge

Update, filed December 1, 2015, and Notice of Case Reassignment, filed March 30, 2016 (Doc.

351).  Given the large number of Defendants and the safety concerns at issue in these cases, the

Court has entered a Protective Order regulating discovery, and the Defendants receive their

discovery on tablets that a coordinated discovery management firm maintains.[3]   See Protective

Order, filed June 16, 2016 (Doc. 589)("Protective Order").

      **1.**     <u>**Motion to Vacate**</u>.

      Perez filed the Motion to Vacate, and J. Gallegos, Troup, Lujan, B. Garcia, Patterson,

Chavez, Alonso, A.A. Garcia, Clark, Montoya, Rodriguez, Varela, Sanchez, Villegas, Baca, R.

Martinez, R.P. Martinez, C. Garcia, and Herrera joined the Motion to Vacate.  <u>See</u> Motion to

Vacate at 1.  The Motion to Vacate begins by arguing that the SNM prosecution might be the

largest and most complicated prosecution the District of New Mexico has ever seen.  <u>See</u> Motion

to Vacate at 1.  Accordingly, the Motion to Vacate explains that discovery in each of the separate

indictments bleeds together, that the discovery is being undertaken in a wholly unique -- and

slow -- manner, and that trial preparation will likely take "twice as long" as normal.  Motion to

Vacate at 1-2.  The Motion to Vacate Defendants thus "request the Court vacate the trial date and

schedule a hearing so the parties can discuss a realistic timetable for all discovery to be produced

---

[2]The Judge Gonzales declared <u>United States v. DeLeon</u> complex in January, 2016.  <u>See</u>
Order Declaring Case Complex, filed January, 7, 2016 (Doc. 211).

[3]On January 2, 2016, Judge Gonzales granted the Defendants' Joint Ex Parte Motion for
Order Appointing Coordinating Discovery Attorney, Russell M. Aoki, for the Benefit of All
Court-Appointed Counsel.  See Order Appointing Coordinating Discovery Attorney, filed
January 22, 2016 (Doc. 231)("Discovery Coordinator Appointment Order").  Judge Gonzales
held a hearing on January 20, 2016, with all parties present.  <u>See</u> Discovery Coordinator
Appointment Order at 1.  The Court found that appointing Mr. Aoki is justified given the
complexity of this case and the thousands of pages of discovery documents.  <u>See</u> Discovery
Coordinator Appointment Order at 2.

by the government, and for defendants to review said discovery."  Motion to Vacate at 2.  In support of the request, the Motion to Vacate again highlights the case's complexity and breadth, the multiple indictments, a protective order restricting discovery, and the use of a coordinated discovery management firm.  See Motion to Vacate at 2-5.  Discovery, because of the use of the coordinated discovery management firm, is thus variable, the Motion to Vacate argues, because some Defendants have to date received more or less than others.  See Motion to Vacate at 3-4.

The Motion to Vacate reiterates, then, that discovery is still ongoing -- and enormous -- making the present timetable for trial untenable.  See Motion to Vacate at 6-7.  The Motion to Vacate thus argues that "pursuant to the requirements of 18 U.S.C. § 3161(h)(7)(B), and consistent with the holding in *United States v. Toombs*, 574 F.3d 1262 (10th Cir. 2009), good grounds exist for the continuance . . . ."  Motion to Vacate at 7.  Beyond the discovery's complexity, the pretrial preparations will, according to the Motion to Vacate, be of such a nature that a continuance will be necessary.  See Motion to Vacate at 8-9.  In sum, the "Defendants who join this Motion agree that they cannot be prepared to try a case of this complexity by the March trial date and a continuance is needed."  Motion to Vacate at 9.  The United States opposes the Motion to Vacate, but only to the extent that the Defendants in the "parallel RICO indictment in 16-cr-1613 do not oppose a continuance of their trial date in July."  Motion to Vacate at 9.  Ultimately, the United States did not file a response to the Motion to Vacate.  See Notice of Completion of Briefing, filed September 30, 2016 (Doc. 707).

     2.    **Motion to Disclose.**

Perez filed the Motion to Disclose,

pursuant to Fed. R. Crim. 12(b)(1), *Giglio v. United States*, 405 U.S. 150 (1972); and *Roviaro v. United States*, 353 U.S. 53 (1957) [to move] the Court for an order requiring the United States to disclose the identity of a confidential informant and

- 11 -

all information concerning the use of this informant during the investigation and prosecution of Mr. Perez' case.

Motion to Disclose at 1.  The requests in the Motion to Disclose "includ[e] but [are] not limited to, the informant's name, addresses, statements  given in this proceeding and others, criminal history, past cooperation as an informant, and any consideration, such as promises, inducements, or payments, extended to and/or received by this informant."  Motion to Disclose at 1.  Troup, Sanchez, Montoya, Baca, Gallegos, and Herrera join the Motion to Disclose.  See Motion to Disclose at 1.

The Motion to Disclose is primarily concerned with Counts 6 and 7 of the Superseding Indictment, which allege that Perez, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, and Herrera, "conspired to and did murder Javier Molina on March 7, 2014." Motion to Disclose at 1-2.  According to the Motion to Disclose, at the time of J.M.'s murder, all Defendants named in Counts 6 and 7 and J.M. -- also alleged to be a SNM member -- were inmates at Southern New Mexico.  See Motion to Disclose at 2.  J.M. was murdered in his cell in pod 1A-B, and multiple shanks were recovered "from trash cans and shower drains" in the investigation thereafter.  Motion to Disclose at 2.  The Motion to Disclose contends that Perez, who uses a wheel chair, was in his cell on pod 1A-B's bottom level when J.M. was murdered on the upper level.  See Motion to Disclose at 2.  Indeed, the Motion to Disclose provides, the defense "has found only one document that contains information suggesting Mr. Perez assisted in killing Mr. Molina."  Motion to Disclose at 2 (citing FBI Confidential Human Source Reporting (dated February 11, 2016), filed September 22, 2016 (Doc. 698-1)).  The Motion to Disclose explains that a CI alleges that Perez "provided his walker to make shanks that were used in the murder."  Motion to Disclose at 2.

The Motion to Disclose then explains that, in the CI's report, the informant discusses attempting to purchase heroin from another SNM member's mother, which Perez contends indicates that the same CI was involved in the December SNM indictments giving rise to this case.  See Motion to Disclose at 2-3 (providing that the similarity between the informant's report regarding heroin purchases from the SNM family member is important).  The Motion to Disclose also recounts that Armenta, "a co-defendant and cooperating witness," neglected to implicate Perez in the murder underlying Counts 6 and 7.  Motion to Disclose at 3-4.  Accordingly, where Perez argues that the only allegation tying him to J.M.'s murder is that his walker was used to make shanks, and the Motion to Disclose provides that "[t]he vague statement made by the informant regarding Mr. Perez's role offers little insight into the basis of the informant's knowledge, making his identity critical."  Motion to Disclose at 4.  The Motion to Disclose further explains that "the informant will provide key testimony for the prosecution, and he possesses information that would benefit Mr. Perez's defense."  Motion to Disclose at 4.

In support of its request, the Motion to Disclose provides that disclosure of CIs can be required where that source "is a participant in and a material witness to the alleged crime."  Motion to Disclose at 6 (citing Roviaro v. United States, 353 U.S. at 59-61).  Then, citing to the Court's opinion in United States v. Rivas, 26 F. Supp. 1082, 1120 (D.N.M. 2014)(Browning, J.), the Motion to disclose explains:

> Three broad categories of cases involving [CIs] exist:  At one extreme are the cases where the informant is a mere tipster, and disclosure is not required.  At the other extreme are cases such as *Roviaro* itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial.  In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant.

- 13 -

Motion to Disclose at 6.  Here, the Motion to Disclose argues that "the informant in this case may have played a crucial role in the alleged criminal transaction based on the allegations he is making, requiring disclosure of his identity."  Motion to Disclose at 6.  "The Tenth Circuit's take on this analysis is well-known."  Motion to Disclose at 6.  Further, the Motion to Disclose provides, "[w]hen a confidential source plays an active role in the government's investigation, the court must consider: '(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors.'"  Motion to Disclose at 7 (citing United States v. Padilla, 2010 WL 4337819, at * 7 (D.N.M. 2010)(Browning, J.)).

The Motion to Disclose, accordingly, argues that "Mr. Perez's right to prepare his defense outweighs the United States' interest in keeping the informant's identity confidential." Motion to Disclose at 7.  This case is one where Perez' interest outweighs the United States', the Motion to Disclose argues, because -- at least for Perez -- a great weight of evidence does not support the allegations against him, and it appears that the CI is the single source of evidence against Perez who the United States will seek to use at trial.  See Motion to Disclose at 7-9. And, further, because the CI appears to have been an integral part of the murder of J.M., the Motion to Disclose contends that disclosure is well within the Court's discretion.  See Motion to Disclose at 7-9.  In conclusion, the Motion to Disclose suggests:

> Disclosing the informant's identity is essential to the fair adjudication of Mr. Perez's case and outweighs the government's interest in keeping it confidential. Learning the identity of the informant at the earlier stage of discovery will be critical given this is the only witness who links Mr. Perez to the crime charged.

Motion to Disclose at 14.

### 3.    Motion to Disclose Response.

The United States responded to the Motion to Disclose with the United States' Response in Opposition to the Joint Motion for Disclosure and Production of Confidential Informant [698],

filed October 17, 2016 (Doc. 741)("Motion to Disclose Response").  The Motion to Disclose Response informs the Court that "the United States and Perez's counsel agreed to disclosure of the [CI]'s identity under a protective order.  Perez's counsel agrees that the United States' agreement to disclosure under the protective order satisfies Perez's requests under the Disclosure Motion."  Motion to Disclose Response at 4.  Yet, for the other Defendants purporting to join the Motion to Disclose, the United States objects to disclosure of this CI, because "there is no basis on which the Court may properly conclude that the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony may be helpful to those remaining Defendants."  Motion to Disclose Response at 4 (citing United States v. Rivas, 26 F. Supp. at 1114)(internal quotation marks and alterations omitted).  The United States thus requests that the Court deny the Motion to Disclose for overbreadth as it pertains to any Defendant besides Perez.  See Motion to Disclose Response at 4.

       4.      **Motion to Disclose Reply**.

Troup, Sanchez, Baca, and Herrera replied in support of the Motion to Disclose with their Reply to Government's Response to Joint Motion for Disclosure and Production of Confidential Informant (Doc. 698), filed November 7, 2016 (Doc. 762)("Motion to Disclose Reply").  The purpose of the Motion to Disclose Reply is to "provide . . . background to assist the Court in determining whether the Confidential Human Source's (CHS) identity should be disclosed."  Motion to Disclose Reply at 2.  With respect to Troup, the Motion to Disclose Reply explains that Troup "has been indicted in Counts 1 and 3 with the murders of F.C. and F.S.," and that "this is a case where there appears to be no physical or scientific evidence nor any objective witness implicating Mr. Troup in these crimes."  Motion to Disclose Reply at 2.  The Motion to

- 15 -

Disclose Reply then continues its explanation that "F.S. was a known informant," and that, according to the CI at issue in this motion, "paperwork relating to F.S. was delivered by 'Cheech.'"  Motion to Disclose Reply at 2.  Yet, the Motion to Disclose Reply argues, another inmate named Kyle Lynn Dwyer has admitted to being the individual who delivered the paperwork -- in fact, Dwyer was disciplined and sent to "PNM Level VI" as a result of delivering the paperwork, with "paperwork" meaning something that indicates that the subject of whichever paperwork has cooperated with law enforcement.  Motion to Disclose Reply at 3.  The Motion to Disclose Reply thus argues that, regarding any potentially contrary information this CI might have, Troup is entitled to discover the CI's "identity to ascertain, among other things, if such information is exculpatory, especially given Mr. Dwyer's unavailability [now deceased]."  Motion to Disclose Reply at 3.  In addition, the Motion to Disclose Reply contends that the informant in question states that Troup and another Defendant, "Weno," "saw that these two individuals were taking too long and killed F.S." themselves.  Motion to Disclose Reply at 3.  Apparently, according to the Motion to Disclose Reply, this informant's report thus "implicates two, unindicted individuals as alternate suspects and provides a motive that otherwise has not been produced in discovery," and Troup therefore needs the CI's "identity to investigate . . . veracity, ability to perceive, ability to contradict other government informants, and to otherwise adequately prepare his defense to the charges."  Motion to Disclose Reply at 3.

The Motion to Disclose Reply then turns to argument by Sanchez, who "has been indicted in Counts 6 and 7 with conspiracy to murder J.M. and the murder of J.M."  Motion to Disclose Reply at 3.  Because Sanchez is implicated in the same murder as Perez is charged, the Motion to Disclose Reply argues that Sanchez should be entitled to the CI's identity so he can investigate the aspects of the crime involving Perez.  See Motion to Disclose Reply at 3.  The

- 16 -

Motion to Disclose Reply then makes the same argument on behalf of Baca, who has been implicated in J.M.'s murder, because the CI "may very well have been a participant in and a material witness to the crime."  Motion to Disclose Reply at 4.  The Motion to Disclose Reply clarifies that the CI does not directly implicate him in J.M.'s murder, but that the CI suggests that Baca orchestrated narcotics facilitation in the prison.  See Motion to Disclose Reply at 4. Further, Baca explains that he was not at Southern New Mexico at the time of J.M.'s murder, meaning that

> any witnesses that the United States intends to call in an attempt to connect Mr. Baca to J.M.'s death must be disclosed so that Mr. Baca may adequately prepare for and defend against the inevitable testimony on the critical issue of whether Mr. Baca was involved in any capacity with J.M.'s death.

Motion to Disclose Reply at 5.  To that point, the Motion to Disclose Reply contends that the United States has not provided the defense with admissible evidence, yet, that Baca was involved in the murder; so far, the United States' case rests only on differing statements from Armenta implicating Baca as the orchestrator of J.M.'s murder.  See Motion to Disclose Reply at 5-6. Accordingly, for Baca, the Motion to Disclose Reply provides that Baca is in the same position as Perez regarding the information this CI has divulged.  See Motion to Disclose Reply at 6.

Last, regarding Herrera, who "has been indicted in Counts 6 and 7" regarding J.M.'s murder, the Motion to Disclose Reply argues that Herrera was not in J.M.'s pod during the murder and that he is implicated only because Armenta has suggested Herrera was involved. Motion to Disclose Reply at 6.  Further, the Motion to Disclose Reply thus contends that, because Armenta has given conflicting statements at different times in the aftermath of J.M.'s murder, that the informant's statements at issue here could be exculpatory and thus Herrera should be entitled to the CI's identity for investigation.  See Motion to Disclose Reply at 7.  The CI, according to the Motion to Disclose Reply, also implicates Herrera's mother with

involvement in "trafficking and racketeering."  Motion to Disclose Reply at 7.  The Motion to

Disclose Reply thus concludes by requesting that the Court order disclosure of the CI's identity

to Troup, Sanchez, Baca, and Herrera.  Motion to Disclose Reply at 7-8.

     5.       **<u>Second Motion to Disclose Reply</u>.**

Montoya replied in support of the Motion to Disclose with his Supplement to Joint

Motion for Disclosure and Production of Confidential Informant (Doc. 698), filed November 11,

2016 (Doc. 768)("Second Motion to Disclose Reply").  The Second Motion to Disclose Reply

argues that Montoya, whom the United States "alleges . . . used a shank provided by co-

defendant Rudy Perez in order to murder Javier Molina," is implicated only by the CI at issue's

statements linking him to the murder.  Second Motion to Disclose Reply at 2.  According to

Montoya, the United States "alleges that an inmate in Santa Fe named Jesse Sosa transferred

information to imprisoned SNM members [in] Las Cruces, and that information was the motive

for killing Javier Molina."  Second Motion to Disclose Reply at 2.  Montoya argues that the CI

has information about Jesse Sosa.  <u>See</u> Second Motion to Disclose Reply at 2-3.  Montoya also

argues that the CI has divulged information to the United States with respect to SNM and drug

traffickers that "were working off their own charges."  Second Motion to Disclose Reply at 3.  In

light of this arrangement, Montoya argues, the CI may be such a drug trafficker, and he

otherwise might have information "likely to lead to information critical to the defense,"

necessitating discovery of his identity.  Second Motion to Disclose Reply at 3.

     6.       **<u>Third Motion to Disclose Reply</u>.**

Defendant Richard Gallegos, a Defendant in <u>United States v. Baca</u>, and C. Garcia, have

submitted the Sealed Reply Supporting Sealed Opposed Motion to Compel the Production of

Unredacted Discovery and the Identification of Confidential Informant, filed November 28, 2016

(Doc. 778)("Third Motion to Disclose Reply").  The Third Motion to Disclose Reply is broader

than the Motion to Disclose, and was filed in United States v. Baca and United States v. Garcia

in addition to the present case, United States v. DeLeon.  See Third Motion to Disclose Reply at

1-2.  The Third Motion to Disclose Reply, at the outset, highlights Gallegos and Garcia's unique

position, because the United States' prosecution of them has resulted in a trial date sooner than

that of the large group of Defendants in United States v. DeLeon.  See Third Motion to Disclose

Reply at 1-2.  Accordingly, the Third Motion to Disclose Reply argues that, for the discovery

provided to date to Garcia and Gallegos, "many of the redactions obscure obviously important

discoverable information," information that, in fact, Gallegos and Garcia contend has been

disclosed to other Defendants.  Third Motion to Disclose Reply at 3-4.  Accordingly, the Third

Motion to Disclose Reply argues that the redactions are improper, and thus, for twenty-seven

different discovery documents and CI reports, now requests copies of those documents and

reports sans redaction.  See Third Motion to Disclose Reply at 4-7.  The Third Motion to

Disclose Reply does not specifically address the Motion to Disclose's contents, but instead

appears to have been filed as a reply to the Motion to Disclose -- as well as to other motions in

the other cases -- to provide Gallegos and Garcia's arguments regarding the legal standard for

disclosing the identities of CIs.  See Third Motion to Disclose Reply at 7-12.  Accordingly, the

Third Motion to Disclose Reply explains:

> The Tenth Circuit's analysis on disclosure of a confidential informant's identity,
> as articulated by this Court, involves, [t]he balancing of the public interest in
> protecting the flow of information in a manner necessary for effective law
> enforcement against an individual's right to prepare his defense.  In making the
> determination as to whether disclosure is necessary, the court must consider the
> particular circumstances of the case, including the crime charged, the possible
> defenses, and the significance of the informer's testimony.  Where it is clear that
> the informant cannot aid the defense the government's interest in keeping secret
> his identity must prevail over the defendant's asserted right of disclosure.
> *Aguilar*, [2010 WL 2977708, at *16-17 (D.N.M. 2010)(Browning, J.)], citing,

> *United States v. Sinclair*, 109 F. 3d 1527, 1538 (10th Cir. 1997); *See United States v. McKenzie*, No. CR 08-1669 JB, 2010 U.S. Dist. LEXIS 13362 *3-4 (D.N.M 2010) (Browning, J.)(quoting *Sinclair* at 1538).  "The defendant must present more than mere speculation about the possible usefulness of an informant's testimony."  *Aguilar*, at 17, citing *United States v. Morales*, 908 F 2d 565, 567 (10th Cir. 1990).  None of these documents Defendants are requesting are cumulative in nature.

Third Motion to Disclose Reply at 10-11.  The Third Motion to Disclose Reply then concludes, stating that Garcia and Gallegos agree that the Court requires a case-by-case analysis regarding disclosure of CIs, and also that the Defendants bear the burden of explaining why the United States' privilege should be defeated in any given case.  See Third Motion to Disclose Reply at 12.  Here, the Third Motion to Disclose Reply argues, the burden is met.  See Third Motion to Disclose Reply at 12.

       **7.**      **<u>Motion to Exclude</u>.**

Perez filed the Motion to Exclude to request "the Court to order the prosecution team, including employees of the Office of the United States Attorney and agents of the Security Threat Intelligence Unit of the Department of Corrections ('STIU'), be precluded from attending the evidence viewing scheduled for December 2, 2016."  Motion to Exclude at 1.  Baca, Gallegos, S. Gutierrez, Herrera, T. Martinez, Montoya, and Sanchez joined the Motion to Exclude.  Motion to Exclude at 1.  The Motion to Exclude explains that the Defendants charged in the Superseding Indictment's Counts 6 and 7 are planning to view certain evidence and tour Southern New Mexico, and that the information they receive is going to be work product which they wish be protected from disclosure to the prosecution.  See Motion to Exclude at 1-2.  The reason that the Motion to Exclude gives to support that work product will entail from the evidence viewing is that

> members of the respective defense teams, including counsel, investigators and experts [will] view, discuss, document, and record evidence and their impressions

<div align="center">- 20 -</div>

of that evidence.  The resulting processes, discussions, notations, recordings, measurements, photographs and other tangible things that will be generated and created by the respective defense teams constitute work product and are not discoverable by the prosecution.

Motion to Exclude at 3.  In addition, the Motion to Exclude contends that the "Defendants are therefore entitled to a prosecution-free zone in which to view, record and discuss evidence." Motion to Exclude at 4-5.  The Motion to Exclude further contends that excluding the prosecution will not otherwise compromise the evidence or the evidence's custody and control, as the Defendants do not seek to exclude supervisory agents who are not aligned with the prosecution.  See Motion to Exclude at 5.

**8.    Motion to Exclude Response.**

The United States responded to the Motion to Exclude with its United States' Response to Defendant's Joint Motion to Exclude the Prosecution Team from December 2, 2016 Evidence Viewing, filed November 25, 2016 (Doc. 775)("Motion to Exclude Response").  The United States primarily opposes the Motion to Exclude, because

(1) Defendant fails to demonstrate that the work-product privilege applies, (2) public policy disfavors Defendant's motion to exclude . . ., (3) the presence of agents and correctional officers at the evidence viewing negates any interest in Defendant's claim to privacy under the work-product doctrine, and (4) Defendant's claim to a "Prosecution Free Zone" is unfounded.

Motion to Exclude Response at 1.  Regarding the inapplicability of the work-product doctrine, the United States argues that the request is prospective and that, because the United States has not attempted to compel disclosure of Defendants' work-product, the doctrine does not yet apply. See Motion to Exclude Response at 2.  Thus, according to the United States, "if no work product has been produced, the rule should not apply."  Motion to Exclude Response at 3.  Also, the United States contends that "public policy disfavors" the Motion to Exclude, because "public policy favors an agreement" amongst the parties as to the parameters of the United States'

- 21 -

presence, as opposed to a total exclusion.  Motion to Exclude Response at 5-6.  Last, the United

States argues that, if anyone acting as an United States agent is there, then the work-product

protection is waived, because it is not a total exclusion.  See Motion to Exclude Response at 7.

**9.      The November 29, 2016, Hearing.**

The Court held a hearing on November 29, 2016.  See Transcript of Hearing (taken

November 29, 2016), filed December 20, 2016 (Doc. 804)("Tr.").   The Court first heard

argument on the Motion to Vacate.  See Tr. at 15:25-16:3 (Court).  The Court provided that, in

the related case United States v. Baca, the Defendants in that case had agreed to move their trial

date, which was the only contingency noted by the United States in their Motion to Vacate

Response, meaning that there likely were not any remaining issues in the Motion to Vacate and it

should be granted.  See Tr. at 16:3-17 (Court).  Perez then explained that there were no issues

remaining, because the United States no longer opposed the Motion to Vacate, but that he

wanted to reiterate the issues surrounding receipt of the tablets.  See Tr. at 17:3-17 (Villa).

Accordingly, given the massive amount of discovery and some of the logistical issues with the

Defendants' review of the discovery, Perez requested that -- in addition to moving the trial date -

- the "scheduling order" dates would move in conjunction with the new trial date.  Tr. at 19:1-

21:2 (Villa).  This, apparently, was an issue for Perez, because the original scheduling order had

garnered agreement amongst all parties, and he was not sure there was still such a consensus in

that regard at the present time.  See Tr. at 21:5-9 (Villa).  Montoya then seconded Perez'

discontent with the tablet discovery process, and suggested that no new scheduling order dates be

set until all discovery was received by the Defendants.  See Tr. at 23:11-25:1 (Hammond).

Herrera similarly then asked the Court "to appreciate the logistics of the discovery issue in this

case."  Tr. at 27:7-15 (Davis).  B. Garcia argued, next, that the related case -- United States v.

- 22 -

Baca -- was less cumbersome and complex, and should be argued before the present case.  See Tr. at 27:23-30:1 (Castle).  Additionally, B. Garcia suggested, as did Montoya, that trial and scheduling order dates not be set in stone until the discovery had been received by all Defendants.  See Tr. at 27:23-30:1 (Castle).  Both Troup and Baca then parroted their co-Defendants' arguments relating to the discovery issues, with Baca explaining to the Court that, on top of the logistical problems in receiving the tablets and loading them with discovery, it was hard to work on the tablets with only minimal technological experience.  See Tr. at 31:8-33:22 (Harbour-Valdez, Lowry).

The United States then argued, and explained that

we had agreed to the continuance in this case that Mr. Villa presented, if the other case, the Baca case, was continued, and that's why we had agreed to the continuance of the Baca case and we had agreed to the continuance in this case. And our understanding was at the time they were just asking that it be continued to next summer, 2017.

Tr. at 34:4-11 (Armijo).  The United States then commiserated that the discovery process was more cumbersome than usual, and explained that discovery would be rolling and that they were "working very hard on it."  Tr. at 34:12-37:13 (Armijo).  The United States maintained that "we would request that the Court set a trial date . . . next summer," and that regarding a scheduling order and timetable, "we can change the dates to reflect that new [trial] date on the discovery order that's already in place."  Tr. at 37:14-24 (Armijo).

Perez then replied to the United States' argument, and generally reiterated how logistically complicated, and expansive, the discovery process has been.  See Tr. at 40:18-42:8 (Villa).  C. Garcia reiterated the complicated nature of the discovery, and argued that the tablet process -- which the United States suggested and implemented -- is clearly not working, and that it was disingenuous of the United States to wash its hands of the problems in getting the tablets

to the Defendants, because it was the United States idea in the first place.  See Tr. at 42:13-44:17

(Sirignano).   The Court then ruled that the United States' "consent here to move this trial is

premised on the fact that we're sliding Baca back, and DeLeon is going to move forward and sort

of take its place.  So I think we had that much of agreement. . . .  So I'm going to set the trial July

10th."  Tr. at 46:15-25 (Court).  The Court noted that it was aware of all of the discovery issues,

and explained that all parties were going to need to work "extremely hard," and that "we need to

stick with the schedule that we hammered out in this case, hammered out in Baca, and take the

agreement that we have, and see if we can try to move this case along."  Tr. at 47:1-10 (Court).

Thus, the Court set the trial date for July 10, 2017, and imposed the scheduling order and

deadlines accordingly.   See Tr. at 47:11-14 (Court).   The Court, then, at the United States'

request, called the related case -- United States v. Varela -- to set a new trial date in that case as

well, and then set the trial date for October 2, 2017.  See Tr. at 48:9-49:23 (Court).

    The Court then specifically addressed Montoya and B. Garcia's requests that the Court

not set a trial date until the discovery process was complete, and explained that such a procedure

"is just not realistic."  Tr. at 50:6-11 (Court).  The Court provided that discovery issues are not

novel -- "it's just part of litigation" -- and that it was the Court's impression that the United

States had already done the bulk of its discovery provision.  Tr. at 50:12-51:9 (Court).  The Court

then agreed to modify the scheduling order to reflect a four month difference across the board.

See Tr. at 54:1-4 (Court).   The Court thus granted the Motion to Vacate, and moved to the

Motion to Exclude.   See Tr. at 55:12-24 (Court).

    With respect to the Motion to Exclude, the Court explained that "sometimes it's normal

to have somebody set in there" when opposing counsel was reviewing discovery documents in

another's law office.  Tr. at 56:19-57:9 (Court).  However, the Court surmised,

in the particular circumstances of this, where we may have a large number of defense lawyers there, they are going to probably be discussing this with each other. . . .  And if the Government lawyers are there I think it's going to inhibit their ability to do the things they need to do to do a site visit.

Tr. at 57:9-17 (Court).  Further, the Court surmised that "I think there are work thoughts, their work product will be disclosed, or . . . it will not take place," given the unique nature of this particular site visit.  Tr. at 57: 18-25 (Court).  Perez then argued the Motion to Exclude, and clarified that "we are scheduled, not only to visit Southern New Mexico Correctional Facility, but also to view all the evidence in this case, all tangible physical evidence," regarding Counts 6 and 7.  Tr. at 58:23-59:13 (Fox-Young).  Perez indicated that "there are easy measures that the Government takes" to use information against the Defendants, such as serving warrants using "filter agents," which Perez wishes to avoid by having the Court "order that any discussions, any work product -- and we think that everything we say, produce, develop, record, any processes that we employ on Friday, are work product, and we don't want that information disclosed to the prosecution team."  Tr. at 60:3-19 (Fox-Young).

The United States then responded, and argued that, in all of its years of experience it had never seen a request like this before.  See Tr. at 61:11-21 (Castellano).  The United States explained its lack of experience with this type of request was, first, probably because it is a nonissue that never arises -- indeed, in this case, they have had smaller evidence viewings where the United States was present, and when Defendants needed to converse, the United States stepped back to allow as much.  See Tr. at 62:7-63:20 (Castellano).  Further, the United States argued, "the presence of a third party vitiates any issues related to privilege," and because here Defendants were conducive to the presence of non-prosecution team law enforcement, they cannot avail themselves of some privilege.  Tr. at 63:21-64:19 (Castellano).  The Court, however, suggested that might not be the case, as it often will have United States Marshalls in

the presence of a defendant and defense counsel during a private conversation, and that did not disavail the defendant of any type of privilege.  See Tr. at 64:21-65:8 (Court).  The United States hesitantly agreed, but still maintained its argument against the Motion to Exclude, and stated further that "it's just not practical, because we need to look at the evidence also, and we don't have that many hours in the day either."  Tr. at 65:9-66:10 (Castellano).  The Court then attempted to figure out just how long and in depth this evidence viewing and site visit would be, and why the United States could not simply go another day.  See Tr. at 67:8-13 (Court).  The United States indicated that there was an evidence viewing in Las Cruces, New Mexico, and also the site visit to Southern New Mexico, which would take a full day.  See Tr. at 67:14-68:9 (Castellano).

Perez then replied by arguing that he recognizes it "is an unusual request, but this is also an unusual case."  Tr. at 68:20-69:1 (Fox-Young).  Perez indicated that they were intent on seeing all of the physical evidence in this case, and not just the evidence in Counts 6 and 7, because all of the allegations are interrelated.  See Tr. at 69:4-13 (Fox-Young).  Perez also reiterated that it was impractical to do this evidence viewing and site visit with the United States present, because of all of the moving parts and the need to confidentially cooperate amongst defense counsel.  See Tr. at 69:14-70:5 (Fox-Young).  Further, Perez explained that the reason the Defendants were seeking to make such a large group visit and viewing was because the United States had declined to allow individual defense counsel to make such a visit and viewing. See Tr. at 71:2-12 (Fox-Young).  B. Garcia then argued that, although the Court was considering the Motion to Exclude in the context of Counts 6 and 7, he assumed the Court's order on the Motion to Exclude would dictate the procedures for future site visits and evidence viewings for other counts.  See Tr. at 71:18-72:12 (Castle).  B. Garcia also argued that the United States, for

- 26 -

Counts 1 and 2 Defendants, had similarly denied individual requests to confidentially view evidence, and that if the United States was requiring these joint viewings, it couldn't also maintain its argument that Defendants were waiving a privilege.  See Tr. at 72:2-22 (Castle).  B. Garcia also said that the only unusual aspect of the Motion to Exclude was the United States' refusal to allow confidentiality, because that is the normal course of action in these cases.  See Tr. at 72:23-73:12 (Castle).  Baca reiterated Perez' argument that "this Court should order that there is no waiver just because other individuals or law enforcement officers may be present; that that doesn't vitiate any work product privilege or attorney-client privilege that would exist."  Tr. at 74:7-16 (Lowry).  The Court then granted the Motion to Exclude, explaining that the "prosecution team should not go in the next day or any other time and try to elicit information about what the defense lawyers did while they were there.  And if approached by anyone with the Corrections Department or State Police -- if that's where the viewing of the other evidence takes place -- with information, they should not take that information without . . . consulting with coordinating counsel, and seeing if it can be worked out."  Tr. at 74:20-75:6 (Court).  The Court further held that

> If the Government wishes to challenge, down the road, that there is not work product here, they can raise that down the road in the specific context of the information that they're trying to get ahold of, or saying that's been waived, rather than us trying to decide that today in a vacuum . . . I think I am trying to preserve the defendants' ability to talk while they're there, and do what they need and can do there.  So I'd be inclined to continue to protect it down the road, whether it fits neatly into some recognized privilege or protection, or just my ability to control the discovery in this case.

Tr. at 75:12-24 (Court).

The Court then turned argument to the Motion to Disclose, which Perez had initially filed, but thereafter had entered into a disclosure agreement regarding the CI whose identity he sought by the Motion to Disclose.  See Tr. at 79:8-14 (Villa).  The Court then took up Troup's

arguments in the Motion to Disclose Reply, with Troup arguing that there had been discovery
that F.S. -- Freddie Sanchez, the victim of Counts 1 and 2 -- was a known informant who's
"paperwork" proving his informant status had been circulated to inmates at Southern New
Mexico.  Tr. at 83:7-11 (Harbour-Valdez).  According to Troup, the CI at issue in the Motion to
Disclose is the first person who indicates "that someone by the name of Cheech delivered that
paperwork to Southern New Mexico."  Tr. at 83:24-84:2 (Harbour-Valdez).  This is relevant to
Troup, he argued, because another gentleman -- named Kyle Dwyer, now deceased -- had been
disciplined by the prison system for his admission that he was the person who delivered
paperwork from "PNM in Santa Fe down to Southern New Mexico."  Tr. at 84: 3-11 (Harbour-
Valdez).  Troup also explained that Kyle Dwyer had appealed his discipline by the prison system
for this admission, but that the result of that appeal was as of then unknown.  See Tr. at 85:2-11
(Harbour-Valdez).  Troup argued that "if in fact Mr. Dwyer was exonerated, perhaps someone
named Cheech is responsible.  We would very much like to know who Cheech is, or [who] was
at PNM at the time and knows about the paperwork."  Tr. at 85:12-22 (Harbour-Valdez).  The
informant's identity, then, who discusses this person named Cheech and the relevant paperwork,
is important because he has provided "an alternate suspect, who perhaps had a hand in this
incident."  Tr. at 84: 20-22 (Harbour-Valdez).  The Court then asked Troup to explain the United
States' case against him, to which Troup replied that the United States alleges that Troup and a
number of other individuals killed "Mr. Sanchez, after this paperwork was circulated in the pod."
Tr. 86:20-23 (Harbour-Valdez).  Troup thus argued that investigating into Cheech and the CI
could lead to exculpatory information for Troup, because the CI talks about Cheech, who
apparently may have delivered paperwork from PNM, and also "the Rascon brothers," who
apparently were in bad standing with SNM and took too long to carry out the hit that Troup is

- 28 -

now alleged to have undertaken.  Tr. at 87:20-88:11 (Harbour-Valdez).  The United States then

argued, and explained that it matters whether a CI is a testifying witness or a nontestifying

confidential human source, because the analysis pertaining disclosure will differ accordingly.

See Tr. at 92:20-93:4 (Beck).  If they are a testifying witness, then the Jencks Act applies to the

CI's disclosure, whereas in the case of no intention to testify, a separate calculus will apply.  See

Tr. at 94:5-22 (Beck).   And, although Troup agreed that that was the correct phrasing of the

applicable law, Montoya then argued that "the law is not black and white on this.  I believe the

law is that, even with a testifying CI, if there are reasons presented why the identity of the CI

needs to be known now for investigative purposes, and preparation purposes of -- particularly if

the CI himself may have been a participant in the crime, I believe that courts have ordered that

CI information be produced well in advance of the Jencks deadlines."   Tr. at 96:17-97:5

(Hammond).  The United States maintained argument that there are district courts which agree

with Montoya's position, primarily because the defendant is going to know the testifying CI's

identity at some time, and they will just need to wait.  See Tr. at 98:13-20 (Beck).  The United

States also explained that it would disclose its testifying CIs in due time, and that it did not

anticipate calling all of its CIs -- meaning, it would not, in all likelihood, be an unmanageable

Jencks Act disclosure.  See Tr. at 99:12-15 (Beck).  The United States then suggested that the

most fair approach to the CIs' disclosure, generally, would be for the Court to "go ahead and

make the determination as to whether the CI should be disclosed, and then -- but they wouldn't

be disclosed immediately, because [the United States] is planning to call them at trial -- but if it's

-- for some reason [the United States is] not going to call that witness . . . then [it] would

immediately disclose that . . . ."  Tr. at 101:2-20 (Beck, Court).  The United States then

specifically argued why the Court should not order the CI's identity disclosed to Troup, because

- 29 -

while the information about Cheech and the paperwork might be helpful to Troup, that is not the standard; instead, the standard is that "the Court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony," where, here, the CI is planning to testify.  Tr. at 102:15-103:10 (Beck).  The Court then asked if the United States could ask the CI who Cheech is and then give that information to Troup.  See Tr. at 104:1-4 (Court).  The United States said that request was possible and agreed to ask the CI.  See Tr. at 104:14-18 (Court).  The Court then asked the United States to clarify its theory with respect to Troup, which the United States explained was that "at some point, there was paperwork . . . passed to two people.  And then, we believe that . . . the Rascon brothers were ordered to hit Freddie Sanchez, and that Troup was one of the people who did it at Southern New Mexico Corrections Facility."  Tr. at 105:11-17 (Beck).

> Troup then argued:
>
> [O]bviously, the CHS is going to testify.  What we're trying to determine is whether he was, in fact, a witness or participant; whether he was one of the people in this pod at Southern, or was in the pod at PNM, from which the paperwork allegedly -- and the hit allegedly derived.

Tr. at 107:23-108:5 (Harbour-Valdez).  Essentially, Troup argued, "the identity of the CHS" would help him "find out if he was, in fact there; if he was an active participant."  Tr. at 108:12-16 (Harbour-Valdez).  The Court was not convinced, however, and pushed Troup to explain why, beyond potentially being present, this CI was different than anyone "else on the planet."  Tr. at 108:17-22 (Court).  The Court concluded:

> I'm not going to order the production of the CHS at the present time.  I'm first going to determine whether the CI analysis is obviated if, in fact, the person is going to be a testifying witness. . . .  I'm going to require the Government to go ahead and give you Cheech, figure out who he is; maybe you'll be able to bulk up your request.

Tr. at 109:18-110:9 (Court).  The Court continued,

- 30 -

at the moment, it seems to me the CHS, as far as Troup, may be a little bit on the periphery of just somebody that -- you know, obviously, everybody would like to know who is there.  But if I start saying I'm going to disclose every CI to see if they were there, I think I've just pretty much required every CI to be disclosed.  So I think it's got to be higher than that.

Tr. at 110:10-17 (Court).  Thus, "I'm inclined to leave this one on the Jencks disclosure list, but maybe you can bulk it up with what you get with Cheech. . . .  I'm not making a final final here, because I don't have to because of this Jencks issue."  Tr. at 110:18-23 (Court).  Sanchez then indicated that he was not interested in the identity of the same CI as Troup, so he did not argue in favor of the Motion to Disclose Reply at that time.   See Tr. at 111:22-112:10 (Jewkes).  Accordingly, Baca took up argument, and explained that the theory of his involvement was that he

> was able to issue paperwork that went from Level 6  to Level 5 at PNM, and then was couriered from Level 5 of PNM down to Southern in order to give the authority to murder Mr. Molina.  And according to the discovery, and what we know about Molina, the Government's allegations of the Molina murder, that paperwork arrived on a Friday, and Mr. Molina was killed -- well, the paperwork arrived on a Thursday; it didn't get into the hands of the people in Mr. Molina's pod until Friday, and then Mr. Molina was allegedly killed based on the paperwork.

Tr. at 113:6-23 (Lowry).  Baca argued, however, that the "confidential human source indicates . . . something entirely different . . . that there was a plot to kill Mr. Molina some time before the paperwork ever arrived, was in the equation, or anything."  Tr. at 113:24-114:3 (Lowry).  Baca bases this argument in the fact that he does not think Perez could have provided his walker for the shanks used in Molina's murder in such a short time span of about twenty-four hours.  See Tr. at 114:10-21 (Lowry).  Baca then reiterated that, for the United States' theory of a conspiracy -- opposed to random jailhouse murder -- to hold water, Perez must have provided his walker in accordance with orders and paperwork, making the time frame all the more relevant.  See Tr. at 116:16-117:2 (Lowry).  Montoya then argued in support of Baca, and himself, by explaining:

- 31 -

We are in the same count with Mr. Baca.  The story that Mr. Lowry recounted is a story that, in one version of the Government's case, results in a shank being in the hands of our client, and that shank being used to carry out this killing.  We have seen discovery in this case that says that the shank or shanks came from the walker.  We have seen other discovery that says that the shank or shanks did not come from the walker.  For us, we think it's as important for our client -- who is alleged to have been directly involved in the homicide -- to know exactly what Mr. Perez is finding out; who is this CI, and what information does he have that would suggest that in some way that there had been a coordinated plot or plan to kill Mr. Molina?  The only evidence we have, other than from a cooperating defendant, is that this homicide was not an ordered hit from on high, but was a result of a beef between two inmates.  That would be very important in this case.  And as far as I can tell, other than the one cooperating defendant, who is sitting here to my right, there is no other witness that we have been told about who would say that there was a plan or a plot.  And so for us, in the defense of our client, we very much need to know, just as Mr. Perez needs to know, who is saying that these shank or shanks were part of a coordinated plot?

Tr. at 118:1-119:4 (Hammond).  Montoya also explained that he had interest in understanding whether the CI is an eyewitness and that, where the provider of the weapons obtained the CI's identity, so should the person accused of using the shank.  See Tr. at 119:15-120:7 (Hammond).

At this point, B. Garcia argued:

The problem here is a problem that's going to reoccur with all these CIs.  And that is that the Government's reports are often devoid of any information as to whether the confidential source has personal knowledge of that which is being reported.  So there is no way to determine whether they're an eye and ear witness to a particular thing that they're recounting, whether they're a hearsay witness.  And so that's a recurring problem.  And so one of the solutions to the problem -- and I just offer this -- is that the Government is probably aware, based upon their interviews with these witnesses, whether they are, in fact, percipient witnesses, or whether they're just a witness that is going to give overall background about the SNM, for example.  So what all these attorneys seem to be getting at is, we don't know whether this is a percipient witness under 613, Federal Rule 613, or whether it's not.  And, instead of us all guessing, and finding out perhaps at the last minute, right before trial, that they were a percipient witness, they were aware of exculpatory information, or they heard it through the grapevine, the Government could disclose to the defense who are the percipient witnesses here in these materials.  It would cut down on the number of motions to disclose confidential informants considerably.

Tr. at 122:10-123:12 (Castle).   Baca concluded by explaining that this particular CI was

providing information that was very important to the United States' theory that Molina's murder

was part of a conspiracy.  See Tr. at 124:5-15 (Lowry).

The Court then questioned the United States whether the time frame between Baca's

order and Perez' provision of the walker for use as a weapon hurts the United States' case

against Baca, "because the timing becomes a pretty important issue there."  Tr. at 126:21-25

(Court).  The United States agreed that "it could," but that the "United States' case is that the

Molina murder was outstanding for a number of years.  It's not as if there was paperwork passed

on one day and it happened the next day."  Tr. at 127:23-128:3 (Beck).  Further, the United

States argued, this particular CI -- who was providing information about certain murders, as well

as information that Baca was regaining, or trying to regain, control of SNM so he could restore it

to its former power -- was not one of the most significant contributors of this information,

because there are multiple sources at play.  See Tr. at 128:4-18 (Beck).  The Court decided:

> I'm going to have to review this in connection with . . . Jencks, I'm not going to
> order the production to Mr. Baca at this time.  I'll study the legal issue, and see if
> this requires any CI analysis.  But if it does require CI analysis, I'm going to think
> about it a little further.  But I'm inclined to order the production here because of
> this timing issue.

Tr. at 129:19-130:1 (Court).  The Court determined to take a hard look at the issue, because

> this information got to him, and then Mr. Perez made shanks out of his walker all
> within 24 hours.  It seems to me that may be the only -- since this is the only
> source of information to either Mr. Perez or to Mr. Baca, I may need to require its
> production if I do the CI analysis.

Tr. at 130:4-13 (Court).  The United States quickly countered, however, that "Tapes have been

disclosed in which Mr. Baca admits his involvement in the Molina murder," undercutting the

importance of the CI's identity, and that the United States' theory is not that Baca ordered the hit

within twenty-four hours, but instead that it was outstanding for a long time.  Tr. at 131:1-3, 14-

20 (Beck).   The Court then ultimately concluded that, because the short time frame was the reason that it was inclined to order disclosure to Baca, the parties would need to get the Court "some particular discovery that you want me to stare at before I make a final decision on the CI analysis . . . .   [and] something specific, as far as recordings or something that link Mr. Baca up to the Molina hit orders . . . ."   Tr. at 133:15-21, 133:23-134:6 (Court).

Herrera then argued in favor of disclosure to him, explaining that "he was actually housed in a connecting cell block called A pod.  The murder occurs in B pod."  Tr. at 135:6-15 (Davis).   The United States, at the Court's beckoning, interjected to explain that "Mr. Herrera was involved -- we have recordings and admissions from him as to his involvement.   He basically sanctioned the hit . . . ."  Tr. at 135:25-136:3 (Armijo).   Herrera argued, however, that in all of the discovery he has reviewed, despite this CI's characterization of him as a high ranking SNM leader, nothing else characterizes him as a leader.   See Tr. at 138:12-18 (Davis). According to Herrera, then, "it's our position that . . . .   [i]f we had the identity of that CS, we could obviously talk to that person, and, in fact verify that Mr. Herrera is not who the Government thinks he is."  Tr. at 140:4-10 (Davis).   At this point, the United States explained that it was fighting the disclosure requests for this CI to protect his identity, because SNM has a history of killing informants.   See Tr. at 140:20-141:3 (Beck).   The United States also argued that Herrera was seeking this CI's identity so he could impeach him by omission, with respect to what the informant did not say in the report, which is something available to Herrera at trial, but does not factor into this disclosure analysis.   See Tr. at 141:12-142:4 (Beck).   The Court concluded that

> I probably am not going to start disclosing CIs because of what's not in these case reporting documents or CHS reporting documents.  I'm a bit of a proponent of the dog doesn't bark theory from time to time.  But it's probably got to be stronger

- 34 -

than that.  So I probably am not going to make the government disclose CHSs on what's not in these reports without a stronger showing.

Tr. at 147:16-23 (Court).

Montoya then took up argument on his Second Motion to Disclose Reply, and explained:

the account that we've seen -- and it's in videos -- is that there was some kind of an altercation in a cell on the second floor; that after that altercation, Mr. Molina came out.  You can see in the video that there is blood on his chest.  He goes down the steps, both -- my client happens to come down the steps, Mr. Armenta comes down.  My client has a very brief fist-to-fist encounter at the bottom, no shank.  And Mr. Armenta comes down.  And you can't see exactly what's going on in the corner, because the camera isn't there.  But the bottom line of this is that Mr. Molina is shanked something like 40-something times.  And then he dies there at the bottom of the steps.  Now, the account that we've been given is that all of that was arranged essentially overnight; that Mr. Baca had given some order; that there was paperwork, the paperwork was brought down from Santa Fe, just as Mr. Lowry summarized it this morning.  Somehow that paperwork had been passed between A pod and B pod, and the instruction had been given to carry out this hit right now.

Tr. at 150:23-151:20 (Hammond).  Montoya, then, maintained that this factual scenario is more akin to a beef between two inmates and was not a coordinated hit that SNM orchestrated.  See Tr. at 153:2-19 (Hammond).  This CI is relevant to Montoya's defense, he argued, because "he was not part of any plan at all . . . he was . . . merely present," and this is a witness, apparently, about which Montoya did not know about until reading the CI's report.  Tr. at 155:6-24 (Hammond).  Montoya concluded by stating that "We don't have any other eyewitnesses, other than the defendants in this case.  So if there is somebody there, I'd like to know that.  But my primary concern is with what he has to say about the shank or shanks."  Tr. at 157:9-18 (Hammond).

The Court then questioned the United States, stating

when I've got two people like Mr. Hammond and Mr. Lowry saying they thought all along that the Government's case was that this was thought up in compressed period of time, you know, I guess I would draw from that that there is something in the record that would support that theory.

- 35 -

Tr. at 158:1-6 (Court).  The United States, accordingly, explained:

> There are other players.  Mr. Sanchez is charged with this murder, Mr. Herrera.
> There is a lot of players in this case that come into play.  But our theory is
> basically that this hit had been out on Mr. Molina for some time.  We have
> Anthony Baca admitting to this on a recording, that has been disclosed, about how
> this hit had been carried out, and why it was necessary to carry it out, and his
> involvement.  We have Mr. Herrera, who his involvement was basically saying he
> wanted to make sure and see the paperwork, to make sure that the hit was a valid
> hit, because they wanted to basically make sure it was righteous, so to speak.  And
> we have him on recording saying that. . . .  We believe that Mr. Sanchez went and
> told Mr. Armenta and Mr. Montoya: You're doing this hit.  You haven't put in your
> time, you haven't done your bones for the SNM.  You guys are going to be
> doing this.  There were three shanks that were actually recovered; not one, not
> two, but three shanks during this investigation afterwards.  I believe on the
> videotape Mr. Montoya is seen assaulting him.  And despite Mr. Hammond's
> rendition of it, I believe on the videotape, you can actually see Mr. Montoya
> handing a shank over to Mario Rodriguez, who then goes and hides the shanks.
> So there is a lot more to the videotape.  We have videotape.  We have statements
> from Mr. Montoya, Mr. Armenta.  After this incident we have cooperators that
> occurred -- that have given statements, obviously, like the one we have here, that
> know about it.  And we have recordings from three defendants to CHSs that were
> made, with them not knowing that they're talking to cooperators while they're
> incarcerated.  So there is many moving parts to this.  There is three shanks; there
> is videotapes.  And this order had been outstanding for a long time.  With the
> SNM, an order can be outstanding for a very long time.

Tr. at 161:4-163:7 (Armijo).  After some exchange with the United States about their theory, the

Court allowed Montoya to reply, and Montoya argued that, if there was no hit from SNM

leaders, then there was no conspiracy and this killing was simply a jailhouse beef.  See Tr. at

176:2-25 (Hammond).  Montoya said that an important issue with respect to the murder and

conspiracy is the hit's timing and the shank's manufacture, because:

> If it turns out that Mr. Perez just made shanks for there to be in the pod -- and
> frankly, that wouldn't surprise me if there were shanks in pods all across this
> state, I wouldn't be surprised by that.  But there is a lot of difference between
> having a shank in a pod and having a shank that is there because someone says
> that the SNM ordered it to be there, and to be used for a specific purpose.  And
> that is what I understand -- at least a piece of that is what this CI is going to say.
> And I believe we need to know that.

DNM 1000

Tr. at 177:10-20 (Hammond).  The Court concluded:

> Well, I think that probably Mr. Hammond and Mr. Beck have probably dragged
> me back to where I was with Mr. Baca.  I'm inclined to find that the CI should be
> disclosed.  We've got this Jencks issue that I'm going to have to deal with as far
> as timing.  But if I, in fact, order CI disclosed at this time, then I'm inclined to
> think it should be disclosed as to Mr. Baca.  I'm not convinced as to Mr.
> Montoya.  I think that -- like I said originally, I think your situation is more akin
> to Mr. Troup's back here.  If I start lowering the bar to that level, that we just
> want to know whether there is a scheme, or whether we want to know who is
> present, probably I'd drop the bar to a point where almost all these CIs will be
> disclosed.  And I don't think that's probably what the law requires.  So I'll give it
> some thought, but I'm not inclined to grant Mr. Montoya's request.

Tr. 178:13-179:6 (Court).  Last, regarding the Third Motion to Disclose Reply, C. Garcia stated

that he and R. Gallegos would be providing the Court supplemental briefing, and thus did not

want a final conclusion as to the disclosures they sought at the time.  See Tr. at 183:5-9 (Adams).

The Court thus ended the hearing.

## 10.   **Baca's Supplemental Brief**.

Defendant Anthony Ray Baca's Supplemental Brief Regarding Timing of the Disclosure

of the Identity of Confidential Informant, filed January 8, 2017 (Doc. 816)("Baca's

Supplemental Brief"), addresses "when" the United States must disclose the CI's identity at issue

in Counts 6 and 7, which deals with J.M.'s murder at Southern New Mexico in March, 2014.

See Baca's Supplemental Brief at 1.  Baca is implicated in J.M.'s murder given the allegation

that he gave paperwork to Varela "confirming Mr. Molina's cooperation with law enforcement,

and that [he] authorized or 'green-lighted' the killing."  Baca's Supplemental Brief at 2.  The

allegations, then, are that Baca gave the paperwork to Varela and that Varela, upon his transport

from PNM to Southern New Mexico, delivered that paperwork to Defendants at Southern New

Mexico and that J.M. was killed within twenty-four hours.  See Baca's Supplemental Brief at 2.

Essentially, Baca's Supplemental Brief argues that, "[o]nce the Court determines that disclosure

of the identity of a confidential informant is appropriate, the defense must have the opportunity to interview the witness in order to determine whether to call him at trial, irrespective of whether the United States plans to do so."  Baca's Supplemental Brief at 4 (referencing Roviaro v. United States, 353 U.S. at 62).   In support, Baca's Supplemental Brief relies on language from the United States Court of Appeals for the Seventh Circuit which states that, "[w]hen a criminal defendant seeks access to confidential informant files, we rely particularly heavily on the sound discretion of the trial judge to protect the rights of the accused as well as the government." Baca's Supplemental Brief at 5 (citing United States v. Phillips, 854 F.2d 273, 277 (7th Cir. 1988)).  Baca's Supplemental Brief, then, explains that the issue in this case is that the United States is incorrectly asserting that "the Court cannot order disclosure of [the CI's] identity prior to trial so long as the government states an intention to call the informant as a witness."  Baca's Supplemental Brief at 5.

Baca's Supplemental Brief thus explains that neither the United States Court of Appeals for the Tenth Circuit nor the Supreme Court of the United States of America have "held that the *Roviaro* analysis applies only to non-testifying witnesses" and that, instead, "the better reasoned decisions from other circuits have held that *Roviaro* trumps the witness disclosure rules."  Baca's Supplemental Brief at 5.  Further, Baca's Supplemental Brief argues that "Baca is not asking the Court to order the government to disclose the witnesses it intends to call at trial, but rather identify a particular person with knowledge that may assist in his defense."   Baca's Supplemental Brief at 5 (citing United States v. Norton, 504 F.2d 342, 343 n.1 (8th Cir. 1974)(citing Roviaro v. United States, and holding that the rules regarding production of witness lists have no bearing in the context of CIs)).  Baca's Supplemental Brief, accordingly, argues that, where an appellate court considers that the failure to disclose a CI "was not error in the

DNM 1002

particular circumstances of that case" when that CI ultimately testifies, such a decision has no

bearing on the defendant's right in a criminal trial to the CI's identity upon a successful <u>Roviaro</u>

<u>v. United States</u> analysis.  Baca's Supplemental Brief at 6-7.  Indeed, according to Baca, that is

the factual scenario at issue in <u>United States v. Pennick</u>, 500 F. 2d 184 (1974), which Baca's

Supplemental Brief argues the United States misplaces reliance, because it only held that the trial

court's failure to order disclosure of the United States' witnesses did not constitute error, where

they testified.  Baca's Supplemental Brief at 8 n.4.  Further, Baca's Supplemental Brief explains,

the district court, in that case, had, nonetheless, undergone a <u>Roviaro v. United States</u> analysis in

reaching its decision not to disclose the testifying CIs' identities.  <u>See</u> Baca's Supplemental Brief

at 8 n.4.

Baca's Supplemental Brief last addresses the Honorable Judge Brack, United States

District Judge for the District of New Mexico's, opinion in <u>United States v. Lujan</u>, 530 F. Supp.

2d 1224 (D.N.M. 2008), which held that "there is differentiation between testifying witnesses

and confidential informants who will not testify.  And that *Roviaro* and that calculus applies only

when it's a CHS that will not testify at trial."  Baca's Supplemental Brief at 8.  Baca's

Supplemental Brief explains, however:

> In that case, the defense filed a motion for disclosure of information "concerning
> the Government's witnesses, informants, confidential sources, etc."  *Lujan*, 530 F.
> Supp. 2d at 1260.  The request included both testifying and non-testifying
> informants.  *Id*.  In response to the motion, the government asserted that there was
> "no one involved in [the] case who provided information on a confidential basis
> who would be considered an informant or source."  *Id*.  The government further
> asserted that it had previously disclosed the identity of two informants who it
> intended to call as witnesses at trial.  *Id*.  It then claimed privilege as to any non-
> testifying confidential informants.  *Id*.  Thus, the only issues before Judge Brack
> were (1) whether the defense was entitled to disclosure of the government's
> witness list prior to trial, and (2) whether the government was required to disclose
> to the defense any non-testifying confidential informants.

- 39 -

Baca's Supplemental Brief at 8-9 (emphasis added).  Baca's Supplemental Brief thus argues that,

where the emphasized language above is the most pertinent to this case's facts, Judge Brack

determined that "the defendants' request moot based on the government's representation that it

had previously disclosed the only two people it would consider to be cooperating individuals. . . .

.  Judge Brack also found that the defendants had not 'demonstrated the need for any informant's

testimony with any particularity.'"   Baca's Supplemental Brief at 9 (quoting United States v.

Lujan, 530 F. Supp. at 1261).

>    **11.    United States' Supplement.**

The United States' Supplement in Response to Opposition to the Joint Motion for

Disclosure and Production of Confidential Informant [698], filed January 13, 2017 (Doc.

824)("United States' Supplement"), begins by explaining the evidentiary basis for Baca's

involvement in J.M.'s murder, which includes recorded statements, involving potentially two

CIs, linking Baca to the order to kill J.M.  See United States' Supplement at 1-6.  There is a

recording of Baca speaking to a CI about Baca's involvement, and Perez speaking to a CI about

Baca's involvement.  See United States' Supplement at 1-6.  The United States' Supplement

explains:

> The Court requested additional evidence linking Anthony Ray Baca to the murder
> of J.M., and corroborating that the 'green light' on J.M. had been outstanding
> longer than 24-48 hours, because the Court concluded that additional
> corroborating evidence negates that the confidential informant (CI) at issue[] has
> information that is helpful and 'significan[t]' to Baca's defense.

United States' Supplement at 2.  The United States' Supplement then argues against the pretrial

disclosure of testifying CIs, first by arguing that Roviaro v. United States can be distinguished,

because, there, "the informer . . . did not testify and was the sole participant, other than the

accused, in the transaction charged . . . [and] the informer was the only witness in a position to

amplify or contradict the testimony of government witnesses." United States' Supplement at 6-8. The United States' Supplement also cites to Smith v. Illinois, 390 U.S. 129, 133 n.8 (1968), where the Supreme Court "noted that the *Roviaro* confidential informer privilege was not relevant to the subject matter of a testifying witness," United States' Supplement at 8, and Banks v. Dretke, 540 U.S. 668, 697 (2004), where the Supreme Court stated that the Roviaro v. United States analysis is limited to non-testifying CIs, see United States' Supplement at 8.

The United States' Supplement then draws the Court's attention to United States v. Pennick, where the Tenth Circuit concluded that "[t]he significant difference between *Roviaro* and the instant case is that in the former the informer did not testify at trial, and in our case he did. Such ruled out a possibility that the informer's testimony could somehow be helpful to Pennick." United States' Supplement at 10 (citing United States v. Pennick, 500 F.2d at 187). The United States' Supplement also explains that the Tenth Circuit concluded that there was "no persuasive reason to depart from the . . . general rule that in a case of this type the Government need not disclose prior to trial the identity of any of its witnesses." United States' Supplement at 10 (citing a number of Tenth Circuit cases standing for the proposition that there is generally no requirement that the United States disclose its witness list). The United States thus argues that "[t]he Tenth Circuit's *Pennick* decision stands on the principle that *Roviaro* analysis does not apply to a testifying confidential informer, because production of a confidential informer as a witness at trial forecloses any concern for the effect of non-disclosure on the defendant's right to a fair trial." United States' Supplement at 10. The United States' Supplement then concludes by citing to various out of circuit cases which, the United States argues, stand for the proposition that a trial court does not error when refusing to order disclosure of testifying CIs and that the Roviaro v. United States analysis was limited to the case of non-testifying CIs. See United

- 41 -

States' Supplement at 11 (citing <u>United States v. Foster</u>, 815 F.2d 1200, 1202-03 (8th Cir. 1987);

<u>United States v. Perkins</u>, 994 F.2d 1184 (6th Cir. 1993); <u>United States v. Casseus</u>, 282 F.3d 253,

257 (3d Cir. 2002); <u>United States v. Glover</u>, 583 F. Supp. 2d 5, 12 (D.D.C. 2008)).

### **LAW REGARDING THE SPEEDY TRIAL ACT, 18 U.S.C. § 3161**

"The dual purpose of the Speedy Trial Act is to protect a defendant's constitutional right

to a speedy indictment and trial, and to serve the public interest in bringing prompt criminal

proceedings." <u>United States v. Saltzman</u>, 984 F.2d 1087, 1090 (10th Cir. 1993)(quoting <u>United</u>

<u>States v. Noone</u>, 913 F.2d 20, 28 (1st Cir. 1990)). The Speedy Trial Act, 18 U.S.C. § 3161(c)(1),

reads in relevant part:

> In any case in which a plea of not guilty is entered, the trial of a defendant
> charged in an information or indictment with the commission of an offense shall
> commence within seventy days from the filing date (and making public) of the
> information or indictment, or from the date the defendant has appeared before a
> judicial officer of the court in which such charge is pending, whichever date last
> occurs. If a defendant consents in writing to be tried before a magistrate judge on
> a complaint, the trial shall commence within seventy days from the date of such
> consent.

18 U.S.C. § 3161(c)(1).

The Speedy Trial Act requires "that an accused person's trial must begin within seventy

days of his indictment or initial appearance, whichever is later." <u>United States v. Cano-Silva</u>,

402 F.3d 1031, 1034 (10th Cir. 2006)(citing 18 U.S.C. § 3161(c)(1)). The Speedy Trial Act

provides that certain periods of delay are not included in computing the time limits for trial. 18

U.S.C. § 3161 states in relevant part:

> **(h)** The following periods of delay shall be excluded in computing the time
> within which an information or an indictment must be filed, or in computing the
> time within which the trial of any such offense must commence:
>
> > **(1)** Any period of delay resulting from other proceedings
> > concerning the defendant, including but not limited to --

DNM 1006

> **(A)**    delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant;
>
> . . . .
>
> **(F)**    delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;
>
> . . . .
>
> **(J)**    delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.
>
> . . . .

**(4)**    Any period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to   stand trial.

. . . .

**(7)**

> **(A)**    Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of   the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.  No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the  court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161.  Courts are instructed to consider specific factors when determining whether

to grant a continuance, and thereby suspend the Speedy Trial Act's deadlines, under section (A)

of 18 U.S.C. § 3161(h)(7).  <u>See</u> 18 U.S.C. § 3161(h)(7)(B).  Section 3161(h)(7)(B) sets forth the

factors a court should consider:

> **(B)**     The factors, among others, which a judge shall consider in determining
> whether to grant a continuance under subparagraph (A) of this paragraph in any
> case are as follows:
>
> > **(i)**     Whether the failure to grant such a continuance in the
> > proceeding would be likely to make a continuation of such
> > proceeding impossible, or result in a miscarriage of justice.
> >
> > **(ii)**     Whether the case is so unusual or so complex, due to the
> > number of defendants, the nature of the prosecution, or the
> > existence of novel questions of fact or law, that it is unreasonable
> > to expect adequate preparation for pretrial proceedings or for the
> > trial itself within the time limits established by this section.
> >
> > **(iii)**     Whether, in a case in which arrest precedes indictment,
> > delay in the filing of the indictment is caused because the arrest
> > occurs at a time such that it is unreasonable to expect return and
> > filing of the indictment within the period specified in section
> > 3161(b), or because the facts upon which the grand jury must base
> > its determination are unusual or complex.
> >
> > **(iv)**     Whether the failure to grant such a continuance in a case
> > which, taken as a whole, is not so unusual or so complex as to fall
> > within clause (ii), would deny the defendant reasonable   time   to
> > obtain counsel, would unreasonably deny the defendant or the
> > Government continuity of counsel, or would deny counsel for the
> > defendant or the attorney for the Government the reasonable time
> > necessary for effective preparation, taking into account the
> > exercise of due diligence.

18 U.S.C. § 3161(h)(7)(B).

The Supreme Court, in <u>United States v. Zedner</u>, 547 U.S. 489 (2006), held that, when a

district court makes no findings on the record to support a § 3161(h)(8) continuance -- now §

3161(h)(7) -- harmless-error review is not appropriate.  <u>See</u> 547 U.S. at 506-07.  In <u>United States</u>

- 44 -

v. Williams, 511 F.3d 1044 (10th Cir. 2007), the Tenth Circuit held that "the Act does not allow

a district court to retroactively grant an ends-of-justice continuance.  'Congress intended that the

decision to grant an ends-of-justice continuance be prospective, not retroactive; an order granting

a continuance on that ground must be made at the outset of the excludable period.'"  511 F.3d at

1055 (quoting United States v. Doran, 882 F.2d 1511, 1516 (10th Cir. 1989)).  In granting an

ends-of-justice continuance, a district court must make explicit finds showing why the

continuance is necessary.  See United States v. Hernandez-Mejia, 406 F. App'x 330, 336 (10th

Cir. 2011)(unpublished).  The Tenth Circuit has explained:

> This court has interpreted strictly the requirements of § 3161(h)(7)(A) and (B).
> We have held (1) that to satisfy the requirements of § 3161(h)(7)(A), the district
> court must make explicit oral or written on-the-record findings explaining the
> reasons why a trial continuance is necessary, unless the facts supporting the
> continuance "are obvious and set forth in the motion for the continuance itself,"
> United States v. Occhipinti, 998 F.2d 791, 797 (10th Cir. 1993)(internal quotation
> marks omitted); (2) that "the record must clearly establish [that] the district court
> considered the proper factors at the time such a continuance was granted,"
> [United States v.] Toombs, 574 F.3d [1262,] 1269 [(10th Cir. 2009)]; (3) that "it
> must be clear from the record that the trial court struck the proper balance when it
> granted the continuance," United States v. Williams, 511 F.3d 1044, 1056 (10th
> Cir. 2007)(alteration and internal quotation marks omitted); and (4) that although
> adequate trial-preparation time is a permissible reason for granting a continuance
> and tolling the Act, "such a reason must be supported by the information and
> evidence presented to the district court," United States v. Gonzales, 137 F.3d
> 1431, 1435 (10th Cir. 1998).

United States v. Hernandez-Mejia, 406 F. App'x at 336.  See United States v. Fuentes, 2011 WL

2533079, at *5 (D.N.M. 2011)(Browning, J.).

Section 3162(a)(1) and (2) of the Act sets out the sanctions applicable when the United

States has not filed an indictment or information, or when the defendant is not brought to trial

within the time limits that § 3161(b) and (c) require:

**(a)**

> **(1)**      If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter, such charge against that individual contained in such complaint shall be dismissed or otherwise dropped.   In determining whether to dismiss the case with  or   without  prejudice,  the  court  shall consider,  among  others,  each  of  the  following  factors:  the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of  justice.

> **(2)**      If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant.  The defendant shall have the burden of  proof        of supporting such motion but the Government shall have the burden of  going  forward  with  the  evidence  in  connection  with  any exclusion of time under subparagraph 3161(h)(3).  In determining whether to dismiss the case   with    or   without   prejudice,   the court shall consider,   among  others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case   which led  to  the  dismissal;  and  the  impact  of  a reprosecution on the   administration of this chapter and on the administration of justice.   Failure of the defendant to move for dismissal  prior  to  trial  or  entry  of  a  plea  of  guilty  or  nolo contendere shall constitute a waiver of the right to dismissal under this section.

18 U.S.C. § 3162(a)(1), (2).

In United States v. Cano-Silva, the Tenth Circuit stated: "The fact that a violation has taken place is not alone sufficient for the application of the more severe sanction of dismissal with prejudice, which should be reserved for more egregious violations.   Dismissal with prejudice is a strong message indeed, and one ill-suited to an isolated and inadvertent violation." 402 F.3d at 1035.

> While dismissal of the indictment is mandatory, the district court retains discretion to determine whether the indictment is dismissed with or without prejudice.  In determining whether to dismiss with or without prejudice, the court

DNM 1010

> "shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice."

United States v. Cano-Silva, 402 F.3d at 1034 (quoting 18 U.S.C. § 3162(a)(2))(citations omitted). The offense's seriousness must be weighed against the delay's severity. See United States v. Jones, 213 F.3d 1253, 1257 (10th Cir. 2000). In addition, the Supreme Court has suggested that the trial court should also consider, when determining whether to dismiss an indictment with prejudice, the prejudice to the defendant that a Speedy Trial violation delay has caused. See United States v. Taylor, 487 U.S. 326, 333-34 (1988).

"It is self-evident that dismissal with prejudice always sends a stronger message than dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays." United States v. Taylor, 487 U.S. at 342. "Preindictment delay that rises to a constitutional violation requires dismissal of the indictment with prejudice to retrial." United States v. Johnson, 120 F.3d 1107, 1110 n.2 (10th Cir. 1997)(citing United States v. Marion, 404 U.S. 307, 324 (1971)). "Where the delay is the result of intentional dilatory conduct, or a pattern of neglect on the part of the Government, dismissal with prejudice is the appropriate remedy." United States v. Saltzman, 984 F.2d at 1093. See United States v. Johnson, 120 F.3d at 1112 ("Ms. Johnson bears no responsibility for the circumstances leading to the Speedy Trial Act violation, and . . . she properly asserted her rights under the Act."). In United States v. Johnson, one aspect of the Speedy Trial Act violations that troubled the Tenth Circuit was that, although the nature of the offense was relatively uncomplicated, the government delayed almost two years in indicting her. See 120 F.3d at 1112.

In United States v. Perez-Alcatan, 376 F. Supp. 2d 1253 (D.N.M. 2005)(Browning, J.), the Court dismissed Perez-Alcatan's indictment without prejudice, because the United States,

DNM 1011

through inadvertent error, failed to indict him within thirty days of the arrest, as the Speedy Trial

Act requires.  See 376 F. Supp. 2d at 1257.  Thirty days from Perez-Alcatan's arrest was May 26,

2005, and a grand jury indicted Perez-Alcatan on June 14, 2005.  See 376 F. Supp. 2d at 1254.

Perez-Alcatan argued that the Court should dismiss his case with prejudice.  See 376 F. Supp. 2d

at 1256.  He contended that his charged crime, re-entry into the United States after conviction for

an aggravated felony, which carried a 16-level enhancement under the United States Sentencing

Guidelines, was not a serious crime.  See 376 F. Supp. 2d at 1257.  His underlying aggravated

felony, however, was voluntary manslaughter.  See 376 F. Supp. 2d at 1254.  The Court looked

to the Sentencing Guidelines, stating that a 16-level enhancement is among the largest in the

Sentencing Guidelines, which signals Congress' intent to consider the crime a serious one.  See

376 F. Supp. 2d at 1256.  Furthermore, the Court stated that the Guidelines lack of authorization

for probation in such circumstances, and that Congress is hiring more border agents and

Assistant United States Attorneys to slow the flow of immigration, and punish those who are

already felons, indicates the crime's seriousness.  See 376 F. Supp. 2d at 1256.  The Court

concluded that the seriousness of the offense favored dismissal without prejudice.  See 376 F.

Supp. 2d at 1256.  The Court also held that the facts and circumstances that led to the delay did

not favor dismissal with prejudice.  See 376 F. Supp. 2d at 1256-57.

    While most immigration cases in which a defendant waives a preliminary hearing and

detention hearing also involve a waiver of presentment to the grand jury, Perez-Alcatan chose to

waive the detention hearing and the preliminary hearing, but not presentment to the grand jury.

See 376 F. Supp. 2d at 1256.  As a result of the unique situation, the file cover in the United

States Attorney's Office was annotated "waiver" and was incorrectly filed, causing untimely

presentment.  376 F. Supp. 2d at 1257.  The Court further held that, because the delay-producing

conduct was an administrative oversight and was without bad faith, dismissing the case with

prejudice would do little to prevent such future mistakes.  See 376 F. Supp. 2d at 1257.  The

Court stated that the "United States continues to present its cases for indictment in a timely

manner; dismissal with prejudice would not improve the professional efforts already in place in

adhering to the Speedy Trial Act."  376 F. Supp. 2d at 1257.  The Court also stated that Perez-

Alcatan had not alleged any actual prejudice in his ability to defend himself.  See 376 F. Supp.

2d at 1257.  The Court, therefore, dismissed the case without prejudice.  See 376 F. Supp. 2d at

1257.

### LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES

In Brady v. Maryland, the Supreme Court explained that "the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution."  373 U.S. at 87 ("Brady").  In Giglio v. United States, the Supreme Court

extended the prosecution's disclosure obligation to evidence that is useful to the defense in

impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405

U.S. at 153 ("Giglio"); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o

distinction is recognized between evidence that exculpates a defendant and 'evidence that the

defense might have used to impeach the [State's] witnesses by showing bias and

interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Finally, the Supreme

Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory

evidence; "regardless of request, favorable evidence is material, and constitutional error results

from its suppression by the government 'if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different.'"

DNM 1013

Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at 682).  See

Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory

evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287,

1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory

evidence clearly supporting a claim of innocence even without request.").  On the other hand,

"[i]t is well settled that there is no affirmative duty upon the government to take action to

discover information which it does not possess."  United States v. Badonie, 2005 WL 2312480,

at *2 (D.N.M. 2005)(Browning, J.)(internal quotation marks omitted).  "A prosecutor does not

have a duty . . . to obtain evidence from third parties."  United States v. Badonie, 2005 WL

2312480, at *2.

During a criminal prosecution, the Federal Rules of Criminal Procedure and the

Constitution of the United States of America require the United States to disclose certain

evidence to a criminal defendant.  Rule 16 of the Federal Rules of Criminal Procedure is one

source that imposes such a duty on the United States.  The Due Process Clause of the

Constitution is another source imposing a duty to disclose on the United States.

### LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E) Documents and Objects.**  Upon a defendant's request, the government must
permit the defendant to inspect and to copy or photograph books, papers,
documents, data, photographs, tangible objects, buildings or places, or copies or
portions of any of these items, if the item is within the government's possession,
custody, or control and:

    **(i)**    the item is material to preparing the defense;

    **(ii)**    the government intends to use the item it its case-in-chief at
              trial; or

    **(iii)**    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition."  United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)).  Rule 16 also does not obligate the United States to "take action to discover information which it does not possess."  United States v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted).  Nor is the United States required to secure information from third parties.  See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.  The court may permit a party to show good cause by a written statement that the court will inspect ex parte.  If relief is granted, the court must preserve the entire text of the party's statement under seal.

DNM 1015

Fed. R. Crim. P. 16(d)(1).  In <u>re Terrorist Bombings of United States Embassies in East Africa</u>, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information."  <u>In re Terrorist Bombings of United States Embassies in East Africa</u>, 552 F.3d at 122.  In <u>United States v. Delia</u>, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]."  <u>United States v. Delia</u>, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16.  <u>United States v. Wicker</u>, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.**  If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> **(B)** grant a continuance;
>
> **(C)** prohibit that party from introducing the undisclosed evidence; or
>
> **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

<u>United States v. Charley</u>, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting <u>United States v. Gonzales</u>, 164 F.3d 1285, 1292 (10th Cir. 1999)).  In <u>United</u>

DNM 1016

States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the Tenth Circuit held that "a court should

impose the least severe sanction."  455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d

1059, 1061 (10th Cir. 1988)).  The Tenth Circuit noted: "Rule 16 and our cases specifically

mention continuance or exclusion of the evidence as preferred remedies." 455 F.3d at 1131.

### LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA

The Due Process Clause of the Constitution requires that the United States disclose to the

defendant any evidence that "is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  The Supreme Court has extended

the prosecution's disclosure obligation to include evidence that is useful to the defense in

impeaching government witnesses, even if the evidence is not inherently exculpatory.  See

Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o

distinction is recognized between evidence that exculpates a defendant and 'evidence that the

defense might have used to impeach the [United States'] witnesses by showing bias and

interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Abello-

Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same

constitutional treatment as exculpatory evidence.").  Finally, the Supreme Court has refined

Brady and clarified that it is not necessary that a defendant request exculpatory evidence:

"Regardless of request, favorable evidence is material, and constitutional error results from its

suppression by the government."  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United

States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The

government's obligation to disclose exculpatory evidence does not turn on an accused's

request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution

- 53 -

has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence

even without request.").

      1.     **Material Exculpatory Evidence Under** Brady.

     "The Constitution, as interpreted in Brady, does not require the prosecution to divulge

every possible shred of evidence that could conceivably benefit the defendant."   Smith v. Sec'y

of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995).   Brady requires disclosure only of

evidence that is both favorable to the accused, and "material either to guilt or to punishment."

Brady, 373 U.S. at 87.   "Evidence is material only if there is a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been

different."   United States v. Bagley, 473 U.S. at 682.   See United States v. Allen, 603 F.3d 1202,

1215 (10th Cir. 2010).   A "reasonable probability," in turn, is a "probability sufficient to

undermine confidence in the outcome."   United States v. Bagley, 473 U.S. at 682 (internal

quotation marks omitted).   The Tenth Circuit has noted that "[t]he mere possibility that evidence

is exculpatory does not satisfy the constitutional materiality standard."   United States v. Fleming,

19 F.3d 1325, 1331 (10th Cir. 1994).   The Tenth Circuit has also stated that evidence is material

if it "might meaningfully alter a defendant's choices before and during trial . . . including

whether the defendant should testify."   Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting

United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotation marks omitted).

     "To be material under Brady, undisclosed information or evidence acquired through that

information must be admissible."   Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir.

1995)(quoting United States v. Kennedy, 890 F.2d at 1059).   The Supreme Court in Cone v. Bell,

556 U.S. 449 (2009), noted:

          Although the Due Process Clause of the Fourteenth Amendment, as
     interpreted by Brady, only mandates the disclosure of material evidence, the

DNM 1018

obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations.  See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)").  See also ABA Model Rules of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; the defendants have no obligation to first note that such materials exist.  See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6 (D.N.M. 2011)(Browning, J.).  This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way."   Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant."  United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.

DNM 1019

2.      **Timing of the Disclosure Under** Brady.

"The obligation of the prosecution to disclose evidence under <u>Brady</u> can vary depending on the phase of the criminal proceedings and the evidence at issue."  <u>United States v. Harmon</u>, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), <u>aff'd</u>, 742 F.3d 451 (10th Cir. 2014). As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in <u>Brady v. Maryland</u>."  <u>United States v. Burke</u>, 571 F.3d at 1054.  The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the <u>Brady</u> rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  <u>United States v. Burke</u>, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  <u>United States v. Burke</u>, 571 F.3d at 1054.  The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with <u>Brady</u>, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

<u>United States v. Burke</u>, 571 F.3d at 1054.  Notably, "not every delay in disclosure of <u>Brady</u> material is necessarily prejudicial to the defense."  <u>United States v. Burke</u>, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."  <u>United States v. Burke</u>, 571 F.3d at 1056.

Once a prosecutor's obligations under <u>Brady</u> have been triggered, however, they "continue[] throughout the judicial process."  <u>Douglas v. Workman</u>, 560 F.3d at 1173.  For instance, the prosecutor's obligation to disclose <u>Brady</u> material can arise during trial.  <u>See</u> <u>United</u>

States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise

from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of

favorable evidence (such as impeachment evidence) that is unavailable to the government until

trial is underway.").  The disclosure obligation continues even while a case is on direct appeal.

See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th

Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received

after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of

impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide

whether the Constitution requires that preguilty plea disclosure of impeachment information.

We conclude that it does not.").  The Supreme Court recognized that "impeachment information

is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."

United States v. Ruiz, 536 U.S. at 632 (emphasis in original).  The Supreme Court acknowledged

that, "[o]f course, the more information the defendant has, the more aware he is of the likely

consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but

concluded that "the Constitution does not require the prosecutor to share all useful information

with the defendant."  United States v. Ruiz, 536 U.S. at 632.  The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness
> of relevant circumstances, does not require complete knowledge of the relevant
> circumstances, but permits a court to accept a guilty plea, with its accompanying
> waiver of various constitutional rights, despite various forms of misapprehension
> under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court explained that "a constitutional

obligation to provide impeachment information during plea bargaining, prior to entry of a guilty

plea, could seriously interfere with the Government's interest in securing those guilty pleas that

DNM 1021

are factually justified, desired by defendants, and help to secure the efficient administration of

justice." United States v. Ruiz, 536 U.S. at 630.   The Tenth Circuit has reiterated these

principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not
> know that he was giving up a claim that the government failed to disclose
> impeachment evidence.   The Supreme Court, however, foreclosed this exact
> argument in United States v. Ruiz, by holding that the government has no
> constitutional obligation to disclose impeachment information before a defendant
> enters into a plea agreement.   Ruiz emphasized that "impeachment information is
> special in relation to the fairness of a trial, not in respect to whether a plea is
> voluntary."   Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if
> the defendant fully understands the nature of the right and how it would likely
> apply in general in the circumstances -- even though the defendant may not know
> the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United

States v. Ruiz, 546 U.S. at 630).[4]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to

exculpatory evidence, but rather applies only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects.   First, the evidence
> withheld by the prosecution in this case is alleged to be exculpatory, and not just

---

[4]United States v. Johnson is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See
10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their
persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order has persuasive value with respect to
> a material issue in a case and would assist the court in its disposition, we allow a
> citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).   The Court
concludes that United States v. Johnson; United States v. Hernandez-Mejia, 406 F. App'x at 336;
McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002); and United States v. Ohiri, 133 F.
App'x 555 (10th Cir. 2005), have persuasive value with respect to a material issue, and will
assist the court in its disposition of this Memorandum Opinion and Order.

DNM 1022

> impeachment, evidence.  Second, Ohiri's plea agreement was executed the day
> jury selection was to begin, and not before indictment in conjunction with a "fast-
> track" plea.  Thus, the government should have disclosed all known exculpatory
> information at least by that point in the proceedings. By holding in <u>Ruiz</u> that the
> government committed no due process violation by requiring a defendant to
> waive her right to impeachment evidence before indictment in order to accept a
> fast-track plea, the Supreme Court did not imply that the government may avoid
> the consequence of a <u>Brady</u> violation if the defendant accepts an eleventh-hour
> plea agreement while ignorant of withheld exculpatory evidence in the
> government's possession.

<u>United States v. Ohiri</u>, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished).  The Tenth Circuit

qualified its holding in <u>United States v. Ohiri</u>, however, stating that the case presented "unusual

circumstances."  133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether <u>Brady v.</u>

<u>Maryland</u>'s restrictions apply to suppression hearings."  <u>United States v. Harmon</u>, 871 F. Supp.

2d at 1151.  In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u>

applies to a suppression hearing, rejected a defendant's argument that the prosecution violated

<u>Brady</u> by failing to disclose impeachment evidence before a suppression hearing on the basis that

the evidence was not impeachment evidence and not material.  <u>See</u> <u>United States v. Johnson</u>, 117

F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically,

the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if
> impeaching, would not establish a reasonable probability that the outcome of the
> suppression hearing would have been different.  First, we question whether the
> evidence in question would have been admitted at the suppression hearing.  Even
> if it had been admitted, however, in light of [the defendant's] lack of truthfulness,
> our confidence in the result of the hearing has not been undermined.  Therefore,
> we hold that the evidence was not material, and that its nondisclosure by the
> prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

DNM 1023

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the Brady line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet Brady rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir. 1999)(citation omitted). Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie. See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the Brady issues at stake here."). The Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings." United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001). The Second Circuit also noted that Brady's applicability to suppression hearings was not "obvious" for plain error purposes. United States v. Nelson, 193 F. App'x 47, 50 (2d Cir. 2006).

Before the Supreme Court issued its United States v. Ruiz decision, the United States Court of Appeals for the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that Brady applies to suppression hearings. See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady

DNM 1024

to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on

other grounds, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression

hearings, because "Brady rests on the idea that due process is violated when the withheld

evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine

a defendant's guilt or punishment." United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir.

2015)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir.

2013)(acknowledging that "[w]hether Brady's disclosure requirements even apply at the motion

to suppress stage is an open question")).   Although the United States Courts of Appeals have

split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must

disclose impeachment evidence before a suppression hearing in light of the Supreme Court's

conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment

evidence before the entry of a guilty plea."   United States v. Harmon, 871 F. Supp. 2d at 1151.

The Tenth Circuit affirmed United States v. Harmon, in which the Court concluded that the

United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the
> Court believes that the Tenth Circuit would extend the holding of United States v.
> Ruiz to suppression hearings.  The Supreme Court's rationale distinguishing the
> guilty-plea process from a trial applies equally to a comparison of the
> suppression-hearing process and a trial.  The Court believes that both the Tenth
> Circuit and the Supreme Court would recognize that impeachment evidence need
> not be disclosed before a suppression hearing.  In United States v. Ruiz, the
> Supreme Court recognized that "impeachment information is special in relation to
> the *fairness of a trial*, not in respect to whether a plea is voluntary."  United States
> v. Ruiz, 536 U.S. at 632 . . . (emphasis in original).  It acknowledged that, "[o]f
> course, the more information the defendant has, the more aware he is of the likely
> consequences of a plea, waiver, or decision, and the wiser that decision will likely
> be," but concluded that "the Constitution does not require the prosecutor to share
> all useful information with the defendant."  United States v. Ruiz, 536 U.S. at 632
> . . . .  Likewise, "the more information the defendant has, the more" likely he will
> be able to successfully suppress a particular piece of evidence, but "the

Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632 . . . .

United States v. Harmon, 871 F. Supp. 2d at 1169 (emphasis in original).  Accordingly, Brady does not require the United States to disclose impeachment evidence before suppression hearings.  See United States v. Harmon, 871 F. Supp. 2d at 1165-67.

### 3.     **Evidence Must Be in the United States' Possession.**

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'"  United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).  Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *2.  On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).  Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)).  "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'"  United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).  A prosecutor does not have a duty, however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties).

- 62 -

## LAW REGARDING THE JENCKS ACT

In Jencks v. United States, 353 U.S. at 667, the Supreme Court held that a "criminal action must be dismissed when the government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." 353 U.S. at 672.  In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671.  Congress later codified Jencks v. United States in 18 U.S.C. § 3500.  See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . .").

Section 3500 of Title 18 of the United States Code provides:

**(a)**    In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)**    After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b).  "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United

- 63 -

States' once that witness has testified."  United States v. Lujan, 530 F. Supp. 2d 1224, 1232

(D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a) & (b)).  The Jencks Act "manifests the

general statutory aim to restrict the use of such statements to impeachment."  Palermo v. United

States, 360 U.S. 343, 349 (1959).  The Jencks Act's purpose is "not only to protect Government

files from unwarranted disclosure but also to allow defendants materials usable for the purposes

of impeachment."  United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo

v. United States, 360 U.S. at 352).

 The Jencks Act defines statements as:

 **(1)** a written statement made by said witness and signed or otherwise adopted
   or approved by him;

 **(2)** a stenographic, mechanical, electrical, or other recording, or a
   transcription thereof, which is a substantially verbatim recital of an oral
   statement made by said witness and recorded contemporaneously with the
   making of such oral statement; or

 **(3)** a statement, however taken or recorded, or a transcription thereof, if any,
   made by said witness to a grand jury.

18 U.S.C. § 3500(e).

 The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act

if they are substantially verbatim."  United States v. Smith, 984 F.2d 1084, 1086 (10th Cir.

1993).  At least one district court within the Tenth circuit has distinguished interview notes from

reports that "embody only the agent's epitomization, interpretation, or impression of an

interview," finding that the latter are not producible under the Jencks Act.  United States v.

Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.).  In United States v. Lujan, the

Honorable Robert C. Brack, United States District Judge for the District of New Mexico,

explained that rough interview notes may be discoverable under the Jencks Act, when a

defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes

contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack held that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must, under 18 U.S.C. § 3500, preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses." 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy. See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."); United States v. Harry, 2013 WL 684671, at *10 (D.N.M. 2013)(Browning, J.). To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)). See United States v. Burton, 81 F. Supp. 3d 1229, 1250-51 (D.N.M. 2015)(Browning, J.). The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements. See United States v. Smith, 984 F.2d at 1086. For example, in United States v. Smith, the Tenth Circuit concluded that a defendant had met his burden and made a

prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had interviewed her before she testified, and the defense counsel moved for production of the notes.  See 984 F.2d at 1085-86.  Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement.  See 984 F.2d at 1086.

In United States v. Fred, No. CR 05-801 JB, the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant.  No. CR 05-801 JB, Order at 1, filed November 8, 2006 (Doc. 86).  The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly prepare for cross-examination at trial of the FBI agent who conducted the interview.  See No. CR 05-801 JB, Order at 1-2.  The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be given to the defendants after the agents testify at trial.  See United States v. Goxcon-Chagal, 2012 WL 3249473, at **2, 6 (D.N.M. 2012)(Browning, J.).  In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce FBI agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial.  See 760 F. Supp. 2d at 1164, 1167.

**THE NEED FOR PRACTICAL AND EFFECTIVE CRIMINAL DISCOVERY**

In 1990, a state jury convicted Debra Milke of murdering her four-year-old son, Christopher.  See Milke v. Ryan, 711 F.3d 998, 1000 (9th Cir. 2013).  The state judge sentenced

her to death.  See Milke v. Ryan, 711 F.3d at 998.  The Honorable Alex Kozinski, Chief Judge

for the Ninth Circuit, described the trial as "a swearing contest between Milke and Phoenix

Police Detective Armando Saldate, Jr."  711 F.3d at 1000.  At the trial, Saldate testified that

Milke confessed to the murder; Milke vehemently protested her innocence and denied

confessing.  See 711 F.3d at 1000.  With no other witnesses, the state judge and jury believed

Saldate.  See Milke v. Ryan, 711 F.3d 998.  They were unaware, however, of one fact that might

have changed their minds: Saldate had a "long history of lying under oath and other

misconduct."  711 F.3d at 1000-01.  Specifically, Saldate had lied to a grand jury or a judge in

four cases, requiring state judges to throw out indictments or confessions.  See 711 F.3d at 1004.

In another four cases, "judges threw out confessions or vacated convictions because Saldate had

violated suspects' Miranda and other constitutional rights during interrogations, often

egregiously."  Milke v. Ryan, 711 F.3d at 1004.  Finally, Saldate's personnel file documented a

five-day suspension "for taking sexual liberties with a motorist he stopped and then lying to his

supervisors about it."  711 F.3d at 1011.  The file revealed that his "supervisors had caught him

in a lie and concluded that his credibility was compromised."  711 F.3d at 1006, 1012

(describing the report as showing that "Saldate has no compunction about lying during the course

of his official duties" and that he has "a willingness to abuse his authority to get what he wants").

The information about Saldate's misconduct was in the hands of the party responsible for

ensuring that justice is achieved -- the state.  Unfortunately, however, the state did not disclose

this information, despite its requirements under Brady and Giglio.  See Milke v. Ryan, 711 F.3d

at 1005 (describing how the state did not mention the evidence, even though an important

question in Milke's case was whether Saldate ignored Milke's request for an attorney).  "This

error resulted in a 'one-sided presentation of evidence' and 'impeded [the jury's] ability to fully

and fairly assess the credibility of both [Milke] and Saldate." Milke v. Ryan, 711 F.3d at 1005 (alterations in the original).  More than that problem, however, the error resulted in Milke's death sentence and imprisonment on death row for twenty-two years.  See Milke v. Ryan, 711 F.3d at 1001.[5]

The disclosure problem is not confined to the context of overzealous police officers closing murder cases.  It reaches to all corners of the criminal justice system.  Judges and scholars are increasingly recognizing the problem with blatant Brady violations.  See Daniel S. Medwed, Brady's Bunch of Flaws, 67 Wash. & Lee L. Rev. 1533 (2010); David Keenan et al., The Myth of Prosecutorial Accountability After Connick v. Thompson: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct, 121 Yale L.J. Online 203 (2011).  For example, in 2012, an investigation revealed that two Department of Justice prosecutors intentionally hid evidence in the 2008 political corruption case against Senator Ted Stevens, the longest serving Republican Senator in history.  See United States v. Stevens, 2009 WL 6525926 (D.D.C. 2009)(Sullivan, J.).  See Henry F. Schuelke III, Special Counsel, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order (dated April 7, 2009), filed March 15, 2012 in In re Special Proceedings, No. 1:09-mc-00198-EGS (D.D.C. March 15, 2012)("Stevens Report").  Special prosecutor Henry F. Schuelke III's blistering report found that the United States team concealed documents that would have damaged the credibility of key United States witnesses and helped the late Stevens to

[5]After the Ninth Circuit vacated Milke's conviction and gave Arizona the chance to re-try Milke, the Arizona Court of Appeals barred any re-trial in a scathing opinion that garnered the New York Times' attention.  See Arizona: No Retrial for Woman Freed from Death Row, N.Y. Times (Dec. 11, 2014), http://www.nytimes.com/2014/12/12/us/arizona-no-retrial-for-woman-freed-from-death-row.html?_r_1.  The Arizona Court of Appeals described the "long course of Brady/Giglio violations" as a "flagrant denial of due process" and a "severe stain on the Arizona justice system."  Milke v. Mroz, 339 P.3d 659, 665-66, 668 (Ariz. Ct. App. 2014).

- 68 -

DNM 1032

defend himself against false-statements charges.  See Stevens Report at 12.  Stevens lost his

Senate seat as the scandal unfolded, dying at age eighty-six in a plane crash two years later.  See

Carrie Johnson, Report: Prosecutors Hid Evidence in Ted Stevens Case, NPR News (May 15,

2012),          http://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-

stevens-case.  Schuelke based his 500-page report on a review of 128,000 documents and

interviews with prosecutors and FBI agents.  See Stevens Report at 12.  United States Attorney

General Eric Holder moved to vacate Stevens' conviction.  See Jerry Seper, Inquiry Slams

Prosecution of Stevens Corruption Case By Justice Department, The Washington Times (March

15, 2012).  The Department of Justice ("DOJ") subsequently "instituted a sweeping training

curriculum for all federal prosecutors, and made annual discovery training mandatory."  Mark

Memmott, Report Slams Sen. Stevens' Prosecutors, NPR News (March 15, 2012),

http://www.npr.org/sections/thetwo-way/2012/03/15/148668283/report-slams-sen-stevens-

prosecutors.

        As Milke v. Ryan and the Stevens Report reveal, prosecutors hold a tremendous amount

of power in criminal prosecutions, often more than the jury.  See Alex Kozinski, Criminal Law

2.0, 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, xxii (2015)(explaining that prosecutors often hold

more power "than jurors because most cases don't go to trial").  They are the ones with access to

the evidence, both inculpatory and exculpatory.  They can disclose it easier than anyone else can.

See Scott H. Greenfield, The Flood Gates Myth, Simple Justice (Feb. 16, 2015),

http://blog.simplejustice.us/2015/02/16/the-flood-gates-myth/.  As one illustration, in Milke v.

Ryan, Milke discovered the impeachment evidence detailing Saldate's misconduct "only after a

team of approximately ten researchers in post-convictions proceedings spent nearly 7000 hours

sifting through court records."  711 F.3d at 1018.  The team worked eight hours a day for three

and a half months searching through the clerk of court's officers for Saldate's name in every criminal case file from 1982 to 1990.  See 711 F.3d at 1018.  It took another researcher another month to review motions and transcripts from each of those cases to find examples of Saldate's misconduct.  See 711 F.3d at 1018.  The Ninth Circuit concluded: "A reasonably diligent lawyer couldn't possibly have found these records in time to use them at Milke's trial."  711 F.3d at 1018.  The prosecutor was in the best position to give Milke the opportunity to effectively cross-examine Saldate and ensure that she had a fair trial.  Although Brady and Giglio require prosecutors to disclose exculpatory evidence to the defense, it is often extremely difficult for criminal defendants to know whether the prosecution is complying with this obligation.  Furthermore, prosecutors exert tremendous control over witnesses.

> They can offer incentives -- often highly compelling incentives -- for suspects to testify.  This includes providing sweetheart plea deals to alleged co-conspirators and engineering jail-house encounters between the defendant and known informants.  Sometimes they feed snitches non-public information about the crime so that the statements they attribute to the defendant will sound authentic.   And, of course, prosecutors can pile on charges so as to make it exceedingly risky for a defendant to go to trial.   There are countless ways in which prosecutors can prejudice the fact-finding process and undermine a defendant's right to a fair trial.

Kozinski, supra, at xxii (internal footnotes omitted).

To address this problem, Holder put together a working group of senior prosecutors, law enforcement representatives, and information technology professionals to improve the DOJ's discovery practices.  See Hearing on the Special Counsel's Report on the Prosecution of Senator Ted Stevens at 3-4, Committee on the Judiciary United States Senate (March 28, 2012)("Hearing").   The DOJ then issued guidelines that federal prosecutors must follow in complying with their discovery obligations in criminal cases.  See Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Issuance of Guidance and Summary of Actions Taken in Response to the Report of the Department of Justice Criminal

DNM 1034

Discovery and Case Management Working Group (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Requirement for Office Discovery Policies in Criminal Matters (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), https://www.justice.gov/dag/memorandum-department-prosecutors.  These memoranda are intended to establish a methodical approach to discovery obligations and to address inconsistent discovery practices among prosecutors within the same office.  See Hearing at 4-5.  Although these memoranda are "not intended to have the force of law or to create or confer any rights, privileges or benefits," DOJ attorneys will likely have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations.  Later in January, 2010, Deputy Attorney General David W. Ogden appointed a long-serving career prosecutor as the DOJ's first full-time National Criminal Discovery Coordinator to lead and oversee all DOJ efforts to impose disclosure practices.  See Hearing at 4.

Many courts and scholars, however, have argued that training prosecutors is insufficient to fully combat discovery abuse.  Instead of relying on prosecutors alone to disclose all potentially exculpatory evidence, they have suggested that judges take a more active role in preventing Brady and Giglio violations.  See United States v. Jones, 686 F. Supp. 2d 147, 149 (D. Mass. 2010)(Wolf, J.)(expressing the district court's skepticism that prosecution-initiated training sessions, in the absence of strong judicial action, would effectively curb Brady violations).  Chief Judge Kozinski has asserted that "[t]here is an epidemic of *Brady* violations

abroad in the land.  Only judges can put a stop to it."[6]  <u>United States v. Olsen</u>, 737 F.3d 625, 626

(9th Cir. 2013)(Kozinski, C.J., dissenting).  Two years after Chief Judge Kozinski described the

"epidemic of *Brady* violations," he observed that his use of the phrase "caused much controversy

but brought about little change in the way prosecutors operate."  Kozinski, <u>supra</u>, at viii (citing

Center for Prosecutor Integrity, An Epidemic of Prosecutor Misconduct, White Paper (Dec.

2013),              <u>available              at</u>              http://www.prosecutorintegrity.org/wp-

content/uploads/EpidemicofProsecutor-Misconduct.pdf.  The reason that there was little action

on his charge may have been that neither he nor anyone else has done what needs to be done to

substantiate his claim with empirical data.  Nonetheless, he proposed some additional reforms,

such as requiring open-file discovery.  <u>See</u> Kozinski, <u>supra</u>, at xxvi-vii.  North Carolina has

adopted such a rule by statute that requires courts to order the "State to make available to the

defendant the complete files of all law enforcement agencies, investigatory agencies, and

prosecutors' offices involved in the investigation of the crimes committed or the prosecution of

the defendant."  N.C. Gen. Stat. § 15A-903(a)(1) (2011).  The DOJ, however, has opposed such a

law, instead advocating that prosecutors should remain in charge of deciding what evidence will

be material to the defense.  <u>See</u> Video Recording: Ensuring that Federal Prosecutors Meet

Discovery Obligations: Hearing on S. 2197 Before the S. Judiciary Comm., 112th Cong.

(2012)(on file with S. Judiciary Comm.)(statement of James M. Cole, Deputy Att'y Gen., U.S.

Dep't of Justice opposing the bill: "[I]n reacting to the *Stevens* case, we must not let ourselves

forget . . . true improvements to discovery practices will come from prosecutors and agents . . . .

In other words, new rules are unnecessary."); Eric Holder Jr., Preface, <u>In the Digital Age,</u>

---

[6]Neither Chief Judge Kozinski nor anyone else has empirically shown that an epidemic of <u>Brady</u> violations is occurring.  The Court does not see an epidemic of <u>Brady</u> violations.  The Assistant United States Attorneys appear to take their duties very seriously.

- 72 -

Ensuring that the Department Does Justice iii, 41 Geo. L.J. Ann. Rev. Crim. Proc. (2012).  Chief

Judge Kozinski contends that effectively deterring Brady and Giglio violations means that

prosecutorial offices across the country must establish firm open-file policies to ensure

compliance.[7]  See Kozinski, supra, at xxviii.

---

[7]In New Mexico, the New Mexico Legislature has not enacted an open-file policy for its state prosecutors, nor does the United States Attorney's Office -- according to an Assistant United States Attorney -- operate under an open-file policy.  See United States v. Hykes, Tr. at 12:7-15 (Hurtado)("I want to affirm clearly in open Court and on the record that there is no open file policy that the U.S. Department of Justice or the United States Attorney's office follows either in this district or across the entire United States.").  Despite the Assistant United States Attorney's contention in that case, however, the United States Attorney's Office has previously represented to the Court that the Albuquerque office operates under such a policy.  See United States v. Rodella, 2015 WL 711931, at *39 n.12 (D.N.M. Feb. 2, 2015)(Browning, J.)(stating that the United States Attorney's Office for the District of New Mexico has "consistently represented that they maintain an 'open file policy'").  The Court recognized that, despite the United States' representations that it maintains an open-file policy, its "conduct before the Court suggests otherwise."  United States v. Rodella, 2015 WL 711931, at *39 n.12.

These attorneys have at times shown that they are willing to disclose to criminal defendants only the bare minimum that the law requires and nothing more.  In United States v. Roybal, No. CR 12-3182 JB, 2014 WL 4748136 (D.N.M. Sept. 4, 2014)(Browning, J.), the United States refused to produce certain raw wiretap data and progress reports they made concerning wiretaps.  See 2014 WL 4748136, at *1.  The United States did not give a reason for denying the defendants' request for the information, other than the law did not require it to produce the documents.  See 2014 WL 4748136, at *4.  Again in United States v. Folse, the United States refused to disclose reports related to a shooting between a co-defendant and a Federal Bureau of Investigation agent for a similar reason: the law did not require it to disclose the information.  See United States v. Folse, No. CR 14-2354, Unsealed Memorandum Opinion and Order, filed January 26, 2015 (Doc. 75). . . .  By its very name -- the Department of Justice -- the United States is also interested in the pursuit of justice.  In refusing to disclose evidence, documents, and materials unless the law requires it to produce the items, the United States may be undermining the appearance of justice.  Defendants are often left in the dark, not knowing what information the United States has in its possession.  While Courts and Congress have placed requirements on what information the United States must disclose, these requirements are a bare minimum and not a recommendation.  Criminal defendants are already at a disadvantage, because of the United States' resources and because the United States gets a head start in every case by being able to investigate before bringing an indictment.  The United States need not compound this disadvantage by refusing to give over any evidence unless it is absolutely required.  After the

- 73 -

While these reforms may indeed decrease the number of <u>Brady</u> and <u>Giglio</u> violations that occur, the Court cannot unilaterally impose those requirements upon attorneys. Judges have several other tools at their disposal, however, and the Court uses several of these tools to ensure compliance with <u>Brady</u> and <u>Giglio</u> in the District of New Mexico. First, while the Court must rely heavily on the prosecutors to do their job under <u>Brady</u> and <u>Giglio</u>, the Court does more than rely solely on the prosecutors to comply with their obligations. <u>See</u> Kozinski, <u>supra</u>, at xxxiii ("*Brady* is not self-enforcing; failure to comply with *Brady* does not expose the prosecutor to any personal risk."); <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430, 431 n.34 (1976)(noting that prosecutors are absolutely immune for "activities [that are] intimately associated with the judicial phase of the criminal process," including the willful suppression of exculpatory evidence). The District of

_____

> United States secures a conviction, the criminal defendant, and the public at large, should feel that the conviction was based on a fair trial in which there was nothing else the defendant could have done to obtain a different result -- *i.e.* the appearance of justice. The nation may not be well served when a defendant is left wondering whether things would have been different if the United States had disclosed all of the information that it possessed. By refusing to disclose all available information, the United States may create the perception that it obtained a conviction through gamesmanship and concealment, <u>i.e.</u>, through sharp practices, and not through the pursuit of truth and justice. This perception undermines the pillars of our criminal justice system. The Court will continue to faithfully follow the law and will not require the United States to disclose any information which the law does not require it to disclose. The Court, however, cautions the United States that, if it continues its pattern of refusing to disclose available information to criminal defendants, it is undermining the representation that it routinely makes that it has an open file policy and that the Court will take that purported policy with a grain of salt. That representation, which is not completely accurate, and the unclear practices of the Assistant United States Attorneys undermine the administration of justice and the public's perception of the justice system. It also puts its convictions unnecessarily at risk, if the Court is wrong that the United States did not have to produce the documents. The United States is a key player in the adversarial system; as the people's representative, it too plays a fundamental role in ensuring the appearance of justice.

<u>United States v. Rodella</u>, 2015 WL 711931, at *39. It appears that the United States has finally abandoned its representations that it has an open-file policy.

- 74 -

New Mexico Magistrate Judges enter orders at the beginning of cases directing prosecutors to comply with those obligations by disclosing documents and objects, reports and tests, expert witness opinions, and all relevant material that Brady and Giglio require.  If courts do not enter an order requiring prosecutors to comply with Brady and Giglio, the court lacks the power to sanction attorneys, because those attorneys will not have violated any court-imposed obligations. See Henry F. Schuelke III, supra, at 507-510.  By entering such orders, the Court can hold prosecutors personally responsible for failures to disclose information.

Second, when prosecutors hide Brady and Giglio material, courts can name the offending prosecutors in their judicial opinions.  One author terms this technique "public shaming."  Adam M. Gershowitz, Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct, 42 U.C. Davis L. Rev. 1059 (2009).  Naming prosecutors' names can serve as a unique tool to encourage compliance with a prosecutor's disclosure obligations.  Prosecutors will know that non-compliance can expose them to embarrassment in front of their friends and colleagues.  See Jenia Iontcheva Turner, Policing International Prosecutors, 45 N.Y.U. J. Int'l L. & Pol. 175, 229 (2012)("The court's judgment condemning particular actions of prosecutors as unlawful can serve as a potent deterrent for most prosecutors, who would not like to be called out publicly by a court for failing in their obligation.").  While the Court is usually reluctant, in both civil and criminal cases, to name the attorneys it sanctions, prosecutors run the risk that the Court may, depending on the egregiousness of a violation, believe that more than a sanction is necessary.

Finally, several scholars have endorsed Professor Jason Kreag's proposal that judges engage in a formal colloquy with the prosecutor on the record during pretrial hearings.  See Jason Kreag, The Brady Colloquy, 67 Stan. L. Rev. Online 47 (2014); Kozinski, supra, at xxxiv (endorsing Kreag's colloquy); Adam M. Samaha & Lior Jacob Strahilevitz, Don't Ask, Must

Tell -- And Other Combinations, 103 Cal. L. Rev. 919, 984 n.296 (2015).  Kreag suggests that

trial judges routinely ask a series of questions such as:

1. Have you reviewed your file, and the notes and file of any prosecutors who handled this case before you, to determine if these materials include information that is favorable to the defense?

2. Have you requested and reviewed the information law enforcement possesses, including information that may not have been reduced to a formal written report, to determine if it contains information that is favorable to the defense?

3. Have you identified information that is favorable to the defense, but nonetheless elected not to disclose this information because you believe that the defense is already aware of the information or the information is not material?

4. Are you aware that this state's rules of professional conduct require you to disclose all information known to the prosecutor that tends to be favorable to the defense regardless of whether the material meets the *Brady* materiality standard?

5. Now that you have heard the lines of cross-examination used by the defense and have a more complete understanding of the theory of defense, have you reviewed your file to determine if any additional information must be disclosed?

Kreag, supra, at 50-51 (internal footnotes omitted).  Kreag contends that the formality of facing a

judge on the record impresses upon prosecutors the need to scrupulously comply with their

disclosure obligations.  See Kreag, supra, at 49.  He further argues that the colloquy will require

prosecutors to explain why they are not disclosing certain information at the time they decide not

to disclose that information, instead of asking for an explanation years later when the non-

disclosure comes to light.  See Kreag, supra, at 53-54.

    The Court agrees that some form of pretrial questioning will increase compliance with

Brady and Giglio.  Despite this agreement, the Court believes that the formal colloquy that Kreag

proposes is not only unnecessary, but also somewhat impractical for district judges that see

hundreds of criminal cases a year.  Because the District of New Mexico sees more felony cases

than any other federal district in the country,[8] and more criminal cases than most courts in the

country, the Court has developed professional relationships with the Assistant United States

Attorneys who appear before it on a regular basis.  See Criminal Cases Commenced, by Number

of Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2015,

JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-

caseload-tables (listing New Mexico as having the highest number of criminal cases involving

felony defendants in the nation).  Asking Assistant United States Attorneys whether they

intentionally refused to disclose exculpatory information can appear derogatory and insulting to

attorneys who frequently appear before the Court.  See Radley Balko, Judge Says Prosecutors

Should Follow Law.   Prosecutors Revolt., Wash. Post. (March 7, 2014), http://

www.washingtonpost.com/news/the-watch/wp/2014/03/07/judge-says-prosecutors-should-

follow-the-law-prosecutors-revolt (describing how a prosecutor opposed the Arizona Supreme

Court's recommendation that Arizona adopt an ethical rule to ensure that prosecutors disclose

new evidence of a potential wrongful conviction, in part because he was insulted by the

suggestion that an ethical guideline was needed to encourage him to do what he said he would do

as a matter of course).  Kreag concedes that "some prosecutors might be insulted by having to

answer these or similar questions from the court, believing that the questions themselves amount

---

[8]In addition to seeing more felony cases than other courts, the District of New Mexico
consistently sees more criminal cases than most other courts in the country.  See Criminal Cases
Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods
Ending March 31, 2015 and 2016, JNET, Criminal Caseload Tables,
http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables ("Criminal
Filings").  In the 12-Month Period ending March 21, 2016, alone, 4,641 criminal cases were filed
in the District of New Mexico.  See Criminal Filings at 1.  Only Arizona, with 5,349, and Texas'
Southern and Western Districts, with 6,128 and 5,899, respectively, saw more criminal filings.
See Criminal Filings at 1.  In comparison, 115 criminal cases were filed in the District of Rhode
Island, 170 were filed in Vermont, 135 were filed in the Northern District of Mississippi, 141
were filed in the Western District of Wisconsin, and 89 were filed in the Eastern District of
Oklahoma.  See Criminal Filings at 1.

- 77 -

to an accusation."  Kreag, supra, at 56.  The Court agrees with this assessment.  The Court has known many of these lawyers for years; there is no need to insult them with questions about whether they have complied with their ethical duties that it does not ask of defense lawyers or civil lawyers.

Moreover, the Court can accomplish the same goals that the colloquy seeks to accomplish by getting assurances at a pretrial hearing that the United States has complied with its duty. Merely holding a hearing or a pretrial conference where the United States Attorney knows that he or she must answer to the Court about discovery issues, and what has been produced, heightens the importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the seriousness of their representations to the Court.[9]  The Court can therefore "signal to young prosecutors [] the importance the judge places on enforcing a prosecutor's ethical and Brady obligations" by holding a hearing or pretrial conference, and asking about discovery issues, without running through a standardized and potentially insulting checklist.  Kreag, supra, at 54.  Second, a hearing or pretrial conference does more than demonstrate the seriousness of the situation.  Like the colloquy, it also personalizes the prosecutor's decision not to disclose.  A hearing or pretrial conference requires prosecutors to acknowledge that they made the non-disclosure decision, and that they are responsible for providing an explanation for that non-disclosure.  Furthermore, the hearing emphasizes -- without having to say it -- that they may be sanctioned for any misrepresentations they make about Brady and Giglio material.  This

---

[9]Those professors and judges who have endorsed the formal colloquy do not hear criminal cases at the district court level, especially with the frequency that the Court does.  See Kozinski, supra; Kreag, supra.  The District of New Mexico sentences hundreds more criminal defendants than judges in most other districts.  A formal colloquy is not always practical in this context.

accountability -- and threat of sanctions for making misrepresentations to the Court -- increases disclosure on the front-end without the need for "public shaming" on the back end if the Court later discovers a Brady or Giglio violation.  The Court agrees that some of Kreag's suggested questions may be useful in some hearings or pretrial conferences.  Other situations, however, call for more pointed and probing questions.  Moving away from a checklist of questions gives judges the flexibility to get to the point more quickly and easily, to ask specific questions rather than general ones, and to avoid impairing its working relationship with United States Attorneys and the assistants in the meantime.  Finally, holding a hearing or pretrial conference encourages prosecutors to review their notes and to effectively prepare a reason for non-disclosure early in the proceedings.  Accordingly, while asking some of Kreag's questions may be helpful, the Court can more practically curb Brady and Giglio violations by asking questions tailored to the circumstance rather than going through a standardized formal checklist.

In sum, the Court is not comfortable with engaging in a colloquy with an Assistant United States Attorney like he or she is a defendant.  While no one wants to admit this fact, the truth is that, if the DOJ prosecutors do not do their duties under Brady and Giglio, the system is in trouble.  The Court, the defense bar, and the nation, to a great extent, trust them.  They are, therefore, entitled to respect, not suspicion, mistrust, or hostility, until they conduct themselves in a manner that is unprofessional.  Sometimes more vigilance is achieved in a respectful environment than one where the Court asks the lawyer: "Have you been ethical today?"

One additional check that the Court requires of prosecutors is to disclose officers' and investigators' notes as "statement[s]" within the meaning of the Jencks Act.  United States v. Harry, 2013 WL 684671, at *1 (D.N.M. 2013)(Browning, J.).  As explained above, some courts -- including the Court -- have concluded that an officer's interview notes are "statement[s]" that

the Jencks Act requires the United States to disclose.  18 U.S.C. § 3500.  See United States v. Harry, 2013 WL 684671, at *11-12 ("The United States must turn over to Harry, after the witness testifies at trial, any investigative notes containing statement from those witnesses . . . ."); United States v. Tarango, 760 F. Supp. 2d at 1164, 1167 (requiring the United States to produce FBI reports, which contain statements from prosecution witnesses after those witnesses testify at trial); United States v. Cooper, 283 F. Supp. 2d at 1238 (noting that rough interview notes may be discoverable under the Jencks Act); United States v. Smith, 984 F.2d at 1086 ("Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).  Officers then maintain these notes pursuant to various standards and protocols.  See United States v. Harrison, 524 F.2d 421, 424 n.2 (D.C. Cir. 1975); United States v. Lujan, 530 F. Supp. 2d at 1267 (stating that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500).  Officers then use their notes as the basis for their reports.  When officers write their reports, however, they may exclude certain information that does not help the prosecution.  These reports are then placed in a prosecutor's file, but the notes are not.  To ensure that any impeachment information is disclosed, the Court requires prosecutors to disclose the investigating officer's notes as Jencks material after the United States' witness testifies at trial.  This disclosure could reveal information that conflicts with the officer's report, serving as valuable impeachment evidence.  The more often that district judges require prosecutors to disclose a testifying officer's notes, the more care officers will take to ensure that

their reports reflect their notes and accurately summarize the events leading to an arrest.  Even if

some courts resist requiring such disclosure, see United States v. Lujan, 530 F. Supp. 2d at 1266,

cases are randomly assigned to different judges.  The threat of being assigned to a judge who

requires disclosure may incentivize officers to include all exculpatory and impeachment

evidence in their formal report.  Additionally, even if a prosecutor's file omits the officer's notes,

courts must require prosecutors to disclose exculpatory information in officers' notes under

Brady.  See Kyles v. Whitley, 514 U.S. at 437 (placing an affirmative obligation on prosecutors

to learn of exculpatory evidence in others' possession); United States v. Padilla, 2011 WL

1103876, at *5 (D.N.M. 2011)(Browning, J.)("The Due Process Clause of the Constitution

requires the United States to disclose information favorable to the accused that is material to

either guilt or to punishment."); United States v. Burke, 571 F.3d at 1054 (holding that the

"belated disclosure of impeachment or exculpatory information favorable to the accused violates

due process when an earlier disclosure would have created a reasonable doubt of guilt").

The Court recently reiterated its approach to criminal discovery in United States v.

Hykes, which concerned a defendant's motion filed pursuant to Giglio, requesting that the

United States "disclose certain pertinent information pertaining to [police officers testifying at

his suppression hearing] as the information is relevant to impeachment."  United States v. Hykes,

2016 WL 1730125, at *2 (D.N.M. 2016)(Browning, J.)(internal quotation marks and citations

omitted).  See United States v. DeLeon, Sealed Memorandum Opinion and Order at 97-111, filed

January 3, 2017 (Doc. 809).  The Defendant in United States v. Hykes argued that

> the Supreme Court's Giglio decision requires the government to disclose evidence
> affecting a government witness' credibility.  [Hykes] states that he "has a good
> faith basis to believe that the internal personnel files of some o[r] all of these
> officers contain information that may potentially be properly used for
> impeachment."  Hykes asserts that "witnesses have revealed that the information
> relied upon by officers to arrest Mr. Hykes was false.  [Hykes] contends that this

false information led the arresting officers to arrest him, beat him, and search him without warrants.  [Hykes] states that, because the Court will determine whether Hykes' Motion to Suppress is well-founded, the officers' credibility is "of critical import for this Court's ultimate decision Hykes reasons that the officers' personnel files will reveal whether the officers are trustworthy.  Hykes argues that credibility information is especially relevant in this case, where the only witnesses against him are police officers, so "anything that goes to their credibility is exculpatory and admissible."

2016 WL 1730125, at **2-3 (citations omitted).   The United States contested the discovery

request for the officers' personnel files in United States v. Hykes, because

the government's review and determination is controlling unless the defense provides grounds to believe there is impeachment information in the items to which the defense seeks access. . . .  Hykes must "make a particularized showing of what information he was seeking or how it would be material" rather than making broad discovery demands.

2016 WL 1730125, at *4 (citations omitted).

Accordingly, the Court held in United States v. Hykes that

Hykes is not sending the United States on a fishing expedition.   Hykes demonstrates that the officers' personnel files may contain impeachment evidence.   As support, Hykes points to the officers' involvement in several excessive-force lawsuits, discrepancies between the officers' story and eyewitnesses' stories, and evidence that the officers had a personal feud with Hykes.

2016 WL 1730125, at *20.   Cf. United States v. Lafayette, 983 F.2d 1102 (D.C. Cir.

1993)(affirming the denial of the appellants' request for an officer's personnel file, because

"nothing in appellants' brief informs us why they have any reason to believe that the personnel

files would provide any useful evidence whatsoever"); United States v. Andrus, 775 F.2d 825,

843 (7th Cir. 1985)(noting that the defendant was "not entitled to the personnel files of the law

enforcement witnesses without even a hint that impeaching material was contained therein").

The Court then reiterated that Hykes had requested specific information contained within the

personnel files and that thus "the United States must search the personnel files of the testifying

officers pursuant to the Court's order at the hearing, examining the list of documents that Hykes

specifically requests in his Giglio Motion."  2016 WL 1730125, at *20.

United States v. Hykes did not deviate from the Court's general philosophy regarding the

administration of discovery under Giglio, Brady, the Jencks Act, and rule 16.  Instead, the Court

in United States v. Hykes merely maintained that

> if the United States uncovers any such exculpatory material, it must produce any
> material evidence in time for its effective use at trial.  See United States v. Coppa,
> 267 F.3d 132, 144 (2d Cir. 2001)("[W]e reiterate the longstanding constitutional
> principle that as long as a defendant possesses *Brady* evidence in time for its
> effective use, the government has not deprived the defendant of due process of
> law.").

United States v. Hykes, 2016 WL 1730125, at **19-20.  Where the Defendant demonstrated that

there was particular impeachment material in the officers' personnel files, the Court ordered the

United States to review the files for the requested information in accordance with its continuing

discovery and disclosure obligations.  United States v. Hykes, 2016 WL 1730125, at **20-21. ).

See United States v. DeLeon, Sealed Memorandum Opinion and Order at 97-111, filed January

3, 2017 (Doc. 809).

## LAW REGARDING THE DISCLOSURE OF AN INFORMANT'S IDENTITY

The Supreme Court, in 1957, held that the government has a privilege "to withhold from

disclosure the identity of persons who furnish information of violations of law to officers

charged with enforcement of that law."  Roviaro v. United States, 353 U.S. at 59.  In that case,

the Supreme Court considered whether the district court

> committed reversible error when it allowed the Government to refuse to disclose
> the identity of an undercover employee who had taken a material part in bringing
> about the possession of certain drugs by the accused, had been present with the
> accused at the occurrence of the alleged crime, and might be a material witness as
> to whether the accused knowingly transported the drugs as charged.

Roviaro v. United States, 353 U.S. at 55.  The defendant in Roviaro v. United States was charged with selling "heroin to one 'John Doe'" and "on the same date and in the same city he 'did then and there fraudulently and knowingly receive, conceal, buy and facilitate the transportation and concealment after importation of . . . heroin, knowing the same to be imported into the United States contrary to law . . . .'"  353 U.S. at 55.

At trial, "the Government relied on the testimony of two federal narcotics agents, Durham and Fields, and two Chicago police officers, Bryson and Sims, each of whom knew" the defendant, and who had "met at 75th Street and Prairie Avenue in Chicago with an informer described only as John Doe."  Roviaro v. United States, 353 U.S. at 56.  At this point, one of the officers -- Bryson -- hid in John Doe's vehicle's trunk as John Doe drove away, and, thereafter, overheard a conversation between the defendant and John Doe after John Doe stopped the vehicle and allowed the defendant to enter.

> He heard [the defendant] greet John Doe and direct him where to drive.  At one point, [the defendant] admonished him to pull over to the curb, cut the motor, and turn out the lights so as to lose a "tail.  "He then told him to continue "further down."  [The defendant] asked about money Doe owed him.  He advised Doe that he had brought him "three pieces this time."  When Bryson heard Doe being ordered to stop the car, he raised the lid of the trunk slightly.  After the car stopped, he saw [the defendant] walk to a tree, pick up a package, and return toward the car.  He heard [the defendant] say, "Here it is," and "I'll call you in a couple of days."

353 U.S. at 57.  Upon investigation, the officers discovered that the package the defendant left under the tree was heroin, and they then arrested the defendant at his home.  See 353 U.S. at 57. The district court's decision that the Supreme Court reviewed progressed as follows: "Before trial, petitioner moved for a bill of particulars requesting, among other things, the name, address and occupation of 'John Doe.'  The Government objected on the ground that John Doe was an informer and that his identity was privileged.  The motion was denied."  353 U.S. at 55.  Further,

"[d]uring the trial John Doe's part in the charged transaction was described by government witnesses, and counsel for petitioner, in cross-examining them, sought repeatedly to learn John Doe's identity.  The court declined to permit this cross-examination and John Doe was not produced, identified, or otherwise made available."  353 U.S. at 55.  The testifying witnesses explained that John Doe was an informant and special employee.  See 353 U.S. at 55, 56 n.3.

The Supreme Court thus took up the issue -- "the propriety of the nondisclosure of the informer's identity," because, obviously, John Doe's identity went undisclosed -- and explained that "the purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.  The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation."  353 U.S. at 59.  Yet, the Supreme Court explained, the privilege is not absolute, and, where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."  353 U.S. at 60-61.  Indeed, the Supreme Court also held:

> The scope of the privilege is limited by its underlying purpose.  Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged.  Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

Roviaro v. United States, 353 U.S. at 60-61.  The Supreme Court then further indicated that the desirability of calling the informant as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide.  See 353 U.S. at 64.  Accordingly, when an informant is a "participant in and a material witness to" the alleged criminal transaction, the disclosure of his or her identity is sometimes required.  353 U.S. at 65.

- 85 -

The standard the Supreme Court thus announced for disclosure of CIs who play an active, as opposed to a passive, role in the investigation is "not fixed"; rather, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors." 353 U.S. at 62.  In the specific context of Roviaro v. United States, the Supreme Court was concerned with the scenario where the informant "helped to set up the criminal occurrence and had played a prominent part in it.  [And h]is testimony might have disclosed an entrapment." 353 U.S. at 64.  The Supreme Court thus concluded that the district court's failure to order disclosure of the informant's identity, who did not testify at trial, "in the face of repeated demands by the accused for his disclosure," was prejudicial error. 353 U.S. at 64-65.

The Supreme Court has, recently, added a gloss to its holding in Roviaro v. United States by distinguishing Roviaro v. United States in a case where the state did not disclose the status of a testifying witness as a CI to the defendant before trial, because, the State argued, "disclosure [of an informant's identity] is not automatic," and, "[c]onsequently, it was [defendant's] duty to move for disclosure of otherwise privileged material," pursuant to the standard in Roviaro v. United States.  Banks v. Dretke, 540 U.S. 668, 697-98 (2004).  In Banks v. Dretke, a postconviction proceeding, the Supreme Court was considering a murder where "Bowie County Deputy Sheriff Willie Huff, lead investigator of the death, learned from two witnesses that [the victim] had been in the company of petitioner, 21-year-old Delma Banks, Jr." 540 U.S. at 676. Apparently, "Huff received a call from a confidential informant reporting that 'Banks was coming to Dallas to meet an individual and get a weapon.'" 540 U.S. at 676.  Banks was then apprehended, interrogated, and charged with the murder.  See 540 U.S. at 676.  Banks, at a pretrial hearing, thus sought information concerning that "confidential informant" who had

- 86 -

DNM 1050

tipped Huff about Banks' trip to Dallas, to which the State explained it "will, without necessity

of motions provide you with all discovery to which you are entitled." 540 U.S. at 676. At trial, a

man named "Robert Farr was a key witness for the prosecution," the paid informant who tipped

Huff about Banks' movements, and accompanied Banks to Dallas. 540 U.S. at 678. Farr

testified, however, that he had not served as a paid confidential informant. See 540 U.S. at 678.

In sum, Banks was convicted, and over the course of his postconviction appeals, maintained that

Farr's status as a confidential informant was material pursuant to Brady. The Supreme Court, in

dicta after already having overturned the conviction, held:

> We need not linger over this argument. The issue of evidentiary law in *Roviaro*
> was whether (or when) the Government is obliged to reveal the identity of an
> undercover informer the Government does not call as a trial witness. . . . The
> Court there stated that no privilege obtains "[w]here the disclosure of an
> informer's identity, or of the contents of his communication, is relevant and
> helpful to the defense of an accused." . . . . Accordingly, even though the
> informer in *Roviaro* did not testify, we held that disclosure of his identity was
> necessary because he could have "amplif[ied] or contradict[ed] the testimony of
> government witnesses.

Banks v. Dretke, 540 U.S. at 697-98. Thus, according to the Supreme Court:

> Here, the State elected to call Farr as a witness. Indeed, he was a key witness at
> both guilt and punishment phases of Banks's capital trial. Farr's status as a paid
> informant was unquestionably "relevant"; similarly beyond doubt, disclosure of
> Farr's status would have been "helpful to [Banks's] defense." . . . Nothing in
> *Roviaro*, or any other decision of this Court, suggests that the State can examine
> an informant at trial, withholding acknowledgment of his informant status in the
> hope that defendant will not catch on, so will make no disclosure motion.

Banks v. Dretke, 540 U.S. at 698. The Supreme Court continued:

> In summary, Banks's prosecutors represented at trial and in state postconviction
> proceedings that the State had held nothing back. Moreover, in state
> postconviction court, the State's pleading denied that Farr was an informant. . . .
> It was not incumbent on Banks to prove these representations false; rather, Banks
> was entitled to treat the prosecutor's submissions as truthful. Accordingly, Banks
> has shown cause for failing to present evidence in state court capable of
> substantiating his Farr *Brady* claim.

DNM 1051

Banks v. Dretke, 540 U.S. at 698.  In light of Banks v. Dretke, then, courts are left to wonder

whether, if at all, Roviaro v. United States applies in the case of disclosure of testifying

witnesses.  See Banks v. Dretke, 540 U.S. at 697-98 ("The issue of evidentiary law in *Roviaro*

was whether (or when) the Government is obliged to reveal the identity of an undercover

informer the Government does not call as a trial witness.").

    As for an answer to that specific question of timing, the Court first looks to the specific

principles originally articulated by the Supreme Court in Roviaro v. United States.  In that

regard, at least as to non-testifying witnesses, "[t]he Tenth Circuit's take on this analysis is well-

known."  United States v. Padilla, 2010 WL 4337819, at *7 (D.N.M. 2010)(Browning, J.).

"Anonymity of informants encourages communications to law enforcement officers."  Usery v.

Local Union 720, Laborers' Int'l Union of N. Am., AFL-CIO, 547 F.2d 525, 527 (10th Cir.

1977).  Cf. United States v. Brantley, 986 F.2d 379, 383 (10th Cir. 1993)("Nor must the

government supply the defendant with information about an informer when the individual

introduces suspected traffickers to narcotics agents."); United States v. Ortiz, 804 F.2d 1161,

1166 (10th Cir. 1986)("We have ruled previously that the government is not required to supply

information about an informer to a defendant when the informer merely provides the initial

introduction.").  The Tenth Circuit's take on the analysis thus places the burden on the defendant

to show that the informant's possible aid to the defendant outweighs the public's interest in

protecting the flow of information, which the confidentiality of the informant's identity

facilitates:

> The disclosure of a confidential informant's identity involves balancing the public
> interest in protecting the flow of information in a manner necessary for effective
> law enforcement against an individual's right to prepare his defense.  In making
> the determination as to whether disclosure is necessary, the court must consider
> the particular circumstances of the case, including the crime charged, the possible
> defenses, and the significance of the informer's testimony.  Where it is clear that

the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure.  A defendant seeking disclosure has the burden of proof, and we review the district court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted).  See

United States v. McKenzie, 2010 WL 597971, at **3-4 (D.N.M. 2010)(Browning, J.)(citing

United States v. Sinclair, 109 F.3d at 1538).  "[T]he defendant must present more than mere

speculation about the possible usefulness of an informant's testimony."   United States v.

Moralez, 908 F.2d at 567.  In sum,

> [a] defendant may obtain the identity and whereabouts of an informer if his testimony might be relevant to the defendant's case and justice would be best served by disclosure[, but d]isclosure of an informant is not required . . . where the information sought from the informer would be merely cumulative, or where the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d 512, 517 (10th Cir. 1986)(internal citations omitted).  See

United States v. Moralez, 908 F.2d at 567.  Disclosure of a CI, therefore, involves a balancing

act of many competing interests.

The Court has required the United States to disclose a CI's identity where the CI "was

integrally involved in the criminal transaction[,] . . . observed the criminal transaction[,] and was

not a mere bystander."   United States v. Aguilar, 2010 WL 2977708, at *5 (D.N.M.

2010)(Browning, J.).  In United States v. Aguilar, the defendant, Aguilar, was one of three

defendants charged with a conspiracy to traffic in cocaine, stemming from a transaction between

his two co-defendants and a government CI.  See 2010 WL 2977708, at *1.  In relation to the

first factor that the Supreme Court identified in Roviaro v. United States -- the crime charged --

the Court noted that "the crimes charged in this case are relatively egregious -- conspiracy,

possession with intent to distribute cocaine, and possessing a gun while committing the other

crimes."  2010 WL 2977708, at *6.  As to the second and third Roviaro v. United States factors -

- 89 -

- the possible defenses and the possible significance of the informer's testimony -- it appeared that the defendant intended to argue that he did not know his alleged co-conspirator possessed cocaine or that the drug transaction was going to occur, and the Court found that, given the CI was present during the crime, the CI's testimony "could be highly significant" to the defenses:

> The [CI] was present in the car with Mirabal, Aguilar, and Garner, and would be in a unique position to testify to what conversations, if any, occurred in the car and whether Aguilar took part in them.  After the four individuals arrived at the [CI]'s residence, again, the [CI] would be in a unique position to testify whether it appeared that Aguilar had any idea that the bag Mirabal retrieved from the car contained cocaine.  Once the three Defendants and the [CI] were inside the [CI]'s residence, the [CI] was able to observe Aguilar's demeanor and whether he actively participated in the drug transaction.  The [CI] could testify as to where Aguilar was and what he did while the [CI] made the alleged drug transaction with Mirabal.

2010 WL 2977708, at *6.  Additionally, the Court noted that the CI might provide relevant information which no other witness could, because Aguilar's "alleged co-conspirators might try to push blame away from themselves and on to Aguilar, and Villegas, a law-enforcement officer, might tend to be biased toward the United States."  2010 WL 2977708, at *6.  The Court thus granted Aguilar's motion and ordered the United States to disclose the CI's identity.  See 2010 WL 2977708, at *6.  The Court also incorporated the following protective order in its decision:

> Ms. Johnson[, Aguilar's attorney,] is ordered that she will not disclose the identity of the CI to anyone -- except the defense investigator she retains in this case -- unless and until she seeks further leave of the Court.  Any information that the United States provides to Ms. Johnson regarding the CI may be discussed only with the investigator and the Assistant United States Attorneys who disclosed it.  Finally, any information the United States provides must be returned once this case is closed.  These requirements should minimize the danger, if any, to the CI and perhaps permit law-enforcement to use him in a covert capacity again in the future, if they so desire.

2010 WL 2977708, at *6.  See also United States v. Rivas, 26 F. Supp. 3d 1082 (D.N.M. 2014)(Browning, J.).

As to the issue of timing for the disclosure of the identity of CIs who plan to testify at

- 90 -

trial, one district court has explained:

> With respect to [testifying] informants, several circuits have adopted the rule that pretrial disclosure of informants' identities is not necessary where they will testify at trial.  *E.g., United States v. Perkins,* 994 F.2d 1184, 1190 (6th Cir. 1993).  That rule is gaining ground in this circuit.  *See DiBlasio v. Keane,* 932 F.2d 1038, 1043 (2d Cir. 1991); *United States v. Leonard,* 817 F. Supp. 286, 302 (E.D.N.Y. 1992).  <u>This court agrees with these authorities, that when no more particularized need for disclosure is averred by defendants, the testimony of a confidential informant at trial obviates the need for pretrial disclosure.</u>  The Jencks Act, 18 U.S.C. § 3500, prescribes the time the government must provide relevant information about testifying witnesses. *See United States v. Valerio*, 737 F. Supp. 844, 846 (S.D.N.Y. 1990).

<u>United States v. Murgas</u>, 967 F. Supp. 695, 712 (N.D.N.Y. 1997)(Munson, S.J.)(emphasis added)(discussing informant who did not testify, but whose identity was not disclosed and was relevant to the defendant's entrapment defense).  See, e.g., <u>United States v. Ford</u>, 2016 WL 483871, at *4-5 (D.D.C. 2016)(Friedman, J.)(discussing different standards for non-testifying witnesses -- where <u>Roviaro v. United States</u> governs -- and testifying witnesses -- where the district court, without expressly disavowing the potential import of <u>Roviaro v. United States</u>, explained are generally governed by <u>Brady</u>, <u>Giglio</u>, rule 16, and the Jencks Act).  The Court agrees that there is a difference between testifying CIs and non-testifying CIs.  It is clear that the <u>Roviaro v. United States</u> analysis applies to non-testifying CIs.  The issues are whether <u>Roviaro v. United States</u> also applies to testifying CIs, whether the United States has an absolute right not to disclose a CI's identity when they testify at trial, or whether some combination of <u>Brady</u>, <u>Giglio</u>, and rule 16 covers testifying CIs.

The law regarding the application of <u>Roviaro v. United States</u> in the Tenth Circuit, specifically regarding the timing of the disclosure of a testifying CI, is unsettled.  In <u>United States v. Pennick</u>, the issue was broader, however, than the disclosure of CIs; instead, the issue involved the trial court's denial of a request "[p]rior to trial . . . to compel the Government to

identify the persons it intended to call as witnesses.  In this regard Pennick's counsel particularly

requested that the Government identify and [sic] informer who was to be called as a Government

witness."   United States v. Pennick, 500 F.2d at 185.   Pennick was convicted and appealed,

explaining:

> The Government's evidence showed that a Government drug agent, and his
> informer, went to Pennick's home in Junction City, Kansas, on two
> separate occasions in September 1972.  On each occasion the informer was searched and,
> after being given money by the agent, the informer proceeded to gain admission
> to Pennick's house, the informer and Pennick being friends.   The informer was
> called as a Government witness and his testimony was that on each occasion he
> bought heroin from Pennick which he later turned over to the Government agent.

500 F.2d at 186.   Pennick, accordingly, argued that "the judgment should be reversed because of

the refusal of the trial court to compel the Government to identify its witnesses by way of pre-

trial discovery, particularly as concerns any witness who was also an informer."   United States v.

Pennick, 500 F.2d at 186.   Further, Pennick argued that, "while Pennick may have no right to

such disclosure prior to trial, the trial court in the exercise of its discretion could nonetheless

order, and under the circumstances should have ordered, such disclosure, particularly when we

are dealing with an informant."   500 F.2d at 186.   The Tenth Circuit, first, indicated that

> Section 3432, 18 U.S.C., provides that a person charged with treason or other
> capital offense shall be furnished at least three days prior to trial with a list of the
> witnesses to be produced at the trial for proving the indictment.   The statute has
> been construed as meaning that in a noncapital case a defendant is not entitled as
> a matter of right to a list of the Government's witnesses in advance of trial. . . .   In
> the instant case the informer was a Government witness and did appear and testify
> upon trial, submitting himself to examination and cross-examination, a fact which
> we deem to be significant.   In other words, we are not here concerned with an
> informer who does not appear on trial as a Government witness, and who
> conceivably could be helpful to the defendant in his defense.   So, the informer in
> the instant case being himself a Government witness, under the general rule cited
> above Pennick was not entitled to learn the identity of the informer, or any other
> Government witness, prior to trial.

United States v. Pennick, 500 F.2d at 186.   The Tenth Circuit ultimately, then, disagreed with

DNM 1056

Pennick that he was entitled to the informant's identity, stating:

> We do not agree with such reasoning and in our view the fact that one of the
> Government's witnesses was an informer weakens, rather than strengthens,
> Pennick's argument that he was entitled in advance of trial to a list of the
> Government's witnesses.  As the trial court noted, informers whose identity is
> revealed prior to trial are often among the missing when the trial date rolls
> around.

500 F.2d at 186.  The Tenth Circuit then explained, however:

> In the instant case the trial court applied the "balancing test" referred to in
> *Roviaro* and took into consideration the various factors mentioned in that case,
> and then in the exercise of its discretion refused to require the Government to
> reveal the identity of its informer who all knew was to testify upon trial.  In so
> doing the trial court did not err.

500 F.2d at 187.  Accordingly, the Tenth Circuit concluded that "[t]he significant difference

between *Roviaro* and the instant case is that in the former the informer did not testify at trial, and

in our case he did.  Such ruled out a possibility that the informer's testimony could somehow be

helpful to Pennick."  500 F.2d at 187.

     Thus, despite silence with respect to the timing of the disclosure of a testifying CI, in

United States v. Pennick, the Tenth Circuit -- at the least -- gave district courts guidance that they

may be able to apply Roviaro v. United States in the case of a testifying CI.  See United States v.

Pennick, 500 F.2d at 187.   Given this discussion of the application of the Roviaro v. United

States analysis to a testifying CI, and the conclusion that it was not in error, district courts are left

to conclude that, at the least, Roviaro v. United States does not preclude a district court from

ordering disclosure of a testifying CI, upon a satisfactory showing by a defendant under Roviaro

v. United States before the time that the United States is generally required to disclose the

identity of its witness list.  See United States v. Pennick, 500 F.2d at 187 ("In the instant case the

trial court applied the 'balancing test' referred to in *Roviaro* and took into consideration the

various factors mentioned in that case, and then in the exercise of its discretion refused to require

the Government to reveal the identity of its informer who all knew was to testify upon trial.  In so doing the trial court did not err.").

In the same year, but a couple of months before United States v. Pennick, the Tenth Circuit decided United States v. Baca, 494 F.2d 424 (10th Cir. 1974).  The Tenth Circuit there considered a trial court's denial of a defendant's motion to disclose the identity of a CI to "permit him to prepare adequately for trial."  494 F.2d at 427.  The trial court denied the motion upon the United States' argument that "in view of the fact that no search warrants were involved and no arrests were effected prior to indictment, that the United States was not obligated to reveal its 'witnesses' at that time."  494 F.2d at 427.  The Tenth Circuit found no error in the trial court's decision, where the CI had testified as to her involvement in controlled narcotic buys, summarily explaining that "[i]t is settled law in this circuit that, in the absence of a statutory or constitutional requirement, the government is not required to endorse the names of its witnesses on the information or indictment, nor is there a requirement that the government disclose its witnesses in any manner, except in a case where trial is for treason or other capital offense." United States v. Baca, 494 F.2d at 427 (emphasis added).

More recently, the Tenth Circuit considered the pretrial disclosure of a witness' identity in United States v. Nevels, 490 F.3d 800, 803 (10th Cir. 2007), where it stated: "We review the admission of testimony from an unlisted government witness for abuse of discretion."  490 F.3d at 803.  In that case, the United States had learned of the existence of an undisclosed witness three days before trial, notified the defendant about the witness three days before trial, and filed a formal notice with the court on the eve of trial as to the witness' likelihood to testify.  See 490 F.3d at 803.  The defendant objected to the witness' testimony at trial, but the district court ordered that the United States needed to make the witness available to the defendant on that first

day of trial and ultimately allowed her testimony two days later.  See 490 F.3d at 803.   In

considering this issue, then, the Tenth Circuit concluded there was no error by the trial court in

allowing this surprise-witness, because, as was the case in United States v. Baca, "in the absence

of a statutory or constitutional requirement, . . . there [is no] requirement that the government

disclose its witnesses in any manner, except in a case where trial is for treason or other capital

offense." U.S. v. Nevels, 490 F.3d at 803.

Roviaro v. United States' plain language, however, suggests that the desirability of

calling a CI as a witness, or at least interviewing the informant in advance of trial, is a matter for

the accused, rather than the government, to decide.  See 353 U.S. at 64.  Indeed, in United States

v. Pennick, the Tenth Circuit indicated that the defendant's satisfactory showing in that case,

under Roviaro v. United States, may have entitled the defendant to the CI's  identity, despite the

"general rule . . .  [that a defendant is] not entitled to learn the identity of the informer, or any

other Government witness, prior to trial."  United States v. Pennick, 500 F.2d at 186 ("In the

instant case the trial court applied the 'balancing test' referred to in Roviaro and took into

consideration the various factors mentioned in that case, and then in the exercise of its discretion

refused to require the Government to reveal the identity of its informer who all knew was to

testify upon trial.  In so doing the trial court did not err.").  Although the Supreme Court in

Banks v. Dretke explains that, factually, the CI at issue in Roviaro v. United States was a non-

testifying witness, making that factual scenario distinct from that which was at issue in Banks v.

Dretke, the Supreme Court in Roviaro v. United States did not otherwise restrict its guidance to a

non-testifying witness.  Nor did the Supreme Court in Banks v. Dretke explicitly restrict its

holding to non-testifying witnesses when it summarily dismissed Roviaro v. United States'

import, because Roviaro v. United States had dealt with a non-testifying witness.  See Banks v.

- 95 -

Dretke, 540 U.S. at 697-98.  Roviaro v. United States' plain language does not preclude the

Court from instructing the United States to disclose a CI's identity upon the proper showing,

regardless of future potential for testimony.  See 353 U.S. at 60-61 (holding that the privilege to

withhold a CI's identity is not absolute, and, where "the disclosure of an informer's identity . . .

is relevant and helpful to the defense of an accused, or is essential to a fair determination of a

cause, the privilege must give way").

        Other courts, in addition to the Tenth Circuit in United States v. Pennick, have indicated

that there might be a significant difference between testifying and non-testifying CIs.  Indeed, the

Courts of Appeals, which are generally in the position of reviewing a CI's untimely disclosure or

nondisclosure, tend to rely on that dichotomy in reaching a conclusion that the trial court below

did not error.  See United States v. Casseus, 282 F.3d 253, 257 (3d Cir. 2002); United States v.

Tejada, 974 F.2d 210, 217 (1st Cir. 1992); United States v. Norton, 504 F.2d at 343 n.1.  For the

most part, those Courts of Appeals have concluded that, where a CI ultimately testifies, a district

court's failure to order early disclosure of the CI's identity does not constitute error.  See United

States v. Casseus, 282 F.3d 253, 257 (3d Cir. 2002); United States v. Tejada, 974 F.2d 210, 217

(1st Cir. 1992); United States v. Norton, 504 F.2d at 343 n.1.

        The United States Court of Appeals for the Third Circuit, in United States v. Casseus,

although not specifically dealing with CIs, dealt with joint defendants who, on appeal, argued

that "the District Court erred by refusing to order the prosecution, within a reasonable time

before trial, to disclose and allow the defense to interview the only available eyewitnesses, who

were in the prosecution's custody."  282 F.3d at 257.  Dispelling the appellants' arguments, the

Third Circuit explained that "a criminal defendant does not have the right to full discovery of the

government's case," and that here the witnesses the appellants wished to have interviewed did

not have <u>Brady</u> information, as "the record is clear that the witnesses had no exculpatory information to offer."  <u>United States v. Casseus</u>, 282 F.3d at 257.  Further, the Third Circuit summarily rejected the appellants' reliance on <u>Roviaro v. United States</u>, as that case regards "the duty of the prosecution to disclose the identity of confidential informants who will not testify. Here, all witnesses did testify, and appellants were actually allowed to interview these witnesses before trial.  We conclude that the Court did not abuse its discretion by denying discovery." <u>United States v. Casseus</u>, 282 F.3d at 257.

The Sixth Circuit, in <u>United States v. Perkins</u>, 994 F.2d 1184 (6th Cir. 1994), addressed the United States' failure to disclose a testifying confidential informant's identity, where that informant ultimately testified against the defendants' interests, and the defense argued that the "district court erred in denying his motion for a bill of particulars. . . . ask[ing] for particulars of the overt acts of the conspirators, the date and places where they were performed, the names of any unindicted coconspirators, and the names and addresses of any informants."  994 F.2d at 1191.  The Sixth Circuit found "no persuasive reason to depart from the . . . general rule" that the government does not have to disclose its witnesses, because the circumstances involved a testifying informant whom the defendant can cross-examine.  994 F.2d at 1191.  In such cases, the Sixth Circuit concluded that, as government witnesses, CIs' testimony would not be helpful to the defendant.  994 F.2d at 1191.  There was no discussion whether the district court, in making its decision, considered the <u>Roviaro v. United States</u> factors as to the disclosure of testifying CIs.

The Sixth Circuit has also considered the following language in <u>Roviaro v. United States</u>: "[O]nce the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable."  <u>Roviaro v. United States</u>, 353 U.S. at

DNM 1061

60.  In United States v. Sierra-Villegas, the Sixth Circuit stated:

> The dictum in Roviaro that Sierra-Villegas relies on -- "once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable" -- must be understood in light of the purpose of the informant privilege: "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials, and, by preserving their anonymity, encourages them to perform that obligation."  . . . . Disclosure to those who might resent the informant's cooperation with law enforcement eliminates the privilege because such disclosure exposes the informant to potential harm, and the privilege is designed to shield the informant from harm that might arise from his or her cooperation.  But so long as some potential harm from further disclosure or publication remains, the government retains an interest in non-disclosure and the privilege may still apply.

United States v. Sierra-Villegas, 774 F.3d 1093, 1098 (6th Cir. 2014).  Where the Court orders CI disclosures under a protective-disclosure agreement, as the United States has already used here in this cased in its disclosure to an individual Defendant, the Court will follow the Sixth Circuit's directions and guidance regarding this language in Roviaro v. United States, when that case -- or its principles -- are applicable.

The United States Court of Appeals for the Eighth Circuit, to the contrary, in United States v. Norton, explained in a footnote that

> these cases do not stand for the proposition that the government may withhold names of participating informants so long as it intends to call them at trial.  Nor do they stand as an invitation to trial courts to routinely deny defendants access to the names and addresses of informants prior to trial on the theory that the error may be cured by making the informant available at trial.  A finding of no prejudice in a particular case ought never be construed as an invitation to deliberate error in the future.

504 F.2d at 343 n.1.  United States v. Norton did not focus, however, on an argument that the failure to disclose a testifying CI harmed a defendant, but instead focused on an argument that the defendant "was injured by the failure of the government to arrest him promptly, a failure which he claims deprived him of the opportunity to interview the informant, thereby discovering

DNM 1062

and preserving any exculpatory evidence." 504 F.2d at 343. In United States v. Gullickson, 982

F.2d 1231, 1234 (8th Cir. 1993), the Eighth Circuit also provided that "[t]he reasoning [under

Roviaro v. United States] hinges on the fact that the informant was not produced before trial and

did not appear at trial." 982 F.2d at 1234

District courts, nonetheless, take the cases case-by-case, considering that approach to be

the most appropriate analytical approach to adequately balance the differing interests under

Roviaro v. United States, Brady, Giglio, rule 16, and the Jencks Act. Cf. United States v. Nance,

168 F. Supp. 3d 541, 552 (W.D.N.Y. 2016)(Arcara, J.). In United States v. Nance, the trial

court, without discussion of whether a number of requested CIs were going to testify, stated:

> a conclusory statement is inadequate to meet Nance's burden of showing that an
> "informant's testimony is . . . material to the defense." United States v. Saa, 859
> F.2d 1067, 1073 (2d Cir. 1988). Nance must demonstrate that an informant
> would do more than "merely . . . cast doubt on the general credibility of one of the
> Government's witnesses."

United States v. Nance, 168 F. Supp. 3d at 552. This observation accords with the Eighth

Circuit's guidance in United States v. Norton. Indeed, in the Court's review, no court has

suggested that merely because a CI testifies, the failure to disclose that CI's identity to a

requesting defendant, who makes an ample showing under Brady, Giglio, rule 16, and Roviaro v.

United States as to that defendant's entitlement to the CI's identity, is somehow a cure for not

disclosing that CI's identity early enough in the pretrial proceedings for the defendant to

interview that CI. See United States v. Norton, 504 F.2d at 343 n.1.

Again, the issues here are whether Roviaro v. United States applies to testifying CIs,

whether the United States has an absolute right not to disclose a CI's identity when they testify at

trial, or whether some combination of Brady, Giglio, and rule 16 covers testifying CIs. The

Court rejects the second notion that the United States has an absolute right not to disclose

testifying CI's identities.  The general rule is certainly that the United States does not have to disclose witnesses before trial.  The United States cannot, however, refuse to disclose potentially material, exculpatory information.  The United States' witnesses often have nothing helpful to say for a defendant.  Rarely does the United States prepare a witness who is testifying favorably to a defendant.  Some witnesses are just a mixed bag.  The United States cannot keep the defendant from finding out about exculpatory evidence just because the United States intends to call the witness.  The favorable evidence that a United States' testifying witness may have still might constitute Brady, Giglio, and rule 16 information, and the Court will apply those doctrines accordingly.

It is true that the Court, in making this observation and conclusion, cannot undercut the Jencks Act's restrictions, and the general rule that the United States does not have to disclose its witnesses until trial.  The Court thinks its rule is consistent with the Jencks Act and the general non-disclosure rule.  The Jencks Act and the non-disclosure rule remain the rules -- no disclosure until trial, when applicable.  But nothing in the United States Constitution protects the United States.  The Jencks Act and the non-disclosure rule are legislative and judicially created rules; they are not protections like, and certainly do not supersede, the Constitution.  Brady, Giglio, and, to a certain extent, rule 16, are grounded in the Constitution's protections of defendants.  Thus, as with most things in the law, when judge-made and legislative rules conflict with the Constitution, the Constitution trumps.

When Roviaro v. United States uses words indicating that disclosure must be had where: "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, [because] the privilege must give way," 353 U.S. at 60-61, academics and appellate judges may be able to draw distinctions between these

- 100 -

phrases and tests, but on the street-level, district-court level -- like this case -- these finer distinctions may be hard to apply.  In a case like this one, where there may be as many as 350 CIs, the Court has to make quick and decisive rulings regarding the disclosure and necessity of their identities, and, all the while, ensuring CI safety; the Court has to make this case work, and it has to make rulings almost as quickly as evidentiary rulings.  It cannot get bogged down in appellate-level consideration of the fine distinctions underlying various disclosure and discovery obligations in criminal cases; it has to enter orders and make rulings while balancing every interest of the parties in a case.  In the end, too, the Court has to ensure a trial that protects the defendant's constitutional rights.

Thus, the Court concludes that <u>Roviaro v. United States</u> does not apply to testifying witnesses.  It also concludes, however, that the distinction does not really make a difference. The Court concludes that <u>Brady</u>, <u>Giglio</u>, and, to an extent, rule 16, still apply to testifying witnesses and the testimony that they will give, even if the United States will call that witness and, normally, does not have to disclose that witness until trial.  A benefit of this rule is that the Court can be creative and flexible in creating disclosure orders.  It can order disclosure for attorney's eyes only.  It can deny the production to protect the CI.  In other words, rather than a blanket, fixed rule, the Court can fashion a disclosure order that gets the defendant and/or counsel anything they need, and still try to protect the CI's safety as much as possible.

In sum, the Court is not requiring the United States to disclose its trial witnesses, but is ordering the United States to disclose a particular person with knowledge that the defendant has shown that person is likely to have material, exculpatory information under <u>Brady</u>.  The Court cannot soundly conclude that, just because the United States has a person on its witness list, the United States does not need to disclose that person's identity pretrial.  If the witness does not

DNM 1065

have <u>Brady</u> information, then the United States does not have to disclose the witness, even if it intends to call the witness at trial.  The United States can completely protect CIs having nothing favorable to say about the Defendants, but if the CI has exculpatory evidence, it will need to disclose that witness' identity, just like it does all other <u>Brady</u> material.  If the rule were otherwise, the United States could shield a lot of <u>Brady</u>, <u>Giglio</u>, and rule 16 information from disclosure just by putting a CI on an undisclosed witness list.  Such would not be consistent with due process and <u>Brady</u>.

Given the aforementioned principles underlying a defendant's ability to overcome the United States' privilege to withhold a non-testifying CI's identity upon a factual showing consistent with <u>Roviaro v. United States</u>, <u>Brady</u>, <u>Giglio</u>, and rule 16,  and that the Supreme Court in <u>Roviaro v. United States</u> did not explicitly restrict its holding to the case of a non-testifying CI, the Court sees no sound reason why, upon a sufficient showing, disclosure of a testifying CI's identity should not occur pretrial.  The Court has accurately concluded, in another case, that "there is a difference between a confidential informant, whose identity the government often never wants to reveal, and a confidential witness, whose identity will ultimately be revealed to facilitate the witness' testimony at trial and the defendant's opportunity to cross examine that witness."  <u>United States v. Tarango</u>, 760 F. Supp. 2d 1163, 1168 (D.N.M. 2009)(Browning, J.).  And, in <u>United States v. Tarango</u>, the Court reached its conclusion to not automatically order disclosure of a testifying CI, in part, because the defendant "will know these witnesses' identities if they become witnesses; the issue is one of timing, not disclosure."  760 F. Supp. 2d at 1168.  The Court, however, did not reach the timing issue in that case, because:

> The United States has offered to give Tarango more than what is required.  Specifically, the United States has agreed to allow Tarango's attorney, Mr. Fisher, to access certain witnesses on the weekend before trial, after the United States has been able to secret those witnesses.  The United States also tentatively

offered to turn over the identities of witnesses and other information for attorney's-eyes only review.  This arrangement[] would be suitable if both parties can come to an agreement on the details.

760 F. Supp. 2d at 1170.  The Court reached a similar agreement in United States v. Padilla, where it held:

> In this case, there is a strong inference -- based on the information confidential sources provided in the search-warrant affidavit -- that the identities of confidential informants who will be called as witnesses may aid the Defendants.  The Court believes that, to adequately investigate information which may be valuable for impeachment purposes, the Defendants' attorneys and investigator should have sufficient time to conduct an investigation, attempt to interview the witnesses, and request necessary information -- which the United States may not have in its possession -- from the proper sources.  Thus, the Court is requiring the United States to provide a list of its witnesses thirty days before trial.

> The Court, however, incorporates a protective order.  Mr. Twohig and Mr. Gorence are ordered that they will not disclose the identities of the confidential informants whom the United States intends to call as witnesses and other sensitive witnesses to anyone -- except the defense investigator they retain in this case -- unless and until Mr. Twohig and Mr. Gorence seek further leave of the Court or until fourteen days before the trial, when the United States must make its witness list publicly available.  Any information that the United States provides to Mr. Twohig and Mr. Gorence regarding the confidential informants whom the United States intends to call as witnesses and other sensitive witnesses may be discussed only with the investigator and the Assistant United States Attorneys who disclosed it.

2010 WL 4337819, at *8.  Because of these agreements, the defendants in those cases did not raise further argument as to the precise timing of the disclosure of the relevant testifying CIs in those cases.  Other courts have reached similar disclosure agreements amongst the parties.

> Based upon the record, the court finds that it is appropriate for the government to reveal the identities of informants numbers 4, 6, 7 and 11 ten days before trial.  This ruling is based upon the court's concern for the safety of these and other informants.  Disclosure of the identities of these informants ten days before trial will provide the defendants an adequate opportunity to prepare their defenses.

United States v. Avalos, 753 F. Supp. 871, 872 (D. Or. 1991)(Frye, J.).

The United States' Brady obligations bolster the lawfulness of disclosure of CIs'

DNM 1067

identities, testifying or not, upon a satisfactory showing under Brady, Giglio, rule 16, or Roviaro v. United States. "The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823. Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). Where the Court is making an in depth and detailed analysis under Brady, Giglio, rule 16, or Roviaro v. United States, and concludes that the United States must disclose a testifying CI's identity, the obligations the United States has under Brady counsel against the United States' refusal to order disclosure until, for instance, the United States' obligations under the Jencks Act arise. Such an individual case-by-case inquiry, it appears, must occur in the Tenth Circuit, and disclosure must be had -- pretrial -- where the Court concludes that the principles at stake in Brady and the other criminal discovery obligations, and potentially in Roviaro v. United States, so demand.

### LAW REGARDING THE CONSTITUTIONAL BASIS FOR ROVIARO V. UNITED STATES

The Supreme Court has held that the principles underlying its holding in Roviaro v. United States are rooted in the Due Process Clause and Confrontation Clause. In Roviaro v. United States the Supreme Court concluded that there was error in the failure to disclose a non-testifying CI, but that case was "not decided on the basis of constitutional claims." United States v. Valenzuela-Bernal, 458 U.S. 858, 870 (1982). The Supreme Court, in McCray v. Illinois, 386

- 104 -

U.S. 300 (1967), considered both Due Process and Confrontation Clause claims in its Roviaro v. United States analysis, albeit in the context of a hearing to determine probable cause for an arrest where testifying officers attested to their CIs' veracity.  See McCray v. Illinois, 386 U.S. at 309-14.  The Supreme Court in McCray v. Illinois ultimately held, in the context of a probable-cause hearing, that "nothing in the Due Process Clause of the Fourteenth Amendment requires a state court judge in every such hearing to assume the arresting officers are committing perjury" and that the Sixth Amendment was similarly not implicated.  386 U.S. at 313-14 (referencing the Sixth Amendment, which states "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence," U.S. Const. amend. VI).  In so holding, the Supreme Court stated that it is generally understood that Roviaro v. United States has a constitutional basis, because

> [w]hile *Roviaro* was not decided on the basis of constitutional claims, its subsequent affirmation in *McCray v. Illinois*, 386 U.S. 300[], where both due process and confrontation claims were considered by the Court, suggests that *Roviaro* would not have been decided differently if those claims had actually been called to the Court's attention.

United States v. Valenzuela-Bernal, 458 U.S. at 870.

The Tenth Circuit noted that Roviaro v. United States protects constitutional rights in Gaines v. Hess, 662 F.2d 1364, 1368 (10th Cir. 1981).  There, the Tenth Circuit stated:

> The Court in *Roviaro* declared that "fundamental requirements of fairness" require restrictions on the Government's privilege to refuse disclosure of an informant's identity. . . .  This strongly indicates that the Court was referring to a constitutional limitation on the privilege, for few phrases are more closely associated to a constitutional guarantee than is the term fundamental fairness. The very "touchstone of due process is fundamental fairness."

DNM 1069

Gaines v. Hess, 662 F.2d at 1368.  The Tenth Circuit further concluded:

> We do not see how the Court's usage of the term could be otherwise construed.
> The public's interest in effective law enforcement is an important one.  But at
> some point, withholding the identity of an informant who may be critical to the
> conduct of the defense infringes the defendant's constitutional right to a fair trial,
> which obviously includes the right to adequately prepare and present that defense.
> *Roviaro* clearly establishes that a blanket disclosure rule is not required.  Only
> under circumstances in which nondisclosure would deprive the defendant of his
> due process right to a fundamentally fair trial is disclosure constitutionally
> mandated.

Gaines v. Hess, 662 F.2d at 1368 (emphasis added).  Cf. McCray v. Illinois, 386 U.S. at 311

("What *Roviaro* makes clear is that this Court was unwilling to impose any absolute rule

requiring disclosure of an informer's identity even in formulating evidentiary rules for federal

criminal trials.").  In that case, the Tenth Circuit considered a drug-buy scenario where the

"informant in question set up the transaction and was the only witness to the sale," and, "[t]hus,

the informant could testify directly to the critical issue in the case: whether [defendant] was the

seller."  Gaines v. Hess, 662 F.2d at 1368.  At trial, "[t]he informant's existence was revealed by

[a witness'] testimony, and the informant was the only one mentioned in the record, other than

[the defendant] himself, who could corroborate or discredit [that witness'] testimony."  662 F.2d

at 1368.  The Tenth Circuit thus held that, "[o]n these facts, it would violate [the defendant's]

due process rights to deny disclosure if in fact the informant could provide potentially significant

exculpatory testimony."  Gaines v. Hess, 662 F.2d at 1368.

Thus, the Due Process Clause does not require the United States to disclose the identity

of CIs in every case, see McCray v. Illinois, 386 U.S. at 309-14, but, to justify compelled

disclosure under Roviaro v. United States and the Due Process Clause, a defendant can show that

his right to the information outweighs the traditional privilege to withhold CIs' identities, as the

Supreme Court explained in Roviaro v. United States, 353 U.S. at 59-62 ("Where the disclosure

DNM 1070

of an informer's identity, or of the contents of his communication, is relevant and helpful to the

defense of an accused, or is essential to a fair determination of a cause, the privilege must give

way."). That showing, accordingly, entails demonstrating that disclosure is material to the

defense or to the fair determination of the cause. See United States v. Rovario at 60-61.

## RELEVANT LAW REGARDING CIVIL DISCOVERY

Rule 34 of the Federal Rules of Civil Procedure governs discovery requests for

documents. See Fed. R. Civ. P. 34. Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

> **(1)** to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:
>
>> **(A)** any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or
>>
>> **(B)** any designated tangible things; or
>
> **(2)** to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a). Rule 26(b)(1) explains that the proper scope of discovery is "any

nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

Information sought is relevant "if the discovery appears reasonably calculated to lead to

discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Federal courts have held that the

scope of discovery under rule 26 is broad. See Gomez v. Martin Marietta Corp., 50 F.3d 1511,

- 107 -

1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning,

J.)("The federal courts have held that the scope of discovery should be broadly and liberally

construed to achieve the full disclosure of all potentially relevant information."). The federal

discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the

relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329

U.S. 495, 507 (1947). As a result of this policy, rule 26 "contemplates discovery into any matter

that bears on or that reasonably could lead to other matter that could bear on any issue that is or

may be raised in a case." Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 649-50 (D.N.M.

2007)(Browning, J.)(internal quotations marks omitted).

A district court is not, however, "required to permit plaintiff to engage in a 'fishing

expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x at 217.

"'Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties

to flesh out allegations for which they initially have at least a modicum of objective support.'"

Rivera v. DJO, LLC, 2012 WL 3860744, at *1 (D.N.M. 2012)(Browning, J.)(quoting Tottenham

v. Trans World Gaming Corp., 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)). See

Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(noting that courts do, and

should, remain concerned about "fishing expeditions, discovery abuse and inordinate expense

involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted).

"[B]road discovery is not without limits and the trial court is given wide discretion in balancing

the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d

at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than

that required for admissibility at trial, "the object of inquiry must have some evidentiary value

before an order to compel disclosure of otherwise inadmissible material will issue."   Zenith

Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (N.D. Ill. 1998).   Courts have also recognized

that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of

admissibility should not be misapplied so as to allow fishing expeditions in discovery."   Zenith

Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

Rule 26(b)(1) was amended in 2000.   Before the 2000 amendments, rule 26(b)(1) defined

the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is
> relevant to the subject matter involved in the pending actions, whether it relates to
> the claim or defense of the party seeking discovery or to the claim or defense of
> any other party, including the existence, description, nature, custody, condition
> and location of any books, documents, or other tangible things and the identity
> and location of persons having knowledge of any discoverable matter.   The
> information sought need not be admissible at the trial if the information sought
> appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).   The 2000 amendments made the following changes, shown here

in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is
> relevant to ~~the subject matter involved in the pending actions, whether it relates to~~
> the claim or defense of ~~the party seeking discovery or to the claim or defense of~~
> any ~~other~~ party, including the existence, description, nature, custody, condition
> and location of any books, documents, or other tangible things and the identity
> and location of persons having knowledge of any discoverable matter.   <u>For good
> cause, the court may order discovery of any matter relevant to the subject matter
> involved in the action.   Relevant</u> ~~The~~ information ~~sought~~ need not be admissible
> at the trial if <u>discovery</u> the ~~information sought~~ appears reasonably calculated to
> lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).   Putting aside the changes to the last sentence -- which the advisory

committee's notes make clear was a housekeeping amendment to clarify that inadmissible

evidence must still be relevant to be discoverable -- the 2000 amendments have two effects:

(i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts

into the process in the entirely new second sentence.

      In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions.  Discovery and Disclosure Practice, supra, at 44-45 (1997).  The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

      The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party.  The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause.  The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery.  The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery.  Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center.  See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action.  The good-cause standard warranting broader discovery is meant to be flexible.

      **The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action.  The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision.  A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.  For example,**

other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard.  Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information.  Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable.  In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.  In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention.  When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence.  As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible.  The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery.  Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence.  As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii).  These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1).  The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated.  See 8 Federal Practice & Procedure § 2008.1 at 121.  This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery.  Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone.  The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance.  The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to exist more to "add teeth" to the relevance standard than to effectuate a substantive narrowing.  It is not surprising that Congress would want to increase judicial presence: "relevance" is a wide-open concept even in the context of trial, see Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."), and it is often said that relevance for discovery is an even broader concept.  One might then say that old rule 26(b)(1)'s relevant discovery provision was toothless.  It is likewise unsurprising that the rulemakers are unable to articulate precise language narrowing the substantive scope of discovery: no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, etc.  The determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers wanted when they: (i) encouraged district judges to take a firmer grasp on the scope of discovery; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

DNM 1076

Of course, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action."  568 F.3d at 1188.  The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action."  This good-cause standard is intended to be flexible.  When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be.  "[T]he actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

## LAW REGARDING ATTORNEY WORK PRODUCT IMMUNE FROM DISCOVERY

The work-product doctrine, which the Supreme Court first recognized in Hickman v. Taylor, 329 U.S. 495 (1947), "shelters the mental processes of the attorney, providing a

- 113 -

privileged area within which he can analyze and prepare his client's case." United States v.

Nobles, 422 U.S. 225, 238 (1975).  "In performing his various duties . . . it is essential that a

lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing

parties and their counsel." Hickman v. Taylor, 329 U.S. at 510.  "Unlike the attorney-client

privilege, the work-product doctrine is distinguishable from the testimonial . . . privileges."

United States v. Ary, 518 F.3d 775, 783 n.4 (10th Cir. 2008).  See In re Qwest Commc'n Int'l.

Inc., 450 F.3d 1179, 1184 n.3 (10th Cir. 2006).  "The work-product doctrine is codified in Fed.

R. Civ. P. 26(b)(3) and is therefore excepted from Fed. R. Evid. 501." United States v. Ary, 518

F.3d at 783 n.4 ("Unlike the attorney-client privilege, the work-product doctrine is

distinguishable from the testimonial "true" privileges.  See In re Qwest Commc'n Int'l. Inc., 450

F.3d at 1185 n.3[].").

Rule 26(b)(3) of the Federal Rules of Civil Procedure governs work-product issues.  See

Frontier Ref. Inc. v. Gorman-Rupp Co., Inc., 136 F.3d 695, 702 n.10 (10th Cir. 1998).  Rule

26(b)(3)(A)-(B) states:

> (A) *Documents and Tangible Things*.  Ordinarily, a party may not discover
> documents and tangible things that are prepared in anticipation of litigation or for
> trial by or for another party or its representative (including the other party's
> attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule
> 26(b)(4), those materials may be discovered if:
>
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
> >
> > (ii) the party shows that it has substantial need for the materials to
> > prepare its case and cannot, without undue hardship, obtain their
> > substantial equivalent by other means.
>
> (B) *Protection Against Disclosure*.  If the court orders discovery of those
> materials, it must protect against disclosure of the mental impressions,
> conclusions, opinions, or legal theories of a party's attorney or other
> representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(A)-(B)(emphasis in original).

"[T]he work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." Citizens Progressive Alliance v. U.S. Bureau of Indian Affairs, 241 F. Supp. 2d 1342, 1358 (D.N.M. 2002)(Smith, M.J.)(citing United States v. Nobles, 422 U.S. at 238). The attorney-work product doctrine "is intended only to guard against divulging the attorney's strategies and legal impressions. . . ." Resolution Trust Corp. v. Dabney, 73 F.3d 262, 266 (10th Cir. 1995). The work-product doctrine does not protect documents or other items that do not reflect the attorney's mental impressions. See United States v. Nobles, 422 U.S. at 238 ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."); In re Grand Jury Proceedings, 658 F.2d 782, 784-85 (10th Cir. 1981)("Such mental impressions are a prerequisite to the invocation of the work product doctrine.").

Analysis whether a communication falls within the attorney-client privilege should precede any inquiry into whether the work-product protection applies. See Upjohn Co. v. United States, 449 U.S. 383, 397 (1981). The work-product protection is broader in scope and reach than the attorney-client privilege, because the privilege extends only to client communications, while the work-product protection encompasses much that has its source outside client communications. See United States v. Nobles, 422 U.S. at 238. Further, rule 26(b)(3) permits disclosure of documents and tangible things constituting attorney-work product only upon a showing of substantial need and inability to obtain the substantial equivalent without undue hardship. See Fed. R. Civ. P. 26(b)(3). The focus of the determination whether a document falls within the work-product protection is whether "the motivating purpose" behind its creation was

to aid in litigation or possible future litigation.  In re Universal Serv. Fund Tel. Billing Practices Litig., 232 F.R.D. 669, 676 (D. Kan. 2005)(O'Hara, J.).

"'Ordinary work product generally refers to materials that are gathered at the request of an attorney in anticipation of litigation.  This type of work product receives less protection than opinion work product.  Opinion work product is, basically, the mental impressions of the attorney.'"  Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 651 (D.N.M. 2007)(Browning, J.)(quoting Sinclair Oil Corp. v. Texaco, Inc., 208 F.R.D. 329, 334 (N.D. Okla. 2002)).  "The party asserting the work-product protection has the burden of demonstrating that it applies and that it has not been waived."  Anaya v. CBS Broad., Inc., 251 F.R.D. at 651 (citing Kovacs v. Hershey Co., 2006 WL 2781591, at *10 (D. Colo. 2006)(Wiley, J.)).

For the work-product doctrine to apply, the asserting party must show that the documents or materials were prepared in anticipation of litigation by or for a party or that party's representative.  See Fed. R. Civ. P. 26(b)(3).  See also S.E.C. v. Goldstone, 301 F.R.D. 593, 650-53 (D.N.M. 2014)(Browning, J.).  "Litigation need not necessarily be imminent as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."  Anaya v. CBS Broad., Inc., 251 F.R.D. at 651.  See Fox v. Cal. Sierra Fin. Servs., 120 F.R.D. 520, 524 (N.D. Cal. 1988)(Woelflen, J.)("There is no requirement that the litigation have already commenced in order for the work-product doctrine to be operative, however, there must be more than a remote possibility of litigation.").  If the party asserting the work-product protection establishes entitlement to the protection, rule 26(b)(3) allows production of attorney-work product materials only upon a showing that the party seeking discovery has "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A).  "Work product can be

DNM 1080

opinion work product, which some courts have held to be absolutely privileged, or non-opinion work product, i.e., fact work product, which may be discoverable under appropriate circumstances." In re Qwest Commc'n Int'l, 450 F.3d at 1186. See generally S.E.C. v. Goldstone, 301 F.R.D. at 650-53 (Browning, J.).

## ANALYSIS

The Court will grant the Motion to Vacate and the Motion to Exclude. The Court will grant in part and deny in part the Motion to Disclose. At the hearing, the Court and some of the Defendants that had joined in the Motion to Disclose -- or filed a reply in support of the Motion to Disclose after the United States and Perez entered into a disclosure agreement mooting the Motion to Disclose as it pertained to him -- came to the agreement that, in preparation for the next hearing, the Defendants would supplement their briefing to make a stronger showing as to why the disclosure of the present CI's identity was proper as to each of the individual Defendants, because the CI's potential presence at the scene of a murder was not going to constitute a sufficient showing requiring disclosure at this stage. That ruling was made applicable to Troup, Sanchez Montoya, and Herrera -- as well as Gallegos, who did not contribute to the Motion to Disclose Reply or make argument at the hearing -- and absent a stronger showing in the future, the CI's identity will not be ordered disclosed to those Defendants at this time, and the Motion to Disclose will be denied without prejudice as to those Defendants. The Court was, however, inclined to require the United States to disclose the CI's identity to Baca, and will thus order such disclosure at this time. The Court further requested that Baca and the parties provide supplemental briefing that addressed the legal standard for the timing of the disclosure of a CI's identity, because that standard was a source of disagreement at the hearing, and the Court was not certain whether the disclosure had to be immediate. The

DNM 1081

Court now concludes that an analysis under <u>Brady</u> is appropriate in the context of a testifying CI, and that the United States' disclosure of such CIs -- where a Defendant has made a sufficient showing under <u>Brady</u>, which is practically similar to the showing under <u>United States v. Roviaro</u> -- must be pretrial, and the Court, in these cases, will order immediate disclosure under attorney and investigator eyes-only protective orders, absent an agreement otherwise amongst the parties.

**I.       THE COURT WILL GRANT THE MOTION TO VACATE.**

The Court will grant the Motion to Vacate. The Motion to Vacate Defendants "request the Court vacate the trial date and schedule a hearing so the parties can discuss a realistic timetable for all discovery to be produced by the government, and for defendants to review said discovery." Motion to Vacate at 2. In support of the request, the Motion to Vacate highlights the case's complexity and breadth, the multiple indictments, a protective order restricting discovery, and the use of a coordinated discovery management firm. <u>See</u> Motion to Vacate at 2-5. The United States opposes the Motion to Vacate, but only to the extent that the Defendants in the "parallel RICO indictment in 16-cr-1613 do not oppose a continuance of their trial date in July." Motion to Vacate at 9. Before the Court took over the case, Judge Gonzales had already declared this case complex, and not adopted the typical scheduling order and time frame for trial. All parties appear to agree, however, that the scheduling order and trial date which the Court set after it declared the case complex has become, yet again, untenable because of the case's complexity. <u>See</u> Motion to Vacate at 1-2, 9. Courts, generally, are instructed to consider specific factors when determining whether to grant a continuance and thereby further continue the Speedy Trial Act's deadlines under section (A) of 18 U.S.C. § 3161(h)(7). <u>See</u> 18 U.S.C. § 3161(h)(7)(B). Section 3161(h)(7)(B) sets forth the factors a court should consider:

**(B)**     The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

> **(i)**     Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

> **(ii)**     Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

> . . . .

18 U.S.C. § 3161(h)(7)(B).  The Court concludes that "failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible," because "the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits" established by the current scheduling order and trial date.  18 U.S.C. § 3161(h)(7)(B)(i)-(ii).  This case, United States v. DeLeon, has already been declared complex, as has the case in United States v. Baca, reinforcing the complexity and logistical difficulty the SNM prosecution presents for the United States, for the Defendants, and for the Court.  At this time, where both the United States and the Defendants agree that there is necessity to extend the trial date further into the future, the Court reaches the same conclusion.  See Tr. at 34:4-37:24 (Armijo)(discussing how the United States agrees that the discovery process is more cumbersome than usual; however, discovery would be rolling and that they were "working very hard on it,"  and with the United States stating: "we would request that the Court set a trial date . . . next summer").  As the Motion to Vacate provides, this might be the largest and most complicated prosecution the District of New Mexico

- 119 -

has ever seen.  See Motion to Vacate at 1.  As well, the Motion to Vacate explains that discovery

in each of the separate indictments bleeds together, that the discovery is being undertaken in a

wholly unique -- and slow -- manner, and that trial preparation will likely take "twice as long" as

normal.  Motion to Vacate at 1-2.  The United States does not otherwise refute that assertion,

and, thus, the Court concludes that good grounds exist for the continuance, pursuant to both the

Speedy Trial Act and United States v. Toombs, 574 F.3d at 1269, and the Court will,

accordingly, grant the Motion to Vacate.

## II.   THE COURT WILL GRANT THE MOTION TO EXCLUDE.

The Court will grant the Motion to Exclude.  The Motion to Exclude explains that the

Defendants charged in the Superseding Indictment's Counts 6 and 7 are planning to view certain

physical evidence and tour Southern New Mexico -- in particular, the pod where one of the

charged murders occurred -- and that the information they receive is going to be work product

which they wish to be protected from disclosure to the prosecution.  See Motion to Exclude at 1-

2.  The reason that the Motion to Exclude gives to support that work product will entail from the

evidence viewing is that

> members of the respective defense teams, including counsel, investigators and
> experts [will] view, discuss, document, and record evidence and their impressions
> of that evidence.  The resulting processes, discussions, notations, recordings,
> measurements, photographs and other tangible things that will be generated and
> created by the respective defense teams constitute work product and are not
> discoverable by the prosecution.

Motion to Exclude at 3.  The Court recognizes, and stated at the hearing, that "in the particular

circumstances of this [case], where we may have a large number of defense lawyers there, they

are going to probably be discussing this with each other. . . .  And if the Government lawyers are

there I think it's going to inhibit their ability to do the things they need to do to do a site visit."

Tr. at 57:9-17 (Court).  Thus, the Court surmised that "I think there are work thoughts, their

DNM 1084

work product will be disclosed, or . . . it will not take place," given the unique nature of this

particular site visit.  Tr. at 57: 18-25 (Court).  The Court adheres to this conclusion, because the

work-product doctrine counsels in favor of allowing the Defendants' attorneys to tour Southern

New Mexico and to view the physical evidence with a "certain degree of privacy, free from

unnecessary intrusion by opposing parties and their counsel."  Hickman v. Taylor, 329 U.S. at

510.  Rule 26(b)(3) of the Federal Rules of Civil Procedure governs work-product issues, see

Frontier Ref. Inc. v. Gorman-Rupp Co., Inc., 136 F.3d at 702 n.10, and states:

> (A) *Documents and Tangible Things*.  Ordinarily, a party may not discover
> documents and tangible things that are prepared in anticipation of litigation or for
> trial by or for another party or its representative (including the other party's
> attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule
> 26(b)(4), those materials may be discovered if:
>
>> (i) they are otherwise discoverable under Rule 26(b)(1); and
>>
>> (ii) the party shows that it has substantial need for the materials to
>> prepare its case and cannot, without undue hardship, obtain their
>> substantial equivalent by other means.
>
> (B) *Protection Against Disclosure*.  If the court orders discovery of those
> materials, it must protect against disclosure of the mental impressions,
> conclusions, opinions, or legal theories of a party's attorney or other
> representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(A)-(B)(emphasis in original).  Indeed, then, "the work-product doctrine

shelters the mental processes of the attorney, providing a privileged area within which he can

analyze and prepare his client's case."  Citizens Progressive Alliance v. U.S. Bureau of Indian

Affairs, 241 F. Supp. 2d at 1358 (citing United States v. Nobles, 422 U.S. at 238).  The attorney-

work product doctrine "is intended only to guard against divulging the attorney's strategies and

legal impressions . . . ."  Resolution Trust Corp. v. Dabney, 73 F.3d at 266.  The work-product

doctrine does not protect documents or other items that do not reflect the attorney's mental

impressions.  See United States v. Nobles, 422 U.S. at 238; In re Grand Jury Proceedings, 658

F.2d at 784-85 ("Such mental impressions are a prerequisite to the invocation of the work

product doctrine.").

The Court recognizes that the discussions and conversations which might ensue during

this and other similar evidence viewings in this case do not fit neatly into work-product

protections.  See Fed. R. Civ. P. 26(b)(3)(protecting from discovery documents and tangible

things that are prepared in anticipation of litigation, or for trial by or for another party or its

representative).  The principles underlining work-product protections cause the Court to exclude

the United States, where

> in the particular circumstances of this [case], where we may have a large number
> of defense lawyers there, they are going to probably be discussing this with each
> other. . . .  And if the Government lawyers are there I think it's going to inhibit
> their ability to do the things they need to do to do a site visit, exclude the United
> States so that the Defendants can effectively prepare for litigation, in private,
> without divulging their mental impressions to opposing counsel.

Tr. at 57:9-17 (Court).  See Hickman v. Taylor, 329 U.S. at 510.  The statements which might be

made by each of the Defendants' attorneys to each other as they view the evidence will likely

indicate what the Defendants' attorneys mental impressions of the case are, limiting their ability

to confide in each other if the United States was present and listening to every word.  See

Hickman v. Taylor, 329 U.S. at 510.  The Court is cognizant that it cannot make an informed

work-product determination without knowing the statements made, questions asked, notes taken,

and/or information given.  The Court is confident, however, that the Defendants' attorneys will

generate some work product at the site and evidence visits and examination.  It is true that the

Defendants' attorneys could take notes that would be work product, and the notes thus would be

protected from production, and, at the same time, the United States would see the rest of what

occurs.  But the presence of the United States will likely chill the production of work product,

rendering the visits and inspections less useful.  The Defendants are entitled to a robust site visit and examination, where they can talk, look at things, and do things outside of the United States' presence.  The Defendants are owed as robust of an opportunity to gather work product as possible consistent with security needs, and the United States' presence is likely to unnecessarily put pressure on that product and create an environment and atmosphere that does not facilitate work product development.  Thus, the Court cannot soundly rely on the work-product doctrine to create an environment for the creation of work product, but it can use its powers under the Criminal Justice Act, 18 U.S.C. § 3006A, with its powers to supervise the effective administration of these complex cases to give the Defendants what they ask.  The Court, accordingly, will grant the Motion to Exclude.

## III.   THE COURT WILL ORDER THE CI'S IDENTITY DISCLOSED TO BACA BEFORE TRIAL.

In addressing the disclosure of the CI implicating Baca in Counts 6 and 7, the Court provides guidance and reiterates the proper legal standard when analyzing the timing of a CI's disclosure where the Court has concluded that the United States must disclose the identity pursuant to Brady -- that conclusion meaning that the Defendant has shown that the CI likely has material, exculpatory evidence, where, should it not be disclosed, "there is a reasonable probability that . . . the result of the proceeding would [be] different," Kyles v. Whitley, 514 U.S. at 433 (discussing Brady standards).  The parties are in agreement that disclosure of both testifying and non-testifying CIs' identities -- under Roviaro v. United States, Brady, Giglio, rule 16, or the Jencks Act -- is, under some circumstances, and at some point, appropriate.  The primary dispute is generally only over the timing of that disclosure after the Court has concluded that disclosure is appropriate.  Regarding CIs in particular, the United States has a privilege "to withhold from disclosure the identity of persons who furnish information of violations of law to

DNM 1087

officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. at 59. "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.   The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." Roviaro v. United States, 353 U.S. at 59. "Anonymity of informants encourages communications to law enforcement officers." Usery v. Local Union 720, Laborers' Int'l Union of N. Am., AFL-CIO, 547 F.2d at 527.

The privilege is not absolute, however, and where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Roviaro v. United States, 353 U.S. at 60-61. The Supreme Court in Roviaro v. United States stated that the desirability of calling the CI as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide. See 353 U.S. at 64. When a CI is a "participant in and a material witness to" the alleged criminal transaction, the disclosure of his or her identity is sometimes required. Roviaro v. United States, 353 U.S. at 65. The standard for disclosure of CIs who play an active, as opposed to a passive, role in the investigation is not fixed; rather, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors." Roviaro v. United States, 353 U.S. at 62. In Roviaro v. United States, for example, the CI "helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment." 353 U.S. at 64. The Supreme Court found that the district court's failure to order disclosure of the CI's identity "in the face of repeated demands by the accused for his disclosure" was prejudicial error. 353 U.S. at 64-65.

The Tenth Circuit's take on the analysis is "well known," United States v. Padilla, 2010

WL 4337819, at *7, and places the burden on the defendant to show that the CI's possible aid to

the defendant outweighs the public's interest in protecting the flow of information, which the

confidentiality of the informant's identity facilitates:

> The disclosure of a confidential informant's identity involves balancing the public
> interest in protecting the flow of information in a manner necessary for effective
> law enforcement against an individual's right to prepare his defense.  In making
> the determination as to whether disclosure is necessary, the court must consider
> the particular circumstances of the case, including the crime charged, the possible
> defenses, and the significance of the informer's testimony.  Where it is clear that
> the informant cannot aid the defense, the government's interest in keeping secret
> his identity must prevail over the defendant's asserted right of disclosure.  A
> defendant seeking disclosure has the burden of proof, and we review the district
> court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted).  See

United States v. McKenzie, 2010 WL 597971, at **3-4 (quoting United States v. Sinclair, 109

F.3d at 1538).  "[T]he defendant must present more than mere speculation about the possible

usefulness of an informant's testimony."  United States v. Moralez, 908 F.2d at 567.  In sum,

> [a] defendant may obtain the identity and whereabouts of an informer if his
> testimony might be relevant to the defendant's case and justice would be best
> served by disclosure[, but d]isclosure of an informant is not required . . . where
> the information sought from the informer would be merely cumulative, or where
> the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d at 517 (internal citations omitted).  See United States v.

Moralez, 908 F.2d at 567.  Specific considerations include the confidential informant's role:

> [C]ases involving confidential informants fall into several broad categories.  At
> one extreme are the cases where the informant is a mere tipster, and disclosure is
> not required.  At the other extreme are cases such as Roviaro itself where the
> informant has played a crucial role in the alleged criminal transaction, and
> disclosure and production of the informant are required to ensure a fair trial.  In
> addition, there are cases where there is a slight possibility a defendant might
> benefit from disclosure, but the government has demonstrated a compelling need
> to protect its informant.

- 125 -

United States v. Moralez, 908 F.2d at 568 (citations omitted).  Cf. United States v. Arms, 2014 WL 6958046, at *3 (E.D. Wis. 2014)(Duffin, M.J.), aff'd sub nom. United States v. Bailey, 2015 WL 687490 (E.D. Wis. 2015)(Adelman, J.).

The Court has required the United States to disclose a CI's identity where the CI "was integrally involved in the criminal transaction[,] . . . observed the criminal transaction[,] and was not a mere bystander." United States v. Aguilar, 2010 WL 2977708, at *5.  In United States v. Aguilar, the defendant, Aguilar, was one of three defendants charged with a conspiracy to traffic in cocaine, stemming from a transaction between his two co-defendants and a government CI. See 2010 WL 2977708, at *1.  In relation to the first factor that the Supreme Court identified in Roviaro v. United States -- the crime charged -- the Court noted that "the crimes charged in this case are relatively egregious -- conspiracy, possession with intent to distribute cocaine, and possessing a gun while committing the other crimes." United States v. Aguilar, 2010 WL 2977708, at *6.  As to the second and third Roviaro v. United States factors -- the possible defenses and the possible significance of the informer's testimony -- it appeared that the defendant intended to argue that he did not know his alleged co-conspirator possessed cocaine or that the drug transaction was going to occur, and the Court found that, given the CI was present during the crime, the CI's testimony "could be highly significant" to the defenses:

> The [CI] was present in the car with Mirabal, Aguilar, and Garner, and would be in a unique position to testify to what conversations, if any, occurred in the car and whether Aguilar took part in them.  After the four individuals arrived at the [CI]'s residence, again, the [CI] would be in a unique position to testify whether it appeared that Aguilar had any idea that the bag Mirabal retrieved from the car contained cocaine.  Once the three Defendants and the [CI] were inside the [CI]'s residence, the [CI] was able to observe Aguilar's demeanor and whether he actively participated in the drug transaction.  The [CI] could testify as to where Aguilar was and what he did while the [CI] made the alleged drug transaction with Mirabal.

2010 WL 2977708, at *6.  Additionally, the Court noted that the CI might provide relevant

- 126 -

information which no other witness could, because Aguilar's "alleged co-conspirators might try

to push blame away from themselves and on to Aguilar, and Villegas, a law-enforcement officer,

might tend to be biased toward the United States."  2010 WL 2977708, at *6.  The Court thus

granted Aguilar's motion and ordered the United States to disclose the CI's identity.  See 2010

WL 2977708, at *6.  The Court also incorporated the following protective order in its decision:

> Ms. Johnson[, Aguilar's attorney,] is ordered that she will not disclose the identity
> of the CI to anyone -- except the defense investigator she retains in this case --
> unless and until she seeks further leave of the Court.  Any information that the
> United States provides to Ms. Johnson regarding the CI may be discussed only
> with the investigator and the Assistant United States Attorneys who disclosed it.
> Finally, any information the United States provides must be returned once this
> case is closed.  These requirements should minimize the danger, if any, to the CI
> and perhaps permit law-enforcement to use him in a covert capacity again in the
> future, if they so desire.

2010 WL 2977708, at *6.  See United States v. Rivas, 26 F. Supp. 3d at 1082.

The Supreme Court has considered Roviaro v. United States where the State asserted that

"disclosure [of an informant's identity] is not automatic," and, "[c]onsequently, it was

[defendants's] duty to move for disclosure of otherwise privileged material."  Banks v. Dretke,

540 U.S. at 697-98.  The Supreme Court held:

> We need not linger over this argument.  The issue of evidentiary law in Roviaro
> was whether (or when) the Government is obliged to reveal the identity of an
> undercover informer the Government does not call as a trial witness. . . .  The
> Court there stated that no privilege obtains "[w]here the disclosure of an
> informer's identity, or of the contents of his communication, is relevant and
> helpful to the defense of an accused." . . . .  Accordingly, even though the
> informer in Roviaro did not testify, we held that disclosure of his identity was
> necessary because he could have "amplif[ied] or contradict[ed] the testimony of
> government witnesses.

Banks v. Dretke, 540 U.S. at 697-98.  Accordingly, the Supreme Court has clearly held that there

is no privilege to withhold the identity of a non-testifying CI whom, after the Court has

conducted its analysis of the factors pursuant to Roviaro v. United States, has "relevant and

- 127 -

helpful to the defense of an accused." <u>Roviaro v. United States</u>, 353 U.S. at 60-61.  Given the aforementioned principles underlying a defendant's ability to overcome the United States' privilege to withhold a CI's identity upon a factual showing consistent with <u>Roviaro v. United States</u>, and that the Supreme Court in <u>Roviaro v. United States</u> did not explicitly restrict its holding to the case of a non-testifying CI, the Court sees no sound reason why, upon a sufficient showing, disclosure of a testifying CI's identity should not, or cannot, similarly be imminent or at least pretrial.  The Court has indeed concluded, in another case, that "there is a difference between a confidential informant, whose identity the government often never wants to reveal, and a confidential witness, whose identity will ultimately be revealed to facilitate the witness' testimony at trial and the defendant's opportunity to cross examine that witness." <u>United States v. Tarango</u>, 760 F. Supp. 2d at 1168.  In <u>United States v. Tarango</u>, the Court reached its conclusion to not automatically order disclosure of a testifying CI, in part, because the defendant "will know these witnesses' identities if they become witnesses; the issue is one of timing, not disclosure." 760 F. Supp. 2d at 1168.  The Court, however, did not reach the timing issue in that case:

> The United States has offered to give Tarango more than what is required. Specifically, the United States has agreed to allow Tarango's attorney, Mr. Fisher, to access certain witnesses on the weekend before trial, after the United States has been able to secret those witnesses.  The United States also tentatively offered to turn over the identities of witnesses and other information for attorney's-eyes only review.  This arrangement[] would be suitable if both parties can come to an agreement on the details.

760 F. Supp. 2d at 1170.  The Court reached a similar agreement in <u>United States v. Padilla</u>, where it held that:

> In this case, there is a strong inference -- based on the information confidential sources provided in the search-warrant affidavit -- that the identities of confidential informants who will be called as witnesses may aid the Defendants.  The Court believes that, to adequately investigate information

DNM 1092

which may be valuable for impeachment purposes, the Defendants' attorneys
and investigator should have sufficient time to conduct an investigation, attempt
to interview the witnesses, and request necessary information -- which the
United States may not have in its possession -- from the proper sources.  Thus,
the Court is requiring the United States to provide a list of its witnesses thirty
days before trial.

       The Court, however, incorporates a protective order.  Mr. Twohig and
Mr. Gorence are ordered that they will not disclose the identities of the
confidential informants whom the United States intends to call as witnesses and
other sensitive witnesses to anyone -- except the defense investigator they retain
in this case -- unless and until Mr. Twohig and Mr. Gorence seek further leave
of the Court or until fourteen days before the trial, when the United States must
make its witness list publicly available.  Any information that the United States
provides to Mr. Twohig and Mr. Gorence regarding the confidential informants
whom the United States intends to call as witnesses and other sensitive
witnesses may be discussed only with the investigator and the Assistant United
States Attorneys who disclosed it.

2010 WL 4337819, at *8.  Because those agreements worked in the defendants' favor in those

cases, there was no further argument as to the precise timing of the disclosure of the relevant

testifying CIs in those cases.  Other courts have reached similar disclosure agreements amongst

the parties.  See United States v. Avalos, 753 F. Supp. 871, 872 (D. Or. 1991)(Frye, J.); United

States v. Arms, No. 14-CR-78, 2014 WL 6958046, at *3, aff'd sub nom. United States v. Bailey,

No. 14-CR-78, 2015 WL 687490.

       Based upon the record, the court finds that it is appropriate for the government to
reveal the identities of informants numbers 4, 6, 7 and 11 ten days before trial.
This ruling is based upon the court's concern for the safety of these and other
informants.  Disclosure of the identities of these informants ten days before trial
will provide the defendants an adequate opportunity to prepare their defenses.

United States v. Avalos, 753 F. Supp. at 872.  Here, however, it is evident that the Defendants

seeking disclosure of testifying CIs' identities are not amenable to the United States' proffer of

disclosure fourteen days before trial, which the United States argues comports with the Jencks

Act.  Absent another agreement, the Court must consider when disclosure of a testifying CI's

identity can be disclosed pursuant to Roviaro v. United States, and if so, when -- or, if in fact

- 129 -

Roviaro v. United States cannot apply to testifying witnesses, whether Brady similarly requires disclosure.

The Court's analysis begins with Roviaro v. United States' plain language, which states that the desirability of calling the CI as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide.  See 353 U.S. at 64.  Although Banks v. Dretke explains that, factually, the CI at issue in Roviaro v. United States was a non-testifying witness, making that factual scenario distinct from that which was at issue in Banks v. Dretke, the Supreme Court in Roviaro v. United States did not otherwise restrict its guidance to such a non-testifying witness.  The Tenth Circuit in United States v. Pennick, 500 F.2d at 187, stated that "[t]he significant difference between Roviaro and the instant case is that in the former the informer did not testify at trial, and in our case he did.  Such ruled out a possibility that the informer's testimony could somehow be helpful to Pennick." United States v. Pennick, 500 F.2d at 187.  The Court is not convinced, however, that the Tenth Circuit held in United States v. Pennick that the United States can absolutely avoid disclosing pretrial a CI with potentially exculpating information for a defendant by virtue of that CI testifying.  See 500 F.2d at 187.  Further, the trial court, which did not err in denying disclosure of a testifying CI, and whose ruling was at issue in United States v. Pennick, had "applied the 'balancing test' referred to in Roviaro and took into consideration the various factors mentioned in that case, and then in the exercise of its discretion refused to require the Government to reveal the identity of its informer who all knew was to testify upon trial."  United States v. Pennick, 500 F.2d at 187.

Instead, under Roviaro v. United States' plain language instructions, the United States must disclose a CI's identity upon the proper showing under that case, regardless of future

potential for testimony.  See 353 U.S. at 60-61.  The Court recognizes, however, that there are

other Supreme Court and Court of Appeals cases that suggest a different analysis under Roviaro

v. United States which relies on that case's facts.  See, e.g., United States v. Ford, 2016 WL

483871, at *4-5 (D.D.C. 2016)(Friedman, J.)(discussing different standards for non-testifying

witnesses -- which Roviaro v. United States governs -- and testifying witnesses -- which the

district court, without expressly disavowing the potential import of Roviaro v. United States,

explained are generally governed by Brady, Giglio, rule 16, and the Jencks Act).  The United

States is correct that the Court, the Tenth Circuit in United States v. Pennick, and other courts

have indicated that there is a significant difference between testifying and non-testifying CIs.

See United States v. Pennick, 500 F.2d at 186.  Indeed, the Supreme Court and Courts of

Appeals, who are generally in the position of reviewing the untimely disclosure or nondisclosure

of a CI, have often relied on that dichotomy in reaching a conclusion that the trial court below

did not err by refusing to order early disclosure of a testifying CI's identity pretrial.  See United

States v. Casseus, 282 F.3d at 257; United States v. Tejada, 974 F.2d at 217.  Cf. United States v.

Norton, 504 F.2d at 343 n.1.  The Court finds persuasive the Eighth Circuit's language in United

States v. Norton, where it explained:

> [T]hese cases do not stand for the proposition that the government may withhold
> names of participating informants so long as it intends to call them at trial.  Nor
> do they stand as an invitation to trial courts to routinely deny defendants access to
> the names and addresses of informants prior to trial on the theory that the error
> may be cured by making the informant available at trial.  A finding of no
> prejudice in a particular case ought never be construed as an invitation to
> deliberate error in the future.

504 F.2d at 343 n.1.  Further, the Court is not concluding that the United States needs to disclose

its entire witness list pretrial in contravention of the "general rule" in this circuit, that general

rule being the primary issue at stake in United States v. Pennick.  United States v. Pennick, 500

F.2d at 186.

> Section 3432, 18 U.S.C., provides that a person charged with treason or other capital offense shall be furnished at least three days prior to trial with a list of the witnesses to be produced at the trial for proving the indictment.  The statute has been construed as meaning that in a noncapital case a defendant is not entitled as a matter of right to a list of the Government's witnesses in advance of trial.

United States v. Pennick, 500 F.2d at 186.

Accordingly, the Court will, upon a sufficient Brady showing to satisfy the burden to overcome the informant's privilege, order the pretrial disclosure of testifying CIs pursuant to a protective order, to ensure the CI's safety, as the United States and Perez have already entered into.  Cf. United States v. Nance, 168 F. Supp. 3d at 552 (stating, without discussion whether a number of requested CIs were to testify, that in that case "a conclusory statement is inadequate to meet Nance's burden of showing that an informant's testimony is . . . material to the defense. . . . Nance must demonstrate that an informant would do more than merely . . . cast doubt on the general credibility of one of the Government's witnesses")(internal quotation marks omitted). Roviaro v. United States does not apply to testifying CIs, but the United States' Brady obligations remain, regardless, and must defeat the informant's privilege upon a satisfactory showing.  Unless the parties agree otherwise, that disclosure must be immediate in this case, pursuant to Brady, and, for the present time, the disclosure will be for attorneys and investigators' eyes only; and disclosure to Baca himself must come, if at all, at trial.  The Court considers this system, as it outlined supra in its law regarding sections, to be the most appropriate analytical and practical approach to adequately balance the differing interests under Brady, Giglio, rule 16, the Jencks Act, and Roviaro v. United States, in this highly complex and complicated case which may be one of the largest prosecutions in this district's history.

As to this particular CI, whom Baca contends has relevant, helpful information to his defense, and thus should have his identity disclosed to Baca, the Court must first ensure that Baca has met his burden under Brady before it orders the disclosure.  Roviaro v. United States' principles are informative.  Accordingly, the Court shoulders the burden on the defendant to show that the CI's possible aid to the defendant outweighs the public's interest in protecting the flow of information, which the confidentiality of the informant's identity facilitates:

> The disclosure of a confidential informant's identity involves balancing the public interest in protecting the flow of information in a manner necessary for effective law enforcement against an individual's right to prepare his defense.  In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony.  Where it is clear that the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure.  A defendant seeking disclosure has the burden of proof, and we review the district court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted).  See United States v. McKenzie, 2010 WL 597971, at **3-4 (quoting United States v. Sinclair, 109 F.3d at 1538).  "[T]he defendant must present more than mere speculation about the possible usefulness of an informant's testimony."  United States v. Moralez, 908 F.2d at 567.  In sum,

> [a] defendant may obtain the identity and whereabouts of an informer if his testimony might be relevant to the defendant's case and justice would be best served by disclosure[, but d]isclosure of an informant is not required . . . where the information sought from the informer would be merely cumulative, or where the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d at 517 (internal citations omitted).  See United States v. Moralez, 908 F.2d at 567 ("Disclosure of an informant is not required where the information sought from him or her would be merely cumulative, or where the informant is not a participant in or a witness to the crime charged.").  Specific considerations include the CI's role:

DNM 1097

[C]ases involving confidential informants fall into several broad categories.  At one extreme are the cases where the informant is a mere tipster, and disclosure is not required.  At the other extreme are cases such as *Roviaro* itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial.  In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant.

United States v. Moralez, 908 F.2d at 568 (citations omitted).[10]  Cf. United States v. Arms, 2014 WL 6958046, at *3, aff'd sub nom. United States v. Bailey, 2015 WL 687490.  To help make this inquiry, the Court may, under Gaines v. Hess, 662 F.2d at 1369, conduct an in camera hearing to determine whether the informant's testimony would lend aid to the defense.  See 662 F.2d at 1369.

Here, Baca explains, he is implicated in J.M.'s murder, because "[t]he government has supplied an FBI 302 dated September 18, 2015 containing statements made by Jerry Armenta that attempt to associate Mr. Baca with J.M.'s death."  Motion to Disclose Reply at 5.  Baca also provides:

The Court should understand, however, that Jerry Armenta provided a videotaped interview less than one month later, on October 6, 2015, to the state prosecutors who were handling the state prosecution of J.M.'s death.  In that videotaped interview, Jerry Armenta does not claim what the FBI 302 purports to say: that the "paperwork was a police report which contained statements made by [J.M.].  The report was obtained by Anthony Ray 'Pup' BACA in Northern New Mexico Correctional Facility and was passed to the Southern New Mexico Correctional Facility by Lupe URQUIZO and Archie VARELA."  *See* [FD 302 at 2, filed

---

[10]The United States has tried to characterize too many CIs in this case as being mere tipsters.  There are definitely tipsters, but perhaps fewer in criminal cases than the United States suggests.  The Court considered the issue of "tipsters" in United States v. McKenzie, with the Court concluding that the CI in that case -- an Amtrak ticket agent that sent information to the DEA -- was the classic example of a mere tipster, stating "The Court is concerned that, if the Court adopts McKenzie's argument, anytime a police officer trains citizens to be alert to criminal activity and they supply information to the police, they become law enforcement officers rather than a tipster.  The Court does not believe that such training is enough to convert a citizen to a law enforcement officer."  United States v. McKenzie, 2010 WL 597971, at **4-5.

- 134 -

September 22, 2016 (Doc. 698-3)].  Instead, Jerry Armenta claims that after J.M. had died, he heard rumors in his pod that Mr. Baca had called for J.M.'s death.

Motion to Disclose Reply at 5.  Baca also argues that the theory of his involvement is that he

> was able to issue paperwork that went from Level 6 to Level 5 at PNM, and then was couriered from Level 5 of PNM down to Southern in order to give the authority to murder Mr. Molina.  And according to the discovery, and what we know about Molina, the Government's allegations of the Molina murder, that paperwork arrived on a Friday, and Mr. Molina was killed -- well, the paperwork arrived on a Thursday; it didn't get into the hands of the people in Mr. Molina's pod until Friday, and then Mr. Molina was allegedly killed based on the paperwork.

Tr. at 113:6-23 (Lowry)(emphasis added).  Accordingly, Baca is arguing that, after seeing the present CI's 302 report, where -- in the context of J.M.'s murder -- the CI at issue has stated that Perez "assisted in the killing of Javier MOLINA; PEREZ provided his walker to make shanks that were used in the murder," and where Baca allegedly ordered that murder, the CI appears to have in-depth knowledge of the murder and is likely to provide material, exculpatory information for Baca's defense.  Baca makes this argument, because the CI "indicates . . . something entirely different [from Montoya's allegations] . . . [indicating instead] that there was a plot to kill Mr. Molina some time before the paperwork ever arrived, [or] was in the equation . . . ."  Tr. at 113:244-114:3 (Lowry).  Baca bases this argument in the fact that he does not think Perez could have provided his walker for the shanks used in Molina's murder in such a short time span of about twenty-four hours.  See Tr. at 114:10-21 (Lowry).  Baca thus contends that, for the United States' theory that J.M.'s murder was the result of a conspiracy which Baca spearheaded -- opposed to this being a random jailhouse murder -- to succeed, Perez must have provided his walker in accordance with orders and paperwork that Baca allegedly sent from PNM, making evidence regarding the time between the hit's order and murder relevant.  See Tr. at 116:16-117:2 (Lowry).  In other words, the United States' case against Baca and Perez appears to rely, in

- 135 -

part, upon a quick turnaround that Baca argues is fundamentally inconsistent with reality.  At the hearing, the Court suggested that there was little evidence indicating how the paperwork was delivered to Southern New Mexico and how "Mr. Perez made shanks out of his walker all within 24 hours.  It seems to me that may be the only -- since this is the only source of information to either Mr. Perez or to Mr. Baca, I may need to require its production if I do the CI analysis."  Tr. at 130:4-13 (Court).  In response to the scant evidence, in supplemental briefing, the United States provided two exchanges between Perez and a CI, and Baca and a CI, which the United States contends support Baca's involvement in J.M.'s murder.  The evidence that the United States provides, however, while tending to implicate Baca, does not explain the short time frame from the alleged paperwork delivery to the murder.  Thus, although the United States has indicated the hit may be longstanding and only reconfirmed by Baca's order, there is still uncertainty about the manufacture of the shanks in such a short time frame.  Thus, pursuant to Brady, the Court concludes that Baca has maintained his showing that the CI -- who appears to have intimate knowledge of both the murder and Perez' walker's involvement -- might have material, exculpatory information for Baca's defense.  Indeed, the CI might disavow Baca's involvement, and the order's impact, altogether.  In light of the particular circumstances of this case, where Baca was not at Southern New Mexico, and the possible material, exculpatory significance of the informer's testimony, where Baca is arguing he did not order J.M's murder, evidenced by the short, less than twenty-four hours, time frame between his alleged delivery of paperwork and the completion of the murder, the Court concludes that Baca has made a sufficient showing for disclosure of the CI.

Regarding the security of the CI, the United States has indicated, by entering into a disclosure agreement with Perez, that it can disclose the CI's identity in a manner -- limiting the

disclosure of the CI's identity to Perez' attorneys and investigators -- that can alleviate some concerns which the United States has about the CI's security.  The Court recognizes that the United States alleges that SNM attacks, and even murders, persons who cooperate with law enforcement, giving rise to heightened security concerns for the CIs in this case.  Accordingly, the Court will order the CIs' identities' disclosure in this case under the protective-disclosure agreement that the United States used for Perez and the present CI.  In sum, because in this instance Baca has persuaded the Court that the CI at issue in Counts 6 and 7 must be disclosed to him under Brady, the Court will order his immediate disclosure to his attorneys and investigators.

## IV.    THE COURT WILL DENY THE MOTION TO DISCLOSE AS TO TROUP, MONTOYA, AND HERRERA AT THIS TIME.

Troup, Sanchez, Montoya, and Herrera have not made a sufficient showing under Brady to warrant pretrial disclosure of this CI at this time.  With respect to Troup, the Motion to Disclose Reply explains that Troup "has been indicted in Counts 1 and 3 with the murders of F.C. and F.S.," and that "this is a case where there appears to be no physical or scientific evidence nor any objective witness implicating Mr. Troup in these crimes."  Motion to Disclose Reply at 2.  The Motion to Disclose Reply then continues its explanation that "F.S. was a known informant," and that, according to the CI at issue in this motion, "paperwork relating to F.S. was delivered by 'Cheech.'"  Motion to Disclose Reply at 2.  The Motion to Disclose Reply argues that another inmate named Kyle Lynn Dwyer has admitted to being the individual who delivered the paperwork -- in fact, Dwyer was disciplined and sent to "PNM Level VI" as a result of delivering the paperwork, with "paperwork" meaning something which indicates that the paperwork's subject has cooperated with law enforcement.  Motion to Disclose Reply at 3.  In addition, the Motion to Disclose Reply contends that the informant in question states that Troup

- 137 -

and another Defendant, "Weno," "saw that these two individuals were taking too long and killed F.S." themselves.  Motion to Disclose Reply at 3.  The Motion to Disclose Reply thus argues that, regarding any potentially contrary information this CI might have, Troup is entitled to discover the CI's "identity to ascertain, among other things, if such information is exculpatory, especially given Mr. Dwyer's unavailability [now deceased]."  Motion to Disclose Reply at 3.

The United States has agreed, however, to disclose the identity of the individual that the CI mentions in his report -- "Cheech" -- to Troup so that Troup may investigate "Cheech" to make a showing that he is entitled to disclosure of the CI's identity at issue in the Motion to Disclose.  At the hearing, Troup argued that, "the identity of the" CI would help him "find out if [the CI] was, in fact there; if he was an active participant" in the murder at issue in Count 3, F.S.'s murder.  Tr. at 108:12-16 (Harbour-Valdez).  Troup, however, could not make a showing as to why, beyond potentially being present, this CI was different than anyone "else on the planet."  Tr. at 108:17-22 (Court).  The Court concluded:

> I'm not going to order the production of the CHS at the present time.  I'm first going to determine whether the CI analysis is obviated if, in fact, the person is going to be a testifying witness. . . .  I'm going to require the Government to go ahead and give you Cheech, figure out who he is; maybe you'll be able to bulk up your request.

Tr. at 109:18-110:9 (Court).  The Court continued:

> At the moment, it seems to me the CHS, as far as Troup, may be a little bit on the periphery of just somebody that -- you know, obviously, everybody would like to know who is there.  But if I start saying I'm going to disclose every CI to see if they were there, I think I've just pretty much required every CI to be disclosed.  So I think it's got to be higher than that.

Tr. at 110:10-17 (Court).  The Court's ruling at the hearing is consistent with the factors under Brady, as Troup has not indicated, beyond merely speculating, that the CI will have relevant, material, and exculpatory information for his defense -- indeed, Troup has not sufficiently

- 138 -

demonstrated to the Court that "there is a slight possibility a defendant might benefit from disclosure" in order to overcome the United States' interest in protecting this CI. United States v. Moralez, 908 F.2d at 568. The only showing Troup has made is that the CI was likely present to witness that Troup and another Defendant, "Weno," "saw that . . . two [other] individuals were taking too long [to murder F.S.,] and [thus] killed F.S." themselves. Motion to Disclose Reply at 3. The Court is not convinced that the CI's presence at the murder scene, absent more, suggests that the CI will be able to provide material, exculpatory information for Troup's defense -- the statement quoted above from the CI is, in fact, inculpatory. Without something more, something to suggest exculpatory information, the Court cannot conclude that it should order the CI's identity's disclosure under Brady.

Regarding Sanchez, the Motion to Disclose Reply indicates that, because Sanchez is implicated in the same murder as Perez is charged, Sanchez should be entitled to the CI's identity so that he can investigate the aspects of the crime involving Perez. See Motion to Disclose Reply at 3. Sanchez declined to make argument at the hearing, however, stating that he was not interested in the identity of the same CI as Troup. See Tr. at 111:22-112:10 (Jewkes). This statement was probably the result of a miscommunication at the hearing, however, as the CI provides information regarding both F.S. and J.M's murders, and the Court thus nonetheless relies on the showing Sanchez made for this CI in the Motion to Disclose Reply at 3. Sanchez does not, however, clear his hurdle under Brady, as he has merely alleged that Counts 6 and 7 name him, alongside Perez, the Defendant whom the CI names in his report.

The Court pauses to note that the Sixth Circuit has considered an argument similar to that which Sanchez attempts to make here, which the Court infers to be relying on the following language in United States v. Roviaro: "[O]nce the identity of the informer has been disclosed to

DNM 1103

those who would have cause to resent the communication, the privilege is no longer applicable."

United States v. Roviaro, 353 U.S. at 60.  The Court is making its holding, for this testifying CI,

in accordance with Brady, but nonetheless addresses this argument for clarity.  In United States

v. Sierra-Villegas, the Sixth Circuit stated:

> The dictum in *Roviaro* that Sierra-Villegas relies on -- "once the identity of the
> informer has been disclosed to those who would have  cause to resent the
> communication, the privilege is no longer applicable" -- must be understood in
> light of the purpose of the informant privilege: "The purpose of the privilege is
> the furtherance and protection of the public interest in effective law enforcement.
> The privilege recognizes the obligation of citizens to communicate their
> knowledge of the commission of crimes to law-enforcement officials, and, by
> preserving their anonymity, encourages them to perform that obligation."  . . . .
> Disclosure to those who might resent the informant's cooperation with law
> enforcement eliminates the privilege because such disclosure exposes the
> informant to potential harm, and the privilege is designed to shield the informant
> from harm that might arise from his or her cooperation.  But so long as some
> potential harm from further disclosure or publication remains, the government
> retains an interest in non-disclosure and the privilege may still apply.

United States v. Sierra-Villegas, 774 F.3d at 1098.  Given that the Court is ordering these CI

disclosures under a protective-disclosure agreement the United States has already used in its

disclosure to Perez, the Court will follow the Sixth Circuit's directions regarding this language in

United States v. Roviaro.

Turning then to Montoya, the Second Motion to Disclose Reply argues that Montoya,

whom the United States "alleges . . . used a shank provided by co-defendant Rudy Perez in order

to murder Javier Molina," is implicated only by the CI's statements linking him to the murder.

Second Motion to Disclose Reply at 2.  After hearing argument that the CI could enlighten

Montoya about the conspiracy's strictures and about J.M.'s murder, the Court ruled:

> I'm not convinced as to Mr. Montoya.  I think that -- like I said originally, I think
> your situation is more akin to Mr. Troup's back here.  If I start lowering the bar to
> that level, that we just want to know whether there is a scheme, or whether we
> want to know who is present, probably I'd drop the bar to a point where almost all
> these CIs will be disclosed.  And I don't think that's probably what the law

requires.   So I'll give it some thought, but I'm not inclined to grant Mr.
Montoya's request.

Tr. 178:13-179:6 (Court).  The Court maintains this holding, because Montoya, like Troup, has

not made a satisfactory showing under <u>Brady</u> that the CI would have material, exculpatory

information for Montoya.  Unlike Baca's case, where he could benefit, by exculpatory testimony

by the CI as to the timing of the shanks' manufacture in relation to Baca's alleged order of the

hit, Montoya has not demonstrated that this CI, as opposed to anyone else, is likely to offer him

material, exculpatory information.  The Court will thus not order disclosure of the CI's identity

to Montoya at this time.

Regarding Herrera, the Motion to Disclose Reply argues that Herrera was not in J.M.'s

pod during the murder and that he is implicated only because Armenta has suggested Herrera

was involved.  <u>See</u> Motion to Disclose Reply at 6.  The Motion to Disclose Reply thus contends

that, because Armenta has given conflicting statements at different times in the aftermath of

J.M.'s murder, that the informant's statements at issue here could be exculpatory, and, thus, that

he is entitled to the CI's identity for investigation.  <u>See</u> Motion to Disclose Reply at 7.  The CI,

according to the Motion to Disclose Reply, also implicates Herrera's mother with involvement in

"trafficking and racketeering" for SNM.   Motion to Disclose Reply at 7.   Herrera's only

argument in his favor is that "it's our position that . . . .  [i]f we had the identity of that CS, we

could obviously talk to that person, and, in fact verify that Mr. Herrera is not who the

Government thinks he is."  Tr. at 140:4-10 (Davis).  As the United States argued at the hearing,

Herrera is seeking this CI's identity so he could impeach him by omission according to what the

informant does not say in the report.  <u>See</u> Tr. at 141:12-142:4 (Beck).  The Court thus concluded

that

I probably am not going to start disclosing CIs because of what's not in these case
reporting documents or [CI's] reporting documents.  I'm a bit of a proponent of

- 141 -

the dog doesn't bark theory from time to time.[11]   But it's probably got to be stronger than that.  So I probably am not going to make the government disclose [CI]s on what's not in these reports without a stronger showing.

Tr. at 147:16-23 (Court).  The Court will maintain this ruling for the time being and not order the

disclosure of this CI to Herrera absent a stronger showing under Brady.

**IT IS ORDERED** that: (i) the Defendants' Joint Motion to Vacate March 2017 Trial

Setting, Impose a Discovery Scheduling Order and Request for a Hearing, filed September 7,

2016 (Doc. 676), is granted; (ii) the Joint Motion to Exclude the Prosecution Team from

December 2, 2016 Evidence Viewing, filed November 8, 2016 (Doc. 763), is granted; and (iii)

The Joint Motion for Disclosure and Production of Confidential Informant, filed September 22,

2016 (Doc. 698), is granted in part, as the Court is ordering disclosure under a protective order to

Baca, and denied in part without prejudice, leaving open the possibility for the Defendants

Edward Troup, Daniel Sanchez, Jerry Montoya, and Carlos Herrera to make a sufficient Brady

showing for disclosure of the CI's identity at a later date.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
   United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

---

[11]See Sir Arthur Conan Doyle, Silver Blaze (1892)(involving a story, where Sherlock Holmes is investigating a race-horse theft, and he solves the case by focusing on the fact that a guard dog did not bark during the commission of the crime).

- 142 -

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

     *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

    *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

-- and --

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

    *Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

    *Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

-- and --

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

    *Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

    *Attorney for Defendant Arturo Arnulfo Garcia*

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

-- and --

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

-- and --

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

DNM 1109

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

    *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

-- and --

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

    *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

-- and --

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

     *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Roy Paul Martinez*

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

-- and --

Christopher W. Adams
Charleston, South Carolina

     *Attorneys for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

-- and --

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Carlos Herrera*

- 147 -

Donald R. West
Don West Law
Orlando, Florida

-- and --

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

    *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

    *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*

DNM 1112

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

17 MAR -9 AM 10: 21

CLERK-LAS CRUCES

DNM 1113

Page: 689          Date Filed: 09/29/2020          Document: 010110415663          Appellate Case: 20-2058

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CRIMINAL NO. <u>15-4268 JB</u> |
| | ) |
| vs. | ) Counts 1, 2, 3, 5 and 7: 18 U.S.C. § |
| | ) 1959(a)(1): Violent Crimes in Aid of |
| **ANGEL DELEON,** | ) Racketeering (Murder); 18 U.S.C. § 2: |
| **JOE LAWRENCE GALLEGOS,** | ) Aiding and Abetting; |
| **EDWARD TROUP, a.k.a. "Huero Troup,"** | ) |
| **LEONARD LUJAN,** | ) Counts 4, 6, 9, 10 and 14:  18 U.S.C. § |
| **BILLY GARCIA, a.k.a. "Wild Bill,"** | ) 1959(a)(5): Violent Crimes in Aid of |
| **EUGENE MARTINEZ, a.k.a. "Little** | ) Racketeering (Conspiracy to Murder); |
| **Guero,"** | ) |
| **ALLEN PATTERSON,** | ) Count 8: 18 U.S.C. § 1959(a)(6): Violent |
| **CHRISTOPHER CHAVEZ, a.k.a.** | ) Crimes in Aid of Racketeering |
| **"Critter,"** | ) (Conspiracy to Commit Assault Resulting |
| **JAVIER ALONSO, a.k.a. "Wineo,"** | ) in Serious Bodily Injury); |
| **ARTURO ARNULFO GARCIA, a.k.a.** | ) |
| **"Shotgun,"** | ) Count 11: 18 U.S.C. §§ 922(g)(1) and |
| **MARIO RODRIGUEZ, a.k.a. "Blue,"** | ) 924(a)(2):  Felon in Possession of a |
| **MAURICIO VARELA, a.k.a. "Archie,"** | ) Firearm; |
| **a.k.a. "Hog Nuts,"** | ) |
| **DANIEL SANCHEZ, a.k.a. "Dan Dan,"** | ) Count 12: 18 U.S.C. § 924(c):  Using and |
| **CONRAD VILLEGAS, a.k.a. "Chitmon,"** | ) Carrying a Firearm During and in |
| **ANTHONY RAY BACA, a.k.a. "Pup,"** | ) Relation to a Crime of Violence; |
| **CHRISTOPHER GARCIA,** | ) |
| **CARLOS HERRERA, a.k.a. "Lazy,"** | ) Count 13: 18 U.S.C. § 1959(a)(3): Violent |
| **RUDY PEREZ, a.k.a. "Ru Dog,"** | ) Crimes in Aid of Racketeering (Assault |
| **ANDREW GALLEGOS, a.k.a. "Smiley,"** | ) with Dangerous Weapon); 18 U.S.C. § 2: |
| **SANTOS GONZALEZ,** | ) Aiding and Abetting; |
| **SHAUNA GUTIERREZ,** and | ) |
| **BRANDY RODRIGUEZ,** | ) Count 15: 18 U.S.C. §§ 1959(a)(3) and |
| | ) 1959(a)(5):Violent Crimes in Aid of |
| Defendants. | ) Racketeering (Attempted Murder, Assault |
| | ) Resulting in Serious Bodily Injury and |
| | ) Assault with Dangerous Weapon); 18 |
| | ) U.S.C. § 2: Aiding and Abetting; |
| | ) |
| | ) Count 16: 18 U.S.C. § 1512: Witness |
| | ) Tampering; 18 U.S.C. § 2: Aiding and |
| | ) Abetting. |

<u>S E C O N D   S U P E R S E D I N G   I N D I C T M E N T</u>

DNM 1114

Page: 690   Date Filed: 09/29/2020   Document: 010110415663   Appellate Case: 20-2058

The Grand Jury charges:

## INTRODUCTORY ALLEGATIONS

## THE RACKETEERING ENTERPRISE, SYNDICATO DE NUEVO MEXICO GANG

1.     At  various times relevant to this Second Superseding Indictment, the defendants,

**ANGEL DELEON,   JOE LAWRENCE GALLEGOS, EDWARD TROUP, a.k.a. "Huero**

**Troup," LEONARD LUJAN, BILLY GARCIA, a.k.a. "Wild Bill," EUGENE MARTINEZ,**

**a.k.a. "Little Guero," ALLEN PATTERSON, CHRISTOPHER CHAVEZ, a.k.a. "Critter,"**

**JAVIER ALONSO, a.k.a. "Wineo," ARTURO ARNULFO GARCIA, a.k.a. "Shotgun,"**

BENJAMIN CLARK, a.k.a. "Cyclone," RUBEN HERNANDEZ, JERRY ARMENTA, a.k.a.

"Creeper," JERRY MONTOYA, a.k.a. "JR," a.k.a. "Plaz," **MARIO RODRIGUEZ, a.k.a.**

**"Blue,"** TIMOTHY MARTINEZ, a.k.a. "Red," **ANTHONY RAY BACA, a.k.a.  "Pup,"**

ROBERT MARTINEZ, a.k.a. "Baby Rob," ROY PAUL MARTINEZ, a.k.a. "Shadow,"

**MAURICIO VARELA, a.k.a. "Archie," a.k.a. "Hog Nuts," DANIEL SANCHEZ, a.k.a.**

**"Dan Dan,"** GERALD ARCHULETA, a.k.a.  "Styx," a.k.a. "Grandma," **CONRAD**

**VILLEGAS, a.k.a. "Chitmon," CHRISTOPHER GARCIA, CARLOS HERRERA, a.k.a.**

**"Lazy," RUDY PEREZ, a.k.a. "Ru Dog," ANDREW GALLEGOS, a.k.a. "Smiley,"**

**SANTOS GONZALEZ,** PAUL RIVERA, **SHAUNA GUTIERREZ** and  **BRANDY**

**RODRIGUEZ,** and others were members/prospects/associates of the Syndicato de Nuevo

Mexico Gang (SNM), a criminal organization whose members/prospects/associates engaged in

acts of violence and other criminal activities, including, murder, kidnapping, attempted murder,

conspiracy to manufacture/distribute narcotics, and firearms trafficking.  At all relevant times,

SNM operated in the District of New Mexico and elsewhere.

2.     SNM, including its leadership, membership, prospects, and associates, constituted

an enterprise as defined in Title 18, United States Code, Sections 1959(b)(2), that is, a group of

DNM 1115

Page: 691

Date Filed: 09/29/2020

Document: 010110415663

Appellate Case: 20-2058

individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## GENERAL BACKGROUND

3.     The Syndicato de Nuevo Mexico ("SNM"), Spanish for Syndicate of New Mexico, is a powerful and violent prison gang, which controlled drug distribution and other illegal activities within the New Mexico penal system, and was also involved in street level narcotics trafficking. It was formed in the early 1980s at the Penitentiary of New Mexico after a prison riot at the penitentiary in February, 1980. During the prison riot, twelve correctional officers were taken hostage and several of them were seriously assaulted and raped by inmates. Thirty-three inmates were killed during the riot, and more than two hundred were injured.

4.     Following the prison riot, the SNM Gang expanded throughout the New Mexico penal system and has boasted of as many as 500 members since the early 1980s. The SNM Gang was comprised of approximately 250 members, who are known as "hermanos," "brothers," "carnales," "dons," "jefes," "big hommies," or "Zia manos" and who controlled the gang. The SNM operated under a "panel" or "mesa" (Spanish for table) of leaders who issued orders to subordinate gang members.

5.     Despite being imprisoned and being closely scrutinized by prison officials, SNM Gang leaders managed to convey orders to SNM Gang members and associates throughout the prison system and outside the prison system through a variety of means, including secret notes, called "kites," or "welas," coded letters, and messages conveyed by complicit visitors. When SNM Gang members or associates completed their sentences and rejoined their communities, they were expected to remain loyal to the SNM Gang and work to further the goals of the SNM

DNM 1116

Appellate Case: 20-2058     Document: 010110415663     Date Filed: 09/29/2020     Page: 692

Gang outside the prison environment.  Members who failed to show continued loyalty to the gang were disciplined in various ways, to include murder and assaults. One of the significant goals of the SNM Gang was to control and profit from narcotics trafficking.

6.      In addition to exerting its control in the New Mexico penal system, the SNM Gang also operated on the streets of New Mexico by intimidating and influencing smaller New Mexico Hispanic gangs for the purpose of establishing a larger network for the SNM's illegal activities.  If a gang did not accede to the SNM Gang's demands, the SNM Gang assaulted or killed the gang's members who were not in custody as well as those members who were incarcerated within the New Mexico penal system.  In addition to intimidation through direct assaults, the SNM Gang was also able to assert control and influence over gang members outside the penal system because gangs did not want their members outside the penal system to be assaulted or killed, and because the gang members knew that, if they are incarcerated, they would need the protection of the SNM Gang while they served their sentences.

7.      The SNM Gang had been and continues to be engaged in a fierce and violent war with rival gangs, to include the Barrio Azteca, Los Carnales, Sureños, and Burqueños gangs. Within the prison system, this rivalry manifested itself in beatings and stabbings, which often resulted in death.  Outside the prison system, the SNM Gang fought for control of territory in which to conduct narcotics trafficking and other crimes, as well as to recruit and influence non-gang members. In addition to fighting for control over numerous illegal activities and using violence and terror for the purpose of enriching themselves, the SNM Gang also engaged in violence simply to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, to gain notoriety and show its superiority over others, and to send a message to others that it was strong, powerful and not to be provoked.

DNM 1117

Page: 693

Date Filed: 09/29/2020

Document: 010110415663

Appellate Case: 20-2058

8.      The SNM Gang sought to maintain its reputation for being strong and powerful and maintained its membership to continue functioning as an organization in prison and on the streets. If the SNM Gang was perceived as being weak, then rival gangs would challenge and assault its members and take over its territory. This could have caused the gang to lose membership and eventually dissolve. The SNM Gang maintained a large membership and a reputation for being strong, powerful and dominant so that rival gangs would think twice before they challenged it and victims/witnesses would think twice about assisting authorities with any prosecution attempt against it.  This allowed the gang to grow in strength, thrive in its criminal activity, and dominate its territory.  A member of the SNM Gang was expected to seek out and beat, stab, or shoot rival gang members.  Similarly, a member of the SNM Gang was expected to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.

9.      SNM Gang members identifed themselves with the Zia symbol and the letters "SNM" or "S," which represented the "Syndicato de Nuevo Mexico" or "Syndicato" which is Spanish for Syndicate. SNM Gang members also utilized the number "19" which represents the 19th letter of the alphabet, "S," and "505," which corresponds with the area code for the greater Albuquerque area.  The SNM Gang claimed the entire state of New Mexico as its territory, which was broken into four geographical regions: North, South, East, and West. As with the numbers "19," and "505," the letters "S" or "SNM," the Zia symbol, and the Spanish word "Syndicato" were commonly, but not exclusively, displayed by SNM Gang members in tattoos, graffiti, drawings, and on clothing, as a way of displaying affiliation, loyalty, and commitment to the gang.

**ROLES OF THE DEFENDANTS**

10.    Defendants **ARTURO ARNULFO GARCIA, a.k.a. "Shotgun,"** GERALD ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma," BENJAMIN CLARK, a.k.a. "Cyclone," **MARIO RODRIGUEZ, a.k.a. "Blue," ANTHONY RAY BACA, a.k.a. "Pup,"** ROBERT MARTINEZ, a.k.a. "Baby Rob," ROY PAUL MARTINEZ, a.k.a. "Shadow," and **DANIEL SANCHEZ, a.k.a. "Dan Dan,"** were the leaders of the enterprise who directed or delegated the power to direct other members of the enterprise to carry out unlawful and other activities in furtherance of the conduct of the enterprise's affairs.

11.    Under the direction and leadership of the enterprise, defendants **ANGEL DELEON, JOE LAWRENCE GALLEGOS, EDWARD TROUP, a.k.a. "Huero Troup," LEONARD LUJAN, BILLY GARCIA, a.k.a. "Wild Bill," EUGENE MARTINEZ, a.k.a. "Little Guero," ALLEN PATTERSON, CHRISTOPHER CHAVEZ, a.k.a. "Critter," JAVIER ALONSO, a.k.a. "Wineo,"** RUBEN HERNANDEZ, JERRY ARMENTA, a.k.a. "Creeper," JERRY MONTOYA, a.k.a. "JR," a.k.a. "Plaz," TIMOTHY MARTINEZ, a.k.a. "Red," **MAURICIO VARELA, a.k.a. "Archie," a.k.a. "Hog Nuts," CONRAD VILLEGAS, a.k.a. "Chitmon," CHRISTOPHER GARCIA, CARLOS HERRERA, a.k.a. "Lazy," RUDY PEREZ, a.k.a. "Ru Dog," ANDREW GALLEGOS, a.k.a. "Smiley," SANTOS GONZALEZ,** PAUL RIVERA, **SHAUNA GUTIERREZ** and **BRANDY RODRIGUEZ,** were members or associates who participated in unlawful and other activities in furtherance of the conduct of the enterprise's affairs.

**PURPOSES OF THE SYNDICATO DE NUEVO MEXICO GANG**

12.    The purposes of the SNM Gang enterprise included the following:

DNM 1119

Page: 695

Date Filed: 09/29/2020

Document: 01011041 5663

Appellate Case: 20-2058

a.   Preserving and protecting the power, territory, reputation, and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults, and murder;

b.   Promoting and enhancing the enterprise and the activities of its members and associates through criminal acts, including, but not limited to, murder, attempted murder, narcotics trafficking, theft of vehicles, robberies, and other criminal activities;

c.   Keeping victims, potential victims, witnesses, and community members in fear of the enterprise and its members and associates through violence and threats of violence;

d.   Protecting the enterprise's members and associates who committed crimes by hindering, obstructing, and preventing law enforcement officers from identifying the offenders, apprehending the offenders, and successfully prosecuting and punishing the offenders;

e.   Providing information to members and associates of the enterprise, including those who were incarcerated, for the purpose of committing acts of violence, robbery, distribution of controlled substances, and other offenses;

f.   Providing financial support and information to SNM Gang members and associates, including those members and associates who were incarcerated.

## MEANS AND METHODS OF THE ENTERPRISE

13.   Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the SNM Gang were the following:

DNM 1120

Appellate Case: 20-2058     Document: 010110415663     Date Filed: 09/29/2020     Page: 696

a.    Members and associates of the enterprise committed, conspired, attempted, and threatened to commit acts of violence, including murders and assaults, to protect and expand the enterprise's criminal operations.

b.    To generate income, members and associates of the enterprise trafficked in controlled substances and extorted narcotic traffickers.

c.    To perpetuate the enterprise, members and associates of the enterprise discussed the membership, rules, and enforcement of the rules of the SNM Gang; the status of SNM Gang members and associates who were arrested or incarcerated; the discipline of SNM Gang members; SNM Gang members' encounters with law enforcement; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and plans and agreements regarding the commission of future crimes, including murder, drug distribution, possession of firearms, and assault, as well as ways to conceal these crimes.

d.    It was further part of the means and methods of the enterprise that members and associates of the enterprise concealed from law enforcement the way in which the enterprise conducted its affairs; the locations where enterprise members discussed and conducted the affairs of the enterprise; the locations where enterprise members stored and possessed weapons and narcotics; and the locations where enterprise members maintained the proceeds from narcotics trafficking.

e.    Members of the SNM Gang also used violence to impose discipline within the SNM Gang. It was further part of the means and methods of the

8

DNM 1121

Page: 697

Date Filed: 09/29/2020

Document: 010110415663

Appellate Case: 20-2058

enterprise that the defendants and other members and associates of the

SNM Gang agreed to distribute narcotics and commit other crimes, and to

conceal their criminal activities by obstructing justice, threatening and

intimidating witnesses, and other means.

14.    The SNM gang enterprise, through its members and associates, engaged in

racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), that is acts and threats

involving murder and robbery in violation of New Mexico law, acts indictable under 18 U.S.C.

§§ 1503, 1512 and 1513 involving obstruction of justice, tampering with or retaliating against a

witness, victim, or informant,  and offenses involving trafficking in narcotics in violation of 21

U.S.C. §§ 841 and 846.

<div align="center">Count 1</div>

<div align="center">Murder of F.C.</div>

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged

and incorporated by reference as though fully set forth herein.

On or about March 26, 2001, in Doña Ana County, in the District of New Mexico, as

consideration for the receipt of, and as consideration for a promise and agreement to pay,

anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the

purpose of gaining entrance to and maintaining and increasing position in the  Syndicato de

Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants,

**ANGEL DELEON, JOE LAWRENCE GALLEGOS, EDWARD TROUP, a.k.a. "Huero**

**Troup," LEONARD LUJAN,** and **BILLY GARCIA, a.k.a. "Wild Bill,"** did unlawfully,

knowingly, and intentionally murder F.C., in violation of  NMSA 1978, Sections 30-2-1 and 30-

1-13.

All in violation of 18 U.S.C. §§1959(a)(1) and 2.

DNM 1122

Page: 698

Date Filed: 09/29/2020

Document: 010110415663

Appellate Case: 20-2058

<div align="center">

Count 2

Murder of R.G.

</div>

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

On or about March 26, 2001, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, **LEONARD LUJAN**, **BILLY GARCIA, a.k.a. "Wild Bill," EUGENE MARTINEZ, a.k.a. "Little Guero," ALLEN PATTERSON,** and **CHRISTOPHER CHAVEZ, a.k.a. "Critter,"** did unlawfully, knowingly, and intentionally murder R.G., in violation of NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

<div align="center">

Count 3

Murder of F.S.

</div>

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

On or about June 17, 2007, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, **JAVIER ALONSO, a.k.a. "Wineo," EDWARD TROUP, a.k.a. "Huero Troup," ARTURO**

**ARNULFO GARCIA, a.k.a. "Shotgun,"** BENJAMIN CLARK, a.k.a. "Cyclone," and RUBEN

HERNANDEZ, did unlawfully, knowingly, and intentionally murder F.S., in violation of

NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

## Count 4

### Conspiracy to Murder A.B.

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged

and incorporated by reference as though fully set forth herein.

In or about November 2012, in Socorro and Valencia Counties, in the District of New

Mexico, and elsewhere,  as consideration for the receipt of, and as consideration for a promise

and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang

(SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the

Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the

defendants, **JOE LAWRENCE GALLEGOS** and **ANDREW GALLEGOS, a.k.a. "Smiley,"**

and others known and unknown to the grand jury, did unlawfully, knowingly, and intentionally

conspire to murder A.B., in violation of  NMSA 1978, Sections 30-2-1 and 30-28-2.

All in violation of 18 U.S.C. § 1959(a)(5).

## Count 5

### Murder of A.B.

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged

and incorporated by reference as though fully set forth herein.

On or about November 12, 2012, in Socorro and Valencia Counties, in the District of

New Mexico, and elsewhere, as consideration for the receipt of, and as consideration for a

promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo

Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing

position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering

activity, the defendants, **JOE LAWRENCE GALLEGOS** and **ANDREW GALLEGOS,**

**a.k.a. "Smiley,"** did unlawfully, knowingly and intentionally murder A.B., in violation of

NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

<u>Count 6</u>

<u>Conspiracy to Murder J.M.</u>

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged

and incorporated by reference as though fully set forth herein.

In March 2014, in Doña Ana County, in the District of New Mexico and elsewhere, as

consideration for the receipt of, and as consideration for a promise and agreement to pay,

anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the

purpose of gaining entrance to and maintaining and increasing position in the Syndicato de

Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants,

JERRY ARMENTA, a.k.a. "Creeper," JERRY MONTOYA, a.k.a. "JR," a.k.a. "Plaz," **MARIO**

**RODRIGUEZ, a.k.a. "Blue,"** TIMOTHY MARTINEZ, a.k.a. "Red," **ANTHONY RAY**

**BACA, a.k.a. "Pup," MAURICIO VARELA, a.k.a. "Archie," a.k.a. "Hog Nuts," DANIEL**

**SANCHEZ, a.k.a. "Dan Dan," CARLOS HERRERA, a.k.a. "Lazy,"** and **RUDY PEREZ,**

**a.k.a. "Ru Dog,"** and others known and unknown to the grand jury, did unlawfully, knowingly,

and intentionally conspire to murder J.M., in violation of NMSA 1978, Sections 30-2-1 and 30-

28-2.

All in violation of 18 U.S.C. § 1959(a)(5).

DNM 1125

Page: 701

Date Filed: 09/29/2020

Document: 01110415663

Appellate Case: 20-2058

Count 7

Murder of J.M.

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

On or about March 7, 2014, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, JERRY ARMENTA, a.k.a. "Creeper," JERRY MONTOYA, a.k.a. "JR," a.k.a. "Plaz," **MARIO RODRIGUEZ, a.k.a. "Blue,"** TIMOTHY MARTINEZ, a.k.a. "Red," **ANTHONY RAY BACA, a.k.a. "Pup," MAURICIO VARELA, a.k.a. "Archie," a.k.a. "Hog Nuts," DANIEL SANCHEZ, a.k.a. "Dan Dan," CARLOS HERRERA, a.k.a. "Lazy,"** and **RUDY PEREZ, a.k.a. "Ru Dog,"** did unlawfully, knowingly and intentionally murder J.M., in violation of NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

Count 8

Conspiracy to Commit Assault Resulting in Serious Bodily Injury to J.R.

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

Starting in or about 2003, and continuing until on or about July 13, 2015, in Doña Ana County, in the District of New Mexico, and elsewhere, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and

maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an

enterprise engaged in racketeering activity, the defendants, **ANTHONY RAY BACA, a.k.a.**

**"Pup,"** GERALD ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma," and **CONRAD**

**VILLEGAS, a.k.a. "Chitmon,"** did unlawfully, knowingly, and intentionally conspire to

commit assault resulting in serious bodily injury to J.R., in violation of NMSA 1978, Sections

30-3-5 and 30-28-2.

 All in violation of 18 U.S.C. § 1959(a)(6).

<div align="center">Count 9</div>

<div align="center">Conspiracy to Murder D.S.</div>

 Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged

and incorporated by reference as though fully set forth herein.

 Starting on a date uncertain, but no later than 2013, and continuing to on or about the date

of this Second Superseding Indictment, in Santa Fe County, in the District of New Mexico, and

elsewhere, as consideration for the receipt of, and as consideration for a promise and agreement

to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for

the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de

Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants,

**ANTHONY RAY BACA, a.k.a. "Pup,"** ROY MARTINEZ, a.k.a. "Shadow," and ROBERT

MARTINEZ, a.k.a. "Baby Rob," and others known and unknown to the grand jury, did

unlawfully, knowingly, and intentionally conspire to murder D.S., in violation of NMSA 1978,

Sections 30-2-1 and 30-28-2.

 All in violation of 18 U.S.C. § 1959(a)(5).

DNM 1127

Appellate Case: 20-2058    Document: 010110415663    Date Filed: 09/29/2020    Page: 703

<u>Count 10</u>

<u>Conspiracy to Murder G.M.</u>

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

Starting on a date uncertain, but no later than 2013, and continuing to on or about the date of this Second Superseding Indictment, in Santa Fe County, in the District of New Mexico, and elsewhere, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, **ANTHONY RAY BACA, a.k.a. "Pup,"** ROY MARTINEZ, a.k.a. "Shadow," ROBERT MARTINEZ, a.k.a. "Baby Rob," and **CHRISTOPHER GARCIA**, and others known and unknown to the grand jury, did unlawfully, knowingly, and intentionally conspire to murder G.M., in violation of NMSA 1978, Sections 30-2-1 and 30-28-2.

All in violation of 18 U.S.C. § 1959(a)(5).

<u>Count 11</u>

<u>Felon in Possession of a Firearm</u>

On or about November 29, 2015, in Bernalillo County, in the District of New Mexico, the defendant, **CHRISTOPHER GARCIA**, having been convicted of at least one of the following felony crimes punishable by imprisonment for a term exceeding one year:

(1)  aggravated battery (great bodily harm) (firearm enhancement),

(2)  felon in possession of a firearm, and

(3)  trafficking a controlled substance,

knowingly possessed, in and affecting commerce, a firearm.

15

DNM 1128

Page: 704

Date Filed: 09/29/2020    Document: 010110415663    Appellate Case: 20-2058

In violation of 18 U.S.C. § 922(g).

## Count 12

### Using and Carrying a Firearm During and in Relation to a Crime of Violence

On or about November 29, 2015, in Bernalillo County, in the District of New Mexico, the defendant, **CHRISTOPHER GARCIA**, during and in relation to a crime of violence for which the defendant may be prosecuted in a court of the United States, specifically, conspiracy to murder as charged in Count 10 of this second superseding indictment, knowingly used and carried a firearm.

In violation of 18 U.S.C. § 924(c).

## Count 13

### Assault With a Dangerous Weapon Upon J.G.

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

On or about March 17, 2015, in Valencia County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM),  an enterprise engaged  in racketeering activity, the defendant, **JOE LAWRENCE GALLEGOS**, did unlawfully, knowingly, and intentionally commit assault with a dangerous weapon against J.G., in violation of  NMSA 1978, §§ 30-3-2 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(3) and 2.

DNM 1129

Page: 705

Date Filed: 09/29/2020

Document: 010110415663

Appellate Case: 20-2058

Count 14

Conspiracy to Murder J.G.

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

On or about February 1, 2016, to on or about February 27, 2016, in Otero and Valencia Counties, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, **JOE LAWRENCE GALLEGOS**, **SANTOS GONZALEZ**, PAUL RIVERA, **SHAUNA GUTIERREZ** and **BRANDY RODRIGUEZ**, and others known and unknown to the grand jury, did unlawfully, knowingly and intentionally conspire to murder  J.G., in violation of  NMSA 1978, §§ 30-2-1 and 30-28-2.

All in violation of 18 U.S.C. § 1959(a)(5).

Count 15

Attempted Murder of J.G., Assault With a Dangerous Weapon Upon J.G.,
Resulting in Serious Bodily Injury to J.G.

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

On or about February 27, 2016, in Valencia County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM),  an enterprise engaged  in racketeering activity, the defendants,

JOE LAWRENCE GALLEGOS, SANTOS GONZALEZ, PAUL RIVERA, SHAUNA

GUTIERREZ and BRANDY RODRIGUEZ, did unlawfully, knowingly, and intentionally

attempt to murder J.G., and committed assault with a dangerous weapon and assault resulting in

serious bodily injury to J.G., in violation of NMSA 1978, §§ 30-2-1, 30-28-1, 30-3-2 , 30-3-5,

and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(3) and 1959(a)(5) and 2.

### Count 16

#### Tampering With a Witness, Victim or Informant by Physical Force or Threat

Paragraphs one through fourteen of this Second Superseding Indictment are re-alleged

and incorporated by reference as though fully set forth herein.

On or about February 27, 2016, in Valencia County, in the District of New Mexico, the

defendants, JOE LAWRENCE GALLEGOS, SANTOS GONZALEZ, PAUL RIVERA,

SHAUNA GUTIERREZ and BRANDY RODRIGUEZ, used and attempted to use physical

force and the threat of physical force against J.G. by assaulting J.G. with a dangerous weapon

with the intent to influence, delay, or prevent J.G. from testifying against JOE LAWRENCE

GALLEGOS in an official proceeding.

All in violation of 18 U.S.C. §§ 1512(a)(2)(A) and 2.

A TRUE BILL:

/s/
FOREPERSON OF THE GRAND JURY

Assistant United States Attorney
03/08/17 5:07PM

## CLERK'S MINUTES OF ARRAIGNMENT

Date: **3/15/2017**                  Judge: **WORMUTH**                  Clerk: **K. SOLIS**

USA vs. **ANDREW GALLEGOS**                                    CR No. **15-4268 JB**
Deft present with counsel: **DONAVON ROBERTS**  ☒ Appt'd.   ☐ Ret'd.

U.S. represented by: **MARIA ARMIJO/RANDY CASTELLANO/MATTHEW BECK, AUSAs**
Name of Interpreter: **N/A**

Court in Session: **1:49 – 1:50 P.M. (1 MIN)**
Liberty: **LCR-SIERRA BLANCA**

☐ Defendant not present          ☐ Bench warrant issued
☐ Waiver of Appearance at Arraignment and Entry of Not Guilty Plea submitted and
   approved in Open Court

**Court asked the Defendant:**
☐  Name                      ☐ Extent of education/schooling        ☐ Age
☐     Whether defendant has any medical or mental health issues or concerns
☒     Whether defendant has received a copy of **SECOND SUPERSEDING INDICTMENT**
☒     Whether defendant has had time to consult with his/her attorney
☐     Whether defendant wants Indictment/Information read in open court
☒     Whether defendant will waive the reading of Indictment/Information
☒     Whether defendant is ready to plead

☒     Defendant entered a **NOT GUILTY** plea to all counts
☒     Matter referred to District Judge
☒     Counsel ordered to file any motions by:
        **SCHEDULING/DISCOVERY DEADLINES TO BE SET BY DISTRICT JUDGE**
☒     Case assigned to:
              ☒     **JUDGE BROWNING**
☒     Trial set on trailing docket commencing: **TO BE SET**
☐     Defendant requested psychiatric examination; Motion to be filed.
☒     Defendant to remain in custody
☐     Defendant advised to file motion to reconsider
☐     Penalty for failure to appear explained
☐     Discovery Order entered
☐     Unseal Case
☐     First appearance of Defendant
☐     Other:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Action No. 15-CR-4268-JB

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ANGEL DELEON, *et. al.*

**3.     EDWARD TROUP**,
**5.     BILLY GARCIA,**

        Defendants.

---

**DEFENDANTS' REPLY TO THE UNITED STATES' RESPONSE IN OPPOSITION TO
THE DEFENDANTS MOTION TO SEVER COUNTS 1 AND 2 [882]**

---

       COME NOW, Defendants Edward Troup and Billy Garcia (the Defendants), by and through undersigned counsel, and hereby submit this Reply to the United States' Response in Opposition to Defendants [sic] Motion to Sever Counts 1 and 2 (Doc. No. 936) [hereinafter "Government Response"].

**I.      BACKGROUND RE: SEVERANCE**

    On February 7, 2017, the Court had a long discussion with the parties regarding severance.  At the onset of this discussion, the Court suggested that it might be premature to rule on severance because it was unclear at that time how many defendants would actually be going to trial.  The parties candidly discussed with the Court their best educated guesses as to how many defendants might go to trial.  The

1

prosecution opined that 6-10 defendants might go to trial.  Defense counsel opined that more than 10 defendants would go to trial, perhaps as many as 15.

There are 22 defendants named in the Second Superseding Indictment.[1] The following ten defendants have entered into plea bargains:  Benjamin Clark, Ruben Hernandez, Jerry Armenta, Jerry Montoya, Gerald Archuleta, Paul Rivera, Roy Paul Martinez, Robert Martinez, Timothy Martinez, and Leonard Lujan.  Thus, as of today, 20 defendants are still set for trial on July 10, 2017.

On February 7, the defense suggested that the trial date of July 10, 2017, be used for the trial of Counts 6 and 7.  There are nine defendants named in these counts. Three of the nine defendants have entered into plea agreements (Jerry Armenta, Jerry Montoya and Timothy Martinez.)  Thus, six of the now-remaining nineteen defendants could be tried in a single trial, including Anthony Ray Baca, who is also charged in Counts 8, 9 and 10.  The Court was not overly enthusiastic about this suggestion. Instead, the Court asked the parties to suggest three different groups of defendants that might be appropriate for three separate trials.  The defense was uncomfortable with the Court's request, but complied with it nonetheless.  If memory serves, none of the following suggestions that were made to the Court—three separate trials—were unanimous with defense counsel:

- Counts 6 and 7, and Counts 13, 14 and 15.
- Counts 4 and 5, and Counts 8-12.
- Counts 1, 2 and 3.

---

[1] Those who have entered guilty pleas were omitted, except Leonard Lujan who entered a guilty plea shortly thereafter.

DNM 1133

The government failed to comply with the Court's request that it provide three different groupings and proposed two different groups:

- Counts 6-12.
- Counts 1, 2, and 3, 4, and 5, 13-15.

In its Response, the government states:  "To the extent that the Court has already determined to sever this case into trials of 10 or fewer defendants, defendants have received the relief they are seeking."  (Government Response, p. 16.)  To be sure, the Court's comments suggested that it was prepared to grant severance of some kind, but it was not clear what the Court's ultimate decision regarding severance would be.

## II. ARGUMENT

### A.  The appropriate legal standard

It is important to recognize at the outset that the Defendants seek severance under Federal Rule of Criminal Procedure 14 and the Due Process Clause of the U.S. Constitution.  The government spends a great deal of space arguing that the counts in the Superseding Indictment (Doc. No. 368) have been properly joined under Rule 8(b). (*See* Government Response, pp. 5-7.)  First, the Defendants have moved to sever *counts*, not defendants, which is what Rule 8(b) covers.  Second, the Defendants are not arguing that the counts are misjoined under Rule 8; rather, the counts should be severed under Rule 14.  Accordingly, the government's legal analysis proceeds from a

fundamental misunderstanding of the issues before the Court.[2]

Furthermore, under Rule 14, the Court may grant severance anytime joinder

"*appears* to prejudice a defendant . . . ." FED. R. CRIM. P. 14(a) (emphasis added).

There are many reasons why a defendant may be prejudiced by joinder and why

severance may thus be appropriate.  The government erroneously relies on this Court's

ruling in *United States v. Gould*, No. CR 03-2274 JB, 2007 WL 1302587, at *2 (D.N.M.

Apr. 6, 2007), to argue that mutually antagonistic defenses is the only situation where

severance may occur.  (Government Response, p. 4.)  But Rule 14 is not so limited.

Rather, the Court should grant a severance whenever "there is a serious risk that a joint

trial would compromise a specific trial right of one of the defendants, or prevent the jury

from making a reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506

U.S. 534, 539 (1993).

The Supreme Court has provided examples of when a risk of prejudice warrants

severance:

> Such a risk might occur when evidence that the jury should not consider
> against a defendant and that would not be admissible if a defendant were
> tried alone is admitted against a codefendant.  For example, evidence of a
> codefendant's wrongdoing in some circumstances erroneously could lead
> a jury to conclude that a defendant was guilty.  When many defendants
> are tried together in a complex case and they have markedly different
> degrees of culpability, this risk of prejudice is heightened.  Evidence that is
> probative of a defendant's guilt but technically admissible only against a
> codefendant also might present a risk of prejudice.  Conversely, a
> defendant might suffer prejudice if essential exculpatory evidence that

---

[2] By limiting their arguments regarding Counts 1 and 2 to severance under Rule 14, the
Defendants do not intend to imply that other counts are properly joined under Rule 8.
The Defendants agree with arguments raised by other defendants that other counts,
specifically Counts 6 and 7, were improperly joined in the Superseding Indictment.
(*See,* in particular, Joint Motion to Sever Defendants Charged With Offenses in Counts
6 and 7 (Doc. 807) and Defendant Perez's Reply to the Government's Response to
Motion to Sever Defendants Charged With Offenses in Counts 6 and 7 (Doc. 887).

DNM 1135

would be available to a defendant tried alone were unavailable in a joint trial.

*Id.* (citations omitted).

In its Response, the government attempts to morph the risk-of-prejudice standard of Rule 14 and *Zafiro* into an actual-prejudice standard by repeating this Court's and the Tenth Circuit's use of "real prejudice" in the context of mutually antagonistic defenses. (Government Response, pp. 1, 4, 5, 7, 8, 16.)  The government's overreliance on these two words demonstrates a fundamental misunderstanding of what a defendant must show to merit severance under Rule 14.  In *United States v. Gould*, No. CR 03-2274 JB, 2007 WL 1302587, at *1 (D.N.M. Apr. 6, 2007), this Court quoted *United States v. Hall*, 473 F.3d 1295, 1302 (10th Cir. 2007), for the proposition that "the defendant must bear a heavy burden of showing real prejudice to his case."  The Tenth Circuit has been clear that "real prejudice" in the pretrial context is different than actual prejudice in a *post-hoc*, appellate or post-conviction context.  In *Fox v. Ward*, 200 F.3d 1286, 1293 (10th Cir. 2000), relied on by the government (Government Response, p. 8), the court explained that "real prejudice" merely means that the risk of prejudice is not illusory: "In order to prevail on such a theory for severance, the defendant must show real prejudice, rather than merely note that each defendant is trying to exculpate himself while inculpating the other."  For this reason, the "real prejudice" analysis fits best in the mutually-antagonistic-defenses situation addressed by this Court in *Gould*.  In such a situation, a defendant needs to show real prejudice in that defenses are "truly mutually exclusive" and not just hypothetically so.  *Fox*, 200 F.3d at 1293.

At this stage, of course, there is no way to determine whether a failure to sever will be actually prejudicial, because the Court cannot know how the evidence will come

in or even if there will be a conviction.  All this Court can evaluate is whether there is a

risk of prejudice warranting severance.  That is what Rule 14 requires, and that is what

the Supreme Court has held is the standard.  *Zafiro*, 506 U.S. at 538, 539.

### B.  Severance of Counts 1 and 2 from the remaining counts is appropriate in this case.

Viewing this case under the proper legal standard, Counts 1 and 2 should be

tried separately from the remaining counts.

By alleging that SNM is a singular enterprise spanning several decades, the

government attempts to render admissible any evidence about that enterprise

regardless of applicability to any charged individual.  (*E.g.*, Government Response p. 7).

In painting with such a broad brush, however, the government demonstrates why

severance is necessary to protect the 2001 Defendants from unfairly prejudicial

evidence and testimony.

Although the government pays lip service to what "a reasonable jury could find"

(Government Response, p. 10), the government does not really dispute that after the

homicides at issue in Counts 1 and 2, SNM factionalized and did not reflect what it may

have been previously.[3]  Nor does the government dispute that the members of SNM

who conspired to murder corrections officials in the community in 2015 as alleged in

Counts 9 and 10, and the organization that would be the SNM at that time, bore no

connection to the individuals charged in Counts 1 and 2.

---

[3] The government asserts that the Defendants have admitted that they were SNM members.  (*E.g.*, Government Response, p. 9.)  While the Defendants have accepted certain alleged facts from discovery for purposes of severance analysis, they have certainly not made any "admissions" in the sense of FED. R. EVID. 801(d)(2).

6

Notably, in support of its arguments about what "a reasonable jury could find,"
the government relies exclusively on cases from other circuits discussing *sufficiency of
the evidence* to support a conviction.  (Government Response, pp. 10-11 (citing *United
States v. Fernandez*, 388 F.3d 1199, 1222–23 (9th Cir. 2004); *United States v. Orena*,
32 F.3d 704, 710-11 (2d Cir. 1994); *United States v. Batts*, 171 F. App'x 977, 981 (4th
Cir. 2006)).)

In *Fernandez*, the Ninth Circuit did separately conduct a severance analysis and
recognized the difficulty a jury faces in compartmentalizing evidence in a case like this:

> Given the multiplicity of counts facing the eleven co-defendants—alleging
> different conspiracies with different goals, as well as several predicate
> RICO or stand-alone VICAR offenses involving different sub-groups of the
> co-defendants—the jury's ability to evaluate the evidence against each
> defendant independently was certainly put to the test.

388 F.3d 1242.  In that case, the fact that the jury acquitted defendants on various
counts and various predicate acts led the appellate court to determine that the
defendants could not demonstrate prejudice from the denial of severance beyond the
severance of defendants with death-eligible counts.  *Id.* at 1243-44.

The problem in this case is that a reasonable jury very well could conflate the
evidence to find culpability or a relationship where none really existed.  This very real
risk is the reason severance is necessary.

In support of severance, the Defendants submit the attached declaration of Joel
D. Lieberman, Ph.D., Chair of the Criminal Justice Department at the University of
Nevada, Las Vegas.  (Exhibit 1.)  Dr. Lieberman explains how, in this case, the risks of

DNM 1138

prejudice from joinder are very real and why jury instructions will be insufficient to remedy those risks.[4]

The mere fact so many charges with considerable violent conduct being joined together raised a risk that it will "produce confusion of evidence between charges and increase[] negative perceptions of defendants on a wide range of dimensions."  (Exhibit 1, p. 4.; *see also id.*, p. 6 ("[A] defendant charged with alarmingly frightful crimes that cause intense fear in the community or crimes that are particularly heinous (e.g., conspiring to murder prison officials or a brutal murder by burning to death) could . . . impact perceptions of defendants charged with other violent but less frightful and heinous crimes.").)  The mere fact of joinder of charges and defendants, without anything more, increases the chances of conviction:

> [W]hen the impact of multiple charges and multiple defendants were examined together, we see an increase in convictions (on the most serious charge) from 67% when a single defendant is charged with one count to 85% when multiple defendants are charged with multiple counts.

(*Id.*, p. 5.)

Contrary to the government's arguments that counts should remain joined because of the similarity of evidence that may be presented during separate trials (Government Response, p. 13), the fact that the various offenses are of a similar character itself makes the risk of unfair prejudice all the greater.  *See Lucero v. Kerby*, 133 F.3d 1299, 1314 (10th Cir. 1998) (discussing danger of trying together cases joined under Rule 8(a) as being of the "same or similar character"); *United States v. Halper*, 590 F.2d 422, 430 (2d Cir. 1978) (same); *Drew v. United States*, 331 F.2d 85, 94 n.8 (D.C. Cir. 1964) (quoting Underhill, *Criminal Evidence* § 205 (5th ed. 1956), for the

---

[4] Dr. Lieberman is available to testify at a hearing on this motion.

proposition that jurors "very naturally believe that a person is guilty of the crime with which he is charged if it is proved to their satisfaction that he has committed a similar offense, or any offense of an equally heinous character.  And it cannot be said with truth that this tendency is wholly without reason or justification, as every person can bear testimony from his or her experience that a man who will commit one crime is very liable subsequently to commit another of the same description").   Courts have long condemned the joinder of counts "where the crimes charged are of such a nature that the jury might regard one as corroborative of the other, when, in fact, no corroboration exists."  *Kidwell v. United States*, 38 App. D.C. 566, 570 (D.C. Cir. 1912).

Similarly, the assertion that SNM is one, longstanding enterprise—despite the lack of evidence of continuity from the time of the conduct at issue in Counts 1 and 2 to the time of the remaining counts—itself argues in favor of severance.  As Dr. Lieberman explains, a perception of a cohesive group increases prejudice to any individual on trial:

> In terms of the secondary concern that individuals' perceptions of a group may color the perceptions of individuals affiliated with the group, Reed and Bornstein (2015a) argue "people tend to make judgments about individuals based on perceptions of their group (Waytz & Young, 2012), with people seeing all group members as similar (Wilder, 1978).  This is particularly true when the group is perceived as cohesive, in which cases individuals members are seen as more responsible for the group's collective actions (Hamilton & Sherman, 1996; Waytz & Young, 2012)" (p. 2).  However, it does not appear that the behavior of all group members contribute equally to the perception of a group.  Rather, the malevolent nature of a group was determined by the most extreme behavior (e.g., homicide) of specific group members (Leon, Oden, & Anderson, 1973).  Given that the defendants in *U.S. v. DeLeon, et al.* are all alleged to be members of Syndicato de Nuevo Mexico Gang (SNM), a group that is cohesive in nature, and that some defendants are charged with very heinous acts, there is reason to believe that jurors will have a pejorative view of many of the defendants, irrespective of the specific evidence presented against them, if defendants are joined at trial.

(Exhibit 1, p. 6.)

Dr. Lieberman's analysis finds support in case law holding that severance is appropriate where a defendant shows that "spillover prejudice will prevent the jury from individualizing each defendant."  *United States v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007).  In this case, the jury will hear of a conspiracy and attempts to kill prison officials in the very community where these jurors live.  There is no allegation, however, that the defendants charged in Counts 1 and 2 had anything to do with that.[5]  But there is a very real danger that a jury will conflate that evidence with any evidence against the defendants charged in Counts 1 and 2.

Furthermore, the government does not dispute that it will seek to introduce significant evidence in a joint trial that would not be admissible in a trial of Counts 1 and 2 alone.  It is anticipated that the government might attempt to introduce other-acts evidence under FED. R. EVID. 404(b) at least in relation to Counts 6 and 7 as well as Counts 9 and 10.  *See Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007) (citing *United States v. Basciano*, No. 05-CR-060 (NGG), 2007 WL 3124622, at *5-6 (E.D.N.Y. Oct. 23, 2007), for the proposition that severance was warranted because introduction of co-defendant's prior conviction for same charge that defendants were facing likely would spillover to defendants).

It is virtually certain that the government will also seek to introduce out-of-court statements by some defendants that would not be admissible against others.  Even if some of these statements might be admissible under FED. R. EVID. 801(d)(2)(E), many of those statements will be inadmissible against defendants who were no longer part of

---

[5] The government does not explain how evidence of SNM conduct after a defendant was no longer active in SNM is admissible to prove something that occurred many years earlier.  (*See* Government Response, pp. 14-15.)

the conspiracy alleged.  For example, there is no evidence that Mr. Troup nor Mr.

Garcia were part of the conspiracy after their release from prison.

Dr. Lieberman explains that a trial of the length and complexity that can be

expected if all counts remain joined will present tendencies for jurors to come to

conclusions based on unacceptable means such as stereotypes and biases.  He

describes the "considerable amount of social psychological research" indicating "that

under conditions of high cognitive demands, which can be produced by high information

load in a long and complex trial, individuals are more likely to rely on heuristics, such as

preexisting stereotypes and biases they may hold to help simplify information and make

decisions."  (Exhibit 1, p. 9 (citation omitted).)  Furthermore, research demonstrates that

"when jurors are forced to contend with greater information load, as a function of a

complex trial, their ability to effectively process evidence is hindered, and they are more

likely to rely on evidence of lower probative value."  (*Id.* (citation omitted).)  In light of the

research of jury behavior, Dr. Lieberman expects that jurors in a joint trial "would

have. . . difficulty distinguishing between the 10 to 15 defendants . . . ."  (*Id.*)

Finally, the government argues that the Defendants "need not worry about a

'tangled web of limiting instructions being read dozens of times per day over the course

of a two to three-month trial.'"  (Government Response, p. 15.)  The government argues

that despite the complexity of this case, the large number of defendants, and the fact

that there will be many, many instances of evidence admissible against a limited

number of defendants, "jury instructions limiting inadmissible evidence will be sufficient

to cure any risk of prejudice."  (*Id.*)  The government argues that such instructions will

be sufficient because each Count 1 and 2 defendant is joined with only a limited number

11

of defendants *in the counts for which each of these defendants is charged*.

(Government Response, p. 15.)  This argument ignores the reality that there are many

other charges and many other defendants in the same indictment.  This will necessitate

repeated and consistent instructions to inform the jury for which counts and which

defendants it may consider evidence.

Additionally, the government's faith in limiting instructions is, in the real world,

misplaced.   In his Declaration, Dr. Lieberman explains that empirical research has

demonstrated the ineffectuality of limiting instructions generally:

> A multitude of studies have examined limiting instructions effectiveness in
> joinder trials, as well as in other contexts. These results generally indicate
> that limiting instructions are ineffective at reducing bias, and that jurors
> express confusion while trying to understand and apply instructions
> related to multiple charges against defendants.

(Exhibit 1, p. 7 (citations omitted).)  Dr. Lieberman goes on to explain that a case where

the government will introduce evidence admissible only against some defendants

presents particular dangers because "[j]urors are generally unable or unwilling to ignore

inadmissible information despite being given limiting instructions from judges."  (*Id.*, p.

8.)

### C. The apparent prejudice to the Defendants and the interest in ensuring a fair trial outweigh interests in judicial economy.

Without explaining why it would be "required to"—or entitled to—introduce *all* the

same evidence at severed trials to prove the racketeering organization, the government

makes the conclusory assertion that it would be.  Thus, the government argues that the

efficiency of a single trial outweighs the interest in securing a fair trial where defendants would not be prejudiced by joinder.[6]

Contrary to the government's arguments, the Defendants do not contend that the Court should grant severance "based on considerations of judicial economy alone." (Government Response, p. 11.)  Rather, the Defendants argue that, in conducting the balancing analysis required by Rule 14, the Court should recognize that there will be significant benefits to judicial economy by severed trials.  (*See* Defendant Troup and Billy Garcia's Motion to Sever Counts 1 and 2 (Doc. 882), pp. 14-20.)  For the reasons explained in the Defendant's Motion, judicial economy favors severance in light of the apparent prejudice from joinder.

### D. Because of the apparent prejudice from a joint trial, severance of Counts 1 and 2 is the best means to afford the 2001 Defendants a fair trial.

The reason that these defendants seek separate trials is because they want fair trials.  There can be no question that a separate trial would be a more fair trial.  The undersigned know that the Court is concerned about being fair.  Dividing this case into four or five trials, which would obviously be more fair, would, of course, impose a significant burden on the Court.  The undersigned are aware of the Court's seriously large caseload, which is mentioned in the Court's Memorandum Opinion and Order. (Doc. 943, p. 77 n. 8.)  That said, there should be no illusions.  If Garcia and Troup are

---

[6] In light of the complexity of this case, the Court deemed it appropriate to appoint additional counsel for many defendants.  The government apparently views the litigation of this severance motion as a chance to second-guess the Court's decision, arguing in non sequitur fashion, "In fact, the best solution to the cost of trying a joint case is to reduce the number of attorneys by dismissing additional counsel for defendants who have more than one."  (Government Response, pp. 13-14.)

forced to go to trial with other defendants, involving other counts, they will be prejudiced by such joinder.

Accordingly, the Court should grant Garcia and Troup's motion and sever Counts 1 and 2 from the remaining counts.

Submitted this 27th day of March 2017.

s/ Patrick J. Burke
Patrick J. Burke
Patrick J. Burke, P.C.
303 16th Street, Suite 200
Denver, CO 80202
Phone:  303-825-3050
Fax:  303-825-2992
Patrick-j-burke@msn.com

Cori Harbour-Valdez
The Harbour Law Firm, PC
P.O. Box 13268
El Paso, TX 79913
Phone: 915-544-7600
Fax: 915-975-8036
cori@harbourlaw.net

Attorneys for Edward Troup (3)


s/ Robert Cooper
Robert Cooper
Jim Castle

Attorneys for Billy Garcia (5)


CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2017, I e-filed the foregoing to the Clerk of the Court via the CM/ECF system which will send notification of such filing to counsel of record.

s/ Jennifer J. Feldman

DNM 1145

## DECLARATION OF DR. JOEL D. LIEBERMAN REGARDING JOINDER IN
## U.S. V. DELEON, ET AL.

1.      I currently serve as Chair of the Criminal Justice Department at the University of
Nevada, Las Vegas, where I am a Full Professor.  I have been Chair of the department for
14 years.  The main focus of my research agenda is on jury decision-making, and I have
worked in this area for over 20 years.  I have authored numerous peer-reviewed journal
articles, book chapters, and books on this topic.  My work has been cited over 1,800
times.  I have been the recipient of numerous federal grants from the Bureau of Justice
Statistics, Department of Homeland Security, and National Science Foundation.  I am
currently a member of the editorial board for *Law and Human Behavior,* the premier
journal in the field of law psychology.  Finally, I am a member of the Executive
Committee for the American-Psychological Law Society.  Further information about my
expertise is highlighted in my attached vita.

2.      I have prepared this declaration based on my review of materials associated with
the case of *U.S. v. DeLeon, et al.* and my expertise in this area.  The materials I reviewed
included motions and other documents sent to me from the office of defense counsel Mr.
Patrick Burke, and existing social science research regarding the impact of joinder on
jury decision-making.[1]

        The Superseding Indictment in the case of *U.S. v. DeLeon, et al.* involves the
joinder of 15 charges of various crimes ranging from violent crimes in aid of racketeering
(murder), conspiracy to commit murder, to carrying a firearm during and in relation to a
crime of violence against 30 defendants, covering a period of time spanning fifteen years.
The central issue I have focused on is what impact does this type of joinder have on
jurors?  Consequently, four key questions emerge.  First, what impact does joining
multiple offenses into a single trial have on jurors?  Second, what impact does joining
multiple defendants into a single trial have on jurors?  Third, if joinder has a prejudicial
impact, are limiting instructions effective at reducing bias created through the joinder
procedure?  Fourth, what are the effects of trial length and complexity on jurors?  A
number of empirical studies have addressed these 4 questions.  A summary of the
findings of these studies is presented below.

3.  Impact of Joining Multiple Offenses into a Single Trial

        Peer-reviewed published empirical research studies have repeatedly shown that
when offenses are joined together, defendants are more likely to be convicted than when
the same charges are tried independently (Bordens & Horowitz, 1983; 1985; Greene &

---

[1] The written case documents included, the Indictment, Superseding Indictment, various Motions for
Severance, and the Government's Responses to those motions.  (More specifically, Docs. 2, 368, 807, 812,
813, 836, 845, 858, 868, 882, 887, 893.)

Lieberman Declaration   2

Loftus, 1985; Horowitz, Bordens, & Feldman, 1980; Kerr & Sawyers, 1979; Leipold & Abbasi, 2006; Reed & Bornstein, 2015a; Tanford & Penrod, 1982; 1984).

These findings have been obtained in both research on actual federal court cases, and in numerous experimental studies.  This "joinder effect" increases with the number of charges that are joined (Tanford & Penrod, 1982).  This phenomenon has been termed the "spillover effect" (Greene & Loftus, 1985) because "evidence of multiple offenses seems to spill over onto, and distort evidence presented on any single charge" (p. 193).  Evidence indicates that *splitting trials reduces the "spillover effect."*

### Research on Federal Court Cases
Leipold and Abbasi (2006) analyzed the outcomes of 19,808 federal trials involving 375,720 defendants over a five-year period, and concluded "joinder of charges has a prejudicial effect on the defendant, increasing the chances of conviction of the most serious charge by more than 10%" (p. 401).  More specifically, they found that the conviction rate on the *most serious charge* against a defendant increases from 68% when a defendant is charged with a single crime to 82% when a second charge is added, and 88% when a third charge is present (up to 89% on a 5th charge).  The fact that the rate of conviction in these joined cases is not far from 100% is highly alarming.

### Experimental Research
Multiple experimental studies have supported the existence of a spillover effect occurring when joinder is used.  For example, Greene and Loftus (1985) used an experimental design to present participants with case materials involving either a homicide trial, a rape trial, or a homicide and rape joined trial.  Participants attributed greater guilt to the defendant when the murder and rape charges were joined together in the same trial, than when the charges were tried separately.

A potential limitation of the Greene and Loftus (1985) study (discussed in detail below) is that college students were used as participants as opposed to more representative subjects.  However, Tanford and Penrod (1984) conducted a study using individuals called for jury duty in a Wisconsin jurisdiction.  Consistent with Greene and Loftus, they found that defendants charged with multiple offenses (i.e., multiple burglary charges for crimes committed in different locations, or burglary, assault, and robbery) were more likely to be found guilty than defendants charged with a single offense (burglary).  In addition, Tanford and Penrod found that joining offenses was associated with greater confusion of evidence in the mind of jurors, and a perception that the prosecution's evidence was stronger and the defense's case was weaker.

The capricious nature of verdicts obtained when charges are joined appears to be dependent, in part, by the order the charges are presented to the jury.  For example, Davis, Tindale, Nagao, Hinsz, and Robertson (1984) found that when multiple charges were joined together, the more serious a preceding charge, the more likely jurors were to convict on a subsequent charge.  Interestingly, Tanford, Penrod, and Collins (1985) found that the greatest prejudice against a defendant occurred on charges that were presented to jurors later in the trial.

However, Horowitz, Bordens, and Feldman (1980) found that the first charge in a joined trial, rather than subsequent charges, produced the greatest prejudice against a defendant.  The differences between these studies may reflect differences in case strength or other factors related to specific case materials.  Taken together the results indicate that joinder effects "are not limited to charges in a particular position" (Tanford, Penrod, & Collins, 1985, p. 333), and that defendants are more likely to be convicted in joined trials than when the charges are severed.  In addition, Tanford and Penrod (1982) found that joinder causes subjects to rate all evidence as more highly incriminating" (p. 473).

As noted above, the primary concern with joinder is that a "spillover effect" may occur, where evidence (including both admissible and inadmissible evidence) from one charge is attributed, either consciously or unconsciously, to another charge.  The spillover effect may occur for several reasons; most notably, (1) jurors may not have an accurate memory of the evidence in joined indictments; and (2) when a juror becomes aware that a defendant is charged with multiple crimes, he or she may attribute more negative characteristics to the defendant, including an overall greater "criminal disposition." These two possibilities are discussed in detail below.

First, errors in jurors' memories may occur because when indictments are joined, evidence associated with one indictment may be remembered as being relevant to other charges.  Consistent with this possibility, Tanford and Penrod (1982) found that when crimes were joined together, jurors made more memory errors, in terms of confusing evidence between charges, than when charges were presented as separate cases.  In addition, this "joinder effect" increases with the number of charges that are joined. Further, consistent with other research, they found that joined trials produce a greater probability the defendant will be found guilty on a specific charge.

Tanford and Penrod (1984) extended these findings and report that jurors were more likely to apply evidence from one charge to another when there was greater similarity between the charges.  Tanford, Penrod, and Collins (1985) and Bordens and Horowitz (1983) also found that jurors exhibit "a high level of confusion of evidence" (Bordens & Horowitz, p. 369) when cases are similar (e.g., three service station burglaries or three burglaries at different establishments).  Consequently, Bordens and Horowitz conclude "contrary to the court's assumption, [jurors] cannot keep the evidence from one charge totally independent from the evidence from the other" (p. 368).

Second, as noted above, when a juror becomes aware that there are multiple charges against the defendant, the juror may attribute more negative characteristics to the defendant, and infer the defendant has a greater "criminal disposition."  Support for this possibility comes from a number of studies.  For example, Greene and Loftus (1985) found that when a rape charge and murder charge were joined together, participants rated that defendant as more dangerous, less likeable and less believable, than when either charge was presented independently.

DNM 1148

Similarly, Tanford and Penrod (1984) found that joined offenses led to more negative impressions of the defendant in terms of factors such as credibility, criminal tendency, and dangerousness.  Tanford, Penrod, and Collis (1985) also report that joining charges led to more negative perceptions of a defendant on a "criminality-credibility" factor (e.g., more dishonest, dangerousness, typical criminal, and likely to commit a future crime) and a "global evaluation" factor (e.g., dislikable, unattractive, and nervous).

Finally, Greene and Loftus (1985), as well as Tanford and Penrod (1982), also report that participants presented with multiple charges against a defendant rated the defendant less positively than participants presented with a single charge against the defendant.  Reed and Bornstein (2015a) suggest that this may be a result of the "fundamental attribution error" occurring (Ross, 1977), where individuals attribute behavior to dispositional qualities, rather than situational factors.

*Conclusions Regarding Impact of Joinder of Offenses in U.S. v. DeLeon, et al.*

Based on the existing research examining actual federal cases, and experimental research involving multiple sample types, there is strong reason to believe that the joinder of offenses will have a significant prejudicial effect against defendants.  Joinder appears to produce confusion of evidence between charges and increases negative perceptions of defendants on a wide range of dimensions.

Further, all of the research studies investigating joinder effects that used an experimental design presented participants with far fewer charges than those brought against the defendants in the *U.S. v. DeLeon, et al*. trial.  Consequently, the magnitude of the problems identified with joining offenses should be exacerbated (perhaps greatly) in *U.S. v. DeLeon, et al*., particularly with the magnitude of participants, victims, and locations that exist across the 15 charges and 30 defendants.[2]

**Consequently, based on my review of relevant research and my overall professional knowledge of the area, it is my opinion that joinder of offenses threatens a defendants' ability to receive fair trial, particularly with the large number of charges in *U.S. v. DeLeon, et al*..**

4.  Impact of Joining Defendants in a Single Trial

When multiple defendants are joined in a trial, jurors appear to inappropriately apply evidence against one defendant to another.  In addition, jurors' perceptions of specific individuals may be affected by their perceptions of a group that the individuals are affiliated with.  However, the magnitude of bias from joining defendants may be less than from joining charges.

---

[2] I have been advised that not all 30 defendants will go to trial.  I have been advised that the government believes that there may be less than 10 defendants who go to trial, while the defendants believe that approximately 15 defendants will go to trial.  Regardless, the comments herein are purposely general in nature and are designed to convey the difficulties that juries have in compartmentalizing evidence, particularly in complex trials.

*Research on Federal Court Cases*

In their examination of the outcome of federal trials, Leipold and Abbasi (2006) found that the effect of multiple defendants was concerning, though less prejudicial than the effect of combining multiple charges.  For example, when one count was charged against one defendant, the conviction rate was 67%.  However, the conviction rate increased to 77% when multiple defendants were charged with a single count.  Interestingly, when multiple counts were charged against multiple defendants, there was not an increase in convictions.  However, when the impact of multiple charges and multiple defendants were examined together, we see an increase in convictions (on the most serious charge) from 67% when a single defendant is charged with one count to 85% when multiple defendants are charged with multiple counts.

Further, Leipold and Abbasi (2006) note that prejudicial effects can occur when the jury is exposed to evidence from other charges that implicate defendant(s) "regardless whether it comes in directly, as proof against the defendant, or through evidence against co-defendants that happens to include the defendant" (p. 371).

*Experimental Research*

Experimental research has not directly addressed the issue of joining multiple defendants within the criminal arena.  However, Reed and Bornstein (2015a) have argued that research on the effects of pretrial publicity may be informative regarding jurors ability to compartmentalize charges against a criminal defendant.  That is, just as in cases of pretrial publicity, the factors jurors consider when making verdict decisions on a specific charge may not be limited to what is presented in court relevant to that charge.  Rather, additional information from other sources may inappropriately impact consideration of the charge.  That line of research has generally shown pretrial publicity is highly damaging to a defendant (see generally, Lieberman, Arndt, & Vess, 2009).  It is quite difficult for jurors to eliminate the biasing effects of pretrial publicity once exposure has occurred (Bornstein, Whisenhunt, Nemeth, & Dunaway, 2002; Steblay, Besirevic, Fulero, & Jimenez-Lorente, 1999), and the information creates a pro-prosecution bias (e.g., Freedman & Burke, 1996).  This trend is likely to emerge regardless of the type of pretrial publicity (i.e., factual or emotional; Kramer, Kerr, & Carroll, 1990; Ogloff & Vidmar, 1994; Wilson & Bornstein, 1998).  Further, jurors often are unable to remember whether they learned information about a defendant from the case or from an outside source, yet they will be confident in the accuracy of their memory, despite errors that may exist (Ruva, McEvoy, & Bryant, 2006).

Consequently, it appears that jurors may be highly biased by information that goes beyond what is presented in court, when that information is viewed as relevant to the case in some way.  Unfortunately, admonitions to set aside pretrial publicity do not appear to be an effective remedy (e.g., Bornstein et al., 2002; Lieberman, Arndt, & Vess, 2009.  For a more extensive discussion of this issue see below - #5. *Effectiveness of Limiting Instructions*).  Based on this finding, it is reasonable to expect that exposure to information about other defendants would be prejudicial for any particular defendant, and

DNM 1150

may be exacerbated if jurors are exposed to a codefendants prior criminal record, if that defendant's record is admitted for limited purposes.

In the context of civil cases, research by Horowitz and Bordens (1988) indicates that when plaintiffs who differ in terms of the severity of their injuries are joined together in a trial, the presence of an extremely injured plaintiff joined with a less severely injured plaintiff resulted in greater overall punitive damages in the case, and the less-injured plaintiff received greater damage awards, than if the cases were tried separately. In addition, the presence of an outlier (an extremely injured plaintiff) made verdicts more unpredictable. These findings imply that in the context of the *U.S. v. DeLeon, et al.* trial, a defendant charged with alarmingly frightful crimes that cause intense fear in the community or crimes that are particularly heinous (e.g., conspiring to murder prison officials or a brutal murder by burning to death) could exert a similar outlying effect, and impact perceptions of defendants charged with other violent but less frightful and heinous crimes.

Reed and Bornstein (2015a) also report the results of a study they conducted (Reed & Bornstein 2015b) that manipulated the number of defendants, how cohesive the group was, and the number of claims in a civil case. The results indicated that larger damages were awarded when defendants were joined than when there was an individual defendant, and this trend was more pronounced in cohesive groups. Although Reed and Bornstein do not report differences based on the number of defendants, it is important to note that the total number of defendants in the trial was relatively small (i.e., a maximum of 3) compared to the large number of defendants in the *U.S. v. DeLeon, et al.* trial. Thus, in *U.S. v. DeLeon, et al.* we would expect this problem to be more pronounced.

In terms of the secondary concern that individuals' perceptions of a group may color the perceptions of individuals affiliated with the group, Reed and Bornstein (2015a) argue "people tend to make judgments about individuals based on perceptions of their group (Waytz & Young, 2012), with people seeing all group members as similar (Wilder, 1978). This is particularly true when the group is perceived as cohesive, in which cases individuals members are seen as more responsible for the group's collective actions (Hamilton & Sherman, 1996; Waytz & Young, 2012)" (p. 2). However, it does not appear that the behavior of all group members contribute equally to the perception of a group. Rather, the malevolent nature of a group was determined by the most extreme behavior (e.g., homicide) of specific group members (Leon, Oden, & Anderson, 1973). Given that the defendants in *U.S. v. DeLeon, et al.* are all alleged to be members of Syndicato de Nuevo Mexico Gang (SNM), a group that is cohesive in nature, and that some defendants are charged with very heinous acts, there is reason to believe that jurors will have a pejorative view of many of the defendants, irrespective of the specific evidence presented against them, if defendants are joined at trial.

*Conclusions Regarding Impact of Joining Defendants in U.S. v. DeLeon, et al.*

The results of research in federal trials, combined with inferences drawn from research on the impact of joining defendants in civil trials, and findings from pretrial publicity and other inadmissible evidence studies indicate that there is reason to believe

Lieberman Declaration   7

that joinder of defendants will have a significant prejudicial effect against defendants. Jurors may have considerable difficulty compartmentalizing information from one defendant to another.  In addition, given the defendants' alleged SNM membership, jurors' negative perceptions of the gang may produce highly negative attributions towards individual defendants.  It is likely that exposure to multiple defendants in a single trial will make their gang membership more salient to jurors, increasing the prejudicial effect.

**Consequently, based on my review of relevant research and my overall professional knowledge of the area, it is my opinion that joinder of defendants threatens the defendants' ability to receive a fair trial, particularly with the large number of defendants in *U.S. v. DeLeon, et al.*.**

5.  Effectiveness of Limiting Instructions

A multitude of studies have examined limiting instructions effectiveness in joinder trials, as well as in other contexts.  These results generally indicate that limiting instructions are ineffective at reducing bias, and that jurors express confusion while trying to understand and apply instructions related to multiple charges against defendants (Greene & Loftus, 1985; Lieberman, Arndt, & Vess, 2009; Severance & Loftus; 1982, Tanford & Penrod, 1984; Tanford, Penrod, & Collins, 1985).

For example, in the Greene and Loftus (1985) study previously discussed, mock jurors attributed greater guilt to defendants charged with murder and rape charges when they were joined together in the same trial, than when the charges were tried separately. However, half the participants were also given limiting instructions adopted from Washington State Pattern Instructions that stated: "A separate crime is charged in each count.  You must decide each count separately as if it were a separate trial.  Your verdict on one count should not control your verdict on any other count" (p. 200).  These instructions were ineffective, as perceptions of guilt were not significantly reduced when the instructions were presented.  Perceptions of guilt remained elevated in the joined trial compared to conditions when the charges were tried separately.

Tanford and Penrod (1984) found similar limiting instruction ineffectiveness in a study where they combined sections from federal and several state joinder instructions "to create a strong and complete set of instructions" (p. 754).  The instructions directed jurors to not make inferences about the defendant's disposition based on multiple charges against him, not to confuse evidence from different charges, and not to accumulate evidence from different charges (meaning that each charge should be considered independently, and jurors should not consider evidence from other charges, when determining a particular charge).  Participants in their study were unable to adhere to these instructions.

However, Tanford, Penrod, and Collins (1985) found limiting instructions reduced the number of convictions in a joined trial, using the same materials as Tanford

and Penrod (1984).  This discrepancy may be a function of Tanford et al. using college students, as opposed to the representative jurors used by Tanford and Penrod.  In general, there is a positive relationship between jury instruction comprehension and education level, and jury instructions are more effective when presented to college students rather than representative jurors (Lieberman, 2009; Lieberman & Sales, 1997).

Given the impact that sample type (i.e., college students vs. representative jurors) may have on instruction effectiveness, it is important to consider the findings of Severance and Loftus (1982) who examined questions submitted to judges by jurors in Superior Courts in King County, Washington.  They found that jurors expressed confusion regarding instructions related to multiple charges against defendants.  They note "there is concern whether jurors understand, and further concern whether jurors can follow limiting instructions if they understand them" (p. 176).

Limiting instructions have also been shown to be problematic in terms of managing the influence of inadmissible testimony (e.g., Lieberman, Arndt, & Vess, 2009).  Jurors are generally unable or unwilling to ignore inadmissible information despite being given limiting instructions from judges.  This phenomenon is particularly relevant to joinder trials, especially one with the large number of joined charges and defendants such as *U.S. v. DeLeon, et al.*, because the likelihood of jurors being exposed to inadmissible information will certainly be greater than if the charges or defendants were severed.  On the basis of existing research, it can be expected that if inadmissible evidence exposure occurs, it will not only prejudicially impact the specific defendant and charge it is directly relevant to, but likely have a negative impact on other charges and defendants, as well.  Administering a limiting instruction to disregard the inadmissible evidence is unlikely to be an effective remedy (Lieberman et al.).

*Conclusions Regarding Potential Limiting Instruction Effectiveness in U.S. v. DeLeon, et al.*

Research on the effectiveness of limiting instructions indicates that these instructions do not have a curative effect on jurors.  In most cases, jurors are unable to compartmentalize information after such directives, and the damaging effects of the joinder procedure remain.  These findings are not unexpected, given the general results of research on jury instructions related to pretrial publicity and other inadmissible evidence, as well as overall jury instruction comprehension.

**Consequently, based on my review of relevant research and my overall professional knowledge of the area, it is my opinion that limiting instructions will not be an effective remedy for any damaging joinder effects that occur.**

6.  Impact of Trial Length and Complexity

The large number of defendants (possibly 10 to 15 of the 30 who are currently charged), and charges involved (up to 15 counts), make *U.S. v. DeLeon, et al*. a highly complex case, that, it is my understanding, may last as long as 2 to 3 months.  Previous

research by the Federal Judicial Center (Cecil, Lind, & Bermant, 1987) has demonstrated that jurors in longer trials (lasting 20 days or more) are more likely than jurors in short-term trials (lasting 6 days or less) to have difficulty understating judicial instructions, and may be unclear as to how to reach a verdict.  Similarly, Heuer and Penrod (1994) examined the impact of trial complexity in a field study involving 160 civil and criminal trials in 33 states, drawn from both state and federal jurisdictions.  They found jurors in complex trials had more difficulty reaching verdicts, and were less confident that their verdicts were the product of an adequate understanding of judicial instructions.

Experimental research has also shown that when jurors are forced to contend with greater information load, as a function of a complex trial, their ability to effectively process evidence is hindered, and they are more likely to rely on evidence of lower probative value (Horowitz, Bordens, Victor, Bourgeois & Lynne, 2001).  This finding is consistent with previous research by Horowitz, FosterLee, and Brolly (1996), who found that jurors recall fewer case-related facts under conditions of high information load.

In addition, jurors had significantly greater difficulty differentiating between plaintiffs, as the number of plaintiffs increased.  Although, Horowitz et al. (1996), explored this issue in the context of a civil trial, my expectation is that jurors would have similar difficulty distinguishing between the 10 to 15 defendants (or more, if fewer of the 30 charged accept plea agreements) who will likely be joined in *U.S. v. DeLeon, et al.*, given the similarity of the charges involved.  For example, Counts 1 through 7 and Count 10 are murder charges, and Counts 9, 10, and 14, are conspiracy to murder.  Even counts 8 (conspiracy to assault) and 15 (attempted murder) are highly similar in nature to the other murder and conspiracy charges.  The fact that many of the murders employ a common tactic of strangulation, and the crimes are committed by members of SNM who have similar demographic backgrounds (e.g., Hispanic males), and to some extent, a similar appearance, in terms of tattoos with the numbers "19" or "505" or the letters of "S" or "SNM," will likely increase perceptions of defendant similarity in the minds of jurors, and reduce jurors' ability to effectively differentiate between the defendants involved.

Further, a considerable amount of social psychological research indicates that under conditions of high cognitive demands, which can be produced by high information load in a long and complex trial, individuals are more likely to rely on heuristics, such as preexisting stereotypes and biases they may hold to help simplify information and make decisions (Hamilton & Sherman, 2014).  In addition, individuals are more likely to recall stereotypic information and overestimate the likelihood of events that match their stereotypes.

The problem of diminished juror performance in complex trials is compounded by the fact that jurors in longer trials typically have lower education levels than jurors in short trials (Cecil, Lind, & Bermant, 1987), and that instructions are typically less effective with less educated jurors (Lieberman & Sales, 1997).  Consequently, attempts to reduce trial complexity through severance of defendants and charges may provide benefits in terms of improving overall instruction comprehension and effectiveness.

Lieberman Declaration  10

*Conclusions Regarding the Impact of Trial Length and Complexity in U.S. v. DeLeon, et al.*

Research exploring the effects of trial length and complexity, has demonstrated that complex trials lead to diminished juror performance, greater confusion over judicial instructions, inability to distinguish between parties involved, and increased reliance on stereotypes and biases when making decisions.  In addition, longer and more complex cases are more likely to have jurors with lower education levels, who may have greater difficulty comprehending instructions, and ultimately, adhering to them.

**Consequently, based on my review of relevant research and my overall professional knowledge of the area, it is my opinion that the joinder of defendants and charges in *U.S. v. DeLeon, et al.* will create a highly complex and lengthy trial that will negatively impact jurors in a variety of ways, and reduce defendants ability to receive a fair trial.**

7.  Methodological Considerations

A number of methodological considerations are relevant to the studies reviewed in this declaration.  Most notably, many of the studies use an experimental approach to investigate the effects of joinder.  Laboratory experiments have been the dominant methodological approach used in psycho-legal research for the past half century (Lieberman, Krauss, Heen, & Sakiyama, 2016).  However, this approach has been criticized for lacking ecological validity (i.e., realism).  More specifically, jury decision-making research has been criticized for using unrepresentative samples (e.g., college students), superficial trial stimuli (e.g., brief written transcripts), and omitting components of actual trials (e.g., voir dire, opening and closing statements, exhibits, deliberations, etc.) (Bray & Kerr, 1979; Diamond, 1997; Weiten & Diamond, 1979).

However, research examining the impact of these factors has found that they typically do not affect study results.  For example, Bornstein (1999) found that sample type (college students vs. representative subjects) and trial format (e.g., written transcript vs. videotaped trial) usually do not impact study outcome.  It is also important to note that within the area of jury decision-making research, a relationship between education level and jury instruction effectiveness has been shown (Lieberman, 2009).  Consequently, if anything, curative instructions could be expected to be more effective with college students than actual jurors, and the concerns demonstrated with the studies reported here, may be more problematic in an actual trial.

It is also important to consider that joinder effects have been obtained using a variety of methodological approaches, including using different types of trial presentations (audiotaped, videotaped, written), jury deliberation (no deliberation, deliberation), measures (dichotomous, continuous) and participant types (students, actual jurors).  In addition, one of the primary goals of the Tanford and Penrod (1984) study was to conduct a study on joinder in a manner that had greater ecological (i.e., real world)

validity.  Their sample included 714 jury eligible individuals summoned for service in a Wisconsin jurisdiction who represented "a wide range of demographic characteristics such as income, occupation, and educational background" (p. 753).  Participants were also given the opportunity to deliberate in groups.  Using this heightened level of realism, the results indicated that "a defendant was more likely to be convicted on a particular charge in a joined trial than on the same charge tried alone, and judges' instructions were ineffective" (p. 749).

Finally, a survey was recently conducted with a sample of authors, editors, and editorial board members of the 3 primary journals outlets for jury decision-making research (Lieberman, Krauss, Heen, & Sakiyama, 2016).  These leading experts in their field, who comprised the sample, provided their attitudes regarding acceptable and unacceptable practices for conducting jury research.  The results strongly indicated that the traditional technique for conducting jury research, in terms of using college students, written transcripts, and omitting deliberations, continues to be an acceptable methodological approach.

*Conclusions Regarding Methodological Conclusions Associated with Social Science Joinder Research*

Although many of the studies reported in my declaration use an experimental laboratory approach to conducting research, it does not appear that this approach threatens the integrity of the results.  The practices used have general acceptance in the field, and the findings have been replicated using a variety of different sample types and procedures.  In addition, the results of a study of federal court cases produced findings consistent with those of experimental research.

**Consequently, based on my review of relevant research and my overall professional knowledge of the area, it is my opinion, that methodological considerations do not threaten the overall findings that joinder of charges and defendants is detrimental to defendants, and providing limiting instructions is not an effective remedy.**

8.  Conclusions

My examination of the empirical research on joinder effects indicates that both joinder of offenses and joinder of defendants increase bias against the defendants, particularly when both types of joinder occur within the same trial.  Consistent with this conclusion, in their recent review of the effects of joinder, Reed and Bornstein (2015a) note "[j]oinder creates the potential of the jury confusing the evidence and making sweeping culpability decisions.  Defense attorneys in particular need to be aware that when they are facing multiple plaintiffs or multiple criminal charges, jurors may be more likely to find them guilty or liable and award harsher penalties" (p. 3).  Further, Tanford, Penrod, and Collins (1985) found that when the results of joinder studies are combined into a single analysis, "the pattern across all studies demonstrates that the finding is a

Lieberman Declaration  12

very robust one" (p. 332).  Thus, it does not appear that the prejudicial effects of joinder are limited to a particular methodological approach or type of trial.

**Consequently, based on my review of relevant research and my overall professional experience, it is my opinion that joinder of defendants threatens defendants' ability to receive a fair trial.  If the charges and defendants in the *U.S. v. DeLeon, et al*. trial are joined together, the likelihood of the defendants being convicted is significantly increased.  It is most alarming that the likelihood of conviction increases independent of the evidence presented.  Further, it is unlikely that limiting instructions will reduce the prejudicial effect caused by joinder.**

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct except for the matters I have stated under belief.  As to those matters, I believe them to be true.

Dated this 10th day of March, 2017.

/s/ Joel D. Lieberman
-----------------------------------------
Joel D. Lieberman, Ph.D.
Chair and Professor
University of Nevada, Las Vegas
Department of Criminal Justice

REFERENCES USED IN DECLARATION OF DR. JOEL D. LIEBERMAN IN
U.S. V. DELEON

Bordens, K. S., & Horowitz, I. A. (1983).  Information processing in joined and severed trials.  *Journal of Applied Social Psychology*, *13*, 351-370.

Bordens, K. S., & Horowitz, I. A. (1985).  Joinder of criminal offenses: A review of the legal and psychological literature.  *Law and Human Behavior*, *9*, 339-353.

Bornstein, B. H. (1999).  The ecological validity of jury simulations: Is the jury still out?  *Law and Human Behavior*, *23*, 75-91.

Bornstein, B. H., Whisenhunt, B. L., Nemeth, R. J., & Dunaway, D. L. (2002).  Pretrial publicity and civil cases: A two way street?  *Law and Human Behavior, 26,* 3-18.

Bray, R. M., & Kerr, N. L. (1979).  Use of the simulation method in the study of jury behavior: Some methodological considerations.  *Law and Human Behavior*, *3*, 107-119.

Cecil, J. S., Lind, E. A., & Bermant, G. (1987). *Jury service in lengthy civil trials*.  Washington, DC: Federal Justice Center.

Davis, J. H., Tindale, R. S., Nagao, D. H., Hinsz, V. B., & Robertson, B. (1984).  Order effects in multiple decisions by groups: A demonstration with mock juries and trial procedures.  *Journal of Personality and Social Psychology*, *47*, 1003-1012.

Diamond, S. S. (1997).  Illuminations and shadows from jury simulations.  *Law and Human Behavior*, *21*, 561-571.

Freedman, J. L., & Burke, T. M. (1996).  The effect of pretrial publicity:  The Bernaldo case.  *Canadian Journal of Criminology, 38*, 253-270.

Greene, E., & Loftus, E. F. (1985).  When crimes are joined at trial.  *Law and Human Behavior*, *9*, 193-207.

Hamilton, D. L., & Sherman, S. J. (1996).  Perceiving persons and groups.  *Psychological Review*, *103*, 336-355.

Hamilton D. L., & Sherman, S. J. (2014).  Stereotypes.  In R. S. Wyer, Jr, & T. K. Srull (Eds.), *Handbook of Social Cognition: Volume 2: Applications* (pp. 1-68).  Psychology Press: Chicago.

Heuer, L., & Penrod, S. (1994). Trial complexity: A field investigation of its meaning and its effects. *Law and Human Behavior*, *18*, 29-51.

Horowitz, I. A. & Bordens, K. S. (1988).  The effects of outlier presence, plaintiff

population size, and aggregation of plaintiffs on simulated civil jury decisions. *Law and Human Behavior*, *12*, 209-229.

Horowitz, I. A., Bordens, K. S., & Feldman, M. S. (1980).  A comparison of verdicts obtained in severed and joined criminal trials. *Journal of Applied Social Psychology*, *10*, 444-456.

Horowitz, I. A., Bordens, K. S., Victor, E., Bourgeois, M. J., & ForsterLee, L. (2001). The effects of complexity on jurors' verdicts and construction of evidence. *Journal of Applied Psychology*, *86*, 641-652.

Horowitz, I. A., ForsterLee, L., & Brolly, I. (1996). Effects of trial complexity on decision making. *Journal of Applied Psychology*, *81*, 757.

Kerr, N. L., & Sawyers, G. W. (1979).  Independence of multiple verdicts within a trial by mock jurors. *Representative Research in Social Psychology*, *10*, 16-27.

Kramer, G. P., Kerr, N. L., & Carroll, J. S. (1990).  Pretrial publicity, judicial remedies, and jury bias.  *Law and Human Behavior, 14*, 409-438.

Leipold, A. D., & Abbasi, H. A. (2006).  The impact of joinder and severance on federal criminal cases: An empirical study.  *Vanderbilt Law Review*, 59, 347-404.

Leon, M., Oden, G. C., & Anderson, N. H. (1973).  Functional measurement of social values.  *Journal of Personality and Social Psychology*, *27*, 301-310.

Lieberman, J. D. (2009).  The psychology of jury instructions.  In J. D. Lieberman & D. Krauss (Eds.), *Psychology in the Courtroom*: *Volume 1 – Jury Psychology: Social Aspects of the Trial Process* (pp. 129-155).  Ashgate Publishing Limited:  Hampshire, England.

Lieberman, J. D., Arndt, J. & Vess, M. (2009).  Inadmissible evidence and pretrial publicity: The effects (and ineffectiveness) of admonitions to disregard.  In J. D. Lieberman & D. Krauss (Eds.), *Psychology in the Courtroom*: *Volume 1 – Jury Psychology: Social Aspects of the Trial Process* (pp. 67-95).  Ashgate Publishing Limited:  Hampshire, England.

Lieberman, J. D., Krauss, D. K., Heen, M., & Sakiyama, M. (2016).  Professional Perceptions of Ideal, Acceptable, and Unacceptable, Jury Decision Making Research. *Behavioral Sciences and the Law, 34,* 495-514.

Lieberman, J. D., & Sales, B. D. (1997).  What social science teaches us about the jury instruction process.  *Psychology, Public Policy, and Law, 3,* 1-56.

Ogloff, J. R. P., & Vidmar, N. (1994).  The impact of pretrial publicity on jurors.  A study to compare the relative effects of television and print media in a child sex

abuse case.  *Law and Human Behavior, 18*, 507-525.

Reed, K., & Bornstein, B. H. (2015a).  Juries, joinder, and justice.  *The Jury Expert*, *27*, 1-5.

Reed, K., & Bornstein, B. H. (2015b).  Culpable by association:  Juror decision making in civil trials.  American Psychology-Law Society.  San Diego, CA.  Cited in Reed, K., & Bornstein, B. H. (2015a).  Juries, joinder, and justice.  *The Jury Expert*, *27*, 1-5.

Ross, L. (1977).  The intuitive psychologist and his shortcomings: Distortions in the Attribution process.  *Advances in Experimental Social Psychology, 10*, 173-220.

Ruva, C., McEvoy, C., & Bryant, J. B. (2006).  Effects of pre-trial publicity and jury deliberation on juror bias and source memory errors.  *Applied Cognitive Psychology*, *21*, 45-67.

Severance, L. J., & Loftus, E. F. (1982).  Improving the ability of jurors to comprehend and apply criminal jury instructions.  *Law & Society Review*, *17*, 153.

Steblay, N. M., Besirevic, J., Fulero, S. M., & Jimenez-Lorente, B. (1999).  The effects of pretrial publicity on juror verdicts: A meta-analytic review.  *Law and Human Behavior, 23*, 219-235.

Tanford, S., & Penrod, S. (1982).  Biases in trials involving defendants charged with multiple offenses.  *Journal of Applied Social Psychology*, *12*, 453-480.

Tanford, S., & Penrod, S. (1984).  Social inference processes in juror judgments of multiple-offense trials.  *Journal of Personality and Social Psychology*, *47*, 749-765.

Tanford, S., Penrod, S., & Collins, R. (1985).  Decision making in joined criminal trials: The influence of charge similarity, evidence similarity, and limiting instructions.  *Law and Human Behavior*, *9*, 319-337.

Waytz, A., & Young, L. (2012).  The group-member mind trade-off.  *Psychological Science, 23*, 77-85.

Weiten, W., & Diamond, S. S. (1979).  A critical review of the jury simulation paradigm: The case of defendant characteristics.  *Law and Human Behavior, 3*, 71-93

Wilder, D. (1978).  Perceiving persons as a group: Effects on attributions of causality and beliefs.  *Social Psychology, 41*, 13-23.

Wilson, J. R., & Bornstein, B. H. (1998).  Methodological considerations in pretrial publicity research.  Is the medium the message?  *Law and Human Behavior, 22*, 585-598.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                    NO.    15-CR-4268 JB-2

JOE GALLEGOS,

      Defendant.

**MOTION TO DISMISS AND TO COMPEL
GOVERNMENT DISCLOSURE OF GRAND JURY TRANSCRIPTS**

COMES NOW JOE GALLEGOS, by and through his counsel, Brock Benjamin and Richard Sindel and respectfully requests pursuant to *United States v. Meyers*, 95 F.3d 1475, 1486 (10th Cir. 1996), the Jencks Act, 18 U.S.C. § 3500, *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, that the Court order the government to produce transcripts of the Grand Jury presentation in the above-captioned case due to the risk that defects in the Grand Jury presentation prejudiced Mr. Gallegos right to due process.  As grounds in support of this Motion, counsel states as follows:

**BACKGROUND**

1.      On December 1, 2015, Mr. Gallegos was charged, in an Indictment, in case number 15-CR-4268, with: Count 1 Violent Crimes in Aid of Racketeering (Murder) and 18 U.S.C. § 2. This indictment was superseded two (2) times. The first Superseding Indictment [Doc. 368], was filed on April 21, 2016 and added approximately six (6)

defendants and nine (9) counts. Of those additional counts Counts 4, 5, 13-15 were additional counts that included Joe Gallegos. Counts 4 and 5 were an allegation of a separate murder of an individual named Adrian Burns. Counts 13-15 were separate allegations involving Joe Gallegos and others against a Jose Gomez. These counts can be grouped as Violent Crimes in Aid of Racketeering and Aiding and Abetting. The Second Superseding Indictment, [Doc. 949] in this matter was filed on March 9, 2017. This indictment added one defendant and one Count. The Count that was added related to Counts 14-15. This case is related to 16-cr-1613.  The discovery provided to date has been voluminous.

2.      It is suspected that several cooperating witnesses, testified before the Grand Jury in this case. Further, it is likely that law enforcement officers summarized cooperating witness testimony before the Grand Jury.no

3.      It is unknown if the witnesses before the Grand Jury advised the panel that the evidence was gained from cooperating witness(es) who are receiving benefits from the government. Or that the information that was presented to the Grand Jury for the Second Superseding Indictment was clarified to correct the earlier misstatement of facts that are believed to surround Counts four (4) and five (5).

4.      The Government has recently disclosed information that does not comport with jurisdiction for the indictment of Counts four (4) and five (5) in this case.

5.      The government has not provided the grand jury transcripts in this case.

6.      The government opposes this motion for production.

<div align="center">

**ARGUMENT AND AUTHORITY**

</div>

A.     **A Grand Jury Presented Exculpatory Evidence Might Not Have Found Probable Cause in This Case**.

The Government has produced a document bate stamped 4472-4473. This document states that "2012, JOE GALLEGOS murdered Adrian Burns on an order from GERALD ARCHULETA because Burns was an informant. GALLEGOS admitted the murder and ROY talks about it on the wire." This is attached as Exhibit "A".  However, subsequent to the production the government has produced a subsequent document on March 9, 2017 that shows that this document is not correct. This is attached as Exhibit "B". The Government has not shown that this erroneous information was not used to obtain the two superseding indictments.

 When a witness knowingly and falsely testifies to the Grand Jury and the defendant is actually prejudiced by that false testimony, a due process violation occurs.  *United States v. Meyers*, 95 F.3d 1475, 1486 (10th Cir. 1996).  Knowing presentation of false evidence by the government also violates due process.  *Id.*, *United States v. Williams*, 504 U.S. 36, 61-64, 112 S. Ct. 1735, 1751, 118 L. Ed. 2d 352 (1992) (Stevens, J., dissenting) ("The standard for judging the consequences of prosecutorial misconduct during grand jury proceedings is essentially the same as the standard applicable to trials.")

Because the Grand Jury transcripts have not yet been disclosed, Mr. Gallegos cannot know what evidence was presented to the Grand Jury, and whether the presentation was erroneous, false, and missing information that may have been material to Mr. Gallegos' defense or even bar prosecution by the federal government.  Mr. Gallegos moves this Court to dismiss the Indictment for a due process violation, and to order the government to disclose the Grand Jury transcripts so that the parties can fully brief the Court.

<div align="center">

3

</div>

**B.    The Grand Jury Transcripts are Also Subject to Disclosure Under the Jencks Act and *Brady* and Its Progeny**.

The Grand Jury transcripts can also be ordered disclosed as early Jencks Act materials, or for their exculpatory and impeachment value under *Brady v. Maryland* and its progeny.  73 U.S. 83 (1963)

1.    Disclosure Pursuant to the Jencks Act.

Pursuant to the Jencks Act, 18 U.S.C. § 3500, grand jury testimony should be produced by the government to the defense when a witness has testified before the Grand Jury and then testifies at trial.  *See United States v. Peters*, 625 F.2d 366, 368 (10th Cir. 1980) (remanding for *in camera* review of Grand Jury testimony for Jencks violation); *United States v. Duran*, 213 F. App'x 764, 767 (10th Cir. 2007) (unreported) (noting that witness's disclosed Grand Jury testimony was Jencks material).

Grand Jury proceedings are secret by statute.  See Fed. R. Crim. Proc. 6(e)(2), (5), and (6).  Mr. Gallegos, therefore, does not fully know who testified before the Grand Jury in this matter.  The bulk of the evidence often presented to the Grand Jury is in the form of summary testimony by the government's case agent, who then usually testifies at trial.  However, it is also common for cooperating witnesses to be presented to the Grand Jury.  As can be seen by the limited information to which the defendant is in possession, information that was inculpatory at the time of indictment is now directly contradicted.

This information should be turned over immediately, pretrial, so that defendant's counsel may have a fair and adequate opportunity to prepare his defense, and to ensure the orderly administration of justice.  *See*, *e.g.*, *United States v. Evans & Associates Const. Co., Inc.*, 839

F.2d 656, 658 on reh'g, 857 F.2d 720 (10th Cir. 1988) (disclosure to prepare defense would not interfere with any ongoing investigation), *United States v. Lujan*, 530 F. Supp. 2d 1224, 1254 (D.N.M. 2008) ("courts have ordered early disclosure in the interests of due process, effective assistance of counsel, and the fair and efficient conduct of trial" and "[t]he circuit courts have also encouraged the practice of early disclosure.")

2.      Disclosure Pursuant to *Brady* and Its Progeny.

To the extent that the government has documents and information that it intends to use at trial, it must afford the defendant complete access to those documents.    Fed. R. Crim. P. 16(a)(1)(C).  Defense counsel has a right to material exculpatory information under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Strickler v. Green*, 527 U.S. 263 (1999); *United States v. Youngblood*, 379 F.2d 365 (2d Cir. 1967).   "Whether the evidence would have been admissible as substantive or impeachment evidence does not alter our conclusion that the evidence is subject to disclosure under *Brady*."  *Scott v. Mullin*, 303 F.3d 1222, 1231 (10th Cir. 2002).

In *Brady*, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady,* 373 U.S. at 87.  The Court observed, "Society wins not only when the guilty are convicted but when criminal trials are fair; our system or the administration of justice suffers when any accused is treated unfairly."  *Id.*

Information should be disclosed early in the case with enough time to avoid a *Brady* violation.   *See*, *e.g.*, *United States v. Lujan*, 530 F.Supp.2d 1224, 1256 (D.N.M. 2008) ("the Tenth Circuit strongly disapproves of delayed disclosure of Brady materials"); *see also* Deputy

5

DNM 1165

Attorney General David W. Ogden, Memorandum for Heads of Litigating Components Handling General Matters (January 4, 2010) (available at http://www.justice.gov/dag/dag-to-usas-component-heads.html) ("Providing broad and early discovery often promotes the truth-seeking mission of the Department and fosters a speedy resolution of a case").  "The touchstone of materiality is a 'reasonable probability' of a different result;" that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also United States v. Robinson*, 583 F.3d 1265, 1270 (10th Cir. 2009) ("A defendant need not show that the withheld records would have "resulted ultimately in [his] acquittal." (citing *Kyles*, at 434) (alteration in original)).  Mr. Gallegos asks for this material now because as his counsel are preparing for trial, including preparing for motions to attack the jurisdiction of the affected Counts.

## POSITION OF PARTIES

Prior to the filing of this motion defense counsel sought positions of other defendants and the government regarding this motion. The positions are as follows:

Defendants Andrew Gallegos, Anthony Baca and Edward Troup join defendant Joe Gallegos in this request.

All other defendants stated that they did not have any opposition or did not respond during the time requested.

The Government is opposed to the instant request for the production of the grand jury transcripts.

## CONCLUSION

WHEREFORE, defendant respectfully requests this Court grant its Motion to Dismiss and Compel Government Disclosure of Grand Jury Transcripts to the extent of ordering the

Government to disclose the Grand Jury Transcripts so that Mr. Gallegos can learn whether there

was a due process violation, and fully brief the Court on the facts and appropriate remedies.

Respectfully submitted,


/s/ Brock Benjamin
BROCK BENJAMIN
Attorney for Defendant
New Mexico Bar No.141535
747 E. San Antonio, Suite 203
El Paso, Texas  79901
Tel (915) 412-5858
Fax (915) 503-2224
Email:  brock@brockmorganbenjamin.com


CERTIFICATE OF SERVICE


The undersigned hereby certifies that on this the 28th day of March, 2017, I
electronically transmitted the attached document to the Clerk's Office using the CM/ECF system
for filing and service to all CM/ECF registrants.


/s/ Brock Benjamin
BROCK BENJAMIN

7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                    **NO.**    **15-CR-4268 JB-2**

**JOE GALLEGOS,**

    **Defendant.**

## NOTICE OF FILING ATTACHMENT OF EXHIBITS
## TO MOTION TO DISMISS AND TO COMPEL GOVERNMENT
## DISCLOSURE OF GRAND JURY TRANSCRIPTS [DOC 1023]

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now, BROCK BENJAMIN and files this, Notice of Filing Exhibits to Motion to Dismiss and to Compel Government Disclosure of Grand Jury Transcripts [Doc 1023] in the above styled and numbered cause, attached hereto as Exhibits "A" and "B", on behalf of Defendant JOE GALLEGOS.

SIGNED this the 28th day of March, 2017.

                                       Respectfully submitted,

                                       */s/ Brock Benjamin*
                                        BROCK BENJAMIN
                                        Attorney for Defendant
                                        New Mexico Bar No.141535
                                        747 E. San Antonio, Suite 203
                                        El Paso, Texas  79901
                                        Tel (915) 412-5858
                                        Fax (915) 503-2224
                                        Email:  brock@brockmorganbenjamin.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 28th day of March, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.


/s/ Brock Benjamin
BROCK BENJAMIN

DNM 1169

FD-302 (Rev. 5-8-10)                        - 1 of 2 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry      02/14/2017

Revisions to Previous FBI Reports:

1.  FD-1023 CHS Reporting Document for ████████, date of report
    08/05/2015, serial # 104, by Special Agent Bryan Acee.
2.  FD-302 debrief and Guilty Plea of ████████, date of report
    09/15/2016, serial # 811, by Special Agent Bryan Acee.

This report is being submitted to amend and clarify prior reporting, as
recorded in the reports cited above. The information that requires further
examination and explanation pertains to a statement from the listed
FD-1023:

**"2012, JOE GALLEGOS murdered Adrian Burns on an order from GERALD ARCHULETA
because Burns was an informant. GALLEGOS admitted the murder and ROY
"Shadow" MARTINEZ talks about it on the wire."**

The statement above was attributed to ████████ during a debrief on August
5, 2015, at the ██████████████. Special Agent (SA) Bryan Acee
met the CHS for the first time on this date and conducted a lengthy
debrief. Prior to this date, the CHS had been operated by SA Katherine
Brusuelas. The CHS related several conversations that he/she had with SNM
members and the contents of those conversations. SA Acee recorded the
information in the referenced FD-1023 (serial 104).

Thirteen months later, SA Acee interviewed ████████ after a court
hearing ████████████. ████████ said he had been reviewing discovery
material in his tablet device and noticed an inaccuracy. ████████ said he
never discussed the Adrian BURNS murder with the CHS. SA Acee recorded the
interview in an FD-302, dated September 15, 2016 (serial 811).

In an effort to track down the recording, SA Acee conducted a review of
████████ file and spoke with SA Brusuelas. No recording was located in
the source's file. SA Brusuelas recalled the CHS had been equipped with a
covert recording device and had been tasked with recording SNM members. SA
Brusuelas subsequently collected the recording device from the source,
however the device failed to record conversations. SA Brusuelas thought the
device had malfunctioned or been damaged.

Investigation on  02/13/2017  at  ████████  ████████  ████████  ████████
File #  245U-AQ-6239655                                Date drafted  02/13/2017
by  Bryan Acee

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

EXHIBIT "A"

U.S. v. DELEON, ET AL.    21822
DNM 1170

FD-302a (Rev. 05-08-10)

245U-AQ-6239655

Continuation of FD-302 of _(U) Revisions to Serials 104 & 811_ , On _02/13/2017_ , Page _2 of 2_

SA Acee requested FBI technical agents pull the device from storage and
check it for data. The technical agents checked the device and confirmed
that it contained no data.

This report is being submitted to document SA Acee's findings in this
matter. This report will be provided to the United States Attorney's Office
so that it may be disclosed to defendants ▮▮▮▮▮▮▮ and Joe Lawrence
GALLEGOS.

Attachments:

1.  FD-1023 CHS Reporting Document for ▮▮▮▮▮▮, date of report
    08/05/2015, serial # 104, by SA Acee.
2.  FD-302 debrief and Guilty Plea of ▮▮▮▮▮▮, date of report
    09/15/2016, serial # 811, by SA Acee.

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  OFFICIAL RECORD |

| **HEADER** |
|---|

| **Source ID:** | ███████████ | *SERIAL # 104*<br>*BY SA BRYAN ACEE* |
| **Date:** | 08/10/2015 | |
| **Case Agent Name:** | SAINATO, JOSEPH | |
| **Field Office/Division:** | Albuquerque | |
| **Squad:** | CRIM | |

| **SOURCE REPORTING** |
|---|

| **Date of Contact:** | 08/05/2015 |
|---|---|

**List all present including yourself (do not include the CHS):**
SA Acee, TFO Myers, and STIU staff from PNM and Central

| **Type of Contact:** | In Person |
|---|---|
| **Country:** | UNITED STATES |
| **City:** | ██ |
| **State:** | ██████ |
| **Date of Report:** | 08/05/2015 |

**Substantive Case File Number**

281D-AQ-6239655

**Source Reporting:**
On 8/5/15, the CHS was interviewed at the FBIAQ office and provided the following information:

<u>SNM Murders and Attempt Murders:</u>

In 1998, MANUEL BENITO, aka: "Panther," LEONARD LUJAN, and FREDERICO MUNOZ, killed SNM member Felix Steve MARTINEZ, aka: "Animal" at the Bernalillo County Detention Center in Albuquerque. ANGEL MUNOZ (deceased) had called the hit. Panther and Playboy admitted the hit.

2000 Murder of Matthew Cavalier at the Bernalillo County Detention Center in Albuquerque. Murder committed by FRANSISCO VILLALOBOS, ROY PAUL MARTINEZ, GERALD ARCHULETA, and SAMUEL SILVA. MARTINEZ and SILVA admitted the murder.

In 2002, JOHNNY STONELAKE drive by shooting of LC member in Clovis, NM (on 11/14/2002). CHS was dating STONELAKE's sister at the time. STONELAKE may be living in Texas now.

2003 Murder of Ronald Contreras at the barber shop by FREDERICO MUNOZ. Killed Contreras because he was LC. The hit was ordered by GERALD ARCHULETA ("Stix"). MUNOZ was ARCHULETA's right hand man. MUNOZ admitted murder.

2004 DAVID CALBURT stabbed Anthony Gonzales at the Penitentiary of New Mexico in Santa Fe. The hit had been ordered by ARTURO GARCIA. CALBURT admitted the hit.

2004 KEVIN OTERO stabbed MICHAEL ASTORGA because ASTORGA rumored to have requested PC. CHS spoke with ASTORGA.

2005 ASTORGA murdered Candido Ray Martinez Jr. over a dope deal. Martinez was also believed to be a snitch. The hit on Martinez had been ordered by MICHAEL "Rupert" ZAMORA ("Oso"). ASTORGA admitted this information to the CHS.

| FD-1023 | | Page 1 of 3 | | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|---|---|

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
| --- | --- | --- |

2006 ASTORGA murdered Deputy James McGrane. ASTORGA was on the run, but the murder of the police officer was over the top and fixed any doubt with fellow SNM members that he was a member in good standing and willing to do what needed to be done. ASTORGA is SNM today because of the two murders.

2006 Attempt murder of Thomas Sanders at the Southern New Mexico Correctional Facility in Las Cruces. PAUL SILVA ("Loco") and ERNEST GUERRO ("Ern Dog") called the hit. The hit was carried out by VINCENT GARDUNO and SAMMY GRIEGO. Sanders took the shank away from GARDUNO after being stabbed twice and beat up both subjects.

2007 Murder of Freddie Sanchez at the Southern New Mexico Correctional Facility in Las Cruces by JAVIER ALONZO, aka: "Wineo," and EDWARD TROUP, aka: "Huero Troup." ARTURO GARCIA put out the hit and BENJAMIN CLARK, aka: "Cyclone" carried the message to Las Cruces when he was transferred there. RASCON brothers were to do the hit, but were afraid. JESSE TRUJILLO covered the cameras. RUBEN HERNANDEZ was a witness for and ratted. TROUP and ALONZO admitted the hit, as did GARCIA.

2008 murder of Sammy Chavez was called by STIX and ARTURO GARCIA. The murder was carried out by BILLY CORDOVA, aka: "Little Shadow," and SERGIO RODRIGUEZ, aka: "Churro." Churro was GARCIA's right hand man. The CHS witnessed the order and spoke with the defendants about the hit after the fact.

During August, 2011, STIX called hit on Paul Silva and MARICIO VARELA, aka: "Archie," and DAVID CALBURT conducted the hit. Silva was stabbed and assaulted at the Level 5 facility in Santa Fe, NM.

2012, JOE GALLEGOS murdered Adrian Burns on an order from GERALD ARCHULETA because Burns was an informant. GALLEGOS admitted the murder and ▮▮▮▮▮▮▮▮▮▮ talks about it on the wire.

2014, ANTHONY BACA, aka: "Pup," ordered the murder of Javier Molina because he was a snitch. Pup put the order out and provided the paperwork to DAVID CALBURT, aka: "Spider." CALBURT provided the paperwork to MARICIO VARELA, aka: "Archie," to take down to Las Cruces to DANIEL SANCHEZ aka: "Dan Dan." JERRY ARMENTA, aka: "Creeper," and JERRY MONTOYA, aka: "Boxer," MARIO RODRIGUEZ, AKA: "Blue," and TIMOTHY MARTINEZ, aka: "Red," to conduct the murder. Dan-Dan watched the murder from a near-by table. The various defendants admitted the hit to the CHS and Blue talks about it on the wire.

March 2015, defendant ROY MARTINEZ, aka: "Shadow" sent a letter to defendant JUAN CARLOS GUTIERREZ, aka: "Gotti" directing GUTIERREZ to murder NMCD Secretary Gregg Marcantel.

MARTINEZ sent a letter to defendant DAMIAN NODAL LOBRADO, aka: "Cuba" directing defendant LOBRADO to murder Secretary Marcantel.
MARTINEZ sent a letter to CHS-XX "Lonely" directing CHAVEZ to murder Secretary Marcantel.

On March 20, 2015, ROBERT MARTINEZ, aka: "Baby Rob" sent a letter to CHS▮▮▮ directing the CHS to murder Secretary Marcantel.
"Baby Rob" sent a letter to RUBEN HINOJOSA directing Ruben to murder Secretary Marcantel.
"Baby Rob" sent a letter to HINOJOSA directing Ruben to murder Secretary Dwayne Santistevan.
"Baby Rob" sent a letter to CHS▮▮▮ directing the CHS to murder STIU Administrator Santistevan.
The hit on Marcantel and Santistevan started with ANTHONY RAY BACA ("Pup"). Pup was eager to hit both victims and pointed out that not even the Mexican Mafia had been able to kill a prison director or secretary. Pup was excited that the SNM would get recognition all over the country. Pup had intel on Santistevan and his family. BILLY CORDOVA ("Lil Shadow") and ROBERT SANCHEZ ("Tiny") were given the hit, however both were arrested shortly after their release from prison. Pup spoke of the NMCD murders at the same time he was planning the Molina murder. This took place at the SNMCF in July 2013. The CHS was present for the conversations.

ANDREW ROMERO:

During late July 2015, early August 2015, ANDREW ROMERO was brought into the SNM. This took place while ROMERO was at the Central NM Correctional Facility. FNU LNU "Griefo" and JOE BARELA brought ROMERO into the SNM. BILLY CORDOVA ("Lil Shadow") attended court and heard the news. CORDOVA brought word back to PNM.

| FD-1023 | | Page 2 of 3 | | FEDERAL BUREAU OF INVESTIGATION |
| --- | --- | --- | --- | --- |

UNCLASSIFIED

**U.S. v. DELEON, ET Al.   21825**

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

ANTHONY RAY BACA (Pup):

The CHS explained and sketched Pup's SNM Zia Structure, which has Pup in the center with two captains. Each of the lines leading away from the center circle (4 in each direction) represents the 16 counties in New Mexico. Each county is run by a lieutenant.

CHRISTOPHER GARCIA is sending money to Pup in prison.

| SIGNATURE |
|---|

| | | |
|---|---|---|
| Submitted By | bmacee (Bryan Acee) | Mon, 10 Aug 2015 12:42:44 -0600 |
| First Level Approved By | skchavez (Sonya Chavez) | Tue, 11 Aug 2015 08:56:24 -0600 |

| FD-1023 | Page 3 of 3 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



SERIAL # 811
BY SA BRYAN ACEE

Date of entry     10/04/2016

On September 15, 2016, FBI Special Agent (SA) Bryan Acee and Task Force
Officer (TFO) Chris Cupit conducted a debrief with ███████████
████████   ███████████   ███████████ ████████ .

    ████████  attorney and defense investigator were present during the
interview, as were Assistant U.S. Attorney's Maria Armijo, Randy Castellano
and Matthew Beck. Officers with the New Mexico Corrections Department's
Security Threat Intelligence Unit transported ████████ to the debrief and
were present.

    ████████  related the following information:

**Adrian Burns Murder:** While reviewing discovery material in the SNM case,
████████ noted a mistake in an FBI Confidential Human Source (CHS) report
(form 10-23). The specific report was dated 08/07/2015, with serial 104. SA
Acee reviewed the report and recognized it to be a summation of a debrief
with CHS-████████ . In the debrief of the CHS, SA Acee reported the CHS
spoke with ████████ about Joe Lawrence GALLEGOS having admitted to
murdering Adrian BURNS. ████████ pointed out that he never spoke with the
CHS about the BURNS murder and had no knowledge of the incident. Shadow?

    ████████  said the name in the report should reflect Timothy MARTINEZ, aka:
"Red," not ████████ .

**Note:** Either the CHS misspoke and confused ████████ and Timothy
MARTINEZ or SA Acee misquoted the CHS during the telephonic debrief of the
CHS.

**Max Gutierrez Murder:** ████████ referenced an FD-302 report in which a
cooperating defendant discussed the murder of Max GUTIERREZ. ████████ said
that he knew Robert HERNANDEZ, aka: "Secia," and Conrad SALAZAR killed
GUTIERREZ. ████████ said that GUTIERREZ admitted the murder to him in 1995,
while incarcerated together within the New Mexico Corrections Department.
In describing the murder, HERNANDEZ said he gave GUTIERREZ "a permanent
smile," which ████████ knew to mean that they slit GUTIERREZ's throat.

    Following the debrief, ███████████████████████████████

Investigation on  09/15/2016   at  Las Cruces, New Mexico, United States (In Person)

File #  245U-AQ-6239655                                      Date drafted  09/15/2016

by  Bryan Acee

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency

**U.S. v. DELEON, ET AL.   21827**
DNM 1175

FD-302a (Rev 05-08-10)

245U-AQ-6239655



(U)

Continuation of FD-302 of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ , On  09/15/2016 , Page  2 of 2

**Import Form**

                                                    U

External System ID:  Delta

Document Title:  (U) ██████████████

Form Imported:  FD-1023

File:  (U) ████████████

Synopsis:  (U) 8/7/15 - CHS Reporting on SNM

**Filing and Security**

Primary Case:  245U-AQ-6239655

Case Title:  (U) OPERATION ATONEMENT;
SYNDICATO DE NUEVO MEXICO
GANG;
OCDETF/PRISON GANGS
SWNML0327

Serial Number:  104

Serialized:  08/11/2015

Category:  Full Investigation
Initiated:  04/02/2015

**Details**

Raw File Text:

HEADER
Source ID: ████████████
Date: 08/10/2015
Case Agent Name: SAINATO, JOSEPH
Field Office/Division: Albuquerque
Squad: CRIM
SOURCE REPORTING
Date of Contact: 08/05/2015
List all present including yourself (do not include the CHS):
SA Acee, TFO Myers, and STIU staff from PNM and Central
Type of Contact: In Person
Country: UNITED STATES
City: AQ
State: New Mexico
Date of Report: 08/05/2015
Source Reporting:
On 8/5/15, the CHS was interviewed at the FBIAQ office and provided
the following information:

SNM Murders and Attempt Murders:

In 1998, MANUEL BENITO, aka: 'Panther,'◆LEONARD LUJAN, and
FREDERICO MUNOZ, killed SNM member Felix
Steve MARTINEZ, aka: 'Animal'◆at the Bernalillo County Detention
Center in Albuquerque. ANGEL MUNOZ
(deceased) had called the hit. Panther and Playboy admitted the hit.

2000 Murder of Matthew Cavalier at the Bernalillo County Detention
Center in Albuquerque. Murder committed by
FRANSISCO VILLALOBOS, ROY PAUL MARTINEZ, GERALD ARCHULETA, and
SAMUEL SILVA. MARTINEZ and SILVA
admitted the murder.

In 2002, JOHNNY STONELAKE drive by shooting of LC member in Clovis,
NM (on 11/14/2002). CHS was dating
STONELAKE¶s sister at the time. STONELAKE may be living in Texas
now.

2003 Murder of Ronald Contreras at the barber shop by FREDERICO

EXHIBIT "B"

U.S. v. BACA, ET AL.,    4472 SNM 1177

6/6/2016 11:09 AM

MUNOZ. Killed Contreras because he was LC.
The hit was ordered by GERALD ARCHULETA �³Stix´���MUNOZ was
ARCHULETA¶s right hand man. MUNOZ admitted
murder.

2004 DAVID CALBURT stabbed Anthony Gonzales at the Penitentiary of
New Mexico in Santa Fe. The hit had been
ordered by ARTURO GARCIA. CALBURT admitted the hit.

2004 KEVIN OTERO stabbed MICHAEL ASTORGA because ASTORGA rumored to
have requested PC. CHS spoke
with ASTORGA.

2005 ASTORGA murdered Candido Ray Martinez Jr. over a dope deal.
Martinez was also believed to be a snitch.
The hit on Martinez had been ordered by MICHAEL ³Rupert´�ZAMORA
�³Oso´���ASTORGA admitted this information
to the CHS.

Substantive Case File Number
281D-AQ-6239655
FD-1023 Page 1 of 3 FEDERAL BUREAU OF INVESTIGATION
UNCLASSIFIED
FD-1023 FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT
UNCLASSIFIED
2006 ASTORGA murdered Deputy James McGrane. ASTORGA was on the run,
but the murder of the police officer
was over the top and fixed any doubt with fellow SNM members that he
was a member in good standing and
willing to do what needed to be done. ASTORGA is SNM today because
of the two murders.

2006 Attempt murder of Thomas Sanders at the Southern New Mexico
Correctional Facility in Las Cruces. PAUL
SILVA �³Loco´��and ERNEST GUERRO �³Ern Dog´��called the hit. The
hit was carried out by VINCENT GARDUNO
and SAMMY GRIEGO. Sanders took the shank away from GARDUNO after
being stabbed twice and beat up both
subjects.

2007 Murder of Freddie Sanchez at the Southern New Mexico
Correctional Facility in Las Cruces
by JAVIER ALONZO, aka: ³Wineo,´�and EDWARD TROUP, aka: ³Huero
Troup.´�ARTURO GARCIA put out the hit and
BENJAMIN CLARK, aka: ³Cyclone´�carried the message to Las Cruces
when he was transferred there. RASCON
brothers were to do the hit, but were afraid. JESSE TRUJILLO covered
the cameras. RUBEN HERNANDEZ was a
witness for and ratted. TROUP and ALONZO admitted the hit, as did
GARCIA.

2008 murder of Sammy Chavez was called by STIX and ARTURO GARCIA.
The murder was carried out by BILLY
CORDOVA, aka: ³Little Shadow,´�and SERGIO RODRIGUEZ, aka:
³Churro.´�Churro was GARCIA¶s right hand man.
The CHS witnessed the order and spoke with the defendants about the
hit after the fact.

During August, 2011, STIX called hit on Paul Silva and MARICIO
VARELA, aka: ³Archie,´�and DAVID CALBURT
conducted the hit. Silva was stabbed and assaulted at the Level 5
facility in Santa Fe, NM.

2012, JOE GALLEGOS murdered Adrian Burns on an order from GERALD
ARCHULETA because Burns was an
informant. GALLEGOS admitted the murder and ROY ³Shadow´�MARTINEZ
talks about it on the wire.

2014, ANTHONY BACA, aka: 'Pup,' ◆ordered the murder of Javier Molina because he was a snitch. Pup put the
order out and provided the paperwork to DAVID CALBURT, aka: 'Spider.' ◆CALBURT provided the paperwork to
MARICIO VARELA, aka: 'Archie,' ◆to take down to Las Cruces to DANIEL SANCHEZ aka: 'Dan Dan.' ◆JERRY
ARMENTA, aka: 'Creeper,' ◆and JERRY MONTOYA, aka: 'Boxer,' ◆MARIO RODRIGUEZ, AKA: 'Blue,' ◆and TIMOTHY
MARTINEZ, aka: 'Red,' ◆to conduct the murder. Dan-Dan watched the murder from a near-by table. The various
defendants admitted the hit to the CHS and Blue talks about it on the wire.

March 2015, defendant ROY MARTINEZ, aka: 'Shadow' ◆sent a letter to defendant JUAN CARLOS GUTIERREZ, aka:
'Gotti' ◆directing GUTIERREZ to murder NMCD Secretary Gregg Marcantel.

MARTINEZ sent a letter to defendant DAMIAN NODAL LOBRADO, aka: 'Cuba' ◆directing defendant LOBRADO to
murder Secretary Marcantel.
MARTINEZ sent a letter to CHS ███ 'Lonely' ◆directing CHAVEZ to murder Secretary Marcantel.

On March 20, 2015, ROBERT MARTINEZ, aka: 'Baby Rob' ◆sent a letter to CHS ███ directing the CHS to murder
Secretary ███ Marcantel.
'Baby Rob' ◆sent a letter to RUBEN HINOJOSA directing Ruben to murder Secretary Marcantel.
'Baby Rob' ◆sent a letter to HINOJOSA directing Ruben to murder STIU Administrator Dwayne Santistevan.
'Baby Rob' ◆sent a letter to CHS ███ directing the CHS to murder STIU Administrator Santistevan.
The hit on Marcantel and Santistevan started with ANTHONY RAY BACA
◆'Pup' ◆◆◆Pup was eager to hit both victims
and pointed out that not even the Mexican Mafia had been able to kill a prison director or secretary. Pup was
excited that the SNM would get recognition all over the country. Pup had intel on Santistevan and his family. BILLY
CORDOVA ◆'Lil Shadow' ◆◆and ROBERT SANCHEZ ◆'Tiny' ◆◆were given the hit, however both were arrested shortly
after their release from prison. Pup spoke of the NMCD murders at the same time he was planning the Molina
murder. This took place at the SNMCF in July 2013. The CHS was present for the conversations.

ANDREW ROMERO:

During late July 2015, early August 2015, ANDREW ROMERO was brought into the SNM. This took place while
ROMERO was at the Central NM Correctional Facility. FNU LNU 'Griefo' ◆and JOE BARELA brought ROMERO into the
SNM. BILLY CORDOVA ◆'Lil Shadow' ◆◆attended court and heard the news. CORDOVA brought word back to PNM.

FD-1023 Page 2 of 3 FEDERAL BUREAU OF INVESTIGATION
UNCLASSIFIED
FD-1023 FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT
UNCLASSIFIED
ANTHONY RAY BACA (Pup):

The CHS explained and sketched Pup's SNM Zia Structure, which has Pup in the center with two captains. Each of
the lines leading away from the center circle (4 in each direction) represents the 16 counties in New Mexico. Each

county is run by a lieutenant.

CHRISTOPHER GARCIA is sending money to Pup in prison.

SIGNATURE
Submitted By
First Level Approved By
FD-1023 Page 3 of 3 FEDERAL BUREAU OF INVESTIGATION
UNCLASSIFIED
FD-1023 FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT
UNCLASSIFIED

**Indexing**

| Display Name | Enterprise Role | Entity Role | Entity Type | US Person |
|---|---|---|---|---|
| ███████ | CHS | Reference | PERSON | |

| | | Page | of 1 | | | | Displaying 1 - 1 of 1 |

**Routing**

**Drafted by:** Bryan Acee

**Approved by:** Bryan Acee

U.S. v. BACA, ET AL.,    44/75/2016 11:00 AM    DNM 1180

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,

       Plaintiff,

v.                                          15-CR-4268 JB

ANDREW GALLEGOS and
JOE GALLEGOS,

       Defendants.


**REPLY TO UNITED STATES' RESPONSE TO
MOTION TO SEVER COUNTS FOUR AND FIVE**

COMES NOW, Defendants Andrew Gallegos, by and through his attorney of record, Donavon A. Roberts, Esq., and joined by Brock Benjamin, Esq., attorney for Joe Gallegos, and respectfully summits the following reply to the government's response [Doc. 933] to Andrew Gallegos' motion to sever Counts four and five from the trial of the other co-Defendants, and in support states:

## INTRODUCTION

The law on severance has been briefed and repeated in numerous documents, including documents 807, 845, 858, 868, 882, 887, 893, 901, 925, 933, 936, 959, and 975. The Gallegos Defendants joins, adopts and incorporates all arguments previously made in the above documents for severance as though stated fully herein. Additionally, since defendant's initial motion to sever, there has been a Second Superseding Indictment, which does not alter the charges with respect to these defendants, nor to their previous argument for severance. Andrew Gallegos further states the following on his particular behalf for severance:

1

1. Andrew Gallegos, unlike many of the defendants charged in this case, is not a member of the SNM and has never sought consideration of anything of value from SNM, nor has he attempted to gain entrance into SNM. He has never participated in the activities of the "enterprise", included in this case.  The only reason Andrew Gallegos is included in this case is because he is Joe Gallegos' younger brother.   Joe Gallegos, unlike Andrew, has been charged in several other counts and allegedly linked to other murders.  Andrew Gallegos, by comparison, is only changed with respect to one murder (Counts 4 and 5); an incident that, unlike many of the other charges in this case, occurred outside of the prison system.  The Supreme Court has recognized that when a jury hears large amounts of incriminating evidence it could predispose them to convict a codefendant whom they otherwise would not. *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

2. Andrew Gallegos further opposes trial with any other defendant in this case pursuant to the Federal Rules of Criminal Procedure because the charges in the Second Superseding indictment do not overlap factually, bear absolutely no relation to each other, occur in distinctly different locations in the state, and at distinctly different times that range over a period of fifteen years.

3.  The multitude of gruesome evidence that the government intends to present at trial on all the other defendants in the indictment, which in many cases allegedly involved years of plotting, and have nothing to do with Andrew Gallegos, will spillover to Andrew simply because of his kinship to Joe Gallegos and Joe being named in multiple counts.  This spillover effect was quite evident at the court's last full hearing where Joe and Andrew were continuously spoken about as if they were one and the same person, collectively referred to by everyone as "Mr. Gallegos", even when the Counts that were being discussed only involved Joe Gallegos and not Andrew.  This in-court-behavior demonstrates the type of

2

Appellate Case: 20-2058   Document: 010110415663   Date Filed: 09/29/2020   Page: 759

4.  The evidence is not of the same or similar character, nor based on the same act of transaction nor part of a common scheme or plan, and just out of principle should not be tried together.

5.  Many of the Defendants charged have markedly higher levels of culpability than Andrew Gallegos.  In fact, many of them were facing the death penalty.  Andrew Gallegos does not have the same level of culpability and the government has presented little to no evidence that would stand on its own to convict Andrew Gallegos or Joe Gallegos of the murder related to Counts 4 and 5.   In fact**, the government has recently withdrawn its most compelling evidence in support of counts 4 and 5; an alleged wire communication or confession by Joe Gallegos that indicated that he killed AB because he had previously disrespected him**.  This alleged wire/confession has been unsubstantiated and any claim of its existence withdrawn by the government (*See,* Doc's. 1023 and 1027; Joe Gallegos' *Motion and Exhibits to Dismiss and Compel Grand Jury Transcript*).   Even if the above wire did exist, it would actually bolster Andrew Gallegos' position that whatever may or may not have happened between Joe and AB was a personal grievance and had nothing to do with Andrew Gallegos, the SNM, or any criminal enterprise.

6.  The Government has still yet to present any concrete evidence, except vague assertions, rumors and speculations that Andrew Gallegos had anything to do with AB's death. It is, therefore, a little disingenuous for them to argue that Andrew Gallegos has failed to show what specific antagonistic defenses are at issue, or what specific constitutional rights will be

3

7.   Further, with respect to the lack of evidence and culpability level for Andrew, the government has had over five years to investigate AB's murder, which might be described as not only gruesome, but unusual and spectacular in nature: The kind of "statement murder" that people talk about, even brag about.  Yet, upon information and belief, despite tactics that include housing informants or government agents with Andrew, recording his communications, surveilling his family's activities, and even recently searching his jail cell, the government have accumulated nothing beyond what the state of New Mexico had when they *nolle prosed* similar charges against Joe and Andrew in 2012 because of the lack of evidence.  The simple fact is that the government cannot convict Andrew of these crimes in a stand-alone trial.  They need the *spillover effect* and the influence of *guilt-by-association* to add weight to what is seemingly a light case against Andrew Gallegos.  This presents an unfair situation for Andrew and offends his right to a fair trial.

8.   Notwithstanding paragraph 6 above, Mr. Andrew Gallegos' defense is antagonistic to his co-defendants (including Joe Gallegos).  If forced to go to trial together, Andrew Gallegos will have no choice but to take the uncomfortable position that his brother or perhaps other co-defendants are responsible for AB's death.  This would, essentially, place Andrew on the same side as the government; an unfair scenario, particularly for Joe Gallegos, because it would be the equivalent of a denial of a fair and impartial trial for Joe.  *See, United States v Valdez*, 262 F. Supp. 474 (D.P.R. 1967). Therefore, to the extent that the jury will be faced with disbelieving one defense over the other, severance is required.  Further, placing Andrew on the opposite side of his brother creates a chilling effect on Andrew's willingness to do or say anything that might harm his brother, even at the expense of his own defense.

DNM 1184

9.  The government's position against severance that more co-defendants will surly plead before trial, making severance moot, is not the test for determining whether severance should be granted.  This type of speculation is particularly unpersuasive given that we are now less than three months away from trial and most of the defendants are still in the case and have expressed no intention to plea given their present circumstances.

Wherefore, Andrew Gallegos states that the allegations claimed by the Government against him is small in comparison to the overall scope of this indictment against the twenty-plus other defendants in this case.  The prejudice suffered by Defendants charged in a small portion of the counts is compounded because the jury is subject to months and months of trial "dealing with dozens of indictments of criminal misconduct that does not involve a minor defendant in any way. US. V. Gallo, <u>668 F. Supp. 736</u> (E.D.N.Y. 1987).  For all the foregoing reasons, Defendant Andrew Gallegos moves the Court to sever Counts 4 and 5 from the Second Superseding Indictment.

Respectfully Submitted,

<u>*/s/ Donavon A. Roberts*</u>
Donavon A. Roberts
P.O. Box 36344
Albuquerque, NM 87176
(505) 506-3749
(505) 503-8405 facsimile
ladar170@aim.com

**Joined by:**

<u>*/s/ Brock Benjamin*          </u>
Brock Benjamin
Richard Sindel
Attorneys for Joe Gallegos (2)
brock.benjamin@gmail.com
*Attorneys for Joe Gallegos*

## CERTIFICATE OF SERVICE

5

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system on, this 30th day of March, 2017, which caused counsel of record for the government, co-defendants, and all other parties to receive a copy of this Motion electronically.

*/s/ Donavon A. Roberts*
Donavon A. Roberts

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,  )
)
Plaintiff,  )
)
v.  )        No. CR-15-4268-JB
)
ANGEL DE LEON, et al,  )
)
**9.  JAVIER ALONSO,**  )
)
Defendants.  )

## REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSTION TO DEFENDANT'S MOTION TO SEVER [893] [Doc. 940]

Defendant Javier Alonso, through counsel, submits this Reply to the Government's Response in Opposition to Defendant's Motion to Sever [893] [Doc. 940].

**I.        Introduction and Procedural History**

Defendant Javier Alonso is charged in Count 3 of the Second Superseding Indictment with the murder of Freddie Sanchez (FS), alleged to have occurred on June 17, 2007. [Doc. 949, pp.10-11].[1]  Also charged in Count 3 are co-defendants Edward Troup and Arturo Arnulfo Garcia.  Mr. Alonso is not charged in any other count in the 16-count Second Superseding Indictment.

---

[1] Mr. Alonso's original Motion to Sever [Doc. 893] was filed prior to the Second Superseding Indictment and therefore cites to the Superseding Indictment [Doc. 368].

DNM 1187

On February 5, 2017, Mr. Alonso filed his Motion to Sever Count 3 and to Sever the Trials of Edward Troup and Javier Alonso. [Doc. 893].  The issues related to severance of various counts have been briefed and argued.  *See e.g.* Docs. 807, 836, 845, 858, 868, 882, 936, 975, 1014 and February 7, 2017 hearing transcript.  This Reply will focus on Mr. Alonso's Motion to be severed from co-defendant Edward Troup for trial.

On March 6, 2017, the government filed its Response in Opposition to Defendant's Motion to Sever. [Doc. 940].  The government opposes severance because Troup's statements which implicate Alonso were not made to a law enforcement agent and, by the government's reckoning, are therefore nontestimonial. [Doc. 940, pp.11-12]. The government further argues that severance can be avoided by proper redaction of Troup's statements. [Doc. 940, p.12].

## II.   <u>Federal Rule of Criminal Procedure 14</u>

<u>Federal Rule of Criminal Procedure 14</u> authorizes courts to sever defendants' trials where consolidation appears to prejudice either the government or a defendant. Crim. P. 14, adopted in 1944 as a "restatement of existing law", was amended 1966. The 1966 amendment to Rule 14 added a provision which provided that "in ruling on a motion by a defendant for severance the court may order the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at trial."  The 1966 Advisory Committee's Note stated that "a defendant may be prejudiced by the

2

admission in evidence against a co-defendant of a statement or confession made by that co-defendant.  This prejudice cannot be dispelled by cross-examination if the co-defendant does not take the stand.  Limiting instructions to the jury may not in fact erase the prejudice."  Notably, the 1966 amendment to Crim. P. 14 was not limited to confessions made by a co-defendant to law enforcement.  Rather, by its express terms, Crim. P. 14 applies to "**any** statements or confessions."

The 1966 amendment to Crim. P. 14 foreshadowed *Bruton v. United States*, 391 U.S. 123 (1968) which came two years later.

In 2002, Crim. P. 14 was again amended.  The 2002 amendment deleted the reference to a defendant's "confession."  The Advisory Committee reported that "the reference to the 'defendant's statement' in the amended rule would fairly embrace **any** confessions or admissions by a defendant." (emphasis added).  Had the 2002 amendment deleted the word "statement" and kept only the word "confession" the government's argument that severance cannot be based on admissions to persons who are not members of law enforcement might find some limited traction.  Instead the 2002 amendment chose to retain the broader word "statement" while eliminating the more narrow word "confession."  The Advisory Committee Notes should dispel any argument that severance pursuant to Crim. P. 14 can only be founded on "confessions" to law enforcement.

Contrary to the government argument, this Court has discretion pursuant to Crim. P. 14 to order severance of Alonso and Troup.  Further, considering the plain

3

language of Crim. P. 14, that Troup's statements were not made to law enforcement does not impinge upon this Court's discretion.

### III.   The *Bruton* Doctrine

### A. Pre-*Bruton*

One is tempted to begin a retrospective of the right of confrontation with the Apostle Paul's trial before Governor Festus at Caesarea wherein Festus admonished "that it is not the custom of the Romans to hand over any man before the accused meets his accusers face to face."  Acts 25:16, NASB.  Alternatively, we could return to the year 1603 and Sir Walter Raleigh's trial for treason at Winchester, wherein Raleigh demanded "Let my accuser come face to face."  1 Criminal Trials 400, 427 (1835).  Instead, bypassing centuries of history except to note that the government has taken a position placing it at odds with both Sir Walter Raleigh and Saint Paul, we will begin this discussion in 1950s New York City.

In *United States v. Della Paoli*, 352 U.S. (1957), five defendants were convicted of conspiracy to possess alcohol in unstamped containers to evade payment of federal taxes.  The trial court admitted in evidence a confession by co-defendant Whitley that implicated defendant Della Paoli.  When the confession was admitted the trial court gave the jury an "emphatic warning that it was to be considered solely in determining the guilt of Whitley and not in determining the guilt of any other defendant." *Id.*, at 234.

In affirming Della Paoli's conviction, the Supreme Court first acknowledged that Whitley's confession was not admissible against Della Paoli.  The Court stated that "the

<div align="center">4</div>

utterance of a co-conspirator made after the termination of the conspiracy was

inadmissible against other co-conspirators." *Id.*, at 239.  Nevertheless, the Court

concluded that the trial court's limiting instruction provided Della Paoli with sufficient

protection so that admission of Whitley's confession was not reversible error.  *Id.*, at

243.

## B. *Bruton v. United States*

In 1968, two years following the 1966 amendment to Crim. P. 14, the

Supreme Court decided *Bruton v. United States*, <u>391 U.S. 123</u> (1968).  In *Bruton*,

George Bruton and William Evans were jointly tried for robbery.  Following his arrest,

Evans gave a confession to a postal inspector in which he admitted that he and Bruton

had committed the robbery. *Id*, at 124.  At trial, the prosecution was allowed to introduce

Evans' confession. *Id.*  The trial court gave a limiting instruction charging the jury that it

was not to consider Evans' confession "in any respect to the defendant Bruton." *Id*, at

125.  Both Bruton and Evans were convicted.  The Supreme Court held that it was

constitutional error to admit into evidence the incriminating statement made by co-

defendant Evans which implicated defendant Bruton and that this error is not cured by a

limiting instruction.  The Court held that admission of a co-defendant's statement that

implicates the defendant impinges the defendant's right to a fair trial and his Sixth

Amendment right to confrontation.  The Court said

> there are some contexts in which the risk that the jury will not, or
> cannot, follow instructions is so great, and the consequences of
> failure so vital to the defendant, that the practical and human
> limitations of the jury system cannot be ignored. Such a context is

> presented here, where the powerfully incriminating extrajudicial
> statements of a codefendant, who stands accused side-by-side with
> the defendant, are deliberately spread before the jury in a joint trial.
> Not only are the incriminations devastating to the defendant but their
> credibility is inevitably suspect . . . . The unreliability of such evidence
> is intolerably compounded when the alleged accomplice, as here,
> does not testify and cannot be tested by cross-examination.

*Id.*, at 135-136 (citations omitted).

The Court continued, "Here, the introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence implicating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." *Id*, at 137.

The Court's opinion in *Bruton* did not rest solely on the Confrontation Clause of the Sixth Amendment. In *Jackson v. Denno*, 378 U.S. 368 (1964), the Supreme Court considered the constitutionality of a New York rule under which the voluntariness of a defendant's confession was determined by the jury, rather than the judge, with the judge instructing the jury to disregard the confession entirely if they determined that it was involuntary. The Court noted that "it is difficult, if not impossible, to prove that a confession which a jury has found to be involuntary has nevertheless influenced the verdict or that its finding of voluntariness, if this is the course it took, was affected by the very evidence showing the confession was true." *Id*, at 389. The Court concluded that New York's procedure violated Constitutional Due Process because it "pose(d)

substantial threats to a defendant's constitutional rights to have an involuntary

confession entirely disregarded. . ." *Id.*

> Relying on *Jackson v. Denno*, the *Bruton* Court stated:

> > If it is a denial of due process to rely on a jury's presumed ability to
> > disregard an involuntary confession, it may also be a denial of due
> > process to rely on a jury's presumed ability to disregard a
> > codefendant's confession implicating another defendant when it is
> > determining that defendant's guilt or innocence.

> > Indeed, the latter task may be an even more difficult one for the jury
> > to perform than the former. Under the New York procedure, which
> > *Jackson* held violated due process, the jury was only required to
> > disregard a confession it found to be involuntary. If it made such a
> > finding, then the confession was presumably out of the case.  In
> > joint trials, however, when the admissible confession of one
> > defendant inculpates another defendant, the confession is never
> > deleted from the case and the jury is expected to perform the
> > overwhelming task of considering it in determining the guilt or
> > innocence of the declarant and then of ignoring it in determining the
> > guilt or innocence of any codefendants of the declarant. A jury
> > cannot 'segregate evidence into separate intellectual boxes.' . . . It
> > cannot determine that a confession is true insofar as it admits that
> > A has committed criminal acts with B and at the same time
> > effectively ignore the inevitable conclusion that B has committed
> > those same criminal acts with A.

*Bruton*, at 130-31, *quoting People* v. *Aranda*, 63 Cal. 2d 518, 528-529, 407 P. 2d 265,

271-272 (CA 1965).  In sum, the *Bruton* rule has constitutional underpinnings separate

and apart from the Confrontation Clause.  Accordingly, any dilution or diminution  of the

Sixth Amendment right to confrontation does not necessarily dilute or diminish the

*Bruton* rule.

> Unit*ed States v. Bruton* was decided in 1968.  In the intervening half century, and

as discussed *infra*, the *Bruton* doctrine has been refined.  However, *Bruton* has never

DNM 1193

been overruled and it remains well established and controlling law in the courts of these United States.

## C. *Bruton*'s progeny

The Supreme Court has had several occasions to clarify and refine its ruling in *Bruton*.[2]  For purposes of this Reply the defense will discuss but two of the Supreme Court opinions refining the *Bruton* doctrine.

### 1. *Richardson v. Marsh*

In *Richardson v. Marsh*, <u>481 U.S. 200</u> (1987), Clarissa Marsh, Benjamin Williams and Kareem Martin were charged with murder. *Id*, at 202.  Marsh and Williams were tried in a joint trial and Williams did not testify at trial. *Id*, at 202, 204.  At trial the prosecution introduced evidence of a confession given by Williams in which he implicated Marsh, Martin and himself. *Id*, at 203-04.  The confession was redacted to remove references to Marsh and "omitted all indication that anyone other than Martin and Williams participated in the crime." *Id*, at 203.  Further, the jury was instructed to "not use it (Williams' confession) in any way against (Marsh)." *Id*, at 204.

---

[2] *Harrington v. California*, <u>395 U.S. 250</u> (1969)(Violation of the *Bruton* doctrine is subject to harmless error review); *Schneble v. Florida*, <u>405 U.S. 427</u> (1972)(same); *Brown v. United States*, <u>411 U.S. 223</u> (1973)(same); *Parker v. Randolph*, <u>442 U.S. 62</u> (1979)(Plurality opinion holding that if the defendant has confessed his guilt, *Bruton* is not violated by the admission of a co-defendant's statement.  Admission of "interlocking confessions" does not violate the Constitution); *Lee v. Illinois*, <u>476 U.S. 530</u> (1986)(Relying on *Roberts v. Ohio*, the Court held that admission of interlocking confessions was improper because the statements lacked sufficient indicia of reliability.  Strictly speaking, *Lee* is not a *Bruton* case because the case was tried to a judge rather than a jury so the adequacy of a limiting instruction which was controlling in *Bruton* was not an issue in *Lee*.  Nevertheless, because *Lee* involves the admissibility of a co-defendant's statement it is frequently cited in the *Bruton* line of cases.); *Cruz v. New York*, <u>481 U.S. 186</u> (1987)(Decided same day as *Richardson v. Marsh*.  *Parker v. Randolph* plurality opinion rejected. Interlocking confessions violate the rule of *Bruton*; however, such violation is subject to harmless error review)

DNM 1194

The Supreme Court ruled that it was not error to admit Williams' confession as redacted because "the confession was not incriminating on its face." *Id*, at 208. Accordingly, the Court decided that the rule of *Bruton* can be satisfied by redaction, a result that *Bruton* itself had suggested. *Id*, at 209, *Bruton* at 134, FN 10.

### 2. *Gray v. Maryland*

In *Gray v. Maryland*, 523 U.S. 195 (1997), Anthony Bell and Kevin Gary were jointly tried for murder. *Id*, at 188. After Bell was arrested he told the police that he (Bell), Kevin Gray and a third person were responsible for the victim's death. *Id.* At Bell and Gray's joint trial the prosecution was permitted to introduce a redacted version of Bell's confession. The detective who testified about Bell's confession said "deleted" or "deletion" whenever the name of Gray or the third participant appeared. *Id.* Immediately thereafter, the detective testified that after Bell's confession the police were able to arrest Gray. *Id*, at 189. A written copy of Bell's confession was received as evidence with the names of Gray and the third person replaced with blank spaces separated by commas. *Id.* The jury was instructed that Bell's confession could not be used as evidence against Gray. *Id.*

The Court acknowledged that in *Richardson v. Marsh* it held that the admission of co-defendant confessions that are redacted to remove any reference to the existence of the other defendants do not violate *Bruton*. *Id*, at 190-91. However, the Court noted that unlike the redacted confession in *Richardson*, the confession in *Gray* mentioned the existence of the non-confessing defendant since the government merely replaced

Gray's name with the word "deleted" or a blank space. *Id*, at 192.  The Court ruled that "a redaction that replaced a defendant's name with an obvious indication of deletion falls within the purview *Bruton*.

> Redactions that simply replace a name with an obvious blank space or a word such as "deleted" or a symbol or other similarly obvious indications of alteration . . . so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result.

*Id*.

### 3.  Other Scions of *Bruton*

Notably, the Court in *Bruton* made no distinction between statements made to law enforcement officers and statements made to civilians.  Neither did the *Bruton* Court distinguish between statements made during formal interrogation and statements made during casual conversation.  Following *Bruton*, the admission of statements of a co-defendant did not depend on whether the statement was made to law enforcement or a civilian.  Numerous decisions from various courts found that the admission of a co-defendant's statement made to a civilian and implicating a fellow defendant violated *Bruton*.  *See e.g.*, *Holland v. Attorney General of New Jersey*, 777 F.2d 150, 157(3rd Cir. 1895)(admission of statement made by co-defendant to the co-defendant's wife violated *Bruton*); *Vincent v. Parke*, 942 F.2d 989, 991-92(6th Cir. 1991)(statement implicating defendant made by co-defendant to his sister violated *Bruton* – co-defendant's "statement to his sister is exactly the type of confession alluded to in *Bruton*"); *State v. Swafford*, 913 P.2d 196, 198-201 (Kan. 1996)(statement made by co-defendant to confidential informant within purview of *Bruton* – "while the conversation between

DNM 1196

(confidential informant) and (co-defendant)is not a typical post-arrest confession, *Bruton* applied to any extrajudicial statement by a nontestifying codefendant"); *United States v. Ruff*, 717 F.2d 855, 857-58(3rd Cir. 1983)(*Bruton* violated by the admission of co-defendant's statements to several family members, including statement to his brother and brother-in-law"); *United States v. Veltman*, 6 F.3d 1483 (11th Cir. 1993)(co-defendant's statement to his cellmate violated *Bruton*); *United States v. Schmick*, 904 F.2d 936, 943-44 (5th Cir. 1990)(co-defendant's statement to a fellow member of Bandido's motorcycle gang violated *Bruton*); *United States v. Truslow*, 530 F.2d 257, 262-63 (4th Cir. 1975)(co-defendant's statement to an acquaintance violated *Bruton* – "The United States contends that *Bruton* should not apply in this case because *Bruton* . . . was the case of a confession to law enforcement officers as distinguished from statements such as those found here. Again, we are of opinion that the distinctions are not valid.")

## IV.   The Impact of *Crawford v. Washington*

In *Crawford v. Washington*, 541 U.S. 36 (2003) the Supreme Court introduced a new paradigm to evaluate the application of the Confrontation Clause to hearsay. Recently some courts have taken the *Crawford* Court's distinction between testimonial and nontestimonial hearsay as an opportunity to undercut *Bruton*.  The Tenth Circuit's opinion in *United States v. Smalls*, 605 F.3d 756 (10th Cir. 2010), the case upon which the government's Response primarily relies, is an example.   Furthermore, the government's citation to *Smalls* and *Washington v. Davis*, 547 U.S. 813 (2006), in its Response at Doc. 940 p. 11 is troublesome.  The government argues that *Davis* stands

DNM 1197

for the proposition that statements "made unwittingly to a Government informant" are "beyond the scope of *Bruton*."  In fact, *Davis* says no such thing.  The Court's opinion in *Davis* does not even mention *Bruton* and the only reference to *Bruton* in all of *Davis* is a passing reference in footnote 2 of Justice Thomas' dissent. *Davis*, 547 U.S. at 837 FN 2.  For the government to argue that *Davis* stands for the notion that statements "made unwittingly to a Government informant" are "beyond the scope of *Bruton*" reveals remarkable and disturbing temerity.

A review of pre-*Crawford* Sixth Amendment jurisprudence is necessary to full understanding of the impact of *Crawford*.  It is critical to accurately appreciate precisely what *Crawford* holds and also to recognize what issues *Crawford* does not address.

### A.  *Ohio v. Roberts*

In 1980 the Supreme Court decided *Ohio v. Roberts*, 448 U.S. 56 (1980).  At defendant Robert's trial the prosecution offered as evidence the transcript of a witness from a preliminary hearing.  Roberts was convicted and appealed claiming that admission of the preliminary hearing transcript violated his Sixth Amendment right to confront witnesses.

The Supreme Court adopted a two-part test to determine whether admission of hearsay statements violates the Sixth Amendment.  Under *Roberts*, for the prosecution to admit hearsay without running afoul of the Sixth Amendment the government must (1) establish that the declarant is unavailable, and (2) prove that the statement "bears adequate indicia of reliability." *Id.* at 66.  The Court held that "reliability can be inferred

12

without more in a case where the evidence falls within a firmly rooted hearsay

exception" and if a statement does not fall within such an exception "the evidence must

be excluded, at least absent a showing of particularized guarantees of trustworthiness."

*Id.*  Applying this two-part test, the Court concluded that admission of the preliminary

hearing transcript did not violate the Confrontation Clause because the defense had the

opportunity to test the witness' testimony through cross-examination at the preliminary

hearing.

*Roberts* remained the controlling authority until 2003 when the Court issued its

opinion in *Crawford v. Washington*.

### B.  *Crawford v. Washington*

In *Crawford v. Washington*, "Michael Crawford stabbed a man who allegedly tried

to rape his wife, Sylvia.  At his trial, the State played for the jury Sylvia's tape-recorded

statement to the police describing the stabbing, even though he had no opportunity for

cross-examination." *Crawford,* 541 U.S. at 38.  Applying the *Roberts v. Ohio* test, the

Washington Supreme Court affirmed Crawford's conviction because "although Sylvia's

statement did not fall under a firmly rooted hearsay exception, it bore guarantees of

trustworthiness." *Id*, at 41.

The Supreme Court reversed and overruled *Ohio v. Roberts*.  The Court held that

"testimonial statements of witnesses absent for trial" are admissible "only where the

declarant is unavailable, and only where the defendant had a prior opportunity to cross-

examine [the witness]." *Id*. at 59.  The Court noted that "the [Confrontation] Clause's

13

ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id*, at 61.

It is important to recognize what the Supreme Court did not do in Crawford.  The Court did not provide a definition to differentiate "testimonial" from "non-testimonial" hearsay.  The Court noted that "various formulations" or "articulations" or "definitions" of "testimonial" could be posited; however, apart from citing examples of statements that would qualify as testimonial under any definition, the Court specifically declined to undertake crafting a controlling definition of testimonial. *Id.*, at 51-53.  The Court left no room for doubt that it was not even attempting to provide a definition of "testimonial." The Court said, "we leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.*, at 68.

## C. Post-*Crawford*

### 1. Distinguishing testimonial from nontestimonial

Following *Crawford*, the Court has provided little clarity to distinguish testimonial from non-testimonial hearsay.  In the companion cases of *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813 (2006), the Court explored the meaning of "testimonial."  The Court ruled that statements are non-testimonial when made under circumstances indicating that the primary purpose of the statement is to meet an "ongoing emergency." *Id.*, at 822.  On the other hand, statements are testimonial when

14

the circumstances indicate that there is no ongoing emergency and the purpose is to establish or prove past events. *Id.* In providing this definition the Court explicitly acknowledge that the definition was intended to have limited application. The Court stated "without attempting to produce an exhaustive classification of all conceivable statements - - or even all conceivable statements in response to police interrogations - - as either testimonial or nontestimonial, [its definition] suffices to decide the present case." *Id.* Importantly, the Court seems to implicitly recognize that some statements may be testimonial even if the statement is not in response to police interrogation.

In *Davis*, the hearsay statements were made by a domestic dispute victim to a 911 operator in the context of an "ongoing emergency." *Id.* at 817. The Court found that the statements in *Davis* were made during an "ongoing emergency" in which the declarant was "speaking about events as they were actually happening, rather than describing past events." *Id.*, at 827. Accordingly, the statements in *Davis* were non-testimonial.

In *Hammon* the hearsay statements were also made by a victim of a domestic dispute but, unlike *Davis*, not in the context of an "ongoing emergency" but rather as part of an investigation into "what happened." *Id*, at 819-20. In *Hammon*, although the statements at issue were made within minutes of the crime, the Court found that there was no ongoing emergency and the declarant was describing what happened instead of "what was happening." Hence, the statements were testimonial.

15

This Court should guard against the invitation to draw the line between testimonial and nontestimonial hearsay based on whether the statement was made to law enforcement or a civilian.  In *Davis*, the Court indicated that its opinion was focused on "interrogations" by law enforcement officers, and thus it was "unnecessary to consider whether and when statement made to someone other than law enforcement personnel are 'testimonial.'" *Id.*, at 822-23, FNs 1 and 2.  The *Davis* Court did however cite as authority decisions suggesting that statements made to civilians may be testimonial and thus subject to Confrontation Clause limitations.  *Id*, at 828 citing *King v. Brasier*, 1Leach 199, 168 Eng. Rep. 202 (1779) wherein "a young rape victim, 'immediately on her coming home, told all the circumstances of the injury' to her mother. . . The case would be helpful to Davis if the relevant statement had been the girl's screams for aid as she was being chased by her assailant. By the time the victim got home, her story was an account of past events."  The Court's remarks certainly imply that statements made to someone other than law enforcement personnel may properly be characterized as testimonial.  Indeed, the distinction between testimonial and nontestimonial seems to be based on whether the statement is made during an "ongoing emergency" or is a statement describing past events.  The audience to whom the statement is made is not controlling.

Recently in *Ohio v. Clark*, __ U.S. __, <u>135 S.Ct. 2173</u> (2015), the Court held that statements by a three-year-old boy to his preschool teacher implicating his stepfather as an abuser were not testimonial.  The Court, however, declined to hold that statements to civilians can never be testimonial.  The Court stated that "[b]ecause at least some

16

statements to individuals who are not law enforcement officers could conceivably raise

confrontation confrontation concerns, we decline to adopt a categorical rule excluding

them from the Sixth Amendment's reach." *Id.*, 2181.

  In short, the government's argument that any statement made to non-law

enforcement is necessarily nontestimonial paints with too broad a brush and should be

rejected.  The Supreme Court has both explicitly refused to adopt the government's

argument, *see Ohio v. Clark*, 135 S.Ct. at 2181, and also included language in its

opinions which implicitly rejects the government's argument, *see Davis/Hammon,* 547

U.S. at 822-23.

### 2.  The boundaries of the Confrontation Clause

  The *Crawford* Court did not explicitly describe the boundaries of the

Confrontation Clause.  To be sure, the Court did state that "even if the Sixth

Amendment is not solely concerned with testimonial hearsay, that is its primary object . .

." *Id.* at 53.  Accepting, as we must, the Court's conclusion that the "primary object" of

the Framer's concern in crafting the Sixth Amendment was testimonial hearsay, does

not mean that testimonial hearsay was the Framer's sole or only concern.  Primary and

sole are not synonymous.  The Court continued:

> The text of the Sixth Amendment does not suggest any open-ended
> exception from the confrontation requirement to be developed by
> the courts.  Rather, the "right . . . to be confronted with the
> witnesses against him" Amdt. 6, is most naturally read as a
> reference to the right of confrontation at common law, admitting
> only those exceptions establish at the time of the founding.

*Id.*, at 54.  As a critical follow-up the Court observed that "[A]ccomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule." *Id* at 56, *quoting Lilly v. Virginia*, 527 U.S. 116, 134 (1999).  Critically, if accomplices' confessions are not within a firmly rooted exception to the hearsay rule then surely such statements were not within any exception established at the time of the founding.

We must acknowledge that the Court, first in *Davis/Hammon* and subsequently in *Whorton v. Bocking*, 549 U.S. 406 (2006), did suggest that the Confrontation Clause is only concerned with testimonial hearsay.  However, neither of *Davis/Hammon* nor *Whorton* involved joint jury trials or even cited *Bruton* or the *Bruton* line of cases.  The facts of *Davis/Hammon* are discussed *supra* at 15 and need not be repeated.  *Whorton v. Bocking* dealt with the narrow issue of whether *Crawford* was retroactive under the rules of *Teague v. Lane*, 489 U.S. 288 (1989).  Those who would expand the holding to *Crawford* to abolish *Bruton* have seized on the Court's comment in *Whorton* that "under *Crawford*, . . . the Confrontation Clause has no application to [nontestimonial statements] and therefore permits their admission even if they lack indicia of reliability." *Id.*, at 420. Given the extremely narrow issue in *Whorton*, *i.e.* whether *Crawford* is retroactive, this statement is dicta.

The Supreme Court's opinion in *Bruton* is clear and for half a century the Court has never overruled *Bruton*.  Further, the Supreme Court has never held that nontestimonial statements of co-defendants do not violate *Bruton* and "it is [the Supreme] Court's prerogative alone to overrule one of its precedents." *State Oil Co.* v.

18

*Khan*, 522 U.S. 3, 20 (1997).  In *Crawford,* the Supreme Court held that testimonial

statements are inadmissible against a criminal defendant unless the declarant is

unavailable and the defendant has had "a prior opportunity for cross-examination."

*Crawford*, 549 U.S. at 68.  This is not a repudiation of *Bruton*.   In *Whorton*, the

Supreme Court simply held that the rule announced in *Crawford* did not apply

retroactively. *Whorton*, 549 U.S. at 421.  This also is not a repudiation of *Bruton*.

Neither *Crawford* nor *Whorton* considered the applicability of *Bruton* to non-testimonial

statements of co-defendants, and neither case imposed a bar to the applicability of the

Confrontation Clause to non-testimonial statements in general.

Although *Whorton* was concerned with the narrow issue of whether *Crawford* is

retroactive under *Teague*, the *Whorton* Court's treatment of *Crawford* merits further

discussion.  One factor in the *Teague* analysis in determining whether a new rule should

be applied retroactively is whether the "rule is a 'watershed rule of criminal procedure'

implicating the fundamental fairness and accuracy of the criminal proceeding." *Whorton*

at 416, *quoting, inter alia, Teague*, at 311.  The *Whorton* Court continued that in order to

qualify as "watershed", a new rule "must be necessary to prevent an impermissibly large

risk of an inaccurate conviction" and "must alter our understanding of the bedrock

procedural elements essential to the fairness of a proceeding." *Whorton*, at 406, internal

quotations and citations omitted.  We must not pass too quickly past *Whorton's*

assessment of *Crawford's* import.

The language of *Teague* and *Whorton* is decidedly and distinctly language that

fits comfortably within a Due Process analysis.  Perhaps no phase is more associated

19

with Due Process than "fundamental fairness" and in *Whorton* the Court ruled that

*Crawford* was not an opinion that implicated "the fairness of a proceeding."  According

to *Whorton*, *Crawford* is not a watershed which is to say that Crawford did not implicate

"fundamental fairness" and was not "essential to the fairness of a proceeding."  Indeed,

the *Whorton* Court explicitly held (not dicta here) that "the *Crawford* rule also did not

'alter our understanding of the bedrock procedural elements essential to the fairness of

a proceeding." *Id*, at 420.  This is an important point.  We have already seen that *Bruton*

itself is based, at least in part, on Due Process considerations.  See *supra* at 6-7.  As

noted above, the *Bruton* Court relied on the Due Process analysis of *Jackson v. Denno*

and explicitly incorporated that analysis in its ruling.  Now in *Whorton* we learn that

*Crawford* had nothing to do with Due Process.  Accordingly, *Crawford* left the Due

Process analysis of *Bruton* undisturbed.  Due Process as a basis for *Bruton*, separate

and apart from the Sixth Amendment Confrontation Clause, was untouched by *Crawford*

and therefore *Bruton* survives *Crawford*.

## V.    The Rules of Evidence

If, as the government argues, the admissibility of Troup's statements is not

circumscribed by the Constitution, then, according to the government's theory,

admissibility is determined solely by reference to the rules of evidence.

In *Della Paoli*, the Supreme Court recognized that a co-defendant's confession is

not admissible against a fellow defendant.  *Della Paoli* only held that, although Whitley's

statements were inadmissible as against Della Paoli, the admission of Whitley's

20

statement was not error because a limiting instruction was given to the jury.    The

Court in *Bruton* reached the same conclusion that the co-defendant's statement is not

admissible against a fellow defendant but departed from *Della Paoli* in assessing the

effectiveness of a limiting instruction.  Indeed, the Court has never deviated from its

ruling that a co-defendant's statement is not admissible against a fellow defendant.  In

*Lee*, 476 U.S. at 541 the Court stated, "the Court has spoken with one voice in declaring

presumptively unreliable accomplices' confessions that incriminate defendants."  In fifty

years of interpreting *Bruton* the Court has never departed from this rule.  The *Bruton*

line of cases rather address whether particular remedial measures (limiting instructions

and redactions) ameliorate the error occasioned by the improper introduction of a co-

defendant's statement.

     In *Williamson v. United States*, 512 U.S. 594, 600–01 (1994), the Supreme Court

considered F.R.E. 804(b)(3) and declared as follows: "In our view, the most faithful

reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory

statements, even if they are made within a broader narrative that is generally self-

inculpatory. The district court may not just assume for purposes of Rule 804(b)(3) that a

statement is self-inculpatory because it is part of a fuller confession, and this is

especially true when the statement implicates someone else."  *Williamson* can leave no

doubt that Troup's statements are not admissible as against Alonso.

     Further, synthesizing *Crawford* and its progeny with F.R.E. 804(b)(3) supports

the conclusion that Troup's statements are in fact testimonial.  For example, *Davis*

suggested that statements are testimonial when the purpose is "to establish past events

21

potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.  F.R.E.

804(b)(3) is an exception to the hearsay rule that applies when the statement "at the

time of its making . . . so far tended to subject the declarant to . . . criminal liability . . .

that a reasonable person in the declarant's position would not have made the statement

unless believing it to be true."  The overlap between the *Davis* formulation of testimonial

and Rule 804(b)(3) is apparent.  If a statement does indeed "subject the declarant to

criminal liability" then by necessity it is "potentially relevant to later criminal prosecution."

To make out the evidentiary foundation necessary for admission under F.R.E. 804(b)(3)

will concomitantly satisfy the *Davis* articulation of what it means for a statement to be

testimonial.

## VI.    Conclusion

The defense understands that *Smalls* operates as binding precedent upon the

Court.  Nonetheless, the Supreme Court has yet to define the precise contours of the

definition of testimonial statements.  Nor, has any Supreme Court decision called into

question or stated that *Crawfor*d in any way limits the *Bruton* rule. To the contrary, the

*Crawford* opinion cites *Bruton* with approval indicating that it is an example of the

Supreme Court upholding core Sixth Amendment confrontation clause principles.

*Crawford*, 541 U.S. at 57.

It is Mr. Alonso's position that Troup's statements implicating the defendant

will ultimately be found to be within the broader class of testimonial statements as

described in *Crawford*.  Moreover, the defense maintains that the *Bruton* rule remains

as an independent component of the Sixth Amendment's Confrontation Clause

protections. The special concerns raised by a co-defendant statement implicating the

defendant reaching the jury without testing by adversarial cross-examination would

require exclusion even if it did not somehow technically fall within the range of

testimonial statements. These concerns were laid out in *Bruton* and re-emphasized in

*Crawford*. Troup's statements are not recorded or written. The supposed hearers of

Troup's statements presumably are cooperating government witnesses. There is no

practical and reliable way to redact the contents. Thus, severance is the appropriate

remedy. Although it would not fully cure the problem, in the absence of severance, the

defendant would request that the Court order redaction.

Even if the Court disagrees with every syllable of Mr. Alonso's analysis of *Bruton*

and *Crawford's* impact on *Bruton*, pursuant to Crim. P. 14 this Court's authority to order

severance or other appropriate relief is limited only by sound discretion.

DATED:  March 30, 2017.

Respectfully submitted,

NATHAN D. CHAMBERS LLC
By: ___s/Nathan D. Chambers_____
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
(303) 825-2222
Attorney for Defendant, Javier Alonso

23

CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.

NATHAN D. CHAMBERS LLC
By: ___s/Nathan D. Chambers_____
Nathan D. Chambers
303 16th Street, Suite 200
Denver, Colorado 80202
(303) 825-2222
Attorney for Defendant, Javier Alonso

DNM 1210

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' NOTICE OF EXPERT WITNESS TESTIMONY

The United States of America hereby provides notice, pursuant to Federal Rule of Criminal Procedure 16, of its intent to introduce, during its case-in-chief at trial, expert testimony.    The United States submits that such evidence is relevant to the issues to be tried before the jury in this case.    The United States asserts that this testimony is admissible evidence, pursuant to Federal Rule of Evidence 702, and that the witnesses have a reliable basis in knowledge and experience regarding their testimony. The United States advises as follows:

### OMI Medical Investigator Ross E. Zumwalt, M.D.

The United States may call as a witness Ross E. Zumwalt, M.D. It is anticipated that Dr. Zumwalt will testify about the autopsies he performed on victims F.C., R.G. and F.S. Dr. Zumwalt's opinion is that the cause of death in all three homicides was ligature strangulation, and the manner of death was homicide.    Dr. Zumwalt will testify to all his findings listed in the autopsy reports. His testimony will include his expert opinion, education, training, experience and specialized knowledge.    The autopsy reports were previously disclosed to Defendants. A copy of his *curriculum vitae* will be provided to defense counsel upon receipt.

**NMDPS Forensic Serology Analyst Kristen Radecki**

The United States may call as a witness Kristen Radecki, a Forensic Serology Analyst with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Radecki will testify regarding the tests conducted, and the results and conclusions of those tests involving DNA as to the homicides of F.C. and R.G., as previously revealed in her written reports disclosed to Defendants. Ms. Radecki's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* will be provided to defense counsel upon receipt.

**NMDPS Forensic Scientist Eve Tokumaru**

The United States may call as a witness Eve Tokumaru, a Forensic Scientist, specializing in forensic serology and DNA analysis, with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Tokumaru will testify regarding the tests conducted, and the results and conclusions of those tests involving DNA as to the homicide of F.C., as previously revealed in her written report disclosed to Defendants. Ms. Tokumaru's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* will be provided to defense counsel upon receipt.

**NMDPS Forensic Latent Print Analyst/Photography Shirley Garcia**

The United States may call as a witness Shirley Garcia, a Forensic Latent Print Analyst, with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Garcia will testify regarding the tests conducted, and the results and conclusions of those tests involving shoe impressions at the scene of the crime as to the homicide of R.G., as previously revealed in her written report disclosed to Defendants. Ms. Garcia's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* will be provided to defense counsel upon receipt.

**NMDPS Forensic Scientist Jennifer Otto**

The United States may call as a witness Jennifer Otto, a Forensic Scientist,

specializing in forensic serology and DNA analysis, with the New Mexico Department of Public

Safety Forensic Laboratory. Ms. Otto will testify regarding the tests conducted, and the results

and conclusions of those tests involving DNA as to the homicide of F.S., as previously revealed

in her written reports disclosed to Defendants. Ms. Otto's testimony will include her expert

opinion, education, training, experience and specialized knowledge. A copy of her *curriculum*

*vitae* will be provided to defense counsel upon receipt.

**OMI Medical Investigator Ian Paul, M.D.**

The United States may call as a witness Ian Paul, M.D. It is anticipated that Dr. Paul will

testify about the autopsy he performed on victim A.B. Dr. Paul's opinion is that the cause of

death was a gunshot wound to the head, and the manner of death was homicide.    Dr. Paul will

testify to all his findings listed in the autopsy report. His testimony will include his expert

opinion, education, training, experience and specialized knowledge.    The autopsy report was

previously disclosed to Defendants. A copy of his *curriculum vitae* will be provided to defense

counsel upon receipt.

**NMDPS Forensic Scientist Kevin M. Streine**

The United States may call as a witness Kevin M. Streine, a Forensic Scientist,

with the New Mexico Department of Public Safety Forensic Laboratory. Mr. Streine will testify

regarding the tests conducted, and the results and conclusions of those tests involving bullet

comparison, general rifling characteristics, cartridge examination, cartridge case examination and

comparison, shot shell examination, and integrated ballistics identification system/National

integrated ballistics information network entry, as to the homicide of A.B., as previously

DNM 427

revealed in his written reports disclosed to Defendants. Mr. Streine's testimony may include

expert opinions or specialized knowledge regarding these matters that is derived from his

education, training, and professional experience as a forensic scientist. A copy of his *curriculum*

*vitae* will be provided to defense counsel upon receipt.

### NMDPS Forensic Scientist Margo Mikesica

The United States may call as a witness Margo Mikesica, a Forensic Scientist,

specializing in forensic serology and DNA analysis, with the New Mexico Department of Public

Safety Forensic Laboratory. Ms. Mikesica will testify regarding the tests conducted, and the

results and conclusions of those tests involving DNA as to the homicide of A.B., as previously

revealed in her written report disclosed to Defendants. Ms. Mikesica's testimony will include her

expert opinion, education, training, experience and specialized knowledge. A copy of her

*curriculum vitae* will be provided to defense counsel upon receipt.

### NMDPS Forensic Scientist Tracy Zehringer

The United States may call as a witness Tracy Zehringer, a Forensic Scientist,

with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Zehinger will

testify regarding the results and conclusions of examinations conducted by the Latent Prints Unit

as to the homicide of A.B., as previously revealed in her written reports disclosed to Defendants.

Ms. Zehinger's testimony will include her expert opinion, education, training, experience and

specialized knowledge. A copy of her *curriculum vitae* will be provided to defense counsel upon

receipt.

### NMDPS Forensic Scientist Teresa Vigil

The United States may call as a witness Teresa Vigil, a Forensic Scientist,

with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Vigil will testify

regarding the results and conclusions of examinations conducted by the Latent Prints Unit as to

the homicide of A.B., as previously revealed in her written report disclosed to Defendants.    Ms.

Vigil's testimony will include her expert opinion, education, training, experience and specialized

knowledge. A copy of her *curriculum vitae* will be provided to defense counsel upon receipt.

### NMDPS Forensic Scientist Eric Young

The United States may call as a witness Eric Young, a Forensic Scientist, with the New

Mexico Department of Public Safety Forensic Laboratory. Mr. Young will testify regarding the

results and conclusions of examinations conducted by the Trace Unit (Fire Debris) as to the

homicide of A.B., as previously revealed in his written report disclosed to Defendants. Mr.

Young's testimony will include his expert opinion, education, training, experience and

specialized knowledge. A copy of his *curriculum vitae* will be provided to defense counsel upon

receipt.

### FBI Forensic Examiner Tiffany L. Smith

The United States may call as a witness Tiffany L. Smith, a Forensic Examiner with the

Federal Bureau of Investigation Laboratory. Ms. Smith will testify regarding the results and

conclusions of examinations conducted by the DNA Analysis Unit as to the homicide of A.B., as

previously revealed in her written report disclosed to Defendants. Additionally, Ms. Smith is

examining a firearm for a possible DNA match.    The United States will disclose her findings

and results once received by the United States.    Ms. Smith's testimony will include her expert

opinion, education, training, experience and specialized knowledge. A copy of her *curriculum

vitae* will be provided to defense counsel upon receipt.

5

**OMI Medical Investigator Hannah Kastenbaum, M.D.**

The United States may call as a witness Hannah Kastenbaum, M.D. It is anticipated that

Dr. Kastenbaum will testify about the autopsy she performed on victim J.M. Dr. Kastenbaum's

opinion is that the cause of death was stab wounds, and the manner of death was homicide.   Dr.

Kastenbaum will testify to all her findings listed in the autopsy report. Her testimony will include

her expert opinion, education, training, experience and specialized knowledge.   The autopsy

report was previously disclosed to Defendants. A copy of her *curriculum vitae* will be provided

to defense counsel upon receipt.

**NMDPS Forensic Scientist Cindy Wood**

The United States may call as a witness Cindy Wood, a Forensic Scientist,

specializing in forensic serology and DNA analysis, with the New Mexico Department of Public

Safety Forensic Laboratory. Ms. Wood will testify regarding the tests conducted, and the results

and conclusions of those tests involving DNA as to the homicide of J.M., as previously revealed

in her written report disclosed to Defendants. Ms. Wood's testimony will include her expert

opinion, education, training, experience and specialized knowledge. A copy of her *curriculum

vitae* will be provided to defense counsel upon receipt.

**NMDPS Forensic Audio/Video Analyst Roger Cain**

The United States may call as a witness Roger Cain, a Forensic Audio/Video Analyst

with Rocky Mountain Information Network. Mr. Cain will testify regarding the results and

conclusions of examinations. Specifically, Mr. Cain examined the Verbatim DVD-R containing

video of the assault on J.M., in order to enhance the audio and video, as previously revealed in

his written report disclosed to Defendants. Mr. Cain's testimony will include his expert opinion,

6

education, training, experience and specialized knowledge. A copy of his *curriculum vitae* will be provided to defense counsel upon receipt.

### FBI Forensic Examiner Theodore Chavez

The United States may call as a witness Theodore Chavez, a Forensic Examiner with the Federal Bureau of Investigation Laboratory, to testify about the tests he performed on the firearm, and his findings as to the firearm described in his report disclosed to Russ Aoki on April 3, 2017. Mr. Chavez's testimony will include his expert opinion, education, training, experience and specialized knowledge. A copy of his *curriculum vitae* will be provided to defense counsel upon receipt.

### LAW and ARGUMENT

Federal Rule of Evidence 702 controls the admissibility of expert testimony and requires district courts to ensure that all scientific, technical or other specialized testimony of an expert witness is both relevant and reliable.   *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (applying same principles to "technical" evidence).   To determine whether an expert's testimony is reliable, the court must "assess the reasoning and methodology underlying the expert's opinion."   *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006).   Courts consider four nonexclusive factors in determining whether expert testimony is sufficiently reliable:

(1) whether the theory at issue can be and has been tested;

(2) whether the theory has been subjected to peer review and publication;

(3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and

7

(4) whether the theory generally has been accepted in the relevant scientific community.

*See Daubert*, 509 U.S. at 593-94.   The Rule 702 inquiry under *Daubert* is a "flexible one," and these factors "do not all necessarily apply . . . in every instance."   *Kumho Tire*, 526 U.S. at 150-51.   A trial court has the same wide "latitude in deciding *how* to test an expert's reliability ... as it enjoys when it decides *whether or not* an expert's testimony is reliable."   *Id*. at 152 (emphasis in original).

WHEREFORE the United States respectfully requests this Court to allow the above-described expert witnesses' testimony because it has "a reliable basis in the knowledge and experience" in the witnesses' respective disciplines, as prescribed by *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).   *See United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009) (Rule 702's reliability requirement for proffered expert testimony may be satisfied where an expert witness' "specialized knowledge" is "acquired through 'experience' and 'training' ").

Respectfully Submitted,
JAMES D. TIERNEY
Acting United States Attorney
**Electronically filed on 4/3/2017**
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM   88011
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CRIMINAL NO.   15-CR-4268 JB |
| vs. | ) | |
| | ) | |
| **JOE LAWRENCE GALLEGOS,** | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND COMPEL GOERNMENT DISCLOSURE OF GRAND JURY TRANSCRIPTS [1023]

Defendant's "Motion to Dismiss and Compel Government Disclosure of Grand Jury Transcripts" ("Motion to Compel") (Doc. 1023) addresses the issue of whether Defendant may inspect grand jury transcripts to determine whether a Due Process violation has occurred. Based on an amended statement by a Confidential Human Source ("CHS") linking Defendant to the murder of Adrian Burns, Defendant contends that false or erroneous information may have been presented to the grand jury to charge Defendant with Counts 4 and 5 of the Superseding Indictment [Doc. 368]. Despite other evidence linking Defendant to the murder, Defendant exploits the amended statement in a brazen attempt to comb through grand jury transcripts in search of *any* useful information that may suggest a violation of Defendant's Due Process rights. Because Defendant fails to offer a sufficient legal or factual basis for disclosure of said transcripts, the United States respectfully requests the Court deny Defendant's Motion to Compel.

## BACKGROUND

On August 5, 2015, FBI Special Agent Bryan Acee, Task Force Officer ("TFO") Mark Meyers, and Security Threat Intelligence Unit staff from the Penitentiary New Mexico and Central New Mexico Correctional Facility conducted a debrief with a Confidential Human Source ("CHS-

1

1") at the FBI field office in Albuquerque, New Mexico. *See* FD-1023 Confidential Human Source Reporting Document for [CHS-1], Serial Number 104 (August 5, 2015) ("CHS-1 Debrief"). During the lengthy debrief, CHS-1 related the contents of several conversations with SNM members, including conversations with another Confidential Human Source ("CHS-2"). Special Agent Acee summarized CHS-1's statements noting that, CHS-1 was informed by CHS-2 that in "2012 Joe Gallegos murdered Adrian Burns on an order from Gerald Archuleta because Burns was an informant. Gallegos admitted the murder and Roy 'Shadow' Martinez talks about it on the wire." CHS-1 Debrief at 2.

On December 1, 2015, Defendant was indicted, along with 23 other Defendants, on charges relating to violations of Title 18 U.S.C. Section 1959—Violent Crimes in Aid of Racketeering ("VICAR") [Doc. 2] committed on behalf of the Syndicato de Nuevo Mexico Gang ("SNM"). Despite CHS-1's statement implicating Defendant in Burns' murder, the United States did not seek charges for this offense. Instead, Defendant was charged in Count 1 for the murder of F.C.

On April 21, 2016, nearly eight months after Defendant was identified as a possible suspect in Burns' murder, Defendant was charged by Superseding Indictment in Counts 4 and 5 with conspiracy to murder, and murder of Adrian Burns. Defendant was also charged in Counts 13 through 15 for the assault and attempted murder of J.G.

On September 15, 2016, Special Agent Acee and TFO Chris Cupit conducted a debrief with CHS-2. *See* FD-302 CHS Reporting Document for [CHS-2], Serial Number 811 (September 15, 2016) ("CHS-2 Debrief"). While reviewing discovery material in the SNM case, CHS-2 noted a mistake in CHS-1's Debrief, and stated that CHS-2 never discussed the murder of Adrian Burns with CHS-1. Because no recording of CHS-1's statements could be produced, Special Agent Acee amended the statement, and provided a copy to the United States Attorney's office to disclose to

Defendant. *See* Special Agent Acee, FBI FD-302 "Report to Amend Prior Reporting" at 2 (Feb. 14, 2017) ("FD-302").

Defendant contends that Counts 4 and 5 of the Superseding Indictment were obtained by erroneous or false statements, and moves this Court to order disclosure of the *entire* grand jury transcript, and dismiss the Superseding Indictment for a violation of Defendant's Due Process rights.[1] Motion to Compel at 1, 3. Defendant's contention fails to find support in law or fact.

## RELEVANT LAW

### A.  Law regarding disclosure of Grand Jury proceedings

"Since the 17th century, grand jury proceedings have been closed to the public, and records of such proceedings have been kept from the public eye." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218 n. 9 (1979) ("*Douglas Oil Co.*"). Indeed, the "proper functioning of the grand jury system depends upon the secrecy of the grand jury proceedings." *Id.* at 218. *See also In re Special Grand Jury 89-2*, 143 F.3d 565, 569 (10th Cir. 1998). "Despite the strong policy of maintaining the secrecy of grand jury proceedings, in certain situations disclosure of grand jury minutes and transcripts is appropriate where justice demands." *United States v. Neha*, 376 F. Supp. 2d 1222, 1224 (D.N.M. 2005) (Browning, J.) (quoting *United States v. Pottorf*, 769 F. Supp. 1176, 1180 (D. Kan. 1991)). *See also* Fed. R. Crim. P. 6(e). The Supreme Court has held that parties seeking disclosure of grand jury transcripts must show: (1) the material they seek is needed to avoid a possible injustice in another judicial proceeding; (2) the need for disclosure is greater than the need for continued secrecy; and (3) the request covers only material so needed. *Neha*, 376 F. Supp. 2d at 1224 (citing *Douglas Oil Co.*, 441 U.S. at 222). If a district court determines disclosure appropriate, "the disclosure order must be structured to cover only . . . information limited to the

---

[1] Because the statement at issue concerns the murder of Adrian Burns, the United States will only address Counts 4 and 5 of the Superseding Indictment.

claimed need." *In re Special Grand Jury 89-2*, 143 F.3d at 572 (citing *United States v. Sobotka*, 623 F.2d 764, 768 (2d Cir. 1980); *In re Grand Jury Matter*, 682 F.2d 61, 66 (3d Cir. 1982)). "In undertaking this inquiry the district court should not determine what is useful to the litigants but rather should focus on the question of whether particularized need has been shown for each item to be released." *Id.* (citing *Dennis v. United States*, 384 U.S. 855, 874-75 (1966)).

**B. Law regarding disclosures under *Brady***

The Due Process Clause of the United States Constitution requires disclosure of any evidence the United States has in its possession that is "material" to the guilt or punishment of a criminal defendant, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), or that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. *Giglio v. United States*, 405 U.S. 150 (1972). Numerous courts, including this one, have found the United States' duty does not grant a criminal defendant unfettered access to Government documents based on the *mere probability* of some benefit to the defendant. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987); *Smith v. Sec. Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995); *United States v. Baca*, No. CR 16-1613 JB, 2016 WL 6404772, at *24 (D.N.M. Oct. 20, 2016). Indeed, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of trial does not establish 'materiality' in the constitutional sense." *United States v. Hykes*, No. CR 15-4299 JB, 2016 WL 1730125, at *6 (D.N.M. Apr. 11, 2016) (Browning, J.) (quoting *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994)). The Supreme Court explained, "the touchstone of materiality" under *Brady* "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514, U.S. 419, 438 (1995). Because "the individual prosecutor has a duty to learn of any

4

favorable evidence known to others acting on the government's behalf in the case," *Kyles*, 514 U.S. at 437-438, "[t]he court should rely on the government's representations of its compliance with *Brady* unless the defendant shows cause to question them and the materiality of the evidence sought." *United States v. Lujan*, 530 F. Supp. 2d 1224, 1256 (D.N.M. 2008) (Brack, J.) (citing *United States v. McVeigh,* 923 F. Supp. 1310, 1314 (D. Colo. 1996)).

**C. Law regarding disclosure under Jencks**

In addition to its Constitutional disclosure obligations, Title 18 U.S.C. § 3500 ("Jencks"), requires the United States to produce statements made by a government witness or prospective government witness (other than the defendant), *after* that witness testifies at trial. Although, "[t]he district court may not require the government to produce Jencks Act material relating to one of its witnesses until *after* the witness has testified." *Lujan*, 530 F.Supp.2d at 1254-55 (Brack, J.) (quoting *United States v. Lewis*, 35 F.3d 148, 151 (4th Cir. 1994). In such instances, early disclosure has been considered a "salutary practice" typically arising in cases where the parties seek to avoid interruptions, and where the government has consented to the early disclosure. *Id.* at 1255 (citing *United States v. Beckford*, 962 F.Supp. 780, 795 (E.D.Va. 1997) (ordering production of Jencks material three days before jury selection voluntarily agreed to by the government)).

## <u>ANALYSIS</u>

Defendant's Motion to Compel relies entirely upon CHS-1's amended statement. Despite Special Agent Acee's timely and forthcoming disclosure that CHS-2 did not recall discussing the murder of Adrian Burns with CHS-1, Defendant characterizes the amendment as a "knowing presentation of false evidence," Motion to Compel at 3, and offers this as the basis to search *all* grand jury transcripts for any *possible* information that the Government may have presented evidence that was "erroneous, false, and missing information that may have been material to

5

[Defendant's] defense or even bar prosecution by the federal government." Motion to Compel at 3. Defendant's contentions fail to find support in law or fact.

**A.  Defendant's contention that false or erroneous information may have been used to charge Defendant with Counts 4 and 5  is implausible**

Defendant contends that the grand jury *may* have found probable cause to charge Defendant in Counts 4 and 5 based on Special Agent Acee's amended notation linking Defendant to Burns' murder. Motion to Suppress at 3 (emphasis added). Defendant's contention is implausible.

First, it is extremely unlikely that the grand jury would have found probable cause to charge Defendant in Counts 4 and 5 based solely upon CHS-1's amended statement. Although the Supreme Court has held that a grand jury may draw information from a wide variety of sources, *United States v. Clandra*, 4014 U.S. 338, 344-45 (1974), the grand jury must find that a "substantial probability existed that the suspect committed the crime." *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010). To an objective observer, CHS-1's statement alone does not give rise to a "substantial probability" that Defendant murdered Adrian Burns. Motion to Compel at 3. Defendant's contention is unreasonable.

Second, Defendant's contention is further diminished by the United States' decision *not* to charge Defendant with Counts 4 and 5 in the original Indictment. The information linking Defendant to Burns' murder was initially obtained during CHS-1's Debrief on August 5, 2015. Although the United States had an opportunity to seek charges for Burns' murder based on this information, it did not.  Instead, the United States' waited nearly eight months before seeking formal charges. During this period, federal investigators obtained additional evidence, including numerous witness statements, linking Defendant to the murder. *See* Response in Opposition to Defendant's Motion to Sever [Doc. 933].  The United States' decision to delay charges is strong evidence that if the amended statement was omitted from the record, the grand jury would still

6

have found probable cause to charge Defendant with Counts 4 and 5 in the Superseding Indictment.

*See Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) ("Where false statements are alleged to have been *included* in an arrest warrant affidavit or grand jury testimony, 'probable cause is determined by setting aside the false information and reviewing the remaining' truthful facts." (quoting *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996)). Accordingly, Defendant's Motion to Compel should be denied on these grounds.

**B.  Defendant offers no factual basis to support a dismissal on Due Process grounds**

Defendant contends that both indictments should be dismissed on the grounds that Defendant's right to Due Process was violated by Special Agent Acee's amendment. Motion to Suppress at 3. Defendant's contention is without merit.

The Tenth Circuit has held that, a due process violation may occur when the Government presents false evidence, or knowing and false testimony to a grand jury.  Motion to Compel at 3 (citing *United States v. Meyers*, 95 F. 3d 1475, 1486 (10th Cir. 1996); *United States v. Williams*, 504 U.S. 36, 61-64 (1992)). "In order to prevail on a due process claim, a defendant must show actual prejudice." *Meyers*, 95 F.3d at 1486 (10th Cir. 1996). Although Defendant uses language suggesting "knowing and false" misrepresentation of facts, Defendant fails to offer any factual basis whatsoever to substantiate Defendant's assertion that Government witnesses *knowingly* presented false information, or that Defendant suffered any actual prejudice. Defendant's contention is diminished by Special Agent Acee's forthcoming admission that, "[e]ither the CHS misspoke and confused CHS-2 with [another Defendant], or SA Acee misquoted the CHS during the telephonic debrief of the CHS," FD-302 (Serial Number 811), and Special Agent Acee's prompt disclosure.

DNM 439

Clearly, Special Agent Acee could not have knowingly presented false information. Accordingly, Defendant's contention is without merit, and the Court should Deny Defendant's Motion to Compel on these grounds.

**C. Defendant fails to satisfy his burden of proof for disclosure of grand jury transcripts**

In *Douglas Oil Co.*, the Supreme Court held that, a party seeking access to grand jury transcripts must show (1) the material they seek is needed to avoid a possible injustice in another judicial proceeding; (2) the need for disclosure is greater than the need for continued secrecy; and (3) the request covers only material so needed. 441 U.S. at 217-224. Defendant fails to offer any factual basis whatsoever to satisfy his burden of proof. Instead, Defendant offers an alternative basis for disclosure: Defendant wishes to inspect grand jury transcripts to determine whether the presentation of evidence was "erroneous, false, and missing information that *may have been* material to [Defendant's] defense." Motion to Compel at 3. Defendant's general request for production of grand jury transcripts amounts to nothing more than a fishing expedition of the Government's files. The Tenth Circuit has foreclosed such requests, holding: general claims that grand jury transcripts will "possibly reveal exculpatory evidence" or "attempts to engage in a fishing expedition in the hopes of discovering useful material" will not prevail. *United States v. Neha*, 376 F. Supp. 2d at 1224 (Browning, J.) (quoting *United States v. Rising*, 867 F.2d 1255, 1260 (10th Cir. 1989); *United States v. Kim*, 577 F.2d 473, 478 (9th Cir. 1978)). Because Defendant offers an insufficient basis for disclosure, Defendant's Motion to Compel should be denied on these grounds.

**D. Defendant is not entitled to pretrial discovery of witness statements to the grand jury under Jencks**

Defendant contends that grand jury testimony should be disclosed under Jencks "so that defendant's counsel may have a fair and adequate opportunity to prepare his defense, and to ensure

8

the orderly administration of justice." Motion to Compel at 4. Defendant's contention fails to find support in law or fact.

This Court recently reiterated its position regarding the Jencks Act, 18 U.S.C. Section 3500, in a recent memorandum opinion and order in *United States v. DeLeon*, et al., No. CR 15-4268 JB (Doc. 943). The Court noted that Jencks statements are not subject to disclosure until the witness has testified on direct examination at trial. Doc. 943 at 63-64, 66. *See also Lujan*, 530 F. Supp. 2d at 1254. The Court has also stated on a number of occasions in this and the related cases that it is not inclined to require the United States to turn over Jencks material early. That being said, the United States intends to turn over the materials at the appropriate time. Accordingly, Defendant's Motion is unwarranted and unnecessary, and should be denied as such without the need for a hearing.

**E.  Defendant is not entitled to disclosure of grand jury proceedings under *Brady***

Defendant contends that "Defense counsel has a right to material exculpatory information," and all *Brady* material "should be disclosed early in the case with enough time to avoid a *Brady* violation." Motion to Compel at 5. Critically, Defendant does not contend that the United States is currently in possession of *Brady* material, rather Defendant seeks disclosure of *Brady* material *if* the United States has any. The United States contends that it has complied with its disclosure obligations under *Brady*, and that it intends to continue doing so until trial. Accordingly, Defendant's Motion to Compel is moot, and should be denied on these grounds. *See Lujan*, 530 F. Supp. 2d at 1256 (Brack, J.) ("[t]he court should rely on the government's representations of its compliance with *Brady* unless the defendant shows cause to question them and the materiality of the evidence sought.").

## CONCLUSION

For the foregoing reasons, the United States respectfully requests the Court deny

Defendant's "Motion to Dismiss and to Compel Government Disclosure of Grand Jury

Transcripts."

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

*Electronically filed on 4/12/17*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
555 S. Telshor Blvd., Suite 300
Las Cruces, NM  88011
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney

DNM 442

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CRIMINAL NO.  15-CR-04268-JB** |
| | § | |
| **JOE GALLEGOS,** | § | |
| | § | |
| **Defendants.** | § | |

### MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

COMES NOW, Defendant Joe Gallegos, by and through his attorney, and pursuant to the Fourth, Fifth and Sixth Amendments to the United States Constitution respectfully moves the court for an Order pursuant to Rule 12(b)(3) suppressing: any statements or admissions of Defendant; any and all observations of law enforcement officers and any other tangible or intangible evidence obtained during, or directly or indirectly derived from, the searches of his person and/or the premises at 4 Erin Court, Los Lunas, New Mexico; and any outbuildings or other structures, vehicles or other property located on or near those locations, in which Defendant had a reasonable expectation of privacy.   The searches occurred on or about, November 20 and 21, 2012. These searches involve the search of a black jeep, cell phone from that jeep and Room 239 of the Imperial Inn, located at 701 Central Avenue NE in Albuquerque, New Mexico and the aforesaid residence. Further, this request should be construed to request suppression of Mr. Joe Gallegos' interviews where he invoked his right to counsel on or about the same dates.   Said evidence was obtained in violation of the Fourth, Fifth and Sixth Amendments to the United States Constitution.

A.     Said statements were not voluntary in that:

1.     Defendant was not presented before a magistrate as soon as practicable, and said statements were obtained prior to presentation before a magistrate, nor was counsel afforded him prior to or during said interrogation.

2.     The length and nature of defendant's custody, and the duration and nature of defendant's interrogation at the police station and the conditions under which it was conducted, were inherently coercive as applied to a person of defendant's age, education, background and physical and mental condition at the time such interrogation occurred. During the interview, Defendant told his interrogators that he was under the influence of narcotics.

3.     Defendant during the interview on or about November 20 or 21, 2012 the Defendant repeats multiple times that he is requesting counsel, but questioning continued.

4.     The affidavit for any search warrant if any was not validly executed and the facts surrounding that information were deemed to be unreliable in a probable cause hearing where a magistrate determined that there was no probable cause to support the offense.

B.     Said statements were the direct result of an unlawful arrest in that:

1.     The arrest was made without a relevant warrant and without probable cause.

2.     Defendant did not violate any law, either misdemeanor or felony, in the presence of the officers, which would warrant the arrest.

3.     The arresting officers had no probable cause or reasonable grounds to believe that the defendant had committed a felony.

In order for the inculpatory statements to be admissible at trial, the Government must show that its agents have complied with the procedural safeguards of *Miranda v. Arizona* , 384

U.S. 436 (1966). Even if Mr. Gallegos did agree to waive his rights and speak with the agents, the Government has the burden of proving that the waiver of her Miranda rights was knowing and voluntary. *Moran v. Burbine* , 475 U.S. 412, 421 (1986); *Edwards v. Arizona* , 451 U.S. 477 (1981); *Miranda* , 384 U.S. at 475. *See North Carolina v. Butler* , 441 U.S. 369, 373 (1979). This is a heavy burden because courts must indulge every reasonable presumption against waiver of fundamental constitutional rights. Id.; *Johnson v. Zerbst* , 304 U.S. 458, 464 (1938). Additionally, the Government must prove Defendant's statements were voluntarily made, despite Miranda warnings, *Arizona v. Fulminante* , 499 U.S. 279 (1991); *Colorado v. Connelly* , 479 U.S. 157 (1986), at an evidentiary hearing. *See Jackson v. Denno* , 378 U.S. 368, 380 (1964).

An evidentiary hearing to resolve this motion is requested.

Respectfully submitted,

/s/ _____
BROCK BENJAMIN
Attorney for Defendant
New Mexico State Bar No. 141535
747 E. San Antonio, Suite 203
El Paso, Texas 79901
Tel. (915) 412-5858
Fax (915) 503-2224

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 9th Day of May, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants

/s/ _____
  BROCK BENJAMIN

1IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

                                    Cause No. 15-4268 JB

v.

JOE LAWRENCE GALLEGOS,

      Defendant.

**DEFENDANT JOE GALLEGOS' MOTION FOR A BILL OF PARTICULARS**

COMES NOW, Defendant Joe Gallegos, through his counsel of record, and under Fed. Crim. P. 7(f) hereby respectfully moves the Court to order Plaintiff to provide counsel with a bill of particulars in this case. Joe Gallegos seeks an order directing the Plaintiff to provide a bill of particulars notifying him of his purported involvement in the charged racketeering enterprise and the evidence to support the requisite evidence that he committed the alleged violent offenses in aid of racketeering for "consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise." Additionally, Joe Gallegos seeks an order directing the Plaintiff to provide a bill of particulars describing (1) the evidence that supports the Plaintiff's claim as articulated in [Doc. 933] that "prior to the murder of A.B. was because A.B. had disrespected defendant and was talking negatively [about him] in the community" and that the murder resulted from the SNM's desire to "preserve and protect" its reputation. Alternatively, the government, again in Doc. 933, advances the supposition, without

evidentiary support in the produced discovery, that "[s]ufficient evidence exists to prove that

Defendant murdered A.B. at the behest of the SNM." [Doc. 933] at pg. 15. To cover all of their

bases, Plaintiffs suggest yet another basis for contending that a state murder is a VICAR offense.

In [Doc. 933] at pg. 19 the Plaintiffs allege "that the Defendants conspired to and murdered A.B.

to receive pecuniary value from SNM...."

In support of his motion, Joe Gallegos submits the following:

**Argument**

**The Language in the Second Superseding Indictment is Insufficient to Apprise Mr.
Gallegos of the Specifics of the Charges Against Him**

Rule 7(c) of the Federal Rules of Criminal Procedure states that an indictment "must be a

plain, concise, and definite written statement of the essential facts constituting the offense

charged." Fed. R. Crim. P. 7(c). The indictment must sufficiently apprise the defendant of what

evidence he must be prepared to meet at trial.

Joe Gallegos requests the government provide a bill of particulars in this case as to

Counts 4, and 5 as well as how the evidence that proves the enterprise and that A.B. was killed in

furtherance of the goals of the enterprise at issue. The purpose of a bill of particulars is to inform

the defendant of the nature of the charge against him with sufficient precision to enable him to

prepare for trial, to avoid or minimize the danger of surprise at time of trial and to enable him to

plead his acquittal or conviction in bar of another prosecution for the same offense when the

indictment itself is too vague and indefinite for such purposes. *Wyatt v. United States* 388 F.2d

395, 397 (10th Cir. 1968), *quoting United States. v. Haskins*, 345 F.2d 111, 114 (6th Cir. 1965);

*see also United States v.Levine*, <u>983 F.2d 165, 166-67</u> (10th Cir. 1992).  The government offers every possible iteration of the VICAR requirements to suggest that Defendant is guilty of the federal offense.  These iterations, in the government's own words, "are speculative and unpersuasive."  [DOC 933] at pg. 17.

The Government's Second Superseding Indictment makes sweeping allegations of Joe Gallegos' involvement in a long-term racketeering conspiracy as overbroadly evidenced in Counts 1, 4, 5, 13, 14, 15, and 16. The failures in the indictment are most obvious and damaging in Counts 4 and 5.  The only suggestion from the government that there is evidence that proves the murder of A.B. qualifies as a VICAR offense is contained in their response to Defendant's Motion to Sever.  In that document, without reference to any factual particulars, the government advances every possible VICAR requirement to justify the federal charge.  Yet, aside from boilerplate language in the Indictment, there are no specific facts contained within the Indictment, or in the produced the discovery, to support those allegations. Joe Gallegos cannot properly defend against the charges in the Indictment, or to adequately address issues such as his role, or the extent of his alleged participation without Plaintiff providing additional details about these issues in the form of a bill of particulars. There is no other way for Gallegos to guard against the government's shifting its "theory" as the evidence unfolds and is challenged in court.

A bill of particulars supplements an indictment drafted with insufficient particularity. *See United States v. Jensen*, <u>193 F. Supp. 2d 601, 605</u> (D.N.Y. 2002). "The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense." *United States v. Ivy*, <u>83 F.3d 1266, 1281</u> (10th Cir. 1996). A bill of

particulars is necessary in a given case when the Court needs to ensure that the defendant is informed of "the *substantive facts* of the charges against him." *United States v. Griffith*, 362 F. Supp. 2d 1263, 1277 (D. Kan. 2005) (emphasis added).

 Joe Gallegos is entitled to know what specific factual events the government intends to prove at trial. A bill of particulars is an appropriate means to provide him with an adequate factual foundation to prepare his defense against the charges. *United States v. Staggs*, 881 F.2d 1527, 1536 (10th Cir. 1989) (J. Logan, Circuit Judge, concurring); *United States v. Walters*, 188 F.R.D. 591, 596 (D. Kan. 1999), *citing United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988) ("The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense") (internal quotations and citation omitted).

 Given the fact that the defense has voluminous discovery in this case, and the inadequate indictment falls woefully short of the fundamental legal requirements, Joe Gallegos is entitled to bill of particulars in order to achieve a general understanding of the basis for his alleged participation in the charged racketeering conspiracy as to Counts 4 and 5 and the evidence against him. "[I]f the allegations in respect to the manner and means of effecting the object of the combination and conspiracy are not set forth in detail, the remedy is to apply for a bill of particulars." *United States v. Mobile Materials, Inc.*, 871 F.2d 902, 908 (10th Cir. 1989) (quoting *Frankfort Distilleries v. United States*, 144 F.2d 824, 832 (10th Cir. 1944)).

As it stands, the indictment provides Joe Gallegos with no notice regarding the alleged placement of these counts under the VICAR umbrella or that A.B.'s death was on behalf of the alleged enterprise.  Mr. Gallegos is to left to guess whether the government will contend at trial that Gallegos murdered A.B. because his pride was hurt, that he did it for money, or prestige.

The government's broom sweeps too broadly and it must advise the Defendant of the evidence it claims supports each of these propositions.  The Government's failure to provide this information impermissibly deprives Joe Gallegos of a fair opportunity to prepare his defense. *See Dunn* at 1029.

Additionally, when the government charges violations of Racketeer Influenced and Corrupt Organization (RICO), a bill of particulars is especially important: With the wide latitude accorded the prosecution to frame a charge that a defendant has "conspired" to promote the affairs of an "enterprise" through a "pattern of racketeering activity" comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope. *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). It is important to note that judges in other RICO related cases have found it necessary to order bills of particulars. *See United States v. Cerna*, 2009 WL 2998929 (N.D. Cal. Sept. 16, 2009); *United States v Ablett*, 2010 WL 3063145 (N.D. Cal. Aug. 3, 2010*); United States v. Cerna*, 2010 WL 3198927 (N.D. Cal. Aug. 11, 2010); *United States v. Martinez*, 2014 WL 1724490 (N.D. Cal. Apr. 30, 2014); *United States v. Alvarez*, 2014 WL 7240670 (N.D. Cal. Dec. 19, 2014).

Where the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the charged conduct is more narrow. *See, e.g., United States v.*

*Barnes,* 158 F.3d 662, 666 (2d Cir.1998 ) ("a bill of particulars or other adequate disclosure is

appropriate where a conspiracy count covers a complex series of events over a number of years,

but provides only the bare bones of the charge"); *Davidoff* at 1154–55 (district court abused

discretion in denying a bill of particulars identifying victims in <u>*seven-year[1]*</u> racketeering

conspiracy; court noted that principles governing bills of particulars "must be applied with some

care when the [g]overnment charges criminal offenses under statutes as broad as RICO").

[emphais added].

      Here, the Indictment avers that the "SNM gang enterprise, through its members and

associates, engaged in racketeering activity as defined in <u>18 U.S.C. §§ 1959(b)(1)</u> and <u>1961(1)</u>,

that is acts and threats involving murder and robbery in violation of New Mexico law. . ." [Doc.

368] pg. 9 As to Joe Gallegos specifically, the indictment alleges that he and others, "as

consideration for the receipt of, and as consideration for a promise and an agreement to pay,

anything of pecuniary value from the Syndicato de Nuevo Mexico gang (SNM), and for the

purpose of gaining entrance to and maintaining and increasing position in the Syndicato Nuevo

Mexico….did unlawfully knowingly and intentionally conspire to murder A.B. (Count 4) and

under the same pretext did murder A.B.  (Count 5).  However, there is no indication of whether

Joe Gallegos was an active member or associate of SNM at the time of the killing.  There is also

no produced evidence that Joe Gallegos murdered or conspired to murder  A.B., in exchange for

or in hopes of receiving anything of pecuniary value, or for the purpose of gaining entrance to

and maintaining and increasing his position in the SNM, a prison experience that was eight years

---

[1] According to the indictment the enterprise lasted no fewer than 37 years.

in his rear view mirror. The  information requested is necessary to defend against the undocumented and conclusory allegations against Joe Gallegos. It is also necessary in order to determine whether, and how, Federal Rule of Evidence 801(d)(2)(E) may apply to statements made by declarants during the course of the conspiracy alleged in Count 4, of which they and the person the statement is offered against were members. *Bourjaily v. United States*, <u>483 U.S. 171, 175</u> (1987).

Given the inadequacy of the allegations in Counts 4 and 5, it is imperative for Joe Gallegos and his attorneys to be made aware of, with a bill of particulars, the exact evidence against him. In order for him to properly prepare his defense.  This Court should order the government to provide a bill of particulars identifying the source of the claims levelled against Mr. Gonzales.

AUSA Maria Armijo, Plaintiff presumably opposes the relief requested herein.

### Conclusion

Wherefore, for the reasons discussed above, Joe Gallegos respectfully requests this Court to order Plaintiff to produce a Bill of Particulars addressing the deficiencies in the Second Superseding Indictment as set forth in this motion.

Respectfully Submitted,

/s/_____

BROCK BENJAMIN
Attorney for Defendant
New Mexico State Bar No. 141535

747 E. San Antonio, Suite 203
El Paso, Texas 79901
Tel. (915) 412-5858
Fax (915) 503-2224

SINDEL NOBLE, P.C.

/s/ Richard H. Sindel
RICHARD H. SINDEL#23406
Attorneys for Joe Gallegos
8000 Maryland Ave- Suite 910
Clayton, MO 63105
(314) 721-6040
(314) 721-8545 (fax)

## Certificate of Service

The above signature certifies that a copy of the foregoing **MOTION TO DISCLOSE** was sent
via the cm/ecf on this 9th day of March, 2017 to all attorneys of record.

/s/ _____

BROCK BENJAMIN

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CLERK'S MINUTES

***BEFORE DISTRICT JUDGE JAMES O. BROWNING***

| | | | |
|---|---|---|---|
| **CR CASE NO.:** | 15-4268-030 | **DATE:** | May 19, 2017 |
| **CASE CAPTION:** | *USA v. S. Gutierrez* | | |
| **CRD:** | K. Wild | **COURT REPORTER:** | J. Bean |
| **COURT IN SESSION:** | 11:32 a.m. | **COURT IN RECESS:** | 11:59 a.m. = :27 |

**TYPE OF PROCEEDING:**   Appeal of Detention Order (Motion Hearing) (see below)

**COURT'S RULING/DISPOSITION:**   Opposed Motion to Set Conditions of Release [1132] – **DENIED**

**ORDER CONSISTENT WITH COURT'S RULING TO BE PREPARED BY:**   Court

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**          **ATTORNEYS PRESENT FOR DEFENDANT(S):**

Randy Castellano, AUSA                     Angela Arellanes (Appointed)

PROCEEDINGS

**COURT IN SESSION:**   **11:32 a.m.**

**COURT:**          Calls case. Counsel enter appearances. Defendant present in custody. USPTS Officer Paul Valdez present. FBI Agents Brian Acee, Joe Sainato and Nancy Stemo, present w/AUSA.

**Ms. Arellanes:**   Argues in support of motion.

**11:42 a.m.   Mr. Castellano:**   Argues in response in opposition to motion.

**11:54 a.m.   Ms. Arellanes:**   Argues in reply in further support of motion.

**11:55 a.m.   Court:**   Know owe opinion on first detention motion heard in November 2016. Denies instant motion. Finds Defendant a flight risk and danger to community. Anything further? Counsel inform there is not.

**Court:**   Informs may write one opinion on both detention motions filed by Defendant.

**COURT IN RECESS:**   **11:59 a.m.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON,
**JOE GALLEGOS**,
**EDWARD TROUP**,
**BILLY GARCIA**,
**ALLEN PATTERSON**,
**CHRISTOPHER CHAVEZ**,
**JAVIER ALONSO**,
**ARTURO ARNULFO GARCIA**,
**MARIO RODRIGUEZ**,
**MAURICIO VARELA**,
**DANIEL SANCHEZ**,
**CONRAD VILLEGAS**,
**ANTHONY RAY BACA**,
**CHRISTOPHER GARCIA**,
**CARLOS HERRERA**,
**RUDY PEREZ**,
**ANDREW GALLEGOS**,
SANTOS GONZALEZ,
**SHAUNA GUTIERREZ**, AND
**BRANDY RODRIGUEZ**.
          Defendants.

---

**MOTION FOR TIMELY DISCOVERY OF *GIGLIO*
MATERIALS**

---

Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen

1

Patterson, Christopher Chavez, Javier Alonso, Arturo Arnulfo Garcia, Mario
Rodriguez, Mauricio Varela, Daniel Sanchez, Conrad Villegas, Anthony
Ray Baca, Christopher Garcia, Carlos Herrera, Rudy Perez, Andrew
Gallegos, Shauna Gutierrez, and Brandy Rodriguez,  pursuant to
Fed.R.Crim.P 16, *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v.
United States*, 405 U.S. 150 (1972), move this Court to enter an order
directing the Government to forthwith make inquiry and disclose in a timely
fashion all of the information described below:

The defense requests disclosure of all materials and information
pertaining to any witness or informant the government intends to present at
trial that is within its possession as outlined below.  Although the defense
believes there is ample case law which would require such disclosure there
is not universal agreement as to what constitutes discoverable materials.  It is
with that uncertainty that this motion is filed.

In addition, the specificity of a defendant's request for *Brady* materials
is a factor the court considers in the postconviction context. *United States v.
Bagley,* 473 U.S. 667, 683, 105 S. Ct. 3375, 3384 (1985*)*. As such, the
defense specifically requests the below listed categories of materials
regarding the informant and lay witnesses.

2

This request extends to individuals who cooperated during the investigation of this case, any indicted codefendants who have made agreements with the government and any individual whose statements the government intends on offering as an exception or exclusion to the hearsay rule. This request extends to those materials in the custody and control of the prosecutors and members of their staff and any others who have participated in the investigation and evaluation of the above-entitled case and who either report to or with reference to this particular case, have reported to the Government, or the existence of which is known or by the exercise of due diligence could be made known to the above-described persons. See, e.g., United States Attorneys' Manual, §9-5.001 ("It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant), and Memorandum for Department Prosecutors, January 4, 2010, from Deputy Attorney General David W. Ogden, Guidance for Prosecutors Regarding Criminal Discovery ("prosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes").

The United States Supreme Court recognizes the serious questions of credibility informers pose. See, e.g., *On Lee v. United States,* 343 U.S. 747, 757, 72 S. Ct. 967, 973 (1952)("The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility"). Jurors suspect informants' motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable. *Ferrara v. United States*, 384 F. Supp. 2d 384, 427 (D. Mass. 2005)("It is well-known that the testimony of cooperating witnesses is inherently suspect and often not credited by juries because the witnesses are criminals with obvious incentives to lie to help themselves"). As Ninth Circuit [Senior] Judge Stephen Trott, a former United States Attorney and Assistant Attorney General in charge of the Criminal Division of the Department of Justice, has written:

> Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law.
> …
> Jurors suspect their motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable, openly expressing disgust with the prosecution for making deals with such "scum."

4

S. Trott, *Words of Warning for Prosecutors Using Criminals As Witnesses*,

47 Hastings L.J. 1381, 1383, 1385 (1996); *Ferrara v. United States*, <u>384 F.

Supp. 2d at 427</u> (D. Mass. 2005).

As Judge Trott explains, "[t]his willingness to do anything includes

not only truthfully spilling the beans on friends and relatives, but also lying,

committing perjury, manufacturing evidence, soliciting others to corroborate

their lies with more lies, and double-crossing anyone with whom they come

into contact, including - and especially - the prosecutor. *Words of Warning*

*for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1383

(emphasis added). See also, Bennett L. Gershman, *Witness Coaching by*

*Prosecutors*, 23 CARDOZO L. REV. 829, 847 (2002)("The cooperating

witness is probably the most dangerous prosecution witness of all. No other

witness has such an extraordinary incentive to lie. Furthermore, no other

witness has the capacity to manipulate, mislead, and deceive his

investigative and prosecutorial handlers …").

The Supreme Court therefore allows defendants broad latitude to

probe informants' credibility by cross-examination and counsel submission

of the credibility issue to the jury with careful instructions. *Banks v. Dretke*,

<u>540 U.S. 668, 701-702</u> (U.S. 2004), *United States v. Halbert*, <u>668 F.2d 489,</u>

496 (10th Cir. Kan. 1982). Indeed, the Tenth Circuit's Criminal Pattern Jury

Instructions (2017), 1.14 provides that:

> You must examine and weigh an informant's testimony with
> greater care than the testimony of an ordinary witness. You
> must determine whether the informant's testimony has been
> affected by self-interest, by an agreement he has with the
> government, by his own interest in the outcome of the case, or
> by prejudice against the defendant.

The information requested is as follows:

1.      NAME AND LAST KNOWN ADDRESS

The defense seeks the last known address of any witness.[1] See, *United*

*States v. Napue*, 834 F.2d 1311 (7th Cir. 1987); *United States v. Tucker*, 716

F.2d 576 (9th Cir. 1983) (failure to interview government witness ineffective

assistance of counsel); *United States v. Cook*, 608 F.2d 1175, 1181 (9th Cir.

1979) (defense has equal right to talk to witnesses); *United States v. Cadet*,

727 F.2d 1453, 1469 (9th Cir. 1984); *Kines v. Butterworth*, 669 F.2d 6 (1st

Cir. 1981)("[t]he equal right of the prosecution and the defense in criminal

proceedings to interview witnesses before trial is clearly recognized by the

courts").

---

[1] For the purpose of this motion the term "witness" refers to any non-law
enforcement individual who the prosecution intends on calling as a witness at trial or
whose statement they are seeking to admit under an exclusion or exception to the hearsay
rule.

Part of the government's claims in this case are that many of the defendants have confided details of the crimes to their fellow inmates. Just as the government interviewed inmates that lived with the defendants to obtain information, the defendants wish to interview the inmates who live with the government's witnesses. If the government claims that the witness is under protection, the government should make a showing to the Court why counsel cannot be trusted with the address.

2.    GUILTY VERDICTS, JUVENILE AND ADJUDICATION OR OTHER BAD ACTS.

This request includes but is not limited to relevant docket numbers and the jurisdiction of pending or past cases. F.R.E. 609. Discovery extends to production of "rap sheets", *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980); *United States v. Leichtfuss*, 331 F.Supp. 723, 736 (N.D. Ill. 1971); see, *United States v. Alvarez-Lopez*, 559 F.2d 1155 (9th Cir. 1977), and includes evidence that a prospective witness is under investigation by federal, state or local authorities for criminal conduct.  *United States v. Chitty*, 760 F.2d 425, 428 (2nd Cir. 1985). F.R.E. 608(b), in some instances, allows cross-examination of witnesses as to specific instances of misconduct, even though such behavior did not result in a felony conviction or arrest.  Acts which involve deceit, fraud or false statements, or impeaches the witness' truthfulness, or shows motive, intent, knowledge, common

7

scheme or plan etc., are subject to disclosure. *United States v. Beltran-Garcia*, 338 Fed. Appx. 765, 770 (10th Cir. 2009) ("Under Federal Rule of Evidence 608(b), specific unrelated instances of a witness's prior misconduct may be used to impeach the witness at the discretion of the court, however, only to the extent the misconduct reflects on the witness's character for truthfulness."); see also, *United States v. Huerta-Rodriguez*, No. CR 09-3206 JB, 2010 U.S. Dist. LEXIS 91589, at *21 (D.N.M. Aug. 12, 2010).

Prior bad acts of witnesses of which the Government is aware clearly implicates the Government's disclosure obligations under *Giglio*. *United States v. Lujan*, 530 F. Supp. 2d 1224, 1249 (D.N.M. 2008)

3.      CONSIDERATION

Promises of consideration whether express or implied, including leniency, favorable treatment or recommendations with respect to any pending or potential criminal, civil, tax court, administrative or other matter, or payments of money, fee or rewards to the witness must be disclosed. *United States v. Reid*, No. 91-5140, 1992 U.S. App. LEXIS 11525, at *13 (10th Cir. May 12, 1992) (*citing A Prosecutor's Duty to Disclose Promises of Favorable Treatment Made to Witnesses for the Prosecution*, 94 Harv. L. Rev. 887, 891 (1981)); *United States v. Shaffer*, 789 F.2d 682 (9th Cir. 1986); *United States v. Gerard*, 491 F.2d 1300 (9th Cir. 1974); *United States*

8

*v. Pope*, 529 F.2d 112 (9th Cir. 1976).  This includes advice concerning any

contemplated prosecution, or possible plea bargain, even if no bargain was

made.  *Brown v. Dugger*, 831 F.2d 1547, 1558 (11th Cir. 1986)(evidence

that witness sought plea bargain is to be disclosed, even if no deal struck);

*Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985); *Greene v.*

*Wainwright*, 634 F.2d 272, 276 (5th Cir. Jan. 1981) ("Whether or not such a

deal existed is not crucial.").

The defense is also seeking disclosure of promises or other

inducement to cooperate and testify against the defendant.  The duty to

disclose such information is an affirmative one. *Giglio v. United States*, 405

U.S. 150 (1972). The obligation to disclose information covered by the

*Brady* and *Giglio* rules exists without regard to whether that information has

been recorded in tangible form. *United States v. Rodriguez*, 496 F.3d 221,

226 (2d Cir. 2007). Thus, promises or inducements that were only made

orally must also be disclosed.

The prosecution must exercise due diligence to determine what

consideration its witnesses have received or expect to receive and to disclose

this information. This includes the total compensation or benefits paid to or

expected by each witness and the source thereof; see, e.g., *Banks v. Dretke*,

540 U.S. 668, 697-98, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004); *United*

*States v. Leja*, 568 F.2d 493 (6th Cir. 1977); *United States v. Partin*, 493 F.2d 750, 757-60 (5th Cir. 1974), *cert. denied*, 434 U.S. 903 (1977); any beneficial treatment in tax, *e.g.* 21 U.S.C. Sec. 7122 and 7623, or administrative matters, *e.g.*, *United States v. Wolfson*, 437 F.2d 862, 874-75 (2d Cir. 1970); any business assistance, e.g., *Azbill v. Pogue*, 534 F.2d 195 (9th Cir. 1976); grants of immunity, e.g. *United States v. Dillard*, 419 F.Supp. 1000 (N.D. Ill. 1976); relief from forfeiture, e.g., *United States v. Parness*, 408 F.Supp. 440, 444-45 (S.D.N.Y. 1975); placement in protective custody, e.g. *United States v. Librach*, 520 F.2d 550 (9th Cir. 1975), cert. denied, 429 U.S. 939 (1976); special treatment while in custody, e.g, *Chavis v. North Carolina*, 637 F.2d 213, 225-26 (4th Cir. 1980); benefits associated with witness' status as an informer, e.g. *United States v. Disston*, 582 F.2d 1108 (7th Cir. 1978); *United States v. Mele*, 462 F.2d 918 (2d Cir. 1972).

4.    BIAS, MOTIVE OR INTEREST

The prosecution must disclose known sources of a witness's bias, motive or interest.  *Douglas v. Workman*, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985));

DNM 464

*Pennsylvania v. Ritchie*, 480 U. S. 39 (1987); *United States v. Strifler*, 851 F.2d 1197 (9th Cir. 1988). The constitutional right to cross-examination of one's accusers for such bias and motive would be hollow indeed if the Government possesses such  information concerning its own witnesses and does not disclose it.  *Davis v. Alaska*, 415 U.S. 308, 315 (1974); *United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir. 1984); *Chipman v. Mercer*, 628 F.2d 528 (9th Cir. 1980); *Patterson v. McCarthy*, 581 F.2d 220 (9th Cir. 1978).  This includes information of any or ongoing investigations in which any witness was or is involved as an informant, confidential or otherwise, witness or provider of information. *United States v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986).

See also, *United States v. Bontkowski*, 49 F.Supp.2d 1075 (N.D.Ill. 1999)("…the government is ordered to produce … any known bias or prejudice of witnesses towards [the defendant]"), U*nited States v. Owens*, 933 F.Supp. 76 (D.Mass. 1996)("All documents which tend to show the bias, prejudice, personal interest of any government witness to testify in favor of the government or against any defendant, and any documents which tend to show a special relationship of the witness or hostility of the witness either to any other government witness or to any of the defendants in a trial").

5.    THREATS

Any threats expressed or implied, direct or indirect, whether

coercively made or directed against any witness in the form of criminal

prosecutions, investigations, or potential prosecutions pending.  If during

plea agreement discussions with a cooperating witness, *Brady* material is

revealed, the prosecution must disclose it. *United States v. Dupuy*, <u>760 F.2d</u>

<u>1492</u> (9th Cir. 1975).  A defendant is entitled to be advised of any matter

which might cause a witness to color his testimony in favor of the

Government out of fear or interest is self-preservation. See, e.g., *United*

*States v. Sutton*, <u>542 F.2d 1239</u> (4th Cir. 1976) (error not to disclose threat

by F.B.I. agent to prosecute witness which was intended to induce witness'

cooperation); *Barnard v. United States*, <u>342 F.2d 309, 314-17</u> (9th Cir.

1975)(error to preclude full exposure of events surrounding the bringing of

an additional charge); *United States v. Bontkowski*, <u>49 F.Supp.2d 1075</u>

(N.D.Ill. 1999)("…the government is ordered to produce … consequences of

not testifying communicated to witnesses"), *United States v. Sutton*, <u>542</u>

<u>F.2d 1239, 1242</u> (4th Cir.1976)("no difference between concealment of a

promise of leniency and concealment of a threat to prosecute"), *United*

*States v. Chit*ty, <u>760 F.2d 425</u> (2nd Cir.1985) ("Not disclosed to defense

counsel, however, was the fact that [the witness] had been notified that he

was the target of an investigation by the United States Attorney's office. The information that [he] had been told that he was under investigation was discloseable pursuant to *Brady* [and] *Giglio*, … [as] it provided a motive to testify favorably to the Government, and the fact was known to the prosecutor's office"), *United States v. Cody*, 722 F.2d 1052 (2nd Cir. 1983)(where "[o]ne of the agents began to argue with [the witness] and apparently lost his temper saying that if [the witness] did not follow instructions he would throw [him] out the window or inform [the defendant] that [he] was an informant …. it would have been better for the government to disclose the threats since they did bear upon [the witness'] credibility").

Evidence of a witness's wrongdoing, even though not amounting to a felony conviction or involving elements of moral turpitude or bad character, may nonetheless be introduced when relevant to show the bias or self-interest of the witness.  See, e.g. *Huerta-Rodriguez,* supra; *United States v. Alvarez-Lopez*, 559 F.2d 1155 (9th Cir. 1977); *Green v. Wainwright*, 634 F.2d 272 (5th Cir 1981). This request includes information concerning the witness' vulnerability to prosecution, parole or probation revocation, or other sanction.  In *United States v. Bonanno*, 430 F.2d 1060 (2d Cir. 1970), cert. denied, 400 U.S. 964 (1971), the court condemned the Government's failure to disclose an outstanding indictment against a witness since the

pendency of the charge would have shown "possible motivation of the

witness to testify favorably for the Government." Id., at 1062.  See, also,

*United States v. Padgent,* 432 F.2d 701 (2d Cir. 1970).  See, also, *United*

*States v. Crumley*, 565 F.2d 945-50 (5th Cir. 1978); *United States v. Gerard*,

491 F.2d 1300, 1304 (9th Cir. 1974).

      6.     PRIOR TESTIMONY

      The existence and identification of each occasion on which a witness

has testified before any court, grand jury, or other tribunal body or made

other statements must be disclosed so defendant can order transcripts of

testimony for use in cross-examination, or investigate sources or extrinsic

impeachment.  C.R.E. 801 (d)(1) and 806.  If the Government has

information which may lead to proof of prior inconsistent statements or

other evidence helpful to defendant, fundamental fairness requires that it be

turned over to the defense without further delay.  18 U.S.C. § 3500(b);  see

also, *Davis v. Heyd*, 479 F.2d 446 (5th Cir. 1973); see also *United States v.*

*Glover*, CIVIL ACTION, No: 98-10059-01-JWL, 1998 U.S. Dist. LEXIS

14437, at *12 (D. Kan. Sep. 1, 1998).

      7.     INTERNAL LAW ENFORCEMENT FILES

      Any and all impeaching information contained in any federal and

local Government files (or computer information) maintained concerning the

DNM 468

witness. In *United States v. Morell*, <u>524 F.2d 550, 552-55</u> (2d Cir. 1975), the

Court of Appeals held that the defense was entitled to impeachment

information in the confidential file of an informant witness.  See also, *United*

*States v. Ramirez*, No. 94-4191, <u>1995 U.S. App. LEXIS 29714, at *10</u> (10th

Cir. Oct. 19, 1995) *United States v. Beekman*, <u>155 F.2d 580</u> (2d Cir. 1946).

8.     COMPETENCY AND MENTAL ILLNESS

Information which impeaches a witness' competency and his capacity

and opportunity to observe, remember, recall and narrate as well as his

character for veracity, partiality and evidence of "basic mental trouble" can

not be suppressed and must be disclosed. *Wiman v. Powell*, <u>293 F.2d 605,</u>

<u>606</u> (5th Cir. 1961); *Powell v. Wiman*, <u>287 F.2d 275, 278-79</u> (5th Cir. 1961).

See also *United States v. Robinson*, <u>583 F.3d 1265, 1274-75</u> (10th Cir. 2009)

(Evidence that a confidential informant has suffered from auditory

hallucinations and saw "things out through the window that are not really

there" was relevant because it would have "provide[d] some significant help

to the jury in its efforts to evaluate the [CI's] ability to perceive or to recall

events or to testify accurately." Evidence of illegal drug use and the

informant's mental condition are the basis of impeaching and exculpatory

information and therefore subject to *Brady*.  *United States v. Robinson*, <u>583</u>

15

F.3d 1265(10th Cir. Kan. 2009), *United States v. Ganadonegro*, 2012 U.S.

Dist. LEXIS 49799 (D.N.M. Apr. 4, 2012).

Any medical, psychological or psychiatric evidence tending to show

that any informant's ability to perceive, remember, communicate, or tell the

truth is impaired. See *United States v. Lindstrom*, 698 F.2d 1154, 1163-68

(11th Cir. 1983) (psychiatric records relevant to credibility); *Chavis,* supra,

637 F.2d at 224 (psychiatric records reflecting on the competency or

credibility of witness); *United States v. McFarland*, 371 F.2d 701, 705 (2nd

Cir.) (prior hospitalizations of witness for mental illness), cert. denied, 387

U.S. 906 (1966). *Powell v. Wiman*, 287 F.2d 275, 279 (5th Cir. 1961)

(same).

9.    FALSE OR INCONSISTENT STATEMENTS

False or erroneous statements, whether under oath or penalty of

perjury, or evidence that any witness does not have a good reputation in the

community for honesty are discoverable, see, *United States v. Strifler*, 851

F.2d 1197 (9th Cir. 1988), or any evidence of contradictory or inconsistent

statements with regard to this case or any statement showing of bias or

motive to fabricate. *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *United*

*States v. Hibler*, 463 F.2d 455 (9th Cir. 1972); *United States v. Minsky*, 963

F.2d 870, 874-77 (6th Cir. 1992)(error not to disclose witness's statement to

F.B.I. contradicted by third party); *Hudson v. Blackburn*, <u>601 F.2d 785, 789</u>

(5th Cir. 1979) (statement of police officer refuting witness' statement that

he identified defendant at lineup); *United States v. Hibler*, <u>463 F.2d 455, 460</u>

(9th Cir. 1972) (statement of police officer casting doubt on story of

witness); United States v. Owens, supra ("The government is required to

reveal any evidence that it has of prior bad acts which go to the reputation of

the witness for truth or veracity or any specific acts which point to the

witness having lied on other occasions"), *United States v. Strifler*, <u>851 F.2d</u>

<u>1197</u> (9th Cir. 1988)(witness' probation file, which contained "among other

things, probation reports showing a tendency in [the witness] to

'overcompensate' for actual or perceived problems; [and] …reports of

repeated instances of [the witness] lying to authorities …would have

provided a basis for impeaching [the witness]").

Specifically included in this request are statements made by any

witness which contradicts a statement made by any other witness as such are

conflicting and can be used to cast doubt on the credibility of one or both

witnesses.

10.    POLYGRAPH TESTS

Oral and written results of any polygraph test administered to any

witness whether by the prosecution or the F.B.I. for the witness protection

DNM 471

program.  See, e.g.,*United States v. Bontkowski*, 49 F.Supp.2d 1075 (N.D.Ill.

1999)("…the government is ordered to produce … information regarding

polygraph examinations of witnesses relating to their testimony"), *United*

*States v. Patino*, 991 F.Supp. 1449 (1997)("[f]ailure to disclose material

exculpatory or impeachment evidence contained in the narrative portion of

[a] polygraph examination report is error").

     Defendant also asks for evidence of any refusals by the witness to take

a polygraph test.  *Carter v. Rafferty*, 826 F.2d 1299 (3rd Cir. 1987).

     11.   PRIOR INFORMANT ACTIVITY

     Evidence that a government informant had acted as an informant on

prior occasions is material.  *United States v. Torres*, 569 F.3d 1277 (10th

Cir. 2009).  The informant's history and pattern of criminal activity and

misconduct serve to illustrate the methods normally employed by the

informant to achieve his goals. Such evidence "might easily extend beyond

that of mere impeachment."  See *United States v. Espinosa-Hernandez*, 918

F2d 911, 914 (11th Cir. 1990).

     In *United States v. Brumel-Alvarez*, 991 F2d 1452, 1465 (9th Cir.

1992), the court held that the failure to disclose an internal DEA

memorandum regarding the informant's conduct, which impeached the

informant's credibility, was reversible error under *Brady*.

12.    PRIOR PLACEMENT RECORDS

For all inmate informants that either indicate they were a percipient witness or overheard admissions by any defendant, placement records must be produced so that the defense can determine whether or not the inmate informant was in a position to have perceived or overheard what they claim to have witnessed.

13.    OTHER

All information within the possession of the Government or in computer files to which the Government has access concerning:

(a)    All records of complaints lodged by or on behalf of the witness while incarcerated and records indicating any disciplinary action, placement in security cell or isolation, belief that the witness might be a security risk and or transfers and the reasons therefore while incarcerated;

(b)    Information and data provided and action thereon if the witness has applied for acceptance into any witness protection program.

(c)    Any reduction, modification in or special terms of sentence for the witness attributed to the witness' cooperation with the Government;

(d)    Any sentence, reduction or modification of sentence which does not conform to the law in existence at the time of the sentence

DNM 473

reduction, along with all information regarding unreported meeting between the sentencing, modifying judge and the Government or the witness;

(e)     Any and all correspondence or other communication between the sentencing, modifying or reducing judge and the Government and or witness regarding the sentence, modification or reduction;

(f)     Information regarding instances of use of controlled substances;

(g)     Any and all information that the witness has recanted their statement or indicated that they were not willing to testify consistent with the statement made inculpating a defendant; and

(h)     Any indication that a witness, after cooperating with the government, went back and cooperated with any defendant or target of the criminal investigation.


<u>CONSULTATION WITH THE COURT</u>

Consultation with the judge is particularly appropriate when the Government has legitimate reasons for protecting the confidentiality of the material requested, for the trial judge can then weigh the Government's need for confidentiality against the defendant's need to use the material in order to obtain a fair trial. *United States v. Bocra*, <u>623 F.2d 281, 285</u> (3d Cir. 1980);

*United States v. Dupuy*, 760 F.2d 1492, 1501 (9th Cir. 1985); *Pennsylvania*

*v. Ritchie*, 480 U.S. 39 (1987); *United States v. Phillips*, 854 F.2d 273 (7th

Cir. 1988)(court examined entire contents of FBI informant file to determine

if government summary was accurate and complete); *Application of Storer*

*Communications, Inc*, 828 F.2d 330 (6th Cir. 1987)(case remanded for in

camera inspection of prosecutor's files); *United States v. Gaston*, 608 F.2d

607 (5th Cir. 1979) (FBI reports of interviews of government witnesses).

The defense, generally, opposes procedures in which they cannot

participate.  However, authority does exist for such procedures.

If the government has a question concerning the need for disclosure or

protection concerns such should be brought to the attention of the Court for

resolution. See, Trott, *Words of Warning for Prosecutors Using Criminals*

*as Witnesses*, 47 Hastings L.J. 1381, 1415-1416 ("If you have any doubt

about a piece of evidence, that very doubt should cause you to seek a pretrial

*Brady* ruling from the court, ex parte, in camera if possible."

Caution should be used in utilizing an *ex parte* showing regarding

risks associated with disclosure.  For example, many of the defendants were

living law abiding lives in the community at the time of the issuance of the

initial indictment.  Claims that these defendants pose an ongoing risk should

be the subject of an adversary hearing.

POSITION OF THE PARTIES

The motion is filed on behalf of defendants Joe Gallegos, Edward

Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Javier Alonso,

Arturo Arnulfo Garcia, Mario Rodriguez, Mauricio Varela, Daniel Sanchez,

Conrad Villegas, Anthony Ray Baca, Christopher Garcia, Carlos Herrera,

Rudy Perez, Andrew Gallegos, Shauna Gutierrez, and Brandy Rodriguez.

Defendant Santos Gonzalez does not object.  The government objects.

WHEREFORE, the defense requests the Court order the government

to comply with its discovery obligations, as outlined above, as soon as

practicable with leave to file specific objections to the disclosure of specified

materials on a showing of a need for a protective order.

Submitted this 24th day of May, 2017.


/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)

/s/ Brock Benjamin
Brock Benjamin
Rick Sindel
Attorneys for Joe Gallegos

/s/ Cori Harbour-Valdez
Cori Harbour-Valdez
Pat Burke
Attorneys for Edward Troup

/s/ Jeff Lahann
Jeff Lahann
Attorney for Allen Patterson

/s/ Orlando Mondragon
Orlando Mondragon
John Granberg
Attorneys for Christopher Chavez

/s/ Noel Orquiz
Noel Orquiz
Nate Chambers
Attorneys for Javier Alonso

/s/ Billy Blackburn
Billy Blackburn
Scott Davidson
Attorneys for Arturo Arnulfo Garcia

/s/ Santiago Hernandez
Santiago Hernandez
Steven Potolsky
Attorneys for Mario Rodriguez

/s/ Mary Stillinger
Mary Stillinger
Joe Spencer
Attorneys for Mauricio Varela

/s/ Richard Jewkes
Richard Jewkes
Amy Jacks
Attorneys for Daniel Sanchez

/s/ B.J. Crow
B.J. Crow
Attorney for Conrad Villegas

/s/ Marc Lowry

DNM 477

Marc Lowry
Teri Duncan
Attorneys for Anthony Ray Baca

/s/ Amy Sirignano
Amy Sirignano
Chris Adams
Attorneys for Christopher Garcia

/s/ Michael Davis
Michael Davis
Carey Bhalla
Attorneys for Carlos Herrera

/s/ Ryan Villa
Ryan Villa
Justine Fox-Young
Attorneys for Rudy Perez

/s/ Donavon Roberts
Donavon Roberts
Attorney for Andrew Gallegos

/s/ Angela Arellanes
Angela Arellanes
Attorney for Shauna Gutierrez

/s/ Alfred Creecy
Alfred Creecy
Attorney for Brandy Rodriguez

CERTIFICATE OF SERVICE

I hereby certify that on May, 2017, I presented the foregoing to the Clerk of
the Court for filing and uploading to the CM/ECF system which will send
notification of such filing to counsel of record.

/s/ James A. Castle

DNM 478

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **JOE LAWRENCE GALLEGOS,** | ) | |
| | ) | |
| Defendant. | ) | |

### UNITED STATES' RESPONSE OPPOSING DEFENDANT JOE GALLEGOS' MOTION FOR A BILL OF PARTICULARS (DOC. 1143)

The United States of America, by and through undersigned counsel, hereby submits this Response Opposing Defendant Gallegos' Motion for a Bill of Particulars. For the reasons set forth more fully in the memorandum, the requested bill of particulars is not necessary and should be denied.

### MEMORANDUM

On May 9, 2017, Defendant Joe Gallegos filed a Motion for a Bill of Particulars.   (Doc. 1143.) The defendant's motion seeks information regarding Counts 4 and 5 of the Second Superseding Indictment. Because the defendant has fallen short of demonstrating that he needs the requested information in order to prepare for trial, the motion should be denied.

The decision whether to grant a motion for a bill of particulars rests with the sound discretion of the district court. *Will v. United States*, 389 U.S. 90, 98-99 (1967); *see* 1 Wright & Leipold, Fed. Prac. & Proc. Crim § 130 (4th ed. 2015) ("A defendant is not entitled to a bill of particulars as a matter of right."); Fed. R. Crim. P. 7(f) ("The court *may* direct the government to file a bill of particulars.")[1] (emphasis added). A bill of particulars is intended to "inform the

---

[1] Rule 7(f) also requires the motion for bill of particulars to be filed "before or within 14 days after

defendant of the nature of the charges against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense **when the indictment itself is too vague and indefinite for such purposes**." *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976) (emphasis added). In ruling on a motion for a bill of particulars, a district court should consider "whether the information requested is necessary to allow the defense to prepare its case adequately or to avoid prejudicial surprise." 1 Wright & Leipold, Fed. Prac. & Proc. Crim § 130. The key question is whether the information sought is necessary for the preparation of a defense, not whether the defendant may find it helpful. *United States v. Fennell*, 496 F. Supp. 2d 279, 284 (S.D.N.Y. 2007).

It is well established that a bill of particulars is not a discovery device: "The purpose of a bill of particulars is *not* to obtain discovery, evidentiary detail of the government's case, or information regarding the government's legal theories." *United States v. Nguyen*, 928 F.Supp. 1525, 1551-52 (D.Kan. 1996), citing *United States v. Gabriel*, 715 F.2d 1447, 1449 (10th Cir. 1983) (emphasis in original).

## I.     The Second Superseding Indictment is Sufficiently Detailed and Specific.

The Court should reject a motion for a bill of particulars when the indictment sets forth the charges against the defendant. *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988). "An indictment is generally sufficient if it sets forth the offense in the words of the statute so long as

---

arraignment or at a later time if the court permits."   There is no indication the defendant has sought or received the Court's permission to file his motion at this late date.

2

the statute adequately states the elements of the offense." *Id.* "Sufficiency is determined by practical rather than technical considerations." *Id.*

The Second Superseding Indictment returned in this case is 18 pages long and goes far beyond what Mr. Gallegos needs to prepare his defense and avoid unfair surprise at trial. With respect to the racketeering enterprise, the Indictment contains two paragraphs introducing the alleged enterprise, seven paragraphs explaining the background of the enterprise, two paragraphs identifying the roles of the defendants, six paragraphs summarizing the purpose of the enterprise, and the types of racketing activity in which the defendants allegedly engaged. (Doc. 949 at 2-9).

Counts Four and Five charge Mr. Gallegos with committing Violent Crimes in Aid of Racketeering in violation of 18 U.S.C. §§ 1959(a)(1), (2), and (5), for murder and conspiracy to murder.  Each of these counts contains two paragraphs that state the date and location of the offense, name other co-conspirators, identify the victim, and set forth the elements of the crimes and the statutes violated. (*Id.* at 11-12.)

The Second Superseding Indictment provides more than adequate information for the defendant to understand the charges against him and fully and fairly prepare for trial; this Circuit requires nothing more. *See, e.g., United States v. Dunn*, 841 F.2d at 1026; *United States v. Dahlman,* 13 F.3d 1391, 1400 (10th Cir. 1993). The Court should therefore deny Mr. Gallegos's motion.

## II.     The United States Provided Extensive Discovery.

A bill of particulars is also properly denied where the government has supplemented the indictment, through discovery or other means, with information that the defendant requires to understand the crimes charged and prepare for trial. *United States v. Kunzman*, 54 F.3d 1522,

3

1526 (10th Cir.1995) (denying motion for bill of particulars when government provided

defendant sufficient discovery prior to trial to inform him of charges and enable him to prepare

his defense).

> As this Court is aware, the United States provided an extraordinary amount of

information to Mr. Gallegos and his co-Defendants in this case. Discovery has been produced in

multiple rounds – in March 2016, July 2016, October 2016, November 2016, December 2016,

February 2017, March 2017, April 2017, and May 2017 – and each time the data was provided to

Russ Aoki, the discovery coordinator in this case. The discovery consists of information in

various forms, including documents, photographs, audio recordings, video recordings, and other

investigatory materials.   All told, the United States has produced over 30 gigabytes of

information thus far.   The discovery for Counts Four and Five consists of approximately 6.5

gigabytes of data.   In addition to the information provided, the United States has made the

physical evidence in this case available to all defense attorneys for inspection at their

convenience.   The United States is aware of its continuing discovery obligations and

supplements its productions, if and when appropriate. Witness statements and other *Jencks*

material will be disclosed according to the schedule that the Court has adopted.

> In short, because the United States has substantially augmented (and will continue to

augment) the Second Superseding Indictment with Rule 16 discovery, *Jencks* information, and

other disclosures that will allow Mr. Gallegos ample opportunity to prepare for trial, the instant

motion for a bill of particulars should be denied. *See Kunzman*, 54 F.3d at 1526.

**III.     The Information that Mr. Gallegos Seeks is Not Properly the Subject of a Bill of Particulars**

Putting aside the sufficiency of the Second Superseding Indictment and the considerable amount of discovery that the United States has produced, a careful review of the information requested in Mr. Gallegos's motion demonstrates that it properly should be denied.   Mr. Gallegos does not state any specific categories of information he seeks, but simply requests a "bill of particulars notifying him of his purported involvement in the charged racketeering enterprise." (Doc. 1143 at 1). In his motion, he argues that he is entitled to the "exact evidence against him." *Id*. at 7.

Mr. Gallegos has (or will have) access to much, if not all, of the information he requested in his motion. For example, the Second Superseding Indictment states the nature, date, and location of each of the alleged acts in Counts Four and Five. The United States supplemented the allegations in the Second Superseding Indictment with discovery that shed more light on the charged crimes—discovery that revealed information about the acts and potential witnesses. To the extent that the United States has already disclosed the information sought in Mr. Gallegos's motion, the requested bill of particulars should be denied as moot.

Even if the Court were to find that the United States has not provided all the information that Mr. Gallegos is requesting, the basis for which Mr. Gallegos has not yet provided, the motion should fail because courts have rejected requests for bills of particulars that, like Mr. Gallegos's request, simply ask for a preview of the United States' legal theories.  *See Nguyen*, 928 F.Supp. at 1551-52 ("The purpose of a bill of particulars is *not* to obtain discovery, evidentiary detail of the government's case, or information regarding the government's legal theories."); *United States v. Muyet*, 945 F.Supp. 586, 598-99 (S.D.N.Y. 1996). The United States is not even required to give

5

notice of the specific evidence it will present in support of aggravating factors. *Nguyen*, 928

F.Supp. at 1551-52.

Finally, this Court previously has denied a request for a bill of particulars under similar

circumstances.  *See United States v. Gould*, No. CR 03-2274 JB, 2007 WL 1302592, at *1

(D.N.M. Mar. 12, 2007) (Browning, J.). The Court stated:

> Contrary to Ms. Gould's assertions, the Court finds that Count V of the Second
> Superceding Indictment is sufficient to apprise her of the essential elements of the
> crime charged, and to inform her of the charge against which she must prepare a
> defense. Count V cites the statute that Ms. Gould is alleged to have violated, tracks
> the statutory language of that statute, provides a description of the way in which
> Ms. Gould violated that statute, and includes the date on and the location where the
> violation allegedly took place. . . . The Court thus concludes that Count V
> adequately provides the elements of the alleged offense and apprises Ms. Gould of
> the charges she must meet.
>
> That Ms. Gould has identified six statements that may relate to the allegations
> contained in Count V strengthens that conclusion. Moreover, the Court notes that
> Ms. Gould has filed several motions in the case thus far, so any lack of detail in
> Count V has not hampered her defense. Indeed, the Court learned about the six
> statements at issue in this case from reading Ms. Gould's motion in limine. Further,
> the Court notes that Ms. Gould has had access, for some time, to discovery
> materials, including Grand Jury, *Brady,* and *Jencks* materials, with which to inform
> herself of the circumstances and conduct underlying the allegations against her
> contained in Count V.
>
> Ms. Gould need only scrutinize one sixty-page document to know the basis of the
> criminal charge against her and the parties have already identified the six material
> statements therein. The court does not believe ordering a bill of particulars would
> give Ms. Gould any information she does not already have.

*Gould*, 2007 WL 1302592, at *4.  As discussed above, this case is very much like *Gould*. The

Second Superseding Indictment in this case is 18 pages long, it names Mr. Gallegos in specific

counts, and those counts are listed by statutory citation and track the charging statute's language.

Furthermore, Mr. Gallegos has received voluminous amounts of discovery, which has been

reviewed in order for the defendant to file various motions.   Clearly, as in *Gould*, Mr. Gallegos's

6

ability to present a defense has not been hampered.   For example, that the information thus far

provided to Mr. Gallegos provides him an adequate ability to present a defense against the charges

may be found in a motion to sever Counts 4 and 5 from that of the other charged offenses (Doc.

868). In that motion, the Defendants Andrew and Joe Gallegos assert that blood and burn marks

found on their clothing on the day of A.B.'s death came from either a pig roasting party or welding

jobs. The Gallegos Defendants go on to state: "[T]here were no witnesses to the murder or specific,

concrete evidence, including DNA, that directly links the Gallegos Defendants to this murder, the

murder scene, or to the location where AB's body was found."   Thus, contrary to Mr. Gallegos's

unsupported, conclusory contentions in his motion, Mr. Gallegos demonstrated that he has

sufficient information to present a defense, and so a bill of particulars is not necessary, and very

likely will not give him any information he does not already have.

## <u>CONCLUSION</u>

For the reasons stated herein, the Court should exercise its discretion and deny Mr.

Gallegos' request for a bill of particulars.   The lengthy Second Superseding Indictment and

voluminous discovery in this matter provide more than enough notice for Mr. Gallegos to

understand the charges against him, prepare his defense, and avoid unfair surprise at trial.   Any

additional details that the defendant seeks are not properly the subject of a bill of particulars.

Because Mr. Gallegos has not established that a bill of particulars is necessary, the instant

motion should be denied.

Respectfully Submitted

JAMES D. TIERNEY
Acting United States Attorney

*__Electronically filed on 6/06/2017__*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel.
(575) 522-2391 – Fax

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
RANDY M. CASTELLANO
Assistant United States Attorney

8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268-2 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **JOE GALLEGOS,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>UNITED STATES' RESPONSE IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE AND STATEMENTS [DOC. 1142]</u>

Defendant Joe Gallegos moves for a blanket suppression of all evidence and statements that police obtained in their investigation of Defendant's murder of Adrian Burns. He contends that the statements should be suppressed because the interrogation was inherently coercive, and because his arrest and the search of his premises, vehicles and the motel room in which he was arrested were unlawful and without probable cause. *See* Motion to Suppress Evidence and Statements [Doc. 1142] ("Motion to Suppress at 1-3). But other than conclusory statements, Defendant does not provide any factual support for his contentions. And he cannot. His arrest was pursuant to a validly-obtained arrest warrant, which was obtained based on a lengthy affidavit supported by facts gleaned from the investigation into the victim's murder. Similarly, the searches of his residence at #4 Erin Court, Los Lunas, NM, the vehicles at his residence, the motel room in Albuquerque, NM, where he was arrested, and his vehicles at that motel were all likewise searched pursuant to validly-obtained search warrants, which warrants were obtained based on lengthy affidavits with facts gleaned from the same investigation. The Court, therefore,

properly should not exclude that evidence law enforcement obtained in its investigation into Burns's murder.

With regard to Defendant's post-arrest statements, Defendant expressly voluntarily, knowingly and intelligently waived his right to remain silent after being read his rights on a recorded interview. And once he clearly and unequivocally invoked his right to speak to an attorney, New Mexico State Police ("NMSP") officers conducting the interview promptly ceased questioning. The statements obtained, therefore, were obtained in compliance with Defendant's constitutional rights, and the Court properly should not therefore exclude those statements.

## **BACKGROUND**

On November 12, 2012 at approximately 10:45 p.m., NMSP began an investigation of a homicide that had occurred in Socorro County on US 60 near mile-post 166 and State Road 304. A body had been discovered at the scene of a reported car fire at 9:00 p.m. in the Bosque area just South of US 60 near SR 304. Upon arrival, NMSP found a body which had been heavily charred by the fire, and was located just to the south of a Mitsubishi Gallant vehicle which was also heavily consumed by fire. NMSP identified the victim as Adrian Burns.

Interviews of friends and family led to statements from the person who had been with Burns up to 7:00 p.m. that night. That individual told investigators that, on the night of the murder, Burns departed his residence at approximately 7:00 p.m. to go Joe Gallegos's residence, which is located at #4 Erin Court, Los Lunas, NM, to collect a drug debt and to sell heroin to Andrew Gallegos. A person also made a statement to law enforcement that the person had observed Joe Gallegos and his brother, Andrew Gallegos, at an Allsup's convenience store between 11:30 p.m. and 12:30 a.m. that night of November 12. At the convenience store, the

2

Gallegos brothers provided that person and her friend with heroin and money, and the Gallegos brothers appeared to be in an unusually generous mood, passing out drugs and money.

NMSP investigators analyzed the phone records of Burns, which revealed the following:

a.      4:41 p.m. - Phone registered to Andrew Gallegos contacted Burns.

b.      4:50 p.m. - Phone registered to Andrew Gallegos contacted Burns.

c.      6:52 p.m. - Phone registered to Joe Gallegos contacted Burns.

d.      7:33 p.m. - Burns called phone registered to Joe Gallegos.

NMSP investigators subsequently obtained arrest warrants for Joe and Andrew Gallegos, as well as a search warrant for the premises of #4 Erin Court and two vehicles there. That search warrant was executed on November 15, 2012. Upon execution of the search warrant, NMSP officers spoke to two individuals at #4 Erin Court, who informed investigators that Joe Gallegos and Andrew Gallegos were recently at the residence, but had departed just before law enforcement's arrival.

On November 20, 2012, members of the U.S. Marshals Fugitive Task Force located and arrested Joe and Andrew Gallegos at the Imperial Motel, located at 701 Central Avenue NE, Albuquerque, NM; both had been on the run from law enforcement. Joe Gallegos and Andrew Gallegos agreed to speak with investigators after NMSP advised them of their *Miranda* rights from reading from their *Miranda* card. Joe Gallegos admitted that Burns had come to his house on November 12, 2012. Joe Gallegos did not provide details pertaining to Burns's murder.

NMSP also seized two vehicles at the Imperial Motel, a Dodge van registered to Joe Gallegos of #4 Erin Court and a black Jeep Grand Cherokee that was registered to Angela

3

Gallegos, Joe Gallegos's daughter, who was harboring Defendant at the Imperial Motel. After NMSP obtained search warrants for the motel room and two vehicles, NMSP searched those areas. In the vehicles, NMSP found cellular telephones in the Jeep, which NMSP search after obtaining search warrants for those phones.

## LEGAL AUTHORITIES

### A. THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution "protects '[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008) (quoting U.S. Const. amend. IV). It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The Court has recognized that "[t]he 'chief evil' from which the Fourth Amendment protects citizens is unwanted police entry into the home, and the 'principal protection' is 'the Fourth Amendment's warrant requirement.'" *United States v. Romero*, 743 F. Supp. 2d 1281, 1301 (D.N.M. 2010) (Browning, J.), (quoting *Thompson*, 524 F.3d at 1132), *aff'd*, 749 F.3d 900 (10th Cir. 2014).

With regard to the probable-cause requirement, the United States Supreme Court "requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant," which issuance should be based on the determination that a totality of the circumstances support "'a fair probability that contraband or other evidence will be found in a particular place.'" *Id.* at 1302 (quoting *United States v. Biglow*,

4

562 F.3d 1272, 1280-81 (10th Cir. 2009)). Once the warrant issues, "[a] magistrate judge's finding of probable cause is . . . given great deference, with the court's role in reviewing the probable-cause finding limited to the sufficiency of the warrant affidavit; the Supreme Court prohibits after-the-fact de novo scrutiny of the probable-cause determination." *Id.* at 1302-03.

## B.  THE FIFTH AND SIXTH AMENDMENTS

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), governs the admissibility of a defendant's statements given during a custodial interrogation by law enforcement. "'Police officers need not administer *Miranda* warnings to everyone they question.' Rather, '*Miranda* applies only to 'custodial interrogations.''" *Romero*, 743 F. Supp. 2d at 1310 (internal citations and alteration omitted) (quoting *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir.2008)). Custodial interrogations are those in which "a suspect's 'freedom of action is curtailed to the degree associated with a formal arrest.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

A defendant may waive the Fifth Amendment privilege against self-incrimination so long as the waiver is voluntary, knowing and intelligent. *See United States v. Christy*, 785 F. Supp. 2d 1004, 1027 (D.N.M. 2011) (Browning, J.) (quoting *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008)), *on reconsideration in part*, 810 F. Supp. 2d 1219 (D.N.M. 2011), *aff'd*, 739 F.3d 534 (10th Cir. 2014). "An express statement of waiver is not required; the waiver can be inferred from the defendant's actions and words." *Id.* (citing *United States v. Nelson*, 450 F.3d 1201, 1211 (10th Cir. 2006)). The government bears the burden to prove by a preponderance of

5

the evidence that a defendant's waiver is valid, which the Court analyzes under a two-part

inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it
> was the product of a free and deliberate choice rather than intimidation, coercion,
> or deception. Second, the waiver must have been made with a full awareness of
> both the nature of the right being abandoned and the consequences of the decision
> to abandon it. Only if the totality of the circumstances surrounding the
> interrogation reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda* rights have been
> waived.

*Id.* at 1027-28 (quoting *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002)).

Once a defendant waives the defendant's right to remain silent, only if the defendant

"clear[ly] and unambiguous[ly]" invokes his right to remain silent must the interrogation cease.

*Id.* at 1028. Similarly, only if the defendant "clear[ly] and unequivocal[ly]" requests that counsel

be present during the custodial interrogation must the interrogation cease. *Id.*; *see id.*

("'Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can

reasonably be construed to be an expression of a desire for the assistance of an attorney.'"

(quoting *Davis v. United States*, 512 U.S. 452, 459 (1994))). *See also* U.S. Const. amend. VI ("In

all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel

for his defence."). The Court's inquiry whether a defendant requested counsel is objective, and if

"'a reasonable officer in light of the circumstances would have understood only that the suspect

*might* be invoking the right to counsel,'" the request is not clear and unequivocal. *Id.* at 1029

(emphasis in original) (quoting *Davis*, 512 U.S. at 459).

DNM 492

<u>**ARGUMENT**</u>

A.    **THE COURT SHOULD NOT EXCLUDE THE EVIDENCE SEIZED, BECAUSE IT WAS SEIZED PURSUANT TO SEARCH WARRANTS SUPPORTED BY PROBABLE CAUSE.**

   1.   <u>**#4 Erin Court and the vehicles on the premises were searched pursuant to a valid search warrant.**</u>

Defendant does not specify what search of #4 Erin Court, Los Lunas, NM, was improper. He also does not specify what seized evidence he seeks to exclude. Nevertheless, the Court should not exclude any such evidence, because any evidence seized was pursuant to a valid search warrant supported by probable cause in the affidavit.

The search of #4 Erin Court began at approximately 12:40 a.m. on November 16, 2012. *See* NMSP Supplemental Report #7 of Sergeant Thomas E. Christian (DeLeon 3695-3732) ("NMSP Supp. Report #7") at 3697, attached as Ex. 1. The search was pursuant to a search warrant that issued at 6:35 p.m. on November 15, 2012, for the premises, its curtilage, all dwellings and structures at #4 Erin Court, and two Chevrolet vehicles on that property. *See* Search Warrant for #4 Erin Court (DeLeon 3753-63) at 3754, 3757, attached as Ex. 2; Sgt. Christian Report at 3. NMSP obtained the search warrants on November 15, 2012, and gathered several officers, including the NMSP Tact Team, to execute the search warrant. *See* NMSP Supplemental Report #8 of R. Mathews (DeLeon 3733-40) ("NMSP Supp. Report #8") at 3735-36, attached as Ex. 3. The Search Warrant for #4 Erin Court authorized nighttime search, *see* Search Warrant for #4 Erin Court at 3754, and the search began at approximately 8:45 p.m., *see* NMSP Supp. Report #8 at 3736.

In the Affidavit for the Search Warrant for #4 Erin Court, Agent Alvino Vigil discusses the discovery of the burned body of Adrian Burns on November 12, 2012, in Socorro, NM, at

7

some time between 7:00 p.m. and 9:00 p.m., for which murder the State of New Mexico

eventually arrested Joe Gallegos and Andrew Gallegos. *See* Search Warrant for #4 Erin Court at

3760. Through interviews of the victim's friends and family, NMSP discovered that the victim

was going to meet Joe Gallegos when the victim left his residence on the night of his November

12 murder, and that he received a phone call from Joe Gallegos just moments before leaving. *See*

*id.* The affidavit states that interviews of the victim's friends and family also identified Joe

Gallegos and Andrew Gallegos as two of the victim's main heroin buyers. *See id.* Additionally,

the affidavit lays out 4 telephone calls -- at 4:41 p.m., 4:50 p.m., 6:52 p.m., and 7:33 p.m. --

between the victim and the Gallegos brothers on the evening of the victim's murder. *See id.* at

3760-61. The affidavit notes that the Gallegos brothers live at #4 Erin Court in Los Lunas, NM,

that the victim's body was found in Socorro, and that, between 11:00 p.m. and 12:30 a.m.

November 12-13, the Gallegos brothers were seen at a convenience store in Belen, NM (which is

in between Socorro and Los Lunas), with a gasoline canister in their truck and selling heroin

packaged in the manner that the victim packaged his heroin. *See id.* at 3761.

This factual basis in the search-warrant affidavit certainly provides probable cause to

believe that the Gallegos brothers murdered the victim. But the United States acknowledges that

the requirement for a search warrant, as opposed to an arrest warrant, requires sufficient facts for

a determination that a totality of the circumstances support "'a fair probability that contraband or

other evidence will be found in a particular place.'" *Romero*, 743 F. Supp. 2d at 1302. That

probable cause is found in the continuation of the affidavit on pages 3761-62, in which Agent

Vigil discusses that, in his training and experience, the persons who committed the crime -- the

Gallegos brothers – among other things, "often transfer . . . evidence between suspect(s) . . .

8

and/or their environment." Search Warrant for #4 Erin Court at 3761. Agent Vigil also avers that "people involved in the commission of the crime(s) often attempt to conceal, tamper with and/or dispose of evidence," and that they "may document information relating to the crime(s) on paper, on computers and/or other forms of media." *Id.* Thus, Agent Vigil avers that, "in order to ensure a complete and thorough investigation, investigators may be required to examine the entire above-mentioned premises, vehicle(s) and/or person(s)," and he therefore "request[ed] that the Court issue a Warrant commanding the above-described premises, vehicle(s) and/or person(s). *Id.* at 3762.

Based on these factual assertions, made under oath before the district court judge who issued the warrant, the Search Warrant for #4 Erin Court properly was issued on November 15, 2012. *See id.* It is clear that these factual assertions "provided information sufficient to determine the existence of probable cause before" the district court judge issued the warrant. *Romero*, 743 F. Supp. 2d. at 1302 (citing. *Biglow*, 562 F.3d at 1280-81). The Court should therefore deny Defendant's Motion to Suppress to the extent that he seeks to suppress

> any and all observations of law enforcement officers and any other tangible or intangible evidence obtained during, or directly or indirectly derived from, the searches of his person and/or the premises at 4 Erin Court, Los Lunas, New Mexico; and any outbuildings or other structures, vehicles or other property located on or near those locations, in which Defendant had a reasonable expectation of privacy.[1]

Motion to Suppress at 1.

---

[1] The United States does not contest for purposes of the Motion to Suppress that Defendant had a reasonable expectation of privacy in his premises and vehicles at #4 Erin Court.

   2.   **Defendants Joe Gallegos and Andrew Gallegos were arrested pursuant to valid arrest warrants.**

Arrest warrants were issued for Joe Gallegos and Andrew Gallegos contemporaneously with the Search Warrant for #4 Erin Court on November 15, 2012, based on probable cause to believe that they had committed, among other things, the murder of Adrian Burns. *See* Warrant for Arrest of Joe Gallegos at 1 (DeLeon 3710), attached as Ex. 4; Warrant for Arrest of Andrew Gallegos at 1 (DeLeon 3711), attached as Ex. 5. On November 20, 2012, law enforcement arrested Joe Gallegos and Andrew Gallegos at the Imperial Hotel, 701 Central Avenue NE, Albuquerque, NM. *See* NMSP Supp. Report #7 at 3697.

   3.   **The hotel room at the Imperial Motel and the two vehicles that belonged to the Gallegos brothers at the motel were searched pursuant to a valid search warrant.**

At the November 20, 2012 arrest of Joe Gallegos and Andrew Gallegos, NMSP officers detained the Gallegos brothers (and the other persons residing with them in the hotel room), as well as their vehicles, until search warrants were obtained. After law enforcement obtained valid search warrants based on probable cause, the hotel room, vehicles and Defendants were searched. The Court properly should therefore deny Defendant's motion to suppress the seized evidence.

Once Defendant and his brother Andrew Gallegos were arrested, they were detained outside of their motel room #239, as were the other individuals arrested with them, including Defendant's daughter, Angela Gallegos. *See* NMSP Report #7 at 3697-98. NMSP officers also seized (but did not immediately search) two vehicles: (1) a white Dodge Van that was registered to Joe Gallegos of #4 Erin Court; and (2) a black Jeep Grand Cherokee that was registered to

DNM 496

Angela Gallegos. *See id.* at 3698. *See* NMSP Supplemental Report #2 by Sergeant W. Troy
Weisler (DeLeon 3390-92) at 3391-92, attached as Ex. 6.

NMSP officers then applied for, and were granted, a search warrant for the motel room,
Jeep, Dodge van, and Joe Lawrence and Andrew Gallegos. *See* Search Warrant for Room in the
Imperial Motel (DeLeon 3948-59) ("Motel Search Warrant"), attached as Ex. 7. Officer
Elizabeth Whitfield was the affiant for the affidavit. *See* Motel Search Warrant at 3956. As
support for the warrant, Officer Whitfield explained to the judge the facts and circumstances of
the discovery of Adrian Burns' body, *see id.*, that the investigation identified the Gallegos
brothers as suspects, and that information recovered from the execution of the Search Warrant
for #4 Erin Court "link both suspects further to the homicide." *Id.* at 3957. Officer Whitfield
averred that surveillance of the Gallegos' home identified the Dodge van parked at that home,
and that the van had left the residence shortly before execution of the Search Warrant for #4 Erin
Court. *See id.* Officer Whitfield also stated that, on November 20, 2012, the United States
Marshals Task Force received information that the Gallegos brothers were at the Imperial Motel,
where they observed the Dodge van and Jeep Cherokee in the parking lot, and where they
observed an individual that they identified as Andrew Gallegos in the room in which they
arrested the brothers later that same day. *See id.* at 3957-58. Officer Whitfield stated that two
women were located with the Gallegos brothers, and that an interview of Joe Gallegos's
daughter, Angela Gallegos, led to information that she knew that her father/Defendant bought
drugs from the victim Adrian Burns and that Defendant had sent her a letter just days before that
said "he was sorry about things that happened and sorry for doing drugs." *Id.* at 3958.

11

After laying out the factual basis of the investigation, Officer Whitfield avers that, based on her previous experience and training as a law enforcement officer, many of the items, documents and other things that she requests to seize from the motel room, vehicles and persons of the Gallegos brothers, would likely be found in those places. *See id.* at 3958-59. Thus, "in order to ensure . . . a complete and thorough investigation" in Adrian Burns's death and the Gallegos' arrest, Officer Whitfield, based on the averments in the affidavit, requested "that the Court issue a Warrant commanding the search [of] the above-described premises, vehicle(s) and/or person(s)." *Id.* at 3959.

Based on these factual assertions, made under oath on November 21, 2012, before the judge, the Motel Search Warrant properly issued on November 21, 2012. *See id.* at 3948, 3959. It is clear that these factual assertions within the Motel Search Warrant affidavit "provided information sufficient to determine the existence of probable cause before" the district court judge issued the warrant. *Romero*, 743 F. Supp. 2d. at 1302 (citing. *Biglow*, 562 F.3d at 1280-81). The Court should therefore deny Defendant's Motion to Suppress to the extent that he seeks to suppress "searches involve the search of a black jeep, cell phone from that jeep and Room 239 of the Imperial Inn, located at 701 Central Avenue NE in Albuquerque, New Mexico."[2] Motion to Suppress at 1.

---

[2] Defendant's Motion to Suppress mentions the search of a "cell phone" from the Jeep that NMSP searched. Motion to Suppress at 1. NMSP didn't search that cellular telephone on November 20 or 21, 2012. *Contra id.* NMSP later searched that cellular telephone, but only after a valid search warrant was obtained on November 29, 2012, for that telephone, among others, based on a comprehensive affidavit virtually identical to that submitted for the Motel Search Warrant. *See* Cricket Wireless Search Warrant (DeLeon 3791-3796), attached as Ex. 9; *id.* at 3793-96.

12

**B.    THE COURT SHOULD NOT EXCLUDE THE DEFENDANT'S STATEMENTS, BECAUSE THE DEFENDANT VOLUNTARILY, KNOWINGLY AND INTELLIGENTLY WAIVED HIS *MIRANDA* RIGHTS, AND DID NOT CLEARLY AND UNEQUIVOCALLY INVOKE HIS RIGHT TO AN ATTORNEY.**

After Defendant's arrest on November 20, 2012, Defendant waived his *Miranda* rights and provided law enforcement with a statement. During the statement, Defendant did not clearly and unequivocally invoke his right to have an attorney present. The Court should therefore deny his Motion to Suppress his post-arrest statements.

On Tuesday, November 20, 2012, at approximately 6:55 p.m., NMSP Agent James Mowduk and Agent Richard Williamson interviewed Defendant and Andrew Gallegos at the NMSP office in Albuquerque, NM. *See* NMSP Supplemental Report #5 by Agent James Mowduk (DeLeon 3429-48) ("NMSP Supp. Report #5") at 3440, attached as Ex. 8. At the start of Defendant's interview, Agent Mowduk advised Defendant of his "Rights per Miranda from a pre-printed card;" Defendant stated that he knew his rights per *Miranda* and agreed to speak with the NMSP agents. *Id.* at 3440. Defendant "stated that he had a couple of things he would like to tell" NMSP agents about the Adrian Burns murder, and provided information about what he allegedly heard about the murder and what he and his brother did that day. *Id.* at 3440-41.

Agents took a break from the interview of Defendant at approximately 8:31 p.m, *see id.* at 3443, when Defendant was provided a bathroom break as soon as requested. *See* Audio Recording of 1st interview of Joe Gallegos on 11-20-12 ("J. Gallegos 1st Recording") at 1:36:29-1:36:35, submitted separately to the Court and Defense Counsel. A secondary interview began "at approximately 12:04 a.m. and lasted approximately 23 minutes." NMSP Supp. Report #5 at 3443; *see also* 2nd Interview of Joe Gallegos on 11-21-12 ("J. Gallegos 2nd Recording") at

00:00-:30, submitted separately to the Court and Defense Counsel. "Eventually the interview terminated at approximately 12:27 a.m. after [Defendant] requested to speak with an attorney." NMSP Supp. Report #5 at 3444.

The interview(s) with Defendant were audio recorded. *See* J. Gallegos 1st Recording. During these interviews, Agent Mowduk advises Defendant of his *Miranda* rights verbally from a written card, and Defendant states that he wants to make a statement. *See* J. Gallegos 1st Recording at 3:08-3:57. Later during the first interview, Defendant says that he doesn't want to talk about certain subjects, including his drug use, *see id.* at 1:01:55-1:02:15, and that he's "getting uncomfortable." *Id.* at 1:29:30-1:29:52. He does not ask for an attorney.

Then, in the second interview, after answering questions for over 11 minutes, Defendant said that he couldn't remember anything and said for the first time that he didn't want to answer any more questions, because he could not recall certain information. *See* J. Gallegos 2nd Recording at 11:21-12:01. But he did not in fact refuse to answer questions and kept talking with NMSP. *See id.* at 12:01-12:28. He then says that he did drugs earlier in the day, but that drug use earlier was not affecting his ability to "see" events presently. *Id.* at 12:28-13:20. Finally, Defendant invoked his right to an attorney -- "I just want a lawyer, and that's it." J. Gallegos 2nd Recording at 22:06-15. NMSP told him he'd get a lawyer tomorrow or the next day, asked if he had any questions of them, and terminated the interview immediately. *See id.* at 22:15-:44. *See also* NMSP Supp. Report #5 at 3443-44.

This Court has concluded that "[a]n express statement of [*Miranda*] waiver is not required; the waiver can be inferred from the defendant's actions and words." *Christy*, 785 F. Supp. 2d at 1027 (citing *Nelson*, 450 F.3d at 1211). But in this case, NMSP agents obtained an

14

express statement of *Miranda* waiver. *See* J. Gallegos 1st Recording at 3:08-3:57. That express

waiver is therefore a clear voluntary, knowing and intelligent *Miranda* waiver, which is a valid

waiver and which renders his post-arrest statements admissible. *See Christy*, 785 F. Supp. 2d at

1027. The United States acknowledges that, if a Defendant clearly and unequivocally invokes his

right to an attorney, the interview must stop. *See Id.* And that's exactly what happened in this

case. Defendant, at approximately 12:27 a.m. on November 21, 2012, requested an attorney, and

NMSP properly terminated the interview. *See* J. Gallegos 2nd Recording at 22:06-:44; NMSP

Supp. Report #5 at 3444. Thus, the government complied with its obligations under *Miranda*

(and with Defendant's Fifth and Sixth Amendment rights).

Defendant also apparently objects to the interview as so lengthy that it was inherently

coercive. *See* Motion to Suppress ¶ A(2) at 2. But the interviews together lasted only

approximately 2 hours -- 6:55-8:27 p.m., and 12:04-12:27 a.m. *See* NMSP Supp. Report #5 at

3443-44. The Tenth Circuit has concluded in the past that even a "lengthy" interview of a 19-

year-old was not coercive where the defendant did not object to the length. *Burnett v. Blackburn*,

160 F. App'x 662, 665-66 (10th Cir. 2005). *See also United States v. Benally*, 146 F.3d 1232,

1240 (10th Cir. 1998) (defendant objected to two interviews as so lengthy to be coercive, and

Tenth Circuit held that "the relatively short duration of the two interviews" belied any claim of

coercion).[3] Defendant, who admitted he's had multiple run-ins with the police before, never

objected to the length of the interview. Moreover, whereas Defendant objects that, "[d]uring the

---

[3] *See, e.g., Clark v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade,* 538 U.S. 63, 71 (2003) (finding petitioner's detention in interview room for eight hours did not render statements involuntary); *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) (six or seven hour questioning not coercive); *Martin v. Wainwright*, 770 F.2d 918, 927 (11th Cir. 1985), *modified by* 781 F.2d 185 (1986) (five hour intermittent questioning did not render confession involuntary); *United States v. Lehman*, 468 F.2d 93, 101 (7th Cir. 1972) ("vigorous" eight hour questioning interrupted by several breaks did not make confession involuntary).

15

interview, Defendant told his interrogators that he was under the influence of narcotics," Motion to Suppress ¶ A(2), Defendant told NMSP officers immediately afterwards that the fact that he'd done drugs that day did not affect his ability to "see" clearly the events about which he was providing statements, J. Gallegos 2nd Recording at 12:28-13:20. So even if he may have been under the influence of narcotics, that didn't affect his ability to voluntarily and knowingly provide the statements he did. The Court should therefore deny Defendant's Motion to Suppress based on alleged inherent coercion.

Defendant provided a valid *Miranda* waiver before he made statements to NMSP on November 20-21. NMSP terminated the interview immediately when Defendant clearly and unequivocally invoked his right to an attorney. The statements he provided in the interim were not obtained in violation of his rights, and are thus admissible at trial. The Court should therefore deny his Motion to Suppress to the extent that he seeks to exclude "any statements or admissions of Defendant." Motion to Suppress at 1.

<u>CONCLUSION</u>

NMSP searched Defendant's residence at #4 Erin Court, the vehicles on the property, the motel room at the Imperial Motel, and Defendant's vehicles on that motel's premises only after they obtained valid search warrants based on well-supported affidavits. The Court should therefore not suppress that evidence. Defendant's statements were obtained after he expressly voluntarily, knowingly and intelligently waived his *Miranda* rights, and before he invoked his right to an attorney. The Court should therefore not suppress his statements. Accordingly, the Court properly should deny Defendant's Motion to Suppress.

16

Respectfully Submitted,
JAMES D. TIERNEY
Acting United States Attorney

***Electronically filed on 6/6/17***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church St.
Las Cruces, NM   88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/_____
MATTHEW M. BECK
Assistant United States Attorney

DNM 503

| NEW MEXICO SUPPLEMENTAL REPORT | | ORI | INCIDENT NO. | PRIMARY | PAGES | REF |
|---|---|---|---|---|---|---|
| | | NMNSP2113 | 2012-18903 | N | 1 | 13 |

| ORIGINAL OFFENSE DATE | 11/12/2012 | SUPPLEMENTAL DATE | 12/03/2012 | CASE NUMBER | 12-23-3-0376 |
|---|---|---|---|---|---|

ORIGINAL OFFENSE REPORTED   1 - HOMICIDE
2 - TAMPERING WITH EVIDENCE

ORIGINAL VICTIM'S NAME

ORIGINAL VICTIM (BUSINESS)

LOCATION OF OCCURRENCE

| PERSON CODE | TYPE CODE | INJURY CODE |
|---|---|---|
| INTERVIEWED | INDIVIDUAL | NONE |

| 1 -NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO. | DOB | AGE | SEX | RACE: WHI | BLK | ASIA | IND | UNK |
|---|---|---|---|---|---|---|---|---|---|
| MONTOYA, GILBERT A | ▮▮▮ | ▮▮▮ | 69 | M | X | | | | |

| OCCUPATION | VICTIM OF OFF. NC | HEIGHT | WEIGHT | HAIR | EYES | ETHNIC | AGG ASSAULT |
|---|---|---|---|---|---|---|---|
| RETIRED/DISABLED | | 508 | 220 | GRY | BRO | H | |

| EMPLOYER / SCHOOL | VICT. OF SUSP. NO. | RELATIONSHIP |
|---|---|---|
| UNKNOWN | | |

GANG AFFILIATION

| ARREST/CITATION NO. | F.B.I. NO | S.I.D. NO. | NCIC NO. | Type of Arrest: | ON VIEW | CITED | CUST. | Residential Status: | RES | NON |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | X | |

IDENTIFICATIONS   DL      NM   ▮▮▮

Address Type: OTHER   Road Type: OTHER (PRIVATE ROAD, ETC.)
Street Address: ▮▮▮
City: ▮▮▮   State: NM   Zip: 87002
County: VALENCIA   Country: UNITED STATES

| TELEPHONES | Home Phone | ▮▮▮ |
|---|---|---|
| TELEPHONES | Work Phone | |

| PERSON CODE | TYPE CODE | INJURY CODE |
|---|---|---|
| INTERVIEWED | INDIVIDUAL | NONE |

| 2 -NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO. | DOB | AGE | SEX | RACE: WHI | BLK | ASIA | IND | UNK |
|---|---|---|---|---|---|---|---|---|---|
| MONTOYA, BEATRICE E | ▮▮▮ | ▮▮▮ | 43 | F | X | | | | |

| OCCUPATION | VICTIM OF OFF. NC | HEIGHT | WEIGHT | HAIR | EYES | ETHNIC | AGG ASSAULT |
|---|---|---|---|---|---|---|---|
| UNKNOWN | | 504 | 135 | BRO | BRO | H | |

| EMPLOYER / SCHOOL | VICT. OF SUSP. NO. | RELATIONSHIP |
|---|---|---|
| UNKNOWN | | |

GANG AFFILIATION

| ARREST/CITATION NO. | F.B.I. NO | S.I.D. NO. | NCIC NO. | Type of Arrest: | ON VIEW | CITED | CUST. | Residential Status: | RES | NON |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | X | |

IDENTIFICATIONS   DL      NM   ▮▮▮

Address Type: OTHER   Road Type: OTHER (PRIVATE ROAD, ETC.)
Street Address: ▮▮▮
City: ▮▮▮   State: NM   Zip: 87002
County: VALENCIA   Country: UNITED STATES

| TELEPHONES | Home Phone | ▮▮▮ |
|---|---|---|
| TELEPHONES | Work Phone | |

| M.O. EVENT CODES : (AGENCY OPTIONAL USE) | TOTAL VALUE STOLEN | TOTAL VALUE REC. |
|---|---|---|
| IB CASE #12-23-3-0367 - SUPPLEMENTAL REPORT #7. | | |

SYNOPSIS
This supplemental report documents my investigative assistance into the homicide investigation of Adrian Burns of Belen, New Mexico. Refer to my report narrative for complete details.

| NEW MEXICO SUPPLEMENTAL REPORT | OCA NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 2 | 13 |

NARRATIVE

INTRODUCTION:

The author of this report is SERGEANT THOMAS E. CHRISTIAN, SR., New Mexico State Police, Investigations Bureau, stationed in Albuquerque, New Mexico (NMSP/IB/Albuquerque). Telephone ██████████.

I have been a commissioned law enforcement officer in the State of New Mexico, and employed with the New Mexico Department of Public Safety, the New Mexico State Police Division - for thirty-four-(34) years (1978 to present).

I was first assigned to the Uniformed Patrol Division of the New Mexico State Police, for twenty-one (21) years and six-(6) months (1978 to 1995 & 1996 to 2001). Additionally, I have been assigned as an investigator with the New Mexico State Police - Investigations Bureau for approximately twelve-(12) years and six-(6) months (1995 to 1996 & 2001 to present). Of the twelve-(12) years and six-(6) months in the Investigations Bureau, I have been a first line supervisor (Sergeant) for approximately eleven-(11) years (2001 to present).

THURSDAY, NOVEMBER 15, 2012:

At approximately 10:30 a.m., I was requested by my immediate supervisor Lieutenant Tim Johnson, New Mexico State Police, Investigations Bureau, stationed in Albuquerque, New Mexico to proceed to Vaughn, New Mexico to pick-up some CD's (Compact Discs) in connection to this homicide investigation.

At approximately 1:27 p.m., at the intersection of US 285 and US 60, in Vaughn, New Mexico I met with Agent Chester Bobbitt, New Mexico State Police, Investigations Bureau, stationed in Clovis, New Mexico. Agent Bobbitt relinquished to me evidence item #MB-1, which was six-(6) CD-R's that contained video surveillance recordings. (Refer to Agent Rich Williamson's report for complete details, as to exactly what is contained on the surveillance recordings.)

Agent Bobbitt also relinquished to me a New Mexico State Police evidence sheet for the six-(6) CD-R's. (See Attachment.)

I then relayed the six-(6) CD-R's to the State Police Office, in Los Lunas, New Mexico.

At approximately 3:25 p.m., while at the State Police Office, in Los Lunas, New Mexico I relinquished evidence item #MB-1 to the Case Agent, Agent Rich Williamson, New Mexico State Police, Investigations Bureau, stationed in Albuquerque, New Mexico. (See Attachment.)

I was then advised the homicide victim in this case was Adrian A. Burns, date of birth: ██████████ of Los Lunas, New Mexico. (See Attachment.)

Two-(2) suspects are:

Joe Lawrence Gallegos, date of birth: ██████████ of Los Lunas, New Mexico. (See Attachment.)

and (his brother)

DNM 505

| NEW MEXICO SUPPLEMENTAL REPORT | | PRIMARY | PAGES | OF |
|---|---|---|---|---|
| NMNSP2113 | 2012-18903 | N | 3 | 13 |

Andrew Robert Gallegos, date of birth: ███████ of Los Lunas, New Mexico. (See Attachment.)

Additionally, I was advised that Arrest Warrants were issued for both Joe Lawrence Gallegos and Andrew Robert Gallegos. In addition, I was told a Search Warrant had been issued for vehicles and the residence/property belonging to the Gallegos brothers.

At approximately 7:45 p.m., I dispatched Agents Jeremy Vaughan and Steve Montano (NMSP/IB/Albuquerque) to assist with this investigation to assist with the Search Warrant service.

At approximately 10:47 p.m., I arrived at #4 Erin Court, in Los Lunas, Valencia County, New Mexico.

This concludes investigative activity for this date.

FRIDAY, NOVEMBER 16, 2012:

At approximately 12:40 a.m., I began my assist with the search of the residence/property at #4 Erin Court, in Los Lunas, Valencia County, New Mexico. I assisted in the search of the residence, the outside of the residence, two-(2) trucks parked at the residence and of sheds on the property. I seized no property or items of potential evidence.

At approximately 3:45 a.m., I concluded my time at #4 Erin Court.

This concludes investigative activity for this date.

TUESDAY, NOVEMBER 20, 2012:

At approximately 5:25 p.m., Lieutenant Johnson told me the Gallegos brothers (Joe Lawrence and Andrew Robert) were in custody, here in Albuquerque, New Mexico. Lieutenant Johnson then requested Agent Jeremy Vaughan and I proceed to the location of the arrests, which was given as 701 Central Avenue NE, in Albuquerque, Bernalillo County, New Mexico. That location was a hotel location, the name of the hotel was - the "Downtown - Imperial Inn."

At approximately 5:36 p.m., Agent Vaughan and I arrived at the "Downtown - Imperial Inn." I made contact with Agent Nathan Lucero, New Mexico State Police, Investigations Bureau, stationed in Albuquerque, New Mexico. Agent Lucero (is assigned to the United States Marshal's Task Force) told me the Gallegos brothers were located and arrested in connection to the outstanding Murder - Arrest Warrants (See Attachments) without incident, in room #239, of the "Downtown - Imperial Inn."

Two-(2) women, who were in the room with the Gallegos brothers when they were arrested, are as follows:

-Angela Gallegos, date of birth ███████ of Belen, New Mexico (See Attachment). and
-Charlene Y. Baldizan, date of birth: ███████, also of Belen, New Mexico. (See Attachments.)

It was later determined, Angela Gallegos is the daughter of Joe Lawrence Gallegos, and

DNM 506

| NEW MEXICO SUPPLEMENTAL REPORT | OR | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 4 | 13 |

Charlene Y. Baldizan in the girlfriend of Andrew Gallegos.

At approximately 5:38 p.m., I entered room #239; no one else was located in the room. I exited the room at approximately 5:40 p.m. I seized no items of evidence from the room. The Gallegos brothers were on the second floor outside of room #239, and in custody. The two-(2) women were downstairs (on the bottom floor) near their vehicles.

The vehicles were listed as follows:

- A white in color, with blue striping, 1996 Dodge Van, bearing (2012) New Mexico license plate number ████. This vehicle is registered to - Joe Gallegos of #04 Erin Court, in Los Lunas, New Mexico.

and

- A black in color, 2000 Jeep Grand Cherokee, bearing (2013) New Mexico license plate number ████. This vehicle is registered to Alfredo Gomez or Angela Gallegos of ████ ████, in Belen, New Mexico. (See Attachments.)

Agent Lucero advised me that room #239 was rented in the name of Loretta Apodaca.

I then walked to the office of the "Downtown Imperial Inn." I made contact with Binaya Paudel, date of birth: ████████████████ and the desk clerk at the "Downtown Imperial Inn."

I asked Mr. Paudel if I could look at the room receipt for room #239, as I wanted to know who had rented the room. Mr. Paudel then allowed me to view the receipt for room (#239) which I did, and additionally, I photographed the receipt.

The receipt for room #239 stated the following - Loretta Apodaca, driver's license ████████ date of birth: ████████ of ████████████ in Belen, New Mexico 87002 rented/checked into the "Imperial Inn" on November 17, 2012, at 6:40 p.m., she was assigned room #239. Checkout was listed as November 24, 2012. The total room rent collected for the week was $175.00 dollars in cash. The receipt also stated that the number of guests was listed at "1." (See Attachment.)

At approximately 6:07 p.m., I concluded my time at the "Downtown Imperial Inn."

At approximately 6:17 p.m., Agent Vaughan and I returned to the State Police Office, in Albuquerque, New Mexico.

Lieutenant Johnson then assigned Agent Vaughan and I to interview Angela Gallegos, date of birth: ████████ in connection to this investigation. Ms. Gallegos' interview was conducted in the west interview room. The interview was audio and video recorded. For complete details of the interview, please refer to Agent Vaughan's supplemental report. I made a few notations in connection to this interview.

INTERVIEW: ANGELA GALLEGOS

The interview began at 6:48 p.m. Angela advised us her dad was Joe Lawrence Gallegos and that Andrew Gallegos was her uncle.

NEW MEXICO SUPPLEMENTAL REPORT

| ORI NO | INCIDENT NO | PRIMARY | PAGE | OF |
|--------|-------------|---------|------|-----|
| NMNSP2113 | 2012-18903 | N | 5 | 13 |

Angela also told us her cellphone ▆▆▆▆▆▆▆ was in her Jeep (listed above in this report) and that her cellphone provider was "Verizon."

Angela also stated she was aware of the media coverage involving her dad and uncle, and she stated that it (the coverage) was unfair.

Angela related that her dad sells scrap metal (he is self-employed) as no one will hire him as he is an ex-convict.

Angela also stated that she knew Adrian Burns, and he (Adrian) sells drugs to her Dad and uncle (Andrew) on a regular basis. Angela stated she does not discuss this with her dad.

Angela also stated she had received a letter from her dad, the other day, that letter is in her purse, which is in her Jeep (listed-above in this report). The letter reportedly stated that he is sorry about things, and wished he had not been doing drugs.

When Angela was asked about the killing of Adrian Burns, she stated her dad said he did not do it, and she believes him.

Agent Vaughan gave Angela his business card.

Note: Angela was wearing the following clothing at the time of our contact with her. Blue jean pants, black in color sneakers, a black in color hoodie, and a gray in color "CNM" t-shirt.

At approximately 7:25 p.m., the interview with Angela was stopped.

I remained in the interview room with Angela, pending disposition for her release by Agent Vaughan.

At approximately 7:51 p.m., I left the interview room.

At approximately 8:14 p.m., I gave information that Agent Vaughan and I had obtained from the interview with Angela Gallegos to Agent Elizabeth Whitfield (NMSP/IB/Albuquerque).

At approximately 8:30 p.m., I gave un-opened bottles of water to Angela Gallegos, Charlene Baldizan and Andrew Gallegos.

At approximately 9:02 p.m., and upon her request, Angela Gallegos was given un-restricted access to a telephone in the Squad Room, at the State Police Office, in Albuquerque, New Mexico.

At approximately 11:35 p.m., Agent Vaughan and I conducted a follow-up interview with Angela Gallegos, again in the west interview room, at the State Police Office, in Albuquerque, New Mexico.

FOLLOW-UP INTERVIEW: ANGELA GALLEGOS

At approximately 11:48 p.m., Angela Gallegos requested to leave the interview room, and she departed.

DNM 508

| NEW MEXICO SUPPLEMENTAL REPORT | ORI NO. NMNSP2113 | CASE NO. 2012-18903 | PRIMARY N | PAGE 6 | OF 13 |
|---|---|---|---|---|---|

At approximately 11:55 p.m., Angela Gallegos left the State Police Office, in
Albuquerque, on foot. Angela's mother was en-route to our location. I recommended to
Angela, before she left, that she wait for her mother to arrive, Angela did not want to
wait and she left. Note: Angela is over eighteen-(18) and she was not intoxicated.

At approximately 11:59 p.m., I offered use of the telephone to Charlene Baldizan,
however; she declined.

This concluded case activity for this date.

WEDNESDAY, NOVEMBER 21, 2012:

At approximately 12:10 a.m., Officer Otis Rodriquez (NMSP/UD/Albuquerque) transported
Charlene Baldizan, from the State Police Office in Albuquerque, New Mexico to the
Metropolitan Detention Center, in Bernalillo County, New Mexico for booking and
incarceration on two-(2) misdemeanor Arrest Warrants, and two-(2) counts of Harboring or
Aiding a felon.

At approximately 11:10 a.m., I attended a case briefing at the State Police Office, in
Albuquerque, New Mexico. Sergeant Isaac Valerio (NMSP/IB/Albuquerque) conducted the
briefing. The briefing was held to give the case status, give updates and assign out
follow-up assignments.

Agent Vaughan and I were assigned to the following follow-up investigation.

- Follow-up with the "Downtown Imperial Inn." If possible, we were to obtain video
surveillance from that business, in connection to this investigation, and room #239. We
were to try to determine who rented room #239 on Saturday, November 17, 2012, at
approximately 6:40 p.m.

- Locate and interview Loretta Apodaca, and seize her cellphone, if possible. Loretta
Apodaca is believed, to have rented the room #239, for the Gallegos brothers.

and

- Locate and interview "Spider," Phillip Jerome Chavira, date of birth: ████████ of
Belen, New Mexico in connection to this investigation. I was advised, that based on
information received, Andrew Gallegos had reportedly given $480.00 dollars (cash) to a
Bryan Giron, to hold for him (Andrew) as he owed "Spider" this money.

Also, if "Spider" was located, question him about his relationship with the Gallegos
brothers.

At approximately 1:35 p.m., Agent Vaughan and I arrived back at the "Downtown Imperial
Inn," located at 701 Central Avenue NE, in Albuquerque, New Mexico 87102.

We made contact with the owner/manager of the Inn, Mr. Amrutlal B. Patel, date of birth
████████ of Albuquerque, New Mexico. Mr. Patel gave Agent Vaughan and I permission to
view and download the recordings from his Net/Promax - DVR-recorder, located inside of
his residence area, at the Inn.

Agent Vaughan and I determined and noted, by looking at the recording time on the

recorder, that the time on the DVR-recorder was approximately fifty-(50) to fifty-four-(54) minutes ahead of the actual time.

It was also determined there are four-(4) surveillance cameras at the Inn. Two-(2) of the cameras are located on the interior area of the office. Additionally, there are two-(2) exterior cameras, located outside of the office.

The following is a synopsis of the four-(4) camera angles at the "Downtown Imperial Inn."

The times and four-(4) camera angles were downloaded to a USB thumb drive, belonging to Agent Vaughan. As stated on the videos the times recorded was from 7:30 p.m., to 8:01 p.m., on Saturday, November 17, 2012.

NOTE: Due to the time error on the DVR the actual (approximate) times recorded were 6:40 p.m., to
7:11 p.m., on Saturday, November 17, 2012.

CAMERA/ANGLE - 1: Video #19290202:

This camera angle is from the inside of the Inn/office area, looking from the southeast to the northwest, from behind the office counter area. Mr. Binaya Paudel is seated behind the counter sitting down.

At approximately 6:41 p.m., Charlene Y. Baldizan and Loretta Apodaca enter the Inn Office, by the north office door. Loretta is the first through the door and Charlene is right behind her.

Loretta and Charlene then leave the office.

At approximately 6:44 p.m., Loretta returns to the Inn/office alone.

Loretta is then seen renting a room (#239). Mr. Paudel takes her identification and fills out a room card. Loretta pays cash for the room.

At approximately 6:49 p.m., Loretta leaves the office.

At approximately 6:50 p.m., Loretta returns to the office as she apparently forgot to pick up the room key. Loretta obtains the key and immediately leaves the office.

This concludes the synopsis of camera #1.

CAMERA/ANGLE - 2: Video #19290203:

This camera angle is from the inside of the Inn/office area, looking from the south-southeast to the northwest, covering the two-(2) guest entrances (the west door and the north door) and the lobby area, out in front of the counter area.

At approximately 6:41 p.m., a white with blue stripes in color 1996 Dodge van, belonging to Joe Gallegos is seen driving north into the Inn property, past the office, and into the parking lot. Approximately, six-(6) seconds later, after the van drives by, the black in color 2000 Jeep belonging to Alfredo Gomez and Angela Gallegos also drives

DNM 510

| NEW MEXICO SUPPLEMENTAL REPORT | OR NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 8 | 13 |

north into the Inn property, past the office, and into the parking lot.

At approximately 6:42 p.m., Loretta Apodaca and Charlene Baldizan together, enter the Inn/office, by use of the north office door.

They both then immediately leave by the north office door.

At approximately 6:44 p.m., Loretta returns to the office alone, where she then rents a room (#239).
At approximately 6:49 p.m., Loretta leaves the office.

At approximately 6:50 p.m., Loretta returns to the office, to get the room key, within seconds she leaves the office.

This concludes the synopsis of camera #2.

CAMERA/ANGLE - 3: Video #19290204:

This camera angle is from the outside (exterior) area of the Inn. The camera is located above the office (north side) at the second floor level. The camera is looking from the south to the north, covering the exterior area of the parking lot and the second floor landing area.

At approximately 6:41 p.m., the Dodge Van (in question) then drives north into the Inn parking lot and parks, just north of the office. The Jeep (in question) is seen following the Dodge Van into the parking lot area. The Jeep then stops and parks on the north side of the Dodge Van.

Charlene is then seen exiting the right front area of the Dodge Van. Loretta then appears to exit the right front area of the Jeep.

Loretta and Charlene then walk south to the Inn/office.

At approximately 6:42 p.m., Loretta and Charlene walk north and return to the vehicles-in question.

At approximately 6:44 p.m., Loretta walks south back to the office.

At approximately 6:49 p.m., Loretta walks back north to the vehicles in question. Loretta immediately turns around and walks back south to the office.

At approximately 6:51 p.m., Loretta returns to the vehicles in question.

The Jeep then drives to the north end area of the Inn/parking lot, and parks.

The Dodge Van then drives to the north end area of the Inn/parking lot, and parks.

Two-(2) people exit the Jeep and walk to the stairs and climb to the second floor. A third person walks from the Jeep to the driver's side area of the Dodge Van. The driver of the Dodge Van then exits the Van. There are now three-(3) people observed, standing around the Dodge Van. One-(1) person is then seen, climbing the stairs to the second floor of the Inn.

DNM 511

| NEW MEXICO SUPPLEMENTAL REPORT | OR. NO. | NICIDENT NO | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 9 | 13 |

Two-(2) more people come from the area of the Dodge Van, and climb the stairs to the second floor.

Possibly five-(5) people were in the two-(2) vehicles.

At approximately 7:05 p.m., the Dodge Van backs up out of its parking spot, and it turns around and then backs up into the parking space it had been parked in.

This concludes the synopsis of camera #3.

and

CAMERA/ANGLE - 4: Video #19291101:

This camera angle is from the outside (exterior) area of the Inn/office, looking from the east to the west, covering the area north of the office's north door - entrance/exit.

At approximately 6:40 p.m., the Dodge Van drives north into the Inn parking lot, with the Jeep right behind the Van.

At approximately 6:41 p.m., Loretta and Charlene enter the office by use of the north office doorway. Within seconds, they (Loretta and Charlene) both exit the office, by the north door, walking back to the north.

At approximately 6:44 p.m., Loretta (by herself) re-enters the office, by use of the north door.

At approximately 6:49 p.m., Loretta leaves the office, by use of the north door, walking north.

At approximately 6:50 p.m., Loretta again re-enters the office, by use of the north door.

At approximately 6:51 p.m., Loretta leave the office, by use of the north door, again walking north.

This concludes the synopsis of camera #4.

At approximately 2:37 p.m., Agent Vaughan and I concluded our time at the "Downtown Imperial Inn."

At the State Police Office, in Albuquerque, New Mexico I then downloaded the four-(4) obtained videos, #19290202, #19290203, #19290204 and 19291101, to a DVD-R. I labeled this evidence item #INV.
At approximately 3:51 p.m., I placed the DVD-R, evidence item #INV, into the evidence vault at the State Police Office, in Albuquerque, New Mexico. (See Attachment.)

This concludes case activity for this date.

TUESDAY, NOVEMBER 27, 2012:

| NEW MEXICO SUPPLEMENTAL REPORT | OR ORI # NMNSP2113 | INCIDENT # 2012-18903 | PRIMARY N | PAGE 10 | PAGES 13 |
|---|---|---|---|---|---|

Agent Jeff Smith (NMSP/IB/Albuquerque) advised me that "Spider" is indeed Phillip J. Chavira, date of birth: ████████ .

This concludes case activity for this date.

WEDNESDAY, NOVEMBER 28, 2012:

At approximately 10:09 a.m., at the State Police Office, in Albuquerque, New Mexico another case briefing was held. Agent Rich Williamson (NMSP/IB/Albuquerque) the Case Agent and Sergeant Isaac Valerio (NMSP/IB/Albuquerque) the Case Supervisor conducted the briefing. The briefing gave case status updates and further case assignments.

Agent Vaughan and I were to continue our attempt to locate and interview "Spider," Phillip J. Chavira, date of birth: ████████ , in connection to this investigation.

Additionally, Agent Vaughan was to obtain an Arrest Warrant for - Loretta Apodaca for - Harboring or Aiding a Felon 30-22-4 (A fourth degree felony) and we were to interview her, if possible, in connection to this investigation. Refer to Agent Vaughan's supplemental report for details as to his obtaining of the Arrest Warrant for Loretta Apodaca.

This concluded case activity for this date.

THURSDAY, NOVEMBER 29. 2012:

At approximately 12:37 p.m., Agent Vaughan, Officer Otis Rodriquez (NMSP/UD/Albuquerque) and I arrived at ████████████ , in Belen, Valencia County, New Mexico. I later learned from Ms. Montoya, while at this location that ████████████████ no longer exists. ████ is now ████████████████████ .

We then went to ████████████ , as we were looking for Loretta Apodaca, date of birth: ████████ , who reportedly lived at this location. Agent Vaughan had in his possession an Arrest Warrant, for Ms. Apodaca's arrest.

Upon arrival, I heard Mr. Gilbert A. Montoya, who lives at ████████████████ , tell Agent Vaughan that he (Mr. Montoya) had not seen Phillip (Phillip J. Chavira) in about three-(3) weeks.

At approximately 12:41 p.m., Loretta Apodaca was located inside of the residence by Agent Vaughan. Refer to Agent Vaughan's supplemental report for details concerning how he located Ms. Apodaca. Additionally refer to Agent Vaughan's supplemental report as to his interview with Ms. Apodaca.

At approximately 12:45 p.m., and upon a request from Agent Vaughan I interviewed Mr. Gilbert Montoya and his daughter, Ms. Beatrice Montoya, in the driveway area out in front of their residence, in connection to this investigation. Note: The Montoya's live immediately west of ████████████ , at ████████████████ . The interview was audio and video recorded. This is a synopsis of that interview.

INTERVIEW: GILBERT A. MONTOYA & BEATRICE E. MONTOYA

Mr. Montoya stated and Ms. Montoya concurred, that Joe Lawrence (Gallegos) and Andrew

DNM 513

| NEW MEXICO SUPPLEMENTAL REPORT | | ORI NO. NMNSP2113 | INCIDENT NO. 2012-18903 | PRIMARY N | PAGE 11 | PAGES 13 |
|---|---|---|---|---|---|---|

Gallegos are his grandsons, and they (Joe and Andrew) were at his residence all day on Sunday, November 11, 2012, from 6 a.m., to 11 p.m., as a Matanza was held for Phillip's (Chavira) birthday, which is - ███████.

Mr. Montoya then stated he did not want to get involved and he was just answering my questions.

Mr. Montoya also stated Phillip J. Chavira is his grandson, and Ms. Montoya's nephew.

Mr. Montoya then clarified that Joe Lawrence and Andrew Gallegos were his step-grandsons.

I was also told Joe Lawrence and Andrew Gallegos are first cousins to Phillip J. Chavira.

When asked, Mr. Montoya did not know where Phillip J. Chavira was, or how to get a hold of, make contact with, Phillip.

Mr. Montoya was curious about as to why we were here and what was going on. I advised Mr. Montoya we were conducting follow-up investigation into the incident (Homicide) in the Bosque.

When asked how he (Mr. Montoya) knew Loretta Apodaca, he stated that she is a friend of the family.

At approximately 12:54 p.m., I concluded my contact with the Montoya's.

At approximately 1:29 p.m., Agent Vaughan formally arrested Loretta Apodaca at ███████ ███████████, in Belen, Valencia County, New Mexico, without incident.

At approximately 1:37 p.m., Agent Vaughan, Officer Rodriquez and I completed our business at this location and departed the area.

At approximately 5:04 p.m., Agent Vaughan and I arrived at ████████████, ███████████ in Belen, Valencia County, New Mexico in connection to this investigation. At this location, we made contact with Ms. Janell P. Andrade, date of birth: ███████ and Mr. Rene Geisseler, date of birth: ███████, both residents at this location. Refer to Agent Vaughan's supplemental report for details concerning these contacts. Note: This contact was audio and video recorded, by me.

At approximately 5:21 p.m., we concluded our contact with Ms. Andrade and Mr. Geisseler.

This concluded case activity for this date.

WEDNESDAY, DECEMBER 5, 2012:

At approximately 10:10 a.m., I attended a case briefing at the State Police Office, in Albuquerque, New Mexico. Sergeant Isaac Valerio (NMSP/IB/Albuquerque) conducted the briefing.

Agent Vaughan and I were assigned to continue our search to locate and interview Phillip J. "Spider" Chavira, date of birth: ███████.

| NEW MEXICO SUPPLEMENTAL REPORT | ORI NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 12 | 13 |

What is Phillip's connection to Joe Lawrence and Andrew "Smiley" Gallegos?

Does Joe owe Phillip Money? The money issue is stated in a recent letter that Joe Lawrence reportedly wrote while in jail, in Socorro, New Mexico.

At approximately 11:10 a.m., the briefing concluded.

This concluded case activity for this date.

THURSDAY, DECEMBER 6, 2012:

At approximately 1:30 p.m., I placed evidence item #TEC AV (five-(5) audio/video recordings, from Thursday, November 29, 2012) into the evidence vault at the State Police Office, in Albuquerque, New Mexico. (See Attachment.)

This concluded case activity for this date.

THURSDAY, DECEMBER 20, 2012:

At approximately 12:57 p.m., Agent Vaughan and I located and interviewed Phillip J. "Spider" Chavira, date of birth: █████████, in connection to this investigation. Mr. Chavira met us at █████████████, in Belen, Valencia County, New Mexico. Refer to Agent Vaughan's supplemental report for complete details of this interview.

Note: I did not record this interview; Agent Vaughan recorded it.

At approximately 1:07 p.m., the interview concluded.

This concludes my involvement in this investigation at this time. Any further involvement will result in the filing of an additional supplemental report.

ATTACHMENTS:

1.    A copy of a NMSP evidence sheet, dated 11/15/2012.
2.    Copies of information and photos on Adrian A. Burns.
3.    Copies of information and photos on Joe Lawrence Gallegos.
4.    Copies of information and photos on Andrew R. Gallegos.
5.    Copies of Arrest Warrants for Joe Lawrence Gallegos and Andrew R. Gallegos.
6.    Copies of information and photos on Angela Gallegos.
7.    Copies of information, a photo, Bench Warrants and information on Charlene Y. Baldizan.
8.    Copies of New Mexico Vehicle Registration inquiries on ████████ and ████████ .
9.    A copy of the Imperial Inn registration receipt, in the name of Loretta Apodaca, dated November 17, 2012.
10. Copies of information and photos on Loretta Apodaca.
11. A copy of a NMSP evidence sheet, dated 11/21/2012.
12. A copy of a NMSP evidence sheet, dated 11/30/2012.

CASE STATUS: ACTIVE.

DNM 515

**NEW MEXICO SUPPLEMENTAL REPORT**

| | ORI NO<br>NMNSP2113 | INCIDENT NO<br>2012-18903 | PRIMARY<br>N | PAGE<br>13 | OF<br>13 |
|---|---|---|---|---|---|

| "I WILL PROSECUTE / TESTIFY SHOULD THE OFFENDER | Y | N | "I UNDERSTAND IT IS A CRIMINAL OFFENSE TO FILE A FALSE REPORT TO POLICE." | COMPLAINTANT / VICTIM CERTIFICATION SIGNATURE  X | DATE |
|---|---|---|---|---|---|

| REPORTING OFFICER<br>**T CHRISTIAN** | RANK<br>**SERGEANT** | I.D. NO<br>**100612** | **12/05/2012** |
|---|---|---|---|
| ASSISTING OFFICER | | | |
| APPROVING OFFICER<br>**WILLIAM T WEISLER** | **SGT** | **121964** | **12/27/2012** |
| DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | | | |

| PROCESSED BY | DATE | DATA ENTRY PERSON<br>**LQUINTANA** | **12/03/2012** |
|---|---|---|---|

| INCIDENT STATUS<br>**ACTIVE** | C.L.A.<br>**X** | C.L.E. | EXCEPTIONAL CLEARANCE CODE<br>**NOT APPLICABLE** | **12/05/2012** |
|---|---|---|---|---|

| AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC.)<br>**RICH WILLIAMSON IS THE CASE AGENT.** | CASES CLEARED BY THIS ARREST |
|---|---|
| | Case No.   Case No.   Case No.<br>**YES.** |

# NEW MEXICO STATE POLICE
# INVESTIGATIONS BUREAU
2501 CARLISLE BOULEVARD NE
ALBUQUERQUE, NEW MEXICO 87110

# IB CASE # 12-23-3-0376.
## NOVEMBER 12, 2012.

## SUPPLEMENTAL REPORT #7

# HOMICIDE

### ADRIAN BURNS
### VICTIM

# ATTACHMENTS.

## NEW MEXICO DEPARTMENT OF PUBLIC SAFETY
## SP-205   EVIDENCE ☒ PROPERTY ☐ CONTROL FORM

| Case Agent/Officer:<br>*Agent R. Williamson* | Page 1 of 2 | Evidence # | Case #, Incident # or NTC #<br>*12-23-3-0376* |
|---|---|---|---|

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED:    ADDRESS FOR RETURN OF PROPERTY:

☐ Crime Scene      **Adrian Burns**

☐ Owner ☐ Other    DOB: ▓▓▓▓▓▓

☐ Suspect        SOC:                                City:

☒ Victim ☐ Witness  Phone #:                State:    Zip:

| LOCATION ITEMS OBTAINED: (ex: suspect car)<br>**Allsups Coorperate Office, Clovis, NM** | COUNTY<br>**Curry** | SUSPECT NAME: (If different than above) |
|---|---|---|

| TYPE OF CASE: (example - burglary, homicide, battery etc.)<br>**Homicide** | VICTIM NAME: (If different than above) |
|---|---|

| Item No. | CASH | $100.00<br>x ___ | $50.00<br>x ___ | $20.00<br>x ___ | $10.00<br>x ___ | $5.00<br>x ___ | $2.00<br>x ___ | $1.00<br>x ___ | Item No. | ☐ Vehicle Seized |
|---|---|---|---|---|---|---|---|---|---|---|
| MONEY ☐ | COIN | $1.00<br>x ___ | $0.50<br>x ___ | $0.25<br>x ___ | $0.10<br>x ___ | $0.05<br>x ___ | $0.01<br>x ___ | Total<br>$ 0.00 | Plate:    Year:<br>VIN:<br>Desc: | |

| Drugs | Firearm | Item No. | Qty | DESCRIPTION OF ARTICLES<br>Property - Include model, serial number, identifying marks, condition, and value, if known<br>Drugs -- Include suspected drug, name, packaging description, and approximate weight |
|---|---|---|---|---|
| ☐ | ☐ | MB1 | 6 | CD-R containing video surveillance from Allsups Store #165, 2348 Hwy 47, Los Lunas, |
| ☐ | ☐ | | | NM (November 12th, 2012 1800 hrs to November 13th, 2012 0200 hrs). |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

*I certify that I have received and hold myself responsible for the articles listed above.*

| Date & Time Rec'd<br>11-15-12  0843 | Print Name:<br>Lt. Matt Broom | Signature: |
|---|---|---|

SP 205 FORM REV 4/9/2007

**STATE OF NEW MEXICO**

**IN THE MAGISTRATE COURT**                    **COUNTY OF SOCORRO**

**State of New Mexico**                          No. M-52 FR-2012-00231

         **VS.**

**Joe Lawrence Gallegos, Defendant**
**DOB:**
**SSN:**
**Height:507 Weight:220**
**ADDRESS:**
**# 4 Erin Court**
**Los Lunas, NM 87031**


**WARRANT FOR ARREST**

   **THE STATE OF NEW MEXICO**
   **TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:**

**BASED ON A FINDING OF PROBABLE CAUSE, YOU ARE HEREBY COMMANDED** to arrest the
above-named defendant and bring the defendant without unnecessary delay before me : to answer the charge of:

Count 1: Open Count of Murder. 30-2-1 1st Degree Felony
Count 2: Kidnapping. 30-4-1. 1st Degree Felony
Count 3: Tampering with Evidence. 30-22-5 3rd Degree Felony
Count 4: Conspiracy to Commit a Felony. 30-28-2 2nd Degree Felony
Count 5: Arson (more than $2,500.00) 30-17-05(A)(E) 3rd Degree Felony


Dated:  November 15, 2012

Bond to be set at first
  "appearance.                                  _____
                                                          Judge

**RETURN WHERE DEFENDANT IS FOUND**

   I arrested the above-named defendant on the 20th day of _November_, 20 _12_, and served a
copy of this warrant on the 20th day of _November_, 20 _12_.


                                                _____
                                                          Signature

                                                _____
                                                          Title

<u>Distribution Instructions</u>
2 copies - Return of Service      1 copy - Defendant

                              **U.S. v.  DELEON, ET AL.   3710** DNM 519
                                                Criminal Form 9-210

## STATE OF NEW MEXICO

**IN THE MAGISTRATE COURT**                    **COUNTY OF SOCORRO**

**State of New Mexico**                         No. _M 52-FR. 2012-0023_

          VS.

**Andrew Gallegos, Defendant**
**DOB:** ▮▮▮▮
**SSN:** ▮▮▮▮▮
**Height: 507 Weight: 150lbs**
**ADDRESS:**
**# 4 Erin Court**
**Los Lunas, NM 87031**

### WARRANT FOR ARREST

**THE STATE OF NEW MEXICO**
**TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:**

**BASED ON A FINDING OF PROBABLE CAUSE, YOU ARE HEREBY COMMANDED** to arrest the
above-named defendant and bring the defendant without unnecessary delay before me : to answer the charge of:

Count 1: Open Count of Murder. 30-2-1 1st Degree Felony
Count 2: Kidnapping. 30-4-1. 1st Degree Felony
Count 3: Tampering with Evidence. 30-22-5 3rd Degree Felony
Count 4: Conspiracy to Commit a Felony. 30-28-2 2nd Degree Felony
Count 5: Arson (more than $2,500.00) 30-17-05(A)(E) 3rd Degree Felony

Dated: _November 15, 2012_                    _____
_Bond to be set at first able_                              Judge
_appearance._

**RETURN WHERE DEFENDANT IS FOUND**

    I arrested the above-named defendant on the _20th_ day of _November_, 20 _12_, and served a
copy of this warrant on the _20th_ day of _November_, 20 _12_.

                                              _____
                                                    Signature
                                              _____
                                                      Title

                              -1-

**Report Printed: 20 November, 2012 18:22:23    Fay Woodward**

**Reply ID: 15178713  Date Received: 11/20/2012 18:22:16**

**Attachment(s): C525**

NLET.DQ.

--NLTA--

        NEW MEXICO DRIVERS LICENSE INQUIRY

NAM: GALLEGOS,ANGELA

ADR:

OLN:          SEX: F       DOB:

HGT: 505      WGT: 150      EYE: BRO

SOC:        DONOR: Y

DRIVER'S LICENSE DATA

----------------------

ISSUE DATE:  20120509      EXP: 20150526

STATUS:   VALID

LICENSE CLASS: D

RESTRICTIONS: NONE()

ENDORSEMENTS: NONE

ISSUE STATE: NM

***THIS INFORMATION IS PROVIDED FOR LAW ENFORCEMENT PURPOSES ONLY***

MRI: 51,193,790

Nov 20, 2012 6:24:54 PM

Printed By: NM022460226 from: 00NSP0501



U.S. v.  DELEON, ET AL.   3713 DNM 522



Report Printed: 20 November, 2012 18:22:30 i    'ay Woodward

Reply ID: 15178703   Date Received: 11/20/2012 18:21:15

Attachment(s): C525

\LTA.NM_VQ.

-NLTA--

Z..VR.NMOLN0000.NMNSP0000.*C525  .

.XT

NEW MEXICO DRIVERS LICENSE AND CITATIONS INQUIRY

NAME/BALDIZAN,CHARLENE Y

ADDRESS/█████████████████████

SEX/F. DOB/███████ HGT/411. WGT/130. EYE/BRO.

SOC██████████ OLN█████████

OLT/CLASS D .

ENDORSEMENTS:NONE

RSTR:NONE

STATUS:LICENSE IS VALID

DATE ISSUED:20100115. FIELD OFFICE:M10. DATE EXPIRES:20131207.

PREVIOUS LICENSE:UNAVAILABLE

ORGAN DONOR:YES.

* CITATION HISTORY FOR OLN/121515296

| CITATION-NUM | AGENCY | VIOL | VIO-DATE | COURT-DATE |
|---|---|---|---|---|
| 0010861151 | 248 | SB1 | 05/24/2012 | 08/01/2012 |
| 0010681369 | 248 | SB1 | 06/18/2011 | 08/24/2011 |
| 0010902997 | 289 | SB1 | 06/15/2000 | 10/03/2002 |

** ACTION HISTORY FOR OLN/121515296

| ACTION | REASON | BEGIN-DATE | ELIG-DATE | REINSTATED |
|---|---|---|---|---|
| SUS | XC4 | 10/24/2011 | 10/24/2111 | 07/12/2012 |
| SUS | XC4 | 10/24/2011 | 10/24/2111 | 07/12/2012 |
| SUS | XC4 | 07/29/2009 | 07/29/2109 | 01/06/2010 |
| SUS | XC3 | 05/18/2005 | 06/15/2105 | 06/05/2005 |
| SUS | XC4 | 08/23/2000 | 08/23/2100 | 03/21/2003 |
| SUS | XC3 | 08/23/2000 | 08/23/2100 | 03/21/2003 |
| SUS | XC3 | 08/17/2000 | 08/17/2100 | 03/21/2003 |

** END OF CITATIONS AND ACTIONS FOR THIS DRIVER **

** NO MORE RECORDS - END RESPONSE

MRI: 51,193,529

Report Printed: 20-November-2012 05:44 ... Username: Chavez
Reply ID: 15179476   Date Received: 11/20/20   23:51:41

**Attachment(s): NM**

NLET.DQ.
--NLTA--

NEW MEXICO DRIVERS LICENSE INQUIRY

NAM: BALDIZAN,CHARLENE Y
ADR: ███████████████████████
DLN: ████████     SEX: F        DOB: ████████
HGT: 411        WGT: 130       EYE: BRO
SOC: ████████    DONOR: Y
IDENTIFICATION CARD DATA
------------------------

ISSUE DATE:   20110209          EXP: 20151130
STATUS:     VALID
LICENSE CLASS: ID
RESTRICTIONS: NONE()
ENDORSEMENTS: NONE
ISSUE STATE:  NM
DRIVER'S LICENSE DATA
--------------------

ISSUE DATE:   20100115          EXP: 20131207
STATUS:    INVALID
LICENSE CLASS: D
RESTRICTIONS: NONE()
ENDORSEMENTS: NONE
ISSUE STATE:  NM
***THIS INFORMATION IS PROVIDED FOR LAW ENFORCEMENT PURPOSES ONLY***
ARI: 51,248,682

DNM 525

Report Printed: 20 November, 2012 18:22:33 :   Jay Woodward
Reply ID: 15178704  Date Received: 11/20/2012 18:21:15
Attachment(s): NONE
NCIC.QWA.


--NCIC Response--


'**MESSAGE KEY QWA SEARCHES ALL NCIC PERSONS FILES WITHOUT LIMITATIONS.
MKE/WANTED PERSON
EXL/D - NO EXTRADITION
ORI/NM0320100 NAM/BALDIZAN,CHARLENE SEX/F RAC/U
DOB▮▮▮▮▮▮  HGT/411 WGT/160 EYE/BR0 HAI/XXX
SOC▮▮▮▮▮
OLN▮▮▮▮▮▮  OLS/NM OLY/2015
OFF/TRAFFIC OFFENSE
DOW/20121016 OCA/20120003536
WNO/20120003536
MIS/SUBJECT HAS 2 WXTS 1ST 20120003536 EXTR WITHIN 100 MILE RADIUS B0ND AM0UNT
MIS/129 CASH 0NLY WXT FAILURE T0 PAY FINES 0R C0STS 0/C UNLAWFUL USE 0F LICENSE
MIS/FTA 2ND WXT 20120004423 EXTR WITHIN 100 MILE RADIUS B0ND AM0UNT 159 CASH
MIS/0NLY WXT FAILURE T0 PAY FINES 0R C0STS 0/C MANDAT0RY USE 0F SEAT BELTS
DNA/N
ADD/01 - RESIDENCE (LAST KNOWN) DDA/20121016
▮▮▮▮▮▮▮▮
CTY/L0S LUNAS STA/NM ZIP/87031
C0U/VALENCIA
0RI IS BELEN PD 505 864-6288
AKA/BALDIZAN,CHARLENE Y
NIC/W306072101 DTE/20121024 1413 EDT DLU/20121024 1417 EDT
IMMED CONFIRM WARRANT AND EXTRADITION WITH ORI


--NM Hot Files Response--


NMNSP0514
QUERY NAM/XYZXYZ,ZYXZYX.SOC/585474057.IND/N.RSH/N.ENS/N.
NEW MEXICO HOT FILES RESPONSE
'** NMLETS WANTED PERSON ***
MKE/WANTED PERSON
D - NO EXTRADITION OUT OF STATE
NAM/BALDIZAN,CHARLENE SEX/F RAC/U DOB/19811107
HGT/411 WGT/160 EYE/BRO HAI/XXX SOC/585474057 OLN/121515296 OLS/NM OLY/2015
OFF/TRAFFIC OFFENSE
DOW/20121016 OCA/20120003536
WNO/20120003536 NOA/N
MIS/SUBJECT HAS 2 WXTS 1ST 20120003536 EXTR WITHIN 100 MILE RADIUS BOND
AMOUNT 129 CASH ONLY WXT FAILURE TO PAY FINES OR COSTS O/C UNLAWFUL
USE OF LICENSE FTA 2ND WXT 20120004423 EXTR WITHIN 100 MILE RADIUS
BOND AMOUNT 159 CASH ONLY WXT FAILURE TO PAY FINES OR COSTS O/C
MANDATORY USE OF SEAT BELTS
NA/N ADD/01 RESIDENCE (LAST KNOWN) DDA/20121016
NU/06 SNA/MERLINDA CT
CTY/LOS LUNAS STA/NM ZIP/87031
COU/VALENCIA
RI/NM0320100 ORI IS/BELEN PD
KA/BALDIZAN,CHARLENE Y
IC/W306072101 DTE/20121024 DLU/20121024

--CJIS Response--

** NEW MEXICO CONCEALED WEAPONS PERMITS QUERY RESPONSE: **
NO RECORDS FOUND

** NEW MEXICO CORRECTIONS DEPARTMENT (NMCD) QUERY RESPONSE: **
NO RECORDS FOUND

MRI: 51,193,531

Nov 20, 2012 6:25:34 PM

Printed By: NM022460226 from: 00NSP0501



**U.S. v.  DELEON, ET AL.   3719** DNM 528

5053523586                                          11:05:11 p.m.   11-20-2012      1/2

# State Of New Mexico
## City of Belen
## Municipal Court

24 OCT '12 @ 11:06

CITY OF BELEN

Issued: 10/16/2012

VS.

Case No. 2012-0003536

CHARLENE BALDIZAN
                Defendant.

Charlene Baldizan                                   Warrant No.

██████████

Los Lunas, NM 87031

Aliases:
DOB: ██████ Height: 411      Sex: F   SSN: ██████      Weight: 160   DLN: NM ██████      Vehicle Make:
Chevy      Vehicle State/Plate: ██████

Bond   $129.00      [ X ] Cash Only          [ ] Surety

BPD Officer Michael Esquibel

## BENCH WARRANT

THE MUNICIPALITY OF BELEN
TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT·

YOU ARE HEREBY COMMANDED to arrest the above-named defendant and bring (him) (her) forthwith before this Court
to answer the following charges listed below unless released as indicated in the Return:

Unlawful Use Of License   Failure To Appear - Court
Failure to Pay fines or costs previously imposed.
Contempt of Court

    [ ]   The defendant failed to appear either on a traffic citation (other than a citation issued for a violation listed
    in Sections 66-8-122 or 66-8-125 NMSA 1978) or a game and fish citation and may be released on a plea of guilty
    and payment of $_____;

OR

    [ X ]   The defendant failed to pay fines and costs and defendant may be released upon payment of the
    outstanding fine and court costs in the amount of $_____129.00_____;

OR

    [ ]   The defendant may be released on bond in the amount of $_____

_____10/16/12_____                          _____
          Date                                              Judge

                    RETURN
The defendant was arrested and taken into custody on the _____ day of _____, _____

[ ]   The defendant was released on bond in the amount set forth above;
[ ]   The defendant was released upon receipt of the fine and court costs set forth above.

                                        _____
                                              Signature

                                        _____
                                              Title

WILL EXTRADITE WITHIN
100 MILE RADIUS

5053523586

11:00:09 p.m.    11-20-2012    1/1

24 OCT '12 ⋅ 11:06

## State Of New Mexico
## City of Belen
## Municipal Court

CITY OF BELEN

VS.

Issued: 10/16/2012

Case No. 2012-0004423

CHARLENE BALDIZAN
            Defendant.

Warrant No.

Charlene Baldizan
▮▮▮▮▮▮

Los Lunas, NM 87031

Aliases:
DOB: ▮▮▮▮  Height: 411    Sex: F   SSN. ▮▮▮▮▮    Weight: 160   DLN: NM ▮▮▮▮    Vehicle Make: Ford    Vehicle State/Plate: ▮▮▮▮

Bond   $159.00      [ X ]  Cash Only           [  ]  Surety

BPD Officer Benjamin Estrada

## BENCH WARRANT

THE MUNICIPALITY OF BELEN
TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:

YOU ARE HEREBY COMMANDED to arrest the above-named defendant and bring (him) (her) forthwith before this Court to answer the following charges listed below unless released as indicated in the Return:

**Mandatory Use Seat Belts**
Failure to Pay fines or costs previously imposed.
Contempt of Court

[  ]   The defendant failed to appear either on a traffic citation (other than a citation issued for a violation listed in Sections 66-8-122 or 66-8-125 NMSA 1978) or a game and fish citation and may be released on a plea of guilty and payment of $_____ ;

OR

[ X ]   The defendant failed to pay fines and costs and defendant may be released upon payment of the outstanding fine and court costs in the amount of $_____159.00_____ ;

OR

[  ]   The defendant may be released on bond in the amount of $_____

10/16/12
_____                    _____
        Date                                      Judge

### RETURN

The defendant was arrested and taken into custody on the _____ day of _____, _____

[  ]   The defendant was released on bond in the amount set forth above:
[  ]   The defendant was released upon receipt of the fine and court costs set forth above

_____
        Signature

_____
        Title

WILL EXTRADITE WITHIN
100 MILE RADIUS

DNM 530

Report Printed: 06 December, 2012 16:11:30 for Carmen Leyba
Reply ID: 15220518  Date Received: 12/6/2012 16:06:01
Attachment(s): C525
NLET.RQ.
--NLTA RESPONSE--
ZZ..RR.26DPS9900.*C525   .
NEW MEXICO VEHICLE REGISTRATION
LIC: ██████, EXPIRE DATE/12-2012   , LIT/TK.
GALLEGOS JOE
04 ERIN CT, LOS LUNAS, NM 87031
DOB ██████
VIN ██████ VCO/WHT. VYR/1996. VMA/DODG. VMO/. VST/CG.
VEHICLE REGISTERED IN/VALENCIA(#14)
TITLE/122443S13816794. TITLE DATE/8/31/2012. STATUS/TITLE IS ACTIVE
INSURANCE/FARMERS.  POLICY NO/189314295. ISSUED/2010-09-13.
INSURANCE EFFECTIVE/1901-01-01. EXPIRES/1901-01-01. CANCELLED/1901-01-01.
LIEN/NEW MEXICO TITLE LOANS  .
    2270 SUN RANCH VILLAGE LOOP SW, LOS LUNAS, NM 87031.
    FROM/2012-07-23. UNTIL/2017-07-23.
MRI: 54,986,587

Report Printed: 06 December, 2012 16:11:38 for Carmen Leyba
Reply ID: 15220514   Date Received: 12/6/2012 16:05:46
Attachment(s): C525
NLET.RQ.
--NLTA RESPONSE--
ZZ..RR.26DPS9900.*C525   .
NEW MEXICO VEHICLE REGISTRATION
LIC:            , EXPIRE DATE/06-2013   . LIT/PC.
GOMEZ ALFREDO OR GALLEGOS ANGELA

DOB
VIN                         . VCO/BLK. VYR/2000. VMA/JEEP. VMO/. VST/4W.
VEHICLE REGISTERED IN/VALENCIA(#14)
TITLE/12192414A184756. TITLE DATE/7/10/2012. STATUS/TITLE IS ACTIVE
INSURANCE/SAFEWAY INS CO. POLICY NO/1037558-NM-PP-001. ISSUED/2012-06-29.
INSURANCE EFFECTIVE/1901-01-01. EXPIRES/1901-01-01. CANCELLED/1901-01-01.
LIEN/BELEN CONSUMER FINANCE   .
   PO BOX 603, BELEN, NM 87002.
   FROM/2012-07-10. UNTIL/2015-06-29.
MRI: 54,986,526

| ROOM NUMBER | DATE | BALANCE FORWARD | ROOM RENT | ROOM TAX | PHONE | OTHER | PAYMENTS CASH | C. CARD ADV. DEP. | ENDING BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| 29 | 1/17 - 11/24 | | 75.00 | | | | $175.00 | | 0 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PAY LAST AMOUNT SHOWN IN THIS COLUMN ↗

## IMPERIAL INN

701 CENTRAL AVE., N.E.
ALBUQUERQUE, NM 87102
(505) 247-4081

ALL RENTALS MUST PAY IN ADVANCE. MANAGEMENT
RESERVES THE RIGHT TO TERMINATE SERVICE AT ANY TIME.
NOTICE TO GUESTS
THE PROPRIETORS OF THIS MOTEL ARE NOT RESPONSIBLE OR
LIABLE FOR ANY LOSS OR BURGLARY, OR ANY INJURY TO
ANY PERSONAL PROPERTY OR VALUABLES, OR ANY
ACCIDENT OR INJURY TO GUESTS.
-NO VISITORS. NO REFUNDS-
WE RESERVE THE RIGHT TO REFUSE SERVICE TO ANYONE.

GUEST SIGNATURE

NAME (PRINT)   Loretta Apodaca

COMPANY   ▮▮▮▮▮▮▮▮▮▮▮

ADDRESS

CITY   Belen   STATE   NM   ZIP   87002

LICENSE NUMBER   MAKE OF CAR   STATE

METHOD OF PAYMENT   CASH MSTR.CHG.   AM EXP DINERS   VISA OTHER

D.L. #   ▮▮▮▮▮▮▮   DOB   ▮▮▮▮▮▮

S.S. #

ROOM   239
RATE $   175
NO. GUESTS   1
ARRIVE   4/75
TIME   6:40
KEY DEPOSIT $

U.S. v.  DELEON, ET AL.   3724   DNM 533

Report Printed: 20 November, 2012 18:23:45    Fay Woodward

Reply ID: 15178721   Date Received: 11/20/2012 18:23:41

Attachment(s): C525

NLET.DQ.

--NLTA--

NEW MEXICO DRIVERS LICENSE INQUIRY

NAM: APODACA,LORETTA

ADR: █████████

DLN: ████    SEX: F    DOB █████

HGT: 503    WGT: 140    EYE: BRO

SOC: █████    DONOR: N

IDENTIFICATION CARD DATA

--------------------

ISSUE DATE:   20120803    EXP: 20160831

STATUS:    VALID

LICENSE CLASS: ID

RESTRICTIONS: NONE()

ENDORSEMENTS: NONE

ISSUE STATE:  NM

DRIVER'S LICENSE DATA

--------------------

ISSUE DATE:   20091112    EXP: 20130926

STATUS:    INVALID

LICENSE CLASS: D

RESTRICTIONS: NONE()

ENDORSEMENTS: NONE

ISSUE STATE:  NM

***THIS INFORMATION IS PROVIDED FOR LAW ENFORCEMENT PURPOSES ONLY***

MRI: 51,194,145

Nov 20, 2012 6:24:23 PM

Printed By: NM022460226 from: 00NSP0501



U.S. v.  DELEON, ET AL.   3726 DNM 535



## NEW MEXICO DEPARTMENT OF PUBLIC SAFETY
## SP-205   EVIDENCE ☒ PROPERTY ☐ CONTROL FORM

| Case Agent/Officer: **Rich Williamson** | Page 1 of 1 | Evidence # | Case #, Incident # or NTC # **12-23-3-0376** |
|---|---|---|---|

|  | NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED: | ADDRESS FOR RETURN OF PROPERTY: |
|---|---|---|
| ☐ Crime Scene | **Related Evidence** | N/A |
| ☐ Owner ☒ Other | DOB: | |
| ☐ Suspect | SOC: | City: |
| ☒ Victim ☐ Witness | Phone #: | State:   Zip: |

| LOCATION ITEMS OBTAINED: (ex: suspect car) **Albuquerque, NM.** | COUNTY **Bernalillo** | SUSPECT NAME: (If different than above) **Joe & Andrew Gallegos** |
|---|---|---|
| TYPE OF CASE: (example - burglary, homicide, battery etc.) **Homicide** | | VICTIM NAME: (If different than above) **Adrian Burns** |

| Item No. | CASH | $100.00 x ___ | $50.00 x ___ | $20.00 x ___ | $10.00 x ___ | $5.00 x ___ | $2.00 x ___ | $1.00 x ___ | Item No. | ☐ Vehicle Seized |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Plate: | Year: |
| MONEY ☐ | COIN | $1.00 x ___ | $0.50 x ___ | $0.25 x ___ | $0.10 x ___ | $0.05 x ___ | $0.01 x ___ | **Total** $ 0.00 | VIN: | |
| | | | | | | | | | Desc: | |

| Drugs ☐ | Firearm ☐ | Item No. | Qty | DESCRIPTION OF ARTICLES — Property - Include model, serial number, identifying marks, condition, and value, if known / Drugs -- Include suspected drug, name, packaging description, and approximate weight |
|---|---|---|---|---|
| ☐ | ☐ | | | |
| ☐ | ☐ | INV | 1 | A DVD-R containing four-(4) videos of different angles at the Imperial Inn located at |
| ☐ | ☐ | | | 701 Central Ave NE in Albuquerque, New Mexico 87102. |
| ☐ | ☐ | | | * All of the four-(4) videos were recorded on Saturday, November 17, 2012. |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | TEC/tec. |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

*I certify that I have received and hold myself responsible for the articles listed above.*

| Date & Time Rec'd 11/21/2012   3:46 PM | Print Name: Tom Christian | Signature: |
|---|---|---|

SP 205 FORM REV 4/9/2007

# NEW MEXICO DEPARTMENT OF PUBLIC SAFETY
## SP-205   EVIDENCE ☒ PROPERTY ☐ CONTROL FORM

| Case Agent/Officer: **Rich Williamson** | Page 1 of 1 | Evidence # | Case #, Incident # or NTC # **12-23-3-0376** |
|---|---|---|---|

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED:   ADDRESS FOR RETURN OF PROPERTY:

☐ Crime Scene — **Related Evidence**   N/A

☐ Owner ☒ Other   DOB:

☐ Suspect   SOC:   City:

☒ Victim ☐ Witness   Phone #:   State:   Zip:.

| LOCATION ITEMS OBTAINED: (ex: suspect car) **Valencia County, NM.** | COUNTY **Valencia** | SUSPECT NAME: (If different than above) **Joe & Andrew Gallegos** |
|---|---|---|

| TYPE OF CASE: (example - burglary, homicide, battery etc.) **Homicide** | VICTIM NAME: (If different than above) **Adrian Burns** |
|---|---|

| Item No. | CASH | $100.00 x ___ | $50.00 x ___ | $20.00 x ___ | $10.00 x ___ | $5.00 x ___ | $2.00 x ___ | $1.00 x ___ | Item No. | ☐ Vehicle Seized Plate: | Year: |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MONEY ☐ | COIN | $1.00 x ___ | $0.50 x ___ | $0.25 x ___ | $0.10 x ___ | $0.05 x ___ | $0.01 x ___ | Total $ 0.00 | VIN: Desc: | | |

| Drugs ☐ | Firearm ☐ | Item No. | Qty | DESCRIPTION OF ARTICLES — Property – Include model, serial number, identifying marks, condition, and value, if known. Drugs – Include suspected drug, name, packaging description, and approximate weight |
|---|---|---|---|---|
| ☐ | ☐ | | | |
| ☐ | ☐ | TEC AV | 1 | A DVD-R containing five-(5) audio/videos of interviews and contacts in Valencia County |
| ☐ | ☐ | | | NM, in connection to this investigation. These recordings were made on Thursday, |
| ☐ | ☐ | | | November 30, 2012. |
| ☐ | ☐ | | | 29 (TEC) - 12/28/12. |
| ☐ | ☐ | | | TEC/tec. |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

*I certify that I have received and hold myself responsible for the articles listed above.*

| Date & Time Rec'd 11/30/2012   9:00 PM | Print Name: Tom Christian | Signature: T.E. Christian |
|---|---|---|

SP 205 FORM REV 4/9/2007

# DEPARTMENT OF PUBLIC SAFETY COVER SHEET

| I N C I D E N T | OFFENSE: | HOMICIDE TAMPERING WITH EVIDENCE | | | INCIDENT NO.: | 2012-18903 |
|---|---|---|---|---|---|---|
| | | | | | CASE NO.: | 12-23-3-0376 |
| | DATE OF OFFENSE: | | November 12, 2012 | | TIME: | 07:00 |
| | LOCATION OF OFFENSE: | Address Type: BUSINESS ADDRESS Street Address: 701 CENTRAL AVE City: ALBUQUERQUE  State: NM  Zip: 87102 County: BERNALILLO  Country: UNITED STATES Address Type: OTHER  Road Type: OTHER (PRIVATE ROAD, ETC.) Street Address: DITCH BANK ROAD City: BERNARDO  State: NM County: SOCORRO  Country: UNITED STATES Intersection: DITCH ROAD AND US 60 MP 168 Descriptive Info: DITCH BANK ROAD ADJACENT TO DRAINAGE DITCH 2 TENTHS OF A MILE SOUTH OF US 60. | | | COUNTY: | Bernalillo Roosevelt Socorro Valencia |

| PERSON CODE | NAME | DOB | SSN# | ADDRESS | TELEPHONE |
|---|---|---|---|---|---|
| WITNESS | CHAVEZ, LINDA | | | | |
| WITNESS | SUTTON, MICHAEL A | | | | |
| INTERVIEWED | GALLEGOS, TINA | | | | |
| INTERVIEWED | NEVAREZ, VICTOR | | | | |
| INTERVIEWED | ORTIZ, ROBERT | | | | |
| INTERVIEWED | PEARSON, ROBERT | | | | |
| INTERVIEWED | PEARSON, SARAH L | | | | |
| INTERVIEWED | MONTOYA, GILBERT A | | | | |
| INTERVIEWED | MONTOYA, BEATRICE E | | | | |
| INTERVIEWED | DEANDA, HORACIO | | | | |
| INTERVIEWED | FERREYRA, ROBERT | | | | |

| | | County: VALENCIA   Country: UNITED STATES |
|---|---|---|
| INTERVIEWED | HALL, STEPHEN | |
| INTERVIEWED | HARDYMAN, LAUREL | |
| INTERVIEWED | WRIGHT, OLIVIA | |
| INTERVIEWED | WRIGHT, DARREL R | |
| INTERVIEWED | BRIDGMAN, KYLE D | |
| VICTIM | BURNS, ADRIAN A | |
| ARRESTED | GALLEGOS, JOE L | |
| ARRESTED | GALLEGOS, ANDREW | |
| INTERVIEWED | GONZALEZ, CESAR O | |
| INTERVIEWED | ORTEGA, JOSE | |
| INTERVIEWED | SUTTON, AMBER K | |
| INTERVIEWED | BURNS, MAXINE | |
| INTERVIEWED | ORNDORFF, DANIEL R | |
| INTERVIEWED | COLLINS, CHRISTIN S | |
| INTERVIEWED | VALLEJOS, LEROY | |
| ARRESTED | BALDIZAN, CHARLENE Y | |
| INTERVIEWED | GALLEGOS, ANGELA | |

| ARRESTED | APODACA, LORETTA | |
| INTERVIEWED | GEISSELER, RENE | |
| INTERVIEWED | ANDRADE, JANELL P | |
| INTERVIEWED | ROMERO, WILLIE | |
| INTERVIEWED | ANAYA, GEORGE | |

| A T T A C H M E N T S | supplemental report #8 by R.Mathews |
|---|---|
| | 1. sketch of the bosque fire scene |
| | 2. sketch of residence in los chavez |
| | 3. evidence form for los chavez residence |
| | 4. evidence form for Imperial Inn and suspects' vehicles |
| | 5. motel room sketch |
| | |
| | |
| | |
| | |
| | |

| A D M I N | REPORTING OFFICER: | **AGENT RICHARD MATHEWS** | CASE STATUS: | **ACTIVE** |
|---|---|---|---|---|
| | COPIES TO: | records<br>7th Judicial DA's Office | | |

DNM 541



**Attachments**

**AV1: COPY OF SEARCH WARRANT FOR # 4 ERIN CT LOS LUNAS, NEW MEXICO, COPY OF ARREST WARRANTS FOR JOE GALLEGOS AND ANDREW GALLEGOS.**

**Case  # 12-23-3-0376**

**Agent Alvino Vigil**
**New Mexico State Police**
**Investigations Bureau**
**Santa Fe**

GOVERNMENT'S EXHIBIT 2

U.S. v.  DELEON, ET AL.    3753 DNM 542

STATE OF NEW MEXICO                    COUNTY OF SOCORRO

IN THE SEVENTH DISTRICT COURT

## SEARCH WARRANT

THE STATE OF NEW MEXICO, TO ANY OFFICER AUTHORIZED

TO EXECUTE THIS WARRANT ON THE PREMISES OF:

Residence located at #4 Erin Court Los Lunas, NM 87031
2001 white Chevy flatbed pickup bearing NM registration plate ███
2000 white Chevy pickup bearing NM registration plate ███

Proof by Affidavit for Search Warrant having been submitted to me, I am satisfied that the person named/described and/or property (evidence) described in the Affidavit are located where alleged in the Affidavit, and I find that grounds exist for the issuance of the Search Warrant. A copy of the Affidavit is attached and made a part of this Search Warrant.

YOU ARE HEREBY COMMANDED TO SEARCH FORTHWITH the person and/or place described in the Affidavit, commencing between the hours of 6:00 a.m. and 10:00 p.m. [ I have specifically authorized a nighttime search as stated below], and continuing thereafter until completed, for the person and/or property (evidence) described in the Affidavit, serving this Warrant together with a copy of the Affidavit, and making the search, and if the person and/or property (evidence) be found there, to seize the person and/or property(evidence) and hold for safekeeping until further Order of the Court.

Executing Officer(s) are directed to prepare a written inventory of any person or property or evidence seized. You are further directed to file the Return and written inventory with the Clerk of this Court promptly after execution of this Search Warrant.

DATED THIS   15th   DAY OF November, 2012 at   6:35   P.M.

_____
JUDGE

## AUTHORIZATION FOR NIGHTTIME SEARCH

I further find that reasonable cause has been shown for nighttime execution of this Warrant. I authorize execution of this Search Warrant at any time of the day or night for the following reasons: Joe Lawrence Gallegos and Andrew Gallegos have demonstrated a willingness to destroy evidence as shown by the burning of the vehicle and body of the victim. Also, they both have numerous felony charges on their criminal history. The charges range from murder, conspiracy to commit murder, aggravated assault, burglary, felon in possession of firearm, trafficking narcotics and assault on a peace officer. Agents have surveillance on the residence and observed Joe Lawrence Gallegos currently at #4 Erin Court Los Lunas, NM. A SWAT Team is currently available and on standby to assist in executing the warrant. Furthermore, the residence is in a semi rural area accessed by a dead end road from which the approach of police vehicles during the day would be easily spotted.

_____
JUDGE

U.S. v.  DELEON, ET AL.   3754 DNM 543

| Case Agent/Officer: WILLIAMSON | | Page 1 of 1<br>If no report is taken attach a<br>legible copy of NTC to form | | Evidence # | Case #, Incident # or NTC #<br>12-23-3-0376 |
|---|---|---|---|---|---|

## NEW MEXICO DEPARTMENT OF PUBLIC SAFETY
## RECEIPT FOR PROPERTY ☐ OR EVIDENCE ☑

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED:   ADDRESS FOR RETURN OF PROPERTY:

☐ Crime Scene

☐ Owner ☐ Other   DOB: _____   #4 ERIN COURT

☑ Suspect   SOC: _____   City: LOS LUNAS

☐ Victim ☐ Witness   Phone #: _____   State: NM Zip: _____

| LOCATION ITEMS OBTAINED: (ex: suspect car) | COUNTY | SUSPECT NAME: (If different than above) |
|---|---|---|
| SUSPECT'S RESIDENCE | VALENCIA | JOE GALLEGOS |

| TYPE OF CASE: (example - burglary, homicide, battery etc.) | VICTIM NAME: (If different than above) |
|---|---|
| HOMICIDE | ADRIAN BURNES |

| Item No. | CASH | $100.00 | $50.00 | $20.00 | $10.00 | $5.00 | $2.00 | $1.00 | Item No. | ☐ Vehicle Seized |
|---|---|---|---|---|---|---|---|---|---|---|
| | | x ___ | x ___ | x ___ | x ___ | x ___ | x ___ | x ___ | Plate: | |
| MONEY ☐ | COIN | $1.00 | $0.50 | $0.25 | $0.10 | $0.05 | $0.01 | Total | VIN: | Year: |
| | | x ___ | x ___ | x ___ | x ___ | x ___ | x ___ | $ 0.00 | Desc: | |

| Drugs ☐ | Firearm ☐ | Item No. | Quantity | DESCRIPTION OF ARTICLES<br>Property - Include model, serial number, identifying marks, condition, and value if known<br>Drugs -- Put suspected drug, packaging description & approximate weight |
|---|---|---|---|---|
| ☐ | ☐ | R-1 | — | BOX OF CARTRIDGES : CASINGS — DIFFERENT CALIBERS x |
| ☑ | ☐ | R-2 | — | GLASS BOTTLE OF SUSPECTED DRUGS (INDIVIDUAL PACKAGES) x |
| ☐ | ☐ | R3 | 1 | CELL PHONE x |
| ☐ | ☐ | R-4 | 1 | PNM DOCUMENT TO JOE GALLEGOS x |
| ☐ | ☐ | R-5 | 1 | CELL PHONE |
| ☐ | ☐ | R-6 | 1 | VEHICLE REGISTRATION x |
| ☐ | ☐ | R-7 | 1 | CHARRED JACKET x |
| ☑ | ☐ | R-8 | 2 | METHADONE BOTTLE : SPOON w/ RESIDUE x |
| ☐ | ☐ | R-9 | 1 | GUN CLEANING KIT x |
| ☐ | ☐ | R-10 | 3 | ID CARDS x |
| ☐ | ☐ | R-11 | 1 | HOLSTER x |
| ☐ | ☐ | R-15 | 1 | GAS CAN FROM WHI PICKUP (NM: 229 RLC) x |
| ☐ | ☐ | R-16 | 2 | HANDCUFFS : CASE FROM WHITE PICKUP (NM: 229 RLC) x |
| ☐ | ☐ | R-17 | 1 | GAS CAN FROM WHI PICKUP (NM: KYE 291) x |
| ☐ | ☐ | WP-3 | 1 | ARCHIVE PHOTO CD x |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

I certify that I have received and hold myself responsible for the articles listed above.

| Date & Time Rec'd<br>11/15/12 | Print Name:<br>MATHEWS | Signature: |
|---|---|---|

SP 205 FORM REV 4/9/2007

Case Agent/Officer: WILLIAMSON

CASE #: 12-23-3-0376

| CHAIN OF CUSTODY | | | | |
|---|---|---|---|---|
| ITEM NO. | DATE/TIME | RELINQUISHED BY | RECEIVED BY | PURPOSE OF CHANGE OF CUSTODY |
| R-1, R2, R3, R4 R5, R6, R7, R8 R9, R10, R11 R15, R16, R17 WP-3 | 11/16/12 0430 | TYPED OR PRINTED NAME MATHEWS SIGNATURE | TYPED OR PRINTED NAME LOCKER SIGNATURE Robert Miller | TO STORAGE |
| ALL | 11-16-12 1420 | TYPED OR PRINTED NAME Robert Miller SIGNATURE Robert Miller | TYPED OR PRINTED NAME TIM JOHNSON SIGNATURE | TRANSFER TO I.B. |
| R-3 R-5 | 11/19/12 1215 | TYPED OR PRINTED NAME TIM JOHNSON SIGNATURE | TYPED OR PRINTED NAME JAMES MOWRCIK SIGNATURE | TRANSFER TO MOWRCIK TO EXECUTE S/W ON 2 PHONES |
| ALL EXCEPT R-3 / R-5 | 11/19/12 1215 | TYPED OR PRINTED NAME LOCKER/ VAULT SIGNATURE | TYPED OR PRINTED NAME TIM JOHNSON SIGNATURE | TRANSFER TO HQ VAULT |
| All except R-3/R-5 | 11/19/12 2:20 | TYPED OR PRINTED NAME TIM JOHNSON SIGNATURE | TYPED OR PRINTED NAME Janelle Card SIGNATURE Janelle Card | HQ Vault |
| | | TYPED OR PRINTED NAME SIGNATURE | TYPED OR PRINTED NAME SIGNATURE | |
| | | TYPED OR PRINTED NAME SIGNATURE | TYPED OR PRINTED NAME SIGNATURE | |
| | | TYPED OR PRINTED NAME SIGNATURE | TYPED OR PRINTED NAME SIGNATURE | |
| | | TYPED OR PRINTED NAME SIGNATURE | TYPED OR PRINTED NAME SIGNATURE | |
| | | TYPED OR PRINTED NAME SIGNATURE | TYPED OR PRINTED NAME SIGNATURE | |

| Final Disposition of Evidence | ☐ Destroyed ☐ Abandoned for auction | ☐ Released to owner ☐ Other | Signature & Date |
|---|---|---|---|
| Explanation of disposition: | | | |

U.S. v. DELEON, ET AL.   3756

DNM 545

STATE OF NEW MEXICO
COUNTY OF SOCORRO
SEVENTH JUDICIAL DISTRICT

STATE OF NEW MEXICO

VS.

Residence located at #4 Erin Court Los Lunas, NM 87031
2001 white Chevy flatbed pickup bearing NM registration plate ███
2000 white Chevy pickup bearing NM registration plate ███

IN THE MATTER OF THE ISSUING A SEARCH WARRANT ON THE 15th DAY OF
November, 2012.

AFFIDAVIT FOR SEARCH WARRANT

Affiant, being duly sworn, upon his oath, states and I have reason to believe that on the
following described premises, vehicle(s) and/or person(s) of:

1. The premises, its curtilage, all dwelling(s), structure(s), whether attached and/or unattached,
trash container(s) well house(s) and/or located at # 4 Erin Court Los Lunas, New Mexico.
The premises appears to consist of a brown single wide mobile home with satellite dish on
the south-west corner of the roof. The roof also has several vehicle tires spread out on the
roof top. The front door of the residence faces west and is tan in color. On the Northwest
side of the mobile home there is an attached corrugated metal shed. The fence across the
front of the property is made of wood poles and tires. The north end of the property has a
fence made of white poles and wire mesh fence. In the northeast corner of property has a
white motorhome parked outside. In front of the front door of the residence is a partially
stripped white box van. The residence has a black mailbox with a red flag marked with the
number 4 at the entrance to the residence.

2. Any and all vehicle(s) located at above-described premises, to be searched.

3. Any and all person(s) located at the above-described premises, to be searched.

In the city or county designated above there is now being concealed:

1. Latent and/or visible print(s), including but not limited to fingerprint(s) and footwear
impression(s).

2. Fingerprint, palm print and/or footprint standards sufficient for laboratory examination from
any person(s) located at the herein-described premises and/or vehicle(s), to be searched.

3. Oral swab standard(s) and Major Case Prints from Joe Lawrence Gallegos and Andrew
Gallegos, sufficient for laboratory examination.

4. Photos of the unclothed body of Joe Lawrence Gallegos and Andrew Gallegos, sufficient to
document any injuries that he/she sustained during the incident, as well as the identification
of other evidence that may have been deposited on his/her person during, or as a result of, the
incident.

5. Clothing from the Joe Lawrence Gallegos and Andrew Gallegos, including but not limited to
footwear.

6. Bodily fluid(s), bodily tissue(s) and/or bodily organ(s) including but not limited to saliva,
semen, blood, bone fragments, skin, hair and/or any item(s) that may have said item(s) upon
and/or within them.

7. Firearm(s), firearm components, firearm accessories, firearm cleaning materials, firearm

cases, firearm owner manuals and/or any other items used to facilitate the possession, use, maintenance and/or transfer of the said item(s). Document(s) that establish or tend to establish ownership, possession, use, transfer and/or the right to ownership, possession, use and/or transfer of the herein-described item(s), to be seized.

8. Ammunition, whether fired or unfired, projectile(s), fragment(s) of projectile(s), ammunition casing(s) whether fired or unfired and/or any other component(s) of ammunition. Document(s) that establish or tend to establish ownership, possession, use, transfer and/or the right to ownership, possession, use and/or transfer of the, herein-described item(s), to be seized.

9. Any weapon(s), tool(s) and/or instrument(s) capable of causing force trauma to the human body. Document(s) that establish or tend to establish ownership, possession, use, transfer and/or the right to ownership, possession, use and/or transfer of the herein-described item(s), to be seized.

10. Any item(s) capable of causing suffocation and/or strangulation and/or injury to the human body. Document(s) that establish or tend to establish ownership, possession, use, transfer and/or the right to ownership, possession, use and/or transfer of the herein-described item(s), to be seized.

11. Residue(s) apparently deposited by the discharge of firearm(s) and/or any explosion(s) and/or any item(s) and/or material(s) that may have said item(s) and/or material(s) on and/or within them.

12. Any item(s) apparently used to restrain and/or control a person. Any item(s) apparently used to facilitate the restraint and/or control of a person.

13. Trace evidence, including but not limited to hair and/or fiber(s) and/or any item(s) and/or material(s) that may have said item(s) on and/or within them.

14. Paint(s), dye(s), primer(s), coating(s), bonding material(s), adhesive(s) and/or any other finishing material(s) and/or any item(s) and/or material(s) that may have said item(s) and/or material(s) on and/or within them.

15. Lubricant(s), oil(s), grease(s), coolant(s) and/or other fluid(s) and/or material(s) used to operate and/or facilitate the operation and/or maintenance of motor vehicle(s).

16. Vegetation and/or soil.

17. Ignitable, flammable, explosive and/or combustible substance(s), whether solid, liquid and/or gas and/or any container(s) and/or material(s) that may contain said substance(s) and/or have said substance(s) on them.

18. Any devise(s) apparently used to ignite, boost, accelerate, fuel, sustain and/or facilitate a fire and/or explosion.

19. Any vehicle(s) and/or component(s) of vehicle(s) apparently used to sell, purchase, contain, transport and/or transfer any devise(s) apparently used to ignite, boost, accelerate, fuel, sustain and/or facilitate a fire and/or explosion.

20. Any record documented on any media which appears to provide documentation, planning, instruction, advice, facilitation and/or otherwise support for the manufacturing, producing, testing, packaging, storing, concealing, sale, transfer, ignition and/or detonation of incendiary and/or explosive devise(s).

21. Any document(s) which have what appears to be the personal identifying information of Adrian Burns on it and/or any version of Adrian Burns name and/or personal identifying information.

22. Driver's license(s) and/or any other forms of identification, whether legitimate or apparently fraudulent, whole and/or in part, complete and/or incomplete, in any state of the manufacturing process. Item(s) used to manufacture and/or facilitate the manufacturing of driver's license(s) and/or any and all other forms of identification.

23. Telephones, pagers, cellular telephones, radio transmitter/receivers, telephonic answering, paging and/or messaging machine(s). Data stored on/within the internal and/or external memory of the herein-described items, to be searched, including, but not limited to text messages, voice messages and/or any other data. This warrant shall authorize the complete

DNM 547

search of the herein-described items, to be searched. It may be necessary to view, listen to and/or manipulate the herein-described items, to be searched, in order to copy, transcribe, transfer and/or otherwise document the data. This warrant shall authorize law enforcement and/or people assisting law enforcement to answer any incoming telephone call(s) which are received on the herein-described items, to be searched, and converse on said items, while executing this warrant and/or after taking possession of the herein-described items, to be searched.

24. Illegal narcotics and/or any other controlled substance(s) and/or suspected illegal narcotics and/or any other suspected controlled substance(s) including, but not limited to any drug or substance listed in Schedules I through V of the Controlled Substance Act or regulations adopted thereto.
25. Illegal narcotics paraphernalia, including but not limited to all equipment, products and/or materials of any kind that are apparently used, intended for use and/or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling and/or otherwise introducing into the human body, a controlled substance or controlled substance analog in violation of the Controlled Substance Act.
26. Currency and/or containers and/or packages containing and/or packaging currency.
27. Documentation of the herein-described premises, vehicle(s), person(s) and/or the herein-described item(s), to be seized, by means of measurement, photography, videography and/or any other means deemed necessary by law enforcement and/or person(s) assisting law enforcement.
28. A complete mechanical inspection of the herein-described vehicle(s), to be searched.
29. Any collision and/or crash data devise(s) including but not limited to data stored on/within the internal and/or external memory of the devise(s).
30. Camera(s), video camera(s), film, whether exposed and/or unexposed, photographic negative(s), photograph(s), photographic print(s), video tape(s), DVD(s) and/or any other image(s) documented on any media, photography and/or videography equipment, photography and/or videography accessories and/or devises apparently used to facilitate photography and/or videography.
31. Item(s) which establish or tend to establish possession, use, residence, occupancy, presence and/or the right to possession, use, residence, occupancy and/or presence at the above described premises and/or vehicle(s), to be searched.
32. Any record documented on any media, which establishes and/or tends to establish the state of mind, motive(s), action(s), means and/or intention(s) of any person(s) with knowledge or apparent knowledge of the crime(s), including, but not limited to diaries, journal(s) audio and/or video tape(s).

and the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

Affiant, Alvino Vigil, is a full time salaried law enforcement officer who has been employed by the New Mexico State Police for a period of approximately ten years. Affiant has received specialized training in criminal investigations through the New Mexico Law Enforcement Academy and the New Mexico State Police Academy. Affiant has received training in the investigation of violent crimes, property crimes as well as crimes involving controlled substances. Affiant has received both classroom and on the job training concerning the investigation of the above offense(s). Affiant has conducted numerous criminal investigations that led to the arrest and conviction of persons in violation of New Mexico State Statutes.

On Monday, November 12, 2012, at approximately 9:00PM Veguita Fire Department responded to a vehicle fire in the area of State Road 304 and US 60, approximately ¾ of a mile south of US 60 along the Rio Grande. While extinguishing the fire, the fire department personnel saw that there was what appeared to be a human body on the ground within feet of the vehicle. The human body also appeared to have been burned and had been handcuffed behind the back. At approximately 9:29PM Socorro County Sheriff's Department was notified and confirmed these observations. The body was described as possibly male wearing blue jeans, a black undershirt, a black hoodie and a gold chain. New Mexico State Police Investigations Bureau was notified at 10:15PM to handle the investigation.

New Mexico State Police arrived on scene at approximately 11:30 p.m. on November 12, 2012. New Mexico State Police Crime Scene Team conducted a brief walk-through of the scene. The scene consisted of a four-door sedan facing northwest with extensive damage due to burning. Lying approximately eight to ten feet south of the vehicle was a deceased human body. The human body was lying on its right side in a fetal position with the individual's hands bound in handcuffs behind the back. The body was also severely burned. The victim was wearing a dark hooded sweatshirt with the hood over the victim's head and face. Most of the clothing on the victim's legs was burnt but partial traces of the victim's socks and blue jeans were visible. Directly next to the victim's face was a plastic bag which appeared to be placed over the victim's head.

New Mexico State Police Criminal Agents received information that tentatively identified the victim as Adrian Burns based on clothing worn by Mr. Burns and a tattoo which matched what was found on the body at the scene. This information was obtained through interviews with friends and family of Mr. Burns, including the owner of the vehicle, who suspected the victim, might be Mr. Burns after hearing news reports the morning of November 13 of a body being found near a burned car. Out of personal concern for Mr Burns' welfare they contacted law enforcement. The clothing description was made by family/friend who last saw Mr Burns at approximately 7:00 p.m. on November 12 and it matched what was found on the deceased. Later investigation based on a VIN found on the vehicle confirmed the owner of the vehicle as the friend of Mr. Burns who had lent Mr. Burns the car on the evening prior. Through these interviews Criminal Agents obtained information that Mr. Burns left his residence on the night of November 12, 2012 at approximately 7:00 pm and was going to meet Mr. Joe Lawrence Gallegos and Mr. Andrew Gallegos, specifically, that Mr. Burns told one of his friends/family that he (Burns) was going to collect money that was owed to him and sell heroin to Andrew Gallegos. This was the last time any family or friends heard or saw Mr. Burns. This person also indicated having heard Mr. Burns receive phone call from Mr. Joe Lawrence Gallegos at approximately 6:52 p.m. Out of fear of retaliation the friends/family who provided information asked to remain anonymous.

Through the interviews noted above three individuals have been identified as Mr. Burns' main heroin buyers: Joe Lawrence Gallegos, Andrew Gallegos and Daniel Orndorff. These individuals are believed to use approximately $120.00 worth of heroin per day. Based on court records for numerous prior arrests and charges it was determined that all three individuals live in the same vicinity in the same neighborhood and that Andrew and Joe Lawrence Gallegos live at #4 Erin Court, Los Lunas, New Mexico..

The following phone records were obtained from Mr. Burns' phone for Monday November 12, 2012, confirming the statements of the friend/family of Mr. Burns:

1.  4:41 p.m. - phone registered to Andrew Gallegos contacts Mr. Burns.

2.  4:50 p.m. – phone registered to Andrew Gallegos contacts Mr. Burns.
3.  6:52 p.m. – phone registered to Joe Gallegos contacts Mr. Burns.
4.  7:33 p.m. – Mr. Burns calls Joe Gallegos.

Information was also received through interviews noted above that between 11:30 p.m. to 12:30 a.m. Joe Gallegos was observed with Andrew Gallegos at 2348 State Highway 47, Belen, NM. 87002 a local Allsup's convenience store, specifically, that a friend/family of Mr Burns who is familiar with Joe and Andrew Gallegos and who has previously been present when Adrian Burns sold heroin personally saw the Gallegos brothers parked at pump number two pumping fuel into a white flatbed single cab pickup with some black tool boxes and a red gasoline container in the rear bed; after fueling the vehicle it was moved to the front of the store; Joe Gallegos entered the store and purchased beer; Joe Gallegos was also observed outside the store selling heroin; and the heroin that was being sold was described as heroin that was packaged in the same manner that Mr. Burns would package his heroin when he would sell it.

On November 14, 2012 an autopsy was conducted on the victim. The victim was identified as Adrian Burns, date of birth: ███████ Results from the autopsy also revealed along with sustaining extensive burns throughout his body, Mr. Burns sustained a gunshot wound to the head which caused his death. The Office of the Medical Investigator determined the cause of death was Homicide.

Documentation of the herein-described premises, vehicle(s) and/or person(s) is important to the investigation. It is important to document the condition and/or location of items found at the scene and/or their context within the scene.

Affiant is aware through training and experience that before, during and/or after the commission crime(s) there is often transfer of evidence between suspect(s), victim(s), witness(es) and/or their environment. This evidence may not be visible to the naked eye. The evidence, if it exists, may assist in determining the identity of any person who may have been present at the time of the incident.

Affiant is aware through training and experience that people involved in the commission of crime(s) often attempt to conceal, tamper with and/or dispose of evidence, including but not limited to the herein-described item(s), to be seized. They may attempt to give aid or assistance to victim(s) after an act of violence. The materials used to render aid may assist investigators in identifying people with knowledge of the crime(s).

Affiant is also aware that suspect(s), victim(s) and/or witness(es) may document information relating to the crime(s) on paper, on computers and/or on other forms of media. They often make and/or receive telephone calls before, during and/or after the commission crime(s). Such information, if it exists, may be material and relevant to this investigation. This warrant shall include the viewing, listening to, copying, transcribing, transferring and/or recording of data on the herein-described item(s), to be seized.

Affiant is aware through training and experience that people who have apparent knowledge of the incident often make telephone calls to the scene and/or attempt to communicate with each other during the time that law enforcement personnel are executing the search warrant. These people often utilize a variety of communications equipment, including, but not limited to pagers and/or cellular telephones to communicate before, during and after the incident. Answering incoming telephone calls while at the scene and speaking with these people often provides law enforcement with information that is material and relevant to this investigation. It is often necessary to answer communications devices including, but not limited to cellular telephones after seizing the devices, pursuant to the warrant.

Affiant is also aware that item(s) which establish or tend to establish possession, use, residence, presence and/or occupancy of the herein-described premises and/or vehicle(s), to be searched, often demonstrate who had access to the premises and/or vehicle(s). Such information may be material and relevant to this investigation.

Therefore, in order to ensure that a complete and thorough investigation, investigators may be required to examine the entire, above-mentioned premises, vehicle(s) and/or person(s), including, but not limited to, the examination of furniture, walls, crawl-spaces and/or attics. It may be necessary for investigators to remove and/or damage entire portions of the premises and/or vehicle(s) including but not limited to doors, windows, carpets, upholstery, clothing, mechanical equipment, plumbing and/or other items.

Therefore, Affiant respectfully requests that the Court issue a Warrant commanding the search the above-described premises, vehicle(s) and/or person(s).

Subscribed and sworn to before me in
Socorro County, New Mexico on this
15th day of November, 2012

District    Judge, Notary or other officer
authorized to administer oaths.

Alvino Vigil
Agent, NM State Police

Approved as to legal sufficiency:

Assistant District Attorney

Note: This affidavit shall be filed in the same file as the search warrant. If no criminal proceedings are filed, the affidavit and warrant shall be filed in a miscellaneous file.

Appellate Case: 20-2058   Document: 010110415663   Date Filed: 09/29/2020   Page: 914



U.S. v.   **DELEON, ET AL.**   **3763**   DNM 552

# NEW MEXICO SUPPLEMENTAL REPORT

| | ORI NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 1 | 8 |

| | | | |
|---|---|---|---|
| ORIGINAL OFFENSE DATE | 11/12/2012 | SUPPLEMENTAL DATE 12/07/2012 | CASE NUMBER **12-23-3-0376** |

| ORIGINAL OFFENSE REPORTED | 1 – HOMICIDE |
|---|---|
| | 2 – TAMPERING WITH EVIDENCE |

| ORIGINAL VICTIM'S NAME | |
|---|---|
| ORIGINAL VICTIM (BUSINESS) | |
| LOCATION OF OCCURRENCE | |

| M.O. EVENT CODES : (AGENCY OPTIONAL USE) | TOTAL VALUE STOLEN | TOTAL VALUE REC. |
|---|---|---|
| IB CASE # 12-23-3-0376; SUPPLEMENTAL REPORT #8 BY R.MATHEWS | | |

| SYNOPSIS |
|---|
| This report documents my involvement in a homicide investigation that began south of Bernardo. |

GOVERNMENT'S EXHIBIT 3

U.S. v. DELEON, ET AL. 3733

DNM 553

| NEW MEXICO SUPPLEMENTAL REPORT | ORI # NMNSP2113 | INCIDENT # 2012-18903 | PRIMARY N | PAGE 2 | OF 8 |
|---|---|---|---|---|---|

NARRATIVE

ASSIGNMENT AND BRIEFING

On November 12, 2012, at approximately 2250 hours, Sergeant Shayne Arthur (NMSP CST, Albuquerque) assigned me to assist with the scene investigation of a reported homicide, in the Bosque, south of US 60, milepost 167, east of Bernardo. Agent Warren Pershall (NMSP CST) was the Crime Scene Manager for this case. The NMSP Case Agent was Agent Richard Williamson. The NMSP Case Supervisor was Isaac Valerio.

I noted that the scene was approximately three tenths of a mile to the south of US 60, mile 167. I attended a briefing conducted by Sergeant Valerio when I arrived. I learned that two Socorro County Deputies responded to a single vehicle fire in the Bosque, along the west side of the Rio Grande River. The vehicle was a 4-door mid-size vehicle that was completely burned and the decedent, who was also burned, was lying on the ground behind the car, with his hands handcuffed behind his back. The volunteer fire department responded to the scene and extinguished the fire with the use of water as well as with shovels and dirt.

DIAGRAM OF SCENE

I used yellow evidence cones (numbers 60-80) to illustrate the approximate perimeter of the burned area. These numbers did not have any evidentiary value. They were only used to illustrate the extent of the fire scene.

Agent Pershall assigned me to diagram the scene with the Leica C10 laser scanner. The Leica C10 ScanStation laser scanner is a high definition survey device (HDS). The laser transmits a beam of light and determines distance using the time of flight for the light beam. Each time the laser is fired, the point on the object it comes into contact with is given an X, Y, Z coordinate. As these points are plotted in reference to the scanner location, a cloud of points, referred to as a "point cloud" is created. These points clouds can be stitched together using reference points from each separate scanner location. This process is called registration. I saved the scan data and the registration in the IB Scanner Hard Drive under the IB case number.

I also obtained raw measurements of the burned area around the vehicle. I noted that the burned area extended approximately 20 feet to the north of the car, 27 feet to the east of the car, 21 feet to the west of the car, and approximately 35 feet south from the car to the roadway.

I also created a two-dimensional sketch of the fire scene. Refer to Attachment 1 for this sketch. For any measurements, refer to the scan data from the Leica C10 Scanner.

SEARCH OF THE BOSQUE ACCESS ROAD

Agent Pershall assigned me to assist other members of the Investigations Bureau with a systematic search of the north/south access road from US 60 to the east/west road that led to the vehicle location. The road to fire scene was the third east-west road that extended into the Bosque from the north-south access road. The fire scene was approximately 575 feet east of the north-south access road

Other agents conducted a systematic search along the east-west road between the vehicle and the north-south access road, and to the east of the vehicle toward the river.

| NEW MEXICO SUPPLEMENTAL REPORT | OR CD | INCIDENT NO | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 3 | 8 |

I conducted the line search along the north-south access road with IB Agents Isaac Valerio, Elizabeth Whitfield, Jim Mowduk, and Wes Cox.  We searched north from the third east-west Bosque road to US 60; looking on both sides of the road for any items that appeared to have been recently deposited along the road.  We noted a number of items that appeared to have been weathered (such as aluminum cans with faded paint and dirt inside), which appeared to have been in the area for longer than a day.

We located a Dr. Pepper can on the embankment at the west side of the north-south road, which was labeled Y-8. This can appeared to have been recently deposited on the ditch bank. Agent Pershall documented and collected this item.  The can was approximately 360 feet to the north of the intersection of the third east/west road and the north-south access road.  The can was approximately seven feet to the west of the roadway.  The location of Y-8 was approximately 155 feet to the south of the second east-west Bosque road.

IB Agents Jim Mowduk, Alvino Vigil, Wes Cox, and I also searched for approximately one-quarter of a mile to the south of the third east-west Bosque road.  We did not find any additional items of evidence.

SEARCH OF FIRE SCENE-Metal Detector

I used a metal detector to search for evidence around and under the body location, after it was removed. I also used a metal detector to search the area the between the body location and the car.

I only located a charred zipper in the area under the body, which State Fire Investigator William Farmer collected as part of his soil sample from the location under the body.

FOLLOW UP SEARCH OF FIRE SCENE

On November 14, 2012, Agent Pershall learned that the decedent sustained a gunshot wound to the head.  Agent Pershall and I returned to the location of the fire to expand our search with the use of metal detectors, in an attempt to find casings or other evidence that might have been left behind.

We searched the entire burn area around the body, and I searched the location under where the back end of the car had been located.  We did not find any casings or additional evidence.


SEARCH WARRANT AT SUSPECTS' RESIDENCE

On November 15, 2012, at approximately 1430 hours, Sergeant Shayne Arthur (NMSP CST) assigned me to assist with the execution of a search warrant at number 4 Erin Court, in Los Chavez.  This residence was the residence of the homicide suspects, Joe and Andrew Gallegos. The NMSP IB Agents requested the assistance of the CST with the search for evidence at the property.

Lieutenant Tim Johnson (NMSP IB) requested that the NMSP Tact Team secure the residence prior to the residence being searched. Because I was assigned to assist with the search of the residence for the Crime Scene Team, Sergeant Chris Ware (NMSP Tact Team) assigned

DNM 555

| NEW MEXICO SUPPLEMENTAL REPORT | ORI NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 4 | 8 |

me to assist with planning the Tact Team Mission.

At about 1630 hours, Team Leader Hugo Munoz and I began the planning the mission, and Assistant Team Leader Shane Todd also subsequently assisted with the mission planning. We conducted a scout of the residence noting the location of the front door as well as the surrounding properties. Officer Munoz and Officer Todd documented their involvement, as well as the specifics of the mission planning according to Tact Team procedures (Mission: TM-12-93). Their reports will be listed under the Tact Team mission number.

We executed the warrant at approximately 2045 hours, by performing a surround and callout of the residence. Officer Joe Chavez and I were assigned to cover the northwest corner of the property and residence, which included the front door, while other members attempted to make contact with the occupants inside.

Officers issued commands to the occupants of the residence with the use of the loud speaker in the marked NMSP Armored Vehicle (Bearcat), which was parked at the southwest corner of the residence. A female came out and advised that she was the only one in the residence.

I maintained security on the exterior side of the residence while the entry team entered and secured the residence. No one was found inside the residence. After the Tact Team secured the residence, the NMSP IB Agents began the search of the property.

Agent Pershall was the manager for this scene and he assigned me to assist with the systematic search. I focused on the back yard and the out buildings that were in the yard on the east side of the residence. I also escorted Valencia County Animal Control officers as they removed the more aggressive dogs and the puppies from the property. I did not find any items of evidence in the out buildings on the east side of the property.

I also assisted with the search of the white pickup truck that was parked on the street in front of the property (NM Plate: ███████). Agent Steve Montano found that this truck was locked and he was not able to find the keys. Agent Montano attempted to enter the truck by banging on the driver's window. I advised Agent Montano that I had a window punch. I stepped up to the passenger's window and deployed my window punch as he continued to bang on the driver's window. Shortly before my window punch broke the passenger window of the pickup truck, Agent Montano broke the driver's side window, causing both windows in the pickup truck to be broken. I listed the items that we documented in the truck in the evidence section below.

Agent Pershall assigned me to create a sketch of the scene, so that we could document where the Agents found items of evidence during the systematic search. Refer to Attachment 2 for the sketch of the property.

Agent Pershall assigned me to be the Evidence Manager; and I collected and packaged the evidence. Not all of the items of evidence were collected; some of the items were documented with photography and then left at the scene. Refer to the evidence section below for the list of items that we identified during this search. Refer to Attachment 3 for the Evidence form that listed the items that we collected.

EVIDENCE: #4 Erin Court

| NEW MEXICO SUPPLEMENTAL REPORT | | | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 5 | 8 |

R-1 Cartridges and casings of various calibers in a diaper bag on the shelf of the closet in the north bedroom.

R-2 Bottle with suspected drugs on the coffee table in the living room.

R-3 Cell phone on the coffee table in the living room.

R-4 PNM notice of intent to disconnect services, addressed to Joe Gallegos, on the coffee table in the living room.

R-5 Cell phone on the floor in the living room, next to the coffee table

R-6 Vehicle registration to a 2004 Mazda, in the name of Joe Gallegos.

R-7 Charred camouflage jacket on the floor of the living room, between the front door and the living room couch.

R-8 Spoon with suspected drug residue and Methadone bottle, located on a shelf in a cabinet in the living room.

R-9 Gun cleaning kit in the headboard of the bed in the south bedroom.

R-10 Three New Mexico IDs in a dresser drawer in the south bedroom.

R-11 Holster on the dresser in the south bedroom.

R-12 Gas can outside the front of the residence (west side of residence).  This item was photographed, but not collected.  The searchers found cobwebs and dirt inside the gas can and no smell of gasoline.

R-13 Gas can outside the front of the residence.  This item was photographed only; it was dry inside and weathered.  There was a large hole in the side of the gas can preventing it from holding any gas.

R-14 Gas can outside the front of the residence.  This can was photographed only.  It was weathered and dusty.

R-15 Gas can on the bed of the white flatbed pickup truck (New Mexico Plate: ████) that was parked on the property, next to the front of the residence

R-16 Handcuffs in a case in the driver's side door pocket of the white flatbed pickup truck on the property ████.

R-17 Gas can in the bed of the white pickup truck on the side of the street, in front of the property (New Mexico plate ████).

R-18 Citation for Andrew Gallegos, found inside the cab of the pickup truck ████. This item was photographed only.


End of Evidence at #4 Erin Court

SEARCH WARRANT: IMPERIAL MOTEL AND VEHICLES

DNM 557

| NEW MEXICO SUPPLEMENTAL REPORT | ORI # | INCIDENT # | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 6 | 8 |

On November 20, 2012, at approximately 1900 hours, Lieutenant Johnson requested the assistance of the Crime Scene Team with executing a search warrant at the Imperial Motel, located at 701 Central Boulevard NW, Room # 239, in Albuquerque. This warrant included the motel room, a black Jeep that was parked in the parking lot, and a van that had been seized by the NMSP and transported to the NMSP Office in Albuquerque. The van had been located on the street near the motel.

The US Marshalls located and arrested the suspects in room 239, at the Imperial Inn, which was located on Central Avenue, west of I-25.

I arrived at the scene at 0045 hours, and Agent Milligan assisted me with this phase of the investigation.

Agent Milligan handled the photography. I handled the evidence collection, and I created a sketch of the scene. Refer to Attachment 4 for the evidence forms that listed the items that we collected. Refer to Attachment 5 for the sketch of the motel room.

EVIDENCE: Room #239:

Agent Milligan and I handled the systematic search of the motel room. We noted the following items of evidence:

G-1 Cellphone on the bed.

G-2 Cellphone in a duffle bag on the floor.

G-3 Cellphone in a black plastic trash bag.

G-4 Letters in a duffle bag.

G-5 Loaded syringe and two rocks of suspected drugs, located on a cut Coke can, on the closet area shelf.

G-5a The cut open Coke can from the closet area shelf.

G-6 Suspected drugs on the bedside table.


EVIDENCE-Black Jeep (New Mexico plate ███████ )

Agent Milligan documented the Jeep with photography and completed the systematic search. I handled the evidence collection. The following is a list of items that we identified in the Jeep:

G-7 Two cellphones on the front driver's seat, batteries removed prior to our arrival.

G-8 Registration in the glove compartment - photographed only.

G-9 Letters in the purse, in the front passenger quadrant.

G-10 Two shirts that were in a bag on the seat of the rear passenger quadrant.

| NEW MEXICO SUPPLEMENTAL REPORT | OCR NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 7 | 8 |

Refer to Attachment 4 for the evidence form that listed the items that we seized.

We finished with the motel room and the Jeep at approximately 0300 hours. Agent Jeff Smith turned the vehicle and the motel room over to a relative.

SEARCH WARRANT-Dodge Van (NM Plate: ███ ):

At approximately 0315 hours, we executed the search warrant on the white 1996 Dodge van. This van was in the Mechanics' Bay at the State Police Office.

Agent Milligan handled the photography, we both did a systematic search, and I handled the evidence collection. Refer to Attachment 4 for the evidence form that listed the items that we collected.

The following is a list of the items that we documented in the van:

G-11 A charred jacket on the floor by the driver side captain's chair, in the middle seating area of the van.

G-12 Notes with hotel information on the center console, next to the driver's seat.

G-13 Blue sweat pants with a presumptive blood drop on the outside of the back of one leg. I tested this stain with a Hema-Stix presumptive blood test. This pair of plants was hanging next to the driver-side captain's chair in the middle seating area. It was on a hanger under a jacket and a jersey.

G-14 Dirty jeans in a pile of clothes on the floor in front of the bench seat in the rear seating area of the van. I found a stain on the outside front of the right pant leg, and two additional stains on the inside of the back left pant leg that tested positive for blood with the Hema-Stix presumptive test.

We finished the search at 0430 hours. I secured the van in the secured parking area of the State Police District Office.

I concluded my involvement in this case at this point. I will document any further involvement in this case in future supplemental reports, if necessary.

End of narrative.

## NEW MEXICO SUPPLEMENTAL REPORT

| ORI NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|
| NMNSP2113 | 2012-18903 | N | 8 | 8 |

| "I WILL PROSECUTE / TESTIFY SHOULD THE OFFENDER | Y | N | "I UNDERSTAND IT IS A CRIMINAL OFFENSE TO FILE A FALSE REPORT TO POLICE." | COMPLAINTANT / VICTIM CERTIFICATION SIGNATURE | X | DATE |
|---|---|---|---|---|---|---|

| REPORTING OFFICER | RANK | I.D. NO | |
|---|---|---|---|
| **RICHARD MATHEWS** | **AGENT** | **2783** | **12/07/2012** |

| ASSISTING OFFICER | | | |
|---|---|---|---|
| | | | |

| APPROVING OFFICER | | | |
|---|---|---|---|
| **SHAYNE ARTHRU** | **SERGEANT** | **2504** | **12/10/2012** |

| DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | | | |
|---|---|---|---|
| | | | |

| PROCESSED BY | DATE | DATA ENTRY PERSON | |
|---|---|---|---|
| | | **RMATHEWS** | **12/07/2012** |

| INCIDENT STATUS | C.L.A. | C.L.E. | EXCEPTIONAL CLEARANCE CODE | |
|---|---|---|---|---|
| **INACTIVE** | | | | **12/07/2012** |

| AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC.) | CASES CLEARED BY THIS ARREST | | |
|---|---|---|---|
| | Case No. | Case No. | Case No. |

## STATE OF NEW MEXICO

**IN THE MAGISTRATE COURT**                                      **COUNTY OF SOCORRO**

**State of New Mexico**                                No. _M-52 FR-2012-00231_

**VS.**

**Joe Lawrence Gallegos, Defendant**
**DOB:** ▮
**SSN:** ▮
**Height:507 Weight:220**
**ADDRESS:**
**# 4 Erin Court**
**Los Lunas, NM 87031**

### WARRANT FOR ARREST

**THE STATE OF NEW MEXICO**
**TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:**

**BASED ON A FINDING OF PROBABLE CAUSE, YOU ARE HEREBY COMMANDED** to arrest the above-named defendant and bring the defendant without unnecessary delay before me : to answer the charge of:

Count 1: Open Count of Murder. 30-2-1 1st Degree Felony
Count 2: Kidnapping. 30-4-1. 1st Degree Felony
Count 3: Tampering with Evidence. 30-22-5 3rd Degree Felony
Count 4: Conspiracy to Commit a Felony. 30-28-2 2nd Degree Felony
Count 5: Arson (more than $2,500.00) 30-17-05(A)(E) 3rd Degree Felony

Dated: _November 15, 2012_

_Bond to be set at first_
_appearance._

_____
                                                                Judge

**RETURN WHERE DEFENDANT IS FOUND**

I arrested the above-named defendant on the _20th_ day of _November_ , 20 _12_ , and served a copy of this warrant on the _20th_ day of _November_ , 20 _12_ .

_____
                                                                Signature

_____
                                                                Title

-1-

**STATE OF NEW MEXICO**

IN THE MAGISTRATE COURT                    **COUNTY OF SOCORRO**

State of New Mexico                        No. _M 52-FR-2012-0023_

          VS.

Andrew Gallegos, Defendant
**DOB:** ▮▮▮▮
**SSN:** ▮▮▮▮
**Height: 507 Weight: 150lbs**
**ADDRESS:**
**# 4 Erin Court**
**Los Lunas, NM 87031**

**WARRANT FOR ARREST**

THE STATE OF NEW MEXICO
TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:

**BASED ON A FINDING OF PROBABLE CAUSE, YOU ARE HEREBY COMMANDED** to arrest the
above-named defendant and bring the defendant without unnecessary delay before me : to answer the charge of:

Count 1: Open Count of Murder. 30-2-1 1st Degree Felony
Count 2: Kidnapping. 30-4-1. 1st Degree Felony
Count 3: Tampering with Evidence. 30-22-5 3rd Degree Felony
Count 4: Conspiracy to Commit a Felony. 30-28-2 2nd Degree Felony
Count 5: Arson (more than $2,500.00) 30-17-05(A)(E) 3rd Degree Felony

Dated: _November 15, 2012_                _[signature] Geo H. Kvell_
_Bond to be set at first able_                                  Judge
_appearance._

**RETURN WHERE DEFENDANT IS FOUND**

      I arrested the above-named defendant on the _20th_ day of _November_, 20_12_, and served a
copy of this warrant on the _20th_ day of _November_, 20_12_.

                              _[signature]_
                                                    Signature
                              _Agent_
                                                    Title

-1-

# NEW MEXICO SUPPLEMENTAL REPORT

| | | ORI NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|---|
| | | NMNSP2113 | 2012-18903 | N | 1 | 3 |

| | | | |
|---|---|---|---|
| ORIGINAL OFFENSE DATE | 11/12/2012 | SUPPLEMENTAL DATE | 11/27/2012 | CASE NUMBER | 12-23-3-0376 |

**ORIGINAL OFFENSE REPORTED**

1 - HOMICIDE

2 - TAMPERING WITH EVIDENCE

ORIGINAL VICTIM'S NAME

ORIGINAL VICTIM (BUSINESS)

LOCATION OF OCCURRENCE

M.O. EVENT CODES : (AGENCY OPTIONAL USE)

**I.B. CASE #12-23-3-0376; SUPPLEMENTAL REPORT #2 BY SERGEANT W. TROY WEISLER**

| TOTAL VALUE STOLEN | TOTAL VALUE REC. |
|---|---|

SYNOPSIS

The following information details my involvement in the investigation of a Homicide, which occurred in the area of Bosque, New Mexico. Refer to report narrative for details.

GOVERNMENT'S EXHIBIT 6

U.S. v.  DELEON, ET AL.   3390   DNM 563

| NEW MEXICO SUPPLEMENTAL REPORT | | ORI | CASE NUMBER | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|---|
| | | NMNSP2113 | 2012-18903 | N | 2 | 3 |

NARRATIVE

On Tuesday, November 20, 2012 at approximately 5:27 p.m., I was contacted by Lieutenant Tim Johnson, New Mexico State Police Investigations Bureau stationed in Albuquerque, New Mexico.  Lieutenant Johnson requested I go to the Imperial Inn, located at 701 Central Avenue NE in Albuquerque.  The two suspects in this homicide had been apprehended at the Imperial Inn.  I responded to the scene and arrived at approximately 6:00 p.m.

At that location I made contact with Lieutenant Johnson and Agent Nathan Lucero, New Mexico State Police Investigations Bureau stationed in Albuquerque.  Lieutenant Johnson advised me of investigative tasks, which needed to be completed.  At approximately 6:23 p.m. I contacted Agent Elizabeth Whitfield, New Mexico State Police Investigations Bureau and requested she come out to work on a search warrant for the suspects' motel room, Room 239, and two vehicles located at the Imperial Inn.

At approximately 6:41 p.m. I contacted Agent Jeffrey Smith, New Mexico State Police Investigations Bureau stationed in Albuquerque and requested he come out to assist with the investigations.  I stood by and secured Room 239 until Patrolman Shaun Wood, New Mexico State Police Uniform Bureau arrived to secure it, while a search warrant was being obtained.  Agent Jeffrey Smith later arrived on scene and relieved Patrolman Wood of his security duties.

Once Patrolman Wood arrived I continued to secure the two vehicles in the parking lot, which had been identified as being used by the suspects and their accomplices.  The vehicles were identified as a blue and white 1996 Dodge van, bearing New Mexico license plate [REDACTED] and a black 2000 Jeep Grand Cherokee, bearing New Mexico license plate [REDACTED].  Both vehicles were parked side by side on the east area of the Imperial Inn parking lot.  I maintained visual security on the vehicles.

During this time I assigned Agent Lucero to conduct a canvass of the patrons staying in the motel rooms near Room 239 where the suspects were located.  For details of the canvass refer to Agent Lucero's supplemental report.

At approximately 9:00 p.m. I sealed the vehicles with evidence tape and photographed them.  The driver's side door of the Jeep was not secured, because it was determined it would be searched on site; however, the van was to be transported to the State Police Office and secured. (See Attachment WTW-1 for a copy of the photographs).

At approximately 10:40 I was contacted by Agent Smith who advised there were possibly cell phones located in the black Jeep, which we would be seizing pursuant to a search warrant.  At that time I entered the Jeep to preserve cell phone evidence from being remotely tampered with or destroyed.  Due to my training and experience I knew it was possible to remotely erase cell phones.  I attempted to secure the smart phones and preserve their integrity in a manner consistent with my training.  I located two smart phones in the Jeep.  One was a Nokia, which I was unable to pull the battery out of, but it appeared there was no power to the phone.  The other phone was a black Motorola smart phone, which I removed the battery from after placing it in "Airplane" mode.  Both phones along with the removed battery were placed on the driver seat of the Jeep.

At approximately 11:15 p.m. Munos Wrecker arrived at the scene to take the van.  It was necessary for the tow truck driver, identified as Ronnie Huizar, to place a tire on the left rear of the vehicle in order to transport.  Sergeant Isaac Valerio, New Mexico State Police Investigations Bureau stationed in Albuquerque arrived on scene and escorted the tow truck and van back to the State Police Office in Albuquerque.

| NEW MEXICO SUPPLEMENTAL REPORT | | ORI NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|---|
| | | NMNSP2113 | 2012-18903 | N | 3 | 3 |

Once a search warrant was obtained by Agent Whitfield, Agents Lauren Milligan and Richard Mathews, New Mexico State Police Crime Scene Team stationed in Albuquerque arrived on scene to process Room 239 and the black Jeep.  Shortly after their arrival I left the scene and security on the black Jeep was maintained by Agent Smith.

On Wednesday, November 21, 2012 I transfered the photographs taken on my department issued digital camera onto a CD-R.  The original CD-R created will be considered evidence and placed in the evidence vault.

This concludes my involvement in this investigation.  Any further information will be documented on a supplemental report.

CASE STATUS: INACTIVE

| "I WILL PROSECUTE / TESTIFY SHOULD THE OFFENDER | Y N | "I UNDERSTAND IT IS A CRIMINAL OFFENSE TO FILE A FALSE REPORT TO POLICE." | COMPLAINTANT / VICTIM CERTIFICATION SIGNATURE    X | | DATE |
|---|---|---|---|---|---|
| REPORTING OFFICER **WILLIAM T WEISLER** | | RANK **SGT** | I.D. NO **121964** | | **11/27/2012** |
| ASSISTING OFFICER | | | | | |
| APPROVING OFFICER **ISAAC VALERIO** | | **SERGEANT** | **3747** | | **11/28/2012** |
| DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | | | | | |
| PROCESSED BY                   DATE | | | DATA ENTRY PERSON **WWEISLER** | | **11/27/2012** |
| INCIDENT STATUS **INACTIVE**   C.L.A.   C.L.E. | | | EXCEPTIONAL CLEARANCE CODE | | **11/27/2012** |
| AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC.) **RICHARD WILLIAMSON IS THE CASE AGENT** | | | CASES CLEARED BY THIS ARREST | | |

CASES CLEARED BY THIS ARREST
Case No.        Case No.        Case No.

U.S. v.  DELEON, ET AL.   3392   DNM 565

[5-211, 6-208, 7-208, 8-207]

**STATE OF NEW MEXICO**

**IN THE DISTRICT COURT**                                    **COUNTY OF BERNALILLO**

State of New Mexico                     CS 2012 000 09                     No.

v.

1. Room number ███ in the Imperial Motel, 701 Central Avenue NE, Albuquerque, New Mexico 87102.
2. A black, 4-door, 2000 year model Jeep Grand Cherokee displaying New Mexico registration ████; VIN number: ███████████; registered to Angela Gallegos.
3. A white with blue markings 1996 year model Dodge van displaying New Mexico registration ████; VIN number: ███████████; registered to Joe Gallegos.
4. Joe Lawrence Gallegos
   DOB: ██████
   SSN: ██████
   Height: 507 Weight: 220
5. Andrew Gallegos
   DOB: ██████
   SSN: ██████
   Height: 507 Weight: 150lbs

**SEARCH WARRANT**

THE STATE OF NEW MEXICO
TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT.

Proof by Affidavit for Search Warrant, having been submitted to me, I am satisfied that there is probable cause that the person named or property described in the Affidavit is located where alleged in the Affidavit and I find that grounds exist for the issuance of the Search Warrant. A copy of the Affidavit is attached and made a part of this Warrant.

YOU ARE HEREBY COMMANDED to search forthwith the person or place described in the Affidavit between the hours of 6:00 a.m. and 10:00 p.m., unless I have specifically authorized a nighttime search, for the person or property described in the Affidavit, serving this Warrant together with a copy of the Affidavit, and making the search and if the person or property be found there, to seize the person or the property and hold for safekeeping until further order of the court.

You are further directed to prepare a written inventory of any person or property seized. You are further directed to file the return and written inventory with the Court promptly after its execution.

Dated: 11/21/12                          _____
                                         DIVISION TFC                    Judge

**AUTHORIZATION FOR NIGHTTIME SEARCH**

I further find that reasonable cause has been shown for nighttime execution of this Warrant. I authorize execution of this Warrant at any time of the day or night for the following reasons: (set forth reasons why a nighttime search is necessary)

                                         _____
                                         DIVISION TFC                    Judge

-1-

Distribution Instructions
1 copy - Court     1 copy - Defendant     1 copy - Service

GOVERNMENT'S EXHIBIT 7
U.S. v.  DELEON, ET AL.   3948 DNM 566

## RETURN AND INVENTORY

I received the attached Search Warrant on ___11 / 21___ , 20 _12_ , and executed it on
___11 / 21___ , 20 _12_ , at _0035_ o'clock (a.m.) (p.m.). I searched the person or premises described in
the Warrant and I left a copy of the Warrant with ___PREMISIS___ (name the person searched or
owner at the place of search) together with a copy of the inventory for the items seized.

The following is an inventory of property taken pursuant to the warrant: _____
___SEE ATTACHED FOR MOTEL ROOM, BLACK JEEP (141 RNG)___

(attach separate inventory if necessary.)

This inventory was made in the presence of ___LIZ  WHITFIELD___ (name of applicant for the
search warrant) and ___R. MATHEWS___ (name of owner of premises or property). (If not available,
name of other credible person witnessing the inventory.)

This inventory is a true and detailed account of all the property taken pursuant to the Warrant.

_____
Signature of Officer

_____
Signature of Owner of Property
or Other Witness

Return made this __4__ day of _December_ , 20 _12_ , at _810_ (a.m.) (p.m.).

_____
(Judge) (Clerk)

After careful search, I could not find at the place, or on the person described, the property described in this warrant.

_____
Officer

_____
Date

-2-

U.S. v.  DELEON, ET AL.   3949 DNM 567

**NEW MEXICO DEPARTMENT OF PUBLIC SAFETY**

**SP-205   EVIDENCE ☑PROPERTY ☐ CONTROL FORM**

| Case Agent/Officer: | Page 1 of 1 If no report is taken attach a legible copy of NTC to form | Evidence # | Case #, Incident # or NTC # |
|---|---|---|---|
| WILLIAMSON | | | 12-23-3-037₆₀ |

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED:     ADDRESS FOR RETURN OF PROPERTY:

☐ Crime Scene

☐ Owner ☐ Other   DOB: _____     701 CENTRAL #239

☑ Suspect   SOC: _____     City: ABQ

☐ Victim ☐ Witness   Phone #: _____     State:     Zip:

| LOCATION ITEMS OBTAINED: (ex: suspect car) | COUNTY | SUSPECT NAME: (If different than above) |
|---|---|---|
| SUSPECT'S MOTEL ROOM | BERNALILLO | Joe/ANDREW GALLEGOS |

| TYPE OF CASE: (example - burglary, homicide, battery etc.) | VICTIM NAME: (If different than above) |
|---|---|
| HOMICIDE | ADRIAN BURNS |

| Item No. | CASH | $100.00 | $50.00 | $20.00 | $10.00 | $5.00 | $2.00 | $1.00 | Item No. | ☐ Vehicle Seized |
|---|---|---|---|---|---|---|---|---|---|---|
| | | x ___ | x ___ | x ___ | x ___ | x ___ | x ___ | x ___ | Plate: | Year: |
| MONEY ☐ | COIN | $1.00 | $0.50 | $0.25 | $0.10 | $0.05 | $0.01 | Total | VIN: | |
| | | x ___ | x ___ | x ___ | x ___ | x ___ | x ___ | $ 0.00 | Desc: | |

| Drugs ☐ | Firearm ☐ | Item No. | Qty | DESCRIPTION OF ARTICLES Property - Include model, serial number, identifying marks, condition, and value, if known Drugs – Include suspected drug, name, packaging description, and approximate weight |
|---|---|---|---|---|
| ☐ | ☐ | G-1 | 1 | CELL PHONE – MOTEL ROOM |
| ☐ | ☐ | G-2 | 3 | CELL PHONES – MOTEL ROOM |
| ☐ | ☐ | G-3 | 1 | CELL PHONE – MOTEL ROOM |
| ☐ | ☐ | G-4 | — | MISC. LETTERS: DOCUMENTS – MOTEL ROOM |
| ☑ | ☐ | G-5 | 3 | 2 ROCKS OF SUSPECTED HEROINE & 1 LOADED SYRINGE (NEEDLE REMOVED) MOTEL ROOM |
| ☐ | ☐ | G-5A | 1 | COKE CAN - (ROCKS FOUND ON CAN) – PARAPHERNALIA - MOTEL ROOM |
| ☑ | ☐ | G-6 | — | BAG OF SUSPECTED DRUGS – MOTEL ROOM |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

*I certify that I have received and hold myself responsible for the articles listed above.*

| Date & Time Rec'd | Print Name: | Signature: |
|---|---|---|
| 11/21/12   0045 | Mathews | |

SP 205 FORM REV 4/9/2007

**NEW MEXICO DEPARTMENT OF PUBLIC SAFETY**
## SP-205   EVIDENCE ☑ PROPERTY ☐ CONTROL FORM

| Case Agent/Officer: WILLIAMSON | Page 1 of 1 If no report is taken attach a legible copy of NTC to form | Evidence # | Case #, Incident # or NTC # 12-23-3-0376 |
|---|---|---|---|

**NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED:**     **ADDRESS FOR RETURN OF PROPERTY:**

☐ Crime Scene

☐ Owner ☐ Other   DOB: _____

☐ Suspect   SOC: _____

☐ Victim ☐ Witness   Phone #: _____

City: _____
State: ____ Zip: ____

| LOCATION ITEMS OBTAINED: (ex: suspect car) SUSPECTS' CAR | COUNTY BERNALILLO | SUSPECT NAME: (If different than above) JOE/ANDREW BALLEGOS |
|---|---|---|

| TYPE OF CASE: (example - burglary, homicide, battery etc.) HOMICIDE | VICTIM NAME: (If different than above) ADRIAN BURNS |
|---|---|

| Item No. | CASH | $100.00 x __ | $50.00 x __ | $20.00 x __ | $10.00 x __ | $5.00 x __ | $2.00 x __ | $1.00 x __ | Item No. | ☐ Vehicle Seized |
|---|---|---|---|---|---|---|---|---|---|---|
| MONEY ☐ | COIN | $1.00 x __ | $0.50 x __ | $0.25 x __ | $0.10 x __ | $0.05 x __ | $0.01 x __ | Total $ 0.00 | Plate: 141RNG  Year: 2000 VIN: Desc: BLACK JEEP GRAND CHEROKEE | |

| Drugs ☐ | Firearm ☐ | Item No. | Qty | DESCRIPTION OF ARTICLES  Property - Include model, serial number, identifying marks, condition, and value, if known  Drugs – Include suspected drug, name, packaging description, and approximate weight |
|---|---|---|---|---|
| ☐ | ☐ | G-7 | 2 | CELL PHONES |
| ☐ | ☐ | G-9 | — | LETTERS : MISC DOCUMENTS FROM PURSE |
| ☐ | ☐ | G-10 | 2 | GRAY TANK TOP T-SHIRTS W/ BURNS ON THEM |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

*I certify that I have received and hold myself responsible for the articles listed above.*

| Date & Time Rec'd 11/21/12  0645 | Print Name: MATHEWS | Signature: |
|---|---|---|

SP 205 FORM REV 4/9/2007

## RETURN AND INVENTORY

I received the attached Search Warrant on _____ 11 / 21 _____ , 20 12 , and

executed it on _____ 11 / 21 _____ , 20 12 , at _____ O315 _____ o'clock (a.m.) (p.m.).
I searched the person or premises described in the Warrant and left a copy of the Warrant with:

_____ WHi DODGE VAN ( NM: ███████ ) _____
*(name of person searched or owner at the place of search)*

together with a copy of the inventory for the items seized.

The following is an inventory of property taken pursuant to the Warrant: *(Attach separate inventory if necessary.)*

SEE ATTACHED

This inventory was made in the presence of _____ MATTHEWS _____
*(name of applicant for the Search Warrant)*

_____ and _____ MILLIGAN _____
*(name of owner of premises or property. If not available, name of other credible person*

_____

*witnessing the inventory.)*

This inventory is a true and detailed account of all the property taken pursuant to the Warrant.

_____
Signature of Officer

_____
Signature of owner of property
or other witness.

Return made this _____ day of _____ , 20 ___ , at _____ o'clock (a.m.) (p.m.)

_____
(Judge)   (Clerk)

After careful search I could not find at the place, or on the person described, the property described in this Warrant.

_____
Date

_____
Officer

**U.S. v.  DELEON, ET AL.   3952** DNM 570

NEW MEXICO DEPARTMENT OF PUBLIC SAFETY
**SP-205   EVIDENCE ☑ PROPERTY ☐ CONTROL FORM**

| Case Agent/Officer: WILLIAMSON | Page 1 of 1 If no report is taken attach a legible copy of NTC to form | Evidence # | Case #, Incident # or NTC # 12-23-3-0376 |
|---|---|---|---|

NAME OF PERSON FROM WHOM PROPERTY WAS OBTAINED:     ADDRESS FOR RETURN OF PROPERTY:

☐ Crime Scene

☐ Owner ☐ Other    DOB:

☑ Suspect    SOC:     City:

☐ Victim ☐ Witness   Phone #:     State:   Zip:

**LOCATION ITEMS OBTAINED:** (ex: suspect car)  SUSPECTS' VAN | **COUNTY** BERNALILLO | **SUSPECT NAME:** (If different than above) Joe/ANDREW GALLEGOS

**TYPE OF CASE:** (example - burglary, homicide, battery etc.)  HOMICIDE | **VICTIM NAME:** (If different than above) ADRIAN BURNS

| Item No. | CASH | $100.00 x ___ | $50.00 x ___ | $20.00 x ___ | $10.00 x ___ | $5.00 x ___ | $2.00 x ___ | $1.00 x ___ | Item No. | ☐ Vehicle Seized |
|---|---|---|---|---|---|---|---|---|---|---|
| MONEY ☐ | COIN | $1.00 x ___ | $0.50 x ___ | $0.25 x ___ | $0.10 x ___ | $0.05 x ___ | $0.01 x ___ | Total $ 0.00 | Plate: 215PWR Year: 1996 VIN: Desc: WHT VAN - DODGE | |

| Drugs ☐ | Firearm ☐ | Item No. | Qty | **DESCRIPTION OF ARTICLES** Property - Include model, serial number, identifying marks, condition, and value, if known Drugs -- Include suspected drug, name, packaging description, and approximate weight |
|---|---|---|---|---|
| ☐ | ☐ | G-11 | 1 | CHARRED JACKET |
| ☐ | ☐ | G-13 | 1 | BLUE SWEAT PANTS w/ SUSP. BLOOD |
| ☐ | ☐ | G-14 | 1 | BLUE JEANS w/ SUSP. BLOOD |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |
| ☐ | ☐ | | | |

*I certify that I have received and hold myself responsible for the articles listed above.*

| Date & Time Rec'd 11/21/12   0315 | Print Name: MATHEWS | Signature: |
|---|---|---|

SP 205 FORM REV 4/9/2007

SECOND JUDICIAL DISTRICT

IN THE SECOND JUDICIAL DISTRICT            2012 DEC -4  PM 2:09
BERNALILLO COUNTY
STATE OF NEW MEXICO        CS 2012 000 09

IN THE MATTER OF THE ISSUING A SEARCH WARRANT ON THE 20ᵗʰ DAY
OF <u>NOVEMBER</u>, 2012.

## AFFIDAVIT FOR SEARCH WARRANT

     Affiant, being duly sworn, upon his oath, states and I have reason to believe that
on the following described premises, vehicle(s) and/or person(s) of:

1. The premise, structure, any and all items, (to include furniture), all rooms within,
   and/or trash container(s) located at room number ▮ in the Imperial Motel, 701
   Central Avenue NE, Albuquerque, New Mexico 87102.  The premise appears to
   consist of a motel complex on the north side of the roadway containing three separate
   buildings. Room number ▮, the room to be searched, is located on the north side of
   the motel complex. The motel has a tan, block exterior with a flat roof. Room number
   ▮ is located on the second floor of the farthest north building of the motel complex.
   The entrance door to room number ▮ faces north and is blue. In the upper center of
   the entrance door, the numbers ▮ are located on a white placard on the door. A
   large window is directly to the left of entrance door. Underneath the window is the
   exterior portion/vent of a heater/air conditioner unit.
2. The vehicles located at above-described premises, to be searched, consisting of:
   - A black, 4-door, 2000 year model Jeep Grand Cherokee displaying New Mexico
     registration ▮; VIN number: ▮; registered to Angela
     Gallegos.
   - A white with blue markings 1996 year model Dodge van displaying New Mexico
     registration ▮; VIN number: ▮; registered to Joe
     Gallegos.
3. Any and all person(s) located at the above-described premises, to be searched,
   consisting of:
   - Joe Lawrence Gallegos
     DOB: ▮
     SSN: ▮
     Height: 507 Weight: 220
   - Andrew Gallegos
     DOB: ▮
     SSN: ▮
     Height: 507 Weight: 150lbs

In the city or county designated above there is now being concealed:

1. Oral swab standard(s) and Major Case Prints from Joe Lawrence Gallegos and
   Andrew Gallegos, sufficient for laboratory examination.
2. Photos of the unclothed body of Joe Lawrence Gallegos and Andrew Gallegos,
   sufficient to document any injuries that he sustained during the incident, as well as the
   identification of other evidence that may have been deposited on his person during, or

as a result of, the incident.

3. Clothing from the Joe Lawrence Gallegos and Andrew Gallegos including but not limited to footwear.

4. Bodily fluid(s), bodily tissue(s) and/or bodily organ(s) including but not limited to saliva, semen, blood, bone fragments, skin, hair and/or any item(s) that may have said item(s) upon and/or within them.

5. Firearm(s), firearm components, firearm accessories, firearm cleaning materials, firearm cases, firearm owner manuals and/or any other items used to facilitate the possession, use, maintenance and/or transfer of the said item(s). Document(s) that establish or tend to establish ownership, possession, use, transfer and/or the right to ownership, possession, use and/or transfer of the herein-described item(s), to be seized.

6. Ammunition, whether fired or unfired, projectile(s), fragment(s) of projectile(s), ammunition casing(s) whether fired or unfired and/or any other component(s) of ammunition. Document(s) that establish or tend to establish ownership, possession, use, transfer and/or the right to ownership, possession, use and/or transfer of the, herein-described item(s), to be seized.

7. Document(s) that establish or tend to establish ownership, possession, use, transfer and/or the right to ownership, possession, use and/or transfer of the herein-described item(s), to be seized.

8. Residue(s) apparently deposited by the discharge of firearm(s) and/or any explosion(s) and/or any item(s) and/or material(s) that may have said item(s) and/or material(s) on and/or within them.

9. Any item(s) apparently used to restrain and/or control a person. Any item(s) apparently used to facilitate the restraint and/or control of a person.

10. Trace evidence, including but not limited to glass, hair and/or fiber(s), vegetation and/or soil, and/or any item(s) and/or material(s) that may have said item(s) on and/or within them.

11. Ignitable, flammable, explosive and/or combustible substance(s), whether solid, liquid and/or gas and/or any container(s) and/or material(s) that may contain said substance(s) and/or have said substance(s) on them.

12. Any devise(s) apparently used to ignite, boost, accelerate, fuel, sustain and/or facilitate a fire and/or explosion.

13. Any document(s) which have what appears to be the personal identifying information of Adrian Burns on it and/or any version of Adrian Burns name and/or personal identifying information.

14. Any document(s) which appear to be related to financial transaction(s) and/or attempted financial transaction(s) involving Adrian Burns.

15. Driver's license(s) and/or any other forms of identification, whether legitimate or apparently fraudulent, whole and/or in part, complete and/or incomplete, in any state of the manufacturing process. Item(s) used to manufacture and/or facilitate the manufacturing of driver's license(s) and/or any and all other forms of identification.

16. Telephones, pagers, cellular telephones, radio transmitter/receivers, telephonic answering, paging and/or messaging machine(s). Data stored on/within the internal and/or external memory of the herein-described items, to be searched, including, but not limited to text messages, voice messages and/or any other data. This warrant shall authorize the complete search of the herein-described items, to be searched. It may be necessary to view, listen to and/or manipulate the herein-described items, to be

searched, in order to copy, transcribe, transfer and/or otherwise document the data. This warrant shall authorize law enforcement and/or people assisting law enforcement to answer any incoming telephone call(s) which are received on the herein-described items, to be searched, and converse on said items, while executing this warrant and/or after taking possession of the herein-described items, to be searched.

17. Illegal narcotics and/or any other controlled substance(s) and/or suspected illegal narcotics and/or any other suspected controlled substance(s) including, but not limited to any drug or substance listed in Schedules I through V of the Controlled Substance Act or regulations adopted thereto.

18. Illegal narcotics paraphernalia, including but not limited to all equipment, products and/or materials of any kind that are apparently used, intended for use and/or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling and/or otherwise introducing into the human body, a controlled substance or controlled substance analog in violation of the Controlled Substance Act.

19. Currency and/or containers and/or packages containing and/or packaging currency.

20. Documentation of the herein-described premises, vehicle(s), person(s) and/or the herein-described item(s), to be seized, by means of measurement, photography, videography and/or any other means deemed necessary by law enforcement and/or person(s) assisting law enforcement.

21. Item(s) which establish or tend to establish possession, use, residence, occupancy, presence and/or the right to possession, use, residence, occupancy and/or presence at the above described premises and/or vehicle(s), to be searched.

22. Any record documented on any media, which establishes and/or tends to establish the state of mind, motive(s), action(s), means and/or intention(s) of any person(s) with knowledge or apparent knowledge of the crime(s), including, but not limited to diaries, journal(s) audio and/or video tape(s).

The facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

Affiant, Elizabeth Whitfield, is a full time salaried law enforcement officer who has been employed by the New Mexico State Police for a period of approximately seven (7) years. Affiant has received specialized training in criminal investigations through the New Mexico Law Enforcement Academy and the New Mexico State Police Academy. Affiant has received training in the investigation of violent crimes including but not limited to homicide investigations. Affiant has received both classroom and on the job training concerning the investigation of the above offense(s). Affiant has conducted numerous criminal investigations that led to the arrest and conviction of persons in violation of New Mexico State Statutes.

On Monday, November 12, 2012, New Mexico State Police Investigations Bureau responded to a homicide which occurred in Bernardo, New Mexico. The victim, identified as Adrian Burns, was discovered behind a burned vehicle. The victim was lying in the fetal position and had been severely burned. The victim had been handcuffed behind his back and a what appeared to be a bag was found over the victim's head. Results from Mr. Burns' autopsy revealed, along with sustaining extensive burns

throughout his body, Mr. Burns sustained a gunshot wound to the head which caused his death.

Through investigation, law enforcement determined suspects of Mr. Burns' homicide were identified as Joe Lawrence Gallegos and Andrew Gallegos. Arrest warrants were obtained for both suspects. Search warrants were obtained and executed on the suspects' residence and belongings. Neither Joe Lawrence Gallegos nor Andrew Gallegos was present at the residence during the search warrant execution. Items and information recovered from the search warrant executions link both suspects further to the homicide. Statements obtained from law enforcement interviews provided information the murder of Mr. Burns appeared to be related to narcotic dealings with the suspects.

Subsequent the search warrant executions, state-wide media released the photos of Joe Lawrence Gallegos and Andrew Gallegos. The mother of the suspects, identified as Tina Gallegos, contacted New Mexico State Police agents. Tina Gallegos informed agents she spoke with her sons and instructed them to turn themselves in to authorities. Tina Gallegos stated she convinced Joe Lawrence Gallegos and Andrew Gallegos to turn themselves in on November 19, 2012, in Los Lunas, New Mexico, which did not occur.

Surveillance of Joe Lawrence Gallegos and Andrew Gallegos' residence identified parked at the residence a white 1996 year model Dodge van displaying New Mexico registration ███████. The vehicle is registered to Joe Gallegos, date of birth: ███████. Upon execution of the search residence warrant, agents were informed by occupants of the residence both Joe Lawrence Gallegos and Andrew Gallegos left the residence prior driving the white van.

On Tuesday, November 20, 2012, U.S. Marshals Task Force conducted surveillance of the Imperial Motel located at 701 Central Avenue NE in Albuquerque, New Mexico, where they received information the suspects may be located. U.S. Marshals Task Force personnel observed in the motel parking lot a white Dodge van displaying New Mexico registration ███████ parked.

Upon further observation, at approximately 6:00 p.m. a black, 4-door, 2000 year model Jeep Grand Cherokee displaying New Mexico registration ███████ arrived and parked directly next to the white van (on the east side of the van). A check of the registration was conducted through dispatch. The Jeep was registered to Angela Gallegos, daughter of Joe Lawrence Gallegos. The female driver, and only occupant of the Jeep, later identified as Angela Gallegos, exited the Jeep. Angela Gallegos appeared to be carrying a large amount of food and went into room number ███. Minutes later, Angela Gallegos exited the motel room and went to the white Dodge van. She then removed items from the van and placed them inside the Jeep she was driving. She then entered room number ███ again.

U.S. Marshals Task Force approached room number ███ at approximately 6:10 p.m. Upon approaching room number ███, a male subject opened the curtain of the motel room and looked out. U.S. Marshals Task Force immediately identified the male subject as Andrew Gallegos. U.S. Marshals Task Force entered motel room number ███ and

executed the arrest warrants of Joe Lawrence Gallegos and Andrew Gallegos. Also present in the motel room were two female subjects identified as Angela Gallegos (date of birth: ▇▇▇▇) and Charlene Y. Baldizan (date of birth: ▇▇▇▇). Both female subjects were detained for questioning.

Upon interviewing Angela Gallegos, she was read her Miranda warning and consented to an interview conducted by New Mexico State Police Investigations Bureau agents. Angela Gallegos stated her father was Joe Lawrence Gallegos and her uncle was Andrew Gallegos. Angela said she was contacted on November 20, 2012 by Charlene Baldizan to come to the motel to help fix a flat tire on the Dodge van belonging to Joe Gallegos. Angela stated she arrived at the motel to help fix the tire. Angela said she was at the motel for approximately 20-30 minutes prior to the U.S. Marshals arriving.

Angela informed agents she received a letter from her dad a few days prior. Her dad wrote in the letter he was sorry about things that happened and sorry for doing drugs. Angela stated the letter is inside her purse, located in the black Jeep. Angela was asked further questions about contacting her father on her cellular phone, but she refused to answer any more questions about her phone. Angela stated her cellular phone is located inside her black Jeep and stated her phone number is ▇▇▇▇ and her carrier is Verizon Wireless. Angela further stated she knew Adrian Burns, the victim, and was aware he sold narcotics to her father and uncle, Andrew Gallegos.

Charlene Baldizan was also read her Miranda warning and consented to an interview conducted by New Mexico State Police Investigations Bureau agents. Charlene stated at approximately 10:00 a.m. on November 20, 2012, Andrew Gallegos called her and informed her the tire to his white Dodge van was flat. Andrew Gallegos asked Charlene to help fix the tire. Charlene stated a friend dropped her off at the Imperial Motel at approximately 1:00 p.m., where she remained until the U.S. Marshals arrived. Charlene stated Angela Gallegos was called to come and assist with the flat tire.

Both Joe Lawrence Gallegos and Andrew Gallegos agreed to answer questions during an interview but gave no details related to the homicide of Adrian Burns.

Documentation of the herein-described premise, vehicles and/or persons is important to the investigation. It is important to document the condition and/or location of items found at the scene and/or their context within the scene.

Affiant is aware through training and experience that before, during and/or after the commission crime(s) there is often transfer of evidence between suspect(s), victim(s), witness(es) and/or their environment. This evidence may not be visible to the naked eye. The evidence, if it exists, may assist in determining the identity of any person who may have been present at the time of the incident.

Affiant is aware through training and experience that people involved in the commission of crime(s) often attempt to conceal, tamper with and/or dispose of evidence, including but not limited to the herein-described item(s), to be seized. They may attempt to give aid or assistance to victim(s) after an act of violence. The materials used to render aid may assist investigators in identifying people with knowledge of the crime(s).

Affiant is also aware that suspect(s), victim(s) and/or witness(es) may document information relating to the crime(s) on paper, on computers and/or on other forms of media. They often make and/or receive telephone calls before, during and/or after the commission crime(s). Such information, if it exists, may be material and relevant to this investigation. This warrant shall include the viewing, listening to, copying, transcribing, transferring and/or recording of data on the herein-described item(s), to be seized.

Affiant is aware through training and experience that people who have apparent knowledge of the incident often make telephone calls to the scene and/or attempt to communicate with each other during the time that law enforcement personnel are executing the search warrant. These people often utilize a variety of communications equipment, including, but not limited to pagers and/or cellular telephones to communicate before, during and after the incident. Answering incoming telephone calls while at the scene and speaking with these people often provides law enforcement with information that is material and relevant to this investigation. It is often necessary to answer communications devices including, but not limited to cellular telephones after seizing the devices, pursuant to the warrant.

Affiant is also aware that item(s) which establish or tend to establish possession, use, residence, presence and/or occupancy of the herein-described premises and/or vehicle(s), to be searched, often demonstrate who had access to the premises and/or vehicle(s). Such information may be material and relevant to this investigation.

Therefore, in order to ensure that a complete and thorough investigation, investigators may be required to examine the entire, above-mentioned premises, vehicle(s) and/or person(s), including, but not limited to, the examination of furniture, walls, crawl-spaces and/or attics. It may be necessary for investigators to remove and/or damage entire portions of the premises and/or vehicle(s) including but not limited to doors, windows, carpets, upholstery, clothing, mechanical equipment, plumbing and/or other items.

Therefore, Affiant respectfully requests that the Court issue a Warrant commanding the search the above-described premises, vehicle(s) and/or person(s).

Subscribed and sworn to before me in
Bernalillo County, New Mexico on this
2/5T   day of NOVEMBER 2012

_____
Judge, Notary or other officer
authorized to administer oaths.

_____
Elizabeth Whitfield
Agent, NM State Police

Approved as to legal sufficiency:

Jason Greenly (telephonically approved at 11:20 p.m.)
Assistant District Attorney

# NEW MEXICO SUPPLEMENTAL REPORT

| | ORI NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 1 | 20 |

| ORIGINAL OFFENSE DATE | 11/12/2012 | SUPPLEMENTAL DATE | 11/29/2012 | CASE NUMBER | 12-23-3-0376 |
|---|---|---|---|---|---|

**ORIGINAL OFFENSE REPORTED**   1 - HOMICIDE

2 - TAMPERING WITH EVIDENCE

ORIGINAL VICTIM'S NAME

ORIGINAL VICTIM (BUSINESS)

LOCATION OF OCCURRENCE

---

| PERSON CODE | TYPE CODE | INJURY CODE |
|---|---|---|
| WITNESS | INDIVIDUAL | NONE |

| 1 -NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO. | DOB | AGE | SEX | RACE: | WHI | BLK | ASIA | IND | UNK |
|---|---|---|---|---|---|---|---|---|---|---|
| CHAVEZ, LINDA | | | 52 | F | | X | | | | |

| OCCUPATION | VICTIM OF OFF. NC | HEIGHT | WEIGHT | HAIR | EYES | ETHNIC | AGG ASSAULT |
|---|---|---|---|---|---|---|---|
| NONE | | 504 | 140 | BRO | BRO | H | |

| EMPLOYER / SCHOOL | VICT. OF SUSP. NO. RELATIONSHIP |
|---|---|
| N/A | |

GANG AFFILIATION
NONE

| ARREST/CITATION NO.  F.B.I. NO | S.I.D. NO. | NCIC NO. | Type of Arrest: | ON VIEW | CITED | CUST. | Residential Status: | RES | NON |
|---|---|---|---|---|---|---|---|---|---|

Address Type: MAILING ADDRESS
PO Box:
City:          State: NM   Zip: 87028

| TELEPHONES | Home Phone |
|---|---|
| TELEPHONES | Work Phone |

---

| PERSON CODE | TYPE CODE | INJURY CODE |
|---|---|---|
| WITNESS | INDIVIDUAL | NONE |

| 2 -NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO. | DOB | AGE | SEX | RACE: | WHI | BLK | ASIA | IND | UNK |
|---|---|---|---|---|---|---|---|---|---|---|
| SUTTON, MICHAEL A | | | 31 | M | | X | | | | |

| OCCUPATION | VICTIM OF OFF. NC | HEIGHT | WEIGHT | HAIR | EYES | ETHNIC | AGG ASSAULT |
|---|---|---|---|---|---|---|---|
| LABORER | | 600 | 190 | BRO | BRO | H | |

| EMPLOYER / SCHOOL | VICT. OF SUSP. NO. RELATIONSHIP |
|---|---|
| CONSTRUCTION | |

GANG AFFILIATION
N/A

| ARREST/CITATION NO.  F.B.I. NO | S.I.D. NO. | NCIC NO. | Type of Arrest: | ON VIEW | CITED | CUST. | Residential Status: | RES | NON |
|---|---|---|---|---|---|---|---|---|---|

Address Type: HOME ADDRESS
Street Address:
City:          State: NM   Zip: 87031
County: VALENCIA   Region: REGION 1

| TELEPHONES | Home Phone |
|---|---|
| TELEPHONES | Work Phone |

GOVERNMENT'S EXHIBIT 8

| NEW MEXICO SUPPLEMENTAL REPORT | ORI NO. NMNSP2113 | INCIDENT NO. 2012-18903 | PRIMARY N | PAGE 2 | OF 20 |
|---|---|---|---|---|---|

| PERSON CODE | TYPE CODE | INJURY CODE |
|---|---|---|
| INTERVIEWED | INDIVIDUAL | NONE |

**3** -NAME (LAST, FIRST, MIDDLE): GALLEGOS, TINA  
SOCIAL SECURITY NO. ▮  DOB ▮  AGE 62  SEX F  RACE: WHI **X**  BLK ASIA IND UNK

OCCUPATION: UNEMPLOYED  
VICTIM OF OFF. NC  HEIGHT 505  WEIGHT 140  HAIR BRO  EYES BRO  ETHNIC H  AGG ASSAULT

EMPLOYER / SCHOOL: NONE  
VICT. OF SUSP. NO. RELATIONSHIP

GANG AFFILIATION: EAST SIDE LOCOS

ARREST/CITATION NO.  F.B.I. NO  S.I.D. NO.  NCIC NO.  Type of Arrest: ON VIEW  CITED  CUST.  Residential Status: RES  NON

IDENTIFICATIONS  **ID**  **NM** ▮

Address Type: PHYSICAL ADDRESS  
Street Address:  
City: ▮  State: NM  Zip: 87031  
County: VALENCIA  Region: REGION 1  Country: UNITED STATES

TELEPHONES  Home Phone ▮ ▮ ▮

| PERSON CODE | TYPE CODE | INJURY CODE |
|---|---|---|
| INTERVIEWED | INDIVIDUAL | NONE |

**4** -NAME (LAST, FIRST, MIDDLE): NEVAREZ, VICTOR  
SOCIAL SECURITY NO. ▮  DOB ▮  AGE 22  SEX M  RACE: WHI BLK ASIA IND UNK

OCCUPATION: STUDENT  
VICTIM OF OFF. NC  HEIGHT 600  WEIGHT 170  HAIR BRO  EYES BRO  ETHNIC W  AGG ASSAULT

EMPLOYER / SCHOOL: UNIVERSITY OF NM  
VICT. OF SUSP. NO. RELATIONSHIP

GANG AFFILIATION: NONE

ARREST/CITATION NO.  F.B.I. NO  S.I.D. NO.  NCIC NO.  Type of Arrest: ON VIEW  CITED  CUST.  Residential Status: RES  NON

Address Type: HOME ADDRESS  
Street Address: ▮  
City: ▮  State: NM  Zip: 87031

TELEPHONES  Home Phone ▮

| PERSON CODE | TYPE CODE | INJURY CODE |
|---|---|---|
| INTERVIEWED | INDIVIDUAL | NONE |

**5** -NAME (LAST, FIRST, MIDDLE)  SOCIAL SECURITY NO.  DOB  AGE SEX RACE: WHI BLK ASIA IND UNK

# NEW MEXICO SUPPLEMENTAL REPORT

| | ORI NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 3 | 20 |

| PERSON CODE | TYPE CODE | INJURY CODE |
|---|---|---|
| INTERVIEWED | INDIVIDUAL | NONE |

**6** - NAME (LAST, FIRST, MIDDLE): PEARSON, ROBERT     SOCIAL SECURITY NO. [REDACTED]     DOB [REDACTED]     AGE 34     SEX M     RACE: WHI [X] BLK ASIA IND UNK

| OCCUPATION | VICTIM OF OFF. NO | HEIGHT | WEIGHT | HAIR | EYES | ETHNIC | | AGG ASSAULT |
|---|---|---|---|---|---|---|---|---|
| COMPUTER TECH. | | 509 | 170 | BRO | BRO | W | | |

EMPLOYER / SCHOOL: UNKNOWN

VICT. OF SUSP. NO.     RELATIONSHIP

GANG AFFILIATION: NONE

| ARREST/CITATION NO.   F.B.I. NO | S.I.D. NO. | NCIC NO. | Type of Arrest: | ON VIEW | CITED | CUST. | Residential Status: | RES | NON |
|---|---|---|---|---|---|---|---|---|---|

Address Type: HOME ADDRESS
Street Address: [REDACTED]
City: [REDACTED]     State: NM   Zip: 87031
County: VALENCIA   Region: REGION 1   Country: UNITED STATES

TELEPHONES     Work Phone     [REDACTED] [REDACTED] [REDACTED]

| PERSON CODE | TYPE CODE | INJURY CODE |
|---|---|---|
| INTERVIEWED | INDIVIDUAL | NONE |

**7** - NAME (LAST, FIRST, MIDDLE): PEARSON, SARAH L     SOCIAL SECURITY NO. [REDACTED]     DOB [REDACTED]     AGE 32     SEX F     RACE: WHI [X] BLK ASIA IND UNK

| OCCUPATION | VICTIM OF OFF. NO | HEIGHT | WEIGHT | HAIR | EYES | ETHNIC | | AGG ASSAULT |
|---|---|---|---|---|---|---|---|---|
| HOUSEWIFE | | 507 | 140 | BLD | HAZ | W | | |

EMPLOYER / SCHOOL: N/A

VICT. OF SUSP. NO.     RELATIONSHIP

GANG AFFILIATION: N/A

| ARREST/CITATION NO.   F.B.I. NO | S.I.D. NO. | NCIC NO. | Type of Arrest: | ON VIEW | CITED | CUST. | Residential Status: | RES | NON |
|---|---|---|---|---|---|---|---|---|---|

Address Type: HOME ADDRESS
Street Address: [REDACTED]
City: [REDACTED]     State: NM   Zip: 87031
County: VALENCIA   Region: REGION 1   Country: UNITED STATES

TELEPHONES     Work Phone     [REDACTED] [REDACTED] [REDACTED]

| M.O. EVENT CODES : (AGENCY OPTIONAL USE) | TOTAL VALUE STOLEN | TOTAL VALUE REC. |
|---|---|---|
| SUPPLEMENTAL REPORT #5 ON I.B. CASE 12-23-3-0376 BY AGENT JAMES MOWDUK. | | |

SYNOPSIS

This supplemental report documents my involvement with the homicide of Adrian Burns, occurring on November 12, 2012 in the Veguita area of Socorro County, New Mexico. Agent Richard WIlliamson is the Case Agent for this homicide investigaiton. Refer to narrative for complete details.

| NEW MEXICO SUPPLEMENTAL REPORT | OR NO. | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 4 | 20 |

NARRATIVE

On Monday, November 12, 2012 at approximately 10:52 pm, I was requested by Sergeant Isaac Valerio, New Mexico State Police, Investigations Bureau, stationed in Albuquerque, New Mexico to assist in a homicide investigation.  The location of the homicide was in the Bosque area, south of Highway U.S. 60 in Socorro County New Mexico.  At that time I was advised that the remains of a human body were located to the rear of a vehicle fire and the victim/ body had been handcuffed behind the back.

Due to the circumstances of the burned vehicle and burned/ handcuffed human body, all available local Agents within the New Mexico State Police Investigations Bureau were requested to respond and assist in the investigation.

I was requested to proceed to the area of the incident for an official briefing and to obtain my investigative assignments.

BRIEFING:

On November 13, 2012 at approximately 12:35 a.m., I arrived on scene and attended a briefing will all responding Agents.  The area of the fire and crime scene was located southwest of the intersection of State Road 304 and U.S. 60 along the eastern edge of the Rio Grande River.  Entrance to the scene was limited and controlled, to maintain the integrity of the scene and to preserve any forensic evidence.

The scene was also marked with the corresponding GPS coordinates: 34 degrees 24.753 North, 106 degrees 48.171 West.

According to information learned thus far, two (2) 911 telephone calls were placed to the local 911 Dispatch Center in reference to a fire burning in the Bosque.  When the local, La Joya, New Mexico Volunteer Fire Department responded, they encountered a dark blue or black Nissan or Dodge Neon driving about the area.  Fire personnel also stated that they obtain additional information from an individual identified as "Kyle" from the New Mexico Boys Ranch, that the fire had involved a passenger vehicle.

No other subjects or vehicles were seen in the immediate area and 911 dispatch had the names and telephone numbers of all reporting parties for possible follow-up questions.

Agent Wesley Cox, New Mexico State Police, Investigations Bureau/ Albuquerque and I were requested to interview all reporting parties and witnesses to the fire reported in the Bosque.  We were also tasked with identifying the dark blue or black Nissan or Dodge Neon driving within the vicinity of the crime scene.

INTERVIEW, KYLE BRIDGEMAN:

On Tuesday, November 13, 2012 Agent Cox and I located and interviewed the administrator of the New Mexico Boys Ranch, Kyle Bridgeman.  Kyle Bridgeman was also identified as one of the 911 callers and eventually, the owner of the dark blue or black vehicle.  We conducted an audio-taped interview with Kyle between the hours of 3:55 a.m. and 4:25 a.m. to which Agent Cox will document in his supplemental report.  For a synopsis of the interview, refer to Agent Cox's supplemental report.  For complete details, refer to the audio recorded interview.

INTERVIEW, LINDA CHAVEZ:

| NEW MEXICO SUPPLEMENTAL REPORT | ORI # | SUPPLEMENT # | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 5 | 20 |

On Tuesday, November 13, 2012, I contacted Linda Chavez on her supplied telephone number obtained from 911 records to request an interview.  I initially requested an in-person interview; however, Linda Chavez advised she had very limited information to provide in furtherance of this investigation and simply wished to give an immediate statement.  I therefore conducted a telephonic interview with Linda Chavez, to which the conversation was not recorded.  The following is a synopsis of the interview with Linda Chavez:

Linda advised that she lives in the La Joya area of Socorro County, New Mexico and on Monday evening (November 12, 2012) she was returning from an ███████████ meeting in Belen, New Mexico.  As she was driving her white 2003 Nissan Xterra eastbound on Highway U.S. 60, she noticed a fire burning approximately 3/4 mile south of Highway 60, in the Bosque area of La Joya.  At approximately 8:45 p.m. and 9:00 p.m. Linda stated that she called Socorro 911 to report the Bosque fire.  As she was diving past the area, Linda stated that she observed no other vehicles entering or departing the immediate area.  The only other vehicles she witnessed were two vehicles traveling westbound on U.S. 60 coming from the Mountainair, New Mexico area.  Linda continued traveling to her residence without any other observations or contact with any subjects or vehicles.

Linda advised that she had no other conversations with any subjects about the fire and was unaware that the fire involved a vehicle and/or a burned victim.

END OF INTERVIEW.

ASSIST CRIME SCENE TEAM WITH SEARCH:

While at the crime scene, I was requested to assist the New Mexico State Police Crime Scene Team with a search of the immediate area surrounding the burned vehicle and victim.
Numerous Agents with the New Mexico State Police Investigations Bureau and State Fire Marshal?s Office systematically conducted a "grid search" of the immediate area for any items of evidentiary value.  During the early morning hours of Tuesday, November 13, 2012, I searched the area surrounding the burned vehicle and victim without locating anything of evidentiary value.  In addition to that search, I was assigned to walk and search the access road and ditch-bank, located west of the crime scene.  During this search, I also located/ seized nothing of evidentiary value.

END OF SEARCH.

BRIEFING AND POSSIBLE IDENTIFICATION OF VICTIM:

As the investigation progressed, a briefing was conducted at the New Mexico State Police Office in Los Lunas, New Mexico with all available Agents.  At approximately 3:00 p.m. it was tentatively learned that the vehicle at the crime scene was consistent with a 2012 Mitsubishi Gallant, registered to Amber Sutton.  It was tentatively learned that the victim was Amber Sutton's boyfriend, Adrian Burns, D.O.B: ██████████ .

JOSEPH LAWRENCE GALLEGOS AND ANDREW "SMILEY" GALLEGOS:

Information obtained through cellular telephone records from the victim (Adrian Burns) revealed that the last two people to communicate (by telephone) and thereafter visit (meet) with Adrian Burns were two brothers, identified as Joseph Lawrence Gallegos and

DNM 582

| NEW MEXICO SUPPLEMENTAL REPORT | | | | | | |
|---|---|---|---|---|---|---|
| | OR ID# | INCIDENT # | | | PRIMARY | PAGE# OF |
| | NMNSP2113 | 2012-18903 | | | N | 6 | 20 |

Andrew "Smiley" Gallegos.  During the briefing, Agents learned through the victim's family that Joseph Lawrence Gallegos and Andrew "Smiley" Gallegos met with Adrian Burns on a daily basis to obtain controlled substances.  That information was also corroborated through cellular telephone records from the victim.

In addition to talking (calling) and visiting (meeting) Adrian Burns the evening of the homicide, both Gallegos brothers were observed at the Allsups Convenience store, located at 2348 Highway 47 in Belen, New Mexico within hours of the reported vehicle fire.  The brothers were observed to be in possession of a larger-than-normal amount of U.S. Currency and a suspiciously large amount of heroin.  The heroin packaging observed at the Allsups store also appeared to be uniquely similar to the manner in which Adrian Burns packaged his heroin.

INTERVIEW, MICHAEL SUTTON:

Upon learning that Michael Sutton witnessed the Gallegos brothers the evening of November 12, 2012; I telephoned Michael to obtain a witness statement detailing his observations and actions that evening.

I contacted Michael Sutton by telephone and conducted an audio recorded interview with him over the telephone.  The interview lasted approximately 12 minutes and the following is a synopsis of the interview.  For complete details, refer to the digital recording:

Michael Sutton stated that he was operating his vehicle (a tan Ford Expedition) with a friend the evening of Monday, November 12, 2012 in the Belen, New Mexico area.

As he approached the Allsups Convenience store, located at 2348 Highway 47 in Belen, New Mexico, Michael stated that he parked at pump #3.  Parked at pump #2 were Joseph Lawrence Gallegos and Andrew "Smiley" Gallegos in a white, single-cab, flatbed truck owned and operated by Joe Lawrence Gallegos.  Michael stated that the time was approximately 11:30 pm to 12:30 am and the Gallegos brothers were pumping gasoline in their white flatbed truck.  Michael stated that Joe Gallegos was wearing a blue and gray sweatshirt, gloves and a beanie on his head.  Smiley Gallegos was wearing a brown sweatshirt, black pants and a beanie.  After pumping gasoline into the truck, Joe parked his white flatbed toward the right of the front entrance doors to the Allsups.  Michael Sutton observed Joe enter the store and purchase a 12 pack of Bud Light beer and exit the store.  Smiley walked toward the eastern entrance doors of the Allsups store but never entered the store.  The friend with Michael Sutton met with the Gallegos brothers and was given an unusually large amount of heroin and some money.  The drug transaction was not anticipated or planned and Michael Sutton and his friend thought it was extremely unusual for the two to share both drugs and money unexpectedly.  Michael Sutton observed the drug transaction and stated that the Gallegos brothers were "giving out money and heroin as if they were Santa Clause."  Michael stated that they gave out approximately $100.00 in U.S. Currency and approximately 1/2 ounce of heroin.  Michael Sutton also described the heroin as packaged in the exact style to which Adrian Burns packaged and distributed his heroin.  He described the heroin as being in $20.00 papers; wrapped in aluminum foil inside of a ripped-off corner of a plastic baggy.

Michael also added that these guys are not known to share controlled substances and knew it to be very unlikely that the brothers would have that quantity of drugs or money to give out.  Michael concluded that whatever occurred between Adrian Burns and the Gallegos brothers that evening was "already a done deal" by the time they arrived at the

DNM 583

| NEW MEXICO SUPPLEMENTAL REPORT | OR NO. | | INCIDENT NO. | PRIMARY | PAGED | OF |
|---|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 7 | 20 |

Allsups that evening.

END OF INTERVIEW.

SURVEILLANCE AT #4 ERIN COURT, LOS LUNAS, NM.

As a search warrant was being drafted for the residence of Joe and Andrew Gallegos, surveillance was conducted at #4 Erin Court to get a detailed description; to include any notable activities taking place at the property.  On Wednesday, November 14, 2012, Agent Wesley Cox and I conducted surveillance at #4 Erin Court, during the surveillance, pictures and video of the property was taken to memorialize the structures, vehicles, persons and miscellaneous items at the property.
Two vehicles were observed parked on the shoulder of #4Erin Court.  The two vehicles include a white, 2001 Chevrolet Flatbed, 2500 truck bearing New Mexico license ███ and a white, 2003 Chevrolet 1/2 ton truck bearing New Mexico ███.  Parked in the driveway to #4 Erin Court was a white, 2000 Chevrolet 1/2 ton truck bearing New Mexico license ███.  Both white 1/2 ton Chevrolet vehicles appeared to have furniture positioned in the bed of each truck.

END OF SURVEILLANCE

EXECUTION OF SEARCH WARRANT AT #4 ERIN COURT.

Following the approval and authorization of a search warrant for #4 Erin Court, Agent Wesley Cox and I conducted surveillance at #4 Erin Court in anticipation of executing the warrant with the New Mexico State Police Tactical Team.

Prior to its execution (on Thursday, November 15, 2012) we observed two of the similar vehicles about the property as the previous day; the white, Chevrolet Flatbed and the white Chevrolet 1/2 ton truck.  Parked on the shoulder, south of #4 Erin Court was a white Dodge Van bearing New Mexico license ███.

During the course of our surveillance of the property, we noticed an unusual amount of local traffic entering and exiting the immediate area of the neighborhood.  At approximately 8:00 pm, Agent Cox and I were confronted by an unknown male, threatening for us to leave the area.  The male subject intentionally had his right hand placed behind his back and threatened to have a 9mm with him.  While threatening Agent Cox and me, the same male produced a clicking or cocking noise behind his back.  In response, Agent Cox and I advised the subject were we leaving the area without any further confrontation or escalation in force.

Within minutes after the confrontation, New Mexico State Police Officer, Leroy Gettler stopped the male individual in a white BMW crossover vehicle.  The subject was thereafter identified as Michael Sanchez, D.O.B: ███.  He was identified, interviewed and thereafter released without any further incident or criminal charges.

While investigating Michael Sanchez and his actions, the New Mexico State Police Tactical Team made contact and entrance into #4 Erin Court.  At approximately 10:43 pm, the property was secured for further searching and processing.

Between the hours of 10:43 pm and 3:45 am I assisted in the search of #4 Erin Court.  During the search, I assisted in the collection and packaging of evidence into evidence

| NEW MEXICO SUPPLEMENTAL REPORT | NMNSP2113 | 2012-18903 | N | 8 | 20 |
|---|---|---|---|---|---|

bags for submission to the Northern Forensic Laboratory and the New Mexico State Police Evidence Vault in Santa Fe, New Mexico.

END OF SEARCH WARRANT EXECUTION.

NEIGHBORHOOD CANVASS -ERIN COURT.

On Friday, November 16, 2012, Agent Cox and I conducted neighborhood canvass interviews with all neighbors on Erin Court. I conducted neighborhood canvass interviews with three residences on Erin Court; residence number ████████, ████████, and ████████ Erin Court. Agent Cox controlled the direction of the other neighbors and will document those interviews in his supplemental report. During the neighborhood canvass interviews, I digitally recorded the conversations for evidence purposes and the following is a synopsis of each neighborhood canvass interview:

NEIGHBORHOOD CANVASS, ████████:

On Friday, November 16, 2012, Agent Cox and I conducted an interview with the occupant of ████████, identified as Victor Nevarez. ████████ is located southwest of #4 (the Gallegos Residence) and is also within viewing distance of Gallegos residence. The interview lasted approximately 12 minutes and the following is a synopsis of the interview. For complete details regarding the interview, refer to the digital recording.

Victor Nevarez advised that he was at school (the University of New Mexico in Albuquerque, New Mexico) the morning hours of Monday, November 12, 2012 until approximately 11:00 am. For the rest of the afternoon of November 12, 2012, Victor was home with his mother and noticed nothing unusual taking place at #4 Erin Court. Victor Nevarez advised that the residence at #4 Erin Court is typically frequented by a plain/ non-descript 2005 to 2007 white, four-door vehicle with no aftermarket rims or accessories. On Monday, November 12, 2012, Victor believed that the only activities taking place at #4 Erin Court was metal cutting/ recycling and no other remarkable noises, altercations or activities were observed to have taken place.

Victor Nevarez added that he and his family typically avoid the occupants and activities taking place at #4 Erin Court as they do not condone any criminal activities that may be occurring at the residence.

END OF INTERVIEW.

NEIGHBORHOOD CANVASS, ████████:

On Friday, November 16, 2012, Agent Cox and I visited the residence at ████████. No one was home at the residences and it appeared to be unoccupied. According to neighbors, the residence is vacant and is going through foreclosure proceedings.

NEIGHBORHOOD CANVASS, ████████:

On Friday, November 16, 2012, I conducted an interview with the occupant of ████████ ████, identified as Robert Ortiz. ████████ is located immediately north of #4 (the Gallegos Residence) and is also within viewing distance of Gallegos residence. The interview lasted approximately 10 minutes and the following is a synopsis of the

DNM 585

| NEW MEXICO SUPPLEMENTAL REPORT | | OR NO | INCIDENT NO | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|---|
| | | NMNSP2113 | 2012-18903 | N | 9 | 20 |

interview.  For complete details regarding the interview, refer to the digital
recording.

Robert Ortiz advised that he has only observed the usual activities taking place at #4
Erin Court; people coming and going at all hours of the day, to include metal cutting
and welding activities.
Robert advised that he noticed Joe Gallegos's girlfriend left the residence about ten
days to two weeks ago, stating that she was at the house at the time, but she recently
moved out.

Robert confirmed that Joe Gallegos and his brother "Smiley" live at #4 Erin Court;
however, people are constantly coming and going.

On Monday, November 12, 2012, Robert stated that he was at home for most of the
afternoon and he did not notice anything unusual taking place at #4 Erin Court.  Robert
was very cognizant of the types of vehicles that frequented the residence and was able
to describe each of their friends and girlfriend's vehicle's is detail.

NEIGHBORHOOD CANVASS, ███████████ :

On Friday, November 16, 2012, Agent Cox and I conducted an interview with the occupants
of ███████████ ; identified as Robert and Sarah Pearson.  ███████████ is located
northwest of #4 (the Gallegos Residence) and is also within viewing distance of Gallegos
residence.  The interview lasted approximately 18 minutes and the following is a
synopsis of the interview.  For complete details regarding the interview, refer to the
digital recording.

Sarah and Robert Pearson recently moved to the neighborhood within the past few months
and noticed that the activities taking place at #4 Erin Court appear to be the typical
criminal/ drug-related activities.

Robert Pearson advised that he typically works long hours and rarely notices activities
taking place at #4 Erin Court -as he tries to keep to himself.  On Monday, November 12,
2012 Robert advised that he worked until 8:00 pm and noticed nothing out of the ordinary
taking place at #4 Erin Court.

Sarah Pearson advised that she noticed nothing unusual the past few days other than
"Smiley" Gallegos returning home this morning to obtain some personal items from the
residence.  Sarah Pearson described the "skinny brother with shaved head" and recognized
the photograph of Andrew "Smiley" Gallegos as being at the house at approximately 8:50
am this morning.  The Pearson's advised that "Smiley" and another male individual were
walking from the residence with a suitcase on wheels.

The Pearsons advised that they intentionally keep to themselves, since they are new to
the area and have hear rumors the Gallegos are involved in drug/ gang criminal activity.


END OF NEIGHBORHOOD CANVASS.

CONTACT WITH TINA GALLEGOS AT #4 ERIN COURT:

On Friday, November 16, 2012, at approximately 4:34 pm, Agent Cox and I made contact

DNM 586

| | OR ID | INCIDENT NO | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 10 | 20 |

with Tina Gallegos (the mother of Andrew and Joe Gallegos) at #4 Erin Court in Los
Lunas, New Mexico.  Tina Gallegos was feeding the dogs at the property and we approached
Tina to engage in consensual conversation.

During our eleven minute conversation, Agent Cox and I advised Tina that her two sons
(Andrew and Joe) each had outstanding warrants for their arrest, charging each with an
open count of murder and other felony charges related to the homicide of Adrian Burns.
In addition to inquiring about her son's whereabouts, we requested she assist our
efforts to apprehend them peacefully (by voluntary surrender) as soon as possible.   It
was mentioned that the son's fugitive status would be broadcast on local television news
channels that evening and their arrests and apprehensions would be attempted by various
law enforcement agencies.

Tina Gallegos expressed her appreciation with our concerns for apprehending her sons in
a peaceful, respectful manner and agreed to assist in our effort.  Arrangements were
made with Tina Gallegos to contact her sons and facilitate a peaceful surrender the
following date (Friday, November 5, 2012).  Tina advised that she had contact with her
sons and she expressed and extreme willingness to resolve the investigation immediately
and without incident.  Tina Gallegos stated that she would contact me on Saturday,
November 17, 2012 with a plan to have her sons turn themselves in to the New Mexico
State Police.

CONTACT WITH TINA GALLEGOS ON NOVEMBER 17, 2012:

On Saturday, November 17, 2012, at approximately 8:16 pm, Tina Gallegos contacted me by
telephone in reference to arranging the safe surrender of her two sons (Joe and Andrew
Gallegos) that evening.  Tina Gallegos advised that her sons were out of the immediate
area and eluded that they were somewhere in southern Arizona or approximately six hours
from New Mexico.  Tina Gallegos stated that she had been in contact with hers sons and
made tentative arrangements with them to travel from the Arizona area to turn themselves
in at the Socorro State Police Office sometime on Monday, November 19, 2012.  Tina
Gallegos requested me to contact her the following date of Sunday November 18, 2012 for
more specific details.

CONTACT WITH TINA GALLEGOS ON NOVEMBER 18, 2012:

On Sunday, November 18, 2012, at approximately 9:12 pm, I contacted Tina Gallegos to
make additional arrangements regarding the Gallegos' surrender.  Tina advised that she
had relayed the information to her sons regarding their safe surrender for Monday,
November 19, 2012 and that they were anticipating their surrender that day, most likely
at the Socorro State Police Office.  Tina advised that she would have to travel and
pick-up her sons from their location (out-of-state) and bring them personally to the
State Police.  Tina requested me to contact her the following day for additional details
and instructions.

CONTACT WITH TINA GALLEGOS ON NOVEMBER 19, 2012:

On Monday, November 19, 2012 I contacted Tina Gallegos to make more definite plans
regarding the surrender.  Tina Gallegos advised that she has spoken with her sons and
stated the surrender preparations were going as anticipated.  Tina requested that I
contact her on Tuesday, November 20, 2012 at 10:00 a.m. for detailed instructions
regarding the surrender location.

DNM 587

| NEW MEXICO SUPPLEMENTAL REPORT | | OFFICER | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|---|
| | | NMNSP2113 | 2012-18903 | N | 11 | 20 |

CONTACT WITH TINA GALLEGOS ON NOVEMBER 20, 2012:

On Tuesday, November 20, 2012, between the hours of 10:00 a.m. and 10:30 a.m. I made numerous attempts to contact Tina Gallegos to arrange the safe apprehension of Joe and Andrew Gallegos.  Tina Gallegos did not answer her telephone nor did she make attempts to return my calls regarding her son's fugitive status.

PROCESSING CELL PHONES AT R.C.F.L.:

On Tuesday, November 20, 2012 between the hours of 12:00 and 4:00 p.m. I processed two cellular telephones at the Region Computer Forensic Laboratory, pursuant to the search warrant issued at #4 Erin Court in Los Lunas, New Mexico.  Two cellular telephones were seized during the execution of said search warrant and were listed as evidence item RM-3 and RM-5.  RM-3 is a black and silver Samsung phone with telephone number (505) 225-9627 belonging to Joe Gallegos.  RM-5 is a blue Samsung phone with telephone number ████ ████ belonging to Karen Cartwright.

While at the Regional computer Forensic Laboratory, I photographed, downloaded and copied all of the accessible data on each phone for evidence purposes.  The data and forensic report of each phone was thereafter submitted onto a computer disk (CD-R?s) for evidentiary purposes.
The data collected for each phone was listed as evidence item #RM-3a, RM-5a and RM-5b respectively for each telephone.

For complete details of each cell phone, refer to the data provided on each computer disk.
(Refer to Attachment #1 for a copy of the DPS Evidence Control Form, SP-205 Form).

END OF PHONE PROCESSING.

ARREST OF JOE AND ANDREW GALLEGOS:

On Tuesday, November 20, 2012, at approximately 5:10 pm, I was contacted by telephone and advised that Joe and Andrew Gallegos were arrested at the Imperial Motel, located at 701 Central Avenue in Albuquerque, New Mexico.  I was advised that members of the Unites States Marshals Service apprehended the Gallegos brothers, along with other friends and associates who assisted their efforts to elude law enforcement.  The arrests were made without incident and I was requested to respond to the motel for additional investigation and instruction.

At Tuesday, November 20, 2012, at approximately 5:40 pm, I arrived at the Imperial Motel, located at 701 Central Avenue in Albuquerque, New Mexico.  I made contact with Joe and Andrew Gallegos outside of room 239 and briefly conversed with them about their physical necessities and the status of their pets at #4 Erin Court in Los Lunas, New Mexico.

The Gallegos brothers requested that I contact their mother, Tina Gallegos, to inform her of their capture and to advise that they were apprehended without incident or injury.

I was also assigned to conduct interviews with Joe and Andrew Gallegos following their transportation to the New Mexico State Police Office in Albuquerque, New Mexico.

DNM 588

| NEW MEXICO SUPPLEMENTAL REPORT | | INCIDENT | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 12 | 20 |

CONTACT WITH TINA GALLEGOS ON NOVEMBER 21, 2012:

On Tuesday, November 20, 2012 at approximately 6:30 pm, I contacted Tina Gallegos to advise her of her sons apprehension and arrest.  During my conversation with Tina, she expressed her appreciation with their safe apprehension and stated that she was responsible for her sons eluding law enforcement capture.  She also stated that the other subjects (Charlene Baldizan and Angela Gallegos) arrested for harboring or aiding her fugitive sons did so at her direction.  She also added that she would accept any criminal liability on behalf of the other subjects for assisting her sons efforts to avoid capture.

Without much more discussion, I simply advised Tina Gallegos that her sons would eventually be booked into the Bernalillo County Detention Center pending their official arraignments regarding the murder charges.

END OF CONTACT WITH TINA GALLEGOS.

INTERVIEW WITH JOSPEH AND ANDREW GALLEGOS:

On Tuesday, November 20, 2012 at approximately 6:55 pm, Agent Richard Williamson and I conducted individual interviews with both Joseph Gallegos and Andrew Gallegos at the State Police Office in Albuquerque, New Mexico.  The interviews were conducted in the Uniform Bureau, east interview room, which is equipped with digital video and audio recording devises.

At the start of each interview, I advised both Joseph and Andrew Gallegos their Rights per Miranda from a pre-printed card. Both Joseph and Andrew each stated they understood their rights per Miranda and agreed to speak with us.  During the interviews, both Agent Williamson and I shared the control and direction of the interviews.

Agent Williamson was assigned to document the interview conducted with Andrew Gallegos in his supplemental report.  I was been assigned to document the interview conducted with Joseph Gallegos.  The following is a synopsis of the interview with Joseph Gallegos:

INTERVIEW, JOSEPH GALLEGOS:

The initial interview with Joe Gallegos began at approximately 6:55 pm and lasted a total of approximately one hour and thirty seven minutes:

I advised Joe where he was being detained, what he was being detained for, and where he would be eventually be booked into jail.  We advised Joe that we wished to obtain a statement from him to give himself an opportunity to exonerated him from these charges and clear himself as a suspect.  We explained that we would prefer him to provide some details valuable to the homicide rather than simply booking him into jail.

Joe Gallegos stated that he had a couple things he would like to tell us.

Joe mentioned that he had met a friend the evening of the homicide (November 12, 20120) who was under police surveillance.  He implied that this friend, "Leroy Vallejos" could verify his and his brother's whereabouts the evening of Monday, November 12, 2012.  He also stated that their meeting was allegedly captured on video; either by police or a

DNM 589

| | RESIDENCE | PRIMARY | PAGE | OF |
| --- | --- | --- | --- | --- |
| NMNSP2113 | 2012-18903 | N | 13 | 20 |

retail store video.  Joe added that the meeting took place at the Allsups Convenience
store, located at 2348 Highway 47 in Belen, New Mexico.

Joe stated that he and Andrew were cruising around that evening looking for a place to
party and unwind.  While stopped at the Allsups, he and Andrew were approached by Leroy
Vallejos.  Joe stated that he gave him a small amount of money "to help him out."  Joe
also eluded that he and Andrew may have given Leroy some heroin as Leroy is into the
same thing.

While at the Allsups Joe stated that he purchased a four pack of toilet paper; however,
he stated that Andrew did not enter the store.

Joe stated that Leroy Vallejos was with a friend, Michael Sutton and that Michael was
driving Leroy around in his (Michael's vehicle).

Joe explained that he is a heroin addict and uses heroin on a daily basis.  Joe was very
ashamed of his drug addiction and declined to provide details as to his daily drug
habits or the drug culture.  Joe stated that he "wished he never got involved with
drugs, as he would have never gotten involved with this."

Joe did explain that he and his brother shared the similar drug (heroin) habit and that
their main source of drug supply was Adrian Burns.  He provided that he has been
purchasing heroin from Adrian Burns over for the past few years and would typically
purchase about $50.00 worth of heroin at a time.  Joe explained that he would use "two
to three" and sell or provide the remaining "$10.00 to $20.00" to other heroin addicts.

Joe also explained that Adrian was his friend and offered a few explanations as to why
someone would want to do this to him.  Joe stated that Adrian had no enemies and
mentioned that Adrian was very savvy about dealing drugs.  Adrian never mentioned
anything about any personal problems or anyone he was having issues with.  The only
worries Adrian ever mentioned was the typical issue of getting arrested by the police
for drug trafficking.  Adrian also apparently told Joe that he had $250,000.00 in U.S.
Currency put away somewhere in a safe location.  Joe further explained that he once saw
a newspaper article that Adrian Burns had approximately $80,000.00 seized by law
enforcement during a police raid a few years back.  Joe's opinion as to the motive of
Adrian's homicide was, "Greed because someone was desperate and wanted his money."  He
added that the killers "would have this money in their bank account and we could find
the killers that way."

Another explanation Joe provided regarding the homicide is that he heard a rumor that
Adrian Burns girlfriend (Amber) was seeing/ dating a police officer on the side.  He
explained that Adrian had prior problems with the police breaking into his residence
(without warrants) and taking money.  Joe also stated that Adrians mother had a
surveillance video tape documenting the police illegally breaking into their house.  Joe
explained that Adrian Burns lived with his mother somewhere in Los Lunas and stated that
Police Officer Joe Portillo and Valencia County Sheriff's Deputy Hall were two officers
who went to Adrians house on occasion.

Joe Gallegos was asked to provide a timeline of things he did the day of Monday,
November 12, 2012.  During this timeline, Joe was very vague as to what he did, who he
was with, and was unable to verify his activities between 7:33 pm and 11:33 pm.

Joe Gallegos stated that he was with his brother, Andrew for most of the day.  He

| NEW MEXICO SUPPLEMENTAL REPORT | OR # | SID # | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 14 | 20 |

advised that he was cutting metal at his residence (located at #4 Erin Court in Los Chavez) and that he "was having a very bad day." Joe stated that he scraps metal for a living and that his cutting torches broke and he also ran out of oxygen. He believed that he drank a few beers that afternoon then called Adrian Burns to deliver heroin to his residence -as he had no gasoline in his truck to meet him. Joe further explained that Adrian always met him to deliver drugs at nearby convenience stores and typically would never deliver to people's house. He advised that Adrian was very smart at dealing narcotics and would "never get caught at someone's house where bad things can happen."

Despite Adrian's habit of never delivering to residences, Joe explained that Adrian Burns agreed to come to his (Joe's) residence sometime around 7:33 p.m. Joe confirmed the approximately times of the two phone calls to Adrian and confirmed that Adrian called (Joe) upon his arrival to the house. Joe stated that it was dark outside and that Joe met Adrian at the entrance to his property. Joe stated that Adrian was driving his white, Mitsubishi car and that he was alone in the vehicle. Joe stated that Adrian never got outside of the vehicle and that he purchased $50.00 worth of heroin from Adrian. After the drug transaction, Joe stated that Adrian Burns departed. Joe was confident that Adrian never exited his vehicle and never entered his residence that evening. Joe also stated that the two did not have any problems and the drug transaction went as usual.

After Adrian left, Joe eluded that he immediately used heroin and "drove around" for the remainder of the night. Joe stated that he did not meet anyone, he did not purchase anything, and he did not go anywhere to verify his whereabouts. Joe stated that he left his phone at his residence the entire time and drove around to his cousins/ grandfathers residence in Belen, New Mexico. Joe denied driving anywhere south of Belen and only offered Leroy Vallejos and the Allsups store to verify his whereabouts later that evening.

When advised that his account left an open window of approximately three (3) to four (4) hours that he could not account for. Joe explained that he "could not remember" what he did between those specific hours (the hours of the homicide). He added, "I took off for a cruise" and "I was high."
When asked where he was and what he was doing when he learned of the homicide, Joe explained that he "did not remember," then explained that he heard Adrian Burns name being broadcast on the local police scanner. He advised that he was home when he heard his name on the scanner and added that his cell phone had an "app" to broadcast the local police scanner.

When asked how long Adrian was at his house of if Adrian came inside, Joe stated, "I can't even be sure... we said a few things, and I was high." Joe then changed the subject and mentioned, "If you want to find the person (who did this) look for the money." Joe later added that "there is a lot of money still out there and that what these things are usually about. Greed and money."

Joe thereafter refused to talk about what occurred after Adrian left, stating the he did not want to talk about his drug use. He mentioned that, it "was making him nervous." He became agitated when we asked probing questions as to what occurred after Adrian left, advising that he doesn't "like talking about drug use and that it is a disgusting habit."

All Joe was able to articulate after Adrian left his residence was being at the Allsups

DNM 591

| NEW MEXICO SUPPLEMENTAL REPORT | | OR NO | INCIDENT NO | | PRIMARY | PAGES |
|---|---|---|---|---|---|---|
| | | NMNSP2113 | 2012-18903 | | N | 15 | 20 |

with Leroy Vallejos.

When we inquired about Joe departing his residence at #4 Erin Court before the search warrant execution (November 15, 2012)  Joe gave a full explanation:  Joe stated that he observed two subjects driving by his residence (in a black truck) before the police executed the search warrant.  After the black truck drove by, a friend called him and advised the police were up the street.  Joe stated that after receiving the phone call from his friend, he immediately departed his residence in his white Dodge Van.  Joe stated he didn't obtain anything from within his house or pack any belongings, he just left -immediately.

Joe stated that he departed his residence for fear that the police would raid his house because of the metal he was cutting in his driveway.  Joe stated that he was leery the police would believe the vehicles he was chopping were stolen.

Joe also mentioned that he was, "Hoping by some chance that someone else would be arrested for this."

Later in the interview we re-questioned Joe about when Adrian came to his house the evening of Monday, November 12, 2012.  Joe stated, "He came alone, it was dark, I met him at his car."  Joe was unable to recall his conversation with Adrian and again became nervous and agitated.

I thereafter asked Joe point blank, "Did Andrew do this? Did something happen between Andrew and Adrian."  Joe responded, "I'm getting uncomfortable."  Joe refused to provide further details of what occurred when Adrian was at his house and stated that he did not want to talk about this anymore.

When inquired if he would be willing to submit to a polygraph, Joe stated that he would be willing to take a polygraph.  When asked "Did you cause the death of Adrian Burns" Joe stated, "I'll beat that 100%."  When I asked, "Were you present when this occurred."  Joe replied, I'll beat that 100%.

After these questions, it was decided we take a break (smoke/ restroom break) at approximately 8:31 pm.

The secondary interview with Joe Gallegos began at approximately 12:04 am and lasted approximately 23 minutes.

During the secondary interview, we attempted to gain additional information relative to Adrian being at Joe's residence that evening and what may have occurred thereafter.  Joe Gallegos was unable to remember or didn't want to talk about specific details of the evening for most of the interview.  Eventually, Joe was confronted with a statement of,"Either you killed him or your brother killed him."  Joe replied, "If you say it's that."  He added, "In his business he was doing a lot more than that."
Joe was unable to explain a burnt jacket located within his residence, stating that, "I can't remember, I can't tell you anything about a burnt jacket."

Joe was also confronted with the question, "Was this a case of self-defense, did someone get disrespected or was this an accident, was is something that went too far?"  Joe responded, "I don't want to talk, you know, I can't remember stuff and I don't want to talk to anybody."

DNM 592

| NEW MEXICO SUPPLEMENTAL REPORT | OR NO | INCIDENT NO | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 16 | 20 |

==Eventually the interview terminated at approximately 12:27 am after he requested to speak with an attorney.==

INTERVIEW, ANDREW GALLEGOS:


The initial interview with Andrew Gallegos began at approximately 9:00 pm and lasted a total of approximately two hours and fifteen minutes:

After taking a break (Smoke and bathroom) a second interview with Andrew Gallegos began at approximately 12:41 am and lasted approximately 57 minutes.

At the inception of the interview, I advised Andrew his Right per Miranda from a pre-printed card. Andrew stated he understood his rights and agreed to speak with us. During the interviews, both Agent Williamson and I shared the control and direction of the interview; however, Agent Williamson will synopsize the interview in his supplemental report.  (For complete details of the interview with Andrew Gallegos, refer to the digital recording.)

END OF INTERVIEW WITH ANDREW GALLEGOS.

PROCESSING VIDEO TAPED INTERVIEW:

On Wednesday, November 21, 2012 at approximately 2:00 pm, I downloaded the recorded interviews conducted with Joe ad Andrew Gallegos from the previous evening.  The recordings were processed from the recording room's hard drive onto a DVD+R computer disk for further processing and submission into evidence.  After downloading the original, I made working copies for distribution to the case agent and submitted the original computer disk to the State Police Evidence Room in Albuquerque, New Mexico. The computer disk containing the interviews with Joe and Andrew Gallegos was labeled, evidence item # JM-1    (Refer to Attachment #2 for a copy of the DPS Evidence Control Form, SP-205 Form).

OBTAINING MAJOR CASE PRINTS FOR JOE AND ANDREW GALLEGOS:

In furtherance of this investigation, I was assigned to conduct additional interviews with subjects/ witnesses as well as obtaining major case prints from suspect, Joe and Andrew Gallegos.  On Tuesday, November 27, 2012 at approximately 12:00 a.m., I obtained the recent, booking information and finger/ palm prints of Joseph and Andrew Gallegos. The major case prints were obtained from the Albuquerque Police I.D. Section and include a copy of each Gallegos's photograph, personal booking information, finger print, and palm print impressions.  The major case prints were processed packaged as evidence and submitted into evidence under Item numbers JG-100 and AG-100 for use at the Northern Forensic Laboratory.  (Refer to Attachment #3 for a copy of the DPS Evidence Control Form, SP-205 Form).

INTERVIEW, MICHAEL SUTTON:

In furtherance of this investigation, I was assigned to conduct an interview with witness, Michael Sutton, to confirm some details of his observations the evening of Monday, November 12, 2012.

I conducted the interview with Michael Sutton at the State Police Office in Los Lunas,

| NEW MEXICO SUPPLEMENTAL REPORT | OCA | INCIDENT NO. | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 17 | 20 |

New Mexico at approximately 4:13 pm and I recorded the interview on my issued, digital recorder. The interview lasted approximately 14 minutes and the following is a synopsis of the interview. For complete details, refer to the digital recording:

Michel Sutton confirmed all of the information he provided me during the initial interview conducted with him on November13, 2012. Other information he was able to describe in further detail was the identity of the individual he was with and the conversation taking place at the Allsups the evening of November 12, 2012 with Joe and Andrew Gallegos.

Michael repeated that he was at the Allsups convenience store located at 2348 Highway 47 in Belen, New Mexico at approximately 11:30 pm, when he observed Joe and Andrew Gallegos fueling their vehicle at pump #2. Michael Sutton reaffirmed that he was operating his tan Ford Expedition and parked at pump #3 to briefly refuel before returning home. He added that he was with one passenger, identified as Leroy Vallejos. While parked at the Allsups, Leroy Vallejos approached Joe Lawrence Gallegos to engage in a short conversation. Without any hesitation, Michael noticed that Joe Gallegos voluntarily provided Leroy a sizeable amount of heroin and some U.S. Currency. Upon returning to the vehicle Michael stated that Leroy Vallejos had approximately 1/4 ounce of heroin packaged in the unique manner to which Adrian Burns packaged his heroin to customers; $20.00 individual packages wrapped neatly in a corner baggy and aluminum foil. Leroy Vallejos advised that he was initially upset at obtaining the heroin as he was "trying to stay clean and kick his heroin habit." In addition, Leroy and Michael knew that it was unusual for Joe and Andrew Gallegos to have that sizeable amount of heroin -as they typically never had that much and rarely just gave it away. Michael Sutton also stated that Leroy Vallejos was given a rolled-up wad of money from Joe and the Leroy Vallejos stated that they told me, "We just pulled off a `movida? (job) and we gotta go clean-up." According to Michael and Leroy, it appeared obvious the Gallegos brothers had just recently committed some act that resulted in them scoring a large amount of heroin and money. They were now voluntarily sharing their gains with their friends and associates to "help them out."

Other information I inquired from Michael Sutton were various rumors of Amber Sutton dating or having a relationship with a police officer. Michael Sutton was adamant that his sister (Amber) was not dating or seeing a police officer, that those statements were just untrue rumors. Michael Sutton advised that he had heard many other rumors of the way in which the murder of Adrian Burns occurred. Most of the rumors were obviously untrue to his personal knowledge. Michael Sutton also advised that he had never heard of Adrian Burns being raided by the police and having $80,000.00 seized/ forfeited as a result of the raid. Michael advised that a few years back, Adrian Burns mentioned that he previously had an ex-girlfriend steal a duffel bag of money from him, but never anything with regard to a police seizure. Michael also was adamant that Adrian Burns only carried a few thousand dollars in his pocket to fund his daily drug dealing operations. Michael stated that it would be highly unlikely that Adrian had a large stash of money hidden somewhere (over ten thousand dollars). Michael stated that Adrian basically had no money anywhere as his sister (Amber) had to purchase and finance their vehicle (the white Mitsubishi Gallant).

Michael Sutton also revealed some information that was either leaked or rumored in the community. In particular, he clarified that he personally heard police scanner radio transmissions (from La Joya Firefighters) that Adrian Burns was located "burned, handcuffed behind his back and that a bag was over his head." Michael advised that he

DNM 594

heard this information from his girlfriend's police/ fire scanner the evening or morning of the homicide.  He mentioned that other rumors proved to be obviously false but these detailed facts were obtained from radio transmissions.


END OF INTERVIEW.


ADDITIONAL INTERVIEWS CONDUCTED:


In furtherance of this investigation, I was assigned to assist and conduct additional interviews with witnesses to confirm or dispel some details or rumors discovered in this investigation.  One of the interviews conducted was with Maxine Burns, the mother of Adrian Burns (the victim).
On Thursday, November 29, 2012 I assisted in a recorded interview with Maxine Burns. Also present during the interview were various family members and close relatives of Adrian Burns.  During this interview, Agent Williamson and Sergeant Isaac Valerio were present and Agent Williamson was assigned to document the interview in his supplemental report.  For a synopsis of the above interview, refer to Agent Williamson's supplemental report.  For complete details, refer to the digital recording.


Following the interview with Maxine Burns, Agent Williamson, Sergeant Valerio and I located and interviewed an additional witness; Daniel "Sleepy" Orndorff.  Daniel was located and interviewed outside his residence (in an unmarked police vehicle) at ██ ██████████████████████████, New Mexico.


On Thursday, November 29, 2012 at approximately 6:16 pm, I recorded the above interview on my department issued, digital recorder.  The interview lasted approximately one hour and forty-three minutes and the following is a synopsis of the interview.  For complete details refer to the digital recording.


INTERVIEW, DANIEL ORNDORFF:


Daniel explained that he has been friends with Adrian Burns for approximately two years; primarily through his heroin use.  Daniel explained that Adrian Burns has been his primary source for heroin, and described that he uses heroin on a consistent basis. Daniel described that he needs heroin from Adrian first this in the morning (typically at 7:00 am) then would obtain more heroin at approximately 7:00 pm.  Daniel also described that he often uses heroin with the Gallegos brothers (Joe and Andrew) on a daily basis because he works with the brothers scrapping metal.  Typically, Daniel would use $20.00 at a time and the Gallegos brothers had similar habits consistent with his use.  Daniel also purchased his heroin with the Gallegos brothers on a daily basis from Adrian Burns and that they would always meet Adrian at the Allsups convenience store on State Road 314 in Los Chavez, New Mexico.  Daniel described the times and methods he would obtain his heroin and added that Adrian typically arrived in his white, Mitsubishi Gallant.  Oftentimes, Adrians girlfriend (Amber) would be present as a passenger in Adrians vehicle.  Daniel was able to describe that Adrian Burns had the best heroin in the local area; Adrians heroin would have a particular smell, taste and purity that was high-grade.  Daniel also described the unique nature Adrian Burns would package his heroin and mentioned that everyone in town knew how it was packaged ($20.00 papers wrapped in aluminum foil and a plastic, corner baggy).  Daniel also stated that Adrian Burns would never sell more than a few $20's, stating that Adrian would never sell more that an 8-ball (1/8 ounce) ever.  Daniel also stated that the Gallegos brothers would typically purchase similar amounts of heroin; $20's and $10's every day and sometimes

DNM 595

| NEW MEXICO SUPPLEMENTAL REPORT | OR NO | INCIDENT NO | PRIMARY | PAGE | OF |
|---|---|---|---|---|---|
| | NMNSP2113 | 2012-18903 | N | 19 | 20 |

multiple times a day. Daniel stated that Andrew Gallegos never had enough heroin and was constantly asking to 'borrow a shot" and Andrew was known for constantly bumming heroin from anyone in sight.

Daniel was able to describe the day of Monday, November 12, 2012, stating that is was the typical day; Daniel awakes each day at 6:00 to 6:30 am and immediately works on obtaining heroin from Adrian. Daniel stated that he obtained heroin that day and would often call Adrian two to three times daily for his heroin. Daniel advised that he would call Adrian Burns on his cell phone and that his (Daniels) cell number was ███████ ██. He explained that his number would be a frequent caller on any cell records requested and that each call typically represented a drug deal.

Daniel advised that he was home ███████████████ the afternoon and evening of Monday, November 12, 2012. Daniel stated that he was not at Joe and Andrew Gallegos residence (#4 Erin Court) that evening when Adrian Burns arrived at #4 Erin Court to deliver heroin (at approximately 7:33pm.) Daniel stated that he did not encounter the Gallegos brothers or visit their residence until after 9:30 pm on November 12, 2012.

Daniel was able to describe when Amber Sutton called and met with him after Adrian failed to return from his last drug deal with the Gallegos brothers (at 7:33 pm.) Amber was asking for Daniel to look for Adrian and to verify if he was still with the Gallegos brothers at their residence. In return, Daniel stated that he walked to #4 Erin Court and entered Joe Gallegos house. Daniel stated that he entered #4 Erin Court sometime around 9:30 pm and observed Joe and Andrew Gallegos "trashing the house." Daniel stated that Joe and Andrew were obviously tweaking on methamphetamine and they advised that they were "cleaning the house." Daniel stated that he has rarely observed Joe under the influence of methamphetamine, but recognized that he was clearly worked-up on meth. Daniel described being at #4 Erin Court and detailed using narcotics at the house, and obtaining a pig leg (pork) from a recent mantanza the Gallegos brothers attended.

Daniel also described that the Gallegos brothers were covered in blood and that the Gallegos brothers reasoned that the blood was from the mantanza the previous day.

After departing #4 Erin Court, Daniel stated that he returned to his residence at █ ███████ and encountered Amber Sutton down the street. Daniel stated that he was not willing to provide the address of Joe and Andrew Gallegos to her, stating that "he wasn't a Rat" and I did't want Amber going to their house at #4 Erin Court.

Daniel stated that he did not know any details of the homicide and had no information as to any suspects or leads in the case. Daniel also stated that he did not witness anything relative to the homicide stating that "it would be stupid to knock-off your supplier." Daniel also mentioned that he was friends with Adrian, that Adrian had kids, that he purchased a car from Adrian and that he has also been at Adrian's house. Daniel adamantly denied having any involvement in the murder of Adrian Burns.

END OF INTERVIEW.

PROCESSING DIGITAL EVIDENCE:

Following all of the recorded interviews conducted, I downloaded and processed all evidence onto a CD-R computer disk for evidence purposes. On December 7, 2012, all

| NEW MEXICO SUPPLEMENTAL REPORT | ORI NO. NMNSP2113 | INCIDENT NO. 2012-18903 | PRIMARY N | PAGE 20 | OF 20 |
|---|---|---|---|---|---|

recorded interviews were downloaded onto an original CD-R disk and working copies of the CD-R were made and distributed to the case agent.  The computer disk of recorded interviews was listed at evidence Item #JM-2 and it was submitted into the State Police Evidence Room in Albuquerque, New Mexico.  (Refer to Attachment #4 for a copy of the DPS Evidence Control Form, SP-205 Form).

END OF DIGITAL EVIDENCE.

This concludes my involvement in this case thus far.  Upon receipt of any additional information, a supplemental report will be submitted.

CASE STATUS:  OPEN/ ACTIVE.

| "I WILL PROSECUTE / TESTIFY SHOULD THE OFFENDER" Y N | "I UNDERSTAND IT IS A CRIMINAL OFFENSE TO FILE A FALSE REPORT TO POLICE." | COMPLAINTANT / VICTIM CERTIFICATION SIGNATURE  X | | DATE |
|---|---|---|---|---|
| REPORTING OFFICER **JAMES MOWDUK** | | RANK **AGENT** | I.D. NO **2113** | **11/29/2012** |
| ASSISTING OFFICER | | | | |
| APPROVING OFFICER **ISAAC VALERIO** | | **SERGEANT** | **3747** | **01/03/2013** |
| DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | | | | |
| PROCESSED BY                    DATE | | DATA ENTRY PERSON **JMOWDUK** | | **11/29/2012** |
| INCIDENT STATUS **ACTIVE**    C.L.A.    C.L.E. | | EXCEPTIONAL CLEARANCE CODE | | **11/13/2012** |

| AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC.) **INVESTIGATIONS BUREAU,** **RECORDS,** **AGENT WILLIAMSON.** | CASES CLEARED BY THIS ARREST |
|---|---|
| | Case No.          Case No.          Case No. |

IN THE SEVENTH JUDICIAL DISTRICT

SOCORRO COUNTY

STATE OF NEW MEXICO


STATE OF NEW MEXICO

     Vs.


IN THE MATTER OF THE ISSUANCE OF A

SEARCH WARRANT FOR:


1. Cricket Wireless
   Attention: Custodian of Records
   5887 Copley Drive, San Diego, California 92111

2. Cellular phone number of investigation (505) 261-5127, (505) 304-0985, (505) 315-5111, (505) 304-9758, (505) 712-5523

## SEARCH WARRANT

### THE STATE OF NEW MEXICO, TO ANY OFFICER AUTHORIZED
### TO EXECUTE THIS WARRANT:

Proof by Affidavit for Search Warrant having been submitted to me, I am satisfied that the person named/described and/or property (evidence) described in the Affidavit are located where alleged in the Affidavit, and I find that grounds exist for the issuance of the Search Warrant. A copy of the Affidavit is attached and made a part of this Search Warrant.

**YOU ARE HEREBY COMMANDED TO SEARCH FORTHWITH** the person and/or place described in the Affidavit, commencing between the hours of 6:00 a.m. and 10:00 p.m. [ I have specifically authorized a nighttime search as stated below], and continuing thereafter until completed, for the person and/or property (evidence) described in the Affidavit, serving this Warrant together with a copy of the Affidavit, and making the search, and if the person and/or property (evidence) be found there, to seize the person and/or property(evidence) and hold for safekeeping until further Order of the Court.

Executing Officer(s) are directed to prepare a written inventory of any person or property or evidence seized. You are further directed to file the Return and written inventory with the Clerk of this Court promptly after execution of this Search Warrant.

DATED THIS ___29___ DAY OF _November_ , 2012 at _13:37 hrs._   ~~AM~~.

_Charles W. Brown_
_____
**JUDGE**

GOVERNMENT'S EXHIBIT 9

U.S. v. DELEON, ET AL.   3791DNM 598

## AUTHORIZATION FOR NIGHTTIME SEARCH

I further find that reasonable cause has been shown for nighttime execution of this
Warrant. I authorize execution of this Search Warrant at any time of the day or night for
the following reasons [ forth reasons why a nighttime search is necessary]:

_____

**JUDGE**

IN THE SEVENTH DISTRICT COURT
SOCORRO COUNTY
STATE OF NEW MEXICO

IN THE MATTER OF THE ISSUING A SEARCH WARRANT ON THE 29TH DAY
OF NOVEMBER, 2012.

### AFFIDAVIT FOR SEARCH WARRANT

   Affiant, being duly sworn, upon his oath, states and I have reason to believe that
on the following described premises, vehicle(s) and/or person(s) of:

  1. Cricket Wireless
    Attention: Custodian of Records
    5887 Copley Drive, San Diego, California 92111

  2. Cellular phone number of investigation (505) 261-5127, (505) 304-0985,
(505) 315-5111, (505) 304-9758, (505) 712-5523

In the city or county designated above there is now being concealed:

1. Document(s) that establish or tend to establish ownership, possession, use, transfer
   and/or the right to ownership, possession, use and/or transfer of the herein-described
   item(s), to be seized.
2. Records for Wednesday, October 10, 2012 to Wednesday, November 28, 2012 to
   include but not limited to subscriber information, incoming, outgoing, and missed
   calls. Times and date of these completed phone calls. Paper documentation showing
   text messages, voice messages, and data transfer usage of the above listed phone
   numbers. Account numbers, subscriber information, and billing information for the
   phone numbers listed as incoming, outgoing, and missed phone calls.
3. Records for the call detail of any and all cellular repeater sites which incoming,
   outgoing, and missed phone calls were documented for these numbers for the period
   encompassing Wednesday, October 10, 2012 to Wednesday, November 28, 2012.
4. Voicemail password reset to make available to Affiant any and all voicemail audio
   recordings saved and/or maintained by this account.

The facts tending to establish the foregoing grounds for issuance of a Search Warrant are
as follows:

   Affiant, Alvino Vigil, is a full time salaried law enforcement officer who has been
employed by the New Mexico State Police for a period of approximately nine (9) years.
Affiant has received specialized training in criminal investigations through the New
Mexico Law Enforcement Academy and the New Mexico State Police Academy. Affiant
has received training in the investigation of violent crimes including but not limited to
homicide investigations. Affiant has received both classroom and on the job training
concerning the investigation of the above offense(s). Affiant has conducted numerous
criminal investigations that led to the arrest and conviction of persons in violation of New
Mexico State Statutes.

On Monday, November 12, 2012, New Mexico State Police Investigations Bureau personnel, to include the affiant, responded to a homicide which occurred in Bernardo, New Mexico. The victim, identified as Adrian Burns, was discovered behind a burned vehicle. The victim was lying in the fetal position and had been severely burned. The victim had been handcuffed behind his back and what appeared to be a bag was found over the victim's head. Results from Mr. Burns' autopsy revealed, along with sustaining extensive burns throughout his body, Mr. Burns sustained a gunshot wound to the head which caused his death.

Through police interviews two individuals have been identified as Mr. Burns' main heroin buyers: Joe Lawrence Gallegos and Andrew Gallegos. These individuals are believed to use approximately $120.00 worth of heroin per day. Both individuals live in the same vicinity in the same neighborhood.

The following phone records were obtained from Mr. Burns' phone for Monday November 12, 2012:

1. 4:41 p.m. - phone registered to Andrew Gallegos contacts Mr. Burns.
2. 4:50 p.m. - phone registered to Andrew Gallegos contacts Mr. Burns.
3. 6:52 p.m. - phone registered to Joe Gallegos contacts Mr. Burns.
   7:33 p.m. - Mr. Burns calls Joe Gallegos.

Arrest warrants were obtained for both suspects by Seventh Judicial District Judge Edmund Kase. Search warrants were obtained and executed on the suspects' residence and belongings. Neither Joe Lawrence Gallegos nor Andrew Gallegos was present at the residence during the search warrant execution. Items and information recovered from the search warrant executions link both suspects further to the homicide. Statements obtained from law enforcement interviews to include the interview of the victim's girlfriend Amber Sutton provided information the murder of Mr. Burns appeared to be related to narcotic dealings with the suspects.

Subsequent the search warrant executions, state-wide media released the photos of Joe Lawrence Gallegos and Andrew Gallegos. The mother of the suspects, identified as Tina Gallegos, contacted New Mexico State Police agents. Tina Gallegos informed agents she spoke with her sons and instructed them to turn themselves in to authorities. Tina Gallegos stated she convinced Joe Lawrence Gallegos and Andrew Gallegos to turn themselves in on November 19, 2012, in Los Lunas, New Mexico, which did not occur.

Surveillance of Joe Lawrence Gallegos and Andrew Gallegos' residence identified parked at the residence a white 1996 year model Dodge van displaying New Mexico registration ▮▮▮▮. The vehicle is registered to Joe Gallegos, date of birth: ▮▮▮▮. Upon execution of the search residence warrant, agents were informed by occupants of the residence both Joe Lawrence Gallegos and Andrew Gallegos left the residence prior driving the white van.

On Tuesday, November 20, 2012, U.S. Marshals Task Force conducted surveillance of the Imperial Motel located at 701 Central Avenue NE in Albuquerque,

New Mexico, where they received information the suspects may be located. U.S. Marshals Task Force personnel observed in the motel parking lot a white Dodge van displaying New Mexico registration ███ parked.

Upon further observation, at approximately 6:00 p.m. a black, 4-door, 2000 year model Jeep Grand Cherokee displaying New Mexico registration ███ arrived and parked directly next to the white van (on the east side of the van). A check of the registration was conducted through dispatch. The Jeep was registered to Angela Gallegos, daughter of Joe Lawrence Gallegos. The female driver, and only occupant of the Jeep, later identified as Angela Gallegos, exited the Jeep. Angela Gallegos appeared to be carrying a large amount of food and went into room number ██ Minutes later, Angela Gallegos exited the motel room and went to the white Dodge van. She then removed items from the van and placed them inside the Jeep she was driving. She then entered room number ██ again.

U.S. Marshals Task Force approached room number ██ at approximately 6:10 p.m. Upon approaching room number ██, a male subject opened the curtain of the motel room and looked out. U.S. Marshals Task Force immediately identified the male subject as Andrew Gallegos. U.S. Marshals Task Force entered motel room number ██ and executed the arrest warrants of Joe Lawrence Gallegos and Andrew Gallegos. Also present in the motel room were two female subjects identified as Angela Gallegos (date of birth: ███) and Charlene Y. Baldizan (date of birth: ███). Both female subjects were detained for questioning.

A search warrant was obtained by Agent Elizabeth Whitfield for Room number ██ at the Imperial Motel located at 701 Central Avenue NE in Albuquerque, New Mexico and for the following vehicles at the motel room white Dodge van displaying New Mexico registration ███ and black 4-door 2000 year model Jeep Grand Cherokee displaying New Mexico registration ███.

While executing the search warrant several cell phones were seized from motel room ██ and from the black Jeep Grand Cherokee. The cell phones were later taken to the New Mexico Regional Computer Forensic Laboratory (NM RCFL) on November 21, 2012. Affiant met with Agent P. Michael Smith, New Mexico State Police, Investigations Bureau, assigned to the NM RCFL. Agent P. Michael Smith escorted Agent Jeffrey Smith and Affiant to the Cell Phone Kiosk room where he assisted in the downloading of the data on several cellular phones. Some of these cellular phones contained memory chips, MicroSD(HC), and the data stored on these chips was downloaded onto compact discs (cds) through the use of the Loose Media Kiosk located at the NM RCFL.
I used the Loose Media Kiosk and cell phone kiosk to download the memory chip and phone data located in the following phones:

1.) Model XT 875 make Motorola Android phone and micro SD(HC)(4G) card # (505)304-9758 Cricket Communications (Evidence Item# G-7).
2.) Make Nokia model X2-01.1 and SD (HC)(8G) card # (805)637-7243 T mobile (Evidence Item# G-7).
3.) Make Samsung Model SCH-R710 and micro SD (HC)(3G) card # (505)315-5111 Cricket Communications(Evidence Item# G-3). Images and call logs could only be

DNM 602

downloaded from this phone.
 4.)  Make ZTE model A310 could not be downloaded # (505)304-0985 or (505)261-5127 Cricket Communications (Evidence Item#G-2).
 5.)  Make Hauwei model M860 #(505)712-5523(Evidence Item#G-1)

 This data was downloaded onto compact discs (cd) and Affiant placed all compact discs containing the downloaded data from the above mentioned cellular phones and memory chips into the evidence vault at the New Mexico State Police Office in Albuquerque.

In order for Agents of the New Mexico State Police to conduct the most thorough investigation, the cell phone records from the above mentioned cell phones need to be obtained and examined. Investigators hope to obtain through the examination of phone records evidence of communication in the form of phone calls or text messages between the suspects, Joe Gallegos, Andrew Gallegos, witnesses and the victim, Adrian Burns. Phone records need to be obtained for the above mentioned time period in order to establish an ongoing relationship or connection between the suspects and the victim. Based on my training and experience I know that some suspects routinely call and share information about a crime they recently committed. The cell phone records may reveal people that the suspects may have shared information or details of the crime they committed.  For this reason records need to be obtained for a reasonable time period after the crime was committed and after their day of arrest.  The suspects were fugitives and on the run for approximately ten days which during this time the suspects like most people, use their cell phones for communication.

Therefore, Affiant respectfully requests that the Court issue a Warrant commanding the production of the above mentioned cellular phone records or documents.

Subscribed and sworn to before me in
~~Socorro~~ *Bernalillo* County, New Mexico on this
29 day of *November*, 2012

*Charles W. Brown*
Judge, ~~Notary or other officer~~
authorized to administer oaths.

Alvino Vigil
Agent, N.M. State Police

Approved as to legal sufficiency:

*Electronic Approval by ADA R. Baca  11/29/12*
Assistant District Attorney

Note:  This affidavit shall be filed in the same file as the search warrant.  If no criminal proceedings are filed, the affidavit and warrant shall be filed in a miscellaneous file.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.      15-4268 JB |
| | ) | |
| ANGEL DELEON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### THE UNITED STATES' RESPONSE TO DEFENDANTS' MOTION FOR TIMELY DISCOVERY OF *GIGLIO* MATERIALS [Doc. 1163]

At the Omnibus Motions hearing in these matters on May 9-11, 2017, the Court ordered the United States to disclose, under *Giglio v. United* States, 405 U.S. 150 (1972), impeachment evidence immediately. The Court concluded that timing of disclosure under *Giglio* is identical to that for *Brady v. Maryland*, 373 U.S. 83 (1963). At the Motions Hearing on May 19, 2017, the Court noted the distinction between *Giglio* materials and statements under Jencks, of which he did not require early production.

Given those rulings, the United States does not oppose many of Defendants' requests, as they request information that the United States concedes may be properly considered *Giglio* materials. The United States opposes, however, Defendants' request for confidential competency and mental illness records, as those materials are protected from the United States' access and it, thus, cannot produce them. The United States will not produce the last known address of its witnesses, as that information does not come within *Gilgio* materials. The United States does not have materials responsive to many of Defendants' requests, as explained below. Otherwise, the United States doesn't oppose the Defendants' Motion for Timely Discovery of *Giglio* Materials [Doc. 1163] ("Motion").

## LEGAL AUTHORITIES

This Court recognized that the Supreme Court held that the Constitution does not require

"'preguilty plea disclosure of impeachment information.'" *United States v. DeLeon*, No. CR 15-

4268 JB, Mem'm Opinion and Order [Doc. 907] at 60 (D.N.M. Feb. 8, 2017) (Browning, J.)

("MOO") (quoting *United States v. Ruiz*, 536 U.S. 622, 629 (2002) ("We must decide whether

the Constitution requires the preguilty plea disclosure of impeachment information. We conclude

that it does not.")). The Supreme Court reached this conclusion, because "impeachment

information is special in relation to the *fairness of a trial*, not in respect to whether a plea is

voluntary." *Ruiz*, 536 U.S. at 629 (emphasis in original). *See* MOO at 60 (quoting the same).

The United States Court of Appeals for the Tenth Circuit pointed out that the Supreme

Court in *Ruiz* "explained that impeachment evidence differs from exculpatory evidence in that it

is not 'critical information of which the defendant must always be aware prior to pleading guilty

given the random way in which such information may, or may not, help a particular defendant.'"

*United States v. Ohiri*, 133 F. App'x 555, 562 (10th Cir. 2005) (unpublished) (quoting *Ruiz*, 536

U.S. at 630). In *Ohiri*, the Tenth Circuit reversed the district court's denial of the § 2255 motion,

because the defendant alleged that the United States withheld *Brady*-type exculpatory evidence

before he pleaded guilty. *See id.* ("[T]he evidence withheld by the prosecution in this case is

alleged to be exculpatory, and not just impeachment, evidence."). In reversing the district court,

the Tenth Circuit's distinction of the facts from those in *Ruiz* suggest that the timing of

disclosure of *Giglio* impeachment evidence and *Brady* exculpatory evidence differs in that *Brady*

exculpatory evidence must be disclosed earlier than *Giglio* evidence:

> By holding in *Ruiz* that the government committed no due process violation by
> requiring a defendant to waive her right to impeachment evidence before
> indictment in order to accept a fast-track plea, the Supreme Court did not imply

2

that the government may avoid the consequence of a *Brady* violation if the
defendant accepts an eleventh-hour plea agreement while ignorant of withheld
exculpatory evidence in the government's possession.

*Ohiri*, 133 F. App'x at 562.

And this Court has recognized the Tenth Circuit's distinction in its treatment of *Brady*
exculpatory evidence and *Giglio* impeachment evidence. *See* MOO at 61-62 ("The Tenth Circuit
has held, however, that *United States v. Ruiz* does not apply to exculpatory evidence, but rather
applies only to impeachment evidence . . . ."); *United States v. Baca*, No. CR 16-1613 JB, 2016
WL 6404772, at *27 (D.N.M. Oct. 20, 2016) (Browning, J.) (same).

The United States District Court for the District of New Mexico has recognized that the
distinction between timing of disclosure of *Giglio* impeachment evidence and *Brady* exculpatory
evidence finds support on two recognized grounds: (i) the use to which such information will be
put; and (ii) the safety concerns of government witnesses.

The Honorable Robert C. Brack, United States District Judge for the District of New
Mexico, pointed out that both of these grounds play into "[t]he precise time at which *Brady* or
*Giglio* evidence must be disclosed." *United States v. Lujan*, 530 F. Supp. 2d 1224, 1255 (D.N.M.
2008) (Brack, J.). In relation to the use to which the information will be put, Judge Brack
explained that the necessary investigation for *Brady* exculpatory evidence provides the rationale
for disclosure of such exculpatory information "well before pure *Giglio* impeachment evidence,
which usually does not require substantial time to prepare for its effective use at trial." *Id.* (citing
*United States v. Beckford*, 962 F. Supp. 780, 788-89 (E.D. Va. 1997)). Second, in relation to the
safety concerns of government witnesses that inheres in disclosure of *Giglio* impeachment
evidence, Judge Brack recognized that "[d]isclosure of *Giglio* material often identifies the
witnesses to whom the material relates, and therefore, the court must take into account the risk to

3

witnesses in early disclosure of *Giglio* evidence." *Id.* at 1256. *See also Beckford*, 962 F. Supp. at 794 ("[P]remature, *wholesale* disclosure of witness statements, even those containing exculpatory or impeachment information, would vitiate an important function of the *Jencks* Act -- the protection of Government witness from influence, threats, harassment, and physical harm." (citing, among others, *United States v. Presser*, 844 F. 2d 1275, 1285 (6th Cir. 1988); *United States v. Thevis*, 84 F.R.D. 47, 53 (N.D. Ga. 1979); *United States v. Stroop*, 121 F.R.D. 269, 275 (E.D.N.C. 1988))).

"It is an open question in this circuit, and there is a conflict among the circuits, as to the timing of disclosure of witness statements subject to the Jencks Act that also meet the *Brady* criteria." *Lujan*, 530 F. Supp. 2d at 1256 (citing *McVeigh*, 923 F. Supp. at 1414 n.11, 1416). The United States Court of Appeals for the D.C. Circuit, faced with the same question, concluded that a balancing approach was the proper analysis for disclosure's timing:

> [A]pplication of a strict rule in this area would inevitably produce some situations in which late disclosure would emasculate the effects of *Brady* or other situations in which premature disclosure would unnecessarily encourage those dangers that militate against extensive discovery in criminal cases, e.g. potential for manufacture of defense evidence or bribing of witnesses. Courts can do little more in determining the proper timing for disclosure than balance in each case the potential dangers of early discovery against the need that *Brady* purports to serve of avoiding wrongful convictions.

*United States v. Pollack*, 534 F.2d 964, 973-74 (D.C. Cir. 1976). That balancing approach is effectively the same approach that Judge Brack endorsed in *Lujan*. That balancing approach is consistent with this Court's recognition that the Tenth Circuit held that the required timing of disclosure of *Brady* exculpatory evidence precedes that of *Giglio* impeachment information.

Finally, this Court has many times recognized that the United States' obligation to produce discovery -- whether it be rule 16, *Brady*, or *Giglio* information -- only extends to

4

information within "the United States' Possession." *United States v. DeLeon*, No. CR 15-4268

JB, Mem'm Opinion and Order [Doc. 907], 2017 WL 2271430, at *30 (D.N.M. Feb. 8, 2017)

(Browning, J.). *See id.* ("'It is well settled that there is no affirmative duty upon the government

to take action to discover information which it does not possess.'" (quoting *United States v.*

*Tierney*, 947 F.2d 854, 864 (8th Cir. 1991)).

<u>**ANALYSIS**</u>

1. NAME AND LAST KNOWN ADDRESS (Motion ¶ 1 at 6)

The United States will not produce "the last known address of any witness." While the

United States concedes that, in certain circumstances, the "'failure to interview government

witness [constitute[s] ineffective of counsel,'" Motion at 6 (quoting *United States v. Tucker*, 716

F.2d 576 (9th Cir. 1983)), witnesses' addresses are not *Giglio* materials, and Defendants do not

cite to a case that so holds. Defendants often locate and are able to interview witnesses in

criminal cases, and are not provided witnesses' last known addresses in those instances.

2. GUILTY VERDICTS, JUVENILE AND [sic] ADJUDICATION OR OTHER BAD

    ACTS (Motion ¶ 2 at 7)

The United States agrees to produce to Defendants summaries of its witnesses' NCIC

reports.[1]

3. CONSIDERATION (Motion ¶ 3, at 8)

---

[1] The trial for the first group of Defendants in No. CR 15-4268 is set for July 10, which is why the Court ordered immediate production of *Giglio* materials on May 9. But the Defendants recently filed a motion to continue (Doc. 1182), which moves to continue the trial to 2018. So, in relation to all of these responses, the United States may identify additional witnesses whom it does not currently intend to call at this case's trial.

5

The United States agrees to produce *Giglio* materials that reflect consideration paid to its witnesses to the extent that they're in the United States' possession.2

4.  BIAS, MOTIVE OR INTEREST (Motion ¶ 4, at 10)

The United States agrees to produce *Giglio* materials that reflect its witnesses' bias, interest, or motive, to the extent that they're in the United States' possession.

5.  THREATS (Motion ¶ 5, at 12)

The United States does not know of any responsive documents in the United States' possession.

6.  PRIOR TESTIMONY (Motion ¶ 6, at 14)

The United States agrees to identify the existence of the occasions of its witnesses' prior testimony "so defendant can order transcripts of testimony for use in cross-examination, or investigate sources or extrinsic impeachment." Motion at 14. In accordance with the Jencks Act, however, the United States will not disclose early the grand jury transcripts from these proceedings.

7.  INTERNAL LAW ENFORCEMENT FILES (Motion ¶ 7, at 14)

The United States agrees to produce agents' notes that constitute *Giglio* materials. If the United States becomes aware of impeaching information contained in law enforcement files within the United States' possession, then the United States will either produce those materials, or consult with the Court. *See* Motion at 20-21 (discussing ex parte consultations with courts in relation to certain *Giglio* issues).

8.  COMPETENCY AND MENTAL ILLNESS (Motion ¶ 8, at 15)

---

[2] Under the law-of-the-case doctrine, the United States recognizes that NMCD's possession is also within the United States' possession.

DNM 609

Competency and mental illness records are protected from the United States' access and the United States, therefore, cannot produce them. *See United States v. Lujan*, 530 F. Supp. 2d 1224, 1259-60 (D.N.M. 2008) (Brack, J.) ("The government does not have the duty to search mental records of its witnesses when it has no reason to believe that they would contain impeachment evidence and when the records are not readily accessible.") (citing *East v. Scott*, 55 F.3d 996, 1003 (5th Cir. 1995); *United States v. DiPaolo*, 804 F.2d 225, 230 (2d Cir. 1986); *United States v. Riley*, 657 F.2d 1377, 1386 (8th Cir. 1981)). The Honorable Robert C. Brack, United States District Judge for the District of New Mexico, recognized a witness's mental health could lead to impeachment evidence, and, thus, "if the government has knowledge of such evidence, it should disclose that fact to the defense." *Id.* at 1260. The United States is aware of such materials for one witness who is a former co-Defendant and who underwent a competency hearing in this matter. Otherwise, the United States is unaware of such materials. The Court should therefore deny this request to the extent that it seeks such materials for other than the former co-Defendant witness. *See Lujan*, 530 F. Supp. 2d at 1259-60.

9.   FALSE OR INCONSISTENT STATEMENTS (Motion ¶ 9, at 16)

The United States agrees to produce *Giglio* materials that constitute its witnesses' false or inconsistent statements, or reputation for dishonesty, to the extent that they're in the United States' possession.

10.   POLYGRAPH TESTS (Motion ¶ 10, at 17)

The United States does have any materials responsive to this request for "[o]ral and written results of any polygraph test administered to any witness whether by the prosecution or the F.B.I. for the witness protection program." Motion at 17-18.

11.   PRIOR INFORMANT ACTIVITY (Motion ¶ 11, at 18)

7

The United States agrees to produce *Giglio* materials that reflect prior informant activities of its witnesses' to the extent that they're in the United States' possession.

12. PRIOR PLACEMENT RECORDS (Motion ¶ 12, at 19)

A witness's prior placement records is not *Giglio* materials. If the record reflects information inconsistent with a witness's anticipated testimony, it may be. But the Defendants have not provided any basis on which such a determination may be made presently.

13. OTHER (Motion ¶ 13, at 19-20)

a)       The United States agrees to produce *Giglio* materials in its possession that reflect "[a]ll records of complaints lodged by or on behalf of the witness while incarcerated and records indicating any disciplinary action, placement in security cell or isolation, belief that the witness might be a security risk and or transfers and the reasons therefore while incarcerated." Motion ¶13(a), at 19.

b)       The United States does not have any materials responsive to this request.

c)       The United States does not have any materials responsive to this request.[3]

d)       The United States does not have any materials responsive to this request

e)       The United States does not have any materials responsive to this request.

f)       The United States agrees to produce *Giglio* materials in its possession that reflect "[i]nformation regarding instances of use of controlled substances" of its witnesses." Motion ¶13(f), at 20.

g)       The United States does not have any materials responsive to this request.

h)       The United States does not have any materials responsive to this request.

---

[3] To the extent that Defendants may contend they're responsive, under the Court's previous order, the United States disclosed the addenda to witnesses' plea agreements.

## **CONCLUSION**

For the foregoing reasons, the United States should grant in part and deny in part the

Defendants' Motion.

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

***Electronically filed on 6/7/17***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/_____
MATTHEW M. BECK
Assistant United States Attorney

9



**U.S. Department of Justice**

*United States Attorney*
*District of New Mexico*

---

200 N. Church St.                              Phone: (575) 522-2304
Las Cruces, NM  88001                          Fax:   (575) 522-2391

June 7, 2017

*Sent via FedEx*

The Honorable James O. Browning
United States District Court
Pete V. Domenici United States Courthouse
333 Lomas Blvd NW, Suite 770
Albuquerque, New Mexico 87102

Richard Sindel                          Brock Benjamin
Sindel, Sindel & Noble, P.C.            Benjamin Law Firm
8000 Maryland Avenue, Suite 350         747 E. San Antonio, Suite 203
Clayton, Missouri 63105                 El Paso, Texas 79901

        RE:   **UNITED STATES v. JOE LAWRENCE GALLEGOS**
              No. 15-CR-4268 JB

Dear Judge Browning and Counsel:

        The enclosed CD contains audio recordings that were referenced in the Government's
Response in Opposition to Defendant Gallegos' Motion to Suppress Evidence and Statements
(Doc. 1184).   The CD contains two files, entitled "1st interview of Joe Gallegos on 11-20-12(J.
Moduck).WMA and "2nd interview of Joe Gallegos on 11-21-12(J. Moduck).WMA."   These
items were provided to all counsel of record on July 1, 2016.

                              Sincerely,

                              JAMES D. TIERNEY
                              Acting United States Attorney

                              MATTHEW BECK
                              Assistant United States Attorney

MMB/ebs
Enclosure as noted

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                 No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA; SHAUNA GUTIERREZ
and BRANDY RODRIGUEZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER[1]

---

[1]In its Sealed Memorandum Opinion and Order, filed June 9, 2017 (Doc. 1187)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect

**THIS MATTER** comes before the Court on the: (i) Defendants' Joint Motion to Sever Defendants Charged with Offenses in Counts 6 & 7, filed December 23, 2016 (Doc. 807)("Motion to Sever"); (ii) Defendant Santos Gonzales' Motion for a Severance of Defendant, filed January 27, 2017 (Doc. 858)("Gonzales' Motion to Sever"); (iii) Opposed Motion to Sever Counts Four and Five, filed January 31, 2017 (Doc. 868)("A. Gallegos' Motion to Sever"); (iv) Defendants Troup and Billy Garcia's Motion to Sever Counts 1 and 2, filed February 2, 2017 (Doc. 882)("Troup's Motion to Sever"); (v) Defendant Javier Alonso's Motion to Sever Count 3 and to Sever the Trials of Edward Troup and Javier Alonso, filed February 5, 2017 (Doc. 893)("Alonso's Motion to Sever"); and (vi) Defendant Santos Gonzales' Amended Motion for a Severance of Defendant, filed February 7, 2017 (Doc. 901)("Gonzales' Amended Motion to Sever"). The Court held a hearing on February 7, 2017; May 9, 2017; and May 19, 2017. The primary issues are whether: (i) severance of Counts 6 and 7 from the fourteen other Counts set forth by the Superseding Indictment, filed April 21, 2016 (Doc. 367)("Superseding Indictment") and the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Second Superseding Indictment"), is required or appropriate; (ii) severance of Counts 4 and 5 from the fourteen other Counts set forth by the Superseding Indictment and the Second Superseding Indictment is required or appropriate; (iii) severance of Counts 1 and 2 from the fourteen other Counts set forth by the Superseding Indictment and the Second Superseding Indictment is required or appropriate; (iv) severance of Count 3, or of Defendant Javier Alonso individually, is required or

---

confidential information within the Sealed MOO before the Court publishes a public version. See Sealed MOO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

appropriate; or (v) severance of Defendant Santos Gonzales[2] is required or appropriate.  Because the Court concludes that some severance is appropriate to ensure judicial efficacy, efficiency, and economy during a joint trial for the complex charges the Second Superseding Indictment raises, the Court will order severance in accordance with the Plaintiff United States of America's proposal at the February 7, 2017, hearing on this matter, wherein the United States suggested two trial groupings.  Accordingly, the Court will grant in part and deny in part the: (i) Motion to Sever; (ii) A. Gallegos' Motion to Sever; (iii) Gonzales' Motion to Sever; (iv) Troup's Motion to Sever; (v) Alonso's Motion to Sever; and (vi) Gonzales' Amended Motion to Sever.  The Court will sever for trial the Superseding Indictment's Counts 6-12 from its Counts 1-5 and 13-15.  The result is a trial for the Superseding Indictment's Counts 6-12, and another, separate trial for the Superseding Indictment's Counts 1-5 and 13-15.  A Second Superseding Indictment was filed on March 9, 2017, after most of the severance motions were filed, adding an additional Defendant, Brandy Rodriguez, as well as an additional Count 16, both of which will be tried in the Counts 1-5 and 13-15 grouping.

## **FACTUAL BACKGROUND**

The Court takes its facts from both the Superseding Indictment and the Second Superseding Indictment.  The background facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, filed October 28, 2016 (Doc. 753).  See United States of America v. Angel DeLeon, 2016 WL 7242579 (D.N.M. 2016)(Browning, J.).  See also United States v. DeLeon, 2016 WL 3124632 (D.N.M. 2016)(Browning, J.).  The Court does not

---

[2]The Superseding Indictment and case caption identifies a "Santos Gonzalez." Superseding Indictment at 1.  Gonzales' briefing, however, identifies a different spelling -- "Santos Gonzales."  Gonzales' Amended Motion to Sever at 1.  The Court will use Gonzales in this Memorandum Opinion and Order.

set forth these facts as findings or the truth.  The Court recognizes that the factual background is largely the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Sindicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM")[3] allegedly committed through its members.  Superseding Indictment at 2.  SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Superseding Indictment at 2.  SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  See Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured.  See Superseding Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members.  See Superseding Indictment at 3.  SNM has approximately 250 members, comprised of "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members."  Superseding Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders

---

[3]Each of the Indictments in this case uses the term "Syndicato."  Superseding Indictment at 1-2.  The Court has become aware, however, that the correct spelling of the Spanish translation for the English term "Syndicate" is "Sindicato."  Real Academia Española, Asociación de Academias de la Lengua Española, Diccionario de la Lengua Española, Sindicato (300th ed. 2014).  The Court will use Sindicato.

outside the prison system.  See Superseding Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Superseding Indictment at 4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Superseding Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Superseding Indictment at 4.  If another gang does not abide by SNM's demands, SNM manages to assault or kill one of the other gang's members to show its power.  See Superseding Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Superseding Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show it superiority over others." Superseding Indictment at 4-5.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Superseding Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Superseding Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See Superseding Indictment at 7.  SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the present investigation by the Federal Bureau of Investigations ("FBI").  United States v. Garcia, No. 15-4275 JB, Memorandum Opinion and Order at 2, filed November 16, 2016 (Doc. 133)(citing United States' Response to Defendant's

Motion to Designate Complex (Doc. 56) at 1, filed May 3, 2016 (Doc. 70)("United States'
Garcia Response")).  The other relevant facts giving rise to this case are as follows.

In March of 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants
Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies
related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their
incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico").
United States v. DeLeon, 2016 WL 7242579, at *3.  The New Mexico Third Judicial District
Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a
gang-related attack.  See United States v. DeLeon, 2016 WL 7242579, at *3.  That New Mexico
grand-jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a
deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  See United
States v. DeLeon, 2016 WL 7242579, at *3.  The Doña Ana County, New Mexico, District
Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges
against alleged accomplice and Defendant Mario Rodriguez, who had been charged with
possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015.
See United States v. DeLeon, 2016 WL 7242579, at *3.  "A spokesperson for the District
Attorney's Office indicated the charges were dismissed because the cases were going to be
prosecuted at the federal court level."  United States v. DeLeon, 2016 WL 7242579, at *3.

The United States now brings this case against thirty Defendants, a case that it indicted in
Las Cruces, New Mexico, charging them with a total of sixteen counts.  See Superseding
Indictment at 1; Second Superseding Indictment at 1.  All Defendants are accused of
participating in the operation and management of the enterprise, and committing unlawful
activities "as a consideration for the receipt of, and as consideration for a promise and an

- 6 -

agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining

entrance to and maintaining and increasing position in SNM, an enterprise engaged in

racketeering activity."   Superseding Indictment at 6-31.   Defendants Arturo Arnulfo Garcia,

Gerald Archuleta,[4] Benjamin Clark, M. Rodriguez, Anthony Ray Baca, Robert Martinez, Roy

Paul Martinez,[5] and Daniel Sanchez are the enterprise's alleged leaders.   See Superseding

---

[4]Archuleta plead guilty on June 16, 2016, stipulating:

> In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the S[i]ndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture I distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.  In 2003, I was an active member of the SNM.  The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM.  J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R. Based upon my status in the SNM, this "green-light" was well known to members of the SNM.  The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting.  The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico.  This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca. As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.  Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R.  This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement, filed June 16, 2016 (Doc. 586).

[5]R.P. Martinez plead guilty on September 15, 2016, stipulating:

> In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the S[i]ndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including  murder, kidnapping,

Indictment at 6.  The other Defendants are allegedly members or associates who acted under the

direction of the enterprise's leaders.  See Superseding Indictment at 6.  The SNM gang

enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as

18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of

New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512 and 1513, "involving

obstruction of justice, tampering with or retaliating against a witness, victim, or an informant";

and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846.

Superseding Indictment at 9.

Specifically, the Superseding Indictment provides that, on March 26, 2001, Defendants

Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia allegedly

murdered "F.C."  Superseding Indictment at 9.  On the same day, Defendants Lujan, B. Garcia,

Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G."

Superseding Indictment at 12.  On June 17, 2007, Defendants Javier Alonso, Troup, A.A. Garcia,

Clark, and Ruben Hernandez allegedly murdered "F.S."  Superseding Indictment at 15.  On

---

attempted murder, and conspiracy to manufacture I distribute narcotics.  The
SNM operates in the District of New Mexico and elsewhere.  The SNM
constitutes an enterprise (individuals associated in fact that engaged in, or the
activities of which, affected interstate commerce) that is engaged in racketeering
activity.  In 2013, I was an active member of the SNM.  On or before 2013, I
conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup,"
and others to murder G.M. and D.S. Specifically, Anthony Baca was angry at the
New Mexico Corrections Department (NMCD) for moving him out of State.
Baca, as the purported leader of the SNM at the time, ordered the murders of
G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang
members ordering the murders and in fact, did write letters ordering the members
to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to
maintain and increase my position in the SNM.  Thus, from 2013 to continuing
into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement, filed September 15, 2016 (Doc. 686).

November 12, 2012, Defendants J. Gallegos and Andrew Gallegos allegedly conspired to murder "A.B." Superseding Indictment at 18. On the same day, Defendants J. Gallegos and A. Gallegos allegedly murdered A.B. <u>See</u> Superseding Indictment at 19. In March, 2014, Defendants Armenta, Montoya, M. Rodriguez, Timothy Martinez, Baca, Mauricio Varela, Sanchez, Carlos Herrera and Rudy Perez allegedly conspired to murder "J.M." Superseding Indictment at 20-21. On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M. <u>See</u> Superseding Indictment at 21.

Further, starting in or around 2003 -- and until about July 13, 2015 -- Defendants Baca, Archuleta, and Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Superseding Indictment at 27. Starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Defendants Baca, R.P. Martinez and Robert Martinez allegedly conspired to murder "D.S." Superseding Indictment at 28. During the same period of time, Defendants Baca, R.P. Martinez, R. Martinez and Christopher Garcia allegedly conspired to murder "G.M." Superseding indictment at 28. On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. <u>See</u> Superseding Indictment at 29. On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder. <u>See</u> Superseding Indictment at 29.

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Superseding Indictment at 30. From February 1, 2016, until February 27, 2016, Defendants J. Gallegos, B. Rodriguez, Santos Gonzales, Paul Rivera, and Shauna Gutierrez allegedly conspired to murder "J.G." Superseding Indictment at 30; Second Superseding Indictment at 17-18. Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera

and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G.  See Superseding Indictment at 31; Second Superseding Indictment at 17-18.  The same Defendants also allegedly tampered with evidence.  See Second Superseding Indictment at 17-18.

For fuller factual context, there are now four cases before the Court related to SNM's alleged federal criminal activity.  In a related case -- United States of America v. Anthony Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.)[6] -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[7]  There is also a prosecution of one Defendant for drug crimes, see United States of America v. Christopher Garcia, No. 15-4275 JB (D.N.M.)(Browning, J.), and of four defendants for further alleged conduct, as is alleged in the present case, constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, see United States of America v. Mauricio Varela, No. 15-4269 JB (D.N.M.)(Browning, J.).

_____

[6]The Court has granted a conditional severance of one Defendant in that case.  See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.).  The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- was asserting his Speedy Trial Act rights.  The Court concluded that, given R. Gallegos' assertion of those Speedy Trial Act rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint trial grouping.  Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . .  If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772 at *30-32.  Ultimately, the Court notes, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor.  See 2016 WL 6404772 at *32 (setting a new trial date to ensure his speedy trial rights were upheld).

[7]The Court has also declared that case complex under the Speedy Trial Act.  See United States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016 (Doc. 238).

## PROCEDURAL BACKGROUND

On December 1, 2015, a federal grand jury indicted twenty-four Defendants for the crimes of Murder (under 18 U.S.C. § 1959(a)(1)); Violent Crimes in Aid of Racketeering and U.S.C. § 2: Principals), Conspiracy to Murder (under 18 U.S.C. § 1959(a)(5); and Conspiracy to Commit Assault Resulting in Serious Bodily Injury (under 18 U.S.C. § 1959(a)(6)). See Indictment at 1, filed December 1, 2015 (Doc. 1)("Indictment"). The Defendants were all allegedly members, prospects, or otherwise associated with SNM, which constitutes an enterprise as 18 U.S.C § 1959(b)(2) defines that term. See Indictment at 2.

On April 21, 2016, a grand jury, by the Superseding Indictment, indicted thirty Defendants -- twenty-four of whom were Defendants in the original Indictment. See Superseding Indictment at 1. In addition to the new Defendants, the Superseding Indictment also contains new charges under modified count numbers. See Superseding Indictment at 9-31. The Superseding Indictment contains fifteen counts for: (i) the Murder of F.C. ("Count 1"); (ii) the Murder of R.G. ("Count 2"); (iii) the Murder of F.S. ("Count 3"); (iv) Conspiracy to Murder A.B. ("Count 4"); (v) the Murder of A.B. ("Count 5"); (vi) Conspiracy to Murder J.M. ("Count 6"); (vii) the Murder of J.M. ("Count 7"); (viii) Conspiracy to Commit Assault Resulting in Serious Bodily Injury to J.R. ("Count 8"); (ix) Conspiracy to Murder D.S. ("Count 9"); (x) Conspiracy to Murder G.M. ("Count 10"); (xi) Felon in Possession of a Firearm ("Count 11"); (xii) Using and Carrying a Firearm During and in Relation to a Crime of Violence ("Count 12"); (xiii) Assault with Dangerous Weapon of J.G. ("Count 13"); (xiv) Conspiracy to Murder J.G. ("Count 14"); and (xv) Attempted Murder of J.G., Assault with a Dangerous Weapon Upon J.G., Resulting in Serious Bodily Injury to J.G. ("Count 15"). Superseding Indictment at 9-31. At the time of the Superseding Indictment's filing, some of the Defendants were death-penalty eligible.

See The United States' Notice of Intent Not To Seek a Sentence of Death, filed June 6, 2016 (Doc. 567)(stating that it would not seek a death sentence against twenty-one Defendants).  The Honorable Ken Gonzales, United States District Judge for the District of New Mexico, initially presided over the case until it was reassigned to the Court on March 30, 2016.[8]  See Judge Update, filed December 1, 2015, and Notice of Case Reassignment, filed March 30, 2016 (Doc. 351).  Given the large number of Defendants and the safety concerns at issue in these cases Judge Gonzales initially entered a Protective Order regulating discovery, and the Defendants continue to receive their discovery on tablets managed by a coordinated discovery management firm.[9]  See Protective Order, filed June 16, 2016 (Doc. 589)("Protective Order").

On March 9, 2017, a grand jury, in a Second Superseding Indictment, indicted thirty-one Defendants -- thirty of whom were Defendants named by the Superseding Indictment.  See Second Superseding Indictment at 1.  The Second Superseding Indictment adds an additional Defendant, B. Rodriguez, as well as a count for Tampering With a Witness, Victim, or Informant by Physical Force or Threat ("Count 16").  Second Superseding Indictment at 17-18.  B. Rodriguez is named in Count 14, Count 15, and the added Count 16.  Count 16 alleges that, on February 27, 2016, J. Gallegos, Gonzales, Rivera, Gutierrez and B. Rodriguez, "used and

---

[8]The Honorable Judge Gonzales declared United States v. DeLeon complex in January, 2016, suspending the Speedy Trial Act's deadlines.  See Order Declaring Case Complex, filed January, 7, 2016 (Doc. 211).

[9]On January 2, 2016, Judge Gonzales granted the Defendants' Joint Ex Parte Motion for Order Appointing Coordinating Discovery Attorney, Russell M. Aoki, for the Benefit of All Court-Appointed Counsel.  See Order Appointing Coordinating Discovery Attorney, filed January 22, 2016 (Doc. 231)("Discovery Coordinator Appointment Order").  Judge Gonzales held a hearing on January 20, 2016, with all parties present.  Discovery Coordinator Appointment Order at 1.  Judge Gonzales concluded that appointing Mr. Aoki was justified given the complexity of this case and the thousands of pages of discovery documents.  See Discovery Coordinator Appointment Order at 2.

attempted to use physical force and the threat of physical force against J.G. by assaulting J.G. with a dangerous weapon with the intent to influence, delay, or prevent J.G. from testifying against JOE LAWRENCE GALLEGOS in an official proceeding . . . in violation of 18 U.S.C. §§ 1512(a)(2)(A) and 2." Second Superseding Indictment at 18.

### 1.   __Motion to Sever.__

The Motion to Sever explains that "Defendants Jerry Armenta, Jerry Montoya, Mario Rodriguez, Timothy Martinez, Anthony Ray Baca, Mauricio Varela, Daniel Sanchez, Carlos Herrera and Rudy Perez (2014 Defendants) are charged in the 15-count superseding indictment in Counts 6 and 7 with conspiracy to commit murder and murder of Javier Molina [('J.M.')]" on March 7, 2014, at Southern New Mexico.  Motion to Sever at 1.  Of the nine Counts 6 and 7 Defendants, whom the Motion to Sever refers to as the "2014 Defendants," only Baca, the Motion to Sever explains, has been charged in the other Counts in the Superseding Indictment. Motion to Sever at 1-2.  The Motion to Sever thus advances

> three main arguments: (1) Counts 6 and 7 were improperly joined under Rule 8(a), as they do not share a sufficient nexus with the other charges to permit joinder; (2) the 2014 Defendants were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 21 other defendants; and (3) should the Court find joinder proper under Rule 8(a) and Rule 8(b), severance is still required under Rule 14 and the Fifth Amendment because a joint trial of the 2014 Defendants for Counts 6 and 7 alongside the 21 other defendants and the 13 other counts in the superseding indictment will deprive the 2014 Defendants of their right to a fair trial.

Motion to Sever at 2.

After recapping an extensive factual background of the case similar to that which the Court has provided in this Memorandum Opinion and Order, the Motion to Sever primarily elaborates on what the Defendants "believe[] the government's theory" is underlying the

Superseding Indictment's factual background regarding Counts 6 and 7.  Motion to Sever at 5.

The Motion to Sever surmises:

> Defendant Baca ordered Mr. Molina to be killed because he was alleged to have cooperated with law enforcement.  Defendants Sanchez and Varela, as alleged intermediate leaders of the SNM, are alleged to have given the go-ahead for the killing and given orders to help execute it.  Defendant Herrera also allegedly sanctioned the killing.  Defendant Perez is accused of providing his walker to make a shank or shanks for the killing.  Defendants Rodriguez and Martinez are accused of going into Molina's cell and choking him until he was unconscious and Defendant Armenta and Defendant Montoya are alleged to have then gone into the cell and stabbed Molina multiple times, which ultimately led to his death. All the 2014 Defendants are alleged to be members of the SNM.

Motion to Sever at 5.  The Motion to Sever also reiterates that, "for the murder of Molina," the "Third Judicial District Attorney's Office in Las Cruces, obtained indictments against Defendants Jerry Armenta, Jerry Montoya and Mario Rodriguez," and that the case was "ready to proceed to trial on November 16, 2015," before the United States brought the present federal charges.  Motion to Sever at 5.

Regarding Counts 1-5, the Motion to Sever does not provide any further factual background beyond that which the Superseding Indictment alleges and which the Court recounts in its Factual Background.  See Motion to Sever at 4-5.  The Motion to Sever highlights, however, the distance in both time and location between the conduct alleged in Counts 1-5, and the conduct in Counts 6 and 7, as well as the different Defendants alleged to have committed the conduct.  See Motion to Sever at 4-5.  For Count 8, the Motion to Sever elaborates on the Superseding Indictment's factual allegations, stating that,

> [i]n his Plea Agreement, Defendant Archuleta states that in 2003 he had a falling out with J.R., who is also alleged to be an SNM member. . . .  As a result, Defendant Archuleta states he put a "green light" on J.R., which is common slang for ordering the murder of a person. . . .  Because of Archuleta's green light, J.R. was shot in 2003, but survived, and then was assaulted in 2015 in SNMCF for the same reason. . . .  Defendant Archuleta implicates Defendant Baca as sanctioning the green light . . . .

- 14 -

Motion to Sever at 6.  For Counts 9 and 10, the Motion to Sever elaborates on the Superseding

Indictment's factual allegations by providing:

> Counts 9 and 10 are both alleged conspiracies to murder Dwayne Santistevan, the head of [the New Mexico Department of Correction's ("NMDOC") Security Threat Intelligence Unit ("STIU")] and former Secretary of Corrections Greg Marcantel.  Defendants Anthony Baca, Roy Martinez and Robert Martinez, are charged in both counts.  Defendant Roy Martinez has entered a plea to both counts. . . .  In his plea, Mr. Martinez claims he conspired with Defendants Baca, Robert Martinez, and others, to kill Marcantel and Santistevan.  Other than Defendant Baca, Martinez does not identify any of the other defendants in Counts 6 and 7 as being involved.  Defendant Chris Garcia is charged in Count 10.

Motion to Sever at 6-7.  The Motion to Sever, last, does not further elaborate on the Court's

recitation of the Superseding Indictment's factual allegations underlying its Counts 11-15.  See

Motion to Sever at 7.

The Motion to Sever then turns to its substantive argument in favor of Counts 6 and 7's

severance.  See Motion to Sever at 7.  The Motion to Sever argues: "Joinder in criminal cases is

governed by Rule 8, and severance, Rule 14 of the Federal Rules of Criminal Procedure as well

as the Fifth Amendment."  Motion to Sever at 7.  Regarding rule 8 of the Federal Rules of

Criminal Procedure, the Motion to Sever explains that "[u]nder Rule 8(a) the joinder of offenses

is appropriate only when the offenses are of the same or similar character, or are based on the

same act or transaction, or are connected with or constitute parts of a common scheme or plan."

Motion to Sever at 7 (emphasis added)(internal quotation marks and citations omitted).  In turn,

the Motion to Sever asserts that "[w]hile Rule 8(a) is construed broadly to allow liberal joinder to

enhance the efficiency of the judicial system, joinder is only proper where at least one of the

Rule 8(a) conditions are met, and those conditions, although phrased in general terms, are not

infinitely elastic."  Motion to Sever at 7-8 (internal quotation marks and citations omitted).  The

Motion to Sever also explains: "Rule 8(b) applies to the joinder of defendants in a criminal trial[,

- 15 -

DNM 628

and, u]nder Rule 8(b), joinder of defendants is proper only where the defendants are alleged to have participated in the same act or transactions, or in the same series of acts or transactions constituting a crime."   Motion to Sever at 8 (emphasis added)(internal quotation marks and citations omitted).

> Still further, the Motion to Sever asserts:

> Even if two or more offenses or defendants are properly joined under Rule 8(a) or (b), joinder is also subject to scrutiny under Rule 14.   While the purpose of joinder is to promote economy and efficiency and to avoid a multiplicity of trials, these objectives must be achieved without substantial prejudice to the right of the defendants to a fair trial.

Motion to Sever at 8 (internal quotation marks and citations omitted).   According to the Motion to Sever, regarding rule 14 of the Federal Rules of Criminal Procedure, rule 14

> provides for relief from prejudicial joinder, allowing that if the joinder of offenses or defendants in an indictment . . . or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Motion to Sever at 8 (internal quotation marks and citations omitted).   Nonetheless, the Motion to Sever concedes, "[u]nder Rule 14, the determination of the risk of prejudice and the decision whether to grant a motion to sever is soundly within the discretion of the trial court."   Motion to Sever at 8 (internal quotation marks and citations omitted).   The Motion to Sever explains that, "[i]n determining whether to grant a motion to sever under Rule 14, the Court must weigh the potential prejudice to the defendant against the considerations of judicial economy and efficiency," and that the United States Court of Appeals for the Tenth Circuit "has held that [p]rejudicial joinder occurs under Rule 14 when an individual's right to a fair trial is threatened or actually deprived."   Motion to Sever at 8-9 (citing United States v. Johnson, 130 F.3d 1420, 1427 (10th Cir. 1997)(internal quotation marks omitted)).

Accordingly, the Motion to Sever first contends that "Counts 6 and 7 were improperly joined under Rule 8(a) and must be severed from the remaining counts," because the offenses joined by the Superseding Indictment are not offenses that are "(1) of the same or similar character, (2) based on the same act or transaction, or (3) constitute parts of a common scheme or plan."  Motion to Sever at 10.  The Motion to Sever identifies that the Superseding Indictment likely joins Counts 11 and 12 -- C. Garcia's firearms offenses -- in accordance with rule 8(a)'s third prong, "constitute parts of a common scheme or plan," but contends that "[t]here are limits, however, to how broadly a Court can construe a common scheme or plan."  Motion to Sever at 10-11.  The Motion to Sever argues: "Under Rule 8(a), offenses are part of a common scheme or plan when the alleged offenses are similar, carried out in the same manner, and are alleged to have occurred over a relatively short period of time."  Motion to Sever at 11 (citing United States v. Jordan, 602 F.2d 171, 172 (8th Cir. 1979)).  The Motion to Sever thus provides:

> Here, all the government can claim is that the defendants are alleged members of the SNM and have been indicted with VICAR offenses.  While the government can claim that the purpose of the offenses as well as the means and methods of the SNM constitute racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), there is no RICO exception to Rule 8 and the government should not be allowed to rely on allegations of RICO conspiracy to draw every alleged crime of every alleged SNM member under the mantel of a common scheme or plan for purposes of Rule 8(a).

Motion to Sever at 11 (citing United States v. Guiliano, 644 F.2d 85, 89 (2d Cir. 1981)("One of the hazards of a RICO count is that when the Government is unable to sustain a conviction under this statute, it will have to face the claim that the prejudicial effect of tarring a defendant with the label of 'racketeer' tainted the conviction on an otherwise valid count.")).

The Motion to Sever then concedes that, besides C. Garcia's offenses, the remaining counts are "either the same type of offense -- murder or conspiracy to commit murder -- or are similar in character -- assault or attempted murder [and w]ith regard to these charges, perhaps the

government could satisfy the first prong of Rule 8(a)" in joining them with Counts 6 and 7.

Motion to Sever at 11.  The Motion to Sever thus argues:

> There is no evidence, however, that Counts 6 and 7 are based on the same acts or transactions as these other charges.  In fact, the crimes alleged in Counts 1 and 2 occurred over a decade before the allegations resulting in Counts 6 and 7.  Thus, while many of these other offenses are the same character of offense as Counts 6 and 7, because of the differences in time, location and offenders the "same act or transaction" provision of Rule 8(a) cannot be met here.

Motion to Sever at 11-12 (citing United States v. Riebold, 557 F.2d 697, 707 (10th Cir. 1977)(holding that joinder is proper "[w]here the evidence overlaps and the offenses are similar . . . and the operable events occurred within a relatively short span of time").  Further, the Motion to Sever argues, when

> [t]urning to the last provision of Rule 8(a), the 11 other murder, conspiracy and assault charges do not constitute parts of a common scheme or plan.  In the Tenth Circuit, the test for joinder is whether there is a common thread.  In this case, there are simply no common threads between Counts 6 and 7 and the other counts, and the only commonality shared by all defendants is their alleged involvement with the SNM.

Motion to Sever at 12 (citing United States v. Caldwell, 560 F.3d 1202, 1212 (10th Cir. 2009)(quoting United States v. Rogers, 921 F.2d 975, 984 (10th Cir. 1990))).  The Motion to Sever, then, ultimately contends:

> While proof a "common purpose" is sufficient to bring a group of people under RICO, Rule 8(a) and the Tenth Circuit require that the offenses share a commonality that goes beyond merely the goals or purpose of the group.  Here, the government will likely argue that these crimes were all committed by SNM members to further SNM goals and thus demonstrate a common scheme or plan.  This argument fails, however, because the government cannot simply use the umbrella of RICO to join every alleged SNM crime by simply stating that the offense shared a common purpose.  The plain language of Rule 8(a) and the Tenth Circuit's test requires more.

Motion to Sever at 12-13.

Next, the Motion to Sever contends that the Counts 6 and 7 "Defendants were improperly

joined under Rule 8(b) with the other 21 Defendants and their trial on Counts 6 and 7 should

therefore be severed."   Motion to Sever at 13.   The Motion to Sever then concedes that, "[i]n

*Zafiro*, the Supreme Court [of the United States] stated that joinder under Rule 8(b) serve[s] the

interests of justice by avoiding the scandal and inequity of inconsistent verdicts."   Motion to

Sever at 13 (citing Zafiro v. United States, 506 U.S. 534, 537 (1993)).   The Motion to Sever

argues, however:

> This possibility of scandal and inequity, however, is not a risk in this case.   In
> cases where other defendants' charges are based on the same alleged crime and
> similar evidence or stem from the same conduct, as was the case in *Zafiro*, the
> court's concern with inequality and inconsistency is understandable.   In *Zafiro*,
> four defendants were arrested together in an apartment with more than 70 pounds
> of cocaine and other drugs. . . .   All four defendants were charged and convicted
> of conspiring to possess illegal drugs, and the Court affirmed the denial of
> defendants' motions to sever.
>
>          In *United States v. Hill*, the Tenth Circuit affirmed the district court's
> denial of a motion to sever where multiple co-defendants and members of the
> Tulsa, Oklahoma[,] Hoover Crips were tried and convicted of conspiracy to
> commit bank robbery. . . .   Co-defendant Dejuan Hill's motion to sever was
> denied because the court reasoned that "[a]lthough the Indictment . . . charged six
> different robberies alleged to have been committed by different defendants over a
> more than two-year period, it also alleged that the defendants had conspired and
> agreed with each other to commit all six of the robberies."

Motion to Sever at 13-14 (quoting United States v. Hill, 786 F.3d 1254, 1258 (10th Cir. 2015),

cert. denied, Hill v. United States, 136 S. Ct. 377 (2015)).   Accordingly, the Motion to Sever

asserts:

> Unlike the defendants in *Zafiro* and *Hill*, here, there is no allegation that the 2014
> Defendants, and the other defendants, with the exception of Defendant Baca
> where noted, conspired and agreed with each other to commit the other crimes
> alleged in the indictment.   In short, there is no evidence that the crimes alleged in
> Counts 6 and 7 were part of a series of acts or transactions.   Even in the most
> favorable light, the indictment alleges that, out of the nine 2014 Defendants, only
> Defendant Baca participated in any of the other counts.   Further, there is no
> evidence of a transactional nexus between the 2014 Defendants and any of the

other defendants or other counts.  There is no evidence that the any of the other 2014 Defendants and other defendants participated in a series of acts or transactions despite the fact that the government has actively investigated these defendants for more than two and half years with the help of cooperating witnesses, confidential informants, and call and mail monitoring.

Motion to Sever at 14.  The Motion to Sever then reiterates the contention that, because

the crimes alleged in Counts 6 and 7 only involve the 2014 Defendants, the *Zafiro* court's concerns for equality and consistence do not exist.  Because the charges against the 2014 Defendants are discrete and not connected to any of the other defendants, a separate trial would not lead to potential inconsistent verdicts with regard to the 2014 Defendants and the other 20 defendants.

Motion to Sever at 15.

Last, the Motion to Sever argues in the alternative that "Counts 6 and 7 should be severed under Rule 14, as the evidence of other murders, assaults, and conspiracy by SNM members will severely prejudice the 2014 Defendants, and a joint trial of all defendants on all counts is impractical."  Motion to Sever at 15.  The Motion to Sever states:

The Federal Rules envision . . . that circumstances may arise where joint trials would be inappropriate and, indeed, harmful to the accused's constitutional rights. Therefore, a three-step inquiry is necessary to determine whether the Court should grant a motion to sever.  First, the Court must determine whether the defenses presented are so antagonistic that they are mutually exclusive.  Second, a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence.  Finally, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.

Motion to Sever at 15-16 (internal quotation marks omitted)(citing United States v. Neha, 2005 WL 3663695, at *2 (D.N.M. 2005)(Browning, J.), aff'd, United States v. Neha, 301 Fed. Appx. 811 (10th Cir. 2008);  United States v. Gould, 2007 WL 1302587, at *2 (D.N.M. 2007)(Browning, J.); United States v. Pursley, 474 F.3d 757, 765 (10th Cir. 2007)).  The Motion to Sever then discusses the case United States v. Gallo, 668 F. Supp. 736 (E.D.N.Y. 1987)(Weinstein, C.J.), where "the District Court granted the defendants' motion for severance

under Rule 14 and separated a 22-count RICO indictment charging 16 defendants into 7 separate

trials."  Motion to Sever at 16.  In that case, the Motion to Sever explains:

> The 22 count indictment charged the defendants, alleged members and associates of the Gambino Crime Family, with RICO and a multitude of "substantive" offenses that took place over the course of two decades and were related to an alleged criminal enterprise. . . .   Although the court determined that the defendants were properly joined under Rule 8(b), it held that severance was required under Rule 14 after considering the prejudice resulting from: (1) the complexity of the indictment; (2) the disproportionality of evidence; (3) whether there is an antagonism of defense strategies and theories; (4) whether there is evidence only admissible as to some defendants; (5) the potential inadequacy of limiting instructions; and (6) the balancing requirements of Rule 14 including the deleterious effect of prolonged complex cases, and whether granting a severance saves time.

Motion to Sever at 16-17.  The Motion to Sever thus argues that, like in <u>United States v. Gallo</u>,

sufficient prejudice would result from a joint trial of these Defendants.  <u>See</u> Motion to Sever at

20.  The Motion to Sever cites the facts that: (i) "Like *Gallo*, this case deals with a complex

RICO indictment spanning decades' worth of criminal allegations [involving] separate, distinct

alleged murder conspiracies that took place at different points in time, involved completely

different alleged conspirators, and different alleged victims"; (ii) "the disproportionality of the

evidence in relation to the 30 defendants charged"; (iii) "it is unclear at this point whether the 30

defendants' defenses are so antagonistic as to be mutually exclusive"; (iv) "[p]resentation of

evidence on the multiple other alleged murders, conspiracy to commit murder, assaults and the

firearms charges not contained in Counts 6 and 7 will subject the 2014 Defendants to undue

prejudice by creating an atmosphere of criminal propensity"; (v) "[i]n a case this complex, a

limiting instruction is more aspirational than a reality, and in a judicial system, dedicated to truth

and justice, such a lack of connection with reality is unacceptable"; (vi) "severing . . . Defendants

from the other co-defendants would best serve the interest of the Court and the jury"; and (vii)

"[e]ven the largest of the federal courtrooms in the District of New Mexico, however, cannot

adequately accommodate the trial, much less *voir dire*."  Motion to Sever 20-25.  The Motion to

Sever also highlights the Court's grant of severance in the related case United States v. Baca,

where the Court "grant[ed] severance in part because a joint trial would prevent the jury from

making a reliable judgment in a case where many defendants with varying degrees of culpability

would be tried together," and because "the risk of prejudice was heightened given the co-

Defendants' 'markedly different degrees of culpability.'"  Motion to Sever at 23 (quoting United

States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.)).  That reasoning, the Motion to

Sever argues, is persuasive here, because, "[a]lthough the Court based its decision to sever that

case on several other factors as well, there are clear parallels with this case, where the defendants

in question (with the exception of Defendant Baca) are only alleged to have been involved with

one incident and the related conspiracy."  Motion to Sever at 23.

In conclusion, the Motion to Sever makes one last argument that "severance of Counts 6

and 7 is necessary to protect the 2014 Defendants' respective rights to a fair trial under the Fifth

Amendment."  Motion to Sever at 25.  The Motion to Sever contends that "[m]isjoinder rises to

the level of a constitutional violation when it results in prejudice so great as to deny a defendant

his Fifth Amendment right to a fair trial" and that "[h]ere the fact that the defendants have been

charged with VICAR offenses cannot overcome the 2014 Defendants' right to a fair trial on the

charges alleged against them."  Motion to Sever at 26-28.  Accordingly, the Motion to Sever

concludes:

> A joint trial of Counts 6 and 7 alongside the other 13 charges is not permitted
> under Rule 8(a), or Rule 8(b) and if it were, it is not permitted under Rule 14 or
> under the Fifth Amendment, as the 2014 Defendants would be prejudiced by the
> presentation to the jury of similar offenses by other purported members of the
> SNM.

Motion to Sever at 28.  For clarity, because there are many motions in this case, the Motion to

Sever explains:

> Counsel for the 2014 Defendants Jerry Montoya (by Larry Hammond), Daniel
> Sanchez (by Amy Jacks), Anthony Ray Baca (by Theresa Duncan), Mauricio
> Varela (by Mary Stillinger) and Timothy Martinez (by Steven Almanza) join in
> the Motion. Counsel for Defendants Joe Gallegos (by Brock Benjamin),
> Christopher Chavez (by Orlando Mondragon), Santos Gonzales (by Erlinda
> Johnson), Conrad Villegas (by B.J. Crowe) and Paul Rivera (by Keith Romero)
> do not oppose this Motion.  Counsel for Defendants Eugene Martinez (by
> Douglas Couleur) and Leonard Lujan (by Dean Clark) take no position on this
> Motion.

Motion to Sever at 28.

### 2.     The Count 3 Defendants' Response.

"Defendants, Edward Troup, Javier Alonso and Arturo Arnulfo Garcia (the Count 3

defendants), through counsel," submitted a response to the Motion to Sever.  Response of

Certain Count 3 Defendants to Joint Motion to Sever Defendants Charged with Offenses in

Counts 6 and 7 [Doc. 807], filed January 6, 2017 (Doc. 812)("Count 3 Response").  The Count 3

Response begins by explaining that "Defendants Edward Troup, Javier Alonso, Arturo Arnulfo

Garcia, Benjamin Clark, and Ruben Hernandez are charged in Count 3 with the murder of

Freddie Sanchez, alleged to have occurred on June 17, 2007":

> Although the government's theory is not entirely clear, it appears, based on the
> discovery produced to date, that the government's theory regarding Count 3 is
> that co-defendants Arturo Garcia and Benjamin Clark ordered that Freddie
> Sanchez be killed, that co-defendant Ruben Hernandez assisted in the homicide
> by covering security cameras, and that co-defendants Edward Troup and Javier
> Alonso killed Freddie Sanchez.  It must be reiterated that this seems to be the
> government's theory; however, discovery has been produced which directly
> contradicts the government's presumed theory.

Count 3 Response at 2-3.  The Count 3 Response then joins the Motion to Sever, primarily

because the Count 3 conduct is alleged to have occurred almost seven years before the Counts 6

and 7 conduct.  <u>See</u> Count 3 Response at 3.  Further, the Count 3 Response argues that "the

factor that allegedly unites the Count 3, 6 and 7 defendants, *i.e.* SNM membership and participation in alleged gang activity, was not present in March of 2014," when at least one of the Count 3 defendants (Javier Alonso) had renounced any association with the SNM and the other active Count 3 defendants (Edward Troup and Arturo Garcia) were not even in the custody of the New Mexico Department of Corrections" during the time period of the Counts 6 and 7 conduct.  Count 3 Response at 3-4.  For clarity, the Count 3 Response concludes by stating: "Undersigned counsel attempted to confer with co-defendants Clark and Hernandez to determine their position regarding this motion.  Counsel for co-defendant Clark indicated that they take no position.  Counsel for co-defendant Hernandez did not respond."  Count 3 Response at 4.

### 3.    The Count 1 and 2 Defendants' Response.

"Defendants Joe Gallegos, Edward Troup, Leonard Lujan, Billy Garcia, Allen Patterson, and Christopher Chavez, by and through their attorneys," also have submitted a response to the Motion to Sever.  See Response of Certain Count 1 and 2 Defendants to Joint Motion to Sever Defendants Charged with Offenses in Counts 6 and 7, filed January 6, 2017 (Doc. 813)("Count 1 and 2 Response").  The Count 1 and 2 Response first posits, for Counts 1 and 2:

> It appears based on the discovery produced to date, that the government's theory is that the two murders, which occurred on the same day in 2001, were orchestrated by Defendant Billy Garcia.  The government's theory is that Mr. Garcia was the "shot caller" for the SNM gang for the period of time encompassing Counts 1 and 2 of the Superseding Indictment.  The government asserts that Mr. Garcia, acting on orders of those higher up in the SNM, orchestrated the murder of both victims by ordering co-defendant Leonard Lujan to arrange for the murders.  The government's theory is that Mr. Lujan then arranged for two teams to carry out the murders of Frank Castillo and Rolando Garza on March 26, 2001.  The government alleges that the first team was comprised of Defendants Angel DeLeon, Joe Lawrence Gallegos, and Edward Troup and that the second team was comprised of Defendants Eugene Martinez, Allen Patterson, and Christopher Chavez.  It must be reiterated that this seems to be the government's theory; however, discovery has been produced which directly contradicts this theory.

DNM 637

Count 1 and 2 Response at 1-2.  The Count 1 and 2 Response then states that, with respect to the

March, 2014, incident date range for the conduct underlying Counts 6 and 7,

> Counts 1 and 2 Defendants Angel DeLeon, Edward Troup, Billy Garcia, Eugene
> Martinez, Christopher Chavez, Allen Patterson were not even in the custody of
> the New Mexico Department of Corrections on March 7, 2014.  Accordingly, the
> factor that allegedly unites the Count 1, 2, 6 and 7 defendants, *i.e.* SNM
> membership and participation in alleged gang activity, was not present in March
> of 2014.

Count 1 and 2 Response at 3.  The Count 1 and 2 Response thus agrees that

> joinder of Counts 1, 2, 6 and 7 will significantly complicate and lengthen any trial
> and that consideration of Federal Rules of Criminal Procedure 8 and 14 counsels
> in favor of severance.  The Counts 1 and 2 Defendants adopt the arguments in the
> Joint Motion to Sever Counts 6 and 7 and accordingly join in the request to sever
> Counts 1, 2, 6, and 7.

Count 1 and 2 Response at 3.  For clarity, the Count 1 and 2 Response explains that "Counsel for

Eugene Martinez takes no position" on the Count 1 and 2 Response.  Count 1 and 2 Response at

3.

### 4.     <u>The United States' Response</u>.

The United States responded to the Motion to Sever with the United States' Response in

Opposition to the Joint Motion to Sever Defendants Charged with Offenses in Counts 6 and 7

[807], filed January 20, 2017 (Doc. 836)("United States' Response").  Ultimately, the United

States Response takes the position that the

> Defendants' contention in the Joint Motion to Sever . . . that Counts 6 and 7 are
> improperly joined under Rule 8(a) is mistaken, because Rule 8(a) . . . does not
> apply in cases where more than one defendant is joined in the same indictment. . .
> .  Defendants' second contention that they are improperly joined under Rule 8(b)
> also fails to find support in the law or the facts, because courts construe Rule 8(b)
> generally to allow for joint trials where the charges overlap factually, and because
> the different defendants in the different counts are all based on SNM's criminal
> activities is particularly logical here, given that the SNM operates as a gang
> within the New Mexico prison system where the incarcerated leaders cannot
> move freely and thus use separate SNM members or associates to carry on the
> SNM enterprise's business -- murders, assaults and assaults with deadly weapons.

> Finally, given the reality that SNM's operations necessarily require that different leaders and members located within and without the different prisons still carry on the SNM's criminal enterprise, and because the nature of the charges require that the United States prove as an element that the SNM is a racketeering enterprise, neither Rule 14 nor the United States Constitution require or support severance of Counts 6 and 7.

United States Response at 1-2 (internal quotation marks and citation omitted). The United States' Response then recaps much of the same facts from the Superseding Indictment which the Court has provided in its Factual Background and then provides its recitation of the applicable law. See United States' Response at 2-4. Here, the United States contends first that "Federal Rule of Criminal Procedure 8 describes two tests for joinder." United States' Response at 5.

> Rule 8(a) specifically provid[es] that "a single defendant" may be charged with two or more offenses "if the offenses charged are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Rule 8(b) provid[es] that "two or more defendants" may be charged "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."

United States' Response at 5-6 (internal citations omitted). The United States then argues that only rule 8(b) applies when "more than one defendant is joined in the same indictment," United States' Response at 6 (citing United States v. Riebold, 557 F.2d 697, 707 (10th Cir. 1977)), and under rule 8(b), "joinder of offenses among multiple defendants was appropriate . . . where a 'number of common threads and much common evidence connecting offenses charged in the indictment'" existed, United States' Response at 6 (quoting United States v. Caldwell, 560 F.3d 1214, 1212 (10th Cir 2009)).

Turning then to the Motion to Sever's argument that the "United States has not alleged that [Counts 6 and 7] Defendants participated in the same series of acts or transactions with the other defendants charged," the United States argues that it "explicitly alleges" all Defendants participated in the "same predicate acts as the other Defendants." United States' Response at 6-

7.  The United States contends that those allegations are sufficient, because "the Supreme Court unanimously held that, to be found guilty of a conspiracy to commit a RICO violation, a defendant need not personally commit or agree to commit two predicate acts of racketeering." United States' Response at 6-7 (citing United States v. Salinas, 522 U.S. 52, 64 (1997)("The RICO conspiracy statute, §1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts.")). Further, the United States maintains that rule 8(b) "permits joinder of defendants in a single indictment where the defendants participated in the same series of acts or transactions constituting an offense.  The rule does not condition joinder upon whether the defendants conspired with each defendant to commit the offenses."  United States' Response at 8.

Next, the United States addresses the Motion to Sever's argument that "the crimes alleged in Counts 6 and 7 are not connected to the other defendants," and asserts that the United States "provided evidence demonstrating that the crimes alleged are connected" to those of all of the other defendants.  United States' Response at 8.  The Motion to Sever's argument, the United States contends, "cannot logically be correct because it circumvents the essential framework of the RICO Act and VICAR statute.  If it were true that such defendants cannot be charged together, this would preclude multi-defendant RICO trials.  That simply cannot be true."  United States' Response at 8.  Indeed, the United States maintains that rule 8(b)'s language permitting joinder for the "same series of acts or transactions . . . is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system."  United States' Response at 8.  The United States thus argues that, under "RICO, the requirements of Rule 8(b) are satisfied when each defendant participated in the affairs of the same enterprise through the commission of the

alleged predicate racketeering acts," United States' Response at 9, and, further, "[a]s is the case

under RICO, the requirements for joinder of defendants under VICAR may be satisfied by

establishing the existence of an enterprise, and that the defendants' charged crimes related to the

affairs of the same enterprise." United States' Response at 10.  In sum, regarding rule 8(b) as it

applies to this case, the United States explains:

> The United States alleges that the SNM gang is a criminal enterprise within the
> meaning of RICO and VICAR, that Defendants are members of the gang.  The
> grand jury found probable cause supports those allegations.  The Defendants are
> charged in Counts 6 and 7 with predicate racketeering offenses -- conspiracy to
> murder, and murder -- relating to the affairs of the SNM enterprise.  Given the
> abundance of case law pertaining to joinder of defendants in RICO and VICAR
> cases, joinder of Defendants in Counts 6 and 7 is clearly proper under Rule 8(b) . .
> . .

United States' Response at 10-11.

The United States Response next addresses the Motion to Sever's contention that "Counts

6 and 7 should be severed under Federal Rule of Criminal Procedure 14 because a joint trial of

all defendants is impractical, and evidence against other defendants charged in the Superseding

Indictment will prejudice the Defendants charged in these counts."  United States Response at

11.  According to the United States, the Defendants "fail to satisfy the first prong of severance

inquiry," wherein the Court must "determine whether the defenses presented are so antagonistic

that they are mutually exclusive."  United States' Response at 11.  Here, the United States

argues:

> In reality, as Defendants admit, it is unclear at this point whether the 30
> defendants' defenses are so antagonistic as to be mutually exclusive. . . .  The
> Rule 14 inquiry requires the Court to find not only that the defenses are
> antagonistic, but that they are "mutually exclusive.". . .  Defendants fail to provide
> any basis at this point on which the Court may determine that joinder of
> defendants or offenses would result in the type of prejudice that Rule 14 requires
> to warrant severance.

United States' Response at 12-13.  The United States also argues that the "Defendants fail to satisfy the second prong of severance inquiry," wherein the Court "must next determine whether relief is available based on a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence," because: (i) there is "no serious risk that a joint trial will prevent the jury from making a reliable judgment about guilt or innocence"; (ii) there is "no serious risk that joinder will compromise Sixth Amendment trial right"; and (iii) there is "no serious risk that joinder will compromise Fifth Amendment trial right."  United States' Response at 13-21.  Specifically, the United States contends that the Defendants are "not entitled to severance merely because they may have a better chance of acquittal in separate trials," and that prejudice "always exists when more than one defendant or offense are tried together," "[b]ut even where a defendant may show such specific and compelling prejudice, both the Supreme Court and the Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover effect where limiting instructions may minimize the risk of undue prejudice."  United States' Response at 13-14.  The United States then shrugs off the Motion to Sever's argument that the case's complexity and magnitude would render a limiting instruction ineffective, because the Tenth Circuit and the Supreme Court counsel otherwise.  See United States' Response at 14.

The United States also provides:

[I]n the unique circumstances that the Superseding Indictment alleges, these murders, conspiracies to murder and other violent crimes that involve the various SNM member Defendants are *res gestae* of the SNM's racketeering "enterprise.". . . Unlike a generic drug-trafficking conspiracy (even a large one), and unlike an organized crime family, the SNM's criminal enterprise operates within the confines of the New Mexico prison system, in which the leaders and the members are not at liberty to travel freely to perpetrate their crimes. . . .  Also locked up in different prison facilities at different locations throughout New Mexico are the victims and targets of the SNM enterprise, including J.M.  Thus, unlike the unconstrained criminals in a drug-trafficking conspiracy or an organized crime

- 29 -

family, in this case, only SNM members within the particular prison at which the
targeted victim resides may carry out the "hit."   It is therefore logical, and
unsurprising, that different SNM members are alleged to have carried out the
SNM's crimes that took place at different locations where the different victims
were housed.

United States' Response at 16.   Complexity notwithstanding, the United States then maintains

that  "courts routinely have found that juries can and do follow jury instructions in complex

RICO and VICAR cases, and that jury instructions are an effective mechanism for granting relief

where prejudice may arise."   United States' Response at 17.   Regarding the Defendants' Sixth

Amendment trial rights and the Motion to Sever's argument that the courtroom is inherently not

conducive to maintenance of that right, the United States next contends that "the hearings have

worked fine just far, and there is no reason to believe that will change."   United States' Response

at 19.   Then, regarding the Defendants' Fifth Amendment trial rights, and the Motion to Sever's

argument that "joinder will prejudice their right to a fair trial because they have been charged

with VICAR offenses alongside other Defendants charged with other crimes," the United States

argues that the "Defendants fail to specify how joinder would compromise their right to a fair

trial.  But, more than that, they fail to acknowledge that, given the nature of the VICAR charges

in Counts 6 and 7, severance would not even cure the prejudice theory they contend may exist."

United States' Response at 19.   Although the Defendants in the Motion to Sever harp on the

notion of spillover prejudice across the counts, the United States maintains:

VICAR is a properly enacted statute that Congress saw fit to enact to prevent the
exact activity alleged in the Superseding Indictment: violent crimes such as
murders perpetrated by individuals who join in a racketeering enterprise such as
SNM.   Second, by charging this murder and conspiracy to murder as VICAR
violations, the United States placed additional burdens on itself: to prove that the
SNM is an enterprise, engages in racketeering activities, and that this murder and
conspiracy to murder were committed by the Defendants to receive pecuniary
value from SNM or to gain entry to, or to maintain or increase position in, SNM.
To the extent that Defendants complain about the additional evidence that's
admissible in a VICAR case such as this, they conveniently omit from their

> Motion to Sever that they receive a huge benefit: if the United States fails to
> prove any one of these additional elements beyond a reasonable doubt, they will
> be found not guilty of the VICAR crimes with which they're charged.

United States' Response at 21.

Turning to the "third prong" of the severance inquiry, the United States again asserts that the Motion to Sever fails to establish the prong's requirements. United States' Response at 22. The United States explains that the Motion to Sever contends that "Counts 6 and 7 would best serve the interest of the Court and the jury by (1) permitting the Court greater flexibility in scheduling matters; (2) facilitating jury selection for fewer defendants; and (3) relieving jury members of jury service for inordinate stretches of time." United States' Response at 22 (internal quotation marks omitted). The United States, then, downplays the burden on the Court and the parties of the joint trial, primarily by arguing that "juries are capable of handling complex litigation." United States' Response at 23. The United States, in sum, objects to severance of the Counts 6 and 7. See United States' Response at 23.

## 5.   **The Supplemental Pleading**.

M. Rodriguez replied to the United States' Response with Defendant Mario Rodriguez' Supplemental Filing in Support of Motion for Severance of Counts 6 and 7; and Motion to Join, filed January 24, 2017 (Doc. 845)("Supplemental Pleading"). The Supplemental Pleading first states:

> Mr. Rodriguez is charged in Counts 6 and 7, and no other Counts. By this
> pleading, he moves to join the severance request of all other Count 6 and 7
> defendants (dkt. 807). We also set forth the following supplemental points and
> authorities, to more fully advance the concept of the Court's inherent authority on
> this issue (even absent a showing of prejudice), and to briefly respond to several
> matters contained in the Government's Response.

Supplemental Pleading at 2-3. The Supplemental Pleading implores that "the traditional factors which establish a judicial preference for joint trials are inapplicable here," because "due to the

unique facts and circumstances of this case, and the nature of the requested severance, neither of these traditional justifications weigh in the Government's favor, regardless of whether or not prejudice otherwise exists."  Supplemental Pleading at 3.  Indeed, the Supplemental Pleading emphasizes:

> The Government ignores the significance of the fact that the instant severance only involves those Defendants charged in Counts 6 and 7, *to wit*: the 2014 J.M. murder.  Accordingly, there can be no 'scandal and inequity of inconsistent verdicts' as a result of the requested severance, since all those so charged will be tried together.

Supplemental Pleading at 3.

The Supplemental Pleading next suggests that, "[a]lthough traditional Rule 8 and Rule 14 considerations are certainly always applicable, [c]ases have been severed in which there is no mention of prejudice to the prosecution or to the defendants."  Supplemental Pleading at 4 (internal quotation marks omitted).  The support for such severance, according to the Supplemental Pleading, comes from "the court's inherent authority to manage its case load and to sever in the interest of efficient administration of justice and judicial economy." Supplemental Pleading at 4 (citing United States v. Bundy, 2016 U.S. Dist. LEXIS 172868 (D. Nev. 2016)("Courts have the inherent authority to manage their docket by severing large groups of defendants into more manageable groups.")).  The Supplemental Pleading then alerts the Court to the failure of the United States to recognize the Court's power in this regard.  See Supplemental Pleading at 5-8.

Turning then to the issue of "public trial considerations," the Supplemental Pleading asserts that there "is a realistic danger that Defendants' Sixth Amendment right to a public trial (among other rights) may be violated."  Supplemental Pleading at 8.  That is the case, according to the Supplemental Pleading, because, "[t]o whatever extent the Las Cruces Federal Courthouse

- 32 -

has difficulty physically accommodating a complex, multi-defendant trial with this many participants and required spectators, the Defendants' public trial rights are implicated." Supplemental Pleading at 9.   The Supplemental Pleading then concludes with a block quote regarding an opinion out of the United States District Court for the District of Nevada:

> [Chief Judge Reed's] . . . decision thoughtfully reviewed and considered the difficulties of a joint trial in a complex multi-defendant case. The decision pointed out that a complex multi-defendant case is "fraught with problems." He recognized that a single trial of a complex multi-defendant case imposes enormous burdens on the defendants, defense counsel, prosecutors, jurors, the court, and the judge. Dozens of people are required to be in court every day. Therefore, the absence of any one person may bring the entire trial to a screeching halt. Complex multi-defendant cases involve reconciling the individual calendars of the prosecutors and each defense attorney with the court's docket. Attorneys carrying a full case load have conflicts with other trials, and the longer the case lingers, the more pronounced these conflicts become. Judge Reed noted that a lengthy trial of multiple defendants creates a unique hardship on each party involved. Jurors spend months away from their daily lives, defendants are required to endure months of pretrial incarceration before their case is finally adjudicated, and often significant amounts of time-consuming evidence are presented which are unrelated to a particular defendant. Attorneys are unable to spend significant time on their remaining cases. The court is forced to expend an exorbitant amount of time on a single case, and other litigants must "queue up for the remaining courtrooms." The result is a strain on the court's docket and unconscionable delays of all other cases. Mancuso also recognized the personal strain on the trial judge in a long complex case. The trial court is required to make rulings as issues come up which often require frequent adjournments necessitated by unavoidable problems associated with multiple jurors, multiple defendants, and their counsel as well as the witnesses and courtroom personnel who are required to be present at all times.

Supplemental Pleading at 11 (quoting United States v. Bundy, 2016 U.S. Dist. LEXIS 172868 (citations omitted)).

### 6. **Gonzales' Motion to Sever**.

Gonzales filed his Amended Motion to Sever on February 5, 2017, and readopted Gonzales' Motion to Sever in full and further addressed Gonzales' speedy trial rights. See Gonzales' Amended Motion to Sever at 1 n.1. The Court addresses Gonzales' severance

arguments in the context of Gonzales' Amended Motion to Sever, because it is difficult to consider Gonzales' Motion to Sever in a vacuum.

### 7.   A. Gallegos' Motion to Sever.

A. Gallegos and J. Gallegos submitted A. Gallegos' Motion to Sever, with A. Gallegos stating:

> Andrew Gallegos, who is not charged elsewhere in the superseding indictment, respectfully request[s] that this Court sever Counts 4 and 5 from trial of the other counts in the superseding indictment.  Although, Defendant Joe Gallegos is also charged in counts 1, 13, 14 and 15 . . . he join[]s in this Motion because the offenses alleged in these other counts involve other different defendants, and occurred in different locations, three to four years after the alleged AB murder, and with respect to count 1, twelve years before the alleged AB murder. Furthermore, none of these additional counts have any relationship to counts 4 and 5.

A. Gallegos' Motion to Sever at 1-2.  A. Gallegos argues:

> (1) Counts 4 and 5 were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 28 other defendants; and (2) should the Court find joinder proper under Rule 8, severance is still required under Rule 14 and the Fifth Amendment because a joint trial of the two Defendants for Counts 4 and 5 alongside the 28 other defendants and the 13 other counts in the superseding indictment will deprive the Gallegos Defendants of their right to a fair trial, especially given that only a small portion of the evidence in the trial of all the defendants would be relevant to Counts 4 and 5.

A. Gallegos' Motion to Sever at 2.   A. Gallegos also asserts that "judicial efficiency and economy supports severance, as a trial of all 24 Defendants on all 15 counts would last considerably longer given the number of defendants and the span of decades between many of the allegations." A. Gallegos' Motion to Sever at 2.  A. Gallegos also contends that

> a joint trial would be logistically impractical because all defendants and their counsel may not even fit in the courtroom during the trial.  These logistical limitations alone implicate the Defendants' right to confront witnesses, be present at all critical stages of the trial and to have a public trial under the Sixth Amendment.

A. Gallegos' Motion to Sever at 2.  After recapping an extensive factual background of the case similar to that which the Court has provided in this Memorandum Opinion and Order, the Motion to Sever primarily elaborates on the nature of Counts 4 and 5, "conspiracy to murder and murder of Adrian Burns (AB)."  A. Gallegos' Motion to Sever at 2-3.

According to A. Gallegos, the Superseding Indictment provides that "Joe and his younger brother, Andrew Gallegos, conspired to and did murder AB on or about November 12, 2012, in Socorro and Valencia counties."  A. Gallegos' Motion to Sever at 4.  A. Gallegos provides, however:

> Although the basis for Counts 4 and 5 are not precisely clear, it is believed the government's theory of the case is, in part, that Defendants Joe and Andrew Gallegos were allegedly low level members of the SNM who received orders from higher-up to kill AB.  It is unspecified as to who specifically gave the kill-order or as to when, where, or how exactly the order came down.  At the time of the murder, AB is alleged to have been the Gallegos Defendants' drug supplier and possible rival of the SNM.  The Gallegos Defendants, who deny membership with the SNM, are alleged to have tortured and killed AB to gain membership or status with the SNM.  AB's body (shot, gasoline doused and burnt) was found in the Bosque with his vehicle, just outside of Socorro County.

A. Gallegos' Motion to Sever at 4.  According to A. Gallegos, he and J. Gallegos are

> alleged to have been the last people to see AB alive at his home in Los Lunas, N.M., where he was first shot and killed.  Some hours after his death, the Gallegos Defendants were said to have been seen in public with blood and pinhole burnt marks on their clothes.

A. Gallegos' Motion to Sever at 4.  These facts, A. Gallegos explains, resulted in

> the State of New Mexico, by the Third Judicial District Attorney's Office in Socorro County, charg[ing] Defendants Joe and Andrew Gallegos in County Magistrate Court (Docket No: M-52-FR-2012-00230) with the murder of AB, along with several other related charges.  The case was investigated by the New Mexico State Police (NMSP), who later arrested the Gallegos Defendants for the murder of AB on November 20, 2012 in Albuquerque, New Mexico.  Upon information and belief, two subsequent DNA tests of the blood found on their clothing was determined to be non-human.  The burnt marks on their clothes were also tested and determined to be non-gasoline related.  The Gallegos Defendants have asserted all along that the blood came from the roasting of a pig during a

birthday celebration the night that they were seen in public, and that the burnt marks were likely from the party or from welding jobs that the brothers often did for spare cash.

A. Gallegos' Motion to Sever at 3-4.   The State of New Mexico, on December 14, 2012, according to A. Gallegos, "filed a *Nolle Prosequi* for both defendants indicating insufficient evidence to proceed."   A. Gallegos' Motion to Sever at 5.   A. Gallegos thus provides and argues:

> Three years later, the first indictment in this federal cause was filed. . . .   Andrew Gallegos and the AB murder were not included in these counts until the superseding indictment was filed on April 21, 2016. . . .   The other counts in the superseding indictment, except Counts 6 and 7 did not have a parallel state prosecution.   Furthermore, the AB murder, unlike most of the alleged murders in the Superseding Indictment, occurred outside of prison and was allegedly committed for profit and not retaliatory reasons.   Upon information and belief, there were no witnesses to the murder or specific, concrete evidence, including DNA, that directly links the Gallegos Defendants to this murder, the murder scene, or to the location where AB's body was found.

A. Gallegos' Motion to Sever at 5.

A. Gallegos then argues that "[t]he Gallegos Defendants must be severed, as their joinder with other 21 defendants under Rule 8(b) is improper and sets a dangerous precedent for infinite joinders."   A. Gallegos' Motion to Sever at 9.   A. Gallegos relies on <u>Zafiro v. United States</u>, 506 U.S. at 537, arguing, "[i]n *Zafiro*, the Supreme Court stated that joinder under Rule 8(b) 'serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'   506 U.S. at 537.   This possibility of scandal and inequity, however, is not a risk in this case."   A. Gallegos' Motion to Sever at 9.   A. Gallegos explains:

> In short, there is no evidence that the crimes alleged in Counts 4 and 5 were part of a series of acts or transactions.   Even in the most favorable light, the indictment alleges that, out of the two Defendants in Counts 4 and 5, only Joe Gallegos is alleged to have participated in any of the other counts.   Also, there is no evidence of a transactional nexus between the Gallegos Defendants named in Counts 4 and 5 and any of the other defendants or other counts.   There is no evidence that the Gallegos Defendants and other defendants participated in a series of acts or transactions despite the fact that the government has actively investigated these

- 36 -

defendants for more than four years with the help of cooperating witnesses, confidential informants, and call and mail monitoring.

A. Gallegos' Motion to Sever at 10.  The risk of an inconsistent verdict -- should the Court sever Counts 4 and 5 -- does not exist, A. Gallegos argues, because "Counts 4 and 5 only involve the Gallegos Defendants, and are discrete and not connected to any of the other defendants, [and] joinder of the Gallegos Defendants is improper under Rule 8(b)."  A. Gallegos' Motion to Sever at 10.  Additionally, A. Gallegos argues, although "[t]he government claims that the purpose of the offenses as well as the means and methods of the SNM constitute racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1)," and "[t]he government further claim[s] that proof of a 'common purpose' is sufficient to bring a group of people under RICO," "the government should not be allowed to simply use the umbrella of RICO to join every alleged SNM crime by simply alleging that the offense shared a common purpose.  This would create a slippery slope that this Court, as a public policy matter, should view with great caution."  A. Gallegos' Motion to Sever at 10-11.

A. Gallegos alternatively argues that "[C]ounts 4 and 5 should be severed under Rule 14, as the evidence of other murders, assaults, and conspiracy by SNM members will prejudice the Gallegos Defendants, and a joint trial of all defendants on all counts is impractical."  A. Gallegos' Motion to Sever at 11.  A. Gallegos relies on the Court's recitation of its rule 14 analysis in United States v. Gould, 2007 WL 1302587, at *2, to argue that the Court should consider in his case "whether the defenses presented are so antagonistic that they are mutually exclusive," whether he has shown "a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence," and whether the Court should then "exercise[] its discretion and weigh[] the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and

expedition in judicial administration."  A. Gallegos' Motion to Sever at 11-12.  A. Gallegos then

points to

> *United States v. Hardwell*, [where] the Tenth Circuit held that joinder under Rule
> 8(b) was not proper when six co-defendants were all charged with conspiracy,
> money laundering, and possession of cocaine with intent to distribute. 80 F.3d
> 1471 (10th Cir. 1996), *on reh'g in part*, *United States v. Hardwell*, 88 F.3d 897
> (10th Cir. 1996).

A. Gallegos' Motion to Sever at 12.  A. Gallegos argues that, in United States v. Hardwell,

> [t]he Tenth Circuit explained that severance was not necessary, in part, because
> the "conspiracy was to commit a single offense; there were only six defendants,
> all charged with the [one] conspiracy" and there was not a great disparity in
> culpability among the defendants. . . .  In reaching this decision, the court directly
> contrasted *Hardwell*, with *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y.
> 1987), a RICO case where severance was granted because it is substantially more
> complex than *Hardwell*, and remarkably similar to the case at hand.

A. Gallegos' Motion to Sever at 12.  A. Gallegos then discusses United States v. Gallo, where

"the District Court granted the defendants' motion for severance under Rule 14 and separated a

22-count RICO indictment charging 16 defendants into 7 separate trials," because:

> Although the court determined that the defendants were properly joined under
> Rule 8(b), it held that severance was required under Rule 14 after considering the
> prejudice resulting from: (1) the complexity of the indictment; (2) the
> disproportionality of evidence; (3) whether there is an antagonism of defense
> strategies and theories; (4) whether there is evidence only admissible as to some
> defendants; (5) the potential inadequacy of limiting instructions; and (6) the
> balancing requirements of Rule 14 including the deleterious effect of prolonged
> complex cases, and whether granting a severance saves time.

A. Gallegos' Motion to Sever at 12-13.  In particular, A. Gallegos notes the United States v.

Gallo court's decision that the RICO indictment in that case was a complex RICO conspiracy,

the jury would need to work hard to keep the legal and factual elements in perspective, and some

defendants were less culpable than the others.  See A. Gallegos' Motion to Sever at 13-14.  A.

Gallegos also notes that, in United States v. Gallo, the court concluded there was a likelihood of

frequent instances in which "evidence admitted against one defendant would also be relevant as

- 38 -

to another under Rule 401, but would be excluded as to the latter under Rule 403 in a separate

trial of that defendant alone because its probative value would be outweighed by the danger of

unfair prejudice," and also discussed how

> the indictment charged a central RICO conspiracy, numerous other conspiracies
> in the substantive counts and the predicates acts and potential uncharged
> conspiracies, the result would be "conspiracies within conspiracies, and
> conspiracies to conceal other conspiracies, conspiracies which are discrete and
> finite, and those which are amorphous and indefinite, involving conspirators
> joining and leaving the conspiracy at various times." . . . Meaning that in such a
> complex trial, "[a]dmissibility decisions will often depend on having faith in the
> jury's ability to heed extraordinarily intricate limiting instructions" which "[o]ver
> the course of several months . . . would virtually be impossible without the aid of
> a computer" given the number of the co-defendants and counts.

A. Gallegos' Motion to Sever at 14.   Specifically, A. Gallegos then provides that, in

"[c]onsidering the balancing requirement of Rule 14, the court noted that '[t]rials in these

"monster" cases' 'create an enormous burden on the courts, as well as on the defendants, the

defense bar, juror, and even prosecutors.'"  A. Gallegos' Motion to Sever at 15.  Indeed, A.

Gallegos references United States v. Gallo's conclusion that

> the overall trial time was probably diminished in the Gallo case by splitting up the
> trials . . . because the trial would be smoother and more concise . . . evidence in
> each case does not scatter about the various contours of the conspiracy . . . there
> are two or three defense counsel cross-examining and raising objections rather
> than one or two dozen . . . sidebars are much more infrequent . . . and
> continuances and adjournments are less common.

A. Gallegos' Motion to Sever at 16 (internal quotation marks and citation omitted).  A. Gallegos

then draws comparisons between this SNM case and United States v. Gallo, suggesting:

> Like *Gallo*, this case deals with a complex RICO indictment spanning decades'
> worth of criminal allegations.  In fact, this Court declared it complex on January
> 7, 2016, even before the government unsealed the April 21, 2016, superseding
> indictment. . . .  Also similar to *Gallo* is the disproportionality of the evidence in
> relation to the 30 defendants charged.  A review of the discovery to date
> demonstrates that the government has revealed far more and far stronger evidence
> against some co-defendants, including audio-recorded conversations and self-
> incriminating statements, than against others.   Accordingly, "[i]nevitable

- 39 -

prejudice to the peripheral defendants is caused by the slow but inexorable accumulation of evidence against the major players." . . .   To date, the government has only presented rumor, conjectures and circumstantial evidence as to the guilt of the Gallegos Defendants, which is not only substantially weaker evidence when compared to the evidence against most of the other defendants, but is clearly indicative of the government relying on the principle of "guilt by association" to prove their case in counts 4 and 5.

A. Gallegos' Motion to Sever at 16-17.  Further, although A. Gallegos concedes that "it is unclear at this point whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive," he contends "there can be no doubt that there will be antagonistic defenses.  For instance, many defendants may argue they were not or are not SNM members.  Other defendants will likely argue the alleged crimes were not done in furtherance of the SNM."  A. Gallegos' Motion to Sever at 17.

Ultimately, A. Gallegos reiterates that the risk of prejudice in this case is great, given the different nature of all of the Counts, and that in particular -- for him in Counts 4 and 5 -- the scant evidence against him will be bolstered by the appeal to guilt by association.  See A. Gallegos' Motion to Sever at 17-18.  A. Gallegos also reiterates that the nature of the Superseding Indictment limits the potential effectiveness of limiting instruction to the jury, stating that

if no severance is granted, the jury will hear about the other murders, conspiracies to commit murder (not of the same victims), a conspiracy to commit assault, assault, and an attempted murder plus the firearms charges, all allegedly in furtherance of the SNM.  Simply hearing about this activity by alleged fellow gang members makes it unlikely the Gallegos Defendants can get a fair shake with the jury, even if a limiting instruction is given and even if the defendants present viable defenses.

A. Gallegos' Motion to Sever at 18-19.  A. Gallegos also notes that, regarding his constitutional right to a fair trial, "[e]ven the largest of the federal courtrooms in the District of New Mexico cannot adequately accommodate the trial, much less voir dire, if a severance is not granted."  A.

Gallegos' Motion to Sever at 19-20. Here, A. Gallegos thus last contends that "severance of counts 4 and 5 is necessary to protect the Gallegos Defendants' respective rights to a fair trial under the Fifth Amendment." A. Gallegos' Motion to Sever at 21. A. Gallegos concludes by stating that Gonzales, Lujan, and Sanchez join he and J. Gallegos in filing A. Gallegos' Motion to Sever, and that no other Defendants have opposed A. Gallegos' Motion to Sever.

## 8. **Troup's Motion to Sever.**

Troup and B. Garcia filed Troup's Motion to Sever, and were joined by "Defendants Andrew Gallegos, Christopher Chavez, A[r]turo Arnulfo Garcia, Rudy Perez, Daniel Sanchez," in their request to sever Counts 1 and 2. Troup's Motion to Sever at 1-2. Troup's Motion to Sever then explains the factual allegations underlying for Counts 1 and 2:

> The 15-count superseding indictment in this case describes alleged activities involving [SNM], over a period of two decades and in regard to alleged criminal acts that occurred in varied locations. Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia are charged in Count 1 with a VICAR violation based on the substantive allegation that they knowingly and intentionally murdered Frank Castillo. . . . Defendants Leonard Lujan, Billy Garcia, Eugene Martinez, Allen Patterson, and Christopher Chavez are charged in Count 2 with a VICAR violation based on the substantive allegation that they knowingly and intentionally murdered Rolando Garza. . . . Counts 1 and 2 accuse these eight defendants (collectively, the "2001 Defendants") of murdering Castillo and Garza on the same day (March 26, 2001), at [Southern New Mexico].

Troup's Motion to Sever at 1-2. Troup's Motion to Sever makes five primary arguments, much of which are similar to those presented in A. Gallegos' Motion to Sever and the Motion to Sever:

> (1) Counts 1 and 2 are remote in time from the remaining counts; (2) when the vast majority of the crimes alleged in the superseding indictment occurred, almost all of the 2001 defendants were living in the community at large and were not part of the prison system; (3) the allegations in Counts 1 and 2 are alleged to have been carried out by a different faction of the SNM than those alleged to have been committed in the other counts; (4) the introduction of evidence of the crimes in the other counts will unfairly prejudice the defendants indicted in Counts 1 and 2 in a manner which limiting instructions cannot cure; and (5) severance of Counts 1 and 2 would be in the interest of judicial economy and efficiency.

Troup's Motion to Sever at 2-3.  Ultimately, Troup's Motion to Sever contends "that a court

determining whether to grant a motion to sever under Rule 14 must weigh the potential prejudice

to the defendant against considerations of judicial economy and efficiency," and that "Federal

Rule of Criminal Procedure 14(a) permits the trial court to conduct separate trials if the joinder

of separate offenses appears to prejudice the defendant or the government."  Troup's Motion to

Sever at 7.  Troup's Motion to Sever states: "In most instances, fairness is pitted against judicial

economy and the court must use its discretion to balance which valid consideration should

prevail.  This case presents no such dilemma . . . fairness and judicial economy both favor

severance."  Troup's Motion to Sever at 8.

Troup first argues that Counts 1 and 2 Defendants "will be unduly prejudiced by joinder,"

because "[e]vidence concerning Counts 9 and 10 will unfairly prejudice all other defendants."

Troup's Motion to Sever at 8.  Specifically, Troup argues

> that Counts 9 and 10 include allegations of a 2015 conspiracy to murder two
> corrections officials in the community, as opposed to violence by inmates against
> inmates within the confined walls of the prison system.  Those crimes are
> different in nature and character, and will undoubtedly cause fear in citizen jurors.

Troup's Motion to Sever at 8.  Indeed, Troup provides:

> A review of the indictment's paragraphs 3-13 does not reveal that attacking
> corrections officers was ever a goal or purpose in the formation or operation of
> the SNM.  Any and all defendants not charged in counts 9 and 10 would suffer
> unfair prejudice if joined with Counts 9 and 10.

Troup's Motion to Sever at 8.  Troup also argues that "[t]here exists a disparity in the quality and

quantity of evidence, which creates antagonistic defenses," and that "[t]he allegations in the

superseding indictment are not related to a single criminal enterprise, but rather describe several

distinct and different criminal enterprises."  Troup's Motion to Sever at 8-9.  Essentially, Troup

argues that SNM has divided and fractured in such a fashion as to extinguish any ties amongst

the Counts 1 and 2 Defendants, and those alleged SNM members in the other counts.  See

Troup's Motion to Sever at 9-12.  In considering whether there are multiple criminal enterprises,

Troup relies on the factors United States v. Woods, 1985 U.S. Dist. LEXIS 16113, at *22-23 (D.

Conn. 1985), sets forth, which are:

> (1) the criminal offenses charged in the indictments; (2) the participants of the
> conspiracies; (3) the dates between which the conspiracies took place; (4) the
> methods of operation; (5) overt acts done in furtherance of the conspiracies; (6)
> the geographic scope of the purported conspiracies or locations where the overt
> acts occurred; (7) the extent to which the purported conspiracies share a common
> objective; and (8) the degree of interdependence between the purported
> conspiracies.

Troup's Motion to Sever at 10.  Troup then explains that the distinct SNM factions from which

the Defendants named in the Superseding Indictment are alleged to associate are the "All Stars,"

the "Old Timers," and the "Rejects," all of whom Troup argues do not interact.  Troup's Motion

to Sever at 11.  In fact, Troup provides:

> The question of whether this is one criminal enterprise or several different
> criminal enterprises is a question of fact to be determined by this Court in
> analyzing whether the counts should remain joined or severed.  The government's
> entire basis for joinder rests on the premise that the SNM is a single criminal
> enterprise.  The facts belie this notion.  The SNM is an umbrella name for a group
> of individuals, much like the name Crips is a name used by various street gangs.
> Just like a Crips gang in one part of Los Angeles may not be the same criminal
> enterprise as another Crips gang in Los Angeles -- where they share nothing more
> than a generalized camaraderie -- the SNM factions often operated independently
> from each other and, indeed, counter to each other.  To say they shared similar
> illegal goals is not to say they are the same criminal enterprise.  The All Stars, for
> example, wanted to exterminate the Old Timers and wanted to take over the New
> Mexico prison system.

Troup's Motion to Sever at 12-13.  Accordingly, Troup argues, "[a]pplying the Woods factors to

these facts leads inescapably to the conclusion that the superseding indictment in reality alleges

separate enterprises."  Troup's Motion to Sever at 13-14.

Troup next appeals to rule 14, and the Court's decision in United States v. Gould, in regard to severance of the Superseding Indictment for efficiency's sake. See Troup's Motion to Sever at 14. Troup first reiterates that there will be no risk of inconsistent verdicts if the Court severs Counts 1 and 2, because Troup is not "requesting severance of defendants within a single criminal episode," but instead requests severance of the entire Counts 1 and 2. Troup's Motion to Sever at 14. Indeed, "[e]fficiency, in the unique circumstances presented in this case, favors severance," Troup argues, and "[t]he cost of a joint trial versus four separate trials cannot be ignored." Troup's Motion to Sever at 14-15. Troup then extrapolates on the costs and burden of a joint trial, estimating that a joint trial of the twenty Defendants left in the case at the time he filed his motion would result in compensation for all defense counsel's time, lodging, meals, and travel, in the amount of $3,236,309.00. See Troup's Motion to Sever at 15-20. In the alternative, Troup provides that the compensation for all defense counsel's time, lodging, meals, and travel, should the Court -- for example -- choose to sever the Counts into five distinct trials, would be in the amount of $1,125,635.72 -- a considerably smaller burden on the taxpayer's dollars. See Troup's Motion to Sever at 20. The difference, ostensibly, is a result of more manageable trials which proceed faster -- or not at all, after Defendants have seen the outcome of one or more of the trials. See Troup's Motion to Sever at 16-19.

Troup last argues that "a joint trial would involve the introduction of innumerable statements and items of evidence inadmissible against the 2001 Defendants, and limiting instructions would not suffice to cure the resulting prejudice." Troup's Motion to Sever at 20. Essentially, Troup contends, "counts 3-15 involve conspiracies to commit crimes that do not involve Defendants Billy Garcia, Lujan, Eugene Martinez, Patterson, or Chavez. Counts 4-15 involve conspiracies that do not involve defendant Troup. That evidence is either irrelevant,

- 44 -

inadmissible hearsay, or inadmissible testimonial statements, as to Counts 1 and 2."  Troup's

Motion to Sever at 20.  Troup then explains:

> The government's argument is that all of the evidence is relevant against all
> defendants, as res gestae of the criminal enterprise.  Assuming arguendo that the
> government gets beyond the relevancy hurdle via the res gestae exception, the
> evidence may still be inadmissible hearsay or a testimonial statement subject to a
> right of confrontation.  The statements of co-defendants who will not testify will
> all be inadmissible against any defendant who was not a co-conspirator.  It is well
> settled that the question whether a single conspiracy or multiple conspiracies exist
> is a question of fact for the trial court to determine.

Troup's Motion to Sever at 20-21.  Troup also rejects

> [t]he government's plan in a joint trial . . .  for the Court to utilize a litany of
> limiting instructions designed to isolate and constrain the jury's consideration of
> evidence to selected defendants[, because l]iterally, for all but two weeks of a
> two- to three-month trial, under the government's plan, the Court would be
> reading a limiting instruction on a continuing basis indicating the evidence is not
> admissible against defendants,

which is untenable.  Troup's Motion to Sever at 21 ("The variations of the instructions will

mount in the dozens if not hundreds.").  Troup argues this method is impractical and supports

severance, relying in part on United States v. Gallo, where the Court concluded the indictment in

fourteen-defendant, twenty-two count RICO case was "far too extensive and intricate to expect

that a jury would be able to discern the myriad of subtle distinctions and mental gyrations that

would be required by the inevitable plethora of limiting instructions necessary."  Troup's Motion

to Sever at 22.  Specifically, Troup asserts that "[a] joint trial here would prevent the jury from

making reliable judgments about guilt or innocence, from one defendant (or set of defendants) to

the next."  Troup's Motion to Sever at 23 (citing Zafiro v. United States, 506 U.S. at 539).

Troup also distinguishes the complex nature of this Superseding Indictment with cases in which

courts determined jury instructions could cure the prejudice in a multi-defendant trial.  See

Troup's Motion to Sever at 23-25 (pointing, in particular, to United States v. Giampa, 904 F.

Supp. 235 (D.N.J. 1995); United States v. Cervone, 907 F.2d 332 (2d Cir. 1990); and United States v. DiNome, 954 F.2d 839 (2d Cir. 1992), in which there was no severance, because "each of these cases involved participation in a common, consistent thread that bound the defendants directly to an identifiable, actual participant in the larger case"). Accordingly, Troup argues:

> Under these circumstances -- unlike those in *Giampa*, *Cervone*, and *DiNome* -- there exists a very real and very strong likelihood of a 'spillover effect' from the more recent crimes alleged in the later counts onto the comparatively ancient crimes alleged in Counts 1 and 2 that involved separate participants, victims, methods, and locations.

Troup's Motion to Sever at 24-25. Troup, in conclusion, alerts the Court that the Second Circuit "described [in] *Cervone* [that] a Rule 14 motion 'is committed to the sound discretion of the trial court' and is 'virtually unreviewable.'" Troup's Motion to Sever at 25.

9.    **The Reply**.

Perez replied to the United States' Response with Defendant Perez's Reply to the Government's Response to Motion to Sever Defendants Charged with Offenses in Counts 6 and 7, filed February 3, 2017 (Doc. 887)("Reply"). The Reply reiterates that "there is little doubt that severance is required under Rule 8 and Rule 14. The only question is how the Court should sever the entirety of the Superseding Indictment." Reply at 2. The Reply notes, and the Court is cognizant of, the fact that other parties have sought severance of certain Counts of the Superseding Indictment, providing that: "Regardless of how the other counts and defendants should ultimately be tried, what remains clear is that the six remaining Defendants charged in Counts 6 and 7 should be tried separately from the remaining defendants and the remaining counts. This outcome is dictated both by Rule 8 and Rule 14." Reply at 2. The Reply also argues that severance of Counts 6 and 7 is "dictated by judicial economy, both now and during trial." Reply at 2. The Reply maintains:

- 46 -

> The government's suggestion this Court should not sever because only a few defendants are likely to proceed to trial is misguided. This approach runs contrary to the interests of judicial economy and is also entirely contrary to the positions of the remaining Defendants. All six of the 2014 Defendants submit they will proceed to trial. The remaining Defendants in the remaining counts have indicated the same. While it is certainly possible some may plea, Defendants do not wish to rely on the government's clairvoyance.

Reply at 3. The balance of the Reply restates the arguments in the Motion to Sever, in particular highlighting Perez' contention that "[s]imply alleging that the Defendants are members of the SNM does not demonstrate that the Defendants are connected and is insufficient to permit joinder." Reply at 8. Further, according to Perez,

> the mere fact that two conspiracies have overlapping memberships will not authorize a single indictment if the conspiracies cannot be tied together into one conspiracy, one common plan or scheme . . . [and h]ere, the United States did not charge a single overarching conspiracy because they could not. The facts simply do not provide sufficient overlapping to warrant it.

Reply at 8. The Reply then mostly discusses the impact of this multi-count and multi-Defendant trial in Las Cruces on judicial economy and efficiency. See Reply at 8-14. Specifically, the Reply argues that "analyzing the cost-benefit of having separate trials in favor of one joint trial weighs heavily in favor of severance," an important factor Perez wishes to bring to the Court's attention. Reply at 15.

**10.    Alonso's Motion to Sever.**

Alonso's Motion to Sever requests that the Court "sever Count 3 from all other counts of the Superseding Indictment. Within Count 3, Mr. Alonso further moves that his trial be severed from the trial of co-defendant Edward Troup." Alonso's Motion to Sever at 1. In support of the motion, Alonso makes

> three main arguments: (1) Count 3 was improperly joined under Rule 8(a), as Count 3 does not share a sufficient nexus with the other charges to permit joinder; (2) Javier Alonso was improperly joined under Rule 8(b), as he is not alleged to have participated in the same act or transaction or in the same series of acts or

transactions that constitute crimes as the other defendants; and (3) should the Court find joinder proper under Rule 8(a) and Rule 8(b), severance is still required under Rule 14 and the Fifth Amendment because a joint trial of [] Mr. Alonso alongside the other remaining defendants and the 14 other counts in the Superseding Indictment will deprive him of his right to a fair trial. Additionally, severance of Count 3 will advance the interests of judicial economy because a joint trial on all counts would be substantially longer and logistically impractical given the number of defendants and the span of decades between many of the allegations.

Alonso's Motion to Sever at 2. Regarding Count 3, Alonso provides:

Count 3 alleges that Edward Troup, Javier Alonso, Arturo Arnulfo Garcia, Benjamin Clark, and Ruben Hernandez, murdered Freddie Sanchez on June 17, 2007 at the Southern New Mexico [] in Las Cruces. Based on the discovery produced to date, it appears that the government's theory regarding Count 3 is that co-defendants Arturo Garcia and Benjamin Clark ordered that Freddie Sanchez be killed, that codefendant Ruben Hernandez assisted in the homicide by covering security cameras, and that co-defendants Edward Troup and Javier Alonso killed Freddie Sanchez. While defense counsel has attempted to discern the government's theory, discovery has been produced that contradicts the government's presumed theory.

Alonso's Motion to Sever at 4.

Alonso, then, first argues -- under rule 8 -- that joinder of the murder alleged in Count 3 is dissimilar in character to other Counts in the Superseding Indictment, in particular "Counts 11 and 12," and that there is "no evidence that the events underlying Count 3 are based on the same act or transaction as any of the other charges," making joinder inappropriate. Alonso's Motion to Sever at 8. Alonso thus contends joinder was inappropriate, because

Count 3 is simply not based on the same act or transaction as any other count in this case . . . [and] there is no evidence of any nexus between Count 3 and any other count in the Superseding Indictment. Count 3 is a discrete event, unconnected to any other count, unconnected to the other defendants, separated by many years from every other allegation in the case, and as a result not part of a common scheme or plan.

Alonso's Motion to Sever at 8.

Alonso next argues in favor of rule 14 severance, stating that

- 48 -

> [t]he factors that counsel in favor of severance under Rule 8 also demonstrate why Javier Alonso would be prejudiced by a joint trial. It is precisely because (1) there is no nexus between Count 3 and the other counts, and (2) because Count 3 and the other counts are not based on the same act or transaction that a joint trial would be unfair to Mr. Alonso.

Alonso's Motion to Sever at 9. Alonso argues that "[t]he introduction of evidence of the other 14 unrelated crimes purportedly committed by and co-defendants who are not charged in Count 3 will deprive Mr. Alonso of his rights to fair trial such that severance should be granted under Rule 14." Alonso's Motion to Sever at 9. Alonso also argues that the "complexity of the indictment, the disproportionality of evidence, and the presence of evidence that would only be admissible as to some defendants make severance a prudent exercise of discretion." Alonso's Motion to Sever at 9. Further, although the United States argues each of the Superseding Indictment's counts are "linked by a shared affiliation with the SNM," Alonso argues that "such link did not exist as to Mr. Alonso during the time alleged in Counts 4-15," Alonso's Motion to Sever at 9-10. In that regard, Alonso points to a conspiracy case, <u>Krulewitch v. United States</u>, 69 S. Ct. 716, 719-20 n.2 (1949)(discussing <u>United States v. Falcone</u>, 109 F.2d 579, 581 (2d Cir. 1940)), for the proposition that a

> co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its merits in the minds of jurors who are ready to believe that birds of a feather are flocked together.

Alonso's Motion to Sever at 10. Alonso also requests severance of Count 3 in the interest of "judicial efficiency and economy," because "a trial of all Defendants on all 15 counts would last considerably longer and would be logistically impractical." Alonso's Motion to Sever at 10-11.

Alonso then turns to argument why he, individually, requests "severance . . . from Edward Troup," because "Edward Troup allegedly made statements that, if admitted at a joint

trial, would implicate Javier Alonso."  Alonso's Motion to Sever at 12.  Specifically, Alonso

explains:

> In *Bruton v. United States*, 391 U.S. 1231 (1968), the Supreme Court held that admission of a non-testifying co-defendant's confession implicating a defendant at their joint trial violated the defendant's Sixth Amendment Confrontation Clause rights.  *Bruton*, involved two defendants -- Evans and Bruton -- tried jointly for robbery.  Evans did not testify, but the Government introduced into evidence Evans' confession, which stated that both he (Evans) and Bruton together had committed the robbery. . . .  The trial judge told the jury it could consider the confession as evidence only against Evans, not against Bruton. . . .  The Court held that, despite the limiting instruction, the introduction of Evans' out-of-court confession at Bruton's trial had violated Bruton's right, protected by the Sixth Amendment, to cross-examine witnesses. . . .  The Court recognized that in some circumstances a limiting instruction may not adequately protect one defendant from the prejudicial effects of the introduction at a joint trial of evidence intended for use only against a different defendant.

Alonso's Motion to Sever at 12.  Alonso also notes that, in <u>Bruton v. United States</u>, the Supreme

Court held that

> "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.  Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect. . . .  The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. . . ." The Court found that Evans' confession constituted just such a "powerfully incriminating extrajudicial statement," and that its introduction into evidence, insulated from cross-examination, violated Bruton's Sixth Amendment rights.

Alonso's Motion to Sever at 13 (quoting <u>Bruton v. United States</u>, 391 U.S. at 135-36).  Alonso

then explains how <u>Bruton v. United States</u> has been refined in the wake of its publication, noting

specifically, however, that, "[d]espite these refinements, *Bruton*'s protective rule remains intact.

Even where the codefendant's statement is not facially or directly inculpatory, *Bruton*

nevertheless applies 'when the statement is evidence of a fact critical to the prosecution's case.'"

Alonso's Motion to Sever at 12 (quoting United States v. Sarracino, 340 F.3d 1148, 1160 (10th

Cir. 2003)(citing United States v. Glass, 128 F.3d 1398, 1404 (10th Cir. 1997))).  As to Troup's

statements which Alonso contends implicate him and might result in a confrontation-clause

violation should he be tried with Troup, those statements are as follows:

> Statement at Deleon 680-681 []: Here Mr. Troup allegedly told a CHS that
> he held Freddie Sanchez's legs while Javier Alonso strangled him with the
> drawstring from a laundry bag.

> Statement at Deleon 1238-1239 []: Here Mr. Troup allegedly told a CHS
> that the murder of Freddie Sanchez was called by Arturo Garcia and Gerald
> Archuleta, that he (Troup) was part of the murder, and that Javier Alonso was
> ordered to kill Sanchez.

> Statement at Baca 2464 []: Here Mr. Troup allegedly told a CHS that he
> and Javier Alonso killed Freddie Sanchez.

Alonso's Motion to Sever at 13.  Alonso concludes by stating that Sanchez, Troup, and A. Baca

have joined Alonso's Motion to Sever, and that no Defendants have objected.  See Alonso's

Motion to Sever at 13.

### 11.   Gonzales' Amended Motion to Sever.

Gonzales' Amended Motion to Sever requests his individual severance from a joint trial

of all Defendants named in the Superseding Indictment.  See Gonzales' Amended Motion to

Sever at 1.  Regarding Gonzales' exposure under the Superseding Indictment, Gonzales explains

that he is "charged in counts 14 and 15 with violent crimes in aid of racketeering (Attempted

murder, assault resulting in serious bodily injury, assault with a dangerous weapon and

conspiracy), in violation of 18 U.S.C. § 1959(a)(3) and (5)."  Gonzales' Amended Motion to

Sever at 1.  More specifically, Gonzales provides:

> According to the discovery provided, the charges against Mr. Gonzales stem from
> his alleged involvement in the beating of J.G. on February 27, 2016.  According
> to various inconsistent versions of events, on February 27, 2016, Santos Gonzales,
> Brandi Rodriguez and Paul Rivera allegedly traveled to a home where J.G. had

been staying. The trio allegedly entered the home and beat J.G. Much of what was reported about the motive for the beating is inconsistent. Some accounts reported that co-defendant Shaunna Gutierrez had spoken with Brandi Gutierrez, outside the presence of Mr. Gonzales, about how J.G. had agreed to testify against Joe Gallegos. Ms. Gutierrez allegedly advised Ms. Rodriguez that J.G., a.k.a. Tiny was staying with C.J. at her home. According to the different accounts of the incident, at the time Gutierrez and Rodriguez were discussing J.G., Santos Gonzales was outside in Ms. Gutierrez's truck.

Gonzales' Amended Motion to Sever at 1-2. Further, Gonzales explains:

> According to various versions, shortly thereafter Ms. Rodriguez, Messrs. Rivera and Gonzales went to C.J.'s home. J.G. was in a back bedroom. According to one of the versions given by J.G, he was at C.J.'s residence when she left to the methadone clinic. He was awakened when he was hit in the stomach. He saw four (4) people in the room with him (Santos Gonzales, Brandy Dominguez, "Oso" (Paul Rivera) and another female). J.G. stated Santos told him 'you remember me?' and hit him on his right eye. J.G. stated they told the girl he did not know to go and stand watch by the door to the house. He said "Oso" hit him with a baton and then gave it to Brandy who hit him as well. J.G. also said that Santos hit him with a machete. . . . After the February 27, 2016, incident, J.G. provided varying accounts of the events. Approximately two weeks after the incident, on March 9, 2016, J.G. stated that he believed that Joe Lawrence Gallegos was also involved in the attack as he was upset with J.G. for failing to provide Gallegos' girlfriend with heroin while Gallegos was in custody.

Gonzales' Amended Motion to Sever at 2. Gonzales also argues that there is no evidence he is an associate of SNM or that he participated in "J.G.'s beating in exchange for consideration for the receipt of and as consideration for a promise and an agreement to pay, anything of value from SNM or for the purpose of gaining entrance to and maintaining or increasing a position in the SNM." Gonzales' Amended Motion to Sever at 3.

Gonzales thus first relies on Zafiro v. United States for the proposition that "severance should be granted . . . if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," and argues that "[s]uch a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is

- 52 -

admitted against a codefendant." Gonzales' Amended Motion to Sever at 4. Regarding severance, Gonzales suggests the Court consider:

> [1] the number of defendants and counts in the indictment; [2] the complexity of the indictment; [3] the estimated length of the trial; [4] disparities in the amount or type of proof offered against the defendants; [5] defendants with markedly different levels of culpability in the overall scheme; [6] conflicts between defense theories or strategies; and [7] potential prejudice from evidence admitted against co-defendants that is inadmissible or excluded as to a particular defendant [i.e., prejudicial spillover].

Gonzales' Amended Motion to Sever at 5 (citing United States v. Dowtin, 2012 WL 7679552, at *2 (E.D.N.Y. 2012)(Levy, M.J.)("No one of the factors is dispositive; instead, the court must decide whether the jury would be reasonably able to consider the evidence as to each individual defendant, independent of his or her co-conspirators.")). Here, accordingly, Gonzales contends that the case is so complex and his role is alleged to be so small that "the evidence against co-defendants will prejudice Mr. Gonzales and it will be difficult for the jury to compartmentalize." Gonzales' Amended Motion to Sever at 6. Specifically, Gonzales' Amended Motion to Sever highlights the gruesome nature and inflammatory images that will be evidence against the Defendants charged in Counts 1, 2, 3, 4, 5, 6, and 7. See Gonzales' Amended Motion to Sever at 6-12. Gonzales thus maintains that there will be "complex and inflammatory evidence" that the

> government will introduce at a joint trial. There can be no dispute that this case presents for the jury a complex determination of facts. In the case against most of the co-defendants, the jury will be asked to determine guilt for offenses that date back to 2001 and involve allegations of murder. The trial will surely be lengthy. On the other hand, if Santos Gonzales is tried separately, the proceedings will be short and more streamlined. The government will only have to present evidence on the limited offenses in which Mr. Gonzales is alleged to have participated. Accordingly, a separate trial would last a fraction of the time of a joint trial. Given the short duration of a separate trial, this factor weighs in favor of severance.

Gonzales' Amended Motion to Sever at 13.

Gonzales also argues in favor of severance by asserting the prejudice to his "fundamental right to a speedy trial pursuant to the Sixth Amendment to the United States Constitution." Gonzales' Amended Motion to Sever at 13.  Gonzales also argues that the "disparity of evidence justifies separate trials," particularly in a case such as this where Gonzales' alleged role is "dwarf[ed]" by the "sheer volume and magnitude of evidence against the co-defendants." Gonzales' Amended Motion to Sever at 16-17.  Gonzales then cites to <u>Zafiro v. United States</u>, where the Supreme Court held: "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." Gonzales' Amended Motion to Sever at 17.

Gonzales next argues that "antagonistic defenses justifies severance," because there will be "conflicts between defense theories or strategies."  Gonzales' Amended Motion to Sever at 18-19.  Specifically, Gonzales states that he is likely to

> present as his defense that he was wholly unaware of the SNM's alleged scheme, particularly whether Joe Lawrence Gallegos had a dispute with J.G. or had ordered a hit on J.G. Mr. Gonzales would also present as part [of] his defense that he is not a member or associate of SNM, he does not know the majority of the co-defendants nor was he involved in or aware of any of the alleged conduct set forth in counts 1-13.  Given the fact that Mr. Gonzales' defense will very likely be antagonistic to the other defendants, a severance is necessary.

Gonzales' Amended Motion to Sever at 19.  Gonzales also suggests that potential "*Bruton* error requires severance," because his "*Bruton* rights . . . will be implicated if the government introduces into evidence statements made by Paul Rivera and Shauna Gutierrez."  Gonzales' Amended Motion to Sever at 19.  Gonzales indicates, that,

> after Paul Rivera was arrested, he said that he had been hanging out at Shauna Gutierrez's trailer.  On the morning of February 27, 2016, Shauna, Brandy Rodriguez and Rivera were at Shauna's trailer.  During which time, Shauna allegedly said that she had found out the whereabouts of J.G., a.k.a. Tiny. According to Rivera, Rodriguez and Gutierrez had been upset because J.G. would testify against Joe Lawrence Gallegos on a state murder case.  According to

- 54 -

Rivera, after Gutierrez and Rodriguez had been discussing J.G., Santos Gonzales arrived at the trailer with his girlfriend. Rivera told agents that he drove Gonzales and Rodriguez to the home where J.G. had been staying. Rivera claimed that Santos Gonzales had a machete. Rivera claimed that Mr. Gonzales hit J.G. with the machete and that Rodriguez had told J.G. "you better not testify against my jefe or I'll kill you." After the beating, the trio allegedly went back to Gutierrez's trailer. According to Rivera, Santos Gonzales cleaned the blood off the machete and some metal pieces.

Amended Motion to Sever at 20. Further, Gonzales provides:

After Shauna Gutierrez was arrested, she gave agents a statement. According to Ms. Gutierrez, on February 27, 2016, she allowed Brandi Gutierrez to borrow her truck. According to Gutierrez, sometime later, Rodriguez returned to her trailer with Gonzales and Rivera and Rodriguez decided to go confront J.G. Gutierrez stated that Rodriguez, Rivera and Gonzales went to confront J.G. at the home where he was staying. When the trio returned to Gutierrez's home, Rodriguez had blood on her shoes and all three asked to be taken home.

Amended Motion to Sever at 20. According to Gonzales,

These statements could be interpreted by the jury as implicating Mr. Gonzales in misconduct related to the allegations set forth in counts 14 and 15 and result in prejudice as Mr. Gonzales would not be able to confront and cross examine the declarants. This prejudice cannot be cured or even mitigated by a cautionary instruction.

Gonzales' Amended Motion to Sever at 20. Gonzales argues

that the fact that Mr. Rivera and Ms. Gutierrez's incriminating statements against Mr. Gonzales are testimonial as defined by *Crawford v. Washington*, 541 U.S. 36 (2004) and *Davis v. Washington, Hammon v. Indiana*, 547 U.S. 813 (2006), doubly implicates Mr. Gonzales' Sixth Amendment rights and the introduction of the statements would result in a violation thereof. A defendant's right under the Sixth Amendment applies even if a co-defendant's statement does not directly or facially implicate another defendant so long as the statement is evidence of a fact critical to the government's case. *United States v. Glass*, 128 F.3d 1398, 1404 (10th Cir. 1997). In this case, defendants Rivera and Gutierrez made incriminating statements to a law enforcement officer and the statements inculpate Mr. Gonzales. Mr. Gonzales was not present during Rivera and Gutierrez's statement. Where a *Bruton* situation exists, the Court may, despite the Confrontation Clause, admit the confession of a non-testifying co-defendant that does not expressly implicate the defendant. "'The confession must be (i) redacted to eliminate any reference to the non-confessing defendant, and (ii) accompanied by an appropriate limiting instruction that the confession is to be considered only against the confessor.'" *Fowler v. Ward*, 200 F.3d 1302, 1307 (10th Cir. 2000).

- 55 -

Gonzales' Amended Motion to Sever at 21-22.  Because "it is clear that Rivera and Gutierrez's statements cannot be redacted in a way to omit reference to Mr. Gonzales, [and] because of the nature of the interview which led to Rivera and Gutierrez's incriminating statements," Gonzales maintains that "[t]he only way to avoid a Confrontation Clause violation is to sever the trials of Mr. Gonzales from Rivera and Gutierrez."  Gonzales' Amended Motion to Sever at 22-23.  Gonzales then concludes by stating that no party has joined Gonzales' Amended Motion to Sever, but that only the United States objects.

### 12.    The February 7, 2017, Hearing.

The Court held a hearing on February 7, 2017.  See Transcript of Hearing, filed February 24, 2017 (Doc. 923)("Tr.").  The Court indicated, before hearing argument from Perez on the Motion to Sever, that:

> We're dealing with a little bit of reduced crowd here in DeLeon.  I guess I'm wondering if some of this may sort itself out as we get a little bit closer to trial in July.  I mean, I don't know how many of the people that are here are still going to be here.  And so I'm wondering if it's a little premature -- not for the argument, I don't mind hearing the argument -- but I wonder if it's a little premature for me to make sort of nuanced decisions here, until we kind of know a little bit better as to who is going to be going to trial.  I do have some problems with -- I think there is a defendant or two that has just some gun charges, felon in possession.  And it seemed to me that those probably shouldn't be going to trial.  But it seemed to me that I had a lot of discretion in this area.  And the RICO charges, the overarching RICO charges, I think it makes it difficult to say that the Government is misjoined.  Maybe I could get a little closer on just the stand-alone gun charges.  But in any case, it seems to me that it's hard for me to say they've been misjoined.  And so it's more of -- falls into the discretion of the Court to try to put a case together that can be tried, and can be tried fairly.  And it seems to me, we're in early February, looking at a July trial date.  It may be that I have to sit on this a little bit until I get a clearer picture of who is actually being -- who is going to go to trial.  So those are my thoughts coming in.  That doesn't mean we don't begin to talk about those issues.  But I'm wondering if I, as the judge, need to wait until I get a little better visibility on what the trial is going to look like.

Tr. at 32:8-33:18 (Court).  Perez agreed that, perhaps, things would look different in July, 2017, but that, nonetheless, he was not "sure that the Government can simply allege SNM is a criminal enterprise engaged in racketeering and join every single violent crime that they could find from 1980."  Tr. at 33:24-34:3 (Villa).  The Court responded that "the problem here [is] that the Government has got to prove predicate acts . . . so, once you have the RICO alleged and their obligation to prove predicate acts, how do I start keeping evidence out . . . of predicate acts?"  Tr. at 34:20-25 (Court).  The Court continued: "[I]sn't the request, though, it's requesting me to sort of slice and dice, here in February, the Government's evidence, and say, well, you and I think they ought to prove their predicate acts by this way, rather than letting the Government decide how they're going to prove their predicate acts."  Tr. at 35:14-22 (Court).  Perez disagreed with the Court's characterization of the Motion to Sever as being an attempt to screen evidence, and explained that "I don't think that they can just say, we're going to try Counts 1 through 5 alongside Counts 6 and 7, simply because those are predicate acts."  Tr. at 36:13-16 (Perez).  The Court was not convinced, explaining that regardless of the severance, the United States' presentation of evidence to establish the RICO predicate acts -- which the Motion to Sever contends might be prejudicial, given the expansive timeline of the conduct in the Superseding Indictment -- would be the same.  See Tr. at 36:17-19 (Court).  The Court then reiterated that the Motion to Sever is, in part, "asking me to turn to the Government and say: You don't need to prove it this way, you can prove it this way.  And that's kind of hard to do.  I mean, typically, we let each side kind of put on their own case."  Tr. at 38:6-9 (Court).  Perez agreed, but suggested that

> there has to be a limiting principle at some point.  I mean, imagine how many more counts and defendants could they add if they found a few more SNM counts?  There has to be some limiting principle.  And that's the balancing act that

the Court does on the Rule 14 side of things. . . .  [And] I think Rule 8 is a limiting principle, too.

Tr. at 38:12-16 (Villa).  Perez continued:

> You know, what we're asking the Court to do is just sever 6 and 7.  What happens with the rest of the case is outside of our control, I guess.  But you know, I think, when you examine the Rule 8 joinder law in terms of overlap of offenses and overlap of participants, you've got a joinder problem.  When you look at the Rule 14 severance with respect to prejudice issues, you've got a problem.  And that's not just an evidentiary problem.  It's, we want the jury to find each of these individuals guilty on their own merits and not on the culmination of all these different murders that are all a little bit different, that involve different players. And there is no evidence that they were all working together, other than this sort of general notion of this is what the SNM does.

Tr. at 40:21-41:11 (Villa).

Perez, after his general colloquy with the Court about the Motion to Sever, began a

slideshow presentation in which he attempted to examine the

> benefits that we'll see from having counts severed based on when the counts occurred, the geographical location, the dates, the times, is going to benefit us pretrial as well.  I mean, Counts 6 and 7 is severed, and there [are] now six of us, and we have a motion hearing that not necessarily everybody needs to be here for -- they certainly can -- we're going to avoid some of these issues that we have even here today.  And I think costs, which we'll talk about as well.

Tr. at 43:4-14 (Villa).  The Court pressed, however, whether,

> if we just hang together a little bit, at what point does it begin to really be any sort of prejudice to you as to whether 6 and 7 are severed or not severed?  At what point, with a July 10th trial date, how long does just rocking along, at what point does it begin to be a real problem for you?

Tr. at 44:10-16 (Court).  Perez supposed that

> I think it's a problem now . . . in terms of prejudice to the defendant, I guess the concerns I have are the same; they need to review that discovery.  But also I have concerns whether this joint trial could happen in July.  I believe 6 and 7 could go. I mean, it was weeks from trial in state court, granted, on only three defendants, but it's basically teed up.

Tr. at 44:20-45:2 (Villa).  Perez then jumped into his primary arguments for the day, explaining:

- 58 -

> You know, the Court's familiar with the Rule 8 standard for joiner. But I think that the question in a case like this is whether, in light of the factual overlap among the charges, joint proceedings create efficiencies such that joinder is proper. And when you're dealing with conspiracy or racketeering, what the more recent case law has found is there must be some relationship between the facts underlying each offense, such that proof of those facts is necessary to establish each offense.

Tr. at 46:19-47:3 (Villa). Perez then recapped some of the unique factual elements of the SNM prosecution that he had outlined in his Motion to Sever, particularly the fact that the jail murder alleged in Counts 6 and 7 occurred in 2014, whereas the jail murders and conduct alleged in Counts 1, 2, and 3 occurred in 2001. See Tr. at 47:4-49:1 (Villa). Perez also argued that, because of the lapse in time, a "completely different faction of the SNM" is responsible for the murder in Counts 6 and 7, so

> you're just talking about members of the same gang from 15 years 10 apart involved in similar type murders. That's the only factual overlap you have. You don't have any overlap of defendants. So there [are] no overlapping defendants. And other than the enterprise separated by 13 years, [there is] no overlap in facts.

Tr. at 49:8-14 (Villa). Perez then reiterated:

> [S]o 1 through 3, I think we have the overlap problem. I think we have the overlap problem. If you go over to the Rule 14 analysis, you have a propensity problem; right? The theory that the Government will put forth is that in Counts 6 and 7 and 1 through 3, there was a member of the SNM who allegedly cooperated with police and was killed for it. And so you try these cases alongside each other. Even if the Government is right, and some people take plea deals, or as we know that that may happen, you've got this atmosphere, if you will, of propensity, where, you know, the 2014 guys may have had no idea about the 2001 case.

Tr. at 50:14-51:1 (Villa). Then, Perez argued, the nature of Counts 4 and 5 -- a conspiracy and murder in 2012 which occurred "outside of the prison walls, in Socorro and Valencia Counties, so not inside the prison" -- widens the gap of factual overlap amongst the Counts, because

> [i]t [is] not like 1 through 3 and 6 and 7, where you have, you know, an order from the top to kill somebody who is also a member of the SNM because they're cooperating with law enforcement. This is just a couple of guys from Valencia

County . . . who had some issues with each other, and one of them ended up
dead.

Tr. at 52:15-21 (Villa).  Perez contended:

> This is outside of the prison walls.  This brings a different element to the jury's
> mind.  And there [are] also some issues, I think, [was] this even an SNM case?
> None of the defendants overlap with Counts 6 and 7.  And there is an unclear
> SNM connection.  This isn't the same modis operandi.  And again, different
> geographical location, outside of the prison walls.  The defenses are much
> different in a case like this.

Tr. at 53:5-13 (Villa).

Perez then addressed Baca, who is alleged to have ordered the murder in Counts 6 and 7,

and also is alleged to have been complicit in the conduct underlying Counts 8, 9, and 10.  See Tr.

at 54:19-24 (Villa).  Perez conceded that, because Baca has been charged in those Counts along

with Counts 6 and 7, there is more factual overlap than with Counts 1-5; however, Perez

maintains that, "[a]gain, the only overlapping facts are the SNM enterprise.  You know, 8, 9, and

10 are much different in character and nature, just like 4 and 5 were."  Tr. at 55:3-6 (Villa).

Perez, accordingly, contended:

> And so I think that . . . trying 8 and 9 through 12, you know, Defendant Baca is
> going to be accused of being [a] leader[] of SNM, ordering these hits, trying to set
> up a conspiracy to kill Mr. Marcantel and Mr. Santistevan.  And if you try those
> counts alongside 6 and 7, where Defendant Baca is also alleged to have ordered
> the hit of the victim, I think you have a real propensity-type problem.

Tr. at 56:8-16 (Villa).  Perez made this argument, because Counts 9 and 10 "are the more

prominent, I guess, allegations of hits on the Secretary of Corrections and the head of STIU,"

ordered by Baca, and Count 8 is

> sort of unique, as it stands on its own, but it's also different.  So it's an assault on
> JR, who had a falling out with Gerald Archuleta; not necessarily clear what the
> nature of the falling out was, but because Gerald Archuleta was basically one of
> the heads of one of the different SNM factions, he has a falling out with this guy;
> he orders the hit on him in 2003.  An attempt on his life is made; it failed; the
> green light stays in effect.  And another attempt is made in 2015, also at Southern

> New Mexico.  None of the defendants overlap, except for Defendant Baca.  But
> Defendant Baca is -- he's not in Southern.  He's -- at the particular time of this
> incident, I'm not sure where he is.  He may have been back in Santa Fe North.
> But it appears to be the only connection is Gerald Archuleta saying Mr. Baca is
> involved.

Tr. at 55:16-56:7 (Villa).  Further,

> [Counts] 9 and 10 are the two conspiracies we talked about.  The only difference
> between 9 and 10 is, for 10, you add Chris Garcia.  Chris Garcia is the subject of
> 11 and 12, felon in possession of a firearm and 924(c).  I think the Government's
> theory is that the gun Mr. Garcia had was going to be passed on to an individual
> [who] was supposed to execute these hits on the Secretary and the head of STIU.
> So those four counts are sort of associated in that way.  But, again, Mr. Baca is
> the only overlapping defendant.  And there aren't any overlapping facts except the
> SNM.

Tr. at 57:1-12 (Villa).  Perez then told the Court about the dissimilarity of

> Counts 13 through 15, these all are, again, outside the prison, executed primarily
> by Joe Gallegos; he's Count 13 by himself.  This is the same victim, JG.  It's an
> assault with a deadly weapon; that's Count 13.  14 and 15 is now a conspiracy to
> murder JG, and that brings in some of these other defendants, three of whom are
> going to trial as we sit here today.  And again, it appears that JG and Mr. Gallegos
> had some personal problems, and this was the result of that, and not necessarily
> any sort of SNM-ordered hit from the higher-ups or things like that.  The
> connection with SNM is tenuous.  The Gallegoses have denied membership in the
> SNM.

Tr. at 57:13-25 (Villa).

Returning to Counts 6 and 7, Perez then reiterated that he was going to trial, and so were

the other Defendants involved in those Counts -- making the United States' contention that the

numbers would be winnowed by the trial date inaccurate.  See Tr. at 58:13-59:25 (Villa).

Indeed, Perez then recognized the Court's "discretion: weighing the prejudice with judicial

economy.  So I think that there is a little bit less discretion when you're looking at antagonistic

defenses and compromising trial rights."  Tr. at 60:2-5 (Villa).  Perez also suggested that the

evidence against him in Counts 6 and 7 outweighs the strength of the evidence against some of

the other Defendants, such as those in Counts 1 and 2, because the United States has evidence of

the Counts 6 and 7 victim being murdered in jail footage and DNA evidence, supporting his argument that the Superseding Indictment should be severed.  See Tr. at 61:1-25 (Villa).  Perez also continued to argue that the facilities at the Court's disposal would not effectively handle the magnitude of a joint trial, commenting that a complete rebuild would be necessary to ensure a constitutional trial.  See Tr. at 62:1-63:25 (Villa).  Perez argued that the magnitude also would cause a burden for the jury, whom may not be able to compartmentalize the evidence they are considering as it relates to the separate Counts.  See Tr. at 64:14-19 (Villa).  Perez also argued that a trial of magnitude would be cost prohibitive in this District, given the available facilities and the involvement of so many different attorneys whom have other caseloads, necessitating severance.  See Tr. at 65:14-21 (Villa).  Perez next reiterated what he calls the specific prejudice to the Counts 6 and 7 Defendants by the nature of the other Counts, in particular Counts "9 [through] 12, the real high profile conspiracies, I think anybody who has to be tried alongside those folks, you know, are just going to experience prejudice."  Tr. at 68:4-7 (Villa).  Perez then concluded his argument.  See Tr. at 68:16-19 (Villa).

M. Rodriguez next addressed the Court, stating:

I'd like to call the Court's attention first to something in the Government's response to the severance motion. . . .  It says, "Prejudice always exists when more than one defendant or offense are tried together."  That's in the Government's pleading, and the Government readily concedes that.  That is a powerful statement.  I think everyone in this courtroom -- I hope the Court included -- acknowledges that if these guys are tried together, there is going to be prejudice.  That's inevitable.  The Court can give all the curative instructions, make all the evidentiary rulings, do everything within its power.  There is going to be prejudice.  Our law says that that prejudice is acceptable when the two traditional justifications for joint trials exist: Preventing the scandal and inequity of inconsistent verdicts, and judicial efficiency.  I believe Mr. Villa has already touched on the inconsistent verdicts scandal and inequity issue.  The Count 6 and 7 Defendants are asking to be tried together.  As a matter of law, by definition, there can be no scandal and inequity of inconsistent verdicts on Counts 6 and 7 by virtue of a severance, if they're all tried together.  So that turns us to the one possible thing that could justify the inevitable admitted prejudice of a joint trial:

- 62 -

> Judicial efficiency. . . .  I submit to the Court, based on all the cases that we set
> out in our pleading and the supplemental pleadings filed by other counsel, that
> that judicial preference ceases to exist when you're talking about mega trials of
> this nature.  When you get to a certain point -- I believe in the Second Circuit the
> presumptive number of defendants is 10.

Tr. at 69:10-70:22 (Potolsky).  M. Rodriguez also provided:

> we've got defendants who, through no fault of their own, other than they're joined
> in a mega trial, have to turn their back to the Court.  That's not a good thing.
> When we've got defendants in the jury box, in the second row of the spectators'
> area, and we are thinking about not giving them a fair trial, but how do we pack
> them all into a courtroom so that their public trial rights are realized, that is a
> problem.  If it saves time and prevents scandal inequity, the law says that's okay.

Tr. at 71:1-11 (Potolsky)(commenting on the fact that the Court has been using the largest

courtroom at its disposal, and there is still overflow necessity, because with the United States

Marshals, Court personnel, attorneys, and Defendants, there is sometimes more than fifty people

in the courtroom at a time).

B. Garcia next argued, and reiterated that a large number of Counts 1 and 2 Defendants

would not be taking plea deals and would be proceeding to trial.  See Tr. at 76:15-25 (Castle).  B.

Garcia also argued that there

> is a large amount of litigation that we're going to be involved in, especially with
> regards to delay in indictment.  I think the Court heard a little earlier that the
> DNA was degraded so bad that the FBI tried to retest it in 2014, and could not
> come up with any results.

Tr. at 79:7-12 (Castle).  Further, B. Garcia, explained, "[w]e're going to need more time.  We

didn't have the advantage of -- I guess advantage -- of being prosecuted in state court, and

having some attorneys working on the case.  We just don't have that situation.  And we're doing

a case that is 15 years old."  Tr. at 79:14-19 (Castle).  B. Garcia had more to add to his argument,

but changed counsel at this point, and in the meantime, the Court asked M. Rodriguez to clarify

what he had said about a presumption that ten Defendants or more "exceeded what [the Second

Circuit] would tolerate as far as a joint trial." Tr. at 83:18-25 (Court).  M. Rodriguez told the

Court he would supplement his argument the next day.  See Tr. at 84:1-5 (Potolsky).  B. Garcia

then argued:

> I thought of these cases as separate matters that ideally should be tried by
> themselves.  I represent one of the defendants in Count 1 and 2, Billy Garcia.
> Billy Garcia is 61 years of age.  Billy Garcia was out of custody at the time, in
> 2015, agents went to his house and arrested him.  Billy Garcia will never take a
> deal.  Billy Garcia is never going to enter a plea in this case.  He's 61 years old.
> He is alleged to be the shot caller with regard to Counts 1 and 2.  The Government
> won't give him a 10-year deal.  We haven't had any discussions whatsoever.  But
> just knowing the offers that are going to come out of the Government's office,
> there won't even be a 10-year deal.  And for a 61-year-old man -- I'm 63, Judge --
> for a 61-year-old man living in prison, he is not going to take a 10-year deal,
> because that is essentially a life sentence.  And when the Government says that
> there are, at the end of the day, only going to be five defendants, I don't see that.
> I just absolutely don't see that.

Tr. at 83:14-85:14 (Cooper).  Further, B. Garcia maintained:

> Th[e] effort, just in itself, is going to take just a huge amount of time.  We haven't
> gotten into any other substantive motions that need to be filed.  I just think it's -- I
> think that it makes more sense to divide things up.  And it's not going to be seven.
> I don't think that is the number.  But I think it ought to be three or four, probably.
> And I have my thoughts on how that should happen.  But I think that after some
> of these defendants see what happens in Counts 6 and 7 -- 6 and 7 is ready.  We
> are not ready.  We're still trying to identify and locate witnesses that were around
> in 2001, that heard parts of conversations with regard to our two counts.  And
> we're having a difficult time doing that.  Your Honor, some of the evidence, we
> think, no longer exists.  Some of these individuals who are witnesses no longer
> exist.  I suspect you're going to see a preindictment delay motion coming from us.
> There is just a tremendous amount of work.

Tr. at 87:12-88:7 (Cooper).  B. Garcia concluded:

> I think it's going to create havoc on other judges' calendars, when we have this
> mega trial with 15 or 20 individuals, Your Honor.  But I think there ought to be a
> severance of Counts 6 and 7.  I think Counts 1 and 2 ought to be severed.  I think
> the Marcantel counts ought to be severed.  I think a couple of the other cases
> ought to be severed.  And I understand that's the best case scenario.

Tr. at 88:18-89:2 (Cooper).

- 64 -

Gonzales then argued regarding the Motion to Sever, clarifying that, "under 18 USC 1959, the Government is not required to prove the predicate acts.  This is VICAR, Violent Crimes in Aid of Racketeering.  And what the Government has to prove is that there is a criminal organization; that the organization is a racketeering enterprise at the time of the offense."  Tr. at 89:20-25 (Johnson).  Gonzales continued that "[t]hey also have to prove that, obviously, the defendant committed a violent crime, and that the defendant acted for the purpose of promoting his position in a racketeering enterprise."  Tr. at 90:6-9 (Johnson).  Accordingly, Gonzales contended, because he was charged only in Counts 14 and 15 which occurred after 2015 -- and, therefore, after the Superseding Indictment allegedly dismantled SNM -- and because he is not an SNM member, proof of the racketeering enterprise is different for his case.  See Tr. at 90:10-23 (Johnson).  Gonzales reiterated that "what you have here is the Government is essentially trying to bootstrap unrelated acts of violence under the umbrella of [VICAR], . . . [and here] the Government doesn't have to prove predicate acts, all they have to prove is the existence of an enterprise."  Tr. at 91:13-15 (Johnson).  The Court was not convinced, asking Gonzales: "How do you prove racketeering enterprise without something that looks a whole lot like proving predicate acts?"  Tr. at 91:21-23 (Court).  Gonzales then responded that "I guess in a way, they do have to present evidence of these particular offenses.  But what may be admissible as -- I don't want to call them predicate acts -- but what may be admissible as to one defendant may not be admissible under Rule 403 as to another defendant."  Tr. at 92:1-6 (Johnson).  Gonzales then maintained that there will be admissibility problems should there be a megatrial involving him. See Tr. at 93:2-6 (Johnson).

Varela then argued that he was charged only in Counts 6 and 7, and that his role in Counts 6 and 7 is alleged to have been the delivery of paperwork ordering the hit, and that "[m]y

concern is if this case is not severed, it will actually be a prejudicial effect on Mr. Varela, because it's going to be -- [painting] many of these defendants with one broad brush is going to [make it] -- much easier to have a guilty verdict." Tr. at 95:11-15 (Spencer).  A. Gallegos and J. Gallegos then alerted the Court that they had moved to sever Counts 4 and 5, and that they were actively investigating those counts.  See Tr. at 96:1-23 (Sindel).   A. Garcia then also explained that he was only charged in Count 3, and that he did not object to severance of Counts 6 and 7.  See Tr. at 97:1-12 (Blackburn).  A. Garcia also explored for the Court that his counsel had done

> a case in Arizona that the prosecution started here in New Mexico, and moved to Arizona.  And the U.S. Attorney's Office here in Albuquerque prosecuted the case along with the individuals in Arizona.  Several months before trial motions were filed, which I expect are going to be filed in this particular case, about how we're going to have security as relates to the trial.  There were issues about having an anonymous jury.  There were issues about how the defendants were going to be placed in the courtroom.  There was not as many murders in that particular case as are alleged in this case.  And we're not talking about a racketeering.  This was a conspiracy, as it relates to a drug organization, not something going back to 1980.  In the end, the Government asked for, and the judge granted the ability for the defendants to be shackled during the course of the trial, and for them to have sort of a belly chain around them during the course of this.  We were in the federal courthouse in Arizona.  In order to do that, and to have that many people that were going to be there, they had to reconstruct that courtroom.

Tr. at 99:13-100:21 (Blackburn).  A. Garcia then reiterated that this case is going to be tried in Las Cruces, and that

> we would have to reconfigure or build a courtroom, which we had to do in Arizona, in order that the jurors could not see their feet being shackled, or because the marshal's office had a device that they could place around the defendants, and if something happened, that it would relate in a shock to them, that they had to be covered from basically the arms down.  And it took them quite a bit of time to construct that courtroom over there.  I think Mr. Hammond -- he was on the phone, I think that was who was on the phone earlier -- he was involved in this particular case where we had to do this.  We had to rebuild the courtroom.

Tr. at 101:4-17 (Blackburn).  A. Garcia then concluded by reiterating the mechanical problems

not severing the case poses.  <u>See</u> Tr. at 101:18-103:18 (Blackburn).  Gonzales then addressed the

Court and said:

> You asked about the case with regard to the 10 defendants.  I have that . . .  The case [is] <u>U.S. v. Casamento</u>, which is 887 F.2d 1141.  And the quote is at page 1152.  It is a Second Circuit case, Your Honor.  That quote, "in assessing the appropriate number of defendants for a trial, in which the prosecution's case is likely to exceed four months, the judge should require an especially compelling justification for a joint trial of more than 10 defendants."

Tr. at 104:10-16 (Johnson).  Gonzales also stated:

> I would direct the Court's attention to <u>United States v. John Shea</u>, 750 F. Supp. 46.  It's a District of Massachusetts 1990 case wherein the Court did grant severance.  And the opinion starts out with, "Given the number of defendants, the number of counts, and estimates of probable length of trial, the Court has an obligation to take steps early in the life of this case to ensure the goals enumerated in Rule 2 of the Federal Rules of Criminal Procedure, quote, 'These rules are intended to provide for the just determination of every criminal proceeding.  They shall be construed to secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay," and cites to Federal Rule of Criminal Procedure 2.

Tr. at 104:17-105:8 (Johnson).

The United States then argued against the Motion to Sever.  <u>See</u> Tr. at 105:20

(Castellano).  The United States agreed that a joint trial of twenty or more Defendants would be

practically untenable.  <u>See</u> Tr. at 105:25-106:4 (Castellano).  Although not a concession, the

nature of the United States' agreement was as follows:

> THE COURT: Mr. Castellano, let me ask you a few questions.  Would you agree that it's going to be extremely difficult and probably not a good idea to try a case with 20 defendants?

> MR. CASTELLANO: It may be difficult, Your Honor.  It's not unprecedented.  Even one of the cases cited by the defense, I think, had 23 defendants who were not severed.  But I do agree that there could be some logistical problems.

> THE COURT: If we were in agreement on that, that we probably shouldn't be barreling toward a trial with 20 defendants, what's the solution from your standpoint?
>
> MR. CASTELLANO: Well, the solution is really how to cut up the pie.

Tr. at 105:21-106:10 (Court, Castellano).  The United States did not want to start cutting up the pie yet, however, and suggested a "wait and see attitude," and requested the Court wait until "possibly May to see how the dust settles. . . .  We probably [will] have . . . two 10-defendant cases."  Tr. at 106:25-107:10 (Castellano).  The United States added the gloss that "I'm not sure it will be just five defendants, but I think it will be a smaller amount."  Tr. at 108:10-11 (Castellano).  The Court then asked:

> Since we seem to be at some agreement that we're not going to be trying 20 defendants, tell me what you think the biggest hurdles to trying 20 defendants are. What is it that, in your mind, you go, yeah, we shouldn't be trying 20 defendants in one case?  What do you think the biggest?  Is it the size of courtrooms we have in Las Cruces?  Is it the security involved?  What is it that, if you had to pick three of the top reasons you think 20 is not doable, what are they?

Tr. at 108:16-25 (Court).  The United States would not concede that the logistics were as big of a problem as the Defendants had argued, but discussed that an

> issue may be a configuration of the courtroom in terms of real problems, and that could be done.  I mean, we could certainly rearrange tables, and things of that nature.  I know there are issues with defendants who are shackled or handcuffed.  But that's been handled in this district a number of times by putting the sheeting in front of tables, and things of that nature.  So most of these problems are not problems we haven't seen and addressed before, even in this district.

Tr. at 109:17-110:1 (Castellano).  The United States also reiterated that

> the defense has mentioned the word 'propensity' a number of times.  But in a VICAR case like this, the charge invites propensity evidence.  The charge tells us that we have to prove that the enterprise engaged in racketeering activities.  It's not individuals, it's the enterprise.  So understand those circumstances, all of this stuff, for the most part, is fair game and we'll be presenting that evidence.

Tr. at 110:20-111:6 (Castellano).   The Court then pushed the United States to give it some

options as to how severance might be accomplished, posing:

> Well, if I put pressure on you to split it up so that there is a smaller number than
> two 10-defendant trials, it doesn't sound like you're ready today to say what you
> would want.  So I guess the question is: Do you want to propose a three trial, less
> than 10 defendants in each trial, way of getting through this case, or do you want
> me to do it?

Tr. at 114:11-18 (Court).  The United States responded: "Obviously, with that option, we would

want to choose it.  But if we were going to do that, I would potentially consider presenting at

least two proposals."  Tr. at 114:19-24 (Castellano).  The United States cautioned, however, that

"some of these defendants . . . said, we would agree to a continuance if we could have our case

tried in 2017 . . . [s]o once again, we're going to have to consider Speedy Trial, and have a

waiver of anybody who agrees to have their case pushed back."   Tr. at 114:25-115:7

(Castellano).  The United States also indicated that

> I think, once you unsever, there is no going back.  I don't think the defense would
> agree to be rejoined into a case, because we'd hear the same thing you heard
> today regarding the need to file motions and we need to prepare for trial.  So I
> think once it happens, it's highly unlikely those counts or defendants will get back
> together.  I think you'd certainly hear from the defense about that.

Tr. at 116:15-23 (Castellano).  The United States then queried the Court:

> I think the only thing really driving severance at this point is logistics.  So the
> question is whether logistics breaks up this case or not.  Because I don't think the
> defense has put forth any other arguments which would warrant severance in this
> case.  So it's obviously in the Court's discretion.

Tr. at 117:15-21 (Castellano).  The United States also reiterated that it would be putting on the

same evidence in any of the severed trials, see Tr. at 118:21-22 (Castellano), because:

> It's on us to prove it, Your Honor.  So, if we allege a prior murder, we have to
> prove the murder.  So that means we have to prove it in the way that we think we
> can prove it.  We can't ask the jury in the middle of trial whether or not we think -
> - they think that we have enough.  We have to present the evidence in a way that
> causes us to believe we proved it beyond a reasonable doubt.  We can't ask that

jury that in the middle of trial.  So, obviously, we have to prove it in the way that we have to prove it.  And that is the burden that's on us.  That was part of our brief, is when you charge a VICAR, you have to prove these things,

Tr. at 119:22-120:9 (Castellano).

The United States then hypothesized that, should there be some severance, the issue of

timing would be an issue; the United States stated:

> Because that one does affect the way the defense prepares, I guess one thing we could do is do this in parts.  We submit our proposals to the Court; let defense counsel take a look at it; then we get together on another occasion to decide the batting order.  And we could give our reasons why we think they should go in a certain order.  I guess the defense could do theirs.  So I think we could do it in probably a few steps. . . .  Because I guarantee no one is going to agree on the order, because people want to try these cases in a different order for different reasons.

Tr. at 123:1-14 (Castellano).  At this point, Gonzales indicated that he was indeed asserting his

speedy trial rights and that he would not waive that right.  See Tr. at 123:16-124:3 (Johnson).

Perez then argued that even splitting trial groups into ten Defendants gave him pause, positing:

> How do we handle logistics, if that's going to be handled in Las Cruces?  And how do we deal with the atmosphere, if you will, that's going to come with the Counts 9 and 10 related to the Marcantel conspiracy that has gotten an extensive amount of media coverage, and that, I think, just adds to the atmosphere?

Tr. at 124:11-17 (Villa).  The Court responded to that query, stating:

> Well, I guess, you know, you can push back on this, but you know -- I mean, I've had high profile -- and I will bet you I've had higher profile than this -- trials.  I always get a jury.  We just -- we get it done.  So I guess I'm not worried about getting a jury.  You know, the television stations in Las Cruces, they don't even cover northern New Mexico.  So I've always been able to -- cases up here, draw from the south, because many times they don't even know the news up here.  So when you say carnival environment, I guess if you're talking about the jury, I guess I've got a high degree of confidence we're going to get plenty of folks that know next to nothing about this case, either here or in Las Cruces or statewide. You can push back on that.  But that's my thoughts.  That's the reason I'm not too worried about that.

Tr. at 124:18-125:9 (Court).  The Court further supposed that

- 70 -

you know, a lot of people don't know Marcantel from anyone else.  Is it that much
more sensational than it might be to somebody that's, you know, stepping outside
of this case, or something like that?  But once we're in the box, once we're in the
case, it's another alleged victim, it's another alleged murder.

Tr. at 125:15-21 (Court).  Perez was not so sure, indicating that Counts 6 and 7 fell into the realm

of "classic prison murder," whereas the Counts 9 and 10 allegations involving the NMDOC

Secretary was a different matter.  Tr. at 125:23-126:13 (Villa).

B. Garcia then argued, and addressed the potential for inconsistent verdicts should, for

example, J. Gallegos be sorted into more than one trial grouping upon severance, stating that:

"the quantum of evidence with regard to each of those counts is very different.  And if he is

found guilty on one, not guilty on two others, that's not necessarily inconsistent."  Tr. at 127:9-

12 (Cooper).  The United States, to that point, responded that

the bottom line is, for all of those counts we have the same elements; four out of
five elements are the same.  The only difference is the element involving the
murder.  So we have to prove the existence of the enterprise; that it engaged in
racketeering activity, interstate commerce, and ultimately, that the crime was
committed for the purpose of gaining or maintaining position in the enterprise or
pecuniary gain.

Tr. at 128:4-13 (Castellano).  This requirement, the United States argued, could give the

Defendants that might end up in multiple trials more "bites at the apple."  Tr. at 129:17-19

(Castellano).  Regarding the differential evidentiary support across Counts, Baca then addressed

the Court and argued that there will be spillover prejudicial effect: "Especially, when you

juxtapose that with what I would even concede is stronger evidence with regard to some of the

counts."  Tr. at 131:18-20 (Lowry).  Baca also suggested:

Having a Baca trial with the 6 and 7, and have that stand alone.  And then have all
the other Baca charges grouped together, which would be 8, 9, 10.  And, if I heard
the Government correctly, they would throw in 11 and 12, because the Chris
Garcia charges were associated with the Marcantel allegations.  From Mr. Baca's
standpoint, that would be the more preferred approach.  And I think in the overall

fairness of the proceeding, that would be a more just and equitable resolution for all of the co-defendants together.

Tr. at 132:6-16 (Lowry).

The Court then considered the argument it had heard, and stated:

I get the feeling that the defendants are wanting to slice, slice, slice. And that seems to me to be too many trials. Because I will end up having a lot of the same evidence over and over, if I take the Government at its word that they're going to put it on over and over. And it seems to me that it's a little early to try to deal too much with the spillover. It's more logistics.

Tr. at 135:23-136:5 (Court). B. Garcia, accordingly, addressed the Court:

Judge, I've been taking copious notes. I've listened to the questions you've been asking. I know what you want to do, I think, given the questions you're asking. And I think that we, as counsel, will probably give you a proposal with regard to three trials. I'd love to split it up seven ways, because I think that would be fairest to everybody concerned. But that's not going to happen. But I think we can split it up three different ways. And I think the Government can give you their proposal as to how to split it up three ways. Then you'll have two, three, four different proposals in front of you, and you can make that determination. But I think we can do that.

Tr. at 136:6-19 (Cooper). Baca then inquired:

Once we're deciding these severance issues, and you're talking about hearing evidence over and over again, I think in terms of the proof of an ongoing enterprise was engaged in racketeering activities, it's really a question of the level of generality that that proof is made. Because the deeper down you get into the substantive counts, the more prejudicial spillover effect you get to co-defendants who happen to be grouped with somebody whose substantive VICAR count they're not associated with at all. So that's really the question I'd like to ask the Government is: Do they expect that evidence to come in at a level of generality, with one or two government witnesses that say, Oh, over the few years they're involved in mayhem, murder, and kidnapping[?]

Tr. at 137:15-138:6 (Lowry). The Court answered that the reason the United States would need to continually introduce the evidence would be, because it "has the burden of proof; [its] going to put on the proof that [it] thinks [it] has to have to prove it beyond a reasonable doubt." Tr. at 138:9-12 (Court). Baca suggested, however, that some of that proof could come in the form of a

"stipulation."  Tr. at 139:7-9 (Lowry).  The Court then stopped that argument, because "the

decision on the table is a severance motion," and the Court could not get that into the "weeds" at

this time.  Tr. at 139:10-13 (Court).  B. Garcia then quickly alerted the Court that there are

> several cases that stand for this proposition, which is that, in VICAR, the temporal
> period you should be looking at is much shorter.  The pattern of racketeering
> activity has some kind of temporal constraint; that the Government is not allowed
> to just go and prove things over a long period of time.  They've got to focus on
> the racketeering activity surrounding the alleged offenses.

Tr. at 139:25-140:5 (Castle).  B. Garcia also argued that, regarding

> temporal limits to the racketeering activity that they can show against certain
> groups of defendants . . . our position, frankly, is it's not just free range; you can't
> go back to the '80s, or even the early 2000s, when you're talking about matters of
> the last few years.  So I would ask if [the United States thinks] there is any
> temporal limit to their ability to prove a pattern of racketeering activity.

Tr. at 141:7-15 (Castle).  The Court then broke for lunch and directed all of the parties to "give

me a proposal.  I'd like to see single-digit trials, no more than three.  Try to give me your

proposal.  See how close we are."  Tr. at 141:20-23 (Court).

The United States returned from lunch and addressed B. Garcia's inquiry regarding

"[h]ow far back in time do you -- if you're putting on a show for the jury, how far back in time

do you think your evidence can go?"  Tr. at 143:18-20 (Court).  According to the United States,

> I don't know if there is a bright line rule . . . I'm showing the Court 18 USC
> Section 1961(5), which is not VICAR, but it is related to RICO.  And that's the
> one that says, "One of the acts had to occur after the effective date of this chapter,
> and the last occurring within 10 years, excluding any period of imprisonment after
> imprisonment for a prior act."

Tr. at 144:15-21 (Castellano).  The United States then gave the Court its proposal for severance:

> First, I'll continue to note the Government's objection, obviously, regarding the
> severance.  But given the posture that we're in now, we have a breakdown of two
> trials.  The first trial being six to 10 defendants, without singling anybody out or
> talking about discussions, that we have reason to believe that we will be at six to
> 10 in the first group.  And the second group would be seven to eight defendants.
> So those would both be single digits.  And the six to 10 certainly will become at

- 73 -

least nine.  We're fairly certain of that.  So we would have two trials, both with single digit defendants, and we would have defendants all tried on their own counts and not charged in separate counts in separate trials.  And we think it works if we have to do it this way.  And I can break it down for the Court if you'd like.

Tr. at 147:12-148:3 (Castellano).  The breakdown was:

So the first would be Counts 1 through 5, and then Counts 13 through 15.  That would be one trial.  And that trial would include Santos Gonzales.  So he's asserted his Speedy Trial right, so I suppose, if he's in that trial, that would go first, just because the Speedy Trial. . . .   The second trial would be Counts 6 through 12, and that would result in a case with probably seven to eight defendants.  And, of course, those numbers could shrink, but these are pretty solid numbers otherwise.  And so Counts -- the first proposal has Andrew Gallegos in all of his counts; it has Mr. Troup in Counts 1 and 3, so he's not separated.  And it has Andrew Gallegos tried with his brother, Joseph Gallegos.  And also in Counts 1 and 2, you would have Mr. Garcia, so that would keep both of his counts together in one trial.  Then Counts 6 through 12 would involve everyone in the Javier Molina murder, and these would all, for the most part, be Anthony Baca counts.  So he would have all of his counts in one trial. . . .   And so -- [l]ooking at Counts 6 and 7, Mr. Armenta, Mr. Montoya, and Mr. Martinez are out of the case.  Mr. Archuleta is out of the case.  Both of the Martinezes in Count 9 are out of the case.  And so this number is smaller than what it looks.

Tr. at 148:9-149:16 (Castellano).  This proposal, the United States argued, "meet[s] the requirements, or at least the -- a preference for judicial economy.  We have kept defendants together who are charged together, and we've kept their counts together.  So they're not severed under the rules."  Tr. at 150:17-21 (Castellano).

The Defendants next gave their proposal:

Judge, before we start, with regard to the Government's proposal, they believe that Counts 1, 2, 3, 4, 5, 13 through 15, they will only have six to 10 defendants.  Based on everything that I know in my discussions with these individuals, I believe that number to be 12.  And the second number seven to eight.  I believe that is accurate.  But the first one I believe is 12.  So, Judge, we have 20 defendants and almost 40 lawyers.  We do not have a unanimous consensus for this proposal.  Every one of us have some sort of an objection or other with regard to this proposal.  Some of us have stronger objections than others, but we, in light of the Court's request, came up with this proposal.  Counts 6 and 7, that's the Molina murder which occurred in 2014, we believe that six defendants will go to trial in that case.  We then broke out Counts 4 and 5, and then 13 through 15.  In

Counts 4 and 5 -- that's Joe Gallegos and Andrew Gallegos -- are charged in that offense with, in that count, 2012 murder, and then, with regard to 13 through 15, again, Joe Gallegos and co-defendants in that case are charged with offenses that occurred in 2012, 2015, and 2016.  There are four defendants in that case.  The next case that we believe should be tried together, or some people think should be tried together, Counts 1, 2, and 3, those are the offenses that occurred down at Southern New Mexico Corrections Facility in 2001 and 2007.  We believe eight defendants will be at trial in that case.  And then, finally, Counts 8 through 12, offenses that basically relate to the Marcantel-Santistevan case, and also Julian Garcia -- or Julian Romero case -- primarily deal with Anthony Ray Baca, Christopher Gallegos, Santos Gonzales, and Shauna Gutierrez.  We think, Your Honor, that you will have three defendants in that trial.  And I just listed four.  I think there is a fairly good likelihood, Your Honor, that we never get to that last trial.  I think, given what may happen in trials prior to that, that trial may go away.  But we have -- so we gave you the four separate trials:  6 and 7; 4, 5, 13 through 15; 1, 2 and 3; and then 8 through 12.  We think that is probably the best way to divvy it up.  The Court asked us to give you three proposals.  And so what we did -- I don't believe that this proposal is as good as the -- our former proposal, but we think Counts 6 and 7, the Molina murder occurring in 2014, together with 13, 14, and 15, offenses that occurred also in 2015 and '16 would be a trial in which you would have nine defendants.  Next, we would try 4 and 5, and then 8 through 12. 4 and 5 deals with Joe Gallegos and Andrew Gallegos.  And then 8 through 12, we would have Anthony Ray Baca, Conrad Villegas, Christopher Garcia.  And we believe that out of that group there would be five defendants.  And then the last trial would be eight defendants in the 2001 and 2007 murders at Southern, Counts 1, 2, and 3.  So those are the two proposals that we gave or that we worked on in the last hour.

Tr. at 152:10-154:24 (Cooper).  After the proposal, Perez reiterated to the Court his concerns about prejudicial spillover across the Counts, citing the public nature of Baca's charges in Counts 9 and 10 regarding the "Marcantel stuff," as well as the "A & E [television] series about the Molina murder."  Tr. at 155:20-156:20 (Villa).  Perez also highlighted that

the entire Marcantel case, as I understand it -- and I'm not an expert in it -- is a bunch of recorded conversations between the various players, including Mr. Baca, Mr. Garcia.  And none of those are admissible against the other 6 and 7 defendants.  And if Mr. Garcia and Mr. Baca proceed to trial, as we would expect in a joint trial, you know, during the Government's case-in-chief anyway, there is going to be a huge <u>Bruton</u> problem that's going to cause logistical problems, which I think the Court was concerned about at this early juncture.  But it's also going to cause constitutional problems.  I mean, I won't even get into the individual <u>Bruton</u> issues we have in 6 and 7.

- 75 -

Tr. at 156:15-157:5 (Villa).  Specifically regarding the United States' proposal, Perez argued:

> I think it brings up the issues I discussed with the Baca prejudice, the spillover effect, the media coverage that comes with it.  The number of defendants, I think I agree with Mr. Cooper's estimates of the total number of defendants.  I think it's nine right now.  The Government suggests that it might be a seven to eight defendant trial.  And they're basing that on information that I just don't have available to me.  But I think the bigger problem with the Government's proposal is not quite as much the number of defendants as it is putting the Marcantel counts with the 6 and 7 defendants.  There is too much of a risk of prejudice, and there is, although logistical problems that you have to deal with, if you take the other proposals, that might work.  But I think you have to separate the Marcantel stuff.  I think it's unfairly prejudicial, frankly, for anybody else's count to go along with that.  I just think that it would be too difficult for the jury to set that aside.  And there is not a whole lot we can do, as much as we believe in the limiting instructions and the Court's guidance.  I just think that's too much of a problem.  Not just hearing the evidence, but again, the spectacle that comes with it.  I think, without having as much information about the other sets of counts, some of the other attorneys may be better suited, but I think that, you know, 1 through 5, and 13 through 15, which is the Government's first proposal, is lumping together, again, Counts 1 through 3; 3 sort of classic murdering of a snitch, if you will, in the prison, with activities that are taking place outside of the prison.  And there is sort of a tenuous SNM connection with Counts 4 through 5, 13 through 15.  It looks to me more like Joe Gallegos issues that he has from his hometown in Valencia County.

Tr. at 159:21-161:13 (Villa).

B. Garcia then added that, regarding the United States' proposition, that "the defendants that need to go to trial twice in our proposal, they have no objection to that. . . .  So I don't think that the Government's proposal, because you only have to go to trial once, is really a factor that impresses the defense."  Tr. at 161:24-162:11 (Cooper).  Villegas then put the Court on notice that no matter how the severance might happen, he would individually be moving for severance for his own trial, because "he is charged in a single incident . . . and . . . there are markedly different levels of culpability . . . [because he is] charged in a three-year max with a bunch of life maxes."  Tr. at 163:1-15 (Crow).  J. Gallegos then argued that the United States' proposal, through the impact of spillover prejudice, was making it easier on itself to prove Counts 1 and 2

- 76 -

by juxtaposing those Counts -- from 2001 -- with more recent conduct in Counts 13-15.  <u>See</u> Tr. at 164:1-165:1 (Sindel).   Gonzales agreed with J. Gallegos, and reiterated that he was maintaining his speedy trial rights, and would not be willing to wait for the Counts 1 and 2 Defendants to become ready for trial.  <u>See</u> Tr. at 165:5-20.  Alonso similarly objected to the United States' proposal, arguing that his conduct was significantly less culpable of the other Defendants in his grouping and that the grouping harmed the Count 3 Defendants.  <u>See</u> Tr. at 165:24-166:21 (Chambers).  A. Gallegos then took the opportunity to remind everyone that he was not J. Gallegos.  <u>See</u> Tr. at 167:6-13 (Roberts).  Gutierrez reiterated Gonzales' argument that Counts 13-15 were dissimilarly situated from Counts 1-5, and that she objected to the groupings and would file her own motion to sever, as well.  <u>See</u> Tr. at 167:18-168:2 (Arellanes).  The United States then responded that

> our preference would be for a 13-defendant trial.  But we would live with two trials of six and seven defendants.  Because the Court has mentioned 15 would be a decent number.  If we could potentially get to 13, that could put all the defendants back together.  But I think in terms two of trials, I think we could probably make that work.

Tr. at 175:3-10 (Castellano).  The Court then took the Motion to Sever under advisement and gave its thoughts, positing:

> I don't have a ruling this afternoon, but let me tell you what I'm thinking.  I'm a little bit back to where I was maybe at the beginning of the day.  I'm much more informed, and I appreciate that.  We all come to a case like this drawing on our experiences.  Ms. Wild can probably tell you how many multi-defendant cases I've had of this number, but I would say three or four in the 20 range or more.  And I guess I am still -- I know this case may be just different, but I guess I'm still a little bit taken back that there is going to be numbers of even like 13 left in this case.  I mean, that just may be the reality, and I'll just have to live with the reality, because I don't have, as you can imagine, the information that y'all have, as y'all talk with each other.  That's just not something I can or should have privy to.  But if I bring my experience to bear, that's a lot of people that are going to trial.  And I just haven't had that experience before.  So I bring a skepticism to it.  So I push these numbers down; probably not much reason for me to push them down below where the Government is saying they are, but I tend to push them

down.  And if that is the case, I probably am going to be looking more of a two trial solution to this, rather than a four or three.  I think I can probably try it.  I don't have a sense in my head as to whether the combination that the Government has proposed is the appropriate one.  But that's sort of my thinking.  I'm not going to sit here and drag this out.  But at the same time, I'm not going to rush toward it.

Tr. at 175:17-176:23 (Court).

**13.    United States' Gonzales Response.**

Regarding Gonzales' Motion to Sever and Gonzales' Amended Motion to Sever, the United States filed its United States Response in Opposition to Defendant's Motion to Sever [858], filed February 24, 2017 (Doc. 925)("United States' Gonzales Response").  The United States refutes Gonzales' argument that his "charged offenses are distinguishable from the overarching [SNM] racketeering enterprise . . . because (1) Defendant's alleged conduct is res gestae of the SNM's racketeering enterprise, and (2) Defendant fails to demonstrate real prejudice resulting from joinder in this case."  United States' Gonzales Response at 1.  The United States further refutes Gonzales' request for severance based on prejudicial spillover, because

> (1) joinder of Defendants in this case does not impose an insurmountable burden upon the Court and jury, (2) fewer Defendants who are charged with similar offenses will be proceeding to trial, and (3) Defendant fails to demonstrate that jury instructions will be insufficient to provide any protection against "prejudicial spillover."

United States' Gonzales Response at 1.  The United States also refutes Gonzales' request for severance based on mutually antagonistic defense theories, because "wholesale denial of association with the SNM and its members does not present a mutually antagonistic defense." United States' Gonzales Response at 1.  Last, the United States refutes Gonzales' argument that "severance should be granted because of a violation of Defendant's Sixth Amendment right

under *Bruton* . . . because there is no *Bruton* issue with regard to either of the proposed co-Defendant statements."  United States' Gonzales Response at 1-2.

The United States then recaps the facts it considers salient, in particular the account of the conduct underlying Counts 14 and 15 by Rivera, who pled guilty, and

> admitted that on or about February 1, 2016 and continuing to February 27, 2016, Rivera conspired with SNM gang members or associates to kill J.G. who was believed to be a witness against fellow SNM gang member, Joe Lawrence Gallegos. . . .  On February 27, 2016, an attempt was made to kill J.G. by assaulting him with a machete and a baton causing serious bodily injury. . . . Gonzalez, Rodriguez, and Rivera were at the residence where J.G. was attacked. . . .  The group intended to prevent J.G. from testifying or cooperating with law enforcement. . . .  Rivera committed these crimes by virtue of [his] membership in the SNM.

United States' Gonzales Response at 2-4.  Regarding the applicable law, the United States then provides that, "[t]o justify relief under Rule 14, a defendant bears a 'heavy burden of showing real prejudice to his case.'"  United States' Gonzales Response at 4 (quoting United States v. Gould, 2007 WL 1302587, at *1).  Further, the United States provides, "'Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.'"  United States' Gonzales Response at 4 (quoting Zafiro v. United States, 506 U.S. at 538-39).  Accordingly, here, the United States maintains that Gonzales' "alleged conduct is indistinguishable from the SNM VICAR conspiracy" and that the Court should not grant severance based on Gonzales' "attempt to minimize his overall culpability."  United States' Gonzales Response at 5-6.  The United States argues that Gonzales' self-described "minor participa[tion]" is an argument that

> may find some support if Defendant was charged with aiding and abetting a multi-defendant tax fraud conspiracy involving several key players and consisting of over eighty substantive counts. . . .  It may also find some support if this were a RICO conspiracy centered on a traditional organized crime family, in which there's one godfather with a select couple of enforcers who carry out the lion's share of the family's criminal activities. . . .  In cases of that nature, an individual

- 79 -

or certain individuals who allegedly engaged in one crime only may have "a markedly different degree of capability," *United States v. Baca*, No. CR 16-1613 JB, 2016 WL 6404772, at *31 (D.N.M. Oct. 20, 2016)(Browning, J.)(quoting *Zafiro*, 506 U.S. at 539), or may be "'conspirators joining and leaving the conspiracy at various times,'" *United States v. Gallo*, 668 F. Supp. 736, 751 (E.D.N.Y. 1987).

United States' Gonzales Response at 6. Here, however, the United States argues that, "in the unique circumstances that the Superseding Indictment alleges, in which the SNM operates by sending its members or associates to assault or murder individuals in their close proximity, Defendant's alleged offense is res gestae of the SNM's racketeering 'enterprise.'" United States' Gonzales Response at 6. With respect to the United States' burden of proving a "racketeering enterprise," the United States then explains that -- for VICAR -- it "must prove that 'an enterprise engaged in racketeering activity,' and that individual members committed racketeering activity 'for the group and/or in concert with other members, or acted in ways that contributed to [or furthered] the purposes of the group, or that were facilitated or made possible by the group.'" United States' Gonzales Response at 7 (United States v. Feliciano, 223 F.3d 102, 116-17 (2d Cir. 2000)). The United States thus argues that Gonzales' arguments that he is only a minor participant is without merit. See United States' Gonzales Response at 7.

The United States next addresses the concept of "spillover prejudice" and argues that "spillover prejudice is insufficient for severance under Rule 14." United States' Gonzales Response at 8. The United States provides that "prejudice always exists when more than one defendant or offense are tried together," and that Gonzales' burden is to show prejudice "of a type which the court is unable to afford protection" and "that the spillover prejudice will prevent the jury from individualizing each defendant." United States' Gonzales Response at 8. Here, the United States maintains that jury instructions will adequately ensure that the jury does not compartmentalize the Defendants and the evidence, arguing specifically that "limiting

instructions may minimize the risk of undue prejudice," and that "juries can and do follow jury

instructions in complex RICO and VICAR cases."  United States' Gonzales Response at 8-11

(citing, e.g., United States v. Jones, 530 F.3d 1292, 1303 (10th Cir. 2008)).

Next, the United States asserts that "wholesale denial of guilt is not a mutually

antagonistic defense," and that Gonzales' argument that "severance is necessary because his

general denial of association with the SNM and its members is so mutually antagonistic that

joinder will be prejudicial" must fail.  United States' Gonzales Response at 12.  According to the

United States, the concept of mutually antagonistic defenses is governed as follows:

> In *United States v. Lynn*, the Tenth Circuit found that, "[i]n this circuit, the
> conflict between codefendants' defenses must be such that 'the jury, in order to
> believe the core of one defense, must necessarily disbelieve the core of the
> other.'"  31 F.3d 987, 992 (10th Cir. 1994)(citing *United States v. Swingler*, 758
> F.2d 477, 495 (10th Cir. 1985)).  The Tenth Circuit held: denial of guilt by one
> party while accusing another is "not so contradictory that the jury must have
> necessarily disbelieved one to believe another."  *Id*.  Indeed, the Court found "the
> jury could have believed all of the Defendants' theories and acquitted all of them,
> but unfortunately for Defendants, did not."  *Id*.

United States' Gonzales Response at 12.  The United States explains that, here, Gonzales seeks

to argue

> that he was wholly unaware of the SNM's alleged scheme, particularly where Joe
> Lawrence Gallegos had a dispute with J.G. or had ordered a hit on J.G.
> [Defendant] would also present as part of his defense that he is not a member or
> associate of SNM, he does not know the majority of the co-defendants nor was he
> involved in or aware of any of the alleged conduct set forth in counts 1-13. . . .
> The sum of Defendant's theory is a wholesale denial of guilt.  As the Tenth
> Circuit found in *Lynn*, this type of claim "amounts to no more than finger
> pointing," and affords no basis for severance on these grounds.

United States' Gonzales Response at 12-13 (quoting United States v. Lynn, 31 F.3d 987, 992

(10th Cir. 1994)).  The United States thus requests that the Court deny Gonzales' Motion to

Sever on this basis.  See United States' Gonzales Response at 13.

- 81 -

Last, the United States addresses Gonzales' assertions that "incriminating statements provided to federal investigators by defendants Paul Rivera and Shauna Gutierrez, also charged in Counts 14 and 15, raises a *Bruton* violation requiring severance on Sixth Amendment grounds."   United States' Gonzales Response at 13 (internal quotation marks omitted). Regarding Rivera's statements, the United States first argues that Gonzales' "*Bruton* claim . . . is moot," because,

> [i]n *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held: the admission of a non-testifying codefendant's confession naming the defendant as a participant in a crime violates a defendant's Sixth Amendment right to confront a witness against him.  On February 1, 2017, Paul Rivera pled guilty to Counts 14 and 15. . . .  The United States intends to call Mr. Rivera as a witness to testify against Defendant.  Accordingly, a *Bruton* issue is not raised where Rivera will testify, and Defendant will have an opportunity to cross-examine Rivera at trial. Defendant is thus not entitled severance based on Rivera's statement to federal investigators.

United States' Gonzales Response at 13.   The United States then reminds the Court what Gutierrez' statement, which Gonzales argues creates a <u>Bruton v. United States</u> conflict, is:

> According to Ms. Gutierrez, on February 27, 2016, she allowed Brandi Rodriguez to borrow her truck.  According to Gutierrez, sometime later, Rodriguez returned to her trailer with Gonzales and Rivera and Rodriguez decided to go confront J.G. Gutierrez stated that Rodriguez, Rivera and Gonzales went to confront J.G. at the home where he was staying.  When the trio returned to Gutierrez's home, Rodriguez had blood on her shoes and all three asked to be taken home.

United States' Gonzales Response at 13-14.  According to the United States, that statement is not even a "confession within the meaning of *Bruton*," because "Gutierrez does not confess to her role in the attempted murder of J.G. or 'expressly incriminate the [D]efendant as [her] accomplice.'"   United States' Gonzales Response at 14 (quoting <u>Bruton v. United States</u>, 391 U.S. at 124 n.1).  The United States alternatively argues, that, "assuming arguendo the Court finds that a *Bruton* issue is raised, the statement may be admissible against Defendant if properly redacted."  United States' Gonzales Response at 14.  Indeed, here, the United States maintains

that "any reference to Defendant's existence could be redacted with a neutral pronoun or phrase without raising a *Bruton* violation."  United States' Gonzales Response at 15.

**14.    Gutierrez' Response.**

Gutierrez filed a supplement to the other Defendants' severance briefing.  See Defendant Shauna Gutierrez' [sic] Opposed Supplement in Support of Motions for Severance, filed February 28, 2017 (Doc. 932)("Gutierrez' Response").  Regarding the allegations against her, Gutierrez first describes:

> Counts 14 and 15 allege that Shauna Gutierrez conspired with Joe Lawrence Gallegos, Santos Gonzales and Paul Rivera to murder J.G. (Jose Gomez) in violation of 18 U.S.C. § 1959, attempted murder of J.G. and Assault with a Dangerous Weapon resulting in Serious Bodily injury to J.G., as consideration of receipt of anything of pecuniary value of the [SNM] Gang, an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in the SNM gang.

Gutierrez' Response at 1-2.  More specifically,

> [t]he discovery . . . states that on February 27, 2016, Jose Gomez was battered by Santos Gonzales, Brandy Dominguez [sic], Oso (Paul Rivera) and an unknown female (not Shauna).  Brandy Dominguez [sic] and Paul Rivera are now cooperating witnesses.  On March 28, 2016, Brandy Rodriguez was arrested and provided a statement in which she claims that Shauna told Brandy that "Tiny" (J.G.) was at Charlene's residence and they needed to go get him.  Rodriguez, Santos Gonzales and Paul Rivera drove Shauna's truck to Charlene's house where they beat and assaulted J.G.  The discovery is replete with conflicting information concerning Shauna Gutierrez.

Gutierrez' Response at 2.  Gutierrez then asserts that she is not an SNM member and is only alleged to be "an associate," and that the only reason she "is indicted is because of her former relationship, formed two (2) months before the first indictment filed December 2015, with Joe Lawrence Gallegos.  Ms. Gutierrez is not the wife of Joe Lawrence Gallegos nor a family member."  Gutierrez' Response at 2-3.

DNM 696

Gutierrez then specifically argues against the United States' proposal at the February 7, 2017, hearing, to sever the Superseding Indictment into two groupings, one of which would be "counts 1-5 and 13-5." Gutierrez' Response at 3. According to Gutierrez, the allegations in Counts 1 and 2 are temporally separated from Counts 14 and 15 by "15 years," and "bear absolutely no relation to each other." Gutierrez' Response at 3. Given each of the Counts' discrete nature, Gutierrez further argues that the prejudice by joinder "is so compelling that the Court would be unable to afford protection, and thus prejudice would result in an unfair trial." Gutierrez' Response at 4. Gutierrez also argues that "joinder of Counts 14 and 15 with Counts 6, 7, 8, 9, 10, 11, and 12 is [also] illogical," because all of the Counts involve Defendants and offenses not of the "same or similar character" as those named and alleged in Counts 14 and 15. Gutierrez' Response at 4. Gutierrez then concludes:

> The allegations claimed by the Government against Ms. Gutierrez is a small fraction compared to the overall scope of this indictment against the twenty nine (29) other Defendants in this case. The prejudice suffered by Defendants charged in a small portion of the counts is compounded because the jury is subject to months and months of trial "dealing with dozens of incidents of criminal misconduct that does not involve" a minor defendant in any way.

Gutierrez' Response at 5 (quoting United States v. Gallo, 668 F. Supp. at 736).

### 15.   United States' A. Gallegos Response.

The United States responded to A. Gallegos' Motion to Sever with the United States' Response in Opposition to the Opposed Motion to Sever Counts 4 and 5 [868], filed February 28, 2017 (Doc. 933)("United States' A. Gallegos Response"). The United States refutes A. Gallegos' argument that the Counts in the Superseding Indictment are

> improperly joined under Rule 8(b) . . . because (1) conspiracy to commit other offenses charged in the Superseding Indictment is not a requirement for joinder; (2) the United States offers a sufficient legal and factual basis for the Court to determine that Defendants participated in the affairs of the [SNM] through the commission of the alleged racketeering offenses; and (3) the United States

establishes Defendants were members of the SNM functioning to achieve a
"common purpose."

United States' A. Gallegos Response at 1.   The United States also refutes A. Gallegos'

contention

> that severance of Counts 4 and 5 should be severed under Rule 14 fails, because
> (1) Defendants fail to show any prejudice arising from antagonistic defenses; (2)
> Defendants fail to show joinder will prejudice Defendants' Fifth and Sixth
> Amendment rights, or prevent the jury from making a reliable judgment about
> Defendants' guilt or innocence; and (3) severance does not serve the best interests
> of the Court or jury.

United States' A. Gallegos Response at 1.   Specifically, regarding A. Gallegos' rule 8(b)

improper joinder argument, the United States reiterates that "a plain reading" of rule 8(b)

"permits joinder of two or more Defendants 'if [defendants] are alleged to have participated in

the same act or transaction, or same series of acts or transactions, constituting an offense or

offenses.'"   United States' A. Gallegos Response at 5 (quoting Fed. R. Crim. P. 8(b)).   The

United States also argues that "the test for a proper joinder is a common thread to each of the

defendants which may be established by common evidence as to various counts" and here, the

> Defendants are among 20 Defendants charged with VICAR offenses committed
> on behalf of the SNM.   Section 1959 makes it a crime to commit any of a list of
> violent crimes, including murder and conspiracy to murder, in return for anything
> of pecuniary value from an enterprise engaged in racketeering activity, or for the
> purpose of joining, remaining with, or increasing a position in such an enterprise.
> . . .   [T]he United States alleges that the SNM gang is a criminal enterprise within
> the meaning of RICO and VICAR, and that Defendants are members of the gang.
> . . .   The grand jury found probable cause supports those allegations.   Defendants'
> alleged conduct is therefore part and parcel of the SNM's reputation for violence,
> comprising exactly the type of conduct that has enabled the SNM to continue its
> racketeering enterprise for over 36 years.   Based on these criminal allegations and
> the body of "common evidence as to various counts" charged in the Superseding
> indictment . . . a sufficient basis exists for the Court to determine proper joinder of
> Defendants under Rule 8(b).

United States' A. Gallegos Response at 6-7 (quoting United States v. Caldwell, 560 F.3d 1202,

1212 (10th Cir. 2009)).   Additionally, "[a]s is the case under RICO, the requirements for joinder

of defendants under VICAR may be satisfied by establishing the existence of an enterprise, and

that the defendants' charged crimes related to the affairs of the same enterprise." United States'

A. Gallegos Response at 8. Accordingly, here, the United States argues it

> charged Defendants with participating in the affairs of the SNM enterprise
> through the commission of the alleged predicate racketeering acts. As the
> Superseding Indictment alleges, Defendants are members of the SNM, a criminal
> enterprise, and, at the behest of the gang, have participated in predicate
> racketeering acts, namely, conspiracy to murder and murder, to assert and
> preserve the reputation of the SNM. . . . The Superseding Indictment
> characterizes the Defendants' collective conduct as "Violent Crimes in Aid of
> Racketeering" pursuant to 18 U.S.C. §§ 1959(a)(1) and (a)(5). . . . Accordingly,
> Defendants cannot escape joinder by claiming that their offenses are "not
> connected to any of the other defendants," when the co-Defendants' alleged acts
> fulfill the essential expectations of the SNM VICAR conspiracy.

United States' A. Gallegos Response at 8. Further, the United States has not abused the rule 8(b)

joinder standard in this case, because -- for the VICAR allegations -- the "United States is

allowed to prove all of the[] essential elements effectively." United States' A. Gallegos

Response at 9.

Turning then to A. Gallegos' arguments regarding severance under rule 14, the United

States first argues that A. Gallegos has failed "to show prejudice arising from antagonistic

defenses," in part because, "[b]y virtue of the number of Defendants who have already pled in

this case, and those who will likely plead in the coming months, the risk of prejudice arising

from antagonistic defenses is diminished." United States' A. Gallegos Response at 12.

Additionally,

> Defendants fail to establish any prejudice whatsoever resulting from antagonistic
> defenses [b]ecause Defendants offer no theory of defense of their own,
> Defendants point to two antagonistic theories that might arise in the course of
> trial: (1) "many defendants may argue they were not or are not SNM members,"
> and (2) "[o]ther defendants will likely argue the alleged crimes were not done in
> furtherance of the SNM.". . . These arguments are analogous to the defendants'
> claim of antagonistic defenses in Linn. The Tenth Circuit held: denial of guilt by
> one party while accusing another is "not so contradictory that the jury must have

- 86 -

necessarily disbelieved one to believe another.". . .  This type of claim "amounts to no more than finger pointing," and affords no basis for severance on these grounds.

United States' A. Gallegos Response at 13.

The United States next contends that the "Defendants fail to show joinder will prejudice specific trial rights or prevent the jury from making a reliable judgement [sic] about guilt or innocence."  United States' A. Gallegos Response at 14.  In fact, "the Court already noted at the hearing on February 7, 2017 that it is inclined to sever this case into groups of 10 or less Defendants.  So, Defendants have already effectively been provided the relief they seek."  United States' A. Gallegos Response at 14.  Regarding the ability of a jury to reach a reliable conclusion, the United States argues that A. Gallegos' reliance on United States v. Gallo is misplaced, because, in that case, that court "dealt with a RICO conspiracy centered on a traditional organized crime family, in which one godfather directed a select couple of enforcers to carry out the lion's share of the family's criminal activities."  United States' A. Gallegos Response at 14.  Unlike the circumstances of United States v. Gallo, the United States contends

the scope of SNM VICAR offenses and the distribution of defendants across the Superseding Indictment is narrow.  Here, the majority of charges stem from violations of Section 1959.  Moreover, no more than six Defendants will proceed on any one count in the indictment, with the largest number of Defendants charged in Counts 6 and 7, of which Defendants are not charged.  Unlike the defendants in Gallo, Defendants are not charged in a small portion of the counts nor are they implicated by bits and pieces of evidence.  In the unique circumstances that the Superseding Indictment alleges, Defendants' alleged offenses are res gestae of the SNM's racketeering "enterprise."

United States' A. Gallegos Response at 15.  The United States also reiterates that, "to the extent that Defendants will suffer prejudice from evidence admitted against co-Defendants, both the Supreme Court and the Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover effect where limiting instructions may minimize the risk of undue

prejudice." United States' A. Gallegos Response at 17 (citing <u>Zafiro v. United States</u>, 506 U.S. at 539). Essentially, the United States maintains that A. Gallegos has not sufficiently shown a need for severance, "[b]ecause Defendants rely on assertions of prejudice generally, and do not point out specific and compelling prejudice, Defendants fail to uphold their burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence." United States' A. Gallegos Response at 17.

The United States also asserts that there is "no risk that joinder will compromise Sixth Amendment trial rights," because A. Gallegos and the Defendants

> fail to establish that joinder would deny Defendants the rights that the Sixth Amendment hold[s] crucial such as, the Constitutional right to cross-examination, opportunity to present an individual defense, right to confront witnesses against them, right to counsel, or right to properly instruct the jury on the admissibility of evidence as to each defendant. The hearings have worked fine thus far, and there is no reason to believe that will change. The rights that Defendants assert may be infringed are not of the same magnitude.

United States' A. Gallegos Response at 18. Additionally, the United States argues, A. Gallegos has not shown that a "risk joinder will compromise Defendants' Fifth Amendment rights," because "given the nature of the VICAR charges in Counts 4 and 5, severance would not cure the prejudice they contend may exist." United States' A. Gallegos Response at 19. The United States explains that the "Defendants complain throughout their Motion to Sever that the United States is somehow improperly using the VICAR statute to back-door evidence that is 'likely inadmissible,'" and, the United States argues, that complaint lacks bases in law, because

> VICAR is a properly enacted statute that Congress saw fit to enact to prevent the exact activity alleged in the Superseding Indictment: violent crimes such as murders perpetrated by individuals who join in a racketeering enterprise such as SNM. Second, by charging this murder and conspiracy to murder as VICAR violations, the United States placed additional burdens on itself: to prove that the SNM is an enterprise, engages in racketeering activities, and that this murder and conspiracy to murder were committed by the Defendants to receive pecuniary value from SNM or to gain entry to, or to maintain or increase position in, SNM.

- 88 -

> To the extent that Defendants complain about the additional evidence that's admissible in a VICAR case such as this, they conveniently omit from their Motion to Sever that they receive a huge benefit: if the United States fails to prove any one of these additional elements beyond a reasonable doubt, they will be found not guilty of the VICAR crimes with which they're charged.

United States' A. Gallegos Response at 20.

Last, the United States contends that "severance does not best serve the interests of the Court or jury," because "it will require the court to undergo the same trial process on multiple occasions," and it does not otherwise "impose an unbearable weight on individual jury members." United States' A. Gallegos Response at 21-22. According to the United States, ultimately, a jury would be capable of handling the complex litigation and severance would not save the judiciary its resources in a meaningful fashion. See United States' A. Gallegos Response at 22. The United States thus requests that the Court choose not to sever the Superseding Indictment. See United States' A. Gallegos Response at 22.

### 16.    United States' Troup Response.

The United States responded to Troup's Motion to Sever with the United States' Response in Opposition to Defendants Motion to Sever Counts 1 and 2 [882], filed March 2, 2017 (Doc. 936)("United States' Troup Response"). The United States argues:

> Defendants' first contention that joinder of Counts 1 and 2 will result in undue prejudice fails, because (1) Defendants do not show real prejudice resulting from joinder; (2) disparity of quality and quantity of evidence does not constitute an antagonistic defense; and (3) Defendants' claims of prejudice are negated by their own admissions. Defendants' second contention that severance should be granted based on considerations for judicial economy fails, because prejudice, not judicial economy, is the proper basis for severance in the Tenth Circuit. Defendants' third contention that Counts 1 and 2 should be severed because joinder will result in the introduction of inadmissible evidence and a tangled web of jury instructions fails, because Defendants offer an insufficient legal and factual basis for severance on this ground.

United States' Troup Response at 1.  In support, after recapping some of the factual background

of this case, the United States first argues that

> the Superseding Indictment clearly states that the purpose of the SNM is to
> "promot[e] and enhance[e] the enterprise and the activities of its members and
> associates through criminal acts," and to "keep victims, potential victims,
> witnesses, and community members in fear of the enterprise and its members and
> associates through violence and threats of violence."

United States' Troup Response at 5 (quoting Superseding Indictment at 7).  Accordingly, then,

the United States maintains that joinder is proper in this VICAR case: "Under RICO, Rule 8(b)

joinder requirements are satisfied when each defendant participated in the affairs of the same

enterprise through the commission of the alleged predicate racketeering acts."  United States'

Troup Response at 5.  As the United States has argued in other briefing, it reiterates that the

Superseding Indictment

> charged Defendants with participating in the affairs of the SNM enterprise
> through the commission of the alleged racketeering acts.  As the Superseding
> Indictment alleges, Defendants are members of the SNM, a criminal enterprise,
> and, at the behest of the gang, participated in racketeering acts, namely the
> murders of F.C. and R.G. . . .  The Superseding Indictment characterizes the
> Defendants' collective conduct as "Violent Crimes in Aid of Racketeering"
> pursuant to 18 U.S.C. § 1959(a)(1). . . .  Accordingly, Defendants cannot escape
> joinder by claiming that they are in "no way shape or form" responsible for
> Counts 9 and 10 when the co-Defendants' alleged acts fulfill the essential
> elements of the SNM VICAR conspiracy.

United States' Troup Response at 7.

The United States next argues that "disparity of quality and quantity of evidence does not

constitute an antagonistic defense for purposes of severance under Rule 14," because those bases

do not satisfy the prejudicial standard.  United States' Troup Response at 8.  Instead, Troup

needs to show, the United States argues, "real prejudice, rather than merely not[ing] that each

defendant is trying to exculpate himself while inculpating the other," and the "conflict between

codefendants' defenses must be such that the jury, in order to believe the core of one defense,

must necessarily disbelieve the core of the other." United States' Troup Response at 8 (internal

quotation marks omitted). Here, the United States maintains that Troup's argument that the

evidence against the Counts 1 and 2 Defendants is older, and perhaps not as robust, as the

evidence for the later Counts, is not grounds for severance under rule 14. See United States'

Troup Response at 8-9.

The United States then addresses Troup's arguments that the Counts 1 and 2 Defendants

were in a different SNM faction than the Counts 3-15 Defendants. See United States' Troup

Response at 9. In that regard, the United States provides that,

> [t]o the extent that Defendants' complain of prejudice resulting from joinder,
> Defendants' own admissions provide a sufficient factual basis for the Court to
> determine that Defendants were members of the SNM during the commission of
> offenses charged in Counts 1 and 2. Defendants' claims are further negated by
> joinder of defendant Troup who establishes the ongoing nature of the enterprise.
> Troup is charged with murdering F.C. in 2001 and F.S. in 2007 -- nearly five
> years after the Defendants claim "The All Stars" assumed control of the gang. . . .
> Defendants' Motion to Sever should be denied on these grounds.

United States' Troup Response at 9. The United States also refutes Troup's argument that the

Counts in the Superseding Indictment correspond with allegations for conduct by fundamentally

different SNM enterprises, stating that

> [a] reasonable jury could find that despite variations of membership, the criminal
> purpose of the SNM has remained the same: to preserve and protect the power,
> territory, reputation, and profits of the enterprise throughout the New Mexico
> penal system and the streets of New Mexico through the use of intimidation,
> violence, threats of violence, assaults, and murder. . . . A reasonable jury could
> also find that the change of name or factions within a group does not establish the
> existence of separate and distinct groups. Indeed, the Supreme Court recognized
> that an enterprise need not even have a name, let alone one that remains constant
> over the course of the enterprise's existence. . . . Finally, a reasonable jury could
> find that despite infighting among the original members of the SNM, the
> enterprise remained the same.

United States' Troup Response at 10.

Next, the United States asserts that the Court "may not grant severance based on considerations for judicial economy alone."  United States' Troup Response at 11.  The United States provides that the Tenth Circuit has held that

> the Court may weigh "considerations of economy . . . and expedition of judicial administration," if the Court finds (1) "defenses presented are so antagonistic that they are mutually exclusive," and (2) "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence."

United States' Troup Response at 11 (quoting United States v. Pursley, 474 F.3d at 757).  The United States thus asserts: "Without a requisite finding of prejudice under the first two prongs, the Court has no discretion to weigh considerations for judicial economy in a motion for severance."  United States' Troup Response at 11-12.  Nonetheless, the United States further argues that the "Defendants still fail to show that severance is more convenient and cost effective than joinder in this case.  The benefits proposed by Defendants overlook the additional expense of time and judicial resources incurred by severance."  United States' Troup Response at 12.  The United States supports its argument by reiterating the "additional time and resources from the Court, Defendants, defense counsel, and the United States" multiple trials would necessitate.  United States' Troup Response at 12-13.

The United States last argues that the "Defendants overstate the effect of inadmissible evidence and excessive jury instructions," because they rely "on a major assumption that all the evidence in Counts 3-15 is either irrelevant, inadmissible hearsay, or inadmissible testimonial statements, as to Counts 1 and 2."  United States' Troup Response at 14 (internal quotation marks omitted).  Indeed, the United States contends, "[t]he effect of Defendants' contention would preclude the United States from producing evidence that Defendants were members of the SNM, and that the SNM was a criminal enterprise when the alleged VICAR offenses were

- 92 -

committed.  This cannot be true."  United States' Troup Response at 14.  At this point, the

United States once again reiterates the fact that "juries can and do follow jury instructions in

complex racketeering cases," and that this case is no different.  United States' Troup Response at

15.

   17.   **United States' Alonso Response**.

      The United States responded to Alonso' Motion to Sever with the United States'

Response in Opposition to Defendant's Motion to Sever [893], filed March 6, 2017 (Doc.

940)("United States' Alonso Response").  According to the United States,

> Defendant's first contention that joinder of Count 3 is improper under Rule 8
> fails, because (1) Defendant's Motion to Sever under Rule 8(a) is improper, and
> (2) Defendant fails to provide a legal or factual basis to support a claim of
> improper joinder under Rule 8(b).  Defendant's second contention that severance
> should be granted under Rule 14 fails, because (1) Defendant fails to show real
> prejudice resulting from joinder in this case, and (2) prejudice, not judicial
> economy, is the proper basis for severance in the Tenth Circuit.  Defendant's third
> contention that severance should be granted because joinder will result in a
> *Bruton* violation fails, because co-Defendant statements implicating Defendant
> are not testimonial.

United States' Alonso Response at 1.  Regarding Alonso's arguments for severance under rule 8,

the United States reiterates its arguments that rule 8(b) applies in this case and that, under rule

8(b), "the test for proper joinder is a common thread to each of the defendants which may be

established by common evidence as to various counts. . . .  Defendant's involvement in Count 3

clearly shares a common thread with each of the co-Defendants charged in the Superseding

Indictment," given the enterprise-related allegations.  United States' Alonso Response at 2-7

(internal quotation marks omitted).  The United States also argues that Alonso fails to "support

his contention that joinder of Count 3 will result in prejudice," stating that

> the Court may weigh "considerations of economy . . . and expedition of judicial
> administration," if the Court finds (1) "defenses presented are so antagonistic that
> they are mutually exclusive," and (2) "a serious risk that a joint trial would

compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." *Pursley*, 474 F.3d at 765 (emphasis added). Without a requisite finding of prejudice under the first two prongs, the Court has no discretion to weigh considerations for judicial economy in a motion for severance.

United States' Alonso Response at 9-10.

The United States next turns to Alonso's argument that "admission of Edward Troup's statements will . . . violate *Bruton*." United States' Alonso Response at 11. The United States explains that Alonso contends that incriminating statements "provided to federal investigators by defendant Edward Troup, also charged in Count 3, raises a *Bruton* violation requiring severance on Sixth Amendment grounds," and if he "is forced to go to trial with Edward Troup, where some or all of [Troup's] statements are admitted, [Alonso's] constitutional right to confrontation will be denied." United States' Alonso Response at 11 (alterations in original). In this case, the United States refutes Alonso's arguments, by arguing that "Troup's statements are not testimonial." United States' Alonso Response at 11. The United States then provides that "[t]he *Bruton* Rule protects a defendant's right to confrontation by barring the admission of testimonial statements made by a non-testifying co-defendant," but "if a co-defendant's statements are 'made unwittingly to a Government informant,' those statements are considered 'nontestimonial,' and are accordingly beyond the scope of *Bruton*." United States' Alonso Response at 11 (quoting United States v. Smalls, 605 F.3d 765, 777 (10th Cir. 2010)). For reference, the United States reminds the Court that the following statements are at issue:

Defendant's Exhibit 1: Troup confessed to being a part of two murders in which two people were strangled to death at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico. Troup stated that during one of the murders, he held [F.S.'s] legs while [Alonso] strangled him to death with a drawstring from a laundry bag.

- 94 -

Defendant's Exhibit 2: Troup bragged about being a part of the murder of [F.S.] as well, and told [confidential informer] that [Alonso], also from Roswell, was ordered to kill [F.S.].

Defendant's Exhibit 3: In 2007, Edward Troup admitted to CHS that he and [Alonso] killed [F.S.].

United States' Alonso Response at 11. Those statements, the United States explains, were "made to a confidential informer whose status was unknown to him at the time," and because "'the Confrontation Clause simply does not apply to nontestimonial statements,' Defendant's Sixth Amendment right to confrontation will not be violated by admission of Troup's statements." United States' Alonso Response at 11-12 (quoting United States v. Smalls, 605 F.3d at 780). Nonetheless, the United States maintains that, "even assuming arguendo that Troup's statements are testimonial, these statements will still be admissible if properly redacted." United States' Alonso Response at 12. Indeed, the United States asserts that "[r]eferences to Defendant are extremely limited, and can be easily redacted with a neutral pronoun or phrase without raising a *Bruton* violation." United States' Alonso Response at 12.

### 18.   **Gonzales' Reply.**

Gonzales replied to the United States' Gonzales Response with Defendant Santos Gonzales' Reply to United States' Response to Mr. Gonzales' Motion to Sever Defendant, filed March 14, 2017 (Doc. 975)("Gonzales' Reply"). Gonzales first argues that "antagonistic defenses in this case require[] severance," because, "[u]nlike other cases involving charges of violent crimes in aid of racketeering and conspiracies to commit thereto, the conspiracies charged in the second superseding indictment are separate and distinct; they are not substantially interrelated by their facts and common aims and rarely involved at least one common participant." Gonzales' Reply at 1. Gonzales also argues that, "[w]hen two defense strategies inexorably clash, particularly considering the duty of co-defendant's counsel to represent his/her

client vigorously as possible by contrasting the two defendants' behavior, severance is necessary," and that is the case here.  Gonzales' Reply at 2.

> Indeed,

> Mr. Gonzales submits that his defense is inexorably antagonistic to his co-defendants to the point that if severance is not granted, prejudice will result.  Mr. Gonzales submits that the offenses charged in counts 1-13 span a period of 14 years, do not involve him whatsoever and are not interrelated or connected.  The government argues that those charged offenses constitute the res gestae of the SNM's racketeering enterprise.  However, critical to Mr. Gonzales is the fact that he is not an SNM member or associate.  Notably, the vast majority of the offenses charged in counts 1-12 occurred in a prison setting and involved validated members of SNM.  Mr. Gonzales simply had no association to SNM.  Just because the government says Mr. Gonzales is an "associate" of SNM does not make it so.  There is no evidence to support their claim unless witnesses are coached into parroting the unfounded allegation.

Gonzales' Reply at 3.  Accordingly, Gonzales contends that, "[i]n a joint trial, the government will introduce evidence of crimes allegedly committed by validated members of SNM in prison settings over a period of 14 years," and this proof will be prejudicial, because

> Mr. Gonzales' defense will be squarely and irreconcilably antagonistic to Ms. Rodriguez, Ms. Gutierrez and Mr. Gallegos' defenses.  Indeed, Mr. Gonzales was unaware of any connection between J.G. and Joe Gallegos.  Therefore, to the extent that the jury will be faced with disbelieving one defense over the other, severance is required.

Gonzales' Reply at 3-4.  In the same vein, Gonzales further argues that the "danger of spillover evidence justifies a severance."  Gonzales' Reply at 4.  In support, Gonzales provides that "[t]he Supreme Court has recognized that when a jury hears large amounts of incriminating evidence it could predispose them to convict a codefendant who they otherwise would not."  Gonzales' Reply at 4 (citing Zafiro v. United States, 506 U.S. at 539).  Gonzales then alerts the Court that "some Courts have granted severance based entirely on the issue of disparity of evidence."  Gonzales' Reply at 4-5 (citing United States v. Burke, 789 F. Supp. 2d 395 (E.D.N.Y. 2011)(noting that the trial of the first two defendants involved three murders, several

kidnappings, drug trafficking, and thirty years' involvement with the Gambino Crime Family,

but the third defendant was only charged with tampering with witnesses while incarcerated, and

concluding that spillover prejudice was enough to sever the trials); United States v. Haworth, 168

F.R.D. 658 (D.N.M. 1996)(Hansen, J.)(considering seven defendants indicted for narcotics

trafficking in an organization where two defendants were death penalty eligible and were facing

at least twenty offenses, including murder, attempted murder, arson, and firearm offenses, and

concluding that, even though all the defendants' charges stemmed from the same conspiracy, the

large number as well as the severity of the charges against the two death eligible defendants

would prejudice the other defendants if they were joined for trial)).   Here, then, Gonzales

reiterates his small role in the grand scheme of the Superseding Indictment in comparison to the

other Defendants.   See Gonzales' Reply at 5-6.

Gonzales last addresses the Bruton v. United States issue, and argues that "[w]hen the

statement of a co-defendant implicates the defendant to the point that it presents a substantial

threat to a defendant's right to a fair trial, defendant may be entitled to a severance."   Gonzales'

Reply at 6.   Accordingly, Gonzales asserts that "the United States Supreme Court [has] held that

the admission of statements by a co-defendant who did not take the stand deprived the defendant

of his rights under the Sixth Amendment Confrontation Clause when those statements implicated

the defendant."   Gonzales' Reply at 7.   In Gonzales' specific case, he maintains:

> The government erroneously argues that the statements made by co-defendant
> Shauna Gutierrez do not implicate Mr. Gonzales.   To the contrary, Ms.
> Gutierrez's statement implicates Mr. Gonzales to the extent Gutierrez claims Mr.
> Gonzales was present when Brandy Rodriguez and Paul Rivera allegedly
> discussed confronting J.G.   According to Ms. Gutierrez's statement, Mr. Gonzales
> then accompanied Rivera and Rodriguez to J.G.'s home.   Ms. Gutierrez's
> statements unquestionably incriminate Santos Gonzales as her statements place
> him at the scene of the crime as well as engaging in the crime.   Specific testimony
> that Mr. Gonzales was involved in the crime is vivid incriminating evidence.
> Replacing Mr. Gonzales' name with a blank or pronoun will do nothing to cure

the prejudice as it will be clear to the jury that there were only four people allegedly involved in the offense.

Gonzales' Reply at 7.  Gonzales also provides that,

> since the filing of Mr. Gonzales' motion to sever, co-defendant Brandy Rodriguez was added to the indictment.  There is no dispute Ms. Rodriguez has made statements implicating Mr. Gonzales.  Indeed, according to Ms. Rodriguez, Mr. Gonzales accompanied her and Mr. Rivera to J.G.'s home and once there the trio beat J.G.  Given the fact that Ms. Rodriguez is now a charged co-defendant and the government would seek to introduce her statements against Mr. Gonzales, in order to avoid a violation of Mr. Gonzales' right to confront and cross examine, severance is required.

Gonzales' Reply at 8.

### 19.   **Troup's Reply.**

Troup also submitted the Defendants' Reply to the United States' Response in Opposition to the Defendants Motion to Sever Counts 1 and 2, filed March 27, 2017 (Doc. 1014)("Troup's Reply").  Troup's Reply begins with discussion about the February 7, 2017, hearing, where "the Court suggested that it might be premature to rule on severance because it was unclear at that time how many defendants would actually be going to trial."  Troup's Reply at 1.  Troup then argues that the United States is overstating the number of Defendants who might plea and that accordingly the Court should not be relying on that information as it considers severance.  See Troup's Reply at 2.  Troup then confirms that "the Defendants seek severance under Federal Rule of Criminal Procedure 14 and the Due Process Clause of the U.S. Constitution," and argues that, "under Rule 14, the Court may grant severance anytime joinder appears to prejudice a defendant."  Troup's Reply at 3-4 (internal quotation marks omitted).  Indeed, Troup argues, it is not the case that "mutually antagonistic defenses is the only situation where severance may occur," and, instead, "the Court should grant a severance whenever there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury

from making a reliable judgment about guilt or innocence."  Troup's Reply at 4 (citing <u>Zafiro v.</u>

<u>United States</u>, 506 U.S. at 539).  Risk of prejudice, Troup argues, could occur

> [w]hen evidence that the jury should not consider against a defendant and that
> would not be admissible if a defendant were tried alone is admitted against a
> codefendant.  For example, evidence of a codefendant's wrongdoing in some
> circumstances erroneously could lead a jury to conclude that a defendant was
> guilty.  When many defendants are tried together in a complex case and they have
> markedly different degrees of culpability, this risk of prejudice is heightened.
> Evidence that is probative of a defendant's guilt but technically admissible only
> against a codefendant also might present a risk of prejudice.  Conversely, a
> defendant might suffer prejudice if essential exculpatory evidence that would be
> available to a defendant tried alone were unavailable in a joint trial.

Troup's Reply at 4 (citing <u>Zafiro v. United States</u>, 506 U.S. at 539).  Troup then argues that, at

> this stage, of course, there is no way to determine whether a failure to sever will
> be actually prejudicial, because the Court cannot know how the evidence will
> come in or even if there will be a conviction.  All this Court can evaluate is
> whether there is a risk of prejudice warranting severance.  That is what Rule 14
> requires.

Troup's Reply at 5-6.

Next, Troup reiterates that severance of Counts 1 and 2 is appropriate, primarily because,

through

> alleging that SNM is a singular enterprise spanning several decades, the
> government attempts to render admissible any evidence about that enterprise
> regardless of applicability to any charged individual. . . .  In painting with such a
> broad brush, however, the government demonstrates why severance is necessary
> to protect the 2001 Defendants from unfairly prejudicial evidence and testimony.

Troup's Reply at 6.  Accordingly, Troup concludes, the broad allegations create "the problem in

this case[, which] is that a reasonable jury very well could conflate the evidence to find

culpability or a relationship where none really existed."  Troup's Reply at 7.  Troup bases his

argument in the "declaration of Joel D. Lieberman, Ph.D., Chair of the Criminal Justice

Department at the University of Nevada, Las Vegas," who asserts that, "in this case, the risks of

prejudice from joinder are very real and . . . jury instructions will be insufficient to remedy those

risks."  Troup's Reply at 7 (citing Declaration of Joel D. Lieberman at 1, filed March 27, 2017 (Doc. 1014-1)("Lieberman Decl.")).  Troup also provides that joinder generally results in an increased likelihood of conviction and that, here, "[c]ontrary to the government's arguments that counts should remain joined because of the similarity of evidence that may be presented during separate trials . . . the fact that the various offenses are of a similar character itself makes the risk of unfair prejudice all the greater."  Troup's Reply at 7-8.

Troup next considers the notion that "SNM is one, longstanding enterprise" and argues that it is not such an enterprise, and that the nature of the allegations regarding the enterprise favors severance, because:

> In terms of the secondary concern that individuals' perceptions of a group may color the perceptions of individuals affiliated with the group, Reed and Bornstein (2015[]) argue "people tend to make judgments about individuals based on perceptions of their group (Waytz & Young, 2012), with people seeing all group members as similar (Wilder, 1978).  This is particularly true when the group is perceived as cohesive, in which cases individual[] member[] are seen as more responsible for the group's collective actions (Hamilton & Sherman, 1996; Waytz & Young, 2012)" (p. 2).  However, it does not appear that the behavior of all group members contribute equally to the perception of a group.  Rather, the malevolent nature of a group was determined by the most extreme behavior (e.g., homicide) of specific group members (Leon, Oden, & Anderson, 1973).  Given that the defendants in U.S. v. DeLeon, et al. are all alleged to be members of [SNM], a group that is cohesive in nature, and that some defendants are charged with very heinous acts, there is reason to believe that jurors will have a pejorative view of many of the defendants, irrespective of the specific evidence presented against them, if defendants are joined at trial.

Troup's Reply at 9 (quoting Lieberman Decl. at 6).  Ultimately, Troup contends that the risk of spillover prejudice is great and that the Court ought consider severance on that factor alone.  See Troup's Reply at 9-11.  Troup in part makes that argument, because the United States' assertion that "limiting instructions" would cure the prejudice is premised in a misunderstanding regarding the "complexity of this case, the large number of defendants, and the fact that there will be many, many instances of evidence admissible against a limited number of defendants."  Troup's Reply

at 11.  Troup also points to the Lieberman Decl. for the proposition that limiting instructions, generally, are ineffectual.  See Troup's Reply at 12 (citing Lieberman Decl. at 7).  Troup then concludes by asserting that the risk of prejudice to the individual Defendants outweighs the interest in judicial economy that joinder can serve, and that the best approach for ensuring that the Defendants receive a fair trial is by severance.  See Troup's Reply at 12-14.

### 20.   A. Gallegos' Reply.

A. Gallegos replied to the United States' A. Gallegos Response with the Reply to United States' Response to Motion to Sever Counts 4 and 5, filed March 30, 2017 (Doc. 1031)("A. Gallegos' Reply").  A. Gallegos adopts the arguments of his co-Defendants which are in favor of severance, and reiterates that he is not an SNM member and has not "participated in the activities of the enterprise." A. Gallegos' Reply at 1-2.  A. Gallegos also asserts that, in comparison to his co-Defendants, his role as alleged by the Second Superseding Indictment is de minimis, and that the evidence the United States will present against the other Defendants will surely prejudice his defense in a joint trial, particularly where he shares a last name with one of the Defendants who is charged with some of the more egregious conduct.  See A. Gallegos' Reply at 2-4.  A. Gallegos contends, further, that his "defense is antagonistic to his co-defendants," because:

> If forced to go to trial together, Andrew Gallegos will have no choice but to take the uncomfortable position that his brother or perhaps other co-defendants are responsible for AB's death.  This would, essentially, place Andrew on the same side as the government; an unfair scenario, particularly for Joe Gallegos, because it would be the equivalent of a denial of a fair and impartial trial for Joe.

A. Gallegos' Reply at 4-5.  A. Gallegos concludes by stating that

> the allegations claimed by the Government against him is small in comparison to the overall scope of this indictment against the twenty-plus other defendants in this case.  The prejudice suffered by Defendants charged in a small portion of the counts is compounded because the jury is subject to months and months of trial dealing with dozens of indictments of criminal misconduct that does not involve a minor defendant in any way.

DNM 714

A. Gallegos' Reply at 6.

21.   **<u>Alonso's Reply</u>**.

Alonso replied to the United States' Alonso Response with his Reply to the Government's Response in Opposition to Defendant's Motion to Sever [893] [Doc. 940], filed March 30, 2017 (Doc. 1036)("Alonso's Reply").  Alonso explains that "Federal Rule of Criminal Procedure 14 authorizes courts to sever defendants' trials where consolidation appears to prejudice either the government or a defendant," and that

> [t]he 1966 amendment to Rule 14 added a provision which provided that "in ruling on a motion by a defendant for severance the court may order the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at trial."

Alonso's Reply at 2.  Further, Alonso explains that

> [t]he 1966 Advisory Committee's Note stated that "a defendant may be prejudiced by the admission in evidence against a co-defendant of a statement or confession made by that co-defendant.  This prejudice cannot be dispelled by cross-examination if the co-defendant does not take the stand.   Limiting instructions to the jury may not in fact erase the prejudice."

Alonso's Reply at 2.  According to Alonso, that "1966 amendment to [rule 14] foreshadowed *Bruton v. United States*, 391 U.S. 123 (1968) which came two years later."  Alonso's Reply at 3.

Alonso next explains:

> In 2002, Crim. P. 14 was again amended.  The 2002 amendment deleted the reference to a defendant's "confession."  The Advisory Committee reported that "the reference to the 'defendant's statement' in the amended rule would fairly embrace any confessions or admissions by a defendant." (emphasis added).  Had the 2002 amendment deleted the word "statement" and kept only the word "confession" the government's argument that severance cannot be based on admissions to persons who are not members of law enforcement might find some limited traction.  Instead the 2002 amendment chose to retain the broader word "statement" while eliminating the more narrow word "confession."  The Advisory Committee Notes should dispel any argument that severance pursuant to Crim. P. 14 can only be founded on "confessions" to law enforcement.

- 102 -

Alonso's Reply at 3.  Accordingly, Alonso asserts "this Court has discretion pursuant to Crim. P.

14 to order severance of Alonso and Troup.  Further, considering the plain language of Crim. P.

14, that Troup's statements were not made to law enforcement does not impinge upon this

Court's discretion."  Alonso's Reply at 3-4.

Alonso next addresses <u>Bruton v. United States</u>, where the Supreme Court held that "it

was constitutional error to admit into evidence the incriminating statement made by [a] co-

defendant . . . which implicated defendant Bruton and that this error is not cured by a limiting

instruction."  Alonso's Reply at 5.  In <u>Bruton v. United States</u>, the Supreme Court was

considering a co-Defendant's "confession to a postal inspector in which he admitted that he and

Bruton had committed the robbery," which the district court admitted pursuant to a limiting

instruction that the jury was not to allow the statement to incriminate Bruton.  Alonso's Reply at

5. Ultimately, the Supreme Court said that

> there are some contexts in which the risk that the jury will not, or cannot, follow
> instructions is so great, and the consequences of failure so vital to the defendant,
> that the practical and human limitations of the jury system cannot be ignored.
> Such a context is presented here, where the powerfully incriminating extrajudicial
> statements of a codefendant, who stands accused side-by-side with the defendant,
> are deliberately spread before the jury in a joint trial.   Not only are the
> incriminations devastating to the defendant but their credibility is inevitably
> suspect . . . .  The unreliability of such evidence is intolerably compounded when
> the alleged accomplice, as here, does not testify and cannot be tested by cross-
> examination.

Alonso's Reply at 5.  Thus, Alonso provides, the Supreme Court concluded that, "[d]espite the

concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay

evidence implicating petitioner, in the context of a joint trial we cannot accept limiting

instructions as an adequate substitute for petitioner's constitutional right of cross-examination."

Alonso's Reply at 6.  Alonso then argues that the Supreme Court's "opinion in *Bruton* did not

rest solely on the Confrontation Clause of the Sixth Amendment," because the Supreme Court

stated:

> If it is a denial of due process to rely on a jury's presumed ability to disregard an
> involuntary confession, it may also be a denial of due process to rely on a jury's
> presumed ability to disregard a codefendant's confession implicating another
> defendant when it is determining that defendant's guilt or innocence.  Indeed, the
> latter task may be an even more difficult one for the jury to perform than the
> former.  Under the New York procedure, which *Jackson* held violated due
> process, the jury was only required to disregard a confession it found to be
> involuntary.  If it made such a finding, then the confession was presumably out of
> the case.  In joint trials, however, when the admissible confession of one
> defendant inculpates another defendant, the confession is never deleted from the
> case and the jury is expected to perform the overwhelming task of considering it
> in determining the guilt or innocence of the declarant and then of ignoring it in
> determining the guilt or innocence of any codefendants of the declarant.  A jury
> cannot segregate evidence into separate intellectual boxes. . . .  It cannot
> determine that a confession is true insofar as it admits that A has committed
> criminal acts with B and at the same time effectively ignore the inevitable
> conclusion that B has committed those same criminal acts with A.

Alonso's Reply at 6-7 (citing Bruton v. United States, 391 U.S. at 130-31)(internal quotation

marks omitted)(discussing Jackson v. Denno, 378 U.S. 368 (1964), where the Supreme Court

held "it is difficult, if not impossible, to prove that a confession which a jury has found to be

involuntary has nevertheless influenced the verdict or that its finding of voluntariness, if this is

the course it took, was affected by the very evidence showing the confession was true," in its

consideration of a New York rule -- that it held violated Due Process -- requiring a jury

determine the voluntariness of a defendant's confession)).  Alonso, accordingly, argues that "the

*Bruton* rule has constitutional underpinnings separate and apart from the Confrontation Clause.

Accordingly, any dilution or diminution of the Sixth Amendment right to confrontation does not

necessarily dilute or diminish the *Bruton* rule."  Alonso's Reply at 7.

Alonso then addresses Bruton v. United States' progeny, first stating that the Bruton v.

United States rule "can be satisfied by redaction."  Alonso's Reply at 8-9 (citing Richardson v.

Marsh, 481 U.S. 200 (1987)).  Alonso notes, however, that "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result."  Alonso's Reply at 9-10 (quoting Gray v. Maryland, 523 U.S. 195 (1997)).  Alonso explains that the Supreme Court

> in *Bruton* made no distinction between statements made to law enforcement officers and statements made to civilians.  Neither did the *Bruton* Court distinguish between statements made during formal interrogation and statements made during casual conversation.  Following *Bruton*, the admission of statements of a co-defendant did not depend on whether the statement was made to law enforcement or a civilian.

Alonso's Reply at 10.  Alonso's discussion of Bruton v. United States' progeny then brought him to Crawford v. Washington, 541 U.S. 36, which "introduced a new paradigm to evaluate the application of the Confrontation Clause to hearsay."  Alonso's Reply at 11.  According to Alonso, "[r]ecently some courts have taken the *Crawford* Court's distinction between testimonial and nontestimonial hearsay as an opportunity to undercut *Bruton*.  The Tenth Circuit's opinion in *United States v. Smalls*, 605 F.3d 765 (10th Cir. 2010), the case upon which the government's Response primarily relies, is an example."  Alonso's Reply at 11.

Alonso then detours his argument to more fully explain to the Court the "impact of *Crawford*," because "[i]t is critical to accurately appreciate precisely what *Crawford* holds and also to recognize what issues *Crawford* does not address" to understand the state of Bruton v. United States in Crawford v. Washington's wake.  Alonso's Reply at 12.  Crawford v. Washington, Alonso argues,

> reversed and overruled *Ohio v. Roberts*.  The Court held that "testimonial statements of witnesses absent for trial" are admissible "only where the declarant is unavailable, and only where the defendant had a prior opportunity to cross-examine [the witness].". . .  The Court noted that "the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than

- 105 -

a substantive guarantee.  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."

Alonso's Reply at 13-14 (quoting Crawford v. Washington, 541 U.S. at 59 (discussing Ohio v. Roberts, 448 U.S. 56 (1980)(creating a two-part test to admit hearsay without running afoul of the Sixth Amendment: (1) establish that the declarant is unavailable, and (2) prove that the statement bears adequate indicia of reliability))).  Alonso then asserts that the Supreme Court, in Crawford v. Washington,

> did not provide a definition to differentiate "testimonial" from "non-testimonial" hearsay.  The Court noted that "various formulations" or "articulations" or "definitions" of "testimonial" could be posited; however, apart from citing examples of statements that would qualify as testimonial under any definition, the Court specifically declined to undertake crafting a controlling definition of testimonial.

Alonso's Reply at 14.

Accordingly, Alonso explains that, "[f]ollowing *Crawford*, the Court has provided little clarity to distinguish testimonial from non-testimonial hearsay."  Alonso's Reply at 14.  Alonso concedes, however: "In the companion cases of *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813 (2006), the Court explored the meaning of 'testimonial.'  The Court ruled that statements are non-testimonial when made under circumstances indicating that the primary purpose of the statement is to meet an 'ongoing emergency.'"  Alonso's Reply at 14.  Further, Alonso argues, the Supreme Court divulged in those cases that,

> on the other hand, statements are testimonial when the circumstances indicate that there is no ongoing emergency and the purpose is to establish or prove past events. . . .  In providing this definition the Court explicitly acknowledge that the definition was intended to have limited application.  The Court stated "without attempting to produce an exhaustive classification of all conceivable statements -- or even all conceivable statements in response to police interrogations -- as either testimonial or nontestimonial, [its definition] suffices to decide the present case.".
> . .  Importantly, the Court seems to implicitly recognize that some statements may be testimonial even if the statement is not in response to police interrogation.

Alonso's Reply at 14-15.  Specifically, Alonso provides:

> In *Davis*, the hearsay statements were made by a domestic dispute victim to a 911 operator in the context of an "ongoing emergency." . . . .  The Court found that the statements in *Davis* were made during an "ongoing emergency" in which the declarant was "speaking about events as they were actually happening, rather than describing past events.". . .  Accordingly, the statements in *Davis* were non- testimonial.

> In <u>*Hammon*</u> the hearsay statements were also made by a victim of a domestic dispute but, unlike *Davis*, not in the context of an "ongoing emergency" but rather as part of an investigation into "what happened.". . .  In *Hammon*, although the statements at issue were made within minutes of the crime, the Court found that there was no ongoing emergency and the declarant was describing what happened instead of "what was happening."   Hence, the statements were testimonial.

Alonso's Reply at 15 (quoting <u>Davis v. Washington</u>, 547 U.S. 813, 817, 827 (2006); <u>Hammon v. Indiana</u>, 547 U.S. at 819-20).   Alonso thus argues that the Court "should guard against the invitation to draw the line between testimonial and nontestimonial hearsay based on whether the statement was made to law enforcement or a civilian."  Alonso's Reply at 16.  Regarding <u>Davis v. Washington</u> specifically, Alonso suggests that "the Court indicated that its opinion was focused on 'interrogations' by law enforcement officers, and thus it was 'unnecessary to consider whether and when statement made to someone other than law enforcement personnel are "testimonial. ""'  Alonso's Reply at 16.  Alonso argues, however, that "[t]he *Davis* Court did . . . cite as authority decisions suggesting that statements made to civilians may be testimonial and thus subject to Confrontation Clause limitations."   Alonso's Reply at 16.   Indeed, Alonso provides:

> Recently in *Ohio v. Clark*, __ U.S. __, 135 S.Ct. 2173 (2015), the Court held that statements by a three-year-old boy to his preschool teacher implicating his stepfather as an abuser were not testimonial.  The Court, however, declined to hold that statements to civilians can never be testimonial.  The Court stated that "[b]ecause at least some statements to individuals who are not law enforcement

DNM 720

officers could conceivably raise confrontation concerns, we decline to adopt a categorical rule excluding them from the Sixth Amendment's reach.

Alonso's Reply at 16-17.   Returning, then, to Crawford v. Washington, Alonso argues that "[a]ccepting, as we must, the Court's conclusion that the "primary object" of the Framer's concern in crafting the Sixth Amendment was testimonial hearsay, does not mean that testimonial hearsay was the Framer's sole or only concern.   Primary and sole are not synonymous."  Alonso's Reply at 17.  Alonso thus explains that the Supreme Court "observed that '[A]ccomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule.'"  Alonso's Reply at 18 (quoting Crawford v. Washington, 541 U.S. at 54 (citing Lilly v. Virginia, 527 U.S. 116, 134 (1999)).

Alonso then concedes that "the Court, first in Davis/Hammon and subsequently in Whorton v. Bocking, 549 U.S. 406 (2006), did suggest that the Confrontation Clause is only concerned with testimonial hearsay.  However, neither of Davis/Hammon nor Whorton involved joint jury trials or even cited Bruton or the Bruton line of cases."  Alonso's Reply at 18.  Alonso explains that

> Whorton v. Bocking dealt with the narrow issue of whether Crawford was retroactive under the rules of Teague v. Lane, 489 U.S. 288 (1989).  Those who would expand the holding to Crawford to abolish Bruton have seized on the Court's comment in Whorton that "under Crawford, . . . the Confrontation Clause has no application to [nontestimonial statements] and therefore permits their admission even if they lack indicia of reliability.". . .  Given the extremely narrow issue in Whorton, i.e. whether Crawford is retroactive, this statement is dicta.

Alonso's Reply at 18 (quoting Whorton v. Bocking, 549 U.S. at 420).  Alonso argues:

> In Crawford, the Supreme Court held that testimonial statements are inadmissible against a criminal defendant unless the declarant is unavailable and the defendant has had "a prior opportunity for cross-examination."  Crawford, 549 U.S. at 68.  This is not a repudiation of Bruton.  In Whorton, the Supreme Court simply held that the rule announced in Crawford did not apply retroactively.  Whorton, 549 U.S. at 421.  This also is not a repudiation of Bruton.  Neither Crawford nor Whorton considered the applicability of Bruton to non-testimonial statements of

co-defendants, and neither case imposed a bar to the applicability of the Confrontation Clause to non-testimonial statements in general.

Alonso's reply at 19.  Alonso thus asserts that "in *Whorton* we learn that *Crawford* had nothing to do with Due Process.   Accordingly, *Crawford* left the Due Process analysis of *Bruton* undisturbed.  Due Process as a basis for *Bruton*, separate and apart from the Sixth Amendment Confrontation Clause, was untouched by *Crawford* and therefore *Bruton* survives *Crawford*." Alonso's Reply at 20.

Alonso next addresses the possibility that, "[i]f, as the government argues, the admissibility of Troup's statements is not circumscribed by the Constitution, then, according to the government's theory, admissibility is determined solely by reference to the rules of evidence."  Alonso's Reply at 20.  In that respect, the Supreme Court, Alonso argues, has held that "a co-defendant's confession is not admissible against a fellow defendant."  Alonso's Reply at 20.  Indeed, Alonso provides:

> In *Lee*, 476 U.S. at 541 the Court stated, "the Court has spoken with one voice in declaring presumptively unreliable accomplices' confessions which incriminate defendants."  In fifty years of interpreting *Bruton* the Court has never departed from this rule.   The *Bruton* line of cases rather address whether particular remedial measures (limiting instructions and redactions) ameliorate the error occasioned by the improper introduction of a co-defendant's statement.

Alonso's Reply at 21.  Alonso concludes:

> Synthesizing Crawford and its progeny with F.R.E. 804(b)(3) supports the conclusion that Troup's statements are in fact testimonial.  For example, *Davis* suggested that statements are testimonial when the purpose is "to establish past events potentially relevant to later criminal prosecution."  *Davis*, 547 U.S. at 822. F.R.E. 804(b)(3) is an exception to the hearsay rule that applies when the statement "at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."  The overlap between the *Davis* formulation of testimonial and Rule 804(b)(3) is apparent.   If a statement does indeed "subject the declarant to criminal liability" then by necessity it is "potentially relevant to later criminal prosecution."   To make out the evidentiary foundation necessary for admission under F.R.E. 804(b)(3) will

- 109 -

concomitantly satisfy the *Davis* articulation of what it means for a statement to be testimonial.

Alonso's Reply at 21-22.  Further, Alonso concedes that

> *Smalls* operates as binding precedent upon the Court.  Nonetheless, the Supreme Court has yet to define the precise contours of the definition of testimonial statements.  Nor, has any Supreme Court decision called into question or stated that Crawford in any way limits the *Bruton* rule.  To the contrary, the *Crawford* opinion cites *Bruton* with approval indicating that it is an example of the Supreme Court upholding core Sixth Amendment confrontation clause principles.

Alonso's Reply at 22.  Ultimately, Alonso argues:

> It is [his] position that Troup's statements implicating the defendant will ultimately be found to be within the broader class of testimonial statements as described in *Crawford*.  Moreover, the defense maintains that the *Bruton* rule remains as an independent component of the Sixth Amendment's Confrontation Clause protections.  The special concerns raised by a co-defendant statement implicating the defendant reaching the jury without testing by adversarial cross-examination would require exclusion even if it did not somehow technically fall within the range of testimonial statements.  These concerns were laid out in *Bruton* and re-emphasized in *Crawford*.  Troup's statements are not recorded or written.  The supposed hearers of Troup's statements presumably are cooperating government witnesses.  There is no practical and reliable way to redact the contents.  Thus, severance is the appropriate remedy.  Although it would not fully cure the problem, in the absence of severance, the defendant would request that the Court order redaction.

Alonso's Reply at 23.

### 22.   The May 9, 2017, Hearing.

At the May 9, 2017, hearing, the Court severed the Second Superseding Indictment into

two trial groupings.  See Transcript of Hearing at 28:18-29:2 (taken May 9, 2017)(Court)("May

Tr.").[10]   One of the trial groupings that the Court created is Counts 1-5, and Counts 13-16; the

other grouping Counts 6-12.  See May Tr. at 28:18-29:2 (Court).  The Court welcomed, however,

further argument regarding severance as well as argument regarding which trial grouping would

---

[10]The Court's citations to the transcript of the hearing refers to the court reporters original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

go first.  See May Tr. at 29:3-30:7 (Court).  The Court quickly resolved that issue, as Perez -- the

only Defendant in the Counts 6-12 grouping who was opposed to a continuance of the July 10,

2017, trial date -- agreed to the continuance in light of the Court's severance order.  See May Tr.

at 32:20-33:6 (Villa).  Accordingly, the pieces fell into place for the Counts 1-5 and 13-16 trial

grouping going first, because Gonzales -- the only Defendant in that grouping opposed to a

continuance of the July 10, 2017, trial date -- maintained his refusal to consent to a continuance.

See May Tr. at 33:23-34:9 (Court); 37:1-22 (Johnson).  The Court then allowed Gonzales to

argue Gonzales' Amended Motion to Sever, beginning the hearing in earnest.  See May Tr. at

37:25-38:6 (Court).

> Gonzales argued:

> The problem respectfully with grouping counts 13 through 16 with Count 1
> through 5 is that what you have is you have evidence that's going to come in in
> counts one through five that would otherwise not be admissible in counts 13
> through 16.  And here's what's more important, Your Honor is that when you
> look at the dates of the incidents, for example Count 1.  Mr. Gonzales was 11
> years old when Count 1 occurred.  Counts one through five involved homicides in
> a prison setting.  Validated SNM members, Mr. Santos Gonzales is neither an
> SNM member nor an associate.  That's our position.

May Tr. at 38:1-19 (Johnson).  The Court responded that "I [] understand, and this is something

I'll say, I can't assume anybody's case, you know, I know what your argument is, but I can't

assume Government's case, I can't assume your case.  When I'm mak[ing] necessary decisions I

just have to assume they're disputed, right?"  May Tr. at 38:21-39:1 (Court).  Gonzales argued

that he understood the Court's position and that, at this stage, the Court is engaged in a facial

challenge to the indictment in the context of his motion to sever, but that

> the Government needs to prove [] that Number 1 [] at the time the offense was
> committed that an enterprise affecting interstate commerce existed and the
> problem with going to trial [on Counts] one through five with counts 13 . . .
> through 16 [is counts 13-16] post-date the original waive [of] indictments in this
> case.  Now, essentially the SNM was dismantled in December of 2015.  So you

- 111 -

> have counts 14 through 16 occurring in February of 2016. So you have evidence
> or if you look at the indictment itself, since you're limited to the facial, to the
> information in the indictment, the SNM was allegedly started sometime in the
> 1980s, you have incidents or crimes occurring in 2001, 2007, as charged in counts
> one through five. . . . These all predate the effective dismantling of the SNM with
> the first waive of indictments in December of 2015. So then we get February of
> 2016, when by the Government's even own admission the SNM had been
> essentially dismantled. So then what you're going to have is this prejudicial
> evidence from counts one through five when the SNM was allegedly still active
> and had not yet been dism[antled] and that's going to spill over and prejudice the
> defendants in counts 14 through 16, because these counts occurred after the SNM
> had been dismantled and that is obvious and evident from the face of the
> indictment and secondly, Your Honor, the Government needs to prove that the
> enterprise at the time that the incident occurred was engaging in racketeering
> activity. So I would submit to the Court, Your Honor, that the evidence that
> would be admitted in counts one through five would result in substantial prejudice
> as to Mr. Gonzales, because effectively there was no SNM or had been
> dismantled by the Government by December of 2015, so I would respectfully
> submit Your Honor that actually counts 14 through 16 should be tried separately
> because of this very dangerous issue that you're going to have, the Government
> wants counts through five tried with counts 14 through 16. Because 14 through
> 16 suffer from tremendous fatal deficien[cies] one of those as I mentioned begins
> that there was no enterprise.

May Tr. at 39:6-40:24 (Johnson). Gonzales also argued to the Court that his assertion of his

Speedy Trial rights, and refusal to consent to a continuance, was pitting his speedy trial rights

against co-Defendants' effective assistance of counsel rights, because the Defendants named in

Counts 1-5 "simply are not ready" to try their case in July considering the more complex nature

of those murder Counts. May Tr. at 41:22-43:25 (Johnson). The Court then indicated that

splitting up the trials any further would probably be breaking up the Second Superseding

Indictment up too much and that the cases Gonzales cited where the trial courts sliced up multi-

defendant indictments into very small groupings were not persuasive. See May Tr. at 43:1-3

(Court). Gonzales nevertheless persisted, arguing that

> I would submit that the evidence that is before the Court here actually necessitates
> [sever]ing counts 13 through 16 primarily because you're going to have
> introduction of evidence from 2001, 2012, 2007 when the SNM [had] not been

dismantled which would not be admissible in counts 13 through 16. So I would on behalf plaintiff . . . ask that the Court [se]ver 13 through 16.

May Tr. at 43:4-12 (Johnson). The Court noted Gonzales' argument, but stated:

I think it's premature for me to decide what evidence is coming in and not. I know a lot of people argued <u>Bruton</u> problems and things like that, but the Government, I [have] opinions out there they can see what I do with [<u>Bruton</u>]. They've got to make a calculation . . . whether they'll get their evidence [in] but I thin[k] [it is] a little early for me to say this is in and that's out.

May Tr. at 43:17-25 (Court).

J. Gallegos then argued that, should the Court consider further severance of the Second Superseding Indictment, he would not be opposed to being tried twice, because if the Court severed Counts 1-5 from 13-16, he would be the only Defendant in that position. <u>See</u> May Tr. at 45:8-46:12 (Benjamin). J. Gallegos also argued that the Court should not be allowing the United States to make decisions as to what should be admitted, suggesting that the Court had stated as much. <u>See</u> May Tr. at 46:5-12 (Benjamin). The Court stopped J. Gallegos, and stated:

No, that's not what I'm saying at all. I'm saying that right now they, they're over here opposing continu[ances], agreeing to continu[ances,] opposing severance, agreeing to certain things, y'all are making some arguments like <u>Bruton</u> arguments. Ms. Johnson did say this evidence is inadmissible. I can't make those fine-tooth [determinations]. This is not a motion in limine. So when in they're making their positions over here and they're taking their positions, they've got to make a decision for themselves, not for the Court, for themselves as to whether they can get evidence in. So that's all I'm doing. I'm kind of. It's a warning to them, not to you, it's a warning to them that if they're going to sit here and oppose [severances] and things like that, they better thin[k] about their evidence. I can't make a determination at this point whether certain evidence is going to be admissible or not. So they're not going to determine the evidence in the case, I am. But they've got make professional judgments as they oppose motions to sever.

May Tr. at 46:13-47:9 (Court).

B. Garcia then argued in favor of Gonzales' Motion to Sever, because

if you deny that motion for severance, what I think effectively happens is that we place Santos Gonzalez's right to a speed[y] trial[,] we elevate that above the right

for a fair trial to all of the counts one through five defendants. Those are the oldest cases Your Honor. I represent Billy [Garcia,] Billy is charged in counts one and two [and] those counts occurred in 2001. It's incredibly more difficult to investigate a 2001 murder than . . . a 2007, 2012, or the incidents that occurred just a couple of years ago. So I think if it's not severed, then what I think what we are telling all of the other defendants, the Billy Garcias, the Alan Pattersons, the Edward Troups who are charged in Counts 1 and 2 that they're right to a fair trial is less important than Santos Gonzalez's right to a speedy trial.

May Tr. at 48:6-22 (Cooper). B. Garcia then reiterated that he is "not anywhere close to being ready," so I think the only way to save that time, Judge, is to sever the Santos Gonzales matter, give him his right to a Speedy Trial." May Tr. at 49:25-50:2 (Cooper). Troup then addressed the Court and noted that he had intended to have a university professor, who had submitted an affidavit attached to Troup's Motion to Sever in favor of severance in this matter, testify before the Court to make a complete record on his motion. See May Tr. at 51:5-12 (Burke). The Court indicated that it had every intention of keeping an open mind as it heard argument regarding Troup's Motion to Sever, and testimony from whomever, and also that it had read and understood the Lieberman Decl., but that it was hearing argument on Gonzales' Motion to Sever at the present time. See May Tr. at 51:23-52:2 (Court).

The United States argued next and maintained that it would prefer the Court keep the trial together. See May Tr. at 53:1-2 (Castellano). Specifically regarding Gonzales' Motion to Sever, the United States explained:

Everyone points to the face of the indictment indicating that these are se[perate] acts but if you look at the face of the indictment what it establishes is one of the elements that we would have to prove at trial and that's the ongoing nature of the enterprise. If you have an . . . enterprise there is a requirement to show the ongoing nature of the enterprise. So if the SNM started in approximately 1980 and exists until today that's evidence we would have to prove. I disagree with Ms. Johnson that arresting . . . members of the SNM [dismantled the enterprise]. . . . I mean this case [is] a per[fect] example of that[,] we have a number of murders that occurred in prison and I think a number of the defendants would disagree with the fact that the [SNM] is now at an end. So arresting and imprisoning members of the SNM does not dismantle the enterprise. There is an

- 114 -

SNM in the state system and also a[n] SNM in the federal system. So this doesn't put an end to anything at this point.

May Tr. at 53:21-54:15 (Castellano). The United States reiterated that it was prepared to prove at trial that this is an ongoing enterprise, and agreed with the Court that "in terms of judicial economy two trials is better than three. It is the same evidence." May Tr. at 54:19-55:9 (Castellano). Regarding Bruton v. United States, the United States agreed with the Court that the evidentiary issues are not ripe for a determination and that, specifically, as it pertains to co-Defendants' statements, the United States has experience redacting such statements to avoid a Bruton v. United States problem at the trial. See May Tr. at 55:10-56:21 (Castellano, Court). Indeed, the United States indicated that, as it relates to Bruton v. United States, and its attempt to introduce evidence of co-Defendants' statements, proceeding in a joint trial as it intends is done "at our own peril, Your Honor. We get that." May Tr. at 57:3-4 (Castellano).

Gonzales then addressed the Bruton v. United States issue, and the Court stated: "It sounds like the Government is willing to run the risk that you may be right on this Bruton problem and I may keep this evidence out and they still want to try the cases to[gether] rather than separate." May Tr. at 58:24-59:3 (Court). Gonzales disagreed, and argued:

> I would submit to the Court that . . . clearly Ms. Gutierrez made statements [--] post arrest statements [--] that implicate Mr. Gonzales. Essentially her statements put Mr. Gonzales at the scene of a crime [and] those are clearly in[culpatory] statements that raise a Bruton issue if we're tried with Ms. Gutierrez. Ms. [Rodriguez] also implicated Mr. Gonzales, not just what one co-defendant said during the alleged commission of the crime but simply you have these defendants making post arrest statements to the Government about what each co-defendant allegedly did. And Your Honor, I would submit to the Court that simply redacting, cutting out Mr. Gonzales' name is going to, is not going to cure the problem.

May Tr. at 59:4-18 (Johnson).  Gonzales also represented to the Court that he was ready for trial,

and that he was not making a misrepresentation about that fact.  <u>See</u> May Tr. at 61:32-62:2

(Johnson, Court).  At this point, the Court explained:

> [I] have thought long and hard about the motion to sever that I expected [Erlinda
> Johnson, Gonzales' counsel] to renew today.  I wanted to get a feel for what
> people had to say after I made the order of [severance and] I wanted to see if the
> Government, after I severed this way what their position would be[.]  [When I]
> really focus [on] what I think is one of the main things is when I turn to this jury
> and start instructing this jury, when they can compartmentalize the evidence, and I
> think on Ms. Johnson's client that they can.  They can compartmental[ize and] I
> think it's going to be reduced.  I know there [are] going to be some evidentiary
> issues, I don't minimize those in any way and we're going to have to work
> through authorization but I think as far as giving Ms. Johnson her client a fair
> trial, I think I have gone a long ways toward doing that, and so I'm not inclined to
> grant the . . . motion to sever.  Down [the] road if it pops up and Government
> starts looking at its evidence and wants to rethink[], we can certainly look at it . . .
> but I think at the present time [the] severance that's been granted is going to solve
> a lot of the problems for Ms. Johnson and Mr. Go[nzales], and so I'm not inclined
> to grant it.

May Tr. at 62:7-63:7 (Court).  The Court also stated that

> when Ms. Johnson stands up and says Mr. Gonzales is not part of the SNM gang,
> I'm not in a position to say one way or [the other] but it concerns me that I need
> to get her case to a trial.  [But] I'm not inclined to give a de facto severance [for]
> the reasons I've already stated.  So I'm going to deny the request.

May Tr. at 82:13-19 (Court).

In relevant part, the Court next addressed Alonso's Motion to Sever.  <u>See</u> Transcript of

Hearing at 48:2, taken May 10, 2017 (Chambers)("2 May Tr.").[11]  Alonso suggested that "the

severance motion has largely been decided," and that he understands

> that [the Court] even said that some dead [horses] deserve to be beat and this is
> one that does but I'm not going to do it.  I think that the severance issue is going
> to continue to come up.  But I'm not going to [waste] your time today arguing
> things you've already read and thought about and ruled on.

---

[11]The May 9, 2017, hearing continued into May 10, 2017.  The Court's citations to the
transcript of the hearing refers to the court reporter's original, unedited version.  Any final
transcript may contain slightly different page and/or line numbers.

DNM 729

2 May Tr. at 48:2-11 (Chambers).  Alonso wished to argue in depth <u>Bruton v. United States</u>,

because

> I heard Your Honor yesterday say that in your experience that most <u>Bruton</u> issues can [b]e cured with some scissors and white out[.]  I well, let me say it a little bit differently.  I have had success, I can't speak for the entire body of law whether every <u>Bruton</u> problem can be solved that way but you just work hard at it.  And generally my experience has been that Ibuprofen [is] able to solve the problem.  If you can't solve it . . . [t]he evidence doesn't com[e in.]

2 May Tr. at 48:16-49:2 (Chambers).  The Court agreed, stating "[t]hat's the reason I warned the

Government that you know they've got to start staring at this stuff.  This is pretty serious[.]

[M]y experience has been though that we usually can massage the things[,] but I can't speak for

the body of <u>Bruton</u> issues out there."  2 May Tr. at 49:3-7 (Court).  Alonso agreed, but explained

that

> many B[ruton] issues can be resolved with proper redaction and the Government even acknowledges as much in their response.  It's a little more dicey in this case than in some other cases.  Frequently the [<u>Bruton</u>] issue involves perhaps a written statement of a co-defendant which can be edited, consistent with . . . the rules. . . .  [I]t's a little trickier though when you're dealing here with confidential informants who will probably just be testifying as to what someone told them.  They are, you are, near relying on the informant to make the necessary re[daction].

2 May Tr. at 49:10-23 (Chambers).  Alonso then explained that, here,

> the fact that these <u>Bruton</u> issues arise in the context of statements made to Government informants leads me then to another part of the discussion.  And that is the Government takes the position the statements made to Government informants are beyond the reach of <u>Bruton</u>.  And they take the position that <u>Bruton</u> only applies to statements made to law enforcement officers.

2 May Tr. at 49:25-50:8 (Chambers).  The Court indicated that it was inclined to agree with

Alonso, saying: "I'm not sure I see that distinction so maybe I can be educated on it but I have

not thought <u>Bruton</u> drew that distinction.  That's a <u>Crawford</u> type issue.  That's not really a

<u>Bruton</u> type issue, I'm not sure I draw that distinction."  2 May Tr. at 50:18-23 (Court).  Alonso

- 117 -

argued that the Court was "very wise the[n]. . . .  <u>Bruton</u> doesn't draw that distinction.  <u>Bruton</u> makes no distinction whatsoever between s[tatements to] law enforcement officers or to civilians."  2 May Tr. at 50:23-51:3 (Chambers).  The Court surmised that maybe

> what they're getting into and I thought about this earlier there may be a hearsay problem with you know the statements in the first place but that's an initial problem rather than a <u>Bruton</u> problem[.]  [Y]ou've always got a hearsay problem when you've got a <u>Bruton</u> problem but those are two different testimony decision[s] . . . .  [M]aybe they're  anticipating that it doesn't have a <u>Crawford</u> issue . . . .  I mean I guess that's one of the things we're going to have to determine  is  whether  these  cooperators['] statements  that  the  cooperators  are picking up are those <u>Crawford</u> hearsay problems.

2 May Tr. at 51:4-21 (Court).  Alonso agreed, acknowledging that "<u>Crawford</u> created in some people's minds issues as to the continued vitality of <u>Bruton</u>."  2 May Tr. at 52:2-5 (Chambers).  Alonso maintained, however, that some statements which are made to persons not in law enforcement can still come within the purview of the Confrontation Clause, primarily because

> <u>Crawford</u> was certainly a Sixth Amendment confrontation clause case but that's not all it was.  <u>Crawford</u> does not rest solely on the confrontation [clause] it also has due process . . . [and] the constitutional underpinnings of <u>Bruton</u> are not sole[ly] [the] confrontation clause or . . .  it's also due process so . . . to the extent that <u>Crawford</u> is a [confrontation] clause [case and] impacted the foundations of <u>Bruton</u>, it didn't touch the due process foundations of <u>Bruton</u>.

2 May Tr. at 52:16-53:3 (Chambers).  Further, Alonso argued,

> <u>Bruton</u> doesn't draw a distinction between statements of law enforcement or civilians or statements made during formal interviews or during casual conversation it simply doesn't draw that distinction and what's important is to remember the history of <u>Bruton</u>, <u>Bruton</u> was decided two years after rule 14 was amended  . . . and . . . the advisory committee notes to rule 14 . . . also draw[] no distinction between statements to law enforcement and statements to anybody else.  There is no distinctions drawn in rule 14.

2 May Tr. at 53:4-14 (Chambers).  Alonso also alerted the Court to the recent case "<u>Ohio v. Clark</u> . . . [,] [where the Supreme Court] specifically said that at least some statements made to

individuals who are not law enforcement could come within the confrontation clause."  2 May Tr. at 54:14-16 (Chambers).

Alonso then addressed the "Tenth Circuit [and] this opinion of theirs in <u>Smalls</u> . . . [which] is wrongly decided but of course I understand that you are obliged to follow it, even if it's wrong."  2 May Tr. at 54:16-23 (Chambers).  Alonso explained, however, that "<u>Smalls</u> leaves undisturbed Rule 14 and the Court's discretion under Rule 14 to take appropriate remedial steps," and

> I think it's when you consider the Government's argument and indeed the Tenth Circuit's interpretation of <u>Bruton</u> and <u>Crawford</u>, the results adopting that particular interpretation are stunning.  If you -- if <u>Smalls</u> is the law, and if the Tenth Circuit's reading of <u>Crawford</u> and <u>Bruton</u> is correct, then it is possible for a defendant to be convicted entirely through unconfronted hearsay.  It's possible under the Government's argument.

2 May Tr. at 54:23-55:9 (Chambers).  The Court was not so sure, positing that

> before you run it through the <u>Crawford</u> -- though, and even an expanded <u>Crawford</u> and <u>Bruton</u>, you still have to go through first the hurdle of the hearsay right?  I mean, if it's blocked by the hearsay rules, it's not coming in . . . so when you say that they would be convicted entirely on hearsay -- well, that's not possible, right?

2 May Tr. at 55:12-21 (Court).  Alonso disagreed, arguing that, "under <u>Smalls</u>," that is possible, because "<u>Smalls</u> said that a statement made by a co-defendant to an informant is admissible against a co-defendant because it's nontestimonial."  2 May Tr. at 55:25-56:3 (Chambers).  The Court was hesitant and suggested that the co-Defendant's statement "has to satisfy some hearsay exception or be nonhearsay before we even get to the constitutional issue."  2 May Tr. at 56:5-7 (Court).  Alonso provided:

> Well, the hearsay exception that would be relied upon is statement against penal interests  . . . but <u>Smalls</u> doesn't say that.  <u>Smalls</u> says it's coming in against everybody . . . and that's frightening, because could you be, a defendant could be convicted based entirely on unconfronted [hearsay] and here's how [that wor]ks Your Honor, you've got three guys who get arrested for mu[rder] and they get placed in separate cells.  And they all talk to their cell ma[te], and during those

conversations they implicate a fourth person.  Under <u>Smalls</u>, and under the
Government's interpretation of <u>Crawford</u> and <u>Bruton</u>, that fourth person could be
convicted based on the testimony of the three cell mates.  Based on the testimony
of people who know nothing at all about the case except what a co-defendant told
them.  That fourth person could be convicted without any ability to cross-
examination a witness who has personal knowledge of the defendants' own
conduct.  That's what <u>Smalls</u> says.  And that is scary.  That, but that's what
<u>Smalls</u> says and that's what the Government is arguing, and we're going to have
to [wrestle] with these <u>Bruton</u> issues at some point, and maybe I'm jumping the
gun here.

2 May Tr. at 56:8-57:8 (Chambers).  The Court asked Alonso:

Well, do you think that the briefing that is supplied is robust enough for me to
make those rulings at this point?  Or is it [] I mean, my [impression] was that it
was more general, and that everybody was flagging this as a reason why I should
[sever], but it wasn't robust in the sense like I would see with a motion in limine,
where I'm really got to sit down and decide whether evidence is coming in or not.
What's your thoughts about the state of the record?"

2 May Tr. at 57:9-18 (Court).  Alonso stated that the Court was in possession of the "reports that

deal with the statements that I believe implicate [<u>Bruton</u>]" and that if "Your Honor believes that

you need to actually hear from the informants to testify what the declarant said, then I suppose

we can do tha[t]."  2 May Tr. at 57:18-58:1 (Chambers).  The Court indicated it did not think that

testimony

was probably necessary . . . .  But I do have to exactly know, I've got to know
what the statements are precisely.  There can't be any fudging on it, because like I
said, if we're cutting and pa[sting] and redacting and leading it's got to be
pinpoint.  And then I've got to know what the Government i[]s relying on with the
two step process, and maybe even three step here to get the evidence in.  So I'm
not sure I need the witness as long as there is precision about the statement that's
coming in.

2 May Tr. at 58:2-11 (Court).

B. Garcia then argued about "<u>Bruton</u> and <u>Crawford</u>," and stated that when Alonso argued

he

talked about the concept that there was perhaps a due process layer for the
analysis the Court needs to undertake[] and if we read <u>Bruton</u> and we read <u>Lee</u> []

- 120 -

and Lilly, at the basis of all of those decision[s], even though they're in confrontation clause terms, they're really talking about the reliability and the fairness involved in the introduction of certain categories of statements and in Lee and in Lilly and prior to Crawford, these statements were historically considered unreliable; that is statements by informants in jail houses. Now, when the Smalls decision was undertaken it was in 2000, I believe. Since 2000, the United States Supreme Court . . . has actually veered in its decision and suggested perhaps there is a [due] process concept here that we need to look at. I would point to the Melendez-Diaz v. Massachusetts case in 2009. . . and in that decision the Supreme Court stated that the Sixth Amendment cont[em]plates two class[es] of witnesses, those against the defendant and those in favor. The prosecution must produce the former. The defendant may call the latter. There is not a third category of witnesses helpful for the prosecution, but somehow immune from confrontation, so the Supreme Court is saying that . . . the prosecution's position that there is a category of witnesses against the defendant that do not need to be confro[nted] [--] Melendez-Diaz rejected that. [T]hey also quoted, we're talking about Thomas' . . . concurrence in part and dissent in part in the Davis decision. But his concurrence specifically stated that the confrontation clause also reaches and prohibits prosecutorial use of technically informal statements when used by the prosecution to evade the confrontation clause.

2 May Tr. at 59:11-60:22 (Castle). B. Garcia continued:

Now, what I'm suggesting and obviously I'm not arguing [Alonso's] motion. But I think since, what's on the table here, essentially is some ideas about whether, how the Court should deal with what we[]re traditionally considered Bruton statements is that the Court would need to undertake not just a hearsay analysis and a strict confrontation clause analysis but also a due process [analysis] . . . [like] where the Court [considers] voluntariness of statements, identifications made [at a] a crime scene[,] [or] the admissibility of expert testimony in areas that have not been, that are novel. In all these instances, the Court [] under[]takes it's due process role to make sure that unreliable evidence doesn't come before the jur[y] and so all I'm suggest[ing] here is that the Supreme Court seems to be moving this direction away from the Smalls strict analysis [which arose] probably because it was close in time after Crawford, and that, and I don't think Smalls, I haven't read in it a while[,] says that there isn't a due process layer that needs be reviewed, and so I think the suggestion . . . may have been by Mr. Chambers that the Court might need to take a look at these statements is a good one because perhaps within the statements the Court can see its reliable. Now, I understand that sounds a lot like Ohio v. Roberts the old standard, but there seems to be . . . a movement back away from the simple concept, is it testimonial or not. And I can't read Melendez-Diaz in any other way than when they said that the confrontation right applies to statements against a defendant.

2 May Tr. at 60:23-62:4 (Castle).

The United States then argued and ultimately stated Alonso "is upset that we're relying on the Smalls case, but the Smalls case is the law of the Circuit and he acknowledges as much in his reply to our response. So the real question is whether or not the Court is willing to overturn Tenth Circuit precedent." 2 May Tr. at 62:18-23 (Castellano). The Court, of course, is not willing to overturn the Tenth Circuit, but instead asked the United States if it sees "anything that in the Supreme Court law since Smalls [--] because it's getting a little bit down the pike [--] that would call into question what the Tenth Circuit did in Smalls." 2 May Tr. at 63:2-5 (Court). The Court also suggested that, "whe[n] the Tenth Circuit first came out with their interpretation of Crawford, they didn't quite nail it. And they had to backtrack from that with subsequent Tenth Circuit opinions is my impression." 2 May Tr. at 63:9-13 (Court). The United States responded by stating:

> [L]et's focus on the statements at issue here for starters. Okay, so this is page 11 of our response and it states that Troup, defendant Troup . . . confessed . . . [w]hen I say confessed it's not to law enforcement it's to another inmate. Troup [confesses] to . . . being a part of two murders in which two people were strangled to death at the southern New Mexico correctional facility at Las Cruces New Mexico. Troup stated that during one of the murders he held F.S.[] at least while the defendant Mr. [Alonso] strangled him to death [with a draw string]. . . . [T]he next is Troup bragged about being a part of the murder [of] F.S. and [said] that the defendant [Alonso] was ordered to kill F.S. [T]he other statement . . . was in 2001 Edward Troup admitted to the CHS that he and [Alonso] . . . had killed F.S. so you can see why it's of concern to Mr. Alonso. Because when you make statements to someone in prison like this, it's nontestimonial, meaning you don't expect this statement to show up in court some day, like you would a confession to law enforcement.

2 May Tr. at 63:16-64:12 (Castellano). The United States then reiterated that Troup made his statements to random prisoners, who were not

> at the time . . . cooperating with anybody. It was talk amongst gang members. So at that time they had no incentives, they were not being paid, nothing of the sort. So, once again there was no expectation that these admissions would come into Court someday. So, once they're nontestimonial, they're outside of Crawford. So we're not talking about Crawford, we're not talking about Bruton.

- 122 -

2 May Tr. at 64:17-25 (Castellano).  The Court was not convinced, and indicated "[t]hat's the leap I'm struggling with . . . why [are] we not talking about Bruton?"  2 May Tr. at 65:1-2 (Court).  The United States responded: "Because Bruton refers to the right to the confrontation where [a] confession was made to a[] Government agent and introduced at a joint trial.  So that is . . . testimonial." 2 May Tr. at 65:3-6 (Castellano).  The Court conceded that such was "certainly the factual situation of Bruton," but pressed the United States whether it could really limit the language in that fashion.  2 May Tr. at 65:7-9 (Court).  The United States argued:

> Not to our facts, because this is a statement against interests that falls under rule 804.  [H]earsay statements against interests are inherently reliable traditionally because those are statements you don't make unless they're believed to be true. Well, they fall outside of hearsay, they fall outside of Bruton because once again we're not talk building testimonial statements here we're talking about nontestimonial.

2 May Tr. at 65:10-19 (Castellano).  The Court further pressed the United States, stating that, although "the hearsay statement is easily satisfied if you have the witness who heard it . . . on the stand," "[b]ut that doesn't get us . . . that doesn't solve the Bruton problem, right?"  2 May Tr. at 65:23-66:3 (Court).  The United States maintained:

> I don't think we're in Bruton, Your Honor.  Because those are testimonial statements, traditionally testimonial statements because they're given to law enforcement and once we give statements to law enforcement we expect them to show up in Court against you so it's testimonial in that way.  Under these circumstances, Smalls tells us that if I murder somebody with Ms. Armijo and I tell Mr. Beck about it, the statement comes in against both myself and Ms. Armijo.  That's what Smalls tells us, that is the law of the Circuit as it stands now.

2 May Tr. at 66:4-14 (Castellano).  The Court was not persuaded: "Well, you may be right[.] I'm struggling with squaring that with Bruton, though, but you may be right as far as Smalls."  2 May Tr. at 66:17-19 (Court).

DNM 736

At this point, the United States explained that <u>United States v. Smalls</u> involved three defendants who murdered a cooperator in jail, and one of the defendants made statements to "an informant, a person not known to him as an informant[,] I'm not sure was even cooperating with the Government at the time until the admissions were taken[, and] the informant then informed law enforcement of the situation."  2 May Tr. at 70:15-71:4 (Castellano).  The United States continued, explaining that eventually law enforcement

> went back with a recorder and the informant took additional statements from [one of the defendants].  And in <u>Smalls</u> what happened was the statements all became admissible against [the defendant who made them], [as well as the other two defendants whom the defendant had implicated].  And [there] is a similar situation here.  So regarding what you were asking about, part of what's in the <u>Smalls</u> case says the text of the confrontation clause reflects focus on the testimonial hearsay. It applies to witnesses against the accused.  In other words those who bear testimony[,] citing to Webster's American dictionary[,] testimony in turn is typically a . . . legal declaration or affirmation made for the [purpose of] proving some fact.  An [ac]cuser makes a formal s[tatement to] Government officers there is testimony in a sense that a person who makes a casual remark to an acquaintance does not.

2 May Tr. at 71:5-22 (Castellano).  The United States reiterated: "The difference . . . is <u>Bruton</u> involved testimonial statements and therefore the confrontation clause, <u>Smalls</u> involves nontestimonial statements that fall outside of the confrontation cla[use] and because it's a statement against interest[] it also falls outside of hearsay.  So that's one of the distinctions."  2 May Tr. at 72:21-73:2 (Castellano).

Alonso then took the opportunity to respond and argued: "Your Honor observed . . . that you were having a difficult time squaring <u>Smalls</u> with <u>Bruton</u>.  And you're not alone.  As evidenced by Judge Kelly's vigorous dissent in <u>Smalls</u>."  2 May Tr. at 74:22-25 (Chambers). Alonso continued:

> The Government first argues, just categorically they state as if it's a matter of settled law that <u>Bruton</u> does not apply to nontestimonial statements.  And that is a matter that remains a matter of dispute, Your Honor.  The Supreme Court has

- 124 -

certainly never ruled that.  Those who would use <u>Crawford</u> to gut <u>Bruton</u> se[ize] upon this language in [<u>Wharton</u>] which I've cited to the Court.  And there was some language by the Court in <u>Wharton</u> . . . that suggest[s] that <u>Bruton</u> doesn't apply to nontestimonial [hearsay statements] but that . . . was not a ruling.  The issue in <u>Wharton</u> . . . was a very narrow issue.  It had to deal with <u>Crawford</u>'s retroactive application under the rules of <u>Teague v. Lane</u>.  And so that's [the] only issue in <u>Wharton</u> . . . but people have taken this language in [<u>Wharton</u>] and taken it completely out of its context []and started stating as a matter of established law that <u>Bruton</u> doesn't apply to nontestimonial hearsay.  And the Supreme Court has never said that.  They never said it in [<u>Bruton</u>], they've never overruled <u>Bruton</u>, so it's a stretch.

2 May Tr. at 75:16-76:14 (Chambers).   Further, regarding <u>Crawford v. Washington</u>, Alonso

argued

the right to be confronted with a witness against him is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding . . . .  The Court went on to say, accomplice confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule citing <u>Lilly v[.] Virginia</u>.  So if a statement against pen[]al interests is not within a firmly ro[o]ted exception to a hearsay rule, it necessarily could not have been an exception that existed at the time of the founding.

2 May Tr. at 76:25-77:12 (Chambers).  Indeed, Alonso suggested,

when you're thinking about whether a statement against penal interests is inherently reliable, it might be as to the person who is inculpating himself.  But there is certainly no reliability as when he inculpates other people.  And the United States Supreme Court has made that recognition as well in a case that I cited in my reply, the <u>Williamson [v. United States</u>, 512 U.S. 600-01 (1994)] case, where the Court said, and I quote, "In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory.  The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else," end quote.

2 May Tr. at 77:13-78:5 (Chambers).  Alonso then concluded, explaining:

Your Honor, you know, this is a real co[ol] issue.  It's fascinating.  But the fact of the matter is no matter what you do with <u>Crawford</u> no matter what [you do] with <u>Bruton</u> no matter what you do with <u>Smalls</u> no matter how you slice that . . . it doesn't change one fact.  Rule 14 still exists.  <u>Smalls</u>, <u>Crawford</u> did not touch rule 14.  And rule 14 gives you the discretion []. . . .  [H]ere's what rule 14 says, if the

- 125 -

joinder of offense or defendants in []an indictment and information whose consolidation for trial appears to prejudice a defendant or the Government, the Court may in order separate trials of the counts, [sever] the defendants' trials or provide any other relief that justice requires.   You have discretion.   That discretion is untouched by Smalls, by Crawford, by anything else.   You have the discretion to make this fair.   And in making that, in exercising your discretion your discretion should be informed by things such as Rule 403.   And the unfair prejudice that comes to people like Mr. Alonso, if the [United States] gets [it]s wish to put in Troup's statements, just without any limitation.

2 May Tr. at 78:6-79:3 (Chambers).

The Court, having considered Alonso's argument, then stated:

Well I'm not going to grant the motion to sever at this time.   Obviously I'm going to have to continue to monitor this case and the evidence that's coming in.   And I'm going to have to probably start making some rulings, so maybe I'll use this motion to drill down a little bit more on the Smalls and Bruton and Crawford issues to give some guidance in this case.   I am inclined to think that given the law that we have here in the Tenth Circuit that . . . this is not a sound basis for declining or for granting the motion to [se]ver.   It does concern me a little bit letting in some statements that even though the Tenth Circuit may be [al]lowing at the present time . . . letting them come in, and down the road the[] landscape may change on us, and decisions that I make []now based upon Tenth Circuit law may change because of the Supreme Court's changing character.   But we all have to deal with that.   And so I think the decision to keep Count 3 in the case and keep Alonso and Troup [together] remains sound but I'm still going to continue to take hard looks at this to make sure that everybody gets a fair trial.

2 May Tr. at 79:8-80:5 (Court).   The parties continued to argue, however, because the United

States then asserted:

I'd also point the Court to the 2014 Smalls decision[,] it's the decision that came out post-trial, post-conviction.   Related to a discussion of prior consisten[t] statements it says that Smalls also argues that for a prior consistent statement to be admissible under the confrontation clause[.]   [I]t must meet pre[-C]rawford standards of reliability but the confrontation clause has no application to nontestimonial statements and therefore permits their admission even if they [lack] indicia of [reliability].

2 May Tr. at 80:7-17 (Castellano).   The Court was unsure why the United States had made that

assertion, because "I don't think there is any disagreement on that, right.   I mean that the

confrontation clause has no application to nontestimonial statements . . .   I'm not trying to butt

- 126 -

up against that.  But I am trying to -- I mean as [Alonso] put it[,] we are talking about Troup's

statements, right?"  2 May Tr. at 80:20-81:1 (Court).  Alonso then argued "the law is what it is,

Crawford says what it says . . . about whether the confrontation clause applies to nontestimonial

hearsay.  But that doesn't answer the question."  2 May Tr. at 81:16-19 (Chambers).   Alonso

continued that

> [i]t . . . doesn't answer the question about the limits of that about the borders of
> the confrontation clause, because the Crawford Court specifically declined to
> define what was testimonial and what was nontestimon[ial] and furthermore . . . in
> cases since Crawford such as Davis and Hammon . . . which were companion
> cases the Court has provided scant they haven't helped much in defining what is
> testimonial and what is nontestimonial.

2 May Tr. at 81:23-82:9 (Chambers).   The Court interjected, stating "it certainly seems to me

that this would fall safely into the nontestimonial" category, because "I mean this one doesn't

seem to me on the edges as much as some other scenarios I've seen."  2 May Tr. at 82:14-16

(Court).  Alonso responded:

> I believe it's testimonial, and my position is derived from a reading of both Davis
> . . . and Ham[mon].  But Davis and Hammon, and the distinction that the Court
> drew in Davis and Hammon was a statement is nontestimonial if it is made in the
> context of an ongoing emergency.  It is testimonial if it is describing past events.

2 May Tr. at 82:17-24 (Chambers).   The Court replied:

> That's more where you come up on the scene and you're sorting out police are
> there, but you can still have some nontestimonial statements with police around.
> You can't draw a bright line and say just because the cops are there it's
> testimonial. . . .  But if you're in a prison cell and you've got a guy talking to [a]
> prisoner, seems to me that's pretty classic nontestimonial?

2 May Tr. at 82:24-83:4 (Court).  Alonso maintained:

> In Davis . . . and in Hammon they're both domestic violence cases, and in Davis
> [and] Hammon, cops talked to the victim of a domestic violence incident.   In
> Davis the hearsay statements were made by [a] domestic dispute victim to a 9/11
> operator . . . after ongoing emergency . . . [and t]he Court found that statements
> in Davis were made during an ongoing emergency in which the declarant was
> speaking about events as they were actually happening rather than describing past

- 127 -

events. . . .   Accordingly, the <u>Davis</u> Court held that the statements were nontestimonial.   In <u>Hammon</u> the statements were also made by the victim of a domestic dispute.   But unlike <u>Davis</u>, not in the context an ongoing [emergency], but rather as an investigation into . . . what happened.   In <u>Hammon</u> although the statements at issue were made within minutes of the crime, the Court found that there was no ongoing emergency and the declarant was describing what happened instead of what was happening.   Hence, the statements were testimonial.   Well, here, the statements that are at issue here are not describing [] current events as they are happening.   They are describing what happened.

2 May Tr. at 83:14-84:14 (Chambers).   The Court disagreed:

I think those are unique.   I'm probably not going to buy that distinction.   Because otherwise, anytime you have somebody giving historical facts you're saying that that's testimonial, and that seems to me I think you've got to still have the presence of the cops.   That's what's making <u>Hammon</u> and <u>Davis</u> so important is that you've got law enforcement. . . .   It's almost the excited utterance exception to the <u>Crawford</u> rule [-- in that] you're in the middle of the fray and people are saying what they're saying they're not going to toss that evidence out. . . . . [Here, y]ou've got somebody that you know is just talking on the phone to somebody else and say I killed that person and they're talking to their cousin and they said they killed somebody.   And you know, how would that not be nontestimonial?

2 May Tr. at 84:14-85:9 (Court).   Alonso reiterated:

Well, the <u>Davis</u> Court actually specifically cites cases, Your Honor, and I'm looking for them in my brief.   One of them is an ancient case you'll probably have to dust off -- wipe the dust off -- this book if you want to read the opinion[. I]t's found at 1 Leach 199, a case, <u>King v[.] Brasier</u>, [from] 1799.   But <u>Davis</u> cites it. The United States Supreme Court relied on it.   I'll leave for another day my opinion about whether the United States Supreme Court [should be] relying on international authority but they did here.   And there it was not a statement to a cop.   It was not.   And that was in 1799.   And in 2015 they reached the same conclusion in <u>Ohio v[.] Clark</u>, where they specifically said, at least some statements to individuals who are not law enforcement [could] conceivably raise confrontation concerns[. W]e decline to adopt a categorical rule excluding them from [the] Sixth Amendment's reach.

2 May Tr. at 85:10-86:2 (Chambers).   The Court commiserated and stated:

I think that's true.   That's what I keep asking Mr. Castellano.   Who is this cooperator, tell me about him.   I mean you[,] know, is this a person that you know that is being paid by law [enforcement][,] or something like that[?]   So I agree with that statement.   You can't just say well it was another prisoner.   Wait, tell me about that prisoner.   So I agree, but I think to just make it a functional test [that is

- 128 -

informative.  The question of w]as it past history or was it current event is
sweeping too broadly.  I think you'd gut the testimon[ial] [and] nontestimonial
distinctions that have been developed since <u>Crawford</u> so I'm probably not going
to go that direction.

2 May Tr. at 86:3-15 (Court).  Alonso assured the Court: "I didn't say that <u>Davis</u> and <u>Hammon</u>

defined testimonial because I don't think it does define it.  I think it provides some guidance,

though.  That's about the best I can do."  2 May Tr. at 86:16-19 (Chambers).

> A. Gallegos then argued A. Gallegos' Motion to Sever, and explained to the Court:

> Judge I won't [take] I don't think too much of your time.  These issues have been
> sort of litigated.  The Court has [it] looks like a decision on this or at least [has]
> proposed a decision.  But to the extent that the Court will remain fluid as its
> indicated on these issues we would like to say a few things on behalf of Mr.
> Andrew Gallegos specifically.

Transcript of Hearing at 35:20-26:2 (taken May 11, 2017)(Roberts)("3 May Tr.").[12]  A. Gallegos

then argued that Counts 4 and 5 were so dissimilar from the other Counts -- because they

occurred outside of prison, were remote in time, and were not linked to SNM and instead reflect

a personal "beef" -- that they counsel in favor of severance of those Counts.  3 May Tr. at 37:2-

38:25 (Roberts).  Indeed, A. Gallegos argued, there is also a disparity of evidence:

> [T]hey don't have any DNA evidence.  They don't have any fingerprint evidence.
> There is no confession, there is no statement regarding this that I'm aware of.
> There was supposedly a wire that was withdrawn, so there is no wire.  There is no
> tape recording that I'm aware of.  There is no video evidence.  The body of Mr.
> Burns was found sometime after he was killed at a different location.  So I'm not
> sure if we have evidence as to when exactly he was killed.  He was apparently
> shot in a different location and brought to a remote location in the Bosque and
> burned from the evidence.  But we don't know exactly when that happened, when
> that occurred.  The gang connection in terms of what the Government has
> proposed is somewhat tenuous[.  T]his feeder gang concept that they've put
> forward, it's not clear, even against how or who ordered this murder where it
> came from, how it came down.

---

[12]The May 9, 2017, hearing also continued into May 11, 2017.  The Court's citations to
the transcript of the hearing refers to the court reporter's original, unedited version.  Any final
transcript may contain slightly different page and/or line numbers.

3 May Tr. at 40:1-18 (Roberts).   Regarding A. Gallegos' co-Defendant in Counts 4 and 5,

however, A. Gallegos argued that J. Gallegos has been charged in six Counts total, reflecting a

stark disparity in culpability.   See 3 May Tr. at 40:19-41:9 (Roberts).   Further, should the Court

try Counts 4 and 5 alongside the other Counts, A. Gallegos argued that the evidence would begin

to stack against all of A. Gallegos' co-Defendants, resulting in a tipped scale against his

innocence by the process of spillover prejudice.   See 3 May Tr. at 41:10-43:18 (Roberts).

The United States then argued, and primarily reiterated that A. Gallegos was not the only

Defendant in this case who is charged in only one Count.   See 3 May Tr. at 44:2-23 (Castellano).

Further, the United States maintained that A. Gallegos was in a "feeder gang into the SNM.  We

also believe he's an SNM gang member[.  W]e will have evidence at trial indicating that he is

and that people who have lived with him indicate that he [has] an SNM gang mentality."  3 May

Tr. at 45:1-5 (Castellano).   The Court then changed subject and inquired: "Does the gang

function, is it the Government's theory . . . that the G[ang] functions even when some of these

people go to federal prison?"  3 May Tr. at 45:11-14 (Court).   The United States indicated that,

yes, indeed, SNM persisted in federal prison; however "they're not [the] biggest fish in the pond

in the federal system so they may belong to each other and recognize as S[NM] but also fall

under other larger gangs."  3 May Tr. at 45:23-46:1 (Castellano).   The United States then

reiterated its theory that the crimes alleged in Counts 4 and 5 were done at the SNM enterprise

activity's behest, and that the evidence in support of their theory is not as weak as A. Gallegos

paints it.   See 3 May Tr. at 46:5-47:3 (Castellano).   A. Gallegos did not reply, and the Court

indicated:

> Well, as I [have] indicated . . . I thought long and hard about it and I was working
> even this morning putting charts into the opinion that I have written that's getting
> a little bit longer, and as I indicated I [will roll all of these motions into the
> opinion, but] at the present time I'm not inclined to sever it further.  I think I've

- 130 -

broken it out in a way that is manageable, increase[s] the fairness to all the defendants.  I tried to reduce to a minimum any prejudice, and still try to be efficient and get these things moving toward trial so I think I've done the best I can on severance.  I'll continue to look at it.  I'll continue to evaluate it as we bar[r]el forward, but at the present time I'm inclined to keep it on the path I've indicated . . . [s]o I'm going to deny this motion.  But [I] will continue to look at the shape of the case as we get closer, but at the present time that's how I'm going to di[vide] it up and get ready to get these trial.

3 May Tr. at 47:12-48:6 (Court).

### 23.     The May 19, 2017, Hearing.

Troup argued Troup's Motion to Sever at the May 19, 2017, hearing.  See Transcript of Hearing (taken May 19, 2017)("4 May Tr.")(Burke).[13]  Troup recognized that the Court had already met much of his concerns by severing the trial into two trial groupings at the previous hearing, but argued nonetheless in favor of further severance of the Counts 1 and 2 Defendants. See 4 May Tr. at 13:2-14:4 (Burke).  Troup also, in response to the Court's question, supported the Court's analysis regarding the import that administrative and logistical concerns in its rule 14 inquiry regarding prejudice to the United States or the Defendants.  See 4 May Tr. at 14:12-19 (Burke).  Troup told the Court that the cases which support such an inquiry included "Gould . . . Zafiro . . . [and] Fox v. Ward."  4 May Tr. at 15:5-20 (Burke).  Regarding the further severance of the Counts 1 and 2 Defendants, Troup provided:

> [T]he prejudice for the Counts 1 and 2 defendants is that [the] Adrian Burns homicide is nasty, and that's Counts 4 and 5.  And then you have -- we would have Counts 13 through 16, and we have this old homicide, you know, 2001.  And yet the events that are portrayed in Counts 13 through 16 not only bring us out of prison into the real world, so to speak, and that's the 2012 homicide involving Adrian Burns.  We then have the beatdown of Jose Gomez, and that's Counts 14 through 16.  And then there was an incident, and that's in 2016.  So expanding from 2001 forward to 2012, and then 2016, does create some prejudice for what I'm calling the Counts 1 and 2 defendants, the five people.

---

[13]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

4 May Tr. at 17:2-16 (Burke).  Regarding the jury's ability to compartmentalize the different Counts and offenses charged in the new Counts 1-5 and 13-16 trial grouping, however, Troup conceded that the arrangement alleviated some of the prejudice, and represented to the Court that he was "glad that we are not in a trial with the Counts 6 through 12 defendants, because that would have been -- I don't know how we could have -- how a jury could have compartmentalized all of that."  4 May Tr. at 18:12-16 (Burke).  Troup argued that the potential for spillover prejudice still exists in his trial grouping, and reminded the Court that the Counts 1 and 2 Defendants were alleged to have committed conduct in 2001, and many of them were out of prison when the rest of the Second Superseding Indictment's charged conduct occurred.  See 4 May Tr. at 19:2-20:25 (Burke).  B. Garcia then argued and explained to the Court that, in its rule 14 analysis and in its consideration of the management of a joint trial, there is "also the independent authority of the Court to supervise its docket."  4 May Tr. at 21:11-25 (Castle).  The Court was hesitant and suggested that the United States has argued there must be a showing of prejudice to the Defendants before it can consider administrative or logistical concerns.  See 4 May Tr. at 22:22-23:3 (Court).  B. Garcia indicated, in response, that "the inherent authority of the Court to manage its docket is [a] good reason.  And the separation of powers favors the judiciary in managing its docket, not the executive branch in defining, essentially, how this Court is going to provide justice to the defendants."  4 May Tr. at 23:6-11 (Castle).

The United States then argued and explained that its position which the Court is referencing comes from "a quote [in] the Gould case, which talks about first looking at antagonistic defenses and prejudice, before getting to the meaning of the first two factors, followed by the Court's administration of justice."  4 May Tr. at 24:2-14 (Castellano).  Perhaps then recognizing that its position was in relation to an exploration of prejudice in the context of

- 132 -

antagonistic defenses specifically, the United States represented to the Court: "We think the Court has discretion.  We think the Court has exercised that discretion.  If the Court's going to leave the case severed this way, we really don't have much more to say about it."  4 May Tr. at 24:21-25 (Castellano).  The Court then asked the United States opinion regarding the jury's ability to compartmentalize the evidence which would be presented at the two trials, to which the United States responded:

> I do think we can compartmentalize, Your Honor.  I mean, there are individual counts, and within those counts there are individual stories.  So the jury will hear about a Garza murder, a Castillo murder, a Sanchez murder, a Burns murder.  So each of those, even though there is an overarching presentation of the evidence, we still have to prove each of those individual murders.  And I think they have their own story, and the jury can compartmentalize each of those stories.

4 May Tr. at 26:4-13 (Castellano).  That ended the argument on severance, and the Court decided not to grant any further severance for the Counts 1 and 2 Defendants at this time.  See 4 May Tr. at 26:21-22 (Court).

## LAW REGARDING RULE 8(b) JOINDER

Rule 8 of the Federal Rules of Criminal Procedure is the procedural vehicle for joinder of both of offenses and of defendants in a criminal proceeding.  Rule 8 provides:

> (a) Joinder of Offenses.  The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged -- whether felonies or misdemeanors or both -- are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> (b) Joinder of Defendants.  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8(a)-(b).  In the Tenth Circuit rule 8(b) governs the propriety of joinder of multiple defendants and their alleged offenses into one indictment.  See United States v.

- 133 -

Case 2:15-cr-04268-JB   Document 1204   Filed 06/30/17   Page 134 of 225
Appellate Case: 20-2058   Document: 010110415663   Date Filed: 09/29/2020   Page: 1109

Eagleton, 417 F.2d 11, 14 (10th Cir. 1969)("Rule 8(a) . . . does not apply in cases where more than one defendant is joined in the same indictment.  Such joinder [of offenses] is governed by Rule 8(b)."). See also 1A Wright et al., Fed. Practice & Procedure: Criminal § 143 (4th ed.)(2017)("The conventional wisdom is that [Rule 8(a)] applies only to the prosecution of a single defendant; if more than one defendant is involved, Rule 8(b) states the test for joinder."); United States v. Mann, 701 F.3d 274, 289 (8th Cir. 2012)("Where an indictment joins defendants as well as offenses, the propriety of the joinder of offenses is governed by Rule 8(b), rather than Rule 8(a)."); United States v. Walker, 657 F.3d 160, 169 (3d Cir. 2011)("Rule 8(a) applies only to prosecutions involving a single defendant, and[,] in a multi-defendant case such as this, the tests for joinder of counts and defendants is merged in Rule 8(b).").  "Joint trials of defendants who are indicted together are preferred because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  United States v. Hall, 473 F.3d 1295, 1301-02 (10th Cir. 2007)(quoting Zafiro v. United States, 506 U.S. at 537).

Under rule 8(b), then, multiple defendants may be tried jointly "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Rule 8(b), along with its phrase "same series of acts or transactions," Fed. R. Crim. P. 8(b), "is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system," United States v. Hopkinson, 631 F.2d 665, 668 (10th Cir. 1980).  In light of rule 8(b)'s broad construction, courts conclude that a conspiracy count -- albeit not necessary -- is sufficient to warrant joinder of all defendants charged in that conspiracy, regardless whether each defendant is charged in each count or with each substantive act.

Although the Indictment in this case charged six different robberies alleged to have been committed by different defendants over a more than two-year period, it

also alleged that the defendants conspired and agreed with each other to commit
all six of the robberies.  Given the broad construction we afford Rule 8 and our
preference for liberal joinder, this was sufficient to permit joinder.

United States v. Hill, 786 F.3d 1254, 1272 (10th Cir. 2015), cert. denied, 136 S. Ct. 377 (2015).

See also 1A Wright, et al., Fed. Practice & Procedure: Criminal § 144 ("All courts agree that a

conspiracy count normally provides a sufficient allegation that the defendants engaged in the

same series of acts or transactions, making joinder permissible . . . .  Not all of the defendants

charged as conspirators need be charged on all substantive counts . . . .").

Although rule 8(b) allows grand juries to indict defendants together in the same charging

instrument "if they are alleged to have participated in the same act or transaction, or in the same

series of acts or transactions, constituting an offense or offenses," Fed. R. Crim. P. 8(b), and

federal courts generally prefer that defendants who are indicted together be tried together, see

Zafiro v. United States, 506 U.S. at 537 (explaining the "preference in the federal system for

joint trials of defendants who are indicted together"), a trial court may still sever defendants and

offenses, and order separate trials -- under rule 14(a) of the Federal Rules of Criminal Procedure

-- if joinder appears to otherwise prejudice a defendant.  See Fed. R. Crim. P. 14(a).  The

Supreme Court has recognized, however, that joint trials "promote efficiency and 'serve the

interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  Zafiro v.

United States, 506 U.S. at 537 (citing Richardson v. Marsh, 481 U.S. at 210).  Some courts, then,

will "'apply a commonsense rule to decide whether, in light of the factual overlap among

charges, joint proceedings would produce sufficient efficiencies such that joinder is proper

notwithstanding the possibility of prejudice to either or both of the defendants resulting from the

joinder."  United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008)(quoting United States v.

Shellef, 507 F.3d 82, 98 (2d Cir. 2007)).

- 135 -

## LAW REGARDING RULE 14(a) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

Pursuant to rule 14(a) of the Federal Rules of Criminal Procedure a court may order separate trials if joinder appears to prejudice a defendant.  See Fed. R. Crim. P. 14(a).  Although rule 8 is liberally and broadly applied in the interest of efficiency, rule 14(a) envisions circumstances that may arise where joint trials would be inappropriate and, indeed, harmful to the accused's constitutional rights.  Rule 14(a) provides, in relevant part: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  Under rule 14(a), then, the court may sever the trials of co-defendants when "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a).  See Zafiro v. United States, 506 U.S. at 538 (using rule 14 as the standard for a severance); United States v. Cox, 934 F.2d 1114, 1119 (10th Cir. 1991)(applying rule 14 to set the standard for severance).  The decision to sever is "within the sound discretion of the trial court." United States v. Cox, 934 F.2d at 1119 (citing United States v. Valentine, 706 F.2d 282, 289-90 (10th Cir. 1983)).  See United States v. Gant, 487 F.2d 30, 34 (10th Cir. 1973)(noting severance "is peculiarly within the discretion of the trial court")(citations omitted).

"Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case." United States v. Hall, 473 F.3d at 1302 (quoting United States v. McConnell, 749 F.2d 1441, 1444 (10th Cir. 1984)).  Again, "[j]oint trials of defendants who are indicted together are preferred, because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" United States v. Hall, 473 F.3d at 1301-02 (quoting Zafiro v. United States, 506 U.S. at 537).

- 136 -

Additionally, "a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by a joint trial." Cummings v. Evans, 161 F.3d at 619 (citing United States v. Youngpeter, 986 F.2d 349, 353 (10th Cir. 1993)).  The prejudice standard envisioned by rule 14 thus requires a showing of actual prejudice, not merely a showing that a defendant "may have a better chance of acquittal in separate trials."  United States v. Pursley, 474 F.3d at 766.  To establish prejudice, a defendant must identify a "'specific trial right' that was compromised or show the jury was 'prevented . . . from making a reliable judgment about guilt or innocence.'"  United States v. Pursley, 474 F.3d at 766 (quoting Zafiro v. United States, 506 U.S. at 539).  Significantly, "[r]ule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."  Zafiro v. United States, 506 U.S. at 538-39.

In interpreting Rule 14, Courts of Appeals have explored the risk that "mutually antagonistic" or "irreconcilable" defenses may supply the prejudice needed in some circumstances as to warrant severance.  Zafiro v. United States, 506 U.S. at 538 (citing, e.g., United States v. Benton, 852 F.2d 1456, 1469 (6th Cir. 1988); United States v. Smith, 788 F.2d 663, 668 (10th Cir. 1986); United States v. Magdaniel-Mora, 746 F.2d 715, 718 (11th Cir. 1984); United States v. Berkowitz, 662 F.2d 1127, 1133-1134 (5th Cir. 1981); United States v. Haldeman, 559 F.2d 31, 71-72 (D.C. Cir. 1976)).  The Tenth Circuit, in United States v. Pursley, provided that, in such a scenario, where a defendant seeks severance because of mutually antagonistic defenses as compared to co-defendants,

> a trial court engages in a three step inquiry.  First, it must determine whether the defenses presented are "so antagonistic that they are mutually exclusive." *United States v. Peveto*, 881 F.2d 844, 857 (10th Cir. 1989).  Second, because "[m]utually antagonistic defenses are not prejudicial per se," a defendant must further show "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or

innocence." *Zafiro v. United States*, 506 U.S. [at] 539[].  Third, if the first two factors are met, the trial court exercises its discretion and "weigh[s] the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration."  *Peveto*, 881 F.2d at 857.

United States v. Pursley, 474 F.3d at 765.   In a court's consideration of such a scenario, "defenses are mutually antagonistic if 'the conflict between codefendants' defenses [is] such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'"  United States v. Pursley, 474 F.3d at 765 (quoting United States v. Linn, 31 F.3d 987, 992 (10th Cir. 1994)).  Defendants must show that "'the acceptance of one party's defense would tend to preclude the acquittal of the other, or that the guilt of one defendant tends to establish the innocence of the other.'"  United States v. Pursley, 474 F.3d at 765-66 (quoting United States v. Peveto, 881 F.2d at 857 (holding mutually exclusive defenses where one defendant said he was preparing to be an informant and invited the other defendant, a purported drug dealer, to his house to gather information, while the other defendant said he was innocently at the house and the first defendant held the second defendant against his will)).

Ultimately, a trial court that denies a request for severance will be reversed only where a defendant demonstrates an abuse of discretion.  See United States v. Pursley, 474 F.3d at 765.  In exercising its discretion, however, the court should "weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials."  United States v. Bailey, 952 F.2d 363, 365 (10th Cir. 1991)(quoting United States v. Cardall, 885 F.2d 665, 667-68 (10th Cir. 1989)).   "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance."  United States v. Bailey, 952 F.2d at 365 (citation omitted).

DNM 751

Essentially, severance will be appropriate when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. at 539. On a rule 14(a) motion, the defendant bears the "heavy burden" of demonstrating a risk of prejudice from continued joinder. United States v. Bailey, 952 F.2d at 365 n.4 (citing United States v. Jones, 707 F.2d 1169, 1171 (10th Cir. 1983); United States v. Petersen, 611 F.2d 1313, 1331 (10th Cir. 1979)). The Supreme Court has stated:

> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh*, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. *See* 481 U.S., at 211.

Zafiro v. United States, 506 U.S. at 539 (emphasis added)(citations omitted).

With respect to a district court's application of rule 14 in practice, particularly in the context of multi-count and multi-defendant RICO, VICAR, or conspiracy indictments, one district court has explained:

> Most often, severance of defendants will be required to protect the rights of defendants against undue prejudice resulting from joinder. In other situations, severance may be required, or at least the argument for severance will be bolstered, by the physical limitations of the courthouse and the logistical difficulties of attempting to conduct a complex multi-defendant trial.

United States v. Gray, 173 F. Supp. 2d 1, 7-8 (D.D.C. 2001)(Lamberth, J.).   Another district

court addressed the possibility of prejudicial joinder of the defendants

> deriving from the number of defendants and the number of counts, the complexity
> of the indictment, estimated length of the trial, disparities in the amount or type of
> proof offered against the defendants, disparities in the degrees of involvement by
> defendants in the overall scheme, possible conflict between various defense
> theories or trial strategies; and, especially, prejudice from evidence admitted only
> against co-defendants but which is inadmissible or excluded as to a particular
> defendant.

United States v. Gallo, 668 F. Supp. at 749.    Indeed, in citing to United States v. Gallo, which

involved a sixteen-defendant prosecution on a twenty-two-count indictment, the United States v.

Gray court approved of "the finding of the *Gallo* court that multi-defendant 'mega-trials' may

warrant some severance."   United States v. Gray, 173 F. Supp. at 8.   Specifically, the United

States v. Gray court explained that, in United States v. Gallo:

> After weighing the potential prejudice against defendants, the court decided that
> the dispositive factor counseling severance was judicial efficiency.  [United States
> v. Gallo, 668 F. Supp.] at 753 ("[T]he prejudices to the defendants are not clearly
> dispositive . . . , we might be reluctant to grant such severances on Rule 14 alone.
> . . .  [W]e question the traditional assumption that denial of severance . . .
> promotes efficiency.").

United States v. Gray, 173 F. Supp. at 8-9.  Indeed, the United States v. Gray court stated that

"[m]any of the factors that counseled against complete joinder of defendants [in United States v.

Gallo] are also persuasive in the instant case" and so it concluded:

> [T]hat despite the general presumption favoring joinder, some form of severance
> is necessary because of the physical limitations of the courtroom and hardship on
> the jurors, the defendants, and the Court.  Severance, however, should be of the
> most limited form necessary to satisfy those interests, because the Court finds that
> joinder of defendants, to the extent possible, will preserve judicial resources and
> permit the jury to have as complete a view of the evidence as possible.

United States v. Gray, 173 F. Supp. at 10.  Accordingly, the United States v. Gray court severed

a "158-count [Indictment]" charging "seventeen defendants" into two trial groupings based on

logistical concerns alone.  United States v. Gray, 173 F. Supp. at 1, 10.  The United States v. Gray court also considered that

> [s]everal defendants have moved for complete severance or other joint trial configurations based on Rule 14 concerns of prejudice against defendants.  In order to prevail upon a claim for severance, [those] defendant[s] must show that joinder would violate that defendant's constitutional fair trial rights, or would "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. [at] 539[].

United States v. Gray, 173 F. Supp. at 10.  Although the United States v. Gray court had already severed the indictment in that case into two trial groupings to alleviate the risk of prejudice to the defendants by logistical inefficiency and impracticality, the court was still open to further requests for severance of individual defendants upon a specific showing that joinder in either of the trial groupings still ran afoul of Zafiro v. United States and rule 14.  See United States v. Gray, 173 F. Supp. at 10.  The rule 14 inquiry regarding the propriety of joinder is ongoing, and as the United States v. Gray court concluded in severing that case's indictment into two trial groupings, its chosen "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants."  United States v. Gray, 173 F. Supp. at 18.

## LAW REGARDING THE CONFRONTATION CLAUSE

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In Crawford v. Washington, the Supreme Court held that, consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant

- 141 -

has had a prior opportunity to cross-examine." 541 U.S. at 59. In <u>Davis v. Washington</u>, 547

U.S. 813 (2006), the Supreme Court further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822. The Tenth Circuit has restated this rule, defining a testimonial statement as "a

'formal declaration made by the declarant that, when objectively considered, indicates' that the

'primary purpose of the [statement is] to establish or prove past events potentially relevant to

later criminal prosecution.'" <u>United States v. Morgan</u>, 748 F.3d 1024, 1048 (10th

Cir. 2014)(alteration in original)(quoting <u>United States v. Smalls</u>, 605 F.3d at 777-78). <u>Accord</u>

<u>United States v. Chaco</u>, 801 F. Supp. 2d 1200, 1209-10 (D.N.M. 2011)(Browning, J.)(discussing

developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial

statement).

In <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009), the Supreme Court addressed

whether the admission of a sworn affidavit by a forensic chemist, who testified in the affidavit

that the substance which police seized from the defendant was cocaine of a certain amount,

violated the Confrontation Clause. <u>See</u> 557 U.S. at 307. The Supreme Court first found that

such affidavits were testimonial, because they were "made under circumstances which would

lead an objective witness reasonably to believe that the statement would be available for use at a

later trial" and because, under Massachusetts law, the sole purpose of the affidavit was to

provide prima facie evidence of the content of the substance seized. 557 U.S. at 310. The

Supreme Court then used the affidavit introduced by the prosecution to outline its concerns

regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine."  At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed.  While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs[.]"  At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320 (citation omitted).  Because there was no opportunity to cross-examine on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause.  See 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error.").  The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification."  Bullcoming v. New Mexico, 131 S. Ct. 2705, 2710, 2715 (2011)("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'").

The importance of the Confrontation Clause's application is further delineated by the Supreme Court's consideration of the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face, which -- except in rare cases -- will violate a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness.  See United States v. Sandoval, No. 04-2362, 2006 WL 1228953, *7-9 (D.N.M. Mar. 7, 2006)(Browning, J.).  In Maryland v. Craig, 497 U.S. 836 (1990) -- which the Supreme Court decided before Crawford v. Washington -- the

- 143 -

Supreme Court rejected a Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child molestation case, under certain circumstances, to testify via a one-way closed circuit television, which did not allow the witness to view the defendant.  See 497 U.S. at 860.   While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court in Maryland v. Craig recognized that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." 497 U.S. at 845.[14]

The Supreme Court in Maryland v. Craig recognized that the context of an adversary proceeding before the trier of fact involves "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor by the trier of fact" that "is the norm of Anglo-American criminal proceedings."  497 U.S. at 846.  The Supreme Court in Maryland v. Craig also acknowledged the peculiar power of face-to-face confrontation in that "face-to-face confrontation enhances the accuracy of fact finding by reducing the risk that a witness will wrongfully implicate an innocent person," 497 U.S. at 846 (citing Coy v. Iowa, 487 U.S. 1012, 1019-20 (1988)), and that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,'" Maryland v. Craig, 497 U.S. at 847 (quoting California v. Green, 399 U.S. 149, 157 (1970)).

The Supreme Court explained in Maryland v. Craig that the Confrontation Clause "reflects a preference for face-to-face confrontation at trial," but that the preference "must occasionally give way to considerations of public policy and the necessities of the case."

---

[14]The Supreme Court has since distanced itself from this holding that the purpose of the Confrontation Clause is to ensure the reliability of evidence.  See Crawford v. Washington, 541 U.S. at 61.

497 U.S. at 849 (internal quotation marks omitted).   The Supreme Court emphasized that the

preference for face-to-face confrontation is strong, and that a defendant's Sixth Amendment

confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only

where denial of such confrontation is necessary to further an important public policy and only

where the reliability of the testimony is otherwise assured."  497 U.S. at 850.

While the issue is decidedly less clear, it is unlikely that a violation of a defendant's

Confrontation Clause rights occur when he calls one of his own witnesses who is aligned with

him by videoconference or telephonically.   See U.S. Const. amend. VI ("In all criminal

prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against

him . . . ." (emphasis added)).   Cf. United States v. Olguin, 643 F.3d 384, 392 (5th Cir.

2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying

against him, not against others.").  The need for "adversariness" is not present when the witness

is aligned with the defendant.  Maryland v. Craig, 497 U.S. at 845.  The Supreme Court spoke in

Crawford v. Washington about the need for the defendant to have "an adequate opportunity to

cross-examine" a witness to satisfy the Confrontation Clause, a need which is not present when

the witness is aligned with the defendant.  541 U.S. at 58.  The Federal Rules of Evidence, for

example, generally do not permit a party to ask leading questions -- a key tool of cross

examination -- of a witness aligned with the party calling the witness.   See Fed. R. Evid.

611(c).[15]  A defendant might also waive a Confrontation Clause challenge by calling his own

witness by videoconference or telephonically.  See United States v. Lopez-Medina, 596 F.3d

---

[15]Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.**
Leading questions should not be used on direct examination except as necessary to develop the
witness's testimony.   Ordinarily, the court should allow leading questions: (1) on
cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness
identified with an adverse party."  Fed. R. Evid. 611(c) (bold in original).

716, 730-734 (10th Cir. 2010)("Prior to <u>Crawford</u>, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue <u>Crawford</u> changed this rule.").

Like many constitutional rights, a defendant may choose to waive his Confrontation Clause rights.  In 1969, the Supreme Court recognized that a defendant may waive his Confrontation Clause rights and that defendants commonly do so when pleading guilty.  <u>See</u> <u>Boykin v. Alabama</u>, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. . . .  Third, is the right to confront one's accusers.").  The Tenth Circuit has recognized that, both before and after the Supreme Court's decision in <u>Crawford v. Washington</u>, a defendant may knowingly waive his Confrontation Clause rights at trial.  <u>See</u> <u>United States v. Lopez-Medina</u>, 596 F.3d at 730-734 (recognizing that Confrontation Clause rights may be waived at trial "at least where there is an explicit waiver").  Specifically, the Tenth Circuit stated: "Prior to <u>Crawford</u>, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue <u>Crawford</u> changed this rule."  <u>United States v. Lopez-Medina</u>, 596 F.3d at 731 (citations omitted).  The Tenth Circuit has held that a defendant's counsel can stipulate to the admissibility of evidence that would otherwise violate the Confrontation Clause if doing so "was a matter of prudent trial strategy."  <u>Hawkins v. Hannigan</u>, 185 F.3d 1146, 1155 (10th Cir. 1999).  The United States Court of Appeals for the Sixth Circuit has recognized that such a waiver can be permissible in the context of the prosecution admitting one of its witnesses' videotaped deposition.  <u>See</u> <u>Earhart v. Konteh</u>, 589 F.3d 337, 344 (6th Cir. 2009).  The Sixth Circuit in that case relied on one of its prior decisions where it had permitted such a waiver:

> The State relies upon our holding in <u>Bailey v. Mitchell</u>, 271 F.3d 652 (6th Cir. 2001), to argue that Earhart waived his right to contest the admission of the

DNM 759

videotape deposition.   In <u>Bailey</u>, we held that a criminal defendant waived his right to confrontation by entering into a <u>quid</u> <u>pro</u> <u>quo</u> agreement with a state prosecutor.  <u>Id</u>. at 657.  The petitioner in <u>Bailey</u> had agreed to allow the State to admit the videotape deposition if the prosecutor would consent to the defendant's motion for a continuance.  <u>Id</u>.  Importantly, the Ohio state courts found as a factual matter that Bailey had made an explicit deal with the prosecutor for the admission of the videotape.  <u>Id</u>.

<u>Earhart v. Konteh</u>, 589 F.3d at 344.  Notably, the Tenth Circuit's case in <u>United States v. Lopez-Medina</u> involved an oral waiver on the record in open court.  <u>See</u> 596 F.3d at 731 ("It is clear from this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his client's) confrontation right through his questioning of Johnson.").

### LAW REGARDING CO-DEFENDANTS' STATEMENTS AND THE CONFRONTATION CLAUSE AFTER <u>CRAWFORD V. WASHINGTON</u>: <u>BRUTON V. UNITED STATES</u> AND NONTESTIMONIAL HEARSAY

<u>Bruton v. United States</u>, 391 U.S. 123 (1968), held that, in a joint trial, a defendant's Sixth Amendment right of confrontation is violated, regardless of any limiting instruction that might be given to the jury, by admitting the confession of a non-testifying codefendant which implicates the defendant.  In <u>Bruton v. United States</u>, George Bruton and William Evans were jointly tried for robbery, and, upon his arrest, Evans gave a confession to a postal inspector in which he admitted that he and Bruton had committed the robbery.  <u>See</u> 391 U.S. at 124.  At trial, the prosecution was allowed to introduce Evans' confession, and the trial court -- perhaps recognizing that evidence might pose a problem -- gave a limiting instruction charging the jury that it was not to consider Evans' confession "in any respect to the defendant Bruton."  391 U.S. at 125.  Both Bruton and Evans were convicted, but, as mentioned, the Supreme Court held that it was constitutional error to admit into evidence the incriminating statement which co-defendant Evans made and which implicated defendant Bruton, and that this error was not otherwise cured by a limiting instruction.  <u>See</u> 391 U.S. at 128.  The Supreme Court noted that a co-defendant's

- 147 -

confession is admissible under hearsay rules only against the confessing co-defendant, which is why the Supreme Court contemplated whether a limiting instruction could satisfactorily cure the problem by instructing jurors to ignore the confession in determining non-confessing co-defendant's guilt or innocence.  See 391 U.S. at 128 n.3 ("We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, . . . the problem arising only because the statement was . . . admissible against the declarant.").  The Supreme Court said that

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.  Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . .  The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

391 U.S. at 135-36.  The Supreme Court also stated:

> If it is a denial of due process to rely on a jury's presumed ability to disregard an involuntary confession, it may also be a denial of due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when it is determining that defendant's guilt or innocence.

391 U.S. at 130-31.  Ultimately, under Bruton v. United States, the Supreme Court held that there is a substantial threat that the jury would ignore a limiting instruction and use the co-defendant's confession as evidence of the other non-confessing defendant's guilt, and thus such confessions are inadmissible unless the codefendant testifies.  See 391 U.S. at 137.

The Supreme Court subsequently explored its Bruton v. United States doctrine in Richardson v. Marsh, 481 U.S. at 200, and Gray v. Maryland, 523 U.S. at 195.  In Richardson v. Marsh, Clarissa Marsh, Benjamin Williams and Kareem Martin faced murder charges.  See 481

- 148 -

U.S. at 202.  Both Marsh and Williams were tried jointly, but Williams did not testify at the joint

trial.  See 481 U.S. at 202, 204.  At trial, the prosecution introduced evidence of Williams'

confession by which he implicated co-Defendants Marsh and Martin, as well as himself.  See

481 U.S. at 203-04.  The trial court redacted the confession to remove references to Marsh, and

"omitted all indication that anyone other than Martin and Williams participated in the crime."

481 U.S. at 203.  The trial court also instructed the jury to "not use it (Williams' confession) in

any way against (Marsh)."  481 U.S. at 204.  The Supreme Court ultimately concluded that the

trial court did not err by admitting Williams' confession as it had been redacted, because "the

confession was not incriminating on its face."  481 U.S. at 208.  Accordingly, the Supreme Court

affirmed that its Bruton v. United States holding could be satisfied in practice by redaction.  See

Richardson v. Marsh, 481 U.S. at 209 (referring to Bruton v. United States, 391 U.S. at 134

n.10).

        In Gray v. Maryland, Anthony Bell and Kevin Gray were tried jointly for murder.  See

Gray v. Maryland, 523 U.S. at 188.  After Bell was arrested, he told the police that he, Gray, and

a third person were responsible for the victim's death.  See Gray v. Maryland, 523 U.S. at 188.

At Bell and Gray's joint trial, the trial court permitted introduction into evidence a redacted

version of Bell's confession.  See 523 U.S. at 188.  The detective who testified about Bell's

confession said "deleted" or "deletion" whenever the name of Gray or the third participant

appeared.  523 U.S. at 188.  Immediately thereafter, however, the detective testified that the

police arrested Gray only upon Bell's confession.  See 523 U.S. at 189.  A written copy of Bell's

confession was introduced with the names of Gray and the third person having been replaced

with blank spaces that were separated by commas.  See 523 U.S. at 189.  The jury was also

instructed that Bell's confession could not be used as evidence against Gray.  See 523 U.S. at 189.

The Supreme Court acknowledged that, in Richardson v. Marsh, it had, indeed, held that the admission of co-defendant confessions that are redacted to remove any reference to the existence of the other defendants will not violate Bruton v. United States.  See Gray v. Maryland, 523 U.S. at 190-91.  The Supreme Court noted, however, that, unlike the redacted confession in Richardson v. Marsh, the confession in Gray v. Maryland referenced the existence of the non-confessing defendant, because the government merely replaced Gray's name with the word "deleted" or a blank space.  Gray v. Maryland, 523 U.S. at 192.  The Supreme Court concluded that a redaction that replaced a defendant's name with an obvious indication of deletion falls within Bruton v. United States' purview, because "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . so closely resemble *Bruton [v. United States*'] unredacted statements that, in our view, the law must require the same result."  Gray v. Maryland, 523 U.S. at 189.

Then came Crawford v. Washington.  See Crawford v. Washington, 541 U.S. at 36.  In Crawford v. Washington, the Supreme Court essentially held that that the Confrontation Clause is violated when hearsay is "testimonial," admitted against a criminal defendant, and the hearsay declarant does not testify at the defendant's trial, unless (i) the declarant was unavailable for trial, and (ii) the defendant was previously able to cross-examine the declarant.  See Crawford v. Washington, 541 U.S. at 59-61.  Crawford v. Washington held that the Confrontation Clause is violated only when testimonial hearsay is admitted against a defendant and the defendant is not given the opportunity to cross-examine the declarant.  See U.S. at 59-61.  This holding necessarily implicates the logic underlying Bruton v. United States, because, to the extent that

- 150 -

Bruton v. United States protects the rights afforded to criminal defendants under the Confrontation Clause, Crawford v. Washington makes clear that the Confrontation Clause protects only against testimonial hearsay that is admitted against a defendant absent the opportunity to cross-examine the declarant. See 541 U.S. at 59-61. With respect to what such a "testimonial" statement might be, however, the Supreme Court in Crawford v. Washington did not provide a definition to differentiate "testimonial" from "non-testimonial" hearsay, and instead noted only that "various formulations" or "articulations" or "definitions" of "testimonial" could be posited; and, apart from citing examples of statements that would qualify as testimonial under any definition, the Supreme Court specifically declined to undertake crafting a controlling definition of "testimonial." 541 U.S. at 51-53. The Court indeed reiterated that it was not providing a definition for "testimonial": "[W]e leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" Crawford v. Washington, 541 U.S. at 68. The Supreme Court has provided, however, that statements made by defendants to fellow prisoners are not testimonial, meaning they would not fall under the purview of the Confrontation Clause after Crawford v. Washington. See Davis v. Washington, 547 U.S. at 825 (providing that statements from one prisoner to another are "clearly" not testimonial).

Subsequent to Crawford v. Washington, many Courts of Appeal have, accordingly, superseded Bruton v. United States' analysis with Crawford v. Washington's. That is, the Courts of Appeal have held that Crawford v. Washington limited Bruton v. United States to protect co-defendants only from testimonial statements. See United States v. Dale, 2010 WL 2977410, at *9 (8th Cir. 2010)(holding that defendant's statements to prisoner were not testimonial and therefore did not violate co-defendant's Confrontation Clause rights); United States v. Castro-Davis, 612 F.3d 53, 65 (1st Cir. 2010)(holding that defendant's recorded telephone statements to

his mother were non-testimonial); United States v. Smalls, 605 F.3d at 768 n.2 ("[T]he *Bruton* rule, like the Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay statements."); United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009)(holding that, because Bruton v. United States is based on the Confrontation Clause, then it also only applies to testimonial statements, and any non-testimonial statement is not subject to it); United States v. Pike, 292 F. App'x 108, 112 (2d Cir. 2008)("[B]ecause the statement was not testimonial, its admission does not violate either *Crawford* or *Bruton*.").   Some federal courts have concluded otherwise, however, and continue to apply Bruton v. United States to nontestimonial statements despite Crawford v. Washington.   See United States v. Ramos-Cardenas, 524 F.3d 600, 609-10 (5th Cir. 2008)(holding that, although the co-defendant's statements were nontestimonial, because they were entered against the declarant, Bruton v. United States governs the analysis and not Crawford v. Washington);   United States v. Williams, 2010 WL 3909480 (E.D. Va. 2010)(Cacheris, J.).

Although the weight of precedent counsels otherwise, the Court pauses to discuss the conclusion in United States v. Williams, a non-binding, out-of-circuit opinion.  United States v. Williams, involved co-defendants Marvin Wayne Williams, Jr., Freddie Wigenton, and Deshawn Anderson, who were charged with conspiracy to distribute crack cocaine, intentional killing while engaged in drug trafficking, and use of a firearm during a drug offense relating in death. See 2010 WL 3909480, at *1.  These defendants allegedly made statements to several witnesses incriminating both themselves and their co-defendants, and the United States intended to introduce those statements at their joint trial.  See United States v. Williams, 2010 WL 3909480, at *1.  The United States District Court for the Eastern District of Virginia concluded that, while the Supreme Court in Crawford v. Washington had held that the Confrontation Clause covers

testimonial hearsay, it did not hold that the Clause exclusively covers only testimonial hearsay.

See United States v. Williams, 2010 WL 3909480, at *2-3 (citing Crawford v. Washington, 541

U.S. at 60-61 ("Members of this Court and academics have suggested . . . two proposals:  First,

that we apply the Confrontation Clause only to testimonial statements. . . .  Second, that we

impose an absolute bar to statements that are testimonial. . . .  In [*White v. Illinois*, 502 U.S. 346,

352-53 (1992)], we considered the first proposal and rejected it.  Although our analysis in this

case casts doubt on that holding, we need not definitively resolve whether it survives our

decision today. . . .")).  The Eastern District of Virginia court reasoned that it is "highly unlikely

that *Crawford* (a case that expanded the Confrontation Clause's application) would have

eviscerated *Bruton* (a Confrontation Clause case that *Crawford* cited) so casually."  United States

v. Williams, 2010 WL 3909480, at *4.  Thus, the Eastern District of Virginia court held that

Bruton v. United States can still apply to the co-defendants' statements at issue in that case and

bar their introduction regardless whether they were non-testimonial.  See United States v.

Williams, 2010 WL 3909480, at *4.[16]

The Tenth Circuit has foreclosed the analysis underlying United States v. Williams and

instead dictates the Court's inevitable conclusion that Crawford v. Washington limited Bruton v.

---

[16]Some academics agree.  See Colin Miller, Avoiding A Confrontation? How Courts
Have Erred in Finding That Nontestimonial Hearsay Is Beyond the Scope of the Bruton
Doctrine, 77 Brook. L. Rev. 625, 661 (2012)(arguing that: "[T]here are two possible
interpretations of the scope of the *Bruton* doctrine in the wake of *Crawford* and its progeny --
and that each should preclude the admission of nontestimonial codefendant confessions.  The
first is that *Crawford*, like its predecessor, had nothing to say about the inadmissibility of
codefendant confessions under the *Bruton* doctrine, meaning that courts should find that even
nontestimonial codefendant statements can violate the doctrine.  The second is that *Crawford*
deconstitutionalized the *Bruton* doctrine, meaning that nontestimonial codefendant statements do
not violate the Confrontation Clause.  In this case, however, courts should readily find that such
nontestimonial codefendant statements violate Federal Rule of Evidence 403 and are therefore
inadmissible anyway.").  The Court reiterates, however, that the Tenth Circuit has reached a
different conclusion.  See United States v. Smalls, 605 F.3d at 768 n.2.

- 153 -

United States's scope to testimonial statements by co-Defendants.  See United States v. Smalls, 605 F.3d at 768 n.2.  In United States v. Smalls, the Tenth Circuit considered a case where Glenn Dell Cook, Walter Melgar-Diaz, and Paul Othello Smalls had been accused of killing Phillip Gantz, who was a jailhouse informant.  See 605 F.3d at 767-68.  Gantz had been helping federal drug enforcement officials with their investigations, and was housed in the same unit as the three defendants Cook, Melgar-Diaz, and Smalls.  See 605 F.3d at 767-68.  Prison guards made a recording of one of the defendants, Cook, implicating his co-defendant Smalls in a confession regarding the murder to a fellow inmate and confidential informant.  See 605 F.3d at 767-68.  Relying on Bruton v. United States, the district court severed the two defendants' trials, because it concluded that Cook's statement could not be introduced against Smalls.  605 F.3d at 768 n.2.  The United States nonetheless moved to admit this statement against Smalls in his separate trial, arguing that the statement was made against his codefendant Cook's penal interests.  See 605 F.3d at 772-73.  The district court concluded that Cook's statement was non-testimonial and then "analyzed the admissibility of Cook's statement under the framework of the Supreme Court's Confrontation Clause jurisprudence as set forth in *Ohio v. Roberts*," thereafter concluding that the statement lacked a "particularized guarantee of trustworthiness," and that the court should exclude the statement.  United States v. Smalls, 605 F.3d at 772-73.

The United States then appealed that decision, and the Tenth Circuit reversed it.  See 605 F.3d at 773-74.  The Tenth Circuit concluded that, if Cook's statement had been testimonial, its exclusion would have been proper, but, because the statement was non-testimonial the Confrontation Clause's protections did not apply.  See 605 F.3d at 787.  The Tenth Circuit reasoned that if the statement met the definition for "statements against interest" under the Federal Rules of Evidence, it was admissible against Smalls.  605 F.3d at 780.  The Tenth

- 154 -

Circuit, accordingly, held that the district court erred in excluding the entire statement, and it

remanded the case to determine exactly which parts of the statement were self-inculpatory and

therefore admissible.  See 605 F.3d at 786-87.  Notably, in reaching this conclusion, the Tenth

Circuit also provided:

> Although the district court's severance order is not part of the record on appeal,
> we take judicial notice of it under Fed. R. Evid. 201 as it appears of record in
> *United States v. Smalls*, No. 06–CR–2403-RB-1, Memorandum Opinion and
> Order (D.N.M. May 7, 2008)(Doc. # 280).  Relying on *Bruton v. United States*,
> 391 U.S. 123 [] and its progeny, the district court reasoned the admission into
> evidence of a recorded statement in which Cook incriminated both himself and his
> alleged cohorts before a CI would violate Defendant Smalls' right to
> confrontation.  In *Bruton*, the Court held that defendant was deprived of his Sixth
> Amendment right to confrontation where his accomplice's confession, made to a
> postal inspector during an interrogation, was introduced at their joint trial.  The
> Court explained that a limiting jury instruction was insufficient under the facts of
> the case to cure any prejudice to that defendant.  As will become apparent from
> our opinion, *Bruton* is consistent with the present state of Sixth Amendment law
> because the accomplice's confession, unlike Cook's statement, was testimonial,
> rendering it inadmissible against the defendant absent an opportunity for cross-
> examination.  Notably, however, the *Bruton* rule, like the Confrontation Clause
> upon which it is premised, does not apply to nontestimonial hearsay statements.

United States v. Smalls, 605 F.3d at 768 n.2.  In the Tenth Circuit, after United States v. Smalls,

it is clear that Crawford v. Washington limits Bruton v. United States and now protects against

the admission only of co-defendants' testimonial statements.  See United States v. Smalls, 605

F.3d at 768 n.2.

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, 2011 WL

5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802).  Under rule 801(c) of the

Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Fed. R. Evid. 801(c).  Hearsay bars a party from presenting its own statements, such as "a

defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination."  United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999)(Carnes, J.).   A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness.   See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)(Hartz, J.)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay.  If admitted for impeachment purposes, however, it is not hearsay.").  Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.   A party opponent's statement is excluded from the definition of hearsay where:

> The statement is offered against an opposing party and:
>
>> **(A)** was made by the party in an individual or representative capacity;
>>
>> **(B)** is one the party manifested that it adopted or believed to be true;
>>
>> **(C)** was made by a person whom the party authorized to make a statement on the subject;
>>
>> **(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
>>
>> **(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).  The United States Court of Appeals for the Tenth Circuit has stated:

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule.  No guarantee of trustworthiness is required in the case of an admission.  The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences of the opinion rule and the rule requiring first-hand knowledge, when

taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility.

<u>Grace United Methodist Church v. City of Cheyenne</u>, 451 F.3d 643, 667 (10th Cir. 2006)(Seymour, J.)(internal quotation marks and alterations omitted).[17]

Hearsay evidence is generally inadmissible "because it is considered unreliable." <u>United States v. Lozado</u>, 776 F.3d 1119, 1121 (10th Cir. 2015)(citing <u>Williamson v. United States</u>, 512 U.S. 594, 598 (1994)). <u>See</u> Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered "to prove the truth of the matter asserted in the statement"). In addition to nonhearsay-styled statements under rule 801, the hearsay rule is also subject to several exceptions. Under rule 804(b)(3), an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest." <u>United States v. Lozado</u>, 776 F.3d at 1125 (citing <u>Williamson v. United States</u>, 512 U.S. at 599-600). A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true." Fed. R. Evid. 804(b)(3)(A). Moreover, the

---

[17]The 2011 restyling of the Federal Rules removed "admissions" from the language of rule 801(d) of the Federal Rules of Evidence, and uses instead the term "statements." Fed. R. Evid. 801(d). This replacement was purposeful: "The term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense -- a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made." Fed. R. Evid. 801, advisory committee's note on 2011 Amendments.

Although the advisory committee made the commentary quoted in the text regarding the trustworthiness of "admissions by a party-opponent" before the 2011 amendments to the Federal Rules of Evidence, the analysis should not be different under the new 2011 restyling of the rules. Because the advisory committee's purpose for the 2011 restyling was to make the rules "more easily understood and to make style and terminology consistent through the rules," and there was no "intent to change any result in any ruling on evidence admissibility," the analysis applied before 2011 should still be useful for cases after the restyling. Fed. R. Evid. 801.

DNM 770

statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3)(B).

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)).  The United States Court of Appeals for the Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d at 787.

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  The Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

## ANALYSIS

The Court will grant in part and deny in part: (i) the Motion to Sever; (ii) Gonzales' Motion to Sever; (iii) A. Gallegos' Motion to Sever; (iv) Troup's Motion to Sever; (v) Alonso's Motion to Sever; and (vi) Gonzales' Amended Motion to Sever.  At the February 7, 2017, hearing, the United States agreed that a joint trial of twenty or more Defendants would be practically untenable.  See Tr. at 105:25-106:4 (Castellano).  Although not a concession, the nature of the United States' agreement was as follows:

> THE COURT: Mr. Castellano, let me ask you a few questions.  Would you agree that it's going to be extremely difficult and probably not a good idea to try a case with 20 defendants?

- 159 -

MR. CASTELLANO: It may be difficult, Your Honor.  It's not unprecedented. Even one of the cases cited by the defense, I think, had 23 defendants who were not severed.  But I do agree that there could be some logistical problems.

THE COURT: If we were in agreement on that, that we probably shouldn't be barreling toward a trial with 20 defendants, what's the solution from your standpoint?

MR. CASTELLANO: Well, the solution is really how to cut up the pie.

Tr. at 105:21-106:10 (Court, Castellano).  The Court then requested that the United States and the Defendants present the Court with different options regarding its determination whether severance of the Superseding Indictment in some manner would be proper.  See Tr. at 141:20-23 (Court).  The Court, having initially adopted a "wait and see approach" regarding severance, is now faced with a July 10, 2017, trial date, and nineteen Defendants who are still in the case.  Tr. at 32:8-33:18 (Court).  The Court also notes that various Defendants have, to date, moved against the Superseding Indictment and Second Superseding Indictment, alleging misjoinder under rule 8 of the Federal Rules of Criminal Procedure and prejudicial joinder under rule 14 of the Federal Rules of Criminal Procedure.  Some Defendants have also asserted their Speedy Trial Act rights as grounds for severance, and some have suggested that Bruton v. United States necessitates severance under the Confrontation Clause, because certain co-Defendants' inculpatory statements could potentially be introduced against them at a joint trial.

The Second Superseding Indictment charges a total of thirty-one Defendants with 16 Counts of various assault, conspiracy to murder, murder, and firearms violations, which the United States further alleges are violent crimes in aid of the SNM racketeering conspiracy.  The Defendants named are not all charged with the same Counts or substantive offenses, causing some Defendants to face a variable level of criminal exposure in comparison to their co-Defendants.  The Second Superseding Indictment's allegations also span a large period of time,

- 160 -

with the first alleged murders occurring in 2001.  After considering the Superseding Indictment;

the Second Superseding Indictment; the Motion to Sever; Gonzales' Motion to Sever; A.

Gallegos' Motion to Sever; Troup's Motion to Sever; Alonso's Motion to Sever; and Gonzales'

Amended Motion to Sever, the Court concludes that a joint trial of all nineteen remaining

Defendants would be impractical at this time.  The unique complexity of this multi-count Second

Superseding Indictment, as it now stands, "would render it difficult, if not impossible, for the

Court to adequately charge a jury as to the applicable law with respect to each defendant and for

the jury to apply the law intelligently in reaching verdicts on the many charges involved."

United States v. Moreton, 25 F.R.D. 262, 263 (W.D.N.Y. 1960)(Henderson, J.).   Further,

although rule 8 of the Federal Rules of Criminal Procedure exists to "enhance the efficiency of

the judicial system," United States v. Bagby, 696 F.3d 1074, 1086 (10th Cir. 2012)(citation

omitted), and although "joint trials conserve state funds, diminish inconvenience to witnesses

and public authorities," United States v. Jones, 530 F.3d at 1298-99 (quoting United States v.

Lane, 474 U.S. 438, 449 (1986)), the Court is convinced that a joint trial for the Second

Superseding Indictment's charges would in fact not facilitate any of those principles.

Accordingly, acting under its authority pursuant to rule 14 of the Federal Rules of Criminal

Procedure, the Court will sever the Second Superseding Indictment at this time in accordance

with the United States' proffer at the February 7, 2017, hearing: Counts 6-12 will be severed

from Counts 1-5 and 13-16.  This severance order is akin to that of the trial court in United States

v. Gray, where the trial court -- tasked with managing an indictment of similar scale -- concluded

that in severing that case's indictment into two trial groupings, its chosen "arrangement of the

defendants appears to be, at least on the information now available, the most efficacious in

preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an

- 161 -

expeditious resolution for all defendants." United States v. Gray, 173 F. Supp. at 18.  As to the individual defendants arguing for further severance, the Court further tests their motions in accordance with the standard of prejudice they must demonstrate under Zafiro v. United States, all the while bearing in mind the beneficial effect of the trial's severance into two trial groupings by this opinion.

The Court thus grants in part and denies in part the Motion to Sever; Gonzales' Motion to Sever; A. Gallegos' Motion to Sever; Troup's Motion to Sever; Alonso's Motion to Sever; and Gonzales' Amended Motion to Sever.  In this opinion, the Court first explains its reasoning for choosing to sever the Second Superseding Indictment in the aforementioned fashion.  Next, the Court addresses its reasoning for choosing not to sever the Second Superseding Indictment as each of the individual moving Defendants has requested.  The Court's reasoning for those denials is rooted in part in the alleviation of the logistical complexities by severance into two distinct trial groupings.  The Court's reasoning is also rooted in its adherence to Tenth Circuit law providing: "[T]he Bruton rule, like the Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay statements."  United States v. Smalls, 605 F.3d at 768 n.2. Ultimately, the Defendants have not demonstrated a prejudice sufficient enough to warrant further severance from the two severed trial groupings at this time.

I.    **THE COURT WILL SEVER COUNTS 6-12 FROM COUNTS 1-5 AND 13-16.**

At present time the Court is faced with a Second Superseding Indictment charging Violent Crimes in Aid of Racketeering, and alleging:

**Count 1: Murder of Frank Castillo -- 3/26/2001 [Southern New Mexico]**
Angel DeLeon
Joe Gallegos
Edward Troup
Leonard Lujan
Billy Garcia

- 162 -

**Count 2: Murder of Rolando Garza -- 3/26/2001 [Southern New Mexico]**
Leonard Lujan
Billy Garcia
Eugene Martinez
Allen Patterson
Chris Chavez

**Count 3: Murder of Freddie Sanchez -- 2007 [Southern New Mexico]**
Javier Alonso
Edward Troup
Arturo Arnulfo Garcia
Ben Clark
Ruben Hernandez

**Counts 4 & 5: Murder of Adrian Burns -- 2012 [Socorro & Valencia Counties]**
Joe Gallegos
Andrew Gallegos

**Counts 6 & 7: Murder of Javier Molina -- 2014 [Southern New Mexico]**
Jerry Armenta
Jerry Montoya
Mario Rodriguez
Timothy Martinez
Anthony Ray Baca aka "Pup"
Mauricio Varela
Daniel Sanchez
Carlos Herrera
Rudy Perez

**Count 8: Conspiracy to Assault Julian Romero -- 2003 to 2015 [Southern New Mexico & Dona Ana County]**
Anthony Ray Baca
Gerald Archuleta aka "Styx"
Conrad Villegas

**Count 9: Conspiracy to Murder D. Santistevan -- 2013 to 2015**
Anthony Ray Baca
Roy Martinez
Robert Martinez

**Count 10: Conspiracy to Murder Marcantel -- 2013 to 2015**
Anthony Ray Baca
Roy Martinez
Robert Martinez
Christopher Garcia

- 163 -

**Count 11: Felon in Possession of Firearm**
Christopher Garcia

**Count 12: Using a Firearm during a Crime of Violence [924(c)]**
Christopher Garcia

**Count 13: Assault with Dangerous Weapon on Jose Gomez -- [Valencia County(not in prison)]**
Joe Gallegos

**Count 14: Conspiracy to Murder Jose Gomez -- Feb. 2016 -- [Otero & Valencia Counties]**
Joe Gallegos
Santos Gonzales
Paul Rivera
Shauna Gutierrez
Brandy Rodriguez

**Count 15: Attempted Murder of Jose Gomez -- [Valencia County (not in prison)]**
Joe Gallegos
Santos Gonzales
Paul Rivera
Shauna Gutierrez
Brandy Rodriguez

**Count 16: Witness Tampering -- [Valencia County (not in prison)]**
Joe Gallegos
Santos Gonzales
Paul Rivera
Shauna Gutierrez
Brandy Rodriguez

Second Superseding Indictment, passim.   The graphical representation of the charges is as follows:

| Counts: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2001 | 2007 | 2012 | 2012 | 2014 | 2014 | 03-15 | 2013 | 2013 | 2015 | 2015 | 2015 | 2016 | 2016 | 2016 |
| Angel DeLeon | x | | | | | | | | | | | | | | | |
| Joe Lawrence Gallegos | x | | x | x | | | | | | | | | x | x | x | x |
| Edward Troup | x | | x | | | | | | | | | | | | | |
| Leonard Lujan | x | x | | | | | | | | | | | | | | |
| Billy Garcia | x | x | | | | | | | | | | | | | | |
| Eugene Martinez | | x | | | | | | | | | | | | | | |
| Allen Patterson | | x | | | | | | | | | | | | | | |
| Christopher Chavez | | x | | | | | | | | | | | | | | |
| Javier Alonso | | | x | | | | | | | | | | | | | |
| Arturo Garcia | | | x | | | | | | | | | | | | | |
| Ben Clark | | | x | | | | | | | | | | | | | |
| Ruben Hernandez | | | x | | | | | | | | | | | | | |
| Jerry Armenta | | | | | | x | x | | | | | | | | | |
| Jerry Montoya | | | | | | x | x | | | | | | | | | |
| Mario Rodriguez | | | | | | x | x | | | | | | | | | |
| Timothy Martinez | | | | | | x | x | | | | | | | | | |
| Mauricio Varela | | | | | | x | x | | | | | | | | | |
| Daniel Sanchez | | | | | | x | x | | | | | | | | | |
| Gerald Archuleta | | | | | | | | x | | | | | | | | |
| Conrad Villegas | | | | | | | | x | | | | | | | | |
| Anthony Ray Baca | | | | | | x | x | x | x | x | | | | | | |
| Robert Martinez | | | | | | | | | x | x | | | | | | |
| Roy Paul Martinez | | | | | | | | | x | x | | | | | | |
| Christopher Garcia | | | | | | | | | | x | x | x | | | | |
| Carlos Herrera | | | | | | x | x | | | | | | | | | |
| Rudy Perez | | | | | | x | x | | | | | | | | | |
| Andrew Gallegos | | | | x | x | | | | | | | | | | | |
| Santos Gonzales | | | | | | | | | | | | | | x | x | x |
| Paul Rivera | | | | | | | | | | | | | | x | x | x |
| Shauna Gutierrez | | | | | | | | | | | | | | x | x | x |
| Brandy Rodriguez | | | | | | | | | | | | | | x | x | x |

As the Court mentioned, nineteen Defendants still remain in the case. Count 16 has also recently been added, and B. Rodriguez, too. The Court grants in part and denies in part each of the motions to sever. The Motion to Sever, in particular, advances

> three main arguments: (1) Counts 6 and 7 were improperly joined under Rule 8(a), as they do not share a sufficient nexus with the other charges to permit joinder; (2) the 2014 Defendants were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 21 other defendants; and

- 165 -

(3) should the Court find joinder proper under Rule 8(a) and Rule 8(b), severance is still required under Rule 14 and the Fifth Amendment because a joint trial of the 2014 Defendants for Counts 6 and 7 alongside the 21 other defendants and the 13 other counts in the superseding indictment will deprive the 2014 Defendants of their right to a fair trial.

Motion to Sever at 2.  Rule 8 of the Federal Rule of Criminal Procedure provides the standards for joinder of offenses and defendants in criminal cases:

> **(a) Joinder of Offenses.**  The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged -- whether felonies or misdemeanors or both -- are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> **(b) Joinder of Defendants.**  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8(a)-(b).  Courts construe this rule "broadly to allow liberal joinder to enhance the efficiency of the judicial system."  United States v. Bagby, 696 F.3d at 1086 (citation omitted).  This approach recognizes that "joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'"  United States v. Jones, 530 F.3d at 1298-99 (quoting United States v. Lane, 474 U.S. at 449).  "Joint trials of defendants who are indicted together are preferred because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  United States v. Hall, 473 F.3d at 1301-02 (quoting Zafiro v. United States, 506 U.S. at 537).

The Court first concludes that there is not misjoinder of Defendants or offenses in this case.  Because the charged offenses are alleged to be violent crimes in aid of racketeering activity, the joined offenses are "connected with or constitute parts of a common scheme or plan" under rule 8(a).  Fed. R. Crim. P. 8(a).  Similarly, rule 8(b) authorizes joinder of the individual

Defendants in this case, because the Defendants "are alleged to have participated in the same act or transactions constituting an offense or offenses," namely violent crimes in aid of a racketeering enterprise.  Fed. R. Crim. P. 8(b).

> If . . . [predicate] acts could properly be considered part of a "pattern of racketeering activity," we see no reason why they could not similarly constitute part of a "series of acts or transactions constituting an offense" within the meaning of Rule 8(b).  Indeed, a construction of Rule 8(b) that required a closer relationship between transactions than that necessary to establish a "pattern of racketeering activity" under RICO might possibly prohibit joinder in circumstances where Congress clearly envisioned a single trial.

United States v. Weisman, 624 F.2d 1118, 1129 (2d Cir. 1980).  The Court thus cannot soundly conclude that the Second Superseding Indictment, making VICAR allegations, misjoined either the Defendants or their charged offenses.  See United States v. Caldwell, 560 F.3d 1202, 1212 (10th Cir. 2009)(requiring a common thread amongst Defendants and offenses to warrant joinder).

Even if separate counts or defendants are appropriately joined under rule 8, where that joinder "appears to prejudice a defendant or the government," a "court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  "That is, Rule 14 provides a safety valve for the highly technical and inclusive analysis under Rule 8."  United States v. Thomas, 61 F. Supp. 3d 1221, 1226 (D.N.M. 2014)(Vázquez, J.), aff'd in part, 849 F.3d 906 (10th Cir. 2017).  In consideration of rule 14 severance, the Court has in the past used the three-part test it outlined in Gould, 2007 WL 1302587, when considering prejudice by the potential that joint defendants might proceed with antagonistic defenses, to guide its analysis:

> First, it must determine whether the defenses presented are so antagonistic that they are mutually exclusive.  Second, because mutually antagonistic defenses are not prejudicial per se, a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable

judgment about guilt or innocence.  Third, if the first two factors are met, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.

Gould, 2007 WL 1302587, at *2 (discussing United States v. Pursley, 474 F.3d at 765).  In consideration of rule 14, however, the Court has almost unlimited discretion to determine whether sufficient prejudice exists to warrant severance.  See Opper v. United States, 348 U.S. 84, 95 (1954).  To that point, the United States Court of Appeals for the Second Circuit has suggested that a defendant "must meet the heavy burden of showing that a joint trial would result in substantial prejudice amounting to a miscarriage of justice."  United States v. Gallo, 668 F. Supp. at 749 (citing United States v. Wilkinson, 754 F.2d 1427, 1435 (2d Cir. 1985); United States v. Sotomayor, 592 F.2d 1219, 1227 (2d Cir. 1979)).

> Among the factors the court must consider in determining whether the prejudice of a joint trial rises to the level of a "miscarriage of justice" are the following: the number of defendants and the number of counts; the complexity of the indictment; the estimated length of the trial; disparities in the amount or type of proof offered against the defendants; disparities in the degrees of involvement by defendants in the overall scheme; possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

United States v. Gallo, 668 F. Supp. at 749.  "There are no precise tests applicable to one or a combination of these factors that can provide a foolproof resolution under Rule 14."  United States v. Gallo, 668 F. Supp. at 749.  According to United States v. Gallo, then,

> the court must decide whether the jury would be "reasonably able" to consider the evidence as to each defendant separately, independent of the evidence against his or her coconspirators.  Often relied upon is the standard formulated by Judge Weinfeld in United States v. Kahaner, 203 F. Supp. 78, 81-82 (S.D.N.Y. 1962). . . .  The ultimate question is whether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct.  In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him?

United States v. Gallo, 668 F. Supp. at 749.  In some cases, despite

> the general presumption favoring joinder, some form of severance is necessary
> because of the physical limitations of the courtroom and hardship on the jurors,
> the defendants, and the Court.  Severance, however, should be of the most limited
> form necessary to satisfy those interests, because the Court finds that joinder of
> defendants, to the extent possible, will preserve judicial resources and permit the
> jury to have as complete a view of the evidence as possible.

United States v. Gray, 173 F. Supp. at 10.  The United States v. Gray court severed a "158-count

[Indictment]" charging "seventeen defendants" into two trial groupings based on logistical

concerns alone.  United States v. Gray, 173 F. Supp. at 1, 10.  The United States v. Gray court

also considered that

> [s]everal defendants have moved for complete severance or other joint trial
> configurations based on Rule 14 concerns of prejudice against defendants.  In
> order to prevail upon a claim for severance, [those] defendant[s] must show that
> joinder would violate that defendant's constitutional fair trial rights, or would
> "prevent the jury from making a reliable judgment about guilt or innocence."
> *Zafiro v. United States*, 506 U.S. [at] 539[].

United States v. Gray, 173 F. Supp. at 10.  Although the United States v. Gray court

preemptively severed the indictment in that case into two trial groupings to presumptively

alleviate the heightened risk of prejudice to the defendants by logistical inefficiency and

impracticality, the court was still open to further requests for severance of individual defendants

upon a specific showing of prejudice by joinder in either of the trial groupings.  See United

States v. Gray, 173 F. Supp. at 10.  The rule 14 inquiry regarding the propriety of joinder is

ongoing, and as the United States v. Gray court concluded when severing that case's indictment

into two trial groupings, its chosen "arrangement of the defendants appears to be, at least on the

information now available, the most efficacious in preserving judicial resources, preventing

duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants."

United States v. Gray, 173 F. Supp. at 18.  The Court considers the United States v. Gray

- 169 -

approach, as well as that of the district courts in the Second Circuit, to be the most-sound approach when considering multi-count and multi-defendant indictments. See 173 F. Supp. at 18; United States v. Moreton, 25 F.R.D. 262, 263 (W.D.N.Y. 1960)(Henderson, J.)("The complex involvement of the various defendants and the multiplicity of charges contained in the indictment would render it difficult, if not impossible, for the court to adequately charge a jury as to the applicable law with respect to each."). Here, the Court concludes -- as a threshold matter -- that numerous logistical and mechanical factors suggest that the jury's compartmentalization of the evidence during a joint trial of the nineteen Defendants might prove to be very difficult or unlikely, and the Court will accordingly sever the Superseding Indictment into two trial groupings, before it considers any other arguments regarding prejudice under rule 14.

First, the physical constraints of the courtroom present logistical challenges.  At the present time, the Court has created a large table for the Defendants by pushing two tables together.  At that table, the Court can sit five Defendants and seven to eight of their lawyers.  Not all Defendants in this case are seated at the table, meaning that some Defendants and their lawyers are seated in the gallery and in the jury box.  The Court has been using the Rio Grande Courtroom in Albuquerque, which is the largest courtroom in the District's two modern buildings that are for criminal trials.  The Court thinks that proceedings in Las Cruces, where this trial will be held, will pose harder problems for situating the Defendants than the Court has addressed in Albuquerque.  Thus, even a high single-digit Defendant trial will require some reorganizing of the courtroom.  The Court notes that it has not had to worry yet about the jury seeing chains and shackles, but that will be a major concern at trial.  However, the Court does not see how it can even try numerous Defendants at one time in a Las Cruces or Albuquerque

courtroom, even its larger one.  Thus, before it even considers prejudice, the Court concludes it must sever in some fashion.

The United States argues that the Court cannot consider the inconvenience to the Court or logistics until it determines that the parties will be prejudiced by failure to sever.  The United States relies on the Court's statements in <u>United States v. Gould</u>, wherein the Court quoted the Tenth Circuit's opinion in <u>United States v. Pursley</u>, which dealt with defendant's arguments for rule 14 severance, because the co-defendants intended to present mutually antagonistic and exclusive defenses at trial:

> First, it must determine whether the defenses presented are so antagonistic that they are mutually exclusive.  Second, because mutually antagonistic defenses are not prejudicial per se, a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence.  Third, if the first two factors are met, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.

<u>Gould</u>, 2007 WL 1302587, at *2 (relying on <u>United States v. Pursley</u>, 474 F.3d at 765).  The Court does not, however, read that quote as saying that the Court cannot consider logistical concerns.  Moreover, if the Court cannot physically try a case, that prejudices the parties.  It is here that rule 14 says: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  <u>Cf.</u> <u>United States v. Gray</u>, 173 F. Supp. 2d at 9 ("First, there is hardship on the administrative structure of the Court -- the absence of any 'one juror, one defendant, one defense attorney, one prosecutor' can thwart the progress of the trial.").

In any case, the Court is convinced that a joint trial of nineteen Defendants runs the risk of preventing the jury from making a reliable judgment.

- 171 -

> When many defendants are tried together in a complex case and they have markedly different degrees of culpability, the risk of prejudice that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence is heightened.

Zafiro v. United States, 506 U.S. at 539.  "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance."  United States v. Hack, 782 F.2d 862, 870 (10th Cir. 1986).  The potential risk that a joint trial of nineteen Defendants at this time will prevent the jury from making a reliable judgment is heightened where, as here, the Superseding Indictment's charges reflect the fact that the co-Defendants have "markedly different degrees of culpability."  Zafiro v. United States, 506 U.S. at 539.  There is a possibility that, in a trial of this magnitude, the jury would lump all defendants together and potentially think of them as a unit, rather than as individuals.  Severing the Second Superseding Indictment will lessen this risk to an acceptable level by lessening the burden on the jury to compartmentalize the evidence.

> The complex involvement of the various defendants and the multiplicity of charges contained in the indictment would render it difficult, if not impossible, for the court to adequately charge a jury as to the applicable law with respect to each . . . defendant, and for the jury to apply that law intelligently in reaching verdicts on the many charges involved.

United States v. Moreton, 25 F.R.D. at 263.  See United States v. Casamento, 887 F.2d 1141, 1152 (2d Cir. 1989)("In assessing the appropriate number of defendants for a trial, in which the prosecution's case is likely to exceed four months, the judge should require an especially compelling justification for a joint trial of more than 10 defendants.").

Again, compounding the jury's potential ability to make a reliable judgment for these Defendants is the impact that the Second Superseding Indictment's complexity will have on judicial resources, given the Second Superseding Indictment's inherent logistical and mechanical

- 172 -

issues as they relate to a nineteen-Defendant megatrial.  It is primarily for those mechanical and logistical problems which the Court will sever the Second Superseding Indictment into what it considers will be two smaller trials of less-than-ten Defendants each.  At present time, the Court has retained nearly all of the lawyers on the complex Criminal Justice Act panel in New Mexico to work for Defendants in this case.  Cf. United States v. Gray, 173 F. Supp. 2d at 9 ("First, there is hardship on the administrative structure of the Court -- the absence of any 'one juror, one defendant, one defense attorney, one prosecutor' can thwart the progress of the trial.").  If scheduling hearings for all of these Defendants to hear pretrial motions is an indicator, the logistical burden of scheduling and facilitating one large trial will be difficult.  The Defendants, further, are scattered at facilities across New Mexico, the fifth-largest state in the country, which burdens the United States Marshals and other law enforcement involved in prisoner transport. The Court can envision a scenario, in a joint trial of all of the Defendants, where there would be routine delays or postponements just as a result of the logistics.  Such delays and postponements, the Court supposes, would most likely have a negative impact on the jury's task in this case. Further, the Court has agreed to try this case in Las Cruces inside of a courtroom which is smaller than the courtroom in which the Court has held its hearings in Albuquerque.  At the pretrial hearings, the Court has been so burdened by the amount of Defendants that the Defendants have been seated everywhere in the courtroom -- and this has included the juror box, counsel tables, gallery, and even the corner off to the right side of the Court's bench.  Cf. United States v. Gray, 173 F. Supp. 2d at 8-9 (discussing the capacity and physical limitations of a courthouse in regard to a megatrial for multiple defendants).

Indeed, the Defendants make an argument which appeals to this problem in the Supplemental Pleading, which suggests that, "[a]lthough traditional Rule 8 and Rule 14

considerations are certainly always applicable, [c]ases have been severed in which there is no mention of prejudice to the prosecution or to the defendants." Supplemental Pleading at 4 (internal quotation marks omitted). The support for such severance, according to the Supplemental Pleading, comes from "the court's inherent authority to manage its case load and to sever in the interest of efficient administration of justice and judicial economy." Supplemental Pleading at 4. Cf. United States v. Bundy, 2016 WL 7227882 at *13-15 (D. Nev. 2017)(Leen, M.J.)("Courts have the inherent authority to manage their docket by severing large groups of defendants into more manageable groups."). Such argument, the Court concludes, comports with the United States v. Gray approach, wherein the district court first severed the trial into two manageable trial groupings given the potential risk of prejudice from the unsevered trial's logistics, and then considered other risks of prejudice on a case-by-case basis. See United States v. Gray, 173 F. Supp. at 18.

Generally, holding a joint trial would certainly be more convenient for the Court -- hence the genesis of rule 8. The potential risk of prejudice, however, outweighs this consideration on the facts of this case as it is presently situated. The Court, accordingly, concludes that the interests underlying its rule 14 authority counsel severance of the Superseding Indictment in some fashion given the logistical and mechanical impossibilities of a nineteen-Defendant megatrial. The United States has suggested two distinct trials, in which the Defendants are tried only once for the Counts in which they are named. The Court has reviewed the United States' suggestion, and agrees that their proffered method of severance of the Superseding Indictment will reduce the potential for prejudice leading the Court to conclude that severance of some type under rule 14 is appropriate. The Court also notes that, in light of the Second Superseding

Indictment, Count 16 will fit neatly into its calculations regarding severance of the Superseding Indictment.  The breakdown will be as follows.

The Court will sever Counts 1-5 and 13-15 of the Superseding Indictment for one trial and include in that grouping the Second Superseding Indictment's additional Defendant -- B. Rodriguez -- as well as its Count 16.  That severed trial would then involve the prosecution of eleven Defendants, none of whom are named in Counts 6-12.  At the February 7, 2017, hearing, the United States indicated that it anticipated plea deals would lessen the number of Defendants to as few as six Defendants in that grouping.  In the Court's own estimation, it anticipates the number of Defendants will fall from eleven to nine by the time of trial.  By severing Counts 1-5 and 13-16 from Counts 6-12, the Counts 6-12 grouping would involve the prosecution of eight Defendants, none of whom are named in Counts 1-5 or 13-16.  At the February 7, 2017, hearing, the United States indicated that it anticipated plea deals would lessen the number of Defendants to as few as seven Defendants in that grouping.  In the Court's own estimation, it anticipates the number of Defendants will fall from eight to five by the time of trial.

The Court is thus left with two trial groupings of what it anticipates will be less than ten Defendants each.  Cf. United States v. Gray, 173 F. Supp. at 18 (concluding its two trial group "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants").  Although the Court's research did not uncover any hard and fast bright line rule, the Court is confident that severing the nineteen Defendants into two trials of less than ten will yield the most effective and manageable path forward.  Many courts, especially in the Second Circuit, sever trials to ensure there are single-digit numbers of defendants.  See United States v. Casamento, 887 F.2d at 1152 ("In assessing

- 175 -

the appropriate number of defendants for a trial, in which the prosecution's case is likely to exceed four months, the judge should require an especially compelling justification for a joint trial of more than 10 defendants."). Cf. United States v. Bundy, 2016 WL 7227882 at *13-15 (severing indictment charging seventeen defendants into three groups of less than ten defendants); United States v. Gray, 173 F. Supp. 2d at 9 (severing indictment charging seventeen defendants into two groups of less than ten defendants); United States v. Andrews, 754 F. Supp. 1161, 1184 (N.D. Ill. 1990)(considering a nineteen-defendant indictment, and ordering severance into three groups of less than ten defendants); United States v. Gallo, 668 F. Supp. at 749 (considering a sixteen-defendant indictment and severing into 5 groups with less than ten defendants); United States v. John Shea, 750 F. Supp. 46, 48-50 (D. Mass. 1990)(Keeton, J.)("Given the number of defendants, the number of counts, and estimates of probable length of trial, the Court has an obligation to take steps early in the life of this case to ensure the goals enumerated in Rule 2 of the Federal Rules of Criminal Procedure: 'These rules are intended to provide for the just determination of every criminal proceeding.  They shall be construed to secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay.'")(emphasis omitted).  But see United States v. Cervone, 907 F.2d 332, 341-43 (2d Cir. 1990)(finding jury instructions were sufficient to avoid prejudice in a RICO case charging 18 defendants with numerous racketeering offenses, where the district court did not sever the indictment, and also stating that a district court's severance decision is "virtually unreviewable"); United States v. DiNome, 954 F.2d 839 (2d Cir. 1992)(finding careful instructions by the trial judge, an outline of the elements of the offenses charged, numerous requests for feedback, and the length of deliberations reinforced the court's conclusion that the jury comprehended a RICO case involving nine defendants charged with numerous racketeering

offenses -- and also stating that the district court's denial of the motion to sever could be reversed only upon a showing that "the district court clearly abused its discretion").

Having reviewed and considered all relevant pleadings and briefing in connection with the Motion to Sever, the Court concludes that the most logical, efficient, and manageable way to try this case is to sever the charges in the Second Superseding Indictment in this fashion. By severing Counts 6-12 from Counts 1-5 and 13-16, the Court is able to significantly lessen the burden of this complex case on the District of New Mexico, as well as elevate the jury's ability to make a reliable judgment for these Defendants in light of the case's expanse and complexity.

The Court will next consider each of the moving Defendants' arguments in favor of further severance. These Defendants have moved for either complete severance or other trial configurations based on rule 14 prejudice concerns. As presented, to prevail on an individual severance claim under rule 14 the Court will require a Defendant show that joinder -- in either of the two trial groupings -- will violate that Defendants' constitutional fair trial rights, or would otherwise "prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. at 539. There is a "heavy burden" of showing sufficient prejudice. United States v. Hall, 473 F.3d at 1302. Specifically, the Defendants in this case argue for further severance, because of the disparity of evidence, potential spillover prejudice, antagonistic defenses, and the admission of co-Defendants' inculpatory statements.

## II.   THE COURT DENIES THE REQUEST TO SEVER COUNTS 6 AND 7 IN THE MOTION TO SEVER.

The Counts 6 and 7 Defendants argue in the Motion to Sever that sufficient prejudice -- to them as a grouping individually -- would result from a joint trial of these Counts 6 and 7 Defendants with their co-Defendants in Counts 8-12. See Motion to Sever at 20. In the Motion to Sever the Counts 6 and 7 Defendants specifically cite the facts that: (i) "this case deals with a

complex RICO indictment spanning decades' worth of criminal allegations [involving] separate, distinct alleged murder conspiracies that took place at different points in time, involved completely different alleged conspirators, and different alleged victims"; (ii) "the disproportionality of the evidence in relation to the 30 defendants charged"; (iii) "it is unclear at this point whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive"; (iv) "[p]resentation of evidence on the multiple other alleged murders, conspiracy to commit murder, assaults and the firearms charges not contained in Counts 6 and 7 will subject the 2014 Defendants to undue prejudice by creating an atmosphere of criminal propensity"; (v) "[i]n a case this complex, a limiting instruction is more aspirational than a reality, and in a judicial system, dedicated to truth and justice, such a lack of connection with reality is unacceptable"; (vi) "severing . . . Defendants from the other co-defendants would best serve the interest of the Court and the jury"; and (vii) "[e]ven the largest of the federal courtrooms in the District of New Mexico, however, cannot adequately accommodate the trial, much less *voir dire*."  Motion to Sever 20-25.  The Counts 6 and 7 Defendants argue that "severance of Counts 6 and 7 is necessary to protect [their] respective rights to a fair trial under the Fifth Amendment."  Motion to Sever at 25.  The Counts 6 and 7 Defendants contend that "[m]isjoinder rises to the level of a constitutional violation when it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial" and that "[h]ere the fact that the defendants have been charged with VICAR offenses cannot overcome the 2014 Defendants' right to a fair trial on the charges alleged against them."  Motion to Sever at 26-28.  Accordingly, the Motion to Sever concludes:

> A joint trial of Counts 6 and 7 alongside the other 13 charges is not permitted under Rule 8(a), or Rule 8(b) and if it were, it is not permitted under Rule 14 or under the Fifth Amendment, as the 2014 Defendants would be prejudiced by the presentation to the jury of similar offenses by other purported members of the SNM.

- 178 -

Motion to Sever at 28.  The Court, by severing the case into two distinct trial groupings has -- in its estimation -- resolved the logistical and practical arguments which the Counts 6 and 7 Defendants make.  See Motion to Sever at 20-25.  Instead, then, the Court will focus on the Counts 6 and 7 Defendants' arguments that they still stand to suffer a more discrete and substantial prejudice from the joint trial with their co-Defendants in Counts 8-12, perhaps mandating further severance of their Counts.  In light of the Counts 6 and 7 Defendants' arguments, the Court must consider whether the Counts 6-12 trial grouping either violates the Counts 6 and 7 Defendants' constitutional fair trial rights, or would otherwise "prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. at 539.  That principle is the standard against which the Court must test the Counts 6 and 7 Defendants' arguments, and there is a "heavy burden" to show sufficient prejudice and persuade the Court that further severance under rule 14 is warranted.  United States v. Hall, 473 F.3d at 1302.

At the outset, the Court is not in a position at this time to ascertain whether the Counts 6 and 7 Defendants will present mutually exclusive antagonistic defenses as compared to their co-Defendants, and the Counts 6 and 7 Defendants concede that reality.  See Motion to Sever at 20-25.  The Counts 6 and 7 Defendants instead generally rely upon the potential for spillover prejudice as grounds for severance, suggesting that substantial prejudice exists given the numerous different victims and offenses that the Second Superseding Indictment charges, the different roles that each of the Defendants have allegedly played according to the Counts in the Second Superseding Indictment, and the inability of a limiting instruction to allow the jury to compartmentalize the evidence against each Defendant as an individual.  See Motion to Sever at

20-25. The Court does not agree that sufficient prejudice for further severance exists at this time

for the Counts 6 and 7 Defendants.

First, the Court notes that the Defendants were charged by a grand jury with the

following:

1.      Defendants were members/prospects/associates of the S[i]ndicato de
Nuevo Mexico (SNM) gang, a criminal organization whose
members/prospects/associates engaged in acts of violence and other criminal
activities, including murder, kidnapping, attempted murder, conspiracy to
manufacture/distribute narcotics, and firearms trafficking.

2.      SNM was formed after the February 1980 prison riots at the Penitentiary
of New Mexico, and has continued as a criminal enterprise within the New
Mexico penal system, and outside of that system, for almost 40 years, bolstering
as many as 500 members, and currently consisting of approximately 250.

3.      The gang, including its leadership, membership, prospects, and associates,
constitutes an "enterprise" as defined in Title 18, United States Code, Section
1959(b)(2), that is, a group of individuals associated in fact that engaged in, and
the activities of which affected, interstate and foreign commerce.

4.      The enterprise constitutes an ongoing organization whose
members/prospects/associates functioned as a continuing unit for a common
purpose of achieving the objectives of the enterprise.

5.      In addition to fighting for control over numerous illegal activities and
using violence and terror for the purpose of enriching themselves, the SNM gang
also engages in violence simply to assert its gang identity, to claim or protect its
territory, to challenge or respond to challenges, to retaliate against a rival gang or
member, to gain notoriety and show its superiority over others, and to send
messages to others that it was strong, powerful and not to be provoked.

6.      Members of the SNM gang are expected to seek out and beat, stab, or
shoot rival gang members.  Similarly, members of the SNM gang are expected to
confront and attack any suspected law enforcement informants, cooperating
witnesses, homosexuals, or sex offenders.

7.      Members who fail to show continued loyalty to the gang are disciplined in
various ways, to include murder and assaults.

United States' Response at 1-3 (internal citations omitted).  Each Defendant charged by the Second Superseding Indictment is, therefore, alleged to have committed an offense out of a "common purpose of achieving the objectives of the enterprise."  United States' Response at 1-3.  Joint trials under rule 8(b) can be an efficient administration of justice where the charges overlap factually, such as here, where the different Defendants charged in the different counts are logically sorted by the Second Superseding Indictment in accordance with discrete examples of SNM's criminal activity.  See United States' Response at 1.  This arrangement and joinder is -- to an extent -- logical, because SNM operates as a prison gang across New Mexico prison system -- where the incarcerated leaders cannot move freely -- and thus have been alleged to use separate SNM members or associates to carry on the SNM enterprise's business in different locations and in different fashions.  See United States' Response at 1.  The reality is that SNM's operations necessarily require that different leaders and members located within different prisons carry on the SNM's criminal enterprise.  See United States' Response at 1.  Because the United States  must prove as an element that the SNM is a racketeering enterprise, and, because Counts 6 and 7 relate to an SNM-sanctioned murder and conspiracy to murder an individual cooperating with law enforcement at Southern New Mexico, the Court considers it sound that the United States would try jointly the SNM members who carried out the SNM enterprise's criminal activity of murdering J.M. at Southern New Mexico (Counts 6 and 7), with the other SNM leaders and members charged with similar violent crimes in aid of racketeering.  See Fed. R. Crim. P. 8(b).  The Court also considers that the nature of the Second Superseding Indictment's charges and allegations -- which suggest that SNM's criminal operations as a prison gang throughout New Mexico inherently requires that the SNM have different leaders at the different prisons who order criminal activities and sanction murder of certain individuals by members and

associates in the same location as the victim and the leader(s) who ordered the hits -- is incompatible with the Counts 6 and 7 Defendants' arguments that the murder charged in those Counts was so remote in time, or was committed by such a remote group of individuals, that rule 14 must be used to sever the Counts given the possibility of spillover prejudice.

The Court recognizes, further, that prejudice "always exists when more than one defendant or offense are tried together." United States v. Gould, 2007 WL 1302587, at *2. Here, specifically, the Defendants are charged with engaging in violent criminal conduct in support of the SNM's alleged criminal enterprise; there will, undoubtedly, be prejudice given that the United States must prove how the discrete conduct charged in each of the Counts relates to the big-picture SNM enterprise. The Court is cognizant, however, of rule 8(b)'s import and Congress' choice to incriminate VICAR conduct in the manner in which it has chosen. To justify severance, the Defendants must demonstrate that joinder violates their constitutional fair trial rights, or would otherwise "prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. at 539. The "heavy burden" of showing sufficient prejudice, United States v. Hall, 473 F.3d at 1302, is not the only hurdle, however; even where a defendant may show such specific and compelling prejudice, both the Supreme Court and the Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover effect where limiting instructions may minimize the risk of undue prejudice, see Zafiro v. United States, 506 U.S. at 539 (limiting instructions often will suffice to cure any risk of prejudice); United States v. Lane, 883 F.2d 1484 (10th Cir. 1989)("As a general rule, we presume that juries follow [limiting] instructions."); United States v. Jones, 530 F.3d 1292 (10th Cir. 2008)(establishing that mere allegations that evidence against one defendant would have a "spillover effect" against another defendant does not demonstrate prejudice (internal quotations omitted)). Here, the

Counts 6 and 7 Defendants merely make general assertions of prejudice, and fail to specifically identify specific and compelling prejudicial concerns, arguing only that there may be propensity problems and an inability of the jury to compartmentalize the evidence, because limiting instructions are merely aspirational in a case this complex. See Motion to Sever at 20-25.  The Court must conclude, then, that the Counts 6 and 7 Defendants do not meet their burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence.  See Zafiro v. United States, 506 U.S. at 539.  The Court, further, will apply this conclusion across the board to all of the Defendants' motions for severance: mere assertions of spillover prejudice are not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise.   The Court is, in particular, emboldened about its conclusion to deny further severance to the Counts 6 and 7 Defendants, because it has already severed the trial into two distinct trial groupings.  Cf. United States v. Gray, 173 F. Supp. at 18.  These trial groupings will alleviate the burden on the jury to compartmentalize the discrete conduct charged in each Count, and, with the help of limiting instructions[18] -- which will charge the jury to consider each Count in the abstract of the others -- will ensure that the jury tests the United States' case in a manner that is fair to each individual Defendant.   See Zafiro v. United States, 506 U.S. at 539 (suggesting that jury limiting instructions can effectively eliminate prejudice in a joint trial).  The Court will not, therefore, sever Counts 6 and 7, from the Counts 6-12 trial grouping, at this time.

---

[18]For example, the Court -- where applicable -- will instruct the jury that the evidence admitted against a Defendant is competent evidence only as to that Defendant, and that the jury must disregard that evidence when determining any co-Defendants' guilt or innocence.

DNM 796

III.    **THE COURT DENIES THE REQUESTS IN GONZALES' AMENDED MOTION TO SEVER TO SEVER GONZALES.**

Gonzales' Amended Motion to Sever makes a variety of arguments in favor of severance of him, individually, because his charged offenses are distinguishable from the overarching SNM racketeering enterprise, the risk of prejudicial spillover, a disparity of evidence with respect to Gonzales, the existence of mutually antagonistic defenses, and the potential for a <u>Bruton v. United States</u> violation should a co-Defendant's statements be introduced against him.    <u>See</u> Gonzales' Amended Motion to Sever at 1-2.    The Court has already considered the Second Superseding Indictment's nature and the nature of its allegations regarding the Defendants' criminal conduct in contribution to the SNM racketeering enterprise, and has concluded that the inherent spillover prejudice is not so substantial as to warrant further severance; the Second Superseding Indictment alleges criminal conduct that is logically and appropriately separated into discrete Counts charging Defendants with committing the conduct for the SNM racketeering enterprise.    <u>See</u> United States' Response at 1-3.    Indeed, the Court is convinced that, in the context of its already severed two trial groupings, the Court will be able to adequately instruct the jury and manage the proceedings to ensure that the jury is able to compartmentalize the evidence, and to consider each count and defendant individually.    <u>See</u> <u>Zafiro v. United States</u>, 506 U.S. at 539.    Regarding Gonzales' argument about the disparity of evidence against him as compared to against his co-Defendants, the Court notes that VICAR, 18 U.S.C. § 1959, does not require, for example, that a defendant commit a "pattern of racketeering activity," but rather, the United States must prove that "an enterprise engaged in racketeering activity," and that individual members committed racketeering activity "for the group and/or in concert with other members, or acted in ways that contributed to [or furthered] the purposes of the group, or that were facilitated or made possible by the group." <u>United States v. Feliciano</u>, 223 F.3d at 116-17.

The Court, then, in consideration of the crimes' natures as the Second Superseding Indictment alleges, will require a much more substantial showing with respect to the evidence's alleged disparity, because Gonzales' singular violent conduct for the SNM racketeering enterprise is what the United States has charged.   See United States v. Feliciano, 223 F.3d at 116-17. Gonzales' claims that he is a "minor participant, lately come to the venture," or that he had no role in "devising" the SNM enterprise or was not in any manner involved in its execution, do not persuade the Court that severance is necessary to ensure his rights to a fair trial, on that account. Gonzales' Motion to Sever at 17.   See Zafiro v. United States, 506 U.S. at 539.   Gonzales also contends that he is not an SNM member and that he will present as a defense a wholesale denial of his guilt, which is necessarily a mutually exclusive antagonistic defense in comparison to his co-Defendants.   See Gonzales' Motion to Sever at 18.   That argument lacks merit, however, because the Tenth Circuit holds that, "[i]n this circuit, the conflict between codefendants' defenses must be such that 'the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'"   United States v. Lynn, 31 F.3d at 992 (citing United States v. Swingler, 758 F.2d 477, 495 (10th Cir. 1985)).   One party's denial of guilt, while accusing another, is "not so contradictory that the jury must have necessarily disbelieved one to believe another."   United States v. Lynn, 31 F.3d at 992.

Last, Gonzales argues that the United States will introduce, against him, incriminating statements provided to federal investigators by defendants Rivera and Gutierrez.   See Motion to Sever at 19.   Gutierrez' statement was made as follows:

> According to Ms. Gutierrez, on February 27, 2016, she allowed Brandi Rodriguez to borrow her truck.   According to Gutierrez, sometime later, Rodriguez returned to her trailer with Gonzales and Rivera and Rodriguez decided to go confront J.G. Gutierrez stated that Rodriguez, Rivera and Gonzales went to confront J.G. at the home where he was staying.   When the trio returned to Gutierrez's home, Rodriguez had blood on her shoes and all three asked to be taken home.

- 185 -

Motion to Sever at 19.   Rivera's statement was made as follows:

> [A]fter Paul Rivera was arrested, he said that he had been hanging out at Shauna
> Gutierrez's trailer.   On the morning of February 27, 2016, Shauna, Brandy
> Rodriguez and Rivera were at Shauna's trailer.   During which time, Shauna
> allegedly said that she had found out the whereabouts of J.G., a.k.a. Tiny.
> According to Rivera, Rodriguez and Gutierrez had been upset because J.G. would
> testify against Joe Lawrence Gallegos on a state murder case.   According to
> Rivera, after Gutierrez and Rodriguez had been discussing J.G., Santos Gonzales
> arrived at the trailer with his girlfriend.   Rivera told agents that he drove Gonzales
> and Rodriguez to the home where J.G. had been staying.   Rivera claimed that
> Santos Gonzales had a machete.   Rivera claimed that Mr. Gonzales hit J.G. with
> the machete and that Rodriguez had told J.G. "you better not testify against my
> jefe or I'll kill you."   After the beating, the trio allegedly went back to Gutierrez's
> trailer.   According to Rivera, Santos Gonzales cleaned the blood off the machete
> and some metal pieces.

Amended Motion to Sever at 20.   According to Gonzales, "[t]hese statements could be
interpreted by the jury as implicating Mr. Gonzales in misconduct related to the allegations set
forth in counts 14 and 15 and result in prejudice as Mr. Gonzales would not be able to confront
and cross examine the declarants," and further, "[t]h[at] prejudice cannot be cured or even
mitigated by a cautionary instruction."   Gonzales' Amended Motion to Sever at 20.[19]   Gonzales
argues, specifically,

> that the fact that Mr. Rivera and Ms. Gutierrez's incriminating statements against
> Mr. Gonzales are testimonial as defined by *Crawford v. Washington*, 541 U.S. 36
> (2004) and *Davis v. Washington*, *Hammon v. Indiana*, 547 U.S. 813 (2006),
> doubly implicates Mr. Gonzales' Sixth Amendment rights and the introduction of
> the statements would result in a violation thereof.   A defendant's right under the
> Sixth Amendment applies even if a co-defendant's statement does not directly or
> facially implicate another defendant so long as the statement is evidence of a fact
> critical to the government's case.   *United States v. Glass*, 128 F.3d 1398, 1404
> (10th Cir. 1997).   In this case, defendants Rivera and Gutierrez made

---

[19]Relying, in part, to the Supreme Court's rejection in Bruton v. United States of a trial
court's choice to only instruct the jury -- and to not redact in a meaningful way the hearsay
statement -- that although one defendant's confession was competent evidence against the
declarant, it was inadmissible hearsay against the co-defendant and therefore had to be
disregarded in determining the co-defendant's guilt or innocence.   See Bruton v. United States,
391 U.S. at 125.

incriminating statements to a law enforcement officer and the statements inculpate Mr. Gonzales. Mr. Gonzales was not present during Rivera and Gutierrez's statement. Where a *Bruton* situation exists, the Court may, despite the Confrontation Clause, admit the confession of a non-testifying co-defendant that does not expressly implicate the defendant. "'The confession must be (i) redacted to eliminate any reference to the non-confessing defendant, and (ii) accompanied by an appropriate limiting instruction that the confession is to be considered only against the confessor.'" *Fowler v. Ward*, 200 F.3d 1302, 1307 (10th Cir. 2000).

Gonzales' Amended Motion to Sever at 21-22. Gonzales contends that, because "it is clear that Rivera and Gutierrez's statements cannot be redacted in a way to omit reference to Mr. Gonzales, [and] because of the nature of the interview which led to Rivera and Gutierrez's incriminating statements," "[t]he only way to avoid a Confrontation Clause violation is to sever the trials of Mr. Gonzales from Rivera and Gutierrez." Gonzales' Amended Motion to Sever at 22-23. Rivera has pled and the United States intends to call Rivera to testify, mooting Gonzales' arguments as to Rivera; regarding Gutierrez, the Court agrees that the testimonial statements which Gutierrez made cannot be redacted in a manner which satisfies Bruton v. United States. Nonetheless, at this time, the Court concludes that, because the United States has indicated that it intends to run the risk of introducing limited evidence at the behest of severance, severance is not necessary under rule 14 at this time.

> At the outset, at the hearing, the Court noted Gonzales' argument, but stated:
>
> I think it's premature for me to decide what evidence is coming in and not. I know a lot of people argued Bruton problems and things like that, but the Government, I [have] opinions out there they can see what I do with [Bruton]. They've got to make a calculation . . . whether they'll get their evidence [in] but I thin[k] [it is] a little early for me to say this is in and that's out.

May Tr. at 43:17-25 (Court). The Court maintains its inclination that it is too soon to be definitively ruling on evidentiary issues without the benefit of more targeted briefing, and recognizes that, regarding Bruton v. United States issues, the United States agrees with the Court that the evidentiary issues may not be ripe for a determination at this time, and, that, specifically

regarding Gonzales' co-Defendants' statements, the United States intends to redact competently

such statements to avoid a <u>Bruton v. United States</u> problem at the trial.  <u>See</u> May Tr. at 55:10-

56:21 (Castellano, Court).  Here, the Court notes, however, that it might not be feasible to redact

Gutierrez' references to Gonzales to ensure that that her statements against her own interest are

admitted in a fashion which is only against her own interest.  The Court considered a redaction in

a number of ways, from changing pronouns to eliminating the reference to Gonzales altogether.

Indeed, the United States recognizes that, as it relates to <u>Bruton v. United States</u>, and its attempt

to introduce evidence of co-Defendants' statements, proceeding with a joint trial will be done "at

our own peril, Your Honor," as it comes to the admission of certain items of evidence."  May Tr.

at 57:3-4 (Castellano).  The Court analyses and redacts Gutierrez' statement as follows.

The Court explains, first, that when Gonzales addressed the <u>Bruton v. United States</u> issue

at the hearing, the Court stated: "It sounds like the Government is willing to run the risk that you

may be right on this <u>Bruton</u> problem and I may keep this evidence out and they still want to try

the cases to[gether] rather than separate."  May Tr. at 58:24-59:3 (Court).  Gonzales disagreed

and argued:

> I would submit to the Court that . . . clearly Ms. Gutierrez made statements [--]
> post arrest statements [--] that implicate Mr. Gonzales.  Essentially her statements
> put Mr. Gonzales at the scene of a crime [and] those are clearly in[culpatory]
> statements that raise a <u>Bruton</u> issue if we're tried with Ms. Gutierrez.  Ms.
> [Rodriguez] also implicated Mr. Gonzales, not just what one co-defendant said
> during the alleged commission of the crime but simply you have these defendants
> making post arrest statements to the Government about what each co-defendant
> allegedly did.  And Your Honor, I would submit to the Court that simply
> redacting, cutting out Mr. Gonzales' name is going to, is not going to cure the
> problem.

May Tr. at 59:4-18 (Johnson).  At this point, the Court explained:

> [When I] really focus [on] what I think is one of the main things is when I turn to
> this jury and start instructing this jury, when they can compartmentalize the
> evidence, and I think on Ms. Johnson's client that they can.  They can

compartmental[ize and] I think it's going to be reduced.  I know there [are] going to be some evidentiary issues, I don't minimize those in any way and we're going to have to work through [that] but I think as far as giving Ms. Johnson her client a fair trial, I think I have gone a long ways toward doing that, and so I'm not inclined to grant the . . . motion to sever.  Down [the] road if it pops up and Government starts looking at its evidence and wants to rethink[], we can certainly look at it . . . but I think at the present time [the] severance that's been granted is going to solve a lot of the problems for Ms. Johnson and Mr. Go[nzales], and so I'm not inclined to grant it.

May Tr. at 62:7-63:7 (Court).  Regarding Bruton v. United States, then, and Gutierrez' obviously inculpatory statement which suggests her role as a potential accomplice to assault, the Court notes that, in its experience, it on some occasions has been able to redact statements like this and instruct the jury in a sufficient manner to comply with Bruton v. United States' requirements pertaining to testimonial statements such as those here which Gutierrez made to law enforcement agents.   See   United States v. Verduzco-Martinez, 186 F.3d 1208, 1214 (10th Cir. 1999)("[W]here a defendant's name is replaced with a neutral pronoun or phrase there is no Bruton violation, provid[ed] that the incrimination of the defendant is only by reference to evidence other than the redacted statement and a limiting instruction is given to the jury.")(citing Bruton v. United States, 391 U.S. at 123).  The statement at issue here is different, on this record. Gutierrez' statement is as follows:

According to Ms. Gutierrez, on February 27, 2016, she allowed Brandi Rodriguez to borrow her truck.  According to Gutierrez, sometime later, Rodriguez returned to her trailer with Gonzales and Rivera and Rodriguez decided to go confront J.G.  Gutierrez stated that Rodriguez, Rivera and Gonzales went to confront J.G. at the home where he was staying.  When the trio returned to Gutierrez's home, Rodriguez had blood on her shoes and all three asked to be taken home.

Motion to Sever at 19.  The Court notes that neither party has cited to the Court the exact statement at issue or provided the Court with the document that contains the proffered statement, and the Court must thus work from the replication Gonzales provides.  Cf. United States' Gonzales Response at 13-14.  Given that the statement is post-arrest and knowingly made to a

- 189 -

police officer, Gutierrez' statement, under <u>Bruton v. United States</u> and <u>Crawford v. Washington</u>, is testimonial.  On this record, the Court cannot redact the statement to only incriminate her.  The first statement incriminates someone else: "According to Ms. Gutierrez, on February 27, 2016, she allowed <u>Brandi Rodriguez</u> to borrow her truck."  Motion to Sever at 19 (emphasis added).  The second sentence incriminates three people: "According to Gutierrez, sometime later, <u>Rodriguez</u> returned to her trailer with <u>Gonzales</u> and <u>Rivera</u> and <u>Rodriguez</u> decided to go confront J.G."  Motion to Sever at 19 (emphases added).  The third sentence incriminates three people: "Gutierrez stated that <u>Rodriguez</u>, <u>Rivera</u> and <u>Gonzales</u> went to confront J.G. at the home where he was staying."  Motion to Sever at 19 (emphases added).  Likewise, the fourth sentence incriminates three people: "When the trio returned to Gutierrez's home, <u>Rodriguez</u> had blood on her shoes and <u>all three</u> asked to be taken home."  Motion to Sever at 19 (emphases added).  The Court is not convinced that it can, under <u>Bruton v. United States</u>, redact the four sentences to only incriminate Gutierrez -- her self-inculpation flows from inculpating the others.  Accordingly, the Court will exclude the statement entirely.  The United States will need to think hard whether it has other evidence, but the Court does not think that this confession or self-incriminating statement may come in.  The Court, accordingly, cannot redact this statement to alleviate any <u>Bruton v. United States</u> concerns at this time.  The United States may need other evidence.  If it has none, the United States may be in a position where severance of Gonzales from Gutierrez could become necessary.  The Court may not be able to admit this statement without severing Gonzales from Gutierrez.  The Court notes that the United States' theory might also involve statements made by Gutierrez regarding where J.G. was located.  The Court does not yet have a full picture of all the evidence against these Defendants in these Counts.  At the present time, however, the Court will not sever Gonzales, because the United States has stated

that it intends to run the risk of limiting evidence rather than pursue severing more Defendants.

See May Tr. at 57:3-4 (Castellano)(discussing at the hearing that the United States recognizes that, as it relates to Bruton v. United States, and its attempt to introduce evidence of co-Defendants' statements, proceeding with a joint trial will be done "at our own peril, Your Honor," as it comes to the admission of certain items of evidence).

In a complex joint trial such as this, the Court is prepared to reconsider such nuanced evidentiary decisions when they are fully briefed as motions in limine.  At this time, the Court still has an unclear picture of which Defendants will be testifying at trial, what statements the United States intends to introduce at trial, and what the precise context is of the excerpted statements that Gonzales alludes to in Gonzales' Amended Motion to Sever.  The United States is now on full alert that the Court will scrutinize testimonial statements that co-Defendants in this case have made which inculpate other co-Defendants, before the Court admits them in light of Bruton v. United States' ban on the admission against joint defendants of unredacted co-defendants' testimonial statements against interest.  See Bruton v. United States, 391 U.S. at 135-36.  Bruton v. United States, the Court reiterates, held:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.  Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.  Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect. . . .  The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. . . ."

Bruton v. United States, 391 U.S. at 135-36.  The Court, accordingly -- despite not being able to admit the statement before it at this time -- cannot conclude at this time that sufficient prejudice

to Gonzales exists warranting his further severance from the Counts 1-5 and 13-16 trial grouping

at this time.

## IV.   THE COURT DENIES THE REQUESTS TO SEVER COUNTS 4 AND 5 IN A. GALLEGOS' MOTION TO SEVER.

A. Gallegos contends that the Court should sever Counts 4 and 5, because this SNM case

is comparable to the case United States v. Gallo, arguing:

> Like *Gallo*, this case deals with a complex RICO indictment spanning decades'
> worth of criminal allegations.  In fact, this Court declared it complex on January
> 7, 2016, even before the government unsealed the April 21, 2016, superseding
> indictment. . . .  Also similar to *Gallo* is the disproportionality of the evidence in
> relation to the 30 defendants charged.  A review of the discovery to date
> demonstrates that the government has revealed far more and far stronger evidence
> against some co-defendants, including audio-recorded conversations and self-
> incriminating statements, than against others.  Accordingly, "[i]nevitable
> prejudice to the peripheral defendants is caused by the slow but inexorable
> accumulation of evidence against the major players." . . .   To date, the
> government has only presented rumor, conjectures and circumstantial evidence as
> to the guilt of the Gallegos Defendants, which is not only substantially weaker
> evidence when compared to the evidence against most of the other defendants, but
> is clearly indicative of the government relying on the principle of "guilt by
> association" to prove their case in counts 4 and 5.

A. Gallegos' Motion to Sever at 16-17.  A. Gallegos concedes that "it is unclear at this point

whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive," but he

nonetheless contends "there can be no doubt that there will be antagonistic defenses.  For

instance, many defendants may argue they were not or are not SNM members.  Other defendants

will likely argue the alleged crimes were not done in furtherance of the SNM."  A. Gallegos'

Motion to Sever at 17.  A. Gallegos gives no further examples, and the Court agrees it is not in a

position to understand what defenses each Defendant may present at this time.  Ultimately,

however, A. Gallegos' argument in favor of severance of Counts 4 and 5 -- in addition to relying

on the logistics and impracticality of a joint 16-Count trial -- maintains that the risk of prejudice

in this case is great, given the different nature of all of the Counts, and that he specifically --

being charged only in Counts 4 and 5 -- risks that an appeal to guilt by association with his co-Defendants will bolster the scant evidence against him.  See A. Gallegos' Motion to Sever at 17-18.  A. Gallegos also reiterates that the Superseding Indictment's nature limits the potential effectiveness of a limiting instruction to the jury, stating that,

> if no severance is granted, the jury will hear about the other murders, conspiracies to commit murder (not of the same victims), a conspiracy to commit assault, assault, and an attempted murder plus the firearms charges, all allegedly in furtherance of the SNM.  Simply hearing about this activity by alleged fellow gang members makes it unlikely the Gallegos Defendants can get a fair shake with the jury, even if a limiting instruction is given and even if the defendants present viable defenses.

A. Gallegos' Motion to Sever at 18-19.  The Court disagrees at this time.

The Court has already concluded that the risk of spillover prejudice does not warrant severance of any individual counts in this case.  Here, A. Gallegos merely makes a general assertion of prejudice, and fails to specifically identify specific and compelling prejudicial concerns, arguing only that there may be an inability of the jury to compartmentalize the evidence against him, because limiting instructions will not stop the weight of evidence against his co-Defendants from spilling over and affecting his defense.  The Court again concludes that A. Gallegos has not met his heavy burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence in his case.  See Zafiro v. United States, 506 U.S. at 539.  A. Gallegos' mere assertion of spillover prejudice is not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise.  The Court, further, has already severed the trial into two distinct trial groupings, alleviating a lot of A. Gallegos' concerns regarding prejudice.  Cf. United States v. Gray, 173 F. Supp. at 18 (concluding that its "arrangement of the defendants appears to be, at least on the information now available, the most

efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants"). The Court reiterates that these trial groupings will alleviate the burden on the jury to compartmentalize the discrete conduct that each Count charges, and, with the help of limiting instructions -- which will charge the jury to consider each Count in the abstract of the others -- will ensure that the jury tests the United States' case in a manner that is fair to each individual Defendant. See Zafiro v. United States, 506 U.S. at 539 (suggesting that jury limiting instructions can effectively eliminate prejudice in a joint trial). The Court will not, therefore, sever A. Gallegos, from the Counts 1-5 and 13-16 trial grouping, at this time.

## V.   THE COURT DENIES THE REQUEST TO SEVER COUNTS 1 AND 2 IN TROUP'S MOTION TO SEVER.

Troup's Motion to Sever, concerned with severance of Counts 1 and 2, argues that at this stage in the prosecution, "there is no way to determine whether a failure to sever will be actually prejudicial, because the Court cannot know how the evidence will come in or even if there will be a conviction. All this Court can evaluate is whether there is a risk of prejudice warranting severance." Troup's Reply at 5-6. As it pertains to Counts 1 and 2, Troup primarily argues:

> By alleging that SNM is a singular enterprise spanning several decades, the government attempts to render admissible any evidence about that enterprise regardless of applicability to any charged individual. . . . In painting with such a broad brush, however, the government demonstrates why severance is necessary to protect the 2001 Defendants from unfairly prejudicial evidence and testimony. . . . [T]he government does not really dispute that after the homicides at issue in Counts 1 and 2, SNM factionalized and did not reflect what it may have been previously. Nor does the government dispute that the members of SNM who conspired to murder corrections officials in the community in 2015 as alleged in Counts 9 and 10, and the organization that would be the SNM at that time, bore no connection to the individuals charged in Counts 1 and 2.

Troup's Reply at 6. Accordingly, because Counts 1 and 2 are remote in time and, because Troup contends that the Counts 1 and 2 Defendants are not part and parcel involved in the same SNM

gang activity as those Defendants charged with conduct in the more recent Counts -- such as Counts 13-16 -- Troup urges the Court to further sever the Second Superseding Indictment to avoid a risk of spillover prejudice to the Counts 1 and 2 Defendants.  See Troup's Reply at 8. That is, Troup argues that severance is appropriate, because "spillover prejudice will prevent the jury from individualizing each defendant."  Troup's Reply at 10 (internal quotation marks and citation omitted).  Troup also asserts that a joint trial will likely result in a "tangled web" of complicated jury instructions, which he argues supports further severance, because the jury will struggle to compartmentalize the evidence.  Troup's Reply at 10-13.

The United States disagrees.  According to the United States, as it has argued in its responses to other Defendants' severance motions, the Counts 1 and 2 Defendants have been charged with VICAR conduct for the SNM enterprise.  See United States' Troup Response at 1-3.  In particular, Counts 1 and 2 allege:

> At approximately 8:35 a.m., R.G., an inmate and associate of the SNM, was found dead in his cell in the Ocean-One-Yellow housing unit at the SNMCF.  R.G.'s body was discovered lying down on his stomach in his bed.  It appeared that he had been strangled.  Nearly 30-minutes later, F.C., an inmate and active member of the SNM, was found dead in his cell in the Paul-One-Green housing unit at the SNMCF.  F.C.'s body was discovered lying face down in his bed with a laundry bag tied around his neck.  The autopsy revealed that the cause of death as to both victims was ligature strangulation, and the manner of death was homicide.  After an extensive investigation, federal investigators discovered that a "green light" was issued for R.G. and F.C. by the SNM.  It was believed that R.G. was cooperating with federal investigators and F.C. "ratted" on another inmate while in prison in Santa Fe.  Witnesses and confidential human informants confirmed that the "green light" was issued by Billy Garcia, a high ranking member of the SNM, and that Edward Troup was involved in the murder of F.C.

United States' Troup Response at 2.  The United States reiterates, then, that it has

> charged Defendants with participating in the affairs of the SNM enterprise through the commission of the alleged racketeering acts.  As the Superseding Indictment alleges, Defendants are members of the SNM, a criminal enterprise, and, at the behest of the gang, participated in racketeering acts, namely the murders of F.C. and R.G. . . .  The Superseding Indictment characterizes the

- 195 -

Defendants' collective conduct as "Violent Crimes in Aid of Racketeering" pursuant to 18 U.S.C. § 1959(a)(1). . . .  Accordingly, Defendants cannot escape joinder by claiming that they are in "no way shape or form" responsible for Counts 9 and 10 when the co-Defendants' alleged acts fulfill the essential elements of the SNM VICAR conspiracy.

United States' Troup Response at 7.  Regarding Troup's arguments that the changes in leadership for SNM between the time that the conduct alleged in Counts 1 and 2 occurred, and the present time, the United States maintains that "the change of name or factions within a group does not establish the existence of separate and distinct groups," and that

the Government is required to prove three structural features to establish the existence of an association-in-fact enterprise: "a purpose, relationships among those associated with the racketeering enterprise, and longevity sufficient to permit these associates to pursue the racketeering enterprise's purpose."  A reasonable jury could find that despite variations of membership, the criminal purpose of the SNM has remained the same: to preserve and protect the power, territory, reputation, and profits of the enterprise throughout the New Mexico penal system and the streets of New Mexico through the use of intimidation, violence, threats of violence, assaults, and murder.

United States' Troup Response at 9-10.

Troup primarily argues that spillover prejudice favors further severance of Counts 1 and 2; the Court has already concluded, however, that the risk of spillover prejudice does not warrant severance of any individual counts in this case.  Here, Troup merely makes a general assertion of prejudice, and fails to specifically identify specific and compelling prejudicial concerns, arguing only that there may be an inability of the jury to compartmentalize the evidence against the Counts 1 and 2 Defendants, because limiting instructions will not stop the weight of evidence against the more-recent offending Defendants from spilling over and affecting their defense.  See Troup's Reply at 10.  The Court again concludes that Troup has not met his heavy burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence regarding the Counts 1 and 2 Defendants in this case.  See Zafiro v. United States, 506

- 196 -

U.S. at 539.  Troup's reliance on an assertion of spillover prejudice rooted in remoteness of time and flux regarding SNM leadership is not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise.  It is not surprising that an organization -- criminal or otherwise -- changes and evolves over time, particularly as leadership changes.  Organizations' cultures change.  That change does not mean, however, that the organization no longer exists.  The Court cannot and should not decide the issue on a motion to sever.  That issue is one for the jury, and the United States will have to prove, beyond a reasonable doubt, that there has been one and only one SNM enterprise, and that it still exists.  The Court, further, has already severed the trial into two distinct trial groupings, alleviating a lot of Troup's concerns regarding prejudice by the jury's failure to compartmentalize.  Cf. United States v. Gray, 173 F. Supp. at 18 (concluding that its "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants").  The Court reiterates that these trial groupings will alleviate the burden on the jury to compartmentalize the discrete conduct that each Count charges, and, with the help of limiting instructions -- which will charge the jury to consider each Defendant in the abstract of the others -- will ensure that the jury tests the United States' case in a manner that is fair to each individual Defendant.  See Zafiro v. United States, 506 U.S. at 539 (suggesting that jury limiting instructions can effectively eliminate prejudice in a joint trial).  The Court will not, therefore, sever Counts 1 and 2, from the Counts 1-5 and 13-16 trial grouping, at this time.

VI.   **THE COURT DENIES THE REQUESTS IN ALONSO'S MOTION TO SEVER TO SEVER HIM FROM COUNT 3 AND TO SEVER COUNT 3 IN TOTALITY.**

Alonso's Motion to Sever requests that the Court "sever Count 3 from all other counts of the Superseding Indictment. Within Count 3, Mr. Alonso further moves that his trial be severed from the trial of co-defendant Edward Troup." Alonso's Motion to Sever at 1. In support of the motion, Alonso -- in addition to arguing that the interests of judicial economy warrant some severance generally -- argues primarily that "severance is . . . required under Rule 14 and the Fifth Amendment because a joint trial of [] Mr. Alonso alongside the other remaining defendants and the 14 other counts in the Superseding Indictment will deprive him of his right to a fair trial." Alonso's Motion to Sever at 2. Regarding Count 3 in particular, Alonso provides:

> Count 3 alleges that Edward Troup, Javier Alonso, Arturo Arnulfo Garcia, Benjamin Clark, and Ruben Hernandez, murdered Freddie Sanchez on June 17, 2007 at the Southern New Mexico [] in Las Cruces. Based on the discovery produced to date, it appears that the government's theory regarding Count 3 is that co-defendants Arturo Garcia and Benjamin Clark ordered that Freddie Sanchez be killed, that codefendant Ruben Hernandez assisted in the homicide by covering security cameras, and that co-defendants Edward Troup and Javier Alonso killed Freddie Sanchez. While defense counsel has attempted to discern the government's theory, discovery has been produced that contradicts the government's presumed theory.

Alonso's Motion to Sever at 4. Under rule 14, then, Alonso provides that he will endure prejudice in a joint trial, "because (1) there is no nexus between Count 3 and the other counts, and (2) because Count 3 and the other counts are not based on the same act or transaction . . . a joint trial would be unfair to Mr. Alonso." Alonso's Motion to Sever at 9. Specifically, Alonso argues that "[t]he introduction of evidence of the other 14 unrelated crimes purportedly committed by . . . co-defendants who are not charged in Count 3 will deprive Mr. Alonso of his rights to fair trial such that severance should be granted under Rule 14." Alonso's Motion to Sever at 9. Alonso also argues that the "complexity of the indictment, the disproportionality of

evidence, and the presence of evidence that would only be admissible as to some defendants

make severance a prudent exercise of discretion."   Alonso's Motion to Sever at 9.   Further,

although the United States argues each of the Superseding Indictment's counts are "linked by a

shared affiliation with the SNM," Alonso argues that "such link did not exist as to Mr. Alonso

during the time alleged in Counts 4-15."   Alonso's Motion to Sever at 9-10.

Alonso also argues why he, individually, requests "severance . . . from Edward Troup,"

because "Edward Troup allegedly made statements that, if admitted at a joint trial, would

implicate Javier Alonso."   Alonso's Motion to Sever at 12.   Specifically, Alonso explains:

> In *Bruton v. United States*, 391 U.S. 1231 (1968), the Supreme Court held that
> admission of a non-testifying co-defendant's confession implicating a defendant
> at their joint trial violated the defendant's Sixth Amendment Confrontation Clause
> rights.   *Bruton*, involved two defendants -- Evans and Bruton -- tried jointly for
> robbery.   Evans did not testify, but the Government introduced into evidence
> Evans' confession, which stated that both he (Evans) and Bruton together had
> committed the robbery. . . .   The trial judge told the jury it could consider the
> confession as evidence only against Evans, not against Bruton. . . .   The Court
> held that, despite the limiting instruction, the introduction of Evans' out-of-court
> confession at Bruton's trial had violated Bruton's right, protected by the Sixth
> Amendment, to cross-examine witnesses. . . .   The Court recognized that in some
> circumstances a limiting instruction may not adequately protect one defendant
> from the prejudicial effects of the introduction at a joint trial of evidence intended
> for use only against a different defendant.

Alonso's Motion to Sever at 12.   Alonso also notes that, in Bruton v. United States, the Supreme

Court held that

> "there are some contexts in which the risk that the jury will not, or cannot, follow
> instructions is so great, and the consequences of failure so vital to the defendant,
> that the practical and human limitations of the jury system cannot be ignored.
> Such a context is presented here, where the powerfully incriminating extrajudicial
> statements of a codefendant, who stands accused side-by-side with the defendant,
> are deliberately spread before the jury in a joint trial.   Not only are the
> incriminations devastating to the defendant but their credibility is inevitably
> suspect. . . .   The unreliability of such evidence is intolerably compounded when
> the alleged accomplice, as here, does not testify and cannot be tested by cross-
> examination. . . ."   The Court found that Evans' confession constituted just such a
> "powerfully incriminating extrajudicial statement," and that its introduction into

evidence, insulated from cross-examination, violated Bruton's Sixth Amendment rights.

Alonso's Motion to Sever at 13 (quoting Bruton v. United States, 391 U.S. at 135-36).  Here, Alonso contends that Troup has made statements which implicate him and might result in a Confrontation-Clause violation should he be tried with Troup.  See Alonso's Motion to Sever at 13.  Alonso provides that the statements he has pinpointed are as follows:

> Statement at Deleon 680-681 []: Here Mr. Troup allegedly told a CHS that he held Freddie Sanchez's legs while Javier Alonso strangled him with the drawstring from a laundry bag.

> Statement at Deleon 1238-1239 []: Here Mr. Troup allegedly told a CHS that the murder of Freddie Sanchez was called by Arturo Garcia and Gerald Archuleta, that he (Troup) was part of the murder, and that Javier Alonso was ordered to kill Sanchez.

> Statement at Baca 2464 []: Here Mr. Troup allegedly told a CHS that he and Javier Alonso killed Freddie Sanchez.

Alonso's Motion to Sever at 13.  Because of the inculpatory and inherently prejudicial nature of these statements, Alonso requests further individual severance under rule 14.  See Alonso's Motion to Sever at 13.

The Court, first, will address Alonso's request to sever Count 3 from the other Counts in the Second Superseding Indictment.  Here, Alonso primarily argues that spillover prejudice and a disparity of evidence favors further severance of Count 3 from the other Counts in the Second Superseding Indictment; the Court has already concluded, however, that the risk of spillover prejudice does not warrant severance of any individual counts in this case.  The Court, in considering Alonso's arguments, views them as making a general assertion of prejudice that fail to specifically identify specific and compelling prejudicial concerns.  Instead, Alonso attempts to argue only that the jury may be unable to compartmentalize the evidence against the Counts 3 Defendants, because limiting instructions will not stop the weight of evidence against their co-

Defendants from spilling over and affecting their defense in a prejudicial manner.  The Court

again, concludes that Alonso has not met his heavy burden of showing that the jury would be

prevented from making a reliable judgment about guilt or innocence regarding the Count 3

Defendants in one joint trial.  See Zafiro v. United States, 506 U.S. at 539.  This case involves a

VICAR indictment, and Alonso's reliance on the potential for spillover prejudice overlooks the

inherent nature of the SNM criminal enterprise and Congress' choice to criminalize this conduct

in this fashion.  The Court, further, has already severed the trial into two distinct trial groupings,

alleviating a lot of Alonso's concerns regarding prejudice by the jury's failure to

compartmentalize in a constitutional manner.  Cf. United States v. Gray, 173 F. Supp. at 18

(concluding that its "arrangement of the defendants appears to be, at least on the information

now available, the most efficacious in preserving judicial resources, preventing duplicitous

testimony and evidence, and reaching an expeditious resolution for all defendants").  The Court

reiterates that these trial groupings will alleviate the burden on the jury to compartmentalize the

discrete conduct that each Count charges, and, with the help of limiting instructions -- which will

charge the jury to consider each Count in the abstract of the others -- will ensure that the jury

tests the United States' case in a manner that is fair to each individual Defendant.  See Zafiro v.

United States, 506 U.S. at 539 (suggesting that jury limiting instructions can effectively

eliminate prejudice in a joint trial).  The Court will not, therefore, sever Count 3, from the

Counts 1-5 and 13-16 trial grouping, at this time.  The Court next considers Alonso's arguments

that Bruton v. United States requires severance of him from his co-Defendant Troup; and,

additionally, should Bruton v. United States not apply to Troup's statements, whether the

admission of Troup's statements requires severance of Troup from Alonso nonetheless.

The problem with Alonso's reliance on Bruton v. United States is twofold.  First, in 2004, the Supreme Court in Crawford v. United States held that the Confrontation Clause protects defendants only from the introduction of testimonial hearsay statements without the opportunity to meaningfully confront the declarant.  Second, subsequent to Crawford v. United States, the majority of the Courts of Appeal similarly have held that Crawford v. Washington has now limited Bruton v. United States to only protect co-defendants from testimonial statements.  See United States v. Dale, 2010 WL 2977410, at *9 (holding that the defendant's statements to prisoner were not testimonial and therefore did not violate the co-defendant's Confrontation Clause rights); United States v. Castro-Davis, 612 F.3d at 65 (holding that the defendant's recorded telephone statements to his mother was non-testimonial); United States v. Smalls, 605 F.3d at 768 n.2 ("[T]he Bruton rule, like the Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay statements."); United States v. Johnson, 581 F.3d at 326 (holding that, because Bruton v. United States is based on the Confrontation Clause, then it also applies only to testimonial statements, and any non-testimonial statement is not subject to it); United States v. Pike, 292 F. App'x at 112 ("[B]ecause the statement was not testimonial, its admission does not violate either Crawford or Bruton.").  Accordingly, the Tenth Circuit has foreclosed the analysis underlying Alonso's arguments and instead dictates the Court's inevitable conclusion that Crawford v. Washington limits Bruton v. United States' scope to co-Defendants' testimonial statements.  See United States v. Smalls, 605 F.3d at 768 n.2.  In United States v. Smalls, the Tenth Circuit -- in no uncertain terms -- stated:

> In Bruton, the Court held that defendant was deprived of his Sixth Amendment right to confrontation where his accomplice's confession, made to a postal inspector during an interrogation, was introduced at their joint trial.  The Court explained that a limiting jury instruction was insufficient under the facts of the case to cure any prejudice to that defendant.  As will become apparent from our opinion, Bruton is consistent with the present state of Sixth Amendment law

- 202 -

because the accomplice's confession, unlike Cook's statement, was testimonial, rendering it inadmissible against the defendant absent an opportunity for cross-examination.  Notably, however, the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements.

United States v. Smalls, 605 F.3d at 768 n.2 (emphasis added).  United States v. Smalls, specifically, involved a joint prosecution of three co-defendants, and considered statements that one co-defendant -- Cook -- made which implicated himself and his co-defendants.  See United States v. Smalls, 605 F.3d at 767-68.  One co-defendant pled, and relying on Bruton v. United States, the district court severed the two remaining defendants' -- Cook and Smalls -- trials, concluding that Cook's statement could not be introduced against his remaining co-defendant, Smalls.  United States v. Smalls, 605 F.3d at 768 n.2, 772-73.  The United States nonetheless moved to admit this statement against Smalls in his separate trial, arguing that the statement was made by Cook against Cook's penal interests.  See 605 F.3d at 772-73.  The district court concluded that Cook's statement was non-testimonial and then "analyzed the admissibility of Cook's statement under the framework of the Supreme Court's Confrontation Clause jurisprudence as set forth in *Ohio v. Roberts*," thereafter concluding that the statement lacked a "particularized guarantee of trustworthiness" and that it should be excluded.  United States v. Smalls, 605 F.3d at 772-73.

When the United States appealed that decision to the Tenth Circuit, the Tenth Circuit reversed it.  See 605 F.3d at 773-74.  The Tenth Circuit concluded that, if Cook's statement had been testimonial, its exclusion would have been proper, but, because the statement was non-testimonial, the Confrontation Clause's protections do not apply.  See 605 F.3d at 787.  As long, therefore, as the statement met the definition for "statements against interest" under the Federal Rules of Evidence, it would be admissible against Smalls.  United States v. Smalls, 605 F.3d at 780.  The Tenth Circuit, accordingly, held that the district court had erred in excluding the

entirety of Cook's statement, and then remanded the case so the district court could determine exactly which parts of Cook's statement were self-inculpatory and therefore admissible against Smalls.  See 605 F.3d at 786-87.  Notably, in reaching this conclusion, the Tenth Circuit also provided:

> Although the district court's severance order is not part of the record on appeal, we take judicial notice of it under Fed. R. Evid. 201 as it appears of record in *United States v. Smalls*, No. 06-CR-2403-RB-1, Memorandum Opinion and Order (D.N.M. May 7, 2008)(Doc. # 280).  Relying on *Bruton v. United States*, 391 U.S. 123 [] and its progeny, the district court reasoned the admission into evidence of a recorded statement in which Cook incriminated both himself and his alleged cohorts before a CI would violate Defendant Smalls' right to confrontation.  In *Bruton*, the Court held that defendant was deprived of his Sixth Amendment right to confrontation where his accomplice's confession, made to a postal inspector during an interrogation, was introduced at their joint trial.  The Court explained that a limiting jury instruction was insufficient under the facts of the case to cure any prejudice to that defendant.  As will become apparent from our opinion, *Bruton* is consistent with the present state of Sixth Amendment law because the accomplice's confession, unlike Cook's statement, was testimonial, rendering it inadmissible against the defendant absent an opportunity for cross-examination.  Notably, however, the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements.

United States v. Smalls, 605 F.3d at 768 n.2 (emphasis added).  In the Tenth Circuit, then, the import of United States v. Smalls is that Crawford v. Washington limited Bruton v. United States and now protects only against the admission of co-Defendants' testimonial statements.  See United States v. Smalls, 605 F.3d at 768 n.2.  The Court's analysis, therefore, must proceed by first inquiring whether Troup's statements which Alonso challenges are testimonial and, then, if they are testimonial, inquiring whether redaction of the statements would alleviate the Bruton v. United States concerns.  Should the Court be unable to alleviate the Bruton v. United States concerns, the Court would be forced to consider severance of Alonso and Troup under rule 14, because a co-defendant's testimonial and inculpatory statement would be inadmissible against the declarant's co-defendants.  See United States v. Smalls, 605 F.3d at 768 n.2.

- 204 -

The Court begins its analysis by recognizing that Troup made his statements to what appears to be various different CHSs.  Those statements, as Alonso describes them, are -- once more -- as follows:

> Statement at Deleon 680-681 []: Here Mr. Troup allegedly told a CHS that he held Freddie Sanchez's legs while Javier Alonso strangled him with the drawstring from a laundry bag.

> Statement at Deleon 1238-1239 []: Here Mr. Troup allegedly told a CHS that the murder of Freddie Sanchez was called by Arturo Garcia and Gerald Archuleta, that he (Troup) was part of the murder, and that Javier Alonso was ordered to kill Sanchez.

> Statement at Baca 2464 []: Here Mr. Troup allegedly told a CHS that he and Javier Alonso killed Freddie Sanchez.

Alonso's Motion to Sever at 13.  In full, the statements are as follows.  Troup, first, apparently spoke to a CHS, with the relevant FBI report stating:

> In late November 2012, [REDACTED] had a conversation with SNM gang member EDWARD TROUP in back yard off of [REDACTED] in Albuquerque. During the conversation, TROUP confessed to being a part of two murders in which two people were strangled to death at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico.  TROUP stated that during one of the murders, he held "Fred Dawg's" (agent note: identified as FREDDIE SANCHEZ, DOB) legs while "Wino" (agent note: identified as SNM gang member JAVIER ALONSO, Jr., DOB) strangled him to death with a drawstring from a laundry bag.  Both TROUP and ALONSO disposed of the drawstring and then took off their clothes and tore up the evidence in an attempt to hide their part in the murder.

FBI 302 Report, U.S. v. Deleon, Et Al 680-81 at 1-2, filed February 5, 2017 (Doc. 893-1)("Troup Statement 1").  Troup, next, apparently spoke to another CHS, with the relevant FBI report stating:

> Fred Sanchez, aka Fred Dawg, from Roswell, New Mexico, was killed by the SNM because he "ratted."  The murder of Sanchez was called by SNM leaders Arturo Garcia, aka Shotgun and Gerald Archuleta, aka Sticks.  Troup bragged about being a part of the murder of Sanchez as well, and told that Javier Alonso Jr., aka Wino, also from Roswell, was ordered to kill Sanchez.

- 205 -

FBI 302 Report, U.S. v. Deleon, Et Al 1238-39 at 1-2 (interview with CHS taken July 5, 2013), filed February 5, 2017 (Doc. 893-2)("Troup Statement 2").   A third FBI Report and CHS Reporting Document indicates that: "In 2007, Edward Troupe [sic] admitted to CHS that he and Javier Alonso killed Freddie Sanchez."  FBI 302 Report FD-1023, U.S. v. Baca, Et Al 2464 at 1, filed February 5, 2017 (Doc. 893-3)("Troup Statement 3").

The Court concludes that Troup's statements are not testimonial, and therefore that Bruton v. United States does not bar their introduction against Alonso under the Confrontation Clause.   In Crawford v. Washington, the Supreme Court held that, consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  541 U.S. at 59.  In Davis v. Washington, the Supreme Court has further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.  The Tenth Circuit has also restated this rule, defining a testimonial statement as "a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'"   United States v. Morgan, 748 F.3d at 1048 (alteration in original)(quoting United States v. Smalls, 605 F.3d at 777-78).  Accord United States v. Chaco, 801 F. Supp. 2d at 1209-10 (discussing developments in Tenth Circuit precedent on the test

regarding what qualifies as a testimonial statement).[20]   With respect to precisely what a

"testimonial" statement is, however, the Supreme Court in <u>Crawford v. Washington</u> was careful

---

[20]Specifically, the Court explained:

The Tenth Circuit has stated that a critical element in determining whether a statement is testimonial or non-testimonial "centers on the reasonable expectations of the declarant." <u>United States v. Summers</u>, 414 F.3d 1287, 1302 (10th Cir. 2005). The Tenth Circuit has held that "a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime." <u>United States v. Townley</u>, 472 F.3d 1267, 1272 (10th Cir. 2007) (quoting <u>United States v. Summers</u>, 414 F.3d at 1302). Other Circuit Courts of Appeal are in accord. <u>See</u> <u>United States v. Townley</u>, 472 F.3d at 1272 (citing <u>United States v. Hinton</u>, 423 F.3d 355, 360 (3d Cir. 2005); <u>United States v. Cromer</u>, 389 F.3d 662, 675 (6th Cir. 2004); <u>United States v. Saget</u>, 377 F.3d 223, 229 (2d Cir. 2004)). The Tenth Circuit in <u>United States v. Smalls</u> . . . called into question some aspects of the definition of testimonial that it set down in <u>United States v. Summers</u>. <u>See</u> <u>United States v. Smalls</u>, 605 F.3d at 777 ("Upon close inspection, Summers' definition of 'testimonial' appears somewhat in tension with <u>Davis[ v. Washington</u>, 547 U.S. 813[] (2006) ]' strictures, and perhaps overly broad. . . ."). Specifically, the Tenth Circuit stated that a testimonial statement must be made in a "formal" context, although they were not specific about what that might mean. <u>See</u> <u>United States v. Smalls</u>, 605 F.3d at 777-78. Next, the Tenth Circuit specified that the <u>United States v. Summers</u> articulation ignored the statement's "primary purpose," and focused instead on the foreseeability to the declarant of the purposes to which the statement "might" be put. <u>United States v. Smalls</u>, 605 F.3d at 777-78. With those two clarifications, it declined to restate a precise definition of a testimonial statement, instead setting forth two proposed definitions, either one of which it might adopt if the issue were put directly before it:

> [W]e might today formulate a definition of a testimonial statement which reads: a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution. Or, to better conform to the current state of Tenth Circuit precedent, we might say: A formal statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime.

<u>United States v. Smalls</u>, 605 F.3d at 778 (proffering these potential tests, but

not to provide a definition to differentiate "testimonial" from "non-testimonial" hearsay, and instead only noted that "various formulations," "articulations," or "definitions" of "testimonial" could be posited; and, apart from citing examples of statements that would qualify as testimonial under any definition, the Supreme Court specifically declined to undertake crafting a controlling definition of testimonial.  541 U.S. at 51-53.  The Court indeed made sure to reiterate that it was not providing a definition for testimonial:  "[W]e leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"  541 U.S. at 68.  The Supreme Court has provided, however, that statements defendants make to fellow prisoners are not testimonial, meaning they would not fall under the purview of the Confrontation Clause after Crawford v. Washington.  See Davis v. Washington, 547 U.S. at 825 (providing that statements from one prisoner to another are "clearly" not testimonial).  The Court considers that this guidance is particularly persuasive in the context of Troup's statements to the CHSs -- whom the Court considers were similarly situated to the prisoner-type CHS comprehended by Davis v. Washington -- whom are now at issue in this case.

Essentially, in Bruton v. United States, the Supreme Court held that a defendant is deprived of his Sixth Amendment right to confrontation where his co-defendant's inculpatory statement, made to a government agent, is introduced at their joint trial.  The Bruton v. United States doctrine and rule, as Crawford v. Washington refined it, thus protects a defendant's right to confrontation by barring the admission of testimonial statements that a non-testifying co-defendant makes.  See United States v. Smalls, 605 F.3d at 768 n.2.  The statements here, by

---

holding "we need not now . . . tender a definitive definition of 'testimonial,' because Cook's statement is nontestimonial regardless of which of the foregoing definitions we apply").

United States v. Chaco, 801 F. Supp. 2d at 1209-10.

which Troup confessed to CHSs that he and Alonso had been ordered to kill, and killed, F.S.,

appear to have been made boastfully and in passing, particularly Troup Statement 1, which the

Court understands occurred in a "backyard."  Troup Statement 1 at 2.  See Troup Statement 2 at

1 ("Troup bragged . . . .").  Although the Crawford v. Washington court was sure not to impose

upon the lower courts a hard-and-fast rule for what a testimonial statement might be, the

Supreme Court has subsequently provided that, where a co-defendant's statements are "made

unwittingly to a Government informant," those statements are not testimonial and are therefore

not afforded the protections provided by Bruton v. United States.  United States v. Smalls, 605

F.3d at 777 ("A declarant's statements to a confidential informant, whose true status is unknown

to the declarant, do not constitute testimony . . . .")(quoting United States v. Saget, 377 F.3d 223

(2d Cir. 2004)).  See Davis v. Washington, 547 U.S. at 825 (citing Bourjaily v. United States,

483 U.S. 171, 181-84 (1987)(considering statements made unwittingly to a government

informant); Dutton v. Evans, 400 U.S. 74, 87-89 (1970)(plurality opinion)(considering

statements from one prisoner to another)).  Indeed, the Tenth Circuit more explicitly emphasized

this maxim in United States v. Smalls, stating:

> Synthesizing *Crawford* and *Davis*, we might today formulate a definition of a
> testimonial statement which reads: a formal declaration made by the declarant
> that, when objectively considered, indicates the primary purpose for which the
> declaration was made was that of establishing or proving some fact potentially
> relevant to a criminal prosecution.  Or, to better conform to the current state of
> Tenth Circuit precedent, we might say: A formal statement is testimonial if a
> reasonable person in the position of the declarant would objectively foresee that
> the primary purpose of the statement was for use in the investigation or
> prosecution of a crime.  *See Summers*, 414 F.3d at 1302.  As we recognized in
> *Summers*, "'[t]he proper inquiry . . . is whether the declarant intends to bear
> testimony against the accused.'"  *Id.* at 1302 n.9 (quoting *United States v.
> Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)).  And the standard by which a court
> measures the declarant's intent is an objective one.  *See Davis*, 547 U.S. at 822;
> *Summers*, 414 F.3d at 1302.  Fortunately, we need not now resolve the apparent
> tension between *Davis* and *Summers*, or tender a definitive definition of
> "testimonial," because Cook's statement is nontestimonial regardless of which of

the foregoing definitions we apply.  In *Davis*, the Court expressed the view that "statements made unwittingly to a Government informant" or "statements from one prisoner to another" are "clearly nontestimonial."

United States v. Smalls, 605 F.3d at 778.

Absent a testimonial statement, then, Alonso cannot make out an argument premised in the Confrontation Clause with respect to the possible introduction of Troup Statement 1, Troup Statement 2, and Troup Statement 3, all of which inculpate him in a murder.  Indeed, because there cannot be a Confrontation Clause violation on the basis of these nontestimonial statements, the Court considers Alonso's issues with these statements to be akin to the arguments each Defendant in this case has been raising regarding spillover prejudice and disparity of the evidence.  The Court, however, has only been given snippets of the evidence that is available to the parties, with these three statements being an example of those particular snippets which the parties choose to attach to their pleadings.  Alonso has not, as of yet, argued to the Court that these three inculpatory statements by Troup are the only items of evidence against him -- or perhaps only a small example of the evidence against him.  Should Alonso or the United States represent as much to the Court, the rules of evidence, like rule 403, could further come into play as the Court considers the United States' case against Alonso.  At the present time, in the context of a motion to sever, the Court is not prepared to sever Alonso from Troup on the basis of three nontestimonial statements which, under Crawford v. Washington and United States v. Smalls, do not implicate Alonso's rights under the Confrontation Clause.  The Court is prepared, however, to make a preliminary ruling as to the admissibility of Troup's three nontestimonial statements in the context of the already severed trial grouping of Counts 1 to 5 and 13-16.  The Court recognizes this issue was briefed and argued as being a Confrontation Clause issue, and thus will

leave open the possibility that further argument and evidence from the parties could alter the Court's perception of the evidence as it relates to the hearsay rules.

To be sure, the Court does not have a robust record to make a definitive Bruton v. United States determination.  Trial is set for July 10, 2017.  First, the Court does not know, definitively, whether the CHS in each of the three statements is the same person.  Because the parties have not told the Court otherwise, the Court will assume it is the same CHS, or at least the different CHSs are similarly situated.  Second, the parties do not tell the Court that the CHS or CHSs are testifying.  If they are not testifying, then there is no Bruton v. United States issue for the Court to decide.  Third, the parties have not indicated that the CHS was a paid informant at the time the statements were made.  The Court will assume the CHS was not paid or otherwise working for the United States or some other government agency at the time.  In other words, the CHS was not working off charges or otherwise cooperating with a government agency at the time the statements were made.  If the CHS were working for or with a government when the statements were made, the Court might need to look closer at whether the statements were testimonial.  Accordingly, the statements do not appear to be testimonial, and the Court does not understand Alonso to argue otherwise.  The statements are, under Smalls v. United States, admissible against Alonso and Troup.  Even if the Court were to sever Alonso from Troup, these statements would be admissible against Alonso in a separate, standalone trial.  Hence, even if the Court were to sever Alonso's trial from Troup's, the severance would not accomplish what Alonso wishes.

Moreover, even if the Supreme Court or Tenth Circuit clarifies the law before the time of trial, and decides that Bruton v. United States requires some cutting and pasting, the Court can do that with these statements.  As to Troup Statement 1, the Court could put a period after "legs," and eliminate the rest of that sentence.  In the next sentence, the Court could delete "Both" and

"and Alonso," and replace "their" with "his" in the rest of the sentence.   Troup Statement 1

would then read:

> During the conversation, TROUP confessed to being a part of two murders in
> which two people were strangled to death at the Southern New Mexico
> Correctional Facility (SNMCF) in Las Cruces , New Mexico.   TROUP stated that
> during one of the murders, he held "Fred Dawg's" (agent note: identified as
> FREDDIE SANCHEZ, DOB [REDACTED]) legs.    TROUP disposed of the
> drawstring and then took off his clothes and tore up the evidence in an attempt to
> hide his part in the murder.   TROUP told [REDACTED] that CHICKIE LNU and
> his brother cleaned up the mess that was made during the murder, to include
> Sanchez' urine.   TROUP also said that an unknown Corrections Officer (CO)
> thought that the inmates were giving each other tattoos, and did not respond to the
> area of the commotion, despite the fact that tattooing was considered contraband
> inside the prison facility.   As a result, the SNM gang members were able to carry
> out the murder without any CO intervention.   TROUP also mentioned that the
> murder of Fred Dawg was an order from headquarters , to which [REDACTED]
> interpreted the term "headquarters" to mean the main New Mexico Prison Facility
> in Santa Fe, New Mexico, where the majority of the SNM leadership was
> incarcerated.   [REDACTED] stated that TROUP was remorseful and was crying
> during much of the conversation.   TROUP told [REDACTED] that Fred Dawg
> provided information on a murder, which was against the SNM by-laws, and that
> was the cause for his murder.

Troup Statement 1 at 1.   Thus, under an older <u>Bruton v. United States</u> analysis, the statement is

coming in against Troup.   There is no reason to sever the case when this statement can be

redacted, as provided, to ensure that it comes in against Troup alone.

The result is the same for Troup Statement 2.   The Court can put a period after "well" and

end the sentence there.   Troup Statement 2, barring any further <u>Bruton v. United States</u>

redactions, would then read:

> Fred Sanchez, aka Fred Dawg, from Roswell, New Mexico, was killed by the
> SNM because he "ratted."   The murder of Sanchez was called by SNM leaders
> Arturo Garcia, aka Shotgun and Gerald Archuleta, aka Sticks.   Troup bragged
> about being a part of the murder of Sanchez as well.

Troup Statement 2 at 1.  Thus, under an old Bruton v. United States analysis, the statement is coming in against Troup.  There is no reason to sever the case when the statement will come in against Troup alone if the case is tried jointly.

The result for Troup Statement 3 is, again, the same.  The Court could take out "and Javier Alonso."  The statement would then read: "Edward Troupe [sic] admitted to CHS that he killed Freddie Sanchez."  Troup Statement 3 at 1.  There is no sound reason to sever the case further when the statement about which Alonso is concerned can come in against Alonso even if he were tried alone.  Moreover, even under an old Bruton v. United States analysis, the statement is still coming in -- as redacted by the Court -- even if Alonso and Troup are tried together.

Here, Alonso cannot keep the statement from coming in, even if Troup is in the case.  The Court can redact it, even under an old Bruton v. United States analysis, to let it in against Troup.  There is no Bruton v. United States problem.  And under Smalls v. United States, it is coming in against Alonso.

The Court, now being left with Troup's three nontestimonial statements which inculpate his co-defendant Alonso, will admit the hearsay statements under an unavailable-declarant exception to the hearsay rule.  Again, the United States appears to be eager to introduce these statements against Alonso in its prosecution of Count 3, and Troup does not appear eager to testify.  Because Troup's statements are nontestimonial and the Confrontation Clause does not come into effect, the Federal Rules of Evidence alone will govern their admissibility, and the Court concludes that these hearsay statements will be admissible against Alonso under rule 804's exception to the ban against hearsay where the declarant is unavailable, "subject, of course, to Rule 403's balancing test."  United States v. Smalls, 605 F.3d at 780.  See Fed. R. Evid. 804(b)(3).  Under rule 804, a hearsay statement is admissible if it is:

A statement that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3)(A)-(B).  Rule 802 "renders hearsay, defined in Rule 801 as an out-of-court statement 'offered in evidence to prove the truth of the matter asserted,' generally inadmissible precisely because it is considered unreliable."  Williamson v. United States, 512 U.S. at 598 (quoting Fed. R. Evid. 802).  Rule 804(b)(3) is one of many exceptions, however, to the hearsay ban, because -- in part -- a hearsay statement "against the declarant's penal interest" is "less subject to legitimate claims of unreliability."  United States v. Smalls, 605 F.3d at 780.  Indeed, "[r]ule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."  Williamson v. United States, 512 U.S. at 599.  In the Tenth Circuit, "'[t]he circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true.'"  United States v. Smalls, 605 F.3d at 780-81 (quoting Fed. R. Evid. 804 advisory committee's notes).  The Tenth Circuit has held, further, that "'[t]here are many circumstances in which Rule 804(b)(3) does allow the admission of statements that inculpate a criminal defendant,' including 'the confessions of arrested accomplices . . . if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor.'"  United States v. Smalls, 605 F.3d at 781 (quoting Williamson v. United States,

- 214 -

512 U.S. at 603).  To explicate this concept, the Tenth Circuit has relied on Supreme Court guidance and stated:

> Perhaps the best (but not only) examples of "truly self-inculpatory" statements admissible against third persons arise in cases of conspiracy.  The Court provided the following explanation, apropos to the present state of affairs:
>
>> For instance, a declarant's squarely self-inculpatory confession -- "yes, I killed X" -- will likely be admissible under Rule 804(b)(3) against accomplices who are being tried under a co-conspirator liability theory.  Likewise, by showing that the declarant knew something, a self-inculpatory statement can in some situations help the jury infer that his confederates knew it as well.  And when seen with other evidence, an accomplice's self-inculpatory statement can inculpate the defendant directly.

United States v. Smalls, 605 F.3d at 782 (quoting Williamson v. United States, 51 U.S. at 603).

Troup Statement 1, Troup Statement 2, and Troup Statement 3 all proceed in the same fashion: Troup makes a self-inculpatory statement to a CHS that he and Alonso killed F.S.  See Troup Statement 1 at 1-2; Troup Statement 2 at 1-2; Troup Statement 3 at 1.  At no point does Troup shift the blame or even appear to reprise his own role in the murder.  See Troup Statement 1 at 1-2; Troup Statement 2 at 1-2; Troup Statement 3 at 1.  The Court, accordingly, considers Troup Statement 1, Troup Statement 2, and Troup Statement 3 to be sufficiently "against the declarant's penal interest" to make them "less subject to legitimate claims of unreliability." United States v. Smalls, 605 F.3d at 780.  The Court concludes that the statements are admissible under rule 804(b)(3), but must next consider the statements under rule 403's balancing test.

Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court weighs the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record,

873 F.2d at 1375.  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d at 638 (quoting United States v. Sides, 944 F.2d at 1563).  Further, district courts should "remain mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  See United States v. Smalls, 605 F.3d at 780 (citing United States v. Tan, 254 F.3d at 1211).

A trial court is vested with wide discretion to balance possible unfair prejudice against probative value.  See United States v. Bice-Bey, 701 F.2d at 1089; United States v. Masters, 622 F.2d at 87-88.  Evidence can be unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.  See United States v. Rodriguez, 192 F.2d at 951.  Evidence is not unfairly prejudicial simply because it damages a case.  See United States v. Caraway, 543 F.3d at 1301; United States v. Curtis, 344 F.3d at 1067; United States v. Martinez, 938 F.2d at 1082.  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 453 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee's note)(emphasis omitted).

Here, Alonso has not had the opportunity to explicate for the Court precisely what evidence he will face at trial.  Alonso has provided in Alonso's Motion to Sever only Troup Statement 1, Troup Statement 2, and Troup Statement 3.  The Court has already concluded that those statements are admissible hearsay statements against penal interest and further concludes that they are not unfairly prejudicial.  Upon this record, the Court is hard pressed to conclude that

"the evidence [has] 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"   United States v. Caraway, 453 F.3d at 1301. Regarding the evidence's probative value, which directly implicates both Troup and Alonso in the murder of F.S., such evidence is exceedingly probative.  Regarding the prejudicial impact of the evidence to Alonso, evidence of his involvement in the crime charged does not otherwise tend to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.  See United States v. Rodriguez, 192 F.2d 951. The Court will not, on this record, exclude the evidence of Troup Statement 1, Troup Statement 2, or Troup Statement 3.

Accordingly, the Court will deny Alonso's request to sever Count 4, from the Counts 1-5 and 13-16 trial grouping, and will also deny Alonso's request to sever him from a joint trial for Count 3 alongside of Troup.  Regarding severance of Count 3 itself, Alonso has not met his high burden of demonstrating that the risk of spillover prejudice in this joint trial necessitates severance of the individual count.  As the Court has mentioned previously, with respect to Alonso's assertions of impracticality and logistical concerns, the Court has already exercised its discretion, and severed the Second Superseding Indictment into two manageable and logically cohesive trial groupings, alleviating -- in the Court's estimation -- much of those concerns. Further, the statements Troup made to CHSs regarding the murder alleged by Count 3 do not implicate his Count 3 co-Defendant Alonso's rights under the Confrontation Clause, because they are nontestimonial.  The hearsay statements are, also, nonetheless admissible against both Troup and Alonso as statements against penal interest.  And, even if the Court does an "old school" Bruton v. United States analysis for prejudice, it could redact or separate each statement to inculpate only Troup and not also Alonso, and still try them together.  The Court will not sever

Alonso from Troup, and try Count 3 twice, because Alonso has not demonstrated a sufficient risk of prejudice by merely contesting the admission of a co-Defendant's inculpatory, nontestimonial statements.

**IT IS ORDERED** that: (i) the Defendants' Joint Motion to Sever Defendants Charged with Offenses in Counts 6 & 7, filed December 23, 2016 (Doc. 807), is granted in part and denied in part; (ii) Defendant Santos Gonzales' Motion for a Severance of Defendant, filed January 27, 2017 (Doc. 858), and Defendant Santos Gonzales' Amended Motion for a Severance of Defendant, filed February 7, 2017 (Doc. 901), are granted in part and denied in part; (iii) Defendant A. Gallegos' Opposed Motion to Sever Counts Four and Five, filed January 31, 2017 (Doc. 868), is granted in part and denied in part; (iv) Defendants Troup and Billy Garcia's Motion to Sever Counts 1 and 2, filed February 2, 2017 (Doc. 882), is granted in part and denied in part; and (v) Defendant Javier Alonso's Motion to Sever Count 3 and to Sever the Trials of Edward Troup and Javier Alonso, filed February 5, 2017 (Doc. 893), is granted in part and denied in part.  The Court, accordingly, severs: (i) Counts 6-12 of the Second Superseding Indictment into one trial grouping; and (ii) Counts 1-5 and 13-16 of the Second Superseding Indictment into a second trial grouping.  The Court is, at the present time, prepared to first try the Counts 1-5 and 13-16 trial grouping, because Defendant Gonzales has asserted his Speedy Trial Act rights and objects to any continuances.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

  *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

  *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

  *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

-- and --

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

     *Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

-- and --

Appellate Case: 20-2058   Document: 010110415663   Date Filed: 09/29/2020   Page: 1196

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

     *Attorney for Defendant Arturo Arnulfo Garcia*

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

-- and --

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

DNM 834

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

    *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

-- and --

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

    *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

    *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

-- and --

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

    *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

-- and --

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

-- and --

Christopher W. Adams
Charleston, South Carolina

    *Attorneys for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

-- and --

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Carlos Herrera*

Donald R. West
Don West Law
Orlando, Florida

-- and --

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

    *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Santos Gonzales*

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

    *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*

Alfred D. Creecy
Walz & Associates
Albuquerque, New Mexico

    *Attorney for Defendant Brandy Rodriguez*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

   vs.                                 No. CR 15-4268 JB

ANGEL DELEON, et al.,

       Defendants.

### FOURTH SCHEDULING ORDER

**THIS MATTER** comes before the Court on the parties' joint request to continue the case and extend deadlines accordingly. The Court grants the parties' request and hereby imposes the following deadlines:

1. <u>August 4, 2017:</u>       Reciprocal discovery by defendants (except for the defendants' continuing duty to disclose).

2. <u>September 1, 2017:</u>      Government scientific expert witness notices and reports; Fed. R. Crim. P. 16 discovery motions.

3. <u>September 15, 2017</u>:     Defense scientific expert witness notices and reports; Responses to Fed. R. Crim. P. 16 discovery motions; Defense objections to scientific expert witness notices.

4. <u>September 29, 2017</u>:     Replies to responses to Fed. R. Crim. P. 16 discovery motions; Government responses to scientific expert witness objections and Government objections to Defense scientific expert witness notices.

5. <u>October 6, 2017</u>:         Fed. R. Crim. P. 12 pretrial motions; *Daubert* motions; Government's notice of gang experts; Motions for *James* and Co-conspirator statements.

6. <u>October 13, 2017</u>:         Defense responses to scientific expert witness objections.

7. <u>October 20, 2017</u>:         Responses to Fed. R. Crim. P. 12 pretrial and *Daubert* motions; Defendants' notice of gang experts; Responses to Motions for *James* and Co-Conspirator statements.

8. <u>October 27, 2017</u>:         Notices of defenses pursuant to Fed. R. Crim. P. 12.1 and 12.3.

9. <u>November 3, 2017</u>:         Replies to Motions for *James* and Co-Conspirators statements.

10. <u>November 10, 2017</u>:         Responses to notices of defenses; Motions *in Limine*; Replies to responses to Rule 12 pretrial motions and *Daubert* motions.

11. <u>November 24, 2017</u>:         Responses to Motions *in Limine*.

12. <u>December 8, 2017</u>:         Replies to Motions *in Limine*;

13. <u>January 12, 2018</u>:         Jury Instructions; proposed *voir dire*; disclosure of exhibit and witness lists.

14. <u>January 19, 2018</u>:         Objections to jury instructions, proposed *voir dire*, exhibit and witness lists.

15. <u>January 29, 2018</u>:         Jury Selection/Jury Trial as to Counts 6 through 12 at 9:00 a.m., Federal Courthouse, Las Cruces, New Mexico.

16. <u>April 9, 2018</u>:          Jury Selection/Jury Trial as to Counts 1 through 5 and 13

through 16 at 9:00 a.m., Federal Courthouse, Las Cruces, New Mexico.

The Court further orders that the United States shall continually make available discovery

on an ongoing basis, and make available to the defendants by the time required by the applicable

law all material for which disclosure is mandated by *Giglio v. United States*, 405 U.S. 150 (1972)

and the Jencks Act, 18 U.S.C. § 3500, unless disclosure is otherwise required herein.

The Court further orders, pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii), that the time between

the entry of this Order and the trial date is excluded for the purposes of the Speedy Trial Act

computation.

_____
UNITED STATES DISTRICT JUDGE

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Action No. 15-CR-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON,
JOE GALLEGOS,
EDWARD TROUP,
LEONARD LUJAN,
**BILLY GARCIA**,
EUGENE MARTINEZ,
ALLEN PATTERSON,
CHRISTOPHER CHAVEZ,
JAVIER ALONSO,
ARTURO ARNULFO GARCIA,
BENJAMIN CLARK,
RUBEN HERNANDEZ,
JERRY ARMENTA,
JERRY MONTOYA,
MARIO RODRIGUEZ,
TIMOTHY MARTINEZ,
MAURICIO VARELA,
DANIEL SANCHEZ,
GERALD ARCHULETA,
CONRAD VILLEGAS,
ANTHONY RAY BACA,
ROBERT MARTINEZ,
ROY MARTINEZ,
CHRISTOPHER GARCIA,
CARLOS HERRERA,
RUDY PEREZ,
ANDREW GALLEGOS,
SANTOS GONZALEZ,
PAUL RIVERA, AND
SHAUNA GUTIERREZ,
BRANDY RODRIGUEZ.
        Defendants.

_____

**DEFENDANT BILLY GARCIA'S NOTICE PURSUANT TO FED. R. CRIM. P. 16(b)**
_____

Defendant Billy Garcia, to the best of his current ability, hereby provides notice, as required by Federal Rule of Criminal Procedure 16 (b), of the following information:

**1.**    Photograph books, papers, documents, data, photographs, tangible objects, buildings or places - The defense intends to use materials provided in discovery by the government. The government has not concluded its disclosures and has indicated it will not conclude its disclosures until two weeks prior to trial.  As such the defense is not currently in a position to know what specific materials it will use at trial and reserved the right to update this notice after receipt of all materials from the government.

2.    Reports of Examinations and Tests - The defense has no scientific tests or experiments to disclose at this time. As the government continues to disclose materials there may be a need to conduct tests and examinations and when such tests or examinations are concluded any material required to be disclosed will be disclosed.

3.    Expert Witnesses - The defense may call as a witness Dr. Phillip B. Danielson, who holds a doctorate in Biology, specializing in DNA analysis. Dr. Danielson will testify regarding the tests conducted by the government's experts, and the results and conclusions of those tests involving DNA as to the homicide of F.C. and R.G.  *See* Exhibit A, Curriculum Vitae of Phillip B. Danielson.

2

The defense reserves the right to supplement this notice if the government endorses any additional experts and upon the completion of the discovery process in this case.

Respectfully Submitted,

Castle & Castle, P.C.
/s/ James A. Castle
JAMES A. CASTLE
1544 Race Street
Denver, Colorado  80206
(303) 675-0500
JCastlelaw@gmail.com

Robert R. Cooper Law Firm
 /s/  Robert R. Cooper
ROBERT R. COOPER
1011 Lomas Blvd NW
Albuquerque, New Mexico  87102
(505) 842-8494
bob@rrcooper.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2017 I filed the foregoing electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

/s/ Robert R. Cooper
ROBERT R. COOPER

3

DNM 844

### *Curriculum Vitae* – Phillip B. Danielson
UNIVERSITY OF DENVER
DEPARTMENT OF BIOLOGICAL SCIENCES

***Background Summary:*** Professor Phillip Danielson, has over 24 years of experience in molecular genetic analysis of biological samples. His experience includes research in forensic genetics and review of forensic casework. He has administered over $3.9 million in research grant funding from the National Institute of Justice, the National Science Foundation, the Department of Defense, the National Center for Missing and Exploited Children, the National Institutes of Health and the University of Denver. Dr. Danielson is a member of the International Society for Forensic Genetics and serves on the Organization of Scientific Area Committees for Biology and DNA which promulgates standards for the US forensic community. He is an active contributor to the professional literature and has had productive research, training and/or academic relationships with the Denver Police Department, the Colorado District Attorneys Council, the National Law Enforcement and Corrections Technology Center (Rocky Mountain Region) and numerous other law enforcement agencies throughout the United States.

**A. Professional Preparation:**

| | | | |
|---|---|---|---|
| Metropolitan State College, Colorado | Biology, | B.S. | 1983 |
| University of Denver, Colorado | Biology, | Ph.D. | 1996 |

**B. Appointments:**

| | |
|---|---|
| 2014-Present | National Institute of Standards, Organization of Scientific Area Committees (Biology/DNA Committee Member) |
| 2014-Present | Rape Kit Advisory Board Member, NMS Labs, Willow Grove, PA |
| 2014-Present | Fellow of the Foundation, Center for Forensic Science Research and Education, Willow Grove, PA |
| 2011-Present | Science Advisor, NMS Labs, Willow Grove, PA |
| 2010-Present | President, ForSci Associates LLC, Denver Colorado |
| 2007-Present | Full Professor, Department of Biological Sciences, Adjunct Professor, Sturm College of Law, University of Denver, Denver, CO |
| 2004-2010 | Science Advisor, National Law Enforcement and Corrections Technology Center, Rocky Mountain Region |
| 2004-2007 | Associate Professor, Department of Biological Sciences, University of Denver, Denver, CO |
| 1997-2003 | Assistant Professor, Department of Biological Sciences, University of Denver, Denver, CO |
| 1996-97 | Post-Doctoral Research Associate, Department of Biological Sciences, University of Denver, Denver, CO |

**C. Publications:**

**Twenty Recent Peer-Reviewed Publications (2001-2016)**
**(31 additional peer-reviewed publications from 1994 to 2001 available on request)**

Legg, K.M., Powell, R., Reisdorph, N., Reisdorph, R. and **Danielson, P.B.** (In Press) Verification of Protein Biomarkers for the Identification of Biological Stains by Quadrupole Time-of-Flight Mass Spectrometry. Electrophoresis.

Patrinos G., **Danielson, P.B.** and Ansorge W. (2016) Molecular Diagnostics: Past, Present, and Future. In: Molecular Diagnostics 3rd Edition (Patrinos G., Ansorge W. and Danielson, P.B. Eds.). Academic Press.

DNM 845

**Danielson, P.B.,** McKiernan H.E. and Legg, K.M. (2016) Integrated PCR Technologies (Sample-to-Answer Technologies). In: Molecular Diagnostics 3rd Edition (Patrinos G., Ansorge W. and Danielson, P.B. Eds.). Academic Press.

McKiernan H.E. and **Danielson, P.B.** (2016) Molecular Diagnostic Applications in Forensic Science. In: Molecular Diagnostics 3rd Edition (Patrinos G., Ansorge W. and Danielson, P.B. Eds.). Academic Press.

Legg, K.M. and **Danielson, P.B.** (2016) State of the Art in Forensic Serology. In Liz Fergus (Ed.), *Sexual Assault Victimization Across the Life Span Second Edition Volume 1: Investigation, Diagnosis, and the Multidisciplinary Team.* STM Learning Inc.

Legg, K. M., Powell, R., Reisdorph, N., Reisdorph, R. and  **Danielson, P. B.** (2014) Discovery of Highly Specific Protein Markers for the Identification of Biological Stains. Electrophoresis. 35(21-22):3069-78.

Komorowski, L.K., Lecaude, S.G., Westring, C.G., **Danielson P.B.** and Dores R.M. (2012) Evolution of Gnathostome Prodynorphin and Proenkephalin: Characterization of a Shark Prodynorphin cDNA. General and Comparative Endocrinology  **177(3): 353-364.**

Kristinsson, R, Lewis, S and **Danielson, P.B.** (2009) Comparative Analysis of the HV1 and HV2 Regions of Human Mitochondrial DNA by Denaturing High-Performance Liquid Chromatography. Journal of Forensic Sciences 54(1):28-36

Westring, CG, Kristinsson, R., Gilbert, DM, and **Danielson, P.B.** (2007) Reduced Volume Protocol for Optimized Quantification of Genomic DNA using the Quantifiler™ Human DNA kit. Journal of Forensic Sciences 52(5):1035-43

**Danielson, P.B.**, Sun, H-Y, Melton, T., and Kristinsson, R. (2007) Resolving mtDNA Mixtures by Denaturing High-Performance Liquid Chromatography and Linkage Phase Determination. FSI Genetics 1:148-153. (invited manuscript)

**Danielson, P.B.** (2005) Mitochondrial DNA Analysis by Denaturing High-Performance Liquid Chromatography for the Characterization and Separation of Mixtures in Forensic Samples. Peer reviewed final research report for electronic release under NIJ cover.

**Danielson, P.B.,** Kristinsson, R., Shelton, R.J. and LaBerge, G.S. (2005) Separating Human DNA Mixtures using Denaturing High-Performance Liquid Chromatography (DHPLC). Expert Review of Molecular Diagnostics 5(1):53-63.  INVITED REVIEW ARTICLE

**Danielson, P.B.** and Dores, R.M. (2004) Evolution of the Opioid/Orphanin Gene Family. In: The Encyclopedia of Endocrinology and Endocrine Disorders, (Luciano Martini, Ed.). Harcourt Press. Volume 3 pp. 419-424. INVITED REVIEW ARTICLE

Dores, R.M. and Danielson, P.B. (2004) Evolution of ACTH, α-MSH and POMC. In: The Encyclopedia of Endocrinology and Endocrine Disorders, (Ed. Luciano Martini). Harcourt Press Volume 1 pp. 30-34. INVITED REVIEW ARTICLE

Dores, R.M., Lecaudé, S., Bauer, D. and **Danielson, P.B.** (2004) Analyzing the Evolution of the Opioid/Orphanin Gene Family. Mass Spectrometry 21:220-243. INVITED REVIEW ARTICLE

LaBerge, G.S., Shelton, R.J. and **Danielson, P.B.** (2003) Forensic Utility of Mitochondrial DNA Analysis based on Denaturing High-Performance Liquid Chromatography. Croatian Medical Journal 44(3):281-288.

DNM 846

**Danielson, P.B.**, LaBerge, G.S. and Shelton, R.J. (2003) Clinical Applications of Denaturing High-Performance Liquid Based-based Genotyping. Croatian Medical Journal 44(4):447-454.

**Danielson, P.B.** (2002) The Cytochrome P450 Superfamily: Biochemistry, Evolution and Drug Metabolism in Humans. Current Drug Metabolism, 3:561-597 INVITED REVIEW ARTICLE

Azadan, R.J., Fogleman, J.C. and **Danielson P.B.** (2002) Capillary Electrophoresis Sequencing: Maximum Read Length at Minimal Cost. BioTechniques 32(1):24-28.

Dores, R.M., Costantino, D., Walnutt, J., **Danielson, P.** and Lecaude, S. (2001) Analyzing the radiation of the proenkephalin gene in tetrapods: Cloning of a *Bombina orientalis* Proenkephalin cDNA. Peptides, 22:2021-2025.

**31 Published Abstracts (1995-2008)**

**75 Poster Presentations and Contributed Papers (1995-2013)**

**D. Synergistic Law Enforcement Associated Activities:** (Some of these were in cooperation with staff from the National Law Enforcement and Corrections Technology Center, Rocky Mountain Region, the Denver Police Department, the Denver District Attorney's Office and local law enforcement and emergency response agencies throughout the Rocky Mountain Region)

2014: Boulder Police Department, "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Boulder, CO.

2013: Boulder Police Department, "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Boulder, CO.

2009: Boulder Police Department, "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Boulder, CO.

2009: "Forensic DNA Outreach to the Law Enforcement Community through the National Law Enforcement and Corrections Technology Center" Presentation to Mr. Darek Newby senior member of the U.S. House appropriations.  Denver, CO

2008 From Crime Scene to Courtroom: Forensic DNA training for Rape and Murder Investigators. Sponsored by the National Law Enforcement and Corrections Technology Center and the Boulder Police Department, Boulder, CO.

2007 National Law Enforcement and Corrections Technology Center and the Weld County Sheriff's Office, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: Reducing Major Crimes through Forensic DNA Analysis of Property Crime Evidence", Greeley, CO.

2007 National Law Enforcement and Corrections Technology Center and the Larimer County Sheriff's Office, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: Reducing Major Crimes through Forensic DNA Analysis of Property Crime Evidence", Fort Collins, CO.

2007 National Law Enforcement and Corrections Technology Center and the Loveland Police Department, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: Reducing Major Crimes through Forensic DNA Analysis of Property Crime Evidence", Loveland, CO.

DNM 847

2007   National Law Enforcement and Corrections Technology Center and the Greeley Police Department, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: Reducing Major Crimes through Forensic DNA Analysis of Property Crime Evidence", Greeley, CO.

2007   From Crime Scene to Courtroom: Forensic DNA training for Rape and Murder Investigators. Sponsored by the National Law Enforcement and Corrections Technology Center and the Boulder Police Department, Boulder, CO.

2006   University of Colorado at Denver "Emerging Technologies in Human DNA Profiling Provide Powerful Tools for Criminal Investigations", Police Leadership Program for the Master's in Public Administration. Denver, CO.

2006   National Law Enforcement and Corrections Technology Center, "Rapid Mitochondrial DNA Analysis: Progress Report on Collaboration with the National Center for Missing and Exploited Children" Regional Advisory Council Meeting, Denver, CO.

2006   Virginia Institute of Forensic Science and Medicine (Present and Future Technological Advances in Human Identification) "mtDNA Mixture Fractionation and Analysis by Denaturing High-Performance Liquid Chromatography", Roanoke, VA.

2006   National Forensic Science Technology Center and the National Institute of Justice (Workshop on Mitochondrial DNA Analysis) "Emerging DNA Technologies (DHPLC) for resolving mixtures", Largo, FL.

2005   National Law Enforcement and Corrections Technology Center and the Albuquerque Police Department (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Albuquerque, NM.

2005   National Law Enforcement and Corrections Technology Center and the Rapid City Police Department, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Rapid City, SD.

2005   National Law Enforcement and Corrections Technology Center and the Boulder Police Department, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Boulder, CO.

2005   University of Colorado at Denver "Emerging Technologies in Human DNA Profiling Provide Powerful Tools for Criminal Investigations", Police Leadership Program for the Master's in Public Administration. Denver, CO.

2005   National Law Enforcement and Corrections Technology Center, "Rapid Mitochondrial DNA Analysis: Collaboration with the National Center for Missing and Exploited Children" Regional Advisory Council Meeting, Denver, CO.

2005   American Society of Industrial Security, "Biological Terrorism: Facts vs. Myths", Longmont, CO.

2005   Colorado Safety Association, "Biological Terrorism: Assessing the Risk", Denver, CO.

2005   Colorado Intergovernmental Risk Sharing Agency, "Facts vs. Myths of Biological Terrorism: How Big is the Risk", Vail, CO.

2005   National Law Enforcement and Corrections Technology Center and the Texas Association of Property and Evidence Inventory Technicians, "Forensic DNA Profiling: Collecting and Storing Evidence", San Antonio, TX.

DNM 848

2004   National Law Enforcement and Corrections Technology Center, Alaska Peace Officers Association, and the Juneau Police Department, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Juneau, AK

2004   National Law Enforcement and Corrections Technology Center and the Denver Police Department, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Denver, CO.

2004   National Law Enforcement and Corrections Technology Center and the Boulder Police Department, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Boulder, CO.

2004   International Bridge, Tunnel, and Turnpike Association, "Bio/Chem/Eco Terrorism: Facts vs. Myths", IBTTA Facilities Management Workshop, Denver, CO.

2004   U.S. Attorney's Office, "Bio/Chem/Eco Terrorism: A Guide for First Responders" Law Enforcement Coordinating Committee Conference on Homeland Security. Witchita, KS. Keynote Speaker.

2004   FBI National Academy, "Bio/Chem/Eco Terrorism: Facts vs. Myths", Bozeman, MT.

2004   National Law Enforcement and Corrections Technology Center, "Rapid Mitochondrial DNA Analysis: Evidence Screening and Separation of Forensic Mixtures", Regional Advisory Council Meeting, Whitefish, MT.

2004   National Center for Missing and Exploited Children, "Rapid Mitochondrial DNA Analysis: Evidence Screening and Separation of Forensic Mixtures", Alexandria, VA.

2004   Royal Canadian Mounted Police and Transgenomic Corporation, "Forensic Utility of Denaturing High-Performance Liquid Chromatography to Analyses of Human Mitochondrial DNA", Ottawa, Canada.

2004   Colorado Crime Analysis Association, "Human DNA Profiling as a Powerful Tool for Criminal Investigations", Denver, CO.

2003   National Law Enforcement and Corrections Technology Center and the Colorado State Sheriff's Association (Conference of Under Sheriffs), "Bioterrorism: Facts vs. Myths", Ft. Collins, Colorado.

2003   University of Denver, College of Law, "Forensic DNA Profiling: The Interface Between Human Genetic Identity and Scientific Evidence", Denver, CO.

2003   Bejing Department of Public Security "Human Mitochondrial DNA Profiling by Denaturing High-Performance Liquid Chromatography", Beijing, Democratic Peoples Republic of China.

2003   National Law Enforcement and Corrections Technology Center, Colorado District Attorneys Council, Colorado Bureau of Investigation, Denver Police Department and the University of Denver, (From Crime Scene to Courtroom Program) "Forensic DNA Profiling: The Application of PCR and Gel Electrophoresis to Human Genetic Identity", Denver, Colorado.

2002   Four State Peace Officers Association, Farmington, New Mexico, Invited Lecturer: Bioterrorism: A Primer for First Responders.

2002   Leavenworth Police Department and Kansas City Kansas Community College, Kansas City, Kansas, Organizer/Instructor: From Crime Scene to Courtroom: DNA Workshop for Law Enforcement and Crime Scene Investigators

DNM 849

2002   Colorado Homicide Investigators Association, Denver, Colorado, Invited Lecturer: Bioterrorism: A Primer for First Responders.

2002   Northwest Colorado Emergency Preparedness Advisory Committee, Steamboat Springs, Colorado, Invited Lecturer: Bioterrorism: A Primer for First Responders.

2002   Wyoming State Police Academy, Douglas, Wyoming, Invited Lecturer: Bioterrorism: A Primer for First Responders.

2002   Federal Bureau of Investigation, InfraGuard and the National Law Enforcement and Corrections Technology Center, Securing the Rockies Conference, Denver, Colorado, Invited Lecturer: Bioterrorism: Bacterial and Viral Agent Threats.

2002   Overland Park, Police Department, 13th Annual Law Enforcement Executives Conference, Overland Park, Kansas, Invited Lecturer: Bioterrorism: Myths versus Facts .

2002   Missoula County Sheriff's Department and the University of Montana, Missoula, Montana, Organizer/Instructor: From Crime Scene to Courtroom: DNA Workshop for Law Enforcement and Crime Scene Investigators

2002   Norman Police Department, Oklahoma University Police Department and Oklahoma University, Norman, Oklahoma, Organizer/Instructor: From Crime Scene to Courtroom: DNA Workshop for Law Enforcement and Crime Scene Investigators

2002   Northern Colorado Peace Officers Association, Fort Collins, Colorado, Invited Lecturer: Bioterrorism: Facts versus Myths for First Responders.

2002   Council of Security and Strategic Technology Organizations, Washington D.C. Invited Lecturer: Bioterrorism: Facts versus Myths for First Responders.

2001   National Law Enforcement and Corrections Technology Center, Rocky Mountain Regional Advisory Council meeting, Albuquerque, New Mexico, Invited Lecturer: Bioterrorism: A Primer for First Responders.

2001   Colorado District Attorneys Council, University of Denver, Denver, Colorado Organizer/ Instructor: Forensic DNA Workshop.

2000   Colorado District Attorneys Council, University of Denver, Denver, Colorado. Organizer/ Instructor: Forensic DNA Workshop.


**E. Additional Professional Presentations, Contributed Papers and Posters and Invited Lectures**

**Forensic Science**

2016   "Hypergeometric Sampling: Introduction to a Statistically Valid Approach for Assessing Population Characteristics" 38th Annual SWAFS Conference, Southwestern Association of Forensic Scientists, Galveston, TX.

2016   "Uncertainty of Measurement for Weight Determinations when Extrapolating from a Sample" 38th Annual SWAFS Conference, Southwestern Association of Forensic Scientists, Galveston, TX.

2016   "Peak Height Considerations in Forensic DNA Typing: Developing Data Driven Interpretation Guidelines" Validation and Mixture Interpretation Standard Operating Procedures Workshop. 27th International Symposium on Human Identification. Minneapolis, MN

DNM 850

2015    "OSAC Overview Biology/DNA", Advanced Topics for Human Identification & Data Interpretation Worshop, The Center for Forensic Science Research & Education, Philadelphia, Pennsylvania.

2015    "Mixture Interpretation Workshop", Advanced Topics for Human Identification & Data Interpretation Worshop, The Center for Forensic Science Research & Education, Philadelphia, Pennsylvania.

2015    "Rigor in Mixture Validation Studies", Advanced Topics for Human Identification & Data Interpretation Worshop, The Center for Forensic Science Research & Education, Philadelphia, Pennsylvania.

2015    "Body Fluid Identification by Proteomics", Advanced Topics for Human Identification & Data Interpretation Worshop, The Center for Forensic Science Research & Education, Philadelphia, Pennsylvania.

2015    "Confirmatory Body Fluid Identification by Mass Spectrometry from Sexual Assault Evidence" 67th Annual Scientific Meeting of the American Academy of Forensic Sciences, Orlando, Florida.

2015    "Body Fluid ID by Mass Spectrometry" Green Mountain DNA Conference, Vermont Forensic Laboratory, Burlington, Vermont.

2014    "Scientific Rigor in Forensic Validation Studies", Advanced Topics for Human Identification & Data Interpretation Worshop, The Center for Forensic Science Research & Education, Philadelphia, Pennsylvania.

2014    "Application of Mass Spectrometry in Forensic Serology," Golden Helix Summer School: Pharmacogenomics and Genomic Medicine - Bridging Research and the Clinic, Golden Helix Foundation, Aegina, Greece.

2014    "Workflow and Data Analysis for a Q-TOF Based Human Blood Identification Assay", Technology Training Workshop, Agilent Technologies and Brasilia Police, Brasilia, Brazil.

2014    "Professional Ethics in the Forensic Sciences", National Medical Services Labs, Willow Grove, PA.

2012    "Quality Control in Forensic Laboratories", Applied DNA Sciences Inc., Stony Brook, NY

2012    "Interpreting Complex DNA Mixtures", National Medical Services Labs inc., Willow Grove, PA

2012    "Parentage and Reverse Parentage Testing", National Medical Services Labs inc. Willow Grove, PA

2012    "Unambiguous Identification of Sexual Assault Evidence: Development of a Unified Body Fluid Assay", 2012 End Violence Against Women International Conference, San Diego, CA

2012    "Validation of Highly-Specific Protein Markers for the Identification of Biological Stains – Adapting Proteomics to Forensics" Colorado Biological Mass Spectrometry Society Summer Meeting 2012, Boulder, CO

2012    "Development and Testing of a Rapid Multiplex Assay for the Identification of Biological Stains", Green Mountain DNA Conference, Department of Public Safety, Vermont Forensics Laboratory, Burlington, VT

DNM 851

2012   "Highly-Specific Protein Biomarkers for the Identification of Biological Stains" NIJ Annual Meeting 2012 - Turning to Science: Enhancing justice, Improving safety and Reducing costs National Institute of Justice, Arlington, VA

2011   "Highly-Specific Protein Biomarker Assays for the Identification of Biological Stains", The National Institute of Justice Conference 2011 - Forensic DNA: Tools, Technology, and Policy. Washington, D.C.

2011   "Resolving mtDNA Mixtures by Denaturing HPLC and Linkage Phase Analysis", The National Institute of Justice Conference 2011 - Forensic DNA: Tools, Technology, and Policy. Washington, D.C.

2011   "Highly-Specific Protein Markers for the Confirmatory Identification of Biological Stains" Invited Seminar, National Medical Services Labs, Willow Grove, PA.

2011   "Forensic DNA Profiling:The Science of Solving Crimes" Invited Public Science Seminar for The Amoco Oil Corporation Alumni Club, Denver, CO

2011   "The Real CSI: Using Modern Forensics to Solve the Most Challenging Cases" OLLI Summer Seminars of OLLI. Denver, CO.

2010   "Discovery and Validation of Highly Specific Protein Markers for the Identification of Biological Stains: Adapting Comparative Proteomics to Forensics" World HUPO, Sydney Australia. (Due to a schedule conflict, Kevin Legg was sent in my place to make this presentation).

2010   "Forensic Analysis of Human DNA in Criminal Investigations" Invited lecture at the University of Denver Law School.

2010    "Forensic DNA and Getting the Real Perpetrator?" First Year Seminar Program. University of Denver, Denver CO

2010   "Forensic DNA Profiling: The Science of Solving Crimes" Invited Public Science Seminar for Split Screen, Lakewood, CO

2010   "Forensic DNA in Court: Wrongful Conviction", Dept. Sociology and Criminology. University of Denver, Denver CO

2010   "Forensic DNA and Getting the Real Perpetrator?" First Year Seminar Program. University of Denver, Denver CO

2010   "Resolving mtDNA Mixtures by Denaturing HPLC and Linkage Phase Analysis", The National Institute of Justice Conference 2010 - Forensic DNA: Tools, Technology, and Policy. Washington, D.C.

2010   "Resolving mtDNA Mixtures by Denaturing HPLC and Linkage Phase Analysis", Second Annual Current and Future Advances in Human Identification Conference Virginia Department of Forensic Science, Hampton, VA

2009   "Forensic DNA Outreach to the Law Enforcement Community through the National Law Enforcement and Corrections Technology Center" Presentation to Mr. Darek Newby senior member of the U.S. House appropriations.  Denver, CO

2009   "An Introduction to the State of Forensic DNA Technologies" National Authority for Scientific Research, Center for Biotechnology Research, Tripoli, Libya

2009   "Emerging Proteomic Technologies for Identifying Human Tissues in Forensic Cases" National Authority for Scientific Research, Center for Biotechnology Research, Tripoli, Libya

DNM 852

2009 "New Approaches to Comparative Sequence Analysis for Missing Persons" National Authority for Scientific Research, Center for Biotechnology Research, Tripoli, Libya

2009 "Mitochondrial DNA Analysis for Analyzing Challenging Evidence and Cases" National Authority for Scientific Research, Center for Biotechnology Research, Tripoli, Libya

2009 Forensic Science in Libya: Training and Database Laboratory Implementation" National Authority for Scientific Research, Center for Biotechnology Research, Tripoli, Libya

2009: "DNA 101: Forensic DNA Profiling in Criminal Investigations" Regis College for Professional Studies. Denver, CO.

2009: "Mitochondrial DNA Analysis in Forensics" Forensic Science Education Conference. American Academy of Forensic Sciences and University of Colorado at Boulder. Boulder, CO

2009: "Isolation of Highly Specific Protein Markers for the Identification of Biological Stains: Adapting Comparative Proteomics to Forensics", The National Institute of Justice Conference 2009, Washington, D.C.

2009: "Isolation of Highly Specific Protein Markers for the Identification of Biological Stains: Adapting Comparative Proteomics to Forensics", 2nd Annual Green Mountain DNA Conference. Department of Public Safety, Vermont Forensic Laboratory. Burlington, VT

2008 The National Institute of Justice Conference 2008 - Forensic DNA: Tools, Technology, and Policy. "Isolation of Highly Specific Protein Markers for the Identification of Biological Stains: Adapting Comparative Proteomics to Forensics", Washington, D.C.

2008 The National Institute of Justice Conference 2008 - Forensic DNA: Tools, Technology, and Policy. "Forensic mtDNA Mixture Analysis by Denaturing High-Performance Liquid Chromatography", Washington, D.C.

2008 Rap Sheet "Advancements in Forensic Science and the Need for Preservation of Evidence." Colorado Criminal Defense Bar Winter 2008. pp. 7-9.

2008 Regis College for Professional Studies "DNA 101: Forensic DNA Profiling in Criminal Investigations". Denver, CO.

2008: DNA Forensics Technology Working Group, "Isolation of Highly-Specific Protein Markers for the Identification of Biological Stains: Adapting Comparative Proteomics to Forensics", National Institute of Justice. Washington, DC

2008: "Forensic DNA in Court: Wrongful Conviction", Invited talk by Dr. Scott Phillips, Dept. Sociology and Criminology. University of Denver, Denver CO

2008: "mtDNA Analysis and Mixture Resolution by Denaturing High-Performance Liquid Chromatography", Invited talk, Vira Core Inc. Kansas City, MO

2008 DNA 101 and the Future of Forensic DNA. Colorado Association of Criminal Justice Educators, Denver, CO.

2008 Advancing Forensic DNA Analysis of Challenging Evidentiary Material: Resolving mtDNA Mixtures by DHPLC. Exempla St. Joseph's Hospital, Denver, CO

2007 National Institute of Justice, "Isolation of Highly Specific Protein Markers for the Identification of Biological Stains: Adapting Comparative Proteomics to Forensics", 8th Annual DNA Grantees' Meeting. Arlington, VA.

2007 Advancing Forensic DNA Analysis of Challenging Evidentiary Material: Resolving mtDNA Mixtures by DHPLC. University of Northern Colorado, Greeley, CO

DNM 853

2006    Forensic Applications of Denaturing High-Performance Liquid Chromatography to mtDNA Analysis. National Institute of Scientific Investigation. Seoul, Republic of Korea.

2006    DNA Mixture Fractionation and Analysis by Denaturing High-Performance Liquid Chromatography. III International Symposium on Biochemistry and Molecular Biology; Federación Latinoamericana de Asociaciones Químicas. (Treasury Department License CT-8218) Havana, Cuba

2006    Forensic Applications of mtDNA Analysis and Denaturing High-Performance Liquid Chromatography. China Central Police Agency, Beijing, People's Republic of China.

2006    Forensic Applications of mtDNA Analysis and Denaturing High-Performance Liquid Chromatography. Shanghai Regional Police Agency, Shanghai, People's Republic of China.

2006    mtDNA Mixture Fractionation and Analysis by Denaturing High-Performance Liquid Chromatography. 85. Jahrestagung der Deutschen Gesellschaft für Rechtsmedizin und DNA in Forensics 2006. Innsbruck, Austria.

2006    Forensic Applications of mtDNA Analysis and Denaturing High-Performance Liquid Chromatography. Shenyang Regional Police Agency, Shengyang, People's Republic of China.

2006    University of Connecticut, Center for Applied Genetics and Technology, Department of Molecular and Cell Biology, "Forensic Analysis of mtDNA: Fractionating Mixtures by Denaturing High-Performance Liquid Chromatography", Storrs, CT.

2006    National Institute of Justice, "Forensic mtDNA Analysis and Mixture Separation by Denaturing High-Performance Liquid Chromatography", 7th Annual DNA Grantees' Meeting. Arlington, VA.

2006    Transgenomic Inc. "mtDNA Mixture Fractionation and Analysis by Denaturing High-Performance Liquid Chromatography", Omaha, NE.

2005    Mitotyping Technologies Incorporated, "mtDNA Mixture Fractionation and Analysis by Denaturing High-Performance Liquid Chromatography: Progress Report", State College, PA.

2005    National Institute of Justice, "mtDNA Mixture Fractionation and Analysis by Denaturing High-Performance Liquid Chromatography", Forensic DNA Research and Development Program Review Conference. Washington, DC.

2005    Louisiana State University Health Sciences Center "Rapid Mitochondrial DNA Analysis for Evidence Screening and Separation of Forensic Mixtures - An Academic Research Career in the World of CSI". Keynote Speaker for the Annual HSC Graduate Student Research Conference, Shreveport, LA.

2005    National Institute of Justice, "Forensic mtDNA Analysis and Mixture Separation by Denaturing High-Performance Liquid Chromatography", 6th Annual DNA Grantees' Meeting. Washington, DC.

2005    Mitotyping Technologies Incorporated, "Forensic Utility of Denaturing High-Performance Liquid Chromatography to Analyses of Human Mitochondrial DNA", State College, PA.

2005    Running Horse Farm Incorporated, "Resolving Errors in the American Stud Book through mtDNA Analysis of Thoroughbred Lineages", Albuquerque, NM.

2005    University of Denver, VIVA Program, ""The DNA Revolution: What Applied Biotechnology Can Do To You and For You."", Denver, CO.

DNM 854

2004 National Institute of Justice, "mtDNA Analysis by DHPLC for the characterization and separation of mixtures in forensic samples", Forensic DNA Research and Development Program Review Conference. Washington, DC.

2004 Cambridge Healthtech Institute, "Human mtDNA Mixture Separation by Denaturing High-Performance Liquid Chromatography" DNA Forensics: Enabling Investigative Examination, 6th Biannual Meeting. McLean, VA. (Session Chair)

2004 Biological Sciences Curriculum Study, "The use of DNA profiling and Electrophoresis in Human Identification: Bringing it to the classroom", Keys to Science Institute for Professional Development, Colorado Springs, CO.

2004 National Institute of Justice, "Forensic mtDNA Analysis and Mixture Separation by Denaturing High-Performance Liquid Chromatography", 5th Annual DNA Grantees' Meeting. Washington, DC.

2004 National Law Enforcement and Corrections Technology Center and the National Institute of Justice, "Institute for Forensic Genetics - Program Overview", Denver, CO.

2004 15th International Symposium on Human Identification. Danielson, P.B., Kristinsson, R and LaBerge G.S. "Forensic mtDNA Analysis and Mixture Separation by Denaturing High-Performance Liquid Chromatography". Phoenix, Arizona.

2004 Alpha Epsilon Delta, "The use of DNA profiling and Electrophoresis in Human Identification", University of Denver, Denver, CO.

2003 Third European-American School in Forensic Genetics and Mayo Clinic Course in Advanced Molecular and Cellular Medicine. "Clinical Applications of Denaturing HPLC DNA Profiling". Zagreb, Croatia

2003 Third European-American School in Forensic Genetics and Mayo Clinic Course in Advanced Molecular and Cellular Medicine. "Rapid Mitochondrial DNA Profiling by Denaturing High Pressure Liquid Chromotography". Zagreb, Croatia

2003 Eleanor Roosevelt Institute & DU Life Sciences Joint Symposium. University of Denver, Denver, Colorado.

2003 Cirtoma Social Service Organization, "Guilty or Innocent: Forensic DNA in Human Identification", Englewood, Colorado.

2003 Sigma-Xi, "Mass Disasters and Sex Crimes: Forensic Analysis of Human Mitochondrial DNA", Scientific Honors Society University of Denver, Denver, Colorado.

2003 University of Denver Leadership Program, "Teamwork: Advancing Forensic DNA Analysis and Benefiting Our Community", University of Denver, Denver, Colorado

2003 University of Denver Alumni Association, "Molecular Biology, Criminal Justice and DU" Denver, CO.

2003 University of Denver, Nelson Hall Office of Residence, "Bioterrorism: Facts vs. Myths", University of Denver, Denver, Colorado

2003 Sun Yat-Sen University, Department of Forensic Scince "Human Mitochondrial DNA Profiling by Denaturing High-Performance Liquid Chromatography", Guangzhou, Democratic Peoples Republic of China.

2003 Beckman-Coulter, Genetic Analysis Seminar, "DNA Sequencing: Throughput, Data Quality and Cost" University of California at Irvine, Irvine, CA.

DNM 855

2003    Beckman-Coulter, Genetic Analysis Seminar, "Advances in Mutation Discovery and Genetic Analysis", Beckman-Coulter World Headquarters, Fullerton CA.

**Molecular Toxicology**

2002    Beckman-Coulter, Genetic Analysis Seminar at the International Symposium of the Association of Biomolecular Resource Facilities, Austin, Texas

2002    Beckman-Coulter, Advanced Technology Seminar Series: Tools and Techniques for Functional Genomics. SanFrancisco, California

2002    Beckman-Coulter, Advanced Technology Seminar Series: Tools and Techniques for Functional Genomics.  Seattle, Washington

2002    Beckman-Coulter, Genetic Analysis Seminar USDA-ARS Oregon State University, Corvallis, Oregon.

2001    Aachen University of Technology and Adolf Kühner AG, 2nd International Symposium on Applied Shaking Technology, New York, New York

1997    University of Arizona, Tucson, Arizona

1996    Japanese Society of Pharmacoanesthesiology, 18th Congress of the Japanese Society of Pharmacoanesthesiology, Tokyo, Japan.

1996    Saga National Medical University, Saga, Japan

1995    Metropolitan State College of Denver, Department of Biology, Denver, Colorado

**Neuroendocrinology**

2002    Beckman-Coulter, Genetic Analysis Seminar at the 13th International Genome Sequencing and Analysis Conference, San Diego, California

2002    Beckman-Coulter, Genetic Analysis Seminar, Oregon Health & Science University (West Campus), Portland, Oregon.

2002    Beckman-Coulter, Genetic Analysis Seminar, Oregon Health & Science University (Marquam Hill Campus), Portland, Oregon.

2001    Beckman-Coulter, Genetic Analysis Seminar, Massachusetts Institute of Technology, Boston, Massachusetts

2001    Metropolitan State College of Denver. Department of Biology, Denver, Colorado

2001    Beckman-Coulter, Genetic Analysis Seminar, Research Triangle Park, North Carolina

2001    University of Camerino, International Symposium on Amphibian and Reptilian Endocrinology and Neurobiology, Camerino, Italy

1999    Hokkaido National University, Division of Biological Sciences, Graduate School of Science, Sapporo, Japan

**F. Research Grants and Contracts**

DNM 856

1. "Validation of a Mass Spectrometry Based Serological Assay" Department of the Army, (PI: Kevin Legg, Co-PI Phillip B. Danielson). Full proposal submitted January 2015, (Duration = 10-01-15 to 9-30-17) Funded at $789,298

2. "Developmental Validation of a High-Specificity Multiplex Assay for Human Body Fluid Identification" National Institute of Justice, (PI: Phillip Danielson). Full proposal submitted April 2012, (Duration = 10-01-12 to 9-30-14) Funded at $576,428

3. "Validation of Highly-Specific Protein Markers for the Identification of Biological Stains", National Institute of Justice, (PI: Phillip Danielson). Concept paper submitted December 2008; Full proposal submitted April 2009, (Duration = 10-01-09 to 9-30-10) Funded at $243,427

4. "Development of Linkage Phase Analysis Software for Resolving mtDNA Mixtures", National Institute of Justice, (PI: Phillip Danielson). Concept paper submitted December 2008; Full proposal submitted April 2009, (Duration = 10-01-09 to 9-30-10) Funded at $42,646

5. "Isolation of Highly-Specific Protein Markers for the Identification of Biological Stains: Adapting Comparative Proteomics to Forensics", Submitted to National Institute of Justice, (PI: Phillip Danielson). Submitted February 2006, Funded at $186,602 (Duration = 10-01-06 to 10-01-09)

6. "Independent Forensic Services", (PI: Phillip Danielson), Forensic Research and Development for Trace DNA Analysis and TOD Determination, Submitted December, 2008, Funded at $87,832. (Duration = 01-01-08 to 12-31-10)

7. "Mitochondrial DNA Mixture Analysis by Denaturing High Performance Liquid Chromatography for the Screening of Forensic Evidence and the Fractionation of Mixtures in Forensic Samples" Submitted to National Center for Missing and Exploited Children, (PI: Phillip Danielson), Submitted September 2005, (Duration = 11-01-05 to 03-31-08) Funded at $106,686

8. "Mitochondrial DNA Mixture Separation and Analysis by Denaturing High Performance Liquid Chromatography" Submitted to National Institute of Justice, (PI: Phillip Danielson), Submitted March 2005, Funded at $254,549 (Duration = 09-01-05 to 08-31-06)

9. "Comparative Proteome Mapping of Body Fluids in Forensics" Beckman-Coulter ProteomeLab Collaborative Grant Program. Funded at $20,000 (Duration = 01-01-05 to 12-31-05) "Mitochondrial DNA Analysis by Denaturing High-Performance Liquid Chromatography for the characterization and Separation of Mixtures in Forensic Samples" ", National Institute of Justice, (PI: Phillip Danielson), Funded at $202,513, Duration = 09-01-03 to 05-31-05.

10. "Aquisition of a ProteomeLab PF2D System for Research and Education" National Science Foundation, (PI: Phillip Danielson, Co-PIs: Joseph Angleson, Miles Brennan, Christina Coughlin and Robert Dores; Other Major Users: David Patterson and Anna Sher), Submitted January 2004, Funded at = $147,080 (NSF Request = $102,956; DU Cost Share = $44,124), Duration = 08-01-04 to 07-31-07.

11. "Purchase of a MALDI-TOF Mass Spectrometer for Research and Education" National Science Foundation Chemistry Research Instrumentation and Facilities, Submitted July 2002, Budget Amount = $318,500, Duration = 02-01-03 to 01-31-06. Funded at (NSF:$199,250; DU: $119,250).

12. "A WAVE Nucleic Acid Fragment Analysis System for Research and Education" National Science Foundation, Submitted October 2001, Budget Amount = $153,280, Duration = 03-01-02 to 02-28-05, Funded at (NSF:$107,296; DU: $45,984)

DNM 857

13. "Deciphering the Evolution of the Opioid/Orphanin Gene Family", National Science Foundation, Submitted July 2001, Budget Amount = $361,644, Duration = 01-01-02 to 12-31-05, Funded at $239,986

14. "Molecular Genetics of the HPA(I) Axis", National Institutes of Health, Submitted January 2001, Budget Amount = $131,390, Duration = 12-01-01 to 11-30-04, Funded at $131,390.

15. "Acquisition of a Real-Time Quantitative PCR System for Research and Education", National Science Foundation, Submitted February 2000, Budget Amount = $143,495, Duration = 08-01-01 to 07-31-04, Funded at $143,495 (NSF:$100,446; DU:$43,049)

16. "Acquisition of an Automated DNA Sequencing and Sample Prep Core Unit for Research and Education", National Science Foundation, Submitted February 1999, Budget Amount = $181,798, Duration = 07-15-99 to 07-14-01, Funded at $181,798 (NSF:$126,798; DU:$54,342)

17. "Opioid-Coding Genes: Evolution in Lungfish and Amphibians", National Science Foundation, Submitted February 1997, Budget Amount = $376,671, Duration = 07-01-98 to 06-30-02, Funded at $327,356.

18. "Evolutionary Genetics of P450 Genes in Desert *Drosophila*", National Science Foundation, Submitted December 1997, Budget Amount = $398,935, Duration = 07-01-98 to 06-31-03, Funded at $270,000.

## I. Examples of Court Testimony (Expert Witness)

2016     Garfield County District Court, sexual assault (expert in forensic genetics/biology)

2016     Pueblo County District Court, sexual assault (expert in forensic genetics/biology; genetic relatedness)

2016     Adams County District Court, arson (expert in molecular biology and forensic DNA analysis)

2015     US District Court for the District of Colorado, firearms possession (expert in forensic genetics/biology)

2015     Denver County District Court, sexual assault (expert in forensic biology)

2015     Jefferson County District Court, sexual assault (expert in forensic biology)

2014     Adams County District Court, sexual assault (expert in molecular and forensic biology)

2014     Denver County District Court, sexual assault/murder (expert in molecular biology and forensic DNA analysis)

2013     Archuleta County District Court, sexual assault/murder (expert in forensic biology)

2013     Superior Court for the District of Columbia, sexual assault/murder (expert in forensic DNA analysis)

2013     Laramie County District Court, sexual assault sexual assault (expert in molecular biology and forensic DNA analysis)

DNM 858

| | |
|---|---|
| 2013 | Adams County District Court, sexual assault (expert in molecular biology and forensic DNA analysis) |
| 2011 | Larimer County District Court, sexual assault (expert in molecular biology and forensic DNA analysis) |
| 2011 | Pueblo County District Court, sexual assault (expert in molecular biology and forensic DNA analysis) |
| 2010 | Denver District Court, Sexual Assault Post Conviction Appeal (expert in molecular biology and forensic DNA analysis) |
| 2007 | Jefferson County District Court, Attempted murder (expert in molecular biology and Forensic DNA analysis) |
| 2006 | Jefferson County District Court, Murder (expert in molecular biology and Forensic DNA analysis) |
| 2006 | Denver District Court, Sexual Assault (expert in molecular biology and forensic DNA analysis) |
| 2005 | Larimer County District Court, DUID (expert in drug metabolism) |
| 2005 | Weld County District Court, DUI (expert in microbiology) |

## H. Collaborators and Other Affiliations:

### (i) Current and/or Previous Collaborators:

Mitchell R. Morrissey (District Attorney, Denver), John Preist (Denver Police Department),  Troy Krenning (Law Enforcement Program Manager, National Law Enforcement and Corrections Technology Center, Rocky Mountain Region), Pete Mang (Colorado Bureau of Investigation), Dr. David Sweet (Bureau of Legal Dentistry, University of British Columbia), Dr. Terry Melton (Mitotyping Technologies Inc), Dr. Sun Honyu (Department of Forensic Medicine, Sun Yat-sen University, Guangzhou, PR China) Greggory S. Laberge (Denver Police Department), Dr. Robert Dores (University of Denver), Dr. JoAnne Simmons (Forensic Biology Division, Institute of Environmental Science & Research, Auckland, New Zealand), Dr. Christian Westring (NMS Labs, Willow Grove, PA), Breanna Meade  (Applied DNA Sciences, Long Island, NY)

### (ii) Graduate and Post Doctoral Advisors:

Graduate Advisor: Dr. Jim Fogleman (University of Denver)

Postdoctoral Advisor: Dr. Robert Dores (University of Denver)

### (iii) Thesis Advisor and Postgraduate-Scholar Sponsor:

**Graduate Students:**

Heather McKiernan Ph.D. student, Univ. of Denver

Richard Eikelenboom Ph.D. student, Univ. of Denver

Kevin Legg Ph.D., Univ. of Denver (Currently Research Scientist Center for Forensic Science Research and Education)

Richard Kristinsson Ph.D., Univ. of Denver (Currently Production Manager Kondria Inc.)

DNM 859

Christian Westring, Ph.D., Univ. of Denver (Currently Director of Criminalistics for NMS Labs, Pennsylvania)

Sarah Lewis, M.S. student, Univ. of Denver (Currently Agent in Charge, Colorado Bureau of Investigation Forensic DNA Laboratory)

Qi Wei, Ph.D. student, University of Denver (Currently Director of Molecular Diagnostics Laboratory at with The Children's Hospital, Denver)

Frank Conrad, MS Degree (Currently in industry)

Robert Shelton, MS student, (Currently a technician with Univ. of Colorado Health Sciences Center)

Erica Blight, MS Degree, (Currently in industry)

Rod Azadan, MS Degree, (Currently in industry)

Katelyn Voglezang, MS Degree, (Currently in industry)

Tina Yee, MS Degree, (Currently in industry)


**Postdoctoral Researchers:**

Joan Foster, Professor, Metropolitan State College of Denver, Denver, CO

Sun Honyu, Professor, Department of Forensic Medicine, Sun Yat-sen University, Guangzhou, PR China)

Kevin Legg Ph.D., Research Scientist Center for Forensic Science Research and Education, Willow Grove PA

DNM 860

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                  15-CR-4268 JB

ANDREW GALLEGOS,

       Defendant.

### NOTICE OF JOINDER IN CO-DEFENDANTS' NOTICE PURSUANT TO RULE 16

COMES NOW, Defendant, Andrew Gallegos, by and through his attorney of record,

Donavon A. Roberts, Esq., and hereby submits this Notice to notify the Court and counsel for all

parties that he joins in the following Co-Defendants' notices:

1. Defendant Garcia's Notice [Doc.1217];

2. Defendant Troup's Notice [Doc. 1218];

3. Defendant Troup's Notice [Doc. 1221].


Respectfully Submitted,

*/s/ Donavon A. Roberts*
Donavon A. Roberts
P.O. Box 36344
Albuquerque, NM 87176
(505) 506-3749
(505) 503-8405 facsimile
ladar170@aim.com

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF
system on, this 22th day of August, 2017, which caused counsel of record for the government,
co-defendants, and all other parties to receive a copy of this Motion electronically.

*/s/ Donavon A. Roberts*
Donavon A. Roberts

DNM 861

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### <u>UNITED STATES' AMENDED NOTICE OF EXPERT WITNESS TESTIMONY</u>

The United States of America hereby provides notice, pursuant to Federal Rule of

Criminal Procedure 16, of its intent to introduce, during its case-in-chief at trial, expert

testimony.    The United States submits that such evidence is relevant to the issues to be tried

before the jury in this case.    The United States asserts that this testimony is admissible

evidence, pursuant to Federal Rule of Evidence 702, and that the witnesses have a reliable basis

in knowledge and experience regarding their testimony. The United States advises as follows:

### <u>OMI Medical Investigator Ross E. Zumwalt, M.D.</u>

The United States may call as a witness Ross E. Zumwalt, M.D. It is anticipated that Dr.

Zumwalt will testify about the autopsies he performed on victims F.C., R.G. and F.S. Dr.

Zumwalt's opinion is that the cause of death in all three homicides was ligature strangulation,

and the manner of death was homicide.    Dr. Zumwalt will testify to all his findings listed in the

autopsy reports. His testimony will include his expert opinion, education, training, experience

and specialized knowledge.    The autopsy reports were previously disclosed to Defendants. A

copy of his *curriculum vitae* will be provided to defense counsel upon receipt.

**NMDPS Forensic Serology Analyst Kristen Radecki**

The United States may call as a witness Kristen Radecki, a Forensic Serology Analyst with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Radecki will testify regarding the tests conducted, and the results and conclusions of those tests involving DNA as to the homicides of F.C. and R.G., as previously revealed in her written reports disclosed to Defendants. Ms. Radecki's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* will be provided to defense counsel upon receipt.

**NMDPS Forensic Scientist Eve Tokumaru**

The United States may call as a witness Eve Tokumaru, a Forensic Scientist, specializing in forensic serology and DNA analysis, with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Tokumaru will testify regarding the tests conducted, and the results and conclusions of those tests involving DNA as to the homicide of F.C., as previously revealed in her written report disclosed to Defendants. Ms. Tokumaru's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* is attached to this notice. *See* Exhibit 1.

**NMDPS Forensic Latent Print Analyst/Photography Shirley Garcia**

The United States may call as a witness Shirley Garcia, a Forensic Latent Print Analyst, with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Garcia will testify regarding the tests conducted, and the results and conclusions of those tests involving shoe impressions at the scene of the crime as to the homicide of R.G., as previously revealed in her written report disclosed to Defendants. Ms. Garcia's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* is attached to this notice. *See* Exhibit 2.

### NMDPS Forensic Scientist Jennifer Otto

The United States may call as a witness Jennifer Otto, a Forensic Scientist, specializing in forensic serology and DNA analysis, with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Otto will testify regarding the tests conducted, and the results and conclusions of those tests involving DNA as to the homicide of F.S., as previously revealed in her written reports disclosed to Defendants. Ms. Otto's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* is attached to this notice. *See* Exhibit 3.

### OMI Medical Investigator Ian Paul, M.D.

The United States may call as a witness Ian Paul, M.D. It is anticipated that Dr. Paul will testify about the autopsy he performed on victim A.B. Dr. Paul's opinion is that the cause of death was a gunshot wound to the head, and the manner of death was homicide.   Dr. Paul will testify to all his findings listed in the autopsy report. His testimony will include his expert opinion, education, training, experience and specialized knowledge.   The autopsy report was previously disclosed to Defendants. A copy of his *curriculum vitae* is attached to this notice. *See* Exhibit 4.

### NMDPS Forensic Scientist Kevin M. Streine

The United States may call as a witness Kevin M. Streine, a Forensic Scientist, with the New Mexico Department of Public Safety Forensic Laboratory. Mr. Streine will testify regarding the tests conducted, and the results and conclusions of those tests involving bullet comparison, general rifling characteristics, cartridge examination, cartridge case examination and comparison, shot shell examination, and integrated ballistics identification system/National integrated ballistics information network entry, as to the homicide of A.B., as previously

revealed in his written reports disclosed to Defendants. Mr. Streine's testimony may include

expert opinions or specialized knowledge regarding these matters that is derived from his

education, training, and professional experience as a forensic scientist. A copy of his *curriculum*

*vitae* is attached to this notice. *See* Exhibit 5.

### NMDPS Forensic Scientist Margo Mikesica

The United States may call as a witness Margo Mikesica, a Forensic Scientist,

specializing in forensic serology and DNA analysis, with the New Mexico Department of Public

Safety Forensic Laboratory. Ms. Mikesica will testify regarding the tests conducted, and the

results and conclusions of those tests involving DNA as to the homicide of A.B., as previously

revealed in her written report disclosed to Defendants. Ms. Mikesica's testimony will include her

expert opinion, education, training, experience and specialized knowledge. A copy of her

*curriculum vitae* is attached to this notice. *See* Exhibit 6.

### NMDPS Forensic Scientist Tracy Zehringer

The United States may call as a witness Tracy Zehringer, a Forensic Scientist,

with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Zehinger will

testify regarding the results and conclusions of examinations conducted by the Latent Prints Unit

as to the homicide of A.B., as previously revealed in her written reports disclosed to Defendants.

Ms. Zehinger's testimony will include her expert opinion, education, training, experience and

specialized knowledge. A copy of her *curriculum vitae* is attached to this notice. *See* Exhibit 7.

### NMDPS Forensic Scientist Teresa Vigil

The United States may call as a witness Teresa Vigil, a Forensic Scientist,

with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Vigil will testify

regarding the results and conclusions of examinations conducted by the Latent Prints Unit as to

DNM 865

the homicide of A.B., as previously revealed in her written report disclosed to Defendants.   Ms. Vigil's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* is attached to this notice. *See* Exhibit 8.

**NMDPS Forensic Scientist Eric Young**

The United States may call as a witness Eric Young, a Forensic Scientist, with the New Mexico Department of Public Safety Forensic Laboratory. Mr. Young will testify regarding the results and conclusions of examinations conducted by the Trace Unit (Fire Debris) as to the homicide of A.B., as previously revealed in his written report disclosed to Defendants. Mr. Young's testimony will include his expert opinion, education, training, experience and specialized knowledge. A copy of his *curriculum vitae* will be provided to defense counsel upon receipt.

**FBI Forensic Examiner Tiffany L. Smith**

The United States may call as a witness Tiffany L. Smith, a Forensic Examiner with the Federal Bureau of Investigation Laboratory. Ms. Smith will testify regarding the results and conclusions of examinations conducted by the DNA Analysis Unit as to the homicide of A.B., as previously revealed in her written report disclosed to Defendants. Additionally, Ms. Smith will testify regarding the results and conclusions of examinations conducted by the DNA Analysis Unit as to the examination of a firearm for a possible DNA match. She will testify about the tests she performed on the firearm, and her findings as to the firearm described in her report disclosed to Russ Aoki on August 1, 2017. Ms. Smith's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* is attached to this notice. *See* Exhibit 9.

DNM 866

### OMI Medical Investigator Hannah Kastenbaum, M.D.

The United States may call as a witness Hannah Kastenbaum, M.D. It is anticipated that Dr. Kastenbaum will testify about the autopsy she performed on victim J.M. Dr. Kastenbaum's opinion is that the cause of death was stab wounds, and the manner of death was homicide.    Dr. Kastenbaum will testify to all her findings listed in the autopsy report. Her testimony will include her expert opinion, education, training, experience and specialized knowledge.    The autopsy report was previously disclosed to Defendants. A copy of her *curriculum vitae* is attached to this notice. *See* Exhibit 10.

### NMDPS Forensic Scientist Cindy Wood

The United States may call as a witness Cindy Wood, a Forensic Scientist, specializing in forensic serology and DNA analysis, with the New Mexico Department of Public Safety Forensic Laboratory. Ms. Wood will testify regarding the tests conducted, and the results and conclusions of those tests involving DNA as to the homicide of J.M., as previously revealed in her written report disclosed to Defendants. Ms. Wood's testimony will include her expert opinion, education, training, experience and specialized knowledge. A copy of her *curriculum vitae* will be provided to defense counsel upon receipt. A copy of her *curriculum vitae* is attached to this notice. *See* Exhibit 11.

### NMDPS Forensic Audio/Video Analyst Roger Cain

The United States may call as a witness Roger Cain, a Forensic Audio/Video Analyst with Rocky Mountain Information Network. Mr. Cain will testify regarding the results and conclusions of examinations. Specifically, Mr. Cain examined the Verbatim DVD-R containing video of the assault on J.M., in order to enhance the audio and video, as previously revealed in his written report disclosed to Defendants. Mr. Cain's testimony will include his expert opinion,

6

education, training, experience and specialized knowledge. A copy of his *curriculum vitae* is
attached to this notice. *See* Exhibit 12.

### FBI Forensic Examiner Theodore Chavez

The United States may call as a witness Theodore Chavez, a Forensic Examiner with the
Federal Bureau of Investigation Laboratory, to testify about the tests he performed on the
firearm, and his findings as to the firearm described in his report disclosed to Russ Aoki on April
3, 2017. Mr. Chavez's testimony will include his expert opinion, education, training, experience
and specialized knowledge. A copy of his *curriculum vitae* is attached to this notice. *See* Exhibit
13.

### LAW and ARGUMENT

Federal Rule of Evidence 702 controls the admissibility of expert testimony and requires
district courts to ensure that all scientific, technical or other specialized testimony of an expert
witness is both relevant and reliable.   *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.
579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (applying same
principles to "technical" evidence).   To determine whether an expert's testimony is reliable, the
court must "assess the reasoning and methodology underlying the expert's opinion."   *United
States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006).   Courts consider four
nonexclusive factors in determining whether expert testimony is sufficiently reliable:

(1) whether the theory at issue can be and has been tested;

(2) whether the theory has been subjected to peer review and publication;

(3) whether there is a known or potential rate of error and whether there are standards
controlling the methodology's operation; and

(4) whether the theory generally has been accepted in the relevant scientific community.

7

*See Daubert*, 509 U.S. at 593-94.    The Rule 702 inquiry under *Daubert* is a "flexible one," and

these factors "do not all necessarily apply . . . in every instance."    *Kumho Tire*, 526 U.S. at

150-51.    A trial court has the same wide "latitude in deciding *how* to test an expert's reliability

... as it enjoys when it decides *whether or not* an expert's testimony is reliable."    *Id*. at 152

(emphasis in original).

WHEREFORE the United States respectfully requests this Court to allow the above-

described expert witnesses' testimony because it has "a reliable basis in the knowledge and

experience" in the witnesses' respective disciplines, as prescribed by *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137 (1999).    *See United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir.

2009) (Rule 702's reliability requirement for proffered expert testimony may be satisfied where

an expert witness' "specialized knowledge" is "acquired through 'experience' and 'training' ").

Respectfully Submitted,

JAMES D. TIERNEY
Acting United States Attorney

***Electronically filed on 9/1/2017***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, New Mexico 88011
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney

8

# CURRICULUM VITAE

# EVE  TOKUMARU, MSFS

New Mexico DPS Forensic Laboratory
4491 Cerrillos Road, P.O.Box 1628, Santa Fe, NM
Office: (505)827-3319  |  Email: eve.tokumaru@state.nm.us

## EDUCATION:

2000 - 2002
**Master of Science Degree**
Marshall University, Huntington, WV
Major: Forensic Sciences

1994 - 1999
**Bachelor of Arts Degrees**
University of California at Santa Cruz, Santa Cruz, CA
Double Major: Psychobiology (cross between biology and neuroscience), Anthropology

## FORENSIC & LABORATORY  EXPERIENCE:

Dec, 2012 – Present
**Forensic Scientist 2 (Serologist / DNA Analyst)**
New Mexico Department of Public Safety Forensic Laboratory
Santa Fe, NM

Jul, 2003 – Dec, 2006
**Forensic Scientist 1 (Serologist / DNA Analyst)**
New Mexico Department of Public Safety Forensic Laboratory
Santa Fe, NM

Jun, 2002 – Jul, 2003
**Forensic Scientist / DNA Analyst, Immunoassay Technologist**
Forensic and Criminalistic Testing, Inc. *(company no longer exists)*
Albuquerque, NM

Jun, 2001 – Aug, 2001
**DNA/CODIS Intern**
Marshall University Forensic Science Center
Huntington, WV

Jun, 2001 – Aug, 2001
**Intern/Volunteer**
Huntington Police Department Crime Scene Investigation Unit
Huntington, WV

**GOVERNMENT'S EXHIBIT 1**

DNM 870

## EXPERT WITNESS COURT TESTIMONY:

| | | |
|---|---|---|
| Apr 5, 2017 | 8th Judicial District Court | Taos, NM |
| Mar 1, 2017 | 5th Judicial District Court | Roswell, NM |
| Jan 25, 2017 | United States District Court | Las Cruces, NM |
| Jan 11, 2017 | 3rd Judicial District Court | Las Cruces, NM |
| Jan 10, 2017 | 6th Judicial District Court | Deming, NM |
| Nov 30, 2016 | 13th Judicial District Court | Los Lunas, NM |
| Feb 10, 2016 | 5th Judicial District Court | Lovington, NM |
| Mar 25, 2015 | 2nd Judicial District Court | Albuquerque, NM |
| Mar 18, 2015 | 5th Judicial District Court | Carlsbad, NM |
| Nov 17, 2014 | 12th Judicial District Court | Alamogordo, NM |
| Jul 29, 2014 | 1st Judicial District Court | Santa Fe, NM |
| May, 2006 | 9th Judicial District Court | Clovis, NM |

## PROFESSIONAL MEMBERSHIPS:

| | |
|---|---|
| 2014 – Present | American Academy of Forensic Sciences |
| 2001 – 2006 | American Academy of Forensic Sciences |
| 2001 – 2003 | International Association for Identification |

## CERTIFICATES:

Apr, 2013
>**Qualified Forensic Scientist in the disciplines of Forensic Biology: Serology and DNA Analysis**
>New Mexico Department of Public Safety Crime Laboratory, Santa Fe, NM

Mar, 2006
>**FBI DNA Quality Assurance Auditor**
>Federal Bureau of Investigation, *(AAFS)* Seattle, WA

Nov, 2006
>**Standard First Aid**
>American Red Cross, Santa Fe, NM

Nov, 2006
>**Adult CPR/AED**
>American Red Cross, Santa Fe, NM

Aug, 2004
>**Instructor**
>New Mexico Law Enforcement Academy, Santa Fe, NM

2004
>**Qualified Forensic Scientist in the discipline of Forensic DNA Analysis**

DNM 871

New Mexico Department of Public Safety Crime Laboratory, Santa Fe, NM

2003
**Qualified Forensic Scientist in the discipline of Forensic Serology**
New Mexico Department of Public Safety Crime Laboratory, Santa Fe, NM

## TRAINING & CONTINUING EDUCATION:

Mar 29-30, 2017
**Yfiler Plus PCR Amplification Kit validation lecture and laboratory (14 hours)**
**Applied Biosystems**
Santa Fe, NM

Jan 09, 2017
**2017 Annual Review of DNA Data Accepted at NDIS**
U.S. Department of Justice, FBI Laboratory Division, Santa Fe, NM

Sep 16, 2016
**Annual Bloodborne Pathogens Training (OSHA)**
Stericycle online training, Santa Fe, NM

Jun 7-9, 2016
**Thermo Fisher Scientific Validation: Quantifiler Trio DNA Quantification**
**Kit, HID Real-Time PCR Analysis Software v1.2, GlobalFiler PCR Amplification**
**Kit, Applied Biosystems 3500 Genetic Analyzer GeneMapper ID-X Software v1.5**
Santa Fe, NM

Mar 02, 2016
**2016 Annual Review of DNA Data Accepted at NDIS**
U.S. Department of Justice, FBI Laboratory Division, Santa Fe, NM

Feb 22-26, 2016
**American Academy of Forensic Sciences 68th Annual Meeting**
Las Vegas, NV

Feb 22, 2016
**Practical Homicide Investigation: An Evaluation of Homicides Involving Child**
**Victims, Child Offenders, and Equivocal Death Investigations (8 hours)**
American Academy of Forensic Sciences, Las Vegas, NV

Nov 30, 2015
**Annual Bloodborne Pathogens Training (OSHA)**
Stericycle online training, Santa Fe, NM

Oct 12-15, 2015
**26th International Symposium on Human Identification**

DNM 872

Promega Corporation, Grapevine, TX

Jan 20, 2015
**2015 Annual Review of DNA Data Accepted at NDIS**
U.S. Department of Justice, FBI Laboratory Division, Santa Fe, NM

Oct 28, 2014
**Forensic Science and the Law (8 hours)**
James Skinner, Ted Vosk, Judge Roderick Kennedy, Cynthia Blackwell, Fred Smith
New Mexico DPS Forensic Laboratory, Santa Fe, NM

Oct 16, 2014
**New Mexico Cold Case Investigators Association 2014 Training (8 hours)**
Dale Ferranto, Sgt. Damon Fay, and Lt. Robert Vasquez
Santa Fe Police Department, Santa Fe, NM

Oct 2, 2014
**New Autosomal and Y-STR Loci and Kits: Making Data Driven Decisions (3 hours)**
Promega Corporation, Phoenix, AZ

Sep 29 – Oct. 2, 2014
**25th International Symposium on Human Identification**
Promega Corporation, Phoenix, AZ

Aug 6, 2014
**DNA Analyst Webinar Series: Validation Concepts and Resources – Part 1**
National Institute of Standards and Technology (NIST), 4 hours, Santa Fe, NM

May 28, 2014
**DNA Mixture Webinar**
National Institute of Standards and Technology (NIST), 4 hours, Santa Fe, NM

May 22, 2014
**Universal Latent Workstation (ULW) Software Training Program**
FBI CJIS Division, at the New Mexico Regional Computer Forensics Laboratory
(NMRCFL), 16 hours, Albuquerque, NM

Mar 03, 2014
**Annual Bloodborne Pathogens Training (OSHA)**
Stericycle online training, 1.0 CE Units, Santa Fe, NM

Jan 14, 2014
**2014 Annual Review of DNA Data Accepted at NDIS**
U.S. Department of Justice, FBI Laboratory Division, Santa Fe, NM

Dec 10, 2013

DNM 873

**Fire Extinguisher Education & Awareness Program (online)**
http://www.fireextinguishertraining.com/
& hands-on demonstration with Q&A by Santa Fe Fire Department's Fire Prevention
New Mexico Department of Public Safety Crime Laboratory, Santa Fe, NM

Nov 11, 2013
**Bloodborne Pathogen Training (15 hrs)**
West Virginia University *(online)*, Instructor Sarah Ellis, Santa Fe, NM

Oct 28, 2013
**Forensic Relationship Statistics Made Easy (8 hrs)**
35th Annual SWAFS conference, Instructor Kelly Beatty, Santa Fe, NM

May 7, 2013
**2013 Annual Review of DNA Data Accepted at NDIS**
U.S. Department of Justice, FBI Laboratory Division, Santa Fe, NM

Apr 12, 2013
**DNA Mixture Interpretation Workshop & Webcast (8 hrs)**
National Institute of Standards and Technology, Albuquerque, NM

Mar 7, 2013
**2012 Annual Review of DNA Data Accepted at NDIS**
U.S. Department of Justice, FBI Laboratory Division, Santa Fe, NM

Jan 24, 2013
**Annual Bloodborne Pathogens Training**
By Stericycle at NM DPS Northern Forensics Laboratory, Santa Fe, NM

Feb 20-21, 2006
**DNA Auditor Training**
Federal Bureau of Investigation *(AAFS)* Seattle, WA

2001 – 2006
**American Academy of Forensic Sciences Annual Meetings**
2003: Speaker

Jun 12-17, 2005
**ABI 3100 Capillary Electrophoresis, GeneMapper ID Data Analysis and Real Time
PCR Training Module**
Marshall University Forensic Science Center, Huntington, WV

Aug, 2004
**Instructor Development**
New Mexico State Police Law Enforcement Academy, Santa Fe, NM

DNM 874

Jun 1-4, 2004
**ABI Prism 310 Genetic Analyzer / AmpFLSTR Training**
Applied Biosystems, Inc., Foster City, CA

Jan 26, 2004
**Reflective Ultra Violet Imaging System (R.U.V.I.S)**
Sirchie Finger Print Laboratories, Santa Fe, NM

2003 – 2004
**International Symposium on Human Identification**
Promega Corporation, Phoenix, AZ

1999 – 2004
**Mountain, Desert & Coastal Forensic Anthropology Annual Meetings**
Lake Mead, NV

## TEACHING & TRAINING GIVEN:

Mar, 2017
**Forensic DNA Evidence: Capabilities and Limitations, 2 hour lecture**
UNM School of Law Wrongful Convictions Class, Professor Gordon Rahn
Albuquerque, NM

Mar, 2016
**Forensic DNA Evidence: Capabilities and Limitations, 2 hour lecture**
UNM School of Law Wrongful Convictions Class, Professor Gordon Rahn
Albuquerque, NM

Mar, 2015
**Forensic DNA Evidence: Capabilities and Limitations, 2 hour lecture**
UNM School of Law Wrongful Convictions Class, Professor Gordon Rahn
Albuquerque, NM

Mar, 2014
**Forensic DNA Evidence: Capabilities and Limitations, 2 hour lecture**
UNM School of Law Wrongful Convictions Class, Professor Gordon Rahn
Albuquerque, NM

2004-2006
**New Mexico State Police Law Enforcement Academy**
Various trainings on proper collection of biological evidence for forensic DNA testing
NM DPS LEA, Santa Fe, NM

*Shirley Garcia*
*Retired Forensic Scientist*
*Department of Public Safety*
*1984 - 2009*

*Education:*

*Santa Fe High School, Santa Fe, New Mexico*
*August 1979 - May 1982 Diploma*

*NM Highlands University, Las Vegas, New Mexico*
*August 1982 - May 1983*
*Studies in Business Administration*

*Fingerprint Classification, Law Enforcement Academy/FBI, Santa Fe, NM*
*February 1985*
*Certificate*

*American Institute of Applied Science, Syracuse, NY*
*May 1989 - September 1990*
*Diploma*

*Advanced Latent Fingerprint Techniques, Law Enforcement Academy/FBI*
*Santa Fe, NM*
*June 1992*
*Certificate*

*Instructor Development, Law Enforcement Academy/Santa Fe, NM*
*December 1992*
*Certificate*

*Advanced Palm Print Identification, Denver, Colorado*
*October 1994*
*Certificate*

*Administrative Advanced Latent Fingerprint School, FBI, Quantico, VA*
*June 1996*
*Certificate*

*Detection & Examination of Footwear Impressions, Tucson, AZ*
*January 2000*
*Certificate*

**GOVERNMENT'S EXHIBIT 2**

*Science of Ridgeology, Thornton, CO*
*August 2001*
*Certificate*

*IAFIS (Integrated Automated Fingerprint Identification System) Seminar*
*Columbus, OH*
*March 2002*
*Certificate*

*Colorado Bureau of Investigation Fingerprint Symposium, Golden, CO*
*May 2002*
*Certificate*

*Krimesite Imager (RUVIS) Reflective Ultra Violet Imaging System Technology*
*Law Enforcement Academy, Santa Fe, NM*
*July 2003*
*Certificate*

*EPIC School of Evidence Photography & Imaging, Albuquerque, NM*
*October 2004*
*Certificate*

*Footwear Impression Comparison & Examination*
*Sam Houston University, Huntsville, TX*
*January 2005*
*Certificate*

***Memberships:***
*International Association for Identification*

***Certifications:***

*Certified by the International Association for Identification, Latent Print Certification Board as a Latent Print Examiner*

*Certified by the Department of Public Safety, Northern Forensic Crime Laboratory in performing examinations in the areas of Latent Prints/Shoe & Tire Track Impression Evidence*

*Certified by the Law Enforcement Academy, Santa Fe, NM in the instruction of Fingerprints/Latent Prints*

*Certified First Aid/Adult & Child CPR*

*Additional Certificates:*

Sexual Harrassment, May 1985
Chief's Records Management System, September 1989
Orion Input Workstation Operations, February 1990
AFIS (Automated Fingerprint Identification System) Input Workstation Operations,
June 1993
National Crime Information Center (NCIC), September 1993
Civil Liability for Trainers, January 1993
Hazardous Materials Level I, December 1993
Defensive Driving, March 2003
Defensive Tactics, June 2003

**Work Experience:**

Department of Public Safety/Northern Forensic Laboratory
Forensic Scientist
November 1993 - Retired 2009

Department of Public Safety/Identification Unit
Fingerprint Specialist
June 1988 - November 1993

Department of Public Safety/Records Unit
Clerk Specialist
September 1986 - May 1988

Department of Public Safety/Identification Unit
Fingerprint Clerk
April 1984 - September 1986

DNM 878

# CURRICULUM VITAE
# JENNIFER OTTO, M.S.

NEW MEXICO DEPARTMENT OF PUBLIC SAFETY
4491 CERRILLOS ROAD
SANTA FE, NM 87504
Phone: 505-827-9507
Fax: 505-827-9280
Email: jennifer.otto@state.nm.us

## EDUCATION

| | |
|---|---|
| 2001 - 2003 | University of North Texas Health Science Center, Fort Worth, Texas<br>M.S. in Forensic Genetics |
| 1997 - 2001 | Texas Lutheran University, Seguin, Texas<br>B.S. in Biology |

## PROFESSIONAL AND RESEARCH EXPERIENCE

**New Mexico Department of Public Safety, Northern Forensic Laboratory, Santa Fe, NM**
3/2010-present          Biology Technical Leader
- ❖ Responsible for technical operations of the Biology section, including the quality assurance program, standard operating procedures, training program, and proficiency testing program

11/2007-present          Forensic Scientist-Biology Section
- ❖ Perform serology and DNA testing for agencies in the state of New Mexico

***IDENTI*GENE, LLC, A Sorenson Genomics Company**
6/2007-10/2007          Forensic DNA Analyst, *IDENTI*GENE facility (Houston, TX)

***IDENTI*GENE, Inc, Houston, TX**
8/2003 – 5/2007          Forensic DNA Analyst

**Harris County Medical Examiner's Office, Houston, TX**
5/2003 – 7/2003          Forensic Genetics Internship Practicum
- ♦ Forensic-related research project into the performance of four DNA extraction techniques on low quantities of blood.

## AFFILIATIONS
2003-present          American Academy of Forensic Sciences

**GOVERNMENT'S EXHIBIT 3**

**UNPUBLISHED PRESENTATIONS**

| | |
|---|---|
| April 2015 | "Do Not Assume: The Reality and Misconceptions About Forensic DNA Testing" **New Mexico Sheriff's Association Conference, Albuquerque, NM** |
| June 2012 | "Sexual Assault Evidence at the NM-DPS Forensic Laboratory" **8th Annual New Mexico Advanced SANE Conference, Albuquerque, NM** |
| Aug 2011 | "Applied Biosystems Validation Support and the Creation of a DNA Databasing Laboratory" **Life Technologies/Applied Biosystems HID University - Berkeley, CA Seminar** |

**CONTINUING EDUCATION**

| | |
|---|---|
| May 2016 | **15th Annual DNA Conference - East**, Bode Cellmark Forensics, Orlando, FL |
| Feb 2015 | **AAFS 67th Annual Meeting**, Orlando, FL |
| Aug 2014 | **Validation Concepts and Resources (Part 1)**, NIST Sponsored Webinar |
| May 2014 | **Probabilistic Genotyping & Software Programs (Part 1)**, NIST Sponsored Webinar |
| Nov 2013 | **DNA Technical Leader Summit**, NIST, Norman, OK |
| April 2013 | **DNA Mixture Interpretation Workshop and Webcast**, NIST |
| Feb 2013 | **AAFS 65th Annual Meeting**, Washington, D.C. |
| Oct 2012 | **23rd International Symposium on Human Identification**, Promega Corp., Nashville, TN |
| June 2011 | **Paternity Statistics for Forensic Casework Training**, Bode Technology, Santa Fe, NM |
| May 2011 | **10th Annual Advanced DNA Technical Workshop-East**, Bode Technology Group, Amelia Island, FL |
| Oct. 2010 | **Forensic Y-STR Training**, Marshall University Forensic Science Center, Santa Fe, NM |
| Mar. 2010 | **7th Annual Advanced DNA Technical Workshop-West**, Bode Technology Group, San Diego, CA |
| Feb. 2009 | **AAFS 61st Annual Meeting**, Denver, CO |
| Oct. 2008 | **19th International Symposium on Human Identification**, Promega Corp., Hollywood, CA |
| Feb 2007 | **AAFS 59th Annual Meeting**, San Antonio, TX |
| Jan 2006 | **AFDAA Biannual Meeting**, Austin, TX |
| Feb 2005 | **AAFS 57th Annual Meeting**, New Orleans, LA |
| Sep 2004 | **Applied Biosystems, Future Trends in Forensic DNA Technology**, Austin, TX |
| Feb 2003 | **AAFS 55th Annual Meeting**, Chicago, IL |

**TESTIMONY EXPERIENCE**

As Identigene DNA Analyst:

2005 - 2010    Criminal District Courts, Harris County, Houston, TX (9 times); Tarrant County Criminal Dist. Court #4, Fort Worth, TX; Galveston County Commissioner's Court, Galveston, TX; 306th District Court, Galveston County, Galveston, TX; 390th District Court, Travis County, Austin, TX; 434th District Court, Fort Bend County, Houston, TX; Common Pleas Court, Wood County, Ohio (deposition); District Court, Jefferson County, Oklahoma; 139th District Court, Hidalgo County, TX; 434th District Court, Fort Bend County, Richmond, TX

As NM-DPS DNA Analyst:

1st Judicial District Court, Santa Fe County, Santa Fe, NM - Jan 2011 (grand jury)

1st Judicial District Court, Rio Arriba County, Tierra Amarilla, NM - Feb 2013

2nd Judicial District Court, Albuquerque, NM - Jan 2015 (Y-STRs), Apr 2016

3rd Judicial District Court, Dona Ana County, Las Cruces, NM - June 2009, Sept 2011, Jan 2014

5th Judicial District Court, Lea County, Lovington, NM – May 2009, Apr 2012, Feb 2013, Feb 2015 (Y-STRs)

5th Judicial District Court, Chaves County, Roswell, NM - May 2010, Aug 2010, Aug 2011, Mar 2013 (defense witness), Nov 2013 (defense witness), Feb 2015

6th Judicial District Court, Luna County, Deming, NM - Mar 2015, Apr 2016

7th Judicial District Court, Catron County, Socorro, NM - July 2015 (Y-STRs)

9th Judicial District Court, Curry County, Clovis, NM - Dec 2009

10th Judicial District Court, Quay County, Tucumcari, NM - Aug 2009

11th Judicial District Court, McKinley County, Gallup, NM - May 2014 (technical reviewer), Oct 2014 (defense witness, Y-STRs)

11th Judicial District Court, San Juan County, Aztec, NM - Dec 2012 (Y-STR's), June 2014, Dec 2014, Apr 2015

11th Judicial District Court, San Juan County, Farmington, NM - Dec 2009 (Y-STR's)

12th Judicial District Court, Otero County, Alamogordo, NM - Oct 2009, May 2010, June 2010, July 2010, Sept 2010, July 2014 (technical reviewer), Oct 2014 (defense witness), Aug 2016, Dec 2016. Jan 2017

12th Judicial District Children's Court, Otero County, Alamogordo, NM - Nov 2013 (video testimony)

13th Judicial District Court, Sandoval County, Bernalillo, NM - Feb 2010, June 2013 (defense witness, Y-STR's)

Chaves County Magistrate Court, Roswell, NM – Oct 2015 (Preliminary hearing)

| | |
|---|---|
| Name and Terminal Degree | Ian D. Paul, M.D. |
| Professional Address | Department of Pathology<br>Office of the Medical Investigator<br>University of New Mexico<br>MSC07 4040<br>1101 Camino de Salud NE<br>Albuquerque, NM 87102 |
| Licensure | New Mexico (6/2005 to present) |
| Board Certification | Forensic Pathology (2005)<br>Anatomic Pathology (2004)<br>Emergency Medicine (2000-2010) |
| Education | Office of the Medical Investigator<br>University of New Mexico<br>Albuquerque, NM<br>Forensic Pathology Fellowship<br>July 1, 2004-June 30, 2005<br><br>Beth Israel Deaconess Medical Center<br>Harvard Medical School<br>Boston, MA<br>Anatomic Pathology Residency<br>July 1, 2001-June 30, 2004<br><br>Boston Medical Center<br>Boston University<br>Boston, MA<br>Emergency Medicine Residency<br>July 1, 1997-June 30, 2000<br><br>Miriam Hospital<br>Brown University<br>Providence, RI<br>Internal Medicine Internship<br>July 1, 1996-June 30, 1997<br><br>McGill University Faculty of Medicine<br>Montreal, Quebec, Canada<br>Doctorate of Medicine<br>1992-1996 |

**GOVERNMENT'S EXHIBIT 4**

Georgetown University
Washington, DC
Master of Science, Physiology
1990-1991

George Washington University
Washington, DC
Bachelor of Science in Biology
1987-1990

Employment                              Department of Pathology
                                        University of New Mexico
                                        Director, Pathology Residency Program
                                        Associate Professor of Pathology
                                        July 1, 2005 to present

Membership in Professional Societies    American Academy of Forensic Sciences
                                        National Association of Medical Examiners
                                        Canadian Society of Forensic Sciences
                                        American College of Emergency Physicians

Invited Lectures                        UNM Graduate Medical Education
                                        Symposium
                                        "The Value of the Autopsy"
                                        January, 2009, Albuquerque, NM

                                        Bernalillo County District Attorneys Office
                                         "Methamphetamine"
                                        May 2007, Albuquerque, NM

                                         Lovelace Radiology
                                        "Forensic Radiology"
                                        November 2005, Albuquerque, NM

Meeting sessions chaired                GME symposium moderator
                                        UNM GME Symposium
                                        January 2009, Albuquerque, NM

Community Service

                                        Founder and President New Mexico Soccer
                                        Foundation

De Tocqueville Society, New Mexico
United Way

Classic FC Soccer, Albuquerque, NM

NM High School Honors Student Mentor

Teaching: I am actively involved in the education of undergraduate students, residents and fellows. My unique training in emergency medicine, anatomic pathology and forensic pathology has driven my passion for bridging clinical medicine and pathology. Many of my informal teaching sessions are focused on translating clinical presentations into pathologic findings. I participate in medical student education by giving three didactic lectures each year in pulmonary pathology, acting as a lab instructor and block tutorial leader and participating in the UNM medical students autopsy experience. I serve as a match mentor to those students who are interested in pathology. I am also actively involved in pathology resident and fellow education. I give a monthly microscopic unknown conference, present multiple didactic lectures, and participate in the anatomic pathology lecture series and journal club. I spend a considerable amount of time teaching at our daily morning and afternoon rounds, in the autopsy suite, at the microscope and in the formulation of reports. I have also participated in multiple outside lectures and teaching sessions as well as served as a high school student mentor.

Service: My service work focuses primarily on providing excellent and accurate autopsy diagnoses. I have testified in court as an expert in forensic pathology more than 50 times over the last five years. My expertise in both pathology and emergency medicine allows me to readily bridge the two specialties. I am also actively involved in our consult service and have reviewed many local and national cases. For the past year I have served as the director of the forensic pathology fellowship program.

Research: My current research interests are focused on comparing the accuracy of computerized tomography (CT) and traditional autopsies in making clinical diagnoses.

Original Research in Refereed Journals:

Nolte K, Mlady G, Zumwalt R, Cushnyr B, Paul I, Wiest P. Postmortem X-ray computed tomography (CT) and forensic autopsy: a review of the utility, the challenges and the future implications. Academic Forensic Pathology. July 2011

Mena OJ, Paul I, Reichard R. Ocular Findings in Raised Intracranial Pressure: A Case of Terson Syndrome in a 7-Month-Old Infant. American Journal of Forensic Medicine and Pathology. July 2011

Bauman M, Marinaro J, Tawil I, Crandall C, Rosenbaum L, Paul I. Ultrasonographic Determination of Pubic Symphyseal Widening in Trauma: The FAST-PS Study. Journal of Emergency Medicine. 2009

Lathrop S, Paul I, Swartz M, Nolte K. Utility of Infectious Disease Coding Sheets for Surveillance in a State Medical Examiner's Office. Journal of Forensic Science. July 2008.

Paul I, Reichard R. Subacute Combined Degeneration Mimicking Traumatic Spinal Cord Injury. American Journal of Forensic Medicine and Pathology. 2008

Sklar D, Crandall C, Loeliger E, Edmunds K, Paul I, Hilitzer D. Unanticipated Death After Discharge Home From the Emergency Department. Annals of Emergency Medicine. 2007

Maclean S, Paul I. Lidocaine toxicity in the presence of hyperkalemia, Annals of Emergency Medicine. 2000

Roy S, Dewitz A, Paul I. Ultrasound Assisted Ankle Arthrocentesis. American Journal of Emergency Medicine. 1999

Rouault T, Haile D, Downey W, Philpott C, Tang C, Samaniego F, Chin J, Paul I, Orloff D, Harford J, Klausner R. An Invited Review, An Iron Sulfur Cluster Plays a Novel Regulatory Role in the Iron Responsive Element Binding Protein. Biometals. 1992

Abstracts:

Nolte KB, Lathrop SL, Hatch GM, Gerrard CY, Elifritz J, Cushnyr BW, Mlady G, Pohl J, Andrews SW, Paul ID, Price JP, Zumwalt RE, Wiest PW. Utility of postmortem x-ray computed tomography (CT) for medicolegal autopsies on decedents with blunt force injuries. 20th World Meeting of the International Association of Forensic Sciences, Seoul, Korea, Oct 17, 2014.

Cushnyr BW, Lathrop SL, Hatch GM, Gerrard CY, Elifritz J, Andrews SW, Paul ID, Price JP, Zumwalt RE, Notle KB. Utility of computed tomography (CT) as a postmortem tool for the diagnosis of blunt force head injuries. 20th World Meeting of the International Association of Forensic Sciences, Seoul, Korea, Oct 17, 2014.

Lathrop SL, Hatch G, Gerrard CY, Williamson S, Price JP, Lopez KM, Andrews SW, Zumwalt RE, Paul ID, Elifritz J, Nolte KB. A prospective double-blinded comparison of autopsy and post-mortem computed tomography (PMCT) for the evaluation of pediatric trauma deaths. American Academy of Forensic Sciences annual meeting, Orlando, FL, February 16-21, 2015.

Gerrard CY, Lathrop SL, Hatch GM, Williamson S, Price JP, Lopez KM, Andrews SW, Zumwalt RE, Paul ID, Elifritz J, Nolte KB. Postmortem Computed Tomography (PMCT) in pediatric deaths attributed to asphyxia. International Society for Forensic Radiology and Imaging, Leicester, UK, May 2015.

Hatch GM, Lathrop SL, Gerrard CY, Poland V. Paul ID, Mlady G, Cushnyr BW, Andrews SW, Pohl J, Wiest PW, Zumwalt RE, Price JP, Elifritz JM, Nolte KB. Comparison of Postmortem Computed Tomography and Autopsy in Gunshot Wound Fatalities. International Society for Forensic Radiology and Imaging, Leicester, UK, May 2015.

Paul ID, Lathrop SL, Hatch GM, Gerrard CY, Poland V, Zumwalt RE, Andrews SW, Price JP, Mlady GW, Pohl J, Cushnyr B. Wiest PW, Nolte KB. A prospective double-blinded comparison of autopsy and post-mortem computed tomography (PMCT) for the evaluation of potential drug poisoning deaths. American Academy of Forensic Sciences annual meeting, Las Vegas, NV, February 26, 2016.

# Curriculum Vitae

## Kevin Streine
### Forensic Scientist, Firearm/Toolmark Examiner
State of New Mexico Department of Public Safety
Northern Forensic Laboratory
PO Box 1628
Santa Fe, New Mexico 87504-1628
505-827-9132

## Education
Certificate of Police Studies, John Jay College of Criminal Justice.

## Employment
2003 – present: New Mexico DPS Northern Forensic Laboratory.

1983 – 2003: New York City Police Department (NYPD).

## Training and Experience
1983 – 1988: Uniformed patrol duties as a sworn Police Officer.

1988 – 1993: Assigned to NYPD Scientific Research Division.  Responsibilities included:

- •  Evidence Control
- •  Quality Control and Assurance
- •  Liaison with District Attorney's Office.

1993 – 2003: Detective, NYPD Firearms Analysis Section.

2003 – present: New Mexico DPS Northern Forensic Laboratory Firearm/Toolmark Unit.

Responsibilities and training include:

Firearms examination and microscopy.  Major areas of study:  firearm and ammunition identification, operability of firearms and ammunition, microscopy, muzzle to victim distance determination, toolmark identification, physical fracture matches, serial number restoration and NIBIN system.

Qualified as an expert witness in the discipline of firearm/toolmark analysis. Testified as an expert witness in approximately 137 trials in New York City Criminal and Family Courts, New York State Supreme Courts, State of New Mexico Courts and United States Federal Courts.

**GOVERNMENT'S EXHIBIT 5**

DNM 887

Specific Training Programs completed include:

- • November, 1996: Integrated Ballistics Identification System (IBIS) Training
- • November, 1996: Drugfire System Training
- • February, 1997: Criminal Justice System Training; by Legal Consultant
- • February, 1997: Expert Testimony, Hearings, and Moot Court; by Legal Consultant
- • March, 1997: Sig-Sauer Armorer's School and Factory Tour
- • August, 1997: Mossberg Armorer's School
- • September, 1997: Basic Ballistics Microscopy Course; by Forensic Consultant
- • March, 1998: Glock Armorer's School
- • April, 1998: Smith & Wesson Armorer's School (pistol) and Factory Tour
- • July, 1998: Beretta Armorer's School
- • June, 1999: Quality Assurance Principles For Forensic Laboratory Personnel; by Forensic Consultant
- • June, 1999: Interview/Testimony Training; by Forensic Consultant
- • February, 2000: Kahr Armorer's School
- • April, 2000: Smith & Wesson Armorer's School (revolver)
- • August, 2000: Bureau of Alcohol, Tobacco, and Firearms Serial Number Restoration Course
- • September, 2000: Remington Armorer's School and Factory Tour
- • August, 2001: National Integrated Ballistic Identification System (NIBIN) Training
- • November, 2001: AFTE Regional Conference
- • February, 2002: SHOT Show
- • February, 2002: NIBIN Users Group Meeting
- • March, 2002: Colt Armorer's School (pistol)
- • April, 2002: IAI Tri-State Conference
- • May, 2002: Ricochet Analysis Workshop; by Lucien Haag
- • May, 2002: AFTE Annual Training Seminar
- • May, 2003: AFTE Annual Training Seminar
- • September, 2003: Office of the Medical Investigator Regional Seminar in Death Investigation
- • February, 2004: Federal Bureau of Investigation Gunpowder and Gunshot Residue School

2

- • July, 2004: Office of the Medical Investigator Regional Seminar in Death Investigation
- • September, 2004: Physical Fracture Match Workshop; by Stephen McKasson
- • May, 2006: Federal Bureau of Investigation Techniques in Toolmark Identification; by Carlo Rosati
- • June, 2006: AFTE Annual Training Seminar
- • February, 2008: Factory Tour of Clerke Arms
- • May, 2008: AFTE Annual Training Seminar
- • May, 2008: Integrity, Character and Ethics Workshop; by Dan Gunnell
- • May, 2008: Critical Decision Making Workshop; by Dan Gunnell
- • June, 2009: AFTE Annual Training Seminar
- • June, 2010: Smith & Wesson Armorer's School (M&P Pistol)
- • January, 2011: Smith & Wesson Armorer's School (M&P Rifle)
- • June, 2011: AFTE Annual Training Seminar
- • June, 2011: Talking Bullets and Cartridge Cases; by Lucien Haag
- • July, 2012: NIST's Measurement Science and Standards in Forensic Firearms Analysis Conference
- • June, 2013: AFTE Annual Training Seminar (Host Committee)
- • May, 2014: AFTE Annual Training Seminar
- • October 2014: Forensic Science and the Law; by Hon. Roderick Kennedy
- • May 2015: Organic Components of Gunshot Residue; by Dr. Bell, ACS
- • May 2015: Hornady Ballistics Demonstration, the Evolution of Ammunition
- • May 2016: Subclass Characteristic Workshop; by Nancy McCombs

**Guest Lecturer**

- • NYPD Criminal Investigation Course
- • NYPD Executive Development Course
- • NYPD Evidence Collection Teams
- • NYPD Laboratory Criminalists (Hair/Fibers & Trace)
- • NYPD Detective Bureau Training
- • NYC Corporation Counsel Attorneys
- • NYC Department of Corrections Investigations Unit
- • New York County District Attorney's Office

3

- • Rockland County District Attorneys Office
- • State of New Mexico Law Enforcement Academy
- • New Mexico Department of Public Safety Crime Laboratory
  Training Workshop and Update Conference

**Professional Society Memberships**

- • Association of Firearm and Toolmark Examiners (AFTE)
- • International Association For Identification  (IAI)
- • Southwestern Association of Forensic Scientists (SWAFS)

**Published Research**

- • AFTE Journal Volume 36 Number 3,  Summer 2004: *An Unsafe Ceska Zbrojovka Model 75*
- • AFTE Journal Volume 38 Number 2,  Spring 2006: *Breechface Marks as Related to Gripping a Firearm*
- • AFTE Journal Volume 39 Number 1,  Winter 2007: *An Interesting Physical Fracture Match*
- • AFTE Journal Volume 42 Number 3,  Summer 2010: *Striated Marks Encountered While Attempting a Physical Fracture Match*
- • AFTE Journal Volume 46 Number 2,  Spring 2014: *Chamber Marks Preserved in a Badly Corroded Firearm*

DNM 890

# MARGO M. MIKESKA

New Mexico Department of Public Safety Forensic Laboratory
P.O. Box 1628, Santa Fe, NM 87507
Phone: (505)-827-9127; email: margo.mikeska@state.nm.us

## EDUCATION:

August 2003—August 2005
**University of North Texas Health Science Center,** Fort Worth, TX
    -Degree: Master of Science
    -Major: Forensic Genetics

August 1999—May 2003
**Angelo State University**, San Angelo, TX
    -Degree: Bachelor of Science
    -Major/Minor: Biology/Chemistry

## POSITIONS:

November 2014—Present
**Supervising Forensic Scientist (DNA)/CODIS Administrator: New Mexico Department of Public Safety Forensic Laboratory, Santa Fe, NM**
    -Supervise the DNA/Biology section of the laboratory
    -Manage federal grant for the DNA section
    -Forensic DNA casework
    -Manage Local CODIS Database operations in the laboratory
    -Validation of new equipment
    -Testimony as an expert witness
    -Assist in the training of new employees, law enforcement and legal personnel

January 2012—Present:
**Contract DNA Auditor (Casework): National Forensic Science Technology Center (NFSTC)**
    -Travel to DNA laboratories around the United States and perform external DNA audits based on the FBI Quality Assurance Standards for Forensic Testing Laboratories.
    -Examine the laboratory's standard operating procedures, forensic case work, personnel records, training records, validations, safety program and quality manual to verify that they are in compliance with the audit document
    -report any findings to the laboratory management and to NFSTC
    -have performed 4 audits to date (Louisiana State Police in 2012, Tennessee DPS Knoxville Regional Crime Lab in 2012, San Bernardino County Sheriff's Office in 2013 and Tucson Police Department Crime lab in 2015)

March 2008—November 2014:
**Forensic Scientist (DNA)/CODIS Administrator: New Mexico Department of Public Safety Forensic Laboratory, Santa Fe, NM**
    -Forensic DNA casework
    -Manage Local CODIS Database operations in the laboratory

**GOVERNMENT'S EXHIBIT 6**

-Validation of new equipment
-Testimony as an expert witness
-Assist in the training of new employees, law enforcement and legal personnel

August 2005—February 2008:
**Forensic DNA Analyst: North Louisiana Criminalistics Laboratory, Shreveport, LA**
-Forensic DNA casework
-Research and Validation
-Testimony as an expert witness
-Assist in the training of law enforcement, sexual assault nurses and new
 employees.

May 2005—July 2005
**DNA Intern:** DNAPrint Genomics, Sarasota, FL
-Internship to satisfy requirements for Master of Science degree

## PROFESSIONAL AFFILIATIONS:

American Academy of Forensic Sciences – Member (2005 – Present)
New Mexico DNA Oversight Committee DPS representative (2014 – Present)
National DNA Index System (NDIS) Audit Review Panel (2015 – Present)

## COURT TESTIMONY:

Court qualified expert witness in Forensic DNA Analysis: (55)
- Caddo Parish, Shreveport, LA (5)
- Chaves County, Roswell, NM (3)
- Cibola County, Grants, NM (1)
- Curry County, Clovis, NM (3)
- Dona Ana County, Las Cruces, NM (5)
- Eddy County, Carlsbad, NM (3)
- Eddy County, Artesia, NM (1)
- Grant County, Silver City, NM (1)
- Lea County, Lovington, NM (2)
- Lincoln County, Carrizozo, NM (1)
- McKinley Country, Gallup, NM (3)
- Mora County, Las Vegas, NM (2)
- Ouachita Parish, Monroe, LA (1)
- Otero County, Alamogordo, NM (2)
- Rio Arriba County, Tierra Amarilla, NM (2)
- Roosevelt County, Portales, NM (3)
- Sandoval County, Bernalillo, NM (2)
- San Juan County, Aztec, NM (7)
- San Juan County, Farmington, NM (1)
- Santa Fe County, Santa Fe, NM (4)
- Taos County, Taos, NM (2)
- Valencia County, Los Lunas, NM (1)

## PROFESSIONAL MEETINGS ATTENDED:

**February 2005:** American Academy of Forensic Sciences (AAFS), New Orleans, LA
**January 2006:** Louisiana 2nd Annual DNA Scientific Meeting, Shreveport, LA
**September 2006:** Louisiana 3rd Annual DNA Scientific Meeting, Baton Rouge, LA
**October 2006:** 17th International Symposium on Human Identification; Promega Corporation, Nashville, TN
**October 2007:** 18th International Symposium on Human Identification; Promega Corporation, Los Angeles, CA
**August 2008:** Association of Forensic DNA Analysts and Administrators (AFDAA), Austin, TX
**February 2009:** American Academy of Forensic Sciences (AAFS), Denver, CO
**March 2010:** Bode Technology Group Annual Advanced DNA Technical Workshop (West), San Diego, CA
**November 2010:** 16th National CODIS Conference, Salt Lake City, UT
**May 2011:** Bode Technology Group Annual Advanced DNA Technical Workshop (East), St. Amelia Island, FL
**June 2011:** New Mexico Advanced SANE Conference, Albuquerque, NM
**November 2011:** 17th National CODIS Conference, Jacksonville, FL
**February 2012:** American Academy of Forensic Sciences (AAFS), Atlanta, GA
**November 2012:** 18th National CODIS Conference, Norman, OK
**March 2013:** Bode Technology Group Annual Advanced DNA Technical Workshop (West), San Diego, CA
**November 2013:** 19th National CODIS Conference, Norman, OK
**October 2014:** 25th International Symposium on Human Identification; Promega Corporation, Phoenix, AZ
**November 2014:** 20th National CODIS Conference, Norman, OK
**February 2015:** 67th American Academy of Forensic Sciences (AAFS), Orlando, FL
**November 2015:** 21st National CODIS Conference, Norman, OK
**September 2016:** 27th International Symposium on Human Identification; Promega Corporation, Minneapolis, MN
**November 2016:** 22nd National CODIS Conference, Norman, OK
**February 2017:** 69th American Academy of Forensic Sciences (AAFS), New Orleans, LA

## WORKSHOPS/TRAINING:

**February 2006:** Powerful Presentations: Surviving and Thriving in the Courtroom. Instructor: Raymond J. Davis and Richard A. Eigenbrod; Shreveport, LA (Louisiana 2nd Annual DNA Scientific Meeting)
**August 2006:** Forensic Anthropology Workshop: Mary Manheim; Benton, LA (North Louisiana Criminal Justice Academy, Bossier Parish Sheriffs Office)
**September 2006:** President's DNA Initiative Forensic Biology Screening Workshop: National Forensic Science Technology Center (NFSTC); Largo, FL
**October 2006:** Advanced Topics in Statistics. Instructors: John V. Planz, Arthur J. Eisenberg and Bruce Budowle; Nashville, TN (17th International Symposium for Human Identification)
**October 2007:** Generating DNA Profiles from Difficult Samples: Los Angeles, CA (18th International Symposium for Human Identification)
**December 2008:** Courtroom Testimony Techniques, Success Instead of Survival. Insturctor: Dwane Hildebrand (Ron Smith and Associates): Santa Fe, NM

**February 2009:** FBI DNA Auditor Training Course. Instructor: Richard A. Guerrieri (Chief, DNA Analysis Unit, FBI Laboratory): Denver, CO

**February 2010:** Quality Assurance Standards/Auditor Training. Online course: US Dept. of Justice Federal Bureau of Investigation Laboratory Division

**June 2010:** CODIS v.5.7.4 Software Training. Instructors: Meghan Carlin and Kenneth Walker (S.A.I.C. and CODIS unit, FBI Laboratory): McLean, VA

**September 2010:** 3500 Genetic Analyzer and Genemapper ID-X training. Instructor Gabe Feltner (Applied Biosystems HID University): Santa Fe, NM

**October 2010:** Forensic Y-STR Training. Instructor: Karen Howard (Marshall University Forensic Science Center): Santa Fe, NM.

**June 2011:** Paternity Statistics for Forensic Casework. Instructors: Pamela Jarman and Dr. Angela Williamson (Bode Technology Group Inc.): Santa Fe, NM

**December 2011:** CODIS 7.0 Software Training. Online Course: US Dept. of Justice Federal Bureau of Investigation Laboratory Division

**March 2012:** 3500, AmpflSTR Identifiler Plus Validation Lectures and Data Analysis Tranining. Instructor Melissa Kotkin (Applied Biosystems HID University): Santa Fe, NM

**July 2012:** CODIS v 7.0 Software Training. Instructors: Lauren Giordano and Jacqueline Klinger (US Dept. of Justice, Federal Bureau of Investigation, Laboratory Division, CODIS Unit): Austin, TX

**April 2013:** DNA mixture Interpretation Workshop and Webcast: Online Course: National Institute of Standards and Technology. Instructor: John Paul Jones II, NIST Law Enforcement Standards Office

**October 2013:** The Recovery and Identification of Human Skeletal Remains: Instructor: Dr Krista Latham. Santa Fe, NM. (35th Southwestern Association of Forensic Scientists Conference)

**November 2013:** Bloodborne Pathogen Training: Online Course: West Virginia University Continuing and Professional Education.

**May 2014:** Probabilistic Genotyping and Software Programs Webcast: Online Course: National Institute of Standards and Technology.

**August 2014:** DNA Analyst Webinar Series: Validation Concepts and Resources (Part 1): Online Course: National Institute of Standards and Technology.

**October 2014:** New Autosomal and Y-STR Loci and Kits: Making Data Driven Decisions: Phoenix, AZ (25th International Symposium for Human Identification)

**February 2015:** Obtaining Successful DNA Profiles from Challenging Samples: Orlando, FL (American Academy of Forensic Sciences)

**June 2014:** Promega Tech Tour; Portsmouth, NH

**September 2015:** Forensic Management Academy, University of West Virginia, Morgantown, WV

**June 2016:** Quantifiler Trio, HID Real-Time PCR analysis software, Globalfiler Validation laboratory and lecture series. Instructor: Amy Liberty (Applied Biosystems Human Identification Professional services): Santa Fe, NM

**June 2016:** DNA barcoding High-Throughput DNA Sequencing Forensic Science. Center for Borders, Trade and Immigration Research (University of Texas at El Paso): El Paso, TX

**September 2016:** What is this Likelihood Ratio and Probabilistic Genotyping Everyone is talking about? Minneapolis, MN (27th International Symposium for Human Identification)

**September 2016:** NIJ's DNA Capacity Enhancement and Backlog Reduction Program Changes and Updates Workshop: Minneapolis, MN (27th International Symposium for Human Identification)

**February 2017:** Navigating the Sea of Resources for Sexual Assault Programs. New Orleans, LA (American Academy of Forensic Sciences)
**March 2017:** Thermo Fisher Scientific Validation Lecture Series, YFiler Plus PCR Amplification Kit, Instructor Caron Pruiett (Human Identification Professional Services), Santa Fe, NM

**PRESENTATIONS:**

**February 2006**: "Validation of ABI AmpFlSTR SEfiler PCR Amplification Kit," Louisiana 2nd Annual DNA Scientific Meeting; Shreveport, LA
**August 2012**: "Lab Capabilities and Evidence collection" Training to Valencia County Sheriff's Department, Los Lunas, NM
**April 2013**: "CODIS eligibility and the levels of CODIS" Training to Santa Fe Police Department Violent Crimes and Burglary Units. Santa Fe, NM
**November 2014**: "Lab Capabilities and Evidence collection" Training to Santa Fe Police Department, Santa Fe, NM
**June 2015**: "Maximizing DNA results with the Promega Maxwell" Promega Tech Tour, Portsmouth, NH



**CURRICULUM VITAE**
# Tracy L. Zehringer
Latent Print Examiner

Miami Valley Regional Crime Laboratory
Fingerprint Section
361 West Third Street
Dayton, OH 45402
Phone 937-225-6425 / Fax 937-496-7916
Email: zehringert@mcohio.org

**EDUCATION:**

2003-Virginia Commonwealth University, Richmond, Virginia
Master of Science Degree in Forensic Science

2001- Texas A&M University, Galveston, Texas
Bachelor of Science Degree in Marine Biology
Tri Beta Biological Honor Society

**PROFESSIONAL EXPERIENCE:**

06/2013—present          Latent Print Examiner
Miami Valley Regional Crime Laboratory-Dayton, OH
- Analyze and process evidence for the presence of latent prints
- Photograph and preserve developed prints
- Conduct comparisons of latent prints to known standards
- Utilize the Automated Fingerprint Identification System and the Integrated Automated Fingerprint Identification System
- Issue reports and testify to my findings
- Provide instruction to agencies when requested
- Assist the medical examiner's office in obtaining fingerprints of the deceased in extreme cases like decomposition or burns

03/2008 – 05/2013          Forensic Scientist, Advanced, Latent Print Examiner
New Mexico Department of Public Safety Forensic Laboratory-Santa Fe, NM
- Analyze and process evidence for the presence of latent prints
- Photograph and preserve developed prints
- Conduct comparisons of latent prints to known standards
- Utilize the Automated Fingerprint Identification System and the Integrated Automated Fingerprint Identification System
- Issue reports and testify to my findings

8/15/2016                                            1
**GOVERNMENT'S EXHIBIT 7**

DNM 896

- Provide instruction to outside agencies, their recruits, and the recruits for the New Mexico State Police

08/2005 - 03/2008       Forensic Scientist II, Latent Print Examiner
<u>Virginia Department of Forensic Science-Richmond, VA</u>
- Analyze and process evidence for the presence of latent prints
- Conduct comparisons of latent prints to known standards
- Utilize the Automated Fingerprint Identification System and the Integrated Automated Fingerprint Identification System
- Issue reports and testify to my findings
- Provide instruction to agencies when requested
- Assist the medical examiner's office in obtaining fingerprints of the deceased in extreme cases like decomposition or burns

10/2007 - 12/2007       Adjunct Professor, Graduate Studies Program
<u>Virginia Commonwealth University-Richmond, VA</u>
- Co-teach the graduate fingerprint class with one other examiner
- Outline and refine course content
- Present information through lectures and practical activities
- Evaluate coursework including papers, presentations, and exams

09/2004 - 08/2005       Forensic Fellow, Latent Print Section
<u>Virginia Institute of Forensic Science and Medicine in conjunction with the Virginia Department of Forensic Science-Richmond, VA</u>
- Train in all aspects of fingerprint science
- Shadow examiners and perform supervised casework
- Conduct comparisons from ten-print to ten-print comparisons to difficult latent print to known comparisons

**FORENSIC TRAINING, CONFERENCES, AND WORKSHOPS ATTENDED:**

Analysis of Distortion in Latent Prints, Jacksonville, FL (06/2017)

IAI International Educational Conference, Cincinnati, OH (08/2016)

- Distortion: Analysis and Discussion (Cause and Effect)
- Blood Prints—To Process or Not to Process?
- Crease and Third Level Ridge Details Workshop
- Improving Gray Scale Perception of Latent Print Details
- Reducing Erroneous Exclusions: The Workshop!

Addressing Bias in Forensic Examinations, Forensic Science Institute of Ohio, Reynoldsburg, OH (05/2015)

Complex Latent Print Examination, Ron Smith & Associates, Chantilly, VA (06/2011)

Advanced Palm Print Comparison Techniques, Ron Smith & Associates, Metairie, LA (06/2010)

Universal Latent Workstation Software Training Program, FBI, Santa Fe, NM (04/2010)

DNM 897

Leadership in Police Organizations, IACP, Santa Fe, NM (08/2009-10/2009)

Footwear/Tire Track Examiner Training Program, National Forensic Science Training Center with Ron Smith & Associates (NIJ Grant), Largo, FL (10/2008-06/2009)

Courtroom Testimony Techniques, Success Instead of Survival, Ron Smith & Associates, Santa Fe, NM (12/2008)

IAI International Educational Conference, Louisville, KY (08/2008)

- Lifting Latent Prints off Unusual and Textured Surfaces
- Using Layers in Photoshop CS3 to Process Forensic Photographs
- Documenting ACE-V Methodology
- Forensic Tire Impression Identification

Virginia State Latent Print Examiner Conference, Virginia Beach, VA (10/2007)

Chesapeake Bay Division IAI Conference, Rocky Gap, MD (03/2007)

Chesapeake Bay Division IAI Conference, Hampton, VA (11/2006)
- Search Smart—Increasing Your Effectiveness in Latent Print Comparisons

Virginia State Latent Print Examiner Conference, Virginia Beach, VA (05/2005)

Basic Forensic Science and Medicine Seminar, Richmond, VA (09/2004)

Masters Degree Intern, Latent Print Section, Virginia Department of Forensic Science (06/2003-08/2003)

**PROFESSIONAL SOCIETY MEMBERSHIPS:**
International Association for Identification, Member, 2008-Present

Chesapeake Bay Division, International Association for Identification, Member, 2005-2008

**CERTIFICATION:**
IAI Certified Latent Print Examiner (December 2012)

**TEACHING EXPERIENCE:**
Latent Prints, Evidence Technician Training at Miami Valley Regional Crime Laboratory, Dayton, OH—10/2013, 2/2014, 3/2014, 9/2015, 10/2015, 1/2016, 2/2016, 3/2016, 4/2016

Latent Prints, Basic Police Officer Training at New Mexico State Police Law Enforcement Academy, Santa Fe, New Mexico—05/2008, 09/2008, 05/2009, 05/2012

Latent Prints and an Overview of Laboratory Capabilities, 1st Judicial District Attorney's Office, Santa Fe, New Mexico—08/2011

Latent Prints, New Mexico State Police Academy, Santa Fe, New Mexico—05/2008, 11/2009, 8/2012

Fingerprints, Summer Forensic Camp for Santa Fe Preparatory, Santa Fe, NM—07/2009

DNM 898

**FORENSIC PRESENTATIONS:**
"Daubert Update from Fall CBD-IAI Conference," Virginia State Latent Print Examiner Conference, Virginia Beach, VA (10/2007)

"Comparison" section from joint presentation on ACE-V, Virginia State Latent Print Examiner Conference, Virginia Beach, VA (10/2007)

"To Count or Not to Count…That is the Question," Virginia State Latent Print Examiner Conference, Virginia Beach, VA (05/2005)

DNM 899

ASCLD/LAB-*International*

# STATEMENT OF QUALIFICATIONS

| Name | Teresa Vigil | Date | 1/25/17 |
|---|---|---|---|

| Laboratory | NMDPS Forensic Laboratory Bureau Santa Fe |
|---|---|

| Job Title | Forensic Scientist |
|---|---|

**Indicate all disciplines in which you do casework:**

| | | | |
|---|---|---|---|
| ☐ | Drug Chemistry | ☐ | Toxicology |
| ☐ | Firearms/Toolmarks | ☐ | Biology |
| ☐ | Trace Evidence | ☐ | Questioned Documents |
| ☒ | Latent Prints | ☐ | Crime Scene |
| ☐ | Digital & Multimedia Evidence | | |

**List all category(ies) of testing in which you do casework:**

Latent Print analysis

**Breath Alcohol Calibration Categories**

| | |
|---|---|
| ☐ | **Toxicology** - Breath Alcohol Measuring Instruments (The work of the laboratory MUST include calibration certificates-do not check the box if work is limited to breath/alcohol testing) |
| ☐ | **Toxicology** - Breath Alcohol Calibration Reference Material |

**Education:** List all higher academic institutions attended (list high school only if no college degree has been attained)

| Institution | Dates Attended | Major | Degree Completed |
|---|---|---|---|
| New Mexico State University | 08/2004 through 05/2008 | Criminal Justice | Bachelors |
| University of Phoenix | 06/2009 through 03/2011 | Criminal Justice | Masters |
| | | | |
| | | | |
| | | | |

**Other Training:** List continuing education, workshops, in-service and other formal training received. Please include the course title, source and date of the training.

*Ron Smith & Associates (June 2010) "Advanced Palm Prints Comparison" and (May 2011) "Essential Ridegeology Concepts"

*FBI (June 2010) "Universal Latent Workshop Software, Scientific Basics of Fingerprints- Classifying, Recording and Comparing and Advanced Comparison for the Tenprint Examiner"

* IAI Conference (July 2010) "Analysis of Distortion in Latent Prints, Lifting Latent Prints off Unusual and Textured Surfaces, Enough is Enough Latent Selection: A study of sufficiency, Evidence Detection with a Forensic Light Source"

* IAI Conference (August 2011) "Enhancement-Getting the most from your latent, Reconciling the Forensic Scientist, the criminal defense attorney, the criminal justice system, developing, documenting and lifting latent prints on regular, unusual and textured surfaces, Science of friction ridge skin, Complex latent print sufficiency: the threshold"

*Forensic Science Initiative (August 2011) Scientific Analysis: Applying ACE-V and Daubert to

**GOVERNMENT'S EXHIBIT 8**

testimony (24 hours), The Application of ACE-V to Simultaneous Impressions/is there a need for 100% verification (Review) of latent print examination (8 hours), Ethics in Forensic Science (8 hours)"

* Ron Smith and Associates- Fundamentals of Latent Print Examination (April 2012)

*Ron Smith and Associates- Expert Witness Testimony Techniques for Laboratory Analysts (May 2012)

*IAI Conference (July 2012) "Methodology for Latent Print Bench Notes," SWGFAST ACE-V Methodology Standard," Distortion: Analysis and Discussion (Effect and Cause)," and Latent Print Advanced Testimony Workshop"

*Ron Smith and Associates-Advanced ACE-V (April 2013)

*SWAFS Ethics class (October 2013)

*ULW Training IAFISMay 2014

*August 2014 IAI Conference Minneapolis Minnesota

*October 2014 Class on Law and Forensics

*August 2016 IAI Conference Cincinnati Ohio

**Courtroom Experience:** List the discipline/category(ies) of testing in which you have qualified to testify as an expert witness and indicate over what period of time and approximately how many times you have testified in each.

testified approximately -10/2012 Tucumcari, NM (Prelim. Hearing), 11/2013 Clovis NM, 11/2013 Lovington NM, 7/2014 Santa Fe District Court, 8/2014 Lovington NM, 12/2014 Aztect NM, 10/2015 Grants NM,

**Professional Affiliations:** List any professional organizations of which you are or have been a member. Indicate any offices or other positions held and the date(s) of these activities.

Rocky Mountain Division of the IAI, International Association of Identification

**Employment History:** List all scientific or technical positions held, particularly those related to forensic science. List current position first. Be sure to indicate employer and give a brief summary of principal duties and tenure in each position.

| Job Title | Forensic Scientist | Tenure | |
|-----------|-------------------|--------|---|
| Employer | NMDPS Forensic Lab | | |
| Provide a brief description of principal duties: | | | |
| Analyze, Process and Evaluate items of physical evidence for latent prints. If latent prints are present I conduct comparisons with the known prints (standards) submitted in the case. If no known prints are submitted the latent prints will be put into the database known as AFIS (Automated Fingerprint Identification System). Write a report of my findings and testify to my findings in a court of law. | | | |

| Job Title | | Tenure | |
|-----------|---|--------|---|
| Employer | | | |
| Provide a brief description of principal duties: | | | |
| | | | |

ASCLD/LAB-*International* Statement of Qualifications                    Page 2 of 3
Approval Date: August 3, 2012                              Effective Date: August 3, 2012
Approved By: Executive Director                                      AL-PD-3018-Ver 3.0

DNM 901

| Job Title | Tenure |
|---|---|
| **Employer** | |
| Provide a brief description of principal duties: | |
| | |

| **Job Title** | | **Tenure** | |
|---|---|---|---|
| **Employer** | | | |
| Provide a brief description of principal duties: | | | |
| | | | |

| **Job Title** | | **Tenure** | |
|---|---|---|---|
| **Employer** | | | |
| Provide a brief description of principal duties: | | | |
| | | | |

**Other Qualifications:**  List below any scientific publication and/or presentation you have authored or co-authored, research in which you are or have been involved, academic or other teaching positions you have held, and any other information which you consider relevant to your qualification as a forensic scientist.
(Use additional sheets if necessary.)

| |
|---|
| |

ASCLD/LAB-*International* Statement of Qualifications                    Page 3 of 3
Approval Date: August 3, 2012                                    Effective Date: August 3, 2012
Approved By: Executive Director                                    AL-PD-3018-Ver 3.0

DNM 902

# CURRICULUM VITAE

Tiffany L. Smith
DNA Casework Unit
Federal Bureau of Investigation Laboratory
2501 Investigation Parkway
Quantico, VA 22135
(703) 632-7789

## EDUCATION

2010        Master of Science in Biology
            West Virginia University
            Morgantown, WV

2007        Bachelor of Science in Forensic and Investigative Sciences
            West Virginia University
            Morgantown, WV

## PROFESSIONAL EXPERIENCE

Aug 2010 – Present        Forensic Examiner
                          Federal Bureau of Investigation Laboratory
                          Nuclear DNA/DNA Casework Unit
                          Quantico, VA

Aug 2007 – May 2010       Teaching Assistant
                          West Virginia University
                          Department of Biology
                          Morgantown, WV

May 2006 – Aug 2006       Intern
                          Connecticut State Forensic Laboratory
                          Meriden, CT

## MEETINGS ATTENDED

2013        American Academy of Forensic Sciences 65th Annual Scientific Meeting
            Washington, DC

2012        Scientific Working Group on DNA Analysis Methods Meeting
            Fredericksburg, VA

2011        Mid-Atlantic Association of Forensic Scientists Fall Workshop – Expert
            Witness Testimony
            Washington, DC

1

**GOVERNMENT'S EXHIBIT 9**

DNM 903

| | |
|---|---|
| 2011 | Scientific Working Group on DNA Analysis Methods Meeting<br>Fredericksburg, VA |
| 2011 | National Institute of Justice Annual Conference<br>Arlington, VA |
| 2009 | Mid-Atlantic Association of Forensic Scientists<br>Baltimore, MD |
| 2006 | Chesapeake Bay Division – International Association for Identification<br>Hampton, VA |
| 2005 | Chesapeake Bay Division – International Association for Identification<br>Morgantown, WV |

## PROFESSIONAL TRAINING

| | |
|---|---|
| 2016 | Human Identification for Forensic Examiners<br>Quantico, VA |
| 2016 | 3500 Genetic Analyzer and Globalfiler Amplification Kit Training<br>Quantico, VA |
| 2015 | Short Tandem Repeat Mixture (STRMix) Software Training<br>Quantico, VA |
| 2015 | Improved Forensic Y-chromosome Analysis<br>Quantico, VA |
| 2014 | National Institute of Standards and Technology DNA Mixture Webinar<br>Quantico, VA |
| 2014 | SWGDAM Interpretation Guidelines for Y-Chromosome STR Typing by<br>Forensic DNA Laboratories<br>Quantico, VA |
| 2013 | National Institute of Standards and Technology DNA Mixture<br>Interpretation Workshop & Webcast<br>Quantico, VA |
| 2013 | Forensic DNA Statistics<br>Quantico, VA |
| 2012 | GeneMapper ID-X Training<br>Quantico, VA |

2

| | |
|---|---|
| 2011 | Y-Filer Training<br>Quantico, VA |
| 2011 | KInCALc 4.0 Training<br>Quantico, VA |
| 2011 | Evaluation of Genetic Kinship in Forensic Analysis<br>Quantico, VA |
| 2011 | Comprehensive Sperm Hy-liter Training<br>Quantico, VA |
| 2011 | Qiagen EZ1 Extraction Training<br>Quantico, VA |
| 2011 | Sperm Hy-Liter Training<br>Quantico, VA |
| 2010-2012 | Nuclear DNA Unit Forensic Examiner Training Program, FBI Laboratory<br>Quantico, VA |
| 2010 | Applied Biosystems Automate Training<br>Quantico, VA |
| 2009 | Interpreting DNA Evidence; 14th Annual Summer Institute in Statistical Genetics<br>Seattle, WA |
| 2006 | Population Genetics and Forensic DNA Analysis Training<br>Meriden, CT |

## PRESENTATIONS

| | |
|---|---|
| 2015 | Evidence Response Team Senior Team Leader and Supervisory Special Agent Conference<br>San Francisco, CA |
| 2013 | Spring 2013 Essentials of Forensic Science for Legal Professionals Program<br>Tulsa, OK |
| 2012 | Sexual Assault Examiner (SAE) Training, Indian Health Services<br>Nashville, TN |
| 2012 | New Employee Training on Nuclear DNA Analysis<br>Quantico, VA |

3

| 2012 | Basic Serology, DNA, and Evidence Collection Training to FBI ERT Fredericksburg, VA |
| 2011 | Forensic DNA Testing and Laboratory Techniques Northern Virginia Community College Manassas, VA |
| 2011 | Basic Serology, DNA, and Evidence Collection Training to FBI ERT Fredericksburg, VA |
| 2011 | New Employee Training on Nuclear DNA Analysis Quantico, VA |

## LECTURES AND INSTRUCTION

Forensic Biology Laboratory, West Virginia University, Morgantown, WV

General Biology I, West Virginia University, Morgantown, WV

General Biology II, West Virginia University, Morgantown, WV

Introductory Physiology Laboratory, West Virginia University, Morgantown, WV

Principles of Biology Laboratory, West Virginia University, Morgantown, WV

The Living Cell Laboratory, West Virginia University, Morgantown, WV

## RESEARCH PROJECTS

| 2009-2010 | The Eradication of DNA Contamination from RNA Isolates |
| 2007-2010 | Investigating the Potential of RNA to be used in Forensic Casework Analysis |
| 2007-2010 | Nucleic Acid Degradation as a Mechanism for Estimating the Age of Semen Stains in Forensic Casework |
| 2007 | The Effect of UV Light on RNA and DNA Amplification |

DNM 906

January 10, 2014

## Hannah A. Kastenbaum, MD

Associate Medical Investigator, Office of the Medical Investigator
Assistant Professor, University of New Mexico Department of Pathology
MSC07-4040
1 University of New Mexico
Albuquerque, NM 87131-0001
(505) 272-3053
hkastenb@salud.unm.edu

| | |
|---|---|
| **Licensures (MD):** | New Mexico (June 2012 to present; unrestricted) |
| | Pennsylvania (2010 to present; unrestricted) |
| | New Mexico (2011-2012; postgraduate trainee) |
| | Pennsylvania (2007-2010; postgraduate trainee) |
| | |
| **Board Certification:** | Forensic Pathology (2012) |
| | Anatomic and Clinical Pathology (2011) |
| | |
| **Education:** | Office of the Medical Investigator |
| | University of New Mexico Health Sciences Center |
| | Albuquerque, NM |
| | Forensic Pathology Fellowship |
| | July 1, 2011 to June 30, 2012 |
| | |
| | Department of Pathology |
| | University of Pittsburgh Medical Center |
| | Pittsburgh, PA |
| | Combined Anatomic and Clinical Pathology Residency |
| | July 1, 2007 to June 30, 2011 |
| | |
| | Jefferson Medical College |
| | Thomas Jefferson University |
| | Philadelphia, PA |
| | Doctorate of Medicine |
| | 2003 to 2007 |
| | |
| | University of Rochester |
| | Rochester, NY |
| | Bachelor of Arts in Biology, Cum Laude |
| | 1999 to 2003 |
| | |
| **Employment:** | Department of Pathology |
| | University of New Mexico Health Sciences Center |
| | Associate Medical Investigator, August 2012 to present |
| | Assistant Professor of Pathology, August 2012 to present |

**GOVERNMENT'S EXHIBIT 10**

**Professional Recognition and Honors:**

- Co- Chief Resident, Department of Pathology, UPMC, 2010-2011
- Co- Chief Resident for Clinical Pathology, UPMC, 2009-2010
- American Society for Pharmacology and Experimental Therapeutics (ASPET) Summer Undergraduate Research Program (SURF) Participant, 2002
- Golden Key International Honor Society
- Rush Rhees Scholarship, University of Rochester, 1999-2003

**Membership in Professional Societies:**

- American Academy of Forensic Sciences, Associate Member, 2012- present
- National Association of Medical Examiners, 2010- present
- College of American Pathologists, 2007- present
- American Society for Clinical Pathology, 2007- present
- American Medical Association, 2003- present
- Pennsylvania Medical Society, 2007-2011
- Allegheny County Medical Society, 2007-2011

**Extramural Professional Activities:**

- "Real Reader" Portfolio Reviewer, University of Rochester Biology/Writing 272: Developing a Professional Biology Writing Portfolio. Fall 2013.
- "Health Professions, Public Health, Life and Neuroscience Research" Panelist. University of Rochester Beyond Rochester Career Panel and Networking Event, October 11, 2013.
- Alumni Volunteer Interviewer for Undergraduate Admissions, University of Rochester. 2012 to present; 2007-2010.

**Invited Lectures:**

2013   " Post-mortem Changes and Estimation of Time of Death." New Mexico Office of the Medical Investigator Basic Training for Medicolegal Death Investigators Course, October 2013.

2013   "Gunshot Wound Fatalities." New Mexico Office of the Medical Investigator Basic Training for Medicolegal Death Investigators Course, April 2013.

2012   "The Final Exit: The Practicalities of Self-Deliverance and Assisted Suicide for the Dying." New Mexico Office of the Medical Investigator Forensic Science Seminar, June 2012.

2012   "Gunshot Wound Fatalities." New Mexico Office of the Medical Investigator Basic Training for Medicolegal Death Investigators Course, March 2012 and October 2012.

2011   "Janiceps conjoined twins with extreme asymmetry: case report with complete autopsy and histopathological findings." New Mexico Office of the Medical Investigator Applicant for Associated Medical Investigator. December 2011.

2011   "Gunshot Wound Fatalities." New Mexico Office of the Medical Investigator Basic Training for Medicolegal Death Investigators Course, October 2011.

2010   "Emerging Topics in Laboratory Medicine: HE4, A Promising New Biomarker for Ovarian Cancer." UPMC Department of Pathology Seminars in Laboratory Medicine Series, August 2010.

2010    "Interpreting Urine Drug of Abuse Testing: Contested or Unexpected Results." Lecture to Clinical Laboratory, Faculty, Staff, and Technologists at University Drive Veteran's Administration Hospital Department of Pathology, August 2010.

2009    "Current Topics in Laboratory Medicine: Allegheny County Medical Examiner's Forensic Laboratories." UPMC Department of Pathology Seminars in Laboratory Medicine Series, September 2009.

**Community Service:**
- Ronald McDonald House Charities of New Mexico
  - Guest Chef Program volunteer:
    - January 1 2013.
    - May 25, 2013
    - August 4, 2013
  - Group Leader for OMI Group, 2013 to present:
    - April 14, 2013
    - June 9, 2013
  - Rock N Glow 5K to benefit RMHC-NM, Volunteer, July 13 2013
- High-5 Donor Club Member, Playworks New Mexico, 2013 to present
- Member of the Albuquerque Community Foundation's Future Fund, 2013 to present
- Aaron's 19th Annual Mudd Volleyball Tournament to Benefit Carrie Tingley Hospital, June 9 2012 and June 7, 2013.

**Scholarly Achievements**
**Original Research Articles in Refereed Journals:**
2010    **Kastenbaum HA,** Khalbuss WE, Felgar RE, Stoller R, Monaco SE. The spectrum of coincident entities with small lymphocytic lymphoma/chronic lymphocytic leukemia (SLL/CLL) diagnosed by cytology. CytoJournal 2010; 7:20.

2009    **Kastenbaum H**, McPherson E, Murdoch G, Ozolek J. Janiceps conjoined twins with extreme asymmetry: case report with complete autopsy and histopathological findings. Pediatr Dev Pathol 2009 Sept-Oct; 12(5): 374-82.

**Refereed Abstracts:**
2009    **Kastenbaum HA,** Khalbuss WE, Felgar RE, Stoller R, Monaco SE. The spectrum of coincident entities with small lymphocytic lymphoma/chronic lymphocytic leukemia (SLL/CLL) diagnosed by cytology. American Society of Cytopathology Annual Scientific Meeting, 2009.

2009    **Kastenbaum H,** Nelson JB, Perepletchikov AM. Pathologic Features of Prostatic Adenocarcinoma in Prostatic Adenocarcinoma in Patients Aged 45 Years and Younger. American Society for Clinical Pathology Annual meeting, 2009.

**Other Writings or Scholarly Activities:**
2010    **Kastenbaum H,** Liman AK. A 68 year old while male with bladder outlet obstruction. UPMC Department of Pathology Anatomic Pathology Case of the Month (September 2010). Published on-line.

2010    **Kastenbaum H.** Metastasis to the calcaneus. UPMC Department of Pathology Anatomic Pathology Case of the Month (February 2010). Published on-line.

2008    **Kastenbaum H,** Pasculle W. A 77 year old male with diarrhea. UPMC Department of Pathology Clinical Pathology Case of the Month (November 2008). Published on-line.

2008    **Kastenbaum H,** Virji MA. A 50 year old female with a pituitary mass. UPMC Department of Pathology Clinical Pathology Case of the Month (May 2008). Published on-line.

**Works in Progress:**
- "Influence of <u>The Final Exit</u> on Asphyxial Suicides in New Mexico: A Retrospective Review" research project with Adela Magallanes, second-year medical student at University of New Mexico School of Medicine
- "Comparison of Post-mortem Computed Tomography and Autopsy in Uncomplicated Hanging Cases" research project with Drs. Gary Hatch and Jamie Elifritz from UNMH Department of Radiology

**Teaching/Education**
**Classroom teaching:**

2013    Presentation, "Pathology of Pulmonary Infections." UNM School of Medicine Phase I-2 Infectious Disease Block. October 2013.

2013    Presentation, "Firearm Fatalities." OMI Introduction to Forensic Pathology Course. July 2013.

2013    Presentation, "Deaths in Custody." OMI Introduction to Forensic Pathology Course. July 2013.

2013    Presentation, "Motor Vehicle Accidents." OMI Introduction to Forensic Pathology Course. July 2013.

2013    Presentation, "Pulmonary Pathology I." UNM School of Medicine Phase I Cardiovascular/Pulmonary/Renal Block.  April 2013.

2013    Presentation, "Pulmonary Pathology II." UNM School of Medicine Phase I Cardiovascular/Pulmonary/Renal Block. April 2013

2013    Presentation, "Pathology of Pulmonary Vascular Diseases." UNM School of Medicine Phase I Cardiovascular/Pulmonary/Renal Block.  April 2013

2012    Presentation, "Pathology of Pulmonary Infections." UNM School of Medicine Phase I-2 Infectious Disease Block. December 2012.

2012    Volunteer Forensic Pathology Expert Witness for Mock Trial Preparation Sessions. UNM School of Law, Evidence and Trial Practice Course. October 2012.

2011    Volunteer Forensic Pathology Expert Witness for Mock Trial Preparation Sessions. UNM School of Law, Evidence and Trial Practice Course. October 2011.

2011    University of Pittsburgh School of Medicine Integrated Pathobiology and Cell Biology Course, Small Group Instructor. Winter 2011.

2009    University of Pittsburgh School of Medicine Integrated Cell Biology and Pathobiology Course, Small Group Instructor. Fall 2009.

**Advancement of non-CME Education:**
- UNM School of Medicine Office for Medical Education Development Lunch and Learn, "Multiple Choice Questions that Effectively Check and Promote Learning." September 18, 2013.
- UPMC Physician Services Division Leadership and Management Certificate Program, Spring 2009.

**Curriculum Development or Educational Administrative Positions:**

- UNM Department of Pathology/ OMI Faculty Coordinator for Pathology Resident Rotations, July 2013 to present.
- OMI Coordinator of Curriculum Development, July 2013 to present:
  - Developed and coordinated new orientation and lecture series, Introduction to Forensic Pathology Course, for Forensic Pathology Fellows at the OMI, July 2013.
- UNM Student Pathology Interest Group Volunteer: Interest Meeting September 2012, OMI Tour October 2012.
- UNMH Department of Pathology Resident Recruitment Committee, 2012.
- UPMC Department of Pathology Curriculum Committee, Resident Member, 2009-2011.
- UPMC Department of Pathology Residency Program, Peer-selected ACGME Site Review Resident Coordinator, Fall 2010.
- UPMC Graduate Medical Education Committee, Resident Member, 2008-2010.
- UPMC Department of Pathology Resident Recruitment committee, Host Resident, 2008-2011.

**University, SOM, HSC Committees and Administrative Positions:**

- UNM Office of Research Scientific Review Committee Member, 2012 to present.
- UNMH Department of Pathology New Faculty Recruitment Committee, September 2012.
- OMI Faculty Liaison to OMI Records Department, 2012 to present.

# Cynthia L. Wood

**Current Employment**
Forensic Scientist
Forensic Biology Section
New Mexico Department of Public Safety
August 2011-March 2016

**Previous Employment**
Forensic Biologist
Forensic Biology Section
Division of Forensic Sciences
Georgia Bureau of Investigation
July 2005-July 2011

**Education**
Bachelor of Science-1999
Georgia State University
Atlanta, GA
Major-Biology with a Chemistry minor
Courses Taken include Molecular Cell Biology, Genetics and Biochemistry

**Specialized Training**
DNA Training Program………………………GBI-DOFS
ABI Prism 310 Genetic Analyzer……………Applied Biosystems/GBI-DOFS
Serology Training Program…………………..NFSTC/GBI-DOFS

*Workshops and Meetings*
- 58th Annual American Academy of Forensic Sciences Meeting, February 2006
- Advanced Topics in STR DNA analysis-AAFS Meeting, February 2006
- Human Population Genetics Workshop-NFSTC at GBI, June 2006
- Forensic Biology Screening Workshop-NFSTC, January 2007
- Promega 18th International Symposium on Human Identification, October 2007
- Advanced DNA Training-Marshall University, July 2008
- Bode Technology Conference, May 2009
- Future Trends in Forensic DNA Technology-Applied Biosystems, August 2009
- Forensic Y-STR Training-Marshall University, July 2010
- Blood Spatter Training-DPS, August 2011
- Promega 22nd International Symposium on Human Identification, October 2011

**GOVERNMENT'S EXHIBIT 11**

- 64th Annual American Academy of Forensic Sciences Meeting, February 2012
- Advanced DNA Mixture Interpretation and Statistical Approaches-AAFS Meeting, February 2012
- Bode 10th Annual Advanced DNA Technical Workshop, March 2013
- DNA Mixture Interpretation Workshop & Webcast, April 2013
- 35th Annual Southwestern Association of Forensic Scientists, October 2013
- Recovery and Identification of Human Skeletal Remains-SWAFS meeting, October 2013
- NIST DNA Analyst Webinar Series: Probablistic Genotyping and Software Problems, May 2014
- 25th International Symposium on Human Identification; September 2014
- Interpretation of Complex DNA Mixtures Workshop; ISHI Meeting; September 2014
- Forensic Science and the Law; October 2014
- Bode 12th Annual Advanced DNA Technical Workshop, March 2015

**Professional Affiliations**

American Academy of Forensic Sciences-member 2006-2016

**Testimony Given As An Expert Witness**

Approximately 72 times in Superior and Juvenile Courts throughout the state of Georgia; 12 times in the state of New Mexico, including Districts 1, 3, 5, 8, 9, 12, and 13.

**Research and Validation**

Validation of Qiagen Investigator Kit for use on the EZ1 robots

# Roger W. Cain, CFVA

2001 W. Pinnacle Peak Rd, #100, Phoenix, AZ 85027 - (623) 251-3139 - rcain@rmin.riss.net



**Audio/Video Forensic Analyst**
*Rocky Mountain Information Network, Inc.*

## Experience

**Rocky Mountain Information Network, Phoenix, Arizona**            **2013- Present**
- Forensic Audio/Video Analyst
- Forensic Lab Lead

**Gilbert Police Department, Gilbert, Arizona**            **2007 - 2013**
- Forensic Video Analyst

**Arizona Department of Public Safety**            **2001 - 2004**
- Background Investigator

**Arizona Department of Public Safety**            **1988 - 2001**
- Police Officer
- Arizona Police Officer Standards Training Board Certified Instructor
- National Highway Traffic Safety Administration Certified Drug Recognition Expert Instructor

## Certifications

**Certified Forensic Video Analyst (CFVA)**
- **Law Enforcement Emergency Services Video Association (LEVA)**
  - October 2012, Certified in the collection, processing and analysis of video evidence.

**Certified Forensic Video Technician**
- **Law Enforcement Emergency Services Video Association (LEVA)**
  - May 2012, Certified in the collection, processing and analysis of video evidence.

**SignalScape StarWitness Product Certification**
- January 2011, Certified in the use of the StarWitness suite of forensic software tools

## Training

**Forensic Video Training**

- AVID dTective Video System Training, 32 hours.
  - Ocean Systems, Burnsville, Maryland 2/2008

**GOVERNMENT'S EXHIBIT 12**

- LEVA Level I, Basic Forensic Video Analysis and the Law, 40 hours.
    - Law Enforcement Emergency Services Video Association, Indianapolis, Indiana 4/2008
- Digital Video and Adobe Photoshop, 40 hours.
    - Resolution Video, Tucson, Arizona 5/2008

- Recovery and Analysis using StarWitness Video Pro, 40 hours.
    - SignalScape Inc. and Resolution Video, Phoenix, Arizona 2/2009

- LEVA Level II, Processing Digital Multimedia Evidence, 40 hours.
    - Law Enforcement Emergency Services Video Association, Indianapolis, Indiana 5/2009

- Expert Witness Preparation and Testimony, 24 hours.
    - Law Enforcement Emergency Services Video Association, Fort Worth, Texas 11/2009

- LEVA International Video Evidence Symposium and Training Conference, 24 hours.
    - Adobe Premier Pro, Photoshop CS4, Building Forensic Kits, Freeware Forensic Tools, Government Run CCTV Issues
    - Law Enforcement Emergency Services Video Association, Fort Worth, Texas 11/2009

- StarWitness Product and Recovery Seminar, 24 hours.
    - SignalScape Inc. and Resolution Video, Phoenix, Arizona 10/2010

- StarWitness Product Certification Training, 40 hours.
    - SignalScape Inc., Cary, North Carolina 1/2011

- Photographic and Video Comparison, 45 hours.
    - Law Enforcement Emergency Services Video Association, Indianapolis, Indiana 3/2011

- Digital Summit International Symposium and Training Conference, 12 hours.
    - Audio Theory, Premiere Pro for Video Forensics, Authentication of Questioned Digital Multimedia Files, Basic Audio Enhancement,
    - Digital Summit International, Las Vegas, Nevada 8/2011

- LEVA Level III, Advanced Forensic Video analysis and the Law, 40 hours.
    - Law Enforcement Emergency Services Video Association, Indianapolis, Indiana 4/2012

- LEVA International Video Evidence Symposium and Training Conference, 24 hours.
    - Adobe CS6 Photoshop, Production Premium, Premier Pro, Reverse Projection using 3D Laser Scanning, Image Authentication, Global Video Program, Imaging Tools, Creating PDF Portfolio
    - Law Enforcement Emergency Services Video Association, San Diego, California 10/2012

- Introduction to Audio Forensics, 24 hours.
    - Resolution Video, Phoenix, Arizona 4/2013

- LEVA International Video Evidence Symposium and Training Conference, 40 hours.
  - Advanced PDF Creation, Premiere Pro Editing, Fundamentals of Video and Image Compression, Examinations involving Compression, FTK for Triage and Archiving, Proprietary Video Players and Windows 7, DVR Recovery.
  - Law Enforcement Emergency Services Video Association, Asheville, North Carolina 9/2013

- LEVA International Video Evidence Symposium and Training Conference, 22 hours.
  - Premiere Pro Editing, Adobe Audition Basics, Reverse Projection Workshop, Fundamentals of Audio Forensics.
  - Law Enforcement Emergency Services Video Association, Coeur d'Alene, Idaho 10/2014

- LEVA International Video Evidence Symposium and Training Conference, 35.5 hours.
  - Image & Video Clarification & Processing using ClearID, Forensic Video Analysis with Amped FIVE, Body Worn Video Summit.
  - Law Enforcement Emergency Services Video Association, Clearwater Beach, Florida 11/2015

- FFMPEG, A Dynamic Forensic Video Workflow, 40 hours.
  - Law Enforcement Emergency Services Video Association, Indianapolis, Indiana 5/2016

- Forensic Analysis and Enhancement of Digital Audio, 18 hours.
  - National Center for Media Forensics, Denver, Colorado 9/2016

- Forensic Analysis and Authentication of Digital Audio, 18 hours.
  - National Center for Media Forensics, Denver, Colorado 9/2016

- Forensic Analysis and Authentication of Digital Images, 18 hours.
  - National Center for Media Forensics, Denver, Colorado 9/2016

- DAC School Forensic Audio/Video Training, 40 hours.
  - Salient Sciences, Phoenix, Arizona 1/2017

**Computer and Electronic Devices Forensic Training**

- Data Recovery and Acquisition – Basic BDRA, 32 hours.
  - National White Collar Crime Center, Phoenix, Arizona 10/2008

- Computers and Electronic Evidence Training (Cell Phones), 4 hours.
  - Gilbert Police Department, Gilbert, Arizona 5/2011

- Digital Evidence Collection Training, 4 hours.
  - International Data Forensic Solutions Center, Phoenix, Arizona 5/2012

- Basic Data Recovery and Acquisition – BDRA, 21 hours.
  - National White Collar Crime Center, Prescott Valley, Arizona 10/2013

- Intermediate Data Recovery and Analysis – IDRA, 29 hours.
  - National White Collar Crime Center, Prescott Valley, Arizona 10/2013

- Accelerated Byte Level Analysis – 40 hours.
  - DME forensics, Scottsdale, Arizona 10/2013
- Windows Artifacts – WinArt, 32 hours.
  - National White Collar Crime Center, Phoenix, Arizona 5/2014

**Investigative, Forensic, and Law Enforcement Related Training**

- Intoxilyzer Quality Assurance Specialist Training and Certification, 16 hours.
  - Arizona Department of Public Safety, Phoenix, Arizona 1/1993

- Latent Fingerprint Development, 12 hours.
  - Arizona Department of Public Safety, Flagstaff, Arizona 2/1993

- DUI Testimony Skills for Prosecutors and Law Officers, 8 hours.
  - Arizona Department of Public Safety, Prescott, Arizona 4/1993

- Ethical Issues in the Public Sector, 4 hours.
  - Arizona Department of Administration, Payson, Arizona 9/1993

- Arizona Police Officer Standards and Training Board Certified Instructor, 40 hours.
  - Arizona Police Officer Standards and Training Board, Tucson, Arizona 2/1997

- Winning in Court, 4 hours.
  - Judge Phares, Gilbert, Arizona 9/2008

- Daubert Overview for Arizona Courts, 4 hours.
  - Arizona Forensics Science Academy, Phoenix, Arizona 3/2012

- Forensic Examiners Self Defense, 2 hours.
  - Donn Hoffman, LA County Dist. Attorney
  - AZ High Technology Crime Investigation Association, Phoenix, Arizona 12/2012

**Instructor**

- Video Forensics Overview, 1 hour.
  - Gilbert Police Command Staff and Sergeants, Gilbert, Arizona 9/2008

- Video Forensics and Photographic/Video Comparison Overview, 1 hour.
  - Gilbert Police Investigations Personnel, Gilbert, Arizona 5/2011

- Video Forensic Overview and Arizona Forensic Video Analysis Lab Capabilities, 1 hour.
  - Arizona Forensic Science Academy, Phoenix, Arizona 3/2012

- Lab Assistant, LEVA Level II, Processing Digital Multimedia Evidence, 40 hours.
  - Law Enforcement Emergency Services Video Association, Indianapolis, Indiana 3/2013

- Lab Assistant, LEVA Level II, Processing Digital Multimedia Evidence, 40 hours.
  - Law Enforcement Emergency Services Video Association, Indianapolis, Indiana 12/2013

- Introduction to DVR Byte Level Analysis, 1 hour
  - AZ HTCIA meeting, Phoenix, Arizona 4/2014

- Court Preparation and Testimony, 8 hours,
  - 2014 (June, August, September, November)
  - Phoenix, Arizona

- Court Preparation and Testimony, 16 hours
  - 2015
    - Thornton, Colorado, March
    - Buffalo, Wyoming, June
    - Cheyenne, Wyoming, June

- Video Forensics and Photographic/Video Comparison Overview, 1 hour.
  - Utah ILO Conference, Park City, Utah 10/2015

- Court Preparation and Testimony, 16 hours
  - 2016
    - Idaho Falls, Idaho, March
    - Lovell, Wyoming, March

- Court Preparation and Testimony, 4 hours
  - Wyoming Game Wardens Association Conference, Jackson, Wyoming, 3/2016

- Renovation of LEVA Curriculum and Certification Leading to Accreditation, 1.5 hours
  - Annual Digital Multimedia Training Symposium, Scottsdale, AZ, 11/2016
  - Co-Instructor

- Game On-A Technical Review for the Forensic Video Analyst, 2 hours
  - Annual Digital Multimedia Training Symposium, Scottsdale, AZ, 11/2016
  - Co-Instructor

**Training Development**

- Overview of forensic video analysis capabilities
  - Development of classroom instruction on the capabilities of forensic video analysis to include the recovery, processing and analysis of video evidence.

- Court Preparation and Testimony
  - Development of lecture and practical exercise instruction on proper case preparation for trial, testimony process, overview of the role of participants during trial, the CSI Effect, Daubert and Frye standards, technical report writing and writing a CV.

**Published Works**

- Rocky Mountain Information Network Bulletin
  - Co-Author – "Getting Your DVR Media Evidence – The Right Way"
  - Published by: Rocky Mountain Information Network (RMIN)
  - Published: May 2016

- Rocky Mountain Information Network Bulletin
  - Co-Author – "Did You Gather All Available Video Evidence"
  - Published by: Rocky Mountain Information Network (RMIN)
  - Published: November 2016

## Expert Witness Testimony

- Qualified as Drug Recognition Expert in a case involving Central Nervous System Stimulants. (Judge Dawson, Div. I, Gila County Superior Court, AZ, Case #CR95-321P) Subject found guilty by jury.  11/1995

- Qualified as Forensic Video Analyst Expert in case involving comparative analysis of video evidence.  (Judge Haws, Div. IV, Yuma County Superior Court, AZ, Case #S1400CR201300594) Subject found guilty by jury. 2/2015

## Associations

- Law Enforcement Emergency Services Video Association
  - Certification Program Manager            2017- Present
  - Certification Panel Board Member         2016

- Arizona High Technology Crime Investigation Association    2014 - Present

- Arizona Forensic Video Analyst Association              2009 - Present

# Statement of Qualifications

**Name of Laboratory:** Federal Bureau of Investigation (FBI) Laboratory

**Name:** Theodore J. Chavez          **Job Title:** Physical Scientist/Forensic Examiner

**Discipline:** Firearm and Toolmark Identification

## Education:

2008    Bachelor of Science, Physics
          Saint Vincent College, Latrobe, PA

## Professional Experience:

### July 2012 to current, Physical Scientist/ Forensic Examiner
### FBI Laboratory Division (LD), Firearms/Toolmarks Unit (FTU)
### Quantico, VA

Qualified Examiner in the fields of Firearm and Toolmark Identification. Conduct examinations on firearm and toolmark evidence, prepare and issue laboratory reports, and provide sworn testimony to the results as necessary. Provide technical instruction and presentations to law enforcement personnel in courses such as: Evidence Response Team (ERT) Shooting Incident Reconstruction School, ERT Basic, and ERT Refresher Course. Current provisional member of the Association of Firearm and Tool Mark Examiners (AFTE) since December 2011. Oversee the Quality Assurance Program for FTU and ensure compliance with current FTU and LD policies, practices and procedures.

### June 2009 to July 2012, Physical Scientist (Forensic Examiner Trainee)
### FBI Laboratory Division, Firearms/Toolmarks Unit
### Quantico, VA

Completed an extensive training program to qualify as an Examiner in the fields of Firearm and Toolmark Identification. The training program is outlined through a training manual that includes preparing test specimens, conducting analysis using the comparison microscope and working alongside other qualified Firearm and Toolmark Examiners, as well as completing training courses: FBI Gunshot Residue School, Evidence Response Team (ERT) Shooting Incident Reconstruction School, and ERT Basic Course-Laboratory Personnel.

### September 2008 to June 2009, Mechanical Engineering Technician
### U.S. Consumer Product Safety Commission
### Gaithersburg, MD

Conducted compliance testing on children's products and produced testing reports. Also assisted with development and maintenance of product testing standards.

### June 2007 to August 2007, FBI Honors Intern
### FBI Laboratory Division, Explosives Unit
### Quantico, VA

Learned about the various capabilities within the Unit, to include the smokeless powder database, the post-blast class, and research being conducted. Assisted in preparing test samples for research on fire and arson evidence.

## Presentations:

October 2012, Presenter at Eastern Regional AFTE – Fall Training Seminar - "Melaku Case Study"
February 2012, Co-presenter with Erich D. Smith
American Academy of Forensic Sciences (AAFS) – 64th Annual Scientific Meeting
"Estimating Uncertainty for Firing Pin Aperture Study"

**GOVERNMENT'S EXHIBIT 13**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CRIMINAL NO.  15-CR-04268-JB |
| | § | |
| JOE LAWRENCE GALLEGOS | § | |
| | § | |
| Defendant. | § | |

<u>**NOTICE OF EXPERT WITNESS TESTIMONY**</u>

Defendant, Joe Lawrence Gallegos, hereby submits this Notice, pursuant to Federal Rule of Criminal Procedure 16, of his intent to introduce the following expert testimony. Defendant submits that such evidence is relevant to the issues to be tried before the jury in this case. The defendant asserts that this testimony is admissible evidence, pursuant to Federal Rule of Evidence 702, and that the witnesses have a reliable basis in knowledge and experience regarding their testimony. The defendant advises as follows:

<u>**Medical Examiner Michael Graham, M.D.**</u>

The defendant may call as a witness Michael Graham, M.D. It is anticipated that Dr. Graham will testify about the autopsies he reviewed of victims F.C., R.G. and F.S. Dr. Graham's opinion is that the cause of death in all three homicides was ligature strangulation, and the manner of death was homicide. His testimony is being noticed so that he may observe and correct any errors that are introduced by the testimony of Dr. Zumwalt.  His testimony will include his expert opinion, education, training, experience and specialized knowledge. A copy of his curriculum vitae is attached as Exhibit "A".

<u>**Forensic Scientist Suzanna Ryan**</u>

The defendant may call as a witness Suzanna Ryan. It is anticipated that the United States will attempt to introduce DNA evidence and other serology reports that were collected during the investigation of this matter. Ms. Ryan is being noticed so that she can provide clarification to any testimony that is introduced that does not coincide with the reports that have been produced to

the defendants in this case. Her testimony will include her specific education, training, experience and specialized knowledge. A copy of her curriculum vitae is attached as Exhibit "B".

The defendant provides this notice per the scheduling order and in anticipation of the possible use of the above individuals at the trial on the merits of this matter.

Respectfully submitted,

/s/ Brock Benjamin
BROCK BENJAMIN
Attorney for Defendant
New Mexico Bar No.141535
747 E. San Antonio, Suite 203
El Paso, Texas 79901
Tel (915) 412-5858
Fax (915) 503-2224
E-Mail: brock@brockmorganbenjamin.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 15th$^{st}$ day of September, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.

/s/ Brock Benjamin
BROCK BENJAMIN

# CURRICULUM VITAE

**NAME**:  Michael Alan Graham

**OFFICE ADDRESS:**

Division of Forensic and Environmental Pathology
St. Louis University School of Medicine
1402 S. Grand Blvd. R518
St. Louis, Missouri 63104
(314) 977-7841

Office of the Medical Examiner
City of St. Louis
1300 Clark St.
St. Louis, Missouri 63103
(314) 622-4971

**E-Mail:**  grahamma@slu.edu

**PERSONAL HISTORY:**

Date of Birth---9/26/51
Place of Birth--East Liverpool, Ohio
Citizenship-----United States of America
Marital Status--Married
Children--------Christopher (12-11-87)
                Patrick (4-8-90)

**EDUCATION**:

1965-1969    Ursuline High School, Youngstown, Ohio
1969-1973    B.A.(biology), St. Louis University, St. Louis, Missouri
1973-1977    M.D., St. Louis University School of Medicine, St. Louis, Missouri

**PROFESSIONAL TRAINING:**

1977-1981    Resident, Anatomic and Clinical Pathology, St. Luke's Episcopal Hospital, Houston, Texas

1981-1982    Fellow, Forensic Pathology, St. Louis University School of Medicine, St. Louis, Missouri

**MEDICAL LICENSURE:**

1.  Missouri

**SPECIALTY CERTIFICATION:**

1. Diplomate, American Board of Pathology
   A.  Anatomic and Clinical Pathology, 1981
   B.  Forensic Pathology, 1982

EXHIBIT "A"

DNM 923

**ACADEMIC APPOINTMENTS:**

1979-1981     Lecturer in Pathology, School of Pharmacy, University of Houston, Houston, Texas

7/1/82-6/30/89    Assistant Professor of Pathology, St. Louis University School of Medicine, St. Louis, Missouri

7/1/89-6/30/96    Associate Professor of Pathology, St. Louis University School of Medicine, St. Louis, Missouri
       1. Pathology Residency Committee (1986-1989)
       2. Director, Division of Forensic and Environmental Pathology (1989-1996)
       3. Director, Medicolegal Death Investigator Training Course (1989-1996)

7/1/96-current    Professor of Pathology, St. Louis University School of Medicine, St. Louis, Missouri
       1. Co-director, Division of Forensic and Environmental Pathology (1996-current)
       2. Co-director, Medicolegal Death Investigator Training Course (1996-current)
       3. Admissions committee, School of Medicine (2006-current)

**PROFESSIONAL ACTIVITIES:**

1982-1985     Assistant Medical Examiner, St. Louis, MO

1985-1989     Deputy Chief Medical Examiner, St. Louis, MO

1985-current    Deputy Medical Examiner, St. Louis County, MO

1985-current    Diagnostic Cardiac Pathology, St. Louis University School of Medicine, St. Louis, MO

1988-current    Medical Staff, St. Louis University Hospital, St. Louis, MO

1986-2015     Deputy Chief Medical Examiner, St. Charles County, MO

1989-current    Chief Medical Examiner, St. Louis, MO
       Mass Casualties/Fatalities Response Planning Committee (2001)

1992-current    Deputy Chief Medical Examiner, Jefferson County, MO

1999-2000     Forensic Pathology Consultant, Office of Special Counsel (John C.Danforth), Investigation concerning the 1993 confrontation at the Mt. Carmel (Branch Davidian) Complex, Waco, TX

**INVITED LECTURES (Partial Listing):**

Medicolegal Death Investigator Training Course, St. Louis University School of Medicine, St. Louis, MO
      1982-current   Asphyxial Deaths
      1985-current   Deaths Due to Bombs and Explosions
      1985-current   Deaths Due to Firearms
      1988-current   Introduction to Forensic Pathology
      1997-current   Deaths Temporally related to Law Enforcement Apprehension and Custody
      2016-current   Water-related Deaths

Forensic Administration Conference, St. Louis University School of Medicine (1986)
      Decision-Making Methods That Will Aid in Determining Standard Operating Procedure for Case Acquisition and Handling

Washington University Dental School
      1984-88   Basic Forensic Pathology

St. Luke's Episcopal Hospital (Houston, Texas)
   1984     Selected Topics in Forensic Pathology (5 day lecture series)

St. Louis Metropolitan Major Case Squad
   1986-87    Asphyxia and Firearm Deaths
   5/22/90    Asphyxia and Firearm Deaths

St. Louis Police Academy Homicide Investigation Training Course
   1985-87   Asphyxia and Firearm Deaths

American Academy of Forensic Sciences Annual Meeting (1988)
    Annual Lectureship in Forensic Toxicology,
                 "Safe Handling of Contagious Specimens"

Symposium on Care of the Multiple Trauma Patient sponsored by The University Hospital and The American Association of Critical Care Nurses, St. Louis, MO
                 "Mechanisms of Firearm Injuries"  (5/24/89)
                 "Investigative Aspects of Forensic Pathology"  (5/11/90)
                 "Interpretation of Firearm Injuries"  (5/3/91)

Annual Court Conference, Missouri Association for Court Administration (5/25/89)
                 "The Risk of AIDS Among Courtroom Personnel"

Statewide Conference on Sudden Infant Death Syndrome, Columbia, MO (10/6/89)
                 "SIDS - Evaluation of the Death Scene as a Necessary Component of the Diagnosis"

Pre-hospital Trauma Symposium sponsored by St. Louis University Medical Center, St. Louis, MO
                 "Postmortem Perspectives"  (3/2/90)
                 "Postmortem Forensic Examination"  (9/28/90)

Southwestern Illinois Law Enforcement Commission Homicide & Criminal Sexual Assault Seminar (4/19/90)
                 "Modes of Violent Death"

Symposium on Pediatric Trauma ("A step beyond resuscitation for the severely injured child") sponsored by Cardinal Glennon, Children's and St. Louis Children's Hospitals  (11/2/90)
                 "Forensic Aspects of Pediatric Trauma"

Fifth Annual Mid-America Transplant Association "Gateway to Life" Symposium, St. Louis, MO (4/26/91)
                 "Role of the Medical Examiner in Organ & Tissue Donation"

National Convention of the National Association of Legal Investigators, St. Louis, MO (6/18/92)
                 "The Role of the Forensic Pathologist in Medical/Legal Investigations"

Eighth Medicolegal Investigation of Death Seminar, West Virginia University School of Medicine, Morgantown, WV (4/3/93)
                 "Deaths Due to Asphyxia"
                 "Deaths Due to Bombings and Explosions"

Forensic Pathology Symposium, Peoria, IL  (5/15/93)
                 "Deaths Due to Firearms"
                 "Deaths Due to Bombings and Explosions"

Missouri Department of Health Seminar ("SIDS-Taking Care of the Caregiver"), St. Louis, MO (6/30/93)
                 "Diagnosis of SIDS-Parameters and Significance"

Citizen's for Missouri's Children Seminar (Kids Count in Missouri), St. Louis, MO (11/3/93)
                 "What Kids Count Outcome Measures Tell Us About Child Safety"

DNM 925

Washington University Medical Center, Department of Neurosurgery Grand Rounds, St. Louis, MO (1/12/94)
         "Interpretation of Firearm Injuries"

Washington University Medical Center, Trauma Symposium ("Crisis in the Streets"), St. Louis, MO (2/25/94)
         "Recognition & Interpretation of Injuries & Evidence"

Cardinal Glennon Children's Hospital, Grand Rounds, St. Louis (4/6/94)
         "Identifying Death Due to SIDS-Where are we and Where are we Going?"

International Society for Clinical Laboratory Technology (8/11/94)
         "Forensic Medicine and the Laboratory"

Minnesota Coroners' and Medical Examiners' Association Annual Forensic Science Seminar (October 6-7, 1994)
         "Medicolegal case management"
         "Injury and Death Due to Firearms"
          "Asphyxial Deaths"
         "Bombs and Expolsions"
         "Role of the Medical Examiner in Organ and Tissue Transplantation"
         "Deaths in Police Custody"

Medicolegal Investigation of Death and Injury in Child Abuse and SIDS Seminar, Federal Bureau of Investigation and the College of American Pathologist, Salt Lake City, UT (August 14, 1995)
         "Sudden Infant Death Syndrome-Investigation and Diagnosis"

American Society of Clinical Pathology --College of American Pathologists fall meeting, New Orleans, LA (September 21, 1995)
         "Forensic Aspects of Pulmonary Pathology"

1996 Spring Training Session, Missouri Coroners & Medical Examiners Association, Jefferson City, MO (March 14, 1996)
         "Asphyxial Deaths"
         "Deaths in Police Custody"

American Society of Clinical Pathology - College of American Pathologists spring meeting, Boston, MA (4/24/96)
         "Medicolegal Evaluation of Deaths in Custody"

American Association of Pathologists' Assistants Annual Conference, St. Louis, MO (9/20/96)
         "Medicolegal Case Management - What to Do, When to Do it & What it Means"

American Society of Clinical Pathology -- College of American Pathologists fall meeting, San Diego, CA (October 3, 1996)
         "Forensic Aspects of Pulmonary Pathology"

Missouri State Public Defenders Trial Skills Workshop, Lake of the Ozarks, MO (12/96)
         "Introduction to Forensic Pathology"
         "Injuries due to Firearms"

American Society of Clinical Pathology -- College of American Pathologists spring meeting, Chicago, IL (April 5, 1997)
         "Covert Hazards in the Work place" in "The Role of the Pathologist
          in the Evaluation of Work-Related Illness, Injury and Death"

POST Blast Investigation Training, Fort Leonard Wood, MO (6/5/98)
         "Forensic Pathology–Explosions"

Northwestern University Traffic Institute 21st National Vehicular Homicide/DUI Conference, Chicago, IL (7/7/98)
         "Forensic Pathology and the Vehicular Homicide Case"

DNM 926

Department of Surgery Grand Rounds, St. Louis University, St. Louis, MO (9/3/98)
    "Firearm Injuries"

Child Death Investigation Seminar; Idaho Dept. of Health and Welfare, St. Luke's Regional Medical Center CARES program, Idaho Dept. of Law Enforcement POST Academy; Boise, Idaho (9/8-9/98)
    "Child Fatality Review in Missouri"
    "Introduction to Death Investigation Principles"
    "Evaluation of Suspected Rebreathing Incidents"
    "Head and Neck Injury and Shaking"
    Presentation of cases (multiple topics)

American Academy of Forensic Sciences workshop: Postmortem Pediatric Forensic Toxicology-Issues in Childhood Poisoning, Orlando, FL (2/19/99)
    "Preparing for and recognizing potential toxicologically-related pediatric deaths: A forensic pathology perspective"
    "Case roundup: A survey of interesting and unique cases"

American Academy of Forensic Sciences Annual Meeting, Orlando, FL (2/22/99)
    "Asphyxial deaths"

Greater St. Louis Area Major Case Squad 34th Annual Retraining Session, St. Louis, MO (3/8/99)
    "Evaluation of Deaths Related to Custody"
    "Medicolegal Evaluation of Death and Injury due to Explosion"

POST Blast Investigation Training, Fort Leonard Wood, MO (4/20/99)
    "Explosion Investigation–Role of the Forensic Pathologist"

Emergency medicine grand rounds, Barnes-Jewish Hospital, St. Louis, MO (8/10/99)
    "Firearms and ballistics"

Barnes-Jewish Hospital Trauma Symposium, St. Louis, MO (2/4/00)
    "Interpretation of Patterns of Injury"

Missouri Dental Association, Missouri Emergency Response Identification Team, Jefferson City, MO (2/5/00)
    "Introduction to Forensic Pathology"
    "Firearm Injuries"
    "Investigation of Deaths Due to Explosions"
    "Asphyxial Deaths"

American Academy of Forensic Sciences Annual Meeting, Reno, NV (2/24/00)
    "Asphyxial Deaths"
    "Gunshot Wounds"

American Society of Clinical Pathology–College of American Pathologists Spring Meeting, Boston, MA (4/8/00)
    "Forensic aspects of pulmonary pathology"

Student National Medical Association, Region II conference, St. Louis, MO (11/4/00)
    "Introduction to forensic pathology"

American Academy of Forensic Sciences Annual Meeting, Seattle, WA (2/22/01)
    "Bombing Injuries"

Sudden Infant Death Syndrome Alliance, Chicago, IL (4/21/00)
    "SIDS–Diagnostic Issues"
American Association of Legal Nurse Consultants, St. Louis Chapter, St. Louis, MO (10/26/01)
    "Introduction to Forensic Pathology"

Public Agency Training Council, San Antonio, TX (11/26/01)

DNM 927

"Pathology Investigative Aspects of Cause, Mechanism and Manner of Death"

Department of Surgery Grand Rounds, St. Louis University Health Sciences Center, St. Louis, MO (5/1/02)
        "Bombs and Explosions"

Missouri Society for Histotechnology Annual Spring Symposium, Lake of the Ozarks, MO (5/18/02)
        "Case Studies in Forensic Pathology"

30th Annual Florida Medcial Examiners Educational Conference, University of Florida, Gainesville, FL (8/24/02)
        "Medicolegal Evaluation of Bombs and Explosions"

Mealey's National Asbestos Litigation Conference 2000, Philadelphia, PA (9/19/02)
        "Low Dose Exposure Cases: The Medicine"

American Academy of Forensic Sciences Annual Meeting, Chicago, IL (2/20/03)
        "Asphyxial Deaths"

Improving Patient Care Through Forensic Science, Department of Veterans Affairs, San Diego, CA (4/24/03)
        "Asphyxial Deaths"

Wisconsin Coroners and Medical Examiners Association Annual Conference, Portage, WI  (6/13/03)
        "Explosion-related Deaths"
        "Deaths in Custody"

Department of Internal Medicine Grand Rounds, St. Louis University, St. Louis, MO (11/21/03)
        "Non-Arteriosclerotic Sudden Unexpected Cardiac Death in Young Persons"

American Academy of Forensic Sciences Annual Meeting, Dallas, TX (2/19/04)
        "Explosion-related Deaths"

Cardiovascular Pathology Specialty Conference, USCAP meeting, Vancouver, BC, Canada (3/9/04)
        "Non-Arteriosclerotic Sudden Unexpected Cardiac Death in Young Persons"

University of Michigan, Department of Pathology, Ann Arbor, MI--Visiting Professor (10/15/04)
        Review of cases
        "Basic Interpretation of Firearm Injuries"

Michigan Association of Medical Examiners annual meeting, Mt. Pleasant, MI (10/16/04)
        "Interpretation of Firearm Injuries"
        "Evaluation of Death and Injury due to Bombs and Explosions"

Mealey's Silica Litigation Conference, New Orleans, LA (10/25/04)
        "The Pathology of Silica-related Diseases"

Missouri State Public Defender Winter Workshops, Lake of the Ozarks, MO (12/2/04)
        "Determining Cause of Death"

American Academy of Forensic Sciences Annual Meeting, New Orleans, LA (2/24/05)
        "Asphyxial Deaths"

Missouri Society for Histotechnology, Lake Ozark, MO (5/20/05)
        "Case Studies in Forensic Pathology—Sudden Death Related to Pregnancy"

Pulmonary Pathology Society 2205 Biennial Pathology Symposium, Lake Annecy, France (6/16/05)
        "Forensic Issues in Pulmonary Pathology"

Mealey's Asbestos-Related Diseases Teleconference (10/25/05)

DNM 928

"Malignant Mesothelioma—101)"

Defense Research Institute Asbestos Medicine Seminar, Miami Beach, FL (11/4/05)
"Causation—Thresholds of Exposure, Fiber Burden Studies and Criteria for Attribution of Asbestos-related Diseases"

Mealey's Asbestos Medicine Seminar, Philadelphia, PA (2/13/06)
"Asbestos-related Lung Disease"
"Asbestos-related Pleural Disease—Malignant Mesothelioma"

American Academy of Forensic Sciences Annual Meeting, Seattle, WA (2/23/06)
"Deaths in Custody"

Arch Air Medical Services "Trends in Emergency Care", St. Louis, MO (3/16/06)
"Forensics—Death Investigation"

Washington University Division of Geriatrics and Nutritional Science and Center for Aging, St. Louis, MO (3/17/06)
"The Law: What should be reported to the Medical Examiner? A look at health disparities from the Medical Examiner's perspective"

Mealey's Asbestos Medicine Conference, Chicago, IL (4/10/06)
"Low Dose and Secondary Exposure Cases: The Medicine and its Application in the Litigation"

Defense Research Institute Silica Medicine Seminar, Dallas, TX (6/16/06)
"Pathological Differential Diagnosis Between Asbestosis and Silicosis and Lung Cancer"

Defense Research Institute Asbestos Medicine Seminar, Las Vegas, NV (10/27/06)
"The Medical Aspects of Substantial Contributing Factor and Mesothelioma—Medical Factors to Consider"

Mealey's International Asbestos Conference, London, UK (11/1/06)
"Medicolegal Aspects of Asbestos-related Lung Disease—Lung Cancer"

Sudden Death, Excited Delirium and In-Custody Death Conference, Institute for the Prevention of In-Custody Deaths, Las Vegas, NV (11/16/06)
"Medicolegal Evaluation of In-Custody Deaths"

Missouri State Public Defender Conference, St. Louis, MO (12/11/06)
"Cause and Time of Death"

Mealey's Asbestos Conference:  the New Face of Asbestos Litigation, Washington, D.C. (2/8/07)
"Malignant Mesothelioma—Overview, 2007"

American Academy of Forensic Sciences, Dallas, TX (2/07)
"Investigation of Deaths due to Asphyxia"

Louisiana Collaborative—Balancing Forensics and Donation, White Castle, LA (4/19/07)
"Medicolegal Investigation of Deaths in Custody"
"Role of the Medical Examiner in Organ and Tissue Transplantation"

Mealey's Asbestos Super Conference, Scottsdale, AZ (9/27/07)
"Diagnosis of Malignant Mesothelioma—2007"

American Academy of Forensic Sciences, Washington DC (2/08)
"Medico-legal Investigation of Deaths in Custody"

Asbestos: Current Issues and Effective Litigation Tactics, Clayton, MO (4/10/08)

DNM 929

"The role of the pathologist in asbestos litigation"

Mealey's National Asbestos Litigation Super Conference, Scottsdale, AZ (9/22/08)
"Localized Malignant Mesothelioma"

Defense Research Institute Asbestos Medicine Seminar, Las Vegas, NV (11/7/08)
"Importance of tumor subtypes in assessing causation"

Southeastern Nova University Forensic Sciences Seminar, Fort Lauderdale, FL (11/14/08)
"Evaluation of Asphyxial Deaths"

American Academy of Forensic Sciences, Denver, CO (2/09)
"Asphyxial Deaths"

Mealey's "Emerging Trends in Asbestos Litigation" conference, Beverly Hills, CA (3/10/09)
"Significance of tumor subtypes in assessing causation"

NBI Conference, "Asbestos: Current Issues and Effective Litigation Tactics," St. Louis, MO (4/7/09)
"Significance of tumor subtypes"

Missouri Bar Association, Criminal Law and Procedure Committee Meeting, "Introduction to Forensic Pathology," Jefferson City, MO (5/8/09)

HarrisMartin's Midwest Asbestos Litigation Conference, "Radiation-induced Malignant Mesothelioma," St. Louis, MO (9/25/09)

Defense Research Institute, Asbestos Medicine Seminar, Miami, FL (11/13/09)
"Molecular aspects of malignant mesothelioma"

Perrin Conference, Asbestos Litigation Conference: A National Overview and Outlook, San Francisco, CA (9/15/10)
"Asbestosis—Update, 2010"

St. Louis University, Department of Pathology "Topics in Pathology", St. Louis, MO (9/20/10)
"Update on Evaluating Injuries and Death Associated With the Use of TASER Devices"

Crime Scene Investigators' National Camp, Lake of the Ozarks, MO (10/27/10)
"Introduction to Forensic Pathology"
"Evaluation of Deaths Occurring in Custody"

American Academy of Forensic Sciences Annual Meeting, Chicago, IL (2/11)
"Evaluation of deaths due to explosions and bombs"

Florida Association of Medical Examiners 38th Annual Educational Conference, West Palm Beach, FL (6/22/11)
"Evaluation of Deaths in Custody"
"TASER Medicine—An Update, 2011"

Mid-America Transplant Services, Board of Directors Retreat, Asheville, NC (9/13/11)
"Role of the Medical Examiner in Organ and Tissue Transplantation"

Perrin Conference, Asbestos Litigation Conference, San Francisco, CA (9/19/11)
"Advances in Asbestos Medicine" (Panel discussion—A. Brody, M. Graham, J. Maddox, V. Roggli)

Defense Research Institute, Asbestos Medicine Conference, Las Vegas, NV (11/11/11)
"Lung cancer update—2011"

American Academy of Forensic Sciences, Annual Meeting, Atlanta, GA (2/23/12)
"Investigation of Deaths Temporarily Associated with Custody"

DNM 930

New York Association of County Coroners and Medical Examiners meeting, Saratoga, NY (9/22/12)
"Evaluation of Deaths Temporally related to Custody"
"Electronic Control Devices—Update, 2012"

Cutting Edge Issues in Asbestos Litigation Conference, Beverly Hills, CA (Perrin Conference, 3/18/13)
"Pathogenesis of Pulmonary Fibrosis and Carcinoma"

Masters 15 Conference for Advanced Death Investigation, St. Louis, MO (7/23/13)
George Gantner, Jr., M.D. Memorial Lecture Award
"TASER Related Deaths: An Update"

St. Louis University Emergency Medicine Grand Rounds, St. Louis, MO (7/30/13)
"Medicolegal Evaluation of Firearm Injuries"

St. Louis University Center for Medieval and Renaissance Studies King Richard III Colloquium (R3@SLU) (2/8/14)
"Richard III—Medicolegal Death Investigation: Then and Now"

Perrin Asbestos Litigation Conference, Mesothelioma Panel, San Francisco, CA (9/9/14)
"Radiation-induced Malignant Mesothelioma"

Michigan Association of Medical Examiners, Fall Conference, Mt. Pleasant, MI (10/25/14)
"Investigating Death and Injury due to Explosions"
"Investigation of Death Temporally Associated with Custody"
"Conducted Electrical Weapons"

Defense Asbestos Lawyers Seminar, Las Vegas, NV (6/3/15)
"Malignant mesothelioma in women"

Perrin Asbestos Litigation Conference, San Francisco, CA (9/15)
"BAP-1 Update—2015"

Iowa Association of County Medical Examiners Annual Meeting, West Des Moines, IO (11/20/15)
"Investigating Deaths Temporally Associated with Apprehension and Confinement"

Missouri Society of Pathologists 2016 meeting, St. Louis, MO (3/19/16)
"Forensic Pathology—What to do, When to do it, What it means"

Defense Asbestos Litigation Seminar, Las Vegas, NV (6/8/16)
"Diagnosis of Malignant Mesothelioma"

International Association of Coroners and Medical Examiners 2016 Annual Training Symposium, Las Vegas, NV (7/26/16)
"Blunt Force Trauma"
"Deaths Temporally Related to Apprehension and Custody"


**SOCIETIES & ACTIVITIES:**

American Academy of Forensic Sciences
Program Co-chairman, 1984 national meeting, Anaheim, California
Plenary Program Co-chairman, 1987 national meeting, San Diego, California
Pathology/Biology Section Secretary (1991-92)
Pathology/Biology Section Chairman (1992-1993)
Pathology/Biology Section Program Committee (1997-1998)
AAFS Standards Board Medicolegal Death Investigation Consensus Body (2016-current)

National Association of Medical Examiners

DNM 931

Education and Publications Committee (1986-1996)
Tissue Banking Committee (1986-1993)
Committee on Pediatric Toxicology Registry (1986-1992)
Committee on Medical Device Malfunction (1987)
Board of Directors (1988-2005)
Executive Committee (1989-2005)
Secretary-Treasurer (1989-2002)
Vice-president (2003)
President (2004)
Chairman, Board of Directors (2005)

National Association of Medical Examiners Foundation
  Member, Initial Board of Trustees (2006)
  Member, Board of Trustees (2006-current)
  Treasurer, Board of Trustees (2006-current)

College of American Pathologists
  Forensic Pathology Committee (1989-1999)
  Forensic Pathology Committee (2007-current)
    Vice Chairman (2010-2012)
    Chairman (2013-2016)
    Advisor (2017)

United States and Canadian Academy of Pathology

Society for Cardiovascular Pathology

Sudden Infant Death Syndrome Resources
  Medical Advisory Board (1988-1995)

American Board of Pathology
  Forensic Test Committee (1992-1997)

Mid-America Transplant Association
  Board of Directors (1991-current)

American Journal of Forensic Medicine and Pathology
  Editorial Board (1992-2009)

State of Missouri East Regional Trauma Committee
  Member (1992-disbanded circa 1994)

Missouri State Child Fatality Review Board
  Spokesperson, Pathologists' Network (1992-1996)

American Red Cross, Tissue Services
  National Medical Examiner/Coroner Advisory Committee (1999-disbanded circa 2006)
    Spokesperson (2003-2004)

Pulmonary Pathology Society

U.S. Department of Health and Human Services
  Organ Donation Breakthrough Collaborative Leadership Coordinating Council (2004-2006)

U.S. National Institute of Justice
  General forensic technical working group (2005-2007)
  NIJ/NAME EMDD Literature Review Project reviewer (2007)
  Peer Reviewer—Fundamental Research to Improve Understanding of the Accuracy, Reliability and

DNM 932

Measurement Validity of Forensic Science Disciplines (2010)
Peer Reviewer—Applied Research and Development in Forensic Science for Criminal Justice Purposes (2012)

National Center for Child Death Review Steering Committee (2005-2006)

TASER International, Inc.
       Scientific and medical advisory board (11/2007-current)

Academic Forensic Pathology
       Editorial board (2011-current)

**AWARDS:**

       President's Award, Sudden Infant Death Syndrome Resources (1986)

       Health Professional of the Year (1992), Combined Health Appeal of Greater St. Louis

       Gift of Life Award, Mid-America Transplant Services and the National Kidney Foundation (1995)

       Outstanding Service Award, National Association of Medical Examiners (1999)

       Roland Quest Annual Award, Dept. of Pathology, St. Louis University (4/26/00)

**PUBLICATIONS:**

1.  Graham, M., Butler, D. and Milam, J., "Thoracic Aortic Thrombi and Hypercoagulability," Cardiovascular Diseases, Dec. 1981, pp. 475-479.

2.  Graham, M., Poklis, A., Mackell, M. and Gantner, G, "A Case of Suicide Involving the Concommitant Intravenous Injection of Barbital and the Oral Ingestion of Arsenic," Journal of the Forensic Sciences, JFSCA, Vol. 28, No. 1, Jan. 1983, pp. 251-254.

3.  Bagherian, V., Graham, M., Gerson, L.P. and Armstrong, D.L., "Double Pituitary Glands with Partial Duplication of Facial and Forebrain Structures with Hydrocephalus," Computerized Radiol., Vol. 8, No. 4, 1984, pp. 203-210.

4.  Cohle, S.D., Graham, M.A., "Sudden Death in Hemodialysis Patients," Journal of Forensic Sciences, JFSCA, Vol. 30, No. 1, Jan. 1985, pp. 158-66.

5.  Mackell, M., Gantner, G., Poklis, A. and Graham, M.,  "An Unsuspected Arsenic Poisoning Murder Disclosed By Forensic Autopsy" American Journal of Forensic Medicine and Pathology, 6(4):358-361, Dec, 1985.

6.  Cohle, S.D., Graham, M.A. and Pounder, D.J., "Nonatherosclerotic Sudden Coronary Death," Pathology Annual, Vol. 21, Part 2: pp. 217-249, 1986.

7.  Poklis, A., Mackell, M. and Graham, M., "Disposition of Cocaine in Fatal Poisoning in Man," J Analytical Toxicology, Vol. 9, Sept/Oct, 1985.

8. Graham, M., Hileman, F., Kirk, D., Wendling, J. and Wilson, J.,  "Background Human Exposure to 2,3,7,8-TCDD," Chemosphere, Vol. 14, No. 6/7, pp. 925-928, 1985.

9.  Graham, M., Hileman, F. D., Orth, R. G., Wendling, J. M. and Wilson, J. D.,"Chlorocarbons in Adipose Tissue From a Missouri Population," Chemosphere, Vol.15, Nos. 9-12, pp 1595-1600, 1986.

10. Newman, A.J., Graham, M.A., Carlton, C.G., Jr., Lieman, S.: "Incidental carcinoma of the prostate at the time of transurethral resection: Importance of evaluating every chip." J. Urol 1982; 128:948-50.

DNM 933

11. Hope, W., William, J., Gantner, G. and Graham, M., "Unacceptable Causes of Death," Metro Medicine, pp. 432-435, September, 1986.

12. Sotelo-Avila, C., Graham, M., Hanby, D. and Rudolph, A., "Nevus Cell Aggregates in the Placenta--A Histochemical and Electron Microscopic Study," Am J Clin Path 1988; 89:395-400.

13. Cohle, S., Graham, M., Dowling, G. and Pounder, D., "Sudden Death and LeftVentricular Outflow Disease," Pathology Annual 1988 (Part 2): 97-124.

14. Cohle, S., Trestrail, J., Graham, M., Oxley, D., Walp, B. and Jachimczyk, J.,"Fatal Pepper Aspiration," Am J Dis Child 1988:633-636

15. Cohle, S., Graham, M., Sperry, K. and Dowling, G., "Unexpected Death Due to Infective Endocarditis,"  Journal of the Forensic Sciences, JFSCA, Vol 34, No. 6,Nov. 1989, pp 1374-1386.

16. Poklis, A., Graham, M., Maginn, D., Branch, C. and Gantner, G., "Phencyclidine and Violent Deaths in St. Louis, Missouri: A Survey of Medical Examiners' Cases from 1977 through 1986," Am J Drug Alcohol Abuse, 16(3&4), pp 265-274 (1990).

17. Kemp, J., Kowalski, R., Burch, P., Graham, M. and Thach, B., "Unintentional Suffocation by Rebreathing: A Death Scene and Physiological Investigation of a Possible Cause of Sudden Infant Death," J Pediatr 1993; 122:881-6

18. Miller, L., Wesp, A., Jennison, S., Graham, M., Martin, T., McBride, L. Pennington, D. and Peigh, P., "Vascular Rejection in Heart Transplant Recipients," J Heart Lung Transplant, 1993; 12:S147-52.

19. Zimmerman, S., Adkins, D, Graham, M., Petruska, P., Bowers, C., Vrahnos, D.and Spitzer, G., "Case Report: Irreversible, Severe Congestive Cardiomyopathy Occurring   in Association with Interferon Alpha Therapy," Cancer Biotherapy 1994; 9:291-299.

20. Tracy, T.F., Silen, M.L. and Graham, M.A., "Delayed Rupture of the Abdominal Aorta in a Child Following a Suspected Handlebar Injury," J Trauma, 1996; 40:119-120.

21. Filkins, J.A., Cohle, S., Levy, B.K. and Graham, M.A.,"Unexpected Deaths Due to Colloid Cysts of the Third Ventricle," J Foren Sci, JFSCA, 1996; 41:521-523.

22. Donoghue, E.R., Graham, M.A., Jentzen, J.M., Lifschultz, B.D., Luke, J.L., and  Mirchandani, H.G., "Position paper: Criteria for the Diagnosis of Heat-Related Deaths," National Association of Medical Examiners, Am J Forensic Med & Pathol 1997; 18(1):11-14

23. Winters, G.L., McManus, B.M., for the Rapamycin Cardiac Rejection Treatment Trial Pathologists, " Consistencies and Controversies in the Application of the International Society of Heart and Lung Transplantation Working Formulation for Heart Transplant Biopsy Specimens," J Heart and Lung Transplantation, 1996; 15:728-735.

24. Long, C., Crifasi, J., Maginn, D., Graham, M., and Teas, S., "Comparison ofAnalytical Methods in the Determination of Two Venlafaxine Fatalities," J Analytic Tox, 21:166-169, 1997.

25. Graham, M and Hutchins, G, "Forensic Pathology–Pulmonary Pathology," Clin Laboratory Med, 1998; 18:241-262.

26.  Randall BB, Fierro MF and Froede RC for the Members of the Forensic Pathology Committee, College of American Pathologists, "Practice Guideline for Forensic Pathology," Arch Pathol Lab Med, 1998; 122:1056-1064

27. Kemp J, Unger B, Wilkins D, Psara R, Ledbetter T, Graham M, Case M and Thach B, "Unsafe Sleep Practices and an Analysis of Bedsharing Among Infants Dying Suddenly and Unexpectedly: Results of a Four-Year, Population-based, Death-scene  Investigation Study of Sudden Infant Death Syndrome and Related Deaths," Pediatrics, 2000; 106(3). URL:http://www.pediatrics.org/cgi/content/full/106/3/e41

28. Case ME, Graham MA, Corey Handy T, Jentzen JM and Monteleone J: The National Association of Medical Examiners Ad Hoc Committee on Shaken Baby Syndrome, "Position Paper on Fatal Abusive Head Injuries in Infants and Young

DNM 934

Children," Am J Forensic Med and Pathol, 2001; 22(2):112-122

29.  Unger B, Kemp JS, Wilkins D, Psara R, Ledbetter T, Graham M, Case M and Thach BT, "Racial disparity and modifiable risk factors among infants dying suddenly and unexpectedly," Pediatrics, 2003; 111(2):E127-31.

30. Pinckard JK and Graham MA, "Heart valve tissue donation does not preclude the diagnosis of clinically significant pediatric cardiac abnormalities," Am J Forensic Med Pathol, 2003: 24:248-253.

31. Pinckard JK and Graham MA, "Pediatric Heart Valve Tissue Donation," ASCP Check Sample (FP04-1), 2004; 46(1):1-9.

32. Pinckard, JK and Graham MA, "Fat Embolism," ASCP Check Sample (FP04-3), 2004; 46(3):25-37

33. Bhalodolia r, Cortese C, Graham M and Hauptman P,  "Fulminant Acute Cellular Rejection with Negative Findings on Endomyocardial Biopsy", J Heart and Lung Transplantation 2006;25:989-92

34. Pinckard JK, Wetli CV and Graham MA, "National Association of Medical Examiners Position Paper on the Medical Examiner Release of Organs and Tissues for Transplantation," Am J Forensic Med Pathol 2007; 28: 202-207

35. Kroll MW, Calklins H, Luceri RM, Graham MA and Heegaard WG, "Sensitive Swine and TASER Electronic Control Devices," ACEM (letter to the editor) (in press)

36.  Kroll MW, Calkins H, Luceri RM, Graham MA and Heegaard WG, "TASER safety," CMAJ (letter to the editor) 2008; 179(7): 677-678

37.  Kroll MW, Walcott GP, Ideker RE, Graham MA, et al. The Stability of Electrically Induced Ventricular Fibrillation. 34th Annual International Conference of the IEEE and EMBS, August-September, 2012:6377-6381

38.  Graham MA and Roggli VL, Medicolegal Aspects of Asbestos I—Malignant Mesothelioma and Lung Cancer, Acad Forensic Pathol 2013 3 (4): 386-406.

39.  Graham, MA, Medicolegal Aspects of Asbestos II—Benign Pleural and Lung Diseases, Acad Forensic Pathol 2013 3 (4): 407-419.

40.  Graham, M, Pill Filler Angiopathy: Recognition and Investigation of Murder by Oral Pharmaceutical Injection. Arch Pathol Lab Med. 2014 138 (5):702-702 (abstract: Pulmonary Pathology Society Biennial Meeting, 6/13)

41. Graham M, Investigation of Deaths Temporally Associated with Law Enforcement Apprehension, Acad Forensic Pathol. 2014 4 (3):366-89

42. Kroll, MW, Still GK, Neuman TS, Graham MA and Griffin LV, Acute forces required for fatal compression asphyxia: A biomechanical model and historical comparisons. Medicine, Science and the Law, 2017 (in press)

**BOOKS AND CHAPTERS:**

1.  Graham, M. and Gantner, G., "Certification of Death," in Forensic Pathology, A Handbook For Pathologists, second edition.  Northfield, IL:  College of American Pathologists; 1990:pp 35-43.

2.  Graham, M. and Gantner, G., "Interacting With the Media," in Forensic Pathology, A Handbook for Pathologists, second edition.  Northfield, IL:  College of American Pathologists; 1990:pp 271-274.

3.  Graham, M. and Gantner, G., "Heat and Cold," in Forensic Pathology, A Handbook for Pathologists, second edition. Northfield, IL:  College of American Pathologists; 1990:pp 165-169.

4.  Gantner, G. and Graham, M., "Death Associated With Fire and Burns," in Forensic Pathology, A Handbook for Pathologists, Northfield, IL:  College of American Pathologists; 1990:pp 159-163.

5.  Gantner, G. and Graham, M., "Evaluating the Quality of the Medicolegal Autopsy Protocol," in Forensic Pathology, A Handbook for Pathologists, second edition. Northfield, IL:  College of American Pathologists; 1990:pp 11-17.

DNM 935

6.  Graham, M., "Pathology: Its Role in Personal Injury Litigation," in Medical Evidence, IICLE, Springfield, IL Chapter 8 (pp 1-22), 1990.

7.  Graham, M., "Role of the Medical Examiner in Child Abuse," in Child Maltreatment,  eds Brodeur, A. and Monteleone, J., G.W. Medical Publishing, Inc. St. Louis, MO,  1994

8.  Graham, M., "Pathology: Its Role in Personal Injury Litigation" in Medical Evidence, IICLE, Springfield, IL (1997)

9.  Graham, M., "Key Differences between the Role of the Coroner in the United States and the United Kingdom" in the Oxford Textbook of Critical Care, Webb A et al (eds), Oxford University Press, Oxford, UK; 1999:pg1044

10. Graham, M., and Hanzlick, R., Forensic Pathology in Criminal Cases, Lexis Law Publishing, Carlsbad, CA, 1997

11. Graham, M., "Role of the Medical Examiner in Child Abuse," in Child Maltreatment, second edition, eds Brodeur, A and Monteleone, J, G.W. Medical Publishing, Inc.,  St. Louis, MO, 1998

12. Graham, M., "The Medical Examiner, part 2," in Child Maltreatment, A Comprehensive Photographic Reference Identifying Potential Child Abuse, second edition, Monteleone, J, G.W. Medical Publishing, Inc., St. Louis, MO, 1998

13. Graham, M and Monteleone, J, "Identifying, Interpreting and Reporting Injuries," in Quick Reference--Child Abuse, Monteleone, J, G.W. Medical Publishing, Inc., St. Louis, MO, 1998

14. Graham, M, "Working with the Media and Methods of Disseminating Information," in CAP Handbook for Postmortem Examination of Unidentified Remains, Fierro, M (ed), College of American Pathologists, Northfield, IL, 1998.

15. Graham, M, "The Medicolegal Autopsy: Description of the Process," in Medicolegal Death Investigation: Treatises in the Forensic Sciences, 2nd edition, Caplan YH and Frank RS (eds), The Forensic Sciences Foundation, Colorado Springs, CO, 1999

16. Graham M and Hanzlick R, Forensic Pathology in Criminal Cases–1999 Companion, Lexis Law Publishing, Charlottesville, VA, 1999

17. Dix J and Graham M, Time of Death, Decomposition and Identification–An Atlas, CRC Press, Boca Raton, FL, 2000

18. Dix J, Graham M and Hanzick R, Asphyxia and Drowning–An Atlas, CRC Press, Boca Raton, FL, 2000

19. Dix J, Graham M and Hanzick R, Investigation of Road Traffic Fatalities–An Atlas, CRC Press, Boca Raton, FL, 2000

20. Hanzlick R and Graham M, Forensic Pathology in Criminal Cases, 2nd ed., Lexis Publishing, New York, New York, 2000

21. Froede RC and Graham MA, The Medicolegal Autopsy: Format and Quality Assurance. In: Froede RC, ed. Handbook of Forensic Pathology, 2nd ed, College Of American Pathologists, Northfield,    IL, 2003

22. Henry TE and Graham MA, Deaths Associated with Fires and Burns. In: Froede RC,  ed. Handbook of Forensic Pathology, 2nd ed, College of American Pathologists, Northfield, IL, 2003

23. Graham MA, Henry TE and Weedn VW, Work-Related Deaths. In: Froede RC, ed. Handbook of Forensic Pathology, 2nd ed, College of American Pathologists, Northfield, IL, 2003

24. Graham MA and Randall BB, Interaction with the Media. In: Froede RC, ed. Handbook of Forensic Pathology, 2nd ed, College of American Pathologists, Northfield, IL, 2003

25. Graham M and Corey T, Role of the Medical Examiner in Fatal Cases. In: Giardino AP and Alexander R, eds. Child Maltreatment—A Clinical Guide and Reference, 3rd ed., GW Medical Publishing, St. Louis, 2005

26. Bennett T, Giardino AP and Graham M, The Medical Examiner, in Alexander R and Giardino AP, eds. Child

<u>Maltreatment—A Comprehensive Photographic Reference Identifying Potential Child Abuse</u>, 3rd ed., GW Publishing, St. Louis, 2005

27. Graham M and Hanzlick R, <u>Forensic Pathology in Criminal Cases</u>, 3rd ed., LexisNexis, New York, 2006

28. Graham M, Corey TS, Hanzlick R and Green MA, Forensic Pathology in the United States and United Kingdom. In: Alexander R, ed. <u>Child Fatality Review</u>, G.W. Medical Publishing, St. Louis, 2007

29. Graham M, Forensic Lung Pathology. In: Tomashefski JP, ed. <u>Dail and Hammar's Pulmonary Pathology</u>, 3rd ed, Springer , New York, 2008

29. Graham MA and Sandomirsky M, Pathology of Asphyxial Disease in emedicine from WebMD, Updated April 6, 2011. Available at http://emedicine.medscape.com/article/1988699-overview.

30.  Graham M, Histopathology of Cutaneous Conducted Electric Weapon Injuries, in Atlas of Conducted Electric Weapon Wounds and Forensic Analysis, Ho JD, et al (eds.), Springer. New York, 2012

**PAPERS PRESENTED:**

1. Newman, A., Graham, M. and Carlton, E., "ABO Antigens in CIS and Dysplasia of the Urinary Bladder," American Urologic Assn., San Francisco, California (1980)

2. Newman, A., Graham, M., et al, "Incidental Carcinoma of the Prostate at the Time of Transurethral Resection: Importance of Evaluating Every Chip," American Urologic Assn., Boston, Mass. (1981)

3. Newman, A., Graham, M., et al, "ABO Antigens in Upper Urinary Tract Transitional Cell Tumors," American Urologic Assn., Boston, Mass. (1981)

4. Graham, M., Hayes, D., Gantner, G., "Medical Center Suicides," American Academy of Forensic Sciences, Anaheim, California (1984)

5. Graham, M., McGivney, J., "Fatal Mediastinitis Following Dental Extraction," American Academy of Forensic Sciences, Anaheim, California (1984)

6. Cohle, S.D., Graham, M.A, "Sudden Death in Hemodialysis Patients," American Academy of Forensic Sciences, Anaheim, CA (1984)

7. Cohle, S.D., Graham, M.A., "Nonatherosclerotic Sudden Coronary Death, International Academy of Forensic Sciences, Oxford, England (September, 1984)
8. Graham, M., Hileman, F., Kirk, D., Wendling, J. and Wilson, J., "Background Human Exposure to 2,3,7,8-TCDD," Fourth International Symposium on Chlorinated Dioxins and Related Compounds, Ottawa, Canada (October, 1984)

9. Graham, M., Wong, S. and Poklis, A., "Death Due to Inhalation of Maleic Anhydride," American Academy of Forensic Sciences, Las Vegas, Nevada (1985)

10. Gantner, G., Graham, M. and Gantner, T., "Provision of Lay Autopsy Reports to Families," American Academy of Forensic Sciences, Las Vegas, Nevada (1985)

11. Graham, M., Hileman, F., Wendling, J. & Wilson, J. "Chlorocarbons in Adipose Tissue Samples," Fifth International Symposium on Chlorinated Dioxins & Related Compounds, Bayreuth, Federal Republic of Germany (Sept. 1985)

12. Graham, M., Tsai, C., Miller, L., Williams, G., Tsai, L., and Martin, T., "Active Lymphocytic Myocarditis in Sudden Unexplained Death," International Academy of Pathology, Annual Meeting, New Orleans, Louisiana (March, 1986)

DNM 937

13.  Graham, M., Hileman, F., Wendling, J., and Wilson, J., "Chlorocarbons in Adipose Tissue and Liver Tissue Samples," Sixth International Symposium on Chlorinated Dioxins and Related Compounds, Fukuoka, Japan (September, 1986)

14.  Graham, M., and McCallister, HA, "The Spectrum of Myocardial Lesions Due to Catecholamines," National Association of Medical Examiners, Annual Meeting, Tucson, AZ (Nov., 1986)

15.  Graham, M., "Evaluation of Human Exposure to Dioxins and Other Environmental Trace Contaminants," American Academy of Forensic Sciences (Plenary Session), San Diego, CA (Feb., 1987)

16.  Burch, P., Graham, M., Poklis, A., "Sudden Death Associated with Phencyclidine," American Academy of Forensic Sciences, San Diego, CA (Feb., 1987)

17.  Graham, M., Burch, P., Cohle, S., Bux, R., Poklis, A. and Lynch, R., "Recreational and Iatrogenic Fatal Water Intoxication," American Academy of Forensic Sciences, Philadelphia, PA (Feb., 1988)

18.  Burch, P. and Graham, M., "SIDS or Infanticide?--Differentiating SIDS From Overlying and Other Forms of Infant Death When Autopsy Findings are Non-diagnostic," American Academy of Forensic Sciences, Philadelphia, PA (Feb.,1988)

19.  Poklis, A., Maginn, D., Graham, M. and Gantner, G., "Drug Abuse Trends in St. Louis, MO; 1977-86," American Academy of Forensic Sciences, Philadelphia, PA (Feb., 1988)

20.  Graham, M., "The Forensic Examination of the Cardiac Transplant Recipient," National Association of Medical Examiners, Boston, MA (Nov., 1988)

21.  Cohle, S., Graham, M., Sperry, K. and Dowling, G., "Unexpected Death Due to Infective Endocarditis," American Academy of Forensic Sciences, Las Vegas, NV (Feb., 1989)

22.  Pegors, C., Vogler, C., Graham, M. and Beeson, R., "Skeletal Muscle in Victims of SIDS: A Morphometric Assessment," American Society of Clinical Pathology, San Francisco, CA (1990) (Poster)

23.  Kemp, J., Kowalski, R., Graham, M. and Thatch, T., "Positional Ventilatory Impairment in a Serial Study of 23 SIDS Cases", The American Pediatric Society and The Society for Pediatric Research, Boston, MA (May, 1992)

24.  Jennison, S., Wesp, A., Graham, M., McBride, L., and Miller, L., "Through Cyclosporin Levels in the Early Postoperative Period Do Not Influence the Rate of Subsequent Acute Cardiac Rejection," Third International Congress on Cyclosporine, Seville, Spain (March, 1994)

25.  Graham, M., "Rebreathing - It's Role in SIDS," National Association of Medical Examiners Interim Meeting, Seattle, (February, 1995)

26.  Case, ME, Graham, MA and Wood JE, "Spinal Cord Injury in Child Abuse", National Association of Medical Examiners, Traverse City, Michigan (September, 1996)

27.  Graham, MA and Case, ME, "Hyperthermia in St. Louis – Evolution of a Community Response", National Association of Medical Examiners, Traverse City, Michigan (September, 1996)

28.  Case ME, Graham MA and Wood JE, "Spinal cord injury in Child Abuse by Shaking," The Second National Conference on Shaken Baby Syndrome, Salt Lake City, Utah (September, 1998)

29.  Unger B, Graham M, et al, "Racial Disparity in Sudden Infant Death Syndrome (SIDS) and Accidental Suffocation: Incidence and death scene findings in a 4-year population based study," Sudden Infant Death Syndrome Alliance, Chicago, IL (4/21/01) (Poster)

30.  Clark S, Graham M and Smialek J, "National Train the Trainer Academy for Medicolegal Death Investigator Training," National Association of Medical Examiners Annual Meeting, Richmond, VA (October, 2001)

31.  Jumbelic M and Graham, M, "Interobserver Variation in Estimating Coronary Atherosclerosis," National Association of Medical Examiners Annual Meeting, Richmond, VA (October, 2001)

DNM 938

32.  Jumbelic M, Kontanis E and Graham M, "Results of Interobserver Variation in Estimating Coronary Atherosclerosis," National Association of Medical Examiners Annual Meeting, Shreveport, LA (September, 2002)

33.  Pinckard JK and Graham M, "Heart Valve Tissue Donation Does Not Preclude the Diagnosis of Clinically Significant Pediatric Cardiac Abnormalities," National Association of Medical Examiners Annual Meeting, Shreveport, LA (September, 2002)

34.  Graham M, Pinckard JK and Kelly K, "Protocol for Optimizing the Examination of Hearts Procured/Processed for Valve Tissue Transplantation," National Association of Medical Examiners Annual Meeting, Shreveport, LA (September, 2002)

35.  Pinckard JK and Graham M, "Deaths of Entertainment-Style Wrestlers: A Case Report and Review of the Literature", National Association of Medical Examiners Annual Meeting, San Jose, CA (September, 2003)

36.  Graham M and Hanzlick R, "The Year in Review", National Association of Medical Examiners Annual Meeting, Nashville, TN (September, 2004)

37.  Kroll M, Panescu D, Brewer J, Lakkireddy DJ and Graham MA, "Weight adjusted meta-analysis of fibrillation risk from TASER conducted electrical weapons", American Academy of Forensic Sciences annual meeting, Denver, CO (February, 2009)

38.  Dutra TF, Graham MA and Turner JW, "Big People, Big Hearts: Histochemical and immunohistochemical stain comparisons of hypertrophic heart sections from morbidly obese decedents, compared with heart sections from age matched controls", National Association of Medical Examiners Annual Meeting, San Francisco, CA (September, 2009)

39.  Graham MA, "Evaluation of Death Temporally Related to Custody (Introduction, Sickle Cell Trait, Water Intoxication)", National Association of Medical Examiners Annual Meeting, Sitka, Alaska (August, 2011)

40.  Dawes D, Ho J, Graham MA, et al, "In Vivo Wound Progression from a TASER X26 Exposure" (Poster), National Association of Medical Examiners Annual Meeting, Alaska (August, 2011)

41.  Kroll MW, Walcott GP, Ideker RE, Graham, MA, Calkins H, Lakkireddy D, Luceri RM and Panescu D, "The Stability of Electrically Induced Ventricular Fibrillation," Institute of Electrical and Electronics Engineers (IEEE),  Engineering in Medicine and Biology Conference, San Diego, CA (September, 2012)

42.  Graham, MA, "Pill Filler Angiopathy—Recognition and Investigation of Murder by Oral Pharmaceutical Injection," Pulmonary Pathology Society Biennial Meeting, Grenoble, France (June, 2012)

43.  Graham MA, et al, "Medical Examiner Collection of Comprehensive, Objective Medical Evidence for Conducted Electronic Weapons and Their Temporal Relationship to Sudden Arrest," National Association of Medical Examiners (NAME) Annual Meeting, Portland, OR (9/23/14)

44.  Graham, MA, "Overview of Investigation of Deaths Temporally Related to Law Enforcement Apprehension," National Association of Medical Examiners Annual Meeting (10/15)

4/4/17

DNM 939



**Suzanna Ryan, MS, D-ABC**
Carlsbad, CA 92008
949-973-7588
sryan@ryanforensicdna.com

## EDUCATION:

**Master of Science in Forensic Science**    **Virginia Commonwealth University**
*December, 1998*                             Richmond, VA

**Bachelor of Science – Biology**           **Lock Haven University of Pennsylvania**
Minor in Chemistry                          Lock Haven, PA
*May, 1997*

## EXPERIENCE:

**Forensic Serologist**                     **Advanced Serology Laboratory**
*November 2015-Present*                      Carlsbad, CA

◊ Perform biological evidence screening on casework evidence
◊ Test evidence items for the presence of blood, semen, saliva, vaginal fluid, and menstrual fluid
◊ Collect DNA samples using the M-Vac Wet Vacuum DNA Collection System

**Independent Forensic DNA Consultant**     **Ryan Forensic DNA Consulting**
*March 2008 – Present*                       Carlsbad, CA

◊ Provide Forensic DNA and Serology consultation services and Expert Witness testimony to law
  enforcement, prosecution and defense agencies
◊ Perform complete review of Forensic DNA casework including bench notes, DNA data, mixture
  interpretations, and statistical conclusions
◊ Review of electronic DNA data utilizing Applied Biosystems' GeneMapper ID or Softgen's GeneMarker HID software
◊ Offer pre-trial and trial assistance
◊ Present educational programs and DNA training for trial counsel and others in the legal system

**Interim Technical Leader/Forensic Scientist**    **Human Identification Technologies**
*October 2009 – March 2010*                        Redlands, CA

◊ Performed serological screening on casework submitted by prosecution and defense agencies
◊ Performed forensic DNA analysis on casework submitted by prosecution and defense agencies
◊ Reviewed other analyst's work
◊ Acted as interim technical leader and aided in maintaining ASCLD/LAB International accreditation

**Forensic DNA Technical Leader &**         **Crime Scene Technologies**
**Quality Assurance Manager**               San Diego, CA
*September, 2006 – March, 2008*

◊ Responsible for maintaining ASCLD/LAB accreditation of the laboratory
◊ Wrote and revised laboratory methods and quality assurance procedures
◊ Devised and performed validation studies for new serology and DNA methodologies
◊ Screened evidence items for the presence of blood, semen, urine, and saliva
◊ Performed STR DNA typing on evidentiary items submitted to the lab
◊ Utilized Organic, Chelex, and DNA IQ extraction methods with Quantifiler quantitation and electrophoresis on an ABI
  310 with analysis using GeneMapper ID

EXHIBIT "B"

◊ Fully trained to use and interpret Identifiler, YFiler, and Minifiler amplification kits/results
◊ Wrote detailed reports based upon findings
◊ Testified in court as an expert witness when needed
◊ Technically reviewed all other analysts' work
◊ Responsible for all technical aspects of the lab including troubleshooting problems

**Instructor**                                                          **VLETA.net**
*August 2009 – December 2012*

◊ Created online Serology and DNA-related training programs for attorneys and for members of the law
   enforcement community via the Virtual Learning and Training Academy

**Contributing Author**                                      **LawOfficer.com**
*July 2008 – February 2009*
◊ Wrote a monthly column for LawOfficer.com concentrating on DNA-related topics

**Adjunct Professor**                                        **National University**
*July 2007 – May 2010*                                       San Diego, CA

◊ Created course syllabus and all test materials for a course entitled "Advanced Forensic Serology and
   DNA" for the Master of Forensic Science program at National University
◊ Created course syllabus and all test materials for an online course entitled "Advanced Criminalistics"
   for the Master of Forensic Science program at National University
◊ Instruct students on techniques of serological testing, sperm cell identification, and hair identification
◊ Instruct students on all aspects of forensic DNA analysis including historical techniques
◊ Designed laboratory exercises to augment student learning

**DNA and GPA Auditor/Assessor**                   **National Forensic Science Tech. Center**
*June, 2006 – August 2011*                           Largo, FL

◊ Trained by FBI personnel to perform DNA Audits of forensic DNA laboratories following the FBI's
   National DNA Quality Assurance Standards

**Criminalist II**                                           **Charlotte-Mecklenburg Police Dept. Crime Lab**
*November, 2005 – August, 2006*                      Charlotte, NC

◊ Screened evidence items for the presence of blood, semen, and saliva
◊ Performed microscopic examination of hairs
◊ STR DNA typing of evidence and reference items utilizing PowerPlex 16 amplification kits
◊ Entered qualifying profiles into the CODIS database
◊ Technically reviewed other analyst's work
◊ Wrote reports based upon serology and DNA findings
◊ Attended Homicide Investigators morning meetings to render assistance when needed

**Adjunct Instructor**                                       **Hillsborough Community College**
*July, 2005 – November 2005*                         Tampa, FL

◊ Created and taught a course entitled "Introduction to Criminalistics" for two semesters
◊ Course provided overview of multiple forensic disciplines including: blood spatter analysis, latent print
   identification, firearms identification, crime scene analysis techniques, fiber and hair testing, glass and
   soil testing, and serology and DNA typing

**Teaching Assistant**                                       **University of Florida**
*November, 2004 – November 2005*                     Gainesville, FL

◊ Teaching Assistant for the online Master of Science in Forensic Science program with UF
◊ Graded papers, tests, and quizzes and answered students questions in the Forensic DNA course

**Crime Laboratory Analyst**                    **Florida Department of Law Enforcement**
*May, 2002 – November, 2005*                    Tampa, FL

◊ Received complete training in serological testing techniques
◊ Performed serology and STR DNA testing on evidence submitted by agencies in 18 counties
◊ Utilized Profiler Plus and COfiler amplification kits with analysis on ABI 310, AB 3100 and AB 3130
◊ Attended crime scenes when requested
◊ Provided training to investigators and attorneys on Forensic Serology and DNA capabilities
◊ Attended Cold Case Squad meetings to answer biological evidence-based questions
◊ Wrote case reports based upon findings and testified in court as an expert witness when needed

**Forensic DNA Analyst 2**                    **The Bode Technology Group, Inc.**
*January, 1999- May, 2002*                    Springfield, VA

◊ Received training in STR DNA typing techniques
◊ Received Top Secret security clearance and performed DNA testing as part of a federal government contract
◊ Performed STR DNA testing on evidence and reference samples
◊ Utilized PowerPlex 1.1, 2.1, Profiler Plus and COfiler amplification kits with electrophoresis performed
  on the FMBIO II or ABI 377 followed by analysis with STaRCall software or GeneScan/Genotyper
◊ Managed a project in conjunction with the International Commission on Missing Persons to identify
  remains found in mass graves in Bosnia
◊ Assisted with mass disaster identification projects such as the Alaska Air flight 261 crash in 2000 and
  the World Trade Center disaster on 09/11/01
◊ Testified in court as an expert witness when needed

**CONTINUING EDUCATION/TRAINING:**

1. Statistics Seminar, The Bode Technology Group, Inc. December 2000
2. Third Annual Fluorescent STR MegaPlex Technology Workshop, Hilton Head, NC. March 2000
3. ABI Prism 377 DNA Sequencer training given by Applied Biosystems at The Bode Technology Group, April 2000
4. STR Analysis Seminar, The Bode Technology Group, November 2000
5. American Academy of Forensic Sciences 53rd Annual Meeting, Seattle, WA. February 2001
6. DNA STR Workshop, Northeastern Association of Forensic Scientists 28th Annual Meeting, Atlantic City, NJ.
   November 2002
7. Florida Dept. of Law Enforcement Forensic Biology Discipline Meeting, Tampa, FL March 2003
8. Introduction to Bloodspatter Analysis Training, Florida Dept. of Law Enforcement, Tampa, FL February 2004
9. NIJ's 5th Annual DNA Grantee's Workshop, Washington, D.C. June 2004
10. SAFS/MAAFS/MAFS/CFC Combined Meeting & Paternity Statistics Workshop, Orlando, FL September 2004
11. MAAFS annual meeting & LCN Workshop, Richmond, VA May 2006
12. ABI Future Trends in Forensic DNA Technology, Research Triangle Park, NC May 2006
13. FBI Auditor Training Course, National Forensic Science Technology Center, Largo, FL, June 2006
14. Forensic Consultants Association Annual Meeting, - "New Developments in Forensic DNA Testing",
    San Diego, CA, December 2006.
15. California Association of Crime Laboratory Directors Spring 2007 Meeting, Temecula, CA, April 2007
16. FBI DNA Auditor Refresher Training and Annual Training for Grant Progress Assessment (GPA) Assessors,
    Washington DC, June 2007
17. American Academy of Forensic Sciences 60th Annual Meeting, Washington, DC. February 2008
18. National Forensic Science Training Center DNA Mixture Interpretation Workshop, online training, October 2011
19. Advanced DNA Mixture Interpretation and Statistical Approaches Workshop.  American Academy of Forensic
    Sciences 64th Annual Meeting, Atlanta, GA.  February 2012
20. Transforming Investigative Potential - DNA Technology Today.  Held at DNA:SI Lab, Burlington, NC. August 2012
21. Tenth Annual Advanced DNA Technical Workshop sponsored by Bode Technology, San Diego, CA March 2013
22. First Annual American Investigative Society of Cold Cases Conference, Fayetteville, NC.  May 2014
23. Promega 25th International Symposium on Human Identification and Probabilistic Software Workshop, Phoenix, AZ.
    October 2014
24. Implementing Next Generation Sequencing for Forensic DNA Analysis. Webinar presented by Forensic Magazine
    and Battelle.  June 2015
25. Second Annual American Investigative Society of Cold Cases Conference, St. Louis, MS.  July 2015.
26. MSI M-Vac Systems training given by Jared Bradley of MSI at Advanced Serology Laboratory, Carlsbad, CA.
    November 2015
27. American Academy of Forensic Sciences 68th Annual Meeting, Las Vegas, NV.  February 2016.
28. Third Annual American Investigative Society of Cold Cases Conference, St. Louis, MS. July 2016.

**EXPERT WITNESS TESTIMONY:**

Qualified as an expert in Serology and/or Forensic DNA Analysis in the following States: California (in Fresno, Kern, Los Angeles, Orange, Placer, San Diego, Santa Clara, Imperial, and Ventura Counties), Idaho, Maryland, Rhode Island (Superior and Supreme Court), Texas, Washington, Iowa, Connecticut (Federal Court), Arizona, New York (Federal Court),Wisconsin, Washington, D.C., and Florida (in Alachua, Polk, Pinellas, Pasco, Duval, Citrus, Sarasota, Hillsborough, Hernando, Highlands, Collier, Lee, and Charlotte Counties and Federal Court in Tampa) and in Kaiserslautern, Germany for a total of over 90 times, as well as more than 20 expert deposition experiences in both civil and criminal trials.

**PUBLICATIONS AND PRESENTATIONS:**

◊ Eleni N, Levedakou, Freeman, D.A., Budzynski, M.J., Early, B.E., Damaso, R.C., Pollard, A.M., Townley, A.J., Gombos, J. L., Lewis, J.L., Kist, F.G., Hockensmith, M.E., Terwilliger, M.L., Amiott, E., McElfresh, K.C., Schumm, J.W., **Ulery, S.R**., Konotop, F., Sessa, T.L., Sailus, J.S., Crouse, C.A., Tomsey, C.S., Ban, J.D., and Nelson, M.S. Characterization and Validation Studies of PowerPlex 2.1, a Nine-Locus Short Tandem Repeat (STR) Multiplex System and Penta D Monoplex, *Journal of Forensic Sciences*, July 2002.
◊ **Ryan, S.R**. and Kelepecz, B.K., "DNA on Guns; How Do You Preserve the Evidence?", Law Officer Magazine, pp 48- 51 Vol. 4 (9) September 2008.
◊ Ryan, S.R., "Using DNA to Solve Cold Cases", www.LawOfficer.com, July 15, 2008.
◊ Ryan, S.R., "Maximize the Usefulness of Sexual Assault Kit Evidence", www.LawOfficer.com, August 19, 2008.
◊ Ryan, S.R., "Y Chromosome DNA Testing", www.LawOfficer.com, September 16, 2008.
◊ Ryan, S.R., "Familial DNA Searching", www.LawOfficer.com, October21, 2008.
◊ Ryan, S.R., "Mini-STR Technology", www.LawOfficer.com, November 20, 2008.
◊ Ryan, S.R., "The DNA Database Problem", www.LawOfficer.com, December 16, 2008.
◊ Ryan, S.R., "Transfer Theory in Forensic DNA Analysis", www.LawOfficer.com, January 20, 2009.
◊ Ryan, S.R., "Latent Prints or DNA?", www.LawOfficer.com, February 17, 2009
◊ Ryan, S.R. "Understanding DNA Evidence; Why It Is Important To Do a Case Review", presented at the National Defender Investigator Association, West Regional Conference, September 17, 2009.
◊ Ryan, S.R. "Defense Attorney's Guide to Forensic Serology and DNA Analysis" presented to the San Diego Public Defender's Office, Vista, California, October 21, 2009.
◊ Ryan, S.R. "DNA: Get It Right", Law Officer Magazine, pp. 28-29 Vol. 5 (11) November 2009.
◊ Ryan, S.R., "The Defense Investigator and Paralegal's Guide to Forensic Serology and DNA Analysis" presented at the National Defender Investigator Association National Conference, April 9, 2010.
◊ Ryan, S.R. "Understanding DNA Evidence:  Analysis Through Interpretation and Beyond" presented for CLE credit to the Kern County Public Defender's Office, November 11, 2011.
◊ Ryan, S.R. "DNA Testing and Mixture Interpretation: an Overview of DNA Analysis & Discussion of the 2010 SWGDAM Guidelines" presented for CLE credit to the Orange County Alternate Defender's Office, February 29, 2012.
◊ Ryan, S.R., "Touch DNA Analysis: Using the Literature to Help Answer Some Common Questions", Forensic Magazine, pp. 31-33 Vol. 9 (3) June/July 2012.
◊ Ryan, S.R., "Investigative Potential:  Using Touch DNA to Generate Leads", presented at the Transforming Investigative Potential - DNA Technology Today conference held at DNA:SI Labs in Burlington, NC. Aug. 2012
◊Ryan, S.R., "The Value and Collection of Touch DNA and Potential Investigative Pitfalls", presented at the LODIS Users Group Meeting held in Palm Bay.  December 4, 2012
◊Ryan, S.R., "Identifying, Collecting, and Packaging DNA Evidence", presented to the Palm Bay Police Department, Palm Bay, FL.  December 4, 2012
◊Ryan, S.R., "Cold Case DNA Evidence - The Progresses and Perils", presented at the First Annual American Investigative Society of Cold Cases Conference held in Fayetteville, NC.  May 2014.
◊Ryan, S.R. "Creative uses of DNA in Cold Cases and Recent Advances in the Field of Forensic DNA Analysis", presented at the Second Annual American Investigative Society of Cold Cases Conference held in St. Louis, MS.  July 2015.
◊Ryan, S.R.  Advances in forensic DNA analysis:  A brief review. *Journal of Cold Case Review*.  Vol.1(1), July 2015.
◊Ryan, S.R., "Defending Against Potentially Inculpatory Sexual Assault Kit Evidence", presented at the National Defender Investigator Association Regional Conference held in Las Vegas, September 10, 2015.
◊Ryan, S.R., "Understanding and Interpreting DNA Results", presented at the National Defender Investigator Association Regional Conference held in Las Vegas, September 10, 2015.
◊Ryan, S.R., "A Guide to Understanding and Interpreting DNA Results" and "Forensic DNA Experts", presented at the National Defender Investigator Association Regional Conference held in Newport Beach, CA, September 8-9, 2016

**PROFESSIONAL ASSOCIATIONS AND CERTIFICATIONS:**

◊  American Academy of Forensic Sciences 1997-present
◊  Certified as a Diplomate in Molecular Biology - American Board of Criminalistics, 2012
◊  Selected as a Member of the Review Board of the American Investigative Society of Cold Cases, 2013 - present
◊  Associate Member California Association of Criminalists 2015-present

**AWARDS:**

◊ Awarded the 2004 Davis Productivity Award from the State of Florida
◊ Awarded a Commendation from the Sarasota Police Department for Outstanding Assistance in the 2004 Wishart
  Murder Investigation, March 2005
◊ Awarded a Certificate of Appreciation for Outstanding Contributions in the Field of Drug Law Enforcement by the
  Drug Enforcement Agency, April 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Action No. No. 15-CR-4268-JB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

ANGEL DELEON, et al

       Defendants.

---

## MOTION TO COMPEL THE GOVERNMENT TO REVEAL THE IDENTITY OF CERTAIN CONFIDENTIAL INFORMANTS REFERENCED IN DISCOVERY MATERIALS

---

Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez move pursuant to Fed R. Crim. P. 12(b)(1), *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); and *Roviaro v. United States*, 353 U.S. 53 (1957), to compel the government to immediately reveal the identities of certain confidential informants referenced in the discovery materials. The government opposes this motion. All other defendants have no objection to the motion.

1.     The defense incorporates by reference the legal standards as set forth in the prior motion for disclosure of confidential informants (Doc. # 869). This motion is filed as a joint motion to assist the Court and government in focusing on informants that relate solely to counts 1 and 2.  Not each defendant who have joined this motion necessarily has

1

grounds for disclosure but for each informant listed below one or more of the defendants filing this motion has sufficient grounds for disclosure.

2.    **Informant at Deleon 27899**- On April 10, 2001, FBI Task Force Officer Edgar Rosa met with Mr. Jim Moore, Coordinator, Security Threat Group (STG) at the Southern New Mexico Correctional Facility (SNMCF). Mr. Moore indicated he had interviewed an unidentified source who indicated the murders of Castillo and Garza were ordered by Angel Munoz (Deleon discovery page 27899).  This information is helpful and exculpatory as Angel Munoz was not in custody and it disputes the government's theory that the order to kill was brought down from PNM North by Billy Garcia.

3.    **Informant at Deleon 19127** - Discovery discloses that New Mexico corrections had developed a source given the moniker of "Source 12."  This source stated that the old time convicts would put holes in you and the youngsters would strangle you." (Deleon discovery pg. 19127). The report in discovery indicates that the "dates of interviews and staff conducting the interview" are contained within a document titled, "Memorandum from STG to Warden Tafoya titled- Confidential sources on the Murders of Inmates Frank Castillo and Rolando Garza."   This memorandum has been lost or destroyed and has not been produced in discovery. Billy Garcia has been identified as a member of the old timers whereas inmates Leroy Lucero, Federico Munoz and other alternate suspects were part of the younger set called the "All Stars."  This source is exculpatory and helpful in that he described the modus operandi of two different factions of the SNM.  The discovery reflects that the strangulation method, used in the murders of Castillo and Garza, was first developed by All Star leader Federico Munoz in combination with his compatriot Leonard Lujan in the 1998 strangulation murder of an inmate. Simply

2

stated, the modus operandi used in the killing of Garza and Castillo was the signature method used by the All Star group of the SNM, a group to which there is no evidence Billy Garcia belonged.

4. **Deleon discovery page 14210** - On April 12, 2001 Warden Lawrence Tafoya interviewed a confidential informant who was given the moniker of "Source 1." This unidentified informant stated that he was a very good friend of inmate Rolando "Looney" Garza. He stated that he grew up with inmate Garza on the streets of Albuquerque. This informant reviewed a photo array and identified Allen Patterson, Ray Molina and Eugene Martinez as the killers of Garza. This inmate indicated he was in the pod when the Garza was murdered. (Deleon discovery page 14210). This informant provides clear exculpatory information for defendant Christopher Chavez as an eyewitness indicates it was Molina and not Chavez who participated in the murder. The witness is exculpatory as to all count 1 and 2 defendants as it contradicts the testimony of Lujan. It is also helpful as Ray Molina is a member of the All Star group of the SNM.

5. **Informant at Deleon 19126** - On July 11, 2001 an informant was interviewed who was given the moniker of "Source 07." Source 7 stated that inmate Alfred Giron (a leader of the SNM) had put a red light on all hits while he was here at SNMCF. When Inmate Giron left, Inmate Leroy Lucero, took over leadership at SNMCF and he honored the red light put on the hits. Source 7 was interviewed again and this interview was taped.[1] (Deleon discovery at page 19126). This information is exculpatory as to Billy Garcia as the informant indicates it was Lucero and not Garcia who ordered the hits. It also appears

---

[1] A review of discovery does not reveal the tape interview of Source 7 was preserved.

from discovery that Leroy Lucero is now a cooperating individual for the government and is likely to testify.

6.  **Informant at Deleon 521** - On June 4, 2004 a confidential source who was given the moniker of "DFS #3" provided information to law enforcement. DFS #3 stated informant who stated that he was housed in K-2-Yellow unit at SNMCF at the time the double homicide occurred. DFS #3 stated that three-four days prior to the killings "Smurf" Leroy Lucero #40700 was telling inmates on the compound that they better get ready because the SNM was going to clean house. This informant is exculpatory as to Garcia as this information is consistent with Lucero, rather than Garcia, giving the order to kill and he is exculpatory as to all defendants as he disputes Lujan.

7.  **Informant at Deleon 19128** – On an unknown date in 2001 Warden Lawrence Tafoya interviewed a confidential informant who was given the moniker of "Source 13."  Source 13 states that he overheard Inmate Eugene Martinez talking with Inmates Leroy Lucero and Jessie Ibarra about carrying out assaults on inmates considered to be rats. Source 13 indicated he heard these statements before the murders took place. Leroy Lucero is believed to be a cooperating witness for the government and is a prime alternate suspect in the murders.  Eugene Martinez is a former codefendant who is also now a cooperating witness.  This informant would impeach both Lucero and Martinez and would identify Ibarra as an alternate suspect.  This evidence is helpful and exculpatory to Allen Patterson, Christopher Chavez and Billy Garcia.

8.  **Informant at Deleon 1222** – On June 16, 2004 a confidential source was interviewed who stated he was good friends with Leroy Lucero as they grew up together as kids. This informant stated that inmate Garza had a rat jacket on him and when inmate

Lucero was around inmate Garza that inmate Lucero was really nervous around him, as if inmate Lucero wanted to take out Garza himself. This informant supports the alternate theory that it was Leroy Lucero who ordered the hit on Garza and not Billy Garcia.

9.    **Informant at Deleon 1249** -  This informant was interviewed between March 28, 2001 and April 3, 2001.  This informant stated that two inmates, both SNM members, were assigned to hit/kill Inmate Rolando Garza. Source stated that Inmate Billy Garcia gave the okay to hit/kill Inmate Garza and that this okay was given to SNM inmate Ray Molina #52563 who in turn assigned or told Gerald Alvarado and Deleon to hit/kill Garza. This informant provides exculpatory information for defendants Patterson and Chavez as he indicates they were not involved in the murder of Garza.  This informant is helpful to all count 1 and 2 defendants as he impeaches the story of Lujan and Eugene Martinez.

10.    **Informant at Deleon 1251** -  On April 9, 2001 an informant who was given the moniker of "Source 1-B" was interviewed. Source 1-B stated that he met with inmate Billy Garcia when he was released from orientation and discussed SNM business with him. He further stated that during one of these meetings, inmate Leonard Lujan was present and was insistent that Bill Garcia give the "green light, to start cleaning house on inmates that they had paperwork on. Source 1-B stated that inmate Lujan was insistent on the need to "clean house" and ultimately got the green light" from Billy Garcia on the evening before the murders took place. This informant is exculpatory to all count 1 and 2 defendants except for Billy Garcia as he contradicts Lujan's contention that he only participated in passing on the order out of fear of being killed.

11.    **Informant at Deleon 1257** -  This informant was interviewed on an unknown date in 2001.  This informant indicated that the order to kill Frank Castillo was on since

DNM 949

2000 and SNM members at SNMCF knew about it at that time.  This contradicts the government's theory that the hit was brought down to SNMCF by Billy Garcia in March 2001.

12.   **Informant at Deleon 3032** – This unidentified informant was interviewed on April 3, 2001. This informant stated that there would be additional killings at the the SNMCF. This informant stated that inmate Billy Garcia had a green light. This meant that Billy Garcia was to be killed. This informant would establish that Billy Garcia was not part of a plan to kill inmates but was rather a target of the group who was orchestrating the murders at SNMCF in the spring of 2001.

13.   **Informant at Deleon 18971** – On March 7, 2001, 19 days before the Garza and Castillo murders, an informant was interviewed by a corrections officer.  This informant had provided accurate information previously. The informant stated that Inmate Leonard Lujan had put a hit out on Inmate Jimmy Gordon anywhere he was moved out too. The informant stated, that Gordon owed Lujan $500.00 dollars and that it was too much to just let go. This informant came forward with this information prior to Billy Garcia ever arriving at SNMCF.  This informant provides evidence that Lujan was capable, in 2001, of issuing a green light on inmates himself and without direction from anyone else.  This informant also provides evidence that contradicts Lujan's statement to authorities that he is not a violent person.



Submitted this 15th day of September 2017.

DNM 950

/s/ Jim Castle

Robert Cooper

Jim Castle

Attorneys for Billy Garcia (5)


CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


/s/ Jim Castle

DNM 951

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No. 15-CR-4268-JB

UNITED STATES OF AMERICA,
        Plaintiff,

v.

ANGEL DELEON, *et. al.*

**3. EDWARD TROUP,**
**5. BILLY GARCIA,**

        Defendants.

---

**DEFENDANTS BILLY GARCIA AND EDWARD TROUP'S SECOND
MOTION TO COMPEL DISCOVERY**

---

COMES NOW, Defendants Billy Garcia and Edward Troup, by and through

undersigned counsel, respectfully submit this Second Motion to Compel Discovery.

**<u>BACKGROUND</u>**

On March 26, 2001, two inmates were killed at the Southern New Mexico

Correctional Facility (SNMCF).  Frank Castillo was killed in the P-1-Green (P-1-G) housing

unit.  Rolando Garza was killed in the Ocean-1-Yellow (O-1-Y) housing unit.  The New

Mexico State Police immediately began an investigation of the two homicides.

On November 2, 2001, the District Attorney for the Third Judicial District formally

declined to prosecute Angel Deleon, whose DNA was found in Castillo's cell, or anyone

else for the killing of Castillo.  Nor was a prosecution brought for the killing of Garza at that

time.

1

There is no physical evidence linking either Billy Garcia or Edward Troup to these homicides.  The prosecution is based on the testimony of informants who are doing the government's bidding.  Informants are presumptively unreliable. *E.g., Banks v. Dretke*, 540 U.S. 668, 701-02 (2004) (citing *On Lee v. United States*, 343 U.S. 747, 757 (1952)). A growing body of research establishes that such testimony is a leading cause of wrongful convictions. Northwestern Center on Wrongful Convictions, *The Snitch System* (2004-2005), http://www.law.northwestern.edu/legalclinic/wrongfulconvictions/documents/SnitchSystemBooklet. Billy Garcia and Edward Troup should not be forced to accept the government's reliance on such individuals while facing the prospect of life in prison.  There is no reason to trust these informants and no reason to trust that the government has provided a balanced view of the investigation which led to these defendants being indicted.

Given the underpinnings of the government's case against these defendants, counsel have vigorously pursued discovery, particularly discovery relating to Leonard Lujan and all individuals who have made statements about the homicides.

## PROCEDURAL HISTORY

The undersigned filed their first Motion for Specific Discovery on May 23, 2016 (Doc. 539).  Thereafter, litigation ensued.  The history of the litigation relating to discovery, as of January 3, 2017, is set forth in the Court's Sealed Memorandum Opinion and Order (Doc. 809).  In that Memorandum Opinion and Order, the Court reminded the government of its obligations:

> "Further, with respect to how closely the United States needs to look at these files, the Court reminded the United States that it "takes a human being sitting there putting their feet in the defense lawyers' shoes and saying, 'Could I use this?'" (October 4, 2016 Hrg. Tr. at 111:2-18 (Court).  (Memorandum Opinion and Order, p. 48)

2

Unfortunately, that hasn't happened.

On April 6, 2017, the undersigned filed their first Motion to Compel Discovery (Doc. 1061) specifically outlining some of the government's many failures to provide discovery. After initially opposing the motion to compel, the government essentially agreed to provide the discovery at the Motions Hearing on May 19, 2017.  (Hearing Trans., 05/19/17, beginning at p. 28)

To date, the government has not provided all of the documents that it said it would provide.  This is true with respect to the discovery outlined in the first Motion to Compel.  It is also true with respect to Confidential Informants. *See,* Defendants Troup and Garcia's Motion to Compel the Government to Reveal the Identity of Certain Confidential Informants Referenced in Discovery Materials. (Doc. 869, filed 01/31/17).  And, most pertinent to this Second Motion to Compel Discovery, it is true with respect to the government's obligation to provide *Giglio* and *Brady* materials.

The parties have had a vigorous debate about the *timing* of the disclosure of *Giglio* and *Brady* materials.  On May 9, 2017, this Honorable Court directed the prosecution to provide *Giglio* and *Brady* materials to the defendants promptly.  (05/09/17 Trans. pps. 206, 209, 215.)  The Court went on to say that the prosecution was required to review its files and produce *Giglio, Brady*, and Rule 16 materials by June 9, 2017.  (05/09/17 Trans. p. 215, lines 4-6.)

In spite of the foregoing Court Orders, the prosecution has not provided all *Giglio* materials relating to its witnesses.  An example would be the bad acts committed by informant defendants that the U.S. Marshals house at Sandoval County Detention Facility.

3

The government has not disclosed all of the records relating to the informants who are housed at that facility.  Another example are the phone calls that informant defendants have placed while incarcerated.  It is clear that the FBI has access to all of these phone calls.  The defense made IPRA requests for some of those calls, but has been informed by Mr. Ricardo Montoya (formerly from the Office of General Counsel for NMCD) and Mr. Jim Brewster, General Counsel for NMCD, that the FBI has taken custody of these requested phone calls.  With the exception of one informant, no other calls from these informant defendants have been disclosed.  It is unfathomable that none of these individuals have said anything which is exculpatory in all of their calls.  These examples are only a small subset of numerous instances the defense is aware of in which the government has not disseminated *Giglio* materials.

This case was set for trial to begin on July 10, 2017.  It was eventually continued on June 19, 2017, 21 days before that trial date.  The government was required to provide the *Giglio, Brady*, and Rule 16 materials for all of their trial witnesses by June 9, 2017.  Thus, it appears that the prosecution is withholding these materials despite a Court Order directing disclosure – and is doing so for improper tactical reasons.

Aside from ignoring the Court's Orders, the prosecution's actions in withholding *Giglio* and *Brady* materials could cause chaos shortly before trial.  If these materials are not produced soon, it will surely lead to preventable litigation on the eve of trial.  The government should comply with the Court's Orders and disclose all *Giglio*, *Brady* and Rule 16 materials now.

The defense requests that the Court issue an order requiring full disclosure by a reasonable and certain date to be set by the Court.  If the government fails to produce

4

*Giglio* or *Brady* materials as that date, any witness as to whom *Giglio* or *Brady* materials are not provided should be stricken as a trial witness.

### Consultation

Defendants Joe Gallegos, Allen Patterson, Christopher Chavez, Arturo Arnulfo Garcia, Mario Rodriguez, Mauricio Varela, Daniel Sanchez, Conrad Villegas, Anthony Ray Baca, Christopher Garcia, Carlos Herrera, Rudy Perez, Shauna Gutierrez and Brandy Rodriguez join this Motion.  Defendant Andrew Gallegos does not oppose this motion. Given the contentions set forth in the motion, concurrence wasn't sought from the government pursuant to D.N.M.LR-Cr 47.1.

Respectfully submitted this 15th day of September, 2017.

s/ Patrick J. Burke
Patrick J. Burke
Cori Harbour-Valdez
Attorneys for Edward Troup (3)

s/ Jim Castle
Jim Castle
Robert Cooper
Attorneys for Billy Garcia (5)

### CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2017, I e-filed the foregoing to the Clerk of the Court via the CM/ECF system which will send notification of such filing to counsel of record.

s/ Jennifer J. Feldman

DNM 956

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Action No. No. 15-CR-4268-JB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

ANGEL DELEON, et al

       Defendants.

---

**SUPPLEMENT TO MOTION TO COMPEL THE GOVERNMENT TO REVEAL THE
IDENTITY OF CERTAIN CONFIDENTIAL INFORMANTS REFERENCED IN
DISCOVERY MATERIALS (Doc. 1248)**

---

     Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez submit this supplement to their Motion to Compel the Government to Reveal the Identity of Certain Confidential Informants Referenced in Discovery Materials (Doc. 1248) based upon the positions of the parties.

1. Undersigned counsel neglected to indicate the position of all parties in the body of the motion to compel.

2. The government opposes this motion. Daniel Sanchez joins in this motion. All other defendants have no objection to the motion.

1

Submitted this 19th day of September 2017.


/s/ Jim Castle

Robert Cooper

Jim Castle

Attorneys for Billy Garcia (5)



CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


/s/ Jim Castle

DNM 958

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Action No. No. 15-CR-4268-JB

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ANGEL DELEON, et al

            Defendants.

---

## NOTICE OF WITHDRAWAL OF PREVIOUSLY FILED MOTION TO COMPEL THE GOVERNMENT TO REVEAL THE IDENTITY OF CERTAIN CONFIDENTIAL INFORMANTS REFERENCED IN DISCOVERY MATERIALS (DOC. NO. 1248)

---

        Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez hereby give notice that they are withdrawing the previously filed Motion to Compel (Doc. No. 1248) as the government has agreed to voluntarily reveal the identities of all informants requested, or indicate that the identity is no longer known, in letter form to counsel by the end of next week. The government does not object to this notice.

Submitted this 28th day of September 2017.

/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)

1

CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2017, I presented the foregoing to the Clerk of the
Court for filing and uploading to the CM/ECF system which will send notification of such
filing to counsel of record.


/s/ Jim Castle

DNM 960

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) CRIMINAL NO.   15-4268 JB |
| | ) |
| vs. | ) |
| | ) |
| **BILLY GARCIA, a/k/a "Wild Bill,"** | ) |
| **EDWARD TROUP, a/k/a "Huero Troup,"** | ) |
| | ) |
| Defendants. | ) |

## UNITED STATES' RESPONSE TO DEFENDANTS BILLY GARCIA AND EDWARD TROUP'S SECOND MOTION TO COMPEL DISCOVERY [1250]

Defendants Billy Garcia and Edward Troup's Second Motion to Compel Discovery [Doc. 1250] seeks production of documents not previously produced as outlined in Defendants' first Motion to Compel Discovery [Doc. 1061], the identities of certain confidential informants as referenced in the Defendants' Motion to Compel the Government to Reveal the Identity of Certain Confidential Informants Referenced in Discovery Materials [Doc. 869], and for the immediate production of *Giglio* and *Brady* materials.

The United States notes that Defendants Billy Garcia and Edward Troup's Second Motion to Compel Discovery [Doc. 1250] was not timely filed. Defendants' deadline to file Fed. R. Crim. P. 16 discovery motions was September 1, 2017. Defendants Billy Garcia and Edward Troup filed their Second Motion to Compel Discovery [Doc. 1250] on September 15, 2017. The United States agreed to a two-week extension in which to file Fed. R. Crim. P. 16 discovery motions to Defendants Rudy Perez and Anthony Ray Baca, it did not extend this two-week extension to any other defendants in the above cause number.

This criminal matter involves approximately 30 Defendants who have been indicted on charges of, among others, violent crimes in aid of racketeering, including charges that they conspired to murder and assault certain individuals. In pursuit of these illegal purposes and activities, Defendants Edward Troup and Billy Garcia murdered F.C. on or about March 26, 2001.  Billy Garcia also murdered R.G. on or about March 26, 2001, and Edward Troup murdered F.S. on or about June 17, 2007. The United States is alleging that Troup and Garcia murdered these individuals to increase or maintain their own standing within SNM.

Following the filing of the Superseding Indictment in this case, Defendants filed a Motion for Specific Discovery.  [Doc. 539].  The government filed its Response on July 5, 2016 [Doc. 613], and the Court held hearings that addressed discovery disclosures on October 4, 2016 and November 29, 2016. A Second Superseding Indictment was filed on March 9, 2017. Defendants filed their first Motion to Compel Discovery on April 6, 2017. [Doc. 1061]. The government filed its Response on April 28, 2017 [Doc. 1115], and the Court held a hearing that addressed discovery disclosures on May 19, 2017.

In the United's States Response to Defendants' Motion to Compel Discovery [Doc. 1115 and Doc. 1061], the government responded that it had produced seven (7) out of the eight (8) items of discovery the Defendants were seeking. The government requested the State Lab provide the underlying data behind the DNA analysis as it relates to Counts One and Two of the Second Superseding Indictment. [Doc. 949]. Upon receipt of the State Lab documents, the United States will disclose them promptly.

In response to Defendants' claim that the United States did not provide identities of Confidential Informants as requested in Defendants' Motion to Compel the Government to Reveal the Identity of Certain Confidential Informants Referenced in Discovery Materials [Doc.

869], the United States emailed to all Defendants Confidential Informant Disclosure letters on June 1, 2017, June 13, 2017 and July 13, 2017, which disclosed the identities of the Confidential Informants requested in Doc. 869.

The United States agrees to provide prison calls for Jerry Armenta, Jerry Montoya and Timothy Martinez while in custody at facilities operated by the New Mexico Corrections Department, from January 1, 2015 to present.  The United States will also disclose any "jail calls" in its possession. The United States recognizes that the Court found that NMCD materials are in the United States' control in this matter.  Thus, the United States does not have within its possession, custody and control all of the requested jail calls while the Defendants have been in the custody of the United States Marshals Service (USMS).  As such, Defendants will need to subpoena each detention center in order to obtain jail calls for cooperating Defendants and informants while in custody of the USMS.

The United States has already provided documents pertaining to the New Mexico Corrections Department Disciplinary Decisions for inmate misconduct incidents that occurred on January 9, 2017 and January 10, 2017, for inmates Benjamin Clark, Billy Cordova, Jerry Armenta and Javier Rubio.

The United States is mindful of its continuing duty to provide discovery under the Federal Rules of Criminal Procedure, which includes all exculpatory information, including information from individuals regardless whether they are going to be witnesses during proceedings. However, *Giglio* and its progeny govern impeachment information. Information used for impeachment necessarily requires a witness at trial. The United States' deadline to disclose its witness list is January 12, 2018. *See* Fourth Scheduling Order [Doc. 1205], filed July 7, 2017. Once the United States finalizes its witness list and decides which co-conspirators and

3

witnesses, including cooperating witnesses, will testify at trial, the United States will ensure that it will then provide to Defendants the *Giglio* material.

## **CONCLUSION**

For the foregoing reasons, the Court should grant in part and deny in part the motion to compel. The Court should deny the motion to compel the identity of certain confidential informants, because the United States agreed to, and did, provide the identities to the Defendants. The Court should grant in part and deny in part the motion to compel the jail calls of certain Defendants and informants, because the United States agrees to provide the calls in its possession, custody, and control, but the Defendants must subpoena the other jail calls for Defendants in the USMS's custody. Finally, the United States is in compliance with its *Giglio* obligations, and will continue to comply as it finalizes whom it will call as witnesses in this case.

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

***Electronically filed on 9/29/2017***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

_____/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                      NO.    15-CR-4268 JB

ANGEL DELEON, et al.,

       Defendants.

### OPPOSED MOTION FOR DESIGNATION OF EVIDENCE BY THE GOVERNMENT PURSUANT TO RULE 12(b)(4)(B)

COMES NOW Christopher Garcia, by and through counsel, Amy Sirignano of the Law

Office of Amy Sirignano, PC and Christopher W. Adams of the Law Office of Christopher W.

Adams, and Edward Troup, through co-counsel Cori Harbor-Valdez, and Patrick Burke, and

Atruro Arnulfo Garcia, through co-counsel Bill Blackburn, and Scott Davidson, and Carlos

Herrera, through co-counsel Michael Davis, and Carey Bahalla, and Daniel Sanchez, through co-

counsel Amy Jacks, and Richard Jewkes, and Chris Chavez, through co-counsel John Granberg,

and Orlando Mondragon, and Rudy Perez, through co-counsel Ryan Villa, and Justine Fox-

Young, and Billy Garcia, through co-counsel James Castle, and Robert Cooper, and Joe

Gallegos, through co-counsel Brock Benjamin and Rick Sindel, and Mario Rodriguez, through

co-counsel Santiago Hernandez, and Steven Potolsky, and Mauricio Varela, through co-counsel

Mary Stillinger, and Joe Spencer, moves this honorable Court, pursuant to Federal Rule of

Criminal Procedure 12(b)(4)(B), for an order requiring the government to immediately designate

any and all evidence that the government intends to use in the prosecution of Mr. C. Garcia, Mr.

Troup, Mr. A. Garcia, Mr. Herrera, Mr. Sanchez, Mr. Chavez, Mr. Perez, Mr. B. Garcia, Mr.

Gallegos, Mr. Rodriguez, and Mr. Varela. In support of his motion, the defendants states the following:

## FACTS AND PROCEDURAL BACKGROUND

In the Second Superseding Indictment, Mr. Garcia, along with multiple codefendants, is charged with being a member of the Syndicato de Nuevo Mexico ("SNM") gang (Doc. 949).

Defendants Angel Deleon, Joe Lawrence Gallegos, Edward Troup, a.k.a. "Huero Troup," Leonard Lujan, and Billy Garcia, a.k.a. "Wild Bill," are charged with Count 1 alleging Violent Crimes in Aid of Racketeering ("VICAR") (Murder), in violation of 18 U.S.C. § 1959(a)(1), and Aid and Abetting, in violation of 18 U.S.C. § 2. *Id*. Defendants Leonard Lujan, Billy Garcia, Eugene Martinez, a.k.a. "Little Guero," Allen Patterson, and Christopher Chavez, a.k.a. "Critter," are charged with Count 2 alleging Violent Crimes in Aid of Racketeering ("VICAR") (Murder), in violation of 18 U.S.C. § 1959(a)(1), and Aid and Abetting, in violation of 18 U.S.C. § 2. *Id*.

Defendants Javier Alonso, a.k.a. "Wineo," Edward Troup, Arturo Arnulfo Garcia, a.k.a. "Shotgun," Benjamin Clark, a.k.a. "Cyclone," and Ruben Hernandez are charged in Count 3 alleging Violent Crimes in Aid of Racketeering ("VICAR") (Murder), in violation of 18 U.S.C. § 1959(a)(1), and Aid and Abetting, in violation of 18 U.S.C. § 2. *Id*.

Defendants Joe Lawrence Gallegos and Andrew Gallegos, a.k.a. "Smiley," are charged in Count 4: alleging Violent Crimes in Aid of Racketeering ("VICAR") (Conspiracy to Murder), in violation of 18 U.S.C. § 1959(a)(5); and Count 5 alleging Violent Crimes in Aid of Racketeering ("VICAR") (Murder), in violation of 18 U.S.C. § 1959(a)(1), and Aid and Abetting, in violation of 18 U.S.C. § 2. *Id*.

2

Defendants Jerry Armenta, a.k.a. "Creeper," Jerry Montoya, a.k.a. "JR," a.k.a. "Plaz,"

Mario Rodriguez, a.k.a. "Blue," Timothy Martinez, a.k.a. "Red," Anthony Ray Baca, a.k.a.

"Pup," Mauricio Varela, a.k.a. "Archie," a.k.a. "Hog Nuts," Daniel Sanchez, a.k.a. "Dan Dan,"

Carlos Herrera, a.k.a. "Lazy," and Rudy Perez, a.k.a. "Ru Dog," are charged in Count 6 alleging

Violent Crimes in Aid Racketeering ("VICAR") (Conspiracy to Murder), in violation of 18

U.S.C. § 1959(a)(5); and Count 7 alleging Violent Crimes in Aid of Racketeering ("VICAR")

(Murder), in violation of 18 U.S.C. § 1959(a)(1), and Aid and Abetting, in violation of 18 U.S.C.

§ 2. *Id*.

Defendants Anthony Ray Baca, Gerald Archuleta, a.k.a. "Styx," a.k.a. "Grandma," and

Conrad Villegas, a.k.a. "Chitmon," are charged in Count 8 alleging Violent Crimes in Aid of

Racketeering ("VICAR") (Conspiracy to Commit Assault Resulting in Serious Bodily Injury), in

violation of 18 U.S.C. § 1959(a)(6). *Id*.

Defendants Anthony Ray Baca, Roy Martinez, a.k.a. "Shadow," and Robert Martinez,

a.k.a. "Baby Rob," are charged in Count 9 alleging Violent Crimes in Aid of Racketeering

("VICAR") (Conspiracy to Murder), in violation of 18 U.S.C. § 1959(a)(5). *Id*.

In Count 10, defendants Anthony Ray Baca, Roy Martinez, and Christopher Garcia are

alleged to have committed Violent Crimes in Aid of Racketeering ("VICAR") (Conspiracy to

Murder), in Violation of 18 U.S.C. § 1959 (a)(5). *Id*.  In Counts 11 and 12, Christopher Garcia

was charged with Count 11: Felon in Possession of a Firearm, in violation of 18 U.S.C. §

922(g)(1); and Count 12: Using and Carry a Firearm During and in Relation to a Crime of

Violence, in violation of 18 U.S.C. § 924(c). *Id*.

DNM 967

In Count 13, Joe Lawrence Gallegos is alleged to have committed Violent Crimes in Aid of Racketeering ("VICAR") (Assault with Dangerous Weapon), in violation of 18 U.S.C. § 1959(a)(3), and Aid and Abetting, in violation of 18 U.S.C. § 2. *Id.*

Defendants Joe Lawrence Gallegos, Santo Gonzalez, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez are charged in Count 14: alleging Violent Crimes in Aid of Racketeering ("VICAR") (Conspiracy to Murder), in violation of 18 U.S.C. § 1959(a)(5); and Count 15: alleging Violent Crimes in Aid of Racketeering ("VICAR") (Attempted Murder, Assault Resulting in Serious Bodily Injury, and Assault with Dangerous Weapon), in violation of 18 U.S.C. § 1959(a)(3), and Aid and Abetting, in violation of 18 U.S.C. § 2; and Count 16: alleging Witness Tampering, in violation of 18 U.S.C. § 1512, and Aid and Abetting, in violation 18 U.S.C. § 2. *Id.*

This case was ordered complex on January 11, 2016 (Docs. 210, 211). This case is related to 15-CR-4275 (Mr. Garcia signed a plea agreement on June 26, 2017, Doc. 294, case 15-CR-4275) and 16-CR-1613.

The discovery provided to date has been voluminous but remains incomplete by the government. Mr. C. Garcia, joined by multiple defendants, filed additional discovery requests pursuant to Federal Rule of Criminal Procedure 16 on September 19 and 22, 2017 (Docs. 1267, 1270).

Mr. C. Garcia has informally and verbally requested that the government provide a specific designation of evidence that it intends to use at trial in compliance with the requirements of Rule 12(b)(4)(B).  The government has not yet complied with the verbal request, or some of the Court's orders regarding discovery (Doc. 203, Tr. 5/9/17, p. 1-9; Doc. 215, p. 1-9).

DNM 968

Due to the nature of this motion, the defense assumes the government opposes this motion.

## **LEGAL ARGUMENT**

In order to expedite preparation for trial and to avoid necessary interruptions during trial to hear suppression or exclusion issues, Rule 12(b)(4)(B) of the Federal Rules of Criminal Procedure provides for the specific designation of evidence that the government intends to use at trial:

> (4) *Notice of the Government's Intent to Use Evidence* . . . .
> **(B)** *At the Defendant's Request.* At the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence- in- chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

Fed. R. Crim. P. 12(b)(4)(B).

By way of this motion, Mr. C. Garcia and co-defendants Edward Troup, Atruro Arnulfo Garcia, Carlos Herrera, Daniel Sanchez, Chris Chavez, Rudy Perez, Billy Garcia, Joe Gallegos, Mario Rodriguez, and Mauricio Varela make this formal request required to trigger Rule 12(b)(4)(B) notice obligations by the government for all Counts of the Second Superseding Indictment.  (Doc. 949).  Rule 12(b)(4)(B) is a procedural mechanism that insures the defendants know of the government's intent to use certain evidence, disclosed under Rule 16, which the defendant may want to challenge its use or move for its suppression. *See* Fed. R. Crim. P. 12, advisory committee notes, 1974 amendment, subdivision (d).[1]  Considering the complexity of,

---

[1] The Advisory Committee's Notes addresses Rule 12(d) prior to the 2002 restyling of the Criminal Rule. *See* Fed. R. Crim. P. 12, advisory committee's notes 2002 amendment. Rule 12(b)(4) is composed of former Rule 12(d) as of 2002. *See id.*

DNM 969

the number of parties in this case, the amount of evidence that has been disclosed and still needs

to be disclosed by the government, Rule 12(b)(4)(B) is an important procedural mechanism for

the defendants, the government, and the Court.  Rule 12(b)(4)(B) can save the parties time and

resources from needlessly litigating unnecessary motions to suppress evidence the government

does not intend to use in its case-in-chief. *See United States v. Lujan*, 530 F. Supp. 2d 1224, 1246

(D.N.M. 2008).[2]

Pursuant to Rule 12, the defendants request government notice of its intent to use

evidence disclosed under Rule 16 to avoid the defense making unnecessary motions to suppress

evidence the government does not intend to use. *See* Fed. R. Crim. P. 12 advisory committee

notes, 1974 amendment, subdivision (d).[3] Mr. C. Garcia, Mr. Troup, Mr. A. Garcia, Mr. Herrera,

Mr. Sanchez, Mr. Chavez, Mr. Perez, Mr. B. Garcia, Mr. Gallegos, Mr. Rodriguez, and Mr.

Varela ask the Court to order the government to designate any evidence disclosed under Rule 16

that may arguably be subject to challenge or suppression. *See Lujan*, 530 F. Supp. 2d at 1244

("The rule provides a mechanism to ensure that the defendant knows of the government's

intention to use evidence to which the defendant may want to object.") (citing Fed. R. Crim. P.

12, advisory committee notes, 1974 amendment). By such disclosure, the defendants will be

alerted to the necessity, if it exists, of making an appropriate motion to challenge or suppress.

---

[2] "While there are few appellate cases on point, many district courts have confronted the tension
between Rules 12 and 16." *United States v. Jacobs*, 650 F. Supp. 2d 160, 171 (D. Conn. 2009);
*see also Lujan*, 530 F. Supp. 2d at 1244 (noting few circuits have addressed Rule 12(b)(4)(B)
and turned to the First Circuit's *United States v. de la Cruz-Paulino*, 61 F.3d 986, 993 (1st Cir.
1995), as being the most on point case).

[3] The Committee notes that the government may not face automatic exclusion of evidence it did
not deliberately fail to give notice, but failure to comply with the duty to notice the defense could
lead to the suppression of evidence. *See* Fed. R. Crim. P. 12, advisory committee's notes 1974
amendment, subdivision (d).

*See id*. This motion requests notice of evidence reasonably subject to challenge or suppression. If a proper argument can be made, counsel should be entitled to the opportunity to make it. Following the defendant's 12(b)(4)(B) request, the government "must notify the defendant of its intention to use certain evidence in order to give the defendant an opportunity before trial to move to suppress that evidence." *See* Fed. R. Crim. P. 12, advisory committee notes, 1975 amendment, subdivision (d); *see also United States v. Anderson*, 416 F. Supp. 2d 110, 112 (D.D.C. 2006) (noting the mandatory nature of Rule 12 triggered at a defendant's request).

As of the date of the filing of this motion, the government has not satisfied its Rule 12(b)(4)(B) notice obligations. First, the government has yet to satisfy it disclosure obligations under Rule 16. *See* Docs. 1270, 1267, 1253, 1061, 1037, 678, 668, 539, 483 (requesting extensive disclosure of evidence by the government pursuant to Rule 16). Should the government complete its disclosure obligations under Rule 16, it will have a continuing duty to notice the defendants under Rule 12(b)(4)(B). *See Lujan*, 530 F. Supp. 2d at 1246 (stating "[m]erely relying on an open-file policy is not sufficient" to satisfy Rule 12 requirements) (citing Fed. R. Crim. P. 12, advisory committee notes, 1974 amendment) (citing also *United States v. de la Cruz-Paulino*, 61 F.3d 986, 993 (1st Cir. 1995)).

The amount of discovery in this case is too voluminous that is impractical for the government to claim it has met its duty to notice to defendants by merely disclosing evidence to the defense.[4] *See id*. Given the amount of discovery currently disclosed in this case, the defendants are the dark as to exactly what evidence the government intends to use in its case-in-

---

[4] The Coordinating Discovery, Russ Aoki estimates that as of September 28, 2017, the government has disclosed approximately 2,824 (1,111 are Bates stamped) .pdf files, 4,939 audio files (not Bates numbered) and 38,963 .jpeg files.

chief. *See Cruz-Paulino*, 61 F. 3d at 993 (quoting *United States v. Kelley*, 120 F.R.D. 103, 107

(E.D. Wis. 1988)).  The defendants require specific notice to effectively bring suppression

motions before trial, as required by Federal Rule of Criminal Procedure 12(b)(3). *See id*. at 994-5

(recognizing a defendant may not be able to immediately rebut evidence that was noticed by the

government and stating it is within the district court's discretion to grant the defendant a

continuance "rather than allowing the government effectively to sandbag the defendant by

introducing previously undesignated evidence").

The defendants, to meet their obligations under Rule 12(b)(3), will have to unknowingly

file unnecessary motions to suppress without the government's notice and identification that it

does not intend to use certain evidence. Filing of such motions will require the Court and parties

to litigate these motions, wasting judicial resources on evidence the government does not intend

to use. *See Lujan*, 530 F. Supp. 2d at 1246.[5] Requiring the government to notice the defendants

under Rule 12(b)(4)((B) will help preserve the integrity of the trial by not interrupting it with

suppression motions. *See Cruz-Paulino*, 61 F.3d at 993; *see also United States v. Yonis Muhudin

Ishak*, 277 F.R.D. 156, 159-60 (E.D. Va. 2011).

Mr. C. Garcia and defendants respectfully also ask that the Court to order the

government to designate any evidence that it reasonably plans to offer in rebuttal.  Although

Rule 12(b)(4)(B) speaks only of evidence that the government intends to use in its case-in-chief,

---

[5] The court in *Lujan* ordered the United States to notify the defense immediately of evidence it
knew it was not going to introduce, with a continuing obligation to supplement, specifically
listing: "any evidence from a particular warrantless search or seizure; search or seizure based on
a warrant; surveillance; interview; beeper or other tracking device; mail cover; display of any
defendant's photograph, likeness, image, or voice-recording". 530 F. Supp. 2d at 1246; *see also
United States v. Jacobs*, 650 F. Supp. 2d 160, 172 (D. Conn. 2009). The Court stated that such
notice would conserve court resources by "avoiding litigation on irrelevant searches or
interviews," but not requiring the United States to disclose its trial strategy by being forced to
specify particular pieces of evidence. *See Lujan*, 530 F. Supp. 2d at 1246.

8

federal courts have the inherent authority to require the government to give notice of such evidence that the government intends to use in rebuttal or otherwise. *See Anderson*, 416 F. Supp. 2d at 110 (noting the court would not prevent the government from using evidence it had not noticed under Rule 12 for purposes of rebuttal, impeachment, and refreshing the witness's recollection as long as the use of the evidence was not planned in advance of trial); *see also Lujan*, 530 F. Supp. 2d at 1247.

Furthermore, the defendants ask that the Court order the government to designate the material with specificity so that Mr. C. Garcia, Mr. Troup, Mr. A. Garcia, Mr. Herrera, Mr. Sanchez, Mr. Chavez, Mr. Perez, Mr. B. Garcia, Mr. Gallegos, Mr. Rodriguez, and Mr. Varela may easily identify the material. *United States v. Yonis Muhudin Ishak*, 277 F.R.D. 156, 159-60 (E.D. Va. 2011). It is not the intent or purpose of Rule 12(b)(4)(B) that the government simply reply that its Rule 12(b)(4)(B) evidence is contained "somewhere" within the mass of discovery items provided under Rule 16. *See Lujan*, 530 F. Supp. 2d at 1246 ("Merely relying on an open-file policy is not sufficient . . . [t]he purpose of the rule is not to reveal the government's trial strategy, but merely to provide the defendant with sufficient information to file the necessary suppression motions.") (citing *United States. v. de la Cruz-Paulino*, 61 F.3d 986, 994 (1st Cir. 1995)) (citing also Fed. R. Crim. P. 12, advisory committee notes, 1974 amendment)); *see also Yonis Muhudin Ishak*, 277 F.R.D. at 158. The government could notice the defendants with a good faith estimate of pieces of evidence that, if identified with specificity, would disclose the government's trial strategy. *See Jacobs*, 650 F. Supp. 2d at 172.

**WHEREFORE**, for the foregoing reasons, Mr. C. Garcia, Mr. Troup, Mr. A. Garcia, Mr. Herrera, Mr. Sanchez, Mr. Chavez, Mr. Perez, Mr. B. Garcia, Mr. Gallegos, Mr. Rodriguez, and Mr. Varela, jointly respectfully request that this Court grant the relief requested herein, and order

DNM 973

the prosecution to designate, immediately and with specificity, all evidence that it intends to use in the trial of this case.

Respectfully Submitted,


s/ *Amy Sirignano, Esq.*
**Amy Sirignano**
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE, #250
Albuquerque, NM 87109
505-242-2770
505-242-2774 facsimile
amy@abqnmlaw.com


s/ *Christopher W. Adams*
**Christopher W Adams**
102 Broad Street Suite C
Charleston, SC 29401
(843) 577-2153
Fax: (877) 883-9114
Email: chris@chrisadamslaw.com


Co-counsel for Christopher Garcia

DNM 974

/s

**Cori Ann Harbour-Valdez**
The Harbour Law Firm, PC
PO Box 13268
El Paso, TX 79913
915-544-7600
Fax: 915-975-8036
Email: cori@harbourlaw.net


/s

**Patrick J. Burke**
Patrick J. Burke, PC
999 18th Street, Suite 2055
Denver, CO 80202
303-825-3050
Fax: 303-825-2992
Email: patrick-j-burke@msn.com


Co-counsel for Edward Troup




/s

**Billy R. Blackburn**
1011 Lomas Blvd. NW
Albuquerque, NM 87102
505-242-1600
Fax: 505-243-6279
Email: Billy@BBlackburnlaw.com


/s

**Scott Moran Davidson**
1011 Lomas Boulevard NW
Albuquerque, NM 87102
505-255-9084
Fax: 505-243-6279
Email: scott@justappeals.net


Co-counsel Arturo Arnulfo Garcia

_____/s_____

**Michael V Davis**

Michael V. Davis, Attorney & Counselor at Law, P.C.

Post Office Box 3748

3949 Corrales Road, Suite 130

Corrales, NM 87048

(505) 242-5979

Fax: 505-899-3103

Email: mdavis@swcp.com


_____/s_____

**Carey Corlew Bhalla**

Law Office of Carey C. Bhalla LLC

925Luna Cir NW

Albuquerque, NM 87102

505-508-5589

Email: carey@bhallalaw.com


Co-counsel for Carlos Herrera


_____/s_____

**Amy E. Jacks**

Law Office of Amy E. Jacks

315 E. 8th St. #801

Los Angeles, CA 90014

213-489-9025

Fax: 213-489-9027

Email: amyejacks@sbcglobal.net


_____/s_____

**Richard Jewkes**

Richard Jewkes

701 N. Saint Vrain St

El Paso, TX 79902

(915) 534-7400

Fax: (915)534-7407

Email: richardjewkes@sbcglobal.net


Co-counsel for Daniel Sanchez

DNM 976

_____/s_____

**Orlando Mondragon**
1028 Rio Grande
El Paso, TX 79902
915-566-8181
Fax: 915-566-9696
Email: mondragonom@gmail.com


_____/s_____

**John L. Granberg**
Granberg Law Office
310 N. Mesa
Suite 424
El Paso, TX 79901
915-543-9000
Fax: 915-543-3201
Email: granberglawoffice@yahoo.com


Co-counsel for Christopher Chavez


_____/s_____

**Justine Fox-Young**
1903 Wyoming Blvd. NE Ste. B
Albuquerque, NM 87112
505-796-8268
Email: justine@foxyounglaw.com

_____/s_____

**Ryan J Villa**
2501 Rio Grande Blvd NW Suite A
Albuquerque, NM 87104
(505) 639-5709
Fax: 505-433-5812
Email: ryan@rjvlawfirm.com


Co-counsel for Rudy Perez

DNM 977

_____/s_____

**James A. Castle**
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206
(303) 675-0500
Fax: (303) 329-5500
Email: JCastlelaw@gmail.com


_____/s_____

**Robert R. Cooper**
1011 Lomas Blvd NW
Albuquerque, NM 87102
505 842-8494
Fax: (505) 243-6279
Email: bob@rrcooper.com


Co-counsel for Billy Garcia


_____/s_____

**Brock Benjamin**
Benjamin Law Firm
747 E. San Antonio, Suite 203
El Paso, TX 79901
(915) 412-5858
Fax: (915) 503-2224
Email: brock@brockmorganbenjamin.com


_____/s_____

**Richard Sindel**
Sindel, Sindel & Noble, P.C.
8000 Maryland Avenue, Suite 350
Clayton, MO 63105
(314) 721-6040
Fax: (314) 721-8545
Email: rsindel@sindellaw.com


Co-counsel for Joe Lawrence Gallegos

DNM 978

/s
**Santiago David Hernandez**
Law Office of Santiago D. Hernandez
1219 E. Missouri, El Paso, TX 79902
915-351-4300
Fax: 915-351-4372
Email: santilawyer@gmail.com


/s
**Steven M Potolsky**
PO Box 50973, Jacksonville Beach, FL 32250
305-335-5539
Fax: 305-358-5917
Email: stevepo@bellsouth.net

Co-counsel for Mario Rodriguez


/s
**Mary Stillinger**
4911 Alameda Ave, El Paso, TX 79905
Phone:(915)775-0705
Fax:(915)886-7178
Email: stillingerlaw@sbcglobal.net

/s
**Michael David Lindsey**
David Lindsey, Attorney
7887 East Bellview Avenue Suite 1100,
Engelwood, CO 80111
Phone: 303-228-2270
Fax: 303-228-2271
Email: david@mdavidlindsey.com


Co-counsel for Mauricio Varela

DNM 979

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of this pleading was
served on opposing counsel via the CM/ECF
system on this 2nd day of October, 2017.

   /s
   ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Amy Sirignano, Esq.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | )    CRIMINAL NO. 15-4268 JB |
| | ) |
| vs. | ) |
| | ) |
| **ANGEL DELEON, et al.,** | ) |
| | ) |
| Defendants. | ) |

## UNITED STATES' RESPONSE TO DEFENDANT DANIEL SANCHEZ'S MOTION TO COMPEL SPECIFIC DISCOVERY [1253]

Defendant Daniel Sanchez's Motion to Compel Specific Discovery [Doc. 1253] ("Motion to Compel") requests disclosure of twelve (12) categories of discovery, which the United States has already produced, will produce, or is not required to produce under Federal Rule of Criminal Procedure 16, Jencks, *Giglio*, or *Brady*. Defendant's first request is for materials related to the disciplinary hearings conducted in reference to the Molina murder.  Defendant's second request is for an inspection of a transport vehicle and trailer similar to the one used to transport inmates from PNM to SNMCF on March 6, 2014.  Defendant's third request is for audio and/or video recordings and/or photographs depicting visitations for cooperators who were the subject of NMCD disciplinary investigations, as well as additional statements regarding the visitations.  Defendant's fourth request is for identification of visiting areas utilized in Defendant's third request and the ability to photograph those areas, as well as surveillance cameras and images and the location of areas designated for use by corrections officers to monitor the inmate visitations.  Defendant's fifth request is for photographs, digital, video or other visual content from cellular telephones used by government informants and/or cooperators.  Defendant's sixth request is for video and other recordings from the scene of the Molina murder on March 7, 2014.  Defendant's seventh request

is for a diagram of SNMCF pods depicting the location of video and other recording devices as they existed on March 7, 2014, as well as maintenance records for the devices. Defendant's eighth request is for discovery related to Lupe Urquizo's alleged obstruction of correctional officers and/or assault on inmate G.C. on December 29, 2016. Defendant's ninth request is for the results of examinations of cooperating witnesses' discovery tablets that were alleged to have been tampered with or misused. Defendant's tenth request is for access to ELSUR devices for the purpose of examining the metadata stored on them. Defendant's eleventh request is for discovery related to the transfer of inmates Lupe Urquizo, Mauricio Varela, and Raynaldo Enriquez to the SNMCF on March 6, 2014. Defendant's twelfth request is for documents containing personal identifying information for Herman Gonzales.

The United States will coordinate with the STIU and FBI prior to the hearing to determine whether these materials exist and disclose what has not been disclosed. The United States will coordinate with the New Mexico Department of Corrections ("NMCD") prior to the hearing, and will disclose requested materials to the extent they are discoverable. The United States respectfully requests the Court deny Defendant's Motion to Compel to the extent the United States has not agreed to disclosure.

## **RELEVANT LAW**

### A. Law regarding discovery under **Federal Rule of Criminal Procedure 16**

Federal Rule of Criminal Procedure 16 is the primary procedural vehicle for discovery in criminal cases. Under the rule, a defendant is entitled to discovery of *his own* oral statements made "in response to interrogation by a person the defendant *knew was a government agent* if the government intends to use the statement at trial." Fed. R. Crim. P. 16(a)(1)(A) (emphasis added). A defendant is also entitled to discovery of *his own* written or recorded statements if the statement

is "within the government's possession, custody, or control" and the "defendant made the statement in response to interrogation by a person the defendant knew was a government agent." Fed. R. Crim. P. 16(a)(1)(b) (emphasis added). Further, "upon a defendant's request, the government must permit the defendant to inspect" documents and other tangible objects that are "within the government's possession, custody, or control" and that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E).

Although the language of Rule 16 is permissive, the scope of discovery under the rule is governed by certain limitations. For example, this Court has repeatedly emphasized that rule 16 does not permit criminal defendants to "embark on a 'broad or blind fishing expedition among documents possessed by the government.'" *United States v. Badonie*, No. CR 03-2062 JB, 2005 WL 2312482, at *2 (D.N.M. 2005) (Browning, J.) (quoting *Jencks v. United States*, 353 U.S. 657, 667 (1957)). *See also United States v. Roybal*, 46 F. Supp. 3d 1127, 1145 (D.N.M. 2014); *United States v. Rodella*, 2015 U.S. Dist. LEXIS 20704, at *41 (D.N.M. 2015); *United States v. Burton*, 81 F. Supp. 3d 1229, at 1244 (D.N.M. 2015). Instead, "[a] defendant must make a prima facie showing of materiality before he is entitled to obtain requested discovery," and "[n]either a general description of the information sought nor conclusory allegations of materiality suffice." *United States v. Lujan*, 530 F. Supp. 2d 1224, 1234 (D.N.M. 2008) (Brack, J.) (quoting *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir.1990)). This Court has also held that "rule 16 'does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.'" *Badonie*, 2005 WL 2312482, at *2 (quoting Fed. R. Crim. P. 16(a)(2)). General requests and requests for materials that do not "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting

3

impeachment or rebuttal" are similarly not subject to disclosure under the rule. *Lujan*, 530 F. Supp. 2d at 1234 (citing *Mandel*, 914 F. Supp. 2d at 1219; *United States v. Jordan*, 316 F.3d 1215, 1250 (11th Cir. 2003)).

## B.  Law regarding disclosures under *Brady* and *Giglio*

Aside from the criminal procedural rules, the United States is also subject to disclosure obligations under the Due Process clause of the United States Constitution. Due Process requires disclosure of any evidence the United States has in its possession that is "material" to the guilt or punishment of a criminal defendant, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), or that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. *Giglio v. United States*, 405 U.S. 150 (1972). Numerous courts, including this one, have found the United States' duty does not grant a criminal defendant unfettered access to Government documents based on the mere probability of some benefit to the defendant. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987); *Smith v. Sec. Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995); *United States v. Baca*, No. CR 16-1613 JB, 2016 WL 6404772, at *24 (D.N.M. Oct. 20, 2016) (Browning, J.). Indeed, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of trial does not establish 'materiality' in the constitutional sense." *United States v. Hykes*, No. CR 15-4299 JB, 2016 WL 1730125, at *6 (D.N.M. Apr. 11, 2016) (Browning, J.) (quoting *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994)). The Supreme Court explained, "the touchstone of materiality" under *Brady* "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514, U.S. 419, 438 (1995). Because "the individual prosecutor has a duty to learn of any favorable evidence known to others

4

acting on the government's behalf in the case," *id.* at 437-438, "[t]he court should rely on the government's representations of its compliance with *Brady* unless the defendant shows cause to question them and the materiality of the evidence sought." *Lujan*, 530 F. Supp. 2d at 1256 (citing *United States v. McVeigh,* 923 F. Supp. 1310, 1314 (D. Colo. 1996)).

### C.  Law regarding disclosure under Jencks

In addition to its Constitutional disclosure obligations, Title 18 U.S.C. § 3500 ("Jencks"), requires the United States to produce statements made by a government witness or prospective government witness (other than the defendant), *after* that witness testifies at trial. Although "[t]he district court may not require the government to produce Jencks material relating to one of its witnesses until after the witness has testified," "some courts have ordered early disclosure." *Lujan*, 530 F. Supp. 2d at 1254-55 (quoting *United States v. Lewis,* 35 F.3d 148, 151 (4th Cir. 1994). In such instances, early disclosure has been considered a "salutary practice" typically arising in cases where the parties seek to avoid interruptions, and where the government has consented to the early disclosure. *Id.* at 1255 (citing *United States v. Beckford*, 962 F. Supp. 780, 795 (E.D. Va. 1997)).

### ANALYSIS

### A.  Request for materials related to the disciplinary hearings conducted in reference to the Molina murder

Defendant's first request seeks discovery of any and all disciplinary hearing recordings conducted in reference to the Javier Molina murder; copies of witness statements presented to the hearing officer; confidential information presented by or to any hearing officer; copies of motions presented to the hearing officer; and copies of questions submitted to the hearing officer by the subjects or their legal representatives.  The United States will confer with representatives from the NMCD and disclose the materials it receives in response to this request.  Confidential materials may be disclosed pursuant to a protective order.

5

**B.  Request to inspect and photograph a transport vehicle and trailer similar to those used to transport inmates from PNM to SNMCF on March 6, 2014.**

Defendant's second request involves sensitive information related to the safe transportation of prisoners in the NMCD system.  However, NMCD officials believe they have located the vehicle used to transport the prisoners in question on March 6, 2014, and will make it available for inspection since it is no longer a vehicle used to transport prisoners.  Prison officials will also attempt to find a similar trailer to the one that was used on that occasion for inspection by the defense.

**C.  Request for audio and/or video recordings depicting visitations for inmates Billy Cordova, Javier Rubio, Benjamin Clark, Jerry Armenta, and/or any other government informant or cooperating witness subject to NMCD disciplinary misconduct investigations, as well as statements regarding those visits.**

The United States has disclosed reports related to these incidents.  The videos of the visitations will be available for review at the United States Attorney's Office.

**D.  Identification of the "visiting areas" utilized by informants and/or cooperators listed in (C) above, as well as access and the ability to photograph the visiting areas and surveillance cameras in the vicinity of those areas, and the location of corrections officers charged with monitoring the visiting areas.**

Defense counsel will be permitted to view the visiting areas utilized by the informants and/or cooperators.  NMCD officials have stated that monitoring of the visitation areas was conducted from a separate area and not in "real time."  Counsel may view the monitors, but only to the extent the monitors do not reveal other sensitive areas or activities taking place at the facility.

**E.  Request for any and all photographs, and digital, video, or other visual content from cellular telephones provided to any government informant and/or cooperator.**

The United States disclosed these materials on March 25, 2016 and June 16, 2017.  There are two images that were retrieved from Eric Duran's phone which will be disclosed to the discovery coordinator in the next round of disclosures.  There was no "phone dump" of Mario

6

Montoya's phone based on the damaged condition of the phone when the FBI retrieved it from

him.

**F. Request for complete and unredacted copies of recordings from the scene of the Molina murder on March 7, 2014.**

The United States has disclosed the requested information.  However, out of an abundance of

caution, the United States has made an additional request of the NMCD for this information and

will disclose additional materials that have not already been disclosed.

**G. Request for a diagram of SNMCF Unit 1A blue and yellow pods depicting the location of recording devices as they existed on March 7, 2014 and maintenance records for the devices from January 1, 2014 through March 10, 2014.**

It is unclear whether this information exists.  The NMCD has agreed to disclose these materials

to the United States to the extent they exist for disclosure to the defense, subject to the Court's

protective order.

**H. Request for reports and other discovery related to inmate Lupe Urquizo's alleged obstruction of correctional officers and/or assault on inmate G.C. on December 29, 2016.**

The United States agrees to disclose the materials it receives from the NMCD related to this

event.

**I. Request for results of the government's examination of the tablets of cooperating witnesses and/or government informants suspected to be involved in efforts to misuse the tablets.**

The United States has received permission from some of the cooperators for an inspection of

their tablets and is waiting for the positions of the remaining cooperators.  The United States will

make an assessment of the nature and scope of any misuse of the tablets and make disclosures

consistent with its *Brady* and *Giglio* obligations at the appropriate time following the inspections.

**J. Request for access to ELSUR devices for the purpose of examining the metadata stored on them.**

DNM 987

The metadata from these devices was disclosed on June 16, 2017.  The United States objects to the disclosure of the devices themselves because this request fails to find support under the law enforcement privilege and constitutes an impermissible fishing expedition. "The 'law enforcement privilege' is the overarching name given to a bundle of privileges that relate to preserving the confidentiality of a law enforcement investigation." *Mohammed v. Holder*, 2014 U.S. Dist. LEXIS 35297, at *12-13 (D. Colo. Mar. 17, 2014) (citing *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010)). "Materials that reveal: (i) law enforcement techniques and procedures; (ii) would undermine the confidentiality of sources; (iii) information that would endanger law enforcement personnel, witnesses, or the privacy of individuals involved in an investigation; or (iv) information that would otherwise interfere with an investigation, may all be subject to the privilege." *Id.* To invoke the privilege, the government must show that disclosure "could reasonably be expected" to interfere with enforcement proceedings. *National Union Fire Ins. Co. v. FDIC*, 1995 U.S. LEXIS 3110, at *10 (D. Kan. Mar. 7, 1995).  "An excellent example in this case is information relating to the means by which a recording device is secured on an informant." *Morrissey v. City of New York*, 1997 U.S. Dist. LEXIS 2660, *12-13 (S.D.N.Y. Mar. 12, 1997).

The dangerous consequences of Defendant's request for disclosure are far reaching.  If the Government discloses the recording devices used to capture conversations like those between the defendants and any confidential informants, other defendants will become alert to law enforcement practices and techniques rendering the benefit of any of these techniques useless in this and other investigations. Moreover, disclosure of the means and methods of recorded conversations with confidential informants would create an irreversible chilling effect for future cooperators.

Defendant should not be permitted to embark on a fishing expedition of the Government's means and methods of investigation to search for any evidence that could conceivably benefit Defendant. This Court has foreclosed such requests, holding: the Constitution "does not grant criminal defendants the right to embark on a 'broad or blind fishing expedition among documents possessed by the Government,'" and a "defendant's mere allegation that the requested information might be material does not entitle him to an unsupervised search of the government's files." *See Rodella*, 2015 U.S. Dist. LEXIS 20704, at *65-66 (citing *United States v. Mayes*, 917 F.3d 457, 461 (10th Cir. 1990)). Finally, the devices are proprietary. The FBI would likely send a representative to argue against disclosure or examination of the devices should the Court seriously consider this request.

This issue was previously briefed and argued to the Court. The United States continues to object to the examination of the ELSUR devices by the defense. In the absence of any claim that the recordings do not fairly and accurately represent the statements made to a confidential informant or informants, Defendant should not be permitted to embark on a fishing expedition of the Government's means and methods of investigation to search for any evidence that could conceivably benefit Defendant. Accordingly, the Court should deny Defendant's request.

**K. Request for property inventory lists for PNM and SNMCF and receipts for confiscated property completed on or about March 6, 2014 for inmates Lupe Urquizo, Mauricio Varela, and Raynaldo Enriquez.**

The requested items were the subject of an IPRA request to the NMCD. The NMCD turned over to the defense the materials it had in its possession and that were responsive to the request. Those items will be redisclosed to the discovery coordinator for disclosure to the rest of the defendants.

**L. Request for a document containing personal identifying information for former NMCD employee Herman Gonzales**

According to NMCD officials, Mr. Gonzales is still employed by the department.  The NMCD will inquire if he is interested in being interviewed by the defense.  If so, efforts will be made to connect him with the defense.

### CONCLUSION

For the foregoing reasons, the United States respectfully requests the Court deny Defendant Daniel Sanchez's Motion to Compel Specific Discovery to the extent the United States opposes disclosure.

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney


*Electronically filed on 10/3/17*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304


I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.


_____/s/_____
RANDY M. CASTELLANO
Assistant United States Attorney

DNM 990

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                          15-CR-4268 JB

ANDREW GALLEGOS,

        Defendant.

### NOTICE OF JOINDER BY ANDREW GALLEGOS PURSUANT TO RULE 16

COMES NOW, Defendant, Andrew Gallegos, by and through his attorney of record, Donavon A. Roberts, Esq., and hereby submits this Notice to notify the Court and counsel for all parties that he joins in the Co-Defendants' *Opposed Motion for Designation of Evidence by the Government Pursuant to Rule 12(b)(4)(B)* [Doc. 1281].

Respectfully Submitted,

*/s/ Donavon A. Roberts*
Donavon A. Roberts
P.O. Box 36344
Albuquerque, NM 87176
(505) 506-3749
(505) 503-8405 facsimile
ladar170@aim.com

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system on, this 5th day of October, 2017, which caused counsel of record for the government, co-defendants, and all other parties to receive a copy of this Motion electronically.

*/s/ Donavon A. Roberts*
Donavon A. Roberts

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,

       Plaintiff,                                       CR 15-4268-JB

vs.

ANGEL DELEON, et. al.

       Defendants.


## DEFENDANT DANIEL SANCHEZ'S MOTION TO SEVER THE TRIAL OF COUNTS 6-7 FROM THE TRIAL OF COUNTS 8-12.

Pursuant to Fed R. Crim. P. 14(a), *Zafrio v .United States*, 506 U.S. 534 (1993) and the

Fifth Amendment of the United States Constitution, defendant Daniel Sanchez moves this Court

to sever the trial of Counts 6-7 from the trial of Counts 8-12.

The government opposes this motion.  Defendant Rudy Perez joins this motion.

Defendant Anthony Ray Baca joins in the request for severance made herein, but does not

necessarily agree to all of the grounds stated in the motion. Defendant Christopher Garcia joins

in the request for severance made herein, but does not agree to the grounds stated in the motion.

Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez,

Arturo Garcia, Mario Rodriguez, Mauricio Varela, Conrad Villegas, Anthony Baca, Carlos

Herrera, Andrew Gallegos and Shauna Gutierrez do not oppose this motion.

DNM 992

I.      **INTRODUCTION**

A joint trial of Daniel Sanchez for the alleged conspiracy to commit murder and murder of Javier Molina (Counts 6 and 7 of the First Superseding Indictment ("FSI"), CR 368) and Anthony Baca, Conrad Villegas, and Chris Garcia for the crimes charged in Counts 8-12 of the FSI (CR 368) (which include the conspiracies to commit the murders of the Secretary of the New Mexico Corrections Department ("NMCD") and the head of the NMCD Security Threat Intelligence Unit ("STIU") and related firearms offenses) would create a serious risk of prejudice to Mr. Sanchez in violation of his Fifth Amendment right to due process of law.  If Counts 6-12 are tried jointly, the jury will be exposed to detailed and convincing evidence of highly inflammatory crimes charged against defendants Baca, Garcia and Villegas.  This other crime evidence would not be otherwise admissible to prove the offenses charged against Daniel Sanchez in Counts 6-7.  As discussed herein, its admission in a joint trial creates a substantial risk that the jurors will make impermissible character inferences about co-defendant Baca and use those inferences against Mr. Sanchez in their deliberations concerning Mr. Sanchez's culpability for the crimes charged in Counts 6-7.

Because the evidence related to Counts 8-12 will prevent the jury from making a reliable judgement about Mr. Sanchez's criminal liability for Counts 6-7, based only on the consideration of competent evidence, a severance or other appropriate remedy should be implemented.

II.     **RULE 14 (a) GIVES THE TRIAL COURT BROAD DISCRETION TO PROVIDE
        APPROPRIATE RELIEF WHERE JOINDER OF OFFENSES OR DEFENDANTS
        CREATES A SERIOUS RISK OF PREJUDICE.**

Pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure ("Rule 14(a)"), a court may sever the trials of co-defendants when "the joinder of offenses or defendants in the

2

indictment...appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a).  *See*

*Zafiro v. United States*, 506 U.S. 534, 538 (1993) (using Rule 14 as the standard for a

severance); *United States v. Cox*, 934 F.2d 1114, 1119 (10th Cir. 1991) (applying Rule 14 to set

the standard for severance); Memorandum Opinion and Order, CR 1204 at p. 136.

      Significantly, Rule 14(a) does not require severance even if prejudice is shown; rather, it

leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.

*Zafiro v. United States*, 506 U.S. at 538-539.  Rule 14(a) provides, in the relevant part: "If the

joinder of offenses or defendants in an indictment, an information, or a consolidation for trial

appears to prejudice a defendant or the government, the court may order separate trials of counts,

sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P.

14(a).  *See United States v. Cox*, 934 F.2d at 1119 (the decision to sever or provide any other

relief that justice requires is "within the sound discretion of the trial court." (citatons omitted);

*United States v. Gant*, 487 F.2d 30, 34 (10th Cir.1973)(noting severance "is peculiarly within the

discretion of the trial court")(citations omitted).

      Severance will be appropriate when "there is a serious risk that a joint trial would

compromise a specific trial right of one of the defendants, or prevent the jury from making a

reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. at 539. On a

Rule14(a) motion, the defendant bears the "heavy burden" of demonstrating a risk of prejudice

from continued joinder. *United States v. Bailey*, 952 F.2d at 365 n.4 (citing *United States v.

Jones*,707 F.2d 1169, 1171 (10th Cir. 1983); *United States v. Petersen*, 611 F.2d 1313, 1331

(10th Cir.1979)). The Supreme Court has stated:

> Such a risk might occur when evidence that the jury should not consider against a
> defendant and that would not be admissible if a defendant were tried alone is admitted

against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant is guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh*, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. *See* 481 U.S., at 211.[1]

*Zafiro v. United States*, 506 U.S. at 539 (citations omitted).

While a defendant's burden of demonstrating a risk of prejudice from continued joinder may be heavy, it is not unattainable. Where a defendant demonstrates a serious risk that a joint trial would prevent the jury from making a reliable judgement about guilt or innocence, a severance or other remedy is appropriate. *Id.*

For example, in *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996), the Court of Appeal reversed the conviction of a defendant who had been denied severance from a co-defendant and remanded the case for a new trial.  The Court held that the requested severance should have been granted because co-conspirator statements and inflammatory documentary evidence, admissible only against the co-defendant, was permitted at the joint trial. *Baker*, 98 F.3d at 335. Further, the Court emphasized that the "extremely serious and admittedly sensational" nature of the offense

---

[1] Another less drastic option is the impaneling of separate juries for separate defendants or groups of defendants and allowing the separate juries to hear only the evidence related to their particular defendants. *See, e.g.*, *Mack v. Peters*, 80 F.3d 230, 236 (7th Cir. 1996) (upholding an Illinois state trial of two defendants before two separate juries); *United States v. Lewis*, 716 F.2d 16, 19 (D.C. Cir. 1983); *United States v. Hayes*, 676 F.2d 1359 (11th Cir.1982); *United States v. Rimar*, 558 F.2d 1271 (6th Cir.1977), *cert. denied*, 435 U.S. 922 (1978); *United States v. Sidman*, 470 F.2d 1158 (9th Cir.1972), *cert. denied*, 409 U.S. 1127 (1973).

4

charged (possession of a toxin (ricin) for use as a weapon) created a substantial risk of prejudice

that could not be cured by the trial court's limiting instructions. *Id.*

      Similarly, in *United States v. Breinig*, <u>70 F.3d 850</u> (6th Cir. 1995), the Court of Appeal

held that defendant Breinig was denied due process of law as guaranteed by the Fifth

Amendment by being tried jointly with his wife, who introduced "highly inflammatory evidence

of his bad character" as part of her defense that "severely and unfairly prejudiced" Breinig.

*Breinig*, *supra*, <u>70 F.3d at 853</u>.

      In this district, in a three defendant case involving kidnaping resulting in death and

tampering with a witness resulting in death, Judge Brack granted a severance based, in part, on

his concern that prejudice from other crimes evidence, admissible against only one defendant,

would increase the risk of prejudice for the other two charged defendants:

> I agree that the introduction of the double murder allegedly committed by Mr. Lujan
> increases the likelihood of prejudice against Mr. Lamunyon and Mr. Medina, because
> such evidence would not be admissible against them in a separate trial. The possibility
> exists that a jury might infer Mr. Medina's and Mr. Lamunyon's guilt because of the
> enhanced likelihood of Mr. Lujan's guilt. *Cf. Basciano*, <u>2007 WL 3124622</u> at *5-6
> (finding severance warranted because introduction of co-defendant's prior conviction for
> same charge that defendants were facing likely would spillover to defendants).

*United States v. Lujan*, <u>529 F.Supp.2d 1315, 1326</u> (D.N.M. 2007).

## III.    THE EVIDENCE COMPARED: COUNTS 6-7 VS. COUNTS 8-12.

### A.    The Evidence Regarding the Crimes Charged against Mr. Sanchez in Counts 6-7.

      Daniel Sanchez is alleged to have participated in a conspiracy to murder and murder of

prison inmate Javier Molina at Southern New Mexico Correctional Facility ("SNMCF") on

March 7, 2014. The anticipated government witnesses to the crime include the actual killers:

Jerry Armenta, Jerry Montoya and Timothy Martinez. Each physically assaulted Molina.

Armenta and Montoya can be seen in prison surveillance video wielding stabbing instruments as they chase Molina from his cell on the upper tier, down the stairs to the entrance of the unit.[2]

At trial, Armenta, Montoya and Martinez are all expected to claim that they were told by Mr. Sanchez to kill Molina, in spite of prior statements to the contrary.  These witnesses have extensive criminal records of violence and deceit and all will testify under the expectation of leniency from the government.  Further impacting their credibility, or lack thereof, these cooperators have had unfettered access to the case discovery and each other as the case has been pending.  They have had ample opportunity to examine the government's evidence and compare their versions of events with the video surveillance, reports of law enforcement, statements of other witnesses, and each other.

According to the story that some government cooperators are expected to tell, just prior to the murder, Daniel Sanchez received and reviewed paperwork proving Molina had previously provided information to law enforcement.  Cooperators are expected to testify that co-defendant Anthony Baca issued an order to kill Molina after reviewing paperwork that showed that in a prior case Molina provided statements to law enforcement incriminating a co-arrestee; that Baca caused the paperwork to be carried from the Penitentiary of New Mexico ("PNM") to SNMCF; that the paperwork was transported by either co-defendant, Mauricio Varela, or government cooperator, Lupe Urquizo;  and that Varela and/or Urquizo caused the paperwork to be passed, under a common door, from their unit to a neighboring unit, where Molina, Sanchez and others

---

[2]  Mr. Sanchez is depicted in the video.  At the time of the homicide, he was sitting in the common area of the unit.  He had no physical contact with Molina.  And, the video shows that he did not handle a weapon at and around the time of the homicide.

6

were housed.  These witnesses are expected to claim that Mr. Sanchez reviewed the "paperwork" in a common area of his unit and then ordered others in the unit to commit the homicide.

In spite of the fact that the housing unit in which Mr. Sanchez resided was monitored 24 hours a day by corrections officers, who are mere feet away from the inmates, there are no corrections staff that reported seeing paperwork passed under the door or being reviewed by Mr. Sanchez in the unit's common area.  The unit had numerous video surveillance cameras.  And, the content of these cameras was carefully reviewed by corrections officers and other law enforcement investigating the murder.  There is no video of paperwork being passed under any door and none depicting Mr. Sanchez reviewing paperwork in the unit's common area.  In spite of searches immediately after the crime, no paperwork, as described by the government cooperators, was ever recovered from Mr. Sanchez, his unit or the neighboring unit.  And, during the course of the government's case investigation, new statements have surfaced, claiming that the order to kill Molina and the paperwork backing it up was transmitted to SNMCF, not on the day of the homicide, but approximately a year prior. This evidence, if believed, potentially removes Mr. Sanchez from having any role in the Molina killing, even if it was initiated based on "paperwork" from Molina's prior case.

Mr. Sanchez has not made any admissions or confessions to law enforcement or undercover government agents and there are no electronic recordings of Mr. Sanchez making incriminating statements regarding the murder.  Further, there is no physical or scientific evidence linking Mr. Sanchez to the murder of Molina.

Thus, the government's evidence against Mr. Sanchez for the crimes charged in Counts 6 and 7, essentially boils down to the credibility of government informants who are liable for the

murder, have provided prior inconsistent accounts of the crime, have had ample opportunity and access to information to manufacture a version of events that attempts to convincingly implicate others in the crime, are facing life imprisonment and will be testifying in an effort to earn a favorable sentencing recommendation from the government.

**B.     The Evidence Regarding the Crimes charged against Baca, Villegas and Garcia in Counts 8-12.**

Co-defendants Anthony Baca and Chris Garcia are accused of conspiring to murder NMCD Secretary G.M. (Count 10).  Garcia, alone, is accused of possessing a firearm to be used in the offense (Counts 11-12). Baca, along with two government cooperators, is accused of conspiring to murder D.S., a top NMCD intelligence chief (Count 9), and Baca and Villegas are accused of conspiring to commit an assault resulting in serious bodily injury to J.R. (Count 8).

The government's evidence of the conspiracy to murder D.S., conspiracy to murder G.M. and related firearms violations was assembled by government cooperator, Eric Duran, who posed as a co-conspirator.  Duran became a government informant while housed at PNM Level VI SHU in February 2015.  Duran provided law enforcement with letters written by Robert Martinez and Roy Paul Martinez (now, government cooperators) soliciting the help of other individuals to carry out "hits" on a high ranking gang intelligence officer, D.S., and the NMCD Secretary, G.M.[3]  According to statements made by government cooperator, Robert Martinez, the thinking was that if letters threatening the murder of D.S. and G.M. were intercepted by STIU officials at NMCD, then SNM gang members, including Robert Martinez and Roy Paul Martinez, would be sent out of state for the remainder of their sentences.  In order to make the

---

[3] Duran's role in causing the letters to be created has yet to be fully explained.

8

threat of murder appear more credible, both Robert and Roy Martinez are expected claim that Baca "ordered" the hits of D.S. and G.M., perhaps years prior.

After Duran obtained the letters, the government provided Duran with a cell phone that had the capability of recording conversations and placed co-defendant Baca next to Duran in the special housing unit ("SHU") at PNM.  In this unit, inmates are confined to their single cells for at least 23 hours a day and subjected to prolonged and isolated confinement conditions. Duran then initiated and recorded conversations with Baca through the air vents that ran between their cells.  Duran is expected to testify that, during these conversations, he and Baca discussed, among other things, the desire to kill G.M., the consequences of carrying out the crimes and the difficulties in finding individuals to reliably execute the plan.

The government also conducted a consensual wiretap on the cell phone it gave to Duran. And, Duran is expected to testify that he used his government issued cell phone to facilitate Baca's communications with individuals on the street so that they could attempt to find someone to perform the hits and provide the firearm(s) required to carry them out.  Duran is expected to testify that, ultimately, Mario Montoya, now a government cooperator, agreed to perform the hit on the Secretary of the NMCD and that co-defendant Garcia agreed to provide a firearm to Montoya. Government law enforcement agents are expected to testify that Garcia was arrested shortly after he was observed dropping off the firearm for Montoya and that they seized the firearm. The government is expected to corroborate Duran and Baca's communications with Montoya, Garcia and others using statements memorialized in text messages and recorded phone conversations.

<div align="center">9</div>

Baca and Villegas are separately accused in Count 8 of conspiracy to commit assault resulting in serious bodily injury to J.R.  Villegas is alleged to have assaulted J.R. in July 2015, in response to a standing order that he be attacked. The motive for this assault is alleged to be that J.R. had a sexual relationship with Gerald Archuleta's wife while Archuleta was in prison. According to the government, sometime in 2003 SNM leaders, authorized Archuleta's request for an order that J.R. be assaulted whenever possible.  The government's evidence of this offense is expected to be video of the assault, supplemented with testimony from Archuleta, who has agreed to cooperate in exchange for a reduced sentence.

Thus, the government's evidence in support of Counts 9-12 consists of the testimony of it's cooperator, Eric Duran, the letters written by Roy and Robert Martinez soliciting assistance in killing D.S. and G.M., the recordings, phone calls and text messages made by Duran with his government provided cell phone, and testimony of other cooperator(s), including Robert Martinez, Roy Paul Martinez, and Mario Montoya, each of whom will be corroborated with audio recordings and/or handwritten letters.  As to Count 8, the government will, primarily, rely on cooperator testimony and video recordings of the crime.

Daniel Sanchez is not charged or implicated in Counts 8-12 and is not a participant in any of the recorded conversations or text messages relevant to Counts 9-12.

Because the crimes charged in Counts 9-12 were allegedly plotted behind bars, with the intent to target civilian victims, including the Secretary of New Mexico's Department of Corrections, these particular offenses have received substantial and sensational publicity in New Mexico and throughout the country. For example, on Sunday, February 21, 2016, the front page Albuquerque Journal ("New Mexico's leading news source.") headline was "Notorious Prison

DNM 1001

Gang Targets NM Corrections Officials."   This was accompanied by color head shots of the

defendants charged with these offenses.

IV.    **IF MR. SANCHEZ IS TRIED BY THE SAME JURY HEARING EVIDENCE OF THE CRIMES CHARGED IN COUNTS 8-12 THEN THERE IS A SERIOUS RISK THAT UNFAIR PREJUDICE WILL TAINT THE JURY VERDICTS ON COUNT 6-7.**

   A.    **The Evidence Related to Counts 8-12 is not Independently Admissible Against Mr. Sanchez to Prove Counts 6-7.**

The evidence the government will offer in support of its allegations that Baca and Garcia

conspired to murder NMCD Secretary G.M. is not admissible against Mr. Sanchez to prove the

VICAR offenses charged in Counts 6-7 of the FSI and would not be admissible if Mr. Sanchez

were tried alone for the conspiracy to murder and murder of Javier Molina.  The government

evidence in support of the charged conspiracy to murder G.M. is expected to consist of informant

testimony buttressed with recorded conversations, telephone calls, and text messages, at times,

chilling in nature, in which the charged defendants, and others, allegedly discuss their plan to

murder G.M., their frustration at the time it is taking to accomplish the task, the details of the

plan, and the procurement of a firearm with which to execute the plan.

Similarly, the evidence that the government will attempt to offer in support of its

allegations that Baca conspired with Roy Martinez and Robert Martinez to murder a high

ranking gang investigator at NMCD, D.S., is not admissible against Mr. Sanchez to prove the

VICAR offenses charged in Counts 6-7 and would not be admissible if Mr. Sanchez were tried

alone for the conspiracy to murder and murder of Javier Molina. The government evidence in

support of these allegations is expected to consist of informant testimony buttressed with letters

DNM 1002

and recorded telephone calls in which the charged defendants, and others, allegedly discuss the plan to murder D.S. and the ways to execute the plan.

And, the evidence that the government will offer in support of its allegations that Baca and Villegas conspired to commit an assault resulting in serious bodily injury to J.R. would not be admissible at all against Mr. Sanchez to prove the VICAR offense in Counts 6-7.

**B.     The FSI Charges Many Defendants, with Varying Degrees of Culpability, Together in a Complex Case, Heightening the Risk of Prejudice.**

In *Zaifro v. United States*, *supra*, the Supreme Court warned that a risk of prejudice from joinder of defendants and/or counts is heightened when many defendants, having markedly different degrees of culpability, are tried together in a complex case.  That is certainly the situation here.  Even with the severance previously granted by the Court, the trial of Counts 6-12 would involve eight (8) defendants, charged with seven (7) different offenses.  Six (6) of the defendants are alleged to have participated in the counts involving the Molina homicide.  And, only Defendant Baca is charged in five (5) counts.  The charges range from weapons possession, to conspiracy to commit assault to murder.  These factors, alone, increase the risk of prejudice any one defendant will experience as a result of a joint trial.

**C.     As to Counts 6-7, the Evidence in Support of Counts 8-12 Becomes Extrinsic Acts Evidence Susceptible to Improper Propensity Character Evidence Inferences that, by Their Nature, Create a Serious Risk of Unfair Prejudice to Mr. Sanchez, and the Admission of Which Would Prevent the Jury from Making a Fair and Reliable Judgement about Daniel Sanchez's Criminal Culpability.**

If the evidence in support of Counts 8-12 is admitted at a joint trial of Mr. Sanchez and Baca, Villegas and Garcia, it creates a serious risk of unfair prejudice to Mr. Sanchez.  Mr. Sanchez's defense to the Molina conspiracy to commit murder and murder is that Baca did not

12

send any paperwork about or order to kill Molina, and that Baca did not task Mr. Sanchez and/or others with committing the murder. The government's claim that Baca purportedly ordered the Molina murder and sent paperwork to Mr. Sanchez, who, dutifully carried out Baca's command, is entirely based on the statements of its cooperators, whose reliability and credibility is highly questionable for all of the reasons discussed above. The government's claims are not buttressed by recordings or phone calls in which the plan to murder Molina is discussed prior to its execution. There are no text messages or letters evidencing an intent or order to kill Molina. There is little, if any evidence, to corroborate the cooperator's claims. Given the nature and quality of the government's evidence as to Counts 6-7, a jury could find that a reasonable doubt exists about whether Mr. Sanchez orchestrated the Molina murder after receiving an order and/or paperwork from PNM.

If Mr. Sanchez is tried with Baca and Garcia and the evidence of Counts 8-12 is presented to the same jury considering Counts 6-7, the government's evidence of the alleged plots to kill NMCD Secretary G.M., and gang intelligence leader, D.S. (based on informant testimony that appears to be strongly corroborated by extant recordings and writings) is susceptible to interpretation by the jury as character evidence establishing Baca's propensity to orchestrate murders. Similarly, the evidence of the conspiracy charged in Count 8, to assault J.R., could be interpreted as further character evidence of Baca's propensity to enforce SNM rules by ordering violent acts. Complicating matters is the fact that the evidence supporting Counts 8-12 could also be interpreted as evidence showing the propensity of SNM gang members to comply with Baca's orders to commit murders and other violent acts. If applied to the jury's evaluation of the truth of the charges in Counts 6-7, this propensity evidence invites

the jury to reason that if Baca ordered murders and other violent assaults, as alleged by the government, and if others followed Baca's orders, as alleged by the government, then Baca must have ordered the Molina murder, sent the order and paperwork to Mr. Sanchez and Mr. Sanchez must have complied with the order.

The risk that the jury will be influenced by impermissible character inferences is amplified in Counts 6-7, where the anticipated government evidence offered to prove Mr. Sanchez's involvement in the crimes is essentially the uncorroborated and inconsistent statements of the actual killers. The written and recorded evidence of the other murder conspiracies charged against Garcia and/or Baca in Counts 8-10 will tend to enhance the credibility of these witnesses, at least insofar as they testify, as anticipated, that Baca ordered a murder and initiated a plan to accomplish it that involved Mr. Sanchez.

The admission of otherwise inadmissible evidence that tends to buttress the credibility of the testimony expected from the actual killers is unfairly prejudicial to Mr. Sanchez. *Cf. United States v. Sampol*, 636 F.2d 621, 639-640 (C.A.D.C., 1980) (defendant necessarily prejudiced where evidence that was inadmissible corroborated government cooperator).

The proscription on the admission of propensity evidence in criminal trials has been a guarantee of due process of law since the abolition of the Star Chamber in 1641.[4] The English

---

[4] "In England, before the 17th Century, courts admitted almost any type of evidence, with the only limitation being rules deeming certain categories of individuals "incompetent" to testify. All other forms of evidence were admissible under the inquisitorial system, which had reigned in England since the Norman Conquest and which found an evidentiary code unnecessary. Under the inquisitorial system, "it was not considered irregular to call witnesses to prove a prisoner's bad character in order to raise a presumption of his guilt." John H. Langbein, The Origins of Adversary Criminal Trial 190-91 (2003).
This open door policy with regard to propensity character evidence could be explained by the inquisitorial system's assumption that the accused committed a crime and the concomitant

DNM 1005

ban on propensity character evidence has been adopted by American courts in both civil and

criminal cases since the middle of the 19th Century. In holding in 1892 that a trial court erred in

admitting evidence indicating that two defendants on trial for murder had previously committed

robberies, the Supreme Court in *Boyd v. United States*, 142 U.S. 450, 458 (1892), forcefully

stated that:

> Proof [of propensity evidence] only tended to prejudice the defendants with the jurors, to
> draw their minds away from the real issue, and to produce the impression that they were
> wretches whose lives were of no value to the community, and who were not entitled to
> the full benefit of the rules prescribed by law for the trial of human beings charged with
> crime involving the punishment of death….However depraved in character, and however
> full of crime their past lives may have been, the defendants were entitled to be tried upon
> competent evidence, and only for the offence charged.

---

requirement that he affirmatively prove his innocence. One of the most conspicuous consumers
of propensity character evidence, and ultimately the harbinger of its death, was The Court of Star
Chamber. Established in 1487, the Star Chamber was an expeditious way for the Tudors and
Stuarts to exorcise political and religious dissenters of the monarchy while masquerading as a
court conducting treason trials. The Star Chamber was the Crown's "organ of terror, renown[ed]
among the citizenry for its arbitrary and cruel decisions," and one of its most capricious practices
was the deluge of character evidence it admitted, resulting in defendants being punished for their
sordid character rather than their culpable conduct. Cheryl Swack, Safeguarding Artistic
Creation and the Cultural Heritage: A Comparison of Droit Moral Between France and the
United States, 22 Colum.-VLA J.L. & Arts 361, 381 n.135 (1998).

The Star Chamber engendered widespread animosity in the citizenry in the years
preceding the English Civil War, eventually prompting the revolutionary Long Parliament to
abolish it in 1641. At the close of the English Civil War, the Restoration, and the Glorious
Revolution, the same dissidents who were subjected to the monarchy's organ of terror had
wrested control of the Parliament, but still felt the sting of the Star Chamber. In an effort to
prevent the ills of the past from infecting the future, these new power wielders passed the
Treason Act of 1695, which contained a provision proscribing prosecutors from proving at trial
any overt acts by the defendant which were not charged in the indictment, thus precluding the
admission of propensity character evidence. While this prohibition on propensity character
evidence was initially limited to treason trials, it soon permeated all criminal trials, with courts
and commentators recognizing that the use of such evidence violated the right to due process of
law guaranteed by the Magna Carta."

Colin Miller, *Evidence: Propensity Character Evidence*, published by CALI eLangdell
Press (2013) (http://evidencecharacter.lawbooks.cali.org/).

15

DNM 1006

The common law judicial proscription on the introduction of propensity character evidence is codified in Federal Rule of Evidence 404 ("Rule 404"). The Advisory Committee Notes to Rule 404 recognize that the "circumstantial use of character evidence is generally discouraged because it carries serious risks of prejudice, confusion and delay." *See Michelson v. United States*, 335 U.S. 469, 476 (1948). Furthermore, quoting the California Law Revision Commission, Rep., Rec. & Studies, 615 (1964), the Advisory Committee Note observes:

> "Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."

The most common situation in which issues about propensity character evidence arise are in situations, as in *Boyd v. United States*, *supra*, where the government seeks to use a defendant's other bad acts against him as proof of a new offense. However, that is not the only situation where propensity character evidence is prohibited. Federal Rule of Evidence 404(b), generally prohibits the introduction of evidence of extrinsic acts that might reflect adversely on the actor's character, unless that evidence bears upon a relevant issue in the case. *Huddleston v. United States*, 485 U.S. 681 (1988). Rule 404(b) provides that: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." By it's plain language, the prohibition of character evidence is not limited to "a defendant's" character. *Huddleston v. United States*, *supra*, 485 U.S. at 685-686 ("The actor in the instant case was a criminal defendant, and the act

16

in question was "similar" to the one with which he was charged. Our use of these terms is not meant to suggest that our analysis is limited to such circumstances."). "By its plain terms, Rule 404(b) mandates that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a *person* in order to show action in conformity therewith," instead of restricting itself to evidence proving "the character of the accused." *United States v. Lucas*, 357 F.3d 599, 605 (6th Cir. 2004) (emphasis in original). The Advisory Committee Notes following Rule 401 explain that rules such as Rule 404 and those that follow it are meant to prohibit certain types of evidence that are otherwise clearly "relevant evidence," but that nevertheless create more prejudice and confusion than is justified by their probative value. "In other words. . . prior bad acts are generally not considered proof of any person's likelihood to commit bad acts in the future and. . .such evidence should demonstrate something more than propensity." *United States v. Lucas*, *supra*, 357 F.3d at 606 (holding that defendant could not present certified copies of criminal conviction documents of third party suspect to raise reasonable doubt regarding defendant's guilt).

If the jury tasked with evaluating the truth of the allegations in Counts 6-7, as to Mr. Sanchez, is exposed to the evidence that will be presented to prove Counts 8-12, there is a very serious risk that the verdicts on Count 6-7 will be corrupted with factual conclusions based on character inferences that affront our longstanding and time-tested notion of due process.

### D.   The Offenses Charged in Counts 9-12 are Exceptionally Serious and Sensational.

The serious and sensational nature of the alleged conspiracies to murder G.M., the head of the NMCD, and D.S., a high ranking corrections official, is a further factor in assessing the risk of unfair prejudice a joint trial will create for Mr. Sanchez. As recognized in *Baker*, *supra*,

DNM 1008

98 F.3d at 335, the more serious and sensational the nature of the offense, the more difficult it is

for jurors to compartmentalize the evidence as to each defendant.  In the media coverage of this

case, it is the allegation about a murder plots, cooked up behind prison walls, targeting high

ranking public officials and moving forward with the selection of assassins and the procurement

of a weapons, that captures the newspaper and television headlines and the public's interest.  It

will also capture the jurors rapt attention.

Yet, Mr. Sanchez had nothing to do with the alleged conspiracies to murder corrections

officials. He is accused of arranging the murder of a prison inmate by members of the inmate's

own prison gang.  The jury tasked with fairly deciding Mr. Sanchez's guilt, or lack thereof, for

the Molina homicide based on their consideration of competent, admissible evidence limited to

that charge.  The jury should not fairly be subjected to evidence about other salacious murder

conspiracies and firearms offenses related to crimes unrelated to Mr. Sanchez's case.

## IV.     REMEDIES: HOW TO AVOID THE SERIOUS RISK OF PREJUDICE.

### A.     Limiting Instruction(s) Cannot Cure the Serious Risk of Prejudice in a Joint Trial of Counts 6-12.

"[I]f you throw a skunk into the jury box, you can't instruct the jury not to smell it."

*Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962).  Jurors cannot forget evidence they

have seen or heard, and neither can they "fractionate evidence into competent and incompetent

segments, using only the former in [their] decision making process.  Note, *The Limiting*

*Instruction—Its Effectiveness and Effect*, 51 MINN. L. REV. 264, 267 (1966); *see also*, *e.g.*,

*Bruton v. United States*, 391 U.S. 123, 131 (1968) (*quoting People v. Aranda*, 407 P.2d 265,

271-72 (Cal. 1965)); John C. Reinard & Rodney A. Reynolds, *The Effects of Inadmissible*

*Testimony Objections and Rulings on Jury Decisions*, 15 J. AM. FORENSIC ASS'N 91, 91

DNM 1009

(1978) (noting that "few are willing to deny the commonly accepted dictum that it is impossible

for an individual to 'forget' something which has been comprehended. Hence, it would be

difficult to believe that jurors could disregard testimony once heard.")  In fact, trying to do so is

likely to prove counterproductive, serving only to highlight the evidence—like asking someone

not to think of a white elephant.  *See United States v. Leviton*, 193 F.2d 848, 865 (2d Cir. 1952)

(Frank, J., dissenting); *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 656 (2d Cir.

1946) (Frank, J., dissenting) (footnote omitted); Linda J. Demaine, *In Search of an

Anti-Elephant: Confronting the Human Inability to Forget Inadmissible Evidence*, 16 GEO.

MASON L. REV. 99 (2008).

 "The naïve assumption that prejudicial effects can be overcome by instructions to the

jury . . . all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336

U.S. 440, 453 (1949) (Jackson, J., concurring), *quoted in*, *e.g.*, *Bruton v. United States*, 391 U.S.

123, 129 (1968); *Jackson v. Denno*, 378 U.S. 368, 388 n.15 (1964). *See also*, *e.g.*, Note, *The

Limiting Instruction—Its Effectiveness and Effect*, *supra*, 51 MINN. L. REV. 264, 267

(1966) (observing that "many learned jurists and scholars . . . entertain no doubt that limiting

instructions are useless").  Learned Hand, while resigned to limited instructions as a practical

necessity, thought it plain that they could not work; they asked jurors to perform "a mental

gymnastic which is beyond, not only their powers, but anybody's else." *Nash v. United States*,

54 F.2d 1006, 1007 (2d. Cir. 1932); *see also*, *e.g.*, *United States v. Gottfried*, 165 F.2d 360, 367

(2d Cir. 1948).  The predominant view of scholars, both law professors and psychologists, is that

evidentiary instructions are frequently exercises in futility. The main title of a frequently cited

study—"On the Inefficacy of Limiting Instructions"— captures the consensus.  Roselle L.

Wissler & Michael T. Saks, *On the Inefficacy of Limiting Instructions: When Jurors Use Prior Conviction Evidence to Decide on Guilt*, 9 L. & HUM. BEHAV. 37 (1985); see also, e.g., Joel D. Lieberman & Jamie Arndt, *Understanding the Limits of Limiting Instructions: Social Psychological Explanations for the Failures of Instructions to Disregard Pretrial Publicity and Other Inadmissible Evidence*, 6 J. PSYCH. PUB. POL'Y & L. 677 (2000).

The reasons for doubting the usefulness of evidentiary instructions have also been reinforced by social science experiments conducted with mock jurors. The results of those experiments provide strong support for the view that evidentiary instructions are at best ineffective and at worst counterproductive. *See, e.g.*, Reid Hastie, Steven D. Penrod & Nancy Pennington, *Inside the Jury* (1983) at 231; Lieberman & Jamie Arndt, *Understanding the Limits of Limiting Instructions: Social Psychological Explanations for the Failures of Instructions to Disregard Pretrial Publicity and Other Inadmissible Evidence*, 6 J. PSYCH. PUB. POL'Y & L. 677 (2000), *supra*, at 703; Aviva Orenstein, *Insisting that Judges Employ a Balancing Test Before Admitting the Accused's Convictions Under Federal Rule of Evidence 609(a)(2)*, 75 BROOK. L. REV. 1291, 1304 n.50 (2010); David A. Sonenshein & Robin Nilon, *Eyewitness Errors and Wrongful Convictions: Let's Give Science a Chance*, 89 OR. L. REV. 263, 290 (2010); J. Alexander Tanford, *Thinking About Elephants: Admonitions, Empirical Research and Legal Policy*, 60 UMKC L. REV. 645, 646 (1992).

As common sense, experience and social science suggest, the use of a limiting instruction in the situation presented here cannot protect Mr. Sanchez from the serious risk of prejudice that would occur in a joint trial of Counts 6-7, with Counts 8-12. By telling the jury that they cannot consider the evidence of the charged conspiracies to murder D.S. and G.M. for Baca's propensity

to order others to commit murder and for others' propensity to abide by those orders, the

instruction would actually highlight and emphasize the harmful and prejudicial nature of that

very evidence.

Jurors are people, not computers. The Supreme Court has recognized that there are some

things that people, no matter how law-abiding and how hard they try, cannot put out of their

mind once they have been exposed to them. *See*, *e.g.*, *Jackson v. Denno*, 378 U.S. 368 (1964)

(juries cannot be trusted to ignore confessions later ruled inadmissible.); *Bruton v. United States*,

391 U.S. 123 (1968) (juries cannot be trusted to apply a confession only against the defendant

who made it (and as to whom the rules of evidence allow it to be admitted) and not against a co-

defendant (as to whom it is inadmissible)). The government's written and recorded proof in

support of its allegations that  Baca, Garcia and others, conspired to murder G.M. and D.S. is just

that kind of evidence. And, even the most expertly crafted limiting instruction would fail to

mitigate the serious risk of prejudice to Mr. Sanchez.

**B.   The Court has Several Severance Options Available, Each of Which Removes the Serious Risk of Prejudice.**

Since the use of limiting instruction(s) is particularly ineffective in this situation, and

even likely to be counter-productive, given the allegations, the only way to protect Mr. Sanchez

from the serious risk of prejudice inherent in a joint trial of Counts 6-7 with Counts 8-12 is some

form of severance. There are several options.

1.   A Severance of Counts 6-7 from Counts 8-12.

In this type of severance, the conspiracy to murder and murder of Molina would be tried

separately from other counts involving Baca, Villegas and Garcia. Baca would be subjected to

DNM 1012

two trials arising out of this indictment, one for the Molina murder and one for the crimes

charged in Counts 8-12.

> 2.    A Severance of Sanchez and other similarly situated Count 6-7 defendants from Baca, Villegas, and Garcia.

In this type of severance, Mr. Sanchez, and any similarly situated defendant(s) charged in

Counts 6-7 would be tried for Counts 6-7.  And Baca, Villegas, Garcia and any remaining

defendant(s) would be tried in a separate trial for the crimes charged in Counts 6-12.  The

government would have to present its evidence relating to the Molina murders twice, to separate

juries, in separate trials.

> 3.    The Use of Two Juries in One Trial.

If the Court elected to remove the serious risk of unfair prejudice with two juries, then

the defendants charged in Counts 6-12 would be tried together, in one trial.  One jury would be

empaneled to hear the Count 6-7 evidence, instruction, and argument as to Mr. Sanchez and any

similarly situated defendant charged in Count 6-7; and the other jury would be empaneled to

hear the Count 6-12 evidence, instruction, and argument as to defendants Baca, Villegas, Garcia

and any remaining defendant(s).  The evidence regarding the Molina homicide would be

presented one time, to both juries simultaneously.  Throughout the trial, there would be times

when only one jury is in the courtroom during the proceedings and times when both juries would

be present.  This option places an extra burden on the Court, and, given the number of

defendants in the case and the logistics of accommodating all case participants, may strain the

physical limitations of the court room facility.

V.       **CONCLUSION**

The trial of Mr. Sanchez on Counts 6-7 cannot be conducted along with the trial of

defendants Baca, Villegas, and Garcia without creating a serious risk of prejudice to Mr.

Sanchez.  Limiting instructions will not cure the risk of prejudice and, for all practical purposes,

will only serve to increase the risk of prejudice.  For all of the reasons discussed above, the Fifth

Amendment's due process guarantee mandates a severance of Mr. Sanchez from the trial of

Baca,Villegas and Garcia on Counts 8-12.

Dated this 6th day of October, 2017          Respectfully submitted,

/s/ *Amy E. Jacks*
Amy E. Jacks
Attorney for Defendant
DANIEL SANCHEZ

/s/ *Richard Jewkes*
Richard Jewkes
Attorney for Defendant
DANIEL SANCHEZ

DNM 1014

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                                    **15-CR-4268 JB**

**ANDREW GALLEGOS,**

        **Defendants.**

### OPPOSED SECOND MOTION
### BY ANDREW GALLEGOS TO SEVER COUNTS FOUR AND FIVE

COMES NOW, Defendants Andrew Gallegos, by and through his attorney of record, Donavon A. Roberts, Esq., and joined by Brock Benjamin, Esq. and Rick Sindel, attorneys for Joe Gallegos, Cori Ann Harbour-Valdez, Esq. and Patrick Burke, Esq. attorneys Edward Troup, and Angela Arellanes, Esq., attorney for Shauna Gutirrez, and respectfully summits this Second Opposed Motion to Sever Counts Four and Five from the trial with counts 1-3 and 13-16, and in support states:

### INTRODUCTION

The law on severance has been argued, briefed and repeated in numerous documents, before the court, including documents 807, 845, 858, 868, 882, 887, 893, 901, 932, 925, 933, 940, 936, 959, 975, 1014, 1031, 1036, and 1108.  Andrew Gallegos (hereafter, may also be referred to as "Gallegos") continues to adopt and incorporate all oral and written arguments previously made in the above documents for severance as though stated fully herein, with the understanding that the court has also previously issued its Order(s) on the matter [Docs. 1187 and 1204], which granted in part and denied in part the various severance motions filed by

DNM 1015

several defendants in this case.  Since the Court's ruling, at least one additional Opposed Motion for Severance has been filed [Doc. 1296], which Andrew Gallegos further adopts and incorporates arguments therein, as additional basis for his renewed Motion for Severance of Counts 4 and 5, and states as follows:

1.  Just as the law on severance has been extensively briefed and argued, the facts in this case has also been recited repeatedly.  Andrew Gallegos adopts his previous factual statements, but for purposes of this motion wishes to emphasis that he is *only charged in the alleged murder of one individual (specifically, the shooting and burning of A.B.*, as represented by counts 4 and 5 in the Second Superseding Indictment.  His brother, Joe Gallegos, however, is charged in: **Count 1** (with Angel Deleon, Edward Troup, a.k.a. "*Huero* Troup", Leonard Lujan, and Billy Garcia, a.k.a. "Wild Bill," for the alleged murder of F.C.); **Count 2** (with L. Lujan, "Wild Bill", Eugene Martinez, a.k.a. "Little Guero", Allan Patterson, and Christopher Chavez, a.k.a. "Critter"); **Count 3**.  (with Javier Alonso, a.k.a. "Wineo" "Wild Bill", "Huero Troup, and Arturo Garcia, a.k.a. "Shotgun"); (**Counts 13, 14** (with "Wineo", Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez for the Assault with a Dangerous Weapon and Conspiracy to murder J.G.); **Count 15** (with "Wineo", Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez for Attempted Murder and Assault With a Dangerous Weapon Upon J.G., Resulting in Serious Bodily Injury); and **Count 16**, which adds the charges of Tampering With a Witness, Victim or Informant by Physical Force or Threat, with respect to the Attempted Murder of J.G. in Count 14.    Just the nicknames alone (i.e*., Wild Bill, Critter, Shotgun, Wineo*) are prejudicial in nature, suggesting a violent, reckless lifestyle for these additional defendants who will

DNM 1016

[1], adds

five additional serious, violent, crimes that include three additional murder victims in

Counts 1-3, attempted murder of J.G. in Count 13, and other serious charges related

to credibility such as tampering with evidence and threats to witnesses. These are all

violent acts against various victims allegedly by Joe Gallegos and others that will be

unfairly imputed as character evidence against Andrew Gallegos, his brother, by a

jury that would otherwise not be allowed to hear this type of prejudicial character or

propensity evidence if counts 4 and 5 were tried separately. This is not only highly

prejudicial but violative of Andrews right to a fair trial, as argued in his previous

pleadings for Severance [Docs. 868 and 1031].  Andrew Gallegos again asserts, for

purposes of this Motion, that he is not a member of the SNM and has never sought

consideration of anything of value from SNM, nor has he attempted to gain entrance

into SNM. He has never knowingly participated in the activities of the "enterprise",

included in this case.  A bill of particulars [Doc. 1143] has been filed against the

jurisdictional evidence that allegedly exists, but as the Court heard, at the hearing on

May 10th, it was "general" evidence presented at the beginning of the case and

relevant to the entire organization, not directed specifically at Counts 4 and 5. Nor it

is assumed, was it more specifically directed at Andrew Gallegos' actions to gain or

---

[1] Although several defendants have already entered plea agreements and technically will not be tried with Andrew Gallegos and the remaining eight or nine other defendants, the crimes, bad acts, and violent reputation of **all eleven** defendants, nonetheless, is expected to be introduced by the government to, intended or not, discredit or prove the bad acts/crimes of "The Gallegos".

DNM 1017

maintain admission or consideration for a thing of value from SNM. In fact, it must be assumed at this juncture, without admitting participation, that if there was a reason for the murder, it presumably would have been for loyalty to family. This is a much more logical justification than has been shown by the Government.

2.   Given the limited, two-count, charges against Andrew Gallegos, it is highly prejudicial to expose a jury responsible for his guilt or innocence to the incriminating direct and indirect character and factual evidence of eleven other, unrelated, defendants and two to five other unrelated violent murders, attempted murder or violent crimes.   Presumably, other bad acts, convictions, damaging reputation and character evidence of the other eight to eleven defendants will also be introduced at a joint trial.   All of these other alleged crimes and/or bad acts, unrelated to Andrew Gallegos would be inadmissible as overly prejudicial and not probative of Andrew's guilt specifically in counts 4 and 5 at a separate trial. The Supreme Court has recognized that when a jury hears large amounts of incriminating evidence it could predispose them to convict a codefendant whom they otherwise would not. *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

3.   This piling on of evidence, unrelated to Andrew's specific charges in counts 4 and 5 amounts to propensity character evidence against him that is highly prejudicial.   This is particularly so given that many of the Defendants that would be before the jury in a joint trial have markedly higher levels of culpability than Andrew Gallegos.   In fact, the government has presented little to no direct evidence that would stand on its own to convict Andrew Gallegos of the murder related to Counts 4 and 5.   They have even admitted in open court this lack of evidence against Andrew; going so far as to

DNM 1018

4.  In *United States v. Lujan*, <u>529 F.Supp.2d 1315, 1326</u> (D.N.M. 2007), a similar

situation to the present case existed.  There, severance was granted based, in part, on

the concern that prejudice from other crimes evidence, admissible against only one

defendant, would increase the risk of prejudice for the other two charged defendants.

The court stated:

> …[T]he introduction of the double murder allegedly committed by Mr. Lujan
> increases the likelihood of prejudice against Mr. Lamunyon and Mr. Medina,
> because such evidence would not be admissible against them in a separate trial.
> The possibility exists that a jury might infer Mr. Medina's and Mr. Lamunyon's
> guilt because of the enhanced likelihood of Mr. Lujan's guilt. *Cf. Basciano*, <u>2007</u>
> <u>WL 3124622</u> at *5-6 (finding severance warranted because introduction of co-

5

DNM 1019

defendant's prior conviction for same charge that defendants were facing likely
would spillover to defendants).

5. This Court has indicated its belief that limiting instructions can cure any serious risk
of prejudice in a joint trial of counts 1-5 and 13 -16, known as the **"Gallegos
Counts"**. While this "moniker" will not make it to the jury, it alone shows how
Andrew' Gallegos' relation to this case on paper alone is prejudicial.  The
predominant view of scholars, both law professors and psychologists, however, is that
evidentiary instructions are frequently exercises in futility. The main title of a
frequently cited study—"On the Inefficacy of Limiting Instructions"— captures the
consensus.  Roselle L. Wissler & Michael T. Saks, *On the Inefficacy of Limiting
Instructions: When Jurors Use Prior Conviction Evidence to Decide on Guilt*, 9 L. &
HUM. BEHAV. 37 (1985); see also, e.g., Joel D. Lieberman & Jamie Arndt,
*Understanding the Limits of Limiting Instructions: Social Psychological Explanations
for the Failures of Instructions to Disregard Pretrial Publicity and Other
Inadmissible Evidence*, 6 J. PSYCH. PUB. POL'Y & L. 677 (2000).

6. Each of the co-defendants attorneys have been contacted for their position on this
motion to sever and each advised no opposition to the relief sought herein.

Wherefore, Andrew Gallegos states that the allegations claimed by the Government
against him is small in comparison to the overall scope of this indictment against the eight other
defendants currently set for trial with him.  The prejudice suffered by Andrew, in what would
ordinally be a short trial, is compounded because the jury is subject to months of trial "dealing
with numerous unrelated charges and criminal misconduct that does not involve a minor
defendant in any way. *See, US. V. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987).  For all the

DNM 1020

foregoing reasons, Defendant Andrew Gallegos moves the Court to sever Counts 4 and 5 from

the Second Superseding Indictment.

Respectfully Submitted,

*/s/ Donavon A. Roberts*
Donavon A. Roberts
P.O. Box 36344
Albuquerque, NM 87176
(505) 506-3749
(505) 503-8405 facsimile
ladar170@aim.com

**Joined by:**

*/s/ Brock Benjamin*
Brock Benjamin
Richard Sindel
Attorneys for Joe Gallegos (2)
brock.benjamin@gmail.com
*Attorneys for Joe Gallegos*

*/s/ Cori Harbour-Valdez*
Cori Harbour-Valdez
Patrick Burke
Charbourlaw@harbourlaw.net
Attorneys for Edward Troup (3)

*/s/ Angela Arellanes*
Angela Arellanes
arellanesattorney@yahoo.com
Attorney for Shauna Gutirrez (30)

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF
system on, this 6th day of October, 2017, which caused counsel of record for the government,
co-defendants, and all other parties to receive a copy of this Motion electronically.

*/s/ Donavon A. Roberts*
Donavon A. Roberts

DNM 1021

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' NOTICE OF, AND MOTION *IN LIMINE* TO ADMIT, GANG EXPERT WITNESSES' TESTIMONY

The United States of America, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G),
provides notice to the Court and to Defendants that the United States intends to introduce into
evidence at trial the gang expert testimony described below. Under prevailing case law, the expert
testimony is relevant to the issues to be tried before the jury and is admissible. The United States,
therefore, moves the Court *in limine* to admit this testimony.

**Proposed Expert Testimony**

The United States intends to call Ronald Martin, Chris Cupit and Sergio Sapien of the New
Mexico Corrections Department Security Threat Intelligence Unit as expert witnesses in the means
and methods of operations of prison gangs, including the Syndicato Nuevo Mexico in particular,
and gang affiliations of the victims and defendants. Unit Coordinator Martin will testify in general
about prison gang activity and more specifically:

a.  The history, culture, codes of conduct, methods of operation and communication, and
    behaviors of the Syndicato Nuevo Mexico ("SNM") security threat group.

b.  The specific membership and affiliation of the Defendants and the Victims in SNM.

   c.  In general, and specific to SNM, security threat group sanctions; reasons for sanctions; how those sanctions are carried out; and a description of weapons manufactured and used.

   d.  The rules and requirements for members and associates to participate in SNM-sanctioned violent crimes, including homicides.

Additionally, the testimony will encompass the following information:

The Syndicato de Nuevo Mexico ("SNM"), Spanish for Syndicate of New Mexico, is a powerful and violent prison gang, which controlled drug distribution and other illegal activities within the New Mexico penal system, and was also involved in street level narcotics trafficking. It was formed in the early 1980s at the Penitentiary of New Mexico after a prison riot at the penitentiary in February, 1980. During the prison riot, twelve correctional officers were taken hostage and several of them were seriously assaulted and raped by inmates. Thirty-three inmates were killed during the riot, and more than two hundred were injured.

Following the prison riot, the SNM Gang expanded throughout the New Mexico penal system and has boasted of as many as 500 members since the early 1980s. The SNM Gang was comprised of approximately 250 members, who are known as "hermanos," "brothers," "carnales," "dons," "jefes," "big hommies," or "Zia manos" and who controlled the gang. The SNM operated under a "panel" or "mesa" (Spanish for table) of leaders who issued orders to subordinate gang members.

Despite being imprisoned and being closely scrutinized by prison officials, SNM Gang leaders managed to convey orders to SNM Gang members and associates throughout the prison system and outside the prison system through a variety of means, including secret notes, called "kites," or "welas," coded letters, and messages conveyed by complicit visitors. When SNM Gang

DNM 1023

members or associates completed their sentences and rejoined their communities, they were expected to remain loyal to the SNM Gang and work to further the goals of the SNM Gang outside the prison environment.   Members who failed to show continued loyalty to the gang were disciplined in various ways, to include murder and assaults. One of the significant goals of the SNM Gang was to control and profit from narcotics trafficking.

In addition to exerting its control in the New Mexico penal system, the SNM Gang also operated on the streets of New Mexico by intimidating and influencing smaller New Mexico Hispanic gangs for the purpose of establishing a larger network for the SNM's illegal activities.  If a gang did not accede to the SNM Gang's demands, the SNM Gang assaulted or killed the gang's members who were not in custody as well as those members who were incarcerated within the New Mexico penal system.  In addition to intimidation through direct assaults, the SNM Gang was also able to assert control and influence over gang members outside the penal system because gangs did not want their members outside the penal system to be assaulted or killed, and because the gang members knew that, if they are incarcerated, they would need the protection of the SNM Gang while they served their sentences.

The SNM Gang had been and continues to be engaged in a fierce and violent war with rival gangs, to include the Barrio Azteca, Los Carnales, Sureños, and Burqueños gangs. Within the prison system, this rivalry manifested itself in beatings and stabbings, which often resulted in death.  Outside the prison system, the SNM Gang fought for control of territory in which to conduct narcotics trafficking and other crimes, as well as to recruit and influence non-gang members. In addition to fighting for control over numerous illegal activities and using violence and terror for the purpose of enriching themselves, the SNM Gang also engaged in violence simply to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate

DNM 1024

against a rival gang or member, to gain notoriety and show its superiority over others, and to send a message to others that it was strong, powerful and not to be provoked.

The SNM Gang sought to maintain its reputation for being strong and powerful and maintained its membership to continue functioning as an organization in prison and on the streets. If the SNM Gang was perceived as being weak, then rival gangs would challenge and assault its members and take over its territory. This could have caused the gang to lose membership and eventually dissolve. The SNM Gang maintained a large membership and a reputation for being strong, powerful and dominant so that rival gangs would think twice before they challenged it and victims/witnesses would think twice about assisting authorities with any prosecution attempt against it.  This allowed the gang to grow in strength, thrive in its criminal activity, and dominate its territory.  A member of the SNM Gang was expected to seek out and beat, stab, or shoot rival gang members.  Similarly, a member of the SNM Gang was expected to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.

SNM Gang members identifed themselves with the Zia symbol and the letters "SNM" or "S," which represented the "Syndicato de Nuevo Mexico" or "Syndicato" which is Spanish for Syndicate. SNM Gang members also utilized the number "19" which represents the 19th letter of the alphabet, "S," and "505," which corresponds with the area code for the greater Albuquerque area.  The SNM Gang claimed the entire state of New Mexico as its territory, which was broken into four geographical regions: North, South, East, and West. As with the numbers "19," and "505," the letters "S" or "SNM," the Zia symbol, and the Spanish word "Syndicato" were commonly, but not exclusively, displayed by SNM Gang members in tattoos, graffiti, drawings, and on clothing, as a way of displaying affiliation, loyalty, and commitment to the gang.

The purposes of the SNM Gang enterprise includes the following:

DNM 1025

a.  Preserving and protecting the power, territory, reputation, and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults, and murder;

b.  Promoting and enhancing the enterprise and the activities of its members and associates through criminal acts, including, but not limited to, murder, attempted murder, narcotics trafficking, theft of vehicles, robberies, and other criminal activities;

c.  Keeping victims, potential victims, witnesses, and community members in fear of the enterprise and its members and associates through violence and threats of violence;

d.  Protecting the enterprise's members and associates who committed crimes by hindering, obstructing, and preventing law enforcement officers from identifying the offenders, apprehending the offenders, and successfully prosecuting and punishing the offenders;

e.  Providing information to members and associates of the enterprise, including those who were incarcerated, for the purpose of committing acts of violence, robbery, distribution of controlled substances, and other offenses;

f.  Providing financial support and information to SNM Gang members and associates, including those members and associates who were incarcerated.

Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the SNM Gang were the following:

a.  Members and associates of the enterprise committed, conspired, attempted, and threatened to commit acts of violence, including murders and assaults, to protect and expand the enterprise's criminal operations.

b.  To generate income, members and associates of the enterprise trafficked in controlled substances and extorted narcotic traffickers.

5

c.  To perpetuate the enterprise, members and associates of the enterprise discussed the membership, rules, and enforcement of the rules of the SNM Gang; the status of SNM Gang members and associates who were arrested or incarcerated; the discipline of SNM Gang members; SNM Gang members' encounters with law enforcement; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and plans and agreements regarding the commission of future crimes, including murder, drug distribution, possession of firearms, and assault, as well as ways to conceal these crimes.

d.  It was further part of the means and methods of the enterprise that members and associates of the enterprise concealed from law enforcement the way in which the enterprise conducted its affairs; the locations where enterprise members discussed and conducted the affairs of the enterprise; the locations where enterprise members stored and possessed weapons and narcotics; and the locations where enterprise members maintained the proceeds from narcotics trafficking.

e.  Members of the SNM Gang also used violence to impose discipline within the SNM Gang. It was further part of the means and methods of the enterprise that the defendants and other members and associates of the SNM Gang agreed to distribute narcotics and commit other crimes, and to conceal their criminal activities by obstructing justice, threatening and intimidating witnesses, and other means.

**Security Threat Intelligence Unit Sergeant Ronald Martin**

Sergeant Martin has specialized knowledge and is a recognized authority on the topic of prison security threat groups, also known as prison gangs, and the SNM in particular. He has 15 years of experience and has served in the Security Threat Intelligence Unit for 11 years. Sergeant

DNM 1027

Martin is a recognized expert in his field of prison gangs; he has provided prison gang training and seminars to all levels of corrections and law enforcement agencies.

As Sergeant, it has been Martin's responsibility to collaborate with other law enforcement authorities, conduct drug trafficking investigations inside and outside of security facilities, gather intelligence, make risk and security threat assessments, and conduct internal security investigations for certification on the California Sureno prison gang for the New Mexico Corrections Department ("NMCD").

Sergeant Martin was qualified as a gang expert and provided testimony concerning the California Sureno gang culture and ideology.  He testified on behalf of the NMCD concerning security threat issues concerning SNM members.

Sergeant Martin's years of service in the NMCD dealing with prison security threat groups and SNM specifically qualifies him as a gang expert in this matter.

Sergeant Martin's experience demonstrates specialized knowledge that is central to this trial, and essential to the United States' burden to prove beyond a reasonable doubt the VICAR charges that it brings against the Defendants in this case

**Security Threat Intelligence Unit Investigator Chris Cupit**

STIU Investigator Cupit has specialized knowledge and is a recognized authority on the topic of prison security threat groups, also known as prison gangs, and the SNM in particular.  He has been employed by the NMCD for approximately 11 and a half years. While employed with the NMCD, Investigator Cupit has worked at the Penitentiary of New Mexico in Santa Fe New Mexico. He was also employed at the Federal Bureau of Prisons USP Atwater in Atwater California for one and a half years. Investigator Cupit has served with the Security Threat Intelligence Unit (STIU) for approximately six and a half years as an Institutional Investigator. His

DNM 1028

duties entailed basic gang identification, identifying organized gang threats towards staff, inmates and the public, to include investigating criminal activity of a gang, which includes a working interaction with Law Enforcement officials. STIU Investigator Cupit is a recognized expert in his field of prison gangs; he has provided prison gang training and seminars to all levels of corrections and to law enforcement agencies.  Investigator Cupit is Certified Trainer for the NMCD, and provides Gang Trainings for the New Mexico Corrections Training Academy, New Mexico Law Enforcement Academy, and instructed at various seminars throughout the state.

As an STIU Investigator, Investigator Cupit has been an investigating officer and supervisor with the Department of Correction gang unit. It has been Investigator Cupit's responsibility to assist in the process to certify prison security threat groups (a.k.a., prison gangs) as criminal, to identify members of those security threat groups, and to collect intelligence on and conduct investigations into those security threat groups and associated individuals.

Investigator Cupit's years of service in the NMCD dealing with prison security threat groups and SNM specifically qualifies him as a gang expert in this matter.

STIU Investigator Cupit's experience demonstrates specialized knowledge that is central to this trial, and essential to the United States' burden to prove beyond a reasonable doubt the VICAR charges that it brings against the Defendants in this case.

**Security Threat Intelligence Unit Captain Sergio C. Sapien**

STIU Captain Sapien has specialized knowledge and is a recognized authority on the topic of prison security threat groups, also known as prison gangs, and the SNM in particular.  He has been employed by the NMCD approximately 17 and a half years. While employed with the NMCD, Capt. Sapien has worked Southern New Mexico Correctional Facility in Las Cruces New Mexico, Central New Mexico Correctional Facility in Los Lunas New Mexico, and the

8

Penitentiary of New Mexico in Santa Fe New Mexico He has served in supervisory positions for the last 10  years as a Sergeant, Lieutenant, and Captain. Capt. Sapien and has served with the Security Threat Intelligence Unit (STIU) for over three years as the STIU Captain/Institutional Investigator. His duties entailed basic gang identification, identifying organized gang threats towards staff, inmates and the public, to include investigating criminal activity of a gang, which includes a working interaction with Law Enforcement officials. STIU Capt. Sapien is a recognized expert in his field of prison gangs; he has provided prison gang training and seminars to all levels of corrections and to law enforcement agencies.  Capt. Sapien is Certified Trainer for the NMCD, and provides Gang Trainings for the New Mexico Corrections Training Academy, New Mexico Law Enforcement Academy, and instructed at various seminars throughout the state.

As STIU Captain, Capt. Sapien has been an investigating officer and supervisor with the Department of Correction gang unit. It has been Capt. Sapien's responsibility to certify prison security threat groups (a.k.a., prison gangs) as criminal, to identify members of those security threat groups, and to collect intelligence on and conduct investigations into those security threat groups and associated individuals.

Capt. Sapien's years of service in the NMCD dealing with prison security threat groups and SNM specifically qualifies him as a gang expert in this matter.

STIU Capt. Sapien's experience demonstrates specialized knowledge that is central to this trial, and essential to the United States' burden to prove beyond a reasonable doubt the VICAR charges that it brings against the Defendants in this case.

**Applicable Law**

The information regarding the training, experience, and qualifications of the proposed witnesses in their respective field, within the context of the testimony proffered, demonstrates that

the testimony of this witness is both relevant and reliable.  If any of the testimony outlined above is challenged, the United States respectfully submits that, pursuant to *Kumho Tire Co., Ltd. v. Carmichael*, the Court should exercise its "special gatekeeping obligation" and should determine that the testimony is admissible as the witnesses have "a reliable basis in knowledge and experience" in their field.  526 U.S. 137, 152 (1999). *See also United States v. Charley*, 189 F.3d 1251, 1261 (10th Cir. 1999); *United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 1233 (D.N.M. 2012) (Browning, J.), *aff'd sub nom. United States v. Medina-Copete*, 757 F.3d 1092 (10th Cir. 2014).

It is within the Court's "broad discretion" to determine the means for assessing an expert's reliability and in making the ultimate determination of reliability.  *See United States v. Velarde*, 214 F.3d 1204, 1208-09 (10th Cir. 2000).  The United States respectfully submits that, if the testimony outlined above is challenged, the Court should treat this notice as a proffer on the training, background and education of the witness and allow the witness's testimony.  Specifically, the United States submits that the testimony of the witness has "a reliable basis in the knowledge and experience of the [relevant] discipline." *See Velarde*, 214 F.3d at 1208 (quoting *Kumho Tire*, 526 U.S. at 149). *See also Taylor*, No. CR 07-1244 WJ, Mem'm Opinion  Order at 2-3.

While Rule 704(b) prohibits an expert from expressing a direct conclusion as to the actual mental state of the defendant, the proposed testimony, which provides the jury with information upon which to make that final conclusion but does not expressly draw that conclusion for the jury, has been found to be permissible and not to fall within "the narrow range of opinions still prohibited under Rule 704." *United States v. Richard*, 969 F.2d 849, 855 (10th Cir. 1992) (quoting *United States v. Theodoropoulos*, 866 F.2d 587, 591 (3d Cir.1989)); *United States v. Mirabal*, 2010 WL 3894137 (D.N.M. 2010) (Browning, J.) ("[T]aking the Tenth Circuit's language [in

*Richard*] at face value, the only testimony that would violate rule 704(b) is testimony that the defendant had the mental state necessary to commit the crime charged. As long as it takes the jury some inferential step to get from the testimony to the defendant's mental state, the witness testimony does not violate the rule."). Whereas the United States' expert witnesses will testify that the SNM is a prison and its criminal acts lead them to opine that the SNM is, in their opinion, an enterprise, the Honorable William P. Johnson, United States District Judge for the District of New Mexico, concluded that this is proper and admissible gang expert testimony in a RICO or VICAR case, as it does not speak to a defendant's requisite mental state. *See Taylor*, No. CR 07-1244 WJ, Mem'm Opinion & Order at 9-10 ("Defendant's argument ultimately amounts to a concern that if SA Griego opines that he is connected with a violent gang in which people often agree to commit violent crimes, the jury will *infer* that he had the requisite mental state. The Tenth Circuit has explicitly held that expert testimony giving rise to such an inference is allowable under Rule 704(b)." (citing *United States v. Richard*, 969 F.2d 849, 854-55 (10th Cir. 1992)).

In this case, there are no novel scientific principles at play and adequate assurances of reliability are set forth above. Accordingly, if any of the testimony set forth above is challenged, this Court should rule that this evidence is admissible based on the pleadings. In the alternative, even if the Court decides that some form of hearing is necessary regarding some of the testimony, the Court may reserve ruling on the testimony's admissibility until it is offered at trial. *See United States v. Nichols,* 169 F.3d 1255, 1262-63 (10th Cir.) (no abuse of discretion to decline to hold a preliminary evidentiary hearing), *cert. denied*, 528 U.S. 934 (1999).

WHEREFORE, the United States respectfully provides notice of its intent to offer the above-described expert testimony in its case-in-chief at trial because the proposed testimony has a "reliable basis in the knowledge and experience" of the witnesses' respective discipline. The

DNM 1032

United States thus moves this court *in limine* to permit this expert testimony.

Respectfully Submitted,

JAMES D. TIERNEY
Acting United States Attorney

**Electronically filed on 10/6/2017**
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney

DNM 1033

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

                                     Cause No. 15-4268 JB

v.

ANGEL DELEON,
**JOE GALLEGOS**,
**EDWARD TROUP**,
**BILLY GARCIA**,
**ALLEN PATTERSON**,
**CHRISTOPHER CHAVEZ**,
**ARTURO ARNULFO GARCIA**,
**MARIO RODRIGUEZ**,
**MAURICIO VARELA**
**DANIEL SANCHEZ**,
**CONRAD VILLEGAS**,
**ANTHONY RAY BACA**,
**CHRISTOPHER GARCIA**,
**CARLOS HERRERA**,
**RUDY PEREZ**,
**ANDREW GALLEGOS**,
**SHAUNA GUTIERREZ**, AND
BRANDY RODRIGUEZ.

      Defendants.

---

**MOTION FOR JAMES HEARING AND DETERMINATION OF CO-CONSPIRATOR
STATEMENTS ADMISSIBILITY AT A PRE-TRIAL HEARING**

---

Defendants request that this Court hold a pre-trial hearing, pursuant to United

States v. James, 590 F.2d 575, 581-582 (5th Cir. 1979).   As to   As grounds, counsel states:

**I.  Factual Background**

On February 27, 2016, Shauna Gutierrez, Brandi Rodriguez, Santos Gonzalez and

Paul "Oso" Rivera drove to 6515 Sunflower, Belen New Mexico, the home of  Charlene Par-

ker-Johnson. The versions of what transpires next depends on which differing versions from each declarant , however, individuals enter the house, and a melee ensues. Paul Rivera in [Doc. 877] states that "J.G. was assaulted"…"to prevent J.G. from testifying or cooperating with law enforcement. I committed these crimes by virtue of my membership in the SNM." There are other statements that allude to the same facts, but from different parties. J.G. left the house with a large laceration on his head. He ran to another residence where the police were called. Ultimately J.G. was treated for his injuries.

Mr. Joe Gallegos, Shauna Gutierrez, Brandi Rodriguez, Santos Gonzalez and Paul "Oso" Rivera are all charged by way of the Second Superseding Indictment in Cause No. 15-4268-JB. Paul Rivera has entered a plea of guilty to Counts 14 and 15  on February 1, 2017.

The Indictment that includes Counts 14-16  has been split into two trials and  the severed Counts 1-5 and 13-16 currently include acts that span 15 years, three (3) murders and two different alleged attempts to kill J.G.

## II.  The Law

Mr. Joe Gallegos and other defendants who have joined this motion  request that this Court determine whether  a conspiracy exists, the alleged statements were made by a co-conspirator to further the purpose of the conspiracy and that the statement(s) are suffi-ciently linked to the conspiracy at a hearing prior to trial in order to avoid undue delay in the trial proceedings and  to avoid prejudice to the defendants.

### a.  F.R.E. § 801(D)(2)(E)

Federal Rules of Evidence  801(d)(2)(E) states that a "statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not to be considered hearsay.

Statements that do not fall within this narrow definition would be hearsay and inadmissible absent some other exception. Further statements that are purported to come from non-testifying witnesses would violate a defendant ability to confront and cross-examine the witnesses against him. *Crawford v. Washington,* 451 U.S. 36 (2004).

**b. 10th Circuit Recognizes Pre-trial determination.**

The 10th Circuit has expressed a "strong preference" that determinations of the admissibility of a co-conspirator statements be made in advance of trial outside the presence of the jury. *See United States v. Urena,* 27 F.3d 1487, 1491 (10th Cir. 1994). This determination would enable a Court to determine whether the government can meet its burden under F.R.E. §801. This is a preferred manner of conducting the determination, than "provisionally" admitting the evidence and finding out later in the trial that the evidence does not meet the requirements necessary to make the hearsay admissible. *See Urena,* 27 F.3d at 1491; *United States v. James,* 590 F.2d 575, 581-582 (5th Cir. 1979). The Government must present, outside the hearing of the jury, sufficient evidence to corroborate the out of court "hearsay" statements that it intends to offer under the federal rules of evidence such that a court can determine that the statements are not inadmissible hearsay. It also affords the court to determine whether the statement were made during and in furtherance of the conspiracy.[1]

### III. "We want Joe"[2]

The defendants file this motion after having received an enormous amount of discovery. This abundance of discovery has made several facts clear. The first is that the actions that are

---

[1] Defendant incorporates by reference the law that is set forth in Docs. 1228, 1292 and 1303 on this matter.
[2] The agents interviewing Paul Rivera at 35:25 in the audio recording state that "We want Joe".

alleged to have been conducted by Joe Lawrence Gallegos, were to  benefit no one or group oth-

er than  Joe Gallegos.[3] Paul Rivera is not a member of  Syndicato Nuevo Mexico (SNM).[4] In the

recorded statement Paul Rivera states that Joe Gallegos was an ESL and did not mention that he

was a member of SNM.[5] Paul Rivera states on the recording that Brandi and Shauna are being

chastised and  yelled at by Joe Gallegos about his problems with J.G.[6]

 Because these  statements  do not support the allegations in the Indictment, the de-

fendants request that the Court hold a pre-trial hearing to determine if the alleged attack

on J.G. was part of  a conspiracy on behalf of the SNM that invokes the jurisdiction of this

Court as well as  what statements,  if any,  were made during the course or in the further-

ance of the conspiracy as required by FRE 802(d)(2)(E).[7]

The defendants request that  *United States v. Urea,* 27 F.3d 1487, 1491 (10th Cir. 1994)

this Court  conduct a pre-trial hearing and require what  statements  the Government plans to seek

to introduce into evidence and produce evidence as to  how the statements  relate to the SNM con-

spiracy.

In order to make efficient use of the Court's time, the Defendants would request that

the Government identify all statements that it intends to offer into evidence in advance of

any hearing on the matter to  will promote the efficient preparation use of time by both

parties.

---

[3] No reference is made in the audio to the acts being "for the benefit" of or "advancement of" the SNM.

[4] Paul Rivera Redacted Interview at 20:00. and at13:00 minutes where he says he's a "junk-ie" and therefore cannot be an SNM member.

[5] *Id. At* 1:37 the agents ask and Paul agrees the "Joe is also with the SNM" There is no follow up on this statement by the Paul or the agents.

[6] *See* Affidavit of Paula Sanchez stating that there are no incriminating statements on the audio calls based on her experience and review of the discovery.

[7] *See* Affidavit of Paula Sanchez.

## IV. Exclusion of Statements of Non-Testifying Defendant Santos Gonzalez

The defendants would request that the Court inquire of the Government what if any statements that it intends to offer from  Defendant Santos Gonzalez. Defendant Santos Gonzales has pled guilty to Counts 14, 15 and 16 of the Second Superceding Indictment. [Doc. 1180] Defendant, Gonzalez, is not expected to testify,  however, reports of investigation and other materials produced purport contained references to statements he is alleged to have made  that the Government may seek to introduce into evidence.   The Defendants would request that these  statements be identified by Bates number and that the Court construe those statements in the manner requested by Billy Garcia's Motion to Prevent the Admission of Statements of Non-Testifying Codefendants Implicating Defendant Billy Garcia and For an Order for the Government to Specify Such Statements Prior to Trial. [Doc. 1307]. Production of statements in advance of trial will help insure that the trial is fair and appropriately expedited by allowing the defendants to identify and determine admissibility *James* statements without interrupting the proceedings.

### Consultation

Given the stance the Government has taken in similar requests and motions , concurrence wasn't sought from the government pursuant to D.N.M.LR-Cr 47.1.

Respectfully Submitted,

*/s/ Brock Benjamin*
**Brock Benjamin**
Benjamin Law Firm
747 E. San Antonio, Suite 203
El Paso, TX 79901
Phone:(915)412-5858
Fax:(915)503-2224
Email: brock@brockmorganbenjamin.com
Co-counsel for Joe Lawrence Gallegos

/s/
_____

**Richard Sindel**
Sindel, Sindel & Noble, P.C.
8000 Maryland Avenue, Suite 350
Clayton, MO 63105
Phone: (314) 721-6040
Fax: (314) 721-8545
Email: rsindel@sindellaw.com
Co-counsel for Joe Lawrence Gallegos

/s/
_____

Amy Sirignano, Esq.
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM 87109
(505) 242-2770
(505) 242-2774 facsimile
E-Mail:  amy@abqnmlaw.com
Counsel for Christopher Garcia

/s/
_____

Christopher W. Adams
The Law Office of Christopher W. Adams, PC
102 Broad Street, Suite C
Charleston, SC 29401
(843) 577-2153
(877) 883-9114 facsimile
chris@chrisadamslaw.com
Co-counsel for Christopher Garcia

/s/
_____

**Cori Ann Harbour-Valdez**
The Harbour Law Firm, PC
PO Box 13268
El Paso, TX 79913
Phone: 915-544-7600
Fax: 915-975-8036
Email: cori@harbourlaw.net
Counsel for Edward Troup

/s/ _____

**Patrick J. Burke**
Patrick J. Burke, PC
999 18th Street, Suite 2055
Denver, CO 80202
Phone: 303-825-3050
Fax: 303-825-2992
Email: patrick-j-burke@msn.com
Co-counsel for Edward Troup


/s/ _____

**James A. Castle**
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206
(303) 675-0500
Fax: (303) 329-5500
Email: JCastlelaw@gmail.com
Counsel for Billy Garcia


/s/ _____

**Robert R. Cooper**
1011 Lomas Blvd NW
Albuquerque, NM 87102
505-842-8494
Fax: (505) 243-6279
Email: bob@rrcooper.com
Co-counsel for Billy Garcia

/s/ _____

**Jeffrey C. Lahann**
665 E. University Ave. #2A
Las Cruces, NM 88005
575-523-4394
Fax: 1-888-694-7241
Email: jeff@lahannlaw.com
Counsel for Allen Patterson

/s/ _____
**Orlando Mondragon**
1028 Rio Grande
El Paso, TX 79902
Phone: 915-566-8181
Fax: 915-566-9696
Email: mondragonom@gmail.com
Counsel for Christopher Chavez


/s/ _____
**John L. Granberg**
Granberg Law Office
310 N. Mesa Suite 424
El Paso, TX 79901
Phone: (915) 543-9000
Fax: (915) 543-3201
Email: granberglawoffice@yahoo.com
Co-counsel for Christopher Chavez


/s/ _____
**Billy R. Blackburn**
1011 Lomas Blvd. NW
Albuquerque, NM 87102
Phone: 505-242-1600
Fax: 505-243-6279
Email: Billy@BBlackburnlaw.com
Counsel for Arturo Arnulfo Garcia


/s/ _____
**Scott Moran Davidson**
1011 Lomas Boulevard NW
Albuquerque, NM 87102
Phone: 505-255-9084
Fax: 505-243-6279
Email: scott@justappeals.net
Co-counsel Arturo Arnulfo Garcia


/s/ _____
**Santiago David Hernandez**
Law Office of Santiago D. Hernandez
1219 E. Missouri
El Paso, TX 79902
Phone: 915-351-4300
Fax: 915-351-4372
Email: santilawyer@gmail.com
Counsel for Mario Rodriguez

/s/ _____
**Steven M Potolsky**
PO Box 50973
Jacksonville Beach, FL 32250
Phone: 305-335-5539
Fax: 305-358-5917
Email: stevepo@bellsouth.net
Co-counsel for Mario Rodriguez

/s/ _____
**Mary Stillinger**
4911 Alameda Ave
El Paso, TX 79905
Phone:(915)775-0705
Fax:(915)886-7178
Email: stillingerlaw@sbcglobal.net
Counsel for Mauricio Varela

/s/ _____
**Amy E. Jacks**
Law Office of Amy E. Jacks
315 E. 8th St. #801
Los Angeles, CA 90014
Phone: 213-489-9025
Fax: 213-489-9027
Email: amyejacks@sbcglobal.net
Counsel for Daniel Sanchez

/s/ _____
**Richard Jewkes**
Richard Jewkes
701 N. Saint Vrain St
El Paso, TX 79902
Phone: (915) 534-7400
Fax:(915) 534-7407
Email: richardjewkes@sbcglobal.net
Co-counsel for Daniel Sanchez

/s/
**B.J. Crow**
Crow Law Firm
400 N. Pennsylvania Ave.
Suite 1150
Roswell, NM 88201
575-291-0200
Fax: 575-291-0201
Email: bj@crow-law-firm.com
Counsel for Conrad Villegas


/s/
**Marc M Lowry**
Rothstein Donatelli LLP
500 4th Street N.W. Suite 400
Albuquerque, NM 87102
Phone:(505) 243-1443
Fax: (505) 242-7845
Email: mlowry@rothsteinlaw.com
Counsel for Anthony Ray Baca


/s/
**Theresa M Duncan**
Duncan Earnest LLC
515 Granite NW, Albuquerque, NM 87102
Phone: 505-842-5196
Fax: 505-750-9780
Email: teri@duncanearnest.com
Co-counsel for Anthony Ray Baca


/s/
**Michael V Davis**
Michael V. Davis, Attorney & Counselor at Law,
P.C.
Post Office Box 3748
3949 Corrales Road, Suite 130
Corrales, NM 87048
Phone: (505) 242-5979
Fax: 505-899-3103
Email: mdavis@swcp.com
Counsel for Carlos Herrera

/s/
_____

**Carey Corlew Bhalla**
Law Office of Carey C. Bhalla LLC
925 Luna Cir NW
Albuquerque, NM 87102
Phone: 505-508-5589
Email: carey@bhallalaw.com
Co-counsel for Carlos Herrera

/s/
_____

**Justine Fox-Young**
1903 Wyoming Blvd. NE Ste. B
Albuquerque, NM 87112
Phone: 505-796-8268
Email: justine@foxyounglaw.com
Counsel for Rudy Perez

/s/
_____

**Ryan J Villa**
2501 Rio Grande Blvd NW Suite A
Albuquerque, NM 87104
Phone: (505) 639-5709
Fax: 505-433-5812
Email: ryan@rjvlawfirm.com
Co-counsel for Rudy Perez

/s/
_____

**Donavon A. Roberts**
PO Box 36344
Albuquerque, NM 87176-6344
Phone: 505-506-3749
Fax: 505-503-8405
Email: ladar170@aim.com
Counsel for Andrew Gallegos

/s/
_____

**Angela Arellanes**
PO Box 1784
Albuquerque, NM 87103
505-247-2417
Fax: 505-242-1878
Email: arellanesattorney@yahoo.com
Counsel for Shauna Gutierrez

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 13th day of October, 2017, I electronical-
ly transmitted the attached document to the Clerk's Office using the CM/ECF system for filing
and service to all CM/ECF registrants.


*/s/ Brock Benjamin*
BROCK BENJAMIN

### AFFIDAVIT

**STATE OF NEW MEXICO**

§
§
§

**COUNTY OF BERNALILLO**

BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, on this day personally appeared **Paula Sanchez-Knudsen**, known to me to be a credible person over the age of 18 and who, after having been by me first duly sworn, stated and deposed upon oath as follows, to-wit:

I am a retired Sergeant from the Bernalillo County Sheriff's Department and was certified as a law enforcement officer for the State of New Mexico. I was employed with the Bernalillo County Sheriff's Department as a law enforcement cadet/officer from April 2001 until my retirement in August 2016. During my tenure at the Sheriff's Department, I was assigned and received experience in the following: field services, Crimes Against Children Unit, Task Force Officer for the Drug Enforcement Agency, Drill Instructor Class 28, Internal Affairs, District Court, and Commission on Accreditation for Law Enforcement Agencies. I have investigative experience in a wide range of areas to include, crimes against children (abuse -physical, verbal, sexual), drug enforcement, administrative investigations, and national accreditation of the Department. Prior to my time as a law enforcement cadet/deputy, I was employed with the City of Albuquerque as a Human Resource Testing Analyst from July 2000-April 2001. I was also employed with the Bernalillo County Sheriff's Department as a Crime Analyst from August 1998-February 2000. I was also employed with the Second Judicial District Attorney's Office as a screener/administrative aid for the Property/Narcotics Division under the HIDTA Grant from July 1995 until August 1998. I acquired both my Masters of Public Administration with certificates in Budgeting and Personnel and my B.A. of Criminal Justice from the University of New Mexico.

I have been appointed as an investigator in the United States v. DeLeon, In Cause No. 15-CR-4268 in the District of New Mexico. As part of my appointment in this matter I have reviewed the discovery that has been produced.

I have reviewed the audio file titled "Redacted Audio of Interview of P. Rivera on 5-18-16." This is a recording with a length of 2:07:55. Paul Rivera represents that Joe Gallegos is a "scary guy" who can fight. He does not identify that Joe Gallegos has done any actions for the benefit of the SNM. Further, he states that he was part of the attack on February 27, 2016. The material fact in the way that he represented this, is that he maintained that it was for the benefit of Joe Gallegos. Paul Rivera did not refer to the SNM during the entire course of his description of the attack on J.G and does not represent that it was for the benefit of SNM. Paul Rivera identifies Joe Gallegos as the head of the East Side Locos (ESL) at approximately 20 minutes into the interview. Paul also states that J.G. has problems with the ESL. Paul does not mention that J.G. had any problems with the SNM. The audio is Paul Rivera's narrative of the events surrounding the attack on J.G. interspersed with comments by the Agents.

The agents ask Joe Gallegos' instructions for the attack on J.G. come from Joe Gallegos through phones or letters. Paul tells the investigators that the instructions came by both methods, though he has never been involved first hand.  I have reviewed the audio recordings from Joe Gallegos jail calls that were produced in this discovery. I have not heard any reference to an attack on J.G. The one reference that I have heard about J.G. in the audio recordings is Shauna Gutierrez telling Joe that she and her son saw J.G. at a party and Joe told Shauna Gutierrez to leave J.G. alone.

The agent's interrogation tactics additionally are influential on the manner of the statement. At approximately 1:19:48 into the interview, an unknown agent tells Paul that he is about 90 percent there. He continues stating that he believes that Paul has been honest up and until Paul exited the vehicle. They then tell Paul that three others have made different stories than Paul has.  They ask Paul to come clean with his story and cite how other stories are matching up and his is not.

Paula Sanchez-Knudsen

SWORN AND SUBSCRIBED BEFORE ME ON THIS 12 TH DAY OF October 2017.

NOTARY PUBLIC

OFFICIAL SEAL
YOLANDA KRANTZ
NOTARY PUBLIC-STATE OF NEW MEXICO
My commission expires  11-15-2020

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

                                    Cause No. 15-4268 JB

v.

ANGEL DELEON,
**JOE GALLEGOS**,
**EDWARD TROUP,**
**BILLY GARCIA,**
**ALLEN PATTERSON,**
**CHRISTOPHER CHAVEZ,**
**ARTURO ARNULFO GARCIA,**
**MARIO RODRIGUEZ,**
**MAURICIO VARELA**
**DANIEL SANCHEZ**
**CONRAD VILLEGAS,**
**ANTHONY RAY BACA,**
**CHRISTOPHER GARCIA,**
**CARLOS HERRERA,**
**RUDY PEREZ,**
**ANDREW GALLEGOS**,
**SHAUNA GUTIERREZ**, AND
BRANDY RODRIGUEZ.

       Defendants.

---

**GALLEGOS DEFENDANT'S MOTION TO DISMISS**
**(PREINDICTMENT DELAY)**

---

Defendants hereby respectfully moves this Court to dismiss Counts 4 and 5, with prejudice, as a result of the pre-indictment delay consisting of three years time after a magistrate's preliminary hearing determined that the State of New Mexico was not able to prove there was sufficient  probable cause to determine that movants had murdered Adrian Burns in 2012.  As grounds, counsel states:

## I.  Factual Background

The movants through counsel would show that the following facts are relevant and necessary to enable the Court of fully understand the significance of the underlying events and the legal and factual bases supporting the requested dismissal and why the movants are prejudiced and denied their constitutional rights:

   a.   On November 12, 2012 Adrian Burns was found dead in a burned-out vehicle.  An autopsy later determined he had been shot by a .22 caliber weapon and was in the vehicle when it caught fire.

   b.    On or about November 20, 2012, Andrew and Joe Gallegos are arrested and taken into custody at a local hotel.

   c.   Defendant Joe Gallegos had been charged with; Murder in the 1st degree (open charge), Kidnapping (to inflict death, physical injury or a sexual offense on the victim - 1st degree), Tampering with evidence (3rd degree), Conspiracy to commit a felony (2nd degree), and Arson (over $2500), in Cause No. M-52-FR-2012-00231.

   d.    On or about December 6, 2012 the state Magistrate Judge held a probable cause hearing pursuant to state statute 5-302 NMSA. The State called multiple police officers and civilians as witnesses.    After hearing all of the State's evidence, the Judge determined that there was a "Failure to Make Showing of Probable Cause" and the complaint was dismissed. *See Exhibit "A".*

   e.    On November 13, 2014 the records of these and other related proceeding were destroyed.[1]

---

See attached Exhibit "B" the Party Information Sheet for Cause No. M-52-FR-2012-00231.

f.  On or about December 5, 2015 the defendant Joe Gallegos was charged by indictment in the Federal District of New Mexico *United States v. Angel Deleon et al.*, Cause No. 15-CR-04268-KG. The general thrust of the indictment included allegations that Joe Gallegos had murdered "F.C." on March 26, 2001 "as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM) and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang…."   [DOC 2. Count 1].  The indictment never mentioned the 2012 murder of Adrian Burns.

On or about April 21, 2016 in [Doc. 368] the Government filed its Superseding Indictment against Joe Gallegos and added Counts 4 and 5 against him. Additionally the Government added Andrew Gallegos as a defendant and charged him in the indictment in only Counts 4 and 5. During the time period from 2012 to April 21, 2016 it is believed that the United States Government maintained files that listed Joe Gallegos as a suspect in one or more offenses and that they were aware of the failed prosecution in relation to Adrian Burns' murder.

## II.  The Law

In order to prevail on this Motion, Messrs. Gallegos, movants must show both that they were prejudiced by the pre-indictment delay and that the delay was motivated by the government's desire to obtain a tactical advantage.  *United States v. Marion*, 404 U.S. 307, 323 (1971), *United States v. Lavasco*, 431 U.S. 783, 789 (1977), *United States v. Wood*, 207 F.3d. 1222, 1234 (10th Cir. 2000), *United States v. Abdush-Shakur,* 465 F.3d 458, 465 (10th Cir. 2006). In evaluating a Due Process claim, the Court must consider both prejudice to the defendant and the reasons for the delay.  *Lavasco,* 431 U.S. at 790.  If the delay was extensive, which it clearly

was in this case, the  violation of the principles of  Due Process may be excused if the delay was

**caused** by an **active** investigation.[2]    *Lavasco*, <u>431 U.S. at 796</u>.   The decision to bring charges

relating to the 2012 homicides was **not** based on complications resulted from an active and

ongoing investigation, but rather to prejudice the defendant by the introduction into evidence and



then parading before the jury
gruesome pictures of the **charred
corpse of Mr. Burns** and the alleged
brutality involved in his demise.
Movants have filed a Motion for a
Bill of Particulars [DOC. 1143]
requesting information that the
Government has to support their

claim that the murder of Adrian Burns was done in consideration of and for the purposes

ascribed in Counts 1 and 2.  The Government's response has been akin to that of Prince Hamlet's

last words, "the rest is silence."  Wm. Shakespeare ."*Hamlet Prince of Denmark,*  Act V, Scene

II, Alfred Harbage  ed., Penguin Books, Inc. 1969. The decision to bring charges relating to these

formerly dismissed state homicides was motivated by the Government's desire to incite and

pander to the jurors passions and prejudices rather than make decisions and reach conclusions

based on  rational and logical thought unmoved and undirected by prejudice and passion.

### III.  Prejudice

During the initial investigation in 2012 a hearing was conducted that resulted in a

determination that a particularly brutal  murder failed to  meet the lowest standard in criminal

---

[2] Interviews of witnesses appear to have begun anew after the Superseding Indictment.

law—probable cause.. The testimony of the officers and other witnesses at that hearing has long since been destroyed. *See* Exhibit "B". The government profited from its destruction and the loss of testimony that  was beneficial to the movants.

The officers who participated at that hearing have been schooled in their mistakes and their testimony will be necessarily tightened to present the Government's case in the most damaging light.    Further, the Government has not produced any statements that it has in its possession that may have been obtained or notes thereof, presumably classifying these as Jenks statements. In reality, based on the outcome of the hearing, arguably any information relating to the testimony or notes of any officer involved in the 2012 investigation should be classified as *Brady* material because of the state magistrate's findings in the probable cause hearing and his subsequent ruling.  See Exhibit "A.".

The prejudice, as described above, becomes more manifest because the prosecution plays a cat-and-mouse game with discovery.   The government refuses to provide *Jencks'* statements until two weeks before trial.  The government has failed to fully disclose and provide *Giglio* and *Brady* materials in good faith.[3]  Thus, Movants suffer ongoing prejudice.  The prejudice caused by the delay might have been ameliorated a bit if the government had had:  1)  properly

---

[3]  The government's strategies and hide and seek gamesmanship is apparent from its response to Defendants Billy Garcia and Edward Troup's Second Motion to Compel [DOC 1275, 9/29/17].  On response it advances as an argument for its continued refusal to live up to its discovery and due process obligation by speciously claiming that, "Information used for impeachment necessarily requires a witness at trial.  The United States' deadline to disclose its witness list is January 12, 2018... Once the United States finalizes its witness list and decides which co-conspirators and witnesses, including cooperating witnesses, will testify at trial, the United States will ensure that it will then provide to Defendants the *Giglio* material."  In other words, the government has no obligation to disclose *Giglio* impeachment material because it has not made a formal declaration of witness identities.   This obfuscation deceptively devised and designed to frustrate the Defendants' opportunity to prepare for trial and fully investigate the holes in the government's case.  The tactic further ignores that the foundation for *Giglio* are the principles set out in *Brady* and *Giglio* material is quite simply a subset of the type of disclosure that *Brady* has required of prosecutors for more than 50 years.   If the government is permitted to get away with this disingenuous tactic, it will have successfully gutted *Giglio*.  Not to mention the fact that the government's Response totally ignores its *Brady* obligations.

preserved evidence; or 2) provided all *Jencks* materials early on, or 3) provided all *Giglio* and *Brady* materials early on.  The government chose to do none of these, however.

The Supreme Court has made clear that certain delays, due to their sheer length, are presumptively prejudicial.  In *Doggett v. United States*, 505 U.S. 647 (1992), the Court declared that:

> Impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown. . . . Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.

*Doggett*, 505 U.S. at 655.   The Supreme Court has made equally clear that the extent to which the defense will be impaired by the delay is "the most serious" of the accused's interests that warrant constitutional protection: "[T]he inability of a defendant to adequately prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious." *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182 (1972).  In *Nikens v. United States*, 323 F.2d 808, 813 (D.C. Cir. 1963), *cert denied*, 379 U.S. 905 (1964), Judge Wright in his concurrence explained that:

> Indeed, a suspect may be at a special disadvantage when a complaint or indictment, or arrest, is purposefully delayed. With no knowledge that criminal charges are to be brought against him, an innocent man has no reason to fix in his memory the happenings on the day of the alleged crime. Memory grows dim with the passage of time. Witnesses disappear. Each day, the accused becomes less able to make out his defense.

In addition, the Government admitted at the May hearings in this matter that it did not have any specific evidence linking the Gallegos brothers to the Rico Conspiracy as alleged in the indictment for the death of Adrian Burns.  The Government stated that it had presented some general evidence. This is gamesmanship 101. This is not a crime that is not able to be prosecuted. The allegations are identical to hundreds of similar homicides that are brought in the State of



Exhibit "D"

New Mexico every year. The United States Government has not pled and does not have sufficient facts to construct the nexus between a run-of-the-mill state homicide and the enterprise to confer jurisdiction upon this Court.   See Joe Gallegos' Motion to Dismiss [DOC. 1023][Withdrawn in DOC. 1145].  The prejudice is obvious, the delay unnecessary, and the loss of constitutional validity for this prosecution requires dismissal as does the prejudice that necessarily follows a delay that was devised and designed to insure a tactical victory for the prosecution.

### IV.  The Decision to Include  Counts Four and Five in the Indictment Was Based on Tactical Considerations

The delay was due to tactical considerations. The decision to include the Burns homicide investigations into the superseding RICO indictment was unquestionably tactical.  It enabled the prosecution to heap the inflammatory evidence guaranteed to result from the Burns counts to

spill over into the jury's decision-making process on the other counts. The tactical advantage being sought by the government was to bring as many prejudicial charges as it could in an overarching Superseding Indictment in its pursuit of the ultimate political goal-- dismantling the SNM.

The defendant has met his burden of showing both prejudice *and* that the delay was done to secure a tactical advantage for the government.

## Consultation

Given the contentious nature of this motion, concurrence wasn't sought from the government pursuant to D.N.M.LR-Cr 47.1.

WHEREFORE, Defendants Gallegos requests an Order from this Honorable Court that Counts Four and Five of the Second Superseding Indictment (Doc. 949) be dismissed.

Respectfully submitted this 13th day of October, 2017.

Respectfully Submitted,

/s/ Brock Benjamin
**Brock Benjamin**
Benjamin Law Firm
747 E. San Antonio, Suite 203
El Paso, TX 79901
Phone:(915)412-5858
Fax:(915)503-2224
Email: brock@brockmorganbenjamin.com
Co-counsel for Joe Lawrence Gallegos

/s/
**Richard Sindel**
Sindel, Sindel & Noble, P.C.
8000 Maryland Avenue, Suite 350
Clayton, MO 63105
Phone: (314) 721-6040
Fax: (314) 721-8545
Email: rsindel@sindellaw.com
Co-counsel for Joe Lawrence Gallegos

/s/
Amy Sirignano, Esq.
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM 87109
(505) 242-2770
(505) 242-2774 facsimile
E-Mail:  amy@abqnmlaw.com
Counsel for Christopher Garcia


/s/
Christopher W. Adams
The Law Office of Christopher W. Adams, PC
102 Broad Street, Suite C
Charleston, SC 29401
(843) 577-2153
(877) 883-9114 facsimile
chris@chrisadamslaw.com
Co-counsel for Christopher Garcia


/s/
**Cori Ann Harbour-Valdez**
The Harbour Law Firm, PC
PO Box 13268
El Paso, TX 79913
Phone: 915-544-7600
Fax: 915-975-8036
Email: cori@harbourlaw.net
Counsel for Edward Troup


/s/
**Patrick J. Burke**
Patrick J. Burke, PC
999 18th Street, Suite 2055
Denver, CO 80202
Phone: 303-825-3050
Fax: 303-825-2992
Email: patrick-j-burke@msn.com
Co-counsel for Edward Troup

/s/ _____

**James A. Castle**
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206
(303) 675-0500
Fax: (303) 329-5500
Email: JCastlelaw@gmail.com
Counsel for Billy Garcia


/s/ _____

**Robert R. Cooper**
1011 Lomas Blvd NW
Albuquerque, NM 87102
505-842-8494
Fax: (505) 243-6279
Email: bob@rrcooper.com
Co-counsel for Billy Garcia

/s/ _____

**Jeffrey C. Lahann**
665 E. University Ave. #2A
Las Cruces, NM 88005
575-523-4394
Fax: 1-888-694-7241
Email: jeff@lahannlaw.com
Counsel for Allen Patterson

/s/ _____

**Orlando Mondragon**
1028 Rio Grande
El Paso, TX 79902
Phone: 915-566-8181
Fax: 915-566-9696
Email: mondragonom@gmail.com
Counsel for Christopher Chavez

/s/
**John L. Granberg**
Granberg Law Office
310 N. Mesa Suite 424
El Paso, TX 79901
Phone: (915) 543-9000
Fax: (915) 543-3201
Email: granberglawoffice@yahoo.com
Co-counsel for Christopher Chavez


/s/
**Billy R. Blackburn**
1011 Lomas Blvd. NW
Albuquerque, NM 87102
Phone: 505-242-1600
Fax: 505-243-6279
Email: Billy@BBlackburnlaw.com
Counsel for Arturo Arnulfo Garcia


/s/
**Scott Moran Davidson**
1011 Lomas Boulevard NW
Albuquerque, NM 87102
Phone: 505-255-9084
Fax: 505-243-6279
Email: scott@justappeals.net
Co-counsel Arturo Arnulfo Garcia


/s/
**Santiago David Hernandez**
Law Office of Santiago D. Hernandez
1219 E. Missouri
El Paso, TX 79902
Phone: 915-351-4300
Fax: 915-351-4372
Email: santilawyer@gmail.com
Counsel for Mario Rodriguez


/s/
**Steven M Potolsky**
PO Box 50973
Jacksonville Beach, FL 32250
Phone: 305-335-5539
Fax: 305-358-5917
Email: stevepo@bellsouth.net
Co-counsel for Mario Rodriguez

/s/ _____
**Mary Stillinger**
4911 Alameda Ave
El Paso, TX 79905
Phone:(915)775-0705
Fax:(915)886-7178
Email: stillingerlaw@sbcglobal.net
Counsel for Mauricio Varela

/s/ _____
**Amy E. Jacks**
Law Office of Amy E. Jacks
315 E. 8th St. #801
Los Angeles, CA 90014
Phone: 213-489-9025
Fax: 213-489-9027
Email: amyejacks@sbcglobal.net
Counsel for Daniel Sanchez

/s/ _____
**Richard Jewkes**
Richard Jewkes
701 N. Saint Vrain St
El Paso, TX 79902
Phone: (915) 534-7400
Fax:(915) 534-7407
Email: richardjewkes@sbcglobal.net
Co-counsel for Daniel Sanchez

/s/
**B.J. Crow**
Crow Law Firm
400 N. Pennsylvania Ave.
Suite 1150
Roswell, NM 88201
575-291-0200
Fax: 575-291-0201
Email: bj@crow-law-firm.com
Counsel for Conrad Villegas


/s/
**Marc M Lowry**
Rothstein Donatelli LLP
500 4th Street N.W. Suite 400
Albuquerque, NM 87102
Phone:(505) 243-1443
Fax: (505) 242-7845
Email: mlowry@rothsteinlaw.com
Counsel for Anthony Ray Baca


/s/
**Theresa M Duncan**
Duncan Earnest LLC
515 Granite NW, Albuquerque, NM 87102
Phone: 505-842-5196
Fax: 505-750-9780
Email: teri@duncanearnest.com
Co-counsel for Anthony Ray Baca


/s/
**Michael V Davis**
Michael V. Davis, Attorney & Counselor at Law,
P.C.
Post Office Box 3748
3949 Corrales Road, Suite 130
Corrales, NM 87048
Phone: (505) 242-5979
Fax: 505-899-3103
Email: mdavis@swcp.com
Counsel for Carlos Herrera

/s/
_____
**Carey Corlew Bhalla**
Law Office of Carey C. Bhalla LLC
925 Luna Cir NW
Albuquerque, NM 87102
Phone: 505-508-5589
Email: carey@bhallalaw.com
Co-counsel for Carlos Herrera

/s/
_____
**Justine Fox-Young**
1903 Wyoming Blvd. NE Ste. B
Albuquerque, NM 87112
Phone: 505-796-8268
Email: justine@foxyounglaw.com
Counsel for Rudy Perez

/s/
_____
**Ryan J Villa**
2501 Rio Grande Blvd NW Suite A
Albuquerque, NM 87104
Phone: (505) 639-5709
Fax: 505-433-5812
Email: ryan@rjvlawfirm.com
Co-counsel for Rudy Perez

/s/
_____
**Donavon A. Roberts**
PO Box 36344
Albuquerque, NM 87176-6344
Phone: 505-506-3749
Fax: 505-503-8405
Email: ladar170@aim.com
Counsel for Andrew Gallegos

/s/
_____
**Angela Arellanes**
PO Box 1784
Albuquerque, NM 87103
505-247-2417
Fax: 505-242-1878
Email: arellanesattorney@yahoo.com
Counsel for Shauna Gutierrez

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 13th day of October, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.

_/s/ Brock Benjamin_____
BROCK BENJAMIN

DNM 1062

STATE OF NEW MEXICO
SOCORRO COUNTY MAGISTRATE COURT IN SOCORRO

**State of New Mexico**
**v**
**JOE L GALLEGOS, Defendant**                                         No. M-52-FR-2012-00231

## PROBABLE CAUSE DETERMINATION

*(For use only if the defendant has been arrested without a warrant and has not been released)*

**Finding of Probable Cause**

[ ]     I find that there is a written showing of probable cause to believe that a crime has been committed and that the above named defendant committed it.

It is ordered that the defendant shall be released:
[ ]        on personal recognizance.
[ ]        on the conditions of release set forth in the release order.

**Failure to Make Showing of Probable Cause**

[ xx]   I find that probable cause has not been shown that a crime has been committed and that the above named defendant committed it.
It is therefore ordered that the complaint against the defendant be and the same is hereby dismissed without prejudice and the defendant be immediately discharged from custody.

*FILED IN*
*SOCORRO COUNTY*
*DEC 06 2012*
*MAGISTRATE COURT*

                                                    *12-6-12*
                                                                          Date
                                                                          Time
                                                              Jim Naranjo, Judge

Unless the defendant has been released on personal recognizance, the amount of bail set and any conditions of release prescribed by a designee must also be reviewed.

This form is not necessary if the finding of probable cause is endorsed by the judge on the criminal complaint or on a statement of probable cause.

## EXHIBIT "A"

DNM 1063

STATE OF NEW MEXICO
SOCORRO COUNTY MAGISTRATE COURT IN SOCORRO

**State of New Mexico**
**v**
**JOE L GALLEGOS, Defendant**

No. M-52-FR-2012-00231

## PROBABLE CAUSE DETERMINATION

*(For use only if the defendant has been arrested without a warrant and has not been released)*

**Finding of Probable Cause**

[ ]   I find that there is a written showing of probable cause to believe that a crime has been committed and that the above named defendant committed it.

It is ordered that the defendant shall be released:
[ ]   on personal recognizance.
[ ]   on the conditions of release set forth in the release order.

FILED IN
SOCORRO COUNTY
DEC 06 2012
MAGISTRATE COURT

**Failure to Make Showing of Probable Cause**

[ xx ]   I find that probable cause has not been shown that a crime has been committed and that the above named defendant committed it.

It is therefore ordered that the complaint against the defendant be and the same is hereby dismissed without prejudice and the defendant be immediately discharged from custody.

12-6-12
_____
Date

_____
Time

_____
Jim Naranjo, Judge

Unless the defendant has been released on personal recognizance, the amount of bail set and any conditions of release prescribed by a designee must also be reviewed.

This form is not necessary if the finding of probable cause is endorsed by the judge on the criminal complaint or on a statement of probable cause.

DNM 1064

Skip to Main Content Logout My Account Search Menu New Criminal Search Refine Search Back

Location : All Courts Help

# REGISTER OF ACTIONS
## CASE NO. M-52-FR-2012-00231

State of New Mexico v. JOE L GALLEGOS

§
§
§
§
§
§

Case Type: **Felony**
Date Filed: **11/19/2012**
Location: **Socorro County Magistrate Court: Socorro**
Judicial Officer: **Naranjo, Jim**

---

### PARTY INFORMATION

| | | | |
|---|---|---|---|
| Defendant | GALLEGOS, JOE L | Male<br>5' 7", 190 lbs | **Attorneys**<br>**Lee Deschamps**<br>*Public Defender*<br>575-838-0777(W)<br><br>Stacey A. Ward<br>*Public Defender*<br>505-238-5797(W) |
| Plaintiff | State of New Mexico | | |

---

### CHARGE INFORMATION

| Charges: GALLEGOS, JOE L | Statute | Level | Date |
|---|---|---|---|
| 1. Murder in the first degree (felony murder) | 30-02-01(A)(2) | Felony | 11/12/2012 |
| 2. Kidnapping (first degree) | 30-04-01 | 1st Degree Felony | 11/12/2012 |
| 3. Tampering with evidence (highest crime a third, fourth or indeterminate degree felony) | 30-22-05 | 4th Degree Felony | 11/12/2012 |
| 4. Murder in the first degree (felony murder) - conspiracy | 30-02-01(A)(2) | 2nd Degree Felony | 11/12/2012 |
| 5. Arson property (over $2,500 but not more than $20,000) | 30-17-05(A) | 3rd Degree Felony | 11/12/2012 |

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

| | |
|---|---|
| 12/06/2012 | **Disposition** (Judicial Officer: Naranjo, Jim)<br>1. Murder in the first degree (felony murder)<br>    Discharged<br>2. Kidnapping (first degree)<br>    Discharged<br>3. Tampering with evidence (highest crime a third, fourth or indeterminate degree felony)<br>    Discharged<br>4. Murder in the first degree (felony murder) - conspiracy<br>    Discharged<br>5. Arson property (over $2,500 but not more than $20,000)<br>    Discharged |

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 11/16/2012 | **MTN: MOTION**<br>*Motion to Seal Court Pleadings (Berry/ADA)* |
| 11/19/2012 | **OPN: CRIMINAL COMPLAINT FILED** |
| 11/19/2012 | **AFFIDAVIT OF ARREST WARRANT** |
| 11/19/2012 | **WAR: ARREST WARRANT ISSUED** |
| 11/26/2012 | **ORD: ORDER FILED**<br>*Order Unsealing the Court Records* |
| 11/26/2012 | **First Appearance** (9:46 AM) (Judicial Officer Naranjo, Jim)<br>Parties Present<br><br>Result: Held |
| 11/26/2012 | **MISCELLANEOUS ENTRY**<br>*Return of Arrest Warrant: def arrested 11/20/12 by Valencia Co SO* |
| 11/26/2012 | **INDIGENT DETERMINATION FOR DEFENDANT FILED** |
| 11/26/2012 | **ORD: ORDER OF APPOINTMENT**<br>*Lee Deschamps apptd as Public Defender, assigned by CCU* |
| 11/27/2012 | **ENTRY OF APPEARANCE FILED**<br>*Entry of Appearance, Request for Speedy Trial & Request for Discovery (Deschamps)* |
| 12/06/2012 | **Preliminary Examination** (9:30 AM) (Judicial Officer Naranjo, Jim)<br>Parties Present<br><br>Result: Held |

EXHIBIT "B"



EXHIBIT "C"



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

                                Cause No. 15-4268 JB

**v.**

ANGEL DELEON,
**JOE GALLEGOS**,
**EDWARD TROUP,**
**BILLY GARCIA,**
**ALLEN PATTERSON,**
**CHRISTOPHER CHAVEZ,**
**ARTURO ARNULFO GARCIA,**
**MARIO RODRIGUEZ,**
**MAURICIO VARELA**
**DANIEL SANCHEZ,**
**CONRAD VILLEGAS,**
**ANTHONY RAY BACA,**
**CHRISTOPHER GARCIA,**
**CARLOS HERRERA,**
**RUDY PEREZ,**
**ANDREW GALLEGOS**,
**SHAUNA GUTIERREZ**, AND
BRANDY RODRIGUEZ.

      Defendants.

**DEFENDANT JOE GALLEGOS' MOTION FOR A BILL OF PARTICULARS AS TO
COUNTS 13-16**

      COMES NOW, the Defendants through their counsel of record, and under Fed. Crim. P.

7(f) hereby respectfully moves the Court to order Plaintiff to provide counsel with a bill of

particulars in this case. Joe Gallegos seeks an order directing the Plaintiff to provide a bill of

particulars notifying him of his purported involvement in the charged racketeering enterprise and the evidence to support the requisite evidence that he committed the alleged violent offenses in aid of racketeering for "consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise." Additionally, Joe Gallegos seeks an order directing the Plaintiff to provide a bill of particulars describing (1) the evidence that supports the Plaintiff's claim as articulated in the Second Superseding Indictment that the actions were for the benefit of the SNM.

In support of his motion, Joe Gallegos submits the following:

## I.   Argument- The Language in the Second Superseding Indictment is Insufficient to Apprise Mr. Gallegos of the Specifics of the Charges Against Him.

Rule 7(c) of the Federal Rules of Criminal Procedure states that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). The indictment must sufficiently apprise the defendant of what evidence he must be prepared to meet at trial.

Joe Gallegos requests the government provide a bill of particulars in this case as to Counts 13-16, as well as how the evidence that proves the enterprise and that J.G. was assaulted in furtherance of the goals of the enterprise at issue. This applies to both assaults upon J.G. The first being the assault in Count 13, March 27, 2016 and the second assault that is alleged to have occurred on February 27, 2016. This second assaults acts make up Counts 14-16 of the Second Superseding Indictment. The purpose of a bill of particulars is to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at time of trial and to enable him to plead his acquittal or

DNM 1069

conviction in bar of another prosecution for the same offense when the indictment itself is too vague and indefinite for such purposes. *Wyatt v. United States* 388 F.2d 395, 397 (10th Cir. 1968), *quoting United States. v. Haskins*, 345 F.2d 111, 114 (6th Cir. 1965); *see also United States v. Levine*, 983 F.2d 165, 166-67 (10th Cir. 1992).

The Government's Second Superseding Indictment makes sweeping allegations of Joe Gallegos' involvement in a long-term racketeering conspiracy as overbroadly evidenced in Counts 1, 4, 5, 13, 14, 15, and 16. The failures in the indictment are most obvious and damaging in Count 13, where even the discovery makes no mention of why this act is believed to have been conducted for the benefit of SNM where Joe Gallegos is identify by a cooperator as a member of the East Side Locos (ESL).[1]  The only suggestion from the government that there is evidence that proves either assault of J.G. qualifies as a RICO offense is contained in their Superseding Indictment. Counts 14-16 are equally faulty as they make sweeping allegations that the assaults or attempted murder were for the benefit of Joe Gallegos in relation to the SNM. This where their own witness does not make that allegation in his interview.[2]  Joe Gallegos cannot properly defend against the charges in the Indictment, or to adequately address issues such as his role, or the extent of his alleged participation without Plaintiff providing additional details about these issues in the form of a bill of particulars. There is no other way for Gallegos to guard against the government's shifting its "theory" as the evidence unfolds and is challenged in court.

---

[1] Paul Rivera in his recorded interview identifies Joe Gallegos as an ESL and only on request by the agent conducting the interview affirms that he is SNM. There is nothing in that affirmation that shows that the alleged assault in Count 13 is for the benefit, or advancement of Joe Gallegos in the SNM.
[2] Paul Rivera's plea agreement factual basis clearly states the elements needed. However, this is contradicted by his statement.

DNM 1070

A bill of particulars supplements an indictment drafted with insufficient particularity. *See United States v. Jensen*, 193 F. Supp. 2d 601, 605 (D.N.Y. 2002). "The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense." *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996). A bill of particulars is necessary in a given case when the Court needs to ensure that the defendant is informed of "the *substantive facts* of the charges against him." *United States v. Griffith*, 362 F. Supp. 2d 1263, 1277 (D. Kan. 2005) (emphasis added).

Joe Gallegos is entitled to know what specific factual events the government intends to prove at trial. A bill of particulars is an appropriate means to provide him with an adequate factual foundation to prepare his defense against the charges. *United States v. Staggs*, 881 F.2d 1527, 1536 (10th Cir. 1989) (J. Logan, Circuit Judge, concurring); *United States v. Walters*, 188 F.R.D. 591, 596 (D. Kan. 1999), *citing United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988) ("The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense") (internal quotations and citation omitted).

Given the fact that the defense has voluminous discovery in this case that does not address Count 13 but minimally and Counts 14-16 the evidence appears to contradict the Indictment. The indictment falls woefully short of the fundamental legal requirements; Joe Gallegos is entitled to bill of particulars in order to achieve a general understanding of the basis for his alleged participation in the charged racketeering conspiracy as to Count 13-16 and the evidence against him. "[I]f the allegations in respect to the manner and means of effecting the object of the

DNM 1071

combination and conspiracy are not set forth in detail, the remedy is to apply for a bill of particulars." *United States v. Mobile Materials, Inc*., 871 F.2d 902, 908 (10th Cir. 1989) (quoting *Frankfort Distilleries v. United States*, 144 F.2d 824, 832 (10th Cir. 1944)).

As it stands, the indictment provides Joe Gallegos with no notice regarding the alleged placement of these counts under the RICO umbrella or that J.G.'s assaults was on behalf of the alleged enterprise.  Mr. Gallegos is to left to guess whether the government will contend at trial that Gallegos assaulted J.G. because his pride was hurt, that he did it for money, or prestige.

The government's broom sweeps too broadly and it must advise the Defendant of the evidence it claims supports each of these propositions.  The Government's failure to provide this information impermissibly deprives Joe Gallegos of a fair opportunity to prepare his defense. *See Dunn* at 1029.

Additionally, when the government charges violations of Racketeer Influenced and Corrupt Organization (RICO), a bill of particulars is especially important: With the wide latitude accorded the prosecution to frame a charge that a defendant has "conspired" to promote the affairs of an "enterprise" through a "pattern of racketeering activity" comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope. *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). It is important to note that judges in other RICO related cases have found it necessary to order bills of particulars. *See United States v. Cerna*, 2009 WL 2998929 (N.D. Cal. Sept. 16, 2009); *United States v Ablett*, 2010 WL 3063145 (N.D. Cal. Aug. 3, 2010*); United States v. Cerna*, 2010 WL 3198927 (N.D. Cal. Aug. 11, 2010); *United States v. Martinez*, 2014 WL 1724490 (N.D. Cal. Apr. 30, 2014); *United States v. Alvarez*, 2014 WL 7240670 (N.D. Cal. Dec. 19, 2014).

DNM 1072

Where the charge against the defendant is broad in scope, a bill of particulars may be more

appropriate than where the charged conduct is more narrow. *See, e.g., United States v. Barnes,* 158

F.3d 662, 666 (2d Cir.1998 ) ("a bill of particulars or other adequate disclosure is appropriate

where a conspiracy count covers a complex series of events over a number of years, but provides

only the bare bones of the charge"); *Davidoff* at 1154–55 (district court abused discretion in

denying a bill of particulars identifying victims in *seven-year*[3] racketeering conspiracy; court noted

that principles governing bills of particulars "must be applied with some care when the

[g]overnment charges criminal offenses under statutes as broad as RICO"). [emphasis added].

Here, the Indictment for Counts 13-16 avers that the "SNM gang enterprise, through its

members and associates, engaged in racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1)

and 1961(1), that is acts and threats involving murder and robbery in violation of New Mexico

law. . ." [Doc. 368] pg. 9

 However, there is no indication of whether Joe Gallegos was an active member or

associate of SNM at the time of the assaults. In fact as cited above, it appears that he was a member

of another organization, ESL, not SNM.  There is also no produced evidence that Joe Gallegos

assaulted J.G., in exchange for or in hopes of receiving anything of pecuniary value, or for the

purpose of gaining entrance to and maintaining and increasing his position in the SNM, a prison

experience that was eight years in his rear view mirror. The information requested is necessary to

defend against the undocumented and conclusory allegations against Joe Gallegos. It is also

necessary in order to determine whether, and how, Federal Rule of Evidence 801(d)(2)(E) may

apply to statements made by declarants during the course of the conspiracy alleged in Count 13,

---

[3] According to the indictment the enterprise lasted no fewer than 37 years.

Page 6 of 14

of which they and the person the statement is offered against were members. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Given the inadequacy of the allegations in Counts 13-16, it is imperative for Joe Gallegos and his attorneys to be made aware of, with a bill of particulars, the exact evidence against him. In order for him to properly prepare his defense. This Court should order the government to provide a bill of particulars identifying the source of the claims leveled against Mr. Gallegos.

AUSA Maria Armijo, Plaintiff presumably opposes the relief requested herein.

### Conclusion

Wherefore, for the reasons discussed above, Joe Gallegos respectfully requests this Court to order Plaintiff to produce a Bill of Particulars addressing the deficiencies in the Second Superseding Indictment as set forth in this motion.

Respectfully Submitted,

*/s/ Brock Benjamin*
**Brock Benjamin**
Benjamin Law Firm
747 E. San Antonio, Suite 203
El Paso, TX 79901
Phone:(915)412-5858
Fax:(915)503-2224
Email: brock@brockmorganbenjamin.com
Co-counsel for Joe Lawrence Gallegos

/s/
**Richard Sindel**
Sindel, Sindel & Noble, P.C.
8000 Maryland Avenue, Suite 350
Clayton, MO 63105
Phone: (314) 721-6040
Fax: (314) 721-8545
Email: rsindel@sindellaw.com
Co-counsel for Joe Lawrence Gallegos

Page 7 of 14

/s/ _____

Amy Sirignano, Esq.
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM 87109
(505) 242-2770
(505) 242-2774 facsimile
E-Mail:  amy@abqnmlaw.com
Counsel for Christopher Garcia


/s/ _____

Christopher W. Adams
The Law Office of Christopher W. Adams, PC
102 Broad Street, Suite C
Charleston, SC 29401
(843) 577-2153
(877) 883-9114 facsimile
chris@chrisadamslaw.com
Co-counsel for Christopher Garcia


/s/ _____

**Cori Ann Harbour-Valdez**
The Harbour Law Firm, PC
PO Box 13268
El Paso, TX 79913
Phone: 915-544-7600
Fax: 915-975-8036
Email: cori@harbourlaw.net
Counsel for Edward Troup


/s/ _____

**Patrick J. Burke**
Patrick J. Burke, PC
999 18th Street, Suite 2055
Denver, CO 80202
Phone: 303-825-3050
Fax: 303-825-2992
Email: patrick-j-burke@msn.com
Co-counsel for Edward Troup

DNM 1075

/s/
**James A. Castle**
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206
(303) 675-0500
Fax: (303) 329-5500
Email: JCastlelaw@gmail.com
Counsel for Billy Garcia


/s/
**Robert R. Cooper**
1011 Lomas Blvd NW
Albuquerque, NM 87102
505-842-8494
Fax: (505) 243-6279
Email: bob@rrcooper.com
Co-counsel for Billy Garcia


/s/
**Jeffrey C. Lahann**
665 E. University Ave. #2A
Las Cruces, NM 88005
575-523-4394
Fax: 1-888-694-7241
Email: jeff@lahannlaw.com
Counsel for Allen Patterson


/s/
**Orlando Mondragon**
1028 Rio Grande
El Paso, TX 79902
Phone: 915-566-8181
Fax: 915-566-9696
Email: mondragonom@gmail.com
Counsel for Christopher Chavez

DNM 1076

/s/_____
**John L. Granberg**
Granberg Law Office
310 N. Mesa Suite 424
El Paso, TX 79901
Phone: (915) 543-9000
Fax: (915) 543-3201
Email: granberglawoffice@yahoo.com
Co-counsel for Christopher Chavez

/s/_____
**Billy R. Blackburn**
1011 Lomas Blvd. NW
Albuquerque, NM 87102
Phone: 505-242-1600
Fax: 505-243-6279
Email: Billy@BBlackburnlaw.com
Counsel for Arturo Arnulfo Garcia

/s/_____
**Scott Moran Davidson**
1011 Lomas Boulevard NW
Albuquerque, NM 87102
Phone: 505-255-9084
Fax: 505-243-6279
Email: scott@justappeals.net
Co-counsel Arturo Arnulfo Garcia

/s/_____
**Santiago David Hernandez**
Law Office of Santiago D. Hernandez
1219 E. Missouri
El Paso, TX 79902
Phone: 915-351-4300
Fax: 915-351-4372
Email: santilawyer@gmail.com
Counsel for Mario Rodriguez

Page 10 of 14

/s/ _____

**Steven M Potolsky**
PO Box 50973
Jacksonville Beach, FL 32250
Phone: 305-335-5539
Fax: 305-358-5917
Email: stevepo@bellsouth.net
Co-counsel for Mario Rodriguez


/s/ _____

**Mary Stillinger**
4911 Alameda Ave
El Paso, TX 79905
Phone:(915)775-0705
Fax:(915)886-7178
Email: stillingerlaw@sbcglobal.net
Counsel for Mauricio Varela


/s/ _____

**Amy E. Jacks**
Law Office of Amy E. Jacks
315 E. 8th St. #801
Los Angeles, CA 90014
Phone: 213-489-9025
Fax: 213-489-9027
Email: amyejacks@sbcglobal.net
Counsel for Daniel Sanchez

DNM 1078

/s/_____

**Richard Jewkes**
Richard Jewkes
701 N. Saint Vrain St
El Paso, TX 79902
Phone: (915) 534-7400
Fax:(915) 534-7407
Email: richardjewkes@sbcglobal.net
Co-counsel for Daniel Sanchez


/s/_____

**B.J. Crow**
Crow Law Firm
400 N. Pennsylvania Ave.
Suite 1150
Roswell, NM 88201
575-291-0200
Fax: 575-291-0201
Email: bj@crow-law-firm.com
Counsel for Conrad Villegas


/s/_____

**Marc M Lowry**
Rothstein Donatelli LLP
500 4th Street N.W. Suite 400
Albuquerque, NM 87102
Phone:(505) 243-1443
Fax: (505) 242-7845
Email: mlowry@rothsteinlaw.com
Counsel for Anthony Ray Baca


/s/_____

**Theresa M Duncan**
Duncan Earnest LLC
515 Granite NW, Albuquerque, NM 87102
Phone: 505-842-5196
Fax: 505-750-9780
Email: teri@duncanearnest.com
Co-counsel for Anthony Ray Baca

/s/
**Michael V Davis**
Michael V. Davis, Attorney & Counselor at Law,
P.C.
Post Office Box 3748
3949 Corrales Road, Suite 130
Corrales, NM 87048
Phone: (505) 242-5979
Fax: 505-899-3103
Email: mdavis@swcp.com
Counsel for Carlos Herrera


/s/
**Carey Corlew Bhalla**
Law Office of Carey C. Bhalla LLC
925 Luna Cir NW
Albuquerque, NM 87102
Phone: 505-508-5589
Email: carey@bhallalaw.com
Co-counsel for Carlos Herrera


/s/
**Justine Fox-Young**
1903 Wyoming Blvd. NE Ste. B
Albuquerque, NM 87112
Phone: 505-796-8268
Email: justine@foxyounglaw.com
Counsel for Rudy Perez


/s/
**Ryan J Villa**
2501 Rio Grande Blvd NW Suite A
Albuquerque, NM 87104
Phone: (505) 639-5709
Fax: 505-433-5812
Email: ryan@rjvlawfirm.com
Co-counsel for Rudy Perez

DNM 1080

/s/ _____
**Donavon A. Roberts**
PO Box 36344
Albuquerque, NM 87176-6344
Phone: 505-506-3749
Fax: 505-503-8405
Email: ladar170@aim.com
Counsel for Andrew Gallegos


/s/ _____
**Angela Arellanes**
PO Box 1784
Albuquerque, NM 87103
505-247-2417
Fax: 505-242-1878
Email: arellanesattorney@yahoo.com
Counsel for Shauna Gutierrez


CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 13th day of October, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.


*/s/ Brock Benjamin* _____
BROCK BENJAMIN

DNM 1081

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

     v.                                            NO: 15-CR-4268 JB

ANGEL DELEON, et al.,

        Defendants.

## DEFENDANTS' MOTION FOR ORDER TO SHOW CAUSE FOR NON-COMPLIANCE OF DISTRICT COURT ORDERS DURING MAY 9-10, 2017 HEARINGS[1]

    Defendants Christopher Garcia through co-counsel, Amy Sirignano of the Law Office of Amy Sirignano, PC and Christopher W. Adams of the Law Office of Christopher W. Adams, and Joe Lawrence Gallegos, through co-counsel Brock Benjamin, and Rick Sindel, and Edward Troup, through co-counsel, Cori Harbour-Valdez, and Pat Burke, and Billy Garcia, through co-counsel Robert Cooper, and Jim Castle, and Allen Patterson, through counsel Jeff Lahann, and Christopher Chavez, through co-counsel Orlando Mondragon, and John Granberg, and Arturo Arnulfo Garcia, through co-counsel Billy Blackburn, and Scott Davidson, and Mario Rodriguez, through co-counsel Santiago Hernandez, and Steven Potolsky, and Mauricio Varela, through co-counsel Mary Stillinger, and Joe Spencer, and Daniel Sanchez, through co-counsel Richard Jewkes, and Amy Jacks, and Anthony Ray Baca, through co-counsel Marc Lowry, and Theresa Duncan, and Carlos Herrera, through co-counsel Michael Davis, and Carey Bhalla, and Rudy Perez, through co-counsel Ryan Villa, and Justine Fox-Young, and Andrew Gallegos, through

---

[1] The Court conducted hearings in this matter during May 9, 10, and 11, 2017. The Court ordered the government to provide certain materials only during the first two (2) days (Docs. 1160, 1161).

1

counsel Donavon Roberts, and Shauna Gutierrez, through counsel Angela Arellanes, respectfully

moves this Court for an Order to Show Cause requiring the government to disclose and/or act

pursuant to the Court's oral orders during the May 9-11, 2017 hearings in this case.   In support

of this Motion, defendants respectfully state:

## PROCEDURAL BACKGROUND

In the Second Superseding Indictment, Mr. Garcia, along with multiple codefendants, is

charged with being a member of the Syndicato de Nuevo Mexico ("SNM") gang.  Mr. Garcia is

alleged to have committed two counts of Violent Crimes in Aid of Racketeering (Conspiracy to

Murder) in Violation of 18 U.S.C. § 1959(a)(5) (Doc. 949, Count 10).  Mr. Garcia was also

charged with being a Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) and

Using and Carry a Firearm During and in Relation to a Crime of Violence in violation of 18

U.S.C. § 924(c) (Doc. 949, Counts 11 and 12).  This case was ordered complex on January 11,

2016 (Docs. 210, 211).

On May 9 -11, 2017, this Honorable Court held hearings on pending motions in this case.

(Docs. 1160, 1161, 1162).


## LAW REGARDING THE PARTIES' OBLIGATIONS TO ABIDE BY A
## DISTRICT COURT ORDER

The obligation of attorneys for the government to comply and follow the Court's orders is

built into the language of the rules and regulations of criminal proceedings. Federal Rule of

Criminal Procedure 16(a)(1)(A) through (G) uses mandatory language "must" requiring the

government to disclose evidence requested by the defendant. Fed. R. Crim. P. 16. Rule 16.1 uses

mandatory language with respect to a Standard Discovery Order issued by the Court by stating

the parties "will comply."  D.N.M.LR-Cr. 16.1.

DNM 1083

Rule 16(d)(2) permits the court to regulate discovery should a party fail to comply with

the rule. Rule 16(d)(2) states:

> If a party fails to comply with this rule, the court may:
> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
> (B) grant a continuance;
> (C) prohibit that party from introducing the undisclosed evidence; or
> (D) enter any other order that is just under the circumstances.

Rule 57.2 states attorneys will comply Rules of Professional Conduct adopted by

the Supreme Court of the State of New Mexico. D.N.M.LR-Cr. 57.2. Rule 16-308 of

New Mexico Rules of Professional Conduct addresses the special responsibilities

required of prosecutors.

> **The prosecutor in a criminal case shall**:
>
> D.   make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal . . .
> G.   **promptly disclose** new, credible and material evidence that creates a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted. Such evidence shall be disclosed in writing when it becomes known to the prosecutor, absent court authorization otherwise. If the defendant is unrepresented, the prosecutor shall inform a person reasonably certain to inform the defendant or take appropriate action.

Rule 16-608 NMRA of the Rules of Professional Conduct (emphasis added).

Also, in a Memorandum issued by the Department of Justice giving guidance to

prosecutors in criminal discovery, Deputy Attorney General Ogden states:

> Prosecutors should consult the local discovery rules for the district in which a case has been indicted. Many districts have broad, automatic discovery rules that require Rule 16 materials to be produced without a request by the defendant and within a specified time frame, unless a court order has been entered delaying discovery, as is common in complex cases. Prosecutors must comply with these local rules, applicable case law, and any final court order regarding discovery. In the absence

3

of guidance from such local rules or court orders, prosecutors should consider making Rule 16 materials available as soon as is reasonably practical but must make disclosure no later than a reasonable time before trial . . . Discovery obligations are continuing, and prosecutors should always be alert to developments occurring up to and through trial of the case that may impact their discovery obligations and require disclosure of information that was previously not disclosed . . . Compliance with discovery obligations is important for a number of reasons. First and foremost, however, such compliance will facilitate a fair and just result in every case, which is the Department's singular goal in pursuing a criminal prosecution.

*See* Deputy Attorney General David W. Ogden, Memorandum for Department of

Prosecutors, Department of Justice Archives,

https://www.justice.gov/archives/dag/memorandum-department-prosecutors; Exh. 1.

The government's duty to comply with the District Court's order to disclose evidence and

discovery is a basic and standard premise which allows criminal proceedings to operate

smoothly.

## GOVERNMENT'S DISCOVERY OBLIGATIONS ORDERED BY JUDGE BROWNING DURING THE MAY 9-10, 2017 HEARINGS

During the May 9 -10, 2017 hearings, the Court ordered that the following be produced . . .

Tr. 5/9/17, 5/10/17 (Docs. 1160, 1161).

• Review/Disclose Brady, Giglio, Rule 16 written and recorded statements re allegations in

Counts 6 & 7 made by Timothy Martinez, Jerry Armenta, and Jerry Montoya (Tr. 5/9/17, 203:1-

8) by June 9, 2017 (Tr. 5/9/17, 215:1-9).  The government produced these ordered documents in

the productions titled, "Armenta – DeLeon 28242; dated June 16, 2017, and DeLeon 22113-

22114," dated May 23, 2017.

• Disclose plea addenda for Timothy Martinez, Jerry Armenta, and Jerry Montoya

(Tr. 215:20-25) to all relevant defendants in 14 days (Tr. 5/9/17, 232:10-25, 226:1-8).  The

government produced these ordered documents in the productions titled, "Timothy Martinez –

DeLeon 22127-22128;" and in "Jerry Armenta - DeLeon 22113-22114;" and "Jerry Montoya -

DeLeon 22129-22130," all dated March 22, 2017.

• Review/Disclose FBI 302s, law enforcement notes pertaining to Timothy

Martinez, Jerry Armenta, and Jerry Montoya (Tr. 5/9/17, 234:2-4) (235:7-24). The government

produced these ordered documents in the productions titled, "Timothy Martinez – DeLeon

22127-22128 (Exhibit A)," dated March 22, 2017; "Armenta – DeLeon 28242," dated June 16,

2017; "DeLeon 2249-2253," dated March 25, 2017; "Montoya – Deleon 26520-26526," dated

June 16, 2017; and "DeLeon 20595-20596," dated March 10, 2017.

• Preserve law enforcement rough interview notes (Tr. 5/9/17, 236:1-18).

• Provide written response regarding 10 discs observed but not reviewed during

SNMCF evidence viewing within 10 days including Bates numbers if already produced. If new

evidence, produce within 14 days. (Tr. 5/9/17, 241:2-6, 241:16-22).

• Provide written confirmation that no additional physical evidence exists within 10

days, not to be construed as ground for exclusion (Tr. 5/9/17, 246:15-25, 249:20-25).

• Defense granted permission to handle physical evidence in presence of non-party

NMSP evidence tech (Tr. 5/9/17, 250:12-22, 252:20-25).

• AUSA Beck agrees to provide date of Perez/Cordova recording redacted from the

transcript (Tr. 5/9/17, 262:13-20).

• AUSA Armijo agrees to produce any transcripts not otherwise disclosed within 10

days (Tr. 5/9/17, 264:5-6, 265:1-4).

• Review/Disclose Brady, Giglio, Rule 16 notes of CHS law enforcement handlers

within 14 days (Tr. 5/10/17, 4:17-20, 5:25, 6:1-2).

- Review/Disclose Brady, Giglio, Rule 16 of documentation/correspondence between FBI, STIU, and NMCD regarding Billy Cordova and the possession of contraband such as phones and recording devices within 14 days (Tr. 5/10/17, 6:9-15, 10:1-11).

- AUSA Beck agrees to provide Billy Cordova's Pen Pack and STIU file (Tr. 5/10/17, 10:13-21, 12:1-8).  The government produced these ordered documents in the production titled, "DeLeon 23142-23215," dated May 23, 2017.

- AUSA Beck agrees that if the government obtains it, the government will produce NMCD's internal affairs investigation to attorneys Nate Chambers, and Cori Harbor-Valdez (Tr. 5/10/17, 48:3-8, 49:20-24, 50:2).

- Review/Disclose Brady, Giglio, Rule 16 grand jury transcripts related to Counts 4 & 5 (Tr. 5/10/17, 94:17-25, 105:2-8).

- AUSA Beck agrees, and Judge Browning orders disclosure of specific informant medical/psych records for Teri and Marc (Tr. 5/10/17, 146:3-9).

- AUSA Beck agrees to produce defendant Baca's prison calls and visitor logs at the Dona Ana County Detention Center from 2/1/2015 – 9/14/2016 (Tr. 5/10/17, 146:11-14, 147:3-4).

- AUSA Beck agrees to produce tangible evidence or materials collected during searches of defendant Baca's cells and all documents related to the collection of that evidence or material while Baca was incarcerated in the NMCD (Tr. 5/10/17 *see generally* 148-149).  The government produced these ordered documents in the productions titled, "Deleon 27757-27864," dated June 16, 2017.

DNM 1087

- AUSA Beck agrees to send letters to Teresa Duncan, Justine Fox-Young, and the Court regarding whether the CHSs' recording devices contained metadata (Tr. 5/10/17 153:3-8, 153:23).

- AUSA Beck agrees to produce photographs from cell phones that the government provided to informants, if in the possession of the government (Tr. 5/10/17 154:20-25, 155:1-8).

- AUSA Beck agrees to permit defense experts conduct physical review of cell phones in the possession of the government or put in writing that the phones are not in the government's possession (Tr. 5/10/17, 155:11-21).

- Review/Disclose Brady, Giglio, and Rule 16 evidence regarding NMCD Secretary Marcantel's statements to A&E Rookie of the Year or NMCD following the Molina murder and Anthony Baca's move out of the state (Tr. 5/10/17, 163:7-14). Government to provide whether the statements were recorded by NMCD. AUSA Beck agrees to confer with NMCD regarding whether NMCD recorded the statements and let Theresa Duncan know (*Id.* at 167:1-8).

## <u>CONCLUSION</u>

The defendants have been careful to review the government's propounded discovery to ascertain whether it has abided by the District Court's orders from May 9-10, 2017. Only the items detailed above have been produced.

Due to the nature of this motion, it is deemed the government is opposed. All defendants that have not joined this motion do no not oppose.

Wherefore, Christopher Garcia and joining defendants respectfully request that this Court issue an Order to Show Cause and ascertain why the Government has not yet abided by the Court's oral orders during the May 9-10, 2017 hearings.

DNM 1088

Respectfully submitted,


        /s
Amy Sirignano
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM  87109
(505) 242-2770
Fax: (505) 242-2774
Email: amy@abqnmlaw.com


        /s
Christopher W. Adams
The Law Office of Christopher W. Adams, PC
102 Broad Street, Suite C
Charleston, SC 29401
(843) 577-2153
Fax:(877) 883-9114
Email: chris@chrisadamslaw.com


Co-counsel for Christopher Garcia


        /s
Brock Benjamin
Benjamin Law Firm
747 E. San Antonio, Suite 203
El Paso, TX 79901
Phone:(915)412-5858
Fax:(915)503-2224
Email: brock@brockmorganbenjamin.com


        /s
Richard Sindel
Sindel, Sindel & Noble, P.C.
8000 Maryland Avenue, Suite 350
Clayton, MO 63105
Phone: (314) 721-6040
Fax: (314) 721-8545
Email: rsindel@sindellaw.com


Co-counsel for Joe Lawrence Gallegos

DNM 1089

_____/s_____

**Cori Ann Harbour-Valdez**
The Harbour Law Firm, PC
PO Box 13268
El Paso, TX 79913
Phone: 915-544-7600
Fax: 915-975-8036
Email: cori@harbourlaw.net

_____/s_____

**Patrick J. Burke**
Patrick J. Burke, PC
999 18th Street, Suite 2055
Denver, CO 80202
Phone: 303-825-3050
Fax: 303-825-2992
Email: patrick-j-burke@msn.com

Co-counsel for Edward Troup

_____/s_____

**James A. Castle**
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206
(303) 675-0500
Fax: (303) 329-5500
Email: JCastlelaw@gmail.com

_____/s_____

**Robert R. Cooper**
1011 Lomas Blvd NW
Albuquerque, NM 87102
505-842-8494
Fax: (505) 243-6279
Email: bob@rrcooper.com

Co-counsel for Billy Garcia

_____/s_____

**Jeffrey C. Lahann**
665 E. University Ave. #2A
Las Cruces, NM 88005
575-523-4394
Fax: 1-888-694-7241

DNM 1090

Email: jeff@lahannlaw.com

Counsel for Allen Patterson

_____/s_____

**Orlando Mondragon**
1028 Rio Grande
El Paso, TX 79902
Phone: 915-566-8181
Fax: 915-566-9696
Email: mondragonom@gmail.com

_____/s_____

**John L. Granberg**
Granberg Law Office
310 N. Mesa Suite 424
El Paso, TX 79901
Phone: (915) 543-9000
Fax: (915) 543-3201
Email: granberglawoffice@yahoo.com

Co-counsel for Christopher Chavez

_____/s_____

**Billy R. Blackburn**
1011 Lomas Blvd. NW
Albuquerque, NM 87102
Phone: 505-242-1600
Fax: 505-243-6279
Email: Billy@BBlackburnlaw.com

_____/s_____

**Scott Moran Davidson**
1011 Lomas Boulevard NW
Albuquerque, NM 87102
Phone: 505-255-9084
Fax: 505-243-6279
Email: scott@justappeals.net

Co-counsel Arturo Arnulfo Garcia

_____/s_____

**Santiago David Hernandez**
Law Office of Santiago D. Hernandez
1219 E. Missouri

El Paso, TX 79902
Phone: 915-351-4300
Fax: 915-351-4372
Email: santilawyer@gmail.com


_____/s_____

**Steven M Potolsky**
PO Box 50973
Jacksonville Beach, FL 32250
Phone: 305-335-5539
Fax: 305-358-5917
Email: stevepo@bellsouth.net


Co-counsel for Mario Rodriguez


_____/s_____

**Mary Stillinger**
4911 Alameda Ave
El Paso, TX 79905
Phone:(915)775-0705
Fax:(915)886-7178
Email: stillingerlaw@sbcglobal.net


_____/s_____

**Michael David Lindsey**
David Lindsey, Attorney
7887 East Bellview Avenue Suite 1100
 Engelwood, CO 80111
Phone: 303-228-2270
Fax: 303-228-2271
Email: david@mdavidlindsey.com


Co-counsel for Mauricio Varela


_____/s_____

**Amy E. Jacks**
Law Office of Amy E. Jacks
315 E. 8th St. #801
Los Angeles, CA 90014
Phone: 213-489-9025
Fax: 213-489-9027
Email: amyejacks@sbcglobal.net

DNM 1092

___/s_____

**Richard Jewkes**
Richard Jewkes
701 N. Saint Vrain St
El Paso, TX 79902
Phone: (915) 534-7400
Fax:(915) 534-7407
Email: richardjewkes@sbcglobal.net

Co-counsel for Daniel Sanchez

___/s_____

**Marc M Lowry**
Rothstein Donatelli LLP
500 4th Street N.W. Suite 400
Albuquerque, NM 87102
Phone:(505) 243-1443
Fax: (505) 242-7845
Email: mlowry@rothsteinlaw.com

___/s_____

**Theresa M Duncan**
Duncan Earnest LLC
515 Granite NW, Albuquerque, NM 87102
Phone: 505-842-5196
Fax: 505-750-9780
Email: teri@duncanearnest.com

Co-counsel for Anthony Ray Baca

___/s_____

**Michael V Davis**
Michael V. Davis, Attorney & Counselor at Law,
P.C.
Post Office Box 3748
3949 Corrales Road, Suite 130
Corrales, NM 87048
Phone: (505) 242-5979
Fax: 505-899-3103
Email: mdavis@swcp.com

___/s_____

**Carey Corlew Bhalla**
Law Office of Carey C. Bhalla LLC
925 Luna Cir NW

DNM 1093

Albuquerque, NM 87102
Phone: 505-508-5589
Email: carey@bhallalaw.com

Co-counsel for Carlos Herrera

_____/s_____

**Justine Fox-Young**
1903 Wyoming Blvd. NE Ste. B
Albuquerque, NM 87112
Phone: 505-796-8268
Email: justine@foxyounglaw.com

_____/s_____

**Ryan J Villa**
2501 Rio Grande Blvd NW Suite A
Albuquerque, NM 87104
Phone: (505) 639-5709
Fax: 505-433-5812
Email: ryan@rjvlawfirm.com

Co-counsel for Rudy Perez

_____/s_____

**Donavon A. Roberts**
PO Box 36344
Albuquerque, NM 87176-6344
Phone: 505-506-3749
Fax: 505-503-8405
Email: ladar170@aim.com

Counsel for Andrew Gallegos

_____/s_____

**Angela Arellanes**
PO Box 1784
Albuquerque, NM 87103
505-247-2417
Fax: 505-242-1878
Email: arellanesattorney@yahoo.com

Counsel for Shauna Gutierrez

DNM 1094

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing
pleading was sent via the Court's CM/ECF
system to opposing counsel, AUSAs Maria
Armijo, Randy Castellano, and Matthew
Beck, this 13th day of October 2017.

_____/s_____

Amy Sirignano, Esq.

DNM 1095

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON,
JOE GALLEGOS,
EDWARD TROUP,
**BILLY GARCIA**,
ALLEN PATTERSON,
CHRISTOPHER CHAVEZ,
JAVIER ALONSO,
ARTURO ARNULFO GARCIA,
MARIO RODRIGUEZ,
MAURICIO VARELA,
DANIEL SANCHEZ,
CONRAD VILLEGAS,
ANTHONY RAY BACA,
CHRISTOPHER GARCIA,
CARLOS HERRERA,
RUDY PEREZ,
ANDREW GALLEGOS,
SANTOS GONZALEZ,
SHAUNA GUTIERREZ, AND
BRANDY RODRIGUEZ.
                    Defendants.

---

**RESPONSE AND OBJECTION TO GOVERNMENT'S PROPOSED GANG EXPERT
EVIDENCE (DOC. No. 1299) ON SIXTH AMENDMENT CONFRONTATION
AND EVIDENTIARY GROUNDS**

---

Defendant Billy Garcia hereby objects to the Government's Proposed Gang Expert

Evidence (Doc. No. 1299) on the grounds that it will violate his Sixth Amendment

DNM 1096

Confrontation Clause rights and Fed.R.Evid Rule 404(b).[1] The government opposes this

response. Defendants Joe Gallegos, Edward Troup, Christopher Chavez, Arturo Arnulfo

Garcia, Mario Rodriguez, Daniel Sanchez, Anthony Ray Baca, Christopher Garcia, Carlos

Herrera, Rudy Perez, and Andrew Gallegos join in the response and defendants Allen

Patterson, Mauricio Varela, Conrad Villegas, Shauna Gutierrez, and Brandy Rodriguez have

no objection to the response.  Mr. Garcia offers the following grounds in support of his

position:

## I.    <u>INTRODUCTION</u>

The government seeks to call at trial three individuals it has designated as gang

experts: Ronald Martin, Chris Cupit, and Sergio Sapien of the New Mexico Corrections

Department Security Threat Intelligence Unit. *See* United States' Notice of, and Motion in

Limine to Admit Gang Expert Witnesses' Testimony (Doc. No. 1299).

All three of these proposed experts were government investigators involved in

debriefings and inmate interviews over the course of the very investigation underlying this

case.  In other words, these witnesses are case agents and/or investigators who the

government now seeks to also use as gang experts to prove the essential elements of VICAR

charges.

The government indicates that these individuals have gained their expertise, in part,

from gathering intelligence and conducting investigations, including criminal investigations

into the Syndicato de Nuevo Mexico ("SNM") "in particular" and the above-captioned

---

[1] This is not the only objection the defense has to the government's endorsement of gang experts.
Other objections will be set forth in separate pleadings regarding disclosure issues and *Daubert*
challenges.

DNM 1097

defendants. *See* Doc. No. 1299, p.1. The government admits quite candidly that it seeks to introduce this expert testimony to prove, "beyond a reasonable doubt the VICAR charges that it brings against the Defendants in this case." Doc. No. 1299, p.7, 8, and 9.

The government's notice alludes to only one actual opinion that these officers would render at trial ("Whereas the United States' expert witnesses will testify that the SNM is a prison (gang) and its criminal acts lead them to opine that the SNM is, in their opinion, an enterprise.") Doc. No. 1299, p.11. The remaining testimony of these three officers as outlined by the government appears not to be opinion evidence at all, but rather a compilation of factual information that these officers and others have collected from testimonial statements from other gang intelligence officers and from inmates during investigative interviews. These officer sources of information include direct conversations with informants and statements by other police officers. Those latter officers presumably received their information from other informants and/or other officers who had likewise obtained their information from other informants.

In other forensic expert situations, the basis of the expertise is not the testimonial statements of other people. For example, DNA evidence is based on science that has nothing to do with forensics. When James Watson and Francis Crick discovered the double helix shape of DNA, they were not doing so under circumstances in which an objective witness would reasonably believe that their discovery would be available for use at a later trial.

But the gang testimony in this case, which the government characterizes as expert testimony, is entirely built on anecdotal evidence which, in reality, is almost entirely derived from reports from other law enforcement officers or out-of-court statements made by gang members to law enforcement during the course of investigations. It appears from the

3

government's notice that it also wishes to use the gang experts to provide a summary of evidence, like is often done in grand jury proceedings.

The Confrontation Clause contemplates an "in limine procedure" to establish the constitutional admissibility of testimonial hearsay statements. *Davis v. Washington*, 547 U.S. 813, 829 (2006).  Mr. Garcia hereby asserts his Sixth Amendment rights and objects to any statements at trial that involve no expertise at all, but rather simply parrot testimonial hearsay in violation of his Confrontation Clause rights.

II.   **LEGAL PRINCIPLES**

A.   **Confrontation Clause**

The Sixth Amendment's Confrontation Clause guarantees the right of the accused "to be confronted with the witnesses against him." U.S. Const. amend. VI. It bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  This is a "bedrock procedural guarantee" that "commands not that evidence be reliable but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id*. at 42.

Core testimonial statements include "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52.  They also include "those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Michigan v. Bryant*, 131 S.Ct. 1143, 1155 (2011).

There is no "forensic" or "expert" exception to the Confrontation Clause. *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2535 (2009); *Bullcoming v. New Mexico*, 131 S. Ct.

DNM 1099

2705, 2713 (2011); *see also Crawford*, 541 U.S. at 54 (there are no "open-ended exceptions

from the confrontation requirement to be developed by the courts."); *Giles v. California*, 128

S. Ct. 2678, 2692 (2008) ("The guarantee of confrontation is no guarantee at all if it is

subject to whatever exceptions courts from time to time consider 'fair.'")

The Tenth Circuit recognizes that special considerations arise under the Confrontation

Clause in the context of gang-expert testimony:

> But there is no sociological expertise in testifying to gang members'
> specific travels, specific uses of gang funds, or commission of specific
> crimes, . . ., When the expert's testimony on such matters is not based
> on personal knowledge but on testimonial hearsay, the testimony
> violates not only the rules of evidence but also the Confrontation
> Clause. We have repeatedly cautioned about the impropriety of
> permitting an "expert" witness to "parrot" testimonial hearsay. As we
> said in *Pablo*, "If an expert simply parrots another individual's out-of-
> court statement, rather than conveying an independent judgment that
> only incidentally discloses the statement to assist the jury in evaluating
> the expert's opinion, then the expert is, in effect, disclosing that out-of-
> court statement for its substantive truth; the expert thereby becomes
> little more than a backdoor conduit for an otherwise inadmissible
> statement." . . ., An important consideration in distinguishing proper
> testimony from parroting is the generality or specificity of the expert
> testimony. As stated in *Mejia*, when gang-expert testimony descends to
> a discussion of specific events recounted by others, the expert is merely
> adding "unmerited credibility" to the sources, 545 F.3d at 192 (internal
> quotation marks omitted), and summarizing evidence in a way that
> should be reserved for the government's closing argument.

*United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015).

In *Garcia*, the Circuit Court quoted *United States v. Mejia*, 545 F.3d 179, 187 (2d Cir.

2008) with approval.  The *Mejia* Court found:

> If the officer expert strays beyond the bounds of appropriately "expert"
> matters, that officer becomes, rather than a sociologist describing the inner
> workings of a closed community, a chronicler of the recent past whose
> pronouncements on elements of the charged offense serve as shortcuts to
> proving guilt. As the officer's purported expertise narrows from "organized
> crime" to "this particular gang," from the meaning of "capo" to the criminality

DNM 1100

of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

*Mejia*, <u>793 F.3d at 190</u>.[2]   In *Meija*, the district court had allowed an officer to testify as a gang expert, not only about the structure and activities of the gang to which the defendants allegedly belonged, *but also about facts gathered during the investigation*. The Second Circuit held that the lower court had erred in admitting the testimony for three main reasons. First, the expert testified about matters that were within the grasp of the average juror, in violation of <u>Fed.R.Evid. 702</u>. *Id*. at 194-96.  Second, portions of the expert's testimony violated <u>Fed.R.Evid. 703</u> because he "'repeat[ed] hearsay evidence without applying any expertise whatsoever,' a practice that allows the Government 'to circumvent the rules prohibiting hearsay.'" *Id*. at 197 (quoting *United States v. Dukagjini*, <u>326 F.3d 45, 59</u> (2nd Cir. 2003)). Third, the expert's repetition of out-of-court testimonial statements made by individuals during custodial interrogations violated the defendants' Confrontation Clause rights under *Crawford*.  *Id*. at 198-99.

Garcia and *Mejia* make clear that "[w]hen an expert's bailiwick is only "internal expertise" of the investigation at hand and the expert does no more than "disgorge . . . factual knowledge to the jury," the expert is "no longer aiding the jury in its factfinding [but is] instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense."" *Garcia*, <u>793 F.3d at 1213</u> (quoting *Mejia*, <u>793 F.3d at 191</u>).

Under *Garcia*, the following types of statements from a proposed gang expert constitute inadmissible testimonial hearsay in violation of the Confrontation Clause:

---

[2] The government fails to cite or mention *Garcia*, *Mejia* or *Pablo* in its notice and *in limine* motion to admit gang expert witness' testimony.

DNM 1101

1.      Gang expert testimony based on out-of-court statements from gang members.  *Garcia*, 793 F.3d at 1214 ("He simply relayed what DV gang members told him ["about the DV's home-invasion robberies of Guatemalan immigrants"].")

2.      Expert testimony "presumably based upon testimonial-hearsay statements of" gang members and victims to police. *Id*. at 1215.

3.      Expert testimony concerning a defendants' "status, meaning seniority or respect" in the gang.  *Id*.

This list is not exhaustive, nor has the specific issue of gang expert testimony as it relates to Confrontation Clause concerns been fully fleshed out to date in appellate cases.[3] This may be due to the recency of the *Melendez-Diaz* and *Bullcoming* decisions.

This Court has previously addressed challenges to gang expert testimony but not in the context of Confrontation Clause objections. *United States v. Goxcon-Chagal*, 885 F. Supp. 2d 1118, 1142, (D.N.M. 2012).

The government often argues and offers assurances to the court and the defense that the expert information will not be offered for the truth of the matter asserted.  Such statements are not credible.  It is, of course, true that "[[o]ut-of-court statements that are related by the expert ***solely*** for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the

---

[3] *See United States v. Pablo*, 696 F.3d 1280, 1293 (10th Cir 2012) ("We add that the manner in which, and degree to which, an expert may merely rely upon, and reference during her in-court expert testimony, the out-of-court testimonial conclusions in a lab report made by another person not called as a witness is a nuanced legal issue without clearly established bright line parameters.")

DNM 1102

Confrontation Clause." *Id. see also Crawford*, 541 U.S., at 59–60, n. 9) (The Confrontation

Clause "does not bar the use of testimonial statements for purposes other than establishing

the truth of the matter asserted." *Williams v. Illinois*, <u>132 S. Ct. 2221, 2235</u> (2012) (emphasis

supplied).  Where the purpose in providing an expert's testimony, however, is to establish the

crime base, or the "enterprise," "racketeering," "enterprise engaged in, or its activities

affected, interstate or foreign commerce" elements or the *mens rea* element of "for the

purpose of gaining entrance to or maintaining or increasing position in an enterprise," the

evidence is absolutely offered for the truth of the matter asserted and, therefore,

Confrontation Clause analysis must apply. Even if that is not the stated purpose, there is a

great danger that the jury will use the information for precisely that purpose. "It is

nonetheless appropriate for district courts to recognize the risk that a particular expert might

become nothing more than a transmitter of testimonial hearsay and exercise their discretion

in a manner to avoid such abuses." *United States v. Johnson*, <u>587 F.3d 625 635</u> (4th Cir.

2009) (cited with approval in *Pablo*, *supra*).

**B.    Law enforcement witnesses who provide both expert and percipient
testimony**

To the extent that experts rely on their own observations, there are significant dangers

when experts sprinkle their lay observations in with expert testimony. The Ninth Circuit has

expressly recognized:

> We have cautioned district courts about the dangers of allowing a case agent to
> offer both expert and lay opinion testimony. [A]n agent's status as an expert
> could lend him unmerited credibility when testifying as a percipient witness,
> cross-examination might be inhibited, jurors could be confused and the agent
> might be more likely to stray from reliable methodology and rely on hearsay.

*United States v. Vera*, <u>770 F.3d 1232, 1242</u> (9th Cir. 2014).

8

So too has the Tenth Circuit: "We recognize that witnesses who testify in both a lay capacity and an expert capacity may present special risks at trial. The 'aura of special reliability and trustworthiness surrounding expert testimony,' may give the witness 'unmerited credibility' and "create[] a risk of prejudice 'because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial.'" *United States v. Sandoval*, 680 Fed. Appx. 713, 718 (10th Cir. 2017) (quoting *United States v. Dukagjini*, 326 F.3d 45, 53-54 (2d Cir. 2002) (citations omitted)).

The *Mejia* Court observed that, "[a]n increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence," finding "it a little too convenient that the government has found an individual who is expert on precisely those facts that the government must prove to secure a guilty verdict -- even more so when that expert happens to be one of the government's own investigators." *Mejia*, 793 F.3d at 190-91. The Court found that the expert's particular use of facts from the case was not harmless beyond a reasonable doubt regarding the elements of the offenses to be proven. *Id*. at 202. *See also United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) ("When a jury hears that an agent's opinion is based on the total investigation, there is a risk it may improperly defer to the officer's opinion, thinking his knowledge of pertinent facts more extensive than its own."); *Dukagjini*, 326 F.3d 45, 54 ("As the testimony of the case agent moves from interpreting individual code words to providing an overall conclusion of criminal conduct, the process tends to more

closely resemble the grand jury practice, improper at trial, of a single agent simply summarizing an investigation by others that is not part of the record.").

A district court must exercise its gate-keeping responsibilities in defining the proper bounds of such expert testimony, particularly where the challenged witness is offering a hybrid of expert and lay opinion, drawing not only from training and experience, but percipient facts, and facts obtained from witnesses who are unavailable at trial. *Freeman*, 498 F.3d at 903; *Daubert*, 509 U.S. at 592-93.

Because juries typically place great stock in expert testimony, the Supreme Court has required judges to ensure "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This rule extends to non-scientific witness testimony, including testimony from law enforcement experts. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).[4]

The Court in *Freeman* was concerned with allowing investigators to serve as both percipient and expert witnesses. *Freeman*, 498 F.3d at 903. First, "a case agent who testifies as an expert receives 'unmerited credibility' for lay testimony." *Id*. (quoting *Dukagjini*, 326 F.3d at 53). Second, "expert testimony by a fact witness or case agent can inhibit cross-examination" since a "failed effort to impeach the witness as expert may effectively enhance his credibility as a fact witness." *Id*. Third, "there is an increased danger that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's sweeping conclusions about appellants' activities." *Id*. Fourth, there is a danger that some "jurors will find it difficult to discern whether the witness is relying properly on his general

---

[4] The defense suggests that it may be efficient to analyze the issues raised in this motion when and if a *Daubert* hearing is conducted.

experience and reliable methodology, or improperly on what he has learned of the case." *Id.*

Finally, "when a case agent/expert strays from the scope of his expertise, he may

impermissibly rely upon and convey hearsay evidence," running "afoul of the Sixth

Amendment Confrontation Clause." *Id.* (further citations omitted); quoted in part in *United*

*States v. Anchrum*, 590 F.3d 795, 803 (9th Cir. 2009).

One of the significant problems with a witness testifying as both an expert and a

percipient witness is that different rules apply to each type of evidence. Percipient witnesses

may not rely on inadmissible evidence in offering their testimony as they must have personal

knowledge of the matters they relate. Fed.R.Evid. Rule 602.   Experts, by contrast, are

authorized by rule to express opinions, which are arrived at, in part, through review of

inadmissible evidence. Fed.R.Evid. Rule 703.

The Tenth Circuit has declined to adopt a per se rule prohibiting or authorizing the

use of case agents as experts, "choosing instead to rely on determinations made by 'the trial

judge who is attuned to the dynamics of the trial.'" *Sandoval*, 680 Fed. Appx. at 719.

**C.**     **Fed. R. Evid. 404(b)**

The foundation proposed for the governmental testimony at issue here will, of

necessity, violate Fed. R. Evid. 404(b). That Rule generally prohibits using evidence of

'other crimes, wrongs, or acts' to prove the "character of a person in order to show action in

conformity therewith." That is precisely what the government says it wants to do here - to

show how other SNM members have behaved historically as a means of explaining why the

defendants in this case, and Billy Garcia in particular, must have behaved the same way

during the charged period of time.

11

In other words, even setting aside the Sixth Amendment issues identified here, it is nevertheless clear that the gang-expert evidence would run afoul of the Federal Rules of Evidence.

III.    **APPLICATION**

The government seeks to introduce the following categories of information from its experts. After each such category, using the same lettering in the government's notice (Doc. No. 1299), the defense describes why the described evidence it is derived from testimonial statements and/or violates Rule 404(b), and therefore inadmissible:

A.    "**The history, culture, codes of conduct, methods of operation and communication, and behaviors of the Syndicato Nuevo Mexico ("SNM") security threat group**."  (Doc. No. 1299, p.1)

Virtually all of this information could only have been obtained through law enforcement interviews and interrogations of inmates or through reports prepared from gang intelligence officers. Ostensibly, the individual testifying witnesses can testify to their observations of the behaviors of gang members.  But this is lay testimony not expert testimony, and even those observations are problematic given that testimonial statements comprise the basis of identifying any particular inmate, whose behavior is being described, as a member of the SNM. Method of operation testimony is clear propensity evidence prohibited under Fed. R. Evid. 404. See Defendants' Motion for Notice of FRE 404(B), 405, 406, 608 and Res Gestae Evidence (Doc. No 1047).

It is unclear what is meant by the "behaviors" of the SNM but depending on the actual testimony there are obvious confrontation, relevancy and Fed. R. Evid. 404 concerns.

B.      "**The specific membership and affiliation of the Defendants and the**

**Victims in SNM.**" (Doc. No. 1299, p.1-2)

The government has previously indicated that any gang expert would not be an

employee of the New Mexico Department of Corrections. 10/4/2016 hrg, 149:21-150:5 (Doc.

No. 743). The Court relied on that representation in denying discovery of DOC materials

relevant to how corrections arrived at the conclusion that a defendant is a member of the

SNM. 2/18/2017 Memorandum Opinion and Order, p. 114 (Doc. No. 907). But now the

government seeks to call corrections officers as experts to do exactly what they indicated

they would not.

Unless the expert personally spoke to a defendant or victim and was told by that

individual that he was a member of the SNM or a different gang, any such information would

necessarily be derived from documents that were collected or hearsay statements that are

testimonial in nature, documents which the government has not produced and successfully

fought to not produce under the representation that any gang expert would not be from

corrections.  To allow such testimony under the guise of expert testimony would be to

tolerate an end-around to *Crawford*, and would result in the government impermissibly

shielding and insulating its case and the sources of its information from scrutiny and "testing

in the crucible of cross examination," *Crawford*, *supra* at 61, which is "the principal means

by which the believability of a witness and the truth of his testimony are tested." *Davis v.*

*Alaska*, 94 S. Ct. 1105, 1111 (1974).

C.      "**In general, and specific to SNM, security threat group sanctions; reasons**

**for sanctions; how those sanctions are carried out; and a description of weapons**

**manufactured and used**." (Doc. No. 1299, p.2)

Again, unless personally observed by the witness, this information is undoubtedly

derived from other law enforcement reports which are testimonial and which may contain

further information derived from testimonial statements made by inmates to law

enforcement. It is also unclear whether this area of offered testimony specifically relates to

the crimes charged.

D.   "**The rules and requirements for members and associates to participate in

SNM sanctioned violent crimes, including homicides.**" (Doc. No. 1299, p.2)

This information could only have been derived from inmate interviews or

interrogations in which core testimonial statements were provided.

The government also provides a narrative as to what its experts will testify.  This

proposed testimony is based on testimonial statements of others to wit:

A.   "**The Syndicato de Nuevo Mexico ("SNM"), Spanish for Syndicate of New

Mexico, is a powerful and violent prison gang, which controlled drug distribution and

other illegal activities within the New Mexico penal system, and was also involved in

street level narcotics trafficking. It was formed in the early 1980s at the Penitentiary of

New Mexico after a prison riot at the penitentiary in February 1980. During the prison

riot, twelve correctional officers were taken hostage and several of them were seriously

assaulted and raped by inmates. Thirty-three inmates were killed during the riot, and

more than two hundred were injured.**" (Doc. No. 1299, p.2).

It is highly doubtful that the experts endorsed by the government witnessed any of the

above-described events.  As such, this information would be gleaned from reports, which are

testimonial in nature, and therefore prohibited under *Crawford* and its progeny. The deaths

and rapes of correctional officers and inmates by individuals predating the alleged formation of the SNM is completely irrelevant and highly prejudicial.

B.    "**Following the prison riot, the SNM Gang expanded throughout the New Mexico penal system and has boasted of as many as 500 members since the early 1980s. The SNM Gang was comprised of approximately 250 members, who are known as "hermanos," "brothers," "carnales," "dons," "jefes," "big hommies," or "Zia manos" and who controlled the gang. The SNM operated under a "panel" or "mesa" (Spanish for table) of leaders who issued orders to subordinate gang members**." (Doc. No. 1299, p.2)

Again, it is doubtful that the experts endorsed by the government witnessed any of the above-described events such that this proposed testimony could only be gleaned from reports, which are testimonial in nature.

The Court, if it admits any of this historical evidence of bad acts by the SNM, should also place a temporal limit on the evidence. *United States v. Cuch*, 842 F.2d 1173, 1177 (10th Cir. 1988) (Before a Court may admit such evidence, it, "must be reasonably close in time to the crime charged.")

C.    "**Despite being imprisoned and being closely scrutinized by prison officials, SNM Gang leaders managed to convey orders to SNM Gang members and associates throughout the prison system and outside the prison system through a variety of means, including secret notes, called "kites," or "welas," coded letters, and messages conveyed by complicit visitors. When SNM Gang members or associates completed their sentences and rejoined their communities, they were expected to remain loyal to the SNM Gang and work to further the goals of the SNM Gang outside**

15

the prison environment. **Members who failed to show continued loyalty to the gang**
**were disciplined in various ways, to include murder and assaults. One of the significant**
**goals of the SNM Gang was to control and profit from narcotics trafficking.**" (Doc. No.
1299, p.2)

Again, this information was derived entirely from testimonial statements made by law
enforcement or inmates speaking to law enforcement.  It is, therefore, objectionable under
*Crawford*. It is also information that cooperating inmates can relate and therefore, there is no
need for expert testimony on the subject.

D.      "**In addition to exerting its control in the New Mexico penal system, the**
**SNM Gang also operated on the streets of New Mexico by intimidating and influencing**
**smaller New Mexico Hispanic gangs for the purpose of establishing a larger network**
**for the SNM's illegal activities. If a gang did not accede to the SNM Gang's demands,**
**the SNM Gang assaulted or killed the gang's members who were not in custody as well**
**as those members who were incarcerated within the New Mexico penal system. In**
**addition to intimidation through direct assaults, the SNM Gang was also able to assert**
**control and influence over gang members outside the penal system because gangs did**
**not want their members outside the penal system to be assaulted or killed, and because**
**the gang members knew that, if they are incarcerated, they would need the protection**
**of the SNM Gang while they served their sentences**." (Doc. No. 1299, p.3)

This information was derived entirely from testimonial statements made by law
enforcement or inmates speaking to law enforcement.  This is the same type of testimony that
crosses permissible boundaries under *Garcia* and *Mejia*.

16

DNM 1111

E.      "**The SNM Gang had been and continues to be engaged in a fierce and violent war with rival gangs, to include the Barrio Azteca, Los Carnales, Sureños, and Burqueños gangs. Within the prison system, this rivalry manifested itself in beatings and stabbings, which often resulted in death. Outside the prison system, the SNM Gang fought for control of territory in which to conduct narcotics trafficking and other crimes, as well as to recruit and influence non-gang members. In addition to fighting for control over numerous illegal activities and using violence and terror for the purpose of enriching themselves, the SNM Gang also engaged in violence simply to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, to gain notoriety and show its superiority over others, and to send a message to others that it was strong, powerful and not to be provoked**." (Doc. No. 1299, p.3-4)

The government derived this information entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. This proposed evidence is also bad character evidence that is inadmissible under Fed. R. Evid. 404(b).

F.      "**The SNM Gang sought to maintain its reputation for being strong and powerful and maintained its membership to continue functioning as an organization in prison and on the streets. If the SNM Gang was perceived as being weak, then rival gangs would challenge and assault its members and take over its territory. This could have caused the gang to lose membership and eventually dissolve. The SNM Gang maintained a large membership and a reputation for being strong, powerful and dominant so that rival gangs would think twice before they challenged it and victims/witnesses would think twice about assisting authorities with any prosecution**

17

**attempt against it. This allowed the gang to grow in strength, thrive in its criminal activity, and dominate its territory. A member of the SNM Gang was expected to seek out and beat, stab, or shoot rival gang members. Similarly, a member of the SNM Gang was expected to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.**" (Doc. No. 1299, p.4).

Again, this information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. It is also evidence which, by its very nature, is designed to give "extra" credibility to government informants. This proposed evidence is also bad character evidence that is inadmissible under Fed. R. Evid. 404(b).

G.      "**SNM Gang members identified themselves with the Zia symbol and the letters "SNM" or "S," which represented the "Syndicato de Nuevo Mexico" or "Syndicato" which is Spanish for Syndicate. SNM Gang members also utilized the number "19" which represents the 19th letter of the alphabet, "S," and "505," which corresponds with the area code for the greater Albuquerque area. The SNM Gang claimed the entire state of New Mexico as its territory, which was broken into four geographical regions: North, South, East, and West. As with the numbers "19," and "505," the letters "S" or "SNM," the Zia symbol, and the Spanish word "Syndicato" were commonly, but not exclusively, displayed by SNM Gang members in tattoos, graffiti, drawings, and on clothing, as a way of displaying affiliation, loyalty, and commitment to the gang**." (Doc. No. 1299, p.4).

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement.

H.      "**The purpose of the SNM Gang Enterprise includes the following:**

18

1.     **Preserving and protecting the power, territory, reputation, and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults, and murder**; (Doc. No. 1299, p.5).

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. *Garcia* and *Mejia* preclude this type of testimony. It is also inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

2.     **Promoting and enhancing the enterprise and the activities of its members and associates through criminal acts, including, but not limited to, murder, attempted murder, narcotics trafficking, theft of vehicles, robberies, and other criminal activities**; (Doc. No. 1299, p.5).

The government derived this information entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. *Garcia* and *Mejia* preclude this type of testimony.  This evidence is inadmissible bad character evidence under Fed.R.Evid. Rule 404(b).

3.     **Keeping victims, potential victims, witnesses, and community members in fear of the enterprise and its members and associates through violence and threats of violence**; (Doc. No. 1299, p.5).

The government derived this information entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. *Garcia* and *Mejia* preclude this type of testimony.  It is also inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

4.     **Protecting the enterprise's members and associates who committed crimes by hindering, obstructing, and preventing law enforcement officers from**

DNM 1114

**identifying the offenders, apprehending the offenders, and successfully prosecuting and punishing the offenders**; (Doc. No. 1299, p.5).

The government derived this information entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. *Garcia* and *Mejia* preclude this type of testimony.  It is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b). It is also hearsay as to the effect on the government's lack of evidence in the case.

5.      **Providing information to members and associates of the enterprise, including those who were incarcerated, for the purpose of committing acts of violence, robbery, distribution of controlled substances, and other offenses**; (Doc. No. 1299, p.5).

The government could only have derived this information from testimonial statements made by law enforcement or inmates speaking to law enforcement.  This is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

6.      **Providing financial support and information to SNM Gang members and associates, including those members and associates who were incarcerated**." (Doc. No. 1299, p.5).

The government could only have derived this information from testimonial statements made by law enforcement or inmates speaking to law enforcement.  This is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

I.      "**Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the SNM Gang were the following**:

1.      "**Members and associates of the enterprise committed, conspired, attempted, and threatened to commit acts of violence, including murders and assaults, to protect and expand the enterprise's criminal operations**." (Doc. No. 1299, p.5).

Again, this information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement and is inadmissible evidence of bad character under Fed.R.Evid. Rule 404 (b). *Garcia* and *Mejia* preclude this type of testimony.

2.      "**To generate income, members and associates of the enterprise trafficked in controlled substances and extorted narcotic traffickers**." (Doc. No. 1299, p.5).

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement and is inadmissible evidence of bad character under Fed.R.Evid. 404(b) and is irrelevant to the crimes charged. This information is irrelevant to the crime charged in this VICAR prosecution.

3.      "**To perpetuate the enterprise, members and associates of the enterprise discussed the membership, rules, and enforcement of the rules of the SNM Gang; the status of SNM Gang members and associates who were arrested or incarcerated; the discipline of SNM Gang members; SNM Gang members' encounters with law enforcement; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and plans and agreements regarding the commission of future crimes, including murder, drug distribution, possession of firearms, and assault, as well as ways to conceal these crimes**." (Doc. No. 1299, p.6).

DNM 1116

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. *Garcia* and *Mejia* prohibit this type of evidence, which is also inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

4.      "**It was further part of the means and methods of the enterprise that members and associates of the enterprise concealed from law enforcement the way in which the enterprise conducted its affairs; the locations where enterprise members discussed and conducted the affairs of the enterprise; the locations where enterprise members stored and possessed weapons and narcotics; and the locations where enterprise members maintained the proceeds from narcotics trafficking.**" (Doc. No. 1299, p.6).

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement and is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b). Again, much of this information is irrelevant to this VICAR prosecution.

5.      "**Members of the SNM Gang also used violence to impose discipline within the SNM Gang. It was further part of the means and methods of the enterprise that the defendants and other members and associates of the SNM Gang agreed to distribute narcotics and commit other crimes, and to conceal their criminal activities by obstructing justice, threatening and intimidating witnesses, and other means.**" (Doc, 1299, p. 6).

DNM 1117

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement and is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b). *Garcia* and *Mejia* preclude this type of testimony.

IV.    **CONCLUSION**

To be clear, despite the narrow permissive allowance for some gang expert testimony authorized in *Garcia*, supra, Mr. Garcia objects to all proposed expert testimony through the officers identified by the government because that testimony will necessarily rely almost entirely on testimonial statements of other law enforcement and testimonial statements of inmates who spoke to law enforcement.  The inmates' statements to law enforcement all occurred where the inmate or an objective person would reasonably believe that the inmate's statements to law enforcement would be available for use at a later trial.  Such statements may also be layered with double or triple hearsay and/or double or triple testimonial statements. If not carefully controlled and limited, the gang expert testimony here – as in *Mejia* and *Garcia* – could easily descend to a discussion of specific events recounted by others, with the proposed experts merely adding "unmerited credibility" to the sources, and summarizing evidence in a way that should be reserved for the government's closing argument.  *Garcia*, 793 F.3d at 1213.

**WHEREFORE**, the defendant Billy Garcia respectfully requests that the Court deny the government's motion *in limine* to admit gang-expert testimony, or at a minimum, carefully and scrupulously limit any such testimony as required by the Sixth Amendment.

DNM 1118

Respectfully submitted this 17th day of October 2017.

/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)


## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


/s/ James A. Castle
James A. Castle

DNM 1119

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

                                      **CR 15-4268-JB**

  **vs.**

**ANGEL DELEON, et. al.**

        **Defendants.**


**DEFENDANT DANIEL SANCHEZ'S MOTION TO COMPEL THE GOVERNMENT TO COMPLY WITH RULE 16 IN NOTICING ITS INTENT TO RELY ON GANG EXPERT WITNESS TESTIMONY OR, IN THE ALTERNATIVE, TO EXCLUDE THE GOVERNMENT'S GANG EXPERT WITNESSES ALTOGETHER.**

Pursuant to the Fifth and Sixth Amendments to the Constitution, Rule 16 of the Federal Rules of Criminal Procedure and Rule 702 of the Federal Rules of Evidence, defendant Daniel Sanchez moves this Court to compel the government to comply with Rule 16 in noticing its intent to rely on gang expert witness testimony, or, in the alternative, Mr. Sanchez moves to exclude the government's gang expert witnesses, altogether.

The government opposes this motion.  All defendants join in this motion.

## I.  INTRODUCTION

Mr. Sanchez is accused in *United States v. DeLeon, et. al.*, 15-CR-4268-JB, with two violent crimes in aid of the Sindicato Nuevo Mexico ("SNM") racketeering enterprise ("VICAR" offenses):  a March 2014 conspiracy to murder inmate J.M.; and a March 7, 2014 murder of J.M. First Superceding Indictment ("FSI"), Counts 6-7 (CR 15-4268 Doc. 368 at p. 20-26).  If Mr. Sanchez is convicted of the charges, he faces a mandatory term of life imprisonment.

1

According to the government's theory of the case, J.M. (Javier Molina, hereinafter "Molina")

was a member of the SNM gang, who was killed by other SNM gang members after SNM gang

leaders ordered that he be hit because, in a prior robbery case, he had made a statement to law

enforcement that incriminated his co-arrestee.  In order to prove the elements of the alleged

VICAR offenses, the government has to prove that, at the time of the Molina homicide, the SNM

was an enterprise engaged in racketeering activity and that the conspiracy to commit murder and

the murder were committed by the defendants to gain entrance to, or to maintain or increase their

position in the enterprise.[1]

The government has noticed its intent to offer testimony from three so-called "gang experts,"

all of whom are employees of the New Mexico Corrections Department ("NMCD"): Ronald

Martin, a sergeant in the Security Threat Intelligence Unit ("STIU"), Chris Cupit, an STIU

investigator, and Sergio C. Sapien, an STIU captain.  *See* Doc 1299, United States' Notice of,

and Motion in Limine to Admit, Gang Expert Witness Testimony ("Gang Expert Notice").  The

Gang Expert Notice fails to comply with the requirements of Rule 16 of the Federal Rules of

Criminal Procedure ("Rule 16"), because it does not state what the experts' opinions are, the

bases and reasons for each of these opinions, and the qualifications of the expert witnesses that

are relevant to their ability to reliably form such opinions.

The discovery of this information is vital to the preparation of the defense in this case, as it

will form the basis of a *Daubert/Kumho* challenge to the qualifications and proffered opinions of

each purported expert pursuant to Federal Rule of Evidence 702, before such evidence is

---

[1] See, e.g., Fifth Circuit Pattern Instruction 2.77a Violent Crimes in Aid of Racketeering;
Ninth Circuit Pattern Instruction 8.151 Violent Crime in Aid of Racketeering Enterprise.

DNM 1121

admissible at trial.  The discovery of this information is also mandatory, if the Court is to

perform its role as gatekeeper, insuring only reliable and relevant evidence is presented to the

jury.

If the government is not required to comply with the requirements of Rule 16 and these

expert witnesses are permitted to testify at trial, then Mr. Sanchez will be denied his

constitutional rights to due process of law and effective assistance of counsel.  For that reason,

absent swift and exacting government compliance with Rule 16, the Court should exclude any

expert testimony from the government's "gang experts." Fed. R. Crim. P. 16(d)(2)(A)-(D).

## II.  Governing Legal Principles

Mr. Sanchez seeks disclosure of discovery regarding the government's "gang experts"

pursuant to Fifth and Sixth Amendments to the Constitution, Rule 16 of the Federal Rules of

Criminal Procedure and Rule 702 of the Federal Rules of Evidence

The admissibility of expert testimony is governed by Fed. R. Evid. 702. Under Rule 702 a

witness may provide scientific, technical or special knowledge if it is determined that such a

person is qualified as an expert. Once qualified, the expert witness may be permitted to offer

opinion testimony "if (1) testimony is based upon sufficient, facts or data, (2) the testimony is

the product of reliable principles and methods, and (3) the witness has applied the principles and

methods reliably to the facts of the case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999);

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

According to Rules 104 and 702, as interpreted by *Daubert*, this Court functions as a

gatekeeper of all proffered expert opinion testimony and must determine the qualifications,

relevance and reliability of all such testimony before it may be presented to the jury. The

3

offering party must make a showing to the Court that the expert opinion is relevant, reliable and based on proper qualifications. Relevance, of course, must be evaluated against the potential prejudice to the accused. Reliability is measured through the methodology upon which the expert bases his or her opinions. *Daubert,* 509 U.S. at 589, 593-95; *United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000). *See also United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002)(holding that the prosecution failed to establish a reliable basis for a drug slang expert because there was no evidence that the "interpretations . . . were supported by reliable methods."). Expert qualifications are based upon the witness' knowledge, skill, experience, training or education in a particular field. The opinions proffered must also be related to the expert's qualifications.

**A.**   **Rule 16 Plainly Requires Comprehensive Disclosure of the Bases of Expert Opinions.**

The accused have a right to discovery of a written summary of the proffered expert opinions of each witness that the prosecution will offer at trial. Fed. R. Crim. P. 16(a)(1)(G). This includes the qualifications of the witness and the bases for the proffered opinions:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence during its case in chief at trial . . . *[T]he summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions and the witness's qualifications*. *Id.* (Emphasis added)

The "bases" for the witness's opinions refer to the required showing of relevance and reliability. The summaries of expert opinions therefore must include the qualifications of each expert, the bases of relevance for each specific opinion, and the bases of reliability for each

DNM 1123

specific opinion including the methodology and techniques used in gathering information and identifying the sources of all information forming the bases.

Furthermore, the prosecution must permit the accused to inspect and copy all papers and documents that are material to the preparation of the defense. Fed. R. Crim. P. 16(a)(1)(E). This rule requires the discovery of all materials relied upon by the prosecution's experts. See Fed. R. Evid. 703 ("the facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing"). Finally, Rule 16(a)(1)(F) permits the accused to inspect and copy results and reports of examinations and tests. In the case of the witnesses at issue, this provision refers to all reports and interagency communications authored by each related to the specific opinion proposed to be submitted to the jury. This rule imposes on the prosecution an obligation to produce all of the requested expert conclusions and communications, including information regarding the methodology used by the expert. *United States v. Yoon*, 128 F.3d 515, 526 (7th Cir. 1997). The prosecution, therefore, also must produce all documents and material relied on or consulted by each witness, all results, reports and conclusions of each witness, and all policies, procedures or other manuals describing the methodology used by such experts in formulating their opinions.

Rule 16(a)(1)(G) plainly requires the prosecution to disclose the bases of its experts' opinions. This disclosure is separate from and in addition to disclosure of a summary of "the witnesses' opinions" and "the witness's qualifications" which the rule also requires. When the Rule was amended in 1993 to expand the scope of Rule 16(a)(1)(G) to require "disclosure of the intent to rely on expert opinion testimony, what the testimony will consist of, and the bases of

DNM 1124

the testimony," the Advisory Committee addressed the constitutional and pragmatic concerns

underlying the amended rule:

> The amendment is intended to minimize surprise that often results from unexpected
> expert testimony, reduce the need for continuances, and to provide the opponent with a
> fair opportunity to test the merits of the experts' testimony through focused
> cross-examinations.

Fed. R. Crim. Pro. 16, Advisory Comm. Notes, 1993 amendment.

Importantly, the Advisory Committee specified precisely what the Rule means by "bases of

the testimony" to insure that the rule would have the intended effects:

> Third, and perhaps most important, the requesting party is to be provided with a summary
> of the bases of the experts' opinion . . . without regard to whether a party would be
> entitled to the underlying bases for expert testimony under other provisions of Rule 16,
> *the amendment requires a summary of the bases relied upon by the expert. That should
> cover not only written and oral reports, tests, reports and investigations, but any
> information that might be recognized as a legitimate bases for an opinion* under
> Federal Rule of Evidence 703, including opinions of other experts.

*Id.* (emphasis supplied).

In other words, the party proffering the expert must provide substantive and comprehensive

discovery - the discovery necessary to give the "opponent . . . a fair opportunity to test the merits

of the experts' testimony and to do focused cross-examinations (including written and oral

reports, test reports and investigations" where applicable). *See e.g. United States v. Zanfordino*,

833 F. Supp. 429, 432-33 (S.D.N.Y. 1993) (granting defense request for discovery regarding the

bases of the experts' testimony under Rule 16 and noting that cross-examination conducted

without that information implicated the Due Process and Confrontation Clauses).

**B.** **Comprehensive Disclosure of the Bases of Expert Opinions is Also Critical to**
**the Court's Ability to Perform Its Gatekeeping Function Over "Expert"**
**Testimony.**

DNM 1125

Compliance with Rule 16 also insures that the parties have the information they need to assist the Court in exercising its gatekeeping role as required by the rules and the Supreme Court's decisions in *Daubert* and *Kumho*. The Supreme Court has instructed, "Fed Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant but reliable" *Kumho*, <u>526 U.S. at 147</u>, quoting *Daubert*, <u>509 U.S. at 589</u> The *Kumho* Court made clear that this inquiry applies not only to "scientific" testimony but also to testimony based on specialized knowledge, such as the testimony the prosecution will present here. *Id.* at 150-152.

Furthermore, in evaluating whether proposed "specialized knowledge"testimony has a reliable basis under *Daubert* and *Kumho*, the Court must look beyond the witness' "qualifications" and conclusions to the facts, reasoning and methodology behind the conclusions. *United States v. Hermanek*, <u>289 F. 3d at 1094</u>. In *Hermanek*, for example, the Ninth Circuit held that the trial judge erroneously admitted the testimony of a prosecution drug or gang expert called to interpret coded drug conversations where "the district court relied solely on the expert's general qualifications without requiring the government to explain the method used to arrive at his interpretations of words he had never encountered before." *Id.* The Ninth Circuit found inadequate the witness' generic reliance on his experience, stating, "The factors (the witness) identified - his knowledge and prior investigation of defendants and the evidence seized in the case - were too vague and generalized to satisfy the requirements of Rule 702." *Id.* By the same token, the prosecution's proffered experts here must "explain the reasoning and methods underlying (their) conclusions," (*Id.*, quoting *Claar v. Burlington N. R.R.Co.*, <u>29 F.3d 499, 502</u> (9th Cir. 1994)) and "explain in . . . detail the knowledge, investigatory facts and evidence [they

7

are] drawing from", (*Id.*) before the Court may admit their testimony. *See also United States v. Medina-Copete*, 757 F.3d 1092, 1003 (10th Cir. 2014) (the district court's failure to fully examine how the proffered expert's testimony would assist the jury compromised the court's reliability analysis.)

The requested discovery is necessary for defense counsel to pose questions for which the Court must have answers to perform its gate keeping function. These include, to what extent are the "experts' opinions" derived from custodial interviews with SNM or other gang members or drop outs? Who were the persons interviewed and under what circumstances? Did the persons interviewed have any bias or incentive to be less than truthful? Were their stories corroborated and, if so, how?  To what extent did these factors affect the "experts" ultimate opinions or conclusions? Are some opinions based solely on personal knowledge gained from phone call and mail information? If so, what were the content of those communications?

If the "expert testimony" involves opinions about whether particular individuals are members or associates of SNM, then what are the criteria for validating an individual as a "member" or "associate?"  How are these criteria applied? What input do the individuals have in challenging the validation designation?"  What is the difference between a "member" and "associate?"

Without knowing the answers to such questions, it is impossible to determine if the purported bases actually support the experts' opinions and, if they do, whether the bases relied upon are sufficiently trustworthy. Without the answers to such questions, it is impossible to know whether each specific opinion is even marginally reliable.

Similarly, the defense has received no indication of the "principles and methods, on which each expert relied in forming a specific opinion," let alone discovery that would allow the defense

8

to explore whether "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. What separates the prosecution witnesses' opinions from the opinions based on "subjective belief and unsupported speculation" that *Daubert* forbids? See *Daubert*, 509 U.S. at 589-90.

> **C.**   **The Fifth and Sixth Amendments Require Comprehensive Disclosure of the Bases of the Proposed Expert Opinions.**

Finally, in the present case, Rule 16 safeguards important constitutional rights that could easily be eviscerated were the prosecution allowed to put on expert testimony without giving the defense a meaningful opportunity to test the proposed evidence and respond. The constitutional due process guarantee of a fair trial confers a meaningful opportunity to present a complete defense, "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). *See also Washington v. Texas*, 388 U.S. 14, 19 (1967) (The right "to offer testimony" is "basic in our system of jurisprudence"). The Sixth Amendment right of an accused to confront the witnesses against him includes the opportunity for adequate and effective cross-examination. *Davis v. Alaska*, 415 U.S. 308 (1974). Of course, these guarantees are meaningless if the prosecution can put on expert testimony with an unknown - and therefore unassailable - factual basis and methodology.

As the Supreme Court has recognized, "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990); *See also United States v. Begay*, 937 F.2d 515 (10th Cir. 1991. Because only comprehensive discovery regarding the bases of the proposed experts' opinions will allow

9

the defense to subject the proposed testimony to "rigorous testing" and "expose to the fact finder

relevant and discrediting information," only comprehensive discovery regarding the basis of the

proposed experts' opinions will allow the accused to exercise their constitutional rights.

**III.    The Government's Gang Expert Notice (Doc. 1299) Fails to Meet the**

**Requirements of Rule 16, Daubert, Kumho and the United States**

**Constitution.**

The government's Gang Expert Notice is wholly inadequate.

For example, the government's summary as to "expert witness," Ronald Martin, an

NMCD employee, gives a list of topics that his testimony will supposedly address:

> Unit Coordinator Martin will testify in general about prison gang activity and more
> specifically:
> a. The history, culture, codes of conduct, methods of operation and
> communication, and behaviors of the Syndicato Nuevo Mexico ("SNM") security
> threat group.
> b. The specific membership and affiliation of the Defendants and the Victims in
> SNM.
> c. In general, and specific to SNM, security threat group sanctions; reasons for
> sanctions; how those sanctions are carried out; and a description of weapons
> manufactured and used.
> d. The rules and requirements for members and associates to participate in
> SNM-sanctioned violent crimes, including homicides.

Doc. 1299 at p. 1-2.  But this list of topics does not say anything about the actual content of

the opinions that the government seeks to introduce or the information upon which the opinions

are based.

What is the history, culture, codes of conduct, methods of operation and communication and

behaviors of the SNM?  What information or observation does Martin rely upon to base these

"opinions?"  What does Martin actually believe about the "specific membership and affiliation"

of each of the defendants and victims in this case? And, as to each, what information or

10

observation are Martin's opinions based on?  To the extent he relies on NMCD policies and

procedures for validating membership or affiliation with a Security Threat Group ("STG") and/or

the opinions of others, what are those policies and procedures,  how are they implemented within

the NMCD, what quality controls are in place to insure compliance with these policies and

procedures and/or to protect the due process rights of affected individuals, and who are the

"others" whose opinions are relied upon? What are the "sanctions," "weapons," and "rules and

requirements for members and associates to participate in SNM-sanctioned violent crimes" that

Martin claims to have expert knowledge about?  What are the bases for these opinions?  And if

these "sanctions," "rules," and "requirements" are based on writings, what writings is Martin

relying on? Where did the writings come from? What is the proof of their authenticity?  If

Martin's opinions are based on "word of mouth" then who's mouth(s) did these words come

from?  Under what circumstances?  What guarantees that the information is reliable and

trustworthy? None of this information is explained in the Government's Expert Notice.

        The government also seems to be indicating that it desires to use Martin's "expert

testimony" to tell a story spanning over 20 years about how the SNM gang formed, fought for and

gained power and influence in the NMCD and on the streets of New Mexico, the purposes of the

gang and the means and methods of how the "defendants and their associates conducted and

participated in the conduct of the affairs of the SNM gang" during this two decades long time

period.  See Doc. 1299 at p. 3-6.  Again, omitted entirely from the Gang Expert Notice is detailed

information about the actual content of these opinions, information about the sources of these

"opinions," the reliability of the sources relied upon, or any methodology, if it exists, for making

determinations about reliability of sources and information.

DNM 1130

The government claims that Martin is "a recognized expert in the field of prison gangs" but fails to state by whom he has been recognized, when, or for what specific purpose or what specific prison gang(s).  The government asserts that Martin "has provided prison gang training and seminars to all levels of corrections and law enforcement agencies" but disclosed nothing about when these trainings and seminars occurred, the topics covered, or the content of Martin's contributions.  Apparently Martin has some sort of gang certification within the NMCD on the "California Sureno prison gang" (the SNM is NOT alleged to be a California Sureno prison gang), but the government provided no information about the nature of the "certification," when it was obtained, what was required to get it, or how that relates the SNM.  Similarly, the government claims that Martin has qualified as a gang expert concerning "California Sureno gang culture and ideology" but no further detail about where, when and in what context(s).

Similarly deficient are the summaries of "gang experts," Chris Cupit's and Sergio Sapien's opinions and bases for them.  *See* Gang Expert Notice, Doc 1299 at p. 7-9.  The government's notice regarding Cupit and Sapien focus solely on their purported qualifications as a "gang experts." The notice is wholly lacking any information about the topics about which the government proffers Cupit's and Sapien's "expert testimony."  And, the notice is silent as to any of Cupit's or Sapien's actual opinions, the bases for them and/or the methods of assessing the reliability of any information source.  Like "expert" Martin, Cupit and Sapien are alleged to be involved in training and seminars and to hold various certifications, but details about those trainings, seminars or certifications are basically non-existent.

**IV. CONCLUSION**

For the reasons discussed herein, Mr. Sanchez respectfully requests that this Court compel the United States to immediately comply with Rule 16 with respect to its Gang Expert Notice.  In the alternative, and for the reasons discussed here, Mr. Sanchez moves this Court for an order excluding all of the government's "gang expert" witness' testimony.

Dated this 20th day of October, 2017          Respectfully submitted,

/s/ *Amy E. Jacks*
Amy E. Jacks
Attorney for Defendant
DANIEL SANCHEZ

/s/ *Richard Jewkes*
Richard Jewkes
Attorney for Defendant
DANIEL SANCHEZ

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of October, 2017, I filed the foregoing pleading electronically, through the CM/ECF system, which caused counsel for Plaintiff and Defendants to be served by electronic means, as more fully reflected in the Electronic Notice of Filing.

/s/ *Amy E. Jacks*
Amy E. Jacks

13

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| ANGEL DELOEN, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT CHRISTOPHER GARCIA'S MOTION FOR *DAUBERT* HEARING AND TO EXCLUDE GOVERNMENT EXPERT WITNESS TESTIMONY [DOC. 1302]

Defendant Christopher Garcia filed his Motion for *Daubert* Hearing and to Exclude Government Expert Witness Testimony [Doc. 1302] ("Motion to Exclude") moving the Court to "hold a *Daubert* evidentiary hearing" purportedly to exclude all of Plaintiff United States of America's witnesses or to "show at a pretrial hearing that those expert statements are admissible." Motion to Exclude at 1-2. It appears that Garcia objects to the United States' Amended Notice of Expert Witness Testimony [Doc. 1242] ("Expert Notice"), because the United States didn't provide to "Mr. Garcia or his co-defendants a *written summary* of the testimony it intends to use through its expert witnesses" separate from their written reports. *Id.* at 3. But Rule 16 of the Federal Rules of Criminal Procedure doesn't require a written summary of the testimony the United States intends to use through its expert witnesses. Rather, the rule's language requires a written summary of the expert's opinions, the bases and reasons for the opinions, and the qualifications. And commentary and case law that discusses this rule makes clear that, in the criminal context, as opposed to the civil context, the United States' notice in this case meets Rule 16's requirements. For this reason, because these experts intend to provide

scientific opinions based on their analysis of the evidence in this case, and because the type of

scientific opinions these experts intend to give have a well-established history of admissibility in

a criminal case such as this, the Court should deny the Motion to Exclude in whole, including the

general, overbroad request for a *Daubert* hearing.

## **BACKGROUND**

The Indictment in this case charged approximately 30 Defendants with, among other

crimes, violent crimes in aid of racketeering, including charges that they conspired to murder and

assault certain individuals. Through the investigation of these assaults and murders, several

scientific and medical experts performed autopsies and other forensic examinations. Those

experts will testify as witnesses in this trial, during which time they will offer their opinions and

conclusions regarding their tests and examinations.

Thus, the United States filed its Expert Notice to provide Defendants notice that it intends

to call these persons, based on their role in this case and based on their scientific expertise,

experience and knowledge, as expert witnesses at trial. Throughout this case, and long before

filing the Expert Notice on September 1, 2017, the United States provided to Defendants in

discovery these experts' written reports, which report the tests they performed, as well as their

observations and conclusions. The United States also provided Defendants with all but 3 of the

16 expert witnesses' CVs, 2 of which will be provided to Defendants in the next discovery

disclosure.

For each scientific expert witness in the Expert Notice, the United States provides a

written summary of the expert's opinions, which are the conclusions reached in the expert's

report(s). The United States also provides a written summary of the bases and reasons for those

2

opinions, which are the tests or examinations performed, and the witness's background,

experience, education and experience. And the United States provides a written summary of the

expert's qualifications, by referencing the witness's CV, which has been or shortly will be

provided to Defendants. The Expert Notice therefore meets Rule 16(a)(1)(G)'s requirements.

Finally, these scientific expert witnesses aren't testifying to cutting-edge or novel

scientific processes which may cause the Court to question their admissibility under *Daubert* and

Fed. R. Evid. 702 and 703. Rather, the United States' 16 scientific expert witnesses include: (i) 3

medical investigators, who are Doctors of Medicine and who performed autopsies of the victims;

(ii) 6 forensic scientists/serology analysts who are employed with state forensic laboratories, and

who performed DNA analysis of the evidence in this case; (iii) 3 forensic latent print analysts,

who are employed by the state forensic laboratory, and who analyzed shoe impressions, or latent

fingerprints at the scenes of the crimes or of the evidence in this case; (iv) 2 forensic scientists

specializing in firearms, who are employed by the state forensic laboratory, and who performed

bullet and/or firearm analysis of evidence in this case; (v) 1 forensic scientist, employed by the

state forensic laboratory, who will testify about the results and conclusions of examinations

conducted by the Trace Unit (Fire Debris) in the homicide of A.B. in this case; and (vi) 1

forensic audio/video analyst, who examined the DVD-R which contained the assault on J.M. in

order to enhance the audio and video of that video.

## RELEVANT LAW

Rule 16 of the Federal Rule of Criminal Procedure provides in relevant part:

**Expert witnesses.**—At the defendant's request, the government must give to the
defendant a written summary of any testimony that the government intends to use
under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-
chief at trial. If the government requests discovery under subdivision (b)(1)(C)(ii)

3

and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G). This Court pointed out: "'It is not clear how much detail must be provided to satisfy this provision.'" *United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 1253 (D.N.M. 2012) (Browning, J.) (quoting 25 J. Moore, *Moore's Federal Practice* § 616.05[3], at 616–65 (3d ed. 2012)).

The Advisory Committee Notes to the 1993 Amendment of Rule 16, in which amendment the expert notice requirements, including the requirements for written reports and bases of opinions, were first codified, provides guidance for what notice may be required. The Federal Criminal Rules Advisory Committee explains, in relation to a written summary of the opinion, that, in some instances, simply "a generic description of the likely witness and that witness's qualifications may be sufficient, e.g., where a DEA *laboratory chemist will testify*, but it is not clear which particular chemist will be available." Fed. R. Crim. P. 16, advisory committee notes to 1993 Amendment (emphasis added).

Likewise, federal courts uphold simple notices that comply with Rule 16 by providing the witness's opinions, the reasons and bases of those opinions, and their qualifications. *See, e.g.*, *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995) (cited in *United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1254 (D.N.M. 2015) (Browning, J.) (expert notice complied with Rule 16's expert notice requirements where, in the Seventh Circuit's words, it "notified the defendants that the witnesses were of the opinion that certain paraphernalia and profile evidence were frequently linked to the sale of narcotics," and provided as the reasons "that the witnesses would

4

be testifying from years of experience as narcotics agents").

In the Tenth Circuit, the Honorable Michael W. McConnell explained the differences

between the requirements of an expert notice in the context of the Federal Rules of Civil

Procedure, and the requirements here, in the context of the Federal Rules of Criminal Procedure.

His explanation makes clear that, here in the federal context, parties are not required to produce

to the opposing parting a separate, detailed written summary of the witness's opinions:

> Rule 16 of the Federal Rules of Criminal Procedure creates an exception to the
> usual rule that defendants need not provide notice of their intention to offer expert
> witnesses. Under Rule 16(b), if the defendant requests disclosure of certain
> evidence and the government complies, the defendant becomes obligated to make
> certain disclosures in return. Specifically, if the defendant requests and receives a
> written summary of any expert testimony the government intends to introduce, the
> defendant must provide a similar notice of any testimony he intends to use. These
> written summaries must include a description of the witness's opinions, the bases
> and reasons for those opinions, and the witness's qualifications. The required
> "written summary," however falls far short of the "complete statement" required
> of litigants in civil cases. *In particular, Rule 16 does not require experts in
> criminal cases to provide written reports explaining their opinions or to make a
> written proffer containing the information required under the civil rules.*

*United States v. Nacchio*, 555 F.3d 1234, 1259-1262 (10th Cir. 2009) (McConnell, J. dissenting)

(emphasis added) (internal citations omitted). Judge McConnell points out that the civil

procedural rules, unlike the criminal procedural rules, require a "'complete statement'" of the

expert witness's opinions and their bases:

> [A]ny party who wishes to use a retained expert must give the opposing party in
> advance of trial a written expert report . . . containing a "complete statement" of
> the witness's opinions   and the "basis and reasons for them"; all data, other
> information, and exhibits on which the testimony is based; and the witness's
> qualifications, publications, previous testimony, and compensation statement.

*Nacchio*, 555 F.3d at 1260 (McConnell, J. dissenting) (quoting Fed. R. Civ. P. 26(a)(2).

DNM 1137

## ARGUMENT

The advisory committee's notes to Rule 16 and case law that discusses the expert notice requirements of that rule show that Garcia's Motion to Exclude is based on a misinterpretation of what Rule 16(a)(1)(G) requires to provide a sufficient "written summary" of the expert witness's expected testimony. Garcia contends that Rule 16(a)(1)(G) requires the United States to disclose more than the experts' written reports: "Without . . . documents *more than just the mere report or one sentence in its notice*, there is no way to determine whether the expert's opinion is reliable." Motion to Exclude at 7 (emphasis in original). He contends that "[t]he testing documents, notes, and any instrument output, among others must be evaluated to assessing the expert's underlying reasoning and methodology to form its [sic] opinion." *Id.*

But the advisory committee's comments to the 1993 amendment to Rule 16 contradict Garcia's argument. The advisory committee explains that the addition requiring a summary of the bases of the expert's opinion was intended to "remedy th[e] problem" in rule 16's language that made it unclear before the amendment that the government had to even disclose its experts before trial. Fed. R. Crim. P. 16, advisory committee notes to 1993 Amendment. The committee provides in its advisory notes as an example a decision in which the court held that the Rule 16 previously "did not otherwise require the government to disclose the identity of its expert witnesses where no reports had been prepared." *Id.*

Here, in contrast to the situation that rule 16's amendments intended to remedy in which no witness was noticed and no reports were given, the United States provided Defendants, including Garcia, with the United States' expert witnesses' names and their written reports, which provide the expert "witness's opinions, the bases and reasons for those opinions, and the

6

witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). Garcia's request for "*more than just the mere report*," Motion to Exclude at 7, and instead for "[t]he testing documents, notes, and any instrument output, among others . . . ," *id.*, go far beyond what the rules committee intended Rule 16's expert notice requirements to provide. Rather, requiring such production would run contrary to the rule committee's guidance that "[t]he amendments are not intended to create unreasonable procedural hurdles." Fed. R. Crim. P. 16, advisory committee notes to 1993 Amendment.

Rule 16 requires that the United States provide Garcia "a written summary of any testimony that the government intends to use . . . . [, which] must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). Directly contrary to Garcia's contention that Rule 16 requires the United States to provide "*more than just the mere report*," Motion to Exclude at 7 (emphasis in original), Judge McConnell pointed out that "[t]he required 'written summary,'" in Rule 16(a)(1)(G) "falls far short of the 'complete statement' required of litigants in civil cases," which is exactly what Garcia is contending. *Nacchio*, 555 F.3d at 1262 (McConnell, J., dissenting). "*In particular, Rule 16 does not require experts in criminal cases to provide written reports explaining their opinions or to make a written proffer containing the information required under the civil rules.*" *Id.* (emphasis added).[1]

---

[1] Indeed, even if this case were proceeding under the Federal Rules of Civil Procedure's more demanding expert notice requirements, all of these scientific experts' expected testimony would nevertheless be admissible as it stands now. All of these scientific experts were involved in the investigation of the underlying homicides. And the physicians treated the victims' bodies. This Court recognized that, under the much more comprehensive expert disclosure requirements under Rule 26(a)(2)(b) of the Federal Rules of Civil Procedure, such treating physicians/scientists do not have to provide the required complete statement in order for their testimony to be admissible:

"The requirement of a written report in paragraph (2)(B) [of Fed. R. Civ. P. 26(a)], however, applies only to those experts who are retained or specially employed to provide such testimony in

DNM 1139

The United States' notice of its scientific experts meets Rule 16's three requirements. The Expert Notice describes "the witness's opinions" in the summary under each heading for each expert witness. *See, e.g.,* Expert Notice at 1. For example, for Dr. Zumwalt, the summary in the Expert Notice provides his "opinion . . . that the cause of death in all three homicides was ligature strangulation, and that the manner of death was homicide." *Id. See* Fed. R. Crim. P. 16(a)(1)(G). The written summary then provides "the bases and reasons for those opinions," *id.*: "[T]he autopsies he performed on victims F.C., R.G., and F.S. . . . . [and] his findings listed in the autopsy reports." Expert Report at 1.[2]  And the Expert Notice's written summary provides a summary of the "witness's qualifications," Fed. R. Crim. P. 16(a)(1)(G), as it provides that the testimony will be based on the witness's "education, training, experience and specialized knowledge," and, in addition to that he was the medical doctor that performed the autopsies, the written summary references each witness's CVs, that have been provided or will be provided. Expert Report at 1.[3]

Each written summary in the expert notice provides that the expert witness will testify

---

the case . . . . A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."

*Montoya v. Sheldon*, 286 F.R.D. 602, 611 (D.N.M. 2012) (Browning, J.) (quoting Fed. R. Civ. P. 26, advisory committee notes to 1993 Amendment).

[2] The United States provided to Defendants the relevant autopsies early on in this case, as exhibited from the very low bates numbers. For example, the autopsies for F.C., R.G., and F.S. are found at Bates Nos. 170-175, 1045-49, and 1367-71, respectively.

[3] Garcia points out that the United States hasn't yet provided Defendants with 3 expert witnesses' CVs. And he's correct; although, two of those three will be produced to Defendants in the discovery coordinator's next upload to the tablets. The United States hadn't received these CVs from the witnesses. As the United States explained to defense counsel, the United States could not obtain Dr. Zumwalt's CV, for example, because he had been out of the country for several months. The United States now possesses Dr. Zumwalt's and Ms. Radecki's CVs. The United States is waiting on only one CV, receipt of which it continues to pursue.

DNM 1140

about the specific test or examination that the witness "performed on [the] victim[]" or victims in
the particular case, and also that the expert witness's "testimony will include [the expert's],
opinion, education, training, experience and specialized knowledge." *E.g.,* Expert Notice at 1.
*See also, e.g.*, *id.* at 2 (Forensic Serology Analyst Kristen Radecki "will testify regarding *the
tests conducted*," (emphasis added), and her testimony "will include her . . . education, training,
experience and specialized knowledge"); *id.* at 3 (Forensic Scientist Jennifer Otto "will testify
regarding *the tests conducted* . . . of those tests involving DNA as to the homicide of F.S., as
*previously revealed in her written reports disclosed to Defendants*," (emphasis added), and her
testimony "will include her . . . education, training, experience and specialized knowledge").
That provides the written notice required under Rule 16(a)(1)(G). *See Nacchio*, 555 F.3d at 1262
(McConnell, J., dissenting).

It's not as if these expert witnesses are fringe scientists or testifying about cutting-edge
scientific techniques that are without precedent, or have very little precedent, in federal courts.
Rather, these expert witnesses are medical doctors and forensic scientists testifying about
scientific techniques that are time-tested, and techniques that are testified about in federal and
state courts across the country on a regular, likely daily, basis. Virtually all murder trials will
involve a medical doctor who testifies about the autopsy performed and the conclusions which
the doctor reached during that autopsy. Dr. Zumwalt's testimony will not be materially different
from that common testimony. Similarly, virtually all murder trial and all attempted murder trials
in which DNA evidence exists, and fingerprint evidence exists, will include a forensic scientist's
testimony about the scientist's DNA analysis and a latent print analysis scientist's testimony
about the tests of fingerprints. Ms. Radecki's, Ms. Rokumaru's and Ms. Zehringer's testimony

will be no different materially.[4]

If, because the prosecution provided no "*more than just the mere report*[s]" of these experts, Motion to Exclude at 7 (emphasis in original), courts granted motions to exclude such commonplace, routine scientific expert testimony, then federal courts simply could not conduct criminal trials. Even if, when the prosecution provided no "*more than just the mere report*[s]" of these common expert witnesses, *id.*, courts were to, in every instance, grant *Daubert* hearings, then the federal courts would grind to a halt.

But even those logistical impossibilities aren't the reason that this Court should deny the Motion to Exclude. This Court should deny Garcia's Motion to Exclude because the Expert Notice satisfies Rule 16's written summary requirements. And because the area of expected testimony is well-precedented as proper, reliable, and admissible testimony under Rules 702 and 703. *Cf. United States v. Baines*, 573 F.3d 979, 990-92 (10th Cir. 2009) (holding that fingerprint analysis is admissible under Rule 702 and *Daubert*); *United States v. Gutierrez-Castro*, 805 F. Supp. 1218, 1229-34 (D.N.M. 2011) (Browning, J.) (same). If Garcia wishes to challenge "the

---

[4] Garcia apparently takes issue with the United States' citation to *United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222 (D.N.M. 2012), because that *case* was reversed and remanded by *United States v. Medina Capote*, 757 F.3d 1092 (10th Cir. 2014). But the Tenth Circuit didn't criticize the Court's construction and interpretation of Rule 16's notice requirements, for which the United States cited to *Goxcon-Chagal*. Rather, the Tenth Circuit concluded that the law enforcement officer provided improper expert opinions. *See* Motion to Exclude at 3-4. *See also United States v. Medina Capote*, 757 F.3d 1092, 1095 (10th Cir. 2014). Here, the United States' Expert Notice relates only to proposed scientific expert witnesses and testimony based on scientific knowledge and experience, and not to any law enforcement expert witnesses, who would testify to expert opinions based on non-scientific knowledge and experience. It is uncontroversial that these two types of testimony are different, and the Court's approach to their admissibility under Rules 702, 703, and *Daubert* and its progeny, are also markedly different. *Accord United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1253 (D.N.M. 2015) (Browning, J.) (quoting *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir.1995) (distinguishing expert notice requirements in a case involving "a drug courier profile," noting that, in "'cases involving technical or scientific evidence," there may be a "greater disclosure" obligation, "including written and oral reports, tests, investigations, and any other information that may be recognized as a legitimate basis for an opinion under Fed.R.Evid. 703.'").

DNM 1142

expert's underlying reasoning and methodology to form [the expert's] opinion," *id.*, then -- given

that the Expert Notice provides notice that the expert will testify about these matters -- as Judge

McConnell recognized, "the questioning may be conducted in a separate hearing outside the

presence of the jury, by motion of either party or of the court, or at the beginning of the witness's

testimony." *Nacchio*, <u>555 F.3d at 1260</u>.

The United States' Expert Notice meets Rule 16(a)(1)(G)'s written summary

requirement. Given these summaries and given the well-established admissibility of the expert

witnesses' proposed testimony, the Court properly should deny Garcia's Motion to Exclude.

## <u>CONCLUSION</u>

For these reasons, the Court properly should deny Garcia's Motion to Exclude the United

States' proposed expert scientific expert witness's testimony in full.

Respectfully Submitted,

JAMES D. TIERNEY
Acting United States Attorney

***Electronically filed on 10/20/17***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/_____
MATTHEW M. BECK
Assistant United States Attorney

11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.    15-4268 JB |
| | ) | |
| **ANDREW GALLEGOS,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S OPPOSED
SECOND MOTION TO SEVER COUNTS 4 AND 5 [1298]**

The United States of America, through its undersigned counsel, hereby files this response to Defendant's Second Motion for Severance.

**PROCEDURAL HISTORY**

Defendant is charged by Second Superseding Indictment [Doc. 949] in Count 4—conspiracy to murder, in violation of 18 U.S.C. Sections 1959(a)(5), and Count 5—murder, in violation of 18 U.S.C. Section 1959(a)(1).  On January 1, 2017, the Defendant filed a Motion to Sever Counts Four and Five of the Superseding Indictment. Doc 868.  The basis of the motion was that the risk of prejudice and guilt by association would bolster the evidence against the defendant. On February 28, 2017, the United States filed its response to the Defendant's motion.  Doc. 933. The Defendant filed his reply on March 30, 2017. Doc. 1031.

This Court held hearings on May 9, 2017 and May 19, 2017 in this case and considered whether a severance of Counts 4 and 5 from the other Counts in the Indictment would be required or appropriate.   On June 30, 2017, this Court filed its Memorandum Opinion and Order severing

1

the Superseding Indictment's Count 6-12 from Counts 1-5 and 13-15.  Doc. 1204.  This Court, however, declined to sever Andrew Gallegos from the Count 1-5 and 13-15 grouping.  Defendant filed his Second Motion to Sever Counts 4 and 5 on October 6, 2017, arguing that evidence unrelated to Defendant's specific charges amounts to "character evidence against him that is highly prejudicial."  Doc. 1298 at 4.

## ARGUMENT

As noted above, this Court previously granted in part and denied in part the Defendant's Motion to Sever Counts Four and Five. The Court concluded that some severance was appropriate to ensure judicial efficacy, efficiency, and economy but  found that the "risk of spillover prejudice does not warrant severance of any individual counts in this case."  Doc. 1204 at 193.   The Court also noted:

> A. Gallegos merely makes a general assertion of prejudice, and fails to specifically identify specific and compelling prejudicial concerns, arguing only that there may be an inability of the jury to compartmentalize the evidence against him, because limiting instructions will not stop the weight of evidence against his co-Defendants from spilling over and affecting his defense. The Court again concludes that A. Gallegos has not met his heavy burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence in his case. *See Zafiro v. United States*, 506 U.S. at 539. A. Gallegos' mere assertion of spillover prejudice is not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise.

*Id.*

In Defendant's Second Motion for Severance, his arguments mirror those raised in his Motion for Severance, Doc. 868, and previously addressed by the Court in its Memorandum Opinion and Order, Doc. 1204.  Defendant does not provide any specific or compelling prejudicial concern to invalidate the Court's previous decision. Moreover, the Defendant does

2

not demonstrate that there is a misjoinder of Defendants or offenses in this case.  The Defendant

merely rehashes his previously raised argument; there are no arguments that were not previously

considered by this Court.  Accordingly, for the reasons this Court previously concluded further

severance is inappropriate, Defendant's Second Motion for Severance should be denied.

      **WHEREFORE,** the foregoing reasons, the United States requests the Court deny the

Defendant's Second Motion to Sever Counts Four and Five.


                               Respectfully Submitted

                               JAMES D. TIERNEY
                               Acting United States Attorney

                               ***Electronically filed on 10/20/2017***
                               MARIA Y. ARMIJO
                               RANDY M. CASTELLANO
                               MATTHEW M. BECK
                               Assistant United States Attorneys
                               200 N. Church Street
                               Las Cruces, NM  88001
                               (575) 522-2304 – Tel.
                               (575) 522-2391 – Fax

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CRIMINAL NO.    15-4268 JB |
| vs. | ) |
| | ) |
| **DANIEL SANCHEZ,** | ) |
| | ) |
| Defendant. | ) |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
SEVER THE TRIAL OF COUNTS 6-7 FROM THE TRIAL OF COUNTS 8-12 [1296]**

The United States of America, through its undersigned counsel, hereby files this response

to Defendant's Motion to Sever the Trial of Counts 6-7 from the Trial of Counts 8-12.

**PROCEDURAL HISTORY**

Defendant is charged by Second Superseding Indictment [Doc. 949] in Count 6—

conspiracy to murder, in violation of 18 U.S.C. Sections 1959(a)(5), and Count 7—murder, in

violation of 18 U.S.C. Section 1959(a)(1).   On December 23, 2016, the Defendant joined in a

Motion to Sever Counts Six and Seven of the Superseding Indictment. Doc 807.  The basis of the

motion was that prejudice would result from a joint trial of these Counts with their Co-defendants

in Counts 8-12.    On January 20, 2017, the United States filed its response to the Defendants'

motion.  Doc. 836.  Defendants' reply was filed on  February 3, 2017. Doc. 887.

This Court held hearings on May 9, 2017 and May 19, 2017 in this case and considered

whether a severance of Counts 6 and 7 from the other Counts in the Indictment would be required

or appropriate.   On June 30, 2017, this Court filed its Memorandum Opinion and Order severing

the Superseding Indictment's Count 6-12 from Counts 1-5 and 13-15.  Doc. 1204.  This Court, however, declined to sever Count 6 and 7 from the 6-12 grouping.

Defendant filed this Second Motion to Sever Counts 6 and 7 on October 6, 2017, arguing that, "if Mr. Sanchez is tried by the same jury hearing evidence of the crimes charged in Counts 8-12 then there is a serious risk that unfair prejudice will taint the jury verdicts on Counts 6-7." Doc. 1296 at 11.

## ARGUMENT

As noted above, this Court previously granted in part and denied in part the Defendant's Joint Motion to Sever Counts Six and Seven. The Court concluded that some severance was appropriate to ensure judicial efficacy, efficiency, and economy.  However, the Court did "not agree that sufficient prejudice for further severance exists at this time for the Counts 6 and 7 Defendants." Doc. 1204 at 180.  The Court also noted that "mere assertions of spillover prejudice are not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise." *Id*. at 183.

This motion is essentially the Defendant's Second Motion for Severance.  In essence, his arguments mirror those raised in Doc. 807, and were previously addressed by the Court in its Memorandum Opinion and Order, Doc. 1204.  Defendant does not provide any specific or compelling prejudicial concern to invalidate the Court's previous decision. Moreover, the Defendant does not demonstrate that there is a misjoinder of Defendants or offenses in this case. The Defendant merely rehashes the previously raised arguments.  As there are no arguments that were not previously considered by this Court when it denied further severance of these counts, and given that there are now fewer Defendants headed to trial, Defendant's Motion for Severance should be denied.

**WHEREFORE,** the foregoing reasons, the United States requests the Court deny the

Defendant's Second Motion to Sever Counts Six and Seven.

Respectfully Submitted

JAMES D. TIERNEY
Acting United States Attorney

***Electronically filed on 10/20/2017***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304 – Tel.
(575) 522-2391 – Fax

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
_____
MARIA Y. ARMIJO
Assistant United States Attorney

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,                                   Criminal No.  15-cr-4268-JB

v.

ANGEL DELEON, *et al.*,

        Defendants.

---

**RESPONSE IN OPPOSITION TO THE GOVERNMENT'S NOTICE OF AND MOTION IN LIMINE TO ADMIT GANG EXPERT TESTIMONY (DOC. 1299) AND REQUEST FOR HEARING PURSUANT TO *DAUBERT* AND *KUMHO TIRE***

---

       Defendant Rudy Perez hereby objects to the Government's Notice of and Motion In Limine to Admit Gang Expert Testimony (Doc. 1299) on the grounds that the Government's notice is deficient pursuant to Federal Rule of Criminal Procedure 16, that the Government has not met its burden to show either that the proposed witnesses are qualified to deliver the proposed opinions or that the proposed testimony is reliable and that it will assist the trier of fact. Mr. Perez requests an evidentiary hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 142 (1999). Mr. Perez reserves his right to supplement this motion if and when the Government supplements its gang expert disclosure to include statements as to what the proposed experts' opinions consist of,

the bases and reasons for each of these opinions, the witnesses' methodologies in arriving at these opinions, and the detailed qualifications of the witnesses.[1]

Mr. Perez is joined in this Response by Defendants Anthony Baca, Daniel Sanchez, Carlos Herrera, Christopher Garcia, Billy Garcia, Edward Troup, Joe Gallegos, Allen Patterson, Christopher Chavez, Arturo Garcia, Mario Rodriguez, Andrew Gallegos, and Shauna Gutierrez. All other counsel for co-Defendants have been contacted and have indicated they do not oppose this Response. As grounds in support of this Response, Mr. Perez states as follows:

## I.      Applicable Law

"Since the Supreme Court of the United States decided *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[, 509 U.S. 579 (1993)], trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." *United States v. Gutierrez–Castro*, 805 F.Supp.2d 1218, 1224 (D.N.M.2011) (Browning, J.). "*Daubert* [] requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." *Id.* The district court "must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact before, permitting a jury to assess such testimony." *United States v. Rodriguez–Felix,* 450 F.3d 1117, 1122 (10th Cir. 2006). The Tenth Circuit has articulated that this gate-keeping process has two parts:

> In determining whether expert testimony is admissible, the district court generally must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. *See* Fed.R.Evid. 702. Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert.*

---

[1] By separate motion, Defendants challenge the Government's Expert Notice under Rule 16 as deficient in these areas. *See* Doc. 1345. Defendants already challenged the Government's Amended Expert Notice for non-compliance with Rule 16. *See* Docs. 1242,1255, 1277.

*United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (citing *Daubert*, 509 U.S. 579).

"Reliability questions may concern the expert's data, method, or his application of the method to the data." *Nacchio*, 555 F.3d at 1241 *(citing Mitchell v. Gencorp Inc.,* 165 F.3d 778, 782 (10th Cir.1999); Fed.R.Evid. 702). The burden is on the party offering the expert to "show that the method employed by the expert . . . is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." *Id.* "[A]ny step that renders the expert's analysis unreliable . . . renders the expert's testimony inadmissible." *Id.* In exercising its gatekeeping role, "generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Id.*

Of course *Kumho Tire* expanded the *Daubert* inquiry to cover expert testimony that is not purely scientific, stating that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 142 (1999). The *Kumho Tire* Court emphasized "the importance of Daubert's gatekeeping requirement," explaining that "[t]he objective of that requirement . . . is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152.

In order to meet its burden to demonstrate that the proposed testimony is admissible as expert testimony, the Government must provide the Court "sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Roach*, 582 F.3d 1192, 1206 (10th Cir. 2009) (citing *Goebel v.*

*Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087-88 (10th Cir. 2000) (Although "the gatekeeper inquiry under Rule 702 is ultimately a flexible determination, . . . a district court, when faced with a party's objection, must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.")). "[B]efore admitting expert testimony, the district court is required to make specific, on-the-record findings that the testimony is reliable under *Daubert.*" *Id.* at 1207 (citing *Goebel*, 215 F.3d at 1088) ("[W]e specifically hold that a district court, when faced with a party's objection, must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.")

## II.     The Government's Notice is Deficient Under Rule 16 and Designates Testimony the Admission of Which Would Be Contrary to the Sixth Amendment

As a threshold matter, Mr. Perez notes that the Government's notice is deficient pursuant to the Federal Rules of Criminal Procedure and the United States Constitution. The Government seeks to call three individuals, Ronald Martin, Chris Cupit, and Sergio Sapien of the New Mexico Corrections Department ("NMCD") Security Threat Intelligence Unit, to testify as "gang experts" at trial. *See* United States' Notice of, and Motion in Limine to Admit Gang Expert Witnesses' Testimony (Doc. 1299).

Rule 16 of the Federal Rules of Criminal Procedure provides that the United States "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed.R.Crim.P. 16(a)(1)(G). The Government sets forth only one opinion that these witnesses would render at trial, "that the SNM is a prison (gang) and its criminal acts lead them to opine that the SNM is, in their opinion, an enterprise." Doc. 1299 at 11. Separate pleadings address the deficiencies of the notice pursuant to Rule 16 with respect to this proffered opinion and the Government's proposed testimony summarizing background facts, *see* Doc.

1345, and pursuant to the Sixth Amendment and based on other evidentiary grounds, *see* Doc.

1337.[2] Mr. Perez incorporates the arguments in those pleadings here and on those bases requests

that the Court deny the Government's motion to admit testimony from these witnesses as gang

expert testimony, or in the alternative, limit any such testimony as required by Rule 16, the Sixth

Amendment and *Daubert*.

### III.    The Government Has Not Met Its Burden to Show that the Witnesses are Qualified to Testify as Experts With Regard to Topics Related to the SNM

In its notice, the Government fails to puts forth a basis on which the Court may make a

finding that the witnesses have any specialized knowledge about the SNM that would endow

them with the expertise to testify on related topics, nor has it even provided the defense with the

*curricula vitae* for its proposed experts. Instead, the Government's notice essentially states that

the three proposed experts should be qualified to opine on the issues in this case by virtue of the

nature of their employment with the NMCD. For instance, the Government posits that Sergeant

Martin's job requires him to "collaborate with other law enforcement authorities, conduct drug

trafficking investigations inside and outside of security facilities, gather intelligence, make risk

and security threat assessments, and conduct internal security investigations for certification on

the California Sureno prison gang for the New Mexico Corrections Department" Doc. 1299 at 7.

The mere fact that Sergeant Martin's job description includes conducting drug trafficking

investigations and performing threat assessments does not imbue him with any specialized

knowledge worthy of an expert designation regarding the SNM. The Government's reference to

---

[2] Mr. Perez objects to the sufficiency of the Government's Rule 16 disclosure but challenges the Government's disclosure and objects to the Government's motion *in limine* to admit the witnesses' testimony more broadly under *Daubert*. *See, e.g. Nacchio*, 555 F.3d at 1242 (upholding the district court's exclusion of defendant's expert testimony, where the government first challenged the testimony under Rule 16)

Sergeant Martin's work conducting "internal security investigations for certification on the California Sureno prison gang" (notably not the SNM) does not translate into the requisite experience to opine on general matters pertaining to prison gangs or to matters involving the SNM.

The Government employs the same circular reasoning with respect to Investigator Cupit, stating that he "is a recognized authority on the topic of prison security threat groups," and therefore has the necessary experience to qualify him as an expert on the SNM. *Id.* at 8. The fact that the NMCD, which this Court has found is part of the prosecution team in this case, recognizes Mr. Martin and Mr. Cupit as "authorities" on the investigation, assessments and classification that the Government has performed in the lead up to this case does not qualify them as experts. The Government makes no proffer that any of these three individuals are, for instance, national experts, presumably because there is no basis for such a proffer. *See United States v. Rodriguez*, 125 F.Supp.3d 1216, 1249 (D.N.M. 2015) ("The expert—testimony rules are not an invitation to the United States to turn the jury trial into the same type of proceeding [as the grand jury], wherein a single expert-whose expertise is really just in the case at hand—can serve as proof of the prosecution's entire case."). The same is true of Captain Sapien, whose proffered expertise the Government also hinges on its own assessment that he is an authority, by virtue of his years training other NMCD employees and his past experience conducting threat assessments for the NMCD. *Id.* at 8-9. The Government provides no information as to the duration or depth of the investigation and review, if any, that these witnesses may have conducted regarding the SNM.

## IV.   The Government Has Not Met Its Burden to Show that the Witnesses' Proffered Testimony Is Based On Reliable Methods and Principles

As noted above, the Government has not provided a basis on which the Court may

properly find that these witnesses have the requisite specific knowledge and experience pertaining to the SNM to make the proffered testimony reliable. *See, e.g., United States v. Norwood*, 16 F.Supp.3d 848, 862 (E.D. Mich. 2014) (proposed testimony of FBI agent on organization and operation of neighborhood-based street gangs was unreliable and irrelevant and therefore inadmissible where his "lack of familiarity with the particular gang or locale at issue in th[e] case ma[de] his opinions unreliable to be placed before the jury.) *Compare United States v. Kamahele*, 748 F.3d 984 (10th Cir. 2014) (expert had years of experience with the subject gang, the Tongan Crips, and testified as to Tongan culture). As this Court has previously noted:

> It is easy for an experience-based expert witness to pass off suspicion, speculation, and intuition as real expertise . . . . To prevent this danger, the district court must vigilantly apply the rule 702 reliability standard to each opinion or assertion to which the defendant objects and, again, ensure that facts outside of the case at hand back the witness' expertise.

*Rodriguez*, 125 F.Supp.3d at 1250. (internal citations omitted)

The Government provides no methodology whatsoever to demonstrate how its witnesses might arrive at the opinion that the SNM is "an enterprise" or at various conclusions regarding "[t]he specific membership and affiliation of the Defendants and the Victims in SNM." Doc. 1299, p.1-2, 11. This gives the Court absolutely no basis on which to find that any such opinions or conclusions are supported by legitimate bases, and the Court should therefore exclude this proffered testimony. *See Rodriguez*, 125 F.Supp.3d at 1250 ("an expert's obligation to show his or her work by establishing legitimate bases for the testimony may be higher when the expertise is of an experiential nature . . . "); *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc) ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.")

The Government further identifies several broad areas of testimony it would elicit from these witnesses at trial, including: threat group sanctions, both general to various gangs and specific to the SNM; descriptions of weapons used in custody; SNM rules and requirements for participation in SNM sanctioned crimes; symbols, words and numbers identified with the SNM; territory of the SNM; various purposes of the "SNM Gang Enterprise;" and various alleged means and methods of the SNM. Having identified these areas, however, the Government provides no information in its notice as to the source of this information, nor does it indicate that the proffered experts have corroborated the information in any way.

As is apparent from the discovery and the Government's recent disclosures with respect to the statements of numerous informants, the Government gleaned this information from statements made by inmates, many of whom are acting as confidential informants who stand to receive benefits from the Government in exchange for these statements. Because the proffered expert testimony would only parrot this otherwise uncorroborated information from potential fact witnesses, it doesn't bear the requisite indicia of reliability to make it admissible. *See United States v. Vann*, 776 F.3d at 758  (alteration in original) (citations omitted) (explaining that the *Kamahele* court upheld the officer's testimony as an expert because he (1) "relied on multiple sources," (2) "based his expert testimony on years of experience," and (3) provided specific "insights into the distinctive traits" of his area of expertise.)

Additionally, because the Government does not articulate any intermediate steps through which its proffered expert witnesses have applied a particular methodology or methodologies based on any specialized knowledge, the Court cannot make a finding that the proffered testimony is reliable. Instead, the Government seeks to put on a large amount of factual evidence in the form of expert opinions without really applying any methodology or specialized

knowledge at all. This substitution of expert opinion in place of factual evidence is clearly impermissible under *Daubert*. "When the Government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense." *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008).

## V.       The Proffered Testimony Constitutes Improper Profile Evidence and Its Admission Would Violate Federal Rule of Evidence 704

The Court should further exclude any testimony from any of these witnesses that an individual defendant has a gang affiliation, as such testimony would constitute improper profile evidence that would serve as substantive evidence of guilt. *See United States v. McDonald*, 933 F.2d 1519, 1521 (10th Cir. 1991) (defining profile evidence as "a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity.")

Additionally, Rule 704(b) specifically precludes an expert witness from stating "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed. R. Evid. 704(b). *See also United States v. Richard*, 969 F.2d 849, 852 (10th Cir. 1992); *United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007) (finding no abuse of discretion where the district court limited a gang expert's testimony to general information about the composition and structure of organized crime families rather than specific information about the membership or rank of the defendants). Furthermore, by instructing the jury that one or more elements of the charged offenses have been satisfied, the expert would contravene the Tenth Circuit's holding that expert witnesses may not

usurp the jury's fact-finding role in determining which version of events is more credible. *See United States v. Adams*, 271 F.3d 1236, 1245-46 (10th Cir. 2001).

## VI. The Proposed Testimony Will Not Assist the Jury and Would Be Substantially More Prejudicial Than Probative

The Government offers a general description of the narrative testimony that it intends to elicit from its three correctional officer witnesses. In summary, the Government intends to elicit testimony that the SNM is a powerful and violent prison gang, which formed in the early 1980s at the Penitentiary of New Mexico after a prison riot (and describing the deaths and serious injuries as a result of the riot), and the subsequent expansion of the SNM and a litany of facts describing historical bad acts of the SNM. This testimony would not assist the jury and would be substantially more prejudicial than probative under Federal Rule of Evidence 403.

"Rule 702 . . . dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." *United States v. Muldrow*, 19 F.3d 1332, 1338 (10th Cir. 1994). *See United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir.1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror.") "When an expert's bailiwick is only internal expertise of the investigation at hand and the expert does no more than disgorge . . . factual knowledge to the jury, the expert is no longer aiding the jury in its factfinding but is instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense." *United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015)(internal quotation omitted). The inquiry as to whether expert testimony may assist the jury goes primarily to relevance because testimony that does not relate to a disputed issue is not relevant and cannot assist the trier of fact as required by Rule 702. *See Daubert*, 509 U.S. at 591-92.

The vast majority of the proposed narrative testimony is entirely without relevance to this prosecution. For instance, the Government has not explained how the lengthy narrative details regarding "the history, culture, codes of conduct, methods of operation and communication, and behaviors of the SNM" would bear on the existence or non-existence of an enterprise in this case. Narrative testimony, like that proffered in the Government's notice, that can be offered by fact witnesses without the added imprimatur of expert testimony is well within the grasp of ordinary jurors. That is, the "activities" or specific crimes committed by members of the SNM can easily be understood by jurors through fact witnesses with first-hand knowledge, without the need for an expert opinion on the ultimate issue of whether a crime was committed. *See, e.g., United States v. McGee*, 408 F.3d 966, 978 (7th Cir. 2005) (affirming rejection of defendant's proposed gang expert in part because substance of testimony was not "beyond the ken of the average juror").

The areas of testimony delineated in the Government's notice may easily be covered with cooperating witnesses, who may certainly testify about their own personal participation in crimes which the Government can then argue amount to "racketeering activity." What the Government is not permitted to do is to elicit this narrative factual testimony from so-called expert witnesses in order to prop up the testimony of its other sources. "[E]xpert testimony cannot be used solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events." *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992).

Even if the Court finds that portions of the background narrative are relevant to the charges in the case, it is clear that such testimony also must be excluded on the grounds that it would be substantially more prejudicial than probative. "The 'aura of special reliability and trustworthiness surrounding expert testimony,' may give the witness 'unmerited credibility' and

'create[] a risk of prejudice 'because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial.'" *United States v. Sandoval*, 680 Fed. Appx. 713, 718 (10th Cir. 2017) (quoting *United States v. Dukagjini*, 326 F.3d 45, 53-54 (2d Cir. 2002) (citations omitted)). *See also United States v. Fosher*, 590 F.2d 381, 383 (1st Cir.1979) ("Quite apart from questions of limited relevance and reliability, . . . the proffered expert testimony would create a substantial danger of undue prejudice and confusion because of its aura of special reliability and trustworthiness.").

The Government's single proffered opinion testimony from these witnesses, that "the SNM is a prison [gang] and its criminal acts lead them to opine that the SNM is, in their opinion, an enterprise" would also be highly misleading to the jury and prejudicial to the Defendants. In a similar case involving allegations of racketeering, a federal district court in the Eastern District of Michigan reasoned as follows with respect to similar testimony:

> In this case, the jury will be required to decide whether a RICO enterprise exists. As the Government has apparently conflated the concept of a gang with the concept of a RICO enterprise, a similar muddling of the concepts of gang and RICO enterprise by the jury may occur if [FBI agent] Bornstein is permitted to testify. [This] testimony, although ostensibly about gangs, could be mistaken as establishing—without more—the existence of a RICO enterprise. In other words, the jury might easily conclude that the Government has met its burden of establishing the enterprise element simply by establishing that the Howard Boys are a gang.

*Norwood* 16 F.Supp.3d at 865. *See also United States v. Crosgrove*, 637 F.3d 646, 660–661 (6th Cir. 2011) (holding that the exclusion of defense expert-witness testimony due to confusion and potential to mislead the jury was proper under Rule 403).

**WHEREFORE**, for all of the above reasons, Mr. Perez and the joined defendants respectfully request that the Court deny the Government's motion *in limine* to admit the

testimony of the three individuals identified in the Government's motion and rather exclude these individuals from testifying at trial, as they are not qualified as experts in the proffered areas, and because their opinions are unreliable, irrelevant, and would be unhelpful to the jury. In the alternative, if the Court is not inclined to rule on the pleadings alone, Mr. Perez and the joined defendants request that the Court hold an evidentiary hearing pursuant to *Daubert* so that it may properly exercise its gatekeeping role and make specific, on-the-record findings with regard to the qualifications of these witnesses and the reliability of any proffered testimony.

Respectfully submitted,

THE LAW OFFICE OF RYAN J. VILLA

*/s/ Ryan J. Villa*
Ryan J. Villa
2501 Rio Grande Blvd. NW, Ste. A
Albuquerque, NM 87104
(505) 639-5709
(505) 433-5812 facsimile
ryan@rjvlawfirm.com

AND

JUSTINE FOX-YOUNG, P.C.

*/s/ Justine Fox-Young*
Justine Fox-Young
1903 Wyoming Blvd. NE, Ste B
Albuquerque, NM 87112
(505) 796-8268
justine@foxyounglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2017, a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/ Justine Fox-Young*
Justine Fox-Young

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CR. No. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| BILLY GARCIA, | ) | |
| EDWARD TROUP, | ) | |
| JOE GALLEGOS, | ) | |
| ANDREW GALLEGOS, | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

The United States responds to Defendant Garcia's (Docs. 1283, 1306), Troup's (Doc.

1284), and Gallegos' (Doc. 1318) Motions to Dismiss.

I.   BACKGROUND

The Castillo Murder

On the morning of March 26, 2001, Frank Castillo, an inmate at the Southern New Mexico

Correctional Facility ("SNMCF") near Las Cruces, New Mexico, was found dead in his cell.

Castillo was an active member of SNM and had several SNM tattoos.   The victim's cell was

located in the Paul-One-Green housing unit, which was a general population unit.   Inmates were

allowed to roam freely, other than in times of lock-down, which was from 10:30 p.m. to 6:00

a.m.   The victim was only wearing underwear when he was found and was face down on his bed

with the blankets pulled up to his hat line during a 9:00 a.m. round.   The medical technicians

removed the blanket from the victim's body, and at that, time witnesses saw a laundry bag tied

around the victim's throat.

All inmates that were housed in the same area were interviewed (or attempted to be interviewed).   Of the inmates that agreed to be interviewed, most agreed that the victim was last seen the night before, shortly before the 10:30 p.m. lock-down.

An autopsy was performed by Dr. Ross Zumwalt.   The cause of death was ligature strangulation.   The manner of death was homicide.

In 2001, various items of evidence were submitted for DNA analysis along with oral swabs from ten of the suspects.   DNA was located on the knotted white cord (ligature on victim); neither Angel DeLeon nor the victim could be eliminated as the possible sources of the DNA.

In 2014, an additional request for DNA testing was made, and a new analysis was conducted on the ligature.   From the new sample taken from the ligature, only the victim was identified as the source of the DNA.

The Garza Murder

On March 26, 2001, Rolando Garza, an inmate at SNMCF, was found dead in his cell at approximately 8:35 a.m.   The victim was affiliated with the Los Carnales gang upon arrival to SNMCF.   He also had affiliated with SNM and had SNM tattoos.   Garza's cell was located in the Ocean-One-Yellow housing unit, which was part of the "general population" housing where inmates were allowed to roam freely, within the unit during times that were not considered "lock down."

It appeared the victim had been strangled.    His body was found on his bed lying down on his stomach, with his face facing to the right.   He was shirtless but had on pants and shoes. Prison medical staff responded, but upon realizing he was dead, did not perform any life saving measures.   New Mexico State Police responded to investigate the crime.

All 13 inmates in the ocean-one cell pod were interviewed, as well as the correctional officers assigned to that pod.

Inmate RM indicated that Chris Chavez and Allen Patterson were involved with the murder. He indicated that, on the morning of the murder, he overheard Chavez and Patterson saying, "He is already awake."   Chavez then told RM, when asked what was going on, that nothing was going on and he should not concern himself with it.   When questioned further by RM, Chavez stated that Patterson and he were going to "fuck up Looney" (victim Garza).     This occurred early in the morning, as soon as the doors to the cells opened.   RM also noticed that Chavez, Patterson and Eugene Martinez were talking.   RM also stated that he heard a scuffle in one of the cell rooms and someone say, "shut the door."     He saw Chavez, Patterson and Martinez go into the victim's cell room, but did not see them leave.   After the incident, Martinez was worried about DNA that had been obtained from the inmates.     RM also said that Chavez was telling other inmates not to "break" and that they could not prove anything on them.   RM indicated that the motive for the murder was that the victim "jumped the fence," meaning Garza had moved from one gang to another.   RM indicated that he was cooperating because he was friends with the victim and did not trust anyone at that point.

Christopher Chavez, when interviewed, denied involvement but indicated he had used heroin before he went to sleep the night before.

After the incident, Eugene Martinez was asking people about DNA, and he appeared very worried about it.   Also, Christopher Chavez was telling other inmates that he was willing to "take care" of any inmate who tells on him.

The autopsy revealed that the cause of death was ligature strangulation, and the manner of

3

death was homicide.   DNA testing did not aid the investigation.

In 2007, Leonard Lujan gave an interview to law enforcement.   At the time, he was pending

charges on an unrelated homicide.   Lujan was initially interviewed by Albuquerque Police

Department detectives, and later, again, by the case agents of the Castillo and Garza homicides.

Lujan admitted his involvement in the murders.   Specifically, he indicated that he gave the

orders on the homicides.   Lujan indicated that he told Eugene Martinez that Looney (Garza)

needed to be killed.   As to the Castillo murder, Lujan indicated that he assigned it to Angel

DeLeon, Joe Gallegos, and a person that he only knew as "Criminal," who was later determined

to be Michael Jaramillo.   The main order had come from Billy Garcia, who was also an inmate

at SNMCF, and that the killings had to be done in the early morning and that both killings had to

be done at the same time by strangulation.    Garza was given a "green light" because he had

jumped fences.   Castillo was killed because he "ratted" on another inmate while in prison in

Santa Fe.   Lujan indicated that he later confirmed with both Eugene Martinez and Christopher

Chavez that they carried out the order on Garza.

In 2015, the FBI interviewed and developed several confidential human sources in reference

to these homicides and in relation to their investigation of the conspiracy to murder high-ranking

state government officials.   One indicated that Billy Garcia admitted to him that Garcia called

the hits on Castillo and Garza when they were incarcerated together at SNMCF in 2009.

Likewise, another indicated that Billy Garcia admitted to him that Garcia called the hits on

Castillo and Garza.   A third indicated that Chris Chavez admitted his involvement in the hit to

him.   Finally, a fourth source indicated that he was on the yard when the hits were called by

Billy Garcia as to both Castillo and Garza.   This fourth source indicated that he and others also

sanctioned the hits.   These sources indicated their willingness to testify to these facts.

<u>Defendant Billy Garcia's Claims</u>

Defendant Garcia moves for dismissal of the charges against him based on an alleged violation of his due process rights based on the following:   (1) destruction of exculpatory evidence; (2) non-disclosure of the identities of confidential informants who have provided helpful and relevant information to the defense; (3) unjustified pre-indictment delay of approximately 15 years.   Doc. 1283 at 2.

The destruction of property claim is based on:

- Video from the prison cells of Garza and Castillo;
- Video from mounted cameras in the prison;
- Evidence from physical examinations of inmates in the various pods;
- Items from Garza's and Castillo's cells;
- Daily logs and correctional officers' log books;
- Inmate mail that was reviewed for leads and provided to federal authorities;
- Recorded phone calls from SNMCF that were made available to federal authorities;
- Copies of corrections records for each SNM member at SNMCF that were provided to federal authorities;
- A diary taken from one inmate's cell;
- A tape-recorded interview of an informant who indicated the murders were ordered by Leroy Lucero and not by Billy Garcia;
- Personal data sheets for the inmates in the pods where the murders occurred;
- A 14-page report of Special Agent Michael Sprunk detailing his interviews of inmates on April 3, and 9, 2001;
- Reports generated by corrections personnel; and
- DNA evidence.

Doc. 1283 at 5-7.   The defense also complains about the non-disclosure or loss of various informants.   Doc. 1283 at 26-33.   Finally, the defense also complains about pre-indictment delay.   Doc. 1283 at 40-45.

5

<u>Defendant Edward Troup's Claims</u>

Defendant Troup's motion to dismiss based on pre-indictment delay complains about the loss of the same items that Defendant Garcia's does, with the exception of the tape-recorded interview of a source who indicated Leroy Lucero ordered the murders and not Billy Garcia; personal date sheets for inmates in the pods where the murders occurred; the 14-page report by Special Agent Michael Sprunk; and DNA evidence.   Doc. 1284 at 4-5.   *See also* Doc. 1283 at 5-7.

<u>Gallegos Defendants' Claims</u>

The Gallegos defendants move to dismiss Counts 4 and 5 and argue that they have been prejudiced by the destruction of "the testimony of the officers and other witnesses at the [state preliminary] hearing."   Doc. 1318 at 5.

## II.   ARGUMENT

The initial threshold question as it relates to the defendants' motions is whether the evidence was lost or destroyed by members of the prosecution team.   If not, the Court will need to decide whether evidence was destroyed "'in good faith and in accord with their normal practice,'" *California v. Trombetta*, <u>467 U.S. 479, 488</u> (1984) (quoting *Killian v. United States*, <u>368 U.S. 231, 242</u> (1961)), or was lost, destroyed, or forgotten negligently.   *See Arizona v. Youngblood*, <u>488 U.S. 51, 58</u> (1988).   Destroyed or lost evidence disposed of in good faith and in accord with normal practices or that was disposed of negligently cannot be said to have been destroyed in bad faith.   The defendants have the burden of showing bad faith or their claims fail.   *See Youngblood*, <u>488 U.S. at 58</u>.

The Court has found in this case that the New Mexico Corrections Department (NMCD)

is so closely aligned with the prosecution that it is part of the prosecution team.    However, that

has not always been the case.    Defendant Garcia notes that, "Nine years before the murders of

Garza and Castillo, in January 1992, the FBI announced the Safe Streets Violent Crime

Initiative."    Doc. 1283 at 7.    "The FBI's Safe Streets and Gang Unit currently administers 160

Violent Gang Safe Streets Gang Task Forces nationwide, staffed by nearly 850 FBI agents, more

than 1,500 state and local law enforcement personnel, and nearly 100 other federal law

enforcements agents."    *Id.* at 8.    Furthermore, Defendant Garcia alleges that the objectives of

another task force, the Central New Mexico Violent Criminal Organization Task Force, stated

that its objectives in 2001 were that:

> Incident reports and investigative reports need to be obtained from the relevant
> correctional and/or investigative agencies.    Disciplinary reports also need to be
> obtained regarding these incidents because they often reflect potential offenders
> or witnesses to the incidents.    Additional investigative leads or suggestions are
> set forth for each homicide where such information has been developed.
> Additional leads should also be developed through a review of the incident reports
> and by speaking with STF Unit officers at each of the facilities.

Doc. 1283 at 9.    More importantly, however, is the fact that the report the defense refers

to above also states that the AUSA who conferred with the FBI about the investigation

> suggested that the most effective way to dismantle the SNM would be through a
> Continuing Criminal Enterprise (CCE) prosecution based on SNM drug
> trafficking activities.    In addition, the investigation of a number of SNM murders
> either ordered or carried out by SNM members would be beneficial in showing
> the gangs (sic) willingness to do anything to protect its drug related activities.

*Id.*    It is in this context that the incident reports and other reports were to be gathered.

The focus was on drug trafficking and not on racketeering murder charges.

Even if the investigation at the time were considered a joint investigation between

the FBI and the NMCD, there is no indication that the two entities were aligned as they

are today.   The defense acknowledges that the Third Judicial District Attorney's Office

in Las Cruces declined prosecution of the Garza and Castillo murders in November 2001,

less than nine months following the murders.   *Id.*   The defense then admits that, on

June 9, 2003, "NMCD formally transferred the investigation of the Garza and Castillo

murders and turned over the investigative case files to the Southern FBI Task Force."

*Id.*   The United States Attorney's Office (USAO) considered the case in 2003 and 2014

and also declined prosecution, following what the defense describes as a period of years

where USAO personnel participated in "witness interviews and meetings where strategies

and tactics regarding the investigation and prosecution of the SNM were discussed."   *Id.*

at 10.

What is clear from the even the defense allegations is that the amount of

coordination throughout the years was nowhere near what it is today.   The prosecution

and the NMCD were not so closely aligned in 2001, 2003, or later that they were required

to keep and maintain the corrections records.   Only the present investigation shows a

close alignment that has joined the United States and NMCD as part of the same

prosecution team.   In the instant prosecution, it was the federal government that

responded to a request by NMCD to investigate the murder conspiracy involving two

high-level state officials in March of 2015.

There was previously no obligation from the federal government to seek the

complained-of information from the state. Consequently, the Court should consider

"whether knowledge possessed by state officials [s]hould be imputed to the federal

prosecutor in a joint investigation with state officials."   *United States v. Beers*, 189 F.3d

8

1297, 1304 (10th Cir. 1999).

> Information possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case. However, we decline to extend this principle for federal prosecutors to exculpatory materials in the possession of the state government. It is unrealistic to expect federal prosecutors to know all information possessed by state officials affecting a federal case, especially when the information results from an unrelated state investigation. We thus hold that the state's knowledge and possession of potential impeachment evidence cannot be imputed to a federal prosecutor for purposes of establishing a *Brady* violation

*Id.*   *See also United States v. Badonie*, No. CR 03-2062 JB, 2005 WL 2312480 at *3 (D.N.M. August 29, 2005) (Browning, J.) (holding that the United States does not have a duty under *Brady v. Maryland* to produce evidence it does not possess, or to "seek information from other governments," such as the Navajo Nation, and thus the United States was not required to produce Navajo Nation Police records, even though the United States may have been able to "get the information [Defendant] Badonie seeks merely be requesting them").

Based on these principles, and based on the different nature of this investigation and prosecution, the United States submits to the Court that the evidence in question should not be attributed to the United States in its analysis of whether the United States lost or destroyed the items in question.   At a minimum, the Court should consider this background in deciding whether the United States has acted in bad faith when considering a constitutional claim based on loss of evidence attributable to the government or whether information was lost or forgotten negligently.

*See United States v. Engstrom*, 965 F.2d 836, 838 (10th Cir. 1992) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988)).

DNM 1171

A.      **The Court Should Deny Defendants' Motions Because Their Due Process Rights Were Not Violated by Pre-Indictment Delay.**

"The Due Process Clause warrants dismissal of indictments for pre-indictment delay only in exceptional circumstances."   *United States v. Comosona*, 848 F.2d 1110, 1113 (10th Cir. 1988). This is because statutes of limitation provide "the primary guarantee against bringing overly stale criminal charges." *United States v. Marion,* 404 U.S. 307, 322 (1971).   In fact, courts have long recognized that "the due process of clause of the Fifth Amendment has 'a *limited* role to play in protecting against oppressive delay.'" *See Engstrom*, 965 F.2d at 838 (quoting *United States v. Lovasco*, 431 U.S. 783, 789 (1977)) (emphasis added).

Nonetheless, the Supreme Court has recognized that "the statute of limitations does not fully define (defendants') rights with respect to the events occurring prior to indictment, and that the Due Process Clause has a limited role to play in protecting against oppressive delay." *United States v. Lovasco,* 431 U.S. 783, 788-89 (1977) (internal quotations and citations omitted).   If a defendant nevertheless seeks to dismiss an indictment on the alleged basis that preindictment delay violates his Fifth Amendment due process rights, the defendant carries the burden of establishing the two requisite findings to justify the drastic remedy of dismissal of the indictment: (i) the defendant suffered actual prejudice due to the delay; and (ii) the United States *purposefully* designed the delay to gain a tactical advantage or to harass.   *See United States v. Colonna*, 360 F.3d 1169, 1176-77 (10th Cir. 2004).   The defendant must satisfy both of these prongs to sustain a claimed due process violation based on pre-indictment delay.

In order to establish actual prejudice, a defendant must demonstrate that he has suffered "definite and not speculative prejudice." *Colonna,* 360 F.3d at 1177 (internal citations and quotations omitted).   "Vague and conclusory allegations of prejudice resulting from the passage

DNM 1172

of time and absence of witnesses are insufficient to constitute a showing of actual prejudice."

*Id.*; *United States v. Trammell,* 133 F.3d 1343, 1351 (10th Cir. 1998).   "[A] showing of mere potential or possible trial prejudice does not suffice."   *United States v. Jackson*, 549 F.3d 963, 970 (5th Cir. 2008).   "[E]stablishing prejudice is a 'heavy' burden that is rarely met."   *United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007).

In *Colonna*, the Tenth Circuit rejected the defendant's claim that the district court erred in denying his motion to dismiss the superseding indictment after a federal grand jury superseded the indictment only five days before trial to add a drug charge against him.   In so holding, the *Colonna* court stressed that, while it is not common for the United States to postpone additional charges just days before trial, "much more is required for a finding of actual prejudice."   *See id.* at 1177.   The *Colonna* court then cited to two prior Tenth Circuit decisions that also rejected a defendant's attempt to dismiss the indictment against him based on claimed pre-indictment delay, *United States v. Wood*, 207 F.3d 1222, 1235 (10th Cir. 2000) (four-year pre-indictment delay was not prejudicial, even though body of victim was putrefied, and defendant's ability to refute autopsy's findings was lost), and *United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir. 1998) (three year, nine month delay did not violate due process clause even though two witnesses had died, where defendant did not specifically allege how the witnesses' testimony would have benefitted his case).

While the Tenth Circuit does not appear to have addressed this precise issue, several other circuits have held that, if a defendant does not establish the first prong regarding substantial prejudice, a court need not address the tactical-advantage issue.   *See Jackson*, 549 F.3d at 969; *Corona-Verbera*, 509 F.3d at 1112.   Even if a court reaches the second prong, that being that the

11

United States purposefully delayed seeking an indictment against the defendant to fain a tactical advantage, the Tenth Circuit has cautioned that, "[t]o warrant dismissal, a defendant must demonstrate the government's delay was intentional and purposeful: 'more than ordinary negligence on the part of the Government representatives must be shown, no matter how high the actual proof of prejudice is." *See United States v. Batie*, 433 F.3d 1287, 1293 (10th Cir. 2006). The Supreme Court has stressed the importance of considering whether the United States has acted in bad faith when considering a constitutional claim based on loss of evidence attributable to the government. *See Engstrom*, 965 F.2d at 838 (quoting *Youngblood*, 488 U.S. at 57).

"[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *United States v. Lovasco,* 431 U.S. 783, 796 (1977); *see also United States v. Muniz*, 1 F.3d 1018, 1024 (10th Cir. 1993).   The law does not require the prosecution to charge a defendant as soon as it believes it has probable cause *or* proof beyond a reasonable doubt.   *Lovasco*, 431 U.S. at 790-93.   Requiring the United States to do so would negatively impact the judicial process.   As noted by the Supreme Court,

> It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause.   It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.   To impose such a duty would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.   From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. . . . From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally

12

unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited.   And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts.   Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so.
. . . .
It might be argued that once the Government has assembled sufficient evidence to prove guilt beyond a reasonable doubt, it should be constitutionally required to file charges promptly, even if its investigation of the entire criminal transaction is not complete. Adopting such a rule, however, would have many of the same consequences as adopting a rule requiring immediate prosecution upon probable cause.
. . . .
Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed."

*Lovasco*, 431 U.S. at 790-95 (internal citations and quotations omitted).

The Defendants have not and cannot establish that their due process rights have been violated as a result of alleged pre-indictment delay.      In this case, the United States obtained information regarding a conspiracy to murder high-level government officials in March 2015. The response was thoroughly to investigate the dealings of the entity responsible for the murder conspiracy—the SNM prison gang.   Thus formed the idea to investigate and prosecute the SNM as a racketeering enterprise, including taking a closer look at cold-case homicides, some of which were years old.   *See, e.g., United States v. Wood,* 207 F.3d 1222, 1235 (10th Cir. 2000) (four-year pre-indictment delay was not prejudicial, even though body of victim was putrefied, and defendant's ability to refute autopsy's findings was lost); *United States v. Trammell,* 133 F.3d 1343, 1351 (10th Cir.1998) (three year, nine month delay did not violate due process clause even

13

though two witnesses had died, where defendant did not specifically allege how the witnesses' testimony would have been of benefit to his case).

The Defendants fail to establish that any alleged pre-indictment delay caused them actual prejudice.   "Vague and conclusory allegations of prejudice resulting from the passage of time and absence of witnesses are insufficient to constitute a showing of actual prejudice."   *Colonna,* 360 F.3d at 1177.; *Trammell,* 133 F.3d at 1351.   Defendants Garcia and Troup speculate that lost video evidence could have presented a different scenario of what happened during the Garza and Castillo murders.   Doc. 1283 at 34-35.   However, the Defendants fail to meet their burden by routinely claiming the lost evidence "was potentially useful."   *Id.*   In fact, the defense uses this same term—"potentially useful"—to describe all of the evidence it claims is lost.   *Id.* at 34-36.   But "a showing of mere potential or possible trial prejudice does not suffice."   *United States v. Jackson,* 549 F.3d 963, 970 (5th Cir. 2008).   More glaring examples of how the defense fails to meet its burden are reflected in the claims of a lost diary and alleged insufficiently preserved DNA evidence.   Doc. 1283 at 36.   It is highly unlikely that a prisoner's diary would have documented the facts surrounding a prison murder.   Furthermore, as opposed to prejudiced, the defense is in a stronger position if the DNA evidence can no longer be tested because no defendant presently pending before this Court has been identified by such evidence.   A subsequent test might actually harm a defendant's position if his DNA was matched to the materials collected in 2001.   Among other things, Defendants Garcia and Troup also complain about the loss of recorded phone calls and inmate mail.   Docs. 1283 at 35; 1284 at 5.   A NMCD memorandum dated April 2, 2001indicates that, as of March 26, 2001, all "inmate telephone lines are turned off to include the Paul Oliver Unit."   DeLeon 717 at 2.   The

14

telephones at the Paul Oliver Unit were still not working properly on April 6, 2001.   *Id.* at 10.

The SNMCF remained on lockdown status on April 2, 2001.   *Id.* at 5.   Also, as of April 12,

2001, "[m]ail scans continued by STF staff and line assist with Inmate outgoing mail in the

Majors (sic) field office."   *Id.* at 12.   So it appears from this memorandum that there were no

phone calls at the facility for the period immediately following the murders, staff were reviewing

mail in attempt to uncover illegal activity.   It is unclear at this point to which calls and letters

the defendants are referring, but it appears that NMCD officials made good faith attempts to

capture and preserve evidence related to the Castillo and Garza murders.   Thus, Defendants

Garcia and Troup have not established that the pre-indictment delay in this case caused them

actual prejudice as it relates to the missing physical evidence because the items discussed in their

motions were not exculpatory on their face.

     The same can be said of the informants who can no longer be named from reports.   Doc.

1283 at 26-31.   **The informant at DeLeon 133** is alleged to have firsthand knowledge that

Leroy Lucero ordered the hits on Garza and Castillo; however, nowhere in the report does it state

this fact.   The report only indicates that the informant provided information to corrections

officials but does not state how the informant knew the information or what his motivation was

in providing the information.

     The same applies to the informant in the previous paragraph of the report at **DeLeon 133**

**(Witness No. 2)**.   E.J. Bustos reported that an informant provided him information indicating

that the murders were the result of a drug war within the SNM gang and that a young faction of

the gang was utilizing strangulation as a means of murder.   There is no indication that the

informant had firsthand knowledge of this information; furthermore, Witness No. 2 contradicted

15

what the previous informant said because the previous informant claimed the murders occurred because the victims were "rats" and not because there was an ongoing drug war within the gang.

**Informant at DeLeon 600 (Doc. No. 869, p.14).** This informant identifies two out of three of the charged defendants who strangled Rolando Garza to death: Allen Patterson and Eugene Martinez. This informant claims inmate Ray Molina was involved but does not mention Defendant Christopher Chavez. Defendant Garcia argues that this informant is potentially helpful because the information provided might be used to impeach Leonard Lujan. However, this information is not particularly helpful to Garcia because the informant also states that Garcia "was the only individual who could okay the hit (murder) of Castillo and Garza at the SNMCF." The informant is thus clearly not helpful to Garcia. Once again, there is no indication that this informant had firsthand knowledge of the murder. Finally, this informant claimed he resided in the same pod as those responsible for the Garza murder, so the defense has the ability to investigate who this person is because the defense has the names of all people living in the pod at the time. *See* DeLeon 728-743.

**Witness at DeLeon 605 (Doc. 869, p. 14).** This informant claimed in April 2001 that he was not in a position to testify. He also indicated that George Manzanares requested the Frank Castillo murder through Joe Pat Martinez, a.k.a. "Cheech." Cheech is a person known to the defense, and it is believed the defense was provided his whereabouts in this case. Consequently, the defense had other means of investigating this information. Furthermore, this informant is not helpful to Defendant Garcia because, like the previous one, the informant also reported that Garcia gave the order to hit Castillo. According to the informant, both Manzanares and Castillo were to be killed for their involvement in the Castillo murder. This

16

informant made clear that both Manzanares and Castillo ordered that Castillo be killed.   This is consistent with information well known in this case:   multiple people can order a hit because one person can issue the order and others can delegate that responsibility.   For example, Leonard Lujan ordered the Castillo and Garza murders after being directed to do so by Defendant Garcia.   This informant's information is not exculpatory as to Defendant Garcia.

     **Informant at DeLeon 606 (Doc. No. 869, p. 18).**   This informant is mentioned in Doc. 1306 at 2 as **Informant at DeLeon 27899**.   It appears the information is exactly the same but arranged in a different format.   The information provided by this informant does not indicate the informant had firsthand knowledge of the information.   And, even if it is true that Angel Munoz ordered the murder of Frank Castillo, it does not also mean that Defendant Garcia took no part in ordering the murder.   Assuming the order came from outside the prison, it still had to be conveyed and executed within the prison where Castillo resided.   This report also indicates that Garcia was believed to have been involved in the killing but that there was no evidence linking him to the killings.   This is consistent with Garcia ordering the murder and others carrying out the order.

     **Informant at Deleon 722 (Doc. No. 869, p. 13).**   This informant claimed Castillo was killed because he called George Manzanares' girlfriend and Manzanares answered the phone. The report goes on to state that the Security Threat Group Unit was in the process of trying to verify this information.   The next page of the report indicates that, the following day, authorities checked the number belonging to Manzanares' girlfriend and learned that no attempts were made to dial her number from the prison facility.   Authorities checked the number back to January of 2000.   There is no indication in the report how the source claimed to know the information he

17

reported, but it also appears the claim was discredited by authorities the following day. Consequently, Defendant Garcia cannot prove this information would be helpful to him.

**Informant at Deleon 14210 (Doc. 869, p. 15).** The same document is mentioned in Doc. 1306 at 3 as **DeLeon discovery page 14210.** It is unclear, but it appears this informant is the same informant discussed above (Witness at DeLeon 600 (Doc. No. 869, p.14)). He mentions the same three people who he claims are responsible for the Garza murder and also says Defendant Garcia "was the only person at S.N.M.C.F. that could make the call or give the green light for the hits to take place." DeLeon 14211. The defense may identify this source based on the fact that he says he lived in the pod where the murder took place and claimed not to be an SNM member, so the defense has alternative means of conducting its investigation since all known occupants of the pod have been provided in discovery.

**Deceased informant Toby Romero.** Contrary to claims made by Defendant Garcia, Romero's information was not "immediately apparent and obvious." Doc. 1283 at 32. In addition to what Garcia submits in his motion, Romero also reported that Billy Garcia held the rank of captain, while Leroy Lucero held the rank of lieutenant. Deleon 14614-14615. Under these circumstances, Lucero would also need Garcia's permission to proceed with the hits because Garcia outranked Lucero. Garcia's authority was also apparent when Romero reported that, through a "false kite" (false allegation of being a snitch), Romero was able to get Defendant Garcia and Shawn Ural to approve a hit on Bobby Ortega. The hit traveled with Ortega and others to a facility in Hobbs, New Mexico, where Ortega was murdered. DeLeon 14619-14620.

Related to the Castillo and Garza murders, Romero stated that Leroy Lucero got permission from Angel Munoz for the murders and that Romero "heard from second hand

18

sources that Garcia was supposed to bring the hit order down to Las Cruces from PNM North."
DeLeon 14623.   Not coincidentally, the Garza and Castillo murders happened shortly after
Garcia's arrival at the prison facility.   This is not surprising, given the fact that Romero claimed
Castillo "had apparently been in some trouble with Wild Bill's nephew while on the streets."
*Id.*   This issue provided an additional motive for Garcia to approve the Castillo murder.
The Defendants also fail to demonstrate that the United States intentionally delayed indicting
them a ploy to gain a tactical advantage.   Rather, the delay was occasioned by the United States'
need to address a conspiracy to murder governmental officials by the SNM followed by an
investigation geared towards dismantling the organization.   The investigation then revealed
informants not previously known to the government who helped to solve a number of cold case
homicides, including the Castillo and Garza murders.   It is important to remember that this is
more than a murder case—its' a racketeering case.   Murder is only one element of Counts 1 and
2.

   **Informant at DeLeon 19127** (Doc. 1306 at 2).   This informant is quoted as saying that
the "old time convicts would put holes in you and the youngsters would strangle you."   That is
the entirety of the statement, so there is no indication that the informant is even talking about
SNM gang members. This information is not clearly exculpatory in any way, especially since the
report discusses statements by a number of other informants, some of whom point the finger at
Allen Patterson, Christopher Chavez, Eugene Martinez, Billy Garcia, Angel DeLeon, Joe
Gallegos, and Edward Troup as murder participants.   DeLeon 19126-19128.

   **Informant at DeLeon 19126** (Doc. 1306 at 4).   This information is actually exculpatory
as to Leroy Lucero and not Defendant Garcia. According to Source 7, Leroy Lucero honored a

*red light, not a green light*, that was already in place by Alfred Giron.   This means that Lucero

agreed that no one would be killed.   This is corroborated by Source 10 who stated that Garza

was "supposed to get hit in December 2000 but inmate Alfred Giron gave him a pass to walk the

line."   DeLeon 19127.   This is further corroborated in DeLeon 1257 by an informant who said

Garza had protection as long as he hung close to Smurf (Leroy Lucero).   Source 7 also

identifies Defendants Patterson, Chavez, and Martinez as those who murdered Garza.

     **Informant at DeLeon 521** (Doc. 1306 at 4).   Source DFS#3 is quoted as saying Leroy

Lucero ("Smurf") was telling inmates three to four days prior to the murders that "the SNM was

going to clean house."   The source goes on to say that Defendant Garcia had ordered the hits on

the two inmates who were killed.   Source 2-A in DeLeon 14211 is quoted as saying "he heard

inmate Billy Garcia make the comment that he was going to 'clean house' at S.N.M.C.F."   It is

more likely that Lucero was aware that after Defendant Garcia arrived at the facility that the red

light in place would be changed to a green light by Garcia and that Garcia was going to "clean

house."   This information is not clearly exculpatory, as these are not people who Defendant

Garcia would want to call as witnesses at trial.

     **Informant at DeLeon 19128** (Doc. 1306 at 5).   Source 13 claimed he overheard inmate

Martinez talking with Leroy Lucero and Jessie Ibarra about carrying out assaults on inmates

considered to be rats before the murders took place.   This discussion covers the assault of

inmates and not their murders.   It also does not mention how close to the murders the statement

was made.   It is already clear from the other sources in this report that Lucero "honored the red

light on the hits."   DeLeon 19126.   Finally, Source 13 is one of a number of sources who

provided information related to the murders, so the information should not be understood in a

DNM 1182

vacuum.    Rather, it is cumulative and, therefore, not clearly exculpatory.

**Informant at DeLeon 1222** (Doc. 1306 at 5).    This informant was disclosed to the defense on October 6, 2017 in a letter sent by email.

**Informant at DeLeon 1257** (Doc. 1306 at 5).    This informant said that the Garza, not Castillo, hit was on since 2000.    He also makes very clear that Garza (Loonie) had protection as long as he hung close to Smurf (Leroy Lucero).    This informant verifies that Lucero was honoring the red lights on inmates and protected Garza, even in light of a hit that was ordered in 2000.    That all changed when Defendant Garcia arrived at the facility.    Furthermore, this is not the first time a hit has been outstanding for a period of time.    The paperwork for the Molina murder made its way to his facility three times before he was murdered.    Finally, the hit on Julian Romero was outstanding for more than a decade.    This information is not helpful to Defendant Garcia.

**Informant at DeLeon 18971** (Doc. 1306 at 6).    This informant indicated that Leonard Lujan put a hit out on another inmate.    This is not exculpatory as to Defendant Garcia.    Lujan likely had the authority to put hits on people before Defendant Garcia's arrival at the facility. This does not change the fact that Garcia outranked Lujan and consequently ordered him to make sure the hits on Castillo and Garza were carried out.

The Defendants make unsubstantiated allegations that the USAO sat on the SNM investigation for years and waited only until an explosive set of charges could be lodged against the criminal enterprise.    That's not accurate.    What is true is that the FBI looked at the SNM from time to time over the years, but it only truly set its sights on the gang after the gang brought serious attention to itself.    The USAO did not participate in, or attempt to influence in any way,

the discovery decisions made by the NMCD, nor did it oversee the NMCD's record keeping practices.   *See United States v. Harry*, 816 F.3d 1268, 1278 (10th Cir. 2016) ("Because the missing texts were not apparently exculpatory, the government violated Defendant's right to due process only if it lost or deliberately destroyed the texts in bad faith.")   Furthermore, the facts demonstrate that, once the USAO decided to prosecute the SNM for racketeering activity, it started collecting evidence of as many prosecutable crimes as it reasonably could.   The focus shifted from a decision in 2001 to prosecute SNM members for a continuing criminal enterprise based on drug-trafficking activity to a racketeering prosecution in 2015.   Because the Defendants have not established that the pre-indictment delay in this case resulted in actual prejudice or was done in bad faith for nefarious purposes, the Court should deny his motion to dismiss summarily.

As explained above, Defendants Troup's motion should be denied for the same reasons Defendant Garcia's motion should be denied.

The same applies to Defendants Joe Lawrence Gallegos and Andrew Gallegos.   Their motion may summarily be denied because they likewise fail to come forward with evidence that any destroyed or lost evidence was disposed of in bad faith.   The Defendants have the burden of showing bad faith or their claims fail.   *See Youngblood*, 488 U.S. at 58.   The Gallegos Defendants have failed to prove that the state magistrate court materials were destroyed in any other manner than destruction through normal practices.

## III.   CONCLUSION

WHEREFORE, for the foregoing reasons, the United States requests that the motions to dismiss summarily be denied based on the defendants' failure to meet their burden.

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

*__Electronically Filed 10/26/2017__*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 - Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record.

_____/s/_____
RANDY M. CASTELLANO
Assistant United States Attorney

DNM 1185

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.     15-4268 JB |
| | ) | |
| **ANGEL DELEON et al.**, | ) | |
| | ) | |
| Defendant. | ) | |

### UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR *JAMES* HEARING AND DETERMINATION OF CO-CONSPIRATOR STATEMENTS ADMISSIBILITY AT A PRE-TRIAL HEARING [1317]

The United States of America, by and through undersigned counsel, hereby submits this Response to Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Chris Chavez, Arturo Arnulfo Garcia, Mario Rodriguez, Mauricio Varela, Daniel Sanchez, Conrad Villegas, Anthony Ray Baca, Christopher Garcia, Carlos Herrera, Rudy Perez, Andrew Gallegos and Shauna Gutierrez's (Defendants) Motion for a *James* Hearing.    Doc 1317.    For the reasons set forth more fully in the response, the requested hearing is not necessary.    To the extent the Court desires a *James* hearing, the United States requests a hearing in which a single agent testifies as a summary witness.

### MEMORANDUM

## I.  Introduction

The defendants request a pretrial hearing to determine the existence of a conspiracy before certain co-conspirator statements are allowed before the jury, also known as a *James* hearing. *See United States v. James*, 590 F.2d 575 (5th Cir. 1979). Even though such hearings are

not required in the Tenth Circuit and there is ample evidence of a conspiracy, the United States

does not oppose the Court holding such a hearing under certain circumstances.

## II.  Factual Background: Summary of the Conspiracy

On February 27, 2016, SNM Gang members entered a residence in Los Lunas, New Mexico

and informed J.G. that Joe Gallegos had put a green light on him and they were going to kill him.

According to J.G., a number of people went to the residence he was at on that day.    When he

was attacked with a machete and metal baton.    J.G. was told by the men that Gallegos had put a

green light on him and they were going to kill him because he was going to testify against

Gallegos.    J.G. was struck on the head with the baton and machete and suffered serious injuries

to the face, head, neck, and hands.    J.G. lost consciousness and Gonzalez and Rivera believed

he was dead.    J.G. gained consciousness sometime later and was able to flee to a neighbor's

home, at which time the police were called.

On March 28, 2016, Rodriguez was arrested at her apartment.    State probation officers

searched her residence and found SNM photographs and letters from various SNM gang

members including Joe Gallegos.    Rodriguez's cellular telephone also contained several text

messages from SNM gang members as well as Gonzalez and Rivera.    After being advised of

her rights, Rodriguez was interviewed.    Rodriguez indicated that she was with Gonzalez, Rivera

and Gutierrez when Guiterrez learned that J.G. was at a residence in Los Lunas.    Gutierrez told

them to get over to the house to take care of J.G.    Rodriguez knew that Gutierrez and Gallegos

were after J.G. because J.G. had agreed to testify against Gallegos.    Rodriguez drove

Gutierrez's vehicle and noticed that she had a metal baton and machete inside the vehicle.

Rodriguez escorted a female out of the house and stayed with the female in the backyard while

Gonzalez and Rivera, who were both armed with a black metal baton and a machete, assaulted

J.G.    At one point, Rodriguez saw J.G. run out of the house with "a serious cut" on his head and noticed he was "all bloody."    Rodriguez jumped over the fence and ran.    Gonzalez and Rivera ran out of the house with their weapons and looked for J.G., but they were unsuccessful and fled. Rodriguez was under the belief that Gonzalez and Rivera were going to kill J.G.

The investigation lead to the indictment of Joe Lawrence Gallegos, Santos Gonzalez, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez.    Two of the defendants have pled guilty. Both Paul Rivera and Santos Gonzalez admitted to conspiring with others to kill J.G. due to J.G. being a witness against Joe Lawrence.    Doc. 877 at 4-5 and Doc. 1180 at 4-5.

## III.  Legal Analysis

### a.  A *James* hearing is not necessary

While there is a preference in the Tenth Circuit for the district court to conduct a *James* hearing pre-trial, it is well settled that the district court can provisionally admit a statement with the requirement that the party offering it prove the existence of the predicate conspiracy through trial testimony or other evidence.    *United States v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998).    Whether at a pre-trial hearing or during trial, the district court can "consider the hearsay statement itself, as well as independent factors," in determining whether a conspiracy has been shown by a preponderance of the evidence.    *Id.*    "Proof of the existence of a conspiracy is often based on circumstantial evidence, and this testimony is sufficient to establish [] participation in a conspiracy by a preponderance of the evidence."    *United States v. Vigil*, No. CR 05 2051 JB, 2006 WL 4109681, at *5 (D.N.M. Aug. 31, 2006) (Browning, J.).    The determination of whether or not to admit evidence is reviewed under an abuse of discretion standard.    *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir. 1990). The Tenth Circuit has

never constructed a fixed formula to govern what it describes as the "James prophylaxis." *United States v. Roberts*, 14 F.3d 502, 514 (10th Cir. 1993).

> To admit out-of-court statements by co-conspirators as non-hearsay pursuant to rule 801(d)(2)(E), the United States must demonstrate by a preponderance of the evidence that: (i) a conspiracy existed; (ii) the declarant and the defendant were members of that conspiracy; and (iii) the statements that the United States seeks to admit were made during the course and in furtherance of the conspiracy.

*Vigil,* 2006 WL 4109681, at *3 (citing *United States v. Sinclair,* 109 F.3d 1527, 1533 (10th Cir.1997)).   The district court can make this finding at either a pre-trial *James* hearing or at the conclusion of the government's case in chief.   *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995).   "The Court may consider the co-conspirator statements themselves, as well as independent evidence, in determining whether the conspiracy existed." *Vigil,* 2006 WL 4109681, at *3 (citing *Champagne Metals v. Ken–Mac Metals, Inc.,* Nos. 04–6222 & 05–6139, 2006 U.S.App. LEXIS 20139, at 15 (10th Cir. Aug. 7, 2006)).

It is well established that "the Constitution does not require 'independent inquiry into the *reliability* of statements that satisfy the requirements of Rule 801(d)(2)(E).'" *Roberts*, 14 F.3d at 514 (quoting *Bourjaily v. United States*, 483 U.S. 171, 183-187 (1987)) (emphasis added). The Supreme Court in *Bourjaily* also "reject[ed] any suggestion that admission of [co-conspirator] statements…violate [] [a defendant's] rights under the Confrontation Clause of the Sixth Amendment." 483 U.S. at 181.   *See also id*. at 182 (agreeing with court of appeals holding "that the requirements for admission under Rule 801(d)(2)(E) are *identical* to the requirements of the Confrontation Clause, and since the statements were admissible under the Rule, there was no constitutional problem." (emphasis added)).   Thus, with both reliability and confrontation rights removed from the inquiry, the scope of the requisite evidentiary determination under Rule

DNM 1189

801(d)(2)(E) is limited and narrow. As a result, provided the district court makes the determination prior to admitting any co-conspirator statements, the manner in which this determination is made remains discretionary with the trial court depending on the practicalities and circumstances of each case. *See, e.g., Vigil,* 2006 WL 4109681 (The court made a ruling to allow co-conspirator statements without a separate hearing and instead relied on the record of the first trial.)

### 1.   Existence of the Conspiracy

The facts clearly establish that a conspiracy to murder existed.   Some of the evidence to support this contention includes the statements made regarding the agreement to commit murder.   These same statements also establish that the declarants were members of the conspiracy.

### 2.   Membership in the Conspiracy

The admissibility of co-conspirator statements does not depend on whether the statements were made between co-conspirators.   *United States v. Heijnen*, No. CR 03-2072 JB, 2006 WL 1228949, at *9 (D.N.M. Feb. 16, 2006) (Browning, J.).   Rule 801(d)(2)(E) requires only that the declarant be a member of the conspiracy, and the defendant (a conspirator on trial against whom the statement is being offered) be a member of the conspiracy. *Id.* The fact that one party to a conversation is a government agent or informant does not itself preclude the admission of statements by the other party if he or she is a member of the conspiracy. *Id.*

### 3.   "In Furtherance" Discussion

Separate from a ruling regarding the discretionary decision to craft a procedure to admit evidence is the ruling on whether or not a statement was made in furtherance of the conspiracy. *Roberts*, 14 F.3d at 514. Statements made to induce enlistment or further participation in the

group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a co-conspirator's fears, or keep co-conspirators abreast of an ongoing conspiracy's activities are examples of statements which are in furtherance of a conspiracy. *Id*. at 515 (citing *United States v. Yarbrough*, 852 F.2d 1522, 1535-36 (9th Cir. 1988)). Similarly, statements which identify other members of the conspiracy and statements regarding the roles of other co-conspirators are statements which are both made in furtherance of the conspiracy.    *Owens*, 70 F.3d at 1125.    The inquiry to determine whether or not a statement is in furtherance of a conspiracy is not the actual effect of the statement, but rather, the declarant's intent in making the statement.    *Roberts*, 14 F.3d at 515.    There is no specific formula for making this determination; the real issue is the context in which the statement was made. *Id.*

The time when a conspiracy ends depends upon the particular facts of the case.    *Id*. "Generally, however, a conspiracy terminates when its central criminal purposes have been attained." *United States v. Silverstein*, 737 F.2d 864, 867 (10th Cir. 1984) (citing *Krulewitch v. United States*, 336 U.S. 440, 442 (1949)).    The Tenth Circuit has rejected the proposition that a statement must actually further the conspiracy to be admissible. *Roberts*, 14 F.3d at 515. It is enough that the statements be intended to promote the conspiratorial objectives. *Id.*

### b.  Manner of Conducting a *James* Hearing

The Supreme Court in *Bourjaily v. United States*, 483 U.S. 171 (1987) "expressly eschewed an opinion on the proper order of proof that trial courts should follow in concluding that the preponderance standard has been satisfied in an ongoing trial." *Roberts*, 14 F.3d at 514 (citations and internal quotations omitted). As the court explained,

> whether the [trial] court holds a pretrial hearing in which a witness testifies

6

about personal contact with a coconspirator, or provisionally admits
coconspirator statements subject to their later being connected up and delays its
ruling on the question, *remains within the discretion of the trial court based
on the particular configuration of the government's evidence and the
constraints of a multi-defendant trial.*

*Id.* (citations omitted) (emphasis added). *See also id.* (expressing reluctance even to opine on

need for written proffer); *United States v. Perez,* 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc)

(noting that, "[i]n many cases, the trial court allows co-conspirator hearsay into evidence before

requisite facts have been established in reliance upon the government's representation that such

proof will be forthcoming later in the trial" (citing *United States v. Reyes,* 798 F.2d 380, 384

(10th Cir. 1986))); *United States v. Mobile Materials, Inc.,* 881 F.2d 866, 869 (10th Cir. 1989)

(per curiam) (noting that, "*[w]hen practical*," determination should be made prior to introduction

of statements to jury but that "trial judge has 'considerable discretion' to admit the statements

conditionally, subject to their later being connected up" (emphasis added)); *United States v.

Austin,* 786 F.2d 986, 990 (10th Cir. 1986) (noting cases affirming trial court ruling even though

preferred order of proof not followed because "not reasonably practical" based on "the intricate,

interwoven web of contacts, meeting, disguises and unusual 'business' dealings and practices."

(quoting *United States v. Pilling,* 721 F.2d 286, 295 (10th Cir. 1983))); *James,* 590 F.2d at 582

(holding that preliminary admissibility determination preferred but not required if not

"reasonably practical").

    If the Court deems it necessary, the Court can hold a pretrial hearing to determine the

admissibility of co-conspirator statements, provided the hearing does not become a "pretrial

trial" that would devolve into a mere vehicle for unwarranted discovery, rather than as a tool for

facilitating the required ruling under Rule 801(d)(2)(E).

7

Some of the conspiracy evidence in this case arises from conversations of the defendants/co-conspirators.   Much of this evidence will meet all aspects of the three-part test for admitting co-conspirator statements on its own accord, with little need for independent evidence.   *See Owens*, 70 F.3d at 1125 (limiting scope of independent evidence required to establish admissibility and approving of use of summary proffer by agent); see also *Lopez-Gutierrez*, 83 F.3d at 1242.   A significant amount of evidence will not be introduced under Rule 801(d)(2)(E), but rather through Rule 801(d)(2)(A) as admissions by a defendant.   An additional quantum of evidence will be introduced based on witness participants' observations and therefore will not be hearsay at all. *See United States v. Nieto*, 60 F.3d 1464, 1467 (10th Cir. 1995). As a result, to the extent that any additional statements not already covered at a pretrial hearing of this conspiracy evidence need to be "connected up," that can be accomplished at trial by the *government,* rather than the defendants, running the risk of a curative instruction should the predicate conspiracy not be established.

To the extent the Court orders a pretrial *James* hearing, the United States respectfully requests that the Court allow a single agent to testify as a summary witness.   In *Owens*, the Court held a "*James*" hearing in which a single FBI agent summarized the co-conspirator statements which the government intended to use at trial.   70 F.3d at 1123-24.   This order of proof is within the discretion of the trial court. *Id.* at 1124. It is important to remember in this context that preliminary questions about the admissibility of evidence are not governed by the rules of evidence (apart from privileges). *Id.*

"Proof of the existence of a conspiracy is often based on circumstantial evidence..." *Vigil*, 2006 WL 4109681, at *5.   Also, the co-conspirator statements themselves can be considered in determining whether or not the conspiracy existed.   *United States v. Lopez-Gutierrez*, 83 F.3d

8

1235, 1242 (10th Cir. 1996). There should also be at least some independent evidence of the

conspiracy, even though this evidence need not be substantial. *Id*. However, a co-conspirator's

testimony (or the summary of that testimony by an agent during a *James* hearing) regarding

direct observations and contacts with a defendant qualifies as the independent evidence

necessary to show the conspiracy.    *Owens*, 70 F.3d at 1125. An agent's testimony can provide

sufficient independent evidence to show the conspiracy existed. *Id*.

      Should the Court decide to hold a *James* hearing prior to trial, the United States

respectfully requests that such hearing be held on the eve of trial, in order to facilitate a ruling on

the admissibility of co-conspirator statements under Rule 801(d)(2)(E). Given the clear abundant

evidence establishing the existence of the conspiracy, defendants' membership in the conspiracy,

and the fact that the statements to be introduced were made in furtherance of the conspiracy,

there will be no need to hold the hearing any earlier.

      **c.   The government should not have to provide a list of co-conspirator**

        **statements**

      The defendants have cited no authority that shows why they would be entitled to the

creation or production of disclosure of a list of co-conspirator statements.    There is no

requirement for a party to produce something that does not exist nor to create this document.

"There is no general constitutional right to discovery in a criminal case…"    *Weatherford v.*

*Bursey*, 429 U.S. 545, 559 (1977).    The requested information is an attempt to gain access to

trial strategy or worse.    "[S]ometimes (particularly in organized crime and drug trafficking

prosecutions, in which forfeiture questions often arise), that sneak preview might not just aid the

defendant's preparations but also facilitate witness tampering or jeopardize witness safety."

*Kaley v. United States*, 134 S. Ct. 1090, 1101–02 (2014).    The defendants and many of the

cooperators in this case remain in prison.    As seen in the facts of this case, the SNM gang calls

for the abuse and murder of individuals if they plan to testify or cooperate with the government.

This echoes back to the importance of having a summary witness at a *James* hearing,

given the acute concerns for safety.    This balanced approach will allow the defendants to get all

the information they seek and to protect the safety of witnesses

### d.    Statements by Santos Gonzalez

Defendant explicitly moves to exclude statements by co-conspirator Santos Gonzalez.

Defendant incorporates the arguments made in Doc 1307, Billy Garcia's Motion to Prevent the

Admission of Statements of Non-Testifying Codefendant Implication Defendant Billy Garcia

and For an Order for the Government to Specify Such Statements Prior to Trial.    In that motion,

Billy Garcia acknowledges that the issue is not ripe yet and does not seek relief. Doc. 1307 at 18.

## CONCLUSION

In the instant case, the United States respectfully submits that Defendants' motion should

be denied in part. It is not clear what statements the Defendants challenge because none are

mentioned in the defense motion.    However it is clear that the United States will be able to

establish that (1) a conspiracy existed; (2) that both the declarants and Defendant were members

of the conspiracy; and (3) that the statements were made in furtherance of the conspiracy.

Because ample evidence exists of the conspiracy, a hearing is not necessary.    To the extent the

Court desires a *James* hearing, the United States requests a hearing in which a single agent

testifies as a summary witness.    This is a procedure approved by the Tenth Circuit in *Owens*.

A list of co-conspirator statements, the names of the declarant and the dates of the statements

should be denied entirely.    Statements by co-conspirator Santos Gonzalez are not ripe at this

time.

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

*Electronically filed on 10/27/17*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88011
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
RANDY M. CASTELLANO
Assistant United States Attorney

11

DNM 1196

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |


**UNITED STATES' RESPONSE TO DEFENDANT RUDY PEREZ'S MOTION TO
SUPPRESS LOST OR DESTROYED EVIDENCE (DOC. 1300)**

Defendant Rudy Perez, joined by Defendants Anthony Baca, Daniel Sanchez, Carlos

Herrera, Chris Garcia, Billy Garcia, Arturo Garcia and Edward Troup, filed a Motion Suppress

Lost or Destroyed evidence (Doc. 1300) ("Motion to Suppress") moving the Court for

"suppression and exclusion of all evidence, physical, testimony, obtained, derived from or

through or pertaining to certain lost or destroyed physical evidence."   Motion to Suppress at 1.

In the alternative, Defendant is requesting the Court "to instruct the jury with an "adverse

inference instruction" pursuant to *Arizona v. Youngblood* and its progeny."   *Id.*   Specifically,

Defendant is requesting this Court for suppression and exclusion of the following:   (1) any and

all post-cooperating statements made by government witnesses regarding allegations that

Defendant voluntarily provided pieces from his walker to other inmates to make a murder

weapon to be used on J.M., (2) any and all post-cooperating statements provided by goverement

witnesses that the J.M. murder was "triggered by the arrival of 'paperwork' to the Southern New

Mexico Correctional Facility ("SNMCF"), (3) any and all images or testimony regarding a

walker that belonged to Defendant, (4) any and all evidence or testimony regarding Defendant's

walker, and (5) any and all physical evidence or testimony regarding the "paperwork"" pertaining to the murder of J.M.   Motion to Suppress at 2.   However, Defendant fails to meet his burden under *Youngblood* and as such, the Court should deny the Motion to Suppress in its entirety.

## **BACKGROUND**

On March 7, 2014, at approximately 5:18 p.m., a fight broke out in HUIA B-Pod at SNMCF.   First responders and an ambulance were called because an inmate had been stabbed. While life saving measures were performed on inmate J.M., no pulse was detected and he was later pronounced dead at Memorial Medical Center upon arrival.

Video surveillance prior to the murder showed Jerry Montoya and Jerry Armenta meet up and walk toward the victim's cell. Shortly after they entered the victim's cell, Timothy Martinez left the cell in a rush.   Mario Rodriguez exited next. Shortly thereafter, the victim exited his cell and appeared to be trying to get away from Montoya and Armenta.   When the victim turned towards the camera, a red blood stain in the middle of his chest was visible. Thereafter, Montoya and Armenta continued to assault the victim at the bottom of the stairs.

Following the attack, law enforcement officers found two homemade knives ("shanks") that were located in the trash can next to the staircase, and a third shank that was located in the top shower.

The autopsy report listed the cause of death as multiple stab wounds (43), most of which were to the chest and abdomen.   There were two clearly discernible stabbing patterns, indicating two persons stabbed the victim.

DNM 1198

In March of 2014, Jerry Montoya and Jerry Armenta were charged with First Degree Murder by a State of New Mexico grand jury, along with other felonies, relating to the death of J.M.   Mario Rodriguez was charged separately by the State of New Mexico with charges relating to one of the weapons used in the murder of J.M.   All State charges were dismissed in November, 2015 based on the fact that the Federal Government was going to prosecute the murder.

On December 1, 2015, a Federal grand jury indicted codefendants Armenta, Montoya, Rodriguez, Martinez, Baca, Varela and Sanchez in Counts 4 and 5 with Violent Crimes in Aid of Racketeering for the Conspiracy to Murder and Murder of J.M.   Doc. 2 at 18-19.

The investigation continued after the Federal Indictment, and   Rudy Perez made incriminating statements while in NMCD that were recorded by another inmate that was working with the Government in early 2016.

Perez was interviewed in 2014 as part of the original investigation.   However, at that time, Perez stated that he was taking a shower and, when he got out of the shower, someone had removed a piece of metal from his walker.   Photographs were taken by New Mexico Corrections Department ("NMCD") of this walker; they demonstrate a perfect fit.   That perfect fit means that one of the murder weapons is consistent with having come from Perez's walker.

On April 21, 2016, Defendants Perez and Herrera were added in the First Superseding Indictment to the counts involving the murder of J.M.

Overall, the Federal Indictments in this case charged approximately 31 defendants with, among other crimes, Violent Crimes In Aid of Racketeering, including charges that they conspired to murder and assault certain individuals. (Docs. 2, 368, 949).   Specifically, this case

3

deals with the Syndicato Nuevo Mexico ("SNM") prison gang, a criminal organization whose members or associates engage in acts of violence and other criminal activity including murder. Doc. 368 at 2.

Three codefendants charged in the J.M. murder have pled guilty and are expected to testify.

## RELEVANT LAW

Defendant incorporates the "legal principles and case law set forth in co-defendant Billy Garcia's Motion to Dismiss, Doc. 1283.   Motion to Suppress at 7.

Cases that involve exculpatory evidence or potentially exculpatory evidence that the government has destroyed or lost generally fall into two separate categories under the Supreme Court cases of *Trombetta* or *Youngblood*.[1]   Under *Trombetta*, a Defendant can claim a due process violation when it is shown that: (1) the destroyed evidence had exculpatory significance that was "apparent before" it was destroyed and; (2) that the defendant remains "unable to obtain comparable evidence by other reasonably available means."   *United States v. Gomez*, 191 F. 3d 1214, 1218-19 (10th Cir. 1999).

Under *Youngblood,* for destroyed evidence that is only considered to be "potentially useful," the Defendant must show government bad faith.   *Id.   See also United States v. Bohl,* 25 F.3d 904, 910 (10th Cir. 1994).   Specifically, the Supreme Court in *Youngblood* stated that a different standard from *Trombetta* should apply when it comes to evidence that could have been subjected to tests which might have led to exculpatory results.   *Youngblood,* 488 U.S. at 57-58. The fact that the government controlled the evidence before destruction and failed to preserve it

---

[1] *California v. Trombetta*, 467 U.S. 479, 488 (1984);   *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

4

does not, in itself, constitute government bad faith.   *United States v. Richard*, 969 P.2d 849, 853

(10th Cir. 1992), cert. denied 506 U.S. 887 (1992).   Further, mere negligence on the part of the

government does not amount to bad faith.   *United States v. Parker*, 7 F.3d 1444, 1452 (10th Cir.

1995).   Altogether, it is the Defendant's burden to show that destroyed or lost evidence was

useful or exculpatory and, when relevant, that there was government bad faith.   *United States v.*

*Donaldson*, 915 F.2d 612, 614 (10th Cir. 1990); *Bohl*, 25 F.3d at 913.   More specifically,

Defendant "bears the burden of showing that the missing evidence met that standard when the

evidence was lost."   *United States v. Harry*, 816 F.3d 1268, 1276 (10th Cir. 2016). *See also*

*Gomez*, 191 F.3d at 1218.

## ARGUMENT

Defendant is specifically alleging that there are "crucial items" no longer obtainable to

include (1) surveillance records of the pods in which the "paperwork" was passed, (2) physical

evidence from the NMCD corroborating whether paperwork was found on the inmates that were

transferred from the Penitentiary of New Mexico ("PNM") to SNMCF, (3) surveillance

recordings which would include the entrance of Defendant's cell, and (4) Defendant's walker.

Motion to Suppress at 6-7.   However, these items do not amount to evidence that was

"apparently exculpatory" prior to being lost or destroyed.   Additionally, it is pure speculation

that all of these items would assist the defense by being exculpatory in nature.   Most likely, the

disputed evidence would have assisted the prosecution.

### A.  Surveillance records of the pods in which the "paperwork" was passed.

The paperwork that was required to confirm the J.M. hit was brought down to SNMCF

by Lupe Urquizo on March 6, 2014 when he was transferred from PNM.   Urquizo then gave the

5

paperwork to Defendant Herrera while he was still in a cell, and in turn, Defendant Herrera passed the paperwork to the adjoining Pod (most likely under the door) for the murder to be completed.

Defendant argues that the lack of surveillance recordings "of the two pods, had they not been destroyed or lost, would further corroborate" the defense theory that there was no physical evidence that paperwork passed ordering J.M.'s murder.   However, the information as to the paperwork was not known to law enforcement until well after surveillance recordings were taped over.   In 2014, the NMCD video recording system only saved recordings for 23 days, at which point, they were taped over.   Therefore, the recordings would have been taped over in March, 2014.   It was not until 2015 that information as to paperwork coming down from PNM was provided to law enforcement, and post-indictment in this case when the details as to the passing of the paperwork was provided to the government.   Therefore, Defendant has not met his burden that the destroyed evidence had exculpatory significance that was "apparent before" it was destroyed.

**B. Physical evidence from NMCD corroborating whether paperwork was found on inmates that were transferred from PNM to SNMCF.**

Defendant argues that the failure to provide corroborating documents that paperwork was found on the inmates that were transferred from PNM to SNMCF immediately before J.M.'s murder is exculpatory.   However, the inmate that brought down the paperwork is expected to testify that he placed the paperwork in his legal documents.   As such, the correctional officer that conducted the inspection would not have conducted a thorough review of that portion of his property upon arrival at SNMCF.   Additionally, the Government will be able to provide to

6

Defendant the name of the correctional officer that inspected and inventoried the transferees' property.   Currently, NMCD is searching for any documents pertaining to that inventory.

As such, Defendant fails to meet the requirements of *Youngblood* with regard to this "lost evidence."   At the initial investigation of the J.M. murder in 2014, the details of how the paperwork came to SNMCF was not known to New Mexico State Police or NMCD.   It was much later in this investigation that information about paperwork coming down from PNM to SNMCF was investigated.   There is no evidence that the Government had knowledge of any possibly exculpatory value of the evidence at the time it was lost or destroyed.   Most importantly, the Defendant will be provided with the name of the correctional officer whose duty it was to inspect and inventory the transferees' property.

**C.  Surveillance records which would include the entrance of Defendant's cell and Defendant's walker.**

Defendant is also requesting surveillance records which would include the entrance to Defendant's cell, and also argues that the walker itself is an essential item of material evidence that is necessary for his defense.   Motion to Suppress at 13.

At the time of the initial investigation by NMSP, it was unknown to NMSP that one of the shanks possibly came from the Defendant's walker.   The case agent, NMSP Sgt. Antonio Palomares, did not realize that one of the shanks came from Defendant's walker.   Sgt. Palomares believed that parts from a *wheelchair* were used, and when Defendant indicated that correctional officers took his walker, he didn't realize the significance of the walker.   The walker itself is inculpatory and not exculpatory.   Defendant has not met his burden by showing that these items had an apparent exculpatory nature to them before they were destroyed.   Even

7

assuming that Defendant has met his burden showing that it might be potentially useful,

Defendant has not met his burden of showing bad faith on the part of the government.

**D.  Bad Faith.**

The disputed items, at best, can only be construed as being "potentially exculpatory."

The Defendant is only entitled to a dismissal of the case if he can show bad faith on the part of

police.  *Bohl*, 25 F.3d at 910.   Here, there is absolutely no government bad faith.   The loss or

destruction of evidence was either done before the importance of the items was known to law

enforcement, or the destruction was innocent in nature and not the result of any type of

governmental malicious intent.   *See Trombetta*, 467 U.S. at 488.

<u>**CONCLUSION**</u>

For these reasons, the Court properly should deny Defendant Perez's Motion to Suppress

in its entirety.

Respectfully Submitted,

JAMES D. TIERNEY
Acting United States Attorney

*<u>Electronically filed on 10/27/17</u>*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **JOE LAWRENCE GALLEGOS,** | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' RESPONSE OPPOSING DEFENDANT JOE GALLEGOS' MOTION FOR A BILL OF PARTICULARS (DOC. 1319)

The United States of America, by and through undersigned counsel, hereby submits this Response Opposing Defendant Gallegos' Motion for a Bill of Particulars. For the reasons set forth more fully in the memorandum, the requested bill of particulars is not necessary and should be denied.

## MEMORANDUM

On October 13, 2017, Defendant Joe Gallegos filed a Motion for a Bill of Particulars. (Doc. 1143.) The defendant's motion seeks information regarding Counts 13 – 16 of the Second Superseding Indictment. Doc. 1319 at 2. Because the defendant has fallen short of demonstrating that he needs the requested information in order to prepare for trial, the motion should be denied.

The decision whether to grant a motion for a bill of particulars rests with the sound discretion of the district court. *Will v. United States*, 389 U.S. 90, 98-99 (1967); *see* 1 Wright & Leipold, Fed. Prac. & Proc. Crim § 130 (4th ed. 2015) ("A defendant is not entitled to a bill of particulars as a matter of right."); Fed. R. Crim. P. 7(f) ("The court *may* direct the government to file a bill of particulars.")[1] (emphasis added). A bill of particulars is intended to "inform the

---

[1] Rule 7(f) also requires the motion for bill of particulars to be filed "before or within 14 days after

defendant of the nature of the charges against him with sufficient precision to enable him to

prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable

him to plead his acquittal or conviction in bar of another prosecution for the same offense *when*

*the indictment itself is too vague and indefinite for such purposes*." *United States v. Birmley*, 529

F.2d 103, 108 (6th Cir. 1976) (emphasis added). In ruling on a motion for a bill of particulars, a

district court should consider "whether the information requested is necessary to allow the

defense to prepare its case adequately or to avoid prejudicial surprise." 1 Wright & Leipold, Fed.

Prac. & Proc. Crim § 130. The key question is whether the information sought is necessary for

the preparation of a defense, not whether the defendant may find it helpful.   *United States v.*

*Fennell*, 496 F. Supp. 2d 279, 284 (S.D.N.Y. 2007).

It is well established that a bill of particulars is not a discovery device: "The purpose of a

bill of particulars is *not* to obtain discovery, evidentiary detail of the government's case, or

information regarding the government's legal theories." *United States v. Nguyen*, 928 F.Supp.

1525, 1551-52 (D.Kan. 1996), citing *United States v. Gabriel*, 715 F.2d 1447, 1449 (10th Cir.

1983) (emphasis in original).

## I.      The Second Superseding Indictment is Sufficiently Detailed and Specific.

The Court should reject a motion for a bill of particulars when the indictment sets forth the

charges against the defendant. *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988). "An

indictment is generally sufficient if it sets forth the offense in the words of the statute so long as

---

arraignment or at a later time if the court permits."   There is no indication the defendant has sought or received the
Court's permission to file his motion at this late date.

the statute adequately states the elements of the offense." *Id.* "Sufficiency is determined by practical rather than technical considerations." *Id.*

The Second Superseding Indictment returned in this case is 18 pages long and goes far beyond what Mr. Gallegos needs to prepare his defense and avoid unfair surprise at trial. With respect to the racketeering enterprise, the Indictment contains two paragraphs introducing the alleged enterprise, seven paragraphs explaining the background of the enterprise, two paragraphs identifying the roles of the defendants, six paragraphs summarizing the purpose of the enterprise, and the types of racketing activity in which the defendants allegedly engaged. (Doc. 949 at 2-9).

Counts 13 – 15 charge Mr. Gallegos with committing Violent Crimes in Aid of Racketeering in violation of 18 U.S.C. §§ 1959(a)(1), (2), and (5), for conspiracy to murder, assault with a dangerous weapon, attempted murder, assault resulting in serious bodily injury and assault with a dangerous weapon, and Count 16 charges Defendant with the crime of Witness Tampering in violation of 18 U.S.C. §1512.   Each of these counts contains two paragraphs that state the date and location of the offense, name other co-conspirators, identify the victim, and set forth the elements of the crimes and the statutes violated. (*Id.* at 11-12.).

The Second Superseding Indictment provides more than adequate information for the defendant to understand the charges against him and fully and fairly prepare for trial; this Circuit requires nothing more. *See, e.g., United States v. Dunn*, 841 F.2d at 1026; *United States v. Dahlman,* 13 F.3d 1391, 1400 (10th Cir. 1993). The Court should therefore deny Mr. Gallegos's motion.

## II.    The United States Provided Extensive Discovery.

 A bill of particulars is also properly denied where the government has supplemented the

3

indictment, through discovery or other means, with information that the defendant requires to understand the crimes charged and prepare for trial. *United States v. Kunzman*, 54 F.3d 1522, 1526 (10th Cir.1995) (denying motion for bill of particulars when government provided defendant sufficient discovery prior to trial to inform him of charges and enable him to prepare his defense).

As this Court is aware, the United States provided an extraordinary amount of information to Mr. Gallegos and his co-Defendants in this case. Discovery has been produced in multiple rounds to Russ Aoki, the discovery coordinator in this case. The discovery consists of information in various forms, including documents, photographs, audio recordings, video recordings, and other investigatory materials.   To date, there are approximately 40,000 pages of documents.   In addition to the information provided, the United States has made the physical evidence in this case available to all defense attorneys for inspection at their convenience.   The United States is aware of its continuing discovery obligations and supplements its productions, if and when appropriate. Witness statements and other *Jencks* material will be disclosed according to the schedule that the Court has adopted.

Defendant argues that there is no indication of whether Joe Gallegos was an active member or associate of SNM at the time of the assaults.   Motion at 6.

In short, because the United States has substantially augmented (and will continue to augment) the Second Superseding Indictment with Rule 16 discovery, *Jencks* information, and other disclosures that will allow Mr. Gallegos ample opportunity to prepare for trial, the instant motion for a bill of particulars should be denied. *See Kunzman*, 54 F.3d at 1526.

4

### III.     The Information that Mr. Gallegos Seeks is Not Properly the Subject of a Bill of Particulars

Putting aside the sufficiency of the Second Superseding Indictment and the considerable amount of discovery that the United States has produced, a careful review of the information requested in Mr. Gallegos's motion demonstrates that it properly should be denied.   Mr. Gallegos does not state any specific categories of information he seeks.   In his motion, he argues that he is entitled to the "exact evidence against him." *Id*. at 7.

Mr. Gallegos has (or will have) access to much, if not all, of the information he requested in his motion. For example, the Second Superseding Indictment states the nature, date, and location of each of the alleged acts in Counts 13 - 16. The United States supplemented the allegations in the Second Superseding Indictment with discovery that shed more light on the charged crimes—discovery that revealed information about the acts and potential witnesses. To the extent that the United States has already disclosed the information sought in Mr. Gallegos's motion, the requested bill of particulars should be denied as moot.

Even if the Court were to find that the United States has not provided all the information that Mr. Gallegos is requesting, the basis for which Mr. Gallegos has not yet provided, the motion should fail because courts have rejected requests for bills of particulars that, like Mr. Gallegos's request, simply ask for a preview of the United States' legal theories.  *See Nguyen*, 928 F.Supp. at 1551-52 ("The purpose of a bill of particulars is *not* to obtain discovery, evidentiary detail of the government's case, or information regarding the government's legal theories."); *United States v. Muyet*, 945 F.Supp. 586, 598-99 (S.D.N.Y. 1996). The United States is not even required to give notice of the specific evidence it will present in support of aggravating factors. *Nguyen*, 928 F.Supp. at 1551-52.

5

Finally, this Court previously has denied a request for a bill of particulars under similar circumstances. *See United States v. Gould*, No. CR 03-2274 JB, 2007 WL 1302592, at *1 (D.N.M. Mar. 12, 2007) (Browning, J.). The Court stated:

> Contrary to Ms. Gould's assertions, the Court finds that Count V of the Second Superceding Indictment is sufficient to apprise her of the essential elements of the crime charged, and to inform her of the charge against which she must prepare a defense. Count V cites the statute that Ms. Gould is alleged to have violated, tracks the statutory language of that statute, provides a description of the way in which Ms. Gould violated that statute, and includes the date on and the location where the violation allegedly took place. . . . The Court thus concludes that Count V adequately provides the elements of the alleged offense and apprises Ms. Gould of the charges she must meet.
>
> That Ms. Gould has identified six statements that may relate to the allegations contained in Count V strengthens that conclusion. Moreover, the Court notes that Ms. Gould has filed several motions in the case thus far, so any lack of detail in Count V has not hampered her defense. Indeed, the Court learned about the six statements at issue in this case from reading Ms. Gould's motion in limine. Further, the Court notes that Ms. Gould has had access, for some time, to discovery materials, including Grand Jury, *Brady,* and *Jencks* materials, with which to inform herself of the circumstances and conduct underlying the allegations against her contained in Count V.
>
> Ms. Gould need only scrutinize one sixty-page document to know the basis of the criminal charge against her and the parties have already identified the six material statements therein. The court does not believe ordering a bill of particulars would give Ms. Gould any information she does not already have.

*Gould*, 2007 WL 1302592, at *4.  As discussed above, this case is very much like *Gould*. The Second Superseding Indictment in this case is 18 pages long, it names Mr. Gallegos in specific counts, and those counts are listed by statutory citation and track the charging statute's language. Furthermore, Mr. Gallegos has received voluminous amounts of discovery, which has been reviewed in order for the defendant to file various motions.   Clearly, as in *Gould*, Mr. Gallegos's ability to present a defense has not been hampered.

6

## CONCLUSION

For the reasons stated herein, the Court should exercise its discretion and deny Mr. Gallegos's request for a bill of particulars.   The lengthy Second Superseding Indictment and voluminous discovery in this matter provide more than enough notice for Mr. Gallegos to understand the charges against him, prepare his defense, and avoid unfair surprise at trial.   Any additional details that the defendant seeks are not properly the subject of a bill of particulars. Because Mr. Gallegos has not established that a bill of particulars is necessary, the instant motion should be denied.

Respectfully Submitted

JAMES D. TIERNEY
Acting United States Attorney

*Electronically filed on 10/27/2017*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

DNM 1211

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

      Plaintiff,

**vs.**                                                        No. 2:15-cr-04268-JB

**ANGEL DELEON, et al.,**

      Defendants.

## MOTION FOR STATEWIDE JURY POOL AND SUPPLEMENTAL JURY QUESTIONNAIRE

Defendant Perez, by his counsel, joined by Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Garcia, Daniel Sanchez, Anthony Baca, Christopher Garcia, Carlos Herrera, Andrew Gallegos and Shauna Gutierrez, hereby request the Court provide a statewide jury pool for jury selection in the trials of this matter and provide the Defendants' proposed supplemental jury questionnaire to all members of the pool for completion prior to voir dire.

## BACKGROUND

The factual and procedural background of this case generally is set forth in detail in this Court's Memorandum Opinion and Order (MOO), pp. 3-13, filed June 30, 2017 [Doc. 1204]. This motion concerns Defendants' request to have a statewide venire for jury selection and require each member of the venire to fill out Defendants' proposed jury questionnaire. Due to the numerous defendants, numerous locations of alleged incidents that give rise to the charge, widespread media coverage of the case and unique considerations underlying a VICAR trial involving alleged prison gang members, a statewide pool is appropriate.

1

The Court severed the Second Superseding Indictment for trial into two groups: 1.) Counts 6-12, and 2.) Counts 1-5 and 13-16.  MOO at 162, 218 [Doc. 1204].  Trial of Counts 6-12 is now scheduled to begin January 29, 2018 and for the second group, April 9, 2018.  *See* Fourth Scheduling Order [Doc. 1205]. The Court determined this severance was necessary because it was "convinced that a joint trial of nineteen Defendants runs the risk of preventing the jury from making a reliable judgment," MOO at 171, and due to the potential risk of prejudice.  MOO at 174.  The same considerations are applicable when considering the use of a supplemental questionnaire and comparing a geographically limited versus geographically diverse jury pool that must consider the multitude of facts, charges and players involved in each count.  Under the current jury plan, New Mexico is divided into two jury divisions, the Northern and Southern.  *See* **Exhibit 1**, Jury Division Map.  For cases held in Las Cruces, the jury pool is normally drawn from the Southern Division.

In its MOO the Court considered the Count 6 and 7 Defendants Motion to Sever [Doc. 807], along with several others.  In that Motion, Count 6 and 7 Defendants set forth the distinct geographical location for each alleged count, along with the different time periods within which the alleged crimes were committed and the different alleged participants.  Defendants incorporate this factual background as though set forth herein.  *See* Motion to Sever, pp. 4-7 [Doc. 807]; *see also* Supplement to Defendant Perez's Motion to Sever Counts 6 and 7 [Doc. 902-1] (powerpoint illustrating pertinent facts to each count).  With this information in mind, the Court set forth in its MOO the nature of each count.  MOO at 162-165.  The Court also recognized that "the nature of the Second Superseding Indictment's charges and allegations…suggest that SNM's criminal operations as a prison gang *throughout* New Mexico inherently requires that the SNM have different leaders at the different prisons who order criminal activities and sanction murder of

2

certain individuals….”  MOO at 181-182 (emphasis added).  Because the allegations in each of the two severed trials occurred throughout the State, Defendants request a statewide jury pool. Due to the nature of the charges in each severed trial, a supplemental jury questionnaire will be critical to determining appropriate jurors to hear the case.

Moreover, this case has been the subject of extensive media coverage.  In addition to the news coverage of key events in the case (such as the indictments, pleas of co-defendants, executions of warrants, and the like), the charges against the defendants were the subject of a television program about rookie correctional officers in New Mexico that aired in 2015 and 2016. *See* A&E Network, Behind Bars: Rookie Year, available at http://www.aetv.com/shows/behind-bars-rookie-year.  Indeed the last episode, which aired November 10, 2016, depicted the arrests of the defendants in this case.  *See* Behind Bars: Rookie Year: The Takedown, summary available at http://www.aetv.com/shows/behind-bars-rookie-year/season-2/episode-12 (“The war against the SNM reaches its climax and the rookies help put the final nail in the gang’s coffin. Purto takes part in a surprise raid on SNM leaders and Javier conducts his first extraction…”).   The program depicted SNM members and the defendants in an incredibility negative and inculpating light.

Given the nature of the case, Defendants propose the attached supplemental jury questionnaire.  *See* **Exhibit 2**, Defendants’ Proposed Jury Questionnaire. Defendants have provided it to the United States.  The United States indicates it is opposed to the questionnaire. The United States is also opposed to a statewide jury pool.

## ARGUMENT

### I.    The Court should provide Defendants with a statewide jury pool, rather than one from only the Southern division.

A statewide jury pool is warranted in this case given the nature of the charges, the large amount of media attention the case has garnered, the risk of prejudice to Defendants from a non-

3

diverse jury pool, and the risk of not obtaining a jury pool that represents a fair cross-section of the community.  "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C.A. § 1861.  As an instrument of public justice, a "jury [must] be a body truly representative of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975); *See United States v. Grisham*, 63 F.3d 1074, 1080 (11th Cir. 1995) (holding that "the Sixth Amendment does not entitle a federal criminal defendant to a jury summoned from a fair cross-section of the community immediately surrounding the place of the crime, but merely to a jury drawn from a fair cross-section of some previously defined geographical area within the boundaries of the judicial district in which the offense occurred").

        This Court has previously ordered a statewide jury pool in complex cases as well as in high profile cases.  For example, this Court ordered a statewide panel in *United States v. Robert Vigil* due to extensive pretrial publicity.  *See* Memorandum Opinion [Dkt. 290] at 2, *United States v. Vigil*, Case No. 05-cr-2051-JB (filed Aug. 16, 2016) ("To empanel a fair and impartial jury, the Court summoned 1,200 jurors from a venire comprised of citizens from all three of the District's Petit Jury Divisions: (i) Albuquerque/Santa Fe; (ii) Las Cruces; and (iii) Roswell.")[1]  In *United States v. McCluskey*, 10-cr-2734-JCH, the Court mailed availability and qualification questionnaires to a statewide venire of 1800 persons.  *United States v. McCluskey*, 10-cr-2734-JCH, Doc. 453 (filed May 14, 2012).  Given the extensive pretrial publicity in this case, and the

---

[1] At the time the Court issued its opinion in *Vigil*, the District Jury Plan divided the state into three divisions.  The current jury plan, effective Oct. 27, 2015, creates two petit jury divisions: the Northern Division and the Southern Division.  *See In the Matter of: Adoption of Court's Modified Jury Plan* [Dkt. 42] at ¶ 2(a), MISC No. 15-MC-04-42 (filed Oct. 27, 2015); **Exhibit 1**, attached, Map of Jury Divisions.

4

geographic diversity of the alleged events giving rise to the charges, a statewide panel is appropriate in this case for the same reasons as in *Vigil* and *McCluskey*.

More recently, in denying a defendant's request for a jury panel selected from a division different from the place of holding court, this Court nonetheless recognized its authority to order a statewide jury in high profile trials such as this one. *See* Memorandum Opinion [Doc. 80] at 18-19, *United States v. Rodella*, 14-cr-02783-JB (filed Sept. 15, 2014). As this Court noted, "it could be desirable sometimes to select a statewide venire when publicity on a case is intense. *One side should not be able to prohibit the Court from drawing a statewide venire.*" *Id.* (emphasis added). In this case, the United States cannot prohibit the Court from drawing a statewide venire as necessary to protect the defendants' rights to a fair and impartial jury.

## II.   The Court should propound Defendants' proposed supplemental Jury Questionnaire.

"To be meaningful, the adequacy of voir dire examination must allow the defendant an opportunity to make reasonably intelligent use of his peremptory challenges and challenges for cause." *United States v. Sandoval*, No. 04-cv-2362-JB; 2006 WL 1304955, at *2 (D.N.M. Feb. 1, 2006) (citing *United States v. Rucker*, 557 F.2d 1046, 1049 (4th Cir.1977)). "[V]oir dire is within the sound discretion of the trial court, and the court's exercise of that discretion will not be disturbed, absent a clear showing of abuse." *Id.* (quoting *United States v. Whitt*, 718 F.2d 1494, 1497 (1983) (citations omitted). This Court has recognized that it has broad discretion in overseeing and managing the jury selection procedure. *Id.* (quoting *United States v. Morris*, 623 F.2d 145, 151 (10th Cir. 1980).

This Court has noted that a juror questionnaire can be "a useful tool to more easily facilitate voir dire." *Lowery v. City of Albuquerque*, 09-cv-0457-JB-WDS; 2012 WL 1372273, at *5 (D.N.M. Apr. 11, 2012). The Court has ordered prospective jurors to complete juror

questionnaires before voir dire as it found this would aid the Court and the parties in obtaining information that will be helpful for the exercise of early cause and peremptory challenges and reduce unnecessary questioning during in Court in voir dire. *Lowery*, 2012 WL 1372273, at *5 (quoting *Sandoval*, 2006 WL 1304955, at *3). In *Lowery*, the Court noted how the questionnaire "will aid judicial economy by allowing the Court to use the limited time available for voir dire to more fully explore any issues revealed within the questionnaires." *Id.* The questionnaire will aid the Court and the parties in more effectively determining the existence and substance of challenges for cause, as well as assisting the parties in the exercise of their peremptory challenges.

In *Sandoval*, this Court permitted a jury questionnaire over the government's objection in a child sex abuse case. The Court reasoned:

> The proposed questionnaire will aid the Court and the parties in obtaining and receiving information that will be helpful for the exercise of early challenges for cause so that prospective jurors do not have to be subjected unnecessarily to questioning in Court in voir dire. The questionnaire will allow the prospective jurors the opportunity to retain some measure of privacy on the sensitive issues that arise in this case, such as sexual abuse, incest, gambling, and religious differences.
>
> The questionnaire will aid judicial economy by allowing the Court and the parties to use the often limited time available for voir dire to address more substantive matters. The questionnaire will also allow the prospective jurors to provide some information about necessary but more mundane lines of inquiry outside the courtroom, thereby relieving the Court of the need to convene to conduct questioning about such mundane matters. By addressing these mundane matters in the questionnaire, the Court will be able to use the time available for in person voir dire more efficiently. The questionnaire will aid the Court and the parties in more effectively determining the existence and substance of challenges for cause, and in exercising those challenges, as well as assisting the parties in determining and exercising peremptory challenges.

*Id.* at 3. The same considerations are in play here.

Although the character and quality of charges is different than in *Sandoval*, given the allegations in this case, much more exacting jury questioning will be required to explore potential bias than in a normal, run-of-the-mill voir dire. The allegations of VICAR murders, conspiracy to

6

commit murders, including the high-profile count of conspiracy to murder the Secretary of Corrections will raise significant emotions in jurors and require delving into matters that may be very sensitive and private.  As the Court recognized in *Sandoval*, a questionnaire can help jurors retain some privacy in answering questions of a sensitive nature.  A questionnaire is a far superior method to inquire into sensitive matters than voir dire in open court,.  Like in *Sandoval*, the proposed questionnaire will promote judicial economy during voir dire and help counsel for all parties identify peremptory and cause challenges.  Because there are five Defendants proceeding to trial in the Count 6 through 12 group, voir dire could take longer and engender more questioning of prospective jurors.  The proposed questionnaire will help streamline this process and limit the number of questions that need to be asked of each juror during voir dire.

## CONCLUSION

For the foregoing reasons, Defendant Perez, by his counsel, joined by Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Garcia, Daniel Sanchez, Anthony Baca, Christopher Garcia, Carlos Herrera, Andrew Gallegos and Shauna Gutierrez, respectfully request the Court provide a statewide jury pool for jury selection in the trials of this matter and propound Defendants' proposed supplemental jury questionnaire.

Respectfully submitted,
THE LAW OFFICE OF RYAN J. VILLA

/s/ *Ryan J. Villa*
RYAN J. VILLA
Counsel for Defendant Perez
2501 Rio Grande Blvd. NW Ste. A
Albuquerque, NM 87104
(505) 639-5709
(505) 433-5812 facsimile
ryan@rjvlawfirm.com

AND

DNM 1218

/s/ *Theresa Duncan*
THERESA DUNCAN
Counsel for Anthony Baca
515 Granite NW
Albuquerque, NM 87102
(505) 842-5196
teri@duncanearnest.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system on, this 6th day of November, 2017, which caused counsel of record for all parties to receive a copy of this Motion electronically.

/s/ *Ryan J. Villa*
Ryan J. Villa

DNM 1219

United States District Court
District of New Mexico
Jury Divisions
November 1, 2015



Juror Name _____

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                    Plaintiff,

    vs.                                  No. CR 15-4268 JB

ANGEL DELEON, et al.,

                    Defendants.

SUPPLEMENTAL JUROR QUESTIONNAIRE

As a prospective juror in this case, you are being asked to fill out a questionnaire reflecting your personal attitudes and experience.   We ask that you complete this questionnaire, to inform us of your present situation and the perspectives you bring to court at this time.  The questions are asked not to invade your privacy, but to make sure that you can be a fair and impartial juror *in this particular case,* though questions contained in the questionnaire may have nothing to do with the facts of this case.  If there is any reason why you might not be able to listen openly to both the prosecution and the defense, it is important that you say so.

The questionnaires will be viewed only by the judge, court personnel, and the legal teams for the prosecution and defense.  At no time will they be made available to the media or the public.

There are no right or wrong answers, only complete and honest answers.  Please respond to *each* question as honestly and completely as you can, based on your best understanding of the questions.  Do not leave any questions blank.  If a particular question does not apply to you, write "N/A" in the space provided for the answer.  Upon completion of the questionnaire, you are required to sign and date the Juror's Oath. Your answers will have the effect of a statement given to the Court under oath.

You should not discuss this case or the questionnaire with anyone, including your family and fellow jurors.  Your answers must be your own.  If you need more space for your responses, or wish to make further comments about any of your answers, please use the extra sheets at the back of the questionnaire. Thank you for your patience and candor.

_____

JUDGE JAMES BROWNING

Juror Name _____

PLEASE PRINT LEGIBLY IN BLACK INK

1. Full name: _____ Gender: _____ Age: ____

2. In what city and area/neighborhood do you live? _____

3. How long have you lived in this area?_____

4. Where did you grow up? _____

5. What other places have you lived (city, state or country)?
_____

6  Do you have brothers or sisters?  ___YES  ___ NO
If YES, please list by gender, age and occupation.

_____
_____
_____
_____

7. What are/were (if deceased or retired) your parents' occupations?
Father: _____
Mother: _____

8  Marital status:      ____ Married for _____ years
   ___ Divorced      ___ Separated      ___ Widowed
   ___ Never married      ___Living with someone

9. Spouse's or significant other's current occupation and employer:

_____

2

DNM 1222

Juror Name _____

10.   If you have children or stepchildren, tell us the following, whether or not they are living in your household.

| Gender | Age | Education Level | Occupation |
|--------|-----|-----------------|------------|
|        |     |                 |            |
|        |     |                 |            |
|        |     |                 |            |
|        |     |                 |            |
|        |     |                 |            |
|        |     |                 |            |

11.   If you have grandchildren, please tell us how many, their ages and occupations, if employed:

# of Male(s):  _____              Ages: _____

Occupations: _____

# of Female(s): _____             Ages: _____

Occupations: _____

12.   How far have you gone in school?

___ 0-11 grade           ___ GED               ___ High school graduate

___ Vocational/technical        ___ College for ____ years      ___ College graduate

___ Post-graduate college education for ___ years

13.   If you attended college or vocational school, please tell us:

Major areas of study: _____

What degrees or certificates did you earn? _____

3

Appellate Case: 20-2058    Document: 010110415663    Date Filed: 09/29/2020    Page: 1586

Juror Name _____

14. Have you ever taken any courses or had any training in the following areas:

___ Law          ___ Law enforcement          ___ Criminology/Penology          ____Investigation

___Forensics          ___ Any health related field

Please describe: _____

_____

_____

15. Have you acquired any experience, training or knowledge in firearms, fingerprinting, fingerprint identification, chemical or DNA analysis, traumatic injury, autopsies, or any other forensic field?

___ YES ___ NO  If YES, please explain.

_____

_____

16. If you, or a close relative, have had military experience, indicate who (relation to you) the branch of service and rank at discharge:

a.   Who (relation to you)? _____

b.   What special schools or training did they receive?

_____

c.   Did they see or participate in combat?   ____ YES   ___ NO   If YES, please explain circumstances.

_____

_____

17. Please tell us the following about your job.  (If not currently employed, tell us about your last job.)

a.   Where do you work? _____

b.   How long have you worked there?  _____

c.   What are your job title(s) and duties:_____

_____

d.   Do you supervise others as part of your job?          ___ YES ___ NO

e.   Do you have responsibility for hiring or firing others?          ___ YES ___ NO

18. What other jobs have you held?

_____

_____

4

Juror Name _____

19.  Have you applied, worked or volunteered for any regulatory or law enforcement agency, which has as a part of its responsibilities the enforcement of any state or federal laws?  ___ YES      ___ NO

If YES, please state what type of law enforcement, where and when, in what capacity and in what specialty. _____

_____

_____

20.  Do you have any friends, relatives or acquaintances who have ever worked for or been involved in law enforcement?

___ YES  ___ NO   If YES, please state who (their relation to you), where, when, for what agency and in what capacity.

_____

_____

21.  Have you or any relatives, friends or acquaintances worked in security or investigative services?

___ YES   ___ NO

If YES, please state who (their relation to you), where, when and circumstances.

_____

_____

22.  Have you or any relatives, friends or acquaintances ever worked in a prison, jail, detention center or for probation services?   ___ YES   ___ NO

If YES, please state who, where, when and circumstances.

_____

_____

23.  Have you or any friends or acquaintances every visited a prison, jail or detention center?

___ YES   ___ NO   If yes, please state who (relation to you) and explain the circumstances:

_____

_____

_____

DNM 1225

Juror Name _____

24.     What religious, civic, social, union, professional, fraternal, political or recreational organizations have you joined or participated in, and what offices, if any, have you held in these organizations?

_____

_____

_____

25.   Have you, any family members or close friends participated in, or contributed money to, any group concerned with crime prevention or victims' rights (such as Crime Stoppers, MADD, SADD, neighborhood watch programs, shelters or crisis centers) or any group that takes public positions on criminal justice issues (including gang violence, prison expansion and prisoner rights)?

___ YES    ___ NO

If YES, please tell us who was involved, at what level, and the nature and position of the group.

_____

_____

_____

26.     Have you or a family member ever joined the National Rifle Association, Gun Owners of America or any other organization concerned with protecting the right to own weapons?

___ YES    ___ NO

a.      What led you to join?    _____

_____

b.      What was the extent of your participation? _____

_____

27.   What is your current political affiliation?

___ Republican    ___ Democrat    ___ Independent    ___ Libertarian

___ Not registered to vote        ___ No party selected

Other (specify) _____

28.   Do you consider yourself to be politically:   ___ Liberal    ___ Conservative    ___ Moderate

29.   Have you ever sought or held political office?    ___ YES    ___ NO   If YES, please give details:

_____

DNM 1226

Juror Name   _____

30.  Have you worked in a political campaign?   ___ YES   ___ NO

If YES, please give name of the candidate, office sought, and issue(s) that led to your active support.

_____

_____

_____

31.  Who are three people you greatly admire?  Why?

a) _____

b) _____

c) _____

32.  Who has had the greatest influence on you personally?  Why?

_____

_____

_____

33.  Have you served on a jury?  ___ YES   ___ NO   If YES, please indicate:

a. State Court   ___ Civil   ___ Criminal   Date(s) _____

b. Federal Court   ___ Civil   ___ Criminal   Date(s) _____

c.  ___ State Grand Jury   Date(s) _____

d.  ___ Federal Grand Jury   Date(s) _____

e. Briefly describe the nature of the case(s) _____

_____

f. Was your trial jury able to reach a verdict? ___ YES   ___ NO

If NO, please explain: _____

g. Were you ever the foreperson?   ___ YES   Number of times _____   ___ NO

h.   Is there anything about your prior jury service that might make it difficult for you to serve again?

___ YES   ___ NO   If YES, please explain.

_____

_____

34.  Have you, any family members or close friends ever been an attorney or ever worked for any private

attorney, city or town attorney, District Attorney, state Attorney General, U.S. Attorney or in a

courthouse?   ___ YES   ___ NO   If YES, please state who, where and when, and in what capacity.

_____

_____

DNM 1227

Juror Name _____

35.     How big a problem is crime in your neighborhood?   _____

_____


36.     What types of crime seem most common?   _____

_____


37.     Are street gangs a problem in your neighborhood?     ___ YES     ___ NO

If YES, please explain.   _____

_____

_____


38.   Have you, or anyone close to you, been the victim or witness of a crime, reported or not?

      ___ VICTIM     ___ WITNESS     ___NEITHER

If YES, please explain who (relation to you), when, and what happened.

_____

_____

a.     Was the incident gang related?        ___ YES     ___ NO

b.     Was it drug-related in any way?   ___YES   __NO

c      Was anyone arrested?     ___ YES     ___ NO

d.     What was the outcome of the case?   _____

d.     If there was a trial, did you/they testify?   ___ YES     ___ NOe

f.     Did you/they think justice was served? Why or why not?

_____

_____

_____


39.   Have you, any family members or close friends called, been interviewed by or made a report to the

police, the FBI or any other local, state or federal law enforcement agency?     ___ YES     ___ NO

If YES, please explain circumstances:

_____

_____

_____

8

Juror Name _____

a.    Would you describe your experience with law enforcement as positive _____ or negative _____?
(Check one and explain)

_____

_____

40.   Would you be more likely to believe an FBI agent over any other witness in a court of law?
___ YES    ___ NO

a.    Do you believe FBI agents are more likely to be truthful on the witness stand?   ___ YES    ___ NO
Why or why not?

_____

_____

41.   Would you be more likely to believe a police officer over any other witness in a court of law?
___ YES    ___ NO

a.    Do you believe police officers are more likely to be truthful on the witness stand?
___ YES    ___ NO    Why or why not?

_____

_____

42.   Have you or any member of your family or close friend been accused, arrested, charged or convicted
of any offense other than a traffic ticket? ___ YES    ___ NO

If YES, please state:

Who (relation to you)? _____

What crime? _____

When? _____

Was the incident gang related in any way?   ___ YES    ___ NO

Was it drug-related in any way?   ___ YES  ___ NO

Outcome? _____

If convicted, did the person serve jail or prison time?   ___ YES    ___ NO

43.   Has someone you know served time in a New Mexico prison?   ___ YES    ___ NO

If YES, who (relation to you), where, for how long? _____

_____

DNM 1229

Juror Name _____

44.   What have you seen, read or heard about violence between prisoners, and what prisoners do to protect themselves?

_____

_____

_____

Source(s)? _____

44.   What have you seen, read or heard about the use of solitary confinement in prisons?

_____

_____

_____

Source(s)? _____

45.   What have you seen, read or heard about gangs in prisons?

_____

_____

_____

Source(s)? _____

46. Are you just as likely to believe the testimony of a prison guard as a police officer in a court of law?

___ YES   ___ NO

a.   Do you think prison guards would likely be truthful on the witness stand?  Why or why not?

_____

_____

47.   Do you believe that a prison inmate is entitled to be presumed innocent until proven guilty if he is being prosecuted for committing a crime while in prison?   _____YES   _____NO

Why or why not?____ _____

____ _____ _____

a. Do you think that it should be easier for the government to convict a prison inmate of a crime than a person who is not in prison?  ___YES   _____NO   Why or why not?

___ _____ _____

____ _____ _____ _____

10

Juror Name _____

48.  Do you own any weapons?  ___ YES  ___ NO

If YES, what type(s) of weapons do you own, and for what purpose(s)?

_____

_____


49.  Have you ever been in a situation in which you felt like you, or someone you know, were in physical

danger or feared being hurt or killed?  __YES  _____NO    If YES, please describe:

_____

_____


50.  Have you, or anyone close to you, ever been threatened with a weapon, including a knife or firearm?

___ YES  ___ NO    If YES, describe the situation(s) and the weapon(s).

_____

_____


51.  Please state your personal opinion about the following:

a.   Hispanic men have been unfairly discriminated against by our criminal justice system.

___ Strongly agree          ___ Agree          ___Agree somewhat

___ Disagree          ___ Strongly disagree


b.   Hispanic males commit most of the violent crime in New Mexico.

___ Strongly agree          ___ Agree          ___Agree somewhat

___ Disagree          ___ Strongly disagree


c.   Hispanic males commit most drug offenses in New Mexico.

___ Strongly agree          ___ Agree          ___Agree somewhat

___ Disagree          ___ Strongly disagree


d.   Hispanic males are more likely to participate in violent gangs in New Mexico.

___ Strongly agree          ___ Agree          ___Agree somewhat

___ Disagree          ___ Strongly disagree

e.   Prison is not enough of a deterrent for Hispanic males engaging in drug crime and gang violence.

___ Strongly agree          ___ Agree          ___Agree somewhat

___ Disagree          ___ Strongly disagree


11

Juror Name _____

52.   Have you known anyone who was involved with drugs?  ___ YES  ___NO

If YES, please explain who, relationship to you, nature of involvement, and particular drug(s).

_____

_____

_____

53.   Have you, or anyone close to you, worked or volunteered in a program concerned with drug

treatment or drug education, or joined any organization or campaign concerned with the use or abuse of

drugs?      ___ YES  ___ NO.

If YES, please state who (relationship to you); name and purpose of program, organization or campaign;

and extent of your participation.  _____

_____

_____

54.   How do you feel about people who sell drugs? _____

_____

55.   Do you think your feelings or experiences involving drugs might influence you in a case where there

are allegations of distribution of drugs?  ____ YES  ____ NO   If YES, please explain:

_____

_____

56.   What have you read or heard about gang involvement in drugs in New Mexico?

_____

_____

What was the source of your information? _____

57.   What have you read or heard about gang activity in New Mexico?

_____

_____

_____

DNM 1232

Juror Name _____

58.   What particular gangs have you heard of?

_____

From what source(s)? _____

59.   Have you, your family or close friends been affected in any way by gang activity?

___ YES  ___ NO      If YES, please explain.

_____

_____

_____

60.   In your opinion, how do you think growing up in a community influenced by gangs and violence

affects a person? _____

_____

_____         _____

61.   What do you think should be done about gangs?

_____

_____

62.   Have you known anyone involved in or recruited by a gang?         ___YES  ___ NO

If YES, please explain. _____

_____

_____

63.      Have you read, seen or heard about a gang called Sindicato de Nuevo Mexico (SNM) or anyone

 supposedly associated with SNM, as it is called?   ___YES  ___ NO

If YES, what have your learned?

_____

_____

_____

Source(s)? _____

64.      Based on what you read, saw or heard, what was your impression of Sindicato de Nuevo Mexico

 and what it was accused of?

13

Juror Name _____

_____

_____

65.   How do you keep up with the news? (Check all that apply)

___ Radio        ___ Television        ___ Newspaper        ___Magazines

___ Internet web/blogs/Twitter/Facebook

____Conversations with coworkers, friends, relatives

____Conversations with others at the courthouse

____Overheard conversations of others about the case

___ Other _____

66.   Which newspapers do you read, either in print or on line?
_____

How often? (check one) ____ Regularly        ____ Somewhat        ____ A little     ____ Not at all

Which parts of the newspaper do you read regularly?

_____

67.   Do you watch any television news programs regularly?    ___ YES   ___ NO   Which ones?

_____

68.   What radio stations do you listen to regularly? _____

Which radio programs do you turn to for news? _____

69.   Do you regularly listen to or watch any radio or television talk shows?   ___ YES   ___ NO

If YES, which ones? _____

70.   What Internet sites or chat rooms do you frequent? _____

_____

a.   Have you ever had a blog or followed a blog?   ___ YES   ___ NO   If Yes, what did they focus on?

_____

_____

b.   Do you regularly comment on blogs?   ___ YES   ___ NO   If YES, which ones?

_____

14

Juror Name _____

71.   Which of the following most closely describes how you use news reports in forming your opinions?

___ I rely on the news

___ I sometimes rely on the news, depending on the reporter

___ I do not rely on news reports alone, but use them as only one basis for forming my opinions.

___ I do not rely on news reports in forming opinions.

___ Other (please describe): _____

72.   What movies, books or TV programs about violent crime, the criminal justice system, prison life or gang activity have been of interest to you?

_____

_____

What did you learn? _____

_____

73.   What criminal cases have you followed in the news?

_____

_____

Why were those cases of particular interest?_____

_____

_____

74.   Do you think if a person is brought to trial, there must be some truth to the charges, and it is likely that person is guilty under the law?        ___ YES    ___ NO     Please explain.

_____

_____

a.    Do you think if a person is brought to trial for being a member of a prison gang allegedly involved in crimes such as murder, assault and conspiracy, there must be some truth to the charges, and it is likely that person is guilty under the law?        ___ YES    ___ NO     Please explain.

_____

_____

75.   The judge will instruct you that the burden is on the prosecution to prove beyond a reasonable doubt that the defendant is guilty; it is not for the defense to prove that the defendant is not guilty.  If, after

DNM 1235

Juror Name _____

hearing the evidence, you thought the defendant could be guilty, but you were not convinced beyond a reasonable doubt, would you be able to return a verdict of not guilty?   ___ YES ___ NO

If NO, why not?

_____

_____

_____

a.      In a trial with multiple defendants who are alleged members of a gang, do you believe the charges against each defendant should be judged individually, where you were not convinced beyond a reasonable doubt that all defendants were equally guilty?   ___ YES ___ NO

76.   A person accused of a crime does not have to testify in his defense, and his silence may not be considered as evidence against him.  How do you feel about that?

_____

_____

This case involves allegations that members, prospects and associates of Sindicato de Nuevo Mexico were engaged in acts of violence and other criminal activity.

77.   Have your read, seen or heard anything about this case?   ___ YES ___ NO

If YES, please indicate the source(s).  (Check all that apply)

___ TV news      ___ Newspaper         ___ Radio news         ___Internet/blogs/Twitter

___ Other people         ___ Overheard conversations

Other (specify) _____

a.   What stands out most in your mind about what you have read, seen or heard?

_____

_____

_____

b.   How did you react to what you read, saw or heard?

_____

_____

c.   What did you last read, see, or hear about this case?

DNM 1236

Juror Name _____

_____

_____

When and where was that? _____


78.     Has anyone discussed with you your possible service as a juror in this case?  ___ YES  ___ NO

 If YES, please briefly describe what was discussed and with whom.

_____

_____

_____


79.   Do you know any employee of the Office of the United States Attorney for the District of New

Mexico, or have you had any dealings with that office?  _____YES  _____NO

If YES, please explain:_____

_____

_____


80.    The trial will be presided over by the Honorable James O. Browning, United States District Judge,

District of New Mexico.  Do you know Judge Browning or any member of his staff?  ___YES  ___NO

If YES, please explain:_____

_____

_____


81.   Do you personally, or in connection with your business, have an interest (financial or otherwise) in

any pending legal action or dispute with the United States, or any officer, agents or employees of the

United States?  _____YES  _____NO   If YES, please explain:

_____

_____


82.   Do you, or anyone close to you, know any of the persons involved in any way with the events

charged in this case?  _____YES  _____NO

If YES, please explain:_____

_____

_____


17

DNM 1237

Juror Name _____

83.   In such a case, where there are allegations such as murder and drug trafficking, will you have difficulty keeping an open mind until you have heard all the evidence, the arguments of attorneys for both sides and the judge's instructions?      ___ YES   ___ NO

If YES, please explain your reaction and how it may affect you if chosen as a juror.

_____

_____

_____

84.   What comes to mind when you think of a conspiracy?

_____

_____

85.   A gang member should be legally responsible for the criminal actions that other members commit on orders from the gang leaders.

___ Strongly agree             ___ Agree             ___ Agree somewhat

___ Disagree             ___ Strongly disagree

86.     How do you feel about an individual who casts the primary blame on others for crimes he has admitted being directly involved in?

_____

_____

87.     What else would you want to know about the individual or the crimes to evaluate that individual's statements?   _____

_____

a.     Would it matter to you that becoming an informant was their only avenue to avoid the full legal consequences of their actions?             ___ YES        ___ NO   Why or why not?

_____

_____

88.   During the course of this trial, you may hear evidence from individuals who are testifying with the expectation of obtaining lenient treatment for their own criminal conduct and/or other benefits.  How do you feel about the truthfulness of that testimony?  Please explain.

_____

_____

18

Juror Name _____

89.   The prosecution will likely introduce into evidence graphic photographs and video recordings of the crimes charged that, as a juror, you would be required to view.  These photographs and recordings will not only show the location of the crime, but the traumatic injuries that the victims suffered.

a.   Knowing your own sensibilities, do you feel it is possible you would not be able to look at such photographs and video recordings at all, if they were part of the evidence?   ___ YES   ___ NO

b.   Do you think your reaction to such graphic images could be so strong as to affect your ability to listen to *all* the evidence and reach a fair and impartial decision whether guilty or not guilty, based on the entirety of the evidence presented in court and the judge's instructions on the law?   ___ YES   ___ NO

Please explain your concerns, if any, about your ability to view and evaluate all evidence, including any graphic photographs and video.

_____

_____

_____

**JURY SERVICE**

90.   Do you agree that every juror is entitled to hold his or her own opinions and that differences in individual opinions should be respected   ___ YES          ___ NO

a.   Will you expect to be treated with dignity and respect during jury deliberations?   And will you likewise treat your fellow jurors with dignity and respect, even if you do not share their view?

___ YES          ___ NO

b.   Will you stand up for the right of every juror to vote their decisions in the manner they feel is appropriate, even if other jurors disagree with their "vote"?   ___ YES          ___ NO

Please explain what you feel it means to you to respect your fellow jurors:

_____

_____

91.   Do you have any health problems that might make it difficult for you to sit as a juror in this case?

___ YES          ___ NO          If YES, please explain:

_____

_____

_____

Juror Name _____

92.      Are you taking any medications which might make it difficult for you to sit and listen attentively to testimony for hours at a time?      ___ YES      ___ NO

If YES, please state the medication(s) and the effect on you.

_____

_____

93.  Please check each of the following situations that might create a hardship for you to serve as a juror:

___ Hearing difficulties      ___ Vision problems      ___ Someone sick at home who needs care

___ Doctor appointments that cannot be rescheduled      ___ No childcare for children at home

___ Pressing business or personal matters that would distract from the trial proceedings      ___ Other

Please explain any situations you have checked.

_____

_____

_____

94.      Is there anything you would like to discuss privately with the Court?   ___ YES   ___ NO

95.      The Court and the parties estimate that after a jury is selected the trial of this case may last as long as two months. Understanding that mere inconvenience is not a sufficient reason, do you wish to ask the judge to excuse you because jury service would be a serious hardship for you?

___ YES   ___ NO      If YES, please explain your reasons as specifically as you can.

_____

_____

_____

96.      Is there any matter, including your past jury service, that may interfere with your duty as a juror to listen with an open mind to the evidence in this case and render an impartial verdict based solely on the evidence (or lack thereof) and the judge's instructions on the law?      ___ YES      ___ NO

If YES, please explain: _____

_____

_____

DNM 1240

Juror Name _____

**JUROR'S OATH**

I affirm under penalty of law that I have answered truthfully and completely all questions in this questionnaire.   I further declare that I have completed this questionnaire without anyone's assistance.

Signature _____

_____

JUROR'S NAME (Please print)

DATE _____

Please use this space to complete any answers to questions in the questionnaire.   Indicate the number of the question, before continuing with your full answer.

DNM 1241

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                          NO.    15-CR-4268 JB

ANGEL DELEON, et al.,

      Defendants.

**REPLY TO UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT
CHRISTOPHER GARCIA'S MOTION FOR DAUBERT HEARING AND TO
EXCLUDE GOVERNMENT EXPERT WITNESS TESTIMONY [DOC. 1302]**

COMES NOW Christopher Garcia, by and through counsel, Amy Sirignano of

the Law Office of Amy Sirignano, PC and Christopher W. Adams of the Law Office of

Christopher W. Adams, and Joe Gallegos through counsel Brock Benjamin and Rick

Sindel, Edward Troup through counsel Cori Harbor Valdez and Pat Burke, and Billy

Garcia through counsel Robert Cooper and James Castle, and Christopher Chavez

through counsel Orlando Mondragon and John Granberg, and Arturo Arnulfo Garcia

through counsel Billy Blackburn and Scott Davidson, and Anthony Ray Baca through

counsel Marc Lowry and Theresa Duncan, and Carlos Herrera through Michael Davis

and Carey Bhalla, and Rudy Perez through counsel Ryan Villa and Justine Fox Young,

and Daniel Sanchez through counsel Amy E. Jacks and Richard Jukes, and in reply to

the government's response (Doc. 1347), states the following:

On October 6, 2017, Mr. Garcia, and joining defendants, filed Defendant Christopher Garcia's Motion for *Daubert* Hearing and to Exclude Government Expert Witness Testimony (Doc. 1302). This Motion asked the Court to hold a *Daubert* evidentiary hearing to exclude potential evidence to be presented by the government's expert witnesses that it intends to introduce under Federal Rule of Evidence 403 and 702 and require the government to show at a pretrial hearing that those expert statements are admissible. Doc. 1302.

On October 20, 2017, the government filed its response United States' Response to Defendant Christopher Garcia's Motion for *Daubert* Hearing And To Exclude Government Expert Witness Testimony [Doc. 1302]. Doc. 1347.

The government contends that Mr. Garcia's request for a written summary of the testimony of its expert witnesses, pursuant to Federal Rule of Criminal Procedure 16, goes beyond requirements of intended purpose of the Rule. Doc. 1347 at 6, 7.

Mr. Garcia is not asking, as the government states, for a 'complete statement' required of litigants in civil cases. *See* Doc. 1347 at 7; Fed. R. Civ. P. 26. Mr. Garcia, with co-defendants, are arguing the government needs to provide as Rule 16 requires: "a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(G).

As previously argued, the government's short one sentence statements about the topic or report its expert will testify about, and conclusory statements that the testimony will be an expert opinion, do not satisfy Rule 16 disclosure requirements. *See* Doc. 1255 at 6; *see also United States v. Banks*, 761 F.3d 1163, 1197-98 (10th Cir. 2014); *United States v. Sandoval*, No. 15-1311, 2017 U.S. App. LEXIS 3692, *6, 7 (10th Cir. March 1, 2017) ("Endorsing a witness as an expert also triggers Federal Rule of Criminal Procedure 16's pretrial disclosure requirements, which ensure that an opposing party will have time to adequately prepare for trial (e.g., to prepare 'an effective cross-examination challenging the experts' qualifications and conclusions,' or to obtain a competing expert).").

Defendants acknowledge that the advisory committee notes for Rule 16 is not intended to create unreasonable procedural hurdles. Fed. R. Crim. P. 16, advisory committee notes, 1993 amendment. Defendants also note that the advisory committee stated:

> Second, the requesting party is entitled to a summary of the expected testimony. This provision is intended to permit more complete pretrial preparation by the requesting party . . . Third, and perhaps most important, the requesting party is to be provided with a summary of the bases of the expert's opinion . . . the amendment requires a summary of the bases relied upon by the expert. That should cover not only written and oral reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts.

*See id*.

DNM 1244

The government is required to provide a written summary of the bases of the expert's opinion, which is not an unreasonable procedural hurdle for the government to satisfy. A written summary of the expert's opinion is not a request for a complete statement, as the government suggests. *See* Doc. 1347 at 7. A summary of the expert's opinion, however, is not *just the expert's generated report* (provided through discovery). Rule 16 requires this summary of the bases of the expert's testimony. *See* <u>Fed. R. Crim. P. 16</u>, advisory committee notes, 1993 amendment.

The government argues , "[i]t's not as if these expert witnesses are fringe scientists or testifying about cutting-edge scientific techniques that are without precedent . . ." *See* Doc. 1347 at 9. This argument is completely irrelevant.

The government appears to suggest that its medical doctor, Dr. Zumwalt (whose CV has not been filed with its Rule 16 notice and provided to all counsel – but was provided via email to counsel for Mr. Troup only[1]), and forensic scientists', Ms. Radecki's, Ms. Rokumaru's and Ms. Zehringer's, testimony should not be tested under *Daubert* standards because "[v]irtually all murder trials" have a medical doctor testify and their testimony is common. *See id*. at 9. This argument subverts the whole purpose of *Daubert*, *Joiner*, and *Kumho Tire* and Federal Rule of Evidence 702. *See Daubert v. Merrell Dow Pharm., Inc.*, <u>509 U.S. 579</u> (1993); *General Elec. Co. v. Joiner*, <u>522 U.S. 136</u>

---

[1] At least two other government expert CVs have not yet been filed with its Notice, and has not yet been provided to the entire defense group.

(1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). A person deemed to be an expert by the government should not, by default, be admitted to testify without evaluation of the expert's qualifications and reliability, simply because they have testified previously.  This argument is not based in any federal law.

It is essential the Court perform its gatekeeping role in determining the reliability and relevancy of a proposed expert's testimony. *See United States v. Medina-Copete*, 757 F.3d 1092, 1101 (10th Cir. 2014) (citing *Kumho Tire*, 526 U.S. at 142) (citing also *Daubert*, 526 U.S. at 152). Additionally, it is important for the Defendants to be able make proper *Daubert* arguments that specifically objects to an expert and the experts testimony, which can only be done once the government completes its required disclosures pursuant to Federal Rule of Criminal Procedure 16(1)(G).

For these reasons, the Mr. Garcia and joined codefendants respectfully request the Court grant Defendant Christopher Garcia's Motion for *Daubert* Hearing and to Exclude Government Expert Witness Testimony (Doc. 1302), and order the government to satisfy its expert witness disclosure requirements pursuant to Rule 16.

Respectfully Submitted,

s/ *Amy Sirignano, Esq.*
**Amy Sirignano**
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE, #250
Albuquerque, NM 87109
505-242-2770
505-242-2774 facsimile
amy@abqnmlaw.com

DNM 1246

s/ *Christopher W. Adams*
**Christopher W Adams**
102 Broad Street Suite C
Charleston, SC 29401
(843) 577-2153
Fax: (877) 883-9114
Email: chris@chrisadamslaw.com

Co-counsel for Christopher Garcia

    /s
**Cori Ann Harbour-Valdez**
The Harbour Law Firm, PC
PO Box 13268
El Paso, TX 79913
915-544-7600
Fax: 915-975-8036
Email: cori@harbourlaw.net

    /s
**Patrick J. Burke**
Patrick J. Burke, PC
999 18th Street, Suite 2055
Denver, CO 80202
303-825-3050
Fax: 303-825-2992
Email: patrick-j-burke@msn.com

Co-counsel for Edward Troup

DNM 1247

   /s

**Billy R. Blackburn**
1011 Lomas Blvd. NW
Albuquerque, NM 87102
505-242-1600
Fax: 505-243-6279
Email: Billy@BBlackburnlaw.com


   /s

**Scott Moran Davidson**
1011 Lomas Boulevard NW
Albuquerque, NM 87102
505-255-9084
Fax: 505-243-6279
Email: scott@justappeals.net


Co-counsel Arturo Arnulfo Garcia


   /s

**Michael V Davis**
Michael V. Davis, Attorney & Counselor at
Law, P.C.
Post Office Box 3748
3949 Corrales Road, Suite 130
Corrales, NM 87048
(505) 242-5979
Fax: 505-899-3103
Email: mdavis@swcp.com


   /s

**Carey Corlew Bhalla**
Law Office of Carey C. Bhalla LLC
925Luna Cir NW
Albuquerque, NM 87102
505-508-5589
Email: carey@bhallalaw.com


Co-counsel for Carlos Herrera

DNM 1248

　　/s
**Amy E. Jacks**
Law Office of Amy E. Jacks
315 E. 8th St. #801
Los Angeles, CA 90014
213-489-9025
Fax: 213-489-9027
Email: amyejacks@sbcglobal.net


　　/s
**Richard Jewkes**
Richard Jewkes
701 N. Saint Vrain St
El Paso, TX 79902
(915) 534-7400
Fax: (915)534-7407
Email: richardjewkes@sbcglobal.net


Co-counsel for Daniel Sanchez


　　/s
**Orlando Mondragon**
1028 Rio Grande
El Paso, TX 79902
915-566-8181
Fax: 915-566-9696
Email: mondragonom@gmail.com


　　/s
**John L. Granberg**
Granberg Law Office
310 N. Mesa
Suite 424
El Paso, TX 79901
915-543-9000
Fax: 915-543-3201
Email: granberglawoffice@yahoo.com


Co-counsel for Christopher Chavez

___/s_____

**Justine Fox-Young**
1903 Wyoming Blvd. NE Ste. B
Albuquerque, NM 87112
505-796-8268
Email: justine@foxyounglaw.com


___/s_____

**Ryan J Villa**
2501 Rio Grande Blvd NW Suite A
Albuquerque, NM 87104
(505) 639-5709
Fax: 505-433-5812
Email: ryan@rjvlawfirm.com


Co-counsel for Rudy Perez


___/s_____

**James A. Castle**
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206
(303) 675-0500
Fax: (303) 329-5500
Email: JCastlelaw@gmail.com


___/s_____

**Robert R. Cooper**
1011 Lomas Blvd NW
Albuquerque, NM 87102
505 842-8494
Fax: (505) 243-6279
Email: bob@rrcooper.com


Co-counsel for Billy Garcia


___/s_____

**Brock Benjamin**
Benjamin Law Firm
747 E. San Antonio, Suite 203

DNM 1250

El Paso, TX 79901
(915) 412-5858
Fax: (915) 503-2224
Email: brock@brockmorganbenjamin.com


   /s                               

**Richard Sindel**
Sindel, Sindel & Noble, P.C.
8000 Maryland Avenue, Suite 350
Clayton, MO 63105
(314) 721-6040
Fax: (314) 721-8545
Email: rsindel@sindellaw.com


Co-counsel for Joe Lawrence Gallegos

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this pleading was served on opposing counsel via the CM/ECF system on this 10 th day of November, 2017.

   /s                             
Amy Sirignano, Esq.

DNM 1251

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL NO. 15-4268 JB** |
| | ) | |
| vs. | ) | |
| | ) | |
| ANGEL DELEON, et. Al. | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' RESPONSE TO DEFENDANT DANIEL SANCHEZ'S MOTION TO COMPEL THE GOVERNMENT TO COMPLY WITH RULE 16 IN NOTICING ITS INTENT TO RELY ON GANG EXPERT WITNESS TESTIMONY OR, IN THE ALTERNATIVE, TO EXCLUDE THE GOVERNMENT'S GANG EXPERT WITNESSES ALTOGETHER [DOC. 1345]

Defendant Daniel Sanchez filed his Motion To Compel The Government To Comply With Rule 16 In Noticing Its Intent To Rely On Gang Expert Witness Testimony Or, In The Alternative, To Exclude The Government's Gang Expert Witnesses Altogether [Doc. 1345] ("Motion to Compel") moving the Court to "compel the government to comply with Rule 16 in noticing its intent to rely on gang expert witness testimony, or to exclude the government's gang expert witnesses, altogether." Motion to Compel at 1. But Rule 16 of the Federal Rules of Criminal Procedure doesn't require a "comprehensive disclosure." Rather, the rule's language requires a written summary of the expert's opinions, the bases and reasons for the opinions, and the qualifications. And commentary and case law that discusses this rule makes clear that, in the criminal context, as opposed to the civil context, the United States' Expert Notice meets Rule 16's requirements. Moreover, to the extent that the Court concludes that the Expert Notice is somehow deficient, which it should not, case law supports that the Court should provide the United States time to comply, or impose a much lesser sanction than exclusion. For these

reasons, the Court should deny the Motion to Compel.

## **BACKGROUND**

The Indictment in this case charged Sanchez and additional defendants with violent crimes in aid of racketeering (VICAR), including charges that, in relation to Sanchez's membership in or association with the SNM prison gang, he conspired to murder, and murdered -- or aided and abetted the murder of – Javier Molina (J.M.). Because Sanchez is charged with VICAR, in addition to proving that Sanchez murdered (or aided and abetted) and conspired to murder J.M., the United States must prove that an enterprise existed at the time and that the J.M. assault was related to the enterprise. *See* 18 U.S.C. § 1959; *United States v. Smith*, 413 F.3d 1253, 1277 (10th Cir. 2005), *overruled on other grounds by United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009).

To meet its burden, the United States provided Sanchez notice that it "intends to call Ronald Martin, Chris Cupit and Sergio Sapien of the New Mexico Corrections Department Security Threat Intelligence Unit as expert witnesses in the means and methods of operations of prison gangs, including the Syndicato Nuevo Mexico in particular, and gang affiliations of the victims and defendants." Expert Notice at 1.

In relation to all three experts' opinions, the United States noticed that it expects that they will testify to opinions regarding, among other things, the history, culture, and code of conduct of the SNM gang, the membership of Sanchez and J.M., SNM sanctions, and the rules and requirements for participation in SNM-sanctioned violent crimes. *See id.* at ¶¶ a-d, at 1-2. Additionally, the United States provided Sanchez a written summary of the opinions that all of the gang experts may testify to, including their opinions about: the history of the SNM, *see id.* at 2-3; battles with rival gangs and other reasons and purposes for the SNM's systematic

2

commissions of violent crimes, *see id.* at 3-4, 5; the expectations and requirements of SNM gang members related to those crimes, *see id.* at 4, 5-6; ways and means of SNM members' identification as such, *see id.*

The United States then provided a written summary of each expert witness's bases and qualifications for their above opinions. *See* Expert Notice at 7-10. Each expert witness bases his expert opinions on years of experience in the New Mexico Corrections Department's Security Threat Intelligence Unit, which is the unit responsible for classifying and monitoring prison gangs, including the SNM, with Sergeant Martin having been in that unit for 11 years, Investigator Cupit having been in the unit for 6 and ½ years, and Captain Sapien having been in the unit for 3 years. *See id.* Each of these witnesses base their opinions on their experience with New Mexico prison gangs throughout that time in the unit, as well as their additional time with NMCD, and specifically on investigation into the SNM gang. *Id.* Additionally, each of these witnesses base their opinions on drug-trafficking investigations inside and outside of the facilities, intelligence-gathering activities, prison security threat and risk assessments towards staff, inmates and the public, and internal security investigations. *See id.* at 7, 8, 9.

The United States also provided Sanchez with a written summary of these experts qualifications, including the years in which they worked with NMCD, *see id.* at 7-9, that they've been recognized as experts in, and presented lectures and seminars within, the prison-gang field, *see id.*, and that they're uniquely qualified because of their interactions with SNM, *see id.*

Given this written summary of these gang expert witnesses' opinions, bases of those opinions, and their qualifications, the Court properly should deny the Motion to Compel.

**<u>RELEVANT LAW</u>**

Rule 16 of the Federal Rule of Criminal Procedure provides in relevant part:

> **Expert witnesses.**—At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G). This Court pointed out: "'It is not clear how much detail must be provided to satisfy this provision.'" *United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 1253 (D.N.M. 2012) (Browning, J.) (quoting 25 J. Moore, *Moore's Federal Practice* § 616.05[3], at 616–65 (3d ed. 2012)). Nevertheless, this Court recognized that, in the context of experiential expert witness -- or, as one court classified it, "'skilled witness[es],'" *United States v. Mejia*, 545 F.3d 179, 189 (2d Cir. 2008) -- a simple one-paragraph notice explaining the area of the expected testimony and that the testimony will be based on the law enforcement officers' "'years of training and experience in the area'" of the testimony is sufficient, "'although barely.'" *Goxcon-Chagal*, 886 F. Supp. 2d at 1253 (quoting *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir.1995)).

The Advisory Committee Notes to the 1993 Amendment of Rule 16, in which amendment the expert notice requirements, including the requirements for written reports and bases of opinions, were first codified, provides guidance for what notice may be required. The Federal Criminal Rules Advisory Committee explains, in relation to a written summary of the opinion, that, in some instances, simply "a generic description of the likely witness and that witness's qualifications may be sufficient, e.g., where a DEA laboratory chemist will testify, but it is not clear which particular chemist will be available." Fed. R. Crim. P. 16, advisory

DNM 1255

committee notes to 1993 Amendment.

Likewise, federal courts uphold simple notices that comply with Rule 16 by providing the witness's opinions, the reasons and bases of those opinions, and their qualifications. *See, e.g.*, *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995) (cited in *United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1254 (D.N.M. 2015) (Browning, J.) (expert notice complied with Rule 16's expert notice requirements where, in the Seventh Circuit's words, it "notified the defendants that the witnesses were of the opinion that certain paraphernalia and profile evidence were frequently linked to the sale of narcotics," and provided as the reasons "that the witnesses would be testifying from years of experience as narcotics agents").

In the Tenth Circuit, the Honorable Michael W. McConnell explained the differences between the requirements of an expert notice in the context of the Federal Rules of Civil Procedure, and the requirements here, in the context of the Federal Rules of Criminal Procedure. His explanation makes clear that, here in the federal context, parties are not required to produce to the opposing parting a separate, detailed written summary of the witness's opinions:

> Rule 16 of the Federal Rules of Criminal Procedure creates an exception to the usual rule that defendants need not provide notice of their intention to offer expert witnesses. Under Rule 16(b), if the defendant requests disclosure of certain evidence and the government complies, the defendant becomes obligated to make certain disclosures in return. Specifically, if the defendant requests and receives a written summary of any expert testimony the government intends to introduce, the defendant must provide a similar notice of any testimony he intends to use. These written summaries must include a description of the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications. The required "written summary," however falls far short of the "complete statement" required of litigants in civil cases. *In particular, Rule 16 does not require experts in criminal cases to provide written reports explaining their opinions or to make a written proffer containing the information required under the civil rules.*

*United States v. Nacchio*, 555 F.3d 1234, 1259-1262 (10th Cir. 2009) (McConnell, J. dissenting) (emphasis added) (internal citations omitted). Judge McConnell points out that the civil

procedural rules, unlike the criminal procedural rules, require a "'complete statement'" of the

expert witness's opinions and their bases:

> [A]ny party who wishes to use a retained expert must give the opposing party in
> advance of trial a written expert report . . . containing a "complete statement" of
> the witness's opinions   and the "basis and reasons for them"; all data, other
> information, and exhibits on which the testimony is based; and the witness's
> qualifications, publications, previous testimony, and compensation statement.

*Nacchio*, 555 F.3d at 1260 (McConnell, J. dissenting) (quoting Fed. R. Civ. P. 26(a)(2).

The Tenth Circuit recognized that, if a party fails to comply with Rule 16, there are a

myriad of sanctions that a Court may impose, and that exclusion of the expert witness's

testimony is a sanction that should almost never be imposed:

> If a party fails to comply with Rule 16, the court may order that party to permit
> the discovery or inspection; specify its time, place, and manner; and prescribe
> other just terms and conditions; grant a continuance; prohibit that party from
> introducing the undisclosed evidence; or enter any other order that is just under
> the circumstances. This court has held that it would be "a rare case where, absent
> bad faith, a district court should exclude evidence rather than continue the
> proceedings." We have noted that the sanction of exclusion of a witness's expert
> testimony is "almost never imposed 'in the absence of a constitutional violation or
> statutory authority for such exclusion.'"

*United States v. Sarracino*, 340 F.3d 1148, 1170 (10th Cir. 2003) (quoting *United States v.*

*Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002); *United States v. Charley*, 189 F.3d 1251, 1262

(10th Cir. 1999)) (citing Fed. R. Crim. P. 16(d)(2)(A)-(D)). To determine the proper sanction, the

Tenth Circuit directs district courts to consider: "(1) the reasons the government delayed

producing requested materials, including whether the government acted in bad faith; (2) the

extent of prejudice to the defendant as a result of the delay; and (3) the feasibility of curing any

prejudice with a continuance." *Id.* (citing *Golyansky*, 291 F.3d at 1249).

DNM 1257

## ARGUMENT

### A. The United States' written summary in its Expert Notice complies with Rule 16's requirements.

The advisory committee's notes to Rule 16 and case law that discusses the expert notice requirements of that rule show that Sanchez's Motion to Compel is based on a misinterpretation of what Rule 16(a)(1)(G) requires to provide a sufficient "written summary" of the expert witness's expected testimony. Sanchez contends that Rule 16(a)(1)(G) requires the United States to provide "comprehensive disclosure of the bases of expert opinions." Motion to Compel ¶ A, at 4. But the advisory committee's comments to the 1993 amendment to Rule 16, and the precedent case law that interpret the rule's notice requirements, contradict Sanchez's argument.

The advisory committee explains that the addition requiring a summary of the bases of the expert's opinion was intended to "remedy th[e] problem" in rule 16's language that made it unclear before the amendment that the government had to even disclose its experts before trial. Fed. R. Crim. P. 16, advisory committee notes to 1993 Amendment. The committee provides in its advisory notes as an example a decision in which the court held that the Rule 16 previously "did not otherwise require the government to disclose the identity of its expert witnesses where no reports had been prepared." *Id.*

Here, in contrast to the situation that rule 16's amendments intended to remedy in which no witness was noticed and no reports were given, the United States provided Sanchez with the United States' expert witnesses' names, six pages of their expected testimony, and a page or more each of the bases and qualifications for those opinions. *See* Expert Notice at 1-10. Sanchez's request for a more "comprehensive disclosure" simply goes beyond what Rule 16's expert notice requires for a written summary. Rather, requiring such production would run

contrary to the rule committee's guidance that "[t]he amendments are not intended to create

unreasonable procedural hurdles." Fed. R. Crim. P. 16, advisory committee notes to 1993

Amendment.

Rule 16 requires that the United States provide Sanchez "a written summary of any

testimony that the government intends to use . . . . [, which] must describe the witness's opinions,

the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P.

16(a)(1)(G). Directly contrary to Sanchez's contention that Rule 16 requires the United States to

provide a "comprehensive disclosure of the bases of expert opinions," Motion to Compel at 4,

Judge McConnell pointed out that "[t]he required 'written summary,'" in Rule 16(a)(1)(G) "falls

far short of the 'complete statement' required of litigants in civil cases," which is exactly what

Sanchez moves this Court to compel the United States to provide. *Nacchio*, 555 F.3d at 1262

(McConnell, J., dissenting). "*In particular, Rule 16 does not require experts in criminal cases to*

*provide written reports explaining their opinions or to make a written proffer containing the*

*information required under the civil rules.*" *Id.* (emphasis added).

The written summary in the United States' Expert Notice meets Rule 16's three

requirements. The Expert Notice provides the summary of "the witness[es] opinions" in the first

6 pages, where it explains the background and opinions that these STIU officers may offer at

trial. *See* Expert Notice at 1-6. Whereas each of these witnesses, or all of them, may cover this

expected evidence, the advisory committee specifically noted that a general notice may cover

such a general opinion. *See* Fed. R. Crim. P. 16, advisory committee notes to 1993 Amendment

("[A] generic description of the likely witness and that witness's qualifications may be sufficient,

e.g., where a DEA laboratory chemist will testify, but it is not clear which particular chemist will

be available.").

The written summary then provides "the bases and reasons for those opinions," as to

each witness, where it explains their background and qualifications during their careers with

NMCD. The SNM is a prison gang that was formed in New Mexico and, although its operations

and influence extend beyond New Mexico, its largest sphere of influence is within NMCD. So

the Expert Notice's summary that each of these expert witnesses has had multiple years of

employment with NMCD, and especially within STIU, provides them bases for the opinions they

intend to offer. Finally, to understand that the qualifications of these three witnesses, including

their experience with NMCD, and STIU, which includes their investigations, intelligence-

gathering, and threat assessment experience therein, qualifies them to testify as experts in this

case, one need only look to the Seventh Circuit's guidance of what meets Rule 16's requirements

for law enforcement expert witness notice. *See Jackson*, 51 F.3d at 651. This Court pointed out

that, in relation to law enforcement type expert opinions such as those Sergeant Martin,

Investigator Cupit, and Captain Sapien may offer, a bare-bones written summary, much shorter

than that the United States provided here, is "'sufficient'":

> The Seventh Circuit found the following summary of expert testimony sufficient,
> "although barely," when the government planned to present evidence regarding a
> drug courier profile:

>> In response to your Request for Written Summary of the
>> Government's Proposed Expert Testimony dated December 3,
>> 1993, please be advised that Officers Emmit C. Carney, Jerry
>> Cheung, and R.J. Kenney may testify at trial concerning the use of
>> beepers, firearms, walkie-talkies, and Western Union wire transfers
>> in connection with the sale of narcotics. In addition, each of these
>> officers may testify that narcotics traffickers often secure locations
>> such as houses or apartments to serve as a base for dealing
>> narcotics. Each of these police officers will base their testimony on
>> their years of training and experience in the area of drug
>> investigations.

> *United States v. Jackson,* 51 F.3d 646, 651 (7th Cir.1995). The Seventh Circuit

elaborated that in "cases involving technical or scientific evidence," there may be a "greater disclosure" obligation, "including written and oral reports, tests, investigations, and any other information that may be recognized as a legitimate basis for an opinion under Fed.R.Evid. 703." *United States v. Jackson,* 51 F.3d at 651 (citing Fed.R.Crim.P. 16(a)(1)(E) advisory committee's note).

*Goxcon-Chagal*, 886 F. Supp. 2d at 1253.

The United States' Expert Notice meets Rule 16(a)(1)(G)'s written summary requirement. Given the depth of the written summaries provided, in contrast to those that the Advisory Rules Committee and courts recognize are sufficient, the Court properly should deny Sanchez's Motion to Compel.

**B. The Court should not exclude the witnesses' testimony, but, if the Court somehow finds the Expert Notice insufficient under Rule 16, should simply order the United States to produce what the Court views as a sufficient written summary.**

The Court properly should conclude that the written summary in the expert notice complies with Rule 16's requirements. But if the Court concludes otherwise, then the Court should order to rewrite its written summary to comply with the Court's view of Rule 16's written requirements.

The Tenth Circuit holds that "it would be 'a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings.'" *Sarracino,* 340 F.3d at 1170 (citations omitted). Here, there is no bad faith on the government's behalf. Rather, the 10-page written summary of the experts' expected testimony, opinions, bases thereof, and their qualifications, evidence the United States' good-faith compliance with Rule 16. *Accord Goxcon-Chagal,* 886 F. Supp. 2d at 1253; *Jackson,* 51 F.3d at 651.

Trial is still several months away. Sanchez has substantial notice about what the United States' experts intend to testify. And Sanchez has thousands of pages of discovery that support

10

the experts' testimony about the SNM and its operations. Under the three factors that the Tenth

Circuit identified in *Serracino*, the Court properly should simply order the United States to

rewrite a written summary immediately. *See* 340 F.3d at 1170 (citing *Golyansky*, 291 F.3d at

1249). The Court should not exclude the United States' witnesses.

## CONCLUSION

The United States' Expert Notice's written summary complies with Rule 16(a)(1)(G)'s

expert notice requirements. The Court properly should deny Sanchez's Motion to Compel in full.

Respectfully Submitted,

JAMES D. TIERNEY
Acting United States Attorney

*Electronically filed on 11/13/17*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney

DNM 1262

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Action No. No. 15-CR-4268-JB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

ANGEL DELEON, et al

      Defendants.

---

**REPLY TO UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS (DOC. 1372)**

---

    Defendant Billy Garcia filed a motion to dismiss (Doc. No. 1283) and a supplement to the motion to dismiss (Doc. No. 1306). The government responded in Doc. 1372 and defense tenders this reply:

    1.    This reply in not lengthy as the issues in dispute are largely factual which will need to be resolved at the hearing. But certain points will be addressed below.

    2.    The government offers certain statements concerning investigation they purportedly conducted in 2015. Such statements are not accompanied by references or citations in the discovery nor are they attached to the government's pleadings. It is believed that these statements are ones provided by inmates Robert Martinez (aka Little Rob), Mario Montoya (aka Mario Poo Poo), Federico Munoz (aka Playboy) and Leonard Lujan. At least two of these inmates, Munoz and Lujan, had been cooperating with the government well in advance of the investigation that began in 2015. As the government has not fully disclosed

1

*Giglio* or *Jencks* materials, it is unknown whether Martinez and Montoya had been informants prior to 2015. To the extent that such statements are being relied upon by the government, the defense wishes to contest that information at hearing as well as to demonstrate that Lujan and Munoz had provided extensive information concerning the 2001 murders prior to 2015.

3.      The government asserts that the defense must make an initial threshold showing that "the evidence was lost or destroyed by members of the prosecution team" without citing authority. Doc. 1372, p. 6.  The defense asserts that the Court will need to focus, not on the members of the current prosecution team, but on the actions or inactions of the United States government and the various task forces it has employed through the years. To the extent that there is a dispute about the degree to which the task forces, the NMDOC, the FBI and the U.S. Attorney's Office coordinated their investigations, such will need to be fleshed out at hearing.

4.      The defense agrees with the government that the Tenth Circuit has indicated that, "more than ordinary negligence on the part of the Government representatives must be shown." See *United States v. Batie*, 433 F.3d 1287, 1293 (10th Cir. 2006). What the Tenth Circuit has not addressed is the language in *United States v. Lovasco*, reiterated in *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850)* and *Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016), in which the Court states that relief can be granted "upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense."  See discussion in Doc. 1283, p. 20.

DNM 1264

5.      In addressing the claim of the loss or destruction of the identities of the various informants the government spends much time pointing out subtle vagaries in the informant witness statements.   But when the defendant has "had no access to the witnesses" and "neither he nor his attorney was afforded an opportunity to interview" the witnesses "to determine what favorable information they possessed" such a dilemma "may well support a relaxation of the specificity required in showing materiality." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 870, 102 S. Ct. 3440, 3448 (1982).   The proper standard to apply in such situations is to require the defense to make a "plausible showing of how their testimony would have been both material and favorable to his defense." *Id*. at 867.

6.      The government has not contested nor addressed the defense discussions regarding the government's duty to disclose the identities of informers pursuant to *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957). This a significant as the *Roviaro* test is different than set forth in the loss or destruction or delay in indictment cases. Similarly, the government has not contested nor addressed the defense claims regarding the violation of the defendants' rights to compulsory process or whether the Court should use its supervisory power to provide sanctions and remedies. Given the significance of the issues at stake, the defense does not urge forfeiture by the government in not responding to these claims other than to note that the government has not offered a compelling reason not to address these two issues.

7.      The defense will provide evidence supporting its individual claims at the hearing currently scheduled.

DNM 1265

Submitted this 15th day of November, 2017.


/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)


## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of November, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


/s/ James A. Castle
James A. Castle

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No. 15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al

Defendants.

---

**MOTION FOR ADDITIONAL PEREMPTORY CHALLENGES**

---

NOW COMES the Defendants, Joe Gallegos, Edward Troup, Billy Garcia, Allen
Patterson, Christopher Chavez, Arturo Arnulfo Garcia, Andrew Gallegos, Shauna Gutierrez
respectfully move this Court pursuant to the Fifth, Sixth and Eighth Amendments to the United
States Constitution and Rule 24 of the Federal Rules of Criminal Procedure, to grant them
each 3   additional peremptory challenges, to be exercised separately and in addition to the 10
joint challenges permitted to the defendants at trial. In support of this motion, Defendants state as
follows:

1.   The Sixth Amendment requirement that a defendant be afforded a fair trial by
an  impartial jury is "fundamental to the American system of justice." *Taylor v. Louisiana*, 419
U.S.  522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The primary purpose of peremptory
challenges  is to help "secure the constitutional guarantee of trial by an impartial jury."
*United States v. Martinez-Salazar*, 528 U.S. 304, 316, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000).

2.   Rule 24(b)(2) of the Federal Rules of Criminal Procedure provides that, when

the government d o e s n o t seek the death penalty, the defense shall have 10 peremptory challenges to split among all defendants. The rule authorizes, "The court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly." Whether to grant additional challenges is within the judge's discretion. *United States v. Hueftle*, 687 F.2d 1305, 1309 (10th Cir. 1982). Each defendant is requesting three additional peremptory challenges, to be exercised separately, above what is provided by Rule 24, due to the complexity of the case, the number of defendants, the marked variation in the quality and quantity of the evidence against them, and the substantial pretrial publicity and prejudice against the Defendants that this case has generated in the community and which has been exacerbated by releases of information by the government and the New Mexico Department of Corrections.

3.   The publicity in this case has been overwhelming both in its scope and potential prejudice.  See Appendices A-LL attached to Opposed Motion for Protective Order to Bar Extrajudicial Statements, Disclosures and Further Leaks of Information by the Parties in this Case (Doc. No. 169).

4.   The Eighth Circuit Court of Appeals has recognized that increasing the number of peremptory challenges is an appropriate means for the trial court to counteract pretrial publicity. *United States v. Blom*, 242 F.2d 799, 804 (8th Cir. 2001).  Based on *Blom* and other cases, the federal district court in *United States v. Johnson*, 362 F. Supp. 2d 1043, 1071 (N.D. Iowa, 2005), held that it is within the trial court's discretion to increase the number of peremptory challenges in a single-defendant case above that provided in Rule 24, although it declined to do so in that case. This, of course, is a multi-defendant case.

5.   The defendants further request that the number of the government's peremptory

challenges remain at 6, as provided by Rule 24. It is the defendants who have suffered from the negative pretrial publicity in this case, not the government. Accordingly, the defendants should be allowed a greater number of peremptory challenges to ameliorate, to some degree, that publicity.

6.      As the trial of these defendants will be the after the trial of other severed defendants, the defense requests this Court to delay ruling until after the first trial so it can assess the degree to which pretrial publicity has permeated the possible venire.

WHEREFORE, for the reasons stated above, the defendants request that this Court grant each defendant three additional peremptory challenges, while keeping the number of the government's peremptory challenges to six, the number provided in Rule 24(b)(2).

Dated this 17th day of November, 2017.


/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)



## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


/s/ James A. Castle
James A. Castle

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No. 15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al

Defendants.

## BRIEF IN SUPPORT OF MOTION FOR ADDITIONAL PEREMPTORY CHALLENGES

The Sixth Amendment to the United States Constitution provides in relevant part as follows: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial* jury of the State and district wherein the crime shall have been committed." [Emphasis added.]

The United States Supreme Court has recognized that the primary purpose of peremptory challenges is to help "secure the constitutional guarantee of trial by an impartial jury." *United States v. Martinez-Salazar*, 528 U.S. 304, 316, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000).  Although peremptory challenges are not constitutionally mandated, they have been described as auxiliary to the Sixth Amendment right to an impartial jury. *United States v. Delgado*, 350 F.3d 520, 524 (6th Cir. 2003). The right to peremptory challenge in federal criminal trials is secured and governed by Rule 24 of the Federal Rules of Criminal Procedure. 350 F.3d at 524. Rule 24 provides that in a non-capital case the defense has 10 peremptory challenges.  Rule 24(b)(1).

The language of Rule 24(b) provides that a district court "may allow additional peremptory challenges to multiple defendants." Whether to grant additional challenges is

within the judge's discretion. *United States v. Hueftle*, 687 F.2d 1305, 1309 (10th Cir. 1982). In

*United States v. Gleeson*, 411 F.2d 1091 (10th Cir. 1969), the Tenth Circuit held that it was not

error to limit four defendants to a total of eleven peremptory challenges. The Eighth Circuit,

however, has recognized that increasing the number of peremptory challenges is an

appropriate means for a district court to counteract pretrial publicity in a single-defendant

case. *United States v. Blom*, 242 F.2d 799, 804 (8th Cir. 2001). See also *United States v.*

*Bentley*, 503 F.2d 957 (5th Ci. 1974); *United States v. LePera*, 443 F.2d 810, 812 (9th Cir.),

*cert. denied*, 404 U.S. 958, 30 L. Ed. 2d 275, 92 S. Ct. 326 (1971).

  Relying upon *Blom*, the federal district court in *United States v. Johnson*, 362 F. Supp.

2d 1043, 1071 (N.D. Iowa, 2005), held that a district court does have the discretion to increase

the number of peremptory challenges in a single-defendant capital case above the number in

Rule 21(b)(1) to counteract pretrial publicity. The *Johnson* Court, however, found that, if it

decided to increase the number of peremptory challenges, it would grant both parties the same

number of additional challenges. 350 F.Supp.2d at 1072. For the reasons stated below, the

defendants submit that Rule 24 does not authorize this Court to increase the number of the

government's peremptory challenges. Nevertheless, *Blom* and *Johnson* stand for the proposition

that this Court has the discretion to award additional peremptory challenges in a single-defendant

capital case. This case, however, is a multi-defendant case and the defendants have varying

interests.

  Should this Court grant the defendants' request for additional peremptory challenges, the

number of the government's peremptory challenges should not be increased. First, the clear

language of Rule 24 only provides that a court may increase the number of a criminal

defendant's peremptory challenges. Rule 24(b). The rule does entitle the government and the

defendant to additional peremptory challenges in the choice of alternate jurors. Rule 24(c)(4). Nowhere, however, does Rule 24 grant a court the discretion to increase the number of the government's peremptory challenges in the choice of non-alternate jurors. Indeed, the Advisory Committee Notes to the 2002 Amendment to Rule 24 state: "The court. . . is not required to equalize the number of challenges where additional challenges are granted to the defendant."

In *United States v. Bruno*, 873 F.2d 555 (2nd Cir. 1989), the Second Circuit recognized that Rule 24 goes not grant a court the discretion to increase the number of the government's peremptory challenges.  The Second Circuit held:

> Although this Rule accords the court discretion in awarding additional challenges to defendants in multi-defendant cases, it does not provide authority to grant any additional challenges to the government unless the defense consents. See *United States v. Haldeman*, 181 U.S. App. D.C. 254, 559 F.2d 31, 79-80 (D.C. Cir. 1976) *cert. denied*, 431 U.S. 933, 97 S. Ct. 2641, 53 L. Ed. 2d 250 (1977) and *United States v. Gleason*, 616 F.2d 2, 29 (2nd Cir. 1979), *cert. denied*, 445 U.S. 931, 100 S. Ct. 1320, 63 L. Ed. 2d 764 (1980), *cert. denied*, 444 U.S. 1082, 62 L. Ed. 2d 767, 100 S. Ct. 1037 (1980).

873 F.2d at 561.

Likewise, the Eighth Circuit has countenanced granting additional peremptory challenges to the defense, while keeping the government's peremptory challenges to the number provided in Rule 24, in an effort to counteract prejudicial publicity suffered by the defense.

In *United States v. Means,* 409 F.Supp. 115 (D.N.D. 1976), the District Court of North Dakota found extreme prejudice to exist against the defendants. As this was a felony case, Rule 24 provided 10 peremptory challenges to the defense and 6 peremptory challenges to the government. In order to assure the defendants received a fair trial, the district court ordered that the defendant would receive 18 peremptory challenges and the government's peremptory challenges would remain at 6.  409 F.Supp. at 118.

Also, in *United States v. Harvey*, 756 F.2d 636 (8th Cir. 1985), the Eighth Circuit noted

that the district court, as an added safeguard against prejudicial pretrial publicity, granted the defendants ten additional peremptory challenges for a total of 20. 756 F.2d 641. See also *United States v. Blanton*, 719 F.2d 815, 828 (6th Cir. 1983) (due to pretrial publicity, the district court, over the government's objection, granted an additional 20 challenges to the defendants).

In *United States v. Reulet*, No. 14-40005-DDC, 2016 U.S. Dist. LEXIS 3026, at *24 (D. Kan. Jan. 11, 2016), the Court granted the defendants 13 peremptory challenges—10 to exercise jointly and one additional challenge for each defendant, which defendants may exercise jointly or individually.

It is the defendants who have suffered from the negative pretrial publicity in this case, not the government. It follows, therefore, that they should be allowed a greater number of peremptory challenges in order to level the playing field to some degree.

For the foregoing reasons, this Court should grant the Defendants three additional peremptory challenges to be used individually to ensure each defendant's right to a fair trial by an impartial jury, while keeping the number of the government's peremptory challenges at 6.

Dated this 17th day of November, 2017.

/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.

/s/ James A. Castle
James A. Castle

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                                                                    NO: 15-CR-4268 JB

ANGEL DELEON, et al.,

     Defendants.

### REPLY TO UNITED STATES' SEALED RESPONSE TO DEFENDANT CHRISTOPHER GARCIA'S MOTION FOR ORDER TO SHOW CAUSE FOR NON-COMPLIANCE OF DISTRICT COURT ORDERS DURING MAY 9-10, 2017 HEARINGS (DOC. 1329)[1]

Defendants Christopher Garcia through co-counsel, Amy Sirignano of the Law

Office of Amy Sirignano, PC and Christopher W. Adams of the Law Office of

Christopher W. Adams, Edward Troup, through co-counsel Cori Harbor-Valdez, and

Patrick Burke,  Joe Gallegos, through co-counsel Brock Benjamin and Rick Sindel,

Atruro Arnulfo Garcia, through co-counsel Billy Blackburn, and Scott Davidson,

Andrew Gallegos, through co-counsel Donavon Roberts, and Chris Chavez, through co-

counsel John Granberg, and Orlando Mondragon, Rudy Perez, through co-counsel

Ryan Villa, and Justine Fox-Young, Carlos Herrera, through co-counsel Michael Davis,

---

[1] The Court conducted hearings in this matter during May 9, 10, and 11, 2017.  The Court ordered the government to provide certain materials only during the first two (2) days (Docs. 1160, 1161).

DNM 1274

and Carey Bahalla, Anthony Ray Baca, through co-counsel Teresa Duncan, and Marc

Lowry, and Daniel Sanchez through co-counsel Amy Jacks and Richard Jewkes, in reply

to government's response (Doc. 1401), states the following:

On October 13, 2017, Mr. Garcia and multiple joining defendants filed

Defendants' Motion for Order to Show Cause for Non-Compliance of District Court

Orders During May 9-10, 2017 Hearings (Doc. 1329). This Motion requested the Court

issue an Order to Show Cause to ascertain why the government has yet to comply with

the Court's oral orders during the May 9-10, 2017 hearings.

On November 3, 2017, the government filed United States' Sealed Response to

Defendant Christopher Garcia's Motion for Order to Show Cause for Non-Compliance

of District Court Orders During May 9-10, 2017 Hearings (Doc. 1329). Doc. 1401.

On November 8 -9, 2017, during the hearings before the Court, the government

orally agreed to disclose additional documents.  As set forth below, defendants

continue to require disclosure of documents the Court ordered the government to

disclose at the May 9-10, 2017 hearings. Those documents are listed as follows:

- Preserve law enforcement rough interview notes (Tr. 5/9/17, 236:1-18). The
government "admonished its agents and task force officers to preserve their notes and
will continue to do so."  Doc. 1402.

- Provide written response regarding 10 discs observed but not reviewed
during SNMCF evidence viewing within 10 days including Bates numbers if already

produced. If new evidence, produce within 14 days. (Tr. 5/9/17, 241:2-6, 241:16-22).   The

United States "agrees to provide the written correspondence with the results from the

reviewed discs and disseminate it to all defense counsel."  Doc. 1402

- Provide written confirmation that no additional physical evidence exists

within 10 days, not to be construed as ground for exclusion (Tr. 5/9/17, 246:15-25,

249:20-25).  The government is taking the position that on June 6, 2017, June 7, 2017,

defense counsel for Rudy Sanchez, Mario Rodriguez and Carlos Herrera were

permitted to tour the Penitentiary of NM and Southern NM Correctional Facility and

were also permitted to view, handle and measure the physical evidence.  All defense

counsel did not obtain written confirmation from the government that no additional

physical evidence exists.

- Defense granted permission to handle physical evidence in presence of

non-party NMSP evidence tech (Tr. 5/9/17, 250:12-22, 252:20-25).  Not all defense

counsel were given that opportunity yet.

- AUSA Beck agrees to provide date of Perez/Cordova recording redacted

from the transcript (Tr. 5/9/17, 262:13-20).  The government confirmed with the FBI that

some of the transcripts do not have dates is because the CHSs did not always provide a

date or time for the recording.  The defendants position is to request the government to

further confer with the FBI and their CHSs and demand them to produce dates and

estimated times of each recording that was transcribed.

- AUSA Armijo agrees to produce any transcripts not otherwise disclosed within 10 days (Tr. 5/9/17, 264:5-6, 265:1-4). The government responded that it disclosed all transcripts (8 of 11) that were transcribed.  Doc. 1401.

- Review/Disclose Brady, Giglio, Rule 16 notes of CHS law enforcement handlers within 14 days (Tr. 5/10/17, 4:17-20, 5:25, 6:1-2).  The government acknowledged that law enforcement notes may implicate its obligations under *Jencks* and will continue to admonish the Agents and Task Force Officers to preserve their notes taken during debriefs with CHSs.  Doc. 1401.

- Review/Disclose Brady, Giglio, Rule 16 of documentation/correspondence between FBI, STIU, and NMCD regarding Billy Cordova and the possession of contraband such as phones and recording devices within 14 days (Tr. 5/10/17, 6:9-15, 10:1-11). The government provided that it does not have any formal documentation *in its possession* regarding Billy Cordova's possession of contraband within the NM Corrections Department.  The NM Department of Corrections is part of the task force and investigative team, and pursuant to Rule 16, these documents, if they exist, should be provided to the defense.

- AUSA Beck agrees that if the government obtains it, the government will produce NMCD's internal affairs investigation to attorneys Nate Chambers, and Cori Harbor-Valdez (Tr. 5/10/17, 48:3-8, 49:20-24, 50:2).  The government produced these records on JUNE 16, 2017.

- Review/Disclose Brady, Giglio, Rule 16 grand jury transcripts related to Counts 4 & 5 (Tr. 5/10/17, 94:17-25, 105:2-8).  The government agreed to re-review the grand jury transcripts related to Counts 4 and 5 for *Brady, Giglio*, or Rule 16 evidence. Doc. 1401.

- AUSA Beck agrees, and Judge Browning orders disclosure of specific informant medical/psych records for Teri and Marc (Tr. 5/10/17, 146:3-9).  The Court ordered these materials during the hearings, and a written order was entered during the last week.

- AUSA Beck agrees to produce defendant Baca's prison calls and visitor logs at the Dona Ana County Detention Center from 2/1/2015 – 9/14/2016 (Tr. 5/10/17, 146:11-14, 147:3-4).  The government produced thousands of jail calls during the week of November 13, 2017, however, it stated, "Baca will need to subpoena the Dona Ana County Detention Center directly for "jail calls" while Defendant Baca was in the custody of the U.S. Marshals Service."  Doc. 1401.

- AUSA Beck agrees to send letters to Teresa Duncan, Justine Fox-Young, and the Court regarding whether the CHSs' recording devices contained metadata (Tr. 5/10/17 153:3-8, 153:23).  While the government confirmed metadata on the devices, and agreed to that request, we have not yet received any written correspondence.  Doc. 1401.

5

- AUSA Beck agrees to produce photographs from cell phones that the government provided to informants, if in the possession of the government (Tr. 5/10/17 154:20-25, 155:1-8). The government has conditioned its response to photographs from the forensic examinations/extractions performed on the cellphones *in the government's possession*, which were provided to informants." *See* Doc. 1401. Defense counsel continues to demand the examination and extraction reports of all phones given to all cooperating informants/CHSs, including the phones that, with the exercise of due diligence, can be brought into the government's possession. Rule 16 requires such inquiry and due diligence.

- AUSA Beck agrees to permit defense experts conduct physical review of cell phones in the possession of the government or put in writing that the phones are not in the government's possession (Tr. 5/10/17, 155:11-21). During the November 8-9 hearings, the defense provided the government with an oral list of the cellular phones and digital ELSUR devices it would like to have its defense expert examine and review. The parties will meet and confer and agree to a time when the defense expert is available.

- Review/Disclose Brady, Giglio, and Rule 16 evidence regarding NMCD Secretary Marcantel's statements to A&E Rookie of the Year or NMCD following the Molina murder and Anthony Baca's move out of the state (Tr. 5/10/17, 163:7-14). Government to provide whether the statements were recorded by NMCD. AUSA Beck

agrees to confer with NMCD regarding whether NMCD recorded the statements and let

Theresa Duncan know (*Id.* at 167:1-8). The government states that it has provided "the

video of Secretary Marcantel addressing inmates at Southern New Mexico Correctional

Facility after the murder of J.M."  Doc. 1401.  However, it did not respond regarding

any videos/statements made by Secretary Marcantel to A&E Rookie of the Year.  *Id.*

    For these reasons, Mr. Garcia and co-defendants respectfully request the Court

order the government to disclose the above-requested information ordered by the Court

during the May 9-10, 2017 hearings.

                              Respectfully submitted,

                              ___/s_____
                              Amy Sirignano, Esq.
                              Law Office of Amy Sirignano, PC
                              5901J Wyoming Blvd. NE #250
                              Albuquerque, NM  87109
                              (505) 242-2770
                              Fax: (505) 242-2774
                              Email: amy@abqnmlaw.com

                              Christopher W. Adams
                              The Law Office of Christopher W. Adams, PC
                              102 Broad Street, Suite C
                              Charleston, SC 29401
                              (843) 577-2153
                              Fax:(877) 883-9114
                              Email: chris@chrisadamslaw.com

                              Co-counsel for Christopher Garcia

                              ___/s_____

Cori Ann Harbour-Valdez
The Harbour Law Firm, PC
PO Box 13268
El Paso, TX 79913
915-544-7600
Fax: 915-975-8036
Email: cori@harbourlaw.net


   /s
Patrick J. Burke
Patrick J. Burke, PC
999 18th Street, Suite 2055
Denver, CO 80202
303-825-3050
Fax: 303-825-2992
Email: patrick-j-burke@msn.com


Co-counsel for Edward Troup


   /s
Brock Benjamin
Benjamin Law Firm
747 E. San Antonio, Suite 203
El Paso, TX 79901
(915) 412-5858
Fax: (915) 503-2224
Email: brock@brockmorganbenjamin.com


   /s
Richard Sindel
Sindel, Sindel & Noble, P.C.
8000 Maryland Avenue, Suite 350
Clayton, MO 63105
(314) 721-6040
Fax: (314) 721-8545
Email: rsindel@sindellaw.com


Co-counsel for Joe Lawrence Gallegos

DNM 1281

_____/s_____

Billy R. Blackburn

1011 Lomas Blvd. NW

Albuquerque, NM 87102

505-242-1600

Fax: 505-243-6279

Email: Billy@BBlackburnlaw.com


_____/s_____

Scott Moran Davidson

1011 Lomas Boulevard NW

Albuquerque, NM 87102

505-255-9084

Fax: 505-243-6279

Email: scott@justappeals.net


Co-counsel Arturo Arnulfo Garcia


_____/s_____

Donavon A. Roberts

PO Box 36344

Albuquerque, NM 87176-6344

505-506-3749

Fax: 505-503-8405

Email: ladar170@aim.com


Counsel for Andrew Gallegos


_____/s_____

Orlando Mondragon

1028 Rio Grande

El Paso, TX 79902

915-566-8181

Fax: 915-566-9696

Email: mondragonom@gmail.com


_____/s_____

John L. Granberg

Granberg Law Office

310 N. Mesa Suite 424

DNM 1282

El Paso, TX 79901

915-543-9000

Fax: 915-543-3201

Email: granberglawoffice@yahoo.com

Co-counsel for Christopher Chavez

____/s_____

Justine Fox-Young

1903 Wyoming Blvd. NE Ste. B

Albuquerque, NM 87112

Phone: 505-796-8268

Email: justine@foxyounglaw.com

____/s_____

Ryan J Villa

2501 Rio Grande Blvd NW Suite A

Albuquerque, NM 87104

(505) 639-5709

Fax: 505-433-5812

Email: ryan@rjvlawfirm.com

Co-counsel for Rudy Perez

____/s_____

Michael V Davis

Michael V. Davis, Attorney & Counselor at

Law, P.C.

Post Office Box 3748, 3949 Corrales Road, Suite

130

Corrales, NM 87048

(505) 242-5979

Fax: 505-899-3103

Email: mdavis@swcp.com

____/s_____

Carey Corlew Bhalla

Law Office of Carey C. Bhalla LLC

925 Luna Cir NW

DNM 1283

Albuquerque, NM 87102

Phone: 505-508-5589

Email: carey@bhallalaw.com

Co-counsel for Carlos Herrera

___/s_____

Marc M Lowry

Rothstein Donatelli LLP

500 4th Street N.W. Suite 400

Albuquerque, NM 87102

(505) 243-1443

Fax: (505) 242-7845

Email: mlowry@rothsteinlaw.com

___/s_____

Theresa M Duncan

Duncan Earnest LLC

515 Granite NW

Albuquerque, NM 87102

505-842-5196

Fax: 505-750-9780

Email: teri@duncanearnest.com

Co-counsel for Anthony Ray Baca

___/s_____

Amy E. Jacks

Law Office of Amy E. Jacks

315 E. 8th St.

#801

Los Angeles, CA 90014

213-489-9025

Fax: 213-489-9027

Email: amyejacks@sbcglobal.net

11

_____/s_____

Richard Jewkes
Richard Jewkes
701 N. Saint Vrain St
El Paso, TX 79902
(915) 534-7400
Fax: (915)534-7407
Email: richardjewkes@sbcglobal.net

Co-counsel for Daniel Sanchez

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system to opposing counsel, AUSAs Maria Armijo, Randy Castellano, and Matthew Beck, this 17th day of October 2017.

_____/s_____

Amy Sirignano, Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

Plaintiff,

**vs.**                                                    No. 2:15-cr-04268-JB

**ANGEL DELEON, et al.**

Defendants.

### UNOPPOSED NOTICE WITHDRAWING MOTION TO COMPEL IMMEDIATE PRODUCTION OF BRADY AND GIGLIO MATERIALS [DOC. 1332]

Defendant Anthony Ray Baca, joined by Chris Chavez, Rudy Perez, Joe Gallegos, Chris Garcia, Shauna Gutierrez, Edward Troup, Carlos Herrera, Billy Garcia, Andrew Gallegos, and Arturo Garcia, respectfully gives notice of his withdrawal without prejudice of his *Motion to Compel Immediate Production of Brady and Giglio Materials* [Doc. 1332].

Respectfully submitted,

/s/ Theresa M. Duncan_____
Theresa M. Duncan
Duncan Earnest, LLC
515 Granite NW
Albuquerque, NM 87102
505-842-5196
teri@duncanearnest.com

ROTHSTEIN DONATELLI, LLP

/s/ Marc M. Lowry
MARC M. LOWRY
500 Fourth Street NW, Suite 400
Albuquerque, NM  87102
(505) 243-1443
mlowry@rothsteinlaw.com

*Attorneys for Anthony Ray Baca*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of November 2017, I filed the foregoing pleading

electronically through the CM/ECF system, which caused counsel for Plaintiff and Defendants to be

served by electronic means, as more fully reflected on the Notice of Electronic Filing.


/s/ Theresa M. Duncan
Theresa M. Duncan

DNM 1287

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON,
JOE GALLEGOS,
EDWARD TROUP,
**BILLY GARCIA**,
ALLEN PATTERSON,
CHRISTOPHER CHAVEZ,
JAVIER ALONSO,
ARTURO ARNULFO GARCIA,
MARIO RODRIGUEZ,
MAURICIO VARELA,
DANIEL SANCHEZ,
CONRAD VILLEGAS,
ANTHONY RAY BACA,
CHRISTOPHER GARCIA,
CARLOS HERRERA,
RUDY PEREZ,
ANDREW GALLEGOS,
SANTOS GONZALEZ,
SHAUNA GUTIERREZ, AND
BRANDY RODRIGUEZ.
                   Defendants.

---

**SUPPLEMENT TO OBJECTION TO GOVERNMENT'S PROPOSED GANG
EXPERT EVIDENCE ON SIXTH AMENDMENT CONFRONTATION
GROUNDS (Doc. No. 1337)**

---

DNM 1288

Defendant Billy Garcia hereby submits the following supplement to his previously

filed Objection to Government's Proposed Gang Expert Evidence on Sixth Amendment

Confrontation Grounds (Doc. No. 1337).

1.      As previously noted, the government's gang evidence does not initially

appear to violate the Federal Rules of Evidence as experts can rely on hearsay. The

defense has urged the Court to apply the Confrontation Clause's exclusionary rule to such

evidence.  A further discussion of the interplay between the rules of evidence and

Confrontation Clause analysis is now offered to clarify this relationship as it applies to

the proffered gang expert testimony.

2.      Fed. R. Evid 703 states:

An expert may base an opinion on facts or data in the case that the expert
has been made aware of or personally observed. If experts in the particular
field would reasonably rely on those kinds of facts or data in forming an
opinion on the subject, they need not be admissible for the opinion to be
admitted. *But if the facts or data would otherwise be inadmissible, the
proponent of the opinion may disclose them to the jury only if their
probative value in helping the jury evaluate the opinion substantially
outweighs their prejudicial effect.*

Emphasis supplied.

3.      The rules allow an expert to testify based on three sources of information.

The Committee Comments to <u>Fed. R. Evid. 703</u> indicate that:

Facts or data upon which expert opinions are based may, under the rule, be
derived from three possible sources. The first is the firsthand observation of
the witness, with opinions based thereon traditionally allowed. . . . The
second source, presentation at the trial, also reflects existing practice. The
technique may be the familiar hypothetical question or having the expert
attend the trial and hear the testimony establishing the facts. The third

DNM 1289

source contemplated by the rule consists of presentation of data to the
expert outside of court and other than by his own perception.

4.      The defense asserts that expert opinions and factual testimony derived from

this third source of facts and data violates the Confrontation Clause if it is based on out of

court testimonial statements.

5.      Although Rule 703 allows an expert to base an opinion on facts not

otherwise admissible, it is important to recognize that the rule is not a reflection of the

common law. Rule 703 was, instead, a creation of the Federal Judicial Conference's

Advisory Committee on the Evidence Rules which deliberately loosened the prevailing

rules surrounding expert testimony that had been developed at common law over several

hundred years. *See* Rosenthal, The Development of the Use of Expert Testimony, 2 Law

& Contemp. Prob. 402 (1935).

6.      The Advisory Committee on the Evidence Rules implemented this

comprehensive shift in evidence law with almost no discussion of potential consequences

in criminal cases in which the Confrontation Clause applies as an exclusionary rule for

the admission of statements not subject to cross-examination. As explained below, this

was not by accident.

7.      The Advisory Committee met 15 times between 1963 and 1970 to negotiate

the final language it would propose for the Federal Rules of Evidence. During these

meetings, Committee members discussed the language of many of the various proposed

rules in minute detail. Yet the entire discussion of Rule 703 occurred during a single

meeting when the Committee simply approved the rule as drafted. *See* Advisory

DNM 1290

Committee on Evidence Rules, Minutes of the Meeting of December 10, 1968, p. 32,

http://www.uscourts.gov/rules-policies/archives/meeting-minutes/advisory-committee-

rules-evidence-december-1968 (Attached as Appendix A).

8.      After observing the Federal Rules of Evidence in practice for over two

decades, the Advisory Committee became concerned that Rule 703 was being used to

improperly evade exclusionary rules. *See* Advisory Committee on Evidence Rules,

Minutes of the Meeting of November 12, 1996, p. 6, http://www.uscourts.gov/rules-

policies/archives/meeting-minutes/advisory-committee-rules-evidence-procedure-

november-1996 (Attached as Appendix B). The Committee directed a report on this

specific issue.  That report determined that Rule 703 was being used as a "'back-door'

hearsay exception." *See* Advisory Committee on Evidence Rules, Minutes of the Meeting

of April 14-15, 1997, p. 6, http://www.uscourts.gov/rules-policies/archives/meeting-

minutes/advisory-committee-rules-evidence-procedure-april-1997 (Attached as Appendix

C); *see also* Advisory Committee on Evidence Rules, Minutes of the Meeting of April 6-

7, 1998, p. 3, http://www.uscourts.gov/rules-policies/archives/meeting-minutes/advisory-

committee-rules-evidence-procedure-april-1998 (Attached as Appendix D) (Noting the

proposed language grew from the premise that Rule 703 "should not be used as a

'backdoor' means of admitting otherwise inadmissible evidence.").

9.      As a result, the Advisory Committee developed language adding a

balancing test as a prerequisite to the admission of inadmissible evidence upon which an

expert relies. *See* April 14-15, 1997 Minutes, *supra*. The proposed amendment would

allow the disclosure to the jury of otherwise inadmissible evidence only if "its probative

4

value in assisting the jury to weigh the expert's opinion substantially outweighs the risk

of prejudice resulting for the jury's possible misuse of the evidence." *See* May 1, 1998

Report of the Advisory Committee on Evidence Rules 3, available at

http://www.uscourts.gov/rules-policies/archives/committee-reports/advisory-committee-

rules-evidence-may-1998 (Attached as Appendix E).

      10.     After issuing its proposed amendment to Rule 703 for public comment, the

Advisory Committee held a public hearing, heard testimony, and considered the public

comments. *See* Advisory Committee on Evidence Rules, Minutes of the Meeting October

22, 1998, p. 3, http://www.uscourts.gov/rules-policies/archives/meeting-

minutes/advisory-committee-rules-evidence-procedure-october-1998 (Attached as

Appendix F); *see also* December 1, 1998 Report of the Advisory Committee on Evidence

Rules 4 available at http://www.uscourts.gov/rules-policies/archives/committee-

reports/advisory-committee-rules-evidence-december-1998 (Attached as Appendix G);

Advisory Committee on Evidence Rules, Minutes of the Meeting of April 12-13, 1999, p.

9-11, http://www.uscourts.gov/rules-policies/archives/meeting-minutes/advisory-

committee-rules-evidence-april-1999 (Attached as Appendix H).

      11.     The Committee purposefully rejected a wholesale hearsay exception for

"reliable information used by an expert" as it "could permit dubious hearsay to be

considered for its truth." *See* Oct. 22, 1998 Minutes, *supra*, p. 8. The Committee also

rejected a suggestion that no rule change was necessary finding "that there remains a

substantial risk that parties will use the existing Rule 703 as a backdoor means of evading

exclusionary rules." *See* April 12-13, 1999 Minutes, *supra*, p. 9. The Advisory

DNM 1292

Committee explicitly stated "[t]he goal of the [Rule 703] amendment is to prevent a party from evading exclusionary rules of evidence through the simple expedient of having an expert rely on the inadmissible information." *See* Dec. 1, 1998 Report, *supra*, p. 4.

12.     On October 25, 1999, the proposed amendment to Rule 703 and the Advisory Committee Note were forwarded to the Supreme Court and later adopted in 2000. *See* Fed. R. Evid. 703 advisory committee's note (2000 Amendments). As a result, the current version of Rule 703 now includes the language, "**But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect**."

13.     Fed. R. Evid. 702 requires that any proffered expert testimony must, among other things, be reliable in its principles and methods; and that the expert has reliably applied the principles and methods to the facts of the case.

14.     Fed. R. Evid. 705 states, "Unless the court orders otherwise, an expert may state an opinion — and give the reasons for it — without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination."

15.     The Committee Comment to Rule 705 states, "If the objection is made that leaving it to the cross-examiner to bring out the supporting data is essentially unfair, the answer is that he is under no compulsion to bring out any facts or data except those unfavorable to the opinion."

DNM 1293

16.     The Supreme Court, however, stated in *Bullcoming v. New Mexico*,

> The prosecution, however, bears the burden of proof. *Melendez-Diaz*, 557
> U.S., at 324, 129 S. Ct. 2527, 174 L. Ed. 2d 314 ("[T]he Confrontation
> Clause imposes a burden on the prosecution to present its witnesses, not on
> the defendant to bring those adverse witnesses into court."). Hence the
> obligation to propel retesting when the original analyst is unavailable is the
> State's, not the defendant's. *See Taylor v. Illinois*, 484 U.S. 400, 410, n. 14,
> 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (Confrontation Clause's
> requirements apply "in every case, whether or not the defendant seeks to
> rebut the case against him or to present a case of his own").

*Bullcoming*, 564 U.S. 647, 666 (2011).

16.     The absence of discussion by the various rules committees regarding the

Confrontation Clause by the drafters of Rules 703 and 705 was not the result of ignorance

of the Clause.  Rather, at the time the commissioners enacted and amended Rules 701-

705, Confrontation Clause analysis focused on the reliability of out of court statements

under *Ohio v. Roberts* and *Bruton v. United States*, and the antecedent cases discussed

therein.  *See Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531 (1980); *Bruton v. United

States*, 391 U.S. 123 (1968). Those reliability concerns were addressed prior to the

admissibility of expert testimony by a court's assessment of the expert testimony as a

gatekeeper of the evidence. *See* Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharm., Inc.*,

509 U.S. 579, 113 S. Ct. 2786 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119

S. Ct. 1167 (1999). As a result, the Committee which drafted rules 703 and 705 and the

subsequent committees through 2000 did not need to address Confrontation Clause

concerns because binding case law addressed the concerns.

17.     *Crawford v. Washington*, announced in 2004, created a paradigmatic shift

in Confrontation Clause analysis from a gatekeeping judicial assessment of reliability to a

DNM 1294

recognition that the Clause is a bedrock procedural guarantee, which "commands not that evidence be reliable but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. 36, 42 (2004).  There are no open-end exceptions to be developed by courts.

18.    The Advisory Committee on the Rules of Evidence has not revisited Rule 702, 703 or 705, except for a stylistic change[1], since *Crawford* in 2004 and certainly not since the issuance of the *Melendez-Diaz* decision in 2009 and the *Bullcoming* decision in 2011.

19.    The fact that rules 701-705 have not been amended since 2000 may be that the Committee has not properly reassessed the rule in response to *Crawford* and its progeny.  It may also be that the Committee views the constitutional dictates of the Confrontation Clause as an overarching independent protection for criminal defendants that does not require a change in the evidence rules that also apply to civil cases and to defense proffered testimony in criminal cases.

20.    The defense initially objects on Confrontation Clause grounds to the admission of testimony from the government's gang experts as to facts or data derived from testimonial statements from witnesses who are not and never have been subject to cross examination.  *United States v. Garcia*, 793 F.3d 1194 (10th Cir. 2015). To be clear, however, the defense similarly objects to *opinion testimony* that is derived from out of court testimonial statements from witnesses who are not subject to cross-examination. In

---

[1] In 2011, Rule 703 was amended to reflect a stylistic change proposed by the Style Subcommittee of the Standing Committee on Rules of Practice and Procedure.

DNM 1295

either instance, the Sixth Amendment would be violated as the reliability of the testimony

must "be assessed in a particular manner: by testing in the crucible of cross-

examination." *Crawford*, <u>541 U.S. at 42</u>.

21.     The defense has been unable to identify any case in which either the Tenth

Circuit or other circuits have analyzed whether the admission of expert *opinion testimony*

violates the Confrontation Clause if it is derived from the testimonial statements of non-

testifying witnesses. Instead, these courts have focused on experts who recount

statements from witnesses not subject to cross-examination. *See*, *e.g.*, *United States v.*

*Garcia*, <u>793 F.3d 1194</u> (10th Cir. 2015) (the court's analysis was confined to five

statements which were comprised of out of court statements of non-testifying witnesses).

Given *Bullcoming* and *Melendez-Diaz*, the defense asserts that an expert's opinion itself

would be inadmissible if it is based on the testimonial statements of non-testifying

witnesses because Mr. Garcia will not be able to cross examine the witnesses who

provided the building blocks of the expert opinion.


Respectfully submitted this 21st day of November, 2017.



<u>/s/ Jim Castle</u>
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)

DNM 1296

## CERTIFICATE OF SERVICE

I hereby certify that on November 21st, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


/s/ James A. Castle
James A. Castle

DNM 1297

**APPENDIX A**

The sixteenth meeting of the Advisory Committee for
on Tuesday, December 10, 1968,
the Rules of Evidence convened/in the Conference Room of the

Administrative Office of the United States Courts, 725 Madison

Place, N.W., at 9:30 a.m.  Chairman Albert E. Jenner opened

the meeting by welcoming the members and guests.  The

following members and guests were present for all or part

of the sessions:

        Chairman Albert E. Jenner
        David Berger
        Hicks Epton
        Robert S. Erdahl
        Joe Ewing Estes (absent Thursday through Saturday)
        Thomas F. Green, Jr.
        Egbert L. Haywood
        Charles W. Joiner (absent Tuesday and Wednesday)
        Frank G. Raichle (absent Thursday through Saturday)
        Herman F. Selvin
        Simon E. Sobeloff (absent Thursday through Saturday)
        Craig Spangenberg
        Robert Van Pelt
        Jack B. Weinstein
        Edward Bennett Williams (absentTuesday and Wednesday)
        Edward W. Cleary, Reporter.

Judge Albert B. Maris, Chairman of the Standing Committee

on Rules of Practice and Procedure, attended through the

Friday session.  Professor James Wm. Moore, member of the

Standing Committee, was present on Tuesday and Wednesday.

Professor Charles A. Wright, member of the Standing Committee,
                            Wednesday,
was present at the/Thursday, and Friday sessions.

- 2 -

Chairman Jenner read a letter he had received from
Edward Bennett Williams, Esquire, expressing his regrets
at not being able to attend the first sessions of the
meeting.  Mr. Williams was out of town trying a case.

Mr. Jenner asked the Reporter if he had any opening
remarks.  Professor Cleary stated the deskbook included
the last final draft for consideration by the Committee.

Mr. Jenner suggested going through the rules
numerically.  He stated he felt the rules should be read
completely and out loud before asking for comments or
suggestions from the members.  If the rule was approved,
the Advisory Committee Note would be included with the
acceptance of its relative rule.

RULE 1-01.  Scope.

Professor Cleary read the rule, changing "commissioners"
in line 3 to magistrates".  He stated the "Magistrates Bill"
would be approved before the rules.  Also, he added
"Commissioners" in the title should be changed to "Magistrates".

Mr. Jenner asked if "all" should precede "proceedings"
in line 1.  Professor Cleary stated the type of proceedings
was brought out in Rule 11-01, Applicability of Rules.

- 3 -

The reporter then turned the attention of the members to his memorandum of November 25, 1968. He read the memorandum.

Professor Moore then suggested abrogating all of Civil Rule 43 instead of only subdivisions (a), (b), and (c). Professor Cleary stated he felt the remaining subdivisions of Civil Rule 43 [(d) Affirmation in Lieu of Oath; (e) Evidence on Motions; and (f) Interpreters] were not matters of evidence but matters of trial procedure.

Mr. Jenner stated he did want to leave the one sentence in which was not be be abrogated from subdivision (a).

Professor Moore suggested leaving those decisions out of the evidence rules. Mr. Jenner said he wanted them included in the evidence rules because "a lawyer would turn to the Rules of Evidence to find them".

It was suggested by Judge Maris the decisions of the committee would be turned over to the standing Committee for referral to the Civil and Criminal Rules Committees.

Judge Estes moved reference to the title of "Evidence" [in open court] be left in the Criminal Rule 26 and Civil Rule 43 with a suggestion that further rules may be found in the Evidence Rules themselves. His motion was carried unanimously.

- 4 -

Referring back to Rule 1-01, Professor Cleary stated "Rule 11-1" in line 4 should read "Rule 11-01".

Professor Cleary then stated "all trial testimony should be taken in open court".

Mr. Berger stated everything included in Civil Rule 43(a) should be abrogated except the first sentence and the title. Also, in Criminal Rule 26, the title "Evidence" should be appropriately changed.

Professor Cleary felt further study should be made as to "Scope", "Application", and the use of the word "orally".

Judge Maris recommended the submission of the changes to the standing Committee to decide if any further work needed to be done.

Mr. Riachle read Rule 26 Depositions Pending Action. He stated "something had to be done".

Mr. Berger restated the motion to approve the recommendation of the reporter.  The motion related to the rules of the Civil and Criminal Procedure being submitted to the standing Committee to determine whether or not the first sentence of Criminal Rule 26 should be subject to more study.  It was mentioned these rules may not be entirely accurate.

q        The motion was carried.

- 5 -

Professor Moore asked if Rule 1-01 referred to "all" courts of the United States or just district courts.

The reporter stated that question could be answered in Rule 11-01. He read the rule <u>Applicability of Rules</u>.

Judge Maris asked if Rule 11-01 was applicable to all district court decisions. The reporter answered yes.

It was suggested "United States Courts of Appeals" be added to subsection (a) of Rule 11-01. It will be added in line 5 after "District of the Canal Zone,". This was stated as a motion and carried.

Under subdivision (b) <u>Proceedings generally</u>, "actions" in line 9 was changed to "proceedings". Mr. Berger suggested line 10 read: "criminal cases, to contempt proceedings except those in which the judge may act summarily,". This was put to a vote and carried.

Subdivision (c)/<u>was approved as drafted</u>                 <u>Rules of privilege</u>

Subdivision (d) <u>Rules inapplicable</u> was read by the chairman. Part (1) <u>Preliminary questions of fact</u> and the introductory clause were approved as drafted. Part (2) <u>Grand jury</u> was approved as drafted. Part (3) <u>Miscellaneous proceedings</u>, when read was changed by striking the second "criminal" in line 11 and line 12 through "by the judge;". There were no bbjections.

- 6 -

Subdivision (e) Rules applicable in part was changed
by suggestion of Mr. Spangenberg to strike "only" in
line 15. There were no objections.

Judge Weinstein drew the attention of the members
to the Advisory Committee Note on Rule 11-01 [specifically
page 467]. He suggested placing a comma after "1 WIGMORE § 4(5)"
and striking the language through the period after "practical
application". "The" was to be in lower case and the sentence
was to read: " . . . 1 WIGMORE § 4(5), the Supreme Court
has not accepted to this view." Judge Weinstein also
suggested adding another sentence after the quoted language
which was:"The rule as drafted does not deal with evidence
required to support an indictment." In support of his
suggestion, he cited 385 F.2d 132 and 269 F. Supp. 149. All
of his suggestions were put to a vote and carried.

RULE 11-02. Title.

This rule was approved as drafted.

RULE 11-03. Effective date.

This rule was approved as drafted.

RULE 1-03. Rulings on evidence.

Judge Van Pelt suggested subdivision (d) Plain Error
as being "appellate procedure".

Subdivision (a) Effect of erroneous ruling,
(1) Objection and (2) Offer of proof was approved as drafted.

~ 7 ~

Subdivision (b) Record of ruling was changed by striking "clearly" in line 1 on page 6.  In line 7 on page 6 "that the matter or witness" is to be stricken.  The purpose:  a witness cannot be privileged.  The title of subdivision (b) was changed to Record of offer and ruling. Subdivision (c) was changed to read: Hearing of jury.  In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by such means as making statements or offers of proof or asking questions in their hearing."

The rewriting was approved.

RULE 1-04.  Preliminary questions of admissibility.

In subdivision (a) General rule, Mr. Haywood suggested changing the second "the" to "that".  There were no objections. Subdivision (b) Relevancy conditioned on fact was proposed to be changed by striking "relevancy" to "probative value" and the title to read: "(b) Particular relevancy conditioned on fact."

Subdivision (c) Presence of jury, was changed as a matter of consistency:  "Presence" in the title and "presence" in line 10 were changed to "hearing".  No motions were made in regard to Rule 1-04.

- 8 -

[The meeting adjourned at 4:55 p.m.
until Wednesday, December 11, 1968
at 9:00 a.m.]

Professor Cleary opened the meeting stating

he had redrafted portions of Rule 1-04.  He suggested

rearranging subdivision (a) by considering first

qualification, privilege second, and then third, admissibility

of evidence.  He read his redraft:  "When the qualification

of a person to be a witness, or the existence of a

privilege, or the admissibility of evidence, is subject

to a condition except as provided in subdivision (b), and

the fulfillment of the condition is in issue, that issue

is to be determined by the judge."

Mr. Spangenberg felt the except clause should be

at the end of the subsection.  The reporter stated if the

judge felt he should not admit more evidence, he could

instruct the jury to disregard it.  Mr. Spangenberg stated

he thought the policy was on the relevancy issue that

relevancy itself is condition, the jury does get a second

look into it, under suitable instructions from the judge.

With regard to subsection (b), Judge Weinstein

suggested changing "relevancy" to "probative force".  Also,

he suggested striking the remainder of the subsection

following the first sentence.  He stated after the terms

of the first sentence, it was up to the jury to give the

evidence whatever weight was necessary.

- 9 -

Mr. Berger stated he felt subsection (a) should be limited to qualification and existence of a privilege, which would be subject to a condition. He then proposed subsection (b) contain admissibility. The reporter felt if read that way, the rule would not take care of certain situations. In other words, Mr. Berger wanted to eliminate "admissibility" from subsection (a) and have it covered in subsection (b).

Mr. Epton stated he felt the trouble with this subsection was that the committee was trying to adopt _____ language for a situation where it is not ordinarily used. He suggested subsection (a) read: "Preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of the evidence shall be determined by the judge. In making his determination, he is not bound by the rules of evidence except claims of privilege." Mr. Jenner did not like "preliminary questions". He stated it was not originally stated as such in subsection (a). He felt that as revised, subsections (a) and (b) eliminated the thrust of relevancy. Mr. Raichel stated once the evidence is in, it's there no matter how improper it may subsequently develop. The

DNM 1306

– 10 –

chairman asked if the committee would accept subsection (b)
as written.   Judge Weinstein said he would be in favor of
it the committee wanted to accept it.   Mr. Jenner stated
Mr. Epton's revision of subsection (a) and subsection (b)
as drafted with a few language changes would be acceptable.
He read Mr. Epton's motion.   Mr. Spangenberg suggested
"admissibility"of evidence shall be determined by the judge
subject to the further provisions of subsection (b)."

Mr. Jenner asked the reporter to give the history
of Rule 1-04.   This session was the fourth time for
consideration of this rule.   The chairman read the motion.
Mr. Erdahl asked Mr. Epton what he would propose for subsection **(b)**
Mr. Epton suggested leaving subsection as drafted.   The
motion was carried with regard to Mr. Epton's suggestion.
Mr. Spangenberg moved subsection (b) be approved as
drafted.   The motion carried.

Subsection (c) <u>Hearing of jury</u>.   Judge Sobeloff
suggested changing "outside" to "out of" in line 9.   There
were no objections.   The chairman read the subsection.
It was moved to approve subsection (c) as amended.   The
motion carried.   Mr. Spangenberg wanted the title of

DNM 1307

- 11 -

subsection (c) .to remain as "Presence of jury." The
chairman was in favor of the title remaining as drafted.
He stated for the record it would remain as such.

Subsection (d) <u>Preliminary hearings on confessions
and evidence unlawfully obtained</u>. Mr. Erdahl suggested
inserting "allegedly" after "evidence" in the title.
Mr. Jenner stated he would prefer the striking of "unlawfully
obtained" from the title. There were no objections to
the chairman's suggestion. For consistency, Judge Sobeloff
suggested changing "outside" in line 16 to "out of".
Mr. Raichle was not in favor of the last sentence beginning
on line 16. His basic reason being that credibility is
not another issue. Judge Weinstein suggested "except if
credibility is involved." should be added at the end of the
subsection. Mr. Spangenberg stated it would be dangerous
to state the subsection in that way. Mr. Berger moved a
period be placed after "at the trial on the issue of guilt",
and striking the remainder of the subsection. After some
discussion and the reporter reading the motions from a
previous meeting, Mr. Berger withdrew his motion. Professor
Cleary suggested changing the last phrase to "The accused
does not by testifying at the hearing render himself liable
to cross-examination . . .". The chairman asked that the

DNM 1308

~ 12 ~

reporter read in full the proposed subsection (d) in light
of the discussion.  The reporter stated the second sentence
beginning "Testimony" in line 16 on page 11 through ", and
he" in line 1 on page 12 be stricken.  A new sentence will
read:  "The accused does not by testifying at the hearing
render himself liable to cross-examination as to other issues
in the case and testimony given by him at the hearing is
not admissible at the trial except for purposes of impeachment."
Professor Green felt the only necessary change would be to
reverse the clauses of the subsection.  Mr. Spangenberg was
in agreement with Professor Green's suggestion and added
"testimony given by him at the hearing is not admissible
at the trial on the issue of guilt."  The chairman restated
the motion:  "The accused does not by testifying at the
hearing subject himself to cross-examination as to other
issues in the case.  Testimony given by him at the hearing
is not admissible on the issue of guilt at the trial."
Mr. Erdahl moved to amend by adding "except for purposes of
impeachment" after "issue of guilt".  The reporter stated
"on the issue of guilt" should be taken out if Mr. Erdahl's
amendment were accepted.  Mr. Erdahl agreed.  Mr. Raichle
suggested changing "render" to "subject".  Mr. Jenner was

- 13 -

against "except for the purposes of impeachment".

Mr. Spangenberg suggested: "Testimony given by him at the hearing is not admissible on the issue of guilt at the trial." The motion to add "except for purposes of impeachment." was lost. The motion to strike the second sentence and adding the new sentence as read by the chairman was carried.

Subdivision (e) Weight and credibility. The chairman read the subdivision. Professor Green felt "This rule does not" rebutted subdivision (d). The chairman suggested "Nothing in this rule limits". Mr. Spangenberg stated it had been decided in subdivision (a) that once a judge had admitted evidence and having made his own determination, a party can nevertheless offer additional evidence. Mr. Epton suggested the government is a party. He felt this interpretation was too broad. The chairman stated his problem could be solved by striking "of a party". Mr. Raichle moved this subdivision be stricken. The vote was 4 for and 5 against. Judge Weinstein moved the whole rule be adopted as amended. The motion was carried.

- 14 -

RULE 1-05.  <u>Summing up and comment by judge</u>.  Mr. Raichle
was against this rule.  He felt it was not a rule of evidence.
He stated the committee should not tell the judge what to do
after all the evidence is in and the arguments have been
made.  Mr. Berger agreed.  Mr. Raichle moved Rule 1-05 be omitted.
Judge Estes stated this rule was necessary.  Judge Maris
stated the fact that this rule appears in the Rules of Evidence
would not affect a judge's rights at all.  The vote on
Mr. Raichle's motion was 4 for and 6 against.  It was lost.
Mr. Epton moved approval of Rule 1-05.  Mr. Raichle asked
if "Review" could be used in lieu of "Summing up" in the title.
Mr. Spangenberg moved "fairly" be added in line 3 after "the
judge may".  It was decided "fairly" would be a reflection upon
the judge's discretion.  The motion was lost.  Mr. Raichle
moved "sum up" be deleted and "review" be in its place.  Judge
Estes stated law books use "sum up".  Professor Cleary stated
"review" does not connotate "summing up all the evidence".  He
felt "review" was a one-sided point of view.  The motion lost.
The chairman suggested inserting "also" after "he" in line 5.
The motion carried.  The chairman then suggested "that they"
be inserted in line 7 after "to the witnesses and".  It
appeared awkward as drafted.  The motion carried.  Mr. Selvin
moved "summation or" be inserted in line 8 after "the judge's".

DNM 1311

- 15 -

The motion carried.  Mr. Raichle moved "sum up" be deleted
from line 3 and "summarize" be in lieu thereof.  The motion
lost.  Judge Van Pelt moved the approval of Rule 1-05 as
amended.  The motion carried.  Mr. Raichle moved the last
sentences of the Note be deleted, because it was disapproved
in the House report.  The motion carried.

 RULE 1-06.  <u>Limited admissibility</u>.  Mr. Raichle moved
the adoption of this rule as drafted.  It was carried.  Judge
Weinstein questioned the last phrase in the Note.  He felt
it unclear.  In accordance with Rule 6 of the New Jersey
Evidence Rules, the reporter suggested "The wording of the
present rule differs, however, in repelling any implication
that limiting or currity instructions are sufficient in all
situations."  Judge Weinstein suggested citing <u>Bruton</u>.

 RULE 1-07.  <u>Remainder of or related writings or recorded
statements</u>.  Judge Weinstein felt this rule was limited by
using "recorded".  He thought it should be moved to Item X
or made more general by striking "recorded".  The chairman
thought "recorded" was all right.  The reporter stated
"writings" were not dealt with generally.  Mr. Selvin stated
Rule 26d(4) of the Federal Rules of Civil Procedure dealt with
this proposition in regard to deposition.  There was a motion
to approve this rule as drafted.  The motion carried.

- 16 -

Regarding the Note, the chairman stated the first sentence was not phrased cleary. He did not feel the rule was an extension. The reporter suggested "The rule is an expression of the rule of completeness [case citations]. It is manifested as to depositions in Rule 26d(4) . . ." In the second paragraph of the Note, the chairman suggested "document" be used in lieu of "statement". It was then mentioned "when a writing or recorded statement" appeared in the rule. No definite motions were made with respect to the Note.

ARTICLE II.   Judicial Notice.

RULE 2-01.   <u>Judicial notice of adjudicative facts.</u>

The reporter stated the change which was made pursuant to the August meeting of the Committee, i.e., the last sentence in subdivision (g). Judge Weinstein preferred subdivision (b) to begin affirmatively: "A judicially notices fact must be free of reasonable dispute . . ." The reporter then suggested "A judicially noticed fact must be either . . ." and "and therefore not subject to reasonable dispute." The chairman read the rule as amended for a vote. Mr. Selvin asked if the phrase "and therefore not subject to reasonable dispute" referred to sources or to fact. It was unclear. It was then suggested since the phrase was meant to refer to "the fact" the last phrase should read "so that the fact is not subject to reasonable dispute." The subdivision was approved as amended. Judge Weinstein stated "In all cases" in subdivision (c) was unnecessary. Mr. Spangenberg felt "discretion" was not the

- 17 -

proper word.  His interpretation of "discretion" would be
that one can or cannot do something.  Mr. Berger suggested
"may" on lieu of "has discretion to".  He so moved.  The
motion carried.  Judge Weinstein moved approval of Rule 2-01
as amended.  The motion carried.  With regard to the Note,
the chairman suggested in the first sentence placing a period
after "judicial notice" and beginning a new sentence with "It
deals . . .".  Further, he suggested striking "to the article
cited above" since the cited article was in the previous line.
There would be no confusion as to which article.  Mr. Selvin
stated "foreign" should appear before "law" when it pertains
to Rule 44.1 of the Federal Rules of Civil Procedure.  This
rule dealt with "foreign law".  On page 38 of the Note, the
chairman suggested "minimum recognition of the right" instead
of "to the right".  On page 43, "The judge instructs" was
changed to "The judge will instruct".  There were no motions
with regard to the Note.

ARTICLE III.  Presumptions.

     RULE 3-01.  <u>Presumptions against accused in criminal
cases</u>.  The reporter gave the history of the rule.  The
chairman questioned "criminal cases" being set out in the
subdivisions since it is included in the title of the rule.
The reporter stated this rule was not set out to cover
presumptions in criminal cases which might be imposed against

- 18 -

the government. He further stated this rule was intended
to give an accused the status of an inference. The chairman
questioned "In all cases" in subdivision (c). He suggested
striking "In criminal cases" in line 2 of subdivision (a)
and "In all cases" in line 7 of subdivision (c). Judge Van Pelt
felt "In criminal cases" could be retained. He felt it was
legislative drafting. Judge Maris was in favor of retaining
the phrase. There were no objections to striking "In all
cases" in subdivision (c). The reporter suggested "Whenever"
in lieu of "When" in line 7 of page 47. There were no
objections. Mr. Selvin felt "is" in line 10 on page 46 was
unnecessary. His reason being that the same type of
phrase is used on page 47 in line 14 without "is". The
reporter stated "the presumed fact is an element". It was
the consensus "is" be added in line 14 of page 47. Mr. Selvin
questioned what the reporter meant by including "basic facts"
in line 14 on page 46. The reporter replied "basic facts
giving rise to presumption". There was a motion the rule be
approved as amended. The motion carried. With respect to
the Note, Judge Weinstein suggested some of the cases cited
do not stand as being correct in the second circuit. The
reporter suggested "While Second Circuit decisions have been
held . . ." There were no definite decisions made regarding
the Note.

Case 2:15-cr-04268-JB   Document 1466-1   Filed 11/21/17   Page 19 of 45
Appellate Case: 20-2058   Document: 010110415663   Date Filed: 09/29/2020   Page: 1678

- 19 -

RULE 3-02. <u>Applicability of State law</u>.   Judge
Weinstein questioned the capitalization of "State".   The
reporter replied it was the A.L.I. style.   It was found in
general to be uncapitalized.   There was a motion to approve
the rule as drafted.   The motion carried.   The chairman
suggested with regard to the Note that in the fifth line from
the bottom of the first paragraph, a period be placed after
the word "defense" and the "and" be stricken.   The next
sentence would begin "Application of the state law . . ."
Judge Van Pelt asked why "technical" presumptions.   The reporter
replied if one were trying to prove admission by virtue of
failure to deny a letter or a submitted account -- one would
have to prove the mailing of the letter.   The "little gap"
of proof has been given the term "tactical" presumption.

RULE 3-03.   <u>Presumptions in other cases</u>.   Judge
Weinstein was in favor of "facts" being in the singular.   The
reporter replied most presumption requires more than one "fact".
Judge Weinstein then suggested adding "necessarily" after
"If reasonable minds would" in subdivisions (A) and (B) to
conform with subdivision (C).   There were no objections to
his suggestion.   It was decided if the term "basic facts"
was used, "giving rise to the presumption" would not be
necessary.   This change was made throughout the rule.   Judge
Weinstein suggested "he" appearing on lines 7 and 12 on page 58
be changed to "the judge" for clarification.   There were no
objections.   Judge Weinstein then suggested striking "depends

upon the evidence relevant thereto and" beginning one line 7 of page 59. There were no objections. There was a motion to approve the rule as amended. The motion carried. With reference to the Note, the reporter suggested deleting the last full sentence on page 63 of the last paragraph on page 62. It was the consensus of the committee to strike it. There was a typographical error in the spelling of Justice Southerland's name on page 67.

ARTICLE IV—RULE

RULE 4-01. Definition of "relevant evidence". This rule was unchanged at the August meeting. Judge Van Pelt moved approval. The motion carried.

RULE 4-02. Relevant evidence generally admissible, irrelevant evidence inadmissible. There was a motion to approve the rule as drafted. The motion carried.

RULE 4-03. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. The reporter stated this draft appeared unchanged from the August meeting. There was a motion to approve the rule as drafted. The motion carried. Mr. Spangenberg suggested with regard to the Note, that "unfair" precede "prejudice" in the first line of the second paragraph on page 81. The members agreed.

RULE 4-04. Character evidence not admissible to prove conduct; exceptions; other crimes. The reporter stated the only change as a result of the August meeting was the addition

- 21 -

of "other crimes" in the title.  Mr. Berger moved approval
of the rule.  The motion carried.

RULE 4-05. <u>Methods of proving character</u>.  There was
a motion to approve this rule as drafted.  The motion carried.

RULE 4-06. <u>Habit; routine practice</u>.  The reporter
stated the title had been changed from "Routine conduct".
Mr. Berger moved approval of the rule.  Mr. Epton stated his
position of opposition to this rule was as always.  He felt
"habit" was dangerous evidence.  The motion carried by a vote
of 6 to 4.

RULE 4-07. <u>Subsequent remedial measures</u>.  The
reporter stated this rule was unchanged from the August
meeting.  There was a motion to approve.  The motion carried.

RULE 4-08. <u>Compromise and offers to compromise</u>. The
reporter stated this rule was assapproved at the August
meeting except for the addition of "or" in the last line.
There was a motion to approve.  The motion carried.

RULE 4-09. <u>Payment of medical and similar expenses</u>.
This rule was unchanged as of the August meeting.  There was
a motion to approve.  The motion carried.

RULE 4-10. <u>Offer to plead guilty; nolo contendere;
withdrawn plea of guilty</u>.  The reporter stated this rule was
substantially changed at the August meeting.  He read the
original version of the rule.  Mr. Epton stated he felt the
revision was much better than the previous version.  He moved
approval.  The motion carried.

- 22 -

RULE 4-11. <u>Liability insurance</u>.   The reporter stated the only change in this rule was to limit reference of insurance to liability insurance.   There was a motion to approve.   The motion carried.

ARTICLE V. Privileges.

RULE 5-01. <u>Privileges recognized only as provided</u>. The reporter stated this rule was not changed at the August meeting.   There was a motion to approve the rule as drafted. The motion carried.

RULE 5-02. <u>Required reports privileged by statute</u>. The reporter called the attention of the members to the fact that two drafts were submitted.   The only difference between the two versions appeared in the last sentence.   At the August meeting, Judge Estes stated he was not satisfied with the wording of the last sentence and would draft a proposal for the December session.   The reporter read the proposal of Judge Estes.   Mr. Raichle asked if this rule extended to a copy of a report.   The reporter replied "it applies to the person making it".   The person making a copy has the right to refuse disclosure.   The reporter stated also that the rule was not meant to render privilege of reports which are not already privileged, but meant to require reports which were privileged.   The rule would leave the question of

DNM 1319

- 23 -

"privilege" up to the state court.  Mr. Jenner stated his understanding of this rule.  "The Committee in August, decided to limit the rule to say there is no privilege under the rule in actions directly involving false statements or fraud in the return or report."  Judge Estes wanted to expand the rule to state that no privilege exists where the exercise of this privilege would aid or conceal fraud where disclosure is essential to a fair determination of a cause.  It was stated the judge passes on whether it is essential to a fair determination or cause.  Judge Estes added it depended whether or not the exercise of this privilege would aid or conceal fraud or the disclosure is essential to a fair determination of a cause.

Mr. Epton suggested the last sentence read:  "No privilege exists under this rule and actions directly involving false statements or fraud in the return or report nor where it would aid or conceal fraud nor where disclosure is essential to a fair determination of a cause."  Judge Estes accepted Mr. Epton's suggestion.  Mr. Epton moved his suggestion be accepted.  Judge Van Pelt suggested "or" in lieu of "nor".  This was acceptable.

Mr. Spangenberg stated he felt the suggested revision of Judge Estes completely eviscerated the policy which appears in the Statutes, which requires that a report be made in the first place.  It was suggested "or where the exercise of the

- 24 -

privilege would aid or conceal fraud or where disclosure is essential to a fair determination of a cause." be added at the end of the revision by Judge Estes. The purpose was to broaden the exercise of the privilege. The vote was 5 to 4. The motion carried. It was decided the final decision on the rule would await Dean Joiner and Mr. Williams. When Dean Joiner and Mr. Williams joined the meeting, Rule 5-02 was moved to be reconsidered. Mr. Epton moved broadening the scope by striking "directly" in line 10 on the first revision. The motion carried. There was a motion to approve the rule as amended. The motion carried.

RULE 5-03. <u>Layyer-client privilege</u>. The reporter stated this rule was unchanged from the August meeting save two commas in line 14. Mr. Raichle moved the adoption of this rule. The motion carried.

RULE 5-04. <u>Psychotherapist-patient privilege</u>. There was a motion to approve the rule as drafted. The motion carried.

RULE 5-05. <u>Husband-wife privilege</u>. The reporter stated this rule was amended at the August meeting with regard to the addition of a reference to the Mann Act. There was a motion to approve the rule as drafted. The motion carried.

RULE 5-06. <u>Communications to clergymen</u>. There was a motion to approve this rule as drafted. The motion carried.

- 25 -

RULE 5-07. <u>Political vote</u>.  Mr. Haywood moved the adoption of this rule.  The motion carried.

RULE 5-08. <u>Trade secrets</u>.  There was a motion to approve the rule as drafted.  The motion carried.

> [At this point, 5:00 p.m.
> the committee adjourned until
> Thursday, December 12, 1968,
> at 9:00 a.m.]

RULE 5-09. <u>Secret of state</u>.  The reporter stated this rule had two very slight changes from the August meeting.  In subdivision (e), line 15, "another party" was in lieu of "opposite party", and in the last line "or dismissing the action" was added.  Mr. Epton suggested adding "by the officer authorized to exercise the claim." should be added after "knowledge" in line 8 of subdivision (d).  Dean Joiner stated this would complicate the rule, because the rule is only a direction to the judge to give notice to the particular person.  Mr. Epton withdrew his suggestion. Mr. Haywood moved approval of the rule as drafted.  The motion carried.  Mr. Epton questioned page 178 of the Note. The reporter stated he would check to see if there had been a typographical error.

RULE 5-10. <u>Identity of informer</u>.  The reporter stated the only change in this rule was in subdivision (c)(3) dealing with the procedure to be followed when the inquiry

-- 26 --

was into the legality of the means by which evidence was
obtained.  The language which was stricken at the August
meeting was "In making his decision, the judge may consider
whether the evidence required after the issuance of the
warrant."  There was a motion to approve the rule as
drafted.  The motion carried.

RULE 5-11. Waiver of privilege by voluntary
disclosure.  The reporter stated this rule was unchanged
from the August meeting.  There was a motion to approve the
rule as drafted.  The motion carried.

RULE 5-12. Privileged matter disclosed under compulsion
or without opportunity to claim privilege.  The rule as
drafted was not changed in the last two previous meetings.
There was a motion to approve this rule as drafted.  The
motion carried.  With regard to the Note, Mr. Berger suggested
expanding the last paragraph to include the example Mr. Epton
brought up with regard to the rule itself, i.e., lawyer
testifying without claiming the privilege.  The reporter
stated Mr. Berger's suggestion was not a very good illustration
because there is a provision in the "Attorney-client" provision
that the lawyer may claim privilege before the client if he
is authorized and his authority is presumed.

DNM 1323

-- 27 --

RULE 5-13. Comment upon or inference from exercise of privilege; instruction. The reporter stated there were no changes in this rule as of the August meeting. Mr. Epton suggested the striking of "judge or" in line 6 of subdivision (a). Mr. Spangenberg disagreed stating the discussion of the committee in a previous meeting came to the conclusion that any comment about the exercise of the privilege would excite the jury and then the jury would be left to draw an inference. The reporter asked if the committee would accept the proposal that subdivisions (a) and (b) be limited to "claims by a party". Mr. Spangenberg suggested "by a party" be placed in subdivision (b) because it is a privilege claimed outside the presence of the jury. Mr. Erdahl was against this suggestion because he stated he had never seen a case where the party waited until the actual trial to claim privileges. Mr. Epton asked if there was a difference between the "claim" or "exercise" of a privilege. The reporter stated "exercise" of a privilege connotated a successful claim. For consistency, Mr. Epton suggested changing "exercise" to "claim" in line 3 and also changed in the caption. The reporter agreed. Dean Joiner moved the rule be approved as amended. The motion carried.

- 28 -

ARTICLE VI.   Witnesses.

RULE 6-01. <u>General rule of competency</u>.   There was
a motion to approve the rule as drafted.   The motion carried.

RULE 6-02. <u>Lack of personal knowledge</u>. The reporter
stated this rule was unchanged at the August meeting.   Judge
Weinstein asked with regard to the phrase "evidence is
introduced sufficient to support a finding that" if it
wasn't inconsistent with the basic rule that "a judge may
make a preliminary determination without proof of evidence".
He moved striking the phrase in lines 2 and 3.   The reporter
disagreed.   He stated if there was controversy over whether
a witness had knowledge, it would be a jury question.   The
judge should not basically pass on the question of whether
a witness had first-hand knowledge, but only whether enough
evidence had been introduced supporting whether the witness
had first hand knowledge.   Mr. Epton agreed with the reporter.
Judge Weinstein withdrew his motion.   There was a motion to
approve the rule as drafted.   The motion carried.

RULE 6-03. <u>Oath or affirmation</u>.   The reporter stated
this rule was unchanged from the August meeting.   There was a
motion to approve the rule as drafted.   The motion carried.

RULE 6-04. <u>Interpreters</u>.   The reporter stated this
rule was unchanged from the August meeting.   There was a
motion to approve.   The motion carried.

-- 29 --

RULE 6-05. Competency of judge as witness. There
was a motion to approve the rule as drafted. The motion
carried.

RULE 6-06. Competency of juror as witness. There
was a motion to approve the rule as drafted. The motion
carried.

RULE 6-07. Who may impeach. There was a motion to
approve the rule as drafted. The motion carried.

RULE 6-08. Evidence of character and conduct of
witness. There was a motion to approve the rule as drafted.
The motion carried. Regarding the Note, Mr. Spangenberg asked
if there was a conflict with the Note which accompanied
Rule 4-05. The reporter supported the inquiry and stated he
would put a cross reference into the Note of Rule 4-05.
Mr. Spangenberg felt the cross reference would be appropriate.
There were no objections from the members.

RULE 6-09. Impeachment by evidence of conviction of
crime. Mr. Williams moved the adoption of this rule as drafted.
The motion carried. Professor Wright questioned if the
reference to the laws were of the jurisdiction where the crime
was committed. Mr. Berger suggested striking "under the laws
of the United States or any State or nation," . Judge Van Pelt
questioned "is" in line 7. He asked if the committee was

~ 30 ~

concerned with whether the crime committed is punishable
or was punishable at the time the crime was committed.  He
also suggested adding "at the time of the conviction".
Mr. Epton moved subdivision (a) be amended to read "For
the purpose of attacking the credibility of a witness,
evidence that he has been convicted of a crime is admissible
but only if the crime of which he was convicted was at the
time of conviction punishable by death or imprisonment in
excess of one year or involved dishonesty of false statement
regardless of the punishment."  The chairman suggested
Mr. Epton's motion be divided into two parts as the drafted
version.  Mr. Epton had no objection.  Mr. Spangenberg stated
it did not answer the questions raised if redrafted.  The
reporter then suggested adding "under the laws of the
convicting sovereignty" to line 8 after "one year".  The
reporter then read subdivision (a) as amended.  Mr. Epton
was in agreement.  Judge Maris suggested "under the law
under which he was convicted" be in lieu of the reporter's
suggestion.  The reporter agreed.  The chairman read the
subdivision for a vote.  The motion to amend carried.  [The
remainder of the rule having already been adopted, the
chairman stated it would stand as approved.]

        RULE 6-10. Religious beliefs or opinions.  The
reporter stated the only change from the August session was
the changing of "virtue" to "reason" in line 4.  Mr. Epton
moved approval of the rule as drafted.  The motion carried.

- 31 -

RULE 6-11. Mode and order of interrogation and
presentation. The reporter stated the only change from the
August session was the addition of "but only" in line 14.
Mr. Williams moved line 13 have a period after "witness"
and begin "the" as a new sentence. The chairman stated
Mr. Williams' motion. It carried. Mr. Spangenberg moved
to strike "but only" in line 14. The motion carried.
Mr. Epton moved approval of the rule as amended. The motion
carried.

RULE 6-12. Writing used to refresh memory. There
was a motion to approve the rule as drafted. The motion
carried.

RULE 6-13. Prior statements of witnesses. The rule
was unchanged as of the August meeting. There was a motion
to approve the rule as drafted. The motion carried.

RULE 6-14. Calling and interrogation of witnesses by
judge. The rule was unchanged from the August meeting.
Mr. Haywood moved approval as drafted. The motion carried.

RULE 6-15. Exclusion and sequestration of witnesses.
The chairman stated the rule was unchanged from the August
meeting. There was a motion for approval. The motion carried.

ARTICLE VII. Opinions and Expert Testimony.

RULE 7-01. Opinion testimony by law witnesses.
Dean Joiner moved the rule be approved as drafted.  The
motion carried.

RULE 7-02. Testimony by experts.  Mr. Berger moved
approval of the rule as drafted.  The motion carried.

RULE 7-03. Opinion testimony by experts.  Mr. Berger
moved approval of the rule as drafted.  The motion carried.

RULE 7-04. Opinion on ultimate issue.  Mr. Berger
moved approval of the rule as drafted.  The motion carried.

RULE 7-05. Disclosure of facts or data underlying
expert opinion.  The reporter stated this rule proceeded on
the theory that one doesn't need to use a hypothetical question
for bringing out the basis or data on which the expert witness's
opinion is based, provided there is opportunity to obtain the
information in other ways.  The reporter wanted to know if the
language was clear.  He felt if discovery were the subject, it
should be stated so in the rule.  Dean Joiner felt subdivision (b)
covered the doubt.  Mr. Spangenberg moved to strike "at or" in
line 6.  Mr. Berger stated "once the witness is testifying, the
opportunity is there no longer".  The reporter stated subdivision (a)
meant the expert, under certain circumstances, may give an
opinion without disclosing either in his own testimony or by the
use of hypothetical questions the data on which his opinion was
based.  Judge Weinstein moved lines 3 through 6 save subdivision (a)

- 33 -

and line 7 through "the expert testifies" be deleted. By striking the introductory of subdivision (a), it was decided "other" in line 9 was unnecessary. It was then suggested "underlying" be placed before "facts". Judge Van Pelt stated this rule was in practice all across the country and working well. The motion to amend was carried. There was a motion to adopt the rule as amended. The motion carried.

With regard to the Note, the reporter suggested striking "The rule leaves it undisturbed except when a better substitute is given in the form of a written statement or the result of discovery". Everyone was in agreement. Judge Weinstein moved the reporter have the authority to change the style of the rules wherever he feels it necessary. Everyone was in agreement.

RULE 7-06. Court appointed experts. The chairman stated this rule had not been considered in August. With regard to subdivision (c), Professor Green stated if one gives the jury a good expert the jury will weigh what the expert says not to just an expert's standing. There was a motion to strike subdivision (c). The chairman disagreed. He stated the subdivision did not state that credibility and weight of an expert's testimony applied "all the time". There was a motion to insert "not" in line 11 after "the judge may", and striking "as relevant to his credibility and the right of his testimony." The motion lost.

Judge Maris suggested striking "trier of the facts" and placing "jury" in lieu thereof. Judge Weinstein moved subdivision (c) read: "The expert witness so appointed may be called as the court's witness but the fact of his appointment by the court may not be revealed to the jury." With regard to not revealing the appointment of an expert witness, the reporter stated the preceding paragraph already contained an authorization to the court or to either party to call the witness. He also stated the jury did not really weigh who appointed an expert witness. Mr. Epton moved the approval of the entire rule stating he was not in favor of the language in the draft of subdivision (c), but he favored even less any suggestions which had been offered. The motion carried. Professor Cleary returned to Judge Maris' suggestion of "jury" in lieu of "trier of the facts". This was carried.

ARTICLE VIII  Hearsay:

RULE 8-01. Definition. Mr. Berger moved for reconsideration of subdivision (c) of Rule 7-06. His reason was to give the judge discretionary power to reveal the fact of the appointment of the judge's expert witnesses. The rule as adopted makes it mandatory upon the judge to do whatever a litigant desires. He moved "Within the court's discretion" be placed at the beginning of the subdivision. Judge Van Pelt acting as chairman, asked for a vote on the motion for reconsideration. The motion carried. Mr. Berger then moved "Within the discretion of the judge" be inserted at the beginning of subdivision (c). The motion carried. This rule was again

- 35 -

reconsidered with Mr. Jenner present.  Mr. Berger suggested:
"In the exercise of his discretion, the judge may authorize
the fact that he appointed an expert witness to be revealed
to the jury".  Judge Weinstein suggested "he" be in lieu of
"the court".  The motion carried.

ARTICLE VIII. Hearsay.

Regarding the reporter's Introductory Note,
Professor Wright pointed out the case citation on page 289
should appear as Brookhart v. Janis.

RULE 8-01. Definitions.  Judge Weinstein moved the
deletion of ", but only if," in line 5.  The motion carried.
Mr. Williams moved the rule be adopted as amended.  The motion
carried.  Professor Wright read from 390 U.S. 719, regarding
the rule.  Judge Weinstein suggested "power" be placed in
lieu of "jurisdiction" and "obtain" in lieu of "compel" in
line 1 on page 295, and striking "by its process" in line 2.  The
reporter favored saving "compel" in the subdivision.  Judge
Weinstein agreed.  His motion carried.  Judge Weinstein moved
"by process" be stricken from subdivision (5).  Judge Van Pelt
felt the rule was too broad if left as Judge Weinstein
recommended.  Judge Weinstein moved "by such diligence", be
in lieu of "by process".  The motion carried.  The rule having
already been approved, the approval stood.

- 36 -

RULE 8-02. Hearsay rule. The chairman stated this rule was not considered at the August meeting. Dean Joiner moved approval. Judge Weinstein suggested striking "in evidence" from lines 1 and 2. This was amended by consensus. Judge Weinstein stated "otherwise" in line 2 was unnecessary. The reporter agreed. There was a motion to approve this rule as amended. The motion carried.

RULE 8-03. Hearsay exceptions: availability of declarant immaterial. The chairman stated this rule was not considered at the August meeting. There was a motion to approve the rule. The motion carried. The reporter stated the "unless" clause in Rule 8-03(b)(3) was an addition to the rule to cover will cases. The reporter also stated he had added it as a model to the state courts. Mr. Spangenberg interpreted the addition as a separate rule saying that memories to former conditions is admissible in the special class of rule cases. Judge Weinstein felt the addition of subdivision (3) should be separate. Mr. Berger suggested a period be placed after "bodily health)" in line 9. Judge Weinstein moved the deletion of the additional language. In addition, Judge Weinstein moved a separate subdivision be added stating: "Statements relating to wills. A statement relating to the execution, revocation, identification or terms of the declarant's will unless the source of information for the circumstances under which it was made indicates his lack of trustworthiness." Mr. Williams

questioned if it would make a judge have to make a finding as
to credibility of a witness before he decides whether he can admit
it or not.   Judge Weinstein replied to some extent, yes.
Mr. Selvin stated the California rules of handling "will" cases.
Judge Weinstein's motion was lost.

Judge Van Pelt moved the striking of "or terms"
in line 12 and placing "or" between "revocation" and "identification".
The reporter replied his understanding of Judge Van Pelt's motion
was where there was uncertainty as to the meaning of the will.
Mr. Selvin was against Judge Van Pelt's motion.   Mr. Berger
felt "or terms" was necessary in the rule.   Judge Van Pelt's
motion lost.

The reporter stated another change in this rule was
subdivision (8) on page 321.   He added "and against the government
in criminal cases," in lines 5 and 6.   This was agreeable with
the members.

RULE 8-04.   <u>Hearsay exceptions: declarant unavailable.</u>
The chairman stated this rule was not considered at the August
meeting.   The reporter stated he had added the last sentence of
subdivision (b)(4).   He stated the example dealt with declaration
against interest.   In <u>Douglas</u> v. <u>Alabama</u>, there was a clear case
presented where admissibility, had the court been inclined to
go along with it, might have been justified on the grounds of a
declaration against interest.   The case had a confession of a
co-defendant who was not on trial being offered and he claims
the privilege of self-incrimination.   The court ruled against

DNM 1334

- 38 -

admissibility.  The situation came up again in Bruton.  It
is a situation in which the motivation of the declarer at the
time he confesses in which he implicates his co-defendant is
such that the declarant does so because he feels it is to
his advantage.  The reporter thought the committee would be
remiss(?) in eliminating penal interest.  It was then moved
by the reporter "implicating both himself and the accused"
be in lieu of "charged with the crime, implicating the accused."
in lines 10 and 11.  The motion carried.  Mr. Berger moved the
approval of Rule 8-04, as amended.  The motion carried.

RULE 8-05. Hearsay within hearsay.  Judge Weinstein
questioned the "hearsay" rules.  The reporter stated there
were only two "hearsay" rules.  The chairman suggested
striking "as" in line 4.  It was suggested "any" be in lieu
of "either" in line 4.  The motion to adopt Rule 8-05 as
amended carried.  The reporter suggested "an" in lieu of
"any" in line 4.  There were no objections.

RULE 8-06. Attacking and supporting credibility of
declarant.  Dean Joiner moved approval of the rule as drafted.
The motion carried.

ARTICLE IX. Authentication and Identification.

RULE 9-01. Requirement of authentication or identification
The reporter stated subdivisions (a) and (b) of this rule were
originally two separate rules.  Following the technique of the

- 39 -

"hearsay" rules, he combined the general provision and
illustration into the same rule.  Regarding subdivision (b)(1),
it was moved "of a person with knowledge" be deleted from
line 13.  The motion carried.

> [At this point, 5:15 p.m.
> the committee adjourned until
> Friday, December 13, 1968 at
> 8:30 a.m.]

Dean Joiner drafted a subdivision to replace
subdivision (9) of Rule 9-01.  His proposal was: "Testimony
of a person with knowledge describing a process or system
used to produce a result together with the opinion of an
expert witness that the result provided fairly represents
or reproduces the facts which the process or system perports
to represent or reproduce."  Judge Weinstein felt "Evidence"
could replace "Testimony of a person with knowledge".  He also
suggested "accurate" should modify "result".  The chairman read
the redraft as amended:  "Evidence describing a process or
system used to produce a result and showing that the result
is accurate".  Mr. Berger moved approval.  The motion carried.
It was suggested by Judge Weinstein the title of the new
subdivision be "Process or System".  Everyone was in agreement.

- 40 -

On subdivision (b)(2) Judge Weinstein felt "testimony of witnesses not testifying as experts," was unnecessary. Mr. Berger suggested "Non-expert" modify "opinion" in subdivision (b)(2). It was also decided "Non-expert" would be in lieu of "Lay" in the title of subdivision (b)(2). The chairman read the subdivision as amended. There was a motion to approve Dean Joiner's draft of Rule 9-01, as amended. The motion carried.

RULE 9-02. Presumptions or authenticity. The reporter stated there were a few changes in this rule. In subdivision (d), line 10, "official" was in lieu of "public". He stated "public" implicated "open to the public". In line 14 he had restored "by the custodian". He stated that in an earlier session the committee had stricken it. He felt without the phrase it left the question of "who made the certificate". Judge Weinstein questioned if "by the custodian" was helpful. The reporter stated the authenticity of the certificate should be taken as established under subdivisions (a) or (b). Mr. Epton stated "by the custodian" was previously stricken because "data compilations" appeared in the same subdivisions. It was then stated the person certifying a form as correct was complete; therefore, "by the custodian" can be deleted. Mr. Spangenberg suggested adding "certifies under seal that the signer has the official capacity and that

~ 41 ~

the signature is genuine" be added at the end of subdivision (b).
He also suggested striking "certified as authentic under seal
by" on lines 14 and 15 on page 412.  Mr. Spangenberg's
suggestions were adopted.  Judge Weinstein moved striking
"by the custodian" in line 14 on page 414.  It was discussed
that some certification would have to be made.  Hence, Judge
Weinstein amended his motion to state line 14 of page 414
read:  "correct by the custodian or other person authorized
to make the certification, by certificate complying with".
The motion carried.  Dean Joiner did not think "all" in line 12
was unnecessary.  The chairman agreed.  The "all" was deleted
by consensus.  It was the consensus of the committee that the
comma in line 13 following "compilations" be deleted.  The
two revisions were approved by a vote.  There was a motion to
approve Rule 9-02, as amended.  The motion carried.

RULE 9-03. Subscribing witness' testimony unnecessary.
The reporter stated this rule was considered at the first
meeting.  Mr. Berger moved approval of the rule as drafted.
The motion carried.

With regard to the Note on page 424, Mr. Epton felt
the illustration of "wills" in the fourth line did not take
into consideration the uniform self-proving statutes.  He felt
"wills" was not appropo.  Mr. Selvin suggested substituting
"e.g." for "i.e." and adding "in some states" after "wills".
There were no objections.

- 42 -

ARTICLE X. <u>Contents of Writings, Recordings, and Photographs.</u>

RULE 10-01. <u>Definitions.</u> The reporter stated he
still felt as he had stated in previous meetings to be against
this rule having "photographs" included. On line 7 of page 425,
Dean Joiner suggested striking "sound". Mr. Selvin suggested
"printing" be included on line 5 of subdivision (a).
Mr. Berger moved the rule be approved as amended. Mr. Haywood
moved subdivision (b) be stricken. Professor Green suggested
retaining subdivision (b) and putting in an exception
similar to the one in "Hearsay", which states "summaries may
be used". The reporter replied this was included in
Rule 10-06 <u>Summaries.</u> Professor Green was satisfied with Rule **10-06.**
The motion to strike subdivision (b) in its entirety was lost.
Mr. Spangenberg moved to exclude "medical X-rays". The motion
lost. He then moved subdivision (b) be amended to read:
"'Photographs' include still photographs, X-ray plates, or
other films exposed by radiation and motion pictures." The
motion lost. The rule having been adopted to approve the
rule with the two amendments: adding "printing" in line 5 and
striking "sound" from line 7, remained.

Mr. Spangenberg suggested subdivision (d) line 9
should be amended by adding "chemical" in lieu of "mechanical".
The reporter stated it was not a chemical re-recording. Mr. **Berger**
moved "or by chemical reproduction" be included after "or
electronic re-recording". This amendment was agreeable to
the committee. It was so amended.

DNM 1339

- 43 -

RULE 10-02. <u>Requirement of original</u>.  The reporter stated there are some "Acts of Congress" that provide that a photographic copy has the status of the original.  Mr. Berger moved approval of the rule as drafted.  Mr. Haywood asked if Xerox copies were included in this rule.  Copies are covered in Rule 10-03. The motion was approved as drafted.

RULE 10-03. <u>Admissibility of duplicates</u>.  Mr. Haywood moved approval of the rule as drafted.  The motion carried.

RULE 10-04. <u>Admissibility of other evidence of contents</u>.  The reporter stated this rule was considered at the second session of the committee.  Judge Weinstein moved approval of the rule as drafted.  The motion carried.

RULE 10-05. <u>Public records</u>.  The reporter suggested striking "all" in line 3 and/inserted stating he had "data compilations" for consistency. Mr. Berger moved approval of the rule as drafted with the amendment of the reporter.  The motion carried.

RULE 10-06. <u>Summaries</u>.  The reporter stated there were no changes to this rule since considered by the committee.  There was a motion to approve.  The motion carried.

RULE 10-07. <u>Testimony or written admission of party</u>.  The reporter stated he had added "without accounting for the non-production of the original."  The reporter further stated he felt the rule was incomplete without the additional phrase. Mr. Berger moved approval of the rule as drafted.  The motion carried.

DNM 1340

RULE 10-08. Functions of judge and jury. The chairman suggested "whether" be stricken in lines 7 and 9 because the modifying "whether" was in line 6. The reporter wanted to leave the "whether[s]" in the rule and move the "(a)" between "raised" and "whether" in line 6 because each subdivision is a distinct question. Mr. Berger moved approval of the rule as amended. The motion carried.

Judge Maris, returning to Rule 8-03, questioned subdivision (b)(10). The reporter agreed it should be amended to conform with the "authentication" provision. He suggested "or other person authorized to make the certification" be inserted in line 6 on page 322, and then a comma be added after "testimony". The committee adopted his suggestions.

With regard to the Note of Rule 10-02, Mr. Spangenberg suggested "Hospital records which may be admitted as business records under Rule 8-03(6) commonly contain reports interpreting X-rays by the staff radiologist, who qualifies as an expert, and these reports need not be excluded from the records by Rule 8-02." be inserted at the end of the partial paragraph beginning on page 433.

Judge Maris stated the District Court of Puerto Rico is a constitutional court not a legislative court. The court is set out in Title 28 as a United States Court. He suggested the first sentence on page 458 be deleted. He stated "the District Court of the District of Columbia" should appear as "the District Court for the District of Columbia" on pages 457 and 458.

- 45 -

RULE 11-02. Title.   There was a motion to approve the rule as
drafted.   Judge Maris was against the title of the rule.   He
felt the Evidence Rules should conform with the other Committee
Rules titles.   It was moved and carried that the rules be
titled "Federal Rules of Evidence".

RULE 11-03. Effective date.   The chairman stated he felt the
rule being left tentative was not good.   The rule should be
stated as "The effective date will be provided by the court."


[The committee adjourned
its final meeting at 1:30 p.m.]

APPENDIX B ADVISORY COMMITTEE ON EVIDENCE RULES

Minutes of the Meeting of November 12, 1996


San Francisco, California


The Advisory Committee on the Federal Rules of Evidence met on November 12, 1996 in the Park Hyatt Hotel in San Francisco, California.

The following members of the Committee were present:

Hon. Fern M. Smith, Chair

Hon. David C. Norton

Hon. Jerry E. Smith

Hon. James T. Turner

Professor Kenneth S. Broun

Frederic F. Kay, Esq.

Gregory P. Joseph, Esq.

John M. Kobayashi, Esq.

Roger Pauley, Esq.

Dean James K. Robinson

Professor Daniel J. Capra, Reporter


Hon. Milton I. Shadur, Hon. Ann K. Covington, and Mary F. Harkenrider, Esq., were unable to attend.


Also present were:

Hon. David S. Doty, Liaison to the Civil Rules Committee

Hon. David D. Dowd, Liaison to the Criminal Rules Committee

Hon. Alicemarie H. Stotler, Chair, Standing Committee on Rules of Practice and Procedure

Professor Daniel R. Coquillette, Reporter, Standing Committee on Rules of Practice and Procedure

Peter G. McCabe, Secretary, Committee on Rules of Practice and Procedure

Professor Rob Aronson, Uniform Rules of Evidence Committee

Joe Cecil, Esq., Federal Judicial Center

John K. Rabiej, Esq., Chief, Rules Committee Support Office

## Opening Business

Judge Smith called the meeting to order at 8:30 a.m. She acknowledged with gratitude the services of the previous Chair, Judge Ralph Winter, and the previous Reporter, Professor Margaret Berger. The minutes of the meeting of April 22, 1996 were then approved by the Committee.

Judge Smith brought the Committee up to date on the status of the amendments proposed by the Committee. The Judicial Conference has approved, and passed on to the Supreme Court, the following: the proposed amendments to Rules 407 and 801; new Rule 804(b)(6); and the movement of the residual exceptions to a single Rule 807.

## Self-Evaluation Report

The Judicial Conference has directed that each of its committees prepare a self-evaluation report. At the Committee meeting, the Chair described the form provided by the Judicial Conference and proposed answers to the questions on the form. After discussion, the following responses were agreed to by the Committee:

1. The Committee should continue to exist, given the constant state of change in the law of evidence, and the continuing need for a deliberative body of experts to respond to new developments.

2. The Committee has the appropriate amount of work.

3. The size of the Committee is appropriate.

4. The Committee membership is representative.

5. The work of the Committee is consistent with its jurisdictional statement.

6. The Committee's jurisdiction overlaps, to some extent, the jurisdiction of the Civil and Criminal Rules Committees, as well as that of the Committee on Court Administration. However, the Evidence Rules Committee is necessary because the Federal Rules of Evidence are trans-substantive, and there is no other committee with the jurisdiction to consider the impact of proposed amendments to the Evidence Rules on all types of federal litigation. Judge Stotler, elaborating on this point, noted that the Judicial Conference had considered the possibility, before the Evidence Rules Committee was reconstituted, of forming a committee with members from the Civil Rules Committee and the Criminal Rules Committee.

This proposal was rejected in favor of a free-standing Evidence Rules Committee.

7. There are no areas within the jurisdiction of other committees that would be better placed with the Evidence Rules Committee.

8. The Committee meets twice per year, 50% of the time in Washington, D.C.

9. The Committee has no suggested changes for its own structure or for the Judicial Conference committee structure in general.

## Rape Counselor Privilege

Congress, in 42 U.S.C.§ 13942(c) (1996), directed that the Judicial Conference report on whether the Federal Rules of Evidence should be amended to include a privilege for confidential communications from sexual assault victims to their counselors. The Evidence Rules Committee directed the Reporter to prepare a proposed statement of the Committee on this issue. After some discussion, the Committee voted unanimously to adopt the statement, which would recommend to the Standing Committee that the Federal Rules of Evidence not be amended to include such a privilege. The Committee concluded that it would be anomalous to have the rape counselor privilege as the only codified privilege in the Federal Rules of Evidence. Nor would such a codification be necessary, since the Supreme Court, in Jaffee v. Redmond, recently established a privilege for statements to psychotherapists and licensed social workers; and it is probable that a rape counselor privilege comes within the Jaffee rule. The Chair expressed concern that the Jaffee protection might not extend to social workers and other therapists who are unlicensed, but opined that we should wait to see how the Jaffee rule develops before proposing any amendments. All Committee members agreed with this assessment. The Committee also agreed that it was unnecessary to address the constitutional issues that might arise in a criminal case when confidential statements of a prosecution witness are shielded by a rape counselor privilege; nothing the Committee could propose would change or resolve this constitutional question.

## Uniform Rules of Evidence

Professor Rob Aronson, a member of the Committee on the Uniform Rules of Evidence, brought the Committee up to date on recent proposals for amending the Uniform Rules. The Uniform Rules Committee has reviewed all the articles up to Article 8. Professor Aronson described the following proposals:

1. Rule 103--The Rule would provide that a pretrial objection must be renewed, unless the court states on the record that a ruling is final.

2. Article 3--The Uniform Rules Committee proposed no change. The concern was that other uniform laws use the term "presumption" in various substantive ways. Professor Aronson noted that it would be useful to have a single rule governing the use of presumptions, but that much of the law of presumptions is based on policy beyond evidence. The Uniform Rules reporter has been instructed to try to draft an all-encompassing rule, but Professor Aronson is not optimistic about its passage.

3. Rule 404--Changes were made in this Rule in response to Federal Rules 413-15. The Reporter to the Uniform Rules Committee has been instructed to draft a "lustful disposition" rule of admissibility, such as exists in many states--permitting evidence of prior unlawful sexual conduct directed toward the same victim. Professor Aronson noted that there is overwhelming support in the Uniform Rules Committee for restricting Rule 404b. The Uniform Rules Committee proposal includes an in camera hearing requirement, as well as a requirement of advance notice (with a good cause exception); it requires clear and convincing proof that the opponent committed the bad act before it can be admitted; and it requires that the probative value of the bad act for its not-for-character purpose must substantially outweigh its prejudicial effect. The Chair asked whether there has been any negative reaction from trial judges as to the proposed in camera requirements. Professor Aronson said that trial judges had been positive about these requirements and that his sense was that trial judges wanted direction in handling evidence of uncharged misconduct.

4. Rule 407--The proposed amended Uniform Rule would apply specifically to product liability cases. No change has been made to the "after the event" language of the rule, but a comment will say that the relevant event is the time of sale rather than the time of injury.

5. Rule 408--This Rule would be modified to make it clear that it would include statements made during the course of an alternative dispute resolution.

6. Rule 412--The proposal adds a legislative purpose section indicating that the purpose of the rule is to protect the privacy of rape victims. Prior sexual conduct of the victim would be admissible only to show source of injury, consent, bias, or the source of sexual knowledge in a case involving a child-victim. The proposed amendment would apply the rule in both civil and criminal cases.

7. Privileges--Unlike the Federal Rules, the Uniform Rules contain a detailed set of privileges. Two amendments to these rules are proposed. First, the psychotherapist-patient privilege would be expanded to cover statements made to licensed social workers. A licensing requirement was thought necessary because otherwise there would be no way to meaningfully limit the therapeutic privilege. Second, the procedural rules concerning invocation and waiver of privileges would be revised and expanded, consistently with the case and statutory law that has developed.

8. Rule 609--A requirement of pretrial notice, parallel to that in Rule 404(b), has been added. Also, when the criminal defendant is the witness, impeachment would not be permitted with non-crimen falsi crimes unless the probative value of the conviction substantially outweighs the prejudice to the defendant.

9. Bias--Uniform Rule 616 currently permits impeachment for bias, subject to the 403 test. The Uniform Rules Committee is recommending that this rule be deleted, due to concern that the rule, by negative implication, could have a confining influence on other methods of impeachment not mentioned in the Rules.

10. Writings--The Uniform Rules Committee would amend every rule in which the term "writing" is used. The term "writing" would be changed to "record", and the term "record" would then be defined as any means of preserving information, much like the definition in the Federal best evidence rule. This change was thought necessary to account for technological developments in preserving writings and records.

Developments in Technology

The proposed change in the term "writings" in the Uniform Rules engendered some discussion about technological advances and their impact on the Federal Rules of Evidence. Judge Stotler pointed out that the problem of electronic data cuts across all the rules, not only the Evidence Rules, as we move toward the "electronic courtroom." The Chair observed that the problems created by technological change are more problems of validity and reliability than definitional. The Chair announced that in response to the challenges created by new technology, Judge Stotler has formed a subcommittee, consisting of one member from each of the advisory committees, as well as the reporters from each advisory committee. The purpose of this subcommittee is to consider how best to respond to changes in data retrieval and presentation in the federal courts. Judge Turner has been appointed by the Chair and has agreed to serve on the technology subcommittee.

## Grants of Certiorari

Roger Pauley suggested that one of the Reporter's duties should be to keep Committee members apprised of cases taken by the Supreme Court involving the interpretation of the Federal Rules of Evidence. A short discussion ensued about the current case in front of the Supreme Court, United States v. Old Chief, which presents the question whether the prosecution must accept a stipulation to a felony in a felon firearm possession prosecution; Roger Pauley noted that there is currently no provision in the Federal Rules which specifically discusses stipulations. The Reporter agreed to keep Committee members apprised of cert. grants involving the Federal Rules of Evidence.

## Issues for the Committee to Pursue

The Chair then asked each member of the Committee whether there was any issue that he or she thought the Committee should pursue. Many issues were discussed.

The Committee agreed to take up the following issues at the next meeting:

1. Rule 103(e): While the Committee's proposal to amend Rule 103 was withdrawn, the Committee unanimously voted to revisit the question of amending the rule to provide instruction to litigants as to when an in limine motion must be renewed at trial. Judge Turner noted that the conflict in the circuits on this question has not gone away. Judge Turner, Greg Joseph and the Reporter were instructed to work on a draft which would provide a neutral solution for the problem, i.e., a solution which would not opt for excusing a trial objection in all cases or for requiring it in all cases, which would provide concrete guidance to litigants, and which would not unduly burden trial judges. Judge Doty noted that the Civil Rules Committee was opposed to the original proposal of the Evidence Rules Committee, which would have required the renewal of an objection unless the "context" instructed otherwise. The Civil Rules Committee thought that wording too ambiguous. It was further suggested in discussion that the Uniform Rules provision should be considered to see if it would be helpful.

2. Rules 404(b) and 609--The Committee generally agreed that it would be useful to provide for a more structured procedure for trial courts to follow in considering the admissibility of evidence of uncharged misconduct and prior convictions. The Reporter was instructed to review how other jurisdictions are

dealing with these matters--including the Uniform Rules and the Michigan Rules of Evidence. The Reporter was also instructed to consider whether a common notice provision could be applied to both rules. The Reporter will review the extant alternatives and set forth options for the Committee at the next meeting.

3. Rule 615--The Reporter informed the Committee that the "Victim of Crime Bill of Rights," 42 U.S.C. 10606, passed in 1990, places some limits on Rule 615. Subsection (b) of the statute sets forth seven rights of victims of crimes. Although the statute is not a model of clarity, paragraph (4) of subsection (b) sets forth the right "to be present at all public court proceedings related to the offense, unless the court determines that testimony by the victim would be materially affected if the victim heard other testimony at trial." It appears that Congress intended to create a limited exception to Rule 615. This exception, which is narrowly tailored to take account of the interests of crime victims and is more recently enacted than the Rule, would take precedence over Rule 615. The relationship between Rule 615 and the Victim of Crime Bill of Rights is currently being tested in the Oklahoma City bombing trial. The Reporter stated that he would report more fully on this issue at the next meeting.

4. Rule 703--The Reporter was directed to prepare a report on whether Rule 703, which permits an expert to rely on inadmissible evidence, has been used, as a practical matter, as a means of improperly evading the hearsay rule. The Reporter agreed to survey the law and practice under Rule 703 and report back to the Committee at the next meeting.

5. Rule 706--Judge Stotler and Joe Cecil informed the Committee that funding had been approved for Judge Pointer's plan to appoint expert witnesses in the breast implant litigation, but that Judge Jones' request for similar funding had been denied. This raised the question of the adequacy of the funding mechanism provided by Rule 706 for court-appointed experts in civil cases. Rule 706 provides that the parties shall pay for court-appointed experts in civil cases, but Judges Pointer and Jones argue that this provision is unfair when the expert's testimony will be used in many subsequent trials. It has been argued that Rule 706 is not even applicable when the court-appointed expert's testimony is used in more than one trial. Another important question is whether Rule 706 has any applicability where the expert is retained by the court for technical assistance, rather than to testify as a witness.

The Committee instructed the Reporter to work with Joe Cecil to develop a proposal for the Committee to consider whether Rule 706 should be amended to accomodate some of the concerns expressed by the judges involved in the breast implant litigation, especially the question of funding by the government.

6. Self-authenticating Business Records--The Committee voted to consider whether Rule 803(6) should be amended to dispense with the requirement of a qualified witness. The Reporter will survey the law of other jurisdictions and prepare a report on the advisability of such an amendment for the next meeting.

7. Obsolete or Inaccurate Rules and Notes--Several Committee members observed that the original Advisory Committee notes are incorrect in some respects. For example, the Note to Rule 104 contains a "not", which creates the opposite impression from what the Advisory Committee intended. The Note to Rule 301 has little or nothing to do with the Rule ultimately adopted. John Rabiej agreed to contact West to determine whether editor's notes could be used to alert the reader to some of these obvious errors.

More broadly, several Committee members observed that the Committee could do a service by updating

the original Advisory Committee notes to account not only for discrepancies but for subsequent case developments. As Judge Jerry Smith noted, practitioners rely on the Advisory Committee comments more than they rely on treatises, etc. Some doubt was expressed, however, as to whether the Advisory Committee notes could be updated outside of any process of amending or re-enacting the Rules. Professor Coquillette agreed to pass along the suggestion that the Evidence Rules should be re-enacted so that the Advisory Committee notes could be updated. Another possible solution discussed was to add a new note after the old note, rather than to amend the original note. Questions were raised about whether changes to the notes, independent of any amendment process, would require the three-year process attendant to amending the Rules themselves.

The Reporter was directed to go through the Rules and the Advisory Committee comments to determine where the Rules or the comments are obsolete, contradictory, or clearly wrong. The Reporter will report back on this matter at the next meeting. Special consideration will be given to the Notes prepared by the Federal Judicial Center, which are included in some published versions of the Federal Rules and which point out where the Advisory Committee Notes are inaccurate or outmoded.

Professor Coquillette informed the Committee that the reporters of all of the committees are going to get together in January to look at anachronisms and inconsistencies throughout the rules and committee notes. One topic of discussion will be the proper procedure for amending the committee notes where appropriate. The Reporter will report back on the results of the reporters' meeting at the next Committee meeting.

8. Circuit Splits--John Kobayashi suggested that it would be a useful long-term project for the Committee to investigate evidentiary issues on which the circuit courts are split. The Reporter agreed to prepare a memorandum on circuit splits for the next meeting.

9. Statutes Bearing on Admissibility of Evidence--The Committee agreed with Dean Robinson's suggestion that the Committee would perform a valuable service by incorporating by reference, in the Federal Rules, all of the many specific statutory provisions outside the Rules which regulate the admissibility of evidence proffered in federal court. The Reporter agreed to conduct a survey of all provisions outside the Rules which affect admissibility, and to report back to the Committee before the next meeting.

10. Automation--John Kobayashi suggested, as a long-term project, that the Committee investigate whether the Evidence Rules should be amended to accomodate changes in automation. The issues are not limited solely to a definition of what constitutes a writing. For example, another issue is: how does one authenticate an electronically produced document? How do the litigants and the court deal with materials presented in interactive form? It was also noted that it would be helpful for trial counsel to have some certainty as to what the judges will do with modern visual evidence--when and whether the judge will reach a determination. Mr. Kobayashi agreed to prepare a memorandum on these issues for the next meeting.

The following issues were discussed, and the Committee decided not to proceed on them at this time:

1. Rule 201: Rule 201(g) makes no reference to whether a criminal defendant should or must be permitted a conclusive fact against the government. Also, the Rule in general makes no attempt to delineate the distinction between legislative and adjudicative fact. The Committee decided, however, that the Rule was not presenting a problem for courts or counsel.

2. Rule 301--Professor Broun noted that Rule 301 applies to evidentiary presumptions but doesn't apply to substantive presumptions, and that it could be useful to develop a definitional hierarchy as to what effect a given presumption would have. The Committee was of the opinion that this would be a massive project with uncertain results. It was noted that the Uniform Rules Committee is investigating whether a rule of evidence can be fashioned to provide a definitional context for all presumptions. The Committee decided to review the Uniform Rules proposal on presumptions when it is completed, and to determine at that point whether such a project should be undertaken.

3. Rule 404b--Frederic Kay suggested that Rule 404(b) should be amended along the lines of the Uniform Rules proposal, so that uncharged misconduct could not be admitted unless the probative value substantially outweighs the prejudicial effect. While there was much sympathy for this position, the Committee unanimously agreed that the proposal would be rejected by Congress, and therefore decided not to pursue the suggestion at this time.

4. Privileges--The Chair noted that the Committee had never considered in detail whether to codify the federal law of privileges. Greg Joseph remarked that codification would be a problematic effort because, under the Enabling Act, any evidentiary rule on privilege must be affirmatively adopted by Congress. The Chair observed that in light of the Committee's recommendation against an amendment for the rape counselor privilege, it might be anomalous at this point to propose any amendment to the Rules with regard to privileges. Judge Stotler pointed out that questions about the scope of a privilege do create problems for the courts. For example, there is an issue of whether the state or federal law of privilege applies in actions brought under the Federal Tort Claims Act. The Committee decided not to attempt to codify the federal law of privileges at this time.

5. Rule 611(b)--Dean Robinson suggested that the Committee might consider whether the Rule should be amended so that the scope of cross-examination would not be limited by the subject matter of the direct. But the Committee decided not to proceed on this matter at this time.

6. Admissibility of Videotaped Expert Testimony--Dean Robinson suggested that the Committee might explore whether the Evidence Rules should be amended to provide for admissibility of videotaped expert testimony. Greg Joseph noted that a rule had been proposed to this effect by the Civil Rules Committee, but that the proposal had been withdrawn. John Kobayashi suggested that experts could be saved the inconvenience of testifying at trial through the method of videoconferencing, but questions were raised as to whether the trial judge would have jurisdiction over the witness in such circumstances. It was pointed out that Judge Pointer's plan in the breast implant litigation is for the videotaped testimony of the experts appointed by the court to be admissible in all breast implant trials. It was ultimately concluded that the Committee would continue to monitor the phenomenon of videotaped expert testimony, but that no action should be taken at this time.

7. Rule 803(8)(B)--The Rule does not on its face permit a law enforcement report favorable to the

criminal defendant to be admitted against the government. It was pointed out, however, that the courts had construed the rule to permit such reports to be admitted in favor of a criminal defendant, so the rule as applied was not posing any problems.

8. Rule 806--No mention is made in the Rule as to whether extrinsic evidence, which would be excluded under Rule 608(b) if offered against a testifying witness, would be admitted to impeach the character for veracity of a hearsay declarant. The Committee agreed, however, that this anomaly was not creating a problem in the courts.

9. Residual Exception--At the last meeting, the Reporter was asked to prepare reports on two aspects of the residual exception: 1. Whether there are conflicts in the cases regarding the notice requirement; and 2. Whether the residual exception has been improperly expanded to admit evidence of dubious reliability. The Reporter prepared a report on each of these issues, and sent them in advance of the meeting to the Committee members.

At the meeting, the Reporter summarized the conclusions of these reports. First, as to the notice requirement, there is some disagreement among the courts as to whether the requirement can be excused for good cause. Also, there is some dispute about whether the proponent must provide notice of a specific intent to invoke the residual exception. Finally, the Reporter pointed out that no consistent approach is taken to the notice requirements found scattered throughout the Evidence Rules.

As to the trustworthiness requirement, the Reporter noted that the disputed question of law was whether "near misses" (hearsay which misses one of the admissibility requirements of one of the categorical exceptions) can qualify as residual hearsay. Most courts have held that the term "not specifically covered" in the residual exception means "not admissible under" one of the other exceptions; thus most courts find near misses to potentially qualify as residual hearsay. As to whether evidence of dubious reliability is being admitted under the residual exception, the Reporter observed that this is largely a subjective question, dependent on one's view of the hearsay rule and its exceptions.

The Committee discussed the issues presented by the Reporter's memoranda. Judge Jerry Smith stated that the current residual exception is a useful tool for trial judges, since the other exceptions are not always well-conceived, and are sometimes underinclusive. John Kobayashi contended that it would be useful to impose a specific number of days before trial as a date for the pre-trial notice requirement. Roger Pauley argued that there was no reason to conform the notice requirements found throughout the Evidence Rules, contending that each Rule has a reason for a different approach as to notice.

Professor Broun stated his impression that the residual exception is being overused, and that it would be useful to give guidance, either by a more specific and stricter definition of trustworthiness, or by a specific exclusion of "near miss" hearsay. But he acknowledged that the question of overuse is to a large extent a normative question on which people can differ. The Chair expressed the opinion that the role of the Committee is not to reduce the discretion of trial judges, but to determine whether rules are unnecessarily ambiguous, incorrect, or are the subject of conflicting opinions among the circuits. Under this standard, there appeared to be no need at this time to amend the residual exception.

A vote was taken and two Committee members were in favor of proceeding and the rest of the members were opposed to proceeding on any amendment to the residual exception at this time.

10. Sentencing Proceedings--Some interest was expressed in extending the Federal Rules of Evidence to

sentencing proceedings, given the fact that Guidelines proceedings are so fact-driven. However, there was a general concern that the issue created policy conflicts beyond the scope of the Committee's jurisdiction--given the existence of a statute and a Sentencing Guideline which specifically provide for flexible admissibility, and given the historically broad discretion of the court to consider all information presented at the sentencing hearing. Therefore, the Committee decided not to proceed on this matter at this time.

## Criminal Forfeiture

Roger Pauley reported to the Committee, for information purposes only, on a Justice Department proposal to make criminal forfeiture part of the ancillary proceedings to a criminal trial, rather than a question for the jury. At this time, this proposal has no immediate impact on the Evidence Rules. Judge Stotler expressed the hope that eventually the patchwork of forfeiture provisions will be made into an integrated whole; but she noted that there are no current proposals to change the Federal Rules of Evidence in any way that would bear upon forfeiture proceedings.

## Liaison Reports

Judge Doty, the liaison to the Civil Rules Committee, reported on the discussion within that Committee of the proposed and withdrawn amendment to Federal Rule of Evidence 103. That Committee concluded that the Evidence Committee's former proposal would have created more problems than it solves.

Judge Dowd, the liaison to the Criminal Rules Committee, reported that the Committee was working on integrating forfeiture provisions. Also, the Committee is considering how Rule 11 guilty pleas were working in light of the Sentencing Guidelines. The Committee is trying to fashion a fair, streamlined procedure to permit defendants and lawyers to determine exactly how Guidelines will affect a plea. The Committee is also concerned about the growing insistence by the government that a defendant waive the right to appeal and to bring a collateral attack as a condition to entering into a plea; the Committee is considering whether to amend Rule 11 to prevent this kind of waiver. The Committee is also considering how to treat alternate jurors once the jury has retired. Judge Dowd noted that none of the described developments has any immediate impact on matters within the jurisdiction of the Evidence Rules Committee.

## Restylized Appellate Rules

Judge Stotler reported that the Appellate Rules have been restyled, so that they are more concise, consistent and clear. She noted that commentary on the changes has been very positive. Those Committee members familiar with the changes unanimously expressed the opinion that the modifications in style are a great improvement. Judge Stotler noted that there is no immediate plan to restyle the Federal Rules of Evidence.

## Evidence Project

The Chair informed the Committee that she had been contacted by Professor Rice of American University Law School, concerning a project that he has sponsored. This project proposes a total overhaul of the Federal Rules of Evidence. After discussion, the Committee determined that while it would monitor the progress of this project, it found no need for a full-scale revision of the Evidence Rules.

## Next Meeting

The Chair announced that the next meeting of the Committee would take place on April 14th and 15th in Washington, D.C.

Respectfully submitted,

Daniel J. Capra

Reed Professor of Law

Reporter

APPENDIX C ADVISORY COMMITTEE ON EVIDENCE RULES

Minutes of the Meeting of April 14-15, 1997

Washington, D.C.

The Advisory Committee on the Federal Rules of Evidence met on April 14th and 15th in the Judicial Conference Center of the Thurgood Marshall Building in Washington, D.C.

The following members of the Committee were present:

Hon. Fern M. Smith, Chair

Hon. Milton I. Shadur

Hon. Jerry E. Smith

Hon. James T. Turner

Professor Kenneth S. Broun

Mary F. Harkenrider, Esq.

Gregory P. Joseph, Esq.

Frederic F. Kay, Esq.

John M. Kobayashi, Esq.

Dean James K. Robinson

Professor Daniel J. Capra, Reporter

Hon. David C. Norton and Hon. Ann K. Covington were unable to attend.

Also present were:

Hon. David S. Doty, Liaison to the Civil Rules Committee

Hon. David D. Dowd, Liaison to the Criminal Rules Committee

Professor Daniel R. Coquillette, Reporter, Standing Committee on Rules of Practice and Procedure

Professor Stephen A. Saltzburg, ABA representative

Professor Leo Whinery, Reporter, Uniform Rules of Evidence Committee

Roger Pauley, Esq., Justice Department

Joe Cecil, Esq., Federal Judicial Center

Joseph F. Spaniol, Jr., Esq., Federal Judicial Center

Peter G. McCabe, Esq., Secretary, Committee on Rules of Practice and Procedure

John K. Rabiej, Esq., Chief, Rules Committee Support Office

Mark Shapiro, Esq., Rules Committee Support Office

## Opening Business

The Chair opened the meeting by asking for approval of the minutes of the November, 1996 meeting. Those minutes were unanimously approved. The Chair reported on the Standing Committee meeting of January, 1997, in which the proposal of the Evidence Rules Committee to recommend against the codification of a rape counsellor privilege was considered. This recommendation was unanimously approved by the Standing Committee and ultimately approved by the Judicial Conference.

## Omnibus Crime Bill

The Committee considered provisions in the Omnibus Crime Bill of 1997 that would amend Federal Rule of Evidence 404 in two respects: 1. Rule 404(a)(1) would be amended to provide that if the defendant

proves a pertinent character trait of the victim, the prosecution can prove a pertinent character trait of the defendant; 2. Rule 404(b) would be amended to add "disposition toward another" to the list of permissible purposes for evidence of uncharged misconduct.

Preliminary discussion was had on the merits of these two proposals. Most members of the Committee agreed conceptually with a rule permitting the prosecution to introduce evidence of the defendant's character, once the defendant introduces evidence of the victim's character. By bringing in character evidence, the defendant has admitted that character is relevant to the case; therefore it makes sense that his own pertinent character traits should be admissible. A minority of the Committee, however, viewed the Congressional proposal as being a misapplication of the "opening the door principle." Concern was also expressed that the provision might be read to permit evidence attacking the defendant's credibility whenever the defendant attacked the victim's credibility.

As to the proposal to amend Rule 404(b), most members of the Committee believed that it is unnecessary to amend the Rule to include "disposition toward another" as a permissible purpose. The list of permissible purposes in the Rule is not intended, nor has it been read, to be exclusive. Adding another purpose to the Rule might create the misimpression that uncharged misconduct evidence could not be admitted unless offered for a purpose specified in the Rule. Further, evidence of disposition toward another would virtually always be admissible to prove intent, identity, or some other not-for-character purpose--therefore no change to the Rule is necessary.

The Committee agreed upon language to be recommended as part of a letter from the Standing Committee to Congress commenting on the Omnibus Crime Control Act. In this language, the Committee states that it has preliminarily reviewed the proposed changes to Rule 404, and that it would appreciate the opportunity to consider them further at the next Committee meeting; it asked that the Congressional proposal be delayed until the Committee has a chance to consider the matter more fully. The Committee agreed to place the substance of the proposed amendments on the agenda for its October, 1997 meeting, with a view to determining whether Rule 404 should be amended, through the rulemaking process, along the lines suggested by the Omnibus Crime Bill proposal. The Reporter was directed to survey the case law on "disposition toward another" evidence, to determine whether there are any cases in which such evidence was erroneously excluded.

Rule 103

At the November, 1996 Committee meeting, a subcommittee was directed to prepare a draft for a new Rule 103(e) to govern in limine practice. The subcommittee agreed upon a draft based on Kentucky Rule 103. The draft covered pretrial rulings on admissibility, and provided that objection to a final, on-the-record pretrial ruling was sufficient to preserve error. It also codified Luce v. United States, and its progeny. Luce held that a defendant must testify at trial to preserve an in limine objection to prior convictions offered to impeach the defendant. The Luce rule has been extended to other situations in which an advance ruling is conditioned on an occurrence at trial, e.g., the bringing of a defense or the elicitation of certain testimony.

A long discussion ensued on the draft. The following points were made, and the draft changed in response to those points:

1. The rule should deal not only with pretrial motions, but also with motions made at trial in advance of the evidence being offered.

2. The rule should not state that a party "may move" for an in limine hearing, since there are some circumstances (e.g., Criminal Rule 12) in which a party must move for an advance ruling to preserve an objection.

3. The rule should not take a position on whether error is preserved when evidence is brought out at trial by the objecting party. The Commentary should state explicitly that while taking the stand is necessary to preserve error under Luce, it is not always sufficient.

Committee members also discussed whether it was appropriate to codify Luce and its progeny. There was general agreement that Luce, and the cases extending it, were sound. It was also agreed, however, that the Luce principles should be limited to criminal cases.

Several suggestions for stylistic changes were addressed, and most of them were incorporated into the Rule. The Committee specifically considered the suggested changes from the Style Subcommittee of the Standing Committee. These comments were very helpful, and were adopted unless they resulted in substantive change or were inconsistent with other language used throughout the Evidence Rules.

A motion was made to submit the Rule as amended, and the Advisory Committee comment as amended, to the Standing Committee, with the recommendation that the Rule be published for public comment. The motion passed by a unanimous vote. The approved draft and Advisory Committee Comment are attached to these minutes.

Rule 615

At the request of the Committee, the Reporter submitted a draft of a revised Evidence Rule 615, along with a proposed Advisory Committee Comment. The purpose of the draft was to incorporate two recent legislative developments with respect to victim's rights: 1. the Victim of Crime Bill of Rights, under which a crime victim cannot be excluded from the trial unless his or her testimony would be materially affected by other evidence presented at the trial; 2. the Victim's Rights Clarification Act of 1997, which

provides that a victim cannot be excluded from trial on the ground that he or she would testify at a sentencing hearing.

During discussion on the Reporter's draft, some stylistic suggestions were made and adopted, including those suggested by the Style Subcommittee of the Standing Committee on the new language proposed in the Rule. The Committee decided unanimously, however, that no change should be made, stylistic or otherwise, to the existing language in the Rule. It was agreed that any amendment should only be for the purpose of adding language to make the Rule consistent with the recent legislation.

A suggestion was made that the definition of "victim", which the draft Rule incorporates by reference from the Victim's Bill of Rights, should be set forth specifically in the Comment. This proposal was approved by all Committee members.

A proposal was made to add language to the Comment to specify that the sequestration provided for in the Rule concerns courtroom exclusion only, and was not intended to limit the inherent authority of the Trial Judge to impose more stringent requirements on witnesses. It was agreed, however, that the proposed amendment should only address the statutory developments--the rule was not causing problems sufficient to warrant a broader review.

A motion was made to submit the Rule as amended, and the Advisory Committee comment as amended, to the Standing Committee, with the recommendation that the Rule be published for public comment. The motion passed by a unanimous vote. The approved draft and Advisory Committee Comment are attached to these minutes.

Rule 706

At the November, 1996 Committee meeting, the Reporter was instructed to review the case law and commentary under Rule 706 to provide some guidance as to whether that Rule should be amended. With the assistance of Joe Cecil of the Federal Judicial Center, the Reporter prepared a report on several issues that have arisen under the Rule. These issues include: 1) problems of funding in civil cases; 2) difficulties in selecting experts; 3) concerns about ex parte communications and depositions; 4) how to distinguish, if necessary, between the roles of court-appointed witness, special master, and technical adviser; and 5) whether the court-appointed status of the expert should be disclosed to the jury.

After reviewing these issues, the Reporter recommended in a written memorandum that consideration of any amendment to Rule 706 be deferred. Problems existing under Rule 706 do not appear so prevalent as to warrant an amendment at this time. The Chair noted that the Committee on Court Administration and Case Management is overseeing a pilot project on court-appointed experts; Judge Pointer's multidistrict litigation involving breast implant cases has been designated as the pilot project. The Chair suggested, and the Committee agreed, that any consideration of an amendment to Rule 706 should be deferred at least until CACM reported on the pilot project.

The Reporter agreed to keep the Committee updated on any new cases arising under Rule 706, and noted that Joe Cecil of the Federal Judicial Center continues to monitor Rule 706 developments in the context of broader empirical research on expert testimony. John Kobayashi agreed to act as a liaison between the Evidence Rules Committee and CACM.

## Rules 404(b) and 609--Procedural Aspects

At the November, 1996 meeting, the Reporter was instructed to prepare a draft of proposed amendments adding procedural requirements to Rules 404(b) and 609. The Reporter prepared a draft of these Rules, based on proposals made by the ABA, the Uniform Rules Drafting Committee, and other sources. The Committee discussed these proposals extensively. Most Committee members were of the view that it was unnecessary to add procedural requirements--such as a hearing requirement, on-the-record balancing, articulation of balancing factors, etc.--to two Rules that were already working well under an extensively developed case law. There was also concern that the failure to follow codified procedural requirements might lead to unnecessary reversals.

The Chair pointed out that the Committee should be reluctant to propose an amendment to a Rule unless that Rule was clearly not working or, as in the case of Rule 615, an amendment was necessary to bring a Rule into line with legislative changes.

All but two members of the Committee were against proceeding at this time on an amendment to Rule 404(b) to include procedural provisions. All members were against proceeding with procedural amendments to Rule 609 at this time.

## Rule 703

At the November, 1996 meeting, the Reporter was instructed to review the case law and commentary under Rule 703, and to report on whether that Rule was being used as a "back-door" hearsay exception. The Reporter's responsive memorandum concluded that there were some cases in which hearsay had been offered as the basis of an expert's opinion, but without a limiting instruction. The Reporter reviewed some other versions of Rule 703 in the states and in the academic commentary, and provided a working draft for the Committee. The draft set forth a balancing approach, applying the principles of Rule 403.

Several members of the Committee found merit in the approach taken by the draft. They believed that the draft would provide trial judges with important guidance, and that without this guidance, Rule 703 would be used as a blank check to admit all kinds of hearsay. Others thought that the amendment would create

problems by forcing parties to call witnesses to provide a foundation for records that formed the basis of an expert's opinion. The response to that concern was that the Rule only prohibited the disclosure of hearsay information when its probative value in explaining the basis of an expert's opinion was substantially outweighed by the risk that the hearsay would be used for its truth. The Rule would not require all records used by an expert to be established through foundation testimony. Other members contended that all aspects of the amendment could be found in other rules; therefore there was no need to amend Rule 703.

The Chair suggested that given the fact that there was dispute within the Committee on the merits of any amendment to Rule 703; that the Committee must respond to legislative initiatives on Rule 702, presenting issues potentially related to those in Rule 703; and that the Committee had already proposed two amendments to be submitted for public comment, the matter should be taken under advisement and reconsidered at the next meeting. All members of the Committee agreed with this suggestion. A new working draft of Rule 703 will be prepared by the Reporter for the next meeting, taking account of the suggestions for stylistic change made by the Committee during discussion and by the Style Subcommittee of the Standing Committee.

Rule 803(6)

At the November, 1996 meeting, the Reporter was instructed to prepare a draft amendment that would permit the foundation requirements under the business records exception to be established through certification. The Reporter reviewed some state versions permitting proof of business records through certification, and also considered 18 U.S.C. § 3505, which permits the certification of foreign business records in criminal cases. The reporter prepared a draft of Rule 803(6) that would permit proof of business records through certification, as well as two draft amendments to Rule 902 (one for domestic records and one for foreign records), which would be necessary to solve the authentication problem for records that are not introduced through a live witness.

A preliminary vote was taken and six members of the Committee were in favor of the concept of self-authentication of business records, while two were opposed. Discussion ensued on the drafts. Those in favor of the proposal contended that self-authentication will avoid the wasteful process of presenting a qualified witness to give essentially conclusory and perfunctory testimony. Members also noted that the trend in the states is toward permitting certification. Others noted the anomaly under current law--that foreign business records can be proved through certification in criminal cases, whereas domestic business records cannot be proved through certification in any case.

The Committee members opposed to the proposal were concerned that permitting proof of business records through certification would shift the burden of proof on admissibility from the proponent to the opponent. The response to these concerns was that the protections included in the draft would provide the proponent with more of a real opportunity to attack the trustworthiness of a proffered record than exists under the current law.

At the suggestion of the Chair, a subcommittee was appointed to consider whether language could be added to the draft, which would require foundation through a qualified witness where a legitimate question is raised as to the trustworthiness or authenticity of the record. The Subcommittee members are Greg Joseph, Jim Robinson, Mary Harkenrider, and the Reporter. The proposal of the Subcommittee will be considered at the next Committee meeting.

## Amending or Updating the Advisory Committee Notes

The general question of whether Advisory Committee notes can be amended without amending the Rules was raised by several Committee members. There were two possibilities for amendments raised: 1) to amend the original Advisory Notes in the few instances in which they were clearly wrong as written and in the more frequent instances in which the Advisory Committee Draft was substantially changed by Congress; and 2) to add a set of updated Advisory Committee Notes to take account of intervening practice and case law. After some discussion, the latter alternative was rejected by the Committee on the ground that it would constitute a massive project with uncertain results. Discussion thereafter focussed on how and whether the Committee could correct the original Advisory Committee Notes to the extent they were clearly wrong as written or rendered confusing or irrelevant due to Congressional changes in the Advisory Committee Draft.

It was noted that it would be problematic to actually amend the original Advisory Committee Notes, because the Notes were part of a congressional enactment. Moreover, the Notes, even if commenting on a version of the Rule different from that actually promulgated, are important legislative history. The Reporter to the Standing Committee commented that the Standing Committee is reluctant to treat the Advisory Committee Notes as anything other than legislative history. Committee members also pointed out that the authority of the Advisory Committee comes from the Enabling Act process--so there is no way to act outside it; the statute states that the Rules are to be accompanied with an explanatory note.

Another possibility considered was whether the Reporter should contact all of the publishers of the Federal Rules of Evidence, and provide them with a list, approved by the Committee, of short editorial comments to be placed in those Advisory Committee Notes that are outmoded by legislation or clearly wrong as written. Some publishers might not agree to include these provisions, however. Another possibility discussed was to revive the Federal Judicial Center comments, which state how and whether an Advisory Committee draft was changed by Congress. Again, it is not certain that publishers would agree to include the FJC notes.

After lengthy discussion, a motion was made that the Reporter prepare a list of statements in the original Advisory Committee Notes that are either wrong as written, or that comment on a draft that was materially changed by Congress; and further that the Committee consult the Standing Committee for guidance as to the appropriate course for alerting lawyers and judges about these outmoded and/or inaccurate provisions. This motion was approved with one dissent.

Effect of Automation

John Kobayashi was asked at the November, 1996 meeting to prepare a report on whether the Federal Rules should be amended to take account of technological developments in presenting evidence. He reported at the April meeting that the problems are complex, and he was not at this point sure that a rule could be drafted to cover all potential developments. He noted that the new Maryland rule on computer-generated evidence, which had been distributed to the Committee, was really a rule of procedure, and could not be used as a model for any evidentiary change.

Some members of the Committee suggested amending the definition of "writings and recordings" in Evidence Rule 1001 to make it applicable throughout the Rules, rather than simply to Article 10. It would be critical, however, to make certain that the term "writings and recordings" is used consistently throughout the Rules.

It was resolved that John Kobayashi would submit a written report on whether and how the Rules should be amended to accommodate technological changes; this Report should consider the possibility of simply applying the Rule 1001 definition to all the Rules.

Circuit Splits

The Committee asked the Reporter to keep it apprised of circuit splits over the interpretation of any Federal Rule of Evidence. The Reporter submitted a memorandum of three circuit splits bearing on evidence that had recently been discussed in circuit court opinions. None of these splits, however, dealt directly with a construction of a Federal Rule of Evidence. One of the splits--over the standard of review for a district court's exclusion of evidence under Daubert--is now before the Supreme Court in Joiner. It was generally agreed that none of the circuit splits set forth in the memorandum warranted an amendment to any Federal Rule of Evidence at this point.

The Reporter apprised the Committee that a number of recent cases indicated a split in the circuits over the interpretation of Evidence Rule 106. Some courts have held that Rule 106 does not allow the admission of hearsay statements, even if that statement would correct a misimpression arising from the introduction of only part of a record. Other courts have said that hearsay can be introduced insofar as necessary to correct such a misimpression. The Reporter agreed to submit a memorandum on this matter

for consideration by the Committee at the next meeting.

## Statutes Affecting Admissibility

At the November, 1996 meeting, the Reporter was asked to collect the Federal statutes that bear on admissibility of evidence in Federal courts. It was thought that it could be useful to amend the Federal Rules to incorporate these statutes by reference. The Reporter found over 100 statutes that affected the admissibility of evidence in Federal courts, and was not confident that he had found all such statutes. The Committee unanimously agreed that it would not be practical to amend the Rules to incorporate by reference all the statutes that might affect admissibility in the Federal courts, now and in the future.

## Proposed Congressional Amendment to Evidence Rule 702

Congress is considering proposals to amend Evidence Rule 702, purportedly to codify the Daubert framework for assessing expert testimony. These proposals were distributed to the Committee and discussed at the meeting. There was general agreement that the proposals--particularly the Senate proposal--imposed such strict requirements that all parties, including the prosecution, could be severely hampered in introducing expert testimony. Expert testimony routinely admitted under current law--such as fingerprint identification and handwriting identification--could possibly be excluded under the Congressional proposals. It was supposed that this was not the intent of the drafters. The conclusion of the Committee was that neither the House nor the Senate provisions accurately codified Daubert, and that neither took account of the large body of post-Daubert case law.

The congressional proposals also seek to expand the Daubert framework beyond scientific expert testimony. While taking no position on the merits of this extention, the Committee unanimously agreed that the congressional proposals would create confusion as to how to delineate between scientific and technical evidence on the one hand, and between technical and non-technical evidence on the other.

Several members noted that Federal Judges and lawyers are expecting the Evidence Rules Committee to deal with the Daubert problem, and that it was no longer appropriate, especially in light of Congressional attempts to amend Rule 702, to continue to take a wait and see attitude. The Reporter was directed, by unanimous vote, to prepare a number of alternative draft proposals for an amendment to address the issues created by Daubert and its progeny. These alternatives will be considered by the Committee at its next meeting. The Committee also voted unanimously to submit its comments on the proposed legislation to the Standing Committee for possible referral to Congress. The Committee unanimously agreed that it was not, at this point, deciding that Rule 702 should actually be amended.

## Forfeiture

Judge Dowd reported that the Criminal Rules Committee had approved an amendment to Criminal Rule 32, providing for comprehensive treatment of forfeiture proceedings. Roger Pauley reported on legislation that would treat forfeiture proceedings as part of sentencing rather than as part of trial, to accord with the Supreme Court's analysis in the recent case of Libretti v. United States. The import of both of these developments is that forfeiture proceedings would not be governed by the Federal Rules of Evidence. At its last meeting, the Evidence Rules Committee discussed the advisability of amending the Federal Rules of Evidence to make them applicable to sentencing proceedings, and decided not to propose such an amendment. No suggestion was made at the April meeting to revisit this decision.

## Uniform Rules of Evidence

Professor Leo Whinery, the Reporter for the Uniform Rules of Evidence drafting committee, reported on developments in the drafting process. The drafting committee has now reviewed Tentative Draft #2 of Articles 1-6, and Tentative Draft #1 of Article 8. Professor Whinery noted that Article 3 of the committee's proposal takes a definitional approach to presumptions, distinguishing between substantive and procedural presumptions. He stated that consideration was being given to placing the Luce rule in Rule 609; but based on the Evidence Rules Committee's proposal, the Uniform Rules Committee would give thought to whether the Luce principle should be applied more broadly and therefore placed in Rule 103. Professor Whinery noted that the Reporters of the Uniform Rules Committee and the Evidence Rules Committee had established a cooperative relationship, and would continue to confer with and assist each other in the future.

## Committee Business

The Chair noted with regret that the terms of John Kobayashi and Judge Jerry Smith expire in October, 1997. She thanked them for all their hard work and assistance to the Committee, and invited them to attend the next Committee meeting.

Next Meeting

The Chair announced that the next meeting of the Committee would take place on October 20th and 21st, in Charleston.

Respectfully submitted,

Daniel J. Capra

Reed Professor of Law

Reporter

**APPENDIX D**                    Advisory Committee on Evidence Rules

Minutes of the Meeting of April 6-7, 1998

New York, N.Y.

The Advisory Committee on the Federal Rules of Evidence met on April 6th and 7th at Fordham Law School in New York City.

The following members of the Committee were present:

Hon. Fern M. Smith, Chair

Hon. David C. Norton

Hon. Milton I. Shadur

Hon. Jerry E. Smith

Hon. James T. Turner

Professor Kenneth S. Broun

Mary F. Harkenrider, Esq.

Gregory P. Joseph, Esq.

Frederic F. Kay, Esq.

John M. Kobayashi, Esq.

Dean James K. Robinson

Professor Daniel J. Capra, Reporter

Also present were:

Hon. Frank W. Bullock, Jr., Liaison to the Standing Committee on

Rules of Practice and Procedure

Hon. David S. Doty, Liaison to the Civil Rules Committee

Hon. David D. Dowd, Liaison to the Criminal Rules Committee

Professor Daniel R. Coquillette, Reporter, Standing Committee on

Rules of Practice and Procedure

Professor Leo Whinery, Reporter, Uniform Rules of Evidence

Drafting Committee

Roger Pauley, Esq., Justice Department

Sol Schreiber, Esq. Member, Standing Committee on Rules of Practice and Procedure

Peter G. McCabe, Esq. Secretary, Standing Committee on Rules of Practice and Procedure

John K. Rabiej, Esq., Chief, Rules Committee Support Office

Joe Cecil, Esq., Federal Judicial Center

Al Cortese, Esq., Product Liability Advisory Council

## Opening Business

The Chair opened the meeting by asking for approval of the minutes of the October, 1997 meeting. These minutes were unanimously approved. The Chair noted with regret that Judge Shadur and Dean Robinson will be leaving the Committee. She thanked them for all their excellent service, and expressed her wish that they would attend the October, 1998 meeting.

The Chair then reported on actions taken at the January, 1998 Standing Committee meeting. The Standing Committee approved all of the Evidence Rules Committee's proposed amendments to be

released for public comment. The proposed amendments are to Rules 103, 404(a), 803(6), and 902. The proposed amendments will be released for public comment on or about August 15, 1998.

Rule 702

Judge Shadur presented the report of the Daubert subcommittee, which was charged with the task of drafting proposed amendments to the rules on experts in light of the Supreme Court's decision in Daubert. Judge Shadur noted the basic premises from which the subcommittee began:

1. Any change in the rules should constitute a minimal departure from the existing language in the rules. Otherwise courts and litigants might think there is more change in the rule than there really is, and important precedent construing well-established language might be lost.

2. The trial court's gatekeeping function should apply to all expert testimony, not only scientific expert testimony.

3. Testimony that is functionally expert testimony should not be admitted under the more permissive standards of lay testimony under Rule 701.

4. Rule 703, which permits an expert to rely on inadmissible information, should not be used as a "backdoor" means of admitting otherwise inadmissible evidence.

Judge Shadur reviewed the subcommittee proposal for Rule 702. The proposal requires a determination of reliability at three distinct points. First, the opinion must be based on sufficient and reliable information. Second, the expert must employ reliable principles and methodology. Third, the expert must apply the principles and methodology reliably to the facts of the case.

Substantial discussion ensued on a number of possible modifications to the proposal. Among the possibilities discussed were:

1. Collapsing the three separate reliability requirements into one or two standards.

2. Changing the reference in the rule from "methodology" to "methods" and clarifying that the Rule is to apply to all expert testimony, including that of law enforcement agents in criminal cases.

3. Changing the reference from "principles and methodology" to "principles or methodology."

The Committee also considered the suggestions of the style subcommittee of the Standing Committee. The style subcommittee version collapsed the three separate reliability requirements into two, and the discussion among Committee members was that it was better to emphasize the three separate requirements of basis, principles/methodology, and application. Also, the style subcommittee version rewrote the entire rule, and the Committee was of the opinion that the existing language of the rule should be maintained to the extent possible.

Finally, the Committee reconsidered whether Rule 702 needed to be amended at all, and whether the subcommittee's version was an improvement on the existing rule. There was general agreement that Rule 702 needs to be amended, in light of the conflict in the courts over the meaning and application of Daubert, and particularly in light of congressional attempts to amend Rule 702 with problematic language.

A motion was made to adopt the subcommittee's proposed amendment of Rule 702, as amended in the course of Committee discussion, and to recommend to the Standing Committee that the proposal be issued for public comment. This motion was approved with nine in favor and one dissent.

The Committee then turned to the draft Advisory Committee Note to Rule 702. Several stylistic

suggestions were made and adopted, and language was included to clarify that the phrase "principles and methods" was not intended to preclude the testimony of law enforcement agents in criminal cases. Further language was added to clarify that the reference in the rule to "facts or data" is intended to permit an expert to rely on opinions of other experts.

A motion was made to adopt the Advisory Committee Note to Rule 702 as amended. This motion was unanimously approved.

A copy of the proposed amendment to Rule 702, and the proposed Advisory Committee Note to Rule 702, is attached to these minutes.

Rule 701

Judge Shadur presented the proposal of the Daubert subcommittee, which would preclude the use of Rule 701 if the witness' testimony relies on "scientific, technical or other specialized knowledge". The proposed language is intended to track that of Rule 702. The goal of the amendment is to channel all expert testimony into Rule 702, thus preventing a party from evading the expert witness disclosure and reliability requirements through the artifice of proffering an expert as a lay witness.

Members of the Justice Department opposed the proposal. They suggested that the term "specialized knowledge" is vague, and that many reversals will occur when trial courts characterize testimony as not based on specialized knowledge when in fact it is. They also questioned whether Rule 702 should apply when the witness, who is testifying to what a lay witness could testify to, is in fact an expert. For example, what if a family friend, who gives an opinion on the competence of an individual, happens to be a psychiatrist?

Several members of the Committee responded to these concerns. They observed that the proposal does not distinguish between types of witnesses but rather between types of testimony. Thus, a family friend who is a psychiatrist need not be qualified as an expert in giving lay opinion testimony as to the competence of a friend. If, however, the proponent emphasizes the witness' specialized training or expertise, then it is only fair that the proponent should qualify the witness as an expert. Committee members pointed out that the proposed amendment will not have a substantial effect on trial practice. A proponent who wants to rely on a witness' expertise would need to establish a foundation even if Rule 701 were not amended.

Concern was also expressed that under the amendment, witnesses would often be precluded from testifying because of a party's failure to comply with the disclosure obligations of Civil Rule 26. The response was that if a witness is not specially retained as an expert, Rule 26 poses no extra discovery obligations; and if the witness is specially retained to give what is tantamount to expert testimony, then it is inappropriate to evade the Rule 26 disclosure requirements by proffering the witness under Rule 701. It was also observed that the rule change would actually benefit lawyers, by requiring them to determine in advance whether a witness would qualify as an expert.

One member suggested, as an alternative, that a gatekeeping function, similar to that of Rule 702, be placed in Rule 701. But it was observed that this would not be an improvement on the proposal. A gatekeeping function could not apply readily to most witness testimony that is truly lay testimony--e.g., "the car was speeding." This means that a distinction would have to be made between prototypical lay witness testimony and testimony based on scientific, technical or other specialized knowledge. Thus the same problem of distinguishing between lay and expert testimony will arise if a gatekeeping function were placed in Rule 701. Moreover, the subcommittee's proposed amendment to Rule 701 has two purposes--to assure that all witness testimony based on specialized knowledge is reliable, and to assure that all such testimony is subject to the disclosure obligations applicable to experts under Civil Rule 26 and Criminal Rule 16. Importing a gatekeeping function into Rule 701 might effectuate the former goal, but it would do nothing to effectuate the latter, because the disclosure rules cover only testimony that is offered under Evidence Rule 702.

The Committee considered the proposal of the Standing Committee's Subcommittee on Style. This proposal approved the language added by the Daubert Subcommittee, but restructured the existing rule. Committee members generally agreed that it would be better to preserve the existing language, and substantial precedent thereunder, to the extent possible.

A motion was made to adopt the Daubert Subcommittee proposal to amend Rule 701, and to recommend to the Standing Committee that the proposal be issued for public comment. Eight members voted in favor, one against, and one abstained.

The Committee moved on to the proposed Advisory Committee Note to an amended Rule 701. The Note emphasizes that the amendment does not distinguish between expert and lay witnesses, but rather between expert and lay testimony. It specifies that any part of a witness' testimony based on scientific, technical or specialized knowledge is subject to the reliability requirements of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules. At the suggestion of some Committee members, a paragraph was added to the Note to indicate that the term "specialized

knowledge" is taken from and intended to have the same meaning as the identical phrase in Rule 702. The added language also clarifies that the amendment is not intended to effect prototypical lay witness testimony, such as opinions concerning sound, size, distance, etc.

A motion was made to adopt the Advisory Committee Note to Rule 701, as amended. Eight members voted in favor, one against, and one abstained.

A copy of the proposed amendment to Rule 701, and the proposed Advisory Committee Note, is attached to these minutes.

Rule 703

Judge Shadur presented the proposal of the subcommittee to amend Rule 703. The amendment would, in certain circumstances, prevent the disclosure to the jury of inadmissible information relied on by an expert in reaching an opinion. Judge Shadur observed that the goal of the proposed amendment is to prevent the use of Rule 703 as a backdoor means of admitting otherwise inadmissible evidence. However, Judge Shadur and many other members expressed concern with the subcommittee's invocation of Rule 403 as the means to keep out otherwise inadmissible evidence. There was general agreement that the Rule 403 test, which presumes admissibility, would not be protective enough. Therefore, Committee members suggested that the subcommittee's proposal be changed to provide that otherwise inadmissible information relied upon by an expert can only be disclosed to the jury if the probative value of the information substantially outweighed its prejudicial effect.

Concern was expressed that a simple reference to probative value and prejudicial effect would be too vague, and that the rule should specify how the otherwise inadmissible information could be probative and how it could be prejudicial. Several Committee members responded to this criticism by noting that there is no such specification in any other Evidence Rule that provides for a balancing of probative value and prejudicial effect. Moreover, the Committee Note sets out the relevant factors.

One Committee member suggested that it might be problematic to refer specifically to the jury in the Rule, because the Evidence Rules are generally applicable to both judge and jury trials. Other Committee members responded, however, that Rule 403 itself specifically mentions the risk of misleading the jury,

and that the very point of the amendment to Rule 703 is to prevent a proponent from using the Rule as a backdoor means of getting otherwise inadmissible information before the jury. No such concern arises in a bench trial.

The Committee considered whether the proposed language, as amended, would be better placed in Rule 705, which specifically deals with disclosure of an expert's basis of information. But it was generally agreed that the problem of disclosure of otherwise inadmissible information to the jury has been treated under Rule 703, and therefore that amending Rule 705 rather than Rule 703 would cause confusion.

Committee members generally agreed that the Rule should make clear that the limitation on admitting evidence under Rule 703 should apply only to the proponent of the expert. The adversary should be free to permit the jury to consider any aspect of an expert's basis. The subcommittee proposal was therefore modified to clarify that the limitations in the Rule applied only when the proponent of the expert offered otherwise inadmissible information relied upon by that expert.

Finally, the Committee considered the suggestions of the Standing Committee's Subcommittee on Style. The Committee again decided against any attempt to change or restructure the existing language in the rule.

A motion was made to adopt the Daubert Subcommittee's proposal to amend Rule 703, as modified, and to recommend to the Standing Committee that the Rule be issued for public comment. Eight members voted in favor and two dissented.

The Committee then discussed the proposed Advisory Committee Note to Rule 703. It was suggested that a paragraph be added to the Note to clarify that the reference in the Rule to the "proponent" would apply in multiparty cases to all parties similarly situated to the party who actually calls the expert. A motion was made to adopt the Committee Note, as modified. The motion was unanimously approved.

## Attorney Conduct Rules

The Chair noted that the Civil Rules Committee at its recent meeting recommended that an ad hoc committee, made up of two representatives from each of the advisory committees, be formed to consider the proposed Federal Rules of Attorney Conduct. The Evidence Rules Committee unanimously agreed with the recommendation of the Civil Rules Committee. The Chair appointed Judge Jerry Smith and the

Reporter to serve as representatives to the ad hoc committee.

A short discussion ensued on some of the issues that the ad hoc committee would have to work through. Several Committee members expressed concern about the current version of proposed Rule 10, which permits the government to contact represented parties in certain circumstances. These members were of the opinion that the current version of Rule 10 was too permissive and would permit government overreaching. Professor Coquillette, the Reporter to the Standing Committee, noted that the Attorney Conduct Rules are still a work in progress, and whether or not Rule 10 is adopted, the rulemaking project will have a salutary effect in that it will bring some type of uniformity (whether horizontal or vertical) to the rules of professional responsibility in the federal courts. Professor Coquillette expressed support for an ad hoc committee, noting that significant thought must given to whether the proposed Rules should be adopted and whether they need modification. This work is better done by an ad hoc committee than by each of the Advisory Committees as a whole. Professor Coquillette noted that the Criminal Rules Committee has also agreed with the ad hoc committee approach.

Professor Coquillette expressed his thanks to the Evidence Rules Committee for the substantial work that it has already done on the Attorney Conduct Rules. The Evidence Rules Committee has provided a detailed list of suggestions as to how the proposed Attorney Conduct Rules and commentary can be improved, and these suggestions have been incorporated into the latest working draft of the Rules.

## Uniform Rules

Professor Whinery, the Reporter for the Uniform Rules of Evidence Drafting Committee, reported on developments in the Uniform Rules project. The first reading of the working draft will be made this summer at the national meeting of the Uniform Laws Commissioners. The Uniform Rules Committee has generally followed the Federal Rules of Evidence, but Professor Whinery noted that there are some marked differences. For example, Proposed Uniform Rule 702 establishes a presumption of admissibility for expert testimony that passes the Frye test, and a presumption of inadmissibility for expert testimony that does not. Then the Rule provides a number of factors that would be relevant to overcoming the presumption one way or another. Also, the Uniform Rules have been amended throughout to update language that might not accommodate the presentation of evidence in electronic form.

## Parent-Child Privileges

The Committee reviewed two bills pending in Congress concerning parent-child privileges. The Senate Bill would direct the Judicial Conference to advise Congress on whether the Federal Rules of Evidence should be amended to include some kind of parent-child privilege. The House Bill would directly amend Evidence Rule 501 to provide a partial privilege for confidential communications between parent and child, and to provide a privilege for a witness to refuse to give testimony against a parent or child.

The Chair expressed concern over what seems to be a piecemeal approach to privileges on the part of Congress. Instead of systematically reviewing the law of privileges, proposals to legislate new privileges seem to proceed on an ad hoc basis in response to newsworthy events. One Committee member noted that some prosecutions tried before him could not have been brought if a parent-child privilege had been in existence.

The Committee approved language that might be used in a letter to Congress in opposition to any kind of parent-child privilege. This language will be referred to the Chair of the Standing Committee, should it be considered appropriate to respond to either of these bills.

## Rule 801(d)(1)(B)

The Committee considered a proposal by Judge Bullock, the liaison to the Standing Committee, to amend Evidence Rule 801(d)(1)(B). In response to Judge Bullock's suggestion, the Reporter prepared a proposed amendment to the Rule that would provide a hearsay exemption for any prior consistent statement that would otherwise be admissible to rehabilitate a witness' credibility. In support of the proposal, Judge Bullock noted that the distinction between substantive and rehabilitative use of prior consistent statements is less than clear and is usually not grasped by jurors. Jurors can, however, assess credibility, so it arguably makes no sense to instruct the jury that a prior consistent statement can be used for credibility but not for its truth.

Committee members generally agreed with the proposal on the merits, but resolved unanimously not to propose an amendment at this time. The Supreme Court, in Tome v. United States, recently construed Rule 801(d)(1)(B), and members wished to avoid the perception that the proposed amendment was designed to overrule Tome. The Chair observed that the Uniform Rules draft codifies Tome, thus bringing the Uniform Rules in line with current federal law. Such salutary uniformity should not be disturbed unless the current rule has created substantial problems for courts and litigants. Under the current Rule, the worst thing that happens is that the jury receives an instruction that has little effect. The Reporter noted that the current Rule is not creating substantial problems in the federal courts. The Committee resolved to table the proposal, and directed the Reporter to monitor the post-Tome case law.

## Computerized Evidence

At the October, 1997 Evidence Rules Committee meeting, the Reporter was directed to report at the next meeting on whether the Evidence Rules need to be amended to accommodate technological advances in the presentation of evidence. For the April, 1998 meeting the Reporter provided the Committee a memorandum, noting that more than twenty Evidence Rules have language that refer to "paper-oriented" evidence, e.g., "record", "memorandum", etc. Arguably, these Rules might be problematic for a proponent who wishes to proffer computerized evidence. The Reporter reviewed the case law, however, and concluded that the courts are handling computerized evidence quite well under the broad and flexible Evidence Rules. Committee members expressed the view that tinkering with language may create rather than solve problems, especially since the current rules seem to be working well. One Committee member noted that the same concerns about technology might have been raised years ago with videotaped presentations; yet the federal courts have had no problem in handling videotaped evidence under the current rules.

It was also observed that any attempt to amend the rules to accommodate electronic evidence would have to proceed along one of three paths, each of which is problematic. One possibility is that each of the problematic rules could be amended directly; but this would mean that more than twenty rules amendments would have to be proposed. Alternatively, the definitions section of Evidence Rule 1001 could be modernized to apply to all the other Rules. The problem with this solution would be that the definitions section would be in the Best Evidence Rule--not the first place a lawyer would look for it. A third possibility would be to add an independent definitions section to the Evidence Rules. But to do that just for computerized evidence would be odd; on the other hand, it would certainly not seem worth the effort to promulgate an all-encompassing definitions section, after 25 years of litigation under the Evidence Rules without such a section.

The Committee unanimously agreed that it would not at this time recommend any amendment to the Evidence Rules with respect to computerized evidence. The Reporter agreed to monitor developments in the case law concerning computerized evidence.

## E-mail Comments

The Committee addressed a proposal by the Standing Committee Subcommittee on Technology, for a

two-year trial period in which comments on the Rules could be made by e-mail. During this two-year period, Reporters would not be required to summarize individual comments; the Rules Support Office would acknowledge each comment by e-mail, and would post a generic explanation of action of the Advisory Committees in response to comments received. Committee members expressed some concern as to how an e-mail comment system would work. Concern was also expressed that comments made by e-mail may not be as careful and considered as comments by mail. On the other hand, the Committee noted that substantial benefits could accrue from greater public input into the Rules process, and that in the long run it might be easier to respond to e-mail comments than to written comments. The Committee unanimously resolved to support the proposal of the Technology Subcommittee for a trial period for e-mail comments.

## Civil Rule 44

At the October, 1997 meeting, the Reporter was directed to consider whether Civil Rule 44 should be abrogated in light of its overlap with certain Evidence Rules providing for authentication of official records--especially Evidence Rule 902. The Reporter conferred with the Reporter to the Civil Rules Committee, researched the relevant case law, and analyzed Civil Rule 44 and its relationship to the Evidence Rules in substantial detail. The Reporter provided the Committee with a memorandum on the subject for the April meeting. That memorandum came to the following basic conclusions: 1. Courts and litigants have not had a problem with the overlap between Civil Rule 44 and the Evidence Rules. 2. In some cases, especially in deportation proceedings, Civil Rule 44 is relied upon as a means of authenticating official records, without reference to the Evidence Rules; while this may not be necessary, any repeal of Civil Rule 44 would upset settled expectations in these areas. 3. There are a few situations in which authentication might be permitted under Civil Rule 44 and not under the Evidence Rules. 4. Abrogation of Civil Rule 44 would also affect the Bankruptcy Rules and the Criminal Rules, both of which refer to Rule 44.

After considering the Reporter's memorandum, and the fact that no problems have been created by the coexistence of Civil Rule 44 and the Evidence Rules, the Committee decided unanimously not to proceed with any effort to abrogate Civil Rule 44.

## Shortening the Rulemaking Process

At the request of the Standing Committee, the Evidence Rules Committee considered how and whether the rulemaking process could be shortened. There was general concern that the process is too long, and that the length of the process encourages Congress to intervene with legislation rather than wait for the

rulemaking process to grind to its conclusion. While it is often proclaimed that the process needs to be as long as it is to assure careful deliberation, the fact is that much of the time in the process is simply waiting time in which no cognitive thought is given to the rules. For example, the Evidence Rules Committee's proposals to amend Rules 103, 404, 803(6) and 902 were approved in January by the Standing Committee to be issued for public comment--yet the public comment period does not begin until August 15th.

John Rabiej noted that much of the problem with the length of the process is due to legislation specifying that the Supreme Court has until May 1 to transmit the rules to Congress, and that the Judicial Conference meetings are to be held in March and September. This adds a number of months to the process because the Judicial Conference can only propose rules changes after its September meeting-- proposing rules changes after the March Judicial Conference meeting would not give the Supreme Court enough time to consider the changes.

One possibility considered by the Committee is to shorten the six month public comment period. This solution might be especially fruitful with respect to technical or non-controversial changes. Many members believed that a two-tier structure might work: a six month comment period for substantial or controversial rules changes, and a much shorter period for technical or non-controversial changes.

The Reporter noted that the rules process can actually take longer than three years. He pointed out that the Evidence Rules Committee's proposal to amend Evidence Rule 103 was delayed for an entire year because the Standing Committee sent it back to the Evidence Rules Committee for redrafting. The Standing Committee had no apparent substantive concerns with the proposal. It was suggested that if the Standing Committee's only objections to an Advisory Committee proposal are on stylistic or drafting grounds, then the proposal should be issued for public comment. Any drafting problems can be corrected in the public comment process, thus shaving a year off what would otherwise be a four-year rulemaking process. The Committee was in unanimous agreement that drafting objections should not delay the release for public comment of a proposed rule. The Committee was also favorably disposed to two alternative proposals: 1. A policy permitting the Advisory Committee to respond to Standing Committee objections within 30 days of the Standing Committee meeting.2. A policy permitting Advisory Committees to publish their proposals for public comment without the necessity for approval by the Standing Committee.

The Evidence Rules Committee generally agrees with the self-study report that the current rulemaking process is too long, and the Committee expressed its interest and willingness to participate in any suggestions or efforts to shorten the process.

New Matters

A Committee member suggested that the Committee might consider how the scope provisions of Rule 1101 are operating. In particular, the Committee might look at whether the exclusions provided in Rule 1101 are necessary, or whether it might now be appropriate to extend the applicability of the Federal Rules to certain other proceedings. The Reporter agreed to investigate the subject and report to the Committee at the next meeting.

Next Meeting

The next meeting of the Evidence Rules Committee is scheduled for October 22nd and 23rd in Washington, D.C. The Committee agreed that if its proposals to amend Rules 701-703 are issued for public comment, the first day of the meeting will be a public hearing on these Rules.

The meeting was adjourned at 10:45 a.m., Tuesday, April 7th

Respectfully submitted,

Daniel J. Capra

Reed Professor of Law

APPENDIX E

COMMITTEE ON RULES OF PRACTICE AND PROCEDURE
OF THE
JUDICIAL CONFERENCE OFTHE UNITED STATES
WASHINGTON, D.C. 20544

**ALICEMARIE H. STOTLER**
CHAIR

**PETER G. McCABE**
SECRETARY

**CHAIRS OF ADVISORY COMMITTEES**

**WILL L. GARWOOD**
APPELLATE RULES

**ADRIAN G. DUPLANTIER**
BANKRUPTCY RULES

**PAUL V. NIEMEYER**
CIVIL RULES

**W. EUGENE DAVIS**
CRIMINAL RULES

**FERN M. SMITH**
EVIDENCE RULES

**TO:**   **Honorable Alicemarie H. Stotler, Chair**
**Standing Committee on Rules of Practice**
**and Procedure**

**FROM:**  **Honorable Fern M. Smith, Chair**
**Advisory Committee on Evidence Rules**

**DATE:  May 1, 1998**

**RE:    Report of the Advisory Committee on Evidence Rules**

# I. Introduction

The Advisory Committee on Evidence Rules met on April 6th and 7th in New York City. At the meeting, the Committee approved three proposed amendments to the Evidence Rules, with the recommendation that the Standing Committee approve them for public comment.

The Evidence Rules Committee also discussed several proposals for amending other Evidence Rules. Specifically, the Committee considered: 1) whether the Evidence Rules should be revised to accommodate technological advances in the presentation of evidence; and 2) whether Evidence Rule 801(d)(1)(B) should be amended to provide a more expansive hearsay exception. The Committee also analyzed whether Civil Rule 44 should be abrogated in light of its apparent overlap with some of the Evidence Rules, and whether the Evidence Rules should be amended to include parent-child privileges. The Committee decided not to propose amendments on either of these subjects at this time.

The Committee considered three matters that do not relate directly to the Evidence Rules, but rather more broadly to the rulemaking process. These matters are: 1) whether comments on

1

the Rules should be received by e-mail; and 2) whether the rulemaking process should be shortened and, if so, how. Finally, the Evidence Rules Committee discussed and voted upon a suggested course for proceeding with the review of the proposed Rules of Attorney Conduct for the federal courts.

The discussion of these and other matters is summarized in Part III of this Report, and is more fully set forth in the draft minutes of the April meeting, which are attached to this Report.

## II. Action Items

### A. Rule 702.

The proposed amendment to Evidence Rule 702 is in response to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc*, and it attempts to address the conflict in the courts about the meaning of *Daubert*. The proposal is also a response to bills pending in Congress that purport to "codify" *Daubert*, but that, in the Committee's view, raise more problems than they solve. The proposed amendment specifically extends the trial court's *Daubert* gatekeeping function to all expert testimony; requires a showing of reliable methodology and sufficient basis; and provides that the expert's methodology must be applied properly to the facts of the case. The Committee prepared an extensive Advisory Committee Note that will provide guidance for courts and litigants in determining whether expert testimony is sufficiently reliable to be admissible. Both the proposed amendment to Evidence Rule 702 and the Advisory Committee Note to the amendment are attached to this Report.

**Recommendation: The Evidence Rules Committee recommends that the proposed amendment to Evidence Rule 702 be approved for public comment.**

### B. Rule 701

The proposal to amend Evidence Rule 701 seeks to prevent the practice of proffering an expert as a lay witness and thereby end-running both the reliability requirements of Rule 702 and the disclosure requirements pertaining to expert testimony. Under the amendment, testimony cannot be admitted under Rule 701 if it is based on scientific, technical or other specialized knowledge. The language of the amendment intentionally tracks the language defining expert testimony in Rule 702. Both the proposed amendment to Evidence Rule 701 and the Advisory

2

Committee Note to the amendment are attached to this Report. The proposed amendment does not prohibit lay witness testimony on matters of common knowledge that have traditionally been the subject of lay opinions.

> **Recommendation: The Evidence Rules Committee recommends that the proposed amendment to Evidence Rule 701 be approved for public comment.**

### C. Rule 703.

The proposal to amend Evidence Rule 703 would limit the disclosure to the jury of inadmissible information that is used as the basis of an expert's opinion. Under current law, litigants can too easily evade an exclusionary rule of evidence by having an expert rely on inadmissible evidence in forming an opinion. The inadmissible information is then disclosed to the jury in the guise of the expert's basis. The proposed amendment imposes no limit on an expert's opinion itself. The existing language of Evidence Rule 703, permitting an expert to rely on inadmissible information if it is of the type reasonably relied upon by experts in the field, is retained. Rather, the limitations imposed by the proposed amendment relate to the disclosure of this inadmissible information to the jury. Under the proposed amendment, the otherwise inadmissible information cannot be disclosed to the jury unless its probative value in assisting the jury to weigh the expert's opinion substantially outweighs the risk of prejudice resulting from the jury's possible misuse of the evidence. Both the proposed amendment to Evidence Rule 703 and the Advisory Committee Note to the amendment are attached to this Report.

> **Recommendation: The Evidence Rules Committee recommends that the proposed amendment to Evidence Rule 703 be approved for public comment.**

## III. Information Items

### A. Issues the Committee Has Decided Not to Pursue

After discussion at the April meeting, the Evidence Rules Committee has decided not to pursue the following issues at this time:

3

*1. Technological Advances in Presenting Evidence.* The Evidence Rules Committee discussed whether the Evidence Rules must be amended to accommodate technological innovations in the presentation of evidence. The Committee studied the case law and determined that the Federal Rules are currently flexible enough to accommodate electronic evidence, and that courts and litigants have had little problem in applying the current rules to such evidence. For example, no case could be found in which computerized evidence was found inadmissible, where comparable non-computerized evidence would have been admitted, due to a limitation in the Rules. The Committee also found that any option for amending the Rules to more specifically cover computerized evidence would be problematic. Direct amendment of all the rules that refer to "paper"-type evidence would require the amendment of almost thirty rules--a prospect that should not be undertaken unless absolutely necessary. Indirect amendment of these rules--either by way of a freestanding definitions section, or by expanding the definitions section of the best evidence rule--presents substantial conceptual and practical problems as well. The Evidence Rules Committee resolved to continue to monitor case law and technological developments, and to reconsider the question of whether to amend the Rules should compelling circumstances dictate.

*2. Rule 801(d)(1)(B):* The Evidence Rules Committee considered a proposal to amend Evidence Rule 801(d)(1)(B) to provide a hearsay exemption for any prior consistent statement that would be otherwise admissible to rehabilitate a witness' credibility. Committee members generally agreed with the proposal on the merits, but resolved unanimously not to propose an amendment at this time. The Supreme Court, in *Tome v. United States,* recently construed Rule 801(d)(1)(B), and members wished to avoid the perception that the proposed amendment was designed to overrule *Tome.* Moreover, the Committee determined that the current Rule is not creating substantial problems in the federal courts. The Committee resolved to table the proposal, and will continue to monitor the post-*Tome* case law.

*3. Civil Rule 44:* The Evidence Rules Committee considered whether it should recommend that Civil Rule 44 be abrogated in light of its overlap with certain Evidence Rules. After substantial research and discussion, the Committee decided against such a recommendation. Civil Rule 44 does not completely overlap the Evidence Rules, and parties in certain types of cases rely on Civil Rule 44 as the sole means of authenticating official records. Since there is no indication of a problem in the cases, the Evidence Rules Committee found it inadvisable to propose any change in this area.

## B. Parent-Child Privilege

Two bills are pending in Congress with respect to the possible amendment of the

DNM 1383

Evidence Rules to include some form of parent-child privilege. The Senate Bill would require the Judicial Conference to report on the advisability of amending the Evidence Rules to include such a privilege. The House Bill would directly amend Evidence Rule 501 to provide a privilege for a witness to refuse to give adverse testimony, or relate confidential communications, concerning the witness' parent or child. The Evidence Rules Committee is unanimously opposed to amending the Evidence Rules to include any kind of parent-child privilege. If such a privilege were adopted, it would be the only codified privilege in the Federal Rules of Evidence--directly contrary to the common-law development of privileges that is the goal of Evidence Rule 501. Moreover, the Committee is convinced (along with the many federal courts that have considered the question) that children and parents do not rely on a confidentiality-based evidentiary privilege when communicating with each other. Nor has the case been made that the benefits of an adverse testimonial privilege outweigh the substantial cost to the search for truth that such a privilege would entail. The Evidence Rules Committee has prepared a draft statement in opposition to the House Bill, as well as a draft statement in response to the Senate Bill. Both of these statements recommend against an amendment of the Evidence Rules that would add a parent-child privilege. These draft statements are attached to this Report.


### C. Proposed Rules of Attorney Conduct


The Evidence Rules Committee was directed, along with the other Advisory Committees, to consider and recommend an appropriate course of action with respect to the proposed Rules of Attorney Conduct. At its meeting, the Evidence Rules Committee noted that the Civil Rules Committee has resolved to recommend that an ad hoc committee, made up of representatives from the advisory committees, be formed to review the proposed Rules of Attorney Conduct. This review will consider the following questions:

1) Whether a "core" set of attorney conduct rules should be adopted for the federal courts, or whether the federal rule should be limited to a single choice of law provision.
2) Assuming that a core set of rules should be adopted, whether the rules as currently proposed fall within the core concern of the federal courts.
3) Whether the proposed rules or notes should be amended in any respect.
4) Whether the Attorney Conduct Rules should be established as a freestanding set of rules, or instead should be placed as an appendix to an existing body of Rules.

The Evidence Rules Committee strongly supports the proposal to establish an ad hoc committee to deal with these complex questions. The Evidence Rules Committee has already provided the Standing Committee's Reporter with extensive commentary and suggestions concerning each of the above issues, and hopes to continue its service by contributing to the work of the ad hoc committee.

DNM 1384

**D. E-mail Comments**

The Standing Committee's Subcommittee on Technology has proposed a two-year trial period in which comments on the Rules could be made by e-mail. During this two-year period, Reporters would not be required to summarize individual comments; the Rules Support Office would acknowledge each comment by e-mail, and would post a generic explanation of action of the Advisory Committees in response to comments received. At its April meeting, the Evidence Rules Committee discussed the advisability of allowing e-mail comments, and unanimously resolved to support the proposal of the Technology Subcommittee.

**E. Shortening the Rulemaking Process**

At the request of the Standing Committee, the Evidence Rules Committee considered how and whether the rulemaking process could be shortened. The Committee unanimously agreed that the current process is too long, and that the length of the process encourages Congress to intervene with legislation rather than wait for the rulemaking process to come to its conclusion. The Committee recognized that much of the delay in the process is due to legislation specifying that the Supreme Court has until May 1 to transmit the rules to Congress, and that the Judicial Conference meetings are to be held in March and September. Yet even within those perameters, the Evidence Rules Committee thought it possible that changes could be adopted to shorten the process, without affecting the studied deliberation that is the hallmark of the rulemaking process. The Committee suggests that the Standing Committee might consider the following possibilities:

1. Shorten the six-month public comment period, at least with respect to changes that can reasonably be considered to be minimal or non-controversial.

2. Permit an Advisory Committee's proposal to be issued for public comment if the Standing Committee's only objections are on stylistic or drafting grounds. Any drafting problems could be corrected in the public comment process, thus shaving a year off what would be a four-year rulemaking process if the proposal were to be sent back to the Advisory Committee for redrafting. An alternative could be the approval of a policy permitting the Advisory Committee to respond to Standing Committee objections within 30 days of the Standing Committee meeting.

3. Permit the Advisory Committees to publish their proposals for public comment without the necessity of initial approval by the Standing Committee--while of course preserving the Standing Committee's ultimate authority to approve or disapprove a proposed rule after the

6

public comment period has concluded.

The Evidence Rules Committee agrees with the Standing Committee's self-study report that the current rulemaking process is too long, and the Committee is willing to participate in any suggestions or efforts to shorten the process.

## IV. Minutes of the April, 1998 Meeting

The Reporter's draft of the minutes of the Evidence Rules Committee's April, 1998 meeting are attached to this report. These minutes have not yet been approved by the Evidence Rules Committee.

Attachments:

    Rules and Committee Notes
    Draft Statements Concerning Parent-Child Privileges
    Draft Minutes

DNM 1386

**APPENDIX F**

# Advisory Committee on Evidence Rules

Minutes of the Meeting of October 22, 1998

Washington, D.C.

The Advisory Committee on the Federal Rules of Evidence met on October 22, 1998, in the Judicial Conference Center of the Thurgood Marshall Building in Washington, D.C.

The following members of the Committee were present:

Hon. Fern M. Smith, Chair

Hon. David C. Norton

Hon. Milton I. Shadur

Hon. Jerry E. Smith

Hon. James T. Turner

Hon. Jeffrey L. Amestoy

Professor Kenneth S. Broun

Mary F. Harkenrider, Esq.

Gregory P. Joseph, Esq.

Frederic F. Kay, Esq.

David S. Maring, Esq.

Professor Daniel J. Capra, Reporter

Also present were:

Hon. Anthony J. Scirica, Chair of the Standing Committee on

Rules of Practice and Procedure

Hon. Frank W. Bullock, Jr., Liaison to the Standing Committee on

Rules of Practice and Procedure

Hon. David S. Doty, Liaison to the Civil Rules Committee

Hon. David D. Dowd, Liaison to the Criminal Rules Committee

Professor Daniel R. Coquillette, Reporter, Standing Committee on

Rules of Practice and Procedure

Professor Leo Whinery, Reporter, Uniform Rules of Evidence

Drafting Committee

Hon. James K. Robinson, Justice Department

Roger Pauley, Esq., Justice Department

Professor Stephen A. Saltzburg, American Bar Association Representative

John K. Rabiej, Esq., Chief, Rules Committee Support Office

Joe Cecil, Esq., Federal Judicial Center

Joseph Spaniol, Esq.


## Opening Business


The Chair opened the meeting by welcoming two new members, Chief Justice Jeffrey Amestoy and David Maring. The Chair then asked for approval of the minutes of the April 1998 meeting. These minutes were unanimously approved.


The Chair reported on actions taken at the June 1998 Standing Committee meeting. The Standing

Committee approved the Evidence Rules Committee's proposed amendments to Rules 701, 702, and 703 to be released for public comment. The proposed amendments to Evidence Rules 103, 404(a), 803(6), and 902 had been approved for release for public comment at a previous meeting of the Standing Committee. The Chair recommended that Committee members read the minutes of the Standing Committee meeting, as the minutes give a comprehensive account of all of the cutting edge issues that the Standing Committee is considering.

## Public Hearing on Rules Released for Public Comment

The first part of the Evidence Rules Committee meeting was devoted to a public hearing on the Rules that have been released for public comment. The following members of the public gave testimony and engaged in dialogue with the Committee members.

1. Professor James Duane, Regent Law School (Rule 103)--Suggesting changes to the Committee Note to Rule 103, and deletion of the Rule's codification of Luce v. United States and its progeny.

2. Roy Katriel, Esq., American University Evidence Project (Rule 702)--Suggesting separation of qualification and reliability standards, and articulation of the standard of proof in the text of the Rule.

3. Libretta Porta, Esq., American University Evidence Project (Rule 703)--Suggesting that the Rule be amended to prohibit an expert from relying on inadmissible information, and that a new hearsay exception be added for reliable information used by an expert.

4. Gerson Smoger, Esq., American Trial Lawyers Association (Rule 702)--Opposing the proposed amendment.

5. Professor Laird Kirkpatrick, University of Oregon Law School (Rules 103, 404, 701, 702, 703, 902)-- Supporting Rule 103 but suggesting deletion of Rule 103's codification of Luce and its progeny; suggesting narrowing of character evidence that can be offered as rebuttal under the proposed amendment to Rule 404 and a change to the Committee Note; opposing proposed Rule 701; opposing proposed Rule 702; supporting but suggesting clarifying language for proposed Rule 703; generally

supporting the proposed amendments to Rules 803(6) and 902.

6. Professor Richard Friedman, University of Michigan Law School (Rules 103, 404, 701, 702, 703, 902)--Suggesting deletion of Rule 103's codification of Luce and its progeny; suggesting narrowing of character evidence that can be offered as rebuttal under the proposed amendment to Rule 404; opposing proposed Rule 701; opposing proposed Rule 702; suggesting clarifying language for proposed Rule 703; generally supporting the proposed amendment to Rules 803(6) and 902.

7. Stephen Morrison, Esq., Lawyers for Civil Justice (Rules 701, 702, 703)--Strongly supporting the proposed amendments to Rules 701, 702, and 703.

## Committee Meeting

After the public hearing was concluded, the Committee met to discuss the public comments received both at the hearing and in writing. The Committee also discussed a public comment received concerning the need to amend another Evidence Rule. The discussion of the public comments and the specific rules was not intended to lead to definitive conclusions, because the public comment period is continuing and the Committee looks forward to receiving further suggestions and comments from members of the public. The Committee decided on a tentative basis, however, that certain changes to the proposals might be made in light of some of the public comments.

## Rule 103

The Committee considered the public comments received to date on the proposed amendment to Rule 103. One comment suggested that a citation in the Committee Note might be misleading and that a different citation might be more illustrative of why objections to definitive advance rulings need not be renewed. The Committee tentatively agreed to replace the current citation with the suggested one. Another comment suggested that the Committee Note should be amended to emphasize that an advance ruling cannot be relied on if the facts and assumptions underlying the trial court's advance ruling are materially changed at trial. The Committee tentatively agreed to address this matter in the Committee Note.

Each of the three public comments received on the proposed amendment (all from law professors) recommend that the language in the proposal codifying Luce v. United States and its progeny should be dropped. None of the commentators seriously suggest that the Rule should be amended to overrule Luce--thereby allowing a party to appeal from an adverse advance ruling even if the ruling is dependent on a trial event that never actually occurs. Rather, the commentators suggest that the second sentence of the proposed amendment should be dropped, and the Committee Note changed to state that the Committee was taking no position on whether Luce should be applied or extended.

The Committee engaged in an extensive discussion on whether the Luce rule should be dropped from the text of the proposed amendment. Some members thought, as they had when the issue was previously discussed, that failing to include any reference to Luce in the text of the Rule might lead to the misconception that the Luce rule had been abrogated. Others noted that the Luce rule has never been questioned by the federal courts and indeed has been extended to comparable situations, e.g., prohibiting a criminal defendant from appealing a ruling that would admit evidence if the defendant pursued a certain defense, where the defendant never pursued that defense at trial.

The Committee agreed to revisit the question of whether the Luce language should be retained at its April 1999 meeting, after the end of the public comment period. No motion was made to tentatively change the proposal at this point.

Rule 404(a)

The proposed amendment to Rule 404(a) provides that if an accused attacks the victim's character, this opens the door to an attack on a "pertinent" character trait of the accused. Two members of the public, both law professors, commented that the term "pertinent" is too broad. For example, in a criminal prosecution with multiple counts, a defendant who chose to attack the victim's character in a defense of one count would open himself up to an attack on a character trait that would be pertinent to a completely unrelated count.

After discussion, the Committee agreed in principle and on a tentative basis that the term "pertinent" was too broad. The Committee tentatively agreed that the word "pertinent" should be replaced with the word "same." Under this proposal, the prosecution could rebut an attack on the victim's character only with evidence of the same bad character trait of the defendant. Some concern was expressed that the use of the word "same" might unduly narrow the prosecution's ability to rebut an attack on the victim's character. The Committee agreed to consider any cases or hypotheticals brought to its attention that might indicate that the prosecution's rebuttal power would have to be broader.

Another public comment suggested that the Committee Note add a reference to the fact that an accused might introduce a negative character trait of the victim for a purpose other than to prove that the victim acted in accordance with the character trait. For example, an accused in a self-defense case might introduce the victim's reputation for violence to show that the accused was aware of that reputation and acted accordingly. In such a case, the door would not be opened to a character attack on the defendant. The Committee tentatively agreed that the Committee Note should be amended in accordance with the suggested comment.

Rule 701

Two public comments expressed concern that the proposed Rule's prohibition of lay testimony based on specialized knowledge would result in a change of practice. The commentators contended, for example, that under the proposal a witness who would testify that a certain substance was drugs would have to be qualified and disclosed as an expert.

The Committee considered whether the proposed amendment might have to be changed in light of these public comments. Some members believed that there are two different kinds of specialized knowledge that a witness might use. One type of knowledge is specialized in the sense that not everyone has it, but it is nonetheless something that one needs no training or expertise to attain. Examples include testimony that certain activity occurs on a corner, or that a certain substance is a drug. Another kind of specialized knowledge is that which is beyond common experience, and which requires experience and training to obtain. Examples are testimony that a product failed due to metal fatigue, or that coconspirators were speaking in code.

Several Committee members expressed the opinion that testimony based on particularized knowledge that any member of the public could obtain without training or expertise should be covered by Rule 701, while testimony based on specialized knowledge that is dependent on special skill or training should be covered by Rule 702. Many members thought that this distinction was already made by the proposed amendment to Rule 701, while others thought that a stylistic change might be made to the text to make it more clear that testimony based on common but particularized knowledge is covered by Rule 701 rather than Rule 702. One possibility considered was to state specifically in the Rule that if testimony is expert testimony within the meaning of Rule 702, then it cannot be admitted under Rule 701. The Committee agreed to revisit the possibility of a stylistic change to Rule 701 at the April 1999 meeting, and to consider new proposals in light of any intervening public comment.

Finally, the Committee considered the suggestion of the Style Subcommittee of the Standing Committee to change the title of Rule 701 so as to refer to witnesses in the singular rather than the plural. It was pointed out, however, that someone searching for the rule would probably be considering the question of witnesses in the plural sense rather than the singular. Moreover, if the title is to be changed, it should be changed in such a way as to indicate that the Rule governs not witnesses but testimony. For these reasons, the Committee decided not to adopt the Style Subcommittee's suggestion at this time.

## Rule 702

The public comment received so far is, not surprisingly, divided on the merits of the proposal to amend Rule 702. A major intervening development is that the Supreme Court has granted certiorari in Kumho Tire v. Carmichael, where the issue is whether the Daubert gatekeeping standards apply to the testimony of a tire failure expert who testified largely on the basis of experience. The Committee agreed that the result in Kumho could affect the viability of the proposed amendment to Rule 702. But it also agreed that it was premature to reconsider the Rule at this point, since the Supreme Court will not hear argument on the case until December. Several Committee members expressed the hope that the Supreme Court would decide Kumho before the April 1999 meeting, so that the Committee would have the opportunity to incorporate the case into the proposed amendment to Rule 702, before that proposal is submitted to the Standing Committee.

The Committee considered the suggestion of the Style Subcommittee to amend the title of Rule 702 in the same manner as the proposed amendment to Rule 701. For the same reasons, the Committee decided not to adopt the Style Subcommittee's suggestion at this time.

One public comment suggested that the proposed amendment to Rule 702 might end up excluding the testimony of experts who purport to educate the factfinder on general background principles only, and who make no attempt to apply their expertise to the facts of the case. The proposed amendment requires that "the witness has applied the principles and methods reliably to the facts of the case." The Committee concluded that this language would not require exclusion of an expert who educates the jury on general principles. Such an expert will have applied the principles and methods reliably to the facts of the case if the testimony fits the facts. The Committee tentatively agreed, however, to amend the Advisory Committee Note to address this question.

The Committee considered and rejected a suggestion from a member of the public that the Rule focus

only on the "case-specific" facts or data that are relied upon by the expert. The Committee unanimously concluded that the expert's reliance on any fact, whether or not case-specific, is a matter for scrutiny by the trial court. The Committee also considered and rejected a suggestion from a member of the public that the Committee Note be amended to provide more elaboration of the distinction between Rules 702 and 703. The Committee concluded that the distinction was already well set forth in the Committee Note.

Finally, the Committee tentatively agreed to make two minor changes to the Committee Note to Rule 702, in order to cite some recent case law and academic commentary.

Rule 703

The public comments on Rule 703 have been almost uniformly positive. Two commentators agreed with the Rule but suggested that language might be added to elaborate on why information relied on by an expert might be probative even though it is not in evidence, and why it might be prejudicial. The Committee considered these comments, and tentatively concluded that it was unnecessary to provide this elaboration in the text of the Rule. The Evidence Rules generally refer to probative value and prejudicial effect without elaboration, leaving the balancing of these factors to the discretion of the trial court. Moreover, the Committee Note to the Rule makes clear what the probative value and prejudicial effect are when the expert relies on information not in evidence.

One public commentator proposed that Rule 703 should be amended to prohibit the expert from relying on information not in evidence, and that a new hearsay exception be added to permit reliable information used by an expert to be admitted for its truth. The Committee considered and rejected these suggestions. Committee members noted that the proposal was in one sense too narrow, because it only dealt with hearsay information relied on by an expert, when in reality an expert might use a wide variety of information not in evidence, e.g., character evidence and subsequent remedial measures. On the other hand, the proposal was too broad, because it could permit dubious hearsay to be considered for its truth.

The Committee considered and tentatively approved the changes to the text of the Rule suggested by the Style Subcommittee of the Standing Committee. These changes would make the language of the Rule more direct and concise. The Committee also tentatively agreed to a stylistic change that would clarify that the Rule covers all information not in evidence that is relied upon by an expert.

The Committee tentatively agreed to add language to the Committee Note that would indicate that the

proponent of the expert might be permitted to disclose the information not in evidence relied on by the expert, if the opponent opens the door by attacking the expert's basis.

Finally, the Committee considered and rejected a proposal that the Committee Note be amended to add a laundry list of factors that a trial court might use in assessing the probative value and prejudicial effect of information not in evidence that is relied upon by an expert. The Committee agreed that these matters should be left to the discretion of the trial judge.

## Rule 902

The Chair suggested that a stylistic change to proposed Rules 902(11) and 902(12) might be considered in order to provide for a more consistent use of the terms "certification" and "declaration." The Committee tentatively agreed to a stylistic change in each subdivision requiring that the qualified witness make a "written declaration of the custodian thereof or another qualified person certifying that the record" meets the requirements of the Rule. The Committee also tentatively agreed to a stylistic change that would replace a pronoun with a more definite term. Finally, the Committee tentatively agreed to add to the Committee Note a reference to the statute governing declarations filed in a federal court.

The Committee rejected a suggestion from a member of the public that the reference to admissibility under Rule 803(6) be deleted from the proposed amendment to Rule 902. The sense of the Committee was that records offered as self-authenticating under proposed Rules 902(11) and (12) would have to meet the admissibility requirements of Rule 803(6).

## Rule 609

Evidence Rule 609 provides that certain convictions are admissible to impeach the character of a witness if a balancing test is met (subdivision (a)(1)), and that other convictions are automatically admissible (subdivision (a)(2)). A public comment was received suggesting that the use of the word "and" between these subdivisions was misleading; the argument was that the use of the word "and" implies that a conviction must meet the requirements of both subdivisions to be admissible, when in fact the subdivisions provide independent paths to admissibility.

The Committee considered this comment and determined that it was not necessary to amend Rule 609. The use of the word "and" clearly indicates that the provisions are independent rather than related--i.e., that both subdivisions provide for admissibility of convictions if their requirements are met.

## Rule 1101

At the April 1998 meeting, the Reporter was directed to prepare a memorandum describing the types of actions in which the Federal Rules do not apply. Then the Committee would consider whether it would be appropriate to amend Rule 1101 to either exclude certain actions from or include certain actions within the rubric of the Evidence Rules.

The Reporter submitted a memorandum indicating that there are several types of actions in which the courts have found the Evidence Rules inapplicable, even though the actions are not specifically excluded under Rule 1101. For example, the Evidence Rules are not applicable in suppression hearings, even though Rule 1101 does not specifically exempt them.

After considering the Reporter's memorandum, the Committee concluded that while Rule 1101 is not comprehensive, there is no need to amend it; the courts have had no problem in exempting certain actions from the Evidence Rules where the nature of the action warrants it. The Committee also concluded that it would not be appropriate to amend the Rule to apply the Evidence Rules to any actions that are currently exempted by Rule 1101. For example, it makes no sense to extend the Evidence Rules to grand jury proceedings, which are ex parte and necessarily less rigid than a trial court proceeding.

## Privileges

The Committee once again discussed whether it should attempt to propose a codification of the privileges. The issue was considered again in light of Congressional activity. Congress recently passed a tax preparer privilege, and there are bills pending in Congress that would establish a parent-child privilege, a secret service privilege, and others.

Some Committee members expressed concern that recommending a set of privilege rules to Congress

might spur even further piecemeal Congressional activity. Unlike other Evidence Rules, rules of privilege are not self-executing; they have to be passed by Congress. Other Committee members thought that the Committee might do a useful service in attempting to set forth rules embracing the current common law of privilege, even if those rules are never even submitted to Congress.

The Chair designated Greg Joseph and the Reporter to consider whether a proposed codification of the privileges would be a worthwhile project. They will report back to the Committee at the April 1999 meeting.

## Rule 902(6)

Evidence Rule 902(6) provides that "[p]rinted materials purporting to be newspapers or periodicals" are self-authenticating. A Committee member pointed out that the Rule may not cover news wire reports that do not subsequently appear in print articles, such as electronic stock market reports. After discussion, the Committee resolved to consider this matter in the future, should another package of amendments to the Evidence Rules be deemed necessary.

## Attorney Conduct Rules

Professor Coquillette informed the Committee that an ad hoc committee will soon meet to consider the draft of the attorney conduct rules. The ad hoc committee is composed of members of each of the Advisory Committees, two members of the Standing Committee, Professor Coquillette, and liaisons from the Committees on Federal/State Jurisdiction and Court Administration and Case Management. The ad hoc committee will proceed slowly so as not to get ahead of several developments that will affect the viability of any proposed attorney conduct rules for the federal courts. Among these developments are: the legislation recently passed in Congress that requires federal prosecutors to abide by state ethics rules; the ABA Ethics 2000 project; and the negotiations between the Justice Department and the Conference of Chief Justices concerning the proposed Rule 4.2.

Professor Coquillette expressed his thanks to the Evidence Rules Committee for the substantial work that it has already done on the Attorney Conduct Rules. The Evidence Rules Committee has provided a detailed list of suggestions as to how the proposed Attorney Conduct Rules and commentary can be improved, and these suggestions have been incorporated into the latest working draft of the Rules.

## Uniform Rules

Professor Whinery, the Reporter for the Uniform Rules of Evidence Drafting Committee, reported on developments in the Uniform Rules project. The first reading of the working draft occurred this summer at the national meeting of the Uniform Laws Commissioners. The Uniform Rules Committee has generally followed the Federal Rules of Evidence, but Professor Whinery noted that there are some marked differences. For example, Proposed Uniform Rule 702 establishes a presumption of admissibility for expert testimony that passes the Frye test, and a presumption of inadmissibility for expert testimony that does not. Then the Rule provides a number of factors that would be relevant to overcoming the presumption one way or another.

Professor Whinery noted that the working relationship that has been established between the Uniform Rules Drafting Committee and the Evidence Rules Committee has been most salutary and will continue in the future.

## Next Meeting

The next meeting of the Evidence Rules Committee is scheduled for April 12th and 13th, 1999, in New York City.

The meeting was adjourned at 5 p.m., Thursday, October 22nd.

Respectfully submitted,

Daniel J. Capra

Reed Professor of Law

APPENDIX G

COMMITTEE ON RULES OF PRACTICE AND PROCEDURE
OF THE
JUDICIAL CONFERENCE OF THE UNITED STATES
WASHINGTON, D.C. 20544

**ANTHONY J. SCIRICA**
CHAIR

**PETER G. McCABE**
SECRETARY

CHAIRS OF ADVISORY COMMITTEES

**WILL L. GARWOOD**
APPELLATE RULES

**ADRIAN G. DUPLANTIER**
BANKRUPTCY RULES

**PAUL V. NIEMEYER**
CIVIL RULES

**W. EUGENE DAVIS**
CRIMINAL RULES

**FERN M. SMITH**
EVIDENCE RULES

TO:     **Honorable Anthony J. Scirica, Chair**
        **Standing Committee on Rules of Practice**
        **and Procedure**

FROM:   **Honorable Fern M. Smith, Chair**
        **Advisory Committee on Evidence Rules**

DATE:   **December 1, 1998**

RE:     **Report of the Advisory Committee on Evidence Rules**

## I. Introduction

The Advisory Committee on Evidence Rules met on October 22nd in Washington, D.C. The Committee held a public hearing on the proposed amendments that are currently released for public comment--proposals to amend Evidence Rules 103, 404(a), 701, 702, 703, 803(6) and 902. After the public hearing, the Committee convened to consider the comments received at the hearing as well as other written comments submitted. The Committee reached tentative agreement on some minor revisions to the text and notes of some of the proposed amendments. The Committee also considered, and decided not to act on, some proposals to amend other Evidence Rules. The discussion of these and other matters is summarized in Part III of this Report, and is more fully set forth in the draft minutes of the October meeting, which are attached to this Report.

Given the fact that a package of proposed amendments to the Evidence Rules is currently in the public comment period, the Evidence Rules Committee will present no action items at the January, 1999 Standing Committee meeting.

1

## II. Action Items

### No Action Items

## III. Information Items

### A. Consideration of Possible Changes to Proposed Amendments Released for Public Comment.

## 1. Rule 103

The proposed amendment to Evidence Rule 103 provides: 1) that a party who loses an advance ruling on evidence need not renew an objection or offer of proof at trial, if the advance ruling is definitive; and 2) that if there is a condition precedent to the advance ruling, such as the pursuit of a certain claim or defense or the testimony of a certain witness, then an appeal cannot be taken on the ruling unless the condition precedent actually occurs at trial.

In light of the public comment received, the Committee tentatively agreed to change a citation in the Committee Note to one that more completely described the need to excuse a party from renewing objections to definitive rulings. The Committee also tentatively agreed with a public comment suggesting that the Committee Note should be amended to emphasize that an advance ruling cannot be relied on if the facts and assumptions underlying the trial court's advance ruling are materially changed at trial.

The second sentence in the proposed amendment, set forth above, would codify the Supreme Court's ruling in *Luce v. United States,* and the cases that have extended the logic of *Luce.* Academics have submitted comment that has been critical of *Luce*; they have suggested that the second sentence of the proposed amendment should be dropped, and the Committee Note changed to state that the Committee was taking no position on whether *Luce* should be applied or extended. After discussion, the Evidence Rules Committee remained in general agreement that the *Luce* principle should remain in the text of the Rule, though some members expressed concern that extending the *Luce* principle to all analogous situations might result in some unintended consequences. The Committee resolved to revisit the question of whether the *Luce* language should be retained at its April, 1999 meeting, after the end of the public comment period.

## 2. Rule 404(a)

The proposed amendment to Evidence Rule 404(a) provides that if an accused attacks the victim's character, this opens the door to an attack on a "pertinent" character trait of the accused. Public comment has raised the concern that the term "pertinent" may be too broad. In a multiple

2

count prosecution, the chosen language might permit the prosecution to attack a character trait of the defendant that is pertinent to a count different from the one on which the defendant attacked the character of the victim.

In light of the public comment, the Evidence Rules Committee has tentatively agreed that the word "pertinent" should be replaced with the word "same." Under this proposal, the prosecution could rebut an attack on the victim's character only with evidence of the same bad character trait of the defendant. The Committee has also tentatively agreed to add to the Committee Note a reference to the fact that an accused might introduce a negative character trait of the victim for a purpose other than to prove that the victim acted in accordance with the character trait; this would not open the door to a character attack on the accused.

## 3. Rule 701

The proposed amendment to Evidence Rule 701 would prohibit lay witness testimony where the witness is testifying on the basis of specialized knowledge. The goal of the amendment is to prohibit lay witnesses from testifying on matters that should be governed by the reliability requirements of Evidence Rule 702. While most public comment on the proposal has been favorable, some commentators have expressed concern that the amendment might prohibit testimony from lay witnesses who testify on the basis of ordinary experience, e.g., that a certain substance was cocaine. The Committee's position is that testimony based on particularized knowledge that any member of the public could obtain without training or expertise should be covered by Rule 701, while testimony based on specialized knowledge that is dependent on special skill or training should be covered by Rule 702. The Committee will consider whether a stylistic change to the proposal is necessary to clarify this distinction.

## 4. Rule 702

The proposed amendment to Evidence Rule 702 provides three reliability-based requirements that all expert testimony must meet: (1) the testimony must be sufficiently based upon reliable facts or data; (2) the testimony must be the product of reliable principles and methods; and (3) the principles and methods used by the witness must be applied reliably to the facts of the case. The public comment received so far is, not surprisingly, divided on the merits of the proposal to amend Rule 702, though most commentary has been quite favorable. A major intervening development is that the Supreme Court will hear argument on December 7 in *Kumho Tire v. Carmichael*, where the issue is whether the *Daubert* gatekeeping standards apply to the testimony of a tire failure expert who testified largely on the basis of experience. The Evidence Rules Committee will continue to monitor the *Kumho* case and its effect, if any, on the proposed amendment to Rule 702. The Committee has also tentatively agreed to make two minor changes to the Committee Note to Rule 702, in order to cite some recent case law and academic commentary.

3

## 5. Rule 703

The proposed amendment to Rule 703 would limit the disclosure to the jury of information relied on by an expert, where that information is otherwise inadmissible. The amendment provides that this information cannot be disclosed unless its probative value (in assisting the jury to weigh the expert's opinion) substantially outweighs the risk of prejudice (from the jury's misusing the evidence). The goal of the amendment is to prevent a party from evading exclusionary rules of evidence through the simple expedient of having an expert rely on the inadmissible information.

The public comments on Rule 703 have been almost uniformly positive. The Evidence Rules Committee has tentatively decided to reject suggestions that the text of the Rule be made more elaborate to specify the probative value and prejudicial effect that the trial judge must consider. The Evidence Rules generally refer to probative value and prejudicial effect without elaboration, leaving the balancing of these factors to the discretion of the trial court. Moreover, the Committee Note to the Rule makes clear what the probative value and prejudicial effect are when the expert relies on information not in evidence. The Committee has also decided to reject more radical proposals that would prohibit the expert from relying on information not in evidence, and that would add a new hearsay exception to permit reliable information used by an expert to be admitted for its truth.

The Committee considered and approved the changes to the text of Evidence Rule 703 suggested by the Style Subcommittee of the Standing Committee. These changes would make the language of the Rule more direct and concise. The Committee also tentatively agreed to a stylistic change that would clarify that the Rule presumptively prohibits disclosure of all information not in evidence that is relied upon by an expert. Finally, the Committee tentatively agreed to add language to the Committee Note that would indicate that the proponent of the expert might be permitted to disclose the information not in evidence relied on by the expert, if the opponent opens the door by attacking the expert's basis.

## 6. Rules 803(6) and 902

The proposed amendments to Rules 803(6) and 902 are interrelated. The amendment to Rule 803(6) would permit business records to satisfy the hearsay exception without the requirement of in-court testimony by a custodian or other qualified witness; such a person would be permitted to certify that the admissibility requirements of the exception are met. The amendment to Rule 902 would provide that a business record accompanied by such a certification can be self-authenticating. The goal of these amendments is to provide consistency in the proving up of business records. Current federal law permits proof of foreign business records in criminal cases by way of certification; but business records in civil cases and domestic business records in criminal cases must still be proven by the testimony of a qualified witness.

DNM 1403

The Evidence Rules Committee has tentatively agreed to a stylistic change to proposed Rules 902(11) and 902(12) that would provide for a more consistent use of the terms "certification" and "declaration." Under this stylistic revision, each new subdivision would require that the qualified witness make a "written declaration of the custodian thereof or another qualified person certifying that the record" meets the requirements of the Rule. The Committee also tentatively agreed to a stylistic change that would replace a pronoun with a more definite term. Finally, the Committee tentatively agreed to add to the Committee Note a reference to the statute governing declarations filed in a federal court.

## B. Other Matters Considered

### 1. Rule 609

Evidence Rule 609 provides that certain convictions are admissible to impeach the character of a witness if a balancing test is met (subdivision (a)(1)), and that other convictions are automatically admissible (subdivision (a)(2)). A public comment was received suggesting that the use of the word "and" between these subdivisions was misleading; the argument was that the use of the word "and" implies that a conviction must meet the requirements of both subdivisions to be admissible, when in fact the subdivisions provide independent paths to admissibility.

The Evidence Rules Committee considered this comment and determined that it was not necessary to amend Rule 609. The use of the word "and" clearly indicates that the provisions are independent rather than related. That is, both subdivisions provide for admissibility of convictions if their requirements are met.

### 2. Rule 1101

Evidence Rule 1101 sets forth the actions and proceedings to which the Federal Rules of Evidence are applicable, and also excludes certain proceedings from the applicability of those Rules. The Evidence Rules Committee considered whether Evidence Rule 1101 should be amended to either exclude certain actions from or include certain actions within the rubric of the Evidence Rules.

The Committee determined that there are several types of actions in which the courts have found the Evidence Rules inapplicable, even though the actions are not specifically excluded under Rule 1101. The Committee also considered whether some of the proceedings currently excluded from the Rules by Rule 1101 should remain so.

Ultimately, the Committee concluded that there is no critical need to amend Rule 1101 at this time. First, the courts have had no problem in exempting certain actions from the Evidence Rules where the nature of the action warrants it, even if there is no explicit exclusion in Rule 1101. Second, the Committee found that it would not be appropriate to apply the Evidence Rules to any proceedings that are currently exempted by Rule 1101.

DNM 1404

## 3. Privileges

The Evidence Rules Committee once again discussed whether it should attempt to propose a codification of the privileges, in light of substantial recent Congressional activity in this area. Committee members are divided on whether the project would be productive. The Chair designated a subcommittee to consider whether a proposed codification of the privileges would be a worthwhile project. The subcommittee will report back to the Evidence Rules Committee at the April, 1999 meeting.

## 4. Rule 902(6)

Evidence Rule 902(6) provides that "[p]rinted materials purporting to be newspapers or periodicals" are self-authenticating. The Evidence Rules Committee has determined that the Rule may not cover news wire reports that do not subsequently appear in print articles, such as electronic stock market reports. The Committee resolved to consider this matter in the future, should another package of amendments to the Evidence Rules be deemed necessary.

### C. Outmoded or Misleading Advisory Committee Notes

The Evidence Rules Committee has engaged in a two-year long project to identify those original Advisory Committee Notes that may be misleading because they comment on a version of the Rule that was either rejected or substantially changed by Congress. The culmination of the project was a report by the Committee's Reporter, setting forth the problematic Notes and providing editorial comment that can be used by publishers to alert the reader that the Note is commenting on a Rule different from that actually enacted.

The Reporter's report has been published as a pamphlet by the Federal Judicial Center. The pamphlet has been distributed to all Federal judges, all publishers of the Federal Rules of Evidence, and other interested parties. The report has also been published in the supplement to Wright and Miller's treatise on federal courts, and will soon be published in Federal Rules Decisions.

## IV. Minutes of the October 1998 Meeting

The Reporter's draft of the minutes of the Evidence Rules Committee's October 1998 meeting are attached to this report. These minutes have not yet been approved by the Evidence Rules Committee.

Attachment:

Draft Minutes

DNM 1405



# Advisory Committee on Evidence Rules

Minutes of the Meeting of April 12-13, 1999

New York, N.Y.

The Advisory Committee on the Federal Rules of Evidence met on April 12th and 13th at Fordham University in New York City.

*The following members of the Committee were present:*

> Hon. Fern M. Smith, Chair
> Hon. Milton I. Shadur, Acting Chair for the first day of the meeting
> Hon. David C. Norton
> Hon. Jerry E. Smith
> Hon. James T. Turner
> Professor Kenneth S. Broun
> Laird Kirkpatrick, Esq.
> Gregory P. Joseph, Esq.
> Frederic F. Kay, Esq.
> John M. Kobayashi, Esq.
> David S. Maring, Esq.
> Professor Daniel J. Capra, Reporter

*Also present were:*

> Hon. Anthony J. Scirica, Chair of the Standing Committee on
>     Rules of Practice and Procedure
> Hon. Frank W. Bullock, Jr., Liaison to the Standing Committee on
>     Rules of Practice and Procedure
> Hon. Richard Kyle, Liaison to the Civil Rules Committee
> Hon. David D. Dowd, Liaison to the Criminal Rules Committee
> Professor Daniel R. Coquillette, Reporter, Standing Committee on
>     Rules of Practice and Procedure
> Professor Leo Whinery, Reporter, Uniform Rules of Evidence
>     Drafting Committee
> Roger Pauley, Esq., Justice Department
> Peter G. McCabe, Esq. Secretary, Standing Committee on Rules of Practice and
>     Procedure
>
> John K. Rabiej, Esq., Chief, Rules Committee Support Office
> Joe Cecil, Esq., Federal Judicial Center

DNM 1406

## Opening Business

Judge Shadur chaired the first day of the meeting. Judge Fern Smith was available by way of telephone conference call on the first day, and was present to chair the second day of the meeting. Judge Shadur opened the meeting  by asking for approval of the minutes of the October, 1997 meeting. These minutes were unanimously approved.

The Committee then considered the proposed amendments to the Evidence Rules that had been released for public comment. The proposed amendments covered Evidence Rules 103, 404(a), 701, 702, 703, 803(6) and 902. The Committee evaluated the public comments received on the proposals,  considered changes to the proposed amendments and Committee Notes, and approved the proposals, as modified, for recommendation to the Standing Committee that they be approved and referred to the Judicial Conference. What follows is a breakdown of the discussions, and the action taken, with respect to each of the proposals.

## Rule 702

The proposal to amend Rule 702 requires that expert testimony have a sufficient basis, that the expert employ reliable principles and methods, and that those principles and methods are reliably employed to the facts of the case. The intent of the proposal is to recognize and refine the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals* and its progeny.

Judge Shadur opened the discussion on Rule 702 by noting that in deciding how to amend the Rule, the Committee was not technically bound by the Supreme Court's intepretation of the existing Rule 702 in *Daubert* and in the recent case of *Kumho Tire v. Carmichael*. However, all members of the Committee were in agreement that the approach taken by the Supreme Court--an approach that is followed in the proposal issued for public comment--provided an excellent and definitive means of regulating unreliable expert testimony.  There was unanimous agreement that if the Rule is to be amended, it should stick as closely as possible to the Supreme Court's teachings in *Daubert* and *Kumho*.

The Committee then considered some of the major criticisms and suggestions that arose in the public comment period. The topics addressed are listed by number:

*1. Proliferation of motions challenging expert testimony*

Some public commentators were concerned that the proposed amendment would lead to a flood of motions challenging expert testimony. A discussion ensued in which some members said they had encountered no increase in challenges to experts since *Daubert*, while other members noted some (but not major) increase. Committee members noted that the public

2

comment had expressed particular concern about the possibility that motions to exclude would increase due to the proposed amendment's extension of the gatekeeper function to non-scientific expert testimony. Since the Supreme Court had resolved that question in *Kumho* consistently with the proposed amendment, Committee members considered most of the concern over a proliferation of motions to be mooted by the *Kumho* decision.

While the concerns expressed in the public comment period did not, in the Committee's view, warrant a rejection or limitation of the language in the text of the proposed amendment, the Committee unanimously agreed to add language to the Committee Note indicating that the amendment is not intended to provide an excuse for an automatic challenge to the testimony of every proffered expert. This language, and supporting authority, is included in the Committee Note attached as an appendix to these minutes.

### 2. Infringing the Right to Jury Trial

Some public commentators asserted that the proposed amendment would deny plaintiffs a right to jury trial, because it would allow the trial judge to exclude expert testimony by deciding credibility questions that should be left to the jury. The Committee found these general criticisms to be unjustified. To the extent the criticism was based on trial judges acting as gatekeepers, this is simply the result of the proposed amendment's codification of *Daubert* and *Kumho*. Even if Rule 702 were not amended, plaintiffs would have to deal with the trial judge's gatekeeping function in excluding the testimony of any expert if that testimony is unreliable. Moreover, the right to jury trial does not mean that litigants are permitted to bring any evidence, no matter how dubious or prejudicial, before a jury. Rather, the right to jury trial means that it is the jury's role to consider all the *reliable* evidence that is not unduly prejudicial, privileged, etc.. There is a legitimate concern that the jury, unschooled in the ways of experts, will if unregulated give undue weight to expert testimony that is in fact unreliable. Therefore, a rule of evidence excluding unreliable expert testimony--such as either the current or the amended Rule 702-- does not violate the right to jury trial.

For all these reasons, the Committee unanimously agreed that any concerns over the loss of the right to jury trial did not warrant a change in the text of the proposed amendment to Evidence Rule 702. The Committee agreed, however, to add to the Committee Note a quotation from the Court in *Daubert*, in which the Court indicates that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." This language, and supporting authority, is included in the Committee Note attached as an appendix to these minutes.

### 3. Extending the Gatekeeper Function to Non-scientific Expert Testimony

Some public commentators objected to the proposed amendment's explicit extension of

3

the *Daubert* gatekeeping function to the testimony of non-scientific experts. These comments were rendered before the Supreme Court's decision in *Kumho*, however. The Court in *Kumho*, citing favorably the Committee Note to the proposed amendment released for public comment, held that the *Daubert* gatekeeping function must be applied to all expert testimony. The *Kumho* Court emphasized the same flexible standards for assessing reliability that are set forth in the proposed amendment and Committee Note. The Committee therefore decided that there was no need to modify either the text or the note of the proposed amendment to address any concerns about extending the gatekeeper function to non-scientific expert testimony.

### 4. Competing Methodologies in the Same Field

Some public commentators have expressed the concern that the proposed amendment to Rule 702 fails to recognize that there might be two or more competing reliable methodologies in the same field. The Committee considered these criticisms and concluded unanimously that the broad language of the proposed amendment, which refers to "reliable principles and methods", is broad enough testimony based on competing methodologies in the same field,  where both are reliable. In order to assuage any concerns on the matter, the Committee agreed to add language to the Committee Note  providing that the amendment "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise." This language, and supporting authority, is included in the Committee Note attached as an appendix to these minutes.

### 5. Experience-based Experts

A few public commentators took the position that the proposed amendment would exclude the testimony of any expert relying on experience, rather than scientific or technical knowledge. The Committee considered these comments and found them to be without merit. Rule 702 specifically states that  experts may be qualified by experience. The proposed amendment, in requiring that experts must employ reliable principles and methods, in no way implies that experience cannot qualify under its terms. The Committee therefore unanimously rejected a suggestion that the term "experience" be included together with the terms "principles and methods" in the text of the proposed amendment. Such a change might give too much weight to experience as a basis for expert testimony.

The Committee nonetheless agreed to amend the Committee Note to emphasize that the testimony of experience-based experts can qualify under the Rule. The revision provides, among other things, that in certain fields, "experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." This language, and supporting authority, is included in the Committee Note attached as an appendix to these minutes.

*6. Requiring the Testimony to be Sufficiently Based on Reliable Facts or Data*

Several organizations expressed concern that the reference in Subpart (1) of the proposed amendment to an expert's reliance on "reliable facts or data" would create several problems. One possibility is that the trial judge could exclude the expert's testimony on the ground that the judge did not believe the underlying data; the concern is that this type of credibility determination could usurp the jury's role. Another possibility expressed in the public comment is that the reference to "reliable facts or data" could be construed to prohibit an expert from relying on hypothetical facts or data. Finally, and most importantly, the commentators noted a possibly problematic overlap between imposing a limitation on reliable facts or data in Rule 702, and imposing a similar limitation on otherwise inadmissible facts or data under Rule 703.

The Committee considered all of these criticisms and collectively found that some or all had merit. The Committee noted that the problems derived from the focus on "reliable" facts or data in Subpart (1). The intent of Subpart (1) is to assure that the expert has relied on a sufficient *quantity* of information; calling for a qualitative assessment (by requiring the information to rise to some independent level of reliability) risks a conflict with Rule 703. Nor is a qualitative assessment of the underlying data necessary in Subpart (1). Subparts (2) and (3) already require the expert to use reliable principles and methods and to apply those principles and methods reliably, so there is virtually no chance that deletion of the term "reliable" from Subpart (1) would result in the admission of unreliable expert testimony.

The Committee therefore unanimously agreed to revise  Subpart (1) of the proposed amendment to Rule 702, to delete the word "reliable", and to restyle the language of Subpart (1) to provide that an expert's opinion must be based on "sufficient facts or data". The proposed Committee Note was modified where necessary to take account of this minor change. A subsequent motion was made to delete Subpart (1) entirely from the proposed amendment. This motion failed by a vote of eight to two.

*7. Focus on an Expert's Reasoning*

One public comment suggested that the proposed amendment should be revised to focus on an expert's "reasoning" rather than the use of "principles and methods". The Committee considered this comment and unanimously concluded that the suggested change was one of style rather than substance, that any stylistic change was not for the better, and therefore that the proposal should not be amended to focus on "reasoning."

*8. Retaining the Existing Rule:*

The Committee considered and discussed several public comments suggesting that Rule 702 should not be amended at all.  One member of the Committee expressed some sympathy

5

with this position. But the remaining Committee members were of the view that the amendment should be forwarded to the Standing Committee, for a number of reasons. First, even after the *Kumho* decision, there are a number of *Daubert* questions on which the courts disagree, including the appropriate standard of proof and the rigor with which expert testimony should be scrutinized. Second, Congress has in the past shown an interest in "codifying" *Daubert*, and the Committee was concerned that these previous legislative proposals created many more problems than they solved. The Committee resolved that it was necessary to respond to these Congressional initiatives with the kind of flexible and carefully drafted amendment that the Committee has proposed.

### 9. *Generalized Expert Testimony:*

One public comment expressed the concern that the proposed amendment would preclude the testimony of experts who would testify only to instruct the jury on general principles--what one Committee member referred to as expert "tutorials." The cause of the concern was Subpart (3) of the proposed amendment, which states as a condition of admissibility that "the witness has applied the principles and methods reliably to the facts of the case." With respect to expert "tutorials", the argument could possibly be made that the expert has not attempted to apply any principles or methods to the facts of the case.

The Committee engaged in an extensive discussion and analysis of whether the proposed amendment should be revised to more specifically permit the testimony of experts who testify to general principles only. One possibility considered was to revise the proposal to provide that the witness must apply the principles and methods reliably to "the issues in the case." But this proposal was found by a majority of  Committee members to call for  a distinction without a difference.

Ultimately, the Committee agreed, by a vote of seven to three,  that the existing text of the proposal was clear enough to indicate that an expert tutorial would be admissible, so long as the expert's testimony was reliable and fit the facts of the case. The Committee then voted unanimously to revise the Committee Note to emphasize that reliable expert testimony can be admitted even where the expert makes no attempt to apply any methodology to the specific facts of the case. Among other things, the revision states that the amendment "does not alter the venerable practice of using expert testimony to educate the factfinder on general principles." This language, and supporting authority, is included in the Committee Note attached as an appendix to these minutes.

### 10. *Public Comment Suggestions to Revise Committee Note*

The Committee considered two sets of public comments that had suggested certain revisions to the Committee Note to the proposed amendment to Evidence Rule 702.

6

One comment suggested that the Committee Note be amended to state that Rule 104(b), rather than Rule 104(a), provides the standard of proof for determining the reliability of expert opinion under Rule 702. The Committee considered this comment and unanimously determined that the suggestion was inconsistent with a number of important precedents: 1) the Supreme Court in *Daubert* expressly stated that the trial judge's gatekeeper function is found within Rule 104(a), and this position was reiterated implicitly in *Joiner v. General Electric* and *Kumho*; 2) the recent amendment adding Evidence Rule 804(b)(6) specifically states in the Committee Note that admissibility questions thereunder are to be decided under Rule 104(a)--the Committee found no distinction between issues decided by the judge under Rule 804(b)(6) and those decided by the judge under Rule 702; and 3) for admissibility determinations by the judge, Rule 104(a) sets the basic rule, to which Rule 104(b) is the exception that is applicable in certain very limited situations. The Committee unanimously determined that none of the reasons for employing the exceptional Rule 104(b) standard applied to the trial judge's determination of the reliability of an expert's opinion.

A second set of comments expressed concern with the Committee Note that was released for public comment, insofar as the Note suggests certain factors that a trial court could consider in determining whether an expert's testimony is reliable. The concern was that the listed factors might be read as being dispositive of the reliability question. The Committee agreed to add language to the Committee Note providing that "no single factor is necessarily dispositive of the reliability of a particular expert's testimony."This language, and supporting authority, is included in the Committee Note attached as an appendix to these minutes.

### 11. Style Subcommittee

The Evidence Rules Committee considered a change suggested by the Style Subcommittee of the Standing Committee.  That change substituted the word "if" for the words "provided that" at the beginning of the proposed amendment to Rule 702. The Committee unanimously agreed to adopt the suggestion.

### 12. Kumho

The Committee unanimously resolved to add language to the Committee Note to take account of the Supreme Court's decision in *Kumho*. The sense of the Committee was that the analysis in *Kumho* is completely consistent with and supportive of,  the approach taken by the proposed amendment and Committee Note; therefore it would be appropriate to cite and quote *Kumho* throughout the Committee Note. All of this language, and supporting authority, is included in the Committee Note attached as an appendix to these minutes.

7

*12. Recommendation*

A motion was made and seconded to recommend to the Standing Committee that the proposed amendment to Evidence Rule 702, as modified following publication, be approved and forwarded to the Judicial Conference. That motion passed by a unanimous vote.

A copy of the proposed amendment to Rule 702, and the proposed  Committee Note to Rule 702, is attached to these minutes.

# Rule 701

The Committee considered the proposed amendment to Evidence Rule 701. As released for public comment, the proposal would preclude testimony under Rule 701 if it were based on "scientific, technical, or other specialized knowledge." The goal of the amendment is to prevent testimony from being admitted under Rule 701 when in fact it is expert testimony and treated as such by the proponent.

An extensive discussion ensued on whether it was appropriate to establish a bright line between expert and lay testimony. Justice Department representatives argued that the proposal would create uncertainty, and would result in many more witnesses being subject to the disclosure provisions applicable to experts. They argued further that any expansion of discovery rules should not come by way of a  rule of evidence. Other members argued, in contrast,  that the proposal would not change existing law in any substantial way. A proponent who purports to present lay witness testimony that is based on extensive experience will have to establish a foundation in any case--the experiential foundation that would qualify the witness under Rule 701 would be the same as the foundation necessary to establish the witness as an expert under Rule 702. Justice Department representatives argued in response that the real problem was one of finding it necessary to disclose such witnesses in advance of trial.

Ultimately, the Committee agreed that both the text and the Note to Rule 701 had to be revised to accommodate DOJ concerns about pretrial disclosure of witnesses such as eyewitnesses testifying on the basis of extensive, particularized experience. The Committee agreed that there was no intent to prevent such witnesses from testifying under Rule 701. On the other hand, the Committee was strongly of the view that a proponent should not be permitted to end-run the requirements of Rule 702 simply by calling testimony "lay witness testimony" when in fact the proponent emphasizes the witness' specialized knowledge and expertise.

After extensive discussion on possible compromise language, and taking account of the suggestions of the Justice Department, the Committee ultimately agreed to one change in the text of the proposal that was issued for public comment. That change modifies the exclusion of testimony under Rule 701 to testimony "not based on scientific, technical or other specialized

knowledge **within the scope of Rule 702**." The inference is, therefore, that some specialized knowledge may provide a permissible basis of lay witness testimony--just not the specialized knowledge that is traditionally within the scope of expert witness testimony. Corresponding changes were made to the Committee Note, and the Note was also amended to delete a paragraph that  had implied that all testimony based on specialized knowledge must be considered expert testimony. Finally, a section was added to the Committee Note indicating that there was no intent to prevent lay witnesses from traditionally accepted subjects such as the value of property and the fact that a certain substance was a narcotic. This new  section of the Committee Note also elaborates on the distinction between lay testimony, which "results from a process of reasoning familiar in everyday life", while  expert testimony "results from a process of reasoning which can be mastered only by specialists in the field."

*Recommendation:*

A motion was made and seconded to recommend to the Standing Committee that the proposed amendment to Evidence Rule 701, as modified following publication to address the Justice Department's concerns over the scope of the Rule, be approved and forwarded to the Judicial Conference. Nine Committee members voted in favor of the motion. The Justice Department representative abstained.

A copy of the proposed amendment to Rule 701, and the proposed  Committee Note to Rule 701, is attached to these minutes.

## Rule 703

The proposed amendment to Evidence Rule 703 would impose limitations on the disclosure to the jury of otherwise inadmissible information used as the basis of an expert's opinion.The Committee  considered some of the major criticisms and suggestions that arose in the public comment period concerning the proposed amendment to Evidence Rule 703. The topics addressed are listed by number:

*1. A Change to the Rule is Unnecessary*

The intent of the proposed amendment is to prevent an opponent from bringing unreliable hearsay or other inadmissible evidence before the jury in the guise of information relied upon by an expert. A few public comments argued that the Rule need not be amended, on the ground that courts have been guarding against the abuses that the amendment seeks to prevent. But based on an extensive review of the case law, as well as other public comments and the experiences of the Committee members, the Committee unanimously agreed that there remains a substantial risk that parties will use the existing Rule 703 as a backdoor means of evading exclusionary rules. Consequently, the Committee determined that the Rule should be amended to guard against that risk.

*2. Rebuttal, and Response to an Anticipated Attack on the Expert's Basis*

Some public comments suggested that the Committee Note should be amended to clarify that a proponent may be able to bring out  inadmissibly used by the expert on rebuttal, if the opponent attacks the basis of an expert's opinion on cross-examination. Along the same lines, these public comments suggested that the Note address whether an expert's inadmissible basis could be brought out on direct in an effort to "remove the sting" of an anticipated attack on the expert's basis. The Committee concluded that the possibilities of disclosing inadmissible information relied upon by an expert— either for rebuttal or in anticipation of an attack on the expert's basis— are encompassed within the balancing test set forth in the proposed amendment. There was therefore no need to amend the text of the Rule to account for these possibilities. The Committee did agree, however, to amend the Committee Note to clarify that the balancing test should be applied to questions of rebuttal and anticipated attack.  The added language provides that "an adversary's attack on an expert's basis will often open the door to a proponent's rebuttal with  information  that was reasonably relied upon by the expert, even if that information would not have been discloseable initially under the balancing test provided by this amendment." It further provides that "in some circumstances the proponent might wish to disclose  information that is relied upon by the expert in order to 'remove the sting' from the opponent's  anticipated attack," and that the trial court "should take this consideration into account in applying the balancing test provided by this amendment."

*3. Requiring Proponents to Qualify Evidence Relied on by an Expert*

One public commentator suggested that the proposed amendment would result in wasted expense, because it would force a proponent to qualify evidence as admissible even if it was only to be used as part of  the basis of an expert's testimony. The Committee found this suggestion to be without merit. If information relied on by an expert is in fact admissible, there is no legitimate reason why a proponent would want or need to admit it solely to explain the basis of an expert's testimony and not for substantive purposes. Nor is there a legitimate reason to forego the process of qualifying evidence that is in fact admissible.

*4. Information "Not in Evidence"*

At its October, 1998 meeting , the Evidence Rules Committee tentatively concluded that the proposed amendment should refer to information "not in evidence" rather than information that is "otherwise inadmissible." The thought was that the reference to information "not in evidence" would provide more clarity. However, on reconsideration, the Committee unanimously determined that the phrase "not in evidence" would be problematic. It would subject even admissible information used by an expert to the strict balancing test simply because the information was not yet put in evidence at the time of the expert's testimony. This could lead to disruption in the order of proof because a proponent could be forced to qualify evidence out of

10

the ordinary sequence, in order to avoid the strict balancing test of the proposed amendment.

After extensive discussion, the Committee resolved to return to the "otherwise inadmissible" language that had been included in the version of the proposed amendment that was issued for public comment. The Committee also resolved to address the concern of some public comments that it might be confusing to refer to the "probative value" of "otherwise inadmissible" evidence. The Committee unanimously agreed to add language to the text of the Rule to indicate that the probative value to be assessed is the degree to which the otherwise inadmissible information assists the jury in understanding the expert's opinion. The Committee Note was also revised to accord with the change in the text.  This language is included in the proposed amendment and Committee Note attached as an appendix to these minutes.

### 5. Explicating Balancing Factors in the Committee Note

The Committee considered the suggestion of some public commentators that the Committee Note to the proposed amendment to Rule 703 should be revised to add a list of factors that a trial court should consider in determining whether otherwise inadmissible information relied on by an expert should be disclosed. Committee members generally expressed a reluctance to include such a checklist. Members were confident that trial judges were experienced in balancing probative value and prejudicial effect in a variety of situations. There was also a concern that by including some factors, courts and litigants might draw a negative inference concerning other factors that are not expressly included on the list. The Committee therefore unanimously agreed that the suggested addition should not be adopted.

### 6. Recommendation

A motion was made and seconded to recommend to the Standing Committee that the proposed amendment to Evidence Rule 703, as modified following publication, be approved and forwarded to the Judicial Conference. The motion was passed by a unanimous vote.

A copy of the proposed amendment to Rule 703, and the proposed  Committee Note to Rule 703, is attached to these minutes.

## Rule 103

The proposal to amend Rule 103 that was issued for public comment would provide that a party need not renew an objection or offer of proof where the trial court has made a definitive advance ruling admitting or excluding evidence. It further codifies and extends the rule of *Luce v. United States.  Luce* held that a criminal defendant who objects to an advance ruling admitting

11

impeachment evidence  must take the stand to preserve any claim of error for appeal.

The Chair began the discussion on Rule 103 by stating that she did not believe it was the Committee's role to expand the application of *Luce*--that was an important policy issue that should be left to the courts. Several Committee members echoed this sentiment, and stated that the proposed Rule should leave the applicability of *Luce* to case law. The way this could be done would be to delete the second sentence of the proposed amendment (the sentence codifying and extending *Luce*), and to state in the Committee Note that there was no intent to address any of the questions raised in *Luce*.

The Justice Department representatives objected to this solution, arguing that deleting the second sentence of the proposal would implicitly overrule *Luce*, and that this implication could not be corrected by a Committee Note. They argued that most of the expressed concern over the second sentence was in its application to civil proceedings. The Justice Department representatives suggested that the text of the proposal could be changed to limit the second sentence, concerning *Luce*, to criminal cases. Some members responded that this solution would implicitly overrule some of the court decisions that had in fact applied *Luce* in a civil setting. The Justice Department representatives responded that the Committee Note could state that there was no intent to deal with *Luce* in a civil setting. It was unclear to many Committee members, however, why a Committee Note would be considered sufficient to clarify any ambiguity about the effect of the Rule on *Luce* in civil cases when, according to the Justice Department, a Committee Note would not be sufficient to clarify any ambiguity about the effect of the Rule on *Luce* in every case.

Other Committee members rejected the contention that dropping the sentence on *Luce* could be construed as an implicit overruling of that decision. The first sentence of the proposed amendment states that there is no need to renew an objection or offer of proof when the advance ruling is definitive. But *Luce* has nothing to do with renewing an objection--rather, it requires a party to testify in order to preserve a claim of error with respect to the admission of impeachment evidence. Testifying and renewing an objection are separate concepts.

Other Committee members, addressing the Justice Department's proposal to limit the *Luce* language to criminal cases, noted that such a limitation had been rejected by the Standing Committee when a previous version of an amendment to Rule 103 was proposed for release for public comment.

A motion was made to delete the second sentence of the proposed amendment to Rule 103 that was issued for public comment; to amend the Committee Note to indicate that there is no intent to disturb *Luce;* and to add language to the Committee Note describing why the question of renewal of objection or offer of proof is different from the question confronted by the Court in *Luce.* This motion passed by a vote of 7 to 3. A second motion was made to retain the second sentence but limit it to criminal cases, and to amend the Committee Note accordingly. This motion failed by a vote of 7 to 3.

After these votes, Committee members expressed concern that Justice Department objections to the deletion of the second sentence of the proposal might result in the rejection of the proposed amendment in its entirety. The sense of the  Committee was that it would be most unfortunate if the first sentence of the proposal were to be rejected due to expressed objections over the deletion of the second sentence. Therefore, in a separate vote, the Committee unanimously agreed that it would prefer to have an amendment with the *Luce* language,  limited to civil cases,  rather than to have no amendment at all.

*Magistrate Judge's Rulings:*

28 U.S.C section 636(b)(1) and  Fed.R.Civ. P. 72(a) require that a party who would object to the nondispositive determination of a magistrate judge on a matter adjudicated without consent of the parties must file an objection with the district court within ten days of the ruling, in order to preserve a claim of error on appeal. A public commentator expressed concern that the proposed amendment to Evidence Rule 103(a) could be construed as in conflict with the statute and the Civil Rule, because the proposed amendment states that a party need not renew an objection or offer of proof as to pretrial definitive rulings.

The Committee, after discussion, determined that there was no inconsistency between the proposed amendment and the statute and Civil Rule. The proposed amendment provides that an objection or offer of proof need not be *renewed* at trial when the pretrial ruling is definitive. The statute and Civil Rule do not require a renewal of an objection; rather, they require the party to essentially *appeal* the Magistrate Judge's ruling to the district court, in order to preserve the right to appeal further to the court of appeals. The Committee therefore found it unnecessary to amend the text of the proposal to refer to 28 U.S.C section 636(b)(1) and  Fed.R.Civ. P. 72(a).

The Committee did agree, however, that it would be useful to add language to the Committee Note that would mention the statute and Civil Rule, and to state that there is no intention to abrogate those provisions. The Committee unanimously agreed to add the following language to the Committee Note:

Nothing in the amendment is intended to affect the provisions of Fed.R.Civ.P. 72(a) or 28 U.S.C. §636(b)(1), pertaining to nondispositive pretrial rulings by magistrate judges in proceedings that are not  before a magistrate judge by consent of the parties. Fed.R.Civ.P. 72(a) provides that a party who fails to file a written objection to a magistrate judge's nondispositive order within ten days of receiving a copy "may not thereafter assign as error a defect" in the order. 28 U.S.C. §636(b)(1) provides that any party "may serve and file written objections to such proposed findings and recommendations as provided by rules of court" within ten days of receiving a copy of the order. Several courts have held that a party must comply with this statutory provision in order to preserve a claim of error. *See, e.g., Wells v. Shriners Hospital*, 109 F.3d 198, 200

13

(4th Cir. 1997)("[i]n this circuit, as in others, a party 'may' file objections within ten days or he may not, as he chooses, but he 'shall' do so if he wishes further consideration."). When Fed.R.Civ.P. 72(a) or 28 U.S.C. §636(b)(1) is operative, its requirement must be satisfied in order for a party to preserve a claim of error on appeal, even where Evidence Rule 103(a) would not require a subsequent objection or offer of proof.

*Subsequent Foundation*

The Committee reviewed a public comment suggesting that the Committee Note to the proposed amendment to Rule 103 be revised to address the problem arising when evidence is admitted subject to connection or foundation, and the proponent never ends up satisfying that foundation requirement. In such circumstances, the objecting party should not be led to believe that an initial objection at the time of the advance ruling would be sufficient to preserve a claim of error predicated on the proponent's failure to establish a foundation. The Committee agreed that it would be useful to amend the Committee Note to provide guidance to practitioners on this question. The Committee voted unanimously to add language to the Committee Note providing that "if the court decides in an advance ruling that proffered evidence is admissible subject to the eventual introduction by the proponent of a foundation for the evidence, and that foundation is never provided, the opponent cannot claim error based on the failure to establish the foundation unless the opponent calls that failure to the court's attention by a timely motion to strike or other suitable motion."

*Style Subcommittee*

The Style Subcommittee of the Standing Committee suggested a minor change to the proposed amendment to Evidence Rule 103 as it was released for public comment. The suggestion was to move the clause "at or before trial" to a different place in the first sentence of the proposal. The Committee unanimously agreed to this change.

*Recommendation:*

A motion was made and seconded to recommend to the Standing Committee that the proposed amendment to Evidence Rule 103, as modified following publication, be approved and forwarded to the Judicial Conference. The motion was passed by a vote of seven to three.

A copy of the proposed amendment to Rule 103, and the proposed  Committee Note to Rule 103, is attached to these minutes.

DNM 1419

## Rule 404(a)

The proposed amendment to Evidence Rule 404(a) that was issued for public comment would provide that if an accused attacks the victim's character, this opens the door to an attack on a "pertinent" trait of character of the accused. At its October, 1998 meeting, the Committee tentatively agreed to change the word "pertinent" to the word "same", thus limiting the door-opening effect to the very trait of character as to which the accused attacked the victim. The Committee Note was also tentatively revised to accord with this textual change, and to clarify that the Rule does not apply if the accused proffers evidence of the victim's character for some purpose other than proving the victim's propensity to act in a certain way. These tentative changes were approved by the Committee at the April meeting, as appropriate and helpful limitations and clarifications.

The Committee also discussed a suggestion that all the references in Rule 404 to a "victim" should be changed to refer to an "alleged victim." Use of the term "alleged" would provide consistency with Rule 412, and would reflect the reality that at the time the character evidence is proffered, the victim's status is alleged, not proven. The Committee agreed to make this change to the text of the proposed amendment, and to make corresponding changes to the Committee Note.

The Committee then discussed the underlying merits of the proposed rule change. Some members expressed concern that the proposal imposes an unjustified penalty on an accused who decides to attack the victim's character; but most members were of the view that the proposal is necessary to prevent a one-sided presentation of character evidence.

*Recommendation:*

A motion was made and seconded to recommend to the Standing Committee that the proposed amendment to Evidence Rule 404(a), as modified following publication, be approved and forwarded to the Judicial Conference. The motion was passed by a vote of nine to one.

A copy of the proposed amendment to Rule 404(a), and the proposed Committee Note to Rule 404(a), is attached to these minutes.

## Rule 803(6)

The proposed amendment to Evidence Rule 803(6) would provide a means of qualifying business records without the necessity of calling a witness to testify at trial. The public comment on the proposal was almost uniformly favorable. The Committee considered one public comment arguing that the proposal could violate a criminal defendant's right to confrontation. But after extensive research into the case law, the Committee found that there is no viable confrontation

question where the record itself fits the requirements of a business record and is qualified by a sworn declaration of the custodian or other qualified witness. The Committee unanimously found that there was no need to amend either the text or the Committee Note of the proposal that was released for public comment.

*Recommendation:*

A motion was made and seconded to recommend to the Standing Committee that the proposed amendment to Evidence Rule 803(6), as issued for public comment, be approved and forwarded to the Judicial Conference. The motion was passed by a unanimous vote.

A copy of the proposed amendment to Rule 803(6), and the proposed Committee Note to Rule 803(6), is attached to these minutes.

## Rule 902

The proposed amendment to Rule 902 would provide a means of authenticating certain business records, other than through the live testimony of a foundation witness. The proposal is intended to work in tandem with the amendment to Evidence Rule 803(6). The intent of the amendment is to provide similar treatment for domestic records, and foreign records in civil cases, as is provided for foreign records in criminal cases by 18 U.S.C. section 3505.

*Right to Confrontation:*

A Justice Department representative suggested that the Committee Note to the proposed amendment to Evidence Rule 902 include a statement that the admission of business records through certification of a qualified witness does not violate a criminal defendant's right to confrontation. Most Committee members thought it unwise, however, to opine about constitutional issues in a Committee Note. The suggestion was therefore rejected.

*Tracking Section 3505*

18 U.S.C. 3505 provides that foreign business records can be admitted in criminal cases by way of certification of a qualified witness. The proposed amendment to Rule 902 seeks to apply the principles of section 3505 to all domestic business records, and to foreign business records in civil cases. The proposed amendment is not a carbon copy of section 3505, however. For example, section 3505 contains a provision that an objection to the record must be entered before trial, or it is deemed waived.  It also provides that the court's ruling on a motion to exclude the record must be made before trial. There are no similar procedural provisions in the proposed amendment to Evidence Rule 902.

16

A Justice Department representative argued that because the language section 3505 differed from that of the proposed amendment, the proposed Rule 902(12) should be expanded to criminal cases. This would in effect provide the government two means of qualifying foreign business records in criminal cases--section 3505 and Rule 902(12). Committee members generally opposed this suggestion, expressing concern that it would result in much confusion. Nor did the Committee find any reason to replicate section 3505 word for word in the Evidence Rules. Section 3505 contains intricate procedural provisions, the type of which are not generally found in the Evidence Rules. The suggestion from the Justice Department representative failed for want of a motion.

### Records Admissible Under Rule 803(6)

One public comment suggested that the reference in the proposed amendment to records admissible under Rule 803(6) would create a problematic circularity. The argument was that a record is only admissible under Rule 803(6) if a qualified witness authenticates the record at trial, or if the record is certified in accordance with Rule 902. But since the proposed amendment to Rule 902 refers back to admissibility under Rule 803(6), the public commentator envisioned an endless cycle of inadmissibility. The Committee concluded that this concern could be remedied by revising the text of the proposal slightly to refer to a "record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian  or other qualified person . . ." Committee members expressed the opinion that it was important to refer to Rule 803(6) in the proposed amendment to Rule 902--such a reference was necessary to provide a connection between the two rules. The Committee voted unanimously to modify the language of the text of Rules 902(11) and (12) to refer to records "that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian  or other qualified person".

### Record Made by a Regularly Conducted Activity

One public comment suggests that the reference in the proposed amendment to records "made by the regularly conducted activity as a regular practice" is awkward, because, it is asserted, an activity cannot make a record. The Committee considered this criticism and determined that the chosen language was appropriate--it tracked the terms of Rule 803(6) and 18 U.S,C. 3505, both of which refer to records made by an activity.

### Explication of Certification Standards

A public comment suggested that the text of the proposed amendment be amended to refer to rules and statutes governing the methods of proper certification. The Committee noted that Rule 902(4), governing authentication of public records,  contains language providing for

17

certification "in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority". The Committee unanimously agreed that it would be appropriate and helpful to add identical language to Rule 902(11). Similar language could not be added to Rule 902(12), however, since that provision governs foreign business records, and certification of those records could not be expected to follow a manner complying with domestic law. The Committee also agreed, in accordance with a tentative decision reached at the October meeting, to amend the Committee Note to provide a reference to 28 U.S.C. §1746, the most important statutory provision governing affirmations under oath. The language added to the text and Committee Note can be found in the appendix to these minutes.

*Notice Provision*

The Committee determined, in response to a suggestion in a public comment, that it would be useful to specify that the proponent must make both the underlying record and the signed declaration available in advance of trial. The Committee also affirmed a tentative decision reached at the October meeting--that the text of the Rule specify that the opponent should have sufficient time to challenge the declaration of the custodian or other qualified witness. These changes were agreed to by unanimous vote.

Some public commentators suggested that the notice provisions should be amended to provide more procedural detail. But the Committee unanimously concluded that such an approach would be inconsistent with the notice provisions found in other Evidence Rules, which are mostly cast in general terms.

*Style Subcommittee*

The Style Subcommittee of the Standing Committee made a number of suggestions for restylizing the proposed amendment to Rule 902. Some of the suggestions were mooted because they were made with respect to proposed revisions that were not adopted. The Evidence Rules Committee unanimously agreed to all of the other suggestions except one--the suggestion for restylizing the phrase "in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority" was not adopted because the existing phrase is drawn verbatim from other Evidence Rules, and the Committee believed it appropriate to use consistent terminology throughout the Evidence Rules.

*Recommendation:*

A motion was made and seconded to recommend to the Standing Committee that the proposed amendment to Evidence Rule 902, as modified following publication, be approved and forwarded to the Judicial Conference. The motion was passed by a unanimous vote.

18

A copy of the proposed amendment to Rule 902, and the proposed  Committee Note to Rule 902, is attached to these minutes.

## Privileges

At the October meeting, the Chair appointed a Subcommittee to conduct a preliminary investigation into whether it would be advisable for the Evidence Rules Committee to begin a project that might propose a codification of  the law of privileges. The Subcommittee reported at the meeting, and unanimously recommended that the Committee should begin a long-term project to attempt to draft proposed rules that would codify the federal law of privileges. The Subcommittee noted that there are many questions on which the courts are divided, both as to the extent of well-accepted privileges and the existence of newer privileges. The Subcommittee also noted that Congress has expressed an interest in codifying privileges on a case-by-case basis, and asserted that if Congress was determined to tinker with privilege law, it would be better to conduct a more wide-ranging review through the rulemaking process.  Finally, the Subcommittee noted that the lack of a codified privilege law created a major gap in the Evidence Rules--a gap that should be closed at some point.

The Committee unanimously agreed that an investigation of the privileges would be a useful project even if the Committee never reached the stage of formally proposing codified rules. In light of this general agreement, the Chair appointed a subcommittee to begin an investigation into codification of the privileges. It was suggested that the Subcommittee begin by reviewing the proposed codification of the original Advisory Committee on Evidence Rules. The Subcommittee consists of Laird Kirkpatrick, David Maring, and the Reporter. Ken Broun will act as a consultant to the Subcommittee. The Committee was in general agreement that this would be a long-term project.

## Technology

Judge Turner, who is the Evidence Rules Committee's representative on the Technology Subcommittee of the Standing Committee, reported on developments in the Standing Committee's technology project. The current focus is on promulgation of rules that will permit electronic filing with consent of the parties. The Technology Subcommittee has held a meeting with a number of judges and lawyers involved in pilot electronic filing projects, and has fashioned a proposed amendment to the Civil Rules that would permit electronic filing with consent of the parties. No changes to the Evidence Rules are contemplated, at least in the immediate future, though the Evidence Rules Committee will continue to monitor technological developments in the presentation of evidence..

DNM 1424

## Uniform Rules

Professor Whinery, the Reporter for the Uniform Rules of Evidence Drafting Committee, reported on developments in the Uniform Rules project. The Drafting Committee is revising the working draft after its first reading before the Uniform Laws Commissioners.  The Uniform Rules Committee has generally followed the Federal Rules of Evidence, but Professor Whinery noted that there are some marked differences. For example, Proposed Uniform Rule 702 establishes a presumption of admissibility for expert testimony that passes the *Frye* test, and a presumption of inadmissibility for expert testimony that does not. Then the Rule provides a number of factors that would be relevant to overcoming the presumption one way or another. Also, the Uniform Rules have been amended throughout to update language that might not accommodate the presentation of evidence in electronic form.

## New Business

The Chair noted that this April meeting has completed a cycle of the Committee--the end of a three-year-long project to propose a package of amendments to the Evidence Rules, most importantly the rules governing expert testimony. The Committee, after discussion, agreed that barring unforeseen developments (such as Congressional activity), there is no need to propose any amendments to the Evidence Rules in the near future.

## Next Meeting

The next meeting of the Evidence Rules Committee is scheduled for October 25th and 26th in Washington, D.C.

The meeting was adjourned at 11:45 a.m., Tuesday, April 13th

Respectfully submitted,

Daniel J. Capra
Reed Professor of Law

20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al,

Defendants.

---

**MOTION FOR ADDITIONAL DISCOVERY REGARDING MONETARY PAYMENTS TO INMATE INFORMANT WITNESSES – NO HEARING REQUESTED**

---

The defendants jointly move for an order of the Court requiring the government to produce additional disclosures regarding payments made to inmate informant witnesses[1].  As grounds therefore, it is stated as follows:

1.    The government has recently produced discovery which funds handed out by the United States government, through the FBI, to inmate informant witnesses. See Appendix A.

---

[1] The defense uses the term informant to include confidential human sources, confidential informants or any other label used by the government for the inmate witnesses listed in Appendix A.

1

2.     Up to September 25, 2017 the United States government has paid

inmate informant witnesses a total of $74,010.26 in taxpayer dollars to 18 inmate

informants.

3.     The disclosure provided by the government merely discloses the

names of the informants and the amounts and types of payments.

4.     The details surrounding the payments must be disclosed as those

details themselves are *Giglio* materials.

5.     The defense requests the Court order the disclosure of the following

information:

a.     The dates of any payment. The dates are important as it will

reveal whether the payments were made as part of a quid pro quo for cooperation.

DOJ policy[2] requires that the FBI maintain documentation of the dates of any

payments to informants.

b.     The reason for the payments. DOJ policy The reasons again are

relevant to determine whether they were part of a quid pro quo for cooperation.

---

[2] During the time of this investigation there have been at least two DOJ policies in effect regarding the handling of informants and Confidential Human Sources. There may be other policies for which the public, and thus counsel, do not have access.  If the defense uses incorrect terms regarding the titles of documentation it is hoped that the government will provide the correct titles of documentation in their response.

DNM 1427

   c. <u>The dates and manner in which the payments were requested,</u>

<u>authorized or promised</u>. This information is relevant to determine whether the

payments were part of a quid pro quo for cooperation. For example, some

informants were paid for gasoline and car repairs. The impeachment value of that

information would be lesser if the payments were related to attending court matters

or interviews with investigators but would be greater if it was a payment for

services rendered. According to DOJ guidelines, the prosecutor for the government

must be contacted and approve the payment of any funds.  All docuemntation

concerning the approval of the prosecutors should be provided.

   d. <u>Whether the informant was or was not advised that he must</u>

<u>report the payments as taxable income and any summaries provided to informants</u>

<u>so they can report their income to the IRS</u>. Although the FBI does not issue 1099's

to its informants, DOJ policy requires them to advise informants that they must

report income and that the FBI can provide a form detailing the payments so the

informant can file a proper income tax return. The FBI is required to document the

payment and the advice of taxability in the FBI's files. The defense requests any

forms that have been provided to informants that have been paid and any

information that details that the  IRS reporting policy was followed. If the

informant was not advised that would be in violation of FBI written policies and

DNM 1428

could be considered by the jury as the government authorizing these informants to

commit new crimes.

      e.     FBI forms requesting authorization to pay informants. DOJ

policy requires that a case agent fill out a form and memorandum detailing the

information justifying payment to any informant, who is the primary benefit of the

payment, and whether the expense was incurred as a direct cost of operating the

informant.

      f.     Receipts provided by informants for expenses and payments.

DOJ policy requires informants to provide receipts for payments such as gas, food,

education and the like, which are reasons attached to certain expenditures listed in

Appendix A. In addition, DOJ policy requires that a receipt must be obtained from

all informants at the time of each payment. DOJ policy indicates that such receipts

will be provided upon order of the court for the current case and any payments paid

for any other case. DOJ policy requires that all documentation of payments shall

specify whether the payment is for services or expenses.

      g.     All FBI summaries of payments provided to informants. DOJ

policy requires agents who give informants more than one payment to document in

summary form the information or services provided by the informant, in

chronological order, for which the informant has been paid since the prior

authorization. This summary should include the general nature of the information

DNM 1429

or service provided by the source in the investigation, and a statement as to the value of the information or service provided by the source, including statistical accomplishments attributed to the informant as a result of the information provided. These summaries will also include dates of payments under a prior authorization and the amount paid on each date, divided into the amounts paid for services and the amounts paid for expenses.

h.    <u>Gifts provided to informants by FBI personnel or DOC personnel</u>. DOJ policy authorizes that a gift may be made to an informant in lieu of payment for services. Given that it is the holiday season, government agents may have been moved in the spirit of giving to provide a gift to its inmate informants. This must be disclosed or at least a copy of any gift receipt should be provided.

i.    <u>All payment reports entered into the FBI's Financial Management System or any similar data base currently used by the FBI</u>. DOJ policy requires that payment reports for informants be entered into an electronic database. The defense requests production of these reports for the reasons detailed above.

j.    <u>Any documented requests for or or promises or discussions regarding post-testimony lump sum payments</u>. The FBI polices encourage each field office to submit requests for lump-sum payments for the informant at the conclusion of any case in which he/she has made significant contributions to FBI

investigative matters. This must be disclosed whether it was requested, offered, denied or approved and whether there have been mere discussions about the possibility of a lump sum payment after testimony is rendered. The impeachment value of such information is obvious.

6.      The prosecution must disclose known sources of a witness 's bias, motive or interest. *Douglas v. Workman*, <u>560 F.3d 1156, 1172-73</u> (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting *United States v Bagley*, <u>473 U.S. 667, 676</u>, <u>105 S. Ct. 3375</u>, <u>87 L. Ed. 2d 481</u> (1985)); *Pennsylvania v. Ritchie*, <u>480 U. S. 39</u> (1987); *United States v. Strifler*, <u>851 F.2d 1197</u> (9th Cir. 1988). The constitutional right to cross-examination of one's accusers for such bias and motive would be hollow indeed if the Government possesses such  information concerning its own witnesses and does not disclose it.  *Davis v. Alaska*, <u>415 U.S. 308, 315</u> (1974); *United States v. Ray*, <u>731 F.2d 1361, 1364</u> (9th Cir. 1984); *Chipman v. Mercer*, <u>628 F.2d 528</u> (9th Cir. 1980); *Patterson v. McCarthy*, <u>581 F.2d 220</u> (9th Cir. 1978); see also *United States v. Owens*,  <u>933 F.Supp. 76</u> (D.Mass. 1996)("All documents which tend to show the bias, prejudice, personal interest of any government witness to testify in favor of the government or against any defendant, and any documents which tend to show a special relationship of the witness or

DNM 1431

hostility of the witness either to any other government witness or to any of the

defendants in a trial").

7.      The defense does not object to the redaction of personal identifying or

location information.

8.      In the interest of judicial economy, the defense does not request a

hearing on this motion but instead requests the Court rule on the papers.

9.      All defendants join in this motion and the government objects.


Respectfully submitted this 30th day of November, 2017.




/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)



## CERTIFICATE OF SERVICE

I hereby certify that on November 30th, 2017, I presented the foregoing to the
Clerk of the Court for filing and uploading to the CM/ECF system which will send
notification of such filing to counsel of record.


/s/ James A. Castle
James A. Castle



**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to
File No.
245U-AQ-6239655

4200 Lueking Park Ave NE
Albuquerque, New Mexico

September 25, 2017

United States Attorney's Office
District of New Mexico
AUSAs Maria Armijo, Randy Castellano, & AUSA Matthew Beck,

RE:  FBI Confidential Human Source (CHS) Payments, current as of September, 25, 2017, as they
pertain to the January, 2017, trial of Anthony Ray Baca

True Name:   **Mario Montoya**
CHS Number:  ▮▮▮▮
Codename:    **"Pyro"**

- CHS Services (Payments): $5,200.00
- Gas: $432.21
- Vehicle Maintenance/Repair: $1,601.50
- Telephone Expenses: $225.05
- Trade School: $2,970.00
- Total: $10,428.76

True Name:   **Gerald Archuleta**
CHS Number:  ▮▮▮▮
Codename:    **"Grandma"**

- CHS Services (Payments): $1,650.00
- Food: $299.62
- Telephone Expenses: $150.00
- Total: $2,099.62

UNCLASSIFIED

True Name:      **Eric Duran**
CHS Number:    ███████
Codename:      **"Ironman"**

- CHS Services (Payments): $42,440.00
- Food: $113.90
- Gas: $102.93
- Telephone Expenses: $1,297.59
- Travel/Subsistence: $542.70
- Miscellaneous Travel: $600.00
- Total: $45,097.12

True Name:      **Javier Alonso**
CHS Number:    ███████
Codename:      **"Wolverine"**

- CHS Services (Payments): $400.00
- Total: $400.00

True Name:      **Jerry Armenta**
CHS Number:    ███████
Codename:      **"Creeper"**

- CHS Services (Payments): $750.00
- Total: $750.00

True Name:      **Benjamin Clark**
CHS Number:    ███████
Codename:      **"Cyclone"**

- CHS Services (Payments): $250.00
- Food: $350.00
- Telephone Expenses: $150.00
- Total: $750.00

True Name:   **David Calbert**
CHS Number: ▮▮▮▮▮
Codename:   **"Spider"**

- CHS Services (Payments): $100.00
- Total: $100.00


True Name:   **Billy Cordova**
CHS Number: ▮▮▮▮▮
Codename:   **"Little Shadow"**

- CHS Services (Payments): $650.00
- Food: $100.00
- Telephone Expenses: $200.00
- Total: $950.00


True Name:   **Ruben Hernandez**
CHS Number: ▮▮▮▮▮
Codename:   **"Disciple"**

- CHS Services (Payments): $650.00
- Total: $650.00


True Name:   **Leonard Lujan**
CHS Number: ▮▮▮▮▮
Codename:   **"Lee"**

- CHS Services (Payments): $1,750.00
- Total: $1,750.00


True Name:   **Eugene Martinez**
CHS Number: ▮▮▮▮▮
Codename:   **"Moses"**

- CHS Services (Payments): $650.00
- Food: $20.41
- Total: $670.41

UNCLASSIFIED

U.S. v. DELEON, ET Al.   30711

DNM 1435

True Name:   **Robert Martinez**
CHS Number: ████████
Codename:    **"Joven"**

- CHS Services (Payments): $2,800.00
- Food: $109.26
- Telephone Expenses: $350.00
- Total: $3,259.26

True Name:   **Roy Martinez**
CHS Number: ████████
Codename:    **"Shadow"**

- CHS Services (Payments): $1,350.00
- Total: $1,350.00

True Name:   **Timothy Martinez**
CHS Number: ████████
Codename:    **"Amasai"**

- CHS Services (Payments): $1,050.00
- Food: $12.86
- Total: $1,062.86

True Name:   **Jerry Montoya**
CHS Number: ████████
Codename:    **"Plaz"**

- CHS Services (Payments): $800.00
- Food: $24.31
- Total: $824.31

UNCLASSIFIED    **U.S. v. DELEON, ET Al.**   30712

DNM 1436

True Name:  **Federico Munoz**
CHS Number: ███████
Codename:   **"Gladiator"**

- CHS Services (Payments): $1,550.00
- Food: $159.26
- Telephone Expenses: $200.00
- Total: $1,909.26


True Name:  **Paul Rivera**
CHS Number: ███████
Codename:   **"Oso"**

- CHS Services (Payments): $1,350.00
- Total: $1,350.00


True Name:  **Lupe Urquizo**
CHS Number: ███████
Codename:   **"Mari"**

- CHS Services (Payments): $600.00
- Food: $8.66
- Total: $608.66


True Name:  **Manuel Armijo**
CHS Number: **N/A**
Codename:   **N/A**

- No payments provided


True Name:  **Richard Gallegos**
CHS Number: **N/A**
Codename:   **N/A**

- No payments provided

UNCLASSIFIED     **U.S. v. DELEON, ET Al.   30713**
DNM 1437

True Name:   **Santos Gonzales**
CHS Number: **N/A**
Codename:    **N/A**

- No payments provided

Please let me know if you have any questions.

Sincerely,

Terry Wade
Special Agent in Charge

By:
Michael Hansen
Acting Supervisory Special Agent

Page 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al

       Defendants.

---

## MOTION IN LIMINE RE: PLEA AGREEMENTS AND ADDENDA

---

The defendants jointly move in limine for an order of the Court preventing the government from introducing the written plea agreements of the cooperating individuals or from referencing certain portions of such agreements in opening statement or during trial absent an order of the Court.

1.    The defense inquired of the government whether they had any intention of moving for the admission of the written plea agreements and/or addenda of any of the cooperating individuals in this case. The government indicated it may move for admission and/or question witnesses about parts of the agreements and/or addenda.

DNM 1439

2.      The plea agreements and addenda all follow a similar format. An example is defendant Jerry Armenta's plea agreement and addenda attached as Appendix A. The plea agreements notably include the following:

a)      Information about the court accepting the plea agreement. Appendix A, p. 3;

b)      Specific facts regarding the case. Appendix A, p. 4-5;

c)      That the United States stipulates that, "the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct." Appendix A, p. 5.

d)      An attestation by the attorney representing the defendant. Appendix A, p. 9.

e)      That the defendant will be providing "truthful and complete information and/or testimony concerning the Defendant's participation in and knowledge of criminal activities." Appendix A, p. 10.

3.      A prosecuting attorney may not offer any "improper suggestions, insinuations, and, especially, assertions of personal knowledge," regarding the defendant's guilt or the credibility of government witnesses, as these "are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1932); *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980) ("Vouching may occur in two ways: the prosecution may

place the prestige of the government behind the witness or may indicate that

information not presented to the jury supports the witness's testimony.") (citing

*Lawn v. United States*, 355 U.S. 339, 359-60 n. 15 (1958)).

4.     Vouching poses the danger that the jury may decide the case based

upon the government's judgment, rather than on an independent consideration of

the evidence. *United States v. Young*, 470 U.S. 1, 18-19  (1985) (reversing where

prosecutor not only vouched for prosecution witness but invoked the integrity of

the court" and thus "placed the imprimatur of the judicial system itself on [the

witness's] testimony."); "Vouching is especially problematic in cases where the

credibility of the witnesses is crucial." *Roberts*, 618 F.2d at 533.

5.     The use of the "truthfulness" portion of a plea agreement "becomes

impermissible vouching . . . when the prosecutors explicitly or implicitly indicate

that they can monitor and accurately verify the truthfulness of the

witness' testimony. *United States v. Bowie*, 892 F. 2d 1494, 1498 (10th Cir. 1990).

6.     The defense also asserts that the plea agreements contain testimonial

assertions by the representative of the United States and counsel for the defendant,

neither of which will be presumably testifying in the trial.

7.     Before the government attempts to show a plea agreement to a

witness, use it in opening statement or reference the portions set forth above in

DNM 1441

paragraph 2, the defense requests that they approach the Court and obtain a ruling

on the admissibility of such.

      8.    The defense does not request a hearing on this motion but instead

requests the Court rule on the papers when the issue arises during trial.

      9.    All defendants join in this motion and the government objects.

Respectfully submitted this 30th day of November, 2017.

/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)

## CERTIFICATE OF SERVICE

I hereby certify that on November 30th, 2017, I presented the foregoing to the
Clerk of the Court for filing and uploading to the CM/ECF system which will send
notification of such filing to counsel of record.

/s/ James A. Castle
James A. Castle

DNM 1442

FILED

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

DEC 13 2016

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-CR-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **JERRY ARMENTA, a.k.a. "Creeper,"** | ) | |
| | ) | |
| Defendant. | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11, Fed. R. Crim. P., the parties notify the Court of the following agreement between the United States Attorney for the District of New Mexico, the Defendant, JERRY ARMENTA, a.k.a. "Creeper," and the defendant's counsel, GARY MITCHELL.

## REPRESENTATION BY COUNSEL

1.     The defendant understands the defendant's right to be represented by an attorney and is so represented.  The defendant has thoroughly reviewed all aspects of this case with the defendant's attorney and is fully satisfied with the attorney's legal representation.

## RIGHTS OF THE DEFENDANT

2.     The defendant further understands the defendant's rights:

   a.     to plead not guilty;

   b.     to have a trial by jury;

   c.     to confront and cross-examine witnesses and to call witnesses to testify for the defense; and

   d.     against compelled self-incrimination.

Case 2:15-cr-04268-JB Document 1502 Filed 11/30/17 Page 2 of 11
Case 2:15-cr-04268-JB Document 903 Filed 12/13/16 Page 2 of 11
Appellate Case: 20-2058    Document: 010110415663    Date Filed: 09/29/2020    Page: 1806

## WAIVER OF RIGHTS AND PLEA OF GUILTY

3.      The defendant hereby agrees to waive these rights and to plead guilty to the Superseding Indictment charging in **Count 6** a violation of 18 U.S.C. § 1959(a)(5): Violent Crimes in Aid of Racketeering Activity (Conspiracy to Murder), and in **Count 7** a violation of 18 U.S.C. § 1959(a)(1): Violent Crimes in Aid of Racketeering Activity (Murder); and 18 U.S.C. § 2: Aiding and Abetting.

## SENTENCING

4.      The defendant understands that the maximum penalty the Court can impose as to **Count 6** is:

a.      imprisonment for a period of not more than ten (10) years;

b.      a fine not to exceed $250,000;

c.      a term of supervised release not to exceed three (3) years.   (If the defendant serves a term of imprisonment, is then released on supervised release, and violates the conditions of supervised release, the defendant's supervised release could be revoked--even on the last day of the term--and the defendant could then be returned to another period of incarceration and a new term of supervised release); and

d.      a mandatory special penalty assessment of $100.00.

5.      The defendant understands that the maximum penalty the Court can impose as to **Count 7** is:

a.      a term of imprisonment for life;

b.      a fine not to exceed $250,000;

c.      a mandatory term of supervised release of not more than five (5) years.   (If the defendant serves a term of imprisonment, is then released on supervised release, and violates the conditions of supervised release, the defendant's supervised release could be revoked--even on the last day of the term--and

2

DNM 1444

the defendant could then be returned to another period of incarceration and a new term of supervised release); and

    d.    a mandatory special penalty assessment of $100.00.

6.    The parties recognize that the Sentencing Guidelines are advisory, and that the Court is required to consider them in determining the sentence it imposes.

7.    It is expressly understood and agreed by and between the defendant and the United States that:

    a.    The United States has made, and will make, NO AGREEMENT pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), that a specific sentence is the appropriate disposition of this case.

    b.    The United States has made, and will make, NO AGREEMENT to approve, to oppose, or not to oppose pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), any request made by the defendant or on behalf of the defendant for a particular sentence in this case, other than the stipulations agreed to below.

    c.    The United States hereby expressly reserves the right to make known to the United States Probation Office and to the Court, for inclusion in the presentence report prepared pursuant to Federal Rule of Criminal Procedure 32, any information that the United States believes may be helpful to the Court, including but not limited to information about any relevant conduct under USSG § 1B1.3.

    d.    Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, the defendant agrees that, upon the defendant's signing of this plea agreement, the facts that the defendant has admitted under this plea agreement as set forth below,

DNM 1445

as well as any facts to which the defendant admits in open court at the defendant's plea hearing, shall be admissible against the defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the defendant expressly waives the defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the defendant admits in conjunction with this plea agreement.

## DEFENDANT'S ADMISSION OF FACTS

8.     By my signature on this plea agreement, I am acknowledging that I am pleading guilty because I am, in fact, guilty of the offense(s) to which I am pleading guilty.   I recognize and accept responsibility for my criminal conduct.   Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the offense(s) to which I am pleading guilty beyond a reasonable doubt, including any facts alleged in the Superseding Indictment that increase the statutory minimum or maximum penalties.   I specifically admit the following facts related to the charges against me, and declare under penalty of perjury that all of these facts are true and correct:

> **In 2005, while incarcerated within the New Mexico Corrections Department, I became a member of the Syndicato de Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture/ distribute narcotics.   The SNM operates in the District of New Mexico and elsewhere.   The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.**

> **On March 6, 2014, I was an active member of the SNM incarcerated at the Southern New Mexico Correctional Facility (SNMCF) in Doña Ana County. Sometime prior to that date, a "green light" had been placed on J.M. The green light had been outstanding for no less than one year prior to the murder. I, along with other SNM gang members, conspired to murder J.M., and,**

4

DNM 1446

specifically Jerry Montoya and I stabbed J.M. with shanks. I was ordered to kill J.M. by virtue of my membership in the SNM.

SNM gang members that conspired to kill J.M., and that participated in his murder were the following:    Anthony Ray Baca, a.k.a. "Pup," Daniel Sanchez, a.k.a. "Dan Dan," Carlos Herrera, Rudy Perez, a.k.a. "Ru Dog," Mario Rodriguez, a.k.a. "Blue," and Timothy Martinez, a.k.a. "Red."

Thus, in March 2014, I conspired with members of the SNM gang to murder J.M., and in fact, J.M. was murdered based on his cooperation with law enforcement, which was a violation of the rules of the SNM.

9.    By signing this Agreement, the defendant admits that there is a factual basis for each element of the crime(s) to which the defendant will plead guilty.   The defendant agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the defendant's sentence, including, but not limited to, the advisory guideline offense level.

<u>STIPULATIONS</u>

10.    The United States and the defendant stipulate as follows:

a.    Pursuant to USSG § 3E1.1(a), the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct.   Consequently, so long as the defendant continues to accept responsibility for the defendant's criminal conduct, the defendant is entitled to a reduction of two (2) levels from the base offense level as calculated under the sentencing guidelines.   This reduction is contingent upon the defendant providing an appropriate oral or written statement to the United States probation officer who prepares the presentence report in this case in which the defendant clearly establishes the defendant's entitlement to this reduction.

5

b.    Provided the defendant meets the requirements of USSG § 3E1.1(b), the government agrees to move for a reduction of one (1) additional level from the base offense level as calculated under the sentencing guidelines.

11.    The defendant understands that the above stipulations are not binding on the Court and that whether the Court accepts these stipulations is a matter solely within the discretion of the Court after it has reviewed the presentence report.  Further, the defendant understands that the Court may choose to vary from the advisory guideline sentence.  The defendant understands that if the Court does not accept any one or more of the above stipulations and reaches an advisory guideline sentence different than expected by the defendant, or if the Court varies from the advisory guideline range, the defendant will not seek to withdraw the defendant's plea of guilty. In other words, regardless of any stipulations the parties may enter into, the defendant's final sentence is solely within the discretion of the Court.

12.    The defendant stipulates that he does not possess any exculpatory information regarding any of his charged co-defendants.

## DEFENDANT'S ADDITIONAL OBLIGATIONS

13.    The defendant understands the defendant's obligation to provide the United States Probation Office with truthful, accurate, and complete information, including, but not limited to defendant's true identity, citizenship status, and any prior criminal convictions.  The defendant hereby represents that the defendant has complied with and will continue to comply with this obligation.  The defendant understands that any misrepresentation with respect to the above obligations may be considered a breach of this plea agreement.

6

## WAIVER OF APPEAL RIGHTS

14.    The defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a defendant the right to appeal a conviction and the sentence imposed.  Acknowledging that, the defendant knowingly waives the right to appeal the defendant's conviction(s) and any sentence, including any fine, at or under the maximum statutory penalty authorized by law, as well as any order of restitution entered by the Court.   In addition, the defendant agrees to waive any collateral attack to the defendant's conviction(s) and any sentence, including any fine, pursuant to 28 U.S.C. §§ 2241, 2255, or any other extraordinary writ, except on the issue of defense counsel's ineffective assistance.

## GOVERNMENT'S AGREEMENT

15.    Provided that the defendant fulfills the defendant's obligations as set out above, the United States agrees not to bring additional criminal charges against the defendant arising out of the facts forming the basis of the present Superseding Indictment.

16.    This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## VOLUNTARY PLEA

17.    The defendant agrees and represents that this plea of guilty is freely and voluntarily made and is not the result of force, threats, or promises (other than the promises set forth in this agreement).   There have been no promises from anyone as to what sentence the Court will impose. The defendant also represents that the defendant is pleading guilty because the defendant is in fact guilty.

DNM 1449

## VIOLATION OF PLEA AGREEMENT

18.     The defendant understands and agrees that if the defendant or the defendant's attorney violates any provision of this plea agreement, the United States may declare this plea agreement null and void, and the defendant will thereafter be subject to prosecution for any criminal violation including, but not limited to, any crime(s) or offense(s) contained in or related to the charges in this case, as well as perjury, false statement, and obstruction of justice, and any other crime committed by the defendant during prosecution of this case.

## SPECIAL ASSESSMENT

19.     At the time of sentencing, the defendant will tender a money order or certified check payable to the order of the United States District Court, District of New Mexico, 333 Lomas Boulevard, NW, Albuquerque, New Mexico 87102, in the amount of $100.00 in payment of the special penalty assessment described above.

## ENTIRETY OF AGREEMENT

20.     This document and any addenda are a complete statement of the agreement in this case and may not be altered unless done so in writing and signed by all parties.   The parties agree and stipulate that this agreement will be considered part of the record of the defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.   This agreement is effective upon signature by the defendant and an Assistant United States Attorney, and upon entry of a guilty plea by the defendant pursuant to this agreement.

DNM 1450

Case 2:15-cr-04268-JB Document 1503-1 Filed 11/30/17 Page 9 of 11
Case 2:15-cr-04268-JB Document 903 Filed 12/13/16 Page 9 of 11
Appellate Case: 20-2058    Document: 010110415663    Date Filed: 09/29/2020    Page: 1813

AGREED TO AND SIGNED this ___ day of _____, 2016.

DAMON P. MARTINEZ
United States Attorney

MARIA Y. ARMIJO
Assistant United States Attorney
555 S. Telshor Blvd., Suite 300
Las Cruces, NM  88011
(575) 522-2304 – Tel.

This agreement has been read to me in the language I understand best, and I have carefully discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms.  My attorney has advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement.  No promises or inducements have been given to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  Finally, I am satisfied with the representation of my attorney in this matter.

JERRY ARMENTA, a.k.a. "Creeper"
Defendant

I am the attorney for JERRY ARMENTA, a.k.a. "Creeper." I have carefully discussed every part of this agreement with my client.  Further, I have fully advised my client of his rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement.  To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

GARY MITCHELL
Attorney for Defendant

9

**EXHIBIT A**

**ADDENDUM TO PLEA AGREEMENT**
**IN *UNITED STATES v. JERRY ARMENTA, a.k.a. "Creeper,"* NO. 15-CR-4268 JB**

1.      This Addendum to the Plea Agreement contains additional terms of the Plea Agreement in *United States v. JERRY ARMENTA, a.k.a. "Creeper,"* No. 15-CR-4268 JB, filed December 13, 2016, (Doc. 802), and is incorporated in the Plea Agreement as if fully set forth therein.

2.      The Defendant hereby agrees to cooperate with the United States by giving truthful and complete information and/or testimony concerning the Defendant's participation in and knowledge of criminal activities.   The Defendant understands that if the Defendant falsely implicates an innocent person in the commission of a crime or exaggerates the involvement of any person in the commission of a crime, or if the Defendant falsely minimizes the involvement of any person in the commission of a crime, then the Defendant will be in violation of this plea agreement, and the United States will have the right to rescind the plea agreement and reinstitute criminal proceedings against the Defendant.

3.      The Defendant agrees to testify truthfully if called as a witness in any state or federal grand jury investigation and/or any civil or criminal proceeding brought in the District of New Mexico or elsewhere by the United States or a governmental entity of the State of New Mexico.

4.      If requested to do so by the United States Attorney's Office, the Defendant will provide all documents, records, writings, tangible objects, or materials of any kind that are in the Defendant's possession, custody, or control and that relate directly or indirectly to any area of inquiry or investigation in this proceeding.

5.      If requested to do so by the United States Attorney's Office, the Defendant will submit a personal financial statement under oath and/or submit to interviews by the United States Attorney's Office regarding the Defendant's capacity to satisfy any fines and/or restitution.

6.      Upon completion of the Defendant's cooperation described above, the United States may move, pursuant to USSG § 5K1.1 and/or 18 U.S.C. § 3553(e), to have the Court depart downward from the applicable guideline or statutory minimum sentence.   The Defendant understands that the decision whether to seek a downward departure for substantial assistance will be made in the sole discretion of the United States Attorney for the District of New Mexico.  The Defendant further understands that, if the United States does file a motion seeking a downward departure, the decision whether to depart downwards, as well as the amount of any departure, is solely within the discretion of the Court.

MARIA Y. ARMIJO
Assistant U.S. Attorney

Date  10/13/16

JERRY ARMENTA, a.k.a. "Creeper"
Defendant

Date  12/13/16

GARY MITCHELL
Attorney for JERRY ARMENTA, a.k.a. "Creeper"

Date  12/13/16

2

**U.S. v. DELEON, ET Al.    22114**

DNM 1453

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No. 15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al,

Defendants.

---

## MOTION FOR ADVANCE NOTICE OF WITNESSES TO BE CALLED BY THE GOVERNMENT – NO HEARING REQUESTED

---

The defendants jointly move for an order of the Court requiring the government to provide one week's advance notice to the defense of the witnesses the government will call each day of the trial. As grounds therefore, it is stated as follows:

1.      The defense has employed numerous expert witnesses for whom the defense will require to be present as advisory witnesses during the testimony of certain witnesses. In order to avoid having to use federal funds to have these experts present throughout the trial, the defense is requesting one week's notice so that they can have their experts present only for relevant testimony. Many of the

1

experts do not live locally and some live out of state. The defense requests one week's notice given the complexities in arranging for cost authorization and travel arrangements for these experts.

2.     The defense also have staff members, such as investigators and paralegals, who are not needed for every day of court. The government has chosen to indict multiple crimes within a single indictment. For much of each trial, particular defense teams will have no questions or duties as the testimony will be regarding counts for which their respective clients are not charged. Given the cost of housing, transportation and the hourly rates paid to these staff members, advance notice of the witnesses to be called will be fiscally prudent.

3.     This case involves tens of thousands of pages of discovery. In order to avoid having a courtroom full of dozens of banker's boxes, one week's advance notice to counsel will allow them to bring only that discovery necessary for the business to be conducted each day in court.

4.     When a witness testifies, the parties will need to have materials at hand that may be necessary as exhibits for the purposes of impeachment. In order to avoid delays in the trial, advance notice of which witnesses will be called is also requested.

5.     Decisions regarding the mode and order of witnesses lie within the district court's broad discretion. Fed. R. Evid. 611(a). "The Federal Rules of

Evidence also counsel the trial court to 'exercise reasonable control over the . . .

examining of witnesses and presenting evidence so as to . . . avoid wasting time . . .

.' " *Montoya v. Sheldon*, No. CIV 10-0360 JB/WDS, 2012 U.S. Dist. LEXIS

155667, at *22 (D.N.M. Oct. 29, 2012). As the Committee Comments to Rule 611

point out, "Spelling out detailed rules to govern the mode and order of

interrogating witnesses presenting evidence is neither desirable nor feasible. The

ultimate responsibility for the effective working of the adversary system rests with

the judge."

      6.    Courts in this district have required advance notice of witnesses to be

called. *United States v. Burger*, 773 F. Supp. 1430, 1439 (D. Kan. 1991); *United*

*States v. Wittig*, No. 03-40142-JAR, 2005 U.S. Dist. LEXIS 49772, at *22 (D. Kan.

Apr. 4, 2005).

      7.    In a case of this complexity extraordinary notice will lead to

efficiency and a better quality of justice. Of course, trials are living, breathing

human events so flexibility should be allowed so a general rule of one week's

notice should allow for shorter notice if the demands of the trial make it necessary.

      8.    In the interests of judicial economy, the defense does not request a

hearing on this motion but instead requests the Court rule on the papers.

      9.    All defendants join in this motion and the government objects.

DNM 1456

Respectfully submitted this 30th day of November, 2017.




/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)


## CERTIFICATE OF SERVICE

I hereby certify that on November 30th, 2017, I presented the foregoing to the
Clerk of the Court for filing and uploading to the CM/ECF system which will send
notification of such filing to counsel of record.


/s/ James A. Castle
James A. Castle

DNM 1457

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                      No.  2:15-cr-4268-JB

ANGEL DELEON, et al,

      Defendants.

---

## MOTION IN LIMINE TO PROHIBIT COOPERATING AND OTHER WITNESSES FROM TESTIFYING TO FEAR OF DEFENDANTS, THE SNM OR RETALIATION, AND ABOUT ANY WITNESS PROTECTION MEASURES

---

The defendants jointly move for an order of the Court prohibiting the government from eliciting, and requiring the government to inform, cooperating and other witnesses not to testify concerning their fear of Defendants, the Sindicato de Nuevo Mexico (SNM), or retaliation for their testimony or cooperation, and concerning any witness protection measures they have been offered or provided.  As grounds therefore, it is stated as follows:

1.    It is anticipated that the government will call numerous cooperating witnesses as well as other witnesses who may express fear of Defendants, the SNM, and retaliation for their testimony.

DNM 1458

2.     It is believed these cooperating witnesses and others may have been offered or provided various witness protection measures in connection with this case.

3.     The Defendants jointly request the Court order the government not to elicit, and to instruct its witnesses not to testify regarding any fear they may have in connection to their cooperation or testimony in this case, or to any witness protection measures that have been offered or elicited.

4.     This evidence is not relevant to any of the issues that will be presented at trial.  *See* Federal Rule of Evidence (FRE) Rule 401, 402.

5.     If this evidence has any probative value, it is substantially outweighed by the danger of unfair prejudice.  *See* FRE 403.

6.     This is not a situation involving a specific threat.  "Evidence of threats by a defendant against a potential witness against him can ... be used to show guilty knowledge." *United States v. Morgan*, 786 F.3d 227, 232 (2d Cir. 2015) (quoting *United States v. Bein,* 728 F.2d 107, 114–15 (2d Cir.1984). That is certainly true when threats are "inextricably intertwined with the evidence regarding the charged offense." *Id.*

7.     Even where there is evidence of actual threats to a witness or of a witness's fear of the defendant, the introduction of such evidence when there is nothing to link the defendant to such fear or threats "except by innuendo" results in a denial of fundamental fairness. *Dudley v. Duckworth*, 854 F.2d 967, 971-72

(7th Cir. 1988) (evidence concerning threats to a witness violated defendant's right to fundamental fairness because such testimony "could only reflect adversely on the petitioner even though the threats were not traced to him or his co-defendants") (citing *United States ex rel. Palmer v. DeRobertis*, 738 F.2d 168, 170 (7th Cir.), *cert. denied*, 469 U.S. 924 (1984)). The court in *Dudley*, quoting *Keyser v. State*, 312 N.E.2d 922, 924 (Ind. App. 1974), recognized that such evidence "becomes so prejudicial to a defendant that no jury could be expected to apply it solely to the question of the credibility of the witness before it and not to the substantial prejudice of the defendant." 854 F. 2d at 970. *See also United States v. Adamo*, 742 F. 2d 927, 945 & n.25 (6thCir. 1984) ("we disapprove of reference by the government's attorney to a witness being protected in a case where it is not obvious, relevant, nor made an issue by defense counsel, and we encourage trial judges to instruct such witnesses not to refer to their participation in the program when testifying before the jury," since such evidence may "raise negative inferences against the defendant if great care is not employed"). *See also Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) (failure to request limiting instruction on use of evidence of threats to witnesses where evidence did not tie defendant to threats, with other failures, constituted ineffective assistance). United States v. Weir, 575 F.2d 668, 670-72 (8th Cir. 1978) (admission of threat evidence without cautionary instruction was reversible error due to risk of unfair prejudice).

DNM 1460

8.      Defendants are not aware of any specific threats This motion simply addresses witnesses testifying to their fear or any witness protection measures.

9.      The defense does not request a hearing on this motion but instead requests the Court rule on the pleadings.

10.     All defendants join in this motion and the government objects.

Respectfully Submitted,
THE LAW OFFICE OF RYAN J. VILLA

By: */s/ Ryan J. Villa*
RYAN J. VILLA
Counsel for Defendant
2501 Rio Grande Blvd. NW, Ste. A
Albuquerque, New Mexico  87104
(505) 639-5709
(505) 433-5812 Fax
ryan@rjvlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 30th, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ Ryan J. Villa*
Ryan J. Villa

DNM 1461

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                               **No. 2:15-cr-04268-JB**

**ANGEL DELEON, et al.,**

       **Defendants.**

### OPPOSED MOTION TO EXCLUDE REFERENCES TO AND EVIDENCE
### OF UNRELATED "ENTERPRISE" ACTS

Defendant Rudy Perez, by counsel, Ryan J. Villa and Justine Fox-Young, hereby moves the Court to exclude any references to and evidence of enterprise acts pertaining to allegations other than the charges in Counts 6-12 of the Second Superseding Indictment, as unrelated acts are not relevant to the charges in this trial and are otherwise prejudicial. All defendants join in this motion, and the Government opposes. As grounds, Mr. Perez states as follows:

1.    The Government initially brought four cases related to SNM's alleged federal criminal activity. In addition to the second superseding indictment in this case, the Government filed *United States of America v. Anthony Baca*, No. CR 16-1613 JB (D.N.M.)(Browning, J.), in which the Government names twelve defendants who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d). The Government also prosecuted one defendant for drug crimes, *see United States of America v. Christopher Garcia*, No. 15-4275 JB (D.N.M.)(Browning, J.), and four defendants for further alleged conduct constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, *see United States of America v. Mauricio Varela*, No. 15-4269 JB (D.N.M.)(Browning, J.).

2.      The Government also charged additional defendants in "one-off" cases that are related to this case and 15-CR-4275, and 16-CR-1613, with identical introductory paragraphs in some criminal complaints.

3.      Counts 6-12 were subsequently severed from Counts 1-5 and 13-16, with Counts 6-12 set to proceed to trial beginning January 29, 2017. *See* Memorandum Opinion and Order Dated June 30, 2017 (Doc 1204).

4.      The Government must prove that "an enterprise engaged in racketeering activity," and that individual members committed racketeering activity "for the group and/or in concert with other members, or acted in ways that contributed to [or furthered] the purposes of the group, or that were facilitated or made possible by the group." *United States v. Feliciano*, 223 F.3d 102, 116-17 (2d Cir. 2000).

5.      In its efforts to prove this element, the Government should be precluded from making any references to or from introducing evidence related to the three other SNM cases, to Counts 1-5 and 13-16 of this indictment, and to other unrelated acts and "one-off" cases.

6.      Evidence pertaining to conduct that is not charged in Counts 6-12 of this indictment is not relevant and is therefore not admissible. Fed. R. Evid. 402.

7.      The only relevant "racketeering activity" is that which occurred "during the time period relevant to the indictment." *United States v. Pimentel*, 346 F.3d 285, 299 (2d Cir. 2003). *See also United States v. Dally*, 2009 WL 10681835 at *3 (D.N.M. May 6, 2009)(Armijo, J.) (instructing the jury, in part, as to the parties' stipulation that "the Aryan Brotherhood was an enterprise as defined in 18 U.S.C. § 1959(b)(2) *during the relevant time period*.")(emphasis added).

2

8.    Even if evidence of acts unrelated to Counts 6-12 is arguably relevant based upon the time period of the events, any probative value of evidence of acts pertaining to Counts 1-5, 13-16 or the other SNM-related cases would be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403.

9.    The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion. *See United States v. Lugo*, 170 F.3d 996, 1005 (10th Cir. 1999). A district court abuses its discretion when it admits evidence that "is of very slight (if any) probative value . . . if there is even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992).

10.    Evidence of enterprise acts that is unrelated to Counts 6-12 of the indictment would be unfairly prejudicial, as it is very likely to provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. *See United States v. Rodriguez*, 192 F.3d 946, 951 (10th Cir. 1999).

11.    Defendants do not request a hearing on this matter.

WHEREFORE, for all of the foregoing reasons, Mr. Perez and all joined defendants respectfully request that the Court enter an Order excluding any references to and evidence of enterprise acts pertaining to allegations other than the charges in Counts 6-12 of the Second Superseding Indictment, as unrelated acts are not relevant to the charges in this trial and are otherwise prejudicial.

3

Respectfully submitted,

THE LAW OFFICE OF RYAN J. VILLA

ryan@rjvlawfirm.com

AND

JUSTINE FOX-YOUNG, P.C.

*/s/ Justine Fox-Young*
Justine Fox-Young
1903 Wyoming Blvd. NE, Suite B
Albuquerque, NM 87112
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Rudy Perez*


ADD ALL JOINED DEFENDANTS IN THE SIGNATURE BLOCK PLEASE

**CERTIFICATE OF SERVICE**

DNM 1465

I HEREBY CERTIFY that on the 1st day of December, 2017, I filed the foregoing pleading electronically through the CM/ECF system, which caused counsel for Plaintiff and Defendants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ *Justine Fox-Young*
Justine Fox-Young

DNM 1466

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.**                                          **No. 2:15-cr-04268-JB**

**ANGEL DELEON, et al.,**

**Defendants.**

### MOTION IN LIMINE TO EXCLUDE STATEMENT OF COOPERATING GOVERNMENT WITNESSES

Defendant Rudy Perez, by counsel, Ryan J. Villa and Justine Fox-Young, joined in this Motion by all Defendants, hereby moves the Court, pursuant to Rule 802 and Rule 403 of the Federal Rules of Evidence, and *Williamson v. United States*, 512 U.S. 594 (1994) for an order excluding hearsay statements offered by Timothy Martinez and Jerry Montoya implicating Mr. Rudy Perez in the conspiracy to murder and murder of Javier Molina on March 7, 2014.

### BACKGROUND

The factual and procedural background of this case generally is set forth in detail in this Court's Memorandum Opinion and Order, pp. 3-13, filed June 30, 2017 [Doc. 1204]. This motion concerns hearsay statements offered by Mr. Perez's co-defendants, turned government witnesses, Timothy Martinez and Jerry Montoya. According recent testimony at the James hearing conducted November 27-29, 2017, it is believed Timothy Martinez will testify that co-defendant Daniel Sanchez told him that "Sanchez had obtained [the shanks] from 'fat ass' the nickname Sanchez used for Rudy Perez." Martinez is expected to testify that Sanchez told him that Mr. Perez gave Sanchez pieces of metal from his walker to be made into shanks, because according to Martinez, Sanchez said "What else is fat ass gonna do?" A supposed reference to Mr. Perez's physical

limitations due to his size and heath conditions. Jerry Montoya is expected to testify that Mario

Rodriguez provided him a shank to use to kill Javier Molina.  Montoya is expected to testify that

when Rodriguez did so, he inexplicably volunteered that the shank came from Mr. Perez's walker.

This information was testified to by Agent Acee during the recent James hearing that took

place November 27 through November 30, 2017.  The James hearing has yet to be concluded.  A

transcript has not yet been prepared.  Mr. Perez submits that these statements as they pertain to

him do not qualify as statements of a co-conspirator because they do not meet the second and third

elements required for such statements.  To admit out-of-court statements by co-conspirators as

non-hearsay pursuant to rule 801(d)(2)(E), the United States must demonstrate by a preponderance

of the evidence that: (i) a conspiracy existed; (ii) the declarant and the defendant were members of

that conspiracy; and (iii) the statements that the United States seeks to admit were made during the

course and in furtherance of the conspiracy.  *See United States v. Sinclair*, 109 F.3d 1527, 1533

(10th Cir. 1997); *United States v. Johnson*, 911 F.2d 1394, 1403 (10th Cir. 1990).  Mr. Perez

submits the United States cannot establish that he was a member of the conspiracy to kill Javier

Molina or that these statements by Daniel Sanchez or Mario Rodriguez, the declarants, were in

furtherance of the conspiracy.

The Tenth Circuit has also held that statements are not in furtherance of the conspiracy if

they are "mere narratives," that is "statements relating to past events, even those connected with

the operation of the conspiracy, where the statement serves no immediate or future conspiratorial

purpose. *See United States v. Wolf*, 839 F.2d 1387, 1393 (10th Cir.), *cert. denied*, 488 U.S. 923

(1988); *United States v. Roberts*, 14 F.3d 502, 514-515 (10th Cir.1993). *See also United States v.*

*Foster*, 711 F.2d 871, 880 (9th Cir.1983), *cert. denied*, 465 U.S. 1103 (1984) (noting that "mere

narrative declarations" made without the intent to induce assistance for the conspiracy do not fall

DNM 1468

within the "strict requirements" of Rule 801); *United States v. Darwich*, 337 F.3d 645, 657-658 (6th Cir.2003) (statements by the defendant's nephews about the amount of marijuana they had packaged the previous evening were casual conversation and not made "in furtherance" of the conspiracy); *United States v. Cornett*, 195 F.3d 776, 782-784 (5th Cir.1999) (finding prejudicial error in admission of statements implicating defendant made regarding "such diverse issues as the bowling prowess of certain friends and relatives, the appearance of some of the patrons at the bowling alley, the merits of certain designer outfits and the respective talents of certain exotic dancers"); *United States v. Mitchell*, 31 F.3d 628, 632 (8th Cir.1994) (holding that a statement that "simply informs a listener" of speaker's criminal acts does not satisfy the in-furtherance requirement); *United States v. Urbanik*, 801 F.2d 692, 698-99 (4th Cir.1986) (finding prejudicial error in admission of statement identifying defendant as a marijuana connection, which was "merely a casual aside"). "A declarant's statement explaining the current status of the conspiracy is 'in furtherance' of that conspiracy only if the addressee is also a co-conspirator." *See United States v. Weaver*, 507 F.3d 178, 185–186 (3d Cir. 2007).

Mr. Perez will pursue this argument at the conclusion of the James hearing. This motion seeks a ruling by the Court that the out-of-court statements of Mr. Sanchez and Mr. Rodriguez that it is expected Mr. Martinez and Mr. Montoya will testify about do not meet any other exception and constitute inadmissible hearsay as to Mr. Perez. Therefore, these statements must be excluded at trial. Although the statement of Mr. Sanchez may be admissible as against him as a statement of a party opponent, given the low probative value of the statement, it is outweighed by the danger of unfair prejudice to Mr. Perez and Defendants Baca, Garcia and Herrera, and should be excluded under Rule 403.

DNM 1469

## ARGUMENT

The United States may seek to admit the statement of Mr. Sanchez through the testimony of Mr. Martinez, and the statement of Mr. Rodriguez, through the testimony of Mr. Montoya, as statements against penal interest. *See* Fed.R.Evid 804(b)(3). Hearsay is admissible under Rule 804(b)(3) even if the declarant is unavailable as a witness. Fed.R.Evid. 804(b). Mr. Sanchez is a co-defendant and cannot be compelled to testify because he has the privilege against self-incrimination. Thus, he is unavailable. *See* Rule 804(a)(1). Mr. Rodriguez is expected to testify, as he is now cooperating, and thus he is not unavailable. Accordingly, the testimony of Mr. Montoya about what Mr. Rodriguez told him must be excluded.

As to Mr. Sanchez's statements, they do not meet the penal interest definition as interpreted by our Supreme Court. Rule 804(b)(3) defines a statement against penal interest as: "A statement which... at the time of its making... so far tended to subject the declarant to... criminal liability... that reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id*. "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594 (1994). The circumstantial guarantee of reliability for this hearsay exception is based on the assumption that people will not make statements implicating themselves criminally unless the statements they are making are actually true. *Id.*

The Supreme Court jurisprudence maintains that "the most faithful reading of Rule 804(b)(3) is that it does not allow for non-self-inculpatory statements, even if they are made in a broader narrative that is generally self-inculpatory." *Williamson*, 512 U.S. at 600. And "whether a statement is self-inculpatory ... can only be determined by view it in context." *Id*. at 603. Thus, for statement to be admissible under Rule 804(b)(3) the statement must be *sufficiently* against the

DNM 1470

declarant's interests. *Smalls*, 605 F.3d 765, 782 (10th Cir. 2010). To determine whether a statement is sufficiently against the declarant's interest the court must consider the "contextual wording of the statement itself" along with "the circumstances under which it was made." *Id*.

In *Williamson*, the Supreme Court construed the meaning of "statement" within Rule 804(b)(3) to "cover only those declarations or remarks within the confession that are individually self-inculpatory" thus rejecting the view that "an entire narrative, including non-self-inculpatory parts may be admissible if is in the aggregate self-inculpatory." 512 U.S. at 601, 114 S. Ct. 2431. Although the Court noted that conspiracy cases may provide the best example of a "truly self-inculpatory" statement admissible under Rule 804(b)(3) against third persons being tried as co-conspirators, the Court also warned that the "district court may not just assume for the purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of fuller confession and [that] this is especially true when the statement implicates someone else." *Id*. at 600-03. "Whether a statement is in fact against interest must be determine from the circumstances of each case." *Id*. at 601. 114 S. Ct. 2436 (quoting Fed.R.Evid. 804(b)(3) committee note). For the district court to determine "whether a statement was sufficiently against the declarant's penal interest, as the Rule objectively defines that phrase" the court must consider the contextual wording of the statement and the surrounding circumstances under which it was made. *Smalls*, 605 at 782.

The statements by declarant Daniel Sanchez to Timothy Martinez allegedly implicating Mr. Perez are not sufficiently against Mr. Sanchez's interest as to be admissible at trial under Fed.R.Evid. 804(b)(3). The statements by Mr. Sanchez are not like those at issue in *United States v. Smalls*. In *Smalls*, the Tenth Circuit reversed and remanded the district court's pretrial ruling excluding the audio recording of Small's accomplice, Cook. 605 F.3d.786. The FBI was investigating the murder of an inmate at the county detention center when Cook began telling his

5

cellmate he was partly responsibility for the killing. *Id*. at 768. Unbeknownst to the Cook, his cellmate was assisting in the murder investigation and wearing a recording device provided by the FBI. *Id*. at 768. Cook confessed to his role in the murder and implicated Smalls and a third individual. *Id*. Not only was the confession captured with the recording device but prison officials who were privy to the plan to record Cook's confession surreptitiously observed Cook and his cellmate talking and described their encounter as an amiable conversation between friends. *Id*. at 772. Based on the recorded confession, Cook, Smalls, and the third individual, were indicted in connection with the murder. *Id*. at 767.

Smalls and Cook were tried separately. *Id*. Prior to Small's trial, the Government sought an order admitting the recorded jailhouse confession against Smalls as "nontestimonial hearsay offered to prove the truth of the matter asserted but admissible under Fed.R.Evid. 804(b)(3) as a statement against Cook's interest." *Smalls*, 605 F.3d.at 772. The district court denied the motion. *Id*. at 773. On appeal, the Tenth Circuit remanded, holding that the district court abused its discretion by excluding the confession. *Id*. at 767. The circuit court explained that the threshold question regarding the admissibility of the jailhouse confession at Small's trial was whether the statements were sufficiently against Cook's interest. *Id*. at 782. To determine whether the statements were sufficiently against Cook's interest, the court looked to the "contextual wording of the statement itself" and the "circumstances under which it was made." *Id*. The court explained that "comments as to how precisely … the murder occurred are undoubtedly against Cook's penal interest and, coupled with the circumstances of their making, trustworthy to the extent required by Rule 804(b)(3). And that makes them *sufficiently* against Cook's penal interests" thus "rendering them admissible under Rule 804(b)(3)." *Id*. at 785-86 (emphasis in the original).

Here, Mr. Sanchez's statements about the source of the shanks being from Mr. Perez's walker are not sufficiently against his interest to meet the hearsay exception.  The source of the shanks had no effect on whether and how the murder of Molina was going to occur.  Although the case at hand and *Smalls* share many factually similarities, the trustworthiness of statements at issue, however, could not be more distinct. In *Smalls*, Cook's jailhouse confession was not only recorded but also observed by prison officials. By contrast, in this case there is no recording of Daniel Sanchez's supposed statement to Timothy Martinez and no independent observation of the encounter to verify that it even took place. Here, the only evidence that Daniel Sanchez ever made these statements is from Timothy Martinez – the man who confessed to choking-out his "best friend" so he could not defend himself as he was being stabbed to death –
and who has given multiple and contradicting accounts of the Molina murder.

Although the statements are not admissible against Mr. Perez or co-Defendants Baca, Garica, and Herrera under the hearsay rules, they may be admissible against Mr. Sanchez as a statement of a party opponent.  However, given the minimal probative value, the Court should exclude them under Rule 403.  The district court has "considerable discretion in performing the Rule 403 balancing test." *Tan*, 254 F.3d at 1211 (10th Cir.). In this case, the trustworthiness of Mr. Martinez's testimony is suspect as discussed above.  Further, the danger of unfair prejudice to Mr. Perez in admitting the statements substantially outweighs any probative value the statements may have against Mr. Sanchez.  Despite an appropriate limiting instruction, the jury may use the statement against Mr. Perez, or his other co-Defendants as substantive evidence of guilt.

It is assumed the Government opposes this motion as it presented these statements at the James hearing indicating its intent to introduce them as evidence at trial.

Respectfully submitted,
THE LAW OFFICE OF RYAN J. VILLA

*/s/ Ryan J. Villa*
Ryan J. Villa
2501 Rio Grande Blvd. NW Ste. A
Albuquerque, NM 87104
(505) 639-5709
(505) 433-5812 facsimile
ryan@rjvlawfirm.com

AND

JUSTINE FOX-YOUNG, P.C.

*/s/ Justine Fox-Young*
Justine Fox-Young
1903 Wyoming Blvd. NE, Suite B
Albuquerque, NM 87112
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Rudy Perez*

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2017, a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

/s/*Ryan J. Villa*
RYAN J. VILLA

8

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | NO.  15-CR-4268-JB |
| | § | |
| ANGEL DELEON, ET AL., | § | |
| | § | |
| Defendants. | § | |

---

**MOTION IN LIMINE INVOKING <u>FEDERAL RULE OF CRIMINAL PROCEDURE 615</u> or "THE RULE"**

---

Defendants Joe Gallegos, by and through his counsel of record, and joined by all defendants, hereby respectfully moves this Court to invoke the Rule in the above cause for all evidentiary hearings and both trials in this cause.  As grounds, counsel states:

**<u>The Rule-</u>**

<u>Federal Rule of Criminal Procedure 615</u> states:

> At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize excluding:
> (a) a party who is a natural person;
> (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney;
> (c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or
> (d) a person authorized by statute to be present.

Defendants are therefore requesting that the Court order that witnesses be excluded from the Court room for all future evidentiary hearings and any trials in this matter. The request is being made at this time so that the parties do not have to re-urge this request for all future evidentiary hearings and trials.

Defendants acknowledge that the Government is entitled the use of its "Case Agent" under

Fed. R. Crim. P. 615. The Defendants believe that individual would be Federal Bureau of

Investigation Special Agent Brian Acee. If this is incorrect, the Defendants would request

that the Government elect who they will have the Court exclude from the application of

Fed. R. Crim. P. 615.

**Consultation**

The Government was consulted on this request and as of the filing of this motion has

not responded, therefore is presumed to be opposed. Should this be incorrect, defendant

will file an amended notice.

**Conclusion**

WHEREFORE, Defendants Gallegos requests an Order from this Honorable Court invoking

the Rule for all evidentiary hearings and both trials.

Respectfully submitted this 1st  day of December, 2017.

Respectfully submitted,

*/s/ Brock Benjamin*
BROCK BENJAMIN
Attorney for Defendant
New Mexico Bar No.141535
747 E. San Antonio, Suite 203
El Paso, Texas  79901
Tel (915) 412-5858
Fax (915) 503-2224
E-Mail:  brock@brockmorganbenjamin.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 1st day of December, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.

*/s/ Brock Benjamin*
BROCK BENJAMIN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **NO.  15-CR-4268-JB** |
| | § | |
| **ANGEL DELEON, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

## MOTION IN LIMINE REQUESTING THE MAINTENANCE OF THE APPEARANCE OF INNOCENCE

Defendants Joe Gallegos by and through his counsel of record, and all other defendants hereby respectfully moves this Court to Maintain the Appearance of Innocence through the trial in the above cause for both trials in this cause.[1] As grounds, counsel states:

### Shackles, Transport, Ski Masks and SOG

Defendants would jointly raise their concerns to the Court in order to ensure that the Court is aware of issues that have occurred outside of the time during which the Court was active. As a whole, defendants believe that the security presence and conditions has been handled well by the Court and the United States Marshall Service. Defendants though, share a concern that the security issue appears to fluctuate on a apparently random basis. As support for this, the writer would direct the Court to the presence that was noted on November 8, 2017 of guards that were for the first time wearing "SOG" marked vests and ski masks in the presence of Counsel, defendants and in the courtroom. These ski mask wearing guards were allegedly wearing the masks in order to protect their identity as they work in a

---

[1] Counsel obtained the phrasing of the request from Robert G. Neds, Criminal Defendants: Maintaining the Appearance of Innocence, 37 Mo. L. Rev. (1972) Available at: http://scholarship.law.missouri.edu/mlr/vol37/iss4/5. Last visited November 30, 2017.

special unit in the New Mexico Department of Corrections. However this protection was useless as the

guards de-masked per the observations of the writer, a minimum of four (4) separate times in the presence

of defendants and counsel in Court. It appears to the undersigned that the guards have a preference of

form over substance.[2] However as these guards are expected to participate in the trial of this cause, the

undersigned and other defendants need to raise this issue early and provide the opportunity for it to be

addressed.

**Defendants' Requests**

Defendants therefore request help from this Court on three specific issues:

1. Transport of the defendants out of sight of any member of the public, to include arrival,

meals and departure from the Courthouse.[3]

2. Absence of any visible form of restraints during the course of the trial in front of the jury.

3. Absence of any security that is in any clothing other than proper gentleperson attire.[4]

Defendants' first and second requests are related and will be dealt with jointly. I**n** Deck v. Missouri,

544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2007), the United States Supreme Court held on

review of a trial conducted by the State of Missouri that the Constitution forbids

> the use of physical restraints visible to the jury absent a trial court determination,
> in the exercise of its discretion that they are justified by a state interest specific to
> a particular trial. Such a determination  [*117] may of course take into account
> the factors that courts have traditionally relied on in gauging potential security
> problems and the risk of escape at trial. Barrett v. United States, No. 09-CIV-105-
> JHP, 2012 U.S. Dist. LEXIS 115360, at *116-17 (E.D. Okla. Aug. 16, 2012).

---

[2] Based on undersigned's experience and the uniforms, the writer believes that the issue that he raises all
stem from guards from Otero or other detention facilities and not United States Marshalls.

[3] At the November 8-9 hearings the defendants were transported through the public elevator/ stairs. The
undersigned believes that the elevator has been repaired and defendants will not be transported through
the courthouse public area.

[4] The undersigned would suggest that a that the term "proper gentleperson attire" should be interpreted as
a full suit similar to what counsel will be wearing.

Defense Counsel has requested and not received a report of any activities of his client or the other Defendants that are pending trial. It is believed that the first two requests, transport and visible shackles can be accomplished by the United States Marshall's Service based on the prior behavior of the defendants.

Defendants' third request is raised based on what has occurred pre-trial in this matter. In the writer's experience in this district the appearance of the United States Marshalls during court has been in keeping with what the writer is requesting. However, this case will have additional security and as most individuals appear to desire to wear khakis and vests the defendants raise this request for proper gentle person attire pre-trial with the Court.

## Consultation

The Government was consulted on this request and has not responded as of the filing of this motion. Should the government provide a position, the undersigned will notify the Court.

## Conclusion

WHEREFORE, Defendants Gallegos requests an Order from this Honorable Court consider the above requests and after full and due consideration allow the defendants a fair trial without the trappings or other visible signs of incarceration or guilt.

Respectfully submitted this 1st day of December, 2017.

Respectfully submitted,

*/s/ Brock Benjamin*
BROCK BENJAMIN
Attorney for Defendant
New Mexico Bar No.141535
747 E. San Antonio, Suite 203
El Paso, Texas 79901
Tel (915) 412-5858
Fax (915) 503-2224
E-Mail: brock@brockmorganbenjamin.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 1st day of December, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.


*/s/ Brock Benjamin*
BROCK BENJAMIN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                  NO.  15-CR-4268-JB

ANGEL DELEON, et al.,

       Defendants.

### OPPOSED MOTION IN LIMINE TO EXCLUDE
### CO-DEFENDANT'S STATEMENTS

COMES NOW, defendant Christopher Garcia, by and through CJA counsel Amy Sirignano, of the Law Office of Amy Sirignano, PC, and Christopher W. Adams, of the Law Office of Christopher W. Adams, PC, and joined by all defendants, submits this Motion in Limine regarding statements made by co-defendants charged in the second superseding indictment (Doc. 949).

Defendants respectfully request the Court order the government not to attempt to elicit, mention, or refer to or any evidence of co-defendants' statements that implicate a defendant in front of the jury until a hearing has been held outside the presence of the jury.

The use of co-defendant's statements implicating or suggesting a defendant maybe highly prejudicial to jointly tried defendants pursuant to Federal Rule of

Evidence 403. Additionally, a defendants' right to cross-examination pursuant to the Confrontation Clause under the Sixth Amendment is implicated when a co-defendant chooses not to testify.

A defendant may be prejudiced with the admission of evidence of a co-defendant's statement or confession made by that co-defendant. *See Bruton v. United States*, 391 U.S. 123, 132 (1968). The prejudice cannot be "dispelled by cross-examination" if the co-defendant does not take the stand. *See id*. Providing limiting instructions to the jury does erase the prejudice to the defendant. *See id*. Before the jury in a joint trial, extrajudicial statements made by a co-defendant may be powerfully incriminating as he stands side-by-side with the defendant. *See id*. at 135. Such statements limit a defendant's credibility but also call into question Sixth Amendment rights to Confrontation when the co-defendant does not take the stand. *See id*.

The admission of a defendant's extrajudicial confession that implicates a co-defendant triggers the Confrontation Clause of the Sixth Amendment. *See Roberts v. Russell*, 392 U.S. 293, 293 (1968) (repeating *Bruton* that there are some situations that limiting instructions to a jury will not resolve the prejudice). "Where two or more defendants are tried jointly, therefore, the pretrial confession of one of them that implicates the others is not admissible against the others unless the confessing defendant waives his *Fifth Amendment* rights so as to permit cross-examination." *See Cruz v. New York*, 481 U.S. 186, 190 (1987). A non-testifying co-defendant's confession is

not directly admissible against the defendant at their joint trial which is barred by the Confrontation Clause. *See id*. at 193-4.

The prosecution is additionally prohibited from introducing redacted co-defendants' confession that refer directly to the "existence" of the non-confessing defendant. *See Gray v. Maryland*, 523 U.S. 185, 192 (1998). The obvious deletion may overemphasize the importance of the deletion and cause the jury to speculate the statement's reference. *See id*.

The government was contacted on December 1, 2017 via email and AUSA Maria Armijo opposes this motion.

Wherefore, Defendants respectfully request the Court order the government not introduce, elicit, or attempt to elicit statements made by defendants named in the second superseding indictment that refer or implicate another defendant. This request extends to prohibit the government from introducing redacted co-defendant statements.

Respectfully submitted,

___/s_____

**Amy Sirignano, Esq.**
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM  87109
Phone: (505) 242-2770
Fax: (505) 242-2774
Email: amy@abqnmlaw.com


___/s_____

**Christopher W. Adams**
The Law Office of Christopher W. Adams, PC
102 Broad Street, Suite C
Charleston, SC 29401
Phone: (843) 577-2153
Fax:(877) 883-9114
Email: chris@chrisadamslaw.com


Co-counsel for Christopher Garcia


**CERTIFICATE OF SERVICE**
I hereby certify that a copy of the
foregoing pleading was sent via the
Court's CM/ECF system to opposing
counsel, AUSAs Maria Armijo, Randy
Castellano, and Matthew Beck, this 1st
day of December 2017.

___/s_____
Amy Sirignano, Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                       NO. 15-CR-4268 JB

ANGEL DELEON et al.,

        Defendants.

## OPPOSED MOTION IN LIMINE TO PROHIBIT WITNESSES FROM READING PRE-TRIAL AND TRIAL TESTIMONY TRANSCRIPTS

COMES NOW, Christopher Garcia, by and through CJA counsel Amy Sirignano, of the Law Office of Amy Sirignano, PC, and Christopher W. Adams, of the Law Office of Christopher W. Adams, PC, and Joe Gallegos through counsel Brock Benjamin and Rick Sindel, Edward Troup through counsel Cori Harbor-Valdez and Pat Burke, Billy Garcia through counsel Robert Cooper and James Castle, Christopher Chavez through counsel Orlando Mondragon and John Granberg, Arturo Arnulfo Garcia through counsel Billy Blackburn and Scott Davidson, Anthony Ray Baca through counsel Marc Lowry and Theresa Duncan, Carlos Herrera through Carey Bhalla and William "Bill" Maynard, Rudy Perez through counsel Ryan Villa and Justine Fox-Young, and respectfully move this Honorable Court in limine to direct that any fact witnesses identified by any party in this matter be prohibited from being in the courtroom prior to the time they testify pursuant to Rule 615, but also from reading transcripts of trial or pretrial testimony given by any other witnesses.  The basis for this motion is as follows:

Because the Defendants in this case will seek to obtain daily transcripts during the trial and transcripts of pre-trial testimony are and will continue to be available, if transcripts of a witness's testimony are made available for other fact witnesses to read or review, it would result

DNM 1486

in a violation of Rule 615 for witnesses to obtain the same information from which they are

excluded pursuant to the Rule.  Further, each fact witness is permitted to testify only to

information of which they have personal knowledge (Rule 620), without regard to any other

witnesses' testimony.

The government was contacted on December 1, 2017 via email and AUSA Maria Armijo

opposes this motion.

WHEREFORE, for the foregoing reasons, joined co-defendants respectfully request this

Court enter an order to direct any fact witnesses identified by any party in this matter be

prohibited from being in the courtroom prior to the time they testify pursuant to Rule 615, but

also from reading transcripts of trial or pretrial testimony given by any other witnesses.

Respectfully submitted,

_/s_____
**Amy Sirignano, Esq.**
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM  87109
Phone: (505) 242-2770
Fax: (505) 242-2774
Email: amy@abqnmlaw.com

_/s_____
**Christopher W. Adams**
The Law Office of Christopher W. Adams, PC
102 Broad Street, Suite C
Charleston, SC 29401
Phone: (843) 577-2153
Fax:(877) 883-9114
Email:chris@chrisadamslaw.com

Counsel for Christopher Garcia

DNM 1487

_/s_____

**Brock Benjamin**
Benjamin Law Firm
747 E. San Antonio, Suite 203
El Paso, TX 79901
Phone:(915)412-5858
Fax:(915)503-2224
Email: brock@brockmorganbenjamin.com


_/s_____

**Richard Sindel**
Sindel, Sindel & Noble, P.C.
8000 Maryland Avenue, Suite 350
Clayton, MO 63105
Phone: (314) 721-6040
Fax: (314) 721-8545
Email: rsindel@sindellaw.com

Co-counsel for Joe Lawrence Gallegos

_/s_____
**Cori Ann Harbour-Valdez**
The Harbour Law Firm, PC
PO Box 13268
El Paso, TX 79913
Phone: 915-544-7600
Fax: 915-975-8036
Email: cori@harbourlaw.net


_/s_____
**Patrick J. Burke**
Patrick J. Burke, PC
999 18th Street, Suite 2055
Denver, CO 80202
Phone: 303-825-3050
Fax: 303-825-2992
Email: patrick-j-burke@msn.com

Co-counsel for Edward Troup

_/s_____
**James A. Castle**
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206

3

(303) 675-0500
Fax: (303) 329-5500
Email: JCastlelaw@gmail.com


    /s
**Robert R. Cooper**
1011 Lomas Blvd NW
Albuquerque, NM 87102
505-842-8494
Fax: (505) 243-6279
Email: bob@rrcooper.com


Co-counsel for Billy Garcia


    /s
**Orlando Mondragon**
1028 Rio Grande
El Paso, TX 79902
Phone: 915-566-8181
Fax: 915-566-9696
Email: mondragonom@gmail.com


    /s
**John L. Granberg**
Granberg Law Office
310 N. Mesa Suite 424
El Paso, TX 79901
Phone: (915) 543-9000
Fax: (915) 543-3201
Email: granberglawoffice@yahoo.com


Co-counsel for Christopher Chavez


    /s
**Billy R. Blackburn**
1011 Lomas Blvd. NW
Albuquerque, NM 87102
Phone: 505-242-1600
Fax: 505-243-6279
Email: Billy@BBlackburnlaw.com


    /s
**Scott Moran Davidson**
1011 Lomas Boulevard NW
Albuquerque, NM 87102
Phone: 505-255-9084

4

Fax: 505-243-6279
Email: scott@justappeals.net

Co-counsel Arturo Arnulfo Garcia

_____/s_____

**Marc M Lowry**
Rothstein Donatelli LLP
500 4th Street N.W. Suite 400
Albuquerque, NM 87102
Phone:(505) 243-1443
Fax: (505) 242-7845
Email: mlowry@rothsteinlaw.com

_____/s_____

**Theresa M Duncan**
Duncan Earnest LLC
515 Granite NW, Albuquerque, NM 87102
Phone: 505-842-5196
Fax: 505-750-9780
Email: teri@duncanearnest.com

Co-counsel for Anthony Ray Baca

_____/s_____

**Carey Corlew Bhalla**
Law Office of Carey C. Bhalla LLC
925 Luna Cir NW
Albuquerque, NM 87102
Phone: 505-508-5589
Email: carey@bhallalaw.com

_____/s_____

**William "Bill" Maynard**
521 Texas Ave
El Paso, TX 79901-1417
Phone: (915) 201-2580
Email: wrm@wrmaynardlaw.com

Co-counsel for Carlos Herrera

DNM 1490

/s

**Justine Fox-Young**
1903 Wyoming Blvd. NE Ste. B
Albuquerque, NM 87112
Phone: 505-796-8268
Email: justine@foxyounglaw.com

/s

**Ryan J Villa**
2501 Rio Grande Blvd NW Suite A
Albuquerque, NM 87104
Phone: (505) 639-5709
Fax: 505-433-5812
Email: ryan@rjvlawfirm.com

Co-counsel for Rudy Perez

**CERTIFICATE OF SERVICE**
I hereby certify that a copy of the foregoing
pleading was sent via the Court's CM/ECF
system to opposing counsel, AUSAs Maria
Armijo, Randy Castellano, and Matthew
Beck, this 1st day of December 2017.

/s

Amy Sirignano, Esq.

6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,

          Plaintiff,                            CR 15-4268-JB

vs.

ANGEL DELEON, et. al.

          Defendants.


**DEFENDANT DANIEL SANCHEZ'S MOTION IN LIMINE TO PROHIBIT
GOVERNMENT FROM MAKING STATEMENTS OR ARGUMENTS THAT
IMPROPERLY SUGGEST THAT PROPENSITY CHARACTER INFERENCES CAN
OR SHOULD BE MADE FROM EXTRINSIC ACT EVIDENCE.**

The defendants jointly move for an order to prohibit the government from making

statements or arguments that improperly suggest that propensity character inferences can or

should be made from extrinsic act evidence.  As grounds therefore, it is stated as follows:

1.  The Court has announced its intention to try Counts 6-7, alleging a conspiracy to

murder and murder of Javier Molina, with Counts 8-12, alleging conspiracies to assault inmate

Julian Romero and murder Security Threat Management Administrator, Dwayne Santistevan,

and New Mexico Cabinet Secretary of Corrections, Greg Marcantel.

2.  As discussed in Defendant Daniel Sanchez's Motion to Sever the Trial of Counts 6-7

From the Trial of Counts 8-12 (Doc. 1296), the evidence that will be offered by the government

in its attempt to prove the alleged conspiracies to assault inmate Romero and to murder

1

Corrections' Secretary Marcantel and STIU Administrator Santestevan is susceptible to interpretation by the jury as character evidence of defendant Anthony Baca's propensity to order alleged SNM gang members to perpetrate violent acts. This same evidence is also susceptible of interpretation by the jury as character evidence regarding the propensity of SNM gang members to comply with Baca's orders to commit violent acts.

3. Federal Rule of Evidence 404(b) ("Rule 404(b)") provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The Advisory Committee Notes to Rule 404 recognize that the "circumstantial use of character evidence is generally discouraged because it carries serious risks of prejudice, confusion and delay." *See Michelson v. United States*, 335 U.S. 469, 476 (1948).

4. By it's plain language, the prohibition of character evidence is not limited to "a defendant's" character. *Huddleston v. United States*, 485 U.S. 681, 685-686 (1988) ("The actor in the instant case was a criminal defendant, and the act in question was "similar" to the one with which he was charged. Our use of these terms is not meant to suggest that our analysis is limited to such circumstances."). "By its plain terms, Rule 404(b) mandates that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a *person* in order to show action in conformity therewith," instead of restricting itself to evidence proving "the character of the accused." *United States v. Lucas*, 357 F.3d 599, 605 (6th Cir. 2004) (emphasis in original).

5. The Advisory Committee Notes following Rule 401 explain that rules such as Rule 404 and those that follow it are meant to prohibit certain types of evidence that are otherwise clearly "relevant evidence," but that nevertheless create more prejudice and confusion than is

DNM 1493

justified by their probative value. "In other words. . . prior bad acts are generally not considered

proof of any person's likelihood to commit bad acts in the future and. . .such evidence should

demonstrate something more than propensity." *United States v. Lucas*, *supra*, 357 F.3d at 606

(holding that defendant could not present certified copies of criminal conviction documents of

third party suspect to raise reasonable doubt regarding defendant's guilt).

   6. The Court has preliminarily indicated that, in its opinion, severance is not appropriate,

since the government would be entitled to present evidence of the crimes charged in Counts 8-12

in a separate trial of Counts 6-7, to establish that the SNM gang is engaged in racketeering

activity, an element of the VICAR offenses alleged in Counts 6-7. [1]

   7. Even if the Court permits the government to prove the racketeering activity element of

the VICAR offenses charged in Counts 6-7 with evidence of Counts 8-12, the government

should not be permitted to use evidence of Counts 8-12 to encourage the fact-finders to make

improper and prejudicial propensity character inferences with that evidence in evaluating the

truth of the charges in Counts 6-7.  If the evidence is admitted at a joint trial to prove that SNM

---

   [1] As of the date of the filing of this motion in limine, the Court has not filed a written order on Mr. Sanchez's Motion to Sever Counts 6-7 from Counts 8-12 (Doc. 1296). However, at the oral argument on the motion, it is counsel's recollection that the Court expressed that this was its reasoning for its indicated ruling denying the requested severance.
   Mr. Sanchez respectfully disagrees.  The government has many other ways to establish the racketeering elements of Counts 6-7 that do not pose such a serious risk of prejudice to Mr. Sanchez.  And, for the reasons discussed in his motion to sever (Doc. 1296), Mr. Sanchez continues to believe that the Court should rightfully exercise its discretion to sever the trial of Counts 6-7 from Counts 8-12, and prohibit the government from proving the racketeering activity element of the VICAR offenses alleged in Counts 6-7 with evidence of Counts 8-12, because the proof associated with those offenses: is not otherwise admissible against Mr. Sanchez; creates the serious risk of unfair prejudice based on the likelihood that the jury will make the propensity character inferences at issue here, regardless of the Court's limiting instructions; and unfairly and prejudicially buttresses the credibility of cooperators the government will use to attempt to prove Counts 6-7.

DNM 1494

is engaged in racketeering activity, then the use of that evidence should be strictly limited to that narrow purpose and none other.

8.   Based on the foregoing, the government should be prohibited from making statements or arguments that suggest that propensity character inferences can or should be made from the from the evidence it presents in its attempt to prove Counts 8-12 and applied to the jury's consideration of the allegations against Mr. Sanchez in Counts 6-7.  If the Court does not preclude the government from making improper and prejudicial statements or arguments that involve such propensity character inferences, then any guilty verdict against Mr. Sanchez in Counts 6-7 will necessarily be corrupted with factual conclusions based on character inferences that affront the United States' longstanding and time-tested notion of due process.

9.   The government opposes this motion in limine.

Dated this 1st day of December, 2017          Respectfully submitted,

/s/ *Amy E. Jacks*
Amy E. Jacks
Attorney for Defendant
DANIEL SANCHEZ

/s/ *Richard Jewkes*
Richard Jewkes
Attorney for Defendant
DANIEL SANCHEZ

4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' MOTION *IN LIMINE* TO PRECLUDE QUESTIONING GOVERNMENT WITNESSES REGARDING PERSONAL INFORMATION

The United States of America hereby moves *in limine* for an order precluding defense counsel from asking government witnesses any questions that attempt to elicit personal information regarding them and their families, including questions about their marital status, their children, their parents, their siblings, their locations and types of employment, and their places of residence, and as grounds asserts:

1.   **Background**

This case, in part, involves the murders of Frank Castillo, Rolando Garza, Freddy Sanchez, Adrian Burns, and Javier Molina and conspiracies to assault or murder Julian Romero, Dwayne Santistevan, Gregg Marcantel, and Jose Gomez.  The defendants are all members or associates of the Syndicato de Nuevo Mexico ("SNM").

Many of the defendants charged in this case are accused of murdering and assaulting individuals because the victim cooperated with law enforcement officers or violated SNM rules.

Within the operational parameters of the SNM, members enforce the rules and promote discipline among members through murder, attempted murder, conspiracy to murder, assault,

and threats against those who violate the rules or pose a threat to the enterprise. "Snitches" are dealt with severely; assault and murder are the common repercussions for violating SNM rules prohibiting cooperation with law enforcement. The SNM also uses murder and the threat of murder to maintain a position of power inside and outside of prison.

The SNM investigation has uncovered a number of potential threats to witnesses. For example, during a recorded conversation, Anthony Ray Baca can be heard talking about a co-defendant's possible testimony. During the conversation, he states: "And his family, his family gets hit. And that shit will hit the news, carnal. And they're gonna say the only motive behind that has been because that fucker testified. That shit hits the new too. That gives us more power. Because of the fact that…everybody's gonna know, 'a la verga, they're gonna hit my family, I'm never gonna tell 'em." In another recorded conversation, Anthony Ray Baca talks about sending a message to the family of a cooperating witness. The message was that the family would be harmed if the witness testified. Finally, law enforcement officers also discovered that Defendant Baca requested that others find the home address of certain New Mexico Corrections Department employees. In one recorded conversation, Defendant Baca states that he believes it would be easier to "get them" if they do not reside on prison grounds.

**2.**    <u>**Necessity to Protect Law Enforcement Personnel and Other Witnesses**</u>

Several witnesses who will testify at the trial in this matter were formerly SNM members who cooperated with FBI agents. The witnesses were instrumental in the bringing about of federal indictments against SNM members in the District of New Mexico. Since the time that this cooperation became known to SNM members, members have planned to harm witnesses.

One of the beliefs of the SNM is that all acts of cooperation with the government must be met with retaliation. If any of the cooperating witnesses' whereabouts or personal information are made known to SNM members, their lives or the lives of their family members could be in

DNM 1497

jeopardy.

The FBI case agents who investigated these cases have also been plotted against for their roles in prosecuting SNM members. If the FBI agents' and other law enforcement agents' whereabouts were made known to the SNM, their lives and their families' lives could also be in jeopardy. Because this case involves an alleged conspiracy to murder police cooperators and law enforcement personnel, the United States requests that the Court order defense counsel to refrain from asking government witnesses any questions pertaining to their personal information.

The United States asserts that there is no basis for defense counsel to inquire into this information during trial as it is not relevant. The United States, under D.N.M.LR-Cr. 47.1, sought the position of defense counsel. Counsel for Defendants either opposed the motion or indicated a preference to see the motion prior to stating a position. However, based on the need to file the motions timely, the United States was unable to present the motion itself to the defense.

BASED ON THE FOREGOING, the United States respectfully requests that the Court enter an order precluding defense counsel from asking government witnesses any questions eliciting personal information about them and their families, including questions about their marital status, their children, their parents, their siblings, their locations and types of employment, and their places of residence.

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

*Electronically filed 12/1/2017*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 – Tel.

3

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.


_____/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

DNM 1499

Appellate Case: 20-2058   Document: 010110415663   Date Filed: 09/29/2020   Page: 1862

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## <u>UNITED STATES' MOTION *IN LIMINE* TO EXCLUDE ANY REFERENCE TO PUNISHMENT OR SENTENCING</u>

The defendants proceeding to trial in this case face lengthy prison sentences if convicted at trial. The United States respectfully moves for an order excluding all direct or indirect reference to, or evidence of, the sentences that might be imposed if Defendants are convicted of the offenses charged. Any reference to a defendant's sentencing exposure generally, or the statutory mandatory minimums more specifically, would be irrelevant, and raising the issue would be unfairly prejudicial to the prosecution.

The Court regularly instructs juries that the sentencing consequences of a guilty verdict are not relevant to a jury's determination of whether the United States has proved the elements of the charged crimes beyond a reasonable doubt.  *See, e.g.,* Tenth Cir. Criminal Pattern Jury Instr. 1.20 (2011).   The instruction gives meaning to the well-established principle that, unless the jury has a role in sentencing, the jury may not, in reaching its verdict, consider what sentence might be imposed.  *Shannon v. United States*, <u>512 U.S. 573, 579</u> (1994) (citing *Rogers v. United States*, <u>422 U.S. 35, 40</u> (1975)).   This "is a reflection of the basic division of labor in our legal system between judge and jury.   The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged.   The judge, by contrast, imposes

sentence on the defendant after the jury has arrived at a guilty verdict." *Id.*   Given this division

of labor, information regarding what sentence might be imposed following a guilty verdict is

"irrelevant to the jury's task," *id.*, and the jury is not to consider the potential punishment that

could result from conviction.   *United States v. Parrish*, 925 F.2d 1293, 1299 (10th Cir. 1991)

(unless statute specifically requires jury participation in determining punishment, jury shall not

be informed of possible penalties).   Providing sentencing information to the jury "invites [jurors]

to ponder matters that are not within their province, distracts them from their fact finding

responsibilities, and creates a strong possibility of confusion." *Shannon*, 512 U.S. at 579.

Further, the United States requests that the Court prohibit the defense from eliciting

testimony about potential punishment from any of the Government witnesses.   *See United States

v. Mirabal,* Slip Op., No. 16-2188, 2017 WL 571191 (10th Cir. Nov. 29, 2017).

For these reasons, this Court should exclude all direct or indirect reference to, or evidence

of, the sentences that might be imposed if the defendants are convicted of the offenses charged in

this case. Additionally, this Court should preclude the defense from seeking punishment

information from witnesses.

The United States, under D.N.M.LR-Cr. 47.1, sought the position of defense counsel.

Counsel for Defendants either opposed the motion or indicated a preference to see the motion prior

to stating a position. However, based on the need to file the motions timely, the United States was

unable to present the motion itself to the defense.

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

***Electronically filed 12/1/2017***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

_____/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## THE UNITED STATES' MOTION *IN LIMINE* FOR A PRETRIAL ORDER PERMITTING THE PROSECUTION TO PRESENT WITNESS TESTIMONY IN INSTALLMENTS

The United States hereby moves *in limine* for an order from the Court, pursuant to Fed. R. Evid. 611(a), permitting the United States to present witness testimony in installments as needed so that the jury can best understand the evidence, and in support of this motion states as follows:

The order of proof at trial is within the sound discretion of the trial court. *See Geders v. United States*, 425 U.S. 80, 86 (1976); *United States v. Hernandez*, 829 F.2d 988, 994 (10th Cir. 1987); *United States v. Krohn*, 573 F.2d 1382, 1387 (10th Cir. 1978).  Pursuant to Fed. R. Evid. 611(a), "the [trial] court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment and undue embarrassment."  Indeed, a trial court has the discretion to permit witnesses to testify in installments to avoid confusing the jury.  *See United States v. Anchrum*, 590 F.3d 795, 803 (9th Cir. 2009) (permitting agent to testify in one phase as a fact witness and again later in the same trial as an expert witness).  Such testimony is permissible so long as the defendant has a full

opportunity to cross-examine the witness each time he or she takes the stand.  *See United States v. DeLuna*, 763 F.2d 897, 911 (8th Cir. 1985).

The United States intends to present testimony at trial from several witnesses who were involved in various portions of the investigation leading to charges in this case, as well as the case agent, Special Agent Bryan Acee, who was involved in several different aspects of the same investigation, and from gang experts Ronald Martin, Chris Cupit and Sergio Sapien of the New Mexico Corrections Department Security Threat Intelligence Unit, who may testify as fact witnesses in additional to their gang expert testimony.  As the Court is aware, this investigation involved several phases and multiple indictments that charged various individuals with RICO conspiracy, VICAR murder, attempted murder, conspiracy to commit murder, assault with a deadly weapon resulting in serious bodily injury and conspiracy to commit assault with a deadly weapon resulting in serious bodily injury, felon in possession of firearm, using or carrying a firearm during and in relation to a crime of violence, and aiding and abetting.

Because of the nature and scope of the investigation, and SA Acee's extensive involvement in various different portions of the investigation, Agent Acee's testimony may be needed at different times during the presentation of evidence to maintain a chronological narrative to avoid confusing the jury.   In addition, the testimony of the government's gang and other witnesses may need to be presented at different times for the same reason.

The United States submits that under the circumstances of this case it appropriate under Fed. R. Evid. 611(a) to permit the United States to present testimony from Agent Acee, Ronald Martin, Chris Cupit, Sergio Sapien, and others in installments as needed to help the jury best understand the evidence.  Permitting the United States to do this, while allowing Defendants a full opportunity to cross examine them during each phase of their testimony, would give the jury the

best opportunity to understand the evidence while at the same time protecting the Defendants'
right to confrontation.

WHEREFORE, the United States respectfully requests that this Court grant this motion *in
limine* and issue an order permitting the United States to present certain testimony in installments
as needed so that the jury can best understand the evidence.

The United States, under D.N.M.LR-Cr. 47.1, sought the position of defense counsel.
Counsel for Defendants either opposed the motion or indicated a preference to see the motion prior
to stating a position. However, based on the need to file the motions timely, the United States was
unable to present the motion itself to the defense.

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

***Electronically filed 12/1/2017***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

_____/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

DNM 1505

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### THE UNITED STATES' MOTION *IN LIMINE* TO ALLOW TRANSCRIPTS CONTAINING ENGLISH TRANSLATIONS OF RECORDED SPANISH CONVERSATIONS AS SUBSTANTIVE EVIDENCE

The United States hereby moves *in limine* for the admission of the English translations of the Spanish-language recorded conversations, words or phrases in this case as substantive evidence. The language of administration of the courts of the United States is English. It is well-settled in this circuit that, when a recording is in English, the recording itself is the substantive evidence, and transcripts of that recording are merely demonstrative aids to help the finders of fact in understanding the evidence. Tenth Circuit Criminal Pattern Jury Instruction 1.40. When this rule is applied, the jurors are usually instructed that "[i]f you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read." *Id.* That rule, however, cannot logically apply to a recording in a foreign language, which the jurors are not required to understand to be qualified for jury service.

Not surprisingly, trial and appellate courts have encountered this issue before and addressed it by admitting English language translations of foreign language conversations as substantive evidence for the jury to read in court, and also to use during deliberations in the jury room. *See e.g., United States v. Curbelo*, 726 F.3d 1260, 1271 (11th Cir. 2013) (holding trial

court properly admitted English translations of Spanish language wiretap recordings); *United States v. Gutierrez*, 367 F.3d 733, 735 (8th Cir. 2004) (finding trial court properly admitted transcripts containing English translations of wiretapped phone conversations); *United States v. Galvan-Estrada*, 494 Fed. Appx. 898, 901 (10th Cir. 2012) (finding evidence at trial sufficient where it included "tapes and translated transcripts of a phone conversation between [the defendant] and another man that police drug investigators reasonably believed concerned a drug transaction"); *United States v. Valenzuela*, 484 Fed. Appx. 243, 246 (10th Cir. 2012) (in reviewing sufficiency of trial evidence, the appellate court noted that the United States "introduced into evidence recorded wiretap conversations in Spanish, each of which was accompanied by a Spanish transcript and an English translation. Most of the recordings were played to the jury. An English translator testified to the contents of the conversations").

Indeed, the pattern jury instructions in some other circuits reflect this well-established evidentiary rule. For example, jurors in the Eighth Circuit are instructed as follows:

> The exhibits admitted during the trial included recordings of conversations in the _____ language. You were also given English transcripts of those conversations. The transcripts were prepared [by the [government][prosecution]] so that you can understand the recordings. Whether a transcript is an accurate translation, in whole or in part, is for you to decide. You should not rely in any way on any knowledge you may have of the language spoken on the recording; your consideration of the transcripts should be based on the evidence introduced in the trial.…
>
> In considering whether a transcript is accurate, you should consider the testimony presented to you regarding how, and by whom, the transcript was made. You may consider the knowledge, training, and experience of the translator, as well as the nature of the conversation and the reasonableness of the translation in light of all the evidence in the case.

Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, 2013 Revised Edition, Instruction 2.06B. Other circuits have adopted similar jury instructions

directing jurors to consider English language transcripts as substantive evidence. For example,

trial courts in the Ninth Circuit instruct jurors in criminal cases where the substance of a recording

is not in dispute that:

> You are about to [hear] [watch] a recording in the [*specify the foreign language*] language. A transcript of the recording has been admitted into evidence. The transcript is an official English-language translation of the recording. Although some of you may know the [*specify the foreign language*] language, it is important that all jurors consider the same evidence.  Therefore, you must accept the English translation contained in the transcript even if you would translate it differently."

Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit, 2010

Edition, Instruction 2.8.

To be qualified as a juror in the courts of the United States, one must speak and understand

English, but not Spanish.   To provide jurors in the courts of the United States with only

Spanish-language recordings to analyze and use during their deliberations, then, would be to

provide them with evidence that would be meaningless to them. To require all jurors in this case

to speak fluent Spanish would impose an additional and unnecessary burden on the Court and the

parties during jury selection. The solution is to do as numerous other courts and circuits have

done, and as the Tenth Circuit has affirmed, and allow the English translations of the Spanish

recordings in this case to be admitted as substantive evidence.

The United States, under D.N.M.LR-Cr. 47.1, sought the position of defense counsel.

Counsel for Defendants either opposed the motion or indicated a preference to see the motion prior

to stating a position. However, based on the need to file the motions timely, the United States was

unable to present the motion itself to the defense.

3

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

*__Electronically filed 12/1/2017__*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

_____/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO.   15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| ANGEL DELEON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' MOTION _IN LIMINE_ TO PRECLUDE SOLICITING TESTIMONY ABOUT SENSITIVE GOVERNMENT RECORDING DEVICES OR PROGRAMS**

At trial, the United States intends to introduce evidence derived from audio recordings between the Defendants and FBI confidential human sources (CHSs). The United States asserts the law enforcement sensitive qualified evidentiary privilege, and respectfully requests that this Court preclude the defense from cross-examining or in any other manner soliciting testimony in the presence of the jury the following information: (1) technical specifications of the audio recording devices, to include methods of installation, concealment and location of devices; and (2) training of government witnesses that would reveal sensitive government programs or sources and methods. The law supports the exclusion of this type of evidence to protect national security interests.

**BACKGROUND**

The United States began the investigation into the SNM prison gang that led to this prosecution on or about March of 2015. Because the SNM prison gang operates primarily within the confines of the prison, and because of the difficult nature of penetrating this criminal organization, the FBI used CHSs to record incriminating conversations with the Defendants. In that process, the FBI provided the CHSs with covert electronic audio recording devices. The

United States provided to Defendants the information from those recording devices, including the recordings and metadata.

The United States intends to play these recordings at trial during the examinations of the CHSs who recorded the Defendants' statements. These CHSs will not, however, testify about the technical specifications of the recording devices, or the concealment and location of such devices.

## BACKGROUND ON THE LAW ENFORCEMENT SENSITIVE QUALIFIED EVIDENTIARY PRIVILEGE

The Supreme Court in *Roviaro v. United States*, recognized an "informer's privilege" that protects the identity of government informants and allows the government to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.  The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.  *Roviaro*, 353 U.S. 53, 59 (1957).

Courts have since extended the qualified privilege in *Roviaro* to cover other investigative techniques, including traditional and electronic surveillance. For example, in *United States v. Green*, the D.C. Circuit upheld the privilege over the defendant's request to learn the location of an observation post used in a drug investigation:

> Just as the disclosure of an informer's identity may destroy his future usefulness in criminal investigations, the identification of a hidden observation post will likely destroy the future value of that location for police surveillance. The revelation of a surveillance location might also threaten the safety of police officers using the observation post, or lead to adversity for cooperative owners or occupants of the building. Finally, the assurance of nondisclosure of a surveillance location may be necessary to encourage property owners or occupants to allow the police to make such use of their property.

*United States v. Green*, 670 F.2d 1148, 1155-1158 (D.C. Cir. 1981).

2

Courts have held that given "the public interest in effective law enforcement," the FBI may assert a qualified privilege to protect sensitive law enforcement techniques and procedures from disclosure. *Roviaro*, 353 U.S. at 59. *See also Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 62-64 (1st Cir. 2007). With respect to electronic surveillance equipment, the 11th Circuit has held that the privilege applies, if information about the equipment is provided to defendants and the public, and it will "educate criminals regarding how to protect themselves against police surveillance. Electronic surveillance is an important tool of law enforcement, and its effectiveness should not be unnecessarily compromised. Disclosure of such information will also educate persons on how to employ such techniques themselves, in violation of Title III." *United States v. Van Horn*, 789 F.2d 1492, 1508 (11th Cir.), *cert. denied*, 479 U.S. 854 (1986).

Even where some aspects of a protected technique are known to the public, "there is no principle . . . that requires an agency to release all details concerning these and similar techniques simply because some aspects of them are known to the public." *Barnard v. U.S. Dep't of Homeland Security*, 598 F.Supp.2d 1, 23 (D.D.C. 2009). *See also Piper v. Dep't of Justice*, 294 F.Supp.2d 16, 31 (D.D.C. 2003) (in FOIA case, court accepted arguments that disclosure of the identity of an electronic device used for monitoring purposes would reduce its effectiveness and allow for individuals being investigated by the FBI to take countermeasures to circumvent the technique).

The law enforcement sensitive evidentiary privilege is "grounded in well-established doctrine and is widely recognized by the federal courts." *In re The City of New York*, 607 F.3d 923, 941 n. 18 (2d Cir. 2010). The privilege is designed, *inter alia*, to prevent disclosure of law enforcement techniques and procedures that once revealed, could risk future circumvention of the law or compromise of the technique. *See generally, id.* at 944. *See also United States v.*

3

*Winner*, 641 F.2d 825, 831 (10th Cir. 1981) (stating that the "law enforcement investigative

privilege is based primarily on the harm to law enforcement efforts which might arise from

public disclosure of investigatory files") (internal quotation marks and ellipsis omitted); *Tuite v.*

*Henry*, 181 F.R.D. 175, 176-77 (D.D.C. July 31, 1998) (unpublished), *aff'd,* 203 F.3d 53 (D.C.

Cir. 1999) ("The federal law enforcement privilege is a qualified privilege designed to prevent

disclosure of information that would be contrary to the public interest in the effective functioning

of law enforcement. [It] serves to preserve the integrity of law enforcement techniques and

confidential sources, protects witnesses and law enforcement personnel, safeguards the privacy

of individuals under investigation, and prevents interference with investigations."); *United States*

*v. Van Horn*, 789 F.2d 1492, 1507-1508 (11th Cir.), *cert. denied,* 479 U.S. 854 (1986) (finding

the existence of a qualified government privilege not to disclose sensitive investigative

techniques); *Dellwood Farms v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir. 1997); *In re Dep't of*

*Investigation*, 856 F.2d 481, 483-84 (2d Cir. 1988) (stating that the law enforcement privilege

exists and prevents the "disclosure of law enforcement techniques and procedures, [preserves]

the confidentiality of sources, [protects] witnesses and law enforcement personnel, [safeguards]

the privacy of individuals involved in an investigation, and otherwise [prevents] interference

with an investigation"); *United States v. Harley*, 682 F.2d 1018, 1020-21 (D.C. Cir. 1982);

*United States v. Green*, 670 F.2d 1148 (D.C. Cir. 1981).

Technical specifications to include the installation, concealment and location of audio

recording devices installed in the defendant's apartment are covered by the "law enforcement

sensitive" qualified evidentiary privilege.  *See In re U.S. Dep't of Homeland Sec.,* 459 F.3d 565,

569-71 (5th Cir. 2006) (finding that "in today's times the compelled production of government

documents could impact highly sensitive matters relating to national security.  Therefore, the

4

reasons for recognizing the law enforcement privilege are even more compelling now than when [prior cases in the 5th Circuit] were decided."); *Tuite v. Henry*, 181 F.D.R. 175, 176-77 (D.D.C. July 31, 1998) (unpublished), *aff'd,* 203 F.3d 53 (D.C. Cir. 1999).

In *United States v. Van Horn*, the Eleventh Circuit specifically recognized that the privilege applies to electronic surveillance devices and upheld the privilege over the defendant's request to learn the type and placement of microphones in a co-defendant's office. *See* 789 F.2d 1492, 1507-08 (11th Cir. 1986).   As referred to above, the law enforcement privilege prevents disclosure, preserves the confidentiality of sources, protects law enforcement, maintains the privacy of individuals, and prevents interference with an investigation."  *In re Dep't of Investigation*, 856 F.2d 481, 483-84 (2d Cir. 1988);  *United States v. Winner*, 641 F.2d 825, 831 (10th Cir.1981) (stating the "law enforcement investigative privilege is based primarily on the harm to law enforcement efforts which might arise from public disclosure of investigatory files") (internal quotation marks and ellipsis omitted); *see also United States v. Harley*, 682 F.2d 1018, 1020-21 (D.C. Cir. 1982); *United States v. Green*, 670 F.2d 1148 (D.C.Cir. 1981).

## APPLICATION OF THE LAW ENFORCEMENT SENSITIVE QUALIFIED EVIDENTIARY PRIVILEGE

The law enforcement privilege is a qualified, not absolute privilege, and therefore, there are circumstances in which information subject to the privilege must nevertheless be disclosed. *In re The City of New York*, 607 F.3d at 940.  The Second Circuit has analyzed, in depth, the actual procedure that should be followed by a court in determining whether the privilege bars disclosure.  *Id*. at 948-49.

As a threshold matter, the party asserting the law enforcement privilege bears the burden of demonstrating that the material the government seeks to protect is the type of material that the

law enforcement privilege is intended to protect – in this case, information pertaining to law enforcement techniques and procedures, as well as information that would seriously impair the ability of a law enforcement agency to conduct future investigations. *Id*. at 948.

Once the party asserting the privilege successfully shows that the law enforcement privilege applies, "there ought to be a pretty strong presumption against lifting the privilege." *Id*. at 945 (quoting *Dellwood Farms v. Cargill, Inc.,* 128 F.3d 1122, 1125 (7th Cir. 1997)). The court must balance the public interest in non-disclosure against the need of a particular litigant for access to the privileged information. *Id.* at 948, (*quoting In re Sealed Case*, 856 F.2d 268, 272 (D.C. Cir. 1988) (*see also Dellwood Farms*, 128 F.3d at 1125) (holding that the actual determination of the existence of the law enforcement sensitive privilege is a "particularistic and judgmental task" that involves balancing the "need of the litigant who is seeking privileged investigative materials . . . against the harm to the government if the privilege is lifted. . . .")) To rebut the presumption against lifting the privilege, the party seeking disclosure must show (1) that its request is "non-frivolous and brought in good faith," (2) that "the information sought is [not] available through other discovery or from other sources," and (3) that there is a "compelling need" for the information relevant to the party's case. *In re City of New York,* 607 F.3d at 948, *quoting Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F. 2d 1336, 1343 (D.C. Cir. 1984). (Other relevant criteria courts have used in determining whether the party seeking disclosure has rebutted the privilege with respect to investigative equipment, often called the *Frankenhauser* criteria, includes: whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; whether the investigation has been completed; whether the information sought is available through other discovery or from other sources; and the importance of the

6

information sought to the plaintiff's case.  *See Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.

Pa. 1973), *Tuite v. Henry*, 181 F.R.D. 175 (D.D.C. 1998), *In re Sealed Case*, 856 F.2d 268, 272

(D.C. Cir. 1988)).

Even if the party seeking disclosure successfully rebuts (by a showing of, among other

things, a "compelling need"), the court must then weigh the public interest in non-disclosure

against the need of the litigant for access to the privileged information before ultimately deciding

whether disclosure is required.  *In re City of New York*, 607 F.3d at 945.

To assess both the applicability of the privilege and the need for the materials, the court

must ordinarily review the materials in question or hold an evidentiary hearing in chambers.

Frequently, because filing documents under seal may inadequately protect particularly sensitive

information, the court may, in the exercise of its informed discretion and on the basis of the

circumstances presented, require that the party possessing the materials appear *ex parte* in

chambers to submit the materials for in camera review by the judge.  *Id.* at 948-49. (An

appropriately general docket entry memorializing any *ex parte* proceedings can be entered in the

public records of the district court so long as it does not compromise the interests of the party

holding the confidential information, or the public.  *Id.* at 949 n. 25); *In re U.S. Department of*

*Homeland Security*, 459 F.3d at 571 (instructing the district court to review the information for

which the law enforcement sensitive privilege is being asserted in camera to evaluate whether the

privilege applies.)

If the court determines that the law enforcement privilege is not sufficient to protect

disclosure of the materials at issue, the materials must be disclosed.  *In re The City of New York*,

607 F.3d at 949.  However, to minimize the effects of disclosure, the court can restrict the

manner in which the documents are provided through the issuance of a protective order.  *See*

Fed. R. Civ. P. 26(c)(1)(G).   The Second Circuit suggested that where release is directed, the documents should be available only on an "attorneys' eyes only" basis or requiring that the documents-and other submissions that reference them-be filed under seal.   *In re The City of New York*, 607 F.3d at 949.

The court will essentially consider the defendant's "need [for] the evidence to conduct his defense and [whether] there are . . . adequate alternative means of getting at the same point. The degree of the handicap [to the defendant] must then be weighed by the trial judge against the policies underlying the privilege." *United States v. Harley*, 682 F.2d 1018, 1020 (D.C. Cir. 1982); *see also United States v. Cintolo*, 818 F.2d 980, 1002 (1st Cir. 1987) (reviewing "whether the [defendant] demonstrate[s] an authentic 'necessity,' given the circumstances, to overbear the qualified privilege"); *United States v. Foster*, 986 F.2d 541, 543-45 (D.C. Cir. 1993) (balancing defendant's need for information against importance of government's interest in avoiding disclosure).

## ARGUMENT

The material in this case that the United States is seeking to protect is of the type that the law enforcement privilege envisioned -- information pertaining to law enforcement techniques and procedures, as well as information that would seriously impair the ability of a law enforcement agency to conduct future investigations.

The recordings exist. And the Defendants challenged their admissibility through motions to suppress and other pretrial litigation, which is the proper avenue to do so. *See* Fed. R. Crim. P. 12(b)(3)(C) and (d) ("The court must decide every pretrial motion"); Fed. R. Evid. 104(a) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court"). Once properly authenticated, therefore, the recordings are admissible.

8

At that point, the only question is what weight the jury should give to the evidence. The technical specifications of the audio recording devices is not probative of the weight that the jury should give to recordings; the recordings exist in the form and quality that they do. So too, the precise concealments or locations of the audio recording devices is not probative of the weight that the jury should give to the recordings; an incriminating admission is an incriminating admission regardless where the recording device was concealed. Finally, for the same reason, the sensitive training given to the CHSs is not probative of the weight that the jury should give to the recordings.

Granted, there is probative value in eliciting certain information from CHS-witnesses that may be used to impeach their testimony, and help frame the weight that the jury may give to the evidence. The United States is not asking the Court to prohibit Defendants from eliciting this relevant and admissible testimony. For example, certainly it is probative of the weight the jury should give to the recordings to ask the CHS-witness whether the CHS had the ability to turn on and off the audio recording devices. And, if so, to ask whether the CHS did turn on and off the devices. The United States does not object to the Defendants asking these questions. But, if the CHS-witness could turn on and off the device, it is not probative of the weight of the evidence to ask the CHS-witness *how* the CHS may have turned on or off the devices. But beyond questions about the operation of the the audio recording devices, the specifications of, concealment of, or their training on how to operate the audio recording devices is not probative of the weight the jury should give to the evidence. The specifications of, concealment of, or their training on how to operate the audio recording devices, likewise, does not make more or less likely any fact of consequence that the jury will have to consider in determining the action. *See* Fed. R. Evid. 401. The Court should therefore exclude any such evidence as irrelevant. *See id.*; Fed. R. Evid. 402.

Beyond the irrelevant nature of such evidence or testimony, disclosing the precise concealments and locations of the audio recording devices and the specifications of such devices unnecessarily compromises the sources and methods used and the future deployment of these investigative tools.  For example, with specific knowledge of the technique used or the concealments, a criminal defendant, or other bad actors observing the trial, could defeat the purpose of the recording system.

The same is true if the Court were to allow the United States' CHS witnesses to be forced to testify about sensitive training that does not relate to their testimony. Testimony related to sensitive training programs could lead to disclosure of sensitive law enforcement programs or even classified material.

Disclosure of methods used by the FBI to install or secret these audio recording devices could also cause unnecessary harm to future investigations where similar techniques may be used.  The public's knowledge of such tradecraft and personnel could enable individuals to employ measures to evade such law enforcement actions.

These possibilities present an unacceptable risk, and squarely demonstrate how disclosure of the information discussed herein "would be contrary to the public interest in the effective functioning of law enforcement," and it would compromise "the integrity of an enforcement technique" used, which is the hallmark of the evidentiary privilege.  *Henry*, 181 F.R.D. at 176-77. Any compromise of the law enforcement sensitive information discussed herein will have a detrimental impact on the national security of the United States.

Moreover, the public interest in nondisclosure significantly outweighs defendant's need for the information at trial. The FBI has always asserted that its sources and methods, to include electronic surveillance capabilities and equipment are law-enforcement sensitive.  In addition,

10

FBI policy dictates that the devices themselves are not to be compromised through court proceedings.  The probative value of any evidence elicited by the defense concerning technical specifications of audio recording devices, specific training of government witnesses on sources and methods, tradecraft of entering and exiting defendant's residences during physical searches or installation of audio devices, and the identity and role of other non-testifying witnesses during collection activities, in light of the security interests in this case, is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, and wasting time. *See* Fed. R. Evid. 403.

Furthermore, any contention that the collected evidence was obtained illegally will be resolved by the Court when it decides other pending related motions.

If the court requires further information or explanation on any matter contained within this motion, the government requests that the court hold an *ex parte* hearing so that the government may have the opportunity to provide further explanation regarding sensitive and/or classified matters.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court instruct the defense and any defense witnesses not to mention, refer to, interrogate concerning, or attempt to convey to the jury in any manner, either directly or indirectly, any of the matters set out in this motion without first obtaining permission from the Court outside the presence and hearing of the jury.  The United States further requests the Court to instruct the defense to warn and caution each and every one of the defense witnesses to follow strictly these instructions.

DNM 1520

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

*Electronically filed on 12/1/17*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N Church St.
Las Cruces, NM  88001
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MATTHEW M. BECK
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )     CRIMINAL NO.    15-4268 JB
                                    )
vs.                                 )
                                    )
ANGEL DELEON, et al.,               )
                                    )
                Defendants.         )

### UNITED STATES' NOTICE OF INTENT TO USE EVIDENCE PURSUANT TO RULE 609

The United States of America hereby notices the Court and Defendants of its intent to offer impeachment evidence of Defendants' felony convictions, as previously disclosed by the United States, and requests a pre-trial ruling that these criminal convictions are admissible for impeachment purposes if any of the Defendants testify at trial.

In pertinent part, Federal Rule of Evidence 609 provides:

> For the purpose of attacking the credibility of a witness ... evidence that an accused has been convicted of such a crime [punishable by death or imprisonment in excess of one year] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused.

Fed.R.Evid. 609(a)(1). *See also United States v. Lugo,* 170 F.3d 996, 1005 (10th Cir. 1999) (no abuse of discretion to admit conviction of attempted possession of a controlled substance when defendant denied knowledge and stated he never got involved in drugs); *United States v. Jefferson*, 925 F.2d 1242, 1256 (10th Cir. 1991) (no abuse of discretion to admit aggravated robbery conviction, even if it was over ten years old).

Rule 609(b) provides a limitation on the admittance of evidence of a criminal conviction "if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later."  Fed. R. Evid. 609(b).

When credibility is central, this weighs in favor of admitting a prior conviction.  *See* Weinstein's Federal Evidence, § 609.05[3][f] (2d ed. 2001).  *See also United States v. Smith*, 10 F.3d 724, 727 (10th Cir. 1993) (no abuse of discretion to allow impeaching with convictions for robbery and burglary given defendant's duress defense and importance of his credibility).

Other circuits have identified the following factors for a district court to consider in weighing prejudice against probative value: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness' subsequent history; (3) the similarity between the past and present crime; (4) the importance of the defendant's testimony; and (5) the centrality of credibility in the trial.  *E.g., United States v. Causey*, 9 F.3d 1341, 1344 (7th Cir. 1993) (admitting prior felony conviction in part because defendant contradicted almost all of the officers' testimony, making credibility centrally important).

If any of the Defendants testify, their credibility will be a central issue for the jury to determine.  The probative value of their conviction or convictions outweigh the prejudicial effect. Accordingly, evidence of any convictions that fall under Rule 609 should be admitted as impeachment evidence.

The United States, under D.N.M.LR-Cr. 47.1, sought the position of defense counsel by sending an email assuming they were opposed to this motion.  At the time of filing, no Defendant indicated they were unopposed to this motion.  As such, the United States is assuming Defendants are opposed to this motion.

Based upon the foregoing, the United States respectfully requests that the Court find that any convictions that fall into Rule 609(b) are admissible under Rule 609.

Respectfully submitted,

JAMES D. TIERNEY
Acting United States Attorney

*__Electronically filed 12/1/17__*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, New Medico 88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court using
the CM/ECF system, and sent notification to
opposing counsel of record on this date.

_____*/s/*_____
MARIA Y. ARMIJO
Assistant United States Attorney

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                       NO.  15-CR-4268-JB

ANGEL DELEON, et al.,

        Defendants.

## OPPOSED MOTION IN LIMINE FOR UPDATED WITNESS LIST, ASSESSMENT OF ALL GOVERNMENT WITNESSES AND VOIR DIRE OF ALL GOVERNMENT EXPERT WITNESSES

COMES NOW, defendant Christopher Garcia, by and through CJA counsel Amy Sirignano, of the Law Office of Amy Sirignano, PC, and Christopher W. Adams, of the Law Office of Christopher W. Adams, PC, and joined by all remaining defendants, submits this Motion in Limine requesting the Court to order the government provide an updated witness list, assess the qualification and admissibility of all government witnesses and related evidence prior to it being presented to the jury, and request voir dire for each of the government's expert witnesses.

The Court "must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). The relevance of evidence depends on whether the facts exists and sufficient proof must be introduced

to support finding the fact does exist. Fed. R. Evid. 104(b). The Court must conduct a

hearing, outside the presence of the jury, on a preliminary question. Fed. R. Evid. 104(c).

Evidence must be determined to be relevant, "it has any tendency to make a fact

more or less probable," prior to its introduction to the jury. Fed. R. Evid. 401(a). The

Court has broad discretion to exclude relevant evidence "if its probative value is

substantially outweighed by danger of . . . unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

evidence." Fed. R. Evid. 403; *United States v. Magallanez*, 408 F.3d 672, 678 (10th Cir.

2005).

A witness may testify in the form a lay opinion if it is "(a) rationally based on the

witness's perception; (b) helpful to clearly understanding the witness's testimony or to

determining a fact in issue; and (c) not based on scientific, technical, or other specialized

knowledge within the scope of Rule 702." Fed. R. Evid. 701. A witness who has been

assessed to qualify as expert, with knowledge, skill, experience, training, or education,

may testify as an expert witness. Fed. R. Evid. 702.

The government provided its Sealed Witness List on November 20, 2017 for the

first wave of Defendants set to go to trial on January 29, 2017. Doc. 1464. The

government's witness list contains approximately 274 potential witnesses. *Id.* Based on

information and belief, the government may have included a deceased person on its list.

Defendants request the government provide a realistic and updated witness list as soon as possible.

The Defendants also request the Court to assess the qualifications and admissibility of all government witnesses and related evidence the witnesses may introduce for relevance. Fed. R. Evid. 104, 401, 403, 701, 702. As noted above, the government may have included a deceased witness on its witness list, who is arguably not relevant, the Defendants want to insure all other proposed witness are properly assessed before giving testimony to the jury.

The government submitted its amended notice of expert testimony on September 9, 2017. Doc. 1242. Defendants objected to all the government's expert witnesses (Doc. 1255) and requested a *Daubert* hearing for all the government's proposed expert witnesses (Doc. 1302).  This motion was resolved during the most recent hearings before the Court.  Defendants further request voir dire of each proposed government expert witness in order properly assess the expert's qualifications basis of the expert's testimony pursuant to Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

The government was contacted via email on December 1, 2017, and AUSA Maria Armijo opposes this motion.

Wherefore, Defendants respectfully request the Court order the government provide an updated witness list, assess the qualification and admissibility of all

government witnesses and related evidence prior to it being presented to the jury, and

request voir dire for each of the government's expert witnesses.

Respectfully submitted,

\_\_\_\_\_/s_____
**Amy Sirignano, Esq.**
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM  87109
Phone: (505) 242-2770
Fax: (505) 242-2774
Email: amy@abqnmlaw.com

\_\_\_\_\_/s_____
**Christopher W. Adams**
The Law Office of Christopher W. Adams, PC
102 Broad Street, Suite C
Charleston, SC 29401
Phone: (843) 577-2153
Fax:(877) 883-9114
Email: chris@chrisadamslaw.com

Co-counsel for Christopher Garcia

**CERTIFICATE OF SERVICE**
I hereby certify that a copy of the
foregoing pleading was sent via the
Court's CM/ECF system to opposing
counsel, AUSAs Maria Armijo, Randy
Castellano, and Matthew Beck, this 1st
day of December 2017.

\_\_\_\_\_/s_____
Amy Sirignano, Esq.

DNM 1529

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

 Plaintiff,

v.         No. 2:15-cr-4268-JB

**ARTURO ARNULFO GARCIA,**

 Defendant.

# MOTION FOR PRE-TRIAL RULINGS
# ON PRE-TRIAL EVIDENTIARY OBJECTIONS TO EXHIBITS

Defendant Arturo Arnulfo Garcia, by and through counsel of record, Billy R. Blackburn and Scott M. Davidson, respectfully requests the Court to rule prior to trial on the parties' pre-trial evidentiary objections to exhibits offered by any other party.

In order to provide for an orderly and fair trial, Mr. Garcia requests that the Court rule on pre-trial evidentiary objections to proposed exhibits prior to trial. The procedure that has been adopted by the Chief Judge in this District, as an example, requires each party to submit to the Court and counsel, 13 days prior to trial, a list of exhibits it intends to introduce at trial. Each party is allowed until 8 days prior to trial to lodge pre-trial evidentiary objections to the exhibits listed, identifying the Rule of

Evidence and/or case law or other legal authority therefor.  Each party is then allowed until 5 days prior to trial to respond to pre-trial objections to exhibits, so that the Court may make pre-trial rulings on these objections.

Mr. Garcia respectfully submits that utilization of this procedure, or something similar, is not intended as a waiver of any objections to exhibits at trial; it is intended to facilitate pre-trial resolution of objections lodged prior to trial.  Mr. Garcia respectfully suggests that this procedure or something similar to it be employed in this case to facilitate an orderly and fair trial.

All defendants, other than Daniel Sanchez, join in this motion.  The Government's position was sought, but at the time of this filing, the Government's position is not known.

Respectfully submitted,

s/ Billy R. Blackburn
BILLY R. BLACKBURN, ESQ.
*1011 Lomas Boulevard NW*
*Albuquerque, NM 87102*
*505.242.1600 (ph)*
*505.243.6279 (fax)*
*billy@bblackburnlaw.com*

s/ Scott M. Davidson
SCOTT M. DAVIDSON
*The Law Office of Scott M. Davidson, Ph.D., Esq.*
*1011 Lomas Boulevard NW*
*Albuquerque, NM 87102*
*505-255-9084*
*scott@justappeals.net*
Counsel for Defendant Garcia

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that I electronically filed this motion with the clerk of the Court by using the CM/ECF system on December 1, 2017.

I also hereby certify that a commercial antivirus program was used to scan this document and it was found to be free of computer viruses.  The program used to ensure the virus-free nature of this document is Mac OS X software, version 10.12.6, last updated November 15, 2017.

s/ Scott M. Davidson
SCOTT M. DAVIDSON

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,
        Plaintiff,

v.                                        Criminal Case No.  15-cr-4268-JB

ANGEL DELEON,
JOE GALLEGOS,
EDWARD TROUP,
BILLY GARCIA,
ALLEN PATTERSON,
CHRISTOPHER CHAVEZ,
JAVIER ALONSO,
**ARTURO ARNULFO GARCIA**,
MARIO RODRIGUEZ,
MAURICIO VARELA,
DANIEL SANCHEZ,
CONRAD VILLEGAS,
ANTHONY RAY BACA,
CHRISTOPHER GARCIA,
CARLOS HERRERA,
RUDY PEREZ,
ANDREW GALLEGOS,
SANTOS GONZALEZ,
SHAUNA GUTIERREZ, AND
BRANDY RODRIGUEZ.
        Defendants.

---

## MOTION IN LIMINE REGARDING ALLEGED BAD ACTS

---

Defendant Arturo Arnulfo Garcia, by and through counsel of

record Scott M. Davidson and Billy Blackburn, hereby respectfully

1

DNM 1533

Appellate Case: 20-2058   Document: 010110415663   Date Filed: 09/29/2020   Page: 1896

moves this Court in limine to prevent the Government from eliciting any and all testimony or other evidence concerning the alleged bad acts of Mr. Garcia as set forth in the letter provided by the Government attached as Appendix A.  As grounds therefore, Mr. Garcia states as follows:

1.    The Government has provided notice to Mr. Garcia of their intent to introduce a laundry list of 37 "bad acts." See Appendix A.

2.    Appendix A lists acts committed as long as 31 years ago and range from "us[ing] another [inmate's] phone time" and marijuana possession to assault on a correctional officer.  Some of the conduct that is the subject of this case---*viz.*, ordering a murder---is included on this list.  There are some ambiguous or incomplete references, such as an "x-ray reveal[ing] an object in his rectum" without specifying the object, or "testing positive for drugs" without specifying the type of drug.

3.    "In demonstrating the relevance of proffered 'other acts' evidence, '[t]he Government must articulate precisely the evidentiary hypothesis by which a fact of consequence may be

2

inferred from the evidence of other acts.'" *United States v. Cuch*, 842 F.2d 1173, 1176 (10th Cir. 1988)(quoting *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985)).  Before the Court may admit such evidence, "it must tend to establish intent, knowledge, motive or one of the enumerated exceptions; must have real probative value, not just possible worth; and must be reasonably close in time to the crime charged." *Id*.  Moreover, "there must be a clear and logical connection between the alleged earlier offense or misconduct and the case being tried." *United States v. Biswell*, 700 F.2d 1310 1317-18 (10th Cir. 1983).  The Tenth Circuit has "developed rigorous criteria for admitting evidence of other crimes, wrongs or acts pursuant to Rule 404(b). We have held that the government first bears the burden of demonstrating how the proffered evidence is relevant to an issue in the case." *Cuch*, 842 F.2d at 1175 (citing *Biswell*, 700 F.2d at 1317).

4.    The Government has not offered an evidentiary hypothesis by which a fact of consequence in this prosecution may be inferred by any one or more of the other bad acts listed in

Appendix A.  As such, Mr. Garcia moves in limine for an order preventing the government from eliciting any of the acts.

5.    Evidence of other acts is not admissible solely to prove a defendant's criminal disposition.  *United States v. Naranjo*, <u>710 F.2d 1465, 1467</u> (10th Cir. 1983) (citing *United States v. Nolan*, <u>551 F.2d 266, 271</u> (10th Cir. 1977)).  Among the considerations the Court must consider in determining admissibility of any of the alleged bad acts is whether they are too remote in time: "[T]here is no absolute rule regarding the number of years that can separate offenses.  Rather, the court applies a reasonableness standard and examines the facts and circumstances of each case."  *United States v. Franklin*, <u>704 F.2d 1183, 1189</u> (10th Cir.) (quoting *United States v. Engleman*, <u>648 F.2d 473, 479</u> (8th Cir. 1981)).

6.    Finally, even if this Court were to determine that the "other acts" evidence satisfies the criteria for admission under Rule 404(b), it must balance the evidence's probative value and prejudicial effect under <u>Fed. R. Evid. 403</u>.  *Cuch*, <u>842 F.2d at 1176</u>.

7.    The other defendants in this case join this motion and the Government opposes it.

For these reasons, Mr. Garcia respectfully requests the Court to order the Government to refrain from eliciting any and all testimony or other evidence concerning the alleged bad acts discussed herein.

Respectfully submitted,

s/ Scott M. Davidson
SCOTT M. DAVIDSON
THE LAW OFFICE OF SCOTT M. DAVIDSON, PH.D., ESQ.
*1011 Lomas Boulevard NW*
*Albuquerque, NM 87102*
*505.255.9084 (ph)*
*505.213.7212 (fax)*
*scott@justappeals.net*

BILLY R. BLACKBURN, ESQ.
*1011 Lomas Boulevard NW*
*Albuquerque, NM 87102*
*505.242.1600 (ph)*
*505.243.6279 (fax)*
*billy@bblackburnlaw.com*
Counsel for Defendant Garcia

5

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that I electronically filed this motion with the clerk of the Court by using the CM/ECF system on December 1, 2017.

I also hereby certify that a commercial antivirus program was used to scan this document and it was found to be free of computer viruses.  The program used to ensure the virus-free nature of this document is Mac OS X software, version 10.12.6, last updated November 15, 2017.

s/ Scott M. Davidson
SCOTT M. DAVIDSON

DNM 1538



**U.S. Department of Justice**

*United States Attorney*
*District of New Mexico*

| | |
|---|---|
| *200 N. Church Street* | *Phone:  (575) 522-2304* |
| *Las Cruces, NM  88001* | *Fax:     (575) 522-2391* |

May 22, 2017

*Sent via email: Billy@BBlackburnlaw.com*    *Sent via email: scott@justappeals.net*

Billy R. Blackburn                          Scott Moran Davidson
1011 Lomas Blvd. NW                   1011 Lomas Boulevard NW
Albuquerque, New Mexico 87102    Albuquerque, New Mexico 87102

        RE:    **UNITED STATES v. ANGEL DELEON, et al.**
                  **No. 15-CR-4268 JB**

Dear Counsel:

        Summarized below are the "bad acts" for your client Arturo Arnulfo Garcia. Also, the United States incorporates by reference the Overt Acts listed in the indictment in cause number 16-CR-1613 JB.

        On or about September 16, 1986, Arturo Arnulfo Garcia possessed marijuana and drug paraphernalia.

        On or about February 23, 1987, Arturo Arnulfo Garcia distributed Marijuana.

        On or about August 20, 1989, Arturo Arnulfo Garcia committed criminal damage to property.

        On or about March 1, 1992, Arturo Arnulfo Garcia trafficked heroin and resisted/concealed his identity.

        On or about October 10, 1993, while in the custody of NMCD, Arturo Arnulfo Garcia assaulted a corrections officer.

        On or about June 14, 1994, while in the custody of NMCD, Arturo Arnulfo Garcia assaulted inmate A.R. with a weapon, homemade sharpened instrument (shank).

        On or about July 16, 1994, while in the custody of NMCD, Arturo Arnulfo Garcia assaulted a correctional officer.

On or about July 22, 1994, while in the custody of NMCD, Arturo Arnulfo Garcia assaulted a correctional officer.

On or about November 15, 1994, while in the custody of NMCD, Arturo Arnulfo Garcia assaulted a correctional officer.

On or about December 29, 1994, while in the custody of NMCD, Arturo Arnulfo Garcia assaulted a correctional officer.

On or about June 12, 1997, Arturo Arnulfo Garcia committed a parole violation.

On or about January 7, 1998, while in the custody of NMCD, Arturo Arnulfo Garcia assaulted a corrections officer.

On or about March 5, 1998, while in the custody of NMCD, Arturo Arnulfo Garcia was placed in administrative segregation due to confidential information obtained revealing the assault of inmate C.P., which was carried out by SNM members at the direction of Arturo Arnulfo Garcia

On or about January 10, 1999, Arturo Arnulfo Garcia committed trespass.

On or about August 17, 1999, Arturo Arnulfo Garcia committed contempt of court.

On or about December 13, 1999, Arturo Arnulfo Garcia committed aggravated assault, escape, resisting arrest, and possessed drug paraphernalia.

On or about July 18, 2001, Arturo Arnulfo Garcia received stolen property, and resisted/evaded/ obstructed an officer.

On or about November 20, 2001, Arturo Arnulfo Garcia tampered with evidence, committed larceny, and theft of a credit card.

On or about April 08, 2002, Arturo Arnulfo Garcia committed armed robbery, aggravated burglary, intimidation of a witness and was charged with habitual offender.

On or about March 24, 2004, while in the custody of NMCD, Arturo Arnulfo Garcia tested positive for drugs.

On or about February 27, 2006, while in the custody of NMCD, Arturo Arnulfo Garcia possessed drug paraphernalia.

On or about April 16, 2007, while in the custody of NMCD, Arturo Arnulfo Garcia possessed amphetamines.

On or about May 8, 2007, while in the custody of NMCD, Arturo Arnulfo Garcia tested positive for drugs.

In late 2008, Arturo Arnulfo Garcia issued an order to have S.C. murdered.

In late 2008, Arturo Arnulfo Garcia admitted that he ordered the murder of S.C. because S.C. had failed to send drugs and money into the prison.

On or about February 20, 2008, while in the custody of NMCD, Arturo Arnulfo Garcia refused to submit to a drug test.

On or about March 18, 2008, while in the custody of NMCD, Arturo Arnulfo Garcia possessed marijuana.

On or about September 19, 2008, Arturo Arnulfo Garcia committed battery on a household member.

On or about June 18, 2009, while in the custody of NMCD, Arturo Arnulfo Garcia had a meeting with other SNM members and proclaimed himself as "Jefe," and threatened SNM member Sammy Griego.

On or about June 24, 2009, while in the custody of NMCD, Arturo Arnulfo Garcia possessed property belonging to other inmates, including a twelve-page police report referencing two other inmates.

On or about August 19, 2009, while in custody of the NMCD, Arturo Arnulfo Garcia was x-rayed due to having pulled down his pants during a visit. The x-ray revealed an object in his rectum.

On or about September 23, 2009, while in the custody of NMCD, Arturo Arnulfo Garcia possessed a homemade knife.

On or about November 9, 2009, while in the custody of NMCD, Arturo Arnulfo Garcia possessed drug paraphernalia.

On or about November 18, 2009, while in the custody of NMCD, Arturo Arnulfo Garcia used another SNM member's phone time.

On or about April 7, 2011, Arturo Arnulfo Garcia possessed morphine.

On or about April 18, 2011, while in the custody of NMCD, Arturo Arnulfo Garcia tested positive for drugs.

On or about July 2, 2012, while in the custody of NMCD, Arturo Arnulfo Garcia possessed drug paraphernalia.

The United States reserves the right to supplement this list as further information becomes available.

If you have any questions regarding this matter, please feel free to call me.

Sincerely yours,

JAMES D. TIERNEY
Acting United States Attorney

MARIA Y. ARMIJO
Assistant United States Attorney

MYA/rcc