IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| v. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT JOE GALLEGOS'
MOTION *IN LIMINE* TO PROHIBIT GOVERNMENT FROM INTRODUCING
EVIDENCE OF ALLEGED "BAD ACTS" [DOC. 1602]**

The United States respectfully requests that the Court deny the Defendant's Motion *In Limine* to Prohibit Government from Introducing Evidence of Alleged "Bad Acts." *See* Docs. 1602 (hereinafter, as "the Motion").   The prior acts evidence which the United States intends to introduce is admissible: (1) to prove that an enterprise existed; and (2) the prior acts are intrinsically linked to evidence of the crimes charged. Thus, the prior act evidence does not implicate Rule 404(b).   Therefore, the United States respectfully requests that the Court deny the Motions, and admit the evidence of prior acts.

    **I.**    **The Prior Acts Evidence is Probative of and Admissible to Prove the Existence of the Racketeering Enterprise.**

The United States does not seek to put forward evidence of prior acts for propensity purposes as suggested by the Motion, but rather to prove the existence of an enterprise and conspiracy in which the defendant took part.   In order to sustain convictions for the offenses charged, the United States must prove that the defendant was a member of an *enterprise* as defined

1

by the meaning of RICO.   *See United States v. Kamahele*, 748 F.3d 984, 1007 (10th Cir. 2014);

*see also United States v. Morrow*, No. CRIMA 04355CKK, 2005 WL 3159572, at *4 (D.D.C.

April 7, 2005) ("To prove a RICO conspiracy, the Government must establish that (1) the

enterprise is an ongoing organization with some sort of framework for making or carrying out

decisions; (2) that the various associates function as a continuing unit; and (3) that the enterprise

be separate and apart from the pattern of activity in which it engages.") (citing *United States v.*

*Irizarry*, 341 F.3d 273, 286 (3d Cir. 2003)).

Generally, courts liberally admit evidence of prior bad acts as it is relevant to proving the

existence, organization, and nature of the RICO or VICAR enterprise, and how each defendant

engaged in the pattern of racketeering.   *See United States v. Diaz*, 176 F.3d 52, 79 (2nd Cir. 1999).

In a conspiracy prosecution, and particularly within a RICO or VICAR prosecution, the

government "is usually allowed considerable leeway in offering evidence of other [uncharged]

offenses 'to inform the jury of the background of the conspiracy charged, and to explain to the jury

how the illegal relationship between the participants in the crime developed.'" *United States v.*

*Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000) (quoting *United States v. Williams*, 205 F.3d 23, 33-34

(2d Cir. 2000)); *see also Old Chief v. United States*, 519 U.S. 172, 183 (1997); *United States v.*

*Tse*, 375 F.3d 148, 155 (1st Cir. 2004) ("In a conspiracy case, the district court may admit evidence

of other bad acts if they tend to suggest a criminal association between the alleged conspirators.");

*United States v. Badru*, 97 F.3d 1471, 1474-75 (D.C. Cir. 1996) (evidence relating to earlier

overseas smuggling trips did not fall within the scope of Rule 404(b) as 'other bad acts' or 'other

crimes' evidence, but was instead *directly relevant* to the conspiracy charged as evidence going to

the means, manner, and modus operandi of the drug distribution scheme (emphasis added)); *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.") (citing *United States v. Lasanta*, 978 F.2d 1300, 1307-08 (2d Cir. 1992)); *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993) ("We have repeatedly held that it is within the court's discretion to admit evidence of prior bad acts to inform the jury of the background of the conspiracy charged, in order to help explain the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators); *Morrow*, 2005 WL 3159572, at *6 (collecting cases).

Specifically, the prior act evidence is admissible as relevant to the structure and hierarchy of the organization, serving as proof of the enterprise itself. *See United States v. Ashburn*, No. 11-CR-0303 (NGG), 2015 WL 588704, at *16 (E.D.N.Y. Feb. 11, 2015); *see also Diaz*, 176 F. 3d at 79-80 (evidence of prior acts admissible "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between co-conspirators"); *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987) (other criminal acts evidence "has been consistently held admissible" to corroborate testimony of cooperating witnesses who testify of their own involvement in these crimes). For example, courts have admitted evidence regarding prior assaults because it is considered evidence of different leadership positions within the organization, and constitutes enterprise evidence. *United States v. Guerrero*, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011), *aff'd* 560 F. App'x 110 (2d Cir. 2014); *Thai*, 29 F.3d at 812-13 (trial court

3

properly admitted testimony that two of the defendants had beaten another member of the gang on

the suspicion that he retained robbery proceeds).

This type of prior act evidence to prove the existence of an enterprise does not fall within

the bulwark of Federal Rule of Evidence 404(b): "An act that is alleged to have been done in

furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b);

rather, it is part of the very act charged." *United States v. Concepcion*, 983 F.3d 369, 392 (2d Cir.

1992); *see also United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) ("Where, as in this case

'the indictment contains a conspiracy charge, 'uncharged acts may be admissible as direct evidence

of the conspiracy itself.'").

The admission of the prior act evidence should not be confined to the time that conspiracy

is alleged to have occurred.   Courts have allowed the admission of other act evidence which

occurred before the charged conspiracy commenced.   *See Ashburn*, 2015 WL 588704, at *15

(citing *Rosa*, 11 F.3d at 334); *see also United States v. Franklin*, 704 F.2d 1183, 1189 (10th Cir.

1983) ("[T]here is no absolute rule regarding the number of years that can separate offenses.

Rather, the court applies a reasonableness standard and examines the facts and circumstances of

each case.") (quoting *United States v. Engleman*, 658 F.2d 473, 479 (8th Cir. 1981)).   Prior acts

which occurred before the conspiracy are still probative, and may be admitted "to prove the

existence of the alleged conspiracy as well as to show its background and history."   *United States

v. Langford*, 990 F.2d 65, 70 (2d Cir. 1993).   Thus, the admission of the prior act evidence does

not depend on whether it occurred before the crime charged or how long ago.

DNM 428

Within the Motion, the Defendant stress that the disclosed evidence of prior acts must be excluded under a Rule 404(b)-type rationale.   However, this type of evidence falls outside of the Rule 404(b) bulwark. So these arguments do not find any sound support in the law.   Furthermore, the evidence of prior acts is both necessary and relevant to the government's case.   Relevant evidence is not merely that which directly establishes a particular offense element.   Rather, to be considered relevant, evidence needs only to tend to prove the government's case and "evidence that adds context and dimension to the government's proof of charges can have that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997); *Cf. United States v. Thomas*, No. 13-1874-MV, 2016 WL 10538006, at *2 (D.N.M. Apr. 15, 2016) (Vasquez, J.); *see also* Fed. R. Evid. 401.   This is particularly significant because as the Supreme Court previously stated, as the government maintains the burden of proof, it has a "need for evidentiary richness and narrative integrity in presenting the case." *Old Chief*, 519 U.S. at 183.

Therefore, the United States respectfully requests that the Court deny the Motion, and admit the evidence of prior acts for the purpose of proving the existence of an enterprise.

## II.   The Prior Act Evidence is Intrinsic to the Charged Offenses

As alluded to above, Rule 404(b) is only applicable to evidence of acts extrinsic to the crimes charged; thus, acts which are intrinsic to the crimes charged are not excludable under Rule 404(b).   *United States v. Record*, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989); *United States v. Conley*, 878 F. Supp. 751, 755 (W.D. Pa. 1994) ("[E]vidence of uncharged 'other crimes, wrongs, or acts' which are 'part and parcel' of the charged offenses, including conspiracy, and which tends to directly and intrinsically establish the defendant's participation in the charged offenses is simply

5

not evidence of *other* crimes, wrongs or acts.   Rule 404(b) is not implicated by such evidence.") (emphasis in original).

Uncharged acts are considered intrinsic, and outside of the Rule 404(b) analysis, if: (1) the act was part of the scheme that is being prosecuted; or (2) the act was "inextricably intertwined with the charged crime such that a witness' testimony 'would have been confusing and incomplete without mention of the prior act.'" *Id.* (quoting *United States v. Richardson*, 764 F.2d 1514, 1521-22 (11th Cir. 1984)); *see also United States v. Williams*, 900 F.3d 823, 825 (5th Cir. 1990) ("'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries to the crime charged.'") (citations omitted); *Badru*, 97 F.3d at 1474 ("Evidence of criminal activity other than the charged offense is not considered extrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of a crime at trial ….") (*quoting United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983) (per curium); *Morrow*, 2005 WL 3159572, at *4.

Similarly, evidence of uncharged criminal activity, or other acts, is admissible when it is direct proof the charged conspiracy.   *United States v. Baez*, 349 F.3d 90, 94 (2d Cir. 2003) (The court upheld the admission of sixteen uncharged crimes in a conspiracy prosecution because "where . . . a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself.")   The prior acts which the United States seeks to introduce are intrinsically intertwined with the alleged offenses.   As these acts are actually direct evidence of the crimes

6

charged, the prior act evidence is admissible and highly relevant to the proceedings.

### III.    The Prior Acts Evidence is Not Unfairly Prejudicial Under Rule 403

Evidence of the defendant's prior acts are not barred by Rule 403.   "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." *United States v. Pettigrew,* 468 F.3d 626, 638 (10th Cir. 2006) (quoting *United States v. Sides,* 944 F.2d 1554, 1563 (10th Cir. 1991)). The Tenth Circuit has instructed district courts to be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." *United States v. Smalls,* 605 F.3d 765, 787 (10th Cir. 2010). The mere fact that the evidence would damage a defendant's case does not make it unfairly prejudicial.   *See United States v. Caraway,* 543 F.3d 1290, 1301 (10th Cir. 2008); *United States v. Curtis,* 344 F.3d 1057, 1067 (10th Cir. 2003); *United States v. Martinez,* 938 F.2d 1078, 1082 (10th Cir. 1991).   Instead, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *United States v. Caraway,* 453 F.3d at 1301 (quoting Fed. R. Evid. 403, advisory committee note).

As stated above the prior acts evidence serves several legitimate purposes as it proves the existence of an enterprise and is intrinsically intertwined with the offenses charged. Furthermore, reason and common sense dictate that "other acts evidence is not unfairly prejudicial when the evidence does not involved conduct 'more inflammatory than the charged crime.'" *See Ashburn,* 2015 WL 588704, at *15 (citing *United States v. Livoti,* 196 F.3d 322, 326 (2d Cir. 1999)).   Thus, given the VICAR charges that the United States has assumed the burden

7

to prove beyond a reasonable doubt, the Court should not properly conclude that the prior acts

evidence is so *unfairly* prejudicial that Rule 403 warrants its exclusion.

### IV.    Conclusion

The United States respectfully requests that the Court deny the Defendant's Motion.   The

prior acts evidence is not barred by Rule 403 or 404(b).   Instead, this evidence is highly probative

and relevant to the United States' case. Indeed, it's necessary, as the prior act evidence proves that

a racketeering enterprise existed and that the Defendant was a member of that enterprise. So this

prior acts evidence is also intrinsic to the crimes charged.   Therefore, the United States

respectfully requests that the Court deny the Motion, and admit the evidence of prior acts.

Respectfully submitted,

JAMES D. TIERNEY
First Assistant United States Attorney

***Electronically Filed 3/7/18***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR DISCOVERY OF THE ARREST AND CONVICTION REPORTS OF WITNESSES' CRIMINAL HISTORY [DOC. 1859]

Defendants Joe Gallegos, Andrew Gallegos, Arturo Garcia, Billy Garcia and Edward Troup move the Court to require the Federal Government to "provide the Defendants with a copy of the Arrest and Conviction Reports information, or alternatively to require the Federal Government to remit to Defendant to inspect and copy such Arrest and Conviction Reports information of all jurors that it conducts in preparation for voir dire. [Doc. 1859] ("Motion for Discovery"). Although the motion heading indicates a request for "witnesses'" criminal histories, in reality the defense is requesting the criminal histories of *potential jurors* in this case, not witnesses.

Defendants request that the United States provide them with arrest and conviction reports of all jurors that it conducts in preparation for voir dire. However, the request is moot because the United States has not requested, has not received, and is not in possession of any information on prospective jurors compiled or provided by investigative agencies. As such, the United States respectfully requests the Court to deny as moot Defendants' request for said information.

Even if, however, the United States did have said information, it has no duty to disclose it. *See Martin v. United States,* 266 F.2d 97, 99 (5th Cir. 1959) ("It is common knowledge that

litigants traditionally investigate prospective jurors to ascertain their qualifications and attitude, and we know of no rule which requires either litigant to divulge to the other the result of his investigation.").

Defendants are not entitled to information on prospective jurors compiled by the United States Attorney's Office because: (1) the information is not discoverable under <u>Fed. R. Crim. P. 16</u>, and (2) the information is attorney-work product.

The information the United States compiles about prospective jurors is not discoverable under <u>Fed. R. Crim. P. 16</u>.

The United States recognizes, and has complied with, its ongoing duties under Rule 16 to provide discovery to Defendant. The Rule provides that:

> (u)pon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or other places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>  (i) the item is material to preparing the defense;
>  (ii) the government intends to use the item in its case-in-chief at trial; or
>  (iii) the item was obtained from or belongs to the defendant.

<u>Fed. R. Crim. P. 16(a)(1)(E)</u>.

In clarifying the Rule, the Supreme Court stated that, "'(t)he defendant's defense' means the defendant's response to the Government's case in chief," and includes those things "which refute the Government's arguments that the defendant committed the crime charged." *United States v. Armstrong*, <u>517 U.S. 456, 462</u> (1996). Additionally, the Ninth Circuit Court of Appeals has found that Rule 16 requires that, "(a) defendant must make a threshold showing of materiality, which requires a presentation of 'facts which would tend to show that the Government is in possession of information helpful to the defense.'" *United States v. Mandel*,

914 F.2d 1215 (9th Cir. 1990). "Neither a general description of the information sought nor conclusory allegations of materiality suffice." *Id* at 1219.

The juror information sought by Defendants is not information that they could use to "refute the Government's arguments that the defendant committed the crime charged," and is therefore not the type of information that is discoverable pursuant to Rule 16.  *United States v. Armstrong*, *supra*, at 456.  And, because the sought-for juror information is not the type of information that is discoverable under Rule 16, Defendants will not be able to show that it is material for purposes of Rule 16.  Fed. R. Crim.P. 16(a)(1)(E)(ii).  Additionally, the proposed information was not obtained from and does not belong to Defendants. Fed. R. Crim. P. 16(a)(1)(E)(iii). Therefore, because the requested information is not subject to disclosure pursuant to Rule 16, Defendants' request should be denied.

Lastly, the information Defendants seek from the United States Attorney's Office is also not discoverable because it is attorney work product.  Notably, the information that they seek is specifically excluded by  Fed. R. Crim. P. 16(a)(2), which exempts from defense inspection, "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim.P. 16(a)(2).  Additionally, a prosecutor's work product is not subject to discovery by a defendant.  *Brady v. Maryland*, 373 U.S. 83 (1963); *Giles v. Maryland,* 386 U.S. 66 (1967); *Goldberg v. United States,* 425 U.S. 94 (1976).  "There is no general constitutional right to discovery in a criminal case. . ."  *Weatherford v. Bursey,* 429 U.S. 545 (1977).

The prosecution is generally not required to disclose a prospective juror's experience or voting record on prior juries.  *U.S. v Kyle,* 469 F.2d 547, 550-51 (D.C. Cir. 1972).  "Ordinarily, there would be no basis for a duty to disclose material pertaining to public aspects of a juror's

DNM 435

service, for example voting record in other cases, and relative experience or inexperience...." *Id.*

at 551.   In sum, criminal defendants have no constitutional or statutory right to see jury dossiers

compiled by the prosecutor from public records, and the prosecutor need not share such

information with the defense, so long as it is reasonably available from other sources.

In *United States v. Costello*, 255 F.2d 876 (2nd Cir. 1958) , the appellant argued that his

trial was unfair because the United States had access to information not available to him, or to

even the wealthiest defendant, to utilize in exercising its peremptory challenges. *Id.* at 883.   In

rejecting Defendant's argument, the Court noted "...not all information properly available to the

prosecution is equally available to the accused*." See also Best v. United States*, 184 F.2d 131

(1st Cir.), *cert. denied*, 340 U.S. 939 (1951) (No abuse of discretion in denying defendant's

motion to inspect and use FBI's report on member's of the venire).

Defendants can obtain the same information as the United States by accessing public

records.   Various internet services and on-line court records are available to the defense, as are

the services of private investigators.   The United States has no obligation to "fish through public

records and collate information" that is "equally available to the defense." *United States v.

Flores*, 540 F.2d 432, 437 (9th Cir. 1976).

This argument has been squarely rejected by courts in the past.   Where the allegation that

permitting investigations of prospective jurors would discourage citizens from serving as jurors

was dismissed, in kind, the contention that it is fundamentally unfair to deprive defendant of a

similar opportunity was rejected in *Best v. United States, supra* at 141, where Chief Judge

Magruder upheld the denial of a defendant's motion to be allowed to inspect and use an FBI

report of its investigation of the veniremen.   *See also*, *Martin v. United States,* 266 F.2d 97, 99

(5th Cir. 1959); *United States v. Falange*, 426 F.2d 930 (2nd Cir. 1970).   The investigation into

the background of prospective jurors may reveal "jurors who might (be) unduly biased in favor

of the defendant.  The exercise of peremptory challenges is a rejective, rather than a selective,

process of which the appellant has no right to complain." *United States v. Costello*, 255 F.2d

876, 884 (2nd Cir.), *cert. denied* (1958).

For the above states reasons, the United States requests this Court to deny Defendants'

motion in its entirety.

Respectfully Submitted,


JAMES D. TIERNEY
First Assistant United States Attorney

***Electronically filed on 3/7/2018***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304 – Tel.


I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

DNM 437

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al,

Defendants.

---

**GENERAL RESPONSE TO UNITED STATES NOTICE OF PROPOSED
JAMES STATEMENTS FOR TRIAL 2 (Doc. 1903)**

---

Billy Garcia, through counsel, hereby responds to the United States Notice of

Proposed James Statements for Trial 2.  Defendants Joe Gallegos, Edward Troup,

Christopher Chavez, Allen Patterson, Arnulfo Arturo Garcia, Andrew Gallegos and

Shauna Gutierrez all join in this response.

1.      The government has filed its notice of *James* statements in

intends to offer at trial. In that motion the government generally addressed

coconspirator statements it intends to offer under Fed. R. Evid. 801 (d) (2) (E).

With some exceptions, the government did not address statements it intended to

offer as statements against interest under Fed. R. Evid. 804 (b) (2) or as admissions

by a party opponent under Fed. R. Evid. 801 (d) (2) (A).

2.     The undersigned has discussed this notice with Mr. Beck of the United States Attorney's Office.  It was his understanding that the Court's prior rulings, of which he disagreed, were that out of court statements of individual SNM members which inculpated that individual were not found not to be statements against interest under Fed. R. Evid. 804 (b) (2) but were instead admissible only as admissions by a party opponent under Fed. R. Evid. 801 (d) (2) (A).  Mr. Beck's understanding comports with the Court's finding that,

> a reasonable prison-gang member might make self-inculpatory statements even if those statements were not true. Accordingly, such statements are not typically admissible under rule 804(b)(3).

Order, (Doc. No. 1882), p. 104. Instead, the Court generally analyzed such statements as admissions by a party opponent.

3.     During trial one, the government conceded that they would "redact the recordings [of Baca, Herrera, and Perez] to take out references to the other co-Defendants on trial made by the declarant-Defendant." United States' Sealed Motion to Reconsider the Court's Two Jury Proposal at 6, filed January 27, 2018 (Doc. 1712).  This was done to avoid separate trials that was contemplated by the Court due to its concern that the jury may not be able to "really grapple with the number of very proper and required limiting instructions." Transcript of Hearing at 52:10-13 (Court)(held January 26, 2018), filed February 7, 2018 (Doc. 1759)("Jan. 26 Tr.").

2

4.      The parties have met and conferred. They believe it would be helpful
to the parties to seek clarification from the Court as to whether it intends to follow
the procedure and analysis it utilized in trial one in regard to trial two as that may
alleviate the necessity of calling numerous witnesses during the upcoming
witnesses. As way of example, defendant Billy Garcia is objecting to the admission
of that portion of a statement allegedly made by defendant Troup to witness James
("Daffy") Garcia in which Troup indicated he had committed the Garza murder
and that Billy Garcia gave the order for the murder.  Defendant Garcia's objections
are numerous but one set of objections rely only on whether Troup's supposed
knowledge is authenticated, properly attributed to Billy Garcia and whether the
government can establish Troup had personal knowledge. This would require
motions hearing testimony by James Garcia who is subpoenaed to testify. But if
the Court and the government will be redacting Billy Garcia's statement from
James Garcia's testimony then no motions hearing is necessary.

5.      The defendants also adopt, if they have not done so before, the
arguments in Motion to Prevent the Admission of Statements of Non-Testifying
Codefendants Implicating Defendant Billy Garcia and for an Order for the
Government to Specify Such Statements Prior to Trial, filed October 10, 2017
(Doc. 1307), Defendant Daniel Sanchez's Motion in Limine to Preclude the
Admission of Un-Confronted, Out of Court Statements Proffered by the

Government at the James Hearing, filed January 8, 2018 (Doc. 1616) and the motions hearings held on such motions.

6.      Specifically, the defendant and those that are joining in this motion assert that the statements listed in the James motion, (Doc. 1903) are inadmissible under the due process and confrontation clauses of the fifth and sixth amendments to the United States constitution.

7.      Each remaining defendant will file separate motions identifying specific statements for which they are raising objections on constitutional and evidentiary grounds.


Respectfully submitted this 9th day of March, 2018.


/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)


## CERTIFICATE OF SERVICE

I hereby certify that on March 2nd, 2018, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


/s/ James A. Castle
James A. Castle

4

**FILED**

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

MAR - **9** 2018

MATTHEW J. DYKMAN
CLERK

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

      No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

      Defendants.

**<u>COURT'S SUPPLEMENTAL JURY INSTRUCTION</u>**

DNM 442

Appellate Case: 20-2058    Document: 010110415671    Date Filed: 09/29/2020    Page: 18

FILED

( Draft 1 ) ; 7 in UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

DNM 443

## SUPPLEMENTAL JURY INSTRUCTION NO. 1  MAR -9 2018

Members of the Jury:

MATTHEW J. DYKMAN
CLERK

(1) You do not have to reach a unanimous agreement on all the charges or all defendants before returning a verdict on some of the charges. If you have reached a unanimous agreement on some of the charges as to one or more of the defendants, you may return a verdict on those charges or a defendant or defendants and then continue deliberating on the others. You do not have to do this, but you can if you wish.

(2) If you do choose to return a partial verdict, that verdict will be final. YOU WILL NOT BE ABLE TO CHANGE YOUR MINDS ABOUT IT LATER ON.

(3) Your other option is to wait until the end of your deliberations, and return all your verdicts then. The choice is entirely yours.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,       )
                                 )
          Plaintiff,       )    CRIMINAL NO. 15-4268 JB
                                 )
       vs.                 )
                                 )
**ANGEL DELEON, et al.,**       )
                                 )
       Defendants.     )

## UNITED STATES' OPPOSED MOTION TO QUASH THE SUBPOENA ISSUED TO NEW MEXICO CORRECTIONS DEPARTMENT FOR THE MENTAL HEALTH RECORDS OF INMATE LEONARD LUJAN

Plaintiff United States of America moves the Court, under Rule 17(c)(2) of the Federal

Rule of Criminal Procedure, to quash Defendant Billy Garcia's subpoena for the mental health

records of Leonard Lujan. Notwithstanding that this Court held that the New Mexico Corrections

Department ("NMCD") is part of the prosecution for this case beginning in December 2015,

Defendant Garcia subpoenaed mental health records from the NMCD on March 1, 2018.[1]  But

the Heath Insurance Portability and Accountability Act ("HIPAA") prevents NMCD from

---

[1] The Court found that NMCD is part of the prosecution team since December 2015. The United States thus has standing to bring this motion to quash on NMCD's behalf. And given Defendant Edward Troup's and Billy Garcia's arguments and attachments to their Restricted Motion to Obtain Physical and Mental Health Records [Doc. 1908] ("Garcia and Troup Health Records Motion"), at 1 n.1 & Appendix A, the United States is a "person[] affected" by this subpoena. *Broadcort Capital Corp. v. Flagler Sec., Inc.*, 149 F.R.D. 626, 628 (D. Colo. 1993). *Cf. id.* (discussing the Advisory Committee Notes' support for a non-party's motion to quash a subpoena under Fed. R. Civ. P. 45: "The notes from the Advisory Committee indicate that "the court protects all persons from undue burden imposed by the use of the subpoena power." There is little doubt that a court has the power and duty to examine all appropriate issues dealing with persons affected by the subpoena under this revised rule."). Also given that motion, and given previous communications with Defendant Garcia's and Troup's counsel, the United States files this motion as opposed without seeking their concurrence. *See* D.N.M.LR-Cr. 47.1.

possibly complying with Defendant Garcia's subpoena. The United States therefore moves the Court to quash the subpoena.

## MEMORANDUM

1.      On March 1, 2018, for Defendant Billy Garcia's counsel served a subpoena on NMCD, demanding production of the mental health records concerning inmate Leonard Lujan, #36895.

2.      NMCD and the United States indicated to Defendant Garcia's counsel that the requested records were confidential and protected from disclosure by HIPAA, which means that NMCD can neither legally or possibly comply with the subpoena.

3.      Defendant Garcia indicated to NMCD and the United States via email his position was that the documents were not protected by HIPAA, that the subpoena was a court order which must be obeyed, and that the HIPAA does not grant any authority for the prison or NMCD to refuse to comply with a subpoena. He further indicated that he would file a motion for sanctions if a motion to quash was not filed by the NMCD.

4.      Defendant Garcia's contentions lack support in the law and the facts. NMCD Cannot legally or possibly comply with the subpoena, which means that neither NMCD nor the United States is required to file a motion to quash, because NMCD's failure to comply with the subpoena is pursuant to an "adequate excuse." Fed. R. Crim. P. 17(g). *See* 2 Wright & Miller, *Fed. Prac. & Proc. Crim.* § 280 (4th ed.). ("Failure to respond to a subpoena is not a contempt if there is "adequate excuse" for the failure. A showing that the person subpoenaed was unable to comply is a complete defense." (footnotes omitted) (citing *United States v. Bryan*, 339 U.S. 323, 330 (1950)). Nevertheless, out of an abundance of caution, the United States files this Motion to Quash to put this issue directly before the Court, and to keep the issue focused on the

confidentiality of the requested records instead of on peripheral and unneeded motions and

responses regarding attempts to seek contempt sanctions. *Cf.* Garcia and Troup Health Records

Motion at 1 n.1 & Appendix A.

5.      Mental Health treatment and diagnosis records of persons (including inmate

Lujan' which the subpoena seeks) constitute protected health information ("PHI") under HIPAA.

45 C.F.R. § 160.103 (defining PHI as individually identifiable health information maintained in

any electronic or other form or medium).

6.      45 C.F.R. § 164.512(e) makes clear that a subpoena is not equivalent to a court

order. *See* 45 C.F.R. § 164.152(e)(1)(i) (a covered entity may disclose PHI in response to an

order of a court, provided that the entity only discloses the PHI expressly authorized by such

order); *id.* § 164.152(e)(1)(ii) (in response to a subpoena *that is not accompanied by an order of*

*a court*, the covered entity may disclose the records only if certain written assurances have been

made by the party seeking the PHI (emphasis added)).

7.      45 C.F.R. § 164.512(e) also makes clear that PHI such as the mental health

records of inmate Lujan, when sought by only a subpoena with no accompanying order, may be

provided only if the party requesting the PHI first provides certain written assurances to NMCD.

More specifically, this regulation requires Defendant Garcia's counsel to provide NMCD with

written assurances (a written statement and accompanying documentation) demonstrating that he

made a good faith effort to provide written notice to inmate Lujan, that the notice included

sufficient information about the litigation or proceeding to permit Lujan to raise an objection to

the court, that the time for Lujan to raise objections has elapsed, and that either no objections

were filed or they were resolved by the Court (and the disclosures sought are consistent with the

Court's resolution). *See* 45 C.F.R. § 164.512 (e)(1)(ii)(A) and (e)(1)(iii). Neither Defendant

DNM 446

Garcia's counsel nor any other counsel or person has made any such written assurances to either NMCD or the United States.

8.      Alternatively, under 45 C.F.R. § 164.512(e), Defendant Garcia's counsel could obtain the requested PHI via subpoena only if they provide NMCD (or the United States) with written assurances -- a written statement and accompanying documentation -- that the parties to the dispute giving rise to the request for information have agreed to a qualified protective order and have presented it to the court, or that Defendant Garcia's counsel requested a qualified protective order from the Court. 45 C.F.R. § 164.512(e)(1)(ii)(B) & (e)(1)(iv). The requirements or elements for the qualified protective order are outlined in (e)(v). Again, neither Defendant Garcia's counsel nor any other counsel or person has made any such written assurances to either NMCD or the United States.

9.      45 C.F.R. § 164.512(e) does not require the movants to file a motion to quash to prevent the release of the PHI sought by the subpoena received from Defendant Garcia's counsel.  Instead, that federal regulation requires defense counsel to provide the written assurances discussed above before the NMCD (or United States) could possibly provide -- or would have any obligation to provide -- the requested PHI mental health records. Again, defense counsel have failed to provide those assurances. While the United States filed this Motion to Quash out of caution, it affirmatively assert that its compliance with and reliance on this federal regulation constitutes Rule 17(g)'s "adequate excuse" non-compliance with the subpoena.

10.     Defendant Garcia's counsel suggested that 45 C.F.R. § 164.512 (k)(5)(i) requires the disclosure of the requested PHI. But reliance on this provision is misplaced at best. That provision allows disclosures of PHI regarding a particular inmate, but to personnel in correctional facilities *only*; defense counsel is not employed by the NMCD or any of its

correctional facilities.  Further, the disclosures of inmate PHI to prison personnel under this

provision may be made only if it's for one or more of the following particularized reasons: the

provision of health care to the inmate; the health and safety of the inmate or other inmates; the

health and safety of correctional facility employees and others at the facility, of those

correctional staff transporting the inmate, and of law enforcement on the premises of the

facility;  or the administration and maintenance of the safety, security and good order of the

correctional facility. *See id.* Defense counsels' use of the mental health records of an inmate

government witness is not for any of these purposes.  Their use of the PHI has nothing to do with

the health and safety of inmates, staff or others, and is instead focused on trying to defend

Defendant Garcia against the pending criminal charges. And, indeed, the release of inmate

Lujan's mental health PHI records to defense counsel would be more likely to jeopardize inmate

Lujan's safety and security, as well as the safety and security of other inmates and staff working

at NMCD facilities.

## <u>CONCLUSION AND REQUEST FOR RELIEF</u>

Defendant Garcia subpoenaed NMCD for inmate Leonard Lujan's mental health records,

notwithstanding that NMCD is part of the prosecution team in this case since December 2015.

And Defendant Garcia completely failed to abide by the clear regulations for subpoena of mental

health records that include PHI under HIPAA. Because NMCD can't legally possibly comply

with the subpoena, NMCD doesn't have to move to quash the subpoena, as non-compliance is

based on "adequate excuse" under Rule 17(g). Nevertheless, the United States moves the Court,

under Rule 17(c)(2), to quash the subpoena under an abundance of caution. Given the Defendant

Garcia's obvious failure to comply with Rule 17 and HIPAA subpoena requirements, the Court

properly should quash the subpoena and conclude that NMCD has an adequate excuse for non-compliance.

Respectfully submitted,

JAMES D. TIERNEY
First Assistant United States Attorney

**Electronically filed on 3/10/2018**
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

/s/
MATTHEW M. BECK
Assistant United States Attorney

6

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CAUSE NO. 2:15-CR-04268-JB** |
| **v.** | § | |
| | § | |
| **CHRISTOPHER CHAVEZ** | § | |
| | § | |
| **Defendant,** | § | |

## RESPONSE TO UNITED STATES NOTICE OF
## PROPOSED JAMES STATEMENTS FOR TRIAL 2 (Doc. 1901)

Christopher Chavez, through counsel, hereby responds to the United States Notice of Proposed James Statements for Trial 2 with specific objections to statements contained therein and raises specific targeted objections to statements not referenced in the government's notice. Co-Defendants Billy Garcia, Edward Troup, Allen Patterson, Andrew Gallegos, Shauna Gutierrez, Joe Gallegos, and Arturo Garcia do not oppose the motion.

1.     The defense assumes that the government intends on calling the witnesses listed as "source." The objections listed herein are based on that assumption. If the government does not intend on calling the "source" then the defense has numerous additional objections.

2.     Christopher Chavez objects to the admission of all statements made by his alleged coconspirators on confrontation and due process grounds. Specifically, there is no reliability inherent in these out of court statements.

3.     Christopher Chavez objects to the admission of all statements regarding counts 1, 3-5 as they are irrelevant to the charges against him and are highly prejudicial as they create the strong probability of a negative spillover effect.

4.      Statement #1 is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez.  Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement. Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

5.      Statement #2  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez  requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

6.      Statement #3  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez  requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

7.      Statement #4  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez  requests at a minimum that any reference to him

be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

8.      Statement #5  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez  requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

9.      Statement #6 is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

10.      Statement #8  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation

clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

11.     Statement #9  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

12.     Statement #10  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

13.     Statement #11  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting

instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

14.     Statement #12  is an alleged statement by Leonard Lujan and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

15.     Statement #14  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

16.     Statement #15  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

17.     Statement #16  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

18.     Statement #30  is an alleged statement by Leonard Lujan and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

19.     Statement #32  is an alleged statement by Willie Amador and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

20.     Statement #34 is an alleged statement by Leonard Lujan and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference

to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

21.     Statement #35  is an alleged statement by Billy Garcia and is inadmissible hearsay as to Christopher Chavez. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement.  Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

22.     Statement #36 is an alleged statement by Joe Gallegos. The defense asserts it is not a coconspirator statement, and Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez requests at a minimum that any reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement. The defense also assets there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for Gallegos's statement. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Billy Garcia.

23.     Statement #37 is an alleged statement by Edward Troup. The defense asserts it is not a coconspirator statement, and Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez requests at a minimum that any

reference to him be redacted and the witness be instructed not to mention Mr. Chavez in the context of this statement. The defense also assets there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for Gallegos's statement. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Billy Garcia.

24.     Statement #38 is an alleged statement by Angel Deleon and is inadmissible hearsay as to Christopher Chavez.  The defense asserts that this is a testimonial statement made to a CO during the process of an investigation and therefore is inadmissible. Christopher Chavez also asserts previously raised due process and confrontation clause objections. Christopher Chavez asserts if such objections are overruled a limiting instruction should be provided indicating this evidence cannot be considered by the jury against Christopher Chavez.

25.     Christopher Chavez objects to any statements, even if not listed above or in the government's James proffer alleged to have been made by any codefendant who is not testifying.

26.     The defense requests that if the Court admits any of the above references statements over the objections of Christopher Chavez that the court allow a continuing objection so as not to require counsel to pose an oral objection during trial that would interrupt the flow of the presentation.

Respectfully submitted,

*John Granberg*

JOHN GRANBERG
Attorney at Law
State Bar No.  142402
310 N. Mesa, Ste. 424
El Paso, Texas 79901
Tel: (915) 543-9000
Fax (915) 543-3201
granberglawoffice@yahoo.com

/s/ Eduardo Solis_____
EDUARDO SOLIS
SBN: 24752
901 Wyoming Ave.
El Paso, TX 79902
(915) 544-1818
(915) 544-4068

Attorneys for Defendant Christopher Chavez

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON,
**JOE GALLEGOS**,
EDWARD TROUP**,**
BILLY GARCIA,
ALLEN PATTERSON,
CHRISTOPHER CHAVEZ,
ARTURO ARNULFO GARCIA,
MARIO RODRIGUEZ,
MAURICIO VARELA
DANIEL SANCHEZ,
CONRAD VILLEGAS,
ANTHONY RAY BACA,
CHRISTOPHER GARCIA,
CARLOS HERRERA,
RUDY PEREZ,
**ANDREW GALLEGOS**,
SHAUNA GUTIERREZ, AND
BRANDY RODRIGUEZ.
                    Defendants.

---

### DEFENDANT JOE GALLEGOS' RESPONSE TO THE UNITED STATE'S NOTICE OF PROPOSED JAMES STATEMENTS (DOC. 1903)

---

Defendants Joe Gallegos hereby would request that the Court consider the following in-

formation in its determination of what statements to consider admitting in the United States' trial

2 against Joe Gallegos.

A. Production of James Statements-As set out in  Doc. 1670, the parties agreed that the United

States was to provide a copy of the statements of co-conspirators for purposes of a *James* evalua-

tion.  Accordingly, the United States has filed Doc. 1903 to fulfill its obligations. Defendant Gal-

legos understandably relies on this pleading and would object if the Government would attempt

at some future time to add supplement this pleading with additional statements.


B. Lack of Support for claims of Jurisdiction in Counts 4 and 5 involving the homicide of  Adri-

an Burns.

There are no statements contained in Doc. 1903 that provide a jurisdictional basis for the

prosecution of Counts 4 and 5. The undersigned brought this to the court's attention in the hear-

ings in  May of  2017 on the hearing where counsel  requested the Grand Jury testimony for

Counts 4 and 5. The Court requested that it be provided the  testimony of FNU Myers to review

in camera based on the Defense request to review the grand jury transcripts.[1] The defense has

inquired of  the government about this issue concerning the government's presentation before the

grand jury  on October 9, 2017 and government counsel . Armijo stated she would review the

transcript. (Attachment A-email exchange). The government's failure to respond to the inquiry

and the noticeable  absence of statements that support the claims advanced by the Defendant in

Doc. 1903 leads to the inevitable-- there are no statements that support federal jurisdiction or tie

Mr. Joe Gallegos to the allegations in Counts 4 and 5 of the Indictment and the claims made by

the government counsel Armijo:

---

[1] THE COURT: Well, do this: Just the portion of Myers' testimony that links this to federal juris-
diction, send me that." Doc. 1161, pg. 110.

"What I can say is that we do have a cooperator who will say that **Adrian Burns disrespected Joe Gallegos**; that Andrew Gallegos stole drugs from Adrian Burns; that Burns was their supplier, and took the theft to the public, which then **shamed the Gallegos brothers**. And shaming an SNM member is not a good thing to do as far as their reputation.

And so we do have specific cooperators that will talk specifically about it. It's not just a generalized, Oh, this is a drug case; oh, this is that. We have specific cooperators that will talk specifically about this." *See* Doc. 1160- Omnibus Hearing Day 2, May 10, 2017. Pg. 112.

As is apparent from a review of Doc. 1903 there are no statements from any co-conspirators that support any claims that they contain **_Jurisdictional language_**. Doc. 1903 produces no "specific cooperators that will talk specifically about this."  Discussing what Maria Armijo told the Court on May 10, 2017.

### C. Specific Objections to the Statements in Doc. 1903.

Defendant Joe Gallegos has the following objections to the statements that are contained in the Notice of *James* Statements. Defendant Gallegos will focus primarily on statements from individuals that will probably be called by the Government.  If there are additional statements not identified, the defense will raise them at the appropriate time.

1. Statement #13-

Defendant objects as this is not a statement and does not provide notice of what was conveyed. Further Defendant would request the ability to voir dire Mr. Leonard Lujan as he is referred to in an audio recording by Leroy Lucero as "crazy Leonard, no one would believe Leonard." Defendant would therefore object on due process and evidentiary grounds to any statements made by Lujan.

2. Statement #36-

Defendant would object to this statement on confrontation grounds. Mr. Leroy Lucero was subpoenaed for the March 12-16, 2018 hearings and Defendant Lucero moved to quash the subpoena and will not be available.

3. Statements #41, #42-

Defendant would object as this statement is vague and the declarant is listed as "Joe and/or Andrew Gallegos". The source is listed as Leroy Vallejos/ Michael Sutton. This information conflicts with the discovery produced and provides no notice of who made the statement and who allegedly heard it. Further it is probably in-violation of the holding in *Bruton v. United States*, 391 U.S. 123 (1968). Additionally, defendant would request that the Court exclude these statements in their entirety as it cannot be redacted or amended in a two person conspiracy to avoid the obvious implication that it must be referring to Joe and/or Andrew Gallegos based on which of the two is claimed to be the declarant.

4. Statement #43-

Defendant would object as this appears to be on an act or an action rather than a statement. No statement is not referenced and the declarant is not mentioned. Further the basis for its admission is not a valid basis for its admissibility as Charlene Baldizan is not a co-conspirator.

5. Statement #44-

Defendant objects to the basis provided. Jason Vanveghel has never been alleged or indentified as a co-conspirator.

6. Statement #45-

Defendant would object as this appears to be an action rather than a statement and there is no indication of the content of the  statement  or when it was made  There are obvious *Bruton* implications.

7. Statement #46-

Defendant would object as this action does not appear to have been done to "induce enlistment or further participation." Additionally, this raises evidentiary concerns as it inconsistent  with the discovery provided; to-wit: that Joe and Andrew Gallegos were at the residence as late as November 15, 2012, two days after "police were coming to search the house."

8. Statement #47-

Defendant objects to this statement as Santos Gonzalez is not expected to testify and this statement is  contained in the factual portion of his plea agreement or in any statements he made to the court at the time of his plea.

9. Statement #48-

Defendant objects to this statement as neither the declarant nor the source is expected to testify and there is no indicia of trustworthiness based on the multiple versions of statements given by both females that is contained in the provided discovery.

10.  Statements #49, #50-

Defendant objects to this statement to the extent that it may have come from Santos Gonzalez who probably will not  testify. Defendant further objects as this statement does not appear trustworthy as the source is not provided ostensibly because he/she remains unknown.

11. Statement #51-

Defendant objects to this statement to the extent that its source is unidentified.

12. Statement #52-

Defendant objects that this does not contain a statement. Further it appears to be factually inaccurate as Shauna Gutierrez confronted  Gomez because she remained at the  residence. Further the source is vague and defendant objects to the lack of specificity.

13. Statements #53 and #59-

Defendant objects to these statements as they are self-serving and are inadmissible  hearsay.

14. Statement #55-

Defendant objects to this statement. It appears inaccurate, as the factual basis for Santos Gonzalez's plea agreement does not state "he was going to kill Gomez." It states "harm,"

15. Statement #56-

Defendant objects to this statement as it is not attributed to any individual. Three individuals are listed as the source. .

16. Statement #57-

Defendant objects to this statement because it is apparent that that it was not made by the claimed declarant.

17. Statement #58-

Defendant objects to this statement as it is not attributed to one individual. Further the statement is believed to be unreliable as it is inconsistent with other statements.

18. Statements #60, #61-

Defendant Mario Chavez has no information regarding this alleged statement and the Defendant would request voir dire on this matter. Further, Defendant Chavez's interview pro-

vided directly contradicts any claim that he has  personal knowledge of the participants. This

statement is believed to be unreliable and the notes reflecting this interview are requested for in-

spection and preparation for cross examination of this source.

19. Statements related to the 2007 events-

Defendant would object and request a limiting instruction for all statements that

are attributed to the designated individuals. Defendant is not alleged to have been involved in

this act.

20. Statement #70-

Defendant would object as it is not believed that Paul Rivera has any personal

knowledge of the declarant nor the actual statement.

**D. Defendant's alleged statements that are not produced in 1903-**

Defendant Joe Gallegos would further request that the Court require the Government to

elect. The statements contained in 1903 run the gamut from actions to simple alleged "admis-

sions." As noted in the opening portion of this motion, the government failed to address certain

other statements.

1. Specifically Agent Madrid of the New Mexico State Police has interviewed an alleged

source that Joe Gallegos has requested to be identified. No statements in 1903 are attributed to

this sourceTo the extent that the source  was  determined to not be credible, defendant seeks

her identify as *Brady* material as well as audio interviews on 3/28/2015 and 4/08/2015 , and

Bates 4938.

2. Ms. Reyna Blea and Ms. Morgan Ramirez were both alleged to have heard Joe Galle-

gos make admissions to the killing. These statements are not in 1903.

3. On August 14, 2015 Agent Madrid was presented with a SNM member who proffered that "Joe Lawrence Gallegos killed Adrian Burns over drugs , money and because Mr. Burns disrespected them." This statement as the Court will note is almost exactly what Ms. Armijo promised the Court in May 2017 that the Government would prove. It is not in Doc. 1903.

**E. Inaccurate statements by Cooperators and need for signs of trustworthiness.**

Defendant Garcia points out and cites to a document at 1909-6 that he understands possibly implicates "Gallegos". The concern with this is that Benjamin Clark in that statement implicates "Ben Gallegos". This statement does not implicate Joe Gallegos and the Court is being notified that many of the statements to include Leonard Lujan's identification are suspect and do not appear accurate on their face.

**<u>Consultation</u>**

Given the contentions set forth in the motion, concurrence wasn't sought from the government pursuant to D.N.M.LR-Cr 47.1.

WHEREFORE, Defendants Gallegos requests an Order from this Honorable Court that binds the  the Government to the Agreement that was reached between the parties and if Doc. 1903 is not in compliance with that agreement, that the Court consider the lack of statements in its determination of the resolution of Doc. 1184 (Bill of Particulars for Counts 4 and 5).

Respectfully submitted this 11th day of March, 2018.

Respectfully Submitted,

*/s/ Brock Benjamin*
**Brock Benjamin**
Benjamin Law Firm
747 E. San Antonio, Suite 203
El Paso, TX 79901
Phone:(915)412-5858
Fax:(915)503-2224
Email: brock@brockmorganbenjamin.com
Co-counsel for Joe Lawrence Gallegos

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 11th day of March, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.

*/s/ Brock Benjamin*
BROCK BENJAMIN

United States District Court

United States

vs

Angel DeLeon, et al.

Case No. 15-CR-4268-JB

## Motion to Quash Subpoena's as per Rule 17(c) (2) of Criminal Procedure.

1. Subpoenas were too delivered to Jim Moore and Cheryl Lackey-Moore on March 7, 2018 by the US Marshal in Oklahoma at Davis Field Convenience Store by Muskogee, Oklahoma.
2. Trail is set to start in Las Cruces, New Mexico on March 12, 2018 at 9:00am.

Jim and Cheryl Moore respectfully request the Subpoena's be Quashed based upon the following:

Their young Son who is 4 years old has Autism and is Non-Verbal requiring constant care. He is in specialized speech/occupational therapy and school 5 days a week. There is not ample time to find a care person for him in Oklahoma or in Las Cruces, New Mexico to provide him with the Specialized Care and Supervision he requires.

The Financial Burden to travel 15hours from Stigler, Oklahoma to Las Cruces, New Mexico and make accommodations is beyond their means and would have to borrowed from friends.

Cheryl Lackey-Moore is also the caregiver for her Elderly Parents who reside in the home as she cooks and cleans for them. Someone will have to be paid to assist them in her absence.

Jim and Cheryl have a family pet that had Emergency Surgery on March 7, 2018 that requires post operational care (antibiotics, surgical site/stitches care). This emergency expense is a contributing factor as to why they are short on funds. This was the same day the Subpoenas were served. The pet would have to be returned to the Vet for care creating more expense.

Jim Moore has contacted the witness coordinator and expressed these concerns to her and suggested a Phone conference/testimony call would be more helpful. As of this time no response has been given.

From:(07)  Stigler Public LibFax: (866) 698-7978                    To:                  Fax: (575) 528-1426              Page 7  of 7  03/08/2018 4:03 PM  06 7 038

Jim and Cheryl thank the court for their time and pray the court grants this motion at this time.


Respectfully submitted:

Jim and Cheryl Moore

*[signature: Jim Moore]*

*[signature: Cheryl Moore]*

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
### for the
### District of New Mexico

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Angel Deleon, et al. | ) | Case No.  15-CR-4268-JB |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Cheryl Lackey
      31213 West Beaver Mountain Road
      Stigler, OK 74462

      **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

_575-528-1400_

| Place of Appearance:  US District Court | Courtroom No.:  320 - Tortugas |
|---|---|
| Las Cruces, NM | Date and Time:  3/12/2018-3/16/2018, 9:00 AM |

      You must also bring with you the following documents, electronically stored information, or objects (_blank if not applicable_):

Please bring with you two copies of all documents you have authored regarding the investigation into the deaths of Freddie Sanchez, Rolando Garza, and Frank Castillo and any file maintained by you in any form whether it be a personal file, an STIU file, an investigative file or a file of any other name.

    (SEAL)

Date: _2-23-18_

                        CLERK OF COURT
                        _Victoria Harvell_
                     Signature of Clerk or Deputy Clerk

The name, address, e-mail, and telephone number of the attorney representing (_name of party_) _____ Billy Garcia _____
_____, who requests this subpoena, are:

Robert Cooper                          James Castle
Robert R. Cooper Law Firm, P.C.        Castle & Castle, P.C.
1011 Lomas Blvd. NW                    1544 Race Street
Albuquerque, NM 87102                  Denver, CO 80206
bob@rrcooper.com                       jcastlelaw@gmail.com
505-842-8494                           303-675-0500

From: (07)  Stigler Public Li Fax: (866) 696-7978          To:          Fax:  (575) 528-1425          Page 5 of 7  03/09/2018 4:03 PM

# CASTLE & CASTLE, P.C.

1544 Race Street
Denver, CO 80206
(303) 675-0500
F: (303) 329-5500

James Andrew Castle
Lisabeth Perez Castle

February 23, 2018

To Whom It May Concern:

    You have been subpoenaed for the entire week of March 12-16, 2018. It is anticipated your testimony will take place one of those days, but which day has not been determined at this time.

    If you wish to be provided with a specific date for attendance, please contact defense witness coordinator, Laura Koch, at 303-263-1483 or by email at paralegalLOS@gmail.com. Otherwise, please appear on March 12, 2018 at 9:00 AM and you will be informed at that time when to reappear.

Thank you,

Jim Castle
Attorney for Billy Garcia

# FAX

| Date: | 03/08/2018 |
|---|---|

| Pages including cover sheet: | 7 |
|---|---|

| To: | |
|---|---|
| | |
| | |
| | |
| | |
| Phone | |
| Fax Number | (575) 528-1425 |

| From: | (07)   Stigler  Public  Library |
|---|---|
| | Stigler Public Library |
| | 410 NE 6th St.. |
| | Stigler |
| | OK            74462 |
| | |
| Phone | (866) 954-2217 * 700 |
| Fax Number | (866) 696-7978 |

**NOTE:**

Attached Image

DNM 472



Head Librarian: Kameran Huggins

Email : stigler@oklibrary.net
Web Page: www.oklibrary.net

Southeastern Public Library
System of Oklahoma

Phone: 1-918-967-4801

# Stigler Public Library
410 NE 6th St.
Stigler, OK  74462
Phone 1-918-967-4801

## ATTENTION

**NAME**      US District Court

**COMPANY**   Clerks Office

**FAX #**     575-528-1425

**PHONE#:**

**COMMENTS**  Motion For Quash

## FROM

**NAME**      Jim Moore

**COMPANY**   Self

**# PAGES** (excluding cover page)   6

**LIBRARY FAX #**      1-866-696-7978

**SENDER PHONE#:**    580-212-9428

**SENDER EMAIL:**     Kqasta51@msn.com.

**CONFIDENTIALITY NOTICE:**

This facsimile message is covered by the Electronic Communications Privacy Act, is
confidential and may include legally protected information.  If you are not the intended recipi-
ent or you received this facsimile by mistake, printing, copying, storing or disseminating
in any way is strictly prohibited and doing so could subject you to civil and or criminal action.
Please notify the sender by telephone you have received this facsimile by mistake and delete
all information you received.

DNM 473

# FAX 575-528-1425

**To:**

United States District Court Clerk's Office

    Las Cruces, New Mexico

**From:**

Jim Moore

Cheryl Lackey-Moore

580-212-9428

Please send stamped received
copy by email to k9asta51@msn.com
if you can as we have no fax at home.
      OR
      teamroperx2@msn.com

DNM 475

Page: 51

Date Filed: 09/29/2020

Document: 010110415671

Appellate Case: 20-2058

**FILED**

UNITED STATES DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT ~~LAS~~ AS CRUCES, NEW MEXICO

**FOR THE DISTRICT OF NEW MEXICO**        MAR 1 2 2018

UNITED STATES OF AMERICA,

      Plaintiff,

**MATTHEW J. DYKMAN**
**CLERK**

vs.                                                                                  No. CR 15-4268 JB

DANIEL SANCHEZ, ANTHONY RAY
BACA, CARLOS HERRERA, and
RUDY PEREZ,

      Defendants.

## **V E R D I C T**

### **DANIEL SANCHEZ**

#### **COUNT 6**

WE, the Jury, find the defendant, **DANIEL SANCHEZ,**       *GUILTY*
                                                        (guilty or not guilty)
of violent crimes in aid of racketeering in conspiring to murder Javier Molina, as charged in Count 6 of

the Indictment.

#### **COUNT 7**

WE, the Jury, find the defendant, **DANIEL SANCHEZ,**       *GUILTY*
                                                        (guilty or not guilty)
of violent crimes in aid of racketeering in the murder of Javier Molina, as charged in Count 7 of the

Indictment.

### **ANTHONY RAY BACA**

#### **COUNT 6**

WE, the Jury, find the defendant, **ANTHONY RAY BACA,** *GUILTY*
                                                        (guilty or not guilty)
of violent crimes in aid of racketeering in conspiring to murder Javier Molina, as charged in Count 6 of

the Indictment.

DNM 476

Appellate Case: 20-2058    Document: 010110415671    Date Filed: 09/29/2020    Page: 52

**COUNT 7**

WE, the Jury, find the defendant, **ANTHONY RAY BACA**, _GUILTY_
(guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Javier Molina, as charged in Count 7 of the

Indictment.

**COUNT 9**

WE, the Jury, find the defendant, **ANTHONY RAY BACA**, _GUILTY_
(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Dwayne Santistevan, as charged in Count

9 of the Indictment.

**COUNT 10**

WE, the Jury, find the defendant, **ANTHONY RAY BACA**, _GUILTY_
(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Gregg Marcantel, as charged in Count 10

of the Indictment.

**CARLOS HERRERA**

**COUNT 6**

WE, the Jury, find the defendant, **CARLOS HERRERA**, _GUILTY_
(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Javier Molina, as charged in Count 6 of

the Indictment.

**COUNT 7**

WE, the Jury, find the defendant, **CARLOS HERRERA**, _GUILTY_
(guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Javier Molina, as charged in Count 7 of the

Indictment.

DNM 477

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 53

**RUDY PEREZ**

**COUNT 6**

WE, the Jury, find the defendant, **RUDY PEREZ**,   *NOT GUILTY*
(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Javier Molina, as charged in Count 6 of

the Indictment.

**COUNT 7**

WE, the Jury, find the defendant, **RUDY PEREZ**,   *NOT GUILTY*
(guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Javier Molina, as charged in Count 7 of the

Indictment.

Dated this __12th__ day of __March__, 2018.


_____
FOREPERSON

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CLERK'S MINUTES

*BEFORE DISTRICT JUDGE JAMES O. BROWNING (IN LAS CRUCES)*

| | | | |
|---|---|---|---|
| **CASE NO.:** | No. CR 15-4268 JB | **DATES:** | March 12-16, 2018 |
| **CASE CAPTION:** | *USA v. DeLeon, et al.* | | |
| **CRD:** | C. Bevel | **COURT REPORTER:** | J. Bean |

**COURT IN SESSION:**

**3/12/18**
9:00am-10:30am      1.5 hr
1:19pm-5:33pm       4 hr 15 min
**3/13/18**
8:36am-11:36am      3 hr
12:45pm-5:31pm      4 hr 46 min
**3/14/18**
8:29am-11:47am      3 hr 22 min
1:00pm-5:32pm       4 hr 32 min
**3/15/18**
8:34am-12:01pm      3 hr 33 min
1:02pm-5:49pm       4 hr 51 min
**3/16/18**
8:30am-1:31pm       5 hr 1 min
2:37pm-5:30pm       3 hr
                    38 hr 48 min

**TYPE OF PROCEEDING:** Motions Hearing (see below)/Pretrial Conference

**COURT'S RULING/DISPOSITION:**

**PRETRIAL CONFERENCE**

1. United States' Notice of Proposed James Statements for Trial 2 [1903] –
2. Motion to Prevent the Admission of Statements of Non-Testifying CoDefendants Implicating Defendant Billy Garcia and for an Order for the Government to Specify Such Statements Prior to Trial [1307] –
3. Non-Party Leroy Lucero's Motion to Quash Subpoena and Request for Expedited Consideration [1900] –
4. Opposed Second Motion by Andrew Gallegos to Sever Counts Four and Five [1298] –
5. Motion to Sever Counts Based on Practical Grounds [1743] -
6. Defendant Shauna Gutierrez' Opposed Motion for a James Hearing [1320] –
7. Defendant Joe Gallegos' Motion for a Bill of  Particulars [1143] –
8. Defendant Joe Gallegos' Motion for a Bill of Particulars as to Counts 13-16 [1319] –
9. Defendant Gallegos Motion to Renew Motion to Dismiss Counts 4 and 5 (PreIndictment Delay) and Motion for a Bill of Particulars as to Counts 13 Through 16 [1808] –

10. Motion for Immediate Production of All Remaining Materials in the Government's Possession Regarding Trial Two Witnesses [1693] -

11. Motion for Production of Brady, Giglio or Jencks Materials Contained In Presentence Report or Cooperating Witnesses, or, in the Alternative, *In Camera* Review [1694] -

12. Motion for Immediate Discovery [1744] –

13. Motion for Discovery of the Arrest and Conviction Reports of Witnesses' Criminal History [1859] -

14. Motion for Immediate Production of Notes of Interviews of Witnesses by Investigating Officers, Substantially Verbatim or Exculpatory Notes of Interviews of Witnesses by the Prosecutors, for Production of Recorded Interviews and for Disclosure of Evidence That Any Notes Have Been Destroyed [1861] -

15. ALREADY HEARD 5/9/17 – [1061] -

16. Motion to Exclude Testimony From Government's Gang Experts as Outlined in the United States' Supplemental Notice of Gang Expert Witnesses' Testimony (Doc. No. 1656) [1671] -

17. Motion for the Imposition of a January 31, 2018 Deadline for the Government to Produce a Summary of Statements It Intends to Offer Against Trial Two Defendants [1670] -

18. Motion to Suppress and Statements [1142] –

19. Motion in Limine Regarding Alleged Bad Acts [1308] -

20. Motion in Limine Regarding Alleged Bad Acts [1504] -

21. Motion in Limine Regarding Alleged Bad Acts [1528] -

22. Motion in Limine Regarding Alleged Bad Acts [1531] -

23. Motion in Limine Regarding Alleged Bad Acts [1532] -

24. Defendant Joe Gallegos' Motion in Limine to Prohibit Government From Introducing Evidence of Alleged "Bad Acts" [1602] -

25. Motion to Dismiss [1283] -

26. Defendant Edward Troup's Motion to Dismiss (PreIndictment Delay) [1284] -

27. Gallegos Defendant's Motion to Dismiss (PreIndictment Delay) [1318] -

28. Defendant Edward Troup and Billy Garcia's Motion for Production of Alleged Co-Conspirators Statements and for Pre-Trial Hearing on Their Admissibility [1292] –

29. Motion for James Hearing and Determination of Co-Conspirator Statements Admissibility at a Pre-Trial Hearing [1317] -

30. United States' Motion in Limine to Exclude Extrinsic Evidence in Violation of Federal Rule of Evidence 403 [1754] -

31. United States' Motion in Limine to Preclude Cross-Examination of Special Agent Acee on Unrelated Conduct [1871]

32. Emergency MOTION to Quash Writ and Request to file Motion sealed and for Telephonic hearing by Fred Quintana [1919] -

33. Opposed Motion for Order to Obtain Physical and Mental Health Records [1908] -

34. Motion to Quash Non-Party Leroy Lucero's Motion to Quash Subpoena and Request for Expedited Consideration by Leroy Lucero [1900]

**ORDER CONSISTENT WITH COURT'S RULING TO BE PREPARED BY:**   Court

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**          **ATTORNEYS PRESENT FOR DEFENDANT(S):**

Maria Armijo/Randy Castellano/
Matthew Beck, AUSAs

Brock Benjamin (for Deft. Joe Lawrence Gallegos)

Cori Harbour-Valdez/Patrick Burke (for Deft. Edward Troup)

Robert Cooper/James Castle (for Deft. Billy Garcia)

Jeff Lahann/Joseph Shattuck (for Deft. Allen Patterson)

John Granberg/Edward Solis (for Deft. Christopher Chavez)

Billy Blackburn (for Deft. Arturo Arnulfo Garcia)

Richard Jewkes/Amy Jacks (for Deft. Daniel Sanchez)

Marc Lowry/Theresa Duncan (for Deft. Anthony Ray Baca)

William Maynard/Carrie Bhalla (for Deft. Carlos Herrera)

Ryan Villa/Justine Fox-Young (for Deft. Rudy Perez)

Donovan Roberts/Lisa Torraco (for Deft. Andrew Gallegos)

Angela Arellanes (for Deft. Shauna Gutierrez)

Jerry Walz (for Deft. Brandy Rodriguez)

Gregg Fallick (for witness Leroy Lucero)

**COURT:**  Calls case.  Counsel enter appearances. *FBI Special Case Agent Brian Acee present.  Cynthia Gilbert, paralegal, present for defense teams.*

**COURT IN SESSION:**

9:00am  Court addresses counsel regarding upcoming trial scheduled to begin April 9. Currently scheduled for 6-8 weeks.  Court will proceed to Pretrial conference related to Trial 2. Court addresses counsel regarding Trial 2.

9:00am  Unites States requests closing arguments after instructions to jury.

9:00am  Court addresses elements and giving preliminary instruction, listing counts. Unites States requests preliminary elements instruction.

9:13am  Mr. Cooper requests holding off until he has an opportunity to review/discuss elements

instruction. Court provides copy of elements instruction to counsel.

| | |
|---|---|
| 9:14am | Mr. Castle addresses court regarding follow up questions after voir dire. |
| 9:15am | Court addresses counsel regarding alternate jurors, court suggests 18 jurors (6 alternates). |
| 9:16am | Ms. Armijo request all jurors including alternates remain under charge, defendants agree. |
| 9:17am | Court addresses counsel regarding day to day schedule for trial. Court inclined to start at 8:30. Trial could be here in Las Cruces or in Albuquerque. |
| 9:20am | Court addresses counsel regarding opening statements; Ms. Armijo requests 1 hour. |
| 9:21am | Mr. Burke requests 45 minutes, opening at the beginning. |
| | Mr. Shattuck request 45 minutes opening at the beginning. |
| | Mr. Granberg 30-45 minutes at beginning. |
| | Mr. Blackburn 45 minutes at beginning |
| | Mr. Roberts 30-40 minutes at beginning. |
| | Ms. Arellanes 30-45 minutes at beginning. |
| | Ms. Armijo requests exhibits used in opening statements presented by power point. |
| | Mr. Castle objects. |
| 9:27am | Court indicates exhibits should be shared, power points related to opening statements do not have to be shared. |
| 9:28am | Court addresses counsel regarding time for voir dire. Ms. Harbour-Valdez requests 1 hour, Mr. Cooper requests 1 hour, Mr. Shattuck, Mr. Lahann, 1 hour, Mr. Granberg requests 1 hour Court indicates preference is to keep it to 55 minutes. Mr. Blackburn requests 55 minutes. Mr. Roberts 42 minutes. Ms. Arellanes requests 40 minutes. Ms. Armijo requests use of numbers rather identification by juror name. |
| 9:37am | Mr. Cooper request court use names rather numbers. |
| 9:37am | First round of questionnaires were sent out to counsel on Friday. Ms. Armijo indicates the government did not receive them. Court will check on status. |
| 9:42am | Mr. Roberts addresses court regarding being able to see through the privacy covers on tables. Court indicates many checks will be made before start of next trial. Court indicates United States gets numbered exhibits, defendants get letters. |
| 9:45am | Mr. Castle addresses court regarding additional preemptory challenges and seating arrangements. Mr. Castle request separate tables so that counsel can consult with their respective clients. |
| 9:51am | Court will take concerns into consideration. Current numbers and logistics will require 2 |

tables whether in Las Cruces or Albuquerque.

| | |
|---|---|
| 9:52am | Mr. Burke addresses court regarding severance, and need for separate tables for defendants; addresses Document 1626 regarding firm date for objections. |
| 9:54am | Ms. Harbour-Valdez request government provide may call and will call witness lists by March 26. |
| 9:54am | Ms. Armijo indicates reciprocal witness list by March 23. |
| 9:55am | Court will have government's list for will call list by March 23. Defendant's to do the same, but may need to be revised after receipt of government's list. |
| 9:57am | Mr. Blackburn agrees need for separate tables. |
| 10:00am | Mr. Castle agrees, to need for separate tables. |
| 10:03am | Mr. Benjamin addresses Court regarding location of trial and time of courtroom open to |
| 10:04am | Mr. Cooper addresses court regarding subpoena of witness' Jim Moore, Cheryl Lackey requests to appear telephonically and Reeve Swainston. |
| 10:04am | No objection by defendants or United States. |
| 10:05am | Court will allow telephonic testimony. |
| 10:08am | Court moves to Motion hearings; Document 1903 – United States' Notice of Proposed James Statements for Trial 2. |
| 10:08am | Mr. Castellano responds. Governments' exhibits 11-18 plea agreements of defendants having pled guilty. |

11-Leonard Lujan

12-Benjamin Clark

13-Ruben Hernandez

14-Javier Alonzo

15-Eugne Martinez

16-Paul Rivera

17-brandi Rodriguez

18-Santos Gonzales

Mr. Castellano moves to admit for purpose of James hearing only.

| | |
|---|---|
| 10:13am | Mr. Castle objects to admission. |
| 10:14am | Mr. Castellano indicates 16 defendants will testify, agreements were signed under oath. |
| 10:16am | Mr. Benjamin, Mr. Burke, Ms. Arellanes, Mr. Solis join in objection. |
| 10:17am | Court admits exhibits 11-18 for purposes of this hearing. |
| 10:19am | Mr. Benjamin addresses court regarding document 1918 filed last night. |
| 10:22am | Mr. Castellano requests Monday, March 26th regarding use of any testimony from first |

trial of any additional statements to be used in Trial 2.

| 10:24am | Mr. Benjamin continues to object. |
| 10:26am | Mr. Burke objects. |
| 10:28am | Court imposes Wednesday end of business day to submit by letter or pleading identifying additional statements. |
| 10:31 | Court in recess. |
| *10:54am* | *TRIAL 1 Counsel released after verdicts returned.* |
| 1:19pm | Court in session. |
| 1:19pm | Mr. Burke addresses court regarding exhibits 1-18 plea agreements. Request addendum be attached. |
| 1:19pm | Court will have addendum attached to plea agreements exhibits 1-18. |
| 1:20pm | Ms. Torraco addresses court regarding statements offered in trial 1, objects. |
| 1:25pm | Court will focus on James statements. |
| 1:26pm | Mr. Castle responds. |
| 1:28pm | Mr. Beck addresses court regarding identification of statements. |
| 1:30pm | Mr. Castle responds requests as many pretrial rulings as possible from the Court to avoid any unnecessary delays during Trial 2. |
| 1:33pm | Court addresses Mr. Castellano regarding establishing conspiracies and who is alleged to have participated. |
| 1:33pm | Mr. Castellano responds, provides Indictment information reference to each conspiracy. |
| 2:06pm | Court indicates there are six conspiracies, |
| 2:09pm | Witness Nancy Stemo sworn. |
| 2:10pm | Mr. Benjamin begins direct examination witness Ms. Stemo. |
| 2:26pm | Mr. Castle addresses Court regarding potential James hearing statements. |
| 2:30pm | Mr. Beck addresses Court with proposed schedule of James hearing provided via email on 3/9 @1:13pm |
| 2:40pm | Mr. Castle responds. |
| 2:48pm | Court in recess. |
| 3:08pm | Court in session. |
| 3:08pm | Court addresses Mr. Beck regarding assurance that they do not intend to elicit any other statements other than what is in discovery. |
| 3:09pm | Mr. Beck responds and agrees. |
| 3:13pm | Mr. Castle responds. |
| 3:13pm | Mr. Burke addresses court regarding new or recalled information being disclosed or |

defendant being present during pretrial interviews.

| | |
|---|---|
| 3:14pm | Mr. Beck responds, objects to defendants' presence at pretrial interviews.  Court will not order defendants to be present during pretrial interviews. |
| 3:18pm | Court addresses counsel regarding motions to dismiss. |
| 3:28pm | Mr. Beck responds regarding AUSAs anticipated testimony. (AUSAs James Braun and Reeve Swainston) |
| 3:35pm | Mr. Castle responds on the court's thoughts on motions to dismiss. |
| 3:51pm | Mr. Benjamin address Court. |
| 3:53pm | Mr. Beck responds. |
| 3:58pm | Mr. Burke responds. |
| 4:00pm | Court will not preclude defendants from calling AUSAs.  They will not be called until end of evidence on Motions to Dismiss. |
| 4:01pm | Court will take up Doc. 1298, court not inclined to sever defendants. |
| 4:03pm | Ms. Torraco presents arguments on Doc. 1298. Motion to Sever Andrew Gallegos. |
| 4:11pm | Court responds to Ms. Torraco. |
| 4:12pm | Ms. Torraco continues with arguments. |
| 4:30pm | Ms. Torraco requests decision be held in abeyance until James hearings are complete. |
| 4:30pm | Ms. Armijo responds. |
| 4:39pm | Mr. Beck responds to Court. |
| 4:47pm | Court in recess. |
| 5:05pm | Court in session. |
| 5:05pm | Ms. Armijo addresses court requesting court deny severance. |
| 5:08pm | Mr. Castle addresses Court regarding Bruton statements. |
| 5:23pm | Ms. Torraco requests court review Gallo case before rendering a decision. |
| 5:29pm | Court will orally deny the motion to Sever at this time. Mr. Garcia's Motion Doc. 1743 will be addressed tomorrow. |
| 5:31pm | Mr. Castle indicates he rests on motion submitted (Doc. 1743); request focus on James hearings, motions to dismiss and individual statements. |
| 5:32pm | Mr. Benjamin indicates James hearing and Bill of Particulars. |
| 5:32pm | Court will resume at 8:30am. |
| 5:33pm | Court in recess. |

**DAY 2: 3/13/18**

| | |
|---|---|
| 8:36am | Court in session. |
| 8:36am | Mr. Grandburg addresses Court regarding Motion for Severance. |

| | |
|---|---|
| 8:39am | Mr. Burke joins and agrees with defense comments on motions to sever. |
| 8:40am | Court denies motion to sever without prejudice. |
| 8:41am | Mr. Castellano conducts direct examination of witness Agent Stemo, previously sworn. |
| 8:42am | Court addresses Mr. Benjamin regarding responses filed. |
| 8:42am | Mr. Shattuck joins in other responses regarding James hearing. |
| 8:43am | Court clarifies responses filed by defendants. |
| 8:48am | Mr. Castellano continues with direct examination of witness Agent Stemo. |
| 9:52am | Mr. Benjamin conducts cross examination of witness Agent Stemo. |
| 10:03am | Court in recess. |
| 10:20am | Court in session. |
| 10:20am | Mr. Benjamin |
| 11:36am | Court in recess. |
| 12:45pm | Court in session. |
| 12:45pm | Mr. Burke conducts cross examination of witness Agent Stemo. |
| 1:20pm | Mr. Castle conducts cross examination of witness Agent Stemo. |
| 2:15pm | Court in recess. |
| 2:31pm | Court in session. |
| 2:31pm | Mr. Granburg conducts cross examination of witness Agent Stemo. |
| 2:45pm | Mr. Blackburn conducts cross examination of witness Agent Stemo. |
| 3:13pm | Mr. Cooper addresses Court, invokes the rule regarding witnesses. |
| 3:14pm | Court: witnesses may not discuss testimony with each other. Witnesses are required to remain outside courtroom. |
| 3:14pm | Ms. Torraco conducts cross examination witness of Agent Stemo. |
| 3:55pm | Ms. Arellanes conducts cross examination of witness Agent Stemo. |
| 4:01pm | Court in recess. |
| 4:19pm | Court in session. |
| 4:19pm | Ms. Arellanes continues with cross examination of witness Agent Stemo. |
| 4:43pm | Mr. Castellano conducts re-direct with witness Agent Stemo. |
| 4:48pm | Mr. Benjamin conduts re-cross examination of witness Agent Stemo. |
| 4:54pm | Mr. Burke conducts re-cross examination of witness Agent Stemo. |
| 4:55pm | Court excuses witness Agent Stemo. |
| 4:55pm | Mr. Castle addresses court, defendants have no witnesses for James hearings. |
| 4:55pm | Court addresses counsel regarding chart for rulings on James hearings. |
| 4:58pm | Mr. Castellano addresses court regarding 2017 Alcorta case he wishes to add that the |

court review.

| | |
|---|---|
| 4:59pm | Court will provide a chart with ruling as the week proceeds. Court will next take up next Motions for Bill of Particulars Doc. 1320. |
| 5:00pm | Ms. Arellanes addresses Court regarding Doc. 1320 Motion for Bill of Particulars. |
| 5:05pm | Mr. Castellano responds. |
| 5:08pm | Court denies Motion for Bill of Particulars Doc. 1320. |
| 5:09pm | Court addresses Mr. Benjamin regarding Motion for Bill of Particulars Doc. 1143, 1319, 1808. |
| 5:10pm | Mr. Benjamin addresses court with argument on Motions for Bill of Particulars. |
| 5:29pm | Ms. Torraco addresses court. |
| 5:31pm | Court will address this matter in the morning. |
| 5:31pm | Court in recess. |

**DAY 3:  3/14/18**

| | |
|---|---|
| 8:29am | Court in session. |
| 8:29am | Court addresses counsel regarding Bill of Particulars yesterday. |
| 8:33am | Ms. Torraco has nothing further regarding Bill of Particular. |
| 8:34am | Mr. Burke addresses Court regarding severance. |
| 8:37am | Mr. Blackburn addresses court regarding severance, joins Mr. Burke's argument. |
| 8:40am | Ms. Armijo responds. |
| 9:04am | Mr. Benjamin addresses Ms. Armijo and the court regarding Bill of Particulars. |
| 9:05am | Ms. Armijo continues with arguments on Bill of Particulars. |
| 9:27am | Mr. Benjamin moves to admit Exhibit A, for Defendant Joe Gallegos. |
| 9:27am | Court admits exhibit A. |
| 9:30am | Mr. Castle addresses Court. |
| 9:32am | Ms. Arellanes joins in motion to sever counts 4 and 5. |
| 9:32am | Court will likely deny the Motion for Bill of Particulars. |
| 9:32am | Mr. Benjamin argues motion to court. |
| 9:35am | Mr. Castle argues motion regarding bifurcation. |
| 9:41am | Mr. Solis addresses Court and joins in Mr. Castles request for bifurcation. |
| 9:44am | Mr. Lahann addresses Court argues and joins in request for bifurcation/severance. |
| 9:46am | Court addresses counsel regarding Bill of Particulars, Doc. 1143 motion is denied. Court is not ruling on severance, admissibility of evidence at this time. |
| 9:49am | Mr. Benjamin addresses court with Motion for Bill of Particulars on counts 13-16, Doc. 1319. |

| | |
|---|---|
| 9:56am | Ms. Armijo responds. |
| 10:01am | Court in recess. |
| 10:19am | Court in session. |
| 10:19am | Ms. Armijo addresses court |
| 10:21am | Mr. Cooper addresses Court regarding Gregg Fallick's motion to quash telephonically today at 1pm. |
| 10:21am | Ms. Armijo addresses Court regarding all pending Motions to Quash. |
| 10:23am | Mr. Cooper addresses court regarding Mr. Sapien's availability and addressing Motions to Quash. |
| 10:26am | Court will hearing Doc.1900 at 1:00pm |
| 10:28am | Mr. Castle addresses Court regarding Defendant Billy Garcia Motion Doc. 1693. |
| 10:36am | Court addresses counsel. |
| 10:42am | Mr. Beck responds. |
| 10:51am | Mr. Castle responds. |
| 10:58am | Court clarifies with counsel on redactions for PSRs related to witnesses for Trial 2. |
| 11:01am | Ms. Armijo will reach out to US Probation regarding outstanding PSRs. |
| 11:07am | Mr. Burke addresses court regarding PSRs to be disclosed. Requests drafts of PSRs as they exist. Requests a court order providing whatever drafts are available. |
| 11:10am | Court requests a letter and draft order from defendants regarding providing draft PSRs. |
| 11:11am | Mr. Castle addresses court regarding Agent Acee's notes being disclosed. |
| 11:11am | Mr. Beck responds. |
| 11:23am | Court has Ms. Bean explain status of transcripts of Trial 1, final approvals and status. |
| 11:28am | Mr. Burke addresses court regarding Doc. 1061 requests paralegal to paralegal communication requesting transcript of Clark 302, Leroy Lucero interview/transcript. DNA documents requested of Ms. Armijo. |
| 11:33am | Mr. Beck responds, information has been requested and will be provided as soon as possible. Counsel to work together to obtain information. |
| 11:34am | Ms. Armijo indicates information has been requested regarding DNA. |
| | Court indicates Mr. Burke can renew Motion to compel if information is not received. |
| 11:35am | Mr. Castle addresses court with arguments on Doc. 1744. Clarifies which requests remain outstanding. |
| 11:39am | Mr. Beck responds. |
| 11:47am | Court in recess. |
| 1:00pm | Court in session. |

| | |
|---|---|
| 1:00pm | Mr. Fallick's addresses court telephonically regarding Motion to Quash Subpoena Doc. 1900. |
| 1:02pm | Court addresses Mr. Fallick. |
| 1:13pm | Mr. Fallick responds, argues Motion to Quash. |
| 1:19pm | Mr. Castle responds, references James statements in chart attributable to Mr. Lucero. |
| 1:29pm | Mr. Burke responds, references James statements in chart attributable to Mr. Lucero. |
| 1:30pm | Mr. Benjamin responds, references James statements in chart Doc. 1903 Table, attributable to Mr. Lucero. |
| 1:32pm | Mr. Solis responds. |
| 1:33pm | Mr. Beck indicates Mr. Lucero will be called at trial, request quashing all subpoenas for this week's hearings. |
| 1:38pm | Mr. Castle responds. |
| 1:46pm | Mr. Beck responds. |
| 1:50pm | Mr. Burke responds. |
| 2:00pm | Mr. Fallick responds. |
| 2:06pm | Court will permit defendant to call Mr. Lucero for limited purpose. Motion Denied. Mr. Fallick to coordinate with Mr. Lucero's probation officer on coordination of travel for Trial. |
| 2:09pm | Mr. Fallick requests advance funds, requests Friday afternoon 1pm. |
| 2:10pm | Mr. Beck indicates two US Attorneys are scheduled to testify Friday afternoon. |
| 2:12pm | Mr. Fallick requests counsel to provide documents relevant to Mr. Lucero. |
| 2:13pm | Court directs defendants put a package of documents, 302s together Mr. Fallick. |
| 2:15pm | Mr. Castle requests transcript of release hearing as requested in Doc. 1907. |
| 2:16pm | Court will grant motion Doc. 1907. |
| 2:17pm | Mr. Beck has no position on releasing transcript. |
| 2:17pm | Court will have transcript of 3/26/16 hearing ready for Mr. Falllick to pick up in Albuquerque courthouse. |
| 2:23pm | Court concludes hearing with Mr. Fallick. |
| 2:23pm | Mr. Castle continues with Doc. 1744 – Discovery requests. |
| 2:30pm | Mr. Beck responds. |
| 2:30pm | Court could provide order to require facilities to turn over calls. |
| 2:32pm | Court in recess. |
| 2:49pm | Court in session. |
| 2:49pm | Court addresses Mr. Sapien, witness Fred Quintana (present) reference Emergency |

MOTION to Quash *Writ and Request to file Motion sealed and for Telephonic hearing* by Fred Quintana Sealed Motion to Quash Doc. 1919.

| | |
|---|---|
| 2:51pm | Mr. Sapien addresses court, requests quashing subpoena. |
| 3:08pm | Mr. Cooper responds, requests resetting matter so that Mr. Sapien can meet with Fred Quintana and be present for hearing. |
| 3:12pm | Court authorizes, without objection of all counsel, Doc. 1909 to be provided to Mr. Sapien (only what is related to his client Fred Quintana). Copy of discovery related to statement also to be provided to Mr. Sapien. |
| 3:14pm | Ms. Armijo responds, request subpoena be quashed. |
| 3:15pm | Court indicates motion properly filed, properly served. Court will allow limited and targeted evidence regarding statements made. Motion denied. Mr. Sapien to stay in touch with Mr. Cooper regarding hearing date. Witness Fred Quintana to be returned to facility previously housed so that he can meet with Mr. Sapien. |
| 3:20pm | Mr. Sapien responds. |
| 321pm | Court concludes hearing with Mr. Sapien. |
| 3:21pm | Court returns to Doc. 1744, nothing further from counsel. |
| 3:22pm | Court addresses counsel regarding Doc. 1859. |
| 3:23pm | Mr. Benjamin responds, agreement reached with United States. |
| 3:23pm | Court denies Doc. 1859. |
| 3:25pm | Mr. Castle addresses court regarding other witnesses – Luis Lopez client and C.J. Mchiney – client. |
| | Court directs counsel to contact counsel to check availability for hearing. |
| 3:26pm | Court addresses Doc. 1861, nothing further from counsel. |
| 3:27pm | Court addresses counsel regarding Doc. 1061 |
| 3:28pm | Mr. Burke, court has already addressed this motion 1061. |
| 3:28pm | Court addresses counsel with next motion Doc. 1671 B. Garcia motion to Exclude Testimony. |
| 3:29pm | Mr. Beck responds, gang expert still listed, however may not call at trial. |
| 3:30pm | Court addresses counsel. |
| 3:31pm | Mr. Castle responds. |
| 3:33pm | Court references previous rulings applicable to all trials. |
| 3:34pm | Mr. Burke responds. |
| 3:35pm | Court addresses counsel with Motion Doc. 1670. |
| 3:35pm | Mr. Castle indicates matter is moot. |

| | |
|---|---|
| 3:35pm | Court addresses Mr. Benjamin with Motion to Suppress Doc. 1142. |
| 3:40pm | Mr. Benjamin request matter be moved back so that accurate transcripts can be reviewed by US Attorney. |
| 3:41pm | Court agrees, moves to Motion in Limine Alleged Bad Acts by Billy Garcia Doc. 1308. |
| 3:46pm | Court addresses counsel regarding Bad Acts. Counsel to meet and confer. |
| 3:50pm | Mr. Solis addresses court regarding procedures for addressing the court with Bad Acts. |
| 3:55pm | Mr. Burke addresses court regarding Doc. 1504 Troup's Oppose Motion in Limine Regarding Alleged Bad Acts. |
| 4:17pm | Court in recess. |
| 4:38pm | Court in session. |
| 4:38pm | Mr. Burke addressee court regarding Troup's remaining bad acts that counsel cannot reach an agreement on. |
| 4:40pm | Counsel with to work the United States on reaching an agreement on Motion in Limine to Exclude Other Bad Acts Docs. 1528, 1531, 1602. |
| 4:42pm | Mr. Lahann addresses court regarding Patterson's Motion in Limine to Exclude Other Bad Acts Doc.1532. |
| 4:46pm | Mr. Beck responds. |
| 4:53pm | Court indicates on the record which Bad Acts are coming in. |
| 4:55pm | Mr. Solis addresses court regarding Motion regarding Mental Health Records. |
| 4:57pm | Matter to be taken up tomorrow re: Doc. 1908 |
| 4:58pm | Mr. Castle addresses court, request proceeding on Motions to Suppress. |
| 4:59pm | Ms. Armijo responds, witness excused, Ms. Armijo needs to review transcript, will be ready tomorrow. |
| 5:00pm | Court will take up Motions to suppress tomorrow. |
| 5:01pm | Mr. Benjamin addresses court with Doc. 1318 Gallegos Motion to Dismiss for Preindictment Delay. |
| 5:13pm | Court addresses Mr. Benjamin. |
| 5:14pm | Ms. Torraco indicates defendant Gallegos joins in this motion. |
| 5:14pm | Mr. Beck responds. |
| 5:24pm | Mr. Beck moves to admit exhibits 1, 2, 3 and 4 related to Doc. 1318. |
| 5:24pm | Mr. Benjamin or other no other defense counsel have any objection to admission. |
| 5:25pm | Court admits exhibits 1-4 related to Doc. 1318. |
| 5:25pm | Mr. Beck continues with arguments related to Motion to Dismiss. |
| 5:27pm | Mr. Benjamin responds. |

5:32pm        Court denies motion at this time, may renew request at a later date.

5:32pm        Court in recess.

**DAY 4: 3/15/18**

8:34am        Court in session.

8:34am        Mr. Benjamin moves to admit Exhibits A-1, A-2 – November 2012 interview of J. Gallegos.

8:35am        Court admits Exhibits A-1, A-2 admitted without objections from counsel.

8:38am        Court addresses counsel.

8:41am        Ms. Armijo calls witness Richard Williamson, witness sworn.

8:42am        Ms. Armijo conducts direct examination of witness Williamson.

              Ms. Armijo moves Government's exhibits 1 and 2 for purposes of this hearing only.

8:49am        Court admits exhibits 1 and 2 without objection from counsel.

8:49am        Ms. Armijo continues with direct examination of witness Williamson.

8:53am        Mr. Benjamin conducts cross examination of witness Williamson.

9:00am        Ms. Armijo conducts re-direct examination of witness Williamson.

9:01am        Court excuses witness Williamson.

9:01am        Mr. Benjamin addresses court with arguments in support of motion

9:04am        Ms. Armijo responds, request court deny motion to suppress.

9:07am        Court addresses counsel, inclined to deny motion for reasons as stated on the record.

9:14am        Mr. Cooper addresses court regarding motion Doc. 1292.

9:15am        Mr. Beck responds.

9:20am        Mr. Cooper calls witness Leonard Lujan, witness sworn.

9:21am        Mr. Beck addresses Court regarding request for mental health records.

9:26am        Mr. Cooper addresses Court regarding request for an order to NM Department of Corrections for mental health records for Leonard Lujan, Eugene Martinez and Lawrence Torres.

9:28am        Mr. Beck responds.

9:31am        Mr. Cooper requests 5 days for NM Dept of Corrections to produce records.

9:31am        Court addresses counsel regarding proposed protective order.

9:34am        Mr. Beck requests 10 days.

9:35am        Mr. Cooper request 5 days for NM Dept of Corrections to provide records to the United States and 5 days to produce to defendant.

9:35am        Mr. Solis addresses court regarding Doc. 1908, request for records, requests 5 days for records.

DNM 491

| | |
|---|---|
| 9:36am | Mr. Clark addresses court regarding protective order request that document not be placed on defendant tablets. |
| 9:37am | Court directs that no mental health records be placed on tablets. |
| 9:40am | Court signs Order regarding mental health records Doc. 1908. |
| 9:40am | Mr. Cooper conducts direct examination of witness Leonard Lujan. |
| 10:01am | Court in recess. |
| 10:19am | Court in session. |
| 10:19am | Mr. Cooper continues with direct examination of witness Leonard Lujan. |
| 11:15am | Mr. Burke conducts direct examination of witness Leonard Lujan. |
| 11:18am | Mr. Solis conducts direct examination of witness Leonard Lujan. |
| 11:27am | Mr. Beck conducts cross examination of witness Leonard Lujan. |
| 11:55am | Mr. Cooper conducts re-direct examination of witness Leonard Lujan. |
| 11:58am | Mr. Cooper moves defendant Billy Garcia's exhibit S. |
| 11:58am | Defendant's exhibit S is admitted without objection by United States. |
| 12:01pm | Court in recess. |
| 1:02pm | Court in session. |
| 1:07pm | Mr. Solis conducts re-direct examination of witness Leonard Lujan. |
| 1:10pm | Court excuses witness Leonard Lujan. |
| 1:11pm | Mr. Castle moves to admit defense exhibits A-R by agreement, relative to Motion to dismiss. (A-Report from Peterson, B. Andrew Armijo, C-transcript of interview, D-email between NMSP and Rhodes, E-Report by C. Lackey, F-Report by R. Duncan, G-Report FBI 302 TFO Rosa, H-report from STG J. Moore, I-Report from L. Tafoya, J-Report L. Jaramillo, K-report T. Archuleta, L- Repot L Tafoya, M- from Norman Rhodes, N-Edgar Rosa, P-Report by Lance Roundy, Q-FBI 302 by Sonya Chavez, R-FBI 302 by Lane Roundy, T-Stipulation of testimony from AUSA Braun). |
| 1:20pm | Court admits exhibits. |
| 1:20pm | Mr. Cooper indicates witness Benjamin Clark testimony is relevant to Doc. 1909. |
| 1:22pm | Mr. Beck objects to testimony. |
| 1:22pm | Witness Benjamin Clark present with his attorney Stephen Hosford, witness sworn. |
| 1:22pm | Mr. Cooper conducts direct examination of witness Clark. |
| 1:33pm | Mr. Beck conducts cross examination of witness Clark. |
| 1:35pm | Court addresses Mr. Beck. |
| 1:35pm | Mr. Beck responds. |
| 1:37pm | Court excuses witness Mr. Clark. |

| 1:38pm | Mr. Castle calls witness Agent Trent Pedersen, witness sworn. |
|--------|--------------------------------------------------------------|
| 1:38pm | Mr. Castle conducts direct examination of witness Pedersen. |
| 2:28pm | Mr. Beck conducts cross examination of witness Pedersen. |
| 2:32pm | Court in recess. |
| 2:46pm | Court in session. |
| 2:46pm | Mr. Beck continues with cross examination of witness Pedersen. |
| 3:11pm | Mr. Castle conducts re-direct examination of witness Pedersen. |
| 3:22pm | Mr. Beck conducts re-cross examination of witness Pedersen. |
| 3:23pm | Mr. Castle conducts re-direct examination of witness Pedersen. |
| 3:25pm | Court excuses witness Pedersen. |
| 3:46pm | Bench conducts conference with all counsel. |
| 3:47pm | Mr. Castle calls witness Dwayne Santistevan, witness sworn. |
| 3:47pm | Mr. Castle conducts direct examination of witness Santistevan. |
| 3:55pm | Mr. Beck conducts cross examination of witness Santistevan. |
| 3:57pm | Mr. Castle conducts re-direct examination of witness Santistevan. |
| 3:58pm | Mr. Grandberg conducts direct examination of witness Santistevan. |
| 3:59pm | Court excuses witness Santistevan. |
| 3:59pm | Mr. Beck calls witness James Pedraza, witness sworn. |
| 3:59pm | Mr. Beck conducts direct examination of witness Pedraza. |
| 4:07pm | Mr. Benjamin conducts direct examination of witness Pedraza. |
| 4:08pm | Mr. Castle conducts re-direct examination of witness Pedraza. |
| 4:12pm | Court excuses witness Pedraza. |
| 4:13pm | Court indicates counsel will be appointed for James Garcia, packet to be put to together |
| 4:15pm | Court in recess. |
| 4:28pm | Court in session. |
| 4:28pm | Court addresses counsel, attorney Cody Rogers to be present for James Garcia. |
| 4:28AM | Mr. Castle calls witness Lawrence Tafoya, witness sworn. |
| 4:28pm | Mr. Castle conducts direct examination of witness Tafoya. |
| 4:36pm | Mr. Solis has no questions of witness Tafoya. |
| 4:38pm | Mr. Beck conducts cross examination of witness Tafoya. |
| 4:42pm | Mr. Beck moves to admit exhibit 1 for Billy Garcia's Motion to Dismiss [Doc. 1283]. |
| 4:42pm | Court admits government exhibit 1 for Billy Garcia's Motion to Dismiss [Doc. 1283], no objection by defendants. |
| 4:42pm | Mr. Beck continues with cross examination of witness Tafoya. |

| 4:45pm | Mr. Castle conducts re-direct examination of witness Tafoya. |
|---|---|
| 4:54pm | Mr. Solis conducts direct examination of witness Tafoya. |
| 5:04pm | Court excuses witness Tafoya. |
| 5:04pm | Mr. Castle indicates Ms. Rogers needs a few minutes with James Garcia. |
| 5:06pm | Mr. Benjamin addresses court on Doc. 1319 – Bill of Particulars, has two requests after meeting and conferring with government. |
| 5:09pm | Ms. Armijo responds. |
| 5:10pm | Court addresses Ms. Armijo and Mr. Benjamin. Court will not require any amendment of the pleadings. Court denies motion Doc. 1319 |
| 5:18pm | Mr. Burke addresses court regarding bifurcation/severance. |
| 5:18pm | Mr. Castle addresses court with to proposed orders reference phone calls from facilities. |
| 5:19pm | Mr. Beck responds. |
| 5:20pm | Court will enter |
| 5:23pm | Ms. Harbour addresses court regarding statements from first trial. |
| 5:25pm | Court addresses Ms. Rogers. |
| 5:25pm | Mr. Castle calls witness James Garcia, witness present with Ms. Rogers, witness sworn. |
| 5:27pm | Mr. Castle conducts direct examination of witness Garcia. |
| 5:30pm | Mr. Beck conducts cross examination of witness Garcia. |
| 5:49pm | Court in recess. |

**DAY 5 3/16/18**

| 8:30am | Court in session. |
|---|---|
| 8:31am | Court addresses witness James Garcia, reminds witness he is under oath. |
| 8:31am | Mr. Beck moves to admit government exhibit 2. |
| 8:33am | Court admits government's exhibit 2, no objections by defendants. |
| 8:33am | Mr. Beck continues with cross examination of witness James Garcia. |
| 8:36am | Mr. Beck to supplement exhibit 2, with 2A a recording. |
| 8:36am | Mr. Burke objects. |
| 8:37am | Mr. Castle joins Mr. Burke's objections. |
| 8:38am | Mr. Beck responds. |
| 8:38am | Court admits 2A for purposes of this hearing only. |
| 8:38am | Mr. Beck continues with cross examination of witness Garcia. |
| 8:44am | Mr. Beck moves to admit government exhibit 3, plea agreement of Javier Alonzo. |
| 8:44am | Mr. Burke objects. |
| 8:44am | Court admits government exhibit 3. |

DNM 494

| 8:49am | Mr. Beck moves to government admit exhibit 4 – FBI 302. |
|---|---|
| | Mr. Burke has same objection. |
| 8:49am | Court admits government exhibit 4. |
| 8:49am | Mr. Beck continues with cross examination of witness Garcia. |
| 8:49am | Mr. Beck moves to admit government's exhibits 5 and 6.  Exhibit 5 will be Edward |
| | Troup's offender physical location Exhibit 6 is James Garcia's offender physical location. |
| 9:13am | Bench conference with all counsel. |
| 9:13am | Court admits government's exhibits 5 and 6 with no objections by defendants. |
| 9:13am | Mr. Beck continues with cross examination of witness Garcia. |
| 9:17am | Mr. Beck moves to admit government's exhibit 7 – FBI 302. |
| 9:17am | Mr. Burke objects. |
| 9:18am | Court addresses Mr. Beck, exhibits are being offered in lieu of further testimony. |
| 9:18am | Mr. Beck moves to admit government's exhibit 8 – FBI 302. |
| 9:19am | Court admits government exhibits 7 and 8 for purposes of this hearing. |
| | Mr. Beck moves to admit government's exhibit 2c (unredacted copy of transcript), |
| | sealed. |
| 9:21am | Court admits government's 2c under seal. |
| 9:22am | Mr. Beck moves to admit government's exhibit 9 under seal PSR James Garcia, |
| | unredacted. |
| 9:22am | Court admits government's 9 under seal without objection. |
| 9:22am | Mr. Castle addresses court regarding PSRs available to defense. |
| 9:23am | Mr. Beck will try to get PSRs to defendants. |
| 9:23am | Mr, Castle to prepare chart for court's review on statements. |
| | Mr. Beck clarifies exhibits 2, 2a, b and c for the court |
| 9:27am | Court excuses Fred Garcia. |
| 9:30am | Mr. Castle will proceed to call witnesses Jim Moore and Cheryl Lackey telephonically. |
| 9:32am | Mr. Grandberg addresses court wishes to take up Mr. Chavez's bad acts motion. Doc. |
| | 1531. |
| 9:35am | Mr. Grandberg addresses court. |
| 9:44am | Ms. Armijo responds. |
| 9:45am | Court addresses counsel regarding Bad Acts statements, evidence will be allowed as |
| | indicated on the record. |
| 9:56am | Court in recess. |
| 10:11am | Court in session. |

DNM 495

| | |
|---|---|
| 10:17am | Mr. Cooper proceeds with direct examination of witness Jim Moore telephonically, witness sworn. |
| 10:38am | Mr. Beck conducts cross examination of witness Jim Moore. |
| 10:48am | Mr. Cooper conducts re-direct of witness Moore. |
| 10:50am | Mr. Grandberg conducts direct examination of witness Moore. |
| 10:51am | Court excuses witness Moore. |
| 10:51am | Mr. Castle calls witness Cheryl Moore (Lackey) telephonically, witness sworn. |
| 10:53am | Mr. Beck addresses court regarding identification of statements for this witness. |
| 10:53am | Mr. Castle conducts direct examination of witness C. Moore. |
| 10:59am | Reference 1909 statements. |
| 11:02am | Mr. Castle addresses court regarding Doc. 1308 – Billy Garcia Bad Acts |
| 11:04am | Mr. Castle calls witness Frederico Munoz, represented by Luis Lopez, witness sworn. |
| 11:08am | Mr. Burke conducts direct examination of witness Munoz. |
| 11:10am | Ms. Armijo conducts cross examination of witness Munoz. |
| 11:13am | Mr. Castle conducts re-direct examination of witness Munoz. |
| 11:17am | Court excuses witness Munoz and his attorney. |
| 11:18am | Mr. Cooper calls witness Robert Martinez- related to Doc. 1909 – regarding statements. |
| 11:21am | Ms. Armijo objects, have not received any documents related to this witnesses testimony. |
| 11:22am | Mr. Cooper withdraws request to call witness Robert Martinez. |
| 11:22am | Court excuses attorney Charles McElhinney from courtroom (witness Robert Martinez not present). |
| 11:23am | Mr. Beck addresses court regarding Doc. 1909 related to exhibit 5 and 6. |
| 11:24am | Mr. Castle addresses court regarding redacting transcript of Leroy Lucero. |
| 11:27am | Mr. Burke addresses court, next witnesses NM State Police officers - Felipe Gonzalez and Norman Rhoades. |
| 11:31am | Mr. Burke calls witness Norman Rhoades, witness sworn. |
| 11:31am | Mr. Burke conducts direct examination of witness Rhoades. |
| 11:47am | Court in recess. |
| 12:05pm | Court in session. |
| 12:06pm | Mr. Castle continues with direct examination of witness Rhoades. |
| 12:08pm | Mr. Solis conducts direct examination of witness Rhoades. |
| 12:10pm | Mr. Beck conducts cross examination of witness Rhoades. |
| 12:24pm | Court excuses witness Rhoades. |

| | |
|---|---|
| 12:24pm | Mr. Burke calls witness Felipe Gonzalez, witness sworn. |
| 12:26pm | Mr. Burke conducts direct examination of witness Gonzalez. |
| 12:31pm | Mr. Burke moves to admit defendant's exhibit U. |
| 12:32pm | Court admits exhibit U into evidence without objection by defendants. |
| 12:32pm | Mr. Burke continues with direct examination of witness Gonzalez. |
| 12:32pm | Mr. Solis conducts direct examination of witness Gonzalez. |
| 12:37pm | Mr. Beck conducts re-cross examination of witness Gonzalez. |
| 12:43pm | Court excuses witness Gonzalez. |
| 12:43pm | Mr. Castle calls witness Leroy Lucero present with his attorney Greg Fallick. |
| 12:45pm | Mr. Fallick addresses court regarding redactions on transcript. |
| 12:46pm | Mr. Castle responds, has no objections. |
| 12:46pm | Mr. Beck addresses court regarding what this witness is being offered for. |
| 12:46pm | Court excuses witness Leroy Lucero from courtroom. |
| 12:47pm | Mr. Castle addresses court regarding proposed proffer. |
| 12:49pm | Mr. Castle calls witness Leroy Lucero, witness sworn. |
| 12:51pm | Mr. Fallick addresses Court regarding Leroy Lucero testimony. |
| 12:51pm | Mr. Castle responds. Request a 104 hearing after he is given immunity. |
| 12:52pm | Mr. Benjamin concurs and joins in request. |
| 12:52pm | Mr. Castle conducts direct examination of witness Leroy Lucero. |
| 12:53pm | Mr. Beck requests Mr. Fallick continue as counsel Leroy Lucero. |
| 12:53pm | Court requests Mr. Fallick continue as counsel for Leroy Lucero. |
| 12:53pm | Court excuses Leroy Lucero and his attorney. |
| 12:55pm | Mr. Castle calls witness Agent Acee, witness sworn. |
| 12:55pm | Mr. Castle conducts direct examination of witness Agent Acee. |
| 1:31pm | Court in recess. |
| 2:37pm | Court in session. |
| 2:37pm | Mr. Castle continues with direct examination of witness Agent Acee. |
| 4:02pm | Court addresses counsel. Offers portions of opinion, not finalized, can be attached to clerk's minutes as exhibits. Court indicates JERS will be utilized in this trial. |
| 4:05pm | Court in recess. |
| 4:22pm | Court in session. |
| 4:23pm | Court addresses counsel regarding un-finalized James Chart which will be court's exhibit 1 to clerk's minutes. |
| 4:25pm | Ms. Harbour-Valdez addresses court regarding counsels' request for judge's focus. |

|       | Future hearing dates and location/seating chart for trial.  Defense counsel request court focus on Motion to Bifurcate, filed today and the motion that was filed earlier this week regarding the configuration of courtroom. |
|-------|------|
| 4:26pm | Court addresses counsel regarding chart, James statements, motions to dismiss, trial location, future hearing dates. |
| 4:40pm | Ms. Harbour-Valdez addresses Court regarding new dolly of information coming from Agent Acee. |
| 4:40pm | Ms. Torraco addresses court regarding new dolly of information from Agent Acee and severance request. |
| 4:44pm | Mr. Castle addresses court regarding bifurcation and severance. |
| 4:44pm | |
| 4:45pm | Court will be entering opinion shortly on jurisdictional issues. |
| 4:46pm | Ms. Armijo addresses court and counsel regarding new dolly of information, clarifies that it is not new, it is evidence related to Burns murder. |
| 4:57pm | Mr. Beck addresses court. |
| 5:01pm | Mr. Castle continues with direct examination of witness Agent Acee. Moves to admit exhibits W, X, Y, and Z by stipulation. |
| 5:02pm | Court admits exhibits W, X, Y, and Z. |
| 5:03pm | Mr. Burke conducts direct examination of witness Agent Acee. |
| 5:08pm | Mr. Beck conducts cross examination of witness Agent Acee. Moves to admit Mr. Lujan's transcripts to 8/8/07 and 9/12/07 as gov'ts exhibits 19 and 20. |
| 5:19pm | Mr. Burke addresses court with regard to exhibit V, counsel agree it is admitted. |
| 5:16pm | Court will convene ex parte related to CJA matters with defense counsel and defendants. |
| 5:30pm | Court in recess. |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No. 15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al,

       Defendants.

---

## NOTICE OF OBJECTION TO PROPOSED COURTROOM SEATING ARRANGEMENT

---

Billy Garcia, through counsel, hereby objects to the proposed courtroom seating arrangements[1] on the following grounds:

1.    The defense understands that the current seating arrangement under consideration is to have two parallel tables. The table closest to the jury would be used to seat all the attorneys in a row without partition. The second table would be behind the first table and would be used to seat all the defendants in a row without partition. This current arrangement was arrived at solely as a result of the size of the courtroom and the number of defendants joined together for trial.

---

[1] The defense understands that the Court has not made final arrangements and has only conveyed the current concepts under consideration.

2.      Such seating arrangements have been used at notorious trials, which

some jurors will have familiarity with, including the most notorious criminal trial

of all, the Nuremburg trials:



3.      The courts have invalidated various courtroom arrangements and

procedures as violating the defendant's right to a fair trial under the Fifth and/or

Fourteenth Amendments to the United States Constitution. See *Deck v. Missouri*,

544 U.S. 622, 632-35 (2005) (invalidating the routine practice of compelling

defendants during the punishment phase of capital cases to wear visible shackles);

*Estelle v. Williams*, 425 U.S. 501, 503-505 (1976) (invalidating the trial court's

requirement that a defendant appear in prison garb); *United States v. Olvera*, 30

2

F.3d 1195, 1198 (9th Cir. 1994) (reversing a conviction because the defendant was compelled to speak the words of a bank robber in front of the jury).

4.      In *Turner v. Louisiana*, 379 U.S. 466, 472 (1965), the Court noted: "Mr. Justice Holmes stated no more than a truism when he observed that 'Any judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere.'" (quoting *Frank v. Magnum*, 237 U.S. 309, 349 (1915) (dissenting opinion)).

5.      A procedure that undermines the presumption of innocence by conveying to the jury that the defendant is guilty is to be avoided. "Courts must carefully guard against the dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Williams*, supra, 425 U.S. at 503. Courtroom procedures that create an unacceptable risk of impermissible factors coming into play are to be avoided. 425 U.S. at 505. Barred courtroom procedures include practices that create "an inherent danger that the jury may form the impression that the defendant is dangerous or untrustworthy (*Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999)) and trial practices that "isolate[] the defendant from others in the courtroom [or] inevitably associate[] him or her with the charged conduct (O*lvera*, supra, 30 F.3d at 1197).

6.      Extensive empirical research in social psychology has documented the degree to which attitudes and behavior are shaped and influenced by situational

3

conditions.[2] That is, the characteristics of the setting in which one finds oneself often determine behavior significantly more than do the personality characteristics or good intentions of the persons in that setting. For these reasons, the courtroom seating arrangement and the messages it communicates can strongly influence a juror's perception of the case.[3]

7.   Empirical research has also demonstrated that instructional safeguards against the types of biasing effects presented by the courtroom seating arrangement "are relatively ineffective and sometimes produce a 'backfire effect,' resulting in jurors being more likely to rely on inadmissible information after they have been specifically instructed to disregard it."

8.   For a number of reasons, the currently suggested seating arrangements would create a constitutionally unacceptable risk of impermissible factors coming into play in the juror's determination of Mr. Garcia's guilt.  As described below,

---

[2] E.g., see the studies reviewed in Haney, C., Making Law Modern: Toward a Contextual Model of Justice, Psychology, Public Policy, and Law, 7, in press. See also, Mischel, W., Personality and Assessment (1968); Sarbin, T., Contextualism: A World View for Modern Psychology, in J.Cole (Ed.) Nebraska Symposium on Motivation. (1976).

[3] Understanding the limits of limiting instructions: Social psychological explanations for the failures of instructions to disregard pretrial publicity and other inadmissible evidence, Psychology, Public Policy & Law, 6, 677-711; Isbell, L., Tyler, J., DeLorenzo, A., Guilty or Innocent? Women's Reliance on Inadmissible Evidence in a Simulated Rape Case, Journal of Applied Social Psychology, Vol. 37, No. 4 p. 717-739 (2007).

the two-row seating platform communicates to the jurors that Mr. Garcia is

particularly dangerous and untrustworthy, that he is just the kind of menacing gang

member who could have committed the charged violent crimes and that he and the

codefendants are in this case together and should win or lose as a team.

9.     The currently planned seating arrangement confines the defendants

and their attorneys to a restricted area. No staff would be able to sit with counsel.

In order to communicate with Mr. Garcia, counsel would need to turn his back on

the jury, and thus would need to choose between communicating with the client or

observing the demeanor of a witness.

10.     The current proposed seating arrangement would also leave the

impression of a casual observer that the defense teams are confined to this structure

because the defendants are dangerous, cannot be trusted to sit in a normal chair and

must be constantly monitored.

11.     Jurors arrive at court with expectation as to how the courtroom will

look based upon what they have seen on television in the innumerable courtroom

dramas, on news programs, and movies and/or what they may have read, or based

upon earlier courtroom experience as jurors, litigants or witnesses. The courtroom

has an expected appearance. The starkly atypical current arrangement of the

courtroom is likely to convey to the jury that there is something atypical—even

extraordinary about this case and perhaps these defendants. They will immediately

perceive the radical ways in which the configuration of the courtroom has been modified in this case, to render it unlike any other that they will have seen. It is likely that at least some of them may make the inference that there is something especially problematic and perhaps particularly threatening about these defendants that warrants such drastic modifications in the standard and expected courtroom configuration. These likely inferences are detrimental to the defendants' fair trial interests.

12.     The currently planned seating arrangement visibly groups the defense teams together in one unitary table. Mr. Garcia has repeatedly moved for severance on the grounds that he will be denied his rights to an individualized determination of guilt if he is tried with the codefendants. If the defense teams are required to sit in a single row or even two rows for the duration of trial, the arrangement would visibly convey to the jurors, for every minute court is in session, that the defendants are one unit.

13.     "[I]f you throw a skunk into the jury box, you can't instruct the jury not to smell it." *Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962). Actions speak louder than words. In light of the empirical studies cited herein, it is doubtful that limiting instructions designed to fix the prejudicial impact of the raised seating platform would be heeded by a jury seeing the defendants sitting in a literal lineup, for the six (6) to eight (8) weeks estimated for the trial.

6

14.     The Sixth Amendment to the United States Constitution provides that

"[i]n all criminal prosecutions, the accused shall enjoy the right...to have the

Assistance of Counsel for his defense." The right to counsel encompasses a

guarantee to the right to the effective assistance of counsel. *Strickland v.*

*Washington*, 466 U.S. 668 (1984).

15.     As part of the right to effective assistance of counsel, the Sixth

Amendment guarantees a defendant the right to confer with counsel in the

courtroom about the broad array of unfolding matters, often requiring immediate

responses, that are relevant to the defendant's stake in his defense and the outcome

of his trial. *Geders v. United States*, 425 U.S. 80, 88 (1976); *United States v.*

*Miguel*, 111 F.3d 666, 672 (9th Cir. 1997). Except when the defendant is testifying

or during brief recesses in that testimony, the defendant enjoys an absolute "right

to unrestricted access to his lawyer for advice on a variety of trial-related matters."

*Perry v. Leeke*, 488 U.S. 272, 284 (1989). The defendant's ability to communicate

with counsel in court remains "one of the defendant's primary advantages of being

present at the trial." *Illinois v. Allen*, 397 U.S. 337 (1970). Actual or constructive

denial of the effective assistance of counsel throughout the court proceedings is

reversible error without any requirement that the defendant show prejudice. *Perry*,

supra, 488 U.S. at 280.

DNM 505

16.    It is a well-settled principle of law that conversations between a defendant and his counsel are protected by the attorney-client privilege and receive complete protection from disclosure. While privilege is a creation of common law, not the constitution, the Sixth Amendment may be violated where the breach of the attorney client privilege results in ineffective assistance of counsel. *Smith v. Moore*, 137 F.3d 808, 819-820 (4th Cir. 1998). The attorney-client privilege does not shield from disclosure statements made by a client to his or her attorney in the presence of third parties who are not agents of the client or the attorney. See 8 Wigmore Evidence, § 2311 ("One of the circumstances by which it is commonly apparent that the communication is not confidential is the presence of a third person who is not the agent of either the client or the attorney."); *In re Walsh*, 623 F.2d 489, 495 (7th Cir. 1980) (attorney required to testify about conversations with client in the presence of third parties), cert. denied, 449 U.S. 994.

17.    Defendants Joe Gallegos, Edward Troup, Allen Patterson, Andrew Gallegos, Arturo Arnulfo Garcia and Shauna Gutierrez join in this motion. Christopher Chavez has taken no position. The government objects to the motion.

Wherefore, for the above cited reasons, Mr. Garcia objects to the proposed seating arrangement, seeks a separate table for he and his counsel to sit at and that the defense staff be given the same access to counsel as will be afforded the prosecution at trial.

Respectfully submitted this 13th day of March, 2018.


/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)


## CERTIFICATE OF SERVICE

I hereby certify that on March 13th, 2018, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.


/s/ James A. Castle
James A. Castle

DNM 508

Appellate Case: 20-2058    Document: 010110415671    Date Filed: 09/29/2020    Page: 84

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al,

Defendants.

## ORDER

The COURT, being fully advised, hereby orders as follows:

That Penitentiary of New Mexico North shall produce to counsel Robert Cooper at 1011 Lomas Blvd NW, Albuquerque, NM 87102 on or before March 21, 2018, all phone calls of Leonard Lujan (#36895), who was an inmate at your facility between 1/1/2015 to the present.

So ordered this ___15th___ day of March, 2018.

_____
Honorable James O. Browning
U.S. District Court Judge

DNM 509

Appellate Case: 20-2058      Document: 01011041571      Date Filed: 09/29/2020      Page: 85

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al,

Defendants.

## ORDER

The COURT, being fully advised, hereby orders as follows:

That the Central Office of the New Mexico Department of Corrections shall produce to counsel Robert Cooper at 1011 Lomas Blvd NW, Albuquerque, NM 87102 on or before March 21, 2018, **all phone calls** of Leonard Lujan (#36895), Robert Lovato (#49921), Frederico Munoz (#46224), Gerald Archuleta (#35359), Robert Martinez (#31925), Benjamin Clark (#48387), who were inmates at NMDC facilities between 1/1/2015 to the present.

So ordered this ___15th___ day of March, 2018.

Honorable James O. Browning
U.S. District Court Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO.   15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' NOTICE REGARDING *JAMES* STATEMENTS FROM TRIAL 1

The United States of America hereby gives notice that the United States may use the co-conspirator statements referenced in the attachment during Trial #2 in this case.

Respectfully submitted,

JAMES D. TIERNEY
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515

*Electronically filed on 3/15/18*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church St.
Las Cruces, NM  88001
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

_____/s/_____
MARIA Y. ARMIJO
Assistant United States Attorney

Case 2:15-cr-04268-JB   Document 1944-1   Filed 03/15/18   Page 1 of 7
Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 87
Case 2:15-cr-04268-JB   Document 1882   Filed 03/07/18   Page 117 of 130

another defendant." Nelson v. O'Neil, 402 U.S. at 634 (Brennan, J., dissenting). Nelson v. O'Neil instead permits states, in crafting evidentiary rules, to depart from the federal "rule that juries are presumed to follow their instructions" and Bruton v. United States' exception to that rule. Richardson v. Marsh, 481 U.S. at 211. See Nelson v. O'Neil, 391 U.S. at 211. Consequently, "due process of law," U.S. Const. amend. XIV § 1, does not incorporate that federal rule.

## VI.  THE COURT MAKES THE FOLLOWING DETERMINATIONS REGARDING STATEMENTS THAT THE DEFENDANTS HAVE NOT SPECIFICALLY IDENTIFIED AS OBJECTIONABLE.

The Court applies its evidentiary analysis to particular statements that the United States presented during the Court's James hearing. In the following table, the Court designates statements by both declarant and transcript citation. That table also contains the Court's conclusions.

| Declarant(s) | Citation | The Court's Conclusions |
|---|---|---|
| Baca | Nov. 27 Tr. at 147:8-16 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| Calbert and Baca | Nov. 27 Tr. at 149:17-21 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| Baca | Nov. 27 Tr. at 149:17-21 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| M. Rodriguez and T. Martinez | Nov. 27 Tr. at 150:11-20 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| T. Martinez | Nov. 27 Tr. at 150:11-20 | Nontestimonial; rule 801(d)(2)(E) applies as against Counts 6-7 Defendants |
| Herrera | Nov. 27 Tr. at 151:1-13 | Nontestimonial; rule 801(d)(2)(A) applies as against Herrera; the Court will give a limiting instruction as to Sanchez, Baca, and Perez |
| M. Rodriguez | Nov. 27 Tr. at 152:8-24 | Nontestimonial |
| Sanchez | Nov. 27 Tr. at 153:6-10 | Nontestimonial; rule 801(d)(2)(A) applies as against Sanchez; rule 803(3) applies generally |
| Gomez | Nov. 27 Tr. at 153:19-154:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 8 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |

**ATTACHMENT**

DNM 511

| Baca | Nov. 27 Tr. at 153:19-154:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 8 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| M. Rodriguez | Nov. 27 Tr. at 155:19-159:2 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 27 Tr. at 159:10-160:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 27 Tr. at 160:6-161:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 27 Tr. at 160:6-161:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 27 Tr. at 161:5-162:13 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 27 Tr. at 162:14-163:25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 27 Tr. at 164:4-14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Baca | Nov. 27 Tr. at 164:23-165:16 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Gomez | Nov. 27 Tr. at 164:23-165:16 | Nontestimonial |
| Baca | Nov. 27 Tr. at 167:5-18 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| C. Garcia | Nov. 27 Tr. at 167:19-169:6 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 27 Tr. at 167:19-169:6 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Sanchez | Nov. 28 Tr. at 40:23-41:8 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| R. Martinez | Nov. 28 Tr. at 41:14-20 | Nontestimonial |
| Sanchez | Nov. 28 Tr. at 42:1-14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Herrera | Nov. 28 Tr. at 42:15-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 28 Tr. at 42:22-43:14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Perez | Nov. 28 Tr. at 43:9-14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |

**ATTACHMENT**

Case 2:15-cr-04268-JB   Document 1944-1   Filed 03/15/18   Page 3 of 7
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 89
Case 2:15-cr-04268-JB   Document 1882   Filed 03/07/18   Page 119 of 130

| T. Martinez | Nov. 28 Tr. at 43:15-44:15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 43:15-44:15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 45:5-8 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Montoya | Nov. 28 Tr. at 45:12-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Sanchez | Nov. 28 Tr. at 45:15-20 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 45:22-46:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Montoya | Nov. 28 Tr. at 46:5-6 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| M. Rodriguez | Nov. 28 Tr. at 46:6-9 | Nontestimonial |
| Molina | Nov. 28 Tr. at 46:6-9 | Nontestimonial; rule 804(b)(2) applies |
| M. Rodriguez | Nov. 28 Tr. at 46:10-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| Herrera | Nov. 28 Tr. at 46:10-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 6-7 Defendants |
| R.P. Martinez | Nov. 29 Tr. at 229:16-230:4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R.P. Martinez | Nov. Tr. at 230:6-19 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R.P. Martinez | Nov. 29 Tr. at 230:22-232:14 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R. Martinez | Nov. 29 Tr. at 232:15-233:7 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R. Martinez | Nov. 29 Tr. at 233:7-24 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 233:25-234:19 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 234:19-25 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the court will give a limiting instruction as to Sanchez, Herrera, and Perez |

**ATTACHMENT**

DNM 513

Case 2:15-cr-04268-JB   Document 1944-1   Filed 03/15/18   Page 4 of 7
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 90
Case 2:15-cr-04268-JB   Document 1882   Filed 03/07/18   Page 120 of 130

| Baca | Nov. 29 Tr. at 236:21-237:5 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
|---|---|---|
| Baca | Nov. 29 Tr. at 237:15-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| R. Martinez | Nov. 29 Tr. at 237:15-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 238:3-11 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Montoya | Nov. 29 Tr. at 238:3-11 | Nontestimonial |
| Baca | Nov. 29 Tr. at 238:25-239:3 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 239:3-8 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 239:18-240:3 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 240:10-15 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 240:15-21 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 241:3-4 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 241:19-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 242:11-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to the other Defendants |
| Baca | Nov. 29 Tr. at 243:3-18 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr.at 243:24-244:7 | Nontestimonial; rule 801(d)(2)(E) applies as to Count 9 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |

**ATTACHMENT**

DNM 514

Case 2:15-cr-04268-JB   Document 1944-1   Filed 03/15/18   Page 5 of 7
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 91
Case 2:15-cr-04268-JB   Document 1882   Filed 03/07/18   Page 121 of 130

| Baca | Nov. 29 Tr. at 244:10-11 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 244:25-245:5 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 245:12-17 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 245:24-246:9 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 247:15-25 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 248:3-7 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 248:16-19 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 249:5-12 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 250:3-5 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 250:11-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| C. Garcia | Nov. 29 Tr. at 250:11-21 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 250:25-251:3 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| C. Garcia | Nov. 29 Tr. at 250:25- | Nontestimonial; rule 801(d)(2)(E) applies as to |

**ATTACHMENT**

DNM 515

Case 2:15-cr-04268-JB   Document 1944-1   Filed 03/15/18   Page 6 of 7
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 92
Case 2:15-cr-04268-JB   Document 1882   Filed 03/07/18   Page 122 of 130

|  | 251:3 | Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
|---|---|---|
| Baca | Nov. 29 Tr. at 251:8-17 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 252:14-21 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 256:17-25 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 257:7-11 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 257:13-14 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 257:15-16 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 257:17-18 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 257:19-21 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Duran | Nov. 29 Tr. at 257:20-21 | Nontestimonial |
| M. Rodriguez | Nov. 29 Tr. at 257:20-21 | Nontestimonial; rule 803(3) applies |
| Baca | Nov. 29 Tr. at 257:21-22 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Baca | Nov. 29 Tr. at 257:25 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| M Rodriguez | Nov. 29 Tr. at 257:25 | Nontestimonial |
| Baca | Nov. 29 Tr. at 258:12-20 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| Baca | Nov. 29 Tr. at 259:1-4 | Nontestimonial; rule 801(d)(2)(A) applies as to Baca; rule 803(3) applies generally |
| C. Garcia | Nov. 29 Tr. at 261:7-13; James Hearing Exhibit 26[22] | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and |

---

[22]The United States indicated at the November 29, 2017 hearing that it would highlight, via Acee's testimony, portions of James Hearing Exhibit 26, "a transcript from a body wire that

- 122 -

**ATTACHMENT**

DNM 516

Case 2:15-cr-04268-JB   Document 1944-1   Filed 03/15/18   Page 7 of 7
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 93
Case 2:15-cr-04268-JB   Document 1882   Filed 03/07/18   Page 123 of 130

| | | Perez |
|---|---|---|
| Parker | Nov. 29 Tr. at 262:1-4 | Nontestimonial; rule 801(d)(2)(E) applies as to Counts 9-10 Defendants; the Court will give a limiting instruction as to Sanchez, Herrera, and Perez |
| Montoya | Nov 29 Tr. at 262:8-263:4 | Testimonial[23] |

**IT IS ORDERED** that: (i) Defendant Santos Gonzales' Motion for Production of Alleged Co-Conspirator Statements, Pre-Trial Hearing on Their Admissibility Pursuant to Fed.R.Evid. 801(d)(2)(E), filed May 9, 2017 (Doc. 1141), is granted; (ii) Defendant Rudy Perez's Motion for Production of Alleged Co-Conspirator Statements and for Pre-Trial Hearing on Their Admissibility, filed August 21, 2017 (Doc. 1228), is granted; (iii) the Opposed Motion for Specification of Co-Conspirator Statements and a Pre-Trial Hearing on the Statements' Admissibility, filed October 6, 2017 (Doc. 1303), is granted in part and denied in part; (iv) Motion to Prevent the Admission of Statements of Non-Testifying Codefendants Implicating Defendant Billy Garcia and for an Order for the Government to Specify Such Statements Prior to Trial, filed October 10, 2017 (Doc. 1307), is granted in part and denied in part; (v) Motion for James Hearing and Determination of Co-Conspirator Statements Admissibility at a Pre-Trial Hearing, filed October 13, 2017)(Doc. 1317), is granted; (vi) Defendant Shauna Gutierrez' Opposed Motion for a James Hearing, filed October 13, 2017 (Doc. 1321), is granted; (vii) Motion in Limine to Exclude Statement of Cooperating Government Witnesses, filed

---

Mario wore when he went to Chris Garcia's house to pick up the firearm," Nov. 29 Tr. at 260:9-11 (Acee), but it added, "I'm actually moving in the entire conversation as part of the co-conspirator statements," Nov. 29 Tr. at 260:13-15 (Castellano).

[23]When Montoya made this statement, he was acting as confidential human source, and he was wearing a wire. See Nov. 29 Tr. at 260:2-11 (Acee). Accordingly, his statement was not made in furtherance of the conspiracy -- because Montoya, as a confidential human source -- was actively working to thwart the conspiracy. That Montoya was wearing a wire indicates that Montoya would reasonably expect his recorded statements to be introduced as evidence at a trial, so those statements are testimonial.

**ATTACHMENT**

DNM 517

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                    No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL Sanchez, a.k.a.
"Dan Dan," GERALD ARCHULETA, a.k.a.
"Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Joe Gallegos' Response to the

United State's [sic] Notice of Proposed James Statements (Doc. 1903), filed March 12, 2018

(Doc. 1918)("Response").  Defendant Joe Gallegos argues, both in the Response and orally, that

the United States has no evidence that the murder of Adrian Burns and the associated conspiracy,

as alleged in Counts 4 and 5 of the Second Superseding Indictment at 11-12, filed March 9, 2017

(Doc. 947)("Indictment"), had anything to do with the Syndicato de Nuevo Mexico ("SNM").[1]

Response at 2-3.  It follows, according to J. Gallegos, that the Court lacks "a jurisdictional basis

for the prosecution of Counts 4 and 5."  Response at 2.  See also Gallegos Defendant's Motion to

Dismiss (Preindictment Delay) at 7, filed October 13, 2017 (Doc. 1318)("The United States

Government has not pled and does not have sufficient facts to construct the nexus between a run-

---

[1]SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  Indictment at 3.  During the riot, thirty-three inmates were killed, and over 200 were injured.  See Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3.  SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members."  Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Indictment at 4.  If another gang does not abide by SNM's demands, SNM will assault or kill one of the other gang's members to show its power.  See Indictment at 4.  SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment at 4.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See Indictment at 8. SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the Federal Bureau of Investigation's present investigation.  See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133).

- 2 -

of-the-mill state homicide and the enterprise to confer jurisdiction upon this Court.").

The Court discerns three problems with J. Gallegos' argument.  First, the Court's jurisdiction over Counts 4 and 5 does not depend on whether Burns' murder or the conspiracy to commit that murder was SNM related.  The Court has "original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."  18 U.S.C. § 3231. Counts 4 and 5 allege offenses against the United States, specifically 18 U.S.C. § 1959 ("VICAR") violations.  Consequently, the Court has jurisdiction over Counts 4 and 5.  See United States v. Perea, 413 F.2d 65, 67 (10th Cir. 1969)("The indictment charged offenses against the United States in language similar to that of the statutes.  Subject matter jurisdiction was vested in the district court upon the filing of the indictment.").

J. Gallegos is correct, however, that the United States can prove the VICAR offenses that Counts 4 and 5 allege only if they introduce evidence indicating that Burns' murder and the conspiracy to commit that murder were either: (i) "consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from" the SNM; or (ii) committed "for the purpose of gaining entrance to or maintaining or increasing position in" the SNM.  18 U.S.C. § 1959.[2]  If the United States fails to introduce such evidence at trial, then

---

[2]The Court's statement -- that the United States must prove that J. Gallegos had an SNM-related purpose for killing Burns -- would not be true if the United States were proceeding against J. Gallegos on an aiding and abetting theory of liability.  To violate VICAR as an aider or abettor, a person must be aware of -- but need not share -- a principal's racketeering-based purpose.  See United States Frampton, 382 F.3d 213, 223 (2d Cir. 2004)

> Applied to the facts of the present case, [a VICAR prosecution,] the burden was on the Government to prove that at the time Johnson[, an alleged aider or abettor,] assaulted Henry, he knew that Frampton[, an alleged principal,] was seeking to increase his position in the 41 Ingalls enterprise and acted toward that end.

United States Frampton, 382 F.3d at 223.  See id. ("The intent necessary to support a conviction for aiding and abetting goes beyond the mere knowledge that the defendant's action would tend to advance some nefarious purpose of the principal.  Rather, the defendant must act with the

DNM 520

"a judgment of acquittal" would be appropriate, because "the evidence [would be] insufficient to

sustain a conviction" on Counts 4 and 5, because there would be no evidence regarding an

element of the charged offenses.  Fed. R. Crim. P. 29(a).  Consequently, J. Gallegos' arguments

about the connection, or the lack thereof, between the SNM, and Burns' murder and the

conspiracy to commit that murder, go to the sufficiency of the United States' evidence and not

_____

specific intent of facilitating or advancing the principal's commission of the underlying crime.").
The United States Court of Appeal for the Tenth Circuit has said:

> To be guilty of aiding and abetting the commission of a crime, the defendant must
> willfully associate himself with the criminal venture and seek to make the venture
> succeed through some action of his own.  Participation in the criminal venture
> may be established by circumstantial evidence and the level of participation may
> be of "relatively slight moment."

United States v. Andersen, 189 F.3d 1201, 1207 (10th Cir. 1999)(quoting United States v. Leos-
Quejada, 107 F.3d 786, 794 (10th Cir. 1997)).
      Someone can aid or abet a VICAR offense even if that person is aware of but indifferent
to the offense's connection to an enterprise that engages in racketeering activity.  For example,
someone planning to join a racketeering enterprise, i.e., a gang, by committing a drive-by murder
might tell their brother about that plan.  Even if the brother does not think the aspiring gangster
should join the gang, he might still provide assistance, e.g., by stealing a car, out of a desire to
prevent law enforcement from identifying -- and imprisoning -- the aspiring gangster.  The
brother would be liable, as an aider or abettor, for the aspiring gangster's VICAR offense even
though he did not want to join the gang and did not want the aspiring gangster to join the gang
either.  If the brother provided the same assistance without knowing the murder's purpose,
however, then he would not be liable for the aspiring gangster's VICAR offense, because, while
the brother knew that the aspiring gangster planned to commit murder, the friend did not know
that the aspiring gangster planned to commit a VICAR murder.
      The Court does not anticipate that the United States will proceed against J. Gallegos on
an aiding and abetting theory, in which case the Court's discussion of VICAR aiding and
abetting is academic, as applied to J. Gallegos' Response.  While the Indictment's Count 5 cites
18 U.S.C. § 2, the federal aiding and abetting statute, and N.M. Stat. Ann. § 30-1-13, the New
Mexico aiding and abetting statute, those statutory citations perhaps apply to J. Gallegos'
brother, Defendant Andrew Gallegos, who is also charged in Count 5.  See Indictment at 12.  In
any event, the Indictment's citations to aiding and abetting statutes are superfluous, because "'a
defendant can be convicted as an aider and abettor even though he was indicted as a principal for
commission of the underlying offense and not as an aider and abettor.'"  United States v. Cooper,
375 F.3d 1041, 1049 (10th Cir. 2004)(quoting United States v. Langston, 970 F.2d 692, 706
(10th Cir. 1992)).  See United States v. Alexander, 447 F.3d 1290, 1299 (10th Cir. 2006)("In
short, a charge of the predicate crime puts defendant on notice that the jury may be instructed on
aiding and abetting, thus satisfying any due process concerns.").

the Court's jurisdiction.

The second problem with J. Gallegos' argument is that, unless the United States consents, the Court must take the Indictment's allegations as true when considering a pretrial motion, and it is not free to evaluate the sufficiency of the evidence.  See United States v. Hall, 20 F.3d 1084, 1087 (10th Cir. 1994)("Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion."); id. ("An indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true."); id. at 1088 (permitting district courts "to dismiss charges at the pretrial stage under the limited circumstances where the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case").  See also Memorandum Opinion and Order at 12, 2018 WL 1175086, at *5, filed December 7, 2017 (Doc. 1553)("MOO")("The Federal Rules of Criminal Procedure contain no analogue to summary judgment under rule 56 of the Federal Rules of Civil Procedure, so the United States does not need to provide pretrial evidentiary support for the Indictment either to the Court or to Gutierrez.").  "The absence of summary judgment in federal criminal cases makes sense, because procedural mechanisms other than summary judgment test the sufficiency of the United States' evidence.  That a properly constituted grand jury returned an indictment 'conclusively determines the existence of probable cause to believe' the defendant perpetrated the offense alleged."  MOO at 12, 2017 WL 62680069, at *5 (quoting Kaley v. United States, 134 S. Ct. 1090, 1097 (2014)(Kagan, J.)).  Accordingly, without the United States' consent, the Court cannot now rule on whether the United States' evidence makes out a VICAR violation.

The final problem with J. Gallegos' argument is that the United States' evidence, as the

United States described it orally, would permit a reasonable jury to conclude that Adrian Burns'

murder and the conspiracy to commit that murder were done "for the purpose of . . .

maintaining" J. Gallegos' position in the SNM.  See 18 U.S.C. § 1959(a).  According to the

United States, its trial evidence will show that SNM rules require its members to retaliate

violently when disrespected and that J. Gallegos killed Burns because of a drug dispute between

the two.  A reasonable jury could infer, from such evidence, that one reason J. Gallegos killed

Burns was because failing to retaliate against Burns, as the SNM rules require, would undermine

J. Gallegos' position in the SNM, which satisfies VICAR.  See United States v. Smith, 413 F.3d

1253, 1278 (10th Cir. 2005)(stating that VICAR's "'motive requirement is satisfied if the jury

could properly infer that the defendant committed his violent crime because he knew it was

expected of him by reason of his membership in the enterprise'" (quoting United States v.

Dhinsa, 243 F.3d 635, 671 (2d Cir. 2001))).  Accordingly, the Court denies the Response to the

extent that it moves the Court to dismiss Counts 4 and 5 for want of jurisdiction or for

insufficient evidence.

**IT IS ORDERED** that the requests in Defendant Joe Gallegos' Response to the United

State's Notice of Proposed James Statements (Doc. 1903), filed March 12, 2018 (Doc. 1918)

regarding the Court's jurisdiction or the sufficiency of the United States' evidence, are denied.

_____
UNITED STATES DISTRICT JUDGE

DNM 523

*Counsel:*

John C. Anderson
  United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

       *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

       *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

       *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

       *Attorney for Defendant Leonard Lujan*

DNM 524

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorneys for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

     *Attorneys for Defendant Christopher Chavez*

DNM 525

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

     *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

     *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

DNM 526

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

    *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

> *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

> *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

> *Attorneys for Defendant Andrew Gallegos*

- 12 -

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

*Attorneys for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*

DNM 530

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                 No.  CR 15-4268 JB

ANGEL DELEON, et al,

     Defendants.

## ORDER

The COURT being fully advised hereby orders as follows:

The New Mexico Department of Public Safety shall produce to Maria Armijo of the United

States Attorney's Office the following materials by March 24, 2018:

All laboratory records associated with the screening, analysis and interpretation of all biological evidence in laboratory case numbers 01-505 & 01-506 (agency case number 01-23-5-0019 & 01-23-5-0020). This will include all paperwork/notes/reports/electronic data files and other files pertaining to

     Bench notes

     Evidence examination records

     Serological testing records

     DNA extraction and quantization records

     Sample dilution/concentration records

     PCR set-up records

     Profile allele calling and interpretation records

     Technical reviews

The original electronic data files for all DNA analyses of known /questioned samples, extraction controls, reagent blanks and allelic ladders generated in the case.

Copies of the laboratory's Standard Operating Procedures for evidence handling/examination, serology and DNA analyses that were used at the time of testing in 2001. This will include but not be limited to all SOPs pertaining to the DNA profiling tests used, the protocols used for data interpretation, the protocol for the statistical analysis of potential matches all memos, guidelines, protocols, and instructions regarding mixture analysis and interpretation, as well as appropriate use of reporting language and instructions concerning statistical approaches to assessing the weight of any potential matches

Copies of the laboratory's Validation Studies for the technologies/methods used to analyze evidentiary and reference items in the case in 2001. This would include validation studies for all thresholds and statistical tools used for analysis of the DNA profiles.

Corrective Action Reports and Contamination Incident Reports

Accreditation Documentation

So ordered this 20th day of March, 2018.

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| **ANGEL DELEON, et al**, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>PROPOSED JURY INSTRUCTIONS</u>

The United States respectfully requests the Court to include the following instructions in

its charge to the jury during the second trial ("Trial 2") in this case, and requests permission to

submit such additional instructions as may become appropriate during trial. Unless otherwise

noted, references are to the 10th Circuit Pattern Jury Instructions (2011 Edition, Updated January

2017).

Respectfully submitted,

FRED FEDERICI
United States Attorney, Acting
Under Authority Conferred by 28
U.S.C. § 515

***<u>Electronically filed 3/23/18</u>***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, New Mexico 88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court using
the CM/ECF system, and sent notification to
opposing counsel of record on this date.

_____*/s/*_____
RANDY M. CASTELLANO
Assistant United States Attorney

**UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___1___**

In any jury trial there are, in effect, two judges. I am one of the judges, you are the other. I am the judge of the law. You, as jurors, are the judges of the facts. I presided over the trial and decided what evidence was proper for your consideration. It is also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict.

In explaining the rules of law that you must follow, first, I will give you some general instructions which apply in every criminal case—for example, instructions about burden of proof and insights that may help you to judge the believability of witnesses. Then I will give you some specific rules of law that apply to this particular case and, finally, I will explain the procedures you should follow in your deliberations, and the possible verdicts you may return. These instructions will be given to you for use in the jury room, so you need not take notes.

Tenth Circuit Pattern Jury Instructions Criminal 1.03 (2011) (**Introduction to Final Instructions**)

DNM 534

### UNITED STATES' PROPOSED JURY INSTRUCTION NO.  __2___

You, as jurors, are the judges of the facts. But in determining what actually happened—that is, in reaching your decision as to the facts—it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences. However, you should not read into these instructions or anything else I may have said or done, any suggestion as to what your verdict should be. That is entirely up to you.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took.

Tenth Circuit Pattern Jury Instructions Criminal 1.04 (2011) (**Duty to Follow Instructions**)

DNM 535

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   3   **

The government has the burden of proving defendants Joe Lawrence Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Arnulfo Garcia, Andrew Gallegos, and Shauna Gutierrez guilty beyond a reasonable doubt. The law does not require a defendant to prove his or her innocence or produce any evidence at all. The government has the burden of proving a defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find that defendant not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt. A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

Tenth Circuit Pattern Jury Instructions Criminal 1.05 (2011) (**Presumption of Innocence – Burden of Proof-Reasonable Doubt**)

DNM 536

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.    4    **

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and the facts that I have judicially noticed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And my comments and questions are not evidence.

During the trial, I did not let you hear the answers to some of the questions that the lawyers asked. I also ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all of these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Tenth Circuit Pattern Jury Instructions Criminal 1.06 (2011) (**Evidence- Defined**)

5

DNM 537

## UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___5___

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case.  One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence, that is, the proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence.  The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in the light of common experience. An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.

By permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 6

DNM 538

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.    6   **

I remind you that it is your job to decide whether the government has proved the guilt of each defendant beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses [including the defendant] who testified in this case. You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was. In making that decision, I suggest that you ask yourself a few questions: Did the witness impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome in this case? Did the witness have any relationship with either the government or the defense? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he/she testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail. And you should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

[The testimony of the defendant should be weighed and his credibility evaluated in the same way as that of any other witness.]

[The defendant did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt. I want you to clearly understand, please, that the Constitution of

the United States grants to a defendant the right to remain silent. That means the right not to

testify or call any witnesses. That is a constitutional right in this country, it is very carefully

guarded, and you should understand that no presumption of guilt may be raised and no inference

of any kind may be drawn from the fact that a defendant does not take the witness stand and

testify or call any witnesses.]

In reaching a conclusion on particular point, or ultimately in reaching a verdict in this

case, do not make any decisions simply because there were more witnesses on one side than on

the other.


Tenth Circuit Pattern Jury Instructions Criminal 1.08 (2011) (**Credibility of Witnesses**)

8

DNM 540

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   7   **

You have heard the testimony of [name of witness]. You have also heard that, before this

trial, he made a statement that may be different from his testimony here in court.

This earlier statement was brought to your attention only to help you decide how

believable his testimony in this trial was. You cannot use it as proof of anything else. You can

only use it as one way of evaluating his testimony here in court.

Tenth Circuit Pattern Jury Instructions Criminal 1.10 (2011) (**Impeachment by Prior
Inconsistencies**)

## UNITED STATES' PROPOSED JURY INSTRUCTION NO.   __8__

You have heard evidence that the defendant has been convicted of a felony, that is, a crime punishable by imprisonment for a term of years. This conviction has been brought to your attention only because you may wish to consider it when you decide, as with any witness, how much of his testimony you will believe in this trial. **The fact that the defendant has been convicted of another crime does not mean that he committed the crime charged in this case, and you must not use his prior conviction as proof of the crime charged in this case**. You may find him guilty of the crime charged here only if the government has proved beyond a reasonable doubt that he committed it.

Tenth Circuit Pattern Jury Instructions Criminal 1.11 (2011) (**Impeachment by Prior Conviction**)

10

DNM 542

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   9**

The testimony of a witness may be discredited or impeached by showing that the witness previously has been convicted of a felony, that is, of a crime punishable by imprisonment for a term of years or of a crime of dishonesty or false statement.  A prior conviction does not mean that a witness is not qualified to testify, but is merely one circumstance that you may consider in determining the credibility of the witness.  You may decide how much weight to give any prior felony conviction or crime of dishonesty that was used to impeach a witness.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 10

11

## UNITED STATES' PROPOSED JURY INSTRUCTION NO.   <u>10</u>

You have heard testimony that after the crime was supposed to have been committed, (name of defendant) (describe the conduct proven; e.g., shaved his beard and cut his hair, went to Los Angeles).

If you believe that (name of defendant) (describe the conduct proven), then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that (he)(she) committed the crime charged. This conduct may indicate that (he)(she) thought (he)(she) was guilty of the crime charged and was trying to avoid punishment. On the other hand, sometimes an innocent person may (describe the conduct proven) for some other reason. Whether or not this evidence causes you to find that the defendant was conscious of (his)(her) guilt of the crime charged, and whether that indicates that (he)(she) committed the crime charged, is entirely up to you as the sole judges of the facts.

Third Circuit Pattern Jury Instructions Criminal 4.3 (2017) (**Consciousness of Guilt -Flight, Concealment, Use of an Alias, etc.**)

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   11**

Accomplice

An accomplice is someone who joined with another person in committing a crime voluntarily and with common intent.  The testimony of an accomplice may be received in evidence and considered by you, even though it is not supported by other evidence.  You may decide how much weight it should have.

You are to keep in mind, however, that accomplice testimony should be received with caution and considered with great care.  You should not convict any defendant based on the unsupported testimony of an alleged accomplice, unless you believe the unsupported testimony beyond a reasonable doubt.

Informant

An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence. You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness. You must determine whether the informant's testimony has been affected by self-interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against the defendant.

You should not convict a defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

Immunity

A person may testify under a grant of immunity (an agreement with the government). His testimony alone, if believed by the jury, may be of sufficient weight to sustain a verdict of

DNM 545

guilt even though it is not corroborated or supported by other evidence. You should consider

testimony given under a grant of immunity with greater care and caution than the testimony of an

ordinary witness.  You should consider whether testimony under a grant of immunity has been

affected by the witness's self-interest, the government's agreement, the witness's interest in the

outcome of the case, or by prejudice against any defendant.

On the other hand, you should also consider that an immunized witness can be prosecuted

for perjury for making a false statement.  After considering these things, you may give testimony

given under a grant of immunity such weight as you find it deserves.

You should not convict any defendant based on the unsupported testimony of an

immunized witness, unless you believe the unsupported testimony beyond a reasonable doubt.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 12

**UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___12___**

The government has entered into a plea agreement with [Robert Martinez, etc…..],

providing for the possibility of a recommendation of a lesser sentence than he would otherwise

likely receive. Plea bargaining is lawful and proper, and the rules of this Court expressly provide

for it.

A person who has entered into a plea agreement with the government is not prohibited

from testifying. On the contrary, such testimony may, by itself, support a guilty verdict. You

should receive this type of testimony with caution and weigh it with great care. You should never

convict a defendant upon the unsupported testimony of such a witness, unless you believe that

testimony beyond a reasonable doubt. The fact that the person has entered into a guilty plea to

the offense charged is not evidence of the guilt of any other person.


Tenth Circuit Pattern Jury Instructions Criminal 1.15 (2011) (**Accomplice-Co-Defendant – Plea
Agreement**), modified

15

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.  __13__**

The testimony of a drug abuser must be examined and weighed by the jury with greater

caution than the testimony of a witness who does not abuse drugs.

[Name of witness] may be considered to be an abuser of drugs.

You must determine whether the testimony of that witness has been affected by the use of

drugs or the need for drugs.

Tenth Circuit Pattern Jury Instructions Criminal 1.16 (2011) (**Witness's Use of Addictive Drugs**)

16

**UNITED STATES' PROPOSED JURY INSTRUCTION NO. __14__**

[During the trial you heard the testimony of who expressed opinions concerning .] In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.

You are not required to accept such an opinion. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.

Tenth Circuit Pattern Jury Instructions Criminal 1.17 (2011) (**Expert Witnesses**)

17

**UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___15___**

Evidence has been presented about a statement attributed to the defendant alleged to have been made after the commission of the crime (or crimes) charged in this case but not made in court. Such evidence should always be considered by you with caution and weighed with care. You should give any such statement the weight you think it deserves, after considering all the circumstances under which the statement was made.

In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement. For example, consider the age, gender, training, education, occupation, and physical and mental condition of the defendant, and any evidence concerning his treatment while under interrogation if the statement was made in response to questioning by government officials, and all the other circumstances in evidence surrounding the making of the statement.

After considering all this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances. If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

Tenth Circuit Pattern Jury Instructions Criminal 1.25 (2011) (**Voluntariness of Statements by Defendant**)

DNM 550

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   16**

During this trial, you have heard sound recordings of certain conversations. These conversations were legally recorded; they are a proper form of evidence and may be considered by you as you would any other evidence. You were also given transcripts of those recorded conversations.

Keep in mind that the transcripts are not evidence. They were given to you only as a guide to help you follow what was being said. The recordings themselves are the evidence. If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read. If you could not hear or understand certain parts of the recordings, you must ignore the transcript as far as those parts are concerned.

Tenth Circuit Pattern Jury Instructions Criminal 1.40 (2011) **(Transcript of Recorded Conversation)**

DNM 551

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   17   **

Certain charts and summaries have been shown to you to help explain the evidence in this case. Their only purpose is to help explain the evidence. These charts and summaries are not evidence or proof of any facts.

Tenth Circuit Pattern Jury Instructions Criminal 1.41 (2011) (**Summaries and Charts**)

DNM 552

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.  ___18___**

The word "racketeering" has certain implications in our society. Use of that term in this statute and in this courtroom should not be regarded as having anything to do with your determination of whether the guilt of this defendant has been proven. The term is only a term used by Congress to describe the statute.

Tenth Circuit Pattern Jury Instructions Criminal 2.74.1 (2011) (**Prejudice from the Word "Racketeering"**)

DNM 553

## UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___19___

Counts 1, 2, 3, 4, 5, 13, 14, and 15 of the Indictment charge specific defendants with committing violent crimes in aid of racketeering, in violation of 18 U.S.C. § 1959.

That law makes it a crime for any person who, as consideration for a promise or agreement to pay anything of pecuniary value from an enterprise engaged in racketeering activity,  or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the law of any State or the United States, or attempts or conspires so to do.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 21

DNM 554

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.    20   **

Defendants Joe Lawrence Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Arnulfo Garcia, Andrew Gallegos, and Shauna Gutierrez are on trial before you upon an Indictment brought by the Grand Jury.  Before reading the indictment to you, I remind you that the Indictment or formal charge against a defendant is not evidence of guilt. Indeed, a defendant is presumed by the law to be innocent.

In this case, the Indictment charges as follows:

<u>Count 1</u>

<u>Murder of Frank Castillo</u>

On or about March 26, 2001, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), or for the purpose of gaining entrance to or maintaining or increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants,  ANGEL DELEON, **JOE LAWRENCE GALLEGOS, EDWARD TROUP, a.k.a. "Huero Troup,"** LEONARD LUJAN, and **BILLY GARCIA, a.k.a. "Wild Bill,"** did unlawfully, knowingly, and intentionally murder Frank Castillo, in violation of  NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§1959(a)(1) and 2.

<u>Count 2</u>

<u>Murder of Rolando Garza</u>

On or about March 26, 2001, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), or for the

DNM 555

purpose of gaining entrance to or maintaining or increasing position in the Syndicato de Nuevo

Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, LEONARD

LUJAN, **BILLY GARCIA, a.k.a. "Wild Bill,"** EUGENE MARTINEZ, a.k.a. "Little Guero,"

**ALLEN PATTERSON,** and **CHRISTOPHER CHAVEZ, a.k.a. "Critter,"** did unlawfully,

knowingly, and intentionally murder Rolando Garza, in violation of NMSA 1978, Sections 30-

2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

Count 3

Murder of Freddie Sanchez

On or about June 17, 2007, in Doña Ana County, in the District of New Mexico, as

consideration for the receipt of, and as consideration for a promise and agreement to pay,

anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), or for the

purpose of gaining entrance to or maintaining or increasing position in the Syndicato de Nuevo

Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, JAVIER

ALONSO, a.k.a. "Wineo," **EDWARD TROUP, a.k.a. "Huero Troup," ARTURO**

**ARNULFO GARCIA, a.k.a. "Shotgun,"** BENJAMIN CLARK, a.k.a. "Cyclone," and RUBEN

HERNANDEZ, did unlawfully, knowingly, and intentionally murder Freddie Sanchez, in

violation of NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

Count 4

Conspiracy to Murder Adrian Burns

In or about November 2012, in Socorro and Valencia Counties, in the District of New

Mexico, and elsewhere, as consideration for the receipt of, and as consideration for a promise

and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang

DNM 556

(SNM), or for the purpose of gaining entrance to or maintaining or increasing position in the

Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the

defendants,  **JOE LAWRENCE GALLEGOS** and **ANDREW GALLEGOS, a.k.a. "Smiley,"**

and others known and unknown to the grand jury, did unlawfully, knowingly, and intentionally

conspire to murder Adrian Burns, in violation of  NMSA 1978, Sections 30-2-1 and 30-28-2.

All in violation of 18 U.S.C. § 1959(a)(5).

<u>Count 5</u>

<u>Murder of Adrian Burns</u>

On or about November 12, 2012, in Socorro and Valencia Counties, in the District of

New Mexico, and elsewhere, as consideration for the receipt of, and as consideration for a

promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo

Mexico Gang (SNM), or for the purpose of gaining entrance to or maintaining or increasing

position in the  Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering

activity, the defendants,  **JOE LAWRENCE GALLEGOS** and **ANDREW GALLEGOS,**

**a.k.a. "Smiley,"** did unlawfully, knowingly and intentionally murder Adrian Burns, in violation

of  NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

<u>Count 13</u>

<u>Assault With a Dangerous Weapon Upon Jose Gomez</u>

On or about March 17, 2015, in Valencia County, in the District of New Mexico, as

consideration for the receipt of, and as consideration for a promise and an agreement to pay,

anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), or for the

purpose of gaining entrance to or maintaining or increasing position in the Syndicato de Nuevo

Mexico Gang (SNM),  an enterprise engaged  in racketeering activity, the defendant, **JOE**

DNM 557

**LAWRENCE GALLEGOS**, did unlawfully, knowingly, and intentionally commit assault with a dangerous weapon against Jose Gomez, in violation of  NMSA 1978, §§ 30-3-2 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(3) and 2.

Count 14

Conspiracy to Murder Jose Gomez

On or about February 1, 2016, to on or about February 27, 2016, in Otero and Valencia Counties, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), or for the purpose of gaining entrance to or maintaining or increasing position in the Syndicato de Nuevo Mexico Gang (SNM),  an enterprise engaged  in racketeering activity, the defendants, **JOE LAWRENCE GALLEGOS**, SANTOS GONZALEZ, PAUL RIVERA, **SHAUNA GUTIERREZ** and BRANDY RODRIGUEZ, and others known and unknown to the grand jury, did unlawfully, knowingly and intentionally conspire to murder  Jose Gomez, in violation of  NMSA 1978, §§ 30-2-1 and 30-28-2.
All in violation of 18 U.S.C. § 1959(a)(5).

Count 15

Attempted Murder of Jose Gomez, Assault With a Dangerous Weapon Upon Jose Gomez

Resulting in Serious Bodily Injury to Jose Gomez

On or about February 27, 2016, in Valencia County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), or for the purpose of gaining entrance to or maintaining or increasing position in the Syndicato de Nuevo Mexico Gang (SNM),  an enterprise engaged  in racketeering activity, the defendants, **JOE LAWRENCE GALLEGOS**, SANTOS GONZALEZ, PAUL RIVERA, **SHAUNA**

26

DNM 558

**GUTIERREZ** and BRANDY RODRIGUEZ, did unlawfully, knowingly, and intentionally attempt to murder Jose Gomez, and committed assault with a dangerous weapon and assault resulting in serious bodily injury to Jose Gomez, in violation of  NMSA 1978, §§ 30-2-1, 30-28-1, 30-3-2 , 30-3-5, and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(3) and 1959(a)(5) and 2.

Count 16

Tampering With a Witness, Victim or Informant by Physical Force or Threat

On or about February 27, 2016, in Valencia County, in the District of New Mexico, the defendants, **JOE LAWRENCE GALLEGOS**, SANTOS GONZALEZ, PAUL RIVERA, **SHAUNA GUTIERREZ** and BRANDY RODRIGUEZ, used or attempted to use physical force or the threat of physical force against Jose Gomez by assaulting Jose Gomez with a dangerous weapon with the intent to influence, delay, or prevent Jose Gomez from testifying against **JOE LAWRENCE GALLEGOS** in an official proceeding.

All in violation of 18 U.S.C. §§ 1512(a)(2)(A) and 2.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 22

27

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   21   **

What I have just read are the charges brought by the Grand Jury in the indictment.

Although the indictment refers to sixteen total defendants, Joe Lawrence Gallegos, Edward

Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Arnulfo Garcia, Andrew

Gallegos, and Shauna Gutierrez are the only defendants who are on trial before you in this

case. The other Defendants are not on trial at this time. You must base your verdict solely

on the evidence received in this trial, and you are not to draw any inferences from the fact

that other Defendants named in the indictment are not on trial before you today.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 23, modified

DNM 560

**UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___22___**

Title 18, United States Code, Section 1959(a), makes it a crime for anyone to commit, threaten to commit, attempt to commit, or conspire to commit a violent crime in aid of an enterprise engaged in racketeering activity.

For you to find any defendant guilty of this crime, as charged in Counts 1, 2, 3, 4, 5, 13, 14, and 15 you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First:          The existence of an "enterprise" as defined in 18 U.S.C. § 1959 (b)(2);

Second:     The charged enterprise engaged in, or its activities affected, interstate or foreign commerce;

Third:        The charged enterprise engaged in "racketeering activity" as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1);

Fourth:       The defendant committed one of the following crimes—or conspired or attempted to commit one of these crimes—which crime violated state or federal law: murder, kidnaping, maiming, assault with a dangerous weapon, assault resulting in serious bodily injury, threatening to commit a crime of violence;

Count 1: Murder of Frank Castillo;

Count 2: Murder of Rolando Garza;

Count 3: Murder of Freddie Sanchez;

Count 4: Conspiracy to murder Adrian Burns;

Count 5: Murder of Adrian Burns;

Count 13: Assault with a dangerous weapon upon Jose Gomez;

29

DNM 561

Count 14: Conspiracy to murder Jose Gomez; and

Count 15: Attempted murder of Jose Gomez, assault with a dangerous weapon resulting upon Jose Gomez, resulting in serious bodily injury to Jose Gomez.

I will instruct you on what the government must prove to establish that a particular defendant committed any of these acts; and

Fifth:          The crime of violence was committed either: (1) as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from the charged enterprise, or (2) for the purpose of gaining entrance to or maintaining or increasing position in the charged enterprise.

If the purpose is to "gain entrance to, or to maintain, or to increase his position in the enterprise,' it is not necessary for the government to prove that this was the sole purpose of a defendant in committing the charged crime.  You need only find that it was a substantial purpose, or that a defendant committed the charged crime as an integral aspect of membership in the enterprise.  In determining a defendant's purpose in committing the alleged crime, you must determine purpose by considering only the facts and circumstances that have been admitted against an individual during the course of the trial.

An "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.

Although the enterprise must be separate and apart from the pattern of racketeering activity in which the enterprise allegedly engaged, it is not necessary to find that the enterprise had some

30

function wholly unrelated to the racketeering activity. The enterprise must be proved to have been an ongoing organization, formal or informal, that functioned as a continuing unit.

An enterprise is a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time. The personnel of the enterprise, however, may change and need not be associated with the enterprise for the entire period alleged in the indictment. Therefore, the government must prove the existence of an association-in-fact enterprise by evidence of an ongoing organization, formal or informal, and by evidence that the various associates functioned as a continuing unit. The enterprise must have the three following structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. The name of the organization itself is not an element of the offense and does not have to be proved. The government need not prove that the enterprise had any particular organizational structure.

The group need not have a hierarchical structure or a "chain of command;" decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, you may nonetheless find that the enterprise element is satisfied by finding a group whose associates engage in spurts of activity punctuated by periods of quiescence [inactivity].

The enterprise is "engaged in interstate commerce" if it directly engaged in the distribution or acquisition of goods or services in such commerce.  The enterprise's conduct "affected" interstate commerce if the conduct had a demonstrated connection or link with such commerce.

31

It is not necessary for the government to prove that a defendant knew or intended that the enterprise was engaged in commerce or that its conduct would affect commerce.  It is  only necessary that the natural consequences of the enterprise's conduct affected commerce in some way.  Only a minimal effect on commerce is necessary.

There must be some nexus between the enterprise and the racketeering activity being conducted by members and/or associates of the enterprise.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 24

Tenth Circuit Pattern Jury Instructions Criminal 2.74.2 (2011) **(Racketeer Influenced and Corrupt Organizations Act)**

Fifth Circuit Pattern Jury Instructions Criminal 2.78 (2015)(modified)**(Violent Crimes in Aid of Racketeering**)

DNM 564

## UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___23___

The first element that the government must prove beyond a reasonable doubt is that an "enterprise" existed as alleged in the Indictment.

The government has charged the following in the Indictment as constituting the enterprise: the Syndicato de Nuevo Mexico Gang (SNM) in Counts 1, 2, 3, 4, 5, 13, 14, and 15.

An enterprise is a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time. This group of people does not have to be a legally recognized entity, such as a partnership or corporation. This group may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose. This group of people must have: (1) a common purpose; (2) an ongoing organization, either formal or informal; and (3) personnel who function as a continuing unit.

If you find these three elements, then you may find that an enterprise existed.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 25

Tenth Circuit Pattern Jury Instructions Criminal 2.74.3 (2011) (modified) (**First Element – The Enterprise**)

Fifth Circuit Pattern Jury Instructions Criminal 2.78 (2015)(modified)(**Violent Crimes in Aid of Racketeering**)

33

## UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___24___

The second element the government must prove beyond a reasonable doubt is that the enterprise was engaged in or had an effect upon interstate (or foreign) commerce.

Interstate commerce includes the movement of goods, services, money and individuals between states (or between states and the District of Columbia or a U.S. Territory or possession or between the United States and a foreign state or nation).

The government must prove that the enterprise engaged in interstate commerce or that its activities affected interstate commerce in any way, no matter how minimal. It is not necessary to prove that the acts of any particular defendant affected interstate commerce as long as the acts of the enterprise had such effect. Finally, the government is not required to prove that any defendant knew he was affecting interstate commerce.

I further instruct you that, pursuant to 21 U.S.C. §§ 801(3), (5), (6), and (7), the possession and/or distribution of a controlled substance has a direct and substantial effect on interstate commerce.

Tenth Circuit Pattern Jury Instructions Criminal 2.74.4 (2011) (**Second Element – Effect on Interstate Commerce**)

DNM 566

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   25   **

The third element which the Government must prove beyond a reasonable doubt as to Counts 1, 2, 3, 4, 5, 13, 14, and 15 is that the enterprise was engaged in racketeering activity.

That racketeering activity may consist of state offenses as well as federal offenses.  The government has charged that that SNM engaged in multiple acts of racketeering activity consisting of the following:  (1) murder and robbery, in violation of New Mexico law; (2) acts involving tampering with a witness, in violation of federal law; and, (3) offenses involving trafficking in narcotics, in violation of federal law.

In order for the state offense of murder to be considered as a racketeering act, the government must prove to you beyond a reasonable doubt that a member or an associate of the racketeering enterprise committed the offense as defined by law.  The elements of that offense are as follows:

First:        someone killed a human being, and

Second:       the killing was with the deliberate intention to take away the life of that person.

In order for the federal offense of witness tampering to be considered as a racketeering act, the government must prove to you beyond a reasonable doubt that:

First:        a member, prospect or associate of the racketeering enterprise used or attempted to use intimidation or threats against another person;

Second:       that member, prospect, or associate acted knowingly and with the intent to influence or prevent the testimony of that other person with respect to an official proceeding.

In order for the offense of possession with intent to distribute a controlled substance to be considered as a racketeering act, the government must prove to you beyond a reasonable doubt that:

35

*First*: a member, prospect, or associate of the SNM knowingly and intentionally possessed a controlled substance as charged, and

*Second*: that person possessed the substance with the intent to distribute it.

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

[Name controlled substance] is a controlled substance within the meaning of the law.

In order for the offense of distribution of a controlled substance to be considered as a racketeering act, the government must prove to you beyond a reasonable doubt that a member, prospect, or associate of the SNM knowingly or intentionally distributed a controlled substance.

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the government to prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

There must be some nexus between the enterprise and the racketeering activity being conducted by members and/or associates of the enterprise.

I instruct you that "racketeering activity" includes numerous offenses, including those listed above. It is for you to determine whether the enterprise engaged in these activities as charged. You should give the words "engaged in" their ordinary, everyday meaning. For an enterprise to be engaged in racketeering activity, it is enough to show that the enterprise committed or was planning to commit some racketeering activity within a period of time short

DNM 568

enough under all of the circumstance so that it is appropriate to say that the enterprise was

engaged in racketeering activity.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 26

DNM 569

**UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___26___**

The fourth element which the Government must prove beyond a reasonable doubt as to Count 4 is that Joe Lawrence Gallegos and Andrew Gallegos conspired to murder Adrian Burns.

The fourth element which the Government must prove beyond a reasonable doubt as to Count 14 is that Joe Lawrence Gallegos and Shauna Gutierrez conspired to murder Jose Gomez.

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. To find a defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

1. The defendant and another person by words or acts agreed together to commit murder;

2. The defendant and the other person intended to commit murder;

3. This happened in New Mexico on or about November 12, 2012 as to Count 4 and from on or about February 1, 2016 to on or about February 27, 2016 as to Count 14.

NM UJI 14-2810 NMRA.

The essential elements of willful and deliberate murder are provided below to aid you in deciding if the Government has proven the first element:

1. Someone killed the victim; and

2. The killing was with the deliberate intention to take away the life of the victim.

NM UJI 14-201 NMRA.

In proving a conspiracy to murder, it is not necessary to show a meeting of the alleged conspirators or the making of an express or formal agreement. The formation and existence of a conspiracy to murder may be inferred from all circumstances tending to show the common intent and may be proved in the same way as any other fact may be proved, either

DNM 570

by direct testimony of the fact or by circumstantial evidence, or by both direct and

circumstantial evidence.

Evidence that a person was in the company of or associated with one or more other

persons alleged or proved to have been members of a conspiracy is not, in itself, sufficient

to prove that such person was a member of the alleged conspiracy.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 29, modified

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   27**

The fourth element which the Government must prove beyond a reasonable doubt as

to Count 1 is that Joe Lawrence Gallegos, Edward Troup, and Billy Garcia murdered Frank

Castillo; as to Count 2 is that Billy Garcia, Allen Patterson and Christopher Chavez murdered

Rolando Garza; as to Count 3 is that Edward Troup and Arturo Garcia murdered Freddie

Sanchez; and as to Count 5 is that Joe Lawrence Gallegos and Andrew Gallegos murdered

Adrian Burns.

The essential elements of first degree murder under New Mexico law are provided below

to aid you in deciding if the Government has proven the fourth element:

1. The defendant killed _____;

2. The killing was with the deliberate intention to take away the life of

   _____

3. This happened in New Mexico on or about _____.

A deliberate intention refers to the state of mind of the defendant. A deliberate intention

may be inferred from all of the facts and circumstances of the killing. The word deliberate means

arrived at or determined upon as a result of careful thought and the weighing of the consideration

for and against the proposed course of action. A calculated judgment and decision may be

arrived at in a short period of time. A mere unconsidered and rash impulse, even though it

includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the

slayer must weigh and consider the question of killing and his reasons for and against such a

choice.

NM UJI 14-201 NMRA.

DNM 572

The essential elements of second degree murder under New Mexico law are provided below to aid you in deciding if the Government has proven the fourth element:

1. The defendant killed _____;

2. The defendant knew that this acts created a strong probability of death or great bodily harm to _____

3. This happened in New Mexico on or about _____.

NM UJI 14-210 NMRA.

You have been instructed on the crimes of first degree murder and second degree murder. You must consider each of these crimes. You should be sure that you fully understand the elements of each crime before you deliberate further. You will then discuss and decide whether the defendant is guilty of murder in the first degree. If you unanimously agree that the defendant is guilty of murder in the first degree, you will return a verdict of guilty of murder in the first degree. If you do not agree, you should discuss the reasons why there is a disagreement.

If, after reasonable deliberation, you do not agree that the defendant is guilty of murder in the first degree you should move to a discussion of murder in the second degree. If you unanimously agree that the defendant is guilty of murder in the second degree, you will return a verdict of guilty of murder in the second degree. If you do not agree you should discuss the reasons why there is a disagreement.

You may not find the defendant guilty of more than one of the foregoing crimes. If you have a reasonable doubt as to whether the defendant committed any one of the crimes, you must determine that he is not guilty of that crime. If you find him not guilty of all of these crimes, you must return a verdict of not guilty.

NM UJI 14-250 NMRA.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 27 and 28, modified

DNM 573

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   28   **

The fourth element which the Government must prove beyond a reasonable doubt as to Count 13 is that Joe Lawrence Gallegos assaulted Jose Gomez with a dangerous weapon.

The fourth element which the Government must prove beyond a reasonable doubt as to Count 15 is that Joe Lawrence Gallegos and Shauna Gutierrez attempted to murder Jose Gomez, assaulted Jose Gomez with a dangerous weapon, or assaulted Jose Gomez resulting in serious bodily injury.

The essential elements of assault resulting in serious bodily injury are provided below to aid you in deciding if the Government has proven the fourth element:

One:            A person intentionally struck Jose Gomez; and,

Two:            As a result of this assault, Jose Gomez suffered serious bodily injury.

The term "serious bodily injury" means bodily injury which involves—
  (A) a substantial risk of death;
  (B) extreme physical pain;
  (C) protracted and obvious disfigurement; or
  (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

The essential elements of attempted murder are provided below to aid you in deciding if the Government has proven the fourth element:

One:            The defendant intended to commit the crime of murder;

Two             The defendant began to do an act which constituted a substantial part of the  murder  but failed to commit the murder;

The essential elements of assault with a dangerous weapon are provided below to aid you in deciding if the Government has proven the fourth element:

One:          Defendant _____ intentionally [struck] [injured] Jose Gomez;

Two:          Defendant _____ used a dangerous weapon, as charged in Count 15 of the indictment; and,

Three:        Defendant _____ acted with the intent to do bodily harm to Jose Gomez.


2 Fed. Jury Prac. & Instr. § 25:09 (6th ed.) (modified) (**The essential elements of the offense charged**), modified

43

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   29   **

The fifth and final element of Counts 1, 2, 3, 4, 5, 13, 14, and 15 that the Government must prove beyond a reasonable doubt is that the Defendant's general purpose in committing the underlying crimes of violence was to maintain or increase their position in (or to gain entrance to) the enterprise.

The Government is required to prove that the defendant's general purpose was to maintain or increase their position in the enterprise. The Government is not required to prove that it was the defendant's sole or principal motive.

In determining whether the defendant's purpose in committing the underlying crime of violence was to maintain or increase his position in the enterprise, you should give the words "maintain" and "increase" their ordinary meanings. You should consider all of the facts and circumstances in making that determination.

For example, you may consider evidence that the crime, if proved, was committed in order to maintain discipline within the enterprise and served to maintain the defendant's position in the enterprise. If the defendant committed the crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed the crime because he thought it would enhance his position or prestige within the enterprise, or if he committed it because he thought it was necessary to maintain the position he already held, this element would be established.

These examples are only meant by way of illustration. They are not exhaustive.

DNM 576

## UNITED STATES' PROPOSED JURY INSTRUCTION NO. ___30___

Counts 1, 2, 3, 5, 13, 15, and 16 also charge a violation of 18 U.S.C. § 2, which provides that: "Whoever commits an offense against the United States, or aids, abet, counsels, commands, induces or procures its commission, is punishable as a principal."

The law makes it a crime to intentionally help someone else commit a crime.  To find Joe Lawrence Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Garcia, Andrew Gallegos, or Shauna Gutierrez guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First:          someone else committed the charged crime, and

Second:          Joe Lawrence Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Garcia, Andrew Gallegos, or Shauna Gutierrez intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about.  This means that the government must prove that find Joe Lawrence Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Garcia, Andrew Gallegos, or Shauna Gutierrez consciously shared the other person's knowledge of the underlying criminal act and intended to help him

Joe Lawrence Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Garcia, Andrew Gallegos, or Shauna Gutierrez need not perform the underlying criminal act, be present when it is performed, or be aware the details of its commission to be guilty of aiding or abetting.  But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 33

DNM 577

## UNITED STATES' PROPOSED JURY INSTRUCTION NO.   31

Count 16 of the indictment charges the defendant Joe Lawrence Gallegos and Shauna Gutierrez with tampering with a witness, victim or informant by physical force or threat, which is a violation of federal law.

In order to find the defendant guilty of this offense, you must find that the government proved each of the following four elements beyond a reasonable doubt:

First:        That the defendant knowingly used or attempted to use physical force or the threat of physical force against Jose Gomez

Second:        That the defendant acted with intent to influence, delay, or prevent the testimony of Jose Gomez in an official proceeding

Third:        That the defendant knew or should have known that the proceeding was pending or was likely to be instituted. [However, the government does not need to prove that an official proceeding was actually pending or about to be instituted at the time of the alleged offense.]

Fourth:        That the official proceeding, was a federal proceeding. [However, the government does not need to prove that the defendant knew that the proceeding was a federal proceeding.]

Third Circuit Pattern Jury Instructions Criminal 6.18.1512A2  (**Obstruction of Justice – Witness Tampering Through Physical Force or Threat of Physical Force)**

46

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   32   **

When the word "knowingly" is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident. Although knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact. Knowledge can be inferred if the defendant was aware of a high probability of the existence of [the fact in question], unless the defendant did not actually believe [the fact in question].

Tenth Circuit Pattern Jury Instructions Criminal 1.37 (2011) (**Knowingly**)

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   33**

You will note that the indictment charges that each offense was committed "on or about" a particular date or range of dates. The government does not have to prove that the crime was committed on the exact date or  dates specified in the Indictment, so long as the government proves beyond a reasonable doubt that the defendant committed the crime on a date reasonably near the date or dates alleged in the Indictment.

Tenth Circuit Pattern Jury Instructions Criminal 1.18 (2011) (**On or About**). *Modified*

DNM 580

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.  ___34___**

     If you find the defendant guilty, it will be my duty to decide what the punishment will be.

You should not discuss or consider the possible punishment in any way while deciding your

verdict.

Tenth Circuit Pattern Jury Instructions Criminal 1.20 (2011) **(Caution - Punishment)**

DNM 581

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   35   **

A stipulation is an agreement between both sides that certain facts are true. A stipulation

means simply that the government and the defendant accept the truth of a particular proposition

or fact. Since there is no disagreement, there is no need for evidence apart from the stipulation.

DNM 582

## UNITED STATES' PROPOSED JURY INSTRUCTION NO. __36__

While you must consider only the evidence in this case, you are permitted to draw

reasonable inferences from the testimony and exhibits, inferences you feel are justified in the

light of common experience. An inference is a conclusion that reason and common sense may

lead you to draw from facts which have been proved.

By permitting such reasonable inferences, you may make deductions and reach

conclusions that reason and common sense lead you to draw from the facts which have been

established by the testimony and evidence in this case.

Tenth Circuit Pattern Jury Instructions Criminal 1.07 (2011) (**Evidence –Direct and
Circumstantial - Inferences**).

DNM 583

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.  <u>  37  </u>**

The defendant did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt. You must understand that the Constitution of the United States grants to a defendant the right to remain silent. That means the right not to testify. That is a constitutional right in this country, it is very carefully guarded, and you must not presume or infer guilt from the fact that a defendant does not take the witness stand and testify or call any witnesses.

Tenth Circuit Pattern Jury Instructions Criminal 1.08.1 (2011) (**Non-Testifying Defendant**)

DNM 584

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.  <u>  38  </u>**

You are here to decide whether the government has proved beyond a reasonable double that the defendants are guilty of the crimes charged. The defendants are not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone is not on trial in this case should be prosecuted for the crimes charged.  The fact that another person *also* may be guilty is no defense to a criminal charge.

*United States v. DeLeon*, et al (15-4268), Trial 1, Jury Instruction No. 35

DNM 585

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   39**

A separate crime is charged against one or more of the defendants in each count of the indictment. You must separately consider the evidence against each defendant on each count and return a separate verdict for each defendant.

Your verdict as to any one defendant or count, whether it is guilty or not guilty, should not influence your verdict as to any other defendants or counts.

Tenth Circuit Pattern Jury Instructions Criminal 1.22 (2011) **(Multiple Defendants-Multiple Counts)**

DNM 586

**UNITED STATES' PROPOSED JURY INSTRUCTION NO.   40   **

In a moment the bailiff will escort you to the jury room and provide each of you with a copy of the instructions that I have just read. Any exhibits admitted into evidence will also be placed in the jury room for your review.

When you go to the jury room, you should first select a foreperson, who will help to guide your deliberations and will speak for you here in the courtroom. [The second thing you should do is review the instructions. Not only will your deliberations be more productive if you understand the legal principles upon which your verdict must be based, but for your verdict to be valid, you must follow the instructions throughout your deliberations. Remember, you are the judges of the facts, but you are bound by your oath to follow the law stated in the instructions.]

To reach a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be unanimous on each count of the indictment. Your deliberations will be secret. You will never have to explain your verdict to anyone.

You must consult with one another and deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are judges—judges of the facts. You must decide whether the government has proved each defendant guilty beyond a reasonable doubt.

A form of verdict has been prepared for your convenience.

**[Explain the Verdict Form]**

The foreperson will write the unanimous answer of the jury in the space provided for each count of the indictment, either guilty or not guilty. At the conclusion of your deliberations, the foreperson should date and sign the verdict.

If you need to communicate with me during your deliberations, the foreperson should write the message and give it to the bailiff. I will either reply in writing or bring you back into the court to respond to your message. Under no circumstances should you reveal to me the numerical division of the jury.

Tenth Circuit Pattern Jury Instructions Criminal 1.23 (2011) **(Duty to Deliberate-Verdict Form)**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) CRIMINAL NO. 15-4269 JB |
| | ) |
| vs. | ) |
| | ) |
| **JOE LAWRENCE GALLEGOS,** | ) |
| **EDWARD TROUP,** | ) |
| **BILLY GARCIA,** | ) |
| **ALLEN PATTERSON,** | ) |
| **CHRISTOPHER CHAVEZ,** | ) |
| **ARTURO ARNULFO GARCIA,** | ) |
| **ANDREW GALLEGOS,** | ) |
| **and** | ) |
| **SHAUNA GUTIERREZ,** | ) |
| | ) |
| Defendants. | ) |

## <u>**V E R D I C T**</u>

### <u>**JOE LAWRENCE GALLEGOS**</u>

#### **COUNT 1**

WE, the Jury, find the defendant, **JOE GALLEGOS** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Frank Castillo, as charged in Count 1 of the

Indictment.

#### **COUNT 4**

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Adrian Burns, as charged in Count 4 of

the Indictment.

DNM 589

**COUNT 5**

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____
(guilty or not guilty)
of violent crimes in aid of racketeering in the murder of Adrian Burns, as charged in Count 5 of the

Indictment.

**COUNT 13**

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____
(guilty or not guilty)
of violent crimes in aid of racketeering in the assault with a dangerous weapon against Jose Gomez, as

charged in Count 13 of the Indictment.

**COUNT 14**

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____
(guilty or not guilty)
of violent crimes in aid of racketeering in conspiring to murder Jose Gomez, as charged in Count 14 of

the Indictment.

**COUNT 15**

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____
(guilty or not guilty)
of violent crimes in aid of racketeering in the attempted murder of Jose Gomez, or the assault resulting in

serious bodily injury to Jose Gomez, or assault with a dangerous weapon upon Jose Gomez, as charged in

Count 15 of the Indictment.

**COUNT 16**

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____
(guilty or not guilty)
of tampering with a witness by physical force or threat, as charged in Count 16 of the Indictment.

**EDWARD TROUP**

> **COUNT 1**

> WE, the Jury, find the defendant,  **EDWARD TROUP,**  _____

> (guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Frank Castillo, as charged in Count 1 of the

Indictment.

> **COUNT 3**

> WE, the Jury, find the defendant, **EDWARD TROUP,**  _____

> (guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Freddie Sanchez, as charged in Count 3 of the

Indictment.

**BILLY GARCIA**

> **COUNT 1**

> WE, the Jury, find the defendant, **BILLY GARCIA,**  _____

> (guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Frank Castillo, as charged in Count 1 of the

Indictment.

> **COUNT 2**

> WE, the Jury, find the defendant, **BILLY GARCIA,**  _____

> (guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Rolando Garza, as charged in Count 2 of the

Indictment.

**ALLEN PATTERSON**

> **COUNT 2**

> WE, the Jury, find the defendant, **ALLEN PATTERSON,**  _____

> (guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Rolando Garza, as charged in Count 2 of the

Indictment.

**CHRISTOPHER CHAVEZ**

     **COUNT 2**

     WE, the Jury, find the defendant, **CHRISTOPHER CHAVEZ,**_____

                             (guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Rolando Garza, as charged in Count 2 of the

Indictment.

**ARTURO ARNULFO GARCIA**

     **COUNT 3**

     WE, the Jury, find the defendant, **ARTURO GARCIA,** _____

                             (guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Freddie Sanchez, as charged in Count 3 of the

Indictment.

**ANDREW GALLEGOS**

     **COUNT 4**

     WE, the Jury, find the defendant, **ANDREW GALLEGOS,**_____

                             (guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Adrian Burns, as charged in Count 4 of

the Indictment.

     **COUNT 5**

     WE, the Jury, find the defendant, **ANDREW GALLEGOS,**_____

                             (guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Adrian Burns, as charged in Count 5 of the

Indictment.

**SHAUNA GUTIERREZ**

### COUNT 14

WE, the Jury, find the defendant, **SHAUNA GUTIERREZ**, _____

(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Jose Gomez, as charged in Count 14 of

the Indictment.

### COUNT 15

WE, the Jury, find the defendant, **SHAUNA GUTIERREZ**, _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the attempted murder of Jose Gomez, or the assault resulting in

serious bodily injury to Jose Gomez, or assault with a dangerous weapon upon Jose Gomez, as charged in

Count 15 of the Indictment.

### COUNT 16

WE, the Jury, find the defendant, **SHAUNA GUTIERREZ**, _____

(guilty or not guilty)

of tampering with a witness by physical force or threat, as charged in Count 16 of the Indictment.

Dated this _____ day of _____, 2018.

_____

FOREPERSON

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )       CRIMINAL NO. 15-4268 JB
                                    )
      vs.                           )
                                    )
**JOE GALLEGOS,**                   )
**EDWARD TROUP, a.k.a. "Huero**     )
**Troup,"**                         )
**BILLY GARCIA, a.k.a. "Wild Bill,"** )
**ALLEN PATTERSON,**                )
**CHRISTOPHER CHAVEZ, a.k.a.**      )
**"Critter,"**                      )
**ARTURO ARNULFO GARCIA, a.k.a.**   )
**"Shotgun,"**                      )
**ANDREW GALLEGOS, a.k.a. "Smiley,"** )
**and**                             )
**SHAUNA GUTIERREZ,**               )
                                    )
            Defendants.             )

## UNITED STATES' PROPOSED VOIR DIRE

The United States of America respectfully requests, pursuant to Rule 24(a) of the Federal

Rules of Criminal Procedure, that this Court include the following questions in its examination of

prospective jurors during the second trial ("Trial 2") in this case. The United States asks to be

allowed to pursue more detailed questioning if further inquiry is appropriate and, if desirable, to

conclude with an inquiry as to whether the particular fact or circumstance would influence a juror

in favor or against either the United States or the defendant. Additionally, the United States asks

that the Court invite jurors to approach the bench to respond outside the hearing of the rest of the

panel if the prospective juror so desires.

A.    **The Charges.**

1.    This is a criminal case. Defendants Joe Lawrence Gallegos, Edward Troup, and Billy Garcia have been charged in the Indictment with violent crimes in aid of racketeering in the murder of (F.C.) Frank Castillo.

2.    Defendants Billy Garcia, Allen Patterson and Christopher Chavez have been charged in the Indictment with violent crimes in aid of racketeering in the murder of (R.G.) Rolando Garza.

3.    Defendants Edward Troup and Arturo Arnulfo Garcia have been charged in the Indictment with violent crimes in aid of racketeering in the murder of (F.S.) Freddie Sanchez.

4.    Defendants Joe Lawrence Gallegos and Andrew Gallegos have been charged in the Indictment with violent crimes in aid of racketeering for conspiring to murder (A.B.) Adrian Burns.   These defendants have also been charged in the Indictment with violent crimes in aid of racketeering in the murder of (A.B.) Adrian Burns.

5.    Defendant Joe Lawrence Gallegos has been charged in the Indictment with violent crimes in aid of racketeering for assault with a dangerous weapon upon (J.G.) Jose Gomez. Defendants Joe Lawrence and Shauna Gutierrez have been charged in the Indictment with violent crimes in aid of racketeering for conspiring to murder (J.G.) Jose Gomez. These defendants have also been charged in the Indictment with violent crimes in aid of racketeering in the murder of (J.G.) Jose Gomez.   These defendants have also been charged in the Indictment with witness tampering.

6.    The Indictment is not evidence itself. It simply contains the charges that

the United States is required to prove to the satisfaction of the trial jury beyond a reasonable doubt. I would like to summarize the charges in this case in order to determine whether there is anything about the nature of this case that may make it difficult or inappropriate for any of you to serve on the jury.

7.     In Count 1, the Indictment charges that on or about March 26, 2001, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the  Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, ANGEL DELEON, **JOE LAWRENCE GALLEGOS, EDWARD TROUP, a.k.a. "Huero Troup,"** LEONARD LUJAN, and **BILLY GARCIA, a.k.a. "Wild Bill,"** did unlawfully, knowingly, and intentionally murder F.C., in violation of NMSA 1978, Sections 30-2-1 and 30-1-13.

8.     In Count 2, the Indictment charges that on or about March 26, 2001, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, LEONARD LUJAN**, BILLY GARCIA, a.k.a. "Wild Bill,"** EUGENE MARTINEZ, a.k.a. "Little Guero," **ALLEN PATTERSON,** and **CHRISTOPHER CHAVEZ, a.k.a. "Critter,"** did unlawfully, knowingly, and intentionally murder R.G., in violation of NMSA 1978, Sections 30-2-1 and 30-1-13.

9.      In Count 3, the Indictment charges that on or about June 17, 2007, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, JAVIER ALONSO, a.k.a. "Wineo," **EDWARD TROUP, a.k.a. "Huero Troup," ARTURO ARNULFO GARCIA, a.k.a. "Shotgun,"** BENJAMIN CLARK, a.k.a. "Cyclone," and RUBEN HERNANDEZ, did unlawfully, knowingly, and intentionally murder F.S., in violation of  NMSA 1978, Sections 30-2-1 and 30-1-13.

10.      In Count 4, the Indictment charges that on or about November 2012, in Socorro and Valencia Counties, in the District of New Mexico, and elsewhere, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, **JOE LAWRENCE GALLEGOS** and **ANDREW GALLEGOS, a.k.a. "Smiley,"** and others known and unknown to the grand jury, did unlawfully, knowingly, and intentionally conspire to murder A.B., in violation of NMSA 1978, Sections 30-2-1 and 30-28-2.

11.      In Count 5, the Indictment charges that on or about November 12, 2012, in Socorro and Valencia Counties, in the District of New Mexico, and elsewhere, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary

value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance

to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an

enterprise engaged in racketeering activity, the defendants, **JOE LAWRENCE GALLEGOS**

and **ANDREW GALLEGOS, a.k.a. "Smiley,"** did unlawfully, knowingly and intentionally

murder A.B., in violation of  NMSA 1978, Sections 30-2-1 and 30-1-13.

12.     In Count 13, the Indictment charges that on or about March 17, 2015, in

Valencia County, in the District of New Mexico, as consideration for the receipt of, and as

consideration for a promise and an agreement to pay, anything of pecuniary value from the

Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and

maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an

enterprise engaged in racketeering activity, the defendant, **JOE LAWRENCE GALLEGOS**,

did unlawfully, knowingly, and intentionally commit assault with a dangerous weapon against

J.G., in violation of  NMSA 1978, §§ 30-3-2 and 30-1-13.

13.     In Count 14, the Indictment charges that on or about February 1, 2016, to

on or about February 27, 2016, in Otero and Valencia Counties, in the District of New Mexico,

as consideration for the receipt of, and as consideration for a promise and an agreement to pay,

anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the

purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo

Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, **JOE**

**LAWRENCE GALLEGOS**, SANTOS GONZALEZ, PAUL RIVERA, **SHAUNA**

**GUTIERREZ** and BRANDY RODRIGUEZ, and others known and unknown to the grand jury,

did unlawfully, knowingly and intentionally conspire to murder  J.G., in violation of NMSA

1978, §§ 30-2-1 and 30-28-2.

14.     In Count 15, the Indictment charges that on or about February 27, 2016, in

Valencia County, in the District of New Mexico, as consideration for the receipt of, and as

consideration for a promise and an agreement to pay, anything of pecuniary value from the

Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and

maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM),   an

enterprise engaged   in racketeering activity, the defendants, **JOE LAWRENCE GALLEGOS**,

SANTOS  GONZALEZ,  PAUL  RIVERA,  **SHAUNA  GUTIERREZ**  and  BRANDY

RODRIGUEZ, did unlawfully, knowingly, and intentionally attempt to murder J.G., and

committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G.,

in violation of NMSA 1978, §§ 30-2-1, 30-28-1, 30-3-2 , 30-3-5, and 30-1-13.

15.     In Count 16, the Indictment charges that on or about February 27, 2016, in

Valencia County, in the District of New Mexico, the defendants, **JOE LAWRENCE**

**GALLEGOS**, SANTOS  GONZALEZ,  PAUL  RIVERA,  **SHAUNA  GUTIERREZ**  and

BRANDY RODRIGUEZ, used and attempted to use physical force and the threat of physical

force against J.G. by assaulting J.G. with a dangerous weapon with the intent to influence, delay,

or prevent J.G. from testifying against **JOE LAWRENCE GALLEGOS** in an official

proceeding.

16.     Does any juror have personal knowledge of the events that occurred in

Doña Ana, Socorro, Valencia, and Otero Counties in New Mexico? Has any juror read or heard

anything about the charges in the Indictment?

B.     **Nature Of The Charges**.

17.     During the trial, you will hear evidence concerning the murders of Frank Castillo, Rolando Garza, Freddie Sanchez, and Adrian Burns and the alleged conspiracy to murder and the assault of Jose Gomez, all members of the Syndicato Nuveo Mexico (SNM) prison gang. Does the fact that the victims, Frank Castillo, Rolando Garza, Freddie Sanchez, Adrian Burns, and Jose Gomez, were SNM members make it difficult for any juror to render a fair verdict? Does the fact that most of the victims were incarcerated in a state prison when the attacks occurred make it difficult for any juror to render a fair verdict? Does any juror feel that he or she could not sit in judgment of your fellow man?

18.     The defendants in this case are members of the Syndicato Nuevo Mexico prison gang, a group known for violence within state prison walls and on the streets. How many of you have heard of the Syndicato Nuevo Mexico or "SNM?" Are you familiar with their views? Do you know anyone who is an SNM member or prospect? Do any of you believe that knowing the defendants' belong to a prison gang would affect your ability to be an impartial judge?

19.     Syndicato Nuevo Mexico is a powerful and violent prison gang that operates inside and outside of state and federal prisons throughout the United States. Do any of you belong to an organization that seeks to promote the rights of prisoners?

20.     Is there anything about the nature of the charges that would cause you to be unable to render a fair verdict in this case?

C.     **Knowledge Of The Trial Participants**.

21.     The defendants in this case are Joe Lawrence Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Arnulfo Garcia, Andrew Gallegos, and

Shauna Gutierrez. Does any juror know, or has he or she had any dealings, directly or indirectly, with the defendants, or with any relative, friend or associate of the defendants?

22.   The alleged victims in this case are Frank Castillo, Rolando Garza, Freddie Sanchez, Adrian Burns, and Jose Gomez. Are there any of you who know or had dealings with these people?

23.   Does any juror have any relatives, friends, associates, or employers who know or who have had any dealings with the defendants?

24.   Defendant Joe Lawrence Gallegos is represented by Brock Benjamin and Richard Sindel.   Do any of you know Mr. Benjamin or Mr. Sindel?   Has any juror had dealings, either directly or indirectly, with Mr. Benjamin or Mr. Sindel?

25.   Defendant Edward Troup is represented by Cori Harbour-Valdez and Patrick Burke.  Do any of you know Ms. Harbour-Valdez or Mr. Burke?  Has any juror had dealings either directly or indirectly, with Ms. Harbour-Valdez or Mr. Burke?

26.   Defendant Billy Garcia is represented by James Castle and Robert Cooper. Do any of you know Mr. Castle or Mr. Cooper?  Has any juror had dealings either directly or indirectly, with Ms. Harbour-Valdez or Mr. Burke?

27.   Defendant Allen Patterson is represented by Jeffrey Lahann and Joseph Shattuck.   Do any of you know Mr. Lahann or Mr. Shattuck?   Has any juror had dealings either directly or indirectly, with Mr. Lahann or Mr. Shattuck?

28.   Defendant Christopher Chavez is represented by Eduardo Solis and John Granberg.   Do any of you know Mr. Solis or Mr. Granberg?   Has any juror had dealings either

directly or indirectly, with Mr. Solis or Mr. Granberg?

29.     Defendant Arturo Arnulfo Garcia is represented by Billy Blackburn and Scott Davidson.   Do any of you know Mr. Blackburn or Mr. Davison?   Has any juror had dealings either directly or indirectly, with Mr. Blackburn or Mr. Davison?

30.     Defendant Andrew Gallegos is represented by Donavon Roberts and Lisa Torraco.   Do any of you know Mr. Roberts or Ms. Torraco?   Has any juror had dealings either directly or indirectly, with Mr. Roberts or Ms. Torraco?

31.     Defendant Shauna Gutierrez is represented by Angela Arellanes.   Do any of you know Ms. Arellanes?   Has any juror had dealings either directly or indirectly, with Ms. Arellanes?

32.     The United States is represented here, as in all cases where it is a party before this Court, by the United States Attorney for the District of New Mexico who, acting under the authority conferred by 28 U.S.C. § 515, is Fred Federici. The conduct of the trial will be in the immediate charge of Assistant United States Attorneys Maria Y. Armijo, Randy M. Castellano and Matthew M. Beck. Do any of you know Mr. Federici or his assistants, Ms. Armijo, Mr. Castellano or Mr. Beck? Have any of you had dealings either directly or indirectly with these individuals?

33.     During the trial you may hear reference to the following people, and some may be called as witnesses: [read witness list] Do any of you know any of these witnesses? Has any juror had dealings, either directly or indirectly, with these witnesses?

**D.**     **Ability To Render A Fair Verdict.**

34.     <u>Expert Witnesses</u>. You may hear testimony in this case by expert

witnesses. Let me advise you that the use of expert testimony is proper in the context of this case. Have any of you had any experiences with experts or do you have any general feelings about the use of experts that would make it difficult for you to render a wholly fair and impartial verdict?

35. <u>Law Enforcement Personnel</u>. The witnesses in this case will include law enforcement personnel. Would you be <u>more</u> likely to believe a witness merely because he or she is a law enforcement officer? Would you be <u>less</u> likely to believe law enforcement witnesses?

36. <u>Confidential Sources/Cooperating Defendants.</u> In this case, some of the witnesses may be confidential sources or cooperating witnesses who agreed to assist law enforcement agents. Does any juror have strong feelings about this law enforcement technique that would prevent you from fairly and impartially judging this evidence?

37. <u>Plea Bargaining.</u> Plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of court. Is there anyone who nevertheless personally disapproves of plea bargaining and would hold a plea bargain against the parties who made a bargain? What if the plea agreement included an agreement to cooperate with law enforcement, or testify in trial in exchange for the possibility of a reduced sentence? Is there anyone here who would automatically believe or disbelieve a person's testimony just because he has pled guilty to an offense or because he is testifying pursuant to an agreement?

**E.    <u>Relationship With Government</u>.**

38. Do any of you know, or have any association -- professional, business, or social, direct or indirect -- with any member of the staff of the United States Attorney's Office for the District of New Mexico, the Federal Bureau of Investigation, the New Mexico Department of Corrections, the New Mexico State Police, or any other law enforcement agency? Is any member

of your family employed by any law enforcement agency, whether federal, state or local?

39.     Does any juror have any strong feelings for or against the United States Attorney's Office, or any particular law enforcement agency?

40.     Have you, or has any member of your family, either as an individual or in the course of business, ever been a party to any legal action or dispute with the United States or any of the officers, departments, agencies, or employees of the United States, or had any interest in any such legal action or dispute and its outcome?

**F.     Prior Jury Service.**

41.     Have you ever, at any time, served as a member of a grand jury, whether in federal, state, county or city court?   If so, when and where did you serve?

42.     Have you ever served as a juror in any court? If so, when and in what court did you serve and was it a civil or a criminal case?

**G.     Experience As A Witness, Defendant, Or Crime Victim.**

43.     Has any juror or any relative or close friend of any juror, ever been involved or appeared as a witness in any investigation by a federal or state grand jury or been questioned in any matter by a federal, state, or local law enforcement agency?

44.     Have you ever been a witness or complainant in any prosecution, state or federal?

45.     Have you, or has any member of your family, any associate or close friend, ever been charged with a crime?

46.     Has any juror or any relative, associate, or close friend ever been the subject of any investigation or accusation by any grand jury, federal or state?

H.       **Burden of Proof**

47.     In every single criminal trial, the United States' burden of proof is beyond a reasonable doubt. A reasonable doubt is a doubt based on reason and common sense.   The United States is not required to prove its case beyond a shadow of a doubt, or beyond all possible doubt.   It must prove it beyond a reasonable doubt.   Does anybody believe that the United States should be held to a higher or lower burden of proof?

48.     Do you promise to follow the Court's instruction that the United States must prove its case beyond a reasonable doubt, nothing more, nothing less?

49.     How many of you watch CSI or other shows related to forensic science?

50.     Does any juror think this type of television program is reality?

51.     Notwithstanding what you see on CSI or other shows related to forensic science, do you all agree that the prosecution can prove a criminal case without presenting any physical evidence?

52.     The United States' burden of proof in this case is beyond a reasonable doubt.   Will anybody hold the United States to proof "beyond a CSI doubt?"

53.     Do you believe that shows like CSI realistically portray scientific tests they show?

54.     Do you understand that the law requires the United States to prove the defendant's guilt beyond a reasonable doubt, but does not require the United States to present any specific type of evidence, including scientific evidence?

55.     Do you understand that in real life there is not always scientific evidence like there is on CSI?

56.     If traditional evidence of guilt in this case is strong enough, would you be able to vote guilty even if no scientific evidence was available?

I.     **Other Questions.**

57.     Discussion of aiding and abetting.

58.     Discussion of conspiracy.

59.     Discussion of circumstantial evidence.

60.     Does any juror have any problem with his or her hearing, vision, or physical health, which would prevent him or her from giving full attention to all the evidence at this trial?

61.     Is any juror taking any medication, which would prevent him or her from giving full attention to all of the evidence at this trial?

62.     Does any juror have any difficulty in reading or understanding English to any degree?

63.     Does any juror have any religious, philosophical or other beliefs which would make him or her unable to act as the judge of the facts in this case and to render a guilty verdict for reasons unrelated to the law and evidence? Does any juror feel that he or she could not sit in judgment of your fellow man?

64.     In these questions, I have tried to direct your attention to possible reasons why you might not be able to sit as a fair and impartial juror. Apart from any prior question, does any juror have the slightest doubt in his or her mind, for any reason whatsoever, that he or she will be able to serve conscientiously, fairly and impartially in this case and to render a true and just verdict without fear, favor, sympathy or prejudice, and according to the law as it will be

explained?

### J.     **Function Of The Court And Jury**

63.     The function of the jury is to decide questions of fact. You are the sole judge of the facts and nothing that the Court or lawyers say or do may encroach in any way on your role as the exclusive fact finder. When it comes to the law, however, you are to take your instructions from the Court and you are bound by those instructions. You may not substitute your notions of what the law is or what you think it should be. At the conclusion of this case, your job will be to determine whether or not the defendants are guilty as charged in the Indictment. Does any juror have any reason that might prevent him or her from accepting the instructions of law that I will give you in this case? Would anyone be unable to reach a firm yes/no, guilty/not guilty verdict based solely on the evidence admitted at trial and on the law?

64.     Will each of you accept the proposition of law that the question of punishment is for the Court alone to decide and that the possible punishment must not enter into your deliberations as to whether the defendant on trial here is guilty? Would the possibility that a defendant might spend time in prison make you even a little less likely or a little more likely to influence your deliberations?

65.     Will each of you accept the proposition of law that neither sympathy nor prejudice should enter into your deliberations as to the guilt or innocence of the defendant and that only the evidence produced here in Court may be used by you to determine the guilt or innocence of the defendant?

66.     Is there any juror who feels that even if the evidence established a defendant's guilt beyond a reasonable doubt, he or she might not be able to render a guilty verdict

for reasons unrelated to the law and evidence?

### K.     Requested Instruction Following Impaneling

67.     From this point until the time when you retire to deliberate your verdict, it is your duty not to discuss this case, and not to remain in the presence of other persons who may be discussing this case. The rule about not discussing the case with others includes discussions even with members of your family or friends. If at any time during the course of this trial, any person attempts to talk to you or to communicate with you about this case, either in or out of the courthouse, you should immediately report such an attempt to me. In this regard, let me explain to you that the attorneys and the defendants in a case are not supposed to talk to jurors, not even to offer a friendly greeting. So if you happen to see any of them outside this courtroom they will, and should, ignore you. Please do not take offense. They will only be acting properly by doing so.

Respectfully Submitted,

FRED FEDERICI
United States Attorney, Acting
Under Authority Conferred by 28
U.S.C. § 515

**_Electronically filed on 3/23/2018_**
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, New Mexico 88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____
MATTHEW M. BECK
Assistant United States Attorney

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **NO.  15-CR-4268-JB** |
| | § | |
| **JOE GALLEGOS,** | § | |
| **EDWARD TROUP,** | § | |
| **BILLY GARCIA,** | § | |
| **ALLEN PATTERSON,** | § | |
| **CHRISTOPHER CHAVEZ,** | § | |
| **ARTURO ARNULFO GARCIA,** | § | |
| **ANDREW GALLEGOS, and** | § | |
| **SHAUNA GUTIERREZ,** | § | |
| | § | |
| **Defendants.** | § | |

### TRIAL TWO DEFENDANTS' JOINT PROPOSED VOIR DIRE

**COME NOW** Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Arnulfo Garcia, Andrew Gallegos and Shauna Gutierrez respectfully seek to address the following issues during voir dire and offer the following sample questions to be asked of the members of the venire panel pursuant to Rule 24(a) of the Federal Rules of Criminal Procedure. The Defendants also intend to ask follow up questions based on individual juror's responses to the questionnaire.

The Defendants propose to engage in voir dire on the following topics:

I.  Introduction
    A.  Indictment – what it is and isn't
    B.  Conspiracy

II.  The Presumption of Innocence

III.  Reasonable Doubt
    A.  Burden Shifting

IV.  Credibility of witnesses in general.
    A.  Informant / Cooperator Testimony

V.    Law enforcement- feelings about police
          A. Gangs
          B.  Drugs / Drug Trafficking

VI.    Violent Crimes in Aid of Racketeering

VII.    Individual Verdicts and Multiple Defendants

VIII.    Individual Verdicts and Multiple Charges

IX.    Uncharged Conduct

X.    Fifth Amendment

XI.    Questionnaire Responses

XII.    Conclusion

The Defendants' voir dire will be designed to discover the bias or prejudice of potential
jurors with regard to these various issues, and will be directed toward determining whether
potential jurors will be able to receive evidence and follow the Court's instructions without undue
bias.

**I. Introduction**

During the Introduction, the Defendants will include statements related to the purpose of
voir dire and the suitability to serve on this jury such as:

1.    Defendants', counsels' and witnesses' names.

2.    That, as human beings, our attitudes, impressions, and feelings are shaped by our life
experiences.

3.    That because of our experiences we tend to lean one way or another on various issues and
that this is natural and expected.

4.    That we are not asking these questions to try to imply that any of the venire are unfair in any
way, but rather to determine whether they might have had some experiences that might make them
lean on one way or another with respect to the issues in this case.

5.      That when an individual leans one way or another on certain issues, it does not make that person bad, because it is natural – rather, it is just an indication that perhaps we would be better suited to serve on a different jury.

6.      That if there are any issues that arise during the voir dire that one of the members is uncomfortable answering in front of the entire panel they can speak with counsel and the judge in private.

### A.      Indictment

1.      What it is and isn't. Claims against gang vs. acts of each defendant.

2.      How many of you believe that the prosecution will seek an indictment only against those it believes to be guilty?

3.      Does anyone feel that since Defendants have been arrested and charged with crimes in the indictment, there must be solid evidence against each of them for those crimes?

### B.      Conspiracy

1.      There are several charges of conspiracy in this case.  What comes to mind when you think of "conspiracy?

      a.      How much involvement does a person have to have to be part of a conspiracy

      b.      There may be evidence that defendant was present when the crimes he is charged with were committed.  Would that fact tend to make you believe he was involved in the crimes and criminally responsible for the crimes?

2.      Defendants – alleged members of a gang.  Guilt *purely* by association?

## II.      Presumption of Innocence

      With regard to the presumption of innocence, the Defendants will ask questions such as:

1.      Who here thinks that the Defendants sit here today because they must have done something wrong, in other words they are sitting here for a reason?

2.      Does everyone understand that as the Defendants sit here today, they are presumed innocent unless and until the Government proves their guilt beyond a reasonable doubt?

3.      Does everyone understand that as the Defendants sit here right now, they are as innocent as anyone that we could pull off the street right now?

4.      How many think presumption of innocence is more an "ideal" of our judicial system, rather than what we can logically and realistically put to practice when a defendant is brought to trial for a violent, senseless crime?

        a.      All the more so if an alleged gang member?  If an alleged prison gang member?

5.      How many believe if gang member = criminal?

6.      How many believe a prisoner – convicted once – deserves no presumption of innocence if charged with another crime *inside* the prison?

        a.      Gang inside prison – more likely guilty because of closed / monitored environment?

        b.      Can you still apply presumption of innocence to a person who was in prison? You are going to hear testimony that these men were in prison when the crimes are alleged to have occurred. Will you be able to still presume them innocent, despite that fact?

7.      Do you understand that the Defendants are not required to prove their innocence, and in fact, need offer no evidence whatsoever?

**III.   Reasonable doubt**

        With regard to proof beyond a reasonable doubt, the Defendants will ask questions such as:

1.      The standard of proof in a criminal case is "beyond a reasonable doubt."  It is the highest burden of proof in our legal system.  What does the term "beyond a reasonable doubt" mean to you?

2.      Judge Browning is going to instruct you that the Government has the burden to prove beyond a reasonable doubt that the Defendants are guilty of the crimes alleged in the indictment.

Do any of you have a problem holding the Government to this standard?

3.      Do any of you think that is too high a standard when the crimes charged are against an alleged gang member, and the charges are murder, conspiracy to murder, drug trafficking?

4.      Do you think it is *as* important to uphold the law that a person is innocent until proven guilty beyond a reasonable doubt as it is to uphold the law against murder and drug trafficking?

5.      Do you understand that you are serving justice just as much by finding a defendant not guilty if you have a reasonable doubt as to his guilt, as you are in finding him guilty if there is no possible reasonable doubt?

6.      Do you realize it is possible when you listen to the case as a whole that you might conclude that the Government has failed to prove beyond a reasonable doubt that the Defendants committed the exact offenses charged?

7.      Do you understand that you cannot find a defendant guilty just because you think he probably committed some crime?  It is not enough to convict a defendant if you merely think he engaged in some criminal conduct at some point in time.  Under your solemn oath you must be convinced beyond a reasonable doubt that the Government proved the particular charge against him in this case and every element of that charge beyond a reasonable doubt before you can convict him of anything. If you concluded that what a defendant did was something you believed to be wrong but that conduct was not the crime charged would you be able to set aside your conclusions of possible wrongdoing and return a verdict of not guilty because the evidence did not prove the defendant guilty of the crime he has been charged with?

8.      Can all of you follow Judge Browning's instruction to presume the Defendants are innocent and find them not guilty if the Government does not prove that they are guilty beyond a reasonable doubt?

9.      Do you understand that you do not have to be unanimous about what the reasonable doubt

is?  Each of you can have a different doubt but if you have a reasonable doubt about the quality of the proof as it relates to the elements of the crime, then you must vote not proven or not guilty. For example, each of you could decide that a portion of the witness's testimony was not believable and then decide to discount that witness's testimony.  It does not have to be the same portion of that witness' testimony for each of you to question that witness's credibility and vote not guilty.

10.     Do you understand you need only one reasonable doubt?

11.     Do you understand a reasonable doubt can be based not only on the evidence that you hear but on the evidence that you don't hear?  It can be based on things you didn't hear and felt you needed to.

12.     If you thought there was a chance one or more Defendants were guilty of any of the crimes charged, but you were not sure and had a reasonable doubt, could you vote not guilty?

      **A.     Burden Shifting**

1.     Would you expect me, as defendant's defense attorney, to prove his/her innocence, given the severity of the charges?  Given he/she is an alleged member of a gang? Of this gang, Syndicato de Nuevo Mexico?

[Explain difference between determining innocence and not guilty]

2.     If you were undecided, would you think you should defer to the Government, and vote guilty?

      a.     Why or why not?

**IV.     Credibility of Witnesses**

      With regard to credibility of witnesses, the Defendants will ask questions such as:

1.     How many of you have had people tell you two different stories about the same incident and then tried to determine which one was telling the truth? How did you go about that? What did you look for to help you decide?

2.      Is there a difference between a biased witness and a mistaken witness?  If so, what is that difference?

3.      What are some reasons a person might lie about what happened in a particular incident?

4.      If a person was under the influence of drugs during an event, how do you think that affects their ability to recall the event?  Would that also depend on the type of drug the witness was using?

5.      Do you believe that heroin, if injected, can affect a person's memory?  Do you believe that injecting heroin could affect a person's perceptions?

6.      How does chronic drug use affect a witness's ability to perceive an event?

7.      How would you consider evidence of a witness's act of untruthfulness in a different situation, in determining that witness's credibility today?

8.      What would you want to know about a witness or their circumstances in deciding whether to credit their testimony?

        A.      **Informant/Cooperator Testimony**

        With regard to informant/cooperator testimony, the Defendants will ask questions such as:

1.      How many of you have been accused of something you didn't do? [Show of hands] Not a good feeling, would you agree?

2.      Have you ever found yourself in a situation in work, at school or in your family where others are telling untruths about you for their personal gain?  How did you feel about that?  What happened as a result?

3.      Part of the evidence the Government will present will be testimony from former gang members offering up information in the hope of lesser sentences for their own crimes and benefits while they are behind bars.

4.      What do you think of someone who has committed a crime who gets favors in exchange for his testimony against someone else?  Would that affect his credibility in your eyes?  Do you think he

might say "anything" to get off or get a lighter punishment?

5.      Or, do any of you feel that a witness called by the prosecution is more objective and more credible than one called by the defense, just by virtue of the fact that he is a government witness?

6.      What if you hear he has mental problems? Would that raise further doubts about his "story"? Why or why not?

7.      Do you think someone would lie to save themselves?

8.      What would you look for to determine if someone were testifying to tell the truth or for some other reason?  What would be important to you?

        a.      [IF TRUE]      Does it make a difference to you if the informant's testimony is that the defendant was the ringleader, trying to lay the crimes on other people?  How would you weigh it in determining defendant's guilt or innocence?

9.      In this case you will hear testimony that the United States Attorney offered a reduced sentence or other benefits to convicted felons or co-conspirators in exchange for their testimony against these Defendants.   You will have to decide if these witnesses are to be believed.   In considering the truthfulness of a witness, will you take into account whether that witness had been offered or received any benefit in the form of cash, reduced sentences, dropped criminal charges, or any other benefit in exchange for testimony against a Defendant?

10.      How difficult would it be for you to question the testimony of a witness who the United States Government claims is telling the truth?  Would you automatically assume that he or she is telling the truth?

11.      Do you think a prosecution witness might not testify truthfully?  Do you think that someone who is testifying in exchange for a reduced sentence, money, or other benefit is likely to testify truthfully or likely to be untruthful?

12.      Do you think that financial assistance or a reduced sentence, or the promise of a possible

reduced sentence, or any other benefit would have any effect on the truthfulness of someone's testimony, particularly someone already in prison and possibly facing a lengthy extension of his sentence?

**V.     Law Enforcement**

With regard to law enforcement, the Defendants will ask questions such as:

1.     A number of you said in your questionnaires that you have worked for, volunteered with, or applied to a law enforcement agency.  [Show of hands]

a.     Experience with drug and gang enforcement?

b.     Impact if juror in this case?

c.     Could you rely *solely* on evidence presented in court in making your decision?

d.     Wouldn't you rely on your own experience to assess the evidence?

2.     And who, among you, has friends or relatives who have worked in law enforcement? [Show of hands]

a.     How often do you see them?

b.     Have you discussed this case with them?  Or being called for jury duty?

c.     Have you discussed the presence of gangs or drugs in your community?

d.     Have you discussed the SNM with them, specifically?  What exactly did you talk about?  Did you form any opinions or impressions of the gang or their activities on the basis of your discussion?

3.     Would you honestly be able to set aside those opinions and impressions and decide this case solely on the evidence presented at trial?

4.     If the court instructs you, with respect to the testimony of both FBI agents and police officers that you are not to assume that such testimony is truthful because the witness happens to be a police officer or a federal agent, can you promise that you will follow the court's instruction?

5.      If the court further instructs you that such testimony of police officers and/or federal agents is to be evaluated by you as jurors just like the testimony of any witness who is not a police officer, and evaluated by you using the same standards as a non-law enforcement officer witnesses, will you promise that you will follow the Court's instruction?

6.      Do you think it is ever appropriate to question an officer's credibility and honesty? Why or why not? When?

7.      Do any of you feel that if a person is arrested, it means that the person definitely did something wrong?

8.      How many of you think an officer could never make a mistake in deciding whether or not someone is doing something wrong? [Show of hands]

        a.      How should an officer act once they realize they made a mistake?

9.      Do you think officers always do what they should? Why or why not?

10.     How many of you feel that a law enforcement officer is more likely to tell the truth than a non-law enforcement officer? [Show of hands]

        a.      What is it about the fact that the person is a law enforcement officer that makes them more or less likely to be telling the truth?

        b.      What are some reasons that an officer might not tell the truth?

11.     How many of you think that an officer would never tell an altered or adjusted version of what actually happened in order to try to help the prosecution prove its case?

12.     What kind of information would be important for you to know in order to determine whether or not an officer was lying or altering or adjusting their story in this case?

13.     How many of you think an officer would never influence a witness who was writing a statement describing an event?

14.     How many of you would feel uncomfortable passing judgment on an officer's credibility?

DNM 619

With regard to the issues in this case, the Defendants will ask questions such as:

**A.    Gangs**

1.    A number of you in your questionnaires expressed concern about the growth of gangs in NM.  How many of you, or someone close to you, have had an encounter with gang activity or gang members that could influence you so that you would not have an open mind if selected as a juror in this case?

   a.    Describe. Impact if selected as a juror?  [At bench individually, after show of hands?]

2.    How many just have "zero tolerance" for gangs?

**B.    Drugs / Drug Trafficking**

1.    How many of you have had reason to be particularly concerned about drugs in your own community or family?  What action, if any, have you taken?

2.    What do you think should be done to people caught selling drugs to curb their distribution?

3.    How do you feel about President Trump's call for the death penalty for those convicted of drug trafficking?

4.    Do any of you harbor such strong feelings against drugs and drug sellers that you could not listen to the evidence in this case with an open mind?

   Would you honestly be able to get beyond those feelings, to decide this case solely on the evidence?

**VI.    Violent Crimes in Aid of Racketeering**

With regard to the charges in this case, the Defendants will ask questions such as:

1.    Does anyone believe they will have difficulty sitting on a case that alleges the Defendants committed violent crimes in aid of a racketeering? Specifically, that the Defendants may have been members of a prison gang and allegedly committed violent acts on behalf of the gang?

2.    If you thought a defendant was a member of a prison gang, some of whom were involved in

racketeering activities, but not necessarily the defendant, could you still judge the facts independently to determine if the defendant committed a VICAR crime or conspiracy? What if the crime was assault? What if the crime was murder?

3.       If you believed a defendant was a member of a prison gang, and other members of the gang committed a violent act on behalf of the gang, such as murder, but you had a reasonable doubt that the defendant was involved in committing or conspiring to commit the murder, would you have any problem voting not guilty?

4.       If you believed a defendant was a leader of a prison gang, and other members of the gang committed a violent act on behalf of the gang, such as murder, but you had a reasonable doubt that the defendant was involved in committing or conspiring to commit a murder or other violent act, would you be able to vote not guilty?

5.       Defendants are charged with conspiracy to commit murder; what type of evidence would you expect to see to prove someone conspired to commit a murder?

6.       What actions or words would constitute an agreement to commit murder? Does agreeing not to tell on someone who a person knows is taking steps to commit a murder, constitute a conspiracy to commit murder?

7.       If someone was in fear for their life if they did not agree to do something that was part of a conspiracy to commit murder, how would that influence whether you thought they were guilty of conspiracy?

**VII.    Individual Verdicts and Multiple Defendants**

With regard to individual verdicts and multiple defendants, the Defendants will ask questions such as:

1.       Who has heard the phrase "guilt by association"? [Show of hands]

        a.       What does it mean to you?

b.    Do you believe the concept of "guilt by association" is consistent or inconsistent with the presumption of innocence?

2.    Can you imagine a situation where someone might be charged with a crime under a theory of guilty by association? What are some examples of how that can happen?

3.    The government alleges that the Defendants in this case are all members or associates of a gang.  Does anyone believe that if one member of a gang is guilty of a crime that means other members are more likely to be guilty of the same crime?  Should all members of the gang be punished based on the actions and criminal activities of other members?

4.    Do you understand that the Government must prove beyond a reasonable doubt the criminal acts alleged must be in furtherance of the goals of the gang?

5.    In a case involving more than one Defendant, the law requires you to separately consider the evidence against each defendant and to return a separate verdict as to each of them.  How do you think you can accomplish this?  How would you keep the evidence as to each Defendant separate?

6.    In a case involving more than one Defendant, the verdict as to one Defendant—whether not guilty or guilty—should not affect or impact upon reaching a verdict as to any other Defendant. What do you think about this principle?  Do you believe that it should apply where the Defendants are alleged members of a prison gang? Why or why not?

## VIII.   Individual Verdicts and Multiple Charges

With regard to individual verdicts and multiple charges, the Defendants will ask questions such as:

1.    Just like individual verdicts against each defendant, you must also decide whether or not a defendant is guilty of each charge, separately, against him. Will you be able to do that?

2.    Do any of you feel that if someone is guilty of one crime charged, then he must be guilty of

all crimes charged?

3.      Will you be able to separate and keep separate the evidence for each charge and weigh it on

its own merit, without considering the other charges?

**IX.     Uncharged Conduct**

With regard to uncharged conduct, the Defendants will ask questions such as:

1.      During the trial, you may hear evidence that a Defendant engaged in alleged crimes other

than the crime or crimes charged.  If you believe that a defendant had committed a crime for which

he has not been charged, but you have a reasonable doubt that he committed an offense for which

he has been charged, would you have any problem voting not guilty?  How would you feel about

voting not guilty?

2.      If you were to hear evidence that a defendant committed crimes or engaged in misconduct

for which he was not being charged, would you feel more inclined to find him guilty of the crimes

with which he is charged? Why or why not?

3.      Do you understand it is up to the government to decide what to include in the indictment?

A person cannot be found guilty of any crime that is not specifically set out in the indictment.

**X.      Fifth Amendment Right**

With regard to the Fifth Amendment right to remain silent, the Defendants will ask

questions such as:

1.      Do all of you know that a person accused of a crime has the right under the Fifth

Amendment to the Constitution to remain silent?

2.      As part of the right to remain silent, the Defendants have the right not to testify and to hold

the Government to its burden of proof beyond a reasonable doubt; does anyone think an accused

should be required to testify? Why or why not?

3.      Do you think a person charged, if he is innocent, should take the stand and explain himself?

DNM 623

Can you think of reasons, other than guilt, that he wouldn't want to testify?

4.      How would you feel if a Defendant did not take the stand?  Would you feel that he was trying to hide something?  Would you be more inclined to give more weight to the evidence against him, and more likely convict him?

5.      If defense counsel instructs a Defendant not to testify will you hold it against him/her in determining if the Government has met its burden of proof?

6.      If Judge Browning instructs you not to let the fact that a Defendant did not testify influence your verdict in any way, can you promise to follow that instruction?

7.      If a Defendant did testify, would you, in all honesty, give the same credence to his testimony as you would to a person who is not the Defendant?

## XI.      Questionnaire Responses

The Defendants intend to ask follow up questions of specific jurors related to those juror's answers to questions asked on the written questionnaire.  Given the variety of topics covered, it is impossible to offer sample questions at this time. However, the questioning will be focused on clarifying or expanding the juror's prior answers.

## XII.      Conclusory Questions

During the Conclusion, the Defendants will ask questions such as:

1.      As we have discussed these various issues, is there anything that has come up that any of you would like to add or to bring to our attention?

2.      Based on our discussion, are there any of you who feel that this might not be the best jury for you to sit on?

3.      If you were in the defendants' position, would you be comfortable with someone just like you, with the same life experiences, same attitudes, same feelings, sitting on this jury?

4.      These questions are only samples and anticipate the general framework of the defendants'

voir dire questions. In the natural course of voir dire, the defendants' topic areas may shift based on

the venire panel's responses. Defense counsel may use concrete examples of personal experience

which relate to these various issues in order to facilitate the discussion by the potential jurors.

DATED:   March 23, 2018.                          Respectfully submitted,


                                                  */s/ Cori A. Harbour-Valdez*
                                                  Cori A. Harbour-Valdez
                                                  The Harbour Law Firm, PC
                                                  1522 Montana Avenue, 3rd Floor
                                                  El Paso, TX 79902
                                                  Phone: 915-544-7600
                                                  Fax: 915-975-8036
                                                  cori@harbourlaw.net
                                                  &
                                                  */s/ Patrick J. Burke*
                                                  Patrick J. Burke
                                                  Patrick J. Burke, P.C.
                                                  999 18th Street, Suite 2055
                                                  Denver, CO 80202
                                                  Phone:  (303) 825-3050
                                                  Fax:  303-825-2992
                                                  Patrick-j-burke@msn.com
                                                  *Counsel for Edward Troup (3)*


**CERTIFICATE OF SERVICE**

        I hereby certify that on March 23, 2018, I caused the instant document to be filed with the
Clerk of the Court using the CM/ECF system that will serve all other parties entitled to service and
notice.

                                                  *s/ Cori A. Harbour-Valdez*
                                                  Cori A. Harbour-Valdez

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **NO.  15-CR-4268-JB** |
| | § | |
| **JOE GALLEGOS,** | § | |
| **EDWARD TROUP,** | § | |
| **BILLY GARCIA,** | § | |
| **ALLEN PATTERSON,** | § | |
| **CHRISTOPHER CHAVEZ,** | § | |
| **ARTURO ARNULFO GARCIA,** | § | |
| **ANDREW GALLEGOS, and** | § | |
| **SHAUNA GUTIERREZ,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## TRIAL 2 DEFENDANTS' PROPOSED JURY INSTRUCTIONS

**COME NOW** Defendants Joe Gallegos, Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, Arturo Arnulfo Garcia, Andrew Gallegos and Shauna Gutierrez respectfully hereby respectfully request that, before the jurors deliberate in this case, they be given the instructions listed below. Defendants further request permission to submit such additional instructions as may become appropriate during the trial.

DATED:   March 23, 2018.                              Respectfully submitted,

> */s/ Cori A. Harbour-Valdez*
> Cori A. Harbour-Valdez
> The Harbour Law Firm, PC
> 1522 Montana Avenue, 3rd Floor
> El Paso, TX 79902
> Phone: 915-544-7600
> Fax: 915-975-8036
> cori@harbourlaw.net
> &
> */s/ Patrick J. Burke*
> Patrick J. Burke
> Patrick J. Burke, P.C.
> 999 18th Street, Suite 2055

Denver, CO 80202
Phone:  (303) 825-3050
Fax:  303-825-2992
Patrick-j-burke@msn.com
*Counsel for Edward Troup (3)*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2018, I caused the instant document to be filed with the Clerk of the Court using the CM/ECF system that will serve all other parties entitled to service and notice.

s/*Cori A. Harbour-Valdez*
Cori A. Harbour-Valdez

## JURY INSTRUCTION NO. 1

Members of the Jury:

In any jury trial there are, in effect, two judges.  I am one of the judges, you are the other.  I am the judge of the law.  You, as jurors, are the judges of the facts.  I presided over the trial and decided what evidence was proper for your consideration.  It is also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdicts.

In explaining the rules of law that you must follow, first, I will give you some general instructions which apply in every criminal case -- for example, instructions about burden of proof and insights that may help you to judge the believability of witnesses.  Then I will give you some specific rules of law that apply to this particular case and, finally, I will explain the procedures you should follow in your deliberations, and the possible verdicts you may return. These instructions will be given to you for use in the jury room, so you need not take notes.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.03 (2011 ed.) (**Introduction to Final Instructions**).

## JURY INSTRUCTION NO.  2

You, as jurors, are the judges of the facts.  But in determining what actually happened -- that is, in reaching your decision as to the facts -- it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you.  You must not substitute or follow your own notion or opinion as to what the law is or ought to be.  It is your duty to apply the law as I explain it to you, regardless of the consequences.  However, you should not read into these instructions, or anything else I may have said or done, any suggestion as to what your verdict should be. That is entirely up to you.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took.

 Authority: <u>Tenth Circuit Pattern Jury Instructions Criminal</u> §1.04 (2011 ed.) (**Duty to Follow Instructions**).

## JURY INSTRUCTION NO. 3

The government has the burden of proving Defendants Joe Gallegos, Edward Troup, Billy Garcia, Christopher Chavez, Allen Patterson, Arturo Arnulfo Garcia, Andrew Gallegos, and Shauna Gutierrez guilty beyond a reasonable doubt. The law does not require any individual defendant to prove their innocence or produce any evidence at all.  The government has the burden of proving each defendant, individually, guilty beyond a reasonable doubt, and if it fails to do so for any individual defendant, you must find that defendant not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of a defendant's guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.  It is only required that the government's proof exclude any "reasonable doubt" concerning any individual defendant's guilt. A reasonable doubt is a doubt based on reason and common sense. It may arise after careful and impartial consideration of all the evidence, or from lack of evidence.  If, based on your consideration of the evidence, you are firmly convinced that a defendant is guilty of the crimes charged, you must find that defendant guilty of that charge.  If on the other hand, you think there is a real doubt about the truth of any charge, then you must give a defendant the benefit of the doubt and find that defendant not guilty of that charge.

It is your duty to consider the evidence applicable to each defendant, separately. You must consider whether a reasonable doubt exists as to each count charged against each individual defendant.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.05 (2011 ed.) (modified) **(Presumption of Innocence–Burden of Proof – Reasonable Doubt**); Tenth Circuit Pattern Jury Instructions Criminal §1.05.1 (2011 ed.) (modified) **(Preponderance of Evidence**).

## JURY INSTRUCTION NO.  4

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations that the lawyers agreed to.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  Their questions and objections are not evidence.  My legal rulings are not evidence.  And my comments and questions are not evidence.

During the trial, I did not let you hear the answers to some of the questions that the lawyers asked.  I also ruled that you could not see some of the exhibits that the lawyers wanted you to see.  And sometimes I ordered you to disregard things that you saw or heard, or I struck things from the record.  You must completely ignore all of these things.  Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Authority:  Tenth Circuit Pattern Jury Instructions Criminal §1.06 (2011 ed.) (modified) (**Evidence-Defined**).

## JURY INSTRUCTION NO.  5

During the course of this trial, and on multiple occasions thought the trial, you have heard evidence that was admitted for a limited purpose and as to a particular defendant, only.

Each time this type of evidence was admitted, I instructed you of the specific limitations placed on your use of that evidence. By providing these instructions, I was not suggesting that you must or should find the particular evidence credible or probative of any issue in this case. However, in the event you decide to consider the limited evidence, then you may only use it only for the limited purpose, and only as to the particular defendant, for which it was admitted.

You are not to consider any limited evidence for any other purpose than the particular purpose for which it was admitted. And, you may not use it in any way during your deliberations concerning any defendant against whom the evidence was not admitted.

Authority:  Federal Rules of Evidence 105; Ninth Circuit Pattern Jury Instructions Criminal 2.11 (**Evidence for Limited Purpose**); *See United States v. Armijo*, 5 F.3d 1229, 1232 (9th. Cir. 1993); *See* Jury Instruction No. 5, Document 1877, 15-CR-4268 ("Trial 1").

- 7 -

## JURY INSTRUCTION NO.  6

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence, that is, the proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in the light of common experience.  An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.

By permitting such reasonable inferences, you may make deductions and reach conclusion that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.

<u>Authority</u>:  <u>Tenth Circuit Pattern Jury Instructions Criminal</u> §1.07 (2011 ed.) (modified) (**Evidence-Direct and Circumstantial-Inferences**).

DNM 633

## JURY INSTRUCTION NO. 7

I remind you that it is your job to decide whether the government has proved the guilt of Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez beyond a reasonable doubt.  In doing so, you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.  You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was.  In making that decision, I suggest that you ask yourself a few questions: Did the witness impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness admit prior instances of untruthfulness? Did the witness testify falsely on prior occasions? Did the witness make prior statements that were inconsistent with his or her testimony? Did the witness collude with others to create false evidence on prior occasions? Did the witness have the opportunity to collude with others prior to his testimony? Did the witness have a personal interest in the outcome in this case? Did the witness have any relationship with the government or a defendant? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he/she testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail.  And you

should keep in mind that innocent misrecollection -- like failure of recollection -- is not uncommon.

You may not consider any defendant's decision not to testify as evidence of guilty. I want you to clearly understand, please, that the Constitution of the United States grants to Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez.

In reaching a conclusion on particular point, or ultimately in reaching a verdicts in this case, do not make any decisions simply because there were more witnesses on one side than on the other. What is important is how believable a witness was and how much weight you think that their testimony deserves.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.08 (2011 ed.) (modified) (**Credibility of Witnesses**); Tenth Circuit Pattern Jury Instructions Criminal §1.08.1 (2011 ed.) (modified) (**Non-Testifying Defendant**).

- 10 -

## JURY INSTRUCTION NO.  8

You have heard evidence that, before this trial, witnesses have made statements that may be different from the witnesses' testimony here in court.

This earlier statement was brought to your attention only to help you decide how believable his testimony in this trial was.  You cannot use it as proof of anything else.  You can only use it as one way of evaluating his testimony here in court.


Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.10 (2011 ed.) (modified)

(**Impeachment by Prior Inconsistencies**).

## JURY INSTRUCTION NO. 9

You have heard evidence that a defendant has been convicted of a felony, that is, a crime punishable by imprisonment for a term of years. The fact that a defendant has been convicted of another crime does not mean that a defendant committed the crime charged in this case, and you must not use a defendant's prior convictions as proof of the crime charged in this case.  You may find them guilty of the crimes charged here only if the government has proved beyond a reasonable doubt that they committed them.


Authority:  Tenth Circuit Pattern Jury Instructions Criminal §1.11 (2011 ed.) (modified) (**Impeachment by Prior Conviction (Defendant's Testimony)**).

## JURY INSTRUCTION NO. 10

The testimony of a witness may be discredited or impeached by showing that the witness previously has been convicted of a felony, that is, of a crime punishable by imprisonment for a term of years or of a crime of dishonesty or false statement.  A prior conviction does not mean that a witness is not qualified to testify, but is merely one circumstance that you may consider in determining the credibility of the witness.  You may decide how much weight to give any prior felony conviction or crime of dishonesty that was used to impeach a witness.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.12 (2011 ed.) (modified)

(**Impeachment by Prior Conviction (Witness Other Than Defendant)**).

DNM 638

### JURY INSTRUCTION NO. 11

You have heard the testimony of **[name of witness]**, who was a witness in the **[government's] [Mr. J. Gallegos', Mr. Troup's, Mr. B. Garcia's, Mr. Chavez', Mr. Patterson's, Mr. A. Garcia's, Mr. A. Gallegos', and Ms. Gutierrez'] case.** You also heard testimony from others concerning their opinion about **a defendant's character for truth-telling or the witness' reputation, in the community where the witness lives, for telling the truth.** It is up to you to decide from what you heard here whether **[name of witness]** was telling the truth in this trial.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.13 (2011 ed.) (modified) (**Impeachment by Evidence of Untruthful Character**).

- 14 -

**JURY INSTRUCTION NO. 12**

Accomplice

An accomplice is someone who joined with another person in committing a crime, voluntarily and with common intent.  The testimony of an accomplice may be received in evidence and considered by you, even though it is not supported by other evidence.  You may decide how much weight it should have.

You are to keep in mind, however, that accomplice testimony should be received with caution and considered with great care.  You should not convict any defendant based on the unsupported testimony of an alleged accomplice, unless you believe the unsupported testimony beyond a reasonable doubt.

Informant

An informant is someone who provides evidence against someone else for a personal reason or advantage.  The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence.  You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness.  You must determine whether the informant's testimony has been affected by self-interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against any defendant.

You should not convict any defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

Immunity

A person may testify under a grant of immunity (an agreement with the government). His testimony alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt even though it is not corroborated or supported by other evidence. You should consider testimony given under a grant of immunity with greater care and caution than the testimony of an ordinary witness. You should consider whether testimony under a grant of immunity has been affected by the witness's own interest, the government's agreement, the witness's interest in the outcome of the case, or by prejudice against any defendant.

On the other hand, you should also consider that an immunized witness can be prosecuted for perjury for making a false statement. After considering these things, you may give testimony given under a grant of immunity such weight as you find it deserves.

You should not convict any defendant based on the unsupported testimony of an immunized witness, unless you believe the unsupported testimony beyond a reasonable doubt.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.14 (2011 ed.) (modified) (**Accomplice-Informant-Immunity**).

# JURY INSTRUCTION NO.  13

The government has called as witnesses, alleged accomplices, who were named as co-defendants in the indictment. The government has entered into plea agreements with these alleged co-defendants [list co-defendants], for the dismissal of some charges and a recommendation of a lesser sentence than he would otherwise likely receive. Plea bargaining is lawful and proper, and the rules of this court expressly provide for it.

An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying.  On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict.  You should receive this type of testimony with caution and weigh it with great care. You should never convict any defendant upon the unsupported testimony of such an accomplice, unless you believe that testimony beyond a reasonable doubt.  The fact that an accomplice has entered into a guilty plea to the offense charged is not evidence of the guilt of any other person.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.15 (2011 ed.) (modified)

(**Accomplice** – **Co-Defendant** – **Plea Agreement**).

## JURY INSTRUCTION NO.  14

The testimony of a drug abuser must be examined and weighed by the jury with greater

caution than the testimony of a witness who does not abuse drugs.

[List witnesses] may be considered to be an abusers of drugs.

You must determine whether the testimony of that witness has been affected by the use of

drugs or the need for drugs.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.16 (2011 ed.) (modified)

(**Witnesses' Use of Addictive Drugs**).

## JURY INSTRUCTION NO.  15

During the trial you heard the testimony of **[name of expert witness]** who expressed opinions concerning **[subject matter of expert testimony]**.  In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.

You are not required to accept such an opinion.  You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.17 (2011 ed.) (modified) (**Expert Witness**); *United States v. Starzecpyzel,* 880 F.Supp. 1027, 1050-51 (S.D.N.Y. 1995); President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature Comparison Methods* (Sept. 20, 2016); President's Council of Advisors on Science and Technology, *An Addendum to the PCAST Report on Forensic Science in Criminal Court.*

- 19 -

## JURY INSTRUCTION NO. 16

Evidence relating to any statement attributed to Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez alleged to have been made after the commission of the crime (or crimes) charged in this case but not made in court, should always be considered by you with caution and weighed with care. You should give any such statement the weight you think it deserves, after considering all the circumstances under which the statement was made.

In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement. For example, consider the age, gender, training, education, occupation, and physical and mental condition of Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez, and any evidence concerning his treatment while under interrogation if the statement was made in response to questioning by government officials, and all the other circumstances in evidence surrounding the making of the statement.

After considering all this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances. If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

As I have previously instructed, any such statement may be considered against the declarant-defendant only, and cannot be considered in any way, whatsoever, as evidence with respect to any other defendant on trial.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.26 (2011 ed.) (modified) (**Confession-Statement—Voluntariness by Defendant**).

## JURY INSTRUCTION NO. 17

The government must prove, beyond a reasonable doubt, that the offense(s) charged in this case was actually committed and that it was Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez who committed it. Thus, the identification of Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez as the person who committed the offense(s) charged is a necessary and important part of the government's case.

You should evaluate the credibility of any witness making an identification in the same manner as you would any other witness. You should also consider at least the following questions:

Did the witness have the ability and an adequate opportunity to observe the person who committed the offense(s) charged? You should consider, in this regard, such matters as the length of time the witness had to observe the person in question, the lighting conditions at that time, the prevailing visibility, the distance between the witness and the person observed, and whether the witness had known or observed the person before.

Is the testimony about an identification made after the commission of the crime(s) the product of the witness's own recollection? In this regard, you should consider very carefully the circumstances under which the later identification was made, including the manner in which Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez was presented to the witness for identification and the length of time that elapsed between the crime(s) and the witness's subsequent identification.

If, after examining all of the testimony and evidence in this case, you have a reasonable doubt as to the identity of Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson,

Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez as the person who committed the offense(s) charged, you must find Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.29 (2011 ed.) (modified) (**Identification Testimony**).

## JURY INSTRUCTION NO. 18

You have heard evidence of other crimes, acts, or wrongs engaged in by Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez.  You may consider that evidence only as it bears on Mr. J. Gallegos', Mr. Troup's, Mr. B. Garcia's, Mr. Chavez', Mr. Patterson's, Mr. A. Garcia's, Mr. A. Gallegos', and Ms. Gutierrez' **[e.g. motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident]** and for no other purpose.  Of course, the fact that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez may have previously committed an act similar to the one charged in this case does not mean that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez  necessarily committed the act charged in this case.


Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.30 (2011 ed.)

(**Similar Acts**). *United States v. Rodella*, 101 F.Supp. 3d 1075, 1085-86 (D.N.M. 2015).

- 23 -

## JURY INSTRUCTION NO.  19

During this trial, you have heard sound recordings of certain conversations. These conversations may be considered by you as you would any other evidence. You were also shown transcripts of those recorded conversations.

Keep in mind that the transcripts are not evidence. They were given to you only as a guide to help you follow what was being said. The recordings themselves are the evidence. If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read. If you could not hear or understand certain parts of the recordings, you must ignore the transcript as far as those parts are concerned.

As I have previously instructed, any such recordings may be considered as evidence against the defendant who is the subject of the recording, only, and cannot be considered in any way, whatsoever, as evidence with respect to any other defendant on trial.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.40 (2011 ed.) (modified)

**(Cautionary Instruction During Trial – Transcript of Recorded Conversation)**.

- 24 -

**JURY INSTRUCTION NO.  20**

Certain charts and summaries have been shown to you to help explain the evidence in this case. Their only purpose is to help explain the evidence. These charts and summaries are not evidence or proof of any facts.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.41 (2011 ed.) (**Summaries and Charts**).

## JURY INSTRUCTION NO. 21

The parties have agreed to certain facts that have been stated to you.  These facts are now conclusively established.

Authority: *See* Jury Instruction No. 19, Document 1877, 15-CR-4268 ("Trial 1").

DNM 651

## JURY INSTRUCTION NO.  22

The word "racketeering" has certain implications in our society. Use of that term in the statute and in this courtroom should not be regarded as having anything to do with your determination of whether the guilt of any defendant has been proven.  The term is only a term used by Congress to describe the statute.


Authority: Tenth Circuit Pattern Jury Instructions Criminal § 2.74.1 (2011 ed.) (**Racketeer Influenced and Corrupt Organization Act: Prejudice from the Word "Racketeering"**).

- 27 -

## JURY INSTRUCTION NO. 23

Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez are charged in Counts 1, 2, 3, 4, 5, 13, 14, and 15 with committing violent crimes in aid of racketeering in violation of 18 U.S.C. § 1959.

The law makes it a crime for any person who, as consideration for a promise or agreement to pay anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the law of any State or the United States, or attempts or conspires so to do.

Authority: Tenth Circuit Pattern Jury Instructions Criminal § 2.74 (2011 ed.) (modified)

**(Racketeer Influenced and Corrupt Organization Act 18 U.S.C § 1962(a) (Introductory Paragraph))**.

## JURY INSTRUCTION NO. 24

Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez are on trial before you upon an Indictment brought by the Grand Jury. Before reading the indictment to you, I remind you that the Indictment or formal charge against Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez is not evidence of guilt.  Indeed, Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez are presumed by the law to be innocent.

In this case, the Indictment charges as follows:

### Count 1

### Murder of Frank Castillo

On or about March 26, 2001, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anthing of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, ANGEL DELEON, **JOE LAWRENCE GALLEGOS, EDWARD TROUP, a.k.a. "Huero Troup,"** LEORNARD LUJAN, and **BILLY GARCIA, a.k.a. "Wild Bill,"** did unlawfully, knowingly, and intentionally **murder FRANK CASTILLO**, in violation of NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

Count 2

Murder of Rolando Garza

On or about March 26, 2001, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), or for the purpose of gaining entrance to and maintaining or increasing position in the  Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, LEORNARD LUJAN, **BILLY GARCIA, a.k.a. "Wild Bill,"** EUGENE MARTINEZ, a.k.a. "Little Guero," **ALLEN PATTERSON,** and **CHRISTOPHER CHAVEZ, a.k.a. "Critter,"** did unlawfully, knowingly and intentionally murder Rolando Garza, in violation of  NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

Count 3

Murder of Freddie Sanchez

On or about June 17, 2007, in Doña Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), or for the purpose of gaining entrance to or maintaining or increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, JAVIER ALONSO, a.k.a. "Wineo," **EDWARD TROUP, a.k.a. "Huero Troup," ARTURO ARNULFO GARCIA, a.k.a. "Shotgun,"** BENJAMIN CLARK, a.k.a. "Cyclone," and RUBEN HERNANDEZ, did unlawfully, knowingly, and intentionally murder Freddie Sanchez, in violation of NMSA 1978, Sections 30-2-1 and 30-1-13..

- 30 -

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

## Count 4

### Conspiracy to Murder Adrian Burns

In or about November 2012, in Socorro and Valencia Counties, in the District of New Mexico, and elsewhere, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, **JOE LAWRENCE GALLEGOS and ANDREW GALLEGOS, a.k.a. "Smiley,"** and others known and unknown to the grand jury, did unlawfully, knowingly, and intentionally conspire to murder Adrian Burns, in violation of NMSA 1978, Sections 30-2-1 and 30-28-2.

All in violation of 18 U.S.C. § 1959(a)(5).

## Count 5

### Murder of Adrian Burns

On or about November 12, 2012, in Socorro and Valencia Counties, in the District of New Mexico, and elsewhere, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicator de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintain and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), and enterprise engaged in racketeering activity, the defendant, **JOE LAWRENCE GALLEGOS and ANDREW GALLEGOS, a.ka. "Smiley,"** did unlawfully, knowingly, and intentionally murder A.B., in violation of NMSA 1978, Sections 30-2-1 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

DNM 656

Count 13

Assault With a Dangerous Weapon Upon Jose Gomez

On or about March 17, 2015, in Valencia County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing activity, the defendant, **JOE LAWRENCE GALLEGOS,** did unlawfully, knowingly, and intentionally murder Adrian Burns, in violation of NMSA 1978, Sections 30-3-2 and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(3) and 2.

Count 14

Conspiracy to Murder Jose Gomez

On or about February 1, 2016, to on or about February 27, 2016, in Otero and Valencia Counties, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, **JOE LAWRENCE GALLEGOS,** SANTOS GONZALEZ, PAUL RIVERA, **SHAUNA GUTIERREZ** and BRANDY RODRIGUEZ, and others known and unknown to the grand jury, did unlawfully, knowingly and intentionally conspire to murder Jose Gomez, in violation of NMSA 1978, §§ 30-2-1 and 30-28-2.

All in violation of 18 U.S.C. § 1959(a)(5).

Count 15

Attempted Murder of Jose Gomez, Assault With a Dangerous Weapon Upon Jose Gomez,
Resulting in Serious Bodily Injury to Jose Gomez

On or about February 27, 2016, in Valencia County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, the defendants, **JOE LAWRENCE GALLEGOS,** SANTOS GONZALEZ, PAUL RIVERA, **SHAUNA GUTIERREZ,** and BRANDY RODRIGUEZ, did unlawfully, knowingly, and intentionally attempt to murder Jose Gomez, and committed assault with a dangerous weapon and assault resulting in serious bodily injury to Jose Gomez, in violation of NMSA 1978 §§ 30-2-1, 30-28-1, 30-3-2, 30-3—5, and 30-1-13.

All in violation of 18 U.S.C. §§ 1959(a)(3) and 1959(a)(5) and 2.

Authority:  Indictment at Count 1, Count 2, Count 3, Count 4, Count 5, Count 13, Count 14 and Count 15, at 9-12, 16-18, filed March 9, 2017 (Doc. 947) (modified); *See* Jury Instruction No. 22, Document 1877, 15-CR-4268 ("Trial 1").

- 33 -

**JURY INSTRUCTION NO. 25**

I have just reviewed the charges brought by the Grand Jury through an indictment.  In this case, the only Defendants on trial before you are Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez.


Authority: *See* Jury Instruction No. 23, Document 1877, 15-CR-4268 ("Trial 1").

## JURY INSTRUCTION NO.  26

Title 18, United States Code, Section 1959(a), makes it a crime for anyone to commit, threaten to commit, attempt to commit, or conspire to commit a violent crime in aid of an enterprise engaged in racketeering activity.

For you to find Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First:*          That the enterprise existed as alleged in the Indictment;

*Second:*          That the enterprise was engaged in interstate commerce or that it's activities affected interstate commerce;

*Third:*          That the enterprise was engaged in racketeering activity;

*Fourth*:          That Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez committed a crime of violence as alleged in the indictment:

Count 1:          (Mr. J. Gallegos, Mr. Troup, and Mr. B. Garcia ): Murder of Frank Castillo;

Count 2:          (Mr. B. Garcia, Mr. Chavez, and Mr. Patterson): Murder of Rolando Garza;

Count 3:          (Mr. Troup and Mr. A. Garcia): Murder of Freddie Sanchez;

Count 4:          (Mr. J. Gallegos and Mr. A. Gallegos): Conspiracy to Murder Adrian Burns;

Count 5:          (Mr. J. Gallegos and Mr. A. Gallegos):  Murder of Adrian Burns

Count 13:          (Mr. J. Gallegos): Assault With a Dangerous Weapon Upon Jose Gomez

- 35 -

Count 14:      (Mr. J. Gallegos and Ms. Gutierrez): Conspiracy to Murder Jose Gomez

Count 15:      (Mr. J. Gallegos and Ms. Gutierrez): Attempted Murder of Jose Gomez, Assault With a Dangerous Weapon Upon Jose Gomez, Resulting in Serious Bodily Injury to Jose Gomez

I will instruct you on what the government must prove to establish that a particular defendant committed any one of these acts; and

*Fifth:*          J. Gallegos', Mr. Troup's, Mr. B. Garcia's, Mr. Chavez', Mr. Patterson's, Mr. A. Garcia's, Mr. A. Gallegos', and Ms. Gutierrez' purpose in committing, threatening to commit, attempting to commit, conspiring to commit the crime of violence was to gain entrance to, or to maintain, or to increase his position in the enterprise.

If the purpose is to "gain entrance to, or to maintain, or to increase his position in the enterprise," it is not necessary for the government to prove that this was the sole purpose of a defendant in committing the charged crime. You need only find that it was a substantial purpose, or that a defendant committed the charged crime as an integral aspect of membership in the enterprise. In determining a defendant's purpose in committing the alleged crime, you must determine what he had in mind. Because you cannot look into a person's mind, you have to determine purpose by considering only the facts and circumstances that have been admitted against an individual defendant during the course of the trial.

An "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate commerce.

Although the enterprise must be separate and apart from the pattern of racketeering activity in which the enterprise allegedly engaged, it is not necessary to find that the enterprise

- 36 -

had some function wholly unrelated to the racketeering activity.  The enterprise must be proved to have been an ongoing organization, formal or informal, that functioned as a continuing unit.

An enterprise is group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time. The personnel of the enterprise, however, may change and need not be associated with the enterprise for the entire period alleged in the indictment. Therefore, the government must prove the existence of an association-in-fact enterprise by evidence of an ongoing organization, formal or informal, and by evidence that the various associates functioned as a continuing unit. The enterprise must have the three following structural features: (1) a purpose; (2) relationships among those associated with the enterprise and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. The name of the organization itself is not an element of the offense and does not have to be proved. The government need not prove that the enterprise had any particular organizational structure.

The group need not have a hierarchical structure or a "chain of command;" decisions may be made on an ad hoc basis and by any number of methods -- by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, you may nonetheless find that the enterprise element is satisfied by finding a group whose associates engage in spurts of activity punctuated by periods of quiescence [inactivity].

The enterprise is "engaged in interstate commerce" if it directly engaged in the distribution or acquisition of goods and services in such commerce. The enterprise's conduct

"affected" interstate commerce if the conduct had a demonstrated connection or link with such commerce.

It is not necessary for the government to prove that a defendant knew or intended that the enterprise was engaged in commerce or that its conduct would affect commerce.  It is only necessary that the natural consequences of the enterprise's conduct affected commerce in some way.  Only a minimal effect on commerce is necessary.

There must be some nexus between the enterprise and the racketeering activity being conducted by members and/or associates of the enterprise.

Authority: Fifth Circuit Pattern Jury Instruction Criminal §2.78 (2015 ed.) (modified) (**Violent Crimes in Aid of Racketeering 18 U.S.C. § 1959(a)**).

## JURY INSTRUCTION NO. 27

The first element that the government must prove beyond a reasonable doubt is that an "enterprise" existed as alleged in the indictment.

The government has charged the following in the Indictment as constituting the enterprise: the Syndicato de Nuevo Mexico Gang (SNM) in Counts 1, 2, 3, 4, 5, 13, 14, and 15.

An enterprise includes a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time. This group of people does not have to be a legally recognized entity, such as a partnership or corporation. This group may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose. This group of people must have: (1) a common purpose; and (2) an ongoing organization, either formal or informal; and (3) personnel who function as a continuing unit.

If you find these three elements, then you may find that an enterprise existed.


Authority: Tenth Circuit Pattern Jury Instructions Criminal § 2.74.3 (2011 ed.) (modified) (**Racketeer Influenced and Corrupt Organization Act – "Section A" First Element – The Enterprise**); Fifth Circuit Pattern Jury Instruction Criminal §2.78 (2015 ed.) (modified) (**Violent Crimes in Aid of Racketeering 18 U.S.C. § 1959(a)**).

DNM 664

## JURY INSTRUCTION NO. 28

The second element the government must prove beyond a reasonable doubt is that the enterprise was engaged in or had an effect upon interstate commerce.

Interstate commerce includes the movement of goods, services, money and individuals between states.

The government must prove that the enterprise engaged in interstate commerce or that its activities affected interstate commerce in any way, no matter how minimal.  It is not necessary to prove that the acts of Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez affected interstate commerce as long as the acts of the enterprise had such effect.  Finally, the government is not required to prove that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez knew he/she was affecting interstate commerce.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §2.74.4 (2011 ed.) (modified)

**(Racketeer Influenced and Corrupt Organization Act – "Section A" Second Element – Effect On Interstate Commerce).**

## JURY INSTRUCTION NO. 29

Interstate commerce means commerce or travel between one state, territory or possession of the United States and another state, territory or possession of the United States, including the District of Columbia.  Commerce includes travel, trade, transportation and communication.

Foreign commerce means commerce between any part of the United States (including its territorial waters), and any other country (including its territorial waters).

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.39 (2011 ed.)

**(Interstate and Foreign Commerce – Defined, 18 U.S.C. § 10).**

DNM 666

## JURY INSTRUCTION NO. 30

If you decide that there was any effect at all on interstate or commerce, then that is enough to satisfy this element.  All that is necessary is that the natural and probably consequence of the acts Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez took would be to affect interstate and commerce.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.39.1 (2011 ed.)

**(Interstate and Foreign Commerce – Effect On, 18 U.S.C. § 10).**

## JURY INSTRUCTION NO. 31

The third element which the government must prove beyond a reasonable doubt as to Counts 1, 2, 3, 4, 5, 13, 14, and 15 is that the enterprise was engaged in racketeering activity.

That racketeering activity may consist of state offenses as well federal offenses.  The government has charged against that the SNM engaged in multiple acts of racketeering activity consisting of the following:  (1) murder and robbery, in violation of New Mexico law; (2) acts involving tampering with a witness, in violation of federal law; and, (3) offenses involving trafficking in narcotics, in violation of federal law.

In order for the state offense of murder to be considered as a racketeering act, the government must prove to you beyond a reasonable doubt that a member or an associate of the racketeering enterprise committed the offense as defined by law.  The elements of that offense are as follows:

> *First*:        someone killed a human being, and

> *Second*:        the killing was with the deliberate intention to take away the life of that person.

In order for the federal offense of witness tampering to be considered as a racketeering act, the government must prove beyond a reasonable doubt that:

> *First*:        a member, prospect, or associate of the racketeering enterprise used or attempted to use intimidation or threats against another person;

> *Second*:        that member, prospect, or associate acted knowingly and with intent to influence or prevent the testimony of that other person with respect to an official proceeding.

- 43 -

In order for the offense of possession with intent to distribute a controlled substance to be considered as a racketeering act, the government must prove to you beyond a reasonable doubt that:

*First:*        a member, prospect, or associate of the SNM knowingly and intentionally possessed a controlled substance as charged, and

*Second:*        that person possessed the substance with the intent to distribute it.

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

[Name controlled substance] are controlled substances within the meaning of the law.

In order for the offense of distribution of a controlled substance to be considered as a racketeering act, the government must prove to you beyond a reasonable doubt that a member, prospect, or associate of the SNM knowingly or intentionally distributed a controlled substance.

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the government to prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

There must be some nexus between the enterprise and the racketeering activity being conducted by members and/or associates of the enterprise.

I instruct you that "racketeering activity" includes numerous offenses, including those listed above. It is for you to determine whether the enterprise engaged in these activities as charged. You should give the words "engaged in" their ordinary, everyday meaning. For an enterprise to be engaged in racketeering activity it is enough to show that the enterprise

DNM 669

committed or was planning to commit some racketeering activity within a period of time short

enough under all of the circumstances so that it is appropriate to say that the enterprise was

engaged in racketeering activity.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.31 (2011 ed.) (modified) (**Actual

or Constructive Possession**); *United States v. Little*, 829 F.3d 1177 (10th Cir. 2016); *Henderson

v. United States*, 135 S. Ct. 1780 (2015); *see* Jury Instruction No. 23, Document 1877, 15-CR-

4268 ("Trial 1").

## JURY INSTRUCTION NO. 32

For you to find Mr. J. Gallegos, Mr. Troup, and Mr. B. Garcia guilty of first degree murder by a deliberate killing of Frank Castillo as charged in Count 1;

The government must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. Mr. J. Gallegos, Mr. Troup, and Mr. B. Garcia killed Mr. Frank Castillo;

2. The killing was with the deliberate intention to take away the life of Mr. Frank Castillo;

3. This happened in New Mexico on or about March 26, 2001.

A deliberate intention refers to the state of mind of Mr. J. Gallegos, Mr. Troup, and Mr. B. Garcia. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.


Authority: UJI 14-201 NMRA (modified) (**Willful and deliberate murder; essential elements**).

- 46 -

**JURY INSTRUCTION NO. 33**

For you to find Mr. J. Gallegos, Mr. Troup, and Mr. B. Garcia guilty of second degree murder as charged in Count 1, the government must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. Mr. J. Gallegos, Mr. Troup, and Mr. B. Garcia killed Mr. Frank Castillo;

2. Mr. J. Gallegos, Mr. Troup, and Mr. B. Garcia knew that his acts created a strong probability of death or great bodily harm to Mr. Frank Castillo;

3. This happened in New Mexico on or about the 26th day of March 2014.

<u>Authority</u>: *see* Jury Instruction No. 28, Document 1877, 15-CR-4268 ("Trial 1").

- 47 -

## JURY INSTRUCTION NO. 34

For you to find Mr. B. Garcia, Mr. Patterson, and Mr. Chavez guilty of first degree murder by a deliberate killing of Rolando Garza as charged in Count 2;

The government must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1.  Mr. B. Garcia, Mr. Patterson, and Mr. Chavez Mr. Rolando Garza;

2.  The killing was with the deliberate intention to take away the life of Mr. Rolando Garza;

3.  This happened in New Mexico on or about March 26, 2001.

A deliberate intention refers to the state of mind of Mr. B. Garcia, Mr. Patterson, and Mr. Chavez. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.


Authority: UJI 14-201 NMRA (modified) (**Willful and deliberate murder; essential elements).**

- 48 -

## JURY INSTRUCTION NO. 35

For you to find Mr. B. Garcia, Mr. Patterson, and Mr. Chavez guilty of second degree murder as charged in Count 2, the government must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. Mr. B. Garcia, Mr. Patterson, and Mr. Chavez killed Mr. Rolando Garza;

2. Mr. B. Garcia, Mr. Patterson, and Mr. Chavez knew that his acts created a strong probability of death or great bodily harm to Mr. Rolando Garza;

3. This happened in New Mexico on or about the 26th day of March 2014.

Authority: *See* Jury Instruction No. 30, Document 1877, 15-CR-4268 ("Trial 1").

- 49 -

## JURY INSTRUCTION NO. 36

For you to find Mr. Troup and Mr. A. Garcia guilty of first degree murder by a deliberate killing of Freddie Sanchez as charged in Count 3;

The government must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1.  Mr. Troup and Mr. A. Garcia killed Mr. Freddie Sanchez;

2.  The killing was with the deliberate intention to take away the life of Mr. Freddie Sanchez;

3.  This happened in New Mexico on or about June 17, 2007.

A deliberate intention refers to the state of mind of Mr. Troup and Mr. A. Garcia. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.


Authority: UJI 14-201 NMRA (modified) (**Willful and deliberate murder; essential elements**).

**JURY INSTRUCTION NO. 37**

For you to find Mr. Troup and Mr. A. Garcia guilty of second degree murder as charged in Count 3, the government must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1.  Mr. Troup and Mr. A. Garcia killed Mr. Freddie Sanchez;

2.  Mr. Troup and Mr. A. Garcia knew that his acts created a strong probability of death or great bodily harm to Mr. Freddie Sanchez;

3.  This happened in New Mexico on or about the 17th day of June 2007.


Authority: *See* Jury Instruction No. 28, Document 1877, 15-CR-4268 ("Trial 1").

- 51 -

### JURY INSTRUCTION NO. 38

For you to find Mr. J. Gallegos and Mr. A. Gallegos guilty of first degree murder by a deliberate killing of Adrian Burns as charged in Count 5;

The government must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1.  Mr. J. Gallegos and Mr. A. Gallegos killed Mr. Adrian Burns;

2.  The killing was with the deliberate intention to take away the life of Mr. Adrian Burns;

3.  This happened in New Mexico on or about November 12, 2012.

A deliberate intention refers to the state of mind of Mr. J. Gallegos and Mr. A. Gallegos. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

Authority: UJI 14-201 NMRA (modified) (**Willful and deliberate murder; essential elements**).

- 52 -

## JURY INSTRUCTION NO.  39

For you to find Mr. J. Gallegos and Mr. A. Gallegos guilty of second degree murder as

charged in Count 5, the government must prove to your satisfaction beyond a reasonable doubt

each of the following elements of the crime:

1.  Mr. J. Gallegos and Mr. A. Gallegos killed Mr. Adrian Burns;

2.  Mr. J. Gallegos and Mr. A. Gallegos knew that his acts created a strong probability of

    death or great bodily harm to Mr. Adrian Burns;

3.  This happened in New Mexico on or about the 12th day of November 2012.


Authority: *See* Jury Instruction No. 28, Document 1877, 15-CR-4268 ("Trial 1").

## JURY INSTRUCTION NO.  40

The fourth element which the government must prove beyond a reasonable doubt as to Count 4 is that Mr. J. Gallegos and Mr. A. Gallegos conspired to murder Adrian Burns.

The fourth element which the government must prove beyond a reasonable doubt as to Count 14 is that Mr. J. Gallegos and Ms. Gutierrez conspired to murder Jose Gomez

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose.   To find a Mr. J. Gallegos, Mr. A. Gallegos, or Ms. Gutierrez guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

1.  Mr. J. Gallegos, Mr. A Gallegos, or Ms. Gutierrez and another person by words or acts agreed together to commit murder;

2.  Mr. J. Gallegos, Mr. A Gallegos, or Ms. Gutierrez and the other person intended to commit murder;

3.  This happened in New Mexico on or about November 2012, as to Count 4, and on or about February 1, 2016, to on or about February 27, 2016, as to Counts 14.

In proving a conspiracy to murder, it is not necessary to show a meeting of the alleged conspirators or the making of an express or formal agreement. The formation and existence of a conspiracy to murder may be inferred from all circumstances tending to show the common intent and may be proved in the same way as any other fact may be proved, either by direct testimony of the fact or by circumstantial evidence, or by both direct and circumstantial evidence.

Evidence that a person was in the company of or associated with one or more other persons alleged or proved to have been members of a conspiracy is not, in itself, sufficient to prove that such person was a member of the alleged conspiracy.

- 54 -

Evidence of a defendant's membership in a gang, by itself, is insufficient to establish that person's guilt of a crime as a coconspirator.

Authority: UJI 14-2810 NMRA (modified) (**Conspiracy: Essential Elements**); UJI 14-201 NMRA (modified) (**Willful and deliberate murder; essential elements**).

## JURY INSTRUCTION NO.  41

In this case, you must consider separately whether Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez are guilty or not guilty of each of the charged crimes.  Even if you cannot agree upon a verdict as to any single defendant on any particular charge, you must return the verdict or verdicts upon which you agree.

Authority:  UJI  14-2812  NMRA  (**Conspiracy;  multiple  defendants;  each  defendant entitled to individual consideration)**.

DNM 681

## JURY INSTRUCTION NO.  42

When the word "knowingly" is used in these instructions, it means that the act was done

voluntarily and intentionally, and not because of mistake or accident.


Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.37 (2011 ed.) (modified)

(**Knowingly – Deliberate Ignorance**).

DNM 682

## JURY INSTRUCTION NO. 43

You will note that the indictment charges that the crimes charged in Count 1 and Count 2 were committed "on or about" March 26, 2001; the crime charged in Count 3 was committed "on or about" June 17, 2007; the crime charge in Count 4 were committed "in or about" November 2012; the crime charged in Count 5 were committed "on or about" November 12, 2012; the crime charged in Count 13 were committed "on or about" March 17, 2015; the crime charged in Count 14 were committed "on or about" February 1, 2016, to "on or about" February 27, 2016; the crime charged in Count 15 were committed "on or about" February 27, 2016.   The government must prove beyond a reasonable doubt that the defendant committed the crimes reasonably near March 26, 2001 (for Count 1 and 2); June 17, 2007 (for Count 3); November 2012 (for Count 4); November 12, 2012 (for Count 5); March 17, 2015 (for Count 13); February 1, 2016, to February 27, 2016 (for Count 14); February 27, 2016 (for Count 15).


Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.18 (2011 ed.) (modified) (**On or About**).

- 58 -

## JURY INSTRUCTION NO.  44

Count 1, 2, 3, 5, 13, and 15 also charges a violation of 18 U.S.C. section 2, which provides that: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

This law makes it a crime to intentionally help someone else commit a crime.  To find Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:   someone else committed the charged crime, and

*Second*: Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the government must prove that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez consciously shared the other person's knowledge of the underlying criminal act and intended to help him.

Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting.  But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough.  Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

Evidence of a defendant's membership in a gang, by itself, is insufficient to establish that person's guilt of a crime as an aider and abettor.

- 59 -

<u>Authority</u>: <u>Tenth Circuit Pattern Jury Instructions Criminal</u> §2.06 (2011 ed.) (**Aid and Abet 18**

**U.S.C. § 2(a)**).

## JURY INSTRUCTION NO. 45

Evidence has been presented that [Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez] were the subject of unfair inducement. Unfair inducement occurs when government agents unfairly cause the commission of a crime. "Government agents" include law enforcement officers or persons acting under their direction, influence or control.

Where [Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez] was not ready and willing to commit the crime of

_____ [**insert type of offense charged in the Indictment**] before first being contacted or approached by a government agent, but is induced or persuaded to commit the crime by a government agent, [Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez] is a victim of unfair inducement.  However, [Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez] are ready and willing to commit the crime at the time of the first contact with the government agent, the mere fact that the government agent provides what appears to be an opportunity to commit the crime is not unfair inducement.

The burden is on the government to prove to your satisfaction beyond a reasonable doubt that [Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez] was not unfairly induced. If you have a reasonable doubt as to whether [Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez] were unfairly induced, you must find [Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez] not guilty.

<u>Authority:</u> UJI 14-5160 NMRA (modified) (**Entrapment; unfair inducement; not predisposed**).

## JURY INSTRUCTION NO. 46

You are here to decide whether the government has proved beyond a reasonable doubt that the defendants are guilty of the crimes charged.  The defendants are not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crimes charged.  The fact that another person *also* may be guilty is no defense to a criminal charge.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.19 (2011 ed.) (modified)

(**Caution – Consider Only Crime Charged**); *United States v. Rodella*, 101 F.Supp. 3d 1075, 1086 (D.N.M. 2015)

## JURY INSTRUCTION NO.  47

If you find any defendant guilty, it will be my duty to decide what the punishment will

be. You should not discuss or consider the possible punishment in any way while deciding your

verdict.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.20 (2011 ed.) (modified)

(**Caution-Punishment, Non-Capital Cases**);

## JURY INSTRUCTION NO.  48

The rights of Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez in this case are separate and distinct.  You must separately consider the evidence against find Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez and return a separate verdict for each as to each crime charged.

Your verdict as to Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez, whether they are guilty or not guilty, should not affect your verdicts as to any other defendant on any other charges.


Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.21 (2011 ed.) (modified)

(**Multiple Defendants – Single Count**); 18 U.S.C. § 1959.

## JURY INSTRUCTION NO.  49

In a moment the Courtroom Deputy Clerk will escort you to the jury room and provide each of you with a copy of the instructions that I have just read.  Any exhibits admitted into evidence will also be placed in the jury room for your review.

When you go to the jury room, you should first select a foreperson, who will help to guide your deliberations and will speak for you here in the courtroom.  The second thing you should do is review the instructions. Not only will your deliberations be more productive if you understand the legal principles upon which your verdict must be based, but for your verdict to be valid, you must follow the instructions throughout your deliberations.  Remember, you are the judges of the facts, but you are bound by your oath to follow the law stated in the instructions.

To reach a verdict, whether it is guilty or not guilty, all of you must agree.  Your verdict must be unanimous on each count of the indictment.  Your deliberations will be secret.  You will never have to explain your verdict to anyone.

You must consult with one another and deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.  During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong.  But do not give up your honest beliefs solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are judges -- judges of the facts.  You must decide whether the government has proved Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez, guilty beyond a reasonable doubt.

A form of verdict has been prepared for your convenience.

[Explain the Verdict Form]

The foreperson will write the unanimous answer of the jury in the space provided for each count of the indictment, either guilty or not guilty.  At the conclusion of your deliberations, the foreperson should date and sign the verdict.

If you need to communicate with me during your deliberations, the foreperson should write the message and give it to the Court Security Officer.  I will either reply in writing or bring you back into the court to respond to your message.  Under no circumstances should you reveal to me the numerical division of the jury.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.23 (2011 ed.) (**Duty to Deliberate – Verdict Form**).

## JURY INSTRUCTION NO.  50

Let me remind you again that nothing I have said in these instructions, nor anything I have said or done during the trial, was meant to suggest to you what I think your decision should be.  That is your exclusive responsibility.


Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.44 (2011 ed.) (modified)

(**Communication with the Court**).

## JURY INSTRUCTION NO.  51

Faithful performance by you of your duties is vital to the administration of justice.

Authority: *See* Jury Instruction No. 40, Document 1877, 15-CR-4268 ("Trial 1"); *see United States v. Gaspar Leal*, No. CIV 16-3069 JB, Instruction No. 20, at 25, filed December 6, 2017 (Doc. 183).

## JURY INSTRUCTION NO. 52

The government must prove, beyond a reasonable doubt, that the offense(s) charged in this case was actually committed and that it was Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez, who committed it. Thus, the identification of Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez, as the person who committed the offense(s) charged is a necessary and important part of the government's case.

You should evaluate the credibility of any witness making an identification in the same manner as you would any other witness. You should also consider at least the following questions:

Did the witness have the ability and an adequate opportunity to observe the person who committed the offense(s) charged? You should consider, in this regard, such matters as the length of time the witness had to observe the person in question, the lighting conditions at that time, the prevailing visibility, the distance between the witness and the person observed, and whether the witness had known or observed the person before.

Is the testimony about an identification made after the commission of the crime(s) the product of the witness's own recollection? In this regard, you should consider very carefully the circumstances under which the later identification was made, including the manner in which Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez was presented to the witness for identification and the length of time that elapsed between the crime(s) and the witness's subsequent identification.

If, after examining all of the testimony and evidence in this case, you have a reasonable doubt as to the identity of Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson,

Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez as the person who committed the offense(s) charged, you must find Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez not guilty.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.29 (2011 ed.) (modified) (**Identification Testimony**).

## JURY INSTRUCTION NO.  53

The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over an object or thing, at a given time, is then in actual possession of it.

A person who, although not in actual possession, knowingly has the power at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it.

More than one person can be in possession of an object if each knows of its presence and has the power to control it.

Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez have joint possession of an object when two or more persons share actual or constructive possession of it. However, merely being present with others who have possession of the object does not constitute possession.

In the situation where the object is found in a place (such as a room or car) occupied by more than one person, you may not infer control over the object based solely on joint occupancy. Mere control over the place in which the object is found is not sufficient to establish constructive possession. Instead, in this situation, the government must prove some connection between Mr. Sanchez, Mr. Baca, Mr. Herrera, and Mr. Perez, and the object.

In addition, momentary or transitory control of an object is not possession. You should not find that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez possessed the object if he possessed it only momentarily, or did not know that he possessed it.

- 72 -

DNM 697

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.31 (2011 ed.) (modified) (**Actual or Constructive Possession**).

DNM 698

## JURY INSTRUCTION NO. 54

Evidence that a person was in the company of or associated with one or more other persons alleged or proved to have been members of a conspiracy is not, in itself, sufficient to prove that such person was a member of the alleged conspiracy.

Authority: UJI 14-2810 NMRA (**Conspiracy: Evidence of Association Alone Does Not Prove Membership in Conspiracy)** (modified).

## JURY INSTRUCTION NO.  55

Evidence that a person was in the company of or associated with one or more other persons alleged or proved to have been members of a conspiracy is not, in itself, sufficient to prove that such person was a member of the alleged conspiracy.

Authority: UJI 14-2814 NMRA **(Conspiracy; evidence of association alone does not prove membership in conspiracy)** (modified).

DNM 700

## JURY INSTRUCTION NO.  56

For you to find Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez guilty of aggravated battery with great bodily harm [as charged in Count ____], the government must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez touched or applied force _____ [name of victim];

2. Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez intended to injury _____ [name of victim];

3. Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez caused great bodily harm to _____ [name of victim] or [acted in a way that would like result in death or great bodily harm to _____ [name of victim];

4. This happened in New Mexico on or about the ____ day of _____, ____.

Authority: UJI 14-323 NMRA (modified) (**Aggravated Battery; great bodily harm; essential elements**).

- 76 -

## JURY INSTRUCTION NO. 57

Great bodily harm means an injury to a person which [creates a high probability of death] or [results in serious disfigurement] or [results in loss of any member or organ of the body] or [results in permanent or prolonged impairment of the use of any member or organ of the body].

Authority: UJI 14-131 NMRA (modified) (**"Great bodily harm" defined**).

- 77 -

## JURY INSTRUCTION NO.  58

Evidence has been presented that government agents exceeded the bounds of permissible law enforcement conduct. Permissible law enforcement conduct is exceeded if government agents:

**[supplied the_____ [describe the contraband or property transferred or sold resulting in charges against Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez and then obtained the same _____ [describe the contraband or property transferred or sold resulting in charges against Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez];**

**[or]**

**[_____*(describe    unconscionable method or illegitimate purpose)*];**

or

**[engaged in conduct which creates a substantial risk that an ordinary person would commit the crime of _____.]**

"Government agents" include law enforcement officers or persons acting under their direction, influence or control.

The burden is on the government to prove to your satisfaction beyond a reasonable doubt that government agents did not exceed the bounds of permissible law enforcement conduct. If you have a reasonable doubt as to whether the government agents exceeded the bounds of permissible law enforcement conduct, you must find the defendant not guilty.

<u>Authority</u>: UJI 14-5161 NMRA (modified) **(Entrapment; law enforcement unconscionable**

- 78 -

**methods and illegitimate purposes**).

DNM 704

## JURY INSTRUCTION NO.  59

Evidence has been presented that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez acted in self-defense.  Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez acted in self-defense, if:

1. There was an appearance of immediate danger of bodily harm to Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez as a result of _____; and

2. Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez were in fact put in fear of immediate bodily harm and [**describe act of** Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez**]; and**

3. Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez used an amount of force that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez believed was reasonable and necessary to prevent the bodily harm; and

4. The force used by Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez ordinarily would not create a substantial risk of death or great bodily harm; and

5. The apparent danger would have caused a reasonable person in the same circumstances to act as Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez did.

DNM 705

The burden is on the government to prove beyond a reasonable doubt that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez did not act in self-defense.  If you have a reasonable doubt as to whether Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez acts in self-defense, you must find Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez not guilty.

Authority: UJI 14-5168 NMRA **(Self-defense; non-deadly force by defendant)**

## JURY INSTRUCTION NO.  60

Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez claim that if he committed the acts charged in the Indictment, he did so only because he was forced to commit the crime.  If you conclude that the government has proved beyond a reasonable doubt that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez committed the crime as charged, you must then consider whether Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez should nevertheless be found ""**not** guilty""  because his actions are excusable because they were performed under duress or coercion.

If you find that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez committed the crime as charged, his actions are justified by duress or coercion only if you find that he has proven the following three elements:

1. Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez were under an unlawful and present, imminent and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to himself **[or a family member, or others];**

2. Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez had no reasonable, legal alternative to violating the law, that he had no chance both to refuse to do the criminal act and also to avoid the threatened harm;

3. a direct causal relationship could have been reasonably anticipated between engaging in the criminal action and avoiding the threatened harm.

DNM 707

Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez, asserting defense of duress or coercion must prove these elements by a preponderance of the evidence. To prove a fact by a preponderance of the evidence means to prove that the fact is more likely so than not so.  This is a lesser burden of proof than to prove a fact beyond a reasonable doubt.

Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.36 (2011 ed.) (modified) (**Coercion or Duress**).

## JURY INSTRUCTION NO. 61

Preponderance of evidence is evidence sufficient to persuade you that a fact is more likely present than not present.

Authority: <u>Tenth Circuit Pattern Jury Instructions Criminal</u> §1.05.1 (2011 ed.) (modified) (**Preponderance of Evidence**).

- 84 -

## JURY INSTRUCTION NO.  62

A separate crime is charged against each defendant in each count of the indictment.  You must separately consider the evidence against each defendant on each count and return a separate verdict for each defendant on each count charged.

Your verdict as to any defendant, or as to any one count, whether it is guilty or not guilty, should not influence your verdict as to any other Defendants or counts.


Authority: Tenth Circuit Pattern Jury Instructions Criminal §1.22 (2011 ed.) (modified) (**Multiple Defendants – Multiple Counts**); Tenth Circuit Pattern Jury Instructions Criminal §1.21 (2011 ed.) (modified) (**Multiple Defendants – Single Count**); 18 U.S.C. § 1959; *United States v. Kamahele,* 748 F.3d 984, 1012 (10th Cir. 2014).

## JURY INSTRUCTION NO.  63

Members of the jury, in a moment, I am going to ask that you go to the jury room and begin deliberations. I realize that you may have some difficulty reaching a unanimous agreement, but that is not unusual. Sometimes, after further discussion, jurors are able to work out their differences and agree.

This is an important case. If you should fail to agree upon a verdict, the case is left open and must be tried again.  Obviously, another trial would require the parties to make another large investment of time and effort, and there is no reason to believe that the case can be tried again by any side better or more exhaustively than it has been tried before you.

You are reminded that Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez are presumed innocent, and that the government, not Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez, has the burden of proof and it must prove Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez' guilt beyond a reasonable doubt. Those of you who may believe that the government has proved Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez' guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough, given that other members of the jury may not be convinced.  And those of you who believe that the government has not proved Mr. J. Gallegos, Mr. Troup, Mr. B. Garcia, Mr. Chavez, Mr. Patterson, Mr. A. Garcia, Mr. A. Gallegos, and Ms. Gutierrez' guilty beyond a reasonable doubt should stop and ask yourselves if the doubt you have is a reasonable one, given that other members of the jury may not share your doubt. In short, every individual juror should reconsider his or her views.

- 86 -

It is your duty, as jurors, to consult with one another and deliberate with a view toward reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

What I have just said is not meant to rush or pressure you into agreeing on a verdict. Take as much time as you need to discuss things. There is no hurry.

In a moment I will ask that you retire and begin your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the instructions I have previously given you.

Authority:  Tenth Circuit Pattern Jury Instructions Criminal §1.42 (2011 ed.) (modified) (**Modified *Allen* Instruction**).

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                       No. CR 15-4268 JB

JOE GALLEGOS,
EDWARD TROUP,
BILLY GARCIA,
CHRISTOPHER CHAVEZ,
ALLEN PATTERSON,
ARTURO GARCIA,
ANDREW GALLEGOS,
SHAUNA GUTIERREZ,

      Defendants.

## **V E R D I C T**

## **JOE GALLEGOS**

### **COUNT 1**

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____

                         (guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Frank Castillo, as charged in Count 1 of

the Indictment.

### **COUNT 4**

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____

                         (guilty or not guilty)

of violent crimes in aid of racketeering in the conspiracy to murder Adrian Burns, as charged in Count 4

of the Indictment.

### **COUNT 5**

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____

                         (guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Adrian Burns, as charged in Count 5 of the

Indictment.

### COUNT 13

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the assault with a dangerous weapon upon Jose Gomez, as

charged in Count 13 of the Indictment.

### COUNT 14

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the conspiracy to murder Jose Gomez, as charged in Count 14

of the Indictment.

### COUNT 15

WE, the Jury, find the defendant, **JOE GALLEGOS,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the attempted murder of Jose Gomez, assault with a dangerous

weapon upon Jose Gomez, resulting in serious bodily injury to Jose Gomez, as charged in Count 15 of

the Indictment.

## **EDWARD TROUP**

### COUNT 1

WE, the Jury, find the defendant, **EDWARD TROUP,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Frank Castillo, as charged in Count 1 of

the Indictment.

### COUNT 3

WE, the Jury, find the defendant, **EDWARD TROUP,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Freddie Sanchez, as charged in Count 3 of the

Indictment.

DNM 714

## BILLY GARCIA

### COUNT 1

WE, the Jury, find the defendant, **BILLY GARCIA,** _____
(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Frank Castillo, as charged in Count 1 of

the Indictment.

### COUNT 2

WE, the Jury, find the defendant, **BILLY GARCIA,** _____
(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Rolando Garza, as charged in Count 2 of

the Indictment.

## CHRISTOPHER CHAVEZ

### COUNT 2

WE, the Jury, find the defendant, **CHRISTOPHER CHAVEZ,** _____
(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Rolando Garza, as charged in Count 2 of

the Indictment.

## ALLEN PATTERSON

### COUNT 2

WE, the Jury, find the defendant, **ALLEN PATTERSON,** _____
(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Rolando Garza, as charged in Count 2 of

the Indictment.

## ARTURO GARCIA

### COUNT 3

WE, the Jury, find the defendant, **ARTURO GARCIA,** _____
(guilty or not guilty)

of violent crimes in aid of racketeering in conspiring to murder Freddie Sanchez, as charged in Count 3

of the Indictment.

**ANDREW GALLEGOS**

**COUNT 4**

WE, the Jury, find the defendant, **ANDREW GALLEGOS,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the conspiracy to murder Adrian Burns, as charged in Count 4

of the Indictment.

**COUNT 5**

WE, the Jury, find the defendant, **ANDREW GALLEGOS,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the murder of Adrian Burns, as charged in Count 5 of the

Indictment.

**SHAUNA GUTIERREZ**

**COUNT 14**

WE, the Jury, find the defendant, **SHAUNA GUTIERREZ,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the conspiracy to murder Jose Gomez, as charged in Count 14

of the Indictment.

**COUNT 15**

WE, the Jury, find the defendant, **SHAUNA GUTIERREZ,** _____

(guilty or not guilty)

of violent crimes in aid of racketeering in the attempted murder of Jose Gomez, assault with a dangerous

weapon upon Jose Gomez, resulting in serious bodily injury to Jose Gomez, as charged in Count 15 of

the Indictment.

DNM 716

Dated this _____ day of _____, 2018.

_____

FOREPERSON

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## **NOTICE OF OTHER CRIMES OR BAD ACTS PURSUANT TO RULE 404(b)**

The United States of America provides formal notice to defense counsel that the United

States intends to present the following evidence pursuant to Fed. R. Evid. 404(b).

## **Argument**

A. RULE 404(b)

The Government seeks to move the admission of threatening statements made by Edward

Troup to witnesses pursuant to Rule 404(b).  Rule 404(b) provides that "evidence of other

crimes, wrongs, or acts" is not admissible as character evidence.  However, such evidence is

admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).

Evidence of consciousness of guilt is a permissible purpose under Rule 404(b) for the

admission of evidence of prior bad acts.  *See United States v. Esparsen*, 930 F.2d 1461, 1476 n.

16 (10th Cir. 1991) ("matters such as motive, intent, plan, or knowledge essentially involve

'consciousness of guilt'") (citing *United States v. Smith*, 629 F.2d 650, 651-52 (10th Cir.), cert.

denied, 449 U.S. 994 (1980) ("Evidence of threats to a prosecution witness is admissible as

showing consciousness of guilt if a direct connection is established between the defendant and

the threat.")).  The "cases holding threats against a witness admissible reason that such threats show the defendant's intent to prevent the witness from testifying, and are thus an implicit acknowledgement of the defendant's guilt." *United States v. Nichols*, 374 F.3d 959 (10th Cir. 2004), *judgement vacated on other grounds*; 543 U.S. 1113 (2005) (citing *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003) ("[T]hreats against a witness constitute an effort by the defendant to tamper with the substance of the government's case, and thus are probative of a defendant's awareness that the goverment is likely to prevail at trial."); *United States v. Young*, 248 F.3d 260, 272 (4th Cir. 2001) (similar)).  The district court's admission of this evidence is reviewed only for abuse of discretion.  *United States v. Snow*, 82 F.3d 935, 943 (10th Cir. 1996).

Evidence that defendant Troup relayed threats against or to any of the witnesses, known to the defendant as a prosecution witness at the time, exhibits his clear intent to interfere with these proceedings by attempting to scare witnesses into not testifying.  The Court has already heard testimony in this case indicating that membership in the SNM is for life.  From time to time people are allowed to "retire" from the enterprise; however, there has been no testimony whatsoever that the known informants have left the SNM without the threat of death following them.

B.  <u>RULE 403</u>

Other bad act evidence that is offered for a proper purpose such as consciousness of guilt under Rule 404(b) is still subject to Rule 403 balancing.  *See United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001).  Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  Although the district court has considerable discretion in performing the Rule 403 balancing, "exclusion of evidence under Rule 403 . . . is an *extraordinary remedy* and should be used *sparingly*." *Id*.

(internal quotations omitted) (emphasis added).  Unfair prejudice must do more than "damage the [d]efendant's position at trial."  *Id*.  Any relevant evidence of a defendant's crime is "by its nature detrimental to a defendant who asserts he is not guilty."  *Id*.  Thus, evidence is only unfairly prejudicial if "it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly* apart from its judgment as to his guilt or innocence of the crime charged."  *Id*. at 1211-1212 (emphasis in original). Furthermore, even if evidence is found to be unfairly prejudicial, it may only be excluded if such prejudice "*substantially* outweigh[s] the probative value of the evidence."  *Id*.  (emphasis in original).

The evidence at issue here is not unfairly prejudicial.  This evidence is not of such an inflammatory nature that it would cause the jury to seek to punish the defendant solely on the basis of this evidence.   It is also highly probative of Troup's consciousness of guilt.  The fact that he intended to prevent any witness from testifying shows that he had concerns that the witnesses would provide testimony damaging.  This evidence display Troup's "awareness that the government is likey to prevail at trial."  Such evidence is highly probative of Troup's guilt, is not inflammatory, and presents little danger of unfair prejudice.  Therefore, introduction of the evidence mentioned above is admissible under Fed. R. Evid. 404(b) and 403.

WHEREFORE, the United States respectfully asks the Court to admit the tendered evidence pursuant to Rule 404(b) at the defendant's trial.

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515

*__Electronically filed on 3/26/2018__*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' MOTION *IN LIMINE*

Plaintiff United States of America moves *in limine* to preclude evidence of any judicial

findings in M-52-FR-201200231, because it is irrelevant under Rule 401 and inadmissible under

Rule 403.

None of the information concerning the rulings by the Socorro County Magistrate Judge

in the State of New Mexico case against Joe Gallegos is relevant to any fact in this case.  Its only

possible effect would be to confuse and/or mislead the jury. There is no rule of evidence that

supports the admission of this information. The United States therefore moves this Court *in

limine* to exclude the information for the judicial findings as evidence in this trial.

## BACKGROUND

On November 12, 2012, at approximately 9:00 p.m., the Veguita Fire Department

responded to a vehicle fire in the area of State Road 304 and US 60, in Socorro County, New

Mexico. Upon arrival on scene, fire department personnel observed a human body, later

identified as Adrian Burns, which was badly burned and handcuffed behind the back, on the

ground in proximity of the vehicle.  The New Mexico State Police took on the initial

investigation.  Through investigation they learned that Adrian Burns was a known drug dealer

who specifically supplied drugs to the Gallegos brothers.  Burns had recently disrespected Joe

Gallegos and had been talking negatively about him in the community.

NMSP investigators conducted interviews of friends and family of Burns, including his

girlfriend Amber Sutton.  Sutton told investigators that on the night of the murder, Burns

departed his residence at approximately 7:00 p.m. and told her that he was going to the residence

of Joe Gallegos, which is located at 04 Erin Court, Los Lunas, New Mexico (04 Erin Court) to

collect a drug debt and to sell heroin to Andrew Gallegos.  Sutton also saw the Gallegos brothers

on November 12, 2012 at the Allsups getting gas at approximately 11:30 p.m. to 12:30 a.m.  The

Gallegos brothers provided Sutton and her friend with heroin and money and both appeared to be

in an unusually generous mood, passing out drugs and money.

Agents interviewed Christin Collins, who is a clerk at a GIANT gas station.  Ms. Collins

indicated that she sold a gallon of gas in a red gas can on Veterans Day (November 12th) to

Andrew Gallegos.  She indicated that it was after dark, and that Gallegos, whom she knows as

Smiley, was more nervous than usual and was anxious to leave the store.  Gallegos told Collins

that his truck had run out of gas.  The video from the GIANT shows Andrew Gallegos putting

gas into the red gas can.

NMSP investigators subsequently obtained arrest warrants for Joe and Andrew Gallegos

as well as a search warrant for 04 Erin Court.  That search warrant was executed on November

15, 2012.  Upon execution of the search warrant, NMSP officers spoke to two individuals at 04

Erin Court, who informed investigators that Joe and Andrew Gallegos were recently at the

residence, but had departed prior to the arrival of law enforcement.

On November 20, 2012, members of the U.S. Marshals Fugitive Task Force located and

arrested Joe and Andrew Gallegos at the Imperial Motel, located at 701 Central Avenue NE,

Albuquerque, New Mexico.  Both had been on the run from law enforcement.  Media had been running their photographs on the news in an effort to locate them.  Joe Gallegos and Andrew Gallegos agreed to speak with investigators.  Both admitted that Burns had come to Joe's house on November 12, 2012, however, they provided contradictory statements as to whether or not the victim came in and stayed in the house as opposed to just selling them drugs and leaving. Neither provided details pertaining to the homicide of Burns.

On Thursday December 6, 2012, a preliminary hearing was held for Joe Gallegos at the Socorro County Magistrate Court in Socorro, New Mexico in connection with the charges. In that hearing, Socorro County Magistrate Judge Jim Naranjo found no probable cause to bind the case over to the Seventh Judicial District Court. Subsequently, the charges against Joe and Andrew Gallegos were dismissed.

The investigation continued as new evidence and witnesses came forward.  Interviews of several different witnesses lead to search warrants and statements of admission by Joe and Andrew Gallegos.

At the time of Joe and Andrew Gallegos' arrests in November 2012, investigators were unaware of the facts and circumstances surrounding the removal of the carpet from 04 Erin Court.  They also did not have cellular telephone information.  It was only after the subsequent investigation and interviews that investigators learned of the information.

**ARGUMENT**

"Relevant evidence is evidence that has a tendency to 'make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United States v. Gutierrez–Castro,* No. CR 10–2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011) (Browning, J.) (citing Fed. R. Evid. 401).

3

Even with a liberal approach to this rule, the evidence of the outcome of the preliminary hearing in the state case is not "of consequence" in this case.  Defendants also cannot stretch the provisions of Rule 403 to allow such misleading information to be presented to the jury.  The evidence of the judicial finding in M-52-FR-201200231 is neither relevant under Rule 401 nor more probative than prejudicial under Rule 403.  The Court should therefore exclude any mention of the judicial finding in this trial.

A Rule 403 balancing is part of the Rule 401 inquiry.  Rule 403 provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.  Fed. R. Evid. 403.  "Unfair prejudice in the Rule 403 context 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (citing Fed. R. Evid. 403 advisory committee's note).

In this case, a federal grand jury has found probable cause on the charges and evidence.  There is no evidence of what was presented to the Socorro County Magistrate Judge for him to render a finding of no probable cause.  There is a notation on the Register of Actions that the hearing was "held" but no further description is provided.  *See* Attachment A.  Given the tight deadlines of when preliminary hearings must be held,[1] the prosecutor could have elected to present no evidence or failed to produce a key witness.  Evidence provided in discovery shows

---

[1] **Time.** A preliminary hearing shall be held within a reasonable time but in any event not later than ten (10) days following the initial appearance if the defendant is in custody and no later than sixty (60) days if he is not in custody.  Failure to comply with the time limits set forth in this paragraph shall not affect the validity of any indictment for the same criminal offense.  Rule 6-202(D) NMRA (2012).

that New Mexico State Police continued their investigation after the December 6, 2012

preliminary hearing.  The case continued to develop long after that  hearing as evidenced by the

indictments in this case.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the

government's Motion *In Limine* precluding the introduction of any evidence of the judicial

finding in M-52-FR-201200231 as it is not probative or relevant.

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515

***Electronically filed on 3/26/2018***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MARIA ARMIJO
Assistant United States Attorney

5

Page 1 of 1

Case 2:15-cr-04268-JB   Document 1977-1   Filed 03/26/18   Page 1 of 1
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 303

Skip to Main Content   Logout   My Account   Search Menu   Search   Refine Search   Back

Location : All Courts

# REGISTER OF ACTIONS
## CASE NO. M-52-FR-2012-00231

| | | | |
|---|---|---|---|
| State of New Mexico v. JOE L GALLEGOS | § | Case Type: | **Felony** |
| | § | Date Filed: | **11/19/2012** |
| | § | Location: | **Socorro Magistrate** |
| | § | Judicial Officer: | **Naranjo, Jim** |
| | § | | |

---

### PARTY INFORMATION

| | | | **Attorneys** |
|---|---|---|---|
| **Defendant** | **GALLEGOS, JOE L** | Male | **Lee Deschamps** |
| | | DOB: 08/10/1969 | *Public Defender* |
| | 06 Merlinda Rd | 5' 7", 200 lbs | 575-838-0777(W) |
| | Los Lunas, NM 87031 | | |
| | DL: NM031111218 | | ~~Stacey A. Ward~~ |
| | | | ~~Public Defender~~ |
| | | | ~~505-238-5797(W)~~ |
| | | | |
| **Plaintiff** | **State of New Mexico** | | |

---

### CHARGE INFORMATION

| Charges: GALLEGOS, JOE L | Statute | Level | Date |
|---|---|---|---|
| 1. Murder in the first degree (felony murder) | 30-02-01(A)(2) | Felony | 11/12/2012 |
| 2. Kidnapping (first degree) | 30-04-01 | 1st Degree Felony | 11/12/2012 |
| 3. Tampering with evidence (highest crime a third, fourth or indeterminate degree felony) | 30-22-05 | 4th Degree Felony | 11/12/2012 |
| 4. Murder in the first degree (felony murder) - conspiracy | 30-02-01(A)(2) | 2nd Degree Felony | 11/12/2012 |
| 5. Arson property (over $2,500 but not more than $20,000) | 30-17-05(A) | 3rd Degree Felony | 11/12/2012 |

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

| | |
|---|---|
| 12/06/2012 | **Disposition** (Judicial Officer: Naranjo, Jim) |
| | 1. Murder in the first degree (felony murder) |
| |     Discharged |
| | 2. Kidnapping (first degree) |
| |     Discharged |
| | 3. Tampering with evidence (highest crime a third, fourth or indeterminate degree felony) |
| |     Discharged |
| | 4. Murder in the first degree (felony murder) - conspiracy |
| |     Discharged |
| | 5. Arson property (over $2,500 but not more than $20,000) |
| |     Discharged |

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 11/16/2012 | **MTN: MOTION** |
| | *Motion to Seal Court Pleadings (Berry/ADA)* |
| 11/19/2012 | **OPN: CRIMINAL COMPLAINT FILED** |
| 11/19/2012 | **AFFIDAVIT OF ARREST WARRANT** |
| 11/19/2012 | **WAR: ARREST WARRANT ISSUED** |
| 11/26/2012 | **ORD: ORDER FILED** |
| | *Order Unsealing the Court Records* |
| 11/26/2012 | **First Appearance** (9:46 AM) (Judicial Officer Naranjo, Jim) |
| | Parties Present |
| | Result: Held |
| 11/26/2012 | **MISCELLANEOUS ENTRY** |
| | *Return of Arrest Warrant: def arrested 11/20/12 by Valencia Co SO* |
| 11/26/2012 | **INDIGENT DETERMINATION FOR DEFENDANT FILED** |
| 11/26/2012 | **ORD: ORDER OF APPOINTMENT** |
| | *Lee Deschamps apptd as Public Defender, assigned by CCU* |
| 11/27/2012 | **ENTRY OF APPEARANCE FILED** |
| | *Entry of Appearance, Request for Speedy Trial & Request for Discovery (Deschamps)* |
| 12/06/2012 | **Preliminary Examination** (9:30 AM) (Judicial Officer Naranjo, Jim) |
| | Parties Present |
| | Result: Held |
| 12/06/2012 | **CLS: DISCHARGED** |
| | *Probable cause determination - no probable cause found.* |
| 11/13/2014 | **FILE DESTROYED** |

Attachment A

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| ANGEL DELEON, et. Al. | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION IN LIMINE TO ADMIT OUT-OF-COURT STATEMENTS MADE BY ADRIAN BURNS

The United States respectfully files this Motion *In Limine* to admit out-of-court statements of Adrian Burns.

## FACTS

On the last day that Adrian Burns was seen alive, Burns asked his girlfriend Amber Sutton if she wanted to go on an errand with him.   Sutton declined but asked where Burns was going.   Burns stated he was on the way to the residence of Joe Gallegos to collect a drug debt and to sell heroin.   After about an hour, Burns had not returned home and Sutton began to worry.   Sutton began to text and call Burns but did not get an answer.   Sutton called friends and family and learned that no one had heard from Burns and could not reach him.   Sutton and others started looking for the Gallegos brothers' home.   Sutton saw the Gallegos brothers later that night at the Allsups getting gas at approximately 11:30 p.m. to 12:30 a.m.   The Gallegos brothers provided Sutton and her friend with heroin and money and both appeared to be in an unusually generous mood, passing out drugs and money.   After little progress, Sutton returned home and began calling local police departments.

## ARGUMENT

"Hearsay testimony is generally inadmissible."   *United States v. Christy*, 2011 WL 5223024, at 5 (D.N.M. Sept. 21, 2011) (Browning, J.) (citing Fed.R.Evid. 802).   "A statement that may otherwise be hearsay may properly be offered for the non-hearsay purpose of showing the statement's effect on the listener.   Furthermore, a party may properly offer a statement for the non-hearsay purpose of showing the declarant's motive or intent for their behavior."   *Id.* (internal citation omitted).   One exception created by the Federal Rules of Evidence is Rule 803(3) which allows admission of "a statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)."   Fed. R. Evid 803.

> For the statement to qualify under the exception, it must relate to the declarant's state of mind during the incident in question. This requirement is not to say that the statement must be said at the very moment of the incident, but for intent to be proved, it must be contemporaneous to the act.   To be contemporaneous and therefore admissible under the present state of mind exception, a statement must be part of a continuous mental process.   In addition to the requirements that the statement be contemporaneous to the incident at hand and relevant to the issues of the case, it must also be established that there was no opportunity for the declarant to fabricate or to misrepresent his thoughts.   The statements of intent must reveal information or details about the future, which has been contrasted with statements of memory, or looking back to the past. When statements entail issues of looking into the past combined with other concerns, it can often be too confusing for a jury to extract, upsetting the balance of advantage, and ultimately making the evidence inadmissible.   The most obvious risk of prejudice is that the jury will consider the hearsay statement not as proof of state of mind and the subsequent conduct of the declarant, but rather for the truth of the facts that are related in the statement.

*United States v. Edwards*, 2017 WL 4857441, at 17 (D.N.M. Oct. 25, 2017) (Browning, J.) (internal citation and quotations omitted). This exception is deeply rooted in our laws.   The

2

Supreme Court held that letters written about anticipated travel prior to the declarant's death can

be used to show he did in fact travel to that location.   *Mutual Life Insurance Co. of New York v.*

*Hillmon*, 145 U.S. 285, 295, 12 S. Ct. 909, 912, 36 L. Ed. 706 (1892)

> A man's state of mind or feeling can only be manifested to others by
> countenance, attitude, or gesture, or by sounds or words, spoken or
> written. The nature of the fact to be proved is the same, and evidence
> of its proper tokens is equally competent to prove it, whether
> expressed by aspect or conduct, by voice or pen.   When the
> intention to be proved is important only as qualifying an act, its
> connection with that act must be shown, in order to warrant the
> admission of declarations of the intention.   But whenever the
> intention is of itself a distinct and material fact in a chain of
> circumstances, it may be proved by contemporaneous oral or written
> declarations of the party.

*Id.*

Burns told Sutton that he was going to the Gallegos home moments before he left.[1]   This

statement is clearly in reference to a future event and not a reflection on the past.   It happens

within minutes of Burns actually leaving the home, satisfying the contemporaneous requirement

of this rule and shows no opportunity for the declarant to misrepresent his thoughts.

The statement can also be used to show its effect on Amber Sutton.   Sutton proceeded to

conduct a search for Burns which started with her looking for the Gallegos' home.   She asked

others to help in her search but ended up calling police departments in as a last attempt to locate

Burns.

---

1 "If *D* says 'I am going to New York tomorrow because Joe stole my money and I have to get it back from him,'
the statement cannot be used to prove that Joe stole money from *D*, because that would be using the state of mind
statement to prove the truth of a past fact…But it could be used to prove that *D* went to New York."   Stephen A.
Saltzburg et al., Fed. Rules of Evidence Manual § 803.02, at 803-32 (11th ed. 2017).

DNM 730

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court grant the

government's Motion *In Limine* to admit the out-of-court statement of Adrian Burns.


Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515


***Electronically filed on 3/26/18***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney

4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON,** | ) | |
| **JOE GALLEGOS,** | ) | |
| **EDWARD TROUP, a.k.a. "Huero** | ) | |
| **Troup,"** | ) | |
| **BILLY GARCIA, a.k.a. "Wild Bill,"** | ) | |
| **ALLEN PATTERSON,** | ) | |
| **CHRISTOPHER CHAVEZ, a.k.a.** | ) | |
| **"Critter,"** | ) | |
| **ARTURO ARNULFO GARCIA, a.k.a.** | ) | |
| **"Shotgun,"** | ) | |
| **ANDREW GALLEGOS, a.k.a. "Smiley,"** | ) | |
| **and** | ) | |
| **SHAUNA GUTIERREZ,** | ) | |
| | ) | |
| Defendants. | ) | |

## <u>UNITED STATES' EXHIBIT LIST</u>

The United States of America hereby submits the attached list of exhibits for the

convenience of the Court and counsel, and without waiving the right to introduce different or

additional exhibits, to be used during trial.

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515

***<u>Electronically filed on 3/26/2018</u>***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 - Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

2

## UNITED STATES v. ANGEL DELEON, et al., 15-CR-4268 JB

### GOVERNMENT'S EXHIBIT LIST TRIAL II

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| | **COUNT 2 Murder of R.G.** | | | | |
| 1. | Video of victim R.G.'s Crime Scene | | | | |
| 2. | White washcloth with suspected blood found in cell 2211, Allen Patterson's cell | | | | |
| 3. | White bunk sheet with apparent blood stains from victim R.G.'s cell | | | | |
| 4. | Bed sheet from floor with apparent blood stain from victim R.G.'s cell | | | | |

DNM 734

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 5. | Pillow case from bunk with apparent blood stain from victim R.G.'s cell | | | | |
| 6. | Shoe impression from sheet bunk from victim R.G.'s cell | | | | |
| 7. | Pair of white Nike shoes with shoe laces from victim R.G.'s cell | | | | |
| 8. | White towel with red stains taken from cell 2215, Eugene Martinez's cell | | | | |
| 9. | Underpants, shorts and socks taken off victim R.G.'s body | | | | |
| 10. | Pair of green pants and belt taken off victim R.G.'s body | | | | |

DNM 735

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 11. | Photo of overview of housing unit O-1 at SNMCF | | | | |
| 12. | Photo of overview of cell location for R.G. homicide | | | | |
| 13. | Photo of overview of cell location for R.G. homicide | | | | |
| 14. | Photo of seal on cell door | | | | |
| 15. | Photo of overview of cell & victim R.G. from cell window | | | | |
| 16. | Photo of overview of cell & victim R.G. from cell window | | | | |

DNM 736

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 17. | Photo of overview of cell from cell window | | | | |
| 18. | Photo of victim R.G.'s lower legs | | | | |
| 19. | Photo of victim R.G. | | | | |
| 20. | Photo of overview of victim R.G.'s desk | | | | |
| 21. | Photo of victim R.G.'s bedding on cell floor | | | | |
| 22. | Photo of victim R.G.'s shoes & articles under the desk | | | | |

DNM 737

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 23. | Photo of overview of cell & victim R.G. | | | | |
| 24. | Photo of pod facing outwards from victim R.G.'s cell | | | | |
| 25. | Photo of victim R.G.'s desk | | | | |
| 26. | Photo of blood stain located on victim R.G.'s bed | | | | |
| 27. | Close-up photo of victim R.G.'s left hand | | | | |
| 28. | Photo of tattoos on victim R.G.'s back | | | | |

DNM 738

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 29. | Photo of victim R.G.'s tattoos on his back | | | | |
| 30. | Photo of blood on victim R.G.'s bed marked as A | | | | |
| 31. | Photo of blood stain on victim R.G.'s sheet marked as B | | | | |
| 32. | Photo of victim R.G. & blood stain on victim R.G.'s bed | | | | |
| 33. | Photo of victim R.G. & blood stains on victim R.G.'s bed & pillow | | | | |
| 34. | Photo of ligature impression on victim R.G.'s neck | | | | |

DNM 739

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|----------|----------------------|-------|--------|------|--------|
| 35. | Close-up photo of ligature impression & marks on victim R.G.'s neck | | | | |
| 36. | Photo of shoe imprint marked as E & blood stains marked as D on victim R.G.'s bed | | | | |
| 37. | Photo of victim R.G.'s shoes & shoe laces marked as F | | | | |
| 38. | Photo of shoe imprint with shoe taken from under victim R.G.'s desk | | | | |
| 39. | Photo of victim R.G.'s eye | | | | |
| 40. | Photo of victim R.G.'s eye | | | | |

7

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 41. | Close-up photo of white towel with reddish stains | | | | |
| 42. | Close-up photo of white paper napkin with red stains | | | | |
| 43. | Photo of the overview of the white pillowcase | | | | |
| 44. | Close-up photo of white pillow case with reddish stain | | | | |
| 45. | Close-up photo of pillow case with writing (#2218) | | | | |
| 46. | Photo of overview of bed sheet | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 47. | Photo toilet paper roll with shoelace string inside it | | | | |
| 48. | Photo of toilet paper roll & shoelace string | | | | |
| 49. | Photo of shoelace string with knots on each end | | | | |
| 50. | Photo of wash hand towel | | | | |
| 51. | Photo of laundry bag with writing(Leroy Lucero) | | | | |
| 52. | OMI Photo of New Mexico State Police sheet regarding victim R.G.'s autopsy | | | | |

9

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 53. | OMI Photo of victim R.G.'s torso | | | | |
| 54. | OMI Photo of victim R.G.'s head | | | | |
| 55. | OMI Photo of the inside of victim R.G.'s lips | | | | |
| 56. | OMI Photo victim R.G.'s legs | | | | |
| 57. | OMI Photo of victim R.G.'s right elbow | | | | |
| 58. | OMI Photo of victim R.G.'s left hand | | | | |

DNM 743

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 59. | OMI close-up photo of victim R.G.'s neck | | | | |
| 60. | OMI photo of incision on right elbow of victim R.G | | | | |
| 61. | OMI photo wounds on victim R.G.'s neck | | | | |
| 62. | OMI photo of abrasions on victim R.G.'s neck | | | | |
| 63. | OMI photo of abrasions on victim R.G.'s neck | | | | |
| 64. | OMI photo of victim R.G.'s back | | | | |

11

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 65. | OMI Photo of victim R.G.'s legs | | | | | |
| 66. | OMI photo of victim R.G.'s hand | | | | | |
| 67. | OMI photo of the back of victim R.G.'s neck | | | | | |
| 68. | OMI Diagram of Injuries for victim R.G. | | | | | |
| 69. | OMI Report of Findings for victim R.G. | | | | | |
| 70. | OMI Report of Death for victim R.G. | | | | | |

12

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 71. | OMI Autopsy Report for victim R.G. | | | | | |
| 72. | Curriculum Vitae for Dr. Ross Zumwalt | | | | | |
| 73. | Diagram of Housing Unit O1, Yellow Pod, cell 1118 | | | | | |
| 74. | Diagram of Housing Unit O1, Yellow Pod, cell 1118 | | | | | |
| 75. | Diagram of O-One Unit | | | | | |
| 76. | Timeline regarding the homicide of victim R.G. | | | | | |

13

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 77. | Flowchart of defendants' involved in R.G.'s homicide | | | | | |
| 78. | Photo of victim R.G. | | | | | |
| 79. | Penitentiary Pack for victim R.G. | | | | | |
| 80. | Security Threat Intelligence Unit File for victim R.G. | | | | | |
| 81. | Penitentiary Pack for Billy Garcia | | | | | |
| 82. | Security Threat Intelligence Unit File for Billy Garcia | | | | | |

DNM 747

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 83. | Offender Location History for Billy Garcia | | | | | |
| 84. | Photo of Billy Garcia | | | | | |
| 85. | Penitentiary Pack for Allen Patterson | | | | | |
| 86. | Security Threat Intelligence Unit File for Allen Patterson | | | | | |
| 87. | Offender Location History for Allen Patterson | | | | | |
| 88. | Photo of Allen Patterson | | | | | |

DNM 748

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 89. | Photo of Allen Patterson | | | | | |
| 90. | Penitentiary Pack for Christopher Chavez | | | | | |
| 91. | Security Threat Intelligence Unit File for Christopher Chavez | | | | | |
| 92. | Offender Location History for Christopher Chavez | | | | | |
| 93. | Photo of Christopher Chavez | | | | | |
| 94. | Photo of Christopher Chavez | | | | | |

16

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 95. | Penitentiary Pack for Leonard Lujan | | | | | |
| 96. | Security Threat Intelligence Unit File for Leonard Lujan | | | | | |
| 97. | Offender Location History for Leonard Lujan | | | | | |
| 98. | Plea Agreement for Leonard Lujan | | | | | |
| 99. | Addendum to Plea Agreement for Leonard Lujan | | | | | |
| 100. | Presentence Report for Leonard Lujan | | | | | |

DNM 750

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 101. | Photo of Leonard Lujan | | | | | |
| 102. | Penitentiary Pack for Eugene Martinez | | | | | |
| 103. | Security Threat Intelligence Unit File for Eugene Martinez | | | | | |
| 104. | Offender Location History for Eugene Martinez | | | | | |
| 105. | Plea Agreement for Eugene Martinez | | | | | |
| 106. | Addendum to Plea Agreement for Eugene Martinez | | | | | |

DNM 751

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 107. | Photo of Eugene Martinez | | | | | |
| 108. | Photo of Eugene Martinez | | | | | |
| 109. | Photo of Eugene Martinez | | | | | |
| 110. | Photo of Eugene Martinez | | | | | |
| 111. | Penitentiary Pack for Leroy Lucero | | | | | |
| 112. | Security Threat Intelligence Unit File for Leroy Lucero | | | | | |

DNM 752

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 113. | Offender Location History for Leroy Lucero | | | | | |
| | **COUNT 2 Murder of F.C.** | | | | | |
| 114. | Victim F.C.'s crime scene video | | | | | |
| 115. | Torn letter found in trash receptacle in victim F.C.'s cell | | | | | |
| 116. | Mattress sheet with blood from victim F.C.'s cell | | | | | |
| 117. | Sheet with blood from victim F.C.'s cell | | | | | |

DNM 753

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 118. | Blanket with blood from victim F.C.'s cell | | | | | |
| 119. | White cord and cotton sweat cap with a red stain | | | | | |
| 120. | Fishnet laundry bag with clothing article inside it | | | | | |
| 121. | Underpants, grey shorts and socks taken off of victim F.C.'s body | | | | | |
| 122. | Photo of the New Mexico State Police Criminal Investigation Sheet for victim F.C. Homicide | | | | | |
| 123. | Photo of the outside of P-1 at Southern New Mexico Correctional Facility | | | | | |

DNM 754

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 124. | Photo of the F.C. Crime Scene (Pod Tiers) | | | | | |
| 125. | Photo of the F.C. Crime Scene (Stairs) | | | | | |
| 126. | Photo of the F.C. Crime Scene (Pod Door 2204 sealed) | | | | | |
| 127. | Photo of victim F.C. | | | | | |
| 128. | Photo of item found in F.C.'s trash receptacle | | | | | |
| 129. | Photo of item found in F.C.'s trash receptacle marked as item A | | | | | |

DNM 755

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 130. | Photo of victim F.C. | | | | | |
| 131. | Photo of victim F.C.'s knees | | | | | |
| 132. | Photo of victim F.C.'s knees | | | | | |
| 133. | Photo of victim F.C. | | | | | |
| 134. | Close-up photo of victim F.C. | | | | | |
| 135. | Photo of blood on victim F.C.'s sheet and blanket. | | | | | |

23

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 136. | Photo of victim F.C.'s cell | | | | | |
| 137. | Photo of victim F.C.'s cell | | | | | |
| 138. | Photo of victim F.C. | | | | | |
| 139. | Photo of victim F.C. | | | | | |
| 140. | Photo of victim F.C. | | | | | |
| 141. | Items found on victim F.C.'s desk in his cell | | | | | |

24

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 142. | Close-up photo of victim F.C. | | | | | |
| 143. | Photo of the Control Center in the Pod | | | | | |
| 144. | Close-up photo of paper found in F.C.'s trash receptacle | | | | | |
| 145. | Photo of victim F.C. | | | | | |
| 146. | Photo of victim F.C. | | | | | |
| 147. | Photo of NMSP Sheet regarding autopsy of victim F.C. | | | | | |

DNM 758

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 148. | OMI photo of victim F. C.'s head and torso with ligature and mesh bag | | | | | |
| 149. | OMI photo of victim F.C.'s legs | | | | | |
| 150. | OMI photo of victim F.C.'s back of head and neck with ligature and mesh bag | | | | | |
| 151. | OMI photo of victim F.C.'s back of head and neck with ligature and mesh bag | | | | | |
| 152. | OMI photo of victim F.C.'s blood stained mesh bag | | | | | |
| 153. | OMI photo of pathologist cutting ligature off of victim F.C. | | | | | |

DNM 759

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 154. | OMI photo of ligature and attached blood stained gray clothe | | | | | |
| 155. | OMI close-up photo of ligature and attached blood stained gray clothe | | | | | |
| 156. | OMI close-up photo of ligature and attached blood stained gray clothe | | | | | |
| 157. | OMI photo of victim F.C.' head and neck | | | | | |
| 158. | OMI close-up photo of victim F.C.'s neck | | | | | |
| 159. | OMI photo of back of victim F.C.'s head and neck | | | | | |

DNM 760

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 160. | OMI close-up photo of back of victim F.C.'s head and neck | | | | | |
| 161. | OMI close-up photo of victim F.C.'s inside of lip | | | | | |
| 162. | OMI photo of victim F.C.'s left leg | | | | | |
| 163. | OMI photo of victim F.C.'s left foot | | | | | |
| 164. | OMI photo of victim F.C.'s right forearm | | | | | |
| 165. | OMI photo of victim F.C.'s right knee | | | | | |

28

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 166. | OMI Diagram of Injuries for victim F.C. | | | | | |
| 167. | OMI Report of Findings for victim F.C. | | | | | |
| 168. | OMI Report of Death for victim F.C. | | | | | |
| 169. | OMI Autopsy Report for victim F.C. | | | | | |
| 170. | Diagram of P-1 Green Pod – F.C. homicide | | | | | |
| 171. | Diagram of P-One Unit | | | | | |

DNM 762

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 172. | Timeline of the day of the homicide of victim F.C. | | | | | |
| 173. | Flowchart of defendants' involved in F.C.'s homicide | | | | | |
| 174. | Photo of victim F.C. | | | | | |
| 175. | Penitentiary Pack for victim F.C. | | | | | |
| 176. | Security Threat Intelligence Unit File for victim F.C. | | | | | |
| 177. | Offender Location History for victim F.C. | | | | | |

DNM 763

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 178. | Penitentiary Pack for Joe Lawrence Gallegos | | | | | |
| 179. | Security Threat Intelligence Unit File for Anthony Joe Lawrence Gallegos | | | | | |
| 180. | Offender Location History for Joe Gallegos | | | | | |
| 181. | Photo of Joe Lawrence Gallegos | | | | | |
| 182. | Penitentiary Pack for Edward Troup | | | | | |
| 183. | Security Threat Intelligence Unit File for Edward Troup | | | | | |

DNM 764

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 184. | Offender Location History for Edward Troup | | | | | |
| 185. | Photo of Edward Troup | | | | | |
| 186. | Photo of Edward Troup | | | | | |
| 187. | Photo of Edward Troup | | | | | |
| 188. | Photo of Edward Troup | | | | | |
| 189. | Photo of Edward Troup | | | | | |

DNM 765

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 190. | Photo of Edward Troup | | | | | |
| 191. | Photo of Edward Troup | | | | | |
| | **COUNT 3 Murder of F.S.** | | | | | |
| 192. | Pillow case with padding containing blood taken from cell 113, victim F.S.'s cell | | | | | |
| 193. | Bottom sheet from bed containing red stain taken from cell 113, victim F.S.'s cell | | | | | |
| 194. | Top sheet from bed containing red stain taken from cell 113, victim F.S.'s cell | | | | | |

DNM 766

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 195. | Cloth ligatures taken from trash in cell 112 | | | | | |
| 196. | White boxer shorts with red stain taken from cell 114 | | | | | |
| 197. | Sweat pants taken from victim F.S.'s body | | | | | |
| 198. | Underpants taken from victim F.S.'s body | | | | | |
| 199. | Photo of victim F.S. | | | | | |
| 200. | Photo of cell 113 & victim F.S. | | | | | |

DNM 767

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 201. | Photo of victim F.S. | | | | | |
| 202. | NMSP Sheet re vicitim F.S. homicide | | | | | |
| 203. | Photo of victim F.S.'s cell | | | | | |
| 204. | Photo of victim F.S.. | | | | | |
| 205. | Photo of victim F.S. & his cell | | | | | |
| 206. | Photo of victim F.S. & his cell | | | | | |

35

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 207. | Photo of victim F.S.'s cell. | | | | | |
| 208. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 209. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 210. | Photo of overview of victim F.S.'s desk area | | | | | |
| 211. | Photo of blood drops on floor of vicitm F.S.'s cell | | | | | |
| 212. | Photo of victim F.S. | | | | | |

DNM 769

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 213. | Photo of victim F.S | | | | | |
| 214. | Photo of victim F.S. | | | | | |
| 215. | Photo of victim F.S.'s shoes under his bunk | | | | | |
| 216. | Photo of blood stain on victim F.S.'s bunk frame | | | | | |
| 217. | Photo of blood drops on floor of victim F.S.'s cell | | | | | |
| 218. | Photo of victim F.S.'s personal items on his desk | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 219. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 220. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 221. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 222. | Photo of victim F.S.'s legs & shoes | | | | | |
| 223. | Photo of victim F.S. | | | | | |
| 224. | Photo of red stains on victim F.S.'s cell floor | | | | | |

38

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 225. | Photo of victim F.S.'s personal belongings | | | | | |
| 226. | Photo of victim F.S. | | | | | |
| 227. | Close-up photo of wound on victim F.S.'s neck | | | | | |
| 228. | Photo of victim F.S. and blood stains on his bed | | | | | |
| 229. | Close-up photo of wounds on victim F.S.'s neck | | | | | |
| 230. | Photo of victim F.S. and blood stains on his bed | | | | | |

39

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 231. | Close-up photo of wounds on victim F.S.'s neck | | | | | |
| 232. | Photo of victim F.S.'s bed with markers | | | | | |
| 233. | Photo of victim F.S.'s shoes with marker | | | | | |
| 234. | Photo of victim F.S.'s shoes with markers | | | | | |
| 235. | Close-up photo of blood stain on victim F.S.' bed frame | | | | | |
| 236. | Photo of trash bag filled with trash and marker | | | | | |

DNM 773

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 237. | Photo of cell 114 | | | | | |
| 238. | Photo of underpants with red stains taken from cell 114 | | | | | |
| 239. | Photo of underpants with red stains taken from cell 114 | | | | | |
| 240. | Photo of cell 116 | | | | | |
| 241. | Photo of underpants with red stains & marker | | | | | |
| 242. | Photo of towel with red stain taken from cell 116 | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 243. | Photo of black glove with marker taken from cell 116 | | | | | |
| 244. | Photo of tennis shoes with marker from cell 116 | | | | | |
| 245. | Photo of boots with marker from cell 114 | | | | | |
| 246. | Photo of sheet from cell 116 | | | | | |
| 247. | Photo of tiers in Pod 1A-B | | | | | |
| 248. | Photo of Pod 1A-B | | | | | |

DNM 775

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 249. | Photo of Pod 1A-B | | | | | |
| 250. | Photo of Rascon | | | | | |
| 251. | Photo of Javier Alonso | | | | | |
| 252. | Photo of Javier Alonso's hands | | | | | |
| 253. | Photo of Javier Alonso's palms | | | | | |
| 254. | Photo of victim F.S.'s eye | | | | | |

43

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|----------|----------------------|-------|--------|------|--------|---|
| 255. | Photo of victim F.S. in his cell | | | | | |
| 256. | Photo of victim F.S. | | | | | |
| 257. | Photo of victim F.S. | | | | | |
| 258. | Photo of victim F.S. | | | | | |
| 259. | Photo of victim F.S. | | | | | |
| 260. | Photo of victim F.S. | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 261. | Photo of vicitm F.S. | | | | | |
| 262. | Photo of victim F.S.'s eye | | | | | |
| 263. | Photo of wounds on victim F.S.'s neck | | | | | |
| 264. | Photo of victim F.S. & blood stains on bed | | | | | |
| 265. | Photo of victim F.S. | | | | | |
| 266. | Photo of victim F.S.'s OMI tag | | | | | |

DNM 778

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 267. | OMI photo of victim F.S. | | | | | |
| 268. | OMI Photo of victim F.S.'s torso | | | | | |
| 269. | OMI Photo of victim F.S.'s midsection | | | | | |
| 270. | OMI photo of victim F.S.'s legs | | | | | |
| 271. | OMI photo of victim F.S.'s feet | | | | | |
| 272. | OMI Photo of victim F.S.'s neck wounds | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 273. | OMI photo of victim F.S.'s neck wounds | | | | | |
| 274. | OMI photo of right side showing victim F.S.'s neck wounds | | | | | |
| 275. | OMI photo of left side showing victim F.S.'s neck wounds | | | | | |
| 276. | OMI photo of right side showing victim F.S.'s neck wounds | | | | | |
| 277. | OMI Diagram of Injuries for victim F.S. | | | | | |
| 278. | OMI Report of Findings for victim F.S. | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 279. | OMI Report of Death for victim F.S. | | | | | |
| 280. | OMI Autopsy Report for victim F.S. | | | | | |
| 281. | Diagram of Housing Unit 1-A | | | | | |
| 282. | Timeline of the day of the homicide of victim F.S. | | | | | |
| 283. | Flowchart of defendants' involved in F.S.'s homicide | | | | | |
| 284. | Photo of victim F.S. | | | | | |

48

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 285. | Penitentiary Pack for victim F.S. | | | | | |
| 286. | Security Threat Intelligence Unit File for victim F.S. | | | | | |
| 287. | Offender Location History for victim F.S. | | | | | |
| 288. | Penitentiary Pack for Arturo Garcia | | | | | |
| 289. | Security Threat Intelligence Unit File for Arturo Garcia | | | | | |
| 290. | Offender Location History for Arturo Garcia | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 291. | Penitentiary Pack for Benjamin Clark | | | | | |
| 292. | Security Threat Intelligence Unit File for Benjamin Clark | | | | | |
| 293. | Offender Location History for Benjamin Clark | | | | | |
| 294. | Plea Agreement for Benjamin Clark | | | | | |
| 295. | Addendum to Plea Agreement for Benjamin Clark | | | | | |
| 296. | Presentence Report for Benjamin Clark | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 297. | Photo of Benjamin Clark | | | | | |
| 298. | Photo of Benjamin Clark | | | | | |
| 299. | Photo of Benjamin Clark | | | | | |
| 300. | Penitentiary Pack for Javier Alonso | | | | | |
| 301. | Security Threat Intelligence Unit File for Javier Alonso | | | | | |
| 302. | Offender Location History for Javier Alonso | | | | | |

DNM 784

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 303. | Plea Agreement for Javier Alonso | | | | | |
| 304. | Addendum to Plea Agreement for Javier Alonso | | | | | |
| 305. | Photo of Javier Alonso | | | | | |
| 306. | Photo of Javier Alonso | | | | | |
| 307. | Photo of Javier Alonso | | | | | |
| 308. | Photo of Javier Alonso | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 309. | Photo of Javier Alonso | | | | | |
| 310. | Photo of Javier Alonso | | | | | |
| 311. | Photo of Javier Alonso | | | | | |
| 312. | Photo of Javier Alonso | | | | | |
| 313. | Penitentiary Pack for Ruben Hernandez | | | | | |
| 314. | Security Threat Intelligence Unit File for Ruben Hernandez | | | | | |

DNM 786

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 315. | Offender Location History for Ruben Hernandez | | | | | |
| 316. | Plea Agreement for Ruben Hernandez | | | | | |
| 317. | Addendum to Plea Agreement for Ruben Hernandez | | | | | |
| 318. | Presentence Report for Ruben Hernandez | | | | | |
| 319. | Photo of Ruben Hernandez | | | | | |
| 320. | Photo of Ruben Hernandez | | | | | |

DNM 787

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 321. | Photo of Ruben Hernandez | | | | | |
| 322. | Photo of Ruben Hernandez | | | | | |
| 323. | Penitentiary Pack for Brian Rascon | | | | | |
| 324. | Security Threat Intelligence Unit File for Brian Rascon | | | | | |
| 325. | Offender Location History for Brian Rascon | | | | | |
| 326. | Penitentiary Pack for Raymond Rascon | | | | | |

DNM 788

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 327. | Security Threat Intelligence Unit File for Raymond Rascon | | | | | |
| 328. | Offender Location History for Raymond Rascon | | | | | |
| | **COUNTS 4 and 5, Conspiracy to Murder and Murder of A.B.** | | | | | |
| 329. | Aerial crime scene video taken on November 13, 2012 by New Mexico State Police | | | | | |
| 330. | Plastic Allsups bag used to cover victim A.B.'s head | | | | | |
| 331. | Allsups' #165 receipt dated November 12, 2012 | | | | | |

56

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 332. | Victim A.B.'s socks | | | | | |
| 333. | Other clothing fragments from victim A.B.'s body | | | | | |
| 334. | Victim A.B.'s undershirt | | | | | |
| 335. | Victim A.B.'s shirt | | | | | |
| 336. | Victim A.B.'s pants | | | | | |
| 337. | Victim A.B.'s jacket | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 338. | GIANT Computer printout of fuel purchase by Andrew Gallegos 2 | | | | | |
| 339. | Letters written by Joe Gallegos and miscellaneous documents | | | | | |
| 340. | Methadone bottle in Joe Gallegos' name and spoon with residue | | | | | |
| 341. | Box of cartridges and casings of different calibers taken from Joe Gallegos' property | | | | | |
| 342. | One (1) .22 caliber casing | | | | | |
| 343. | Charred black plaid jacket found in Joe Gallegos' van | | | | | |

58

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 344. | Letters to Andrew Gallegos, a.k.a. "Smiley" and documents found in the Imperial Inn motel room | | | | | |
| 345. | Samsung cellphone Model – SCH-R631, Serial No. 268435460108209247 | | | | | |
| 346. | One (1) cellphone retrieved from Imperial Inn motel room | | | | | |
| 347. | Three (3) cellphones retrieved from Imperial Inn motel room | | | | | |
| 348. | Cellphone unknown type | | | | | |
| 349. | Gun cleaning kit | | | | | |

DNM 792

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 350. | Partially burned denim fabric | | | | | |
| 351. | Charred camouflage jacket | | | | | |
| 352. | Earring, rubber band and chain fragments collected from victim A.B.'s body | | | | | |
| 353. | Two (2) grey tank tops with burns on them | | | | | |
| 354. | Burnt handcuffs removed from victim A.B. | | | | | |
| 355. | Handcuffs and case recovered from White Pickup (NM 229RLC) | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 356. | One (1) gun holster | | | | | |
| 357. | PNM utility documents belonging to Joe Gallegos | | | | | |
| 358. | Photo of the burnt car & victim A.B.'s burnt body | | | | | |
| 359. | Photo of the burnt car & victim A.B's burnt body | | | | | |
| 360. | Photo of burnt car & victim A.B.'s burnt body | | | | | |
| 361. | Photo of victim A.B.'s burnt body | | | | | |

DNM 794

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 362. | Photo of the trunk of the burnt car | | | | | |
| 363. | Photo of the burnt car | | | | | |
| 364. | Photo of the interior of the burnt car | | | | | |
| 365. | Photo of objects marked at the crime scene | | | | | |
| 366. | Photo of a plastic bottle marked as 1 | | | | | |
| 367. | Photo of a Dr Pepper can marked as 2 | | | | | |

DNM 795

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 368. | Photo of plastic bottle with fluid marked as 3 | | | | | |
| 369. | Photo of burnt can marked as 4 | | | | | |
| 370. | Photo of burnt debris marked as 5 | | | | | |
| 371. | Photo of evidence at the crime scene marked as 6 | | | | | |
| 372. | Photo of the crime scene | | | | | |
| 373. | Photo of a zip tie marked as 7 | | | | | |

DNM 796

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 374. | Photo of victim A.B.'s burnt hands | | | | | |
| 375. | Photo of victim A.B.'s burnt body | | | | | |
| 376. | Photo of victim A.B.'s head partially in the plastic bag | | | | | |
| 377. | Photo of victim A.B.'s burnt, bloody face | | | | | |
| 378. | Photo of victim A.B. | | | | | |
| 379. | Photo of the side view of victim A.B. | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 380. | Photo of Dr Pepper can marked as 8. | | | | | |
| 381. | Photo of burnt debris marked as 1 | | | | | |
| 382. | OMI photo of burnt clothing | | | | | |
| 383. | OMI Photo of burnt clothing | | | | | |
| 384. | OMI photo of tag on victim A.B.'s wrist | | | | | |
| 385. | OMI photo of victim A.B.'s burnt body & clothing | | | | | |

DNM 798

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 386. | OMI photo of victim A.B.'s burnt body & clothing | | | | | |
| 387. | OMI Photo of victim A.B.'s burnt hands handcuffed behind his back | | | | | |
| 388. | OMI photo of handcuffs on victim A.B. | | | | | |
| 389. | OMI Photo of victim A.B.'s burnt body | | | | | |
| 390. | OMI photo of a bullet hole near victim A.B.'s ear | | | | | |
| 391. | OMI photo of bullet hole near victim A.B.'s ear | | | | | |

DNM 799

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 392. | OMI photo of a gash on victim A.B.'s brow | | | | | |
| 393. | OMI photo of a gash on victim A.B.'s brow and forehead | | | | | |
| 394. | OMI photo of victim A.B.'s burnt leg | | | | | |
| 395. | OMI photo of victim A.B.'s burnt torso | | | | | |
| 396. | OMI photo of burnt handcuffs removed from victim A.B.'s body | | | | | |
| 397. | OMI photo of fragments of victim A.B.'s belt | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 398. | OMI photo of victim A.B.'s burnt clothing | | | | | |
| 399. | OMI Diagram of Injuries for victim A.B. | | | | | |
| 400. | OMI Report of Findings for victim A.B. | | | | | |
| 401. | OMI Report of Death for victim A.B. | | | | | |
| 402. | OMI Autopsy Report for victim A.B. | | | | | |
| 403. | Curriculum Vitae for Dr. Ian Paul | | | | | |

DNM 801

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 404. | Photo of the crime scene | | | | | |
| 405. | Photo of the crime scene | | | | | |
| 406. | Photo of the crime scene with markers | | | | | |
| 407. | Photo of the burnt car | | | | | |
| 408. | Photo of the burnt car | | | | | |
| 409. | Photo of the burnt car | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 410. | Photo of the burnt car & body of victim A.B. | | | | | |
| 411. | Photo of victim A.B.'s burnt body | | | | | |
| 412. | Photo of victim A.B.'s burnt body | | | | | |
| 413. | Photo of victim A.B.'s burnt body | | | | | |
| 414. | Close-up photo of victim A.B.'s burnt body | | | | | |
| 415. | Photo of victim A.B.'s burnt hands handcuffed behind his back | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 416. | Photo of victim A.B.'s head partially covered by the plastic bag | | | | | |
| 417. | Photo of victim A.B.'s burnt body and clothing | | | | | |
| 418. | Photo of victim A.B. | | | | | |
| 419. | Photo of charred camouflage jacket | | | | | |
| 420. | Close-up photo of the charred portion of the jacket | | | | | |
| 421. | Photo of suspect's residence | | | | | |

71

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 422. | Photo of vehicle in front of suspect's residence | | | | | |
| 423. | Photo of vehicle on suspect's property | | | | | |
| 424. | Photo of vehicles on suspect's property | | | | | |
| 425. | Photo of vehicle on suspect's property | | | | | |
| 426. | Photo of suspect's residence | | | | | |
| 427. | Photo of suspect's residence | | | | | |

DNM 805

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 428. | Photos of vehicles in front of suspect's residence | | | | | |
| 429. | Photo of vehicle in front of suspect's residence | | | | | |
| 430. | Photo of suspect's residence | | | | | |
| 431. | Photo of suspect's residence | | | | | |
| 432. | Photo of inside of suspect's residence | | | | | |
| 433. | Photo of inside of suspect's residence | | | | | |

73

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 434. | Photo of inside of suspect's residence | | | | | |
| 435. | Photo of box of cartridges of different calibers inside suspect's residence marked as 1 | | | | | |
| 436. | Photo of glass bottle and cellphone inside suspect's residence marked as 2 & 3 | | | | | |
| 437. | Close-up photo of glass bottle marked as 2 | | | | | |
| 438. | Close-up photo of cellphone marked as 3 | | | | | |
| 439. | Photo of PNM utility bill in Joe Gallegos' name marked as 4 | | | | | |

74

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 440. | Photo of cellphone marked as 5 | | | | | |
| 441. | Close-up photo of cellphone marked as 5 | | | | | |
| 442. | Photo of evidence marked as 6 | | | | | |
| 443. | Photo of charred camouflage jacket marked as 7 | | | | | |
| 444. | Photo of methadone bottle in Joe Gallegos' name and spoon with residue marked as 8 | | | | | |
| 445. | Photo of gun cleaning kit marked as 9 | | | | | |

DNM 808

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 446. | Photo of evidence marked as 10 | | | | | |
| 447. | Photo of gun holster marked as 11 | | | | | |
| 448. | Close-up photo of gun holster marked as 11 | | | | | |
| 449. | Photo of items on back of suspect's flatbed truck | | | | | |
| 450. | Photo of red gas can marked as 12 | | | | | |
| 451. | Close-up photo of red gas can | | | | | |

DNM 809

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 452. | Photo of faded gas can marked as 13 | | | | | |
| 453. | Photo of red gas can marked as 14 | | | | | |
| 454. | Photo of vehicle driver's door marked as 16 | | | | | |
| 455. | Photo of evidence in driver side vehicle door marked as 16 | | | | | |
| 456. | Photo of handcuffs and holster from suspect's vehicle marked as 16 | | | | | |
| 457. | Photo of handcuffs and holster marked as 16 | | | | | |

DNM 810

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 458. | Close-up photo of handcuffs | | | | | |
| 459. | Photo of red gas can marked as 17 | | | | | |
| 460. | Photo of documents located in suspect's vehicle marked as 18 | | | | | |
| 461. | Photo of white truck seized from suspect's property | | | | | |
| 462. | Photo of white truck seized from suspect's property | | | | | |
| 463. | Photo of white truck seized from suspect's property | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 464. | Photo of white truck seized from suspect's property | | | | | |
| 465. | Photo of evidence tape on white truck seized from suspect's property | | | | | |
| 466. | Photo of items in the bed of the white truck seized from suspect's property | | | | | |
| 467. | Photo of white truck at processing | | | | | |
| 468. | Photo of items in the back of the white truck at processing | | | | | |
| 469. | Photo of the interior of the white truck at processing | | | | | |

DNM 812

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 470. | Photo of interior of white truck at processing | | | | | |
| 471. | Photo of evidence in white truck marked as 1 at processing | | | | | |
| 472. | Evidence inside white truck marked as 2 at processing | | | | | |
| 473. | Evidence inside white truck marked as 2 at processing | | | | | |
| 474. | Photo of Allsup's receipt marked as 3 at processing | | | | | |
| 475. | Photo of gas cans from white truck at processing | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|----------|----------------------|-------|--------|------|--------|---|
| 476. | Photo of evidence in white truck at processing | | | | | |
| 477. | Photo of evidence in white truck marked as 4 at processing | | | | | |
| 478. | Photo of evidence in white truck marked as 5 at processing | | | | | |
| 479. | Photo of stained rag found in white truck at processing | | | | | |
| 480. | Photo of stain on seat in white truck marked as 7 at processing | | | | | |
| 481. | Photo of gas cans in bed of white truck at processing | | | | | |

DNM 814

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 482. | Photo of red gas can from white truck at processing | | | | | |
| 483. | Photos of items from white truck marked as 8 at processing | | | | | |
| 484. | Photo of red gas can marked as 9 | | | | | |
| 485. | Photo of Joe Gallegos' van & Angela Gallegos' jeep at Imperial Inn parking lot | | | | | |
| 486. | Photo of Joe Gallegos' van & Angela Gallegos' jeep at Imperial Inn parking lot | | | | | |
| 487. | Photo of Imperial Inn sign | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 488. | Photo of Angela Gallegos' car at Imperial Inn parking lot | | | | | |
| 489. | Photo of Imperial Inn rooms | | | | | |
| 490. | Photo of Imperial Inn hallway | | | | | |
| 491. | Photo of door 239 at Imperial Inn | | | | | |
| 492. | Photo of inside of room 239 | | | | | |
| 493. | Photo of inside of room 239 | | | | | |

DNM 816

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 494. | Photo of inside of room 239 | | | | | |
| 495. | Photo of bed in room 239 | | | | | |
| 496. | Photo of ice chest in room 239 | | | | | |
| 497. | Photo of items in room 239 | | | | | |
| 498. | Photo of cellphone in room 239 marked as 1 | | | | | |
| 499. | Photo of inside of room 239 | | | | | |

DNM 817

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 500. | Photo of evidence found in room 239 marked as 2 | | | | | |
| 501. | Photo of evidence found in room 239 marked as 3 | | | | | |
| 502. | Photo of evidence found in room 239 marked as 5 | | | | | |
| 503. | Photo Items found in room 239 | | | | | |
| 504. | Photo of evidence found in room 239 marked as 4 | | | | | |
| 505. | Photo of letters found in room 239 | | | | | |

85

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 506. | Photo of letter found in room 239 | | | | | |
| 507. | Photo of letter to Andrew Gallegos, a.k.a. Smiley found in room 239 | | | | | |
| 508. | Photo of letter found in room 239 | | | | | |
| 509. | Photo of envelope addressed to Andrew Gallegos from Frankie Gallegos found in room 239 | | | | | |
| 510. | Photo of evidence found in room 239 | | | | | |
| 511. | Photo of the inside of Angela Gallegos' vehicle | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 512. | Photo of inside of room 239 | | | | | |
| 513. | Photo of evidence found in Angela Gallegos' vehicle marked as 9 | | | | | |
| 514. | Photo of evidence in Angela Gallegos' vehicle marked as 10 | | | | | |
| 515. | Photo of cellphones in Angela Gallegos' vehicle marked as 7 | | | | | |
| 516. | Photo of evidence found in Angela Gallegos' vehicle marked as 8 | | | | | |
| 517. | Photo of evidence in Angela Gallegos' vehicle marked as 9 | | | | | |

DNM 820

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 518. | Photo of letter | | | | | |
| 519. | Photo of letter | | | | | |
| 520. | Photo of letter | | | | | |
| 521. | Photo of a men's grey tank top | | | | | |
| 522. | Photo of Joe Gallegos' van at processing | | | | | |
| 523. | Photo of items inside of Joe Gallegos' van marked as 11 | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 524. | Photo of evidence in Joe Gallegos' van marked as 12 | | | | | |
| 525. | Photo of evidence found in Joe Gallegos' van marked as 13 | | | | | |
| 526. | Photo of athletic pants taken from Joe Gallegos' van | | | | | |
| 527. | Photo of charred black plaid jacket taken from Joe Gallegos' van | | | | | |
| 528. | Photo of evidence found in Joe Gallegos' van marked as 14 | | | | | |
| 529. | Photo of red stains on pants taken from Joe Gallegos' van | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 530. | Photo of U.S. 60, mile marker 167.5 | | | | | |
| 531. | Photo of U.S. 60, mile marker 167.5 & river | | | | | |
| 532. | Photo of riverbed | | | | | |
| 533. | Photo of firearm found in river | | | | | |
| 534. | Photo of firearm found in riverbed | | | | | |
| 535. | Photo of firearm found in river | | | | | |

DNM 823

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 536. | Photo of firearm found in river marked as 1 | | | | | |
| 537. | Photo of bullet in the chamber | | | | | |
| 538. | Penitentiary Pack for Andrew Gallegos | | | | | |
| 539. | Security Threat Intelligence Unit File for Andrew Gallegos | | | | | |
| 540. | Offender Location History for Andrew Gallegos | | | | | |
| 541. | Photo of Andrew Gallegos | | | | | |

DNM 824

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 542. | Photo of Andrew Gallegos | | | | | |
| | **COUNT 13 Assault of J.G. With a Dangerous Weapon** | | | | | |
| 543. | Photo of Branden Chavez's Charger | | | | | |
| 544. | Photo of Branden Chavez's Charger | | | | | |
| 545. | Photo of Branden Chavez's Charger | | | | | |
| 546. | Photo of the inside of Branden Chavez's Charger | | | | | |

DNM 825

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 547. | Photo of the inside of Branden Chavez's Charger | | | | | |
| 548. | Photo of the backseat of Branden Chavez's Charger | | | | | |
| 549. | Photo of the inside of Branden Chavez's Charger | | | | | |
| **COUNTS 14, 15 and 16, Conspiracy to Murder J.G., Attempted Murder, Assault With a Dangerous Weapon Resulting in Serious Bodily Injury of J.G., and Tampering With a Witness, Victim or Informant by Physical Force or Threat** | | | | | | |
| 550. | Photo of residence where the assault took place on victim J.G. | | | | | |
| 551. | Photo of residence where assault took place on victim J.G. | | | | | |

93

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 552. | Photo of residence where assault took place on victim J.G. | | | | | |
| 553. | Photo of inside of residence where assault took place on victim J.G. | | | | | |
| 554. | Photo of blood stains from assault on victim J.G. | | | | | |
| 555. | Close-up photo of blood stains from assault on victim J.G. | | | | | |
| 556. | Close-up photo of blood from assault on victim J.G. | | | | | |
| 557. | Photo of blood stain from assault on victim J.G. marked as 1 | | | | | |

DNM 827

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 558. | Photo of blood from assault on victim J.G. marked as 2 | | | | | |
| 559. | Photo of blood from assault on victim J.G. marked as 2 | | | | | |
| 560. | Photo of blood from assault on victim J.G. | | | | | |
| 561. | Photo of the room where the assault on victim J.G. took place | | | | | |
| 562. | Photo of suspect's residence | | | | | |
| 563. | Photo of victim J.G. | | | | | |

DNM 828

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 564. | Photo of victim J.G. | | | | | |
| 565. | Photo of victim J.G. | | | | | |
| 566. | Photo of victim J.G. | | | | | |
| 567. | Photo of victim J.G.'s head wound | | | | | |
| 568. | Photo of injuries to victim J.G.'s hand | | | | | |
| 569. | Photo of residence where assault on victim J.G. occurred | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 570. | Photo of white van used in the assault of victim J.G. | | | | | |
| 571. | Photo of the inside of the white van | | | | | |
| 572. | Photo of items inside the white van | | | | | |
| 573. | Photo of machete found in the white van | | | | | |
| 574. | Photo of the white van's door | | | | | |
| 575. | Audio of a jail call between Shauna Gutierrez and female (1) | | | | | |

97

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 576. | Audio of a jail call between Shauna Gutierrez and female (2) | | | | | |
| 577. | Penitentiary Pack for Paul Rivera | | | | | |
| 578. | Security Threat Intelligence Unit File for Paul Rivera | | | | | |
| 579. | Offender Location History for Paul Rivera | | | | | |
| 580. | Plea Agreement for Paul Rivera | | | | | |
| 581. | Addendum to Plea Agreement for Paul Rivera | | | | | |

DNM 831

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 582. | Presentence Report for Paul Rivera | | | | | |
| | **Enterprise** | | | | | |
| 583. | Photo of Vincent Garduno (RICO Discovery) | | | | | |
| 584. | Photo of Vincent Garduno (RICO Discovery) | | | | | |
| 585. | Letter from Arturo Garcia to Robert Martinez dated 03-06-2008 (RICO Discovery) | | | | | |
| 586. | Letter from Arturo Garcia to Gerald Archuleta dated 07-25-2008 (RICO Discovery) | | | | | |

DNM 832

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 587. | Letter from Arturo Garcia to Gildardo Rodriguez dated 08-08-2008 (RICO Discovery) | | | | | |
| 588. | Letter from Arturo Garcia to Mario Rodriguez dated 03-31-2010 (RICO Discovery) | | | | | |
| 589. | Letter from Arturo Garcia to Mario Rodriguez dated 05-04-2010 (RICO Discovery) | | | | | |
| 590. | Letter from Billy Garcia to Ricky Valdespino (RICO Discovery) | | | | | |
| 591. | SNM Group Photo | | | | | |
| 592. | SNM Group Photo | | | | | |

DNM 833

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 593. | SNM Group Photo | | | | | |
| 594. | SNM Group Photo | | | | | |
| 595. | SNM Group Photo | | | | | |
| 596. | Penitentiary Pack for Timothy Martinez | | | | | |
| 597. | Security Threat Intelligence Unit File for Timothy Martinez | | | | | |
| 598. | Offender Location History for Timothy Martinez | | | | | |

DNM 834

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 599. | Plea Agreement for Timothy Martinez | | | | | |
| 600. | Addendum to plea agreement for Timothy Martinez | | | | | |
| 601. | Presentence Report for Timothy Martinez | | | | | |
| 602. | Penitentiary Pack for Jerry Montoya | | | | | |
| 603. | Security Threat Intelligence Unit File for Jerry Montoya | | | | | |
| 604. | Offender Location History for Jerry Montoya | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 605. | Plea Agreement for Jerry Montoya | | | | | |
| 606. | Addendum to plea agreement for Jerry Montoya | | | | | |
| 607. | Penitentiary Pack for Mario Rodriguez | | | | | |
| 608. | Security Threat Intelligence Unit File for Mario Rodriguez | | | | | |
| 609. | Offender Location History for Mario Rodriguez | | | | | |
| 610. | Plea Agreement for Mario Rodriguez | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 611. | Penitentiary Pack for Mario Montoya | | | | | |
| 612. | Security Threat Intelligence Unit File for Mario Montoya | | | | | |
| 613. | Offender Location History for Mario Montoya | | | | | |
| 614. | Information for Mario Montoya | | | | | |
| 615. | Plea Agreement for Mario Montoya | | | | | |
| 616. | Addendum to plea agreement for Mario Montoya | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 617. | Penitentiary Pack for Robert Martinez | | | | | |
| 618. | Security Threat Intelligence Unit File for Robert Martinez | | | | | |
| 619. | Offender Location History for Robert Martinez | | | | | |
| 620. | Plea Agreement for Robert Martinez | | | | | |
| 621. | Addendum to plea agreement for Robert Martinez | | | | | |
| 622. | Penitentiary Pack for Roy Martinez | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 623. | Security Threat Intelligence Unit File for Roy Martinez | | | | | |
| 624. | Offender Location History for Roy Martinez | | | | | |
| 625. | Plea Agreement for Roy Martinez | | | | | |
| 626. | Addendum to plea agreement for Roy Martinez | | | | | |
| 627. | Presentence Report for Roy Martinez | | | | | |
| 628. | Penitentiary Pack for Gerald Archuleta | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 629. | Security Threat Intelligence Unit File for Gerald Archuleta | | | | | |
| 630. | Offender Location History for Gerald Archuleta | | | | | |
| 631. | Plea Agreement for Gerald Archuleta | | | | | |
| 632. | Addendum to plea agreement for Gerald Archuleta | | | | | |
| 633. | Penitentiary Pack for Jacob Armijo | | | | | |
| 634. | Security Threat Intelligence Unit File for Jacob Armijo | | | | | |

DNM 840

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 635. | Offender Location History for Jacob Armijo | | | | | |
| 636. | Plea Agreement for Jacob Armijo | | | | | |
| 637. | Addendum to plea agreement for Jake Armijo | | | | | |
| 638. | Presentence Report for Jacob Armijo | | | | | |
| 639. | Addendum to Presentence Report for Jacob Armijo | | | | | |
| 640. | Penitentiary Pack for Frederico Munoz | | | | | |

DNM 841

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 641. | Security Threat Intelligence Unit File for Frederico Munoz | | | | | |
| 642. | Offender Location History for Frederico Munoz | | | | | |
| 643. | Information for Frederico Munoz | | | | | |
| 644. | Plea Agreement for Frederico Munoz | | | | | |
| 645. | Addendum to plea agreement for Frederico Munoz | | | | | |
| 646. | | | | | | |

DNM 842

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 647. | | | | | | |
| 648. | | | | | | |
| 649. | | | | | | |
| 650. | | | | | | |
| 651. | | | | | | |
| 652. | | | | | | |

DNM 843

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 653. | | | | | | |
| 654. | | | | | | |
| 655. | | | | | | |
| 656. | | | | | | |
| 657. | | | | | | |
| 658. | | | | | | |

DNM 844

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 659. | | | | | | |
| 660. | | | | | | |
| 661. | | | | | | |
| 662. | | | | | | |
| 663. | | | | | | |
| 664. | | | | | | |

DNM 845

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 665. | | | | | | |

DNM 846

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No. 15-CR-4268-JB

UNITED STATES OF AMERICA,
        Plaintiff,

v.

3.  **EDWARD TROUP**,
        Defendant.

---

### EDWARD TROUP'S OBJECTION TO THE GOVERNMENT'S NOTICE OF OTHER CRIMES OR BAD ACTS PURSUANT TO RULE 404(b) (DOC. 1976)

---

COMES NOW, Edward Troup, by and through counsel, and submits this Objection to the government's Notice of Other Crimes or Bad Acts Pursuant to Rule 404(b) (Doc. 1976), filed on March 26, 2018 (two weeks before trial).

**I.      The government's Notice is insufficient to allow either Mr. Troup to respond or the Court to make a ruling on admissibility.**

Nowhere in its four-page "Notice" does the government actually give notice of what evidence it intends to introduce.  Rule 404(b)(2)(A) requires reasonable notice of the general nature of the evidence the government seeks to introduce.  While this is not an onerous requirement, the government's Notice does not meet it.  Rather, the government gives notice only that it intends to introduce evidence that Mr. Troup "relayed threats against or to any of the witnesses, known to [him] as a prosecution witness at the time."  (Doc. 1976 at 2.)  This does not serve the purpose of the notice requirement of Rule 404(b)(2)(A).

Furthermore, the Court retains discretion to require the government to

provide more specific notice than what may be required on the face of the rule:

> The court in its discretion may, under the facts, decide
> that the particular request or notice was not
> reasonable, either because of the lack of timeliness or
> completeness.  Because the notice requirement
> serves as condition precedent to admissibility of
> 404(b) evidence, the offered evidence is inadmissible
> if the court decides that the notice requirement has
> not been met.
>
> Nothing in the amendment precludes the court from
> requiring the government to provide it with an
> opportunity to rule in limine on 404(b) evidence before
> it is offered or even mentioned during trial.  When
> ruling in limine, the court may require the government
> to disclose to it the specifics of such evidence which
> the court must consider in determining admissibility.

Fed. R. Evid. 404, advisory committee note to 1991 Amendments.

The government's notice is insufficient to allow this Court to carry out its

obligations under Rule 404.  "The Government must articulate precisely the

evidentiary hypothesis by which a fact of consequence may be inferred from the

evidence of other acts.  In addition, the trial court must specifically identify the

purpose for which such evidence is offered and a broad statement merely

invoking or restating Rule 404(b) will not suffice."  *United States v. Romine*, 377

F. Supp. 2d 1129, 1132 (D.N.M. 2005) (Browning, J.) (quoting *United States v.*

*Kendall*, 766 F.2d 1426, 1436 (10th Cir.1985)); *see also id.* at 1133 (ruling that

government's proffered evidence was not admissible absent further specificity).

Because the government has not provided sufficient notice of the acts it

intends to introduce or the precise evidentiary hypothesis under which it would

introduce this evidence, the Court should exclude any such evidence at trial.  In

2

the alternative, the Court should order the government to provide more specific

notice and allow Mr. Troup an opportunity to respond.

## II.      Conclusion

WHEREFORE, for all the reasons stated herein, Mr. Troup respectfully

asks that the Court exclude the government's proffered 404(b) evidence or, in the

alternative, order the government to provide more specific notice.

Respectfully submitted this 28th day of March 2018.

*s/ Cori Harbour-Valdez*
Cori Harbour-Valdez
The Harbour Law Firm,
P.C.
1522 Montana Avenue, 3rd
Floor
El Paso, Texas 79902
(915) 544-7600
(915) 975-8036 fax
&
Patrick Burke
Patrick J. Burke, P.C.
999 18th Street, Suite 2055
Denver, Colorado 80202
(303) 825-3050
(303) 825-2992 fax
*Attorneys for Edward
Troup (3)*

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2018, I electronically filed the foregoing
with the Clerk of the Court via the CM/ECF system which will send notification of
such filing to all counsel of record.

*s/ Cori Harbour-Valdez*
Cori Harbour-Valdez

3

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| ANGEL DELEON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' REPLY IN SUPPORT OF ITS NOTICE OF OTHER CRIMES OR BAD ACTS PURSUANT TO RULE 404(b) (DOC. 1976)

Defendant Edward Troup filed his Objection to the United States' Notice of Other Crimes or Bad Acts Pursuant to Rule 404(b) [Doc. 1994] ("Objection") and requests that this Court exclude the government's proffered 404(b) evidence, or in the alternative, order the government to provide more specific notice. The government requests that the Court admit the United States' proposed evidence.

On March 26, the United States filed formal notice to defense counsel that the United States intends to present evidence of threatening statements made by Edward Troup to witnesses. In the notice, the United States argues that evidence that Troup relayed threats against or to the witnesses, known to the defendant as prosecution witnesses at the time, exhibits his clear intent to interfere with the proceedings by attempting to scare witnesses into not testifying. Specifically, the United States intends to present the following evidence, pursuant to Fed. R. Evid. 404(b).

1.  On February 5, 2018, Guadalupe Urquizo testified that he was threatened at the detention facility in Otero County.   He stated that Troup made remarks "saying there's another FBI informant right there, and started disrespecting and saying that

Dan Dan and Sanchez and Carlos Herrerra came back from court and said, 'All you FBI informants need to stop doing what you're doing.   Have some respect for each other and stop doing what you're doing.'"   Tr. Transcript, February 5, 2018, pgs. 275-276 (Trial 1).

2.   On February 20, 2018, Mario Montoya testified that Troup was "yelling out that all of us cooperators think that the FBI and the US Government is our friend.   But we're going to find out in the end that, as soon as they're done prosecuting these guys, they're going to line us up and prosecute us next. That we're probably going to end up with more time than them."   He went on to say, "I thought he was just trying to plant the seed of doubt for us to come here today and cooperate."   Real Time Tr. Transcript, February 20, 2018, pgs 165-166 (Trial 1).

3.   Troup made threatening statements to Benjamin Clark.

4.   Troup was also a member of a group of people who called Samuel Gonzales "a rat" when he was expected to testify in Trial 1.

Troup moves to exclude the evidence because the government did not give notice of what it intends to introduce.   However, the United States' notice coupled with this reply meets the requirements of Rule 404(b).

## **CONCLUSION**

For these reasons, the Court properly should admit the United States' tendered evidence pursuant to Rule 404(b) at the defendant's trial.

2

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515

**_Electronically filed on 3/29/18_**
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.   15-4268 JB |
| | ) | |
| **ANGEL DELEON, et al,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' RESPONSE TO MOTION TO BIFURCATE COUNTS 4 AND 5
FROM COUNTS 1-3 AND 13-16 [1948]**

The United States of America, through its undersigned counsel, hereby files this response

to Defendant's Motion to Bifurcate Counts 4 and 5 from Counts 1-3 and 13-16.

This Court has held numerous hearings on the issue of severance in this case and its sister

case.  This Court has written several thoughtful opinions on whether a severance of Counts 4 and

5 from the other counts in the Indictment are required or appropriate.   On June 30, 2017, this

Court filed its Memorandum Opinion and Order severing the Superseding Indictment's Counts 6-

12 from Counts 1-5 and 13-15. Doc. 1204.  This Court, declined to sever Andrew Gallegos from

the Counts 1-5 and 13-15 grouping.  Defendant Andrew Gallegos filed yet another motion to sever

Counts 4 and 5 on October 6, 2017, raising no new issues.  Doc. 1298 at 4.  Defendant Andrew

Gallegos and Joe Gallegos oppose Defendant Billy Garcia's Motion to Bifurcate.  Doc. 1948 at

12.

**ARGUMENT**

As noted above, this Court previously held hearings and ruled on several motions to sever,

including consideration of Counts Four and Five. The Court concluded that some severance was

1

appropriate to ensure judicial efficacy, efficiency, and economy but found that the "risk of spillover prejudice does not warrant severance of any individual counts in this case."  Doc. 1204 at 193. The Court also noted:

> A. Gallegos merely makes a general assertion of prejudice, and fails to specifically identify specific and compelling prejudicial concerns, arguing only that there may be an inability of the jury to compartmentalize the evidence against him, because limiting instructions will not stop the weight of evidence against his co-Defendants from spilling over and affecting his defense. The Court again concludes that A. Gallegos has not met his heavy burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence in his case. *See Zafiro v. United States*, 506 U.S. at 539. A. Gallegos' mere assertion of spillover prejudice is not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise.

*Id.*

Defendant Garcia proposes that the evidence of Adrian Burns' murder is too prejudicial for the jury to set aside when considering the guilt or innocence of the remaining defendants. "'[T]he Court has a number of measures available that can prevent unfair prejudice to defendants and that are less burdensome than separate trials. These measures include cautionary warnings, limiting instructions, and other instructions to the jury.'"  *Browder v. City of Albuquerque*, 2016 WL 10245980, at *2 (D.N.M. July 21, 2016) (Brack, R.) *citing Shane v. Killinger*, No. 01-cv-00194 MCA/WWD, Doc. 132 at *30 (D.N.M. Mar. 31, 2003) (citation omitted).  "Bifurcation is not an abuse of discretion if such interests favor separation of issues and the issues are clearly separable. Regardless of efficiency and separability, however, bifurcation is an abuse of discretion if it is unfair or prejudicial to a party." *Angelo v. Armstrong World Industries, Inc.*, 11 F.3d 957, 964 (10th Cir. 1993) (internal citation omitted).  "The party seeking bifurcation bears the burden of proving that bifurcation is proper 'in light of the general principle that a single trial tends to lessen the delay, expense, and inconvenience.'"  *Martinez v. Salazar*, 2015 WL

2

Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 431

13638322, at *1 (D.N.M. July 1, 2015) (Gonzales, K.) *citing Belisle v. BNSF Ry. Co.,* 697 F.Supp.2d 1233, 1250 (D. Kan. 2010).  This Motion raises no new evidence and makes no new assertions of prejudice.  In fact, the motion is essentially another motion to sever which is dressed up and given a new name.  Even this motion goes so far as to refer to a "first trial" and a "second trial."  Doc. 1948 at 4.

Defendant Garcia argues that admission of evidence concerning alleged crimes by his co-defendants will cause "spillover prejudice."   A similar argument was made in the sister case that has already gone to trial.  This Court gave several limiting instructions to the jury during the trial and in its final jury charge to assess the evidence against each defendant separately from the evidence presented against other defendants.  The verdicts show that the jury was mindful of the Court's instructions and considered each count and defendant separately.  *See United States v. Diaz,* 176 F.3d 52 (2d Cir. 1999) (Holding that a defendant being charged with only one of nine murders was not prejudiced by a severance denial.)

The Defendant attempts to shoestring a bad acts analysis when looking at the enterprise evidence that the United States must prove.  Doc. 1948 at 10-11.  This stretch is unnecessary in the Tenth Circuit where the United States must show a "shared a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *United States v. Harris*, 695 F.3d 1125, 1136 (10th Cir. 2012) ("As to 'longevity,' the record showed that the pattern of activity that the government alleged continued over a period of years.") (internal citation and quotations omitted).

In Defendant's Motion to Bifurcate, his arguments mirror those raised in the many Motions for Severance previously addressed by the Court in its Memorandum Opinions and Orders.  Defendant does not provide any specific or compelling prejudicial concern to invalidate

3

the Court's previous decisions.  The Defendant merely rehashes previously raised arguments;

there are no arguments that were not previously considered by this Court.  Accordingly, for the

reasons this Court previously concluded further severance is inappropriate, Defendant's Motion

to Bifurcate should be denied.

  **WHEREFORE,** the foregoing reasons, the United States requests the Court deny the

Defendant's Motion to Bifurcate Counts 4 and 5 from Counts 1-3 and 13-16.

              Respectfully Submitted,

              FRED FEDERICI
              Attorney for the United States,
              Acting Under Authority Conferred
              by 28 U.S.C. §515

              ***Electronically filed on 3/29/2018***
              MARIA Y. ARMIJO
              RANDY M. CASTELLANO
              MATTHEW M. BECK
              Assistant United States Attorneys
              200 N. Church Street
              Las Cruces, NM  88001
              (575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/           
MARIA Y. ARMIJO
Assistant United States Attorney

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**

        **Plaintiff,**

                                                    **15 CR 4268 JB**

    **Vs.**

**ANGEL DELEON, et. al.**

        **Defendants.**

**DEFENDANT JOE GALLEGOS AND DEFENDANT ANDREW GALLEGOS**
**RESPONSE TO GOVERNMENT'S EXHIBITS**

    COMES NOW, the defense, Andrew Gallegos by and through attorneys Donovan Roberts

and Lisa Torraco and defendant Joe Gallegos by and through attorneys Brock Benjamin and

Richard Sindel and move this Court to suppress the governments exhibits outlined in the United

States document 1979.

    For Cause:

1.    The United States indicted Joe and Andrew Gallegos on two counts for the murder of A.B.

which are counts 4 and 5 of the indictment herein.

2.    The United States filed its exhibit list, Document number 1979, on March 26, 2018.  The

document is 155 pages and itemizes 645 exhibits.

3.    Of the exhibits listed in document 1979; exhibits 329 to 542 relate to counts 4 and 5 of the

indictment; the murder of A.B.

4.    Many of the exhibits are duplicative and overly prejudicial.

For Cause:

I.      Exhibits Relating To The Allsups Bag

The role of the Allsups bag is very emotionally provocative.  Someone suffocated A.B. prior to his death.  As such, the government is planning on admitting the Allsups bag into evidence in 3 different ways.  The first is the admission of the bag itself, via Exhibit 330, the plastic Allsups bag. The government also intends to admit Exhibit 376 which is the photo of the victim partially covered by the Allsups bag.  Finally, the government intends to admit Exhibit 416, which is also a photo of the victim with his head partially covered by the Allsups bag.  The only role the admission of the bag and two photos of the bag is necessary is that it serves to emotionally sicken and prejudice the jury.  The actual Allsups bag has body fluids on the bag, therefore, only one photo of the bag should be permitted into evidence.

II.     Exhibits Relating To The Gun

The firearm used to shoot A.B. was not recovered.  However, the government wishes to admit evidence that Joe Gallegos and/or Andrew Gallegos owned firearms.  The weapons [U.S. proposed exhibits 341, 342, 349, 356, 435, 445, 447 & 448, itemized below]  are not connected to any charged conduct and are not part of the notice of bad acts for each defendant.  The mere fact that the Gallegos had weapons is more prejudicial than probative. *See* Fed. R. Evid. 403. These exhibits are clearly only offered to confuse and or mislead the jury.

For Cause:

Exhibit 341 Box of cartridges and casings of different calibers taken from Joe Gallegos' property

Exhibit 342 One (1) .22 caliber casing

Exhibit 349 Gun Cleaning kit

Exhibit 356 one (1) gun holster

Exhibit 435 Photo of box of cartridges of different calibers inside suspect's residence marked as"1"

Exhibit 445 Photo of gun cleaning kit marked as "9"

Exhibit 447 Photo of gun holster marked as "11"

Exhibit 448 Close-up photo of gun holster marked as "11"

III.     Handcuffs From A.B. - Duplicates May Exist Under Exhibits Related To OMI Photos

At some point, A.B. was handcuffed. This will strike fear in the hearts of the jurors.  One will assume that A.B. was handcuffed when he was alive in order to keep him still.  This thought alone will scare many jurors.  However in addition to the live testimony from the officers and from the medical examiner, (OMI) the government goes much further.  The government plans on admitting several photos of the handcuffed burnt body and the actual handcuffs.  To wit,

Exhibit 354 Burnt handcuffs removed from decedent

Exhibit 387 OMI photo of victim handcuffed

Exhibit 388  OMI photo of victim handcuffed

Exhibit 396 OMI photo of burn handcuffs removed from A.B.'s body.

Exhibit 415 photo of victim's hands handcuffed

These photos are cumulative and overly prejudicial.  These use of 4 photos to show the same thing as described by the witnesses is done only for dramatic purposes, it is a way of admitting many photos of the decedent, and it will evoke sympathy.


IV.     Handcuffs From Suspect Joe Gallegos

The government intends to enter as an exhibit handcuffs that were found in Joe Gallegos van.  It undisputed that these handcuffs are not the same handcuffs used on A.B.   The handcuffs

found in Joe Gallegos van are completely irrelevant.  It appears that the government is trying to admit the evidence to show that Joe Gallegos acted in conformity with his previous conduct of carrying handcuffs. This type of propensity conduct is inadmissible.

Exhibit 456 photo of handcuffs and holster from Gallegos' vehicle marked as "16"

Exhibit 355 handcuffs and case recovered from white pickup

Exhibit 457 Photos of handcuffs and holster from Gallegos

Exhibit 458 close up photo of handcuffs and holster

V.    Rifle Found In The River

The police found a rifle in the river.  There is no evidence to support that this rifle was used to harm or murder A.B.  There are no matching ballistics, the calibers do not match, no one can tie this firearm to the defendants.  Yet, the government moves to admit the following exhibits:

Exhibit 533 photo of firearm found in river

Exhibit 534 photo of firearm found in river bed

Exhibit 535 photo of firearm found in river bed

Exhibit 536 photo of firearm found in river marked as "1"

Exhibit 537 bullet found in chamber

These exhibits should be excluded as irrelevant, cumulative, a waste of time and overly prejudicial.

VI.    Exhibits Relating To The Clothing Worn By A.B. At The Time Of His Death - Duplicate Exhibits May Exist Under Exhibits Related To Exhibits Related To OMI And A.B.'s Burnt Body.

The government's exhibit list is full of duplicative exhibits relating to the victim's clothing. The government is attempting to admit police photos of clothing, OMI photos of the clothing and the actual clothing worn by the decedent at the time of his death.  This is much like a first year law

class evaluating the standard of a "reasonable man" wherein he wears a belt and suspenders.  In

summary, the government is overdoing the evidence.

Exhibit 332 Victim A.B.'s Socks

Exhibit 333 Other clothing fragments from victim A.B.'s body

Exhibit 334 Victim A.B.'s undershirt

Exhibit 335 Victim A.B.'s shirt

Exhibit 336 Victim A.B.'s pants

Exhibit 337 Victim A.B.'s jacket

Exhibit 350 is Partially burned denim fabric

Exhibit 351 charred camouflage jacket.

Exhibits 353 two (2) grey tank tops with burns on them

Exhibit 382 OMI photos of burnt clothing

Exhibit 383 OMI photos of burnt clothing.

Exhibit 385 OMI photo of victim with clothing

Exhibit 386 OMI photo of victim with clothing

Exhibit 398 OMI photo of victim's burnt clothing

Exhibit 417 photo of victim's burnt body and clothing

Exhibit 419 photo of charred camouflage jacket

Exhibit 420 close up photo of charred portion of the charred camouflage jacket

Exhibit 443 photo of charred camouflage jacket marked as "7"

Exhibit 521 photo of tank top

These photos are cumulative and overly prejudicial.  This volume of photos of the victims

clothing are unnecessary.

Other clothing includes admission of the Gallegos clothing.  For example:  [Exhibit 343] a charred black plaid jacket found in Gallegos van and in addition to the admission of the jacket the government wants to admit photos of the black plaid jacket [Exhibit 527]. This jacket was purposely not tested and is intended to be admitted without a factual basis for its alleged use in the offense.  This type of duplication is unnecessary,  a waste of time and become overly prejudicial. To wit:

Exhibit 526 photo of athletic pants taken from Gallegos van

Exhibit 529 photo of red stains on pants taken from Gallegos van

VII:   Exhibits Relating To The Cell Phones:

The government identified numerous cell phones and photos of the same cell phones for admission into evidence.   Some of these cell phones may not have any relevance and do not need to be admitted.  If relevant, the government does not need the cell phone and the photo of the cell phone.  For Cause:

Exhibit 345  Samsung cell phone model SCH-R 631

Exhibits 346 cell phone retrieved from Imperial motel room

Exhibits 347 three cell phones retrieved Imperial motel room

Exhibit 348 one unknown type cell phone

Exhibit 436 photo of glass bottle and cell phone

Exhibit 438 close up photo of cell phone marked "3"

Exhibit 440, photo of cell phone marked as "5"

Exhibit 441 close up photo of cell phone marked as "5"

Exhibit 498 Photo of cellphone in room 239 marked as 1

Exhibit 515 Photo of cellphones in Angela Gallegos' vehicle marked as "7"

VII:    <u>Exhibits Of Burnt Body Of A.B.</u>

The photos of A.B.'s charred and mutilated body are the basis for which the co-defendants'

Motions to Sever.  No party wants to be associated with the horrific A.B. murder.  As such, each

photo of A.B. strongly suggests a brutal murder.  Each photo, on its own, is highly emotional.

There is only one reason the government would want to admit multiple photos of A.B.'s dead body

and that is to invoke sympathy and anger.

Exhibit 352 Earring, rubber band and chain fragments collected from vitim A.B.'s body

Exhibit 358 Photo of the burnt car and vitim A.B.'s burnt body

Exhibit 359 Photo of the burnt car and vitim A.B.'s burnt body

Exhibit 360 Photo of the burnt car and vitim A.B.'s burnt body

Exhibit 361 Photo of  victim A.B.'s burnt body

Exhibit  374 Photo of victim A.B.'s burnt hands

Exhibit 375 Photo of victim A.B.'s burnt body

Exhibit 377 Photo of victim A.B.'s burnt, bloody face

Exhibit  378 Photo of victim A.B.

Exhibit 379 Photo of side view of victim A.B.

Exhibit 384 Photo of tag on victim A.B.'s wrist

Exhibit 385 OMI photo of victim A.B.'s burnt body of clothing

Exhibit 389 OMI photo of victim A.B.'s burnt body

Exhibit 394 OMI Photo of victim A.B.'s burnt leg

Exhibit 395 OMI photo of victim A.B.'S burnt torso

Exhibit 410 Photo of the burnt car and body of victim A.B.

Exhibit 411 Photo of victim A.B.'s burnt body

Exhibit 412 Photo of victim A.B.'s burnt body

Exhibit 413 Photo of victim A.B.'s burnt body

Exhibit 414 Close up photo of victim A.B.'s burnt body

Exhibit 418 Photo of victim A.B.

IX.   Exhibit Of Burnt Car

Again, multiple photos of the burnt vehicle are cumulative, prejudicial and a complete

waste of time, since one photo tells the story the government wishes to portray.

Exhibit 362 Photo of the trunk of the burnt car

Exhibit 363 Photo of the burnt car

Exhibit 364 Photo of the interior of the burnt car

Exhibit 369 Photo of burnt car marked as "4"

Exhibit 407 Photo of the burnt car

Exhibit 408 Photo of the burnt car

Exhibit 409 Photo of the burnt car

X:   Exhibits Related To Allsups Receipt

Upon information and belief, the government does not need an original receipt and a photo

of the same receipt:

Exhibit 331 Allsups' #165 receipt dated November 12, 2012

Exhibit 474 Photo of Allsup's receipt marked as 3 at processing

XI:   Exhibits Related To Objects Found At Crime Scene

Upon information and belief, the government does not need multiple photos of the receipt,

moreover, many of the photos are irrelevant.  To wit:  The government has not established a

relevance is established between the can of Dr. Pepper and the murder, or the plastic bottle, and

other debris depicted in the photos.

Exhibit 365 Photo of objects marked at the crime scene

Exhibit 366 Photo of plastic bottled marked as "1"

Exhibit 367 Photo of Dr. Pepper can marked as "2"

Exhibit 368 Photo of plastic bottle with fluid marked as "3"

Exhibit 370 Photo of burnt debris marked as "5"

Exhibit 371 Photo of evidence at the crime scene marked as "6"

Exhibit 372 Photo of crime scene

Exhibit 373 Photo of zip tie marked as "7"

Exhibit 380 Photo of Dr. Pepper can marked as "8"

Exhibit 381 Photo of burnt debris marked as "1"

Exhibit 404 Photo of the crime scene

Exhibit 405 Photo of the crime scene

Exhibit 406 Photo of the crime scene with markers

XII:   <u>Exhibits Related To OMI Photos - Duplicate Photos May Exist Under Exhibits Related To A.B.'s Burnt Body And A.B.'s Clothing</u>

The Office of the Medical Examiner is expected to testify.  The OMI doctor's testimony is

sufficient to establish that the doctor viewed burnt clothing, that he viewed the handcuffs, and the

signs of death and trauma.  The doctor will testify to the gunshot to the head and the bullet wound.

Upon information and belief, these OMI photos and reports will be duplicative to the police photos

taken at the scene.  The OMI report will be testified to while on the stand and the reports'

admissions are unnecessary and admitted only to invoke an emotional response from the jury.

One photo of the decedent's death is sufficient to tell the story of his death.  Multiple photos become prejudicial and cumulative.   Here is the list of the OMI photos proposed by the government:

Exhibit 382 OMI Photo of burnt clothing

Exhibit 383 OMI photo of burnt clothing

Exhibit 384 OMI photo of tag on victim A.B.'s wrist

Exhibit 385 OMI photo of victim A.B.'s burnt body and clothing

Exhibit 386 OMI photo of victim A.B.'s burnt body and clothing

Exhibit  387 OMI photo of victim A.B.'s burnt hands handcuffed behind his back

Exhibit  388 OMI photo of handcuffs on victim A.B.

Exhibit 389 OMI Photo of victim A.B.'s burnt body

Exhibit 390 OMI photo of a bullet hole near victim A.B.'s ear

Exhibit 391 OMI photo of bullet hole near victim A.B.'s ear

Exhibit 392 OMI photo of gash on victim A.B.'s brow

Exhibit 393 OMI photo of gash on victim A.B.'s brow and forehead

Exhibit 394 OMI photo of A.B.'s burnt leg

Exhibit 395 OMI photo of A.B.'s burnt torso

Exhibit 396 OMI photo of burnt handcuffs removed from victim A.B.'s body

Exhibit 397 OMI photo of fragments of victim A.B.'s belt

Exhibit 398 OMI photo of victim A.B.'s burnt clothing

Exhibit 399 OMI diagram of injuries for victim A.B.

Exhibit 400 OMI Report of Findings for victim A.B.

Exhibit 401 OMI report of death for victim A.B.

Exhibit 402 OMI Autopsy report for victim A.B.

## LAW AND AUTHORITY

The Federal Rule 401 Test for Relevant Evidence

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

The notes of advisory committee on proposed rules state that the "problems of relevancy call for an answer to the question whether an item of evidence, when tested by the processes of legal reasoning, possesses sufficient probative value to justify receiving it in evidence.  Thus, assessment of the probative value of evidence . . . which he is charged is a matter of analysis and reasoning."

As a general principle, under the Federal Rule of Evidence, Rule 403 "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403.

The Federal Rule of Evidence 403 states:  Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons. The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

"Our law favors admission of all relevant evidence not otherwise proscribed; thus, exclusion under this rule is an extraordinary remedy [that] should be used sparingly." *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir., 2014) (Alteration original, internal quotation omitted) (Analyzing Rule 403 in the 404(B) context).

### Unfair Prejudice

The Federal courts have determined that evidence is properly admitted under Rule 403, the trial court must "consider (1) whether the evidence was relevant, (2) whether it had the potential to unfairly prejudice the defendant, and (3) whether its probative value was substantially outweighed by the danger of unfair prejudice." *United States v. MacKay*, 715 F.3d 807, 839 (10th Cir., 2013) citing to *United States v. Cerno*, 529 F.3d 926, 933 (10th Cir., 2008). "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *MacKay*, at 840 citing to *United States v. Leonard*, 439 F.3d 648, 652 (10th Cir.2006).

In this matter, it is undisputed that the photos of A.B. dead body are horrific.  The photo are so bad, the parties not indicted on counts 4 and 5 have moved to sever from counts 4 and 5 because the A.B. photos are so emotionally provocative that all other defendants want distance from those photos.  The murder by itself if very horrific.  There is evidence that A.B. was suffered blunt force trauma to the head, shot, handcuffed, transported in the trunk of a vehicle and burnt.  The facts alone are going to make the jury want to convict any and all suspects.  A pile of photos to emphasize the grotesque killing will only add emotional appeal, but no factual benefit.

"Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." It is not enough that the

risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must substantially outweigh the evidence probative value." *Id.* "In balancing, we give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Id* (internal quotation omitted). "We underscore that Rule 403 does not protect a party from all prejudice, only unfair prejudice." *United States v. Watson*, 766 F.3d 1219, 1242 (10th Cir., 2014).

In *United States. v. Smith*, 534 F.3d 1211 (10th Cir., 2008), the defendant challenged the admission of graphic photographs of a murder scene in the context of a conspiracy charge. "Photographs of bloodied, bullet-ridden bodies and blood-stained clothes are different than testimony of the sort at issue in *Portillo-Quezada* — they are much more shocking and much more likely to provoke an emotional response." *Smith*, at 1219.

If [the photos] were not intended to provoke a substantial emotional response, one must ask why the government felt the need to include them at all: it was obvious that these were two murders done with multiple bullet wounds. While evidence of the murders is certainly admissible, graphic evidence that adds nothing to the description of the bullet-ridden bodies except shock, is prejudicial under Rule 403.

*Id.* However, the court ultimately concluded that if the admission of the photographs was error it was harmless. *Smith*, at 1220. In addition, "gruesomeness alone does not make photographs inadmissible." *U.S. v. Naranjo*, 710 F.2d 1465, 1468 (10th Cir., 1983) (photos of shooting victims torso and face were disturbing but were used properly in connection with pathologist's identification of the deceased, his testimony concerning the autopsy he performed, and his findings as to the way the wound caused death). Herein the photos of A.B. are gruesome. What distinguishes A.B. from the facts of *Smith* are the multitude of the gruesome photos. One photo can tell the story of A.B.'s death, while several photos will simply make the jury ill and emotional.

In the context of counts 4 and 5: each successive photo is less probative and more prejudicial. At this juncture considerations of wasting time and needlessly presenting cumulative evidence arise. After all, no one photo adds any evidence that the prior photo does not Further, if there is any unfair, prejudicial effect it accumulates and intensifies with each repetition. I believe your instinct that one photo is awful, though likely probative, is true but there may be good reason to keep out successive photos.

### **Cumulative Evidence and Waste of Time**

In *United States v. Twitty,* No. 16-1322 (10th Cir., 2017) (non-precedential), the court, dismissed the idea that photos of every single weapon involved in a case was cumulative because the government introduced only one photo for each weapon or ammunition. In this matter, the government intends to introduce multiple photos, and then close-up photos of the same picture.  This type of evidence building is cumulative and a waste of time.

In *United States v. Archuleta*, 737 F.3d 1287 (10th Cir., 2013), admission of a second detective's testimony about gang tattoos and structure was not needless cumulative because second detective's testimony had more details and additional subjects over first detective.

In *Eller v. Trans Union*, LLC, 739 F.3d 467 (10th Cir., 2013), the decision to exclude a credit report for being cumulative and wasting time in a suit under the Fair Credit Reporting Act was upheld because Plaintiff had the opportunity to testify about said report and introduce other evidence of his difficulties with the credit reporting agency. In this matter, the government has the testimony of firefighters, police officers and the medical examiner to support that handcuffs were on A.B. when his body was found.  Yet, the government wants to admit several photos and the actual handcuffs.  Likewise, the government has testimony regarding the Allsups bag.  Yet the government wants to offer photos and the actual bag itself in order to prejudice the jury.

In *United States. v. Edwards*, 540 F.3d 1156 (10th Cir., 2008), the court upheld the admission of five 911 calls made on the night of a shooting, reasoning that the recordings were brief and the government only played five of thirty-five.

Going back further, *United States. v. Olivo*, 80 F.3d 1466 (10th Cir., 1996) (supplemental opinion), exclusion of photo exhibits of drugs found the home of a co-conspirator turned government witnesses was upheld because they only served to prove what the witness had already admitted, that law enforcement seized drugs from his home. This is very different than the multiplicity of photos and close - up photos, as well as clothing and other substantive evidence. *Olivo* [and also *United States. v. Golden*, 671 F.2d 369 (10th Cir., 1982), wherein the trial court was found to within its discretion to admit testimony of victim's grandmother even though the testimony paralleled other testimony.] can be distinguished by the volume of photos and original evidence proposed by the government.

WHEREFORE, defendants Joe Gallegos and Andrew Gallegos pray this Court to limit the exhibits to be admitted into evidence and for any other relief this Court deems proper and just.

Respectfully submitted,

  /s/  Lisa Torraco
LISA TORRACO
Attorney for Andrew Gallegos
State Bar No.: 6692
823 Gold Ave. SW
Albuquerque, NM 87102
Tel: (505) 244-0530
Fax: (505) 244-0532
LisaTorraco@gmail.com

*/s/ Donavon Roberts*
DONAVON ROBERTS
Attorney for Andrew Gallegos
State Bar No.:
723 Fruit Ave. NW
Albuquerque, NM 87102
Tel: (505) 506-3749
Fax: (505) 503-8405
Ladar170@aim.com

## CERTIFICATE OF SERVICE

I, LISA TORRACO, hereby certify that on April 2, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all counsel of record and/or I hereby certify that I have mailed by United States Postal Service or delivered by hand the document to the following non-CM/ECF participants:

*/s/   Lisa Torraco*
LISA TORRACO
DONAVON ROBERTS
Attorneys for Andrew Gallegos
State Bar No.: 6692
823 Gold Ave. SW
Albuquerque, NM 87102
Tel: (505) 244-0530
Fax: (505) 244-0532
LisaTorraco@gmail.com

*/s/ Donavon Roberts*
DONAVON ROBERTS
Attorney for Andrew Gallegos
State Bar No.:
723 Fruit Ave. NW
Albuquerque, NM 87102
Tel: (505) 506-3749
Fax: (505) 503-8405
Ladar170@aim.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

      Plaintiff,

                             15 CR 4268 JB

vs.

ANGEL DELEON, et. al.

      Defendants.

## DEFENDANT ANDREW GALLEGOS' MOTION IN LIMINE TO PROHIBIT GOVERNMENT FROM INTRODUCING EVIDENCE OF ALLEGED "BAD ACTS"

Defendant, Andrew Gallegos, moves this Court in limine to prevent the government from eliciting any and all testimony concerning the alleged bad acts of Mr. Gallegos as set forth in the letter provided by the government attached as Appendix A. As grounds therefore, it is stated as follows:

1. The Government has provided notice to Mr. Gallegos of their intent to introduce a laundry list of 8 "bad acts." See attachment A.

2. Attachment A lists acts committed as long as 22 years ago and range from burglary charges and drug charges.

3. The alleged "bad acts" cannot be used to show that Mr. Gallegos had the propensity to commit the crime charged. *United States v. Moran*, 503 F.3d 1135, 1145 (10th Cir. 2007). According to Federal Rule of Evidence 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

4. "In demonstrating the relevance of proffered other acts evidence, '[t]he Government must articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts.'" *United States v. Cuch*, 842 F.2d 1173, 1177 (10th Cir. 1988)(quoting *United States v. Kendall,* 766 F.2d 1426, 1436 (10th Cir. 1985)). Before the Court may admit such evidence, "it must tend to establish intent, knowledge, motive or one of the enumerated exceptions; must have real probative value, not just possible worth; and must be reasonably close in time to the crime charged." *Id.; United States v. Morales-Ramirez,* No. CR 05-920 JB, 2006 U.S. Dist. LEXIS 29675 at *2-3 (D.N.M. Feb. 10, 2006). Moreover, "there must be a clear and logical connection between the alleged earlier offenses or misconduct and the case being tried." *United States v. Biswell*, 700 F.2d 1310 (10th Cir. 1983). The Tenth Circuit has developed rigorous criteria for submitting evidence of other crimes, wrongs or acts pursuant to Rule 404(b): "We have held that the government first bears the burden of demonstrating how the proffered evidence is relevant to an issue in the case." *Id.* at 1317.

5. Among the considerations the Court must consider in determining the admissibility of any of the alleged bad acts is whether they are too remote in time: "[T]here is no absolute rule regarding the number of years that can separate offenses. Rather, the court applies a reasonableness standard and examines the facts and circumstances of each case." *United States v. Franklin,* 704, F.2d 1183, 1189 (10th Cir. 1983)(*quoting United States v. Engleman*, 648 F.2d 473, 479 (8th Cir. 1981)). Many of the alleged bad acts are simply too remote to be reasonable.

6. The government has not offered any evidentiary hypothesis by which a fact of consequence in this prosecution may be inferred by any of the 8 "bad acts" it listed in the notice

contained in *Appendix A*. As such, Mr. Gallegos moves in limine for an order preventing the government from eliciting evidence or testimony as to any of the "bad Acts."

7. The government noticed that it intends to introduce evidence that on or about October 4, 2016 Andrew Gallegos did chant "Rat! Rat!" when Jerry Armenta and Ben Clark escorted from the courtroom. It is unclear from Exhibit A who will testify about that statement, and defense demands to know the name of the witness who will present this evidence. Defense insists that Andrew Gallegos was not one of the people who chanted "Rat!" and believes this statement has low reliability.

8. Andrew Gallegos denies that he vouched for Mario Chavez to become a gang member and denies ordering him to do anything. Defense wishes to voir dire the witness outside the presence of the jury before the government attempts to admit this act.

9. Finally, even if the trial court determines that the "other acts" evidence satisfies the criteria for admission under Rule 404(b), it must balance the evidence's probative value and prejudicial effect under Fed. R. Evid. 403. *United States v. Cuch*, 842 F.2d 1176 (10th Cir. 1988). Applying the required balancing test would dictate that the alleged "bad acts" should be inadmissible in this case.

WHEREFORE, Mr. Gallegos, through undersigned counsel, moves in limine for an order preventing the government from eliciting testimony relating to the alleged "bad acts" set forth in *Attachment A*.

Respectfully submitted,

_____ /s/   Lisa Torraco
LISA TORRACO
and DONAVON ROBERTS
Attorneys for Andrew Gallegos
823 Gold Ave. SW
Albuquerque, NM 87102
Tel: (505) 244-0530
LisaTorraco@gmail.com

## CERTIFICATE OF SERVICE

I, LISA TORRACO, hereby certify that on April 3, 2018, I electronically filed the foregoing
document with the Clerk of the Court using the CM/ECF System, which will send notification of
such filing to all counsel of record and/or I hereby certify that I have mailed by United States
Postal Service or delivered by hand the document to the following non-CM/ECF participants:

_____ /s/   Lisa Torraco
LISA TORRACO
and DONAVON ROBERTS
Attorney for Andrew Gallegos
State Bar No.: 6692
823 Gold Ave. SW
Albuquerque, NM 87102
Tel: (505) 244-0530
Fax: (505) 244-0532
LisaTorraco@gmail.com



**U.S. Department of Justice**

*United States Attorney*
*District of New Mexico*

|  |  |
|---|---|
| *200 N. Church Street* | *Phone: (575) 522-2304* |
| *Las Cruces, NM  88001* | *Fax:    (575) 522-2391* |

March 8, 2018

*Sent via email: ladar170@aim.com*          *Sent via email: lisatorraco@gmail.com*

Donavon A. Roberts                          Lisa Torraco
PO Box 36344                                620 Roma Ave NW
Albuquerque, New Mexico 87176-6344          Albuquerque, New Mexico 87102

RE:    <u>UNITED STATES v. ANGEL DELEON, et al.</u>
       No. 15-CR-4268 JB

Dear Counsel:

Summarized below are the "bad acts" for your client Andrew Gallegos.

On or about January 29, 1996, Andrew Gallegos was convicted of aggravated burglary, assault, battery and two counts of aggravated battery.

On or about March 3, 2005, while in the custody of the Valencia County Detention Center, Andrew Gallegos conspired with Frankie Gallegos to smuggle narcotics into the Valencia County Detention Center. Valencia County Detention Center staff apprehended Frankie Gallegos and recovered a film canister containing a small plastic baggie with a black substance.

On or about October 4, 2007, Andrew Gallegos was convicted of 21 U.S.C. § 843(b), that being use of a telephone to facilitate a drug trafficking offense.

On or about May 16, 2013, Andrew Gallegos was convicted of possession of a controlled substance.

On or about May 4, 2015, while in the custody of NMCD, Andrew Gallegos was in possession of a controlled substance.

On or about October 4, 2016, Andrew Gallegos, Allen Patterson, Jerry Montoya, Javier Alonso, and Arturo Garcia chanted "Rat! Rat!" when Jerry Armenta and Ben Clark were escorted out the courtroom.

Andrew Gallegos vouched for Mario Chavez, a.k.a. "Goofy" to become an SNM member. Andrew Gallegos ordered Mario Chavez to stab an 18th street gang member in order for Mario Chavez to earn his bones. Mario Chavez used to supply Andrew Gallegos with heroin.

Items seized from Andrew Gallegos' cell while at Torrance County Detention Center included his moniker "Smiley," "505" and "ESL."

The United States reserves the right to supplement this list as further information becomes available.

If you have any questions regarding this matter, please feel free to call me.

Sincerely yours,

JAMES D. TIERNEY
First Assistant United States Attorney

MARIA Y. ARMIJO
Assistant United States Attorney

MYA/rcc

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

     Plaintiff,

                                 **15 CR 4268 JB**

vs.

ANGEL DELEON, et. al.

     Defendants.

## DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION IN LIMINE TO ADMIT OUT OF COURT STATEMENTS MADE BY ADRIAN BURNS

COMES NOW, Andrew Gallegos by and through attorneys Donavon Roberts and Lisa Torraco and joined by defendant Joe Gallegos by and through attorneys Brock Benjamin and Richard Sindel, and moves this Court to exclude any and all statements of Adrian Burns, and in support states:

1. In its motion, the Government moves to admit hearsay statements purportedly made by the decedent, Adrian Burns. Supposedly these statements were made to his girlfriend with no other witnesses around. The government concedes, as it must, that the statements of the now deceased Adrian Burns are hearsay. Unless the statements fit an exception, such hearsay is inadmissible. [United States Doc. 1978, 2]. *See also* Fed.R.Evid. 802.

2. The United States, however, seeks to admit the statements under the "state of mind exception, to the hearsay rule. [United States Doc. 1978].

1

3. "The essence of the state of mind exception is that there are circumstantial guarantees of trustworthiness attendant to a statement that reflects a then existing mental, emotional or physical condition." *United States. v. Rodriguez-Pando*, 841 F.2d 1014, 1019 (10th Cir., 1988). These statements have probative value "mainly because the declarant has no chance to reflect upon and perhaps misrepresent his situation." *Id.*

4. In this case, there are no circumstantial guarantees of trustworthiness and no reason to believe the declarant had no chance to reflect, prepare, and perhaps misrepresent his situation. The Government has offered no foundation to show why the declarant, who according to this very statement was in the midst of advancing his criminal lifestyle, would accurately represent where he was going or who he was meeting rather than lie to mislead or protect those closest to him and/or those he intended to meet.

5. Even if the proposed statement that the alleged victim told Amber Sutton that he was planning on visiting Mr. Gallegos had those guarantees and *properly* fits within Fed.R.Evid. 803(3) this does not give the government unlimited license to backdoor in allegations of a drug debt, the sale of illegal narcotics, or other speculation. The Government's stated intent to use the statement to show why Amber Sutton searched for the decedent in the manner she did is not relevant unless and until Defendant makes an issue of the reasonableness of Ms. Sutton's investigation.

6. If the Government's goal is to admit this statement as probative of the decedent's plan, then the reason he was visiting Mr. Gallegos, that is the existence of a debt and the allegation that Mr. Gallegos was involved in the sale of narcotics, is irrelevant to that point and unfairly prejudicial and should be excluded under Rule 403. Fed.R.Evid. 403

DNM 880

(court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence).

7. This proffered testimony may be duplicative of the statements of Andrew and Joe Gallegos, which this Court has already ruled will be admitted, and should thus be excluded as needlessly cumulative. Fed.R.Evid. 403.

8. Lastly, Fed.R.Evid. 803(3) specifically excludes statements of belief from the state of mind exception. The "state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind." *United States v. Joe,* 8 F.3d 1488, 1493 (10th Cir., 1993). The statement that Defendant owed money is therefore inadmissible under this rule.

9. At the motion hearing on March 14, 2018, the Government, through Ms. Armijo, represented that it intends to introduce other hearsay statements of decedent Adrian Burns at trial.

10. On March 14, 2018, Ms. Armijo read the statement to the court, stating that Adrian Burns told Dan Orendorff (a/k/a/ "Sleepy") that Joe (and/or Andrew) Gallegos owed him money and that Sleepy should no longer do business with him. No hearsay exception applies to allow the Government to introduce these statements for the truth of its allegation that Defendant owed a drug debt. There is no rule of evidence that permits the admission of

3

such statement. This is neither a statement of presence sense impression nor does it have

any guarantee of trustworthiness.

WHEREFORE, defendants Andrew and Joe Gallegos move this Court to limit the admission

of any and all statements by Adrian Burns and for any other relief this Court deems proper and

just.

Respectfully submitted,

_____ /s/  Lisa Torraco
LISA TORRACO
and DONAVON ROBERTS
Attorneys for Andrew Gallegos
823 Gold Ave. SW
Albuquerque, NM 87102
Tel: (505) 244-0530
LisaTorraco@gmail.com

## CERTIFICATE OF SERVICE

I, LISA TORRACO, hereby certify that on April 3, 2018, I electronically filed the foregoing
document with the Clerk of the Court using the CM/ECF System, which will send notification of
such filing to all counsel of record and/or I hereby certify that I have mailed by United States
Postal Service or delivered by hand the document to the following non-CM/ECF participants:

_____ /s/  Lisa Torraco
LISA TORRACO
and DONAVON ROBERTS
Attorneys for Andrew Gallegos
823 Gold Ave. SW
Albuquerque, NM 87102
Tel: (505) 244-0530
Fax: (505) 244-0532
LisaTorraco@gmail.com

4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**

        **Plaintiff,**

                                        **15 CR 4268 JB**

**vs.**

**ANGEL DELEON, et. al.**

        **Defendants.**

## RESPONSE TO UNITED STATES' MOTION IN LIMINE [Doc. 1977].

COMES NOW, Andrew Gallegos by and through his attorneys, Donavon Roberts and Lisa Torraco, and herby responds to the *United States' Motion in Limine* [Doc. 1977]. For Cause:

1.   Defendant Andrew Gallegos joins Joe Gallegos' *Response to the United States' Motion in Limine* [Doc. 2031].

2. The state investigation of the Adrian Burns' murder is relevant. Fed. R. 401. In fact, the Government has identified several New Mexico State Police officer's and Valencia County Deputies on its witness list in this Federal prosecution.

3. This Federal prosecution of Counts 4 and 5 is relying on the evidence gathered by the state investigators, and the state prosecutors.

4. The car, the photos, statements and other critical evidence about this horrific murder were all preserved by the government.

5. However, as pointed out by co-defendant Joe Gallegos in his response [Doc. 2031] the actual testimony at the hearing on this matter was destroyed by the

1

(state) government.  The testimony was taken at a probable cause determination before a state magistrate judge.  This judge ultimately found there was insufficient evidence to find the low threshold of probable cause against Joe and Andrew Gallegos.

6.  The Magistrate Judge made this ruling based solely on the testimony at the probable cause hearing.  See Appendix A, attached to Joe Gallegos Response, [Doc. 2031].

7.  Upon information and belief, there were still other suspects in the Adrian Burns murder, and that evidence was also presented or at a minimum it was argued at the hearing.

8.  In addition to the fact that a "No PC order" was found.  More critical is the testimony on which this Order was found.

9.  It is the testimony upon which the No P.C. order was found is critical lost evidence in this prosecution.

10. Obviously the state prosecution had exculpatory evidence because a NO PC finding was issued by the court.  Moreover, it follows logical conclusion that the exculpatory evidence was the testimony and it is now destroyed.

11. The defense is entitled to this exculpatory evidence.

**<u>Law and Authority</u>**

The constitutional duty of the States to preserve evidence is limited to evidence that might be expected to play a role in the suspect's defense. The evidence must possess an exculpatory value that was apparent before it was destroyed, and must also be of such

2

a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta* 467 U.S. 479 (1984). *Trombetta* was a DWI case that was reversed due to the lack of preservation of evidence. Herein we have a similar situation wherein the State of New Mexico failed to preserve the testimony of witnesses at the Probable Cause hearing. When a magistrate finds no probable cause to charge people of a felony, the magistrate has a duty to preserve that testimony just as it would in preserving the testimony when probable cause is found.

*U.S. v. Baca*, 687 F.2d 1356, 1359 (10th Cir., 1982) says that "When evidence has been lost or destroyed, courts engage in "a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in the light of its nature, its bearing upon critical issues in the case and strength of the government's untainted proof."

Herein the State Court knowingly destroyed exculpatory evidence, which prevents the defendant from introducing that exculpatory material in this matter. Joe and Andrew Gallegos have now been "intentionally denied" the right to present this evidence their defense.

"*Augenblick* indicates that the proper focus in a case of lost evidence as opposed to suppressed evidence is not solely on the potential prejudice to the defendant from the evidence's non production as in *Brady* and *Agurs,* but also upon the government's culpability. Following *Augenblick,* this court stated that a "three-pronged examination" is to be made in order to ascertain whether a defendant's due process right has been

3

prejudiced by the destruction of evidence. *United States v. Picariello*, 568 F.2d 222 (1st Cir. 1978). The following are to be considered. "(F)irst, was the evidence material to the question of guilt or the degree of punishment; second, was defendant prejudiced by its destruction; and third, was the government acting in good faith when it destroyed the evidence." *U.S. v. Arra*, 630 F.2d 836 (1st Cir., 1983) (Persuasive Authority Only)

"*Baca* makes no showing of culpability on the part of the federal government for the loss of this evidence, and we decline to adopt a per se rule that destruction of important evidence by state officers prior to the issuance of a federal indictment precludes the federal government from prosecuting for violation of its laws."*U.S. v. Baca*, 687 F.2d 1356, 1359 (10th Cir., 1982)   In *Baca,* the court found nothing in the record indicating any kind of communication or collusion.

Andrew and Joe Gallegos have a fundamental due process right to present as much of this defense as can be salvaged.  The defendants have a right to let the jury know that there has previously been testimony that was insufficient to uphold a charge and certainly much less evidence to uphold a conviction. Perhaps, the witnesses have changed their story, perhaps there is new evidence, but at a minimum, the defense should be allowed argue that due process requires that you can at least ask them about this issue.

Fed. R. Evid. 403 is a balancing test.  The testimony taken within 10 days of Adrian Burns murder, and was under oath, is part of the chain of evidence that should be presented to the Government showing that this case does not show that Joe and Andrew murdered Adrian Burns, let alone murdered Adrian Burns "for the purpose of gaining

4

entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico

Gang (SNM), an enterprise engaged in racketeering activity." [Doc. 368 at 18-19]

**<u>Remedy</u>**

The defense believes the issue of the lost testimony and the failure of the state to

preserve the testimony, AND the NO PC finding is all relevant.

The evidence now available in this matter that does not support the Government's

theory.  The "No PC" finding will be used in support of the defense theory that there is

insufficient evidence to support Andrew Gallegos' role in the murder and certainly that

there is no evidence to support these actions were a furtherance in the SNM enterprise.

Dismissal is one appropriate remedy, but since dismissal was not granted, at a minimum

the defense should be permitted to present evidence on the No PC finding.

WHEREFORE, the defense responds that the no PC finding of the Magistrate

court is relevant, and should be admitted.  The defense prays for any other relief this

Court deems proper and just.


Respectfully Submitted,

_____ /s/  Lisa Torraco
LISA TORRACO
and DONAVON ROBERTS
Attorneys for Andrew
Gallegos
823 Gold Ave. SW
Albuquerque, NM 87102
Tel: (505) 244-0530
LisaTorraco@gmail.com

5

**CERTIFICATE OF SERVICE**

I, LISA TORRACO, hereby certify that on April 4, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all counsel of record and/or I hereby certify that I have mailed by United States Postal Service or delivered by hand the document to the following non-CM/ECF participants:

       */s/   Lisa Torraco*
LISA TORRACO
and DONAVON ROBERTS
Attorneys for Andrew Gallegos
823 Gold Ave. SW
Albuquerque, NM 87102
Tel: (505) 244-0530
Fax: (505) 244-0532
LisaTorraco@gmail.com

6

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CLERK'S MINUTES

*BEFORE DISTRICT JUDGE JAMES O. BROWNING (IN LAS CRUCES)*

| | | | |
|---|---|---|---|
| **CASE NO.:** | No. CR 15-4268 JB | **DATES:** | April 4-5, 2018 |
| **CASE CAPTION:** | *USA v. DeLeon, et al.* | | |
| **CRD:** | C. Bevel | **COURT REPORTER:** | J. Bean |

| | | | | |
|---|---|---|---|---|
| **COURT IN SESSION:** | 8:34am | **COURT IN RECESS:** | 12:06pm | 3 hr. 32 min |
| | 1:06pm | | 5:37pm | 4 hr. 31 min |
| | **Day 2:** | | **Day 2:** | |
| | 8:32am | | 12:04pm | 3 hr 37 min |
| | 1:06pm | | 5:51pm | 4 hr 45 min |
| | | | **16 hr. 22 min** | |

**TYPE OF PROCEEDING:** Motion Hearing (see below)/Pretrial Conference (continuation from 3/12-16/18)

**COURT'S RULING/DISPOSITION:**

1. Sealed Emergency, Partially Unopposed Motion to Withdraw as counsel, to sever and to Continue (1959) **DENIED WITHOUT PREJUDICE**
2. Motion in Limine Regarding Alleged Bad Acts (1308)
3. Motion in Limine Regarding Alleged Bad Acts (1528)
4. Motion in Limine Regarding Alleged Bad Acts 1531)
5. Motion in Limine Regarding Alleged Bad Acts (1602)
6. Motion to Dismiss (1283)
7. Defendant Edward Troup's Motion to Dismiss (PreIndictment Delay) (1284)
8. United States Motion in Limine to Exclude Extrinsic Evidence in Violation of Federal Rule of Evidence 403 (1754)
9. United States Motion in Limine to Preclude Cross-Examination of Special Agent Acee on Unrelated Conduct (1871)
10. United States Notice of Proposed James Statements for Trial 2 (1903)
11. Sealed Motion to Quash Ex Parte Writ of Habeas Corpus ad Testificandum for Custody of Inmate Fred Quintana and Request for Emergency Telephonic Hearing (1919) **DENIED**
12. Notice of Objection to Proposed Courtroom Seating Arrangement (1936) **WITHDRAWN**
13. Motion to Bifurcate Counts 4 & 5 From Counts 13 and 13-16 (1948) **INCLINED TO DENY**
14. United States Motion in Limine (1977) **GRANTED**
15. Motion in Limine to Admit Out-of-Court statements Made by Adrian Burns (1978) **GRANTED**
16. Restricted Motion to Obtain Physical and Mental Health Records (1985)
17. Notice to Court. Request for Order Compelling Disclosure and Motion to Strike Certain Witnesses (1993)

18. Edward Troup's Objection to the Government's Notice of Other Crimes or Bad Acts Pursuant to Rule 404(b) (1994)

19. Motion for Order to Show Cause Why the Custodian for Bernalillo County Sheriff's Department Should not be Held in Contempt (1996)**WITHDRAWN**

20. Restricted Motion to Strike Government Witnesses Brian Rascon and Raymond Rascon (2011)

21. Restricted Motion to Strike Government Witness Benjamin Clark (2012)

22. United States Sealed Opposed Motion in Limine Regarding Statements Against Penal Interest Under Rule 804(B)(3) (1912)


**ORDER CONSISTENT WITH COURT'S RULING TO BE PREPARED BY:**      Court

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**

Maria Armijo/Randy Castellano/
Matthew Beck, AUSAs

**ATTORNEYS PRESENT FOR DEFENDANT(S):**

Brock Benjamin (for Deft. Joe Lawrence Gallegos)

Cori Harbour-Valdez/Patrick Burke (for Deft. Edward Troup)

Robert Cooper/James Castle (for Deft. Billy Garcia)

Jeff Lahann/Joe Shattuck (for Deft. Allen Patterson)

John Granberg (for Deft. Christopher Chavez)

Billy Blackburn (for Deft. Arturo Arnulfo Garcia)

Donovan Roberts/Lisa Torraco (for Deft. Andrew Gallegos)

**COURT:**          Calls case.  Counsel enter appearances, defendants present in custody. Cynthia Gilbert, paralegal, present for defense team.

**COURT IN SESSION:**

8:34am     Court addresses counsel regarding privacy covers and visibility of leg restraints. All attorneys move to jury box to view privacy screens covering defendants tables.

8:41am     Court addresses counsel regarding order of motions to be addressed.

8:43am     Mr. Davidson addresses Court, argues in support of Sealed Motion Doc. 1959.

8:47am     Mr. Blackburn addresses Court, argues in support of Mr. Davidson's motion to withdraw. Request Court continue trial to July trial with other related defendants.  Informs Court of conflict with witness, James "Daffy" Garcia.

8:59am     Mr. Burke addresses Court regarding conflict of Mr. Davidson and Mr. Blackburn.

9:00am     Ms. Armijo responds, concerned with Mr. Blackburn's conflict regarding witness Garcia.

9:03am     Court directs government to file a motion regarding disqualification of Mr. Blackburn. Court concerned about late issues being raised.

9:04am     Ms. Armijo indicates conflict was raised orally in December hearings. Ms. Armijo has

|         | nothing further on Mr. Davidson's motion. |
|---------|-------------------------------------------|
| 9:05am  | Bench conference with counsel. |
| 9:56am  | Court addresses all counsel, Court will deny Mr. Davidson's motion without prejudice. |
| 9:58am  | Mr. Burke addresses Court regarding Mr. Blackburn's conflict. |
| 9:59am  | Court responds, suggests counsel speak during break. |
| 9:59am  | Mr. Castle requests hand written notes taken during James Garcia's debrief be turned over as soon as possible. |
| 10:00am | Court recommends counsel discuss, Court to address Defendant's Billy Garcia's Bad Acts. |
| 10:01am | Court in recess. |
| 10:31am | Court in session. |
| 10:32am | Court will address Billy Garcia's Bad Acts Motion, Doc. 1308, appendix A. |
| 10:32am | Mr. Castle addresses Motion. |
| 10:47am | Mr. Castellano responds. |
| 11:28am | Court addresses counsel regarding Bad Acts, Doc. 1528, Mr. Blackburn wishes to move motion to later after he and Ms. Armijo continue to narrow those issues. |
| 11:28am | Court addresses J. Gallegos Motion in Limine Doc 1602. |
| 11:31am | Ms. Armijo responds re: J. Gallegos Motion in Limine Doc. 1602. |
| 11:33am | Mr. Brock responds. |
| 11:34am | Court addresses Mr. Brock and Ms. Armijo. |
| 11:46am | Ms. Armijo and Ms. Harbour-Valdez address juror excusals. |
| 11:48am | Court has removed the jurors that counsel have agreed should be excused for hardship. Court to provide a random seating chart to counsel before Monday. Keeping in mind that not all jurors listed may be present. |
| 11:54am | Mr. Cooper asks when chart might be available. |
| 11:54am | Court addresses counsel regarding court's denial of excusal which were left in the pool. Ms. Armijo and Ms. Harbour-Valdez to meet and confer regarding denied excusals. Ms. Armijo requests larger note pads for jurors to take notes on. |
| 11:58am | Mr. Castle addresses the need for Agent Acee's testimony, Agent Acee not present for hearings. |
| 12:00pm | Mr. Beck responds, Agent Acee's testimony was completed on March 16, 2018. |
| 12:00pm | Mr. Castle has re-direct for Agent Acee. |
| 12:02pm | Mr. Beck indicates Agent Acee is not available today. |
| 12:03pm | Mr. Burke requests 10 minutes on re-direct for Agent Acee. |

| | |
|---|---|
| 12:05pm | Mr. Castle and Mr. Burke agree that testimony could be completed by phone with Agent Acee. |
| 12:05pm | Ms. Torraco requests counsel be allowed to bring their own chairs. |
| 12:06pm | Court in recess. |
| 1:06pm | Court in session. |
| 1:10pm | Court addresses counsel regarding seating charts, chairs and notepads. |
| 1:13pm | Mr. Beck addresses Court regarding contact with witness James Garcia and Mr. Glazener, government will call James Garcia as a witness. |
| 1:21pm | Mr. Blackburn addresses court about possibility of James Garcia waiving the conflict. |
| 1:24pm | Mr. Beck responds. |
| 1:27pm | Mr. Castle responds. |
| 1:30pm | Mr. Beck addresses Court regarding Doc. 1909, responds filed last night, Doc. 2051. |
| 1:40pm | Mr. Castle responds. |
| 1:45pm | Court takes up Phillip Sapien's Sealed Motion to Quash Ex Parte Writ of Habeas Corpus ad Testificandum for Custody of Inmate Fred Quintana, Doc. 1919. |
| 1:45pm | Mr. Castle calls witness Fred Quintana, witness sworn.  Mr. Quintana's attorney Philip Sapien present. |
| 1:45pm | Mr. Castle conducts direct examination of witness Fred Quintana. |
| 1:50pm | Mr. Burke conducts direct examination of witness Fred Quintana. |
| 1:54pm | Mr. Grandburg conducts direct examination of witness Fred Quintana. |
| 1:55pm | Mr. Beck conducts cross examination of witness Fred Quintana. |
| 2:01pm | Mr. Castle conducts re-direct examination of witness Fred Quintana. |
| 2:03pm | Mr. Burke conducts re-direct examination of witness Fred Quintana. |
| 2:07pm | Court excuses witness Fred Quintana. |
| 2:08pm | Mr. Castellano addresses Court regarding statements. |
| 2:10pm | Mr. Castle calls witness Andrew Armijo, witness sworn. |
| 2:11pm | Mr. Castle conducts direct examination of witness Armijo. |
| 2:30pm | Mr. Beck conducts cross examination of witness Armijo. |
| 2:31pm | Court in recess. |
| 2:53pm | Mr. Beck resumes cross examination of witness Armijo. |
| 3:02pm | Court excuses witness Mr. Armijo. |
| 3:02pm | Mr. Cooper addresses Court regarding Ms. Gibson, she has returned to TorC. Will be back tomorrow.  Mr. Cooper calls Edgar Rosa, task force agent, witness sworn. |
| 3:03pm | Mr. Cooper conducts direct examination of witness Edgar Rosa. |

| | |
|---|---|
| 3:19pm | Mr. Beck conducts cross examination of witness Edgar Rosa. |
| 3:28pm | Mr. Cooper conducts re-direct examination of witness Edgar Rosa. |
| 3:30pm | Court excuses witness Edgar Rosa. |
| 3:30pm | Mr. Castle calls witness Juan Barela, witness sworn. |
| 3:30pm | Mr. Castle conducts direct examination of witness Barela. |
| 3:41pm | Mr. Castellano conducts cross examination of witness Barela. |
| 3:47pm | Mr. Castle conducts re-direct examination of witness Barela. |
| 3:48pm | Court excuses witness Barela. |
| 3:49pm | Mr. Castle addresses Court regarding next motion Doc. 1754 |
| 3:50pm | Mr. Beck responds. |
| 3:52pm | Court inclined to allow, it will be up to defendants. |
| 3:53pm | Mr. Burke nothing to add. |
| 3:54pm | Ms. Armijo addresses Court, believes jury does not want to see extrinsic evidence. |
| 3:54pm | Court addresses United States' Motion in Limine to Preclude Cross-Examination of Agent Acee on Unrelated Conduct. Doc. 1871 – at present time counsel will not go in to that. If the door is opened, will address it at that time via bench conference. |
| 3:57pm | Court addresses counsel on James statements and additional briefing related to Doc. 1903. Court addresses counsel on Mr. Sapien's motion regarding Fred Quintana, motion Doc. 1919 is effectively **denied**. |
| 4:01pm | Mr. Castle responds, documents 1936 and 1996 are withdrawn. |
| 4:02pm | Court addresses counsel on Doc. 1948 Motion to Bifurcate Counts 4 & 5 from Counts 1-3 and 13-16. |
| 4:05pm | Mr. Benjamin responds regarding defendant J. Gallegos position. |
| 4:06pm | Mr. Castle argues in support of Motion to Bifurcate Doc. 1948. |
| 4:09pm | Ms. Torraco argues in support of bifurcation of Counts 4 & 5. |
| 4:24pm | Mr. Castellano argues against bifurcation. |
| 4:32pm | Court in recess. |
| 4:51pm | Court in session. |
| 4:52pm | Court addresses counsel regarding sequencing and counsel can create their own seating chart. Court indicates Mr. Glazener will be here tomorrow at 10am with witness James Garcia. |
| 4:54pm | Ms. Armijo addresses sequence for jurors. |
| 4:54pm | Court will have seating chart Monday morning. |
| 4:56pm | Court addresses counsel regarding letter received from Mr. Fallick, regarding Leroy |

|         | Lucero's appearance and testimony tomorrow. Court will file letter on the docket. |
|---------|------|
| 4:58pm | Mr. Castle addresses court regarding spill over testimony of witnesses related to Counts 4 & 5. |
| 4:59pm | Court is likely to deny bifurcation. |
| 5:00pm | Court will take up United States Motion in Limine Doc. 1977. |
| 5:01pm | Mr. Castellano addresses court in support of Motion. |
| 5:02pm | Court inclined to grant the motion. |
| 5:06pm | Mr. Benjamin responds. |
| 5:11pm | Ms. Torraco responds, filed response shortly before noon, Doc. 2066. |
| 5:11pm | Court has reviewed the response. |
| 5:12pm | Ms. Torraco argues against motion. |
| 5:15pm | Mr. Castellano responds. |
| 5:21pm | Court will grant the motion Doc 1977. |
| 5:26pm | Ms. Torraco addresses Court, clarifying what can be said related to ultimate finding by State Magistrate Judge. |
| 5:28pm | Court takes up Motion in Limine to Admit Out-of-Court Statements Made by Adrian Burns, Doc. 1978. Court inclined to grant motion. |
| 5:29pm | Ms. Armijo argues in support of Motion in Limine. |
| 5:31pm | Mr. Benjamin responds, argues against Motion in Limine. |
| 5:33pm | Ms. Torraco responds, argues against Motion in Limine. |
| 5:35pm | Court addresses counsel regarding statement of the case, time for closing arguments, and spiral notebooks for jurors. |
| 5:36pm | Counsel agree to spiral notebooks. |
| 5:37pm | Court will order 18 and a few extras. |
| 5:37pm | Court in recess. |

**DAY 2: 4/5/18**

|         |      |
|---------|------|
| 8:32am | Court in session. |
| 8:33am | Court addresses Mr. Roberts on anything further on Burns statements. Court grants Motion Doc. 1978. |
| 8:33am | Mr. Benjamin responds, will draft a limiting instruction for the Court's review. |
| 8:35am | Court clarifies statement that will be admitted. |
| 8:40am | Ms. Torraco addresses Court. |
| 8:43am | Mr. Beck addresses Court with Agent Acee's notes from James Garcia debrief. |
| 8:55am | Court addresses Mr. Beck and request rough draft of factual basis for James Garcia's |

|         | plea. |
|---------|-------|
| 8:56am  | Mr. Beck reads factual basis for James Garcia plea. |
| 9:15am  | Mr. Burke addresses Court responds to hand written notes of Agent Acee. |
| 9:27am  | Ms. Harbour-Valdez addresses Court. |
| 9:36am  | Mr. Castle addresses Court. Requests the plea agreement proposed for James Garcia to be disclosed to defense counsel, could be subject to protective order. |
| 9:46am  | Mr. Burke responds, requests more time to consult with Ms. Harbour-Valdez. |
| 9:50am  | Ms. Harbour-Valdez request more time to consult with Mr. Burke. |
| 9:50am  | Mr. Castle responds, addresses Court. |
| 9:54am  | Court addresses Mr. Beck regarding concerns about James Garcia pleading guilty tomorrow. |
| 9:55am  | Mr. Beck responds, has concerns about witness James Garcia pleading guilty. |
| 9:58am  | Court directs Mr. Beck to provide a copy of draft of factual basis for plea to the Court. |
| 9:58am  | Mr. Beck to provide copies. Mr. Beck does not object to ex parte meeting with Mr. Castle. |
| 9:59am  | Court directs Mr. Beck to provide CRD with copy of plea agreement. (Marked as exhibit 1) |
| 10:00am | Mr. Blackburn indicates witness James Garcia's attorney Mr. Glazener is here. |
| 10:01am | Court in recess. |
| 11:11am | Agent Acee appears telephonically. |
| 11:22am | Mr. Castle conducts re-direct of Agent Acee. |
| 11:54am | Mr. Castle moves to admit exhibits AA and AB, no objections by defense. |
| 11:54am | Court admits exhibits AA and AB. |
| 11:54am | Mr. Beck conducts re-cross examination of Agent Acee. |
| 12:03pm | Defendants have no further questions for Agent Acee. |
| 12:04pm | Court excuses Agent Acee. |
| 12:04pm | Court in recess. |
| 1:06pm  | Court in session in ex parte conference with Mr. Castle. |
| 1:18pm  | Court in recess. |
| 1:26pm  | Court addresses Deputy Gunter regarding doors open for defense counsel at 7:30am and not removing defendants via the transport out of the building while jurors are leaving. |
| 1:35pm  | Ms. Harbour-Valdez addresses Court regarding sequential list. |
| 1:36pm  | Court indicates the list will be coming shortly. |

| | |
|---|---|
| 1:37pm | Ms. Armijo responds. |
| 1:37pm | Mr. Cooper calls witness Joshua Mirka, witness sworn, present with counsel Ms. Gibson. |
| 1:37pm | Mr. Cooper conducts direct examination of witness Mirka. |
| 1:45pm | Mr. Beck conducts cross examination of witness Mirka. |
| 1:49pm | Mr. Cooper conducts re-direct of witness Mirka. |
| 1:50pm | Court excuses witness Joshua Mirka. |
| 1:50pm | Mr. Beck addresses Court with concerns of written transcript seen by witness Mirka in custody. |
| 1:52pm | Court responds, perhaps the US Marshal can check with the facility and see what paperwork is in Lujan's cell. |
| 1:53pm | Mr. Cooper responds. |
| 1:54pm | Court directs that the taint team be in communication with the US Marshal regarding what is found. |
| 1:55pm | Ms. Armijo addresses court regarding numerous materials being found in possession of defendant Rudy Perez. |
| 1:56pm | Court to speak to taint team telephonically this afternoon regarding materials be |
| 2:02pm | Mr. Castle calls witness Joseph Otero, witness sworn. |
| 2:02pm | Bench conference with counsel. |
| 2:08pm | Mr. Castle conducts direct examination of witness Otero. |
| 2:14pm | Mr. Beck conducts cross examination of witness Otero. |
| 2:15pm | Mr. Castle conducts re-direct examination of witness Otero. |
| 2:16pm | Court excuses witness Otero. |
| 2:17pm | Mr. Castle calls witness Leroy Lucero, witness sworn. |
| 2:17pm | Mr. Castle conducts direct examination of witness Leroy Lucero. |
| 2:23pm | Mr. Beck addresses court regarding Kastigar letter provided to witness Lucero, indicates witnesses attorney Mr. Fallick availability by phone. |
| 2:23pm | Court addresses witness Lucero regarding protections of Kastigar letter. |
| 2:23pm | Mr. Castellano addresses Court regarding witness Lucero not feeling well. |
| 2:24pm | Mr. Castle continues with direct examination of witness Lucero. |
| 2:49pm | Court in session. |
| 2:50pm | Court addresses counsel regarding taint attorneys availability by phone. |
| 2:55pm | Court addresses taint attorney Mr. Eicker telephonically regarding materials at detention facility in hard copy that should not be. |

| | |
|---|---|
| 3:06pm | Mr. Cooper addresses Court, objects to blanket search of defendants cells. |
| 3:07pm | Ms. Armijo responds. |
| 3:08pm | Court directs that counsel provide a list including cooperators to CRD |
| | Mr. Castle resumes direct examination of witness Leroy Lucero. |
| 3:17pm | Mr. Benjamin conducts direct examination of witness Leroy Lucero. |
| 3:22pm | Mr. Beck conducts cross examination of witness Leroy Lucero. |
| 3:30pm | Mr. Castle conducts re-direct examination of witness Leroy Lucero. |
| 3:36pm | Court excuses witness Leroy Lucero. |
| 3:37pm | Court will address defense Notice to Court, Request for Order Compelling Disclosure to Motion to Strike Certain Witnesses. Doc. 1993. |
| 3:38pm | Mr. Castle addresses Doc. 1993. |
| 3:39pm | Mr. Beck responds, notes have been turned over. |
| 3:40pm | Mr. Castle continues. |
| 3:48pm | Mr. Benjamin addresses Court. |
| 3:49pm | Court addresses Edward Troup's Objections Doc. 1994 |
| 3:49pm | Mr. Castellano responds. |
| 3:50pm | Mr. Burke responds. |
| 3:56pm | Court address counsel, inclined to allow as indicated on the record. |
| 4:04pm | Court takes up Restricted Motion to Strike Government Witnesses Brian Rascon and Raymond Rascon Doc. 2011. |
| 4:04pm | Mr. Burke addresses Motion. |
| 4:05pm | Mr. Beck responds, no pen packet existed until today, will disclose to defendants. |
| 4:06pm | Court will deny Motion Doc. 2011. |
| 4:07pm | Court addresses Restricted Motion to Strike Government Witness Benjamin Clark Doc. 2012. |
| 4:08pm | Mr. Beck responds. |
| 4:16pm | Court in recess. |
| 4:33pm | Court in session. |
| 4:38pm | Court addresses counsel regarding sequential order, attempts to telephonically conference Ms. Wild. |
| 4:39pm | Ms. Armijo and Ms. Harbour-Valdez to call Ms. Wild directly now, outside the courtroom. |
| 4:39pm | Court addresses Deputy Marshal Adrian Gunder regarding timing for arrival of attorneys, defendants and jurors. |

| | |
|---|---|
| 4:41pm | Mr. Burke continues on Restricted Motion to Strike Government Witness Benjamin Clark Doc. 2012. |
| 4:43pm | Court denies Restricted Motion to Strike Government Witness Benjamin Clark Doc. 2012. |
| 4:44pm | Court inquires about time for closings – M. Armijo 3 hours combine, Mr. Benjamin 1.5 hr, Burke- 1. 15 min, Cooper – 2 hrs, Lahann 1.15 min, Grandburg- 1 hr 45 min, Blackburn 1 hr 15 min Torraco 1 hr. |
| 4:40pm | Court addresses statement of the case - directs by 10 am tomorrow defendants get back to the Government by 3:00, and then either file something agreed to by the end of business tomorrow, or send Court competing statements of the case indicating what your differences are, and then I'll try to prepare one over the weekend<br>No objections to voir dire. Court addresses conflict with Billy Blackburn. |
| 4:50pm | Mr. Blackburn responds. |
| 4:56pm | Deputy Gunder addresses Judge regarding taint team. Court will not give any further direction. |
| 4:57pm | Court addresses Mr. Blackburn and conducts colloquy with Arturo Garcia regarding conflict free counsel. |
| 4:57pm | Defendant responds yes, wishes to make a voluntary waiver and keep Mr. Blackburn as counsel. |
| 5:05pm | Court addresses counsel on United States Sealed Opposed Motion in Limine Regarding Statements Against Penal Interest Under Rule 804(B)(3) Doc. 1912. |
| 5:08pm | Mr. Beck responds. |
| 5:08pm | Mr. Castle will submit a small, less than five page summary argument about the application of 804(b)(3) to the specific statements. |
| 5:10pm | Mr. Beck address Claims Chart re: Billy Garcia and Troup's Motions to Dismiss. Previously emailed to jobproposed text |
| 5:11pm | Mr. Cooper addresses court with CJA matters. |
| 5:31pm | Mr. Blackburn addresses Court ex parte. |
| 5:51pm | Court in recess. |

# UNITED STATES DISTRICT COURT

### District of New Mexico

**USA v. DeLeon, et al.**                                        Case No. CR 15-4268 JB

**Exhibit and Witness List**

| Presiding Judge:<br>James O. Browning | Plaintiff's Counsel:<br>Maria Armijo/Randy Castellano/Matt Beck, AUSA's | Defendant's Counsel:<br>see minutes |
|---|---|---|
| **Pretrial Motions Hearing Dates:**<br>April 4-5, 2018 | **Court Reporter:**<br>Jennifer Bean | **Courtroom Deputy/Law Clerk:**<br>Carol Bevel |

| Plf. No. | Def. No. | Date Offered | Marked | Admitted | Description of Exhibits and Witnesses |
|---|---|---|---|---|---|
| | | | | | **Wednesday, April 4, 2018** |
| | A | 4/5/18 | | Yes | Cori Harbour-Valdez hand written notes from Daffy Garcia meeting |
| | | | | | |
| | AA | 4/5/18 | | Yes | FBI 302 dated 1/22/02 bates label 43684 |
| | AB | 4/5/18 | | yes | FBI 302 dated 3/21/18 re: bates label 61829 |
| 1 | | 4/5/18 | | Yes | Draft plea agreement for James Garcia |
| | | | | | |
| | | | | | ***END*** |

DNM 899

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                    No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL Sanchez, a.k.a.
"Dan Dan," GERALD ARCHULETA, a.k.a.
"Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the United States' Motion *In Limine*,

filed March 26, 2018 (Doc. 1977)("First MIL"); and (ii) the Motion in Limine to Admit Out-of-

Court Statements Made by Adrian Burns (Doc. 1978)("Second MIL").  The primary issues are:
(i) whether the finding that no probable existed to prosecute Defendants Joe Gallegos and
Andrew Gallegos for Adrian Burns' murder that the Honorable Jim Naranjo, Jr., Socorro County
Magistrate Judge,[1] made on December 6, 2012 constitutes admissible evidence in this case, a
federal prosecution of the Burns murder as a Violent Crime in Aid of Racketeering under 18
U.S.C. § 1959("VICAR"); and (ii) whether a statement that Burns made to this girlfriend, Amber
Sutton, shortly before his death, stating that he was going to J. Gallegos' residence to collect a
drug debt and to sell heroin is admissible hearsay as a statement of the declarant's then-existing
state of mind.  The Court concludes that: (i) the Magistrate Judge's probable-cause determination
is relevant but inadmissible; and (ii) Burns' statement to Sutton is admissible as a statement of
the declarant's then-existing state of mind, specifically his plan.

In the First MIL, the Plaintiff United States of America argues that the Magistrate
Judge's probable-cause determination is inadmissible, because it has no tendency to make a fact
of consequence more or less probable.  See First MIL at 4 (citing Fed. R. Evid. 401).  The United
States also argues that the Magistrate Judge's probable-cause determination is inadmissible,
because the danger that the probable-cause determination will confuse or mislead the jury
substantially outweighs the determination's probative value.  See First MIL at 4 (citing Fed. R.
Evid. 403).  The United States bases its arguments on assertions that: (i) after the probable-cause

---

[1]Magistrate Judge Naranjo is not a lawyer.  Outside of Bernalillo and Dona Ana
Counties, New Mexico Magistrate Judges need only a high school diploma or General
Equivalence Degree.  See N.M. Stat. Ann. § 35-2-1 ("No person is eligible for election or
appointment to the office of magistrate unless he has graduated from high school or has attained
the equivalent of a high school education . . . .").  See also id. ("In magistrate districts with a
population of more than two hundred thousand persons in the last federal decennial census, no
person is eligible for election or appointment to the office of magistrate unless he is a member of
the bar of this state and licensed to practice law in this state . . . .").

determination, the investigation into Burns' death continued and uncovered additional evidence, see First MIL at 3; (ii) "a federal grand jury has found probable cause on the charges and evidence," First MIL at 4; and (iii) neither the United States nor the Defendants know what evidence was presented to Magistrate Judge Naranjo, see First MIL at 4.

In the Second MIL, the United States argues that Burns' statement to Sutton that "he was on his way to the residence of Joe Gallegos to collect a drug debt and to sell heroin," is a statement of Burns' then-existing state of mind, specifically his plan. Second MIL at 1. It follows, according to the United States, that Burns' statement is admissible for its truth under rule 803(3) of the Federal Rules of Evidence. See Second MIL at 2. The United States contends, alternatively, that Burns' statements is admissible to show its effect on Sutton, i.e., that it caused her to begin searching for Burns, "which started with her looking for the Gallegos' home." Second MIL at 3.

J. Gallegos filed a response to the First MIL. See Response to Motion in Limine [Doc. 1977] at 1, filed April 3, 2018 (Doc. 2031)("First Response"). J. Gallegos argues that the United States' argument "that there is no evidence to show what was presented to the Socorro County Magistrate" is "self serving," because "[t]hey, the government[,] lost," i.e., failed to preserve, that evidence. First Response at 2. J. Gallegos adds:

> Probable cause in this case is an issue that was determined by Magistrate Jim Navarro and the government, in the same position as the State, is collaterally estopped from arguing otherwise. This does not preclude their case as it is based on a different theory, but they should be subject to cross on this fact.

First Response at 2-3.

A. Gallegos filed a response to the Second MIL. See Defendant's Response to Government's Motion in Limine to Admit Out of Court Statements Made by Adrian Burns at 1,

filed April 3, 2018 (Doc. 2050)("Second Response").  A. Gallegos argues that Burns' statement

to Sutton is inadmissible hearsay, because rule 803(3) of the Federal Rules of Evidence renders

statements of a declarant's then-existing state of mind admissible because of circumstantial

guarantees of reliability that attend those statements.  See Second Response ¶ 3, at 2.

A. Gallegos contends that no such guarantees attend Burns' statements.  See Second Response

¶ 4, at 2.  A. Gallegos also argues that, even if statements regarding Burns' plan to go to

J. Gallegos' residence are admissible under rule 803(3), statements regarding the reason for that

visit -- that J. Gallegos owed Burns a drug debt -- are not admissible under rule 803(3), because

that rule does not permit statements of belief to be introduced to prove the fact believed.  See

First Response ¶ 8, at 3.  Further, according to A. Gallegos, "[t]he Government's stated intent to

use the statement to show why Amber Sutton searched for the decedent in the manner she did is

not relevant unless and until Defendant makes an issue of the reasonableness of Ms. Sutton's

investigation."  Second Response ¶ 5, at 2.  In addition to hearsay arguments, A. Gallegos

contends that "the existence of a [drug] debt and [Burns'] allegation that Mr. Gallegos was

involved in the sale of narcotics, is . . . unfairly prejudicial and should be excluded under Rule

403."  Second Response ¶ 6, at 2.  A. Gallegos concludes by noting:

> On March 14, 2018, Ms. Armijo read the statement to the court, stating that
> Adrian Burns told Dan Orendorff (a/k/a "Sleepy") that Joe (and/or Andrew)
> Gallegos owed him money and that Sleepy should no longer do business with
> him.  No hearsay exception applies to allow the Government to introduce these
> statements for the truth of its allegation that Defendant owed a drug debt.

Second Response ¶ 10, at 3.

The Court concludes that Magistrate Judge Naranjo's probable-cause determination is

relevant but inadmissible.  Rule 401 of the Federal Rules of Evidence sets a very low bar for

relevance; any tendency to make a fact of consequence more or less relevant suffices.  See Fed.

R. Evid. 401.   That a Magistrate Judge found that no probable cause existed to prosecute J. Gallegos and A. Gallegos for Burns' murder makes it less likely that the Gallegos brothers killed Burns, so the probable-cause determination is relevant.

Rule 403 states that the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of" unfair prejudice, confusing the issues, or wasting time. Fed. R. Evid. 403.   Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."   Fed. R. Evid. 403 advisory committee notes.   When the jury trusts in the judgment of another factfinder instead of forming its own judgment based on the evidence presented, it employs an improper -- albeit unemotional -- basis for decision.   See United States v. Young, 470 U.S. 1, 18-19 (1985)(Burger, C.J.).

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

United States v. Young, 470 U.S. at 18-19.

> The Court would be concerned . . . that the jury would decide that DeSantis is disabled not upon its own judgment and understanding of the evidence, but on the fact that an ostensibly smart person looked at some evidence -- quite possibly evidence that is not presented to the jury -- and came to that conclusion.

De Santis v. Napolitano, 2010 WL 2292592, at *24 (D.N.M. May 26, 2010)(Browning, J.) Thus, the danger that the jury will defer to Magistrate Judge Naranjo's probable-cause determination is a danger of unfair prejudice.

- 5 -

DNM 904

Further, there is no way for the jury to determine what evidence was presented to Magistrate Judge Naranjo, so the jury would need to evaluate the resulting probable-cause determination in the abstract.  Conducting such an evaluation requires knowledge regarding the intricacies of New Mexico criminal practice and procedure and the qualifications of New Mexico magistrate judges.  Even the Court had to educate itself regarding New Mexico preliminary hearings to determine probable cause, and it was surprised to learn that most New Mexico Magistrate Judges are not lawyers, see supra note 1, but "[t]he Rules of Evidence apply" at the preliminary hearings that those Magistrate Judges conduct, N.M. R. Ann. 6-202.  Educating a jury on those matters threatens to turn a trial into a law school seminar, which would waste time and potentially confuse the issues.  Accordingly, the Court excludes the probable-cause determination under rule 403 of the Federal Rules of Evidence.

The Court does not agree with J. Gallegos' argument regarding collateral estoppel and failure to preserve evidence.  See First Response at 2-3.  For one thing, collateral estoppel would apply against the United States only if it had been a party to the state court proceeding.  It was not.  Additionally, the United States had no obligation to preserve the evidence presented to the Magistrate Judge Naranjo; nothing in the record indicates that the United States ever possessed that evidence.  Even if the United States possessed that evidence, it was not obliged to preserve that evidence unless the evidence "both possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to

DNM 905

obtain comparable evidence by other reasonably available means." California v. Trombetta, 467

U.S. 479, 489 (1984).[2]

The Court concludes that Burns' statement to Sutton, which the Second MIL describes, is

admissible for its truth under rule 803(3) of the Federal Rules of Evidence.  According to that

rule,

> [a] statement of the declarant's then-existing state of mind (such as motive, intent,
> or plan) or emotional, sensory, or physical condition (such as mental feeling, pain,
> or bodily health), but not including a statement of memory or belief to prove the
> fact remembered or believed unless it relates to the validity or terms of the
> declarant's will.

Fed. R. Evid. 803(3).   Burns' statement describes where he planned to go -- J. Gallegos'

residence -- and what he planned to do there -- collect a drug debt and sell heroin, see Second

MIL at 1, so it is admissible for its truth as a statement of the declarant's then-existing plan, see

Fed. R. Evid. 803(3).[3]   That statement -- indicating that Burns planned to confront J. Gallegos

about a drug debt on the night he died -- is both relevant and highly probative, because the

United States' theory of the case is that J. Gallegos and A. Gallegos murdered Burns because of

the drug dispute between J. Gallegos and Burns.   Accordingly, the statement is admissible

notwithstanding rule 403 of the Federal Rules of Evidence.

---

[2]That Magistrate Judge Naranjo did not find probable cause existed does not mean that the evidence presented to him was exculpatory; it indicates only that he determined that the evidence presented was not sufficiently inculpatory to justify a murder prosecution.

[3]The United States indicated orally that, in its opinion, this statement is also admissible as a declaration against penal interest under rule 804(b)(3) of the Federal Rules of Evidence, because it indicates that Burns was engaged in drug dealing.   The Court is not, however, convinced that Burns' statement has "so great a tendency . . . to expose the declarant to . . . criminal liability" that a reasonable person in Burns' position would have made the statement "only if the person believed it to be true."  Fed. R. Evid. 804(b)(3).   That Burns made the statement to his girlfriend indicates that a reasonable person in Burns' position would not expect law enforcement to learn of the statement, and Burns' statement tends to expose him to criminal liability only if law enforcement becomes aware of that statement.

Finally, the additional Burns statements that A. Gallegos identifies -- that Burns told Orendorff that J. Gallegos owed him money and that Orendorff should not do business with him -- are not admissible for their truth.  <u>See</u> Second Response ¶ 10, at 3-4.  They are, however, admissible to show that Burns was bad-mouthing and disrespecting J. Gallegos such that J. Gallegos had to retaliate violently to preserve his standing in the SNM, <u>i.e.</u>, that J. Gallegos killed Burns "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).  J. Gallegos is, however, entitled to a limiting instruction informing the jury that they can use this Burns statement for the fact that it was made and not for its truth.

**IT IS ORDERED** that (i) the United States' Motion *In Limine*, filed March 26, 2018 (Doc. 1977), is granted; and (ii) Motion in Limine to Admit Out-of-Court Statements Made by Adrian Burns (Doc. 1978), is granted.

_____
UNITED STATES DISTRICT JUDGE

- 8 -

*Counsel:*

John C. Anderson
  United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

*Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

*Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

*Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

*Attorney for Defendant Leonard Lujan*

DNM 908

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

   *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

   *Attorneys for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

   *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

   *Attorneys for Defendant Christopher Chavez*

DNM 909

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

     *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

     *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

     *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

     *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

     *Attorney for Defendant Roy Paul Martinez*

DNM 912

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

    *Attorneys for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

    *Attorneys for Defendant Brandy Rodriguez*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

     Defendants.

## COURT'S FIRST PROPOSED PRELIMINARY JURY INSTRUCTIONS
### (without citations)

Members of the Jury:

At the end of the trial I will give you detailed guidance on the law and on how you will go about reaching your decision.  But now I simply want to generally explain how the trial will proceed.

This criminal case has been brought by the United States government.  I will sometimes refer to the government as the prosecution.  The government is represented by assistant United States Attorneys, Maria Armijo, Randy Castellano, and Matthew Beck.  The defendant, Joe Lawrence Gallegos, is represented by his lawyer, Brock Benjamin; the defendant, Edward Troup, is represented by his lawyers, Cori Harbour-Valdez and Patrick Burke; the defendant, Billy Garcia, is represented by his lawyers, Bob Cooper and James Castle; the defendant, Allen Patterson is represented by his lawyers, Joe Shattuck and Jeffrey Lahann; the defendant Christopher Chavez, is represented by his lawyers, John Granberg and Eduardo Solis; the defendant Arturo Arnulfo Garcia, is represented by his lawyers, Billy Blackburn and Scott Davidson; and the defendant, Andrew Gallegos, is represented by his lawyers, Donavon Roberts and Lisa Torraco.

The indictment charges Mr. Joe Gallegos, Mr. Edward Troup, and Mr. Billy Garcia with Violent Crimes in Aid of Racketeering (Murder of F.C.); Mr. Billy Garcia, Mr. Christopher Chavez, and Mr. Allen Patterson with Violent Crimes in Aid of Racketeering (Murder of R.G.); Mr. Edward Troup and Mr. Arturo Arnulfo Garcia with Violent Crimes in Aid of Racketeering (Murder of F.S.); Mr. Joe Gallegos and Mr. Andrew Gallegos with Violent Crimes in Aid of Racketeering (Conspiracy to Murder A.B.); Mr. Joe Gallegos and Mr. Andrew Gallegos with Violent Crimes in Aid of Racketeering (Murder of A.B.); Mr. Joe Gallegos with Violent Crimes in Aid of Racketeering (Assault with a Dangerous Weapon Upon J.G.); Mr. Joe Gallegos with

**Court's Proposed Preliminary Jury Instructions Before Trial - Page** 2

Violent Crimes in Aid of Racketeering (Conspiracy to Murder J.G.); Mr. Joe Gallegos with Violent Crimes in Aid of Racketeering (Attempted Murder of J.G., Assault With a Dangerous Weapon Upon J.G., Resulting in a Serious Bodily Injury to J.G.); and Mr. Joe Gallegos with Tampering With a Witness, Victim or Informant by Physical Force or Threat.  The indictment is simply the description of the charges made by the government against Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos; it is not evidence of guilt or anything else.  Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos pleaded not guilty and are presumed innocent.  They may not be found guilty by you unless all twelve of you unanimously find that the government has proved their guilt beyond a reasonable doubt.

The first step in the trial will be the opening statements.  The government in its opening statement will tell you about the evidence which it intends to put before you.  Just as the indictment is not evidence, neither is the opening statement.  Its purpose is only to help you understand what the evidence will be.  It is a road map to show you what is ahead.

After the government's opening statement, Mr. Joe Gallegos', Mr. Troup's, Mr. Billy Garcia's, Mr. Patterson's, Mr. Chavez', Mr. Arturo Garcia's, and Mr. Andrew Gallegos' attorney may make an opening statement.

Evidence will be presented from which you will have to determine the facts.  The evidence will consist of the testimony of the witnesses, documents and other things received into the record as exhibits, and any facts about which the lawyers agree or to which they stipulate.

The government will offer its evidence.  After the government's evidence, Mr. Joe Gallegos', Mr. Troup's, Mr. Billy Garcia's, Mr. Patterson's, Mr. Chavez', Mr. Arturo Garcia's, and Mr. Andrew Gallegos' lawyers may present evidence, but they are not required to do so.  I

**Court's Proposed Preliminary Jury Instructions Before Trial - Page** 3

remind you that Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos are presumed innocent, and it is the government that must prove Mr. Joe Gallegos', Mr. Troup's, Mr. Billy Garcia's, Mr. Patterson's, Mr. Chavez', Mr. Arturo Garcia's, and Mr. Andrew Gallegos' guilt beyond a reasonable doubt. If Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos submit evidence, the government may introduce rebuttal evidence.

At times during the trial, a lawyer may make an objection to a question asked by another lawyer, or to an answer by a witness. This simply means that the lawyer is requesting that I make a decision on a particular rule of law. Do not draw any conclusion from such objections or from my rulings on the objections. If I sustain an objection to a question, the witness may not answer it. Do not attempt to guess what answer might have been given if I had allowed the answer. If I overrule the objection, treat the answer as any other. If I tell you not to consider a particular statement, you may not refer to that statement in your later deliberations. Similarly, if I tell you to consider a particular piece of evidence for a specific purpose, you may consider it only for that purpose.

During the course of the trial I may have to interrupt the proceedings to confer with the attorneys about the rules of law that should apply. Sometimes we will talk briefly, at the bench. But some of these conferences may take more time, so I will excuse you from the courtroom. I will try to avoid such interruptions whenever possible, but please be patient even if the trial seems to be moving slowly because conferences often actually save time in the end.

You are to consider all the evidence received in this trial. It will be up to you to decide what evidence to believe and how much of any witness's testimony to accept or reject.

After you have heard all the evidence on both sides, I will instruct you on the rules of law

**Court's Proposed Preliminary Jury Instructions Before Trial - Page** 4

which you are to use in reaching your verdict.

The final part of the trial occurs when the government, and Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos, will each be given time for their final arguments.

During the course of the trial I may ask a question of a witness.  If I do, that does not indicate I have any opinion about the facts in the case but am only trying to bring out facts that you may consider.

If you would like to take notes during the trial, you may.  On the other hand, you are not required to take notes.

If you do decide to take notes, be careful not to get so involved in note taking that you become distracted, and remember that your notes will not necessarily reflect exactly what was said, so your notes should be used only as memory aids.  Therefore, you should not give your notes precedence over your independent recollection of the evidence.  You should also not be unduly influenced by the notes of other jurors.  If you do take notes, leave them in the jury room at night and do not discuss the contents of your notes until you begin deliberations.

To find Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos guilty of the crime of Committing Violent Crimes in Aid of Racketeering, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:  the existence of an "enterprise" as defined in 18 U.S.C. § 1959(b)(2);

*Second*: the charged enterprise engaged in, or its activities affected, interstate or foreign commerce;

*Third*: the charged enterprise engaged in "racketeering activity" as defined in 18 U.S.C.

**Court's Proposed Preliminary Jury Instructions Before Trial - Page 5**

§§ 1959(b)(1) and 1961(1);

*Fourth*: Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos committed one of the following crimes -- or conspired or attempted to commit one of these crimes -- which crime violated state or federal laws: murder, assault with a dangerous weapon, and assault with dangerous weapon resulting in serious bodily injury; and

*Fifth*:  the crime of violence was committed either: (i) as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from the charged enterprise; or (ii) for the purpose of gaining entrance to or maintaining or increasing position in the charged enterprise.

Ordinarily, the attorneys will develop all the relevant evidence that will be necessary for you to reach your verdict.  However, in rare situations, a juror may believe a question is critical to reaching a decision on a necessary element of the case.  In that exceptional circumstance, you may write out a question and provide it to the courtroom deputy while the witness is on the stand.  I will then consider that question with the lawyers.  If it is determined to be a proper and necessary question, I will ask it.  If I do not ask it, you should recognize that I have determined it is not a legally appropriate question and not worry about why it was not asked or what the answer would have been.

During the course of the trial, you should not talk with any witness, or with Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos, or with any of the lawyers at all.  In addition, during the course of the trial you should not talk about the trial with anyone else.  Do not discuss the case with anyone or provide any information about the trial to anyone outside the courtroom until the verdict is received.  Do

**Court's Proposed Preliminary Jury Instructions Before Trial - Page** 6

not use the internet or any other form of electronic communication to provide any information.

Simply put, do not communicate with anyone about the trial until your verdict is received.  Also,

you should not discuss this case among yourselves until I have instructed you on the law and you

have gone to the jury room to make your decision at the end of the trial.  It is important that you

wait until all the evidence is received and you have heard my instructions on the controlling rules

of law before you deliberate among yourselves.  Let me add that during the course of the trial

you will receive all the evidence you properly may consider to decide the case.  Because of this,

you should not attempt to gather any information or do any research on your own.  Do not

attempt to visit any places mentioned in the case, either actually or on the internet, and do not in

any other way try to learn about the case outside the courtroom.

The court reporter is making stenographic notes of everything that is said.  This is

basically to assist any appeals.  However, a typewritten copy of the testimony will not be

available for your use during deliberations.  On the other hand, any exhibits will be available to

you during your deliberations.

Now that the trial has begun you must not hear or read about it in the media.  The reason

for this is that your decision in this case must be made solely on the evidence presented at the

trial.

With that introduction, Ms. Armijo, you may present the opening statement for the

government.

**Court's Proposed Preliminary Jury Instructions Before Trial - Page** 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| **ANGEL DELEON, et al**, | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT PROPOSED STATEMENT OF THE CASE

1.     This is a criminal case brought by the United States government.   I will sometimes refer to the United States as the prosecution.   The charges against the defendants are contained in an Indictment.   There are seven defendants who are charged in this trial, and all seven are charged with a crime which is a type of racketeering charge.   Specifically, the United States alleges that the defendants were members or associates of a racketeering enterprise known as the Syndicato Nuevo Mexico, or SNM, gang. An indictment is a mere accusation. The indictment is not any evidence at all of guilt. It is just the formal way that the government tells the defendant what crimes he is accused of committing. Each individual defendant has plead not guilty to the charges against him, is presumed innocent and that presumption stays with the defendant throughout trial.

2.     Assistant United States Attorneys Maria Y. Armijo, Randy M. Castellano, and Matthew M. Beck will be prosecuting this case and representing the United States of America.   The defendants are Joe Lawrence Gallegos, represented by Brock Benjamin and Richard Sindel; Edward Troup, represented by Cori Harbour-Valdez and Patrick Burke; Billy Garcia, represented by James Castle and Robert Cooper; Allen Patterson, represented by Jeffrey

Lahann and Joseph Shattuck; Christopher Chavez, represented by John Granberg and Eduardo Solis; Arturo Arnulfo Garcia, represented by Billy Blackburn and Scott Davidson; and Andrew Gallegos, represented by Donavon Roberts and Lisa Torraco.

3.      The defendants are charged as follows:   Defendants Joe Lawrence Gallegos, Edward Troup, and Billy Garcia have been charged in the Indictment with violent crimes in aid of racketeering for the murder of Frank Castillo, occurring on or about March 26, 2001.

4.      Defendants Billy Garcia, Allen Patterson, and Christopher Chavez have been charged with violent crimes in aid of racketeering for the murder of Rolando Garza, occurring on or about March 26, 2001,.

5.      Defendants Edward Troup and Arturo Arnulfo Garcia have been charged with violent crimes in aid of racketeering for the murder of Freddie Sanchez, occurring on or about June 17, 2007.

6.      Defendants Joe Lawrence Gallegos and Andrew Gallegos have been charged with violent crimes in aid of racketeering for the murder of Adrian Burns, occurring on or about November 12, 2012.   Defendants Joe Lawrence Gallegos and Andrew Gallegos have also been charged with violent crimes in aid of racketeering for conspiring to murder Adrian Burns.

7.      Defendant Joe Gallegos has been charged with violent crimes in aid of racketeering for the assault of Jose Gomez with a dangerous weapon, for conspiring to murder Jose Gomez, and for the attempted murder of Jose Gomez with a deadly weapon which resulted in serious bodily injury to Jose Gomez, occurring on or about February 27, 2016.

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515

***Electronically filed on 4/16/18 by***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, New Mexico 88001
(575) 522-2304 – Tel.

Approved:

Brock Benjamin
Counsel for Joe Lawrence Gallegos

Cori Harbour-Valdez
Counsel for Edward Troup

James Castle
Counsel for Billy Garcia

Jeffrey Lahann
Counsel for Allen Patterson

John Granberg
Counsel for Christopher Chavez

Billy Blackburn
Counsel for Arturo Arnulfo Garcia

Donavan Roberts
Counsel for Andrew Gallegos

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____
RANDY M. CASTELLANO
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) CRIMINAL NO. 15-4268 JB |
| | ) |
| vs. | ) |
| | ) |
| **JOE GALLEGOS,** | ) |
| **EDWARD TROUP, a.k.a. "Huero** | ) |
| **Troup,"** | ) |
| **BILLY GARCIA, a.k.a. "Wild Bill,"** | ) |
| **ALLEN PATTERSON,** | ) |
| **CHRISTOPHER CHAVEZ, a.k.a.** | ) |
| **"Critter,"** | ) |
| **ARTURO ARNULFO GARCIA, a.k.a.** | ) |
| **"Shotgun," and** | ) |
| **ANDREW GALLEGOS, a.k.a. "Smiley,"** | ) |
| | ) |
| Defendants. | ) |

## UNITED STATES' UNOPPOSED NOTICE OF REMOVAL OF WITNESS

The United States of America and Trial II Defendants hereby agree to remove James

Johnny Garcia from their respective Witness Lists as to the trial set for April 9, 2018.[1]

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515
_**Electronically filed on 4/6/2018**_
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel

---

[1] The United States sent an email asking all counsel to respond with opposition by 4:00 p.m., April 6, 2018, or the United States would assume there was no opposition to the removal of James Garcia. Counsel either responded that they did not oppose his removal, or did not respond.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____

MARIA Y. ARMIJO
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT BILLY GARCIA'S BRIEF IN SUPPORT OF INAPPLICBILITY OF OF [sic] FED. R. [sic] 803 [sic] (b) [sic] (3) [sic] (DOC. NOS. 1909 AND 2009) [DOC. 2085]

Plaintiff United States of America responds to Defendant Billy Garcia's Brief in Support of Inapplicability of of [sic] Fed. R. [sic] 803 [sic] (b) [sic] (3) [sic] [Doc. 2085] ("B. Garcia Brief").[1]  On April 5, 2018, the Court provided to the parties pages 103 to 112 of its draft of its memorandum opinion and order regarding the admissibility of certain statements under Rules 801(d)(2)(A) and 804(b)(3) of the Federal Rules of Evidence. *See* Statements Against Interest Draft Findings, emailed to the parties on Apr. 5, 2018 ("Draft Findings"). In the Draft Findings, the Court concludes properly that it must assess each statement individually to determine whether it is admissible only under Rule 801(d)(2)(A) or whether it may be admissible also as a statement against penal interest against all Defendants under Rule 804(b)(3). *See* Draft Findings at 105. The Draft Findings appears to have focused much of the Court's effort in deciding the admissibility of certain statements on the first statement that Defendant B. Garcia contests: Defendant Edward Troup's statements to James Garcia, a.k.a. "Daffy." *See* Draft Findings at

---

[1] The title of the B. Garcia Brief appears to have several errors. Based on the substance of the brief, the statements to which it cites, and the previous pleadings that Defendant B. Garcia applies, the United States believes that it should refer to rule 804(b)(3). The United States responds to the brief accordingly.

106-112. In its analysis of those statements, the Court concludes properly that "Troup's statements indicating that he killed Sanchez and Castillo are sufficiently against Troup's penal interest [so that they are] admissible under rule 804(b)(3)." *Id.* at 107 (citing *United States v. Smalls*, 605 F.3d 765, 783 (10th Cir. 2010)). The Court based that proper conclusion on the corroborating circumstance that Defendant Troup told the inculpatory statements to a fellow Syndicato Nuevo Mexico ("SNM") member. The testimony throughout the Rule 104-type hearing on these statements established corroborating circumstances that render these statements admissible under Rule 804(b)(3) as statements against penal interest, including: (i) that SNM members almost always discuss SNM business, including their commissions of SNM crimes; (ii) they don't expect that their SNM brothers will tell law enforcement about these statements, but that they are always aware of the possibility that the SNM member may cooperate at some point and disclose these statements; and (iii) that these declarants -- Defendant Christopher Chavez, Defendant Troup, Defendant Joe Gallegos, and Defendant Angel DeLeon -- made statements consistent with each others' statements and consistent with a great amount of independent evidence. The Court properly should conclude that these statements that Defendant B. Garcia contests are, indeed, admissible under Rule 804(b)(3) as statements against penal interest.

## RELEVANT LAW

An out-of-court statement is admissible hearsay -- no matter who made the statement or who offers it into evidence -- if the declarant is unavailable and if "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A). In addition to being against the declarant's interest, a statement must also be "supported by corroborating circumstances that clearly indicate

its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to

criminal liability." Fed. R. Evid. 804(b)(3)(B). "[T]he presence -- or absence -- of evidence

corroborating a statement's contents, the circumstances in which a statement was made, the

declarant's credibility, whether the declarant had a motive to lie, and whether the statement is

internally consistent are all relevant to the rule 804(b)(3)(B) inquiry." Draft Findings at 104

(citing *United States v. Lozado*, 776 F.3d 1119, 1132 (10th Cir. 2015)).[2] Additionally, the Court

has indicated that it will look at additional circumstance of corroboration, including those that

Professor Stephen A. Saltzburg notes as factors in the *Federal Rules of Evidence Manual*. *See*

Draft Findings at 108; 4 Stephen A. Saltzburg et al., *Federal Rules of Evidence Manual* §

304.02[9], at 804-21-23 (Matthew Bender 11th ed.). Those include: (i) "'the **amount of**

**independent evidence supporting the truth of the declarant's statement**," Draft Findings at

108 (emphasis in original) (citation omitted); (ii) the timing and circumstances under which the

statement was made; (iii) the declarant's motive in making the statement and whether there was a

reason for the declarant to lie; (iv) whether the declarant repeated the statement and did so

consistently, even under different circumstances; (v) the party or parties to whom the statement

was made; (vi) the relationship between the declarant and the opponent of the evidence; and

(vii) the nature and strength of independent evidence relevant to the conduct in question. *See* 4

Saltzburg et al., *supra*, § 304.02[9], at 804-21-22.

## ANALYSIS

The Court correctly concluded that Defendant "Troup's statements indicating that he

killed Sanchez and Castillo are sufficiently against Troup's penal interest [such that they are]

---

[2] The Draft Findings cite to *United States v. Lovato* at the top of page 104, and then the sentence quoted here cites to *United States v. Lovado*. The United States believes that these are typos, and the Tenth Circuit decision to which the Court is citing is *United States v. Lozado*.

admissible under rule 804(b)(3)." Draft Findings at 107. The Court likely reached that

conclusion by reading the statements set forth in the FBI 302 report closely, and comparing those

statements with the other corroborating evidence that the United States admitted during the

hearing, including the plea agreement and FBI 302 report for Javier Alonso. Alonso's statements

about how the Fred Dog (Freddie Sanchez) murder occurred aligned almost perfectly with James

Garcia's statements in the FBI 302 of his May 2013 interview, which James Garcia cannot

otherwise know, as he's never talked to Alonso. Indeed, he testified that he doesn't know who is

"Wino" -- the name he gave in the FBI 302, which is Alonso's a.k.a. or moniker. Additionally,

the Court likely also reached this conclusion based on that the May 2013 FBI 302 of James

Garcia says that Troup repeated his statements about Fred Dog's murders twice: in 2012 while

out of prison and in approximately 2008 while in prison. Thus, Troup repeated these statements

to James Garcia, under different circumstances. Additionally, the Court probably recognized that

Defendant Troup repeatedly made statements to other SNM members about his participation in

the Fred Dog and Pancho (Frank Castillo) members, including, as Defendant B. Garcia points

out in his B. Garcia Brief, to at least Samuel Gonzales, Fred Quintana, and Ben Clark. *See* B.

Garcia Brief ¶¶ (1)(c), (f), and (g).[3] Plus, whereas James Garcia relates that Wino strangled Fred

Dog with a laundry bag drawstring and that they disposed of the drawstring afterwards, this

aligns both with Alonso's statements, but also is corroborated by the autopsy and autopsy

photographs, and by the fact that the drawstring never has been recovered. Finally, Troup's

statements about Defendant B. Garcia ordering the murder corresponds with several other

cooperators' testimony, and is corroborated by Leroy Lucero's testimony at the 104-type hearing

that Defendant B. Garcia would have been the leader of SNMCF when he arrived shortly before

---

[3] Troup also admitted his participation in the Freddie Sanchez murder to Frederico Muñoz in front of Javier
Alonso while they were incarcerated together.

the murders and, under SNM rules, would've had to order the murders for them to take place at all. Thus, there are a wealth of corroborating circumstances that "'give[] the judge some assurance—when added to the fact that the statement was against the declarant's interest—that the declarant was telling the truth.'" Draft Findings at 108 (quoting 4 Saltzburg et al., *supra*, § 804.02[9]).

These same or similar corroborating circumstances and assurances of truthfulness adhere in each of the declarants' statements that Defendant B. Garcia contests in his B. Garcia Brief.

For example, in paragraph 1(c), Defendant B. Garcia contests the admissibility as a statement against penal interest the exact same declarant's statement under the same circumstances that the Court already concluded properly is admissible. The only difference is that Defendant Troup made this statement to Samuel Gonzales. But Samuel Gonzales, like James Garcia, is an SNM member. Defendant Troup's statement to Gonzales about his participation in the 2001 murder of Pancho, like his statement of the same to James Garcia, was made while they were incarcerated together. So this statement to Gonzales, like the same statement by Defendant Troup to James Garcia, is "sufficiently against Troup's penal interest [such that it is] admissible under rule 804(b)(3)." Draft Findings at 107.

Likewise, Defendant B. Garcia contests the admissibility of the same statement by Defendant Troup to SNM member Fred Quintana. *See* B. Garcia Brief ¶ 1(f). As Quintana testified during the April 4-5 hearings, Defendant Troup stated to Quintana that he killed "Pancho." Quintana explained that, like Defendant Troup's statements to James Garcia at the barbecue in 2012, Quintana and Defendant Troup were out on "the streets" at the time.  So looking to the factors for corroborating circumstances, this is another consistent statement by the same declarant under different circumstances (Defendant Troup was incarcerated when he told

5

James Garcia and Gonzales about his participation in this murder, and was not incarcerated when he told Quintana). Moreover, looking to "whether the declarant had a motive to lie," Draft Findings at 104, Quintana testified that Defendant Troup told Quintana about his participation in Pancho's murder in an attempt to have Quintana relay this message to another SNM member, Richie Gallegos, in hopes that Richie Gallegos (incarcerated in the BOP at the time) would call off the SNM hit on Defendant Troup's brother. And Quintana said that, if Defendant Troup was lying about his participation in the murder, Quintana would have been killed and Defendant Troup would have been killed. So Defendant Troup had no motive to lie, and had a serious motive to tell the truth -- it would have preserved the lives of Quintana, Defendant Troup's brother, and Defendant Troup himself. Thus, the Court should conclude properly that there are sufficient corroborating circumstances to "give[] the judge some assurance—when added to the fact that the statement was against the declarant's interest—that the declarant was telling the truth." Draft Findings at 108 (quotation marks & citation omitted).

The same analysis adheres to the consistency with which the Defendants, including Defendant Troup, and also Defendants Christopher Chavez, Joe Gallegos, and others, made statements against their penal interests to other SNM members.

Getting back to the B. Garcia Brief, Defendant B. Garcia does not apply correctly this analysis to the Defendants' statements against their penal interests. In paragraphs 2-5, Defendant B. Garcia asserts that several witnesses testified that the Defendant-declarants' statements to them didn't include that Defendant B. Garcia ordered the murders. And while that may be true, it does not follow that "[a]ny statements by the codefendants to these five witnesses that are admitted, must be accompanied by a limiting obstruction [sic] preventing such evidence from being used against Billy Garcia as they would be admitted solely as statements by a party

opponent and would be inadmissible solely against that party and not Billy Garcia." B. Garcia

Brief ¶ 5. These statements aren't "admitted solely as statements by a party opponent." *Id.*

Rather, all of these statements by Defendant Troup, Defendant Chavez, Defendant Gallegos, and

others, properly are admissible under Rule 804(b)(3) as statements against penal interest. *Contra*

B. Garcia Brief ¶¶ 8, 9, 10, 11.[4] Because Rule 804(b)(3) is an exception to the rule against

hearsay, that evidence comes in as any other non-hearsay evidence, and a limiting instruction

would be improper. The United States Supreme Court made clear that introduction of a co-

defendant's statement that merely tends to corroborate other evidence inculpating a co-defendant

does not offend the Constitution.

---

[4] Defendant B. Garcia asserts that "[t]he government put on no evidence establishing either that Chavez implicated Billy Garcia or establishing a foundation under Fed. R. Evid. 804 (b) (3)." B. Garcia Brief ¶ 10. Elsewhere he asserts that, "[a]lthough the government objected to a Fed. R. Evid. 104 hearing . . . of the statements made to the eleven witnesses, both parties participated in the hearings, examined the witnesses, admitted exhibits and had an opportunity to present evidence." *Id.* ¶ 4. And he asserts: "For witnesses Phillip Gonzales, Samuel Gonzales, Robert Lovato and Julian Romero, Billy Garcia proceeded through the introduction and admission of exhibits setting forth their statements. The government chose not to present any additional evidence regarding statements by codefendants to those four individuals." *Id.* ¶ 7.

It certainly appears from these assertions that Defendant B. Garcia suggests to the Court that the United States somehow waived these statements' admission into evidence, and/or he suggests that the evidence of one witness at these hearings is cabined to that witness and not admissible to the other statements Defendant B. Garcia contests in his several pleadings. If indeed those are Defendant B. Garcia's assertions, they're without a basis in fact or law for at least two reasons.

First, James Garcia's failure to answer truthfully the questions asked under oath is probative whether SNM members refuse to cooperate with law enforcement. That evidence from James Garcia applies to every single statement that Defendant B. Garcia contests in so far as, because the declarants would anticipate that all SNM members would act as James Garcia did, and refuse to snitch or tell when called to testify about these incriminating statements, the declarants wouldn't say something incriminating to an SNM member unless they believed it was true. *See* Fed. R. Evid. 804(b)(3)(A). Similarly, Leroy Lucero's testimony that all SNM members know that there is the potential that a certain SNM member might at some point cooperate with law enforcement -- in relation to Defendant Gallegos's question to him whether he was concerned that Lawrence Torres might tell law enforcement that he saw Defendant Gallegos participate in the murder -- is probative whether *all of these* incriminating statements "'when made . . . had so great a tendency . . . to expose the declarant to civil or criminal liability.'" Draft Findings at 103 (quoting Fed. R. Evid. 804(b)(3)(A)).

Second, the United States was against this 104 hearing on Defendant B. Garcia's targeted response in the first place, because the United States pointed out to the Court that, just like any other exception to or exclusion from the rule against hearsay, the United States, as the evidence's proponent, bears the burden to establish its admissibility at trial. The United States' position has been consistent that, as with any evidence (and any other hearsay exception or exclusion), this foundation should be laid at trial, and not through a 104 hearing. But the Court disagreed, stating on April 4 that it found this preview of the evidence helpful. Nevertheless, the Court in its Draft Findings points out that whether these statements are admissible at trial under Rule 804(b)(3) as statements against penal interest "is an issue that the Court will need to assess in light of the other evidence introduced at trial." Draft Findings at 108 (citing Fed. R. Evid. 804(b)(3)(B)).

DNM 934

At bottom, just as the Court concluded that Defendant Troup's admissions to James Garcia "indicating that he killed Sanchez and Castillo are sufficiently against Troup's penal interest [such that they are ] admissible under rule 804(b)(3), so too are the same types of admissions by the other SNM co-Defendants to other SNM members and associates under the same circumstances. The Court properly should admit those statements made under virtually identical corroborating circumstances as statements against penal interests.

The United States disagrees with the Court's conclusion that "Troup's statement indicating that B. Garcia ordered the Castillo murder is not, however, sufficiently self-inculpatory." Draft Findings at 107-08. To support this draft finding, the Court cites to two quotations from the Supreme Court's decision in *Williamson v. United States*, 512 U.S. 594, 599 (1994). But neither of those quotations support this finding.

That "rule 804(b)(3) 'covers only those declarations or remarks within the confession that are individually self inculpatory,'" and that "'[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory-parts,'" Draft Findings at 107-08 (original alteration & citation omitted), do not exclude Defendant Troup's statement that Defendant B. Garcia ordered the Garza and Castillo murders. Notably, those directions from the Supreme Court don't direct the Court to exclude the less-self-inculpatory statements when there exist more-self-inculpatory statements alongside them. Take, for example, the hypothetical situation in which Defendant Troup is charged in this same case with the same murders under the same circumstances. But instead of admitting to James Garcia that he participated in Castillo's murder, he says to James Garcia only that he's an SNM member, that Garza and Castillo are SNM members, that he was in the pod with Castillo, and that Defendant B. Garcia ordered the murders. In that hypothetical, the statement that Defendant

B. Garcia ordered the murders would be admissible under Rule 804(b)(3) as a statement against penal interest. It would be admissible as such because the other trial evidence will show these were SNM murders (because of who was killed by whom and in what ways), that SNM members carried out SNM murders, and that the highest-ranking SNM member in the pod calls these murders. Moreover, Defendant Troup's admission that Defendant B. Garcia -- a high-ranking SNM member -- called these murders tends to expose him to criminal liability under VICAR and RICO, because it negates the defense that these murders were personal beefs or prison fights unrelated to the SNM. Thus, removing Defendant Troup's more-self-inculpatory admissions, there is no doubt that these other statements about Defendant Troup being an SNM member, being in the pod with Castillo and same facility as Garza, and that Defendant B. Garcia ordered the murders, "are individually self inculpatory,'" and certainly not "non-self-inculpatory-parts'" of his confession. Draft Findings at 107-08 (internal quotation marks & citation omitted). Defendant Troup's statement to James Garcia that Defendant B. Garcia ordered the murders is, therefore, admissible under Rule 804(b)(3) as a statement against penal interest, especially in this VICAR prosecution.

    Finally, in relation to Paragraph 6, the United States does not seek to admit Defendant Chavez's statement to Mirka as a statement against penal interest. Rather, if the United States seeks to introduce this evidence at trial, this statement is admissible under Rule 803(3) as a statement of Defendant Chavez's then-existing state of mind. Defendant B. Garcia misinterprets the context of this statement. Defendant Chavez told Mirka that he was SNM and that Defendant B. Garcia *currently* "'runs the car' and all of the defendants planned to stick together." Mirka FBI 302 [Doc. 2009-2] at 2. So this statement shows Defendant Chavez's intent in making

9

statements to Josh Mirka at all: he intends to stick together with the SNM and Defendant B.

Garcia is the leader of those in the SNM currently.

## **CONCLUSION**

The Court properly concluded that Defendant Troup's statements to James Garcia about

his participation in the murders of Sanchez and Castillo are admissible under Rule 804(b)(3) as

statements against penal interest. The Court properly should apply that conclusion to the same

incriminating statements that other Defendants made to other SNM members and associates. The

Court, therefore, should deny Defendant B. Garcia's targeted response pleadings in Docs. 1909,

2009, and 2085, to the extent that he attempts to limit these statements against the declarants'

penal interest.

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States, Acting
Under Authority Conferred by 28 U.S.C. §
515
**Electronically filed on 4/7/2018**
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/
MATTHEW M. BECK
Assistant United States Attorney

DNM 937

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON,** | ) | |
| **JOE GALLEGOS,** | ) | |
| **EDWARD TROUP, a.k.a. "Huero** | ) | |
| **Troup,"** | ) | |
| **BILLY GARCIA, a.k.a. "Wild Bill,"** | ) | |
| **ALLEN PATTERSON,** | ) | |
| **CHRISTOPHER CHAVEZ, a.k.a.** | ) | |
| **"Critter,"** | ) | |
| **ARTURO ARNULFO GARCIA, a.k.a.** | ) | |
| **"Shotgun," and** | ) | |
| **ANDREW GALLEGOS, a.k.a. "Smiley,"** | ) | |
| | ) | |
| Defendants. | ) | |

## **UNITED STATES' SUPPLEMENTAL EXHIBIT LIST**

The United States of America hereby submits the attached list of exhibits for the convenience of the Court and counsel, and without waiving the right to introduce different or additional exhibits, to be used during trial.

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515

**_Electronically filed on 4/9/2018_**
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 - Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

2

# UNITED STATES v. ANGEL DELEON, et al., 15-CR-4268 JB

## GOVERNMENT'S EXHIBIT LIST TRIAL II

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| | **COUNT 2 Murder of R.G.** | | | | |
| 1. | Video of victim R.G.'s Crime Scene | | | | |
| 2. | White washcloth with suspected blood found in cell 2211, Allen Patterson's cell | | | | |
| 3. | White bunk sheet with apparent blood stains from victim R.G.'s cell | | | | |
| 4. | Bed sheet from floor with apparent blood stain from victim R.G.'s cell | | | | |

DNM 940

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 5. | Pillow case from bunk with apparent blood stain from victim R.G.'s cell | | | | |
| 6. | Shoe impression from sheet bunk from victim R.G.'s cell | | | | |
| 7. | Pair of white Nike shoes with shoe laces from victim R.G.'s cell | | | | |
| 8. | White towel with red stains taken from cell 2215, Eugene Martinez's cell | | | | |
| 9. | Underpants, shorts and socks taken off victim R.G.'s body | | | | |
| 10. | Pair of green pants and belt taken off victim R.G.'s body | | | | |

2

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 11. | Photo of overview of housing unit O-1 at SNMCF | | | | |
| 12. | Photo of overview of cell location for R.G. homicide | | | | |
| 13. | Photo of overview of cell location for R.G. homicide | | | | |
| 14. | Photo of seal on cell door | | | | |
| 15. | Photo of overview of cell & victim R.G. from cell window | | | | |
| 16. | Photo of overview of cell & victim R.G. from cell window | | | | |

3

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 17. | Photo of overview of cell from cell window | | | | |
| 18. | Photo of victim R.G.'s lower legs | | | | |
| 19. | Photo of victim R.G. | | | | |
| 20. | Photo of overview of victim R.G.'s desk | | | | |
| 21. | Photo of victim R.G.'s bedding on cell floor | | | | |
| 22. | Photo of victim R.G.'s shoes & articles under the desk | | | | |

4

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 23. | Photo of overview of cell & victim R.G. | | | | |
| 24. | Photo of pod facing outwards from victim R.G.'s cell | | | | |
| 25. | Photo of victim R.G.'s desk | | | | |
| 26. | Photo of blood stain located on victim R.G.'s bed | | | | |
| 27. | Close-up photo of victim R.G.'s left hand | | | | |
| 28. | Photo of tattoos on victim R.G.'s back | | | | |

DNM 944

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 29. | Photo of victim R.G.'s tattoos on his back | | | | |
| 30. | Photo of blood on victim R.G.'s bed marked as A | | | | |
| 31. | Photo of blood stain on victim R.G.'s sheet marked as B | | | | |
| 32. | Photo of victim R.G. & blood stain on victim R.G.'s bed | | | | |
| 33. | Photo of victim R.G. & blood stains on victim R.G.'s bed & pillow | | | | |
| 34. | Photo of ligature impression on victim R.G.'s neck | | | | |

DNM 945

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 35. | Close-up photo of ligature impression & marks on victim R.G.'s neck | | | | |
| 36. | Photo of shoe imprint marked as E & blood stains marked as D on victim R.G.'s bed | | | | |
| 37. | Photo of victim R.G.'s shoes & shoe laces marked as F | | | | |
| 38. | Photo of shoe imprint with shoe taken from under victim R.G.'s desk | | | | |
| 39. | Photo of victim R.G.'s eye | | | | |
| 40. | Photo of victim R.G.'s eye | | | | |

7

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 41. | Close-up photo of white towel with reddish stains | | | | |
| 42. | Close-up photo of white paper napkin with red stains | | | | |
| 43. | Photo of the overview of the white pillowcase | | | | |
| 44. | Close-up photo of white pillow case with reddish stain | | | | |
| 45. | Close-up photo of pillow case with writing (#2218) | | | | |
| 46. | Photo of overview of bed sheet | | | | |

DNM 947

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 47. | Photo toilet paper roll with shoelace string inside it | | | | |
| 48. | Photo of toilet paper roll & shoelace string | | | | |
| 49. | Photo of shoelace string with knots on each end | | | | |
| 50. | Photo of wash hand towel | | | | |
| 51. | Photo of laundry bag with writing(Leroy Lucero) | | | | |
| 52. | OMI Photo of New Mexico State Police sheet regarding victim R.G.'s autopsy | | | | |

9

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 53. | OMI Photo of victim R.G.'s torso | | | | |
| 54. | OMI Photo of victim R.G.'s head | | | | |
| 55. | OMI Photo of the inside of victim R.G.'s lips | | | | |
| 56. | OMI Photo victim R.G.'s legs | | | | |
| 57. | OMI Photo of victim R.G.'s right elbow | | | | |
| 58. | OMI Photo of victim R.G.'s left hand | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling |
|---|---|---|---|---|---|
| 59. | OMI close-up photo of victim R.G.'s neck | | | | |
| 60. | OMI photo of incision on right elbow of victim R.G | | | | |
| 61. | OMI photo wounds on victim R.G.'s neck | | | | |
| 62. | OMI photo of abrasions on victim R.G.'s neck | | | | |
| 63. | OMI photo of abrasions on victim R.G.'s neck | | | | |
| 64. | OMI photo of victim R.G.'s back | | | | |

11

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 65. | OMI Photo of victim R.G.'s legs | | | | | |
| 66. | OMI photo of victim R.G.'s hand | | | | | |
| 67. | OMI photo of the back of victim R.G.'s neck | | | | | |
| 68. | OMI Diagram of Injuries for victim R.G. | | | | | |
| 69. | OMI Report of Findings for victim R.G. | | | | | |
| 70. | OMI Report of Death for victim R.G. | | | | | |

DNM 951

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 71. | OMI Autopsy Report for victim R.G. | | | | | |
| 72. | Curriculum Vitae for Dr. Ross Zumwalt | | | | | |
| 73. | Diagram of Housing Unit O1, Yellow Pod, cell 1118 | | | | | |
| 74. | Diagram of Housing Unit O1, Yellow Pod, cell 1118 | | | | | |
| 75. | Diagram of O-One Unit | | | | | |
| 76. | Timeline regarding the homicide of victim R.G. | | | | | |

13

DNM 952

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 77. | Flowchart of defendants' involved in R.G.'s homicide | | | | | |
| 78. | Photo of victim R.G. | | | | | |
| 79. | Penitentiary Pack for victim R.G. | | | | | |
| 80. | Security Threat Intelligence Unit File for victim R.G. | | | | | |
| 81. | Penitentiary Pack for Billy Garcia | | | | | |
| 82. | Security Threat Intelligence Unit File for Billy Garcia | | | | | |

14

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 83. | Offender Location History for Billy Garcia | | | | | |
| 84. | Photo of Billy Garcia | | | | | |
| 85. | Penitentiary Pack for Allen Patterson | | | | | |
| 86. | Security Threat Intelligence Unit File for Allen Patterson | | | | | |
| 87. | Offender Location History for Allen Patterson | | | | | |
| 88. | Photo of Allen Patterson | | | | | |

15

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 89. | Photo of Allen Patterson | | | | | |
| 90. | Penitentiary Pack for Christopher Chavez | | | | | |
| 91. | Security Threat Intelligence Unit File for Christopher Chavez | | | | | |
| 92. | Offender Location History for Christopher Chavez | | | | | |
| 93. | Photo of Christopher Chavez | | | | | |
| 94. | Photo of Christopher Chavez | | | | | |

16

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 95. | Penitentiary Pack for Leonard Lujan | | | | | |
| 96. | Security Threat Intelligence Unit File for Leonard Lujan | | | | | |
| 97. | Offender Location History for Leonard Lujan | | | | | |
| 98. | Plea Agreement for Leonard Lujan | | | | | |
| 99. | Addendum to Plea Agreement for Leonard Lujan | | | | | |
| 100. | Presentence Report for Leonard Lujan | | | | | |

17

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 101. | Photo of Leonard Lujan | | | | | |
| 102. | Penitentiary Pack for Eugene Martinez | | | | | |
| 103. | Security Threat Intelligence Unit File for Eugene Martinez | | | | | |
| 104. | Offender Location History for Eugene Martinez | | | | | |
| 105. | Plea Agreement for Eugene Martinez | | | | | |
| 106. | Addendum to Plea Agreement for Eugene Martinez | | | | | |

DNM 957

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 107. | Photo of Eugene Martinez | | | | | |
| 108. | Photo of Eugene Martinez | | | | | |
| 109. | Photo of Eugene Martinez | | | | | |
| 110. | Photo of Eugene Martinez | | | | | |
| 111. | Penitentiary Pack for Leroy Lucero | | | | | |
| 112. | Security Threat Intelligence Unit File for Leroy Lucero | | | | | |

19

DNM 958

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 113. | Offender Location History for Leroy Lucero | | | | | |
| | **COUNT 2 Murder of F.C.** | | | | | |
| 114. | Victim F.C.'s crime scene video | | | | | |
| 115. | Torn letter found in trash receptacle in victim F.C.'s cell | | | | | |
| 116. | Mattress sheet with blood from victim F.C.'s cell | | | | | |
| 117. | Sheet with blood from victim F.C.'s cell | | | | | |

DNM 959

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 118. | Blanket with blood from victim F.C.'s cell | | | | | |
| 119. | White cord and cotton sweat cap with a red stain | | | | | |
| 120. | Fishnet laundry bag with clothing article inside it | | | | | |
| 121. | Underpants, grey shorts and socks taken off of victim F.C.'s body | | | | | |
| 122. | Photo of the New Mexico State Police Criminal Investigation Sheet for victim F.C. Homicide | | | | | |
| 123. | Photo of the outside of P-1 at Southern New Mexico Correctional Facility | | | | | |

DNM 960

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 124. | Photo of the F.C. Crime Scene (Pod Tiers) | | | | | |
| 125. | Photo of the F.C. Crime Scene (Stairs) | | | | | |
| 126. | Photo of the F.C. Crime Scene (Pod Door 2204 sealed) | | | | | |
| 127. | Photo of victim F.C. | | | | | |
| 128. | Photo of item found in F.C.'s trash receptacle | | | | | |
| 129. | Photo of item found in F.C.'s trash receptacle marked as item A | | | | | |

DNM 961

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 130. | Photo of victim F.C. | | | | | |
| 131. | Photo of victim F.C.'s knees | | | | | |
| 132. | Photo of victim F.C.'s knees | | | | | |
| 133. | Photo of victim F.C. | | | | | |
| 134. | Close-up photo of victim F.C. | | | | | |
| 135. | Photo of blood on victim F.C.'s sheet and blanket. | | | | | |

DNM 962

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 136. | Photo of victim F.C.'s cell | | | | | |
| 137. | Photo of victim F.C.'s cell | | | | | |
| 138. | Photo of victim F.C. | | | | | |
| 139. | Photo of victim F.C. | | | | | |
| 140. | Photo of victim F.C. | | | | | |
| 141. | Items found on victim F.C.'s desk in his cell | | | | | |

DNM 963

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 142. | Close-up photo of victim F.C. | | | | | |
| 143. | Photo of the Control Center in the Pod | | | | | |
| 144. | Close-up photo of paper found in F.C.'s trash receptacle | | | | | |
| 145. | Photo of victim F.C. | | | | | |
| 146. | Photo of victim F.C. | | | | | |
| 147. | Photo of NMSP Sheet regarding autopsy of victim F.C. | | | | | |

DNM 964

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 148. | OMI photo of victim F. C.'s head and torso with ligature and mesh bag | | | | | |
| 149. | OMI photo of victim F.C.'s legs | | | | | |
| 150. | OMI photo of victim F.C.'s back of head and neck with ligature and mesh bag | | | | | |
| 151. | OMI photo of victim F.C.'s back of head and neck with ligature and mesh bag | | | | | |
| 152. | OMI photo of victim F.C.'s blood stained mesh bag | | | | | |
| 153. | OMI photo of pathologist cutting ligature off of victim F.C. | | | | | |

DNM 965

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 154. | OMI photo of ligature and attached blood stained gray clothe | | | | | |
| 155. | OMI close-up photo of ligature and attached blood stained gray clothe | | | | | |
| 156. | OMI close-up photo of ligature and attached blood stained gray clothe | | | | | |
| 157. | OMI photo of victim F.C.' head and neck | | | | | |
| 158. | OMI close-up photo of victim F.C.'s neck | | | | | |
| 159. | OMI photo of back of victim F.C.'s head and neck | | | | | |

DNM 966

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 160. | OMI close-up photo of back of victim F.C.'s head and neck | | | | | |
| 161. | OMI close-up photo of victim F.C.'s inside of lip | | | | | |
| 162. | OMI photo of victim F.C.'s left leg | | | | | |
| 163. | OMI photo of victim F.C.'s left foot | | | | | |
| 164. | OMI photo of victim F.C.'s right forearm | | | | | |
| 165. | OMI photo of victim F.C.'s right knee | | | | | |

DNM 967

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 166. | OMI Diagram of Injuries for victim F.C. | | | | | |
| 167. | OMI Report of Findings for victim F.C. | | | | | |
| 168. | OMI Report of Death for victim F.C. | | | | | |
| 169. | OMI Autopsy Report for victim F.C. | | | | | |
| 170. | Diagram of P-1 Green Pod – F.C. homicide | | | | | |
| 171. | Diagram of P-One Unit | | | | | |

DNM 968

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 172. | Timeline of the day of the homicide of victim F.C. | | | | | |
| 173. | Flowchart of defendants' involved in F.C.'s homicide | | | | | |
| 174. | Photo of victim F.C. | | | | | |
| 175. | Penitentiary Pack for victim F.C. | | | | | |
| 176. | Security Threat Intelligence Unit File for victim F.C. | | | | | |
| 177. | Offender Location History for victim F.C. | | | | | |

30

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 178. | Penitentiary Pack for Joe Lawrence Gallegos | | | | | |
| 179. | Security Threat Intelligence Unit File for Anthony Joe Lawrence Gallegos | | | | | |
| 180. | Offender Location History for Joe Gallegos | | | | | |
| 181. | Photo of Joe Lawrence Gallegos | | | | | |
| 182. | Penitentiary Pack for Edward Troup | | | | | |
| 183. | Security Threat Intelligence Unit File for Edward Troup | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 184. | Offender Location History for Edward Troup | | | | | |
| 185. | Photo of Edward Troup | | | | | |
| 186. | Photo of Edward Troup | | | | | |
| 187. | Photo of Edward Troup | | | | | |
| 188. | Photo of Edward Troup | | | | | |
| 189. | Photo of Edward Troup | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 190. | Photo of Edward Troup | | | | | |
| 191. | Photo of Edward Troup | | | | | |
| | **COUNT 3 Murder of F.S.** | | | | | |
| 192. | Pillow case with padding containing blood taken from cell 113, victim F.S.'s cell | | | | | |
| 193. | Bottom sheet from bed containing red stain taken from cell 113, victim F.S.'s cell | | | | | |
| 194. | Top sheet from bed containing red stain taken from cell 113, victim F.S.'s cell | | | | | |

DNM 972

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 195. | Cloth ligatures taken from trash in cell 112 | | | | | |
| 196. | White boxer shorts with red stain taken from cell 114 | | | | | |
| 197. | Sweat pants taken from victim F.S.'s body | | | | | |
| 198. | Underpants taken from victim F.S.'s body | | | | | |
| 199. | Photo of victim F.S. | | | | | |
| 200. | Photo of cell 113 & victim F.S. | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 201. | Photo of victim F.S. | | | | | |
| 202. | NMSP Sheet re vicitim F.S. homicide | | | | | |
| 203. | Photo of victim F.S.'s cell | | | | | |
| 204. | Photo of victim F.S.. | | | | | |
| 205. | Photo of victim F.S. & his cell | | | | | |
| 206. | Photo of victim F.S. & his cell | | | | | |

35

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 207. | Photo of victim F.S.'s cell. | | | | | |
| 208. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 209. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 210. | Photo of overview of victim F.S.'s desk area | | | | | |
| 211. | Photo of blood drops on floor of vicitm F.S.'s cell | | | | | |
| 212. | Photo of victim F.S. | | | | | |

DNM 975

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 213. | Photo of victim F.S | | | | | |
| 214. | Photo of victim F.S. | | | | | |
| 215. | Photo of victim F.S.'s shoes under his bunk | | | | | |
| 216. | Photo of blood stain on victim F.S.'s bunk frame | | | | | |
| 217. | Photo of blood drops on floor of victim F.S.'s cell | | | | | |
| 218. | Photo of victim F.S.'s personal items on his desk | | | | | |

DNM 976

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 219. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 220. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 221. | Photo of victim F.S.'s personal items on his desk | | | | | |
| 222. | Photo of victim F.S.'s legs & shoes | | | | | |
| 223. | Photo of victim F.S. | | | | | |
| 224. | Photo of red stains on victim F.S.'s cell floor | | | | | |

DNM 977

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 225. | Photo of victim F.S.'s personal belongings | | | | | |
| 226. | Photo of victim F.S. | | | | | |
| 227. | Close-up photo of wound on victim F.S.'s neck | | | | | |
| 228. | Photo of victim F.S. and blood stains on his bed | | | | | |
| 229. | Close-up photo of wounds on victim F.S.'s neck | | | | | |
| 230. | Photo of victim F.S. and blood stains on his bed | | | | | |

DNM 978

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 231. | Close-up photo of wounds on victim F.S.'s neck | | | | | |
| 232. | Photo of victim F.S.'s bed with markers | | | | | |
| 233. | Photo of victim F.S.'s shoes with marker | | | | | |
| 234. | Photo of victim F.S.'s shoes with markers | | | | | |
| 235. | Close-up photo of blood stain on victim F.S.' bed frame | | | | | |
| 236. | Photo of trash bag filled with trash and marker | | | | | |

40

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 237. | Photo of cell 114 | | | | | |
| 238. | Photo of underpants with red stains taken from cell 114 | | | | | |
| 239. | Photo of underpants with red stains taken from cell 114 | | | | | |
| 240. | Photo of cell 116 | | | | | |
| 241. | Photo of underpants with red stains & marker | | | | | |
| 242. | Photo of towel with red stain taken from cell 116 | | | | | |

DNM 980

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 243. | Photo of black glove with marker taken from cell 116 | | | | | |
| 244. | Photo of tennis shoes with marker from cell 116 | | | | | |
| 245. | Photo of boots with marker from cell 114 | | | | | |
| 246. | Photo of sheet from cell 116 | | | | | |
| 247. | Photo of tiers in Pod 1A-B | | | | | |
| 248. | Photo of Pod 1A-B | | | | | |

DNM 981

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 249. | Photo of Pod 1A-B | | | | | |
| 250. | Photo of Rascon | | | | | |
| 251. | Photo of Javier Alonso | | | | | |
| 252. | Photo of Javier Alonso's hands | | | | | |
| 253. | Photo of Javier Alonso's palms | | | | | |
| 254. | Photo of victim F.S.'s eye | | | | | |

43

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 255. | Photo of victim F.S. in his cell | | | | | |
| 256. | Photo of victim F.S. | | | | | |
| 257. | Photo of victim F.S. | | | | | |
| 258. | Photo of victim F.S. | | | | | |
| 259. | Photo of victim F.S. | | | | | |
| 260. | Photo of victim F.S. | | | | | |

DNM 983

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 261. | Photo of vicitm F.S. | | | | | |
| 262. | Photo of victim F.S.'s eye | | | | | |
| 263. | Photo of wounds on victim F.S.'s neck | | | | | |
| 264. | Photo of victim F.S. & blood stains on bed | | | | | |
| 265. | Photo of victim F.S. | | | | | |
| 266. | Photo of victim F.S.'s OMI tag | | | | | |

DNM 984

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|----------|----------------------|-------|--------|------|--------|---|
| 267. | OMI photo of victim F.S. | | | | | |
| 268. | OMI Photo of victim F.S.'s torso | | | | | |
| 269. | OMI Photo of victim F.S.'s midsection | | | | | |
| 270. | OMI photo of victim F.S.'s legs | | | | | |
| 271. | OMI photo of victim F.S.'s feet | | | | | |
| 272. | OMI Photo of victim F.S.'s neck wounds | | | | | |

DNM 985

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 273. | OMI photo of victim F.S.'s neck wounds | | | | | |
| 274. | OMI photo of right side showing victim F.S.'s neck wounds | | | | | |
| 275. | OMI photo of left side showing victim F.S.'s neck wounds | | | | | |
| 276. | OMI photo of right side showing victim F.S.'s neck wounds | | | | | |
| 277. | OMI Diagram of Injuries for victim F.S. | | | | | |
| 278. | OMI Report of Findings for victim F.S. | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 279. | OMI Report of Death for victim F.S. | | | | | |
| 280. | OMI Autopsy Report for victim F.S. | | | | | |
| 281. | Diagram of Housing Unit 1-A | | | | | |
| 282. | Timeline of the day of the homicide of victim F.S. | | | | | |
| 283. | Flowchart of defendants' involved in F.S.'s homicide | | | | | |
| 284. | Photo of victim F.S. | | | | | |

48

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 285. | Penitentiary Pack for victim F.S. | | | | | |
| 286. | Security Threat Intelligence Unit File for victim F.S. | | | | | |
| 287. | Offender Location History for victim F.S. | | | | | |
| 288. | Penitentiary Pack for Arturo Garcia | | | | | |
| 289. | Security Threat Intelligence Unit File for Arturo Garcia | | | | | |
| 290. | Offender Location History for Arturo Garcia | | | | | |

DNM 988

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 291. | Penitentiary Pack for Benjamin Clark | | | | | |
| 292. | Security Threat Intelligence Unit File for Benjamin Clark | | | | | |
| 293. | Offender Location History for Benjamin Clark | | | | | |
| 294. | Plea Agreement for Benjamin Clark | | | | | |
| 295. | Addendum to Plea Agreement for Benjamin Clark | | | | | |
| 296. | Presentence Report for Benjamin Clark | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 297. | Photo of Benjamin Clark | | | | | |
| 298. | Photo of Benjamin Clark | | | | | |
| 299. | Photo of Benjamin Clark | | | | | |
| 300. | Penitentiary Pack for Javier Alonso | | | | | |
| 301. | Security Threat Intelligence Unit File for Javier Alonso | | | | | |
| 302. | Offender Location History for Javier Alonso | | | | | |

DNM 990

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 303. | Plea Agreement for Javier Alonso | | | | | |
| 304. | Addendum to Plea Agreement for Javier Alonso | | | | | |
| 305. | Photo of Javier Alonso | | | | | |
| 306. | Photo of Javier Alonso | | | | | |
| 307. | Photo of Javier Alonso | | | | | |
| 308. | Photo of Javier Alonso | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 309. | Photo of Javier Alonso | | | | | |
| 310. | Photo of Javier Alonso | | | | | |
| 311. | Photo of Javier Alonso | | | | | |
| 312. | Photo of Javier Alonso | | | | | |
| 313. | Penitentiary Pack for Ruben Hernandez | | | | | |
| 314. | Security Threat Intelligence Unit File for Ruben Hernandez | | | | | |

DNM 992

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 315. | Offender Location History for Ruben Hernandez | | | | | |
| 316. | Plea Agreement for Ruben Hernandez | | | | | |
| 317. | Addendum to Plea Agreement for Ruben Hernandez | | | | | |
| 318. | Presentence Report for Ruben Hernandez | | | | | |
| 319. | Photo of Ruben Hernandez | | | | | |
| 320. | Photo of Ruben Hernandez | | | | | |

DNM 993

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 321. | Photo of Ruben Hernandez | | | | | |
| 322. | Photo of Ruben Hernandez | | | | | |
| 323. | Penitentiary Pack for Brian Rascon | | | | | |
| 324. | Security Threat Intelligence Unit File for Brian Rascon | | | | | |
| 325. | Offender Location History for Brian Rascon | | | | | |
| 326. | Penitentiary Pack for Raymond Rascon | | | | | |

DNM 994

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 327. | Security Threat Intelligence Unit File for Raymond Rascon | | | | | |
| 328. | Offender Location History for Raymond Rascon | | | | | |
| | **COUNTS 4 and 5, Conspiracy to Murder and Murder of A.B.** | | | | | |
| 329. | Aerial crime scene video taken on November 13, 2012 by New Mexico State Police | | | | | |
| 330. | Plastic Allsups bag used to cover victim A.B.'s head | | | | | |
| 331. | Allsups' #165 receipt dated November 12, 2012 | | | | | |

DNM 995

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 332. | Victim A.B.'s socks | | | | | |
| 333. | Other clothing fragments from victim A.B.'s body | | | | | |
| 334. | Victim A.B.'s undershirt | | | | | |
| 335. | Victim A.B.'s shirt | | | | | |
| 336. | Victim A.B.'s pants | | | | | |
| 337. | Victim A.B.'s jacket | | | | | |

57

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 338. | GIANT Computer printout of fuel purchase by Andrew Gallegos 2 | | | | | |
| 339. | Letters written by Joe Gallegos and miscellaneous documents | | | | | |
| 340. | Methadone bottle in Joe Gallegos' name and spoon with residue | | | | | |
| 341. | Box of cartridges and casings of different calibers taken from Joe Gallegos' property | | | | | |
| 342. | One (1) .22 caliber casing | | | | | |
| 343. | Charred black plaid jacket found in Joe Gallegos' van | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 344. | Letters to Andrew Gallegos, a.k.a. "Smiley" and documents found in the Imperial Inn motel room | | | | | |
| 345. | Samsung cellphone Model – SCH-R631, Serial No. 268435460108209247 | | | | | |
| 346. | One (1) cellphone retrieved from Imperial Inn motel room | | | | | |
| 347. | Three (3) cellphones retrieved from Imperial Inn motel room | | | | | |
| 348. | Cellphone unknown type | | | | | |
| 349. | Gun cleaning kit | | | | | |

DNM 998

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 350. | Partially burned denim fabric | | | | | |
| 351. | Charred camouflage jacket | | | | | |
| 352. | Earring, rubber band and chain fragments collected from victim A.B.'s body | | | | | |
| 353. | Two (2) grey tank tops with burns on them | | | | | |
| 354. | Burnt handcuffs removed from victim A.B. | | | | | |
| 355. | Handcuffs and case recovered from White Pickup (NM 229RLC) | | | | | |

DNM 999

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 356. | One (1) gun holster | | | | | |
| 357. | PNM utility documents belonging to Joe Gallegos | | | | | |
| 358. | Photo of the burnt car & victim A.B.'s burnt body | | | | | |
| 359. | Photo of the burnt car & victim A.B's burnt body | | | | | |
| 360. | Photo of burnt car & victim A.B.'s burnt body | | | | | |
| 361. | Photo of victim A.B.'s burnt body | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 362. | Photo of the trunk of the burnt car | | | | | |
| 363. | Photo of the burnt car | | | | | |
| 364. | Photo of the interior of the burnt car | | | | | |
| 365. | Photo of objects marked at the crime scene | | | | | |
| 366. | Photo of a plastic bottle marked as 1 | | | | | |
| 367. | Photo of a Dr Pepper can marked as 2 | | | | | |

DNM 1001

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 368. | Photo of plastic bottle with fluid marked as 3 | | | | | |
| 369. | Photo of burnt can marked as 4 | | | | | |
| 370. | Photo of burnt debris marked as 5 | | | | | |
| 371. | Photo of evidence at the crime scene marked as 6 | | | | | |
| 372. | Photo of the crime scene | | | | | |
| 373. | Photo of a zip tie marked as 7 | | | | | |

DNM 1002

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|----------|----------------------|-------|--------|------|--------|--|
| 374. | Photo of victim A.B.'s burnt hands | | | | | |
| 375. | Photo of victim A.B.'s burnt body | | | | | |
| 376. | Photo of victim A.B.'s head partially in the plastic bag | | | | | |
| 377. | Photo of victim A.B.'s burnt, bloody face | | | | | |
| 378. | Photo of victim A.B. | | | | | |
| 379. | Photo of the side view of victim A.B. | | | | | |

DNM 1003

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 380. | Photo of Dr Pepper can marked as 8. | | | | | |
| 381. | Photo of burnt debris marked as 1 | | | | | |
| 382. | OMI photo of burnt clothing | | | | | |
| 383. | OMI Photo of burnt clothing | | | | | |
| 384. | OMI photo of tag on victim A.B.'s wrist | | | | | |
| 385. | OMI photo of victim A.B.'s burnt body & clothing | | | | | |

DNM 1004

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 386. | OMI photo of victim A.B.'s burnt body & clothing | | | | | |
| 387. | OMI Photo of victim A.B.'s burnt hands handcuffed behind his back | | | | | |
| 388. | OMI photo of handcuffs on victim A.B. | | | | | |
| 389. | OMI Photo of victim A.B.'s burnt body | | | | | |
| 390. | OMI photo of a bullet hole near victim A.B.'s ear | | | | | |
| 391. | OMI photo of bullet hole near victim A.B.'s ear | | | | | |

DNM 1005

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 392. | OMI photo of a gash on victim A.B.'s brow | | | | | |
| 393. | OMI photo of a gash on victim A.B.'s brow and forehead | | | | | |
| 394. | OMI photo of victim A.B.'s burnt leg | | | | | |
| 395. | OMI photo of victim A.B.'s burnt torso | | | | | |
| 396. | OMI photo of burnt handcuffs removed from victim A.B.'s body | | | | | |
| 397. | OMI photo of fragments of victim A.B.'s belt | | | | | |

DNM 1006

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 398. | OMI photo of victim A.B.'s burnt clothing | | | | | |
| 399. | OMI Diagram of Injuries for victim A.B. | | | | | |
| 400. | OMI Report of Findings for victim A.B. | | | | | |
| 401. | OMI Report of Death for victim A.B. | | | | | |
| 402. | OMI Autopsy Report for victim A.B. | | | | | |
| 403. | Curriculum Vitae for Dr. Ian Paul | | | | | |

DNM 1007

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 404. | Photo of the crime scene | | | | | |
| 405. | Photo of the crime scene | | | | | |
| 406. | Photo of the crime scene with markers | | | | | |
| 407. | Photo of the burnt car | | | | | |
| 408. | Photo of the burnt car | | | | | |
| 409. | Photo of the burnt car | | | | | |

DNM 1008

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 410. | Photo of the burnt car & body of victim A.B. | | | | | |
| 411. | Photo of victim A.B.'s burnt body | | | | | |
| 412. | Photo of victim A.B.'s burnt body | | | | | |
| 413. | Photo of victim A.B.'s burnt body | | | | | |
| 414. | Close-up photo of victim A.B.'s burnt body | | | | | |
| 415. | Photo of victim A.B.'s burnt hands handcuffed behind his back | | | | | |

70

DNM 1009

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 416. | Photo of victim A.B.'s head partially covered by the plastic bag | | | | | |
| 417. | Photo of victim A.B.'s burnt body and clothing | | | | | |
| 418. | Photo of victim A.B. | | | | | |
| 419. | Photo of charred camouflage jacket | | | | | |
| 420. | Close-up photo of the charred portion of the jacket | | | | | |
| 421. | Photo of suspect's residence | | | | | |

71

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 422. | Photo of vehicle in front of suspect's residence | | | | | |
| 423. | Photo of vehicle on suspect's property | | | | | |
| 424. | Photo of vehicles on suspect's property | | | | | |
| 425. | Photo of vehicle on suspect's property | | | | | |
| 426. | Photo of suspect's residence | | | | | |
| 427. | Photo of suspect's residence | | | | | |

DNM 1011

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 428. | Photos of vehicles in front of suspect's residence | | | | | |
| 429. | Photo of vehicle in front of suspect's residence | | | | | |
| 430. | Photo of suspect's residence | | | | | |
| 431. | Photo of suspect's residence | | | | | |
| 432. | Photo of inside of suspect's residence | | | | | |
| 433. | Photo of inside of suspect's residence | | | | | |

DNM 1012

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 434. | Photo of inside of suspect's residence | | | | | |
| 435. | Photo of box of cartridges of different calibers inside suspect's residence marked as 1 | | | | | |
| 436. | Photo of glass bottle and cellphone inside suspect's residence marked as 2 & 3 | | | | | |
| 437. | Close-up photo of glass bottle marked as 2 | | | | | |
| 438. | Close-up photo of cellphone marked as 3 | | | | | |
| 439. | Photo of PNM utility bill in Joe Gallegos' name marked as 4 | | | | | |

74

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 440. | Photo of cellphone marked as 5 | | | | | |
| 441. | Close-up photo of cellphone marked as 5 | | | | | |
| 442. | Photo of evidence marked as 6 | | | | | |
| 443. | Photo of charred camouflage jacket marked as 7 | | | | | |
| 444. | Photo of methadone bottle in Joe Gallegos' name and spoon with residue marked as 8 | | | | | |
| 445. | Photo of gun cleaning kit marked as 9 | | | | | |

DNM 1014

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 446. | Photo of evidence marked as 10 | | | | | |
| 447. | Photo of gun holster marked as 11 | | | | | |
| 448. | Close-up photo of gun holster marked as 11 | | | | | |
| 449. | Photo of items on back of suspect's flatbed truck | | | | | |
| 450. | Photo of red gas can marked as 12 | | | | | |
| 451. | Close-up photo of red gas can | | | | | |

DNM 1015

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 452. | Photo of faded gas can marked as 13 | | | | | |
| 453. | Photo of red gas can marked as 14 | | | | | |
| 454. | Photo of vehicle driver's door marked as 16 | | | | | |
| 455. | Photo of evidence in driver side vehicle door marked as 16 | | | | | |
| 456. | Photo of handcuffs and holster from suspect's vehicle marked as 16 | | | | | |
| 457. | Photo of handcuffs and holster marked as 16 | | | | | |

DNM 1016

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 458. | Close-up photo of handcuffs | | | | | |
| 459. | Photo of red gas can marked as 17 | | | | | |
| 460. | Photo of documents located in suspect's vehicle marked as 18 | | | | | |
| 461. | Photo of white truck seized from suspect's property | | | | | |
| 462. | Photo of white truck seized from suspect's property | | | | | |
| 463. | Photo of white truck seized from suspect's property | | | | | |

DNM 1017

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|----------|----------------------|-------|--------|------|--------|---|
| 464. | Photo of white truck seized from suspect's property | | | | | |
| 465. | Photo of evidence tape on white truck seized from suspect's property | | | | | |
| 466. | Photo of items in the bed of the white truck seized from suspect's property | | | | | |
| 467. | Photo of white truck at processing | | | | | |
| 468. | Photo of items in the back of the white truck at processing | | | | | |
| 469. | Photo of the interior of the white truck at processing | | | | | |

DNM 1018

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 470. | Photo of interior of white truck at processing | | | | | |
| 471. | Photo of evidence in white truck marked as 1 at processing | | | | | |
| 472. | Evidence inside white truck marked as 2 at processing | | | | | |
| 473. | Evidence inside white truck marked as 2 at processing | | | | | |
| 474. | Photo of Allsup's receipt marked as 3 at processing | | | | | |
| 475. | Photo of gas cans from white truck at processing | | | | | |

DNM 1019

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 476. | Photo of evidence in white truck at processing | | | | | |
| 477. | Photo of evidence in white truck marked as 4 at processing | | | | | |
| 478. | Photo of evidence in white truck marked as 5 at processing | | | | | |
| 479. | Photo of stained rag found in white truck at processing | | | | | |
| 480. | Photo of stain on seat in white truck marked as 7 at processing | | | | | |
| 481. | Photo of gas cans in bed of white truck at processing | | | | | |

DNM 1020

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 482. | Photo of red gas can from white truck at processing | | | | | |
| 483. | Photos of items from white truck marked as 8 at processing | | | | | |
| 484. | Photo of red gas can marked as 9 | | | | | |
| 485. | Photo of Joe Gallegos' van & Angela Gallegos' jeep at Imperial Inn parking lot | | | | | |
| 486. | Photo of Joe Gallegos' van & Angela Gallegos' jeep at Imperial Inn parking lot | | | | | |
| 487. | Photo of Imperial Inn sign | | | | | |

DNM 1021

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 488. | Photo of Angela Gallegos' car at Imperial Inn parking lot | | | | | |
| 489. | Photo of Imperial Inn rooms | | | | | |
| 490. | Photo of Imperial Inn hallway | | | | | |
| 491. | Photo of door 239 at Imperial Inn | | | | | |
| 492. | Photo of inside of room 239 | | | | | |
| 493. | Photo of inside of room 239 | | | | | |

DNM 1022

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 494. | Photo of inside of room 239 | | | | | |
| 495. | Photo of bed in room 239 | | | | | |
| 496. | Photo of ice chest in room 239 | | | | | |
| 497. | Photo of items in room 239 | | | | | |
| 498. | Photo of cellphone in room 239 marked as 1 | | | | | |
| 499. | Photo of inside of room 239 | | | | | |

DNM 1023

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 500. | Photo of evidence found in room 239 marked as 2 | | | | | |
| 501. | Photo of evidence found in room 239 marked as 3 | | | | | |
| 502. | Photo of evidence found in room 239 marked as 5 | | | | | |
| 503. | Photo Items found in room 239 | | | | | |
| 504. | Photo of evidence found in room 239 marked as 4 | | | | | |
| 505. | Photo of letters found in room 239 | | | | | |

DNM 1024

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 506. | Photo of letter found in room 239 | | | | | |
| 507. | Photo of letter to Andrew Gallegos, a.k.a. Smiley found in room 239 | | | | | |
| 508. | Photo of letter found in room 239 | | | | | |
| 509. | Photo of envelope addressed to Andrew Gallegos from Frankie Gallegos found in room 239 | | | | | |
| 510. | Photo of evidence found in room 239 | | | | | |
| 511. | Photo of the inside of Angela Gallegos' vehicle | | | | | |

DNM 1025

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 512. | Photo of inside of room 239 | | | | | |
| 513. | Photo of evidence found in Angela Gallegos' vehicle marked as 9 | | | | | |
| 514. | Photo of evidence in Angela Gallegos' vehicle marked as 10 | | | | | |
| 515. | Photo of cellphones in Angela Gallegos' vehicle marked as 7 | | | | | |
| 516. | Photo of evidence found in Angela Gallegos' vehicle marked as 8 | | | | | |
| 517. | Photo of evidence in Angela Gallegos' vehicle marked as 9 | | | | | |

DNM 1026

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 518. | Photo of letter | | | | | |
| 519. | Photo of letter | | | | | |
| 520. | Photo of letter | | | | | |
| 521. | Photo of a men's grey tank top | | | | | |
| 522. | Photo of Joe Gallegos' van at processing | | | | | |
| 523. | Photo of items inside of Joe Gallegos' van marked as 11 | | | | | |

DNM 1027

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 524. | Photo of evidence in Joe Gallegos' van marked as 12 | | | | | |
| 525. | Photo of evidence found in Joe Gallegos' van marked as 13 | | | | | |
| 526. | Photo of athletic pants taken from Joe Gallegos' van | | | | | |
| 527. | Photo of charred black plaid jacket taken from Joe Gallegos' van | | | | | |
| 528. | Photo of evidence found in Joe Gallegos' van marked as 14 | | | | | |
| 529. | Photo of red stains on pants taken from Joe Gallegos' van | | | | | |

89

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 530. | Photo of U.S. 60, mile marker 167.5 | | | | | |
| 531. | Photo of U.S. 60, mile marker 167.5 & river | | | | | |
| 532. | Photo of riverbed | | | | | |
| 533. | Photo of firearm found in river | | | | | |
| 534. | Photo of firearm found in riverbed | | | | | |
| 535. | Photo of firearm found in river | | | | | |

DNM 1029

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 536. | Photo of firearm found in river marked as 1 | | | | | |
| 537. | Photo of bullet in the chamber | | | | | |
| 538. | Penitentiary Pack for Andrew Gallegos | | | | | |
| 539. | Security Threat Intelligence Unit File for Andrew Gallegos | | | | | |
| 540. | Offender Location History for Andrew Gallegos | | | | | |
| 541. | Photo of Andrew Gallegos | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 542. | Photo of Andrew Gallegos | | | | | |
| | **COUNT 13 Assault of J.G. With a Dangerous Weapon** | | | | | |
| 543. | Photo of Branden Chavez's Charger | | | | | |
| 544. | Photo of Branden Chavez's Charger | | | | | |
| 545. | Photo of Branden Chavez's Charger | | | | | |
| 546. | Photo of the inside of Branden Chavez's Charger | | | | | |

DNM 1031

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 547. | Photo of the inside of Branden Chavez's Charger | | | | | |
| 548. | Photo of the backseat of Branden Chavez's Charger | | | | | |
| 549. | Photo of the inside of Branden Chavez's Charger | | | | | |
| **COUNTS 14, 15 and 16, Conspiracy to Murder J.G., Attempted Murder, Assault With a Dangerous Weapon Resulting in Serious Bodily Injury of J.G., and Tampering With a Witness, Victim or Informant by Physical Force or Threat** | | | | | | |
| 550. | Photo of residence where the assault took place on victim J.G. | | | | | |
| 551. | Photo of residence where assault took place on victim J.G. | | | | | |

DNM 1032

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 552. | Photo of residence where assault took place on victim J.G. | | | | | |
| 553. | Photo of inside of residence where assault took place on victim J.G. | | | | | |
| 554. | Photo of blood stains from assault on victim J.G. | | | | | |
| 555. | Close-up photo of blood stains from assault on victim J.G. | | | | | |
| 556. | Close-up photo of blood from assault on victim J.G. | | | | | |
| 557. | Photo of blood stain from assault on victim J.G. marked as 1 | | | | | |

DNM 1033

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 558. | Photo of blood from assault on victim J.G. marked as 2 | | | | | |
| 559. | Photo of blood from assault on victim J.G. marked as 2 | | | | | |
| 560. | Photo of blood from assault on victim J.G. | | | | | |
| 561. | Photo of the room where the assault on victim J.G. took place | | | | | |
| 562. | Photo of suspect's residence | | | | | |
| 563. | Photo of victim J.G. | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 564. | Photo of victim J.G. | | | | | |
| 565. | Photo of victim J.G. | | | | | |
| 566. | Photo of victim J.G. | | | | | |
| 567. | Photo of victim J.G.'s head wound | | | | | |
| 568. | Photo of injuries to victim J.G.'s hand | | | | | |
| 569. | Photo of residence where assault on victim J.G. occurred | | | | | |

DNM 1035

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 570. | Photo of white van used in the assault of victim J.G. | | | | | |
| 571. | Photo of the inside of the white van | | | | | |
| 572. | Photo of items inside the white van | | | | | |
| 573. | Photo of machete found in the white van | | | | | |
| 574. | Photo of the white van's door | | | | | |
| 575. | Audio of a jail call between Shauna Gutierrez and female (1) | | | | | |

97

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 576. | Audio of a jail call between Shauna Gutierrez and female (2) | | | | | |
| 577. | Penitentiary Pack for Paul Rivera | | | | | |
| 578. | Security Threat Intelligence Unit File for Paul Rivera | | | | | |
| 579. | Offender Location History for Paul Rivera | | | | | |
| 580. | Plea Agreement for Paul Rivera | | | | | |
| 581. | Addendum to Plea Agreement for Paul Rivera | | | | | |

DNM 1037

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 582. | Presentence Report for Paul Rivera | | | | | |
| | **Enterprise** | | | | | |
| 583. | Photo of Vincent Garduno (RICO Discovery) | | | | | |
| 584. | Photo of Vincent Garduno (RICO Discovery) | | | | | |
| 585. | Letter from Arturo Garcia to Robert Martinez dated 03-06-2008 (RICO Discovery) | | | | | |
| 586. | Letter from Arturo Garcia to Gerald Archuleta dated 07-25-2008 (RICO Discovery) | | | | | |

DNM 1038

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 587. | Letter from Arturo Garcia to Gildardo Rodriguez dated 08-08-2008 (RICO Discovery) | | | | | |
| 588. | Letter from Arturo Garcia to Mario Rodriguez dated 03-31-2010 (RICO Discovery) | | | | | |
| 589. | Letter from Arturo Garcia to Mario Rodriguez dated 05-04-2010 (RICO Discovery) | | | | | |
| 590. | Letter from Billy Garcia to Ricky Valdespino (RICO Discovery) | | | | | |
| 591. | SNM Group Photo | | | | | |
| 592. | SNM Group Photo | | | | | |

100

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 593. | SNM Group Photo | | | | | |
| 594. | SNM Group Photo | | | | | |
| 595. | SNM Group Photo | | | | | |
| 596. | Penitentiary Pack for Timothy Martinez | | | | | |
| 597. | Security Threat Intelligence Unit File for Timothy Martinez | | | | | |
| 598. | Offender Location History for Timothy Martinez | | | | | |

DNM 1040

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 599. | Plea Agreement for Timothy Martinez | | | | | |
| 600. | Addendum to plea agreement for   Timothy Martinez | | | | | |
| 601. | Presentence Report for Timothy Martinez | | | | | |
| 602. | Penitentiary Pack for Jerry Montoya | | | | | |
| 603. | Security Threat Intelligence Unit File for Jerry Montoya | | | | | |
| 604. | Offender Location History for Jerry Montoya | | | | | |

DNM 1041

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 605. | Plea Agreement for Jerry Montoya | | | | | |
| 606. | Addendum to plea agreement for Jerry Montoya | | | | | |
| 607. | Penitentiary Pack for Mario Rodriguez | | | | | |
| 608. | Security Threat Intelligence Unit File for Mario Rodriguez | | | | | |
| 609. | Offender Location History for Mario Rodriguez | | | | | |
| 610. | Plea Agreement for Mario Rodriguez | | | | | |

DNM 1042

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 611. | Penitentiary Pack for Mario Montoya | | | | | |
| 612. | Security Threat Intelligence Unit File for Mario Montoya | | | | | |
| 613. | Offender Location History for Mario Montoya | | | | | |
| 614. | Information for Mario Montoya | | | | | |
| 615. | Plea Agreement for Mario Montoya | | | | | |
| 616. | Addendum to plea agreement for Mario Montoya | | | | | |

DNM 1043

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 617. | Penitentiary Pack for Robert Martinez | | | | | |
| 618. | Security Threat Intelligence Unit File for Robert Martinez | | | | | |
| 619. | Offender Location History for Robert Martinez | | | | | |
| 620. | Plea Agreement for Robert Martinez | | | | | |
| 621. | Addendum to plea agreement for Robert Martinez | | | | | |
| 622. | Penitentiary Pack for Roy Martinez | | | | | |

DNM 1044

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 623. | Security Threat Intelligence Unit File for Roy Martinez | | | | | |
| 624. | Offender Location History for Roy Martinez | | | | | |
| 625. | Plea Agreement for Roy Martinez | | | | | |
| 626. | Addendum to plea agreement for Roy Martinez | | | | | |
| 627. | Presentence Report for Roy Martinez | | | | | |
| 628. | Penitentiary Pack for Gerald Archuleta | | | | | |

106

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 629. | Security Threat Intelligence Unit File for Gerald Archuleta | | | | | |
| 630. | Offender Location History for Gerald Archuleta | | | | | |
| 631. | Plea Agreement for Gerald Archuleta | | | | | |
| 632. | Addendum to plea agreement for Gerald Archuleta | | | | | |
| 633. | Penitentiary Pack for Jacob Armijo | | | | | |
| 634. | Security Threat Intelligence Unit File for Jacob Armijo | | | | | |

DNM 1046

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 635. | Offender Location History for Jacob Armijo | | | | | |
| 636. | Plea Agreement for Jacob Armijo | | | | | |
| 637. | Addendum to plea agreement for Jake Armijo | | | | | |
| 638. | Presentence Report for Jacob Armijo | | | | | |
| 639. | Addendum to Presentence Report for Jacob Armijo | | | | | |
| 640. | Penitentiary Pack for Frederico Munoz | | | | | |

DNM 1047

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 641. | Security Threat Intelligence Unit File for Frederico Munoz | | | | | |
| 642. | Offender Location History for Frederico Munoz | | | | | |
| 643. | Information for Frederico Munoz | | | | | |
| 644. | Plea Agreement for Frederico Munoz | | | | | |
| 645. | Addendum to plea agreement for Frederico Munoz | | | | | |
| 646. | Offender Location History for Rolando Garza | | | | | |

DNM 1048

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 647. | Video of Assault of victim F.S. (Disc 1) | | | | | |
| 648. | Video of Assault of victim F.S. (Disc 2) | | | | | |
| 649. | Aerial photo of Southern New Mexico Correctional Facility | | | | | |
| 650. | Level III IV VI Facility Layout - With Legend | | | | | |
| 651. | Photo of a letter addressed to Joe Gallegos located in the Charger | | | | | |
| 652. | Photo of handcuffs located in the Charger | | | | | |

110

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 653. | Photo of Timothy Martinez | | | | | |
| 654. | Photo of Timothy Martinez | | | | | |
| 655. | Photo of Timothy Martinez | | | | | |
| 656. | Photo of Timothy Martinez | | | | | |
| 657. | Photo of Timothy Martinez | | | | | |
| 658. | Photo of Timothy Martinez | | | | | |

111

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 659. | Photo of Timothy Martinez | | | | | |
| 660. | Photo of Jerry Montoya | | | | | |
| 661. | Photo of Jerry Montoya | | | | | |
| 662. | Photo of Jerry Montoya | | | | | |
| 663. | Photo of Jerry Montoya | | | | | |
| 664. | Photo of Jerry Montoya | | | | | |

DNM 1051

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 665. | Photo of Jerry Montoya | | | | | |
| 666. | Photo of Jerry Montoya | | | | | |
| 667. | Photo of Jerry Montoya | | | | | |
| 668. | Photo of Jerry Montoya | | | | | |
| 669. | Photo of Jerry Montoya | | | | | |
| 670. | Photo of Mario Rodriguez | | | | | |

DNM 1052

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 671. | Photo of Mario Rodriguez | | | | | |
| 672. | Photo of Mario Rodriguez | | | | | |
| 673. | Photo of Mario Rodriguez | | | | | |
| 674. | Photo of Mario Rodriguez | | | | | |
| 675. | Photo of Mario Rodriguez | | | | | |
| 676. | Photo of Mario Rodriguez | | | | | |

DNM 1053

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 677. | Photo of Mario Rodriguez | | | | | |
| 678. | Photo of Mario Rodriguez | | | | | |
| 679. | Photo of Mario Rodriguez | | | | | |
| 680. | Photo of Robert Martinez | | | | | |
| 681. | Photo of Robert Martinez | | | | | |
| 682. | Photo of Robert Martinez | | | | | |

DNM 1054

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 683. | Photo of Robert Martinez | | | | | |
| 684. | Photo of Robert Martinez | | | | | |
| 685. | Photo of Robert Martinez | | | | | |
| 686. | Photo of Robert Martinez | | | | | |
| 687. | Photo of Roy Martinez | | | | | |
| 688. | Photo of Roy Martinez | | | | | |

DNM 1055

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 689. | Photo of Roy Martinez | | | | | |
| 690. | Photo of Roy Martinez | | | | | |
| 691. | Photo of Roy Martinez | | | | | |
| 692. | Photo of Roy Martinez | | | | | |
| 693. | Photo of Gerald Archuleta | | | | | |
| 694. | Photo of Gerald Archuleta | | | | | |

117

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 695. | Photo of Gerald Archuleta | | | | | |
| 696. | Photo of Gerald Archuleta | | | | | |
| 697. | Photo of Gerald Archuleta | | | | | |
| 698. | Photo of Jake Armijo | | | | | |
| 699. | Photo of Jake Armijo | | | | | |
| 700. | Photo of Jake Armijo | | | | | |

DNM 1057

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 701. | Photo of Jake Armijo | | | | | |
| 702. | Photo of Jake Armijo | | | | | |
| 703. | Photo of Jake Armijo | | | | | |
| 704. | Photo of Jake Armijo | | | | | |
| 705. | Photo of Jake Armijo | | | | | |
| 706. | Photo of Frederico Munoz | | | | | |

119

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 707. | Photo of Frederico Munoz | | | | | |
| 708. | Photo of Frederico Munoz | | | | | |
| 709. | Photo of Frederico Munoz | | | | | |
| 710. | Photo of Frederico Munoz | | | | | |
| 711. | Photo of Frederico Munoz | | | | | |
| 712. | Photo of Frederico Munoz | | | | | |

DNM 1059

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 713. | Photo of Frederico Munoz | | | | | |
| 714. | Photo of Frederico Munoz | | | | | |
| 715. | Bernalillo County Metropolitan Detention Center housing records for Jacob Armijo | | | | | |
| 716. | Bernalillo County Metropolitan Detention Center housing records for Gerald Archuleta | | | | | |
| 717. | Bernalillo County Metropolitan Detention Center housing records for Bill Garcia | | | | | |
| 718. | Photo of Burnt car and victim A.B.'s burnt body (victim A.B.) | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 719. | Photo of victim A.B.'s burnt body (victim A.B.) | | | | | |
| 720. | Photo of victim A.B.'s burnt hands handcuffed (victim A.B.) | | | | | |
| 721. | Photo of the burnt car (victim A.B.) | | | | | |
| 722. | Photo of the interior of the burnt car (victim A.B.) | | | | | |
| 723. | Photo of crime scene with markers (victim A.B.) | | | | | |
| 724. | Photo of burnt clothing marked as 5 (victim A.B.) | | | | | |

DNM 1061

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 725. | Photo of crime scene with markers (victim A.B.) | | | | | |
| 726. | Photo of the burnt car (victim A.B.) | | | | | |
| 727. | Photo of victim A.B.'s burnt body (victim A.B.) | | | | | |
| 728. | Photo of burnt car (victim A.B.) | | | | | |
| 729. | Photo of burnt debris marked as 1(victim A.B.) | | | | | |
| 730. | Photo of suspect's vehicle (victim A.B.) | | | | | |

DNM 1062

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 731. | Photo of suspect's vehicle (victim A.B.) | | | | | |
| 732. | Photo of the flatbed of suspect's vehicle (victim A.B.) | | | | | |
| 733. | Photo of the inside of suspect's residence (victim A.B.) | | | | | |
| 734. | Photo of pink bag in suspect's residence marked as 1 (victim A.B.) | | | | | |
| 735. | Photo of the contents of the pink bag (victim A.B.) | | | | | |
| 736. | Photo evidence in suspect's residence marked as 2, 3, 4 & 5 (victim A.B.) | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 737. | Photo of Joe Gallegos' vehicle registration (victim A.B.) | | | | | |
| 738. | Photo of charred camouflage jacket marked as 7 (victim A.B.) | | | | | |
| 739. | Photo of evidence found in suspect's residence marked as 8 (victim A.B.) | | | | | |
| 740. | Photo of gun cleaning kit marked as 9 (victim A.B.) | | | | | |
| 741. | Photo of a gas can marked as 13 (victim A.B.) | | | | | |
| 742. | Photo of gas can marked as 14 (victim A.B.) | | | | | |

DNM 1064

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 743. | Photo of evidence on the flatbed truck marked as 15 (victim A.B.) | | | | | |
| 744. | Photo of evidence marked as 15 (victim A.B.) | | | | | |
| 745. | Photo of correspondence addressed to Andrew Gallegos (victim A.B.) | | | | | |
| 746. | Photo of evidence marked as 17 (victim A.B.) | | | | | |
| 747. | Audio of a jail call made by Arturo Garcia | | | | | |
| 748. | Audio of a jail call made by Arturo Garcia | | | | | |

DNM 1065

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 749. | Plea Agreement for Shauna Gutierrez | | | | | |
| 750. | Addendum to Plea Agreement for Shauna Gutierrez | | | | | |
| 751. | Photo of 26.8 gn missle | | | | | |
| 752. | Photo of 26.8 gn missle | | | | | |
| 753. | Billy Garcia's Offender History 01/01/1900 – 04/03/2018 | | | | | |
| 754. | Jail call made by Andrew Gallegos on May 7, 2015 | | | | | |

DNM 1066

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 755. | Jail call made by Andrew Gallegos on May 8, 2015 | | | | | |
| 756. | Jail call made by Andrew Gallegos on May 10, 2015 | | | | | |
| 757. | Jail call made by Andrew Gallegos on May 11, 2015 | | | | | |
| 758. | SNM Photo | | | | | |
| 759. | Diagram of victim A.B.'s crime scene | | | | | |
| 760. | Diagram of #4 Erin Court, Los Chavez | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 761. | T-Mobile Records | | | | | |
| 762. | T-Mobile Certificate of Authenticity | | | | | |
| 763. | Cricket Records | | | | | |
| 764. | Cricket Certificate of Authenticity | | | | | |
| 765. | Video provided by Southern New Mexico Correctional Facility of the assault on J.M. on 03-07-2014 | | | | | |
| 766. | Photo of victim J.R. after the assault on July 13, 2015 | | | | | |

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 767. | Photo of victim J.R.'s face after the assault on July 13, 2015 | | | | | |
| 768. | Photo of the right side of victim J.R.'s face after the assault on July 13, 2015 | | | | | |
| 769. | Close up photo of victim J.R.'s arm after the assault on July 13, 2015 | | | | | |
| 770. | Close up photo of victim J.R.'s left side of his face after the assault on July 13, 2015 | | | | | |
| 771. | Close up photo of victim J.R.'s right side of his face after the assault on July 13, 2015 | | | | | |
| 772. | Close up photo of victim J.R.'s face after the assault on July 13, 2015 | | | | | |

DNM 1069

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 773. | Photo of the back of victim J.R.'s head after the assault on July 13, 2015 | | | | | |
| 774. | Close up photo of victim J.R.'s forehead after the assault on July 13, 2015 | | | | | |
| 775. | Close up photo of the top of victim J.R.'s head after the assault on July 13, 2015 | | | | | |
| 776. | Close up photo of the victim J.R.'s arm after the assault on July 13, 2015 | | | | | |
| 777. | Photo of the blood smear on the wall and floor after the assault of victim J.R. on July 13, 2015 | | | | | |
| 778. | Photo of shorts and towel belonging to Conrad Villegas containing blood stains | | | | | |

DNM 1070

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 779. | Close up photo of shorts and towel belonging to Conrad Villegas containing blood stains | | | | | |
| 780. | Photo of shoes belonging to Conrad Villegas containing blood stains | | | | | |
| 781. | Gas can (victim A.B.) | | | | | |
| 782. | Audio of jail call made by Arturo Garcia | | | | | |
| 783. | Penitentiary Pack for Julian Romero | | | | | |
| 784. | Security Threat Intelligence Unit File for Julian Romero | | | | | |

132

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 785. | Offender Location History for Julian Romero | | | | | |
| 786. | Group photo including Julian Romero | | | | | |
| 787. | Penitentiary Pack for Billy Cordova | | | | | |
| 788. | Security Threat Intelligence Unit File for Billy Cordova | | | | | |
| 789. | Offender Location History for Billy Cordova | | | | | |
| 790. | Penitentiary Pack for Phillip Gonzales | | | | | |

133

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 791. | Security Threat Intelligence Unit File for Phillip Gonzales | | | | | |
| 792. | Offender Location History for Phillip Gonzales | | | | | |
| 793. | Plea Agreement for Phillip Gonzales | | | | | |
| 794. | Addendum to Plea Agreement for Phillip Gonzales | | | | | |
| 795. | Presentence Report for Phillip Gonzales | | | | | |
| 796. | Penitentiary Pack for Joseph Otero | | | | | |

DNM 1073

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 797. | Security Threat Intelligence Unit File for Joseph Otero | | | | | |
| 798. | Offender Location History for Joseph Otero | | | | | |
| 799. | Penitentiary Pack for Lawrence Torres | | | | | |
| 800. | Security Threat Intelligence Unit File for Lawrence Torres | | | | | |
| 801. | Offender Location History for Lawrence Torres | | | | | |
| 802. | Penitentiary Pack for Robert Lovato | | | | | |

135

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 803. | Security Threat Intelligence Unit File for Robert Lovato | | | | | |
| 804. | Offender Location History for Robert Lovato | | | | | |
| 805. | Information for Robert Lovato | | | | | |
| 806. | Plea Agreement for Robert Lovato | | | | | |
| 807. | Addendum to Plea Agreement for Robert Lovato | | | | | |
| 808. | Presentence Report for Robert Lovato | | | | | |

DNM 1075

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 809. | Penitentiary Pack for Willie Romero | | | | | |
| 810. | Security Threat Intelligence Unit File for Willie Romero | | | | | |
| 811. | Offender Location History for Willie Romero | | | | | |
| 812. | Penitentiary Pack for Samuel Gonzales | | | | | |
| 813. | Security Threat Intelligence Unit File for Samuel Gonzales | | | | | |
| 814. | Offender Location History for Samuel Gonzales | | | | | |

137

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 815. | Penitentiary Pack for Fred Quintana | | | | | |
| 816. | Security Threat Intelligence Unit File for Fred Quintana | | | | | |
| 817. | Offender Location History for Fred Quintana | | | | | |
| 818. | Plea Agreement for Fred Quintana | | | | | |
| 819. | Addendum to Plea Agreement for Fred Quintana | | | | | |
| 820. | Penitentiary Pack for John Montano | | | | | |

138

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 821. | Security Threat Intelligence Unit File for John Montano | | | | | |
| 822. | Offender Location History for John Montano | | | | | |
| 823. | Penitentiary Pack for Sammy Griego | | | | | |
| 824. | Security Threat Intelligence Unit File for Sammy Griego | | | | | |
| 825. | Offender Location History for Sammy Griego | | | | | |
| 826. | Photo of the Penitentiary of New Mexico Facility | | | | | |

DNM 1078

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 827. | Close up photo of the Penitentiary of New Mexico South Facility | | | | | |
| 828. | Close up photo of the Penitentiary of New Mexico North Facility | | | | | |
| 829. | Audio of conversation between Arturo Garcia and Sergio Rodriguez (RICO Discovery) | | | | | |
| 830. | Photo of the inside of suspect's residence (victim A.B.) | | | | | |
| 831. | Photo of the inside of suspect's residence (victim A.B.) | | | | | |
| 832. | Photo of red gas can (victim (A.B.) | | | | | |

140

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 833. | Photo of Andrew Gallegos' Driver's License found in Angela Gallegos' purse (victim A.B) | | | | | |
| 834. | Photo of tire in Angela Gallegos' vehicle (victim A.B.) | | | | | |
| 835. | Photo of the inside of Joe Gallegos' van (victim A.B.) | | | | | |
| 836. | Photo of athletic pants with reddish stain (victim A.B.) | | | | | |
| 837. | Close up photo of athletic pants with reddish stain (victim A.B.) | | | | | |
| 838. | Photo of Southern New Mexico Correctional Facility | | | | | |

141

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 839. | Penitentiary Pack for victim J.G. | | | | | |
| 840. | Security Threat Intelligence Unit File for victim J.G. | | | | | |
| 841. | Offender Location History for victim J.G. | | | | | |
| 842. | Penitentiary Pack for Ray Molina | | | | | |
| 843. | Security Threat Intelligence Unit File for Ray Molina | | | | | |
| 844. | Offender Location History for Ray Molina | | | | | |

DNM 1081

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 845. | Penitentiary Pack for Steven Morales | | | | | |
| 846. | Security Threat Intelligence Unit File for Steven Morales | | | | | |
| 847. | Offender Location History for Steven Morales | | | | | |
| 848. | Penitentiary Pack for Joe Martinez | | | | | |
| 849. | Security Threat Intelligence Unit File for Joe Martinez | | | | | |
| 850. | Offender Location History for Joe Martinez | | | | | |

DNM 1082

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 851. | Jail call made by Andrew Gallegos on May 20, 2015 | | | | | |
| 852. | Jail call made by Andrew Gallegos on May 22, 2015 | | | | | |
| 853. | | | | | | |
| 854. | | | | | | |
| 855. | | | | | | |
| 856. | | | | | | |

144

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 857. | | | | | | |
| 858. | | | | | | |
| 859. | | | | | | |
| 860. | | | | | | |
| 861. | | | | | | |
| 862. | | | | | | |

145

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 863. | | | | | | |
| 864. | | | | | | |
| 865. | | | | | | |
| 866. | | | | | | |
| 867. | | | | | | |
| 868. | | | | | | |

DNM 1085

| Exh. No. | Description Of Exhibit | Notes | Off'd? | Obj? | Ruling | |
|---|---|---|---|---|---|---|
| 869. | | | | | | |
| 870. | | | | | | |

DNM 1086

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al,

Defendants.

---

## MOTION IN LIMINE REGARDING THE TESTIMONY OF
## AGENT ACEE

---

Billy Garcia, through counsel, hereby moves in limine to prevent the
following areas of testimony by Agent Acee during the trial.

1.     During the trial of codefendants Baca, Perez, Sanchez and
Herrera, Agent Acee testified about several objectionable areas which were
not objected to by counsel.  In order that the same objectionable areas are
not introduced in the current trial the defense files these objections.

2.     Fed. R. Evid. 103 (d) states, "To the extent practicable, the
court must conduct a jury trial so that inadmissible evidence is not suggested
to the jury by any means."

3.     During the earlier trial, Agent Acee testified that there were concerns with providing defendants with paper copies of discovery and the concern that the distribution of paper discovery will result in harm to witnesses.  This testimony is improper character evidence.  There is no evidence that Mr. Billy Garcia has threatened any witness or made any contacts with anyone to tamper with any witness.

4.     During the earlier trial, Agent Acee testified that he shares information with the USMS in order to segregate cooperators from defendants.  This evidence is also improper character evidence and is irrelevant.

5.     During the earlier trial, Agent Acee testified that Kastigar letters are designed to ensure witnesses to speak honestly and freely.  The government's intentions are not relevant in this trial. It is also improper vouching. A prosecuting attorney may not offer any "improper suggestions, insinuations, and, especially, assertions of personal knowledge," regarding the credibility of government witnesses, as these "are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1932); *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980) ("Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate

DNM 1088

that information not presented to the jury supports the witness's testimony.")

(citing *Lawn v. United States*, 355 U.S. 339, 359-60 n. 15 (1958)). Vouching

poses the danger that the jury may decide the case based upon the

government's judgment, rather than on an independent consideration of the

evidence. *United States v. Young*, 470 U.S. 1, 18-19 (1985) (reversing where

prosecutor not only vouched for prosecution witness but invoked the

integrity of the court" and thus "placed the imprimatur of the judicial system

itself on [the witness's] testimony."); "Vouching is especially problematic in

cases where the credibility of the witnesses is crucial." *Roberts*, 618 F.2d at

533.[1]

      6.     During the earlier trial, Agent Acee testified that Level 6 of

PNM was reserved for inmates who create risk of violence and were at risk.

It is believed that the government will be eliciting evidence that Billy Garcia

was housed at PNM level 6.  Such evidence would, again, be improper

character evidence.

      7.     During the earlier trial, Agent Acee testified regarding the

credibility or believability of certain witnesses such as Billy Cordova. The

---

[1] In the first trial the defense did object and the court overruled the objection.
The defense, however, did not raise concerns over improper vouching but
merely objected based on speculation.

DNM 1089

defense arguably opened the door to this area of questioning. Such evidence is inadmissible vouching evidence.

8.     During the earlier trial, Agent Acee testified concerning his belief that a cooperator was guilty or not guilty of certain crimes.  Agent Acee's opinion regarding such is irrelevant, is based on inadmissible evidence and is based on testimonial hearsay and therefore should not be the subject of Agent Acee's testimony.

9.     During the earlier trial, Agent Acee testified that certain cooperators were "walking dead men." Such a comment is a play of the fears of jurors and introduces an arbitrary factor into the case. It is also improper expert opinion and Agent Acee has not been endorsed as an expert.

10.     All trial two defendants join in this motion. It is assumed that, because the government elicited this testimony in the first trial, they object.

11.     Absent a ruling in advance of Agent Acee testifying, the defense requests that if the government intends on offering the above areas of testimony that they approach the bench and obtain an advance ruling concerning admissibility.


Respectfully submitted this 9th day of April, 2018.


4

/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for B.  Garcia (5)

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2018, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.

/s/ James A. Castle
James A. Castle

DNM 1091

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON, et al,

Defendants.

---

## OBJECTIONS TO GOVERNMENT'S EXHIBITS (DOC. NO. 1979 and 2088)

---

Defendant Billy Garcia and the remaining trial two defendants jointly object to the government's exhibits as set forth below:

1.      As the defense has not yet had the opportunity to review the government's actual exhibits in detail, this written objection should not be considered to be a comprehensive list of all so that the parties and the Court may satisfy with the aspirations of Fed. R. Evid. 103 that, "[t]o the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." See also Fed. R. Evid. 104 (c) ("The court must conduct any hearing on a preliminary question so that the jury cannot hear it if: (1) the

1

hearing involves the admissibility of a confession; (2) a defendant in a criminal case is a witness and so requests; or (3) justice so requires.)[1]

2.      Exhibits 76, 77, 172, 173, 282, 283 purport to be "timelines" and "flowcharts" of the events regarding counts 1-3.  These documents constitute hearsay, testimonial statements in violation of the sixth amendment right to confrontation and are argumentative.

3.      Exhibits 81, 85, 90, 178, 182, 288, 538 purport to be the "penitentiary packs" of defendants Billy Garcia, Allen Patterson, Christopher Chavez, Joseph Gallegos, Edward Troup, Arturo Garcia, and Andrew Gallegos, respectively. These materials constitute hearsay and testimonial statements in violation of the sixth amendment right to confrontation and should be excluded under Fed. R. Evid. 403. The defendants also object to certain portions of the "penitentiary packs" of the government's witnesses.

4.      Exhibits 82, 86, 91, 179, 183, 289, 539 purport to be the "Security Threat Intelligence Unit" files of defendants Billy Garcia, Allen Patterson, Christopher Chavez, Joseph Gallegos, Edward Troup, Arturo Garcia, and Andrew Gallegos, respectively. These materials constitute hearsay and testimonial statements in violation of the sixth amendment right to confrontation and should be

---

[1] The defense did receive a disk with the government's exhibits at 5:00 PM on today's date, but given the number of exhibits, the defense has not yet been able to review them with any degree of particularity.

DNM 1093

excluded under Fed. R. Evid. 403. The defendants' also object to certain portions of the "Security Threat Intelligence Unit" files of the government's witnesses.

5.      Defendant Billy Garcia objects to exhibit 590 due to lack of authentication, relevance and under Fed. R. Evid. 403.

6.      The defendants object to exhibits 591-595 based on a lack of foundation, relevancy and under Fed. R. Evid. 403.

7.      Billy Garcia objects to exhibit 753 based on previously raised sixth amendment confrontation grounds.

8.      The government has listed numerous photos as exhibits without specificity.  The defense has just received these exhibits this evening and will make objections at the time that such exhibits are offered.

9.      The defendants reiterate their objections to portions of the cooperating witnesses' plea agreements as redacted copies have not been provided or reviewed as required by this Court's prior rulings.


Respectfully submitted this 9th day of April, 2018.



/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)

3

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 9th, 2017, I presented the foregoing to the Clerk of
the Court for filing and uploading to the CM/ECF system which will send
notification of such filing to counsel of record.


/s/ James A. Castle
James A. Castle

DNM 1095

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CLERK'S MINUTES

### BEFORE DISTRICT JUDGE JAMES O. BROWNING (IN LAS CRUCES)

| | | | |
|---|---|---|---|
| **CASE NO.:** | No. CR 15-4268 JB | **DATES:** | April 9 – May 22, 2018 |
| **CASE CAPTION:** | *USA v. DeLeon, et al.* | **TOTAL TIME:** | 225 hours 21 min |
| **CRD:** | C. Bevel | **COURT REPORTER:** | J. Bean |

**MONDAY, APRIL 9, 2018**

| **COURT IN SESSION:** | 8:27 a.m. | **COURT IN RECESS:** | 8:50 a.m. = :23 |
|---|---|---|---|
| | 9:03 a.m. | | 9:04 a.m. = :01 |
| | 9:17 a.m. | | 9:22 a.m. = :05 |
| | 10:20 a.m. | | 12:22 p.m. = 2:02 |
| | 1:36 p.m. | | 3:23 p.m. = 1:42 |
| | 3:41 p.m. | | 5:34 p.m. = 1:53 |
| | | | **TOTAL = 7:08** |

**TUESDAY, APRIL 10, 2018**

| **COURT IN SESSION:** | 8:29 a.m. | **COURT IN RECESS:** | 10:03 a.m. = 1:34 |
|---|---|---|---|
| | 10:23 a.m. | | 12:06 p.m. = 1:43 |
| | 1:13 p.m. | | 2:51 p.m. = 1:38 |
| | 3:12 p.m. | | 4:54 p.m. = 1:42 |
| | 5:08 p.m. | | 5:31 p.m. = :23 |
| | | | **TOTAL = 7:00** |

**WEDNESDAY, APRIL 11, 2018**

| **COURT IN SESSION:** | 8:32 a.m. | **COURT IN RECESS:** | 10:08 a.m. = 1:36 |
|---|---|---|---|
| | 10:27 a.m. | | 12:21 p.m. = 1:54 |
| | 1:21 p.m. | | 2:27 p.m. = 1:54 |
| | 3:16 p.m. | | 3:54 p.m. = .38 |
| | 4:56 p.m. | | 5:30 p.m. = 1:04 |
| | | | **TOTAL = 9:06** |

**THURSDAY, APRIL 12, 2018**

| **COURT IN SESSION:** | 8:23 a.m. | **COURT IN RECESS:** | 10:15 a.m. = 1:47 |
|---|---|---|---|
| | 10:29 a.m. | | 11:56 p.m. = 1:27 |
| | 1:05 p.m. | | 2:31 p.m. = 1:26 |
| | 2:51 p.m. | | 4:18 p.m. = 1:27 |
| | 4:34 p.m. | | 5:31 p.m. = .57 |
| | | | **TOTAL = 6.57** |

**FRIDAY, APRIL 13, 2018**

| **COURT IN SESSION:** | | **COURT IN RECESS:** | |
|---|---|---|---|
| | 8:21 a.m. | | 9:48 a.m. = 1.27 |

|                         | 10:04 a.m.<br>11:45 a.m.<br>2:19  p.m.<br>4:02 p.m. |                        | 11:30 a.m. = 1.26<br>1:15 p.m. =1.30<br>3:50 p.m. =1.31<br>5:31 p.m. =1.29<br>**TOTAL = 7.22** |

**MONDAY, APRIL 16, 2018**

| **COURT IN SESSION:** | 8:23 a.m.<br>10:07 a.m.<br>11:46 a.m.<br>2:16 p.m.<br>4:07 p.m. | **COURT IN RECESS:** | 9:47 p.m. =1.24<br>11:23 p.m. = 1.16<br>1:16 p.m. = 1.30<br>3:48 p.m.1.32<br>5:29 p.m. 1.22<br>**TOTAL = 6.54** |

**TUESDAY, APRIL 17, 2018**

| **COURT IN SESSION:** | 8:22 a.m.<br>10:05 a.m.<br>11:50 a.m.<br>2:14 p.m.<br>4:05 p.m. | **COURT IN RECESS:** | 9:48 a.m. = 1.26<br>11:34 a.m. = 1.29<br>1:09 p.m. =1.19<br>3:47 p.m.= 1.33<br>5:31 p.m.= 1.26<br>**TOTAL = 7.13** |

**WEDNESDAY, APRIL 18, 2018**

| **COURT IN SESSION:** | 8:26 a.m.<br>10:27 a.m.<br>12:57 p.m.<br>2:49 p.m.<br>4:36 p.m. | **COURT IN RECESS:** | 10:02 a.m. =1.36<br>11:50 a.m. =1.23<br>2:32 p.m. =1.35<br>4:18 p.m. =1.29<br>5:31 p.m. =1.29<br>**TOTAL = 7.32** |

**THURSDAY, APRIL 19, 2018**

| **COURT IN SESSION:** | 8:22 a.m.<br>10:07 a.m.<br>11:48 a.m.<br>2:13 p.m.<br>4:03 p.m. | **COURT IN RECESS:** | 9:50 a.m. =1.28<br>11:34 a.m. =1.27<br>1:16 p.m. =1.28<br>3:46 p.m. =1.33<br>5:32 p.m. =1.48<br>**TOTAL = 7.44** |

**FRIDAY,  APRIL 20, 2018**

| **COURT IN SESSION:** | 8:23 a.m.<br>10:20 a.m.<br>12:03 p.m.<br>2:35 p.m.<br>4:12 p.m. | **COURT IN RECESS:** | 10:02 a.m. =1.39<br>11:46 a.m. =1.26<br>1:32 p.m. =1.29<br>3:56 p.m. =1.21<br>5:38 p.m. =1.26<br>**TOTAL = 7.21** |

**MONDAY,  APRIL 23, 2018**

| **COURT IN SESSION:** | 8:22 a.m.<br>10:03 a.m.<br>11:49 a.m.<br>2:21 p.m.<br>4:06 p.m. | **COURT IN RECESS:** | 9:47 a.m. =1.22<br>11:34 a.m. =1.31<br>1:16 p.m. =1.27<br>3:47 p.m. =1.26<br>5:31 p.m. =1.25<br>**TOTAL = 6.18** |

**TUESDAY, APRIL 24, 2018**

| **COURT IN SESSION:** | 8:31 a.m.<br>10:15 a.m.<br>12:03 p.m.<br>2:33 p.m.<br>4:19 p.m. | **COURT IN RECESS:** | 10:01 a.m. = 1.30<br>11:46 a.m. = 1.31<br>1:30 a.m. = 1.27<br>4:03 p.m. = 1.30<br>5:28 p.m. = 1.09<br>**TOTAL = 7.06** |

**WEDNESDAY, APRIL 25, 2018**

| **COURT IN SESSION:** | 8:23 a.m.<br>10:16 a.m.<br>12:57 p.m.<br>2:48 p.m.<br>4:31 p.m. | **COURT IN RECESS:** | 10:03 a.m. =1.20<br>11:49 a.m. =1.30<br>2:34 p.m. =1.31<br>4:16 p.m. =1.32<br>5:34 p.m. =1.03<br>**TOTAL = 6.56** |

**THURSDAY, APRIL 26, 2018**

| **COURT IN SESSION:** | 8:21 a.m.<br>10:03 a.m.<br>11:47 a.m.<br>2:21 p.m.<br>4:06 p.m. | **COURT IN RECESS:** | 9:48 a.m.= 1.27<br>11:32 a.m. =1.29<br>1:17 p.m. = 1.20<br>3:46 p.m. = 1.25<br>5:32 p.m. = 1.24<br>**TOTAL = 7.07** |

**FRIDAY, APRIL 27, 2018**

| **COURT IN SESSION:** | 8:21 a.m.<br>10:01 a.m.<br>11:51 a.m.<br>2:19 p.m.<br>3:49 p.m. | **COURT IN RECESS:** | 9:46 a.m. =1.25<br>11:34 a.m. = 1.33<br>1:16 p.m. = 1.25<br>3:30 p.m. = 1.11<br>5:32 p.m. 1.17<br>**TOTAL = 6.51** |

**MONDAY, APRIL 30, 2018**

| **COURT IN SESSION:** | 8:21 a.m.<br>10:01 a.m.<br>11:54 a.m.<br>2:27 p.m.<br>4:15 p.m. | **COURT IN RECESS:** | 9:46 a.m. =1.25<br>11:38 a.m. =1.37<br>1:20 p.m. =1.26<br>4:02 p.m. =1.35<br>5:37 p.m. =1.22<br>**TOTAL = 7.25** |

**TUESDAY, MAY 1, 2018**

| **COURT IN SESSION:** | 8:26 a.m.<br>10:18 a.m.<br>12:01 p.m.<br>2:28 p.m. | **COURT IN RECESS:** | 10:06 a.m.= 1.40<br>11:47 a.m.=1.29<br>1:31 p.m.=1.30<br>4:01 p.m.=1.30 |

4:15 p.m.

5:37 p.m.=1.22
**TOTAL = 7.31**

**WEDNESDAY, MAY 2, 2018**

**COURT IN SESSION:**    8:25 a.m.
10:16 a.m.
12:53 p.m.
2:49 p.m.
4:30 p.m.

**COURT IN RECESS:**    10:02 a.m. =1.37
11:46 a.m. =1.30
2:32 p.m. =1.39
4:17 p.m. =1.28
5:31 p.m. =1.01
**TOTAL =7.15**

**THURSDAY, MAY 3, 2018**

**COURT IN SESSION:**    8:30 a.m.
10:16 a.m.
12:03 p.m.
2:28 p.m.
4:19 p.m.

**COURT IN RECESS:**    10: 02 a.m. =1.32
11:46 a.m. =1.30
1:31 p.m. =1.28
4:01 p.m. =1.33
5:38 p.m. =1.19
**TOTAL =8.41**

**FRIDAY, MAY 4, 2018**

**COURT IN SESSION:**    8:26 a.m.
10:18 a.m.
12:03 p.m.
2:34 p.m.
4:16 p.m.

**COURT IN RECESS:**    10:01 a.m.=1.35
11:46 a.m. =1.28
1:31 p.m. =1.28
4:01 p.m. =1.27
5:32 p.m. =1.16
**TOTAL =7.14**

**MONDAY, MAY 7, 2018**

**COURT IN SESSION:**    8:21 a.m.
10:02 a.m.
11:47 a.m.
2:17 p.m.
3:56 p.m.

**COURT IN RECESS:**    9:44 a.m. =1.23
11:32 a.m. =1.30
1:16 p.m. =1.29
3:47 p.m. =1.30
5:32 p.m. =1.36
**TOTAL =7.28**

**TUESDAY, MAY 8, 2018**

**COURT IN SESSION:**    8:23 a.m.
10:18 a.m.
11:58 a.m.
2:34 p.m.
4:20 p.m.

**COURT IN RECESS:**    10:01 a.m. =1.38
11:47 a.m. =1.29
1:34 p.m. =1.36
4:02 p.m. =1.28
5:31 p.m. =1.11
**TOTAL =7.22**

**WEDNESDAY, MAY 9, 2018**

**COURT IN SESSION:**    8:21 a.m.
8:29 a.m.
10:02 a.m.
12:30 p.m.
2:17 p.m.
3:41 p.m.

**COURT IN RECESS:**    8:22 a.m. =.01
9:56 a.m. = 1.27
11:33 a.m. =1.31
2:01 p.m. =1.31
3:30 p.m. =1.13
5:33 p.m. =1.52
**TOTAL =7.35**

**THURSDAY, MAY 10, 2018**

| COURT IN SESSION: | 8:25 a.m.<br>10:14 a.m.<br>12:03 p.m.<br>2:32 p.m.<br>4:19 p.m. | COURT IN RECESS: | 10:02 a.m. =1.37<br>11:46 a.m. =1.32<br>1:31 p.m. =1.28<br>4:04 p.m. =1.32<br>5:31 p.m. =1.12<br>**TOTAL = 7.21** |

**FRIDAY, MAY 11, 2018**

| COURT IN SESSION: | 8:23 a.m.<br>10:23 a.m.<br>12:20 p.m.<br>2:42 p.m.<br>4:32 p.m. | COURT IN RECESS: | 10:08 a.m. =1.45<br>12:04 p.m. =1.41<br>1:46 p.m. =1.26<br>4:14 p.m. =1.32<br>5:34 p.m. =1.02<br>**TOTAL = 7.26** |

**MONDAY, MAY 14, 2018**

| COURT IN SESSION: | 8:23 a.m.<br>9:29 a.m.<br>10:45 a.m.<br>12:33 p.m.<br>3:04 p.m.<br>4:54 p.m. | COURT IN RECESS: | 9:15 a.m. =.52<br>10:27 a.m. =.58<br>12:17 p.m. =.58<br>2:01 p.m. =1.28<br>4:34 p.m. =1.30<br>5:41 p.m. =.47<br>**TOTAL =5.31** |

**TUESDAY, MAY 15, 2018**

| COURT IN SESSION: | 8:26 a.m.<br>10:16 a.m.<br>12:10 p.m.<br>2:52 p.m.<br>4:31 p.m. | COURT IN RECESS: | 10:02 a.m. =1.36<br>11:54 a.m. =1.38<br>1:46 p.m. =1.36<br>4:18 p.m. =1.26<br>5:34 p.m. =1.03<br>**TOTAL = 7.19** |

**WEDNESDAY, MAY 16, 2018**

| COURT IN SESSION: | 8:28 a.m.<br>10:20 a.m.<br>12:06 p.m.<br>2:36 p.m.<br>4:17 p.m. | COURT IN RECESS: | 10:03 a.m. =1.35<br>11:51 a.m. =1.31<br>1:33 p.m. =1.27<br>4:04 p.m. =1.28<br>5:44 p.m. =1.27<br>**TOTAL =  7.28** |

**THURSDAY, MAY 17, 2018**

| COURT IN SESSION: | 8:27 a.m.<br>10:19 a.m.<br>1:36 p.m.<br>1:57 p.m. | COURT IN RECESS: | 10:02 a.m. =1.35<br>11:44 a.m. =1.25<br>1:44 p.m. =.8<br>6:25 p.m.=4.28<br>**TOTAL = 7.36** |

**MONDAY, MAY 21, 2018**

| COURT IN SESSION: | 8:25 a.m.<br>9:00 a.m.<br>11:21 a.m. | COURT IN RECESS: | 8:48 a.m. =.23<br>11:03 a.m. =2.03<br>1:03 p.m. =1.42 |

| | | |
|---|---|---|
| | 2:07 p.m. | 3:40 p.m. =1.33 |
| | 3:57 p.m. | 5:00 p.m. =1.03 |
| | | **TOTAL = 6.44** |

**TUESDAY, MAY 22, 2018**

| | | |
|---|---|---|
| **COURT IN SESSION:** | 8:28 a.m. | 9:12 a.m. =.44 |
| | 9:23 a.m. | 10:40 a.m. =1.17 |
| | 10:55 a.m. | 12:13 p.m. =1.18 |
| | 1:23 p.m. | 2:57 p.m. =1.34 |
| | 3:13 p.m. | 5:00 p.m. =1.47 |
| | 5:40 p.m. | 5:50 p.m. =.10 |
| | | **TOTAL = 6.50** |

**TYPE OF PROCEEDING:** Jury Selection/Trial

**COURT'S RULING/DISPOSITION:**

**ORDER CONSISTENT WITH COURT'S RULING TO BE PREPARED BY:**    N/A

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**

Maria Armijo/Randy Castellano/
Matthew Beck, AUSAs

**ATTORNEYS PRESENT FOR DEFENDANT(S):**

Brock Benjamin/Richard Sindel (for Deft. Joe Gallegos)

Cori Harbour-Valdez/Patrick Burke (for Deft. Edward Troup)

Robert Cooper/James Castle (for Deft. Billy Garcia)

Jeff Lahann/Joseph Shattuck (for Deft. Allen Patterson)

John Granberg/Ed Solis (not present for jury selection) (for Deft. Christopher Chavez)

Billy Blackburn/Scott Davidson (not present for jury selection) (for Deft. Arturo Arnulfo Garcia)

Donovan Roberts/Lisa Torraco (for Deft. Andrew Gallegos)

**COURT IN SESSION:**    **8:27 a.m.**

**COURT:**    Calls case. Counsel enter appearances. Defendants as listed above present in custody. Case agents Bryan Acee and Nancy Stemo present.

## MONDAY, APRIL 9, 2018

(CRD- K.Wild)

**Court:** Discusses joint statement of case with counsel; confirms no changes to first proposed preliminary jury instructions; discusses courtroom configuration w/counsel – asks if any counsel wish to review the configuration from an observer's perspective?  Counsel decline.  Informs the following

prospective jurors (identified by sequencing number) have been excused:  405, 1629 and 1361; the following have been added to ensure the requisite number of individuals appear today:  926, 975, 1041, 1034, 1062 and 1070; and, parties agree to release no. 883.

**8:44 a.m.  Mr. Castellano:**  Requests bench conference.

**Court:**  Calls and conducts same. Will excuse prospective juror no. 831.

**8:48 a.m.  Open court.**

**Court:**  Anything further need to address before begin selection?

Counsel inform there is not.

**Court in recess:  8:50 a.m.**

**Court in session:  9:03 a.m.**

**Court:**  Discusses mechanics of jury selection with counsel.

**Court in recess:  9:04 a.m.**

**Court in session:  9:17 a.m.**

**Court:**  Discusses mechanics of jury selection with counsel.

**Court in recess:  9:22 a.m.**

**Court in session:  10:20 a.m.**

**10:21 a.m.  Venire panel enters courtroom.**

**Court:**  Begins seating venire panel.

**10:34 a.m.  Court:**  Thanks prospective jurors for appearing; introduces staff; explains voir dire process.

**10:44 a.m.  Voir dire panel sworn.**

**10:45 a.m.  Court:**  Conducts voir dire.  Parties agree and Court allows excusal of prospective jurors (by seating arrangement) nos.: 36 & 54 – CRD to so inform them at break.

**12:20 p.m.  Court:**  Gives cautionary instructions and excuses venire panel for lunch for an hour.

**12:22 p.m.  Venire panel exits courtroom.**

**CRD informs prospective jurors nos. 36 & 54 of excusal and no need to return.**

**Court in recess:  12:22 p.m.**

**Court in session:  1:36 p.m.**

**Venire panel enters courtroom.**

**1:41 p.m.  Court:**  Continues conducting voir dire.

**Court:**  Gives cautionary instructions and excuses jury for break

**3:23 p.m.  Venire panel exits courtroom.**

**Court in recess:  3:23 p.m.**

**Court in session:  3:41 p.m.**

**Venire panel returns to courtroom.**

**Court:**  Continues conducting voir dire.

**5:30 p.m. Court:**  Gives cautionary instructions and excuses jury until 8:30 a.m. tomorrow morning.

**5:33 p.m.  Venire panel exits courtroom.**

**Court in recess:  5:34 p.m.**

<u>**TUESDAY, APRIL 10, 2018**</u>

**Court in session:  8:29 a.m.**

**Court:**  Discusses parameters of seizure issue with counsel.

**8:35 a.m.  Venire panel enters courtroom.**

**Court:**  Continues conducting voir dire.

**10:02 a.m. Court:**  Gives cautionary instructions and excuses jury for break; prospective juror no. 44 to be excused at the break.

**10:03 a.m.  Venire panel exits courtroom.**

**Court in recess:  10:03 a.m.**

**CRD informs prospective juror no. 44 of excusal.**

**Court in session:  10:23 a.m.**

**Mr. Beck:**  Discusses content of voir dire.

**Court:**  Will have parties re-read Govt.'s witness list to panel.

**10:27 a.m.  Venire panel enters courtroom.**

**Court:**  Continues conducting voir dire.

**11:11 a.m.  Mr. Beck:**  Conducts voir dire on behalf of Govt.

**12:06 p.m.  Court:**  Excuses venire panel for lunch break.

**Venire panel exits courtroom.**

**Court in recess:  12:06 p.m.**

**Court in session:  1:13 p.m.**

**1:14 p.m.  Venire panel enters courtroom.**

**1:16 p.m.  Mr. Cooper:**  Conducts voir dire on behalf of Defendant Billy Garcia.

**2:51 p.m.  Court:**  Excuses venire panel for break.

**Venire panel exits courtroom.**

**Court in recess:  2:51 p.m.**

Per Court's instruction, prospective juror no. 28 is excused – CRD so informs individual.

**Court in session:  3:12 p.m.**

**3:16 p.m.  Venire panel enters courtroom.**

**Mr. Granberg:**  Conducts voir dire on behalf of Defendant Christopher Chavez.

**4:09 p.m.  Ms. Harbour-Valdez:**  Conducts voir dire on behalf of Defendant Edward Troup.

**4:51 p.m.  Court:**  Agrees to excuse prospective jurors nos. 3 & 15.

**Court in recess:  4:54 p.m.**

**CRD informs prospective jurors nos. 3 & 15 of excusal.**

**Court in session:  5:08 p.m.**

**5:09 p.m. Venire panel enters courtroom.**

**Mr. Sindel:**  Conducts voir dire on behalf on Defendant Joe Gallegos.

**Court in recess:  5:31 p.m.**


<u>**WEDNESDAY, APRIL 10, 2018**</u>

**Court in session:  8:32 a.m.**

Court and counsel discuss mechanics of voir dire.

**8:38 a.m.  Venire panel enters courtroom.**

**8:41 a.m.  Mr. Sindel:**  Continues conducting voir dire on behalf of Joe Gallegos.

**Mr. Roberts:**  Conducts voir dire on behalf of Defendant Andrew Gallegos.

**10:08 a.m.  Court:**  Excuses venire panel for break.

**Venire panel exits courtroom.**

**Court in recess:  10:08 a.m.**

**Court in session:  10:27 a.m.**

**10:28 a.m.  Venire panel returns to courtroom.**

**10:29 a.m.  Mr. Blackburn:**  Conducts voir dire on behalf of Defendant A. Garcia.

**11:29 a.m.  Mr. Lahaan:**  Conducts voir dire on behalf of Defendant A. Patterson.

**11:46 a.m.  Court:**  Calls and conducts bench conference.

**11:49 a.m.  Open court.**

**Court:**  Gives cautionary instructions and excuse venire panel until 2:00 p.m.

Venire panel exits courtroom.

**Court:**  Discusses with counsel how they wish to proceed – take lunch and then deal with cause and

peremptory – deal with cause or both before lunch?

Counsel wish to confer outside presence of Court.

**Court:**  Okay.

**Court in recess:**

**Court in session:  12:21 p.m.**

Court:  Understand there are 6 individuals that the parties' have agreed to release for cause and there are 8 contested will need to hear after lunch; parties wish Court to formally excuse the 6 now and then take up contested issues after lunch.

**Mr. Beck:**  Correct.

**Mr. Cooper:**  Wants Court to rule on all of the peremptory challenges now.

**Court:**  Fine, so long as all parties understand if all prospective jurors do not return from lunch may have to revisit whether to release some.

**Mr. Beck:**  Parties agree to release for cause prospective jurors nos.: 7, 8, 9, 13, 31 and 42.

**Mr. Cooper:**  Speaking on behalf of all Defendants – agree to all.

**Court:**  Strikes for cause prospective juror nos.: 7, 8, 9, 13 and 42; takes 31 under advisement.

**Mr. Beck:**  Moves to strike for cause on a contested basis prospective jurors nos.: 1, 10, 50 and 55.

**Mr. Cooper:**  Argues in opposition as to prospective juror no. 1, 10 and 55.

**Mr. Sindel:**  Argues in opposition as to prospective juror no. 1 and 50.

**Court:**  Strikes for cause prospective juror no. 50; does not strike for cause prospective jurors nos.: 1, 10 and 55.

**Mr. Cooper/Mr. Sindel:**  Moves to strike for cause on a contested basis on behalf of all Defendants prospective jurors nos.: 5, 6, 23 and 35.

**Mr. Beck:**  Argues in opposition to all.

**Court:**  Strikes for cause prospective jurors nos.:  35; does not strike for cause prospective jurors nos.:  5, 6, 23 and 31 (discussed above).  Will release all other folks that have been waiting.

**Court in recess:  1:21 p.m.**

**Court in session:**

**Court hears parties' peremptory challenges as reflected on challenge sheet.**

**Venire panel enters courtroom.**

**Court:**  Thanks venire panel, again, for service today.

**CRD announces prospective jurors selected to serve on jury.**

**Court:**  Excuses prospective jurors not selected – thanks for service.

**Jury sworn.**

**Court:**  Gives preliminary instructions.  Gives cautionary instructions.

**COURT IN RECESS:**

## THURSDAY, APRIL 12, 2018

(CRD- C. Bevel)

**Court in session: 8:23 am**

Jury present.

Counsel give opening statements.

10:01am Court  Gives cautionary instructions and excuses jury for morning break.

Mr. Castle wants juror Swanter excused.

Ms. Armijo agrees, concerns with Swanter also.

Ms. Sindel also concerned.

**Court in recess:** 10:15am

**Court in session:** 10:29am

10:29am Mr. Castle continues with opening statements.

11:22am Mr. Burke delivers opening statements.

11:37am Mr. Grandburg delivers opening statements.

11:53 am Gives cautionary instructions and excuse jury for lunch.

**11:56 am Court in recess.**

1:05 pm Mr. Blackburn delivers opening statements.

1:30 pm Mr. Roberts delivers opening statements.

1:57 pm Mr. Shattuck delivers opening statements.

2:13 pm Mr. Castellano calls witness Agent Bryan Acee, witness sworn. Mr. Castellano conducts direct examination of witness Agent Acee.

2:31 pm Gives cautionary instructions and excuses jury for break.

**2:31 pm Court in recess**.

**2:51 pm Court in session**, jury present.

2:51pm Mr. Castellano continues with direct examination of witness Agent Acee.

3:20 pm Bench conference.

3:21 pm Mr. Castellano continues with direct examination of witness Agent Acee.

3:44 pm Court admits Exhibits 84, 88, 89 without objection of defendants.

**4:18 pm Court in recess.**

**4:34 pm Court in session.**

4:35 pm Mr. Castellano continues with direct examination of witness Agent Acee,

5:06 pm Mr. Castle conducts cross examination of witness Agent Acee.

5:31 pm Court gives cautionary instructions and excuse jury for evening.

**5:31pm court in recess.**

**Court admitted the following exhibits without objection:**

84, 88, 89,  101, 109, 110, 181, 185, 186, 187, 188, 189, 191, 297, 298, 319, 320, 321, 322, 541, 541, 583, 584, 653, 656, 660, 668, 670, 671, 680, 683, 689, 692, 693, 698, 704, 706, 708, 713, 853, 854, 855, 856, 857, 858, 859.


## FRIDAY, APRIL 13, 2018

**8:21 am Court in session.**

8:21 am Ms. Torraco addresses Court with renewed motion to sever.

8:23 am Mr. Burke renews motion to sever.

8:24 am Ms. Armijo responds.

8:28am Jury present.

8:29 am Mr. Castle continues with cross examination of witness Agent Acee.

9:08 am Bench conference with counsel.

9:08 am Mr. Castle continues with cross examination of witness Agent Acee.

9:48 am  Court gives cautionary instructions and excuses jury for morning break.

**9:48 am Court in recess.**

**10:04 am Court in session.**

10:04 am Court addresses counsel regarding note from juror, lunch break and documents from Taint attorney Eicker.

10:09 am Jury present, Mr. Castle continues with cross examination of Agent Acee.

**11:30 am Court in recess.**

**11:45 am Court in session.**

12:21 pm Bench conference with counsel.

12:21 pm Mr. Castle continues with cross examination of witness Agent Acee.

12:23 pm Mr. Lahann conducts cross examination of witness Agent Acee.

12:29 pm Mr. Benjamin conducts cross examination of witness Agent Acee.

12:41 pm Bench conference with Ms. Armijo, Mr. Benjamin, Mr. Castellano, Mr. Beck

1:12 pm  Court gives cautionary instructions and excuses jury for lunch break.

1:13 pm Court addresses counsel regarding specific things court should be focused on.

1:13pm Ms. Armijo responds.

1:14pm Mr. Castle responds.

**1:15 pm Court in recess.**

**2:19 pm Court in session,** Court notes that Clerk's exhibit 1 is note from juror, exhibit 2, documents for court review  related to Daniel Archuleta, exhibit 3- documents for court review  related to Sergio Rodriguez, and provided to counsel.

2:20pm  Jury present.

2:20 pm Mr. Benjamin continues with cross examination of witness Agent Acee.

2:52 pm Mr. Blackburn conducts cross examination of witness Agent Acee.

3:16 pm  Mr. Solis conducts cross examination of witness Agent Acee.

**3:50 pm Court in recess** excuses jury for break.

**4:06 pm Court in session**, jury present.

4:06 pm Ms. Torraco conducts cross examination of witness Agent Acee.

4:49 pm Mr. Burke conducts cross examination of witness Agent Acee.

5:02pm Mr. Castellano conducts re-direct examination of witness Agent Acee.

5:31pm Court gives cautionary instructions and excuses jury for weekend.

**5:31pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government – none

Defendants – Q-3, AL, AM, DB, DC, BO1, BQ, CO1.

<u>**Monday, April 16, 2018**</u>


**8:23am Court in session.**

8:23am Court addresses counsel with motions filed over the weekend.

Ms. Armijo requests Court focus on Mario Rodriguez motion.

Mr. Blackburn  addresses court regarding continuing objections.

Mr. Sindel addresses court regarding testimony of Mario Rodriguez.

8:28am Jury present.

8:29am Mr. Castellano conducts re-direct testimony of Agent Acee.

9:02am Mr. Castle conducts re-cross examination of witness Agent Acee.

9:12am Mr. Benjamin conducts re-cross examination of witness Agent Acee.

9:24am Mr. Solis conducts re-cross examination of witness Agent Acee.

9:36am Mr. Castellano conducts re-direct examination of witness Agent Acee.

9:37am Court excuses witness Agent Acee.

9:38am Ms. Armijo calls witness Jerry Roark, witness sworn. Ms. Armijo conducts direct examination

of witness Roark.

9:47am court excuses jury for morning break.

**9:47am Court in recess.**

**10:07am Court in session**, jury present.

10:07am Ms. Armijo resumes direct examination of witness Roark.

10:51am Court excuses jury to allow continued direct examination of witness Roark by Ms. Armijo.

10:52am Mr. Cooper conducts cross examination of witness Roark.

10:55am Jury returns to courtroom, Ms. Armijo resumes direct examination of witness Roark.

11:06am Mr. Burke conducts cross examination of witness Roark.

11:17am Mr. Cooper conducts cross examination of witness Roark.

11:32am Court excuses jury for morning break.

**11:32am Court in recess.**

11:46am Court in session, jury present.

11:46pm Mr. Cooper continues with cross examination of witness Roark.

12:01pm Mr. Sindel conducts cross examination of witness Roark.

1:00pm Mr. Shattuck conducts cross examination of witness Roark.

1:14pm Mr. Grandburg conducts cross examination of witness Roark.

**1:16pm Court in recess.**

**2:16pm Court in session.**

2:17pm Ms. Armijo requests warrant for Michael Jaramillo. Court will issue warrant, Ms. Armijo to provide.

2:17pm USM Joe Castro addresses Court regarding defendant's motion Doc. 2117; USM Castro provides reports of incidents, marked as clerk's exhibit 5.

2:21pm Jury present. Mr. Grandburg continues with cross examination of witness Roark.

2:31pm Bench conference with counsel.

2:42pm Mr. Grandburg continues with cross examination of witness Roark.

2:42pm Mr. Blackburn conducts cross examination of witness Roark.

3:17pm Ms. Armijo conducts re-direct examination of witness Roark.

3:46pm Mr. Sindel conducts re-cross examination of witness Roark

3:48pm Court excuses jury for afternoon break.

**3:48pm Court in recess.**

**4:07pm Court in session.**

4:08pm Ms. Armijo continues with re-direct examination of witness Roark.

4:09pm Mr. Sindel conducts re-cross examination of witness Roark.

4:17pm Ms. Torraco conducts re-cross  examination of witness Roark.

4:18pm Mr. Shattuck conducts re-cross  examination of witness Roark.

4:19pm Court releases witness Roark, could be recalled.

4:24pm Ms. Armijo calls witness Mario Rodriguez, witness sworn. Ms. Armijo conducts direct examination of witness Rodriguez.

5:28pm Court excuses jury for the evening.

**5:29pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government – 83, 87, 92, 97, 104, 113, 177, 180, 184, 287, 290, 293, 302, 315, 325, 328, 540, 579, 598, 604, 609, 613, 619, 624, 630, 635, 642, 646, 679, 785, 789, 792, 798, 801, 804, 811, 814, 817, 822, 825, 826, 827, 828, 841, 847, 850, 860, 861, 868a, 868b, 879, 880, 881, 882, 883, 884.

Defendants – A, B, C, G, K, L, M.

## <u>Tuesday, April 17, 2018</u>

**8:22am Court in session.**

Court addresses counsel regarding taint team documents.

8:29am Jury present.

8:33am Ms. Armijo resumes direct examination of witness Rodriguez.

9:36am Bench conference with counsel.

9:48am Court excuses jury for morning break.

**9:48am Court in recess.**

**10:05am Court in session**, jury present.

10:58am Mr. Lahann conducts cross examination of witness Mario Rodriguez.

11:03am Mr. Castle conducts cross examination of witness Mario Rodriguez.

11:19am Mr. Sindel conducts cross examination of witness Mario Rodriguez.

11:34am Court excuses jury for morning break.

**11:34am Court in recess**.

**11:50am Court in session**, jury present.

11:50am Mr. Sindel continues with cross examination of witness Mario Rodriguez.

**1:09pm Court in recess.**

**2:14pm Court in session**, jury present.

2:14pm Mr. Sindel continues with cross examination of witness Mario Rodriguez.

2:45pm Ms. Torraco conducts cross examination of witness Mario Rodriguez.

3:07pm Mr. Blackburn conducts cross examination of witness Mario Rodriguez.

3:37pm Ms. Armijo conducts re-direct examination of witness Mario Rodriguez.

**3:47pm Court in recess.** Jury excused for afternoon break,.

**4:05pm Court in session**, jury present.

4:05pm Ms. Armijo resumes with re-direct examination of witness Mario Rodriguez.

4:12pm Court excuses witness Mario Rodriguez.

4:13pm Mr. Beck calls witness Julian Romero, witness sworn.

5:31pm Court excuses jury for evening.

**5:31pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government – 588, 589, 610, 783, 784a, 786, 863a, 862, 874, 875

## <u>Wednesday, April 18, 2018</u>

**8:26am Court in session.**

8:28am Court addresses counsel regarding juror late arrival due to Highway 70 road block, reads question from juror and discusses status of disclosure of PSRs.

8:37am Mr. Burke addresses court regarding doc. 2121 filed yesterday.

8:42am Mr. Beck responds.

8:46am Mr. Castle addresses court, Ms. Armijo responds.

8:57am Jury present.

8:58am Mr. Beck continues with direct examination of witness Julian Romero.

9:32am Mr. Cooper conducts cross examination of witness Julian Romero.

10:02am Jury excused for morning break.

**10:02am Court in recess.**

**10:27am Court in session.**

10:27am Mr. Cooper continues with cross examination of witness Julian Romero.

10:33am Mr. Sindel conducts cross examination of witness Julian Romero.

10:52am Mr. Beck continues with re-direct examination of witness Julian Romero.

11:00am Court excuses witness Julian Romero.

11:01am Mr. Beck calls witness Raymond Martinez, witness sworn.

11:25am Mr. Sindel conducts cross examination of witness Raymond Martinez.

11:49am Court excuses jury for lunch break.

**11:50am Court in recess.**

**12:57pm Court in session.**

12:58pm Jury present.

12:58pm Mr. Sindel conducts cross examination of witness Raymond Martinez.

1:26pm Mr. Solis conducts cross examination of witness Raymond Martinez.

1:34pm Mr. Beck conducts re-direct examination of witness Raymond Martinez.

1:37pm Mr. Sindel conducts re-cross examination of witness Raymond Martinez.

1:56pm Court excuses witness Raymond Martinez.

1:57pm Mr. Castellano calls witness Phillip Gonzales, witness sworn.

2:09pm Mr. Castellano conducts direct examination of witness Phillip Gonzales.

**2:32pm Court in recess**, jury excused for afternoon break.

**2:49pm Court in session.**

2:49pm Mr. Castellano continues with direct examination of witness Phillip Gonzales.

3:54pm Court excuses jury, takes testimony of witness Phillip Gonzales.

3:57pm Mr. Castle questions witness Phillip Gonzales.

4:03pm Jury returns to courtroom.

4:04pm Mr. Cooper conducts cross examination of witness Phillip Gonzales.

4:16pm Jury excused for afternoon break.

**4:18pm Court in recess.**

**4:36pm Court in session**, jury present.

4:37pm Court addresses jury regarding coffee and candy in the courtroom Court will inquire where rule came from and see what can be done.

4:37pm Mr. Cooper continues cross examination of witness Phillip Gonzales.

4:55pm Mr. Sindel conducts cross examination of witness Phillip Gonzales.

5:31pm Court excuses jury for evening.

**5:31pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government – 775, 768, 767, 766, 876, 877, 878, 11, 12, 13, 123, 124, 125, 126, 130, 140, 790, 591, 793, 794

Defendants: J-5


**<u>Thursday, April 19, 2018</u>**

**8:22am Court in session.** Mr. Sindel addresses Court regarding hand written notes disclosed late yesterday related to Michael Jaramillo.

8:32am Mr. Beck responds.

8:40pm Jury present.

8:40am Mr. Sindel continues with cross examination of witness Phillip Gonzales.

8:45am Mr. Solis conducts cross examination of witness Phillip Gonzales.

8:51am Mr. Castellano conducts re-direct examination of witness Phillip Gonzales.

9:10am Mr. Cooper conducts re-cross examination of witness Phillip Gonzales.

9:14am Mr. Casellano conducts re-direct examination of witness Phillip Gonzales.

9:21am Court excuses witness with instruction that he is subject to being recalled. He may not speak to anyone about his testimony.

9:21am Ms. Armijo calls witness Chris Barela, witness sworn.

9:21am Ms. Armijo conducts direct examination of witness Chris Barela.

9:34am Mr. Sindel conducts cross examination of witness Chris Barela.

9:44am Mr. Grandburg conducts cross examination of witness Chris Barela.

9:46am Court excuses jury for morning break.

9:47am Court addresses counsel regarding potential witness Michael Jaramillo.

**9:50am Court in recess**.

**10:07am Court in session**, Mr. Solis address court with inquiry about jury touring Southern NM Correctional Facility. Mr. Castle addresses court with stipulation regarding investigators in the courtroom, government in agreement.

10:09am Jury present.

10:10am Mr. Grandburg continues with cross examination of witness Chris Barela.

10:17am Ms. Armijo conducts re-direct examination of witness Chris Barela.

10:20am Court excuses witness Chris Barela.

10:21am Ms. Armijo calls witness Nancy Smith, witness sworn.

10:21am Ms. Armijo conducts direct examination of witness Nancy Smith.

10:42am Mr. Shattuck conducts cross examination of witness Nancy Smith.

10:49am Mr. Granburg conducts cross examination of witness Nancy Smith.

10:51am Mr. Sindel conducts cross examination of witness Nancy Smith.

10:59am Ms. Armijo conducts re-direct examination of witness Nancy Smith.

11:02am Mr. Sindel conducts re-cross examination of witness Nancy Smith.

11:03am Mr. Shattuck conducts re-cross examination of witness Nancy Smith.

11:04am Ms. Smith excuses witness Nancy Smith.

11:04am Mr. Armijo calls witness Norman Rhoades.

11:04am Bench conference with counsel.

11:26am Mr. Castellano conducts direct examination of witness Norman Rhoades.

11:31am Court addresses jury regarding lunch break, jury excused for morning break.

11:33am Court addresses Mr. Beck regarding entitlement to witness lists.

**11:34am Court in recess.**

**11:48am Court in session**, court addresses counsel regarding

11:52am Jury present, Mr. Castellano continues with direct examination of witness Norman Rhoades.

1:05pm Court excuses witness Norman Rhoades, instructs not to discuss testimony, will be recalled tomorrow.

1:05pm Mr. Beck calls witness Robert Allen Duncan, witness sworn.

1:11pm Mr. Beck conducts direct examination of witness Robert Duncan.

1:16pm Court excuses for lunch break.

**1:16pm Court in recess**.

**2:13pm Court in session**. Court addresses counsel with proposed ruling regarding proposed witness Michael Jaramillo.

2:20pm Jury present, Mr. Beck resumes direct examination of witness Robert Duncan.

3:27pm Mr. Benjamin conducts cross examination of witness Robert Duncan.

**3:46pm Court in recess**, jury excused for afternoon break.

**4:03pm Court in session**, addresses counsel regarding witness Michael Jaramillo issue, court does not believe appeal can be taken, double jeopardy attaches and the court will address further. Mr. Beck requests court further address matter tomorrow afternoon after sending jury home early.

4:06pm Jury present, Mr. Benjamin continues with cross examination of witness Robert Duncan.

4:17pm Mr. Shattuck conducts cross examination of witness Robert Duncan.

4:21pm Mr. Solis conducts cross examination of witness Robert Duncan.

4:42pm Court excuses witness Robert Duncan.

4:44pm Mr. Beck calls witness Albert Venegas, witness sworn.

4:44pm Mr. Beck conducts direct examination of witness Albert Venegas.

4:56pm Mr. Lahann conducts cross examination of witness Albert Venegas.

5:03pm Mr. Sindel conducts cross examination of witness Albert Venegas.

5:09pm Mr. Grandburg conducts cross examination of witness Albert Venegas.

5:11pm Mr. Beck conducts re-direct examination of witness Albert Venegas.

5:16pm Court excuses witness Albert Venegas.

5:16pm Mr. Castellano calls witness Felipe Gonzalez, witness sworn.

5:16pm Mr. Castellano conducts direct examination of witness Felipe Gonzalez.

5:30pm Court excuses jury for evening.

5:32pm Court addresses counsel regarding Michael Jaramillo testimony.

**5:32pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government – 1, 2, 3, 4, 5, 6, 7, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 21, 32, 33, 34, 35, 36, 37, 38, 47, 48, 49, 50, 51, 73, 74, 75, 114, 115, 116, 117, 118, 119, 120, 121, 122, 127, 128, 129, 131, 132, 133, 134, 135, 136, 137, 138, 139, 141, 142, 143, 144, 145, 146, 170, 171, 174.

Defendant-none

## Friday, April 20, 2018

**8:23am Court in session.**

8:23am Court addresses counsel regarding witness Michael Jaramillo. Mr. Benjamin addresses court regarding government subpoena to Angela Gallegos that's Joe Gallegos' daughter. Court indicates witness should plan on coming.

8:29am Jury present. Mr. Castellano continues with direct examination of witness Felipe Gonzalez.

8:53am Mr. Grandberg conducts cross examination of witness Felipe Gonzalez.

9:03am Mr. Lahann conducts cross examination of witness Felipe Gonzalez.

9:14am Mr. Castellano conducts re-direct examination of witness Felipe Gonzalez.

9:20am Mr. Grandburg conducts

9:21am Ms. Armijo calls witness Roberta Stellman, MD, witness sworn.

9:21am Ms. Armijo conducts direct examination of witness Roberta Stellman.

9:38am Mr. Shattuck conducts cross examination of witness Roberta Stellman.

9:43am Mr. Benjamin conducts cross examination of witness Roberta Stellman.

9:57am Court excuses witness Roberta Stellman.

9:58am Witness Norman Rhoades.

10:02am Court excuses jury for morning break.

**10:02am Court in recess.**

**10:20am Court in session**, jury present. Court addresses jury and counsel regarding timing of lunch break.

10:20am Mr. Sindel conducts cross examination of witness Norman Rhoades.

11:34am Mr. Castle conducts cross examination of witness Norman Rhoades.

**11:46am Court in recess**, jury excused for morning break.

**12:03pm Court in session**, jury present.

12:03pm Mr. Castle continues with cross examination of witness Norman Rhoades.

12:30pm Mr. Shattuck conducts cross examination of witness Norman Rhoades.

12:39pm Mr. Castellano conducts re-direct examination of witness Norman Rhoades.

1:00pm Mr. Burke conducts re-cross examination of witness Norman Rhoades.

1:10pm Mr. Castle conducts re- cross examination of witness Norman Rhoades.

1:15pm Court excuses Norman Rhoades.

1:17pm Mr. Castellano calls witness Roy Paul Martinez, witness sworn.

1:17pm Mr. Castellano conducts direct examination of witness Roy Paul Martinez.

**1:32pm Court in recess.**

**2:35pm Court in session.**[1]

3:54pm Court excuses jury for afternoon break.

**3:56pm Court in recess.**

**4:12pm Court in session.**

4:12pm Mr. Beck addresses Court

4:19pm Jury present.

4:19pm Mr. Cooper conducts cross examination of witness Roy Paul Martinez.

5:14pm Court addresses jury regarding Mr. Blackburn illness, witness Roy Paul Martinez will be cross examined by Mr. Blackburn on Monday.

5:31pm Court excuses jury for weekend.

5:34pm Court confers with Mr. Benjamin and Ms. Armijo regarding subpoena of Joe Gallegos' daughter.

**5:38pm  Court in recess.**

**Court admitted the following exhibits without objection.**

Government –9, 10, 152, 622, 625, 626, 78

Defendants- none.


<u>**Monday, April 23,2018**</u>

**8:22am Court in session.**

Mr. Solis addresses Court with motion filed Doc. 2141.

8:32am Jury present.

---

8:44am Mr. Beck continues with direct examination of Joseph Otero.

9:10am Mr. Solis conducts cross examination of witness Joseph Otero.

9:30am Mr. Shattuck conducts cross examination of witness Joseph Otero.

9:47am Court excuses jury for morning break.

**9:47am Court in recess.**

**10:03am Court in session**, jury present.

10:04am Mr. Shattuck continues with cross examination of witness Joseph Otero.

10:07am Mr. Sindel conducts cross examination of witness Joseph Otero.

10:19am Mr. Cooper conducts cross examination of witness Joseph Otero.

10:37am Mr. Beck conducts re-direct examination of witness Joseph Otero.

10:58am Mr. Solis conducts re-cross examination of witness Joseph Otero.

11:00am Court excuses witness Joseph Otero.

11:08am  Mr. Castellano recalls witness Roy Paul Martinez. Court reminds witness he is still under oath.  Mr. Castellano continues with direct examination of witness Roy Paul Martinez.

11:19am Court excuses witness Roy Paul Martinez.

11:20am Mr. Beck calls witness Leonard Lujan, witness sworn.

11:25am Mr. Beck conducts direct examination of witness Leonard Lujan.

**11:34am Court in recess.**

**11:49am Court in session**, jury present. Mr. Beck continues with direct examination of witness Leonard Lujan.

1:16pm Jury excused for lunch break.

**1:16pm Court in recess.**

**2:21pm Court in session**, jury present.

2:12pm Mr. Beck continues with direct examination of witness Leonard Lujan.

3:16pm Mr. Castle conducts cross examination of witness Leonard Lujan.

3:47pm Court excused for afternoon break.

**3:47pm Court in recess.**

**4:06pm Court in session**, jury present.

4:06pm Mr. Castle continues with cross examination of witness Leonard Lujan.

5:30pm Court excuses jury for evening.

**5:31pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-95, 98, 99, 796, 885

Defendant- AU, Y2

## **Tuesday, April 24, 2018**

**8:31am Court in session**, jury present.

8:34am Mr. Castle continues with cross examination of witness Leonard Lujan.

9:59am Mr. Solis conducts cross examination of witness Leonard Lujan.

10:01am Jury excused for morning break.

**10:01am Court in recess**.

**10:15am Court in session**, jury present.

10:15am Mr. Sindel conducts cross examination of witness Leonard Lujan.

11:35am Mr. Burke conducts cross examination of witness Leonard Lujan.

11:43am Mr. Beck conducts re-direct examination of witness Leonard Lujan.

11:46pm Jury excused for morning break.

**11:46pm Court in recess.**

**12:03pm Court in session**, jury present.

12:03pm Mr. Beck continues with re-direct examination of witness Leonard Lujan.

1:29pm Mr. Castle conducts re-cross examination of witness Leonard Lujan.

**1:30pm Court in recess**.

**2:33pm Court in session**, jury present.

2:33pm Mr. Castle continues with re-cross examination of witness Leonard Lujan.

2:57pm Mr. Sindel conducts re-cross examination of witness Leonard Lujan.

3:40pm Mr. Beck conducts re-direct examination of witness Leonard Lujan.

3:53pm Court excuses witness Leonard Lujan.

3:54pm Ms. Armijo calls witness Lawrence Torres, witness sworn.

3:56pm Ms. Armijo conducts direct examination of witness Lawrence Torres.

**4:02pm Court in recess** for afternoon break.

**4:19pm Court in session**, Court address counsel regarding mental health records pending disclosure.

4:21pm Jury present.

4:21pm Ms. Armijo continues with direct examination of witness Lawrence Torres.

5:06pm Court excuses jury, continues with questions of witness Lawrence Torres. Court addresses counsel regarding medical records.

5:16pm Jury present. Ms. Armijo resumes direct examination of witness Lawrence Torres.

**5:28pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government- 799

Defendants – BV1, BV2 –admitted conditionally, BV3

## **Wednesday April 25, 2018**

**8:23am Court in session**, Court addresses counsel regarding witness Lawrence Torres testimony; showing of unavailability of DeLeon.

8:25am Mr. Beck responds.

8:32am Mr. Castle addresses Court regarding anticipated testimony from witness Robert Lovato.

8:40am Jury present. Ms. Armijo continues with direct examination of witness Lawrence Torres.

8:49am Mr. Burke conducts cross-examination of witness Lawrence Torres.

9:39am Mr. Sindel conducts cross-examination of witness Lawrence Torres.

10:02am Court excuses jury for morning break.

10:02am Court addresses Mr. Beck regarding use of ex parte information regarding location of DeLeon.

**10:03am Court in recess.**

**10:16am Court in session**, Court addresses counsel regarding DeLeon matter, juror #15

10:23am Jury present, Mr. Sindel continues cross-examination of witness Lawrence Torres.

11:28am Bench conference with counsel.

11:49am Court excuses jury for lunch break.

**11:49am Court in recess**.

**12:57pm Court in session**, jury present.

12:57pm Court excuses witness Lawrence Torres.

12:58pm Mr. Castellano calls witness Eugene Martinez, witness sworn.

12:58pm Mr. Castellano conducts direct examination of witness Eugene Martinez.

2:32pm Jury excused for afternoon break.

2:33pm Court denies Doc.2151 filed by Mr. Benjamin.

2:33pm Court grants Doc.

**2:34pm Court in recess**.

**2:48pm Court in session**, jury present.

2:48pm Mr. Castellano continues with direct examination of witness Eugene Martinez.

3:17pm Mr. Cooper conducts cross examination of witness Eugene Martinez.

4:16pm Court excuses jury for afternoon break.

**4:16pm Court in recess.**

**4:31pm Court in session.**

4:31pm Mr. Cooper continues with cross examination of witness Eugene Martinez.

5:31pm Court excuses jury for the evening.

5:32pm Court addresses counsel regarding jury instructions.

5:33pm Mr. Castle addresses Court regarding scheduling  tomorrow.

**5:34pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-102, 105, 106, 595


## Thursday, April 26, 2018


**8:21am Court in session**. Court addresses counsel regarding draft jury instructions; pace of trial

8:27am Jury present, Mr. Cooper continues with cross examination of witness Eugene Martinez.

9:21am Mr. Lahann conducts cross examination of witness Eugene Martinez.

**9:48am Court in recess** for morning break, jury excused.

**10:03am Court in session**, jury present.

10:03am Mr. Lahann continues with cross examination of witness Eugene Martinez.

10:24am Mr. Grandburg conducts cross examination of witness Eugene Martinez.

10:59am Mr. Castellano conducts re-direct examination of witness Eugene Martinez.

**11:32am Court in recess**, excuses jury for morning break, jury prefers morning break and late lunch.

**11:47am Court in session**, Ms. Armijo addresses Court regarding witness Angela Gallegos.

11:49am Jury present.

11:56am Mr. Cooper conducts re-cross examination of witness Eugene Martinez.

12:33pm Mr. Lahann conducts re-cross examination of witness Eugene Martinez.

12:37pm Mr. Castellano conducts re-direct examination of witness Eugene Martinez.

12:39pm Court excuses witness Eugene Martinez.

12:43pm Ms. Armijo calls witness Angela Gallegos, witness sworn.

12:46pm Ms. Armijo conducts direct examination of witness Angela Gallegos.

**1:17pm Court in recess**, jury excused.

**2:21pm Court in session**, bench conference with counsel; court addresses counsel with regard to

Clerk's exhibit 12, email and printed photo of defendant Andrew Gallegos provided by US Marshal, taken by Lisa Torraco and posted on social media by Andrew Gallegos' family member.

2:39pm Jury in present.

2:57pm Ms. Torraco conducts cross examination of witness Angela Gallegos.

3:20pm Mr. Benjamin conducts cross examination of witness Angela Gallegos.

3:23pm Ms. Armijo conducts re-direct examination of witness Angela Gallegos.

3:24pm Court excuses witness Angela Gallegos.

3:24pm Mr. Castellano calls witness Manuel Jake Armijo, witness sworn.

**3:46pm Court in recess**, excuses jury for afternoon break.

**4:06pm Court in session**, jury present.

4:06pm Mr. Castellano continues with direct examination of witness Manuel Jacob Armijo.

4:50pm Mr. Castle conducts cross examination of witness Jake Armijo.

**5:32pm Court in recess**, jury excused for evening.

**Court admitted the following exhibits without objection.**

Government-24A, 25A, 339, 421, 462, 463, 485, 513, 514, 594, 633, 636, 637, 833, 834, 835, 895, 896, 897, 901, 902, 905

Defendants- BX9, BX10, BX14, BX15, BX16, AW, AV, AX, EB, AZ, AY

(Not admitted BX1-4)


## **Friday, April 27, 2018**


**8:21am Court in session**. Court addresses counsel regarding writ for Rayna Blea, Mr. Benjamin responds. Court will enter Order and writ.

8:26am Jury present. Mr. Castle continues with cross examination of witness Manuel Jacob Armijo.

9:44am Mr. Burke conducts cross examination of witness Manuel Jacob Armijo.

9:46am Court excuses jury for morning back.

**9:46am Court in recess.**

**10:01am Court in session**, court addresses counsel regarding juror question about pace of trial.

10:03am Jury present, Mr. Burke continues with cross examination of witness Manuel Jacob Armijo.

10:12am Mr. Sindel conducts cross examination of witness Manuel Jacob Armijo.

10:54am Mr. Castellano conducts re-direct examination of witness Manuel Jacob Armijo.

10:57am Mr. Castle conducts re-cross examination of witness Manuel Jacob Armijo.

10:59am Mr. Sindel conducts re-cross examination of witness Manuel Jacob Armijo.

11:00am Court excuse witness Manuel Jacob Armijo.

11:00am Mr. Beck calls witness Kyle Bridgman, witness sworn.

11:00am Mr. Beck conducts direct examination of witness Kyle Bridgman

11:22am Mr. Roberts conducts cross examination of witness Kyle Bridgman.

11:26am Mr. Benjamin conducts cross examination of witness Kyle Bridgman.

11:31am Mr. Beck conducts re-direct examination of witness Kyle Bridgman.

11:32am Court excuses witness Kyle Bridgmen.

11:34am Jury excused for morning break.

11:34am Court addresses counsel regarding jury instruction related to plea agreements by Monday, close of business. Court addresses counsel regarding pace of trial directs counsel to meet and confer and provide a script about finishing trial by June 1 as originally indicated to the court and the jury first thing Monday morning.

**11:34 am Court in recess.**

**11:51am Court in session.**

11:51am Ms. Armijo calls witness Manuel Monte, witness sworn.

11:35am Ms. Armijo conducts direct examination of witness Manuel Monte.

12:06pm Mr. Roberts conducts cross examination of witness Manuel Monte.

12:07pm Mr. Benjamin conducts cross examination of witness Manuel Monte.

12:16pm Court excuses witness Manuel Monte.

12:16am Ms. Armijo calls witness Kiersten Harzewski, witness sworn.

12:36pm Ms. Torraco conducts cross examination of witness Kiersten Harzewski.

12:37pm Mr. Benjamin conducts cross examination of witness Kiersten Harzewski.

1:08pm Ms. Armijo conducts re-direct examination of witness Kiersten Harzewski.

1:10pm Ms. Torraco conducts cross examination of witness Kiersten Harzewski.

1:12pm Mr. Benjamin conducts re-cross examination of witness Kiersten Harzewski.

1:15pm Court excuses witness Kiresten Harzewski.

1:16pm Court excuses jury for lunch break.

**1:16pm Court in recess.**

**2:19pm Court in session.**

2:20pm Mr. Castellano calls witness Amber Sutton, witness sworn.

2:20pm Mr. Castellano conducts direct examination of witness Amber Sutton.

3:27pm Jury excused for afternoon recess.

3:37pm Court addresses counsel regarding statements by witness Amber Sutton.

**3:30pm Court in recess.**

**3:49pm Court in session.**

3:49pm Mr. Castellano continues with direct examination of witness Amber Sutton.

3:51pm Ms. Torraco conducts cross examination of witness Amber Sutton.

4:17pm Mr. Benjamin conducts cross examination of witness Amber Sutton.

4:39pm Mr. Castellano conducts re-direct examination of witness Amber Sutton.

4:47pm Court excuses witness, subject to being recalled.

4:47pm Ms. Armijo calls witness Richard Williamson, witness sworn.

4:48pm Ms. Armijo conducts direct examination of witness Richard Williamson.

5:31pm Court excuses jury.

**5:32pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-329, 330, 354, 359, 530, 531, 701, 715, 716, 717, 890, 891, 892, 893, 894, 907, 915, 916

Defendants-

## <u>Monday, April 30, 2018</u>

**8:21am Court in session**, court addresses counsel anything need to be addressed, Mr. Lahann indicates that Mr. Shattuck will not be present until this afternoon.

8:27am Jury present, Ms. Armijo continues with direct examination of witness Richard Williamson.

9:02am Mr. Benjamin conducts cross examination of witness Richard Williamson.

**9:46am Court in recess**, excuses jury for morning break.

**10:01am Court in session**, Court addresses counsel regarding email from Mr. Castle on outstanding

10:05am Jury present.

10:05am Mr. Benjamin continues with cross examination of witness Richard Williamson.

11:25am Ms. Torraco conducts cross examination of witness Richard Williamson.

11:32am Court excuses jury for morning.

11:33am Court addresses counsel regard request for script, Court inclined to require government to disclose all witnesses, Court inclined only to allow direct examination, cross and brief re-direct; Court again asks for a script by tomorrow morning– witness to be called, time for direct, cross

**11:38am Court in recess.**

**11:54am Court in session.**

11:56am Jury present. Ms. Torraco continues with cross examination of witness Richard Williamson.

12:47pm Ms. Armijo conducts re-direct examination of witness Richard Williamson.

12:57am Court excuses witness Richard Williamson, witness subject to recall.

1:05pm Mr. Beck calls witness Morgan Ramirez, present with counsel Santiago Juarez, witness sworn.

1:05pm Mr. Beck conducts direct examination of witness Morgan Ramirez.

1:10pm Court excuses jury for lunch break.

1:11pm Court addresses counsel regarding 302 for witness Morgan Ramirez. Court indicates when limiting instruction will be given.

1:15pm Mr. Beck responds.

1:15pm Ms. Torraco responds.

1:20pm Mr. Benjamin addresses Court regarding statements to be admitted with limiting instruction.

**1:20pm Court in recess.**

**2:27pm Court in session.**

2:30pm Mr. Beck continues with direct examination of witness Morgan Ramirez.

2:49pm Mr. Benjamin conducts cross examination of witness Morgan Ramirez.

3:19pm Ms. Torraco conducts cross examination of witness Morgan Ramirez.

3:29pm Mr. Beck conducts re-direct examination of witness Morgan Ramirez.

3:32pm Court excuses witness Morgan Ramirez.

3:32pm Mr. Beck calls witness Michael Sutton, witness sworn.

3:32pm Mr. Beck conducts direct examination of witness Michael Sutton.

3:49pm Ms. Torraco conducts cross examination of witness Michael Sutton.

3:56pm Mr. Benjamin conducts cross examination of witness Michael Sutton.

4:02pm Court excuses jury for afternoon break.

**4:02pm Court in recess.**

**4:15pm Court in session.**

4:17pm Jury present.

4:22pm Mr. Beck conducts re-direct examination of witness Michael Sutton.

4:25pm Court excuses jury, Mr. Beck plays recorded statement of witness Michael Sutton.

4:32pm Court excuses witness Michael Sutton.

4:33pm Bench conference regarding next witness Willie Romero.

4:46pm Ms. Armijo calls witness Bill Farmer, witness sworn.

4:46pm Ms. Armijo conducts direct examination of witness Bill Farmer.

5:07pm Ms. Torraco conducts cross examination of witness.

5:27pm Mr. Benjamin conducts cross examination of witness.

5:32pm Court excuses jury for evening

5:33pm Court addresses counsel regarding script, witness to testify, time for direct examination, cross examination.

**5:37pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-331, 359, 360, 362, 363, 364, 372, 404, 406, 408, 408, 409, 412, 423, 427, 428, 431, 432, 433, 434, 449, 526, 723, 728, 729, 743, 759, 836, 886, 887, 899, 900, 908, 909, 910

Defendant- ED

## Tuesday, May 1, 2018

**8:26am Court in session**, Ms. Torraco addresses Court. Mr. Cooper addresses Court with proposed script. Ms. Armijo and Mr. Beck responds.

8:35am Jury present. Court addresses jury regarding pace of trial, number of witnesses has been reduced. Court and parties are working very hard to trial in the time frame originally indicated.

8:39am Mr. Benjamin continues with cross examination of Bill Farmer.

8:40am Ms. Armijo conducts re-direct examination of witness Bill Farmer.

8:44am Court excuses witness Bill Farmer.

8:44am Mr. Castellano calls witness Jason Vanveghel, witness sworn.

8:46am Mr. Castellano conducts direct examination of witness Jason Vanveghel.

9:17am Ms. Torraco conducts cross examination of witness Jason Vanveghel.

9:32am Mr. Sindel conducts cross examination of witness Jason Vanveghel.

10:02am Court excuses jury for morning break.

10:03am Court addresses counsel regarding proposed script. Proposed script will be filed under seal.

**10:06am Court in recess.**

**10:18am Court in session.**

10:21am Jury present, Mr. Sindel continues with cross examination of witness Jason Vanveghel.

10:46am Mr. Castellano conducts re-direct examination of witness Jason Vanveghel.

11:10am Mr. Beck calls witness Charlene Baldizan, witness sworn.

11:14am Mr. Beck conducts direct examination of witness Charlene Baldizan.

11:46am Court excuses jury for break.

**11:47am Court in recess.**

**12:01pm Court in session.**

12:02pm Mr. Beck continues with direct examination of witness Charlene Baldizan.

12:22pm Ms. Torraco conducts cross examination of witness Charlene Baldizan.

12:58pm Mr. Benjamin conducts cross examination of witness Charlene Baldizan.

12:59pm Mr. Beck conducts re-direct examination of witness Charlene Baldizan.

1:04pm Court excuses witness Charlene Baldizan.

1:04pm Ms. Armijo calls witness Richard Mathews, witness sworn.

1:05pm Ms. Armijo conducts direct examination of witness Richard Mathews.

**1:31pm Court in recess.**

**2:28pm Court in session.** Mr. Beck addresses Court

2:34pm Jury present.

2:34pm Ms. Armijo continues with direct examination of witness Richard Mathews.

3:45pm Mr. Benjamin conducts cross examination of witness Richard Mathews.

**4:01pm Court in recess.**

**4:15pm Court in session.** Mr. Beck addresses court regarding witness appearance tomorrow, no issues and witness will appear.

4:16pm Jury present, Mr. Benjamin continues with cross examination of witness Richard Mathews.

5:02pm Ms. Torraco conducts cross examination of witness Richard Mathews.

5:32pm Court excuses jury for evening.

5:32pm Court addresses counsel regarding pace of trial.

**5:37pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government- 340, 341, 343, 344, 348, 349, 350, 351, 355, 356, 415, 420, 435, 436, 439, 440, 442, 443, 445, 446, 447, 454, 455, 457, 487, 488, 491, 492, 493, 496, 497, 499, 503, 504, 511, 512, 521, 522, 525, 527, 733, 738, 754, 755, 756, 757, 760, 851, 852.


## <u>Wednesday, May 2, 2018</u>


**8:25am Court in session.** Court addresses counsel with new proposed trial schedule provided by counsel this morning.

8:29am Jury present, Ms. Torraco continues with cross examination of witness Richard Mathews.

8:37am Ms. Armijo conducts re-direct examination of witness Richard Mathews.

8:50am Ms. Torraco conducts brief voir dire for foundation to admit exhibit EF.

8:51am Ms. Armijo voir dires witness Richard Mathews.

8:52am Court admits exhibit EF.

8:52am Ms. Armijo continues with re-direct examination of witness Richard Mathews.

8:57am Court excuses witness Richard Mathews.

9:00am Ms. Armijo calls witness Christy Collins, witness sworn.

9:00am Ms. Armijo conducts direct examination of Christy Collins.

9:34am Mr. Roberts conducts cross examination of witness Christy Collins.

9:39am Court excuses jury to allow Mr. Roberts to refresh witness Christy Collins memory with audio recording of interview with NM State Police.

9:46am Jury present, Mr. Robert continues with witness Christy Collins.

9:53am Mr. Benjamin conducts cross examination of witness Christy Collins.

9:56am Ms. Armijo conducts re-cross examination of witness Christy Collins.

9:58am Court excuses witness Christy Collins.

9:59am Mr. Castellano calls witness Willie Romero.

10:00am Court excuses jury for morning break.

10:01am Court addresses counsel regarding time schedule for witness testimony.

**10:02am Court in recess.**

**10:16am Court in session.**  Court addresses counsel regarding trial schedule, schedule

10:20am Mr. Beck calls witness Clay Goret, witness sworn.

10:21am Mr. Beck conducts direct examination of witness Clay Goret.

10:54am Mr. Benjamin conducts cross examination of witness Clay Goret.

11:13am Ms. Torraco conducts cross examination of witness Clay Goret.

11:15am Court excuses witness Clay Goret.

11:15am Mr. Castellano calls witness Willie Romero, witness sworn.

11:16am Mr. Castellano conducts direct examination of witness sworn.

11:39am Mr. Sindel conducts cross examination of witness Willie Romero.

**11:46am Court in recess.**

**12:53pm Court in session.** Mr. Beck addresses Court regarding fact witnesses to be called.

12:54pm Jury present, Mr. Sindel continues with cross examination of witness Willie Romero.

1:29pm Mr. Castellano conducts re-direct examination of witness Willie Romero.

1:38pm Court excuses witness Willie Romero.

1:39pm Mr. Castellano calls witness Clayton Martinez, witness sworn.

1:40pm Mr. Castellano conducts direct examination of witness Clayton Martinez.

2:00pm Mr. Benjamin conducts cross examination of witness Clayton Martinez.

2:26pm Mr. Castellano conducts re-direct examination of witness Clayton Martinez.

2:27pm Mr. Benjamin conducts re-cross examination of witness Clayton Martinez.

2:28pm Mr. Castellano conducts re-direct examination of witness Clayton Martinez.

2:28pm Court excuses witness Clayton Martinez.

2:29pm Ms. Armijo calls witness Otto King, witness sworn.

**2:32pm Court in recess** for afternoon break.

**2:49pm Court in session.**

2:49pm Ms. Armijo conducts direct examination of witness Otto King.

3:14pm Mr. Benjamin conducts cross examination of witness Otto King.

3:41pm Ms. Armijo conducts re-direct examination of witness Otto King.

3:43pm Court excuses witness Otto King.

3:43pm Ms. Armijo calls witness Jose Gomez, witness sworn.

3:44pm Ms. Armijo conducts direct examination of witness Jose Gomez.

**4:17pm Court in recess.**

**4:30pm Court in session**, Court addresses counsel with proposed trial schedule, Cori Harbor-Valdez to provide court with draft of trial schedule with government concluding on May 18.

4:34pm Jury present.

4:34pm Mr. Benjamin conducts cross examination of witness Jose Gomez.

**5:31pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government- 338, 413, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 809, 839, 898, 911, 912, 914, 917, 918, 919, 920, 921, 922, 923, 924, 925, 926, 927, 928, 929, 930, 931, 932, 933, 934, 935, 936, 937, 938, 939, 940, 949, 962, 963, 964, 965

Defendants- EF, EG-1, EG-2, EH-1

## Thursday, May 3, 2018

**8:30am Court in session.** Court addresses counsel with new trial schedule proposals.

8:32am Jury present. Court addresses jury about Law Day, thanks for service, focus and time and attention to trial.

8:35am Mr. Benjamin continues with cross examination of witness Jose Gomez.

9:01am Ms. Armijo conducts re-direct examination of witness Jose Gomez.

9:06am Court excuses witness Jose Gomez.

9:06am Mr. Beck calls witness Margaret Calles, witness sworn.

9:07am Mr. Beck conducts direct examination of witness Margaret Calles.

9:15am Ms. Torraco conducts cross examination of witness Margaret Calles.

9:18am Mr. Benjamin conducts cross examination of witness Margaret Calles.

9:20am Ms. Torraco conducts cross examination of witness Margaret Calles.

9:21am Mr. Beck conducts re-direct examination of witness Margaret Calles.

9:21am Court excuses witness Margaret Calles.

9:22am Mr. Castellano calls witness Paul Rivera, witness sworn.

9:25am Mr. Castellano conducts direct examination of witness Paul Rivera.

**10:02am Court in recess** for morning break.

**10:16am Court in session.**

10: 16am Mr. Castellano continues with direct examination of witness Paul Rivera.

10:18am Mr. Lahann conduct cross examination of witness Paul Rivera.

10:20am Mr. Sindel conducts cross examination of witness Paul Rivera.

11:04am Mr. Blackburn conducts cross examination of witness Paul Rivera.

11:19am Mr. Castellano conducts re-direct examination of witness Paul Rivera.

11:26am Mr. Sindel conducts re-cross examination of witness Paul Rivera.

11:28am Mr. Castellano conducts re-direct examination of witness Paul Rivera.

11:28am Court excuses witness Paul Rivera.

11:32am Ms. Armijo calls witness Shauna Gutierrez, witness sworn.

11:32am Ms. Armijo conducts direct examination of witness Shauna Gutierrez.

**11:46am Court in recess.**

**12:03pm Court in session.**

12:03pm Ms. Armijo continues with direct examination of witness Shauna Gutierrez.

12:54pm Mr. Benjamin conducts cross examination of witness Shauna Gutierrez.

**1:31pm Court in recess.**

**2:28pm Court in session.** Mr. Sindel address Court regarding trial scheduling. Ms. Armijo indicates Dr. Paul will testify next.

2:34pm Ms. Armijo calls witness Ian Paul, witness sworn.

2:35pm Ms. Armijo conducts direct examination of witness Dr. Ian Paul.

2:38pm Court recognizes witness Dr. Paul as an expert in forensic pathology.

2:38pm Ms. Armijo continues with direct examination of witness Dr. Paul.

3:04pm Mr. Benjamin conducts cross examination of witness Dr. Paul.

3:21pm Mr. Roberts conducts cross examination of witness Dr. Paul.

3:25pm Ms. Armijo conducts re-direct examination of witness Dr. Paul.

3:27pm Court excuses witness Dr. Paul.

3:28pm Witness Shauna Gutierrez returns to witness stand.

3:32pm Mr. Benjamin continues with cross examination of witness Shauna Gutierrez.

3:50pm Ms. Armijo conducts re-direct examination of witness Shauna Gutierrez.

**4:01pm Court in recess.**

**4:19pm Court in session.**

4:19pm Mr. Benjamin continues with cross examination of witness Shauna Gutierrez.

4:19pm Court excuses witness Shauna Gutierrez.

4:22pm Ms. Armijo calls witness Ralph Mantz, witness sworn.

4:22pm Ms. Armijo conducts direct examination of witness Ralph Mantz.

4:44pm Mr. Burke conducts cross examination of witness Ralph Mantz.

4:51pm Mr. Sindel conducts cross examination of witness Ralph Mantz.

5:07pm Mr. Blackburn conducts cross examination of witness Ralph Mantz.

5:13pm Court excuses witness Ralph Mantz.

5:15pm Ms. Armijo calls witness David Morales, witness sworn.

5:15pm Ms. Armijo conducts direct examination of witness David Morales.

5:25pm Court excuses witness David Morales.

5:33pm jury excuse for evening

5:34pm Mr. Sindel address court regarding witness Jaramillo

**5:38pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-199, 201, 202, 203, 207, 208, 209, 211, 214, 215, 215, 216, 217, 218, 219, 221, 222, 224, 225, 227, 228, 229,230, 231, 232, 233, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 250, 251, 252, 253, 254, 257, 258, 249, 281, 284, 382, 383, 385, 390, 391, 392, 393, 397, 398, 577, 580, 581, 750, 946, 950, 951, 953, 954, 955, 957, 958, 959, 960, 961, 966, 969.

Defendants – BQ1

<u>**Friday, May 4, 2018**</u>

**8:26am Court in session**, Court addresses counsel with new proposed agreed proposed calendar.

8:30am Jury present.

8:31am Mr. Beck calls witness Benjamin Clark, witness sworn.

8:31am Mr. Beck conducts direct examination of witness Benjamin Clark.

**10:01am Court in recess.**

**10:18am Court in session.**

10:20am Jury present. Mr. Blackburn conducts cross examination of witness Benjamin Clark.

11:42am Mr. Burke conducts cross examination of witness Benjamin Clark.

**11:46am Court in recess.**

**12:03pm Court in session.**

12:04pm Jury present, Mr. Burke continues with cross examination of witness Benjamin Clark.

12:31pm Mr. Grandberg conducts cross examination of witness Benjamin Clark.

1:00pm Mr. Sindel conducts cross examination of witness Benjamin Clark.

**1:31pm Court in recess**, court cautions jury, gives instructions, jury excused for lunch break.

**2:34 pm Court in session**; Court advises all counsel that order regarding Defendant Troup's motion in limine has been filed (doc. 2207); Jaramillo opinion will be next; counsel to advise if anything else is more important for Court to consider first.

2:37 pm Jury present in courtroom; witness on his way to the courtroom.

2:41 pm Mr. Sindel continues cross examination of witness Benjamin Clark.

3:01 pm Bench conference.

3:02 pm Re-direct examination of witness Benjamin Clark by Mr. Beck.

3:28 pm Re-cross examination of witness Benjamin Clark by Mr. Burke.

3:29 pm Re-cross examination of witness Benjamin Clark by Mr. Sindel.

3:29 pm Witness Benjamin Clark steps down.

3:30 pm Government calls Samuel Gonzales; sworn.

3:31 pm Direct examination of witness Samuel Gonzales by Mr. Castellano.

3:34 pm Government's exhibit 812 moved and admitted without objection.

3:35 pm Continuation of direct examination of witness Samuel Gonzales by Mr. Castellano.

3:49 pm Objection by Mr. Blackburn (hearsay, foundation); Bench conference held.

3:52 pm Continuation of direct examination of witness Samuel Gonzales by Mr. Castellano.

**4:01 pm** Jury excused for afternoon break**; court in recess.**

**4:16 pm Court in session.**

4:19 pm Jury present in courtroom.

4:19 pm Continuation of direct examination of witness Samuel Gonzales by Mr. Castellano.

4:23 pm Cross examination of witness Samuel Gonzales by Ms. Harbour-Valdez.

4:33 pm Cross examination if witness Samuel Gonzales by Mr. Blackburn.

5:02 pm Re-direct examination of witness Samuel Gonzales by Mr. Castellano.

5:05 pm Witness Samuel Gonzales steps down.

5:05 pm Government calls Ruben Hernandez; sworn.

5:05 pm Bench conference held.

5:08 pm Direct examination of witness Ruben Hernandez by Mr. Beck.

5:14 pm Government's exhibit 313 moved and admitted without objection.

5:14 pm Continuation of direct examination of witness Ruben Hernandez by Mr. Beck.

5:31 pm Jury excused for the evening.

**5:32 pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-190, 294, 295, 299, 812, 313, 291.

### <u>Monday, May 7, 2018</u>

**8:21am Court in session.**  Court addresses counsel regarding Motions in Liminie filed over the weekend, Ruben Hernandez and Timothy Martinez.  Mr. Burke responds.

8:34am Jury present.

8:34am Mr. Beck resumes direct examination of witness Ruben Hernandez.

9:16am Mr. Burke conducts cross examination of Ruben Hernandez.

**9:44am Court in recess**. Jury excused for morning break.

**10:02am Court in session**, jury present.

10:02am Mr. Burke continues with cross of witness Ruben Hernandez.

10:13am Mr. Blackburn conducts cross examination of witness Ruben Hernandez.

10:40am Mr. Sindel conducts cross examination of witness Ruben Hernandez.

11:09am Ms. Beck continues conducts re-direct of witness Ruben Hernandez.

11:20am Mr. Burke conducts re-cross examination of witness Ruben Hernandez.

11:22am Mr. Sindel conducts re-cross examination of witness Ruben Hernandez.

11:25am Court excuses witness Ruben Hernandez.

11:25am Mr. Castellano recalls witness Norman Rhodes.

11:26am Mr. Castellano continues with direct examination of witness Norman Rhodes.

**11:32am Court in recess**. Jury excused for morning break.

**11:47am Court in session.**

11:47am Mr. Castellano continues with direct examination of witness Norman Rhodes.

12:21pm Mr. Burke conducts cross examination of witness Norman Rhodes.

12:29pm Mr. Solis conducts cross examination of witness Norman Rhodes.

12:35pm Court excuses witness Norman Rhodes, to remain under oath, subject to recall.

12:35pm Mr. Beck calls witness Javier Alonzo, witness sworn.

**1:16pm Court in recess.**

**2:17pm Court in session**. Counsel address Court regarding witnesses scheduled

2:20pm Jury present, Mr. Beck continues with witness Javier Alonzo.

3:17pm Mr. Burke conducts cross examination of witness Javier Alonzo.

3:30pm Mr. Blackburn conducts cross examination of witness Javier Alonzo.

**3:47pm Court in recess**, jury excused for afternoon break.

**3:56pm Court in session.**

4:00pm Mr. Blackburn continues with cross examination of witness Javier Alonzo.

4:13pm Ms. Torraco conducts cross examination of witness Javier Alonzo.

4:16pm Mr. Solis conducts cross examination of witness Javier Alonzo.

4:19pm Mr. Beck conducts re-direct examination of witness Javier Alonzo.

4:30pm Court excuses witness Javier Alonzo.

4:31pm Mr. Castellano calls witness Leroy Lucero, witness sworn.

4:36pm Mr. Castellano conducts direct examination of witness Leroy Lucero.

**5:32pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-111, 111A, 192, 193, 194, 195, 196, 197, 281A, 300, 303, 304, 312, 316, 317 647, 648, 967, 968, 970, 971, 972, 973, 974

Defendants- BR 1, 2, 3, Y11


**<u>Tuesday, May 8, 2018</u>**

**8:23am Court in session.** Counsel addresses Court regarding order for USM re: tablets, counsel discuss jury instructions, latest draft filed this morning.

8:27am Jury present. Court addresses jury about preference of snacks, requests any needs be passed along to CRD.

8:27am Mr. Castellano continues with direct examination of witness Leroy Lucero.

8:31am Mr. Castle conducts cross examination of witness Leroy Lucero.

**10:01am Court in recess.**

**10:18am Court in session.**

10:18am Mr. Castle continues with cross examination of witness Leroy Lucero.

**11:47am Court in recess.**

**11:58am Court in session.**

12:01pm Mr. Castle continues with cross examination of witness Leroy Lucero.

12:23pm Mr. Solis conducts cross examination of witness Leroy Lucero.

12:46pm Mr. Burke conducts cross examination of witness Leroy Lucero.

12:51pm Mr. Blackburn conducts cross examination of witness Leroy Lucero.

12:58pm Mr. Sindel conducts cross examination of witness Leroy Lucero.

**1:34pm Court in recess** for lunch break.

**2:34pm Court in session**, Court addresses counsel regarding

2:37pm Jury present, Mr. Sindel conducts cross examination of witness Leroy Lucero.

2:45pm Mr. Castellano conducts re-direct examination of witness Leroy Lucero.

3:00pm Mr. Castle conducts re-cross examination of witness Leroy Lucero.

3:14pm Mr. Sindel conducts re-cross examination of witness Leroy Lucero.

3:17pm Mr. Solis conducts re-cross examination of witness Leroy Lucero.

3:18pm Mr. Castellano conducts re-direct examination of witness Leroy Lucero.

3:19pm Court excuses witness Leroy Lucero.

3:20pm Mr. Castellano calls witness John Montano, witness sworn.

3:21pm Mr. Castellano conducts direct examination of witness John Montano.

3:55pm Ms. Harbour-Valdez conducts cross examination of witness John Montano.

**4:02pm Court in recess**, jury excused for afternoon break.

**4:20pm Court in session.**

4:20pm Ms. Harbour-Valdez continues with cross examination of witness John Montano.

4:51pm Mr. Blackburn conducts cross examination of witness John Montano.

5:05pm Mr. Sindel conducts cross examination of witness John Montano.

5:12pm Mr. Castellano conducts re-direct examination of witness John Montano.

5:15pm Mr. Blackburn conducts re-cross examination of witness John Montano.

5:15pm Court excuses witness John Montano.

5:16pm Ms. Armijo calls witness Frederico Munoz, witness sworn.

5:16pm Ms. Armijo conducts direct examination of witness Frederico Munoz.

**5:31pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-820

Defendants – CE1, CN4, 5, 6, EI

*BU2, BU3 – not admitted, government objects*

## <u>Wednesday, May 9, 2018</u>

**8:21am Court in session.** Court addresses counsel regarding call from Juror early this morning, CRD contacted Ms. Harbour-Valdez and Mr. Castellano; counsel agree to release juror, Court verifies that all counsel agree to excuse juror. CRD to contact juror and notify of release from duty.

**8:29am Court in session**. Jury present.

8:33am Ms. Armijo resumes direct examination of witness Frederico Munoz.

9:10am Mr. Castle conducts cross examination of witness Frederico Munoz.

**9:56am Court in recess.**

**10:02am Court in session**. Mr. Castle continues cross examination of witness Frederico Munoz.

**11:33am Court in recess.** Jury excused for lunch break.

**12:30pm Court in session.**

12:33pm Jury present.

12:35pm Mr. Burke conducts cross examination of witness Frederico Munoz.

12:49pm Mr. Solis conducts cross examination of witness Frederico Munoz.

12:53pm Mr. Blackburn conducts cross examination of witness Frederico Munoz.

1:06pm Mr. Sindel conducts cross examination of witness Frederico Munoz.

1:23pm Ms. Armijo conducts re-direct examination of witness Frederico Munoz.

1:36pm Mr. Castle conducts re-cross examination of witness Frederico Munoz.

1:42pm Court excuses witness Frederico Munoz.

1:42pm Mr. Beck calls witness Raymond Rascon, witness sworn.

1:43pm Mr. Beck conducts direct examination of witness Raymond Rascon.

**2:01pm Court in recess** for afternoon break.

**2:17pm Court in session.**

2:17pm Mr. Beck continues direct examination of witness Raymond Rascon.

2:22pm Court excuses witness Raymond Rascon.

2:23pm Mr. Castellano calls witness Billy Cordova, witness sworn.

2:26pm Mr. Castellano conducts direct examination of witness Billy Cordova.

**3:30pm Court in recess.** Jury excused for afternoon break.

**3:41pm Court in session.** Court addresses counsel regarding limiting instruction to be given.

3:44pm Jury present, Mr. Castellano continues with direct examination of witness Billy Cordova.

3:55pm Mr. Blackburn conducts cross examination of witness Billy Cordova.

4:16pm Mr. Burke conducts cross examination of witness Billy Cordova.

4:28pm Mr. Cooper conducts cross examination of witness Billy Cordova.

4:47pm Court introduces Mr. John Samore, attorney for Billy Cordova.

4:48pm Witness Billy Cordova, by recommendation of his attorney John Samore, envokes his Fifth Amendment Right not to answer.  Court sustains questions.

5;02pm Mr. Cooper continues with cross examination of witness Billy Cordova.

5:31pm Court excuses jury for evening.

5:33pm Counsel address court

**5:33pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-326, 640, 643, 644, 645, 707, 710, 712, 787

Defendants-

### Thursday, May 10, 2018

**8:25am Court in session.**  Court addresses counsel regarding testimony of Billy Cordova, clerk's exhibit 14 will be limiting instruction given. Mr. Solis addresses court with concerns about upcoming testimony of Mr. Cupit. Ms. Armijo responds.

8:32am Jury present. Mr. Cooper continues with cross examination of witness Billy Cordova.

9:41am Mr. Grandburg conducts cross examination of witness Billy Cordova.

9:52am Mr. Sindel conducts cross examination of witness Billy Cordova.

**10:02am Court in recess** for morning break.

**10:14am Court in session.**

10:25am Court excuses witness Billy Cordova so that Dr. Zumwalt's testimony can be taken out of order.

10:25am Mr. Beck calls witness Dr. Ross Zumwalt, sworn.

10:25am Mr. Beck conducts direct examination of witness Dr. Ross Zumwalt.

10:29am Court recognizes Dr. Ross Zumwalt as expert in areas of pathology.

10:29am Mr. Beck resumes direct examination of witness Dr. Zumwalt.

11:28am Mr. Shattuck conducts cross examination of witness Dr. Zumwalt.

11:44pm Mr. Sindel conducts cross examination of witness Dr. Zumwalt.

**11:46am Court in recess.**

**12:03pm Court in session**.

12:03pm Jury present, Mr. Sindel continues cross examination of witness Dr. Zumwalt.

12:36pm Mr. Burke conducts cross examination of witness Dr. Zumwalt.

12:45pm Mr. Grandburg conducts cross examination of witness Dr. Zumwalt.

12:47pm Mr. Beck conducts re-direct examination of witness Dr. Zumwalt.

12:58pm Mr. Sindel conducts re-cross examination of witness Dr. Zumwalt.

1:00pm Mr. Shattuck conducts re-cross examination of witness Dr. Zumwalt.

1:02pm Mr. Beck conducts re-direct examination of witness Dr. Zumwalt.

1:03pm Court excuses witness Dr. Ross Zumwalt.

1:04pm Mr. Castellano recalls witness Billy Cordova.

1:05pm Mr. Samore and counsel address court at bench conference regarding witness Billy Cordova's assertion of the Fifth Amendment.

1:13pm Mr. Sindel continues with cross examination of witness Billy Cordova.

1:27pm Mr. Lahann conducts cross examination of witness Billy Cordova.

1:30pm Mr. Roberts conducts cross examination of witness Billy Cordova.

**1:31pm Court in recess.**

**2:32pm Court in session.**  Mr. Castle addresses court regarding witness Mr. Munoz and antisocial personality disorder documents.

2:35pm Jury present, Mr. Roberts continues with cross examination of witness Billy Cordova.

3:08pm Mr. Castellano conducts re-direct examination of witness Billy Cordova.

3:25pm Mr. Burke requests brief re-cross, Court declines request, notifies witness Billy Cordova that he is subject to recall by Mr. Burke. Witness Billy Cordova excused.

3:26pm Ms. Armijo calls witness Samuel Griego, sworn.

3:26pm Ms. Armijo conducts direct examination of witness Samuel Griego.

4:01pm Court excuses jury for afternoon break.

4:02pm Court addresses counsel regarding accurate trial schedule, encourages everyone to move along.

**4:04pm Court in recess.**

**4:19pm Court in session.** Ms. Armijo continues with direct examination of witness Samuel Griego.

4:21pm Mr. Castle conducts cross examination of witness Samuel Griego.

5:24pm Mr. Solis conducts cross examination of witness Samuel Griego.

**5:31pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-52-72, 147-151, 153-166, 266-277, 823, 984


## Friday, May 11, 2018

**8:23am Court in session**, Court addresses Mr. Davidson regarding jury instruction,

8:33am Witness Samuel Griego reminded he's under oath. Mr. Solis continues with cross

DNM 1137

examination of witness Samuel Griego.

8:46am Ms Harbour-Valdez conducts cross examination of witness Samuel Griego.

8:52am Mr. Blackburn conducts cross examination of witness Samuel Griego.

9:29am Ms. Armijo conducts re-direct examination of Samuel Griego.

9:38am Mr. Castle conducts re-cross examination of witness Samuel Griego.

9:39am Court excuses witness Samuel Griego.

9:42am Mr. Beck calls witness Gerald Archuleta, witness sworn.

9:42am Mr. Beck conducts direct examination of witness Gerald Archuleta.

10:01am  Jury excused for morning break.

10:02am Court addresses counsel regarding rulings regarding witness Gerald Archuleta's convictions. Court addresses testimony of Cupit.

**10:08am Court in recess.**

**10:23am Court in session.** Mr. Castle addresses court regarding witness Gerald Archuleta's previous convictions.

10:25am Jury present.

10:28am Mr. Beck continues with direct examination of Gerald Archuleta.

11:28am Mr. Burke conducts cross examination of Gerald Archuleta.

11:47am Mr. Shattuck conducts cross examination of Gerald Archuleta.

11:47am Mr. Blackburn cross examination of Gerald Archuleta.

12:01pm Jury excused for break.

12:02pm Court addresses counsel regarding revised schedule and longer testimony for Cupit. Court addresses Mr. Castle regarding jury instruction.

**12:04pm Court in recess.**

**12:20pm Court in session,** jury present, Mr. Blackburn continues with cross examination of Gerald Archuleta.

1:29pm Mr. Solis conducts cross examination of Gerald Archuleta.

1:30pm Mr. Benjamin conducts cross examination of Gerald Archuleta.

**1:46pm Court in recess.**

**2:42pm Court in session**. Counsel address court

2:48pm Jury present, Mr. Benjamin continues with cross examination of Gerald Archuleta.

3:01pm Mr. Cooper conducts cross examination of Gerald Archuleta.

4:02pm Mr. Beck conducts re-direct examination of Gerald Archuleta.

4:10pm Court excuses jury for break.

4:11pm Court addresses counsel regarding jury instruction regarding Frederico Munoz testimony. Mr. Castle responds. Court addresses counsel regarding Cupit testimony, Mr. Solis' objection is sustained, Mr. Cupit will not testify.

**4:14pm Court in recess.**

**4:32pm Court in session.**

4:32pm Mr. Beck conducts re-direct examination of Gerald Archuleta.

4:34pm Mr. Lahann conducts cross examination of witness Gerald Archuleta.

4:34pm Mr. Blackburn re-cross examination of Gerald Archuleta.

4:39pm Mr. Benjamin conducts re-cross examination of Gerald Archuleta.

4:41pm Court excuses Gerald Archuleta.

4:42pm Ms. Armijo calls witness Agent Nancy Stemo, witness sworn.

4:59pm Court excuses Agent Nancy Stemo.

5:00pm Mr. Castellano recalls Agent Acee, sworn.

5:01pm Mr. Castellano conducts direct examination of witness Acee.

5:31pm Court excuses jury for weekend.

**5:34pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-586, 628A, 631, 632, 987

Defendants – BC1, BP2


**Monday, May 14, 2018**

**8:23am Court in session.**  Court addresses counsel regarding Trial 3- potential conflict with Billy Blackburn. Mr. Blackburn responds.

Ms. Armijo and Ms. Harbour-Valdez indicate they have reached a stipulation regarding DNA, to be identified as an exhibit and read to jury by the Court.

8:32am Mr. Sindel addresses court regarding Agent Acee's testimony regarding threats or assaults against cooperators, minimal discovery received. Mr. Castellano responds, more received from Agent Acee and being provided now.

8:35am Jury present, Agent Nancy Stemo reminded previously sworn, Ms. Armijo continues with direct examination of witness Agent Stemo.

8:52am Mr. Benjamin conduct cross examination of witness Agent Stemo.

**9:15am Court in recess**, jury excused for break.

**9:29am Court in session.** Jury present. Mr. Benjamin continues with cross examination of witness

Nancy Stemo.

9:51am Ms. Torraco conducts cross examination of witness Agent Stemo.

9:53am Ms. Armijo conducts re-direct examination of witness Agent Stemo.

9:55am Court excuses Agent Stemo, Mr. Benjamin requests she be subject to recall.

9:56am Mr. Beck calls Michael Jaramillo, witness sworn.

9:56am Mr. Beck conducts direct examination of witness Michael Jaramillo.

**10:27am Court in recess**, jury excused.

**10:45am Court in session**, jury present. Mr. Beck continues with direct examination of witness Michael Jaramilo.

10:56am Mr. Burke conducts cross examination of witness Michael Jaramillo.

11:44am Mr. Sindel conducts cross examination of witness Michael Jaramillo.

**12:17pm Court in recess.**

**12:33pm Court in session.** Mr. Sindel continues with cross examination of witness Michael Jaramillo.

1:32pm Mr. Cooper conducts cross examination of witness Michael Jaramillo.

1:49pm Mr. Solis conducts cross examination of witness Michael Jaramillo.

1:50pm Mr. Lahann conducts cross examination of witness Michael Jaramillo.

1:52pm Mr. Beck conducts re-direct examination of witness Michael Jaramillo.

**2:01pm Court in recess** for lunch break.

**3:04pm Court in session.**

3:05pm Mr. Beck continues with re-direct examination of witness Michael Jaramillo.

3:06pm Mr. Cooper conducts re-direct examination of witness Michael Jaramillo.

3:07pm Court excuses witness Michael Jaramillo, Mr. Cooper request he remain subject to recall.

Court instructs witness Michael Jaramillo not to speak to anyone about his testimony.

3:10pm Mr. Castellano recalls Agent Acee, court reminds Agent Acee he is still under oath.

3:54pm Mr. Solis conducts re-cross examination of witness Agent Acee.

4:13pm Mr. Castle conducts re-cross examination of witness Agent Acee.

**4:34pm Court in recess** for afternoon break.

**4:54pm Court in session.**

4:54pm Jury present, Mr. Castle continues to conduct re-cross examination of witness Agent Acee.

5:31pm Jury excused for evening.

5:32pm Ms. Armijo addresses court regarding defense witnesses.

5:33pm Ms. Harbour-Valdez addresses Court regarding Rule 29, maybe 1 hour and a half.

5:35pm Mr. Benjamin indicates witness Brandy Rodriguez will envoke Fifth Amendment will move to admit exhibit

5:38pm Court addresses Mr. Davidson regarding jury instructions.

5:39pm Mr. Davidson responds.

5:41pm Mr. Castle responds.

**5:41pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-944, 986, 988, 990, 991, 992, 993, 994, 995, 996, 997, 998, 999 , 1004

Defendants- EJ, EL1, EL2


**Tuesday, May 15, 2018**

**8:26am Court in session**, Ms. Armijo addresses court requests Jenks materials for defense witnesses,

8:30am Jury present, Mr. Castle continue with cross examination of witness Agent Acee.

8:58am Mr. Burke conducts cross examination of witness Agent Acee.

9:13am Mr. Sindel conducts cross examination of witness Agent Acee.

**10:02 Court in recess** for morning break.

**10:16am Court in session**, counsel addresses court regarding witness Felix Reyes, Mr. Castellano indicates he has potential exposure, requests an attorney be appointed. Court to appoint counsel, court to contact Barry Crutchfield regarding representation of witness Jimmie Gordon.

10:24am Jury present, Mr. Sindel continues with cross examination of witness Agent Acee.

11:28am Court excuses witness Agent Acee, subject to recall.

11:28am Court reads stipulation – marked as 1001

**11:54am Court in recess.**

**12:10pm Court in session.**

12:11pm Mr. Benjamin calls witness Eve Tokumaru, witness sworn.

12:11pm Mr. Benjamin conducts direct examination of witness Eve Tokumaru.

12:15pm Court recognizes witness Tokumaru in field of forensic science, specifically DNA.

12:45pm Ms. Armijo conducts cross examination of witness Eve Tokumaru.

12:53pm Mr. Solis conducts examination of witness Eve Tokumaru.

12:56pm Mr. Benjamin conducts re-direct examination of witness Eve Tokumaru.

12:58pm Ms. Armijo conducts cross examination of witness Eve Tokumaru.

12:59pm Court excuses witness Eve Tokumaru.

12:59pm Mr. Castellano recalls Agent Acee, resumes direct examination of Agent Acee.

**1:46pm Court in recess.**

**2:52pm Court in session.**

2:52pm  Jury present, Mr. Castellano continues with direct examination of Agent Acee.

2:54pm Mr. Sindel conducts re-cross examination of Agent Acee.

3:04pm Mr. Burke conducts re-cross examination of Agent Acee.

3:22pm Mr. Solis conducts re-cross examination of Agent Acee.

3:28pm Court excuses Agent Acee.

3:34pm Ms. Armijo indicates subject to discussions at bench regarding

3:34pm Mr. Benjamin calls witness Elizabeth Padilla, witness sworn.

3:34pm Mr. Benjamin conducts direct examination of witness Elizabeth Padilla.

3:41pm Mr. Cooper conducts direct examination of witness Elizabeth Padilla.

3:50pm Mr. Beck conducts cross examination of witness Elizabeth Padilla.

3:58pm Mr. Benjamin conducts voir dire of witness Elizabeth Padilla regarding exhibits J2 and J3. Court admits government's 1007, 1008.

4:11pm Mr. Benjamin conducts re-direct examination of witness Elizabeth Padilla.

**4:18pm Court in recess.**

**4:31pm Court in session.** Court addresses counsel regarding scheduling Rule 29 and arguments on jury instructions.

4:35pm Jury present, Mr. Beck conducts re-cross examination of witness Elizabeth Padilla.

4:37pm Mr. Benjamin conducts re-direct examination of witness Elizabeth Padilla.

4:38pm Mr. Lahann conducts cross examination of witness Elizabeth Padilla.

4:41pm Court excuses witness Elizabeth Padilla.

4:41pm Court addresses jury regarding schedule for this afternoon (releasing early) and returning tomorrow at 9:30 am. Court gives cautionary instructions to jury and excuses for evening.

4:45pm Mr. Benjamin argues for Rule 29, judgment of acquittal.

5:05pm Mr. Castellano responds.

5:19pm Mr. Benjamin responds.

5:20pm Court issues ruling denying Rule 29 motion to dismiss counts against Joe Gallegos, Court finds enough evidence exists for jury to find defendant Joe Gallegos committed the crimes alleged.

5:25pm Mr. Davidson argues in support of Rule 29 Judgment of Acquittal or dismissal for lack of jurisdiction as to Arturo Garcia.

5:31pm Mr. Cooper addresses court regarding no access to their witness Felix Reyes. Court gives

**5:34pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-1001, 1002, 1005, 1006, 1007, 1008

Defendants- BV1, BV2, EK1-5, EM, EN, EO

## <u>Wednesday, May 16, 2018</u>

**8:28am Court in session.** Court addresses counsel regarding Joe Gallegos' Rule 29 – Counts 4 and 5 taken under advisement, will not deny at this time.

8:30am Mr. Davidson resumes argument on Rule 29 Motion for Arturo Garcia.

8:37am Mr. Castellano responds.

8:40am Mr. Davidson responds.

8:40am Court takes Arturo Garcia's Rule 29 Motion under advisement regarding Interstate Commerce arguments. Cooperating and immunized witnesses, that evidence can sustain a conviction.

8:43am Mr. Castellano responds, cites two cases that support commerce constitutional cases.

8:44am Mr. Cooper addresses Court with Rule 29 arguments on behalf of Billy Garcia, adopts arguments on Commerce clause as submitted by Mr. Davidson for Arturo Garcia.

8:46am Court takes Commerce clause arguments under advisement as well. Court will not grant Rule 29 on substantive evidence.

8:47am Ms. Harbour-Valdez addresses Court with Rule 29 arguments on behalf of Edward Troup. Adopts all arguments by counsel already addressed.

8:50am Mr. Castellano responds.

8:51am Court takes defendant Troup's Rule 29 motion under advisement; evidence that Troup was aiding and abetting. Count 3 – sufficient evidence that Troup was involved.

8:53am Mr. Grandburg addresses Court with Chris Chavez's Rule 29 motion.

8:57am Mr. Castellano responds.

8:58am Court will not grant Rule 29 on Chris Chavez's motion. Court finds suficient evidence on the evidence.

8:59am Mr. Lahann addresses court with Allen Patterson's Rule 29 arguments.

9:06am Mr. Castellano responds.

9:09am Mr. Lahann responds.

9:09am Court will take Commerce clause arguments under advisement; there are factual disputes for the jury to determine. There is evidence that Patterson is an SNM member.

9:11am Ms. Torraco addresses court with Rule 29 arguments for Andrew Gallegos. Joins arguments by defendants on Commerce clause.

9:15am Mr. Castellano responds.

9:24am Ms. Torraco responds.

9:27am Mr. Castellano responds.

9:28am Court will take Andrew Gallegos Rule 29 under advisement.

9:30am Mr. Benjamin addresses Court.

9:30am Mr. Castellano addresses court regarding witnesses today, needing counsel appointed.

9:31am Mr. Cooper and Mr. Blackburn respond.

9:40am Jury present. Mr. Blackburn calls witness George Bernal, witness sworn.

9:41am Mr. Blackburn conducts direct examination George Bernal.

10:01am Jury excused for morning break.

**10:03am Court in recess.**

**10:20am Court in session.**

10:23am Mr. Blackburn continues with direct examination George Bernal.

10:26am Ms. Armijo conducts cross examination George Bernal.

10:28am Court excuses witness George Bernal.

10:29am Mr. Cooper calls witness Jimmie Ray Gordon, witness sworn.

10:30am Mr. Cooper conducts direct examination of witness Jimmie Gordon.

11:40am Mr. Castellano conducts cross examination of witness Jimmie Gordon.

11:47am Court excuse jury for break.

11:48am Court directs CRD to have witness Jimmie Gordon contact his attorney Mr. Crutchfield during recess.  Court addresses counsel regarding attorneys appointed for defense witnesses.

**11:51am Court in recess.**

**12:06pm Court in session.** Counsel address court regarding witness Jimmie Gordon, Ms. Armijo moves to admit exhibit 947, no objection by Mr. Benjamin. Court admits exhibit 947.

12:13pm Mr. Benjamin addresses Court with clarification on Rule 29 motion.

12:15pm Mr. Castellano continues with cross examination of witness Jimmie Gordon.

12:28pm Mr. Sindel conducts direct examination of witness Jimmie Gordon.

12:29pm Mr. Cooper conducts re-direct examination of witness Jimmie Gordon.

12:52pm Mr. Castellano conducts re-cross examination of witness Jimmie Gordon.

12:53pm Court excuses witness Jimmie Gordon, Mr. Solis requests witness Jimmie Gordon be subject to recall. Court so informs witness.

12:54pm Mr. Burke calls witness Kurt Thoene, witness sworn.

12:45pm Mr. Burke conducts direct examination of witness Kurt Thoene.

1:06pm Ms. Armijo has no cross examination of witness Kury Thoene.

1:06pm Court excuses witness Kurt Thoene.

1:17pm Mr. Benjamin calls witness William Elliott, witness sworn.

1:18pm Mr. Benjamin conducts direct examination of witness William Elliott.

**1:33pm Court in recess.**

**2:36pm Court in session.**  Mr. Burke addresses court regarding representations by Ms. Armijo as to defendant Edward Troup's criminal history; request proof from Ms. Armijo. Ms. Armijo provides document noting defendant Troup's arrest, requests that no copies be made, that it be marked as Clerk's exhibit 16 and sealed. Court will mark as exhibit 16 and seal.

2:41pm Jury present. Mr. Benjamin continues with direct examination of witness William Elliott.

3:10pm Ms. Armijo conducts cross examination of witness William Elliott.

3:24pm Court excuses jury to allow Mr. Benjamin to

3:25pm Mr. Burke addresses Court regarding sealed clerk's exhibit 16, provides exhibit 16 to the court.

3:38pm Ms. Armijo continues with cross examination of witness William Elliot.

3:42pm Mr. Benjamin conducts re-direct examination of witness William Elliot.

3:44pm Court excuses witness William Elliot, Court advises he is subject to recall.

3:36pm Mr. Castle calls witness Lorenzo Mora, witness sworn.

3:36pm Mr. Castle conducts direct examination of witness Lorenzo Mora.

4:01pm Court excuses jury for afternoon break.

4:03pm Court addresses counsel regarding

4:04pm Mr. Grandburg requests to recall Jimmie Gordon. Court suggests counsel discuss.

**4:04pm Court in recess.**

**4:17pm Court in session.** Mr. Burke and Mr. Davidson address court regarding arrest records and criminal records.

4:20pm Jury present.  Mr. Castle continues with direct examination of Lorenzo Mora.

4:36pm Court excuses witness Lorenzo Mora, to be recalled after testimony of Jimmie Gordon.

4:37pm Witness Jimmie Gordon resumes witness stand.

4:37pm Mr. Solis conducts cross examination of witness Jimmie Gordon. Requests to be allowed to treat witness as a hostile witness.  Court will allow.

4:56pm Mr. Castellano conducts re-cross examination of witness Jimmie Gordon.

4:56pm Court excuses witness Jimmie Gordon.

4:59pm Court excuses witness Lorenzo Mora.

5:11pm Court excuses jury for the evening.

5:12pm Ms. Armijo addresses Ms. Torraco's request to recall Agent Williamson, Ms. Torraco requests assistance from government in subpoenaing Capitan Valero from NM State Police.

5:15pm Mr. Castle addresses Court regarding Eugene Martinez's competency, admission of exhibit EV.

5:24pm Mr. Beck responds, objects to admission of exhibit EV.

5:28pm Court addresses counsel regarding jury instructions, Mr. Beck responds.

5:29pm Mr. Davidson addresses Court regarding jury instruction number 7 and number 12.

5:30pm Mr. Beck addresses Court regarding Brian Acee.

5:32pm Ms. Harbour-Valdez addresses Court regarding scheduling for charge conference, preparation of closing arguments, need for reviewing transcripts.

5:35pm Mr. Beck responds.

5:36pm Mr. Cooper responds.

5:38pm Court inquires about defendants having sufficient time to present their case. Recommends getting jury instructions done, possibly closing Monday and Tuesday.

5:41pm Mr. Beck responds.

5:41pm Ms. Torraco responds, does not feel like she has had opportunity to present defendant A. Gallegos case, still needs witnesses served.

5:43pm Court recommends counsel meet and confer over the evening.

**5:44pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-947

Defendants-EP, EU (8 photos), ET, BX1, EQ

Defendants exhibits not admitted- EV, BX1


### **Thursday, May 17, 2018**

**8:27am Court in session.** Court addresses counsel, reviews Eugene Martinez testimony.

8:35am Mr. Castle has 1 witness.

8:35am Ms. Torraco addresses Court regarding witness availability, witness was served and has not contacted her or appeared today.

8:36am Mr. Solis requests additional time to present closing arguments. No objection from counsel,

Court will allow.

8:39am Jury present.

8:39am Mr. Castle calls witness Felix Reyes, witness sworn.

8:39am Mr. Castle conducts direct examination of witness Felix Reyes.

9:27am Mr. Sindel conducts direct examination of witness Felix Reyes.

9:32am Mr. Lahann conducts direct examination of witness Felix Reyes.

9:39am Mr. Castellano conducts cross examination of witness Felix Reyes.

**10:02am Court in recess.**

**10:19am Court in session.**

10:19am Mr. Castellano continues cross examination of witness Felix Reyes.

10:24am Mr. Castle conducts re-direct examination of witness Felix Reyes.

10:26am Court excuses witness Felix Reyes.

10:26am Mr. Burke calls witness Ted Asbury, witness sworn.

10:26am Mr. Burke conducts direct examination of witness Ted Asbury.

10:56am Mr. Solis conducts direct examination of witness Ted Asbury.

10:58am Mr. Beck conducts cross examination of witness Ted Asbury.

11:24am Mr. Burke conducts re-direct examination of witness Ted Asbury.

11:30am Court excuses witness Ted Asbury.

11:36am Bench conference with counsel.

11:36am Mr. Benjamin, Mr. Sindel, Mr. Haurobr, mr. Cooper, Castle, Shattudck, Lahann, Grandburg, Solis, Davidson, Blackburn, Torraco, Roberts. Ms. Armijo indicates government has no rebuttal. Court clerk to get with defense counsel and reconcile defendants exhibits.

11:41am Court addresses jury regarding afternoon schedule. Requests jury return by 3:30pm. Court gives cautionary instructions to jury, now that evidence has all been taken.

11:44 Court excuses jury for lunch; to return at 3:30pm

**11:44pm court in recess.**

**1:36pm Court in session**, counsel and court discuss jury instructions.

1:40pm Mr. Blackburn addresses court regarding Trial 3 counsel.

**1:44pm Court in recess.**

**1:57pm Court in session**, court convenes jury charge conference with counsel.

4:12pm Court addresses counsel, will provide updated set of jury instructions.

4:13pm Mr. Davidson renews Rule 29 motion for defendant Arturo Garcia.

4:13pm Court responds.

DNM 1147

4:16pm Court will file final instructions.

4:49pm Court reads instructions to jury.

6:21pm Court gives cautionary instructions to jury, releases until Monday, 8:30am.

6:21pm Court addresses counsel regarding any changes to jury instructions.

**6:25pm Court in recess.**

**Court admitted the following exhibits without objection.**

Government-1009

Defendants-ER, ES, EW, H, I


## Monday, May 21, 2018


**8:25am Court in session**, counsel addresses Court regarding Albuquerque Journal article.

8:32am Jury present. Court polls jurors individually, asks if individually if they read the article.

**8:48am Court in recess**.

**9:00am Court in session**, jury present.

9:02am Mr. Beck delivers closing statements to jury on behalf of Government.

**11:03am Court in recess** for morning break.

**11:21am Court in session**, jury present. Mr. Castle delivers closing statements to jury on behalf of Billy Garcia.

**1:03pm Court in recess**, gives jury cautionary instructions, releases for lunch break.

**2:07pm Court in session**, court addresses counsel regarding juror request for judge to sign quilting square.  No counsel object.

2:07pm Jury present, Mr. Lahann delivers closing statements to jury on behalf of Allen Patterson.

2:54pm Mr. Grandburg delivers closing statements to jury on behalf of Christopher Chavez.

**3:40pm Court in recess** for afternoon break.

**3:57pm Court in session**, jury present.

3:58pm Mr. Solis delivers closing statements to jury on behalf of Christopher Chavez.

4:46pm Bench conference with counsel to address objections to Mr. Solis' closing statements.

4:49pm Mr. Solis continues with closing statements to jury on behalf of Christopher Chavez.

4:51pm Court addresses jury, gives cautionary instruction, excuses for evening.

**5:00pm Court in recess.**


## May 22, 2018

**8:28am Court in session.** Jury present, Ms. Harbour-Valdez delivers closing statements to jury on behalf of Edward Troup.

**9:12am Court in recess.**

**9:23am Court in session**, jury present. Ms. Torraco delivers closing statements to jury on behalf of Andrew Gallegos.

**10:40am Court in recess.**

**10:55am Court in session**, jury present. Mr. Blackburn delivers closing statements to jury on behalf of Arturo Garcia.

**12:13pm Court in recess**. Court excuses jury for lunch.

**1:23pm Court in session**, jury present. Mr. Sindel delivers closing statements to jury on behalf of Joe Gallegos.

**2:57pm Court in recess.**

**3:13pm Court in session.**  Court addresses counsel regarding final review of jury instructions and verdict to be provided to jury.  Court inquires about physical evidence going back to jury, counsel agree to keep physical evidence in courtroom, provide to jury only if requested. Judge will explain exhibits are to be viewed in JERS system.

3:18pm Jury present, Mr. Castellano delivers rebuttal statement to jury.

4:36pm  Court addresses jury gives instructions to jury before deliberations regarding use of electronic communications, use of JERS for viewing exhibits, physical exhibits.

4:41pm Court addresses alternates, requests they remain seated, excuses jury to deliberation room. Addresses alternates, keeps alternates under charge in jury assembly room, may have electronic devises during deliberations. Court will keep them under charge for now and see how it goes.

**5:00pm Court in recess.**

**5:40pm Court in session**, Court addresses counsel regarding jury's requested schedule of 8-5 daily.

5:44pm Jury present. Court addresses jury regarding scheduling, evening recess.

**5:50pm Court in recess.**

.



1. 5k Team for Reduced Sentence
   Does this state how much a Sentence
   can be Reduced? OR is it wide
   open - Including Dismissal

2. Does the Defense pay for the
   Testimony of a "Expert" Witness

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 2 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 727

Case 2:15-cr-04268-JB   Document 852   Filed 01/26/17   Page 1 of 9

**FILED**

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

JAN 26 2017

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, )
)
      Plaintiff, )
) CRIMINAL NO. 15-CR-4268 JB
    vs. )
)
TIMOTHY MARTINEZ, a.k.a. "Red," )
)
      Defendant. )

## PLEA AGREEMENT

Pursuant to Rule 11, Fed. R. Crim. P., the parties notify the Court of the following agreement between the United States Attorney for the District of New Mexico, the Defendant, TIMOTHY MARTINEZ, a.k.a. "Red," and the defendant's counsel, STEVEN ALMANZA and RAY VELARDE.

### REPRESENTATION BY COUNSEL

1.    The defendant understands the defendant's right to be represented by an attorney and is so represented.   The defendant has thoroughly reviewed all aspects of this case with the defendant's attorney and is fully satisfied with the attorney's legal representation.

### RIGHTS OF THE DEFENDANT

2.    The defendant further understands the defendant's rights:

    a.    to plead not guilty;

    b.    to have a trial by jury;

    c.    to confront and cross-examine witnesses and to call witnesses to testify for

        the defense; and



EXHIBIT
Clerk's
2

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 3 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 728

Case 2:15-cr-04268-JB   Document 852   Filed 01/26/17   Page 2 of 9

d.      against compelled self-incrimination.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

3.      The defendant hereby agrees to waive these rights and to plead guilty to the
Superseding Indictment charging in **Count 6** a violation of 18 U.S.C. § 1959(a)(5): Violent Crimes
in Aid of Racketeering Activity (Conspiracy to Murder), and in **Count 7** a violation of 18 U.S.C.
§ 1959(a)(1): Violent Crimes in Aid of Racketeering Activity (Murder); and 18 U.S.C. § 2: Aiding
and Abetting.

## SENTENCING

4.      The defendant understands that the maximum penalty the Court can impose as to
**Count 6** is:

a.      imprisonment for a period of not more than ten (10) years;

b.      a fine not to exceed $250,000;

c.      a term of supervised release not to exceed three (3) years.   (If the
defendant serves a term of imprisonment, is then released on supervised
release, and violates the conditions of supervised release, the defendant's
supervised release could be revoked--even on the last day of the term--and
the defendant could then be returned to another period of incarceration and
a new term of supervised release); and

d.      a mandatory special penalty assessment of $100.00.

5.      The defendant understands that the maximum penalty the Court can impose as to
**Count 7** is:

a.      a term of imprisonment for life;

b.      a fine not to exceed $250,000;

c.      a mandatory term of supervised release of not more than five (5) years.   (If
the defendant serves a term of imprisonment, is then released on supervised

2

DNM 1152

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 4 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 729

Case 2:15-cr-04268-JB   Document 852   Filed 01/26/17   Page 3 of 9

release, and violates the conditions of supervised release, the defendant's supervised release could be revoked--even on the last day of the term--and the defendant could then be returned to another period of incarceration and a new term of supervised release); and

  d.  a mandatory special penalty assessment of $100.00.

6.  The parties recognize that the Sentencing Guidelines are advisory, and that the Court is required to consider them in determining the sentence it imposes.

7.  It is expressly understood and agreed by and between the defendant and the United States that:

  a.  The United States has made, and will make, NO AGREEMENT pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), that a specific sentence is the appropriate disposition of this case.

  b.  The United States has made, and will make, NO AGREEMENT to approve, to oppose, or not to oppose pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), any request made by the defendant or on behalf of the defendant for a particular sentence in this case, other than the stipulations agreed to below.

  c.  The United States hereby expressly reserves the right to make known to the United States Probation Office and to the Court, for inclusion in the presentence report prepared pursuant to Federal Rule of Criminal Procedure 32, any information that the United States believes may be helpful to the Court, including but not limited to information about any relevant conduct under USSG § 1B1.3.

  d.  Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, the defendant agrees that, upon the defendant's signing of this plea

3

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 5 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 730

Case 2:15-cr-04268-JB   Document 852   Filed 01/26/17   Page 4 of 9

agreement, the facts that the defendant has admitted under this plea agreement as set forth below,

as well as any facts to which the defendant admits in open court at the defendant's plea hearing,

shall be admissible against the defendant under Federal Rule of Evidence 801(d)(2)(A) in any

subsequent proceeding, including a criminal trial, and the defendant expressly waives the

defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence

410 with regard to the facts the defendant admits in conjunction with this plea agreement.

## DEFENDANT'S ADMISSION OF FACTS

8.       By my signature on this plea agreement, I am acknowledging that I am pleading

guilty because I am, in fact, guilty of the offense(s) to which I am pleading guilty.   I recognize

and accept responsibility for my criminal conduct.   Moreover, in pleading guilty, I acknowledge

that if I chose to go to trial instead of entering this plea, the United States could prove facts

sufficient to establish my guilt of the offense(s) to which I am pleading guilty beyond a reasonable

doubt, including any facts alleged in the Superseding Indictment that increase the statutory

minimum or maximum penalties.   I specifically admit the following facts related to the charges

against me, and declare under penalty of perjury that all of these facts are true and correct:

In 2009, while incarcerated within the New Mexico Corrections Department, I became a member of the Syndicato de Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture/ distribute narcotics.   The SNM operates in the District of New Mexico and elsewhere.   The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

On March 7, 2014, I was an active member of the SNM incarcerated at the Southern New Mexico Correctional Facility (SNMCF) in Doña Ana County. Sometime prior to that date, a "green light" had been placed on the person identified in the indictment as J.M. The green light had been outstanding for

4

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 6 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 731

Case 2:15-cr-04268-JB   Document 852   Filed 01/26/17   Page 5 of 9

no less than one year prior to the murder. I was told by Mario Rodriguez, a.k.a. "Blue," that I was being ordered to participate in the murder by Daniel Sanchez, a.k.a. "Dan Dan." Sanchez confirmed his order to me as well.

I, along with other SNM gang members, conspired to murder J.M., and, specifically, Rodriguez and I participated in the murder by attempting to incapacitate J.M. before Montoya and Armenta stabbed him with shanks. The shanks were made from a walker belonging to Rudy Perez. I was ordered to participate in the murder of J.M. by virtue of my membership in the SNM.

Thus, in March 2014, I conspired with members of the SNM gang to murder J.M., and in fact, J.M. was murdered based on his cooperation with law enforcement, which was a violation of the rules of the SNM.

9.      By signing this Agreement, the defendant admits that there is a factual basis for each element of the crime(s) to which the defendant will plead guilty. The defendant agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the defendant's sentence, including, but not limited to, the advisory guideline offense level.

## STIPULATIONS

10.      The United States and the defendant stipulate as follows:

a.      Pursuant to USSG § 3E1.1(a), the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct. Consequently, so long as the defendant continues to accept responsibility for the defendant's criminal conduct, the defendant is entitled to a reduction of two (2) levels from the base offense level as calculated under the sentencing guidelines. This reduction is contingent upon the defendant providing an appropriate oral or written statement to the United States probation officer who prepares the presentence report in this case in which the defendant clearly establishes the defendant's entitlement to this reduction.

5

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 7 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 732

Case 2:15-cr-04268-JB   Document 852   Filed 01/26/17   Page 6 of 9

b.    Provided the defendant meets the requirements of USSG § 3E1.1(b), the government agrees to move for a reduction of one (1) additional level from the base offense level as calculated under the sentencing guidelines.

11.    The defendant understands that the above stipulations are not binding on the Court and that whether the Court accepts these stipulations is a matter solely within the discretion of the Court after it has reviewed the presentence report.   Further, the defendant understands that the Court may choose to vary from the advisory guideline sentence.   The defendant understands that if the Court does not accept any one or more of the above stipulations and reaches an advisory guideline sentence different than expected by the defendant, or if the Court varies from the advisory guideline range, the defendant will not seek to withdraw the defendant's plea of guilty. In other words, regardless of any stipulations the parties may enter into, the defendant's final sentence is solely within the discretion of the Court.

12.    The defendant stipulates that he does not possess any exculpatory information regarding any of his charged co-defendants.

## DEFENDANT'S ADDITIONAL OBLIGATIONS

13.    The defendant understands the defendant's obligation to provide the United States Probation Office with truthful, accurate, and complete information, including, but not limited to defendant's true identity, citizenship status, and any prior criminal convictions.   The defendant hereby represents that the defendant has complied with and will continue to comply with this obligation.   The defendant understands that any misrepresentation with respect to the above obligations may be considered a breach of this plea agreement.

6

Case 2:15-cr-04268-JB    Document 2324-1    Filed 04/09/18    Page 8 of 255
Appellate Case: 20-2058    Document: 010110415671    Date Filed: 09/29/2020    Page: 733

Case 2:15-cr-04268-JB    Document 852    Filed 01/26/17    Page 7 of 9

## WAIVER OF APPEAL RIGHTS

14.    The defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a defendant the right to appeal a conviction and the sentence imposed.  Acknowledging that, the defendant knowingly waives the right to appeal the defendant's conviction(s) and any sentence, including any fine, at or under the maximum statutory penalty authorized by law, as well as any order of restitution entered by the Court.   In addition, the defendant agrees to waive any collateral attack to the defendant's conviction(s) and any sentence, including any fine, pursuant to 28 U.S.C. §§ 2241, 2255, or any other extraordinary writ, except on the issue of defense counsel's ineffective assistance.

## GOVERNMENT'S AGREEMENT

15.    Provided that the defendant fulfills the defendant's obligations as set out above, the United States agrees not to bring additional criminal charges against the defendant arising out of the facts forming the basis of the present Superseding Indictment.

16.    This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## VOLUNTARY PLEA

17.    The defendant agrees and represents that this plea of guilty is freely and voluntarily made and is not the result of force, threats, or promises (other than the promises set forth in this agreement).   There have been no promises from anyone as to what sentence the Court will impose. The defendant also represents that the defendant is pleading guilty because the defendant is in fact guilty.

DNM 1157

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 9 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 734

Case 2:15-cr-04268-JB   Document 852   Filed 01/26/17   Page 8 of 9

## VIOLATION OF PLEA AGREEMENT

18.    The defendant understands and agrees that if the defendant or the defendant's attorney violates any provision of this plea agreement, the United States may declare this plea agreement null and void, and the defendant will thereafter be subject to prosecution for any criminal violation including, but not limited to, any crime(s) or offense(s) contained in or related to the charges in this case, as well as perjury, false statement, and obstruction of justice, and any other crime committed by the defendant during prosecution of this case.

## SPECIAL ASSESSMENT

19.    At the time of sentencing, the defendant will tender a money order or certified check payable to the order of the United States District Court, District of New Mexico, 333 Lomas Boulevard, NW, Albuquerque, New Mexico 87102, in the amount of $200.00 in payment of the special penalty assessment described above.

## ENTIRETY OF AGREEMENT

20.    This document and any addenda are a complete statement of the agreement in this case and may not be altered unless done so in writing and signed by all parties.   The parties agree and stipulate that this agreement will be considered part of the record of the defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.   This agreement is effective upon signature by the defendant and an Assistant United States Attorney, and upon entry of a guilty plea by the defendant pursuant to this agreement.

8

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 10 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 735

Case 2:15-cr-04268-JB   Document 852   Filed 01/26/17   Page 9 of 9

AGREED TO AND SIGNED this _____ day of _____, 2017.

DAMON P. MARTINEZ
United States Attorney

MARIA Y. ARMIJO
Assistant United States Attorney
555 S. Telshor Blvd., Suite 300
Las Cruces, NM   88011
(575) 522-2304 – Tel.

This agreement has been read to me in the language I understand best, and I have carefully discussed every part of it with my attorneys.  I understand the terms of this agreement, and I voluntarily agree to those terms.  My attorneys have advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement.  No promises or inducements have been given to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  Finally, I am satisfied with the representation of my attorneys in this matter.

TIMOTHY MARTINEZ, a.k.a. "Red"
Defendant

We are the attorneys for TIMOTHY MARTINEZ, a.k.a. "Red." We have carefully discussed every part of this agreement with our client.  Further, we have fully advised our client of his rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement.  To our knowledge, our client's decision to enter into this agreement is an informed and voluntary one.

STEVEN ALMANZA
Attorney for Defendant

RAY VELARDE
Attorney for Defendant

9

**FILED**
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

DEC 13 2016

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JERRY ARMENTA, a.k.a. "Creeper," | ) |
| | ) |
| Defendant. | ) |

CRIMINAL NO. 15-CR-4268 JB

## PLEA AGREEMENT

Pursuant to Rule 11, Fed. R. Crim. P., the parties notify the Court of the following agreement between the United States Attorney for the District of New Mexico, the Defendant, JERRY ARMENTA, a.k.a. "Creeper," and the defendant's counsel, GARY MITCHELL.

### REPRESENTATION BY COUNSEL

1.     The defendant understands the defendant's right to be represented by an attorney and is so represented.   The defendant has thoroughly reviewed all aspects of this case with the defendant's attorney and is fully satisfied with the attorney's legal representation.

### RIGHTS OF THE DEFENDANT

2.     The defendant further understands the defendant's rights:

    a.     to plead not guilty;

    b.     to have a trial by jury;

    c.     to confront and cross-examine witnesses and to call witnesses to testify for the defense; and

    d.     against compelled self-incrimination.

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 12 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 737

Case 2:15-cr-04268-JB   Document 802   Filed 12/13/16   Page 2 of 9

## WAIVER OF RIGHTS AND PLEA OF GUILTY

3.      The defendant hereby agrees to waive these rights and to plead guilty to the

Superseding Indictment charging in **Count 6** a violation of 18 U.S.C. § 1959(a)(5): Violent Crimes

in Aid of Racketeering Activity (Conspiracy to Murder), and in **Count 7** a violation of 18 U.S.C.

§ 1959(a)(1): Violent Crimes in Aid of Racketeering Activity (Murder); and 18 U.S.C. § 2: Aiding

and Abetting.

## SENTENCING

4.      The defendant understands that the maximum penalty the Court can impose as to

**Count 6** is:

     a.      imprisonment for a period of not more than ten (10) years;

     b.      a fine not to exceed $250,000;

     c.      a term of supervised release not to exceed three (3) years.   (If the
        defendant serves a term of imprisonment, is then released on supervised
        release, and violates the conditions of supervised release, the defendant's
        supervised release could be revoked--even on the last day of the term--and
        the defendant could then be returned to another period of incarceration and
        a new term of supervised release); and

     d.      a mandatory special penalty assessment of $100.00.

5.      The defendant understands that the maximum penalty the Court can impose as to

**Count 7** is:

     a.      a term of imprisonment for life;

     b.      a fine not to exceed $250,000;

     c.      a mandatory term of supervised release of not more than five (5) years.   (If
        the defendant serves a term of imprisonment, is then released on supervised
        release, and violates the conditions of supervised release, the defendant's
        supervised release could be revoked--even on the last day of the term--and

DNM 1161

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 13 of 255
Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 738

Case 2:15-cr-04268-JB   Document 802   Filed 12/13/16   Page 3 of 9

the defendant could then be returned to another period of incarceration and a new term of supervised release); and

    d.    a mandatory special penalty assessment of $100.00.

6.    The parties recognize that the Sentencing Guidelines are advisory, and that the Court is required to consider them in determining the sentence it imposes.

7.    It is expressly understood and agreed by and between the defendant and the United States that:

    a.    The United States has made, and will make, NO AGREEMENT pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), that a specific sentence is the appropriate disposition of this case.

    b.    The United States has made, and will make, NO AGREEMENT to approve, to oppose, or not to oppose pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), any request made by the defendant or on behalf of the defendant for a particular sentence in this case, other than the stipulations agreed to below.

    c.    The United States hereby expressly reserves the right to make known to the United States Probation Office and to the Court, for inclusion in the presentence report prepared pursuant to Federal Rule of Criminal Procedure 32, any information that the United States believes may be helpful to the Court, including but not limited to information about any relevant conduct under USSG § 1B1.3.

    d.    Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, the defendant agrees that, upon the defendant's signing of this plea agreement, the facts that the defendant has admitted under this plea agreement as set forth below,

DNM 1162

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 14 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 739

Case 2:15-cr-04268-JB   Document 802   Filed 12/13/16   Page 4 of 9

as well as any facts to which the defendant admits in open court at the defendant's plea hearing, shall be admissible against the defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the defendant expressly waives the defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the defendant admits in conjunction with this plea agreement.

<u>DEFENDANT'S ADMISSION OF FACTS</u>

8.     By my signature on this plea agreement, I am acknowledging that I am pleading guilty because I am, in fact, guilty of the offense(s) to which I am pleading guilty.   I recognize and accept responsibility for my criminal conduct.   Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the offense(s) to which I am pleading guilty beyond a reasonable doubt, including any facts alleged in the Superseding Indictment that increase the statutory minimum or maximum penalties.   I specifically admit the following facts related to the charges against me, and declare under penalty of perjury that all of these facts are true and correct:

In 2005, while incarcerated within the New Mexico Corrections Department, I became a member of the Syndicato de Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture/ distribute narcotics.   The SNM operates in the District of New Mexico and elsewhere.   The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

On March 6, 2014, I was an active member of the SNM incarcerated at the Southern New Mexico Correctional Facility (SNMCF) in Doña Ana County. Sometime prior to that date, a "green light" had been placed on J.M. The green light had been outstanding for no less than one year prior to the murder. I, along with other SNM gang members, conspired to murder J.M., and,

4

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 15 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 740

Case 2:15-cr-04268-JB   Document 802   Filed 12/13/16   Page 5 of 9

specifically Jerry Montoya and I stabbed J.M. with shanks. I was ordered to kill J.M. by virtue of my membership in the SNM.

SNM gang members that conspired to kill J.M., and that participated in his murder were the following:   Anthony Ray Baca, a.k.a. "Pup," Daniel Sanchez, a.k.a. "Dan Dan," Carlos Herrera, Rudy Perez, a.k.a. "Ru Dog," Mario Rodriguez, a.k.a. "Blue," and Timothy Martinez, a.k.a. "Red."

Thus, in March 2014, I conspired with members of the SNM gang to murder J.M., and in fact, J.M. was murdered based on his cooperation with law enforcement, which was a violation of the rules of the SNM.

9.     By signing this Agreement, the defendant admits that there is a factual basis for each element of the crime(s) to which the defendant will plead guilty.   The defendant agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the defendant's sentence, including, but not limited to, the advisory guideline offense level.

<u>STIPULATIONS</u>

10.     The United States and the defendant stipulate as follows:

a.     Pursuant to USSG § 3E1.1(a), the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct.   Consequently, so long as the defendant continues to accept responsibility for the defendant's criminal conduct, the defendant is entitled to a reduction of two (2) levels from the base offense level as calculated under the sentencing guidelines.   This reduction is contingent upon the defendant providing an appropriate oral or written statement to the United States probation officer who prepares the presentence report in this case in which the defendant clearly establishes the defendant's entitlement to this reduction.

5

**FILED**

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

NOV 15 2016

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-CR-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| BENJAMIN CLARK, a.k.a. "Cyclone," | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Sealed

## PLEA AGREEMENT

Pursuant to Rule 11, Fed. R. Crim. P., the parties notify the Court of the following

agreement between the United States Attorney for the District of New Mexico, the Defendant,

BENJAMIN CLARK, a.k.a. "Cyclone," and the defendant's counsel, STEPHEN E. HOSFORD

and JERRY DANIEL HERRERA.

### REPRESENTATION BY COUNSEL

1.      The defendant understands the defendant's right to be represented by an attorney

and is so represented.   The defendant has thoroughly reviewed all aspects of this case with the

defendant's attorneys and is fully satisfied with the attorneys' legal representation.

### RIGHTS OF THE DEFENDANT

2.      The defendant further understands the defendant's rights:

   a.      to plead not guilty;

   b.      to have a trial by jury;

   c.      to confront and cross-examine witnesses and to call witnesses to testify for

           the defense; and

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 17 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 742

Case 2:15-cr-04268-JB   Document 768   Filed 11/15/16   Page 2 of 9

    d.    against compelled self-incrimination.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

3.    The defendant hereby agrees to waive these rights and to plead guilty to **Count 3** of the Superseding Indictment charging a violation of 18 U.S.C. § 1959(a)(1): Violent Crimes in Aid of Racketeering Activity (Murder); and 18 U.S.C. § 2: Aiding and Abetting.

## SENTENCING

4.    The defendant understands that the maximum penalty the Court can impose as to **Count 3** is:

    a.    a term of imprisonment for life;

    b.    a fine not to exceed $250,000;

    c.    a mandatory term of supervised release of not more than five (5) years.  (If the defendant serves a term of imprisonment, is then released on supervised release, and violates the conditions of supervised release, the defendant's supervised release could be revoked--even on the last day of the term--and the defendant could then be returned to another period of incarceration and a new term of supervised release); and

    d.    a mandatory special penalty assessment of $100.00.

5.    The parties recognize that the Sentencing Guidelines are advisory, and that the Court is required to consider them in determining the sentence it imposes.

6.    It is expressly understood and agreed by and between the defendant and the United States that:

    a.    The United States has made, and will make, NO AGREEMENT pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), that a specific sentence is the appropriate disposition of this case.

2

DNM 1166

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 18 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 743

Case 2:15-cr-04268-JB   Document 768   Filed 11/15/16   Page 3 of 9

      b.     The United States has made, and will make, NO AGREEMENT to approve, to oppose, or not to oppose pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), any request made by the defendant or on behalf of the defendant for a particular sentence in this case, other than the stipulations agreed to below.

      c.     The United States hereby expressly reserves the right to make known to the United States Probation Office and to the Court, for inclusion in the presentence report prepared pursuant to Federal Rule of Criminal Procedure 32, any information that the United States believes may be helpful to the Court, including but not limited to information about any relevant conduct under USSG § 1B1.3.

      d.     Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, the defendant agrees that, upon the defendant's signing of this plea agreement, the facts that the defendant has admitted under this plea agreement as set forth below, as well as any facts to which the defendant admits in open court at the defendant's plea hearing, shall be admissible against the defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the defendant expressly waives the defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the defendant admits in conjunction with this plea agreement.

### DEFENDANT'S ADMISSION OF FACTS

      7.     By my signature on this plea agreement, I am acknowledging that I am pleading guilty because I am, in fact, guilty of the offense(s) to which I am pleading guilty. I recognize and accept responsibility for my criminal conduct. Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the offense(s) to which I am pleading guilty beyond a reasonable doubt,

DNM 1167

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 19 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 744

Case 2:15-cr-04268-JB   Document 768   Filed 11/15/16   Page 4 of 9

including any facts alleged in the Superseding Indictment that increase the statutory minimum or

maximum penalties. I specifically admit the following facts related to the charges against me,

and declare under penalty of perjury that all of these facts are true and correct:

> In 1998, while incarcerated with the New Mexico Department of Corrections, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture/ distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

> In 2007, I was an active member of the SNM. In June of 2007, I aided and abetted Javier Alonso, a.k.a. "Wineo," Edward Troup, a.k.a. "Huero Troup," Arturo Arnulfo Garcia, a.k.a. "Shotgun," Ruben Hernandez and others to murder the person identified in the superseding indictment as F.S., who was an inmate in the Southern New Mexico Correctional Facility (SNMCF) in Doña Ana County. Alonso, Garcia, Troup, Hernandez, F.S. and I were members of the SNM. In March or April of 2007, a member of the SNM arrived at the SNMCF where I was incarcerated and provided me "paperwork" that was sent from Garcia. It was sent down to SNMCF because F.S. was believed to be en route to SNMCF. The "paperwork" was necessary to show that F.S. was not in good standing with the SNM, and that he needed to be killed as a result of his prior cooperation with law enforcement. At the time the "paperwork" was sent to SNMCF, I was the "main enforcer" for the SNM at SNMCF. Thus, many "orders" went through me in order for them to be acted on by SNM members. On June, 17, 2007, SNM members Alonso and Troup killed F.S. in his cell, while Hernandez covered the camera lens to the camera that could have captured some of the illegal activity.

> By passing the "paperwork" along to the necessary SNM gang members, I aided and abetted in the murder of F.S. as the "paperwork" was vital prior to the murder being committed. I did this because it was expected of me by virtue of my membership in the SNM gang.

> Thus, in 2007, I aided and abetted the murder of F.S.

4

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 20 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 745

Case 2:15-cr-04268-JB   Document 768   Filed 11/15/16   Page 5 of 9

8.     By signing this Agreement, the defendant admits that there is a factual basis for each element of the crime(s) to which the defendant will plead guilty.   The defendant agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the defendant's sentence, including, but not limited to, the advisory guideline offense level.

## STIPULATIONS

9.     The United States and the defendant stipulate as follows:

a.     Pursuant to USSG § 3E1.1(a), the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct.   Consequently, so long as the defendant continues to accept responsibility for the defendant's criminal conduct, the defendant is entitled to a reduction of two (2) levels from the base offense level as calculated under the sentencing guidelines.   This reduction is contingent upon the defendant providing an appropriate oral or written statement to the United States probation officer who prepares the presentence report in this case in which the defendant clearly establishes the defendant's entitlement to this reduction.

b.     Provided the defendant meets the requirements of USSG § 3E1.1(b), the government agrees to move for a reduction of one (1) additional level from the base offense level as calculated under the sentencing guidelines.

10.     The defendant understands that the above stipulations are not binding on the Court and that whether the Court accepts these stipulations is a matter solely within the discretion of the Court after it has reviewed the presentence report.   Further, the defendant understands that the Court may choose to vary from the advisory guideline sentence.   The defendant understands that

5

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 21 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 746

Case 2:15-cr-04268-JB   Document 768   Filed 11/15/16   Page 6 of 9

if the Court does not accept any one or more of the above stipulations and reaches an advisory guideline sentence different than expected by the defendant, or if the Court varies from the advisory guideline range, the defendant will not seek to withdraw the defendant's plea of guilty. In other words, regardless of any stipulations the parties may enter into, the defendant's final sentence is solely within the discretion of the Court.

11.   The defendant stipulates that he does not possess any exculpatory information regarding any of his charged co-defendants.

### DEFENDANT'S ADDITIONAL OBLIGATIONS

12.   The defendant understands the defendant's obligation to provide the United States Probation Office with truthful, accurate, and complete information, including, but not limited to defendant's true identity, citizenship status, and any prior criminal convictions.  The defendant hereby represents that the defendant has complied with and will continue to comply with this obligation.  The defendant understands that any misrepresentation with respect to the above obligations may be considered a breach of this plea agreement.

### WAIVER OF APPEAL RIGHTS

13.   The defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a defendant the right to appeal a conviction and the sentence imposed.  Acknowledging that, the defendant knowingly waives the right to appeal the defendant's conviction(s) and any sentence, including any fine, at or under the maximum statutory penalty authorized by law, as well as any order of restitution entered by the Court.  In addition, the defendant agrees to waive any collateral attack to the defendant's conviction(s) and any sentence, including any fine, pursuant to 28 U.S.C. §§ 2241, 2255, or any other extraordinary writ, except on the issue of defense counsel's ineffective assistance.

6

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 22 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 747

Case 2:15-cr-04268-JB   Document 768   Filed 11/15/16   Page 7 of 9

## GOVERNMENT'S AGREEMENT

14.     Provided that the defendant fulfills the defendant's obligations as set out above, the United States agrees not to bring additional criminal charges against the defendant arising out of the facts forming the basis of the present Superseding Indictment.

15.     This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## VOLUNTARY PLEA

16.     The defendant agrees and represents that this plea of guilty is freely and voluntarily made and is not the result of force, threats, or promises (other than the promises set forth in this agreement).   There have been no promises from anyone as to what sentence the Court will impose.   The defendant also represents that the defendant is pleading guilty because the defendant is in fact guilty.

## VIOLATION OF PLEA AGREEMENT

17.     The defendant understands and agrees that if the defendant or the defendant's attorney violates any provision of this plea agreement, the United States may declare this plea agreement null and void, and the defendant will thereafter be subject to prosecution for any criminal violation including, but not limited to, any crime(s) or offense(s) contained in or related to the charges in this case, as well as perjury, false statement, and obstruction of justice, and any other crime committed by the defendant during prosecution of this case.

## SPECIAL ASSESSMENT

18.     At the time of sentencing, the defendant will tender a money order or certified check payable to the order of the United States District Court, District of New Mexico, 333 Lomas

7

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 23 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 748

Case 2:15-cr-04268-JB   Document 768   Filed 11/15/16   Page 8 of 9

Boulevard, NW, Albuquerque, New Mexico 87102, in the amount of $100.00 in payment of the special penalty assessment described above.

<u>ENTIRETY OF AGREEMENT</u>

19.    This document and any addenda are a complete statement of the agreement in this case and may not be altered unless done so in writing and signed by all parties.   The parties agree and stipulate that this agreement will be considered part of the record of the defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.   This agreement is effective upon signature by the defendant and an Assistant United States Attorney, and upon entry of a guilty plea by the defendant pursuant to this agreement.

AGREED TO AND SIGNED this ___ day of ___ 2016.

DAMON P. MARTINEZ
United States Attorney

MARIA Y. ARMIJO
Assistant United States Attorney
555 S. Telshor Blvd., Suite 300
Las Cruces, NM  88011
(575) 522-2304 – Tel.

8

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 24 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 749

Case 2:15-cr-04268-JB   Document 768   Filed 11/15/16   Page 9 of 9

This agreement has been read to me in the language I understand best, and I have carefully discussed every part of it with my attorneys. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorneys have advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement. No promises or inducements have been given to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorneys in this matter.

_____
BENJAMIN CLARK, a.k.a. "Cyclone"
Defendant


We are attorneys for BENJAMIN CLARK, a.k.a. "Cyclone." We have carefully discussed every part of this agreement with our client. Further, we have fully advised our client of his rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement. To our knowledge, our client's decision to enter into this agreement is an informed and voluntary one.

_____          _____
STEPHEN E. HOSFORD                         JERRY DANIEL HERRERA
Attorney for Defendant                     Attorney for Defendant

9

DNM 1173

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 25 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 750

Case 2:15-cr-04268-JB   Document 802   Filed 12/13/16   Page 6 of 9

b.      Provided the defendant meets the requirements of USSG § 3E1.1(b), the government agrees to move for a reduction of one (1) additional level from the base offense level as calculated under the sentencing guidelines.

11.     The defendant understands that the above stipulations are not binding on the Court and that whether the Court accepts these stipulations is a matter solely within the discretion of the Court after it has reviewed the presentence report.  Further, the defendant understands that the Court may choose to vary from the advisory guideline sentence.   The defendant understands that if the Court does not accept any one or more of the above stipulations and reaches an advisory guideline sentence different than expected by the defendant, or if the Court varies from the advisory guideline range, the defendant will not seek to withdraw the defendant's plea of guilty. In other words, regardless of any stipulations the parties may enter into, the defendant's final sentence is solely within the discretion of the Court.

12.     The defendant stipulates that he does not possess any exculpatory information regarding any of his charged co-defendants.

### DEFENDANT'S ADDITIONAL OBLIGATIONS

13.     The defendant understands the defendant's obligation to provide the United States Probation Office with truthful, accurate, and complete information, including, but not limited to defendant's true identity, citizenship status, and any prior criminal convictions.  The defendant hereby represents that the defendant has complied with and will continue to comply with this obligation.  The defendant understands that any misrepresentation with respect to the above obligations may be considered a breach of this plea agreement.

DNM 1174

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 26 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 751

Case 2:15-cr-04268-JB   Document 802   Filed 12/13/16   Page 7 of 9

## WAIVER OF APPEAL RIGHTS

14.    The defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a defendant the right to appeal a conviction and the sentence imposed.   Acknowledging that, the defendant knowingly waives the right to appeal the defendant's conviction(s) and any sentence, including any fine, at or under the maximum statutory penalty authorized by law, as well as any order of restitution entered by the Court.   In addition, the defendant agrees to waive any collateral attack to the defendant's conviction(s) and any sentence, including any fine, pursuant to 28 U.S.C. §§ 2241, 2255, or any other extraordinary writ, except on the issue of defense counsel's ineffective assistance.

## GOVERNMENT'S AGREEMENT

15.    Provided that the defendant fulfills the defendant's obligations as set out above, the United States agrees not to bring additional criminal charges against the defendant arising out of the facts forming the basis of the present Superseding Indictment.

16.    This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## VOLUNTARY PLEA

17.    The defendant agrees and represents that this plea of guilty is freely and voluntarily made and is not the result of force, threats, or promises (other than the promises set forth in this agreement).   There have been no promises from anyone as to what sentence the Court will impose. The defendant also represents that the defendant is pleading guilty because the defendant is in fact guilty.

7

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 27 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 752

Case 2:15-cr-04268-JB   Document 802   Filed 12/13/16   Page 8 of 9

## VIOLATION OF PLEA AGREEMENT

18.     The defendant understands and agrees that if the defendant or the defendant's attorney violates any provision of this plea agreement, the United States may declare this plea agreement null and void, and the defendant will thereafter be subject to prosecution for any criminal violation including, but not limited to, any crime(s) or offense(s) contained in or related to the charges in this case, as well as perjury, false statement, and obstruction of justice, and any other crime committed by the defendant during prosecution of this case.

## SPECIAL ASSESSMENT

19.     At the time of sentencing, the defendant will tender a money order or certified check payable to the order of the United States District Court, District of New Mexico, 333 Lomas Boulevard, NW, Albuquerque, New Mexico 87102, in the amount of $100.00 in payment of the special penalty assessment described above.

## ENTIRETY OF AGREEMENT

20.     This document and any addenda are a complete statement of the agreement in this case and may not be altered unless done so in writing and signed by all parties.   The parties agree and stipulate that this agreement will be considered part of the record of the defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.   This agreement is effective upon signature by the defendant and an Assistant United States Attorney, and upon entry of a guilty plea by the defendant pursuant to this agreement.

8

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 28 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 753
Case 2:15-cr-04268-JB   Document 802   Filed 12/13/16   Page 9 of 9

AGREED TO AND SIGNED this _13th_ day of _December_, 2016.

DAMON P. MARTINEZ
United States Attorney

MARIA Y. ARMIJO
Assistant United States Attorney
555 S. Telshor Blvd., Suite 300
Las Cruces, NM  88011
(575) 522-2304 – Tel.

This agreement has been read to me in the language I understand best, and I have carefully discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms.  My attorney has advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement.  No promises or inducements have been given to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  Finally, I am satisfied with the representation of my attorney in this matter.

JERRY ARMENTA, a.k.a. "Creeper"
Defendant

I am the attorney for JERRY ARMENTA, a.k.a. "Creeper." I have carefully discussed every part of this agreement with my client.  Further, I have fully advised my client of his rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement.  To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

GARY MITCHELL
Attorney for Defendant

9

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 29 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 754

Case 2:15-cr-04268-JB   Document 880   Filed 02/01/17   Page 1 of 9

**FILED**

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

FEB 0 1 2017

MATTHEW J. DYKMAN
CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,               )
                                   )      CRIMINAL NO. 15-CR-4268 JB
    vs.                           )
                                   )
**RUBEN HERNANDEZ,**               )
                                   )
        Defendant.               )

## PLEA AGREEMENT

Pursuant to Rule 11, Fed. R. Crim. P., the parties notify the Court of the following agreement between the United States Attorney for the District of New Mexico, the Defendant, RUBEN HERNANDEZ and the defendant's counsel, PEDRO PINEDA.

## REPRESENTATION BY COUNSEL

1.    The defendant understands the defendant's right to be represented by an attorney and is so represented.  The defendant has thoroughly reviewed all aspects of this case with the defendant's attorney and is fully satisfied with the attorney's legal representation.

## RIGHTS OF THE DEFENDANT

2.    The defendant further understands the defendant's rights:

    a.    to plead not guilty;

    b.    to have a trial by jury;

    c.    to confront and cross-examine witnesses and to call witnesses to testify for the defense; and

    d.    against compelled self-incrimination.

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 30 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 755

Case 2:15-cr-04268-JB   Document 880   Filed 02/01/17   Page 2 of 9

### WAIVER OF RIGHTS AND PLEA OF GUILTY

3.    The defendant hereby agrees to waive these rights and to plead guilty to **Count 3**

of the Superseding Indictment charging a violation of 18 U.S.C. § 1959(a)(1): Violent Crimes in

Aid of Racketeering Activity (Murder); and 18 U.S.C. § 2: Aiding and Abetting.

### SENTENCING

4.    The defendant understands that the maximum penalty the Court can impose as to

**Count 3** is:

      a.    a term of imprisonment for life;

      b.    a fine not to exceed $250,000;

      c.    a mandatory term of supervised release of not more than five (5) years.   (If
         the defendant serves a term of imprisonment, is then released on supervised
         release, and violates the conditions of supervised release, the defendant's
         supervised release could be revoked--even on the last day of the term--and
         the defendant could then be returned to another period of incarceration and
         a new term of supervised release); and

      d.    a mandatory special penalty assessment of $100.00.

5.    The parties recognize that the Sentencing Guidelines are advisory, and that the

Court is required to consider them in determining the sentence it imposes.

6.    It is expressly understood and agreed by and between the defendant and the

United States that:

      a.    The United States has made, and will make, NO AGREEMENT pursuant

to Federal Rule of Criminal Procedure 11(c)(1)(C), that a specific sentence is the appropriate

disposition of this case.

2

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 31 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 756

Case 2:15-cr-04268-JB   Document 880   Filed 02/01/17   Page 3 of 9

b.      The United States has made, and will make, NO AGREEMENT to approve, to oppose, or not to oppose pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), any request made by the defendant or on behalf of the defendant for a particular sentence in this case, other than the stipulations agreed to below.

c.      The United States hereby expressly reserves the right to make known to the United States Probation Office and to the Court, for inclusion in the presentence report prepared pursuant to Federal Rule of Criminal Procedure 32, any information that the United States believes may be helpful to the Court, including but not limited to information about any relevant conduct under USSG § 1B1.3.

d.      Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, the defendant agrees that, upon the defendant's signing of this plea agreement, the facts that the defendant has admitted under this plea agreement as set forth below, as well as any facts to which the defendant admits in open court at the defendant's plea hearing, shall be admissible against the defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the defendant expressly waives the defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the defendant admits in conjunction with this plea agreement.

<u>DEFENDANT'S ADMISSION OF FACTS</u>

7.      By my signature on this plea agreement, I am acknowledging that I am pleading guilty because I am, in fact, guilty of the offense(s) to which I am pleading guilty.  I recognize and accept responsibility for my criminal conduct.  Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering this plea, the United States could prove facts

DNM 1180

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 32 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 757

Case 2:15-cr-04268-JB   Document 880   Filed 02/01/17   Page 4 of 9

sufficient to establish my guilt of the offense(s) to which I am pleading guilty beyond a reasonable doubt, including any facts alleged in the Superseding Indictment that increase the statutory minimum or maximum penalties. I specifically admit the following facts related to the charges against me, and declare under penalty of perjury that all of these facts are true and correct:

> In 2007, while incarcerated with the New Mexico Department of Corrections, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture/ distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

> In 2007, I was an active member of the SNM. In June of 2007, I aided and abetted Javier Alonso, a.k.a. "Wineo," Edward Troup, a.k.a. "Huero Troup," Arturo Arnulfo Garcia, a.k.a. "Shotgun," Benjamin Clark, a.k.a. Cyclone and others to murder the person identified in the superseding indictment as F.S., who was an inmate in the Southern New Mexico Correctional Facility (SNMCF) in Doña Ana County. Alonso, Garcia, Troup, Clark, F.S. and I were members of the SNM at the time. On June, 17, 2007, SNM members Alonso and Troup killed F.S. in his cell, while I covered the camera lens to the camera that could have captured some of the illegal activity. I also served as a lookout in case anyone came. I heard the sound of a struggle followed by silence. Shortly after that I saw Troup walking quickly to his room and Alonso tucking in F.S.'s body in his bed. Clark and Garcia also aided and abetted in the murder.

> I did this by virtue of my membership in the SNM and to maintain or increase my position in the SNM.

> Thus, in 2007, I aided and abetted the murder of F.S.

8.      By signing this Agreement, the defendant admits that there is a factual basis for each element of the crime(s) to which the defendant will plead guilty. The defendant agrees that

DNM 1181

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 33 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 758

Case 2:15-cr-04268-JB   Document 880   Filed 02/01/17   Page 5 of 9

the Court may rely on any of these facts, as well as facts in the presentence report, to determine the defendant's sentence, including, but not limited to, the advisory guideline offense level.

STIPULATIONS

9.     The United States and the defendant stipulate as follows:

a.     Pursuant to USSG § 3E1.1(a), the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct.   Consequently, so long as the defendant continues to accept responsibility for the defendant's criminal conduct, the defendant is entitled to a reduction of two (2) levels from the base offense level as calculated under the sentencing guidelines.   This reduction is contingent upon the defendant providing an appropriate oral or written statement to the United States probation officer who prepares the presentence report in this case in which the defendant clearly establishes the defendant's entitlement to this reduction.

b.     Provided the defendant meets the requirements of USSG § 3E1.1(b), the government agrees to move for a reduction of one (1) additional level from the base offense level as calculated under the sentencing guidelines.

10.     The defendant understands that the above stipulations are not binding on the Court and that whether the Court accepts these stipulations is a matter solely within the discretion of the Court after it has reviewed the presentence report.   Further, the defendant understands that the Court may choose to vary from the advisory guideline sentence.   The defendant understands that if the Court does not accept any one or more of the above stipulations and reaches an advisory guideline sentence different than expected by the defendant, or if the Court varies from the advisory guideline range, the defendant will not seek to withdraw the defendant's plea of guilty.

5

DNM 1182

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 34 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 759

Case 2:15-cr-04268-JB   Document 880   Filed 02/01/17   Page 6 of 9

In other words, regardless of any stipulations the parties may enter into, the defendant's final sentence is solely within the discretion of the Court.

11.    The defendant stipulates that he does not possess any exculpatory information regarding any of his charged co-defendants.

DEFENDANT'S ADDITIONAL OBLIGATIONS

12.    The defendant understands the defendant's obligation to provide the United States Probation Office with truthful, accurate, and complete information, including, but not limited to defendant's true identity, citizenship status, and any prior criminal convictions.   The defendant hereby represents that the defendant has complied with and will continue to comply with this obligation.   The defendant understands that any misrepresentation with respect to the above obligations may be considered a breach of this plea agreement.

WAIVER OF APPEAL RIGHTS

13.    The defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a defendant the right to appeal a conviction and the sentence imposed.   Acknowledging that, the defendant knowingly waives the right to appeal the defendant's conviction(s) and any sentence, including any fine, at or under the maximum statutory penalty authorized by law, as well as any order of restitution entered by the Court.   In addition, the defendant agrees to waive any collateral attack to the defendant's conviction(s) and any sentence, including any fine, pursuant to 28 U.S.C. §§ 2241, 2255, or any other extraordinary writ, except on the issue of defense counsel's ineffective assistance.

GOVERNMENT'S AGREEMENT

14.    Provided that the defendant fulfills the defendant's obligations as set out above, the

6

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 35 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 760

Case 2:15-cr-04268-JB   Document 880   Filed 02/01/17   Page 7 of 9

United States agrees not to bring additional criminal charges against the defendant arising out of the facts forming the basis of the present Superseding Indictment.

15.     This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## VOLUNTARY PLEA

16.     The defendant agrees and represents that this plea of guilty is freely and voluntarily made and is not the result of force, threats, or promises (other than the promises set forth in this agreement).   There have been no promises from anyone as to what sentence the Court will impose. The defendant also represents that the defendant is pleading guilty because the defendant is in fact guilty.

## VIOLATION OF PLEA AGREEMENT

17.     The defendant understands and agrees that if the defendant or the defendant's attorney violates any provision of this plea agreement, the United States may declare this plea agreement null and void, and the defendant will thereafter be subject to prosecution for any criminal violation including, but not limited to, any crime(s) or offense(s) contained in or related to the charges in this case, as well as perjury, false statement, and obstruction of justice, and any other crime committed by the defendant during prosecution of this case.

## SPECIAL ASSESSMENT

18.     At the time of sentencing, the defendant will tender a money order or certified check payable to the order of the United States District Court, District of New Mexico, 333 Lomas Boulevard, NW, Albuquerque, New Mexico 87102, in the amount of $100.00 in payment of the special penalty assessment described above.

DNM 1184

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 36 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 761

Case 2:15-cr-04268-JB   Document 880   Filed 02/01/17   Page 8 of 9

## ENTIRETY OF AGREEMENT

19.    This document and any addenda are a complete statement of the agreement in this

case and may not be altered unless done so in writing and signed by all parties.   The parties agree

and stipulate that this agreement will be considered part of the record of the defendant's guilty plea

hearing as if the entire agreement had been read into the record of the proceeding.   This agreement

is effective upon signature by the defendant and an Assistant United States Attorney, and upon

entry of a guilty plea by the defendant pursuant to this agreement.

AGREED TO AND SIGNED this ____ day of _____, 2017.

DAMON P. MARTINEZ
United States Attorney

MARIA Y. ARMIJO
Assistant United States Attorney
555 S. Telshor Blvd., Suite 300
Las Cruces, NM   88011
(575) 522-2304 – Tel.

8

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 37 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 762

Case 2:15-cr-04268-JB   Document 880   Filed 02/01/17   Page 9 of 9

This agreement has been read to me in the language I understand best, and I have carefully discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorney has advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement. No promises or inducements have been given to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

_____
RUBEN HERNANDEZ
Defendant

I am the attorney for RUBEN HERNANDEZ. I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

_____
PEDRO PINEDA
Attorney for Defendant

9

DNM 1186

190

 1   five times.  It wasn't just a generation.  But my

 2   generation -- when I got to prison, the older ones

 3   used to call us the Pepsi Generation.  The Pepsi

 4   Generation.  A remark like -- and then during -- a

 5   remark like, "You guys are stupid."  Know what I

 6   mean?  The Pepsi Generation.

 7        Q.   And it changed who could be a member, how

 8   you were --

 9        A.   Angel Munoz was the last person I knew

10   that was respected universally.  He used to say he

11   don't want to be the leader, but he was the leader.

12   He was pretty much.  I don't know if he wanted it or

13   not for real in his heart, but he used to say he

14   didn't want to be the leader.  He used to say, "I

15   don't want kids.  I don't want dads.  I want

16   brothers.  That's it."

17             After him, nobody commanded the same

18   respect or the same obedience or the same anything,

19   really.  Everybody tried.  But Angel -- I seen him

20   be like Leroy Torrez, and that was like his son.  He

21   treated that guy like his son.  But JR -- Leroy

22   Torrez had -- I don't even remember what he did, but

23   he did something.  And we asked him what's up.  And

24   he put his head down, and he said, "Hit him."

25             And these other guys, they wouldn't green

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT
Clerk's
3

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 39 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 764

191

1   light their best friend.  They wouldn't green light

2   even their worst enemy, as long as that guy was

3   giving him dope.  So Angel had that respect, because

4   he didn't -- whatever you say about him, I never

5   seen it, he never used the dope as part of

6   consideration.  He did whatever was good for the

7   group, was what he would consider, in my eyes.

8        Q.   You think drug addiction completely

9   changed the SNM?

10        A.   I think the leadership quality changed the

11   SNM.  Bad leaders made bad decisions, and bad

12   decisions led to bad outcomes.

13        Q.   Let's talk about those transcripts a

14   little bit.  You talked about this first transcript

15   and I think it was audio 356.  But the very first

16   time you spoke to Mr. Baca over the phone, the name

17   Gregg Marcantel never came up, did it?

18        A.   You have the transcript and you have the

19   recording.  Like I said, you can play it.

20        Q.   Well, we played it today.

21        A.   Okay.  What did you hear?

22        Q.   Well, I'm asking you.  Did you ever hear

23   his name come up?

24        A.   I remember it came up, but I don't know if

25   it came up in that particular phone call or that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

192

1   conversation.

2       Q.   And in that conversation, you guys talked

3   about:  The only three people would know about that,

4   and that would be you, Eric Duran, and Anthony Baca.

5       A.   Yeah.  He's saying, "Don't tell nobody

6   else."

7       Q.   And he said it was going to be you three

8   only.  And at that time, you had already contracted

9   with the FBI to become a confidential human source

10  of information.

11      A.   Yeah.  I didn't mention that on that phone

12  call, though.

13      Q.   No.  It would have defeated the purpose of

14  having the phone call.

15      A.   Yes.

16      Q.   But you were a confidential human source?

17      A.   Yeah.

18      Q.   And you'd become a confidential human

19  source shortly after your arrest in September 2015?

20      A.   Yes.

21      Q.   You had an initial debrief with the FBI

22  and the United States attorney on October 6?

23      A.   I'm not sure of the date, but yeah, sounds

24  right.

25      Q.   And then you signed a confidential human

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

193

1   source contract on October 27?

2       A.   Sounds right.   If that's what the

3   paperwork says.

4       Q.   And so they gave you the phone and just

5   had you, again, go back out in the field, and you

6   were assisting the FBI in doing controlled

7   purchases.

8       A.   I made controlled buys and stuff and

9   pretty much that was my life.

10      Q.   And you're working off your charges?

11      A.   I wouldn't say I was working them off.   I

12  still got charged.   I still face a significant

13  amount of time, but I definitely got a deal, like

14  you said.

15      Q.   And you're putting in the work for Team

16  America?

17      A.   I'm on Team America.

18      Q.   And you're putting in the work?

19      A.   I'm putting in work.

20      Q.   So I want to make sure the jury

21  understands is that first recording we listened to

22  it was you, who was a Government informant, talking

23  to Mr. Baca; correct?

24      A.   You can go back to the transcript and you

25  can look at it.   It's either me or Crazo, because we

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

194

1    were the only two --

2         Q.    You and Crazo were both Government

3    informants?

4         A.    Yes.   But I don't think either one of us

5    knew it at the time.   I don't know if he did or not.

6    The way I understand it, whoever initiated the call

7    is a confidential human source.   So whoever

8    initiated that call, whether it was me or Crazo,

9    it's going to be the confidential human source, is

10   the way I understand it.

11             MR. LOWRY:   Can we approach, Your Honor?

12             THE COURT:   You may.

13             (The following proceedings were held at

14   the bench.)

15             MR. LOWRY:   Your Honor, this gets a little

16   overly complicated, the way these recordings were

17   made.   The communication was initiated by a phone

18   call.   Both confidential human sources also had

19   their ELSUR devices, and both used both to record

20   calls.   So the Government's exhibit I think is the

21   ELSUR device.   And we had a transcript of the exact

22   same recording made of the phone call.   This witness

23   just testified that whoever initiated the call was

24   the confidential human source.   And this shows who

25   initiated the call.   Whereas, the Government's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@itsupport.com

DNM 1191

195

1  transcript did not, because it was an ELSUR

2  recording.  All I want to do is show him the very

3  first page that shows who initiated the call.

4        MR. CASTELLANO:  The problem is that

5  sometimes these were recorded at both ends.  For

6  example, if Eric Duran called Montoya, Eric Duran's

7  portion may have captured additional information

8  from discussions before the call.  So Mr. Montoya

9  would only know what he captured when he answered

10  the call.

11        So they may not have the right exhibit to

12  ask this witness that question.  Because unless he

13  initiated the call, he doesn't know what happened

14  before the call was initiated, if that makes sense.

15  This witness would have no basis of knowledge what

16  happened on the other end of the line until he

17  actually answered the phone.

18        THE COURT:  Well, I think I'll let you

19  explain this to the jury with that.  But it seems to

20  me that he's got a transcript here of the telephone

21  call, and --

22        MR. CASTELLANO:  I agree.

23        THE COURT:  -- chances are 50/50 it's

24  right.

25        MR. CASTELLANO:  The issue is that he may

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

196

1    not have been part of the conversation until he

2    answered his phone.  And so, like I said, Eric Duran

3    may have had a conversation before the call started

4    to which Mr. Montoya wasn't privy.  I don't know how

5    we explain that to the jury.  Mr. Montoya only knows

6    what happens when he answered his phone and began

7    the conversation.  So it's maybe a better question

8    for Eric Duran and not Mario Montoya.

9           MR. LOWRY:  Mario Montoya answered the

10   phone.

11          THE COURT:  I'll let you put it up there.

12   I think if the Government wants to explain, it's

13   that important -- looks like it's marginal to me --

14   if the Government wants to explain it, it's probably

15   50/50 you're right.

16          MR. LOWRY:  I wouldn't be here if I

17   thought I was wrong.

18          THE COURT:  If the Government wants to

19   pursue another explanation, they can do it.  All

20   right.

21          (The following proceedings were held in

22   open court.)

23          THE COURT:  Mr. Lowry.

24          MR. LOWRY:  May I approach?

25          THE COURT:  You may.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

197

1      A.    Like I say, it's just my assumption about

2  the confidential human source thing.  I don't know

3  that for a fact.  My assumption.

4  BY MR. LOWRY:

5      Q.    I'm going to show you the beginning of

6  that call.

7      A.    "Hello," I would say I was answering the

8  phone if I said "Hello."

9      Q.    If you were answering, who initiated the

10  call?

11      A.    I would probably say maybe Eric Duran.

12  Like I said, I don't know if that's how the papers

13  are.  Just by me reviewing them, that's what it

14  looks like to me.

15      Q.    If I understood your testimony just now,

16  you said whoever initiated the call would be a

17  confidential human source.

18      A.    I believe that's the way -- would be the

19  confidential human source in that paperwork.  I

20  believe that by reading it, and looking at it,

21  because sometimes it lists me as the confidential

22  human source, and sometimes it lists Eric Duran as

23  the confidential human source.  So my opinion is

24  that maybe the person that initiated the call is the

25  confidential human source.  Because we're both --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1194

198

1   like I said, I don't know that he is, and I don't

2   know if he knows that I am.  But it would be my

3   assumption that that's why it's like that.   I

4   wondered about it myself.

5        Q.   So you worked with the FBI; right?

6        A.   Yes.

7        Q.   And after that first call, I believe you

8   said, "Hey, give me a couple of days."  You talked

9   about that on direct.  You didn't want to act right

10  away.

11       A.   Yeah, I wanted time to find out if he

12  wanted me to get a weapon, which I say I don't

13  really know.

14       Q.   And you wanted time to coordinate with the

15  FBI so you could plan your next steps; correct?

16       A.   Okay.  I was -- in my opinion, my thought

17  process, I'm thinking, I don't know what these

18  people want me to do.  Do they want me to say I have

19  a gun and I'm going to do it and that's the case

20  right there?  Or do they want me to play along and

21  say, "No, you get me a gun?"  You know what I mean?

22  And see where it goes.  So basically, they come and

23  just talk to me, see where it goes.  You don't have

24  a weapon.

25       Q.   Right.  They said for you to tell them you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

199

1  don't have a weapon.

2       A.   Yeah.

3       Q.   Because they didn't want you participating

4  in the conspiracy.

5       A.   I think they wanted me to let them talk.

6       Q.   Right.  And they wanted them to reach out

7  to other people.

8       A.   Yeah.

9       Q.   That's fair?

10      A.   I would say they wanted to see if they

11  were really going to do this, or if they're just

12  talking shit.  Excuse my language.  Sorry.

13           I really believe that they were curious at

14  that point whether it was an actual thing or just

15  throwing off steam or something.

16      Q.   But you would agree with me in that first

17  call we listened to, there is no mention of Gregg

18  Marcantel.

19      A.   If you play the tape and we listen to it,

20  whichever one is the first one, I could answer your

21  question.  But there's a lot of tapes.  In some of

22  them he's mentioned, and some of them he's not.  If

23  you want to play it and we'll listen to it, and I'll

24  tell you if I hear his name or not.

25           I understand it's your job to defend, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

200

1    it's my job to tell the truth.  I'm not trying to

2    confuse anybody.  I'm trying to stick to the facts

3    here.

4         Q.   Right.  But we listened to it.  Do you

5    remember what we listened to?

6         A.   We listened to a few, yes.  I remember it

7    was one of them we listened to.  But I don't know

8    which one was the first one or which one was the

9    last one, or which one his name was specifically

10   mentioned.  But thank God, it's on tape.

11        Q.   Right.  Now, the second recording we

12   listened to was Government's Exhibit 380.  And I

13   want to play a little clip for you, if we could.

14             (Tape played.)

15        Q.   Now, you were talking about inaccuracies

16   in the transcript, but what you just heard was Mr.

17   Baca saying Barney Rubble or the other one; right?

18        A.   I heard Crazo telling him -- what it

19   sounds like to me, Crazo is telling him, "You didn't

20   tell him everything.  You only told him two."

21             And Pup says, "Huh?"

22             And Crazo says, "You only told him two."

23   Not -- T-W-O is what he's saying.  "You only told

24   him two."  He doesn't know who the other one is, I'm

25   supposing.  And Pup said, "Yeah, I told him Barney

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1197

201

1   Rubble or the other one."

2        Q.    Right.

3        A.    "But he only told me two."

4        Q.    And throughout this transcript, the two

5   names that keep cropping up are Adam Vigil and

6   Dwayne Santistevan?

7        A.    I haven't heard.  Yeah, if that's what --

8   if those are the names on this particular recording,

9   yes.

10       Q.    And those would be the two names we're

11  talking about; if you agree with me, that those were

12  the two names?

13       A.    Those are the two names we're talking

14  about.

15       Q.    Right.  Now, later on in that, you sort of

16  try to steer Mr. Baca towards the top dog or what

17  you call the top one.

18       A.    I don't think I tried to steer him

19  anywhere.  I just talked to him like I normally

20  would and acted the way I normally would if I was

21  still down for this cause.

22       Q.    Right.  But on your direct examination,

23  you said that the top one was Gregg Marcantel.

24       A.    That's what I would consider the top dog,

25  yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

202

1     Q.    But if they're talking about STIU

2  officers, the top dog is -- the top one is Dwayne

3  Santistevan; correct?

4     A.    If you're specifically talking about STIU,

5  the head of STIU would be Dwayne Santistevan.

6     Q.    Right.  And if you're talking about Barney

7  Rubble as the other one in the clip we saw, the

8  other one being --

9     A.    Administration.  So the top dog in

10  administration would be Gregg Marcantel.

11     Q.    Well, they weren't talking about

12  administration; they were talking about STIU.

13     A.    Adam Vigil is administration.  Adam Vigil

14  is the unit manager, a lieutenant.  He could have

15  been a deputy warden.

16     Q.    Right.  But they were talking about --

17  you're familiar with Dwayne Santistevan from your

18  days at the pen; right?

19     A.    Yeah, Dwayne Santistevan would be top dog

20  in STIU.

21     Q.    Right.

22     A.    Gregg Marcantel would be the top dog of

23  administration.

24     Q.    And in the same transcript when Mr. Baca

25  was saying, "Look them up on Google searches," you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1199

203

1    weren't looking up the administration; you were

2    looking up STIU?

3        A.   I was looking up Director of Adult

4    Prisons, Secretary of Corrections.  That's what I

5    was looking up on the cellphone.

6            MR. LOWRY:  May I approach, Your Honor?

7            THE COURT:  You may.

8        A.   And I think he suggested STIU as well,

9    maybe.  The highlighted portion.

10   BY MR. LOWRY:

11       Q.   You can read the whole thing.

12       A.   It doesn't say that at all.  I'm telling

13   you.  I'll give you -- I'll give you -- I think part

14   of the STIU, or the STIU, or whatever, website.

15           MR. LOWRY:  I was just asking him to

16   review it, not read it.

17       A.   Don't read?  Okay, I read it.  Or STIU

18   would mean administration or STIU.  That's what it

19   would mean to me.

20       Q.   Right.  You were focused on STIU because

21   that's where Adam Vigil and Dwayne Santistevan

22   worked.

23       A.   Or STIU.  Secondary was STIU, is how I

24   would take it.  And that's a different context.

25       Q.   But Gregg Marcantel's name never comes up

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1200

204

1   in this transcript.  Only Adam Villa and Dwayne

2   Santistevan.

3       A.   People don't say "gun," people don't say

4   "murder," people don't say a lot of things in that

5   transcript that are taking place.

6       Q.   Right.  But I mean, if you're on Team

7   America, you want this to be Gregg Marcantel,

8   because that's where you're trying to push it.

9       A.   That's where you're not getting it, man.

10  I don't care if these guys get convicted or they're

11  found innocent.  It's not really about that to me.

12  I don't care.  I'm redeeming myself.  I'm doing what

13  I need to do for me.  I'm struggling with my

14  addiction, with my skeletons in my closet, and I'm

15  doing what I need to do for me and my family.

16      Q.   Right.

17      A.   Whatever happens to these guys, I don't

18  have a horse in that race, man.  I agreed to

19  cooperate and answer the questions truthfully.

20      Q.   Work with me on the transcript, then.

21  Because the transcript doesn't say Gregg Marcantel

22  anywhere in it.

23      A.   It doesn't say.  I hadn't seen it.

24  Nothing you've shown me.  But I've heard it on the

25  tapes.  I don't know which one, but I've heard it on

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

205

1   the tapes.  What you've shown me so far, I have not

2   seen the name Gregg Marcantel.  Have not.

3        Q.   Would you like to review the whole

4   transcript?

5        A.   Play the whole tape.

6        Q.   Well, it would be faster if you review the

7   transcript.

8        A.   I'm a pretty slow reader, but I'll read it

9   if you want me to.

10            MR. LOWRY:  May I approach?

11            THE COURT:  You may.

12        A.   Is this all one conversation?  Sir?  Is

13   this all one conversation?

14        Q.   Yes.

15        A.   How far of this do you want me to read?

16   The entire thing?

17        Q.   Well, I was asking you a simple question:

18   If you recall hearing Gregg Marcantel's name

19   anywhere in that conversation and --

20        A.    So I heard his name in some conversations;

21   in some conversations I didn't.  In this particular

22   conversation, I would have to go through the whole

23   thing to remember exactly what was said.  It was two

24   years ago.  And like I said, most of the time I was

25   just saying, "Yeah, yeah," playing a role. I don't



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

206

1   remember which conversation it did or didn't come up

2   in.  It came up in some, and some of them it didn't.

3   This one, I'm inclined to say that it didn't come up

4   in this conversation, but I wouldn't know for sure

5   without reading the whole thing.

6       Q.   And I don't want to rush you.  I just --

7   like you said, I want to know the truth.

8       A.   I'm telling you the truth.  I'm trying to

9   give you guys to the best of my ability the truth.

10       Q.   But the question is simple.  You said you

11   reviewed the audiotapes before you came to court to

12   testify.

13       A.   Yes, and we played most of them in here

14   today.  But there is a lot of audiotapes and there

15   are different conversations.

16       Q.   This is the second audiotape, and you have

17   the transcript right there, so just finish reviewing

18   it and let us know.

19       A.   Okay.  Well, yeah, I don't believe

20   Marcantel's name is in this conversation.  I think

21   when he says that one or the other one, he's either

22   referring to Santistevan or Marcantel.

23           MR. LOWRY:  May I approach, Your Honor?

24           THE COURT:  You may.

25       A.   As far as I can -- and I think Carlos

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1203

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 55 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 780

207

1    Valdez' name is mentioned somewhere in there, too.

2    BY MR. LOWRY:

3        Q.    Thank you, Mr. Montoya.

4        A.    Yes, sir.

5        Q.    And that brings us to the third transcript

6    that we listened to today.  And by the way, nobody

7    gave a time reference for the first two recordings

8    we heard.  Do you, by any chance, know what time

9    that they were recorded?

10       A.    I think most of them were in the daytime.

11       Q.    But do you know what month?

12       A.    Oh, it was after I got arrested and before

13   Christmas Eve.

14       Q.    That's the best of your ability?

15       A.    Yeah.

16       Q.    So during the second call, then, at that

17   point you're telling Mr. Baca you can't get a gun?

18       A.    One of the calls, I was telling him I

19   can't get a gun.

20       Q.    Right.  And the whole purpose of that is

21   so -- to see where the conversation goes, to see how

22   he's going to go get a weapon?

23       A.    If he gets a gun, and if he proceeds with

24   the plan and really tries to get it done, or --

25       Q.    Right.  But you suggested that he go to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


Bean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1204

208

1   Chris.

2       A.    I suggested he go to Chris for money.

3       Q.    And a gun.

4       A.    I don't think I suggested the gun.  He

5   said, "Tell Chris, kick in with some money."

6       Q.    Well, you had gone to Chris for guns

7   before, Chris Garcia?

8       A.    I had gone to Chris for guns and money and

9   dope before, on a hundred occasions.

10       Q.    Right.  And you had actually testified on

11   direct that I think you picked up a pistol from

12   Chris to actually do the Shane Dix murder.

13       A.    Chris actually gave me two pistols that I

14   was supposed to use in that crime.

15       Q.    But you got pulled over, and those pistols

16   got confiscated by the police.

17       A.    Yeah, I believe, yeah.  It was one pistol.

18       Q.    Right.  And if I understand correctly, you

19   were never charged with that because you worked with

20   Mr. Lerner.

21       A.    I never worked with him.  He asked me --

22   and I would have.  I would have.  At that point was

23   pretty much the beginning of the end for me, while

24   I'm trying to get away from this.  And he told me,

25   "I'll make sure you don't get charged for this



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

209

```
 1   firearm.  You make some controlled buys for me.  I
 2   want you to buy from Chris Garcia."
 3            And I told him, "Yeah, okay."
 4            He told me, "Okay.  You come by tomorrow
 5   or you're busted."
 6            I was, like, "Let's just do it now."
 7            And he said, "No, come by tomorrow."  So
 8   he let me go.
 9            And at that time I was really conflicted
10   about what I was going to be in my life, if I wanted
11   to be a drug addict, or what.  I was in the process
12   of leaving my ex-wife.  But the guns were not in the
13   trunk of her car -- the gun.  And they never showed
14   up.  So, yeah, he never showed up.  So I never
15   worked with him.  I never gave him permission or
16   anybody before this case.
17       Q.   But you weren't charged with that?  Lerner
18   never followed through?
19       A.   No, I think -- I don't know, man.  I think
20   it was my opinion that -- I think he was breaking
21   the rules a little bit by not filing that case.  And
22   I think they don't do it like that no more.  That
23   was in 200- -- a long time ago.
24       Q.   2004, 2005?
25       A.   Somewhere around there.  But I was ready
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

210

1    to go then, actually.

2       Q.   You were ready to do it then, work with

3    him?

4       A.   I would have, if it would have happened

5    that day, yep.

6            I've done a lot of things in my life, but

7    I wasn't going to kill nobody at that point.  I had

8    a gun in the trunk for that purpose.

9       Q.   But the larger point, I think, in

10   reviewing these transcripts is every time Mr.

11   Marcantel's name comes up, it comes up from

12   someone -- at least initially -- other than Mr.

13   Baca.  There is a transcript where you and Chris

14   Garcia are talking about "Why waste your time with

15   Santistevan?  Why don't you go for the top?"

16      A.   Yeah, the conversation with Chris -- and I

17   don't know who initiated the conversation -- but the

18   conversation taking place at this time between this

19   group of individuals and myself was:  "If you're

20   going to step in front of a bus, then step in front

21   of the fastest bus or the best bus or go all out, or

22   stay home.  Don't even do it.  Or do it all out.  If

23   you're going to do it, do it right.  If not, don't

24   do it at all.

25      Q.   That's in Government's Exhibit 394, where

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

211

1   it's just you talking to Chris.

2        A.   Maybe.  Sounds right.

3        Q.   Would you like to see the transcript?

4        A.   I believe you.

5        Q.   But again, you're working with Team

6   America; you know what Team America's game plan is?

7        A.   I actually don't know what their game plan

8   is.  They don't tell me.  They just tell me they're

9   going to call and they call.  Act like yourself, be

10  yourself, don't expose yourself.  Act like you would

11  normally act.  And that's what I would do.  I would

12  be trying to promote myself within the gang.

13       Q.   So you're saying it was your idea, then,

14  to come up with "Go for the top, go for the

15  secretary, why waste your time with the low guys"?

16       A.   I'm just -- I wouldn't say it was my idea.

17  That's what I would normally say.  That's what I

18  would say.  If I was still involved in the gang, and

19  I was having this conversation, that would be my

20  part of the conversation.  I would be, like, "What

21  do you mean?  Why are you going to shoot this guy?"

22       Q.   But you weren't involved in the gang.

23  You're part of Team America.

24       A.   But I'm playing like I'm part of the gang.

25       Q.   For Team America?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

212

1      A.    For Team America; right.

2      Q.    So you're suggesting, "Don't waste your

3  time with the low-level guys.  Go for something

4  bigger."

5      A.    That's what I would do.

6      Q.    And even then, he said it's up to you?

7      A.    He said, "Kill anyone you want, as long as

8  you kill one of these guys for me."  He said, "It

9  doesn't really matter to me which one."  He doesn't

10  care which one.  He's trying to make himself out to

11  be John Gotti, or, whatever.  I don't know.

12      Q.    Did there come a time where, throughout

13  all the conversations, Mr. Baca said, "Don't tell

14  Chris Garcia about anything"?

15      A.    Yes.

16      Q.    Because he didn't want Chris Garcia to

17  know why anybody needed a gun?

18      A.    He was telling me that.  And I think it

19  was more for my benefit.  Because Chris knew

20  everything.  And we were talking about it.  I wanted

21  to make sure Chris --

22      Q.    Well, Chris didn't know anything from Mr.

23  Baca, did he?

24      A.    I don't know.  I don't know what

25  conversations they were having when I wasn't on the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

213

1  phone because they were calling Chris separate from

2  me, I believe.  I don't know for sure.

3       Q.   But from the conversations you

4  participated in?

5       A.   From the conversations I participated in,

6  what I was being led to believe or being told was:

7  Chris doesn't know anything, and we don't want him

8  to know anything, because he might tell because

9  there's paperwork on him.

10       Q.   So the idea was to keep him in the dark.

11       A.   In the dark.  We just need some weapons

12  for whatever reason.  But then when I would go talk

13  to Chris, he knew everything.  He would say on the

14  conversation, "Yeah, I talked to Pup," and when he

15  said it was that one, I'm verga.

16       Q.   Did there come a time when the FBI told

17  you, "Hey, you've got to tell Chris what's going on;

18  he needs to know who the target of the hit was"?

19       A.   No, they never told me to tell anybody

20  anything or suggest anything to anybody.  They told

21  me to play along like I'm part of the gang, like I'm

22  willing to follow their instructions.

23       Q.   Because the very last call that we

24  listened to, the one that's on November 29, 2015,

25  you're the first person that mentions Gregg

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


Bean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

214

1   Marcantel.

2        A.    Okay.

3        Q.    Well, it's not Chris Garcia.

4        A.    Okay.

5        Q.    So you --

6        A.    Can I see the transcript before we talk

7   about it?

8        Q.    Absolutely.

9             MR. LOWRY:   May I approach, Your Honor?

10             THE COURT:   You may.

11        A.    Okay.   Where are you talking about?   I'm

12   not trying to slow you down.

13   BY MR. LOWRY:

14        Q.    No, that's fine.   Take your time.

15        A.    I mentioned Marcantel by name.   At that

16   point it was already settled that's who was supposed

17   to be getting.   I'm saying, yeah, Marcantel is a big

18   boy.

19        Q.    But you just testified it wasn't settled.

20   You could have taken your pick.

21        A.    Well, I could have taken my pick, yeah.   I

22   could have taken my pick and I could have settled on

23   anyone I wanted.   I could have came back and said,

24   "I'm going to kill Archuleta."   I could have came

25   back and said any one of them.   It didn't matter to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

215

 1   him which one.  I could have said Archuleta.  That's

 2   the name that we settled on.

 3       Q.   Who is "we"?

 4       A.   The people in this conversation.  Like I

 5   just told you, I went in there acting like I would

 6   normally act.  These are the suggestions, one of

 7   these guys.  I don't care which one.  Pick one and

 8   do it.  That's the one.  That's the one I picked.

 9   This is, "Okay," so then I'm going to -- this is the

10   one I suggested.  You know what I mean?

11       Q.   That's the one you suggested after you

12   suggested --

13       A.   After we had the conversation, one of

14   these ones right here.

15       Q.   Right.

16       A.   One of these ones right here, you pick

17   which one.  I don't care which one.  That's the one

18   I picked.

19       Q.   Right.  And that's after you suggest going

20   for the Secretary of Corrections, instead of the

21   low-level guy.

22       A.   I didn't make the decision.  I'm the pawn.

23   I'm the guy that's going to go do it.

24       Q.   You did make the decision.

25       A.   If it was my decision, I'd choose somebody

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1212

216

1   else to do it.

2          Q.    You did.  You chose Mandel Lon Parker.

3          A.    I chose Mandel Parker to come with me.

4          Q.    Correct.

5          A.    Yeah, but I didn't choose him to go do it.

6   I didn't initiate this plan.  I was at home getting

7   busted for selling heroin.  And all of a sudden, I

8   get a phone call from the North facility --

9          Q.    Hold on, Mr. Montoya.

10         A.    Wait up.  Do you want an answer?

11         Q.    Mr. Montoya, hold on for a second.

12         A.    I get a phone call from the North, and

13  get --

14         Q.    This started when you said, in the very

15  first call, there's going to be three people that

16  know about it.  You were going to handle it.  You

17  were going to handle the business yourself.  It was

18  you, Eric Duran, and Anthony Baca.

19         A.    Yes.

20         Q.    And you told Anthony Baca, "I'll handle it

21  myself"?

22         A.    Yeah, I told him that at first, yes.

23         Q.    And then after you talked with the FBI,

24  they said, "You've got to tell them you don't have a

25  gun.  You got to go somewhere else."

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

217

1       A.    They didn't tell me, "Don't tell them

2   that."  They didn't tell me to tell him anything.

3   They told me, "Go along with this.  Go along with

4   whatever.  But you don't have a gun."

5           Yeah, they told me I don't have a gun.

6       Q.    They told you you don't have a gun?

7       A.    I don't have a gun.

8       Q.    But you have in the past?  In September

9   you were busted with a gun.

10      A.    I'd had guns in the past.

11      Q.    A gun you didn't have to plead guilty to.

12      A.    I've had numerous guns.

13      Q.    You're not going to have to serve

14  mandatory prison time.

15      A.    A lot of guns that I didn't have to serve

16  mandatory prison time.  I thank God every day that I

17  don't.

18          How many guns do you think your clients

19  have, and they don't have to serve?

20      Q.    I get to ask the questions.  Not many.

21  He's been in prison.

22      A.    How many shanks?

23      Q.    So --

24      A.    How many murders?

25      Q.    So you got to say, "I need help"; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

218

1       A.    Yeah, I got to say I need help.

2       Q.    You got to pick the help.

3       A.    I got to pick the help, yeah.

4       Q.    And you got to go pick the source of the

5    firearm.

6       A.    No, I didn't pick the source.

7       Q.    Well, you suggested the source.

8       A.    I think the source was -- that's the

9    person I was close to.  That's the person I used to

10   hang out with, Chris Garcia, as you pointed out last

11   time we were talking.  And when I suggested it, when

12   I mentioned it, about the money, I think the

13   response was, yeah, we're already on that.  We're

14   already on that.  I'm pretty sure it was something

15   to that effect.

16             So I didn't pick the source.  That was the

17   source.  That was pretty much the logical source.

18             MR. LOWRY:  May I have a moment, Your

19   Honor?

20             THE COURT:  You may.

21      A.    Mr. Lowry, I'd like to apologize now.

22   When you come on me like that, it's my natural

23   reaction to --

24      Q.    No --

25      A.    -- push back.  And I apologize.  It's not

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

219

1   about that.

2        Q.   I don't mean to come at you.

3        A.   It's your job.  I understand.

4        Q.   Now, I just want to go back.  When we

5   started talking about benefits, I want to sort of

6   end with benefits.  The Government didn't -- they

7   asked about some of your priors.  You've had a

8   fairly significant number of prior convictions;

9   correct?

10       A.   Yes, I have.

11            MR. LOWRY:  And may I approach, Your

12   Honor?

13            THE COURT:  You may.

14   BY MR. LOWRY:

15       Q.   I'm handing you what's been marked for

16   identification as AJ-1.

17            MR. LOWRY:  And Your Honor, I believe I

18   was informed by the United States that we could

19   stipulate to its admission.

20            THE COURT:  All right.  Any objection, Mr.

21   Castellano?

22            MR. CASTELLANO:  No, sir.  We have the

23   same exhibit on our side as well.  There is no

24   objection.

25            THE COURT:  Any other defendant have any

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

220

1    objection?

2            Not hearing any, then Defendants' Exhibit

3    AJ-1 will be admitted into evidence.

4            (Defendants' Exhibit AJ-1 admitted.)

5    BY MR. LOWRY:

6        Q.    Do you recognize that?

7        A.    If it's my rap sheet or my J&Ss, or all

8    the crimes that I was convicted of, I would

9    stipulate to that also.  I was not a good guy.  I'm

10   still a work in progress, is the term I like to use.

11       Q.    The reason I bring it up is just because

12   when you're trying to calculate your criminal

13   history or see what kind of prison sentence you get,

14   your criminal history bears a lot on that factor,

15   does it not?

16       A.    Yes, I understand it can go back to 10

17   years or 15 years.  I served a certain amount of

18   time.  I think most of that, if not all of it, is

19   beyond the 15-year mark.

20           THE COURT:  Mr. Lowry, do you want to take

21   this up after we take our afternoon break?

22           MR. LOWRY:  Absolutely, Your Honor.

23           THE COURT:  All right.  We'll be in recess

24   for about 15 minutes.  All rise.

25           (The jury left the courtroom.)

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


Bean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

221

1          THE COURT:  All right.  We'll be in recess

2    for about 15 minutes.

3          (The Court stood in recess.)

4          THE COURT:  All right.  We'll go on the

5    record.  Is there anything we need to discuss before

6    we bring the jury in, Ms. Armijo, Mr. Castellano?

7          MS. ARMIJO:  No, Your Honor.

8          MR. CASTELLANO:  No, Your Honor.

9          THE CLERK:  We're waiting on counsel for

10   defendant Herrera, and Mr. Villa just walked in.

11   There they come.

12         THE COURT:  All right.  Ms. Duncan, you

13   had something?

14         MR. LOWRY:  Thank you, Your Honor.

15         MS. ARMIJO:  Your Honor, I did think of

16   something.

17         THE COURT:  Okay.  Let me let Ms. Duncan,

18   then we'll come back to you.

19         MS. DUNCAN:  Your Honor, I just wanted to

20   be heard on the Government's trial brief,

21   introducing their Exhibits 304 and 305.  I want to

22   note in the transcript there is no doubt that Mr.

23   Baca is talking about the murder for which he's been

24   convicted and the question before the Court was

25   whether it was an enterprise act, which our position

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1218

222

1   is it absolutely isn't.

2        If you read on page 6040, when Mr. Baca is

3   talking about the events leading up to the murder,

4   he says, "And then Luis comes at me, and he starts

5   swinging the fierro at me.  But the juras already

6   see there, right there by the fucking metal

7   detector, and they fucking hey, hey, hey."

8        So what that transcript indicates is that

9   Luis Velasquez, who is the person who Mr. Baca

10  killed, attempted to stab Mr. Baca with a shank the

11  day before Mr. Baca stabs him.  So there are a bunch

12  of things in play here.  But there is just not

13  sufficient evidence from which the jury can infer

14  that this had something to do the SNM versus a

15  personal disrespect issue.

16        And the fact that the person who fought

17  Mr. Velasquez with Mr. Baca was not an SNM member

18  also rebuts his allegation that it was on behalf of

19  the enterprise.

20        So I think the Court's initial inclination

21  to keep this out was the right one.

22        THE COURT:  Well, it was based upon the

23  fact -- why I initially kept it out was because the

24  Government wasn't presenting any admissible evidence

25  that this was an SNM-related crime.  I think they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


Bean & Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

223

1   have presented some evidence.

2          I guess where I am is whether it's

3   sufficient for a reasonable jury to infer.  I guess

4   in one sense I've been sitting here thinking, boy,

5   if I let this one in, any murder by an SNM member is

6   SNM-related.  On the other hand, I'm sitting here

7   thinking, well, they've got Mr. Baca saying, Carnal;

8   they say he's not a carnal, the fellow that wanted

9   to go along with him, and didn't, turned him down.

10         That was the reason I was asking a little

11  bit about the timetable of when he became a leader.

12  I was thinking during the lunch hour that if he was

13  a leader, once you become a leader, it's kind of

14  like everything you do becomes probably SNM-related.

15  You can't divorce yourself from the organization

16  that you're running.  The president can't say he's

17  probably Trump Enterprises one day and president the

18  next.  He's president.  And so that doesn't seem to

19  fit.

20         So I'm thinking -- I do think the

21  Government has now pointed out some admissible

22  evidence.  I do think we're a little bit further

23  down the pike than we were when I was saying I

24  didn't see any admissible evidence from having Mr.

25  Archuleta up here.  But I've stared at that line.  I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1220

224

1   could almost memorize it now.  I'm staring at it,

2   too, so I'll continue to give it some thought.

3          MS. DUNCAN:  Okay.

4          THE COURT:  All right.  Ms. Armijo, can

5   yours wait?

6          MS. ARMIJO:  We need to deal with it

7   before Eric Duran testifies.  And he'll be the next

8   witness.

9          THE COURT:  All right.  All rise.

10          (The jury entered the courtroom.)

11          THE COURT:  All right.  Mr. Montoya, I'll

12   remind you that you're still under oath.

13          THE WITNESS:  Yes.

14          THE COURT:  Mr. Lowry, if you wish to

15   continue your cross-examination of Mr. Montoya, you

16   may do so at this time.

17          MR. LOWRY:  I do.

18          THE COURT:  Mr. Lowry.

19   BY MR. LOWRY:

20       Q.   Mr. Montoya, you initially debriefed with

21   the United States on October 6, 2015; is that

22   correct?

23       A.   Sounds right.

24       Q.   Shortly after your arrest?

25       A.   Shortly after my arrest.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

225

1     Q.   At that debrief they specifically asked

2  you about the hit on Gregg Marcantel?

3     A.   I believe so.  I believe that's recorded

4  also.

5     Q.   And you told them you didn't have any

6  information whatsoever about it?

7     A.   Before these phone calls, yeah.  If it was

8  before these phone calls, I had no information on

9  it.

10    Q.   So before the phone calls, you knew about

11  the United States' interest in Gregg Marcantel?

12    A.   I think I was asked if I knew anything

13  about any hits on the DOC staff, any specific

14  threats.  I think I said no at that point.  There

15  are people always talk about stuff like that.  And

16  you asked me who or when or where.  Most of the time

17  I couldn't really say, because it usually goes in

18  one ear and out the other.

19    Q.   Now, moving on, I want to finish up here,

20  but you agree with me you have an extensive criminal

21  history?

22    A.   Yes.

23    Q.   And starting as early as 1993?

24    A.   Probably when I was 12 years old.

25    Q.   Right.  And you talked about this on

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

Bean
&Associates, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

226

1  direct, that you spent -- actually, Mr. Yoakum was a

2  friend from the Boys' Home?

3      A.   Yeah.

4      Q.   So you spent time in Springer.  So you

5  grew up in the system, so to speak?

6      A.   I spent all my life addicted to drugs, and

7  committing crimes to get drugs.

8      Q.   Right.  They're all property crimes.

9      A.   Most of them.

10     Q.   So why revert to property crime in

11 Colorado?  Was that to support a new drug habit?

12     A.   Sometimes drugs.  Colorado, I didn't

13 revert to property crime.  I am pretty innocent till

14 proven guilty.  And I'm going to plead the Fifth on

15 that.  I am charged with a crime.  But not every

16 time I was charged with a crime I was convicted.

17 Not everybody that is charged with a crime is

18 guilty.

19     Q.   But in November 1993, you pled guilty in

20 two separate cases; one to two counts of auto

21 burglary?

22     A.   Yes.

23     Q.   And you got a three-year stint at the

24 Department of Corrections?

25     A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

227

1      Q.   And you pled no contest to attempted

2  residential burglary?

3      A.   Yes.

4      Q.   And you got 13 months concurrent to the

5  auto theft charge?

6      A.   Yes.

7      Q.   And then in 1995, you actually escaped?

8      A.   Yes.

9      Q.   And you got, what, nine years but six

10 suspended on the escape?

11     A.   Yes.

12     Q.   And in May of 1995, again you entered a

13 guilty plea of receiving stolen property?

14     A.   Yeah.

15     Q.   And you had a seven-year sentence, but all

16 of that was suspended except for the habitual

17 offender sentence of four years?

18     A.   Yes.  Suspended the underlying, and gave

19 me the habitual time.

20     Q.   And in October of 1996, you pled guilty to

21 bringing contraband into jail, which you talked

22 about on direct examination with Mr. Castellano?

23     A.   Yeah.

24     Q.   I'm just curious.  Why didn't you -- when

25 you got to the jail and you're suffering with

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1224

228

1  withdrawals, you didn't consider just going into the

2  detox program, methadone program there?

3      A.   I believe I was -- see, my memory is kind

4  of bad.  But I believe I might have been on

5  methadone already before I got to the jail.  But it

6  takes a while for them to start you on the program.

7  And I would have been perfectly happy getting

8  methadone.  I didn't ask for somebody to give that

9  to me.  I built up that reputation, and when I hit

10 the county jail, people come and bring me stuff.

11     Q.   Now, in November 2002, you again pled

12 guilty to possession of heroin, controlled

13 substance?

14     A.   Yeah.

15     Q.   And got a two-year-six-month sentence?

16     A.   I got the one-year bitch, and 18 months.

17     Q.   And finally, in May of 2011, I think --

18 2010, pardon me -- you pled guilty to again

19 possession of controlled substance, heroin?

20     A.   I think, yeah.

21     Q.   So you have -- that criminal history will

22 factor in mightily in your sentencing guideline

23 calculation?

24     A.   Some of it.

25     Q.   All of it; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1225

229

1       A.   No, not the stuff that's 15 years old or

2    older doesn't calculate in, according to my

3    understanding.  I don't know.  Maybe I'm wrong.  But

4    the way I understand the guidelines is 10 years,

5    unless you serve more than 13 months.  Then it's 15

6    years they can go back on the conviction and

7    calculate in, yes.  And if it does calculate in,

8    it's like four years.  I'm hoping it calculates in,

9    actually.

10      Q.   You have a powerful incentive to get the

11   benefit of that bargain to reduce your sentence down

12   to nothing, don't you?

13      A.   According to the plea bargain that I took,

14   the way I understand it, with all the points for all

15   the crimes that you listed, if they go by the

16   guidelines, I believe it's four years.  I'm hoping

17   all those crimes factor in, and they go by the

18   guidelines, and I get a probation or a prison

19   sentence.  Them crimes are not really part of my

20   plea bargain.  My plea bargain was to be done with

21   this, to, in fact, show that I'm not part of this

22   organization anymore.

23      Q.   And the plea bargain avoided your gun

24   charge altogether?

25      A.   It avoided, yeah, the gun, and it avoided

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

230

1  the RICO.  It avoided a lot of things.  I got a

2  great benefit from it, no doubt.

3          MR. LOWRY:  No further questions, Your

4  Honor.

5          THE COURT:  Thank you, Mr. Lowry.

6          Any other defendant have cross-examination

7  of Mr. Montoya?

8          MS. JACKS:  No, Your Honor.

9          THE COURT:  Not hearing any, Mr.

10 Castellano, do you have redirect of Mr. Montoya?

11         MR. CASTELLANO:  Yes, Your Honor.

12                 REDIRECT EXAMINATION

13 BY MR. CASTELLANO:

14    Q.   Mr. Montoya, I want to start at kind of

15 the end there where you were asked about an escape

16 conviction.

17    A.   Yes, sir.

18    Q.   Can you tell the members of the jury about

19 that escape?

20    A.    It was a brand-new prison in Milan, New

21 Mexico.  I was transferred there.  I wanted to get

22 back to the Main facility where all the dope was.

23 And somebody told me, "If you threaten a warden that

24 you're going to escape, they'll take you back."

25          So I went and told the warden, I'm going

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

231

1    to escape.  He told me, "Yeah, whatever.  Go.  You

2    don't tell us where to put you.  We tell you."

3            And that day we went to the yard.  And the

4    water had eroded a channel right under the fence.

5    It was like there was a hole in the fence.  So

6    pretty much like on a dare, me and a friend of mine,

7    AB Archuleta, said, "You go."  "No, you go."

8            So I went.  And once I was on the other

9    side, I took off running and made my way to

10   Albuquerque.

11       Q.   How long were you gone before you got

12   captured?

13       A.   Five days.

14       Q.   Now, when you were being asked about your

15   criminal history, you used a word "one-year bitch."

16   What does that term mean?

17       A.   That's commonly referred to as the

18   Habitual Offender Act, and everybody calls it "the

19   bitch" for short, because --

20       Q.   And so, in other words, do you have -- if

21   you have a conviction and you have a prior

22   conviction before that, can your sentence be

23   increased because of your prior convictions?

24       A.   Then you would be a habitual offender

25   because of your priors and your sentences.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

232

1      Q.    You were asked about convictions going

2   back as far as 1993.  What's your understanding

3   about whether that will count against you for

4   criminal history points?

5      A.    I understand it will only go back 15

6   years.

7      Q.    What's the relationship between Chris

8   Garcia and Mr. Baca?

9      A.    They're brothers.  Pup knows he's a rat.

10  Chris thinks he has everybody convinced that he's

11  not.  There is paperwork on him.  Everybody uses him

12  for money and drugs.

13     Q.    Are they close in any way?

14     A.    I think most of these guys would be close

15  to anybody that sends them money and dope, or if

16  they think they can control.

17     Q.    Now, do you recall in the first recording

18  when Eric Duran and Mr. Baca first called you,

19  almost out of the gate, Santistevan's name is

20  mentioned?  Do you remember that?

21     A.    I don't remember the order of the phone

22  calls.  But, yeah, he was mentioned in the phone

23  calls.

24     Q.    And do you remember in that first

25  conversation -- if not, I can refresh your

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

233

1    recollection with the transcript -- in the first

2    conversation, do you remember that Mr. Baca had only

3    been in town -- or back in the state for about one

4    week?

5          A.    Yeah, I remember that conversation.

6          Q.    And so within one week, is it fair to say

7    that Mr. Baca is asking you to kill somebody?

8          A.    Yeah, first week back.

9          Q.    And out of the gate, did you have any

10   doubt that he, certainly at the beginning, wanted to

11   kill either Mr. Santistevan or Adam Vigil?

12         A.    There is no doubt that he wanted to kill

13   somebody in administration or STIU.

14         Q.    And by the time you picked up the firearm,

15   on November 29 of 2015 from Chris Garcia, was it

16   clear that the focus had become Gregg Marcantel?

17         A.    Yeah, it appeared to be pretty clear to me

18   that that was -- he wanted the person hit that was

19   responsible for sending him out of state.

20         Q.    Between you and Mr. Baca, who is the

21   leader and who is the soldier?

22         A.    Oh, I think I would be the soldier, and I

23   think he would be the leader.

24         Q.    So if Mr. Baca did not want Mr. Marcantel

25   hit, couldn't he have just ordered you not to do it?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

234

1     A.    Yeah, he ordered me not to.  He ordered

2  all of us to leave Red alone when he got out.  On

3  several occasions he told me, "Leave that guy

4  alone."  Okay.

5     Q.    And did the bargain you entered into with

6  the Government -- does it change what the recordings

7  say or do the recordings pretty much speak for

8  themselves?

9     A.    The recordings speak for themselves.  I

10 can't change them.  You can't change them.  Nobody

11 can change them.  They're on tape, and they say what

12 they say.

13    Q.    So do they change Mr. Baca's words?

14    A.    No.

15    Q.    What about Chris Garcia's?

16    A.    No.

17    Q.    What about Mandel Parker's?

18    A.    Don't change any words.  It's all spoken

19 words, and everybody is responsible for them.

20    Q.    Now, you mentioned that there would be

21 times you would speak with Chris Garcia.  And it

22 seems like there were things that he already knew

23 that you hadn't discussed with him.  Do you remember

24 that?

25    A.    Yeah, "Don't tell Chris nothing."

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1231

235

1          But when I get there, Chris is telling me,

2    "What the hell is wrong with them?  They're stupid.

3    Which one do they want?  That's the one I thought.

4    You know, you're dumb.  What do they think?  You're

5    going to end up in prison so long, you're going to

6    end up in the hole so long, you're going to forget

7    your name."  Stuff like that.  So obviously somebody

8    is telling him.

9          Q.   Right.  So are there other conversations

10   that Chris Garcia may have had with Mr. Baca that

11   you didn't hear?

12         A.   I'm sure there was.

13         Q.   So regardless of whose idea it was, was it

14   clear by November 29 of 2015 that Mr. Baca wanted

15   Mr. Marcantel killed?

16         A.   Yeah.  He would have been happy with any

17   one of them.  But, yeah, Marcantel, I think, was the

18   one who was responsible for sending him out of

19   state.

20         Q.   And by that time, was it also clear that

21   Chris Garcia wanted Mr. Marcantel killed?

22         A.   I would say he provided the weapon and

23   gave me advice on how to get away with it, and plant

24   evidence and just direct the investigation.  I would

25   say he wanted it to happen.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1232

236

1      Q.   And the same thing with Mandel Parker?

2      A.   Yeah.

3      Q.   And so are you the one who is running this

4   show, or are you just passing messages back and

5   forth between Mr. Baca, Mr. Garcia, and Mr. Parker?

6      A.   I'm following instructions.  I'm obviously

7   not running the show.  You can hear the tapes, and

8   you can tell who is in command of the conversations.

9           MR. CASTELLANO:  May I have a moment, Your

10  Honor?

11          THE COURT:  You may.

12          MR. CASTELLANO:  Pass the witness, Your

13  Honor.

14          THE COURT:  Thank you, Mr. Castellano.

15          Do you have anything further, Mr. Lowry?

16          MR. LOWRY:  Very briefly, Your Honor.

17          THE COURT:  Mr. Lowry.

18                   RECROSS-EXAMINATION

19  BY MR. LOWRY:

20      Q.   We can all agree the tapes speak for

21  themselves; right?

22      A.   I would say so.

23      Q.   And the whole time these tapes were made,

24  Mr. Baca was in Level 6 at the PNM North; correct?

25      A.   In the really bad predator predator

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


**Bean & Associates**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DNM 1233

237

1   program at that point.

2        Q.   That was nonresponsive.

3        A.   Level 6 at the facility.

4        THE COURT:  Hold on.  I'll strike your

5   response.  Listen to Mr. Lowry's question.  And if

6   Mr. Castellano wants to bring out anything further.

7        The jury will disregard his answer.

8        THE COURT:  Mr. Lowry?

9        A.   I apologize.

10  BY MR. LOWRY:

11       Q.   The whole time these calls were recorded,

12  Mr. Baca was at Level 6 at PNM North?

13       A.   I believe so.

14       Q.   The only way he could make a call out was

15  on the jail's phone system, which is recorded;

16  correct?

17       A.   Or -- yes, or --

18       Q.   Or Eric Duran's cellphone?

19       A.   Yes.

20       Q.   Which was wiretapped?

21       A.   Yes.

22       Q.   So every conversation Mr. Baca had would

23  be recorded?

24       A.   Not necessarily.  That's not the only

25  cellphone in that prison.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

238

1      Q.   Every phone conversation would have been

2  recorded; correct?

3      A.   Every phone conversation upon the prison

4  phones would be recorded.  Every phone conversation

5  on Eric Duran's phone would be recorded by -- Eric

6  Duran was not the only inmate that had a cellphone.

7      Q.   How do you know how many people in Level 6

8  had cellphones?

9      A.   I don't know how many --

10     Q.   You don't, do you?

11     A.   -- people had cellphones, but I know there

12  was more than one.

13     Q.   How do you know that?

14     A.   I've been there.

15     Q.   So you can testify with certainty that in

16  November of 2015, Mr. Baca had access to a

17  cellphone?

18     A.   I can tell you that if I was at the North

19  facility, probably about 98 percent chance that

20  somebody in that pod has a cellphone I can get my

21  hands on.  Of if not that pod, the next pod.  Or if

22  not that pod, the next pod.

23     Q.   The most secure facility in the State of

24  New Mexico?

25     A.   People -- yeah.  You give them too much

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

239

```
 1   credit.

 2        Q.   But my question to you is --

 3        A.   If there was a conversation on Crazo's

 4   cellphone, it was recorded.  If there was a

 5   conversation on the pod cellphone, it was recorded.

 6   But I'm telling you that there are cellphones in

 7   that prison right now.

 8        Q.   You said you were following instructions?

 9        A.   Yes.

10        Q.   You were following instructions from Team

11   America; right?

12        A.   From Team America.

13             MR. LOWRY:  No further questions, Your

14   Honor.

15             THE COURT:  Thank you, Mr. Lowry.

16             Anything further, Mr. Castellano?

17             MR. CASTELLANO:  No, Your Honor.

18             THE COURT:  All right.  Mr. Montoya, you

19   may step down.

20             Is there any reason Mr. Montoya cannot be

21   excused from the proceedings?

22             MR. CASTELLANO:  No, Your Honor.

23             THE COURT:  How about from the defendants?

24             Not hearing any, Mr. Montoya, you may be

25   excused from the proceedings.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



DEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

240

1

2    UNITED STATES OF AMERICA

3    STATE OF NEW MEXICO

4

5                    C-E-R-T-I-F-I-C-A-T-E

6        I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

7    Official Court Reporter for the State of New Mexico,

8    do hereby certify that the foregoing pages

9    constitute a true transcript of proceedings had

10   before the said Court, held in the District of New

11   Mexico, in the matter therein stated.

12        In testimony whereof, I have hereunto set my

13   hand on this 26th day of March, 2018.

14

15           _____

16           Jennifer Bean, FAPR, RMR-RDR-CCR
             Certified Realtime Reporter
17           United States Court Reporter
             NM Certified Court Reporter #94
18           333 Lomas, Northwest
             Albuquerque, New Mexico 87102
19           Phone:      (505) 348-2283
             Fax: (505) 843-9492
20           License expires:  12/31/18

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

PROPOSED INSTRUCTION CONCERNING REFERENCE TO FIRST TRIAL

Yesterday, Agent Acee referred to  members of the SNM who, in a separate trial,  were convicted of offenses legally similar to the offenses charged against  these defendants. That proceeding is unrelated to these proceedings.  You are instructed that Agent Acee's testimony cannot be considered in determining the guilt  of any of the defendants in the case before you.  .

*[handwritten annotations]*

EXHIBIT
4

DNM 1238



# MANAGEMENT & TRAINING CORPORATION
Otero County Prison Facility  •  10 McGregor Range Road  •  Chaparral, NM 88081
Phone:  505-824-4884  •  Fax:  505-824-3158

# MEMO

**To:**  **Lt. Soto**

**From:**  **D.O L. Rodriguez 0324**

**Subject:**  **Inmate Otero, Joseph**

**Date:  04/16/08**

On 04/13/08 at approximately 0555 hours reporting Officer L. Rodriguez and Officer C. Flores escorted inmate Otero, Joseph # 97075051 from intake cell 274 to the transport van. Along the way inmate Garcia, Billy #83963051 was in intake cell 265, as we passed the cell inmate Garcia stated "U Este Vato" meaning "This Guy". Inmate Otero was escorted out of intake without further incident.

End of memo.

*0324*



**EXHIBIT**
Clerk's
5

4/16/18



# MANAGEMENT & TRAINING CORPORATION

Otero County Prison Facility  •  10 McGregor Range Road  •  Chaparral, NM 88081
Phone:  505-824-4884  •  Fax:  505-824-3158

# MEMO

**To:**    **Lt. Soto**

**From:** D.O. C. Flores

**Subject: Inmate Otero, Joseph**

**Date:    04/16/08**

On 04/13/08 at approximately 0555 hours reporting Officer C. Flores and Officer L. Rodriguez escorted inmate Otero, Joseph # 97075051 from intake cell 274 to the transport vehicle. During the escort inmate Garcia, Billy #83963051 was in intake cell 265, as we passed the cell inmate Garcia stated "U Este Vato" meaning "This Guy". Inmate Otero was escorted out of intake without further incident.

End of Statement

*C. Flores*

4/16/18

DNM 1240



**MANAGEMENT & TRAINING CORPORATION**

Otero County Prison Facility • 10 McGregor Range Road • Chaparral, NM 88081
Phone: 575-824-4884 • Fax: 575-824-3158

# MEMO

**To: Lt. Soto**

**From: Officer M. Saldana**

**Subject: Inmate Joseph Otero**

**Date: April 16, 2018**

On Friday April 13, 2018 I was in intake and observed inmate Joseph Otero USMS 9707505 in cell 274 and inmate Garcia, Billy USMS 83963051 in cell 265. I did not witness any conversation or interaction between either inmate.

End of Statement

X _M. Saldana_

4|16|18

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 93 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 818
Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 1 of 52

AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
AT Albuquerque NM

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

SEP 2 2016

MATTHEW J. DYKMAN
CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

See Attachment A, which is incorporated
herein by this reference.

Case No. 16-MR-628

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated herein by this reference.

located in the _____ District of _____ New Mexico _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated herein by this reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. § 1962(d) | - | Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy; |
| 18 U.S.C. §§ 1512, 1513 | - | Intimidating and Retaliating Against a Victim, Witness, or Informant; |
| 21 U.S.C. § 846 | - | Conspiracy to Distribute a Controlled Substance. |

The application is based on these facts:

Refer to the attached 83-page search warrant affidavit, with sealing request.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Bryan Acee, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 2, 2016

*Judge's signature*

City and state: Albuquerque, New Mexico

Karen B. Molzen, Chief U.S. Magistrate Judge
*Printed name and title*

EXHIBIT
Clerk's
6

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 94 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 819

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 2 of 52

## TABLE OF CONTENTS

TRAINING AND EXPERIENCE.................................................................................3

INTRODUCTION..................................................................................................6

PURPOSE OF AFFIDAVIT.......................................................................................7

BACKGROUND ALLEGATIONS REGARDING GANGS AND DRUG TRAFFICKERS.....................9

SNM GANG CRIMINAL ENTERPRISE........................................................................14

HISTORY OF THE SNM GANG................................................................................19

VIOLENCE TARGETING VICTIMS, WITNESSES, AND INFORMANTS..............................23

CONFIDENTIAL HUMAN SOURCES..........................................................................27

BACKGROUND OF THE INVESTIGATION...................................................................34

    Phase I Takedown.........................................................................................36

    Phase II Takedown........................................................................................37

PROBABLE CAUSE.............................................................................................38

    The Target Subjects.......................................................................................39

    Threats to Victims, Witnesses, and Informants, and Drug

    Distribution in Furtherance of the Gang's Objectives......................................51

THE SUBJECT PREMISES.....................................................................................69

SEARCHING FOR TATTOOS..................................................................................77

REQUEST FOR NIGHT SERVICE.............................................................................78

CONCLUSION...................................................................................................79

REQUEST FOR SEALING......................................................................................80

EXHIBIT 1.......................................................................................................81

DNM 1243

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 95 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 820

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 3 of 52

| SUBJECT PREMISES | TARGET SUBJECTS | LOCATION |
|---|---|---|
| A-1 | SAMUEL SILVA aka "RABBS" | Santa Fe County Adult Correctional Facility, 28 Camino Justicia, Santa Fe, New Mexico |
| A-2 | ████████████████████ | Otero County Prison Facility, 10 McGregor Range Rd, Chaparral, New Mexico |
| A-3 | ████████████████████ | Torrance County Detention Center, 209 County Road A049, Estancia, New Mexico |
| A-4 | SHAWN HENRY URAL aka "SHAWN SHAWN" | 4512 Valley Gardens Circle, Albuquerque, New Mexico |
| A-5 | JUAN ANTONIO MARTINEZ aka "BABY" | 113 60th Street NW, #B-113, Albuquerque, New Mexico |
| A-6 | RUPERT MICHAEL ZAMORA aka "OSO," "MAMA BEAR," "BLUE BLACK"  JACOB ANTHONY ZAMORA aka "HEAT" | 4916 5th Street NW, Albuquerque, New Mexico |
| A-7 | WILLIE ROMERO aka "Demon" | 1009 West Delgado Avenue, Belen, New Mexico |
| A-8 | RICHARD CANDELARIA aka "EL CHOKE," "RICHIE"  EDWARD CANDELARIA, aka "EDDIE" | 4312 Enfield Court, Albuquerque, New Mexico |
| A-9 | ROBERT DEHERRERA aka "WESOS" | 2704 Apple Valley Road SW, Albuquerque, New Mexico |
| A-10 | THOMAS ROBERT LLOYD aka "BOBBY LLOYD," "HUERO LLOYD" | 2801 Cottonwood Lane SW, Albuquerque, New Mexico |
| A-11 | LANCE ROMAN NATSEWAY aka "BABY BOY," "PEEWEE" | 11901 Ibex Avenue NE, Albuquerque, New Mexico |
| A-12 | ANTHONY AVILIO LUCERO aka "EL WINO"  JIMMY JOE LUCERO aka "FLACO" | 423 ½ Pacific Avenue SW, Albuquerque, New Mexico |
| *13 NMCD | GILBERT HIPOLITO ALIRES | 300 Camino Uno SW, Albuquerque, New Mexico (to be searched by state parole agents) |
| *14 US BOP | FRANKIE GALLEGOS aka "CUNTE" | USP Beaumont, Texas (to be searched by BOP prison officials) |

*-13 will be searched by New Mexico Probation and Parole Division officers, pursuant to the conditions of ALIRES's terms of supervision.

*-14 will be searched by U.S. Bureau of Prison officials, as FRANKIE GALLEGOS is a federal inmate.

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 96 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 821

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 6 of 52

acting in an undercover capacity, supervising cooperating sources, managing undercover agents, issuing subpoenas, analyzing phone records, financial records, telephone tolls, and Title III and consensual wiretap investigations. Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations, gangs, and criminal enterprises to purchase, transport, store, and distribute controlled substances. I am also familiar with how those individuals and organizations hide the often substantial profits generated from their criminal activities.

6. I have qualified, in federal and state court, on several occasions, as an expert witness in drug trafficking and possession of controlled substances with intent to distribute matters. I have served as an adjunct professor, law enforcement instructor, and presenter on drug and gang investigations at the California Highway Patrol Academy, Los Angeles Police Department Academy, New Mexico State Police Academy, Bernalillo County Sheriff's Office Academy, as well as at training classes and seminars for the Organized Crime Drug Enforcement Task Force, International Outlaw Motorcycle Gang Investigator's Association, California Narcotic Officer's Association, California Gang Investigator's Association, New Mexico Gang Task Force, New Mexico State University, and University of New Mexico.

DNM 1245

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 97 of 255
Appellate Case: 20-2058   Document: 010110416671   Date Filed: 09/29/2020   Page: 822

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 7 of 52

## INTRODUCTION

7.    As the lead agent in the investigation of the SNM, I have become
aware of multiple threats aimed at several victims, witnesses,
informants, and perceived informants, in the United States' case
against the SNM.    I believe the threats are being perpetrated by
members and associates of the SNM, who operate within the District of
New Mexico and elsewhere.    I believe the requested search warrants
will yield evidence of such a plot.    The requested search warrants are
based on two sets of criteria: (1) ████████████████████████████████
████████████████████████████████████ and (2) information derived
from knowledge about the SNM Gang.

8.    I believe all nine informants, in the extant investigation, to be
reliable and honest.    I recognize that their cooperation with the FBI
is a serious betrayal to the SNM.    I am certain that all nine
informants, once their identities are revealed, will be marked for
death by the gang.

9.    Because the FBI is not ready to disclose the identity of these
highly placed sources, I am not seeking arrest warrants for the Target
Subjects at this time.    Rather, I am pursuing a far less intrusive
method, that is, ████████████████████████████████████ to search
for specific evidence of a ████████████████████████████████████,
████████████████████████████████████    I also believe that
the mere execution of the requested search warrants, combined with
subject interviews, will likely dissuade the Target Subjects and
mitigate the threats.

DNM 1246

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 98 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/10/2020   Page: 023

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 8 of 52

### PURPOSE OF THE AFFIDAVIT

10.   Based on the evidence obtained in this investigation, and as described further below, I believe there is probable cause to believe the physical properties associated with the individuals **FRANKIE GALLEGOS**, aka "CUNTH,"[1] **SAMUEL SILVA**, aka "RABBS," **JOE LAWRENCE GALLEGOS**, **ANDREW GALLEGOS**, aka "SMILEY," **SHAWN HENRY URAL**, aka "SHAWN SHAWN," **JUAN ANTONIO MARTINEZ**, aka "BABY," **RUPERT MICHAEL ZAMORA**, aka "OSO," "MAMA BEAR," "BLUE BLACK," **JACOB ANTHONY ZAMORA**, aka "HEAT," **WILLIE ROMERO**, aka "DEMON," **RICHARD CANDELARIA**, aka "EL CHOKE," "RICHIE," **EDWARD CANDELARIA**, aka "EDDIE," **ROBERT DEHERRERA**, aka "WESOS," **THOMAS ROBERT LLOYD**, aka "BOBBY LLOYD," "HUERO LLOYD," **GILBERT HIPOLITO ALIRES**, **LANCE ROMAN NATSEWAY**, aka "BABY BOY," "PEEWEE," **ANTHONY AVILIO LUCERO**, aka "EL WINO," and **JIMMY JOE LUCERO**, aka "FLACO" (collectively, the "Target Subjects") contain evidence of various forms of federal criminal activity.

11.   This affidavit is submitted in support of search warrants for evidence, fruits, and instrumentalities of violations of: 18 U.S.C. § 1962(d) Racketeer Influenced and Corrupt Organizations (hereinafter "RICO") Conspiracy, 18 U.S.C. § 1512 Tampering with a witness, victim, or an informant, 18 U.S.C. § 1513 Retaliating against a witness, victim, or an informant, 18 U.S.C. § 2 Aiding and Abetting, and 21 U.S.C. § 846 Conspiracy to Distribute Controlled

---

[1] Frankie Gallegos is currently in the custody of the U.S. Bureau of Prisons, outside the District of New Mexico. While I believe he is in possession of contraband that is relevant to the instant investigation, and in violation of federal law, his person and property will not be searched pursuant to the requested search warrant. Rather, the FBI will request the U.S. Bureau of Prisons search his prison cell, and property within the cell, for evidence of racketeering activity, as more fully described in Attachment B (attached hereto).

DNM 1247

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 99 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 824

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 9 of 52

Substances (hereinafter referred to as the "Target Offenses") for the premises described in Attachments A-1 to A-12, as those items are set forth in Attachment B (hereby incorporated), and are collectively referred to as the "Subject Premises."

12.   This affidavit also seeks a warrant to allow law enforcement members executing the search warrants to search the bodies of the Target Subjects[2] for tattoos evidencing membership in or association with the SNM Gang, to include the Valley Gardens, Eastside Locos (ESL), and Barelas street gangs, and other affiliated New Mexico street gangs, and to photograph those tattoos.

13.   This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in this investigation; however, the   affidavit sets forth only the facts that support probable cause to search the requested locations, as well as relevant background information.   Where I refer to conversations herein, they are related in substance and, in part, based on conversations between fellow agents, task force officers, other law enforcement personnel, or confidential human sources that assisted law enforcement.   Any observations referenced herein that I did not personally witness were relayed to me in oral and/or written reports by members of surveillance teams from the SSGTF, New Mexico Corrections Department (NMCD), or other law enforcement agencies.   All figures, times, and calculations set forth herein are approximate.   Unless otherwise

---

[2] FBI agents previously served search warrants on two of the Target Subjects, Joe Gallegos and Andrew Gallegos, to photograph their tattoos. Joe Gallegos and Andrew Gallegos will not be searched for tattoos.

DNM 1248

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 100 of 255
Appellate Case: 20-2058  Document: 010110415671  Date Filed: 09/29/2020  Page: 825

Case 1:16-mr-00628-KBM  Document 1  Filed 09/02/16  Page 10 of 52

specified, weights of controlled substances are approximate and are based on net measurements.

### BACKGROUND ALLEGATIONS REGARDING GANGS AND DRUG TRAFFICKERS

14. Based upon my training, experience, and participation in the SNM Gang investigation, as well as the investigation of other gang/criminal enterprises and drug trafficking organizations (DTO), I am aware of the following information:

a)     Individuals engaged in the type of criminal conduct constituting the Target Offenses (RICO conspiracy, witness, victim, and informant intimidation and retaliation, aiding and abetting, and conspiracy to distribute controlled substances) maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence includes, but is not limited to: telephone numbers, telephone books, address books, credit and hotel receipts, travel receipts, records in fictitious or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk United States currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

DNM 1249

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 101 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 826

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 11 of 52

b)      Individuals engaged in the type of criminal conduct constituting the Target Offenses described herein maintain regular contact with one another. This contact does not terminate once an individual is incarcerated. Members of gang/criminal enterprises routinely send and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, to include financial help and/or witness intimidation or elimination (as is the case in the extant investigation). In addition, incarcerated members often keep photographs of themselves and other members of the gang/criminal enterprise in order to impress or intimidate other inmates.

c)      Members of the SNM, and the street gangs that support the SNM, such as the Valley Gardens, ESL, and Barelas street gangs, aggressively pursue informants, suspected informants, and persons who betray the SNM. I am aware that the SNM relays such information to one another through covert communications, messages, telephone calls, personal visits, letters, and mail disguised as "legal mail." SNM members and associates send controlled substances to inmates disguised as legal mail. The instruments used to create fictitious and fraudulent legal mail include letters, writings, envelopes, stamps, labels, printing devices, or markings used to create such packages.

d)      I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones,

DNM 1250

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 102 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 827

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 12 of 52

often at the same time, in an effort to avoid law enforcement monitoring.   I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, and use fictitious names or the names of others to register the cellular phones used to advance their unlawful activities.   These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms.

e)    In addition, I am also familiar with the increasingly popular use of text messaging, instant messaging, and electronic mail, used by gang/criminal enterprises and DTOs to advance their unlawful activities.   Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement.

f)    Individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law

DNM 1251

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 103 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 828

Case 1:16-mr-00628-KBM  Document 1  Filed 09/02/16  Page 13 of 52

enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug trafficking bury evidence underground in various containers on their property.

g)  Members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open, the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who may assist drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money, through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection of law enforcement, and any reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy or electronic form. I have personally been involved in search warrants which resulted in the discovery of such records that were more than one year old.

DNM 1252

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 104 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 829

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 14 of 52

h)     Individuals involved in gang/criminal enterprises and
DTOs possess items of identification, including but not limited
to, driver's licenses, rent receipts, bills, and address books.
These items are relevant to the identity of those involved in the
criminal enterprise, the possessor of the items seized, and
occupants of the premises searched.

i)     I am aware that members of the SNM use, possess, and
conceal bladed and/or blunt weapons, such as knives, shanks,
razor blades, metal pipes, metal fittings, edged weapons, and
firearms, to include rifles, shotguns, and handguns.     These
weapons are used and possessed by members of the gang to commit
murders, attempted murders, assaults, robberies, to protect
illicit drug supplies, to avoid arrest or escape from custody, to
intimidate rivals, victims, witnesses, and persons who have
betrayed the SNM, to impose discipline within the gang, and for
other criminal activity.    I   know   that   firearms   are
instrumentalities of the crime of drug trafficking and that
firearms are critical "tools of the trade" for the SNM.   Members
and associates of the SNM are expected to possess and maintain
weapons and firearms.

j)     These   items   are   often   stored   by   members   of
gang/criminal enterprises and DTOs on their person, in their
businesses, residences (to include jail or prison cells) and
surrounding garages, outbuildings, and yards, the residences of
friends or relatives, and vehicles.

DNM 1253

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 105 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 830

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 15 of 52

## SNM GANG CRIMINAL ENTERPRISE

15.   The SNM, including its leadership, membership, prospects, and associates, constitutes an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which, affect interstate commerce. The enterprise constitutes an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

16.   I am aware that members and associates of the SNM commit, conspire, attempt, and threaten to commit acts of violence to protect and expand the enterprise's criminal operations and reputation. Historically, the SNM generated income by distributing controlled substances, extorting weaker drug dealers, and participating in robberies and burglaries.   To maintain the SNM criminal enterprise, members of the gang discuss: the membership, rules (which the SNM refer to as "reglas"), and enforcement of the rules; the status of SNM members and associates who are arrested or incarcerated; the discipline of SNM members; encounters with law enforcement; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and plans and agreements regarding the commission of future crimes, including murder, assault, robbery, drug distribution, possession of weapons and firearms, as well as ways to conceal these crimes.

DNM 1254

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 106 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 831

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 16 of 52

17.   With regard to the possession and concealment of weapons and firearms, I am aware that members of the SNM, and the street gangs that support the SNM, use, possess, and conceal bladed and/or blunt weapons, such as knives, shanks, razor blades, metal pipes, metal fittings, and similar weapons when incarcerated.   Similarly, SNM members on the street use, possess, and conceal firearms and edged weapons.   These weapons are used and possessed by members of the gang to commit murders, attempted murders, assaults, robberies, to protect illicit drug supplies, to avoid arrest or escape from custody, to intimidate rivals, victims, witnesses, and members or associates who have betrayed the SNM, to impose discipline within the gang, and for other criminal activity.   I have arrested several members and associates of the SNM for: murder in aid of racketeering, using and carrying a firearm during and in relation to a crime of violence, assault with a dangerous weapon in aid of racketeering, possession of firearms, or ammunition, by a convicted felon, and possession of a firearm in furtherance of a crime of violence.

18.   I am aware that the majority of SNM members are convicted felons, as supported by the fact that the SNM criminal enterprise is a prison gang, comprised primarily of state or federal prisoners, or former prisoners.

19.   I am aware the SNM maintains separate, but related, hierarchies within the NMCD (state) prisons and the U.S. Bureau of Prisons (BOP) (federal) facilities.   The vast majority of the SNM membership is confined to the state prisons; however, dozens of members are

DNM 1255

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 107 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/20/2020   Page: 832

Case 1:16-mr-00628-KBM  Document 1  Filed 09/02/16  Page 17 of 52

currently serving time in BOP custody or on federal supervised release. An SNM member can be considered a "state" or a "fed" member, and those terms are used to describe where the individual member "earned his bones" or was "made" a member - that is, performed criminal acts that displayed fidelity to the mission and interests of the gang. The terms may also describe where the member served the majority of his time as a member of the gang.

20. Communication between the state and federal SNM members is crucial in order to relay orders from gang leaders, communicate gang truces or wars, share information on members, particularly the recruitment of new members and disavowing of members, inmate release dates, the identity of suspected informants, money transfers, and the ever present distribution of controlled substances, as well as other information. Communication between the state and federal SNM members is at an all-time high, given the large number of SNM members under federal indictment and likely headed to the BOP in the near future. The SNM, like other prison gangs, maintains a tenuous presence within the BOP facilities, and a significant increase, or decrease, of incarcerated members can impact "prison politics" or the balance of power among the prison gangs. The influx of SNM members into the BOP will likely give rise to the SNM's footprint within the federal prisons. I am aware that the federal SNM members have peace treaties with some of the prison gangs within the BOP. As such, the federal members of the SNM will need to educate their incoming "brothers" on the proper ways and mannerisms in the BOP. One potentially disastrous

DNM 1256

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 108 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 833

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 19 of 52

often based on family history and the ever present drug business. I have observed drug sales to transcend gang ties and have seen rivalries set aside when money is to be made.

22.    The SNM continues to recruit new members and exert control over the various street gangs. One Albuquerque-based gang, Thugs Causing Kaos (TCK), has traditionally operated alone and without gang alliances. The TCK are not a "neighborhood gang" and don't claim a particular geographical area. The TCK and SNM share many of the same enemies. Two recent developments indicate the SNM has begun to embrace the TCK and recently brought a TCK member into the SNM.[4]

23.    Additional intelligence suggests that the SNM/TCK alliance has been enhanced through SNM member RUPERT MICHAEL ZAMORA's efforts. RUPERT ZAMORA has been observed by a confidential human source to be in the company of TCK member JACOB ANTHONY ZAMORA, aka "HEAT," who is believed to be a relative of RUPERT ZAMORA. JACOB ZAMORA was observed carrying a handgun, while in the company of RUPERT ZAMORA, and bragged that he had "been hitting licks" (doing robberies) with his "big homie" (RUPERT ZAMORA).

---

[4] Through source information and subject interviews, FBI and NMCD officials confirmed the SNM made TCK member Andrew Romero a member of the SNM. Romero, who is pending trial in the May 2015 murder of a Rio Rancho police officer, was transferred to the NMCD after he assaulted staff at the Bernalillo County Metropolitan Detention Center. While at the Central New Mexico Corrections Facility (CNMCF) in Los Lunas, NM, Romero expressed to several SNM members, one of whom was an FBI confidential human source, his interest in joining the gang. Romero had previously been considered an SNM associate, due to a family connection he had to the gang. While at the CNMCF, Romero worked with SNM members to fashion a couple of homemade knives and planned an escape attempt with another member of the SNM. The escape was to take place when Romero and the other SNM member were to be transported to court. Romero was reportedly able to escape his prison cell at CNMCF, during the late night hours, and passed the knives and other contraband between SNM members. Once the confidential human source reported this information to case agents, the NMCD was notified and Romero's cell was searched. NMCD officers located Romero's homemade knife and seized it. Romero was subsequently transferred to the NMCD's Level Six facility in Santa Fe.

DNM 1257

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 109 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 834

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 20 of 52

24.   Additional source reporting indicated that the SNM and TCK had set aside any differences and have agreed to support each other.

25.   In summary, I believe the SNM Gang exists solely to engage in racketeering activity.   Generally speaking, it has been my observation that SNM-generated crimes are not random, SNM members do not act alone, SNM affairs are widespread within the prison system and on the street, and SNM members engage in criminal activity for sustained periods of time.   I believe the SNM has historically engaged in a wide variety of crimes; however, I consider the SNM to be most proficient at murder and smuggling drugs into the prison.

## HISTORY OF THE SNM GANG

26.   The SNM was formed in the early 1980s at the Penitentiary of New Mexico after a prison riot in February, 1980.   During the prison riot, fourteen correctional officers were taken hostage and several of them were seriously assaulted and raped by inmates.   Thirty-three inmates were killed during the riot, and more than two hundred were injured. The majority of inmates killed were perceived to be "rats" or informants.

27.   Following the prison riot, the SNM expanded throughout the New Mexico penal system and has bolstered as many as 500 members since the early 1980s.   NMCD officials estimate the SNM is comprised of approximately 200 members presently, who are known as "hermanos," "brothers," "carnales," "dons," "jefes," "big homies," or "Zia manos."

28.   Despite being imprisoned and closely scrutinized by prison officials, SNM leaders still manage to convey their orders to gang

Search Warrant Affidavit Page | 19

DNM 1250

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 110 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 835

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 21 of 52

members and associates throughout the prison system and outside the prison system through a variety of means, including contraband cellular telephones, secret notes called "kites" or "welas," coded letters, and messages conveyed by complicit visitors.[1]   When SNM members or associates complete their sentences and rejoin their communities, they are expected to remain loyal to the SNM and work to further the goals of the SNM outside the prison environment.   One of the significant goals of the SNM is to control and profit from drug trafficking inside the penal system and on the street.

29.   In addition to exerting its control in the New Mexico and federal penal systems, the SNM also operates on the streets of New Mexico by intimidating and influencing smaller New Mexico Hispanic gangs for the purpose of establishing a larger network for the SNM's illegal activities.   If a gang does not accede to the SNM, the SNM will assault or kill the gang's members who are not in custody as well as those members who are incarcerated within the New Mexico penal system. In addition to intimidation through direct assaults, the SNM is also able to assert control and influence over gang members outside the penal system because gangs do not want their members outside the penal system to be assaulted or killed, and because the gang members know that, if they are incarcerated, they may need the protection of the SNM while they serve their sentences.

30.   The SNM have been and continue to be engaged in a fierce and violent war with rival prison gangs, to include the Barrio Azteca,

---

[1] The SNM utilizes female family members and girlfriends to pass messages to other members of the gang. Female associates and family members have also been used to smuggle drugs into prison facilities on behalf of the SNM.

DNM 1259

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 111 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 836

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 24 of 52

36. SNM members operate under a "blood in, blood out" rule that prohibits them from leaving the gang unless they are assaulted (i.e. "jumped out") or killed.

37. Members who are in "bad standing" within the gang are put on a "greenlight" list, which means they are to be assaulted or killed by other members of the gang. ███████████████████████████████████ ███████████████████████████████████ member(s) that spons ██ ███████ that member into the gang.



38. SNM members are forbidden to speak with law enforcement officials and to do so may result in the SNM member's violent death at the hands of his fellow gang members; this was the case on multiple occasions in this investigation.

## VIOLENCE TARGETING VICTIMS, WITNESSES, AND INFORMANTS

39. Over the course of this investigation, I have become aware of several instances in which members or associates of the SNM have threatened or conducted violent acts aimed at victims, witnesses, informants (to include suspected informants) and cooperating defendants. The FBI refers to its informants as confidential human sources (hereinafter "CHS" for both plural and singular).

40. Some of the recent examples of violence targeting victims, witnesses, and CHS follow.

41. ███████ In February 2016, during a recorded telephone call, a CHS, who is a member of the SNM, spoke with a fellow SNM member and the member's mother, who is a long-time heroin dealer and target of the investigation. The CHS attempted to order heroin from the mother.

DNM 1260

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 112 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 837

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 25 of 52

The SNM member and his mother became suspicious of the CHS and subsequently declined to sell heroin to the CHS. A few days later, the CHS was shot several times by a street gang member with family ties to the SNM. It should be noted that the CHS was utilized in the December 2015 ("Phase I") takedown operation of the SNM.

42. ▮▮▮▮▮▮ In February 2016, three subjects entered a residence in Los Lunas, NM, and assaulted a victim, who was cooperating with Valencia County officials in an aggravated battery against a known SNM member. The assailants beat the victim with clubs and a machete. The assailants told the victim that the assault was due to the fact that the victim was scheduled to testify against the SNM member. The victim was struck in the head with the machete at least two times. The assailants allegedly stopped the attack when the victim lost consciousness and was believed to be dead. The assailants then began burglarizing the residence. The victim regained consciousness sometime later and was able to escape to a neighbor's house, where police were summoned to the scene. The assailants fled the area.

43. ▮▮▮▮▮▮ In March 2016, a known SNM member in the custody of the NMCD was overheard on a covert FBI recording device talking to other known SNM members about killing FBI agents and blowing up a federal building, due to the FBI's investigation of the SNM.

44. ▮▮▮▮▮▮ In March 2016, the same SNM member cited above, in Example 3, was overheard on a covert FBI recording device talking to other known SNM members about killing informants and anyone else that cooperated with the FBI.

DNM 1261

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 113 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 838

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 26 of 52

45. ▬▬▬▬▬ In March 2016, the brother of a CHS was shot by suspected members of the SNM and the family of the CHS was threatened by SNM members.

46. ▬▬▬▬▬ In April 2016, a known leader within the SNM, who has been charged with racketeering offenses, communicated to a cooperating witness, the names of persons who were on the SNM's "green light" list. The list included several employees of the NMCD, various jail staff members, and several CHS, and cooperating defendants.

47. ▬▬▬▬▬ In June 2016, a known member of the SNM, who is facing federal carjacking and firearms charges, solicited a CHS to locate and murder two victims before his federal trial began. The SNM member provided the CHS with the names, addresses, and photos of the victims. Prior to requesting the CHS's assistance, the SNM member had requested another member murder his victims; however, that member was arrested on RICO Conspiracy charges during the ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬.



48. ▬▬▬▬▬ In July 2016, the CHS referenced in Example 1, was the victim of a fire-bombing at his residence, in which an unknown person threw a Molotov cocktail (incendiary device) into his residence and started a fire.

49. ▬▬▬▬▬ In July 2016, a cooperating defendant, who is a member of the SNM incarcerated with other SNM members, reported that several known SNM members were trying to get close to an SNM leader, who had pled guilty to Violent Crimes in Aid of Racketeering (hereinafter "VICAR") charges, so that they could murder him.

DNM 1262

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 114 of 255
Appellate Case: 20-2058  Document: 010110415671  Date Filed: 09/29/2020  Page: 839

Case 1:16-mr-00628-KBM  Document 1  Filed 09/02/16  Page 27 of 52

50. &#9608;&#9608;&#9608;&#9608; In August 2016, SNM leaders called for a meeting among SNM members (state and fed) on the street, to re-organize the gang and "hit" certain informants and witnesses that were suspected of cooperating with the FBI.

 a) **NOTE:** In August 2016, as part of the discovery process, the SNM racketeering defendants received Samsung Tablet devices that contained thousands of pages of discovery material, to include recorded conversations and videos. The discovery material created a renewed call for violence against anyone who had "snitched" or cooperated with the government. FBI sources within the SNM have reported on this issue. The U.S. Marshals Service and correctional officials continue to closely monitor the SNM defendants. On August 4, 2016, correctional officers at the Torrance County Detention Center in Estancia, New Mexico, found three shanks in the SNM pod where the following defendants were held: JAVIER ALONSO, DANIEL ARCHULETA, MANUEL BENITO, DAVID CALBERT, CHRISTOPHER CHAVEZ, ANDREW GALLEGOS, RICHARD GALLEGOS, ARTURO GARCIA, BILLY GARCIA, VINCENT GARDUNO, SANTOS GONZALEZ, EUGENE MARTINEZ, TIMOTHY MARTINEZ, JERRY MONTOYA, ALLEN PATTERSON, RUDY PEREZ, SERGIO RODRIGUEZ, and EDWARD TROUP.

51. I believe the SNM have held several meetings and discussions, and continue to do so, in an effort to make good on their threats to kill witnesses, victims, informants, and anyone else who defies the SNM.

DNM 1263

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 115 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 840

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 28 of 52

52.  Within the past few days, I became aware that some SNM racketeering defendants have been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮, that contain the discovery material for the individual defendants, in order to show other members who some of the informants and cooperators are.

### CONFIDENTIAL HUMAN SOURCES

53.  During the course of this investigation, which remains active, case agents utilized several CHS and undercover agents to conduct more than 75 controlled drug and firearms purchases from SNM members and associates. During one such buy, a CHS was also able to purchase four new ballistic vests from an SNM member.  FBI agents collected hundreds of hours of recordings of SNM members through the interception of prison and jail telephone calls and several court authorized wire taps.  Additional recordings were made by CHS and undercover agents who used covert recording devices during meetings and discussions with SNM members and associates.  These recordings captured dozens of conversations pertaining to gang related homicides, assaults, drug trafficking, the identity of suspected informants, and other gang business.  Case agents encouraged the various CHS to maintain contact with SNM Gang members and associates who were engaged in ongoing criminal activity.

54.  Nine CHS were utilized in the investigation:

DNM 1264

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 116 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 841

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 29 of 52

| CHS Number | Status within the Gang |
|---|---|
| CHS-1 | CHS-1 is an SNM Gang leader and was made a member while incarcerated within the NMCD. |
| CHS-2 | CHS-2 is an SNM Gang member and was made a member while incarcerated within the BOP. |
| CHS-3 | CHS-3 is an SNM Gang member and was made a member while incarcerated within the NMCD.  CHS-3 also represented the SNM while in the BOP. |
| CHS-4 | CHS-4 is an SNM Gang member and was made a member while incarcerated within the NMCD. |
| CHS-5 | CHS-5 is an SNM Gang member and was made a member while incarcerated within the NMCD. |
| CHS-6 | CHS-6 is an Eastside Locos Gang member and SNM associate. |
| CHS-7 | CHS-7 is an SNM Gang associate. |
| CHS-8 | CHS-8 is an SNM Gang member and was made a member while incarcerated within the NMCD. |
| CHS-9 | CHS-9 is an SNM and Barelas associate. |

55.  **CHS-1** is an SNM Gang leader and an influential member of the gang.  CHS-1 began cooperating as an FBI source in 2016.  CHS-1 provided background information about the membership, structure, and customs of the SNM.  CHS-1 identified individuals believed to be members or associates of the SNM, Barelas, and Valley Gardens gangs. CHS-1 positively identified many subjects of the investigation from photographs, including several of the Targets listed in this affidavit.  CHS-1 conducted controlled drug buys and introduced an undercover agent to targets of the investigation.  CHS-1 was facing federal drug charges related to CHS-1's participation in a conspiracy to smuggle Suboxone to SNM members incarcerated within NMCD prisons.

DNM 1265

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 117 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 842

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 31 of 52

consider the information CHS-2 provided to be reliable because much of it was corroborated through independent source information, information obtained from public databases, law enforcement investigations, controlled buys, and physical and electronic surveillance. To my knowledge, CHS-2's information has not been found to be false or misleading.

57.   **CHS-3** is an SNM member and has represented the gang in the state and federal prison systems. When not incarcerated, CHS-3 served as an enforcer for the SNM and a local drug distributor. CHS-3 began cooperating as an FBI source in 2015. CHS-3 provided information on the SNM, Barelas, Eastside Locos, and Valley Gardens gangs. CHS-3 conducted controlled drug buys and utilized an FBI cellular telephone, equipped with wire intercept capabilities, during the course of the investigation. CHS-3 positively identified many subjects of the investigation from photographs, including several of the Targets listed in this affidavit. CHS-3 has felony convictions for aggravated battery, armed robbery, breaking and entering, possession of a controlled substance, trafficking a controlled substance, and aggravated burglary. CHS-3 is facing VICAR and drug conspiracy charges in the FBI's case against the SNM Gang. I found the information from CHS-3 to be reliable because much of it was corroborated by independent source information, other law enforcement investigations, and physical and electronic surveillance. To my knowledge, CHS-3's information has not been found to be false or misleading.

DNM 1266

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 118 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 843

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 32 of 52

58.   **CHS-4** is an SNM Gang member and drug supplier.   CHS-4 has been serving as an FBI source since 2016.   CHS-4 is incarcerated in the NMCD and has been utilized to collect evidence inside the prison through the use of covert recording devices.   CHS-4 collected several hours of recorded conversations, to include direct evidence in a cold case VICAR homicide that the government charged.   CHS-4 provided information on the SNM, Barelas, ESL, and Valley Gardens gangs.   CHS-4 provided background information about the membership, structure, and customs of the SNM.   CHS-4 identified individuals believed to be members or associates of the SNM.   CHS-4 positively identified many subjects of the investigation from photographs, including several of the Targets listed in this affidavit.   CHS-4 has prior felony convictions for aggravated burglary, armed robbery, aggravated battery, breaking and entering, possession of a controlled substance, and manslaughter.   I found the information from CHS-4 to be reliable because much of it was corroborated by independent source information, other law enforcement investigations, and physical and electronic surveillance.   To my knowledge, CHS-4's information has not been found to be false or misleading.

59.   **CHS-5** is an SNM Gang member.   CHS-5 provided information as an FBI source from August 2011 to April 2012, when CHS-5's cooperation was terminated because CHS-5 was involved in an assault and shooting while cooperating with the FBI.   CHS-5 was re-opened as an FBI source in 2016 and provided information on the SNM, Barelas, Valley Gardens, and ESL gangs.   CHS-5 participated in controlled drug buys and

DNM 1267

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 119 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 844

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 33 of 52

provided background information about the membership, structure, and customs of the SNM.   CHS-5 identified individuals believed to be members or associates of the gang, to include several of the Targets listed in this affidavit.   CHS-5 has pending federal charges for being a felon in possession of a firearm and ammunition.   CHS-5 has prior felony convictions for murder, robbery, auto burglary, possession of a controlled substance, tampering with evidence, aggravated battery, and residential burglary.   I found the information from CHS-5 to be reliable because much of it was corroborated by independent source information, other law enforcement investigations, and physical and electronic surveillance.   To my knowledge, CHS-5's information has not been found to be false or misleading.

60.   **CHS-6** is a member of the ESL Street Gang and began cooperating with the FBI in 2016.   CHS-6 provided information on the SNM and ESL gangs.   CHS-6 is facing federal charges for Intimidating and Retaliating Against a Victim, Witness, or Informant.   CHS-6 has prior felony convictions for assault, shoplifting, child abuse, possession of a controlled substance, and resisting arrest.   CHS-6 positively identified many subjects of the investigation from photographs, including several of the Targets listed in this affidavit I found the information from CHS-6 to be reliable because much of it was corroborated by independent source information, other law enforcement investigations, and physical surveillance.   To my knowledge, CHS-6's information has not been found to be false or misleading.

DNM 1268

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 120 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 845

Case 1:16-mr-00528-KBM   Document 1   Filed 09/02/16   Page 34 of 52

61.   CHS-7 is an SNM Gang member.   CHS-7 began cooperating as an
FBI source in 2015.   CHS-7 provided information on the SNM, Barelas,
and Valley Gardens gangs.   CHS-7 conducted controlled drug and firearm
buys and wore a covert recording device during the buys.   CHS-7 has
felony convictions for trafficking stolen property and residential
burglary.   CHS-7 positively identified many subjects of the
investigation from photographs, including several of the Targets
listed in this affidavit.   I found the information from CHS-7 to be
reliable because much of it was corroborated by independent source
information, other law enforcement investigations, and physical and
electronic surveillance.   To my knowledge, CHS-7's information has not
been found to be false or misleading.

62.   CHS-8 is a member of the SNM Gang.   CHS-8 began cooperating
as an FBI source in 2016.   CHS-8 provided information on the SNM,
Barelas, and Valley Gardens gangs.   CHS-8 has pending felony charges
in state court.   CHS-8 has felony convictions for aggravated assault
with a deadly weapon (x2) and false imprisonment.   CHS-8 positively
identified many subjects of the investigation from photographs,
including several of the Targets listed in this affidavit.   I found
the information from CHS-8 to be reliable because much of it was
corroborated by independent source information, other law enforcement
investigations, and physical and electronic surveillance.   To my
knowledge, CHS-8's information has not been found to be false or
misleading.

DNM 1269

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 121 of 255
Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 846

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 36 of 52

Justice, Organized Crime Drug Enforcement Task Force (OCDETF) investigation, designated "Operation Atonement."

66.    The investigation into the SNM began in March 2015, when SNM leaders ANTHONY RAY BACA, aka "PUP," ROBERT MARTINEZ, aka "BABY ROB," and ROY MARTINEZ, aka "SHADOW," called for the murder of the cabinet secretary of the NMCD and the administrator in charge of the NMCD's Security Threat Intelligence Unit (STIU). The threat culminated in late 2015, when BACA directed CHRIS GARCIA, a member on the street, to obtain firearms and murder the NMCD officials or their families. GARCIA acquired two firearms and provided a handgun to a second SNM member, an FBI CHS, to be utilized in the murder of the cabinet secretary. A third member of the gang, MANDEL LON PARKER, aka "CHUCO," agreed to assist with the murders, but unbeknownst to him, GARCIA instructed the CHS to kill PARKER after the "mission" was complete, because GARCIA did not trust PARKER.

67.    Over the course of the investigation, case agents infiltrated the SNM Gang through the utilization of multiple FBI sources, wiretaps, undercover agents, and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

68.    I am submitting this affidavit based upon my personal knowledge as the case agent for the investigation of the SNM, which is derived from my participation in the investigation, as well as that of fellow agents and officers who have assisted me in the investigation. In addition, I have developed information I believe to be reliable from the following sources:

DNM 1270

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 122 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 847

Case 1:16-mr-00628-K8M   Document 1   Filed 09/02/16   Page 37 of 52

a) Information provided by the FBI, NMCD, BCSO, BOP and other law enforcement officials (also referred to herein as "agents"), including oral and written reports;

b) Results of physical surveillance conducted by agents;

c) Information provided by undercover agents and CHS;

d) Information derived from consensually recorded conversations;

e) Information derived from lawfully intercepted telephone communications;

f) A review of license and automobile registration records; and

g) Records from the FBI's National Crime Information Center and New Mexico Motor Vehicle Division.

## Phase I Takedown

69.   In December 2015, FBI SSGTF agents and federal prosecutors from the District of New Mexico presented a portion of the SNM Gang investigation to the federal Grand Jury and obtained more than forty (40) indictments against members and associates of the SNM on federal drug, gun, and racketeering violations. Following the issuance of the federal indictments, the SSGTF and other law enforcement officers served dozens of search and arrest warrants on members and associates of the SNM. In the months that followed the Phase I operation, SSGTF agents arrested several additional SNM members and associates on criminal complaints for VICAR homicide, possession of firearms and/or ammunition by convicted felons, tampering with and retaliating against a witness, victim, or an informant, possession with intent to

DNM 1271

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 123 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 848

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 38 of 52

distribute controlled substances and conspiracy to distribute controlled substances.

### Phase II Takedown

70.   In ████ ████, SSGTF agents and federal prosecutors presented additional evidence to the federal Grand Jury and obtained ███ supplementary indictments against thirty-nine real additional members and associates of the SNM Gang.   The two indictments incorporated 22 counts of RICO Conspiracy, VICAR (murder, attempt murder, conspiracy to commit murder, assault with a deadly weapon resulting in serious bodily injury and conspiracy to commit assault with a deadly weapon resulting in serious bodily injury), felon in possession of a firearm, using or carrying a firearm during and in relation to a crime of violence, and aiding and abetting.

71.   Several SNM members are cooperating with the FBI and I have interviewed these persons and continue to do so.   I have also interviewed victims of SNM violence and former SNM members, who have renounced the gang.   I extended my knowledge about the membership and culture of SNM through discussions with CHS, cooperating defendants, undercover agents, SSGTF investigators, and the NMCD's STIU, which monitor SNM members throughout the state's prison, parole, and probation systems.   Some of the information I have learned about the SNM gang/criminal enterprise follows.

DNM 1272

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 124 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 849

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 39 of 52

### PROBABLE CAUSE

72.  As previously mentioned, this affidavit is being submitted for 12 search warrants to aid FBI agents in stopping several imminent threats made by members of the SNM.  The threats have been directed at specific informants, victims, and witnesses in the government's case. Much of the threat information has been corroborated by well-placed members of the gang, who are serving as FBI sources, to include CHS-1 thru CHS-9 (who were introduced in paragraphs 53-63).

73.  The Target Subjects are suspected of racketeering activity and conspiracy to harm victims, witnesses, and informants.  The Target Subjects are also suspected of participating in an ongoing conspiracy to distribute controlled substances in furtherance of the SNM's objectives and purposes.  All of the Target Subjects are habitual offenders with impressive criminal histories and extensive experience in the criminal justice system.

74.  In the paragraphs that follow, I will identify the Target Subjects in greater detail, note whether they are state or federal SNM members, or members of street gangs that support the SNM Gang, and describe their roles in the Target Offenses in greater detail.  I have also included the arrest history of the Target Subjects, and where possible, noted the offenses for which they were convicted.[*]

---

[*] Criminal history records were obtained from the FBI's National Criminal Information Center (NCIC).  I believe the records accurately reflect the subject's arrest record; however, conviction data is often not listed, or listed as "disposition unknown," because not all arresting agencies enter post-arrest data. Where possible, I have listed the subject's arrests and convictions.

DNM 1273

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 125 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 850
Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 40 of 52

## The Target Subjects

### FRANKIE GALLEGOS, aka "CUNTE"

75.     FRANKIE GALLEGOS is a validated member of the SNM and is believed to be the highest ranking member of the SNM within the BOP. FRANKIE GALLEGOS is currently incarcerated at the U.S. Prison Beaumont, Texas, on a 2007 conviction for Conspiracy to Distribute Methamphetamine.   Prior to becoming an SNM member, FRANKIE GALLEGOS was a member of the ESL street gang.[7]   FRANKIE GALLEGOS is the brother

---

[7] The ESL gang was the target of federal and state prosecution in 2007 for methamphetamine trafficking and multiple homicides. Ben Gallegos, the brother of Frankie, Andrew and Joe Gallegos was subsequently convicted of operating a Continuing Criminal Enterprise. Seven other members of the gang, to include Frankie Gallegos and Andrew Gallegos were convicted of drug trafficking crimes.

Albuquerque Journal: Task Force Investigates Valencia Gang Members, Friday, May 20, 2005, By Mike Gallagher, Journal Investigative Reporter. Authorities are investigating members of an alleged Valencia County drug gang for possible involvement in the shooting and strangulation deaths of seven people. Over the last several months, the Journal has learned, a task force including federal, state and county officers has focused on alleged members of the East Side Locos. The gang is based in the Valencia County community of Los Chavez near Belen. A number of alleged gang members and associates have been arrested on drug charges and are in federal custody. Also, there are indications that federal prosecutors are considering the possibility of a death penalty prosecution against some members of the gang. The gang has been active in the Los Lunas and Belen area since the early 1990s. Law enforcement officials consider the group to be "home grown" and not affiliated with gangs of the same name in other parts of the country. Federal, state and local law enforcement agents arrested 10 of 12 suspects on federal drug charges in early morning raids conducted in Valencia County on March 10. The remaining two suspects have since been arrested. After the drug arrests, law enforcement agencies established a Combined Agency Homicide Team to investigate seven homicides in Bernalillo and Valencia counties. The task force, announced at a March 26 press conference, is composed of sheriff's deputies from Valencia and Bernalillo counties, State Police and the U.S. Drug Enforcement Administration.
The victims: Investigators believe the killings were drug- or gang-related, and some of the killings are described as exceptionally cold-blooded. Cases under investigation include:

- The Nov. 26, 2004, strangulation deaths of Cruse Rael, 31, his girlfriend, Deanna Sais, 43, and her son Jason Slade, 22, at a house on Isleta SW.
- The April 18, 2004, shooting deaths of Eddie Verdugo and girlfriend Joyleen Chavez, 43, in their Los Chavez home.
- The Dec. 12, 2004, shooting death of Elizabeth Gonzales, 26, of Belen, whose body was found in a field east of Tome Hill.
- The December 2000 death of Phillip Silva, whose body was found on a South Valley ditch bank by a passer-by. Silva had a rope wrapped around his neck and a bag covering his head.

Arrest warrants in the drug case say the group moved and sold methamphetamine, crack cocaine and marijuana between Valencia County and California. Warrants also state that undercover officers were able to buy methamphetamine from some gang members for several months before the raid. The government also seeks the forfeiture of $63,900 seized in the raid. Facing federal indictment for conspiracy to distribute methamphetamine

DNM 1274

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 126 of 255
Appellate Case: 20-2058  Document: 010110415671  Date Filed: 09/29/2020  Page: 851

Case 1:16-mr-00628-KBM  Document 1  Filed 09/02/16  Page 41 of 52

of JOE LAWRENCE GALLEGOS and ANDREW GALLEGOS, both of whom are also
SNM and ESL members.  FRANKIE GALLEGOS is considered a federal and
state SNM member, due to his history of incarceration.  FRANKIE
GALLEGOS has prior arrests for assault, evading arrest, reckless
driving, aggravated battery, multiple counts of aggravated burglary,
battery upon a peace officer, trafficking methamphetamine and parole
violations.

### SAMUEL SILVA, aka "RABBS"

76.  SAMUEL SILVA is a validated member of the SNM, as well as
the ESL, and is currently incarcerated at the Santa Fe County Adult
Detention Center, Santa Fe, New Mexico, (Subject Premises "A-1")
pending federal sentencing on two counts of carjacking and using a
firearm in the commission of a violent crime.

77.  SILVA has prior arrests for vehicle theft (x2), burglary,
armed robbery (x2), drive-by shooting, assault with a deadly weapon,
battery with a deadly weapon, kidnapping (x2), attempted murder, being
a felon in possession of a firearm (x3), resisting/evading a police
officer (x2), shooting at/from a motor vehicle, possession of drug
paraphernalia, aggravated residential burglary, kidnapping with great
bodily harm, retaliating against a witness, intimidating a witness,

---

are: Anthony "Bubba" Gallegos, 35; Ben "Benji" Gallegos, 33; Andrew "Smiley" Gallegos, 29; Frankie "Cunte" Gallegos, 25; Raul "Silent" Duran, 24; Robert "Moonman" Cloven, 48; Louis "Monster" Sisneros, 21; Juan "Juan-2-3" Colles, 30; Phillip "Spider" Chavira, 36; Virgil Richardson, 34; Yvonne Buentiempo, 29; and Monica Valenzuela, 28. Low enforcement officials consider the Gallegos brothers the leaders of the group.  State court records show Andrew Gallegos also faces a charge that he attempted to smuggle drugs into a corrections facility. Frankie Gallegos is on parole from a series of indictments and guilty pleas dating back to 1997. Colles is on parole from his 2000 guilty plea to leaving the scene of an accident that killed veteran Albuquerque firefighter Chris J. Chavez on Rio Bravo SW in June 1999. He was sentenced to seven and a half years in prison...
http://absjournal.com/cgi-bin/print_it.pl?page=/news/state/352905nm05-20-05.htm

DNM 1275

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 127 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 852

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 42 of 52

conspiracy to commit murder, tampering with evidence, car-jacking (x2), and use or possess a firearm during a crime of violence.

78.   SILVA has been convicted of being a felon in possession of a firearm (x2), aggravated assault with a deadly weapon, kidnapping, auto theft, resisting or evading a police officer, attempted murder in the second degree, and shooting at or from a motor vehicle.

### JOE LAWRENCE GALLEGOS

79.   JOE LAWRENCE GALLEGOS is a validated member of the SNM and is currently incarcerated at the Otero County Prison Facility, Chaparral, New Mexico, (Subject Premises "A-2") on two VICAR murder charges.   JOE LAWRENCE GALLEGOS was arrested by the FBI in December 2015, during the Phase I operation.   JOE LAWRENCE GALLEGOS has prior arrests for aggravated assault, aggravated battery (x3), being a felon in possession of a firearm (x3), murder, conspiracy to commit murder, receiving stolen property, criminal damage to property (x4), resisting or obstructing a police officer (x4), eluding an officer, assaulting a police officer, battery on a police officer (x3), possession of an explosive device, dangerous use of an explosive device, aggravated battery on a police officer, possession of a controlled substance, possession of drug paraphernalia, aggravated assault with a deadly weapon, drive-by shooting, aggravated burglary, conspiracy to commit a felony, shooting at a dwelling, bribing or intimidating a witness, being a habitual offender, murder in aid of racketeering(x2), and assault causing great bodily injury in aid of racketeering.

DNM 1276

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 128 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 853

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 43 of 52

80.   JOE LAWRENCE GALLEGOS has been convicted of resisting arrest, intimidating of a witness, contributing to the delinquency of a minor (x2), being a felon in possession of a firearm (x2), criminal damage to property (x2), battery upon a peace officer (x2), being a habitual offender, bribery or intimidation of a witness, assaulting a police officer, disorderly conduct, DWI, and parole violations.

81.   JOE LAWRENCE GALLEGOS has a pending arrest warrant out of Valencia County for receiving stolen property.

### ANDREW GALLEGOS, aka "SMILEY"

82.   ANDREW GALLEGOS is a suspected member of the SNM and is currently incarcerated at the Torrance County Detention Center in Estancia, New Mexico, (Subject Premises "A-3") on a VICAR murder charge. ANDREW GALLEGOS was arrested by the FBI in April 2016, during the Phase II operation.   ANDREW GALLEGOS has prior arrests for criminal damage to property, minor in possession of alcohol, reckless driving, possession of a controlled substance (x2), trafficking a controlled substance (x2), conspiracy to commit murder, aggravated assault with a deadly weapon (x2), criminal sexual penetration, concealing identification (x3), evading or obstructing an officer, failure to register as a sex offender, shoplifting, aggravated fleeing, being a felon in possession of a firearm, negligent use of a firearm, and parole violations.

83.   ANDREW GALLEGOS has been convicted of possession of a controlled substance, criminal sexual penetration, conspiracy to

DNM 1277

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 129 of 255
Appellate Case: 20-2058    Document: 010110415671    Date Filed: 09/29/2020    Page: 854

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 44 of 52

distribute methamphetamine, and use of a communication facility in connection with a drug offense.

### SHAWN HENRY URAL, aka "SHAWN SHAWN"

84.   SHAWN URAL is a validated member of the SNM Gang and Valley Gardens street gang.   URAL lives at 4512 Valley Gardens Circle, Albuquerque, New Mexico (Subject Premises "A-4").  URAL is from the Valley Gardens street gang and resides within the gang's geographical area with other members of the Valley Gardens gang.

85.   URAL has previously been arrested for murder (x2), conspiracy to commit murder, aggravated battery, aggravated assault, assault, battery upon a peace officer, resisting arrest, evading arrest, escape from jail, armed robbery (x3), distribution of a controlled substance, possession of a controlled substance, burglary, possession of a weapon by a prisoner, tampering with evidence (x2), criminal damage to property, and parole violations.

86.   URAL has been convicted of murder, aggravated assault, conspiracy to commit aggravated assault, tampering with evidence, armed robbery with a deadly weapon, and conspiracy to commit criminal damage to property.

### JUAN ANTONIO MARTINEZ, aka "BABY"

87.   JUAN MARTINEZ is a validated member of the SNM and Valley Gardens gangs.   MARTINEZ is considered a federal SNM member and lives at 113 60th Street NW, #B-113, Albuquerque, New Mexico (Subject Premises "A-5").

DNM 1278

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 130 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 855

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 45 of 52

88.   MARTINEZ has prior arrests for burglary, assault, shooting from a vehicle, being a felon in possession of a firearm (x2), aggravated battery, aggravated assault, forgery, conspiracy, tampering with evidence, DUI (x2), and parole violations.

89.   MARTINEZ has been convicted of forgery and being a felon in possession of a firearm.

**RUPERT MICHAEL ZAMORA, aka "OSO," "MAMA BEAR," "BLUE BLACK"**

90.   RUPERT ZAMORA is a validated member of the SNM and Barelas gangs.   RUPERT ZAMORA lives at 4916 5th Street NW, Albuquerque, New Mexico (Subject Premises "A-6").   RUPERT ZAMORA is the highest ranking SNM member on the streets of Albuquerque.   RUPERT ZAMORA is currently out of custody, on pre-trial release, on a state case for possession of heroin, cause number T-4-FR-2016-001445.   RUPERT ZAMORA has prior arrests for residential burglary (x4), aggravated burglary (x2), robbery (x2), aggravated battery causing great bodily harm, evading arrest, possession of stolen credit cards (x4), possession of heroin, larceny (x3), theft of a credit card (x2), receiving stolen property (x2), dealing in stolen credit cards, being a prisoner in possession of a deadly weapon (x2), and parole violations.

91.   RUPERT ZAMORA has been convicted of aggravated battery with a deadly weapon, possession of a weapon by a prisoner, residential burglary (x4), robbery, theft of a credit card, possession of a stolen credit card (x2), fraudulent use of a credit card (x2), and forgery.

DNM 1279

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 131 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/30/2020   Page: 856

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 46 of 52

### JACOB ANTHONY ZAMORA, aka "HEAT"

92.   JACOB ANTHONY ZAMORA is a documented member of the TCK gang in Albuquerque and lives at 4916 5th Street NW, Albuquerque, New Mexico (Subject Premises "A-6") with RUPERT ZAMORA.   JACOB ZAMORA has prior arrests for distribution of cocaine, tampering with evidence (x2), kidnapping, aggravated battery with a deadly weapon, distribution of an imitation controlled substance, auto burglary, battery, robbery, criminal damage to property, trafficking a controlled substance, possession of a controlled substance, and probation violations.

93.   JACOB ZAMORA has been convicted of trafficking a controlled substance and robbery.

### WILLIE ROMERO, aka "DEMON"

94.   WILLIE ROMERO is a suspected member of the SNM and ESL gangs.   ROMERO lives at 1009 West Delgado Avenue, Belen, New Mexico (Subject Premises "A-7").   ROMERO is the highest ranking SNM member in the Belen/Los Lunas area.   ROMERO has previously been arrested for aggravated assault with a deadly weapon, robbery (x2), aggravated battery, aggravated battery with a deadly weapon, drug trafficking, aggravated assault on a peace officer, resisting arrest (x2), being an accessory to a crime, receiving a stolen vehicle, shoplifting (x3), armed robbery, and parole violations.

95.   ROMERO has been convicted of armed robbery with a deadly weapon, aggravated battery with a deadly weapon, escaping from a peace officer, being a felon in possession of a firearm, and shoplifting.

DNM 1280

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 132 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 857

Case 1:16-mr-00628-KBM   Document 1   Filed 09/02/16   Page 48 of 52

identification, receiving stolen property (x3), residential burglary (x4), aggravated battery, aggravated assault with a deadly weapon, and parole violations.

99.    EDWARD CANDELARIA has been convicted of aggravated assault, distribution of a controlled substance (x3), receiving or transferring a stolen vehicle, being an armed career criminal, and forgery (x2).

### ROBERT DEHERRERA, aka "WESOS"

100.    DEHERRERA is a validated member of the SNM and Valley Gardens gangs.    DEHERRERA is considered a federal SNM member. DEHERRERA currently lives at 2704 Apple Valley Road SW, Albuquerque, New Mexico (Subject Premises "A-9").    DEHERRERA is out of custody on pre-trial release in two state cases for breaking and entering; cause number T-4-FR-2016-003337, and altering an engine number, cause number T-4-FR-2016-006719.    DEHERRERA has previously been arrested for burglary (x2), aggravated assault, aggravated battery (x2), aggravated battery with a deadly weapon, threatening a witness, bribing a witness, possession of a controlled substance (x3), trafficking a controlled substance, bringing contraband into a prison, concealing identity, armed robbery (x2), unlawful taking of a motor vehicle, auto burglary (x2), possession of burglary tools, aggravated battery with a deadly weapon, commercial burglary, resisting arrest, assaulting a police officer, DWI, eluding a police officer, and parole violations.

101.    DEHERRERA has been convicted of aggravated battery with a deadly weapon, commercial burglary, armed robbery, vehicle theft, and vehicle burglary.

DNM 1281

Case 2:15-cr-04268-JB Document 2324-1 Filed 04/09/18 Page 133 of 255
Appellate Case: 20-2058 Document: 010110415674 Date Filed: 09/29/2020 Page: 858

Case 1:16-mr-00628-KBM Document 1 Filed 09/02/16 Page 49 of 52

**THOMAS ROBERT LLOYD, aka "BOBBY LLOYD," "HUERO LLOYD"**

102. LLOYD is a member of the SNM and Valley Gardens gangs.
LLOYD lives at 2801 Cottonwood Lane SW, Albuquerque, New Mexico
(Subject Premises "A-10"). LLOYD has been arrested for aggravated
battery on a police officer, aggravated fleeing from a police officer,
aggravated burglary with a deadly weapon, receiving or transferring a
stolen vehicle (x2), aggravated burglary (x2), possession of heroin
(x2), aggravated battery causing great bodily injury, DWI (x2),
fleeing a police officer (x2), receiving stolen property, aggravated
assault with a deadly weapon, kidnapping, assault, tampering with
evidence, possession of crack cocaine, escaping from jail, possession
of drug paraphernalia, residential burglary, and parole violations.

103. LLOYD has been convicted of aggravated battery upon a peace
officer, aggravated burglary with a deadly weapon, aggravated fleeing
a law enforcement officer, receiving or transferring a stolen vehicle,
possession of heroin, battery, escaping from jail, residential
burglary, and possession of drug paraphernalia.

**LANCE ROMAN NATSEWAY, aka "BABY BOY" "PEE WEE"**

104. LANCE NATSEWAY is a validated member of the SNM GANG and
lives at 11901 Ibex Avenue NE, Albuquerque, New Mexico (Subject
Premises "A-11"). NATSEWAY is on state probation for possession of a
controlled substance.

105. NATSEWAY has been arrested for robbery, receiving stolen
property, conspiracy (x2), tampering with evidence, child abuse,
possession of a controlled substance (x5), resisting or obstructing a

police officer (x3), burglary (x3), shoplifting (x2), auto burglary, larceny, DUI, aggravated burglary with a deadly weapon, and parole violations.

106. LANCE NATSEWAY has been convicted of possession of a controlled substance, robbery, conspiracy, burglary and possession of drug paraphernalia.

### ANTHONY AVILIO LUCERO, aka "EL WINO"

107. ANTHONY LUCERO is a validated member of the SNM and Barelas gangs and lives at 423 ½ Pacific Avenue SW, Albuquerque, New Mexico (Subject Premises "A-12"), with his brother JIMMY JOE LUCERO.  ANTHONY LUCERO is on pre-trial release in a state case for possession of heroin; cause number T-4-FR-001752.

108. ANTHONY LUCERO has been arrested for aggravated assault with a deadly weapon, aggravated assault, trafficking a controlled substance (x3), domestic battery, child abuse, being a felon in possession of a firearm (x2), commercial burglary (x2), residential burglary, auto burglary, larceny, resisting arrest, evading a police officer, abandonment of a child, tampering with evidence, possession of a controlled substance (x5), DUI (x2), trafficking firearms, being a prisoner in possession of a deadly weapon, and parole violations.

109. ANTHONY LUCERO has been convicted of being a felon in possession of a firearm, aggravated assault, child abandonment, being a habitual offender, trafficking a controlled substance, aggravated assault with a deadly weapon, possession of a controlled substance, and commercial burglary (x2).

### JIMMY JOE LUCERO, aka "FLACO"

110.  JIMMEY LUCERO is a validated member of the SNM and Barelas gangs and lives at 423 ½ Pacific Avenue SW, Albuquerque, New Mexico (Subject Premises "A-12"), with his brother ANTHONY AVILIO LUCERO.

111.  JIMMY  LUCERO  has  prior  arrests  for  armed  robbery, aggravated  assault  (x2),  resisting  arrest,  tampering  with  evidence, embezzlement,  commercial  burglary  (x3),  breaking  and  entering  (x2), vehicle theft (x2), receiving, concealing, or possessing stolen mail, making a false report of a crime, larceny, receiving stolen property, being  a  habitual  offender,  theft,  conspiracy,  possessing  burglary tools,  burglary,  shoplifting  (x2),  disorderly  conduct  (x3),  possession of a controlled substance (x3), and parole violations.

112.  JIMMY LUCERO has been convicted of receiving, concealing, or  possession  of  stolen  mail,  armed  robbery,  commercial  burglary, residential burglary, disorderly conduct, receiving or transferring a stolen vehicle, and shoplifting.

### GILBERT HIPOLITO ALIRES

113. GILBERT ALIRES is a member of the Valley Gardens gang and lives at 300 Camino Uno SW, Albuquerque, New Mexico.  ALIRES is on state probation for larceny and this location is his residence of record with the NMCD.  ALIRES was present during one SNM Gang meeting, when members discussed hitting snitches.  ALIRES was referenced during a second SNM meeting as willing to aid the SNM.  I am not requesting to search ALIRES' residence pursuant to a search warrant; however, NMCD parole officers will check his residence to ensure ALIRES is not

DNM 1284

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 136 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/20/2020   Page: 861

Case 1:16-mr-00628-KBM  Document 1  Filed 09/02/16  Page 52 of 52

participating in any activities to harm victims, witnesses, or informants. FBI agents will accompany state parole officers and attempt to interview ALIRES about his gang affiliation and involvement in the instant matter.

114. ALIRES has been arrested for concealing his identity, possesoion of a controlled substance (x4), armed robbery, embezzlement, possession of burglary tools (x2), receiving or transferring a stolen motor vehicle, larceny, bringing contraband into a correctional facility, DWI, criminal damage to property, and probation violations.

115. ALIRES has been convicted of larceny (x2) and criminal damage to property.

### Threats to Victims, Witnesses, and Informants, and Drug Distribution in Furtherance of the Gang's Objectives

116. **Threat 1:** This threat pertains to the conspiracy to murder "Victim 1" and "Witness 1."

117. SSGTF agents believe JOE LAWRENCE GALLEGOS and ANDREW GALLEGOS, aka "SMILEY," want to kill Victim 1 and Witness 1, both of whom are paramount to multiple VICAR offenses that the GALLEGOS brothers have been charged with. JOE and ANDREW GALLEGOS have solicited other gang members, friends, and family members to help them locate and "hit" Victim 1 and Witness 1. The information that supports this belief follows.

118. JOE GALLEGOS has been in federal custody since December 2015, when FBI agents arrested him for the 2001 VICAR murder of FC.

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 137 of 255
Appellate Case: 20-2058   Document: 010110415674   Date Filed: 09/29/2020   Page: 862

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 1 of 29

JOE GALLEGOS was charged, in a superseding indictment, with a second VICAR murder in April 2016, for the murder of AB. JOE GALLEGOS was also charged with the VICAR attempted murder of "Victim 1", who JOE GALLEGOS had previously stabbed. JOE GALLEGOS' younger brother, ANDREW GALLEGOS, aka "SMILEY," was also charged in April 2016, for the 2012 VICAR murder of AB.

119. JOE GALLEGOS and ANDREW GALLEGOS have communicated with their younger brother, FRANKIE GALLEGOS, who runs the SNM Gang within the federal prison system, and explained the charges against them. They also identified who they thought the witnesses might be. The communications between FRANKIE, JOE, and ANDREW GALLEGOS were facilitated through a combination of personal visits, coded letters, telephone conversations, and third party friends or members of their family. CHS-2 and CHS-6 participated in some of the communications, and CHS-2 and CHS-6 were asked, at separate times, to provide assistance to JOE and ANDREW GALLEGOS. CHS-2 and CHS-6 described the request for assistance to mean locating witnesses or informants, convincing them not to testify, and "taking them out if necessary."

120. FRANKIE GALLEGOS told CHS-6 to locate Witness 1, who had provided information to the FBI that resulted in a federal search warrant on JOE and ANDREW GALLEGOS' residence in Los Chavez, NM. During the execution of the search warrant, Witness 1 was present at the location and pointed out potential locations within the residence that might contain evidence. Members of the FBI's Evidence Response Team subsequently located suspected blood stains on the floor and

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 138 of 255
Appellate Case: 20-2058  Document: 010110415671  Date Filed: 09/29/2020  Page: 863

Case 1:16-mr-00628-KBM  Document 1-1  Filed 09/02/16  Page 2 of 29

walls within the residence.  FBI agents, with assistance from the fire department, removed sections of the floor and walls inside the residence that appeared to contain blood evidence believed to be related to the 2012 kidnapping and murder of AB.  The sections of the floor and walls were sent to the FBI laboratory for further analysis.

121.  CHS-6 reported that JOE GALLEGOS, ANDREW GALLEGOS, and their relatives in the Belen area were looking for Witness 1 and relying on "FRANKIE's guys" (the SNM) to hit Witness 1.  CHS-6 also reported that JOE GALLEGOS had been trying to find Victim 1, whom JOE GALLEGOS had previously stabbed, so the SNM/ESL could finish Victim 1.

122.  CHS-6 reported that JOE GALLEGOS sent word to CHS-6 to have fellow ESL member WILLIE ROMERO help CHS-6 locate Witness 1 and Victim 1.  CHS-6 has been in touch with ROMERO and reported that ROMERO had already received word from FRANKIE (GALLEGOS) to "smash" Victim 1, and ROMERO told CHS-6 that his "boys" had already "beat down" Witness 1.

123.  I have been in contact with Witness 1, who recently reported being "jumped" at a social gathering near his/her home. Witness 1 told FBI agents that an unknown person assaulted Witness 1, when Witness 1 exited a bathroom, inside a residence, where Witness 1 was hanging out with friends.  Witness 1 said that a male subject punched Witness 1 in the back and called Witness 1 a "snitch." Witness 1 fought with the subject for a few seconds and was able to break free and flee the residence.  Witness 1 was not able to fully identify the subject, but recognized him to be an ESL gang member or associate.  Witness 1 had previously seen the subject in the company

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 139 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 864

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 3 of 29

of ESL gang member "DEMON" (WILLIE ROMERO), who is also a suspected member of the SNM.

124. ANDREW GALLEGOS has been observed using the telephone access cards of other inmates in an attempt to disguise his use of the telephone and to call other persons and discuss the identity and whereabouts of suspected informants and witnesses. During a recent telephone call to a female, ANDREW GALLEGOS used coded language to discuss the fact that another ESL member was likely cooperating with law enforcement. ANDREW GALLEGOS and the female talked about the fact that people on the street knew about the informant and the informant used to work for "Sam Jefe," who I believe is SAMUEL SILVA.

125. CHS-8 is a close associate of JOE GALLEGOS and was recently housed next to him in jail. CHS-8 talked with JOE GALLEGOS and learned that JOE GALLEGOS had a female on the outside that was pulling police reports and trying to locate Victim 1 and Witness 1 for JOE GALLEGOS. CHS-8 warned JOE GALLEGOS about "trusting people on the outside," to which JOE GALLEGOS told CHS-8 that his female friend could be trusted because "she knew where a body was and she never said shit."

126. The identity of the female is unknown at this time. I do not believe the female to be JOE GALLEGOS' former girlfriend, SHAUNA GUTIERREZ, because I arrested her a few weeks ago and she is in custody. I suspect agents will learn the identity of the unknown female when the requested warrants are served.

DNM 1288

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 140 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 865

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 6 of 29

some questions about ROMERO, as CHS-2 did not know ROMERO.   SILVA
assured CHS-2 that ROMERO was a "carnal" (SNM) and "a good homie" who
had put in work for the Eastside (ESL) in the past.   SILVA told CHS-2
that ROMERO always had "cuetes" (guns) and CHS-2 could get one from
him.   SILVA told CHS-2 that ROMERO would be "down to put in work"
(assault or kill) if the plan was solid.

134.   CHS-2 was incarcerated for an extended period of time,
which resulted in SILVA sending word to other members of the SNM and
ESL to help him take out the victims.

135.   CHS-6 described two occasions when other ESL members talked
about "Jefe Sam" (SILVA) having reached out for the homies to get at
him because he had a job that needed to be done.   CHS-6 said that
he/she took that to mean SILVA needed someone taken out.   CHS-6 said
that the other ESL members understood that to mean the same thing.
CHS-6 reported that one ESL member had learned from DEMON (WILLIE
ROMERO) that QUINTANA had a ranch near Belen, New Mexico, and the "S"
(SNM) were waiting for QUINTANA or his family to return to the ranch.

136.   During a recent meeting, JIMMY JOE LUCERO told CHS-1 that
RICHIE and EDDIE (RICHARD AND EDWARD CANDELARIA) were looking for
FLACO (FRED QUINTANA) over "some old beef in the feds."   The LUCERO
brothers told CHS-1 that QUINTANA was "a snitch and was on the
streets, but the feds were making it look like he was locked up."

137.   EDWARD CANDELARIA has contacted CHS-9, and continues to do
so, regarding the whereabouts of FRED QUINTANA.   CHS-9 has been known
to remain in touch with QUINTANA, and EDWARD CANDELARIA is aware of

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 141 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 866

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 7 of 29

that. EDWARD CANDELARIA has repeatedly asked CHS-9 to locate QUINTANA and provide his location to EDWARD CANDELARIA. CHS-9 believes EDWARD CANDELARIA wants to hurt QUINTANA, because EDWARD CANDELARIA has told CHS-9 that QUINTANA is a snitch and made some problems for "the family" when QUINTANA was in the feds (BOP).

138.    **Threat 3**: This threat pertains to the conspiracy to murder GERALD ARCHULETA, aka "STYX," Ernie ESTRADA, aka "Bad Boy," and other cooperators or perceived cooperators.

139. FRANKIE GALLEGOS is responsible for all SNM members within the BOP. FRANKIE GALLEGOS has been closely monitoring the progress of state SNM members who were indicted in Phase I and Phase II, as the SNM presence within the BOP will likely increase dramatically. Such an increase is beneficial to the SNM within the federal system, as they have to interface with rival prison gangs and allies. FRANKIE GALLEGOS has been inquiring about the progress of the case, to include who the suspected informants and cooperators are. FRANKIE GALLEGOS has shown added interest in the case, as his brothers JOE LAWRENCE GALLEGOS and ANDREW GALLEGOS were arrested by the FBI on VICAR murder charges. As the leader of the federal SNM, FRANKIE GALLEGOS is responsible for vetting the incoming SNM members to ensure none of them cooperated with law enforcement, as any persons shown to have cooperated will have to be killed. I believe additional scrutiny on incoming SNM members is warranted by the fact that a potential power struggle may ensue within the SNM, as several of the state leaders are older and more influential within the gang and may attempt to seize

DNM 1290

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 142 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 867

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 8 of 29

power from FRANKIE GALLEGOS upon their arrival into the BOP. Case
agents have reviewed letters between FRANKIE GALLEGOS and other
members of the SNM or ESL.

140. Federal SNM member JUAN MARTINEZ, aka "BABY," maintains
contact with other federal SNM members and has held meetings at his
residence with other members of the SNM. CHS-2 has attended meetings
at MARTINEZ's residence and has purchased Suboxone from MARTINEZ.
MARTINEZ, CHS-2, and other members of the federal SNM have discussed
the current racketeering case against the SNM and the need for "all
the snitches to get hit." MARTINEZ told CHS-2 that he had been in
touch with Richie (RICHARD CANDELARIA) and Cunte (FRANKIE GALLEGOS)
and both men believed STYX (GERALD ARCHULETA) was a snitch. MARTINEZ
told CHS-2 that "the brothers were gonna clean house," a reference to
getting rid of anyone snitching on the SNM.

141. CHS-2 reported that MARTINEZ claimed to be the right-hand
man of RICHARD CANDELARIA and had been meeting with RICHARD CANDELARIA
regarding some "work."

142. Within the past 15 days, CHS-7 met with NATSEWAY and
requested to purchase a firearm from NATSEWAY. NATSEWAY said he
normally had firearms, but was out. NATSEWAY said he could get CHS-7
a .45 or Glock. CHS-7 and NATSEWAY talked about the current case
against the SNM. NATSEWAY mentioned STYX (GERALD ARCHULETA) having
pled guilty and being a snitch. NATSEWAY said some of the "big
homies" had asked NATSEWAY to "go in on a PV" (parole violation) so he

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 143 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 868

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 9 of 29

could get near STYX and hit him.  NATSEWAY told CHS-7 that he could do it because NATSEWAY was raised by ANGEL MUNOZ and STYX knew that.[*]

143.  Within the past 30 days, CHS-8 was asked by JIMMY JOE LUCERO and ANTHONY LUCERO to hit a "paisa" (Mexican national) who had informed police about their heroin distribution operation.  The information the "paisa" shared with law enforcement is believed to have contributed to the arrest of the LUCERO brothers on April 5, 2016, in Albuquerque.  The LUCERO brothers subsequently bonded out of custody and are back on the street.

144.  Within the past 10 days, CHS-1 met with JIMMY JOE LUCERO and ANTHONY LUCERO.  During that meeting the LUCERO brothers told CHS-1 that the brothers (SNM) were planning on hitting STYX.  JIMMY JOE LUCERO said a youngster would be going in on a parole violation and would get next to STYX and hit him.

145.  During a recent meeting, CHS-1 requested a firearm from the LUCERO brothers.  JIMMY JOE LUCERO said that they had two handguns, but recently gave them to RICHIE (RICHARD CANDELARIA) in exchange for "chiva" (heroin).

146.  Several CHS reported the SNM wants to kill former member Ernie ESTRADA, aka "Bad Boy," because they believe him to be a federal informant.  ESTRADA left the SNM several years ago and went through the NMCD's Restoration Population Program ("RPP"), which is a gang dropout program.

---

[*] Angel Munoz was the founding member of the SNM Gang and is considered the "Godfather" of the gang. Natseway's mother is Rosa Munoz, the former wife of Angel Munoz. While Natseway is not Angel's biological son, CHS-7 said that Natseway, his brothers and sister, all claim to have been raised by Angel.

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 144 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 869

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 10 of 29

147. ESTRADA had been brought into the SNM by member SHAWN HENRY URAL, aka "SHAWN SHAWN." Several CHS reported that URAL was tasked with killing ESTRADA and was prepared to do so.

148. URAL became a subject of the present investigation after CHS-1 reported that URAL, SNM member BENJAMIN MARQUEZ, aka "BENJI," and SNM associate JANET ARMIJO were selling heroin and methamphetamine from 4512 Valley Gardens Circle, Albuquerque, New Mexico (Subject Premises "A-4"). ARMIJO is the primary resident at the house and allows various gang members to stay with her. ARMIJO has children with SNM member DALE ADOLFO CHAVEZ, aka "DREAMER," who is presently incarcerated at the Penitentiary of New Mexico. CHS-1 reported the location as an "SNM house" that was frequented at all times of the day and night by members of the SNM and Valley Gardens gangs. [10]

149. CHS-1, CHS-2, CHS-3, CHS-4, CHS-5, CHS-7, and CHS-8, all members of the SNM, reported that they had been to the Valley Gardens location (Subject Premises A-4) and either observed drugs at the premises on multiple occasions, or purchased drugs from URAL or ARMIJO at the location. CHS-3 and CHS-4 reported having dropped drugs off at the location, to be sold, on behalf of other SNM members (these transactions took place prior to CHS-3 and CHS-4 cooperating with the FBI).

---

[10] On March 31, 2016, the Albuquerque police SWAT team executed a search warrant on the Valley Gardens residence for homicide detectives. The search warrant authorized detectives to search the premises for a handgun that was used in the February 5, 2016, murder of an Army soldier, at an ATM, in an Albuquerque parking lot. SNM member Benjamin Marquez told detectives that he sold the gun for $200, to a known parolee who frequented the Valley Gardens house for drugs.

DNM 1293

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 145 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 870

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 11 of 29

150. In recent weeks, CHS-1 reported being present when SNM members discussed the current status of the government's case against the SNM.   CHS-1 said that much of the discussion pertained to who the government's witnesses and informants might be.   The CHS related the following details to FBI case agents:

151. ▇▇▇▇▇▇▇▇          Within the past 45-days, CHS-1 met with BENJAMIN MARQUEZ, URAL, MARTINEZ, DEHERRERA, LLOYD and GILBERT ALIRES at Subject Premises A-4.   All of the aforementioned subjects are Valley Gardens gang members and all but ALIRES are members of the SNM. The group discussed the federal indictments and media coverage that had come from the case.   The older members of the group expressed disbelief of the fact that GERALD ARCHULETA had recently pled guilty and seemed to be cooperating with the government.   CHS-1 reported that the members of the gang believed ARCHULETA to be a cooperator because he had only received a three-year sentence and implicated ANTHONY RAY BACA, aka "PUP," in criminal activity in the plea agreement.   CHS-1 related that MARQUEZ said ARCHULETA should be hit for being a rat. All of the gang members were in agreement.   DEHERRERA and MARTINEZ, both federal SNM members, said that ARCHULETA would be "hit for sure" once he arrived at a BOP facility.   DEHERRERA and MARTINEZ went on to say that they had been in touch with "RICHIE" (RICHARD CANDELARIA) and "FRANKIE G" (FRANKIE GALLEGOS) and the SNM in the feds were aware of the situation and would "hit Styx and a few other vatos," once they arrived.   FRANKIE GALLEGOS told DEHERRERA and MARTINEZ to hit anyone who was "snitching on the onda" (SNM).

DNM 1294

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 146 of 255
Appellate Case: 20-2058  Document: 010110415671  Date Filed: 09/29/2020  Page: 871

Case 1:16-mr-00628-KBM  Document 1-1  Filed 09/02/16  Page 12 of 29

152. ████████  Within the past 30-days, CHS-1 attended a meeting at Subject Premises A-4 with MARQUEZ, URAL, MARTINEZ, DEHERRERA, and RUPERT ZAMORA. CHS-1 provided the following information about the meeting: RUPERT ZAMORA delivered methamphetamine to MARQUEZ and indicated that it had come from WILLIE (ROMERO), who was "doing good" and had "good shit." RUPERT ZAMORA told MARQUEZ that he owed RUPERT ZAMORA 10% of his proceeds from drugs sales and that the money would go to "the onda" (SNM). CHS-1 had not seen anyone "taxed" and asked MARQUEZ why RUPERT ZAMORA was charging other brothers. MARQUEZ told CHS-1 that "the brothers in Santa" (Penitentiary of New Mexico in Santa Fe) had sent word that RUPERT ZAMORA was in charge of Albuquerque and ROMERO was in charge of Los Lunas and Belen. CHS-1 and the rest of the brothers were to get in line with RUPERT ZAMORA and ROMERO because they needed to "do some house cleaning" to "get rid of the ratas" (informants).

153. RUPERT ZAMORA told CHS-1 and the other brothers that he had been talking to CUNTE (FRANKIE GALLEGOS), through RICHARD CANDELARIA, and the brothers needed to keep their federal brothers informed on the progress of the case so they (the fed SNM) could receive the "good brothers" and "hit all the ratas."

154. RUPERT ZAMORA said that FRANKIE had requested assistance in hitting ERNIE ESTRADA and "a couple other people" (Victim 1 and Victim 2) for RABBS (SAMUEL SILVA). RUPERT ZAMORA said he wanted ESTRADA hit too and cited several reasons ESTRADA needed to go: (1) the federal tabla (leaders) said he needs to go, (2) ESTRADA had tried to call a

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 147 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 872

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 13 of 29

hit on SNM member "Brn Dog" in 2005, (3) ESTRADA had paper saying he
was an FBI informant, (4) ESTRADA had gone into the RPP (gang dropout)
program while incarcerated, and (5) ESTRADA was believed to be an FBI
informant and FRANKIE GALLEGOS said ███████ ██ going to testify ██
███ ██████ ███████ ██ ███████ ██████ ██ ████ ██████ ████ ██████ ███
██████

155. CHS-1 felt RUPERT ZAMORA wanted ESTRADA dead for personal
reasons too, explaining that ESTRADA had messed around with RUPERT
ZAMORA's girlfriend "Sunshine" (EVA BLAKEMAN) and had something to do
with her death (which occurred in 2011 and may have been the result of
a drug overdose).

156. CHS-1 explained that the hit on ESTRADA was URAL's
responsibility because URAL had brought ESTRADA into the SNM.   URAL
accepted the responsibility in taking ESTRADA out and told the other
members that he thought he could get ESTRADA to the house, but would
need help hitting him and getting rid of his body.   The group
discussed the benefits of giving him a "hotshot" versus just shooting
him.   URAL said he would have BOBBY LLOYD (THOMAS ROBERT LLOYD) and
GILBERT (ALIRES) find ESTRADA and lure him to the house, which URAL
thought would be easy because he thought ESTRADA would want to get
high.

157. RUPERT ZAMORA told the other brothers that RICHIE (RICHARD
CANDELARIA) wanted QUINTANA hit and he and EDDIE (EDWARD CANDELARIA)
had been looking for QUINTANA.

DNM 1296

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 148 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 873

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 14 of 29

158. <u>Meeting #3</u>:   Within the past 10-days, CHS-1 attended a meeting at the Valley Gardens location (Subject Premises A-4). CHS-1 reported that the following SNM members were at the house and participated in the discussion: URAL, DEHERRERA, LLOYD, BABY (JUAN MARTINEZ), RUPERT ZAMORA, and JACOB ZAMORA. RUPERT ZAMORA told the others that ERNIE ESTRADA had not been seen around the methadone clinics. LLOYD reported that ESTRADA was rumored to be attending, or working at, the Legacy Church, off Central Boulevard, in the South Valley. RUPERT ZAMORA told LLOYD to "check it out" and let him know. RUPERT ZAMORA told the other SNM members that he had sent JACOB ZAMORA and his crew to look for ESTRADA and his girlfriend at a couple apartment complexes, but nobody had seen ESTRADA.

159. RUPERT ZAMORA went on to say that he had JACOB ZAMORA and some "TCK boys" collecting debt for him. RUPERT ZAMORA said the TCK were "down for smashing people" if they didn't pay and asked the group to bring any TCK "beefs" (disagreements or disputes) to him to handle.

160. URAL said that once ESTRADA was located, or a phone number was found, URAL could get ESTRADA to come over to "party" and get high. CHS-1, DEHERRERA, MARTINEZ, and LLOYD were "down" for finding ESTRADA and hitting him.

161. CHS-1 observed JACOB ZAMORA to be armed with a black handgun, which he kept in his waistband.

162. <u>Drug Conspiracy</u>:   CHS-1, CHS-2, CHS-3, CHS-6, and CHS-9 communicate with FRANKIE GALLEGOS through third parties. FRANKIE GALLEGOS is careful on the telephone and normally sends coded messages

DNM 1297

Case 2:15-cr-04268-JB Document 2324-1 Filed 04/09/18 Page 149 of 255
Appellate Case: 20-2058 Document: 010110415671 Date Filed: 09/29/2020 Page: 874

Case 1:16-mr-00628-KBM Document 1-1 Filed 09/02/16 Page 16 of 29

165. MARTINEZ told CHS-2 that he could supply Suboxone and methamphetamine to CHS-2 anytime. CHS-2 recently participated in a controlled drug buy from MARTINEZ, during which CHS-2 purchased a bulk quantity of Suboxone. MARTINEZ told CHS-2 to get heroin from URAL at his trailer on Valley Gardens.

166. CHS-1 has observed MARTINEZ at URAL's residence on several occasions. CHS-1 has observed MARTINEZ pick up methamphetamine from URAL and BENJAMIN MARQUEZ[11] at Subject Premises A-4 on several occasions.

167. Within the past 3-days, CHS-1 spoke with MARTINEZ and confirmed that he had Suboxone to sell. CHS-1 said that he/she would contact MARTINEZ for a few "strips" of Suboxone as soon as CHS-1 received some money owed to CHS-1. MARTINEZ said that he had a couple hundred strips and would save some for CHS-1.

168. Within the past 3-days, CHS-5 met with the LUCERO brothers at their residence and observed them sell heroin to three separate people, during a one-hour period.

169. Within the past 3-days, CHS-1 met with the LUCERO brothers and observed them to be in possession of heroin.

170. Within the past 3-days, CHS-1 spoke with RICHARD CANDELARIA and confirmed that RICHARD CANDELARIA had heroin for sale. RICHARD CANDELARIA told CHS-1 to come over to his house anytime (to purchase heroin).

---

[11] Benjamin Marquez resides at 4512 Valley Gardens Circle SW, Albuquerque, New Mexico. In August 2016, Marquez was arrested at the location by agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") on a federal arrest warrant charging multiple counts of distribution of methamphetamine. The arrest took place as FBI surveillance agents were monitoring the location for SNM Gang activities.

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 150 of 255
Appellate Case: 20-2058  Document: 010110415671  Date Filed: 09/29/2020  Page: 875

Case 1:16-mr-00628-KBM  Document 1-1  Filed 09/02/16  Page 17 of 29

171. Within the past 3-days, CHS-6 spoke with ROMERO and confirmed that he had heroin to sell to CHS-6. ROMERO told CHS-6 to come to ROMERO's house when CHS-6 was ready to purchase the heroin.

172. Ongoing surveillance of Subject Premises A-4 (4512 Valley Gardens Circle, Albuquerque, New Mexico) and A-12 (423 ½ Pacific Avenue SW, Albuquerque, New Mexico) has shown consistent vehicle and foot traffic to the premises, where visitors (or would be drug buyers) enter the premises for 2-5 minutes and then depart. I believe these short duration visits are consistent with drug trafficking activities.

173. Since ANDREW GALLEGOS has been incarcerated, CHS-6 reported that ANDREW GALLEGOS sent word to CHS-6 to obtain Suboxone from WILLIE ROMERO and have a female associate bring it to ANDREW GALLEGOS during a jail visit. CHS-6 sent word back to ANDREW GALLEGOS that CHS-6 was working on finding a female courier that could bring the Suboxone in during a visit. CHS-6 relayed to ANDREW GALLEGOS that CHS-6 was having trouble finding a female who had a clean record and a reliable vehicle that could make it out to the jail in Estancia, NM (Torrance County Detention Center). ANDREW GALLEGOS sent word back to CHS-6 that the "carnals" (SNM) were getting dope into the jail through legal mail and the guards were afraid to open the legal mail. ANDREW GALLEGOS also said that the guards were too afraid to enter their pod and would leave the mail piled up in the library for one of the SNM inmates to collect. ANDREW GALLEGOS requested that CHS-6 obtain Suboxone and have it sent to him as legal mail.

DNM 1299

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 151 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 876
Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 18 of 29

174. Several CHS have reported that RUPERT ZAMORA is selling methamphetamine and heroin, and charging street-level dealers a ten percent tax to sell drugs in Albuquerque. RUPERT ZAMORA is reportedly using the SNM and TCK gangs to enforce the tax and collect money from dealers. Two persons recently arrested for possession with intent to distribute controlled substances also reported this information to authorities.

175. CHS-1 and CHS-5 reported ROMERO, RUPERT ZAMORA, and the CANDELARIA brothers were trafficking multiple ounces of heroin to SNM members in the Espanola, New Mexico, and Las Vegas, New Mexico areas.

176. While ROMERO is believed to be the primary source of supply for heroin, CHS-1 and CHS-5 reported that RICHARD CANDELARIA has a drug connection with a person RICHARD CANDELARIA met in the BOP and that person is a member of a known organized crime group that operates in New Mexico, Texas, Oklahoma, and elsewhere.

### THE SUBJECT PREMISES:

177. I have reviewed law enforcement databases, driver's license information, vehicle registration records, NMCD files and other available commercial and law enforcement databases, and I believe the following Target Subjects are living at the specified locations (A-1 through A-12) listed below.

DNM 1300

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 152 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 877

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 19 of 29

| SUBJECT PREMISES | TARGET SUBJECT | LOCATION |
|---|---|---|
| A-1 | SAMUEL SILVA aka "RABBS" | Santa Fe County Adult Correctional Facility, 28 Camino Justicia, Santa Fe, New Mexico |
| A-2 | JOE LAWRENCE GALLEGOS | Otero County Prison Facility, 10 McGregor Range Rd, Chaparral, New Mexico |
| A-3 | ANDREW GALLEGOS aka "SMILEY" | Torrance County Detention Center, 209 County Road A049, Estancia, New Mexico |
| A-4 | SHAWN HENRY URAL aka "SHAWN SHAWN" | 4512 Valley Gardens Circle, Albuquerque, New Mexico |
| A-5 | JUAN ANTONIO MARTINEZ aka "BABY" | 113 60th Street NW, #B-113, Albuquerque, NM |
| A-6 | RUPERT MICHAEL ZAMORA aka "OSO," "MAMA BEAR," "BLUE BLACK"

JACOB ANTHONY ZAMORA aka "HEAT" | 4916 5th Street NW, Albuquerque, New Mexico |
| A-7 | WILLIE ROMERO aka "Demon" | 1009 West Delgado Avenue, Belen, New Mexico |
| A-8 | RICHARD CANDELARIA aka "EL CHOKE," "RICHIE"

EDWARD CANDELARIA, aka "EDDIE" | 4312 Enfield Court, Albuquerque, New Mexico |
| A-9 | ROBERT DEHERRERA aka "NESOS" | 2704 Apple Valley Road SW, Albuquerque, New Mexico |
| A-10 | THOMAS ROBERT LLOYD aka "BOBBY LLOYD," "HUERO LLOYD" | 2801 Cottonwood Lane SW, Albuquerque, New Mexico |
| A-11 | LANCE ROMAN NATSEWAY aka "BABY BOY," "PEE WEE" | 11901 Ibex Avenue NE, Albuquerque, New Mexico |
| A-12 | ANTHONY AVILIO LUCERO aka "EL WINO"

JIMMY JOE LUCERO aka "FLACO" | 423 ½ Pacific Avenue SW, Albuquerque, New Mexico |

178. **Subject Premises A-1**: I am aware that SAMUEL SILVA is presently incarcerated at the Santa Fe County Adult Correctional Facility, 28 Camino Justicia, Santa Fe, New Mexico, on federal charges. The search of Subject Premises A-1 will be limited to

Search Warrant Affidavit Page | 70

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 153 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 878
Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 20 of 29

SILVA's jail cell and any personal property belonging to SILVA that is being stored at the jail. Because SILVA is represented by counsel, and may have attorney-client material among his possessions, an FBI filter team[12] will be utilized to search SILVA's jail cell and property.

179. **Subject Premises A-2:** I am aware that JOE LAWRENCE GALLEGOS is presently incarcerated at the Otero County Prison Facility, 10 McGregor Range Rd, Chaparral, New Mexico, on federal charges. The search of Subject Premises A-2 will be limited to JOE GALLEGOS' jail cell and any personal property belonging to JOE GALLEGOS that is being stored at the jail. Because JOE GALLEGOS is represented by counsel, and may have attorney-client material among his possessions, an FBI filter team will be utilized to search JOE GALLEGOS' jail cell and property.

180. **Subject Premises A-3:** I am aware that ANDREW GALLEGOS is presently incarcerated at the Torrance County Detention Center, 209 County Road A049, Estancia, New Mexico, on federal charges. The search of Subject Premises A-2 will be limited to ANDREW GALLEGOS' jail cell and any personal property belonging to ANDREW GALLEGOS that is being stored at the jail. Because ANDREW GALLEGOS is represented by counsel, and may have attorney-client material among his

---

[12] The Filter Team will be comprised of FBI agents that are not assigned to the SNM Gang Investigation. Any evidentiary items seized by Filter Team agents will be presented to a Filter AUSA, not assigned to the SNM Gang case, for review. Only after the Filter Team AUSA determines that the items seized are not attorney-client privileged information, will the items be turned over to the FBI case agents and AUSAs for inclusion in the instant case. This procedure will be utilized in the searches of incarcerated Defendants Samuel Silva, Joe Lawrence Gallegos, and Andrew Gallegos.

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 154 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 879

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 21 of 29

possessions, an FBI filter team will be utilized to search ANDREW GALLEGOS' jail cell and property.

181. **Subject Premises A-4:** I believe SHAWN HENRY URAL lives at Subject Premises A-4, located at 4512 Valley Gardens Circle, Albuquerque, New Mexico.

182. Indicia of Residence

183. Multiple CHS have visited URAL at the Subject Premises in recent weeks.

184. Official police records list the Subject Premises as his residence.

185. URAL's fifth-wheel RV is parked in the front yard, with extension cords running from the house to the RV.

186. Surveillance agents recently observed URAL enter the residence and fifth-wheel at the Subject Premises.

187. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

188. **Subject Premises A-5:** I believe JUAN ANTONIO MARTINEZ lives at Subject Premises A-5, located at 113 60th Street NW, #B-113, Albuquerque, New Mexico.

189. Indicia of Residence

190. MARTINEZ listed the Subject Premises as his residence with social services.

191. Official police records list the Subject Premises as his residence.

DNM 1303

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 155 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 880
Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 22 of 29

192. A query of the LexisNexis/Accurint database listed the Subject Premises as being MARTINEZ's residence.

193. Surveillance agents recently observed MARTINEZ at the Subject Premises.

194. CHS have visited MARTINEZ at the Subject Premises on multiple occasions.

195. MARTINEZ's vehicle is parked in front of the Subject Premises.

196. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

197. **Subject Premises A-6:** I believe RUPERT MICHAEL ZAMORA and JACOB ANTHONY ZAMORA live at Subject Premises A-6, located at 4916 5th Street NW, Albuquerque, New Mexico.

198. Indicia of Residence

199. JACOB ZAMORA is on state probation, and the Subject Premises is his residence of record.

200. RUPERT ZAMORA and JACOB ZAMORA have been observed at the Subject Premises during recent surveillance.

201. RUPERT ZAMORA's NMCD file lists the Subject Premises as his residence.

202. Official police records list the Subject Premises as the residence of RUPERT ZAMORA and JACOB ZAMORA.

203. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

DNM 1304

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 156 of 255
Appellate Case: 20-2058  Document: 010110415671  Date Filed: 09/29/2020  Page: 881
Case 1:16-mr-00628-KBM  Document 1-1  Filed 09/02/16  Page 24 of 29

217. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

218. **Subject Premises A-9:** I believe ROBERT DEHERRERA lives at Subject Premises A-9, located at 2704 Apple Valley Road SW, Albuquerque, New Mexico.

219. Indicia of Residence

220. Official police records list the Subject Premises as his residence.

221. NMCD records list the Subject Premises as his residence.

222. A query of the LexisNexis/Accurint database listed the Subject Premises as being DEHERRERA's residence.

223. Surveillance agents recently observed DEHERRERA at the Subject Premises.

224. DEHERRERA is on pre-trial release and lists the Subject Premises as his residence.

225. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

226. **Subject Premises A-10:** I believe THOMAS ROBERT LLOYD lives at Subject Premises A-10, located at 2801 Cottonwood Lane SW, Albuquerque, New Mexico.

227. Indicia of Residence

228. Official police records list the Subject Premises as his residence.

229. NMCD records list the Subject Premises as his residence.

DNM 1305

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 157 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 882

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 25 of 29

230. A query of the LexisNexis/Accurint database listed the Subject Premises as being LLOYD's residence.

231. Surveillance agents recently observed LLOYD at the Subject Premises.

232. LLOYD is on pre-trial release and lists the Subject Premises as his residence.

233. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

234. **Subject Premises A-11**: I believe LANCE ROMAN NATSEWAY lives at Subject Premises A-11, located at 11901 Ibex Avenue NE, Albuquerque, New Mexico.

235. Indicia of Residence

236. NATSEWAY is on state probation, with GPS monitoring, and the Subject Premises is his residence of record.

237. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

238. **Subject Premises A-12**: I believe ANTONIO AVILIO LUCERO and JIMMY JOE LUCERO live at Subject Premises A-12, located at 423 ½ Pacific Avenue SW, Albuquerque, New Mexico.

239. Indicia of Residence

240. Official police records list the Subject Premises as their residence.

241. NMCD records list the Subject Premises as their residence.

242. Surveillance agents recently observed vehicles registered to the LUCERO brothers at the Subject Premises.

DNM 1306

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 158 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 883

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 26 of 29

243. Both brothers are on pre-trial release and list the Subject Premises as their residence.

244. CHS have visited the LUCERO brothers at the Subject Premises.

245. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

### SEARCHING FOR TATTOOS:

246. When the search warrants are executed, agents will attempt to interview the Target Subjects[13] about their affiliation with the gang(s). It has been my experience that many people lie when speaking with law enforcement and will sometimes go to great lengths to conceal their gang ties. Furthermore, the Target Subjects may exercise their constitutional right to refrain from speaking with law enforcement agents. Therefore I am requesting FBI agents be permitted to search the Target Subject's bodies, above the waist and below the thighs, for tattoos in an effort to discern and document their gang affiliation.

247. I am aware that SNM members have distinct tattoos that represent their dedication to the SNM criminal enterprise. The members display these tattoos to gain respect within the enterprise and to intimidate non-members. Similarly, members of street gangs that support the SNM, such as the Valley Gardens, ESL, TCK, and Barelas gangs, have tattoos evidencing their membership and status

---

[13] Target Subjects Samuel Silva, Joe Lawrence Gallegos, and Andrew Gallegos will not be interviewed, as they are represented by counsel. Joe Lawrence Gallegos and Andrew Gallegos will not be searched for tattoos, as FBI agents served similar search warrants on their persons when they were previously arrested.

DNM 1307

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 159 of 255
Appellate Case: 20-2058  Document: 010110415671  Date Filed: 09/29/2020  Page: 884

Case 1:16-mr-00628-KBM  Document 1-1  Filed 09/02/16  Page 27 of 29

within the gangs.  I am seeking the court's permission to utilize FBI photographers to photograph and document the Target Subject's tattoos. Such photo documentation would help positively identify subjects and better document and determine the Target Subjects gang affiliation.

248.  I am aware that some of the tattoos evidencing membership in or association with the SNM include, but are not limited to: the Zia symbol, the letters "SNM" or "S," the words "Syndicato de Nuevo Mexico," "Syndicato," "Burque," "Duke City," "New Mexico," the numbers "19," (S being the 19th letter of the alphabet) "505," the Peacock bird, the outline of the State of New Mexico, and other imagery that may signify New Mexico.

249.  Law enforcement and corrections department records that I have reviewed in this case indicate that all of the Target Subjects have one or more tattoos on their bodies.  I believe the Target Subjects may have SNM Gang related tattoos.

250.  **Exhibit 1** contains several examples of SNM tattoos.

#### REQUEST FOR NIGHT TIME SERVICE:

251.  I am requesting the Court authorize the FBI, to include local law enforcement, to serve these warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e) (2) (A) (ii).  Agents and officers will be attempting to serve the requested search warrants in closely coordinated and simultaneous raids.  FBI Special Weapons and Tactics (SWAT) teams have been briefed on this operation and will be utilized to execute some of the search warrants.  State probation/parole officers will be conducting searches of specific SNM

Search Warrant Affidavit Page | 78

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 160 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 885
Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 28 of 29

members who are on supervised release, in conjunction with the FBI operation. SNM members incarcerated within the state prisons will also be searched.[14]

252. Subject Premises A-4 thru A-12 are located in residential neighborhoods and I believe it will be safer for law enforcement officers to approach the premises under the cover of darkness. Night time service will prevent law enforcement agents from being seen by the Target Subjects, and minimize their efforts to destroy evidence, attempt to evade detection by law enforcement, or warn potential targets of the presence of law enforcement prior to the execution of search the warrants. In addition, there is less vehicular and pedestrian traffic near the Subject Premises during the night, thus reducing the risk to civilians if any shots are fired by the Target Subjects. Therefore, I am requesting authorization to serve the requested search warrants at the Subject Premises any time of the day or night.

### CONCLUSION:

253. Based on the foregoing, I believe that there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 1962(d), 1512, 1513, 2, and 21 U.S.C. § 846, as more particularly described in Attachment B will be found at the Subject Premises and on the Target Subjects. Therefore, I submit that this affidavit supports probable cause for warrants to search the premises described in Attachment A

---

[14] NMCD officials will search incarcerated SNM members in an effort to seize weapons and collect intelligence pertaining to the pending threats. Similarly, BOP officials will conduct a search of Frankie Gallegos' prison cell and property.

DNM 1309

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 161 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 886

Case 1:16-mr-00628-KBM   Document 1-1   Filed 09/02/16   Page 29 of 29

and seize the items described in Attachment B.   This affidavit has been reviewed by FBI Assistant Division Counsel Anthony Costanza and Assistant United States Attorneys Maria Armijo, Randy Castellano, and Matthew Beck of the District of New Mexico.

### REQUEST TO SEAL THIS AFFIDAVIT

254.   Because this Affidavit is part of an ongoing investigation that would be jeopardized by the premature disclosure of the information herein, as well as further endanger the life of the sources, witnesses, and victims, I request that this Affidavit be FILED UNDER SEAL until further order of the Court.

Respectfully submitted,

Bryan Acee, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me on September 2, 2016:

KAREN B. MOLZEN
U.S. CHIEF MAGISTRATE JUDGE

ATTACHMENT:   Exhibit 1, containing sample SNM Gang tattoos.

To be filed under SEAL until further order of the court:  ((Yes)/ (No)  Initial  KBM

DNM 1310

Appellate Case: 20-2058    Document: 010110415671    Date Filed: 09/29/2020    Page: 887

DNM 1311

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 163 of 255
Appellate Case: 20-2050   Document: 010110415671   Date Filed: 09/29/2020   Page: 888
Case 1:16-mr-00628-KBM   Document 2   Filed 09/02/16   Page 2 of 16

## ATTACHMENT A
## PREMISES TO BE SEARCHED

| SUBJECT PREMISES | TARGET SUBJECT | LOCATION |
|---|---|---|
| A-1 | SAMUEL SILVA aka "RABBS" | Santa Fe County Adult Correctional Facility, 28 Camino Justicia, Santa Fe, New Mexico |
| A-2 | JOE LAWRENCE GALLEGOS | Otero County Prison Facility, 10 McGregor Range Rd, Chaparral, New Mexico |
| A-3 | ANDREW GALLEGOS aka "SMILEY" | Torrance County Detention Center, 209 County Road A049, Estancia, New Mexico |
| A-4 | SHAWN HENRY URAL aka "SHAWN SHAWN" | 4512 Valley Gardens Circle, Albuquerque, New Mexico |
| A-5 | JUAN ANTONIO MARTINEZ aka "BABY" | 113 60th Street NW, #B-113, Albuquerque, New Mexico |
| A-6 | RUPERT MICHAEL ZAMORA aka "OSO," "MAMA BEAR," "BLUE BLACK"<br><br>JACOB ANTHONY ZAMORA aka "HEAT" | 4916 5th Street NW, Albuquerque, New Mexico |
| A-7 | WILLIE ROMERO aka "Demon" | 1009 West Delgado Avenue, Belen, New Mexico |
| A-8 | RICHARD CANDELARIA aka "EL CHOKE," "RICHIE"<br><br>EDWARD CANDELARIA, aka "EDDIE" | 4312 Enfield Court, Albuquerque, New Mexico |
| A-9 | ROBERT DEHERRERA aka "WESOS" | 2704 Apple Valley Road SW, Albuquerque, New Mexico |
| A-10 | THOMAS ROBERT LLOYD aka "BOBBY LLOYD," "HUERO LLOYD" | 2601 Cottonwood Lane SW, Albuquerque, New Mexico |
| A-11 | LANCE ROMAN NATSEWAY aka "BABY BOY," "PEEWEE" | 11901 Ibex Avenue NE, Albuquerque, New Mexico |
| A-12 | ANTHONY AVILIO LUCERO aka "EL WINO"<br><br>JIMMY JOE LUCERO aka "FLACO" | 423 W Pacific Avenue SW, Albuquerque, New Mexico |

Detailed descriptions and color photographs of each location follow.

Attachment A | Page 1 of 13

Case 2:15-cr-04268-JB Document 2324-1 Filed 04/09/18 Page 164 of 255
Appellate Case: 20-2058 Document: 010110415671 Date Filed: 09/29/2020 Page: 889

Case 1:16-mr-00628-KBM Document 2 Filed 09/02/16 Page 3 of 16

## ATTACHMENT A
## PREMISES TO BE SEARCHED

Location:        "A-1" Santa Fe County Adult Correctional Facility
Target Subject: **SAMUEL SILVA**, aka **"RABBS"**

The premise is located at the **Santa Fe County Adult Correctional Facility, 28 Camino Justicia, Santa Fe, New Mexico.** The search is to include SILVA's jail cell and all of SILVA's personal property within the premises.

An FBI "Filter Agent" will conduct the search and turn any potential evidence over to the "Filter AUSA" for review.

Attachment A | Page **2** of **13**

DNM 1313

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 165 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 890

Case 1:16-mr-00628-KBM   Document 2   Filed 09/02/16   Page 4 of 15

**ATTACHMENT A**
**PREMISES TO BE SEARCHED**

Location:        "A-2" Otero County Prison Facility
Target Subject:  JOE LAWRENCE GALLEGOS

The premise is located at the **Otero County Prison Facility, 10 McGregor Range Road, Chaparral, New Mexico.** The search is to include JOE LAWRENCE GALLEGOS's jail cell and all of JOE LAWRENCE GALLEGOS's personal property within the premises.

An FBI "Filter Agent" will conduct the search and turn any potential evidence over to the "Filter AUSA" for review.

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-3" Torrance County Detention Center
Target Subject: ANDREW GALLEGOS, aka "SMILEY"

The premise is located at the **Torrance County Detention Center, 209 County Road A049, Estancia, New Mexico**. The search is to include ANDREW GALLEGOS's jail cell and all of ANDREW GALLEGOS's personal property within the premises.

An FBI "Filter Agent" will conduct the search and turn any potential evidence over to the "Filter AUSA" for review.

Attachment A | Page 4 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 167 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 892

Case 1:16-mr-00628-KBM   Document 2   Filed 09/02/16   Page 6 of 16

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        **"A-4"**
Target Subject:  **SHAWN HENRY URAL**, aka **"SHAWN SHAWN"**

The premise is located at **4512 Valley Gardens Circle, Albuquerque, New Mexico**, and can be described as a single-story residence, with brown brick and tan stucco siding, a black metal security screen door, and the numbers 4512 are posted on a black mailbox in front of the residence.  A white Sportsmen fifth-wheel camper trailer is parked in the front yard, with electrical cords extending from the trailer to the house.

The search is to include the residence, the fifth-wheel trailer, and all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.





Shawn Ural's fifth wheel trailer in front of the residence

Attachment A | Page 5 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 168 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 893

Case 1:16-mr-00628-KBM   Document 2   Filed 09/02/16   Page 7 of 16

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-5"
Target Subject:  JUAN ANTONIO MARTINEZ, aka "BABY"

The premise is located at 113 60ᵗʰ Street NW, apartment #B-113, Albuquerque, New Mexico, and can be described as a single-story apartment complex, tan and brown in color, with brown trim, the numbers 113 are posted on the front of the building and "B-113" is posted next to the front door of the Subject Premises.

The search is to include all rooms, outbuildings, and trash containers designated for use by apartment B-113.  Any vehicles parked at the location that are owned or operated by the Target Subject will be searched as well.  Photographs of the Subject Premises are attached below and incorporated herein.



Juan Martinez's vehicle parked in front of the Subject Premises

Attachment A | Page 6 of 13

Case 2:15-cr-04268-JB Document 2324-1 Filed 04/09/18 Page 169 of 255
Appellate Case: 20-2058 Document: 010110415671 Date Filed: 09/29/2020 Page: 894
Case 1:16-mr-00628-KBM Document 2 Filed 09/02/16 Page 8 of 16

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:            "A-6"

Target Subjects: RUPERT MICHAEL ZAMORA, aka "OSO," and
                 JACOB ANTHONY ZAMORA, aka "HEAT"

The premise is located at 4916 5th Street NW, Albuquerque, New Mexico,
and can be described as a single story residence, brown in color, with
brown trim, the numbers 4916 are posted on a black mailbox, in front
of the Subject Premises.

The search is to include all rooms, outbuildings, trash containers and
vehicles located on the property of the Subject Premises. Photographs
of the Subject Premises are attached below and incorporated herein.



**Rupert Zamora in front of the Subject Premises**

Attachment A | Page 7 of 13

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 170 of 255
Appellate Case: 20-2058  Document: 010110415671  Date Filed: 09/29/2020  Page: 895

Case 1:16-mr-00628-KBM  Document 2  Filed 09/02/16  Page 9 of 16

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:      "A-7"
Target Subject: WILLIE ROMERO, aka "DEMON"

The premise is located at 1009 West Delgado Avenue, Belen, New Mexico,
and can be described as a single story residence with tan siding and
brown trim.  The numbers 1009 are posted in the front of the house.

The search is to include all rooms, outbuildings, trash containers and
vehicles located on the property of the Subject Premises. Photographs
of the Subject Premises are attached below and incorporated herein.



**Willie Romero In front of the Subject Premises**

Attachment A | Page 8 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 171 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 896

Case 1:16-mr-00628-KBM   Document 2   Filed 09/02/16   Page 10 of 16

## ATTACHMENT A
## PREMISES TO BE SEARCHED

Location:          "A-8"
Target Subjects: RICHARD CANDELARIA, aka "EL CHOKE" "RICHIE" and
                 EDWARD CANDELARIA, aka "EDDIE"

The premise is located at **4312 Enfield Court, Albuquerque, New Mexico**,
and can be described as a single story residence, off-white in color,
with brown trim, the numbers 4312 are posted on the garage, under a
light.

The search is to include all rooms, outbuildings, trash containers and
vehicles located on the property of the Subject Premises. Photographs
of the Subject Premises are attached below and incorporated herein.



**Edward Candelaria in front of the Subject Premises**

Attachment A | Page **9** of **13**

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 172 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 897

Case 1:16-mr-00628-KBM  Document 2  Filed 09/02/16  Page 11 of 16

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-9"
Target Subject: ROBERT DEHERRERA, aka "WESOS"

The premise is located at **2704 Apple Valley Avenue SW, Albuquerque, New Mexico,** and can be described as a single story residence, white in color, with blue trim and a blue metal roof, the numbers 2704 are posted on the black mailbox in front of the Subject Premises.

The search is to include all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.



Attachment A | Page 10 of 13

DNM 1321

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 173 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 898

Case 1:16-mr-00628-KBM   Document 2   Filed 09/02/16   Page 12 of 16

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-10"
Target Subject:  THOMAS ROBERT LLOYD, aka "BOBBY LLOYD" "HUERO LLOYD"

The premise is located at 2801 Cottonwood Lane SW, Albuquerque, New Mexico, and can be described as a single story residence, white in color, with white brick siding; the numbers 2800 are posted on the front of the house.

The search is to include all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.





Thomas Lloyd in front of the Subject

Attachment A | Page 11 of 13

DNM 1322

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 174 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 899

Case 1:16-mr-00628-KBM   Document 2   Filed 09/02/16   Page 13 of 16

## ATTACHMENT A
## PREMISES TO BE SEARCHED

Location:        "A-11"
Target Subject:  LANCE ROMAN NATSEWAY, aka "BABY BOY" "PEE WEE"

The premise is located at **11901 Ibex Avenue NE, Albuquerque, New Mexico**, and can be described as a two-story residence, tan in color, with tan siding, the numbers 11901 are posted on the front of the house, under a light.

The search is to include all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.



Attachment A | Page **12** of **13**

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 175 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 900

Case 1:16-mr-00628-KBM   Document 2   Filed 09/02/16   Page 14 of 16

## ATTACHMENT A
## PREMISES TO BE SEARCHED

Location:          "A-12"
Target Subjects: ANTHONY AVILIO LUCERO, aka "EL WINO" and
                 JIMMY JOB LUCERO, aka "FLACO"

The premise is located at 423 ½ Pacific Avenue SW, Albuquerque, New
Mexico, and can be described as a single story residence, located
behind 423 Pacific Avenue SW, light brown in color, with brown trim,
the numbers 423 ½ are posted on the mailbox to the right of the
driveway, in front of the residence.

The search is to include all rooms, outbuildings, trash containers and
vehicles located at the Subject Premises. Photographs of the Subject
Premises are attached below and incorporated herein.





DNM 1324

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 176 of 255
Appellate Case: 20-2063   Document: 010110415671   Date Filed: 09/29/2020   Page: 901
Case 1:16-mr-00628-KBM   Document 2   Filed 09/02/16   Page 15 of 16

## ATTACHMENT B
### ITEMS TO BE SEIZED

All evidence of violations of 18 U.S.C. § 1962(d) Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, 18 U.S.C. §§ 1512, 1513 Tampering with or Retaliating against a witness, victim, or an informant, 21 U.S.C. § 846 Conspiracy to Distribute a Controlled Substance; including but not limited to the following items:

    1)    Evidence of membership or affiliation with the Syndicato de Nuevo Mexico (SNM) Gangs to include any documents, photographs, drawings, writings, objects, or graffiti depicting gang members names, initials, logos, monikers, slogans, or containing mention of gang membership, affiliation, activity or identity; "green light" disciplinary lists, murder or assault lists, witness, victim, or confidential informant lists, inmate lists, address and telephone number lists, letters, law enforcement reports, jail or department of corrections reports, judgments, pre-sentencing reports, newspaper articles, computer generated reports, legal documents, money order receipts, money orders, money remittance receipts, pre-paid money cards such as MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk United States currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

    2)    Evidence of drug trafficking: to include Heroin, Methamphetamine, Suboxone, or other controlled substances, books, records, receipts, notes, ledgers and other documents relating to transporting, ordering, purchasing, manufacturing or distributing of controlled substances.

    3)    Proceeds of drug trafficking: including currency, jewelry, vehicles, and other assets or financial records.

    4)    Evidence of violent activities: including documents or writings related to the planning of violent acts; maps or drawings specific to residences or locations where acts of violence have occurred or may occur; photographs that depict acts of violence, victims, potential victims, witnesses, or informants.

    5)    Instruments used to create and send inmates controlled substances disguised as "Legal Mail," to include letters, writings, envelopes, stamps, labels, printing devices, or markings used to create such packages.

    6)    Cellular telephones and their contents: to include phone book or contacts list, call history, text messaging, audio/video files, photographs, and any other material stored on telephones that is related to the above listed offenses.

Attachment B, Page 1

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 177 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 902

Case 1:16-mr-00528-KBM   Document 2   Filed 09/02/16   Page 16 of 16

## ATTACHMENT B
## ITEMS TO BE SEIZED

7)    Firearms and weapons: including rifles, shotguns, and handguns, ammunition and items related to the possession of firearms. Bladed or blunt weapons, such as knives, shanks, razor blades, metal pipes, metal fittings, or edged weapons, appearing to be possessed, concealed or utilized in a gang assault. Such weapons may have gang names, monikers, symbols, or be fashioned in a manner that could aid in concealment or disguise.

8)    Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys.

9)    Safes, combinations or key-lock strong boxes or other secure storage containers, suitcases, locked cabinets and types of locked or closed containers, and hidden compartments that may contain any of the foregoing.

10)   Gang Tattoos: The Targets Subjects listed below will be searched and photographed for tattoos evidencing membership in or association with the Syndicato de Nuevo Mexico (SNM) Gang. The listed subjects will be photographed above the waist and below the thighs.

a)    SAMUEL SILVA,
b)    SHAWN HENRY URAL,
c)    JUAN ANTONIO MARTINEZ,
d)    RUPERT MICHAEL ZAMORA,
e)    JACOB ANTHONY ZAMORA.
f)    WILLIE ROMERO,
g)    RICHARD CANDELARIA,
h)    EDWARD CANDELARIA,
i)    ROBERT DEHERRERA,
j)    THOMAS ROBERT LLOYD,
k)    LANCE ROMAN NATSEWAY,
l)    ANTHONY AVILIO LUCERO, and
m)    JIMMY JOE LUCERO.

DNM 1326

DNM 1327

Case 1:16-mr-00628-KBM   Document 5   Filed 09/09/16   Page 1 of 18

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

**FILED**
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

for the

District of New Mexico

**16 SEP -9 PM 2: 05**

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |   Case No. 16-MR-628
| **See Attachment A, which is incorporated** | ) |
| herein by this reference. | ) |
| | ) |

**CLERK-ALBUQUERQUE** *lmn*

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ **New Mexico**
*(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is incorporated herein by this reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

See Attachment B, which is incorporated herein by this reference.

**YOU ARE COMMANDED** to execute this warrant on or before _September 16, 2016_ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Karen B. Molzen _____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued: _September 2, 2016 at 10:53 am_   _Karen B. Molzen_
*Judge's signature*

ity and state:   Albuquerque, New Mexico   _____   Chief U.S. Magistrate Judge Karen B. Molzen
*Printed name and title*

Case 1:16-mr-00628-KBM   Document 5   Filed 09/09/16   Page 3 of 18

| | LOCATION | TARGET SUBJECT | TIME OF SERVICE | ITEMS/PERSON(S) SEIZED |
|---|---|---|---|---|
| A-6 | 4916 5th Street NW, Albuquerque, New Mexico | RUPERT MICHAEL ZAMORA and JACOB ANTHONY ZAMORA | 6:08am | No items were seized from the residence. Rupert Zamora was photographed by agents.<br><br>Jacob Zamora was not home at the time of service. |
| A-7 | 1009 West Delgado Avenue, Belen, New Mexico | WILLIE ROMERO | 7:20am | 1 handgun, $9,722 and miscellaneous documents were seized from the residence. The Target Subject was not home at the time.<br><br>On 9/9/16 at 11:00am, Romero came to the FBI Albuquerque office and was photographed. |
| A-8 | 4312 Enfield Court, Albuquerque, New Mexico | RICHARD CANDELARIA and EDWARD CANDELARIA | 5:24am | Numerous gang photographs were seized. Edward Candelaria was photographed. Richard Candelaria was not home at the time of service. |
| A-9 | 2704 Apple Valley Road SW, Albuquerque, New Mexico | ROBERT DEHERRERA | 5:00pm | No items were seized from the residence. Robert DeHerrera was not home at the time of service. |
| A-10 | 2801 Cottonwood Lane SW, Albuquerque, New Mexico | THOMAS ROBERT LLOYD | 5:24am | Heroin and drug paraphernalia were seized from the residence. Thomas Lloyd was not home at the time of service. |
| A-11 | 11901 Ibex Avenue NE, Albuquerque, New Mexico | LANCE ROMAN NATSEWAY | 4:58am | No items were seized from the residence. Lance Natseway was photographed by agents. |
| A-12 | 423 ½ Pacific Avenue SW, Albuquerque, New Mexico | ANTHONY AVILIO LUCERO and JIMMY JOE LUCERO | 6:04am | 5 handguns and 3 rifles were seized from the residence. Both Lucero brothers were photographed. |

Page 3

---

### Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:   09/09/2016

_Executing officer's signature_

Bryan Acee, FBI Special Agent
_Printed name and title_

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 181 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 906

Case 1:16-mr-00628-KBM   Document 5   Filed 09/09/16   Page 4 of 18

## ATTACHMENT A
### PREMISES TO BE SEARCHED

| SUBJECT PREMISES | TARGET SUBJECT | LOCATION |
|---|---|---|
| A-1 | SAMUEL SILVA aka "RABBS" | Santa Fe County Adult Correctional Facility, 28 Camino Justicia, Santa Fe, New Mexico |
| A-2 | JOE LAWRENCE GALLEGOS | Otero County Prison Facility, 10 McGregor Range Rd, Chaparral, New Mexico |
| A-3 | ANDREW GALLEGOS aka "SMILEY" | Torrance County Detention Center, 209 County Road A049, Estancia, New Mexico |
| A-4 | SHAWN HENRY URAL aka "SHAWN SHAWN" | 4512 Valley Gardens Circle, Albuquerque, New Mexico |
| A-5 | JUAN ANTONIO MARTINEZ aka "BABY" | 113 60th Street NW, #B-113, Albuquerque, New Mexico |
| A-6 | RUPERT MICHAEL ZAMORA aka "OSO," "MAMA BEAR," "BLUE BLACK"  JACOB ANTHONY ZAMORA aka "HEAT" | 4916 5th Street NW, Albuquerque, New Mexico |
| A-7 | WILLIE ROMERO aka "Demon" | 1009 West Delgado Avenue, Belen, New Mexico |
| A-8 | RICHARD CANDELARIA aka "EL CHOKE," "RICHIE"  EDWARD CANDELARIA, aka "EDDIE" | 4312 Enfield Court, Albuquerque, New Mexico |
| A-9 | ROBERT DEHERRERA aka "WESOS" | 2704 Apple Valley Road SW, Albuquerque, New Mexico |
| A-10 | THOMAS ROBERT LLOYD aka "BOBBY LLOYD," "HUERO LLOYD" | 2801 Cottonwood Lane SW, Albuquerque, New Mexico |
| A-11 | LANCE ROMAN NATSEWAY aka "BABY BOY," "PEEWEE" | 11901 Ibex Avenue NE, Albuquerque, New Mexico |
| A-12 | ANTHONY AVILIO LUCERO aka "EL NINO"  JIMMY JOE LUCERO aka "FLACO" | 423 ½ Pacific Avenue SW, Albuquerque, New Mexico |

Detailed descriptions and color photographs of each location follow.

Attachment A | Page 1 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 182 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 907

Case 1:16-mr-00628-KBM   Document 5   Filed 09/09/16   Page 5 of 18

**ATTACHMENT A**
**PREMISES TO BE SEARCHED**

Location:       "A-1" Santa Fe County Adult Correctional Facility
Target Subject: **SAMUEL SILVA, aka "RABBS"**

The premise is located at the **Santa Fe County Adult Correctional
Facility, 28 Camino Justicia, Santa Fe, New Mexico**. The search is to
include SILVA's jail cell and all of SILVA's personal property within
the premises.

An FBI "Filter Agent" will conduct the search and turn any potential
evidence over to the "Filter AUSA" for review.

Attachment A | Page **2** of **13**

DNM 1331

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 183 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 908

Case 1:16-mr-00628-KBM   Document 5   Filed 09/09/16   Page 6 of 18

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-2" Otero County Prison Facility
Target Subject:  JOE LAWRENCE GALLEGOS

The premise is located at the **Otero County Prison Facility, 10 McGregor Range Road, Chaparral, New Mexico**. The search is to include JOE LAWRENCE GALLEGOS's jail cell and all of JOE LAWRENCE GALLEGOS's personal property within the premises.

An FBI "Filter Agent" will conduct the search and turn any potential evidence over to the "Filter AUSA" for review.

Attachment A | Page 3 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 184 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 909

Case 1:16-mr-00628-KBM   Document 5   Filed 09/09/16   Page 8 of 18

## ATTACHMENT A
## PREMISES TO BE SEARCHED

Location:        "A-4"
Target Subject:  SHAWN HENRY URAL, aka "SHAWN SHAWN"

The premise is located at **4512 Valley Gardens Circle, Albuquerque, New Mexico**, and can be described as a single-story residence, with brown brick and tan stucco siding, a black metal security screen door, and the numbers 4512 are posted on a black mailbox in front of the residence.  A white Sportsmen fifth-wheel camper trailer is parked in the front yard, with electrical cords extending from the trailer to the house.

The search is to include the residence, the fifth-wheel trailer, and all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.



Shawn Ural's fifth wheel trailer in front of the residence

Attachment A | Page 5 of 13

DNM 1333

## ATTACHMENT A
## PREMISES TO BE SEARCHED

Location:        "A-5"
Target Subject:  JUAN ANTONIO MARTINEZ, aka "BABY"

The premise is located at 113 60ᵗʰ Street NW, apartment #B-113,
Albuquerque, New Mexico, and can be described as a single-story
apartment complex, tan and brown in color, with brown trim, the
numbers 113 are posted on the front of the building and "B-113" is
posted next to the front door of the Subject Premises.

The search is to include all rooms, outbuildings, and trash containers
designated for use by apartment B-113.  Any vehicles parked at the
location that are owned or operated by the Target Subject will be
searched as well. Photographs of the Subject Premises are attached
below and incorporated herein.



Juan Martinez's vehicle parked in front of the Subject Premises



Attachment A | Page 6 of 13

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-7"
Target Subject: WILLIE ROMERO, aka "DEMON"

The premise is located at **1009 West Delgado Avenue, Belen, New Mexico,** and can be described as a single story residence with tan siding and brown trim.   The numbers 1009 are posted in the front of the house.

The search is to include all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.



**Willie Romero in front of the Subject Premises**

Attachment A | Page 8 of 13

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-9"
Target Subject: ROBERT DEHERRERA, aka "WESO9"

The premise is located at **2704 Apple Valley Avenue SW, Albuquerque, New Mexico**, and can be described as a single story residence, white in color, with blue trim and a blue metal roof, the numbers 2704 are posted on the black mailbox in front of the Subject Premises.

The search is to include all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.



Attachment A | Page 10 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 188 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 913

Case 1:16-mr-00628-KBM   Document 5   Filed 09/09/16   Page 15 of 18

**ATTACHMENT A**
**PREMISES TO BE SEARCHED**

Location:          "A-11"
Target Subject:  LANCE ROMAN NATSEWAY, aka "BABY BOY" "PEE WEE"

The premise is located at **11901 Ibex Avenue NE, Albuquerque, New
Mexico**, and can be described as a two-story residence, tan in color,
with tan siding, the numbers 11901 are posted on the front of the
house, under a light.

The search is to include all rooms, outbuildings, trash containers and
vehicles located on the property of the Subject Premises. Photographs
of the Subject Premises are attached below and incorporated herein.



Attachment A | Page 12 of 13

DNM 1337

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 189 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 914

Case 1:16-mr-00628-KBM   Document 5   Filed 09/09/16   Page 16 of 18

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:          "A-12"
Target Subjects: ANTHONY AVILIO LUCERO, aka "EL WINO" and
                 JIMMY JOE LUCERO, aka "FLACO"

The premise is located at **423 ½ Pacific Avenue SW, Albuquerque, New Mexico**, and can be described as a single story residence, located behind 423 Pacific Avenue SW, light brown in color, with brown trim, the numbers 423 ½ are posted on the mailbox to the right of the driveway, in front of the residence.

The search is to include all rooms, outbuildings, trash containers and vehicles located at the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.



Attachment A | Page **13** of **13**

Case 1:16-mr-00628-KBM  Document 5  Filed 09/09/16  Page 17 of 18

## ATTACHMENT B
## ITEMS TO BE SEIZED

All evidence of violations of 18 U.S.C. § 1962(d) Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, 18 U.S.C. §§ 1512, 1513 Tampering with or Retaliating against a witness, victim, or an informant, 21 U.S.C. § 846 Conspiracy to Distribute a Controlled Substance; including but not limited to the following items:

1) Evidence of membership or affiliation with the Syndicato de Nuevo Mexico (SNM) Gangs to include any documents, photographs, drawings, writings, objects, or graffiti depicting gang members names, initials, logos, monikers, slogans, or containing mention of gang membership, affiliation, activity or identity; "green light" disciplinary lists, murder or assault lists, witness, victim, or confidential informant lists, inmate lists, address and telephone number lists, letters, law enforcement reports, jail or department of corrections reports, judgments, pre-sentencing reports, newspaper articles, computer generated reports, legal documents, money order receipts, money orders, money remittance receipts, pre-paid money cards such as MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk United States currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

2) Evidence of drug trafficking: to include Heroin, Methamphetamine, Suboxone, or other controlled substances, books, records, receipts, notes, ledgers and other documents relating to transporting, ordering, purchasing, manufacturing or distributing of controlled substances.

3) Proceeds of drug trafficking: including currency, jewelry, vehicles, and other assets or financial records.

4) Evidence of violent activities: including documents or writings related to the planning of violent acts; maps or drawings specific to residences or locations where acts of violence have occurred or may occur; photographs that depict acts of violence, victims, potential victims, witnesses, or informants.

5) Instruments used to create and send inmates controlled substances disguised as "Legal Mail," to include letters, writings, envelopes, stamps, labels, printing devices, or markings used to create such packages.

6) Cellular telephones and their contents: to include phone book or contacts list, call history, text messaging, audio/video files, photographs, and any other material stored on telephones that is related to the above listed offenses.

Attachment B, Page 1

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 191 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 916

Case 1:16-mr-00628-KBM   Document 5   Filed 09/09/16   Page 18 of 18

## ATTACHMENT B
## ITEMS TO BE SEIZED

7)    Firearms and weapons: including rifles, shotguns, and handguns, ammunition and items related to the possession of firearms. Bladed or blunt weapons, such as knives, shanks, razor blades, metal pipes, metal fittings, or edged weapons, appearing to be possessed, concealed or utilized in a gang assault.  Such weapons may have gang names, monikers, symbols, or be fashioned in a manner that could aid in concealment or disguise.

8)    Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys.

9)    Safes, combinations or key-lock strong boxes or other secure storage containers, suitcases, locked cabinets and types of locked or closed containers, and hidden compartments that may contain any of the foregoing.

10)    Gang Tattoos: The Targets Subjects listed below will be searched and photographed for tattoos evidencing membership in or association with the Syndicato de Nuevo Mexico (SNM) Gang. The listed subjects will be photographed above the waist and below the thighs.

a)    SAMUEL SILVA,
b)    SHAWN HENRY URAL,
c)    JUAN ANTONIO MARTINEZ,
d)    RUPERT MICHAEL ZAMORA,
e)    JACOB ANTHONY ZAMORA,
f)    WILLIE ROMERO,
g)    RICHARD CANDELARIA,
h)    EDWARD CANDELARIA,
i)    ROBERT DEHERRERA,
j)    THOMAS ROBERT LLOYD,
k)    LANCE ROMAN NATSEWAY,
l)    ANTHONY AVILIO LUCERO, and
m)    JIMMY JOE LUCERO.

DNM 1340

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 192 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 917

Case 1:16-mr-00628-KBM   Document 1-6   Filed 09/02/16   Page 1 of 2

## ATTACHMENT A
## PREMISES TO BE SEARCHED

Location:        "A-5"
Target Subject:  JUAN ANTONIO MARTINEZ, aka "BABY"

The premise is located at 113 60th Street NW, apartment #B-113,
Albuquerque, New Mexico, and can be described as a single-story
apartment complex, tan and brown in color, with brown trim, the
numbers 113 are posted on the front of the building and "B-113" is
posted next to the front door of the Subject Premises.

The search is to include all rooms, outbuildings, and trash containers
designated for use by apartment B-113.  Any vehicles parked at the
location that are owned or operated by the Target Subject will be
searched as well. Photographs of the Subject Premises are attached
below and incorporated herein.



**Juan Martinez's vehicle parked in front of the Subject Premises**



Attachment A | Page 6 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 193 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 918
Case 1:16-mr-00628-KBM   Document 1-6   Filed 09/02/16   Page 2 of 2

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-6"

Target Subjects: RUPERT MICHAEL ZAMORA, aka "OSO," and
                 JACOB ANTHONY ZAMORA, aka "HEAT"

The premise is located at 4916 5th Street NW, Albuquerque, New Mexico, and can be described as a single story residence, brown in color, with brown trim, the numbers 4916 are posted on a black mailbox, in front of the Subject Premises.

The search is to include all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.



**Rupert Zamora in front of the Subject Premises**

DNM 1342

Case 1:16-mr-00628-KBM   Document 1-7   Filed 09/02/16   Page 1 of 2

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-7"
Target Subject:  WILLIE ROMERO, aka "DEMON"

The premise is located at **1009 West Delgado Avenue, Belen, New Mexico**, and can be described as a single story residence with tan siding and brown trim.  The numbers 1009 are posted in the front of the house.

The search is to include all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.



**Willie Romero in front of the Subject Premises**

Attachment A | Page 8 of 13

DNM 1343

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 195 of 255
Appellate Case: 20-2050   Document: 010110415671   Date Filed: 09/29/2020   Page: 920
Case 1:16-mr-00628-KBM   Document 1-8   Filed 09/02/16   Page 1 of 1

**ATTACHMENT A**
**PREMISES TO BE SEARCHED**

Location:          "A-9"
Target Subject: ROBERT DEHERRERA, aka "WESOS"

The premise is located at **2704 Apple Valley Avenue SW, Albuquerque,
New Mexico,** and can be described as a single story residence, white in
color, with blue trim and a blue metal roof, the numbers 2704 are
posted on the black mailbox in front of the Subject Premises

The search is to include all rooms, outbuildings, trash containers and
vehicles located on the property of the Subject Premises. Photographs
of the Subject Premises are attached below and incorporated herein.



Attachment A | Page 10 of 13

## ATTACHMENT A
## PREMISES TO BE SEARCHED

Location:         "A-10"
Target Subject:   THOMAS ROBERT LLOYD, aka "BOBBY LLOYD" "HUERO LLOYD"

The premise is located at 2801 Cottonwood Lane SW, Albuquerque, New Mexico, and can be described as a single story residence, white in color, with white brick siding; the numbers 2800 are posted on the front of the house.

The search is to include all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.





Thomas Lloyd in front of the Subject

DNM 1345

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:        "A-12"
Target Subjects: ANTHONY AVILIO LUCERO, aka "EL WINO" and
                 JIMMY JOE LUCERO, aka "FLACO"

The premise is located at **423 ½ Pacific Avenue SW, Albuquerque, New
Mexico**, and can be described as a single story residence, located
behind 423 Pacific Avenue SW, light brown in color, with brown trim,
the numbers 423 ½ are posted on the mailbox to the right of the
driveway, in front of the residence.

The search is to include all rooms, outbuildings, trash containers and
vehicles located at the Subject Premises. Photographs of the Subject
Premises are attached below and incorporated herein.



Attachment A | Page 13 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 198 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 923
Case 1:16-mr-00628-KBM   Document 1-2   Filed 09/02/16   Page 1 of 1

**EXHIBIT 1**
Example SNM Gang Tattoos



Search Warrant Affidavit Page | 81

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 199 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 924

Case 1:16-mr-00628-KBM   Document 1-3   Filed 09/02/16   Page 1 of 1

**EXHIBIT 1**
Example SNM Gang Tattoos



Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 200 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 925
Case 1:16-mr-00628-KBM   Document 1-4   Filed 09/02/16   Page 1 of 1

**EXHIBIT 1**
Example SNM Gang Tattoos



Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 201 of 255
Appellate Case: 20-2058    Document: 010110415671    Date Filed: 09/29/2020    Page: 926

Case 1:16-mr-00628-KBM   Document 1-11   Filed 09/02/16   Page 1 of 2

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

All evidence of violations of 18 U.S.C. § 1962(d) Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, 18 U.S.C. §§ 1512, 1513 Tampering with or Retaliating against a witness, victim, or an informant, 21 U.S.C. § 846 Conspiracy to Distribute a Controlled Substance; including but not limited to the following items:

1)    Evidence of membership or affiliation with the Syndicato de Nuevo Mexico (SNM) Gangs to include any documents, photographs, drawings, writings, objects, or graffiti depicting gang members names, initials, logos, monikers, slogans, or containing mention of gang membership, affiliation, activity or identity; "green light" disciplinary lists, murder or assault lists, witness, victim, or confidential informant lists, inmate lists, address and telephone number lists, letters, law enforcement reports, jail or department of corrections reports, judgments, pre-sentencing reports, newspaper articles, computer generated reports, legal documents, money order receipts, money orders, money remittance receipts, pre-paid money cards such as MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk United States currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

2)    Evidence of drug trafficking: to include Heroin, Methamphetamine, Suboxone, or other controlled substances, books, records, receipts, notes, ledgers and other documents relating to transporting, ordering, purchasing, manufacturing or distributing of controlled substances.

3)    Proceeds of drug trafficking: including currency, jewelry, vehicles, and other assets or financial records.

4)    Evidence of violent activities: including documents or writings related to the planning of violent acts; maps or drawings specific to residences or locations where acts of violence have occurred or may occur; photographs that depict acts of violence, victims, potential victims, witnesses, or informants.

5)    Instruments used to create and send inmates controlled substances disguised as "Legal Mail," to include letters, writings, envelopes, stamps, labels, printing devices, or markings used to create such packages.

6)    Cellular telephones and their contents: to include phone book or contacts list, call history, text messaging, audio/video files, photographs, and any other material stored on telephones that is related to the above listed offenses.

Attachment B, Page 1

DNM 1350

## ATTACHMENT B
### ITEMS TO BE SEIZED

7)   Firearms and weapons: including rifles, shotguns, and handguns, ammunition and items related to the possession of firearms. Bladed or blunt weapons, such as knives, shanks, razor blades, metal pipes, metal fittings, or edged weapons, appearing to be possessed, concealed or utilized in a gang assault.  Such weapons may have gang names, monikers, symbols, or be fashioned in a manner that could aid in concealment or disguise.

8)   Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys.

9)   Safes, combinations or key-lock strong boxes or other secure storage containers, suitcases, locked cabinets and types of locked or closed containers, and hidden compartments that may contain any of the foregoing.

10)   Gang Tattoos: The Targets Subjects listed below will be searched and photographed for tattoos evidencing membership in or association with the Syndicato de Nuevo Mexico (SNM) Gang. The listed subjects will be photographed above the waist and below the thighs.

a)   SAMUEL SILVA,
b)   SHAWN HENRY URAL,
c)   JUAN ANTONIO MARTINEZ,
d)   RUPERT MICHAEL ZAMORA,
e)   JACOB ANTHONY ZAMORA,
f)   WILLIE ROMERO,
g)   RICHARD CANDELARIA,
h)   EDWARD CANDELARIA,
i)   ROBERT DEHERRERA,
j)   THOMAS ROBERT LLOYD,
k)   LANCE ROMAN NATSEWAY,
l)   ANTHONY AVILIO LUCERO, and
m)   JIMMY JOE LUCERO.

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 203 of 255
Appellate Case: 20-2058    Document: 010110415671    Date Filed: 09/29/2020    Page: 928

Case 1:16-mr-00628-KBM   Document 1-5   Filed 09/02/16   Page 1 of 5

## ATTACHMENT A
## PREMISES TO BE SEARCHED

| SUBJECT PREMISES | TARGET SUBJECT | LOCATION |
|---|---|---|
| A-1 | SAMUEL SILVA aka "RABBS" | Santa Fe County Adult Correctional Facility, 28 Camino Justicia, Santa Fe, New Mexico |
| A-2 | JOE LAWRENCE GALLEGOS | Otero County Prison Facility, 10 McGregor Range Rd, Chaparral, New Mexico |
| A-3 | ANDREW GALLEGOS aka "SMILEY" | Torrance County Detention Center, 209 County Road A049, Estancia, New Mexico |
| A-4 | SHAWN HENRY URAL aka "SHAWN SHAWN" | 4512 Valley Gardens Circle, Albuquerque, New Mexico |
| A-5 | JUAN ANTONIO MARTINEZ aka "BABY" | 113 60th Street NW, #B-113, Albuquerque, New Mexico |
| A-6 | RUPERT MICHAEL ZAMORA aka "OSO," "MAMA BEAR," "BLUE BLACK"  JACOB ANTHONY ZAMORA aka "HEAT" | 4916 5th Street NW, Albuquerque, New Mexico |
| A-7 | WILLIE ROMERO aka "Demon" | 1009 West Delgado Avenue, Belen, New Mexico |
| A-8 | RICHARD CANDELARIA aka "EL CHOKE," "RICHIE"  EDWARD CANDELARIA, aka "EDDIE" | 4312 Enfield Court, Albuquerque, New Mexico |
| A-9 | ROBERT DEHERRERA aka "WESOS" | 2704 Apple Valley Road SW, Albuquerque, New Mexico |
| A-10 | THOMAS ROBERT LLOYD aka "BOBBY LLOYD," "HUERO LLOYD" | 2801 Cottonwood Lane SW, Albuquerque, New Mexico |
| A-11 | LANCE ROMAN NATSEWAY aka "BABY BOY," "PEEWEE" | 11901 Ibex Avenue NE, Albuquerque, New Mexico |
| A-12 | ANTHONY AVILIO LUCERO aka "EL WINO"  JIMMY JOE LUCERO aka "FLACO" | 423 ½ Pacific Avenue SW, Albuquerque, New Mexico |

Detailed descriptions and color photographs of each location follow.

Attachment A | Page 1 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 204 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 929

Case 1:16-mr-00628-KBM   Document 1-5   Filed 09/02/16   Page 5 of 5

## ATTACHMENT A
### PREMISES TO BE SEARCHED

Location:          "A-4"
Target Subject:   **SHAWN HENRY URAL**, aka "SHAWN SHAWN"

The premise is located at **4512 Valley Gardens Circle, Albuquerque, New Mexico**, and can be described as a single-story residence, with brown brick and tan stucco siding, a black metal security screen door, and the numbers 4512 are posted on a black mailbox in front of the residence. A white Sportsmen fifth-wheel camper trailer is parked in the front yard, with electrical cords extending from the trailer to the house.

The search is to include the residence, the fifth-wheel trailer, and all rooms, outbuildings, trash containers and vehicles located on the property of the Subject Premises. Photographs of the Subject Premises are attached below and incorporated herein.





Shawn Ural's fifth wheel trailer in front of the residence

Attachment A | Page 5 of 13

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 205 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 930
Case 2:15-cr-04275-JB   Document 294   Filed 06/26/17   Page 2 of 7

## WAIVER OF RIGHTS AND PLEA OF GUILTY

3.      The defendant hereby agrees to waive these rights and to plead guilty to the
Superseding Indictment charging in **Counts 1 and 3** a violation of 21 U.S.C. § 841(a)(1) and
(b)(1)(C): Distribution of Heroin, in **Count 2** a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C):
Distribution of Cocaine Base, in **Count 4**, a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B):
Distribution of 100 Grams and More of Heroin, and in **Count 5** a violation of 21 U.S.C. § 841(a)(1)
and (b)(1)(B): Possession With Intent to Distribute 100 Grams and More of Heroin, and 18 U.S.C.
§ 2, Aiding and Abetting.

### SENTENCING

4.      The defendant understands that the maximum penalty the Court can impose for
Counts 1, 2 and 3 is:

   a.      imprisonment for a period of not more than twenty (20) years;

   b.      a fine not to exceed **$1,000,000.00**;

   c.      a mandatory term of supervised release of not less than three (3) years.
           (If the defendant serves a term of imprisonment, is then released on
           supervised release, and violates the conditions of supervised release, the
           defendant's supervised release could be revoked--even on the last day of the
           term--and the defendant could then be returned to another period of
           incarceration and a new term of supervised release); and

   d.      a mandatory special penalty assessment of $100.00.

5.      The defendant understands that the minimum and maximum penalty the Court can
impose for Counts 4 and 5 is:

   a.      imprisonment for a period of not less than five (5) years nor more than forty
           (40) years;

   b.      a fine not to exceed **$5,000,000.00**;

   c.      a mandatory term of supervised release of not less than four (4) years.
           (If the defendant serves a term of imprisonment, is then released on

2

DNM 1354

Case 2:15-cr-04268-JB    Document 2324-1    Filed 04/09/18    Page 206 of 255
Appellate Case: 20-2058    Document: 010110415671    Date Filed: 09/29/2020    Page: 931
Case 2:15-cr-04275-JB    Document 294    Filed 06/26/17    Page 3 of 7

supervised release, and violates the conditions of supervised release, the defendant's supervised release could be revoked--even on the last day of the term--and the defendant could then be returned to another period of incarceration and a new term of supervised release); and

    d.    a mandatory special penalty assessment of $100.00.

6.    The parties are aware that the Court may accept or reject this plea agreement, or may defer its decision as to acceptance or rejection until there has been an opportunity to consider the presentence report. Pursuant to Federal Rule of Criminal Procedure 11(e)(5), if the Court rejects this plea agreement, the defendant shall have the right to withdraw Defendant's plea of guilty.

7.    The United States hereby expressly reserves the right to make known to the United States Probation Office and to the Court, for inclusion in the presentence report prepared pursuant to Federal Rule of Criminal Procedure 32, any information that the United States believes may be helpful to the Court, including but not limited to information about any relevant conduct under USSG § 1B1.3.

8.    Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, the defendant agrees that, upon the defendant's signing of this plea agreement, the facts that the defendant has admitted under this plea agreement as set forth below, as well as any facts to which the defendant admits in open court at the defendant's plea hearing, shall be admissible against the defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the defendant expressly waives the defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the defendant admits in conjunction with this plea agreement.

DNM 1355

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 207 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 932
Case 2:15-cr-04275-JB   Document 294   Filed 06/26/17   Page 4 of 7

## DEFENDANT'S ADMISSION OF FACTS

9.      By my signature on this plea agreement, I am acknowledging that I am pleading guilty because I am, in fact, guilty of the offense(s) to which I am pleading guilty. I recognize and accept responsibility for my criminal conduct. Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the offense(s) to which I am pleading guilty beyond a reasonable doubt, including any facts alleged in the Superseding Indictment that increase the statutory minimum or maximum penalties. I specifically admit the following facts related to the charges against me, and declare under penalty of perjury that all of these facts are true and correct:

On August 7, 2015, I sold 49.6 grams of heroin and 23.96 grams of cocaine base to an individual who, unbeknownst to me, was cooperating with law enforcement.

On August 11, 2015, I sold 76.3 grams of heroin to an individual who, unbeknownst to me, was cooperating with law enforcement.

On September 10, 2015, I sold 148.8 grams of heroin to an undercover officer.

On December 3, 2015, I possessed with intent to distribute approximately 200 grams of heroin. I kept the heroin at a relative's house. On December 3, 2015, law enforcement personnel located the heroin at that house. I knew that the substances I possessed were illegal drugs, and I possessed them in order to distribute them.

10.     By signing this agreement, the defendant admits that there is a factual basis for each element of the crime(s) to which the defendant will plead guilty. The defendant agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the defendant's sentence, including, but not limited to, the advisory guideline offense level.

## STIPULATIONS

11.     The United States and the defendant stipulate as follows:

a.      The defendant and the United States agree, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), that a specific sentence in the range of 180 to 240 months is the

4

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 208 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 933
Case 2:15-cr-04275-JB   Document 294   Filed 06/26/17   Page 5 of 7

appropriate sentence in this case if the Court finds the defendant is a Career Offender pursuant to the United States Sentencing Guidelines. The defendant and the United States further agree, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), that a specific sentence in the range of 120 to 150 months is the appropriate sentence in this case if the Court finds the defendant is not a Career Offender. This agreement takes into account the Defendant's acceptance of responsibility, with no further reduction to occur. The remaining components of the defendant's sentence, including but not limited to any fine or restitution and the length and conditions of supervised release, shall be imposed by the Court after the presentation of evidence and/or argument by the parties.

b.     The parties agree that sentencing in this matter will not occur until after the conclusion of 15-CR-4268 JB and 16-CR-1613 JB.

## DEFENDANT'S OBLIGATIONS

12.     The defendant understands the defendant's obligation to provide the United States Probation Office with truthful, accurate, and complete information, including, but not limited to defendant's true identity, citizenship status, and any prior criminal convictions. The defendant hereby represents that the defendant has complied with and will continue to comply with this obligation. The defendant understands that any misrepresentation with respect to the above obligations may be considered a breach of this plea agreement.

## WAIVER OF APPEAL RIGHTS

13.     The defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a defendant the right to appeal a conviction and the sentence imposed. Acknowledging that, the defendant knowingly waives the right to appeal the defendant's conviction(s) and any sentence, including any fine, imposed in conformity with this Fed. R. Crim. P. 11(c)(1)(C) plea agreement,

5

Case 2:15-cr-04268-JB   Document 2324-1   Filed 04/09/18   Page 209 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 934
Case 2:15-cr-04275-JB   Document 294   Filed 06/26/17   Page 6 of 7

as well as any order of restitution entered by the Court, **except the defendant will be allowed to appeal a finding that he is a Career Offender based on his prior conviction(s) for Aggravated Battery (Great Bodily Harm)**. In addition, the defendant agrees to waive any collateral attack to the defendant's conviction(s) and any sentence, including any fine, pursuant to 28 U.S.C. §§ 2241, 2255, or any other extraordinary writ, except on the issue of defense counsel's ineffective assistance.

## GOVERNMENT'S AGREEMENT

14.     Provided that the defendant fulfills the defendant's obligations as set out above, the United States agrees not to bring additional criminal charges against the defendant arising out of the facts forming the basis of the present **Superseding Indictment**. However, this agreement does not prohibit the United States from continuing its prosecution of the defendant In cause numbers 15-CR-4268 JB and 16-CR-1613 JB.

15.     The United States agrees to dismiss Count 6 of the Superseding Indictment at the time of sentencing.

16:     This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## VOLUNTARY PLEA

17.     The defendant agrees and represents that this plea of guilty is freely and voluntarily made and is not the result of force, threats or promises (other than the promises set forth in this plea agreement and any addenda). The defendant also represents that the defendant is pleading guilty because the defendant is in fact guilty.

6

Case 2:15-cr-04268-JB  Document 2324-1  Filed 04/09/18  Page 210 of 255
Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 935

Case 2:15-cr-04275-JB  Document 294  Filed 06/26/17  Page 7 of 7

AGREED TO AND SIGNED this _____ day of _____, 2017.

JAMES D. TIERNEY
Acting United States Attorney

MARIA Y. ARMIJO
Assistant U.S. Attorney
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 – Tel.
(575) 522-2391 – Fax


This agreement has been read to me in the language I understand best, and I have carefully discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorney has advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement. No promises or inducements have been given to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

CHRISTOPHER GARCIA
Defendant


I am the attorney for CHRISTOPHER GARCIA. I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

AMY SIRIGNANO
CHRISTOPHER W. ADAMS
Attorneys for Defendant

8

**EXHIBIT**
Clerk's
6

Question — Why were Andrew or Joe
Gallegos put in on SNM Bad?
Could they has Self Identified to the
prison that they were SNM?

Question — What is a Life Setence? Is it
Really Life, OR can it be Reduced
by good behavior, OR other Reasons?

DNM 1360

*Gerald Archuletta*

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

41.   None.

### Adult Criminal Conviction(s)

| Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|
| 42. | 03/16/1985 (Age 18) | Robbery/Second Judicial District Court, Albuquerque, NM; Docket No.: 1995CR39630 | 08/16/1985: 3 years custody (deferred), 3 years probation. 07/02/1986: Probation violation | 4A1.2(e)(3) | 0 |

The defendant was represented by counsel. The defendant was initially charged with Armed Robbery and Conspiracy to Commit Armed Robbery; however, the charge was reduced to Robbery. According to the Information filed in this case, the defendant took and carried away United States currency and merchandise, from Kathyleen Todd, with intent to permanently deprive Kathyleen Todd of the property. In addition, the defendant took the property by use or threatened use of force or violence.

| | | | | |
|---|---|---|---|---|
| 43. | 01/07/1987 (Age 20) | Involuntary Manslaughter (Firearm Enhancement)/ 2nd Judicial District Court, State of New Mexico, Albuquerque, NM; Docket No.: 42081 | 24/1986: 2.5 years imprisonment; 1 year parole; Anger/Stress management counseling | 4A1.2(e)(3) 4A1.1(a) 3 |

The defendant was represented by counsel. The defendant was convicted under the name Julian Bustamante, aka Jerry Edward Archuleta. According to the Information filed in this case, the defendant caused the death of Benny Bustamante by an act committed in an unlawful manner or without due causation and circumspection.

14



| 44. | 04/20/1988 (Age 21) | Murder (2nd Degree)/ New Mexico 2nd District Court; Bernalillo County, Albuquerque, NM; Docket No.: D-202-CR-1988-45393 | 11/28/1988: Ct.1 - 12 years custody, 2 years parole. Ct.2 4 years consecutive, 2 years parole, consecutive 06/30/1999: Paroled 11/16/1999: Parole violation 08/18/2000: Parole violation | 4A1.2(e)(3) 4A1.(a) | 0 +3 |

The defendant was represented by counsel. The defendant was convicted under the name Gerald Edward Archuleta, aka Julian Bustamante. The defendant was initially charged with 1st Degree Murder (Willful and Deliberate). According to the Information filed in this case, the defendant did murder Frances Montano, and knew that his acts created a strong probability of death or great bodily injury.

| 45. | 02/13/1994 (Age 27) | Simple Assault/ Second Judicial District Court, Albuquerque, NM; Docket No.: 1994CR397 | 11/04/1994: 6 months jail | 4A1.2(e)(3) 4A1.(c) | 0 1 |

The defendant was represented by counsel. The defendant was initially charged with Aggravated Assault (Deadly Weapon). According to the Indictment filed in this case, the defendant did assault or strike at Michael Barrett, with a knife.

| 46. | 08/27/2000 (Age 33) | Conspiracy to Commit 2nd Degree Murder/ Second Judicial District Court, Albuquerque, NM; Docket No.: 2000CR3770 | 05/14/2002: 10 years imprisonment; 6 years suspended to 4 years imprisonment; 5 years probation; 2 years parole 08/10/2003: Probation commenced 10/21/2003: FTC arrest. 01/14/2004: 2033 days confinement (1460 days suspended), followed by 1095 days probation. 05/08/2005: Probation commenced. 09/25/2005: FTC arrest. 10/19/2005: 730 days confinement. | 4A1.1(a) | 3 |

15

CONFIDENTIAL DRAFT

The defendant was represented by counsel. The charges of Accessory to 1st Degree Murder; Accessory to Tampering with Evidence; Bribery of Witness (Threats and Retaliation) were dismissed.

| | | | | | |
|---|---|---|---|---|---|
| 47. | 03/24/2007 (Age 40) | Count 4: Conspiracy to Commit Aggravated Battery (Deadly Weapon) Count 5: Possession of Firearm or Destructive Device by Felon/ Second Judicial District Court, Albuquerque, NM; Docket No.: 2007CR1582 | 02/12/2008: Ct. 4: 5.5 years imprisonment; 1 year parole Ct. 5: 18 months imprisonment to run consecutively to Ct. 4 totaling 7 years imprisonment | 4A1.1(a) | 3 |

The defendant was represented by counsel. **

| | | | | | |
|---|---|---|---|---|---|
| 48. | 04/03/2007 (Age 40) | Breaking and Entering/ Second Judicial District Court, Albuquerque, NM; Docket No.: 2007CR1653 | 02/12/2008: 18 months to run concurrent to Docket No.: 2007CR1582 | 4A1.1(a) | 3 |

The defendant was represented by counsel. **

## Criminal History Computation

49.   The criminal convictions above result in a subtotal criminal history score of nine. 16

50.   The defendant committed the instant offense while under a criminal justice sentence for paragraph 46; therefore, two points are added. USSG §4A1.1(d).

51.   The total criminal history score is 11. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of 11 establishes a criminal history category of V. VI

## Other Criminal Conduct

| Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|
| 52.   09/01/1999 (Age 32) | Cts. 1&2: Battery | Bernalillo County Metropolitan Court, Albuquerque, NM; Docket No.: T-4-DV-1999-003837 | 09/11/2000: |

The defendant was represented by counsel.

CONFIDENTIAL DRAFT

| | Date of Referral | Charge/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|---|
| 53. | 07/07/1993 (Age 14) | Ct. 3: Criminal Damage to Property ($1,000 or Less)/ Second Judicial District Court - Children's Court , Albuquerque, NM; Docket No.: D-202-JR-1993-01428 | 10/22/1993: 6 months Consent decree 04/08/1994: Probation revoked; committed to Children, Youth, and Families Department for a period not to exceed 15 days 04/11/1994: Nolle Prosequi filed | 4A1.2(e)(3) | 0 |

The defendant was represented by counsel. **

| | | | | | |
|---|---|---|---|---|---|
| 54. | 07/30/1994 (Age 15) | Armed Robbery/ Second Judicial District Children's Court Division, Albuquerque, NM; Docket No.: CH 95-066 | 08/04/1995: Up to 2 years probation | 4A1.2(e)(3) | 0 |

The juvenile was represented by counsel. He was also charged with the following, all of which were dismissed pursuant to the plea agreement: Count 2: Armed Robbery; Count 3: Aggravated Battery (Deadly Weapon); Count 4: Attempt to Commit a Felony, to wit: Armed Robbery; Count 6: Unlawful Possession of a Handgun by a Minor; Count 7: Violation of Liquor Statutes; and Count 8: Unlawful Carrying of a Deadly Weapon. The additional charge of Armed Robbery (Count 5) was administratively closed so that the case could proceed before the Grand Jury.

The defendant did take and carry away US currency from a local convenience store and/or a person's immediate control, intending to deprive said person or business of the property and was armed with a handgun, a deadly weapon, and took the property by use or threatened use of force or violence.

### Adult Criminal Conviction(s)

| | Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|---|
| 55. | 07/30/1994 (Age 15) | Armed Robbery/ Second Judicial District Court, Albuquerque, NM; | 05/10/1996: 9 years custody, to run consecutively to the sentence imposed in | 4A1.1(c) | 1 |

17

DRAFT CONFIDENTIAL



| | | | | | |
|---|---|---|---|---|---|
| | Docket No.: CH-CH-95-0066 | | CH-CH-96-867; all suspended for 5 years probation<br>04/30/1997: Probation revoked; placed on a new term of five years probation<br>04/29/1998: Probation revoked: 9 years custody, to run consecutively to CH-CH-86-867, for a total of 18 years custody | | |

The defendant was represented by counsel. The Court found the defendant was not amendable to rehabilitation or treatment as a juvenile and that he was not eligible for commitment to an institution for the developmentally disabled or the mentally disordered; therefore, he was sentenced as an adult.

| | | | | | |
|---|---|---|---|---|---|
| 56. | 07/01/1995<br>(Age 16) | Aggravated Burglary with a Deadly Weapon/ Second Judicial District Court, Albuquerque, NM;<br>Docket No.: CH-CH-96-867 | 04/01/1996: 9 years custody, to run consecutively to the sentence imposed in CH-CH-95-66; suspended and placed on probation for five years<br>04/30/1997: Probation revoked; placed on a new term of five years probation<br>04/29/1998: Probation revoked: 9 years custody, to run consecutively to CH-CH-95-66, for a total of 18 years custody | 4A1.1(a) | 3 |

The defendant was represented by counsel. The Court found the defendant was not amendable to rehabilitation or treatment as a juvenile and that he was not eligible for commitment to an institution for the developmentally disabled or the mentally disordered; therefore, he was sentenced as an adult.

| | | | | | |
|---|---|---|---|---|---|
| 57. | 07/29/1997<br>(Age 18) | Ct. 1: Possession of Deadly Weapon by a Prisoner/ | 05/04/1998: 9 years custody, to run consecutively to the | 4A1.1(a) | 3 |

DNM 1365

| | | | | | |
|---|---|---|---|---|---|
| | Second Judicial District Court, Albuquerque, NM;<br>Docket No.: D-202-CR-1997-02401 | | sentence imposed in CR97-3993 (9 years), for a total period of 18 years custody; and consecutive to the 18 year sentences imposed in CH-CH-95-66 and CH-96-867, for a total of 36 years custody; all but seven years suspended<br>02/12/2003: Probation revoked; 18 years custody, with credit for time served<br>05/14/2003: Sentence completed | | |

The defendant was represented by counsel. The defendant was also charged with Assault by a Prisoner; however, that charge was dismissed. The defendant had a pointed metal rod with a sharpened end and green thread handle (known as a "shank"), which was a deadly weapon or an object or instrument which, when used as a weapon, could cause death or great bodily harm, in his possession and at the time, the defendant was an inmate at the Bernalillo County Detention Center, a jail. Additionally, the defendant did allegedly intentionally place a Corrections Officer at the detention facility, in apprehension of an immediate battery likely to cause death or great bodily harm.

| | | | | | |
|---|---|---|---|---|---|
| 58. | 10/14/1997<br>(Age 18) | Ct. 3: Possession of a Deadly Weapon by a Prisoner/<br>Second Judicial District Court, Albuquerque, NM;<br>Docket No.: D-202-CR-1997-03993 | 05/04/1998: 9 years custody, to run consecutively to the sentence imposed in CR 97-2401<br>02/17/2003: Probation revoked; remanded for a term of 18 years, with 2 years parole, 2,555 days pre-sentenced credit, 1,320 days suspended; total of 2,555 days confinement to be served, 2 years parole if not already served | 4A1.1(a) | 3 |

The defendant was represented by counsel. The defendant was also charged with the following: Count 1: Bringing Contraband Into a Jail and Count 2: Possession of a Deadly Weapon by Prisoner; both of which were dismissed. The defendant did allegedly carry

19

marijuana, a controlled substance, into the confines of a the Bernalillo County Detention Center, a jail; and did, while a prisoner in the Bernalillo County Detention Center, possess a deadly weapon, to wit: a shank.

| | | | | | |
|---|---|---|---|---|---|
| 59. | 11/28/2009 (Age 30) | Ct. 1: Speed - 26-30 MPH Over Limit Ct. 3: Failure to Pay Fines Imposed/ Bernalillo County Metropolitan Court, Albuquerque, NM; Docket No.: T-4-TR-2009-063899 | 12/18/2009: Ordered to pay fines and fees 02/17/2010: Completed payments | 4A1.2(c)(2) | 0 |

Attorney representation is unknown. The defendant was also charged with the following: Count 2: Failure to Exhibit Evidence of Car Registration Upon Demand. This count was dismissed as the defendant complied with the prosecution's conditions. No additional information has been received regarding the offense conduct in this case.

| | | | | | |
|---|---|---|---|---|---|
| 60. | 08/20/2010 (Age 31) | Shoplifting (Over $250 But Less Than $500)/ Bernalillo County Metropolitan Court, Albuquerque, NM; Docket No.: T-4-CR-2010-017371 | 11/01/2010: Ordered to pay restitution | 4A1.1(c) | 1 |

The defendant was represented by counsel. The offense conduct is unknown; however the defendant was ordered to pay restitution in the amount of $80.99 to Sears.

| | | | | | |
|---|---|---|---|---|---|
| 61. | 01/20/2011 (Age 31) | Speeding (11-15 MPH Over Limit)/ Bernalillo County Metropolitan Court, Albuquerque, NM; Docket No.: T-4-TR-2011-004301 | 02/17/2011: Ordered to pay fines and fees | 4A1.2(c)(2) | 0 |

Attorney representation is unknown. No additional information has been received regarding the offense conduct in this case.

| | | | | | |
|---|---|---|---|---|---|
| 62. | 10/17/2011 (Age 32) | Speeding (Over 35 MPH Over Limit)/ Bernalillo County Metropolitan Court, Albuquerque, NM; | 11/14/2011: Ordered to pay fines and fees; allowed to complete community service in lieu of fines | 4A1.2(c)(2) | 0 |

DRAFT CONFIDENTIAL

Docket No.: T-4-TR-
2011-047725

Attorney representation is unknown. No additional information has been received regarding the offense conduct in this case.

| 63. | 09/07/2014 (Age 35) | Speeding (Over by 31-35 MPH)/ Bernalillo County Metropolitan Court, Albuquerque, NM; Docket No.: T-4-TR-2014-028067 | 10/02/2014: Ordered to pay fines and fees; community service | 4A1.2(c)(2) | 0 |

Attorney representation is unknown. No additional information has been received regarding the offense conduct in this case.

Federico
Munoz

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

| Date of Referral | Charge/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|
| 108. 04/27/1994 (Age 14) | Auto Burglary/Second Judicial District Court, Albuquerque, NM; Docket No.: 1994CH822 | 05/10/1994: 2 years probation | 4A1.2(e)(3) | 0 |

According to the charging document, the defendant had possession of a 1994 Ford Mustang owned by Sherylne Yazzie, while also taking two Pendleton blankets and a jacket. The defendant willfully refused to bring his vehicle to a stop when given visual and/or audible commands by law enforcement officials and caused damage to the vehicle's ignition and door locks.

| | | | | |
|---|---|---|---|---|
| 109. 05/02/1994 (Age 14) | Ct. 1: Auto Burglary/ Second Judicial District Court, Albuquerque, NM; Docket No.: 1994JR886 | 05/10/1994: 2 years probation 06/14/1994: Probation revoked; 2 years probation 08/04/1994: Probation revoked; 2 years custody to Children, Youth and Families Department | 4A1.2(e)(3) | 0 |

22

CONFIDENTIAL (watermark)

The defendant was represented by counsel. Count 2: Conspiracy to Commit Auto Burglary and Count 3: Attempt to Commit a Felony, to wit: Unlawful Taking of a Vehicle were dismissed pursuant to a plea agreement. According to the charging document, the defendant entered a 1988 Chevrolet Blazer belonging to another, with intent to commit a felony.

On May 18, 1994, a petition to revoke probation was filed after the defendant was arrested on new charges. According to offense reports, an officer observed a vehicle traveling at high rate speed; swerve toward two females walking along the roadside. The two females jumped out of the way to avoid being hit. The officer conducted a traffic stop and made contact with the driver, Frederico Munoz. Upon questioning, Munoz advised he was just trying to scare the two females due to a disagreement they had with one of the passengers inside the vehicle. The officer also discovered the vehicle had been reported stolen to which Munoz admitted he obtained the vehicle from another individual; knowing it was stolen. Munoz was charged with Aggravated Assault (Deadly Weapon); Aggravated Assault (Deadly Weapon); Conspiracy to Commit Aggravated Assault (Deadly Weapon); Receiving or Transferring a Stolen Vehicle; Conspiracy to Commit Receiving or Transferring a Stolen Vehicle. In addition, he violated conditions of his probation by driving a stolen vehicle and was associating with another probationer. Munoz admitted to Receiving or Transferring a Stolen Vehicle with all remaining counts of the petition to revoke probation being dismissed.

On July 7, 1994, a petition to revoke probation was filed after the defendant was arrested on new charges. According to offense reports, an officer conducted a traffic stop on a vehicle for failing to display a license plate. The officer made contact with the driver and requested a driver's license. The driver identified as Frederico Munoz advised he did not have his driver's license with him. The officer questioned Munoz as to who owned the vehicle wherein Munoz provided a false name. When the officer requested Munoz and his two passengers exit the vehicle, Munoz sped away. While being pursued by the officer, Munoz drove through several residential yards, striking chain link fences. The vehicle entered a dead end street at which time the occupants exited the vehicle and attempted to flee. However, Munoz and one of the passengers were arrested while the other passenger got away. An inspection of the vehicle revealed the steering column had been "punched" and the vehicle had been reported stolen. Officers made contact with the victim who advised the vehicle sustained $4,410.00, in damages. Munoz was charged with Receiving or Transferring a Stolen Vehicle; Evading an Officer; Eluding an Officer; Criminal Damage to Property Over $1,000.00, and violating his curfew. Munoz admitted to Receiving or Transferring a Stolen Vehicle with the remaining counts being dismissed.

**Adult Criminal Conviction(s)**

| | Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|---|
| 110. | 09/10/1995 (Age 15) | Ct. 1: Receiving or Transferring a Stolen | 03/06/1996: Ct. 1: 1 year imprisonment; | 4A1.1(a) | 3 |

23

DNM 1370

| | | | | |
|---|---|---|---|---|
| | Vehicle (Possession)<br>Ct. 2: Conspiracy to<br>Commit Receiving or<br>Transferring a Stolen<br>Vehicle (Possession)/<br>Second Judicial District<br>Court, Albuquerque,<br>NM; Docket No.:<br>1995JR02749 | Ct. 2: 18 months<br>imprisonment to run<br>consecutively for a total<br>of 2 ½ years<br>imprisonment; 18<br>months suspended; 1<br>year parole<br>12/18/1996: Parole<br>revoked; 2 ½ years<br>imprisonment | | |

The defendant was represented by counsel. Count 3: Resisting, Evading or Obstructing an Officer was dismissed. Pursuant to the plea agreement, the defendant was charged as a youthful offender and was sentenced as an adult. In addition, the charge of Escape from the New Mexico Boy's School would not be filed in Docket No. 1994JR886. According to offense reports, officers observed two vehicles traveling at a high rate of speed, and in a reckless manner. A traffic stop was conducted on both vehicles, wherein one vehicle parked in front of the other. As an officer approached the lead vehicle, making contact with the driver, Frederico Munoz, the second vehicle pulled away from the side of the road and sped away. The officer immediately grabbed Munoz by the arm and began extracting him from the vehicle. While being extracted, Munoz began shouting "the car's stolen." In addition, the vehicle began rolling down the hill; striking another parked vehicle resulting in minor damage. Munoz was arrested and transported to the detention center.

On October 4, 1996, a motion to revoke parole was filed as the defendant violated his terms of supervision by: failing to report to his probation officer; changing his residence without notify his probation officer; failing to maintain legitimate employment; failing to submit to a random urinalysis and was considered a fugitive.

| | | | | |
|---|---|---|---|---|
| 111. | 02/06/1998<br>(Age 17) | Ct. 1: Armed Robbery/<br>Second Judicial District<br>Court, Albuquerque,<br>NM; Docket No.:<br>1998JR530 | 08/19/1998: Ct. 1: 9<br>years imprisonment; 4<br>years suspended; 5<br>years imprisonment; 4<br>years probation; 2 years<br>parole<br>01/27/2005: Early order<br>of discharge | 4A1.1(a) | 3 |

The defendant was represented by counsel. Count 2: Conspiracy to Commit Armed Robbery; Count 3: Kidnapping; Count 4: Unlawful Taking of a Motor Vehicle and Count 5: Battery were dismissed. According to offense reports, an officer responded to a call regarding a robbery. Upon arrival, the officer met with the victim. The victim advised Dolores Perea invited him to her residence, and upon arrival, an individual, later identified as Frederico Munoz, answered the door. The victim asked for Perea at which time Munoz advised she was in her room. As the victim proceeded toward Perea's room, Munoz pulled a knife; holding it the victim's throat. Munoz, along with another

24

CONFIDENTIAL DRAFT

unidentified male, ordered the victim to his vehicle and proceeded to drive him to a field. Munoz ordered the victim to empty his pockets at which time Munoz took the victim's wallet containing $120.00, before driving away in the victim's vehicle. The investigation led officers to Munoz's residence where they made contact with Munoz and Perea. Munoz was arrested and transported to the detention center.

On December 4, 2001, a motion to revoke the defendant's probation was filed as the defendant violated his terms of supervision whereby: failing to report to his probation officer; cutting off his electronic monitor and was considered a fugitive.

On January 27, 2005, the defendant received an early discharge from probation after accepting a sentence of life imprisonment in Docket No. 03CR1442.

| | | | | | |
|---|---|---|---|---|---|
| 112. | 07/05/1998 (Age 18) | First Degree Murder (Willful and Deliberate)/Second Judicial District Court, Albuquerque, NM; Docket No.: 2007CR1485 | 05/04/2007: Life imprisonment (30 years imprisonment before eligible for parole); 5 years parole to run concurrent to Docket No. 03CR1442 | 4A1.1(a) | 3 |

It is noted, this offense is referenced in Overt Acts 5, 7, 8, 9 and 10 of Information 16CR1613. The defendant was represented by counsel. According to offense reports, on July 5, 1998, officers responded to the Bernalillo County Detention Center in reference to a suspicious death. Upon arrival, officers learned a corrections officer was performing head count when the victim, F.M., was discovered lying in his bed with a pillow covering his face. When the victim did not respond to verbal commands, the officer removed the pillow to discover the victim had a tightly wrapped ligature around his neck. Medical personnel responded; however, could not revive the victim. The incident went unsolved.

In March 2007, information was received implicating Frederico Munoz, Manuel Benito and Leonard Dujan. Detective proceeded to question Munoz while he was in custody on an unrelated matter. Upon questioning, Munoz advised he instigated an altercation with several black inmates in order to create a diversion. He admitted he strangled the victim in his cell, which took a couple attempts as the victim recovered after the first attempt. Munoz indicated he murdered the victim over "influence issues" of who was going to call the shots in jail. Nonetheless, Munoz stated murdering the victim was wrong which is why he was confessing to the murder.

On April 9, 2007, an Information was filed charging Mr. Munoz with First Degree Murder.

| | | | | | |
|---|---|---|---|---|---|
| 113. | 08/06/1999 (Age 19) | Possession of Deadly Weapon/Explosive by a Prisoner/First Judicial District Court, Santa | 03/22/2001: 9 years imprisonment suspended to 5 years probation | 4A1.1(c) | 1 |

25

Fe, NM; Docket No.:
1999CR905

The defendant was represented by counsel. According to the Indictment, the defendant did have in his possession a deadly weapon, to wit: a shank, while in the lawful custody of the Department of Corrections.

On December 22, 2003, the defendant was unsatisfactorily discharged from supervision as he committed a new felony offense.

| | | | | | | |
|---|---|---|---|---|---|---|
| 114. | 01/02/2002 (Age 21) | Ct. 1: Armed Robbery with a Deadly Weapon/ Second Judicial District Court, Albuquerque, NM; Docket No.: 2002CR00002 | 12/13/2002: Ct. 1: 9 years imprisonment; suspended to 5 years probation; 2 years parole 01/27/2005: Early discharge from supervision | 4A1.1(c) | 1 |

The defendant was represented by counsel. Count 2: Conspiracy to Commit Armed Robbery; Counts 3&4: Aggravated Assault with a Deadly Weapon; Count 5: False Imprisonment; Count 6: Possession of a Firearm or Destructive Device by a Felon; Count 6: Aggravated Assault on a Peace Officer, and Count 7: Receiving Stolen Property (Firearm) were dismissed.

According to the charging document, on December 8, 2001, the defendant took and carried away a wallet, $100.00 in US currency and credit cards from the immediate control of another while armed with a handgun. In addition, the defendant restrained or confined the victim and struck the victim with the firearm. A warrant was issued for Munoz' arrest.

On December 19, 2001, officers observed a vehicle being driven by Munoz' girlfriend, and suspected the male passenger was Munoz. A traffic stop was conducted at which an officer observed Munoz pointing a firearm at the officer. The officer took cover; ordering Munoz to exit the vehicle. Munoz expressed fear of being shot by the officer; however, after being reassured the officer would not inflict any harm, Munoz exited the vehicle and was arrested.

On May 23, 2003, a motion to revoke probation was filed as the defendant violated his terms of supervision by committing a new offense; Docket No. 03CR1442.

On December 22, 2004, the motion to revoke probation was withdrawn as the defendant received an early order of discharge on suspended sentence after pleading to life imprisonment in 03CR1442.

| | | | | | |
|---|---|---|---|---|---|
| 115. | 05/15/2003 | Ct. 1: First Degree | 12/17/2004: Ct. 1: Life | 4A1.1(a) | 3 |

26

|            |                        |                       |
|------------|------------------------|-----------------------|
| (Age 23)   | Murder (Willful and    | imprisonment          |
|            | Deliberate)/Second     | (defendant shall serve|
|            | Judicial District Court,| 30 years imprisonment|
|            | Albuquerque, NM;       | before being considered|
|            | Docket No.:            | for parole); 5 years  |
|            | 2003CR1442             | parole                |

It is noted, this offense is referenced in Overt Acts 5, 7, 8, 9 and 10 of Information 16CR1613. The defendant was represented by counsel. Counts 2&3: Tampering with Evidence and Count 4: Possession of Firearm or Destructive Device by a Felon were dismissed. According to offense reports, on April 26, 2003, officers responded to the Goodfellas Barber Shop in reference to gun shots. Upon arrival, officers observed the victim, R.C. lying on the ground receiving medical attention from emergency personnel. Officers questioned several witness who advised the victim and an individual, later identified as Frederico Munoz were observed having an argument inside the barbershop. As the victim began to leave, Munoz pulled a firearm shooting the victim several times before leaving the area. According to the medical examiner's report, the victim died as the result of nine separate gunshot wounds.

On May 15, 2003, the defendant was arrested pursuant to a warrant.

Robert
Martinez

### Juvenile Adjudication(s)

40.    None.

### Adult Criminal Conviction(s)

| | Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|---|
| 41. | 08/16/1983 (Age 19) | Ct. 1- Robbery Ct. 2- Burglary Ct. 3- Conspiracy/ Eigth Judicial District Court, Albuquerque, NM; Case No.: 83CR0047 | 11/22/1983: 6. 5 years, followed by 2 years parole | | 0 |

The circumstances for this case are not available.

| | | | | | |
|---|---|---|---|---|---|
| 42. | 06/24/1988 (Age 24) | Ct. 1: Murder (2nd Degree) Ct. 2: Aggravated Burglary, Ct. 3: Habitual Offender Case No.: CR88-410-004 | 12/15/1988: Sentenced to 39 years custody with mandatory Parole | 4A1.1(a) | 3 |

The circumstances for this case are not available.

| | | | | | |
|---|---|---|---|---|---|
| 43. | 03/06/1999 (Age 34) | Battery on a Peace Officer/ New Mexico State Penitentiary, Santa Fe, NM; Case No.: | : Unable to locate disposition | | 0 |

The circumstances for this case are not available.

| | | | | | |
|---|---|---|---|---|---|
| 44. | 03/15/2000 (Age 37) | Ct. 1- Aggravated Battery (Deadly Weapon/Great Bodily Harm) | 06/03/2002: Cts. 1, 3 years custody followed by 2 years parole, with 8 year habitual offender | 4A1.1(a) | 3 |

13

|  |  | Ct. 2- Conspiracy to Commit Aggravated Battery<br>Ct. 3- Habitual Offender/<br>3rd Judicial District Court, Albuquerque, NM;<br>Case No.:CR2001-0233 | enhancement, as to Ct. 2: 18 months custody, imprisonment, followed by 1 year parole, with an 8 year enhancement for habitual offender, Ct 2 shall be served consecutive to Ct. 1 for a total of 20 years and 6 months, followed by 2 years parole, sentence imposed shall run consecutive to Case No.: 94CR580 |  |  |

The circumstances for this case are not available.

| 45. | 07/19/2006<br>(Age 42) | Ct. 1: Battery Upon a Peace Officer,<br>1st Judicial District Court, Santa Fe, NM;<br>Case No.: D-0101CR2007-00117 | 09/19/2008: Found guilty 18 months custody with 8 year habitual offender enhancement for a total of 9.5 years, followed by 1 year parole, as to Count 1, this case is to run consecutive to case CR88-410-004 and CR94-580 and CR2001-0233, | 4A1.1(a) | 3 |

The circumstances for this case are not available. The defendant was additionally charged with Count 2 and 3 which were subsequently dismissed.

### Criminal History Computation

46. The criminal convictions above result in a subtotal criminal history score of six.

47. The total criminal history score is six. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of six establishes a criminal history category of III.

### Other Criminal Conduct

| | Date of<br>Arrest | Charge | Agency | Disposition |
|---|---|---|---|---|
| 48. | 05/08/1994<br>(Age 30) | Ct. 1 : Aggravated Battery (Deadly | | 05/26/1995:  3 years as to Ct. 1, sentence |

14

Weapon/Great Bodily Harm)
Ct. 2: Possession of a Deadly Weapon by a Prisoner ,
Ct. 3.  Conspiracy
Ct. 4 Habitual Enchancment/
First Judicial District Court, Santa Fe, NM: D-101-CR-1994-00580

enhanced by 4 years for a total of 7 years, as to Ct 2,  9 years custody enhanced by 4 years for habitual offender, for a total of 13 years, as to Ct. 3, 18 moths, enhanced by 4 year for habitual offender, for a total of 5 ½ years, the sentences imposed are to run consecutively for a total of 25 ½  years to be served consecutively to CR88-410-4

The circumstances for this case are not available.

**Pending Charges**

49.    None.

**Other Arrests**

| Date of Arrest | Charge | Agency | Disposition |
| --- | --- | --- | --- |
| 50. 09/12/1982 (Age 18) | Ct. 1: Driving Under the Influence of Alcohol Ct. 2: Driving Impaired by Alcohol | Trinidad, CO | 12/01/1982: Unknown |

Records regarding the specific offense were no longer available due to the age of the case.

| 51. 04/05/1983 (Age 19) | Mischief - Damage Property; Las Animas County Court, Trinidad, CO | Trinidad Police Department; Trinidad, CO | Unknown |

Records regarding the specific offense were not available due to the age of the case.

15

DNM 1377

OFFICIAL RECORD

FD-302 (Rev. 5-8-10)



EXHIBIT
Clerks
8

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/19/2018

On April 18, 2018, Michael JARAMILLO was interviewed at the United States District Courthouse in Las Cruces, New Mexico by Assistant United States Attorney (AUSA) Matthew Beck and Federal Bureau of Investigation (FBI) Special Agent (SA) Joseph Sainato. Also present was Gerald Montrose, Defense Counsel for JARAMILLO. Prior to the interview, JARAMILLO was presented with a Kastigar letter, which he reviewed with Mr. Montrose and signed. Mr. Montrose then provided the signed letter to AUSA Beck. JARAMILLO then provided the following information:

JARAMILLO initially went to prison in 1998 for stealing a car and shooting from the vehicle's window. JARAMILLO was brought into the Syndicato de Nuevo Mexico (SNM) gang in approximately 2000 at the Central New Mexico Correctional Facility (CNMCF) by Leroy LUCERO, aka "Smurf." LUCERO approached JARAMILLO and asked him to join the SNM. JARAMILLO joined because he thought being an SNM gang member would help him get through prison. LUCERO and Michael LNU, aka "Smiley," were the only SNM gang members in the Pod at the time JARAMILLO was recruited. JARAMILLO believed LUCERO asked him to join because JARAMILLO and "Smiley" were both members of the Albuquerque 18th Street gang. JARAMILLO described LUCERO as an "old-school" SNM gang member. During JARAMILLO's recruitment, LUCERO told him the rules of being an SNM gang member, which included the following:

1. Membership is for life; you can never get out.
2. You can never "rat." The penalty for "ratting" is death.
3. You have to do what you're told or what you were told to do will happen to you instead.
4. You have to earn your bones.
5. You have to have loyalty to the SNM over everyone, even your own family.

JARAMILLO stated that, at that time, he believed he could get out of prison without actually "earning his bones," but subsequently "earned his bones" by "taking out" Frank CASTILLO, aka "Poncho." Prior to being incarcerated at the CNMCF, JARAMILLO was incarcerated in Santa Rosa but "PC-ed" [requested protective custody], which is why he was transferred.

JARAMILLO was released from prison not long after joining the SNM, but returned to prison on a parole violation and new charges shortly

Investigation on  04/18/2018  at Las Cruces, New Mexico, United States (In Person)

File #  245U-AQ-6239655                                    Date drafted  04/19/2018

by  Joseph Sainato

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PGP
4/19/18

US v DELEON ET AL    7DNM 1378

FD-302a (Rev. 05-08-10)

245U-AQ-6239655

Continuation of FD-302 of (U) 4/18/18 Interview of Michael JARAMILLO , On 04/18/2018 , Page 3 of 4

DELEON then waited for GALLEGOS to say it was time. JARAMILLO relayed that he knew both DELEON and GALLEGOS were SNM gang members.

GALLEGOS's delivery of heroin came in later that day or the next. GALLEGOS called DELEON and JARAMILLO into his cell just before evening lockdown and told them that the murder would take place the next morning. GALLEGOS informed DELEON and JARAMILLO that they would go into CASTILLOS's cell as soon as the doors opened the next morning. GALLEGOS told them the plan was to go into CASTILLO's cell and use heroin with CASTILLO, then "take him out." JARAMILLO believed the heroin belonged to GALLEGOS. GALLEGOS told DELEON and JARAMILLO that his family would pay for an attorney for them if they got in trouble and instructed them to refuse a DNA test if requested by the police. GALLEGOS directed DELEON and JARAMILLO as to what their roles would be in the murder. GALLEGOS said he and DELEON would hold CASTILLO down as he was taking his "hit" of heroin and JARAMILLO would choke him out. JARAMILLO recounted that GALLEGOS instructed him to strangle CASTILLO. GALLEGOS also told them that he would have Edward TROUP act as a lookout during the murder. GALLEGOS then called TROUP over to his cell and told TROUP that he would have to be a lookout in the morning. GALLEGOS told TROUP that he would have to be outside of his cell in the morning and to keep everybody else in the Pod inside of their cells. TROUP agreed and the conversation ended. JARAMILLO knew TROUP to be an SNM gang member. JARAMILLO stated that GALLEGOS had given him heroin earlier that day and he snorted it after lockdown that night. That was the first time JARAMILLO had ever used heroin.

The next morning, GALLEGOS, DELEON and JARAMILLO went into CASTILLO's cell as soon as the doors opened. JARAMILLO noted that CASTILLO did not seem surprised, and believed that CASTILLO knew they were going to use heroin that morning. GALLEGOS pulled out the heroin and gave it to CASTILLO. JARAMILLO was not sure if GALLEGOS used heroin as well that morning, or just CASTILLO. As CASTILLO was injecting the heroin, GALLEGOS and DELEON grabbed him, flipped him around and held him face-down on his bed, with his head toward the wall. As soon as GALLEGOS and DELEON grabbed CASTILLO, JARAMILLO grabbed the drawstring from CASTILLO's laundry bag, which was hanging from a shelf. JARAMILLO wrapped the string around CASTILLO's neck and strangled him from behind. CASTILLO struggled for approximately 30 seconds. Once CASTILLO stopped struggling, JARAMILLO tied a knot in the string and left it around his neck. JARAMILLO stated that he saw TROUP downstairs as he walked out of CASTILLO's cell; nobody else was outside of their cells. JARAMILLO returned to his cell, then went to breakfast. After breakfast, JARAMILLO went outside into the main compound area, which was when NMCD officials instituted a lockdown and put the inmates back into their respective cells within their respective housing units. JARAMILLO estimated this occurred less than an hour after the murder had taken

245U-AQ-6239655

(U) 4/18/18 Interview of Michael
Continuation of FD-302 of JARAMILLO                    , On 04/18/2018 , Page 4 of 4

place. After the lockdown, JARAMILLO stated nothing further happened until the State Police arrived later that night. JARAMILLO said he subsequently gave a brief statement to the State Police and submitted to a DNA test. JARAMILLO stated he learned of Rolando GARZA's homicide while being questioned by State Police.

JARAMILLO relayed that the SNMCF stayed on lockdown for several months following the murders until New Mexico Corrections Department (NMCD) officials dispersed inmates into other facilities throughout the state. During the lockdown, SNMCF officials let inmates out of their cells one at a time to shower. On several occasions, GALLEGOS walked by JARAMILLO's cell and asked JARAMILLO what he had told the police and if he had given a DNA sample.

Several years later, JARAMILLO ran into TROUP at the Penitentiary of New Mexico (PNM) Northern Facility. At that time, State Police investigators had been doing inmate interviews and TROUP asked JARAMILLO if he had been interviewed by the police. JARAMILLO also ran into TROUP several years after he was released from prison at a motorcycle shop in Albuquerque. TROUP was with James GARCIA, aka "Daffy." JARAMILLO stated he never saw DELEON again.

JARAMILLO further provided that approximately 1.5 to 2 years prior to April 18, 2018, he was visited by a defense investigator for Joe GALLEGOS. JARAMILLO told the investigator that he did not know anything and did not want any part of the case.

JARAMILLO admitted that he does use marijuana.


SA Sainato's notes were scanned and attached to this report.

245U-AQ-6239655

(U) 4/18/18 Interview of Michael

Continuation of FD-302 of JARAMILLO _____, On 04/18/2018 , Page 2 of 4

thereafter and was housed in the Southern New Mexico Correctional Facility
(SNMCF) when CASTILLO was murdered in 2001. JARAMILLO was again released
approximately 6 months to a year after the murder, then returned to prison
several months later on a parole violation, as well as new charges.
Approximately 1-2 years before being released, JARAMILLO was assaulted by
SNM gang member Tomas CLARK in the J-1 Green Pod of the SNMCF. JARAMILLO
"PC-ed" after the assault, then continued to make up reasons for SNMCF
officials to keep him out of general population and in protective custody
until his release.

JARAMILLO mainly associated with SNM gang member Lorenzo VALDEZ while
incarcerated. JARAMILLO stated he knew Angel DELEON, Joe GALLEGOS and
Edward TROUP, but was not close with them. JARAMILLO does not have any SNM-
related tattoos.

2001 Murder of Frank CASTILLO

JARAMILLO was not sure who "had the keys" to the SNMCF at the time, but
guessed that it was LUCERO. JARAMILLO first heard of the plan to murder
CASTILLO when he was approached by Leonard LUJAN. JARAMILLO had never met
LUJAN prior to being approached, but knew he was an SNM gang member and
knew who he was by reputation. JARAMILLO stated that LUJAN hung out with
the "heavy hitters" in the SNM gang. Though he had never met Billy GARCIA,
JARAMILLO heard that he was coming to the SNMCF prior to his arrival via
rumors and word-of-mouth, and knew that he was already at the SNMCF when
LUJAN approached him about murdering CASTILLO. JARAMILLO stated he never
introduced himself or spoke to Billy GARCIA, but knew who he was because
he saw him eating and other people would point him out to JARAMILLO,
identifying him as "Wild Bill." JARAMILLO recalled that GARCIA was only at
the SNMCF for several days to a week before CASTILLO's murder took place.

JARAMILLO stated he was walking across the SNMCF compound a day or two
before CASTILLO's murder when he was approached by Leonard LUJAN. LUJAN
told JARAMILLO to walk with him and JARAMILLO followed LUJAN to the
library, where Angel DELEON was waiting for them. LUJAN told JARAMILLO
that he was going to have to "put in work" and instructed him and DELEON
to talk to Joe GALLEGOS about it. LUJAN relayed that GARCIA told LUJAN to
find people to murder CASTILLO and LUJAN chose JARAMILLO, GALLEGOS and
DELEON. JARAMILLO relayed he understood the order to be serious because it
had come from GARCIA.

JARAMILLO then went back to the Pod to talk to GALLEGOS about the order.
JARAMILLO could not recall if DELEON walked with him or not, but stated
DELEON was present when the three spoke. GALLEGOS told DELEON and
JARAMILLO that he was waiting on a delivery of heroin and that they would
wait until after the delivery to make the move on CASTILLO. JARAMILLO and



Mental Health records
James Castle
to:
Carol_Bevel, Armijo, Maria (USANM)
04/24/2018 04:39 PM
Hide Details
From: James Castle <jcastlelaw@gmail.com>
To: Carol_Bevel@nmcourt.fed.us, "Armijo, Maria (USANM)" <Maria.Armijo@usdoj.gov>

Here is a list of the top priority witnesses for whom we wish the mental health records and the status of whether they objected or not:

**Frederico Munoz**- no objection
**Robert Martinez**- no objection
Fred Quintana- no objection
**Gerald Archuleta**- no objection
**Manuel Jacob Armijo**- no objection
Benjamin Clark- no objection


Sammy Griego- objected
Robert Lovato- objected
Javier Alonso-objected

I have put in **bold** the witnesses who we want the records on first


James Castle
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206
(303) 675-0500
email: jcastlelaw@gmail.com


*This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone at 303-675-0500, and delete the message from your system.*


--------------------
Click below to report this message as spam
for Carol_Bevel@nmcourt.fed.us
Report This As Spam



EXHIBIT
Clerk's
10

11-29-12

Interview of Sleepy

Never said they did it



EXHIBIT
Clerk's
11

Ex A

U.S. v DELEON, ET AL   71681

**Castro, Joe (USMS)**

| | |
|---|---|
| **From:** | Castro, Joe (USMS) |
| **Sent:** | Tuesday, April 24, 2018 8:51 AM |
| **To:** | Ortiz, Matthew (USMS) |
| **Cc:** | Aloyo, Luis (USMS); Gunder, Adrian (USMS); Baerga, Augustine (USMS); Peters, Sophia (USMS); Hinojosa, Abel (USMS); Best, Nathaniel (USMS); Fuata, Harvey (USMS); Mickendrow, Christopher (USMS); King, Mario (USMS); Kitt, Eric (USMS); White, Lee (USMS); Gutierrez, Joseph (USMS) |
| **Subject:** | Re: FYI |

☐▓♂☐ Thanks Matt.

**Joe A. Castro**
Supervisory Deputy US Marshal
United States Marshals Service
District of New Mexico - Las Cruces
(575) 386-4204 o


On Apr 24, 2018, at 8:47 AM, Ortiz, Matthew (USMS) ▓▓▓▓▓▓▓▓> wrote:

> The female attorney for Andrew Gallegos asked if she could take a pic with the two of them. I said no! She said well this book is gonna make me a lot of money. So apparently she's writing a book about this.
>
> -Matt
>
> Sent from my iPhone



DNM 1384

SmileynShelly Gallegos
Gallegos is  feeling loved.
Monday at 12:56 AM ·

My baby darren I love this man more then words can say it's like this around the world and back and back around he is my soulmate with out a doubt. And I love the way he loves me and the ways he shows it. It's the sweetest ever may God bless you always baby MUAHHHH!!!



Write a comment...

DNM 1385



SmileynShelly Gallegos
Gallegos is 😊 feeling loved.
15 hrs · 🔒

I love this man so very much. Andrew Gallegos I love you baby MUAHHHH god bless you always my love! ❤️😘💋😘❤️❤️❤️

Write a comment...

Sent from my iPhone

**Adecaia Miller**
Hi shell so who is taking the picture lol

1h  Like  Reply

**Crystal Silva**
Lol looks like the attorney is throwing skins 😂😂 yeah

6h  Like  Reply

Write a comment...

DNM 1387



**SmileynShelly Gallegos**
Gallegos is 🥰 feeling loved.

🕘 hrs · 🌐

👍 Like          💬 Comment

😊😊 **SmileynShelly Galle...allegos and 7 othe**

👍🏻 Like   Reply

**SmileynShelly Gallegos Gallegos**
My Baby already for court good
luck baby I'm praying for you and
Joe so you both can come home
already we you guys need to be

55m   Like   Reply   💬 1

**Adecasia Miller**
Hi shell so who is taking the
picture lol

1h   Like   Reply   💬 1

**Crystal Silva**
Lol looks like the attorney is
throwing skinas 👎👎👎 yeah

6h   Like   Reply   💬 2

Write a comment...

FD-302 (Rev. 10-6-95)

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    05/31/2012

On or about 05/02/2012, Special Agent Lance Roundy,
Albuquerque Division, Las Cruces Resident Agency of the Federal
Bureau of Investigation received from Teresa Zarski, United States
Bureau of Prisons, Lewisburg Federal Penitentiary, a copy of a
letter from "P-Tu-Fo" addressed to "Pie." Zarski confirmed that the
letter was from inmate and Sindicato Nuevo Mexico gang leader LEROY
LUCERO, aka Smurf, to JAMIE YARA, aka Payaso. The copy of the
letter was attached and made a part of this file.





---

Investigation on    05/02/2012    at    Las Cruces, New Mexico

File #  281D-AQ-62017-NMDOC-39                      Date dictated    05/30/2012

by   SA Lance Roundy:lr LR

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

U.S. v. DELEON, ET AL.   15846
1521-002.wpd

Pie,

Q-vo Hermano, Como Te Va? Well I hope and pray that when you do get this wila that it finds you and the family in the best of health and the upmost of Spirits. Say fool it was good to finally hear from you. Ive been calling the cell # 9766 but nada also the house #. But finally I got ahold of you. It sux because I get the phone at weired hours so I just try tm I get ahold of someone. But N-E ways im hoped to hear your doing good. Yeah the phone disconected so I couldnt call back for 1/2 hr then I called back ____ were ____. I guess when duty calls its on up and at Em! Wi ____ ____

An I can walk is S this way and 3 th vida que vivo. One of these days. Say I reports and the refucel to this program here. Also Im all this bullshit it doesn essutten or nothing like that. I never been hit, Ive done the fecho but never got caught. Cholo or whoever else wants to tusm shit they can run there mouth. These so - calless brothers here in the Feds are weaky, soft as bitches who cant stand for us but I'yll try to do another andes dirty work. Its fuckew up out here. I can look in the mirror and not see No Flaws theres no skeletons in my closet. And alot of people cant say that. Alot of these victos use the ____ the yeras that esqua an cavsry trouble what happene to me they caught me ____ went an told them to give me a ba ____ for a Dissplinery Transfher on my last

Its Skennable ase. But yeah here all t ____ ive been doy ____ stne my stay ber in the B.O.P. Even the Shot (Report) they seen ____ for figuity with Fenare a (Red) I dresst push him like the repart said I gave him a ____ shot but he

§1   ____ken!—

____ es la
____ my
Sent out
____ ever

§2   Suys off much ____ bittere put man Cali...

DNM 1390

2

slipped it so it didnt catch him right. Next time I know shed report to me next Ha-Ha. Yeah bessuss all this shit ive been in this phase program for 3 yrs and still not going anywhere yet. The Goos thing ive got this vieca she's been down for me for a couple of years already. She's made her way up here a couple of times say little thing! She's gonna be coming up with in the next few months the first time she plans the second she came by drop because of the Chos-chows and whens, whens!  — Say I may need your esudra to get me a good peace or two me and this Cubatcho are putting our Nickles and Dimes To-eth... He's a little rich boy so im gonna charge him — gots to because if I dont someone else will — you know what you mean. She's a good girl so make — is with Her. Por Fivor Bueno? But sonic bro get bz — set like so I can put it into motion I was go — then but the little punk is krazy, it with the Ruiez and Greeners so I cant trust him. It sucks to say that but its true. It hurts, thats my bro but you know how it is them vatos have been his homie for all his life so they have put poisson in his head. There even closing that cops to my son. He told me that them people are his family and he's down for them so I told him fk him and them butches. He better stay out of my way because if not he might catch one also. But enough of all that shit I get all prost off. Frakin Asshole, So your saying that Susa is looning Hot! I bet esa she's always been a good looning girl. She's nothing like her sisters huh! Thats crazy that Ray last his eye sight on one of his eyes. I called him but he's to busy to throw Rollo. Always talking to someone like a politician huh. Frakin Fat Ass huh Yeah I wont need my $ on calling him anymore from all that. Say why did Fuzz

§6

so back to Jail? Dirty I 
him a few times but some
was his ruca. or maybe even him? Quien sabe que -no? Is the
sideline cheerleader (chola) still out there? Yeah when I spoke
to Sticks he tole me that that Veto not to be trusted. he's a
brother but I wont respect him anymore. Its loco bro that
alot of these Vatos (Karnals) are trying to do so much but its
like nothing is gettin done. Nada. We have so many enemys
that we need to focuse on but were over here focussing on
eachother. Looking for somet

'Cus I tried to call
im pretty sure it

see Drama. It sucks
by myself but

dude, big time. In Someway §3

then its also Gotcho. Its g
cause they not there to .
close to home its expensive

see my enemys
ect. Wish I was
WSBP3. I made a

jood chunck ut I last year here but its hard to keep
the flow saves como. She can ml -----   -   my 3-5 months

on it. So

Ive got Esquire now with this whiteboy so
Let me know brems. As Soon As Possible §4
write but just a few lines to get back
here so. If its a go ill send it next

out. I like to
: her cell #
gone out

this so por favor get back to me

, Salvados

to the Veto locos de Southwest.' oh yeah I heard wedo
Troup is gettin short? The Grinch who stole X-mas! _ Your.
Part of that one huh, _ He-He. Puchas Locos. Amor Fool

Siempre Con
Respecto
P-Tu-Fo

If you have Any
Questions on these
papers let me know
Also im gonna send a
..

FD-302a (Rev. 05-08-10)

245U-AQ-6239655

Continuation of FD-302 of (U) 4/2/18 Pretrial Interview of Billy Cordova ,On 04/02/2018 ,Page 3 of 4

Zac" groomed CORDOVA for the SNM. CORDOVA went to the residence with the intention of killing "Baby Zac" and asked him about the paperwork because he wanted to see "Baby Zac's" reaction. CORDOVA had a gun on him. "Baby Zac" pulled out discovery and CORDOVA thought it was fake. "Baby Zac" stated he was not a rat and there was no paperwork on him. "Baby Zac" stated he "should've killed that vato. [He] couldn't get [the] gun out fast enough and Styx shot him in the chest." "Baby Zac" knew CORDOVA was a soldier loyal to ARCHULETA. All the tabla members had soldiers behind them. "Baby Zac" told CORDOVA, "[I] know what you're here for. Billy calls and order. In my eyes, Billy is above all them dudes." CORDOVA took this to mean that "Baby Zac" was following B. GARCIA's orders when he attempted to shoot ARCHULETA. Willie ROMERO, aka "Demon," told CORDOVA that ARCHULETA had ratted. CORDOVA asked for the paperwork because he was out with "Baby Zac" and it was never produced.

In 2014, CORDOVA saw B. GARCIA at a car wash. CORDOVA asked about ARCHULETA and B. GARCIA stated he didn't know because ARCHULETA got out and left for Tennessee. B. GARCIA stated ARCHULETA should've stayed and handled it and "Zac didn't rat. Zac is my nephew. [He] does what I tell him to do. That's my familia." CORDOVA knew B. GARCIA had given passes and explained that Chris [GARCIA] was not Billy's nephew but "[that] vato's productive." C. GARCIA and B. GARCIA weren't related but were both from El Washe.

Between January to March 2014, CORDOVA (cell 8) was housed at Southern with TROUP (cell 14) in yellow pod. CORDOVA would give TROUP drugs and remarked TROUP and Ben CLARK, aka "Cyclone," were close. TROUP told CORDOVA, "When Cyclone went to seg, he looked back and said, "make sure you handle that viaje."" TROUP also stated Ernest GUERRERO, aka "Ern Dog," kept going to the door and pushed the issue when the RASCON brothers took too long. GUERRERO was housed in green pod. TROUP stated he was tired of waiting on those vatos and stated, "Me and the brother handled it. Those two chafa brothers wouldn't." TROUP told CORDOVA, "it's good you work out. When I did the viaje in 2001, that vato was a challenge. I had to tell the brother, grab his feet. For Fred Dog, he wasn't a challenge."

In approximately June 2015, CORDOVA was being shuttled back and forth from PNM North and Central because of court. CORDOVA was housed in D pod, cell 7 with Andrew GALLEGOS (cell 15), aka "Smiley." At yard, CORDOVA told GALLEGOS about his murder case and Andrew GALLEGOS told him how to beat a murder case and brought up the 2004 murders and stated, "we were whacking fuckers. [They] sell for us or not at all in Valencia or Socorro. The FBI had to build the case. We left no evidence. [They had to] look for shoe prints. Cunte took the mulleta." GALLEGOS explained his brother, Frankie GALLEGOS, aka "Cunte," took the rap so the rest could get off. "Cunte"

FD-302a (Rev. 05-08-10)

245U-AQ-6239655

(U) 4/2/18 Pretrial Interview of Billy

Continuation of FD-302 of  Cordova                                        , On  04/02/2018  , Page  4 of 4

took the rap because most of the evidence was on him. A. GALLEGOS also stated, "don't plea out. fight it. Look at us, we got charged for Adrian BURNS' murder and [were] released [a] few months later, if no evidence. Even though we did it, we got off. All hearsay. Some people say bulldogging for dope. Some people say we owed him money. It's all good. [I'm] getting out again. 18 months left." A. GALLEGOS stated "they shot him, bound [him] up and burned" him. "They" was a reference to himself and Joe GALLEGOS. A. GALLEGOS also stated, "they [law enforcement] found him bound up in a trunk of a car burned in the bosque. They didn't have no evidence." GALLEGOS stated they walked, "nobody ratted. stick together." A. GALLEGOS told CORDOVA that if there was more evidence on him, to take the plea and let the nephew off and vice versa. The person that was let off would give the other skina.

CORDOVA utilized A. GALLEGOS' pin to call his wife during that time frame because CORDOVA was interim level six and was limited to four phone calls a month. A. GALLEGOS had unlimited calls because he was pending a transfer to Southern. CORDOVA was caught and was written up for fraud and misuse of a telephone. Task Force Officer Chris Cupit was able to corroborate the use of A. GALLEGOS' pin by CORDOVA during June 2015.

CORDOVA was aware Joe GALLEGOS was SNM as were Andrew and Frankie. A. GALLEGOS stated, "all eastsiders respect us. We're all from the onda." GALLEGOS asked about CORDOVA's nephew joining the SNM but CORDOVA did not want him involved in it.

CORDOVA attempted to provide cell numbers/placement information for individuals he spoke to. FNU LNU, aka "Bozo," and several others were put on the leva in 2005 for not having a weapon and not handling it.

FD-302 (Rev. 5-8-10)

- 1 of 1 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ___04/20/2018___

On April 19, 2018, SA Bryan Acee, SA Leysha Lopez Recci, SA Tom Neale,
SA Joe Sainato, SA Nancy Stemo, and TFO Chris Cupit assisted in creating a
timeline regarding attempted contacts and conversations with Michael
JARAMILLO. The timeline is attached.



---

Investigation on ___04/18/2018___ at   Albuquerque and Las Cruces, New Mexico, United States (In
Person, Phone)

File # 245U-AQ-6239655                                    Date drafted ___04/20/2018___

by  Nancy Stemo

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

SA Bryan Acee

4/19/18

Michael Jaramillo Timeline

Notes

**Background:**

1. Lujan statements included Jaramillo

**March 12, 2018 – Present**

2. March 12, 2018 thru March 16, 2018 - Acee identified statements by Jaramillo at motion hearings in LC.

3. March 14, 2018 – Acee request SAs attempt to locate Jaramillo and interview.

4. March 16, 2018 – SAs check Jarmillo's LKA (parole address). Address no good.

5. March 19, 2018 – FBI found good address. SA Lopez and TFO Cupit contacted Jaramillo at his residence and explain SNM case. Jaramillo was advised that he'd provided prior statements to NMSP/NMCD and they had been provided to defendants. Jaramillo resistant to be witness, no longer gang member, did not remember anything from 2001, and emphasized strong concern for personal and family safety.  Jaramillo said he wanted to talk to his wife and would contact agents. Rather than providing his cell number, Jaramillo gave agents his wife's number. Jaramillo did not contact agents.

6. March 21, 2018 – SA Stemo attempt contact at Jaramillo residence; however no one answered door.

7. March 26, 2018 – SA Lopez and SA Stemo attempt contact at residence at 7am. Jaramillo's wife, Catherine Jaramillo, claimed he was gone for the day. Catherine told agents Jaramillo was very stressed and did not remember anything. SAs asked Catherine to have Jaramillo contact them.

8. March 28, 2018 – SA Acee requested 13 trial subpoenas from USAO, to include one for Michael Jaramillo.

9. March 29, 2018 – FBI received the requested trial subpoenas and began serving them.

10. March 30, 2018 – SA Lopez and SA Neale attempted contact at the residence; however, no one answered.

11. March 30, 2018 – SA Lopez and Neale returned to the residence and served Jaramillo's wife with the subpoena at their residence. Catherine Jaramillo accepted service, but was upset with agents. Catherine reiterated Jaramillo did not have helpful information for the FBI.

12. March 30, 2018 – SA Lopez attempted to call Jaramillo's; however, the call went unanswered.

13. April 2, 2018 – SA Lopez spoke with Catherine Jaramillo and Catherine advised that Jaramillo was willing to sit down with agents and talk. A meeting was set for April 4.

14. April 4, 2018 – SAs were tied up at the SNM shakedown operation at PNM and rescheduled the meeting with the Jaramillo's for April 5.

15. April 5, 2018 – SA Lopez and SA Stemo met with Jaramillo. He claimed he did not know anything and could not recall events at SNMCF in 2001. SAs showed him his prior statements and photos of person in the SNM pods at SNMCF in 2001. Jaramillo maintained he did not know anything.

16. April 6, 2018 – SA Lopez spoke with Jaramillo on phone. SA Lopez suggested Jaramillo speak with SA Acee.  SA Acee spoke with Jaramillo for approximately 30 minutes. SA Acee explained the history of the investigation, acknowledged Jaramillo's safety concerns, and questioned Jaramillo as to why he was so afraid. SA Acee mentioned the names of several other witnesses from within the SNM to ease Jaramillo's

SA Bryan Acee

4/19/18

concerns. Jaramillo and Acee debated Jaramillo's validation as SNM and SA Acee read Jaramillo his prior statements and explained what "discovery" was.  Jaramillo claimed he could not remember anything. At one point he said he had "blacked out or something" in reference to the 2001 incident. Jaramillo also indicated "even if I did know anything" he was "too afraid to testify about it." SA Acee advised Jaramillo he had a subpoena and he would need to appear and provide truthful testimony. SA Acee advised Jaramillo that he could also be called by the defense as a witness.  Jaramillo maintained he would not be helpful as a witness. SA Acee advised Jaramillo that he had a decision to make: 1) show up in court prepared and having met with the AUSAs and having done some pretrial preparation, or 2) show up blind and take your chances on it going well. SA Acee advised Jaramillo the decision was his to make. SA Acee told him to make sure he answered all questions honestly because once he was under oath he didn't want to lie or he could be charged with perjury. SA Acee mentioned Daffy. Jaramillo knew Daffy. SA Acee told Jaramillo to let him know what his choice was by Monday (April 9, 2018). Acee provided his cell number and obtained Jaramillo's. Acee told Jaramillo he wanted to hear from him and not his wife.

17.  April 9, 2018 – Jaramillo failed to contact Acee.

18.  April 10, 2018 – SA Acee told SA Lopez to find out what Jaramillo's decision was. SA Acee told Lopez to relay that if Jaramillo didn't want to pretrial then he should just show up at Las Cruces courthouse on 4/16/18 at 8am. SA Lopez called Jaramillo and he did not answer.

19.  April 10, 2018 – SA Lopez called Jaramillo a second time and he answered. Jaramillo said he was done talking to the FBI. SA Lopez advised Jaramillo to be at LC courthouse Monday, 4/16/18 at 8am.

20.  April 10, 2018, SA Lopez text Jaramillo with information regarding the subpoena (travel, address, reimbursement, contact numbers, etc.) and reminded him to be at courthouse 4/16/18 at 8am.

21.  April 13, 2018, Catherine Jaramillo called USAO regarding the subpoena. USAO inadvertently advised Catherine Jaramillo that they did not need to show up on the April 16, because Jaramillo was not on the witness list and the USAO representative was unaware of the FBI's conversation with Jaramillo.

22.  April 16, 2018 – SA Acee advised the AUSAs that Jaramillo had not shown up pursuant to his subpoena and requested an arrest warrant. AUSA Armijo asked the court for an AW. The Court acknowledged the request and asked AUSA Armijo to prepare the warrant. SA Acee advised the SAs and USAO team of the pending warrant. SA Acee then learned of the miscommunication between the USAO and FBI. The USAO called Jaramillo and asked him to appear on April 18, 2018. SA Acee advised AUSAs that Jaramillo may have been involved in the Castillo homicide based on his responses to the FBI.

23.   AUSAs then requested the court appoint Jaramillo with an attorney.

24.  April 18, 2018 – Jarmillo and wife arrived in LC and meet with attorney. Kastigar provided and Jaramillo debriefed. SA Sainato provided the debrief notes to USAO and they were disclosed. AUSA Beck advised court and defendants.

25.  April 19, 2018 – SA Sainato's debrief 302 produced.

26.  April 19, 2018 – SA Acee constructed this timeline.

4268T2DAT14042618

20      Q.   Okay.

21      A.   So I may have misunderstood it.

22      Q.   And then you had five cases that you got

23   dismissed, right him?

24      A.   Correct.

25      Q.   So has the Government gone to the DA in

151

1   Albuquerque to tell them about the evidence that

2   they've uncovered where you went to Dr. Johnson in

3   Los Angeles and you lied to her about your competency

4   and the fact that Judge Browning has found that

5   you're competent?  Have they gone to tell the DA in

6   Albuquerque that this all has happened?

7      A.   I don't know.

8      Q.   Do you know if they've done anything to

9   help the DA in Albuquerque reinstate those charges in

10   the five cases that were dismissed because you

11   fraudulently got that order of incompetency?

12      A.   I don't necessarily think I fraudulently

13   got it.  I may have exaggerated on a few questions,

14   but that's what the doctor, that was his decision

15   that was his opinion.

16      Q.   After hearing that you witnessed your

17   father and brother get shot and killed in a park lot

18   and you saw that your father was bleeding and your

19   older brother was laying there in the parking lot and

20   you shook him you were there you actually shook the

21   body and the the body didn't respond.  So all of that

22   happens with Dr. Harrington and you don't think that

23   that's a fraud?

24      A.   That was one question out of hundreds, one

Page 127



EXHIBIT
Clerk's
17
DNM 1398

4268T2DAT14042618

25    questioning and they termed whether I'm incompetent

152

1    or not.

2        Q.   But if you exaggerated on that one

3    question, did you exaggerate on all the others?

4        A.   No.

5        Q.   Okay.  Let --

6        A.   I may have exaggerated on a few, but not

7    all of them.

8        Q.   Okay.  Let's talk about Dr. Johnson.

9        A.   All right.

10        Q.   You exaggerated on all of those tests and

11    you tried to convince her that you were not

12    competent, right.

13        A.   I basically didn't cooperate with her and I

14    shut down on a lot of the tests just yes no, yes no,

15    yes no whatever and just went through it just to get

16    out of there.

17        Q.   You shut down and you lied about the facts,

18    right?

19        A.   A few facts, yes.

20        Q.   Important facts?

21        A.   Just about not for facts, about my brother

22    and my dad.

23        Q.   That's not important?

24        A.   It's important, but that one, that one lie

25    isn't going to determine a whole you know thing.

153

1        Q.   You even lied to Dr. Westfried, didn't you?

2        A.   I don't -- I don't recall.

Page 128

DNM 1399

4268T2DAT14042618

3    Q.    Who is Dr. Westfried?

4    A.    He's the doctor that interviewed me.

5    Q.    And you and your defense team hired him to

6    evaluate you for purposes of this competency hearing,

7    correct?

8    A.    Yes.

9    Q.    And you submitted to an evaluation by him.

10   And then at the end of that evaluation, he wrote a

11   report; correct?

12   A.    Yes.

13   Q.    And he testified at the competency hearing

14   with regard to his findings in that hearing, didn't

15   he?

16   A.    Correct.

17   Q.    You don't think lied to him?

18   A.    I told you I lied before.  I lied about my

19   father and my brother.  They got killed and I wasn't

20   there, but I told the doctors that I was.

21   Q.    He asked you to state the charges against

22   you.  He wanted to know if you had an understanding

23   of the charges and the potential consequences that

24   you were facing as a result of this particular case;

25   correct?

                                              154

1    A.    Correct.

2    Q.    And when he asked you about that, you said,

3    yeah, there is all kinds of stuff.  They have all

4    kinds of people hurt.  Something about a cop.  I

5    don't know how to read it.  That's what you told

6    them, right?

7    A.    Yes, there is all kinds of charges.

                        Page 129

4268T2DAT14042618

8    Q.   Yeah, but you do know how to read, righ?

9    A.   Yeah, I know how to read.

10   Q.   And then you went on to say that the guys

11   were talking saying something about prison guard

12   getting hurt and about drugs.  A long time ago

13   somebody got hurt in prison.  Do you remember talking

14   about that to him?

15   A.   There have been many, many prison guards

16   hurt.  There was many killings on this indictment,

17   there was orders to hit cops so there was lots.

18   Q.   But my question is do you remember that,

19   your discussion with him about that?

20   A.   I think so.  I remember.

21   Q.   And then you went on to say:  "They have me

22   on all kinds of stuff.  I don't know those guys.  I

23   was with my mother, wife, my family.  I'm at home.  I

24   don't know nothing about prison guard or cop shot.

25   I'm at home with my chickens, my animals.  Remember,

155

1    I said I didn't sleep for four months.  They had me

2    here for something I didn't do."  That's not true, is

3    it?

4    A.   That's not true.  But I --

5    Q.   And then you were asked -- excuse me.

6         You were asked about your understanding of

7    the trial process.  And your response was, "I don't

8    know, please -- tell them please don't send me to

9    jail.  I didn't do this.  Help me."  That was your

10   response as to Dr. Westfried, right?

11   A.   I've never been in trial, so I didn't

12   understand the trial process.

Page 130

4268T2DAT14042618

13       Q.   But importantly there, you were talking

14   about how you didn't do this?

15       A.   Yes.

16       Q.   And you were referring to the murder of

17   Looney, right?

18       A.   I was in denial.  I was trying to deny it

19   and say that I didn't do it.

20       Q.   And this was in March of 2017?

21       A.   Yes.

22       Q.   Just a couple of months before you entered

23   a plea?

24       A.   Yes.

25       Q.   Later on in another place you were asked

156

1    about your ability to assist counsel.  And you

2    response, and part of that discussion you said I

3    didn't do it.  I want to go home and be with my

4    family and go fishing, I didn't do it, right?

5        A.   Right.

6        Q.   You're lying to them, aren't you?

7        A.   Yes, I didn't want to admit to doing it.  I

8    didn't want to go to prison.

9        Q.   You were then asked what evidence that you

10   thought there was against you with regard to this

11   case and you said I don't think so nobody told me,

12   right?

13       A.   Right there was no evidence.

14       Q.   So Mr. Couleur didn't tell you what sort of

15   evidence there was against you?

16       A.   Yeah, he explained that there was.

17       Q.   So if he explained?

Page 131

DNM 1402

4268T2DAT14042618

18      A.   A Right.

19      Q.   So if he explained it to you, then you

20   telling the Dr. that you don't know nobody told you

21   about the evidence is a lie, isn't it?

22      A.   Before, before I was found competent.

23      Q.   Yes or no is that a lie?

24      A.   It's a lie.

25      Q.   Okay.                                    157


1       Q.   You went on to say that you took a picture

2    of somebody who was part of a group, "maybe just

3    because some, because I knew somebody.  If I didn't

4    do nothing, what are they going to say that they

5    have?  I don't understand."  You got agitated and you

6    said, "I don't know what to say or do."

7            You just felt that you didn't do anything,

8    right?

9       A.   I didn't want to admit to being involved

10   with this group.  I didn't want to admit to being

11   involved with this crime, so I lied.

12      Q.   You asked if you had read any of the law

13   enforcement reports asked if you had any discovery in

14   the case and you said well, they gave me a thing, I

15   don't understand it, the thing was the tablet I

16   presume and that was a lie right?

17      A.   They gave me a tablet.  And I was

18   learning -- I didn't know how to fully operate, and I

19   was getting shown how to use it.

20      Q.   Okay.  But I guess my question was:  It's a

21   lie when you told him that you had not read the

22   discovery, and nobody had given you the discovery and

Page 132

4268T2DAT14042618

23  you hadn't read any police reports.  Because we're

24  now in March of 2017, and you had the tablet for

25  many, many months, right?                              158

1       A.  I think so.

2       Q.  You were asked if you thought you might be

3   able to help your lawyer.  And isn't it true you

4   responded, "I don't know, for what?  I didn't do it.

5   Why do we have to go through this?  This sounds like

6   a bunch of hogwash to me."

7           Again, you're denying it right?

8       A.  Correct.  I did not.

9       Q.  And that's a lie, right?

10      A.  Correct.

11      Q.  Not truthful?

12      A.  Correct.

13      Q.  And throughout this process you continued

14  to lie to Dr. Westfried and tell him you didn't do

15  anything, and you shouldn't even be here, right?

16      A.  Correct.  I didn't want to be here.

17      Q.  Your Honor, I would move the admission of

18  defendants B X one, B X 2, B X 3, and B X 4.

19          THE COURT:  Your thoughts on that, Mr.

20  Castellano?

21          MR. CASTELLANO:  I object.  Those are only

22  used for purposes of impeachment, and otherwise

23  unadmissible.

24          THE COURT:  I think that's correct, so I

25  will keep those out.                                   159

1           MR. COOPER:  Thank you, Your Honor.
                        Page 133

DNM 1404



ct union

Harry and Meghan
n era **PAGE A16**

## Two for two

Justify captures Preakness,
...ys in Triple Crown contention

**SPORTS >> D1**

EXHIBIT
Clerk's
18

...EADING NEWS SOURCE

# UNDAY
# JRNAL

ESTABLISHED 1880

**STATE** ★★★

# SNM credo: 'Blood in, blood out'

### FBI: Prison gang expected loyalty for life; trial wraps up

Copyright © 2018 Albuquerque Journal

**BY COLLEEN HEILD**
JOURNAL INVESTIGATIVE REPORTER

The Syndicato de Nuevo Mexico prison gang was born behind the walls of the Penitentiary of New Mexico in Santa Fe 38 years ago.

But in the latest federal criminal racketeering trial of seven of its alleged members, all but one of the defendants was out on the streets when arrested.

Prosecutors allege that all seven gang members had literally gotten away with murder in cases originally investigated by New Mexico State Police as far back as 2001.

The defendants face federal charges of murder, attempted murder and witness intimidation to further the gang's criminal racketeering enterprise.

Beginning this week, jurors who have listened to six weeks of trial testimony in a Las Cruces courtroom are expected to begin deliberations in the case.

See **MURDER** >> **A8**

ope

y help



# Murder trial of alleged SNM members wraps up



Joe Gallegos



Andrew Gallegos

**From PAGE A1**

The crimes: three unsolved prison murders, an assault and attempted murder of a witness in the federal SNM case; and the shooting death of a Los Lunas area man found handcuffed and on fire behind his torched car near the Rio Grande in 2012.

To convict the men of racketeering, the jury must conclude that they committed the underlying violent crimes to increase or maintain their position within the SNM. If convicted of murder in furtherance of SNM racketeering, they face life in prison.

The defendants include two brothers, Joe Lawrence Gallegos and Andrew "Smiley" Gallegos; along with Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, and Arturo Arnulfo Garcia.

Several defendants deny any affiliation with the SNM gang, which at one time boasted as many as 500 members and formed after the deadly 1980 prison riot at the state penitentiary.

Defense attorneys contend that "a murderers' row" of cooperating prosecution witnesses — some who have pleaded guilty and are awaiting sentencing in the case — cannot be believed.

The evidence is circumstantial, defense attorneys say, with no DNA or other physical evidence tying their clients to the crimes.

On March 28, the first trial of four other defendants, including the alleged leader of the SNM.

member inmate at the Southern New Mexico Correctional Facility and

See PAGE A9

# Witness in Syndicato federal trial: 'I was scared of him'

*Woman lived with accused, testifies he spoke of drug dealer's murder*

**BY COLLEEN HEILD**
JOURNAL INVESTIGATIVE REPORTER

She showed up to U.S. District Court in Las Cruces without identification, looking bewildered and a little scared.

As Morgan Ramirez began to testify April 30 as a prosecution witness against her ex-boyfriend and alleged Syndicato de Nuevo Mexico gang member, Joe Lawrence Gallegos, she bit her lower lip and tears welled in her eyes.

The 30-year-old woman recalled that she and Gallegos had lived together in his Los Chavez mobile home near Belen, where there was an add-on room without lights or windows that she testified, "used to creep me out."

She testified about the day Joe Gallegos told her not to worry, that "someone may have gotten shot in there, but no one died."



MARLA BROSE/JOURNAL

That conversation occurred, she told the jury, sometime after a heroin dealer named Adrian Burns was found shot in the head, a plastic bag covering his face. He was handcuffed and partially burned. His car was nearby, having been set on fire in a wooden area near the Rio Grande.

Burns was Gallegos' drug dealer, and Gallegos, along with younger brother Andrew Gallegos, had been suspects in the Nov. 12, 2012 murder, court records state. They were arrested by New Mexico State Police, but criminal charges were dismissed a month after the murder. A Socorro magistrate judge concluded there was insufficient evidence.

But both Gallegos brothers are now on trial in Las Cruces on federal violent crime in aid of racketeering murder charges in Burns' death. They have pleaded not guilty.

Morgan Ramirez, who is 18 years younger than Joe Gallegos, testified about another conversation in which she said Gallegos told her "they tried to shoot him (Burns) in the head and it got stopped by a bone in his ear."

Joe Gallegos told her that Burns didn't get robbed before his death but was killed because he had "a big mouth," she testified.

Anytime Burns' name was mentioned, Ramirez testified, Joe Gallegos would say: "Yeah, he sure does." (She took that as apparent reference to his fiery demise.)

Ramirez testified that said she never told anybody about the comments back then and ended her on-and-off again relationship with Joe Gallegos in 2013.

Upon cross-examination, Ramirez quickly regained her composure. She acknowledged she was facing a first-degree murder charge in the fatal shooting of an Edgewood gas station clerk on Feb. 11.

Ramirez, along with six others, are also charged with armed robbery and tampering with evidence in that case. She was released on her own recognizance and is on house arrest pending trial.

Ramirez is also facing felony forgery and theft of identity charges in a separate case filed earlier this year. She conceded during cross examination that she also has a January 2016 felony forgery charge pending and a November 2016 charge of receiving or transferring a stolen vehicle.

Joe and Andrew Gallegos of Los Chavez, a community north of Belen, are two of the alleged SNM defendants facing possible life in prison on federal criminal charges if convicted of committing violent crimes to further the gang's criminal enterprise.

[text redacted]

eration, according to the state Corrections Department.

[text redacted]

records state. His convictions include intimidating a witness, assaulting a police officer and being an habitual offender.

Asked whether she was expecting a benefit from the government for her testimony, Ramirez replied, "I am trying to take care of myself on my own. I'm doing everything so I can get my life figured out."

She acknowledged that Gallegos "did take care of me" and had asked her to marry him.

"In the end," Ramirez testified, "I was scared of him."

Morgan Ramirez, left, appears for arraignment on March 22 on criminal charges related to the fatal shooting of an Edgewood, N.M., gas station clerk. She was among seven defendants charged in the case, but traveled to Las Cruces last month to testify in the federal SNM prison gang trial.



FESTIVAL 31 FLAMENCO

JUNE 9 - 16, 2018

38 workshops

13 unique performances

Kids Camp: June 4th-15th

New Mexico Pass: Tickets to 7 shows at a 30% discount!

FFIABQ.ORG

THE SUNDAY JOURNAL

From **PAGE A8**

Testimony in the current trial, which began in early April with U.S. District Judge James Browning presiding, underscored the influence of the gang beyond prison walls.

Of the 100-plus people charged with federal and/or state crimes during a three-year FBI investigation into SNM dubbed "Operation Atonement," nearly 70 percent were on the streets, federal court records show. Some were on parole, while others were on probation or pre-trial release awaiting trial on state charges. Despite their freedom, they were still very much a part of the prison gang, prosecutors have alleged.

According to a federal search warrant affidavit, former prisoners are still expected to keep ties with the gang, sometimes being required to smuggle drugs into prison or elsewhere.

"█████████████████████
█████████ in blood out," said one FBI analyst.

"█████" Archuleta, a former leader of SNM who left New Mexico seven years ago, testified that he relocated to Tennessee.

████████████ to keep in contact with the SNM members and others, and assist in █████████████████████ who were prosecutors alleging in the SNM case. "When I got out in 2011, I had already distanced myself from the "S," because I basically wanted something better for myself and my son." However, he testified, a SNM member sent him the drug Suboxone in Tennessee, and Archuleta sent nearly $2,400 to the inmate's prison account as payment.

Elizabeth Martinez, of the U.S. Attorney's Office in New Mexico, told the Journal that closing arguments in the trial are set for Monday and Tuesday.

But neither she nor FBI spokesman Frank Fisher would respond to Journal questions about the case, citing Justice Department policy. Neither would say whether the SNM investigation is ongoing.

## Four murders

In the current trial, testimony has focused on four murders and a machete attack against a potential witness in the SNM case.

Six of the seven defendants now on trial were arrested in Albuquerque, Los Chavez near Belen, Silver City and Denver, Colo., federal court records show.

Some defense attorneys contend that their clients, if they had been affiliated with SNM, were released from prison years ago, and left the gang lifestyle behind. Others deny SNM membership.

████████████████████
████████████ court motion that his client "has lived a life relatively free from crime" and "neither of the crimes for which he was imprisoned ████████████████ ████████ volved prison gang █████████ ity."

The Gallegos brothers are charged in the shooting death of heroin dealer Adrian Burns, more than five years after a Socorro magistrate judge found a lack of probable cause and the charges were dropped.

The original charges were filed in November 2012 by State Police, but additional witnesses were located after the dismissal.

Gallegos' attorneys maintained in federal court records that state authorities back in 2012 had determined that ++++the Burns' murder wasn't gang related.

Joe Gallegos is also charged in the March 26, 2001, murder of Frank Castillo, along with four other defendants.

Castillo and fellow inmate Rolando Garza were strangled to death on the same day, at the same hour, in separate areas of the Southern New Mexico Correctional Facility outside Las Cruces. The deadly attacks were orchestrated by SNM leaders, prosecutors say.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                  No. CR 15-4268 JB

JOE LAWRENCE GALLEGOS
EDWARD TROUP, a.k.a. "Huero Troup;"
BILLY GARCIA, a.k.a. "Wild Bill;"
ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
ARTURO ARNULFO GARCIA, a.k.a. "Shotgun;"
ANDREW GALLEGOS, a.k.a. "Smiley;"
     · Defendants.

## **NOTE FROM THE JURY**

**YOUR HONOR:**

_____

_____

_____

_____

_____

_____

_____

_____

_____

DATED AT LAS CRUCES ON _____

TIME: _____

_____
SIGNATURE OF FOREPERSON



# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                    No. CR 15-4268 JB

ANGEL DELEON
JOE LAWRENCE GALLEGOS
EDWARD TROUP, a.k.a. "Huero Troup;"
LEONARD LUJAN
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little Guero;"
ALLEN PATTERSON;
 CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a. "Shotgun;"
BENJAMIN CLARK, a.k.a. "Cyclone;"
RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie," a.k.a. "Hog Nuts;"
DANIEL SANCHEZ, a.k.a. "Dan Dan;"
GERALD ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma;"
CONRAD VILLEGAS, a.k.a. "Chitmon;"
ANTHONY RAY BACA, a.k.a. "Pup;"
ROBERT MARTINEZ, a.k.a. "Baby Rob;"
ROY PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA;
CARLOS HERRERA, a.k.a. "Lazy;"
RUDY PEREZ, a.k.a. "Ru Dog;"
ANDREW GALLEGOS, a.k.a. "Smiley;"
SANTOS GONZALEZ;
PAUL RIVERA;
SHAUNA GUTIERREZ;
BRANDY RODRIGUEZ

     Defendants.

## COURT'S FIRST DRAFT OF TABLE TO BE INCLUDED IN THE IMPENDING MEMORANDUM OPINION AND ORDER REGARDING THE *JAMES* ISSUE
### (provided to the parties on April 4, 2018)

## FINDINGS OF FACT

The Federal Rules of Criminal Procedure require the Court to state "its essential findings on the record" when "factual issues are involved in deciding a motion. Fed. R. Crim. P. 12(d). Accordingly, the Court makes the following findings[9]:

1.      A conspiracy to kill Frank Castillo existed.  Leonard Lujan Plea Agreement ¶ 7, at 4-5, filed March 13, 2017 (Doc. 963)(<u>James</u> Hearing Exhibit 11)("Lujan Plea Agreement").

2.      The Castillo conspiracy included five indicted conspirators: (i) DeLeon, (ii) J. Gallegos; (iii) Troup; (iv) Lujan; and (v) B. Garcia.  <u>See</u> Lujan Plea Agreement ¶ 7, at 4-5.

3.      The Castillo conspiracy included eight unindicted conspirators: (i) Angel Munoz; (ii) Leroy Lucero; (iii) Michael Jaramillo; (iv) Federico Munoz; (v) Willy Amador; and (vi) Jessie Ibarra.  [cite].

4.      The Castillo conspiracy continued until Castillo's death on March 26, 2001.  <u>See</u> Lujan Plea Agreement ¶ 7, at 4-5.

---

[9]The United States made several assertions at the Court's <u>James</u> hearing which the Court's findings of fact do not reflect.  First, the United States asserted that a conspiracy to kill Adrian Burns existed and that the conspiracy included J. Gallegos, A. Gallegos, Charlene Baldizan, and Jesse Van Veghel.  <u>See</u> Afternoon Tr. at 15:12-19 (Court, Castellano); <u>id.</u> at 23:7-14 (Castellano).  The evidence that the United States introduced at the <u>James</u> hearing indicates, at most, that Baldizan and Van Veghel agreed to conceal Burns' murder after the fact.  <u>See</u> Mar. 13 Tr. at 34:25-36:1 (Castellano, Stemo)(describing Baldizan's alleged involvement in hiding the Gallegos brothers from law enforcement and "agreeing to getting rid of the van that the Gallegos brothers knew the police were looking for"); <u>id.</u> at 36:2-38:1 (Castellano, Stemo)(describing how Van Veghel allegedly assisted the Gallegos brothers by destroying evidence).  Thus, the <u>James</u> Hearing evidence indicates that Baldizan and Van Veghel might have joined a conspiracy to conceal the Burns murder, but it does not indicate that they joined a conspiracy to commit the Burns murder.  Second, there is no evidence indicating that J. Gallegos and A. Gallegos agreed to kill Burns as opposed to J. Gallegos killing Burns and then enlisting his brother afterwards to help conceal the murder.  Thus, the Court does not find that a conspiracy to murder Burns existed.  Third, the

- 25 -

5.     A conspiracy to kill Rolando Garza existed.   See Eugene Martinez Plea Agreement ¶ 9, at 3-4, filed May 5, 2017 (Doc. 1138)(James Hearing Exhibit 15)("E. Martinez Plea Agreement"); Lujan Plea Agreement ¶ 7, at 4-5.

6.     The Garza conspiracy included five indicted conspirators: (i) Lujan; (ii) B. Garcia; (iii) E. Martinez; (iv) Patterson; and (v) Chavez.   See E. Martinez Plea Agreement ¶ 9, at 3-4; Lujan Plea Agreement ¶ 7, at 4-5.

7.     The Garza conspiracy included eight unindicted conspirators: (i) Angel Munoz; (ii) Leroy Lucero;  (iii) Michael Jaramillo;  (iv) Federico Munoz;  (v) Willie Amador;  and (vi) Jessie Ibarra; (vii) Jimmy Gordon; and (viii) Geraldine Martinez. [cite].

8.     The Garza conspiracy continued until Garza's death on March 26, 201.   E. Martinez Plea Agreement ¶ 9, at 3-4; Lujan Plea Agreement ¶ 7, at 4-5.

9.     A conspiracy to kill Freddie Sanchez existed.   See Javier Alonso Plea Agreement ¶ 7, at 4-5, filed August 28, 2017 (Doc. 1237)(James Hearing Exhibit 14)("Alonso Plea Agreement"); Ruben Hernandez Plea Agreement ¶ 7, at 4, filed February 1, 2017 (Doc. 880)(James Hearing Exhibit 13)("Hernandez Plea Agreement"); Benjamin Clark Plea Agreement ¶ 7, at 4, filed November 15, 2016 (Doc. 768)(James Hearing Exhibit 12)("Clark Plea Agreement").

10.     The Sanchez conspiracy included five indicted conspirators: (i) Alonso; (ii) Troup; (iii) A. Garcia; (iv) Hernandez; and (v) Clark.   See Alonso Plea Agreement ¶ 7, at 4-5; Hernandez Plea Agreement ¶ 7, at 4; Clark Plea Agreement ¶ 7, at 4.

- 26 -

11.     The Sanchez conspiracy included six unindicted conspirators: (i) Javier Alonso;

(ii) FNU/LNU;[10] (iii) Kyle Dwyer; (iv) Jessie Trujillo; (v)Joe Martinez; and (vi) Ernest Guerrero.

[cite].[11]

12.     The Sanchez conspiracy continued until Sanchez' death on June 17, 2007.  See

Alonso Plea Agreement ¶ 7, at 4-5; Hernandez Plea Agreement ¶ 7, at 4; Clark Plea Agreement

¶ 7, at 4.

13.     A conspiracy to murder Jose Gomez and to prevent him from testifying existed.

See Santos Gonzalez Plea Agreement ¶ 10, at 4-5, filed June 5, 2017 (Doc. 1180)(James Hearing

Exhibit 18)("Gonzalez Plea Agreement"); Brandy Rodriguez Plea Agreement ¶ 13, at 5-6, filed

February 23, 2018 (Doc. 1830)(James Hearing Exhibit 17)("B. Rodriguez Plea Agreement");

Paul Rivera Plea Agreement ¶ 8, at 4-5, filed February 1, 2017 (Doc. 877)(James Hearing

Exhibit 16)("Rivera Plea Agreement").

---

[10]FNU/LNU stands for First Name Unknown/Last Name Unknown. [cite].

[11]The United States identified Brian Rascone and Raymond Rascon as Sanchez conspiracy members, but at the testimony at the Court's James hearing indicates that the Rascon brothers refused to kill Sanchez.  See Mar. 13 Tr. at 24:3-11 (Stemo).

> The Rascon brothers were tasked to do the hit [on Sanchez] originally but when Javier Alonso approached them Raymond Rascon said they didn't want to do it because they were short to the door, meaning they were going to get out of prison shortly therefore Javier Alonso instructed Edward Troup and they both went into the cell and took care of business.  When they were doing that, the Rascon brothers came to offer their aid as a way to save face with the gang.

Mar. 13 Tr. at 24:3-11 (Stemo).  That the Rascon brothers refused to kill Sanchez indicates that they did not agree to kill Sanchez, i.e., that they were not members of the Sanchez conspiracy.  That they subsequently offered their assistance in cleaning up the murder scene indicates, at most, that the Rascon brothers joined a conspiracy to conceal the Sanchez murder and not a conspiracy to commit the Sanchez murder.  Consequently, the Court concludes that the Rascon brothers were not members of the Sanchez conspiracy.

- 27 -

14.     The Gomez conspiracy included five people: (i) Paul Rivera; (ii) J. Gallegos; (iii) Santos Gonzales; (iv) Shauna Gutierrez; and (v) Brandy Rodriguez.   See Gonzalez Plea Agreement ¶ 10, at 4-5; B. Rodriguez Plea Agreement ¶ 13, at 4-5; Rivera Plea Agreement ¶ 8, at 4-5.

15.     The Gomez murder conspiracy began on or about February 1, 2016 and continued until on or about February 27, 2016.  Gonzalez Plea Agreement ¶ 10, at 4-5.  B. Rodriguez Plea Agreement ¶ 13, at 4-5; Rivera Plea Agreement ¶ 8, at 4-5.

- 28 -

III.    **THE COURT MAKES PARTICULARIZED JUDGMENTS REGARDING THE JAMES PROFFER STATEMENTS' ADMISSIBILITY UNDER THE FEDERAL RULES OF EVIDENCE.**

The Court is able to make general determinations regarding the existence of conspiracies and their membership.  See FOFs.  The Court is also able to make general determinations regarding whether the James Proffer statements are testimonial.  See supra § 1.  A statement-by-statement approach is necessary, however, when determining whether statements were made during and in furtherance of a conspiracy.  See Fed. R. Evid 801(d)(2)(E).[17]

| **James Proffer Statement** | **Ruling** |
|---|---|
| Statement 1: "Billy Garcia tasked Leonard Lujan with finding an inmate to carry out the murders of Garza and Castillo.  The murders were to be executed simultaneously."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001 | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).  See Mar. 13 Tr. at 9:13-10:8 (Castellano, Stemo).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 4, at 2; Patterson Response ¶ 5, at 2.  The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |

---

[17]While the Court must make individualized determinations regarding whether -- and against whom -- individual statements are admissible under rule 801(d)(2)(E), the Court can make general determinations regarding the Defendants requests for "a continuing objection."  B. Garcia Response ¶ 21, at 9; A. Gallegos Response ¶ 7, at 3; Troup Response ¶ 23, at 6; Patterson Response ¶ 31, at 12.  The Court will not grant that request for two reasons.  First, the parties will need to make oral objections and not rely on continuing objections to apply the Court's evidentiary analysis to witness testimony.  Second, the Court's pretrial determinations are somewhat tentative, because evidence introduced at trial or variances between witness testimony and the James Proffer may alter those determinations.  Oral objections will bring those issues to the Court's attention.  Consequently, the Court will require the Defendants to make oral objections to evidence that they believe is inadmissible, and if the Court overrules those objections, the Defendants will need to determine whether they wish the Court to provide a limiting instruction.  See Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose -- but not against another party or for another purpose -- the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly.").

- 69 -

| | |
|---|---|
| Objections: Chavez Response, Patterson Response | |
| Statement 2: "Billy Garcia wanted Castillo and Garza 'to be taken out' by strangulation." <br><br> Declarant: Billy Garcia <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).  <u>See</u> Mar. 13 Tr. at 10:9-13 (Castellano, Stemo).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, <u>see</u> FOF, so the Court denies their objections, <u>see</u> Chavez Response ¶ 5, at 2; Patterson Response ¶ 6, at 2-3.  The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 3: "The Castillo and Garza murders were an order.  Anyone who did not follow that order was to be killed as well." <br><br> Declarant: Billy Garcia <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).  <u>See</u> Mar. 13 Tr. at 10:14-11:2 (Castellano, Stemo).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, <u>see</u> FOF, so the Court denies their objections, <u>see</u> Chavez Response ¶ 6, at 2; Patterson Response ¶ 7, at 3.  The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 4: "Billy Garcia was planning to kill everyone in the unit with a green light but was starting with Castillo and Garza." <br><br> Declarant: Billy Garcia <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his plan, so it is admissible for its truth as against all the Defendants under rule 803(3).  <u>See</u> Mar. 13 Tr. at 11:3-10 (Castellano, Stemo).  The Court accordingly denies Chavez' and Patterson's objections.  <u>See</u> Chavez Response ¶ 7, at 2; Patterson Response ¶ 8, at 3-4. |
| Statement 5: "These murders needed to be done because the SNM gang was losing status with | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth as against all the Defendants under rule 803(3). |

- 70 -

| | |
|---|---|
| other gangs." <br><br> Declarant: Billy Garcia <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | See Mar. 13 Tr. at 11:11-22 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's objections. See Chavez Response ¶ 8, at 3; Patterson Response ¶ 9, at 4. |
| Statement 6: "Leonard Lujan tells Eugene Martinez 'I'm telling you right now where it's coming from and everything,' referring to Billy Garcia." <br><br> Declarant: Leonard Lujan (first-level) and Billy Garcia (second-level). <br><br> Source: Leonard Lujan, Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). See Mar. 13 Tr. at 11:23-12:7 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 4, at 2; Patterson Response ¶ 10, at 4. The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 7: "Billy Garcia ordered the murder of Castillo due to him cooperating with law enforcement." <br><br> Declarant: Billy Garcia. <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth as against all the Defendants under rule 803(3). See Mar. 13 Tr. at 12:8-16 (Castellano, Stemo). The Court accordingly denies Patterson's objection. See Patterson Response ¶ 11, at 4-5. |
| Statement 8: "Billy Garcia ordered Garza to be killed for being a former Los Carnales member." | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth as against all the Defendants under rule 803(3). See Mar. 13 Tr. at 12:17-25 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's |

- 71 -

| Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | objections. See Chavez Response ¶ 10, at 3-4; Patterson Response ¶ 12, at 5. |
|---|---|
| Statement 9: "'What the fuck is going on? I sent word a long time ago to clean house.' Billy Garcia was upset Leonard Lujan had not taken charge in the facility."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement could be offered for a non-hearsay purpose, i.e., as circumstantial evidence of B. Garcia's state of mind.<br><br>This statement is also admissible for its truth against the Counts 1 and 2 Defendants under rule 801(d)(2)(E), because B. Garcia's recrimination regarding Lujan's failure to act appear calculated to spur Lujan to take further action towards the Castillo and Garza murders. See Mar. 13 Tr. at 13:1-24 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 11, at 4; Patterson Response ¶ 13, at 5-6. If the statement is offered for its truth, the Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 10: "Leroy Lucero received word from Billy Garcia that several hits were supposed to happen. Garcia told him he didn't need help since Lucero was getting out."<br><br>Declarant: Billy Garcia<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | Part of this statement is a statement of B. Garcia's then-existing state of mind, specifically his plans, so that portion of the statement is admissible as against all of the Defendants under rule 803(3). The remainder of the statement, B. Garcia's direction to Lucero, is a statement in furtherance of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E), because B. Garcia, in declining Lucero's help, is arranging the details of the Castillo and Garza murders. See Mar. 13 Tr. at 15:15-22 (Castellano, Stemo). Accordingly, the statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 12, at 4; Patterson Response ¶ 14, at 6. To the extent that the statement is admissible against the Counts 1 and 2 Defendants under rule 801(d)(2)(E), the Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 11: "Leroy Lucero | This statement is admissible for its truth against the |

- 72 -

| | |
|---|---|
| confirmed the message that several hits were supposed to happen with Angel Munoz.     Munoz said 'Something has to happen Carnal Billy's on his way.'"<br><br>Declarant: Angel Munoz<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | members of the Counts 1 and 2 conspiracies, under rule 801(d)(2)(E).  See Mar. 13 Tr. at 16:12-17:4 (Castellano, Stemo).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 13, at 4-5; Patterson Response ¶ 15, at 6.  The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 12: "Leonard Lujan met with Eugene Martinez and tasked him with the murder of Garza by strangulation and told Martinez to pick people to help."<br><br>Declarant: Leonard Lujan<br><br>Source: Leonard Lujan, Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the Count 2 conspirators under rule 801(d)(2)(E).  See Tr. at 17:4-16 (Castellano, Stemo).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 14, at 5; Patterson Response ¶ 16, at 6-7.  The Court will give a limiting instruction as to A. Garcia, A. Gallegos, J. Gallegos, and Troup. |
| Statement 13: "Leonard Lujan met with Joe Gallegos, Angel DeLeon, and 'Criminal'[18] and ordered Castillo murdered by strangulation."<br><br>Declarant: Leonard Lujan<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: J. Gallegos Response, | The James Proffer lists Leonard Lujan as both this statement's declarant and its source.  See James Proffer at 8.  Agent Stemo's testimony indicates that she is aware of this out-of-court Lujan statement via another out-of-court statement, which Lujan made circa 2007.  See Mar. 13 Tr. at 65:7-16 (Benjamin, Stemo).  The 2007 statement was made long after the Count 1 conspiracy ended with Castillo's death, so it is not admissible under rule 801(d)(2)(E).  The earlier statement, however, was made during and in furtherance of the Count 1 conspiracy during and in furtherance of the Count 1 conspiracy by a member of that conspiracy.  See Mar. 13 Tr. at 17:17-24, 18:20- |

---

[18]"Criminal" refers to Michael Jaramillo.  See Mar. 13 Tr. at 130:24-131:1 (Castellano, Stemo).

- 73 -

| | |
|---|---|
| Patterson Response | 19:1 (Castellano, Stemo).  Patterson is not a member of the Count 1 conspiracy, see FOF, so the Court grants Patterson's objection insofar as it requests a limiting instruction, see Patterson Response ¶ 17, at 7. |
| | J. Gallegos requests the opportunity to voir dire Lujan, because "he is referred to in an audio recording by Leroy Lucero as 'crazy Leonard, no one would believe Leonard.'"  J. Gallegos Response ¶ 1, at 3.  The Court denies that request, because voir dire is not an appropriate mechanism for testing Lujan's credibility. |
| | J. Gallegos argues that this statement is an action -- giving an order -- and not a statement.  See J. Gallegos Response ¶ 1, at 3; Mar. 13 Tr. at 64: 11-13 (Benjamin).  Under the Federal Rules of Evidence, a statement must be an assertion.  See Fed. R. Evid. 801(a)("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.").  J. Gallegos is correct insofar as orders and commands -- e.g., "fetch me a shrubbery" -- like questions -- e.g., "what do you want to eat for lunch?" -- are not assertions, because they are neither true nor false.  Consequently, orders and questions cannot be hearsay both because hearsay must be a statement, see Fed. R. Evid. 801(c)("'Hearsay' means a statement . . . ."), and because an utterance that is neither true nor false cannot be offered "to prove the truth of the matter asserted," Fed. R. Evid. 801(c)(2). |
| | While orders and commands are not, themselves, assertions they may -- like questions -- contain implicit assertions.  See United States v. Summers, 414 F.3d 1287, 1298 (10th Cir. 2005)(Kelly, J.)(concluding that a defendant's question -- "'How did you guys find us so fast?'" -- was an implicit assertion of "both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so quickly").[19]  As an example, |

---

[19]At least according to Aristotle, contingent predictions are another example of utterances that are neither true nor false:

> In the case of that which is or which has taken place, propositions, whether positive or negative, must be true or false.  Again, in the case of a pair of contradictories, either when the subject is universal and the propositions are of a universal character, or when it is individual, as has been said,[] one of the two must be true and the other false . . . .

- 74 -

| | ordering someone to "give me one pound of your best marijuana" implicitly asserts that the person to whom the order is addressed possess a controlled substance. Likewise, asking someone whether they stopped beating their wife is implicitly an assertion both that the person questioned is married and an assertion that, at one point, they abused their wife.  Thus, the orders that the James Proffer identifies can qualify as hearsay if those orders contain implicit assertions. |
| | Listing orders in the James Proffer is useful, even if those orders do not contain implicit assertions, because people often make orders in quick succession, and -- if they are not lawyers -- they do not always scrupulously distinguish between the two.   Statement 13 indicates that Lujan ordered others to kill Castillo, but Lujan may unexpectedly |

---

When the subject, however, is individual, and that which is predicated of it relates to the future, the case is altered.  For if all propositions whether positive or negative are either true or false, then any given predicate must either belong to the subject or not, so that if one man affirms that an event of a given character will take place and another denies it, it is plain that the statement of the one will correspond with reality and that of the other will not. For the predicate cannot both belong and not belong to the subject at one and the same time with regard to the future.

    . . . .

[T]o say that neither the affirmation nor the denial is true, maintaining, let us say, that an event neither will take place nor will not take place, is to take up a position impossible to defend.  In the first place, though facts should prove the one proposition false, the opposite would still be untrue.  Secondly, if it was true to say that a thing was both white and large, both these qualities must necessarily belong to it; and if they will belong to it the next day, they must necessarily belong to it the next day.  But if an event is neither to take place nor not to take place the next day, the element of chance will be eliminated.  For example, it would be necessary that a sea-fight should neither take place nor fail to take place on the next day.

    . . . .

A sea-fight must either take place to-morrow or not, but it is not necessary that it should take place to-morrow, neither is it necessary that it should not take place, yet it is necessary that it either should or should not take place to-morrow.  Since propositions correspond with facts, it is evident that when in future events there is a real alternative, and a potentiality in contrary directions, the corresponding affirmation and denial have the same character.

Aristotle, On Interpretation § I, Pt. 9, available at http://classics.mit.edu/Aristotle/interpretation. html.

- 75 -

| | testify that he told those people that he wanted them to kill Castillo, which is a statement regarding Lujan's desires and not, technically, an order.  Alternatively, Lujan may testify both that he gave the order that Statement 13 describes and he may indicate that he also made statements regarding the reasons for that order or other associated statements. |
|---|---|
| | That the United States lists orders in the James Proffer is prudent, because it permits the Defendants and the Court to consider and argue, respectively, whether those orders contain implicit assertions.  It also permits the Court to make findings that will permit it to quickly rule on unexpected statements closely associated with those orders, e.g., if an order was made during a conspiracy by a conspirator then statements made by the same person at much the same time were also made during a conspiracy by a conspirator.[20]  Further, if the United States did not list orders in the James Proffer, the Defendants could complain at trial -- perhaps legitimately -- regarding unfair surprise.  Accordingly, the Court denies J. Gallegos' objection that "this is not a statement."  J. Gallegos Response ¶ 1, at 3. |
| Statement 14: "Billy Garcia wanted knowledge of the plan kept to very few individuals."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections:  Chavez  Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, so it is admissible for its truth against all the Defendants under rule 803(3).  See Mar. 13 Tr. at 19:2-9 (Castellano, Stemo).  The Court accordingly denies Chavez' and Patterson's objections.  See Chavez Response ¶ 15, at 5; Patterson Response ¶ 18, at 7-8. |
| Statement 15: "Once alarms were sounded and the murders discovered,  Billy  Garcia congratulated Leonard Lujan with 'Amor.'"<br><br>Declarant: Billy Garcia | This statement was made after Castillo and Garza died, so it was not made during the Counts 1 and 2 conspiracies.  Accordingly, it is not admissible under rule 801(d)(2)(E).<br><br>The  United  States  could  offer  this  statement  as circumstantial  evidence  of  B. Garcia's  state  of  mind, however.  Consequently, the Court grants Chavez' and Patterson's objections to admitting this statement for its |

---

[20]Whether a statement was made in furtherance of a conspiracy, however, will depend on the content and content of the statement.

| | |
|---|---|
| Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections:    Chavez    Response, Patterson Response | truth under rule 801(d)(2)(E), <u>see</u> Chavez Response ¶ 15, at 16; Patterson Response ¶ 19, at 8, but the Court may admit this statement for a non-hearsay purpose. |
| Statement 16: "Frederico Munoz part of the committee that sanctioned the hit on Garza and Castillo.   Munoz wanted Garza killed for being Los Carnales."<br><br>Declarant: Billy Garcia<br><br>Source: Federico Munoz<br><br>Date: On or before March 26, 2001<br><br>Objections:    Chavez    Response, Patterson Response | The testimony at the Court's <u>James</u> hearing indicates that Federico Munoz admitted to the information contained in this statement.  <u>See</u> Mar. 13 Tr. at 19:25-20:7 (Castellano, Stemo).   Federico Munoz testifying and repeating that admission raises no hearsay issues, because Munoz has personal knowledge regarding his own motives and regarding whether he was part of a group that ordered the Castillo and Garza murders.  <u>See</u> Fed. R. Evid. 602. |
| Statement 17: "Arturo Garcia placed hit on Sanchez because he was suspected to be cooperating with law enforcement."<br><br>Declarant: Arturo Garcia<br><br>Source: Eric Duran<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This is a statement of A. Garcia's then-existing state of mind, so it is admissible for its truth against all the Defendants under rule 803(3).  <u>See</u> Mar. 13 Tr. at 20:16-21:1 (Castellano, Stemo). |
| Statement 18: "Ben Clark passed around paperwork on Sanchez's cooperation with police.   Stating 'everyone who needs to see it has seen it, get rid of it.'"<br><br>Declarant: Ben Clark<br><br>Source: Ruben Hernandez<br><br>Date: On or before June 17, 2007 | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  <u>See</u> Mar. 13 Tr. at 21:2-13 (Castellano, Stemo).  The act of passing around paperwork and any associated statements -- <u>see</u> <u>supra</u> Statement 13 (analyzing the relationship between acts and statements) -- furthered the Sanchez conspiracy, because the paperwork indicated that the Sanchez murder was a legitimate SNM hit, which induced further action on the part of conspirators.  Destroying the paperwork afterward furthered the conspiracy by preventing law enforcement from learning of -- and potentially preventing -- the |

| | |
|---|---|
| Objections: None | planned Sanchez murder. |
| Statement 19: "Arturo Garcia wrote to Frankie Gonzales that Brian and Raymond Rascon were to take care of the next murder for SNM."<br><br>Declarant: Arturo Garcia<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 21:14-22:1 (Castellano, Stemo). |
| Statement 20: "Ben Clark put Javier Alonso in charge of making sure Sanchez was killed and told the Rascon brothers to complete the hit."<br><br>Declarant: Ben Clark<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 22:2-10 (Castellano, Stemo). |
| Statement 21: "Word was sent from the green pod that if Sanchez was not killed, others in the Blue pod would be killed."<br><br>Declarant: FNU [First Name Unknown] LNU [Last Name Unknown]<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 22:11-23:1 (Castellano, Stemo). |
| Statement 22: "Edward Troup was told to go help with Sanchez's | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 23:15-21 |

- 78 -

| | |
|---|---|
| murder."<br><br>Declarant: Javier Alonso<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | (Castellano, Stemo). |
| Statement 23: "While Edward Troup and Javier Alonso were finishing killing Sanchez, Brian and Raymond Rascon came and asked if they could help."<br><br>Declarant: Brian Rascon and/or Raymond Rascon<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | This statement is actually an action -- specifically an offer -- and not an assertion, so it cannot be hearsay.  See Tr. 23:22-24:14 (Stemo).<br><br>    The Rascon brothers were tasked to do the hit originally but when Javier Alonso approached them    Raymond Rascon said they didn't want to do it because they were short to the door, meaning they were going to get out of prison shortly therefore Javier Alonso show instructed Edward Troup and they both went into the cell and took care of business.  When they were doing that, the Rascon brothers came to offer their aid as a way to save face with the gang.<br><br>Tr. at 24:3-11 (Stemo). See supra Statement 13 (discussing the relationship between actions and statements).  That the Rascon brothers offered their aid after Sanchez' death indicates that the conspiracy to kill Sanchez no longer existed, so any associated statements are not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E).  See United States v. Alcorta, 853 F.3d 1123, 1139 (10th Cir. 2017)("To be sure, to qualify for the coconspirator exception a statement must have been made during the conspiracy.   Statements made after the objectives of the conspiracy have either failed or been achieved are not made during the conspiracy and must be excluded.").  Further, that the Rascon brothers refused to kill Sanchez when Alonso approached them indicate that they did not join the Sanchez conspiracy.  See Tr. at 24:3-11(Stemo).<br><br>Troup argues that this statement lacks a sufficient foundation, because the James Proffer identifies the declarant as "'Brian Rascon and/or Raymond Rascon.'" Troup Response ¶ 4, at 2 (quoting James Proffer at 13). |

- 79 -

| | |
|---|---|
| | This statement's admissibility does not depend on whether the person who offered assistance is Brian Rascon, Raymond Rascon, or both.  See United States v. Brinson, 772 F.3d 1314, 1321-22 (10th Cir. 2014)(concluding that an unidentified declarant's statements were admissible, because they were not offered to prove the truth of the matter asserted).  Accordingly, the Court denies Troup's objection.  See Troup Response ¶ 4, at 2. |
| Statement 24: "Javier Alonso told the Rascon brothers to keep a look out when the brothers asked if they could help."<br><br>Declarant: Javier Alonso<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is actually an action -- giving the Rascon brothers an order -- so it is not hearsay.  See Tr. at 24:15-21 (Stemo, Castellano).   See also supra Statement 13 (discussing the relationship between actions and statements).  That Alonso gave this order after Sanchez' death indicates that any associated statements were not made during the Sanchez conspiracy, so those statements are not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E).  See United States v. Alcorta, 853 F.3d at 1139. |
| Statement 25:  "Edward Troup kissed Javier Alonso on the cheek and told him he was proud of him."<br><br>Declarant: Edward Troup<br><br>Source: Javier Alonso<br><br>Objections: None | This is a statement of Troup's then-existing state of mind, so it is admissible against all Defendants under rule 803(3).  See Tr. at 24:22-25:5 (Castellano, Stemo). |
| Statement 26: "After Sanchez was murdered, Edward Troup began telling Ruben Hernandez that he was next."<br><br>Declarant: Edward Troup<br><br>Source: Javier Alonso;  Ruben Hernandez<br><br>Date: On or before June 17, 2007<br><br>Objections: None | Agent Stemo's testimony indicates that this statement stands in for several closely associated statements:<br><br>    Q.    Following the murder in statement number, was an indication that Edward Troup began telling Ruben Hernandez that he was next?<br><br>    A.    Yes.<br><br>    Q.    And what was the indication about Ruben Hernandez at or around the time -- at or around the time of the murder?<br><br>    A.    I believe Mr. Hernandez did not |

- 80 -

| | |
|---|---|
| | cover the cameras properly.<br><br>Q.   At that point, according to statements by Javier Alonso and others was Ruben Hernandez seen as possibly scared and weak?<br><br>A.   Yes, he was actually on crutches at the time.<br><br>Q.   Related to the statement is there another statement related to Edward Troup stating in part that Ruben Hernandez failed to cover the camera because he was scared?<br><br>A.   Yes.<br><br>Tr. at 25:6-24 (Stemo, Castellano).<br><br>To the extent that this is a statement of Troup's plans or a statement regarding how other inmates viewed Hernandez, it is a statement of then-existing state of mind, so it is admissible for its truth under rule 803(3).   To the extent that these statements are offered as circumstantial evidence of Troup's state of mind, they are not offered to prove the truth of the matter asserted, so they are not hearsay. |
| Statement 27: "Arturo Garcia sent word about Sanchez to Ben Clark."<br><br>Declarant: Arturo Garcia<br><br>Source: Ben Clark, Eric Duran<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).   See Tr. at 25:25-26:9 (Castellano, Stemo). |
| Statement 28: "Ben Clark and Arturo Garcia sent several letters about Sanchez to each other."<br><br>Declarant: Arturo Garcia<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007 | Sending letters is an action and not a statement, but the statements in those letters regarding the Sanchez murder are admissible against the Count 3 conspirators under rule 801(d)(2)(E).   See Tr. at 26:10-18 (Castellano, Stemo).. |

DNM 1427

| | |
|---|---|
| Objections: None | |
| Statement 29: "Javier Alonso and Edward Troup were expected to oversee the murder, and Troup told the Rascon brothers to hit Sanchez."<br><br>Declarant: Ben Clark<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | Troup argues that the portion of this statement referring to Benjamin Clark's expectations circa 2007 is not a statement at all. See Troup Response ¶ 5, at 2. Troup is correct -- expectations are not statements. Clark can, however, testify about what his expectations were at that time. If, however, this statement refers to expectations that belong to someone other than Clark, the United States would need to establish how Clark knows about those expectations. If that foundation is statements of someone's then-existing state of mind, then those statements are admissible under rule 803(3). If that foundation is statements that are circumstantial evidence of the declarant's state of mind then those statements are not offered to prove the truth of the matter asserted, so they are not hearsay. In any event, the Court denies Troup's objection. See Troup Response ¶ 5, at 2.<br><br>That Troup told the Rascon brothers to hit Sanchez is an order and not a statement, see supra Statement 13 (discussing the relationship between actions and statements), but any associated statement that Troup made are admissible against the Count 3 conspirators under rule 801(d)(2)(E), see Tr. at 26:19-27:1 (Castellano, Stemo). That the Rascon brothers refused to murder Sanchez indicates that they did not join the Count 3 conspiracy. See Tr. at 24:3-11 (Stemo). A rule 801(d)(2)(E) statement, however, needs to be made by a conspirator, but it does not need to be made to a conspirator. See Fed. R. Evid. 801(d)(2)(E). Consequently, that the Rascon brothers did not join the Count 3 conspiracy does not affect whether Troup's statements are admissible under rule 801(d)(2)(E). |
| Statement 30: "Leonard Lujan told Willie Amador and Jesse Ibarra to 'handle that' and told Eugene Martinez that 'I'm running this prison now.'"<br><br>Declarant: Leonard Lujan<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, | Stemo's testimony indicates that "statement number 30 is incorrect" and that "[w]hat it actually says is, Lujan told Martinez to tell SNM members, Willie Amador and Jesse Martinez to handle that." See Tr. at 173:25-174:3 (Stemo). Lujan's order to E. Martinez is an action and not an assertion, see supra Statement 13 (discussing the relationship between actions and statements), but any associated statements would be admissible for their truth against the Count 2 Defendants under rule 801(d)(2)(E). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez |

- 82 -

| Patterson Response | Response ¶ 18, at 6; Patterson Response ¶ 21, at 8-9.  The Court will give a limiting instruction as to |
|---|---|
| Statement 31: "Christopher Chavez heard about the hit on Garza and volunteered to participate in the operation."<br><br>Declarant: Chris Chavez<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Patterson Response | That Chavez volunteered is an action and not a statement. See supra Statement 13 (discussing the relationship between actions and statements).<br><br>This statement is not hearsay, because Chavez' act, volunteering to participate in the Garza murder, is neither true nor false.  The Court anticipates that there are other statements associated with Chavez' act which could be offered for their truth.  For example, it would have been natural for Chavez to state that he wanted to participate in the Garza murder, which would be a statement of then-existing state of mind under rule 803(3).  Any statements made by Count 3 conspirators attempting to induce Chavez to volunteer would have been made during and in furtherance of the Count 3 conspiracy, so they would be admissible for their truth under rule 801(d)(2)(E) as to the Count 3 conspirators. |
| Statement 32: "Willie Amador told Eugene Martinez to be lookout during the Garza murder and stated, 'If something happens, you already know.'"<br><br>Declarant: Willie Amador<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections:   Chavez   Response, Patterson Response | This statement was made during and in furtherance of the Count 2 conspiracy and it was made by Willie Amador, a member of that conspiracy.   It is not testimonial. Accordingly, the statement is admissible for its truth against the Count 2 conspirators under rule 801(d)(2)(E). |
| Statement 33: While strangling Garza someone in the room yelled 'Close the door!'"<br><br>Declarant:   Allen   Patterson   or Christopher Chavez<br><br>Source: Eugene Martinez | B. Garcia argues that, because the James Proffer lists this statement's declarant as "Allen Patterson or Christopher Chavez," James Proffer at 18, "[t]here is no ability to properly attribute or authenticate the statement to any particular declarant." B. Garcia ¶ 5, at 2-3.<br><br>This statement -- "Close the door!" -- is a command, so it is neither true nor false.   See supra Statement 13 (analyzing the relationship of actions and statements). |

- 83 -

| Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response | Associated statements are probably admissible against the Count 2 conspirators under rule 801(d)(2)(E).<br><br>As to authentication, rule 901 states that "the proponent [of an item of evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 609(a). Accordingly, so long as the United States claims only that this statement was made by either Patterson or Chavez, it only needs, under rule 609, to introduce evidence sufficient to support a finding that one of those two individuals made the statement. See Fed. R. Evid. 609(a). The testimony of the witness who relates this statement to the jury -- assuming that the witness has knowledge -- satisfies that requirement. See Fed. R. Evid. 609(b)(1)(stating that the testimony of a witness with knowledge satisfies rule 609's authentication requirement). Accordingly, the Court denies B. Garcia's objection. B. Garcia ¶ 5, at 2-3. |
| Statement 34: "Leonard Lujan approached Eugene Martinez and told him to talk to Willie Amador about the murders."<br><br>Declarant: Leonard Lujan<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objection: Chavez Response, Patterson Response | This statement is admissible against the Counts 2 Defendants under rule 801(d)(2)(E). See Mar. 13 Tr. at 30:20-31:1 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's objections. See Chavez Response ¶ 20, at 6-7; Patterson Response ¶ 24, at 10. |
| Statement 35: "Eugene Martinez asked Billy Garcia and Garcia confirmed the order and said 'it's coming from me' and 'make sure it happens.'"<br><br>Declarant: Billy Garcia<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, | This statement is admissible against the Counts 2 Defendants under rule 801(d)(2)(E). See Mar. 13 Tr. at 31:2-12 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's objections. See Chavez Response ¶ 21, at 7; Patterson Response ¶ 25, at 10. |

- 84 -

| Patterson Response | |
|---|---|
| Statement 36: "Joe Gallegos later informed Leroy Lucero that Lawrence Torres saw and was concerned Torres might snitch." <br><br> Declarant: Joe Gallegos <br><br> Source: Leroy Lucero <br><br> Date: On or before March 26, 2001 <br><br> Objections: B. Garcia Response, Chavez Response, A. Gallegos Response, J. Gallegos Response, Patterson Response | The United States orally conceded that this statement is not admissible under rule 801(d)(2)(E) of the Federal Rules of Evidence, because it was made four or five years after the Castillo and Sanchez murders. <u>See</u> Mar. 13 Tr. at 32:5-13 (Castellano)   The United States suggested, however, that the statement is admissible against Troup under rule 801(d)(2)(A).  The statement also appears to be a statement of then-existing state of mind under rule 803(3) to the extent that it expresses J. Gallegos' concerns and as circumstantial evidence of J. Gallegos' state of mind, <u>i.e.</u> consciousness of guilt. .  It is not admissible under rule 803(3), however, to show that Lawrence Torres saw anything, because rule 803(3) doesn't permit a statement of belief to be used to show the fact believed.  <u>See</u> Fed. R. Evid. 803(3). <br><br> The Court accordingly denies Patterson's objection.  <u>See</u> Patterson Response ¶ 26, at 10-11. <br><br> That this statement is nontestimonial means that its admission does not offend the Confrontation Clause, so the Court denies J. Gallegos' objection "on confrontation grounds." J. Gallegos Response ¶ 2, at 4. |
| Statement 37: "Edward Troup told Lawrence Torres, 'This has nothing to do with you.  Don't come up here.'" <br><br> Declarant: Edward Troup <br><br> Source: Lawrence Torres <br><br> Date: On or before March 26, 2001 <br><br> Objections: B. Garcia Response, Chavez Response, Patterson Response | The United States provided additional context for this statement at the Court's <u>James</u> hearing: <br><br> > On the morning of the murder, March 26, 2001, Lawrence Torres woke up. As he walked out to heat up water for his coffee, he saw Angel DeLeon and Edward Troup, and it looked like to him that they were disassembling a laundry bag.  He put his water into the microwave, went back to his cell.  He heard  a struggle, so he looked out to see what was happening, and he saw Mr. Edward Troup sitting at a table.  Mr. Torres tried go upstairs to see what was happening, and that's when Mr. Troup made that statement. <br><br> Mar. 13 Tr. at 33:20-33:5 (Stemo).   This statement is admissible against the Count 1 Defendants under rule 801(d)(2)(E), because Troup was a member of that conspiracy and he made the statement to prevent outside |

- 85 -

| | |
|---|---|
| | interference with the Castillo murder.   The Court accordingly denies B. Garcia's, Chavez', and Patterson's objections.   <u>See</u> B. Garcia Response ¶ 7, at 3; Chavez Response ¶ 23, at 7-8; Patterson Response ¶ 27, at 11. |
| Statement 38: "Angel Deleon had a scratch on his finger and told a female CO that he cut himself."<br><br>Declarant: Angel Deleon<br><br>Source: Lawrence Torres<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Chavez Response | The <u>James</u> hearing testimony indicates that Deleon made this statement after the Castillo murder, so it was not made during the conspiracy to commit that murder.   <u>See</u> Mar. 13 Tr. at 33:9-21(Castellano, Stemo).   Consequently, it is not admissible for its truth under rule 801(d)(2)(E).    The statement is admissible, however, as circumstantial evidence of DeLeon's state of mind, specifically his consciousness of guilt.<br><br>The Court accordingly denies Chavez' objections.   <u>See</u> Chavez Response ¶ 24, at 8.<br><br>Offering a hearsay statement for a purpose other than its truth does not implicate the Confrontation Clause, <u>see</u> <u>Tennessee v. Street</u>, 471 U.S. 409, 417 (1985), so the Court denies B. Garcia's objection that "this is a testimonial statement made to a CO during the process of an investigation and therefore is inadmissible," B. Garcia Response ¶ 8, at 4. |
| Statement 39: "Kyle Dwyer came to SNMCF with 'paperwork' on Sanchez."<br><br>Declarant: Kyle Dwyer<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: None | That Dwyer brought the Sanchez paperwork to SNMCF is an action and not a statement.   <u>See</u> <u>supra</u> Statement 13 (analyzing the relationship between actions and statements). |
| Statement 40: "The 'paperwork' came from the Crazy Town Roswell gang."<br><br>Declarant: Ben Clark<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: None | Clark likely does not have personal knowledge regarding the paperwork's origins; he probably knows that the paperwork came from the Crazy Town Roswell gang because somebody told him about the paperwork's origins.   <u>See</u> Fed. R. Evid. 602.   The Court has no information regarding that out-of-court statement to Clark, so it cannot analyze whether that statement is admissible for its truth. |

- 86 -

| | |
|---|---|
| Statement 41: "Joe and Andrew Gallegos just pulled 'a job' and had to go 'clean up.' They were giving money and heroin to friends to 'help them out.' Joe Gallegos said, 'I just came up.'"<br><br>Declarant: Joe and/or Andrew Gallegos<br><br>Source: Leroy Vallejos, Michael Sutton<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | This statement is not admissible under rule 801(d)(2)(E), because the Court has not concluded that a conspiracy to murder Adrian Burns existed.<br><br>The James Proffer is not entirely clear regarding which statements A. Gallegos made and which statements J. Gallegos made. Rule 801(d)(2)(A) permits the statement to be admitted against whichever Gallegos brother made the statement. If one Gallegos brother made a statement, it may be admissible against the other under rule 801(d)(2)(B), which permits a statement to be introduced against a party that "manifested that it adopted or believed [the statement] to be true." Fed. R. Evid 801(d)(2)(B). See id. advisory committee notes ("Adoption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue."). Additionally, the statement might be admissible as an excited utterance. See Fed. R. Evid. 803(2).<br><br>A. Gallegos objects to this statement, because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3. At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point. It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge. See Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 602.02[2]("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible.").<br><br>J. Gallegos objects to this statement and Statement 42, because admitting them "is probably in-violation [sic] of the holding in *Bruton v. United States*, 391 U.S. 123 (1968). That this statement is nontestimonial indicates that admitting it for its truth does not offend the Confrontation |

- 87 -

| | |
|---|---|
| | Clause.  Further, if rule 801(d)(2)(A) and rule 801(d)(2)(B) both apply, the statement is admissible against both Gallegos brothers.  The Court accordingly denies J. Gallegos' objection.  <u>See</u> J. Gallegos Response ¶ 3, at 4. |
| Statement 42: "Joe and Andrew Gallegos were covered in blood and advised they were 'cleaning the house.' Joe Gallegos later went by Leroy Vallejos' house and tried to give Vallejos his and Andrew Gallegos' truck."<br><br>Declarant:  Joe  and/or  Andrew Gallegos<br><br>Source: Daniel Orndorff, Michael Sutton, Leroy Vallejos<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E).<br><br>A. Gallegos objects to this statement, because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'"  A. Gallegos Response ¶ 5, at 3.  At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point.  It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge.  <u>See</u> Stephen A. Saltzburg et al., <u>Federal Rules of Evidence Manual</u> § 602.02[2]("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible.").<br><br>J. Gallegos objects to this statement's admission, because it is an action and not a statement.  <u>See</u> |
| Statement 43: "Charlene Baldizan agreed to get rid of the van because the Gallegos brothers knew police were looking for it."<br><br>Declarant: Gallegos brothers<br><br>Source: Charlene Baldizan<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E).<br><br>A. Gallegos objects to this statement, because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'"  A. Gallegos Response ¶ 5, at 3.  At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point.  It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge.  <u>See</u> Stephen A. Saltzburg et al., <u>Federal Rules of Evidence Manual</u> § 602.02[2]("The exception to the rule is a |

| | statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible."). |
|---|---|
| Statement 44: "Joe and Andrew Gallegos asked Jason Van Veghel to clean up the living room and pull the carpet up and gave him 2-3 hits of heroin for it. Joe Gallegos also asked Van Veghel to clean blood off air compressor."<br><br>Declarant: Joe Gallegos<br><br>Source: Jason Van Veghel<br><br>Date: On or about November 13, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | United States orally struck "and Andrew" from statement 44.<br><br>J. Gallegos objects to this statement, because Van Veghel "has never been alleged or identified as a co-conspirator." J. Gallegos Response ¶ 5, at 4. After J. Gallegos filed his response, the United States orally identified Van Veghel as a conspirator at the Court's <u>James</u> hearing. Additionally, whether a statement is admissible under rule 801(d)(2)(E) depends on whether the statement was made by a conspirator and not on whether the statement was made to a conspirator.<br><br>Rule 801(d)(2)(E) does not apply to this statement, however, because the Court has not found that a conspiracy to murder Adrian Burns existed. Nonetheless, Van Veghel can testify regarding the actions he took and any instructions he received without running afoul of the rule against hearsay. |
| Statement 45: "The next day, at Joe Gallegos request, Andrew Gallegos threw a set of keys and a wrist watch into a field."<br><br>Declarant: Andrew Gallegos<br><br>Source: Jason Van Veghel<br><br>Date: On or about November 13, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E). Van Veghel can testify regarding the actions he observed, such as A. Gallegos throwing a set of keys and a wrist watch into a field, without running afoul of the rule against hearsay, however. |
| Statement 46: "Joe Gallegos found out the police were coming to search the house and he gave several guns and other stolen goods to Jason Van Veghel to store elsewhere."<br><br>Declarant: Joe Gallegos | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E).<br><br>Van Veghel can testify regarding actions he observed -- such as J. Gallegos giving him several guns and stolen goods -- without running afoul of the rule against hearsay. Statements indicating why J. Gallegos was giving Van Veghel those guns and goods are admissible as |

- 89 -

| | |
|---|---|
| Source: Jason Van Veghel<br><br>Date: On or about November 13, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | circumstantial evidence of J. Gallegos' state of mind or as statements of J. Gallegos' then-existing state of mind under rule 803(3).<br><br>J. Gallegos argues that this statement is "inconsistent with the discovery provided." J. Gallegos response ¶ 7, at 5. J. Gallegos can impeach this statement based on that inconsistency, but it does not render the statement inadmissible. |
| Statement 47: "Santos Gonzales told Gomez 'You remember me?' They then told Gomez that Joe Gallegos put a hit out and they were there to kill him."<br><br>Declarant: Santos Gonzales<br><br>Source: Jose Gomez<br><br>Date: On or about February 27, 2016<br><br>Objection: J. Gallegos Response | J. Gallegos argues that this statement is inadmissible, because "Santos Gonzalez is not expected to testify and this statement is contained in the factual portion of his plea agreement." J. Gallegos Response ¶ 8, at 5. The United States probably reused language from Gonzalez' plea agreement when drafting the <u>James</u> Proffer, but that does not render Jose Gomez' testimony relating the substance of Gonzalez' out-of-court statement inadmissible.<br><br>Any statements that J. Gallegos made ordering others to kill Gomez are admissible against J. Gallegos under rule 801(d)(2)(A). Statements that those others made to Gomez are either circumstantial evidence of the declarant's state of mind or statements of then-existing state of mind, specifically their motive for assaulting Gomez. |
| Statement 48: "Shauna Gutierrez said 'they didn't finish him' when Gomez ran away."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Brandy Rodriguez<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | United States orally indicated that this statement will only come in if Brandy Rodriguez testifies to it. <u>See</u> Mar. 13 Tr. at 41:7-12 (Castellano). Consequently, J. Gallegos' assertion that "neither the declarant nor the source is expected to testify." J. Gallegos Response ¶ 48, at 5. If B. Rodriguez testifies, then J. Gallegos' assertion is false. If B. Rodriguez does not testify, this statement will not be offered into evidence, so whether it is admissible is moot.<br><br>J. Gallegos also asserts that "there is no indicia of trustworthiness based on the multiple versions of statements given by" B. Rodriguez and Gutierrez. J. Gallegos ¶ 9, at 5. J. Gallegos can argue to the jury that this statement is untrustworthy, but that does not render the statement inadmissible unless the United States relies upon an exception to the hearsay rule that has indicia of trustworthiness -- or the lack of indicia of untrustworthiness -- as an element. <u>See</u>, <u>e.g.</u>, Fed. R. Evid. 803(6)(E) |
| Statement 49: "Santos Gonzalez and Paul Rivera knocked on the | |

- 90 -

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                    No. CR 15-4268 JB

ANGEL DELEON
JOE LAWRENCE GALLEGOS
EDWARD TROUP, a.k.a. "Huero Troup;"
LEONARD LUJAN
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little Guero;"
ALLEN PATTERSON;
 CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a. "Shotgun;"
BENJAMIN CLARK, a.k.a. "Cyclone;"
RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie," a.k.a. "Hog Nuts;"
DANIEL SANCHEZ, a.k.a. "Dan Dan;"
GERALD ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma;"
CONRAD VILLEGAS, a.k.a. "Chitmon;"
ANTHONY RAY BACA, a.k.a. "Pup;"
ROBERT MARTINEZ, a.k.a. "Baby Rob;"
ROY PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA;
CARLOS HERRERA, a.k.a. "Lazy;"
RUDY PEREZ, a.k.a. "Ru Dog;"
ANDREW GALLEGOS, a.k.a. "Smiley;"
SANTOS GONZALEZ;
PAUL RIVERA;
SHAUNA GUTIERREZ;
BRANDY RODRIGUEZ

     Defendants.

## COURT'S SECOND DRAFT OF TABLE TO BE INCLUDED IN THE IMPENDING MEMORANDUM OPINION AND ORDER REGARDING THE *JAMES* ISSUE
### (provided to the parties on April 9, 2018)

Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 1014

**DRAFT JAMES TABLE**

| Statement | Objections | Ruling |
|---|---|---|
| Statement 1: "Billy Garcia tasked Leonard Lujan with finding an inmate to carry out the murders of Garza and Castillo. The murders were to be executed simultaneous."<br><br>Declarant: B. Garcia<br>Source: Leonard Lujan | Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). See Draft Hearing Transcript at 9:13-10:8 (Castellano, Stemo)(held March 13, 2018)("Tr.")[1]  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 4, at 2; Patterson Response ¶ 5, at 2. The Court will give a limiting instruction as to A. Garcia, A. Gallegos, and Gutierrez. |
| Statement 2: "Billy Garcia wanted Castillo and Garza 'to be taken out' by strangulation."<br><br>Declarant: B. Garcia<br>Source: Leonard Lujan | Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). See Tr. at 10:9-13 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 5, at 2; Patterson Response ¶ 6, at 2-3. The Court will give a limiting instruction as to A. Garcia, A. Gallegos, and Gutierrez. |
| Statement 3: "The Castillo and Garza murders were an order. Anyone who did not follow that order was to be killed as well."<br><br>Declarant: B. Garcia<br>Source: Leonard Lujan | Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). See Tr. at 10:14-11:2 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 6, at 2; Patterson Response ¶ 7, at 3. The Court will give a limiting instruction as to A. Garcia, A. Gallegos, and Gutierrez. |
| Statement 4: "Billy Garcia was planning to kill everyone in the unit with a green | Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his plan, so it is admissible for its truth as |

[1]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

DNM 1438

Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 1015

| | | |
|---|---|---|
| light but was starting with Castillo and Garza."<br><br>Declarant: B. Garcia<br>Source: Leonard Lujan | | against all the Defendants under rule 803(3). <u>See</u> Tr. at 11:3-10 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's objections. <u>See</u> Chavez Response ¶ 7, at 2; Patterson Response ¶ 8, at 3-4. |
| Statement 5: "These murders needed to be done because the SNM gang was losing status with other gangs."<br><br>Declarant: B. Garcia<br>Source: Leonard Lujan | Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth as against all the Defendants under rule 803(3). <u>See</u> Tr. at 11:11-22 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's objections. <u>See</u> Chavez Response ¶ 8, at 3; Patterson Response ¶ 9, at 4. |
| Statement 6: "Leonard Lujan tells Eugene Martinez 'I'm telling you right now where it's coming from and everything,' referring to Billy Garcia."<br><br>Declarant: Leonard Lujan (first-level) and B. Garcia (second-level).<br>Source: Leonard Lujan, Eugene Martinez | Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). <u>See</u> Tr. at 11:23-12:7 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, <u>see</u> FOF, so the Court denies their objections, <u>see</u> Chavez Response ¶ 4, at 2; Patterson Response ¶ 10, at 4. The Court will give a limiting instruction as to A. Garcia, A. Gallegos, and Gutierrez. |
| Statement 7: "Billy Garcia ordered the murder of Castillo due to him cooperating with law enforcement."<br><br>Declarant: B. Garcia.<br>Source: Leonard Lujan | Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth as against all the Defendants under rule 803(3). <u>See</u> Tr. at 12:8-16 (Castellano, Stemo). The Court accordingly denies Patterson's objection. <u>See</u> Patterson Response ¶ 11, at 4-5. |
| Statement 8: "Billy Garcia ordered Garza to be killed for being a former Los Carnales member."<br><br>Declarant: B. Garcia<br>Source: Leonard Lujan | Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth as against all the Defendants under rule 803(3). <u>See</u> Tr. at 12:17-25 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's objections. <u>See</u> Chavez Response ¶ 10, at 3-4; Patterson Response ¶ 12, at 5. |

| Statement 9: "'What the fuck is going on? I sent word a long time ago to clean house.' Billy Garcia was upset Leonard Lujan had not taken charge in the facility."<br><br>Declarant: B. Garcia<br>Source: Leonard Lujan | Chavez Response, Patterson Response | This statement could be offered for a non-hearsay purpose, i.e., as circumstantial evidence of B. Garcia's state of mind.<br><br>This statement is also admissible for its truth against the Counts 1 and 2 Defendants under rule 801(d)(2)(E), because B. Garcia's recrimination regarding Lujan's failure to act appear calculated to spur Lujan to take further action towards the Castillo and Garza murders.  See Tr. at 13:1-24 (Castellano, Stemo).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 11, at 4; Patterson Response ¶ 13, at 5-6.  If the statement is offered for its truth, the Court will give a limiting instruction as to A. Garcia, A. Gallegos, and Gutierrez. |
| Statement 10: "Leroy Lucero received word from Billy Garcia that several hits were supposed to happen.  Garcia told him he didn't need help since Lucero was getting out."<br><br>Declarant: B. Garcia<br>Source: Leroy Lucero | Chavez Response, Patterson Response | Part of this statement is a statement of B. Garcia's then-existing state of mind, specifically his plans, so that portion of the statement is admissible as against all of the Defendants under rule 803(3).  The remainder of the statement, B. Garcia's direction to Lucero, is a statement in furtherance of the Counts 1 and 2 conspiracies, because B. Garcia, in declining Lucero's help, is arranging the details of the Castillo and Garza murders.  See Tr. at 15:15-22 (Castellano, Stemo).  Accordingly, the statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 12, at 4; Patterson Response ¶ 14, at 6.  The Court will give a limiting instruction as to A. Garcia, A. Gallegos, and Gutierrez. |
| Statement 11: "Leroy Lucero confirmed the message that several hits were supposed to happen with Angel Munoz. | Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies, under rule 801(d)(2)(E).  See Tr. at 16:12-17:4 (Castellano, Stemo).  The Court's findings of fact |

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1017

| | | |
|---|---|---|
| Munoz said 'Something has to happen Carnal Billy's on his way.'"<br><br>Declarant: Angel Munoz<br>Source: Leroy Lucero | | indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 13, at 4-5; Patterson Response ¶ 15, at 6. The Court will give a limiting instruction as to A. Garcia, A. Gallegos, and Gutierrez. |
| Statement 12: "Leonard Lujan met with Eugene Martinez and tasked him with the murder of Garza by strangulation and told Martinez to pick people to help."<br><br>Declarant: Leonard Lujan<br>Source: Leonard Lujan, Eugene Martinez | Chavez Response, Patterson Response | This statement is admissible for its truth against the Count 2 conspirators under rule 801(d)(2)(E). See Tr. at 17:4-16 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 14, at 5; Patterson Response ¶ 16, at 6-7. The Court will give a limiting instruction as to A. Garcia, A. Gallegos, J. Gallegos, Gutierrez, and Troup. |
| Statement 13: "Leonard Lujan met with Joe Gallegos, Angel DeLeon, and 'Criminal'[2] and ordered Castillo murdered by strangulation."<br><br>Declarant: Leonard Lujan<br>Source: Leonard Lujan | J. Gallegos Response, Patterson Response | The James Proffer lists Leonard Lujan as both this statement's declarant and its source. See James Proffer at 8. Agent Stemo's testimony indicates that she is aware of the this out-of-court Lujan statement via another out-of-court statement, which Lujan made circa 2007. See Tr. at 65:7-16 (Benjamin, Stemo). The latter statement was made long after the Count 1 conspiracy ended with Castillo's death, so it is not admissible under rule 801(d)(2)(E). The initial statement, however, was made during and in furtherance of the Count 1 conspiracy was made during and in furtherance of the Count 1 conspiracy by a member of that conspiracy. See Tr. at 17:17-24, 18:20-19:1 (Castellano, Stemo). Patterson is not a member of the Count 1 conspiracy, see FOF, so the Court grants Patterson's objection insofar as it requests a limiting instruction, see Patterson Response ¶ 17, at 7.<br><br>J. Gallegos requests the opportunity to voir dire Lujan, because "he is referred to in an audio recording by Leroy Lucero as 'crazy |

---

[2]"Criminal" refers to Michael Jaramillo. See Tr. at 130:24-131:1 (Castellano, Stemo).

Leonard, no one would believe Leonard.'"  J. Gallegos Response ¶ 1, at 3.  The Court denies that request, because voir dire is not an appropriate mechanism for testing Lujan's credibility.

J. Gallegos argues that this statement is an action -- giving an order -- and not a statement.  See J. Gallegos Response ¶ 1, at 3; Tr. at 64: 11-13 (Benjamin).  Under the Federal Rules of Evidence, a statement must be an assertion.  See Fed. R. Evid. 801(a)("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.").   J. Gallegos is correct insofar as orders and commands -- e.g., "fetch me a shrubbery" -- like questions -- e.g., "what do you want to eat for lunch?" -- are not assertions, because they are neither true nor false.   Consequently, orders and questions cannot be hearsay both because hearsay must be a statement, see Fed. R. Evid. 801(c)("'Hearsay' means a statement . . . ."), and because an utterance that is neither true nor false cannot be offered "to prove the truth of the matter asserted," Fed. R. Evid. 801(c)(2).

While orders and commands are not, themselves, assertions they may -- like questions -- contain implicit assertions.  See United States v. Summers, 414 F.3d 1287, 1298 (10th Cir. 2005)(Kelly, J.)(concluding that a defendant's question -- "'How did you guys find us so fast?'" -- was an implicit assertion of "both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so quickly").[3]  As an example, ordering

---

[3]At least according to Aristotle, contingent predictions are another example of utterances that are neither true nor false:

In the case of that which is or which has taken place, propositions, whether positive or negative, must be true or false.  Again, in the case of a pair of contradictories, either when the subject is universal and the propositions are of a universal character, or when it is individual, as has been said,[] one of the two must be true and the other false . . . .

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1018

DNM 1442

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1019

|  |  | someone to "give me one pound of your best marijuana" implicitly asserts that the person to whom the order is addressed possess a controlled substance.  Likewise, asking someone whether they stopped beating their wife is implicitly an assertion both that the person questioned is married and an assertion that, at one point, they abused their wife.  Thus, the orders that the James Proffer identifies can qualify as hearsay if those orders contain implicit assertions. |
|  |  | Listing orders in the James Proffer is useful, even if those orders do not contain implicit assertions, because people often make |

---

When the subject, however, is individual, and that which is predicated of it relates to the future, the case is altered.  For if all propositions whether positive or negative are either true or false, then any given predicate must either belong to the subject or not, so that if one man affirms that an event of a given character will take place and another denies it, it is plain that the statement of the one will correspond with reality and that of the other will not. For the predicate cannot both belong and not belong to the subject at one and the same time with regard to the future.

. . . .

[T]o say that neither the affirmation nor the denial is true, maintaining, let us say, that an event neither will take place nor will not take place, is to take up a position impossible to defend.  In the first place, though facts should prove the one proposition false, the opposite would still be untrue.  Secondly, if it was true to say that a thing was both white and large, both these qualities must necessarily belong to it; and if they will belong to it the next day, they must necessarily belong to it the next day.  But if an event is neither to take place nor not to take place the next day, the element of chance will be eliminated.  For example, it would be necessary that a sea-fight should neither take place nor fail to take place on the next day.

. . . .

A sea-fight must either take place to-morrow or not, but it is not necessary that it should take place to-morrow, neither is it necessary that it should not take place, yet it is necessary that it either should or should not take place to-morrow.  Since propositions correspond with facts, it is evident that when in future events there is a real alternative, and a potentiality in contrary directions, the corresponding affirmation and denial have the same character.

Aristotle, On Interpretation § I, Pt. 9, available at http://classics.mit.edu/Aristotle/interpretation.html.

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1020

| | | orders in quick succession, and -- if they are not lawyers -- they do not always scrupulously distinguish between the two. Statement 13 indicates that Lujan ordered others to kill Castillo, but Lujan may unexpectedly testify that he told those people that he wanted them to kill Castillo, which is a statement regarding Lujan's desires and not, technically, an order.  Alternatively, Lujan may testify both that he gave the order that Statement 13 describes and he may indicate that he also made statements regarding the reasons for that order or other associated statements. |
| | | That the United States lists orders in the <u>James</u> Proffer is prudent, because it permits the Defendants and the Court to consider and argue, respectively, whether those orders contain implicit assertions.  It also permits the Court to make findings that will permit it to quickly rule on unexpected statements closely associated with those orders, <u>e.g.</u>, if an order was made during a conspiracy by a conspirator then statements made by the same person at much the same time were also made during a conspiracy by a conspirator.[4]  Further, if the United States did not list orders in the <u>James</u> Proffer, the Defendants could complain at trial -- perhaps legitimately -- regarding unfair surprise.  Accordingly, the Court denies J. Gallegos' objection that "this is not a statement." J. Gallegos Response ¶ 1, at 3. |
| Statement 14: "Billy Garcia wanted knowledge of the plan kept to very few individuals."<br><br>Declarant: B. Garcia<br>Source: Leonard Lujan | Chavez     Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, so it is admissible for its truth against all the Defendants under rule 803(3).  <u>See</u> Tr. at 19:2-9 (Castellano, Stemo).  The Court accordingly denies Chavez' and Patterson's objections.  <u>See</u> Chavez Response ¶ 15, at 5; Patterson Response ¶ 18, at 7-8. |
| Statement 15: "Once alarms were sounded and the murders discovered, | Chavez     Response, Patterson Response | This statement was made after Castillo and Garza died, so it was not made during the Counts 1 and 2 conspiracies.  Accordingly, it |

---

[4]Whether a statement was made in furtherance of a conspiracy, however, will depend on the content of the statement.

DNM 1444

| | | |
|---|---|---|
| Billy Garcia congratulated Leonard Lujan with 'Amor.'"<br><br>Declarant: B. Garcia<br>Source: Leonard Lujan | | is not admissible under rule 801(d)(2)(E).<br><br>The United States could offer this statement as circumstantial evidence of B. Garcia's state of mind, however. Consequently, the Court grants Chavez' and Patterson's objections to admitting this statement for its truth under rule 801(d)(2)(E), see Chavez Response ¶ 15, at 16; Patterson Response ¶ 19, at 8, but the Court may admit this statement for a non-hearsay purpose. |
| Statement 16: "Frederico Munoz part of the committee that sanctioned the hit on Garza and Castillo. Munoz wanted Garza killed for being Los Carnales."<br><br>Declarant: B. Garcia<br>Source: Federico Munoz | Chavez Response, Patterson Response | |
| Statement 17: "Arturo Garcia placed hit on Sanchez because he was suspected to be cooperating with law enforcement."<br><br>Declarant: A. Garcia<br>Source: Eric Duran | None. | This is a statement of A. Garcia's then-existing state of mind, so it is admissible for its truth against all the Defendants under rule 803(3). See Tr. at 20:16-21:1 (Castellano, Stemo). |
| Statement 18: "Ben Clark passed around paperwork on Sanchez's cooperation with police. Stating 'everyone who needs to see it has seen it, get rid of it.'"<br><br>Declarant: Clark<br>Source: Ruben Hernandez | None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E). See Tr. at 21:2-13 (Castellano, Stemo). The act of passing around paperwork -- see supra Statement 13 regarding the relationship between acts and statements -- because the paperwork indicated that the Sanchez murder was a legitimate SNM hit, which induced further action on the part of conspirators. Destroying the paperwork afterward furthered the conspiracy by preventing law enforcement from learning of -- and potentially preventing -- the planned Sanchez murder. |
| Statement 19: "Arturo Garcia wrote to Frankie Gonzales that Brian and Raymond Rascon were to take care of | None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E). See Tr. at 21:14-22:1 (Castellano, |

- 8 -

| | | |
|---|---|---|
| the next murder for SNM."<br><br>Declarant: A. Garcia<br>Source: Javier Alonso | | Stemo). |
| Statement 20: "Ben Clark put Javier Alonso in charge of making sure Sanchez was killed and told the Rascon brothers to complete the hit."<br><br>Declarant: Clark<br>Source: Javier Alonso | None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 22:2-10 (Castellano, Stemo). |
| Statement 21: "Word was sent from the green pod that if Sanchez was not killed, others in the Blue pod would be killed."<br><br>Declarant: FNU LNU<br>Source: Javier Alonso | None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).   See Tr. at 22:11-23:1 (Castellano, Stemo). |
| Statement 22: "Edward Troup was told to go help with Sanchez's murder."<br><br>Declarant: Javier Alonso<br>Source: Javier Alonso | None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 23:15-21 (Castellano, Stemo). |
| Statement 23: "While Edward Troup and Javier Alonso were finishing killing Sanchez, Brian and Raymond Rascon came and asked if they could help."<br><br>Declarant:   Brian    Rascon    and/or Raymond Rascon<br>Source: Javier Alonso | Troup Response | This statement is actually an action -- specifically an offer -- and not an assertion, so it cannot be hearsay.  See Tr. 23:22-24:14 (Stemo).<br><br>The Rascon brothers were tasked to do the hit originally but when Javier Alonso approached them   Raymond Rascon said they didn't want to do it because they were short to the door, meaning they were going to get out of prison shortly therefore Javier Alonso show instructed Edward Troup and they both went into the cell and took care of business.  When they were doing that, the Rascon brothers came to offer their aid as a way to |

| | | |
|---|---|---|
| | | save face with the gang.<br><br>Tr. at 24:3-11 (Stemo). <u>See</u> <u>supra</u> Statement 13 (discussing the relationship between actions and statements).  That the Rascon brothers offered their aid after Sanchez' death indicates that the conspiracy to kill Sanchez no longer existed, so any associated statements are not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E).   <u>See</u> <u>United States v.</u> <u>Alcorta</u>, 853 F.3d 1123, 1139 (10th Cir. 2017)("To be sure, to qualify for the coconspirator exception a statement must have been made during the conspiracy.  Statements made after the objectives of the conspiracy have either failed or been achieved are not made during the conspiracy and must be excluded.").  Further, that the Rascon brothers refused to kill Sanchez when Alonso approached them indicate that they did not join the Sanchez conspiracy. <u>See</u> Tr. at 24:3-11(Stemo).<br><br>Troup argues that this statement lacks a sufficient foundation, because the <u>James</u> Proffer identifies the declarant as "'Brian Rascon and/or Raymond Rascon.'"  Troup Response ¶ 4, at 2 (quoting <u>James</u> Proffer at 13).  This statement's admissibility does not depend on whether the person who offered assistance is Brian Rascon, Raymond Rascon, or both.  <u>See</u> <u>United States v. Brinson</u>, 772 F.3d 1314, 1321-22 (10th Cir. 2014)(concluding that an unidentified declarant's statements were admissible, because they were not offered to prove the truth of the matter asserted).  Accordingly, the Court denies Troup's objection.   <u>See</u> Troup Response ¶ 4, at 2. |
| Statement 24: "Javier Alonso told the Rascon brothers to keep a look out when the brothers asked if they could help."<br><br>Declarant: Javier Alonso | None | This statement is actually an action -- giving the Rascon brothers an order -- so it is not hearsay.  <u>See</u> Tr. at 24:15-21 (Stemo, Castellano).   <u>See</u> <u>also</u> <u>supra</u> Statement 13 (discussing the relationship between actions and statements).  That Alonso gave |

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1024

| | | |
|---|---|---|
| Source: Javier Alonso | | this order after Sanchez' death indicates that any associated statements were not made during the Sanchez conspiracy, so those statements are not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E).   See United States v. Alcorta, 853 F.3d at 1139. |
| Statement 25: "Edward Troup kissed Javier Alonso on the cheek and told him he was proud of him."<br><br>Declarant: Edward Troup<br>Source: Javier Alonso | None | This is a statement of Troup's then-existing state of mind, so it is admissible against all Defendants under rule 803(3).   See Tr. at 24:22-25:5 (Castellano, Stemo). |
| Statement 26: "After Sanchez was murdered, Edward Troup began telling Ruben Hernandez that he was next."<br><br>Declarant: Edward Troup<br>Source:   Javier   Alonso;   Ruben Hernandez | None | Agent Stemo's testimony indicates that this statement stands in for several closely associated statements:<br><br>Q.      Following the murder in statement number, was an indication that Edward Troup began telling Ruben Hernandez that he was next?<br><br>A.      Yes.<br><br>Q.      And what was the indication about Ruben Hernandez at or around the time -- at or around the time of the murder?<br><br>A.      I believe Mr. Hernandez did not cover the cameras properly.<br><br>Q.      At that point, according to statements by Javier Alonso and others was Ruben Hernandez seen as possibly scared and weak?<br><br>A.      Yes, he was actually on crutches at the |

Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 1025

| | | |
|---|---|---|
| | | time.<br><br>Q.    Related to the statement is there another statement related to Edward Troup stating in part that Ruben Hernandez failed to cover the camera because he was scared?<br><br>A.    Yes.<br><br>Tr. at 25:6-24 (Stemo, Castellano).<br><br>To the extent that this is a statement of Troup's plans or a statement regarding how other inmates viewed Hernandez, it is a statement of then-existing state of mind, so it is admissible for its truth under rule 803(3).  To the extent that these statements are offered as circumstantial evidence of Troup's state of mind, they are not offered to prove the truth of the matter asserted, so they are not hearsay. |
| Statement 27: "Arturo Garcia sent word about Sanchez to Ben Clark."<br><br>Declarant: A. Garcia<br>Source: Ben Clark, Eric Duran | None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 25:25-26:9 (Castellano, Stemo). |
| Statement 28: "Ben Clark and Arturo Garcia sent several letters about Sanchez to each other."<br><br>Declarant: A. Garcia<br>Source: Ben Clark | None. | Sending letters is an action and not a statement, but the statements in those letters regarding the Sanchez murder are admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 26:10-18 (Castellano, Stemo).. |
| Statement 29: "Javier Alonso and Edward Troup were expected to oversee the murder, and Troup told the Rascon brothers to hit Sanchez." | Troup Response | Troup argues that the portion of this statement referring to Benjamin Clark's expectations circa 2007 is not a statement at all.  See Troup Response ¶ 5, at 2.  Troup is correct -- expectations are not statements.  Clark can, however, testify about what his |

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1026

| Declarant: Ben Clark<br>Source: Ben Clark | | expectations were at that time. If, however, this statement refers to expectations that belong to someone other than Clark, the United States would need to establish how Clark knows about those expectations. If that foundation is statements of someone's then-existing state of mind, then those statements are admissible under rule 803(3). If that foundation is statements that are circumstantial evidence of the declarant's state of mind then those statements are not offered to prove the truth of the matter asserted, so they are not hearsay. In any event, the Court denies Troup's objection. See Troup Response ¶ 5, at 2.<br><br>That Troup told the Rascon brothers to hit Sanchez is an order and not a statement, see supra Statement 13 (discussing the relationship between actions and statements), but any associated statement that Troup made are admissible against the Count 3 conspirators under rule 801(d)(2)(E), see Tr. at 26:19-27:1 (Castellano, Stemo). That the Rascon brothers refused to murder Sanchez indicates that they did not join the Count 3 conspiracy. See Tr. at 24:3-11 (Stemo). A rule 801(d)(2)(E) statement, however, needs to be made by a conspirator, but it does not need to be made to a conspirator. See Fed. R. Evid. 801(d)(2)(E). Consequently, that the Rascon brothers did not join the Count 3 conspiracy does not affect whether Troup's statements are admissible under rule 801(d)(2)(E). |
| Statement 30: "Leonard Lujan told Willie Amador and Jesse Ibarra to "handle that" and told Eugene Martinez that 'I'm running this prison now.'"<br><br>Declarant: Lujan | Chavez Response, Patterson Response | |
| Statement 31: "Christopher Chavez heard about the hit on Garza and volunteered to participate in the | B. Garcia Response, Patterson Response | This statement is not hearsay, because Chavez' act, volunteering to participate in the Garza murder, is neither true nor false. The Court anticipates that there are other statements associated with |

| | | |
|---|---|---|
| operation." <br><br> Declarant: Chavez | | Chavez' act which could be offered for their truth.  For example, it would have been natural for Chavez to state that he wanted to participate in the Garza murder, which would be a statement of then-existing state of mind under rule 803(3).  Any statements made by Count 3 conspirators attempting to induce Chavez to volunteer would have been made during and in furtherance of the Count 3 conspiracy, so they would be admissible for their truth under rule 801(d)(2)(E) as to the Count 3 conspirators. |
| Statement 32: "Willie Amador told Eugene Martinez to be lookout during the Garza murder and stated, 'If something happens, you already know.'" <br><br> Declarant: Amador | Chavez Response, Patterson Response | This statement was made during and in furtherance of the Count 2 conspiracy and it was made by Willie Amador, a member of that conspiracy.  It is not testimonial.  Accordingly, the statement is admissible for its truth against the Count 2 conspirators under rule 801(d)(2)(E). |
| Statement 33: While strangling Garza someone in the room yelled 'Close the door!'" <br><br> Declarant: Patterson or Chavez | B. Garcia Response | B. Garcia argues that, because the <u>James</u> Proffer lists this statement's declarant as "Allen Patterson or Christopher Chavez," <u>James</u> Proffer at 18, "[t]here is no ability to properly attribute or authenticate the statement to any particular declarant."  B. Garcia ¶ 5, at 2-3. <br><br> This statement -- "Close the door!" -- is a command, so it is neither true nor false.  Accordingly, it is not a statement offered for its truth.  Additionally, it is nontestimonial. <br><br> As to authentication, rule 901 states that "the proponent [of an item of evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 609(a).  Accordingly, so long as the United States claims only that this statement was made by either Patterson or Chavez, |

Appellate Case: 20-2058        Document: 010110415671        Date Filed: 09/29/2020        Page: 1028

| | | |
|---|---|---|
| | | it only needs, under rule 609, to introduce evidence sufficient to support a finding that one of those two individuals made the statement.  See Fed. R. Evid. 609(a).   The testimony of the witness who relates this statement to the jury -- assuming that the witness has knowledge -- satisfies that requirement.  See Fed. R. Evid. 609(b)(1)(stating that the testimony of a witness with knowledge satisfies rule 609's authentication requirement). |
| Statement 34: "Leonard Lujan approached Eugene Martinez and told him to talk to Willie Amador about the murders."<br><br>Declarant: Lujan | Chavez Response, Patterson Response | |
| Statement 35: "Eugene Martinez asked Billy Garcia and Garcia confirmed the order and said 'it's coming from me' and 'make sure it happens.'"<br><br>Declarant: B. Garcia | Chavez Response, Patterson Response | |
| Statement 36: "Joe Gallegos later informed Leroy Lucero that Lawrence Torres saw and was concerned Torres might snitch."<br><br>Declarant: J. Gallegos | B. Garcia Response, Chavez Response, A. Gallegos Response, J. Gallegos Response, Patterson Response | The United States orally conceded that this statement is not admissible under rule 801(d)(2)(E) of the Federal Rules of Evidence.   The United States suggested, however, that the statement is admissible against Troup under rule 801(d)(2)(A). The statement also appears to be a statement of then-existing state of mind under rule 803(3). |
| Statement 37: "Edward Troup told Lawrence Torres, 'This has nothing to do with you.  Don't come up here.'"<br><br>Declarant: Troup | B. Garcia Response, Chavez Response, Patterson Response | |
| Statement 38: "Angel Deleon had a scratch on his finger and told a female | B. Garcia Response, Chavez Response | |

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1029

| | | |
|---|---|---|
| CO that he cut himself." <br><br> Declarant: Deleon | | |
| Statement 39: "Kyle Dwyer came to SNMCF with 'paperwork' on Sanchez." <br><br> Declarant: Dwyer | None | |
| Statement 40: "The 'paperwork' came from the Crazy Town Roswell gang." <br><br> Declarant: Clark | None | |
| Statement 41: "Joe and Andrew Gallegos just pulled 'a job' and had to go 'clean up.' They were giving money and heroin to friends to 'help them out.' Joe Gallegos said, 'I just came up.'" <br><br> Declarant: Joe and/or Andrew Gallegos | A. Gallegos Response, J. Gallegos Response | |
| Statement 42: "Joe and Andrew Gallegos were covered in blood and advised they were 'cleaning the house.' Joe Gallegos later went by Leroy Vallejos' house and tried to give Vallejos his and Andrew Gallegos' truck." <br><br> Declarant: J. Gallegos and A. Gallegos | A. Gallegos Response, J. Gallegos Response | |
| Statement 43: "Charlene Baldizan agreed to get rid of the van because the Gallegos brothers knew police were looking for it." <br><br> Declarant: J. Gallegos and A. Gallegos | A. Gallegos Response, J. Gallegos Response | |
| Statement 44: "Joe and Andrew Gallegos asked Jason Van Veghel to | A. Gallegos Response, J. Gallegos Response | United States orally struck "and Andrew" from statement 44. |

DNM 1453

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1030

| | | |
|---|---|---|
| clean up the living room and pull the carpet up and gave him 2-3 hits of heroin for it.  Joe Gallegos also asked Van Veghel to clean blood off air compressor."<br><br>Declarant: J. Gallegos | | |
| Statement 45: "The next day, at Joe Gallegos request, Andrew Gallegos threw a set of keys and a wrist watch into a field."<br><br>Declarant: A. Gallegos | A. Gallegos Response, J. Gallegos Response | |
| Statement 46: "Joe Gallegos found out the police were coming to search the house and he gave several guns and other stolen goods to Jason Van Veghel to store elsewhere."<br><br>Declarant: J. Gallegos | A. Gallegos Response, J. Gallegos Response | |
| Statement 47: "Santos Gonzales told Gomez 'You remember me?'  They then told Gomez that Joe Gallegos put a hit out and they were there to kill him."<br><br>Declarant: Gonzales | Gutierrez Response, J. Gallegos Response | Gutierrez argues that the James proffer, this statement's de |
| Statement 48: "Shauna Gutierrez said 'they didn't finish him' when Gomez ran away."<br><br>Declarant: Gutierrez | Gutierrez Response, J. Gallegos Response | United States orally indicated that this statement will only come in if Brandy Rodriguez testifies to it. |
| Statement 49: "Santos Gonzalez and Paul Rivera knocked on the door and asked for Gomez.   They then told Charlene Parker-Johnson that she should | Gutierrez Response, J. Gallegos Response | |

DNM 1454

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1031

| | | |
|---|---|---|
| leave the house."<br><br>Declarant: Santos Gonzalez and/or Paul Rivera | | |
| Statement 50: "Santos Gonzalez and Paul Rivera yelled, 'He's running!' and 'He's getting away!' when Gomez started to run."<br><br>Declarant: Gonzales and/or Rivera | Gutierrez Response, J. Gallegos Response | These are admissible as excited utterances, <u>see</u> Fed. R. Evid. 803(2), or present-sense impressions, <u>see</u> Fed. R. Evid. 803(1). |
| Statement 51: "Joe Gallegos placed a hit on Gomez because Joe Gallegos feared Gomez would testify against him on a state murder charge."<br><br>Declarant: Gutierrez and B. Rodriguez | Gutierrez Response, A. Gallegos Response, J. Gallegos Response | |
| Statement 52: "Upon learning where Gomez was staying, Shauna Gutierrez and Brandy Rodriguez agreed they needed to go after Gomez."<br><br>Declarant: Gutierrez and B. Rodriguez | Gutierrez Response, J. Gallegos Response | |
| Statement 53: "Paul Rivera agreed to help with the hit on Gomez."<br><br>Declarant: Rivera | J. Gallegos Response | |
| Statement 54: "You better not testify against my Jefe, or I'll kill you!"<br><br>Declarant: B. Rodriguez | None | |
| Statement 55: "Santos Gonzales also stated he was going to kill Gomez."<br><br>Declarant: Gonzalez | Gutierrez Response, J. Gallegos Response | |
| Statement 56: "Told Shauna Gutierrez they had completed their mission. | Gutierrez Response, J. Gallegos Response | The Gutierrez statement is a statement of then-existing state of |

DNM 1455

Appellate Case: 20-2058   Document: 010110415671   Date Filed: 09/29/2020   Page: 1032

| | | |
|---|---|---|
| Shauna Gutierrez laughed and said she was 'happy to hear' Gomez was likely dead."<br><br>Declarant: B. Rodriguez, Rivera, Gonzalez | | mind.  See Fed. R. Evid. 803(3). |
| Statement 57: "Shauna Gutierrez told Santos Gonzalez to move the truck they used to another location and leave it for a few days."<br><br>Declarant: Gutierrez | Gutierrez Response, J. Gallegos Response | |
| Statement 58: "'How come you guys didn't do the job more fully?' after she previously told Rivera, Gonzalez, and Rodriguez to 'Go get him.'<br><br>Declarant: Gutierrez | Gutierrez Response, J. Gallegos Response | |
| Statement 59: "Don't Testify"<br><br>Declarant: Rivera | J. Gallegos | |
| Statement 60: "Brandy Rodriguez and Shauna Gutierrez had people in place for an attack on Gomez."<br><br>Declarant: B. Rodriguez | Gutierrez Response, J. Gallegos Response | United States orally indicated that the date refers to Mario Chavez' interview with the FBI. |
| Statement 61: "Joe Gallegos ordered the hit on Gomez, and Shauna Gutierrez planned the hit."<br><br>Declarant: Gutierrez | Gutierrez Response, A. Gallegos Response, J. Gallegos Response | United States orally indicated that the declarant should be Brandy Rodriguez and that it doesn't know whether the statement was made before or after the assault on Gomez.  If the statement was made before the assault then it would be a coconspirator statement under rule 801(d)(2)(E). If it was made after the assault, it would be an admission[5] under rule 801(d)(2)(A) or a statement against |

---

[5]But Brandy Rodriguez has pled guilty, so even if it is an admission as to her, it would not be admissible in this trial on that basis.

DNM 1456

| | | interest under rule 804(b)(3).[6]   This all applies to statement 60 also. |
|---|---|---|
| Statement 62: "'Paperwork' on Sanchez was delivered from Arturo Garcia to Ben Clark, approving the murder."<br><br>Declarant: A. Garcia | None | |
| Statement 63: "'Cheeky' and 'Coquito' were tasked with the murder of Sanchez but did not want to carry it out."<br><br>Declarant: Cheeky and Coquito | Troup Response | |
| Statement 64: "Javier Alonso asked how to get rid of the marks on his hands from strangling Sanchez."<br><br>Declarant: Alonso | None | |
| Statement 65: "'That'd be messed up if the paperwork on the guy I just got showed up.' Ben Clark also sent Arturo Garcia a list of names of people in the pod."<br><br>Declarant: Clark | None | |
| Statement 66: "Edward Troup and Javier Alonso attempted to hide in John Montano's cell after lock down after the murder of Sanchez."<br><br>Declarant: Troup and Alonso | Troup Response | United States orally indicated that this statement is actually just an action, but it indicated that it is uncertain whether there were statements made that are associated with that act. |
| Statement 67: "Jimmie Gordon was asked to get information on Garza from | None | |

[6]But there has been no indication that Brandy Rodriguez is unavailable.  That she has already pled guilty indicates that

DNM 1457

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1033

Appellate Case: 20-2058     Document: 010110415671     Date Filed: 09/29/2020     Page: 1034

| | | |
|---|---|---|
| Geraldine Martinez." <br><br> Declarant: Gordon | | |
| Statement 68: "Billy Garcia put a hit on Archuleta which was communicated to Archuleta through 'Baby Zac' over a disagreement about Castillo's murder." <br><br> Declarant: Baby Zac. | B. Garcia Response | |
| Statement 69: "Brandy Rodriguez kicked Gomez and said, 'This is a message from Joe!'" <br><br> Declarant: B. Rodriguez | A. Gallegos Response | |
| Statement 70: "Shauna Gutierrez stated she is 'ride or die' with Joe Gallegos, after admitting that she and Joe Gallegos put a hit on Brandy Rodriguez based on the belief Rodriguez was a cooperator." <br><br> Declarant: Gutierrez | Gutierrez Response, A. Gallegos Response, J. Gallegos Response | The United States indicates that this statement was made in furtherance of a new uncharged conspiracy to harm Brandy Rodriguez for suspected cooperation.  Shauna Gutierrez and J. Gallegos are, according to the United States, the members of this conspiracy.  United States intends to call this the "conspiracy to hit Brandy Rodriguez." |
| Statement 71: "Christopher Chavez asked 'Is this right?' in reference to the Garza murders and Leroy Lucero said 'you got to do what you got to do.'" <br><br> Declarant: Chavez | B. Garcia Response, Patterson Response | |
| Statement 72: "Javier Alonso asked if the marks on his hands were noticeable." <br><br> Declarant: Alonso | None | |
| Statement 73: "Ordered the surveillance cameras covered." <br><br> Declarant: Troup or Trujillo | Troup Response | |

| | | |
|---|---|---|
| Statement 74: "'Now hurry Bolo now you know what time it is.' (In reference to covering the cameras.)" <br><br> Declarant: Trujillo | None | |
| Statement 75: "Just stay there and don't let no one in, use your crutch to block the door if you have to." <br><br> Declarant: Trujillo | None | |
| Statement 76: "'Ya stuvo (all done) take them off.'  (In reference to the camera covers.)" <br><br> Declarant: Trujillo | None | |
| Statement 77: Kyle asked Ruben Hernandez to take something to Samuel Gonzales and to tell Samuel Gonzales 'that was all he had.' <br><br> Declarant: Kyle Dwyer | Troup Response | |
| Statement 78: "Samuel Gonzales asked if Sanchez was dead, then again asked 'For real is he dead?'" <br><br> Declarant: Gonzales | None | |
| Statement 79: "'Chicky' was cutting his sleeves off and asked Ruben Hernandez to hang up his wet sleeves." <br><br> Declarant: "Chicky" | None | |
| Statement 80: "Edward Troup told 'Chicky' to cut his sleeves in small pieces or give the sleeves to someone | Troup Response | |

| | | |
|---|---|---|
| next door."<br><br>Declarant: Troup | | |
| Statement 81: "First thing in the morning we need you to move the body in the fetal position and wipe down the toilet."<br><br>Declarant: Brian Rascon and/or Edward Troup | Troup Response | |
| Statement 82: "'That's what we are all asking of you.' (Told to Ruben Hernandez whenhe didn't want to clean the cell.)"<br><br>Declarant: Brian Rascon | Troup Response | |
| Statement 83: "'Not that's an order, you already know what time it is.' (Told to Ruben Hernandez when he continued to not want to clean the cell.)"<br><br>Declarant: Brian Rascon | Troup Response | |
| Statement 84: "Ruben Hernandez asked if he was next for refusing to clean the cell and Brian Rascon said 'no, if the door is closed what can you do?'"<br><br>Declarant: Brian Rascon | Troup Response | |
| Statement 85: "'Your next mother fucker.' Said to Ruben Hernandez as they passed each other."<br><br>Declarant: Troup | None | |
| Statement 86: "We better be ready for hell cause we're fixing to go through | None | |

- 23 -

| | | |
|---|---|---|
| hell." Declarant: Trujillo | | |
| Statement 87: Edward Troup stated that it was every man for themselves and if you can get a plea bargain for 15 or less do it but 'no fucking ratting,' 'that's a no no.'" Declarant: Brian Rascon | Troup Response | |
| Statement 88: "Go wipe down the toilet, don't worry about moving the body." Declarant: Brian Rascon | Troup Response | |

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                          No. CR 15-4268 JB

ANGEL DELEON
JOE LAWRENCE GALLEGOS
EDWARD TROUP, a.k.a. "Huero Troup;"
LEONARD LUJAN
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little Guero;"
ALLEN PATTERSON;
 CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a. "Shotgun;"
BENJAMIN CLARK, a.k.a. "Cyclone;"
RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie," a.k.a. "Hog Nuts;"
DANIEL SANCHEZ, a.k.a. "Dan Dan;"
GERALD ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma;"
CONRAD VILLEGAS, a.k.a. "Chitmon;"
ANTHONY RAY BACA, a.k.a. "Pup;"
ROBERT MARTINEZ, a.k.a. "Baby Rob;"
ROY PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA;
CARLOS HERRERA, a.k.a. "Lazy;"
RUDY PEREZ, a.k.a. "Ru Dog;"
ANDREW GALLEGOS, a.k.a. "Smiley;"
SANTOS GONZALEZ;
PAUL RIVERA;
SHAUNA GUTIERREZ;
BRANDY RODRIGUEZ

     Defendants.

## COURT'S THIRD DRAFT OF TABLE TO BE INCLUDED IN THE IMPENDING MEMORANDUM OPINION AND ORDER REGARDING THE *JAMES* ISSUE
### (provided to the parties on April 9, 2018)

**FINDINGS OF FACT**

The Federal Rules of Criminal Procedure require the Court to state "its essential findings

on the record" when "factual issues are involved in deciding a motion. Fed. R. Crim. P. 12(d).

Accordingly, the Court makes the following findings[9]:

    1.      A conspiracy to kill Frank Castillo existed.  Leonard Lujan Plea Agreement ¶ 7, at

4-5, filed March 13, 2017 (Doc. 963)(James Hearing Exhibit 11)("Lujan Plea Agreement").[10]

---

[9]The United States made several assertions at the Court's James hearing which the Court's findings of fact do not reflect.  First, the United States asserted that a conspiracy to kill Adrian Burns existed and that the conspiracy included J. Gallegos, A. Gallegos, Charlene Baldizan, and Jesse Van Veghel.  See Afternoon Tr. at 15:12-19 (Court, Castellano); id. at 23:7-14 (Castellano).  The evidence that the United States introduced at the James hearing indicates, at most, that Baldizan and Van Veghel agreed to conceal Burns' murder after the fact.  See Mar. 13 Tr. at 34:25-36:1 (Castellano, Stemo)(describing Baldizan's alleged involvement in hiding the Gallegos brothers from law enforcement and "agreeing to getting rid of the van that the Gallegos brothers knew the police were looking for"); id. at 36:2-38:1 (Castellano, Stemo)(describing how Van Veghel allegedly assisted the Gallegos brothers by destroying evidence).  Thus, the James Hearing evidence indicates that Baldizan and Van Veghel might have joined a conspiracy to conceal the Burns murder, but it does not indicate that they joined a conspiracy to commit the Burns murder.  Second, there is no evidence indicating that J. Gallegos and A. Gallegos agreed to kill Burns as opposed to J. Gallegos killing Burns and then enlisting his brother afterwards to help conceal the murder.  Thus, the Court does not find that a conspiracy to murder Burns existed.  Third, the United States indicated, on March 13, 2018, that it intends to offer Statement 70 as a statement made during and in furtherance of an uncharged conspiracy to harm B. Rodriguez premised on an erroneous belief that she was cooperating with law enforcement.  See March 13 Tr. at 55:9-14 (Castellano); id. at 55:19-56:16 (Court, Castellano).  The only indication that such a conspiracy existed, however, is Statement 70 itself.  For the purpose of rule 801(d)(2)(E) of the Federal Rules of Evidence, a statement "does not by itself establish . . . the conspiracy or participation in it."  Fed. R. Evid. 801(d)(2).  Accordingly, the Court does not find that a conspiracy to harm B. Rodriguez existed.

[10]The Court accepted into evidence a letter by Assistant United States Attorney Jack Burkhead stating that Lujan would be incredible in the eyes of a rational factfinder.  The Court expressed its concern regarding "whether I can find by a preponderance of the evidence, just based on him [Lujan], without any corroborating evidence at all," that a conspiracy to kill Castillo existed.  Mar. 16 Tr. at 271:21-23 (Court).  The Lujan Plea Agreement is, however, corroborated by evidence that the Court can consider when deciding whether a conspiracy to kill Castillo existed.  See, e.g., Samuel Gonzales 302 at 5 ("Francisco CASTILLO was killed in 2001 because he 'messed up' with Billy GARCIA."); Quintana 1023 ("2001 Murder of Frank Castillo

- 25 -

2.    The Castillo conspiracy included five indicted conspirators: (i) DeLeon, (ii) J. Gallegos; (iii) Troup; (iv) Lujan; and (v) B. Garcia.  See Lujan Plea Agreement ¶ 7, at 4-5.

3.    The Castillo conspiracy included eight unindicted conspirators: (i) Angel Munoz, see Mar. 13 Tr. at 9:17-10:9 (Castellano, Stemo); (ii) Leroy Lucero see Mar. 13 Tr. at 16:16-24 (Castellano, Stemo); (iii) Michael Jaramillo, see Mar. 13 Tr. at 18:22-4 (Castellano, Stemo); id. at 20:2-9 (Castellano, Stemo); (iv) Federico Munoz, see Mar. 13 Tr. at 21:10-22 (Castellano, Stemo); (v) Willy Amador, see Mar. 13 Tr. at 29:16-24 (Castellano, Stemo); and (vi) Jessie Ibarra, see Mar. 13 Tr. at 29:16-24 (Castellano, Stemo).

4.    The Castillo conspiracy continued until Castillo's death on March 26, 2001.  See Lujan Plea Agreement ¶ 7, at 4-5.

5.    A conspiracy to kill Rolando Garza existed.   See Eugene Martinez Plea Agreement ¶ 9, at 3-4, filed May 5, 2017 (Doc. 1138)(James Hearing Exhibit 15)("E. Martinez Plea Agreement"); Lujan Plea Agreement ¶ 7, at 4-5.

6.    The Garza conspiracy included five indicted conspirators: (i) Lujan; (ii) B. Garcia; (iii) E. Martinez; (iv) Patterson; and (v) Chavez.  See E. Martinez Plea Agreement ¶ 9, at 3-4; Lujan Plea Agreement ¶ 7, at 4-5.

7.    The Garza conspiracy included seven unindicted conspirators: (i) Angel Munoz, see Mar. 13 Tr. at 9:17-10:9 (Castellano, Stemo); (ii) Leroy Lucero, see Mar. 13 Tr. at 16:16-24 (Castellano, Stemo); (iii) Michael Jaramillo, see Mar. 13 Tr. at 18:22-19:4 (Castellano, Stemo); (iv) Federico Munoz, see Mar. 13 Tr. at 21:10-22 (Castellano, Stemo) ; (v) Willie Amador, see

―――――――――

and Rolando Garcia at the Southern New Mexico Correctional Facility in Las Cruces were called by BILLY GARCIA ('Wild Bill').  Several members participated in the double homicide and EDWARD TROUP and CHRISOPHER CHAVEZ admitted to the murders during conversations with the CHS.").  That corroborating evidence assuages the the concern regarding Lujan's credibility that it expressed on March 16, 2018.

- 26 -

Mar. 13 Tr. at 29:23-30:11 (Castellano, Stemo); and (vi) Jessie Ibarra, see Mar. 13 Tr. at 29:16-24 (Castellano, Stemo); and (vii) Jimmy Gordon, see Mar. 13 Tr. at 52:18-59:10 (Castellano, Stemo).[11]

8.      The Garza conspiracy continued until Garza's death on March 26, 201.  E. Martinez Plea Agreement ¶ 9, at 3-4; Lujan Plea Agreement ¶ 7, at 4-5.

9.      A conspiracy to kill Freddie Sanchez existed.  See Javier Alonso Plea Agreement ¶ 7, at 4-5, filed August 28, 2017 (Doc. 1237)(James Hearing Exhibit 14)("Alonso Plea Agreement"); Ruben Hernandez Plea Agreement ¶ 7, at 4, filed February 1, 2017 (Doc. 880)(James Hearing Exhibit 13)("Hernandez Plea Agreement"); Benjamin Clark Plea Agreement ¶ 7, at 4, filed November 15, 2016 (Doc. 768)(James Hearing Exhibit 12)("Clark Plea Agreement").

10.     The Sanchez conspiracy included five indicted conspirators: (i) Alonso; (ii) Troup; (iii) A. Garcia; (iv) Hernandez; and (v) Clark.  See Alonso Plea Agreement ¶ 7, at 4-5; Hernandez Plea Agreement ¶ 7, at 4; Clark Plea Agreement ¶ 7, at 4.

11.     The Sanchez conspiracy included five unindicted conspirators: (i) Javier Alonso, see Mar. 13 Tr. at 23:13-21 (Castellano, Stemo); (ii) FNU/LNU, see Mar. 13 Tr. at 23:22-24:7 (Castellano, Stemo);[12] (iii) Kyle Dwyer, see Mar. 13 Tr. at 33:22-34:6 (Castellano, Stemo);

---

[11]The United States identified Geraldine Martinez as a member of the conspiracy to murder Garza.  See Mar. 12 Tr. at 102:2 (Castellano).  The United States only presented evidence about her in connection with Statement 67, indicating that Jimmy Gordon was asked to obtain information about Garza from Geraldine Martinez.  See Mar. 13 Tr. at 52:18-53:10 (Castellano, Stemo).  No evidence indicates that Geraldine Martinez agreed to kill Garza, so the Court cannot soundly conclude that Geraldine Martinez was a member of a conspiracy to kill Garza.

[12]FNU/LNU stands for First Name Unknown/Last Name Unknown.  See Mar. 12 Tr. at 97:1-8 (Castellano).

(iv) Jessie Trujillo, see Mar. 13 Tr. at 58:6-59:8 (Castellano, Stemo); and (v) Ernest Guerrero, see Mar. 13 Tr. at 24:1-11 (Castellano, Stemo).[13]

12.     The Sanchez conspiracy continued until Sanchez' death on June 17, 2007.  See Alonso Plea Agreement ¶ 7, at 4-5; Hernandez Plea Agreement ¶ 7, at 4; Clark Plea Agreement ¶ 7, at 4.

13.     A conspiracy to murder Jose Gomez and to prevent him from testifying existed. See Santos Gonzalez Plea Agreement ¶ 10, at 4-5, filed June 5, 2017 (Doc. 1180)(James Hearing Exhibit 18)("Gonzalez Plea Agreement"); Brandy Rodriguez Plea Agreement ¶ 13, at 5-6, filed February 23, 2018 (Doc. 1830)(James Hearing Exhibit 17)("B. Rodriguez Plea Agreement"); Paul Rivera Plea Agreement ¶ 8, at 4-5, filed February 1, 2017 (Doc. 877)(James Hearing Exhibit 16)("Rivera Plea Agreement").

---

[13]The United States identified Brian Rascone and Raymond Rascon as Sanchez conspiracy members, but at the testimony at the Court's James hearing indicates that the Rascon brothers refused to kill Sanchez.  See Mar. 13 Tr. at 24:3-11 (Stemo).

> The Rascon brothers were tasked to do the hit [on Sanchez] originally but when Javier Alonso approached them Raymond Rascon said they didn't want to do it because they were short to the door, meaning they were going to get out of prison shortly therefore Javier Alonso instructed Edward Troup and they both went into the cell and took care of business.  When they were doing that, the Rascon brothers came to offer their aid as a way to save face with the gang.

Mar. 13 Tr. at 24:3-11 (Stemo).  That the Rascon brothers refused to kill Sanchez indicates that they did not agree to kill Sanchez, i.e., that they were not members of the Sanchez conspiracy.  That they subsequently offered their assistance in cleaning up the murder scene indicates, at most, that the Rascon brothers joined a conspiracy to conceal the Sanchez murder and not a conspiracy to commit the Sanchez murder.  Consequently, the Court concludes that the Rascon brothers were not members of the Sanchez conspiracy.

The United States also identified Joe Martinez as a member of the Sanchez conspiracy.  See Mar. 12 Tr. at 105:12-16 (Castellano).  The United States introduced no evidence, however, indicating that he was a member of the Sanchez conspiracy.  The accordingly does not conclude that Joe Martinez was a member of the Sanchez conspiracy.

- 28 -

14.     The Gomez conspiracy included five people: (i) Paul Rivera; (ii) J. Gallegos; (iii) Santos Gonzales; (iv) Shauna Gutierrez; and (v) Brandy Rodriguez.  See Gonzalez Plea Agreement ¶ 10, at 4-5; B. Rodriguez Plea Agreement ¶ 13, at 4-5; Rivera Plea Agreement ¶ 8, at 4-5.

15.     The Gomez murder conspiracy began on or about February 1, 2016 and continued until on or about February 27, 2016.  Gonzalez Plea Agreement ¶ 10, at 4-5.  B. Rodriguez Plea Agreement ¶ 13, at 4-5; Rivera Plea Agreement ¶ 8, at 4-5.

16.     An uncharged conspiracy to kill Gerald Archuleta existed.  See Mar. 13 Tr. at 11-22 (Castellano, Stemo).

17.     The conspiracy to kill Archuleta included B. Garcia and Reynaldo Garcia, a.k.a. Baby Zac.  See Mar. 13 Tr. at 19-25 (Castellano, Stemo).

- 29 -

III.   **THE COURT MAKES PARTICULARIZED JUDGMENTS REGARDING THE JAMES PROFFER STATEMENTS' ADMISSIBILITY UNDER THE FEDERAL RULES OF EVIDENCE.**

The Court is able to make general determinations regarding the existence of conspiracies and their membership.  See FOFs.  The Court is also able to make general determinations regarding whether the James Proffer statements are testimonial.  See supra § 1.  A statement-by-statement approach is necessary, however, when determining whether statements were made during and in furtherance of a conspiracy.  See Fed. R. Evid 801(d)(2)(E).[19]

| **James Proffer Statement** | **Ruling** |
|---|---|
| Statement 1: "Billy Garcia tasked Leonard Lujan with finding an inmate to carry out the murders of Garza and Castillo.  The murders were to be executed simultaneous."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001 | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).  See Mar. 13 Tr. at 9:13-10:8 (Castellano, Stemo).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 4, at 2; Patterson Response ¶ 5, at 2.  The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |

---

[19]While the Court must make individualized determinations regarding whether -- and against whom -- individual statements are admissible under rule 801(d)(2)(E), the Court can make general determinations regarding the Defendants requests for "a continuing objection."  B. Garcia Response ¶ 21, at 9; A. Gallegos Response ¶ 7, at 3; Troup Response ¶ 23, at 6; Patterson Response ¶ 31, at 12.  The Court will not grant that request for two reasons.  First, the parties will need to make oral objections and not rely on continuing objections to apply the Court's evidentiary analysis to witness testimony.  Second, the Court's pretrial determinations are somewhat tentative, because evidence introduced at trial or variances between witness testimony and the James Proffer may alter those determinations.  Oral objections will bring those issues to the Court's attention.  Consequently, the Court will require the Defendants to make oral objections to evidence that they believe is inadmissible, and if the Court overrules those objections, the Defendants will need to determine whether they wish the Court to provide a limiting instruction.  See Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose -- but not against another party or for another purpose -- the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly.").

| Objections: Chavez Response, Patterson Response | |
|---|---|
| Statement 2: "Billy Garcia wanted Castillo and Garza 'to be taken out' by strangulation."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). <u>See</u> Mar. 13 Tr. at 10:9-13 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, <u>see</u> FOF, so the Court denies their objections, <u>see</u> Chavez Response ¶ 5, at 2; Patterson Response ¶ 6, at 2-3. The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 3: "The Castillo and Garza murders were an order. Anyone who did not follow that order was to be killed as well."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). <u>See</u> Mar. 13 Tr. at 10:14-11:2 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, <u>see</u> FOF, so the Court denies their objections, <u>see</u> Chavez Response ¶ 6, at 2; Patterson Response ¶ 7, at 3. The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 4: "Billy Garcia was planning to kill everyone in the unit with a green light but was starting with Castillo and Garza."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his plan, so it is admissible for its truth as against all the Defendants under rule 803(3). <u>See</u> Mar. 13 Tr. at 11:3-10 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's objections. <u>See</u> Chavez Response ¶ 7, at 2; Patterson Response ¶ 8, at 3-4. |
| Statement 5: "These murders needed to be done because the SNM gang was losing status with | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth as against all the Defendants under rule 803(3). |

| | |
|---|---|
| other gangs." <br><br> Declarant: Billy Garcia <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | See Mar. 13 Tr. at 11:11-22 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's objections. See Chavez Response ¶ 8, at 3; Patterson Response ¶ 9, at 4. |
| Statement 6: "Leonard Lujan tells Eugene Martinez 'I'm telling you right now where it's coming from and everything,' referring to Billy Garcia." <br><br> Declarant: Leonard Lujan (first-level) and Billy Garcia (second-level). <br><br> Source: Leonard Lujan, Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). See Mar. 13 Tr. at 11:23-12:7 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 4, at 2; Patterson Response ¶ 10, at 4. The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 7: "Billy Garcia ordered the murder of Castillo due to him cooperating with law enforcement." <br><br> Declarant: Billy Garcia. <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth as against all the Defendants under rule 803(3). See Mar. 13 Tr. at 12:8-16 (Castellano, Stemo). The Court accordingly denies Patterson's objection. See Patterson Response ¶ 11, at 4-5. |
| Statement 8: "Billy Garcia ordered Garza to be killed for being a former Los Carnales member." | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible for its truth as against all the Defendants under rule 803(3). See Mar. 13 Tr. at 12:17-25 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's |

- 72 -

| | |
|---|---|
| Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | objections. See Chavez Response ¶ 10, at 3-4; Patterson Response ¶ 12, at 5. |
| Statement 9: "'What the fuck is going on? I sent word a long time ago to clean house.' Billy Garcia was upset Leonard Lujan had not taken charge in the facility."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement could be offered for a non-hearsay purpose, i.e., as circumstantial evidence of B. Garcia's state of mind.<br><br>This statement is also admissible for its truth against the Counts 1 and 2 Defendants under rule 801(d)(2)(E), because B. Garcia's recrimination regarding Lujan's failure to act appear calculated to spur Lujan to take further action towards the Castillo and Garza murders. See Mar. 13 Tr. at 13:1-24 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 11, at 4; Patterson Response ¶ 13, at 5-6. If the statement is offered for its truth, the Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 10: "Leroy Lucero received word from Billy Garcia that several hits were supposed to happen. Garcia told him he didn't need help since Lucero was getting out."<br><br>Declarant: Billy Garcia<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | Part of this statement is a statement of B. Garcia's then-existing state of mind, specifically his plans, so that portion of the statement is admissible as against all of the Defendants under rule 803(3). The remainder of the statement, B. Garcia's direction to Lucero, is a statement in furtherance of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E), because B. Garcia, in declining Lucero's help, is arranging the details of the Castillo and Garza murders. See Mar. 13 Tr. at 15:15-22 (Castellano, Stemo). Accordingly, the statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 12, at 4; Patterson Response ¶ 14, at 6. To the extent that the statement is admissible against the Counts 1 and 2 Defendants under rule 801(d)(2)(E), the Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 11: "Leroy Lucero | This statement is admissible for its truth against the |

| | |
|---|---|
| confirmed the message that several hits were supposed to happen with Angel Munoz. Munoz said 'Something has to happen Carnal Billy's on his way.'"<br><br>Declarant: Angel Munoz<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | members of the Counts 1 and 2 conspiracies, under rule 801(d)(2)(E). See Mar. 13 Tr. at 16:12-17:4 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 13, at 4-5; Patterson Response ¶ 15, at 6. The Court will give a limiting instruction as to A. Garcia and A. Gallegos. |
| Statement 12: "Leonard Lujan met with Eugene Martinez and tasked him with the murder of Garza by strangulation and told Martinez to pick people to help."<br><br>Declarant: Leonard Lujan<br><br>Source: Leonard Lujan, Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the Count 2 conspirators under rule 801(d)(2)(E). See Tr. at 17:4-16 (Castellano, Stemo). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez Response ¶ 14, at 5; Patterson Response ¶ 16, at 6-7. The Court will give a limiting instruction as to A. Garcia, A. Gallegos, J. Gallegos, and Troup. |
| Statement 13: "Leonard Lujan met with Joe Gallegos, Angel DeLeon, and 'Criminal'[20] and ordered Castillo murdered by strangulation."<br><br>Declarant: Leonard Lujan<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: J. Gallegos Response, | The James Proffer lists Leonard Lujan as both this statement's declarant and its source. See James Proffer at 8. Agent Stemo's testimony indicates that she is aware of this out-of-court Lujan statement via another out-of-court statement, which Lujan made circa 2007. See Mar. 13 Tr. at 65:7-16 (Benjamin, Stemo). The 2007 statement was made long after the Count 1 conspiracy ended with Castillo's death, so it is not admissible under rule 801(d)(2)(E). The earlier statement, however, was made during and in furtherance of the Count 1 conspiracy during and in furtherance of the Count 1 conspiracy by a member of that conspiracy. See Mar. 13 Tr. at 17:17-24, 18:20- |

---

[20]"Criminal" refers to Michael Jaramillo. See Mar. 13 Tr. at 130:24-131:1 (Castellano, Stemo).

- 74 -

| | |
|---|---|
| Patterson Response | 19:1 (Castellano, Stemo).  Patterson is not a member of the Count 1 conspiracy, see FOF, so the Court grants Patterson's objection insofar as it requests a limiting instruction, see Patterson Response ¶ 17, at 7. |
| | J. Gallegos requests the opportunity to voir dire Lujan, because "he is referred to in an audio recording by Leroy Lucero as 'crazy Leonard, no one would believe Leonard.'"  J. Gallegos Response ¶ 1, at 3.  The Court denies that request, because voir dire is not an appropriate mechanism for testing Lujan's credibility. |
| | J. Gallegos argues that this statement is an action -- giving an order -- and not a statement.  See J. Gallegos Response ¶ 1, at 3; Mar. 13 Tr. at 64: 11-13 (Benjamin).  Under the Federal Rules of Evidence, a statement must be an assertion.  See Fed. R. Evid. 801(a)("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.").  J. Gallegos is correct insofar as orders and commands -- e.g., "fetch me a shrubbery" -- like questions -- e.g., "what do you want to eat for lunch?" -- are not assertions, because they are neither true nor false.  Consequently, orders and questions cannot be hearsay both because hearsay must be a statement, see Fed. R. Evid. 801(c)("'Hearsay' means a statement . . . ."), and because an utterance that is neither true nor false cannot be offered "to prove the truth of the matter asserted," Fed. R. Evid. 801(c)(2). |
| | While orders and commands are not, themselves, assertions they may -- like questions -- contain implicit assertions.  See United States v. Summers, 414 F.3d 1287, 1298 (10th Cir. 2005)(Kelly, J.)(concluding that a defendant's question -- "'How did you guys find us so fast?'" -- was an implicit assertion of "both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so quickly").[21]  As an example, |

---

[21]At least according to Aristotle, contingent predictions are another example of utterances that are neither true nor false:

> In the case of that which is or which has taken place, propositions, whether positive or negative, must be true or false.  Again, in the case of a pair of contradictories, either when the subject is universal and the propositions are of a universal character, or when it is individual, as has been said,[] one of the two must be true and the other false . . . .

- 75 -

|  | ordering someone to "give me one pound of your best marijuana" implicitly asserts that the person to whom the order is addressed possess a controlled substance. Likewise, asking someone whether they stopped beating their wife is implicitly an assertion both that the person questioned is married and an assertion that, at one point, they abused their wife. Thus, the orders that the <u>James</u> Proffer identifies can qualify as hearsay if those orders contain implicit assertions. |
|---|---|
|  | Listing orders in the <u>James</u> Proffer is useful, even if those orders do not contain implicit assertions, because people often make orders in quick succession, and -- if they are not lawyers -- they do not always scrupulously distinguish between the two.    Statement 13 indicates that Lujan ordered others to kill Castillo, but Lujan may unexpectedly |

---

When the subject, however, is individual, and that which is predicated of it relates to the future, the case is altered.  For if all propositions whether positive or negative are either true or false, then any given predicate must either belong to the subject or not, so that if one man affirms that an event of a given character will take place and another denies it, it is plain that the statement of the one will correspond with reality and that of the other will not. For the predicate cannot both belong and not belong to the subject at one and the same time with regard to the future.

. . . .

[T]o say that neither the affirmation nor the denial is true, maintaining, let us say, that an event neither will take place nor will not take place, is to take up a position impossible to defend.  In the first place, though facts should prove the one proposition false, the opposite would still be untrue.  Secondly, if it was true to say that a thing was both white and large, both these qualities must necessarily belong to it; and if they will belong to it the next day, they must necessarily belong to it the next day.  But if an event is neither to take place nor not to take place the next day, the element of chance will be eliminated.  For example, it would be necessary that a sea-fight should neither take place nor fail to take place on the next day.

. . . .

A sea-fight must either take place to-morrow or not, but it is not necessary that it should take place to-morrow, neither is it necessary that it should not take place, yet it is necessary that it either should or should not take place to-morrow.  Since propositions correspond with facts, it is evident that when in future events there is a real alternative, and a potentiality in contrary directions, the corresponding affirmation and denial have the same character.

Aristotle, <u>On Interpretation</u> § I, Pt. 9, <u>available at</u> http://classics.mit.edu/Aristotle/interpretation. html.

- 76 -

| | testify that he told those people that he wanted them to kill Castillo, which is a statement regarding Lujan's desires and not, technically, an order. Alternatively, Lujan may testify both that he gave the order that Statement 13 describes and he may indicate that he also made statements regarding the reasons for that order or other associated statements. |
| --- | --- |
| | That the United States lists orders in the James Proffer is prudent, because it permits the Defendants and the Court to consider and argue, respectively, whether those orders contain implicit assertions. It also permits the Court to make findings that will permit it to quickly rule on unexpected statements closely associated with those orders, e.g., if an order was made during a conspiracy by a conspirator then statements made by the same person at much the same time were also made during a conspiracy by a conspirator.[22] Further, if the United States did not list orders in the James Proffer, the Defendants could complain at trial -- perhaps legitimately -- regarding unfair surprise. Accordingly, the Court denies J. Gallegos' objection that "this is not a statement." J. Gallegos Response ¶ 1, at 3. |
| Statement 14: "Billy Garcia wanted knowledge of the plan kept to very few individuals." <br><br> Declarant: Billy Garcia <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, so it is admissible for its truth against all the Defendants under rule 803(3). See Mar. 13 Tr. at 19:2-9 (Castellano, Stemo). The Court accordingly denies Chavez' and Patterson's objections. See Chavez Response ¶ 15, at 5; Patterson Response ¶ 18, at 7-8. |
| Statement 15: "Once alarms were sounded and the murders discovered, Billy Garcia congratulated Leonard Lujan with 'Amor.'" <br><br> Declarant: Billy Garcia | This statement was made after Castillo and Garza died, so it was not made during the Counts 1 and 2 conspiracies. Accordingly, it is not admissible under rule 801(d)(2)(E). <br><br> The United States could offer this statement as circumstantial evidence of B. Garcia's state of mind, however. Consequently, the Court grants Chavez' and Patterson's objections to admitting this statement for its |

---

[22]Whether a statement was made in furtherance of a conspiracy, however, will depend on the content and content of the statement.

- 77 -

| | |
|---|---|
| Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | truth under rule 801(d)(2)(E), see Chavez Response ¶ 15, at 16; Patterson Response ¶ 19, at 8, but the Court may admit this statement for a non-hearsay purpose. |
| Statement 16: "Frederico Munoz part of the committee that sanctioned the hit on Garza and Castillo. Munoz wanted Garza killed for being Los Carnales."<br><br>Declarant: Billy Garcia<br><br>Source: Federico Munoz<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | The testimony at the Court's James hearing indicates that Federico Munoz admitted to the information contained in this statement. See Mar. 13 Tr. at 19:25-20:7 (Castellano, Stemo). Federico Munoz testifying and repeating that admission raises no hearsay issues, because Munoz has personal knowledge regarding his own motives and regarding whether he was part of a group that ordered the Castillo and Garza murders. See Fed. R. Evid. 602. |
| Statement 17: "Arturo Garcia placed hit on Sanchez because he was suspected to be cooperating with law enforcement."<br><br>Declarant: Arturo Garcia<br><br>Source: Eric Duran<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This is a statement of A. Garcia's then-existing state of mind, so it is admissible for its truth against all the Defendants under rule 803(3). See Mar. 13 Tr. at 20:16-21:1 (Castellano, Stemo). |
| Statement 18: "Ben Clark passed around paperwork on Sanchez's cooperation with police. Stating 'everyone who needs to see it has seen it, get rid of it.'"<br><br>Declarant: Ben Clark<br><br>Source: Ruben Hernandez<br><br>Date: On or before June 17, 2007 | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E). See Mar. 13 Tr. at 21:2-13 (Castellano, Stemo). The act of passing around paperwork and any associated statements -- see supra Statement 13 (analyzing the relationship between acts and statements) -- furthered the Sanchez conspiracy, because the paperwork indicated that the Sanchez murder was a legitimate SNM hit, which induced further action on the part of conspirators. Destroying the paperwork afterward furthered the conspiracy by preventing law enforcement from learning of -- and potentially preventing -- the |

- 78 -

| | |
|---|---|
| Objections: None | planned Sanchez murder. |
| Statement 19: "Arturo Garcia wrote to Frankie Gonzales that Brian and Raymond Rascon were to take care of the next murder for SNM."<br><br>Declarant: Arturo Garcia<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 21:14-22:1 (Castellano, Stemo). |
| Statement 20: "Ben Clark put Javier Alonso in charge of making sure Sanchez was killed and told the Rascon brothers to complete the hit."<br><br>Declarant: Ben Clark<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 22:2-10 (Castellano, Stemo). |
| Statement 21: "Word was sent from the green pod that if Sanchez was not killed, others in the Blue pod would be killed."<br><br>Declarant: FNU [First Name Unknown] LNU [Last Name Unknown]<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 22:11-23:1 (Castellano, Stemo). |
| Statement 22: "Edward Troup was told to go help with Sanchez's | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 23:15-21 |

- 79 -

| | |
|---|---|
| murder." <br><br> Declarant: Javier Alonso <br><br> Source: Javier Alonso <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | (Castellano, Stemo). |
| Statement 23: "While Edward Troup and Javier Alonso were finishing killing Sanchez, Brian and Raymond Rascon came and asked if they could help." <br><br> Declarant: Brian Rascon and/or Raymond Rascon <br><br> Source: Javier Alonso <br><br> Date: On or before June 17, 2007 <br><br> Objections: Troup Response | This statement is actually an action -- specifically an offer -- and not an assertion, so it cannot be hearsay. See Tr. 23:22-24:14 (Stemo). <br><br>     The Rascon brothers were tasked to do the hit originally but when Javier Alonso approached them Raymond Rascon said they didn't want to do it because they were short to the door, meaning they were going to get out of prison shortly therefore Javier Alonso show instructed Edward Troup and they both went into the cell and took care of business. When they were doing that, the Rascon brothers came to offer their aid as a way to save face with the gang. <br><br> Tr. at 24:3-11 (Stemo). See supra Statement 13 (discussing the relationship between actions and statements). That the Rascon brothers offered their aid after Sanchez' death indicates that the conspiracy to kill Sanchez no longer existed, so any associated statements are not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E). See United States v. Alcorta, 853 F.3d 1123, 1139 (10th Cir. 2017)("To be sure, to qualify for the coconspirator exception a statement must have been made during the conspiracy. Statements made after the objectives of the conspiracy have either failed or been achieved are not made during the conspiracy and must be excluded."). Further, that the Rascon brothers refused to kill Sanchez when Alonso approached them indicate that they did not join the Sanchez conspiracy. See Tr. at 24:3-11(Stemo). <br><br> Troup argues that this statement lacks a sufficient foundation, because the James Proffer identifies the declarant as "'Brian Rascon and/or Raymond Rascon.'" Troup Response ¶ 4, at 2 (quoting James Proffer at 13). |

- 80 -

| | This statement's admissibility does not depend on whether the person who offered assistance is Brian Rascon, Raymond Rascon, or both.  See United States v. Brinson, 772 F.3d 1314, 1321-22 (10th Cir. 2014)(concluding that an unidentified declarant's statements were admissible, because they were not offered to prove the truth of the matter asserted).  Accordingly, the Court denies Troup's objection.  See Troup Response ¶ 4, at 2. |
| Statement 24: "Javier Alonso told the Rascon brothers to keep a look out when the brothers asked if they could help."  Declarant: Javier Alonso  Source: Javier Alonso  Date: On or before June 17, 2007  Objections: None | This statement is actually an action -- giving the Rascon brothers an order -- so it is not hearsay.  See Tr. at 24:15-21 (Stemo, Castellano).  See also supra Statement 13 (discussing the relationship between actions and statements).  That Alonso gave this order after Sanchez' death indicates that any associated statements were not made during the Sanchez conspiracy, so those statements are not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E).  See United States v. Alcorta, 853 F.3d at 1139. |
| Statement 25:  "Edward Troup kissed Javier Alonso on the cheek and told him he was proud of him."  Declarant: Edward Troup  Source: Javier Alonso  Objections: None | This is a statement of Troup's then-existing state of mind, so it is admissible against all Defendants under rule 803(3).  See Tr. at 24:22-25:5 (Castellano, Stemo). |
| Statement 26: "After Sanchez was murdered, Edward Troup began telling Ruben Hernandez that he was next."  Declarant: Edward Troup  Source: Javier Alonso;  Ruben Hernandez  Date: On or before June 17, 2007  Objections: None | Agent Stemo's testimony indicates that this statement stands in for several closely associated statements:  Q.     Following the murder in statement number, was an indication that Edward Troup began telling Ruben Hernandez that he was next?  A.     Yes.  Q.     And what was the indication about Ruben Hernandez at or around the time -- at or around the time of the murder?  A.     I believe Mr. Hernandez did not |

- 81 -

| | |
|---|---|
| | cover the cameras properly. |
| | Q.    At that point, according to statements by Javier Alonso and others was Ruben Hernandez seen as possibly scared and weak? |
| | A.    Yes, he was actually on crutches at the time. |
| | Q.    Related to the statement is there another statement related to Edward Troup stating in part that Ruben Hernandez failed to cover the camera because he was scared? |
| | A.    Yes. |
| | Tr. at 25:6-24 (Stemo, Castellano). |
| | To the extent that this is a statement of Troup's plans or a statement regarding how other inmates viewed Hernandez, it is a statement of then-existing state of mind, so it is admissible for its truth under rule 803(3).  To the extent that these statements are offered as circumstantial evidence of Troup's state of mind, they are not offered to prove the truth of the matter asserted, so they are not hearsay. |
| Statement 27: "Arturo Garcia sent word about Sanchez to Ben Clark."<br><br>Declarant: Arturo Garcia<br><br>Source: Ben Clark, Eric Duran<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 25:25-26:9 (Castellano, Stemo). |
| Statement 28: "Ben Clark and Arturo Garcia sent several letters about Sanchez to each other."<br><br>Declarant: Arturo Garcia<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007 | Sending letters is an action and not a statement, but the statements in those letters regarding the Sanchez murder are admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Tr. at 26:10-18 (Castellano, Stemo).. |

- 82 -

| | |
|---|---|
| Objections: None | |
| Statement 29: "Javier Alonso and Edward Troup were expected to oversee the murder, and Troup told the Rascon brothers to hit Sanchez."<br><br>Declarant: Ben Clark<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | Troup argues that the portion of this statement referring to Benjamin Clark's expectations circa 2007 is not a statement at all.  See Troup Response ¶ 5, at 2.  Troup is correct -- expectations are not statements.  Clark can, however, testify about what his expectations were at that time.  If, however, this statement refers to expectations that belong to someone other than Clark, the United States would need to establish how Clark knows about those expectations.  If that foundation is statements of someone's then-existing state of mind, then those statements are admissible under rule 803(3).   If that foundation is statements that are circumstantial evidence of the declarant's state of mind then those statements are not offered to prove the truth of the matter asserted, so they are not hearsay.   In any event, the Court denies Troup's objection.  See Troup Response ¶ 5, at 2. |
| | That Troup told the Rascon brothers to hit Sanchez is an order and not a statement, see supra Statement 13 (discussing the relationship between actions and statements), but any associated statement that Troup made are admissible against the Count 3 conspirators under rule 801(d)(2)(E), see Tr. at 26:19-27:1 (Castellano, Stemo).  That the Rascon brothers refused to murder Sanchez indicates that they did not join the Count 3 conspiracy.  See Tr. at 24:3-11 (Stemo).  A rule 801(d)(2)(E) statement, however, needs to be made by a conspirator, but it does not need to be made to a conspirator.   See Fed. R. Evid. 801(d)(2)(E).  Consequently, that the Rascon brothers did not join the Count 3 conspiracy does not affect whether Troup's statements are admissible under rule 801(d)(2)(E). |
| Statement 30: "Leonard Lujan told Willie Amador and Jesse Ibarra to 'handle that' and told Eugene Martinez that 'I'm running this prison now.'"<br><br>Declarant: Leonard Lujan<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections:   Chavez   Response, | Stemo's testimony indicates that "statement number 30 is incorrect" and that "[w]hat it actually says is, Lujan told Martinez to tell SNM members, Willie Amador and Jesse Martinez to handle that."  See Tr. at 173:25-174:3 (Stemo).  Lujan's order to E. Martinez is an action and not an assertion, see supra Statement 13 (discussing the relationship between actions and statements), but any associated statements would be admissible for their truth against the Count 2 Defendants under rule 801(d)(2)(E).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see FOF, so the Court denies their objections, see Chavez |

- 83 -

| Patterson Response | Response ¶ 18, at 6; Patterson Response ¶ 21, at 8-9. |
|---|---|
| Statement 31: "Christopher Chavez heard about the hit on Garza and volunteered to participate in the operation." <br><br> Declarant: Chris Chavez <br><br> Source: Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objections: B. Garcia Response, Patterson Response | That Chavez volunteered is an action and not a statement. See supra Statement 13 (discussing the relationship between actions and statements). <br><br> This statement is not hearsay, because Chavez' act, volunteering to participate in the Garza murder, is neither true nor false.  The Court anticipates that there are other statements associated with Chavez' act which could be offered for their truth.  For example, it would have been natural for Chavez to state that he wanted to participate in the Garza murder, which would be a statement of then-existing state of mind under rule 803(3).  Any statements made by Count 3 conspirators attempting to induce Chavez to volunteer would have been made during and in furtherance of the Count 3 conspiracy, so they would be admissible for their truth under rule 801(d)(2)(E) as to the Count 3 conspirators. |
| Statement 32: "Willie Amador told Eugene Martinez to be lookout during the Garza murder and stated, 'If something happens, you already know.'" <br><br> Declarant: Willie Amador <br><br> Source: Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | This statement was made during and in furtherance of the Count 2 conspiracy and it was made by Willie Amador, a member of that conspiracy.  It is not testimonial.  Accordingly, the statement is admissible for its truth against the Count 2 conspirators under rule 801(d)(2)(E). |
| Statement 33: While strangling Garza someone in the room yelled 'Close the door!'" <br><br> Declarant: Allen Patterson or Christopher Chavez <br><br> Source: Eugene Martinez <br><br> Date: On or before March 26, 2001 | B. Garcia argues that, because the James Proffer lists this statement's declarant as "Allen Patterson or Christopher Chavez," James Proffer at 18, "[t]here is no ability to properly attribute or authenticate the statement to any particular declarant."  B. Garcia ¶ 5, at 2-3. <br><br> This statement -- "Close the door!" -- is a command, so it is neither true nor false.   See supra Statement 13 (analyzing the relationship of actions and statements).  Associated statements are probably admissible against the Count 2 conspirators under rule 801(d)(2)(E). <br><br> As to authentication, rule 901 states that "the proponent [of |

- 84 -

| | |
|---|---|
| Objections: B. Garcia Response | an item of evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 609(a).  Accordingly, so long as the United States claims only that this statement was made by either Patterson or Chavez, it only needs, under rule 609, to introduce evidence sufficient to support a finding that one of those two individuals made the statement.  See Fed. R. Evid. 609(a). The testimony of the witness who relates this statement to the jury -- assuming that the witness has knowledge -- satisfies that requirement.  See Fed. R. Evid. 609(b)(1)(stating that the testimony of a witness with knowledge satisfies rule 609's authentication requirement).    Accordingly, the Court denies B. Garcia's objection.  B. Garcia ¶ 5, at 2-3. |
| Statement 34: "Leonard Lujan approached Eugene Martinez and told him to talk to Willie Amador about the murders." <br><br> Declarant: Leonard Lujan <br><br> Source: Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objection:    Chavez    Response, Patterson Response | This statement is admissible against the Counts 2 Defendants under rule 801(d)(2)(E).  See Mar. 13 Tr. at 30:20-31:1 (Castellano, Stemo).  The Court accordingly denies Chavez' and Patterson's objections.  See Chavez Response ¶ 20, at 6-7; Patterson Response ¶ 24, at 10. |
| Statement 35: "Eugene Martinez asked Billy Garcia and Garcia confirmed the order and said 'it's coming from me' and 'make sure it happens.'" <br><br> Declarant: Billy Garcia <br><br> Source: Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objections:    Chavez    Response, Patterson Response | This statement is admissible against the Counts 2 Defendants under rule 801(d)(2)(E).  See Mar. 13 Tr. at 31:2-12 (Castellano, Stemo).  The Court accordingly denies Chavez' and Patterson's objections.  See Chavez Response ¶ 21, at 7; Patterson Response ¶ 25, at 10. |
| Statement 36: "Joe Gallegos later informed    Leroy    Lucero    that Lawrence    Torres    saw    and    was | The United States orally conceded that this statement is not admissible under rule 801(d)(2)(E) of the Federal Rules of Evidence, because it was made four or five years after the |

- 85 -

| | |
|---|---|
| concerned Torres might snitch." <br><br> Declarant: Joe Gallegos <br><br> Source: Leroy Lucero <br><br> Date: On or before March 26, 2001 <br><br> Objections: B. Garcia Response, Chavez Response, A. Gallegos Response, J. Gallegos Response, Patterson Response | Castillo and Sanchez murders.  See Mar. 13 Tr. at 32:5-13 (Castellano)   The United States suggested, however, that the statement is admissible against Troup under rule 801(d)(2)(A).  The statement also appears to be a statement of then-existing state of mind under rule 803(3) to the extent that it expresses J. Gallegos' concerns and as circumstantial evidence of J. Gallegos' state of mind, i.e. consciousness of guilt. .  It is not admissible under rule 803(3), however, to show that Lawrence Torres saw anything, because rule 803(3) doesn't permit a statement of belief to be used to show the fact believed.  See Fed. R. Evid. 803(3). <br><br> The Court accordingly denies Patterson's objection.  See Patterson Response ¶ 26, at 10-11. <br><br> That this statement is nontestimonial means that its admission does not offend the Confrontation Clause, so the Court denies J. Gallegos' objection "on confrontation grounds." J. Gallegos Response ¶ 2, at 4. |
| Statement 37: "Edward Troup told Lawrence Torres, 'This has nothing to do with you.  Don't come up here.'" <br><br> Declarant: Edward Troup <br><br> Source: Lawrence Torres <br><br> Date: On or before March 26, 2001 <br><br> Objections: B. Garcia Response, Chavez Response, Patterson Response | The United States provided additional context for this statement at the Court's James hearing: <br><br> On the morning of the murder, March 26, 2001, Lawrence Torres woke up. As he walked out to heat up water for his coffee, he saw Angel DeLeon and Edward Troup, and it looked like to him that they were disassembling a laundry bag.  He put his water into the microwave, went back to his cell.  He heard  a struggle, so he looked out to see what was happening, and he saw Mr. Edward Troup sitting at a table.  Mr. Torres tried go upstairs to see what was happening, and that's when Mr. Troup made that statement. <br><br> Mar. 13 Tr. at 33:20-33:5 (Stemo).   This statement is admissible against the Count 1 Defendants under rule 801(d)(2)(E), because Troup was a member of that conspiracy and he made the statement to prevent outside interference with the Castillo murder.   The Court accordingly denies B. Garcia's, Chavez', and Patterson's objections.  See B. Garcia Response ¶ 7, at 3; Chavez Response ¶ 23, at 7-8; Patterson Response ¶ 27, at 11. |
| Statement 38: "Angel Deleon had a | The James hearing testimony indicates that Deleon made |

- 86 -

| | |
|---|---|
| scratch on his finger and told a female CO that he cut himself."<br><br>Declarant: Angel Deleon<br><br>Source: Lawrence Torres<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Chavez Response | this statement after the Castillo murder, so it was not made during the conspiracy to commit that murder.  See Mar. 13 Tr. at 33:9-21(Castellano, Stemo).  Consequently, it is not admissible for its truth under rule 801(d)(2)(E).  The statement is admissible, however, as circumstantial evidence of DeLeon's state of mind, specifically his consciousness of guilt.<br><br>The Court accordingly denies Chavez' objections.  See Chavez Response ¶ 24, at 8.<br><br>Offering a hearsay statement for a purpose other than its truth does not implicate the Confrontation Clause, see Tennessee v. Street, 471 U.S. 409, 417 (1985), so the Court denies B. Garcia's objection that "this is a testimonial statement made to a CO during the process of an investigation and therefore is inadmissible," B. Garcia Response ¶ 8, at 4. |
| Statement 39: "Kyle Dwyer came to SNMCF with 'paperwork' on Sanchez."<br><br>Declarant: Kyle Dwyer<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: None | That Dwyer brought the Sanchez paperwork to SNMCF is an action and not a statement.  See supra Statement 13 (analyzing the relationship between actions and statements). |
| Statement 40: "The 'paperwork' came from the Crazy Town Roswell gang."<br><br>Declarant: Ben Clark<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: None | Clark likely does not have personal knowledge regarding the paperwork's origins; he probably knows that the paperwork came from the Crazy Town Roswell gang because somebody told him about the paperwork's origins.  See Fed. R. Evid. 602.  The Court has no information regarding that out-of-court statement to Clark, so it cannot analyze whether that statement is admissible for its truth. |
| Statement 41: "Joe and Andrew Gallegos just pulled 'a job' and had to go 'clean up.'  They were giving money and heroin to friends to 'help them out.'  Joe Gallegos said, | This statement is not admissible under rule 801(d)(2)(E), because the Court has not concluded that a conspiracy to murder Adrian Burns existed.<br><br>The James Proffer is not entirely clear regarding which |

- 87 -

| | |
|---|---|
| 'I just came up.'"<br><br>Declarant: Joe and/or Andrew Gallegos<br><br>Source: Leroy Vallejos, Michael Sutton<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | statements A. Gallegos made and which statements J. Gallegos made. Rule 801(d)(2)(A) permits the statement to be admitted against whichever Gallegos brother made the statement. If one Gallegos brother made a statement, it may be admissible against the other under rule 801(d)(2)(B), which permits a statement to be introduced a party that "manifested that it adopted or believed [the statement] to be true." Fed. R. Evid 801(d)(2)(B). See id. advisory committee notes ("Adoption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue."). Additionally, the statement might be admissible as an excited utterance. See Fed. R. Evid. 803(2).<br><br>A. Gallegos objects to this statement, because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3. At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point. It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge. See Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 602.02[2]("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible.").<br><br>J. Gallegos objects to this statement and Statement 42, because admitting them "is probably in-violation [sic] of the holding in Bruton v. United States, 391 U.S. 123 (1968). That this statement is nontestimonial indicates that admitting it for its truth does not offend the Confrontation Clause. Further, if rule 801(d)(2)(A) and rule 801(d)(2)(B) both apply, the statement is admissible against both Gallegos brothers. The Court accordingly denies J. Gallegos' objection. See J. Gallegos Response ¶ 3, at 4. |
| Statement 42: "Joe and Andrew Gallegos were covered in blood and advised they were 'cleaning | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible |

| | |
|---|---|
| the house.' Joe Gallegos later went by Leroy Vallejos' house and tried to give Vallejos his and Andrew Gallegos' truck."<br><br>Declarant: Joe and/or Andrew Gallegos<br><br>Source: Daniel Orndorff, Michael Sutton, Leroy Vallejos<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | under rule 801(d)(2)(E).<br><br>A. Gallegos objects to this statement, because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3. At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point. It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge. See Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 602.02[2]("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible.").<br><br>J. Gallegos objects to this statement's admission, because it is an action and not a statement. See |
| Statement 43: "Charlene Baldizan agreed to get rid of the van because the Gallegos brothers knew police were looking for it."<br><br>Declarant: Gallegos brothers<br><br>Source: Charlene Baldizan<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E).<br><br>A. Gallegos objects to this statement, because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3. At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point. It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge. See Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 602.02[2]("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible."). |
| Statement 44: "Joe and Andrew Gallegos asked Jason Van Veghel to clean up the living room and pull | United States orally struck "and Andrew" from statement 44. |

- 89 -

| | |
|---|---|
| the carpet up and gave him 2-3 hits of heroin for it. Joe Gallegos also asked Van Veghel to clean blood off air compressor." <br><br> Declarant: Joe Gallegos <br><br> Source: Jason Van Veghel <br><br> Date: On or about November 13, 2012 <br><br> Objections: A. Gallegos Response, J. Gallegos Response | J. Gallegos objects to this statement, because Van Veghel "has never been alleged or identified as a co-conspirator." J. Gallegos Response ¶ 5, at 4. After J. Gallegos filed his response, the United States orally identified Van Veghel as a conspirator at the Court's <u>James</u> hearing. Additionally, whether a statement is admissible under rule 801(d)(2)(E) depends on whether the statement was made by a conspirator and not on whether the statement was made to a conspirator. <br><br> Rule 801(d)(2)(E) does not apply to this statement, however, because the Court has not found that a conspiracy to murder Adrian Burns existed. Nonetheless, Van Veghel can testify regarding the actions he took and any instructions he received without running afoul of the rule against hearsay. <u>See</u> Fed. R. Evid. 801(c). |
| Statement 45: "The next day, at Joe Gallegos request, Andrew Gallegos threw a set of keys and a wrist watch into a field." <br><br> Declarant: Andrew Gallegos <br><br> Source: Jason Van Veghel <br><br> Date: On or about November 13, 2012 <br><br> Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E). Van Veghel can testify regarding the actions he observed, such as A. Gallegos throwing a set of keys and a wrist watch into a field, without running afoul of the rule against hearsay, however. <u>See</u> Fed. R. Evid. 801(c). |
| Statement 46: "Joe Gallegos found out the police were coming to search the house and he gave several guns and other stolen goods to Jason Van Veghel to store elsewhere." <br><br> Declarant: Joe Gallegos <br><br> Source: Jason Van Veghel <br><br> Date: On or about November 13, 2012 <br><br> Objections: A. Gallegos Response, | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E). <br><br> Van Veghel can testify regarding actions he observed -- such as J. Gallegos giving him several guns and stolen goods -- without running afoul of the rule against hearsay. Statements indicating why J. Gallegos was giving Van Veghel those guns and goods are admissible as circumstantial evidence of J. Gallegos' state of mind or as statements of J. Gallegos' then-existing state of mind under rule 803(3). <br><br> J. Gallegos argues that this statement is "inconsistent with the discovery provided." J. Gallegos response ¶ 7, at 5. J. Gallegos can impeach this statement based on that |

- 90 -

| | |
|---|---|
| J. Gallegos Response | inconsistency, but it does not render the statement inadmissible. |
| Statement 47: "Santos Gonzales told Gomez 'You remember me?' They then told Gomez that Joe Gallegos put a hit out and they were there to kill him."<br><br>Declarant: Santos Gonzales<br><br>Source: Jose Gomez<br><br>Date: On or about February 27, 2016<br><br>Objection: J. Gallegos Response | J. Gallegos argues that this statement is inadmissible, because "Santos Gonzales is not expected to testify and this statement is contained in the factual portion of his plea agreement." J. Gallegos Response ¶ 8, at 5. The United States probably reused language from Gonzalez' plea agreement when drafting the <u>James</u> Proffer, but that does not render Jose Gomez' testimony relating the substance of Gonzalez' out-of-court statement inadmissible.<br><br>Any statements that J. Gallegos made ordering others to kill Gomez are admissible against J. Gallegos under rule 801(d)(2)(A). Statements that those others made to Gomez are either circumstantial evidence of the declarant's state of mind or statements of then-existing state of mind, specifically their motive for assaulting Gomez. |
| Statement 48: "Shauna Gutierrez said 'they didn't finish him' when Gomez ran away."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Brandy Rodriguez<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | United States orally indicated that this statement will only come in if Brandy Rodriguez testifies to it. <u>See</u> Mar. 13 Tr. at 41:7-12 (Castellano)("Brandy Rodriguez is not cooperating with the Government at this time, but I am submitting this statement for the Court's consideration in case that changes."). Consequently, J. Gallegos' assertion that "neither the declarant nor the source is expected to testify" creates no admissibility issues.     J. Gallegos Response ¶ 48, at 5.  If B. Rodriguez testifies, then J. Gallegos' assertion is false.  If B. Rodriguez does not testify, this statement will not be offered into evidence, so whether it is admissible is moot.<br><br>J. Gallegos also asserts that "there is no indicia of trustworthiness based on the multiple versions of statements given by" B. Rodriguez and Gutierrez.     J. Gallegos ¶ 9, at 5.  J. Gallegos can argue to the jury that this statement is untrustworthy, but that does not render the statement inadmissible unless the United States relies upon an exception to the rule against hearsay that has indicia of trustworthiness -- or the lack of indicia of untrustworthiness -- as an element.  <u>See</u>, <u>e.g.</u>, Fed. R. Evid. 803(6)(E). |
| Statement 49: "Santos Gonzalez and Paul Rivera knocked on the door and asked for Gomez. They then told Charlene Parker-Johnson | J. Gallegos "objects to this statement to the extent that it may have come from Santos Gonzales who probably will not testify.  Defendant further objects as this statement does not appear trustworthy as the source is not provided ostensibly because he/she remains unknown."  J. Gallegos |

- 91 -

| | |
|---|---|
| that she should leave the house." <br><br> Declarant: Santos Gonzalez and/or Paul Rivera <br><br> Source: Charlene Parker-Johnson <br><br> Date: On or about February 27, 2016 <br><br> Objections: J. Gallegos Response | Response ¶ 10, at 5.  Contrary to the J. Gallegos Response, the <u>James</u> Proffer identifies the source of this statement as Charlene Parker-Johnson and not as Santos Gonzales or unknown.  <u>See James</u> Proffer at 26.  <u>See also</u> Mar. 13 Tr. at 42:2-11 (Castellano, Stemo). |
| Statement 50: "Santos Gonzalez and Paul Rivera yelled, 'He's running!' and 'He's getting away!' when Gomez started to run." <br><br> Declarant: Santos Gonzales and/or Paul Rivera <br><br> Source: Charlene Parker-Johnson <br><br> Date: On or about February 27, 2016 <br><br> Objections: J. Gallegos Response | J. Gallegos "objects to this statement to the extent that it may have come from Santos Gonzales who probably will not testify.  Defendant further objects as this statement does not appear trustworthy as the source is not provided ostensibly because he/she remains unknown."  J. Gallegos Response ¶ 10, at 5.  Contrary to the J. Gallegos Response, the <u>James</u> Proffer identifies the source of this statement as Charlene Parker-Johnson and not as Santos Gonzales or unknown.  <u>See James</u> Proffer at 26.  <u>See also</u> Mar. 13 Tr. at 42:12-43:2 (Castellano, Stemo). <br><br> These are admissible as excited utterances, <u>see</u> Fed. R. Evid. 803(2), or present-sense impressions, <u>see</u> Fed. R. Evid. 803(1). |
| Statement 51: "Joe Gallegos placed a hit on Gomez because Joe Gallegos feared Gomez would testify against him on a state murder charge." <br><br> Declarant: Shauna Gutierrez and Brandy Rodriguez <br><br> Source: Paul Rivera <br><br> Date: On or about February 27, 2016 <br><br> Objections: A. Gallegos Response, J. Gallegos Response | J. Gallegos "objects to this statement to the extent that its source is unidentified."  J. Gallegos Response ¶ 11, at 5. The source of this statement is not unidentified, however. <u>See James</u> Proffer at 27. <br><br> This statement is admissible against J. Gallegos under rule 801(d)(2)(E).   B. Rodriguez and Gutierrez were both members of the Courts 14-16 conspiracy.  <u>See supra</u> FOF ¶ 14.   The statement was made in furtherance of that conspiracy, because it enlisted Rivera's assistance in the conspiracy.  This statement is not, however, admissible against A. Gallegos, because he was not a member of the Counts 14-16 conspiracy, and the Court will -- at A. Gallegos' request, give the jury a limiting instruction.  <u>See</u> A. Gallegos Response ¶ 4, at 2-3. |
| Statement 52: "Upon learning where Gomez was staying, Shauna Gutierrez and Brandy Rodriguez | This statement is admissible against J. Gallegos under rule 801(d)(2)(E) as a statement made during and in furtherance of the Counts 14-16 conspiracy.  <u>See</u> Mar. 13 Tr. at 44:2-7 |

- 92 -

| | |
|---|---|
| agreed they needed to go after Gomez."<br><br>Declarant: Shauna Gutierrez and Brandy Rodriguez<br><br>Source: Paul Rivera, Brandy Rodriguez<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | (Castellano, Stemo). |
| Statement 53: "Paul Rivera agreed to help with the hit on Gomez."<br><br>Declarant: Paul Rivera<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | Paul Rivera's testimony stating that he agreed to help with the hit on Gomez is not a statement offered "to prove the truth of the matter asserted," so it raises no hearsay issues. Fed. R. Evid. 801(c). That Rivera's testimony may be "self-serving" does not render it inadmissible. J. Gallegos Response ¶ 13, at 6. |
| Statement 54: "You better not testify against my Jefe, or I'll kill you!"<br><br>Declarant: Brandy Rodriguez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: None | This statement is admissible to as circumstantial evidence of B. Rodriguez' state of mind. |
| Statement 55: "Santos Gonzales also stated he was going to kill Gomez."<br><br>Declarant: Santos Gonzalez<br><br>Source: Paul Rivera | This statement is admissible as a statement of the declarant's then-existing state of mind, specifically his plan. See Fed. R. Evid. 803(3). J. Gallegos asserts that this statement is inaccurate, because it is not consistent with Santos Gonzalez' plea agreement. J. Gallegos Response ¶ 14, at 6. J. Gallegos can use that inconsistency to impeach this statement, but it does not render this |

- 93 -

| Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | statement inadmissible. |
| --- | --- |
| Statement 56: "Told Shauna Gutierrez they had completed their mission. Shauna Gutierrez laughed and said she was 'happy to hear' Gomez was likely dead."<br><br>Declarant: Brandy Rodriguez, Paul Rivera, Santos Gonzales<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | The Gutierrez statement is admissible as a statement of the declarant's then-existing emotional condition. <u>See</u> Fed. R. Evid. 803(3).<br><br>B. Rodriguez', Rivera's, and Santos Gonzalez' statements occurred immediately after the assault on Gomez. <u>See</u> Mar. 13 Tr. at 45:6-13(Castellano, Stemo). These statements are, accordingly, admissible as excited utterances. <u>See</u> Fed. R. Evid. 803(2).<br><br>J. Gallegos objects to this statement, because "[t]here individuals are listed as the source." J. Gallegos Response ¶ 15, at 6. Three individuals can make the same statement, however. For example, one person can make an oral statement and two others can make the same statement nonverbally by nodding their heads. <u>See</u> Fed. R. Evid. 801(a)("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."). |
| Statement 57: "Shauna Gutierrez told Santos Gonzalez to move the truck they used to another location and leave it for a few days."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | Gutierrez' giving orders to Santos Gonzales is an action and not a statement. It is also a statement of the declarant's then-existing state of mind, if Rivera testifies that Gutierrez elaborated regarding her plans, <u>e.g.</u>, to tell someone to retrieve the truck in a few days.<br><br>J. Gallegos argues that this statement is inadmissible, because "it is apparent that it was not made by the claimed declarant." J. Gallegos Response ¶ 16, at 6. J. Gallegos is free to argue to the jury that it should not credit the evidence that the United States introduces to show that this statement was made, but such an argument does not render this statement inadmissible hearsay. |
| Statement 58: "'How come you guys didn't do the job more fully?' after she previously told Rivera, Gonzalez, and Rodriguez to 'Go get him.'<br><br>Declarant: Shauna Gutierrez<br><br>Source: Brandy Rodriguez, Paul | The <u>James</u> hearing testimony indicates that this is a two-part statement. First, before the Gomez assault, Gutierrez "told Paul Rivera, Santos Gonzalez to go get him." Mar. 13 Tr. at 46:9-16 (Castellano, Stemo). Second, after the<br><br>Gutierrez' pre-assault orders -- and any associated statements, <u>see</u> <u>supra</u> Statement 13 (analyzing the relationship between verbal actions and statements) -- were made during and in furtherance of the conspiracy to assault |

- 94 -

| | |
|---|---|
| Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | Gomez, so they are admissible against J. Gallegos under rule 801(d)(2)(E). See Mar. 13 Tr. at 46:9-16(Castellano, Stemo). The post-assault statement is admissible as circumstantial evidence of Shauna Gutierrez' state of mind, i.e., to show that she expected and intended Gomez to be killed or hurt more seriously. |
| Statement 59: "Don't Testify"<br><br>Declarant: Paul Rivera<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | This statement is admissible against J. Gallegos under rule 801(d)(2)(E) as a statement made during and in furtherance of the Counts 14-16 conspiracy, because it was made to induce Gomez not to testify against J. Gallegos. See Mar. 13 Tr. at 46:25-47:5 (Castellano, Stemo). |
| Statement 60: "Brandy Rodriguez and Shauna Gutierrez had people in place for an attack on Gomez."<br><br>Declarant: Brandy Rodriguez<br><br>Source: Mario Chavez<br><br>Date: On or about March 29, 2017<br><br>Objections: J. Gallegos Response | The United States orally indicated that the date refers to Mario Chavez' interview with the FBI and not to the date the statement was made. See Mar. 13 Tr. at 47:6-12 (Castellano, Stemo).<br><br>According to the United States, Mario Chaves "would pass letters between Joe Gallegos, who was in county jail at the time, and Brandy Rodriguez and Shauna Gutierrez." See Mar. 13 Tr. at 47:15-18 (Stemo). That Mario Chavez passed letters back and forth between J. Gallegos, B. Rodriguez, and Gutierrez is an action and not a statement. Statements ordering or arranging the Gomez assault that were made before the assault took place are admissible against J. Gallegos under rule 801(d)(2)(E).<br><br>At the James hearing, the United States conceded that if B. Rodriguez made this statement after the assault on Gomez then it would not be admissible under rule 801(d)(2)(E). See Mar. 13 Tr. at 49:4-10(Castellano)(addressing statement 61); id. at 49:20-21 (Castellano)("But the same applies, I would say, with Statements 60 and 61"). The United States argued that the statement "would then be considered a statement against interests or an admission by Brandy Rodriguez." Mar. 13 Tr. at 49:8-10 (Castellano). The United States has not, however, shown that B. Rodriguez -- who has already pled guilty -- is unavailable, which is a prerequisite to admitting an out-of-court statement as a declaration against interest. See Fed. R. Evid. 804(b)(3). That B. Rodriguez made the statement |

- 95 -

| | means that it is admissible for its truth against B. Rodriguez under rule 801(d)(2)(A), but B. Rodriguez is not a Trial 2 Defendant, so the statement would not be admissible at Trial 2 under rule 801(d)(2)(A). |
| --- | --- |
| Statement 61: "Joe Gallegos ordered the hit on Gomez, and Shauna Gutierrez planned the hit."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Mario Chavez<br><br>Date: On or about March 29, 2017<br><br>Objections: A. Gallegos Response, J. Gallegos Response | United States orally indicated that the declarant should be Brandy Rodriguez and that it doesn't know whether the statement was made before or after the assault on Gomez. The United States also orally indicated that it does not know whether this statement was made before or after the assault on Gomez.<br><br>At the <u>James</u> hearing, the United States conceded that if B. Rodriguez made this statement after the assault on Gomez then it would not be admissible under rule 801(d)(2)(E). <u>See</u> Mar. 13 Tr. at 49:4-10(Castellano).  The United States argued that the statement "would then be considered a statement against interests or an admission by Brandy Rodriguez."  Mar. 13 Tr. at 49:8-10 (Castellano).  The United States has not, however, shown that B. Rodriguez -- who has already pled guilty -- is unavailable, which is a prerequisite to admitting an out-of-court statement as a declaration against interest.  <u>See</u> Fed. R. Evid. 804(b)(3). That B. Rodriguez made the statement means that it is admissible for its truth against B. Rodriguez under rule 801(d)(2)(A), but B. Rodriguez is not a Trial 2 Defendant, so the statement would not be admissible at Trial 2 under rule 801(d)(2)(A).<br><br>Even if B. Rodriguez made this statement before the Gomez assault, it would not be admissible against J. Gallegos under rule 801(d)(2)(E), because the statement does not appear to have been made in furtherance of the Counts 14-16 conspiracy.   Mario Chavez was not a member of this conspiracy and the United States has not introduced evidence showing that divulging details to this non-member advanced the conspiracy's goals. |
| Statement 62: "'Paperwork' on Sanchez was delivered from Arturo Garcia to Ben Clark, approving the murder."<br><br>Declarant: Arturo Garcia<br><br>Source: Samuel Gonzalez, John Montano, Javier Rubio | That the paperwork was sent is an action and not a statement.  <u>See</u> <u>supra</u> Statement 13. Associated statements approving the Sanchez murder or conveying that approval to other members of the Sanchez conspiracy were made during and in furtherance of the conspiracy, so they are admissible against the Count 3 Defendants under rule 801(d)(2)(E). |

| Date: On or before June 17, 2007<br><br>Objections: None | |
|---|---|
| Statement 63: "'Cheeky' and 'Coquito' were tasked with the murder of Sanchez but did not want to carry it out."<br><br>Declarant: Cheeky and Coquito<br><br>Source: Samuel Gonzales<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | Cheeky and Coquito are Raymond and Brian Rascon, respectively. See Mar. 13 Tr. at 50:15-21 (Castellano, Stemo). The Rascon brothers conveyed the information contained in this statement to Samuel Gonzales. See Mar. 13 Tr. at 50:22-24 (Castellano, Stemo). The Court has concluded that the Rascon brothers are not members of the Count 3 conspiracy, so their statements to Samuel Gonzales are not admissible under rule 801(d)(2)(E). No other exception to the rule against hearsay applies, so the Rascon brothers' statement is not admissible for its truth. Samuel Gonzales apparently lacks personal knowledge as to the substance of the Rascon brothers' statement -- as opposed to that they made that statement -- so he cannot testify that the Rascon brothers were tasked with the Sanchez murder even if Samuel Gonzalez does not relate that statement to the jury. See Fed. R. Evid. 602. |
| Statement 64: "Javier Alonso asked how to get rid of the marks on his hands from strangling Sanchez."<br><br>Declarant: Javier Alonso<br><br>Source: Samuel Gonzales<br><br>Date: On or before June 17, 2007<br><br>Objections: None | Javier Alonso made this statement after Sanchez' death, so it was made after the conspiracy to kill Sanchez ended. That this statement was not made during the conspiracy to kill Sanchez indicates that it is not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E). That Alonso asked how to get rid of the marks from strangling Sanchez is a question, but it implicitly asserts that he strangled Sanchez. See United States v. Summers, 414 F.3d at 1298.<br><br>If Samuel Gonzales actually saw marks on Alonso's hands, Samuel Gonzales could testify to that fact, as opposed to Alonso's statement regarding that fact. If, additionally, Samuel Gonzales is sufficiently familiar with the sort of marks that stranglers typically have on their hands, he could testify to his opinion regarding whether those marks could have been caused by strangling someone. See Fed. R. Evid. 701. |
| Statement 65: "'That'd be messed up if the paperwork on the guy I just got showed up.' Ben Clark also sent Arturo Garcia a list of names of people in the pod." | The James hearing testimony indicates that Clark's oral remark referred to Sanchez, but the Court does not have enough context regarding that remark to determine whether it was made in furtherance of the conspiracy to kill Sanchez, as opposed to being an off-hard remark made for no particular purpose. |

- 97 -

| | |
|---|---|
| Declarant: Ben Clark<br><br>Source: John Montano<br><br>Date: On or before June 17, 2007<br><br>Objections: None | The <u>James</u> hearing testimony indicates that Clark provided the list of names to A. Garcia, "[s]o that he would know who was present at the pod and who would be next, or who hasn't put in work." <u>See</u> Mar. 13 Tr. at 51:18-23 (Castellano, Stemo). Clark's statement to A. Garcia was, thus, made during and in furtherance of the Count 3 conspiracy, so it is admissible for its truth against the Count 3 conspirators under rule 801(d)(2)(E). |
| Statement 66: "Edward Troup and Javier Alonso attempted to hide in John Montano's cell after lock down after the murder of Sanchez."<br><br>Declarant: Edward Troup and Javier Alonso<br><br>Source: John Montano<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | United States orally indicated that this statement is actually just an action, but it indicated that it is uncertain whether there were statements made that are associated with that act. <u>See</u> Mar. 13 Tr. at 52:5-16 (Castellano, Court). <u>See also</u> <u>supra</u> Statement 13 (analyzing the relationship between actions and statements). |
| Statement 67: "Jimmie Gordon was asked to get information on Garza from Geraldine Martinez."<br><br>Declarant: Jimmie Gordon<br><br>Source: Jimmie Gordon<br><br>Date: On or before March 26, 2001<br><br>Objections: None | Geraldine Martinez was a prison librarian, and that Jimmie Gordon was asked to get information about Garza from Geraldine Martinez is a verbal action and not a statement. See supra Statement 13 (analyzing the relationship between verbal actions and assertions). Accordingly, Gordon's testimony about the request to obtain information about Garza does not relate hearsay. <u>See</u> Fed. R. Evid. 801(c). |
| Statement 68: "Billy Garcia put a hit on Archuleta which was communicated to Archuleta through 'Baby Zac' over a disagreement about Castillo's murder."<br><br>Declarant: Baby Zac.<br><br>Source: Gerald Archuleta | This statement is not admissible under rule 801(d)(2)(E), because Baby Zac did not tell Archuleta about the conspiracy to murder him in furtherance of that conspiracy. |

- 98 -

| | |
|---|---|
| Date: None<br><br>Objections: B. Garcia Response | |
| Statement 69: "Brandy Rodriguez kicked Gomez and said, 'This is a message from Joe!'"<br><br>Declarant: Brandy Rodriguez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: A. Gallegos Response | This statement is admissible as an excited utterance, see Fed. R. Evid. 803(2), and as a statement of the declarant's then-existing state of mind, specifically her motive, see Fed. R. Evid. 803(3). |
| Statement 70: "Shauna Gutierrez stated she is 'ride or die' with Joe Gallegos, after admitting that she and Joe Gallegos put a hit on Brandy Rodriguez based on the belief Rodriguez was a cooperator."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Paul Rivera<br><br>Date: On or about November 2016<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The United States intends to offer this statement dicates that this statement was made in furtherance of an uncharged conspiracy to harm B. Rodriguez premised on an erroneous belief she was cooperating with law enforcement. See March 13 Tr. at 55:9-14 (Castellano); id. at 55:19-56:16 (Court, Castellano)   The Court has not found that such a conspiracy existed, however, so this statement is not admissible under rule 801(d)(2)(E).   See supra note 9.<br><br>Gutierrez' statement that she is ride or die with J. Gallegos is admissible as a statement of the declarant's then-existing emotional condition.   See Fed. R. Evid. 803(3). |
| Statement 71: "Christopher Chavez asked 'Is this right?' in reference to the Garza murders and Leroy Lucero said 'you got to do what you got to do.'"<br><br>Declarant: Christopher Chavez<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, | When Chavez indicated that he "wasn't sure about the murder, [he was] clarifying whether or not there was, in fact, a green light on Mr. Garza." Mar. 13 Tr. at 57:16-20 (Castellano, Stemo). Consequently, both Chavez' question and Lucero's response were made during and in furtherance of the Count 2 conspiracy, so they are admissible against the Count 2 conspirators under rule 801(d)(2)(E). |

- 99 -

| Patterson Response | |
|---|---|
| Statement 72: "Javier Alonso asked if the marks on his hands were noticeable."<br><br>Declarant: Javier Alonso<br><br>Source: John Montano<br><br>Date: On or about June 17, 2007<br><br>Objections: None | Alonso asked Montano this question after the Sanchez murder. See Mar. 13 Tr. at 57:21-58:5 (Castellano, Stemo). Consequently, this statement was not made during the conspiracy to kill Sanchez, so it is not admissible under rule 801(d)(2)(E). Alonso's question implicitly asserts that he has marks on his hands, but that implicit assertion is admissible as a present-sense impression. See Fed. R. Evid. 803(1). |
| Statement 73: "Ordered the surveillance cameras covered."<br><br>Declarant: Edward Troup and/or Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | Ruben Hernandez and Jesse Trujillo were both supposed to cover the surveillance cameras during the Sanchez murder, so corrections officers could not watch what was happening. See Mar. 13 Tr. at 58:15-24 (Castellano, Stemo). In separate statements to the United States, Hernandez mentioned both Trujillo and Troup. See Mar. 13 Tr. at 58:11-14 (Castellano, Stemo). Statements directing Hernandez to cover the surveillance cameras -- no matter whether Troup or Trujillo made those statements -- were made by a Count 3 conspirator during and in furtherance of that conspiracy, so they are admissible under rule 801(d)(2)(E) against the Count 3 Defendants. |
| Statement 74: "'Now hurry Bolo now you know what time it is.' (In reference to covering the cameras.)"<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | This statement was made by a Count 3 conspirator during and in furtherance of the Count 3 conspiracy, so it is admissible against the Count 3 Defendants. See Mar. 13 Tr. at 58:25-59:8 (Castellano, Stemo). |
| Statement 75: "Just stay there and don't let no one in, use your crutch to block the door if you have to."<br><br>Declarant: Jesse Trujillo | This statement was made by a Count 3 conspirator during and in furtherance of the Count 3 conspiracy, so it is admissible against the Count 3 Defendants. See Mar. 13 Tr. at 59:9-21 (Castellano, Stemo). |

DNM 1498

| | |
|---|---|
| Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objection: None | |
| Statement 76: "'Ya stuvo (all done) take them off.' (In reference to the camera covers.)"<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | This statement occurred after Sanchez' death, so it was not made during the conspiracy to kill Sanchez, so it is not admissible under rule 801(d)(2)(E). <u>See</u> Mar. 13 Tr. at 59:22-60:5 (Castellano, Stemo). The statement is admissible, however, as an excited utterance. <u>See</u> Fed. R. Evid. 803(2). |
| Statement 77: "Kyle asked Ruben Hernandez to take something to Samuel Gonzales and to tell Samuel Gonzales 'that was all he had.'"<br><br>Declarant: Kyle Dwyer<br><br>Source: Ruben Hernandez<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | The <u>James</u> hearing testimony indicates that Hernandez took a single folded piece of paper to Samuel Gonzales and that the contents of that piece of paper are unknown. <u>See</u> Mar. 13 Tr. at 221:19-222:3 (Blackburn, Stemo). Kyle Dwyer's statement to Hernandez is not admissible for its truth, but it is potentially admissible as circumstantial evidence of Dwyer's state of mind and for its effect on Samuel Gonzales. |
| Statement 78: "Samuel Gonzales asked if Sanchez was dead, then again asked 'For real is he dead?'"<br><br>Declarant: Samuel Gonzales<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | Samuel Gonzales asked Hernandez this question immediately after he delivered a piece of paper to Gonzales from Kyle Dwyer. <u>See</u> Mar. 13 Tr. at 61:1-3 (Castellano, Stemo). Gonzales' questions are not statements, so they are not hearsay. <u>See</u> <u>supra</u> Statement 13 (describing the relationship between verbal actions and statements). Those questions are admissible, however, as circumstantial evidence of Gonzales' state of mind. |
| Statement 79: "'Chicky' was cutting his sleeves off and asked Ruben Hernandez to hang up his | This statement was made after Sanchez died, so was not made during the conspiracy to kill Sanchez. <u>See</u> Mar. 13 Tr. at 61:12-14 (Castellano, Stemo). Accordingly, it is not |

- 101 -

| | |
|---|---|
| wet sleeves."<br><br>Declarant: "Chicky"<br><br>Source: John Montano<br><br>Date: On or about June 17, 2007<br><br>Objections: None | admissible against the Count 3 Defendants under rule 801(d)(2)(E).<br><br>Chicky refers to Raymond Rascon.  See Mar. 13 Tr. at 4-7 (Castellano, Stemo).  That Rascon was cutting up his sleeves and his request to Hernandez are actions and not hearsay.  See supra Statement 13 (analyzing the relationship between actions and statements).  That there was "an indication or concern that Raymond Rascon was cutting off his sleeves because there might be something incriminating on the material," Mar. 13 Tr. at 61:15-19 (Castellano, Stemo), might be admissible as a present-sense-impression, an excited utterance, or a statement of the declarant's then-existing state of mind.  See Fed. R. Evid. 803(1)-(3). |
| Statement 80: "Edward Troup told 'Chicky' to cut his sleeves in small pieces or give the sleeves to someone next door."<br><br>Declarant: Edward Troup<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | This statement was made after Sanchez died, so was not made during the conspiracy to kill Sanchez.  See Mar. 13 Tr. at 61:12-14 (Castellano, Stemo); id. at 61:20-24 (Castellano, Stemo).  Accordingly, it is not admissible against the Count 3 Defendants under rule 801(d)(2)(E).  It is, however, admissible as circumstantial evidence of Troup's state of mind, e.g., consciousness of guilt.<br><br>Troup's statement is admissible against him for its truth under rule 801(d)(2)(A). |
| Statement 81: "First thing in the morning we need you to move the body in the fetal position and wipe down the toilet."<br><br>Declarant: Brian Rascon and/or Edward Troup<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | The United States indicated, at the James Hearing, that both Brian Rascon and Troup made this statement at different times.  See Mar. 13 Tr. at 62:15-18(Castellano, Stemo).  This statement is admissible for its truth as a statement of the declarants' then-existing state of mind, i.e., their plan to have Hernandez clean the cell.  See Fed. R. Evid. 803(3).  It is also admissible to show its effect on Hernandez.  Further, Troup's statement is admissible against him for its truth under rule 801(d)(2)(A).  It is not, however, admissible for its truth under rule 801(d)(2)(E), because it was made after Sanchez' death, so it was not made during the conspiracy to kill Sanchez. |
| Statement 82: "'That's what we are all asking of you.' (Told to Ruben Hernandez when he didn't want to | This statement is admissible for its effect on Hernandez and as circumstantial evidence of Rascon's state of mind.  It is not, however, admissible for its truth under rule 801(d)(2)(E), because it was made after Sanchez' death, so |

- 102 -

| | |
|---|---|
| clean the cell.)"<br><br>Declarant: Brian Rascon<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | it was not made during the conspiracy to kill Sanchez. |
| Statement 83: "'Not [sic] that's an order, you already know what time it is.' (Told to Ruben Hernandez when he continued to not want to clean the cell.)"<br><br>Declarant: Brian Rascon<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | This statement is admissible for its effect on Hernandez and as circumstantial evidence of the declarant's state of mind, i.e., Rascon's plan to have Hernandez clean the cell. See Fed. R. Evid. 803(3). It is not, however, admissible under rule 801(d)(2)(E), because it was made after Sanchez' death, so it was not made during the conspiracy to kill Sanchez. |
| Statement 84: "Ruben Hernandez asked if he was next for refusing to clean the cell and Brian Rascon said 'no, if the door is closed what can you do?'"<br><br>Declarant: Brian Rascon<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | Hernandez' question and Rascon's reply are admissible as circumstantial evidence of Hernandez' state of mind. The assertion implicit in Rascon's reply -- that Hernandez was not able to enter Sanchez' cell -- is not admissible for its truth unless Hernandez' testimony indicates that Rascon's implicit assertion is a present-sense impression. See Fed. R. Evid 803(1). |
| Statement 85: "'Your next mother fucker.' Said to Ruben Hernandez as they passed each other."<br><br>Declarant: Edward Troup<br><br>Source: Ruben Hernandez | This statement is admissible either for its truth as a statement of the declarant's then-existing state of mind, i.e., as a statement of Troup's plan, see Fed. R. Evid. 803(3), or as circumstantial evidence of Troup's state of mind and not for its truth, see Fed. R. Evid. 801(c).<br><br>This statement is admissible for its truth against Troup under rule 801(d)(2)(A). |

- 103 -

| | |
|---|---|
| Date: On or before June 17, 2007<br><br>Objections: None | |
| Statement 86: "We better be ready for hell cause we we're fixing to go through hell."<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | This statement -- indicating that the Trujillo expects law enforcement scrutiny, see Mar. 13 Tr. at 64:19-22 (Castellano, Stemo) -- is admissible as a statement of declarant's then-existing state of mind, see Fed. R. Evid. 803(3). |
| Statement 87: Edward Troup stated that it was every man for themselves and if you can get a plea bargain for 15 or less do it but 'no fucking ratting,' 'that's a no no.'"<br><br>Declarant: Brian Rascon<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | Troup -- and not Rascon -- made this statement. See Mar. 13 Tr. at 65:1-4 (Castellano, Stemo). This statement is admissible for its truth against Troup under rule 801(d)(2)(A). |
| Statement 88: "Go wipe down the toilet, don't worry about moving the body."<br><br>Declarant: Brian Rascon<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | This statement is admissible notwithstanding the general rule against hearsay, because it is a verbal action and not an assertion. See supra Statement 13. |

DNM 1502

IV.    **THE COURT MAKES PARTICULARIZED JUDGMENTS REGARDING THE CO-DEFENDANT STATEMENTS' ADMISSIBILITY UNDER RULES 801(d)(2)(A) AND 804(b)(3) OF THE FEDERAL RULES OF EVIDENCE.**

A statement that "is offered against an opposing party," and "was made by the party in an individual or representative capacity" is not hearsay even if that statement is offered to for its truth.  Fed. R. Evid. 801(d)(2)(A).  The Advisory Committee notes to rule 801 explain:

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule.  No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility.

Fed. R. Evid. 801 advisory committee notes (citations omitted).  Consequently, the Federal Rules of Evidence exclude a criminal defendant's out-of-court statements that are the United States offers against that defendant from the general rule against hearsay.  See Fed. R. Evid. 802 (stating that "[h]earsay is not admissible unless" a federal statute, the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court" provides otherwise).

An out-of-court statement is admissible hearsay -- no matter who made the statement or who offers it into evidence -- if the declarant is unavailable and if "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability."  Fed. R. Evid. 804(b)(3)(A).  In addition to being against the declarant's interest, a statement must also be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."  Fed. R. Evid. 804(b)(3)(B).  "The Tenth Circuit has not squarely addressed

- 105 -

how a statement must be corroborated." United States v. Lovato, 776 F.3d at 1132.  United States v. Lovado indicates, however, that the presence -- or absence -- of evidence corroborating a statement's contents, the circumstances in which a statement was made, the declarant's credibility, whether the declarant had a motive to lie, and whether the statement is internally consistent are all relevant to the rule 804(b)(3)(B) inquiry.  See 776 F.3d at 1132-33.

In United States v. Smalls, the Tenth Circuit commented that "[w]e may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend." 605 F.3d at 783.  In its James MOO, however, the Court concluded that United States v. Smalls' generalization does not apply to in-prison statements that one SNM member makes to another.  See James MOO at 103-04.  See also United States v. Smalls, 605 F.3d at 782 (stating that whether a statement is so self-inculpatory that it is admissible under rule 804(b)(3) "depends not only on the contextual wording of the statement itself but also on the circumstances under which it was made.").  The Court reasoned that, "[w]hile people in ordinary situations expose themselves to both social censure and criminal liability," when they make inculpatory statements, "prison-gang members speaking to fellow members earn social benefits -- such as respect or an appearance of power -- when they make inculpatory claims." James MOO at 103.[23]  The Court also reasoned that declarants who makes inculpatory statements to fellow prison-gang members have some assurance that those statements will not make their way to law-enforcement ears, "because prison-gang members face violent retaliation for collaborating with law enforcement." James MOO at 103-04.  Consequently, the Court concluded that "a

_____

[23]For example, the Court heard testimony, during the first trial in this case, that Billy Cordova, one of the United States' cooperating witnesses falsely claimed [Sammy Chavez]

- 106 -

reasonable prison-gang member might make self-inculpatory statements even if those statements were not true," so in-prison statements that one SNM member makes to another "are not typically admissible under rule 804(b)(3)."  James MOO at 104.

The United States correctly argues that, when applying rule 804(b)(3), "the Court must look at each statement individually and assess whether the factors that courts look to for the required corroboration apply to each of the offered statements."  804(b)(3) MIL at 2.  The Court's generalization about in-prison statements that one SNM member makes to another is not contrary to that principle, because the Court's generalization is a heuristic, a rule of thumb.  Under some circumstances, an in-prison statement that one SNM member makes to another is such that "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true."  Fed. R. Evid. 804(b)(3)(A).  For example, in the James MOO, the Court applied its analysis to the particular facts surrounding the statements at issue:

> [W]hen Perez made his statements to Cordova, prison-yard rumors indicated, falsely, that Perez cooperated with the United States regarding the Molina murder.  Perez' statements to Cordova suggest that those life-threatening rumors are false, because they demonstrate loyalty to the SNM, and because, if Perez helped carry out the Molina murder, then providing information to law enforcement would expose him to criminal liability.  Consequently, a reasonable person in Perez' position might make self-incriminating statements regarding the Molina murder to another SNM member to combat life-threatening prison-yard rumors, even if those self-incriminating statements were not true.

James MOO at 104.  The Court accordingly assesses individually each of the out-of-court statements that B. Garcia identifies to determine whether that statement is admissible for its truth against all the Defendants under rule 804(b)(3) or against the declarant-Defendant only under rule 801(d)(2)(A).

- 107 -

| Co-Defendant Statement[24] | Ruling |
|---|---|
| Statement 1: Alleged statement made by Edward Troup to James "Daffy" Garcia in which he allegedly indicates that B. Garcia ordered the hits.<br><br>Declarant: Edward Troup<br><br>Source: James Garcia<br><br>Date: 11/2012 | According to the J. Garcia 302, the FBI interviewed J. Garcia on May 9, 2013. <u>See</u> J. Garcia 302 at 1. In this interview, again according to the J. Garcia 302,<br><br>In late November 2012, [J. Garcia] had a conversation with SNM gang member EDWARD TROUP in [redacted] back yard off of [redacted] in Albuquerque. During the conversation, TROUP confessed to being a part of two murders in which two people were strangled to death at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico. Troup stated that during one of the murders, he held 'Fed Dawg's' (agent note: identified as FREDDIE SACHEZ . . . ) legs while 'Wino' (agent note: identified as SNM gang member JAVIER Alonso, Jr. . . . ) strangled him to death with a drawstring from a laundry bag. Both TROUP and ALONSO disposed of the drawstring and then took off their clothes and tore up the evidence in an attempt to hide their part in the murder. TROUP told [J. Garcia] that CHICKIE LNU [Last Name Unknown] and his brother cleaned up the mess that was made during the murder, to include Sanchez' urine. TROUP also said that an unknown Corrections Officer (CO) thought that the inmates were giving each other tattoos, and did not respond to the area of the commotion, despite the fact that tattooing was considered contraband inside the prison facility. As a result, the SNM gang members were able to carry out the murder without any CO intervention. TROUP also mentioned that the murder of Fred Dawg was an order from headquarters, to which [J. Garcia] interpreted the term ' headquarters' to mean the main New Mexico Prison Facility in Santa Fe, New Mexico, where the majority of the SNM |

---

[24]The Court draws its list of Co-Defendant statements from a table that B. Garcia submitted at the Court's request:

- 108 -

|  | leadership was incarcerated. [J. Garcia] stated that TROUP was remorseful and was crying during much of the conversation. TROUP told [J. Garcia] that Fred Dawg provided information on a murder, which was against the SNM by-laws, and that was the cause for his murder. |
|  | [J. Garcia] stated that TROUP had told him about SANCHEZ's murder in approximately 2008 when [J. Garcia] violated his probation/parole and was incarcerated in the New Mexico Prison System. Additionally, during the same conversation, TROUP provided [J. Garcia] with information regarding his role in the murder of [Frank Castillo] in approximately 2001 at the SNMCF. TROUP told [J. Garcia] that that BILLY GARCIA, aka Wild Bill, gave the order to kill [Castillo], and that TROUP walked [Castillo] into his ([Castillo's]) cell where ANGEL DELEON and and [sic] others were waiting for [Castillo]. Once inside the cell, TROUP slammed the door, while DELEON and another SNM gang member/associate strangled [Castillo] to death. |

J. Garcia 302 at 2-3.

Assuming that Troup invokes his right to remain silent, he is unavailable for rule 804 purposes. See Fed. R. Evid. 804(a). Troup's statements indicating that he killed Sanchez and Castillo are sufficiently against Troup's penal interest admissible under rule 804(b)(3). See United States v. Smalls, 605 F.3d 765, 783 (10th Cir. 2010)("We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind—even one of sound mind who is not particularly honest—falsely confessed a murder to an apparent acquaintance or friend."). Troup's statement indicating that B. Garcia ordered the Castillo murder is not, however, sufficiently self-inculpatory. See Williamson v. United States, 512 U.S. 594, 599 (1994)(stating that rule 804(b)(3) "cover[s] only those declarations or remarks within the confession that are

individually self-inculpatory"); id. ("The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts."). Additionally, Troup's statements are admissible against him as admissions of a party opponent. See Fed. R. Evid. 801(d)(2)(A).

Whether Troup's statements are "supported by corroborating circumstances that clearly indicate [their] trustworthiness" is an issue that the Court will need to assess in light of the other evidence introduced at trial. Fed. R. Evid. 804(b)(3)(B).

> We believe that a showing of corroborating circumstances is sufficient if it gives the judge some assurance—when added to the fact that the statement was against the declarant's interest—that the declarant was telling the truth. And in determining corroborating circumstances, the court should consider all the factors listed in the draft Advisory Committee Note—not just the additional circumstantial guarantees of reliability but also the **amount of independent evidence supporting the truth of the declarant's statement**. All the listed factors are pertinent to whether the declarant made an accurate statement; and figuring out whether the declarant gave an accurate account is, after all, the point of the enterprise.

Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 804.02[9] (emphasis added).

When J. Garcia testified at the Court's hearing on March 15-16, 2018, however, he disavowed portions of the J. Garcia 302:

> Q.      Has anybody ever admitted to you in a conversation with you that they were involved in those murders that happened at the Southern New Mexico Correctional Facility in 2001?  Has anyone ever told you that they did it?

- 110 -

DNM 1508

A.      No, not that I remember, no.

. . . .

Q.      Now, have you heard rumors about what happened there in 2001, from other inmates, or other people?

A.      Yeah.

Q.      But no one has personally said to you, "I did it," or "I was part of it"?

A.      No.

Q.      Or say out loud, "I was part of it"?

A.      No.

J. Garcia Tr. at 3:16-4:9 (Castle, J. Garcia).  J. Garcia's hearing testimony is inconsistent with the J. Garcia statements that the J. Garcia 302 memorializes, which renders those statements -- including J. Garcia 302 statements relating Troup statements -- less credible.  See Fed. R. Evid. 612 (stating that a hearsay declarant's credibility may be attacked via "evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred").    J. Garcia's hearing testimony does not, however, make the Troup statements -- as opposed to the J. Garcia 302 statements relating the Troup statements -- any more or less credible, so that testimony is irrelevant to whether the Troup statements are "supported by corroborating circumstances that clearly indicate [their] trustworthiness."  Fed. R. Evid. 804(b)(3)(B).  Put another way, J. Garcia's testimony is relevant to whether Troup made the statements that the J. Garcia 302 describes, but it is not relevant to whether those statements -- if Troup made them -- are trustworthy.  While the Court must determine, by a preponderance of the evidence, whether those statements are admissible for their truth, see Fed. R. Evid. 104(a), whether the statement was made at all is a conditional-relevance question which the jury decides if "proof [is] introduced sufficient to support a finding" that the statement was made, Fed. R. Evid. 104(b).  See id. advisory committee notes (listing, as a conditional relevance example,

- 111 -

If J. Garcia does not testify that Troup made the statements that the J. Garcia 302 describes, then the J. Garcia 302 is the only evidence indicating that Troup actually made such a statement, and the J. Garcia 302 is not admissible for its truth. Hearsay within hearsay "is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 805.02[2] ("[A] statement admissible under Rule 801(d) can be admitted when included in another hearsay statement if the other hearsay statement qualifies as an exception."). The J. Garcia 302 is hearsay within hearsay within hearsay, because the J. Garcia 302 is a collection of out-of-court statements memorializing J. Garcia's out-of-court statements to the FBI, which relate Troup's out-of-court statements.

The first hearsay level -- the J. Garcia 302 itself -- is not admissible for its truth unless its author, Special Agent Lance Roundy, testifies, because "the primary purpose for which the [J. Garcia 302] was made was that of establishing or proving some fact potentially relevant to a criminal prosecution," so the J. Garcia 302 is testimonial. United States v. Smalls, 605 F.3d at 778. See Crawford v. Washington, 541 U.S. at 68 ("Where testimonial evidence is at issue [and the declarant does not testify], the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). Further, the Federal Rules of Evidence do not permit the J. Garcia 302 to be admitted for its truth as a public record, because it is a record setting out "a matter observed by law-enforcement personnel," which do not qualify as public records "in a criminal case." Fed. R. Evid. 803(8)(A)(ii). See supra, Federal Rules of Evidence Manual § 803.02[d] ("Under the predominant view, the exclusionary language [of rule 803(8)(A)(ii) and 803(8)(A)(iii)] covers only those police-generated reports that are prepared under adversarial circumstances -- in anticipation of litigation -- and so are subject to manipulation by authorities bent on convicting a particular criminal defendant."). But see id. ("Courts have held, correctly we think, that the law enforcement exclusion in the rule is inapplicable if the public official who prepared the report actually testifies at trial. The confrontation concerns that give rise to the statutory exclusions are allayed where the declarant is

- 112 -

subject to cross-examination at trial."). For the same reason, the J. Garcia 302 is not admissible as a record of a regularly conducted activity;

> In criminal cases, the argument has sometimes been made that a law enforcement report that is inadmissible due to the exclusionary language of Rule 803(8)(A)(ii) and (iii) can nonetheless be admitted as a record of regularly conducted activity under Rule 803(6). However, if the exclusionary language is properly applied so as to exclude only those law enforcement reports that are subjective and made under adversarial circumstances—which is the position taken by most courts, as discussed above—then there is no conflict between the rules. This is because records that are prepared in anticipation of litigation are excluded under the trustworthiness criterion of Rule 803(6); and those are, in effect, the only records that are excluded under the prevailing view of Rule 803(8).

Supra, Federal Rules of Evidence Manual § 803.02[e]. None of the other exceptions to the rule against hearsay apply, so the J. Garcia 302 is admissible only if Roundy testifies.

Even if the United States renders the J. Garcia 302 admissible for its truth by calling Roundy as a witness, the second hearsay level -- the J. Garcia statements that the J. Garcia 302 contains -- is not admissible its truth. No exception to the general rule against hearsay, see Fed. R. Evid. 802, applies; those statements are not excited utterance, for example, see Fed. R. Evid. 803(2). Additionally, J. Garcia's statements in an FBI interview are testimonial, so the Confrontation Clause permits their introduction only if J. Garcia takes the stand or if J. Garcia is unavailable. of Evidence, even if J. Garcia testifies and thereby satisfies the Confrontation Clause.[25] See Crawford

---

[25]Showing that J. Garcia is unavailable satisfies the Confrontation Clause, because J. Garcia testified at a pretrial hearing, so the Defendants have had "a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. at 68.

- 113 -

| | |
|---|---|
| | v. Washington, 541 U.S. at 68.<br><br>The third level of hearsay -- the Troup statements that the J. Garcia statements relate -- are admissible for their truth against Troup, see Fed. R. Evid. 802(d)(2)(A). They are not admissible against any other Defendant under rule 802(d)(2)(A), however. |
| Statement 2: Leroy Lucero is a government witness. Lucero indicates Chavez and Joe Gallegos admitted involvement in the murder of Garza to him as did others. It is unknown whether Chavez and Gallegos implicated B. Garcia.<br><br>Declarant: Christopher Chavez, Joe Gallegos<br><br>Source: Leroy Lucero<br><br>Date: unknown | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence. J. Gallegos' statements are likewise admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>When Lucero testified on March 16, 2018, he invoked his right to remain silent regarding the Castillo and Garza murders. See Mar. 16 Tr. at 160:3-7 (Castle, Lucero). The Court sustained that invocation, because Lucero had not been afforded any kind of immunity. See Mar. 16 Tr. at 157:18-20 (Beck)("I don't believe at this point we have provided him a Kastigar letter[26] and adequately debriefed him to have the protection."); id. at 158:24-25 (Court)("I'm inclined to sustain the privilege."). The Court is, thus, unable to make a pretrial determination regarding whether Lucero will testify at trial regarding statements that Chavez or J. Gallegos made or whether those statements will be admissible for their truth under rule 804(b)(3) of the Federal Rules of Evidence. |
| Statement 3: Fred Quintana is a government witness. Quintana indicates both Troup and Chavez admitted to involvement in the 2001 murders. It is unknown whether Chavez and Gallegos implicated B. Garcia.<br><br>Declarant: Edward Troup, | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence. Troup's statements are likewise admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>The Quintana 1023 states: |

---

[26]In Kastigar v. United States, 406 U.S. 441 (1972)(Powell, J.), the Supreme Court concluded that "the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony." 406 U.S. at 443.

- 114 -

| | |
|---|---|
| Christopher Chavez<br><br>Source: Fred Quintana<br><br>Date: unknown | 2001 Murder of Frank Castillo and Rolando Garcia at the Southern New Mexico Correctional Facility in Las Cruces were called by BILLY GARCIA ("Wild Bill"). Several members participated in the double homicide and EDWARD TROUP and CHRITOPHER CHAVEZ admitted to the murders during conversations with [Quintana].<br><br>Quintana 1023 at 2.  The Quintana 1023 does not provide enough details about the statements that Troup and Chavez allegedly made to Quintana for the Court to make the fine-grained inquiry that <u>Williamson v. United States</u> requires. Consequently, the Court does not now conclude that those statements are admissible under rule 804(b)(3) of the Federal Rules of Evidence.  The Court is willing to reconsider whether Troup or Chavez made statements that are admissible under rule 804(b)(3) when it has more information. |
| Statement 4: Ben Clark is a witness for the government. Clark indicated Angel Deleon, Troup and Joe Gallegos confessed their involvement in the 2001 murders to him and that one or both may have indicated that B. Garcia called the hit.<br><br>Declarant: Angel Deleon, Edward Troup, Joe Gallegos<br><br>Source: Ben Clark<br><br>Date: 2004 | Troup's statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.  J. Gallegos' statements are likewise admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.   Deleon's statements, however, are not admissible under rule 801(d)(2)(A), because Deleon is not a Trial 2 Defendant.<br><br>Clark testified on March 15, 2018, and indicated that he had spoken with four individuals about the Castillo and Garza murders: "Eugene Martinez, Leonard Lujan, Edward Troup, and Joe Gallegos."  Mar. 15 Tr. at 159:6-7(Clark).  Clark indicated that E. Martinez, Troup and J. Gallegos did not say that B. Garcia ordered the Castillo and Garza murders.  <u>See</u> Mar. 15 Tr. at 159:9-12 (Cooper, Clark)(discussing E. Martinez' statements); <u>id.</u> at 159:25-16:2 (Cooper, Clark)(discussing Troup's statements; <u>id.</u> at 160:9-12 (Cooper, Clark)(discussing J. Gallegos' statements).  Clark indicated, however, that "Leonard Lujan did tell me Billy Garcia had something to do with it." Mar. 15 Tr. at 159: 13-17 (Cooper, Clark).  According to Clark, Lujan told him |

- 115 -

|  | "multiple times from '03 to '04 that Billy Garcia called those hits." Mar. 15 Tr. at 162:14-16 (Beck, Clark).[27]  That B. Garcia ordered the Castillo and Garza murders does not, taken alone, tend to subject Lujan to criminal liability, so those statements are not admissible for their truth under rule 804(b)(3).  See Williamson v. United States, 512 U.S. at 599.[28] |
|  | Additionally, the United States has not established that Lujan or E. Martinez is unavailable, which is a prerequisite for introducing any of Lujan's statements under rule 804(b)(3).  See Fed. R. Evid. 804(b)(3).  See also United States' Sealed Supplemental Witness List for Trial II at 2, filed April 9, 2018 (Doc. 2089)(listing Lujan and E. Martinez as witnesses). |

---

[27]Clark's testimony regarding Lujan's statements indicates that B. Garcia's recent assertion that "[w]itnesses Munoz, Clark, Lucero, Quintana, and Otero all testified that none of Billy Garcia's codefendants made any statements to them which implicated Billy Garcia" is false.  Brief in Support of Inapplicability of of [sic] Fed. R. 803(b)(3) (Doc. Nos. 1909 and 2009) ¶ 5, at 3, filed April 6, 2018 (Doc. 2085).

[28]The Court can imagine, however, Lujan statements indicating that B. Garcia ordered the Castillo and Garza murders that would incriminate Lujan, e.g., "I obeyed B. Garcia's order to kill Castillo."

| | |
|---|---|
| Statement 5: Samuel Gonzales is a witness for the government. He indicates Troup made statements about the 2001 murders.   It is unknown   whether   Gonzalez indicates Troup implicated Billy Garcia<br><br>Declarant: Edward Troup<br><br>Source: Samuel Gonzales<br><br>Date: unknown | Troup's statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>According to the Samuel Gonzales 302:<br><br>     Edward TROUP spoke to GONZALES about the 2001 murder of Rolando GARZA. TROUP did not provide details, but told GONZALES that he was there.  GARZA was killed because he was a known member of the rival prison gang Los Carnales.   Francisco CASTILLO was killed in 2001 because he "messed up" with Billy GARCIA.<br><br>Samuel Gonzales 302 at 5.  Those statements do not incriminate Troup, so they are not admissible as declarations against Troup's penal interests under rule 804(b)(3).  See Williamson v. United States, 512 U.S. at 599. |
| Statement 6: Robert Lovato is a government   witness.     Lovato indicates that Christopher Chavez admitted involvement in the 2001 murder of Garza.<br><br>Declarant: Christopher Chavez<br><br>Source: Robert Lovato<br><br>Date: 2012 | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>The Lovato 302 indicates that "CHAVEZ talked about the murder of Rolando Garza and was paranoid that he might get caught for it.  CHAVEZ was under the impression that law enforcement might be making some arrests in the case and was worried."  Lovato 302 at 2.  This statement is sufficiently inculpatory that a reasonable person in Chavez' position would not have made it if it were false.  See Fed. R. Evid. 804(b)(3).  The Lovato 302 indicates that that Chavez was very fearful when he talked to Lovato, which is a circumstance that corroborates the substance of Chavez' statement.  See Fed. R. Evid. 804(b)(3)(B). |

- 117 -

| Statement 7: Julian Romero is a government witness. Romero indicates that Christopher Chavez confessed to his role in the 2001 murders.<br><br>Declarant: Christopher Chavez<br><br>Source: Julian Romero<br><br>Date: unknown | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>According to the Romero 302, "CHAVEZ admitted to Romero that he killed Garza." Romero 302 at 7. This statement is sufficiently inculpatory that a reasonable person in Chavez' position would not make the statement unless that person believed it to be true. See United States v. Smalls, 605 F.3d at 783 ("We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend."). |
| Statement 8: Timothy Martinez is a government witness. T. Martinez claims that Christopher Chavez confessed to his involvement in the murders and during such confession implicates Allen Patterson in the murder.<br><br>Declarant: Christopher Chavez<br><br>Source: Timothy Martinez<br><br>Date: unknown | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>The T. Martinez 302 indicates Chaves told T. Martinez that Garza "'was getting up and was gonna escape and then Allen PATTERSON came in and tackled him (GARZA). PATTERSON wasn't even in on the hit. He just gave skina and helped.'" T. Martinez 302 at 5. This statement only incriminates Patterson and not Chavez, so it is not admissible under rule 804(b)(3). See Williamson v. United States, 512 U.S. at 599.<br><br>Under rule 801(d)(2)(A), the jury can use Chavez' statement to T. Martinez against Chavez and not against any other Defendant. The portion of that statement describing Patterson's actions has little probative value vis-à-vis Chaves, but the jury may improperly use that portion of the statement against Patterson even if the Court gives a limiting instruction. Consequently, serious rule 403 issues would attend any attempt to introduce that portion of Chavez' statement to T. Martinez. |

DNM 1516

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON,** | ) | |
| **JOE GALLEGOS,** | ) | |
| **EDWARD TROUP, a.k.a. "Huero** | ) | |
| **Troup,"** | ) | |
| **BILLY GARCIA, a.k.a. "Wild Bill,"** | ) | |
| **ALLEN PATTERSON,** | ) | |
| **CHRISTOPHER CHAVEZ, a.k.a.** | ) | |
| **"Critter,"** | ) | |
| **ARTURO ARNULFO GARCIA, a.k.a.** | ) | |
| **"Shotgun," and** | ) | |
| **ANDREW GALLEGOS, a.k.a. "Smiley,"** | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' OBJECTION TO DEFENDANT
### JOE LAWRENCE GALLEGOS'S OPENING STATEMENT EXHIBITS

The United States of America hereby submits its objection to Defendant Joe Lawrence Gallegos's proposed opening statement exhibits. The United States objects to the 911 call(s) related to the assault of J.G. that occurred on March 17, 2015, scientific reports, and to the transcripts and recordings of cooperating Defendant Leonard Lujan.

The United States objects to the exhibits based on hearsay, as to the scientific reports, 911 call(s) and transcripts and recordings. Additionally, Defendant Gallegos provided to the United States 58 unidentified calls only a few weeks ago. These calls were not identified in any coherent manner, and the United States has not been able to identify to date even which 911 call(s) from these 58 that Defendant Gallegos intends to introduce. So the United States has not been provided

with any reasonable notice of the contents of the 911 call(s), and, therefore, does not know the contents of the 911 call(s) that Defendant Gallegos intends to introduce.

Because these exhibits are, at least at the present time, inadmissible hearsay, the Court should exclude these exhibits for use in Defendant Gallegos's opening statements. Additionally, given Defendant Gallegos's failure to timely provide the United States with the 911 calls, and given his failure to identify to the United States which 911 call(s) from this untimely production he intends to introduce, the Court should exclude the call(s) from Defendant Gallegos's opening statements.

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515

*__Electronically filed on 4/11/2018__*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 - Tel.

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

/s/
_____
MARIA Y. ARMIJO
Assistant United States Attorney

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CAUSE NO.  15-CR-04268-JB-2** |
| | § | |
| **JOE GALLEGOS** | § | |

### UNOPPOSED MOTION TO UNSEAL 16-MJ-993

Defendant Joe Lawrence Gallegos, by and through his counsel of record, Brock Benjamin and Richard Sindel move pursuant to LR49.1 to unseal the above cause.

On or about March 14, 2016 the United States filed a criminal complaint against Jose Antonio Gomez. This complaint was 21 U.S.C. § 846 - Conspiracy to Distribute Controlled Substances. The affidavit and other filings in this cause should be public record as the arrest was effected on or about March 22, 2016. Exhibit "A".

The matters in this cause should be public record as the complaint was initiated by Federal Bureau of Investigation Special Agent Brian Acee. The matter is believed to relate to the current case.

The United States was contacted regarding this motion and is not opposed to this request.

The other defendants are presumed to be unopposed to this request.

Wherefore, the undersigned respectfully requests that the matter 16-MJ-993 be unsealed.

Respectfully submitted,

BROCK BENJAMIN
747 E. San Antonio, STE. 203
El Paso, Texas 79901
tel: 575-448-1433
fax: 915-503-2224
NM Bar: 141535

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 11th day of April, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to

Maria Armijo
200 N. Church
Las Cruces, New Mexico 88001
maria.armijo@usdoj.gov

and all other participants

/s/ Brock Benjamin
BROCK BENJAMIN

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

| United States of America | ) | |
| v. | ) | Case No. |
| Jose Antonio Gomez | ) | |
| | ) | *16mj 993* |
| | ) | |
| _____ | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    Jose Antonio Gomez                                               ,
who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment          ❏ Superseding Indictment     ❏ Information     ❏ Superseding Information     ☑ Complaint
❏ Probation Violation Petition     ❏ Supervised Release Violation Petition     ❏ Violation Notice     ❏ Order of the Court

This offense is briefly described as follows:

21 U.S.C. Section 846 - Conspiracy to Distribute Controlled Substances

Date:      03/14/2016                                     _____
                                                           *Issuing officer's signature*

City and state:     Albuquerque, New Mexico              **KAREN B. MOLZEN**
                                                         **U.S. MAGISTRATE JUDGE**
                                                           *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* 3/22/2016 , and the person was arrested on *(date)* 3/22/2016 at *(city and state)* LOS LUNAS, NEW MEXICO |
| Date: 3/22/16              _____ *Arresting officer's signature* OTTO A. KING Detective |
| Bryan Acee, FBI Special Agent *Printed name and title* |

EXHIBIT "A"

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                          No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL Sanchez, a.k.a.
"Dan Dan," GERALD ARCHULETA, a.k.a.
"Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

    **THIS MATTER** comes before the Court on the United States' Sealed Motion Regarding

Attorney Conflict, filed April 4, 2018 (Doc. 2071)("Motion").  The primary issue is whether the

Defendant Arturo Arnulfo Garcia's attorney, Billy Blackburn, can continue to represent A. Garcia notwithstanding Mr. Blackburn's prior representation of James Garcia, one of Plaintiff United States of America's witnesses, in a state court murder prosecution.  In the case in which Mr. Blackburn represented J. Garcia, J. Garcia "was found guilty of Murder in the 2nd Degree, Tampering with Evidence and Possession of Firearm or Destructive Device by a Felon on November 28, 1995."  Motion at 2.  "The murder was not an SNM related homicide."  Motion at 2.

The United States District Court for the District of New Mexico requires attorneys representing criminal defendants to "comply with the Rules of Professional Conduct adopted by the Supreme Court of the State of New Mexico."  D.N.M. LR-Cr R. 57.2.  Those rules impose two distinct duties vis-à-vis an attorney's former clients.[1]  The first is a duty of confidentiality.  Attorneys cannot "use information relating to the representation" of a former client to their disadvantage, unless "the information has become generally known."  N.M. R. Prof'l Conduct 16-109(C)(1).  Likewise, an attorney cannot "reveal information relating to the representation."  N.M. R. Prof'l Conduct 16-109(C)(2).  The second is a duty to refrain from representing someone whose "interests are materially adverse to the interests of [a] former client."  N.M. R. Prof'l Conduct 16-109(A).

That second duty applies, however, only to the matters in which an attorney represented a former client and to "substantially related" matters.  N.M. R. Prof'l Conduct 16-109(A).  A particular matter's scope -- and, hence, whether it is the same matter in which an attorney

---

[1]In addition to the duties owed to a former client, the New Mexico Rules of Professional Conduct state that a lawyer cannot represent a client if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a former client."  N.M. R. Prof'l Conduct 16-107(A)(2).

represented a former client -- "depends on the facts of a particular situation or transaction," but "[t]he underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." N.M. R. Prof'l Conduct 16-109 cmt. 2.  A matter is substantially related to a matter in which an attorney represented a former client "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  N.M. R. Prof'l Conduct 16-109 cmt. 3 (emphasis added). "Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related."  N.M. R. Prof'l Conduct 16-109 cmt. 3.

On April 5, 2018, the Court spoke with Mr. Blackburn ex parte regarding the details of the case in which Mr. Blackburn represented J. Garcia.  Mr. Blackburn's representations to the Court indicate that he could not ethically cross-examine J. Garcia, because Mr. Blackburn might use or reveal confidential information relating to his prior representation of J. Garcia in such a cross-examination.  See N.M. R. Prof'l Conduct 16-109(C).  Nothing before the Court indicates, however, that Mr. Blackburn has any information related to J. Garcia's decades-old case that would advance A. Garcia's position if J. Garcia does not testify.  On April 6, 2018, the United States and the Defendants removed J. Garcia from their witness lists.  See United States' Unopposed Notice of Removal of Witness at 1, filed April 6, 2018.  Consequently, there is no

practical danger that Mr. Blackburn will use or reveal any nonpublic[2] information related to that

representation.  See N.M. R. Prof'l Conduct 16-109(C).  Correlatively, there is no "significant

risk" that Mr. Blackburn's representation of A. Garcia "will be materially limited" by his duty of

confidentiality to J. Garcia.  N.M. R. Prof'l Conduct 16-107(B).  The Court accordingly

concludes that Mr. Blackburn's representation of A. Garcia can continue notwithstanding Mr.

Blackburn's continuing duty to maintain J. Garcia's confidences.

Similarly, there is no substantial risk that information as would normally have been

obtained in Mr. Blackburn's representation of J. Garcia in a non-SNM-related murder

prosecution would materially advance A. Garcia's position in this case.  See N.M. R. Prof'l

Conduct 16-109 cmt. 3.  Further, A. Garcia's federal prosecution for a Violent Crime in Aid of

Racketeering, 18 U.S.C. § 1959 ("VICAR") based on his alleged participation in SNM does not

involve the same transaction or legal dispute as J. Garcia's non-SNM-related state murder

prosecution.  See N.M. R. Prof'l Conduct 16-109 cmt. 3.  Accordingly, the Court concludes that

A. Garcia's VICAR prosecution is not substantially related Mr. Blackburn's prior representation

of J. Garcia.  Likewise, Mr. Blackburn cannot be justly regarded as changing sides, so the two

matters are not the same.  See N.M. R. Prof'l Conduct 16-109 cmt. 3.  Accordingly, the Court

concludes that Mr. Blackburn can continue to represent A. Garcia notwithstanding Mr.

Blackburn's continuing duty of loyalty to J. Garcia.

To the extent that Mr. Blackburn's prior representation of J. Garcia creates any issues

under the Sixth Amendment to the Constitution of the United States of America -- e.g., by

causing Mr. Blackburn to pull his punches while cross-examining J. Garcia -- A. Garcia can

---

[2]An attorney is permitted to use information relating to a former client's representation --
as opposed to information relating to a current client's representation -- if the information has
become generally known.  See N.M. R. Prof'l Conduct 16-109(C)(1).

DNM 1525

unilaterally waive those issues.  Conflicts of interest potentially create Sixth Amendment issues, because an attorney's divided loyalties may render their assistance constitutionally ineffective. See Cuyler v. Sullivan, 446 U.S. 335, 345 (1980)("[A] lawyer forced to represent codefendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment.").  A defendant can, however, "waive his right to the assistance of an attorney unhindered by a conflict of interests."  Holloway v. Arkansas, 435 U.S. 475, 483 n.5 (1978). Consequently, if A. Garcia knowingly and intelligently waives any conflicts that stem from Mr. Blackburn's prior representation of J. Garcia, Mr. Blackburn's continued representation of A. Garcia does not offend A. Garcia's Sixth Amendment rights.

The Court grants the Motion insofar as it seeks a determination regarding whether Mr. Blackburn can ethically continue to represent A. Garcia.  The Court denies the Motion -- insofar as it seeks Mr. Blackburn's disqualification -- because it concludes that Mr. Blackburn's representation of A. Garcia does not create a conflict of interest vis-à-vis Mr. Blackburn's former representation of J. Garcia.  Out of an abundance of caution, however, the Court will seek a conflict-of-interest waiver from A. Garcia to avoid any Sixth Amendment issues, because such a waiver resolves any potential Sixth Amendment issues down the road.

**IT IS ORDERED** that: (i) the request for a determination in the United States' Sealed Motion Regarding Attorney Conflict, filed April 4, 2018 (Doc. 2071), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 USC § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneysoh
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

      *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

      *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorneys for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

     *Attorneys for Defendant Christopher Chavez*

- 7 -

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

    *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

    *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

    *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

    *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

    *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

    *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

    *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

    *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

    *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

    *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

DNM 1531

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

DNM 1532

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

    *Attorneys for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

    *Attorneys for Defendant Brandy Rodriguez*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                    No. CR 15-4268 JB

ANGEL DELEON
JOE LAWRENCE GALLEGOS
EDWARD TROUP, a.k.a. "Huero Troup;"
LEONARD LUJAN
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little Guero;"
ALLEN PATTERSON;
 CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a. "Shotgun;"
BENJAMIN CLARK, a.k.a. "Cyclone;"
RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie," a.k.a. "Hog Nuts;"
DANIEL SANCHEZ, a.k.a. "Dan Dan;"
GERALD ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma;"
CONRAD VILLEGAS, a.k.a. "Chitmon;"
ANTHONY RAY BACA, a.k.a. "Pup;"
ROBERT MARTINEZ, a.k.a. "Baby Rob;"
ROY PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA;
CARLOS HERRERA, a.k.a. "Lazy;"
RUDY PEREZ, a.k.a. "Ru Dog;"
ANDREW GALLEGOS, a.k.a. "Smiley;"
SANTOS GONZALEZ;
PAUL RIVERA;
SHAUNA GUTIERREZ;
BRANDY RODRIGUEZ

     Defendants.

**COURTS FOURTH DRAFT OF TABLE TO BE INCLUDED IN THE IMPENDING
MEMORANDUM OPINION AND ORDER REGARDING THE JAMES ISSUE
(provided to the parties on April 11, 2018)**

| **James Proffer Statement[21]** | **Ruling** |
|---|---|
| Statement 1: "Billy Garcia tasked Leonard Lujan with finding an inmate to carry out the murders of Garza and Castillo.  The murders were to be executed simultaneous."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections:   Chavez   Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).[22]  See Mar. 13 Tr. at 9:13-10:8 (Castellano, Stemo).  Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see Chavez Response ¶ 4, at 2; Patterson Response ¶ 5, at 2. |
| Statement 2: "Billy Garcia wanted Castillo and Garza 'to be taken out' by strangulation."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections:   Chavez   Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).   See Mar. 13 Tr. at 10:9-13 (Castellano, Stemo).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see Chavez Response ¶ 5, at 2; Patterson Response ¶ 6, at 2-3. |

---

[21]The James Proffer lists eighty-eight statements that the United States intends to offer into evidence as coconspirator statements under rule 801(d)(2)(E) of the Federal Rules of Evidence.  The United States apparently compiled those statements from its pretrial interviews with potential witnesses, which the James Proffer denominates sources.  The Court anticipates, however, that the United States will present the James Proffer statements to the jury by calling the sources to testify before the jury and not by introducing the source's pretrial statements.

[22]When a statement is admissible against some Trial 2 Defendants and not against all of them, the Court is willing to give a limiting instruction, but the parties will need to request one both to bring the issue to the Court's attention and because the Defendants may not always want the Court to give a limiting instruction -- even when they are entitled to one -- for fear of highlighting and emphasizing testimony's impermissible uses.  See Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose -- but not against another party or for another purpose -- the court, **on timely request**, must restrict the evidence to its proper scope and instruct the jury accordingly."  (emphasis added)).

- 74 -

| | |
|---|---|
| Statement 3: "The Castillo and Garza murders were an order. Anyone who did not follow that order was to be killed as well."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).  See Mar. 13 Tr. at 10:14-11:2 (Castellano, Stemo).  The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see Chavez Response ¶ 6, at 2; Patterson Response ¶ 7, at 3. |
| Statement 4: "Billy Garcia was planning to kill everyone in the unit with a green light but was starting with Castillo and Garza."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his plan, so it is admissible for its truth under rule 803(3).  See Mar. 13 Tr. at 11:3-10 (Castellano, Stemo).  The Court accordingly overrules Chavez' and Patterson's objections.  See Chavez Response ¶ 7, at 2; Patterson Response ¶ 8, at 3-4. |
| Statement 5: "These murders needed to be done because the SNM gang was losing status with other gangs."<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible under rule 803(3).  See Mar. 13 Tr. at 11:11-22 (Castellano, Stemo).  The Court accordingly overrules Chavez' and Patterson's objections.  See Chavez Response ¶ 8, at 3; Patterson Response ¶ 9, at 4. |
| Statement 6: "Leonard Lujan tells Eugene Martinez 'I'm telling you right now where it's coming from and everything,' referring to Billy | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E).  See Mar. 13 Tr. at 11:23-12:7 (Castellano, Stemo).  Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their |

- 75 -

| | |
|---|---|
| Garcia." <br><br> Declarant: Leonard Lujan (first-level) and Billy Garcia (second-level). <br><br> Source: Leonard Lujan, Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | objections, see Chavez Response ¶ 4, at 2; Patterson Response ¶ 10, at 4. |
| Statement 7: "Billy Garcia ordered the murder of Castillo due to him cooperating with law enforcement." <br><br> Declarant: Billy Garcia. <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible under rule 803(3).  See Mar. 13 Tr. at 12:8-16 (Castellano, Stemo).   The Court accordingly overrules Patterson's objection.  See Patterson Response ¶ 11, at 4-5. |
| Statement 8: "Billy Garcia ordered Garza to be killed for being a former Los Carnales member." <br><br> Declarant: Billy Garcia <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | This statement is a statement of B. Garcia's then-existing state of mind, specifically his motive, so it is admissible under rule 803(3).   See Mar. 13 Tr. at 12:17-25 (Castellano, Stemo).  The Court accordingly overrules Chavez' and Patterson's objections.  See Chavez Response ¶ 10, at 3-4; Patterson Response ¶ 12, at 5. |
| Statement 9: "'What the fuck is going on? I sent word a long time ago to clean house.'  Billy Garcia was upset Leonard Lujan had not taken charge in the facility." | This statement could be offered for a purpose other than its truth, e.g., as circumstantial evidence of B. Garcia's state of mind.  If it is offered for a non-hearsay purpose, the Court will give a limiting instruction informing the jury that it can use the statement for that limited purpose and not for its truth. |

- 76 -

| | |
|---|---|
| Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is also admissible for its truth against the Counts 1 and 2 Defendants under rule 801(d)(2)(E), because B. Garcia's recrimination regarding Lujan's failure to act appears calculated to spur Lujan to take further action towards the Castillo and Garza murders. See Mar. 13 Tr. at 13:1-24 (Castellano, Stemo). Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see Chavez Response ¶ 11, at 4; Patterson Response ¶ 13, at 5-6. |
| Statement 10: "Leroy Lucero received word from Billy Garcia that several hits were supposed to happen. Garcia told him he didn't need help since Lucero was getting out."<br><br>Declarant: Billy Garcia<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | Part of this statement -- "Leroy Lucero received word from Billy Garcia that several hits were supposed to happen" -- is a statement of B. Garcia's then-existing state of mind, specifically his plan, so that portion of the statement is admissible under rule 803(3). The remainder of the statement, B. Garcia's declination of Lucero's proffered assistance, is a statement in furtherance of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E), because that declination was part of making the arrangements for the Castillo and Garza murders. See Mar. 13 Tr. at 15:15-22 (Castellano, Stemo). Accordingly, the statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies under rule 801(d)(2)(E). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see Chavez Response ¶ 12, at 4; Patterson Response ¶ 14, at 6. |
| Statement 11: "Leroy Lucero confirmed the message that several hits were supposed to happen with Angel Munoz. Munoz said 'Something has to happen Carnal Billy's on his way.'"<br><br>Declarant: Angel Munoz<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is admissible for its truth against the members of the Counts 1 and 2 conspiracies, under rule 801(d)(2)(E). See Mar. 13 Tr. at 16:12-17:4 (Castellano, Stemo). Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see Chavez Response ¶ 13, at 4-5; Patterson Response ¶ 15, at 6. |
| Statement 12: "Leonard Lujan met with Eugene Martinez and tasked | This statement is admissible for its truth against the Count 2 conspirators under rule 801(d)(2)(E). See Mar. 13 Tr. at |

| | |
|---|---|
| him with the murder of Garza by strangulation and told Martinez to pick people to help." <br><br> Declarant: Leonard Lujan <br><br> Source: Leonard Lujan, Eugene Martinez <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | 18:10-21 (Castellano, Stemo).  Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see Chavez Response ¶ 14, at 5; Patterson Response ¶ 16, at 6-7. |
| Statement 13: "Leonard Lujan met with Joe Gallegos, Angel DeLeon, and 'Criminal'[23] and ordered Castillo murdered by strangulation." <br><br> Declarant: Leonard Lujan <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: J. Gallegos Response, Patterson Response | Agent Stemo's testimony indicates that she is aware of this statement, which Lujan made in 2001, via another out-of-court statement, which Lujan made circa 2007.  See Mar. 13 Tr. at 65:7-16 (Benjamin, Stemo).  The 2007 statement was made long after the Count 1 conspiracy ended, so it is not admissible under rule 801(d)(2)(E).  The earlier statement, however, was made during and in furtherance of the Count 1 conspiracy during and in furtherance of the Count 1 conspiracy by a member of that conspiracy.  See Mar. 13 Tr. at 17:17-24, 18:20-19:1 (Castellano, Stemo).  Patterson is not a member of the Count 1 conspiracy, see supra FOF ¶¶ 2-3, so the Court sustains Patterson's objection insofar as it requests a limiting instruction, which the Court will give at Patterson's in-court request, see Patterson Response ¶ 17, at 7. <br><br> J. Gallegos requests the opportunity to voir dire Lujan, because "he is referred to in an audio recording by Leroy Lucero as 'crazy Leonard, no one would believe Leonard.'"  J. Gallegos Response ¶ 1, at 3.  The Court denies that request, because voir dire is not an appropriate mechanism for testing Lujan's credibility.  J. Gallegos is free to argue to the jury that they should not credit this statement, however. <br><br> J. Gallegos argues that this James Proffer statement is an action -- giving an order -- and not a statement for Federal Rules of Evidence purposes.  See J. Gallegos Response ¶ 1, at 3; Mar. 13 Tr. at 64:11-13 (Benjamin).  Under the Federal Rules of Evidence, all statements are assertions. |

---

[23]"Criminal" refers to Michael Jaramillo.  See Mar. 13 Tr. at 130:24-131:1 (Castellano, Stemo).

- 78 -

|  | See Fed. R. Evid. 801(a)("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.").  See also id. advisory committee notes ("The effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion.").  Verbal actions like orders and commands -- e.g., "fetch me a shrubbery" -- as well as questions -- e.g., "what do you want to eat for lunch?" -- are not always assertions, because they are neither true nor false. [24]   See also Fed. R. Evid. 801 advisory committee |

[24]At least according to Aristotle, contingent predictions are another example of utterances that are neither true nor false:

> In the case of that which is or which has taken place, propositions, whether positive or negative, must be true or false.  Again, in the case of a pair of contradictories, either when the subject is universal and the propositions are of a universal character, or when it is individual, as has been said,[] one of the two must be true and the other false . . . .

> When the subject, however, is individual, and that which is predicated of it relates to the future, the case is altered.  For if all propositions whether positive or negative are either true or false, then any given predicate must either belong to the subject or not, so that if one man affirms that an event of a given character will take place and another denies it, it is plain that the statement of the one will correspond with reality and that of the other will not. For the predicate cannot both belong and not belong to the subject at one and the same time with regard to the future.

> . . . .

> [T]o say that neither the affirmation nor the denial is true, maintaining, let us say, that an event neither will take place nor will not take place, is to take up a position impossible to defend.  In the first place, though facts should prove the one proposition false, the opposite would still be untrue.  Secondly, if it was true to say that a thing was both white and large, both these qualities must necessarily belong to it; and if they will belong to it the next day, they must necessarily belong to it the next day.  But if an event is neither to take place nor not to take place the next day, the element of chance will be eliminated.  For example, it would be necessary that a sea-fight should neither take place nor fail to take place on the next day.

> . . . .

> A sea-fight must either take place to-morrow or not, but it is not necessary that it

- 79 -

notes ("When evidence of conduct is offered on the theory that it is not a statement, and hence not hearsay, a preliminary determination will be required to determine whether an assertion is intended."). Consequently, orders and questions generally are not hearsay both because hearsay must be a statement, see Fed. R. Evid. 801(c)("'Hearsay' means a statement . . . ."), and because something that is neither true nor false cannot be offered to prove the truth of the matter asserted, see Fed. R. Evid. 801(c)(2). See also Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 801.02[c] ("If proffered evidence is not a 'statement' within the meaning of Rule 801(a), then it cannot be hearsay, and so cannot be excluded under the rule.").

While orders and commands are not, themselves, assertions they may -- like questions -- contain implicit assertions. See United States v. Summers, 414 F.3d 1287, 1298 (10th Cir. 2005)(Kelly, J.)(concluding that a defendant's question -- "'How did you guys find us so fast?'" -- was an implicit assertion of "both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so quickly"). For example, a lawyer asking a witness whether the witness stopped beating their wife indicates both that the witness has a wife and that the witness abused their wife. Whether those two indications are assertions, however, depends on the lawyer's intent. See United States v. Summers, 414 F.3d at 1300 ("Taken together, [United States v. Jackson, 88 F.3d 845 (10th Cir. 1996)] and [United States v. Long, 805 F.2d 1572 (D.C. Cir. 1990)(Thomas, J.)] do not foreclose the possibility that a declaration in the form of a question may nevertheless constitute an assertion within the meaning of Rule 801(a) and (c). Rather, both cases properly focus the inquiry on the declarant's intent."). Thus, the verbal acts that the James Proffer identifies can qualify as statements -- and, hence, as hearsay -- if they

---

should take place to-morrow, neither is it necessary that it should not take place, yet it is necessary that it either should or should not take place to-morrow. Since propositions correspond with facts, it is evident that when in future events there is a real alternative, and a potentiality in contrary directions, the corresponding affirmation and denial have the same character.

Aristotle, On Interpretation § I, Pt. 9, available at http://classics.mit.edu/Aristotle/interpretation.html.

DNM 1541

|  | were intended to be assertions. <u>See</u> Fed. R. Evid. 801 advisory committee notes ("The key to the definition is that noting is an assertion unless intended to be one."). The Court, when it comes across verbal actions listed in the <u>James</u> Proffer will, thus, assess whether those verbal acts contain implicit assertions. |
|--|--|
|  | That the United States lists, in the <u>James</u> Proffer, verbal acts is useful even if those verbal acts do not contain implicit assertions, because people often take verbal actions and make statements in quick succession and people who are not lawyers do not always scrupulously distinguish between verbal actions and statements. For instance, Statement 13 indicates that Lujan ordered others to kill Castillo, but Lujan may testify that he told people that "I want you to kill Castillo," which is a statement regarding Lujan's desires. Alternatively, Lujan may testify that he gave the order that Statement 13 describes and immediately followed that order with an explanation regarding why Castillo should be killed. That the United States included Statement 13 in the <u>James</u> Proffer puts the Defendants on notice that Lujan may testify regarding this sort of statements associated with the order that Statement 13 describes. It also allows the Court to make findings that will permit it to rule quickly on unexpected statements closely associated with those orders, <u>e.g.</u>, if an order was made during a conspiracy by a conspirator then statements made by the same person at much the same time were also made during a conspiracy by a conspirator.[25] |
| Statement 14: "Billy Garcia wanted knowledge of the plan kept to very few individuals." <br><br> Declarant: Billy Garcia <br><br> Source: Leonard Lujan <br><br> Date: On or before March 26, 2001 <br><br> Objections: Chavez Response, Patterson Response | This is a statement of B. Garcia's then-existing state of mind, so it is admissible for its truth under rule 803(3). <u>See</u> Mar. 13 Tr. at 19:2-9 (Castellano, Stemo). The Court accordingly overrules Chavez' and Patterson's objections. <u>See</u> Chavez Response ¶ 15, at 5; Patterson Response ¶ 18, at 7-8. |
| Statement 15: "Once alarms were | This statement was made after Castillo and Garza died, so |

---

[25]Whether a statement is made in furtherance of a conspiracy, however, depends on the statement's content.

| | |
|---|---|
| sounded and the murders discovered, Billy Garcia congratulated Leonard Lujan with 'Amor.'"<br><br>Declarant: Billy Garcia<br><br>Source: Leonard Lujan<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | it was not made during the Counts 1 and 2 conspiracies. Accordingly, it is not admissible under rule 801(d)(2)(E). It is admissible, however, as an implicit statement of B. Garcia's then-existing state of mind, i.e. that he approves of the job Lujan. See Fed. R. Evid. 803(3). |
| Statement 16: "Frederico Munoz part of the committee that sanctioned the hit on Garza and Castillo. Munoz wanted Garza killed for being Los Carnales."<br><br>Declarant: Billy Garcia<br><br>Source: Federico Munoz<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | The testimony at the Court's James hearing indicates that Federico Munoz admitted to the information contained in this statement. See Mar. 13 Tr. at 19:25-20:7 (Castellano, Stemo). Federico Munoz testifying and repeating that admission raises no hearsay issues, because Munoz has personal knowledge regarding his own motives and regarding whether he was part of a group that ordered the Castillo and Garza murders. See Fed. R. Evid. 602. |
| Statement 17: "Arturo Garcia placed hit on Sanchez because he was suspected to be cooperating with law enforcement."<br><br>Declarant: Arturo Garcia<br><br>Source: Eric Duran<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This is a statement of A. Garcia's then-existing state of mind, so it is admissible for its truth against all the Defendants under rule 803(3). See Mar. 13 Tr. at 20:16-21:1 (Castellano, Stemo). |
| Statement 18: "Ben Clark passed around paperwork on Sanchez's cooperation with police. Stating 'everyone who needs to see it has | The statement that "everyone who needs to see it has seen it" is admissible against the Count 3 conspirators under rule 801(d)(2)(E). See Mar. 13 Tr. at 21:2-13 (Castellano, Stemo). The act of passing around paperwork is not a statement, so it is admissible against all the defendants. |

DNM 1543

| | |
|---|---|
| seen it, get rid of it.'" <br><br> Declarant: Ben Clark <br><br> Source: Ruben Hernandez <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | See supra Statement 13 (analyzing the relationship between acts and statements). |
| Statement 19: "Arturo Garcia wrote to Frankie Gonzales that Brian and Raymond Rascon were to take care of the next murder for SNM." <br><br> Declarant: Arturo Garcia <br><br> Source: Javier Alonso <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Mar. 13 Tr. at 23:1-12 (Castellano, Stemo). |
| Statement 20: "Ben Clark put Javier Alonso in charge of making sure Sanchez was killed and told the Rascon brothers to complete the hit." <br><br> Declarant: Ben Clark <br><br> Source: Javier Alonso <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Mar. 13 Tr. at 23:13-21 (Castellano, Stemo). |
| Statement 21: "Word was sent from the green pod that if Sanchez was not killed, others in the Blue pod would be killed." <br><br> Declarant:  FNU  [First  Name Unknown]  LNU  [Last  Name Unknown] | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Mar. 13 Tr. at 23:22-24:7 (Castellano, Stemo). |

- 83 -

| | |
|---|---|
| Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | |
| Statement 22: "Edward Troup was told to go help with Sanchez's murder."<br><br>Declarant: Javier Alonso<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E). See Mar. 13 Tr. at 25:2-8 (Castellano, Stemo). |
| Statement 23: "While Edward Troup and Javier Alonso were finishing killing Sanchez, Brian and Raymond Rascon came and asked if they could help."<br><br>Declarant: Brian Rascon and/or Raymond Rascon<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | This statement is a verbal action -- specifically an offer -- and not an assertion, so it cannot be hearsay. See Mar. 13 Tr. 25:9-26:2 (Castellano, Stemo).<br><br>The Rascon brothers were tasked to do the hit originally but when Javier Alonso approached them. Raymond Rascon said they didn't want to do it because they were short to the door, meaning they were going to get out of prison shortly therefore Javier Alonso show instructed Edward Troup and they both went into the cell and took care of business. When they were doing that, the Rascon brothers came to offer their aid as a way to save face with the gang.<br><br>Mar. 13 Tr. at 25:15-24 (Stemo). See supra Statement 13 (discussing the relationship between actions and statements). The Rascon brothers were not members of the Count 3 conspiracy, so none of the statements that they made are admissible for their truth under rule 801(d)(2)(E). See supra n.14.<br><br>Troup argues that this statement lacks a sufficient foundation, because the James Proffer identifies the declarant as "'Brian Rascon and/or Raymond Rascon.'" Troup Response ¶ 4, at 2 (quoting James Proffer at 13). This statement's admissibility does not depend on whether the person who offered assistance is Brian Rascon, |

- 84 -

| | |
|---|---|
| | Raymond Rascon, or both.  See United States v. Brinson, 772 F.3d 1314, 1321-22 (10th Cir. 2014)(concluding that an unidentified declarant's statements were admissible, because they were not offered to prove the truth of the matter asserted).  Accordingly, the Court overrules Troup's objection.  See Troup Response ¶ 4, at 2. |
| Statement 24: "Javier Alonso told the Rascon brothers to keep a look out when the brothers asked if they could help."<br><br>Declarant: Javier Alonso<br><br>Source: Javier Alonso<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is an action -- giving the Rascon brothers an order -- so it is not hearsay.  See Mar. 13 Tr. at 26:3-10 (Stemo, Castellano).  See also supra Statement 13 (discussing the relationship between actions and statements).  That Alonso gave this order after Sanchez' death indicates that any associated statements were not made during the Sanchez conspiracy, so those statements are not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E).  See United States v. Alcorta, 853 F.3d at 1139. |
| Statement 25: "Edward Troup kissed Javier Alonso on the cheek and told him he was proud of him."<br><br>Declarant: Edward Troup<br><br>Source: Javier Alonso<br><br>Objections: None | This is a statement of Troup's then-existing state of mind, so it is admissible against all Defendants under rule 803(3).  See Mar. 13 Tr. at 26:11-19 (Castellano, Stemo). |
| Statement 26: "After Sanchez was murdered, Edward Troup began telling Ruben Hernandez that he was next."<br><br>Declarant: Edward Troup<br><br>Source: Javier Alonso; Ruben Hernandez<br><br>Date: On or before June 17, 2007<br><br>Objections: None | Stemo's testimony indicates that this James Proffer statement is several closely associated statements:<br><br>Q.     Following the murder in statement number, was an indication that Edward Troup began telling Ruben Hernandez that he was next?<br><br>A.     Yes.<br><br>Q.     And what was the indication about Ruben Hernandez at or around the time -- at or around the time of the murder?<br><br>A.     I believe Mr. Hernandez did not cover the cameras properly.<br><br>Q.     At     that     point,     according     to |

- 85 -

| | statements by Javier Alonso and others was Ruben Hernandez seen as possibly scared and weak? |
|---|---|
| | A.    Yes, he was actually on crutches at the time. |
| | Q.    Related to the statement is there another statement related to Edward Troup stating in part that Ruben Hernandez failed to cover the camera because he was scared? |
| | A.    Yes. |
| | Mar. 13 Tr. at 26:20-27:13 (Stemo, Castellano). |
| | The portion of this statement that articulates Troup's plan, i.e., a plan to assault or kill Hernandez, are admissible as statements of Troup's then-existing state of mind under rule 803(3).  To the extent that these statements are offered for their effect on Hernandez, i.e., intimidation, they are not offered to prove the truth of the matter asserted, so they are not hearsay, and the Court will give a limiting instruction. |
| Statement 27: "Arturo Garcia sent word about Sanchez to Ben Clark."<br><br>Declarant: Arturo Garcia<br><br>Source: Ben Clark, Eric Duran<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Mar. 13 Tr. at 27:24-28:7 (Castellano, Stemo). |
| Statement 28: "Ben Clark and Arturo Garcia sent several letters about Sanchez to each other."<br><br>Declarant: Arturo Garcia<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: None | Sending letters is an action and not a statement, but the statements in those letters regarding the Sanchez murder are admissible against the Count 3 conspirators under rule 801(d)(2)(E).  See Mar. 13 Tr. at 27:24-28:7 (Castellano, Stemo). |

- 86 -

| | |
|---|---|
| Statement 29: "Javier Alonso and Edward Troup were expected to oversee the murder, and Troup told the Rascon brothers to hit Sanchez."<br><br>Declarant: Ben Clark<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | Troup argues that Benjamin Clark's expectations circa 2007 are not statements. See Troup Response ¶ 5, at 2. Troup is correct, expectations are not statements, but Clark can testify about what his expectations were at that time if he remembers. |
| Statement 30: "Leonard Lujan told Willie Amador and Jesse Ibarra to 'handle that' and told Eugene Martinez that 'I'm running this prison now.'"<br><br>Declarant: Leonard Lujan<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | Stemo's testimony indicates that "statement number 30 is incorrect" and that "[w]hat it actually says is, Lujan told Martinez to tell SNM members, Willie Amador and Jesse Martinez to handle that." See Tr. at 173:25-174:3 (Stemo). Lujan's order to E. Martinez is an action and not an assertion, see supra Statement 13 (discussing the relationship between actions and statements), but any associated statements would be admissible for their truth against the Count 2 Defendants under rule 801(d)(2)(E). The Court's findings of fact indicate that Chavez and Patterson are members of the Count 2 conspiracy, see supra FOF ¶ 6, so the Court overrules their objections, see Chavez Response ¶ 18, at 6; Patterson Response ¶ 21, at 8-9. |
| Statement 31: "Christopher Chavez heard about the hit on Garza and volunteered to participate in the operation."<br><br>Declarant: Chris Chavez<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Patterson Response | That Chavez volunteered is an action and not a statement. See supra Statement 13 (discussing the relationship between actions and statements).<br><br>This statement is not hearsay, because Chavez' act, volunteering to participate in the Garza murder, is neither true nor false. The Court anticipates that there are other statements associated with Chavez' act which could be offered for their truth. For example, it would have been natural for Chavez to state that he wanted to participate in the Garza murder, which would be a statement of then-existing state of mind under rule 803(3). Any statements made by Count 3 conspirators attempting to induce Chavez to volunteer would have been made during and in furtherance of the Count 3 conspiracy, so they would be admissible for their truth under rule 801(d)(2)(E) as to the Count 3 conspirators. |

- 87 -

| | |
|---|---|
| Statement 32: "Willie Amador told Eugene Martinez to be lookout during the Garza murder and stated, 'If something happens, you already know.'"<br><br>Declarant: Willie Amador<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement was made during and in furtherance of the Count 2 conspiracy and it was made by Willie Amador, a member of that conspiracy. It is not testimonial. Accordingly, the statement is admissible for its truth against the Count 2 conspirators under rule 801(d)(2)(E). |
| Statement 33: While strangling Garza someone in the room yelled 'Close the door!'"<br><br>Declarant: Allen Patterson or Christopher Chavez<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response | B. Garcia argues that, because the James Proffer lists this statement's declarant as "Allen Patterson or Christopher Chavez," James Proffer at 18, "[t]here is no ability to properly attribute or authenticate the statement to any particular declarant." B. Garcia ¶ 5, at 2-3.<br><br>This statement -- "Close the door!" -- is a command, so it is neither true nor false. See supra Statement 13 (analyzing the relationship of actions and statements). Associated statements are probably admissible against the Count 2 conspirators under rule 801(d)(2)(E).<br><br>As to authentication, rule 901 states that "the proponent [of an item of evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 609(a). Accordingly, so long as the United States claims only that this statement was made by either Patterson or Chavez, it only needs, under rule 609, to introduce evidence sufficient to support a finding that one of those two individuals made the statement. See Fed. R. Evid. 609(a). The testimony of the witness who relates this statement to the jury -- assuming that the witness has knowledge -- satisfies that requirement. See Fed. R. Evid. 609(b)(1)(stating that the testimony of a witness with knowledge satisfies rule 609's authentication requirement). Accordingly, the Court overrules B. Garcia's objection. B. Garcia ¶ 5, at 2-3. |
| Statement 34: "Leonard Lujan approached Eugene Martinez and told him to talk to Willie Amador | This statement is admissible against the Counts 2 Defendants under rule 801(d)(2)(E). See Mar. 13 Tr. at 30:20-31:1 (Castellano, Stemo). The Court accordingly overrules Chavez' and Patterson's objections. See Chavez |

- 88 -

| | |
|---|---|
| about the murders."<br><br>Declarant: Leonard Lujan<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objection: Chavez Response, Patterson Response | Response ¶ 20, at 6-7; Patterson Response ¶ 24, at 10. |
| Statement 35: "Eugene Martinez asked Billy Garcia and Garcia confirmed the order and said 'it's coming from me' and 'make sure it happens.'"<br><br>Declarant: Billy Garcia<br><br>Source: Eugene Martinez<br><br>Date: On or before March 26, 2001<br><br>Objections: Chavez Response, Patterson Response | This statement is admissible against the Counts 2 Defendants under rule 801(d)(2)(E). See Mar. 13 Tr. at 31:2-12 (Castellano, Stemo). The Court accordingly overrules Chavez' and Patterson's objections. See Chavez Response ¶ 21, at 7; Patterson Response ¶ 25, at 10. |
| Statement 36: "Joe Gallegos later informed Leroy Lucero that Lawrence Torres saw and was concerned Torres might snitch."<br><br>Declarant: Joe Gallegos<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Chavez Response, A. Gallegos Response, J. Gallegos Response, Patterson Response | The United States orally conceded that this statement is not admissible under rule 801(d)(2)(E) of the Federal Rules of Evidence, because it was made four or five years after the Castillo and Sanchez murders. See Mar. 13 Tr. at 32:5-13 (Castellano) The United States suggested, however, that the statement is admissible against Troup under rule 801(d)(2)(A). The statement also appears to be a statement of then-existing state of mind under rule 803(3) to the extent that it expresses J. Gallegos' concerns and as circumstantial evidence of J. Gallegos' state of mind, _i.e._ consciousness of guilt. . It is not admissible under rule 803(3), however, to show that Lawrence Torres saw anything, because rule 803(3) doesn't permit a statement of belief to be used to show the fact believed. See Fed. R. Evid. 803(3).<br><br>The Court accordingly overrules Patterson's objection. See Patterson Response ¶ 26, at 10-11.<br><br>That this statement is nontestimonial means that its admission does not offend the Confrontation Clause, so the |

- 89 -

| | Court overrules J. Gallegos' objection "on confrontation grounds." J. Gallegos Response ¶ 2, at 4. |
|---|---|
| **Statement 37:** "Edward Troup told Lawrence Torres, 'This has nothing to do with you. Don't come up here.'"<br><br>Declarant: Edward Troup<br><br>Source: Lawrence Torres<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Chavez Response, Patterson Response | The United States provided additional context for this statement at the Court's <u>James</u> hearing:<br><br>> On the morning of the murder, March 26, 2001, Lawrence Torres woke up. As he walked out to heat up water for his coffee, he saw Angel DeLeon and Edward Troup, and it looked like to him that they were disassembling a laundry bag. He put his water into the microwave, went back to his cell. He heard a struggle, so he looked out to see what was happening, and he saw Mr. Edward Troup sitting at a table. Mr. Torres tried go upstairs to see what was happening, and that's when Mr. Troup made that statement.<br><br>Mar. 13 Tr. at 33:20-33:5 (Stemo). This statement is admissible against the Count 1 Defendants under rule 801(d)(2)(E), because Troup was a member of that conspiracy and he made the statement to prevent outside interference with the Castillo murder. The Court accordingly overrules B. Garcia's, Chavez', and Patterson's objections. <u>See</u> B. Garcia Response ¶ 7, at 3; Chavez Response ¶ 23, at 7-8; Patterson Response ¶ 27, at 11. |
| **Statement 38:** "Angel Deleon had a scratch on his finger and told a female CO that he cut himself."<br><br>Declarant: Angel Deleon<br><br>Source: Lawrence Torres<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Chavez Response | The <u>James</u> hearing testimony indicates that Deleon made this statement after the Castillo murder, so it was not made during the conspiracy to commit that murder. <u>See</u> Mar. 13 Tr. at 33:9-21(Castellano, Stemo). Consequently, it is not admissible for its truth under rule 801(d)(2)(E). The statement is admissible, however, as circumstantial evidence of DeLeon's state of mind, specifically his consciousness of guilt.<br><br>The Court accordingly overrules Chavez' objections. <u>See</u> Chavez Response ¶ 24, at 8.<br><br>Offering a hearsay statement for a purpose other than its truth does not implicate the Confrontation Clause, <u>see</u> <u>Tennessee v. Street</u>, 471 U.S. 409, 417 (1985), so the Court overrules B. Garcia's objection that "this is a testimonial statement made to a CO during the process of an investigation and therefore is inadmissible," B. Garcia |

- 90 -

| | Response ¶ 8, at 4. |
|---|---|
| Statement 39: "Kyle Dwyer came to SNMCF with 'paperwork' on Sanchez."<br><br>Declarant: Kyle Dwyer<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: None | That Dwyer brought the Sanchez paperwork to SNMCF is an action and not a statement. See supra Statement 13 (analyzing the relationship between actions and statements). |
| Statement 40: "The 'paperwork' came from the Crazy Town Roswell gang."<br><br>Declarant: Ben Clark<br><br>Source: Ben Clark<br><br>Date: On or before June 17, 2007<br><br>Objections: None | Clark likely does not have personal knowledge regarding the paperwork's origins; he probably knows that the paperwork came from the Crazy Town Roswell gang because somebody told him about the paperwork's origins. See Fed. R. Evid. 602. The Court has no information regarding that out-of-court statement to Clark, so it cannot analyze whether that statement is admissible for its truth. |
| Statement 41: "Joe and Andrew Gallegos just pulled 'a job' and had to go 'clean up.' They were giving money and heroin to friends to 'help them out.' Joe Gallegos said, 'I just came up.'"<br><br>Declarant: Joe and/or Andrew Gallegos<br><br>Source: Leroy Vallejos, Michael Sutton<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | This statement is not admissible under rule 801(d)(2)(E), because the Court has not concluded that a conspiracy to murder Adrian Burns existed.<br><br>The James Proffer is not entirely clear regarding which statements A. Gallegos made and which statements J. Gallegos made. Rule 801(d)(2)(A) permits the statement to be admitted against whichever Gallegos brother made the statement. If one Gallegos brother made a statement, it may be admissible against the other under rule 801(d)(2)(B), which permits a statement to be introduced a party that "manifested that it adopted or believed [the statement] to be true." Fed. R. Evid 801(d)(2)(B). See id. advisory committee notes ("Adoption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue."). Additionally, the statement might be admissible as an excited utterance. See Fed. R. Evid. 803(2).<br><br>A. Gallegos objects to this statement, because "there is a |

- 91 -

| | lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3. At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point. It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge. See Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 602.02[2]("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible."). |
| | J. Gallegos objects to this statement and Statement 42, because admitting them "is probably in-violation [sic] of the holding in *Bruton v. United States*, 391 U.S. 123 (1968). That this statement is nontestimonial indicates that admitting it for its truth does not offend the Confrontation Clause. Further, if rule 801(d)(2)(A) and rule 801(d)(2)(B) both apply, the statement is admissible against both Gallegos brothers. The Court accordingly overrules J. Gallegos' objection. See J. Gallegos Response ¶ 3, at 4. |
| Statement 42: "Joe and Andrew Gallegos were covered in blood and advised they were 'cleaning the house.' Joe Gallegos later went by Leroy Vallejos' house and tried to give Vallejos his and Andrew Gallegos' truck."<br><br>Declarant: Joe and/or Andrew Gallegos<br><br>Source: Daniel Orndorff, Michael Sutton, Leroy Vallejos<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E).<br><br>A. Gallegos objects to this statement, because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3. At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point. It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge. See Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 602.02[2]("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have |

- 92 -

| | personal knowledge for the statement to be admissible."). |
|---|---|
| | J. Gallegos objects to this statement's admission, because it is an action and not a statement.  See |
| **Statement 43:** "Charlene Baldizan agreed to get rid of the van because the Gallegos brothers knew police were looking for it."<br><br>Declarant: Gallegos brothers<br><br>Source: Charlene Baldizan<br><br>Date: On or about November 12, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E).<br><br>A. Gallegos objects to this statement, because "there is a lack of personal knowledge and an overall inability to properly attribute or authenticate the source for those statements that are simply identified with both Joe and Andrew Gallegos, or simply the 'Gallegos brothers.'" A. Gallegos Response ¶ 5, at 3.  At trial, the witness who relates these statements to the jury will probably identify the declarant with more specificity, and the parties can address personal knowledge and authentication at that point.  It is worth noting, however, that a party offering a statement for its truth under rule 801(d)(2) need not establish that the declarant had personal knowledge.  See Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 602.02[2]("The exception to the rule is a statement admissible under Rule 801(d)(2) as a statement of a party-opponent, where the declarant need not have personal knowledge for the statement to be admissible."). |
| **Statement 44:** "Joe and Andrew Gallegos asked Jason Van Veghel to clean up the living room and pull the carpet up and gave him 2-3 hits of heroin for it.  Joe Gallegos also asked Van Veghel to clean blood off air compressor."<br><br>Declarant: Joe Gallegos<br><br>Source: Jason Van Veghel<br><br>Date: On or about November 13, 2012<br><br>Objections: A. Gallegos Response, J. Gallegos Response | United States orally struck "and Andrew" from statement 44.<br><br>J. Gallegos objects to this statement, because Van Veghel "has never been alleged or identified as a co-conspirator." J. Gallegos Response ¶ 5, at 4.  After J. Gallegos filed his response, the United States orally identified Van Veghel as a conspirator at the Court's James hearing.  Additionally, whether a statement is admissible under rule 801(d)(2)(E) depends on whether the statement was made by a conspirator and not on whether the statement was made to a conspirator.<br><br>Rule 801(d)(2)(E) does not apply to this statement, however, because the Court has not found that a conspiracy to murder Adrian Burns existed.  Nonetheless, Van Veghel can testify regarding the actions he took and any instructions he received without running afoul of the rule against hearsay.  See Fed. R. Evid. 801(c). |
| **Statement 45:** "The next day, at Joe Gallegos request, Andrew Gallegos | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible |

- 93 -

| | |
|---|---|
| threw a set of keys and a wrist watch into a field." <br><br> Declarant: Andrew Gallegos <br><br> Source: Jason Van Veghel <br><br> Date: On or about November 13, 2012 <br><br> Objections: A. Gallegos Response, J. Gallegos Response | under rule 801(d)(2)(E). Van Veghel can testify regarding the actions he observed, such as A. Gallegos throwing a set of keys and a wrist watch into a field, without running afoul of the rule against hearsay, however. See Fed. R. Evid. 801(c). |
| Statement 46: "Joe Gallegos found out the police were coming to search the house and he gave several guns and other stolen goods to Jason Van Veghel to store elsewhere." <br><br> Declarant: Joe Gallegos <br><br> Source: Jason Van Veghel <br><br> Date: On or about November 13, 2012 <br><br> Objections: A. Gallegos Response, J. Gallegos Response | The Court has not found that a conspiracy to murder Adrian Burns existed, so this statement is not admissible under rule 801(d)(2)(E). <br><br> Van Veghel can testify regarding actions he observed -- such as J. Gallegos giving him several guns and stolen goods -- without running afoul of the rule against hearsay. Statements indicating why J. Gallegos was giving Van Veghel those guns and goods are admissible as circumstantial evidence of J. Gallegos' state of mind or as statements of J. Gallegos' then-existing state of mind under rule 803(3). <br><br> J. Gallegos argues that this statement is "inconsistent with the discovery provided." J. Gallegos response ¶ 7, at 5. J. Gallegos can impeach this statement based on that inconsistency, but it does not render the statement inadmissible. |
| Statement 47: "Santos Gonzales told Gomez 'You remember me?' They then told Gomez that Joe Gallegos put a hit out and they were there to kill him." <br><br> Declarant: Santos Gonzales <br><br> Source: Jose Gomez <br><br> Date: On or about February 27, 2016 <br><br> Objection: J. Gallegos Response | J. Gallegos argues that this statement is inadmissible, because "Santos Gonzalez is not expected to testify and this statement is contained in the factual portion of his plea agreement." J. Gallegos Response ¶ 8, at 5. The United States probably reused language from Gonzalez' plea agreement when drafting the James Proffer, but that does not render Jose Gomez' testimony relating the substance of Gonzalez' out-of-court statement inadmissible. <br><br> Any statements that J. Gallegos made ordering others to kill Gomez are admissible against J. Gallegos under rule 801(d)(2)(A). Statements that those others made to Gomez are either circumstantial evidence of the declarant's state of mind or statements of then-existing state of mind, specifically their motive for assaulting Gomez. |

- 94 -

| Statement 48: "Shauna Gutierrez said 'they didn't finish him' when Gomez ran away."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Brandy Rodriguez<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | United States orally indicated that this statement will only come in if Brandy Rodriguez testifies to it. <u>See</u> Mar. 13 Tr. at 41:7-12 (Castellano)("Brandy Rodriguez is not cooperating with the Government at this time, but I am submitting this statement for the Court's consideration in case that changes."). Consequently, J. Gallegos' assertion that "neither the declarant nor the source is expected to testify" creates no admissibility issues. J. Gallegos Response ¶ 48, at 5. If B. Rodriguez testifies, then J. Gallegos' assertion is false. If B. Rodriguez does not testify, this statement will not be offered into evidence, so whether it is admissible is moot.<br><br>J. Gallegos also asserts that "there is no indicia of trustworthiness based on the multiple versions of statements given by" B. Rodriguez and Gutierrez. J. Gallegos ¶ 9, at 5. J. Gallegos can argue to the jury that this statement is untrustworthy, but that does not render the statement inadmissible unless the United States relies upon an exception to the rule against hearsay that has indicia of trustworthiness -- or the lack of indicia of untrustworthiness -- as an element. <u>See</u>, <u>e.g.</u>, Fed. R. Evid. 803(6)(E). |
| Statement 49: "Santos Gonzalez and Paul Rivera knocked on the door and asked for Gomez. They then told Charlene Parker-Johnson that she should leave the house."<br><br>Declarant: Santos Gonzalez and/or Paul Rivera<br><br>Source: Charlene Parker-Johnson<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | J. Gallegos "objects to this statement to the extent that it may have come from Santos Gonzales who probably will not testify. Defendant further objects as this statement does not appear trustworthy as the source is not provided ostensibly because he/she remains unknown." J. Gallegos Response ¶ 10, at 5. Contrary to the J. Gallegos Response, the <u>James</u> Proffer identifies the source of this statement as Charlene Parker-Johnson and not as Santos Gonzales or unknown. <u>See</u> <u>James</u> Proffer at 26. <u>See also</u> Mar. 13 Tr. at 42:2-11 (Castellano, Stemo). |
| Statement 50: "Santos Gonzalez and Paul Rivera yelled, 'He's running!' and 'He's getting away!' when Gomez started to run."<br><br>Declarant: Santos Gonzales and/or | J. Gallegos "objects to this statement to the extent that it may have come from Santos Gonzales who probably will not testify. Defendant further objects as this statement does not appear trustworthy as the source is not provided ostensibly because he/she remains unknown." J. Gallegos Response ¶ 10, at 5. Contrary to the J. Gallegos Response, the <u>James</u> Proffer identifies the source of this statement as |

| | |
|---|---|
| Paul Rivera<br><br>Source: Charlene Parker-Johnson<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | Charlene Parker-Johnson and not as Santos Gonzales or unknown.  <u>See</u> <u>James</u> Proffer at 26.  <u>See also</u> Mar. 13 Tr. at 42:12-43:2 (Castellano, Stemo).<br><br>These are admissible as excited utterances, <u>see</u> Fed. R. Evid. 803(2), or present-sense impressions, <u>see</u> Fed. R. Evid. 803(1). |
| Statement 51: "Joe Gallegos placed a hit on Gomez because Joe Gallegos feared Gomez would testify against him on a state murder charge."<br><br>Declarant: Shauna Gutierrez and Brandy Rodriguez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: A. Gallegos Response, J. Gallegos Response | J. Gallegos "objects to this statement to the extent that its source is unidentified."  J. Gallegos Response ¶ 11, at 5.  The source of this statement is not unidentified, however.  <u>See</u> <u>James</u> Proffer at 27.<br><br>This statement is admissible against J. Gallegos under rule 801(d)(2)(E).   B. Rodriguez and Gutierrez were both members of the Courts 14-16 conspiracy.  <u>See</u> <u>supra</u> FOF ¶ 14.   The statement was made in furtherance of that conspiracy, because it enlisted Rivera's assistance in the conspiracy.   This statement is not, however, admissible against A. Gallegos, because he was not a member of the Counts 14-16 conspiracy, and the Court will -- at A. Gallegos' request, give the jury a limiting instruction.  <u>See</u> A. Gallegos Response ¶ 4, at 2-3. |
| Statement 52: "Upon learning where Gomez was staying, Shauna Gutierrez and Brandy Rodriguez agreed they needed to go after Gomez."<br><br>Declarant: Shauna Gutierrez and Brandy Rodriguez<br><br>Source: Paul Rivera,  Brandy Rodriguez<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | This statement is admissible against J. Gallegos under rule 801(d)(2)(E) as a statement made during and in furtherance of the Counts 14-16 conspiracy.  <u>See</u> Mar. 13 Tr. at 44:2-7 (Castellano, Stemo). |
| Statement 53: "Paul Rivera agreed to help with the hit on Gomez." | Paul Rivera's testimony stating that he agreed to help with the hit on Gomez is not a statement offered "to prove the truth of the matter asserted," so it raises no hearsay issues.  Fed. R. Evid. 801(c).   That Rivera's testimony may be |

| | |
|---|---|
| Declarant: Paul Rivera<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | "self-serving" does not render it inadmissible.  J. Gallegos Response ¶ 13, at 6. |
| Statement 54: "You better not testify against my Jefe, or I'll kill you!"<br><br>Declarant: Brandy Rodriguez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: None | This statement is admissible to as circumstantial evidence of B. Rodriguez' state of mind. |
| Statement 55: "Santos Gonzales also stated he was going to kill Gomez."<br><br>Declarant: Santos Gonzalez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | This statement is admissible as a statement of the declarant's then-existing state of mind, specifically his plan.  See Fed. R. Evid. 803(3).  J. Gallegos asserts that this statement is inaccurate, because it is not consistent with Santos Gonzalez' plea agreement.   J. Gallegos Response ¶ 14, at 6.  J. Gallegos can use that inconsistency to impeach this statement, but it does not render this statement inadmissible. |
| Statement 56: "Told Shauna Gutierrez they had completed their mission.  Shauna Gutierrez laughed and said she was 'happy to hear' Gomez was likely dead."<br><br>Declarant: Brandy Rodriguez, Paul Rivera, Santos Gonzalez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, | The Gutierrez statement is admissible as a statement of the declarant's then-existing emotional condition.  See Fed. R. Evid. 803(3).<br><br>B. Rodriguez', Rivera's, and Santos Gonzalez' statements occurred immediately after the assault on Gomez.   See Mar. 13 Tr. at 45:6-13(Castellano, Stemo).   These statements are, accordingly, admissible as excited utterances.  See Fed. R. Evid. 803(2).<br><br>J. Gallegos objects to this statement, because "[t]here individuals are listed as the source." J. Gallegos Response ¶ 15, at 6.  Three individuals can make the same statement, |

- 97 -

| 2016<br><br>Objections: J. Gallegos Response | however.   For example, one person can make an oral statement and two others can make the same statement nonverbally by nodding their heads.   See Fed. R. Evid. 801(a)("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."). |
|---|---|
| Statement 57: "Shauna Gutierrez told Santos Gonzalez to move the truck they used to another location and leave it for a few days."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | Gutierrez' giving orders to Santos Gonzales is an action and not a statement.   It is also a statement of the declarant's then-existing state of mind, if Rivera testifies that Gutierrez elaborated regarding her plans, e.g., to tell someone to retrieve the truck in a few days.<br><br>J. Gallegos argues that this statement is inadmissible, because "it is apparent that it was not made by the claimed declarant." J. Gallegos Response ¶ 16, at 6.  J. Gallegos is free to argue to the jury that it should not credit the evidence that the United States introduces to show that this statement was made, but such an argument does not render this statement inadmissible hearsay. |
| Statement 58: "'How come you guys didn't do the job more fully?' after she previously told Rivera, Gonzalez, and Rodriguez to 'Go get him.'<br><br>Declarant: Shauna Gutierrez<br><br>Source: Brandy Rodriguez, Paul Rivera<br><br>Date: On or about February 27, 2016<br><br>Objections: J. Gallegos Response | The James hearing testimony indicates that this is a two-part statement.  First, before the Gomez assault, Gutierrez "told Paul Rivera, Santos Gonzalez to go get him." Mar. 13 Tr. at 46:9-16 (Castellano, Stemo).  Second, after the Gutierrez' pre-assault orders -- and any associated statements, see supra Statement 13 (analyzing the relationship between verbal actions and statements) -- were made during and in furtherance of the conspiracy to assault Gomez, so they are admissible against J. Gallegos under rule 801(d)(2)(E).  See Mar. 13 Tr. at 46:9-16(Castellano, Stemo).   The post-assault statement is admissible as circumstantial evidence of Shauna Gutierrez' state of mind, i.e., to show that she expected and intended Gomez to be killed or hurt more seriously. |
| Statement 59: "Don't Testify"<br><br>Declarant: Paul Rivera<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016 | This statement is admissible against J. Gallegos under rule 801(d)(2)(E) as a statement made during and in furtherance of the Counts 14-16 conspiracy, because it was made to induce Gomez not to testify against J. Gallegos.  See Mar. 13 Tr. at 46:25-47:5 (Castellano, Stemo). |

- 98 -

| Objections: J. Gallegos Response | |
|---|---|
| Statement 60: "Brandy Rodriguez and Shauna Gutierrez had people in place for an attack on Gomez."<br><br>Declarant: Brandy Rodriguez<br><br>Source: Mario Chavez<br><br>Date: On or about March 29, 2017<br><br>Objections: J. Gallegos Response | The United States orally indicated that the date refers to Mario Chavez' interview with the FBI and not to the date the statement was made.  See Mar. 13 Tr. at 47:6-12 (Castellano, Stemo).<br><br>According to the United States, Mario Chaves "would pass letters between Joe Gallegos, who was in county jail at the time, and Brandy Rodriguez and Shauna Gutierrez." See Mar. 13 Tr. at 47:15-18 (Stemo).  That Mario Chavez passed letters back and forth between J. Gallegos, B. Rodriguez, and Gutierrez is an action and not a statement. Statements ordering or arranging the Gomez assault that were made before the assault took place are admissible against J. Gallegos under rule 801(d)(2)(E).<br><br>At the James hearing, the United States conceded that if B. Rodriguez made this statement after the assault on Gomez then it would not be admissible under rule 801(d)(2)(E). See Mar. 13 Tr. at 49:4-10(Castellano)(addressing statement 61); id. at 49:20-21 (Castellano)("But the same applies, I would say, with Statements 60 and 61").  The United States argued that the statement "would then be considered a statement against interests or an admission by Brandy Rodriguez." Mar. 13 Tr. at 49:8-10 (Castellano). The United States has not, however, shown that B. Rodriguez -- who has already pled guilty -- is unavailable, which is a prerequisite to admitting an out-of-court statement as a declaration against interest.  See Fed. R. Evid. 804(b)(3).  That B. Rodriguez made the statement means that it is admissible for its truth against B. Rodriguez under rule 801(d)(2)(A), but B. Rodriguez is not a Trial 2 Defendant, so the statement would not be admissible at Trial 2 under rule 801(d)(2)(A). |
| Statement 61: "Joe Gallegos ordered the hit on Gomez, and Shauna Gutierrez planned the hit."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Mario Chavez<br><br>Date: On or about March 29, 2017<br><br>Objections: A. Gallegos Response, | United States orally indicated that the declarant should be Brandy Rodriguez and that it doesn't know whether the statement was made before or after the assault on Gomez. The United States also orally indicated that it does not know whether this statement was made before or after the assault on Gomez.<br><br>At the James hearing, the United States conceded that if B. Rodriguez made this statement after the assault on Gomez then it would not be admissible under rule 801(d)(2)(E). See Mar. 13 Tr. at 49:4-10(Castellano).  The United States |

- 99 -

| | |
|---|---|
| J. Gallegos Response | argued that the statement "would then be considered a statement against interests or an admission by Brandy Rodriguez." Mar. 13 Tr. at 49:8-10 (Castellano). The United States has not, however, shown that B. Rodriguez -- who has already pled guilty -- is unavailable, which is a prerequisite to admitting an out-of-court statement as a declaration against interest. <u>See</u> Fed. R. Evid. 804(b)(3). That B. Rodriguez made the statement means that it is admissible for its truth against B. Rodriguez under rule 801(d)(2)(A), but B. Rodriguez is not a Trial 2 Defendant, so the statement would not be admissible at Trial 2 under rule 801(d)(2)(A). |
| | Even if B. Rodriguez made this statement before the Gomez assault, it would not be admissible against J. Gallegos under rule 801(d)(2)(E), because the statement does not appear to have been made in furtherance of the Counts 14-16 conspiracy. Mario Chavez was not a member of this conspiracy and the United States has not introduced evidence showing that divulging details to this non-member advanced the conspiracy's goals. |
| Statement 62: "'Paperwork' on Sanchez was delivered from Arturo Garcia to Ben Clark, approving the murder." <br><br> Declarant: Arturo Garcia <br><br> Source: Samuel Gonzalez, John Montano, Javier Rubio <br><br> Date: On or before June 17, 2007 <br><br> Objections: None | That the paperwork was sent is an action and not a statement. <u>See supra</u> Statement 13. Associated statements approving the Sanchez murder or conveying that approval to other members of the Sanchez conspiracy were made during and in furtherance of the conspiracy, so they are admissible against the Count 3 Defendants under rule 801(d)(2)(E). |
| Statement 63: "'Cheeky' and 'Coquito' were tasked with the murder of Sanchez but did not want to carry it out." <br><br> Declarant: Cheeky and Coquito <br><br> Source: Samuel Gonzales <br><br> Date: On or before June 17, 2007 | Cheeky and Coquito are Raymond and Brian Rascon, respectively. <u>See</u> Mar. 13 Tr. at 50:15-21 (Castellano, Stemo). The Rascon brothers conveyed the information contained in this statement to Samuel Gonzales. <u>See</u> Mar. 13 Tr. at 50:22-24 (Castellano, Stemo). The Court has concluded that the Rascon brothers are not members of the Count 3 conspiracy, so their statements to Samuel Gonzales are not admissible under rule 801(d)(2)(E). No other exception to the rule against hearsay applies, so the Rascon brothers' statement is not admissible for its truth. Samuel Gonzales apparently lacks personal knowledge as |

| | |
|---|---|
| Objections: Troup Response | to the substance of the Rascon brothers' statement -- as opposed to that they made that statement -- so he cannot testify that the Rascon brothers were tasked with the Sanchez murder even if Samuel Gonzalez does not relate that statement to the jury.  See Fed. R. Evid. 602. |
| Statement 64: "Javier Alonso asked how to get rid of the marks on his hands from strangling Sanchez."<br><br>Declarant: Javier Alonso<br><br>Source: Samuel Gonzales<br><br>Date: On or before June 17, 2007<br><br>Objections: None | Javier Alonso made this statement after Sanchez' death, so it was made after the conspiracy to kill Sanchez ended. That this statement was not made during the conspiracy to kill Sanchez indicates that it is not admissible for their truth against the Count 3 conspirators under rule 801(d)(2)(E).  That Alonso asked how to get rid of the marks from strangling Sanchez is a question, but it implicitly asserts that he strangled Sanchez.  See United States v. Summers, 414 F.3d at 1298.<br><br>If Samuel Gonzales actually saw marks on Alonso's hands, Samuel Gonzales could testify to that fact, as opposed to Alonso's statement regarding that fact.  If, additionally, Samuel Gonzales is sufficiently familiar with the sort of marks that stranglers typically have on their hands, he could testify to his opinion regarding whether those marks could have been caused by strangling someone.  See Fed. R. Evid. 701. |
| Statement 65: "'That'd be messed up if the paperwork on the guy I just got showed up.'  Ben Clark also sent Arturo Garcia a list of names of people in the pod."<br><br>Declarant: Ben Clark<br><br>Source: John Montano<br><br>Date: On or before June 17, 2007<br><br>Objections: None | The James hearing testimony indicates that Clark's oral remark referred to Sanchez, but the Court does not have enough context regarding that remark to determine whether it was made in furtherance of the conspiracy to kill Sanchez, as opposed to being an off-hard remark made for no particular purpose.<br><br>The James hearing testimony indicates that Clark provided the list of names to A. Garcia, "[s]o that he would know who was present at the pod and who would be next, or who hasn't put in work."  See Mar. 13 Tr. at 51:18-23 (Castellano, Stemo).  Clark's statement to A. Garcia was, thus, made during and in furtherance of the Count 3 conspiracy, so it is admissible for its truth against the Count 3 conspirators under rule 801(d)(2)(E). |
| Statement 66: "Edward Troup and Javier Alonso attempted to hide in John Montano's cell after lock down after the murder of Sanchez."<br><br>Declarant:   Edward   Troup   and | United States orally indicated that this statement is actually just an action, but it indicated that it is uncertain whether there were statements made that are associated with that act.  See Mar. 13 Tr. at 52:5-16 (Castellano, Court).  See also supra Statement 13 (analyzing the relationship between actions and statements). |

- 101 -

| | |
|---|---|
| Javier Alonso<br><br>Source: John Montano<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | |
| Statement 67: "Jimmie Gordon was asked to get information on Garza from Geraldine Martinez."<br><br>Declarant: Jimmie Gordon<br><br>Source: Jimmie Gordon<br><br>Date: On or before March 26, 2001<br><br>Objections: None | Geraldine Martinez was a prison librarian, and that Jimmie Gordon was asked to get information about Garza from Geraldine Martinez is a verbal action and not a statement. See supra Statement 13 (analyzing the relationship between verbal actions and assertions). Accordingly, Gordon's testimony about the request to obtain information about Garza does not relate hearsay. See Fed. R. Evid. 801(c). |
| Statement 68: "Billy Garcia put a hit on Archuleta which was communicated to Archuleta through 'Baby Zac' over a disagreement about Castillo's murder."<br><br>Declarant: Baby Zac.<br><br>Source: Gerald Archuleta<br><br>Date: None<br><br>Objections: B. Garcia Response | This statement is not admissible under rule 801(d)(2)(E), because Baby Zac did not tell Archuleta about the conspiracy to murder him in furtherance of that conspiracy. |
| Statement 69: "Brandy Rodriguez kicked Gomez and said, 'This is a message from Joe!'"<br><br>Declarant: Brandy Rodriguez<br><br>Source: Paul Rivera<br><br>Date: On or about February 27, 2016 | This statement is admissible as an excited utterance, see Fed. R. Evid. 803(2), and as a statement of the declarant's then-existing state of mind, specifically her motive, see Fed. R. Evid. 803(3). |

- 102 -

| | |
|---|---|
| Objections: A. Gallegos Response | |
| Statement 70: "Shauna Gutierrez stated she is 'ride or die' with Joe Gallegos, after admitting that she and Joe Gallegos put a hit on Brandy Rodriguez based on the belief Rodriguez was a cooperator."<br><br>Declarant: Shauna Gutierrez<br><br>Source: Paul Rivera<br><br>Date: On or about November 2016<br><br>Objections: A. Gallegos Response, J. Gallegos Response | The United States intends to offer this statement dicates that this statement was made in furtherance of an uncharged conspiracy to harm B. Rodriguez premised on an erroneous belief she was cooperating with law enforcement. See March 13 Tr. at 55:9-14 (Castellano); id. at 55:19-56:16 (Court, Castellano)   The Court has not found that such a conspiracy existed, however, so this statement is not admissible under rule 801(d)(2)(E).   See supra note 9.<br><br>Gutierrez' statement that she is ride or die with J. Gallegos is admissible as a statement of the declarant's then-existing emotional condition. See Fed. R. Evid. 803(3). |
| Statement 71: "Christopher Chavez asked 'Is this right?' in reference to the Garza murders and Leroy Lucero said 'you got to do what you got to do.'"<br><br>Declarant: Christopher Chavez<br><br>Source: Leroy Lucero<br><br>Date: On or before March 26, 2001<br><br>Objections: B. Garcia Response, Patterson Response | When Chavez indicated that he "wasn't sure about the murder, [he was] clarifying whether or not there was, in fact a green light on Mr. Garza." Mar. 13 Tr. at 57:16-20 (Castellano, Stemo). Consequently, both Chavez' question and Lucero's response were made during and in furtherance of the Count 2 conspiracy, so they are admissible against the Count 2 conspirators under rule 801(d)(2)(E). |
| Statement 72: "Javier Alonso asked if the marks on his hands were noticeable."<br><br>Declarant: Javier Alonso<br><br>Source: John Montano<br><br>Date: On or about June 17, 2007<br><br>Objections: None | Alonso asked Montano this question after the Sanchez murder.   See Mar. 13 Tr. at 57:21-58:5 (Castellano, Stemo).  Consequently, this statement was not made during the conspiracy to kill Sanchez, so it is not admissible under rule 801(d)(2)(E).  Alonso's question implicitly asserts that he has marks on his hands, but that implicit assertion is admissible as a present-sense impression.   See Fed. R. Evid. 803(1). |
| Statement 73:   "Ordered the | Ruben Hernandez and Jesse Trujillo were both supposed to |

- 103 -

| | |
|---|---|
| surveillance cameras covered."<br><br>Declarant: Edward Troup and/or Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | cover the surveillance cameras during the Sanchez murder, so corrections officers could not watch what was happening. See Mar. 13 Tr. at 58:15-24 (Castellano, Stemo). In separate statements to the United States, Hernandez mentioned both Trujillo and Troup. See Mar. 13 Tr. at 58:11-14 (Castellano, Stemo). Statements directing Hernandez to cover the surveillance cameras -- no matter whether Troup or Trujillo made those statements -- were made by a Count 3 conspirator during and in furtherance of that conspiracy, so they are admissible under rule 801(d)(2)(E) against the Count 3 Defendants. |
| Statement 74: "'Now hurry Bolo now you know what time it is.' (In reference to covering the cameras.)"<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | This statement was made by a Count 3 conspirator during and in furtherance of the Count 3 conspiracy, so it is admissible against the Count 3 Defendants. See Mar. 13 Tr. at 58:25-59:8 (Castellano, Stemo). |
| Statement 75: "Just stay there and don't let no one in, use your crutch to block the door if you have to."<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objection: None | This statement was made by a Count 3 conspirator during and in furtherance of the Count 3 conspiracy, so it is admissible against the Count 3 Defendants. See Mar. 13 Tr. at 59:9-21 (Castellano, Stemo). |
| Statement 76: "'Ya stuvo (all done) take them off.' (In reference to the camera covers.)"<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007 | This statement occurred after Sanchez' death, so it was not made during the conspiracy to kill Sanchez, so it is not admissible under rule 801(d)(2)(E). See Mar. 13 Tr. at 59:22-60:5 (Castellano, Stemo). The statement is admissible, however, as an excited utterance. See Fed. R. Evid. 803(2). |

| | |
|---|---|
| Objections: None | |
| Statement 77: "Kyle asked Ruben Hernandez to take something to Samuel Gonzales and to tell Samuel Gonzales 'that was all he had.'"<br><br>Declarant: Kyle Dwyer<br><br>Source: Ruben Hernandez<br><br>Date: On or before June 17, 2007<br><br>Objections: Troup Response | The James hearing testimony indicates that Hernandez took a single folded piece of paper to Samuel Gonzales and that the contents of that piece of paper are unknown.  See Mar. 13 Tr. at 221:19-222:3 (Blackburn, Stemo).  Kyle Dwyer's statement to Hernandez is not admissible for its truth, but it is potentially admissible as circumstantial evidence of Dwyer's state of mind and for its effect on Samuel Gonzales. |
| Statement 78: "Samuel Gonzales asked if Sanchez was dead, then again asked 'For real is he dead?'"<br><br>Declarant: Samuel Gonzales<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | Samuel Gonzales asked Hernandez this question immediately after he delivered a piece of paper to Gonzales from Kyle Dwyer.  See Mar. 13 Tr. at 61:1-3 (Castellano, Stemo).  Gonzales' questions are not statements, so they are not hearsay.  See supra Statement 13 (describing the relationship between verbal actions and statements).  Those questions are admissible, however, as circumstantial evidence of Gonzales' state of mind. |
| Statement 79: "'Chicky' was cutting his sleeves off and asked Ruben Hernandez to hang up his wet sleeves."<br><br>Declarant: "Chicky"<br><br>Source: John Montano<br><br>Date: On or about June 17, 2007<br><br>Objections: None | This statement was made after Sanchez died, so was not made during the conspiracy to kill Sanchez.  See Mar. 13 Tr. at 61:12-14 (Castellano, Stemo).  Accordingly, it is not admissible against the Count 3 Defendants under rule 801(d)(2)(E).<br><br>Chicky refers to Raymond Rascon.  See Mar. 13 Tr. at 4-7 (Castellano, Stemo).  That Rascon was cutting up his sleeves and his request to Hernandez are actions and not hearsay.  See supra Statement 13 (analyzing the relationship between actions and statements).  That there was "an indication or concern that Raymond Rascon was cutting off his sleeves because there might be something incriminating on the material," Mar. 13 Tr. at 61:15-19 (Castellano, Stemo), might be admissible as a present-sense-impression, an excited utterance, or a statement of the declarant's then-existing state of mind.  See Fed. R. Evid. 803(1)-(3). |

- 105 -

| | |
|---|---|
| Statement 80: "Edward Troup told 'Chicky' to cut his sleeves in small pieces or give the sleeves to someone next door."<br><br>Declarant: Edward Troup<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | This statement was made after Sanchez died, so was not made during the conspiracy to kill Sanchez.  See Mar. 13 Tr. at 61:12-14 (Castellano, Stemo); id. at 61:20-24 (Castellano, Stemo).  Accordingly, it is not admissible against the Count 3 Defendants under rule 801(d)(2)(E). It is, however, admissible as circumstantial evidence of Troup's state of mind, e.g., consciousness of guilt.<br><br>Troup's statement is admissible against him for its truth under rule 801(d)(2)(A). |
| Statement 81: "First thing in the morning we need you to move the body in the fetal position and wipe down the toilet."<br><br>Declarant: Brian Rascon and/or Edward Troup<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | The United States indicated, at the James Hearing, that both Brian Rascon and Troup made this statement at different times.  See Mar. 13 Tr. at 62:15-18(Castellano, Stemo).  This statement is admissible for its truth as a statement of the declarants' then-existing state of mind, i.e., their plan to have Hernandez clean the cell.  See Fed. R. Evid. 803(3).  It is also admissible to show its effect on Hernandez.  Further, Troup's statement is admissible against him for its truth under rule 801(d)(2)(A).  It is not, however, admissible for its truth under rule 801(d)(2)(E), because it was made after Sanchez' death, so it was not made during the conspiracy to kill Sanchez. |
| Statement 82: "'That's what we are all asking of you.' (Told to Ruben Hernandez when he didn't want to clean the cell.)"<br><br>Declarant: Brian Rascon<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | This statement is admissible for its effect on Hernandez and as circumstantial evidence of the declarant's state of mind.  It is not, however, admissible for its truth under rule 801(d)(2)(E), because it was made after Sanchez' death, so it was not made during the conspiracy to kill Sanchez. |
| Statement 83: "'Not [sic] that's an order, you already know what time it is.' (Told to Ruben Hernandez when he continued to not want to clean the cell.)" | This statement is admissible for its effect on Hernandez and as circumstantial evidence of the declarant's state of mind, i.e., Rascon's plan to have Hernandez clean the cell.  See Fed. R. Evid. 803(3).  It is not, however, admissible under rule 801(d)(2)(E), because it was made after Sanchez' death, so it was not made during the conspiracy |

| | |
|---|---|
| Declarant: Brian Rascon<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | to kill Sanchez. |
| Statement 84: "Ruben Hernandez asked if he was next for refusing to clean the cell and Brian Rascon said 'no, if the door is closed what can you do?'"<br><br>Declarant: Brian Rascon<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: Troup Response | Hernandez' question and Rascon's reply are admissible as circumstantial evidence of Hernandez' state of mind. The assertion implicit in Rascon's reply -- that Hernandez was not able to enter Sanchez' cell -- is not admissible for its truth unless Hernandez' testimony indicates that Rascon's implicit assertion is a present-sense impression. <u>See</u> Fed. R. Evid 803(1). |
| Statement 85: "'Your next mother fucker.' Said to Ruben Hernandez as they passed each other."<br><br>Declarant: Edward Troup<br><br>Source: Ruben Hernandez<br><br>Date: On or before June 17, 2007<br><br>Objections: None | This statement is admissible either for its truth as a statement of the declarant's then-existing state of mind, <u>i.e.</u>, as a statement of Troup's plan, <u>see</u> Fed. R. Evid. 803(3), or as circumstantial evidence of Troup's state of mind and not for its truth, <u>see</u> Fed. R. Evid. 801(c).<br><br>This statement is admissible for its truth against Troup under rule 801(d)(2)(A). |
| Statement 86: "We better be ready for hell cause we're fixing to go through hell."<br><br>Declarant: Jesse Trujillo<br><br>Source: Ruben Hernandez<br><br>Date: On or about June 17, 2007<br><br>Objections: None | This statement -- indicating that the Trujillo expects law enforcement scrutiny, <u>see</u> Mar. 13 Tr. at 64:19-22 (Castellano, Stemo) -- is admissible as a statement of declarant's then-existing state of mind, <u>see</u> Fed. R. Evid. 803(3). |
| Statement 87: Edward Troup stated | Troup -- and not Rascon -- made this statement. <u>See</u> Mar. |

- 107 -

| | |
|---|---|
| that it was every man for themselves and if you can get a plea bargain for 15 or less do it but 'no fucking ratting,' 'that's a no no.'" | 13 Tr. at 65:1-4 (Castellano, Stemo). This statement is admissible for its truth against Troup under rule 801(d)(2)(A). |
| Declarant: Brian Rascon | |
| Source: Ruben Hernandez | |
| Date: On or about June 17, 2007 | |
| Objections: Troup Response | |
| Statement 88: "Go wipe down the toilet, don't worry about moving the body." | This statement is admissible notwithstanding the general rule against hearsay, because it is a verbal action and not an assertion.  See supra Statement 13. |
| Declarant: Brian Rascon | |
| Source: Ruben Hernandez | |
| Date: On or about June 17, 2007 | |
| Objections: Troup Response | |

- 108 -

reasonable prison-gang member might make self-inculpatory statements even if those statements were not true," so in-prison statements that one SNM member makes to another "are not typically admissible under rule 804(b)(3)." James MOO at 104.

The United States correctly argues that, when applying rule 804(b)(3), "the Court must look at each statement individually and assess whether the factors that courts look to for the required corroboration apply to each of the offered statements." 804(b)(3) MIL at 2. The Court's generalization about in-prison statements that one SNM member makes to another is not contrary to that principle, because the Court's generalization is a heuristic, a rule of thumb. Under some circumstances, an in-prison statement that one SNM member makes to another is such that "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true." Fed. R. Evid. 804(b)(3)(A). For example, in the James MOO, the Court applied its analysis to the particular facts surrounding the statements at issue:

> [W]hen Perez made his statements to Cordova, prison-yard rumors indicated, falsely, that Perez cooperated with the United States regarding the Molina murder. Perez' statements to Cordova suggest that those life-threatening rumors are false, because they demonstrate loyalty to the SNM, and because, if Perez helped carry out the Molina murder, then providing information to law enforcement would expose him to criminal liability. Consequently, a reasonable person in Perez' position might make self-incriminating statements regarding the Molina murder to another SNM member to combat life-threatening prison-yard rumors, even if those self-incriminating statements were not true.

James MOO at 104. The Court accordingly assesses individually each of the out-of-court statements that B. Garcia identifies to determine whether that statement is admissible for its truth against all the Defendants under rule 804(b)(3).[27]

---

[27]While the Court analyzes whether the statements that B. Garcia has identified are admissible for their truth under rule 804(b)(3) of the Federal Rules of Evidence, but the United States can attempt to admit statements under rule 804(b)(3) even if the Defendants had no pretrial notice regarding those statements. The United States has no obligation to provide

- 111 -

| Co-Defendant Statement[28] | Ruling |
| --- | --- |
| Statement 1: Alleged statement made by Edward Troup to James "Daffy" Garcia in which he allegedly indicates that B. Garcia ordered the hits.<br><br>Declarant: Edward Troup<br><br>Source: James Garcia<br><br>Date: 11/2012 | According to the J. Garcia 302, the FBI interviewed J. Garcia on May 9, 2013.  See J. Garcia 302 at 1.  In this interview, again according to the J. Garcia 302,<br><br>In late November 2012, [J. Garcia] had a conversation with SNM gang member EDWARD TROUP in [redacted] back yard off of [redacted] in Albuquerque.  During the conversation, TROUP confessed to being a part of two murders in which two people were strangled to death at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico.  Troup stated that during one of the murders, he held 'Fed Dawg's' (agent note: identified as FREDDIE SACHEZ . . . ) legs while 'Wino' (agent note: identified as SNM gang member JAVIER Alonso, Jr. . . . ) strangled him to death with a drawstring from a laundry bag.  Both TROUP and ALONSO disposed of the drawstring and |

pretrial notice regarding the identities of its non-expert witnesses before trial.  See United States v. Russell, 109 F.3d 1503, 1510 (10th Cir. 1997)("In noncapital cases, moreover, there is no constitutional right to pretrial disclosure of witnesses."); id. ("Rule 16 does not require pretrial disclosure of nonexpert witnesses . . . ."))  See also United States v. Tarango, 760 F. Supp. 2d 1163, 1170 (D.N.M. 2009)(Browning, J.)("The Court will not order the United States to reveal its witness' identities or disclose those witness' FBI 302s before trial.").  But see United States v. Russell, 109 F.3d at 1510 ("There is no constitutional barrier to trial courts requiring the mutual pretrial disclosure of witnesses. . . . And we have long recognized the power of district courts to sanction violations of reciprocal discovery agreements.").  It would be incongruous if the United States were obliged to provide pretrial notice regarding the rule 804(b)(3) statements that its witnesses will relate at trial when it does not -- absent an agreement of the parties -- have to provide pretrial notice about who those witnesses will be.  That B. Garcia chose to identify out-of-court statements that he anticipates the United States will offer under rule 804(b)(3) allows the Court to provide pretrial guidance to the parties that will -- hopefully -- facilitate trial, but it does not accelerate the United States burden to establish -- under rule 804(b)(3) or otherwise -- that its evidence is admissible.

[28]The Court draws its list of Co-Defendant statements from a table that B. Garcia submitted at the Court's request.  The Court supplements that list of codefendant statements with entries for Joseph Otero and Josh Mirka; B. Garcia did not identify statements that those two individuals made until he filed the B. Garcia Supplement.  See B. Garcia Supplement ¶¶ 2-3, at 1-3.

- 112 -

then took off their clothes and tore up the evidence in an attempt to hide their part in the murder.   TROUP told [J. Garcia] that CHICKIE LNU [Last Name Unknown] and his brother cleaned up the mess that was made during the murder, to include Sanchez' urine.   TROUP also said that an unknown Corrections Officer (CO) thought that the inmates were giving each other tattoos, and did not respond to the area of the commotion, despite the fact that tattooing was considered contraband inside the prison facility.   As a result, the SNM gang members were able to carry out the murder without any CO intervention.  TROUP also mentioned that the murder of Fred Dawg was an order from headquarters, to which [J. Garcia] interpreted the term ' headquarters' to mean the main New Mexico Prison Facility in Santa Fe, New Mexico, where the majority of the SNM leadership was incarcerated.    [J. Garcia] stated that TROUP was remorseful and was crying during much of the conversation. TROUP told [J. Garcia] that Fred Dawg provided information on a murder, which was against the SNM by-laws, and that was the cause for his murder.

[J. Garcia] stated that TROUP had told him about SANCHEZ's murder in approximately 2008 when [J. Garcia] violated his probation/parole and was incarcerated in the New Mexico Prison System. Additionally, during the same conversation, TROUP provided [J. Garcia] with information regarding his role in the murder of [Frank Castillo] in approximately 2001 at the SNMCF.   TROUP told [J. Garcia] that that BILLY GARCIA, aka Wild Bill, gave the order to kill [Castillo], and that TROUP walked [Castillo] into his ([Castillo's]) cell where ANGEL DELEON and and [sic] others were waiting for [Castillo].  Once inside the cell, TROUP slammed the door, while DELEON and another SNM gang

- 113 -

member/associate strangled [Castillo] to death.

J. Garcia 302 at 2-3.

Assuming that Troup invokes his right to remain silent, he is unavailable for rule 804 purposes. See Fed. R. Evid. 804(a). Troup's statements indicating that he killed Sanchez and Castillo are sufficiently against Troup's penal interest admissible under rule 804(b)(3). See United States v. Smalls, 605 F.3d 765, 783 (10th Cir. 2010)("We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind—even one of sound mind who is not particularly honest—falsely confessed a murder to an apparent acquaintance or friend."). Troup's statement indicating that B. Garcia ordered the Castillo murder is not, however, sufficiently self-inculpatory. See Williamson v. United States, 512 U.S. 594, 599 (1994)(stating that rule 804(b)(3) "cover[s] only those declarations or remarks within the confession that are individually self-inculpatory"); id. ("The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts."). Additionally, Troup's statements are admissible against him as admissions of a party opponent. See Fed. R. Evid. 801(d)(2)(A).

Whether Troup's statements are "supported by corroborating circumstances that clearly indicate [their] trustworthiness" is an issue that the Court will need to assess in light of the other evidence introduced at trial. Fed. R. Evid. 804(b)(3)(B).

> We believe that a showing of corroborating circumstances is sufficient if it gives the judge some assurance—when added to the fact that the statement was against the declarant's interest—that the declarant was telling the truth. And in determining corroborating circumstances, the court should consider all the factors listed in the draft Advisory Committee Note—not just the additional circumstantial guarantees of reliability but also the **amount of independent evidence supporting the truth of the declarant's statement**. All the listed

- 114 -

factors are pertinent to whether the declarant made an accurate statement; and figuring out whether the declarant gave an accurate account is, after all, the point of the enterprise.

Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 804.02[9] (emphasis added).

When J. Garcia testified at the Court's hearing on March 15-16, 2018, however, he disavowed portions of the J. Garcia 302:

> Q.    Has anybody ever admitted to you in a conversation with you that they were involved in those murders that happened at the Southern New Mexico Correctional Facility in 2001?  Has anyone ever told you that they did it?
>
> A.    No, not that I remember, no.
>
> . . . .
>
> Q.    Now, have you heard rumors about what happened there in 2001, from other inmates, or other people?
>
> A.    Yeah.
>
> Q.    But no one has personally said to you, "I did it," or "I was part of it"?
>
> A.    No.
>
> Q.    Or say out loud, "I was part of it"?
>
> A.    No.

J. Garcia Tr. at 3:16-4:9 (Castle, J. Garcia).  J. Garcia's hearing testimony is inconsistent with the J. Garcia statements that the J. Garcia 302 memorializes, which renders those statements -- including J. Garcia 302 statements relating Troup statements -- less credible.  See Fed. R. Evid. 612 (stating that a hearsay declarant's credibility may be attacked via "evidence of the declarant's inconsistent statement or conduct, regardless of when it

- 115 -

occurred").    J. Garcia's hearing testimony does not, however, make the Troup statements -- as opposed to the J. Garcia 302 statements relating the Troup statements -- any more or less credible, so that testimony is irrelevant to whether the Troup statements are "supported by corroborating circumstances that clearly indicate [their] trustworthiness." Fed. R. Evid. 804(b)(3)(B).  Put another way, J. Garcia's testimony is relevant to whether Troup made the statements that the J. Garcia 302 describes, but it is not relevant to whether those statements -- if Troup made them -- are trustworthy.  While the Court must determine, by a preponderance of the evidence, whether those statements are admissible for their truth, see Fed. R. Evid. 104(a), whether the statement was made at all is a conditional-relevance question which the jury decides if "proof [is] introduced sufficient to support a finding" that the statement was made, Fed. R. Evid. 104(b).  See id. advisory committee notes (listing, as a conditional relevance example,

If J. Garcia does not testify that Troup made the statements that the J. Garcia 302 describes, then the J. Garcia 302 is the only evidence indicating that Troup actually made such a statement, and the J. Garcia 302 is not admissible for its truth.  Hearsay within hearsay "is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 805.02[2] ("[A] statement admissible under Rule 801(d) can be admitted when included in another hearsay statement if the other hearsay statement qualifies as an exception.").  The J. Garcia 302 is hearsay within hearsay within hearsay, because the J. Garcia 302 is a collection of out-of-court statements memorializing J. Garcia's out-of-court statements to the FBI, which relate Troup's out-of-court statements.

The first hearsay level -- the J. Garcia 302 itself -- is not admissible for its truth unless its author, Special Agent Lance Roundy, testifies, because "the primary purpose for which the [J. Garcia 302] was made was that of establishing or proving some fact potentially relevant to a criminal prosecution," so the J. Garcia 302 is testimonial.  United States v. Smalls, 605 F.3d at 778.  See Crawford v. Washington, 541 U.S. at 68 ("Where testimonial evidence is at issue [and the declarant does not testify], the Sixth

Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). Further, the Federal Rules of Evidence do not permit the J. Garcia 302 to be admitted for its truth as a public record, because it is a record setting out "a matter observed by law-enforcement personnel," which do not qualify as public records "in a criminal case." Fed. R. Evid. 803(8)(A)(ii). See supra, Federal Rules of Evidence Manual § 803.02[d] ("Under the predominant view, the exclusionary language [of rule 803(8)(A)(ii) and 803(8)(A)(iii)] covers only those police-generated reports that are prepared under adversarial circumstances -- in anticipation of litigation -- and so are subject to manipulation by authorities bent on convicting a particular criminal defendant."). But see id. ("Courts have held, correctly we think, that the law enforcement exclusion in the rule is inapplicable if the public official who prepared the report actually testifies at trial. The confrontation concerns that give rise to the statutory exclusions are allayed where the declarant is subject to cross-examination at trial."). For the same reason, the J. Garcia 302 is not admissible as a record of a regularly conducted activity;

> In criminal cases, the argument has sometimes been made that a law enforcement report that is inadmissible due to the exclusionary language of Rule 803(8)(A)(ii) and (iii) can nonetheless be admitted as a record of regularly conducted activity under Rule 803(6). However, if the exclusionary language is properly applied so as to exclude only those law enforcement reports that are subjective and made under adversarial circumstances—which is the position taken by most courts, as discussed above—then there is no conflict between the rules. This is because records that are prepared in anticipation of litigation are excluded under the trustworthiness criterion of Rule 803(6); and those are, in effect, the only records that are excluded under the prevailing view of Rule 803(8).

Supra, Federal Rules of Evidence Manual § 803.02[e]. None of the other exceptions to the rule against hearsay

- 117 -

apply, so the J. Garcia 302 is admissible only if Roundy testifies.

Even if the United States renders the J. Garcia 302 admissible for its truth by calling Roundy as a witness, the second hearsay level -- the J. Garcia statements that the J. Garcia 302 contains -- is not admissible its truth.  No exception to the general rule against hearsay, see Fed. R. Evid. 802, applies; those statements are not excited utterance, for example, see Fed. R. Evid. 803(2).  Additionally, J. Garcia's statements in an FBI interview are testimonial, so the Confrontation Clause permits their introduction only if J. Garcia takes the stand or if J. Garcia is unavailable.  of Evidence, even if J. Garcia testifies and thereby satisfies the Confrontation Clause.[29]  See Crawford v. Washington, 541 U.S. at 68.

The third level of hearsay -- the Troup statements that the J. Garcia statements relate -- are admissible for their truth against Troup, see Fed. R. Evid. 802(d)(2)(A).  They are not admissible against any other Defendant under rule 802(d)(2)(A), however.

---

[29]Showing that J. Garcia is unavailable satisfies the Confrontation Clause, because J. Garcia testified at a pretrial hearing, so the Defendants have had "a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. at 68.

- 118 -

| | |
|---|---|
| Statement 2: Leroy Lucero is a government witness. Lucero indicates Chavez and Joe Gallegos admitted involvement in the murder of Garza to him as did others. It is unknown whether Chavez and Gallegos implicated B. Garcia.<br><br>Declarant: Christopher Chavez, Joe Gallegos<br><br>Source: Leroy Lucero<br><br>Date: unknown | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence. J. Gallegos' statements are likewise admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>When Lucero testified on March 16, 2018, he invoked his right to remain silent regarding the Castillo and Garza murders. See Mar. 16 Tr. at 160:3-7 (Castle, Lucero). The Court sustained that invocation, because Lucero had not been afforded any kind of immunity. See Mar. 16 Tr. at 157:18-20 (Beck)("I don't believe at this point we have provided him a Kastigar letter[30] and adequately debriefed him to have the protection."); id. at 158:24-25 (Court)("I'm inclined to sustain the privilege."). The Court is, thus, unable to make a pretrial determination regarding whether Lucero will testify at trial regarding statements that Chavez or J. Gallegos made or whether those statements will be admissible for their truth under rule 804(b)(3) of the Federal Rules of Evidence. |
| Statement 3: Fred Quintana is a government witness. Quintana indicates both Troup and Chavez admitted to involvement in the 2001 murders. It is unknown whether Chavez and Gallegos implicated B. Garcia.<br><br>Declarant: Edward Troup, Christopher Chavez<br><br>Source: Fred Quintana<br><br>Date: unknown | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence. Troup's statements are likewise admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>The Quintana 1023 states:<br><br>2001 Murder of Frank Castillo and Rolando Garcia at the Southern New Mexico Correctional Facility in Las Cruces were called by BILLY GARCIA ("Wild Bill"). Several members participated in the double homicide and EDWARD TROUP and CHRISTOPHER CHAVEZ admitted to the |

---

[30]In Kastigar v. United States, 406 U.S. 441 (1972)(Powell, J.), the Supreme Court concluded that "the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony." 406 U.S. at 443.

- 119 -

| | murders during conversations with [Quintana]. |
| | |
| | Quintana 1023 at 2.  The Quintana 1023 does not provide enough details about the statements that Troup and Chavez allegedly made to Quintana for the Court to make the fine-grained inquiry that Williamson v. United States requires. Consequently, the Court does not now conclude that those statements are admissible under rule 804(b)(3) of the Federal Rules of Evidence.  The Court is willing to reconsider whether Troup or Chavez made statements that are admissible under rule 804(b)(3) when it has more information. |
| Statement 4: Ben Clark is a witness for the government. Clark indicated Angel Deleon, Troup and Joe Gallegos confessed their involvement in the 2001 murders to him and that one or both may have indicated that B. Garcia called the hit.<br><br>Declarant: Angel Deleon, Edward Troup, Joe Gallegos<br><br>Source: Ben Clark<br><br>Date: 2004 | Troup's statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.  J. Gallegos' statements are likewise admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.  Deleon's statements, however, are not admissible under rule 801(d)(2)(A), because Deleon is not a Trial 2 Defendant.<br><br>Clark testified on March 15, 2018, and indicated that he had spoken with four individuals about the Castillo and Garza murders: "Eugene Martinez, Leonard Lujan, Edward Troup, and Joe Gallegos."  Mar. 15 Tr. at 159:6-7(Clark).  Clark indicated that E. Martinez, Troup and J. Gallegos did not say that B. Garcia ordered the Castillo and Garza murders.  See Mar. 15 Tr. at 159:9-12 (Cooper, Clark)(discussing E. Martinez' statements); id. at 159:25-16:2 (Cooper, Clark)(discussing Troup's statements; id. at 160:9-12 (Cooper, Clark)(discussing J. Gallegos' statements).  Clark indicated, however, that "Leonard Lujan did tell me Billy Garcia had something to do with it."  Mar. 15 Tr. at 159: 13-17 (Cooper, Clark).  According to Clark, Lujan told him "multiple times from '03 to '04 that Billy Garcia called those hits."  Mar. 15 Tr. at 162:14-16 (Beck, Clark).[31]  That B. Garcia ordered the Castillo and Garza murders does not, |

[31]Clark's testimony regarding Lujan's statements indicates that B. Garcia's recent assertion that "[w]itnesses Munoz, Clark, Lucero, Quintana, and Otero all testified that none of Billy Garcia's codefendants made any statements to them which implicated Billy Garcia" is false.  Brief in Support of Inapplicability of [sic] Fed. R. 803(b)(3) (Doc. Nos. 1909 and 2009) ¶ 5, at 3, filed April 6, 2018 (Doc. 2085).

| | |
|---|---|
| | taken alone, tend to subject Lujan to criminal liability, so those statements are not admissible for their truth under rule 804(b)(3).  See Williamson v. United States, 512 U.S. at 599.[32]<br><br>Additionally, the United States has not established that Lujan or E. Martinez is unavailable, which is a prerequisite for introducing any of Lujan's statements under rule 804(b)(3).  See Fed. R. Evid. 804(b)(3).  See also United States' Sealed Supplemental Witness List for Trial II at 2, filed April 9, 2018 (Doc. 2089)(listing Lujan and E. Martinez as witnesses). |
| Statement 5: Samuel Gonzales is a witness for the government. He indicates Troup made statements about the 2001 murders.  It is unknown whether Gonzalez indicates Troup implicated Billy Garcia<br><br>Declarant: Edward Troup<br><br>Source: Samuel Gonzales<br><br>Date: unknown | Troup's statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>According to the Samuel Gonzales 302:<br><br>    Edward TROUP spoke to GONZALES about the 2001 murder of Rolando GARZA. TROUP did not provide details, but told GONZALES that he was there.  GARZA was killed because he was a known member of the rival prison gang Los Carnales.  Francisco CASTILLO was killed in 2001 because he "messed up" with Billy GARCIA.<br><br>Samuel Gonzales 302 at 5.  Those statements do not incriminate Troup, so they are not admissible as declarations against Troup's penal interests under rule 804(b)(3).  See Williamson v. United States, 512 U.S. at 599. |

---

[32]The Court can imagine, however, Lujan statements indicating that B. Garcia ordered the Castillo and Garza murders that would incriminate Lujan, e.g., "I obeyed B. Garcia's order to kill Castillo."

- 121 -

| | |
|---|---|
| Statement 6: Robert Lovato is a government witness.   Lovato indicates that Christopher Chavez admitted involvement in the 2001 murder of Garza.<br><br>Declarant: Christopher Chavez<br><br>Source: Robert Lovato<br><br>Date: 2012 | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>The Lovato 302 indicates that "CHAVEZ talked about the murder of Rolando Garza and was paranoid that he might get caught for it.   CHAVEZ was under the impression that law enforcement might be making some arrests in the case and was worried."  Lovato 302 at 2.  This statement is sufficiently inculpatory that a reasonable person in Chavez' position would not have made it if it were false.  See Fed. R. Evid. 804(b)(3).  The Lovato 302 indicates that that Chavez was very fearful when he talked to Lovato, which is a circumstance that corroborates the substance of Chavez' statement.  See Fed. R. Evid. 804(b)(3)(B). |
| Statement 7: Julian Romero is a government witness.   Romero indicates that Christopher Chavez confessed to his role in the 2001 murders.<br><br>Declarant: Christopher Chavez<br><br>Source: Julian Romero<br><br>Date: unknown | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>According to the Romero 302, "CHAVEZ admitted to Romero that he killed Garza."  Romero 302 at 7.  This statement is sufficiently inculpatory that a reasonable person in Chavez' position would not make the statement unless that person believed it to be true.  See United States v. Smalls, 605 F.3d at 783 ("We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend."). |

- 122 -

| | |
|---|---|
| Statement 8: Timothy Martinez is a government witness. T. Martinez claims that Christopher Chavez confessed to his involvement in the murders and during such confession implicates Allen Patterson in the murder.<br><br>Declarant: Christopher Chavez<br><br>Source: Timothy Martinez<br><br>Date: unknown | Chavez' statements are admissible against him for their truth as admissions of a party opponent under rule 801(d)(2)(A) of the Federal Rules of Evidence.<br><br>The T. Martinez 302 indicates Chaves told T. Martinez that Garza "'was getting up and was gonna escape and then Allen PATTERSON came in and tackled him (GARZA). PATTERSON wasn't even in on the hit. He just gave skina and helped.'" T. Martinez 302 at 5. This statement only incriminates Patterson and not Chavez, so it is not admissible under rule 804(b)(3). See Williamson v. United States, 512 U.S. at 599.<br><br>Under rule 801(d)(2)(A), the jury can use Chavez' statement to T. Martinez against Chavez and not against any other Defendant. The portion of that statement describing Patterson's actions has little probative value vis-à-vis Chaves, but the jury may improperly use that portion of the statement against Patterson even if the Court gives a limiting instruction. Consequently, serious rule 403 issues would attend any attempt to introduce that portion of Chavez' statement to T. Martinez. |
| Statement 9: "The defense is objecting to an alleged statement made by an unidentified declarant to Joseph Otero in which he allegedly indicates that Billy Garcia ordered the hits." B. Garcia Supplement ¶ 2, at 1-2. | In a March 21, 2018 interview, Otero told the FBI that "Billy GARCIA gave the orders to kill GARZA." 3/21/2018 Conversation with Joseph Otero (drafted March 22, 2018) at 1, filed March 31, 2018 (Doc. 2009-1)("Otero 302"). The Otero 302 does not indicate whether Otero has personal knowledge regarding whether B. Garcia ordered the Garza murder, e.g., Otero could have overheard B. Garcia giving the order to kill Garza. If, on the other hand, Otero lacks personal knowledge and believes that B. Garcia ordered the Garza murder because of someone else's out-of-court statement, Otero cannot testify that B. Garcia ordered the Garza murder. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Otero could testify regarding the statements that he heard, notwithstanding rule 602, because Otero would have personal knowledge that the statements were made, but those out-of-court statements are potentially excluded by the rule against hearsay, but the limited record before the Court does not permit it to make a definite determination one way or the other. |

- 123 -

| | |
|---|---|
| Statement 10: "Josh Mirka is a witness for the government. He has made statements about who was responsible for the 2001 murders and recounts statements Christopher Chavez allegedly made to him which implicate Billy Garcia. | In a March 22, 2018 interview with the FBI, Mirka indicated that "CHAVEZ said that he was 'Sindicato,' that 'Bill runs the car' and all of the defendants planned to stick together." 3/22/2018 Interview of Josh Mirka (drafted March 23, 2018) at 1, filed March 31, 2018 (Doc. 2009-2). The United States indicates that it does not intend to offer the statements that Chavez made to Mirka under rule 804(b)(3). <u>See</u> Response Brief at 9. The United States intends, instead, to offer those statement as statements of the declarant's then-existing state of mind under rule 803(3), because Chavez' statement to Mirka "shows Defendant Chavez's intent in making statements to Josh Mirka at all: he intends to stick together with the SNM and Defendant B. Garcia is the leader of those in the SNM currently." Response Brief at 9-10. <br><br> Chavez' statement to Mirka is not, however, admissible for its truth under rule 803(3) of the Federal Rules of Evidence. That Chavez believes that B. Garcia is an SNM leader, <u>i.e.,</u> that B. Garcia runs the car, cannot be offered under rule 803(3) to show that Chavez' belief is true. <u>See</u> Fed. R. Evid 803(3)(stating that the then-existing state of mind exception to the rule against hearsay does not apply to "a statement of memory or belief to prove the fact remembered or believed"). Chavez' told Mirka that all of the Defendants plan to stick together, but rule 803(3) only applies to a statement of the declarant's then-existing plan. <u>See</u> Fed. R. Evid. 803(3). Thus, to the extent that Chavez' statement refers to the plans of Defendants other than Chavez, rule 803(3) does not apply. |

- 124 -

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                     No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL Sanchez, a.k.a.
"Dan Dan," GERALD ARCHULETA, a.k.a.
"Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ,
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States' Objection to Defendant

Joe Lawrence Gallegos's Opening Statement Exhibits, filed April 11, 2018

(Doc. 2099)("Objection").  The Court held a hearing on April 11, 2018.  Plaintiff United States

of America argues that Defendant Joe Lawrence Gallegos should not be able to use "911 call(s)

related to the assault of J. G. that occurred on March 17, 2015, scientific reports, and to the

transcripts and recordings of cooperating Defendant Leonard Lujan."  Objections at 1.  "[A]s to

the scientific reports, 911 call(s) and transcripts and recordings," the United States "objects to the

exhibits based on hearsay."  Objections at 1.  The United States also argues that J. Gallegos

should not be able to use the 911 calls, because he has failed to give "reasonable notice of the

contents of the 911 call(s)," because he "provided to the United States 58 unidentified calls only

a few weeks ago," and has not identified which of those calls he intends to use during his

opening statement.  Objections at 1-2.

On March 12, 2018, the United States and the Defendants agreed to let each other know

if they intended to use exhibits during their opening statements.  See Transcript of Motion

Hearing at 25:13-26:1 (held March 12, 2018)(Court), filed April 3, 2018 (Doc. 2026)("Tr.").

> So I guess we have an agreement on exhibits.  If you're going to use exhibits,
> you'll show those to each other before the trial starts.  But as far as PowerPoints, I
> tend to agree, they're probably a work in progress.  So all I can do is kind of give
> you an admonition to try to think about putting yourself in the shoes of the other
> side, and not trying to do something that's going to draw an objection and delay
> the trial, and delay your opening as well.
>
> Everybody -- I know the Government wanted more -- but everybody agree
> with that from the defendants' standpoint?  All right.  So we'll go with that.

Tr. at 25:13-26:1 (Court).  That agreement does not, however, require its parties to show their

opening statement exhibits to the Court in advance, so the Court needs to assess the United

States' arguments in the Objections without access to the exhibits that J. Gallegos provided to the

United States.  The Court will, however, give tentative guidance to the parties.

The Court overrules the United States' hearsay objections to J. Gallegos' opening statement exhibits, because those exhibits are likely admissible notwithstanding the general rule against hearsay.   The 911 calls relating to the March 17, 2015, assault on J.G. are likely admissible as excited utterances.  See Fed. R. Evid. 803(2)("A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.").[1] J. Gallegos orally indicated, on April 11, 2018, that the New Mexico State Police prepared the scientific report, which concludes that a particular firearm was not the weapon used to kill Adrian Burns.  That scientific report is likely admissible as a public record.  See Fed. R. Evid. 803(8)(excluding from the rule against hearsay "[a] record or statement of a public office if . . . it sets out . . . against the government in a criminal case, factual findings from a legally authorized investigation" as long as "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness").   The Court cannot determine whether the Lujan recordings or reading the Lujan transcripts are admissible for their truth under rule 801(d)

---

[1]Admitting those calls into evidence -- if offered by J. Gallegos -- does not violate the Confrontation Clause to the Sixth Amendment of the Constitution of the United States of America for two reasons.  First, 911 calls are not ordinarily testimonial, so admitting a 911 call into evidence does not implicate the Confrontation Clause.  See Davis v. Washington, 547 U.S. 813, 827 (2006)("A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance."  (quoting Crawford v. Washington, 541 U.S. 36, 51 (2004))).  Second, the Confrontation Clause protects a right that belongs to "the accused" and not to the United States, so J. Gallegos can elect to waive that right, i.e. to introduce unconfronted testimonial hearsay.  U.S. Const. amend. VI.  J. Gallegos is the only Defendant at the second trial in this case who is accused of assaulting J.G. on March 17, 2015, see Second Superseding Indictment at 16, filed March 9, 2017 (Doc. 947), so introducing the 911 calls associated with that assault requires J. Gallegos -- and no other Defendant -- to waive his rights under the Confrontation Clause, see Richardson v. Marsh, 481 U.S. 200, 207 (1987)("Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."  (quoting U.S. Const. amend. VI)).

or rule 803,[2] but the Court anticipates that J. Gallegos will want to use those recordings and transcripts to impeach Lujan's anticipated testimony and not for their truth.[3]   Evidence impeaching Lujan is admissible only if Lujan testifies, but Lujan's testimony appears central to the United States' case in chief, and the Court would be surprised if Lujan does not testify.[4] Nothing in the Federal Rules of Evidence requires parties to wait to introduce impeachment evidence until after a witness testifies; on the contrary, those rules commit "the mode and order of examining witnesses and presenting evidence" to the Court's discretion.   Fed. R. Evid. 611.[5] Accordingly, the Court will permit J. Gallegos to use the Lujan recordings and transcripts in his

---

[2]That Lujan is included on the United States' witness list, see United States' Sealed Supplemental Witness List for Trial II at 2, filed April 9, 2018 (Doc. 2089), indicates that Lujan is not "unavailable as a witness," so rule 804's hearsay exceptions do not apply, Fed. R. Evid. 804.

[3]J. Gallegos confirmed orally that he intends to use Lujan's recorded statements to impeach Lujan's anticipated testimony by contradiction.

[4]The United States orally indicated that it would be likewise surprised if Lujan does not testify as part of its case in chief.

[5]The United States orally asserted that Lujan's prior statements that J. Gallegos intends to use in his opening statement do not necessarily contradict the testimony that Lujan will give at trial.  The United States also orally asserted that, if Lujan's prior statements are consistent with his trial testimony, then Lujan's prior statements are not relevant for impeachment by contradiction purposes.  Those assertions are both true, but they do not change the court's analysis, because the court can admit evidence conditionally.

> "When an item of evidence is conditionally relevant, it is often not possible for the offeror to prove the fact upon which relevance is conditioned at the time the evidence is offered.  In such cases it is customary to permit him to introduce the evidence and 'connect it up' later.   Rule 104(b) continues this practice, specifically authorizing the judge to admit the evidence 'subject to' proof of the preliminary fact.  It is, of course, not the responsibility of the judge sua sponte to insure that the foundation evidence is offered; the objector must move to strike the evidence if at the close of the trial the offeror has failed to satisfy the condition."

Huddleston v. United States, 485 U.S. 681, 690 n.7 (1988)(quoting 21 C. Wright & K. Graham, Federal Practice and Procedure § 5054, 269-70 (1st ed. 1977)).

DNM 1587

opening if he intends to offer them as impeachment evidence.[6]  The Court will reconsider this determination, however, if the United States represents to the Court that it will not call Lujan as a witness.

The Court also overrules the United States' notice objections to J. Gallegos' opening statement exhibits.  The agreement between the parties regarding opening statement exhibits does not specify a deadline for disclosing opening statement exhibits other than "before the trial starts."  Tr. at 25:15 (Court).  Consequently, that J. Gallegos disclosed the 911 calls he intends to use in his opening "a few weeks ago" gives the United States significantly more notice than the parties' agreement requires.  Objections at 1.  The Court determines that requiring the United States to review fifty-eight telephone calls over a few weeks is not excessive.  Compare Objections at 1 ("Defendant Gallegos provided to the United States 58 unidentified calls only a few weeks ago."), with Defendant Carlos Herrera's Motion to Dismiss, or in the Alternative, for Mistrial Based on Repeated Brady and Giglio Violations ¶ 1, at 1, filed March 1, 2018 (Doc. 1842)("This trial began on January 29, 2018.  During voir dire, the Government disclosed approximately 3,500 pages of discovery."); id. ¶ 4, at 1 ("On Wednesday, February 28, 2018, during the Defendants' case in chief, the government disclosed 981 pages of new material, purportedly belonging to the government's witness Mario Rodriguez.").

**IT IS ORDERED** that the United States' Objection to Defendant Joe Lawrence Gallegos's Opening Statement Exhibits, filed April 11, 2018 (Doc. 2099), is overruled.

---

[6]J. Gallegos will need to tell the jury in his opening statement that the Court will instruct them to use Lujan's out-of-court statements only to determine whether Lujan is telling the truth when he contradicts those statements while testifying.

DNM 1588

UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 USC § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

      *Attorneys for Defendant Joe Lawrence Gallegos*

- 6 -

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorneys for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

    *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

    *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

    *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

    *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

  *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

  *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

  *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

  *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

  *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

     *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

    *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

    *Attorneys for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

    *Attorneys for Defendant Brandy Rodriguez*